FILED
3/9/2023 11:25 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. CC-23-01483-C

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | In the County Court |
| *v.* | § | |
| | § | At Law Nº |
| Twin City Fire Insurance Company, | § | |
| | § | Dallas County, Texas |
| *Defendant.* | § | |

---

## ORIGINAL PETITION AND JURY DEMAND

---

### DISCOVERY PLAN

1.      Jeff Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

### INTRODUCTION AND NOTICE OF RELATED CASE: DALLAS COUNTY COURT AT LAW NO. 5

2.      This case appears to be a *related case* as described in Local Civil Rules 1.06, 1.07(a), and maybe 1.07(d).[1] It arises out of an earlier jury verdict and judgment in favor of Jeff Carpenter in Dallas County Court at Law No. 5, Cause Number CC-08-2072-E, styled

---

[1] Local Civ. R. 1.06 ("… pending case is so related to another case previously filed in or disposed of by another Court of Dallas County … that a transfer of the later case to such other Court would facilitate orderly and efficient disposition of the litigation …"); Local Civ. R. 1.07(a) ("Any case arising out of the same transaction or occurrence as an earlier case …."); Local Civ. R. 1.07(d) ("Any suit concerning which the duty of an insurer to defend was involved in the earlier suit.").


EXHIBIT
B

*Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik.*

3.      In that earlier case, defendants' liability insurance carrier rejected a reasonable opportunity to settle for less than remaining policy limits. It did so even though policy limits were eroding toward zero with every penny of litigation costs and every dollar of attorneys' fees. Ultimately, four of its insureds were hit with an adverse jury verdict and a judgment that exceeded remaining policy limits by around $2 million.

4.      The defendant insureds appealed to the Fifth Court of Appeals and the Texas Supreme Court but were not successful. The judgment was affirmed and remains unsatisfied. Dallas County Court at Law No. 5 ordered turnover of the defendant insureds' common law *Stowers* claim against their liability insurance carrier, along with associated rights and privileges, to Jeff Carpenter. The present case involves that *Stowers* claim.

### PARTIES

5.      Twin City Fire Insurance Company is licensed to conduct multiple lines of insurance business in Texas, according to the Texas Department of Insurance. It was licensed to conduct business in Texas, and did conduct business in Texas, at the time the claims asserted herein accrued. It may be served with process through its registered agent in Texas as follows:

CT Corporation System
1999 Bryan Street
Suite 900
Dallas, Texas 75201

6.      Jeff Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued and who continues to reside in Dallas County, Texas.

## JURISDICTION

7.      The Court has subject matter jurisdiction over this case because (1) Jeff Carpenter seeks damages within its jurisdictional limits and (2) the asserted claims are not subject to exclusive jurisdiction in any other court.

8.      The Court has personal jurisdiction over Twin City Fire Insurance Company ("Twin City") because (1) the asserted claims arose directly from Twin City's acts and omissions in Texas, and (2) Twin City's affiliations with Texas are so continuous and systematic that Twin City is "essentially at home" in Texas.

## VENUE

9.      Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because all or a substantial part of the events and omissions giving rise to the asserted claims occurred in Dallas County, Texas. This case involves a liability insurance

company's negligence in Dallas County, Texas in rejecting a reasonable opportunity to set-tle within policy limits. It involves a jury verdict and judgment in Dallas County, Texas against the defendant insureds in excess of policy limits.

### SOME *STOWERS* FUNDAMENTALS

### basic negligence duty and reason for rule

10.     When insurance companies have the right to control settlement of claims against their insureds, they owe their insureds a *Stowers* duty. The *Stowers* opinion explains that the insurance company is:[2]

> held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages.

This duty sounds in negligence, has been around for almost a century, and is similar to other areas of law in which a right of control gives rise to a legal duty.[3]

---

[2] *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved).

[3] *See, e.g., Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) ("Having undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the [] house while performing its contract with the builder.").

11.     The ultimate issue in a *Stowers* case is whether a settlement offer is such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to a judgment higher than the policy limits. The *Stowers* negligence standard is flexible and depends on context. Here is an example. The *Stowers* duty usually arises only with a settlement offer within policy limits. But it may also arise with a settlement offer above policy limits when the insured agrees to pay the excess.[4]

12.     The *Stowers* duty is born of insurance companies who want to save money for themselves to the detriment of insureds. If a policy limit is the maximum insurance company risk — whether a case settles or goes to trial —, then why settle at all? Why not gamble the insured's personal finances and take a chance at trial? Even if odds of a defense win are slim. Even if trial could expose the insured to damages higher than policy limits.

### insurer excuses: coverage dispute is no excuse

13.     Sometimes an insurance company admits a duty to defend but decides there is no indemnity coverage and so rejects a reasonable settlement offer within policy limits. In those situations, the insurance carrier "risks significant potential liability for bad-faith insurance practices [*Stowers*] if it does not ultimately prevail in its coverage contest."[5]

---

[4] *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 n.13 (Tex. 1994) ("We do not reach the question of when, if ever, a *Stowers* duty may be triggered if an insured provides notice of his or her willingness to accept a reasonable demand above the policy limits, and to fund the settlement, such that the insurer's share of the settlement would remain within the policy limits.").

[5] *Excess Underwriters at Lloyds, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 46 (Tex. 2008).

When it comes to the *Stowers* duty, the insurance carrier "bear[s] the risk that its point of view [on coverage] might have been incorrect, which could result in liability for any excess judgment."[6]

14.    So, a good faith dispute about insurance coverage is not a defense to *Stowers* liability. Reasonable doubt about insurance coverage is not a defense. Uncertainty about insurance coverage is not a defense. That a reasonable liability insurance carrier would contest coverage is not a defense. A mistaken belief that there is no coverage is not a defense.

### insurer excuses: not knowing all facts is no excuse

15.    Not knowing all the facts, or even most of the facts, does not mean there is no *Stowers* duty.[7] The question is whether, based on facts the insurer knew or should have known at the time, a settlement offer is such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to a judgment higher than the policy limits.

---

[6] *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 850 (Tex. 1994).

[7] *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, C.A. No. 3:10-CV-2048-D, n.10 (N.D. Tex. March 5, 2013) (citing references omitted) ("There is no per se requirement that an insurer know all, or even most, of the facts of the case in order to have a *Stowers* duty.").

### ABBREVIATED BACKGROUND: THE LIABILITY INSURANCE POLICY

### Twin City Fire Insurance Company



16.     The Hartford Financial Services Group, Inc. operates through subsidiaries under the brand name *The Hartford*. Twin City Fire Insurance Company ("Twin City") is one of those subsidiaries and uses *The Hartford* brand. It is part of the Hartford Fire & Casualty Group and is licensed to conduct multiple lines of insurance business in Texas.

### the named insureds

17.     Twin City issues a liability insurance policy under which named insureds include all the defendants in the earlier case:

---

[8] photograph credit: www.vacuumglassllc.com/the-hartford

| defendant insureds | abbreviated name |
|---|---|
| Southwest Housing Development Company, Inc. | SH Development |
| Affordable Housing Construction, Inc. | AH Construction |
| Southwest Housing Management Corporation, Inc. *a/k/a* and *d/b/a* Southwest Housing Management Company, Inc. | SH Management |
| Brian Potashnik | Brian |
| Cheryl Potashnik | Cheryl |

### control over defense and settlement

18.     Twin City controls the defense of its insureds.[9] It also controls settlement of claims against its insureds. It forbids its insureds, under any circumstances, from entering any settlement agreement without its prior written consent:[10]

> **(C)** The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

---

[9] Policy Common Terms & Conditions § VII(A) ("The Insurer shall have the right and duty to defend any Claim for which the Insureds give notice to the Insurer, even if such Claim is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate."); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 846 (Tex. 1994) (describing this policy provision as giving insurance carrier control over the insured's defense).

[10] Policy Common Terms & Conditions § VII(C).

**deductible then $1 million eroding policy limits**

19.     The policy has a $75,000 deductible and a $1 million aggregate limit of liability.[11] Defense costs are part of that $1 million limit:[12]

> **V.   DEFENSE COSTS**
>
> Solely with respect to all **Liability Coverage Parts**:
>
> **(A)**  **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

Once the deductible is met, policy limits erode toward zero with every penny of litigation costs and every dollar of attorneys' fees.[13]

**employment practices liability coverage**

20.     At the time, the policy has a relatively high premium for such low aggregate policy limits. The employment practices liability ("EPL") coverage may partially explain this. The EPL part of the policy covers what many other insurance policies do not[14] — such as punitive damages, intentional misconduct, failure to comply with implied employment agreements, and failure to comply with  oral employment agreements.

---

[11] Policy Declarations, Item 5: Liability Coverage Part Elections.

[12] Policy Common Terms & Conditions § VI(A).

[13] *Id.* & Policy Common Terms & Conditions § II(E).

[14] *See, e.g.,* L.D. Simmons, II & Lowndes C. Quinlan, *New Appleman on Insurance Law* § 28.02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

21.    Most other types of insurance policies — such as commercial general liability, auto, homeowners, errors and omissions, and directors and officers liability — do not cover these types of claims. But insurance companies developed and marketed EPL policies to cover gaps in other types of insurance policies.[15]

### duty to defend, duty to indemnify, and reservation of rights

22.    Policy premiums pay for two overarching forms of EPL coverage: (1) defense costs including attorneys' fees, and (2) liability for damages, also called indemnity. As to defense costs, Twin City owes the insureds a duty to defend. As to liability for damages, Twin City owes the insureds a duty to indemnify.

23.    In the earlier case, Twin City admits it has a duty to defend. After the defendant insureds meet the $75,000 deductible, Twin City defends under a reservation of rights on indemnity coverage. In the reservation of rights letter, Twin City wrongly claims lack of coverage on even dirt simple coverage issues, showing a lack of reasonable insurer conduct.

### ABBREVIATED BACKGROUND: FACTS TWIN CITY KNEW OR SHOULD HAVE KNOWN

24.    What follows is factual information Twin City knew, or should have known, at the time it rejected a reasonable settlement offer within policy limits.

---

[15] *See* Jeffrey W. Stemple, *Law of Insurance Contract Disputes* § 21.06, at 21-47 to 21-48.

**nature of insureds' business**

25.     The defendant insureds are in the affordable housing industry throughout Texas and a few other states. They work together to (1) develop or acquire sites for affordable housing communities, (2) construct new affordable housing units, and (3) manage continuing operation of the affordable housing community properties.



16

**decision to sell business, oral 3% pay-to-stay agreement**

26.     Brian and Cheryl Potashnik decide to sell their business. Brian — the highest-level person over all business entities — promises lucrative additional pay to executive Jeff Carpenter if Jeff will stay on to help make the asset sale happen. There will be a lot more work, such as due diligence and working to retain other important employees in the interim

---

16 Potter's House at Primrose Senior Housing, photograph credit: www.apartment-guide.com/apartments/Texas/Dallas/Potters-House-at-Primrose-Senior-Housing/156183/

before any asset sale happens. Other than the Potashniks, Jeff will be the most important person to effectuate the sale and will often serve as the "face" of the companies.

27.     Once a letter of intent to sell assets is signed, Brian offers Jeff 3% of net proceeds from the asset sale if Jeff will continue to stay on as long as needed to help make the asset sale happen. The 3% is the total of: gross asset sale revenue to sellers, less normal closing costs, less sales proceeds bonuses paid to other employees [latter pay-to-stay incentives to be decided by Jeff]. They estimate the 3% deal at just over $1 million. The agreement is oral. They shake hands on the deal.

28.     Jeff stays on as long as needed. He delays start at a new job to stay on. He knows he will not have a job with the asset purchaser because the purchaser already has someone in his position. An asset sale agreement goes forward. The anticipated asset sale price is around $37 million. A separate agreement is signed to transfer asset management to the purchaser — including management of the affordable housing community properties. At that point, Brian and Cheryl inform their executive Jeff that he has completed his end of the bargain in staying on and is no longer needed.

### criminal investigation of owners
### and importance of pay-to-stay deal

29.     Before the decision to sell the business, the FBI raids the business and criminally investigates Brian and Cheryl Potashnik. The Potashniks deny any criminal wrongdoing. Employees including Jeff believe and trust them. Logically, preventing employee

mass exodus due to the criminal investigation, coupled with the potential sale of the business, is important to attracting buyers for any actual sale of the business. Logically, preventing mass exodus of key employees like Jeff is even more important.

### failure to comply with oral 3% deal and motive for doing so

30.    Once Brian and Cheryl confirm that Jeff kept his end of the bargain and will no longer be needed or employed, they quickly back off the oral 3% deal. They've recently been indicted on criminal charges. They're concerned about the asset sale and whether they will have enough money left over to fund their own criminal defense.



---

[17] Photograph credit of Brian and Cheryl outside federal courthouse: Paul O'Donnell, published in the *The Dallas Morning News*, March 19, 2012.

31.   Brian says to Jeff in part:

Um, and as far as our agreement goes, where we compensate you, as we promised, it's gonna depend on where we end up in all of this.

\*\*\*

I mean, I'm telling you that we're, we're going to dig ourselves out of this thing and then hopefully, you know, at the end of the day, get something out of it from Cascade [asset purchaser] and get the deal closed and pay the costs that we have to defend ourselves [in criminal proceedings] and have money left over so that we can, you know, give you a bonus, …

\*\*\*

I mean, you have Cheryl and I both committed to you that when things work themselves out that there will be a bonus if there's anything there at the end of the day that we have where we can you know, actually give out bonuses …

\*\*\*

I mean, and, you know, it sucks because obviously, at this point, we thought we'd have everything closed and that we would have some money. Um, we didn't think we would get, you know, would have been indicted. You know, I've been hearing for two years plus from Mike Uhl [criminal defense attorney] that you're not gonna get indicted, don't worry. They don't have a case. They don't have a case. You know.

\*\*\*

It's a cluster fuck is what it is. And that's the whole problem right now. We just have no idea where this thing is going to uh, to settle out, you know. And I have the additional pressure, as does Cheryl on top of it, of not knowing where we're going to end up. You know, in our own lives personally and being separated as a family, God forbid and you know, I mean, I just don't uh, I don't know what to tell you.

\*\*\*

We're, we're just trying to pay bills – trying to stay out of prison. I mean, what more can I tell you?

32.     Cheryl also does not appear to know or care that Texas enforces oral agreements and says to Jeff in part:

> You have conversations that we've had. You have intentions that we've had. You have what we intend to do and what we wanna do. You don't have any rights.
>
>                     ***
>
> So, you know, at the end of the day, you could not, you know, $37 million [asset sale price] goes like that. You know, it sounds like a lot of money, but on the business side and with all the contingent liability. You know, it's scary.
>
>                     ***
>
> You know it looked one way July 15th or June 15th whenever, I don't remember the exact time frame. But, you know, anticipating another six months of overhead and all the obligations that go along with it um, you know, it really starts to eat away at what's gonna be left.
>
>                     ***
>
> You know, and then it was like when, when we got indicted all of a sudden it was like oh my God. (inaudible 8:19 – 8:30) But, you know, there's just so much concern about what everybody's gonna do an how they're gonna react.

### lawsuit, insured defendants' loss on summary judgment

33.     During the earlier case, the defendant insureds filed motions for summary judgment — a total of at least 4 motions for summary judgment. They claimed there was no evidence sufficient for a jury to return a verdict in Jeff's favor. The Court denied the motions.

### reasonable settlement offer within policy limits,
### Twin City rejection, and consequences for insureds

34.     Twin City receives a reasonable settlement offer within policy limits. The settlement offer is within coverage, within policy limits, and offers an unconditional and

full release of all insureds on all claims. The defendant insureds request and instruct Twin City to accept the offer.

35.     Twin City also receives warnings about common mistakes in *Stowers* evaluations, an extensive written coverage analysis showing that the oral handshake agreement claim [among others] is clearly covered, and additional information.

36.     After multiple extensions of time to consider the *Stowers* settlement offer, Twin City rejects the *Stowers* settlement offer and offers nothing to resolve the case — *i.e.*, zero. The highest settlement offer from the defense through multiple pretrial mediations is $100,000. The jury returns a verdict in favor of Jeff against four insureds for past earned wages due under an oral agreement. The jurors refer to this as the 3% deal. After a bench trial on attorneys' fees, the trial court renders a judgment that now exceeds $2 million. The defendant insureds appeal to the Fifth Court of Appeals and the Texas Supreme Court but are not successful.

37.     Twin City had the right under Texas law to seek a declaration on coverage before the harm occurred[18] — rejection of the *Stowers* offer and denial of coverage. The purpose is to clarify the parties' rights *before* harm occurs.[19] Twin City had about five years

---

[18] Tex. Civ. Prac. Rem. Code § 37.004(b) ("A contract may be construed either before or after there has been a breach.").

[19] *See* Tex. Civ. Prac. Rem. Code § 37.008 ("The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy

to do so before the *Stowers* offer. It chose not to do so. It ignored coverage analysis provided to it. It rejected a full-release settlement offer within policy limits. It instead exposed its insureds to a multi-million-dollar final judgment that was more than 3 times the settlement offer. It chose to exhaust its policy limits on an unsuccessful defense rather than a full-release settlement. Its policy limits are now zero. Its later conduct also shows lack of reasonableness, intent, and motive.

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF *STOWERS* DUTY

38.     The above allegations are incorporated herein.

39.     Jeff has standing to bring this claim pursuant to a turnover order.

40.     Twin City received and rejected a reasonable settlement offer, such that an ordinarily prudent insurer would accept the settlement offer, considering the likelihood and degree of the insureds' potential exposure to a judgment higher than the policy limits.

41.     The oral handshake agreement claim against the insureds [among others] was within the scope of policy coverage.

42.     The settlement offer was within policy limits and included a full release of all insureds on all claims.

---

giving rise to the proceeding.'").

43.     The insureds agreed to dismiss their counterclaims and instructed Twin City to accept the settlement offer.

44.     The jury verdict and judgment resulted in covered damages far higher than policy limits.

45.     This petition seeks all foreseeable damages to the insureds as a result of the *Stowers* violation, including but limited to the amount of the judgment in excess of policy limits.

## EQUITABLE RELIEF

46.     Due to apparent systemic problems at Twin City, there is a reasonable likelihood that Twin City practices will result in noncompliance with the *Stowers* duty in the future. Twin City has not taken steps to show that it is unlikely to violate the law in the future.

## PUNITIVE DAMAGES

47.     The harm Twin City caused to its insureds resulted from malice or gross negligence. *Malice* means a specific intent to cause substantial injury or harm to the insureds. *Gross negligence* means an act or omission by Twin City:

> (1) which when viewed objectively from the standpoint of Twin City at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(2) of which Twin City has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

48.     Twin City was actually aware that the foreseeable consequences of its conduct could or would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of an insurance claim — such as death, grievous physical injury, or financial ruin.

## CONDITIONS PRECEDENT

49.     All conditions precedent to filing suit and to recovery on the asserted claims have occurred, been performed, or been waived.

## JURY DEMAND

50.     Jeff requests a jury trial on all issues triable of right or choice by a jury.

## NO FEDERAL CLAIMS

51.     Jeff does not assert any claim, cause of action, or request for relief under any federal law in this original petition.

## REMEDIES REQUESTED

52.     Texas Rule of Civil Procedure 47 requires an original petition to select among specified ranges of potential relief. This original petition selects the range in Texas Rule of Civil Procedure 47(c)(4). This range may change over time. Jeff is free to suggest more or

less based on the evidence. The jury is free to find more or less at trial based on the evidence.

53.    This is because the rule is just meant to identify any expedited actions and the nature of the case at the time of filing. The rule does not affect a party's substantive rights.

54.    Jeff respectfully requests all appropriate legal and equitable remedies that may be available to him, including:

A.    judgment on the *Stowers* claim asserted herein;

B.    upon a finding that Twin City violated the *Stowers* duty, appropriate injunctive relief prohibiting Twin City from engaging in the systemic insurance practices that led to the violation — with the specifics to be tailored to the systemic problems, deficiencies, and gaps that the evidence shows;

C.    the following additional equitable relief as may be appropriate:

(1) requiring Twin City to provide training and otherwise modify its insurance practices in a way that reduces the risk of future violations of the *Stowers* duty — with the specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows;

(2) ordering all non-monetary equitable relief that may be appropriate to remedy the harm from a *Stowers* violation;

D.    all damages that the *Stowers* violation proximately caused;

E.    punitive damages as may be appropriate under Texas law;

F.    costs under the Texas Rules of Civil Procedure;

G.    prejudgment interest as allowed by law;

H.    postjudgment interest as allowed by law.


Respectfully submitted,


*/s/ Amy Gibson*

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jeff Carpenter*

FILED
4/3/2023 10:01 AM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Case 3:23-cv-00769-N   Document 1-2   Filed 04/11/23   Page 22 of 27   PageID 28

CAUSE NO. CC2301483C

| | | |
|---|---|---|
| JEFFREY W. CARPENTER | § | IN THE COUNTY COURT |
| | § | |
| v. | § | AT LAW NUMBER 3 |
| | § | |
| TWIN CITY INSURANCE COMPANY | § | DALLAS COUNTY, TEXAS |

## TWIN CITY INSURANCE COMPANY'S
## ORIGINAL ANSWER TO PLAINTIFF'S ORIGINAL PETITION

Twin City Fire Insurance Company ("Twin City") files its answer to Jeffrey Carpenter's ("Carpenter") Original Petition as follows:

### GENERAL DENIAL

Twin City generally denies the allegations contained in Carpenter's Original Petition as permitted by Rule 92 of the Texas Rules of Civil Procedure and requires that Carpenter prove his cause of action by a preponderance of the credible evidence. Twin City reserves its right to amend its answer to raise all applicable affirmative defenses.

### PRAYER

Twin City requests that Carpenter take nothing by his suit, that it be awarded its taxable costs of court, and that the Court grant such other relief to which it is justly entitled.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY

By: /s/ Steven J. Knight
    STEVEN J. KNIGHT
    State Bar No. 24012975
    Christine Kirchner
    State Bar No. 00784403
    1200 Smith Street, Suite 1400
    Houston, Texas 77002
    (713) 658-1818

<u>CERTIFICATE OF SERVICE</u>

A true copy of the foregoing has been served on all attorneys of record by electronic services on April 3, 2023.

GIBSON WILEY PLLC
Amy E. Gibson
amy@gwfirm.com
David L. Wiley
david@gwfirm.com
1500 Jackson Street # 109
Dallas, Texas 75201

/s/ Steven J. Knight
STEVEN J. KNIGHT

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laura Ortiz on behalf of Steven Knight
Bar No. 24012975
laura.ortiz@chamberlainlaw.com
Envelope ID: 74254540
Filing Code Description: Ody - Original Answer
Filing Description:
Status as of 4/3/2023 10:49 AM CST

Associated Case Party: JEFFREYW.CARPENTER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| AMY E.GIBSON | | AMY@GWFIRM.COM | 4/3/2023 10:01:11 AM | SENT |
| DAVID L.WILEY | | DAVID@GWFIRM.COM | 4/3/2023 10:01:11 AM | SENT |

FILED
3/14/2023 12:04 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

# THE STATE OF TEXAS
## CITATION

CAUSE NO. CC-23-01483-C
COUNTY COURT AT LAW NO. 3
Dallas County, Texas

TO:

**TWIN CITY FIRE INSURANCE COMPANY**
**ITS REGISTERED AGENT CT CORPORATION SYSTEM**
**1999 BRYAN STREET SUITE 900**
**DALLAS TX 75201**

**JEFFREY W. CARPENTER,** *Plaintiff(s)*

VS.

**TWIN CITY FIRE INSURANCE COMPANY**
*Defendant(s)*

"You have been sued. You may employ an attorney. If you or your Attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and ORIGINAL PETITION AND JURY DEMAND, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org." Your answer should be addressed to the clerk of County Court at Law No. 3 of Dallas County, Texas at the Court House of said County, 600 Commerce Street, Suite 101, Dallas, Texas 75202.

Filed in said Court on the 9th day of March, 2023, a copy of which accompanies this citation.

WITNESS: **JOHN F. WARREN,** Clerk of the County Courts of Dallas County, Texas. GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this 10th day of March, 2023 A.D.

JOHN F. WARREN, Dallas County Clerk



By_____
Alicia Mata
_____, Deputy



---

ATTORNEY

CITATION
ORIGINAL PETITION AND JURY
DEMAND

CC-23-01483-C

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 3
Dallas County, Texas

JEFFREY W. CARPENTER, *Plaintiff(s)*

VS.

TWIN CITY FIRE INSURANCE
COMPANY, *Defendant(s)*

SERVE:
TWIN CITY FIRE INSURANCE
COMPANY
ITS REGISTERED AGENT
CT CORPORATION SYSTEM
1999 BRYAN STREET SUITE 900
DALLAS TX 75201

ISSUED THIS
10TH DAY OF MARCH, 2023

JOHN F. WARREN, COUNTY CLERK
BY: ALICIA MATA, DEPUTY

Attorney for Plaintiff
AMY E GIBSON
GIBSON WILEY PLLC
1500 JACKSON ST
SUITE 109
DALLAS TX 75201
214-522-2121

NO OFFICERS' FEES HAVE BEEN
COLLECTED BY DALLAS COUNTY CLERK

RETURN OF SERVICE

Came to hand on the **10th** day of **March, 2023** at **05:00** o'clock **P.M.**, and executed in **Dallas** County, Texas, by delivering to the within named **Defendant**, to-wit:

**Twin City Fire Insurance Company**
**by delivering to its registered agent, CT Corporation System,**
**by delivering to George Martinez**
**@ 1999 Bryan Street, Suite 900, Dallas, TX 75201**
**on March 13, 2023 at 11:20 A.M.**

in person, a true copy of this **Citation** in Case No. **CC-23-01483-C** with the date of delivery marked thereon and a copy of the **Plaintiff's Original Petition** attached thereto.

**FEES:**

| | | |
|---|---|---|
| Serving | $ **85.00** | |
| Mileage | $ **00.00** | |
| **TOTAL** | **$85.00** | |

_____ 6/30/23
Authorized Person

ScottW.Hickman PPS#SCH000000616_____
Printed Name

On this day personally appeared **Scott W. Hickman** known to me to be the person whose name is subscribed on the foregoing instrument and who has stated under oath that he executed the **Citation** in the above numbered cause, pursuant to the Texas Rules of Civil Procedure.

Subscribed and sworn to before me on the **13th** day of **March, 2023**.

Marcy Arriaga
My Commission Expires
5/27/2026
Notary ID
129831244

_____
Notary Public in and for the State of Texas

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 73640873
Filing Code Description: Ody - Return Of Service
Filing Description: .TWIN CITY FIRE INSURANCE COMPANY
Status as of 3/14/2023 2:57 PM CST

Associated Case Party: JEFFREYW.CARPENTER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| AMY E.GIBSON | | AMY@GWFIRM.COM | 3/14/2023 12:04:37 PM | SENT |
| DAVID L.WILEY | | DAVID@GWFIRM.COM | 3/14/2023 12:04:37 PM | SENT |