UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | Civil Action No. 3:23-cv-00769-N |
| | § | |
| Twin City Fire Insurance Company, | § | |
| | § | |
| *Defendant*. | § | |

---

**APPENDIX IN SUPPORT OF PLAINTIFF JEFF CARPENTER'S RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This Appendix is also bookmarked. It is numbered starting with this page, so the Appendix page numbers will match the filed document page numbers.

### INDEX OF EXHIBITS

Exhibit 1:  Twin City insurance policy.......................................................... 5

Exhibit 2:  Coverage analysis insureds — entity defendants........................................ 78

Exhibit 3:  Coverage analysis insureds — individual defendants................................. 81

Exhibit 4:  Judge Fish opinion in Twin City lawsuit against Carpenter...................... 84

Exhibit 5:  Dallas Court of Appeals opinion affirming jury verdict and judgment..... 95

Exhibit 6:  Merger & Acquisition talent retention survey…………………………... 110

Exhibit 7:  Trial transcript...............................................................................  127

Exhibit 8:  Jury verdict...................................................................................  1702

Exhibit 9:  Final judgment...............................................................................  1728

Exhibit 10: *Stowers* letter...............................................................................  1737

Exhibit 11: *Stowers* letter coverage analysis................................................  1742

Exhibit 12: Original Petition and Jury Demand [before removal].......................  1938

Respectfully submitted,


*/s/ Amy Gibson*
_____

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jeff Carpenter*

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on August 2, 2023, she filed the *Appendix in Support of Plaintiff Jeff Carpenter's Response to Defendant's Motion for Summary Judgment* with the United States District Court for the Northern District of Texas through the CM/ECF system, such that defendant should be served with a copy of the filed document as follows:

**VIA CM/ECF SYSTEM**

Ms. Christine Kirchner
c.kirchner@chamberlainlaw.com
Mr. Steven J. Knight
steven.knight@chamberlainlaw.com
Mr. Chris M. Lemons
chris.lemons@chamberlainlaw.com

Chamberlain Hrdlicka, White, Williams & Aughtry
1200 Smith Street #1400
Houston, Texas 77002

*Attorneys for Twin City Fire Insurance Company*

Mr. Michael W. Johnston
johnston@johnstonlegalgroup.com

Johnston Legal Group PC
1616 Wabash Avenue
Fort Worth, Texas 76107-6598

*Local Counsel for Twin City Fire Insurance Company*

*/s/ Amy Gibson*

_____
Amy E. Gibson

# Exhibit 1

# insurance policy



# Hartford Financial Products

### Policy Separator Page

Insured Name:        SOUTHWEST HOUSING MANAGEMENT

Policy Number:       KB 0229269

Effective Date:       3/04/2007

Department:          H53      MIDDLE MARKET CORE BUSINESS

Underwriter:          SUSAN CARLEY

Job User:            Barber, Billie

Job Number:          570289

Job Name:            EPLPRINT

Date Printed:         3/08/2007          14:33:30

CONFIDENTIAL

Appendix 000006



Date: MARCH 8, 2007

LORRAINE A KEHM
LOCKTON COMPANIES OF COLORADO, INC.
8110 EAST UNION AVE
SUITE 700
DENVER, CO 80237-2984

RE: SOUTHWEST HOUSING MANAGEMENT

POLICY NUMBER: 00 KB 0229269-07  3/04/2007

Dear LORRAINE,

Enclosed please find an original and your copy of the policy for the above captioned account.

Thank you very much.

Sincerely,

SUSAN CARLEY

Enclosures

Appendix 000007

TWIN CITY FIRE INSURANCE CO.
INDIANAPOLIS, IN 46268-0930                    ,



a stock insurance company, herein
called the Insurer

# PRIVATE CHOICE ENCORE! POLICY

## DECLARATIONS

**Policy Number:**      00 KB 0229269-07

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5: LIABILITY COVERAGE PARTS ELECTIONS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE, PROVIDED THAT SUCH NOTICE IS GIVEN NOT LATER THAN 60 DAYS AFTER ANY MANAGER BECOMES AWARE THAT SUCH CLAIM HAS BEEN MADE. DEFENSE COSTS ARE APPLIED AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**ITEM 1:  Named Entity and Address:**

```
SOUTHWEST HOUSING MANAGEMENT
5910 NORTH CENTRAL EXPRESSWAY
SUITE #1145
DALLAS, TX 75206
```

**ITEM 2:  Producer's Name and Address:**

```
81227
LOCKTON COMPANIES OF COLORADO,
INC.
8110 EAST UNION AVE
DENVER, CO 80237-2984
```

**ITEM 3:  Policy Period:**

**(A)**  Inception Date:      3/04/07

**(B)**  Expiration Date:     3/04/08
        12:01 a.m. local time at the address shown in ITEM 1

**ITEM 4:  Premium:**       $33,706

CONFIDENTIAL

Appendix 000008

**ITEM 5:    Liability Coverage Part Elections:**

Only those Coverage Parts and Coverage Features that are designated with an "X" are included under this Policy

☐   Combined Aggregate Limit of Liability For All Coverage Parts $_____N/A_____

☐   Defense Outside the Limit of Liability

| COVERAGE PART | AGGREGATE LIMIT OF LIABILITY | DEDUCTIBLE | PRIOR OR PENDING DATE | COVERAGE FEATURES |
|---|---|---|---|---|
| ☐ Directors, Officers and Entity Liability | $ NOT COVERED | Insured Person Liability $ 0 <br><br>Corporate Reimbursement $ NOT COVERED | NOT COVERED | ☐ **Entity Liability Coverage** Deductible: $ NOT COVERED Prior or Pending Date: NOT COVERED |
| ☒ Employment Practices Liability | $ 1,000,000 | $ 75,000 | 03/04/06 | ☐ **Third Party Liability Coverage** Sublimit of Liability: $ NOT COVERED Deductible: $ NOT COVERED Prior or Pending Date: NOT COVERED |
| ☒ Fiduciary Liability | $ 1,000,000 | $ 2,500 | 03/04/06 | ☒ **Settlement Program Coverage** Deductible: $ 0 Prior or Pending Date: 03/04/06 |
| ☐ Miscellaneous Professional Liability | $ NOT COVERED | $ NOT COVERED | NOT COVERED | ☐ Retroactive Date: NOT COVERED |

**ITEM 6:    Non-Liability Coverage Part Elections:**

Only those Coverage Parts that are designated with an "X" are included under this Policy

| COVERAGE PART | LIMIT(S) OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| ☒ Crime | See Crime Coverage Part Dec. Page, Form No. PE00H11701 0904 | See Crime Coverage Part Dec. Page, Form No. PE00H11701 0904 |
| ☒ Kidnap and Ransom/Extortion | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. PE00H17101 0904 | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. PE00H17101 0904 |

**ITEM 7:** **Extended Reporting Period:**

(A) Duration:          12 MONTHS

(B) Premium*:          100%

\* Premium for the Extended Reporting Period elected shall be the indicated percentage of the sum of the annual premium specified for all Liability Coverage Parts, plus the annualized amounts of any additional premiums charged during the Policy Period.

**ITEM 8:** **Endorsements:**

This Policy includes the following endorsements at issuance:

   SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**ITEM 9:** **Address For Notices to Insurer:**

**For Claims other than Kidnap and Ransom/Extortion:**      **For all notices other than Claims:**

The Hartford                                                The Hartford
Claims Department                                           Compliance Department
Hartford Financial Products                                 Hartford Financial Products
2 Park Ave., 5th Floor                                      2 Park Ave., 5th Floor
New York, New York  10016                                   New York, New York  10016

For Kidnap and Ransom/Extortion Claims see Kidnap and Ransom/Extortion Coverage Part Declarations.

This Policy shall not be valid unless countersigned by the Insurer's duly authorized representative.

Date of Issue: _____      Countersigned by: _____

                                                            **Authorized Representative**

Appendix 000010

# PRIVATE CHOICE ENCORE! POLICY
## CRIME COVERAGE PART DECLARATIONS



THE
HARTFORD

In return for the payment of the premium, and subject to all the terms of this Coverage Part, we agree with you to provide the insurance stated in this Coverage Part.

**1.    Coverages, Limits of Insurance and Deductibles:**

Insuring Agreements, Limits of Insurance and Deductible Amounts shown below are subject to all of the terms of this Coverage Part that apply.

| **Insuring Agreements Forming Part of This Coverage Part** | **Limit(s) of Insurance** | **Deductible Amount(s)** |
|---|---|---|
| 1.  Employee Theft | $ 1,000,000 | $ 25,000 |
| 2.  Depositors Forgery or Alteration | $ 1,000,000 | $ 25,000 |
| 3.  Inside The Premises - *Money, Securities and Other Property* | $ 1,000,000 | $ 25,000 |
| 4.  Outside The Premises - *Money, Securities and Other Property* | $ 1,000,000 | $ 25,000 |
| 5.  Computer and Funds Transfer Fraud | $ 1,000,000 | $ 25,000 |
| 6.  Money Orders and Counterfeit Currency | $ 50,000 | $ 0 |

**2.    Cancellation of Prior Insurance:**  By acceptance of this Coverage Part you give us notice canceling prior policies or bonds numbered _____N/A_____.  The cancellation(s) is effective at the time this Coverage Part becomes effective.

**3.    Form Numbers of Endorsements Forming Part of This Coverage Part When Issued:**

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

CONFIDENTIAL
00 KB 0229269-07    3/04/07

Appendix 000011

# PRIVATE CHOICE ENCORE! POLICY
## KIDNAP AND RANSOM/EXTORTION COVERAGE PART
### DECLARATIONS

THE **HARTFORD**

In return for the payment of the premium, and subject to all the terms of this Coverage Part, we agree with you to provide the insurance stated in this Coverage Part.

**1.    Coverages, Limits of Insurance and Deductibles:**
Insuring Agreements, Limits of Insurance and Deductible Amounts shown below are subject to all of the terms of this Coverage Part that apply.

| Insuring Agreements Forming Part of This Coverage Part | Limit(s) of Insurance | Deductible Amount(s) |
|---|---|---|
| A.   Kidnap/Ransom/Extortion | $ 1,000,000 | $ 0 |
| B.   Expense | $ 1,000,000 | $ 0 |
| C.   Custody/Delivery | $ 1,000,000 | $ 0 |
| D.   Personal Accidental Death, Dismemberment & Disability Loss | | |
| (i)  Loss of Extremity | $ 250,000 | $ 0 |
| (ii) All Other Personal Accidental Death, Dismemberment & Disability Loss | $ 500,000 | $ 0 |
| Coverage Part Limit of Insurance (Maximum Limit of Insurance for all loss under this Coverage Part): | $ N/A | |

**2.    Independent Security Consultant:**        Control Risks Group

**3.    Notice under Section IV. General Agreements, (B) Conditions Precedent to Liability must be addressed to the Insurer's Independent Security Consultant:**

Control Risks Group
1600 K Street, NW
Suite 1600
Washington, DC 20006
Telephone (202) 449-3330 (main number – 9:00am-5:00pm EST)
011 44 20 7481 1851 (emergency number, London, England)
011 44 20 7970 2100 (main number, London, England)

(All Control Risks Group phone numbers accept collect calls.)

and to:

The Hartford
Attn: Joseph Coppola
Hartford Financial Products
Claims Department – Middle Market
2 Park Ave., 5th Floor
New York, New York  10016
212-277-0970

**4.    Form Numbers of Endorsements Forming Part of This Coverage Part When Issued:**

    SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**5.    Cancellation of Prior Insurance:**  By acceptance of this Coverage Part you give us notice canceling prior policies or bonds numbered ___N/A___.  The cancellation(s) is effective at the time this Coverage Part becomes effective.

CONFIDENTIAL

PE 00 H171 01 0904        00  KB  0229269-07    3/04/07    © 2004, The Hartford

Appendix 000012

Page 1 of 1

GU 207
(6-78)

# ENDORSEMENT

This endorsement, effective on   3/04/07   at 12:01 A.M. standard time, forms a part of

Policy No.  00 KB 0229269-07   of the   TWIN CITY FIRE INSURANCE CO.

Issued to   SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

SCHEDULE OF FORMS AND ENDORSEMENTS

|    |            |       |                                                                                  |
|----|------------|-------|----------------------------------------------------------------------------------|
|    | RN00N02600 | 5/93  | IN WITNESS PAGE                                                                  |
|    | PE00H01202 | 9/04  | PRIVATE CHOICE ENCORE! POLICY                                                    |
|    | PE00H01400 | 5/02  | EMPLOYMENT PRACTICES LIABILITY COVERAGE PART                                     |
|    | PE00H01500 | 5/02  | FIDUCIARY LIABILITY COVERAGE PART                                                |
|    | PE00H11801 | 9/04  | CRIME COVERAGE PART                                                              |
|    | PE00H17201 | 9/04  | KIDNAP AND RANSOM/EXTORTION COVERAGE PART                                        |
| 1  | PE00H07401 | 8/05  | ADD SUBSIDIARY ENDORSEMENT                                                       |
| 2  | PE00H11100 | 3/04  | HIPAA COVERAGE (INCLUDING SUBLIMIT FOR PENALTIES)                                |
| 3  | PE00H12800 | 4/04  | JOINT INSURED                                                                    |
| 4  | PE00H16000 | 4/04  | JOINT VENTURE, GENERAL PARTNERSHIP, LIMITED PARTNERSHIP OR LIMITED LIABILITY COMPANY |
| 5  | PE00H17500 | 4/04  | AMEND TERRITORY                                                                  |
| 6  | PE00H24300 | 11/05 | ENCORE! PLUS ENDORSEMENT (COMMON TERMS AND CONDITIONS)                           |
| 7  | PE00M02400 | 9/04  | SPECIFIC INDIVIDUAL CLAIMANT EXCLUSION                                           |
| 8  | PE42H05201 | 5/04  | TEXAS AMENDATORY - COMMON TERMS AND CONDITIONS ENDORSEMENT                       |
| 9  | PE42H08800 | 5/04  | TEXAS NUCLEAR LIABILITY EXCLUSION                                                |
| 10 | PE00H24700 | 1/06  | AMEND EMPLOYEE BENEFIT PLANS PROVISIONS                                          |
| 11 | PE00H23900 | 4/05  | GENETIC MAKEUP ENDORSEMENT                                                       |
| 12 | HR42H00300 | 6/05  | TEXAS CANCELLATION AND NONRENEWAL ENDORSEMENT                                    |

Rev. Ed. Date (04/02)
GU 207 (6-78)

CONFIDENTIAL

Appendix 000013

GU 207
(6-78)

# ENDORSEMENT

This endorsement, effective on        3/04/07                    at 12:01 A.M. standard time, forms a part of

Policy No.   00 KB 0229269-07        of the        TWIN CITY FIRE INSURANCE CO.

Issued to    SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

SCHEDULE OF FORMS AND ENDORSEMENTS

13   PE42H17700    9/04   TEXAS CHANGES

     HG00H05600    4/06   IMPORTANT NOTICE TO POLICYHOLDERS - TERRORISM RISK
                          INSURANCE ACT

     RN42N01400    1/93   IMPORTANT NOTICE

     RN42R03001   10/98   TEXAS NOTICE

Rev. Ed. Date (04/02)
GU 207 (6-78)
CONFIDENTIAL

Appendix 000014

## PRIVATE CHOICE ENCORE! POLICY

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5: COVERAGE ELECTIONS PROVIDES CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE, PROVIDED THAT SUCH NOTICE IS GIVEN NOT LATER THAN 60 DAYS AFTER ANY MANAGER BECOMES AWARE THAT SUCH CLAIM HAS BEEN MADE. DEFENSE COSTS ARE APPLIED AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

**COMMON TERMS AND CONDITIONS**

**I.      TERMS AND CONDITIONS**

(A)  All Coverage Parts included in this Policy are subject to the following Common Terms and Conditions. If any provision in these Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

(B)  Except as otherwise provided by specific reference to other Coverage Parts, the terms and conditions of each Coverage Part shall apply only to such Coverage Part.

**II.     COMMON DEFINITIONS**

The following terms, whether used in the singular or plural, shall have the meanings specified below:

(A)  **"Affiliate"** means any insurance company controlling, controlled by or under common control with the Insurer.

(B)  **"Application"** means the application for this Policy, including any materials or information submitted therewith, such application shall be on file with the Insurer and deemed a part of and attached hereto, as if physically attached hereto. **"Application"** also means an application for any policy in an uninterrupted series of policies issued by the Insurer, or an **Affiliate**, of which this Policy is a renewal or replacement.

(C)  **"Claim"** shall have the meaning specified for such term in each Coverage Part.

(D)  **"Debtor in Possession"** means a "debtor in possession" as such term is defined in Chapter 11 of the United States Bankruptcy Code as well as any equivalent status under any similar law.

(E)  "**Defense Costs**" means reasonable and necessary legal fees and expenses incurred in the investigation, defense or appeal of a **Claim**. **Defense Costs** shall include the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds. **Defense Costs** shall not include salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**.

(F)  **"Employee"** means any past, present, or future:

(1)  employee of an **Insured Entity** in such person's capacity as an employee, including any part time, seasonal, temporary, leased, or loaned employee; or

(2)  volunteer with an **Insured Entity** in such person's capacity as a volunteer.

However, for purposes of the Crime Coverage Part, see the definition of **Employee** within the Crime Coverage Part, Section IV. DEFINITIONS, (D) Employee. For purposes of the Kidnap and

CONFIDENTIAL
CNA-ENC2169-07      3/04/07

Appendix 000015

Ransom/Extortion Coverage Part, see the definition of **Employee** within the Kidnap and Ransom/Extortion Coverage Part, Section II. DEFINITIONS, (B) Employee.

**(G)** "**ERISA**" means the Employee Retirement Income Security Act of 1974.

**(H)** "**Financial Insolvency**" means the status of an **Insured Entity** as a result of:

    **(1)** the appointment of any conservator, liquidator, receiver, rehabilitator, trustee, or similar official to control, supervise, manage or liquidate such **Insured Entity**; or

    **(2)** such **Insured Entity** becoming a **Debtor in Possession**.

**(I)** "**Insured Entity**" means:

    **(1)** the **Named Entity;** or

    **(2)** any **Subsidiary**.

    **Insured Entity** shall include any such entity as a **Debtor in Possession**.

**(J)** "**Insured Person**" shall have the meaning specified for such term in each Coverage Part.

**(K)** "**Insureds**" shall have the meaning specified for such term in each Coverage Part.

**(L)** "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

**(M)** "**Liability Coverage Part**" means the Directors, Officers and Entity Liability, Employment Practices Liability, Fiduciary Liability and Miscellaneous Professional Liability Coverage Parts, if included in ITEM 5 of the Declarations.

**(N)** "**Loss**" shall have the meaning specified for such term in each Coverage Part.

**(O)** "**Manager**" means any natural person who is a past, present or future:

    **(1)** duly elected or appointed director, officer, member of the board of managers or management committee member of an **Insured Entity;**

    **(2)** in-house general counsel of an **Insured Entity;** or

    **(3)** executive of an **Insured Entity** created outside the United States of America to the extent that such executive holds a position equivalent to those described in (1) or (2),

    For purposes of the Kidnap and Ransom/Extortion Coverage Part, see the definition of **Manager** within the Kidnap and Ransom/Extortion Coverage Part, Section II. DEFINITIONS, (P) Manager.

    in such person's capacity in such position.

**(P)** "**Named Entity**" means the entity named in ITEM 1 of the Declarations.

**(Q)** "**Non-Liability Coverage Part**" means the Crime and Kidnap and Ransom/Extortion Coverage Parts in ITEM 6 of the Declarations.

**(R)** "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 3 of the Declarations or any earlier cancellation date.

CONFIDENTIAL      HFD 00239469-07     3/04/07
Appendix 000016

**(S)** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, odors, noise, lead, oil or oil product, radiation, asbestos or asbestos-containing product, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes, without limitation, material to be recycled, reconditioned or reclaimed.

**(T)** **"Subsidiary"** means any:

    **(1)** corporation in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the outstanding securities representing the right to vote for the election of the board of directors of such corporation;

    **(2)** limited liability company in which and so long as the **Named Entity** owns or controls, directly or indirectly, the right to elect, appoint or designate more than 50% of such entity's managers;

    **(3)** corporation operated as a joint venture in which and so long as the **Named Entity** owns or controls, directly or indirectly, exactly 50% of the issued and outstanding voting stock and which, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock of such corporation, the **Named Entity** solely controls the management and operation of such corporation; or

    **(4)** foundation, charitable trust or political action committee in which and so long as such entity or organization is controlled by the **Named Entity** or any **Subsidiary** as defined (1) through (3) above.

**(U)** **"Wrongful Act"** shall have the meaning specified for such term in each Coverage Part.

## III.   COVERAGE EXTENSIONS

**(A) Spousal Liability Coverage**

Coverage shall apply to the lawful spouse of an **Insured Person** for a **Claim** made against such spouse, provided that:

    **(1)** such **Claim** arises solely out of:

        **(a)** such person's status as the spouse of an **Insured Person;** or

        **(b)** such spouse's ownership of property sought as recovery for a **Wrongful Act**;

    **(2)** the **Insured Person** is named in such **Claim** together with the spouse; and

    **(3)** coverage of the spouse shall be on the same terms and conditions, including any applicable Deductible, as apply to coverage of the **Insured Person** for such **Claim**.

No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse.

**(B) Estates and Legal Representatives**

In the event of the death, incapacity or bankruptcy of an **Insured Person,** any **Claim** made against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** shall be deemed to be a **Claim** made against such **Insured Person**. No coverage shall apply to any **Claim** for a **Wrongful Act** of such estate, heirs, legal representatives or assigns.

## IV.   LIMIT OF LIABILITY

Solely with respect to all **Liability Coverage Parts**:

CONFIDENTIAL
HFD 02169-07   3/04/07

Appendix 000017

**(A)** The Limit of Liability for each Coverage Part in ITEM 5 of the Declarations shall be the maximum aggregate amount that the Insurer shall pay under such Coverage Part for all **Loss** from all **Claims** covered under such Coverage Part.

**(B)** Notwithstanding the above, if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

**(1)** such single Limit of Liability shall be the maximum aggregate amount that the Insurer shall pay for all **Loss** from all **Claims** covered under all included Coverage Parts combined; and

**(2)** any amount specified as a Limit of Liability for any individual Coverage Part in ITEM 5 of the Declarations shall be subject to, part of, and not in addition to, the amount stated as the Combined Aggregate Limit of Liability For All Coverage Parts.

## V.    DEFENSE COSTS

Solely with respect to all **Liability Coverage Parts:**

**(A)** **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

**(B)** Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then payment of **Defense Costs** shall be in addition to any applicable Limit of Liability, provided that:

**(1)** if a Limit of Liability is specified for any individual Coverage Part in ITEM 5 of the Declarations, then the maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under such Coverage Part shall be 50% of such Limit of Liability;

**(2)** if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

**(a)** the single maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under all included Coverage Parts combined shall be 50% of such Limit of Liability; and

**(b)** any amount of **Defense Costs** available for any individual Coverage Part shall be subject to, part of, and not in addition to, the single maximum amount of **Defense Costs** available for all included Coverage Parts combined specified in (a) above; and

**(3)** if the amount available for **Defense Costs** in (1) or (2) above is exhausted by the payment of **Defense Costs**, then **Defense Costs** shall be paid by the Insurer out of any remaining applicable Limit of Liability until the exhaustion of the applicable Limit of Liability.

## VI.    DEDUCTIBLE

Solely with respect to all **Liability Coverage Parts:**

**(A)** The Insurer shall pay **Loss** in excess of the Deductible applicable to each **Claim** as specified in ITEM 5 of the Declarations.

**(B)** The Deductible shall be borne by the **Insureds** uninsured at the **Insureds'** own risk.

**(C)** Any **Defense Costs** incurred by the Insurer shall apply to the Deductible. The **Insureds** shall reimburse the Insurer upon request for any amounts paid regarding a **Claim** that are within the applicable Deductible for such **Claim**.

CONFIDENTIAL GO-RL-00159169-07     3/04/07

Appendix 000018

**(D)** If a **Claim** is covered under more than one Coverage Part, the applicable Deductible for each Coverage Part shall be applied separately to such **Claim**, provided that the maximum Deductible applied to such **Claim** shall not exceed the highest of such applicable Deductibles.

**(E)** No Deductible shall apply to **Loss** incurred by any **Insured Person** that an **Insured Entity** is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is not able to do so by reason of **Financial Insolvency.**

**(F)** If an **Insured Entity** is permitted or required by common or statutory law to indemnify an **Insured Person** for any **Loss,** or to advance **Defense Costs** on their behalf, and does not do so other than because of **Financial Insolvency**, then such **Insured Entity** and the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the Deductible that would have applied if such indemnification had been made.

**(G)** If a **Subsidiary** is unable to indemnify an **Insured Person** for any **Loss**, or to advance **Defense Costs** on their behalf, because of **Financial Insolvency**, then the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the applicable Deductible that would have applied if such indemnification had been made.

## VII.   DEFENSE AND SETTLEMENT

Solely with respect to all **Liability Coverage Parts:**

**(A)** The Insurer shall have the right and duty to defend any **Claim** for which the **Insureds** give notice to the Insurer, even if such **Claim** is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate.

**(B)** The Insurer's duty to defend any **Claim** shall cease upon exhaustion of any applicable Limit of Liability.

Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer's duty to defend any **Claim** shall cease upon exhaustion of the maximum aggregate amount of **Defense Costs** available under Section V. DEFENSE COSTS, and any applicable Limit of Liability.

If any Limit of Liability is exhausted, the premium for this Policy shall be deemed fully earned.

**(C)** The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

**(D)** The Insurer may, with the written consent of the **Insureds**, settle any **Claim** for a monetary amount that the Insurer deems reasonable.

**(E)** Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer may settle any **Claim** for a monetary amount that the Insurer deems reasonable and the consent of the **Insureds** shall not be required to settle a **Claim**.

**(F)** The **Insureds** shall give to the Insurer all information and cooperation as the Insurer may reasonably request.

## VIII.   NOTICE OF CLAIM

Solely with respect to all **Liability Coverage Parts:**

**(A)** As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable, provided that such notice shall be given not later than sixty (60) days

Appendix 000019

after any **Manager** becomes aware that such **Claim** has been made. Such notice shall specify the Coverage Part under which notice is being given.

**(B)** If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period** on the date that the Insurer receives the above notice.

## IX.   EXTENDED REPORTING PERIOD

**(A)** If any **Liability Coverage Part** is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under this Policy (the "Extended Reporting Period").

**(B)** To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor.  The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within sixty (60) days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

**(C)** The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

**(D)** The Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the **Policy Period**.

**(E)** Coverage during the Extended Reporting Period shall apply to **Claims** made for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity. No coverage shall apply for any **Wrongful Act** occurring after such time.

**(F)** There is no separate or additional Limit of Liability for the Extended Reporting Period.

## X.   INTERRELATIONSHIP OF CLAIMS

Solely with respect to all **Liability Coverage Parts:**

All **Claims** based upon, arising from or in any way related to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

**(A)** any of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period;**

**(B)** notice of any **Wrongful Act** described above was given to the Insurer under this Policy pursuant to Section VIII. NOTICE OF CLAIM (B); or

**(C)** notice of any **Wrongful Act** described above was given under any prior insurance policy.

## XI.   ALLOCATION

Solely with respect to all **Liability Coverage Parts:**

CONFIDENTIAL          CG-PROD-12469-07     3/04/07

Appendix 000020

If **Loss** is incurred that is partially covered and partially not covered by this Policy, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters or because a **Claim** is made against both covered and uncovered parties, such **Loss** shall be allocated as follows:

(A)   100% of **Defense Costs** shall be allocated to covered **Loss**; and

(B)   **Loss** other than **Defense Costs** shall be allocated between covered and non-covered

**Loss** based upon the relative legal exposure of the parties to such matters.

## XII.   OTHER INSURANCE

If **Loss** arising from any **Claim** is insured under any other valid and collectible policy or policies, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## XIII.   CANCELLATION

(A)   The Insurer may cancel this Policy for non-payment of premium by sending not less than 10 days notice to the **Named Entity**. This Policy may not otherwise be cancelled by the Insurer.

(B)   Except as provided in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity, the **Insureds** may cancel this Policy by sending written notice of cancellation to the Insurer. Such notice shall be effective upon receipt by the Insurer unless a later cancellation time is specified therein.

(C)   If the Insurer cancels this Policy, unearned premium shall be calculated on a pro rata basis. If the **Insureds** cancel this Policy, unearned premium shall be calculated at the Insurer's customary short rates. Payment of any unearned premium shall not be a condition precedent to the effectiveness of a cancellation. The Insurer shall make payment of any unearned premium as soon as practicable.

## XIV.   CHANGES IN EXPOSURE

Solely with respect to all **Liability Coverage Parts**:

(A)   **Mergers and New Subsidiaries**

If, before or during the **Policy Period**, any **Insured Entity**:

(1)   merges with another entity such that the **Insured Entity** is the surviving entity; or

(2)   acquires a **Subsidiary**,

then such newly merged or acquired entity and its subsidiaries, managers, directors, officers, and employees shall be **Insureds** to the extent such entities and persons would otherwise qualify as **Insureds** under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring after such merger or acquisition. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before such transaction or for any **Interrelated Wrongful Acts** thereto.

If the fair value of the assets of any newly merged or acquired entity exceed 25% of the total assets of the **Named Entity** as reflected in its most recent consolidated audited financial statements prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage under the **Liability Coverage Parts** for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

CONFIDENTIAL                HFD 002469-07      3/04/07

Appendix 000021

**(B)  Takeover of Named Entity**

If, during the **Policy Period**:

**(1)**  the **Named Entity** merges into or consolidates with another entity such that the **Named Entity** is not the surviving entity; or

**(2)**  more than 50% of the securities representing the right to vote for the **Named Entity's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert,

then coverage shall continue under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring before such transaction. No coverage shall be available for any **Wrongful Act** occurring after such transaction. Upon such transaction, this Policy shall not be cancelled and the entire premium for this Policy shall be deemed fully earned.

The **Insureds** shall give the Insurer written notice of such transaction as soon as practicable, but not later than ninety (90) days after the effective date of such transaction.

**(C)  Loss of Subsidiary Status**

If, before or during the **Policy Period**, any entity ceases to be a **Subsidiary**, then coverage shall be available under the **Liability Coverage Parts** for such **Subsidiary** and its **Insured Persons**, but only for a **Wrongful Act** of such **Insureds** occurring before such transaction. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after such transaction.

**XV.     SUBROGATION**

The Insurer shall be subrogated to all of the **Insureds'** rights of recovery regarding any payment of **Loss** by the Insurer under this Policy. The **Insureds** shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of any documents necessary to enable the Insurer to effectively bring suit in the name of the **Insureds**. The **Insureds** shall do nothing to prejudice the Insurer's position or any potential or actual rights of recovery.

**XVI.    APPLICATION**

**(A)**  The **Insureds** represent that the declarations and statements contained in the **Application** are true, accurate and complete. This Policy is issued in reliance upon the **Application**. If the **Application** contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by the Insurer, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented.

**(B)**  For the purpose of determining coverage:

**(1)**  knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and

**(2)**  knowledge possessed by the **Named Entity's** chairman of the board, chief executive officer, chief operating officer, or chief financial officer or anyone signing the **Application** shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity**.

**XVII.   ACTION AGAINST THE INSURER**

Solely with respect to all **Liability Coverage Parts**:

**(A)**  No action shall be taken against the Insurer unless there shall have been full compliance with all the terms and conditions of this Policy.

CONFIDENTIAL    KR-0029469-07    3/04/07

Appendix 000022

**(B)** No person or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against the **Insureds** nor shall the Insurer be impleaded by the **Insureds** in any such **Claim**.

Solely with respect to the **Crime Coverage Part**:

**(A)** No legal action shall be taken against the Insurer involving loss unless the **Insured** has complied with all the terms of this Policy; and

**(B)** No legal action shall be taken against the Insurer involving loss until ninety (90) days after the **Insured** has filed proof of loss with us; and

**(C)** No legal action shall be taken against the Insurer involving loss unless such action is brought within two (2) years from the date that the **Insured** discovers such loss.

Solely with respect to the Kidnap And Ransom/Extortion Coverage Part:

No suit, action or proceeding for recovery of any claim under this Policy shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy shall have been complied with and the same be commenced within twenty-four (24) months after a claim for actual loss or expenses has been reported to the Insurer by the **Insured**.

## XVIII.   ASSIGNMENT

Assignment of interest under this Policy shall not bind the Insurer without its consent as specified in a written endorsement issued by the Insurer to form a part of this Policy.

## XIX.   BANKRUPTCY OR INSOLVENCY

Bankruptcy or insolvency of any **Insureds** shall not relieve the Insurer of any of its obligations under this Policy.

## XX.   AUTHORIZATION OF NAMED ENTITY

The **Named Entity** shall act on behalf of all **Insureds** with respect to all matters under this Policy, including, without limitation, giving and receiving of notices regarding **Claims**, cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Policy.

## XXI.   CHANGES

This Policy shall not be changed or modified except in a written endorsement issued by the Insurer to form a part of this Policy.

## XXII.   ENTIRE AGREEMENT

This Policy, including the Declarations, Common Terms and Conditions, included Coverage Part(s), **Application** and any written endorsements attached hereto, constitute the entire agreement between the **Insureds** and the Insurer relating to this insurance.

## XXIII.   NOTICES

**(A)** All notices to the **Insureds** shall be sent to the **Named Entity** at the address specified in ITEM 1 of the Declarations.

**(B)** All notices to the Insurer shall be sent to the address specified in ITEM 9 of the Declarations. Any such notice shall be effective upon receipt by the Insurer at such address.

## XXIV.   HEADINGS

CONFIDENTIAL          CNA-CED29469-07     3/04/07

Appendix 000023

The headings of the various sections of this Policy are intended for reference only and shall not be part of the terms and conditions of coverage.

**XXV.    REFERENCES TO LAWS**

**(A)**  Wherever this Policy mentions any law, including, without limitation, any statute, Act or Code of the United States of America, such mention shall be deemed to include all amendments of, and all rules or regulations promulgated under, such law.

**(B)**  Wherever this Policy mentions any law or laws, including, without limitation, any statute, Act or Code of the United States of America, and such mention is followed by the phrase "or any similar law", such phrase shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, statutes and any rules or regulations promulgated under such statutes as well as common law.

**XXVI.    COVERAGE TERRITORY**

Coverage under this Policy applies worldwide.

CONFIDENTIAL   CCB-029469-07   3/04/07

Appendix 000024



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

**TWIN CITY FIRE INSURANCE COMPANY**
HOME OFFICE - INDIANAPOLIS, INDIANA
ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
(A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

Brian S. Becker, Secretary

David Zwiener, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN
  CONFIDENTIAL
  00  KB  0229269-07    3/04/07

Appendix 000025

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**

## I.   INSURING AGREEMENTS

### (A)  Employment Practices Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

### (B)  Third Party Liability (Elective)

If Third Party Liability Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Third Party Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to the Third Party Liability Coverage Sublimit of Liability, Deductible, and Prior or Pending Date in Item 5 of the Declarations. Such Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this Coverage Part.

## II.   DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

### (A)  "Benefits" means any form of compensation other than salaries, wages, bonuses, or **Stock Benefits**.

### (B)  "Claim" means any:

**(1)**   **Employment Practices Claim**; or

**(2)**   **Third Party Claim**.

### (C)  "Employment Practices Claim" means any:

**(1)**   written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

**(2)**   civil proceeding commenced by the service of a complaint or similar pleading;

**(3)**   formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document; or

**(4)**   arbitration proceeding commenced by a demand for arbitration,

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

**"Employment Practices Claim"** also means an audit conducted by the United States of America Office of Federal Contract Compliance Programs commenced by the receipt of a notice of violation, order to show cause, or a written demand for monetary or injunctive relief.

CONFIDENTIAL69-07     3/04/07

Appendix 000026

**"Employment Practices Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Employment Practices Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**"Employment Practices Claim"** shall not include any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.

(D) **"Employment Practices Wrongful Act"** means a **Wrongful Act** involving any:

(1) wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

(2) sexual or other workplace harassment, including quid pro quo and hostile work environment;

(3) employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;

(4) invasion of privacy, employment-related defamation (including libel and slander) or any employment-related misrepresentation;

(5) **Retaliation**;

(6) breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

(7) violation of the Family and Medical Leave Act.

To the extent that an **Employment Practices Claim** alleges an **Employment Practices Wrongful Act** described above, **"Employment Practices Wrongful Act"** also means a **Wrongful Act** related to the above involving any:

(1) employment-related wrongful infliction of emotional distress or mental anguish;

(2) failure to create, provide for or enforce adequate or consistent employment-related policies or procedures; or

(3) negligent retention, supervision, hiring or training.

(E) **"Independent Contractor"** means any natural person working in the capacity of an independent contractor pursuant to an **Independent Contractor Agreement.**

(F) **"Independent Contractor Agreement"** means any express contract or agreement between an **Independent Contractor** and an **Insured Entity** specifying the terms of the **Insured Entity's** engagement of such **Independent Contractor.**

(G) **"Insured Person"** means any:

(1) **Employee**;

(2) **Manager**; or

(3) regarding Insuring Agreement (A), an **Independent Contractor** provided that within 30 days of an **Employment Practices Claim** having been made against such **Independent Contractor** that the **Insured Entity** agrees in writing to indemnify such **Independent Contractor** for any **Loss** arising out of such **Claim**.

CONFIDENTIAL    COR 0021969-07    3/04/07

Appendix 000027

**(H)** **"Insureds"** means any:

    **(1)** **Insured Entity**; or

    **(2)** **Insured Person.**

**(I)** **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

    **Loss** shall include punitive and exemplary damages, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, or the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

    **Loss** shall not include:

    **(1)** taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

    **(2)** non-monetary relief;

    **(3)** future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**;

    **(4)** **Stock Benefits**; or

    **(5)** salaries, wages, or bonuses, except as a component of a front or back pay award.

**(J)** **Retaliation** means negative treatment of an **Employee** or **Independent Contractor** based upon such person:

    **(1)** exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

    **(2)** refusing to violate any law;

    **(3)** assisting, testifying in, or cooperating with a proceeding or investigation regarding alleged violations of law by an **Insured Entity;**

    **(4)** disclosing or threatening to disclose alleged violations of law to a superior or to any governmental agency; or

    **(5)** filing any claim against an **Insured Entity** under the Federal False Claims Act or any similar "whistle blower" laws.

**(K)** **"Stock Benefits"** means any offering, plan or agreement between an **Insured Entity** and any **Employee** that grants stock, stock options or stock appreciation rights in the **Insured Entity** to such person, including, without limitation, restricted stock or any other stock grant.  **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans.

**(L)** **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of an **Insured Entity. Third Party** shall not include **Employees**.

**(M)** **"Third Party Claim"** means any:

    **(1)** written demand for monetary damages or non-monetary relief commenced by the receipt of such demand;

CONFIDENTIAL      HFD 02 19469-07    3/04/07

Appendix 000028

**(2)** civil proceeding commenced by the service of a complaint or similar pleading;

**(3)** formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; or

**(4)** arbitration proceeding commenced by the filing of a demand for arbitration,

by or on behalf of a **Third Party**.

"**Third Party Claim**" also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Third Party Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**(N)** "**Third Party Wrongful Act**" means a **Wrongful Act** involving any:

**(1)** discrimination against a **Third Party** based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law; or

**(2)** sexual harassment against a **Third Party**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

**(O)** "**Wrongful Act**" means any actual or alleged:

**(1)** error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

**(2)** matter claimed against an **Insured Person** solely by reason of their serving in such capacity.

## III.  EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)** The Insurer shall not pay **Loss** for any **Claim**:

**(1)** for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

**(2)** based upon, arising from, or in any way related to any:

**(a)** prior or pending demand, suit or proceeding against any **Insureds** as of; or

**(b)** audit initiated by the Office of Federal Contract Compliance Programs before,

the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit, proceeding, or audit;

**(3)** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

**(4)** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

**(5)** for breach of any **Independent Contractor Agreement**; or

**(6)** for violation of the National Labor Relations Act or any similar law.

---

PE 00 H014 00 0502                                    ©2002, The Hartford                                    Page 4 of 6
CONFIDENTIAL

Appendix 000029

**(B)** Other than an **Employment Practices Claim** for **Retaliation**, the Insurer shall not pay **Loss** for any **Claim**:

    **(1)** based upon, arising from, or in any way related to any:

        **(a)** discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

        **(b)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

    **(2)** based upon, arising from, or in any way related to any workers' compensation, unemployment compensation, disability benefits, or social security law, or any similar law;

    **(3)** for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

    **(4)** for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:

        **(a)** overtime wages; or

        **(b)** minimum wages.

**(C)** Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

    **(1)** for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement;

    **(2)** for costs associated with providing any accommodations required by the Americans With Disabilities Act or any similar law;

    **(3)** for **Benefits**, provided that this exclusion shall not apply to any **Employment Practices Claim** for wrongful termination, dismissal or discharge of employment; or

    **(4)** based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.

## IV. EXCLUSION APPLICABLE TO INSURING AGREEMENT (B)

The Insurer shall not pay **Loss** for any **Third Party Claim** based upon, arising from or in any way related to any price discrimination or violation of any anti-trust law or any similar law designed to protect competition or prevent unfair trade practices.

## V. OTHER INSURANCE

**(A)** The coverage provided under this Policy for any **Employment Practices Claim** shall be primary.

**(B)** Notwithstanding the above, the coverage provided under this Policy for any **Employment Practices Claim** made against a temporary, leased or loaned **Employee** or an **Independent Contractor** shall be excess of the amount of any deductible, retention and limits of liability under any other policy or policies applicable to such **Claim**, whether such other policy or policies are stated to be primary, contributory, excess, contingent or

CONFIDENTIAL

QBE 0021969-07   3/04/07

Appendix 000030

otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## VI.  COORDINATION OF COVERAGE

If this Coverage Part and either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part are included under this Policy, and a **Claim** is covered under this Coverage Part and any such other Coverage Part, **Loss** shall be first covered and paid under this Coverage Part.

If notice of a **Claim** has been given under either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part and a determination is made by the Insurer that such **Claim** would be covered under this Coverage Part if notice had been given under this Coverage Part, then the **Insureds** shall be deemed to have given notice of such **Claim** under this Coverage Part at the same time that notice was given under such other Coverage Part.

## VII.  CHANGES IN EXPOSURE

(A)  This section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

(B)  In addition to the asset percentage size limit for automatic coverage of any newly merged or acquired entity specified in Common Terms and Conditions Section XIV. Changes in Exposure (A), if the number of employees of a newly merged or acquired entity exceeds 25% of the number of employees of all **Insured Entities** combined prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

## VIII.  DEDUCTIBLE WAIVER

Regarding a **Claim** that is a class action civil proceeding, no Deductible shall apply to **Defense Costs** incurred in connection with such **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Deductible otherwise applicable to such **Claim**, if a:

(A)  final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

(B)  complete and final settlement with prejudice;

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

CONFIDENTIAL

HFD CB219469-07     3/04/07

Appendix 000031

**FIDUCIARY LIABILITY COVERAGE PART**

## I.   INSURING AGREEMENTS

### (A)  Fiduciary Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Fiduciary Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds** or by any person for whose **Wrongful Acts** the **Insureds** are legally responsible.

### (B)  Settlement Programs (Elective)

If Settlement Program Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Settlement Fees** on behalf of the **Insureds** resulting from a **Settlement Program** for which a **Settlement Program Notice** is received by the Insurer during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to a Sublimit of Liability of $100,000. Such a Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this Coverage Part. This Insuring Agreement shall also be subject to the Settlement Program Coverage Deductible and Prior or Pending Date in Item 5 of the Declarations.

## II.   DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

**(A)**   **"Claim"** means any:

    **(1)**   **Fiduciary Claim**; or

    **(2)**   **Settlement Program Notice**.

**(B)**   **"Employee Stock Ownership Plan"** means any **Insured Plan** that invests more than 10% of its assets in securities of **Insured Entities.**

**(C)**   **"Fiduciary Claim"** means any:

    **(1)**   written demand for monetary damages or injunctive relief commenced by the receipt of such demand;

    **(2)**   civil proceeding commenced by the service of a complaint or similar pleading;

    **(3)**   criminal proceeding commenced by the return of an indictment; or

    **(4)**   formal administrative or regulatory proceeding commenced by the filing or service of a notice of charges, formal investigative order or similar document, including an investigation by the Department of Labor or Pension Benefit Guaranty Corporation.

**"Fiduciary Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Fiduciary Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

CONFIDENTIAL
HFD 02279469-07     3/04/07

Appendix 000032

**(D)** **"Insured Person"** means any:

    **(1)** **Manager**;

    **(2)** **Employee**; or

    **(3)** past, present, or future trustee of an **Insured Plan** in such person's capacity as a trustee.

**(E)** **"Insured Plan"** means any past, present, or future:

    **(1)** employee welfare benefit plan or employee pension benefit plan, as defined in **ERISA**, sponsored solely by an **Insured Entity**, or jointly by an **Insured Entity** and a labor organization, for the benefit of **Employees** only;

    **(2)** employee benefit plan, including an excess benefit plan, not subject to Title 1 of **ERISA**, sponsored solely by an **Insured Entity** for the benefit of **Employees** only;

    **(3)** government-mandated insurance program for unemployment, social security or disability benefits for **Employees** other than workers compensation; or

    **(4)** any other plan, fund, or program specifically included as an **Insured Plan** in a written endorsement issued by the Insurer to form a part of this Policy.

Notwithstanding the above, an **Insured Plan** shall not include any:

    **(1)** **Employee Stock Ownership Plan**; or

    **(2)** any multi-employer plan.

**(F)** **"Insureds"** means any:

    **(1)** **Insured Entity;**

    **(2)** **Insured Person**; or

    **(3)** **Insured Plan.**

**(G)** **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

**Loss** shall include punitive and exemplary damages and the multiple portion of any multiplied damage award where insurable by law.  Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall not include:

    **(1)** taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed; or

    **(2)** non-monetary relief.

Notwithstanding the above, **Loss** shall include:

    **(1)** civil penalties of up to 5% imposed pursuant to **ERISA** Section 502(i) or up to 20% imposed pursuant to **ERISA** Section 502(l); or

CONFIDENTIAL

HIG-02-29469-07    3/04/07

Appendix 000033

(2) if **Settlement Program Coverage** is included, **Settlement Fees**.

(H) **"Settlement Fees"** mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insureds** become legally obligated to pay as a result of a **Wrongful Act**. **Settlement Fees** shall not include costs of corrections, other than fees or penalties.

(I) **"Settlement Program"** means any voluntary compliance resolution program or similar voluntary settlement program administered by the United States of America Internal Revenue Service or any other governmental body that is entered into by an **Insured Entity**.

(J) **"Settlement Program Notice"** means a prior written notice to the Insurer by any **Insured Entity** of its intent to enter into a **Settlement Program** that includes a detailed description of the **Wrongful Act** for which notice will be given under the **Settlement Program**.

(K) **"Wrongful Act"** means any actual or alleged:

(1) error, misstatement, misleading statement, act, omission, neglect or breach of duty constituting a violation of any responsibilities, obligations or duties imposed upon fiduciaries of an **Insured Plan** by **ERISA** or any similar law;

(2) error, misstatement, misleading statement, act, omission, neglect or breach of duty in counseling, providing interpretations, handling records, or effecting enrollment, termination or cancellation of **Employees**, participants, or beneficiaries under an **Insured Plan**; or

(3) matter claimed against any **Insureds** solely due to such **Insureds** acting in the capacity of a fiduciary of an **Insured Plan**.


III.    **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**

(A) The Insurer shall not pay **Loss** for any **Claim**:

(1) for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

(2) based upon, arising from, or in any way related to any prior or pending demand, suit or proceeding against any **Insureds** as of the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

(3) based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

(4) based upon, arising from, or in any way related to any:

(a) discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

(b) direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

(5) based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability:

CONFIDENTIAL PE 00769-07    3/04/07

Appendix 000034

    **(a)**   that would have been incurred in the absence of such contract or agreement; or

    **(b)**   assumed under any agreement or declaration of trust under which any **Insured Plan** was established;

**(6)**   based upon, arising from, or in any way related to the gaining, in fact, of any personal profit, remuneration or advantage to which the **Insureds** are not legally entitled; or

**(7)**   based upon, arising from, or in any way related to any deliberately fraudulent or criminal act or omission or any willful violation of law by the **Insureds** if a judgment or other final adjudication establishes such an act, omission or violation.

Regarding exclusions (6) and (7) above, no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**.

**(B)**   Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

**(1)**   for failure to pay benefits pursuant to any **Insured Plan**, provided that this exclusion shall not apply to the extent that recovery of such benefits is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person**;

**(2)**   based upon, arising from, or in any way related to a failure to fund, or collect contributions owed to, an **Insured Plan**; or

**(3)**   for return or reversion of any contributions or assets to an **Insured Entity** from an **Insured Plan**.

## IV.  WAIVER OF RECOURSE

The Insurer shall have no right of recourse against any **Insureds** for any payment of **Loss** made by the Insurer under this Coverage Part because of a **Wrongful Act** by such **Insureds** if the premium for this Policy was paid for by other than an **Insured Plan**.

## V.  CHANGES IN EXPOSURE

**(A)**   This Section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)**   The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (A) Mergers and New Subsidiaries shall also apply to any employee benefit plan of any newly merged or acquired entity and to any trustee of such plan to the extent that such plan and trustee would otherwise qualify as **Insureds** under this Policy. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before the merger or acquisition of the entity or for any **Interrelated Wrongful Acts** thereto.

**(C)**   The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (C) Loss of Subsidiary Status shall also apply to any **Insured Plan** of a former **Subsidiary** and any trustee of such plan. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after an entity ceases to be a **Subsidiary**.

## VI.  TERMINATED PLAN COVERAGE

CONFIDENTIAL    HFD 6127969-07   3/04/07

Appendix 000035

Subject to the terms and conditions of this Policy and Coverage Part, coverage shall be afforded for **Loss** resulting from any **Claim** against the **Insureds** for a **Wrongful Act** involving any **Insured Plan** terminated by an **Insured Entity**, including post-termination **Wrongful Acts**.

## VII. DEDUCTIBLE WAIVER

No Deductible shall apply to **Defense Costs** incurred in connection with a **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Deductible otherwise applicable to such **Claim**, if a:

**(A)**  final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)**  complete and final settlement with prejudice,

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

CONFIDENTIAL    KB-E2-29469-07    3/04/07

Appendix 000036

## CRIME COVERAGE PART

### I.   INSURING AGREEMENTS

Coverage is provided under the following Insuring Agreements for which there is a Limit of Insurance shown in the Declarations.

**(A)   INSURING AGREEMENT 1. - EMPLOYEE THEFT**

The Insurer will pay for direct loss of or damage to **Money**, **Securities** and **Other Property** that results directly from **Theft** by an **Employee**, whether or not identifiable, while acting alone or in collusion with other persons.

**(B)   INSURING AGREEMENT 2. - DEPOSITORS FORGERY OR ALTERATION**

**(1)**   The Insurer will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money** that are

   **(a)**   made or drawn upon the **Insured**; or

   **(b)**   made or drawn by one acting as the **Insured's** agent and drawn on the **Insured's** account or that are purported to have been so made or drawn.

**(2)**   The Insurer will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

**(3)**   If the **Insured** is sued for refusing to pay any instrument in B.1. above, on the basis that it has been forged or altered and the **Insured** has the Insurer's written consent to defend against that suit, the Insurer will pay for any reasonable legal expenses that the **Insured** incurs and pays in such defense. The amount that the Insurer will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement. If a Deductible Amount applies to this Insuring Agreement, the Insurer will also apply it to the amount of legal expenses incurred in this Insuring Agreement.

**(4)**   The **Insured** must include with its proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss and describing both sides of said instrument.

**(C)   INSURING AGREEMENT 3. – INSIDE THE PREMISES**

**(1)**   The Insurer will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises** resulting directly from **Theft**, disappearance or destruction.

**(2)**   The Insurer will pay for loss of or damage to **Other Property**

   **(a)**   inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

   **(b)**   inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

**(3)**   The Insurer will pay for loss from damage to the **Premises** or its exterior resulting from an actual or attempted

   **(a)**   **Theft** of **Money** or **Securities**; or

   **(b)**   **Robbery** or **Safe Burglary** of **Other Property** if the **Insured** is the owner of the **Premises** or is liable for damage to it.

**(4)**   The Insurer will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** or unlawful entry into those containers.

CONFIDENTIAL KFB-022169-07     3/04/07

Appendix 000037

**(D)  INSURING AGREEMENT 4. – OUTSIDE THE PREMISES**

    **(1)**  The Insurer will pay for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

    **(2)**  The Insurer will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

**(E)  INSURING AGREEMENT 5. - COMPUTER AND FUNDS TRANSFER FRAUD**

The Insurer will pay for loss of and loss from damage to **Money**, **Securities** and **Other Property** following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**

    **(1)**  to a person (other than a **Messenger**) outside those **Premises**; or

    **(2)**  to a place outside those **Premises**.

And, the Insurer will pay for loss of **Money** or **Securities** through **Funds Transfer Fraud** resulting directly from **Fraudulent Transfer Instructions** communicated to a **Financial Institution** and instructing such institution to pay, deliver, or transfer **Money** or **Securities** from the **Insured's Transfer Account**.

**(F)  INSURING AGREEMENT 6. - MONEY ORDERS AND COUNTERFEIT CURRENCY**

The Insurer will pay for loss resulting directly from the **Insured's** having accepted in good faith and in the regular course of business, in exchange for merchandise, **Money** or services;

    **(1)**  money orders issued by any post office, express company or bank in the United States of America or Canada that are not paid upon presentation; and

    **(2)**  **Counterfeit** currency of the United States of America, Canada, or any other country in which the **Insured** maintains physical premises. Unless otherwise shown in the Declarations for this Coverage Part, the Limit of Insurance under this insuring agreement is $50,000. There is no deductible applying to loss covered under this agreement unless otherwise shown in the Declarations for this Coverage Part.

## II.  LIMIT OF INSURANCE

The most that the Insurer will pay for loss in any one **Occurrence** is the applicable Limit of Insurance shown in the Declarations.

## III.  DEDUCTIBLE

We will not pay for loss in any one **Occurrence** unless the amount of the loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. In the event that more than one Deductible Amount could apply to the same loss, only the highest Deductible Amount will be applied.

## IV.  DEFINITIONS

**(A)**  **"Banking Premises"** means the interior portion of that part of any building occupied by a banking institution or similar safe depository.

**(B)**  **"Counterfeit"** means an imitation of an actual valid original that is intended to deceive and to be taken as an original.

CONFIDENTIAL   GHR 00279469-07   3/04/07

Appendix 000038

**(C)** "**Custodian**" means the **Insured**, or any of the **Insured's** partners, or members or any **Employee** while having the care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

**(D)** "**Employee**" means:

    **(1)** any natural person:

        **(a)** while in the **Insured's** service or for 60 days after termination of service; and

        **(b)** whom the **Insured** compensates directly by salary, wages, commissions; and

        **(c)** whom the **Insured** has the right to direct and control while performing services for it; including one:

        **(d)** who is a director or trustee while performing acts coming within the scope of the usual duties of an **Employee** or while acting as a member of any of the **Insured's** elected or appointed committees to perform on the **Insured's** behalf, specific, as distinguished from general directorial acts; or

        **(e)** who is a non-compensated officer; or

        **(f)** who is a volunteer who is not compensated, other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**; or

        **(g)** who is a former employee, director, partner, member or trustee retained as a consultant while performing services for the **Insured**; or

        **(h)** who is a student intern or guest student pursuing studies or duties in any of the **Insured's** offices or **Premises**; or

        **(i)** who is leased to the **Insured** under an agreement between the **Insured** and a labor leasing firm, while that person is subject to the direction and control of the **Insured** and performing services for the **Insured**; or

        **(j)** who is the **Insured's** partner or limited liability member, but the Insurer will not pay for loss caused by any partner or limited liability member, unless the amount of the loss exceeds the sum of

            **i.** any amounts the **Insured** owes that partner or limited liability member; and

            **ii.** the value of that partner's partnership interest, or that limited liability member's ownership interest determined by the closing of the **Insured's** organization's books on the date of discovery of the loss by the **Insured's** organization by anyone not in collusion with the person causing the loss, and

            **iii.** any applicable Deductible Amount; then the Insurer will pay the amount of loss excess of that sum, up to the Limit of Insurance applicable to Insuring Agreement 1.

    **(2)** a natural person who is a trustee, officer, **Employee**, administrator or manager, except an administrator or a manager who is an independent contractor, of any **Employee Benefit Plan(s)** insured under this Coverage Part; and the **Insured's** director or trustee while that person is handling **Money** or **Securities** or **Other Property** of **Employee Benefit Plan(s)** insured under this Coverage Part.

    **(3)** a natural person who is furnished temporarily to the **Insured** to substitute for a permanent **Employee** to meet seasonal or short term work load conditions and while that temporary person is subject to the **Insured's** direction and control and performing services for the **Insured**. However, such persons are excluded while having care and custody of property outside the **Premises**.

**Employee** does NOT mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character.

CONFIDENTIAL   HIG 0079169-07   3/04/07

Appendix 000039

(E) **"Employee Benefit Plan(s)"** means any welfare or pension plan(s) as defined in the Employee Retirement Income Security Act (ERISA) of 1974, including amendments thereto and regulations promulgated thereunder, and which is sponsored by one or more of the **Insured(s)**.

(F) **"Financial Institution"** means a bank, savings bank, savings and loan association or similar thrift institution, a stockbroker, mutual fund, liquid assets fund, or similar investment institution in which the **Insured** maintains a **Transfer Account**.

(G) **"Forgery"** means the signing of the name of another person or organization with intent to deceive; it does not mean a signature that consists in whole or in part of one's own name signed with or without authority, in any capacity, for any reason.

(H) "**Fraudulent Transfer Instructions"** means

    (1) fraudulent electronic, telegraphic, facsimile, cable, teletype or telephone instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account and which instructions purport to have been authorized by the **Insured** but which have been fraudulently transmitted by another; or

    (2) fraudulent written instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account through an electronic funds transfer system at specified times or under specified conditions and which instructions purport to have been duly authorized by the **Insured** but which have been fraudulently issued, forged or altered by another.

(I) **"Funds Transfer Fraud"** means **Theft** of **Money** or **Securities** from any of the **Insured's Transfer Accounts** at a **Financial Institution** and occurring through **Fraudulent Transfer Instructions** communicated to such **Financial Institution**.

(J) **"Insured"** shall mean any **Insured Entity**.

(K) **"Investigative Expenses"** means reasonable expenses incurred and paid by the **Insured** in establishing the existence and amount of any direct loss covered under an Insuring Agreement within this Coverage Part. The reasonableness of such expenses shall be determined by the Insurer and shall not include the **Insured's** internal corporate obligations such as **Employee** wages or any other internal costs.

(L) **"Messenger"** means the **Insured**, any of the **Insured's** partners or members or any **Employee** while having care and custody of property outside the **Premises**.

(M) **"Money"** means currency, coins and bank notes in current use and having a face value; and travelers checks, register checks and money orders held for sale to the general public.

(N) **"Occurrence"** means

    (1) as respects the Employee Theft Insuring Agreement, all loss caused by, or involving, one or more **Employees**, whether the result of a single act or a series of acts.

    (2) as respects the Forgery or Alteration Insuring Agreement, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

    (3) as respects all other Insuring Agreements, an act or series of related acts involving one or more persons; or an act or event or a series of related acts or events not involving any person.

(O) **"Other Property"** or property means any tangible property other than **Money** or **Securities** that has intrinsic value but does not include any property excluded under this Coverage Part. **Other Property** does **not** include trade secrets, proprietary information, confidential information or any copyrights, patents, trademarks, proprietary manufacturing or processing procedures, or secret or confidential information, including but not limited to credit card numbers, bank account numbers or any similar information.

CONFIDENTIAL
    HIG 00729469-07    3/04/07

Appendix 000040

(P)  **"Premises"** means the interior of that portion of any building that the **Insured** occupies in conducting its business.

(Q)  **"Robbery"** means the unlawful taking of property from the care and custody of a person by one who has caused or threatened to cause that person bodily harm or committed an obviously unlawful act witnessed by that person.

(R)  **"Safe Burglary"** means the unlawful taking of property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior, or, the taking of a safe or vault from inside the **Premises**.

(S)  **"Securities"** means negotiable or non-negotiable instruments or contracts representing either **Money** or property and includes tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and, evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**; but does not include **Money**.

(T)  **"Theft"** means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of the **Insured**.

(U)  "**Transfer Account**" means an account maintained by the **Insured** at a **Financial Institution** from which the **Insured** or its authorized representative may cause the payment, transfer or delivery of **Money** or **Securities** by any means described in the **Fraudulent Transfer Instructions** definition.

(V)  "**Watchperson**" means any person whom the **Insured** retains specifically to have the care and custody of property inside the **Premises** and who has no other duties.

## V.  EXCLUSIONS  *(Applying To All Insuring Agreements Unless Otherwise Specified)*

**This Coverage Part Does Not Apply To And The Insurer Will Not Pay For:**

(A)  **Accounting or Arithmetical Errors or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

(B)  **Acts Committed By The Insured**

Loss resulting from **Theft** or any other dishonest or criminal acts committed by the **Insured** whether acting alone or in collusion with others.

(C)  **Acts of Employees, Managers, Directors or Trustees**

Loss resulting from **Theft** or any other dishonest or criminal act committed by any of the **Insured's Employees**, managers, directors or trustees whether acting alone or in collusion with other persons or while performing services for the **Insured** or otherwise except when covered under Insuring Agreement 1.

(D)  **Employee Cancelled Under Prior Insurance**

Loss caused by any of the **Insured's Employees** or by any **Employee** of the **Insured's** predecessor in interest, for whom similar prior insurance has been cancelled and not reinstated since the last cancellation.

(E)  **Exchanges or Purchases**

Loss resulting from the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase.

(F)  **Fire**

Loss from damage to the premises resulting from fire, however caused, except for loss of or damage to **Money** or **Securities** and loss from damage to a safe or vault under Insuring Agreement 3.

CONFIDENTIAL
CC FED 022469-07     3/04/07

Appendix 000041

**(G)  Governmental Action**

Loss resulting from seizure or destruction of **Money**, **Securities** or **Other Property** by order of governmental authority.

**(H)  Indirect Loss**

Loss that is an indirect result of any act or **Occurrence** covered by this Coverage Part including but not limited to loss resulting from

**(1)**  the **Insured's** inability to realize income that it would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**.

**(2)**  payment of damages of any type for which the **Insured** is legally liable. But the Insurer will pay compensatory damages arising directly from a loss covered under this Coverage Part.

**(3)**  payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence of or the amount of loss under this Coverage Part, provided, however, that the Insurer will reimburse the **Insured** for **Investigative Expenses** up to $5,000 (Five Thousand Dollars) it incurs per **Occurrence** with the Insurer's prior consent, to determine the amount of loss covered under this Coverage Part, provided that the amount of direct covered loss exceeds the Deductible Amount for the applicable Insuring Agreement. Such reimbursement is part of, and not in addition to, the Limit of Insurance for the applicable Insuring Agreement.

**(I)  Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon

**(1)**  an inventory computation; or

**(2)**  a profit and loss computation.

However, where the **Insured** establishes wholly apart from such inventory computations that it has sustained a loss covered under this Coverage Part, then the **Insured** may offer its inventory records and actual physical count of inventory in support of the amount of loss claimed.

**J)  Legal Expenses**

Expenses related to any legal action except when covered under Insuring Agreement 2.

**(K)  Money Operated Devices**

Loss of **Money** contained in any money operated device unless a continuous recording instrument in the device records the amount of any **Money** deposited in it.

**(L)  Motor Vehicles or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers, or semi-trailers or equipment or accessories attached to them. This exclusion shall apply only to Insuring Agreement 4.

**(M)  Nuclear**

Loss resulting from nuclear reaction, nuclear radiation, radioactive contamination, chemical or biological contamination, or any related act or incident.

**(N)  Risks Inherent in Insurance Operations**

Loss resulting directly or indirectly from contractual or extra contractual liability sustained by the **Insured** in connection with the issuance of contracts or purported contracts of insurance, indemnity or suretyship.

CONFIDENTIAL   GB01769-07    3/04/07

Appendix 000042

**(O)  Trading Losses**

Loss resulting directly or indirectly from any authorized or unauthorized trading of **Money**, **Securities** or **Other Property**, whether in the **Insured's** name or in a genuine or fictitious account.

**(P)  Transfer or Surrender of Property**

Loss of or damage to **Money**, **Securities** or **Other Property** after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**

**(1)**  on the basis of unauthorized instructions, unless covered under Insuring Agreement 5.; or

**(2)**  as a result of a threat to do bodily harm to any person; or

**(3)**  as a result of a threat to do damage to any property.

But this Exclusion does not apply under Insuring Agreement 4. to loss of **Money**, **Securities** and **Other Property** while outside the **Premises** or **Banking Premises** in the care and custody of a **Messenger** if the **Insured**:

**(a)**  had no knowledge of any threat at the time that the conveyance began; or

**(b)**  had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**(Q)  Vandalism**

Loss from damages to the **Premises** or to the exterior of any safe, vault, cash box, cash drawer or cash register by vandalism or mischief.

**(R)  Voluntary Parting of Title To or Possession of Property**

Loss resulting from the **Insured**, or anyone acting on its express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property. This exclusion shall apply only to Insuring Agreements 3. and 4.

**(S)  War and Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion, or revolution, or any related act or incident.

**(T)  Warehouse Receipts Losses**

Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

## VI.  GENERAL CONDITIONS

**(A)  ARMORED MOTOR VEHICLE COMPANIES**

Under Insuring Agreement 4. the Insurer will pay only for the amount of loss the **Insured** cannot recover

**(1)**  under its contract with the armored motor vehicle company; and

**(2)**  from any insurance or indemnity carried by or for the benefit of customers of the armored motor vehicle company, or from the armored motor vehicle company.

**(B)  CANCELLATION AS TO ANY EMPLOYEE**

CONFIDENTIAL

CONF 00219469-07    3/04/07

Appendix 000043

Insuring Agreement 1. is cancelled as to any **Employee**

**(1)** immediately upon discovery by the **Insured** or any of its partners, members, managers, officers, directors or trustees not in collusion with the **Employee** of **Theft** or any other dishonest act in excess of $1,000 committed by the **Employee** whether before or after becoming employed by the **Insured**; or

**(2)** on the date specified in a notice mailed to the **Insured**. The date will be at least 30 days after the date of the mailing. And, the mailing of notice to the **Insured** at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

**(C) CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by the **Insured** as it relates to this Coverage Part at any time. It is also void if the **Insured** at any time intentionally conceals or misrepresents a material fact concerning

**(1)** this Coverage Part;

**(2)** the property covered under this Coverage Part;

**(3)** your interest in the property covered under this Coverage Part; or

**(4)** a loss under this Coverage Part.

**(D) CONSOLIDATION OR MERGER**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become **Employees** or the **Insured** acquires the use and control of any additional **Premises**

**(1)** the **Insured** must give us written notice within 90 days after the effective date of such consolidation or merger, or purchase or acquisition of assets or liabilities, and obtain the Insurer's written consent to extend this insurance to such additional **Employees** or **Premises**. The Insurer may condition its consent upon payment of an additional premium; but there shall only be a premium charge if such merger or acquisition results in a 15%, or greater, increase in the number of **Employees**, assets or revenues acquired through the merger or acquisition.

**(2)** For the first 90 days after the effective date of such consolidation or merger, or purchase or acquisition of assets or liabilities, any insurance afforded for **Employees** or **Premises** also applies to these additional **Employees** or **Premises** for acts committed within this 90-day period.

**(E) DISCOVERY**

**(1)** The Insurer will pay for loss which the **Insured** sustains through acts or events committed or occurring at any time and which are discovered by the **Insured** during the Policy Period or during the period provided in General Condition G., DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS.

**(2)** Discovery of loss occurs when the **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this Coverage Part has been, or may be incurred even though the exact amount or the details of the loss may not then be known.

**(3)** Discovery also occurs when the **Insured** receives notice of an actual or potential claim against it alleging facts, which if true, would constitute a covered loss under this policy.

**(4)** No coverage will be available under this Coverage Part for any loss of which the **Insured** was aware prior to the inception date of this Coverage Part.

**(F) DISCOVERY SUPERSEDING LOSS SUSTAINED COVERAGE – LIABILITY FOR PRIOR LOSSES**

CONFIDENTIAL   HIG 023969-07   3/04/07
Appendix 000044

**(1)** If this Coverage Part has replaced similar prior insurance written by a company other than the Insurer, and such other insurance provided a period of time to discover loss occurring prior to the termination or cancellation of that coverage, and a loss is discovered within the period provided by prior insurance to discover losses, the Insurer will not pay for such loss unless the amount exceeds the Limit of Insurance under said prior Policy. The Insurer will then only pay the **Insured** for any excess loss subject to the Insuring Agreements, Exclusions and General Conditions of this Coverage Part.

**(2)** Any payment that the Insurer makes to the **Insured** under this insurance shall not exceed the difference between the amount of insurance under the **Insured's** prior Policy and the Limit of Insurance shown in the Declarations and the Insurer will not apply its **Deductible Amount** to any excess loss payment.

**(G)  DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS**

The Insurer will pay for loss that the **Insured** sustained prior to the effective date of termination or cancellation of this Coverage Part, which is discovered by the **Insured**:

**(1)** no later than 60 days from the date of the termination, cancellation or non-renewal; and

**(2)** as respects any **Employee Benefit Plan(s)**, no later than 1 year from the date of that termination, cancellation or non-renewal.

However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** to replace, in whole or in part, the insurance afforded by this Coverage Part, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(H)  DUTIES IN THE EVENT OF LOSS**

After the **Insured** discovers a loss or a situation which may result in a loss of, or damage to, **Money**, **Securities** or **Other Property**, it must

**(1)** notify the Insurer as soon as possible but no later than 90 days after discovery of loss;

**(2)** submit to examination under oath at the Insurer's request and give it a signed statement;

**(3)** give the Insurer a detailed, sworn proof of loss within 120 days;

**(4)** cooperate with the Insurer in the investigation and settlement of any claim; and

**(5)** with respect to Insuring Agreements 3. and 4., notify the police if the **Insured** has reason to believe that its loss involves a violation of law.

**(I)  EMPLOYEE BENEFIT PLANS PROVISION**

**(1)** The Insurer will pay for loss of or damage to **Money**, **Securities** or **Other Property** of any **Employee Benefit Plan(s)** sponsored exclusively by any **Insured** resulting directly from **Theft** by an **Employee**. The Limit of Insurance applicable to any **Employee Benefit Plan** shall equal the lesser of ten percent (10%) of the **Employee Benefit Plan** assets as of the beginning of such **Employee Benefit Plan** fiscal year or five hundred thousand dollars ($500,000).

**(2)** Any payments the Insurer makes to the **Insured** for loss sustained by any **Employee Benefit Plan** will be held by that **Insured** for the use and benefit of the **Employee Benefit Plan** sustaining the loss.

**(3)** If two or more **Employee Benefit Plans** are insured under this Coverage Part, any payment which the Insurer makes for loss sustained by two or more **Employee Benefit Plans**, or of commingled **Funds** or **Other Property** of two or more **Employee Benefit Plans**, which arises out of one **Occurrence**, is to be shared by each **Employee Benefit Plan** sustaining loss in the proportion that the Limit of Insurance required for each **Employee Benefit Plan** bears to the total of those limits.

**(J)  JOINT INSURED**

CONFIDENTIAL                    KB 002469-07    3/04/07

Appendix 000045

**(1)** If more than one **Insured** is named in the Declarations, the first named **Insured** will act for itself and for every other **Insured** for all purposes of this Coverage Part. If the first named **Insured** ceases to be covered, then the next **Insured** will become the first named **Insured**.

**(2)** If any **Insured**, partner, member or officer of an **Insured** has knowledge of any information relevant to this Coverage Part, that knowledge is considered to be knowledge of every **Insured**.

**(3)** An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

**(4)** If this Coverage Part or any of its Insuring Agreements is cancelled, terminated or non-renewed as to any **Insured**, loss sustained by that **Insured** is covered only if discovered by the **Insured** during the period of time provided in General Condition G., DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS. And this extended period to discover loss also terminates in accordance with paragraph 2 of that condition.

**(5)** The Insurer will not pay a greater amount for loss sustained by more than one **Insured** than the Insurer would pay if all of the loss had been sustained by one **Insured**.

**(K) OWNERSHIP OF PROPERTY; INTERESTS COVERED**

**(1)** The property covered under this Coverage Part is limited to **Money, Securities or Other Property**

    **(a)** that the **Insured** owns or leases; or

    **(b)** owned by the **Insured's** client and which the **Insured** holds on its **Premises** or which is in the custody of one acting as the **Insured's Messenger** and while such **Money, Securities** or **Other Property** is in transit; or

    **(c)** for which the **Insured** is legally liable excepting loss of client **Money, Securities** or **Other Property** occurring on such client's premises.

**(2)** However, this Coverage Part is for the **Insured's** benefit alone and no other person or organization has any rights or benefits. Any claim for a loss of client **Money, Securities** or **Other Property** occurring on the **Insured's Premises** or while in transit in the custody of a **Messenger** may only be made by the **Insured** in its proof of loss.

**(L) VALUATION**

**(1)** Subject to the applicable Limit of Insurance, the Insurer will pay for

    **(a)** loss of **Money** but only up to and including its face value. The Insurer may, at its option, pay for a loss of **Money** issued by any country other than the United States of America in either the face value in the **Money** issued in that country, or, in the United States of America dollar equivalent determined by the rate of exchange on the day that the loss occurred.

    **(b)** loss of **Securities** but only up to and including their value at the close of business on the day that the loss was discovered. But, the Insurer may, at its option, 1) pay the value of such **Securities**, 2) replace them in kind in which event the **Insured** must assign to the Insurer all its rights, title and interest in and to those **Securities** or 3) pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the Insurer will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of

        **i.** the value of the **Securities** at the close of the business on the day the loss was discovered; or

        **ii.** the Limit of Insurance.

    **(c)** loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation, subject to 2. below. However, the Insurer will not pay for more than the lesser of

CONFIDENTIAL
GL 0000969-07   3/04/07
© 2004, The Hartford

Appendix 000046

> **i.**  the Limit of Insurance applicable to the lost or damaged property; or
>
> **ii.**  the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or
>
> **iii.**  the amount that the **Insured** actually spends that is necessary to repair or replace the lost or damaged property.

**(2)**  The Insurer will not pay on a replacement cost basis for any loss or damage

   **(a)**  until the lost or damaged property is actually repaired or replaced; and

   **(b)**  unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

   If the lost or damaged property is not repaired or replaced, the Insurer will pay based on actual cash value.

**(3)**  The Insurer may, at its option, pay for loss of or damage to property other than **Money** in the **Money** of the country in which the loss occurred; or in the United States of America dollar equivalent of the **Money** of the country where the loss occurred determined by the rate of exchange on the day the loss was discovered. Any property that the Insurer pays for or replaces becomes its property.

**(4)**  Loss of or loss from damage to any books or records of account or other records, tapes, disks, or electronic media used by the **Insured** in the business but only if such books, records, tapes or disks are actually reproduced and then only for not more than the blank books, pages, tapes and disks or other materials plus the cost of labor for the actual transcription or copying of data which the **Insured** shall furnish to reproduce such books, records, tapes or disks.

**(M)  RECORDS**

   The **Insured** must keep records of all property covered under this Coverage Part so that the Insurer can verify the amount of any loss.

CONFIDENTIAL  HFD 00139469-07    3/04/07

Appendix 000047

**KIDNAP AND RANSOM/EXTORTION COVERAGE PART**

## I.  INSURING AGREEMENTS

**(A)  Kidnap/Ransom/Extortion**

The Insurer shall reimburse **Ransom Monies** paid by the **Insured** or any **Insured Person** resulting from a covered **Kidnapping** or **Extortion Threat**.

**(B)  Expense**

The Insurer shall reimburse **Expenses** paid by the **Insured** resulting from a covered **Kidnapping** or **Extortion Threat**, or resulting from a **Detention** or **Hijacking** of any **Insured Person**.

**(C)  Custody/Delivery**

If, as a result of a covered **Kidnapping** or **Extortion Threat**, the **Insured** sustains a loss due to destruction, disappearance, confiscation or wrongful appropriation of **Ransom Monies** while being delivered to persons demanding the **Ransom Monies** by anyone who is authorized by the **Insured** or **Insured Person** to have custody thereof; the Insurer will reimburse the **Insured** for such loss.

**(D)  Personal Accidental Death, Dismemberment & Disability Loss**

The Insurer shall pay the amount in Item 1 (D) of the Declarations of this Coverage Part for **Personal Accidental Death, Dismemberment & Disability Loss** from a covered **Kidnapping**, or resulting from a **Detention** or **Hijacking.**

## II.  DEFINITIONS

The following terms, whether used in the singular or plural in this Coverage Part, shall have the meanings specified below:

**(A)  "Detention"** means the involuntary confinement of an **Insured Person** for a period of not less than twenty four (24) hours, for whatever reason other than **Kidnapping**.

**(B)  "Employee"** means:

**(1)**  Any natural person:

**(a)**  while in the service of the **Insured**;

**(b)**  who is compensated directly by salary, wages or commissions by the **Insured**; and

**(c)**  who the **Insured** has the right to direct and control while performing services for the **Insured**;

**(2)**  Any natural person who is furnished temporarily to the **Insured**:

**(a)**  to substitute for a permanent **Employee** as defined in paragraph (1) above, who is on leave; or

**(b)**  to meet seasonal or short-term work load conditions;

while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

**(3)**  Any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business;

CONFIDENTIAL     HIG 022969-07     3/04/07

Appendix 000048

**(4)** Any natural person who is a former official, **Employee**, director, partner, **Member**, **Manager**, representative or trustee retained as a consultant while performing services for the **Insured**; or

**(5)** Any natural person who is a guest student or intern pursuing studies or duties.

**Employee** shall not mean independent contractor.

**(C)** **"Expense"** means, solely in connection with **Kidnapping, Extortion Threat, Detention** or **Hijacking**, the reasonable fees and expenses for, or cost of:

**(1)** the independent security consultant in Item 2 of the Coverage Part Declarations Page;

**(2)** an independent negotiator;

**(3)** an independent public relations consultant and/or interpreter;

**(4)** reasonable fees and expenses for legal services necessary to secure the release of an **Insured Person**;

**(5)** an independent forensic analyst;

**(6)** communication equipment, recording equipment and advertising incurred solely and directly to obtain the release of an **Insured Person**;

**(7)** **"Reward"**, which shall mean the amount paid by the **Insured** or an **Insured Person** to an **Informant** for information which directly leads to the arrest and conviction of the individual(s) responsible for **Kidnapping, Extortion Threat, Detention** or **Hijacking**;

**(8)** interest for a loan taken by the **Insured** or **Insured Person** from a financial institution for the purpose of paying **Ransom Monies** as payment under Insuring Agreement (A);

**(9)** travel and accommodations incurred by an **Insured Person**;

**(10)** **"Salary"**, which shall mean the amounts of compensation paid by the **Insured** at an annual rate, including bonuses, commissions, incentive payments, health and welfare and pension benefits (at the level in effect on the date of the **Kidnapping, Detention** or **Hijacking**) which the **Insured** continues to pay an **Insured Person**. Payment of **Salary** ends at the earliest of:

**(a)** up to forty-five (45) days after such **Insured Person** is released, if the **Insured Person** is not yet back at work,

**(b)** when such **Insured Person** suffers **Loss of Life**,

**(c)** one hundred and twenty (120) days after the last credible evidence following abduction that the **Insured Person** is still alive; or

**(d)** solely with respect to **Detention** or **Hijacking**, for twenty-four (24) months after the commencement of such **Detention** or **Hijacking**, whichever is more recent;

**(11)** the **"Salary"** of a replacement **Employee** to conduct the duties of the **Insured Person** following the **Kidnapping, Detention or Hijacking** of such **Insured Person**. Such coverage shall apply to the **Salary** in effect at the time of such **Kidnapping, Detention** or **Hijacking** and will end forty-five (45) days after such **Insured Person** is released or suffers **Loss of Life**;

**(12)** reasonable defense costs incurred by an **Insured** and judgments or settlements which an **Insured** becomes legally obligated to pay as a result of a judgment or settlement in any suit brought by an **Insured Person** (or the estate, heirs, or legal representatives) alleging negligence or incompetence:

CONFIDENTIAL   HIG 0029469-07    3/04/07

Appendix 000049

(a) in the hostage retrieval operations or negotiations in a covered **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** of such **Insured Person**; or

(b) in the prevention of a covered **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** of such **Insured Person**.

As additional conditions precedent to the Insurer's liability, the **Insured** shall (a) immediately notify the Insurer of any such claim or suit, (b) not admit liability in any such claim or suit. The Insurer shall have the right to investigate, negotiate or settle any such claim or suit or to take over the conduct of the defense thereof;

**(13)** personal financial loss suffered by an **Insured Person** as a result of a **Kidnapping, Detention** or **Hijacking** and the result of the inability to attend to personal financial matters including, but not limited to, failure to renew insurance contracts and the failure to exercise stock options;

**(14)** independent security guard services for a period of up to thirty (30) days during a **Kidnapping, Extortion Threat, Detention** or **Hijacking**;

**(15)** any other direct expenses, reasonable in amount and reasonably incurred by the **Insured**, including (a) fees for related medical services (including psychiatric care, reasonable costs for cosmetic, dental or plastic surgery) which is medically required to correct any permanent disfigurement sustained by an **Insured Person** or guest directly as a result of a **Kidnapping, Detention** or **Hijacking** within twenty four (24) months following their release, and (b) reasonable expenses incurred for a period of not more than 30 days for rest and rehabilitation of an **Insured Person** and his/her spouse and children following the release of such **Insured Person** from a **Kidnapping, Detention** or **Hijacking**, provided such expenses are incurred within six (6) months following the release of such **Insured Person** and the maximum Limit of Insurance for this coverage shall not exceed $25,000 per **Insured Person** per covered incident.

**(D)** "**Extortion Threat**" means **Bodily Injury Extortion, Computer Virus Threat, Property Damage Extortion, Products Extortion** or **Trade Secrets Extortion** as herein defined:

**(1)** "**Bodily Injury Extortion**" means any threat, for the purpose of demanding **Ransom Monies,** communicated to the **Insured** or an **Insured Person** to kill, physically injure or kidnap an **Insured Person**.

**(2)** "**Computer Virus Threat**" means any threat, for the purpose of demanding **Ransom Monies**, communicated to the **Insured** to alter, adulterate, or destroy any of the **Insured's** computer programs through the introduction into the **Insured's** computer systems, instructions or data which are not authorized by the **Insured**.

**(3)** "**Property Damage Extortion**" means any threat, for the purpose of demanding **Ransom Monies,** communicated to the **Insured** to physically damage, contaminate or pollute any buildings or **Premises**, (including, furniture, fixtures, fittings, machinery or equipment [fixed or mobile]), works of art and other contents, bloodstock and livestock, owned or leased by the **Insured**.

**(4)** "**Products Extortion**" means any threat, for the purpose of demanding **Ransom Monies,** communicated to the **Insured** that products of the **Insured**, or products that are to be passed off as such, or goods which the **Insured** handles, will be contaminated, polluted or rendered substandard.

**(5)** "**Trade Secrets Extortion**" means any threat, for the purpose of demanding **Ransom Monies**, communicated to the **Insured** to disseminate, utilize or divulge information including formulas, patterns, patents, compilations of data, programs, devices, methods, techniques or processes, or other proprietary information which is particular to the **Insured** in the conduct of business, provided the **Insured** makes constant and conscious efforts not to disclose such information to any third party.

All such threats related by a common committed, attempted or threatened wrongful act or made simultaneously against the same **Insured** or **Insured Person** will be deemed to constitute a single **Extortion Threat**.

CONFIDENTIAL HIG 021969-07    3/04/07

Appendix 000050

**(E)** **"Hijacking"** means the illegal holding under duress of an **Insured Person**, in excess of four (4) hours, while traveling in any motor vehicle, aircraft, or waterborne vessel for whatever reason other than **Kidnapping.**

**(F)** **"Informant"** means any person, other than an **Insured Person**, providing information not otherwise obtainable, solely in return for a **Reward** offered by the **Insured**.

**(G)** **"Insured"** means the named **Insured** or any **Subsidiary** of the named **Insured**, which existed prior to the inception date of the Policy and was disclosed in the Application for this insurance.

**(H)** **"Insured Person"** means:

   **(1)** any **Employee**;

   **(2)** any director, trustee, partner, **Member**, **Manager**, proprietor (if the **Insured** is a sole proprietorship) or officer of an **Insured**;

   **(3)** any **Relative** of an **Employee**;

   **(4)** any natural person who is employed in the household of an **Employee** while in the home of such **Employee**;

   **(5)** any natural person who is a resident or a guest in the home of an **Employee**;

   **(6)** any customer or guest of an **Insured** on the **Premises** of an **Insured**;

   **(7)** any customer of an **Insured** or a guest traveling with an **Employee**; or

   **(8)** any natural person who is temporarily retained by any **Insured** or an independent security consultant to deliver a **Ransom Monies** or **Extortion Threat** payment.

**(I)** **"Kidnapping"** means any event or connected series of events of seizing, detaining, abducting or carrying away by fraudulent means, of the **Insured or** one or more **Insured Persons**, except a minor by a parent thereof (or by a person acting on behalf of a parent), for the purpose of demanding **Ransom Monies**.

**(J)** **"Loss of Extremity"** means the permanent physical separation or the total irrecoverable loss of use of a digit or part thereof, or an ear, nose or genital organ or part thereof by deliberate mutilation.

**(K)** **"Loss of Life"** means:

   **(1)** death, including clinical death, determined by a medical examiner or similar local governing medical authority; or

   **(2)** the lack of communication from an **Insured Person** or those responsible for the **Kidnapping, Detention** or **Hijacking** of such **Insured Person** for a period of one (1) year following the later of:

      **(a)** such **Kidnapping, Detention** or **Hijacking**;

      **(b)** the last communication from such **Insured Person**; or

      **(c)** the last communication from those responsible for such **Kidnapping, Detention** or **Hijacking**.

**(L)** **"Loss of Sight"** means the loss of sight of one or both eyes that is certified as being entire and irrevocable to the extent of legal blindness by a qualified medical practitioner specializing in ophthalmology and approved by the Insurer.

**(M)** **"Loss of Speech and/or Hearing"** means the permanent total loss of the capability of speech and/or hearing that is certified by a qualified medical practitioner specialist and approved by the Insurer.

CONFIDENTIAL

Appendix 000051

**(N)** **"Loss of Use"** means the permanent total loss of function of a foot, hand, or thumb and index finger that is certified by two qualified medical practitioners (approved by the Insurer) as being beyond hope of improvement.

**(O)** **"Manager"** means a person serving in a directorial capacity for a limited liability company.

**(P)** **"Member"** means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

**(Q)** **"Personal Accidental Death, Dismemberment & Disability Loss"** means **Loss of Life, Loss of Use, Loss of Sight, Loss of Speech and/or Hearing,** or **Loss of Extremity** of an **Insured Person** when such **Personal Accidental Death, Dismemberment & Disability Accidental Loss**:

    **(1)** is unanticipated and independent of any illness, disease or other bodily malfunction of such **Insured Person**; and

    **(2)** arises from a source outside of such **Insured Person**.

**(R)** **"Premises"** means buildings, facilities or properties occupied by the **Insured** in conducting its business or a residence occupied by any director, officer or **Employee** of the **Insured**.

**(S)** **"Ransom Monies"** shall mean cash and/or marketable goods or services that the **Insured** shall have surrendered to meet a **Kidnapping** or **Extortion Threat** demand. In the case of marketable goods or services, the Insurer shall pay the actual cash value thereof at the time of surrender.

**(T)** **"Relative"** means a spouse, domestic partner, child, step-child, adopted child, adopted stepchild, foster child, spouse of married children, grandchild, sister, brother, parent, parent-in-law, step-parent, grandparent, grandparent-in-law.

## III. EXCLUSIONS

This Coverage Part does not apply:

**(A)** to loss due to any fraudulent, dishonest or criminal acts of the **Insured**, its **Employees**, any **Insured Person** or any person authorized by the **Insured** to have custody of **Ransom Monies**;

**(B)** to loss resulting from fraud by any **Insured Person** allegedly the subject of a **Kidnapping, Extortion Threat, Detention** or **Hijack** if the **Insured** had not, prior to payment, made reasonable efforts to determine that such **Kidnapping, Extortion Threat, Detention** or **Hijacking** was genuine;

**(C)** to loss due to confiscation or expropriation of **Reward** or **Ransom Monies** by any governmental authority;

**(D)** to loss of income not realized by the **Insured** as the result of a covered loss;

**(E)** to loss due to the surrender of **Ransom Monies;**

    **(1)** in any face to face encounter involving the use or threat of force or violence unless surrendered by a person who is in possession of such **Ransom Monies** at the time of such surrender for the sole purpose of conveying them to pay a previously communicated demand for **Ransom Monies**;

    **(2)** on the **Premises** unless brought onto the **Premises** after the receipt of the **Kidnapping** or **Extortion Threat** demand for the purpose of paying such demand;

**(F)** under Insuring Agreement (B)

    **(1)** due to any act or alleged act of the **Insured** or **Insured Person** which would be a criminal offense if committed by the same party in a country where the **Insured** is headquartered or of which the **Insured Person** is a national, unless the Insurer determines that such allegations were intentionally false,

CONFIDENTIAL                    HIG 022969-07      3/04/07

Appendix 000052

fraudulent and malicious and made solely and directly to achieve political, propaganda or coercive effect upon or at the expense of the **Insured** or **Insured Person** who was subject to the **Detention** or **Hijacking**;

(2) due to any actual or alleged violation of the laws of a foreign country by the **Insured** or **Insured Person**, unless the Insurer determines that such allegations were intentionally false, fraudulent and malicious and made solely and directly to achieve political, propaganda or coercive effect upon or at the expense of the **Insured** or **Insured Person** who was subject to the **Detention** or **Hijacking;**

(3) due to the failure of the **Insured** or an **Insured Person** to properly procure or maintain immigration, work, travel, residence or similar visas, permits or other documentation;

(4) due to an **Insured Person** taking part in any political activity or the operations of any security or armed forces;

(5) due to an **Insured Person** traveling to a country after the U.S. Department of State issues a travel warning;

(6) due to an **Insured Person** traveling to or remaining in a country after the U.S. Government provides a directive to leave the country in question.

(G) loss sustained by one **Insured** to the advantage of any other **Insured**;

(H) loss resulting from fraud by an **Insured Person** allegedly the subject of a **Personal Accidental Death, Dismemberment & Disability Loss;**

(I) to any loss, including **Expenses** due to any **Kidnapping** and/or **Extortion Threat** that is part of a connected series of acts involving **Kidnapping** and/or **Extortion Threat** beginning prior to the **Policy Period**, or prior to the acquisition, consolidation or purchase of assets of another entity.

(J) to any **Expenses** related to recalling a product.

## IV.   GENERAL AGREEMENTS

(A)  **Beneficiary:**

The **Benefit Amount** for all other **Personal Accidental Death, Dismemberment & Disability Accidental Loss,** other than **Loss of Life,** will be paid to the **Insured Person**. The **Benefit Amount** for **Loss of Life** will be paid to the estate of the **Insured Person**

(B)  **Conditions Precedent to Liability:**

As a condition precedent to the Insurer's liability under Insuring Agreement (A), the **Insured** shall have approved the payment of **Ransom Monies**. In the event of a **Kidnapping** or **Extortion Threat** of an **Insured Person** or guest during the **Policy Period**, and prior to the payment of **Ransom Monies**, the first named **Insured** shall make every reasonable effort to:

(1) determine that the **Kidnapping** or **Extortion Threat** has actually occurred, and;

(2) give immediate oral notice to the independent security consultant referenced in C (1) of II. DEFINITIONS and oral or written notice to the Insurer; and

(3) notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction thereover of the demand for **Ransom Monies** and comply with their recommendations and instructions.

As additional conditions precedent to the Insurer's liability, the **Insured** shall:

(1) use all due diligence and do all things reasonably practicable to avoid or diminish any loss**; and**

Appendix 000053

**(2)** use all reasonable efforts not to disclose the existence of this Coverage Part.

**(C) Consolidation - Merger**

If through consolidation or merger with, purchase or acquisition of assets or liabilities of, some other entity, any additional persons become an **Insured** or **Insured Persons** or the Insured acquires the use and control of any additional **Premises**:

**(1)** The **Insured** must give the Insurer written notice and obtain its written consent to extend this insurance to such additional **Insured Persons** or **Premises**. The Insurer may condition its consent upon payment of an additional premium; but

**(2)** For the first 90 days after the effective date of such consolidation, merger, or purchase or acquisition of assets or liabilities, any insurance afforded for **Insured Persons** or **Premises** also applies to these additional **Insured Persons** or **Premises** for acts occurring within this 90-day period.

As respects the coverage provided by this Coverage Part, with respect to the consolidation, merger, purchase or acquisition of assets or liabilities, no coverage shall apply if there are known incidents or threats as of the date of the acquisition, if such incidents or threats are known to:

**(a)** the **Insured**;

**(b)** any **Insured Person**;

**(c)** the entity from whom the **Insured** is consolidating, merging, purchasing or acquiring assets or liabilities; or

**(d)** the employees, officers, directors, managers, members or partners of an entity described in (c) above.

**(D) Expense Coverage**

The Insurer shall indemnify the **Insured** for **Expenses** incurred by the **Insured** for the purpose of investigating a **Kidnapping** or **Extortion Threat**, paying **Ransom Monies**, negotiating or obtaining the release of any **Insured Person** or guest, or other **Expenses** directly related to a **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking**; provided such **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** is insured hereunder. Indemnification for **Expenses** under Insuring Agreement (A) shall be in addition to the Limit of Insurance; provided that the amount payable hereunder for **Expenses** involved with any loss under Insuring Agreement (A) shall not exceed the Limit(s) of Insurance stated in Item 1 of the Declarations for that Insuring Agreement.

**(E) Joint Insured**

**(1)** By acceptance of this Coverage Part, the first named **Insured** for itself and all other **Insureds** agree that this Coverage Part embodies all agreements existing between themselves and the Insurer or any of its agents relating to this insurance. The first named **Insured** will act for itself and for every other **Insured** for purposes of this insurance.

**(2)** If any **Insured** or **Insured Person** has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every **Insured** and **Insured Person**.

**(3)** An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

**(4)** All losses and other payments, if any, payable by the Insurer shall be payable to the first named **Insured**, and the Insurer shall not be responsible for the proper application of any payment made. The Insurer shall not be liable for loss sustained by one **Insured** to the advantage of any other **Insured**. If the **Insured** shall agree to and shall make payment to any **Insured** other than the first named **Insured** or to any **Insured Person**, such payment shall be treated as though made to the first named **Insured**.

Appendix 000054

**(5)**   The **Insurer** will not pay more for loss sustained by more than one **Insured** than the amount it would pay if all the loss had been sustained by one **Insured**.

**(F)   Limits of Insurance and Deductible**

**(1)**   The Insurer's Limit of Insurance shall apply only to that part of loss that is excess of the applicable Deductible Amount indicated in Item 1. of the Declarations of the Coverage Part.

**(2)**   Subject to (1) above, if a Coverage Part Limit of Insurance is shown in Item 1. of the Coverage Part Declarations, the Insurer's maximum liability for all loss during the **Policy Period** shall not exceed the Coverage Part Limit of Insurance stated in Item 1. of the Coverage Part Declarations.

**(3)**   Subject to (1) and (2) above, the Insurer's maximum liability for each loss shall not exceed the Limit(s) of Insurance set forth in Item 1 of the Declarations of this Coverage Part, regardless of the number of **Insureds** or **Insured Persons** sustaining the loss.

**(4)**   Payment of loss under this Coverage Part will not reduce the liability of the Insurer for other losses; provided that the maximum liability of the Insurer will not exceed the dollar amount as set forth in Item 1 in the Declarations of this Coverage Part:

**(a)**   Applicable to Insuring Agreement (A):   for all loss of property and other consideration actually surrendered as **Ransom Monies** and **Extortion Threat** payments arising from one **Kidnapping** or **Extortion Threat** or a series of related **Kidnappings** or **Extortion Threats**;

**(b)**   Applicable to Insuring Agreement (B):   for all **Expenses** arising from one **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** or a series of related **Extortion Threats**, **Detentions** or **Hijackings**;

**(c)**   Applicable to Insuring Agreement (C):   for all loss of property and other consideration intended as **Ransom Monies** or **Extortion Threat** payments arising from one **Kidnapping** or **Extortion Threat** or a series of **Kidnappings** or **Extortion Threats**;

**(d)**   Applicable to Insuring Agreement (D):

**(i)**   If an **Insured Person** suffers more than one covered **Personal Accidental Death, Dismemberment & Disability Loss**, the Insurers maximum liability for all such **Personal Accidental Death, Dismemberment & Disability Loss** shall be the All **Other Personal Accidental Death, Dismemberment & Disability Loss** amount as set forth in 1. D. (ii) of the Declarations of this Coverage Part.

**(ii)**   If more than one **Insured Person** suffers a covered **Personal Accidental Death, Dismemberment & Disability Loss** resulting from the same **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** or a series of related **Extortion Threats**, **Detentions** or **Hijackings**, the Insurers maximum liability for all such **Personal Accidental Death, Dismemberment & Disability Loss** shall be All Other **Personal Accidental Death, Dismemberment & Disability Loss** amount as set forth in 1. D. (ii) of the Declarations of this Coverage Part, which shall be divided proportionately among such **Insured Persons**.

Loss includes the total of **Ransom Monies**, net of all recoveries, which the **Insured** shall have (a) paid by reason of any one **Kidnapping**, alleged **Kidnapping** or **Extortion Threat**, or (b) lost while being delivered by reason of any one **Kidnapping**, alleged **Kidnapping** or **Extortion Threat**. A connected series of acts, incidents or events of **Extortion Threat** by one person or collaborating persons shall constitute one loss.

In the event there are multiple **Insureds** or **Insured Persons**, the maximum liability of the Insurer for loss sustained by one or all **Insureds** or **Insured Persons** shall not exceed the amount for which the Insurer would be liable if all losses were sustained by one **Insured** or **Insured Person**. The Limit of Insurance applicable to any loss shall not be cumulative from **Policy Period** to **Policy Period**.

Appendix 000055

**(G)  Loss Sustained**

A loss shall be deemed to have been sustained under:

**(1)**  Insuring Agreement (A), at the time of the surrender of the **Ransom Monies** or **Extortion Threat** payment;

**(2)**  Insuring Agreement (B), at the time of payment of incurred **Expenses**;

**(3)**  Insuring Agreement (C), at the time of the actual destruction, disappearance, confiscation or wrongful abstraction of **Ransom Monies**;

**(4)**  Insuring Agreement (D), at the time of the **Accidental Loss.**

**(H)  Personal Assets**

In the event that a demand for **Ransom Monies** or a **Bodily Injury Extortion Threat** is directed against any **Insured Person** rather than against the **Insured**, **Ransom Monies** surrendered, or intended to be surrendered by or on behalf of such **Insured Person** and the following resulting **Expenses:** (C)(1) through (9) and (C)(13) through (15); incurred by or on behalf of such **Insured Person** shall at the option of the **Insured**, be considered property or other consideration surrendered on behalf of the **Insured** and **Expenses** incurred by the **Insured**. The **Insured** must approve the **Ransom Monies** or **Extortion Threat** payment made by the **Insured Person**.

## V.   CONDITIONS AND LIMITATIONS:

**(A)  RECOVERIES**

In the event of any payment under this Policy, all recoveries, less the actual cost to the Company of recovery, shall be distributed in the following manner: the **Insured** shall be reimbursed for any loss and/or **Expense** which exceed the amount of insurance provided by this Policy; the balance, if any, shall be applied to reimbursement of the Company to the extent of its payment and any remainder paid to the **Insured**. If there is no excess payment, any such recoveries shall be distributed first in reimbursement to the Company to the extent of its payment and any remainder paid to the **Insured**.

**(B)  POLICY PERIOD**

This Coverage Part applies to loss or **Expenses** sustained at any time, provided that they result from a **Kidnapping, Extortion Threat, Detention** or **Hijacking** which occurs during the **Policy Period** and provided that any claim for such loss or **Expenses** is reported to the Company no later than twelve (12) months after the expiration of the **Policy Period**.

**(C)  VALUATION**

The Company shall not be liable for more than the actual cash value of any **Ransom Monies** paid at the time it is paid less any amounts which are recovered from the persons to whom the **Ransom Monies** were paid. If a loss or **Expense** involves currency other than that of the United States of America, the Company shall not be liable for more than the United States dollar equivalent of the foreign currency as of the day when the foreign currency is paid as **Ransom Monies**. The rate of the exchange will be at the rate published in the Wall Street Journal on the day when the **Ransom Monies** are paid.

CONFIDENTIAL   GC 029469-07   3/04/07

Appendix 000056

ENDORSEMENT NO:   1

| This endorsement, effective 12:01 am, | 3/04/07 | forms part |
|---|---|---|
| of policy number | 00 KB 0229269-07 | |

**issued to:**    SOUTHWEST HOUSING MANAGEMENT

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADD SUBSIDIARY ENDORSEMENT

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**COMMON TERMS AND CONDITIONS**, section **II. COMMON DEFINITIONS, (T) "Subsidiary",** is amended by the addition of the following:

> **Subsidiary** also means:
> AFFORDABLE HOUSING CONSTRUCTION, INC.
> SOUTHWEST HOUSING INVESTMENTS
> SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.

All other terms and conditions remain unchanged.

*David Zwiener, President*

Appendix 000057

ENDORSEMENT NO:      2

**This endorsement, effective 12:01 am,**      3/04/07                                         **forms part**
**of policy number**      00 KB 0229269-07

**issued to:**            SOUTHWEST HOUSING MANAGEMENT

**by:**                   TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### HIPAA COVERAGE

### (INCLUDING SUBLIMIT FOR PENALTIES)

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**Fiduciary Liability Coverage Part,** Section **II. DEFINITIONS (G), Loss** is amended to include civil penalties imposed upon an **Insured** under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or any rules or regulations promulgated thereunder.

**Fiduciary Liability Coverage Part,** Section **II. DEFINITIONS (K), Wrongful Act** is amended to include any actual or alleged breach of the responsibilities, obligations or duties imposed upon an **Insured** by HIPAA or any rules or regulations promulgated thereunder.

The Insurer's aggregate Limit of Liability for all **Loss** involving civil penalties imposed upon an **Insured** under HIPAA or any rules or regulations promulgated thereunder shall be $25,000. Such Limit of Liability shall be part of, and not in addition to, the **Fiduciary Liability** aggregate limit of liability shown on the Declarations.

All other terms and conditions remain unchanged.

David Zwiener, President

Appendix 000058

ENDORSEMENT NO:     3

**This endorsement, effective 12:01 am,**     3/04/07                 **forms part**
**of policy number**     00 KB 0229269-07

**issued to:**     SOUTHWEST HOUSING MANAGEMENT

**by:**     TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## JOINT INSURED

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

This endorsement modifies the Crime Coverage Part insurance provided under the following:

INSURING AGREEMENT -     [X]    EMPLOYEE THEFT - INSURING AGREEMENT 1.

                          [X]    DEPOSITORS FORGERY OR ALTERATION - INSURING AGREEMENT 2.

                          [X]    INSIDE THE PREMISES – MONEY, SECURITIES AND OTHER PROPERTY – INSURING AGREEMENT 3.

                          [X]    OUTSIDE THE PREMISES – MONEY, SECURITIES AND OTHER PROPERTY – INSURING AGREEMENT 4.

                          [X]    COMPUTER AND FUNDS TRANSFER FRAUD - INSURING AGREEMENT 5.

                          [X]    MONEY ORDERS AND COUNTERFEIT CURRENCY – INSURING AGREEMENT 6

The following is/are added as a named Insured:

TX BROOK APTS LP;TX MELODY APTS LP;TX BIRCHWOOD APTS LP;HILLSBORO HSNG LP;
CHATTANOOGA HSNG,LP;KNOLLWOOD VILLAS,LP;TX HILLSIDE APTS LP;OAK HOLLOW HSNG,LP;
TX TIMBERCREEK,LP;CO CREEKSIDE HSNG,LP;TAHOE HSNG,LP;HIGHLAND GARDENS,LP;
CLARKRIDGE VILLAS HSNG,LP;SOUTHERN OAKS HSNG,LP;TX; KIRNWOOD APTS LP; ARLINGTON
SR HSNG LP;MHMR SR HSNG,LP;GREENVILLE SR HSNG,LP; TX HAMPTON SR HSNG LP;
PARKS AT WESTMORELAND SR HSNG,LP;ARBORS HSNG PARTNERS,LTD; TX BLUFFVIEW HSNG,
LP;CEDAR HILL SR HSNG,LP;HEATHERWILDE VILLAS HSNG,LP; PLEASANT VALLEY VILLAS
HSNG,LP;LAREDO VISTA,LP; HEATHERWILDE ESTATES HSNG,LP;PLEASANT VALLEY
COURTYARDS,LP;HICKORY TRACE HSNG,LP;PRIMROSE SA II HSNG,LP;PRIMROSE HOUSTON I
HSNG,LP;PRIMROSE HOUSTON SO HSNG,LP;TX HAMPTON VILLAS,LP; PRIMROSE HOUSTON
HSNG,LP;PRIMROSE SA IV HSNG,LP;ARBOR WOODS HSNG,LP;TX ALDINE-BENDER HSNG,LP;
TX OLD MANOR HSNG,LP;TX PASADENA HSNG,LP;TX LAURELAND HSNG,LP; TX JOHN WEST
HSNG,LP;TX CRIST HSNG,LP;TX GARTH HSNG,LP;TX SCYENE HSNG,LP;TX BAMMEL HSNG,LP;
PARMER VILLAS HSNG,LP;PRIMROSE HOUSTON 7 HSNG,LP;TX ACME A SO HSNG,LP; NEW
BRAUNFELS 2 HSNG,LP;TX PLEASANTON HSNG,LP;TX PALACIO HSNG,LP;HAYDEN 05 HSNG,LP;
EXCONDIDO HSNG,LP;TX TENISON HSNG,LP;CLARK 05 HSNG,LP

Appendix 000059

The following is/are deleted as a named Insured:

All other terms and conditions remain unchanged.

David Zwiener, President

CONFIDENTIAL

Appendix 000060

**ENDORSEMENT NO:**     4

**This endorsement, effective 12:01 am,**     3/04/07     **forms part**
**of policy number**   00 KB 0229269-07

**issued to:**     SOUTHWEST HOUSING MANAGEMENT

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## JOINT VENTURE, GENERAL PARTNERSHIP,

## LIMITED PARTNERSHIP OR LIMITED LIABILITY COMPANY

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

This endorsement applies to **INSURING AGREEMENT 1. – EMPLOYEE THEFT** of the Crime Coverage Part of the Policy.

I.    This insurance covers losses to any joint venture, general partnership, limited partnership or limited liability company in which the **Insured** participates, and coverage shall only apply to the **Insured's** percentage of ownership interest in the joint venture, general partnership, limited partnership or limited liability company. Coverage for loss shall only apply if such loss results directly from **Theft** by the **Insured's Employee(s)**. Losses caused by employees of other joint venture, general partnership, limited partnership or limited liability company participants are not covered under this Crime Coverage Part.

II.   Section **VI. GENERAL CONDITIONS,** paragraph **(K) OWNERSHIP OF PROPERTY; INTERESTS COVERED** is modified to be in compliance with this endorsement.

All other terms and conditions remain unchanged.

David Zwiener, President

Appendix 000061

**ENDORSEMENT NO:**   5

**This endorsement, effective 12:01 am,**   3/04/07   forms   part
**of policy number**   00 KB 0229269-07

**issued to:**   SOUTHWEST HOUSING MANAGEMENT

**by:**   TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND TERRITORY

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

This endorsement applies to the Kidnap and Ransom/Extortion Coverage Part of the Policy.

**COMMON TERMS AND CONDITIONS**, Section **XXVI.**, **COVERAGE TERRITORY** is deleted and replaced by the following:

**XXVI.   COVERAGE TERRITORY**

Coverage under this Policy applies worldwide with the exception that, with respect to the Kidnap and Ransom/Extortion Coverage Part indicated above, there shall be no coverage for acts committed or events occurring within the following territories scheduled below:

**SCHEDULE OF EXCLUDED TERRITORIES:**

COLOMBIA

David Zwiener, President

CONFIDENTIAL
Appendix 000062

**ENDORSEMENT NO:** 6

forms part

This endorsement, effective 12:01 am,    3/04/07
of policy number    00 KB 0229269-07

**issued to:**    SOUTHWEST HOUSING MANAGEMENT

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ENCORE! PLUS ENDORSEMENT

## (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

**COMMON TERMS AND CONDITIONS**, are amended as follows:

1.  Section **II., COMMON DEFINITIONS,** is amended by the addition of the following:

    **(v )**    **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

2.  Section **II., COMMON DEFINITIONS**, **(I), Insured Entity,** is amended by the addition of the following:

    **Insured Entity** shall also include any such entity as a general partner of a limited partnership in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the limited partnership interest and such **Insured Entity** is the sole general partner.

3.  Section **III., COVERAGE EXTENSIONS, (A), Spousal Liability Coverage,** is deleted and replaced with the following:

    **(A)    Spousal/Domestic Partner Liability Coverage**

    Coverage shall apply to the lawful spouse or **Domestic Partner** of an **Insured Person** for a **Claim** made against such spouse or **Domestic Partner**, provided that:

    **(1)**    such **Claim** arises solely out of:

    **(a)**    such person's status as the spouse or **Domestic Partner** of an **Insured Person; or**

    **(b)**    such spouse or **Domestic Partner's** ownership of property sought as recovery for a **Wrongful Act**;

    **(2)**    the **Insured Person** is named in such **Claim** together with the spouse or **Domestic Partner**; and

    **(3)**    coverage of the spouse or **Domestic Partner** shall be on the same terms and conditions, including any applicable Deductible, as apply to coverage of the **Insured Person** for such **Claim**.

    No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse or **Domestic Partner**.

4.  Section **VIII., NOTICE OF CLAIM, (A),** is deleted and replaced with the following:

    **(A)**    As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the termination of the **Policy Period**, or Extended Reporting Period as described in Section IX. Such notice shall specify the Coverage Part under which notice is being given.

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H243 00 1105    © 2005, The Hartford    Page 1 of 1
CONFIDENTIAL

Appendix 000063

**ENDORSEMENT NO:**  7

| | | |
|---|---|---|
| **This endorsement, effective 12:01 am,** | 3/04/07 | **forms part** |
| **of policy number** | 00 KB 0229269-07 | |

**issued to:**      SOUTHWEST HOUSING MANAGEMENT

**by:**      TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SPECIFIC INDIVIDUAL CLAIMANT EXCLUSION

### EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, (A),** is amended to include the following:

**(7 )** brought by, or on behalf of, the individual(s) listed below, and/or the estate, beneficiaries, heirs, legal representatives, and assigns of such individual(s):
    CHRISTINE SULLIVAN

All other terms and conditions remain unchanged.

David Zwiener, President

Appendix 000064

ENDORSEMENT NO:      8

This endorsement, effective 12:01 am,      3/04/07      forms part
of policy number      00 KB 0229269-07

issued to:      SOUTHWEST HOUSING MANAGEMENT

by:      TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS AMENDATORY

## COMMON TERMS AND CONDITIONS ENDORSEMENT

Solely with respect to all **Liability Coverage Parts**:

I. **Extended Reporting Period**

A. It is hereby understood and agreed that the following paragraphs are added to Section **II. COMMON DEFINITIONS**:

(W̄ ) **Termination of Coverage**, whether undertaken by the Insurer or the **Insured** at any time, means:

(1) cancellation or nonrenewal of a policy, other than for nonpayment of premium; or

(2) decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured**.

B. It is hereby understood and agreed upon that Section **IX. EXTENDED REPORTING PERIOD** is deleted and replaced by:

IX. **EXTENDED REPORTING PERIOD**

(A) Upon **Termination of Coverage**, the Named Entity shall be entitled to an automatic extended reporting period ("Automatic Extended Reporting Period") of thirty (30) days from the end of the **Policy Period** to report **Claims** under this Policy.

(B) If this Policy is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under this Policy (the "Optional Extended Reporting Period").

(C) To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor. The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within 60 days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

(D) The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

CONFIDENTIAL

Appendix 000065

**(E)** The Optional Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the Automatic Extended Reporting Period, but the duration will not be less than twelve (12) months.

**(F)** Coverage during the Automatic Extended Reporting Period or the Optional Extended Reporting Period shall apply to **Claims** made for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described in Section XIV. CHANGES IN EXPOSURE (B). No coverage shall apply for any **Wrongful Act** occurring after such time.

**(G)** There is no separate or additional Limit of Liability for the Extended Reporting Period.

All other terms and conditions remain unchanged.

David Zwiener, President

CONFIDENTIAL

Appendix 000066

ENDORSEMENT NO:    9

**This endorsement, effective 12:01 am,**    3/04/07                                **forms part**
**of policy number**    00 KB 0229269-07

**issued to:**       SOUTHWEST HOUSING MANAGEMENT

**by:**          TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS NUCLEAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following Coverage Parts:

PRIVATE CHOICE ENCORE POLICY

Soley for the purpose of this endorsement:

I.   **FIDUCIARY LIABILITY COVERAGE PART, MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE PART and DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART,** Section **II. DEFINITIONS** is amended to add:

   M  .   **Nuclear Waste** means any waste material **(a)** containing **By-Product Material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **Source Material** content, and **(b)** resulting from the operation by any person or organization of any **Nuclear Reactor** or any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing **Spent Fuel**, or **(3)** handling, processing or packaging **Nuclear Waste**;

   N  .   **Nuclear Reactor** means any apparatus designed or used to sustain nuclear fission in a self supporting chain reaction or to contain a critical mass of fissionable material;

   O  .   **Spent Fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **Nuclear Reactor**;

   P  .   **Source Material** and **By-Product Material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

II.   **DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART,** section **IV.**, **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, is amended to add:

   (M ) based upon, arising from, or in any way related to any:

      1.   discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

      2.   direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, **Nuclear Waste** or radiation;

      provided that this exclusion shall not apply to any **Derivative Action** otherwise covered under Insuring Agreement **(A) Insured Person Liability**.

PE 42 H088 00 0504                          © 2004, The Hartford                          Page 1 of 2
CONFIDENTIAL

ENDORSEMENT NO:      9

III. **FIDUCIARY LIABILITY COVERAGE PART**, section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, and **MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE PART**, section **III., EXCLUSIONS**, are amended to add:

(A8) based upon, arising from, or in any way related to any:

1. discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

2. direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, **Nuclear Waste** or radiation.

All other terms and conditions remain unchanged.

David Zwiener, President

CONFIDENTIAL
© 2004, The Hartford

Appendix 000068

**ENDORSEMENT NO:**   10

| | | |
|---|---|---|
| **This endorsement, effective 12:01 am,** | 3/04/07 | **forms part** |
| **of policy number** | 00 KB 0229269-07 | |

**issued to:**     SOUTHWEST HOUSING MANAGEMENT

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND EMPLOYEE BENEFIT PLANS PROVISIONS

This endorsement modifies insurance provided under:

**PRIVATE CHOICE ENCORE! POLICY**

**CRIME COVERAGE PART** section **VI. GENERAL CONDITIONS, (I) EMPLOYEE BENEFIT PLANS PROVISIONS, (1),** is amended by adding the following:

No deductible shall apply to such loss.

All other terms and conditions remain unchanged.

David Zwiener, President

Appendix 000069

**ENDORSEMENT NO:** 11

**This endorsement, effective 12:01 am,** 3/04/07 **forms part**
**of policy number** 00 KB 0229269-07

**issued to:** SOUTHWEST HOUSING MANAGEMENT

**by:** TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## GENETIC MAKEUP ENDORSEMENT

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, Section **II, DEFINITIONS, (D) (3),** is deleted and replaced by the following:

(3)   employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, genetic makeup or refusal to submit to genetic makeup testing, or other protected status established under federal, state or local law;

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H239 00 0405
CONFIDENTIAL                                    © 2005, The Hartford                          Page 1 of 1

Appendix 000070

ENDORSEMENT NO.      12

| | | |
|---|---|---|
| **This endorsement, effective 12:01 am,** | 3/04/07 | **forms part** |
| **of policy number** | 00 KB 0229269-07 | |

**issued to:**      SOUTHWEST HOUSING MANAGEMENT

**by:**      TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS CANCELLATION AND NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

I.   The Cancellation provision of this Policy is deleted and replaced by the following:

NOTICE OF CANCELLATION

A.   This Policy may be canceled by the **Insured** by surrender thereof to the **Insurer** or any of its authorized agents or by mailing to the **Insurer** a written notice stating when thereafter the cancellation shall be effective.

B.   The **Insurer** may cancel this Policy at any time during the term of this Policy only for nonpayment of premium.

C.   The **Insurer** shall deliver or mail to the **Insured** a written notice of cancellation at the address shown on this Policy not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reasons(s) for cancellation.

D.   The **Insurer** may not cancel this Policy based solely on the fact that the **Insured** is an elected official.

E.   If this Policy shall be cancelled by the **Insured**, the **Insurer** shall retain the customary short rate proportion of the premium hereon, except as otherwise provided in this Policy. If the **Insurer** cancels this Policy, the **Insurer** shall retain the pro rata proportion of the premium hereon.

II.  The following provision is added:

NOTICE OF NONRENEWAL

A.   The **Insurer** may refuse to renew this Policy by delivering or mailing to the **Insured** a written Notice of Nonrenewal at the address shown on this Policy. Such written notice shall state the reason(s) for nonrenewal. The Notice of Nonrenewal must be delivered or mailed not later than the 60th day before the date on which this Policy expires. If the notice is delivered or mailed later than the 60th day before the date on which this Policy expires, the coverage shall remain in effect until the 61st day after the date on which the notice is delivered or mailed. Earned premium for any period of coverage that extends beyond the expiration date of this Policy shall be computed pro rata based on the previous year's rates.

B.   The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

CONFIDENTIAL

Appendix 000071

C.   The **Insurer** may not refuse to renew this Policy based solely on the fact that the **Insured** is an elected official.

All other terms and conditions remain unchanged.

David Zwiener, President

CONFIDENTIAL

Appendix 000072

ENDORSEMENT NO.   13

**This endorsement, effective 12:01 am,**      3/04/07                                **forms part**
**of policy number**      00 KB 0229269-07

**issued to:**      SOUTHWEST HOUSING MANAGEMENT

**by:**      TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS CHANGES

### (Applicable to the Crime Coverage and Kidnap and Ransom/Extortion Coverage)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

With respect to the Crime Coverage Part, the following condition is added to Section **VI.**, **GENERAL CONDITIONS**.

With respect to the Kidnap And Ransom/Extortion Coverage the following is added to Section **V. CONDITIONS AND LIMITATIONS**.

**CLAIMS HANDLING**

1.  Within 15 days after Insurer receives written notice of **Claim**, Insurer will:

    a.  acknowledge receipt of the **Claim**. If Insurer does not acknowledge receipt of the **Claim** in writing, Insurer will keep a record of the date, method and content of the acknowledgment;

    b.  begin any investigation of the **Claim**; and

    c.  request a signed, sworn proof of loss, specify the information **Insured** must provide and supply **Insured** with the necessary forms. Insurer may request more information at a later date, if during the investigation of the **Claim** such additional information is necessary.

2.  Insurer will notify **Insured** in writing as to whether:

    a.  the **Claim** or part of the **Claim** will be paid;

    b.  the **Claim** or part of the **Claim** has been denied, and inform **Insured** of the reasons for denial;

    c.  more information is necessary; or

    d.  Insurer needs additional time to reach a decision. If Insurer needs additional time, Insurer will inform **Insured** of the reasons for such need.

    Insurer will provide notification, as described in **2.a.** through **2.d.** above, within 15 business days after Insurer receives the signed, sworn proof of loss and all information Insurer requested.

    If Insurer has notified **Insured** that Insurer needs additional time to reach a decision, Insurer must then either approve or deny the **Claim** within 45 days of such notice.

PE 42 H177 00 0904                          © 2004, The Hartford                          Page 1 of 2
        CONFIDENTIAL

Appendix 000073

3. Insurer will pay for covered loss or damage within 5 business days after:

   a. Insurer has notified **Insured** that payment of the **Claim** or part of the **Claim** will be made and has reached agreement with **Insured** on the amount of **loss**; or

   b. an award has been made.

   However, if payment of the **Claim** or part of the **Claim** is conditioned on **Insured's** compliance with any of the terms of this Coverage Part, Insurer will make payment within 5 business days after the date **Insured** has complied with such terms.

4. The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

All other terms and conditions remain unchanged.

David Zwiener, President

CONFIDENTIAL

Appendix 000074

**Named Insured:** SOUTHWEST HOUSING MANAGEMENT

**Policy Number:** 00 KB 0229269-07

**Effective Date of this Notice:** 3/04/07

**Insurer:** TWIN CITY FIRE INSURANCE CO.

# IMPORTANT NOTICE TO POLICYHOLDERS – TERRORISM RISK INSURANCE ACT

You are hereby notified that under the Terrorism Risk Insurance Act (the "Act") we must make terrorism coverage as defined by the Act available in your policy. However, the actual coverage provided by your policy for acts of terrorism, as is true for all coverages, is limited by the terms, conditions, exclusions, limits, other provisions of your policy, any endorsements to the policy and generally applicable rules of law.

The terrorism coverage as defined by the Act does not apply to Crime, Kidnap and Ransom/Extortion, or Miscellaneous Professional Liability coverage parts, if any or all of those coverage parts are elected under this policy

Any terrorism coverage as defined by the Act made available in our policies is partially reinsured by the United States of America under a formula established by the Act. Under this formula, for losses occurring in 2006, the United States will pay 90% of covered terrorism losses exceeding a statutorily established deductible paid by insurers until such time as insured losses under the program reach $100 billion. For losses occurring in 2007, the United States will pay 85% of covered terrorism losses exceeding a statutorily established deductible paid by insurers until such time as insured losses under the program reach $100 billion. If losses under the program reach $100 billion, Congress will determine the procedures for, and the source of, any payments for losses in excess of $100 billion.

You will not be required to pay a premium for terrorism coverage at this time. If, upon renewal of your policy, a premium is going to be charged for terrorism coverage, we will provide you with notification of what that premium will be.

Losses that are not eligible for federal reinsurance under the Act include, but are not limited to, losses due to acts of terrorism to property located outside the United States (as defined in the Act) and losses due to acts of domestic terrorism.

Appendix 000075

| | |
|---|---|
| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |

To obtain information or make a complaint:

Para obtener informacion o para someter una queja.

You may contact your agent.

Puede comunicarse con su agente.

You may call The Hartford Insurance Group at the toll-free telephone number for information or to make a complaint at:

Usted puede llamar al numero de telefono gratis de The Hartford Insurance Group para informacion o para someter una queja al

**1-800-392-7805**

**1-800-392-7805**

You may also write to The Hartford.

Usted tambien puede escribir a The Hartford.

**The Hartford
Hartford Plaza
Hartford, CT. 06115**

**The Hartford
Hartford Plaza
Hartford, CT. 06115**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

**1-800-252-3439**

**1-800-252-3439**

You may write the Texas Department of Insurance

Puede escribir al Departamento de Seguros de Texas

P.O. Box 149104
Austin, TX 78714-9104
Fax Number (512) 475-1771

P.O. Box 149104
Austin, TX 78714-9104
Fax Number (512) 475-1771

**PREMIUM OR CLAIMS DISPUTES: Should you have a dispute concerning your premium or about a claim you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.**

**DISPUTAS SOBRE PRIMAS O RECLAMOS: Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI)**

**ATTACH THIS NOTICE TO YOUR POLICY: This notice is for information only and does not become a part or condition of the attached document.**

**UNA ESTE AVISO A SU POLIZA: Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.**

ILNP 85 16 06 92 TX
RN 42 N014 00000KI3 L223069-07   3/04/07

CONFIDENTIAL

Appendix 000076

Dear Insured:

Your insurance coverage is offered through one of the member insurance companies of The Hartford Insurance Group. The Hartford Insurance Companies recognize that minimizing the exposure to loss is a major concern for each policyholder. We maintain a fully staffed Loss Control Department which can assist you in identifying and reducing such loss exposure. If you are interested in obtaining more information on the nature of these loss control services, please contact your insurance producer or:

The Hartford
Hartford Plaza
Hartford, CT  06115

Telephone – (860)–547-4707

Please contact me if you require any other information.

CONFIDENTIAL   HIG 0021969-07    3/04/07

Appendix 000077

# Exhibit 2

# coverage analysis insureds — entity defendants

## Insureds — Entity Defendants

SH Management is an insured because it is the named entity.

SH Development  and AH Construction are insureds because each is a named subsidiary.

---

Common Terms & Conditions § II(K)

(K)  "Insureds" shall have the meaning specified for such term in each Coverage Part.

---

EPL Coverage Part § II(H)

(H) "Insureds" means any:

(1) **Insured Entity**; or

(2) **Insured Person**.

---

EPL Coverage Part does not define Insured Entity

---

Common Terms & Conditions § II(I)

(I) "Insured Entity" means:

(1) the **Named Entity**; or

(2) any **Subsidiary**.

Insured Entity shall include any such entity as a Debtor in Possession.

---

EPL Coverage Part does not define Named Entity

---

Common Terms & Conditions § II(P)

(P) "Named Entity" means the entity named in ITEM 1 of the Declarations.

ITEM 1 of the Declarations lists SH Management as the Named Entity

Common Terms & Conditions § II(I)

(I) "Insured Entity" means:

(1) the **Named Entity**; or

(2) any **Subsidiary**.

Insured Entity shall include any such entity as a Debtor in Possession.

EPL Coverage Part does not define Subsidiary

Common Terms & Conditions § II(T) defines Subsidiary, but the un-amended definition is not necessary due to an endorsement.

Endorsement No. 1

COMMON TERMS AND CONDITIONS, section  II. COMMON DEFINITIONS, (T) "Subsidiary", is amended  by the addition of the following:

 Subsidiary also means:
AFFORDABLE HOUSING CONSTRUCTION, INC.
SOUTHWEST HOUSING INVESTMENTS
SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.

# Exhibit 3

# coverage analysis insureds — individual defendants

## Insureds — Individual Defendants

Cheryl Potashnik is an insured because she was a manager of at least one insured entity. For example, the website for SH Management, SH Development, and AH Construction listed her as Chief Operating Officer.

Brian Potashnik is an insured because he was a manager of at least one insured entity. For example, Texas Secretary of State records show that he was a Director of SH Management, SH Development, and AH Construction and that he was the President of SH Management, SH Development, and AH Construction.

Common Terms & Conditions § II(K)

(K) "Insureds" shall have the meaning specified for such term in each Coverage Part.

EPL Coverage Part § II(H)

(H) "Insureds" means any:

(1) **Insured Entity**; or

(2) **Insured Person**.

EPL Coverage Part § II(G)

(G) "Insured Person" means any:

(1) **Employee;**

(2) **Manager**; or

(3) [not at issue in this case]

EPL Coverage Part does not define Manager

Common Terms & Conditions § II(O)

(O) "Manager" means any natural person who is a past, present or future:

Appendix 000082

(1)  duly elected or appointed director, officer, member of the board of managers or management committee member of an Insured Entity;

(2) [not at issue in this case]; or

(3) [not at issue in this case].

# Exhibit 4

# *Twin City Fire Ins. Co. v. Carpenter*, No. 3:21-cv-1077-G [Doc. 22] (N.D. Tex. July 26, 2021) (Fish, J.)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TWIN CITY FIRE INSURANCE )
COMPANY, )
     )
               Plaintiff, )            CIVIL ACTION NO.
     )
VS. )            3:21-CV-1077-G
     )
JEFFREY W. CARPENTER, )
     )
               Defendant. )

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is the Rule 12(b)(1) motion to dismiss Twin City Fire

Insurance ("Twin City")'s complaint filed by the defendant Jeffrey W. Carpenter

("Carpenter"). *See* Jeff Carpenter's Motion to Dismiss Complaint for Declaratory

Relief and Brief in Support ("Motion") (docket entry 8). For the reasons set forth

below, the motion is granted.

### I. <u>BACKGROUND</u>

Carpenter sued Twin City's insureds in Texas state court on March 13, 2008.

*See* Motion at 4. Twin City paid the defense costs "subject to a full reservation of

Appendix 000085

rights that included the right to deny indemnity coverage . . . [and] all other rights and defenses available under the Policy and applicable law." Complaint (docket entry 1) at 5. The litigation carried on for several years. Carpenter tendered a purported "*Stowers* demand" on February 11, 2016. *See* Motion at 4; Complaint at 5. Twin City rejected the offer, and the case went to trial.

The case was tried in January of 2018. Complaint at 5. Carpenter prevailed, and final judgment was entered in his favor along with a damages award of $928,020.76 and $820,818.00 in attorneys' fees. See *id*. at 6. Twin City's insureds then filed appeals to the intermediate appeals court and eventually the Texas Supreme Court. See *id*.; Motion at 6. Twin City continued to fund the litigation. The Texas Supreme Court denied the petition for review and later denied a motion for rehearing on March 5, 2021, ending the appeals process. *See* Motion at 6.

On April 30, 2021, the trial court entered a "turnover order" stating "Carpenter is entitled to the right to have liquidated all common law causes of action Judgment Debtors may own under *G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929) and its progeny, to see if they might satisfy, in whole or in part, the judgment in this case."[1] Complaint at 6-7. The

---

[1]    Under Texas law, this is the cause of action available to insureds against insurers for breaching their "*Stowers* duty to exercise ordinary care when settling a third-party claim against its insured." Michol O'Connor, *O'Connor's Texas Causes of Action* 384 (2018).

Appendix 000086

turnover order also granted Carpenter rights to certain documents and related information.  *See* Motion at 8.  Twin City has not given Carpenter any documents up to this point.  See *id.* at 9.

Twin City instead filed this action for a declaratory judgment on May 12, 2021.  The complaint alleges that the insured must have been entitled to coverage under the policy in order to succeed in a *Stowers* action and requests that the court declare Carpenter's original claim against the insureds was never covered under the policy.  *See* Complaint at 7.  Carpenter subsequently filed the instant motion to dismiss on June 3, 2021, asking the court, in its discretion, not to hear the case.  *See* Motion at 2, 9, 12.  Twin City responded on June 17, 2021.  *See* Twin City Fire Insurance Company's Response to Jeffrey Carpenter's Motion to Dismiss ("Response") (docket entry 11).  Carpenter replied on July 1, 2021.  *See* Reply in Support of Jeff Carpenter's Motion to Dismiss Complaint for Declaratory Relief ("Reply") (docket entry 13).  The motion is therefore fully briefed and ripe for decision.

## II.  ANALYSIS

Courts in the Fifth Circuit consider three questions when deciding whether to dismiss a declaratory relief action: (1) whether the claim is justiciable; (2) whether the district court has the authority to grant declaratory relief; and (3) whether to exercise its discretion not to hear the case.  See *Sherwin-Williams Company v. Holmes*

-3-

*County*, 343 F.3d 383, 387 (5th Cir. 2003). The court will assume, since the parties do not dispute, that the claim is justiciable and the court has authority to grant declaratory relief. The only issue is whether the court should nonetheless decline to hear the case.

The Fifth Circuit has identified seven nonexclusive factors to consider when making this determination:

(1) whether there is a pending state action in which all of the matters in controversy may be fully litigated;

(2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant;

(3) whether the plaintiff engaged in forum shopping in bringing the suit;

(4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist;

(5) whether the federal court is a convenient forum for the parties and witnesses;

(6) whether retaining the lawsuit would serve the purposes of judicial economy; and

(7) whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.

-4-

*Sherwin-Williams*, 343 F.3d at 388 (quoting *St. Paul Insurance Company v. Trejo*, 39 F.3d 585, 590–91 (5th Cir.1994)).  This list is nonexclusive, and a court may consider other factors in deciding how to exercise its discretion to decide or dismiss a declaratory judgment action.  See *id*.

These "*Trejo*" factors are directed towards three aspects common to all of the federal circuits' expressions of the factors given by the Supreme Court in *Brillhart v. Excess Insurance Company of America*, 316 U.S. 491 (1942): federalism—"the proper allocation of decision-making between state and federal courts"; fairness—"distinguish[ing] between legitimate and improper reasons for forum selection"; and efficiency—avoidance of "duplicative or piecemeal litigation where possible."[2]  *Sherwin-Williams*, 343 F.3d at 390–91.  Specifically, the first and last *Trejo* factors address federalism concerns; the second, third, and fourth factors address fairness concerns; and the fifth and sixth factors address efficiency concerns.  *Id*. at 391.

A.  Federalism

Both parties correctly note that no state lawsuit is pending at this time.

---

[2]     The court mentions this as a reminder that the *Trejo* factors are not meant as a simple checklist to be added up at the end.  Treating them as such can cause one to lose the forest for the trees.  The factors are useful, though nonexclusive (and thus nondispositive), guideposts for determining whether retaining jurisdiction over the particular case serves the ultimate interests of federalism, fairness, and efficiency.  As will be detailed, Carpenter has convincingly shown that exercising jurisdiction over this case serves none of the three interests.

Appendix 000089

Further, the court accepts that it is not being asked to interpret the turnover order or any other state court order. That said, "the proper allocation of decision-making between state and federal courts" is still implicated. See *id*. at 390–91, 394, 397. "In sum, this dispute is not governed by federal law and there are no federal interests at stake. The state law to be applied is well-settled. The state court is perfectly capable of resolving this dispute in accordance with its own law." *Allstate Insurance Company v. Seelye*, 198 F.Supp.2d 629, 632 (W.D. Penn. 2002) (citing *State Auto Insurance Companies v. Summy*, 234 F.3d 131, 136 (3rd Cir. 2000) ("When the state law is firmly established, there would seem to be even less reason for the parties to resort to the federal courts. Unusual circumstances may occasionally justify such action, but declaratory judgments in such cases should be rare.")). The court is wary of meddling in a controversy that presents only state law issues. Further, while it is technically accurate that there is no pending state action, it seems obvious that one is coming. Carpenter confirms as much, "there is not currently a state court action . . ., though one is anticipated." Motion at 10. The court is thus inclined to conclude federalism is better served by declining to exercise jurisdiction in this case.

## B. Fairness

Again, it appears obvious that this case was brought in anticipation of Carpenter's *Stowers* action against Twin City. Thus, "this court must next determine whether [Twin City] brought the suit for proper or improper reasons." *Capco*

-6-

*International, Inc. v. Haas Outdoors, Inc.*, No. 3:03–CV–2127-G, 2004 WL 792671, at

*4 (N.D. Tex. Apr. 9, 2004) (Fish, C.J.) (citing *Sherwin-Williams*, 343 F.3d at

397–99). "Improper reasons for bringing declaratory judgment actions include

'subverting the real plaintiff's advantage in state court.'" *Id*. at *4 n.4 (quoting

*Travelers Insurance Company v. Louisiana Farm Bureau Federation, Inc.*, 996 F.2d 774,

777 (5th Cir. 1993)). "The courts properly decline relief if the declaratory-judgment

procedure, and the federal forum, is being used for 'procedural fencing' or 'in a race

for *res judicata*.' On the other hand, if the issuance of a declaratory judgment would

effectively settle the dispute and clarify the legal relations at issue, then it may be

granted." Wright & Miller § 2759 (4th ed. April 2021 update). "[I]t is not one of

the purposes of the declaratory judgment acts to enable a prospective negligence

action defendant to obtain a declaration of non-liability." *Torch, Inc. v. LeBlanc*, 947

F.2d 193, 196 n.2 (5th Cir. 1991) (citations omitted); see also Wright & Miller,

*supra*, § 2765 ("The courts also have held that it is not one of the purposes of the

declaratory judgments act to enable a prospective negligence action defendant to

obtain a declaration of nonliability . . . [other considerations should not] outweigh

the right of a personal-injury plaintiff to choose the forum and the time, if at all, to

assert a claim.").

     The court concludes that Twin City filed this lawsuit for "improper reasons."

It had many years to have a court declare whether its insureds were covered under

Appendix 000091

the policy.  It chose to do so only after it was faced with a *Stowers* claim.  Indeed, it chose to do so just weeks after the turnover order was entered.  One has to ask, why now?  Why in 2021, as opposed to any year since 2008, did Twin City decide it needed a court to declare its obligations under the policy?  The answer seems obvious.  Now faced with the prospect of a coercive *Stowers* lawsuit, Twin City wants to pluck out one element of that claim and have a federal court examine that discrete issue divorced from the whole *Stowers* action.  This can only be described as "procedural fencing" and a "race for *res judicata*."  Wright & Miller § 2759.

Furthermore, there is no ongoing relationship between these parties that needs clarification.  Carpenter is not Twin City's insured.  Twin City owes no contractual obligations to Carpenter (and for that matter, it no longer owes any contractual obligations to its original insureds).  Carpenter gets it right when he argues "[w]ithout the *Stowers* negligence claim, there is no stand-alone coverage issue." Reply at 1.  Twin City is using the peculiar doctrinal structure of a *Stowers* action in an attempt to convert a common-law tort action into a coverage dispute.  See *Mid-Continent Insurance Company v. Liberty Mutual Insurance Company*, 236 S.W.3d 765, 776 (Tex. 2007) ("*Stowers* is the only *common law tort duty* in the context of third party insurers responding to settlement demands.") (emphasis added).  The court is disinclined to allow such maneuvering.  Doing so would allow prospective tort defendants to "'subvert[] the real plaintiff's advantage in state court.'" *Capco*, 2004

-8-

WL 792671, at *4. "Therefore, the three *Trejo* factors that address fairness—whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant, whether the plaintiff engaged in forum shopping, and whether possible inequities exist in allowing the declaratory plaintiff to gain precedence in time or to change forums—all weigh against . . ." exercising jurisdiction. *Id.* (citing *Trejo*, 39 F.3d at 590–91).

## C. Efficiency

"[C]ourts look with disfavor on piecemeal litigation of the matters in controversy and may refuse declaratory relief on those grounds." Wright & Miller § 2759. The court would seriously risk piecemeal litigation should it allow this declaratory judgment action to proceed. If the court were to find in Carpenter's favor, the rest of the *Stowers* claim would still need to be litigated. See *Allied-General Nuclear Services v. Commonwealth Edison Company*, 675 F.2d 610, 611 (4th Cir. 1982) (upholding the district court's decision to dismiss because it might not settle the entire controversy); *Loyalty Conversion Systems Corporation v. American Airlines, Inc.*, No. 2:13–CV–655, 2014 WL 4352533, at *5 (E.D. Tex. Sep. 2, 2014) (citing *Allied-General*) ("It is well settled that the declaratory remedy should not be invoked merely to try issues or determine the validity of defenses in pending cases.") (internal citations omitted). Two lawsuits to adjudicate one cause of action is the definition of piecemeal litigation. Given this possibility, the court concludes that the interests of judicial economy are served by declining to exercise jurisdiction over this case.

-9-

Appendix 000094

## D. Exercise of Jurisdiction Not Warranted

All three interests, federalism, fairness, and efficiency, point towards dismissal. In particular, the fairness factors resoundingly point in that direction. At bottom, this is a common-law tort dispute that should be adjudicated as such rather than as an insurance coverage dispute. Therefore, the court declines to exercise jurisdiction over this case.

## III. CONCLUSION

For the reasons set forth above, Carpenter's Rule 12(b)(1) motion to dismiss is GRANTED.

SO ORDERED.

July 26, 2021

_____

A. JOE FISH
Senior United States District Judge

-10-

# Exhibit 5

# *Potashnik v. Carpenter*, No. 05-19-00238-CV (Tex. App.—Dallas, 2020, *pet. denied*)

**AFFIRMED and Opinion Filed August 27, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

---

**No. 05-19-00238-CV**

---

**BRIAN POTASHNIK, SOUTHWEST HOUSING DEVELOPMENT**
**COMPANY, INC., SOUTHWEST HOUSING MANAGEMENT**
**CORPORATION, INC. A/K/A AND D/B/A SOUTHWEST HOUSING**
**MANAGEMENT COMPANY, INC., AND AFFORDABLE HOUSING**
**CONSTRUCTION, INC., Appellants**
**V.**
**JEFFREY W. CARPENTER, Appellee**

---

**On Appeal from the County Court at Law No. 5**
**Dallas County, Texas**
**Trial Court Cause No. CC-08-02072-E**

---

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Evans
Opinion by Justice Evans

After an eight-day jury trial, Brian Potashnik, Southwest Housing
Development Company, Inc., Southwest Housing Management Corporation, Inc.,
a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable
Housing Construction, Inc. appeal from an adverse judgment on Jeffrey W.
Carpenter's breach of contract claim against them. In two issues, appellants
challenge the legal sufficiency of the evidence to support the jury's finding that the

parties formed an enforceable agreement.  After reviewing the record, we affirm the trial court's judgment for the reasons that follow.

BACKGROUND

Brian and Cheryl Potashnik[1] operated the various appellant companies which developed, owned, and managed affordable housing complexes.  In 2006, Brian and Cheryl decided to sell their business.  At that time, Jeff Carpenter was the executive vice president of Southwest Housing Management Corporation, Inc.  Brian and Cheryl wanted Carpenter and other key employees to stay on until the transfer of management to the ultimate purchaser for the purposes of continuity, which was important to the asset sale.  According to Cheryl, when they informed Carpenter and other key employees of their plans to sell, they told them that if the sale was successful and there was money left over at the end of the day, they wanted them to participate in the success of the sale.  At trial, Cheryl also admitted she told Carpenter that they intended to pay him a bonus if and when the sale went through.  Carpenter similarly testified that in May 2006, when Brian and Cheryl told him about their plans to sell, Brian told him this would be good for both families and that they worked hard and should reap some of the rewards.  According to Carpenter, Brian told him he wanted Carpenter to stay because there was a lot to do and Carpenter would be involved in the due diligence and communication between the teams once

---

[1] Cheryl's legal last name is Geiser, but she used Potashnik in business during the relevant time period.

Appendix 000097

a buyer was selected.  Brian further told Carpenter that once they selected a buyer and knew the numbers better, they would put together a very lucrative bonus program for Carpenter's efforts.  Brian and Carpenter shook hands after that first conversation about the sale.  Another executive testified at trial that Brian later told him that if the transactions went well, Carpenter might not have to work again.

Carpenter testified that on October 13, 2006, Brian informed him that a buyer had been selected.  Brian then indicated to Carpenter his bonus would be based on the letter of intent they were about to sign with the buyer.  Carpenter testified that he and Brian "walked through" the numbers that were based on three percent of the gross sales price of $36 million minus normal closing costs and minus sale proceed bonuses paid to other key employees.  Carpenter and Brian did the math and estimated a stay bonus of around $1,020,000.  They shook hands after Brian explained the bonus formula.  At that time, the anticipated closing date for the transaction was spring/summer 2007.  The next business day, Carpenter approached Brian to ask about increasing the bonus from three percent to five percent.  Brian rejected the idea of five percent, stating it would have to stay at three percent because that was what was approved, "we've committed to it," and he could not do any more than that.

At some point while the sale was pending, Carpenter and the sellers learned definitively that Carpenter would not have a position with the buyer because the buyer had its own person for Carpenter's job.  Subsequently, Carpenter was

Appendix 000098

approached by another company that tried to recruit him immediately with a higher starting base salary than he was earning at the time.  Nevertheless, Carpenter testified he declined the offer because he was "a man of his word," said he would stay on, and was not willing to walk away from the three percent stay bonus and back-earned bonuses.[2]  At trial, Jeff Richards, the recruiter for the company, confirmed Carpenter would not start the new job immediately because he had a considerable amount of money coming to him from his current employer if he stayed on.

In late September/early October 2007, Carpenter learned from Brian and Cheryl that criminal indictments were looming against them and the business was losing up to $1 million per month on their personal legal defense fees.[3]  The sale of the business, which was initially expected to close in the spring/summer of 2007, was delayed, and the management transition from appellants to the new buyer was set for November 1, 2007.  At trial, Cheryl confirmed that they wanted Carpenter to stay on, so they intended to pay him a bonus to work through a certain point in connection with the asset sale which ultimately was the point in which the management of the business was transferred to the new buyer.

Carpenter testified that he met with Brian on October 12, 2007 at which time Brian acknowledged that Carpenter had earned both his three percent bonus as well

---

[2] The jury found against Carpenter on the back-earned annual bonuses.

[3] The FBI had previously searched appellants' offices in 2005, but Brian and Cheryl assured Carpenter they had done nothing wrong.

Appendix 000099

as the back-earned bonuses.  On October 21, 2007, Carpenter met Brian and Cheryl for dinner and they told him he would get paid when they get paid, i.e., at the closing. Cheryl again reassured Carpenter she "would never screw [him]."  Cheryl testified that October 31, 2007 was the last day they needed Carpenter to stay on to help with the asset sale.  It is undisputed that Carpenter worked for appellants through October 31, 2007.  The next day, on November 1, Carpenter received his termination paperwork/severance agreement offering him $50,000 and no other payments if he released all potential claims against appellants.  Carpenter did not sign the agreement and ultimately filed this breach of contract lawsuit.

After a jury trial consisting of five days of testimony from various witnesses and other evidence, the jury answered the following question in Carpenter's favor:

QUESTION 4

Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees

2. if Jeff Carpenter would stay as long as needed on[sic] to help make the asset sale happen

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

Appendix 000100

The trial court rendered judgment on the jury's verdict in favor of Carpenter, awarding him $928,020.76 in actual damages plus pre- and post-judgment interest, attorney's fees, and conditional appellate attorney's fees.  Appellants then filed this appeal challenging the legal sufficiency of the evidence to support the jury's affirmative finding in question four.

<div align="center">ANALYSIS</div>

In their two issues on appeal, appellants contend the evidence is legally insufficient to support the jury's "yes" answer to Question 4.  Because appellants challenge the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that there is no evidence to support the finding.  *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014).  Evidence is legally sufficient to support a jury's verdict when it would allow reasonable and fair-minded jurors to reach the challenged finding.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  When we review a finding for legal sufficiency, we consider the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not.  *See id.*

In their first issue, appellants argue there is no evidence to support the jury's finding that the parties formed a contract on October 13, 2006.  They contend Carpenter's own admission that he asked Brian for five percent of sales revenue on the next day, October 14, 2006, "is fatal to the jury's finding that the parties reached

<div align="center">–6–</div>

<div align="right">Appendix 000101</div>

an agreement on October 13." Appellants specifically rely on the following Carpenter testimony to establish conclusively the parties never reached an agreement on October 13:

> Q. So what's the date of your asking for five percent, sir?
>
> A. It was the next business day after October 13th.
>
> Q. So October 14 you were still negotiating, correct?
>
> A. I believe so.

Appellants assert this evidence demonstrates as a matter of law there was no meeting of the minds to prove the parties agreed that Carpenter would be paid three percent of gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees. We do not agree that this lone statement by Carpenter, taken out of context and ignoring multiple days of testimony and numerous admissions by Brian and Cheryl, precludes the jury's finding.

To prove the existence of a valid contract, a party must establish an offer was made, the other party accepted the offer, the parties had a meeting of the minds on the essential terms of the contract (mutual assent), each party consented to the terms, and the parties executed and delivered the contract with the intent that it be mutual and binding. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). An action for breach of contract may involve disputes on any combination of these requirements, as well as a number of defenses that can be asserted by a defendant. *Id*. Here, appellants challenge the legal sufficiency of the

Appendix 000102

evidence with respect to the mutual assent or meeting of the minds requirement to contract formation. Whether the parties reached an agreement is a question of fact. *See Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.— Houston [14th Dist.] 2010, pet. denied).

Carpenter testified that on October 13, 2006, Brian informed him of the specifics of the bonus he would receive and they walked through the math. The bonus was based on the letter of intent that was going to be signed and would equal three percent of the gross sales price of $36 million minus normal closing costs, including items like broker fees, title fees, legal fees, and bonuses or severances paid to other employees. Carpenter testified they estimated his bonus to be about $1,020,000. At that time, the two shook hands on the deal. Brian never stated the deal had to be in writing. Cheryl also admitted that they intended to pay Carpenter a bonus out of sales proceeds when the sale went through. According to Carpenter, the next day he went to Brian's office and asked to raise the percentage from three percent to five percent. Brian responded that "it would have to stay at three percent, that's what we talked about, that's what I approved, and we've committed to it." Carpenter also testified that Brian said "he has another person that he has to approve or . . . work through. She can – it's been approved at three percent and that's what we discussed, that's what we talked about, and I can't do five percent." There is no evidence that Carpenter rejected the three percent on which they had already agreed. In addition to this evidence, the jury heard testimony from Cheryl that, to encourage

–8–

key employees to stay on through the sale, they talked to the employees and "let them know that if, at the end of the day, the sale was successful and there was money left over at the end of the day that we wanted them to participate in the success of the sale and of the business."  Carpenter also testified that Brian told him that if he stayed, and when they settled on a buyer, "we'll put together a very lucrative bonus program for you for your efforts."

According to Carpenter, when he and Brian were in Las Vegas around January 12, 2007 they discussed putting the deal in writing, and Brian said it was going to be done but attorneys were too busy.  Brian then stated to Carpenter, "Jeff if it's that important to you, you know, I'll write it on the back of a napkin."  But there were only cloth napkins available so Carpenter decided to trust Brian on the oral deal. Moreover, Carpenter stated that, on October 12, 2007, Brian told him that Carpenter had fulfilled his obligation and had earned his three-percent bonus and back-earned bonuses as of that day.  Another executive, Deepak Sulakhe, testified that Brian told him that if the transaction went well, Carpenter might not have to work again.

Carpenter's testimony that he attempted to get Brian to agree to a five percent bonus after they agreed to three percent the day before is not conclusive evidence that the parties were still negotiating and thus never reached an agreement.  Instead, the jury could have viewed Carpenter's statement as seeking a modification of the original agreement that Brian rejected.  At best, this testimony could be viewed as conflicting with other evidence.  In a legal sufficiency analysis, we assume the jury

–9–

resolved conflicting testimony in a manner favorable to the verdict.  *See City of Keller*, 168 S.W.3d at 819.  We resolve appellants' first issue against them.

In their second issue, appellants contend that because the terms of the purported agreement are too indefinite, it is unenforceable as a matter of law. Specifically, appellants argue that evidence Carpenter "would stay on as long as needed to make the asset sale happen" in exchange for three percent of undefined gross asset sale revenue to sellers minus undefined normal closing costs was, at best, a promise to work together and not an enforceable contract because the agreement does not reflect a meeting of the minds on the services to be provided.

We agree with appellants that in order to be legally enforceable, a contract must be sufficiently definite in its terms to allow a court to understand what a promisor undertook.  *See T.O. Stanley Boot Co. Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).  The parties must agree to the material terms of the contract before a contract can be enforced and where an essential term is open for future negotiation, there is no binding contract.  *Id.*  But a contract need only be definite and certain as to those terms that are essential and material to the agreement.  *Fischer v. CTMI L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). When a material or essential term is missing or not certain when the contract was allegedly formed, the contract will fail for indefiniteness.  *See Marx v. FDP, LP*, 474 S.W.3d 368, 376 (Tex. App.— San Antonio 2015, pet. denied).

Appendix 000105

In analyzing whether a contract is sufficiently definite to be enforceable, we are guided by the following five basic principles:  (1) we may not rewrite the parties' contract; (2) because the law disfavors forfeitures, whenever the contract language is reasonably susceptible to an interpretation that is sufficiently definite, we will apply that interpretation, (3) we will imply terms that can be reasonably implied, (4) terms that appear indefinite may be given precision by usage of trade or by course of dealing between parties, and (5) partial performance under an agreement may remove uncertainty and establish an enforceable contract; in fact, a party's actions "[i]n reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed." *Fischer*, 479 S.W.3d at 239–40 (internal citations omitted).

In support of their position, appellants focus on the meaning of Carpenter's promise to stay on to "help make the asset sale happen" after Brian and Cheryl informed him they were selling the companies.  They argue the meaning of the promise cannot be ascertained because it provides no objective criteria or guidelines by which a court can measure Carpenter's efforts.  After reviewing the record before us, we conclude that the evidence was legally sufficient to establish the material terms of the agreement between appellants and Carpenter were sufficiently definite and clear, no terms were left open for future negotiation, and the parties mutually agreed to the material terms.

Appendix 000106

To the extent that appellants rely on Carpenter's testimony that he was still negotiating on October 14 to conclusively establish there was no meeting of the minds, we have already considered and rejected this argument in our resolution of their first issue.

Appellants also argue the duration for Carpenter's performance was also indefinite because of Carpenter's testimony that:

> A. Well, we did have an agreement for me to help assist in closing the sale. And it -- depending on the time frame, it was going to be either the sales closing or until my time is no longer needed, knowing that I was not going to have a position to go to. So it was a floating target.
>
> Q. All right. None of that was agreed to when you had the bump, shake, oral agreement with Mr. Potashnik in October 13, 2006?
>
> A. We had -- we had a targeted frame of closing in, as I said before, in April, May of 2007. And as we got closer to that it became more of a moving target.

They assert this testimony establishes that the parties did not agree on the time for performance or how long Carpenter had to stay on. We do not agree. That the parties did not have a specific date on which Carpenter's performance would end does not render the agreement too indefinite to be enforceable. Carpenter also testified that when Brian informed him that he was going to sell the business, he told Carpenter that he wanted Carpenter to stay and do his job. Brian specifically told Carpenter that Carpenter would be involved in the due diligence and communication between the teams once a buyer was selected. Based on the evidence, a reasonable jury could have determined that the parties agreed that if Carpenter continued to do

–12–

his job and perform these other responsibilities until the asset sale closed or he was no longer needed, he would be entitled to the three percent bonus. Carpenter and others testified that even when Carpenter was offered another job at a more lucrative base salary, he did not quit his position but instead stayed through October 31, 2007, the day before the management transition to the buyer. Moreover, there was evidence that about ten days earlier, on October 21, 2007, Brian and Cheryl confirmed to Carpenter that he sufficiently performed his obligations and would get paid his three percent bonus at closing, when they got paid.

We likewise are unpersuaded by appellants' argument that the agreement's payment term was not clear or definite enough to be enforceable because there was no understanding as to how "normal closing costs" were to be determined. Carpenter testified that Brian and he estimated the amount of normal closing costs to be about $1 million when they went through the math to calculate the bonus on October 13 and there is no indication that these costs would not be able to be ascertained with specificity at the time of the closing of the asset purchase agreement when the bonus was to be paid.

The supreme court's decision in *Vanegas v. American Energy Services* also supports our conclusion that an enforceable contract exists. 302 S.W.3d 299, 303–04 (Tex. 2009). In *Vanegas*, the supreme court concluded the employer's promise to pay employees a five percent bonus from sale/merger proceeds was enforceable upon the employees' performance of staying until the sale. *Id*. at 304. The court

–13–

reasoned whether the promise was illusory at the time it was made is irrelevant; what matters is whether the promise is enforceable by the time of breach. *Id*. at 303. We conclude the material terms of the contract are sufficiently definite to enable a court to determine the parties' respective obligations and provide a remedy for the contract's breach. Accordingly, we resolve appellants' second issue against them.

<div align="center">CONCLUSION</div>

Based on the record before us, we conclude the evidence was legally sufficient to support the jury's finding of an enforceable contract. Accordingly, we affirm the trial court's judgment.

/David Evans/
DAVID EVANS
JUSTICE

190238F.P05

Appendix 000109

# Exhibit 6

# Towers Watson 2014 Global M&A Retention Survey:

# How Companies Use Agreements to Keep Top Talent



# 2014 Global M&A Retention Survey

**How Companies Use Agreements to Keep Top Talent**





# 2014 Global M&A Retention Survey

How Companies Use Agreements to Keep Top Talent



## Contents

| | |
|---|---|
| Introduction | 2 |
| Key Findings | 3 |
| Why Retention Matters | 4 |
| Lessons From the Top: What High-Retention Companies Do Differently | 5 |
| Best Practice: Identify Retention Candidates That Matter to the Deal | 6 |
| Best Practice: Focus Initial Retention Efforts on Senior Leaders | 6 |
| Best Practice: Cash Is King | 7 |
| Retention Bonuses Grow in Popularity | 8 |
| Best Practice: Balance Pay to Stay With Pay to Perform | 8 |
| What's the Right Budget for Retention Bonuses? | 9 |
| Beyond the Bonus: Keeping Employees Over the Long Term | 10 |
| Towers Watson's Views | 11 |
| About the Survey | 12 |



# Introduction

The importance of retaining key talent during a merger or acquisition — and for many years after the merger — has become a given. Many deals are based on the premise that these employees will continue to create the capability being acquired, enhance and expand customer relationships, and lead teams to higher levels of performance. As a result, acquirers around the world are increasingly focused on pre-integration and integration efforts to identify these employees, and take steps to ensure they remain with the newly combined organization.

Yet respondents to Towers Watson's 2014 Global M&A Retention Study say that they still haven't found the perfect retention strategy. While a majority (68%) of respondents report that over 80% of employees who sign a retention agreement stay for the full retention period, fewer than half (43%) say they retained that same level of retention one year later.

In truth, a magic key — one that works for all top talent — may not exist. The disruption that comes with an acquisition or merger, coupled with an improving job market in many regions, can prompt high-performing employees to decide that the risks of staying on with the new organization are simply too high and that better opportunities lie elsewhere. In some cases, they may simply choose not to wait to see how things turn out.

To understand what employers do to retain key staff during a transaction, we conducted a global study of 248 organizations in 14 countries. (See page 12 for further information about the survey.) In this survey (our second), we focus on the effectiveness of retention agreements — one of the tactics most frequently used to keep talent. Our first study, conducted in 2012, took a broader look at the factors that lead to the successful retention of talent.

As in 2012, we focus on the half of our respondents that are most successful at retaining top talent to see how their actions compare to less successful companies.



## How We Define High-Retention Companies

We define high-retention companies as those that reported retention rates over **60%** for the full retention period. Low-retention companies are those that reported retention rates of **40%** or less.

Appendix 000114

# Key Findings

- **Who is targeted for retention?**
Employees' ability to affect the success of the transaction is the most commonly cited factor for determining retention eligibility — this criterion topped high-potential status, job function, job level and job title.
- **When are retention agreements signed?**
Just over half of senior leaders targeted for retention agreements are asked to sign at or before the initial signing, whereas close to a third of other employees are asked to sign after close.
- **What information is being used to identify retention agreement recipients?**
Buyers most frequently turn to the target's senior leaders (76%) and unit leaders (50%) to identify employees appropriate for retention agreements.
- **What is the most common type of retention award?**
Cash bonuses — generally expressed as a percentage of base salary — are the most common type of financial award in retention agreements for senior leaders (75%) and other employees (81%).
- **How are retention payouts set, measured and awarded?**
Just over one-half of retention budgets are 2% or less of the total purchase price of the acquired company, and these costs are largely borne by the buyer (67%).

Retention agreements typically use a combination of pay-to-stay and pay-to-perform metrics for senior leaders, but nonexecutives are most likely to receive exclusively time-based agreements.

For agreements that include performance metrics, payouts for both senior leaders and other employees are most commonly based on the performance of the acquired company, but payouts for senior leaders are also frequently measured on the entire company's performance as well as on their ability to achieve synergy targets.

Over a quarter (27%) of respondents provide higher retention awards to employees who otherwise benefit financially from the transaction (through acceleration of incentive awards and/or proceeds from stock owned at the time of the sale) as a way to strengthen their incentive to stay. In contrast, 16% of companies said that acquired employees who earned substantial compensation as a result of the deal received smaller retention awards.

On average, senior leaders receive far larger payouts and have longer retention periods than do other employees.

Vesting schedules vary; they are either prorated or are fully vested at the end of the retention period.

- **Does the retention rate remain high following the conclusion of the retention plan?**
A high percentage (68%) of employers report that employees who signed retention agreements stayed for the full retention period in the majority of cases, but this high retention rate is maintained by less than half (43%) in the following year.

Key employees understand their value in the marketplace. Most employees who left before the end of the retention period were either uncomfortable with the new culture or their new role, or were aggressively pursued by competitors.

Appendix 000115

## Figure 1. Business reasons or objectives for the transition



n = 248    U.S. n = 115    Non-U.S. n = 133

## Why Retention Matters

Regardless of the reasons for a transaction *(Figure 1)*, most respondents believe their transaction was highly or mostly successful in achieving its objectives *(Figure 2)*. However, high-retention companies were more likely to rate their transactions as successful with respect to their strategic objectives (88%) than were low-retention companies (67%). U.S. organizations making global transactions were slightly more likely to rate their transactions as strategically successful compared to those making purely domestic transactions (94% versus 82%).

"Retaining key talent is one of the biggest factors influencing the success of the transaction."
— 2014 survey participant

## Figure 2. Most respondents believe their transaction achieved its strategic objectives



Highly successful    Mostly successful    Somewhat successful    Not very successful    Not at all successful

Appendix 000116

**Lessons From the Top**

# What High-Retention Companies Do Differently

The fact that **88%** of high-retention companies rate their transaction as highly or mostly successful in terms of meeting their strategic objectives, compared to **67%** of low-retention companies, points to the critical impact that talent retention can have on deal success. High-retention companies behave differently from others in six critical ways.



**1.** They are more likely than others to **identify eligible employees** for retention based on their ability to affect the success of the transaction (**73%** for high-retention firms versus **33%** for low-retention firms).



**2.** They are more likely to **tap into** the target's senior leadership for information about which employees to keep (**66%** versus **27%**).



**3.** They are significantly more likely than low-retention companies to include **management discretion** (that is, the opinion of the target's leadership) in the retention-agreement selection process (**32%** versus **8%**).



**4.** They focus on cash bonuses rather than other forms of retention awards. **Cash bonuses** (exclusively or with other forms of compensation) are more likely to be included in retention agreements used by high-retention firms (**80%** for senior leadership, **89%** for other employees) compared to low-retention firms (**50%** and **55%**, respectively).

**5.** They are less likely than low-retention companies to rely on data from the target's HR systems to identify retention candidates. Job description data are used by only **28%** of high-retention companies, compared to **58%** of low-retention companies, and reporting-level information is used by just **36%** of high-retention companies, compared to **67%** of low-retention companies.

**6.** They offer **retention target value** that is higher than low-retention acquirers. For senior leaders, the median value of the retention plan among high-retention companies is **60%** of base salary, versus **35%** for low-retention companies. A similar difference exists for retention packages offered to nonexecutives (**28%** versus **16%**).

## Other key practices of high-retention companies:

- They identify retention candidates as early as possible.
- They employ a global retention philosophy and strategy but allow for local and regional variations.
- They secure retention agreements with senior leaders before other employees.
- They realize the importance of retention bonuses but also focus on other factors, including culture, the role of managers and other factors, to keep top talent.
- High-retention firms are more likely to use retention agreements that combine pay-to-stay and pay-to-perform metrics.

Appendix 000117

"Ensure the business understands the acquisition objectives and targets employees who can drive those results."

— 2014 survey participant

**Figure 3. Individuals with high potential and those critical to the success of the deal are prime candidates for retention agreements**





| | |
|---|---|
| Ability to affect success of transaction (e.g., individuals with key skills) | 63 |
| High-potential status | 45 |
| Job function (e.g., finance, legal) | 44 |
| High-performance status | 39 |
| Management discretion | 30 |
| Reporting level | 27 |
| Job title | 25 |
| Post-transaction job status (e.g., jobs to be eliminated) | 21 |
| Salary level/grade | 16 |
| Business unit | 15 |
| Work location | 13 |
| Other factors | 9 |

"Discuss retention sooner with senior executives, and provide more details up front about the options being provided and the value to the employee."

— 2014 survey participant

## Best Practice: Identify Retention Candidates That Matter to the Deal

By a wide margin, the people with the ability to affect the success of the transaction are most likely to be offered retention agreements *(Figure 3)*. High-retention companies are more likely than others to identify these employees for retention (73% compared to 33% of low-retention companies). Senior leaders of the acquired company are not the only employees who fall into this group. It also includes those with the specialized skills needed to keep the organization up and running during the sometimes-chaotic early months. Who these people are depends on the organization and its goals, but they can range from sales staff to customer service, to technical staff and other key contributors.

In our experience, acquirers look at many job families and employee levels in establishing retention bonus participation. Clearly, it's more efficient to take the steps necessary to keep key talent than it is to find, hire and integrate new talent during or just after an acquisition. And in regions, industries and specific job categories where the competition for talent is fierce, keeping the right people becomes even more critical to success.

Employees are chosen for retention agreements most commonly through direct input by the target company leaders. Identification of key talent by the target's leaders is used by 76% of respondents and is considered the most useful strategy by 62% of them. Pure data-driven criteria such as salary grade structures, performance ratings or job descriptions are seen as not nearly as useful to acquirers when selecting retention plan participants.

## Best Practice: Focus Initial Retention Efforts on Senior Leaders

There are several compelling reasons to start the retention process by focusing on senior leaders. First, they tend to be a limited group of people who are aware of the transaction and responsible for getting the deal done. Therefore, it's critical for them to be completely on board and aligned with the goals and strategies of the acquisition. To do this effectively, they can't be distracted by concerns

Appendix 000118

about their own futures, so it's often helpful to provide them with a clear personal stake in the success of the new company.

In fact, data from the survey show that, globally, companies are very focused on their leaders: 32% of respondents said senior leaders are asked to sign retention agreements before the initial merger signing and 22% at the initial merger agreement signing. By contrast, only 12% of respondents said that other employees are asked to sign retention agreements before the initial merger signing and 14% at the initial signing (*Figure 4*).

With that said, earlier timing for the signing of retention agreements does not appear to actually improve retention rates. In fact, low-retention companies are more likely than high-retention companies to concentrate agreement signings around the time of the initial merger signing.

The data show several other critical differences between retention agreements for senior leaders and those for other employees:

- In addition to cash, which respondents provide to both leaders (75%) and other employees (81%), companies are much more likely to provide other incentives to leaders, including time-vested shares and stock options.
- For companies that include time-based (i.e., pay-to-stay) metrics in their retention agreements, senior leaders have longer retention periods than other employees. A retention period of over 18 months after close was imposed on senior leaders by 41% of companies with pay-to-stay provisions, while only 24% of companies imposed this on other employees.
- Average award size for senior leaders dwarfs that for other employees. The median retention bonus value as a percentage of base salary is 49% of base salary for senior leaders, versus 27% for other employees.

## Best Practice: Cash Is King

While a combination of cash and other types of awards is common, cash prevails (*Figure 5*). This is especially true among high-retention companies. In the U.S., high-retention companies are much more likely to provide cash bonuses (80% for senior leaders, 89% for others) than low-retention companies (50% and 55%, respectively), while low-retention companies are more likely to include bonus guarantees (50% for senior leadership) and stock options (58% for senior leadership) compared to high-retention companies (18% and 27%, respectively).



**Figure 4. Senior leaders are asked to sign retention agreements before other employees**

Before the initial signing — Senior leadership 32, Other employees 12

At the initial signing — Senior leadership 22, Other employees 14

Between the initial signing and the close — Senior leadership 26, Other employees 29

At the close — Senior leadership 9, Other employees 12

After the close — Senior leadership 10, Other employees 31

Other time — Senior leadership 1, Other employees 2

■ Senior leadership (n = 218)   ■ Other employees (n = 198)

**Figure 5. Cash bonuses are by far the most common financial award used in retention agreements**

Cash retention bonuses — Senior leadership 75, Other employees 81

Time-vested full shares/share units — Senior leadership 33, Other employees 16

Stock options — Senior leadership 32, Other employees 7

Increases in base pay — Senior leadership 26, Other employees 28

Guaranteed payment of regular bonus — Senior leadership 23, Other employees 21

Performance-vested full shares/share units — Senior leadership 16, Other employees 6

Other type(s) of financial awards — Senior leadership 6, Other employees 5

■ Senior leadership (n = 220)   ■ Other employees (n = 197)

Appendix 000119

# Retention Bonuses Grow in Popularity

The use of various types of bonuses and equity has grown since our 2012 survey, while the use of annual bonus guarantees has stayed about the same. Two years ago, 74% of participants reported using retention bonuses for either senior leadership or other employees, or both, compared to 83% today. In 2012, 47% reported using equity grants (i.e., stock options or time-vested full shares/share units or performance-vested full shares/share units) compared to 56% today. Also in 2012, 25% reported using bonus guarantees in retention agreements, slightly lower than the 27% using them today.

Cash is an attractive retention reward for nonexecutive employees because it provides a higher degree of certainty during a transition period that is fraught with risk. With cash awards, employees know what they will receive, and it's easier for them to determine whether the award makes staying worthwhile. It's interesting to note that companies with low retention rates most frequently cited the following reasons for employee departures: retention package not generous enough (36%), displeased with new pay structure (36%) and displeased with new benefit structure (36%). Clearly, a more generous retention package like those paid by high-retention companies is more likely to keep key employees at the company for the full retention period.

There are some notable differences by region in the form of retention payments. U.S.-based companies are slightly more likely to use cash bonuses with nonexecutives than non-U.S.-based companies (88% versus 74%), and are also more likely to make full share/share unit grants to both senior leaders (42% versus 29%) and nonexecutives (22% versus 9%). In contrast, non-U.S. companies reported using base pay increases for nonexecutives (35% versus 21%) and guaranteed payment of regular bonuses (27% versus 18% for senior leaders, and 28% versus 14% for nonexecutives) to a greater degree than U.S. respondents.

Target retention plan values also differ based on geography. U.S. respondents provide significantly larger average award sizes for senior leadership compared to non-U.S. respondents (65% of base salary versus 39% at the median). This difference was not as significant for awards made to those below the senior leadership level (30% of base salary for U.S. companies, 25% for non-U.S. companies).

## Best Practice: Balance Pay to Stay With Pay to Perform

Including performance metrics in a retention agreement is tempting, especially given stakeholders' expectations of quick and measurable financial success for a merger or acquisition. Some companies are even forgoing pay-to-stay agreements in favor of those that are based purely on financial performance.

Notably, only 1% of respondents to our 2012 survey had retention agreements that were purely performance based, whereas 14% and 16% of respondents report using such agreements today (for senior leadership and other employees, respectively). In 2012, 46% of the retention agreements for acquisitions were purely time-based, and 51% were a combination of time and performance measures. Currently, only 35% are purely time-based, and 48% use a combination of time and performance measures.

> "Next time, we'll develop performance-based criteria for mid-level employees."
>
> — 2014 survey participant

Appendix 000120

This shift toward more performance-based pay has not appeared to improve retention rates. In 2014, high-retention respondents are more likely to use combination agreements of pay-to-stay and pay-to-perform metrics (59%), while low-retention firms are more likely to use purely performance-based agreements (42%).

While the theory behind performance-based metrics makes sense, overusing them can backfire. Employees who are measured on metrics that are unattainable or out of their control are more likely to forgo the bonus opportunity and seek employment elsewhere. Alternatively, they may stay with the company but feel less engaged in their work than they might have been had the performance measures been easier to meet when they were established.

The challenge is to get the right balance between encouraging top performance and setting reasonable performance metrics — that is, those that reflect the employee's job level, role, skills and the degree to which he or she can reasonably be expected to influence company performance.

# What's the Right Budget for Retention Bonuses?

Although the median cost of a retention plan relative to the deal size is just under 2% globally *(Figure 6),* that statistic tells only part of the story. The higher the deal value, in general, the lower the relative size of the retention budget. Most companies reach for a sweet spot that encourages retention by an optimal number of key employees — not the maximum number of employees — so that individual values can be meaningful to the participant without overspending in the aggregate. With that said, it is also possible to both underspend and overspend at the individual level: Too little and there's no incentive to stay; too much and employees' focus turns to the bonus payout date.

In addition, companies need to understand the role of the purchase price in keeping top executives. Some companies don't provide a retention bonus for top executives who are already going to profit from the company's sale. Their rationale: Why provide an additional bonus to an executive who may be making a significant profit on the sale of the company — especially if that profit dwarfs the bonus? The retention bonus won't keep the executive who plans to leave, making it a needless expense.



**Figure 6. The median retention budget is just under 2% of the total transaction cost**



| | |
|---|---|
| Less than 1% | 29 |
| 1% to 2% | 23 |
| 3% to 5% | 28 |
| 6% to 10% | 14 |
| 11% to 20% | 4 |
| Greater than 20% | 2 |

> "Provide clear, up-front and honest communication to employees (from both the acquired and acquiring companies) so that expectations are set realistically."
>
> — 2014 survey participant

## Beyond the Bonus: Keeping Employees Over the Long Term

While 68% of respondents indicated they are able to retain a high percentage of employees (over 80%) for the full retention period, fewer than half (43%) maintain that rate one year later. This raises a crucial question: How well are companies using the retention period to build employee engagement, develop and communicate a positive culture, work individually with key employees to keep them on board for the long term — and help ensure the success of the merger over a longer period?

Retention bonuses are important — at least for the length of the retention period — but they're only part of the equation. In our consulting experience, personal outreach by leaders and managers, strategic promotions of some individuals and employees' participation on task forces are also beneficial. And let's not forget the role of total rewards — particularly learning and development, and career opportunities for high-potential candidates, and a reward philosophy that clearly differentiates high performers.

Local and regional customs also come into play after a deal. Multinational acquirers that build a culture and compensation philosophy that is global but allows for regional and local variations can make key employees feel comfortable — and wanted — in the new environment.

In fact, the factors that are critical for retaining and engaging employees are the same whether or not a company is in the midst of a merger or acquisition. Our 2014 Global Workforce Study, which garnered responses from more than 32,000 employees in 31 markets, shows the importance of these workplace attributes in driving retention, and reinforces the link between high rates of retention and employee engagement. For example, respondents said:

- The top drivers of employee attraction and retention continue to reflect the fundamentals — pay, security and career advancement.
- Sustainable engagement requires strong leaders and managers. In companies where both leaders and managers are perceived by employees as effective, 72% of employees are highly engaged.
- Inspiring and motivating employees is the most important driver of leadership effectiveness.

Organizations keen to retain top talent during and after a merger could increase their success rate by focusing on cultural issues, including a clear articulation of the employment deal and frequent communication from senior leadership, combined with manager training that emphasizes people skills. They would also do well to pay attention to career development and pay differentiation for top performers.

> "Address behavioral motivators to retention, not just money, and actively manage a succession plan to backfill everyone with a retention bonus."
> — 2014 survey participant

Appendix 000122



*Towers Watson's Views*

Develop a thoughtful retention strategy that is based on the deal objectives. It's almost impossible to be dogmatic about a retention strategy; there are simply too many unknowns. But companies can go a long way toward positioning the transaction for success by:

- Starting with a clear strategy that reflects the business goals of the transaction
- Identifying the roles and functions most critical to success
- Setting a budget for retention bonuses
- Assigning roles and responsibilities for developing and administering the process

Once the framework is in place, necessary exceptions can be made. These exceptions will likely be more frequent in cross-border mergers where differences in culture and regulations will need to be accommodated.

Finally, it's also important to avoid developing customized deals for many people, because such an approach is time-consuming and, as our data show, does not help overall retention.

Retention should start with executives. By solidifying retention agreements with senior leaders first, companies can keep them engaged in the merger process. The behavior of senior leaders is critical to the retention and engagement of employees. Easing their concerns early will help to roll out an effective retention strategy for their teams. While agreements don't necessarily need to be signed before close, don't wait too long. They should be completed very quickly after the merger.

Develop different retention plans for senior leaders and other employees. The strategies for these two groups should be developed separately, taking into consideration such factors as bonus size and form (with an emphasis on cash for nonexecutives), length of retention period (generally, longer for executives) and the degree to which performance metrics should be part of the agreement (a greater emphasis on performance for executives).

Think beyond the bonus. Finally, companies should pay close attention to the factors that will keep employees for the long term, including career development, pay differentiation for top performers and a clearly articulated employment deal. Helping new employees understand the corporate culture can be especially important when a large company acquires a smaller one, where the culture may have been very different.

Appendix 000123

**Figure 7. Industry breakdown**

| | |
|---|---|
| 0% | 10% 20% 30% |

Manufacturing — 22

High Technology — 12

Financial Services, excluding Insurance — 11

Communications/Media/Telecommunications — 9

Health Care, excluding Pharmaceuticals — 6

Insurance — 6

Energy — 4

Food and Beverage — 4

Pharmaceuticals — 4

Natural Resources — 3

Professional and Business Services — 3

Aerospace and Defense — 2

Property and Construction — 2

Utilities — 2

Wholesale — 2

Auto and Transport Equipment — 1

Retail — 1

Tourism and Leisure — 1

Transportation — 1

Charities and Nonprofit — 0

Education — 0

Government — 0

Other — 3

**Base: Total respondents (n = 248)**

## About the Survey

The 2014 Global M&A Retention Study examines the structure, use and effectiveness of retention agreements during an acquisition or merger, with a particular focus on the financial elements of those agreements. Survey participants responded in terms of one particular merger or acquisition their company had initiated or completed within the past two years.

To qualify for the survey, organizations had to employ least 500 people (1,000 if based in the U.S.), have completed either a merger or acquisition within the past two years, and used employee retention agreements for at least one of those transactions.

The survey had 248 respondents from 14 different countries (Australia, Belgium, Brazil, Canada, Germany, Indonesia, Japan, Malaysia, Mexico, the Netherlands, Singapore, South Korea, the U.K. and the U.S.). They represented virtually every industry *(Figure 7)*. Sixty-nine percent of responding companies are publicly held. Thirty-two percent of transactions were global, and 10% were regional.

**Figure 8. Headquarters location**

| | |
|---|---|
| 0% | 10% 20% 30% 40% 50% |

United States — 50 / 46

Japan — 10 / 10

Canada — 9 / 8

Southeast Asia (Indonesia, Malaysia, Singapore) — 7 / 11

Brazil — 7 / 8

United Kingdom — 4 / 7

Germany — 3 / 2

Netherlands — 2 / 4

Mexico — 1 / 2

Other — 7 / 2

■ Company headquarters   ■ Respondent location

**Base: Total respondents (n = 248)**



Appendix 000124



## About Towers Watson

Towers Watson is a leading global professional services company that helps organizations improve performance through effective people, risk and financial management. With more than 14,000 associates around the world, we offer consulting, technology and solutions in the areas of benefits, talent management, rewards, and risk and capital management.

Copyright © 2014 Towers Watson. All rights reserved.
TW-NA-2014-37760

towerswatson.com

 /company/towerswatson     @towerswatson     /towerswatson



Appendix 000126

# Exhibit 7

# trial transcript

REPORTER'S RECORD

VOLUME 1 of 11

<u>Trial Court Cause No. CC-08-02072-E</u>

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| | ) | |
| SOUTHWEST HOUSING DEVELOPMENT | ) | |
| COMPANY, INC., ET AL, | ) | |
| | ) | |
| Defendants. | ) | DALLAS, TEXAS |

───────────────────────────────────────────────

PRETRIAL MOTIONS

───────────────────────────────────────────────


     On the 22nd day of January, 2018, the following

proceedings came on to be heard outside the presence

of a jury, in the above-entitled and -numbered cause;

and the following proceedings were had before the

HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

Dallas County, Texas:

     Proceedings reported by Computerized Stenotype Machine.

APPEARANCES:


MS. AMY GIBSON
SBN 00793801
MR. DAVID WILEY
SBN 24029901
Gibson Wiley, PLLC
1500 Jackson Street, Suite 714
Dallas, Texas 75201
(214)522-2121
Attorneys for Plaintiff

          -AND-

MR. BRIAN SANFORD
SBN 17630700
Sanford Firm
1910 Pacific Avenue, Suite 15400
Dallas, Texas 75201
(469)361-9111
Attorney for Plaintiff

          -AND-

MR. LAWRENCE "LARRY" FRIEDMAN
SBN 07469300
MR. MICHAEL DONOHUE
SBN 05989380
MR. JASON FRIEDMAN
SBN 24059784
Friedman & Feiger, LLP
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972)788-1400
Attorneys for Defendants

          -AND-

MR. RYAN HALE
SBN 24097784
Hawkins Parnell Thackston & Young, LLP
4514 Cole Avenue, Suite 500
Dallas, Texas 75205-5412
(214)780-5138
Appellate Attorney for Defendants

VOLUME 1

January 22, 2018                                    PAGE

Proceedings ----------------------------------     4

Witnesses Sworn ------------------------------      4

Rule Invoked ---------------------------------      5

Defendants' Motions to Exclude ---------------      7

Defendants' Motion to Exclude Plaintiff's Evidence   45

Plaintiff's Motion for Sanctions --------------     54

Motions in Limine ----------------------------      83

Motions in Limine Agreements ------------------     97

Motions in Limine (Cont'd) --------------------     99

Pretrial Conference --------------------------     163

Court's Rulings ------------------------------     167

Adjournment ----------------------------------     175

Court Reporter's Certificate ------------------    176

Exhibit Certification ------------------------     177

EXHIBIT INDEX
(FOR HEARING ONLY)

| DEFENDANTS' NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Miscellaneous documents | 43 | 45 |

P R O C E E D I N G S

January 22, 2018

THE COURT:  Tell me your names.

MR. GOLDSTEIN:  Aaron Goldstein.

MR. GRAF:  Rick Graf.

THE COURT:  What's the last name?

MR. GRAF:  Graf, G-r-a-f.

MS. GRAY:  Devona Gray.

THE COURT:  I'm going to swear you in as witnesses and then I'll explain the importance of being sworn in as witnesses.

(Witnesses sworn)

THE COURT:  The -- you've all been subpoenaed to appear here today but we're not going to take any testimony in the court today.  So what we do when someone's subpoenaed for a particular day and that -- we swear them in as a witness is we get their agreement that they'll return when it's their turn to testify.  And the attorneys will contact you at least a day in advance before it's your turn to testify, and that way we don't keep you here day to day till it is your turn to testify.

Do all of you agree to return when the attorney calls you to let you know?

(All witnesses said yes)

THE COURT:  All right.

Are you -- is someone invoking the rule?

MR. L. FRIEDMAN:  Yes, sir.

THE COURT:  Okay.

MS. GIBSON:  Yes, Your Honor.

THE COURT:  In addition to that, you are welcome to discuss the case with either the attorney -- either sets of the attorneys in the case, but you cannot discuss your testimony with anyone else so long as you're a witness in the case.  Once you and whoever else you're talking to has been excused as a witness in the case, you're welcome to talk about your testimony.  But up until that time the only people you can discuss the case with are the attorneys in the case.

If -- for example, if Mr. Goldstein -- you may know each other.  I don't know.  But if Mr. Goldstein were to testify first, Mr. Graf could not contact Mr. Goldstein to see what questions they asked you, what answers did you give.  It would be in violation of the court rules.  And with that we'll see you whenever it's your turn to testify.  One of the attorneys will contact you.

(Off the record)

THE COURT:  We'll go on the record in Cause Number 08-2072, Jeffrey Carpenter versus Southwest Housing and others.

Who's here for the plaintiff?

MS. GIBSON:  Amy Gibson, David Wiley, and
Brian Sanford.

THE COURT:  And for defendants?

MR. L. FRIEDMAN:  Larry Friedman,
Mike Donohue, and Jason Friedman; and our client,
Cheryl Potashnik, is here as well.

THE COURT:  That's good.

And, Ms. Gibson, you're announcing ready
for trial?

MR. L. FRIEDMAN:  I'm sorry.  Our appellate
lawyer --

MS. GIBSON:  Yes, Your Honor.

MR. L. FRIEDMAN:  Our appellate counsel is
here too.

MR. HALE:  Good morning, Your Honor.
Ryan Hale.

THE COURT:  Ryan Hale.

MS. GIBSON:  Yes, Your Honor.

THE COURT:  And, Mr. Friedman, you're ready
for trial?

MR. L. FRIEDMAN:  Yes, sir.

THE COURT:  All right.

First thing we'll take up is a motion to
exclude.  Mr. -- who's going to present that for defendants?

MR. L. FRIEDMAN:  Jason Friedman.

THE COURT:  Very good.

DEFENDANTS' MOTIONS TO EXCLUDE

MR. J. FRIEDMAN:  Good morning, Your Honor.

We have three motions to exclude.  The first motion to exclude is motion to exclude evidence of expert testimony regarding attorneys' fees.  The -- the defendants, in their answer and counterclaim at the time, sent request for disclosures to the plaintiff in 2008.  We, thereafter, served requests for production seeking attorneys' fees and engagement agreements; all of which, as the Court is aware, the plaintiff is seeking attorneys' fees.

Ms. Gibson and Mr. Wiley weren't counsel of record at the time.  I believe that was Rogge Dunn.  He did not produce his engagement letter.  He did not produce his attorneys' fees.  Then after that Gardere Wynne was the attorney.

The case was separated in arbitration. Additionally, the defendant served requests for production seeking engagement agreements and attorneys' fees in the arbitration.  Then, as the Court's aware, it was consolidated back to this court.

MR. L. FRIEDMAN:  Consolidated and combined.

MR. J. FRIEDMAN:  Consolidated and

combined.  And then Ms. Gibson and Mr. Wiley made an appearance.  And since that time no one has produced any fee statements or any of the three engagement letters of any firm.

They have also supplemented their disclosures -- it's in a different motion -- they supplement -- they've -- they've supplemented or amended their disclosures on June 24th, 2008; June 3rd, 2009; September 25th, 2009; July 30th, 2010; May 31st, 2016; August 2nd, 2016; January 4th, 2017; January 5th, 2018; and as recently as last night, January 21st, 2018.  In each of the disclosures it says that they're going to supplement and provide their fees.

They've had -- they've had chance after chance.  In fact, nine chances to put a number for their attorneys' fees, disclose their fees, and provide their statements.  So, as we sit here today, they've provided no excuse.  They've said they'll supplement, but they still haven't done so.

THE COURT:  Very good.

Ms. Gibson?

MS. GIBSON:  Yes, Your Honor.

With -- generally, with respect to this motion, while we were counsel in the case we provided expert reports on attorneys' fees, including expert reports.  And I

believe that lengthy expert disclosure is attached to
defendants' motion.

          At no time before this motion was filed
this weekend did defendant say that they believe there was
some defect in the expert disclosures.  And in our response
we cite both Texas Supreme Court case authority and Dallas
Court of Appeals authority, as well as other cases, that say
if a party does not do what we did in this case when we
needed documents from the other side or saw there was a
defect, is point the defect out to the other side, confer on
it.  If you don't reach agreement, file a motion to compel
and get an order.

          But the Texas Supreme Court has said if
those issues are not raised and the party waits until -- and
tries to exclude at trial, they have waived any claim for
sanctions, including exclusion.  And that is Remington Arms
versus Caldwell, Texas Supreme Court, from 1993.

          And that's what we did in this case.  For
example, with respect to financial records, we conferred
with the other side ages ago.  What we couldn't agree on we
filed a motion to compel on and we got an order.  And I'm
hearing for the first time that defendants think there's
some deficiency in the expert disclosures.

          Now, Mr. -- Mr. Friedman says -- he refers
to claims that we will supplement.  I'm not sure what he is

talking about, but it certainly wasn't from any conference on fees.

THE COURT:  Okay.  Did --

MS. GIBSON:  Now --

THE COURT:  In these expert reports, did you give them -- I assume you gave them hourly rate.  Did you give them a total number?

MS. GIBSON:  No, we did not give a total.

THE COURT:  Did you give the number of hours so they could do the math?

MS. GIBSON:  No, we did not -- we did not give the hours at that time, as they continued to accrue.

THE COURT:  Okay.

MS. GIBSON:  But at -- but at no time did anyone pick up the phone or send communication saying that they wanted something more.

THE COURT:  Well, all right.

MS. GIBSON:  Now, I mean, certainly, I mean, rather than give them completely redacted statements, we do intend to show them complete unredacted fee statements.  And absent all of what -- everything that happened this weekend, we had intended to do that this weekend.

THE COURT:  Did the request for production call for fee statements?

MS. GIBSON:  So, with respect to request
for production, I believe defendant cited to a request for
production sent when Gardere Wynne was counsel.

THE COURT:  Right.

MS. GIBSON:  And we could not find what
happened there, whether they were served or what happened,
but we did look at the file.  And it looks like the
parties -- defendants had filed a motion to stay all
discovery, and we saw a reference to a Rule 11 agreement at
the time agreeing that no responses would be due until
further notice.  And it looks like nothing ever happened
after that.  In other words, all discovery was stayed for a
period of time.  And as far as we can tell from the file we
inherited, defendants never followed up on that agreement.

THE COURT:  Well, how much are you seeking
in attorney -- you must know by now.

MS. GIBSON:  I -- I don't have the --

THE COURT:  Right.

MS. GIBSON:  -- total memorized,
Your Honor.

THE COURT:  What's your ballpark?

MS. GIBSON:  I would think it's probably in
the neighborhood of 400-.

THE COURT:  Mr. Friedman?

MR. J. FRIEDMAN:  Your Honor, I just want

to clarify.  We asked for attorneys' fee statements and engagement agreements in both the -- when it was separated in the arbitration and the court case.  We were never provided the documents requested.  It's their duty to supplement, not ours.  The rule is to avoid surprise.

The case they cite actually says you waive your right to seek the Court's relief if you don't raise it pretrial, so that's what we're doing.  We're raising it pretrial.  The case she cites is it's waived if you go through the entire trial and then bring it up.

So, as we sit here today, she doesn't even know -- she doesn't even know her fees, has not produced her fee statements, and she could have done it last night.  So each one of the experts says that they've reviewed documents and they'll -- and they'll supplement and their reports aren't due yet.  So --

THE COURT:  These expert reports that are attached to your motion, they say that they'll supplement something in there?

MR. J. FRIEDMAN:  Yeah.  Let me see.

Yeah.  For example, on Page 54 it says that these will be provide -- Documents:  These will be provided at a later date; the expert disclosures are not yet due.

They were never provided.  So that's on 54 of the -- so if you're looking at Tab 6 --

THE COURT:  I see it.

MR. J. FRIEDMAN:  Oh.  It says documents.

THE COURT:  It does say that.  It says these will be provided at a later date, his expert disclosures are not due yet.

You never -- did you ever provide anything after these?

MS. GIBSON:  Well, I -- we provided expert disclosures.  And I believe the fee statements that have been produced in this case are limited, and they're completely redacted.

THE COURT:  You're saying you have produced fee statements.

MS. GIBSON:  Well --

THE COURT:  They're saying you haven't.

MS. GIBSON:  -- well, not -- not all of them.  These are Gardere.  They're completely redacted.

THE COURT:  That would be a small part of the case.

MS. GIBSON:  Right.  That's what I'm saying.  Yes, it was small.

Your Honor, the cases -- you know, certainly here the cases that we cite on the need to obtain a prior ruling the Texas Supreme Court says you need to get a pretrial ruling on anything that exists before trial or

waive any claim to exclude.  And the point of these cases is
to confer and go through the regular process and point out
the defects rather than laying behind the log.

For -- and then the Dallas Court of Appeals
case that we cite also points out on the context of 193.6 on
excluding transcripts that there was no motion to compel
filed before they sought exclusion.  And as the Dallas Court
of Appeals case explains, that we cite in Broyhill
Furniture, generally, when you have a case when fees have
been pled as relief from the outset, there's no -- there's
no surprise on later production of fee statements because
everyone knows what's been happening in this case.  Everyone
has been participating.  It's just the ultimate details that
they don't know about.

And given that we disclosed -- made expert
disclosures a long time ago and that fees have been
requested in this case for years, if defendants thought
there was a defect in our discovery they needed to call us
and talk to us about it and ask for them at some point
before seeking to exclude.

Now --

THE COURT:  I think they're just trying to
limit you to what your discovery response says.  And you
didn't respond with your economic calculations or how you --
up until yesterday, you were saying you'd supplement.

MS. GIBSON:  I'm sorry.  Up until what?

THE COURT:  Until -- as late as yesterday, from what Mr. Friedman's telling me, you would say -- you were saying that you would supplement.  You've never supplemented.

MS. GIBSON:  That conversation -- I don't know what he's talking about.

THE COURT:  He said that you -- your -- whatever you supplemented yesterday, you still -- whatever discovery responses you supplemented yesterday as far as the expert, the calculation of economic damages for attorneys' fees you still said we will supplement.

MS. GIBSON:  Oh, Your Honor, what we supplemented yesterday was just an update to previously disclosed calculations on the sale proceed bonus and annual bonuses.

THE COURT:  Okay.

MS. GIBSON:  But it's not --

THE COURT:  So you didn't say anything about attorneys' fees in there that you would supplement?

MS. GIBSON:  No.

THE COURT:  So the last thing you said about attorneys' fees was --

MS. GIBSON:  In our expert report disclosed previously.

MR. L. FRIEDMAN:  If you look at the expert reports, it only talk -- it only talks about their qualifications.  It doesn't rely -- it doesn't talk about any documents they relied on.  It doesn't talk about any fee agreement with the plaintiff and it doesn't talk about any invoices or records of time or even quantum meruit with regard to this particular case.

It's our understanding that some of these lawyers were paid on an hourly basis.  Some may have a contingent-fee agreement.  There's no way for us to tell or measure or calculate attorneys' fees in this case.

The reports are interesting but they only talk about the lawyers' primary practice and employment law, State Bar activities, membership and employment law associations, CLE taken in employment law subjects, legal education, experience practicing commercial litigation, running a law firm, counseling on hundreds of employment matters and etcetera.  It only goes to the qualifications of the expert.  And there's no way -- nothing was provided that would enable the defendants to calculate the amount of attorneys' fees.  There's nothing provided that indicates the amount of attorneys' fees requested in order to give us an opportunity to calculate it.  Therefore, we believe that the request for attorneys' fees at this point has to be excluded.

THE COURT:   Okay.

MS. GIBSON:   And, Your Honor, just separately as to exclusion of the entire claim for attorneys' fees, I don't believe El Apple applies to Chapter 38 fee claims.   And the documents could be used to refresh recollection and witnesses could just testify.   But the cases we cite seem pretty strong to me.   But if they had an issue and they wanted something, they needed to let us know.   Particularly, in such a long case, pick up the phone and talk about it and not wait and exclude the weekend before trial.

THE COURT:   Okay.   All right.   Well, I'll look at the case that you're citing, Remington Arms versus Caldwell.

This is pretrial.   I mean, it says failure to obtain a pretrial ruling on discovery as used.

MS. GIBSON:   Well, I think the point of the case is, is not just you need to get a ruling on the eve of trial.   The point of the cases is courts got tired of people not conferring or moving to compel and just waiting and laying behind the log and seeking to exclude.   And -- and so I think the context of the cases is that if there's a particular defect in the discovery responses they need to confer and give this side an opportunity to cure.

MR. J. FRIEDMAN:   Your Honor, if I may, the

case she cites says we do, however, agree that the failure
to obtain a pretrial ruling on discovery disputes that exist
before commencement of a trial constitute a waiver of a
claim of sanctions.  We hold that Craig Wade (phonetic) and
any objections by failing to request a pretrial hearing on
the alleged discovery and requesting preferential trial
setting, if pretrial discovery is not revealed until after
trial's begun, a party cannot be said to have waived this.
So the exact point is, yes, we're bringing it up pretrial
and as the case she cites sets.

        THE COURT:  Well, there's also a provision
for 193.6, I think, or that you can make some accommodation
so that there's not surprise.  Maybe we'll look at that, but
I'll look at that Remington Arms case.

        What was your second motion to exclude?

        MR. J. FRIEDMAN:  Well, we had a -- we had
a motion to exclude late-filed disclosures.  We received
disclosure last night.

        THE COURT:  Which number is this one?
Which tab?

        MR. J. FRIEDMAN:  Ten.

        MS. GIBSON:  What is -- Mr. Friedman,
what's the title of this one?

        THE COURT:  It's motion to exclude
late-filed disclosures.

MS. GIBSON:  Okay.

MR. J. FRIEDMAN:  Do you have a copy?

MS. GIBSON:  Yes.  Yes, I do.

MR. J. FRIEDMAN:  Your Honor, did you find it?

THE COURT:  Yeah.

MR. J. FRIEDMAN:  The plaintiff was served with a request for disclosure from defendants on April 7th, 2008.  This case was filed in March of '08.  The plaintiff supplemented his disclosures eight times prior to yesterday.  Yesterday was the ninth time.  The plaintiff had 10 years to calculate his damages claim, and one would assume that in March of '08 when he filed his case alleging a agreement that he would know what his damages were.  'Cause if he didn't have any damages in March of '08 when he filed this case, why would he file the case?

So now, at about 5:00 o'clock on January 21st, 2018, on the eve of this trial, we received Jeff Carpenter's damages supplement to consolidated disclosures -- excuse me, at 1:21 p.m. yesterday.

As the Court is aware, if a party fails to timely respond to request for disclosures is precluded from presenting any witness's evidence and/or testimony that would otherwise be disclosed in the response for request for disclosures.

20

193.6(a) establishes the penalty for discovery that is not timely disclosed and/or failure to provide complete responses is exclusion of evidence.  Rule 193.6(a) is mandatory and the penalty is exclusion.  In this case they waited until the day before trial to serve these late disclosures.

THE COURT:  Ms. Gibson?

MS. GIBSON:  Yes, Your Honor.

May I approach?

THE COURT:  Certainly.

MR. J. FRIEDMAN:  And, Your Honor, if I may point out one more thing, the defendants took Mr. Carpenter's deposition even last week.  And as of last week he could not even calculate his damages or articulate the exact amount of his damages.  And this was a -- a week ago.

THE COURT:  Okay.

MS. GIBSON:  This is a flagged copy of the motion and flagged copies of prior disclosures.  What we did --

MR. L. FRIEDMAN:  May we have a copy of what you handed to the Court?

MS. GIBSON:  I don't even have a copy for myself.

THE COURT:  One of them is your motion that

you gave me.

MR. L. FRIEDMAN:  And what was the other?

MS. GIBSON:  Prior disclosures on damages.

MR. L. FRIEDMAN:  Which one?

MS. GIBSON:  I gave Judge Greenberg my copies, but it would have been the consolidated disclosures.

MR. L. FRIEDMAN:  There was more than one.

MS. GIBSON:  And then there was a supplement to the consolidated disclosures.

MR. L. FRIEDMAN:  Can you give me the date of those disclosures, please?

MS. GIBSON:  I flagged them for -- for the Court.

MR. L. FRIEDMAN:  It doesn't help me. There are eight disclosures and more than one was --

THE COURT:  The certificate of service on the first one is May 31st, 2016.

MR. L. FRIEDMAN:  Thank you.  And the other one?

THE COURT:  And the other one is January 4, 2017.

MS. GIBSON:  Your Honor, what we supplemented was an updated calculation from prior disclosures.  And at the flag -- at the flags on the disclosures attached to the motion, we explained the

supplements.  So, for example, with respect to annual bonuses, rather than seeking a range between the minimum and the maximum we chose a number based on Brian Potashnik's statement and relied on a document that was produced in this case long ago.  So that was just selecting a specific number.

During Mr. Carpenter's deposition that damages disclosure was disclosed during a break at his deposition, but is simply an update to select a specific number.  Prior disclosures gave the range of bonuses between 50,000 and 200,000.  What we have done in selecting a number is reduced the maximum we can claim at trial, and we also no longer seek a pro rata portion of those bonuses for his last year.  So the only thing those disclosures do are reduce the amount we seek at trial.

The other tab, Your Honor, goes to the sale proceeds bonus.  And at the tab on those attached to defendants' motion we explain supplementation.

First, we had previously estimated the part of the formula that deducted stay bonuses paid to certain other employees from Mr. Carpenter's bonus.  Defendants haven't provided the financial records, despite Court order, that would allow us to do a more specific calculation.  So, ultimately, what I did was I used a statement from Cheryl Potashnik's deposition that she recently gave and what she

said the number was, 2.1 million.  So we updated the
calculation to reflect that.

And then there are two line items in our
previous formula.  The line items where you see the escrow
amendments, Your Honor, those were all previously disclosed.
But we found that there was a discrepancy in the closing
documents on two of the line items.  It was Bank of America
paid 2.5 million or 2,000,000, and in the update I used the
lower of the two numbers.

There was also a discrepancy on one of the
closings on what the net proceeds were to the sellers.  It
wasn't a big difference, but in the supplement we point out
that we choose to use the lower number and show the
defendants where the discrepancy is.

With respect to the prior disclosures, the
consolidated disclosures that I've shown the Court, we had
previously and long ago disclosed the calculation as best as
we could at the time without additional financial records or
information from defendants.  In fact, the same numbers are
used on the escrow amendments.  The same chart is there.
All we did was address two discrepancies in the documents on
two line items and ended up using Cheryl Potashnik's
deposition testimony rather than trying to estimate, because
defendants did not ultimately provide records that they have
that would have allowed us to calculate the total amount of

stay bonuses paid to other employees.

THE COURT:  Okay.

MR. L. FRIEDMAN:  Your Honor, may I see the disclosures that were handed to you?

THE COURT:  Sure.

MS. GIBSON:  Oh, and those financial records I'm talking about are stay-bonus records were among those that the Court ordered defendants to produce.  And it hasn't happened.

(Pause)

THE COURT:  Did you want to respond?

MR. L. FRIEDMAN:  Yeah.

So the answer is, Judge, that what counsel handed to you doesn't comply with Rule 194.2, which requires plaintiff to provide us with the amount and any method of calculating economic damages.  What plaintiff provided us was with guesstimates or guesses of how they may at some point in the future, if given certain documents that they believe may exist, they would calculate damages.  But it's all based on hypothesis and conjecture.  We're entitled to rely on a specific amount, which amount changed as of last night, and we're allowed to rely on a specific calculation.

THE COURT:  When you say it changed last night, it sounds like it went down last night.

MR. L. FRIEDMAN:  Well, it did.

THE COURT:  Well, that's to your benefit.

MR. L. FRIEDMAN:  It may be, but it changes the defense in the case.  We now have to reconfigure our defense based on a different calculation.  We need different documents.  We need different -- different analysis in order to meet what is now a new theory of the plaintiff's less than 24 hours before trial.

THE COURT:  It's not a new theory.  Correct me if I'm wrong, but if I understood Ms. Gibson's argument right, it's the same theory all along.

They didn't have actual numbers until they took Ms. Potashnik's deposition, which was just recent.  I mean, the discovery in this case -- unusual case, everyone will agree -- was, for such an old case, was going up till the very last minute.  You had to expect that there's going to be some different numbers are given in this late discovery that the supplementation is going to be late.  But this supplementation is to your benefit.

MR. L. FRIEDMAN:  It's actually a different theory --

THE COURT:  All right.

MR. L. FRIEDMAN:  -- because when we analyzed Mr. Carpenter's sworn statements over the period of time in this case Mr. Carpenter gave different formulas of what he believed his so-called, alleged, oral agreement was

with Mr. Potashnik.  So, on some occasions it included he
netted out employee bonuses to other employees.  Another
case, on other occasions, he included those bonuses.  On
some occasions he said this agreement was only with
Mr. Potashnik.  On other occasions he didn't know who his
agreement was with.  On other occasions he had an agreement
with all the defendants.

       So it wasn't until last night that we
understood the claim that the plaintiff was going to trial
on.  We don't believe their claim, but we at least knew less
than 24 hours before trial what the claim is that they're
going to trial on.

       In addition, at various points along the
way they claimed that Mr. Carpenter was owed $200,000 a year
in bonuses.  Then it was we don't know how much a year in
bonuses, based on the company's profitability.  Then when
they found out from Mrs. Potashnik's -- Ms. Geiser's
deposition that the companies weren't profitable, they said,
okay, well, now we're going down to a minimum of $50,000 a
year because that's what he got on his first-year bonus.

       So the theories have changed, the
calculations have changed, and the damage number has
changed.  And, yes, last night, less than 24 hours before
trial, we learned -- in violation of the rule -- that it was
to our benefit.  But that requires us to prepare in a

different way for a different analysis.  And if it was a surprise it becomes trial by ambush and it is a violation of Rule 194.  So we don't think they get a chance to ambush us the night before trial.

THE COURT:  One of those rules of 193 and 194 calls for acceptable supplementation.  It doesn't give an exact date like the prior rule that says 30 days before trial.  Maybe it does.

MR. L. FRIEDMAN:  Not rule -- not 194.  194 says they have to provide their response 30 days after they were served with the disclosure.

THE COURT:  And then after that it says acceptable supplementation.  And I understand, for whatever reason, you were going up to the few days before trial taking depositions in this case and you took Mr. Carpenter's deposition just a few days before.

MR. L. FRIEDMAN:  And I did.  You got to anticipate there's got to be some reason to take the deposition.  There's still some information.

But he changed his story and now he's changed his calculation, and what I didn't anticipate was that he'd change his whole theory in the case in his whole entire method of calculation.  And I didn't anticipate learning about it the day before trial.

Now, see, Mr. Carpenter is their witness.

THE COURT:   Right.

MR. L. FRIEDMAN:   He always knew what his damages were.   He always knew how he was going to calculate his damages.

THE COURT:   He didn't know the hard numbers.

MR. L. FRIEDMAN:   Okay, but he always knew how he was going to calculate his damage.

THE COURT:   You're saying he changed it?

MR. L. FRIEDMAN:   He changed it.

THE COURT:   Tell me --

MS. GIBSON:   Your Honor, it's not true. Jeff Carpenter's formula for calculating the stay sale proceed, stay bonus, was disclosed ages ago.   I think it's in his declaration in response to summary judgment years ago.   The disclosures that we served on the annual bonus calculation the formula has never changed.   This is not a new theory.   It's in black and white in front of you that the formula hasn't changed.

In fact, even on prior disclosure we did line items for each amount based on escrow documents that we subpoenaed.   That hasn't changed.   We simply needed to update with line items on that whether there was a discrepancy in the documents, and we updated based on Ms. Potashnik's deposition.

We also, at one point, anticipated after this Court's order requiring defendants to produce financials by January 15 at noon that we may have some additional calculation there, but they never provided the information.  None of this is new.

Mr. Carpenter hasn't changed his theories. He hasn't changed the formula for the annual bonuses -- or the sale proceeds bonus.  And with respect to the annual bonuses, it has always been arranged from 50,000 to 200,000. It's, again, in black and white in front of the Court.

What we did here was simply pick a number rather than just giving a range.  And that number, the numbers we used there, were in a document that was disclosed in this case in one of the first sets that Gardere produced. So this is not new information.  It is not a new theory.  It is merely an update on some calculations previously provided.

THE COURT:  Okay.

MR. L. FRIEDMAN:  So Rule 193.5 says that any amendments to disclosures or discovery less than 30 days before trial is presumed to be untimely.

THE COURT:  Well, that's -- yeah.  You would think in a case this old that you'd have everything wrapped up in a bow, you know, years ago ready to go.  But if it's a presumption, that's a pretty good presumption for

a case this old.  But since you were going right up until
the time of trial taking depositions and Ms. Gibson says you
still haven't produced the documents that you need, despite
a Court order to get those hard numbers, you know, it seems
to me that that presumption can be overcome.

I'm still not clear why you're saying it's
a change, not a change in numbers -- not just a change in
numbers but a change in theory or, you know, how the -- what
the formula for the damages are.

MR. L. FRIEDMAN:  Okay.  Well, two things.
Number one, we have responded to the Court order and we've
told Ms. Gibson that we provided everything in Mr. and Mrs.
Potashnik's possession, custody, and control.  She's just
not satisfied with that response.  I can't help it.

THE COURT:  I understand what you told me.

MR. L. FRIEDMAN:  Okay.

THE COURT:  I'm not ruling on that.

MR. L. FRIEDMAN:  I'm just saying.

Number two, let's take a 10-minute recess
so that we can pull out different formulas that
Mr. Carpenter has given us with regard to these damages.

THE COURT:  All right.  Fair enough.

MR. L. FRIEDMAN:  Thank you.

THE COURT:  See you in 10 minutes.

(Recess taken)

MR. L. FRIEDMAN:  Your Honor, I've handed
you a handwritten sheet that we prepared during the recess
specifying the different damage amounts and calculations
provided during the course of this case by Mr. Carpenter and
his various counsel.  I count one, two, three, four, five,
six, seven, eight, nine, ten, eleven, twelve, a minimum of
twelve different times in disclosures, pleadings,
declarations, and depositions that Mr. Carpenter has stated
different methods of calculations, different amounts of
damages, or that he didn't know the amount of damages or
didn't -- wasn't able to calculate his damages.  I'd like
Mr. Donohue and Mr. Jason Friedman to go through this and
point out the differences.

But based on all of these which I'm going
to ask the Court to take judicial notice of the pleadings
that we mention, we're ready for trial.  We're just not
ready to address the attorneys' fees issue and the damage
fee -- the damage calculations and damage amount because
sufficient information was not provided to us during the
course of this case.

So let me start with May 16 , '06,
according to Mr. Carpenter's declaration which was filed
with the court in response to our summary judgment motion on
July 22nd, 2013.

Do I need to ask you to take judicial

notice of each pleading every time?

        THE COURT:  I'll take judicial notice of the entire file.

        MR. L. FRIEDMAN:  Okay.

        So, Mike, you want to address that?

        MR. DONOHUE:  Address what?  I'm sorry.

        MR. L. FRIEDMAN:  The formula that he expressed in his declaration on July 22nd, 2013.

        MR. DONOHUE:  I don't think I have the declaration.

        MS. GIBSON:  I have it.

        MR. DONOHUE:  Do you?

        MS. GIBSON:  Well, I have it up on my computer.  It's the formula on the annual bonuses.  The three percent is at Page 516.

        MR. L. FRIEDMAN:  Let Mike handle it.

        MS. GIBSON:  Okay.

        MR. DONOHUE:  Thank you.

        Sixteen?

        MS. GIBSON:  Yeah, 16.  And it continues on the next page.

        MR. DONOHUE:  Yes, Paragraph 16 of the declaration filed in response to motion for summary judgment that we had filed first addresses the three percent of net proceeds for the sale of Southwest Housing units' assets and

Mr. and Mrs. Potashnik's partnership interest assets in the apartment community.  She calls that the sales proceeds bonus.  He addresses that as, I believe in a May 2006 pleading with -- allegedly with Brian Potashnik.

MR. L. FRIEDMAN:  Mr. Carpenter pinpoints May 16, 2006, as the date --

MR. DONOHUE:  Yes.

MR. L. FRIEDMAN:  -- he allegedly reached an oral agreement with Mr. Brian Potashnik and then he sets out what he states in his declaration --

MR. DONOHUE:  Yes.

MR. L. FRIEDMAN:  -- was that oral agreement.

MR. DONOHUE:  And he says that the net proceeds from it was a gross compensation for the sale transaction minus, A, closing cost of broker's fees, attorneys' fees related to the sale transaction, titles fees, other normal closing costs; and, B, any compensation paid from the sales proceeds to any other employees.  He says that was the formula that was allegedly discussed between he and Mr. Brian Potashnik in May of 2006.

MS. GIBSON:  No.  The initial offer did not specify.

MR. DONOHUE:  Okay.  I apologize.  It does say that the initial offer did not specify the specific

percentage or formula, which I take is the formula that I just read to you.  But that's the formula that he originally -- or at least in his declaration he filed in July of 2013 with this court said.  The problem with that is that he also says in a amendment, draft amendment --

MR. L. FRIEDMAN:  Well, that's his first stated formula.  Then the next time he states the formula is on March 14, 2007, in an amendment to his employment agreement which Mr. Carpenter claims he handed to Brian Potashnik.

MR. DONOHUE:  Do you happen to have that? If you don't --

MS. GIBSON:  I mean, I can find it for you, but --

MR. DONOHUE:  That's fine.  I appreciate you letting me look at that.

MS. GIBSON:  That's an underlying document in this case, not a pleading in this case.

MR. DONOHUE:  No, it's not, but --

MR. L. FRIEDMAN:  He testifies about it in his deposition.

MR. DONOHUE:  I'm going to represent to the Court that the -- this draft amendment that he says that he gave on March 14th of '07 to Mr. Potashnik does not have that same formula.  Instead of deducting the compensation

supposedly paid to other employees from the sale proceeds he said there will be no deduction if any other employees are paid compensation on the sales proceeds.  So it reverses that aspect of the formula.

          MR. L. FRIEDMAN:  It reverses what Mr. Carpenter says was the original formula, and the draft amendment to his employment contract is inconsistent with Mr. Carpenter's notion that he had an oral agreement and didn't need a written one.  And the -- and the draft amendment to the employment agreement was written by Mr. Carpenter, drafted by Mr. Carpenter.

          THE COURT:  If this is based on an oral agreement the burden is on Mr. Carpenter to establish the terms of the oral agreement.  And it seems like if there's some inconsistency from over the years that that just -- that's your cross-examination that he doesn't even know the terms of the oral agreement that he's alleging.  I'm not agreeing with that.  That just seems like that that's part of the cross-examination.

          MR. L. FRIEDMAN:  Correct.  But on prior occasions he gives different renditions of what his formula to calculate damages are and the amount of damages, and we get within 24 hours of trial a new method of calculation and a new amount of damages.  And that doesn't leave us in a position to be able to adequately prepare to meet the damage

calculations and the damage amount at trial.  That's why
we're asking the Court to exclude the plaintiff's evidence
with regard to damages and damage calculations.

THE COURT:  Okay.

All right.  Mr. Donohue, go ahead.

MR. DONOHUE:  And I'll say one other thing
about this March 14th, 2007 time frame.  He also presented
what he calls his personal notes with Brian Potashnik.  In
fact, if the Court prefers, I can introduce this as -- not
so much.  The last page of these personal notes he sets
forth what he claims are his earned bonuses through a
spreadsheet.  This is by way of his employment agreement and
he calculates it out.

Now, this -- granted, this is March 14th of
'07.  He's still employed.  But he says he has coming due to
him $600,502 and sets out a formula, which is -- which is
different, although it has the same minimum and maximum
earned.  But what he's asking for is different than when
he's asking for now.

Now, I could be mistaken, but I thought I
heard that they were no longer -- this morning from
Ms. Gibson -- that they're no longer seeking in their damage
calculation their proportionate share of the 2007 employment
agreement bonus.  I could be mistaken on that.  If I am --

MS. GIBSON:  It's correct.  We are no

longer seeking a pro rata share for the last partial year of
work.

        MR. DONOHUE:  So if that's the case, if
that's correct, this $600,000 number we should be able to
rely at least on this number as being the method and manner
in what he's seeking as of at least March 14th, 2007.  And
he's not even seeking 2007 bonuses.

        THE COURT:  Well, right.  And is the number
not 600,000 then?

        MS. GIBSON:  Your Honor, earlier they were
talking about the three-percent formula.

        THE COURT:  Right.

        MS. GIBSON:  This is the annual bonuses?

        THE COURT:  Right.

        MR. DONOHUE:  Correct.

        MS. GIBSON:  What Mr. Donohue is referring
to is during employment Jeff had given a document on what he
thought he deserved.  That's what he's talking about.  Which
is not the same as the damages we're claiming in this case.
Our damages are based on what Brian Potashnik, from Brian's
mouth, acknowledged was owed.  The document he's referring
to is just something during the employment relationship
where they're talking about how much or how much more
Jeff Carpenter will get in annual bonuses, and Jeff gives a
spreadsheet on what he thinks he deserves.  It's not --

THE COURT:  What are your damages for -- is it the same amount of damages for 2004, 2005, and 2006?

MS. GIBSON:  So, with respect to 2004, 2005, and 2006 --

THE COURT:  Right.

MS. GIBSON:  -- those are together as one, as one unit.

THE COURT:  But it's an annual bonus.  And is --

MS. GIBSON:  Right.  It's --

THE COURT:  -- it the same amount each year?

MS. GIBSON:  Well, we -- I mean, that's in dispute, but the range is from 50,000 minimum to 200,000.

THE COURT:  Okay.

MS. GIBSON:  And that's always been the case.  That's always been what we disclosed.  But Brian, as far as the numbers he had talked about with Jeff, numbers he actually -- came out of his mouth, within that range, that's the $400,000 amount that we supplemented with.  In other words, rather than asking the jury to decide what was agreed within the range, we're giving a number within the range, if that makes sense.  But it's always been on the annual bonuses calculated between 50- and 200,000 in each year of employment.

MR. DONOHUE:  Okay.

THE COURT:  In your supplement now, if the max under what you're saying, that it's always been between 50- and 200,000, the max has been 600,000 'cause 3 times 200,000 is 600,000?

MS. GIBSON:  Correct.

THE COURT:  Right.  Are you saying the max now is 400,000?

MS. GIBSON:  That's correct.

MR. L. FRIEDMAN:  They can claim the max is 1 million or 9 million or 900 million.  They just never disclosed it to us until yesterday.

THE COURT:  Well, they disclosed a greater number.

MR. L. FRIEDMAN:  They disclosed a different number and different calculations.

THE COURT:  All right.

MR. L. FRIEDMAN:  So yesterday, for the first time, they disclosed a new number and new calculation. It's just not fair.

THE COURT:  All right.

Mr. Donohue, anything else?

MR. L. FRIEDMAN:  Yeah.  So that, also, in a sworn declaration, Mr. Carpenter says that on May 14th, 20 -- 2007, he had a breakfast meeting with Mr. Potashnik

40

and again discussed, yet again, a different formula to
calculate his damages.  And I don't believe any amount.

       THE COURT:  Okay.  That's all before the
lawsuit.  That doesn't have anything to do with
supplementation or --

       MR. L. FRIEDMAN:  Okay.

       THE COURT:  -- or responses to discovery.

       MR. L. FRIEDMAN:  But that was in his
declaration, so we're entitled to the sworn declaration
which he filed with the court which we're entitled to rely
on.

       Then you look at plaintiff's original
petition where they don't put any formula in plaintiff's
original petition where they -- which they filed on March
11th, 2008.  They don't put any amount of damages and no
formula.

       THE COURT:  Okay.

       MR. L. FRIEDMAN:  Then you go to
plaintiff's first disclosure response on June 24th, 2008.

       Right, Mike?

       MR. DONOHUE:  Well, one thing, one
correction.  They do disclose a formula.

       Jason, can you put that up there?

       MR. L. FRIEDMAN:  I'm sorry.

       MR. DONOHUE:  It's a formula that's not the

formula that --

        MR. J. FRIEDMAN:  So, in plaintiff's original petition Mr. Carpenter verifies under oath that the formula is three percent of the gross sale, less normal closing costs, brokerage fees, attorneys' fees related to the sale -- not the criminal case -- title fees and other normal closing costs.  The agreement was made in consideration in part, plaintiff remains the employee of one or more of the defendants --

        MR. DONOHUE:  It's important to note that he does not deduct compensation paid to other employees from sales proceeds as he claims now and as far as in his original petition.

        THE COURT:  Okay.

        MR. L. FRIEDMAN:  Then he -- he made -- plaintiff makes additional disclosures on June 30th, 2010, his third disclosure response.

        MR. J. FRIEDMAN:  His third disclosure response on June -- you said July 30th?

        MR. L. FRIEDMAN:  June 30th, 2010.

        MR. J. FRIEDMAN:  I have that.  It's actually June of '0 --

        MR. L. FRIEDMAN:  Third disclosure response.

        MR. J. FRIEDMAN:  I don't have June.  I

have one before that.

MS. GIBSON:  There are -- there are some on that date from the arbitration proceeding.

MR. L. FRIEDMAN:  That was July 30th, 2010.

MR. J. FRIEDMAN:  I don't have that date.

MR. L. FRIEDMAN:  Well, look in your motion to exclude.  Do you have your motion to exclude?

(Pause)

MS. GIBSON:  Your Honor, in the interest of time, I'm not -- I'm hearing that they think they have some things to cross-examine Mr. Carpenter on, but I'm not hearing that the most recent update to our disclosures changes the previously and long ago disclosed formulas.

MR. L. FRIEDMAN:  Yeah.  It's misleading.

MS. GIBSON:  And if they have something, you know, I think that's the issue.

MR. L. FRIEDMAN:  It's misleading and it didn't give us adequate time to prepare for trial because 12 -- 11 times before they gave us different formulas.  And we're entitled to rely on the formula and the -- there was no formula and there was no calculation and there was no amount of damages as of their last disclosure on May 31st, 2016.

MS. GIBSON:  Your Honor, that's not true.  Even the formula that Mr. Donohue read from Jeff's

declaration matches the formula in the supplemental disclosures and the disclosure before that. Nothing has changed since the -- as far as the formulas or what we're talking about on annual bonuses or the sales proceed bonus since our disclosure before the latest update.

THE COURT: We'll come back to this if we have to, but what is the motion to exclude all evidence?

MR. J. FRIEDMAN: Well, the motion to exclude --

THE COURT: What tab number is it?

MR. L. FRIEDMAN: Your Honor, let me move to admit my handwritten notes as Exhibit Number 1 --

THE COURT: Sure.

MR. L. FRIEDMAN: -- for the purposes of this hearing.

THE COURT: All right.

MR. L. FRIEDMAN: And let me point the Court's attention to the plaintiff's original petition filed March 11, 2008; Plaintiff's first disclosure responses, which I believe was -- had a certificate of service of June 24th, 2008; plaintiff's third disclosure responses with the certificate of service June 30th, 2010; plaintiff's arbitration disclosure responses, July 30th, 2010, which is part of the consolidated cases filed in this court; John [sic] Carpenter's declaration, sworn declaration --

44

THE COURT:  Jeff Carpenter.

MR. L. FRIEDMAN:  I'm sorry.

Jeff Carpenter's sworn declaration of July 22nd, 2013; Jeff Carpenter's fifth disclosure response, May 31st, 2016; Jeff Carpenter's second arbitration disclosure response, January 4, 2017; Jeff Carpenter's deposition testimony on 1/15 -- January '18; and Jeff Carpenter's January 21st, 2018, ninth disclosure response that was filed within 24 hours of trial date.

And ask the Court -- I know the Court's taken judicial notice of all the pleadings filed with the court -- and just say that based on all of the inconsistent information provided by the plaintiff and the lack of specific response to the request for disclosure that requires plaintiffs to disclose the method of calculation of damages and the amount of damages they are seeking, that we would ask the Court -- because we have no way to properly prepare for trial on the amount of damages or the method of calculation, we'd ask the Court to exclude any evidence with regard to plaintiff's method of calculation of damages or amount of damages plaintiff is seeking in this case.

THE COURT:  Okay.

And I've taken -- you want to attach to the reporters record just your handwritten note there or all those documents?

45

MR. L. FRIEDMAN:  I want to attach all those documents and I want --

THE COURT:  Do you have them?

MR. L. FRIEDMAN:  Yes.

-- and I want leave to attach Jeff Carpenter's deposition of January 15th, 2018.

THE COURT:  All right.

Okay, and we'll -- if you can gather those documents up, we'll get them to the court reporter.

MR. L. FRIEDMAN:  Thank you.

THE COURT:  All right.  Who has the motion to exclude plaintiff's evidence?  Mr. Friedman?

MR. J. FRIEDMAN:  Yeah.

MOTION TO EXCLUDE PLAINTIFF'S EVIDENCE

MR. J. FRIEDMAN:  Your Honor, the motion to exclude all plaintiff's evidence is based on the fact that the plaintiff's evidence is based on the fact that they failed to timely provide us with witness lists and the pretrial materials pursuant to the scheduling order.

On February -- February 8th, 2017, the Court granted a continuance in this matter.  Through its order, the Court continued the trial set for March 6, 2017, at the time.  It was eventually set for January 22nd, 2018. At the time of the continuance the parties were operating under an agreed scheduling order, and the Court's

continuance stated that all deadlines shall be extended
accordingly.

   The agreed scheduling order required the
parties to file a final witness list, including expert
witnesses, a list of exhibits expected to be offered at
trial, final designation of line and page numbers of
deposition testimony expected at trial, motion in limine,
both jury charge questions, definitions, final proposed jury
questionnaire.  And based on this it required -- plaintiff
was required to file the above-referenced list of documents
four days before trial commenced, and that did not take
place.

   THE COURT:  Okay.

   Ms. Gibson?

   MS. GIBSON:  Yes, Your Honor.

   There is -- since the last continuance
there is no deadline for pretrial disclosures, and that's
why Mr. Donohue and I were discussing that we had talked
about whether we wanted to do that by agreement at the
hearing on last Friday.  The Court just suggested that I
submit a preliminary witness and exhibit list to the Court
at pretrial but wouldn't hold us to it.

   The prior scheduling order before the prior
trial setting had specific dates for various deadlines.
What defendants are trying to argue is that the parties

should have somehow inferred that we needed to use those
dates, calculate how far away they were from the last trial
setting, and adopt that here.  The bottom line in this case
and what -- why I find this motion so unbelievable is the
parties had worked on a new scheduling order in this case,
and then I guess our dockets blew up and it never happened.
And so what we did -- and we talked about it -- is we
continued to do things by agreement.

    And, in fact, at the latest most recent
conference about agreeing on hard deadlines like discovery
deadlines it was defendants' suggestion that we leave
that open.  And as a result we have been continuing to do
discovery all the way through the Friday before trial.
There's -- there's no -- and the fact that there wasn't any
deadline for exhibit lists or witness lists after the last
continuance is shown by the fact the defendants didn't file
anything until yesterday after we submitted our preliminary
witness list.

    THE COURT:  Okay.

    Mr. Friedman, anything else?

    MR. L. FRIEDMAN:  There is a scheduling
order.

    Do we have the order?

    MR. DONOHUE:  Is it not in --

    MR. L. FRIEDMAN:  The order of continuance

by this Court indicated that the prior scheduling order
would continue in effect.  We abided by it.  We didn't file
an exhibit list or witness list until after the plaintiff
did.  We don't need an exhibit list or a witness list if the
plaintiff wasn't going to file one of theirs, so we waited
till after they did it.

          MS. GIBSON:  Your Honor, the scheduling
order, the last scheduling order he is referring to is one
both parties had informed the Court that they intended to
use new deadlines in connection with the continuance.  And
so what --

          THE COURT:  You're saying that --

          MS. GIBSON:  -- Mr. Friedman is trying --

          THE COURT:  -- the prior scheduling order
had dates, specific dates, not -- it didn't say that the,
you know, page and line designations were due 10 days before
trial?  It said --

          MS. GIBSON:  Exactly.

          THE COURT:  It said, you know, May 15th or
whatever the date was?

          MS. GIBSON:  Exactly.

          So what Mr. Friedman is essentially trying
to argue is after the parties have agreed and continued to
do things by agreement since the last reset is that somehow
we should have met either pretrial deadlines on the dates in

the old scheduling order -- which would have been more than
a year ago -- or that we somehow should have inferred that
there was some, you know, some deadline based on the dates
between the specific dates in the last scheduling order.

          THE COURT:   Okay.   And the prior scheduling
order is this one.   The last scheduling order that actually
had dates in it was this one that was May 11th, 2016?

          MR. L. FRIEDMAN:   No.   I think it's
February -- I think it's February 17th, 2017.

          MS. GIBSON:   I think Mr. Friedman's talking
about a prior deadline, not the date of the prior order.

          MR. L. FRIEDMAN:   But I'm just referring to
the February 8th, 2017 order.

          THE COURT:   There's no deadlines in that
one.

          MR. L. FRIEDMAN:   But it says all deadlines
shall be extended accordingly.

          MS. GIBSON:   And, quite frankly, when we
were discussing this issue when Mr. Donohue was in front of
this Court last Friday, no one made a claim --

          THE COURT:   Right.

          MS. GIBSON:   -- that there was some
pretrial deadline, 'cause there wasn't.

          THE COURT:   To say all deadlines shall be
extended accordingly, I can't take that -- maybe there's a

miscommunication between you, but I can't take that to say that you calculate the number of days in the last one before the trial setting and just add that to this one.  If you wanted to do that, you could have submitted a scheduling order; which you probably should have done for a case this size.

Was there some documents that were on their exhibit list that they produced in the exhibit list that were a surprise to you that you hadn't seen before?

MR. DONOHUE:  We got the exhibit list late last night.

THE COURT:  All right.

MS. GIBSON:  Your Honor, I'll represent --

MR. DONOHUE:  Right before midnight.

MS. GIBSON:  -- they all have been produced.  I'm sorry.  They've all been produced unless they were actually letters, for example, to counsel.  Like, there's a settlement letter from Chapter 38.

MR. L. FRIEDMAN:  What time was that exhibit list sent to us, 'cause I didn't see it?

MS. GIBSON:  It was -- it was -- we filed and served it late last night.  What the Court had asked me to do was bring a copy this morning.

MR. L. FRIEDMAN:  Was it after midnight?

MS. GIBSON:  No, but it -- but it was late.

51

MR. L. FRIEDMAN:  I mean, I didn't see it.
I went to sleep at 11:00.  I didn't see it.

THE COURT:  All right.

MR. L. FRIEDMAN:  So, Judge, at some point
these lists were not timely served on us.  These lists were
not timely served.  I mean, it's not -- it's not only was it
a surprise.  We had to have it in time that we could prepare
our case.  We didn't.

They're the plaintiff.  They have the
burden of proof.  We have to know what -- we know there was
no oral agreement.  We've known that for 10 years.  We have
to know what they're going to allege on this made-up story
and we don't.  So this is a surprise and it's trial by
ambush.

THE COURT:  Well, you just took his
deposition.  You don't know what his -- his allegation is
about the oral contract?

MR. L. FRIEDMAN:  I know what his new
allegations are.  Yes, I do.  I know what last week's
allegations are, and they're different than the 11 other
pleadings that he filed in the case and his -- and the sworn
declaration.  Yeah, I do.

THE COURT:  Well --

MR. L. FRIEDMAN:  But I don't know who
they're going to call as witnesses and what documents

they're going to use which would help me prepare for trial.

              THE COURT:  Well, in most of your cases you have a scheduling order calling for lots and lots of things to be done on particular days.  Why not have done that in this case?

              MR. L. FRIEDMAN:  But don't be -- please don't penalize us for following the Court's order.  The Court said here's a continuance, all deadlines are scheduled -- are extended accordingly.  I don't need a certified public accountant to figure out to take those dates and apply them to the new trial date.

              MS. GIBSON:  Your Honor, if that -- if Mr. Friedman was being accurate in what he was saying, defendants' wouldn't have been taking depositions the week before trial.  They wouldn't have tried to file a motion for summary judgment so close to trial, though they couldn't get a hearing set.  Because under Mr. Friedman's analysis, defendants would have been late.

              And, quite frankly, although Mr. Friedman spouts off about the case, what this really is is a hail Mary in a case where Cheryl Potashnik testified under oath, yes, we intended to pay Jeff Carpenter the stay bonus from sales proceeds.

              MR. L. FRIEDMAN:  Not exactly.

              THE COURT:  Okay.  Y'all can argue about

what the evidence is just on pretrial things.

All right.  You have objections to some witnesses.  Was that for failure to disclose or -- or --

MR. DONOHUE:  No.  All the witnesses were disclosed.  All the witnesses are in their -- their disclosures.

THE COURT:  Okay.  I just wrote down the things you said about the witness -- objections to witnesses.

Was there an objection to --

MR. L. FRIEDMAN:  We have to look, Your Honor.

THE COURT:  Okay.

MR. L. FRIEDMAN:  We don't have it at this time.

THE COURT:  And have y'all confirmed on defendants' motion in limine?

And you said you filed a motion in limine or not?

MS. GIBSON:  No, Your Honor.

THE COURT:  You did not.

MS. GIBSON:  We filed a motion for sanctions.

THE COURT:  Okay.  And do you have a copy of that?

MS. GIBSON:  Yes.

I think I already gave -- yeah, I already gave you a copy.

THE COURT:  All right.

MS. GIBSON:  It's separate and it's clipped by binder.

THE COURT:  It's separate and clipped by a binder.

MS. GIBSON:  Well, it's --

THE COURT:  All right.  Okay.

MS. GIBSON:  Do you have it?

THE COURT:  Yeah, I have it.

MS. GIBSON:  Okay.

THE COURT:  All right.  What is your motion for sanctions against defendants?

PLAINTIFF'S MOTION FOR SANCTIONS

MS. GIBSON:  So, the motion for sanctions surrounds the Court's order overruling objections to document requests we served on each defendant.  The Court ordered that defendants provide responses by January 15th at noon.  We received nothing.  The defendants moved for reconsideration on January 17th, I believe, and the Court denied the motion for reconsideration.

At the motion for reconsideration I had shown the Court some indication that we believed the

defendants actually have control -- sufficient possession, custody, or control over certain documents even though they they say they can't find anything.  And in the motion for sanctions we've addressed three types of those documents and asked for narrowly tailored sanctions.  For example, at Page 2 part of the documents we have requested was defendants' copy of the Hexter Fair Title Company escrow documents, the purchase and sale agreement with Cascade, and all of the sale closing documents.  Defendant said that they couldn't find those documents; but Cheryl Geiser testified when I said, "Where is the seller's copy of the purchaser and sale agreement," she said her attorneys have a copy of it.  That's possession, custody, or control.

When I ask about escrow documents and all the clothing -- closing statements she says either these attorneys or the closing attorneys would have them.  And, yet, in responses they simply say they can't find the documents.  It's apparent that what they're doing is just looking in their house rather than going out and getting documents that they have control over and could easily get.

And our frustration in this case is defendants, when they want to use the documents, will ask their accountants, will ask their attorneys, will go pull Secretary of State records, will go to the probation office to get probation records.  But in response to similar

requests they tell us none.  So the claim that they
diligently searched and have nothing to provide is false.

The remedy we request here is simply that
the Hexter Fair Title documents, the escrow documents that
we have from closing, and the documents we subpoenaed from
Cascade -- which is all the closing documents, including the
purchase and sale agreement -- that those be deemed admitted
for purposes of trial.  In other words, they can't object to
admissibility of what we got from third parties.

THE COURT:  All right.  Was there an
objection?

MR. L. FRIEDMAN:  Yeah, there's an
objection.  It's going to be lack of foundation and hearsay.

They don't have a way to get those
documents in at trial.  The -- those documents were held by
those lawyers and accountants and everybody else for the
requisite four-year time period and then they were destroyed
in the normal course of business.  They're here 10 years
later wanting to know where those documents are.  We don't
have the documents and I don't know if they have the
documents or not.  We asked for them six years ago and they
were destroyed.  So if they can hunt them up somewhere else,
that's their business.

Apparently, they found those documents, but
what they failed to do was to get a proper business records

affidavit and now they're stuck.  Well, they're stuck.

THE COURT:  What did Ms. Potashnik or Ms. Geiser mean -- does she prefer Geiser?

MR. L. FRIEDMAN:  Well, they were divorced in 2014 --

THE COURT:  Right.

MR. L. FRIEDMAN:  -- and she's Cheryl Geiser.

THE COURT:  Okay.

What did she mean when she says she's sure her attorneys have a copy of it?

MR. J. FRIEDMAN:  Well, at the time of her depo', which was two weeks ago, she knew that we had copies of the closing statements.

THE COURT:  By "we", she means you?

MR. J. FRIEDMAN:  Yes, us, because Amy subpoenaed them.  That was the -- that was the only way we had them.

THE COURT:  Right.

MR. J. FRIEDMAN:  Amy subpoenaed those documents years ago.  So that's, yes, we have them; and she has them from Amy.

THE COURT:  Okay.  But if you produce them then there's --

MR. J. FRIEDMAN:  She produced them.

THE COURT:  I know, but you have them.

MR. J. FRIEDMAN:  Correct.

THE COURT:  If you turn around -- she's asked for them.  If you turn around and produce the very same thing or you respond they're the documents you already have, then there's a provision in the rules for authentication because you've produced them.

MR. J. FRIEDMAN:  Sure.  I didn't turn around and produce them because Amy gave them -- Ms. Gibson gave them to us.

THE COURT:  Right.

MR. J. FRIEDMAN:  So I understand what you're saying, Your Honor, but I never regurgitated their --

THE COURT:  Did you say no need to produce them, you already have them?

MR. J. FRIEDMAN:  Well, Ms. Gibson and I talked about it; that she was going to subpoena them because I didn't have them and my client didn't have them.  So the agreement was she was going to subpoena them.  And then she gave me a copy.  It's such a voluminous document.  It's thousands and thousands of documents on a US -- she sent me a -- Ms. Gibson, correct me if I'm wrong -- I believe she sent me a USB drive or a disk.

Is that correct?

MS. GIBSON:  Of the -- the purchaser's copy

of the closing document was produced on disk.

They are voluminous.  That's part of the reason we're seeking tailored sanctions.  It's a lot easier if I have their copy and I don't have to deal with objections.

Hexter -- quite frankly, originally the defendants had said they would provide the PSA documents and at that point was material to the coverage dispute and then they changed their minds.

THE COURT:  You're saying --

MS. GIBSON:  But the bottom line is Cheryl Potashnik is testifying that they exist.  There's no evidence before this Court that anyone destroyed these documents.  In fact, we got them from Cascade's attorneys, Foster & Pepper in Seattle, well after four years later.

MR. J. FRIEDMAN:  And, Your Honor, this was never brought up like Ms. Gibson was saying earlier.

MR. L. FRIEDMAN:  Wait a second.

We fulfilled our responsibility when we were asked for them, period.  Plaintiff's counsel sought to get those documents elsewhere and apparently they did.  It's their responsibility to prove up those documents from those other sources, and they easily could have.  Now they're trying to blame us for it or take an end run around their failure to build a foundation.

THE COURT:  It would have been easier for them to submit a business records affidavit.

MR. L. FRIEDMAN:  Okay.

THE COURT:  But there's more than one way to authenticate a document.  If you -- you're saying you fulfilled your duty; she's saying you didn't.  And she's given me some proof that you didn't because your own client says that you have, assuming that by "her attorney" she's referring to you and not another set of attorneys.  But in any event, that's within her care, custody, and control, but it's her attorneys that have it.

MR. L. FRIEDMAN:  We have -- I don't know if we have all the closing documents.  We have only those documents that were provided to us by plaintiff's counsel.

THE COURT:  Okay.

MR. L. FRIEDMAN:  And that's all we have.

MR. J. FRIEDMAN:  And at the time of her deposition, yes, we had all those --

MR. L. FRIEDMAN:  I can handle this.

It's my view when she has Ms. Potashnik on the stand she can prove them up, if she can prove them up.

THE COURT:  Okay.

What about the witness agreements?

MS. GIBSON:  Sure.

Another type of document request that we

made involved any agreements that would tell us how much the stay bonuses were.  And, also, we asked for agreement --

MR. L. FRIEDMAN:  I'm sorry.  I didn't hear that.  Say it again.

MS. GIBSON:  How much the stay bonuses were for other employees.

THE COURT:  The stay?

MS. GIBSON:  Stay.  Paid to stay.

THE COURT:  All right.

MS. GIBSON:  Pay-and-stay bonuses paid out to other employees.  That goes to part of the formula.  We also asked for any agreements with witnesses that might include nondisparagement, cooperation, non-cooperation clauses, and participation or non-participation clauses in litigation.  And it turns out that severance agreements with employees included the bonus amount and also included nondisparagement, confidentiality, and cooperation clauses. With respect to those documents, Cheryl Geiser again testifies that she thinks her lawyers have them and that the separation agreements include the stay-bonus amounts paid out.

And so, again, defendants have responded in written discovery saying that they can't find documents. And we think what's going on is the defendants are only looking in their home and not going to their bank or going

to their attorney to get responsive documents.  But here again, the documents exist.  They didn't produce them.  They violated the Court's order.  And so we are asking that with respect to this part that witnesses be allowed to testify free and clear of any nondisparagement, confidentiality, or other clauses.

And the bank records are also part of the sanction on damages.  They both -- both of the issues go together, agreements with the amount of stay bonuses on various financial and bank records.

With respect to the bank records, defendants have said that they can't find any.  But consistent with its history, I mean, Mr. Potashnik, at the time of his deposition, said he hadn't even looked.  But again, it's pretty clear that they're not going to the bank and saying we need, you know, the bank records we requested.

MR. L. FRIEDMAN:  So --

MS. GIBSON:  And so with respect -- with respect to that, what we requested that defendants cannot contest our calculation-of-sale-proceeds payment and strike any defenses on that calculation, because they would not -- they did not provide documents that would have allowed us to be more specific than we were.  And, of course, the employee bonuses play into this because Mr. Carpenter's three-percent, sale-proceeds, stay bonus one of the things

that came off of that number is stay bonuses, amounts to pay
to certain other select employees.

And we also, you know, offer evidence that
defendants are quite capable of producing what is in their
control when it's something they want.  But when it's
something we want they don't do it and they say they can't
find it.

THE COURT:  Mr. Friedman?

MR. L. FRIEDMAN:  So here's what the case
boils down to.  The Potashniks were selling their business.

THE COURT:  Right.

MR. L. FRIEDMAN:  They wanted their key
executives to stay until the end.  It was a very complicated
sale, a lot of low-income housing regulations, Affordable
Housing regulations.  It involved many entities, lot of
expenses, numerous different loans and numerous different
partners in numerous different entities.

Frankly, the Potashniks didn't know if
there would be any money left for them at the end.  So the
Potashniks said to a number of -- making up this number -- a
half a dozen of their executives, look, if you stay till the
end -- which Mr. Carpenter didn't -- but if you stay to the
end and if there's money left over, we'll give you-all a
nice bonus.  That's it.  So that was the extent of any
agreement with anybody anywhere.

People had stayed till the end.  Some of them didn't get a nice bonus.  Mr. Carpenter didn't.  Not only did he leave early, but he left early and sued the Potashniks.  I don't know anybody who gives people who sue them a bonus.  Be that as it may for another day.

The plaintiffs have no case.  They have no oral agreement.  Mr. Carpenter chased Brian Potashnik around for a year shoving written agreement after written agreement in front of him, and Brian and Cheryl Potashnik said the same thing, "Look, we can't make a commitment," over and over again.  We cannot make a commitment if we don't know if there's money for us.  We certainly don't know if there's money left over.

People that stay, you know, if things work out we'll give them a bonus.  That's the best they could get out of anybody.

What they want to do is bootstrap their case in retrospect.  They want to say, look, all these other people got bonuses, so Mr. Carpenter should have gotten a bonus.  And in our motion for limine we're asking the Court keep out anybody else's deal because that was their deal.  Let's concentrate on Mr. Carpenter's deal.

Either he -- either he had a deal or he didn't have a deal.  It had nothing to do with Ms. Reidy, who had been with the company for 20 years.  Mr. Carpenter

had been there only three-and-a-half years.

THE COURT:  Are you planning on calling any of those witnesses?

MR. L. FRIEDMAN:  She's going to call them.

THE COURT:  No, are you planning?

Say I grant that motion in limine.  Were you planning on calling any other --

MR. L. FRIEDMAN:  No.

THE COURT:  -- employees who received a --

MR. L. FRIEDMAN:  No.

MS. GIBSON:  They're on their witness list.

MR. L. FRIEDMAN:  Well, they're on our witness list because they're on her witness list.  But we don't -- we have -- we dropped our claims, counterclaim.  We have no burden of proof.  Now that we've taken his -- the deposition, currently, he's got no case, he's got no evidence.

Frankly, I think this is a -- if you let -- if you let them go to trial I think it's a directed-verdict case.  There's nothing for us to do.  I'm just going to sit quietly and object to all their hearsay evidence nicely, quietly, politely, gently.

MS. GIBSON:  Your Honor, none of that had anything to do with the --

THE COURT:  Oh, it had a little bit to do

with one of the things I was concerned about in yours; that if there's a non-disparagement agreement between a witness --

        MS. GIBSON:   Oh, I see.

        THE COURT:   -- and a party wanted to know whether they're intending to call that party as a witness. And that's something we'll have to take up with the motions in limine.

        How many employees are you -- tell me how -- are you -- tell me what your theory is with the other employees who received a bonus.  Are you saying that they're -- they're similarly situated or...

        MS. GIBSON:   Well, two issues.  Now, one, I would point out that there is no motion to exclude other people's deals in the motions in limine.

        THE COURT:   He says there's a motion in limine.  I hadn't looked at it.

        MS. GIBSON:   It's not -- it's not in there.

        THE COURT:   All right.

        MS. GIBSON:   But, first, the other deals were coming off of Mr. Carpenter's formula.

        Well, let me back up.  The Potashniks developed a program to keep important employees in place, and that was a bonus program.  Mr. Carpenter, as the highest level person beneath the Potashniks over management,

participated in setting bonuses for other people in that program. And as a result, Mr. -- Brian Potashnik had -- had said that the amounts paid to folks that Jeff was setting and selecting for the stay-bonus program --

THE COURT: Uh-huh.

MS. GIBSON: -- would come off of his bonus. That would encourage him to set an amount that was enough to keep them, because they needed them to help make the asset sale go through but not, you know, give his favorite employee a windfall. And so it's part of the formula. But as far as for other people's -- so -- and the amounts come off the formula. That's why the amounts are relevant.

And the program that was in place for all of these people, including Mr. Carpenter, is part of the circumstantial evidence that there was a deal. And, I mean, to say that there was no deal with Mr. Carpenter would be like saying we're going to pay stay bonuses to all of our first-string people, you know, except one of our three-star quarterbacks.

THE COURT: Why not just ask those questions of Mr. Potashnik?

MS. GIBSON: Mr. Potashnik denies everything, including what Cheryl Potashnik testified. He will say Cheryl Potashnik says we discussed the need to keep

on important employees, we discussed incentive bonuses to
get people to stay on, we had a plan in place.
Mr. Potashnik consistently says never happened, never
happened, never happened.

THE COURT:  So his position would be then
that there's no separation agreements, no non-disparagement
clause?  'Cause the only way you'd get that
non-disparagement clause is if you paid them something in
consideration.

MS. GIBSON:  Right.  His position is none
of this ever happened.

MR. WILEY:  (Inaudible).

MS. GIBSON:  What?  I'm sorry.  Maybe I --

MR. WILEY:  To clarify, Judge, my
understanding is that Mr. Potashnik's position is people
were paid at the end but not promised anything.  And they
have been given a severance, but there had been no prior
discussions and there had been no prior promise.  That's
inconsistent with what Ms. Geiser --

THE COURT:  It was an incentive but not a
contract.

MR. WILEY:  It was -- it was -- for
Mr. Potashnik's testimony it seems he said there were not
even any discussions.  Just at the end of the day they
decided we're going to pay out these bonuses and get people

to sign severances.

But to your point about the nondisclosure agreements our concern, of course, is biased when the witness is testifying from the chair.  The jury should know if they have some sort of a nondisclosure agreement that we're not privy to, we can't question them about.

Also, if you look at the nondisclosure agreement that was contained in the severance proposal made to Jeff Carpenter, the NDA has a payback provision.  If you say something bad about us, you've got to pay this money back.  Of course, all that goes to witness (unintelligible), so that's another reason why we think we were entitled to these agreements.  You had ordered that they be produced. They said they didn't have them, even though Ms. Geiser says they do, of course.

THE COURT:  It would be so much better if this was a moot issue 'cause those people weren't going to testify.

MR. WILEY:  Sure.

MS. GIBSON:  Well, and part of it also goes to the issue that this is -- this is how they did business. Despite people having certain written employment agreements, they did make oral deals with employees.  That's how things worked.

THE COURT:  What authority -- I realize I

have lots of authority and I'm not asking you to do my job, but what authority do I have to void a contractual agreement between two people saying you don't have to abide by the terms of that contract?

          MS. GIBSON:  Your Honor, I believe Mr. Wiley did the research.  I believe he didn't find Texas cases but did find others saying, essentially, that the need -- the truth of the subpoena power, the oath, trumps private contracts.

          But, Mr. Wiley?

          MR. WILEY:  Yeah, there are a lot of articles on it.  I haven't found a Texas case that frankly says a judge trumps a contract.  It just seems so obvious.  It may be one of those things that never comes up in the courts; but a judge can, of course, compel someone to testify even if they have a nondisclosure agreement.  But I don't have a Texas case on it for you, Judge.

          THE COURT:  Okay.

          MR. WILEY:  But -- but again, Judge, that's why as boots and suspend -- or belts and suspenders we're asking for as a sanction that you just allow these people to be free from that nondisclosure agreement.

          THE COURT:  Well, that's -- that's what I was asking, if I have authority to do that.  It seems like one sanction would be that they can't testify, period,

'cause you can't trust the testimony or they couldn't answer the questions.  But this -- this is backwards in this case because it's -- you're just wanting to call them.  Plaintiff is wanting to call them, not defendants, when ordinarily you would think it would be the former employer that would want to call them.

　　　　MR. WILEY:  That's correct.  We want them to testify and we want them to testify to the amounts they were paid and that they got hush money.  They were paid to be silent about this.

　　　　THE COURT:  All right.

　　　　MS. GIBSON:  And not saying anything bad about defendants.  I mean, that's the clause that concerns me.

　　　　THE COURT:  What's your motion in -- what's your motion in limine on that one?

　　　　MR. L. FRIEDMAN:  Are you listening?

　　　　MR. DONOHUE:  Yeah.

　　　　There is no motion in limine addressing that but, obviously, it's a question of relevance.

　　　　MR. L. FRIEDMAN:  Well, we'll amend to add a motion in limine on that.

　　　　Look, this case is about one thing.  Did Brian Potashnik, one, make any agreement with Mr. Carpenter?  And number two, Mr. Carpenter, in his deposition, couldn't

identify or didn't know whether he made any deal with
Brian Potashnik individually or on behalf of any of the
defendants he sued.

        We eliminated that Mr. Potashnik had the
authority to make any deal on behalf of Mrs. Geiser.  She
needs to be nonsuited.  I've asked them to do it.

        Number two, he couldn't say Mr. Potashnik
made a deal on behalf of Affordable Housing.  They need to
be dismissed before the trial.  And he couldn't say
Mr. Potashnik made a deal on behalf of Southwest
Development.  They need to be nonsuited.

        So, conceivably, Mr. Potashnik made a deal
as president of management company because that's who
Mr. Carpenter's employment contract is with.  So you're down
to Carp -- Potashnik, Brian Potashnik, if he exceeded his
authority as president and management company, who was the
actual employer.  But there was no oral contract.  And all
they can do is say, well, you made an oral contract with the
guy sitting in the back over there, so you must have made an
oral contract with him or you made an oral contract with the
sheriff.  So you must have made an oral contract with him.

        THE COURT:  With the sheriff?

        MR. L. FRIEDMAN:  Well, I'm just saying --

        THE COURT:  Oh.

        MR. L. FRIEDMAN:  -- that all they can do

is say you made an oral contract with someone else who worked for your company 10 times longer than Carpenter, had a different job than Carpenter, different responsibilities than Carpenter, and stayed with you till the end and didn't sue you, so you must have made an oral contract with Carpenter.  They should have to prove a foundation and approach the bench before they're allowed to put that testimony before -- before the jury.

THE COURT:  What was Mrs. Geiser's position?  Who did she work for?

MR. L. FRIEDMAN:  Mrs. Geiser was an employee of Southwest Management.

THE COURT:  An employee.

And what was Mr. Potashnik's position at Southwest Management?

MR. L. FRIEDMAN:  He was the president.

THE COURT:  They weren't owners?

MR. L. FRIEDMAN:  They were ultimate owners.  The owners were limited partnerships for the -- Mr. Potashnik -- this is a general comment.

THE COURT:  Right.

MR. L. FRIEDMAN:  Mr. Potashnik was the one-percent owner of the GP, general partner that --

THE COURT:  Right.

MR. L. FRIEDMAN:  -- of the limited

partnership that owned management, something like that.  So indirectly owners, yes.

        THE COURT:  Right.

        And the hierarchy of Southwest Housing Management, was -- was Carpenter above --

        MR. L. FRIEDMAN:  He was executive vice president.

        THE COURT:  Above or below Geiser?

        MR. L. FRIEDMAN:  In title, above.  But, you know, the Potashniks were married at the time and went home every day and, you know, the extended wife has an influence over the husband.  I can accurately answer that question.

        Oh, I'm sorry.  I'm now told Brian was the sole owner of all three defendant entities.

        THE COURT: But Carpenter only worked for one of them?

        MR. L. FRIEDMAN:  He was employed by management.

        And, look, this management company managed dozens of entities, dozens, so Brian Potashnik had the authority to sign different things.  So he would say, you know, handle this for Affordable, handle this for management, handle this for Estrada, handle this for different entities, different apartments.  They owned 60

75

properties at one point, so they -- the management company managed all the properties, but Carpenter's employer was management.

        THE COURT:  Okay.

        MR. L. FRIEDMAN:  This is just a throw it up against the wall and see what comes down.

        MS. GIBSON:  Your Honor --

        THE COURT:  It's time to throw it up against the wall.  Why -- if it's such a strong case, let's get Mr. Potashnik under oath, let's get Mr. Carpenter under oath, let's -- let's --

        MR. L. FRIEDMAN:  We're ready under two conditions.  One, it has to be done fairly, no surprises, no ambush, change the case every minute of the day.  And number two, so long as we concentrate on whether there was an agreement with Carpenter.  Not interested in all these other --

        THE COURT:  Okay.

        MR. L. FRIEDMAN:  Different people had different job responsibilities and employment.  It was all done by Carpenter.

        THE COURT:  Okay.  Well, I'm -- I'm interested in the second thing and focusing on what the agreement was with Carpenter, not with other people, because we don't want to try cases within a case.  And it's not a

ruling yet.  We'll get what your theory is and what your briefing is on that.

But anything else you want to say about that?

MS. GIBSON:  I would just point out a couple of things.  One is lots of people thought that Cheryl Potashnik was an owner.  She held herself out that way.

THE COURT:  All right.

MS. GIBSON:  She --

THE COURT:  You don't want to nonsuit her?

MS. GIBSON:  She -- that's correct.

But with respect to the asset sale, Brian Potashnik, who was the president and owner of each company seller, had the authority to enter that deal for all of the sellers.  And all five of the defendants are sellers in asset sales and Brian Potashnik is expressly named as the agent for all the sellers.  So if Brian Potashnik is going to make a deal with an employee to give a percent of asset-sale proceeds, he is obviously and necessarily doing that for the sellers.  And so if that's where you get to those defendants in connection with the asset sale, it was important that they stay.

And there is more evidence of an agreement. You know, it's not just Mr. Carpenter's, you know, saying

so.  For example, if he delayed a job offer, even though he
knew he wouldn't have a job.  Because he had been promised
the compensation, he stayed as long as was needed.  It's
undisputed that he completed his work and they let him go to
pursue other work when the management transitioned to the
purchasers.  And that was his last day.

            THE COURT:  When the mood's been --

            MS. GIBSON:  The evidence of the program,
regardless of whether, you know, what people's individual
deals are, we're not claiming the deals were all the same.
But the fact that they had a program in place to retain key
employees and pay stay bonuses, it's all over the documents
in this case.  And it's important circumstantial evidence
that there was a deal among other evidence.

            THE COURT:  But you have the documents.

            MS. GIBSON:  Not the agreements.  I mean,
we -- so, for example, there may be a document referring to
pay and stay, all right, without, you know, more detail on
those witnesses.  And the highest level people --
Sara Reidy, Keith Jones, and Jeff Carpenter -- Jeff's
president -- or I'm sorry -- EVP of the management company.
Keith Jones is COO.  Sara Reidy is EVP over the development
company.

            On the stay-to-pay bonus schedule there's a
blank because they had higher separate oral deals with the

owners.    And so the fact that they were there and oral deals were made with them before they ultimately got paid is circumstantial evidence as well.    Without trying to get into --

THE COURT:    There were oral agreements with other people, I can see, but you're saying Mr. Potashnik or Ms. Potashnik deny that in their own testimony?

MR. L. FRIEDMAN:    Everyone does.    Everyone does.

MS. GIBSON:    No.

MR. L. FRIEDMAN:    The witnesses do.

THE COURT:    One at a time, please.

MS. GIBSON:    No.    What -- Brian Potashnik denies all kind of things, so his credibility is -- I mean, he's, maybe, our best witness, in a way.

But Cheryl Potashnik will testify, yes, we intended -- now, I don't know what she'll actually do.    This is based on deposition testimony.    Yes, we intended to pay bonuses.    Yes, the intent was to get people to stay.    If you will stay, we will pay you.    There was no dispute about those oral agreements until the company started bleeding money for the individual defendant's criminal defense.

After Jeff had already performed, that's when they're saying if there's anything left over we'll pay you, but now we're concerned that there's not enough money

79

for us.  But at that point Jeff had fully completed his obligations to their satisfaction under the oral deal.

But I don't -- I don't need -- I do need amounts, unless we just go with what Cheryl Potashnik said, but I don't need to get into the nitty-gritty of anyone's deal.  It's just the program or these oral promises made, was it for you to stay, that's important; not trying whether other individuals did or did not have a deal.  And what I don't -- you know, something that's confounding is defendants will say, yes, we intended to pay the stay bonuses; yes, we informed people of that; yes, we talked to specific numbers; and they stayed, but -- but there was no agreement.

THE COURT:  Okay.  I know this sounds like we're getting off the -- this issue.  But what -- who would -- what -- who would your first witness be?  Who would your first few witnesses be?

MS. GIBSON:  Cheryl Potashnik and Brian Potashnik.

THE COURT:  And when would you call Mr. Carpenter?

MS. GIBSON:  Probably toward the end of the case in chief.

Now, one -- one --

THE COURT:  And who else would you be --

who's Goldstein, Graf, and Gray?

        MS. GIBSON:  Um --

        MR. L. FRIEDMAN:  It's a law firm.

        (Laughter)

        MS. GIBSON:  It does sound that way.

        Rick Graf is the person who was in Jeff's position with the purchaser.  Well, actually, with the purchaser's management company.  And he is the reason Jeff was not going to have a job.

        THE COURT:  Uh-huh.

        MS. GIBSON:  And he also worked with Jeff on due diligence.  So there's no -- there's no stay-bonus issue with that one.

        Aaron Goldstein is someone who congratulated Jeff on, based on what Brian had said, that he was going to be a millionaire.  He was a landscaper for the company.  I believe he also --

        THE COURT:  You're saying the landscaper heard that Jeff was going to get a big bonus and --

        MS. GIBSON:  Well, this isn't just a -- I mean, this is a landscaper for the companies, who works with them on all of their properties.  I mean, like, it's --

        THE COURT:  All right.  A business.

        MS. GIBSON:  -- it's a huge vendor.

        THE COURT:  An associate or colleague heard

that he was going to --

                MS. GIBSON:  A friend of Brian Potashnik's, yes.

                He also knows some about due diligence more toward the asset sale.

                And who else did you ask me about?

                THE COURT:  Gray.  Ms. Gray.

                MS. GIBSON:  Devona Gray was the head of human resources and would have -- some of what she did is just to prove up certain organizational charts that have people's salaries and bonus potential on them.  But she also, I believe, was involved in the -- to some extent on the stay program.  And there are also just various miscellaneous issues that she can prove up for us because of her position with the company.

                THE COURT:  Okay.

                MS. GIBSON:  And then other -- you know, one witness I may have to call out of order, Keith Jones, the former CFO.  He is leaving for vacation on Wednesday morning.  So he will -- he will be here tomorrow.

                MR. L. FRIEDMAN:  What about Deepak?

                MS. GIBSON:  What about Deepak?

                MR. L. FRIEDMAN:  Are you taking him out of order?

                MS. GIBSON:  He's not on our list.

MR. L. FRIEDMAN:  Oh.  All right.

THE COURT:  And who --

MS. GIBSON:  We may call him as a rebuttal witness or something.

THE COURT:  Who are your other witnesses?

MS. GIBSON:  Sure.  Let me just go through and explain.

So Jeff Carpenter's wife also knew about the deal and was also there when Cheryl Potashnik would say things like we would never screw you on the bonus deal.

Debbie Workman, the former VP of property operations, I don't know if we'll call her.  We've been trying to serve her with a trial subpoena since December.  She's possible.

Devona Gray we've talked about.

Jeff Richards, he's a "we'll call by video".  He is someone that recruited Jeff for months wanting him to go work somewhere else.  And Jeff wouldn't, wouldn't go because he -- he needed to stay to get his bonus.  But he's -- he's short.  He's, like, 20 minutes, I think.

Keith Jones, who I've just talked about, the CFO.  Paul Cohen, who is a friend of Brian Potashnik's and participated in due diligence.  Rick Graf we've talked about.

83

Sandy Dixon, possible.  She just transcribed the transcripts of audio recordings, but I don't know that we'll need her.  The transcripts are on defendants' exhibit list as well.

Sara Reidy, we've talked about her.  She was former EVP over development and she was also one of the key players that was promised a larger incentive to stay.

And then we have certain attorney-fee witnesses.  And then other people are possible.  I don't know who we may end up calling as rebuttal witnesses.

MOTIONS IN LIMINE

THE COURT:  Okay.  All right.

Just looking at, Mr. Friedman, your -- the motion in limine that you filed, these are all, except for the prior conviction -- convictions -- conviction of Mr. Potashnik, these are kind of standards to claims, discovery disputes, mediation, all that.

Was there -- did you look at theirs?  Was there anything that --

MR. WILEY:  Yes, Judge.

In fact, we filed a response, and in there we created a chart showing you the problems we have with each of them.  With a lot of them it's just the way they were worded, but -- but we mentioned a number of them.  Some of them were just so general.  For example, you know, they

84

want to exclude all hearsay where there's no, you know,
exception.  And so for some of those they're so general
it would be like taking the Texas rules of evidence and
saying here, Judge, we want a motion in limine on these.

        THE COURT:  All right.

        MR. WILEY:  But -- but we created a chart
for you and filed it with our response on each individual
one.  I'm happy to go through all of those with you.

        THE COURT:  Okay.

        MR. WILEY:  So, on their first one for
improper expert testimony, again, we think it's just too
general.  And, also, under the Remington Arms case that was
mentioned earlier they didn't seek any motion or a ruling to
compel anything prior to seeking exclusions evidence; and we
think that they were required to confer and move to compel
before seeking exclusion.

        The same thing on Number 2, witnesses not
properly identified.  On Number 3 it's -- the way they have
it phrased is one way, and unilateral it would only apply
to us and not them.

        And, also, the litigation tasks are
relevant to fees, so they don't want any discussion of, for
example, preparing motions in limine, arguing motions in
limine.  But the fees issue is in place, so we would need to
testify regarding tasks relevant to fees.

85

Same thing with Number 4 and Number 5.
Number 4 and 5 are the criminal histories.  And the parties
have both submitted separate briefing --

THE COURT:  All right.

MR. WILEY:  -- on those and I can get to
that momentarily.  But both of those, again, litigation
tasks are relevant to fees.

Same with Number 6.  Number 6, the way it's
drafted as well is one way and unilateral.  That is, they
don't abide by the goose/gander rule there.

Number 7, too general.  And, again, there
was no motion to compel filed before.

Number 8 is one way, unilateral.  There's
some problems with the wording there.

Number 9, the -- the way they have this
phrased is just too broad.  It says an absent witness, but
we think they could work on the language there.  It may be
something we could -- we could work with them on.

Number 10, calling any witness who does not
have knowledge in -- knowledge of relevant facts.  That's
just too general.  It's also, the way they have it phrased,
calling any witness in plaintiff's list, is one way and
unilateral.  But, also, they mention a couple of specific
people like Mike Uhl and James Fisher.  And we think their
testimony may be relevant.

Mike Uhl represented the Potashniks in connection with the federal investigation and would have been working with employees at the companies and responding to FBI subpoenas.

Also, Mr. Fisher may be a rebuttal witness on net worth. Again, it's one way, unilateral, and the finances are relevant to alter ego issues.

MS. GIBSON: It's not just net worth.

MR. WILEY: And it's -- yeah, it's not just net worth. They say size, financial status, those kinds of things.

Number 12, again, too general and no motion to compel under the Remington Arms case.

Settlement, Number 13, again, the litigation tasks are relevant to fees. And, also, they've asserted the defense about efforts to settle. They've made that a defense saying that our client did not take reasonable efforts to settle the case. So that makes settlements -- or mediates -- so that makes settlement mediation at issue.

Number 14, relevance -- reference to evidentiary objections. Again, litigation tasks relevant to fees. Same with Number 15. Same with Number 16.

Number 17, again, mediation. Goes to efforts-to-settle defense that they've asserted.

Number 18, reference to counsel.  They, again, make it one way.  And the expense, the criminal defense, is at issue.  And so that can play into how much you were paying, how high-powered were these criminal defense attorneys, how many were you getting, that sort of thing.  Because the expense of the criminal defense itself was why -- well, it goes to alter ego.  It goes to whether there was any sort of use of company (unintelligible) to pay the criminal defense.

Number 19, unfair requests for documents. We could be okay with it if there was an edit; that it said request that opposing "provide" instead of "request for".

And then Number 20, again, I let off with. That one's just too general.  That's the hearsay motion in limine.  It says any reference to hearsay statements not admissible under any exception to the hearsay rule.  Well, that's just like taking the rules of evidence and saying you want a motion in limine.

MS. GIBSON:  And it would also preclude us from offering things for a limited purpose.

MR. WILEY:  I have more specific -- I have more specific analysis I can share on the criminal histories of the defendants, and the parties have each separately briefed those.

THE COURT:  Okay.  We'll take that up in

due course.

Anything else, Mr. Donohue?

MR. DONOHUE:  Your Honor, yes, on our motion in limine.  Of course, if the Court's going to rule on the order of limine as to one party, it applies to the other.

THE COURT:  Right.

MR. DONOHUE:  I mean, that's part of the problems.

I sent this over to Ms. Gibson to confer. I never got back any -- any kind of response from her.

THE COURT:  It's just something -- y'all can probably go on goose/gander type of stuff.  I imagine you can agree.

MR. DONOHUE:  Sure.

THE COURT:  And the too general stuff, if you can sit down and say what your specific concern is, you can probably reach some agreement.

MR. DONOHUE:  Certainly.  Certainly.

THE COURT:  Okay.

MR. DONOHUE:  As far as the improper expert testimony --

(Mr. J. Friedman entered the courtroom.)

MR. DONOHUE:  -- again, this goes to failure to properly disclose under Rule 194 and the -- the

requirement that they want to say that there's no order that
we got from the Court compelling --

        THE COURT:  Uh-huh.

        MR. DONOHUE:  -- them to disclose what
their attorneys' fees were going to be and what they based
it on.

        THE COURT:  Is that only referring to
expert attorney-fee witnesses?

        MR. DONOHUE:  That's the only experts they
have -- they have listed, I believe.

        MS. GIBSON:  Your Honor, we did disclose as
possible experts other people who just -- just fact
witnesses who may qualify but, no, nothing -- nothing
formal.

        THE COURT:  You don't have a damages
expert?

        MS. GIBSON:  No.

        MR. DONOHUE:  Right.  It's attorneys' fees.
And, again, you've heard the argument --

        THE COURT:  Right.

        MR. DONOHUE:  -- before about the fee
statements not being produced and their argument that, well,
an order is required from us compelling them.  Well, no,
they have a -- they have an obligation under Rule 193, as
the Court correctly pointed out, to supplement timely.  And

they never did.

Witnesses not properly identified.  I will
say that the witness list we got last night everybody is on
their disclosures, so I have no issue with that.

And, of course, you're going to take up the
references to the prior convictions of --

THE COURT:  Right.

MR. DONOHUE:  -- Mr. and Mrs. Potashnik
separately.

As far as the witness who does not have
knowledge of relevant facts, they mentioned, I think,
Mike Uhl.  That's part and parcel.  He was one of the
criminal defense attorneys.  That's part and parcel, I
suppose, of the Court's ruling on the -- on the limine as
far as the convictions.

THE COURT:  Right.

MR. DONOHUE:  Mr. Bill Fisher, they state
in here -- they state in their disclosures that he may
testify as to Brian Potashnik's history of entering and
refusing to comply with agreements with others when refusal
to comply benefits Brian Potashnik.  What's that got to do
with this lawsuit?  I mean, it's not relevant.

It's clear that they would try to inject
something as prejudicial to Mr. Potashnik as if, well, he
acted in compliance with his failure to perform some act

91

before, supposedly.  Well, then we'd have to try that case.
That type of thing, obviously, is too far afield if that's
what they're asking Mr. Fisher to come here and testify.

THE COURT:  And if he calls him it would be
in rebuttal.

MS. GIBSON:  That's right.

MR. WILEY:  Rebuttal.  If someone gets up
and says, you know, he was great and always kept his word
and always did what he said, rebuttal, yes.

THE COURT:  All right.

MR. L. FRIEDMAN:  Look, Bill Fisher was the
rat that turned State's evidence, got wired.  He was the one
that started all this Don Hill/City Hall investigation.  So
I can -- I can retry that case because I was involved, but
it's going to -- it's going to cause me to go take
Don Hill's deposition and all those people.

Bill Fisher needs to be out of this case
and any reference to the criminal proceeding too.

MS. GIBSON:  Your Honor, Bill Fisher didn't
cooperate at the FBI's request, but Bill Fisher was one of
the founders of these businesses --

MR. L. FRIEDMAN:  Absolutely not.

MR. DONOHUE:  It was gone --

MS. GIBSON:  -- is my understanding.

MR. DONOHUE:  -- before Mr. Carpenter ever

showed up at the scene.

THE COURT:  It's not even a issue ripe for decision right now because they haven't listed him as a witness.  It would depend on what the testimony is in the case in chief.

MR. DONOHUE:  But if -- so they're saying that if any employee comes in here or anybody that we asked were these good employees -- employers, rather -- and they say, yes, Mr. Potashnik was excellent, they're going to come in with Mr. Fisher and say that opens the door?

THE COURT:  We'll see what the testimony is.  In general, you know, character evidence is -- is not admissible or it's a limited type of thing.  But I don't want to retry another case.  I agree with you on that.

MR. DONOHUE:  Certainly.

As far as settlement discussions, what we're referring to, Your Honor, is the -- the employment agreement themselves.  Before Mr. Carpenter or Southwest Housing Management could file suit they were required to go to mediation.  He breached that.  We pointed that out as a defense early on in the case.

THE COURT:  You're not putting on anything in your case about that.  Or are you?

MR. DONOHUE:  I think -- I don't believe we're going to put anything on in our case, no.  As far

as --

MR. L. FRIEDMAN:  We're not going to put on anything happening at mediation --

MR. DONOHUE:  No.

MR. L. FRIEDMAN:  -- but we're going to say he didn't go to mediation before you filed your lawsuit.

MR. DONOHUE:  That's not the substance of what was discussed at mediation.  No negotiation terms, that's what I'm -- that's what the motion in limine focuses on.

What she's referring to, that we've somehow injected it into the case by defense, again, that's just a defense that -- that you were required to go to mediation before you filed suit.  And he did not do so.  That's all. Not this --

MS. GIBSON:  Your Honor --

THE COURT:  It's a defense to --

MR. L. FRIEDMAN:  To breach of contract.

MR. DONOHUE:  It's a pre-requirement to filing suit under his employment agreement that he did not follow.

THE COURT:  All right.

MR. DONOHUE:  That's what it is.  It's prerequisite.

MS. GIBSON:  Your Honor, may I just show

you the defense, because it goes far beyond that?  May I approach?

THE COURT:  Sure.

MS. GIBSON:  Because the defense is -- I don't know how it's a defense, but they say he failed to use his best efforts to settle.  And so that means getting into a lot more than whether or not he --

MR. DONOHUE:  We're not going to get into --

MS. GIBSON:  -- actually went to mediation.

MR. DONOHUE:  So Your Honor knows, we're not going to get into any settlement-discussion negotiations whatsoever.

MS. GIBSON:  Well --

MR. DONOHUE:  Whether somebody negotiated in good faith or not, that's not going to be injected in front of the jury.

MS. GIBSON:  I'd like the defense withdrawn, if that's the case.  I don't want to not address something in my case in chief and be surprised when it comes up.

MR. DONOHUE:  We'll certainly amend it to make it clear that it's failure to --

THE COURT:  To go, period, not --

MR. DONOHUE:  -- to go to mediation

before --

        THE COURT:  -- before --

        MR. DONOHUE:  Right.  To request mediation before filing suit.  That's all I'm asking.

        THE COURT:  Okay.

        MS. GIBSON:  If they eliminate everything other than going to mediation before suit, that's okay to me.  I just want to make sure it's gone.

        MR. L. FRIEDMAN:  Well, it's -- it's five till 12:00.  Why don't you let us address it over lunch and we'll clarify it.

        THE COURT:  All right.

        Go ahead.

        MR. DONOHUE:  I believe the rest of these are -- and I don't disagree with David that these are fairly general, standardized, and I think they can be agreed upon.

        THE COURT:  Fair enough.

        We'll take a lunch break.  And when we come back we'll finish the motion in limines and you'll be ready to offer documents into evidence and I'll give you rulings on the things I've heard already.

        MS. GIBSON:  I'm sorry.  What about offering documents in evidence?

        THE COURT:  Do you have -- are you offering documents into evidence today?

                    MS. GIBSON:  Not -- no, Your Honor, not at
the hearing.  I hoped that we would have some agreed
exhibits to offer, but --

                    THE COURT:  Okay.

                    MS. GIBSON:  -- they didn't even want to
talk about witness lists, so...

                    THE COURT:  No, I said exhibits too, but
you can start seeing what you agree on.

                    This is yours.  I don't know if this looks
familiar or not.  I'll take it if it's for me.

                    Let's take --

                    MR. L. FRIEDMAN:  Judge, before we go off
the record --

                    THE COURT:  Uh-huh.

                    MR. L. FRIEDMAN:  -- I've got all of the
documents that go with Exhibit 1.

                    THE COURT:  If you'll bring those to our
court reporter.

                    MR. L. FRIEDMAN:  And I've retyped the --
and I've retyped the handwritten list.  I'd like to
substitute it as Exhibit Number 1.

                    Is it admitted, Your Honor?

                    THE COURT:  It's admitted, yes.

                    MR. L. FRIEDMAN:  Thank you.

                    THE COURT:  So about till -- we'll meet at

1:15?

MR. L. FRIEDMAN:  Delighted.

(Court's Exhibit 1 marked for
identification)

(Lunch recess taken)

AGREEMENTS ON MOTIONS IN LIMINE

THE COURT:  Did you reach anymore
agreements on the motions in limine?

MR. DONOHUE:  Your Honor, Michael Donohue
on behalf of defendants.

I just spoke with Ms. Gibson and there are
a few that we make in mutual that we can stipulate to.  Did
you want me to read those for the record?

THE COURT:  Sure.

MR. DONOHUE:  And correct me if I'm wrong,
Ms. Gibson.

On Number 6, claims of privilege, provided
that's mutual, that's agreed upon in limine.  On Number 8,
references regarding uncalled witnesses, provided that's
mutual, that's agreed upon.

On Number 9, testimony of a witness who
does not appear, in their response they had printed a copy
of Judge Ginsberg's order that addresses witnesses who did
not appear unless they appear by videotape.  And we will
stipulate to Judge Ginsberg's standing order with respect to

testimony of a witness who does not appear, Number 9.

THE COURT:  What is his standing order?

MR. DONOHUE:  I can read it.

MS. GIBSON:  It's the language that's cited in our response.

THE COURT:  Number 9?

MR. DONOHUE:  Yes, sir.

MS. GIBSON:  What happened to it?

MR. DONOHUE:  Here it is.

It's entitled <u>Testimony of Absent Witness</u>, and I'll read it.  Any statement or suggestion as to the probable testimony of any witness or alleged witness who is unavailable to testify or who the parties suggesting such testimony does not in good faith expect to testify in the trial.  If the party is expected to testify by deposition, this provision does not apply to testimony contained in the deposition expected to be offered.

THE COURT:  Okay.

MR. DONOHUE:  And there's also a stipulation as to Number 18, the motion in limine references to counsel, provided that's a reference to counsel for -- that represent the parties in this lawsuit.

THE COURT:  All right.

MS. GIBSON:  And, Your Honor, there's -- there's one more.  Also Number 3, if it's mutual.

THE COURT:  All right.

MR. DONOHUE:  Yes, that's agreed upon.

MOTIONS IN LIMINE (CONT'D)

THE COURT:  All right.

Improper expert testimony is really not something enforceable, but you've objected to some expert testimony.  Your objection is on the record.  You'll -- you'll get a ruling.

Was there something specific that you were concerned about there?

MR. DONOHUE:  Nothing more than what was raised earlier this morning with the Court --

THE COURT:  All right.

MR. DONOHUE:  -- as far as the --

THE COURT:  Number 1, you understand she's saying there is no improper -- you know, you say there's no -- don't mention that somebody was speeding, that's something you can enforce by motion in limine.  When you use a word like "don't do something improper", they -- that's just not something I can enforce because --

MR. DONOHUE:  It's too general.  I understand.

THE COURT:  Right.

So we'll rule on the motion to exclude expert testimony, but other than that it's overruled.

100

Although, it's -- there's always good-faith requirement, just like you were reading in that, that don't ask a question that you don't in good faith believe is a proper question.

    MS. GIBSON:  I'm sorry.  What?

    THE COURT:  That was Number 1, improper expert testimony.  You did not have an agreement on that one.

    MS. GIBSON:  Okay.

    THE COURT:  Number 2, witnesses not properly identified.  Again, we're going to limit -- at the end the protocol will be that at the end of day one, at the end of the day you have to identify -- both sides have to identify the witness you're calling the next day.  And so if there's a motion to strike that witness or exclude that witness the third day, the witness's testimony, we'll hear that the afternoon, not when the witness is called up to the stand.  So we'll get it on the record later.

    But, you know, Ms. Gibson -- and this was unofficial, but she said that she thought her first witnesses would be Cheryl Greiser [sic] and Brian Potashnik. And we'll get that at the end of the day.  So I'm sure you're not trying to exclude them.  But if you were, the time to do that would be when she identifies them at the end of the day.

MR. DONOHUE:  At the afternoon of?

THE COURT:  Right.

MR. DONOHUE:  Okay.

THE COURT:  Do you agree on -- do y'all want to argue former prior convictions or go through the rest of these?  Why don't we go through the rest of these and come back to that.

MR. DONOHUE:  All right, sir.

THE COURT:  Seven is excluding the documents into evidence for failure to timely supplement discovery responses.  We'll take up supplemental issues separately, but any document not produced should not be used.  So the motion in limine is granted to any document that was not produced, period.

It doesn't mean it won't come in.  Approach the bench first -- and this is mutual -- approach the bench first and let's find ought whether there was a reason it wasn't produced in the first place, there wasn't a proper request, or that this was something -- well, that would be the only reason, that there was no proper request or you just found it, something like that.

Ten is calling any witness who does not have knowledge of relevant facts or whose testimony would inadmissible.  That's just -- that's an argumentative one.  But plaintiffs aren't going to concede if they're calling a

witness that's not relevant.  But at the end of the day when
they say they want to call Mr. Fisher, that would be a time
to argue that --

           MR. DONOHUE:  All right, sir.

           THE COURT:  -- he doesn't have knowledge of
relevant facts.

           You mentioned Mike Uhl before and then
James Fisher.  He's out of subpoena range.  I'm betting
you're not getting him.

           Net worth, if they have a claim for
punitive damages and -- no claims for punitive damages?

           MR. DONOHUE:  There's no such claim.

           MS. GIBSON:  Your Honor, I'm sorry.  To
clarify, you know, there are P & L statements and things
like that that are relevant to the entity defendants.

           THE COURT:  All right.

           MS. GIBSON:  And as to the individual
defendants --

           THE COURT:  Right.

           MS. GIBSON:  -- the literal net worth we're
not going to get into; but, certainly, money they received,
you know, direct financial benefit-type issues.

           THE COURT:  Direct financial benefit.  What
do you mean?

           MS. GIBSON:  Well, for example, one of the

questions is whether the individual defendants used the corporate forum to commit a fraud on Mr. Carpenter primarily for their own personal benefit.  And so one way to get there is they drained the entities of assets into various proceeds for themselves.

    THE COURT:  Okay.

    MS. GIBSON:  Which I think is different than net worth, but --

    THE COURT:  Right.  That sounds different than net worth to me.  But what is the relevance of the P & L statements for the business entities?

    MS. GIBSON:  Well, defendants produced those statements because they claim Mr. Carpenter could not receive the high end of the bonus range because the organization as a whole never made a profit.  And we think the documents show the opposite.

    THE COURT:  Well, and that's something that we will hear from Mr. Potashnik or Ms. Greiser [sic], if they testify first, that that's the reason that the bonus wasn't paid.

    MS. GIBSON:  I mean, I don't -- it's just one of many defenses that they have asserted and so we designated those exhibits.

    THE COURT:  Okay.  Again, that doesn't sound like net worth to me.

MR. DONOHUE:  We're talking prime --

MS. GIBSON:  And --

MR. DONOHUE:  Go ahead.  Not to interrupt.

MS. GIBSON:  I'm sorry.

And so it's not necessarily on this one, the net worth, as I think we all understand it to be.  It's the -- it's the rest of the limine that goes beyond that and to finances, financial status, financial condition.

THE COURT:  All right.  Well, to the extent it involves net worth it's granted.  To the extent that it involves documents like profit and loss statements you can object to those documents when they're offered, and we'll take -- take it up and see what the -- what the issues are.

MR. DONOHUE:  Okay.

Go ahead.  I'm sorry.

THE COURT:  And damages not disclosed in discovery, you have a motion on that.  We'll rule on that.

The settlement issue is certainly that you mediated last week or that, you know, that there's settlement offers or not.  I don't see that coming in.  But if there's a defense on your side that there wasn't a mediation, period --

MR. DONOHUE:  Right.

THE COURT:  -- you're certainly welcome. Breach of contract, did the first -- did one party breach it

before the other so that the other breach is excused, if
that's a defense that --

                MR. L. FRIEDMAN:  Yeah.  The
breach-of-employment contract calls for --

                THE COURT:  Right.

                MR. L. FRIEDMAN:  -- if there's a dispute,
good-faith settlement negotiations for a period of time.
After that you have to call for mediation.  If that doesn't
work out after that, you have to go to arbitration.  After
that you go do what you want.  And so he didn't do that.

                MS. GIBSON:  Your Honor, on -- on these
issues, I mean, we don't intend to get into a bunch of
settlement discussions.  But on the mediation portion --

                THE COURT:  Right.

                MS. GIBSON:  -- we would be entitled to
talk about what happened later to show that it wasn't really
material or that it was futile going to mediation.

                THE COURT:  It wasn't that the fact that
you didn't go to mediation was not material?

                MS. GIBSON:  Right.  Because we later went
and -- early in the case -- and there was no offer.

                Also, for part of the Chapter 38
presentment was oral, I believe at a mediation.  And then as
backup we have included in our --

                THE COURT:  What do you mean?  What's a

Chapter 38 presentment?

     MS. GIBSON:  I'm sorry.  For attorneys'
fees.

     THE COURT:  Right.

     MS. GIBSON:  Some evidence that we are
presenting, you know, a claim for payment and they haven't
paid the just amount owed.  There is a settlement letter
from Gardere and then this was also orally done at
mediation.

     THE COURT:  Okay.

     It sounds to me -- and I could be wrong --
this is their defense.  So this is evidence you would be
putting on after they establish some evidence of their own.
So it seems to me the scope of your evidentiary offer on
this issue is dependent upon what they do in their defense.

     MS. GIBSON:  On Chapter 38 proffer, I
believe that's my burden since they did not -- they
specifically denied that that --

     THE COURT:  But all you have to do for
Chapter 38 is say that you made a demand, and you can offer
your demand letter into evidence.

     MS. GIBSON:  Okay.  And -- but it is a
settlement offer.

     THE COURT:  Right.

     MS. GIBSON:  Okay.

THE COURT:  Fair.  Fair enough.  You can do that.

MS. GIBSON:  Okay.

And then if I understand the Court, on -- on futility and materiality, I need to wait until their case in chief?

THE COURT:  As soon as they open the door on that.  Right.

MS. GIBSON:  Okay.

THE COURT:  My preference would be that we not get into -- although it may have been waived here -- we not get into what occurred at mediations.  But if that is their defense I think they've opened the door to that, and I'm not trying to preclude you from defending their affirmative defense.

MS. GIBSON:  And then in --

MR. L. FRIEDMAN:  We don't agree with that. The fact of -- the fact that they didn't submit the claim to a mediation is a defense, not what happened at mediation.

MR. DONOHUE:  Right.

MR. L. FRIEDMAN:  We're never going to get into what happened at mediation.

THE COURT:  Okay.  Well, then I'll --

MR. L. FRIEDMAN:  We're bound by statute.

THE COURT:  I'll hear your evidence.  All

I'm saying is you're going first on that issue.

          MR. L. FRIEDMAN:  Yeah.

          THE COURT:  And then we'll see what's at issue.

          MR. L. FRIEDMAN:  Sure.

          THE COURT:  And I don't know the answer to the question whether futility is an affirmative defense to an affirmative defense.  Maybe y'all know that.  I don't know.

          MS. GIBSON:  Well, it would really go to Doctrine of First Material --

          THE COURT:  Right.

          MS. GIBSON:  It would essentially go to materiality.

          THE COURT:  Yeah.  That would be a better way to say it is futility, 'cause that's the actual question is, "Was there a material breach?"

          MS. GIBSON:  And -- and just to clarify while we're here, I realize you haven't ruled on the attorneys' fees issue --

          THE COURT:  Uh-huh.

          MS. GIBSON:  -- but, you know, when we're describing tasks there will be discussion of insurance coverage, attending mediation, etcetera.  What do we do about that?  I mean, I had -- I had actually thought

about --

THE COURT:  The thing you do is you try to bring these issues to the bench.

MS. GIBSON:  Your Honor, we offered that to the other side and they rejected our offer.  I mean, I'm happy to have the Court decide that issue, if necessary, after a verdict.

THE COURT:  Well, I'll let y'all consider that.

That was 13.  Fourteen is reference to evidentiary objections.

MR. DONOHUE:  What is the ruling on 13 as far as just settlement discussions are concerned?

THE COURT:  Settlement discussions, the motion in limine is granted with the understanding that if I determine that you've opened the door to that by the way you present your affirmative defense of they were the first to breach the contract, then we'll take that issue up.

MS. GIBSON:  And, Your Honor, on fees?

THE COURT:  Huh?

MS. GIBSON:  I'm sorry.  On fees?  Like, what if some of the tasks of our discussion was --

THE COURT:  We aren't taking that up yet.

MS. GIBSON:  Okay.

MR. L. FRIEDMAN:  And what about insurance

coverage?

THE COURT:  We haven't taken that up yet.
I want to see if you can get an agreement.  I haven't ruled
on attorneys' fees, period.

MR. DONOHUE:  Yeah.  There is no limine on
insurance coverage but, certainly, that should be limined
out, any -- any kind of insurance coverage.  There's no --

THE COURT:  Right.  If they can't come up
with an agreement to try attorneys' fees to the bench, if we
even try it, even if I were to grant your motion you'd still
need some type of record for the court of appeals so that a
number could be inserted instead of remanded.  Because when
it's remanded you have to retry the entire case, and I know
you don't want to do that.  You need something -- some type
of record.

I don't know the exact answer to your
question.  I think it would probably be something that you
had to research and, you know, discreet issues.  And -- and
if you cross-examine their witness on something to the point
for them to give a truthful answer and they had to mention
insurance coverage, that's what they would have to do.  But
it would be something that you would be opening the door to,
not something they would be putting in evidence in the first
place.

Do you understand what I'm saying?  I may

not have said that too well.

MR. DONOHUE:  Well, you're saying if we open the door by asking a question which elicits --

THE COURT:  Right.

MR. DONOHUE:  -- or mentions insurance.

THE COURT:  Right.

MR. DONOHUE:  But all we're asking for is a limine that insurance should not be injected by either proponent of insurance coverage.

MR. L. FRIEDMAN:  Insurance company.

MS. GIBSON:  And --

THE COURT:  And Ms. Gibson's point was that if she presents testimony on attorneys' fees she has to say what she did, how she spent her time -- and part of her time.  And my recollection was that was a good portion.  The first several years of the case was Ms. Gibson spending time trying to convince the insurance carrier that there was coverage on this issue.  And if that's attorney -- reasonable and necessary attorneys' fees, that's the reasonable and necessary attorneys' fees.

I'd rather her phrase it in a way that doesn't mention insurance coverage.  But if you start cross-examining her saying, well, you just said you spent 40 hours researching a difficult legal issue, what was that on and where's the memo that you drafted to the file reflecting

all of this, where's the correspondence, she has to give a truthful answer.

MR. L. FRIEDMAN:  I understand, Judge, but battling the insurance company is not recoverable for the claims that she pled.  If she did that, she did that for some other reason.

THE COURT:  Well, I think that's -- that's a different issue that -- that you can -- you can argue. And we can take that up.  But, you know, the -- and I don't know whether I agree with that or not.  I know Ms. Gibson is not going to agree with that.  But that's not what we usually deal with, you know, when we're talking about reasonable necessary attorneys' fees.

If she -- if her expert opinion is that that was reasonable and necessary, your argument is that it's not.  I don't see how you avoid insurance coverage if you're going to take that position.  I'd urge you to try the attorneys' fees to the -- to the bench.  But I don't want to --

MR. L. FRIEDMAN:  Let us confer with the client at the next break.

THE COURT:  All right.

Fourteen is reference to evidentiary objections.

MS. GIBSON:  That's --

113

THE COURT:  That's mutual?

MS. GIBSON:  Your Honor, I'm sorry.

THE COURT:  That's all right.

MS. GIBSON:  Fourteen and fifteen are repeats --

THE COURT:  All right.

MS. GIBSON:  -- that have already been addressed.

THE COURT:  Okay.  But you agree to those as long as they're mutual?

MS. GIBSON:  Yes, yes.

THE COURT:  Sixteen is discovery disputes. And other than attorneys' fees you can say you came down here on discovery disputes type of things, but the Court rulings -- I'm not explaining my rulings to the jury.  So you can't come down here and say we argued, we won, the Court ordered this.  But you can say you came down here on discovery disputes.  There weren't a whole lot of them, by the way, as far as cases like this --

MS. GIBSON:  Right.

THE COURT:  -- are concerned, a fairly rough case for the Court.

MS. GIBSON:  I don't know that this is a discovery dispute.

THE COURT:  All right.

MS. GIBSON:  But there may be some discovery issues, not rulings or anything --

THE COURT:  Right.

MS. GIBSON:  -- that we address with witnesses.  So, for example --

THE COURT:  Right.  You're saying that, you know, you want to ask the witness did you look for a document and you didn't produce it.

MS. GIBSON:  Something like that.

THE COURT:  Yeah.  Okay.  I think that's okay.  That's not a discovery dispute that I'm leaning on.

MR. DONOHUE:  So then on 16, just for clarification, Your Honor, other than for testimony on attorneys' fees, possibly?

THE COURT:  The way this is framed I think I agree with that.  She's not the witness.  Ms. Gibson is talking about something else.

I don't want you to ask each other that, you know -- of course, your comments should be addressed to the bench, not to each other.  But as you're examining a witness you shouldn't look over to the other side and say, Will you agree that this is an authentic document?  Will you stipulate to this?

And that's what this is concerning.  That's the way that this is phrased here.  You shouldn't do that.

115

MR. DONOHUE:  Okay.

THE COURT:  That mediation, I guess I'm a little troubled about that since it has a part in the contract and the contract said that they'd pay.  That's a little different than common law and statutory rules regarding mediation.  But we'll just leave that and see how that's presented as a defense.

Nineteen is evidence based on documents or information not produced.  Was there a specific issue that you had in mind with that?

MR. DONOHUE:  Not specifically.

THE COURT:  'Cause there is -- you can ask, like you said before, if this involved property damage to an automobile, you can -- you can ask -- you can produce the repair bill or you can ask the owner of the vehicle how much did you pay to repair it.  You can -- you can ask questions about, you know, when the information might also be contained in a document.

MR. DONOHUE:  Right.

THE COURT:  But, you know, we have the hearsay objections.  You're not waiving your hearsay objections.  I think that's just one that's too unwieldy for me to enforce --

MR. DONOHUE:  Okay.

THE COURT:  -- on motion in limine.

116

Nineteen, unfair request for documents. You can't ask counsel for a particular document during the course of the trial in front of the jury, if that's what this is going to.

MR. DONOHUE:  Yes.

THE COURT:  Twenty is hearsay statements. Again, it's too general, but I trust that you will ask questions that are in good faith.  I'll rule on the objection if the question is asked, but the standard is good faith.

MS. GIBSON:  Your Honor, while we're on these types of issues, may I raise something that's similar to what was just discussed?

THE COURT:  Uh-huh.

MS. GIBSON:  I see on defendants' exhibit list they are listing a transcript of a TRO hearing and --

THE COURT:  We had a TRO hearing?

MS. GIBSON:  Yes.  Originally, Coston (phonetic) tried to get some money set aside when the sale closed, and my understanding is defendants --

THE COURT:  Was it a temporary injunction or a TRO?

MS. GIBSON:  I believe -- I believe it was -- I may have just called it TRO hearing meaning injunction hearing, but my understanding is that defendants

intend to use that to try and say that the Court has already said you didn't have enough evidence of a substantial likelihood of success.  So I would like that excluded because that would, like, be like me saying the Court ruled on summary judgment, there was enough facts for the jury to return a verdict.

THE COURT:  I'll grant a motion on a standing Court ruling.  But that's sworn testimony in this proceeding.  If there's an admission in there, that's an admission subject to cross-examination.  But my rulings are off limits because I'm not going to explain my rulings to the jury, and who knows what I was thinking if I wanted to explain.

MS. GIBSON:  Your Honor, there was no -- it was just the attorneys arguing.

THE COURT:  So it was probably a temporary restraining order, not a temporary injunction.

MR. DONOHUE:  Your Honor, we do have a supplement to the motion in limine that --

MR. L. FRIEDMAN:  Wait.  I mean, there's -- there's sworn testimony from the plaintiff attached to the plaintiff's original petition.

MS. GIBSON:  Well, that's different than --

MR. L. FRIEDMAN:  So, I mean, that's fair game.

118

THE COURT:   That's what I said.

MS. GIBSON:   This is different.

THE COURT:   I said sworn testimony can be used --

MS. GIBSON:   Okay.

THE COURT:   -- to impeach somebody who's testifying.   My ruling is not sworn testimony.   And for you to say the judge has already ruled on this, it would require me to explain when my ruling was and what the burden of proof was at that stage, and I'm not going to do that. Testimony in this courtroom is not hearsay.

MR. DONOHUE:   Right.

May I approach?

MS. GIBSON:   And -- oh, sorry.

MR. DONOHUE:   This is a supplement to the motion in limine that we urged this morning.

MS. GIBSON:   Your Honor, they have also listed excerpts from deposition transcripts to offer as exhibits, and we would object to that.

THE COURT:   We don't generally do that, but we're going to offer exhibits separately so you can object --

MS. GIBSON:   Okay.

THE COURT:   -- when it's offered.

MS. GIBSON:   Okay.

THE COURT:   Generally speaking, we'll look and see what you're doing.   Don't -- deposition testimony does not go in as evidence because it's no different than testimony from the witness stand.   We don't have that printed up and send that into evidence either.

MR. DONOHUE:   Your Honor, I just handed you defendants' supplemental motion in limine and, really, beginning on the third page.

THE COURT:   Right.

MR. DONOHUE:   Specific objections in limine:   Improper evidence of other employees' employment agreements and bonuses.   And, again, this is evidence. Whether such evidence is testimonial, verbal, demonstrative or documentary regarding payments or bonuses paid to any employee other than Jeffrey Carpenter of the defendants at any time, such evidence is irrelevant for the matters presented.

Further -- further, probative value of any such evidence is substantially outweighed by the likelihood such evidence would prejudice the jury, confuse the issues, and mislead the jury under Texas Rules of Evidence 401 through 403.   And I would submit that Rule 404 would apply also.

THE COURT:   All right.   Ms. Gibson, you've talked about this some already but --

120

MS. GIBSON:  Your Honor, yeah.

THE COURT:   -- but you may not have seen this before right now.

MS. GIBSON:  I have not seen this before right now, but generally the arguments remain the same.

The amounts paid to other employees as stay bonuses come off of the formula to calculate Jeff Carpenter's bonus.  In other words, it's three percent of -- three percent of a certain total.  The total is seller's revenue minus normal closing costs, minus stay bonuses paid to other employees, because Jeff helped set those.  That was the reason for that.  So we need the amounts.

Also, the program that they had in place to pay bonuses to important employees to stay on, despite the asset sale, is some circumstantial evidence; and not all we have, but important circumstantial evidence of an agreement.

Also, any non-disparagement clause was in agreements that employees signed saying they can't say anything bad about the defendants may go to bias.

THE COURT:  All right.

MR. L. FRIEDMAN:  There -- there is no program.  There's no evidence or a program in any of the depositions or documents that have been uncovered in this case.  So that's a -- that's a false start.  They already

121

have a number that they've latched onto, which is $2 million
or two million one for calculation purposes.  That's all
they need.

If we go into every employee's specific
plan -- so, I'm going to take Sara Reidy.  She's with the
company for 20 years.  She stayed with the company till the
end.  She was rehired by the new company.  I'm going to wind
up trying eight different cases for that.

THE COURT:  All right.

MR. L. FRIEDMAN:  And I don't want to.

THE COURT:  I don't want that either.
That's not one of the witnesses that she, Ms. Gibson,
indicates she was calling, though.

MS. GIBSON:  She --

MR. DONOHUE:  Yeah, she is, Ms. Reidy.

MS. GIBSON:  Sara Reidy, yes.

THE COURT:  I didn't write that name down
when you told me your witnesses.  Maybe I missed that.

MR. L. FRIEDMAN:  It's not one we swore in
today but, I mean, I just did that --

THE COURT:  No, she said others that
weren't sworn in today too.  Richardson, Cohen, Jones.

MS. GIBSON:  Right.  Some people I was able
to reach and let them know they --

MR. L. FRIEDMAN:  And so, just given by way

Appendix 000248

of example on some of those other people you mentioned are in the same position.  They're all different circumstances, all different deals, but there was no company-wide formula. There was no meetings about a formula.

THE COURT:  And you're not calling any of them?

MR. DONOHUE:  Not for that purpose.  Not for -- to get into whether they got an oral agreement to be paid a bonus which they assert, but for the purpose --

THE COURT:  Well, if they have something in a contract that, you know, prohibits that, some non-disparagement agreement in a contract and you're calling them as witnesses, don't you think that's relevant?

MR. DONOHUE:  I think that would be relevant whether or not they have a non-disparagement provision.

MR. L. FRIEDMAN:  Are you saying, Your Honor, that the non-disparagement provision would prevent them from giving honest testimony?

THE COURT:  I don't know.  I hope they'll give honest testimony.

MR. L. FRIEDMAN:  Because I've faced this before and I never viewed a contractual non-disparagement agreement as interfering with sworn testimony.

MS. GIBSON:  I have literally seen it

interfere.  We'll have to see what happens.

        THE COURT:  I'm saying the jury's entitled to know that there's an agreement between the witness and the party that the party -- the witness won't say anything disparaging about the party, if that's the case.

        MR. L. FRIEDMAN:  Yeah.  I understand.

        THE COURT:  Okay.

        As far as the motion in limine, we'll take it up more later if we have to, but I'll grant the motion in limine as to the program as it relates to the specifics of other individuals and deny it as to the amount because that's part of the calculation.

        MS. GIBSON:  So --

        THE COURT:  Nondisparagement we'll take up if any of those witnesses are actually called.

        MS. GIBSON:  Your Honor, to make sure I understand, are you saying we can talk about the program, you know, and whether, you know, there were oral agreements made without getting into anyone's particular deal?

        THE COURT:  You can say it's part of your damage calculation that, you know, this amount of money was paid out, bonuses, and that's how you collected that without going into the details of each individual bonus, who it was paid to and what the circumstances were as to whether that person met the criteria or didn't meet the criteria.

MS. GIBSON:  Okay, but we can still talk about the program, generally?

THE COURT:  That there was a program to pay out an amount.

MR. GIBSON:  Okay.  Some of the documents --

THE COURT:  That would not be -- that's the testimony if that's how you calculated things.

MS. GIBSON:  Okay.

MR. L. FRIEDMAN:  I'd like that limine on the program, because there's no evidence of a program.  If she can lay the foundation, she can have it, but I don't want her to say in opening -- don't want her to say in opening you're going to hear about a program.  She doesn't have it.

THE COURT:  Opening's not evidence.

But before you get any evidence you have to lay a foundation.  Who's your witness on that?

MS. GIBSON:  Several.  I mean, several witnesses can testify to that plan or program.

MR. L. FRIEDMAN:  But who is -- who is one?

MS. GIBSON:  Well, the defendants.  Well, Brian Potashnik is going to deny all of it.

THE COURT:  He's one of the first witnesses we'll know about.

MS. GIBSON:  Keith Jones worked with Jeff Carpenter in studying stay bonuses for select, key, corporate employees.

Jeff Carpenter obviously participated in that process and program and talked to Brian about setting other employees.  And, obviously, each person who received the stay bonus knows about it, and probably HR as well.

THE COURT:  Okay.

MR. DONOHUE:  Your Honor, the only relevance is to their damage calculation.  They say that there was X amount that was paid to other employees that deducted from what he claims is his oral agreement.  That's the only thing that would be possibly relevant.

THE COURT:  I'll grant the motion in limine.  We'll hear about this --

MR. DONOHUE:  All right.

THE COURT:  -- but I guess it depends a lot on what your defense and your cross-examination is.  Because if you're flat out denying that, as I take it you are, that there was any agreement or any type of program and they have evidence of an election program for bonuses --

MR. DONOHUE:  There was a program for severance payments paid for when they left the company and they -- when they left and went -- transitioned to the new company.

MS. GIBSON:  Well, that --

MR. DONOHUE:  That's what that was.  That's not a bonus.  That's severance pay.

MS. GIBSON:  Those -- those --

MR. L. FRIEDMAN:  And everyone was offered severance, including Mr. Carpenter.  Everyone took the severance except Mr. Carpenter.  Everyone stayed till the end except Mr. Carpenter.  No one sued the company except Mr. Carpenter.

MS. GIBSON:  Your Honor, that misstates what happened.  The stay bonuses ultimately were paid as severance because upon the sale, obviously, the three entity defendants weren't employing anyone anymore.

THE COURT:  Are you drawing some legal distinction between a severance and a bonus?

MR. L. FRIEDMAN:  First of all, severance is a common term that we all know.

THE COURT:  Right.

MR. L. FRIEDMAN:  Stay bonus is a term that Ms. Gibson made up like Donald Trump makes up fake news and things like that.

THE COURT:  I don't know whether --

MR. L. FRIEDMAN:  It's not a term that's used in the industry or anywhere else.  There's no such thing as a stay bonus other than in this case.

MS. GIBSON:  Well, that's not true.

MR. L. FRIEDMAN:  And no one got a stay bonus.  Some people got a discretionary bonus from Brian Potashnik and their employers at the end of the day after he determined that there was enough money to pay discretionary bonuses, which he made up on his own when he felt like it at a specific time.

THE COURT:  Okay.  And the discretionary bonuses were separate from the severance?

MR. L. FRIEDMAN:  Absolutely.  Yes.

THE COURT:  Discretionary bonuses, according to Mr. Potashnik -- he's going to testify in the case -- were not based on any formula or anything that was communicated to the employee.  It was based upon his generosity.

MR. L. FRIEDMAN:  Yes.

THE COURT:  The company was winding down.

MR. L. FRIEDMAN:  Yes, that's what he will say.

MS. GIBSON:  We dispute that.

MR. L. FRIEDMAN:  The severance payments were paid and then the bonus -- the discretionary bonuses came later.

THE COURT:  But you're suing for a bonus, not a severance pay.  Or are you saying the same thing?

MS. GIBSON:  Well, it -- it --
Your Honor --

MR. WILEY:  We don't have any agreements.

MS. GIBSON:  So the stay bonuses ended up
being a severance pay.  Okay.  So, for example, different
people were asked to stay different lengths of time.  And
let's say I stayed through the end of this week as asked.
They're selling the company and so the stay bonuses were
paid out, and my understanding is -- I haven't seen the
agreement -- but in these severance agreements.  But it's
one in the same.

The severance, for example, there are
documents that talk about pay -- or I'm sorry -- stay and
pay for employees' amounts and there are also documents that
list the stay and pay amounts in a severance payment
spreadsheet because they're one in the same.  Once their
work is done, the company is being sold.  And so there is a
severance of employment at that point, even if people
continued to work for the purchaser.

MR. L. FRIEDMAN:  So, I understand my
challenge in this case that I will have to address things
that are simply made up.  Severance is one thing.  Those
were offered, accepted, and paid.  Discretionary bonus was
something else.  Mr. Potashnik will testify to that early in
the case.  That should put an end to it.

THE COURT:  Okay.  We'll hear his testimony.

All right.  Did you want to go back to 4 and 5?

MR. DONOHUE:  Yes, sir.

On -- on 4, Your Honor, this is a reference to the prior conviction --

MS. GIBSON:  No.

MR. DONOHUE:  -- or arrest of Cheryl Potashnik.  She was convicted on December 21st of 2010 for bribery concerning the state government receiving federal benefits and was sentenced to probation for two years.  She served the probation successfully and we've got on evidence the business records affidavit from the probation office, the U.S. District Court in the northern district of Texas, to that effect.  And under --

MR. L. FRIEDMAN:  She pled guilty.

MR. DONOHUE:  -- under Texas Rule of Evidence 609(c)(2), evidence of conviction is inadmissible --

MS. GIBSON:  Your Honor, I'm sorry to interrupt.

I'm told no.  Sorry.

MR. DONOHUE:  -- if the probation has been satisfactorily completed for the conviction and the person

has not been convicted of a later crime that was classified
as a felony or involved moral turpitude, regardless of
punishment.  She has not been convicted of any later crime,
a felony or moral turpitude.  She served out her
probationary sentence successfully.  There's evidence --

        THE COURT:  Was there a crime annulment or
a certificate of rehabilitation?

        MR. DONOHUE:  There is.  There's a -- there
is a business records affidavit on file from the United
States District Court for probation and pretrial services
dated September 16th, 2012.  It's the attachment to
Ms. Potashnik from that office saying that, Dear
Ms. Potashnik, your period of supervision has expired on
blank.

        THE COURT:  She completed her probation.
That's not a pardon.

        MR. DONOHUE:  It's not a pardon, no.  She
successfully completed her probation.

        THE COURT:  But C is effective pardon,
annulment, or certificate of rehabilitation.  Are you
claiming one of those three things, pardon, annulment, or
certificate of rehabilitation?

        MR. DONOHUE:  We're claiming that she
successfully completed her probation as opposed to a
certificate of rehabilitation, which basically -- under --

if you'll read the rule, it says evidence of a conviction is
not admissible if, under (c)(2), probation has been
satisfactorily completed for the conviction and the person
has not been convicted of a later crime that was classified
as a felony or involved moral turpitude, regardless of
punishment.  And that's what she did.  She successfully
completed probation.  And so, under 609(c)(2), her
conviction is inadmissible.

       THE COURT:  Okay.

       MR. WILEY:  Judge --

       THE COURT:  Why don't you argue both those
together.

       MR. DONOHUE:  Okay.

       As far as the conviction of
Brian Potashnik, he was convicted on December 17th, 2010.
He pled guilty and was convicted of one count, conspiracy to
commit bribery concerning the state government receiving
federal benefits.  Not only is that conviction not relevant,
but it's -- it would prejudice him and the other defendants,
confuse the issues, and mislead the jury under Rule 403.

       But, moreover, under Rule 609(a)(2),
looking at Part A, evidence of a criminal conviction, offer
to attack a witness's character for truthfulness must be
admitted if, number one, the crime was a felony or involved
moral turpitude, regardless of punishment.  Number two, the

probative value of the evidence outweighs its prejudicial effect to a party.  And number three, it's elicited from the witness or established by public record.  Now, here Part 2, the probative value of the evidence, outweighs its prejudicial effect to a party.

There's a five -- nonexclusive five-factor test that the Texas Court of Criminal Appeals came down with in 1992 under Theus that, first of all, stated that with regard to determining the probative value of the evidence, whether it outweighs its prejudicial effect to a party, that the party, the proponent seeking to introduce the evidence, has the burden of demonstrating that the probative value of the conviction outweighs its prejudicial effect.

It then outlined the five non-exclusive factors.  Number one, the impeachment value of the prior crime.  Number two, the temporal proximity of the past crime relevant to the charged offense and the witness' subsequent history.  Number --

THE COURT:  This is like contemporaneous. This is a 10-year-old case.

MR. DONOHUE:  I understand.

THE COURT:  All right.

MR. DONOHUE:  Number 3, the similarity -- well, it's not only the temporal proximity but any witness' subsequent history.  That's also important.  Which, there's

been none with respect to Mr. Potashnik.

I think plaintiffs would have you believe differently.  They cite a case out of the Houston Court of Appeals that seems to say that.  But what it doesn't do, it correctly recites the five factors of this but then it gives no explanation for leaving out the second part of factor number two as far as the witness' subsequent criminal history.

But then on the third factor, Your Honor -- and I'll say this, the Dallas Court of Appeals is clear in the Enriquez case, 2014, that's cited in our reply brief that that is part of the requirement on the second factor is -- is determining -- or consideration of the witness's subsequent criminal history, if any.

Number 3 is similarity between the past crime and the offense being prosecuted.  Number 4, the importance of defendant's testimony.  And 5, the importance of the credibility issue.

Taking these one at a time, the first the impeachment value of the prior crime, bribery on its face may seem like it -- what -- what Theus says is when a party seeks to impeach a witness with evidence of a crime that relates more to a deception than not, the first factor weighs in favor of admission of such evidence.

Well, is bribery a crime of deception?

Quite frankly, I could find no case law that said it is or
is not.  Plaintiffs cite no case law that says that it is or
is not.  And I would submit that it's their burden to show
this under Theus that these five factors apply, and they
have not shown that in fact bribery is a crime of deception.
On its face, perhaps, arguably it is; but there's no
authority to that effect.

       THE COURT:  A lot of -- most of the times
when this issue comes up the crimes are drugs or domestic
violence or murder or something like it.

       MR. DONOHUE:  Crimes of violence.

       THE COURT:  You don't usually have bribery
type of things.  And it just seems to me this is a lot
closer to -- the rule is impeach the credibility of the
witness and at some point bribery is a lot more relevant,
it's as bad as a crime as --

       MR. DONOHUE:  Than what you've seen before,
is what you're saying?

       THE COURT:  Yeah.

       MR. DONOHUE:  Yes.  I understand.

       The second factor, the temporal proximity
of a past crime relative to the charged offense and witness'
subsequent history, this crime occurred in -- well, the
conviction occurred December of 2010.  I'm not sure when the
crime was committed, but there has been no subsequent

criminal history by Mr. Potashnik.  And that weighs into
that also, so we would submit that the second factor weighs
against admission for the prior conviction.

And, again, as I've said earlier, they want
to divorce that second aspect of the second factor, witness'
subsequent history, from the analysis; but it's not under
the Dallas Court of Appeals.

The third factor, similarity between a past
crime and the offense being prosecuted.  If the past crime
is similar to the offense being prosecuted, that facilitates
towards not admitting the conviction.  The reason being,
under Theus, the rationale is that there's a caution to not
present a situation where the jury would convict on the
perception of a past pattern of conduct instead of the facts
of the charged offense.  That's analogous in a civil case
that would weigh against admission if the conduct in issue
is similar to the past crime.

Your Honor, this -- this is about --
primarily about an alleged oral agreement where
Mr. Potashnik, according to Mr. Carpenter, he says that he
basically allegedly told him that if he stayed with the
company that he would pay him a bonus; that if he -- in
other words, a bribe, if you will -- bribed him to stay.  He
had other opportunities.  You'll hear testimony from
Mr. Carpenter spoken that he had other opportunities and he

was bribed into staying by Mr. Potashnik's supposed carrot of a bonus.

It's similar to a bribe, if you will.  In fact, you'll hear from Mr. Carpenter's testimony that they had a handshake deal similar to a bribe, a handshake or a back door type of deal.  And that's -- so the similarity there facilitates towards not admitting the prior conviction.

The fourth and fifth factors and importance of the defendant's testimony and the importance of the credibility issue are related and intertwined.  Both depend on the availability of other testimony other than the testifying defendant.

When the case -- this is Theus -- when the case involved the testimony of only the defendant and the State's witnesses, however, the importance of the defendant's credibility and testimony escalates.  Well, this case doesn't just depend on Brian Potashnik's testimony. They've asserted this breach of the alleged oral agreement not only against Mr. Potashnik but against Cheryl Geiser and against all three of the entity defendants.  So there's other representatives and Ms. Geiser, obviously, that will testify as to the supposed oral agreement, number one.

He's also, Mr. Carpenter, sued for quantum meruit.

THE COURT:  Well, who's -- who else is going to testify on your side?

MR. DONOHUE:  There's -- there's going to be other witnesses that, if they call them, they're going to be asked point blank.  And they're former representatives of the company.  For instance, Mr. Keith Jones.  She's mentioned Sara Reidy.  She mentioned her.  Whether or not they have any knowledge of this supposed oral agreement, they were representatives of the companies also.

Same thing with Deepak Sulakhe, who's not one of their witnesses, but ours.  Certainly, he's going to testify.  In fact, he was friends with Mr. Carpenter, and he'll give testimony as to whether or not there was an oral agreement based on his discussions and implications that were made by Mr. Carpenter to Mr. Sulakhe.  So those people's testimony, their credibility will be weighed also.  So that -- that weighs against admission of the past conviction of Mr. Potashnik.

And I think that about covers it, Your Honor.  Thank you.

THE COURT:  Mr. Wiley?

MR. WILEY:  Yes, Judge.  Thank you.

There are a few issues here to cover.  First, defendants focus on Rule 609.  609 only deals with impeachment by conviction.  There are other ways that this

can come in.

But 609 only deals with a presumption that you admit these things if there's a conviction and it takes these certain criteria.  But the fact of conviction of both of the individual defendants goes to a completely different issue that's not pure impeachment, so it's outside of Rule 609, and that is on alter ego.  And here's how: Corporations in Texas, under the business organizations code, can -- that is, they can -- it is permissive for corporations to pay criminal defense attorneys' bills if certain conditions are met.

Those three conditions are these:  First, if the company determines that the person acted in good faith; second, the company reasonably believed that the person's conduct was in the corporation's best interest; and third -- and this is the important one -- did not have reasonable cause to believe the person's conduct was unlawful.

Here, Ms. Geiser and Mr. Potashnik ran the companies, maybe owned the companies.  Certainly, Brian Potashnik admits he does.  There's some discrepancy as to Ms. Geiser's ownership interest.

So, if they did not have reasonable cause to believe their conduct was unlawful, then -- I'm sorry -- if the company didn't have that reasonable belief, then the

company could not have paid for their criminal defense fees. Therefore, if the companies were prohibited from paying those and they did it anyway, that shows the requisite, personal, direct benefit needed for alter ego.  So that's an issue, the criminal defense and prosecution, that's completely outside of Rule 609, which is pure credibility impeachment with criminal conviction.

On the fact of criminal conviction there's really two points when addressing 609.  One is the pure fact of conviction.  The second is the role of the other things other than conviction; like, the prosecution, the FBI raid, all of the duties that it took to respond to the FBI raiding, running the company while the FBI was prosecuting the individual defendants.  That's outside of the pure fact of conviction, and Ms. Gibson can address that.

On the pure fact of conviction, I think -- I think Mr. Donohue is right as it concerns Ms. Geiser and probation on the pure fact of conviction for Rule 609 purposes.  Not so with Brian Potashnik, though, and here's why.  Brian Potashnik didn't have the same outcome as Ms. Geiser.

When we look at the Theus factors -- and I agree with Mr. Donohue that those are the factors you look at -- it says in there that these are nonexclusive factors. The first, the value of the crimes, whether it involved

deception.   And I think it seems obvious on its face that
bribery involves a crime of deception against the community,
if not other people.

On the second factor -- and this is where
Mr. Donohue and I disagree -- he mentions that it's a
two-prong factor.   That is, that there's temporal proximity
and subsequent criminal history.   While it's true, Theus
says that the law favors admission if -- and this is
quote -- if the past crime is recent and if the witness has
demonstrated a propensity for running afoul of the law.   So
it does mention both of those.

We cite a Houston Court of Appeals decision
that only cited one, but I think the answer is this:   These
are nonexclusive factors.   And so you can consider both of
those, whether there was any subsequent criminal history and
the temporal proximity, but you don't throw both out just
because you only have one.

Again, these are nonexclusive factors.   And
besides, their rule would go too far without any logical
policy reason.   That is, they would say you have to have
temporal proximity, but it can't be too close because you
have to have enough time for a subsequent criminal history.
And that doesn't make sense.   There shouldn't be one free
pass before someone can be impeached with a criminal
history.

The third factor -- and this is all in the brief, so I'll be brief with it -- the third factor is similarity between the crime and the act of trial.  I think it proves too much to say that, well, this breach of contract was like a bribe.  It was a handshake deal or, as they call it, a back-door deal or a back-hand deal.  It's a contract, and that's different than bribery.  All of the elements are different and there's no mens rea with breach of contract.  We think that factor favors admission.

And for the fourth and fifth factors that are related, the importance of the defendants' testimony and their credibility, clearly, with an oral agreement, the main players here who made the agreement, that's the big issue here, right?  Who made the agreement?  Who's telling the truth about whether the agreement was made?

It doesn't matter that there are other witnesses who may say I don't think Jeff had a deal or I do think Jeff had a deal.  The main point is the parties to the deal.  What did they say between them?  And that's the big credibility issue and that's why the fourth and fifth factors of the Theus test favor admission.

And then on the points other than the pure fact of conviction, Ms. Gibson is going to address why it ties into the big story in this case.

THE COURT:  All right.

MS. GIBSON:  I don't think that their motion in limine goes beyond conviction or arrest.

Is that correct?

MR. L. FRIEDMAN:  It goes -- it goes to the whole criminal matter.

MS. GIBSON:  Well, that's not how I read it.

But as -- but if the Court wants to take a look at the whole criminal matter, there was no dispute about whether the parties had an agreement up until -- up until the defendants found out they were going to be indicted and got arrested.  The time frame on this is the indictments were filed under seal September 27, 2007. Brian Potashnik called up Carpenter to let him know they were going to be indicted.

At the very beginning of October the defendants, pursuant to arrest warrants, voluntarily surrendered.  And it's at that time that they start explaining to Jeff Carpenter that they're not sure that they're going to be able to pay him now because they are concerned about their criminal defense fees.  The CFO explains that the companies were bleeding about a million dollars a month in fees, and this is even pre -- this is even pre-indictment.

THE COURT:  The fees in criminal defense

fees?

        MS. GIBSON:   Yes, even pre-indictment.

        And it also goes to part of the motive as to why they needed Jeff Carpenter to stay.   Because Jeff -- the FBI raided -- this is pre-indictment -- the FBI raided the offices June 20th of 2005.   The sale-of-the-business discussions were in 2006.   They needed Jeff Carpenter and people like him to stay on.

        Where are they going to get another EVP to come work for a company that's about to get sold, with two owners who are in criminal trouble that's all over the papers in Dallas?  It goes to -- and part of the work that Jeff Carpenter did was to respond to -- respond to FBI subpoenas, communicate with the attorneys, spearhead the diligence efforts to turn over documents.

        But the telephone transcripts that are on defendants' wit -- or exhibit list as well, both Cheryl and Brian -- this is on November 2nd, and Mr. Carpenter had completed everything he need -- they needed from him on October 31st.   Now, suddenly, on November 2nd they're saying, well, you don't have any legal rights, there was no agreement, you don't -- you know, you need to sign the severance and maybe we'll pay you if we get paid, but we've got to be able to have money for ourselves to pay the criminal defense attorneys.   And that's the motive for

suddenly denying that there was an agreement in the first
place and for breaching.

And showing why something happened goes --

THE COURT:  Okay.

On that second part, you know, aside from
609(2), it's the investigation and the expenditures, not
pleading guilty or --

MS. GIBSON:  I am complete -- I'm
separating the guilty pleas.  That's a separate issue.  I'm
talking about just all of the activity that is part of the
timeline in this case.

In fact, some of the discussions about
Jeff's agreement with them took place and was interrupted
with, for example, Mike Uhl, a criminal defense attorney,
calling.  And Ms. Potashnik starts crying and that's why
they don't end up, you know, further discussing his deal
during that meeting.  But it's all over the events in this
case.

And the -- yeah, but the actual pleas, that
happened after the fact.  Jeff was gone by then.

MR. L. FRIEDMAN:  My turn?

THE COURT:  Sure.

MR. L. FRIEDMAN:  Interesting story but not
the provable facts in this case.

What happened was the FBI raided these

145

companies on June 20, 2005, Father's Day.  Up until that
point the Potashniks had no idea they were under
surveillance or being investigated by the FBI.  The FBI
raided the companies and then began investigating the
companies.

Up until the time a year later, on October
2nd, 2007, when an arrest warrant was issued for Brian and
Cheryl Potashnik, they had no idea that they were targets of
this investigation.  They didn't receive a target letter.
They weren't asked to come in and talk to the FBI.  They
weren't asked to come in and talk to the U.S. attorney.

But numerous companies, including the three
defendant companies in this case, had received subpoenas for
information.  And they didn't know that Bill Fisher was
telling his tales to the FBI as well.  Spending, as it was,
was spent properly by the corporations defending themselves
from these onslaught of FBI subpoenas.

There never was an oral agreement.  That's
why Mr. Carpenter chased Mr. Potashnik around for a year
trying to get him to sign an amendment to his employment
contract, which is what he signed.  That's why Mr. Carpenter
gave 11 different renditions of what, supposedly, the oral
agreement was.  And that's why the probative value of these
convictions or the criminal prosecution does not outweigh
the prejudice to my clients.

146

This is a simple case.  Either he can prove he had an oral agreement -- same elements that he would need to prove if he had a written agreement -- or he can't.  The reality of it is he can't.

So what they want to do is bootstrap everybody else's employment agreement to this and say because these people had one he must have had one.  And if they can't do that they want to say, well, these are bad people, so don't believe them.  That's just not what this case is about.  Either he can prove his oral agreement -- which we don't think he can -- or he can't.  And that's it.

If we go into the criminal matter, then I do have to try the criminal case to show that Carpenter slipped through the crack.  He was involved in the criminal matter more so than Mrs. Potashnik.  I've probably got to get Ms. Potashnik and Brian Potashnik's criminal counsel down here to make sure, you know, I don't get them in trouble.  I mean, you really -- I really have not been counting on trying the criminal case in this matter. It just takes on a whole different dimension.

THE COURT:  Well, you have two different issues.  One is the evidentiary rule where prior convictions can come into evidence, and they agree under that rule that Mrs. Geiser's plea of guilty does not come in and they disagree about whether Mr. Potashnik's does.

MR. L. FRIEDMAN:  Okay.

THE COURT:  So -- and then there's a second issue.  And if it does, under 609 you're not retrying the criminal case.  The only thing that comes into evidence is, you know, that they pled guilty to whatever charge and, I guess, if they were sentenced for that.  You don't get to go back --

MR. L. FRIEDMAN:  He.

THE COURT:  -- and retry the criminal case.

MR. L. FRIEDMAN:  He.  Just he.

THE COURT:  He, Mr. Wiley.

That's the other thing the defendants can put on is the fact of the conviction.  You don't go into the details and you don't go into the defenses.  You don't get to convince this jury that it was a -- it was a bogus charge in the first place or that he only pled guilty because, you know --

MR. L. FRIEDMAN:  To protect his wife and family.

THE COURT:  Right.  It's just the very fact.

And it doesn't come all that often.  But, you know, again, usually it's more often drug possession or something like that.  It's just the fact of a conviction within the past 10 years, felony conviction.

MR. L. FRIEDMAN:  But that very fact could
be case determinative and that's what they're counting on.
And in this instance, truly, the probative value does not
outweigh the prejudice.

THE COURT:  And we'll -- we'll address
that.  But what you're saying is you -- even under the 609
rule you'd have to retry the criminal case, and I'm saying
you don't; that, you know, the facts and the defenses and
the good faith or whatever doesn't come into evidence --

MR. L. FRIEDMAN:  I hear you.

THE COURT:  -- under that.

And I can make a ruling on that.  And,
again, (inaudible) --

I guess I'm a little more troubled by
the -- Ms. Gibson's argument that, you know, while this was
all going on -- I hear you saying -- and I'm not saying you
don't believe it, but I'm hearing you saying that, look,
there's no agreement, it's a simple case, it's a two-witness
case, Brian Potashnik and Jeff Carpenter.  And I'd like it
to be that, a two-person case, but if they -- if they -- if
you are denying -- if Mr. Potashnik is denying that there
was an agreement, period, they're entitled to put on some
circumstantial evidence that there was an agreement.

And his argument was, look, they had an
agreement.  But when all of a sudden they had to start

149

spending a million dollars a month in order to pay defense
attorneys and they couldn't afford to live up to their prior
agreements, I mean, that sounds like a state-of-mind
argument that makes some sense.

MR. L. FRIEDMAN:  Counsel needs to be
candid with the Court and advise the Court that there is no
evidence that the companies, Mrs. Potashnik, Mr. Potashnik,
was paying a million dollars a month in legal fees and that
it had no effect on their oral -- alleged oral agreement.

MS. GIBSON:  The only thing that's untrue
is what Mr. Friedman just said.

Keith Jones testified.  Now, they were
already bleeding money on criminal defense, okay, but
Keith Jones, CFO, testified that they were bleeding about a
million a month in criminal defense fees.  And the
transcripts --

THE COURT:  You said he testified.  He
testified by deposition.  That's something here.  I'm not
saying pull it out now.  You can say, here, Mr. Friedman,
let's sit down and look at this and --

MS. GIBSON:  Absolutely.

And it's all over the telephone transcripts
where Brian Potashnik and Cheryl Potashnik are talking about
we don't know if we're going to have enough money.  The sale
hasn't closed yet.  We didn't think we would be indicted.

150

That's happened now.  We've got these criminal defense attorneys, you know, that we need to pay.  I'm paraphrasing, but it's all over the transcripts.

And beyond that, even before they actually got indicted, they really needed people to stay on.  In fact, at some point the deal was in jeopardy because of the criminal investigation.  It was all over the news.  And so that is also circumstantial evidence that -- as to why they would pay the stay bonuses to important employees.

MR. L. FRIEDMAN:  So, I apologize I wasn't at Keith Jones' deposition last week.  I don't know what he testified to, but up until last --

THE COURT:  Well, somebody was there.

MR. L. FRIEDMAN:  -- up until last week there was no evidence and I don't know what his testimony was.  But here's what I do know:  That in plaintiff's original petition, a petition for temporary restraining order and injunction which kicked this party off --

THE COURT:  Which kicked what party off?

MR. L. FRIEDMAN:  This lawsuit.

THE COURT:  Oh, okay.  I thought you meant a party to the lawsuit.

(Laughter)

MR. L. FRIEDMAN:  No.  Which kicked this lawsuit off.

151

Under oath, Mr. Carpenter says -- and this is before the indictment -- Mr. Carpenter says when the sale process began one or more of the defendants agreed to pay plaintiff three percent of the gross sale, less normal closing cost of brokerage fees, attorneys' fees related to the sale, parentheses, not the criminal case, title fees, and other normal closing costs.  The agreement was made in consideration in part for plaintiff remaining an employee of one or -- one or more of the defendants to assist in effectuating the sale.  That's his sworn testimony.  Not including the criminal case and no mention of the deduction of any employee bonuses.

May I approach and show you, Your Honor?

THE COURT:  I take your representation that you're reading it accurately.  If you weren't, I know the other side would be pointing that out to me.

MR. L. FRIEDMAN:  Sure.

THE COURT:  That's not addressing her argument.

MR. L. FRIEDMAN:  Well, relying on Mr. Carpenter's sworn statement as opposed to arguments of convenient, this doesn't -- these -- the criminal matter nor the fees for criminal defense nor other employees' bonuses has any relevance to this case.  This was the deal they relied on to file this lawsuit with a Rule 13 endorsement

from none other than Rogge Dunn.

          THE COURT:  I remember he was in it.

          MS. GIBSON:  Your Honor --

          MR. L. FRIEDMAN:  And -- and Mr. Carpenter.

          MS. GIBSON:  Your Honor, we have the testimony up if you'd like to read it.

          THE COURT:  No, that's okay.

          MS. GIBSON:  Okay.

          MR. L. FRIEDMAN:  So it doesn't matter if they spent a zillion dollars.  Mr. Carpenter says under oath "not the criminal case".  So do we believe him now or do we believe him then?

          THE COURT:  Well, that's -- you know, that's a question you -- that's an argument you make in front of the jury.  You said this one time; this another time.

          MR. L. FRIEDMAN:  But this matter's case could be case determinative.

          THE COURT:  All right.

          MR. L. FRIEDMAN:  That's why it's so important.

          THE COURT:  Okay.

          MR. L. FRIEDMAN:  So they should be -- they should have to approach the bench before they blurt it out.

          MS. GIBSON:  I was -- I was just going to

153

say as far as the pleading that that's a pretty old version
of the pleading.  But we don't have to plead evidence.  We
just plead the claim.

            THE COURT:  Sure.

            MR. L. FRIEDMAN:  But they swore -- but
Mr. Carpenter swore it was true.

            MR. DONOHUE:  May I say something,
Your Honor?

            THE COURT:  Sure.

            MR. DONOHUE:  Mr. Wiley pointed out to the
Court that there's another reason, supposedly, for
introducing the evidence of a conviction, and that is their
alter ego theory.  And then he reads from the business
organizations code about permissive indemnification of
governing persons.  Part C in the case, the criminal
proceeding, did not have a reasonable cause to believe the
person's conduct was unlawful.  That person would be
entitled to indemnification.  However -- and he -- and their
argument is, well, they did have belief because they were
convicted and he pled guilty of conspiracy to commit
bribery.

            Well, Part D of that same subsection says a
person does not fail to meet the standard under
Subsection A -- which I just read part of -- solely because
of the determination of a proceeding by Part 4 solely

154

because of the termination of a proceeding by conviction.
So that is not determinative to plead guilty or otherwise
and being convicted as to whether or not a governing person
is entitled to permissive indemnification.

MR. WILEY:  Judge, I don't think it says
I'm pleading guilty.  It does say conviction and uses the
word "solely" here.  Yeah, that's the point, is just because
there's a judgment or a conviction doesn't mean that the
company didn't have reasonable to -- cause to believe that
the person's conduct was unlawful in paying those fees.  But
if they pled guilty and they were at the top of the food
chain, so to speak, then of course the company didn't have
reasonable cause to believe that the person's actions were
unlawful.

But here they plead guilty.  And in that
subsection that Mr. Donohue's mentioning it doesn't say
pleading guilty.  It says solely by judgment or conviction
that may not be enough.  But if you have other stuff -- and
here again, we have a guilty plea.  The bigger point here
with this is that if the company was not permitted to pay
their criminal defense fees then that money should have been
back in the company.  That is, they were bleeding the
company for these fees, and that shows alter ego.  Or at
least it's one of the predicate steps to showing alter ego.

MR. L. FRIEDMAN:  Even according to

Mr. Wiley it was entirely proper for the company to pay for their own defense fees when they were the only subject of the FBI's interest.  So up until a year-and-a-half after this, the FBI's interest began, the Potashniks individually were not involved.

THE COURT:  Were there separate charges against these business entities?

MS. GIBSON:  No.

MR. L. FRIEDMAN:  No.

But Mr. Carpenter was only -- from the time of the arrest warrant issued, October 2nd, 2007, to the time that he left the company and took another job, which was November 2nd, 2007, he was only there 30 days, exactly 30 days.  So he just doesn't get to complain about that, the company paying for their own defense.  And then he left, so...

MR. WILEY:  Judge, quick response.

Mr. Friedman mentions that this was for defending the company in some criminal investigation.  The CFO of the company, Keith Jones, the CFO of all the companies, testified this -- and here's the question at deposition -- when you talked about bleeding a million a month in lawyer fees, are you talking about criminal defense fees for Brian Potashnik and Cheryl Potashnik?  Their CFO said yes.

THE COURT:  Okay.

Your motion in limine, if read literally, only goes to the 609 issues.  And in your response you've raised more issues and you've presented good arguments that you were prepared for.

I haven't even seen your response.  I address 609 issues frequently enough that I can rule on that.  But as far as anything else, particularly if you're saying this is case determinative, I need to read your response and get a better hold of what -- what your arguments are.

And I'm not familiar at all with that provision.  I mean, I understand your argument about bleeding the fees, the argument about alter ego.  I'm not familiar at all with that provision of the Business Corporation Act or whatever you're reading from.  So I guess I need your response.

As to the 609 issues, they -- you agreed on Ms. Geiser; and I'll deny the limine as to Brian Potashnik, that bribery, as it goes to 609.

But this seems just more on point than most all of the criminal convictions that we deal with and the types of cases we try in this court.  So the very fact that there was a plea of guilty and a conviction can come into evidence.  You can voir dire on that if you want.  But as

far as the -- what the criminal conspiracy involved, the
facts underlying it, and whether or not that that's evidence
of a motive like you were arguing, I guess I'm going to have
to see some more evidence and read your brief that you filed
that I haven't seen.

        MS. GIBSON:  Your Honor, we --

        MR. L. FRIEDMAN:  Well, we -- we deny it
for now until they persuade you otherwise?

        MS. GIBSON:  Well, Your --

        THE COURT:  Yeah.  Sure.

        MS. GIBSON:  Your Honor, wait.  Then I --

        MR. L. FRIEDMAN:  I mean grant it for now
until they persuade you otherwise.

        THE COURT:  I'll grant your oral motion
till I rule on it.  I'll let you know before you have to
voir dire on it.

        MS. GIBSON:  So just to back up a moment,
on a 609 issue I thought the ruling was granted as to
Ms. Geiser.

        THE COURT:  Right.

        MS. GIBSON:  Denied as --

        THE COURT:  Right.

        MS. GIBSON:  -- to Brian Potashnik.

        THE COURT:  Right.

        MS. GIBSON:  But as to the events leading

up in the timeline --

        THE COURT:  Right.

        MS. GIBSON:  -- that's not in their motion and so it's not in our response.

        MR. L. FRIEDMAN:  We made an oral amendment.

        MS. GIBSON:  Okay.

        THE COURT:  Mr. Wiley was reading from it.

        MR. WILEY:  I filed a trial brief, Judge, on the --

        THE COURT:  That's what I hadn't seen.

        MS. GIBSON:  Oh.

        MR. WILEY: -- on the alter ego issue.

        THE COURT:  Whatever you filed I haven't seen, so I don't know.

        MS. GIBSON:  So he -- he did file something on the alter ego issue.

        But as far as explaining -- you know, as far as briefing and explaining to the Court that they really needed him to stay because they were having criminal problems as far as, you know, the transcripts where Brian and Cheryl talk about, you know, you have no legal rights suddenly, that type of thing wasn't in the motion in limine. It was addressed here.  And so we have not filed a written response as to those issues.

THE COURT:  Did you want to file a written
response or did you want to --

MS. GIBSON:  Well, I don't --

THE COURT:  -- let me have the deposition
testimony?

MS. GIBSON:  It's --

THE COURT:  Or tell me what.

MS. GIBSON:  The criminal -- what happened
with them criminally is so bound up in the facts that I
don't know how we -- you know, I don't know how we do this
without -- even -- even exhibits that Mr. Friedman used in
Mr. Carpenter's deposition talk about the criminal
proceeding.

THE COURT:  He may have opened the door and
there maybe some labor issues.  I don't know.  All I'm
saying is you're reading through things that I haven't
looked at and I will look at them.

MS. GIBSON:  So, I mean -- so, what are you
telling us to do?

THE COURT:  I'm not telling you to do
anything.

MS. GIBSON:  Oh, okay.

THE COURT:  I can read what you -- what you
filed.  If you want to file something else, I'll read that.

MR. L. FRIEDMAN:  Can we Email it to you,

160

Judge?

               THE COURT:  Huh?

               MR. L. FRIEDMAN:  Can we Email it to you?

               THE COURT:  Sure.

               MR. WILEY:  So there is no ruling yet?

               THE COURT:  You can Email me if you want to
rephrase your motion in limine.  There's nothing more for
you to -- you made your argument.

               MR. L. FRIEDMAN:  Do you --

               THE COURT:  I guess if you have cases to
cite --

               MR. L. FRIEDMAN:  Do you have a direct
Email?

               THE COURT:  Yeah.  It's mgreenberg, first
initial and last name, @dallascounty.org.

               MR. L. FRIEDMAN:
mgreenberg@dallascounty.org?

               THE COURT:  Right?

               MR. WILEY:  And, Judge, just to be clear on
your ruling right now, you're reserving ruling on the alter
ego --

               THE COURT:  Right.

               MR. WILEY:  -- issue?

               Brian, fact of conviction comes in under
609 for pure impeachment.

161

THE COURT:  Right.

MR. WILEY:  Cheryl stays out --

THE COURT:  Right.

MR. WILEY:  -- under 609 for pure impeachment.  You're going to hold off on considering about the big story, the other things other than pure fact of conviction?

THE COURT:  Right.

MR. WILEY:  Thank you.

THE COURT:  Okay.  And I want you to know that now because that may be a topic for your voir dire examination.

MR. L. FRIEDMAN:  Well, my understanding was your ruling was keep the big story out unless you decide that it's in.

THE COURT:  Right.  That's my ruling also.

MR. L. FRIEDMAN:  Okay.

MS. GIBSON:  So -- sorry.  So, are -- is the Court going to rule in the morning?  I mean, this affects --

THE COURT:  I'll see what's made it onto my computer by tonight.  None of these things you're talking about have made it onto my computer yet.

MS. GIBSON:  Right.  Well, they didn't.  It wasn't part of their motion.

THE COURT:  You're right.  There's nothing
on their side, period.

MS. GIBSON:  Okay.

THE COURT:  So -- so you're one step ahead
of them that you anticipated an argument and -- and filed
something on it.  I'm just saying you're coming at me with
something that they say is case determinative and you say is
so wrapped up that you couldn't try the case without it.
And I don't have a -- you're entitled to an informed ruling.
I haven't looked at this.

MR. L. FRIEDMAN:  So, my appellate
lawyer --

THE COURT:  Some of this stuff comes up all
the time and I -- I can give you a ruling on the fly.

MR. L. FRIEDMAN:  I just make -- I need to
make a record objection to your -- to the portions you
denied.

THE COURT:  Oh, sure.  You've objected and
it's noted.

MR. L. FRIEDMAN:  Thank you.

THE COURT:  Okay.  You preserved -- I'll
leave it up to your appellate lawyer to tell you how to
preserve error.

MR. L. FRIEDMAN:  Respectfully and
collegiately.  Thank you.

THE COURT:  Okay.  About time for our break.

Do y'all have exhibits you want to offer that you might use tomorrow?

MS. GIBSON:  We -- we do not.  We've got exhibits on the way being delivered here, but I don't -- we haven't talked about anything we would agree to pre-admit.

THE COURT:  Y'all talk about that.  Let's take a -- it's 2:41.  Let's take a 20-minute break.  We'll meet back at 3:00 o'clock.

(Recess taken)

PRETRIAL CONFERENCE

THE COURT:  Ms. Gibson, this was on file and you agreed to recite it, the Business Organization Act, and the deposition testimony you were talking about is on file.  So we're going to have that.  And -- and make sure Mr. Friedman and Mr. Donohue have that and we'll be all set on that.

And you did or did not want to do exhibits?

MS. GIBSON:  Your Honor, it looks like we will reach some agreements, but we won't be ready to do that till morning.

THE COURT:  All right.

And, Mr. Friedman, you'll check with your client about trying attorneys' fees separately after the

trial?

          MR. L. FRIEDMAN:  Yes.

          THE COURT:  All right.

          MR. L. FRIEDMAN:  The other thing is we've reached an agreement on a jury questionnaire, provided that this doesn't inhibit either side from asking whatever they usually ask in voir dire.  But I've been informed by your number one court reporter that you have your own jury questionnaire.

          THE COURT:  Well, we don't usually do a questionnaire.  Particularly, we're trying to get the jury in the box.

          MR. L. FRIEDMAN:  Well, we thought since -- since the great complications in this case, the length of time, and --

          THE COURT:  And we certainly don't do one this long.

          MR. L. FRIEDMAN:  -- in order -- in order to save the Court time and allow us to pick the right jurors to promote the efficiency of the court and help the court reporter maybe we can narrow it down to three pages.

          THE COURT:  Well, it's an hour each for voir dire and this isn't the type of case.  If it's a business dispute, it's not like a medical malpractice case where people have strong feelings about it.  We'll -- we'll

165

talk more about voir dire tomorrow morning.

On the -- on the motion to exclude the expert testimony, that's the two of you, whichever one of you will be testifying as an expert witness. I'll withhold some of that until we determine that there's agreement on -- on trying that separately. But in the meantime you need to produce as soon as you can, today or tomorrow morning, the attorneys' fees statements that you intend to rely on and make yourself available.

We can put you on out of order later in the case. But if only one of you are testifying, make yourself available for deposition. The rule provides that you can mitigate the surprise of a late designation by various means, and one of those is by getting all the information out there. So I'm not ruling on a hundred percent of that; but the more you can do to mitigate the surprise of that, the more that can come in.

But under any circumstance it's hard to supplement a good portion of your attorneys' fees because a good portion of your attorneys' fees are the few days before trial and what actually occurs at trial during the course of a particularly long trial like this. So, if nothing else, at least that portion would come in. If we try a bench trial, it may be two separate findings; one for the entire case and one for everything from a week before, up through

the end of trial.

        MR. L. FRIEDMAN:  Will you please note my objection for the record?

        THE COURT:  Of course.  And if you want to submit a written ruling, I'll sign that.  And for all of these you want to submit a written ruling.  And for everything -- you're also welcome to have a running objection on any matter.

        MR. L. FRIEDMAN:  My objection is the basis of surprise because we don't have the attorneys' fees statements.  We don't have the invoices.  We don't have the fee agreements.

        THE COURT:  And I don't want to interfere with your good attorney's advice there, but I would say make that objection when I make a final ruling.  If you want to put that on the record now, you can, but I have -- you know, I've given a suggestion over here how to mitigate surprise.  I haven't determined whether or not she's mitigated the surprise yet.

        MR. L. FRIEDMAN:  I will do -- not only will I defer to your good judgment, but I will count on you to give a suggestion to our side when we need it.

        THE COURT:  All right.  Very good.  Thank you.

                         COURT'S RULINGS

          THE COURT:   And motion to exclude all
evidence is denied and the motion to exclude the
supplemental disclosures about how the damages were
calculated is denied.

               We still haven't taken up the designations,
page/line designations for the witness that you're doing by
videotape.  But if you'll let me know when you're doing that
we'll do that in time for you to edit the tape and I'll get
both sides' objections.

               And -- and the only thing I haven't ruled
on, I believe -- your motion for sanctions is -- as far as
sanctions, as far as the non-disparagement agreement, that
depends on who testifies.

               As far as, you know, documents, I'm not
going to instruct the jury as to presume anything because
this just was brought up too late for me to determine that
something was held back in bad faith.  But you can question
a witness, just like you were saying or we were discussing
earlier, that did you look -- you know, we asked for this
document, did you look for this document.  But I'm not going
to instruct the jury to make any presumption like they would
in a spoliation type of case.

               MS. GIBSON:   Your Honor, I'm not asking for
that.

THE COURT:  Was there a third?

MS. GIBSON:  Your Honor, one of -- one of the most important ones just as a practical matter is our request that the subpoenaed closing documents and escrow documents be admitted.  The closing documents alone, a paper copy is seven boxes.  Now, I'm designating -- I will designate excerpts I plan to use, but I really don't want to have to drag out seven boxes.

THE COURT:  Right.  And I don't want you to do seven boxes.

I know Mr. Friedman has a hearsay objection as to that and you're seeking as a sanction that he -- that his hearsay objection be overruled.  And what I was saying, maybe inarticulately, was Mr. Friedman was saying, look, you know, if you want to show the excerpts to Ms. Geiser and see if you can establish those as a business predicate, you can do that.  I think I'll just hold off on that ruling to see what she says in her testimony about those.  But whether they come in or not, that's still -- you still have the information to calculate your damages.

I just can't believe that you need -- I'm not sending back to the jury boxes of closing documents that they'll never look at.

MS. GIBSON:  They're -- so, they're here because I just never want any question --

THE COURT:  Right.

MS. GIBSON:  -- if someone wants to look at something.

THE COURT:  I think Mr. Donohue does.

MR. DONOHUE:  Yeah.

MS. GIBSON:  But -- but if those documents, for example, show through closing memos how much was paid to sellers and --

THE COURT:  I would think it's the closing memos you would want to present to the jury then, not the --

MS. GIBSON:  Well -- and it shows --

THE COURT:  -- surveyor's --

MS. GIBSON:  -- it shows who -- yeah, not the whole thing, but there's certainly various parts of it.

THE COURT:  How many properties were you talking about?

MS. GIBSON:  A lot.  I mean, enough that the closing documents are -- I don't -- I don't know the total, but enough that just the closing documents are seven boxes.

MR. L. FRIEDMAN:  Seven or seventy?

THE COURT:  Seven.

MS. GIBSON:  Seven.

MR. L. FRIEDMAN:  Okay.

THE COURT:  And as far if there's an oral

motion in limine about --

MR. L. FRIEDMAN:  We're going to put it in writing for you, Your Honor.  So, it's under way.

THE COURT:  And I'll rule on that in the morning.  But I did look at theirs.  You need to look at their response in the deposition testimony what they've attached to that.

MR. DONOHUE:  Your Honor, there is a -- there is a response.  You talking about on the alter ego?

THE COURT:  And then you responded to that.

MR. DONOHUE:  We did respond to that.  It's on top.

THE COURT:  I'll read your response.

MR. DONOHUE:  Yes, sir.

THE COURT:  I read theirs, but I did see that you filed a response to their response -- or a reply to their response.

MS. GIBSON:  And, you know, just heads-up just for everyone, I don't know if it helps anyone but we intend to submit alter ego.  Within that will be some winding-up issues.  We do not intend to submit a separate winding-up issue.

THE COURT:  What do you mean?

MS. GIBSON:  Well, the way it was pleaded, statutory alter ego and not giving notice of winding up were

171

pled separately.  But the -- the winding-up-notice issue is just part of the alter-ego charge as opposed to separate theories.

THE COURT:  You're supposed to give notice -- the company was supposed to give notice to Mr. Carpenter of winding up?

MS. GIBSON:  Yes.  You have -- if you're going to dissolve a company you have to represent that you have paid off claims, creditors, etcetera.  And so for anyone who has a claim you're required to give notice.

THE COURT:  Right.

MS. GIBSON:  And --

THE COURT:  And you're saying --

MS. GIBSON:  -- and that's just --

THE COURT:  -- you're not asserting that as a separate cause of action?

MS. GIBSON:  Exactly.

And we do not intend to submit joint employer that works on the facts but we're borrowing from employment law, and we don't want to be the first on anything in this case.

MR. L. FRIEDMAN:  What -- what statute is that, the notice statute?

THE COURT:  The notice of winding up, what statute is that?

MS. GIBSON:  I don't -- I don't have it --
I can't think of it off the top of my head.

THE COURT:  Probably business corporations.

MR. L. FRIEDMAN:  Well, I've looked and
I've asked.

THE COURT:  Huh?

MR. L. FRIEDMAN:  I've looked for it and
I've asked for it.

THE COURT:  She's not asserting it, so you
won that argument.

MR. L. FRIEDMAN:  Okay.

MS. GIBSON:  Right, but it will be part of
the alter-ego charge.

MR. L. FRIEDMAN:  Well, that's what I'm
saying.

THE COURT:  Well, then you need to tell him
where you're finding that from.

MS. GIBSON:  Sure.

THE COURT:  All right.

And who are you calling tomorrow?

MS. GIBSON:  I may have to call CFO Keith
Jones out of order.  So that's a timing issue.

I plan to call Cheryl Potashnik first, I
think.

THE COURT:  Probably be at the end of the

day by then.

        MS. GIBSON:  By then.

        THE COURT:  Unless you're planning on only being 30 minutes with him.

        MS. GIBSON:  History in this case shows I'm a lot faster than others.  I try to get what I need and get out.

        THE COURT:  Sure.

        MS. GIBSON:  And then only other heads-up just on all of the rulings -- and I think this is true for any case but, obviously, we may re-urge something if the defendants do what we think they'll do and trash our client and say they've got Mother Theresa and Bill Gates.

        MR. L. FRIEDMAN:  Mother Theresa's not on our witness list.

        MS. GIBSON:  Well, what I mean is --

        THE COURT:  I recognize that there's a doctrine of waiver, opening the door, things such as that. And you're certainly welcome to --

        MS. GIBSON:  And part of the reason I'm announcing it is just should they choose to, you know, do or not do that.  That's really for defense counsel.

        THE COURT:  You don't have to say before --

        MS. GIBSON:  Okay.

        MR. L. FRIEDMAN:  Is that a warning?

MS. GIBSON:  No.  No.

THE COURT:  It's a warning.

MR. L. FRIEDMAN:  Threat or warning?

THE COURT:  Ask her what she means when I'm not around.

MR. L. FRIEDMAN:  Okay.

THE COURT:  It may be a fair warning.  She just doesn't want to say it in front of me.

MR. L. FRIEDMAN:  Only if it's mutual, Your Honor.

THE COURT:  Mutual that --

MR. L. FRIEDMAN:  Only if the fair warning she gave is mutual, I said.

THE COURT:  Sure.

I believe we talked about that, too, I believe in the goose versus gander thing.

MR. L. FRIEDMAN:  So one other thing.  Maybe Keith Jones will be here, maybe not.  She's asking us to have Mrs. Potash -- Mrs. Geiser here, which we will.

THE COURT:  Uh-huh.

MR. L. FRIEDMAN:  And should we have -- is number two witness or number three witness Mr. Potashnik?  We should have him here?

MS. GIBSON:  Yes.

THE COURT:  Yeah.  He's a party to the

lawsuit.  You should have him here, but I guess that's up to you.

If Mr. Jones is set, are you going to do your direct examination after she does her examination?

MR. L. FRIEDMAN:  Yeah, probably.

THE COURT:  I've got to believe that would take you to the end of the day with Jones and Cheryl Potashnik.  So if you want to hold off on Mr. Potashnik till Wednesday you can do that.

MR. L. FRIEDMAN:  You know what, I want to think about that, but I'm planning on doing it.

THE COURT:  All right.  I would say just -- if you're not going to do that, you should tell her tonight, because she may need to have a third witness lined up.

MR. L. FRIEDMAN:  Okay.

THE COURT:  All right.  And we'll see you tomorrow morning at 9:00 o'clock.

MR. L. FRIEDMAN:  No questionnaire?

THE COURT:  No questionnaire.

(End of proceedings)

176

THE STATE OF TEXAS

COUNTY OF DALLAS

I, Vikki L. Ogden, Official Court Reporter in and for the County Court at Law Number 5 of Dallas County, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the total cost for the preparation of the Reporter's Record is $1,181.20 and will be paid by Friedman & Feiger, LLP.

WITNESS MY OFFICIAL HAND this the 19th day of September, 2018.


/S/ Vikki L. Ogden
_____
VIKKI L. OGDEN, Texas CSR# 6309
Official Court Reporter
Dallas County Court at Law No. 5
600 Commerce Street, Floor 5
Dallas, Tx. 75202
(214)653-6443
Certification Expires:  12/31/18

<u>CAUSE NO. CC-08-02072-E</u>

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| | ) | |
| SOUTHWEST HOUSING DEVELOPMENT | ) | |
| COMPANY, INC., ET AL, | ) | |
| | ) | |
| Defendants. | ) | DALLAS, TEXAS |

I, Vikki L. Ogden, Official Court Reporter in and for the County Court at Law No. 5 of Dallas County, Texas, do hereby certify that the following exhibit constitutes a true and complete duplicate of the original exhibit admitted into evidence during the proceedings in the above-entitled and -numbered cause as set out herein before the Honorable Mark Greenberg, beginning January 22, 2018.

WITNESS MY OFFICIAL HAND on this the 19th day of October, 2018.


/S/ Vikki L. Ogden
_____
Vikki L. Ogden, Texas CSR# 6309
Official Court Reporter
Dallas County Court at Law No. 5
600 Commerce Street, Floor 5
Dallas, Texas 75202
(214)653-6443

## DIFFERENT DAMAGE AMOUNTS AND CALCULATIONS

05/22/2006   Alleged Verbal Agreement (referenced in the Declaration of Jeffrey Carpenter)

03/14/2007   Amendment to Employment Agreement (referenced in "JC's Personal Notes", Defendants' Trial Exhibit No. 14)

05/14/2007   Breakfast Meeting (referenced in the Declaration of Jeffrey Carpenter)

03/11/2008   Plaintiff's Original Petition and Petition for Temporary Restraining Order and Injunction

06/24/2008   Plaintiff's Responses to Request for Disclosure

07/30/2010   Claimant's Responses to Respondent's Request for Disclosure (regarding EA Bonus)

07/22/2013   Declaration of Jeffrey Carpenter

05/31/2016   Jeff Carpenter's Consolidated Disclosures (discloses 3% for First Time, inforces EA calculation & amount)

01/15/2018   Deposition of Jeffrey Carpenter, Vol. II (no amount)

01/21/2018   Jeff Carpenter's Damages Supplement to Consolidated Disclosures (changed calculation)

DEFENDANT'S
EXHIBIT
1
PENGAD 800-631-6989

Appendix 000305



JC Personal Notes to Discuss Personal/Financial Items with Brian 3-14-07:  @ 7:00 A.M.

1. No one has been more committed, dedicated, protective, focused, delivered, went out the way to protect your interests than I.
   a. I am feeling betrayed, unkept promises or lied to?, used or not treated fairly.
   b. I contributed greatly to position the company for sell opportunity by the many daily extras because they had to be done by someone who knew how and cared; I was told that I would be taken care of... I have played a much bigger role than just management since day one because it had to be and I was asked to "just take care of it"... · ·
2. Only person in companies that have not had any increases and bonuses that have been promised and have been told that they have certainly been earned and deserved... I personally spearheaded the overall company's best interest... to keep the company strong and moving forward...
   a. Took control of FBI investigation and company hysteria and managed the employees and company image of third parties; I kept the solidarity of the organization together for past couple of years...
   b. Finishing construction and development issues for the past two+ years... major gaps that I have been filling in because they are a must to the companies
   c. Have delivered "results" in all phases of each and every operations of the company
   d. Hurricane Katina...1000 time above and beyond...
   e. Development, construction, management, central services, and ownership quality controls and savings etc.
   f. Corporate leadership, structure and solidarity without official authority...
   g. Doing construction and developments jobs plus a lot of central services...
   h. Expense savings... insurance... expenses in mgmt, personnel, recruiting, design and construction value engineering (loop systems, signage, landscaping, national accounts,)  ·
   i. Vegas REHAB completed by management and refinancing... savings
3. Personal Financial Concerns:
   a. Depleting savings due from the lack of bonus and increase wage dollars that I needed to pay my personal lawsuit expense and tax lien and daily family obligations as a result payment deferral.
   b. My personal budget is $300 to 350K  per annum--- bonuses or earned income not paid.
   c. Sale of house in Dallas to relocate possible losses...
   d. Family life has deteriorated to point of possible no return... explosive spouse and family arguments... marriage is a point of disaster...
   e. Massive sacrifice of family, personal and professional health...
4. Legal fees being partially paid by my bonuses...My not getting paid bonuses and wages is helping to pay attorney fees every where else. Why am I the very last person to not receive anything but 24 months of delays and unkept promises, etc...
5. Others received significant raises, bonuses, and promotions unearned... K, S, M, DS= $275k+ in 2005   Others get paid but I have not...
6. 148% growth, from 26 sites of 4762 units to 55 sites and 11,830 units delivered and I took the lead for accountability corporately, management, construction and development ( 3 years of some construction & development fees and profits coming in)
7. MGMT and state of company much more challenging than was led to believe prior to joining company without the investigation
8. Since May 2005, unkept promises of dollars and partnership/ownership to me; actually even shortly after I joined company and touring sites
9. On May 15, 2006, when I was told of sale... we are to old need to spend better quality of life with family, expectations was several $MM of belief and then when was told all of our discussions were separate of earned bonuses and dollars to me from conversions to be applied to earned bonuses, prior discussions were extra bonuses were told of Fairway-50k, McKinney-50k, Vegas-100-200k
10. Employment Agreement has actually not been honored... Never kept promises from Employment Agreement of bonuses to be paid and structured bonus/wage program and ownership interest of companies/LP's that have been requested repeatedly...
11. Over a dozen conversations stating that dollars would be coming to me and consequently I have been pushed off repeatedly as well as not being followed up to meet or talk when agreed etc.
    a. "I am a man of my word"... "Trust Me..." "Good faith only goes so far"... from Brian numerous times...
    b. On numerous occasions supposed to meet with KJ to discuss financial make up of the company... regardless if should have been taken care of even if required special funding or advances... partial... or sale document to be timely...
    c. Was there truthful intentions to sell company... timing of when decision made and others told versus when I was, consequently no partner status prevailed but avoided... missed other opportunities...
12. My dedication, trust, loyalty, perseverance has never wavered but attention and concentration are now starting to be diverted because of the lack of action ---- three years of tremendous commitment and sacrifices for my allegiance to SWH companies and to Brian and Cheryl personally.
13. Title change--COO, wage change  and 4 weeks vacation for references and if Cascade sale does not go thru

DEFENDANTS' EXHIBIT NO.
014

CARPENTER 0013

14. Apparently will be unemployed after transactions... led to believe to be picked up for at least transition period... have not been able to start job search until...

CARPENTER 0014

Earned Bonuses Spreadsheet 3-14-07

| Employment Period | Base Wage | Annual Bonus Paid* | E. A. Minimum Bonus | E. A. Maximum Bonus | Earned E.A. Bonus Differences Unpaid | Minimum Increase Expected (5-10%) | Increase $ Amount Unpaid | Estimated Revised Base Unpaid | Wage Differences Unpaid |
|---|---|---|---|---|---|---|---|---|---|
| 3/15/04–3/14/05 | $ 200,000 | $ (50,000) | $ 50,000 | $ 200,000 | $ 150,000 | 8% | $ 16,000 | $216,000 | $ 16,000 |
| 3/15/05–3/14/06 | $ 200,000 | $ (25,000) | $ 50,000 | $ 216,000 | $ 191,000 | 8% | $ 17,280 | $233,280 | $ 33,280 |
| 3/15/06–3/14/07 | $ 200,000 | $ - | $ 50,000 | $ 233,280 | $ 233,280 | 8% | $ 18,662 | $251,942 | $ 51,942 |
| | | $ (75,000) | | | $ 574,280 | | | | $ 101,222 |

|  |  |
|---|---|
| Earned Bonuses Unpaid | $ 574,280 |
| Wage Differences Unpaid | $ 101,222 |
| Annual Bonus Paid | $ (75,000) |
| Due | $ 600,502 |

*$50k Relocation Advance only and $25k bonus to assist to pay taxes.

CARPENTER 0015

Appendix 000308

CAUSE NO. _____

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHWEST HOUSING DEVELOPMENT | § | AT LAW NO. _____ |
| COMPANY, INC.; SOUTHWEST | § | |
| HOUSING MANAGEMENT COMPANY, | § | |
| INC.; AFFORDABLE HOUSING | § | |
| CONSTRUCTION, INC.; BRIAN | § | |
| POTASHNIK; and CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND PETITION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

TO THE HONORABLE JUDGE OF THE COURT:

Jeffrey W. Carpenter files this Original Petition and Petition for Temporary Restraining Order

and Injunction complaining of Defendants and would show the court the following:

### I.
### LEVEL III DISCOVERY CONTROL PLAN

1.  Discovery is intended to be conducted under Level III pursuant to Texas Rule of Civil

Procedure 190.4.

### II.
### PARTIES

2.  Plaintiff Jeffrey W. Carpenter is an individual residing in Dallas, Dallas County,

Texas.

3.  Defendant Southwest Housing Development Company, Inc. ("SWHD") is a Texas

corporation with its principal place of business in Dallas County, Texas.

4.  Defendant Southwest Housing Management Company, Inc. ("SWHM") is a Texas

---

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                    page 1
R:\6\0646\60881\SubsPldgs\Petition.doc

corporation with its principal place of business in Dallas County, Texas.

5.    Defendant Affordable Housing Construction, Inc. ("AHC") is a foreign corporation with its principal place of business in Dallas County, Texas.

6.    Defendant Brian Potashnik is a resident of Dallas, Dallas County, Texas.

7.    Defendant Cheryl Potashnik is a resident of Dallas, Dallas County, Texas.

### III.
### SERVICE

8.    Defendant Southwest Housing Development Company, Inc may be served as follows:

> **Southwest Housing Development Company, Inc.**
> **By Serving Its Registered Agent for Service of Process**
> **Keith R. Jones**
> **5910 N. Central Expwy., Suite 1145**
> **Dallas,  TX  75206**

or at any other location where it may be legally served.

9.    Defendant Southwest Housing Management Company, Inc. may be served as follows:

> **Southwest Housing Management Company, Inc.**
> **By Serving Its Registered Agent for Service of Process**
> **Keith R. Jones**
> **5910 N. Central Expwy., Suite 1145**
> **Dallas,  TX  75206**

or at any other location where it may be legally served.

10.    Defendant Affordable Housing Construction, Inc. may be served as follows:

> **Affordable Housing Construction, Inc.**
> **By Serving Its Registered Agent for Service of Process**
> **Warren Kirshenbaum**
> **5910 N. Central Expwy., Suite 1145**
> **Dallas,  TX  75206**

or at any other location where it may be legally served.

11.    Defendant Brian Potashnik may be served as follows:

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                                                                page 2
R:\6\0646\60881\SubsPldgs\Petition doc

Appendix 000310



**Brian Potashnik**
**4419 Highland Drive**
**Dallas, TX 75205**

or at any other location where he may be legally served.

12.     Defendant Cheryl Potashnik may be served as follows:

**Cheryl Potashnik**
**4419 Highland Drive**
**Dallas, TX 75205**

or at any other location where she may be legally served.

## IV.
## JURISDICTION AND VENUE

13.     Plaintiff seeks damages and relief for one or more of Defendants' breaches of contract committed in Dallas County, Texas. Defendants conduct business and/or reside or maintain principal places of business in Dallas County, Texas. Plaintiff's damages are in excess of the minimum jurisdictional limit of this court. Therefore, jurisdiction and venue are proper in this court.

## V.
## FACTS

14.     Brian and Cheryl Potashnik are two individuals under indictment by the United States of America for their involvement in real estate dealings done by and through their companies SWHD, SWHM, and/or AHC. Exhibit A (the "Indictment"). The real estate dealings generally involve low-income subsidized multi-family projects that relied on tax-exempt bonds and housing credits.

15.     The indicted felony offenses include:

        a.     Conspiracy to Commit Bribery Concerning a State Government Receiving Federal Benefits (Indictment p. 26);

        b.     Bribery Concerning a State Government Receiving Federal Benefits and aiding and abetting (Indictment p. 43);

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc                                                    page 3

c.  Conspiracy to Commit Bribery Concerning a Local Government Receiving Federal Benefits (Indictment p. 47); and

d.  Bribery Concerning a Local Government Receiving Federal Benefits and Aiding and Abetting (Indictment p. 91).

16.  The United States seeks for the Potashniks, upon conviction of any of the offenses, to forfeit "any and all property constituting or derived from proceeds traceable to the respective offense." Indictment p. 163.

17.  The factual allegations evidence various means used by the Potashniks to move money, and make payments, in an effort to conceal their activities including:

a.  using personal checks to conceal payments (Indictment p. 28);

b.  maintaining accounts under SWHM to conceal payment of bills (Indictment p. 29);

c.  using other entities' accounts to make payments (*e.g.*, Indictment p. 30); and

d.  purchasing money orders to conceal payments (*e.g.*, Indictment p. 39).

18.  The Potashniks also allegedly made birthday party contributions, cash payments, cash payments for purported consulting fees, and awarded construction contracts to further their activities and artifice. Indictment p. 50. They even insisted on invoices to help form the appearance of legitimacy. Indictment p. 51. They categorized payments falsely as legal fees (Indictment p. 57), as consulting fees (Indictment p. 58), and worked on building "files" for the transactions (Indictment p. 61).

19.  Each of these activities (and the many others in the Indictment not set forth specifically herein), singularly or collectively, display an ability and willingness to secrete, hide, or falsify financial transactions.

20.  On or around October 16, 2006, (prior to the July 27, 2007 indictment) one or more of

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc

page 4

Appendix 000312

the Defendants and related or affiliated limited partnerships or similar entities, including those listed

herein, (collectively "Southwest Housing entities") entered a Letter of Intent ("LOI") with Cascade

Affordable Housing, LLC and its related entities (collectively "CAH"). The LOI is to purchase from

the Southwest Housing entities:

> Any and all rights, benefits and interests in or derived from each Partnership
> or Project by Seller, directly or indirectly, including without limitation,
> general partnership interests, Class B limited partner interests, loan
> receivables, incentive management fees, distributions, capital proceeds,
> development fees, guaranty fees, asset management fees, property
> management fees and disposition fees and the agreements associated
> therewith (altogether, the "Assets"). The Assets shall include, in any event,
> 100% of the general partnership interest in each Partnership, except in those
> Partnerships where Southwest is not affiliated with the general partner.

The LOI is signed by the Potashniks with no reference they signed for a specific entity or in a

capacity for an entity.

21. The partnerships and projects identified included, but are not limited to:

> Arbor Woods Housing, L.P.
> Arbors Housing Partners, Ltd.
> Arlington Senior Housing, L.P.
> Cedar Hill Senior Housing, L.P.
> Chattanooga Housing, L.P.
> Clark 05 Housing, L.P.
> Clarkridge Villas Housing, L.P.
> Heatherwilde Estates Housing, LP
> Hickory Trace Housing, L.P.
> Highland Gardens, L.P.
> Hillsboro Housing, L.P.
> Knollwood Villas, L.P.
> Laredo Vista Housing, L.P.
> MHMR Senior Housing, L.P.
> New Braunfels 2 Housing, L.P.
> Oak Hollow Housing, L.P.
> Parmer Villas Housing, L.P.
> Pleasant Valley Courtyards Housing, L.P.
> Pleasant Valley Villas Housing, L.P.
> Primrose Houston 1 Housing, L.P.
> Primrose Houston 7 Housing, L.P.

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc                                    page 5

Appendix 000313

Primrose Houston South Housing, L.P.
Primrose SA II Housing, L.P.
Primrose SA IV Housing, L.P.
Southern Oaks Housing, L.P.
Tahoe Housing, L.P.
Texas Birchwood Apartments, L.P.
Texas Brook Apartments, L.P.
Texas Hampton Senior Housing, L.P.
Texas Kirnwood Apartments, L.P.
Texas Melody Apartments, L.P.
Texas-Estrada Apartments L.P.
TX Acme A South Housing, L.P.
TX Aldine-Bender Housing, L.P.
, TX Bammel Housing, L.P.
TX Bluffview Housing, L.P.
TX Crist Housing, L.P.
TX Garth Housing, L.P.
TX Hampton Villas, L.P.
TX Hillside Apartments, L.P.
TX John West Housing, L.P.
TX Laureland Housing, L.P.
TX Old Manor Housing, L.P.
TX Palacio Housing, L.P.
TX Pasadena Housing, L.P.
TX Pleasanton Housing, L.P.
TX Scyene Housing, L.P.
TX Tenison Housing, L.P.
TX Timbercreek Housing, L.P.

22.     Generally, the sale is for interests in various housing developments. The properties are owned by limited partnerships. The limited partnerships generally have the same registered agent or registered agent address as the Southwest Housing Defendants. Additionally, the general partner of each limited partnership is normally a limited liability company with the same address as the limited partnership and the Southwest Housing Defendants. The principal for most of the general partners is usually either Mr. or Ms. Potashnik. Finally, apparently as part of the Sale, limited liability companies (with names generally beginning with "CAH-IDA" and continuing with names very similar to the limited partnerships and the general partners) were formed in August of 2007.

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                                page 6
R:\6\0646\50881\SubsPldgs\Petition.doc



23.    By way of example, Arbor Woods Housing, L.P.'s registered agent is:

Warren A. Kirshenbaum
5910 N. Central Expwy., Suite 1145
Dallas, Texas  75206

The principal is listed as:

Arbor Woods Development, L.L.C.
General Partner
5910 N. Central Expwy., Suite 1145
Dallas, Texas  75206

Arbor Woods Development, L.L.C. has its registered agent as

Keith R. Jones
5910 N. Central Expwy.
Dallas, Texas 75206

and its principal is

Cheryl Potashnik
Director-President
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206.

Exhibit B.

24.    As another example, Clark 05 Housing, L.P. has its registered agent as

Warren A. Kirshenbaum
5910 N. Central Expwy.
Dallas, Texas 75206

and its general partner as

Clark 05 Development, L.L.C.
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206

The general partner's registered agent is

Keith R. Jones
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc

page 7

Appendix 000315

and the principal is

Brian Potashnik
Manager
5910 N. Central Expwy.
Dallas, Texas 75206.

Exhibit C.

25.     On or around March 12-14, 2008, one or more of the Defendants and/or the Southwest Housing entities will sell to CAH their interest in approximately 46 properties with approximately 6-8 interests in other property to be sold/closed in the near future (collectively the "Sale"). The Sale was approved by the Texas Department of Housing and Community Affairs on or about January 31, 2008. Exhibit D (portion of hearing transcript). The value of the Sale is estimated at a base price of $37 million. The sale is for all of the partnerships' interests in each property controlled by the Southwest Housing entities, their furniture, furnishings, and to assume an office space lease. Essentially, the Sale will leave only shells.

26.     When the Sale process began, one or more of the Defendants agreed to pay to Plaintiff 3% of the gross Sale less normal closing costs of brokerage fees, attorneys' fees related to the Sale (not the criminal case), title fees and other normal closing costs. The agreement was made in consideration for, in part, Plaintiff remaining an employee of one or more of the Defendants to assist in effectuating the Sale.

27.     Not surprisingly, as the Sale was close to becoming final, Brian and Cheryl Potashnik individually and/or as principals of the Southwest Housing Defendants or entities repudiated the performance of Defendants' contractual obligations, without excuse.

28.     Defendants' refusal to perform the contract is a breach of it.

29.     As set forth hereinabove, and in the Indictment (which is incorporated herein as if set

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc                                                                    page 8

Appendix 000316

forth verbatim), the Potashniks are facing substantial criminal liabilities. Defendants have exhibited and shown over the course of years a proclivity and willingness to secrete funds, move funds through the use of various vehicles (checks, cash, traveler's checks, false invoices), and falsify documents.

30.     The Potashniks are currently subject to significant, potential legal liabilities, necessitating the expenditure of substantial sums for the defense of same. The Potashnik's trial date was recently continued until January 20, 2009 in part because of the case's complexity. Exhibit E.

31.     The Potashniks maintain off-shore financial accounts to which some, most, or all of the Sale's funds may be secreted and placed outside of the court's jurisdiction.

32.     Moreover, the Sale will leave shell entities with no continuing operations or revenue.

33.     Plaintiff, as set forth more fully below, does NOT seek to effect the Sale (and such would not be in his interests), but, instead seeks through equitable relief to have 3% of the net Sale (estimated to be $1,080,000) plus the minimum $150,000 in owed bonuses (as set forth below) placed into the registry of the Court. No amount is sought for the other components of the ultimate recovery potential at this time. Plaintiff will be irreparably injured and without adequate legal relief if the Sale's funds are dissipated, misused or secreted. The amount is a small fraction of the Sale.

34.     Additionally, in February 2004, Plaintiff entered an Employment Agreement with SHM. Exhibit F. In accordance with paragraph 4(b), Plaintiff was to receive between $50,000 and $200,000 for his 2004 year bonus, with subsequent years being paid similarly.

35.     Despite this clear contractual agreement, SHM has failed and refused to pay the bonuses, thereby breaching the contract.

## VI.
### FIRST CAUSE OF ACTION AGAINST DEFENDANTS:
### BREACH OF CONTRACT: SALE AGREEMENT

36.     Plaintiff pleads a cause of action pursuant to Texas state law against Defendants for

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc                                                    page 9

Appendix 000317

breach of contract. The allegations contained in the preceding paragraphs of this Petition are hereby re-averred and re-alleged for all purposes with the same force and effect as if set forth verbatim.

37.     Plaintiff and one or more of the Defendants entered into a valid contractual agreement providing in part 3% of the net Sale as a bonus to Plaintiff. Plaintiff gave Defendants valuable consideration and fully performed all duties required of him under the contract and performed all conditions precedent or such were waived.

38.     Defendants' breached the contract. Defendants breached the contract by repudiating the performance of their obligations, without just excuse. Defendants have absolutely and unconditionally refused to perform the contract and have showed a fixed intention to refuse to perform.

39.     As a direct and proximate result of Defendants' breach of contract, Plaintiff has suffered damages, which are largely incalculable, in excess of the minimum jurisdictional limit of this court.

40.     As a result of the above-described breach of contact, Plaintiff was required to retain attorneys to prosecute this action and agreed to pay the retained attorneys a reasonable fee. Pursuant to Texas Civil Practice & Remedies Code § 38.001 *et seq.*, Plaintiff seeks his reasonable and necessary attorneys' fees. Plaintiff has performed all conditions precedent or such have been waived.

### VII.
### SECOND CAUSE OF ACTION AGAINST SHM:
### BREACH OF CONTRACT: EMPLOYMENT BONUS

41.     Plaintiff pleads a cause of action pursuant to Texas state law against SHM for breach of contract. The allegations contained in the preceding paragraphs of this Petition are hereby re-averred and re-alleged for all purposes with the same force and effect as if set forth verbatim.

42.     Plaintiff and SHM entered into a valid written contractual agreement for Plaintiff's

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R.\6\0646\60881\SubsPldgs\Petition.doc

page 10

Appendix 000318

employment. As part of the agreement, Plaintiff was to receive yearly bonuses. Plaintiff gave SHM valuable consideration and fully performed all duties required of him under the contract and performed all conditions precedent or such were waived.

43. SHM breached the contract by failing to pay Plaintiff required bonuses.

44. As a direct and proximate result of SHM's breach of contract, Plaintiff has suffered damages in excess of the minimum jurisdictional limit of this court.

45. As a result of the above-described breaches of contact, Plaintiff was required to retain attorneys to prosecute this action and agreed to pay the retained attorneys a reasonable fee. Pursuant to Texas Civil Practice & Remedies Code § 38.001 *et seq.*, Plaintiff seeks his reasonable and necessary attorneys' fees. Plaintiff has performed all conditions precedent or such have been waived.

## VIII.
## PRELIMINARY INJUNCTIVE RELIEF

46. Plaintiff seeks preliminary injunctive relief pursuant to Texas state law. The allegations contained in the preceding paragraphs of this Petition are hereby re-averred and re-alleged for all purposes with the same force and effect as if set forth verbatim.

47. The Sale is currently scheduled to occur on or before March 17, 2008. As a result of the Sale, Defendants and/or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved), singularly or collectively, will come into possession of sums, of which approximately 3% of the net is due Plaintiff. Additionally, Plaintiff is owed a minimum of $150,000.

48. Defendants have exhibited and shown over the course of years a proclivity and willingness to secrete funds, move funds through the use of various vehicles (checks, cash, travelers

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                    page 11
R:\6\0646\60881\SubsPldgs\Petition.doc

Appendix 000319

checks, false invoices), and are currently subject to significant, potential legal liabilities, necessitating, the expenditure of substantial sums for the defense of same. Moreover, at the Sale's conclusion, only shells of the entities will remain.

49.     Plaintiff will be irreparably harmed if Defendants or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved) are allowed to dissipate, misuse, or abscond with the Sale's funds; funds that would otherwise be available to pay for a judgment against one or more of them. Plaintiff, unless this Court enjoins Defendants from dissipating a small portion of Sale's funds, will have no adequate remedy at law as Defendants would not be able to respond in damages, or such funds will be improperly secreted.

50.     Based on the foregoing, and the facts incorporated herein as if set forth verbatim, Plaintiff moves and prays for injunctive relief described in greater particularity in the Prayer, which is incorporated by reference as if set forth verbatim to protect Plaintiff.

## IX.
## JURY DEMAND

51.     Plaintiff demands that this court empanel a lawful jury to hear this case.

## X.
## RESERVATION OF RIGHTS

52.     Plaintiff specifically reserves the right to bring additional causes of action against Defendants and to amend this Petition as necessary.

## XI.
## PRAYER

THEREFORE, Plaintiff prays that the Court:

    a.     issue a temporary restraining order:

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                                                        page 12
R:\6\0646\60881\SubsPldgs\Petition.doc

Appendix 000320

(i)    restraining Defendants or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved) from dissipating the estimated 3% of the net Sale in the amount of $1,080,000 and the $150,000 minimum owed bonus; and

(ii)    requiring Defendants or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved), singularly or in combination, to interplead $1,230,000 to the court's registry within 24 hours of the Sale's closing and funding;

b.    set a date for a temporary injunction hearing and, at such time, issue a temporary injunction continuing the above relief during the pendency of this action;

c.    upon final trial the court enter judgment in favor of Plaintiff against Defendants, jointly or severally, for damages, both general and special, in an amount in excess of the minimum jurisdictional limit of this court and for reasonable attorney's fees, reasonable paralegal fees, cost of court, pre- and post-judgment interest at the highest rates allowed by law; and

d.    for such other and further relief, general or special, at law or in equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

**ROGGE DUNN**
Texas State Bar No. 06249500
**GREGORY M. CLIFT**
Texas State Bar No.: 00795835
**CLOUSE DUNN KHOSHBINLLP**
5200 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2142
Telephone: (214) 220-3888
Facsimile: (214) 220-3833

**ATTORNEYS FOR PLAINTIFF**

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction    page 13
R:\6\0646\60881\SubsPldgs\Petition.doc

Appendix 000321

## **VERIFICATION**

STATE OF TEXAS            )
                          )
COUNTY OF DALLAS          )

BEFORE ME, the undersigned notary public, in and for the County and State aforesaid, personally appeared Jeffrey W. Carpenter, who being by me first duly sworn, on oath deposed and stated as follows:

My name is Jeffrey W. Carpenter. I am of sound mind and body, over 21 years of age, and have never been convicted of a felony or offense involving moral turpitude. I am fully competent to make this affidavit.

I was employed by and/or worked with the Defendants. As part of my job responsibilities and working with Defendants, I am knowledgeable of the negotiations regarding and sale of partnership interests in various properties as more fully discussed in the pleading. I am also knowledgeable of the contracts I entered with one or more of the Defendants and conversations with those Defendants or representatives of them.

All factual averments contained in paragraphs 20, 21, 22, 25, 26, 27, 30-35 of Plaintiff's Original Petition are within my personal knowledge and are true and correct.

FURTHER AFFIANT SAYETH NOT.

Jeffrey W. Carpenter

SUBSCRIBED AND SWORN TO BEFORE ME, to certify which witness my hand and seal of office, on the _11th_ day of _March_, 20_08_.

(SEAL)
GLORIA A. HERNANDEZ
Notary Public, State of Texas
My Commission Expires 11-02-10

Notary Public in and for
the State of Texas

My Commission Expires: _11-2-10_ .

Verification of Jeffrey W. Carpenter                                          solo page
R:\6\0646\60881\SubsPldgs\Verif-Carpenter.doc

Appendix 000322

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHWEST HOUSING DEVELOPMENT | § | AT LAW NO. 5 |
| COMPANY, INC.; SOUTHWEST | § | |
| HOUSING MANAGEMENT COMPANY, | § | |
| INC.; AFFORDABLE HOUSING | § | |
| CONSTRUCTION, INC.; BRIAN | § | |
| POTASHNIK; and CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S RESPONSES TO REQUEST FOR DISCLOSURE

**(a)**    **the correct names of the parties to this lawsuit**

RESPONSE:

The parties are correctly named.

**(b)**    **the name, address and telephone number of any potential parties;**

RESPONSE:

None.

**(c)**    **the legal theories and, in general, the factual bases of the responding party's claims or defenses;**

RESPONSE:

On or around October 16, 2006, one or more of the Defendants and related or affiliated limited partnerships or similar entities (collectively "Southwest Housing entities") entered a Letter of Intent ("LOI") with Cascade Affordable Housing, LLC and its related entities (collectively "CAH"). The LOI is to purchase from the Southwest Housing entities:

> Any and all rights, benefits and interests in or derived from each Partnership or Project by Seller, directly or indirectly, including without limitation, general partnership interests, Class B limited partner interests, loan receivables, incentive management fees, distributions, capital proceeds,

Appendix 000323

development fees, guaranty fees, asset management fees, property management fees and disposition fees and the agreements associated therewith (altogether, the "Assets"). The Assets shall include, in any event, 100% of the general partnership interest in each Partnership, except in those Partnerships where Southwest is not affiliated with the general partner.

The LOI is signed by the Potashniks with no reference they signed for a specific entity or in a capacity for an entity.

Generally, the sale is for interests in various housing developments. The properties are owned by limited partnerships. The limited partnerships generally have the same registered agent or registered agent address as the Southwest Housing Defendants. Additionally, the general partner of each limited partnership is normally a limited liability company with the same address as the limited partnership and the Southwest Housing Defendants. The principal for most of the general partners is usually either Mr. or Ms. Potashnik. Finally, apparently as part of the Sale, limited liability companies (with names generally beginning with "CAH-IDA" and continuing with names very similar to the limited partnerships and the general partners) were formed in August of 2007.

One or more of the Defendants and/or the Southwest Housing entities will sell or have sold to CAH their interest in approximately 52 properties (collectively the "Sale"). The Sale was approved by the Texas Department of Housing and Community Affairs on or about January 31, 2008. The value of the Sale is estimated at a base price of $37 million. The sale is for all of the partnerships' interests in each property controlled by the Southwest Housing entities, their furniture, furnishings, and to assume an office space lease.

When the Sale process began, one or more of the Defendants agreed to pay to Plaintiff 3% of the gross Sale less normal closing costs of brokerage fees, attorneys' fees related to the Sale, title fees and other normal closing costs. The agreement was made in consideration for, in part, Plaintiff remaining an employee of one or more of the Defendants to assist in effectuating the Sale.

As the Sale was close to becoming final, Brian and Cheryl Potashnik individually and/or as principals of the Southwest Housing Defendants or entities repudiated the performance of Defendants' contractual obligations, without excuse. Defendants' refusal to perform the contract is a breach of it.

Additionally, in February 2004, Plaintiff entered an Employment Agreement with SHM. In accordance with paragraph 4(b), Plaintiff was to receive between $50,000 and $200,000 for his 2004 year bonus, with subsequent years being paid similarly. Despite this clear contractual agreement, SHM has failed and refused to pay the bonuses, thereby breaching the contract.

Plaintiff and one or more of the Defendants entered into a valid contractual agreement providing in part 3% of the net Sale as a bonus to Plaintiff. Plaintiff gave Defendants valuable consideration and fully performed all duties required of him under the contract and performed all conditions precedent or such were waived. Defendants breached the contract. Defendants breached the contract by repudiating the performance of their obligations, without just excuse. Defendants

have absolutely and unconditionally refused to perform the contract and have showed a fixed intention to refuse to perform.

Additionally, Plaintiff and SHM entered into a valid written contractual agreement for Plaintiff's employment. As part of the agreement, Plaintiff was to receive yearly bonuses. Plaintiff gave SHM valuable consideration and fully performed all duties required of him under the contract and performed all conditions precedent or such were waived. SHM breached the contract by failing to pay Plaintiff required bonuses.

**(d)**     **the amount and any method of calculating economic damages;**

RESPONSE:

Plaintiff requires additional discovery to finalize his damage calculations.   However, generally, he seeks the agreed-to 3% of the gross Sale less normal closing costs for brokerage fees, attorney's fees related to the sale, title fees and other normal closing costs.  He also seeks three years of bonuses ranging from $50,000 to $200,000 per year resulting in an estimated damage figure of $150,000-$600,000.  Plaintiff also seeks his reasonable and necessary attorney's fees, paralegal fees, costs of court, and pre- and post-judgment interest.   Plaintiff may seek all or a range of these damages.

**(e)**     **the name, address and telephone number of persons having knowledge of relevant facts and a brief statement of each identified person's connection with the case;**

RESPONSE:

Jeff Carpenter
c/o Rogge Dunn
Clouse Dunn Khoshbin LLP
1201 Elm St., Suite 5200
Dallas, TX  75270
(214) 220-3888
Knowledgeable of claims made in lawsuit.

Brian Potashnik
Cheryl Potashnik
c/o Lawrence J. Friedman
Friedman & Feiger, LLP
5301 Spring Valley Road, Suite 200
Dallas, TX  75254
(972) 788-1400
Knowledgeable regarding Plaintiff's performance, the sales of properties, and various representations.

Appendix 000325

Cascade Affordable Housing, LLC
and related entities
Basil P. Rallis
Pier 70
2801 Alaskan Way, Suite 200
Seattle, WA 98121
Knowledgeable regarding the purchase of various properties.

(f)     for all testifying experts:

    (1)     the expert's name, address and telephone number;

    (2)     the subject matter on which the expert will testify;

    (3)     the general substance of the experts' mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by or otherwise subject to the control of the responding party, documents reflecting such information;

    (4)     if the expert is retained by you, employed by or otherwise subject to the control of the responding party;

        (A)     All documents, tangible things, reports, models or data compilations that have been provided to, reviewed by or prepared by or for the expert in anticipation of the expert's testimony; and

        (B)     the expert's current resume and bibliography.

RESPONSE:

Testifying experts have not been determined.

(g)     any discoverable indemnity and insuring agreements;

RESPONSE:

None.

(h)     any discoverable settlement agreements;
RESPONSE:

None.

(i)     any discoverable witness statements;

---

Appendix 000326

RESPONSE:

    None.

(j)    all medical records and bills that are reasonably related to the injuries and damages asserted or, in lieu thereof, an authorization permitting the disclosure of such medical records and bills; and

RESPONSE:

    None.

(k)    all medical records and bills obtained by the responding party by virtue of an authorization furnished by the requesting party.

RESPONSE:

    None.

(l)    The name, address and telephone number of any person who may be designated as a responsible third party.

RESPONSE:

    None.

---

Appendix 000327



# CDK ▲ CLOUSE
## ▲ DUNN
### ▲ KHOSHBIN
#### LLP
**TRIAL ATTORNEYS**

5200 RENAISSANCE TOWER
1201 ELM STREET
DALLAS, TEXAS 75270-2142
PH: (214) 220.3888  ▲  FAX: (214) 220.3833

**GREGORY M. CLIFT**
DIRECT DIAL: (214) 239-2777
EMAIL: GCLIFT@CDKLAWYERS.COM

NO. OF PAGES:                    _8_    (INCLUDING THIS COVER PAGE)

FAX TO            **Lawrence J. Friedman**      **(972) 788-2667**

DATE:             June 24, 2008

OUR FILE NO.:     **0646-60881**

Person to contact regarding this transmission:  Gloria A. Hernandez (214) 239-2695

SPECIAL MESSAGE:

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE AND THE PAGES THAT FOLLOW IS ATTORNEY PRIVILEGED AND
CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER
OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE
INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, DISSEMINATION, DISTRIBUTION, COPYING OR
ELECTRONIC OR OTHER STORAGE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY CALL US COLLECT BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE
TO US AT THE ABOVE ADDRESS VIA FAX AND THE U.S. POSTAL SERVICE.  WE WILL REIMBURSE YOU FOR ALL REASONABLE
COSTS AND EXPENSES YOU INCUR IN COMPLYING WITH THESE REQUESTS.

R:\6\0646\60881\Corresp\Atty,Crt,Parties\FriedmanFax-GMC.doc

AMERICAN ARBITRATION ASSOCIATION
DALLAS, TEXAS

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
|    Claimant, | § | |
| | § | |
| v. | § | CASE NO. 71 166 00042 09 |
| | § | |
| SOUTHWEST HOUSING | § | |
| MANAGEMENT CO., INC., | § | |
| | § | |
|    Defendant. | § | |

## CLAIMANT'S RESPONSES TO RESPONDENT'S REQUEST FOR DISCLOSURE

Pursuant to the American Arbitration Association Employment Arbitration Rules and the parties' written agreement concerning the deadlines to serve these responses, Claimant Jeffrey W. Carpenter ("Carpenter") serves his responses to Respondent's Request for Disclosure, as follows:

**(a)** **the correct names of the parties to the lawsuit:**

Carpenter believes the parties have been correctly named.

**(b)** **the name, address, and telephone number of any potential parties:**

Carpenter is not aware of any potential parties at this time. Carpenter is excluding from this answer any potential parties potentially responsible for any

Appendix 000329

arbitration award against Southwest Housing Management Co., Inc.

(c)     **the legal theories and, in general, the factual bases of the responding party's claims or defenses (the responding party need not marshal all evidence that may be offered at trial):**

### Claimant's Affirmative Claims for Relief

Carpenter contends that Southwest Housing Management Co., Inc. ("Southwest Housing") breached its agreement and obligation to pay him earned annual bonuses for the years 2004, 2005, 2006, and a pro rata share of an earned annual bonus for the year 2007.  In the alternative, in the event the arbitrator concludes that no express agreement or no enforceable agreement governed some or all of these annual bonus agreements, Carpenter seeks to recover in *quantum meruit*.

### Respondent's Defenses

According to available records, Respondent has not filed an answer or other responsive pleading in the arbitration and thus has not asserted any defenses, affirmative or otherwise.

**(d)**     **the amount and any method of calculating economic damages:**

**Annual Bonuses.**   Carpenter seeks to recover agreed, earned annual bonuses for the years 2004, 2005, 2006, and a pro rata portion of an agreed, earned annual bonus for the year 2007.

**Minimum Bonuses.**   The agreed minimum earned annual bonuses are as follows:

Year 2004: $50,000
Year 2005: $50,000
Year 2006: $50,000
Year 2007: $50,000 [pro rata share is $41,917.81]

Minimum Total:  $191,917.81

**Maximum Bonuses.**   The agreed maximum earned annual bonuses are as follows:

Year 2004: $200,000
Year 2005: $200,000
Year 2006: $200,000
Year 2007: $200,000 [pro rata share is $167,671.23]

Maximum Total: $767,671.23

**Year 2007 Pro Rata Calculation.**   The pro rata calculation that Carpenter will use to calculate the pro rata share of the agreed, earned annual bonus for 2007 is 306 days[1] divided by 365 days.

**Reduction on Damages.**   Carpenter will deduct from damages the difference between (1) $50,000 paid toward, first, the costs associated with moving to Texas for this employment position, including costs associated with selling and purchasing a home, and, second, toward agreed bonuses, and (2) costs associated with moving to Texas for this employment position, including costs associated with selling and purchasing a home, up to a maximum agreed amount

---

[1]     January 1, 2007 through November 2, 2007



Appendix 000331

of $36,000. The remainder is included as damages because that amount was to be taken from agreed bonuses that Southwest Housing never paid. The $50,000 was a forgiveness loan or advance in the sense that this was not a traditional loan as opposed to an agreed amount to be applied toward agreed compensation with respect to moving expense and bonuses.

**Alternative *Quantum Meruit* Calculation.** Alternatively, Carpenter seeks as damages the reasonable value of his services pursuant to his alternative claim for *quantum meruit*. At this time, Carpenter plans to leave the amount to the discretion of the arbitrator.

**Attorneys' Fees.** The written employment agreement states that it "shall be governed by the laws of the State of Texas applicable to agreements made and to be performed therein."[2] Accordingly, Carpenter seeks reasonable and necessary attorneys' fees potentially recoverable pursuant to Texas Civil Practice and Remedies Code § 38.001 *et. seq.* Carpenter seeks to recover these attorneys' fees on his claims for rendered services, performed labor, written contract, and oral contract.

The written employment agreement also states that "Each party shall bear its own attorneys' fees and costs of arbitration except as otherwise ordered by the arbitrator(s)."[3] Accordingly, Carpenter alternatively seeks an order from the arbitrator awarding him attorneys' fees, whether pursuant to Texas Civil Practice and Remedies Code Chapter 38 or otherwise.

**Costs of Arbitration.** Carpenter seeks an order from the arbitrator awarding his costs of arbitration.[4]

**Interest.** Carpenter seeks all permissible pre-judgment interest and post-judgment interest.

---

[2]     Employment Agreement, p. 6 ¶ 13.

[3]     Employment Agreement, p. 5 ¶ 10(a).

[4]     Employment Agreement, p. 5 ¶ 10(a).

(e)    **the name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case:**

See Exhibit A accompanying these disclosures.

(f)    **for any testifying expert:**

    1.    **the expert's name, address, and telephone number;**

    2.    **the subject matter on which the expert will testify;**

    3.    **the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;**

    4.    **if the expert is retained by, employed by, or otherwise subject to the control of the responding party:**

        A.    **all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and**

        B.    **the expert's current resume and bibliography:**

Douglas Haloftis
Gardere Wynne Sewell, L.L.P.
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761
(214) 999-4670

Amy E. Gibson
David L. Wiley
Gibson Wiley, PLLC
1700 Commerce Street, Suite 1570
Dallas, Texas 75201
(214) 522-2121

**Subject:** Mr. Haloftis may testify regarding the reasonableness and necessity of attorneys' fees and costs that Carpenter incurred through Gardere Wynne Sewell, L.L.P.'s representation of Carpenter in the arbitration. Ms. Gibson and Mr. Wiley my testify regarding the reasonableness and necessity of attorneys' fees and costs that Carpenter seeks to recover in the arbitration.

**Opinions:** These attorneys have not yet formed any opinions, as attorneys' fees and costs continue to accrue.

The opinions as to the reasonableness and necessity of attorneys' fees will be based on the following factors outlined in Texas Disciplinary Rule of Professional Conduct 1.04: (A) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (B) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (C) the fee customarily charged in the locality for similar legal services; (D) the amount involved and the results obtained; (E) the time limitations imposed by the client or by the circumstances; (F) the nature and length of the professional relationship with the client; (G) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (H) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. The basis for these opinions will also include consideration of billing judgment and attorney time records in this case for all parties.

The opinions as to expenses will be based on expense records in this case for all parties and recoverable expenses under the Texas Rules of Civil Procedure, the employment agreement, and the American Arbitration Association Employment Arbitration Rules.

**Documents:** (1) attorney time records and expense records in this case for all parties including defendant, redacted to protect privileged information, work product, proprietary information, and information concerning other clients [*e.g.* as to latter, vendor invoice with more than one client expense reflected], (2) selected finished work product for tasks performed in the case, and (3) self-reported results contained in the Texas Lawyer survey of hourly rates in the locality for the years 2007, 2008, 2009, and 2010.

**Resume and Bibliography:** Biographies and published works of attorneys working on this case will be provided with the expert reports.

Those persons disclosed as persons who may have knowledge concerning the reasonable value of Carpenter's services may also qualify as experts on that subject.

**(g)** **any indemnity and insuring agreements described in Rule 192.3(f):**

Carpenter is not aware of any such agreements.

(h)     **any settlement agreements described in Rule 192.3(g):**

    None

(i)     **any witness statements described in Rule 192.3(h):**

    Carpenter will provide additional witness statements once the undersigned counsel obtains the Teris document results and conducts a privilege review.

(j)     **in a suit alleging physical or mental injury and damages from the occurrence that is the subject of the case, all medical records and bills that are reasonably related to the injuries or damages asserted or, in lieu thereof, an authorization permitting the disclosure of such medical records and bills:**

    Not applicable.

(k)     **in a suit alleging physical or mental injury and damages from the occurrence that is the subject of the case, all medical records and bills obtained by the responding party by virtue of an authorization furnished by the requesting party:**

    Not applicable.

(l)     **the name, address, and telephone number of any person who may be designated as a responsible third party:**

    Carpenter is not aware at this time of any person who may be designated as a responsible third party.

Appendix 000335

Respectfully submitted,


*/s Amy Gibson*_____
Amy E. Gibson
Texas State Bar No. 00793801

David. L. Wiley
Texas State Bar No. 24029901

**Gibson Wiley PLLC**
1700 Commerce Street, Suite 1570
Dallas, Texas 75201-5302
Telephone: (214) 522-2121
Facsimile: (214) 522-2126
E-Mail Addresses:

amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR CLAIMANT
JEFFREY W. CARPENTER

Appendix 000336

## CERTIFICATE OF SERVICE

The undersigned certifies that, on July 30, 2010, a true copy of Claimant's Responses to Respondent's Request for Disclosure was served on Respondent Southwest Housing Management Co., Inc. through its attorneys of record as follows:

### VIA EMAIL BY AGREEMENT

Mr. Lawrence J. Friedman
Mr. Michael D. Donohue
Mr. Jason H. Friedman
Friedman & Feiger, LLP
5301 Spring Valley Road
Suite 200
Dallas, Texas 75254
Email: lfriedman@fflawoffice.com
      mdonohue@fflawoffice.com
      jhfriedman@fflawoffice.com


                    /s Amy Gibson_____
                    Amy E. Gibson

Appendix 000337

1. Jeannie Shipley
   Project Coordinator- Develop. Finance
   Southwest Housing Development
   214-891-1402 Cascade Office

2. Tammy Holloway
   Sr. Executive Assistant
   Southwest Housing Development
   214-869-2653

3. Adrian Iglesias
   Assistant Developer
   Southwest Housing Development
   512-971-9127

4. Matthew T. Martin
   EVP of Construction
   Affordable Housing Construction
   817-917-2147

5. Kevin Belew
   Project Manager
   Affordable Housing Construction
   214-869-8688

6. Devona Gray, PHR
   Human Resources Manager
   Southwest Housing
   214-534-9124

7. Lori Meyer
   VP of Accounting
   Southwest Housing Management
   214-505-4150

8. Julie Mingus
   Treasury Manager
   Southwest Housing
   682-518-9337

9. Suzanne Milch
   Director of Compliance & Training
   Southwest Housing Management
   214-629-1729

10. Aimee Murphree
    Sr. Compliance Administrator
    Southwest Housing Management
    469-644-4080

11. Don Young
    Compliance Administrator
    Southwest Housing Management
    469-371-2437

12. Debra Patterson
    Executive Administrative Assistant
    Southwest Housing Management
    972-207-8283

13. Lizzette Tejeda
    Administrative Assistant
    Southwest Housing Management
    214-538-7551

14. Anne Marie Smith
    Director of Property Software & Training
    Southwest Housing Management
    214-282-1841

15. Brad Bloomer
    *IT Manager*
    Southwest Housing
    828-668-2723

16. Mark Harding
    Senior Director of Maintenance and Training
    Southwest Housing Management
    214-293-0881

17. Tom McQuitty
    Assistance Director of Maintenance
    Southwest Housing Management
    214-926-8785

18. Naomi Sanit
    Director of Resident Relations
    Southwest Housing
    (214) 891–7813

19. Peru Greer
    Director of Family Programs
    Southwest Housing Management
    214-499-3406

20. Melvin Traylor
    Director of Family Programs
    Southwest Housing Management
    469-471-3877

21. Kathleen Anderson
    Director Senior Programs
    Southwest Housing Management
    214-704-4837

22. Agapito Perez
    Transportation Coordinator
    Southwest Housing Management
    214-505-0546

23. Debbie Workman
    VP of Property Operations
    Southwest Housing Management
    214-675-1225

24. Lani Grant
    District Manager- Dallas
    Southwest Housing Management
    214-724-7146

25. Jenny Stevenson
    District Manager- Dallas
    Southwest Housing Management
    214-616-8811

26. Charles Payne
    District Manager- Dallas
    Southwest Housing Management
    214-244-5831

27. Carol Dougherty
    District Manager-Houston
    Southwest Housing Management
    713-447-5971

28. Tina Chapa
    District Manager- San Antonio
    Southwest Housing Management
    210-628-4821

29. Julie Hudson
    District Manager- Austin
    Southwest Housing Management
    512-239-8394

30. Mary Nixon
    Business Manager-Dallas Area
    Potter's House at Primrose/ Rosemont at
    Mission Hills/ Primrose at Highland Meadows
    972-224-0613

31. Kelly Davlin Hullender
    Business Manager- Dallas Area
    Rosemont at Mayfield Villas
    214-317-5662

32. Bruce Clark
    Service Manager- Dallas Area
    Rosemont at Bluff Ridge -SWM
    817-703-2787

33. Dana Goss
    Business Manager- Houston Area
    Primrose at Heritage Park
    281-782-2364

34. Felicia Gates
    Business Manager-Houston Area
    Primrose Pasadena

Appendix 000341

979-574-5014

35. Marci Benavides
    Area Business Manager-Brownsville, TX
    Rosemont at El Dorado and Highland Gardens
    855-810-7846 Office

    **And** Persons Defendants have named in discovery requests and responses

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| **JEFFREY W. CARPENTER,** | § | |
| | § | |
| Plaintiff | § | |
| and Counter-Defendant, | § | |
| | § | |
| | § | |
| v. | § | **IN THE COUNTY COURT** |
| | § | |
| | § | |
| **SOUTHWEST HOUSING** | § | **AT LAW NO. 5** |
| **DEVELOPMENT COMPANY, INC.;** | § | |
| **SOUTHWEST HOUSING** | § | |
| **MANAGEMENT COMPANY, INC.;** | § | **DALLAS COUNTY, TEXAS** |
| **AFFORDABLE HOUSING** | § | |
| **CONSTRUCTION, INC.;** | § | |
| **BRIAN POTASHNIK; AND** | § | |
| **CHERYL POTASHNIK,** | § | |
| | § | |
| Defendants | § | |
| and Counter-Plaintiffs. | § | |

## DECLARATION OF JEFFREY CARPENTER

1. My name is Jeffrey Wayne Carpenter. I am 54 years old and do not suffer from any physical or mental problems that would prevent me from providing truthful or accurate sworn testimony. The facts and statements in this declaration are true and correct. Unless otherwise noted or apparent from my testimony, the facts and statements in this declaration are based on my personal knowledge including my training, education, and experience.

DECLARATION OF JEFFREY CARPENTER — PAGE 1 OF 11

**DEFENDANTS'
EXHIBIT NO.**

**043**

2.     I graduated "with distinction" from Eastern Kentucky University in 1981 with a B.B.A. in Real Estate. I have more than 15 years of experience in the affordable housing industry — which generally involves the development, construction, and operation of apartment communities for individuals and families with low-to-moderate incomes. For example, these apartment communities may also include assisted living facilities, independent living facilities, and accommodations to assist persons with disabilities. I have continuously been a Certified Property Manager since 1989 through the Institute of Real Estate Management. I am a former Member of the National Multi-Housing Council Board of Directors. I have been a member of various local chapters of the National Apartment Association. At various times during my career, I have been affiliated with industry organizations such as the National Association of Home Builders, the National Association of Realtors, the Urban Land Institute, the National Affordable Housing Management Association, and the Council of Affordable Rural Housing.

3.     While I was employed with Fore Property Company ("Fore") in Nevada, I was recruited to move my family to Texas and begin work with Southwest Housing. Deepak Sulakhe [a former colleague of mine at Fore], Brian Potashnik, and Cheryl Potashnik were the persons primarily involved in the recruitment and hiring process from the Southwest Housing side. They explained to me at various points during this process that Southwest Housing had good growth opportunity but needed drastic improvement in management infrastructure and corporate organization to be able to accomplish that growth. Brian Potashnik explained that my role would be to spearhead property management and be actively engaged in the re-organization of the organization as a whole. In the same time frame, I was also in negotiations for a senior executive position with a Real Estate Investment Trust organization. I ultimately accepted the position with Southwest Housing.

4.     Before accepting the position, I learned from Southwest Housing that the Southwest Housing organization involved three units that worked together:

> Southwest Housing Management Company, Inc. ("SH Management")
> Southwest Housing Development Company, Inc. ("SH Development")
> Affordable Housing Construction, Inc. ("Affordable Housing")

5.     Before accepting the position, I learned from Southwest Housing that Brian Potashnik was the highest-level person over each of these units, that Brian Potashnik and Cheryl Potashnik were married, and that Cheryl Potashnik was also involved in the business. Before accepting the position, I discussed employment agreement compensation issues with Brian Potashnik. Mr. Potashnik worked out, among other compensation, a base salary amount and bonus range amounts that we discussed and agreed was intended to place me in the range of $400,000 per year in earnings. Although there was a minimum range for bonuses, most of my discussions with Mr. Potashnik

DECLARATION OF JEFFREY CARPENTER — PAGE 2 OF 11

about bonuses centered on the potential for an annual $200,000 bonus, which he explained would be based on how well the Southwest Housing organization as a whole — SH Management, SH Development, and Affordable Housing together — performed. I had further discussions about the details of compensation with Ms. Potashnik, who explained that Mr. Potashnik normally handled these issues but that she was stepping in because Mr. Potashnik was not available to do it. Ms. Potashnik and I discussed and agreed that there would be a minimum annual bonus, even though she insisted on leaving the word "discretionary" in the phrase "minimum discretionary bonus potential." In part because Mr. Potashnik was not available at the time, Ms. Potashnik said a more detailed bonus plan would be provided to me within the first 90 days of my employment. On February 25, 2004, I signed an "Employment Agreement" with SH Management for the position of Executive Vice President, with employment to begin on March 15, 2004. Attached to this declaration as Exhibit A is an accurate copy of that employment agreement, except that the bates-numbers were not part of the original.

6.      On Monday, March 15, 2004, I began and then continued work to assist and take control, as warranted, of areas of the Southwest Housing organization that needed direction, leadership, and continuity.   This included the complete overhaul of the management, compliance, maintenance, marketing, property management accounting, and central service areas.  I also began and then continued to work on improving communications between SH Management, SH Development, and Affordable Housing and establishing common goals under the "one company" concept.

7.      I was never provided with a more detailed annual bonus plan in the first 90 days of employment or any time thereafter.  I was never provided by anyone — either orally or in writing — with a revised annual bonus plan.  I was never informed by anyone — either orally or in writing — that the annual bonus plan was eliminated.  I was never informed — either orally or in writing — by anyone, at any time before being informed that my employment was terminated, that a decision had been made that I would not receive an annual bonus under this annual bonus plan.

8.      On the contrary, Brian Potashnik and Cheryl Potashnik both confirmed at various points during my employment that I had earned and was owed annual bonuses under the annual bonus plan (the "Annual Bonuses") — i.e., I met their requirements for the Annual Bonuses.  They expressed to me at various points during my employment their intent to pay me more than the minimum Annual Bonuses, although they never stated a number but promised to get it done.  They both told me that I had contributed greatly to the organization in many different ways, above and beyond the typical call of duty, and much more than what I was hired on to do.  They each repeatedly said things like "thank you," "we really appreciate it," and other positive and "pat on the back" accolades, many of which tied into conversations about the need to pay me earned Annual Bonuses that were overdue.

DECLARATION OF JEFFREY CARPENTER — PAGE 3 OF 11

9.      As examples of the level of work I provided in addition to day-to-day duties, I spearheaded dealings with the Federal Bureau of Investigation after the FBI arrived at the corporate offices on June 20, 2005 to start an investigation into conduct of Brian Potashnik and Cheryl Potashnik.  I, along with others, handled challenges that Hurricanes Katrina and Rita brought in dealing with evacuees, employees, government agencies, lenders, volunteers, etc.

10.     Attached to this declaration as Exhibit B is an accurate copy of a record of a check that Affordable Housing issued to me in the amount of $50,000, except that the bates-number was not part of the original.  This is the only lump sum payment of $50,000 that I ever received during my employment with SH Management.  Although Brian Potashnik described the payment as what he called a "forgiveness loan" to help me close on my new home in Texas because I had not sold my home in Nevada [and that is what I believe the payment was for], the memo on the check does state "Advance against bonus."  I received this check on or around the date on the check — November 11, 2004 — which was before the end of my first calendar year of employment on March 14, 2005.

11.     During my employment tenure of more than 3½ years, I developed a working knowledge of the Southwest Housing organization, operations, and structure. "Southwest Housing" referred to the organization as a whole — SH Management Company, SH Development, and Affordable Housing.  These units operated in practice as a single, integrated business unit with what was known as a "one company concept." They operated from the same primary office space, shared the same facilities, had access to the same resources, and worked closely together in a joint effort to provide quality affordable housing communities at the same properties.    They shared a joint responsibility to the others for this common purpose.  Attached to this declaration as Exhibit C are accurate copies of an email string and attachments concerning outstanding development, construction, and management issues to be addressed at specific properties, except that the bates-numbers were not part of the original.  This is an example of how the Southwest Housing units worked jointly to resolve matters at the same affordable housing properties.

12.     SH Development generally created the evolution and design of new affordable housing communities and was primarily responsible for issues such as site selection, acquisition, feasibility analysis, approvals, permitting, financing, land development, demographic studies, and traffic analysis.  Affordable Housing generally constructed the new affordable housing communities and was primarily responsible for issues such as estimating, building construction, design and competitive bidding, civil engineering, architecture & value engineering, construction consulting, project management, construction management, and budget development.

DECLARATION OF JEFFREY CARPENTER — PAGE 4 OF 11

13.    SH Management worked hand-in-hand with the development and construction units to deliver the overall finished product to residents and was primarily responsible for issues such as leasing and marketing apartments, stabilizing financial performance for permanent financing, rent collection and accounting, financial control and budgeting, capital expenditures, employee training, market analysis and plans, maintenance services, approving and accepting ownership sign-off for construction quality, compliance and program management, reporting, and on-site leadership, advertising, marketing and public relations services, and extensive training for all team members. Prior to re-organizing Central Services [a department of certain centralized functions], SH Management also provided accounting services, IT support, risk management oversight, and human resources functions for all Southwest Housing units.

14.    Brian Potashnik was the highest-level person over SH Management Company, SH Development, and Affordable Housing. Attached to this declaration as Exhibit D are accurate copies of organizational charts for the Southwest Housing Executive Team, for SH Management, and for SH Development that were in effect during my employment tenure and provided to me, except that the bates-numbers were not part of the originals.

15.    Attached to this declaration as Exhibit E is an accurate copy of the "Leadership" page from the Southwest Housing website that was in place during my employment tenure, except that the bates-numbers were not part of the originals. There is no distinction among Southwest Housing units — the leadership is represented to the public merely as Southwest Housing. Attached to this declaration as Exhibit F is an accurate copy of the employee packet, with my notes on some pages, that was provided to me when I started my employment with SH Management, except that the bates-numbers were not part of the originals. There is no distinction among Southwest Housing units — all employees of all units received the same packet. Attached to this declaration as Exhibit G is an accurate copy of excerpts from the Southwest Housing Associate Handbook revised January 2007 that was supposed to be provided to associate employees of all Southwest Housing units during my tenure after that date, except that the bates-numbers were not part of the originals. There is no distinction among Southwest Housing units — all associate employees of all units were governed by the same employment policies.

16.    During my employment tenure, Brian Potashnik offered that I would receive at least 3% of the net proceeds from the sale of the Southwest Housing units' assets and Mr. Potashnik's and Ms. Potashnik's partnership interest assets in the apartment communities (the "Sales Proceeds Bonus") if I would stay on and assist in effectuating the asset sale for as long as needed. I accepted the offer and committed to stay as long as needed — *i.e.* until the management leadership changed or the closing of the asset sale or other date when I was no longer needed. Mr. Potashnik and I agreed that

DECLARATION OF JEFFREY CARPENTER — PAGE 5 OF 11

Appendix 000347

"net proceeds" formula was gross compensation from the sale transaction, minus (a) closing costs of brokerage fees, attorneys' fees related to the sale transaction, title fees, other normal closing costs and (b) any compensation paid from the sale proceeds to any other employees. The initial offer did not specify the specific percentage or formula — the specific percentage and formula were agreed later when Mr. Potashnik had a better handle on the likely sale price for the Southwest Housing assets and his and Ms. Potashnik's affordable housing assets [the partnerships that owned the properties].

17. The initial offer happened during a meeting at Brian Potashnik's home that I believe took place on or around May 22, 2006. Mr. Potashnik said something like "I have some news, and it's gonna be a very good day for the Potashnik family and the Carpenter family." He said he was selling the company. His tone and the context of our conversation made clear to me that he was referring to all of the Southwest Housing units' assets and Mr. Potashnik's and Ms. Potashnik's partnership interest assets in the apartment communities. He explained that, because I was in a high-level position, there might or might not be an opportunity for me to continue working with the purchaser. But he needed me to stay on and help effectuate the sale — such as assisting with due diligence, acting as the "face" of the "company" [again referring to the organization as a whole], maintaining my own and other employees' motivation, and continuing to work to lease up new construction. He explained that, other than him and Ms. Potashnik, I was the most important person in terms of effectuating a sale. He asked me to not lose focus on the prize, said that they needed me to make this happen, and said I would be working closely with many potential third parties especially on due diligence. He said if I stayed on, then I would be generously rewarded for my efforts — I would not need to worry about working. He said once offers came in and we were a little further down the road, we would work out a lucrative "sales proceeds bonus" for me and others. I got to work as requested, and the work involved work with each of the Southwest Housing units — SH Development, Affordable Housing, and SH Management — and Ms. Potashnik and Mr. Potashnik, as all of their affordable assets were to be sold.

18. During the process of trying to sell the assets, Mr. Potashnik or Ms. Potashnik kept me informed of major events including the following: (a) a letter of intent with Cascade Affordable Housing, LLC ("Cascade") was executed in October of 2006 ("LOI") that stated a potential sales price range and (b) a Purchase and Sale Agreement with Cascade was executed in April of 2007 for about $37 million. I saw both documents. Not long after the LOI was executed, Brian Potashnik and Cheryl Potashnik informed me at various times during more than one conversation that I most likely would not be obtained or employed by the purchaser. Cascade's management group known as Pinnacle — through its representative Rick Graf — also let me know this during our first couple of meetings as we began meeting to develop a smooth due diligence process and operational transition.

DECLARATION OF JEFFREY CARPENTER — PAGE 6 OF 11

19.     On or about October 13, 2006, Brian Potashnik and I met at Café Express and discussed the sales-related issues and the Sales Proceeds Bonus that I would receive. He at this time had a better handle on the potential sales price. Mr. Potashnik informed me that I would receive a minimum of 3% of the net proceeds, with the net proceeds based on gross compensation from the sale transaction, minus (a) closing costs of brokerage fees, attorneys' fees related to the sale transaction, title fees, other normal closing costs and (b) any compensation paid from the sale proceeds to any other employees. We estimated closing costs not to exceed 3% of the total sales price and that I would receive around $1,020,000 from the sales proceeds. I asked Mr. Potashnik to put the agreement in writing. Mr. Potashnik said Randy Alligood, the Southwest Housing attorney, would be putting it together. At the time the specific amount and formula were agreed upon, it was reasonably clear that I would not be working for the purchaser after the deal closed. Mr. Potashnik again implored me to stay on, claiming that continuity and my continued services were essential to the success of the transaction. The bonus from net proceeds of the asset sale was the carrot he used to entice me to stay on. I turned down at least one other job offer to do so.

20.     SH Development, Affordable Housing, SH Management, Brian Potashnik, and Cheryl Potashnik were all parties to the agreement for the Sales Proceeds Bonus. This was clear based on the additional work I was to do, and did do, to benefit each of them in connection with efforts to sell the Southwest Housing and the Potashniks' affordable housing assets, the tone and demeanor of Mr. Potashnik during our conversations on the issue, and the context of my conversations with both Mr. Potashnik and Ms. Potashnik on the issue. Mr. Potashnik was the highest-level person at SH Development, Affordable Housing, and SH Management. I had been informed early on that Mr. Potashnik usually handled compensation agreements. Further, Southwest Housing Chief Financial Officer Keith Jones provided me a draft agreement for himself on a sales proceeds bonus, and that draft also included SH Development, Affordable Housing, SH Management, Brian Potashnik, and Cheryl Potashnik as parties to the agreement. Attached to this declaration as Exhibit H is an accurate copy of the email and attachment that Mr. Jones sent to me and that I received, except that the bates-numbers were not part of the original. Further, a proposed separation agreement that Southwest Housing much later prepared and sent to me [which I refused to sign] noted a separation of my employment with SH Development, Affordable Housing, and SH Management and required a release of these units as well as the Potashniks. This document is discussed in more detail and attached later in this declaration.

21.     During December of 2006 and January of 2007, Mr. Potashnik and I had several brief discussions in which he claimed the Sales Proceeds Bonus was being put in writing. On January 12, 2007, Mr. Potashnik met me for dinner while I was working in Las Vegas, Nevada for Southwest Housing. During the dinner conversation, I asked about the attorney preparing a writing of the Sales Proceeds Bonus agreement. Mr.

Potashnik said the attorney was too busy and that I could prepare the writing. He said he wanted me to remain focused and did not want me distracted in any way. He said he understood the importance to me and to trust him to get it done. He said something like if we ended up having to put the agreement on the back of a napkin, we would do it. At no time during any of these conversations did Mr. Potashnik deny that he had made the Sales Proceeds Bonus agreement.

22.     On or about March 14, 2007, Mr. Potashnik and I met at a restaurant. During the conversation, I handed him a writing of the agreement on the Sales Proceeds Bonus and also include a calculation of what I believed was due in earned but past due Annual Bonuses, as well as some of my notes and an annual bonus breakdown. He assured me that he would get that resolved the following week. At no time during this conversation did Mr. Potashnik deny that he had made the Sales Proceeds Bonus agreement or that I was owed past due Annual Bonuses.

23.     On or about May 14, 2007, Mr. Potashnik and I were finally able to get together, and we met for breakfast. During the conversation, Mr. Potashnik said they had been too busy with the sales issues and the investigation to address the bonuses but promised to do so. I asked specifically about getting some money paid toward the past due Annual Bonuses. Mr. Potashnik claimed for the first time that the 3% Sales Proceeds Bonus would cover the past due Annual Bonuses. I said he had to be kidding me and that was completely unacceptable and wrong. Mr. Potashnik then said they didn't have any money right then to pay me the Annual Bonuses because most of the dollars were going to pay their criminal defense lawyers.

24.     On or about May 16, 2007, I met with Cheryl Potashnik and Brian Potashnik in Ms. Potashnik's office to discuss the compensation owed to me. But the discussion started with the FBI investigation process and criminal defense attorney Mike Uhl was on the phone. Mr. Potashnik became very agitated and left the office. Ms. Potashnik was obviously hurt, upset and crying. Ms. Potashnik then composed herself, tried unsuccessfully to reach Mr. Potashnik to return for the meeting, and then discussed the compensation issue with me.     Ms. Potashnik was very understanding and compassionate and agreed with me that the past due Annual Bonuses were separate from the Sales Proceeds Bonus. Looking eye-to-eye to me, she said to the effect of "I would never screw you" and "you've earned it" and that they really appreciate all that I do and they know how hard I worked and the many extras I had done. She promised to address the writing issue, and I gave her copies of what I had previously provided to Mr. Potashnik.

25.     In the meantime, I continued to be absorbed with additional daily tasks related to the asset sale, conversions, investigation and legal matters, construction items, due diligence and multiple inspections, compliance utility allowance issues, the Las

Vegas property, transitional preparedness, and employee motivation and relations, in addition to day to day business dealings. Keeping employees of all Southwest Housing units, both at the corporate office and at the property site level, informed and motivated was the most challenging task due to changes in anticipated closing dates. However, employee turnover due to the potential asset sale was very low and Southwest Housing continued to make gains in property performance.

26.     On or about September 20, 2007, Southwest Housing formally announced to employees the impending Cascade acquisition. On or about September 25, 2007, Brian Potashnik and Cheryl Potashnik met with me at the Starbucks near the office and informed me that they were going to be indicted. We discussed, among other things, the critical need to keep Southwest Housing employees focused on work, which became a major undertaking for me at the corporate office and in the affordable housing communities.

27.     On or about the first week of October 2007, a media frenzy began concerning the indictments. On or about October 4, 2007, the Cascade team and its management team conducted a Southwest Housing corporate employee orientation. Shortly thereafter, the Cascade team and its management team announced a November 1, 2007 target date for the management transition. I spent most of my time at this point keeping the Southwest Housing teams focused and motivated.

28.     On or about October 12, 2007, I met with Brian Potashnik at his home. During this meeting, I directly asked about the past due Annual Bonuses owed to me and the Sales Proceeds Bonus that was agreed upon in order for me to stay on with Southwest Housing. I reiterated the specifics of the Sales Proceeds Bonus agreement — including the 3% number and the net proceeds formula and my agreement to stay on in exchange. Mr. Potashnik told me if he got paid [from the asset sale], I would get paid. Mr. Potashnik expressed concern over attorneys' fees incurred due to the indictments, how much money might be left over after the asset sale, and how he could memorialize the Sales Proceeds Bonus agreement in writing, but he never denied that I was owed past due Annual Bonuses, and he never denied any aspect of the agreement for the Sales Proceeds Bonus.

29.     During the same meeting, I told Mr. Potashnik that I had another employment opportunity in place once I completed my work with Southwest Housing and asked Mr. Potashnik what he thought about the timing of the transition.   Mr. Potashnik responded that I should take the job and that I would get everything we had discussed — the past due Annual Bonuses the Sales Proceeds Bonus — whether I left sooner or later. I told Mr. Potashnik that I had flexibility and just needed a clearer understanding of when I would not be needed any longer, as I had always said I would stay to the end — management transition or closing — and would do so.

DECLARATION OF JEFFREY CARPENTER — PAGE 9 OF 11

30.    On or about October 21, 2007, I had dinner with Brian Potashnik and Cheryl Potashnik. The dinner conversation generally centered on the indictments and the asset sale, and we also generally discussed the Sales Proceeds Bonus. Mr. Potashnik and Ms. Potashnik never denied the agreement for the Sales Proceeds Bonus. Mr. Potashnik said I would have to trust them. Ms. Potashnik said to the effect of "I told you before that I, we would never screw you and we are not planning to" and "you have been a very valuable employee and friend."

31.    On or about October 29, 2007, I met with Cheryl Potashnik in her office. During this meeting, I asked Ms. Potashnik what else she might need or what else I could do to assist with the management transition. Ms. Potashnik said she could not think of anything at the moment but there could be something in the future. I asked how long she needed or wanted me to stay around to assist with the transition. Ms. Potashnik responded that I would just need to be there to the end of the week with the Consulting and Asset Management Agreement getting signed. I was aware that the Consulting and Asset Management Agreement was for the management transition associated with the sale of the Potashniks' affordable housing assets and the Southwest Housing units' assets.

32.    During the same meeting, I asked Ms. Potashnik about getting paid immediately at least some of the bonus compensation that was owed to me. Ms. Potashnik said all she could do until the closings started in the next several weeks was to pay me an additional 30 days of pay and that the extra 30 days' pay would not count against the bonus compensation owed to me.

33.    I believe it was Mr. Potashnik who officially announced the termination of my employment on November 1, 2007 — I believe during a telephone call with me and possibly also Ms. Potashnik. After 5:00 p.m. that day, I received an email from Chief Financial Officer Keith Jones with an attached proposed separation agreement. The proposed separation agreement stated that my last day of work would be November 2, 2007 and that I would be paid for 136.7 hours of accrued paid time off and for regular wages earned through my termination date. It stated that it ended all employment relationships between me and SH Management, Affordable Housing, and SH Development. It had a single signature space for these entities under the name "Southwest Housing." It included a full release of claims against each of these entities. It did not mention the 30 additional days' pay, the past due Annual Bonuses, or the Sales Proceeds Bonus. I was stunned, extremely upset, and angry.

34.    On November 2, 2007 in the morning, Brian Potashnik called me, as I had tried to reach him the previous night. I recorded this telephone conversation. I have reviewed Exhibit A to the Declaration of Sandy Dixon, and the transcript of conversation

DECLARATION OF JEFFREY CARPENTER — PAGE 10 OF 11

reflected in the second column of the chart in Exhibit A accurately reflects the substance of the November 2, 2007 conversation with Mr. Potashnik.

35.    On November 2, 2007 in the afternoon, I met with Cheryl Potashnik in her office. I recorded the conversation. I have reviewed Exhibit B to the Declaration of Sandy Dixon, and the transcript of conversation reflected in the second column of the chart in Exhibit B accurately reflects the substance of the first part of the November 2, 2007 conversation with Ms. Potashnik.

36.    I never received the promised Annual Bonuses as agreed. I was damaged because I did not, but should have, received the Annual Bonuses. I never received the Sales Proceeds Bonus. Colleagues of mine who I am aware stayed with Southwest Housing and then were hired with the purchaser Cascade or its management arm Pinnacle through the conclusion of the asset sale to Cascade — such as Southwest Housing Vice President of Accounting Lori Meyer, Southwest Housing Regional Manager Jenny Stevenson, and Southwest Housing CFO Keith Jones — informed me while they were working at Cascade or its management arm Pinnacle that the asset sale with Cascade did close and that there was a profit and that they each received bonuses from the asset sale proceeds. I was damaged because I did not, but should have, received the Sales Proceeds Bonus.

37.    Neither SH Development nor SH Management nor Southwest Housing Management Corporation, Inc. ever provided me with notice that any of them were winding up or dissolving.

38.    My name is Jeffrey Wayne Carpenter. My date of birth is November 2, 1958. My address is 7246 Mimosa Lane, Dallas, Texas 75230. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 22nd day of July, 2013

JEFFREY W. CARPENTER

DECLARATION OF JEFFREY CARPENTER — PAGE 11 OF 11

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | IN THE COUNTY COURT |
| | § | |
| SOUTHWEST HOUSING | § | AT LAW NO. 5 |
| DEVELOPMENT COMPANY, | § | |
| INC.; SOUTHWEST HOUSING | § | DALLAS COUNTY, TEXAS |
| MANAGEMENT CORPORATION, | § | |
| INC. a/k/a and d/b/a SOUTHWEST | § | |
| HOUSING MANAGEMENT | § | |
| COMPANY, INC.; AFFORDABLE | § | |
| HOUSING CONSTRUCTION, | § | |
| INC.; BRIAN POTASHNIK; and | § | |
| CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | |

| | |
|---|---|
| SOUTHWEST HOUSING | § |
| MANAGEMENT CORPORATION, | § |
| INC., | § |
| | § |
| Counter-Plaintiff, | § |
| | § |
| v. | § |
| | § |
| JEFFREY W. CARPENTER, | § |
| | § |
| Counter-Defendant. | § |

## JEFF CARPENTER'S CONSOLIDATED DISCLOSURES

Appendix 000354

**(a)** **the correct names of the parties to the lawsuit:**

Jeff believes at this time that the parties have been correctly named.

**(b)** **the name, address, and telephone number of any potential parties:**

Jeff is not aware at this time of any potential parties who have not been joined in this case.

**(c)** **the legal theories and, in general, the factual bases of the responding party's claims or defenses (the responding party need not marshal all evidence that may be offered at trial):**

> **failure to comply with and repudiation of written agreement — annual bonuses**
>
> **and alternative claim for quantum meruit**

Jeff previously served disclosures for the annual bonuses claim and associated *quantum meruit* claim. These consolidated disclosures defer inclusion of those disclosures or updated disclosures while the current *Stowers* demand remains open, to preserve eroding liability insurance limits.

> # failure to comply with and repudiation of oral agreement — sale proceeds payment
>
> ## and alternative claim for quantum meruit

Brian Potashnik and Cheryl Potashnik own and operate several companies that construct, own, and operate apartment properties. In May 2006, Brian Potashnik meets with Jeff Carpenter. Brian Potashnik announces plans to sell the companies. Brian Potashnik says Jeff may not have a job after the sale. Brian Potashnik says he needs Jeff to stay on and help make the sale happen. Brian Potashnik says that if Jeff stays on as long as needed, then Jeff will be paid a lucrative bonus in connection with the sale. Brian Potashnik says he will work out a specific formula later when he has a better idea of the potential sale price.

Brian Potashnik and Cheryl Potashnik see that Jeff accepts and stays on and gets to work to make the sale happen. Several months later, Brian Potashnik and Cheryl Potashnik sign a letter of intent to sell the companies' assets and their related personal ownership interest assets. Brian Potashnik then meets with Jeff. Brian Potashnik now says Jeff most likely will not have a job after the sale. Brian Potashnik says that he still needs Jeff to stay on as long as needed to make the sale happen. Brian Potashnik announces the bonus formula for Jeff — if Jeff will stay on despite the anticipated asset sale and likelihood of no employment position for Jeff after the asset sale — and works with Jeff to estimate the bonus at about $1.2 million.

Brian Potashnik and Cheryl Potashnik see that Jeff stays on and continues to work to make the sale happen. Several months later, Brian Potashnik signs the purchase and sale agreement in which Brian Potashnik, Cheryl Potashnik, and the companies are all sellers. Brian Potashnik and Cheryl Potashnik see that Jeff continues to stay on and work to make the sale happen. Brian Potashnik and Cheryl Potashnik continue to affirm the incentive pay owed to Jeff in connection with the asset sale.

Several months later as the asset sale management transition appears close, Brian Potashnik learns from Jeff that Jeff has an another employment opportunity lined up but has made the start date flexible to allow Jeff to stay on as long as needed to make the sale happen. Brian Potashnik and Cheryl

Appendix 000356

Potashnik continue to affirm the incentive pay owed to Jeff in connection with the asset sale. Brian Potashnik and Cheryl Potashnik continue to praise Jeff for his work.

Soon after, Cheryl Potashnik tells Jeff that he will only be needed until the management transfer agreement is in place in connection with the sale. Within days, Brian Potashnik signs that agreement. Brian Potashnik and Cheryl Potashnik inform Jeff that his work is complete — *i.e.,* Jeff has completed his end of the bargain for the pay-to-stay agreement.

A day or so later, Brian Potashnik and Cheryl Potashnik each tell Jeff that Jeff might not be paid. Brian Potashnik and Cheryl Potashnik each say they are worried about whether there will be enough money left over to meet their needs. A few weeks later, Cheryl Potashnik tells Jeff that she believes Jeff is not entitled to any bonuses after termination of employment.

Brian Potashnik, Cheryl Potashnik, and the companies then complete a series of closings under the purchase and sale agreement. Brian Potashnik, Cheryl Potashnik, and the companies receive a total of more than $30 million in net profits under the purchase and sale agreement.

These basic facts give rise to legal claims for (1) failure to comply with and repudiation of the oral pay-to-stay agreement and (2) an alternative claim for quantum meruit. Jeff fully earned compensation under the pay-to-stay agreement — he stayed. He turned down at least one job and delayed employment negotiations and start date for another job in order to do so. Defendants have not paid.

**(d)   the amount and any method of calculating economic damages:**

*See* Part (d) attached hereto.

Jeff previously served disclosures calculating damages for the annual bonuses claim and associated *quantum meruit* claim. These consolidated disclosures defer inclusion of those disclosures or updated disclosures while the current *Stowers* demand remains open, to preserve eroding liability insurance limits.

(e) **the name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case:**

*See* Part (e) attached hereto. Jeff previously served disclosures concerning persons with knowledge on the annual bonuses claim and associated *quantum meruit* claim. These consolidated disclosures defer inclusion of those disclosures or updated disclosures while the current *Stowers* demand remains open, to preserve eroding liability insurance limits.

(f) **for any testifying expert:**

    1.    **the expert's name, address, and telephone number;**
    2.    **the subject matter on which the expert will testify;**
    3.    **the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;**
    4.    **if the expert is retained by, employed by, or otherwise subject to the control of the responding party:**
        A.    **all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and**
        B.    **the expert's current resume and bibliography:**

*See* Part (f) attached hereto.   Expert disclosures are not yet due in this case.

(g) **any indemnity and insuring agreements described in Rule 192.3(f):**

Jeff is not aware of any at this time, other than the insuring agreement that Defendants produced.

**(h)**   **any settlement agreements described in Rule 192.3(g):**

None at this time

**(i)**   **any witness statements described in Rule 192.3(h):**

Jeff produced witness statements as part of earlier production. These consolidated disclosures generally defer production of additional witness statements while the current *Stowers* demand remains open, to preserve eroding liability insurance limits. But Jeff is not withholding any witness statement in the form of an affidavit or declaration or similar statement.

Appendix 000359

Respectfully submitted,


*/s/ Amy Gibson*
Amy Gibson
Texas State Bar No. 00793801

David L. Wiley
Texas State Bar No. 24029901

Gibson Wiley PLLC
1500 Jackson St. #714
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR
JEFF CARPENTER

Appendix 000360

## CERTIFICATE OF SERVICE

The undersigned certifies that, on May 31, 2016, a true copy of Jeff Carpenter's Consolidated Disclosures was served on all other parties, through their attorneys of record, as follows:

**VIA EMAIL**

Mr. Michael Donohue
Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
mdonohue@fflawoffice.com
jhfriedman@fflawoffice.com

_/s/ Amy Gibson_
Amy E. Gibson

Appendix 000361

(d)   the amount and any method of calculating economic damages:

---

### 3% net profits pay-to-stay agreement

---

Defendants contend that they need a court order to produce to Jeff Carpenter the sale and closing documents in their possession, custody, or control.  So, Jeff subpoenaed those documents from asset purchaser Cascade Affordable Housing LLC to help preserve liability insurance limits.  Discovery has not yet occurred on whether line item sellers' closing costs in those documents are legitimate, normal closing costs.  This calculation assumes *arguendo for now* that all of sellers' closing costs are legitimate, normal closing costs and that the subpoenaed Cascade Affordable Housing LLC documents are complete.

**Amount:  $945,639.6978**

**Method of calculation:**
3% of total net profits to sellers in connection with the purchase and sale agreement, with net profits calculated as gross revenue minus the sum of normal closing costs and incentive compensation [incentive to stay on despite anticipated asset sale] paid to certain corporate employees from that revenue

Net profits to sellers in connection with purchase and sale agreement after closing costs = $33,521,323.26

| Net Profits to Sellers | |
|---|---:|
| Escrow Amendment 1 | $1,850,000.00 |
| Escrow Amendment 2 | $925,000.00 |
| Escrow Amendment 3 | $925,000.00 |
| Escrow Amendment 4 | $925,000.00 |
| Escrow Amendment 5 | $925,000.00 |
| Escrow Amendment 6 | $1,850,000.00 |
| Escrow Amendment 7 | $925,000.00 |
| Escrow Amendment 8 | $925,000.00 |
| Escrow Amendment 9 | $925,000.00 |
| Escrow Amendment 10 | $925,000.00 |

| Closing Memo II | $17,606,679.17 |
| Closing Memo II | $2,314,644.09 |
| Bank of America Payment | $2,500,000.00 |

Net profits to sellers in connection with purchase and sale agreement after closing costs and an estimated $2,000,000 in incentive payments [incentive to stay on despite anticipated asset sale] made to certain corporate employees from the purchase and sale agreement revenue = $31,521,323.26

Estimated incentive payments [incentive to stay on despite anticipated asset sale] made to certain corporate employees from the purchase and sale agreement revenue = between about $1,500,000 and $2,000,000.

Defendants have not yet provided the amounts actually paid. The above estimate is based on these estimates:

| Sara Reidy: | between about $500,000 and $800,000[1] |
| Keith Jones: | between about $168,000 and $200,000[2] |
| Deborah Workman: | between about $31,625 and $63,250[3] |
| Other specified corporate employees: | between $510,011 and $765,017[4] |
| Contingency for potential additional corporate employees paid from purchase and sale agreement revenue: | $250,000 |
| | |
| Total range: | between $1,459,636 and $2,078,267 |

---

[1]     Jeff understands that this payment was about $800,000.  But there is some indication that this payment was about $500,000.

[2]     Jeff understands that this payment was originally intended to be around a year's salary.  But Jeff believes that amount may have increased due to the delay in asset sale closing.  Human Resources listed Keith Jones' annual salary at $168,000 in March 2007 before any later raises or regular bonuses.

[3]     Jeff understands that this payment was to be either about 3 months' salary or 6 months' salary.  Human Resources listed Deborah Workman's annual salary at $126,499.88 in March 2007 before any later raises or regular bonuses.

[4]     While Jeff was still doing work for the sellers, Chief Financial Officer Keith Jones provided Jeff with a spreadsheet of about 49 named corporate employees — excluding those identified above — with estimated incentive pay at 2 months' salary and 3 months' salary.  These totals are listed above.

Appendix 000363

## reasonable attorneys' fees

Defendants' conduct caused Jeff to incur attorneys' fees to pursue this case. Defendants are responsible for reasonable attorneys' fees pursuant to Texas Civil Practice and Remedies Code Chapter 38.[5] Jeff currently plans to use expert testimony to show these losses, which continue to accrue, and expert disclosures are not yet due. Amount and method of calculation will be disclosed in connection with expert disclosures.

## court costs

Defendants' conduct caused Jeff to incur court costs to pursue this case. Defendants are responsible for court costs pursuant to the Texas Rules of Civil Procedure.[6] Jeff currently plans to use expert testimony to show these losses, which continue to accrue, and expert disclosures are not yet due. Amount and method of calculation will be disclosed in connection with expert disclosures.

---

[5]    Tex. Civ. Prac. Rem. Code § 38.001 ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor; . . . or (8) an oral or written contract.").

[6]    *See* Tex. R. Civ. P. 131 (successful party to recover costs).

<div style="border:1px solid #000; padding:10px; text-align:center;">

**interest**

</div>

Defendants are responsible for prejudgment interest and postjudgment interest.[7] Total prejudgment interest through September 7, 2015 just for breach of the oral agreement — excluding costs and attorneys' fees — is **$225,973.894**.

### Prejudgment Interest

| dates of prejudgment interest accrual | 180 days after suit was filed through the day before judgment is "rendered"[8]<br><br>180 days after March 11, 2008 = September 7, 2008 |
|---|---|
| compounding | none[9] |
| prejudgment interest rate | 5 percent[10]<br><br>$32,281.9848 annually<br><br>$225,973.894 through September 7, 2015 |

---

[7]    A court may award prejudgment interest under general principles of equity. *Perry Roofing v. Olcott*, 744 S.W.2d 929 (Tex. 1988).

[8]    *See* Tex. Fin. Code § 304.104.

[9]    *See id.*

[10]    *See Dallas Area Rapid Transit v. Agent Sys., Inc.*, No. 02-12-00517-CV, 2014 WL 6686331, at *16 (Tex. App.—Dallas 2014, no pet.) (contract case) ("we conclude and hold that the trial court should have calculated prejudgment and postjudgment interest at the rate of five percent instead of six percent").

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | IN THE COUNTY COURT |
| | § | |
| SOUTHWEST HOUSING | § | AT LAW NO. 5 |
| DEVELOPMENT COMPANY, | § | |
| INC.; SOUTHWEST HOUSING | § | DALLAS COUNTY, TEXAS |
| MANAGEMENT CORPORATION, | § | |
| INC. a/k/a and d/b/a SOUTHWEST | § | |
| HOUSING MANAGEMENT | § | |
| COMPANY, INC.; AFFORDABLE | § | |
| HOUSING CONSTRUCTION, | § | |
| INC.; BRIAN POTASHNIK; and | § | |
| CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | |

## JEFF CARPENTER'S DAMAGES SUPPLEMENT
## TO CONSOLIDATED DISCLOSURES

Appendix 000366

**(d)**     **the amount and any method of calculating economic damages:**



This revised damages calculation method and total was disclosed during an off the record break for this purpose at the oral deposition of Jeff Carpenter, with the exception of the first year $50,000 minimum bonus credit previously disclosed.

Total: $400,000

Time period: 3 years
March 15, 2004 [employment start date] through March 14, 2007 [date marking three years of employment]

The following is based on what Brian Potashnik did say as far as bonus numbers outside the sale proceeds stay bonus addressed below.  Brian Potashnik said he would apply dollars from conversions to those earned bonuses.  The annual minimum was $50,000 with an annual maximum of $200,000.  The minimum for the first year was paid.  The minimum for the next two years was $100,000.  Brian Potashnik also said he intended to pay $50,000 from a particular property source [Fairway], $50,000 from another property source [McKinney], and $100,000 to $200,000 from another property source [Vegas].  *See* March 14, 2007 JC Personal Notes produced at bates-label Carpenter 0013.  Although Brian was discussing possible sources of funds from which he wanted to pay, in doing so he set certain amounts he intended to pay.

Calculation:
$50,000 year 2 minimum
$50,000 year 3 minimum
$300,000 [from discussions about sources of funding for bonus payments as discussed above — $50,000, $50,000, $200,000]

Total = $400,000

Brian Potashnik's statements also show part of the reasonable value of compensable work at the time and place it was performed.  This was part of the value Brian Potashnik assigned to the work Jeff Carpenter performed.

Appendix 000367

## 3% net sale proceeds pay-to-stay agreement and alternative claim for quantum meruit

This calculation is updated (1) to reflect Cheryl Geiser's deposition testimony, (2) after defendants chose not provide documents on January 15, 2018 despite a Court order that they do so, as those documents would have aided in updating the below calculation, (3) to explain further the Bank of America payment previously disclosed, and (4) do reduce the Phase I net proceeds amount previously disclosed due to conflicting closing document numbers for this amount. The calculation assumes *for now* that all of sellers' closing costs are legitimate, normal closing costs, with the exception of $2 million paid to Bank of America. *See* Cheryl Potashnik deposition & Sellers' Closing Statement Phase I produced at Carpenter 0732.

### *Net Sale Proceeds to Sellers After Closing Costs*
### *$32,999,032.39*

| | |
|---|---|
| Escrow Amendment 1 [*e.g.*, CAH-SW000831-34] | $1,850,000.00 |
| Escrow Amendment 2 [*e.g.*, CAH-SW000835-36] | $925,000.00 |
| Escrow Amendment 3 [*e.g.*, CAH-SW000837-39] | $925,000.00 |
| Escrow Amendment 4 [*e.g.*, CAH-SW000840-41] | $925,000.00 |
| Escrow Amendment 5 [*e.g.*, CAH-SW000842-43] | $925,000.00 |
| Escrow Amendment 6 [*e.g.*, CAH-SW000844-45] | $1,850,000.00 |
| Escrow Amendment 7 [*e.g.*, CAH-SW000846-48] | $925,000.00 |
| Escrow Amendment 8 [*e.g.*, CAH-SW000849-50] | $925,000.00 |

Appendix 000368

| Escrow Amendment 9 [*e.g.,* CAH-SW000851-53] | $925,000.00 |
|---|---|
| Escrow Amendment 10 [*e.g.,* CAH-SW000854-55] | $925,000.00 |
| Sellers' Closing Statement Phase I [*e.g.,* Carpenter 0731-32] | $17,584,388.30 |
| Bank of American Payment [*e.g.,* Sellers' Closing Statement Phase I; Carpenter 0732] | $2,000,000.00 |
| Closing Memo Phase II [*e.g.,* Carpenter 0588-89] | $2,314,644.09 |
| Total | $32,999,032.39 |

 The May 28, 2008 Phase I Closing Memorandum shows $17,606,679.17 as the net proceeds due to sellers. *See, e.g.,* closing memorandum produced at Carpenter 0586-87. But Keith Jones' May 28, 2008 email with the subject "wiring instructions for sellers net proceeds" and its sellers' closing statement attachment show this total for the Phase I closing as $17,584.388.30. *See* Keith Jones email with attachment produced at Carpenter 0731-32. Mr. Carpenter uses the lower number for the Phase I closing.

 Several escrow disbursement records show the disbursement to Bank of America as $2.5 million. *See, e.g.,* escrow disbursement records produced at Carpenter 0648, 0668, 0726. But Keith Jones' May 28, 2008 email attachment shows a payment of $2 million to Bank of America. *See* Keith Jones email with attachment produced at Carpenter 0731-32. Mr. Carpenter uses the lower number for the Bank of America payment.

 Please note that the referenced documents appear in more than one place in the documents Jeff Carpenter provided — *i.e.,* the same documents may have additional bates-numbers.

Appendix 000369

### *Sale Proceeds Stay Bonuses Paid to Selected Corporate Employees*
### *$2,100,000*

Cheryl Potashnik testified that total sales proceeds stay bonuses paid out to selected employees was about $2.1 million. She testified: "The total bonuses paid out at sale were approximately $2.1 million." Defendants have not provided requested documents that would show the actual total for sales proceeds stay bonuses paid out to their employees, though ordered to do so.

### *3% Formula Amount*
### *$926,970*

Brian Potashnik, agent for sellers, offered Jeff Carpenter 3% of defined net sale proceeds if Jeff Carpenter would stay on as long as needed to help make the asset sale happen. Cheryl Potashnik affirmed the agreement. Jeff Carpenter was not likely to have a job with the purchaser after the sale because the purchaser had someone in place for that position already. Brian Potashnik made the agreement with the specific formula on or about October 13, 2006 as follows: 3% of this total: sales price, at that time estimated at about $36 million, less normal closing costs, estimated at that time at 3% of the sales price, less bonuses that would be paid to other key employees to stay. Brian Potashnik and Jeff Carpenter estimated the bonus at that time as $1,020,000. This means Brian Potashnik must have calculated 3% of $34 million [to get $1,020,000]. This means he must have estimated (1) closing costs at about $1,080,000 [3% of $36 million] and (2) about $920,000 in stay bonuses for other key employees. Mr. Carpenter has used actual numbers from the asset sale under the formula Brian Potashnik came up with:

> gross asset sale revenue to sellers
> *less* normal closing costs
> *less* sale proceeds stay bonuses paid to selected employees

net proceeds to sellers after closing costs [calculated above] = $32,999,032.39
stay bonuses paid to other selected employees [identified above] = $2,100,000
difference = $30,899,032.39, rounded down to $30,899,032
3% of $30,899,032 = $926,970.96, rounded down to $926,970

Brian Potashnik's estimate of $1,020,000 shows part of the reasonable value of compensable work — staying on as long as needed to help make the asset sale happen after October 13, 2006. Jeff Carpenter uses the lower final number of $926,970.

Appendix 000370

Respectfully submitted,


*/s/ Amy Gibson*
Amy Gibson
Texas State Bar No. 00793801

David L. Wiley
Texas State Bar No. 24029901

Gibson Wiley PLLC
1500 Jackson Street #714
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126
E:
amy@gwfirm.com
david@gwfirm.com

*Attorneys for Jeff Carpenter*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on January 21, 2018, a true copy of the foregoing supplemental damages disclosure was served on all parties, through their attorneys of record, as follows:

**ELECTRONIC SERVICE VIA TEXAS E-FILE SYSTEM**

Mr. Michael Donohue
Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
mdonohue@fflawoffice.com
jhfriedman@fflawoffice.com

*/s/ Amy Gibson*
Amy E. Gibson

Appendix 000372

(e)     **the name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case:**

Persons are included in this disclosure as required under the Texas Rules of Civil Procedure.  Many persons with no fault and no blame are included in this disclosure due to knowledge of relevant facts.  The inclusion of any person in this disclosure is not to be taken as any indication of fault, blame, or wrongdoing as opposed to possession of relevant knowledge, with the exception of the defendants.

Appendix 000373

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Jeff Carpenter**<br>7246 Mimosa Lane<br>Dallas, Texas 75230<br>H: (214) 265-1214 | plaintiff and counter-defendant | deposition not yet completed<br>fact witness | | |
| **Vikki Carpenter**<br>7246 Mimosa Lane<br>Dallas, Texas 75230<br>H: (214) 265-1214 | Jeff's wife | not deposed<br>fact witness | | |
| **Brian Potashnik**<br>38819 Wisteria Drive<br>Palm Desert, California | defendant and seller in asset sale | not deposed<br>fact witness | | |
| **Cheryl Geiser Potashnik**<br>3707 Princeton Avenue<br>Dallas, Texas 75205 | defendant and seller in asset sale | not deposed<br>fact witness | | |
| **Southwest Housing Development Company, Inc.**<br><br>**Corporate Representative(s)** *and* **Records Custodian**<br>3707 Princeton Avenue<br>Dallas, Texas 75205 | defendant and seller in asset sale | not deposed<br>fact witness<br>records custodian | | |

Appendix 000374

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc.**<br><br>**Corporate Representative(s)** *and* **Records Custodian**<br>3707 Princeton Avenue<br>Dallas, Texas 75205 | defendant and seller in asset sale | not deposed<br>fact witness<br>records custodian | | |
| **Affordable Housing Construction, Inc.**<br><br>**Corporate Representative(s)** *and* **Records Custodian**<br>3707 Princeton Avenue<br>Dallas, Texas 75205 | defendant and seller in asset sale | not deposed<br>fact witness<br>records custodian | | |
| **Cynthia A. Mallon**<br>Cynthia A. Mallon LLC<br>2651 Silver Bend Drive<br>Apex, North Carolina 27539 | former Vice President of Human Resources for Southwest Housing 2002-2005 | not deposed<br>fact witness | | |
| **Devona Gray**<br>1712 Little River Court<br>De Soto, Texas 75115<br>H: (972) 230-5579 | former Human Resources Manager for Southwest Housing<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) use of financial incentives to convince employees to stay on despite potential asset sale<br>(2) employee salaries, incentive compensation, accrued paid time off<br>(3) process to transition or lay off employees in connection with asset sale<br>(4) employee concerns about Brian Potashnik and Cheryl Potashnik criminal indictments and effect on asset sale | not deposed<br>fact witness | | |

Appendix 000375

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| Keith R. Jones<br>409 Yacht Club Drive<br>Rockwall, Texas 75032<br>H: (972) 772-7607 | former Chief Financial Officer for Southwest Housing<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) use of financial incentives to convince employees to stay on despite potential asset sale<br>(2) employee salaries, incentive compensation, accrued paid time off<br>(3) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus]<br>(4) management and employee transition and layoffs as part of asset sale<br>(5) time line of events for asset sale and criminal investigation and indictment of Brian Potashnik and Cheryl Potashnik<br>(6) financial interrelationship between sellers | not deposed<br>fact witness | | |
| Sara Reidy<br>2010 Kessler Parkway<br>Dallas, Texas 75208<br>M: (214) 906-7914 | former Executive Vice President for SH Development<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) use of financial incentives to convince employees to stay on despite potential asset sale<br>(2) employee salaries, incentive compensation, accrued paid time off<br>(3) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus]<br>(4) management and employee transition and layoffs as part of asset sale<br>(5) time line for asset sale and criminal investigation and indictment of Brian Potashnik and Cheryl Potashnik<br>(6) explanation of property life cycle in development and construction | not deposed<br>fact witness | | |

Appendix 000376

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Debbie Workman**<br>2005 Zavala Road<br>Keller, Texas 76248-8395<br>H: (817) 745-1504 | former Vice President of Property Operations for Southwest Housing<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) use of financial incentives to convince employees to stay on despite potential asset sale<br>(2) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus]<br>(3) explanation of property management<br>(4) Jeff's understanding that he would not have an employment position after the asset sale<br>(5) time line for asset sale and criminal investigation and indictment of Brian Potashnik and Cheryl Potashnik | not deposed<br>fact witness | | |
| **Harry Bookey**<br>Chairman<br>BH Management Services LLC<br>400 Locust Street<br>Suite 790<br>Des Moines, Iowa 50309<br>W: (515) 244-2622 | Jeff turned down potential job with BH Companies at time when he understood he would not have an employment position after the asset sale<br><br>additional connections —<br>may educate jury about:<br>(1) knowledge of significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale | not deposed<br>fact witness | | |
| **Jeff Richards**<br>4301 South Miller Place<br>Chandler, Arizona 85249<br>M: (806) 433-2936 | former principal in American Housing Foundation<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) AHF delayed employment negotiations and delayed start date for Jeff due to significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale<br>(2) AHF compensation package for Jeff | not deposed<br>fact witness | | |

Appendix 000377

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| Steve W. Sterquell II<br>Alden Torch Financial, LLC<br>1225 17th Street<br>Denver, Colorado 80202<br>M: (806) 206-1887 | former management member in American Housing Foundation<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) AHF delayed employment negotiations and delayed start date for Jeff due to significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale | not deposed<br>fact witness | | |
| Jerry L. Wright<br>1015 Rocky Creek Drive<br>Pflugerville, Texas 78660-2870<br>M: (713) 825-2060 | outside mortgage lender and outside consultant to American Housing Foundation<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) AHF delayed employment negotiations and delayed start date for Jeff due to significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale | not deposed<br>fact witness | | |
| Paul Cohen<br>5701 Eastman Drive<br>Plano, Texas 75093<br>M: (214) 912-6100 | real estate entrepreneur<br><br>additional connections —<br>may educate jury about:<br>(1) Brian Potashnik saying to the effect that that the planned asset sale would result in over a million dollars to Jeff | not deposed<br>fact witness | | |
| Aaron Goldstein<br>2034 E Hickory Hill Rd<br>Argyle, Texas 76226<br>M: (214) 837-5072 | commercial landscaper, former Southwest Housing vendor representative<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) Brian Potashnik saying to the effect that that the planned asset sale would make Jeff a millionaire | not deposed<br>fact witness | | |

Appendix 000378

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Rick Graf**<br>**President and Chief Executive Officer**<br>**Pinnacle Property Management Services LLC**<br>5055 Keller Springs Road #400<br>Addison, Texas 75001<br>W: (214) 891-7800 | former President of Central Division for American Management Services d/b/a Pinnacle [purchaser's management arm]<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) knowledge of significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale<br>(2) warned Jeff early in the process that Jeff likely would not have an employment position after asset sale [purchaser-side would likely use its own people]<br>(3) later confirmed that Jeff would not have an employment position after the asset sale [purchaser-side had its own person in place]<br>(4) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus]<br>(5) time line for asset sale and criminal investigation and indictment of Brian Potashnik and Cheryl Potashnik | not deposed<br>fact witness | | |
| **Randall ("Randy") M. Alligood**<br>*and*<br>**Broad & Cassel**<br>**Corporate Representative(s)**<br>*and* **Records Custodian**<br>Bank of America Center<br>390 North Orange Avenue<br>Suite 1400<br>Orlando, Florida 32801-4961<br>W: (407) 839-4202<br>M: (407) 701-8682 | attorney and law firm primarily responsible for representing sellers in connection with asset sale<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) purchase and sale agreement, sellers' closing costs, sellers' profits<br>(2) escrow agreement, what funds went in and out of escrow account, sellers' profits<br>(3) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus]<br>(4) whether anyone ever asked him to memorialize oral pay-to-stay agreement with Jeff as Brian Potashnik claimed | not deposed<br>fact witness<br>records custodian | | |

Appendix 000379

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Mike Kuntz** *and* **Foster Pepper PLLC Corporate Representative(s)** *and* **Records Custodian** 1111 Third Avenue Suite 3400 Seattle, Washington 98101-3299 W: (206) 447-4400 | attorney and law firm primarily responsible for representing purchaser(s) in asset sale<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) purchase and sale agreement, sellers' closing costs, sellers' profits<br>(2) escrow agreement, what funds went in and out of escrow account, sellers' profits<br>(3) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed fact witness records custodian | | |
| **Stanley ("Stan") J. Harrelson** S&M Investments LLC Pier 70 2801 Alaskan Way Suite 200 Seattle, Washington 98121 W: (206) 215-9700 | former President and Chief Executive Officer of American Management Services d/b/a Pinnacle [purchaser's management arm] and Manager of purchaser Cascade Affordable Housing LLC who signed purchase and sale agreement and escrow agreement<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) purchase and sale agreement, sellers' closing costs, sellers' profits<br>(2) escrow agreement, what funds went in and out of escrow account, sellers' profits<br>(3) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed fact witness | | |
| **Carol Erick** Hexter-Fair Title Company 8333 Douglas Avenue Suite 130, L.B. 80 Dallas, Texas 75225 W: (214) 373-9999 | Executive Vice President of Hexter-Fair Title Company who signed escrow agreement connected with asset sale<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) escrow agreement, what funds went in and out of escrow account, sellers' profits<br>(2) funds that escrow agent held and paid to Bank of America | not deposed fact witness | | |

Appendix 000380

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **John Twining** *and* **Bank of America** **Corporate Representative(s)** *and* **Records Custodian** W: (214) 209-2239 | outside lender to sellers additional connections — may educate jury about all or part of: (1) funds that escrow agent held and paid to Bank of America | not deposed fact witness records custodian | | |
| **Cascade Affordable Housing LLC and affiliates** **Corporate Representative(s)** *and*  **Records Custodian** Pier 70 2801 Alaskan Way Suite 200 Seattle, Washington 98121 W: (206) 215-9700 | purchaser(s) in asset sale | not deposed fact witness records custodian | | |
| **Hexter-Fair Title Company** **Corporate Representative(s)** *and*  **Records Custodian** 8333 Douglas Avenue Suite 130, L.B. 80 Dallas, Texas 75225 W: (214) 373-9999 | escrow agent in asset sale | not deposed fact witness records custodian | | |
| **Basil P. Rallis** President and Chief Operating Officer Bayside Communities 2033 North Main Street Suite 340 Walnut Creek, California 94596 W: (415) 644-5880 | former Director for purchaser Cascade Affordable Housing LLC additional connections — may educate jury about all or part of: (1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed fact witness | | |

Appendix 000381

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Susan Weston**<br>The Susan Weston Company<br>2655 Mount View Drive<br>Dallas, Texas 75234<br>W: (972) 308-6092 | former Regional Education Director for American Management Services d/b/a Pinnacle [purchaser's management arm]<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed<br>fact witness | | |
| **Buz Owens**<br>BGO Architects<br>4202 Beltway Drive<br>Addison, Texas 75001<br>W: (214) 520-8878 | former Southwest Housing vendor representative<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus]<br>(2) work and associated savings on claimed compliance issues during due diligence process | not deposed<br>fact witness | | |
| **Aimee Murphree**<br>The Liberty Group<br>5151 Belt Line Road #420 Dallas, Texas 75254<br>W: (972) 458-7666 | former Senior Compliance Administrator for SH Management<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed<br>fact witness | | |
| **Mark Harding**<br>3121 Pinehurst Court<br>Denton, Texas 76210-8689<br>M: (214) 293-0881 | former Senior Director for Maintenance & Training and Vice President of Facilities for Southwest Housing<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed<br>fact witness | | |

Appendix 000382

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| Matthew ("Matt") T. Martin<br>3528 Doris Walker Trail<br>Burleson, Texas 76028-3278<br>H: (817) 478-4506 | former Senior Executive Vice President of AH Construction<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus]<br>(2) Jeff's understanding that he would not have an employment position after the asset sale | not deposed<br>fact witness | | |
| Jeannie Shipley<br>Corporate Entity & Portfolio Specialist<br>Pinnacle Property Management Services LLC<br>5055 Keller Springs Road #400<br>Addison, Texas 75001<br>W: (214) 891-7801 | former Project Coordinator and Custodian of Records for SH Development Finance<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed<br>fact witness | | |
| Suzanne Milch<br>Director of Training<br>Fore Property Company<br>1741 Village Center Circle<br>Las Vegas, Nevada  89134<br>W: (702) 835-1399 | former Director of Compliance & Management Training for Southwest Housing<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) due diligence and other work required to make asset sale happen [explains why defendants could not afford an employee exodus] | not deposed<br>fact witness | | |
| Tammy Holloway<br>Office Manager and Executive Assistant<br>5414 Hewitts Cove<br>Rowlett, Texas 75089<br>H: (972) 203-6268 | former Senior Executive Assistant for SH Development primarily assisting Brian Potashnik | not deposed<br>fact witness | | |

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Deepak Sulakhe**<br>7328 Mimosa Lane<br>Dallas, Texas 75230<br>H: (214) 432-7610 | former Senior Vice President of SH Development | not deposed on oral agreement claim<br><br>deposed on annual bonus claim<br><br>fact witness | | |
| **Brad Bloomer**<br>Business Intelligence Consultant<br>iOLAP<br>2600 Network Boulevard #570<br>Frisco, Texas 75034<br>W: (214) 618-8082 | former Information Technology Manager at Southwest Housing<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) the Information Technology Department's backup — when Jeff's work for sellers was completed — of laptop that Jeff used while working for sellers<br>(2) understanding that Jeff would take the laptop after his work for sellers was completed | not deposed<br>fact witness | | |
| **Mike Uhl**<br>Fitzpatrick Hagood Smith & Uhl, LLP<br>2515 McKinney Avenue<br>Suite 1400<br>Dallas, Texas 75201-7600<br>W: (214) 237-0809 | one of attorneys who represented Brian Potashnik and Cheryl Potashnik in connection with federal investigation and federal criminal indictment | not deposed<br>fact witness | | |
| **Ahhe David Lowell**<br>Chadbourne & Parke LLP<br>1301 Avenue of the Americas<br>New York, New York 10019-6022<br>W: (212) 408-1170 | one of attorneys who represented Brian Potashnik and Cheryl Potashnik in connection with federal criminal indictment and guilty pleas | not deposed<br>fact witness | | |

Appendix 000384

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **James R. "Bill" Fisher**<br>Sonoma Housing Advisors<br>5430 LBJ Freeway, Suite 1200<br>Dallas, Texas 75240<br>W: (972) 663-9368 | former employee of Southwest Housing and former principal in competing company who wore a wire to assist Federal Bureau of Investigation in uncovering events that led to federal criminal charges against Brian Potashnik and Cheryl Potashnik<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) Brian Potashnik's history of entering and refusing to comply with agreements with others when refusal to comply benefits Brian Potashnik | not deposed<br>fact witness | | |
| **Lynn Walsh**<br>Senior Vice President<br>South Coast Partners<br>800 Rockmead Drive<br>Suite 230<br>Kingwood, Texas 77339<br>W: (281) 358-3199 | executive search professional who has worked with Jeff<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) may recall existence of significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale<br>(2) may recall that Jeff would not have an employment position after the asset sale | not deposed<br>fact witness | | |
| **David A. Kunes**<br>Partner<br>Huntington Partners<br>Oakbrook Commons<br>400 Oakbrook Drive, Suite 2102<br>Greensburg, Pennsylvania<br>W: (724) 864-1600 ext. 103 | executive search professional who has worked with Jeff<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) may recall existence of significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale<br>(2) may recall that Jeff would not have an employment position after the asset sale | not deposed<br>fact witness | | |

Appendix 000385

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Elizabeth Evans**<br>Adaptive Advisors<br>3229 Stuart Street<br>Denver, Colorado 80212<br>W: (702) 456-6912 | executive search professional who has worked with Jeff<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) may recall existence of significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale<br>(2) may recall that Jeff would not have an employment position after the asset sale<br>(3) provided Jeff with a compensation chart for his job search | not deposed<br>fact witness | | |
| **Thomas G. Williams**<br>Executive Vice President and Senior Managing Director<br>Specialty Consultants<br>2710 Gateway Towers<br>Pittsburgh, Pennsylvania 15222-1189<br>W: (412) 918-2205 | executive search professional who has worked with Jeff<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) may recall existence of significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale<br>(2) may recall that Jeff would not have an employment position after the asset sale | not deposed<br>fact witness | | |
| **Shirley Steinle**<br>Vice President of Executive Search<br>The Liberty Group<br>7500 San Felipe, Suite 950<br>Houston, Texas 77063<br>W: (713) 961-7666 | executive search professional who has worked with Jeff<br><br>additional connections —<br>may educate jury about all or part of:<br>(1) may recall existence of significant financial incentive for Jeff to stay on as long as needed to help effectuate asset sale<br>(2) may recall that Jeff would not have an employment position after the asset sale | not deposed<br>fact witness | | |
| **Dave Holland**<br>contact information unknown | former employee of AH Construction who defendant-sellers designated as a person with knowledge | not deposed<br>fact witness | | |

Appendix 000386

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Brian Sanford**<br>The Sanford Firm<br>1910 Pacific Avenue<br>Suite 15400<br>Dallas, Texas 75201<br>W: (214) 717-6653 | non-retained expert witness on issue of issue of attorneys' fees hourly rates for this case | not deposed<br>expert witness | | |
| **Douglas Haloftis**<br>Barnes & Thornburg LLP<br>2100 McKinney Avenue<br>Suite 1250<br>Dallas, Texas 75201-6908<br>W: (214) 258-4137 | knowledge of attorneys' fees and expenses for Gardere Wynne work on this case | not deposed<br>fact witness | | |
| **Amy E. Gibson**<br>Gibson Wiley PLLC<br>1500 Jackson St. #714<br>Dallas, Texas 75201<br>W: (214) 522-2121 | witness on issue of attorneys' fees and expenses | not deposed<br>fact witness<br>expert witness | | |
| **David L. Wiley**<br>Gibson Wiley PLLC<br>1500 Jackson St. #714<br>Dallas, Texas 75201<br>W: (214) 522-2121 | witness on issue of attorneys' fees and expenses | not deposed<br>fact witness<br>expert witness | | |
| **Larry Friedman**<br>Friedman & Feiger, LLP<br>5301 Spring Valley Road<br>Suite 200<br>Dallas, Texas 75254<br>W: (972) 788-1400 | knowledge of (1) attorneys' and paralegals' regular hourly rate, reduced hourly rate, and reduced insurance defense hourly rate at Friedman & Feiger, LLP<br>(2) Friedman & Feiger, LLP attorneys' and paralegals' time spent related to Jeff's affirmative claims for relief in this case including defenses to those claims | not deposed<br>fact witness | | |

Appendix 000387

## Postjudgment Interest

| dates of postjudgment interest accrual | beginning on the date the judgment is rendered and ending on the date the judgment is satisfied [11] |
|---|---|
| items of damages or judgment on which postjudgment interest does not accrue | none[12] |
| compounding | compounds annually[13] |
| postjudgment interest rate | 5 percent[14] |

| tax consequences |
|---|

The employer is also responsible for adverse tax consequences that a judgment at trial may cause. Whether and to what extent adverse tax consequences may occur is not known at this time.

---

[11]     *See* Tex. Fin. Code § 304.005.

[12]     *See* Tex. Fin. Code § 304.003(a).

[13]     *See* Tex. Fin. Code § 304.006.

[14]     This is the current rate.
*See* http://www.occc.state.tx.us/pages/int_rates/Index.html.   The rate may change before judgment.

Appendix 000388

| Witness | Connection | Deposition, Type, Probability | Sworn | Testified |
|---|---|---|---|---|
| **Mike Donohue**<br>Friedman & Feiger, LLP<br>5301 Spring Valley Road<br>Suite 200<br>Dallas, Texas 75254<br>W: (972) 788-1400 | knowledge of (1) attorneys' and paralegals' regular hourly rate, reduced hourly rate, and reduced insurance defense hourly rate at Friedman & Feiger, LLP<br>(2) Friedman & Feiger, LLP attorneys' and paralegals' time spent related to Jeff's affirmative claims for relief in this case including defenses to those claims | not deposed<br>fact witness | | |
| **Jason Friedman**<br>Friedman & Feiger, LLP<br>5301 Spring Valley Road<br>Suite 200<br>Dallas, Texas 75254<br>W: (972) 788-1400 | knowledge of (1) attorneys' and paralegals' regular hourly rate, reduced hourly rate, and reduced insurance defense hourly rate at Friedman & Feiger, LLP<br>(2) Friedman & Feiger, LLP attorneys' and paralegals' time spent related to Jeff's affirmative claims for relief in this case including defenses to those claims | not deposed<br>fact witness | | |

Appendix 000389

(f)    **for any testifying expert:**

1.    the expert's name, address, and telephone number;
2.    the subject matter on which the expert will testify;
3.    the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;
4.    if the expert is retained by, employed by, or otherwise subject to the control of the responding party:
       A.    all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and
       B.    the expert's current resume and bibliography:

Jeff Carpenter reserves the right to elicit expert testimony from each witness a Defendant may designate as an expert witness. Jeff does not, in reserving that right, thereby agree that the expert testimony or any report is admissible under Texas Rule of Evidence 702 and opinions interpreting same.

Expert disclosures are not yet due in this case. Jeff identifies the following experts at this time.

Brian Sanford
1910 Pacific Avenue #15400
Dallas, Texas 75201
(972) 372-9200

**Subjects:** Mr. Sanford may testify regarding (1) reasonable hourly rates for Amy E. Gibson and David L. Wiley in this case, and (2) the challenges, complexity, and time investment necessary to prevail in employment cases on behalf of a worker.

**Summary of opinions:** This will be provided at a later date, as

expert disclosures are not due yet.

> Amy E. Gibson
> Gibson Wiley PLLC
> 1500 Jackson St. #714
> Dallas, Texas 75201
> (214) 522-2121

> David L. Wiley
> Gibson Wiley PLLC
> 1500 Jackson St. #714
> Dallas, Texas 75201
> (214) 522-2121

**Subjects:** Ms. Gibson and Mr. Wiley will testify regarding the reasonableness and necessity of attorneys' fees and recoverable expenses for which Defendants are responsible in this case.

**Opinions:** Ms. Gibson and Mr. Wiley have not yet formed an opinion as to the reasonableness and necessity of total attorneys' fees and recoverable expenses for which the employer is responsible in this case, as those attorneys' fees and expenses continue to accrue and some of the relevant factors cannot be assessed at this time. Interim opinions will be provided at a later date, as expert disclosures are not due yet. The current reasonable hourly rate is **$495 per hour**.

The opinions as to the reasonableness and necessity of attorneys' fees will be based on the following factors outlined in Texas Disciplinary Rule of Professional Conduct 1.04: (A) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (B) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (C) the fee customarily charged in the locality for similar legal services; (D) the amount involved and the results obtained; (E) the time limitations imposed by the client or by the circumstances; (F) the nature and length of the professional relationship with the client; (G) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (H) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

The basis for this opinion will also include consideration of billing judgment, completed work in this case for all parties, attorney time records in this case for all parties, various reduced and non-reduced hourly rates of defense attorneys and paralegals in this case, contrast comparisons with studies of hourly rates up to $2,000 per hour, and recent court awards for lawyers in employment cases, such as those that follow.

| RATE PER HOUR | JD YEAR | ATTORNEY NAME | DATE AWARDED | CASE / JUDGE |
|---|---|---|---|---|
| **NORTH TEXAS** | | | | |
| $750 | 1985 | Charla Aldous | 07/27/10 | *Nassar v. University of Texas Southwestern Medical Center*, No. 3:09-CV-1337 [Doc. 160] (N.D. Tex. Dallas) (Judge Jane Boyle), *reversed on other grounds.* |
| $700 | 1979 | Russell W. Budd | 05/08/15 | *Olibas v. Native Oilfield Servs., LLC*, No. 3:11-cv-2388-B [Doc. 302] (N.D. Tex. Dallas) (Judge Jane Boyle) |
| $685 | 1972 | Hal Gillespie | 03/02/12 | *Rush Truck Centers of Texas, L.P. v. Fitzgerald*, No. DC-09-15958-D (95th District Court for Dallas County, Texas) (Judge Ken Molberg) |
| | | | 12/27/13 | *Miller v. Raytheon Co.*, No. 3:09-cv-440-O [Doc. 226] (N.D. Tex. Dallas) (Judge Reed O'Connor) |
| $650 | 1986 | Brian Sanford | 12/28/15 | *Kostić v. Texas A&M Univ. – Commerce*, No. 3:10-cv-02265-M [Doc. 281] (N.D. Tex. Dallas) (Judge Barbara M.G. Lynn) |
| $600 | 1995 | Matthew R. Scott | 01/16/14 | *Green v. Dallas County Schools*, No. DC-12-09857 (162nd District Court for Dallas County, Texas) (Judge Phyllis Lister Brown), *reversed on other grounds.* |
| $550 | 1982 | John E. Wall | 07/16/13 | *B&S Welding, LLC, Work Related Injury Plan v. Oliva-Barron*, No. DC-09-12619-D (95th District Court for Dallas County, Texas) (Judge Ken Molberg) |
| $550 | 1978 | Yona Rozen | 12/27/13 | *Miller v. Raytheon Co.*, No. 3:09-cv-440-O [Doc. 226] (N.D. Tex. Dallas) (Judge Reed O'Connor) |

Appendix 000392

| $500 | 2001 | Brian P. Lauten | 07/27/10 | *Nassar v. University of Texas Southwestern Medical Center*, No. 3:09-CV-1337 [Doc. 160] (N.D. Tex. Dallas) (Judge Jane Boyle), *reversed on other grounds.* |
|---|---|---|---|---|
| $495 | 1995 | J. Derek Braziel | 02/28/13 | *Owens v. Marstek, LLC*, No. 3:11-cv-01435-B [Doc. 26] (N.D. Tex. Dallas) (Judge Jane Boyle) (adopting fees requested in Doc. 24) |
| $495 | 1992 | Robert E. McKnight | 12/28/15 | *Kostić v. Texas A&M Univ. – Commerce*, No. 3:10-cv-02265-M [Doc. 281] (N.D. Tex. Dallas) (Judge Barbara M.G. Lynn) |
| $475 | 1999 | Charles Branham | 04/09/14 | *Parker v. ABC Debt Relief, Ltd.*, No. 3:10-CV-01332-P-BN [Doc. 241] (N.D. Tex. Dallas) (Judge Jorge Solis) |
| $475 | 1994 | Jeffrey Goldfarb | 04/09/14 | *Parker v. ABC Debt Relief, Ltd.*, No. 3:10-CV-01332-P-BN [Doc. 241] (N.D. Tex. Dallas) (Judge Jorge Solis) |
| $450 | 2002 | Joe Gillespie | 08/24/12 | *Black v. Settlepou, P.C.*, No. 3:10-CV-1418-K [Doc. 133] (N.D. Tex. Dallas) (Judge Ed Kinkeade) |
| $450 | 1998 | Barry S. Hersh | 12/28/15 | *Kostić v. Texas A&M Univ. – Commerce*, No. 3:10-cv-02265-M [Doc. 281] (N.D. Tex. Dallas) (Judge Barbara M.G. Lynn) |
| $450 | 1995 | Amy E. Gibson | 12/28/15 | *Kostić v. Texas A&M Univ. – Commerce*, No. 3:10-cv-02265-M [Doc. 281] (N.D. Tex. Dallas) (Judge Barbara M.G. Lynn) |
| $450 | 1993 | Robert Lee | 04/27/15 | *Ramirez v. NTD Group, Inc.*, No. DC-14-03809 (14th Judicial District Court for Dallas County, Texas) (Judge Eric Moye) |
| $437 | 1997 | Peter A. Milianti | 12/23/15 | *McAfee v. Schneider Nat'l Carriers, Inc.*, No. 3:14-cv-1500-P [Doc. 52] (N.D. Tex. Dallas) (Magistrate Judge David Horan) |
| $400 | 2004 | Brent R. Walker | 07/27/10 | *Nassar v. University of Texas Southwestern Medical Center*, No. 3:09-CV-1337 [Doc. 160] (N.D. Tex. Dallas) (Judge Jane Boyle), *reversed on other grounds.* |
| $400 | 1997 | Allen Vaught | 05/08/15 | *Olibas v. Native Oilfield Servs., LLC*, No. 3:11-cv-2388-B [Doc. 302] (N.D. Tex. Dallas) (Judge Jane Boyle) |

| $400 | 1993 | Douglas Welmaker | 12/03/15 | *Mauricio v. Phillip Gaylen, P.C.*, No. 3:14-cv-00064-L [Doc. 41] (N.D. Tex. Dallas) (Magistrate Judge Irma Ramirez) |
|------|------|------------------|----------|------------------------------------------------------------------------|
| $400 | 1993 | Douglas Welmaker | 02/11/15 | *Robinson v. Nexion Health at Terrell, Inc.*, No. 3:12-cv-03853-L-BK [Doc. 56] (N.D. Tex. Dallas) (Magistrate Judge Renee Harris Toliver) |
| $400 | 1992 | David Langenfeld | 12/03/15 | *Mauricio v. Phillip Gaylen, P.C.*, No. 3:14-cv-00064-L [Doc. 41] (N.D. Tex. Dallas) (Magistrate Judge Irma Ramirez) |
| $395 | 1996 | Christine Neill | 11/08/10 | *Wesley v. Yellow Transportation, Inc.*, No. 3:05-CV-2266 [Doc. 234] (N.D. Tex. Dallas) (Judge Sidney Fitzwater) |
| $375 | 2005 | James D. Sanford | 12/27/13 | *Miller v. Raytheon Co.*, No. 3:09-cv-440-O [Doc. 226] (N.D. Tex. Dallas) (Judge Reed O'Connor) |
| $360 | 2003 | M. Jeanette Fedele | 03/02/12 | *Rush Truck Centers of Texas, L.P. v. Fitzgerald*, No. DC-09-15958-D (95th District Court for Dallas County, Texas) (Judge Ken Molberg) |
| $350 | 2009 | Todd Goldberg | 04/09/14 | *Parker v. ABC Debt Relief, Ltd.*, No. 3:10-CV-01332-P-BN [Doc. 241] (N.D. Tex. Dallas) (Judge Jorge Solis) |
| $350 | 2009 | Corinna Chandler | 04/09/14 | *Parker v. ABC Debt Relief, Ltd.*, No. 3:10-CV-01332-P-BN [Doc. 241] (N.D. Tex. Dallas) (Judge Jorge Solis) |
| $350 | 2006 | Jamie J. McKey | 01/16/14 | *Green v. Dallas County Schools*, No. DC-12-09857 (162nd District Court for Dallas County, Texas) (Judge Phyllis Lister Brown) |
| $350 | 2006 | Carmen Artaza | 10/16/14 | *Jones v. Brentwood Healthcare, Ltd.*, No. DC-13-02573 (134th District Court for Dallas County, Texas) (Judge Dale Tillery) |
| $250 | 2012 | Megan Dixon | 04/27/15 | *Ramirez v. NTD Group, Inc.*, No. DC-14-03809 (14th Judicial District Court for Dallas County, Texas) (Judge Eric Moye) |
| $250 | 2011 | Michael L. Parsons | 12/03/15 | *Mauricio v. Phillip Gaylen, P.C.*, No. 3:14-cv-00064-L [Doc. 41] (N.D. Tex. Dallas) (Magistrate Judge Irma Ramirez) |

| $250 | 2011 | David Norris | 12/28/15 | *Kostić v. Texas A&M Univ. – Commerce*, No. 3:10-cv-02265-M [Doc. 281] (N.D. Tex. Dallas) (Judge Barbara M.G. Lynn) |
|------|------|--------------|----------|---|

The opinions as to expenses will be based on expense records in this case for all parties and recoverable expenses under the Texas Rules of Civil Procedure.

**Documents:** These will be provided at a later date, as expert disclosures are not due yet. Those documents may include (1) attorney time records and expense records in this case, redacted to protect privilege and work product and proprietary information (2) various finished work product for tasks performed in the case that has been served or otherwise produced, (3) court opinions and other records in which courts have awarded certain hourly rates for attorneys, samples of which are outlined above, (4) the regular, reduced, and insurance defense hourly rates and attorney time and expense records for defense counsel and paralegals in this case, and (5) manual on complex litigation, which include employment litigation as one of very few categories of complex litigation.

**Resumes and Bibliographies:** Attached

Appendix 000395



**Gibson Wiley PLLC**
ATTORNEYS & COUNSELORS AT LAW



David L. Wiley
Email: david@gwfirm.com

David is a principal in Gibson Wiley PLLC, a law firm dedicated to representing people in disputes with current or former employers. He serves on the Council governing the Labor and Employment Law Section of the State Bar of Texas. He was previously associated with the Commercial Litigation Section of Jenkens & Gilchrist, P.C., in Dallas, Texas and the Litigation Section of King & Ballow in Nashville, Tennessee.

David is a former two-year law clerk to the Honorable Mary Ann Vial Lemmon of the United States District Court for the Eastern District of Louisiana in New Orleans. He is a graduate of the St. Mary's University School of Law in San Antonio, where he served as a Comment Editor on the Editorial Board of the St. Mary's Law Journal. He is also a graduate of Stephen F. Austin State University in Nacogdoches, Texas.

David is licensed to practice law in Texas, Louisiana, and Tennessee. For three consecutive years, the Texas Super Lawyers edition of Texas Monthly Magazine listed him as a "Rising Star" in the field of Plaintiff's Employment Litigation.

He has represented numerous employees in various types of employment litigation. He prefers representing people instead of entities. Over the years, he has represented nurses, police officers, laborers, executives, administrative assistants, lawyers, sales associates, managers, educators, and many, many others. He has presented continuing legal education seminars to other lawyers in the field of employment law for over 15 years.

Appendix 000396

**DATE**   **SPEECH**

09/20/15   Ethics & Professionalism Panel:   What
the Court and Jury See and Hear (co-
presenters Chief U.S. District Judge Fred
Biery and Marcia Jackson of Wick
Phillips Gould & Martin, LLP)

03/11/15   Professionalism:   Dealing with Difficult
Opposing Counsel

01/21/15   Discovery Questions:  What Do You Ask
(co-presenter Shafeeqa Watkins
Giarratani of Norton Rose Fulbright)

03/11/14   Common Written Discovery Issues in
Employment Cases

01/18/13   e-Discovery

09/14/12   Avoiding and Winning Discovery
(co-presenter Shannon Schmoyer of
Schmoyer Reinhard LLP)

01/26/12   Discovery and Common Written
Discovery Issues (co-presenter Shannon
Schmoyer of Schmoyer Reinhard LLP)

03/23/11   Common Discovery Issues in
Employment Litigation (with co-
presenters Enrique Chavez of the
Chavez Law Firm, Shannon Schmoyer of
Schmoyer Reinhard LLP, and Marcia
Jackson of Wick Phillips Gould &
Martin, LLP)



### Gibson Wiley PLLC
ATTORNEYS & COUNSELORS AT LAW



Amy E. Gibson
Email: amy@gwfirm.com
Telephone: (214) 522-2121
Facsimile: (214) 522-2126

Amy is a principal in Gibson Wiley PLLC, a law firm dedicated to representing workers in a wide range of employment and contractor disputes and to representing individuals in health and disability insurance disputes. The firm's clients have ranged from high-level executives to minimum wage workers.

Education
The University of Texas at Austin, B.A. 1991
Baylor School of Law, J.D. 1995
Senior Notes and Comments Editor, Baylor Law Review

Selected Speaking Engagements & Publications
*Pretext*, The University of Texas School of Law, 23rd Annual Labor & Employment Law Conference, May 3-4, 2016, Austin

*Settlement Agreements*, State Bar of Texas, 24th Annual Advanced Employment Law Course, January 14-15, 2016, Dallas

*Retaliation Red Flags: What can help you or hurt you in preventing or proving retaliation?*, The University of Texas School of Law, 22nd Annual Labor & Employment Law Conference, May 12-13, 2015, Austin

*Ethical Issues in Settlement*, Tarrant County Bar Association Labor & Employment Section, December 16, 2014, Fort Worth

*Pitfalls in Settlements: Traps for the Unwary*, State Bar of Texas, 25th Annual Labor & Employment Law Institute, September 19-20, 2014, San Antonio

*Potentially Illegal or Unethical Terms in Settlement Agreements and Negotiations*, National Employment Lawyers Association Dallas-Fort Worth Chapter, June 11, 2014, Dallas

*Whistleblower & Retaliation Law: Selected Developments Including Developing Trends*, The University of Texas School of Law, 20th Annual Labor & Employment Law Conference, May 16-17, 2013, Austin

*Retaliation*, State Bar of Texas Annual Meeting, Labor & Employment Law Section, June 20-21, 2013, Dallas

*Retaliation: Just When You Thought You Knew It All*, The University of Texas School of Law, 18th Annual Labor & Employment Law Conference, May 12-13, 2011, Austin

*Beyond Twombly and Iqbal: Effective Pleading and Discovery Techniques in Employment Cases: Perspective from Plaintiffs' Counsel*, The University of Texas School of Law, 17th Annual Labor & Employment Law Conference, May 20-21, 2010, Austin

*Retaliation Update*, Dallas Bar Association Labor & Employment Section, April 19, 2010

*Statutory Retaliation Provisions*, State Bar of Texas, 18th Annual Advanced Employment Law Course, January 14-15, 2010, Dallas

*Current Retaliation Issues: What Can Help You or Hurt You from the Perspective of Plaintiff's Counsel*, The University of Texas School of Law, 16th Annual Labor & Employment Law Conference, May 28-29, 2009, Austin

*Beyond Burlington Northern: Issues in Retaliation Law*, Texas Lawyer, March 3, 2008

*Cimino v. Raymark Industries: Propriety of Using Inferential Statistics and Consolidated Trials to Establish Compensatory Damages in Mass Torts*, 46 BAYLOR L. REV. 463 (1994)

REPORTER'S RECORD

VOLUME 2 of 11

Trial Court Cause No. CC-08-02072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| Plaintiff, | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) | |
| Defendants. | ) | DALLAS, TEXAS |

TRIAL ON THE MERITS

On the 23rd day of January, 2018, the following proceedings came on to be heard within the presence of a jury, in the above-entitled and -numbered cause; and the following proceedings were had before the HONORABLE MARK GREENBERG, Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

```
 1                        APPEARANCES:

 2

    MS. AMY GIBSON
 3  SBN 00793801
    Gibson Wiley, PLLC
 4  1500 Jackson Street, Suite 714
    Dallas, Texas 75201
 5  (214)522-2121
    Attorneys for Plaintiff
 6
            -AND-
 7
    MR. BRIAN SANFORD
 8  SBN 17630700
    Sanford Firm
 9  1910 Pacific Avenue, Suite 15400
    Dallas, Texas 75201
10  (469)361-9111
    Attorney for Plaintiff
11
            -AND-
12
    MR. LAWRENCE "LARRY" FRIEDMAN
13  SBN 07469300
    MR. MICHAEL DONOHUE
14  SBN 05989380
    MR. JASON FRIEDMAN
15  SBN 24059784
    Friedman & Feiger, LLP
16  5301 Spring Valley Road, Suite 200
    Dallas, Texas 75254
17  (972)788-1400
    Attorneys for Defendants
18
            -AND-
19
    MR. RYAN HALE
20  SBN 24097784
    Hawkins Parnell Thackston & Young, LLP
21  4514 Cole Avenue, Suite 500
    Dallas, Texas 75205-5412
22  (214)780-5138
    Appellate Attorney for Defendants
23


24
    ALSO PRESENT:  Steve Page, AV Technician
25
```

1                              VOLUME 2

2     January 23, 2018                                    PAGE

3     Proceedings ------------------------------------      5

4     Motions in Limine (Cont'd) --------------------       5

5     Court's Rulings --------------------------------     13

6     Witnesses Sworn --------------------------------     17

7     Jury Instructions ------------------------------     25

8     Plaintiff's Voir Dire --------------------------     31

9     Defendants' Voir Dire --------------------------     82

10    Venire Person 24 Excused -----------------------     99

11    Defendants' Voir Dire (Cont'd) ----------------    100

12    Individual Voir Dire ---------------------------    111

13    Jury Strikes -----------------------------------    118

14    Jury Announced and Sworn ----------------------    134

15    Opening Statement by Ms. Gibson ---------------    136

16    Opening Statement by Mr. L. Friedman ----------    151

17    Defendants' Motion to Call Keith Jones --------    168

18    Court's Ruling ---------------------------------    170

19
      PLAINTIFF'S
20    WITNESSES:
                   Direct      Cross    Redirect    Recross
21    Cheryl Geiser   175       ---        ---         ---
      Keith Jones     198       209        227         235
22

23    Defendants' Motion to Disregard ---------------    240

24    Defendants' Motion for Mistrial ---------------    241

25    Court's Ruling ---------------------------------    241

```
1                       VOLUME 2 (Cont'd)

2    January 23, 2018                              PAGE

3    Court's Ruling on Deposition Objections -------    243

4    Adjournment ------------------------------------    243

5    Court Reporter's Certificate ------------------    244

6    Exhibit Certification ------------------------    245

7

8                       EXHIBIT INDEX
                    (FOR PRETRIAL HEARING ONLY)
9
     DEFENDANTS'
10   NO.        DESCRIPTION            OFFERED    ADMITTED

11   1          GMail                    7          7

12   2          Employment Agreement     7          7

13   ********************************************************
     ********************************************************
14
                        EXHIBIT INDEX
15                    (FOR TRIAL ONLY)

16   PLAINTIFF'S
     NO.        DESCRIPTION            OFFERED    ADMITTED
17
     1          Phone Conversations      22         23
18
     2          Employment Agreement     22         23
19
     3          Email                    22         23
20
     4          Severance Allowance List 238        --
21
     5          Amendment to Employment  238        --
22              Agreement

23
     DEFENDANTS'
24   NO.        DESCRIPTION            OFFERED    ADMITTED

25   53         Objections and Responses 222       ---
                to Interrogatories
```

Appendix 000403

```
 1                    P R O C E E D I N G S
 2                    January 23, 2018
 3                    (Conference held off the record)
 4                    MOTIONS IN LIMINE (CONT'D)
 5                    THE COURT:  Go ahead.  You put a good
 6    amount of this on the record yesterday.  Go ahead and make
 7    your argument.
 8                    MR. L. FRIEDMAN:  Is Ryan here?
 9                    MR. DONOHUE:  Yeah.
10                    MR. L. FRIEDMAN:  Let Ryan make it.
11                    You know Ryan Hale, our appellate lawyer.
12                    MR. HALE:  Good morning, Your Honor.
13                    MR. L. FRIEDMAN:  The smartest one in the
14    group.
15                    MR. HALE:  Yes, Your Honor.  So, as you saw
16    in our motion, we really think that presenting evidence of
17    the criminal investigation, the FBI investigation, and the
18    raid or anything related to the criminal proceedings really
19    doesn't have any relevance as to whether the parties
20    actually formed an oral agreement.  If anything, it's, I
21    believe, intended to be inflammatory and just to sort of
22    assume what they're trying to prove in the first place.
23                    THE COURT:  Ms. Gibson?  And you made
24    arguments on this yesterday, too --
25                    MS. GIBSON:  Yes, Your Honor.
```

1        THE COURT:  -- if you want to add anything.

2        MS. GIBSON:  Yes, Your Honor, we made

3    arguments on it yesterday.

4        We attached testimony from the CFO and

5    Cheryl Potashnik.  I, additionally, have a highlighted copy

6    of the telephone transcript.

7        THE COURT:  Of what?

8        MS. GIBSON:  The telephone transcript.

9        THE COURT:  All right.

10       MS. GIBSON:  It's one the parties have

11   agreed to pre-admit.  This is actually my copy, but the

12   transcript shows that -- well, to back up, what happened

13   with the criminal proceedings before that transcript shows

14   why they needed Jeff to stay and other key employees,

15   because of all of the criminal investigation that was going

16   on even pre-indictment.

17       Second, it's part of the work that

18   Jeff Carpenter did in his position for the defendants.  He

19   was working on compliance with subpoenas.  It was a lot of

20   additional work.

21       And the proceedings also explained why the

22   Potashniks backed out.  Jeff Carpenter's work as far as the

23   Potashniks needing him to stay was done on October 31st.

24   And then all of a sudden on November 2nd, which is the date

25   of those transcripts, Brian and Cheryl are now saying, well,

1    we hope we can pay you, but we need to see where this all

2    shakes out because we didn't think we had been indicted.

3              They talked repeatedly about the need to

4    pay for their criminal defense and that they want to make

5    sure they have enough left over for that.  And so it shows

6    the motivation for denying suddenly that there was an

7    agreement.

8              Before -- and recency in time, although

9    criminal proceedings had been going on, the sealed

10   indictment was filed late September.  The arrest warrants

11   were in early October.  They surrendered to authorities in

12   early October and this conversation is happening shortly on

13   the heels of that on November 2nd.

14             The criminal proceedings are so bound up in

15   the facts that I don't even know how -- how we exclude it.

16   I mean, that's the reason the Potashniks gave Jeff, one of

17   the reasons.

18             THE COURT:  All right.

19             All right.  Mr. Hale, anything else?

20             MR. L. FRIEDMAN:  I want to add, for the

21   purposes of this hearing, a copy of the employment contract

22   and a copy of Mr. Carpenter's Email of November 15th, 2007,

23   and ask that they be admitted for the purposes of this

24   hearing only.

25             THE COURT:  Sure.

1          MR. L. FRIEDMAN:  Employment contract is

2    Exhibit 1 [sic] and Mr. Carpenter's Email to Brian and

3    Cheryl, November 15th, 2007, as Exhibit Number 2 [sic].

4                THE COURT:  Okay.

5          MR. L. FRIEDMAN:  So, in response to

6    Ms. Gibson's comment that poor Mr. Carpenter had to do --

7    had to respond to requests by the FBI to -- for information

8    outside the scope of his employment -- can somebody put me

9    on the Elmo?

10          So, I'll call the Court's attention to

11    Mr. Carpenter's signed employment agreement as of February

12    13, 2004.  Paragraph 3 talks about duties.  And for the

13    $200,000-a-year-base annual salary, as you can see in

14    Paragraph 4A, Mr. Carpenter's duties under 3A encompass the

15    following:  Employee shall perform the duties and functions

16    assigned to him from time to time in the sole discretion of

17    the company and shall report to the president of the company

18    or such other person as directed by the president.

19          So the claim that Mr. Potashnik -- which is

20    an unsubstantiated claim, by the way -- but giving

21    Ms. Gibson the benefit of the doubt, even if Mr. Potashnik

22    asked him to respond by way of giving certain information to

23    Department of Justice or the FBI in response to a subpoena,

24    that was encompassed by the duties Mr. Carpenter had under

25    his employment agreement.  That was not extra work.  He

1    didn't get paid extra for that.  That was part of his

2    exorbitant $200,000-a-year salary.

3              In addition, pointing to Exhibit Number 2

4    [sic] for this hearing, to an Email Mr. Carpenter wrote to

5    Brian and Cheryl Potashnik on November 15th, 2007, wherein

6    in the first full paragraph he says -- for the highlighted

7    portion, he says, Last year after the Cascade transaction

8    was announced and it became reasonably clear that I would

9    not be retained after closing of that transaction, you

10   implored me to stay with the company through that time,

11   through the closing; as that continuity and my continued

12   services were essential to the success of that transaction.

13   That was Mr. Carpenter's self-serving language.

14             But nevertheless, he says, In exchange --

15   my comments -- for staying through the closing you informed

16   me that I would be entitled to receive three percent of the

17   proceeds of that transaction, net of certain costs.  Which,

18   based on the structure at that time, it would represent an

19   amount in excess of $1 million.  That is evidence in

20   Mr. Carpenter's own words that his alleged deal was, if he

21   stayed through the closing of the transaction, then he would

22   be entitled to whatever he's alleging he was entitled to.

23   And the undisputed proof is he didn't stay through the

24   closing of the transaction.  He was terminated before, as

25   part of his at-will employment.

1            And he sued the Potashniks a year before

2    the trans -- or six, eight months before the transaction

3    closed.  So nothing to do with the criminal prosecution or

4    indictment or subsequent conviction -- although, I know you

5    ruled on that -- has to do with Mr. Carpenter's alleged oral

6    agreement.  And as Ms. Gibson said yesterday, that it's

7    merely there for prejudicial purposes.

8            THE COURT:  She didn't say that.

9            MS. GIBSON:  Mr. Friedman, I'm sorry.  What

10    Bates were you using on that Email?

11            MR. L. FRIEDMAN:  I'm sorry?

12            MS. GIBSON:  I'm sorry.  Can you tell me

13    what Bates number you were using that from?

14            MR. L. FRIEDMAN:  Here, let me just hand it

15    to you.

16            THE COURT:  All right.  Anything else?

17            MS. GIBSON:  Your Honor, just from our

18    perspective, I mean, certainly they're -- they're going to

19    argue that his salary covered everything, but the original

20    agreement contemplated future separate deals.

21            THE COURT:  Okay.

22            MS. GIBSON:  The contract could be orally

23    modified or have a separate oral deal.

24            MR. L. FRIEDMAN:  So let me address that.

25            MS. GIBSON:  And it's undisputed that he

11

1    stayed as long as --

2                    THE COURT:   What you're addressing,  though,

3    is whether or not there was an -- y'all are just talking

4    about two different things.   We're going to trial on the

5    issue about whether or not there was an agreement.

6                    MR. L. FRIEDMAN:   Yeah, period.

7                    THE COURT:   I know that you're saying that

8    there wasn't; that you're entitled to a directed verdict.

9    If you get a directed verdict, that will put an end to it.

10   But right now, looking at the evidence in the light most

11   favorable to the plaintiff, they have an argument that

12   there's an agreement.   Maybe it's a great argument; maybe

13   it's a lousy argument.   There's some argument.

14                   And so what you're trying to say is that --

15   that none of this goes to the formation of an agreement.

16   That's not her argument about whether or not the criminal

17   proceedings go to the formation of an agreement.   It goes to

18   whether or not there was a motivation for breaking the

19   agreement or for not living up to the agreement.   And the

20   motivation was, according to them -- I'm expressing no

21   opinion on the merits -- was that the company was

22   hemorrhaging money because of the legal fees that they were

23   paying.

24                   MR. L. FRIEDMAN:   All we're saying is if

25   she can make that foundation she has to approach the bench

1    first in order to make and show that she's made that

2    foundation.  We don't even think she could make that

3    foundation, Judge.  And we think to blurt it out in opening

4    before she knows she can't prove it or before we know she

5    can't prove it --

6              THE COURT:  But if she can't make that

7    foundation then it'll never get to the jury.  It would be a

8    directed verdict, just like you're saying, because they've

9    never established there is an agreement.

10             MR. L. FRIEDMAN:  We're talking about two

11   things.  We're talking about two things.  We're talking

12   about her -- Mr. Carpenter's failure to establish there was

13   an oral agreement.  But in order to get there we're talking

14   about Mr. Carpenter's attempt to prejudice the jury by

15   trying their case about this criminal conviction.  And

16   that's all they're going to try is there was a criminal

17   conviction, there was a criminal investigation, there was

18   this, this, this, criminal, criminal, criminal, criminally,

19   and ignore -- virtually ignore the alleged oral agreement.

20   And we're saying that the probative value is outweighed by

21   the prejudicial effect of all this talk about something that

22   has nothing to do with the oral agreement.

23             THE COURT:  Okay.  Well, anything else?

24             MS. GIBSON:  No, Your Honor.  I mean, what

25   we've provided you is from the mouths of the defendants.

1               COURT'S RULINGS

2          THE COURT:   All right.

3               Okay, the motion in limine is denied as its

4     phrased.  To the extent that they're -- you know, like, you

5     have a transcript like this where you have testimony that

6     they were hemorrhaging money or that they weren't satisfying

7     their obligations because of legal fees, you can go into

8     that.

9               As to the detail and the facts of the

10    criminal proceeding, there's no reason to go into that other

11    than what the conviction was for Mr. Potashnik.  But don't

12    want to try the merits of the underlying or collateral

13    criminal proceeding.  It was a good lawsuit or it was a bad

14    lawsuit, who knows.  Whatever it was, you have to defend

15    yourself when there's a lawsuit.  So we're expressing no

16    opinion on the merits of the criminal proceeding.

17              Maybe it was a witch hunt.  Maybe he pled

18    guilty because that was the --the only -- you know,

19    sometimes, like the judge in Collin County who was faced

20    with either pleading guilty or losing her children, I mean,

21    what was she supposed to do?  Now, you know, she's been

22    exonerated.

23              But we'll stay out of the details of the

24    criminal proceedings as much as we can.  To the extent that

25    you're arguing they were hemorrhage money, that's fair game.

```
 1                    MR. L. FRIEDMAN:  Thank you.
 2                    THE COURT:  And --
 3                    MR. L. FRIEDMAN:  Let me just note a record
 4      objection.
 5                    THE COURT:  That note for the record?
 6                    MR. L. FRIEDMAN:  An objection about any
 7      mention about criminal.
 8                    THE COURT:  Oh, sure.  Absolutely.
 9                    MR. L. FRIEDMAN:  Thank you.
10                    THE COURT:  And let's have a -- an
11      agreement on the record that you can have a running
12      objection as to any matters that I've ruled on already,
13      including this.  And you can check with your appellate
14      counsel and make sure that preserves your record that you
15      have a running objection on all of this.
16                    MR. L. FRIEDMAN:  I would also ask for a, I
17      suppose, a running motion for mistrial.
18                    THE COURT:  Right.  And you can have a
19      running motion from there.  And then you can bring it up
20      periodically, you know, after the first couple days.  Say
21      this is what I'm talking about, you have a running motion
22      for mistrial, here's -- here's what happened, just like I
23      said it would.  And -- and I know you tried, meaning me, but
24      you just, you know, weren't following my argument.  Here it
25      is.
```

1                    You can have a running motion on that.

2                    MR. L. FRIEDMAN:  Thank you.

3                    MR. HALE:  Your Honor, we also have a

4    running objection.  Can we just clarify it's to each

5    witness, argument, and all evidence offered?

6                    THE COURT:  Say that again.

7                    MR. HALE:  I'm sorry.  I just wanted to

8    clarify that the running objection will be as to all

9    witnesses --

10                   THE COURT:  Exactly right.  Exactly right.

11                   MR. HALE:  Okay.

12                   MR. L. FRIEDMAN:  And one more thing.  So,

13   we are willing to try the attorneys' fees matter

14   separately --

15                   THE COURT:  All right.

16                   MR. L. FRIEDMAN:  -- before the Court --

17                   THE COURT:  All right.

18                   MR. L. FRIEDMAN:  -- without a jury.

19                   THE COURT:  Good.

20                   MR. L. FRIEDMAN:  You asked yesterday to

21   check with the clients' advice.

22                   THE COURT:  And I appreciate that.  We'll

23   do that.

24                   MR. L. FRIEDMAN:  I'm authorized and I've

25   advised the Court.

 1                      THE COURT:  Okay.  I appreciate that.
 2                      MR. L. FRIEDMAN:  And I'm not sure.  I'll
 3      see how the testimony goes, but at this point I'm inclined
 4      to save my case until after the close of plaintiff's case.
 5                      THE COURT:  All right.  Okay.
 6                      MR. L. FRIEDMAN:  If that changes, I'll
 7      advise the Court.
 8                      THE COURT:  All right.  Fair enough.
 9                      MR. DONOHUE:  Your Honor, one more thing.
10      We have a witness that came in today that would like to be
11      sworn in.
12                      THE COURT:  All right.  Is that --
13                      MR. DONOHUE:  Deepak Sulakhe.
14                      THE COURT:  All right.
15                      MR. DONOHUE:  I'll bring him in.
16                      THE COURT:  All right.
17                      MS. GIBSON:  And, Your Honor, may I check,
18      also?  I believe we had someone who was supposed to be here
19      this morning.
20                      THE COURT:  Sure.
21                      (Deepak Sulakhe entered the courtroom.)
22                      THE COURT:  All right, if you'd come all
23      the way up here.
24                      And tell me your name.
25                      THE WITNESS:  Deepak Sulakhe.

```
1                    THE COURT:  D-e-p-a-k?
2                    THE WITNESS:  D-e-e-p-a-k.
3                    THE COURT:  All right.  And what's the last
4    name?
5                    THE WITNESS:  S-u-l-a-k-h-e.
6                    THE COURT:  -k-h-e.  Sulakhe.
7                    And what's your name?
8                    THE WITNESS:  Keith Jones.
9                    THE COURT:  Okay, I'm going to swear you in
10   as a witness first and then I'll explain the importance of
11   having sworn you in.  If you'd raise your right hand, an
12   appropriate response to this oath is I do or I will.
13                   (Deepak Sulakhe and Keith Jones sworn)
14                   THE COURT:  All right.  And you both have
15   been subpoenaed to appear here today.  Your testimony won't
16   be called here for today, but once you're subpoenaed you
17   have to agree to come back when you're contacted and told to
18   come back.  Or the alternative is you have to stay here day
19   to day till it's your turn to testify.  I never had anyone
20   say they wanted to stay here day to day till testifying, so
21   I take it your agreement is to come back when the attorneys
22   contact you --
23                   MR. SULAKHE:  Sure.
24                   THE COURT:  -- to tell you that it's your
25   turn to testify.
```

Appendix 000416

1              So that's one thing is you're agreeing to

2    that.  And the other thing is that the attorneys invoked the

3    rule that prohibits witnesses from speaking with each other

4    about the facts of the case as long as they are witnesses.

5              I don't know whether you-all know each

6    other or not.  But if you do or if you know other witnesses

7    who are testifying, you cannot contact them, you know, after

8    they testify and say, "What did they ask you?  What did you

9    tell them?"

10             The only people you can talk to about the

11   facts of the case are the attorneys.  And it's up to you

12   whether you want to talk to the attorneys or not.  If you

13   want to, you're welcome to; if you don't want to, tell them

14   you don't want to talk to them.  Hundred percent up to you.

15             Can these witnesses be excused?

16             Do you have a contact number?

17             MR. SULAKHE:  Yeah.

18             THE COURT:  Let me get -- Mr. Sulakhe,

19   what's your contact number?

20             MR. SULAKHE:  (214)632-1565.

21             MR. L. FRIEDMAN:  632-1565?

22             THE COURT:  Yeah, -1565.

23             Mr. Jones?

24             MR. JONES:  (469)585-6064.

25             MR. L. FRIEDMAN:  585-6064?

1                    MR. JONES:  Yes, sir.

2                    THE COURT:  All right.

3                    MR. L. FRIEDMAN:  And it's my

4     understanding -- I may be wrong about this -- that Mr. Jones

5     will be taken out of order.

6                    THE COURT:  Was this Mr. -- were you the

7     CFO?

8                    THE WITNESS:  Yes.

9                    THE COURT:  You may be testifying today,

10    though.

11                   THE WITNESS:  Yes.

12                   THE COURT:  Are you leaving?

13                   THE WITNESS:  I'm on vacation tomorrow.

14                   THE COURT:  Okay.

15                   MS. GIBSON:  To Canada.  So we --

16                   MR. L. FRIEDMAN:  Oh, well, Canada, that

17    doesn't count.

18                   MS. GIBSON:  -- we hope to call Mr. Jones

19    out of order second.  And if -- if something happens, we'd

20    call him later by video, but we'd prefer that he be called

21    live.

22                   THE COURT:  Well, can he return in, you

23    want to say, in three -- how long will you be with

24    Ms. Geiser?

25                   MS. GIBSON:  I would say, probably, maybe

1     an hour or so hour, hour or two.  I would say two is a safer

2     time.

3                     MR. L. FRIEDMAN:  Here's my request.

4     Number one, that we allow Mr. Jones to escape to his

5     vacation.

6                     THE COURT:  Well, she's agreed to that.

7     She said if she doesn't get to him today that she'll do him

8     by videotape.

9                     MR. L. FRIEDMAN:  But, number two, we would

10    call him in our case in chief.  Therefore, I would call him

11    out of order today live and then let him -- and then excuse

12    him as a witness.  So, either way, we would want him today

13    out of order.

14                    THE COURT:  Well, you should put him on

15    first then.  And we can't get the jury -- or if we don't

16    start evidence till, say, 3:00 o'clock, then --

17                    MR. L. FRIEDMAN:  Yeah.

18                    MS. GIBSON:  Your Honor, it's important.

19    I'm sorry.  It's important to us that our first witness be

20    the first witness.

21                    THE COURT:  All right.

22                    MS. GIBSON:  Otherwise, I would move

23    Mr. Jones first.

24                    THE COURT:  All right.  We'll see.

25                    If you'll just be on hand, someone will

1    call you and ask you to come back today at 3:00 or 3:30 or
2    call you and tell you that we're not going to get to you
3    today.  Somebody will call you today.
4                        THE WITNESS:  Okay.
5                        THE COURT:  All right.
6                        All right.  And if you testify,
7    Mr. Sulakhe, I believe it will be toward the end of the
8    case, which will probably be a couple weeks.
9                        You were saying if he's called it'd be in
10   rebuttal.
11                       MS. GIBSON:  I may.  I believe he is being
12   called in defendants' case in chief.
13                       THE COURT:  Okay.
14                       MR. DONOHUE:  That's correct.
15                       THE COURT:  All right.
16                       All right.  Somebody will call you next
17   week, probably Mr. Donohue.
18                       MR. SULAKHE:  Thank you.
19                       MR. JONES:  Thank you.
20                       MR. L. FRIEDMAN:  Thank you.
21                       (Mr. Jones and Mr. Sulakhe exited the
22                       courtroom.)
23                       MS. GIBSON:  Your Honor, may I grab that
24   transcript back?
25                       THE COURT:  Yeah, you sure can.

1                    MS. GIBSON:  I'm sorry.

2                    THE COURT:  And we're off the record.

3                    (Off the record)

4                    (Recess taken)

5                    MS. GIBSON:  I'm sorry.  I think we have

6      just, like, three exhibits to pre-admit.

7                    THE COURT:  All right.

8                    MS. GIBSON:  I apologize.

9                    One -- and if y'all will confirm this is

10     Plaintiff's Exhibit 1 -- these are transcripts of a

11     telephone recording.  Also, Exhibit 2, which is the

12     employment agreement.  I believe Plaintiff's 3 is the Email

13     from Cheryl.

14                    Mike, will you double check and confirm

15     that for me that we agreed on Plaintiff's 3?

16                    MR. DONOHUE:  Yeah.

17                    We have no objection to this.

18                    THE COURT:  And you didn't have an

19     objection to 1 or 2?

20                    MR. DONOHUE:  I'm sorry.  What was 1?

21                    THE COURT:  The transcript between

22     Potashnik --

23                    MR. L. FRIEDMAN:  The uncertified

24     transcripts --

25                    MR. DONOHUE:  No objection.  They are what

```
1    they are.
2                    THE COURT:   They are what they are.   I
3    agree.
4                    One, two, and three are admitted.
5                    MS. GIBSON:   And I believe that is it for
6    this morning.
7                    THE COURT:   Very good.
8                    MR. L. FRIEDMAN:   And, Your Honor, may I
9    approach and hand you the two exhibits that were admitted on
10   the motion in limine?
11                   THE COURT:   For the reporter's record.
12                   (Off the record)
13                   (Recess taken)
14                   (The jury entered the courtroom.)
15                   THE COURT:   Good morning, ladies and
16   gentlemen.
17                   (No response)
18                   THE COURT:   Let me try again.   Good
19   morning, ladies and gentlemen.
20                   (The jury panel responded.)
21                   THE COURT:   My name is Mark Greenberg.   I'm
22   the presiding judge in this court.   Welcome to County Court
23   at Law Number 5.
24                   The case before you is the case of
25   Jeffrey Carpenter vs. Southwest Housing and several other
```

24

1    defendants.

2                    The first thing we'll do is ask the

3    attorneys to introduce themselves and tell you who they

4    represent.  We're going to start over here to your left with

5    Ms. Gibson.

6                    MS. GIBSON:  Amy Gibson and Brian Sanford,

7    and we represent Jeff Carpenter.

8                    THE COURT:  All right.  Thank you.

9                    Mr. Friedman.

10                   MR. L. FRIEDMAN:  My name is

11   Larry Friedman.  My law firm is Friedman & Feiger.  I

12   represent Cheryl Potashnik Geiser.  I represent

13   Brian Potashnik.

14                   Did I say that right?

15                   I represent Cheryl Geiser Potashnik, both

16   of them, Geiser Potashnik and Potashnik Geiser.  And I

17   represent Southwest Housing Management, Southwest Housing

18   Development, and Affordable Housing Construction.  And with

19   me today are my two good partners, Michael Donohue and

20   Jason Friedman, who is also my son.  And we have issues.

21                   (Laughter)

22                   THE COURT:  All right.  Thank you, Counsel.

23                   MR. L. FRIEDMAN:  This is Steve Page.  He's

24   our presentation specialist.

25                   THE COURT:  All right.  Thank you.

Appendix 000423

```
 1                    JURY INSTRUCTIONS
 2              THE COURT:  And let me introduce you --
 3    you've already met our bailiff, Rick Wilson -- let me also
 4    introduce you to Vikki Ogden, who's over here to your left,
 5    our left.  Vikki's the court reporter for this trial.  She's
 6    the official court reporter for this court.  It will be her
 7    job to transcribe all the proceedings, including everything
 8    that happens during this jury selection process.  So during
 9    the course of this proceeding, if she doesn't hear one of
10    your responses, she may ask you to speak up or to hold up
11    your number so she can make sure that she gets everything
12    taken down.
13              The -- when people come into the
14    courtroom -- and I know it's already been a little bit of a
15    long morning for you -- the things they want to know are
16    these:  They want to know what type of case this involves.
17    This is a business dispute.  The attorneys will tell you a
18    little bit more about the nature of the case when they give
19    you -- when they start their portion of the jury selection
20    when they ask you questions.  In order to put their
21    questions in some perspective to the jury they will give you
22    a little bit of a background of what their contentions are
23    in the case.
24              But the purpose of jury selection is not to
25    go into details about facts of the case, so you really won't
```

1   learn the entire nature of the case until after we pick the

2   jury and we have the opening statements.  But you'll hear a

3   little bit about the nature of the case once the attorneys

4   begin their portion of jury selection.

5            The second thing the people who come in

6   here want to know is how long the trial will be.  The trial

7   is going to be seven to ten days.  I know that's a long

8   time, but this is a complex case.  It involves a substantial

9   amount of issues.  And I've spent a good amount of time with

10  the attorneys and I believe that that's a fair estimate.

11           That is just an estimate, though.  It's

12  hard to predict the length of the trial.  We haven't tried

13  this case a previous time to be able to time out and measure

14  it.  It really depends on a lot of different factors.  But

15  if their estimate is seven to ten days, we're in trial

16  Monday through Thursday, four days a week.  So if it does go

17  past the seven days or eight days it will probably go into a

18  third week.

19           The earliest we ever start is 9:00 o'clock.

20  Sometimes we start at 9:30 in the morning and the latest we

21  ever go is 5:30 in the afternoon; although, we prefer to

22  stop by 5:00 o'clock or before 5:00 o'clock.  But if we

23  start late some days because of other proceedings in the

24  court, at 9:30 -- I'll start at 9:30.  Then we may go past

25  5:00 o'clock.

1            So the one thing you want to know is the

2    nature of the case.  Can't tell you too much right now about

3    that.  The second thing you want to know is how long the

4    trial is.  I can only give you a rough estimate there.  Then

5    the third thing people want to know is how long will you be

6    there on those hard benches.  That's also a little bit up in

7    the air.

8            In just a minute we're going to start the

9    jury selection process.  Each attorney will have one hour to

10   ask you questions.  We're going to have a lunch break in

11   between.

12           We're going to start off with Ms. Gibson.

13   We'll see what time she finishes.  Then we may start

14   Mr. Friedman's portion of jury selection.  And we'll break

15   his up.  We'll take a lunch break.  And when you come back

16   from the lunch break we'll finish up the examination.

17           The reason I can't tell you exactly how

18   long the process will take is we don't know how many people

19   we're going to need to talk to after the attorneys finish

20   their portion of jury selection.  For example, because of

21   the length of the trial, some of you will have some

22   conflicts that prevent you from serving the length of the

23   trial.  We want to hear what you have to say, but we need to

24   talk to you individually about that.  So those type of

25   things depend on how many people we need to talk to.

1        But remember throughout the course of the

2   jury selection that we will talk to you individually after

3   the attorneys ask questions.  So if there's something on

4   your mind, if you don't want to answer a question that they

5   ask if it involves some matter of privacy or if you're

6   really worried about the length of the trial and you have

7   some conflicts, you have small children at home who might be

8   unattended, we're going to talk to you after the attorneys

9   finish asking all of their questions.

10       So those are the three things people want

11  to know most.  And I know it's a little bit frustrating that

12  I didn't give you a really solid answer to any of those

13  three things, but that's the nature of lawsuits.

14       This portion of trial is referred to as

15  jury selection.  You may have heard the term downstairs,

16  "voir dire", and they both mean jury selection.  This is the

17  portion of the trial where the attorneys spend some time

18  with you to make sure there's nothing about this particular

19  case that makes it difficult for you to be a fair and

20  impartial juror.

21       When you were down in the central jury room

22  they played a video.  If you watched that video, you saw

23  that a retired judge swore in a mock jury.  If you watched

24  that, you saw that there was three parts to the juror's

25  oath.

1          The juror's oath is that you will render a

2     true verdict.  A true verdict is a good-faith verdict on

3     your part.  It's a verdict that is accurate, as best you can

4     determine what is accurate.  It is not a rush to judgment.

5     It is not a verdict based upon a coin flip or any method of

6     chance.

7          These parties have been waiting a long time

8     for their day in court.  What they deserve is a jury who

9     will render a true verdict and not a rush to judgment.

10          The second part of the juror's oath is that

11    you will base your verdict only on the evidence presented

12    during the course of the trial.  The evidence is sworn

13    testimony that comes from the witness stand or documents

14    admitted into evidence.  So, the attorneys may want to ask

15    you a few questions to make sure there's nothing about this

16    particular case that makes it difficult for you to base your

17    verdict only on the evidence; that you don't have some

18    knowledge of the facts in this case from outside the

19    evidence that might sway your decisions in this case.

20          And the third part of the juror's oath is

21    that you will follow the law as given to you by the Court.

22    Throughout the course of the trial and particularly at the

23    end of the case I will give you instructions in law.

24          At the end of the case I'll give you what's

25    called the charge of the Court.  The charge of the Court

1    will have all the legal instructions and definitions that

2    you will need to know in order to answer jury questions.

3    And it's your answers to the jury questions that make up the

4    verdict, and then I take your verdict and convert that to a

5    judgment.  But the instructions and definitions that I give

6    you in the jury form are not mine or this court only.

7    They're the law that applies to all cases like this that are

8    tried in the state of Texas.

9                    Just as an example, one of the instructions

10   I will give you is what the burden of proof is.  I will tell

11   you that the burden of proof, in order to even answer a

12   question yes, you must find that the yes answer is supported

13   by a preponderance of the evidence.  And I will give you a

14   definition of preponderance of the evidence.  It means the

15   greater weight and degree of credible or believable

16   evidence.  For you to find that a fact is true, you must

17   find that it is more likely true than not true.

18                    So, the attorneys may want to ask you

19   questions to make sure that you will follow the evidence --

20   the law in the case, this case.  And remember the law in

21   this case is the very same law that applies throughout cases

22   like this throughout the state of Texas.  So, even if you

23   think the law should be different, recognize that these

24   attorneys have instructed their clients in a valiant way to

25   their case with the idea that this jury will follow the law

1    in the case just as I'm sworn to do, just as they're sworn

2    to do, also.

3                    Again, each side will have one hour to ask

4    you questions.  When they ask you questions they're not

5    trying to pry.  They're trying to represent their clients.

6    And they will, of course, represent their clients with great

7    skill and distinction.

8                    When they ask a question there is no right

9    answer to their question.  There's no wrong answers.

10   There's only honest answers.  The best way for you to help

11   these attorneys represent their clients is for you to give

12   them honest answers to their questions.

13                   So, I've taken up enough of your time.  We

14   want to get the process started.

15                   The attorney for the party that brings the

16   lawsuit, the party with the burden of proof, gets to go

17   first in asking questions during jury selection or on voir

18   dire examination.  Ms. Gibson represents Mr. Carpenter, so I

19   will turn it over to her and let her begin asking questions.

20                   (Prospective Juror 5 was dismissed in

21                    the central jury room.)

22                   PLAINTIFF'S VOIR DIRE

23                   MS. GIBSON:  Thank you.

24                   Good morning.

25                   (The jury panel responded.)

1              This case is a business dispute over some

2      handshake agreements.  And I'm not going to go into a lot of

3      the facts or the details of the case.  Is that okay with

4      y'all?

5              So what do you think is going to happen now

6      at this stage during jury selection?  Does anyone think that

7      I am going to drag private stuff out of you?  Okay.  If

8      anyone does, that's understandable.  But here's the deal:

9      If I ask any question and the answer is too private, you

10     know, don't go there, you let me know and I will not dig in

11     or go further.

12             Is there anyone here who thinks I'm not

13     doing my job if I don't dig into that personal private stuff

14     that somebody doesn't want to talk about?  All right, I see

15     no hands.

16             As you heard, Judge Greenberg has given me

17     a limited amount of time to question you.  So, is it okay

18     with you if I don't specifically ask each person each

19     question and don't get to talk to all of you an equal amount

20     of time?  Is that okay?

21             I'm first going to ask just about if anyone

22     personally knows any of the people who might be involved in

23     this case.

24             (Several "no" responses made by the panel)

25             VENIRE PERSON 4:  Yes.

```
 1                        MS. GIBSON:  I hear yes?
 2                        VENIRE PERSON 4:  Yes, ma'am.
 3                        MS. GIBSON:  Okay.  Who do you know?
 4                        VENIRE PERSON 4:  Steve Page.
 5                        MS. GIBSON:  Yes, the wonderful IT person
 6      who works for Friedman Feiger.
 7                        MR. L. FRIEDMAN:  He's fired.
 8                        (Laughter)
 9                        MR. L. FRIEDMAN:  Take your stuff.
10                        MS. GIBSON:  And how do you know each
11      other?
12                        THE COURT:  Ms. Gibson, when -- when they
13      respond to you be sure and get their number.
14                        MS. GIBSON:  I'm sorry.
15                        VENIRE PERSON 4:  I'm sorry.
16                        MS. GIBSON:  Could you raise --
17                        VENIRE PERSON 4:  Yes, ma'am.
18                        (Venire Person 4 raised his number.)
19                        MS. GIBSON:  Number 4.
20                        And what's your relationship?
21                        VENIRE PERSON 4:  Steve and I are part of a
22      organization that does charitable work for Lucas Stone that
23      does film and Disney, and he also went to high school with
24      my sister.
25                        MR. L. FRIEDMAN:  I can't hear.
```

```
 1                    THE COURT:  Okay.  Would you --
 2                    MS. GIBSON:  I believe you said he also
 3      went to high school with your sister.
 4                    VENIRE PERSON 4:  He went to high school
 5      with my sister.
 6                    MS. GIBSON:  And they do charitable work
 7      with Lucas Stone and?
 8                    VENIRE PERSON 4:  501st Legion.
 9                    MS. GIBSON:  And do you -- and if you were
10      in the -- if you were in the plaintiff's shoes in this case,
11      would you want you on this jury?
12                    VENIRE PERSON 4:  I might question it.
13                    MS. GIBSON:  Okay.  And why is that?
14                    VENIRE PERSON 4:  Just out of my friendship
15      with Steve.
16                    MS. GIBSON:  Anyone else already know
17      someone in the case?
18                    Y'all aren't going to be able to see this,
19      are you?
20                    THE COURT:  Some of them will.  They can
21      see it on --
22                    MS. GIBSON:  Anyone know Jeff Carpenter,
23      Brian Potashnik, Cheryl Potashnik, also known as
24      Cheryl Geiser, Jason Friedman, Larry Friedman, Mike Donohue,
25      Amy Gibson, David Wiley, Gibson Wiley law firm,
```

```
1    Brian Sanford, David Norris, Jennifer Birdsall, Sanford law
2    firm?
3                    Anyone know anyone who has worked for
4    Southwest Housing Development, Southwest Housing Management,
5    Affordable Housing Construction, a company known as
6    Pinnacle, a company known as Cascade?
7                    Does anyone know Aaron Goldstein,
8    Dave Holland, Debbie Workman, Deepak Sulakhe, Devona Gray,
9    Jeff Richards, Jeanie Shipley, Julie Mingus, Keith Jones?
10                   VENIRE PERSON 20:  I know Julie Mingus --
11                   MS. GIBSON:  Okay.  And how do you know --
12                   VENIRE PERSON 20:  -- if it's the same
13   Julie Mingus.
14                   We worked at an accounting office together,
15   if she's an accountant, if she's the same Julie Mingus.
16                   MS. GIBSON:  Can you show us your number?
17                   (Venire Person 20 complied.)
18                   MS. GIBSON:  Number 20.
19                   And if you -- do you think that knowing her
20   would have any impact on how you view this case?
21                   VENIRE PERSON 20:  I don't think so.
22                   MS. GIBSON:  So, if she testified for one
23   side or the other, that wouldn't affect how you view the
24   case?
25                   VENIRE PERSON 20:  I don't think so.
```

1              MS. GIBSON:  Keith Jones, Lori Myer,

2      Mark Jones, Matt Kelly, Matt Martin, Paul Cohen, Rick Graf,

3      Sara Reidy, Vikki Carpenter?

4              And does anyone recognize anyone else in

5      the courtroom sitting in the jury box?  Okay, I see no

6      hands.

7              The next question I'd like to ask you is --

8      to help me get to know a little bit about you, this question

9      is about your passion.  Now, I've been doing this awhile,

10     and most people honestly answer this question with their

11     passion being God or spirituality and their family.  But

12     with all due respect to those passions, what I'm asking is

13     more what's your next passion.  If you had no other

14     obligations, what would you choose to do all day?

15             I'm going to start with Juror Number 1.

16             VENIRE PERSON 1:  Well, I'm retired, so I

17     watch a lot of DVDs and I do a lot of reading.

18             MS. GIBSON:  What kind of DVDs?

19             VENIRE PERSON 1:  Generally, a lot of BBC

20     crime dramas.

21             MS. GIBSON:  And what does that passion

22     tell us about you?

23             VENIRE PERSON 1:  Well, I'm an attorney, so

24     anything that involved the law is of interest to me.

25             MS. GIBSON:  Okay.

```
 1                      Does anyone else share a similar passion?

 2                      Okay, let's -- how about Juror Number 6?

 3                      VENIRE PERSON 6:   Mountain living.

 4                      MS. GIBSON:   What is it?

 5                      VENIRE PERSON 6:   Mountain living.

 6                      MS. GIBSON:   Mountain living.

 7                      VENIRE PERSON 6:   Yes.

 8                      MS. GIBSON:   Okay.   Anything in particular

 9    about that?

10                      VENIRE PERSON 6:   I just like the solitude.

11                      MS. GIBSON:   Okay.   So you're pretty much

12    miserable right now.

13                      VENIRE PERSON 6:   Nature.

14                      MS. GIBSON:   Okay.

15                      Anyone share a similar passion for

16    outdoors?

17                      Juror 14, tell us about yours.

18                      VENIRE PERSON 14:   I like horseback riding.

19                      MS. GIBSON:   Horseback riding.

20                      And over here, Juror 19?

21                      VENIRE PERSON 19:   Yeah.   I just like being

22    outside.

23                      MR. GIBSON:   And who else?   Yes, Juror 4.

24                      VENIRE PERSON 4:   I have a ranch.   I'm

25    outside.
```

```
1                      MS. GIBSON:  I'm sorry?
2                      VENIRE PERSON 4:  I have a ranch.
3                      MS. GIBSON:  Oh, a ranch.  And what do you
4       do?
5                      VENIRE PERSON 4:  We raise cattle.
6                      MS. GIBSON:  Raise cattle.  Okay.
7                      Anybody else?  Yes?
8                      VENIRE PERSON 21:  My wife bought me a bike
9       to get into.  I'm retired, so I've been spending a lot of
10      time doing endurance riding, and I just love it.
11                     MS. GIBSON:  Who else?  Yes?
12                     VENIRE PERSON 23:  I've been doing
13      whatever, 'cause I took a year off college and been driving
14      around different states.
15                     MS. GIBSON:  Anyone else?  Yes?
16                     VENIRE PERSON 7:  Motorcycle riding.
17                     MS. GIBSON:  And where do you like to go
18      ride?
19                     VENIRE PERSON 7:  Wherever the road takes
20      me.  There's never a destination.  It's just the ride.
21                     MS. GIBSON:  And what does that -- what
22      does that tell us about you?
23                     VENIRE PERSON 7:  Exploring new places.  I
24      want to be places.
25                     MS. GIBSON:  Anyone else have a passion for
```

1    motorcycle riding or just exploring new places?  Yes.
2    Juror 12?
3                    VENIRE PERSON 12:  Yes.  I enjoy traveling,
4    going around the world.
5                    MS. GIBSON:  Anybody else?  Yes.  Juror 9?
6                    VENIRE PERSON 9:  Yes.  I also enjoy
7    international travel.  I have a fascination.
8                    MS. GIBSON:  And what are some examples of
9    places you'd like to go?
10                   VENIRE PERSON 9:  I'd like to travel around
11   Europe.  I've been to Japan a few times and southeast Asia.
12                   MS. GIBSON:  And I apologize that I'm
13   calling y'all by numbers, but I just cannot memorize all
14   these names.
15                   So, how about you, ma'am?  What's your
16   passion?
17                   VENIRE PERSON 10:  I'm a retired funeral
18   director in embalmment, and my passion is with the death and
19   dying industry.
20                   MS. GIBSON:  And what -- what does that
21   tell us about you?
22                   VENIRE PERSON 10:  I work in a field where
23   death occurs and I have a grief support in our church that I
24   work faithfully with, and trying to help comfort the persons
25   or people that have had a loss.

1                     MS. GIBSON:  Wonderful.

2                     Anyone else share a similar passion of

3      helping other people through grief or loss or anything

4      similar?  Yes?

5                     VENIRE PERSON 12:  I'm a doctor, so I do

6      that a lot.

7                     MS. GIBSON:  What kind?

8                     VENIRE PERSON 12:  I do a fellowship in

9      palliative care, which is hospice care.

10                    MS. GIBSON:  Anybody else?

11                    MR. L. FRIEDMAN:  I'm sorry.  I didn't hear

12     what kind of care.

13                    VENIRE PERSON 12:  Palliative care.

14                    MS. GIBSON:  Yes, Juror 8?

15                    VENIRE PERSON 8:  Huh?

16                    MS. GIBSON:  I'm sorry.  I'm just saying

17     the number.

18                    VENIRE PERSON 8:  All right.

19                    My passion is going to work every day,

20     because we make breast implants for the body and we, you

21     know, do a lot of good for humanity.

22                    MS. GIBSON:  And is that for cancer --

23                    VENIRE PERSON 8:  Yeah.

24                    MS. GIBSON:  -- patients?

25                    VENIRE PERSON 8:  Yes.

```
 1                    MS. GIBSON:  Wonderful.
 2                    Anyone else share a similar passion?  Okay.
 3                    I haven't heard from you, Juror Number 2.
 4      What's your passion?
 5                    VENIRE PERSON 2:  Well, so, my passion is
 6      mostly based on faith.
 7                    MS. GIBSON:  Okay.  And so, if -- if you
 8      had no other obligations, what would you do all day in
 9      connection with faith?
10                    VENIRE PERSON 2:  I mean, if I don't have
11      anything to do I'll read a Bible or watch some preachings,
12      some evangelists and stuff.
13                    MS. GIBSON:  Anybody else share a similar
14      passion?
15                    VENIRE PERSON 28:  It's hard for us to
16      hear.
17                    MS. GIBSON:  To hear me?
18                    VENIRE PERSON 28:  No, the others.
19                    MS. GIBSON:  Oh, okay.  Okay.  Good point.
20      Thank you.
21                    Even though I'm asking about passions after
22      family and faith, this gentleman said that he would still
23      say that his passion is faith and he likes to watch various
24      programs, religious, on TV and things of that nature, read
25      the Bible.
```

```
1                      VENIRE PERSON 2:  Correct.
2                      MS. GIBSON:  And -- and did I miss
3    something?
4                      VENIRE PERSON 2:  No.  I think you're good.
5                      MS. GIBSON:  Okay.
6                      Anybody else have that as their passion?
7    Okay.
8                      Juror Number 3, what is your passion?
9                      VENIRE PERSON 3:  Getting to know new
10   people, learning about them.
11                     MS. GIBSON:  And tell us a little bit more
12   about that.  Where do you do that?
13                     VENIRE PERSON 3:  Well, I'm a bookkeeper,
14   so I meet new people every day.  Some people tell me their
15   life story.  They feel comfortable talking to me.
16                     MS. GIBSON:  And what does that tell us
17   about you?
18                     VENIRE PERSON 3:  That I have a good
19   listening ear and I don't judge when they are talking.
20                     MS. GIBSON:  For people who couldn't hear,
21   her passion is she loves to meet new people.  She said it
22   more eloquently than I'm summarizing it.  And it says about
23   her, essentially, that she's got a really good listening
24   ear.
25                     Is that -- did I get that right?
```

43

1                       Anyone have a similar passion?  Okay.

2                       Who have I missed on the front row?  Ma'am,

3       on the end?  And can you hold up your number for us?

4       Eleven.

5                       VENIRE PERSON 11:  My passion is mentorship

6       in teaching, and I do that through -- we have a 501(c)(3)

7       plan, which is a transitional housing program for young moms

8       in their program.

9                       MS. GIBSON:  And what does that tell us

10      about you?

11                      VENIRE PERSON 11:  I'm very compassionate

12      for young ladies and children, especially.  I have nothing

13      against men.  But I have a heart for young women and

14      children and that's my way of walking out my faith.

15                      MS. GIBSON:  Anybody have a similar

16      passion, helping out other people kind of in a mentor

17      situation and helping them through whatever -- yes?

18                      VENIRE PERSON 21:  Mine's helping others

19      that are not as (inaudible).  We moved my father-in-law here

20      into a nursing facility.  And since I -- I see him every day

21      and, of course, I get to know the residents.  And it's just

22      interesting.  I've learned more about the elderly and

23      elderly care in the past six months than I ever dreamed of

24      what was required of that.  So...

25                      MS. GIBSON:  And what does that tell us

1    about you?

2                    VENIRE PERSON 21:  I guess I'm -- I'm

3    interested in people's issues or something about that

4    person, what their challenges are.  And if there's something

5    I can do to help with that challenge to make it easier, I'd

6    be glad to do it.

7                    MS. GIBSON:  Anyone else have a similar

8    passion?  Okay.

9                    Sir, you would be Juror 13.  What's your

10   passion?

11                   VENIRE PERSON 13:  My passion is try to

12   clean up my health.  I'm healthy.  Right now I'm retired and

13   also working.  In my spare time I enjoy to watch sport

14   [sic], and in the meantime my wife watch my grandson.  And

15   occasionally I want to travel to outside Asia, tour.

16                   MS. GIBSON:  And was -- what did -- did you

17   mention one of the first things is helping people and

18   health?

19                   VENIRE PERSON 13:  No.  I try to keep

20   myself healthy --

21                   MS. GIBSON:  Oh, keep yourself healthy.

22                   VENIRE PERSON 13:  -- by staying working

23   and keep moving.  Say it like that.

24                   And also I'm Christian.  On the weekend or

25   people need help, I help them, my church also.

```
 1                    MS. GIBSON:  Wonderful.

 2                    Anyone else share a similar passion?

 3                    Okay, I don't want to -- I don't want this

 4      to be a firing line, so I'm going to go to the middle of

 5      Row 2.  Can you tell us what your passion is?

 6                    VENIRE PERSON 16:  Yeah.  I like traveling

 7      to see family and friends around the U.S. and then I love to

 8      go to Italy or other foreign countries.

 9                    MS. GIBSON:  And can you hold up your juror

10      number for us?

11                    (Venire Person 16 complied.)

12                    MS. GIBSON:  Sixteen.  Okay.

13                    MR. L. FRIEDMAN:  I didn't -- I didn't hear

14      what she said.

15                    VENIRE PERSON 16:  I just said that I would

16      enjoy traveling and traveling around the U.S. to see my

17      family and friends.

18                    MR. L. FRIEDMAN:  Thank you.

19                    MS. GIBSON:  And 15?

20                    VENIRE PERSON 15:  Passion for me would be

21      exercising.  Just having, through fitness, like, almost

22      every day, having some kind of goal around that journey.

23      And I was, like -- I was, like, in all kinds of pain and

24      this has helped me through that.  And something that I just

25      now started to really enjoy recently.
```

1          MS. GIBSON:  Anyone else have a similar

2     passion for fitness and health?  Yes?

3          VENIRE PERSON 28:  I recently retired.  And

4     through the years (inaudible), I'm a third-degree black belt

5     in taekwondo, and I exercise two or three hours a day.

6          MS. GIBSON:  Wow.

7          Anybody else share the same passion or even

8     have a black belt or similar?  Yes?

9          VENIRE PERSON 26:  I work out every day.

10         MS. GIBSON:  Anyone else?

11         THE REPORTER:  What are those numbers,

12    please?

13         MS. GIBSON:  Oh, I'm sorry.  28, 26, 25.

14         THE REPORTER:  Thank you.

15         MS. GIBSON:  And 42, in the back, you're --

16    and what is your passion?

17         VENIRE PERSON 42:  I would say my main

18    passion would be building with my hands.  I'm an

19    electrician, problem solving, but I also share the fitness

20    passion.

21         MR. L. FRIEDMAN:  So, I humbly apologize,

22    but I'm just not hearing the person in the back.

23         VENIRE PERSON 42:  I share the fitness

24    passion.

25         MS. GIBSON:  And working with his hands.

1          Anybody else share a passion for working

2     with your hands, something along those lines?  Okay.  Number

3     18?

4               VENIRE PERSON 18:  I like crafting and

5     creating.  I got a (unintelligible) tool for Christmas, but

6     I do like building things.

7               MS. GIBSON:  Who else?  Yes?

8               VENIRE PERSON 27:  I'm basically the same

9     as her, just enjoy making things or writing.

10              MS. GIBSON:  Juror 7?

11              VENIRE PERSON 7:  I like building stuff.  I

12    work at a sign shop and we cut and build all kinds of

13    different designs that designers come up with, welding,

14    wiring.

15              MS. GIBSON:  Number 36?

16              VENIRE PERSON 36:  I paint a lot.

17              MS. GIBSON:  What type do you paint with?

18              VENIRE PERSON 36:  Abstract and watercolor

19    mostly.

20              MS. GIBSON:  And what does that say about

21    you?

22              VENIRE PERSON 36:  I have -- I'm an

23    introvert and I'm not going to go around people, so I'm able

24    to be brave and not have to be around a bunch of people.

25              MS. GIBSON:  Anyone else share a similar

1    passion?  Okay.

2                         Who have I missed on the second row?

3                         (Venire Person 17 raised her number.)

4                         MS. GIBSON:  Yes?

5                         VENIRE PERSON 17:  I would say culinary and

6    cooking.

7                         MS. GIBSON:  Culinary and what?

8                         VENIRE PERSON 17:  Culinary and cooking.

9                         MS. GIBSON:  And what type?

10                        VENIRE PERSON 17:  Anything.

11                        MS. GIBSON:  Anything.

12                        And what does that tell us about you?

13                        VENIRE PERSON 17:  I'm open to try new

14   things.

15                        MS. GIBSON:  Anybody else share a passion

16   for cooking?

17                        VENIRE PERSON 28:  I share a passion for

18   eating.

19                        (Laughter)

20                        MS. GIBSON:  Well, you two need to talk.

21                        VENIRE PERSON 28:  Yeah.

22                        MS. GIBSON:  In the back?

23                        VENIRE PERSON 41:  I enjoy cooking.  It's a

24   good creative outlet.

25                        MS. GIBSON:  And you're Jury [sic] 41?

1              VENIRE PERSON 41:  Forty-one.

2              MS. GIBSON:  Forty-one.

3              Who have I missed?  Has anyone not talked

4    about a passion of theirs?  Juror 22?

5              VENIRE PERSON 22:  Yeah.  I enjoy camping,

6    hiking, you know.

7              MS. GIBSON:  Wonderful.  What does that

8    tell us about you?

9              VENIRE PERSON 22:  That I like to get out

10   of the city, be in nature.

11             MS. GIBSON:  Who else have I missed who

12   hasn't talked?  Juror 29?

13             VENIRE PERSON 29:  I teach a youth group

14   and lead a community group.

15             MS. GIBSON:  And what -- what does that

16   tell us about you?

17             VENIRE PERSON 29:  I like to invest in

18   people.

19             MS. GIBSON:  Who else?  Juror 39?

20             VENIRE PERSON 39:  I'm an independent

21   contractor.  I do claims -- claims work but I also want to

22   be a networker where I'm putting people together for

23   services.  So that's my passion.  It's something that I'm

24   trying to work on putting together.

25             MS. GIBSON:  For what type of services?

```
1              VENIRE PERSON 39:  Like, anything.  I'm
2    always the person that someone will call or my number's
3    given to someone.  Well, call Lisa.  She knows this or she
4    knows that.  Or, if I don't know, well, then I'll research
5    it and find out and get an answer for somebody.
6              MS. GIBSON:  And your neighbor here, 38?
7              VENIRE PERSON 38:  My passion would be
8    animals.  I just like helping them, finding them homes,
9    caring for them.
10             MS. GIBSON:  Anyone else share a passion
11   about animals?
12             (Venire Person 28 raised her hand.)
13             MS. GIBSON:  Okay.
14             And 36?
15             VENIRE PERSON 36:  Animals.
16             MS. GIBSON:  Okay.
17             Who have I not -- who's not gotten to talk
18   about their passion?  Juror 37?
19             VENIRE PERSON 37:  I'm an artist.  I manage
20   a store but I'm an artist and I sell my art.  And as far as
21   family, I've had another loss, so I take care of my family.
22   And in the process of moving so I can be closer to my mom
23   and dad.
24             MS. GIBSON:  Thank you for sharing that.
25             Juror 40?
```

1      VENIRE PERSON 40:  I'm terribly boring.

2  After family, I love my job.  It's my passion.  I don't know

3  what I'm going to do when I retire.

4      (Laughter)

5      MS. GIBSON:  And what do you do?

6      VENIRE PERSON 40:  (Inaudible).

7      THE REPORTER:  I'm sorry.  I can't hear

8  her.

9      MS. GIBSON:  She's a judge's assistant.

10      VENIRE PERSON 40:  At the bankruptcy court

11  for 30 years.

12      MS. GIBSON:  At the bankruptcy court for 30

13  years.  Juror Number 40.

14      THE REPORTER:  Thank you.

15      MS. GIBSON:  Who have I missed?

16  Thirty-five?

17      VENIRE PERSON 35:  Given the opportunity,

18  I'd like to do work on some old family land working with my

19  brother.

20      MS. GIBSON:  I'm sorry.  I couldn't hear.

21      VENIRE PERSON 35:  Working with my brothers

22  on some old family land.

23      MS. GIBSON:  What do you do on the land?

24      VENIRE PERSON 35:  Everything that's

25  necessary.

52

```
1                    MS. GIBSON:  Everything that's necessary.
2    Thank you.
3                    Who else?  Juror 34?
4                    VENIRE PERSON 34:  Enjoy the outdoors --
5                    MS. GIBSON:  And what --
6                    VENIRE PERSON 34:  -- camping.
7                    MS. GIBSON:  Okay.
8                    Who hasn't gotten to say a thing?  Juror
9    32?
10                   VENIRE PERSON 32:  I work at a daycare.  So
11   children is my passion, just watching them learn new things
12   and development skills, growing.
13                   MS. GIBSON:  Anyone who has not already
14   talked about passion share a passion for caring for
15   children?  Okay.
16                   And your neighbor, Juror 31?
17                   VENIRE PERSON 31:  My passion is music.  I
18   worked with a lot of music.
19                   MS. GIBSON:  What type?
20                   VENIRE PERSON 31:  Any one.  MD, hip hop,
21   just a select.
22                   MS. GIBSON:  And who have I missed?  Juror
23   43?
24                   VENIRE PERSON 43:  I mean, I could take
25   pieces of a lot of these passions and I wouldn't say I just
```

1    have one.  Helping folks, having good conversations with

2    friends, spending time with family, traveling, outdoors.

3    Lots of different things, lots of interests.

4                    MS. GIBSON:  And I can't see everyone real

5    well on the back row.  Have I missed anyone?  Who hasn't

6    spoken?  I don't think you have.  Yes?

7                    VENIRE PERSON 44:  Just getting healthy.

8    Forty-four.

9                    MS. GIBSON:  Getting healthy, health.

10   Okay.

11                   And your neighbor, have you spoken?

12                   VENIRE PERSON 45:  No, but my passion would

13   be crafts with my grandbabies.

14                   MS. GIBSON:  Crafts.  And I know I just

15   heard her number, but what is your number?  Forty-five.

16   Okay, I can't count.

17                   Has everyone -- have I missed anyone?  Has

18   anyone not gotten to talk about their passion?  All right.

19   Thank you.

20                   So, is there anyone here that's willing to

21   sum up what we've just heard about passions?  In other

22   words, what -- what kind of connections you're seeing.  Any

23   volunteers?  Yes?

24                   VENIRE PERSON 7:  Most people like to be

25   outdoors and doing things.

1                          MS. GIBSON:  Okay.

2                          And somebody else started to raise --

3                          UNIDENTIFIED VENIRE PERSON:  Staying

4        healthy.  Everybody wants to be healthy, it sounds like.

5                          MS. GIBSON:  Okay.

6                          Anyone else see the connections?

7                          VENIRE PERSON 8:  Also, people want to help

8        other people.

9                          MS. GIBSON:  Anyone else?

10                         VENIRE PERSON 33:  There's overlap.  It's

11       not just one decision for everything.

12                         MS. GIBSON:  Thank y'all.

13                         Okay.  I can take your comments, whatever

14       they are.  I'm tough.  And I've heard that many, many people

15       have negative feelings about trial lawyers.  What have you

16       heard?  Yes?

17                         VENIRE PERSON 12:  My dad's an attorney.

18       He's a litigator.  My mom is a paralegal, does antitrust.

19       So they always say they hate plaintiffs.

20                         MS. GIBSON:  Okay.

21                         THE COURT:  They always say what?

22                         MS. GIBSON:  They hate the plaintiffs.

23                         THE COURT:  Oh.

24                         MS. GIBSON:  Do you agree with them?

25                         VENIRE PERSON 12:  I mean, I don't know

1    enough about law.  I went to medical school.  I didn't want

2    to do that, so...

3                    MS. GIBSON:  How about -- how about liar?

4    Has anyone heard that trial attorneys are liars?  Yes, yes,

5    yes.  Okay.

6                    So you've heard there are exceptions to

7    every rule, and I'm not asking you to trust me now.  We just

8    met.  But will everyone give me the chance to earn your

9    trust during this trial?  I appreciate it.

10                   So far today, just today, in your everyday

11   life, what kind of rules have you followed?

12                   UNIDENTIFIED VENIRE PERSON:  Coming here.

13                   (Laughter)

14                   MS. GIBSON:  Yes.  Okay, coming here.

15                   How about Juror Number 3?  What kind of

16   rules have you followed today?

17                   VENIRE PERSON 3:  None, really, besides

18   what they had us do when we came in the building.

19                   MS. GIBSON:  Okay.

20                   Did anyone drive here?  Okay.

21                   Let's see.  Juror Number 1, did you follow

22   any rules driving here?

23                   VENIRE PERSON 1:  Sure.  Traffic rules.

24                   MS. GIBSON:  All right.  And even in just

25   following those rules and coming to the courthouse, do you

56

1    expect other people to follow those traffic rules?

2                    VENIRE PERSON 1:  I hope that they do.

3                    MS. GIBSON:  Okay.

4                    Do you think you deserve to have other

5    people follow those traffic rules?

6                    VENIRE PERSON 1:  Yes.

7                    MS. GIBSON:  Okay.  And do you think that's

8    your right to have other people follow the rules?

9                    VENIRE PERSON 1:  Yes.

10                   MS. GIBSON:  If it's 2:00 a.m. in the

11   morning and no one's around and there's no emergency and

12   you're driving and you come to a red light, what do you do?

13                   (Multiple panel members said "stop".)

14                   MS. GIBSON:  Anyone -- anyone say go ahead

15   and go through?  Yes, Juror 27?

16                   VENIRE PERSON 27:  I did it once when I was

17   younger and I actually got a ticket for that, so I don't do

18   that anymore.

19                   (Laughter)

20                   MS. GIBSON:  Okay.  All right.

21                   And then Juror 7?

22                   VENIRE PERSON 7:  Sometimes a motorcycle is

23   not heavy enough to make the light change.  And they told us

24   in class if you sit there through three lights then you can

25   go.

1          MS. GIBSON:  So that's for your own
2     safety --
3          VENIRE PERSON 7:  Yes.
4          MS. GIBSON:  -- right?
5          Okay.  Anyone else?  All right.
6          (Venire Person 16 sneezed.)
7          MS. GIBSON:  Bless you.
8          VENIRE PERSON 16:  Thank you.
9          MS. GIBSON:  Okay.  It's been said by
10    judges and legal scholars and has been written over the
11    years that a jury speaks in their verdict and their verdict
12    becomes the conscience of the community.  You heard
13    Judge Greenberg talk about the laws at issue in this case
14    being the same all over Texas.  And each case sets
15    precedence, not just for Dallas County, but elsewhere in the
16    state.
17          Ultimately, the jury becomes the guardian
18    of the community's safety; whether it's emotional, physical,
19    or financial.  And now that's a responsibility as a member
20    of the jury to the community that is a heavy one, and some
21    people are not comfortable with playing a role in which they
22    will render a verdict and act as the conscience of the
23    community.
24          Is there anyone here who is unwilling or
25    unable or simply chooses not to be part of the voice of this

1    community?  I see no hands.

2                    Can anyone give us an example of where a

3    jury has made a difference in their community?  Not even the

4    attorneys?

5                    We have another attorney on the panel, I

6    think.  Don't we?  Yes.

7                    Does anyone feel that jury verdicts can

8    have an impact beyond the particular case involved or have

9    any experience with that?  Any examples?  Yes?

10                   VENIRE PERSON 11:  I just believe that it

11   can set a precedence.  Whether it's a judge's or a jury's

12   verdict, it can set a precedence for future cases.

13                   MS. GIBSON:  Who else feels the same way,

14   that this -- Juror 9, 36 -- can you hold up your cards for

15   me -- 12, 14, 21, 22, 23, 13, 18, 27, 39, 40, 43, 41, 35,

16   42.

17                   Juror Number 2, how do you feel?

18                   VENIRE PERSON 2:  I agree.

19                   MS. GIBSON:  Oh, you agree, Juror 2.

20                   Do you agree, Juror 3?

21                   VENIRE PERSON 3:  It could.

22                   MS. GIBSON:  It could.

23                   Juror 4 -- Juror 5 -- or 6.  Sorry.

24                   VENIRE PERSON 6:  If it's a jury -- jury

25   trial, every jury gets to help with different -- I don't see

1    that it sets a precedent with juries.

2                    MS. GIBSON:  Okay.

3                    VENIRE PERSON 7:  I agree.

4                    MS. GIBSON:  Okay.  Juror 7 agrees.

5                    Do you agree, 8, Number 8?

6                    VENIRE PERSON 8:  Uh-huh.

7                    MS. GIBSON:  Number 8.

8                    Number 9, you've held yours up.

9                    Juror 10, do you agree?

10                   (Venire Person 10 nodded affirmatively.)

11                   MS. GIBSON:  Okay.

12                   Anyone -- has anyone not talked about this

13   on the second row?

14                   VENIRE PERSON 20:  I don't agree.

15                   MS. GIBSON:  You do not agree.

16                   Can you hold up your juror number?  Twenty.

17   Tell me about that.

18                   VENIRE PERSON 20:  I think each trial is

19   separate.  And precedent, when you think of trial level, it

20   wouldn't go in without saying that.

21                   MS. GIBSON:  Okay.

22                   Who has not spoken?  Did I already get your

23   answer for 19?

24                   VENIRE PERSON 19:  No.  I think it's a

25   combination of both.

60

```
 1                    MS. GIBSON:  Combination of both.
 2                    VENIRE PERSON 17:  Indifferent people.
 3                    MS. GIBSON:  Juror 17, indifferent.
 4                    Fifteen and sixteen, also indifferent.
 5      Twenty-nine, thirty-seven, thirty-eight, indifference.
 6                    Anyone else indifferent on the second row?
 7                    Has anyone -- who have I not talked to on
 8      the second row on this question?
 9                    Third row, who have I not gotten an answer
10      from on the third row?  Yes?
11                    VENIRE PERSON 25:  Indifferent.
12                    MS. GIBSON:  Indifferent.
13                    Anyone else on the third row also feel
14      indifferent?
15                    And I'm sorry.  What was -- what was
16      your -- Juror 25.
17                    VENIRE PERSON 28:  I'm not sure.
18                    MS. GIBSON:  Okay.  And what's your number?
19      Twenty-eight.
20                    Thank y'all.
21                    Does anyone feel that we all serve somebody
22      when we're at work, whether it is our employer or a customer
23      or somebody else?  Who feels that way?  Can you raise your
24      hand?
25                    (Venire persons raised their hands.)
```

1                    MS. GIBSON:  Almost -- almost everyone.

2                    VENIRE PERSON 12:  Can you repeat the

3     question?  Sorry.

4                    MS. GIBSON:  Sure.

5                    Who feels we all serve somebody when it

6     comes to work, whether it's our employer or a customer or a

7     contractor or somebody else?

8                    Anyone -- anyone disagree?  Anyone feel

9     that we don't all serve someone at work?  Okay.

10                   In the first row, Juror 1, who do you

11    serve?

12                   VENIRE PERSON 1:  Well --

13                   MS. GIBSON:  Even --

14                   VENIRE PERSON 1:  -- right now, since I'm

15    retired, I guess probably myself and my wife.

16                   MS. GIBSON:  Okay.

17                   And, Juror 2, who do you serve when it

18    comes to work?

19                   VENIRE PERSON 2:  When it comes to work I

20    say I put God first before anything.  I have a fear of God.

21    I have to respect others, so you put him first.

22                   MR. L. FRIEDMAN:  I apologize.  I'm just

23    not hearing him.  Can you speak up a little bit, please?

24                   VENIRE PERSON 2:  Can you repeat that for

25    him?

1                    MS. GIBSON:  He was more eloquent, but he

2          was essentially saying that he serves God.

3                    Is that correct?

4                    MR. L. FRIEDMAN:  Thank you.

5                    MS. GIBSON:  Did I get that right?

6                    VENIRE PERSON 2:  Correct.

7                    MS. GIBSON:  And, y'all, I don't want to

8          put words in your mouth.  So if I get something wrong when

9          someone can't hear, let me know.

10                   Juror Number 3?

11                   VENIRE PERSON 3:  Customers.

12                   MS. GIBSON:  What?

13                   VENIRE PERSON 3:  Customers.

14                   MS. GIBSON:  Customers.  Okay, what kind of

15         customers?

16                   VENIRE PERSON 3:  Different types.  I sell

17         money orders and bill pays and stuff like that, so that's

18         all I see is customers.

19                   MS. GIBSON:  Okay.

20                   Juror 4?

21                   VENIRE PERSON 4:  My students and their

22         families.

23                   MS. GIBSON:  Students and their families.

24                   And Juror 6?

25                   VENIRE PERSON 6:  Customers.

63

```
1                     MS. GIBSON:  Customers.  What type?
2                     VENIRE PERSON 6:  I'm in the food industry.
3                     MS. GIBSON:  Okay.  And so, what -- what's
4        the -- what type of work are we talking about?
5                     VENIRE PERSON 6:  We manufacture foods
6        for -- we're like a co-packer.
7                     MS. GIBSON:  Okay.
8                     VENIRE PERSON 6:  So we have different
9        brands.
10                    MS. GIBSON:  Juror 7?
11                    VENIRE PERSON 7:  I serve my managers and
12       designers to complete the task at hand.
13                    MS. GIBSON:  Okay.
14                    VENIRE PERSON 8:  A combination.  I serve
15       God and I also serve our patients and customers.  Our
16       customers and our doctors because we make the breast
17       implants, so we have to be -- we're all joined together.
18                    MS. GIBSON:  Sure.
19                    Juror 9?
20                    VENIRE PERSON 9:  It's pretty broad.  I'm
21       essentially the face of our department.  I'm the first
22       person people see, so I'm the one that they come to for
23       information.  I serve anyone that comes to ask me questions
24       and I answer their questions.
25                    MS. GIBSON:  Juror 10?
```

1           VENIRE PERSON 10:  The family is first and

2     the (inaudible) that work with us.

3           MS. GIBSON:  And second row?  Who do you

4     serve?

5           UNIDENTIFIED VENIRE PERSON:  God first and

6     internal and external customers, the managers, the

7     president, the CEO, the board, as well as our commercial

8     customers, including the government.

9           MS. GIBSON:  And our doctor?

10          UNIDENTIFIED VENIRE PERSON:  My patients.

11          MS. GIBSON:  Your patients.  Okay.

12          And, sir?

13          UNIDENTIFIED VENIRE PERSON:  I work for a

14    company and I serve my employer.

15          MS. GIBSON:  Okay.

16          Who else feels, on the second row, that

17    they serve their employer?  Sixteen, seventeen, fourteen,

18    and twenty, and eighteen.

19          For those who didn't raise your cards, who

20    do you feel you serve at work?  Yes?

21          VENIRE PERSON 19:  Customers.  I work for

22    IT department.

23          MS. GIBSON:  Fifteen?

24          VENIRE PERSON 15:  Well, it's recently

25    finished university, so I'm still unemployed right now.  So

```
1   it could be employers, but right now I'd say family that I
2   serve right now.
3                   MS. GIBSON:  And who do you serve?
4                   VENIRE PERSON 14:  Me?
5                   MS. GIBSON:  Yes.
6                   VENIRE PERSON 14:  I serve my husband and
7   my daughter-in-law, grandson, and I'm also in the fast-food
8   industry.
9                   MS. GIBSON:  Okay.  And who do you serve in
10   the fast-food industry?
11                   VENIRE PERSON 14:  Customers.
12                   MS. GIBSON:  Okay.
13                   All right.  Thank y'all.
14                   Who here -- who here has, on the first two
15   rows, has children?
16                   VENIRE PERSON 28:  What?
17                   MS. GIBSON:  Children.
18                   Juror Number 3, what have you taught your
19   children, if anything, about keeping their commitments?
20                   VENIRE PERSON 3:  She's real young right
21   now, so...
22                   MS. GIBSON:  Oh, how old?
23                   VENIRE PERSON 3:  She's two.
24                   MS. GIBSON:  Okay.  Okay.  Two-year-olds
25   don't keep commitments.
```

```
1                    (Laughter)

2            VENIRE PERSON 14:   My grandson is four.

3            MS. GIBSON:   Who -- who here has children

4    that are old enough that you have taught them something

5    about keeping their commitments?

6                    Yes, Juror 7?

7            VENIRE PERSON 7:   Yes.  I grew up in Boy

8    Scouts, and my son's all into Boy Scouts and taught himself

9    how to uphold the law of being an upright person.  If you

10   tell somebody you're going to be there, be there.  If you're

11   going to tell somebody you're going to do something, go do

12   it.

13           MS. GIBSON:   Okay.

14                   And Juror 6?

15           VENIRE PERSON 6:   Your word is everything

16   about you.  If you tell somebody your word, you keep it.

17           MS. GIBSON:   Okay.

18                   And Juror 10?

19           VENIRE PERSON 10:   I have taught all of my

20   sons to be as honest as they possibly can and treat people

21   like they want to be treated.  And if you promise anything,

22   do whatever you can to perform and make sure it gets done.

23           MS. GIBSON:   And who -- who on the first

24   row that hasn't spoken and agrees with Juror 10?  Juror 8?

25           VENIRE PERSON 8:   Yes, I do.
```

```
1                    MS. GIBSON:  Okay.

2                    Juror 4.

3                    Anyone disagree?

4                    How about on the second row.  Who agrees?

5     Most everyone.

6                    Who disagrees?  Did juror -- did you

7     raise --

8                    UNIDENTIFIED VENIRE PERSON:  I don't have

9     kids.

10                   MS. GIBSON:  Oh, sorry.

11                   All right.  On the second row, how many of

12    you agree that keeping your commitments is important?

13    Everybody.

14                   How about on the third row?  Everybody.

15                   How about on the fourth row?

16                   I'm just asking about keeping your

17    commitments.  Okay.  Everyone.

18                   And how about on the row behind that?

19                   Thank you.

20                   How am I doing on time, Judge?

21                   THE COURT:  You have 19 minutes left -- or

22    18.

23                   MS. GIBSON:  Okay.

24                   Some of the biggest commitments that we

25    make in life are oral.  Can somebody give us some examples
```

1    of commitments we make in life that are oral?

2                    VENIRE PERSON 29:  Wedding bells.

3                    MS. GIBSON:  What?

4                    VENIRE PERSON 29:  Wedding bells.

5                    MS. GIBSON:  Wedding bells.

6                    How about when you-all were sworn in this

7    morning?  You took an oath.  You did that orally.

8                    Can anyone else give an example of some of

9    the big commitments we make in life that are oral and not in

10   writing?

11                   VENIRE PERSON 14:  To God.

12                   MS. GIBSON:  To God.  Many people declare

13   their faith to God and that is oral.

14                   Any other examples?

15                   VENIRE PERSON 12:  Hippocratic.

16   Hippocratic oath.

17                   MS. GIBSON:  Ah, the hippocratic oath for

18   doctors, oral.  Okay.

19                   Some people feel that handshake agreements

20   should be enforceable when it comes to business.  Other

21   people feel that only a written agreement should be

22   enforceable and the person who did not document the deal has

23   only themselves to blame.  Which way do you lean?

24                   VENIRE PERSON 28:  I've watched Judge Judy

25   now that I am --

1                    MR. L. FRIEDMAN:  I didn't hear.  Say that

2      again.

3                    VENIRE PERSON 28:  I watch a lot of

4      Judge Judy now that I'm retired, and it has to be on paper

5      with a signature.

6                    MS. GIBSON:  Okay.  So you feel -- so you

7      feel it has to be in writing and signed?

8                    VENIRE PERSON 28:  Absolutely.

9                    MS. GIBSON:  Anyone on the first row also

10     lean toward it has to be in writing, and if you didn't get

11     it in writing you have only yourself to blame?  Juror 8, 4,

12     3, 2, and 6.  Thank you.

13                    How about on the second row?  Who leans

14     toward it has to be in writing and if you don't document the

15     deal you have only yourself to blame?  Nineteen, seventeen,

16     sixteen, fifteen, fourteen, thirteen, eleven.

17                    Some people feel so strongly about the need

18     to get an agreement in writing that once they hear a case

19     about an oral handshake agreement they don't need to hear

20     anything more before they think the defense should prevail.

21     Who leans that way, even if just a little?

22                    VENIRE PERSON 28:  Can you explain that?

23                    MS. GIBSON:  Sure.

24                    Some people feel so strongly that an

25     agreement must be in writing that the only thing they need

1    to hear in a case to decide for defendants is that the case

2    is about an oral handshake agreement.  Who feels that

3    strongly on the first row?  How about on the second row?

4    Third row?

5                    VENIRE PERSON 28:  I apologize.  I'm from

6    another country.  I mean, I speak English well, but it's not

7    my first language.

8                    I still feel that it has to be in writing.

9                    MS. GIBSON:  Okay.

10                   Twenty-two.

11                   And who on the next row feels that

12   strongly?  Thirty-seven, thirty-eight, thirty-nine, forty.

13                   Who feels --

14                   VENIRE PERSON 19:  So I'd just add the

15   caveat that to me it has to be in writing if it's a

16   substantial amount of money that's involved.  If you're

17   walking around with a builder and you go, can you fix that

18   spot over there and he says he's going to fix it, okay.

19                   MS. GIBSON:  Okay.

20                   VENIRE PERSON 19:  But if it's a half

21   million dollars it should be in writing.

22                   MS. GIBSON:  Okay.  And do you feel pretty

23   strongly about that?

24                   VENIRE PERSON 19:  Yes.

25                   MS. GIBSON:  Okay.  And that's -- that's an

1  opinion you came into this courtroom with?

2          VENIRE PERSON 19:  It's an opinion I have,

3  the way I conduct business myself at work.

4          MS. GIBSON:  Sure.  And do you feel so

5  strongly that if the amount is significant that you couldn't

6  consider a handshake agreement for a large amount of money?

7          VENIRE PERSON 19:  It would be very hard

8  for me to.

9          MS. GIBSON:  Okay.

10          If you were the plaintiff in this case,

11  would you want you on the jury?

12          VENIRE PERSON 28:  What?

13          MS. GIBSON:  Would you want you on the

14  jury?

15          VENIRE PERSON 19:  If it's all about a

16  handshake deal and it's a large sum of money, no, I probably

17  wouldn't.

18          MS. GIBSON:  Okay.

19          VENIRE PERSON 20:  I probably wouldn't

20  either.  I put everything in writing in an Email for

21  facility management, whether it's fire safety or general

22  contractor.  So I don't -- an agreement, like, holographic

23  or without a contract, to me is kind of -- I won't even say

24  what I think it is.  It's that strong.

25          MS. GIBSON:  Okay.

1          VENIRE PERSON 20:  I'm not saying I
2    couldn't judge it, but -- or be on the jury -- but, myself,
3    I would never be in that situation, I don't think.
4          MS. GIBSON:  Okay.  So, for you two, as far
5    as fairness, if you were -- if the rules were that you were
6    the plaintiff in a handshake case, would you want you on
7    your jury?
8          MR. L. FRIEDMAN:  I'm going to ask that
9    counsel clarify it and ask one juror at a time.
10         THE COURT:  Sure.
11         MS. GIBSON:  I'm asking Juror Number 20.
12         THE COURT:  Were you asking Juror 20?
13         MS. GIBSON:  Yes.
14         VENIRE PERSON 20:  So, on the plaintiff's
15   side, you're asking?
16         MS. GIBSON:  Yeah.
17         If you were a plaintiff -- I know you
18   wouldn't be there, as you said, but if you were a plaintiff
19   on a handshake deal, would you want you on your jury panel?
20         MR. L. FRIEDMAN:  I'm going to object to
21   the question.
22         THE COURT:  What's your objection?
23         MR. L. FRIEDMAN:  Putting the jury in the
24   shoes of the plaintiff.
25         MS. GIBSON:  Your Honor, it's permissible

73

1    for jury selection.

2                    THE COURT:   Okay.   Go ahead.

3                    Overruled.

4                    VENIRE PERSON 20:   I would say no.

5                    MS. GIBSON:   Anyone have strong feelings on

6    the first row about having an agreement in writing if you're

7    going to come to the court?   Jurors 2, 3, 4, 6, 8.

8                    Juror 2, tell us about that.

9                    VENIRE PERSON 2:   You mean if everybody

10   cannot agree on anything, handshake or verbal?   But anything

11   that involves money, involves anything, like, you know, has

12   to be on paper, at least some sort of documentation.

13                   MS. GIBSON:   Okay.

14                   Okay.   Juror 3?

15                   VENIRE PERSON 3:   Yeah.   Right.   Proof.

16   'Cause I can tell you anything and then go back on it, and

17   we'll end up in court and I don't have anything to show for

18   it.

19                   MS. GIBSON:   Okay.

20                   Is there anyone on the first row that feels

21   so strongly about having an agreement in writing that you

22   don't think you could be fair or maybe you aren't the right

23   juror for a case over a handshake agreement?

24                   Juror 8, you feel that strongly?   Yes?

25                   VENIRE PERSON 8:   Yeah.   I feel everything

74

```
 1    should be set in stone.
 2                    MS. GIBSON:  Okay.
 3                    Juror 3, you feel that way?
 4                    VENIRE PERSON 3:  Yes.
 5                    MS. GIBSON:  Juror 4.
 6                    Anyone else on the first row?
 7                    VENIRE PERSON 6:  Yes.
 8                    MS. GIBSON:  Juror 6.  All right.
 9                    For -- for those of you who -- well, can
10    you put your cards back up if you just said you felt that
11    strongly, on the first row, including Juror 2?
12                    (The first row complied.)
13                    MS. GIBSON:  You-all feel so strongly about
14    having an agreement in writing that you might not be the
15    best juror for a handshake agreement case?
16                    VENIRE PERSON 3:  Will we know a lot of
17    details?
18                    MS. GIBSON:  So, who said -- I'll --
19    I'll -- I'm going to come back to you.  Who said absolutely?
20    Juror 8.
21                    Juror 4, tell us about that.
22                    VENIRE PERSON 4:  In my line of work you
23    have to document everything.  If verbal is agreed it can
24    destroy relationships.
25                    MS. GIBSON:  Okay.
```

1        Juror 3, you agree with Juror 4?

2        VENIRE PERSON 3:  Uh-huh.

3        MS. GIBSON:  Okay.  And you don't feel like

4  you -- you could be really fair in a handshake oral

5  agreement case; is that right?

6        VENIRE PERSON 3:  No.

7        MS. GIBSON:  Okay.

8        And -- and just to confirm, who else on the

9  first row feels so strongly about written agreements that

10  they don't feel like they could be fair to the plaintiff in

11  a case over a handshake oral agreement?  Juror 6.

12        And who -- Juror 3, you said yes to that as

13  well?  Is that yes, just for the court reporter?

14        VENIRE PERSON 3:  Repeat the question

15  again.  I'm sorry.

16        MS. GIBSON:  Sure.

17        You feel so strongly about getting written

18  agreements in writing that you could not be fair in a case

19  over an oral handshake agreement?

20        VENIRE PERSON 3:  Right.  Yes.

21        MS. GIBSON:  Okay.

22        Who on the first row feels the same way as

23  Juror 3, who hasn't already answered?

24        Okay.  Row two, how many of you feel so

25  strongly about having an agreement in writing that you don't

```
1    think you would be the right juror or could be completely
2    fair in a case that's over an oral handshake deal?  Okay,
3    hold your cards up.  Juror 20, 19, 16, 15, 14, 13.
4                       Juror 13, tell us about that.
5                       VENIRE PERSON 13:  You know, I've seen what
6    a handshake thing and people doing a handshake -- I didn't
7    do that.  So, to me, it had to be written in order to, okay,
8    here you -- you read there, you sign there, and then they
9    cannot change it.
10                      MS. GIBSON:  Row three, how many of you
11   feel so strongly that an agreement ought to be writing that
12   you don't feel you would be the right juror or could be fair
13   in a case about an oral handshake agreement?  Juror 28, 26,
14   25.
15                      Twenty-five, kind of?
16                      VENIRE PERSON 25:  Are you asking about the
17   opposite as well?
18                      VENIRE PERSON 17:  See, I'm on the fence
19   too.
20                      MS. GIBSON:  Juror 17, you're saying either
21   way?
22                      VENIRE PERSON 17:  Yeah.
23                      MS. GIBSON:  Okay.
24                      Who -- and I'm going to come back to you in
25   a second, sir.  Who else on the third row feels so -- felt
```

1   so strongly about written agreements that they don't feel

2   like they could be fair in an oral handshake case?  Juror

3   22.

4            Is there anybody else that I missed on row

5   three?  How about row four?  Jurors 39 and 37.

6            Juror 17, you said either way.  What did

7   you mean by that?

8            VENIRE PERSON 17:  It would mean it would

9   just -- know what the situation was and what -- what you're

10  doing with it.

11           MS. GIBSON:  Okay.

12           VENIRE PERSON 17:  I mean, I personally

13  think it should be in writing, but it just depends.

14           MS. GIBSON:  Okay.

15           And, sir?

16           VENIRE PERSON 25:  I was just talking about

17  the verbal agreement.

18           MS. GIBSON:  So you feel strongly about the

19  verbal agreement?

20           VENIRE PERSON 25:  The verbal agreement,

21  yes.

22           MS. GIBSON:  How are we doing on time?

23           THE COURT:  You have six minutes left.

24           MS. GIBSON:  Okay.

25           Jeff Carpenter has a medical condition that

1    may require him to abruptly leave the courtroom at times.

2    Will -- does anyone have an issue with that?  Okay, so y'all

3    understand if that happens?  Okay.

4                    Jeff Carpenter has been told to try not to

5    react during this trial and to just stay as stone faced as

6    possible.  That may not always happen, but will y'all

7    understand that he was -- he has been told, you know, not to

8    react?  Is that acceptable, to the extent possible?

9                    What do y'all think when an employee or a

10   worker sues the people they worked for?  What do you -- what

11   do you think the employer or the defendant is going to do in

12   response?

13                   VENIRE PERSON 14:  The employer is going to

14   fire them.

15                   MS. GIBSON:  Okay.  Okay.

16                   In kind of retaliation?  Is that what

17   you're talking about?

18                   VENIRE PERSON 14:  Yeah.

19                   MS. GIBSON:  Okay.

20                   Anyone have an expectation that an employer

21   or former employer might retaliate in some other way?

22                   VENIRE PERSON 10:  There's laws against

23   that, so --

24                   MS. GIBSON:  Okay.

25                   VENIRE PERSON 10:  -- I wouldn't expect

1    them to.

2                    MS. GIBSON:  Okay.  All right.

3                    Anybody else?  Yes?

4                    VENIRE PERSON 27:  I mean, there's laws

5    against it, so I don't expect they do it directly, but it

6    might happen indirectly that you don't give them a good

7    referral than you might otherwise.

8                    MS. GIBSON:  Okay.  So, absent the issue,

9    are you saying -- if I hear you correctly, you're saying the

10   employer changes his attitude about whether this person is a

11   good employee?

12                   VENIRE PERSON 27:  Uh-huh.

13                   MS. GIBSON:  Yes?

14                   VENIRE PERSON 27:  Yeah.

15                   MS. GIBSON:  Okay.

16                   Does anyone have experience in situations

17   in which they have seen someone stand up for their rights in

18   any type of context and then get attacks, attacks on

19   character and things of that nature?  Has anyone had an

20   experience with that?  Anyone heard of that happening?  I

21   see some heads nodding.

22                   Sir, in the red checked shirt.

23                   VENIRE PERSON 23:  But I don't know if -- I

24   worked at my first job.  We had a manager that was extremely

25   lazy and one of my coworkers briefly, assertively, told him

1     to get up and start working.  And he was immediately fired

2     on the spot.  So I guess that could be a slight retaliation.

3                     MS. GIBSON:  Okay.

4                     And I saw -- I'm sorry.  Can you hold up

5     your juror number?  Twenty-seven.

6                     VENIRE PERSON 27:  I don't think I was -- I

7     think I was just nodding because I --

8                     MS. GIBSON:  Oh.

9                     VENIRE PERSON 27:  -- understand what you

10    were saying.

11                    MS. GIBSON:  Okay.  Okay.

12                    VENIRE PERSON 27.  Sorry.

13                    MS. GIBSON:  That's okay.

14                    Anybody else have an example of something

15    you've seen or heard of along those lines?

16                    VENIRE PERSON 27:  Yeah, I did have

17    something for that.  Sorry.  But, basically, the whole

18    Harvey Weinstein thing, he was telling people not to work

19    with certain actresses.

20                    MS. GIBSON:  Okay.

21                    Juror 20?

22                    VENIRE PERSON 20:  Yeah.  This,

23    unfortunately, goes back to knowing Julie Mingus.  She

24    termed some employees and there was a wrongful employment,

25    couple cases that were settled out of court.  That's

1    something I was just reminded of.

2                    MS. GIBSON:  Okay.

3                    And, Juror 9, did you raise your card?

4                    VENIRE PERSON 9:  Yes.  Mine is mostly out

5    of -- it's not a personal experience but it's here.  So, in

6    my first job I was sexually harassed and I reported it.  And

7    then when I moved on to my next job there were issues with

8    that company, but I was advised against reporting it for

9    fear that I would be blacklisted from looking for other jobs

10   because I'd already done that in the first company that I'd

11   worked for.  So people said to expect -- excuse me --

12   retribution if I were to make another claim.

13                   MS. GIBSON:  And I'm sorry that happened to

14   you, but thank you -- thank you for sharing it.

15                   THE COURT:  You have about one minute left.

16                   MS. GIBSON:  Okay.

17                   Number 17?

18                   VENIRE PERSON 17:  My whole company just

19   folded and we were laid off, over 33 percent of the company,

20   which is against the WARN Act.  So myself and other

21   employees are going to be suing them.

22                   MS. GIBSON:  So you're -- you're waiting to

23   see what happens?

24                   VENIRE PERSON 17:  Yes.

25                   MS. GIBSON:  Okay.

```
 1                    All right.  I think my time is about up and
 2       I want to respect that deadline, but thank y'all for your
 3       time.
 4                    THE COURT:  All right.  Thank you,
 5       Ms. Gibson.
 6                    Is everyone okay going another 20 minutes
 7       or so?
 8                    (Multiple panel members said yes.)
 9                    THE COURT:  All right.  Very good.
10                    Mr. Friedman?
11                    MR. L. FRIEDMAN:  I would prefer to break
12       now.
13                    THE COURT:  It's really better if you can
14       do 20 minutes.
15                    MR. L. FRIEDMAN:  All right.  If it's
16       better for you, it's better for me.
17                    THE COURT:  All right.
18                    MR. L. FRIEDMAN:  I need to stretch.
19                    May I, Your Honor?
20                    THE COURT:   Please.
21                    MR. L. FRIEDMAN:  All right.
22                       DEFENDANTS' VOIR DIRE
23                    MR. L. FRIEDMAN:  Again, my name is
24       Larry Friedman, and I am honored to represent Cheryl and
25       Brian Potashnik, Southwest Housing Management Company,
```

83

1    Affordable Housing Construction, and Southwest Housing

2    Development.

3              The Potashniks, including Cheryl Potashnik

4    Geiser and Cheryl Geisner [sic] -- Geisner [sic]

5    Potashnik -- not only are clients of mine but they're good

6    friends.  I've known them for over 20 years and I know them

7    to be good people, and I'm here defending them in this case.

8              Voir dire, the French word, means speak the

9    truth.  And it's one opportunity that the lawyers in this

10   case have to speak with the jury directly.  The next time we

11   get to face the actual jury we will give opening statements,

12   which will be a statement of what we hope to prove or intend

13   to prove during the case.  And then the last time we get to

14   address the jury will be closing arguments, which will be a

15   summary of what we believe we proved during the case.  But

16   this is really the only time when we get to have a back and

17   forth with the jury.

18             There are no right or wrong answers.  This

19   is just an opportunity to get to know the jurors, potential

20   jurors, and find out if you're the right juror for this

21   case.

22             What do we want to know?  Whether you have

23   any lifetime prejudices or biases that carry forward into

24   this case.  Everybody has prejudices; everybody has biases.

25             If you remember our first president,

84

1   George Bush, he hated broccoli.  Hated it, choked on it,

2   fell over it, would never order it.  And if he saw a menu

3   item that said steak and broccoli, he wouldn't order it.  He

4   had a prejudice against broccoli.

5             We Dallas Cowboy fans, we hate the God damn

6   Eagles.

7             (Laughter)

8             MR. L. FRIEDMAN:  Anytime their name comes

9   up, anytime we see anything with an E on it, we hate them.

10  We hope they lose.  We hope they trip and fall and all go

11  get the flu right before the playoff game.  That's just the

12  way it is and it's been forever.  We have a prejudice.

13            And we love the Cowboys.  Whether they have

14  a winning season or losing season, we love the Cowboys.  We

15  proudly wear their star.  We wear it all around the world.

16  That's our prejudice.

17            And our biases, for those of you who have

18  children or grandchildren, we're always biased in favor of

19  our kids.

20            You know, I watch the news like all of you,

21  and they parade the criminal defendant in front of the

22  court.  And that person, man or woman, has robbed 34 banks,

23  wounded 17 people, and that person's mother comes in front

24  of the TV cameras and say, "Not my Billy.  He was a good

25  boy."  Because every mother, every father, has a bias

85

1    towards their child.  So, every one of us comes to court

2    with a prejudice or a bias.  And that's really what this is

3    all about.  It's really a dialogue.

4                  And I will tell you, for those of you who

5    have not spoken up or had your say, there's an old adage

6    that we lawyers believe in; which is, if you talk, you walk.

7    The more you talk, the more likely it is you walk.  And if

8    you have nothing to say, you stay; the more likely it is you

9    stay.  So, I encourage everybody to talk as much as you can.

10   Let us get to know who you are, what your thoughts are, what

11   your beliefs are.  And then we can -- we can determine

12   whether or not you're a good juror for this case.  And

13   that's really -- that's -- that's all it's about.

14                  We already thank you for your service and

15   we believe in the jury system.  We appreciate your being

16   here.  And for those of you who ultimately get picked for

17   the jury, we're going to have even more deeper thanks for

18   you.

19                  You've already heard from Ms. Gibson, and

20   you can surmise this is a case about an oral contract.

21   Mr. Carpenter believes, alleges, that he had an oral

22   contract.  It's not clear on who he identifies, but probably

23   with Mr. Potashnik, for over-a-million-dollar bonus.

24   Mr. Potashnik denies it.  Mrs. Potashnik denies it, who

25   worked for the company.

1              I don't think you'll hear from anyone else

2      who will support Mr. Carpenter's story and I don't think

3      you'll see any evidence that wasn't formulated by anyone

4      other than Mr. Carpenter, but this case is about an oral

5      contract.  And the jury that gets chosen will have to decide

6      whether or not Mr. Carpenter, who's a sophisticated

7      businessman who was hired by Southwest Management Company by

8      virtue of a written employment contract -- you'll be able to

9      see that written employment contract.  And in that written

10     employment contract there's a clause that says no other

11     agreements regarding your employment -- I'm paraphrasing --

12     can be made by -- by the parties unless it's signed in

13     writing by both parties.

14              Nevertheless, Mr. Carpenter alleges that

15     Mr. Potashnik was gracious enough to give him a

16     million-dollar -- he calls it a bonus -- outside of a

17     agreement.  And, basically, that's what the case is.  So

18     that's why Ms. Gibson asked you about it and that's why it's

19     important to focus on your thoughts and comments about

20     following rules, contractual agreements, and things like

21     that.

22              I've been trying not to go over the same

23     things that Ms. Gibson went over.  I'm going to try not to

24     take up my full hour and give you back some time.

25              I want to talk about motorcycles because I

```
 1    had two Harley -- what's your bike?
 2                    VENIRE PERSON 7:  I have a Harley and a
 3    Honda Gold Wing.
 4                    MR. L. FRIEDMAN:  Oh, man, I had -- you
 5    been to Sturgis?  Four times.
 6                    Sturgis is the big motorcycle rally in
 7    Sturgis --
 8                    VENIRE PERSON 14:  I know.  I'm from
 9    California.
10                    MR. L. FRIEDMAN:  From LA?
11                    But I've have been there four times and I
12    rode Harleys until I fell on my head and had twenty-three
13    stitches.  And then my wife retired me from riding Harleys.
14    I bought another Harley and hid it from her.  She found it,
15    sold it, kept the money.  And I bought another Harley and
16    hid it from her.  She found it and sold it, kept the money,
17    and then I got tired of playing that game.
18                    (Laughter)
19                    MR. L. FRIEDMAN:  So, I am retired from the
20    Harley-Davidson business.
21                    Let me ask you a general question.  How
22    many of you have had experience with written contracts in
23    your business?  So let me take the first row first.  I know
24    that, Mr. Short, you're an attorney.
25                    VENIRE PERSON 1:  Yes.
```

1                    MR. L. FRIEDMAN:  And let me just ask you
2     what kind of attorney you were.
3                    VENIRE PERSON 1:  Just civil.
4                    MR. L. FRIEDMAN:  So you've written
5     contracts?
6                    VENIRE PERSON 1:  Yes.
7                    MR. L. FRIEDMAN:  You've enforced
8     contracts?
9                    VENIRE PERSON 1:  Yes.
10                    MR. L. FRIEDMAN:  And over the course of
11    your -- you look like you have (unintelligible), so I'm
12    saying your short career as an attorney -- you recognize the
13    importance of having agreements in writing?
14                    VENIRE PERSON 1:  It's important.  It's
15    not -- not every case is the same.
16                    MR. L. FRIEDMAN:  But it's important?
17                    VENIRE PERSON 1:  It's important.
18                    MR. L. FRIEDMAN:  And you've had experience
19    negotiating contracts?
20                    VENIRE PERSON 1:  Not a whole lot.  That's
21    not the general part of my practice.
22                    MR. L. FRIEDMAN:  Okay.
23                    So, let me continue.  Anyone else on the
24    first row had their own personal experience, their spouse or
25    anyone in their family or anyone that they live with

1    negotiating contracts?

2                    Mr. Page's friend.  By the way, that's not

3    always an asset.

4                    (Laughter)

5                    VENIRE PERSON 4:  Understood.

6                    Every year we have to sign teacher

7    contracts set forth by the school board.  And right now

8    we're working on -- in addition to the house, we're working

9    on a contract we have right now.

10                   MR. L. FRIEDMAN:  Okay.  And for major

11   commitments your experience is that the major commitments

12   for complicated or large money matters are always in

13   writing?

14                   VENIRE PERSON 4:  Yes.

15                   MR. L. FRIEDMAN:  And by knowing Mr. Page,

16   that doesn't mean that if the Court instructs you to follow

17   the law, the Court gives you instructions, that you wouldn't

18   follow.  You would follow the Court's instructions at the

19   end of the case?

20                   VENIRE PERSON 4:  Yes, sir.

21                   MR. L. FRIEDMAN:  And knowing Mr. Page

22   could be an asset or a liability.  We haven't explored that.

23                   Okay.  Could you be fair and listen to the

24   evidence presented from the jury box?

25                   VENIRE PERSON 4:  Uh-huh.

1          MR. L. FRIEDMAN:  And you'd follow the

2     Court's instructions, correct?

3          VENIRE PERSON 4:  Yes.

4          MR. L. FRIEDMAN:  And, Mr. Brock?

5          VENIRE PERSON 6:  I'm the maintenance

6     manager in the food industry, so I negotiate the contracts

7     for refrigeration companies and stuff like that, building

8     grounds.

9          MR. L. FRIEDMAN:  You've had a lot of

10    experience negotiating contracts.  And would you -- would

11    you agree that the important matters usually get reduced to

12    writing?

13         VENIRE PERSON 6:  Well, in the food

14    industry it's not in writing.  It doesn't happen.

15         MR. L. FRIEDMAN:  It doesn't happen.

16    That's because of --

17         VENIRE PERSON 6:  Audits.  Audits.

18         MR. L. FRIEDMAN:  Audits and health and

19    things like that.  Okay, well, that's good.

20         VENIRE PERSON 7:  I had a -- excuse me -- I

21    had a handshake deal on a house and we went over the

22    contract.  We were moving forward with it and the lady,

23    about three-and-a-half weeks into the contract, pulled the

24    contract out from under me and kind of threw me to the

25    wayside and I lost about $1500 in the process.  And it was a

1    handshake deal on the house.  The contract was legal and

2    binding but she had the right to pull it out from under me,

3    and that has still left a wound, see.

4                    MR. L. FRIEDMAN:  Can we still sue her?

5                    (Laughter)

6                    MR. L. FRIEDMAN:  I've got a card.

7                    VENIRE PERSON 6:  I think the house is way

8    gone by now.  So it's --

9                    MR. L. FRIEDMAN:  All right.

10                   VENIRE PERSON 6:  -- lost one.

11                   MR. L. FRIEDMAN:  How about you?

12   Ms. Poindexter --

13                   VENIRE PERSON 8:  Yes.

14                   MR. L. FRIEDMAN:  -- did you say you had

15   experience with contracts?

16                   VENIRE PERSON 8:  No.

17                   MR. L. FRIEDMAN:  Okay.  Good.

18                   And, Ms. -- Mrs. Ciraci?

19                   VENIRE PERSON 9:  Yes.

20                   MR. L. FRIEDMAN:  Yeah.  What about you?

21                   VENIRE PERSON 9:  A lot of our vendors are

22   musicians, comedians, and things like that.  So I've dealt

23   with explaining to them what happens if their contracts from

24   me (inaudible) as the state institutions cannot have and

25   need to be changed.  But other than that I don't have a

1    whole lot of contracts beyond lease agreements.

2                    MR. L. FRIEDMAN:  But you have some

3    experience.

4                    And, Ms. Parson?

5                    VENIRE PERSON 10:  I'm with the funeral

6    business.  We have to do contracts because of the State and

7    it has to be in writing.

8                    MR. L. FRIEDMAN:  And what's the name of

9    the funeral business that you work for?

10                   VENIRE PERSON 10:  I work for Laurel Land.

11                   MR. L. FRIEDMAN:  Then you know the Byrum

12   Funeral Home?

13                   VENIRE PERSON 10:  It was, at that time

14   frame, Stewart.

15                   MR. L. FRIEDMAN:  Yeah, 'cause that's a

16   client of mine.  Do you know them, the Byrum Funeral Home?

17                   VENIRE PERSON 10:  Who?

18                   MR. L. FRIEDMAN:  Byrum Funeral Home.

19                   VENIRE PERSON 10:  I know them in

20   Lancaster.

21                   MR. L. FRIEDMAN:  Yes.

22                   VENIRE PERSON 10:  I know of them.

23                   MR. L. FRIEDMAN:  And that wouldn't, the

24   fact that I represent them and they probably get my

25   business?

1          VENIRE PERSON 10:  They're greater north

2     Dallas.

3          MR. L. FRIEDMAN:  So let me ask this

4     general question.  Based on what you've heard so far, is

5     anybody here leaning towards the plaintiff?  Was that a

6     sneeze or a --

7          VENIRE PERSON 25:  I'm sorry.  I was

8     yawning.

9          MR. L. FRIEDMAN:  This is like an auction.

10          (Laughter)

11          MR. L. FRIEDMAN:  If you raise your card,

12     you're it.

13          VENIRE PERSON 25:  It's the wrong sign.

14          MR. L. FRIEDMAN:  If you scratch your nose,

15     you bought it.  That's 300,000.

16          (Laughter)

17          MR. L. FRIEDMAN:  So this is real life.

18     You've only heard one side.  So, based on what Ms. Gibson

19     has said, is anybody here leaning towards the plaintiff?

20          Does anybody here feel like if somebody

21     brought a lawsuit, you know, they have an advantage?  If

22     somebody lost money or claims they lost money, that they

23     have an advantage coming to the courthouse?  Is there

24     anybody here that feels that way?

25          Is there anybody here -- let me ask the

1    first -- the front row -- that doesn't feel they could be

2    fair or doesn't feel that they would follow the Court's

3    instructions and follow the law and be impartial listening

4    to the evidence in the jury box?

5                    VENIRE PERSON 8:  All I have to say is that

6    I feel everything should be set in stone, which is in

7    writing.  That's the way I feel.

8                    MR. L. FRIEDMAN:  Right.  But if the Court

9    instructs you that you're only to consider evidence from the

10   jury box and gives you instructions about what it is

11   you're -- you're to consider, in other words, what the

12   formation of an oral contract is, what the formation of a

13   agreement is, and what the burden of proof is, you would be

14   able -- you would follow the Court's instructions?

15                    You have to answer verbally so --

16                    VENIRE PERSON 8:  Oh, possibly.

17                    MR. L. FRIEDMAN:  -- Vikki can pick it up.

18                    You're not sure about it?  Okay, we'll --

19   we can talk privately.

20                    So, as to Jurors 1 through 7, minus 5,

21   everybody here feels like they can listen to the evidence

22   impartially.

23                    Let me ask the second row.  Everybody here

24   feel they could follow the Court's instruction, be

25   impartial, can listen to the evidence from the jury box?  Is

1    there anyone in the second row?  Second row feel that they

2    can't?  So everybody from Juror 11 through 19 -- we'll go

3    with 20, 18 through 20.

4                    I'm going to talk to you, 19 and 20.

5                    VENIRE PERSON 20:  So, everything I do at

6    work.

7                    MR. L. FRIEDMAN:  I wanted a consensus.

8    No, I'm just paraphrasing to put in --

9                    VENIRE PERSON 19:  Yeah.  So, serving

10   contractually bounds, and all in writing, and there's

11   nothing in my line of work you get that's not --

12                   MR. L. FRIEDMAN:  And remind me again --

13                   VENIRE PERSON 19:  IT.

14                   MR. L. FRIEDMAN:  So you're in IT.

15                   VENIRE PERSON 19:  So IT contracts,

16   performance based.  If it's not in writing, it's not going

17   to be enforceable.

18                   MR. L. FRIEDMAN:  And why is it that people

19   in your --

20                   VENIRE PERSON 19:  Because a lot of times

21   they don't -- there's -- you've got to have terms.  And most

22   terms, those contracts have performance based, and so you've

23   got to know where you are on the way on a software contract.

24                   MR. L. FRIEDMAN:  And you're an honest

25   person.

1      VENIRE PERSON 19:   Yeah.

2      MR. L. FRIEDMAN:   All right.   Thank you.

3      You have a bachelors degree.

4      Someone else that we did the --

5      UNIDENTIFIED VENIRE PERSON:   Yes.

6      MR. L. FRIEDMAN:   And as someone in your

7   position, notwithstanding everything you said, if the judge

8   instructs you to follow the law, to listen to the evidence

9   from the jury box and follow his instructions --

10      UNIDENTIFIED VENIRE PERSON:   Yeah.   It

11   would be a difficulty to sell, but I could.

12      MR. L. FRIEDMAN:   And I've got Mr. Gillett.

13      VENIRE PERSON 20:   Yes.

14      MR. L. FRIEDMAN:   I love your razors.   I'm

15   not the first one that said that.

16      Tell me about yourself.

17      VENIRE PERSON 20:   I'm facility manager and

18   I -- yesterday, I had a diesel for backup generators.   I

19   didn't know I had a poorly written contract before we ever

20   make the actual agreement part of the contract, and they

21   couldn't even answer it.   And this is a contract on Email.

22   So, oral contracts for me can be -- even 20 grand will not

23   be acceptable.   So compensation for a million is almost

24   laughable, and I'm surprised y'all are in court.

25      MR. L. FRIEDMAN:   You're not the only one.

1  But how many people hate Emails?  I get thousands a day.

2              And have you been to Cummins, Indiana?  Got

3  a leg up on you because I have been to Cummins, Indiana.

4  It's a relatively -- it's small geographically and Cummins

5  engines is in there.  It's like Mayberry:  The Cummins bank;

6  Cummins barber shop; Cummins city mall.  And it's an

7  interesting place.  I'd go back.

8              Now, you're sophisticated, do a lot of

9  business, and you're here today, correct?

10             VENIRE PERSON 20:  Yes.

11             MR. L. FRIEDMAN:  If the judge instructs

12 you to follow the law and listen to the evidence that comes

13 in from the witness stand only, you could do that?

14             VENIRE PERSON 20:  I think you asked that a

15 few minutes ago and I said no.

16             MR. L. FRIEDMAN:  I didn't ask you.

17             VENIRE PERSON 20:  Oh, I'm sorry.

18             MR. L. FRIEDMAN:  I asked you about the

19 razors.  But, look, could you be impartial and follow his

20 instruction?  That's the question to you, Mr. Gillett.

21             VENIRE PERSON 20:  I would find it hard,

22 difficult.

23             MR. L. FRIEDMAN:  But not impossible.

24 Difficult is one thing; possible is something else.

25             VENIRE PERSON 20:  Okay.

1          MR. L. FRIEDMAN:  I'm going to put you down
2     as hard.
3          VENIRE PERSON 20:  That's fine.
4          THE COURT:  Y'all come over here just a
5     minute.
6          (Off the record)
7          THE COURT:  Ladies and gentlemen, we'll
8     take our lunch break.  We'll take an hour and 10 minutes for
9     lunch.
10          As I mentioned earlier, throughout the
11     course of the trial I'll give instructions in law.
12          (Jury instructions given)
13          THE COURT:  So it is 12:17 now.  If you'll
14     be back in the hallway at 1:15, Rick, our bailiff, will
15     bring you in.
16          Please remember your numbers.  Please
17     remember what row you're on.  Please remember who's seated
18     next to you.  That way, when he brings you in, you'll be
19     able to get seated quite quickly.
20          (The jury exited the courtroom.)
21          (Lunch recess taken)
22          THE COURT:  Mr. Romano, so English is your
23     first language?
24          VENIRE PERSON 24:  Yes.  Yes, sir.
25          THE COURT:  Do you speak Spanish -- do you

1    speak Spanish before English or English before Spanish?

2                    VENIRE PERSON 24:   A little -- little

3    English.

4                    THE COURT:   Okay.   Did you understand all

5    the questions that Ms. Gibson asked?

6                    VENIRE PERSON 24:   No, sir.

7                    THE COURT:   Okay.   All right.

8                    We're going to excuse you as a juror now.

9    We'll take your juror badge and Vikki will take you out

10   through the clerk's office over here.

11                   (Off the record)

12                   (The jury entered the courtroom.)

13                   THE COURT:   Welcome back.   Good afternoon

14   now, ladies and gentlemen.

15                   Could I ask everybody on the front row to

16   hold up your numbered cards?

17                   (Row 1 complied)

18                   THE COURT:   Thank you.   Put those down.

19                   Everybody on the second row, would you hold

20   up your numbered cards, please?

21                   (Row 2 complied)

22                   THE COURT:   Thank you.

23                   And everybody on the third row,

24   Mr. Romano's not here, so it should be 21, 22, 23, then go

25   to 25.

100

```
1                      (Row 3 held up their juror cards.)
2                      THE COURT:  Very good.  Thank you.
3                      On the fourth row?
4                      (Row 4 held up their juror cards.)
5                      THE COURT:  On the fifth row?
6                      (Row 5 held up their juror cards.)
7                      THE COURT:  Very good.  Thank you-all.
8                      Again, welcome back.  Good afternoon,
9   ladies and gentlemen.
10                     When we stopped just before lunch,
11  Mr. Friedman was conducting his voir dire examination or
12  jury selection examination.  We'll ask him to continue, to
13  pick up just where he left off.
14                     Mr. Friedman, sir, whenever you're ready.
15                     MR. L. FRIEDMAN:  Thank you.
16                     DEFENDANTS' VOIR DIRE (CONT'D)
17                     MR. L. FRIEDMAN:  Okay.  I just have a few
18  more questions and to a couple of particular jurors.
19                     So I looked over my notes and your jury
20  cards at lunchtime.  And I just wanted to ask Mr. Short,
21  because you're an attorney and I know you have a background,
22  a long background of practicing civil law.  Based on all of
23  your experience as a lawyer practicing somewhat in this
24  field, do you think it would be difficult for you to be
25  impartial listening to this case?
```

Appendix 000499

1          VENIRE PERSON 1:  I've served on probably

2     half a dozen juries before, so I don't see how it would be

3     any different than any of the others.

4          MR. L. FRIEDMAN:  I didn't ask you directly

5     but I wanted to ask you about that.

6          And then help me with the pronunciation,

7     Ms. Van.

8          VENIRE PERSON 11:  Vanantwerp.

9          MR. L. FRIEDMAN:  Vanantwerp.

10          This case does involve some charitable

11    corporations, 501(c)(3) independent foundation.  I even

12    think some of the partners in the 60-property portfolio may

13    be charitable foundations.  Is -- is the fact that we may be

14    dealing with the subject of charitable foundations, will

15    that affect your ability to be impartial in this case?

16          VENIRE PERSON 11:  No, sir.

17          MR. L. FRIEDMAN:  Okay.

18          Ms. Billingsley, the cooker.

19          VENIRE PERSON 17:  That's me.

20          MR. L. FRIEDMAN:  Did you bring anything

21    back from lunch?

22          VENIRE PERSON 17:  I should have.

23          MR. L. FRIEDMAN:  You are healthy.  Some

24    brownies.

25          I have you down for saying something like

1    didn't go one way or another or something like that.  What's

2    your kind of -- what's your thought and opinion and feelings

3    about that?

4                    VENIRE PERSON 17:  I think it really just

5    depends on the situation.  I would need more information

6    before I was able to make a decision.

7                    MR. L. FRIEDMAN:  So you would be willing

8    to listen to the evidence that you heard in court?

9                    VENIRE PERSON 17:  Yes.

10                    MR. L. FRIEDMAN:  You would be willing to

11   judge it fairly?

12                    VENIRE PERSON 17:  Yes.

13                    MR. L. FRIEDMAN:  You'd be willing to

14   follow the Court's instructions?

15                    VENIRE PERSON 17:  Yes.

16                    MR. L. FRIEDMAN:  And make your decision

17   impartially, based on the evidence?

18                    VENIRE PERSON 17:  Correct.

19                    MR. L. FRIEDMAN:  Okay.  Good with that.

20                    And then, Ms. Baker, same thing with you.

21                    VENIRE PERSON 18:  Yes, I could.

22                    MR. L. FRIEDMAN:  You'd be willing to

23   listen to the evidence, be impartial?

24                    VENIRE PERSON 18:  Right.

25                    MR. L. FRIEDMAN:  Make your decision based

103

1    upon --

2                    VENIRE PERSON 18:   The evidence.

3                    MR. L. FRIEDMAN:   -- the evidence?

4              And I don't have you down as an opinion one

5    way or another about oral agreements.   Did you have one?

6                    VENIRE PERSON 18:   No.   It would have to be

7    based on all of the information at hand.

8                    MR. L. FRIEDMAN:   And have you ever made an

9    oral agreement or anyone in your family?

10                   VENIRE PERSON 18:   Yes.

11                   MR. L. FRIEDMAN:   And what type was that?

12                   VENIRE PERSON 18:   Probably with my kids.

13   Ask them to do something and compromise.   My kids are

14   adults.   If I say I'm going to do something, to me that's an

15   oral agreement.

16                   MR. L. FRIEDMAN:   And did you reserve the

17   right to smack them in the pants if they didn't follow the

18   instruction?

19                   VENIRE PERSON 18:   Probably so.

20                   MR. L. FRIEDMAN:   I'm a big believer in

21   smacking them in the pants.   Five of my kids are lawyers, my

22   oldest daughter runs her own business, and they got there by

23   me smacking them in the pants.   So something I did worked.

24              What about business agreements?   Do you

25   have a thought or feeling or opinion about whether or not

1    business agreements should be in writing?

2                        VENIRE PERSON 18:  I do.  I'm a birth

3    registrar and I do birth certificates at a hospital, and to

4    me that's a written agreement.  There's, like, gray area in

5    there, but I do believe that what's written should stand

6    firm.

7                        MR. L. FRIEDMAN:  Okay.

8                        And, Mr. Crawford, Number 23, I may not

9    have taken good notes, but I did get your opinions or

10   thoughts or feelings about written agreements and oral

11   agreements.

12                       VENIRE PERSON 23:  Yeah.  So, with me

13   personally, I've made a few, I guess, handshake agreements.

14   I'm a metal fabricator, and on certain things I've done oral

15   agreements, but that was more due to the relation of the

16   person; so, a close friend or relative, never a -- an actual

17   entity where I'm making a profit.

18                       MR. L. FRIEDMAN:  Do you have an opinion or

19   a feeling or a thought about an oral agreement, alleged oral

20   agreement between employer and employee?

21                       VENIRE PERSON 23:  Can you expand on that?

22                       MR. L. FRIEDMAN:  Yeah.  I mean should

23   those types of agreements be in writing or orally is okay?

24                       VENIRE PERSON 23:  It's a difficult thing

25   to determine.  I guess if you're talking specifically about

1    this situation, don't know anything about it.  And so, going

2    off of that, all we know is the sum of money.  And that, you

3    can't really make a decision off that, because I'm sure the

4    underlying evidence of everything there may or may not have

5    an influence on how someone decides their point of view.

6    So, at this time I can't say that I have a determination in

7    whatever has gone on.

8                        MR. L. FRIEDMAN:  And would the sum of

9    money make a difference to you if it was an alleged oral

10   agreement for over a million dollars?  I mean, would that be

11   significant to you to have in writing?

12                       VENIRE PERSON 23:  To an extent.

13   Personally, for me there would have to be more of a

14   relationship between the people.

15                       MR. L. FRIEDMAN:  Okay.  Fair enough.

16                       And, Ms. Billingsly, what about you?  Do

17   you have an opinion?  If an agreement had to do with

18   business, would you lean more one way or another with regard

19   to whether it should be oral or written?

20                       VENIRE PERSON 17:  I would think it should

21   be written.

22                       MR. L. FRIEDMAN:  And what about you,

23   Ms. Baker?

24                       VENIRE PERSON 18:  I would think it should

25   be written.  That's --

1            MR. L. FRIEDMAN:  How much time do I have

2    left, Judge?

3            THE COURT:  You have till 2:07, about 37

4    minutes.

5            MR. L. FRIEDMAN:  Well, I think as a -- as

6    a present to you, Judge, I'm going to give you back all that

7    time.

8            THE COURT:  Very good.

9            MR. L. FRIEDMAN:  I've had enough.  Thank

10   you.

11           THE COURT:  I'll take it.

12           Ladies and gentlemen, that concludes the

13   portion of jury selection where the attorneys ask you

14   questions.  The final portion of jury selection is some

15   individual questions.  The people we need to talk to fall

16   into one or more of several categories.  We need to talk to

17   any juror who wanted to answer a question but, for whatever

18   reason, did not answer a question.

19           We often have jurors who are shy about

20   speaking in front of a group.  Perfectly understandable.

21   Sometimes an attorney asks a question and you didn't want to

22   answer in front of the entire group.  That's perfectly

23   understandable.

24           If for whatever reason you wanted to answer

25   a question but didn't, we want to hear -- still hear what

1    you have to say.  It was not speak then or forever hold your

2    peace, but this will be speak now or forever hold your

3    peace.  We need to know what's on your mind if you haven't

4    shared that already.

5                    We also need to talk to any jurors who have

6    any matter of privacy to bring to my attention.  This would

7    most often involve matters of medical privacy.

8                    We don't go more than about an hour and 15

9    minutes without taking a break, but we often have jurors who

10   are uncomfortable going that length of time without taking a

11   break.  They'd rather take a very predictable break every

12   hour on the hour for 10 minutes.  That's something we can

13   accommodate.

14                   Sometimes we have jurors who are taking

15   medication and the medication affects their ability to

16   concentrate or to follow the evidence or to even stay awake.

17   We don't want to ask you to not take your medication in

18   order to serve on this jury, but we don't want to ask those

19   type of questions in front of the entire jury panel.  That's

20   a privacy matter.  But that would be an example of a medical

21   condition that we cannot accommodate.  But if you have some

22   matter of privacy like that, a medical condition or a

23   religious conviction against sitting in judgment of others,

24   we want to talk to you privately and see if it's something

25   we can accommodate or not.

1          And the third group -- and this would be

2     the largest group -- is we need to talk to any juror who

3     cannot commit -- cannot commit to being here for the length

4     of the trial.  The trial may be seven to ten trial days, and

5     we're in trial four days a week, Monday through Thursday.

6     On Fridays we hear motions in all of our other cases.

7          Sometimes we'll start at 9:00 o'clock.

8     Most often we'll start at 9:00 o'clock.  On some days we may

9     start at 9:30.  Most days we're going to try and stop by

10    5:00 o'clock, but we may go up until 5:30 on some days,

11    particularly if we have a witness who's not available at

12    another time.  Or if it's right in the middle of the

13    examination, sometimes it's not fair to cut off an

14    attorney's questioning, let the attorney go home and -- let

15    the witness go home and study up a little bit more and then

16    come back and ask the questions.

17          Fairness to the parties requires that we

18    let the questioning continue a little bit past 5:00 o'clock.

19    But we certainly recognize that there will be a lot of

20    information.  We don't want to overload you with

21    information, so we want to keep the day at a length where it

22    will allow you to make a fair and true judgment in the case.

23          The type of -- the reasons that you may not

24    be able to serve include you have small children at home or

25    you're the primary caregiver of an elderly parent and the

1    children or the parent may be unattended, may be in danger

2    by your jury service.  If -- if you have prepaid tickets to

3    a vacation, if you have a surgery planned, if you have, you

4    know, an important doctor's appointment, those type of

5    things, those are the type of things we need to know about

6    in order to determine whether or not we can excuse you as a

7    juror.

8              If you have a business reason, most often

9    business reasons do not allow me to excuse you as a juror,

10   but we will certainly hear what you have to say.  Sometimes

11   we have people who have been unemployed for a period of time

12   and just started a job this week.  We don't want you to

13   endanger a job that you just started.  So I'm not saying

14   there's no reason if it's a business reason.  It's something

15   we'll hear and we'll make a determination.

16             So having said -- and -- and if there's --

17   if there's just something you wanted to report and you

18   haven't reported it yet, we'll do that too.  You can tell us

19   that too.

20             So, on the first row, Jurors 1 through 10,

21   is there anybody who knows that they need to report

22   something to the Court, you wanted to answer a question, you

23   have some privacy matter, you have a conflict with the

24   length or the timing of the trial?  On the front row?  You

25   got to raise up your cards.  Juror Number 3.

1              Anyone else on the front row?

2              On the second row?  Sixteen, thirteen.

3    Okay.

4              And, Mr. Gillett, if you'd stay behind,

5    'cause I wanted to determine if Julie Mingus is the same one

6    that's in this case.  If you'd stay behind also.

7              On the third row?  Twenty-two and

8    twenty-five.  Anyone else?

9              On the fourth row?  Thirty-seven,

10   thirty-eight, thirty-nine.

11             On the last row?  Forty-one, forty-one --

12   forty-one, forty-four, forty-five.

13             Okay, we're going to take a break here.

14   The break's going to be about 30 minutes.  If you raised

15   your card, please stay behind.  If you didn't raise your

16   card, we're going to see you back at about 5 after 2:00.  it

17   may be a little bit longer.  It depends on how long it takes

18   for us to talk to everyone.

19             If you raised your card, please stay

20   behind.  If you didn't raise your card but you want to

21   report something, stay behind.

22             So, Juror Number 2, you stay behind too.

23   All right?

24             (The jury panel exited the courtroom.)

25             THE COURT:    All right.  The attorneys,

1    Ms. Gibson, Mr. Friedman, we're going to do this in the jury

2    room.  You can bring everyone you want or no one that you

3    want.

4                        (Off the record)

5                     INDIVIDUAL VOIR DIRE

6                THE COURT:  If you'll come in here.

7                (Venire Person 2 entered the jury room.)

8                What did you want to tell us, sir?

9                VENIRE PERSON 2:  I have two jobs and I

10   work overnight and daytime.  And on this one is my first

11   time working on Tuesdays and it's my second week.  Last week

12   I was absent for a doctor appointment and today for the

13   jury, and I also --

14               THE COURT:  If you are serving as a juror,

15   will you still be working the overnight job?

16               VENIRE PERSON 2:  Yeah.

17               THE COURT:  So you can't even say that

18   you'd be awake through the entire trial?

19               VENIRE PERSON 2:  I can't.

20               THE COURT:  Thank you for sharing that with

21   us.

22               (Venire Person 2 exited the jury room.)

23               MR. L. FRIEDMAN:  Judge, I didn't hear what

24   he said.

25               THE COURT:  He said he has a overnight job

1    and he can't commit to being awake during the trial.

2                    Ms. --

3                    MR. L. FRIEDMAN:  That's an advantage.

4                    THE COURT:  I know.

5                    (Venire Person 3 entered the jury room.)

6                    THE COURT:  Ms. Bennett, what'd you want to

7    tell us?

8                    VENIRE PERSON 3:  Small children, one, in

9    getting out of daycare.  It closes at 5:00.  And the other

10   gets out at 3:45.

11                   THE COURT:  And how old are they?

12                   VENIRE PERSON 3:  Two and four.

13                   THE COURT:  And you're the primary

14   caregiver?

15                   VENIRE PERSON 3:  Yes.

16                   THE COURT:  Thank you for sharing that with

17   us.

18                   (Venire Person 3 exited the jury room.)

19                   THE BAILIFF:  Thirteen is coming in.

20                   (Venire Person 13 entered the jury room.)

21                   THE COURT:  Mr. Kruoch, what'd you want to

22   tell us, Juror Number 13?

23                   VENIRE PERSON 13:  It's me and my wife.

24   Grandbaby, two years old, my wife is not in good condition

25   to take care of all the time.  So I will work second shift.

1    In the morning time I have to watch the baby.

2                    THE COURT:  Is it fair to say that you're

3    the primary caregiver of a two-year-old?

4                    VENIRE PERSON 13:  Yeah.

5                    THE COURT:  Thanks for sharing that with

6    us.

7                    (Venire Person 13 exited the jury room.)

8                    THE COURT:  Is that Juror Number 16?

9                    THE BAILIFF:  Number 16.

10                   (Venire Person 16 entered the jury room.)

11                   VENIRE PERSON 16:  Hi.

12                   THE COURT:  Are you 16?

13                   VENIRE PERSON 16:  I'm 16.

14                   THE COURT:  Ms. Russell.

15                   VENIRE PERSON 16:  So, I got laid off

16   starting last Monday, starting a new job Wednesday, so

17   tomorrow --

18                   THE COURT:  All right.  Thanks for sharing

19   with us.

20                   (Venire Person 16 exited the jury room.)

21                   THE COURT:  Twenty-three?

22                   THE BAILIFF:  No, Number 20.  Sorry.

23                   THE COURT:  Who's witness is Julie Mingus?

24                   MR. DONOHUE:  Ours.

25                   MS. GIBSON:  Yes.

1          THE COURT:  Do any of y'all know her or how

2     old she is or anything?

3          MS. GIBSON:  I believe she does work in

4     accounting.

5          MR. L. FRIEDMAN:  She was on our list.

6     We're not going to call her.

7          THE COURT:  Thanks.

8          THE BAILIFF:  Number 25.

9          (Venire Person 22 entered the jury room.)

10         VENIRE PERSON 22:  Hi.  There was a

11    Mark Jones on the transparency that you put up for the

12    listed parties that I know.

13         THE COURT:  I'm sorry.  You're?

14         VENIRE PERSON 22:  Number 22.

15         THE COURT:  And you know?

16         VENIRE PERSON 22:  I know a Mark Jones.  I

17    don't know if it's the same one or not.

18         THE COURT:  Who's witness?

19         MR. DONOHUE:  He's our witness.

20         THE COURT:  And who is he?

21         MR. DONOHUE:  Judge, he's formerly with

22    Southwest Housing Management and --

23         MR. J. FRIEDMAN:  He lives in Puerto Rico.

24         MR. L. FRIEDMAN:  He lives there.  He's now

25    fulfilling a contract for people in Puerto Rico.

1            VENIRE PERSON 22:  Definitely not him.

2            (Venire Person 22 exited the jury room.)

3            (Venire Person 25 entered the jury room.)

4            THE COURT:  Number 25?

5            VENIRE PERSON 25:  I suffer from some mild

6    panic, so I get very uncomfortable sometimes in a crowd,

7    very sweaty, where I could make a noise or something could

8    happen.  Not impossible.  Outside of vacation February 8th

9    to the 11th.  So I don't know how long it is going to be.

10            THE COURT:  All right.  About the anxiety,

11   no right answers, no wrong answers, only honest answers.

12   You have to be able to concentrate and follow the evidence.

13   Are you concerned that you might have an anxiety attack

14   during the course of the trial that will prevent you from

15   following some of the evidence?

16            VENIRE PERSON 25:  It's possible, but

17   sometimes I have been doing better.

18            THE COURT:  Thanks for sharing with us.

19            (Venire Person 25 exited the jury room.)

20            THE COURT:  That was 25.

21            THE BAILIFF:  Thirty-seven is coming up.

22            THE COURT:  All right.

23            (Venire Person 37 entered the jury room.)

24            VENIRE PERSON 37:  Hi.

25            It's more business.  I sold my house this

116

```
1    week and I have to be out by Thursday, and I start a new job
2    next week and I don't have any time off.
3                    THE COURT:  All right.
4                    MR. L. FRIEDMAN:  I'm sorry.  What now?
5                    VENIRE PERSON 37:  I have to do all this
6    while working.
7                    MR. L. FRIEDMAN:  Which number?
8                    THE COURT:  Thirty-seven.
9                    (Venire Person 37 exited the jury room.)
10                   THE COURT:  And, Rick, we're not going to
11   do that last row.
12                   MR. L. FRIEDMAN:  She was new job and sold
13   her house.
14                   THE COURT:  She started a new job.
15                   MS. GIBSON:  Thursday.
16                   THE COURT:  Or in a couple days.
17                   MS. GIBSON:  Sorry.  She had to be out of
18   the house by Thursday.  Sorry.
19                   THE COURT:  We're not going to get to her.
20                   (Venire Person 38 entered the jury room.)
21                   VENIRE PERSON 38:  I'm actually on
22   probation.  I have to meet with my PO on Thursday at --
23                   THE COURT:  Are you on probation for a
24   crime involving theft?
25                   VENIRE PERSON 38:  No.  DWI.
```

117

1              MR. L. FRIEDMAN:  What number?

2              THE COURT:  Thirty-eight.

3              All right.  Thanks for sharing that with

4    us.

5              (Venire Person 38 exited the jury room.)

6              THE BAILIFF:  And 39.  Number 39.

7              You want me to release the last three?

8              THE COURT:  Don't.

9              (Venire Person 39 entered the jury room.)

10             VENIRE PERSON 39:  Hello.

11             I'm self-employed and I'm single and I'm

12   the only one that pays my bills, so it would really be a

13   hardship if I had to stay.

14             THE COURT:  So, if you had to serve on the

15   jury, would you worry that you're not going to be able to

16   pay your bills and keep you from following the evidence in

17   this case?

18             VENIRE PERSON 39:  It might.  It might

19   not -- well, yes, it would.

20             THE COURT:  Thanks for sharing that with

21   us.

22             (Venire Person 39 exited the jury room.)

23             MS. GIBSON:  What -- I'm sorry.  What

24   number was that?

25             THE COURT:  It's 39.

```
 1                              JURY STRIKES
 2                  THE COURT:   These are just hardships.   Some
 3       of y'all may have challenges for cause.
 4                  Juror Number 2 has an overnight job, won't
 5       commit to not working the overnight job.   And he also has a
 6       daytime job and that would affect his ability to stay awake
 7       and focus on this case.   I also thought that, with all
 8       respect to people of faith, he seemed to me -- strikes me as
 9       someone who was kind of looking at something, didn't focus
10       on the evidence as much as some righteous path or something.
11       I don't know.
12                  Is there an objection to striking him for
13       cause; not for hardship, not for bias or prejudice?
14                  MR. L. FRIEDMAN:   I don't know what -- I
15       don't know what your protocol is, so I didn't say anything,
16       but usually I get an opportunity to examine him a little bit
17       and find out is it a real job, daytime job, I mean.
18                  THE COURT:   Yeah, that's not my protocol.
19                  MR. L. FRIEDMAN:   A lot of these people
20       just want to get out of jury duty, so I'm going to object to
21       him.
22                  MS. GIBSON:   No objection from plaintiff.
23                  MR. L. FRIEDMAN:   So I have to object for a
24       letting him go for cause.
25                  THE COURT:   All right.   Fair enough.
```

1          Two is struck over the objection of
2 plaintiff.
3                    MS. GIBSON:  Defendant.
4                    THE COURT:  Defendant.  I apologize.
5          Juror 3 has three children under the age of
6 five.  She is primary caregiver.  One is in elementary
7 school or some type of preschool and the other is in daycare
8 and gets out at 3:00.  That's a statutory exemption.
9                    Any objection to strike her for hardship?
10                   MS. GIBSON:  Not from plaintiff.
11                   MR. L. FRIEDMAN:  No.
12                   THE COURT:   Three is struck for cause.
13         Thirteen is a grandparent, primary
14 caregiver of grandchild, but along with his wife.  Having a
15 three-year-old grandchild, I understand that takes up
16 energy.
17                   MR. L. FRIEDMAN:  You know I love you,
18 Judge, but you're too kind.
19         He said his wife takes care of a
20 two-year-old.  He helps.  I didn't get the impression he's
21 the primary caregiver until you suggested it.
22         He's a good witness for our side.  I'm
23 urging you not to strike him and I would object to your
24 striking him for cause.
25                   MS. GIBSON:  No objection from plaintiff.

1          And my understanding is that he said his

2   wife is not well enough to care for the child full time and

3   that he had to take a shift --

4          MR. L. FRIEDMAN:  All right.  I'm going to

5   ask you to bring him back so we can examine him.

6          THE COURT:  I'm going to strike him, but

7   your objection is noted on the record.

8          Sixteen, starting a new job.  And she said

9   tomorrow, I believe, and doesn't want to miss the first 10

10  days of her work.

11         Any objection?

12         MR. L. FRIEDMAN:  Yes, I'm going to object

13  on that, Your Honor.

14         MS. GIBSON:  No objection from plaintiff.

15         MR. L. FRIEDMAN:  Your Honor, they can't

16  fire her for jury duty.  She'll just start two weeks later.

17  They'll find a way.

18         THE COURT:  Next one is 22.

19         MR. L. FRIEDMAN:  Then you'll have another

20  case.

21         THE COURT:  Twenty-two is okay.  He thought

22  he knew someone.

23         Twenty-five has --

24         MR. L. FRIEDMAN:  Well, 20 is okay because

25  we're not calling Julie Mingus.

1          THE COURT:  As far as hardship, 20 is okay.

2    I was only going for hardships.

3          MR. L. FRIEDMAN:  Okay.

4          THE COURT:  Twenty-two does not have a

5    hardship.

6          Twenty-five has anxiety issues.  Is there

7    agreement to strike him?

8          MR. L. FRIEDMAN:  No.  I'm not buying it.

9    He said he can listen.  He may or may not have an anxiety

10   attack.  If he does, we'll deal with it at the time.

11         THE COURT:  He also had a prepaid vacation

12   February 8th.

13         MR. L. FRIEDMAN:  We know it doesn't go to

14   February 8th.

15         MS. GIBSON:  We'd like to keep him too.

16         THE COURT:  I'll look at that.  We'll see

17   where we're getting at, but he's going on vacation February

18   8th.  I'll take your oral representations we're not going

19   that far, but...

20         All right.  Y'all take a couple minutes and

21   we'll do your strikes for cause.  I'll look over your notes

22   and we'll meet back out front in the courtroom.  But right

23   now, tell you where we're at.  We struck 2, 3, 13, 16, and

24   25 is on rebuttal.

25         MR. L. FRIEDMAN:  Two, three, thirteen,

1   sixteen, and twenty-five.

2                    THE COURT:  We haven't struck 25 yet.  I

3   wanted to see how many strikes for cause.  Do you have any

4   strikes for cause?  Do you know yet?

5                    MR. L. FRIEDMAN:  I don't know yet.

6                    THE BAILIFF:  Five has got the flu and

7   sixteen is not here, also.

8                    MR. L. FRIEDMAN:  Five is out.

9                    THE COURT:  Sixteen was here, but on

10  yours --

11                   MR. L. FRIEDMAN:  Twenty-four -- sixteen

12  here.

13                   THE BAILIFF:  Yeah.  Twenty-four is gone.

14                   MR. L. FRIEDMAN:  But 16 is here.

15                   THE COURT:  But she's struck for cause.  I

16  struck her over your objection.

17                   MR. J. FRIEDMAN:  You struck two, three --

18                   THE COURT:  And I'm also striking five

19  because she's not here, and twenty-four was struck earlier.

20  So two and three are off, five is off, thirteen is off,

21  sixteen is off, and twenty-four is off.

22                   MR. L. FRIEDMAN:  Twenty-four too?

23                   THE COURT:  Uh-huh.  He speaks Spanish

24  only.

25                   MR. L. FRIEDMAN:  Might be good for us.

123

1      THE COURT:  I know.  And for them.

2      Three strikes each.  And we haven't done

3  strikes for cause yet, but you get three strikes each.

4  After you do your three strikes each, we seat the first six

5  in line.  After we seat the first six in line, those are the

6  jurors, then the next three in line.  For the next three in

7  line, each side gets one strike, and the one's left sort of

8  alternate.  You have to do your three strikes before I can

9  do your strike on the alternates.

10      Does everyone understand?

11      MR. L. FRIEDMAN:  Yes.

12      MS. GIBSON:  I'm sorry.  I'm not following

13  the process.  Do you mind repeating it one more time?

14      THE COURT:  In just a few minutes we're

15  going to do strikes for cause.

16      MS. GIBSON:  Right.

17      THE COURT:  After that we're going to

18  figure out --

19      MS. GIBSON:  Right.

20      THE COURT:  After you do the three strikes,

21  the first six left standing on our jury.  And after we

22  figure out who the first strikes are we'll take the next

23  three in line.  And each of you get one strike of those

24  three, and the one that's standing is an alternate juror.

25      And the reason we do it that way is in case

124

```
1    you have a double strike.  For lawyers at your level case,
2    if you have a double strike, don't know who the first six
3    are.  The next three in line are going to be medical after
4    you do your three preemptory strikes.
5                   So take a couple minutes, look at your
6    notes, determine who you want to strike for cause, and we'll
7    meet back in the courtroom.
8                   MR. L. FRIEDMAN:  Can we use the jury room?
9                   (Off the record)
10                   (Recess taken)
11                   THE COURT:  All right.  We're doing strikes
12    for bias and prejudice now and strikes for cause, and we're
13    on the record now.
14                   Ms. Gibson, did you have any strikes for
15    cause other than the hardship ones we've already done?
16                   MS. GIBSON:  Yes, Your Honor.
17                   THE COURT:  Which ones?
18                   MS. GIBSON:  Four, six, eight, nineteen,
19    twenty.
20                   MR. L. FRIEDMAN:  Wait a second.  Four,
21    six, eight, nineteen, twenty.  Who else?
22                   MS. GIBSON:  Thirteen's gone, right?
23                   Fourteen.
24                   MR. L. FRIEDMAN:  You took it out of order.
25    Fourteen?
```

1              MS. GIBSON:  Yeah.

2              MR. SANFORD:  Fifteen.

3              MS. GIBSON:  Fifteen, seventeen,

4    twenty-two -- oh, I'm sorry, not seventeen -- twenty-two,

5    twenty-six, twenty-eight, thirty-seven, thirty-nine.

6              Did I miss any, Brian?

7              MR. L. FRIEDMAN:  You got up to my waist,

8    waist size.

9              MS. GIBSON:  And then we just -- and that's

10   it.

11             THE COURT:  Okay.

12             Juror Number 4, do you agree to that,

13   Mr. --

14             MR. L. FRIEDMAN:  No, absolutely not.

15   There was no showing of prejudice.

16             THE COURT:  All you have to do is tell me

17   no.

18             And your ground was because he knew the AV

19   person for that one?

20             MS. GIBSON:  It was -- it was that he --

21   not just that he knew the AV person but, also, he's one of

22   the people that said that his conviction about agreements

23   being in writing was so strong that he did not believe he

24   could be fair in a case involving an oral handshake.

25             THE COURT:  Right.  And I imagine that's

126

1    what most of these are.

2                    MS. GIBSON:   Yes.

3                    THE COURT:   And you're going to be opposing

4    those?

5                    MR. L. FRIEDMAN:   We're opposing all of

6    them.

7                    THE COURT:   Okay.   All right.

8                    Most of those were not strikes for cause.

9    It's like asking someone in car wreck cases, you know, your

10   defendant ran through a red light, can you overlook that or

11   are you starting off behind?  It's -- you're talking about a

12   fact in the case that they have an opinion about the value

13   of evidence is not unusual.  It's to be expected.

14                   The question you need to ask was what

15   Mr. Friedman asked for most of them is, the Court's going to

16   give you instructions in the law, can you follow the law

17   whatever it is?  And I'll give them an instruction as to

18   when they can enforce an oral contract.  I'm assuming that

19   will be part of your jury charge.  So, all those people who

20   said I would value a written contract over an oral contract,

21   it's like saying I don't think you should run through a red

22   light.  It doesn't mean you're negligent, but you're

23   starting off on rough footing there.

24                   MS. GIBSON:   And these are -- these are

25   only people that said their beliefs were so strong that they

1   could not be fair in the case.

2                    THE COURT:  Well, we can go through each

3   one of them, but only -- it's just up to me to determine

4   whether they can be fair or not.  It's like saying you can't

5   be fair to someone running the red light again.  You know,

6   it's a bad fact in the case.  Doesn't mean that they won't

7   follow the instructions; 'cause when I give them instruction

8   as to what negligence is, it doesn't say that running a red

9   light is negligence per se.  It says, Did the person act

10  with ordinary reasonable care?

11                   There could be reasons you run a red light,

12  like there's an emergency vehicle behind you.  You'll have

13  to make your argument that there's a reason that this wasn't

14  a written contract, but you should expect that in a

15  high-dollar thing like this most people would prefer

16  something in writing than an oral contract.

17                   But for those who said that they wouldn't

18  follow the law, we'll take those up, but I want you to

19  preserve your error.

20                   But for Number 4 that is denied as a

21  challenge for cause.

22                   MR. SANFORD:  But what about he did know --

23                   THE COURT:  He doesn't know a lawyer.  He

24  knows an AV person.  He said he could be fair and wasn't

25  going to hold that for or against, one way or the other.

```
 1                    Six, is six the same thing about the oral
 2      versus written contract?
 3                    MS. GIBSON:  Correct.
 4                    THE COURT:  Okay.  And you don't agree to
 5      that, Mr. --
 6                    MR. L. FRIEDMAN:  No.  We object,
 7      Your Honor.
 8                    THE COURT:  Six is denied.
 9                    Eight?
10                    MS. GIBSON:  Is the same.
11                    THE COURT:  Eight said she could possibly
12      follow the Court's instructions --
13                    MR. SANFORD:  Right.
14                    THE COURT:  -- instead of that she would
15      follow the Court's instructions.
16                    MR. L. FRIEDMAN:  I thought -- I thought I
17      was -- there's two arguments here.  One is that Ms. Gibson
18      didn't ask any of these people whether or not they could be
19      impartial, whether or not they could follow the Court's
20      instructions, and whether or not they would follow the law.
21      And number two, the closest she got was saying, Do you feel
22      strongly about oral contracts?  And I think to the extent I
23      thought anybody came close, I got them to say they would
24      follow the law, your instructions, and some of them to be
25      impartial.  So I think she falls in that category.
```

Appendix 000527

```
 1                    If you want, then let's bring her back and
 2      ask her.
 3                    THE COURT:  She -- you rehabilitated most
 4      of them, not all of them.  She was one that was not
 5      rehabilitated, so I'll grant eight.
 6                    Is 14 next?
 7                    THE BAILIFF:  Did you say we're striking
 8      eight?
 9                    THE COURT:  Yes.
10                    MS. GIBSON:  Yes.
11                    THE COURT:  Okay.  Same reason?
12                    MS. GIBSON:  Yes.
13                    THE COURT:  And do you agree to that one,
14      Mr. Friedman?
15                    MR. L. FRIEDMAN:  No, sir.  We object.
16                    THE COURT:  Okay.  That's denied.
17                    Fourteen.  Next one is 19 -- or 15.  Same
18      reason?
19                    MS. GIBSON:  Yes.
20                    THE COURT:  Okay.  Do you agree to that?
21                    MR. L. FRIEDMAN:  We object, Your Honor.
22                    THE COURT:  Okay.  That's denied.
23                    The next one is 19.
24                    MS. GIBSON:  That's right.
25                    THE COURT:  Okay.
```

1          Do agree with that one?

2          MR. L. FRIEDMAN:  No.

3          Mr. SANFORD:  Your Honor, he did say --

4          THE COURT:  He was a little closer than

5    some other ones, but in the end he said he'd follow the

6    Court's instructions with difficulty.  And this is what I've

7    talked about in the beginning.  I'm saying you don't have to

8    agree with the law.  You have to agree to follow it.  And

9    that's what he was saying is, well, if that's the law, I'll

10   do that.  It doesn't mean I agree with that.

11         MR. L. FRIEDMAN:  He said he'd follow it.

12         THE COURT:  Okay.  Twenty, same reason?

13         Do you agree to 20?

14         MR. L. FRIEDMAN:  No, absolutely not.

15         THE COURT:  Okay.

16         Twenty said he would not.  He has an

17   outside influence because he just dealt with a contract.

18   And he stuck to his guns, despite your repeated questioning,

19   that he would not follow the law.  He'd require a written

20   contract.  So it's granted as to 20.

21         MR. L. FRIEDMAN:  All right.  We object to

22   it.

23         THE COURT:  Okay.  It's on the record.

24         Twenty-two, same reason?

25         MS. GIBSON:  Yes.

```
1                           THE COURT:  Okay.
2                     And you don't agree to that?
3                     MR. L. FRIEDMAN:  No, sir.
4                     THE COURT:  Okay.  That's denied.
5                     Twenty-six, the same reason?
6                     MS. GIBSON:  Yes.
7                     THE COURT:  Okay.
8                     And you don't agree to that?
9                     MR. L. FRIEDMAN:  No, sir.
10                    THE COURT:  Okay.  That's denied.
11                    Twenty-eight, same reason?
12                    MS. GIBSON:  Yes.
13                    THE COURT:  Okay.
14                    And you don't agree?
15                    MR. L. FRIEDMAN:  We do not agree.
16                    THE COURT:  Okay.
17                    And I know you have some more.  We're going
18      to stop right there for -- for now.
19                    Did you have any challenges for cause?
20                    MR. L. FRIEDMAN:  No, sir.
21                    THE COURT:  Okay.
22                    Go off the record a second.
23                    (Off the record)
24                    (Recess taken)
25                    THE COURT:  So the plaintiff's preemptory
```

132

1    challenges were on Jurors 4, 6, and 14, Jurors Campbell,

2    Brock, and Teresa R.; and defendants' were on 1, 7, and 11,

3    Short, Murphy, and Vanantwerp.  Given those preemptory

4    challenges and the strikes for cause that the Court has

5    earlier ruled on on the record, the first six in line are

6    Juror Number 1 is former Juror Number 9, Samantha Ciraci;

7    Juror Number 2 is former Juror Number 10, Norma Parsons --

8    Parson; Juror Number 3 is former Juror Number 12,

9    Lauryn Josephs; Juror Number 4 is former Juror Number 15,

10   Jimmy Nguyen; Juror Number 5 is former Juror Number 17,

11   Lisa Billingsley; Juror Number 6 is former Juror Number 18,

12   Annette Baker.

13           Despite, given the Court's ruling and the

14   preemptory strikes that are on the record, do you agree that

15   those are the first six in line on the plaintiff's side?

16           MS. GIBSON:  Your Honor, I'm sorry.  I

17   missed what you said between 12 and 17.

18           THE COURT:  Okay.  Juror Number -- former

19   Juror Number 12 is Juror Number 3; former Juror Number 15 is

20   former -- is now Juror Number 4; former Juror Number 17 is

21   Juror Number 5; and former Juror Number 18 is Juror Number

22   6.

23           MS. GIBSON:  Yes, Your Honor.

24           THE COURT:  All right.

25           Mr. Friedman, do you agree with that?

1           MR. L. FRIEDMAN:  Yes.

2           I'd like to re-urge the objections that I

3    made on the "for cause" rulings but, otherwise, then I would

4    agree.

5           THE COURT:  Your objections to the ones I

6    granted?

7           MR. L. FRIEDMAN:  Yes.

8           THE COURT:  You're talking about the

9    hardships?

10          MR. L. FRIEDMAN:  Yes.

11          THE COURT:  Okay, okay.  It's re-urged

12   and --

13          MR. L. FRIEDMAN:  Hardships and the ones

14   for cause.

15          THE COURT:  Right, right.

16          MR. L. FRIEDMAN:  Yeah.

17          THE COURT:  Fair enough.

18          And all that's on the record.  The Court

19   stands by its rulings.

20          As to the next three jurors in line,

21   plaintiff struck Juror Number 19, Mr. Knudsen, and defendant

22   struck 21, Leland Stoehr, and so leaves the alternate juror

23   as Number 22, Brian Bell.

24          And everyone agreed with that?

25          MS. GIBSON:  Yes.

1           MR. L. FRIEDMAN:  Yes.

2           THE COURT:  Okay.

3           For all of you, including the AV person

4    whose name you should know now but I already forgot, you can

5    stay -- you can come back up here or you go all the way to

6    the very back row.  Once we get the jurors in the box and

7    release the other jurors, you can come back over here.  But

8    if you want to go to the very last row, you can do that, or

9    you can come up here with counsel.

10           (Off the record)

11           (The jury panel entered the courtroom.)

12           THE COURT:  Welcome back.  Good afternoon,

13    ladies and gentlemen.

14           I'm going to read the names -- we're going

15    to have six jurors and one alternate, but we're going to

16    refer to everybody as a juror.  We're going to read your

17    names first, make sure you're present in the courtroom.

18    Then we're going to bring seven jurors up to the jury box

19    and swear them in as jurors.  Once they're sworn in, we're

20    going to wish the rest of you a good day.

21           Juror Number 1, just let me know right now

22    that you're present in the courtroom.  Or, if you wanted to

23    get up and start making your way toward Rick, that's fine

24    too.

25           (Jury announced and sworn in)

1              THE COURT:  Members of the jury, the first

2     portion of trial is jury selection.  We've completed that

3     portion of trial.

4              As you learned during jury selection, the

5     attorneys did not go into detail about the facts of the

6     case.  They only gave you a very general overview what was

7     at issue.  During opening statements, though, they can argue

8     to you what they believe the evidence in the case will be.

9     What the attorneys argue in opening statements is not

10    evidence.  It's argument.

11             The oath you just took was to base your

12    verdict only on the evidence presented during the course of

13    the trial.  Evidence is sworn testimony that comes from the

14    witness stand or sworn testimony that comes from a

15    deposition -- I will explain that to you when we get to

16    it -- or information contained in documents that are

17    admitted into evidence.  All the documents that are admitted

18    into evidence will go back to the jury room with you when

19    the case is over and you begin your deliberations.  So you

20    don't need to worry about trying to memorize information on

21    a document if there's a date or a number there.  You'll have

22    the actual document itself.

23             So, what the attorney says is not evidence.

24    And by allowing the attorneys to highlight for you what they

25    think the evidence will be, it will make it easier for you

1    to follow the evidence once we start calling witnesses to

2    the witness stand and presenting documents to you that have

3    been admitted into evidence.

4            Each side will have 30 minutes for an

5    opening statement.  The attorney for the plaintiff, because

6    the burden of proof is on the plaintiff, goes first in

7    giving an opening statement.  Ms. Gibson most likely will

8    give the opening statement for the plaintiff.

9            Is everybody okay going for an hour before

10   we take a break?

11           Okay, Ms. Gibson, you're up, ma'am.

12           MS. GIBSON:  Your Honor, may I just move

13   the flip chart first?

14           Is over here okay --

15           THE COURT:  Yeah.

16           MS. GIBSON:  -- so that everyone can see?

17           Can everyone see?  Can all of you see?

18           Mr. Friedman, can you see?

19           MR. L. FRIEDMAN:  Yes.

20           PLAINTIFF'S OPENING STATEMENT

21           MS. GIBSON:  Good afternoon.

22           What brings us to the Dallas County

23   courthouse today are the business financial safety rules

24   that protect us all from harm.  These safety rules, like all

25   safety rules, only protect us if juries choose to enforce

137

1    them.

2                    Safety Rule Number 1, businesses must live

3    up to their agreements with those who have lived up to

4    theirs, to protect businesses, workers, and families from

5    harm.

6                    Safety Rule Number 2, those who operate

7    businesses in Texas must honor Texas law about enforcement

8    of oral agreements, especially handshake agreements, to

9    protect businesses, workers, and their families from

10   financial harm.  In Texas, oral agreements can be

11   enforceable.

12                   Now let me tell you the story of what

13   happened in this case.  Brian Potashnik and Cheryl Potashnik

14   operate companies that build, own, and manage apartment

15   complexes throughout Texas and elsewhere.  Brian Potashnik

16   and Cheryl Potashnik discussed selling the business.

17   Brian Potashnik and Cheryl Potashnik discussed the potential

18   for a mass exodus of employees before the asset sale

19   happened.

20                   Brian Potashnik and Cheryl Potashnik

21   discussed how to get important employees to stay on as long

22   as needed for the asset sale.  Brian Potashnik and

23   Cheryl Potashnik discussed bonuses as an incentive to get

24   important employees to stay on.

25                   Let me take you to May of 2006.

1    Brian Potashnik meets at his home with his executive vice

2    president of one of the companies.  Brian Potashnik

3    announces plans to sell the business.  Brian Potashnik says

4    he needs his vice president to stay on as long as needed to

5    help make sure the asset sale goes through.  Brian Potashnik

6    says that if the vice president stays as long as needed then

7    the vice president will be paid a lucrative bonus from the

8    sale proceeds.

9            Brian Potashnik says he will work out a

10   specific formula for the bonus later, once he has a better

11   idea of what the asset-sale price might be.  Brian Potashnik

12   and his vice president shake hands.  Brian Potashnik and

13   Cheryl Potashnik then receive oral updates from this vice

14   president about routine operations, due diligence work, and

15   employee morale.

16           Brian Potashnik asks this vice president,

17   for example, to handle some tours to market the business for

18   potential purchasers and investors.  About six months later,

19   Brian Potashnik and Cheryl Potashnik sign a letter of intent

20   to sell the company's assets, including -- and their

21   individual assets related to the business.

22           Brian Potashnik again meets with his vice

23   president of the management company.  Brian Potashnik says

24   the vice president definitely will not have a job with the

25   purchaser after the sale.  This is because the purchaser

1   already has a management company and someone in the vice
2   president's same position.  Brian Potashnik says he still
3   needs his vice president to stay on as long as needed, even
4   though he likely will not have a job with the purchaser
5   after the sale.
6           Brian Potashnik, at this point, explains
7   the specific bonus formula for his vice president.
8   Brian Potashnik and his vice president estimate the bonus at
9   $1,020,000.  Brian Potashnik and his vice president shake
10  hands on the deal.  Brian Potashnik and Cheryl Potashnik
11  anticipate at this time that the sale will close within less
12  than a year.
13          Brian Potashnik and Cheryl Potashnik see
14  that the vice president stays on and continues to work to
15  make the asset sale happen.  Brian Potashnik learns that the
16  vice president delays a job offer in order to stay on with
17  them as long as needed.  Over a year later, Brian Potashnik
18  and Cheryl Potashnik say the sale is about to happen.  The
19  management transition to the purchaser to take over
20  management functions has been signed.  As a result, they
21  explain that the vice president's work is complete and he is
22  no longer needed and free to go find other employment.
23          Cheryl Potashnik thanks the employee for
24  his work.  Cheryl Potashnik assures the employee that he
25  will be paid once the asset sale goes through.  A day or so

1    later, Brian Potashnik and Cheryl Potashnik tell the now

2    former vice president that they might not pay the asset-sale

3    bonus.  Brian Potashnik and Cheryl Potashnik say they are

4    worried about whether there will be enough money to meet

5    their personal needs.

6              A few weeks later, Cheryl Potashnik tells

7    the former vice president that she checked with

8    Brian Potashnik and Brian Potashnik never promised the

9    bonus.  Brian Potashnik closes the sale.  Brian Potashnik

10   and Cheryl Potashnik and all of the companies receive a

11   total of more than 30 million in net asset-sales proceeds,

12   meaning asset-sale revenue minus their closing cost.

13             The vice president is Jeff Carpenter.  The

14   simple truth is keeping wages that a worker has earned is

15   stealing.  These defendants are here today because they

16   chose to violate the safety rules requiring businesses and

17   business people live up to their agreements.

18             All of the defendants in this case sold

19   assets in the asset sale.  None of the defendants lived up

20   to the agreement with Jeff Carpenter.

21             Southwest Housing Management is also here

22   today because it never paid certain annual bonuses that were

23   still owed to Jeff Carpenter.  And the final reason these

24   defendants are here today is because the defendants have

25   refused to be accountable for the harm they've caused.

```
 1                    Before we came to trial we had to determine
 2      a few things.  First, we had to determine whether an oral
 3      handshake agreement is legally enforceable in Texas.  And
 4      the law in Texas is that if the agreement --
 5                    MR. L. FRIEDMAN:  I object to her
 6      instructing the jury about the law within the province of
 7      the Court.
 8                    MS. GIBSON:  This is what I anticipate in
 9      the charge.
10                    THE COURT:  Well, preface it that way.
11                    MS. GIBSON:  Okay.
12                    I anticipate that the Court will charge
13      you.  In other words, give you instructions that a contract
14      that is possibly performable within a year is enforceable in
15      Texas as an oral agreement.  I anticipate that the Court
16      will also instruct you that when you decide whether the
17      agreement can possibly be performed within a year that you
18      look at the beginning of the deal, not at the end of the
19      deal.  So if, at beginning of the deal, it looks like it
20      could be performed even possibly within a year, an oral
21      agreement is enforceable even if it ultimately took more
22      than a year to finish the work.
23                    And you will see in this case that
24      Jeff Carpenter finished his obligations on October 31, 2006.
25      Management transfer to the purchaser happened November 1,
```

1    2006.   And at the time of the original deal struck earlier

2    in October of 2006 when Brian Potashnik announced his

3    specific bonus formula and they shook on the deal, they

4    anticipated that the asset sale would happen spring or

5    summer of 2007, unless at the outset the agreement could

6    possibly be performed within a year.   Those types of oral

7    agreements in Texas are just as enforceable as written.

8                   We also had to determine -- that's seven

9    and eight.  Is that right?  We also had to determine did

10   Brian Potashnik have the authority to make this deal on

11   behalf of the sellers in the asset sale, but you will see

12   that the asset-sale documents list Brian Potashnik as the

13   agent for all of the sellers.  Brian Potashnik was an owner,

14   an officer, of each of the three defendants:   Southwest

15   Housing Development; Affordable Housing Construction; and

16   Southwest Housing Management.  Those were the three

17   businesses they used in the organization to build apartment

18   complexes from site selection to construction to management.

19                   Brian Potashnik, in making a deal to and

20   offering a deal for a percentage of certain proceeds that

21   the sellers would receive, necessarily appeared to be acting

22   on behalf of all the sellers; in addition to the written

23   documents stating that Brian Potashnik was the agent for all

24   of the sellers in the asset sale.

25                   We also had to determine before we came

1    here is there evidence of an agreement.  This is a handshake

2    agreement that, obviously, is not in writing.  And we found

3    that we could.

4                    For example, Cheryl Potashnik concedes that

5    they intended to pay Jeff Carpenter a sales-proceed bonus

6    from the asset sale.  You will hear evidence that

7    Brian Potashnik and Cheryl Potashnik put a program in place

8    to set asset-sale bonuses for employees.

9                    And, in fact, they asked -- or

10   Brian Potashnik asked Jeff Carpenter to help set those

11   bonuses for key employees that reported to Mr. Carpenter.

12   He was asked to identify them and to help set the amount of

13   their bonuses.  These are sometimes known as stay bonuses or

14   stay-and-pay bonuses.  The intent is to get important people

15   to stay, rather than jumping ship, to make the target more

16   attractive and make sure the asset sale happens.

17                   Further, Jeff Carpenter, it's undisputed,

18   was not going to have a job with the purchaser after the

19   asset sale happened.  And, yet, Jeff Carpenter delayed a job

20   offer for months in order to stay on and fulfill his end of

21   the bargain.  You will hear that Cheryl Potashnik, shortly

22   before Jeff's work was over or around that time, looked him

23   in the eye and said, We would never screw you; and referring

24   to the past-due annual bonuses and the stay-bonus percentage

25   of proceeds from the asset sale.

1              We also had to determine why the defendants

2       did not pay Jeff Carpenter, because other employees were

3       paid their stay bonuses even though their agreements were

4       also oral agreements.

5              MR. L. FRIEDMAN:  Objection, Your Honor,

6       violates the limine.

7              THE COURT:   Sustained.

8              MS. GIBSON:   We -- we also had to look at

9       what the motivation was to not pay Jeff Carpenter.

10      Jeff Carpenter left at an earlier date than some of the

11      other employees.  Jeff Carpenter was to get the highest

12      bonus amount of any of the employees, at least so far as

13      Brian Potashnik had told him.

14             MR. L. FRIEDMAN:  Objection, Your Honor.

15      She continues to violate the limine.

16             THE COURT:  You can say that there was a

17      program.  You can't talk about other -- what other people

18      were or were not getting or supposed to get, only if there

19      was a program.  So, objection's sustained.

20             MS. GIBSON:  Okay.

21             You will also hear that there was no

22      dispute about whether or not there was actually a handshake

23      agreement until the defendants had gotten what they needed

24      from Jeff Carpenter.  And they had started to become

25      concerned about finances for two reasons:  First, they were

1    concerned because the deal had not closed yet; and, second,

2    they were concerned because they were having to pay

3    attorneys to defend them against -- they were having to pay

4    criminal defense attorneys surrounding --

5                    MR. L. FRIEDMAN:  Your Honor --

6                    MS. GIBSON:  -- investigation --

7                    MR. L. FRIEDMAN:  -- another violation of

8    limine.

9                    THE COURT:  It's not.  I said she can go

10   into that.

11                   Overruled.  Go ahead.

12                   MS. GIBSON:  Okay.

13                   They were concerned about the bills and the

14   amount of money they were having to pay to their criminal

15   defense attorneys in connection with a criminal --

16                   MR. L. FRIEDMAN:  That is a violation of

17   the limine.  Objection.

18                   THE COURT:  We'll take it up off the

19   record, but the objection's overruled.

20                   MS. GIBSON:  Jeff Carpenter, we also had to

21   determine what to do and how to assess later attacks on

22   Jeff Carpenter that have happened throughout this case.  And

23   when we looked into it you will see there is evidence that

24   this is just what people do when they don't want to pay

25   money pursuant to an agreement.  Suddenly, the person

1   doesn't deserve it or suddenly someone deserves the money

2   more.

3   But you will hear that Jeff Carpenter

4   completed his work.  It is undisputed that he was not fired

5   for performance.  It is undisputed that he was not

6   disciplined.  The attacks on Mr. Carpenter happened after he

7   stood up for himself concerning the handshake deal on the

8   sale-proceeds bonus.  For example, at one point

9   Jeff Carpenter was accused of stealing a laptop, but you

10  will see that Jeff Carpenter is continuing to Email the

11  Potashniks -- or at least Brian Potashnik -- after he left

12  employment to help make the asset sale go through.  That and

13  other type of evidence is inconsistent with someone who has

14  stolen a laptop and left.

15  We also had to determine whether a written

16  agreement with one of the defendants affects the agreements

17  at issue in this case.  And the answer is no.  The only

18  written employment agreement is with Southwest Housing

19  Management, none of the other defendants or individuals

20  involved in the asset sale.

21  You will also see that the agreement from

22  the beginning contemplated the possibility of future

23  separate deals.  For example, the agreement --

24  THE COURT:  Do you want Rick to help you or

25  you know what --

147

1              MS. GIBSON:  I am just -- it was still on
2    defendants'.  I had to switch it to plaintiff's.
3              THE COURT:  All right.
4              MS. GIBSON:  The original deal contemplated
5    the agreement with Southwest Housing Management that, in
6    addition here, there would be future agreements concerning
7    bonuses separate and apart from this agreement.  Nor does
8    the agreement say whether later agreements about bonuses
9    have to be in writing or may be oral.  The agreement also
10   anticipates that in the future Mr. Carpenter may be
11   employed with any of the affiliates of Southwest Housing
12   Management.  In other words, he would be allowed at some
13   point.  He was allowed in the future to do work for the
14   other entities and the organization.
15              We also had to look at whether a contract
16   that says it cannot be modified in writing can actually be
17   modified in writing.  And I anticipate that you will be
18   charged what the law is in cases like this one.  Parties can
19   orally modify an agreement even if the agreement says that
20   modifications must be in writing.  But more important, here
21   the writing is necessary if they need to amend or alter the
22   terms of this agreement.
23              The asset-sale bonus did not require a
24   change in the compensation terms that were covered under
25   this agreement.  The annual bonuses after year one did not

1   require any change in the compensation covered in this

2   agreement because this agreement only covers the limited

3   types of compensation.

4             Your Honor, how am I doing on time?

5             THE COURT:  You have till 3:12, so you have

6   eight more minutes.

7             MS. GIBSON:  Okay.

8             The agreement, the written agreement, is

9   only with Southwest Housing Management.  Covered salary.  It

10  covered year-one annual bonus.  It covered expense

11  reimbursement.  It covered relocation expenses because

12  Mr. Carpenter was recruited to move to Dallas for this job.

13  The written agreement covered temporary housing for that

14  relocation.

15            It covered PTO.  It covered insurance.  It

16  covered car allowance.  It covered severance.  And it

17  covered health club and a certain adjustment in salary

18  concerning health insurance premiums.

19            The separate deal on the bonus for the

20  asset-sale proceeds was for Jeff Carpenter to stay.  They

21  asked him to stay.  And if he did so, they would pay the

22  bonus.

23            The stay-to-pay bonus doesn't require a

24  change in any of the types of benefits covered under their

25  written agreement, whether it's considered a separate deal

1   or an oral handshake modification of this deal, because at

2   the time that the written agreement was entered into no

3   asset sale was on the horizon or contemplated.  As a result,

4   you will see that Paragraph 12 doesn't apply because there's

5   no need to amend or alter those compensation terms with a

6   separate agreement.

7              Defendants also later claim that a

8   particular paragraph barred the compensation.  Now, the

9   defendants didn't claim this until they became concerned

10   about the sale -- the asset sale not having closed yet and

11   their criminal defense fees that they were incurring.

12              This provision says employee will not be

13   entitled to any compensation or benefits pursuant to this

14   agreement on termination except as noted below, and then

15   they offer six weeks' base salary.  But, again, this is

16   talking about pursuant to this agreement, which is what's

17   covered under the agreement; which is salary, the annual

18   bonuses for the first year, and several other items, none of

19   which involved the stay-and-pay/asset-sale bonus or annual

20   bonuses after year one.

21              Once defendant started hinting or

22   indicating that they might not pay the bonus they had

23   promised all along and just about a day after defendants got

24   everything they needed from Jeff Carpenter to help make the

25   asset sale happen, Jeff Carpenter recorded a conversation

150

1    with Cheryl Potashnik and Brian Potashnik.  He did so

2    without their knowledge in the hopes that they would say

3    something confirming the oral agreement.

4              Now, we had to look at -- even though the

5    defendant said you have what we intended to do, you have our

6    discussion, you have what we have promised, Jeff Carpenter

7    at no time during the conversation stood up for himself and

8    said this was our agreement, this was the formula, and

9    documented that way on the telephone call why didn't this

10   happen.  And you will hear that Jeff Carpenter was stunned,

11   generally speaking, that Cheryl Potashnik was suddenly

12   saying he had no legal rights.  You will also hear that his

13   intent was simply to record and see what they might say on

14   their own.

15             With respect to damages in this case, you

16   will see that the calculation of the asset-sale bonus was

17   pursuant to a formula and it was -- Brian, do you see the

18   marker?

19             MR. SANFORD:  Here.

20             MS. GIBSON:  Thanks.

21             The formula was three percent of a certain

22   number, which was calculated with seller's revenue, minus

23   normal closing costs, minus the amount of stay bonuses paid

24   out to other selected key employees.  And that amount totals

25   just over $900,000.  It was originally estimated at

1    $1,020,000, but using the actual numbers the bonus was a

2    little over $900,000.

3                    THE COURT:  You have about one minute left.

4                    MS. GIBSON:  Okay.

5                    And with respect to -- now, with respect to

6    the annual bonuses, you will see that the number was based

7    on words from Brian Potashnik's as to what he thought was

8    owed.  That number is $400,000.

9                    Thank you.

10                   THE COURT:  Thank you, Ms. Gibson.

11                   Mr. Friedman?

12                   MR. L. FRIEDMAN:  Yes, sir.  I'm going to

13   move over there.

14                   DEFENDANTS' OPENING STATEMENT

15                   MR. L. FRIEDMAN:  May it please the Court.

16                   THE COURT:  Counsel.

17                   MR. L. FRIEDMAN:  Counsel, ladies and

18   gentlemen of the jury, I'm back.

19                   Again, I represent Brian and Cheryl

20   Potashnik and the three corporate defendants:  Southwest

21   Housing Management;  Southwest Housing Development;

22   Affordable Housing Construction;  Brian Potashnik;  and

23   Cheryl Potashnik.

24                   This case is only about one thing, whether

25   or not Mr. Carpenter can avoid the signed written contract

152

1    that he entered into with Southwest Housing Management, his
2    employer, and create an oral contract.
3              You'll not hear any evidence about safety
4    rules or pay and stay.  In fact, you won't hear any evidence
5    from anyone who was present when an oral contract was made.
6    You won't hear evidence from anyone who says they witnessed
7    an oral contract.
8              And you'll hear evidence from
9    Mrs. Potashnik and Mr. Potashnik when they say they didn't
10   make an oral contract.  And the writing surrounding
11   Mr. Carpenter's claims that there was an oral contract from
12   Mr. and Mrs. Potashnik will say we can't make a commitment
13   to you now until the business closes and we see what the net
14   proceeds are; and then, yeah, we'd like to pay employees
15   some severance.  And that's consistent.  The deposition was
16   consistent of the Potashniks from the beginning, over and
17   over and over again.
18             What you will hear from Mr. Carpenter is
19   something about a meeting that only he remembers that
20   happened on October 13th, 2006, where he remembers a
21   formula.  I've narrowed it down.  I heard testimony.
22             You'll hear the evidence from the witness
23   stand that Mr. Carpenter didn't plead for what he sued in
24   this lawsuit 10 years ago.  That's right, this lawsuit's
25   been pending for 10 years, since March 11th, 2008.

1  Mr. Carpenter has held this lawsuit over the Potashniks'

2  head for 10 years hoping, waiting, and leveraging for

3  settlement.  But it hasn't come because the Potashniks never

4  made a deal with him.  They weren't going to pay him for

5  some promise that they didn't make, and that's why we're

6  here 10 years later.

7              Mr. Carpenter's made up this story and it's

8  not even believable.  The evidence that we'll present to you

9  will show you it's a fabricated story and there was no

10  agreement beyond the written employment contract for any

11  additional compensation.

12              Pay to stay, another term that was used in

13  the Affordable Housing business -- stay to pay or whatever

14  it was -- are not terms that were commonly used.  They

15  weren't used by Mr. and Mrs. Potashnik.  That's something

16  that was made up as a catchy phrase in this lawsuit.

17              Let me have the employment contract, if you

18  don't mind.

19              The only written agreement that was made by

20  Mr. Carpenter -- the only agreement that was made by

21  Mr. Carpenter was with his employer, Southwest

22  Management -- Southwest Housing Management Corporation.

23              Now, lest you think that the Potashniks are

24  some big conglomerate or inherited their money or something

25  like that, the truth of the matter is that Brian Potashnik

154

1    started this company in 1993, by myself, with no money and

2    no employees.  A year later he hired Cheryl Potashnik.

3                    But in 1994 -- just hold that there -- but

4    in 1994 they acquired a rundown property in Carrollton,

5    Texas.  It was already an Affordable Housing project.  It

6    wasn't being used to its potential.  It had been seriously

7    run down.  Brian and Cheryl Potashnik bought that

8    property -- or Brian bought the property -- and Brian and

9    Cheryl renovated it.  And that's how they got into the

10   Affordable Housing business with one single property.

11                   Since 1994, they acquired one property at a

12   time, one or two properties a year, up until about the year

13   2000, 2001, when they really got to know their business and

14   their business took off.  From 2001 to 2008, when they sold

15   their business -- and these dates are all wrong.  I'm going

16   to hold Ms. Gibson and Mr. Carpenter to these dates.  To

17   2008, when they sold their business, they built -- they

18   built hard, blood, sweat, and tears, hard labor -- they

19   built a company with some 60 properties and I think it's

20   about 12,000 apartment units.  They built them.

21                   They got to a point when they needed more

22   expertise than the two of them had.  And as they grew

23   they -- they acquired more property managers and more

24   people.  And at some point in 2004 they hired Mr. Carpenter.

25                   Now, Mr. Carpenter is not a babe in the

1   woods.  Mr. Carpenter had serious experience in property

2   management.  Mr. Carpenter owned his own company, he had

3   been executive vice president at the other housing

4   management companies, and he knew the business and he

5   represented himself to know the property management

6   business, which he did.  Mr. Carpenter's an excellent

7   property manager and did a good job for the Potashniks.  It

8   wasn't perfect, it wasn't perfect, but he did good.

9                And you will see -- go back to the slide,

10  if you don't mind -- when we show you the employment

11  contract that in the employment contract -- can you blow up

12  the duties -- you will see that Mr. Carpenter agreed and

13  that his testimony will be that he read that contract before

14  he signed it, he understood it before he signed it, and he

15  intended to comply with each and every provision in the

16  contract when he signed it.  So there's no wiggle room here

17  for Mr. Carpenter, and he agreed to perform the duties and

18  functions assigned to him by Mr. Potashnik.

19                Now, with regard to the Southwest

20  companies, there was Southwest Development.  The development

21  would find the properties, get it ready for construction.

22  There was Affordable Housing Construction.  That was a

23  construction company that would come in and build the

24  apartment complexes.  And then there was Southwest

25  Management, which is the company that Mr. Carpenter worked

1    for.

2              Southwest Housing Management would manage

3    the properties.  That was a big job.  So now they have a lot

4    of employees.  You'll hear from Mr. Potashnik or

5    Mrs. Potashnik about the number of employees in that

6    company.

7              So, when they hired Mr. Carpenter, he

8    signed this contract.  And 3(a) says he takes his

9    instructions, the job duties comes from the company, he

10   reported to Mr. Potashnik.

11             Let me go to the next paragraph, quote two,

12   two, Paragraph 2.  Can you do that for me?

13             Paragraph 2, Mr. Carpenter agreed that he

14   was an at-will employee, and he continued to be an at-will

15   employee for his entire employment with the company.  That

16   means he could be hired, he could be fired at any time; but,

17   likewise, he could leave at any time.  And every day that he

18   worked for Southwest Housing Management he was an at-will

19   employee that could be hired and fired at any time.

20             Let's go to compensation, number four.

21   Now, for the executive position that he had he was paid

22   $200,000, $200,000 a year, which was an executive salary and

23   a lot of money.  It's not only a lot of money because it's a

24   lot of money, it's a lot of money because in the Southwest

25   Housing business they were paying for expertise that

1    Mr. Carpenter had.

2              Let's move forward on the contract.

3    Paragraph 4A is the $200,000 salary and Paragraph 4B talks

4    about any bonus he would get with regard to his employment

5    at Southwest Housing Management, the only employer he ever

6    had during the three-and-a-half years he worked for the

7    Southwest Management, the only contract he ever signed.  And

8    I think he got one check from Affordable Housing which was

9    trued up at the end of the year by accounting.  But other

10   than that, every check he got in three-and-a-half years was

11   from Southwest Housing Management.

12             But in it -- and I'll show you the full

13   paragraph on every document that we present to you, not just

14   one line at a time -- but the full paragraph not only

15   addresses Mr. Carpenter's bonus in his first year of

16   $50,000, which he received, but it also talks about bonus --

17   bonuses in future years, which could be changed at the sole

18   discretion of the company.

19             And you-all know what sole discretion

20   means; that it's up to the employer to decide at the end of

21   every year whether Mr. Carpenter got a bonus.  And it says

22   it will determine on the basis of overall profitability of

23   the organization as a whole.  And as you heard from

24   Ms. Gibson, the organization as a whole, particularly

25   Southwest Management, was abusing money.

158

1           Now, we're going to show you evidence

2     that -- notwithstanding what Ms. Gibson just told you --

3     that Ms. Potashnik's position all the time was that they

4     couldn't make a commitment to Mr. Carpenter.  They'd like

5     to.  They'd like to give him -- give him severance, but they

6     couldn't (unintelligible).  Same thing with Mr. Potashnik.

7           And I'm glad she brought up these

8     tape-recorded conversations, because the day of his last day

9     at the company Mr. Carpenter secret -- secretly recorded two

10    conversations:  One with Mr. Potashnik on the telephone and

11    the other one in person with Mrs. Potashnik.

12          And during those conversations -- I counted

13    it up and I think there was some -- about eighty times in

14    the two conversations when he had an opportunity to speak.

15    Eighty times he had an opportunity to say to the Potashniks,

16    What about that deal you promised me?  What about that deal

17    for an extra stay-to-pay bonus and three percent or two

18    percent of -- of the sales proceeds, less the brokerage fees

19    and less the closing costs, and that you promised to pay me

20    at close?  Eighty times he had an opportunity -- over eighty

21    times he had an opportunity to say that on tape when he knew

22    he was the only one recording the conversation, and eighty

23    times he didn't take the opportunity to nail down

24    Mrs. Potashnik or Mr. Potashnik on that tape recording.

25          Now, why was he tape recording the

159

1      conversation?  He'll have to explain that again to you.

2                    What was the purpose of that recording?  He

3      wanted to get evidence of his deal, which he didn't believe

4      he had up until the day he left the company.  And he didn't

5      get it on the phone because he knew he didn't have a deal.

6                    Now, when he left the company -- go to the

7      termination provision, please -- you'll see evidence that

8      when he left the company -- go up a little bit, please.

9      Termination.  Next, please.  There you go.

10                   So you'll see evidence that when he left

11     the company, notwithstanding it says the employee will not

12     be entitled to any compensation or benefits pursuant to this

13     agreement, effective upon termination of employee's

14     employment, but then it says in the event company terminates

15     employee, employee will receive severance in an amount equal

16     to six weeks' base salary in a lump sum payable upon such

17     termination.  Southwest Housing Management, through the

18     Potashniks, handed him a severance agreement on the day he

19     was -- his last day.

20                   The severance agreement included a check

21     for six weeks' base salary and severance of $150,000, and

22     severance of $150,000 which was in their discretion.  And

23     Mr. Carpenter turned it down.  He said, no, I'm not doing

24     it.  I'm entitled to a bonus from the proceeds of the sale.

25                   Now, remember the Potashniks had spent 16

1    years building this business.  They put money into it, they

2    signed personal guaranties, they sacrificed themselves and

3    their family.  They divorced in 2014, maybe as a result of

4    some of these pressures.  They're still friends and they

5    still raise their two college-age boys together.  They may

6    not be friends with me when this is over with, but they're

7    still friends with each other.

8              But they offered Mr. Carpenter over

9    $150,000 as severance and he said, no, he wasn't going to

10   take it.  So why wasn't he going to take it?  Well, in the

11   course of the last 10 years we uncovered some personal notes

12   that Mr. Carpenter had written to himself.

13             Do we have those notes on there,

14   Steve?

15             And in those personal notes, which we'll

16   offer into evidence, you will see that --

17             MS. GIBSON:  Your Honor, I'm going to

18   object to showing exhibits --

19             THE COURT:  You can't show a document --

20             MS. GIBSON:  -- that haven't been

21   pre-admitted.

22             THE COURT:  -- unless it's already been

23   admitted into evidence.

24             MR. L. FRIEDMAN:  Oh, okay.

25             In the document that's entitled

1    Mr. Carpenter's personal notes, which is dated March 14th,

2    2007, Mr. Carpenter writing by himself that he was by

3    himself, ostensibly for no other purpose than keeping notes,

4    writes that the $200,000-a-year salary wasn't enough for

5    him; that his budget, his living budget, was 300- to 350,000

6    and he couldn't make ends meet.  He needed money.  He needed

7    more money.

8              He had a tax lien on his house.  He had

9    sued his former employer when he left and he was paying

10    lawyers in that lawsuit, and he had a bunch of expenses at

11    home that he couldn't cover.  So you'll ask yourself what's

12    the motivation for this lawsuit.  The motivation for this

13    lawsuit is Mr. Carpenter wants more money and Mr. Carpenter

14    wants money that he didn't earn.  A hundred fifty thousand

15    dollars is a good severance for somebody who had worked

16    there three-and-a-half years.

17              Now, we'll show you evidence that

18    Mr. Carpenter never -- not only never reached an agreement

19    with Mr. Potashnik, over the last 10 years he changed what

20    he stated was his original agreement.  The agreement he put

21    first in his original petition is different than the

22    agreement he stated later on in sworn pleadings, different

23    than the agreement he set forth in a declaration, and

24    different than the agreement he stated later on.  We'll show

25    you that over the years Mr. Carpenter couldn't even keep his

1    deals straight.

2                    In addition, we'll show you that all during

3    this period of time Mr. Carpenter sought the written

4    agreement that he knew -- go to Paragraph 12, please -- that

5    he knew he had to have in order to make it binding and

6    enforceable, because Paragraph 12 of his written employment

7    contract with Southwest Management Company -- Southwest

8    Manage -- Southwest Housing Management required him.  No

9    amendment or alteration of the terms of this agreement shall

10    be valid unless made in writing and signed by both parties

11    to this agreement.

12                    And you'll have to ask yourself -- this

13    will show you so much evidence that Mr. Carpenter continued

14    to try to get Brian or Cheryl Potashnik to sign in writing.

15    He wrote an amendment to this contract himself and handed it

16    to them with an agreement he wanted, which he now claims was

17    an oral agreement.  You have to ask yourself, Why did he

18    want a written agreement if he had a valid, enforceable,

19    oral agreement?  And why did he draft an amendment to that

20    contract if this so-called oral agreement had nothing to do

21    with that contract?

22                    So Mr. Carpenter's own conduct over the

23    period of time isn't consistent with someone who claims that

24    on October 13th, 2006, they had a valid, binding, and

25    enforceable agreement.

1          Now, with regard to the statute of

2     limitations' -- cause we anticipate that you will be asked a

3     statute-of-limitations question -- according to

4     Mr. Carpenter, he made his deal with Brian Potashnik on

5     October 13th, 2006.  And when asked about it, he will

6     testify that that agreement had a beginning and had an end.

7     And he testified the beginning was October 13th, 2006, and

8     he testified that the end was October 31, 2007, and his last

9     day of employment was -- I think he was terminated on

10    November 1st and then his last day of employment was

11    November 2nd.

12         That agreement, if it was made -- which we

13    say it wasn't made, but if the agreement that Mr. Carpenter

14    has concocted to get us here today is what he says it was,

15    it was performable in over a year and prohibited by the

16    statute of frauds under the laws of the State of Texas.  So

17    it couldn't have been performed.

18         So, ladies and gentlemen, we're going to

19    ask you to listen carefully to the evidence because we

20    believe that the plaintiffs will try to distract you and

21    talk about safety rules or what other employees were doing

22    or this or that.  But the only issue in this case -- and

23    we'll present evidence directly on point -- the only issue

24    in this case is did Mr. Carpenter make an agreement with

25    Mr. Potashnik.  If so, what were the terms of the agreement?

1    Did Mr. Potashnik ever agree to it?  And we think the
2    evidence will show it just never happened.  It never
3    happened and it can't be enforceable.
4                      And when you get to know Mr. Potashnik a
5    little bit, nobody who built that business over 15 or 16
6    years would make an agreement to give an employee that
7    worked there for three years a million-dollar bonus on a
8    handshake on a verbal agreement.  If he had made that
9    agreement, which he didn't, it would have been in writing,
10   and it wasn't.
11                      So, thank you for your time and attention.
12   I know this has been a long day, and we'll be presenting
13   evidence to you.
14                      THE COURT:  All right.  Thank you,
15   Mr. Friedman and Ms. Gibson.
16                      Members of the jury, that concludes the
17   opening statements.  The next phase of trial is the
18   evidentiary phase of trial where witnesses are called to the
19   witness stand and testimony is presented to you under oath.
20   Before we do that, we'll take a 10-minute break.
21                      At the end of the day I'll give you some
22   instructions that will govern your entire course of the
23   trial.  But the instruction I'll give you right now is that
24   if you want to call home and tell people that you're serving
25   on the jury, you can do that if you have a mobile phone.

1    But all you can do right now is tell them that you're on the

2    jury and you may go as late as 5:30 today.  We'll see how it

3    goes.

4                        But we'll see you back in 10 minutes.  This

5    is the jury room here.  Rick will show you where that is and

6    we'll see you back in 10 minutes.

7                        (The jury exited the courtroom.)

8                        THE COURT:  Mr. Friedman, your attention,

9    please.

10                       Ms. Gibson, just to clarify it, all this I

11   know was clear on the record about other employees' bonuses.

12   You can say there's a program but you can't compare and

13   contrast other employees.  You can't say what other

14   structure was for another employee or whether they got

15   theirs or not because then we're trying a case within a case

16   and showing why this one's different.

17                       If there's a program you can do, you can't

18   say other people got it or what other people's situation

19   was.

20                       MS. GIBSON:  Your Honor, clarification, the

21   other people who got paid, that came off of -- that's part

22   of his damages formula.

23                       THE COURT:  Well, I'll look at that.  We're

24   not trying a case within a case is what I'm saying.  You

25   can't compare and contrast, if that's what you're doing.

Appendix 000564

1           Bring that up at the end of the day if you
2     have to.
3           And about the criminal stuff, the ruling is
4     that they can go into that there were -- they were under
5     investigation; that they were, to use one of the witness's
6     words, hemorrhaging money, spending so much money on
7     criminal defense attorneys.  That was the Court's ruling.
8           The facts of the underlying case don't
9     come into evidence.  Whether it was a meritorious case or
10    not doesn't come into evidence.  But the fact that they were
11    having to spend money to defend themselves and their
12    obligation is, is, you know, they were -- that providing
13    motivation for something or another, that comes into
14    evidence.
15          MR. L. FRIEDMAN:  She said "they", meaning
16    Mr. and Mrs. Potashnik.  And we had -- you had a ruling that
17    it wouldn't include Mrs. Potashnik.
18          THE COURT:  The Rule 609(2) ruling does not
19    include her, so that won't come into evidence.
20          MR. L. FRIEDMAN:  But when she said
21    "they" --
22          THE COURT:  They're spending money --
23    "they" means all the defendants.
24          MR. L. FRIEDMAN:  All right.
25          THE COURT:  Clear that up, I guess, if that

167

```
1    was not clear.  But I think -- and now that I understand
2    your objection --
3                     MR. L. FRIEDMAN:  I don't want to go back
4    over it.  I don't know if it was captured.  That's why I
5    objected, because she said "they".
6                     THE COURT:  All right.  I didn't understand
7    that the first time.
8                     Y'all need to -- if she's calling
9    Ms. Geiser first, you need to confer on how long things are
10   going to take and whether it's worth trying to get Mr. Jones
11   on and off or not.
12                    MR. L. FRIEDMAN:  I don't want to be the
13   cause of not making his prepaid Canadian vacation.
14                    THE COURT:  Oh, no, I'm saying he's -- she
15   wants to play his videotape deposition.
16                    MR. L. FRIEDMAN:  We want to call him live
17   since he's here and sworn in.
18                    MS. GIBSON:  It's our trial subpoena and
19   our case in chief.  We don't agree to break to have him --
20                    THE COURT:  I'm saying negotiate between
21   yourself [sic].  See how long each side's going to take.  We
22   can go up till 5:30.  Maybe you can reach an agreement;
23   maybe you can't.
24                    MR. L. FRIEDMAN:  She knows our position.
25                    (Recess taken)
```

Appendix 000566

```
 1          DEFENDANTS' MOTION TO CALL KEITH JONES OUT OF ORDER
 2                    MR. L. FRIEDMAN:  I'm going to make a
 3    motion to call Keith Jones out of order because he's flew
 4    [sic] in and he's got a special vacation tomorrow.
 5                    THE COURT:  Tell me how long your
 6    examination of him is.
 7                    MR. L. FRIEDMAN:  It could be 30 minutes,
 8    but 30 minutes max.
 9                    MS. GIBSON:  Your Honor --
10                    THE COURT:  How long is your questioning of
11    his?
12                    MS. GIBSON:  Probably longer than that but,
13    you know, defendants noticed and took his deposition.  I
14    just -- it's very -- the order of proof in this case is
15    really important to me.
16                    THE COURT:  It's a seven- or eight-day
17    trial.  That you have one witness out of order shouldn't
18    affect that much.  I mean, I can explain it to the jury.
19                    MS. GIBSON:  Well, first, I mean, for
20    the --
21                    MR. DONOHUE:  Your Honor, can I just call
22    Keith Jones?  He's here and can come right down.
23                    MS. GIBSON:  Your Honor, for the most part,
24    I wouldn't care, like, calling him before Brian.  But as far
25    as our case, it is very important that our first witness is
```

```
1    Cheryl Potashnik.
2                    THE COURT:  I don't want you to give your
3    mental impressions or work product or anything, but can you
4    tell me something more than that, like, why you're saying
5    that?
6                    MS. GIBSON:  Well, without -- without
7    getting into work product, we think it makes a big
8    difference as far as impressions on the jurors as to
9    whether --
10                   THE COURT:  If this was a two-day trial, I
11   could understand that.  In a trial of this length -- and I
12   hope it's not as long as y'all are saying.
13                   MS. GIBSON:  And, Your Honor --
14                   THE COURT:  It's more likely they won't
15   even remember.
16                   MS. GIBSON:  I'll assume we'd have to
17   completely switch gears, but --
18                   THE COURT:  You can play your -- you can
19   still do your videotape.  If he does his direct, you can do
20   your --
21                   MS. GIBSON:  But I just -- I just don't
22   want them to get to do their live direct before I call
23   Cheryl Potashnik.  I mean, I would rather call her up and
24   allow them --
25                   THE COURT:  He's -- you'd rather call her
```

1     and what?

2                    MS. GIBSON:  And -- and -- and us use video

3     and let them, if they think they need him live after

4     Cheryl --

5                    THE COURT:  He's not going to be here.

6     He's going to Canada.

7                    MS. GIBSON:  No, no, no, no.  I mean today.

8                    THE COURT:  If you'll agree to -- to finish

9     with Ms. Geiser by, say, 5:00 o'clock, that's fine.

10                    MS. GIBSON:  I don't --

11                    THE COURT:  I'll give him 30 minutes with

12    Mr. Jones.

13                    MS. GIBSON:  I don't know if I will.  And I

14    apologize.  I just think it's very, very important as far as

15    our order of proof.

16                              COURT'S RULING

17                    THE COURT:  I'll grant the motion to call

18    him out of order.  We have to work with witnesses.

19                    MS. GIBSON:  Well, Your Honor, they took

20    his deposition.  I mean, they have --

21                    MR. DONOHUE:  But they'll be --

22                    MS. GIBSON:  We subpoenaed --

23                    MR. DONOHUE:  She advised us yesterday that

24    she was going to call him live.

25                    THE COURT:  He's subpoenaed is the thing.

1    I'm not going to keep him from going to Canada.  He's under

2    the Court's jurisdiction.  The alternative is for me to

3    order him to stay day to day till he testifies.

4            MS. GIBSON:  Could we start with Cheryl and

5    break for his testimony?

6            THE COURT:  You can do that.  If you want

7    to go -- Mr. Friedman is asking for 30 minutes and I'll hold

8    him to 30 minutes with Mr. Jones.  If you want time with

9    Mr. Jones, tell me how much time and we can stop Cheryl at

10   that point and do Mr. Jones.  If you want to do your

11   examination of him by videotape, let Mr. Friedman have his

12   30 minutes.  We'll stop your examination at 4:50, give them

13   a break, take a 10-minute break and do Mr. Jones from 5:00

14   to 5:30.

15           MR. L. FRIEDMAN:  Let me make a suggestion

16   nobody will like.  They subpoenaed him.  He's here.  We've

17   got a live witness.  Let's put him on and do him back and

18   forth and get rid of him.  And then we'll put on

19   Ms. Potashnik first thing in the morning.

20           THE COURT:  Well, she doesn't want to do

21   that, but that may be what we end up doing.

22           MR. L. FRIEDMAN:  It's been a long day.

23   They won't remember anything now.

24           THE COURT:  Well, okay.  That's her call.

25           MS. GIBSON:  Can I -- can I talk to Brian

1     for about --

2                         THE COURT:  Sure.

3                         MS. GIBSON:  -- a minute about it?

4                         MR. L. FRIEDMAN:  About 45 seconds.

5                         (Off the record)

6                         MS. GIBSON:  Your Honor, okay, here's a

7     suggestion, is Mr. Friedman's suggestion, is we go just 30

8     minutes with Cheryl.  Then we'll break.  I will be quick

9     with Mr. Jones, as quick as I can.

10                        THE COURT:  Okay.

11                        MS. GIBSON:  And then we'll finish with

12    Cheryl tomorrow?

13                        THE COURT:  Sure.

14                        MS. GIBSON:  Okay.

15                        MR. DONOHUE:  Well, we'd like to certainly

16    divide up whatever time we have with Mr. Jones evenly, if

17    that's possible.

18                        THE COURT:  I'm holding -- well, I can't

19    say evenly.  You told me 30 minutes.  You know, if she goes

20    past 5:00, I'll, you know, stop her there and let you have

21    30 minutes.

22                        MR. DONOHUE:  All right, sir.

23                        THE COURT:  So let him know that we'll get

24    him in 30 minutes or so.

25                        And we may not have to break, considering

1      it's already 4:00 o'clock.

2                      (Off the record)

3                      MR. HALE:  Yes, Your Honor.  If we don't

4      already have one, can I have a running objection to the

5      motions -- or excuse me -- for the reason stated in our

6      motion in limine regarding the criminal investigation

7      saying that it's not relevant to whether there was a

8      formation of a contract?

9                      THE COURT:  You can have a running

10     objection on that from the beginning, on up and through the

11     trial.  So I've already granted a running objection.  But if

12     I didn't, I'm granting it now retroactive to the beginning

13     of trial.

14                     MR. HALE:  Thank you, Your Honor.

15                     MR. L. FRIEDMAN:  Thank you, Your Honor.

16                     (The jury entered the courtroom.)

17                     THE COURT:  All right.  Welcome back and

18     good afternoon, members of the jury.

19                     We're going to start the evidentiary phase

20     of the trial where witnesses are called to the witness stand

21     and testimony is presented to you under oath.  All this, the

22     beginning of the trial -- and we like to start things off

23     smoothly -- we're going to take this a little bit out of

24     order.

25                     The first witness that the -- the

1    plaintiffs call witnesses in the first instance.  The first

2    witness they call, we're going to go with her for about 30

3    minutes.  Then we're going to stop her testimony and call

4    another witness because that witness is not available

5    tomorrow.  He's out of the country, so we want to make sure

6    we get his testimony today.  So we're going to have one

7    witness for about 30 minutes, then another witness.  And

8    when you come back tomorrow we'll finish up that first

9    witness.

10             So, Ms. Gibson, it's your witness, I'm

11   taking it.  If you'd call your first witness.

12             MS. GIBSON:  Your Honor, plaintiffs call

13   Cheryl Geiser.

14             THE COURT:  Ms. Geiser, if you'd come up

15   here, ma'am.

16             And before you step up on those steps I'm

17   going to swear you in.

18             (Witness sworn)

19             THE COURT:  Have a seat here right in front

20   of you.  Ms. Gibson will ask you questions first.

21             If you don't hear a question or a response,

22   let us know and we'll ask the attorney to repeat the

23   question or the witness to repeat the response.

24             Ms. Gibson.

25

175

```
1                          CHERYL GEISER,
2    having been first duly sworn, testified as follows:
3                        DIRECT EXAMINATION
4    BY MS. GIBSON:
5         Q.    Please tell us your full name.
6         A.    Cheryl Lorraine Geiser.
7         Q.    Your maiden name is Geiser?
8         A.    Yes.
9         Q.    Okay.  And you were formerly known as
10   Cheryl Potashnik?
11        A.    Yes, in certain circumstances.
12        Q.    Okay.
13              You've never actually changed your last
14   name to Potashnik but you used that last name while you were
15   married to Brian Potashnik --
16        A.    Correct.
17        Q.    -- correct?
18              MR. L. FRIEDMAN:  Your Honor, can I just
19   ask the witness to pull the microphone up --
20              THE COURT:  Yeah.
21              MR. L. FRIEDMAN:  -- closer to her?
22              THE COURT:  Just pull it to you there.
23              THE WITNESS:  Like that?
24              MR. L. FRIEDMAN:  You can pull it.  Yeah,
25   good.  Thank you.
```

1          Q.     (By Ms. Gibson) And you generally use the last
2     name Potashnik just for business purposes?
3          A.     Yes.
4          Q.     Can you explain to the jury what at-will
5     employment is?
6          A.     My understanding of at-will employment in Texas is
7     that an employer or employee can hire and fire at will -- or
8     an employer can hire an fire at will; an employee could stay
9     on their job or leave at will.
10         Q.     Okay.
11                So, Jeff Carpenter did not have to stay as
12    long as needed to help make the asset sale happen, correct?
13         A.     I don't understand the question.
14         Q.     What part of it are you having trouble with and
15    I'll work with you?
16                     MR. L. FRIEDMAN:  Objection, argumentative.
17                     THE COURT:  Overruled.
18                     MS. GIBSON:  I'm just --
19                     THE WITNESS:  Can you ask me again,
20    please?
21                     MS. GIBSON:  Sure.
22         Q.     (By Ms. Gibson) Jeff Carpenter did not have to
23    stay on as long as needed to help make the asset sale
24    happen --
25                     MR. L. FRIEDMAN:  Objection.

1        Q.   (By Ms. Gibson) -- correct?

2                  MR. L. FRIEDMAN:  It assumes facts not in

3        evidence.

4                  THE COURT:  Overruled.

5        A.   Jeff Carpenter did not have to stay employed with

6        the company.  Correct.

7        Q.   (By Ms. Gibson) Okay.  But Jeff Carpenter did

8        stay, correct?

9        A.   Jeff Carpenter stayed employed with the company

10       until he left the company, yes.

11       Q.   And he stayed all the way through the transition

12       to the purchaser's management company taking over

13       management?

14       A.   Yes.

15       Q.   Okay.

16                  And I made a mistake in opening.  Someone

17       tried to correct me, but I want to talk to you about some

18       dates.  So I got those two wrong.

19                  In -- can you see this, Ms. Geiser?

20       A.   Yes.

21       Q.   Okay.

22                  MS. GIBSON:  And can every -- Mr. Friedman,

23       can everyone see?

24       Q.   (By Ms. Gibson) In October of 2006, when did

25       you-all contemplate that the asset sale was going to go

1    through?

2                    MR. L. FRIEDMAN:  Wait, wait.

3                    I'm going to object to her marking that

4    exhibit because she's now assuming facts not in evidence.

5                    Well, what's happening?

6                    THE COURT:  It's not an exhibit.  It's a

7    demonstrative.

8                    MS. GIBSON:  Right.

9                    THE COURT:  It's not been admitted in

10   evidence.

11                   MR. L. FRIEDMAN:  Okay.

12                   THE COURT:  And we probably won't be

13   admitting demonstratives.

14       Q.   (By Ms. Gibson) In October of 2006 the asset sale

15   was anticipated to happen in spring of 2007 or summer of

16   2007, correct?

17       A.   I'm sorry.  I have to think about this.  Oh, let

18   me think.  In October of '06 -- I'm just not having a good

19   memory on the dates of when the purchase and sale agreement

20   was signed.

21       Q.   The -- do you recall originally, regardless of

22   October 6, that originally the closing was anticipated to

23   happen in spring or summer of 2007?

24       A.   I do remember that the -- the length of time that

25   the sale was anticipated to take was shorter than how it

1    actually turned out.

2         Q.    Okay.

3               And the management transition date -- and

4    I -- I accidentally wrote down the wrong year, meaning

5    '07 -- the management transition date was November 1, 2007,

6    correct?

7         A.    Somewhere thereabouts, yes.

8         Q.    Okay.  And so, at the end -- as of the end of the

9    day on October 31st, 2007, you-all no longer needed

10   Jeff Carpenter, correct?

11        A.    And that was the last day of his employment.

12   Correct.

13        Q.    Okay.  And you no longer needed him as of then

14   because of the transition to new management?

15        A.    Correct.

16        Q.    Okay.

17              Ms. Geiser, is it fair to say that you

18   intended to pay Jeff Carpenter an asset-sale-proceeds bonus?

19        A.    I intended, if there was money left at the end of

20   the sale, that some amount would be paid.

21        Q.    Okay.

22              Do you recall giving your deposition in

23   this case, Ms. Geiser?

24        A.    Yes.

25        Q.    Okay.  And you recall that I was there?

1        A.    Yes.

2        Q.    And do you recall that at your deposition, when I

3   asked you --

4                    MR. L. FRIEDMAN:   Line and page?

5                    MS. GIBSON:   84, 15-18.

6                    MR. L. FRIEDMAN:   Excuse me.

7        Q.    (By Ms. Gibson) When I asked you that question at

8   deposition, "So, is it fair to say that you intended to pay

9   Jeff Carpenter a sales-proceeds bonus," you answered, "Yes"?

10       A.    Yes.

11       Q.    And you wanted Jeff Carpenter to stay on working

12  through a certain point in connection with the asset sale?

13       A.    Yes.

14       Q.    And that point was the point in which management

15  transitioned to Pinnacle, which was the management arm of

16  the purchaser in the asset sale?

17       A.    That management transition was not originally

18  contemplated in the purchase and sale agreement, so that was

19  a conflict that came up later in time, as I remember.

20       Q.    Okay.  But, ultimately, you wanted Jeff Carpenter

21  to stay on working through a certain point in the asset

22  sale, correct?

23       A.    Yes.

24       Q.    And that point, ultimately, was the point in which

25  management transitioned to Pinnacle, correct?

1      A.    Yeah.    That's fair.

2      Q.    Okay.    And Pinnacle was the shorthand name for the

3   management arm of the purchaser, correct?

4      A.    I don't recall if Pinnacle was the management arm

5   of the purchaser, but it was the management company that the

6   purchaser had designated that would take over the management

7   of the portfolio that they were purchasing.

8      Q.    Okay.

9            And Jeff Carpenter stayed on until

10   management was transitioned to Pinnacle --

11      A.    Correct.

12      Q.    -- correct?

13            And once Jeff Carpenter had done that,

14   y'all did not need him to stay on anymore, correct?

15      A.    Correct.

16      Q.    The gist of the management transfer agreement was

17   that the seller's management services concerning the

18   Affordable Housing properties was being transferred to the

19   purchaser's management team?

20      A.    Say that again, please.

21      Q.    Sure.    The gist of that agreement on the

22   management transfer --

23      A.    Uh-huh.

24      Q.    -- of November 1, 2007 --

25      A.    Uh-huh.

1       Q.    -- was that the seller's management services
2    concerning the Affordable Housing properties was being
3    transferred to the purchaser's management team, correct?
4       A.    Yes.
5       Q.    In other words, Pinnacle took over management of
6    the apartment complexes from Southwest Housing Management at
7    that point?
8       A.    Yes.
9       Q.    You wanted Jeff Carpenter to stay on until that
10   point for purposes of continuity, to continue his role in
11   managing properties and providing you and Brian Potashnik
12   with that continuity, correct?
13      A.    The continuity was provided to the company,
14   Southwest Housing Management, and to the portfolio of the
15   property.  I would not say that it was to Brian and I
16   personally.
17      Q.    Okay.
18            MR. L. FRIEDMAN:  Can I just get that
19   microphone closer to the witness, please?
20      Q.    (By Ms. Gibson) Ms. Geiser, is that how you spoke
21   to Jeff Carpenter when he -- when he worked with you?  Did
22   you specifically delineate between saying we, Brian and I,
23   or saying Southwest Housing Development Company requests
24   that you -- or Southwest Housing Management requests that
25   you stay on?

1          A.    I think it depended on the circumstance.

2          Q.    What circumstance does it depend on?

3          A.    I can't sit here today and say what circumstances

4    it depended on.

5          Q.    So, is it your testimony then that you-all spoke

6    more formally than just saying "we", we would like you to

7    stay on?

8          A.    Probably in that context I would have been saying

9    we --

10                MR. L. FRIEDMAN:  Objection, calls for

11   speculation.

12                THE COURT:  Overruled.

13         A.    -- we in the context of speaking on behalf of the

14   company.  So, yes, I said we, but it was we in the context

15   of his employment with Southwest Housing Management.

16         Q.    (By Ms. Gibson) Okay.

17                And do you recall -- you recall your

18   deposition, correct?

19         A.    Uh-huh.

20         Q.    And I was there --

21         A.    Yes.

22         Q.    -- right?

23                And when I asked you the question -- this

24   is 54, 9-10.

25                MR. L. FRIEDMAN:  Line and page, please?

Appendix 000582

1              THE COURT:  She just said it.

2              MS. GIBSON:  54, 9-10.

3              MR. L. FRIEDMAN:  I need a chance to look

4     at it before she publishes it.

5              THE COURT:  Okay.

6         Q.   (By Ms. Gibson) I asked you, "Why did you want

7     Jeff Carpenter to stay on until that transfer of management

8     to the purchaser," and you said, "For continuity."

9         A.   Correct.

10        Q.   All right.  You didn't make distinctions at that

11    time between different entities or different companies,

12    correct?

13        A.   I don't know that it was the same question.  I can

14    look at it again.

15             MS. GIBSON:  I don't remember what I just

16    said.  Can you read it back?

17             THE COURT:  No.

18             MS. GIBSON:  Okay, okay.

19        Q.   (By Ms. Gibson) I believe what I had said is, at

20    the -- when you answered the question in deposition, you

21    weren't making fine distinctions between different corporate

22    entities, correct, in connection with that question?

23             MR. L. FRIEDMAN:  Improper impeachment.

24             THE COURT:  Overruled.

25             THE WITNESS:  Can I see the question again?

1                    MS. GIBSON:  Sure.

2                    The question is --

3                    THE WITNESS:  The question that you asked

4     me at deposition?

5                    MS. GIBSON:  Sure.

6          Q.   (By Ms. Gibson) So the question that I had asked

7     you is, "Why did you want Jeff Carpenter to stay on until

8     that transfer of management to the purchaser," and you said,

9     "For continuity."

10         A.   Can I see the part above that?

11         Q.   Sure.

12                   MR. L. FRIEDMAN:  Optional completeness,

13    Your Honor?

14                   THE COURT:  She's not through yet, and it's

15    her witness right now.

16         Q.   (By Ms. Gibson) Okay.  So, can you see there what

17    is above?  What's right above that is, But the gist of the

18    agreement was that seller's management services

19    concerning --

20                   MR. L. FRIEDMAN:  There's no question to

21    impeach her on.

22                   THE COURT:  She just asked her --

23                   MS. GIBSON:  She asked me a question.  I

24    think I'm entitled to try and answer.

25                   THE COURT:  Objection's overruled.  Go

1    ahead.

2         Q.    (By Ms. Gibson) -- concerning these Affordable

3    Housing properties was being transferred to the purchaser's

4    management team.

5         A.    Yes.

6         Q.    Why did you want Jeff Carpenter -- and you said

7    some more there.  Pinnacle took over managing the properties

8    that Southwest Housing Management was managing up till that

9    point.  Why did you want Jeff Carpenter to stay on until

10   that transfer of management to the purchaser?  And you said

11   for continuity.

12        A.    Correct.

13        Q.    Okay.  And then you --

14        A.    But I qualified --

15              MR. L. FRIEDMAN:  And I'd like to read --

16        Q.    (By Ms. Gibson) And then you explained --

17              MR. L. FRIEDMAN:  -- the optional

18   completeness down to Line 22.

19              THE COURT:  Let her finish.

20              MS. GIBSON:  Okay.

21        Q.    (By Ms. Gibson) And so there you are not

22   distinguishing between various --

23        A.    Well, you mentioned --

24        Q.    -- different entities --

25        A.    -- Southwest Housing Managing [sic] prior in that

1    question, and I was speaking as it related to Southwest

2    Housing Management.

3        Q.    Ms. Geiser, my --

4                    MR. L. FRIEDMAN:  Optional completeness.

5    It's right there in the deposition.

6        Q.    (By Ms. Gibson) -- my original question included

7    the rest of that.

8                    THE COURT:  Excuse me.

9                    MS. GIBSON:  Yes.

10                   THE COURT:  There's an objection.

11                   You can do optional completeness in your

12   own examination of her.  She asked that part to be read that

13   she just read.

14                   MR. L. FRIEDMAN:  Thank you.

15                   MS. GIBSON:  Okay.

16       Q.    (By Ms. Gibson) And you also said that you wanted

17   Jeff Carpenter to stay on until that point to continue his

18   role in managing properties and providing you and

19   Brian Potashnik with that continuity, correct?

20       A.    The company was provide -- the continuity was

21   provided to the company.

22       Q.    And -- okay.

23                   You said the continuity was only provided

24   to whom?

25       A.    To the company.

1        Q.    Okay.

2                    And you -- you obviously recall being at

3        your deposition?

4        A.    Yes.

5        Q.    Okay.

6                    And so, what I had asked you is that you

7        also said you wanted Jeff Carpenter to continue in his role

8        in managing properties and providing you and Brian Potashnik

9        with that continuity.  And you said it was only the

10       Southwest Housing Management Corporation?

11       A.    As I sit here today, the continuity that was being

12       provided was to the company, Jeff's role as the executive

13       vice president of the management team.

14       Q.    Okay.

15                   At your deposition -- this is 54, 14-18 --

16       you had said for continuity.  And I asked, Any other reason?

17       You say, We wanted Jeff to continue.

18       A.    Providing the management company with --

19                   MR. L. FRIEDMAN:  Excuse me.  I do object

20       because, first of all, it's improper impeachment.  Second of

21       all, this wasn't the question she asked.

22                   THE COURT:  Okay.  This is what she just

23       wanted to read to the jury --

24                   MR. L. FRIEDMAN:  It was, but it wasn't

25       prefaced with an improper question, and this is not

189

1 inconsistent with this witness's just before testimony.

2      THE COURT: Okay.

3      MS. GIBSON: Your Honor, I --

4      THE COURT: Stop, stop, stop.

5      MS. GIBSON: Sorry.

6      THE COURT: Objection's overruled. Go

7 ahead.

8      MS. GIBSON: Okay.

9  Q. (By Ms. Gibson) And you said, We wanted Jeff to

10 continue. Do you see above the highlighted line?

11  A. Uh-huh.

12  Q. Who are you referring to when you say we?

13  A. Providing the management company with that

14 continuity.

15  Q. Well, you say we wanted Jeff to continue. Who is

16 we?

17  A. We is Brian and Cheryl.

18  Q. Okay.

19    And you also said to continue his role as

20 executive vice president with the management company, to

21 continue managing the properties, and providing us with that

22 continuity.

23  A. And I qualify that and I say providing the

24 management company with that continuity.

25  Q. Okay. Well, who are you referring to by "us". Is

1    that you and Brian again?

2         A.    Yes.

3         Q.    Okay.

4                    And at the time of these events you

5    believed that that type of continuity was important to the

6    asset sale, correct?

7         A.    Yes.

8         Q.    And, of course, not just with Jeff Carpenter, but

9    with other key employees as well?

10        A.    Yes.

11        Q.    In the time leading up to the asset sale you

12   learned at some point that Jeff Carpenter was not likely to

13   have a job with the purchaser after the asset sale?

14        A.    Correct.

15        Q.    And Jeff Carpenter was not likely to have a job

16   with the purchaser after the asset sale because the

17   purchaser's management company already had someone in

18   Jeff Carpenter's -- in Jeff Carpenter's equivalent position,

19   correct?

20        A.    Whether it was a similar position or equivalent,

21   yes, that's correct.

22        Q.    Jeff Carpenter's employment ended because

23   Jeff Carpenter was no longer needed after y'all transitioned

24   property management, correct?

25        A.    Yes.

1          Q.    With the management transition on November 1,

2   2007, Jeff Carpenter had done all that was asked of him, as

3   far as staying on, by the end of the day on October 31,

4   2007, correct?

5          A.    Yes.

6          Q.    You believe your word is important to you?

7          A.    Yes.

8          Q.    You think it's important to honor your word?

9          A.    Yes.

10         Q.    Do you concede that businesses must live up to

11  their agreements with those who have lived up to theirs?

12                    MR. L. FRIEDMAN:   Argumentative,

13  Your Honor.

14                    THE COURT:   Overruled.

15         A.    I believe that businesses enter into agreements;

16  the terms of which both parties agreed to.

17         Q.    (By Ms. Gibson) Do you concede that businesses

18  must live up to their agreements with those who have lived

19  up to their end of the bargain?

20                    MR. L. FRIEDMAN:   Asked and answered.

21         A.    I believe that businesses enter into agreements

22  where both parties agree to the terms and conditions of the

23  agreement.

24         Q.    (By Ms. Gibson) Ms. Geiser, one more time.

25                    THE COURT:   You've asked it twice.   You've

1    got to move on.

2                    MS. GIBSON:  Okay.

3         Q.    (By Ms. Gibson) Do you concede that those who

4    operate businesses in Texas must honor Texas law about

5    enforcement of oral agreements?

6                    MR. L. FRIEDMAN:  Calls for legal

7    conclusion, lack of foundation.

8                    THE COURT:  Overruled.

9                    THE WITNESS:  Can you ask me that question

10   again?

11                   MS. GIBSON:  Sure.

12        Q.    (By Ms. Gibson) Do you concede that those who

13   operate businesses in Texas must honor Texas law about

14   enforcement of oral agreements?

15                   MR. L. FRIEDMAN:  Argumentative.

16                   THE COURT:  Overruled.

17        A.    I'm not a lawyer, but I would answer yes.

18        Q.    (By Ms. Gibson) At one point you were an employee

19   of SH Management, correct?

20        A.    I was an employee of Southwest Housing Management.

21        Q.    Okay.  I'm sorry.  That's my abbreviation.

22                   Southwest Housing Management, correct?

23        A.    Yes.

24        Q.    Okay.  And you did not have a written employment

25   agreement at the time, correct?

1      A.    From the time I started in 1994, no, I did not

2   have a written employment agreement.

3      Q.    Okay.  And you expected that your agreements would

4   be honored, even if not in writing?

5      A.    I don't know what you mean by that question.

6      Q.    Did you expect that your oral agreements would be

7   honored even though you did not have a written employment

8   agreement?

9      A.    I don't know what you mean by oral agreement.

10     Q.    For pay.  For pay.

11     A.    I don't believe a salary negotiation or a salary

12  relationship, a payroll relationship between an employer and

13  employee, is a oral agreement.

14     Q.    Have you ever had an oral agreement for pay?

15     A.    I don't know what that means, an oral agreement

16  for pay.

17     Q.    In salary?  You don't know what an oral agreement

18  is?

19     A.    For pay.

20     Q.    For pay?

21     A.    Yeah.

22     Q.    All right.

23                 Have you --

24     A.    I had many jobs where I haven't had a written

25  agreement and -- yes.

1        Q.    Okay.  And was it your expectation that the
2   employers would honor your agreement even though it wasn't
3   in writing?
4        A.    I believe that employers have to honor their
5   payroll obligations to their employees, yes.
6        Q.    You say payroll obligations.  Are you
7   distinguishing that from oral agreements for bonuses?
8        A.    I believe that if there is an agreement both
9   parties agree to the terms of the agreement and they're
10  obligated to comply with it.
11       Q.    Okay.
12             So, you have testified that you intended to
13  pay Jeff Carpenter an annual asset-sale-proceeds bonus.
14             MR. L. FRIEDMAN:  Objection, misstates
15  witness's testimony, assumes facts not in evidence.
16             THE COURT:  If you don't agree, tell her
17  you don't agree with what she said.
18             THE WITNESS:  Yes, I don't agree with the
19  way you characterized that.
20             MS. GIBSON:  Well, earlier when I said, Is
21  it fair to say you intended to pay Jeff Carpenter an
22  asset-sale-proceeds bonus, I believe you said yes.
23             MR. L. FRIEDMAN:  It misstates the
24  witness's prior testimony and assumes facts not in evidence.
25             THE WITNESS:  The intention would have been

1    to pay Jeff an amount out of the proceeds from the sale.

2    That term asset-sale-proceed bonus is a term that I feel

3    like you've adopted, but that's not a term that I'm

4    comfortable with.

5         Q.    (By Ms. Gibson) Okay, what term are you

6    comfortable with?

7         A.    A bonus out of the proceeds of the sale.

8         Q.    Okay.  Instead of asset-sale-proceeds bonus, you

9    want me to say bonus out of what?

10        A.    The proceeds of the sale.

11        Q.    Out of proceeds of sale.  Okay.

12             So you intended to pay Jeff Carpenter a

13   bonus out of proceeds of the sale, correct?

14        A.    Yes.

15        Q.    And the point of this bonus was you wanted

16   Jeff Carpenter to stay on working, correct?

17        A.    No.

18        Q.    No?

19        A.    No.

20        Q.    You did not want Jeff Carpenter to stay on working

21   to a certain point in connection with the asset sale?

22        A.    No, I did.

23        Q.    Okay.  So you wanted Jeff to stay on working and

24   Jeff stayed?

25        A.    Yes.

```
1         Q.    Okay.   And he stayed as long as needed?
2         A.    He stayed as long as we paid his salary and until
3    we no longer needed him.
4         Q.    What do you mean as long as we paid his salary?
5         A.    Well, if we had stopped paying his salary he
6    wouldn't have stayed.
7         Q.    Well, he stayed on as long as you asked him to;
8    isn't that right?
9         A.    And as long as I think he needed to pay his salary
10   and the company continued to pay his salary.
11        Q.    I don't understand what your distinction is.
12        A.    Well, what is your distinction?
13        Q.    Jeff stayed on as long as you asked him to?
14        A.    Yes.
15        Q.    Okay.   All right.
16                    In the time leading up to the asset sale --
17                    MR. DONOHUE:   Your Honor, if I may, just --
18   not to interrupt, but it's almost --
19                    THE COURT:   She started at quarter of 2:00,
20   so you have two minutes left.
21                    MR. DONOHUE:   Thank you.
22                    THE COURT:   More than that.   You have about
23   three minutes left.
24                    MS. GIBSON:   Okay.   I will -- this may be a
25   good time to go ahead and break to let the other witness --
```

1           THE COURT:  All right.

2           Ms. Geiser, thank you, ma'am.

3           MS. GIBSON:  -- in.

4           THE COURT:  We're going to ask you to sit

5    back here with Mr. Potashnik and we'll finish you up

6    tomorrow morning.

7           If you'd go ahead and call, for the record,

8    your next witness.

9           Mr. Donohue, would you get -- Rick, would

10   you get Mr. Jones from outside, wherever he's at.

11          MS. GIBSON:  I just need to switch the

12   chairs.

13          (The witness entered the courtroom.)

14          THE COURT:  Mr. Jones, if you'd come all

15   the way up here, sir.  Mr. Jones, if you'd just come have a

16   seat up here.

17          MS. GIBSON:  We are on Plaintiff's 4?

18          THE COURT:  Four, I think, is next.

19          Just have a seat.

20          Mr. Jones was sworn in this morning before

21   you-all got here.  So his testimony, like all the witnesses,

22   is under oath.

23          And, again, if you'd call him for the

24   record, Ms. Gibson.

25          MS. GIBSON:  I'm sorry?

1              THE COURT:  If you'd call the witness for

2      the record.

3              MS. GIBSON:  Oh, yes.  The plaintiff calls

4      Keith Jones.

5              THE COURT:  All right.  Very good.  He's on

6      the stand.

7                        <u>KEITH JONES,</u>

8      having been first duly sworn, testified as follows:

9                       DIRECT EXAMINATION

10     BY MS. GIBSON:

11     Q.    Mr. Jones, you are the former chief financial

12     officer for the business, the businesses that

13     Brian Potashnik and Cheryl Potashnik ran?

14     A.    The three Southwest Housing companies, yes.

15     Q.    Okay.  And your salary was allocated across one or

16     more of those entities?

17     A.    Yes.

18     Q.    Okay.  Was it allocated across all three?

19     A.    Yes.

20     Q     All right.

21              And during your tenure as CFO, you -- you

22     worked with Jeff Carpenter on setting sale-proceeds bonuses

23     for other employees as part of the -- as -- let me -- let me

24     say that again.  You worked -- well, let me just do this.

25     I'm handing you what's been marked Exhibit 4.  Do you

1    recognize Exhibit 4, Mr. Jones?

2        A.   Yes.

3        Q.   And is Exhibit 4 an accurate copy of an Email that

4    you sent to Jeff Carpenter while you were employed as CFO?

5                 MR. L. FRIEDMAN:  Let's approach,

6    Your Honor.

7                 MR. DONOHUE:  May we approach?

8                 THE COURT:  Okay.

9                 (Sidebar conference held)

10       Q.   (By Ms. Gibson) Mr. Jones --

11                MR. L. FRIEDMAN:  Was the ruling on the

12   record?

13                THE COURT:  It is -- well, I don't know.

14   There was an offer on the record, but four is not admitted

15   at this time.  We'll put the objection on the record at a

16   later time.

17                MR. L. FRIEDMAN:  Thank you.

18       Q.   (By Ms. Gibson) Mr. Jones, during your tenure as

19   chief financial officer, you worked with Jeff Carpenter in

20   connection with identifying --

21                MS. GIBSON:  And I'm not going to ask

22   specifics, Your Honor.

23       Q.   (By Ms. Gibson) -- identifying employees for

24   purposes of a stay-bonus program to help incentivize key or

25   important employees to stay?

1      A.    Yes.

2      Q.    Okay.

3                  And the two of you helped -- with respect

4      to that stay-bonus program, you and Jeff Carpenter -- what

5      group of employees?  You know, what's the pool of employees

6      from which you were identifying important people?

7      A.    Office staff that we needed to maintain through

8      the transition of sale.

9      Q.    Okay.

10                 And in connection with that bonus

11     program -- and I'm not going to get into amounts -- you and

12     Jeff also worked on identifying what amounts to pay those

13     important employees in connection with the stay-bonus

14     program, correct?

15     A.    I guess that it was just truly based upon what

16     people's salaries were.  So we were offering amounts for

17     staying.

18     Q.    Correct.  But you and Jeff were discussing what

19     amounts those should be, correct?

20     A.    Yes.

21     Q.    All right.

22     A.    Along with Cheryl.

23     Q.    Sure.  You-all were making recommendations on

24     amounts pursuant to the stay-bonus program and then

25     submitting that to Brian Potashnik or Cheryl Potashnik?

1      A.    Yes.

2      Q.    And does -- does the document in front of you

3   refresh your recollection that you were working on that

4   stay-bonus program at least as of April 25, 2007?

5      A.    Yes.

6                MR. DONOHUE:  Your Honor, I'm going to go

7   ahead and object to this whole line of questioning calling

8   this a stay bonus.

9                THE COURT:  Well, it's his words.

10               MR. L. FRIEDMAN:  His words, and then she's

11  asking to read from the document that's not even in

12  evidence.

13               THE COURT:  It's one lawyer, one witness.

14  It's Mr. Donohue's witness, I'm taking it.

15     Q.    (By Ms. Gibson) And I am handing you what's been

16  marked Plaintiff's Exhibit 5.

17               MS. GIBSON:  And this is the same issue,

18  Your Honor.  I just -- I just need to be -- make it -- make

19  their objection formal.

20               THE REPORTER:  Walk behind me, please.

21     Q.    (By Ms. Gibson) I'm handing you --

22               THE COURT:  You've got to walk around the

23  court reporter.

24               MS. GIBSON:  Oh, I'm sorry.

25     Q.    (By Ms. Gibson) -- Exhibit 5.

1              And does that -- is Exhibit 5 another

2    document concerning the stay-bonus program?

3         A.    Yes.   One says severance payroll and one says July

4    7th bonus wages.

5         Q.    Okay.  And on the stay-bonus program --

6              MR. DONOHUE:   Your Honor, I believe the

7    witness is looking at a document that has not been

8    introduced into evidence.

9              THE COURT:   You can show him the document

10   to refresh his memory if he needs his memory refreshed.   He

11   hasn't said that he needs his memory refreshed yet.

12             THE WITNESS:   These are --

13             THE COURT:   They have an objection to

14   that --

15             THE WITNESS:   Okay.

16             THE COURT:   -- document, as you know.   So

17   ask him questions if he doesn't remember something.

18             MR. DONOHUE:   My concern, Your Honor, is

19   just which document he's looking at.  I don't believe --

20             THE COURT:   It's the one in your hand.

21             MS. GIBSON:   Oh.  I thought I handed it to

22   you.  I apologize if I didn't.

23             MR. DONOHUE:   Is it the same document?

24             MR. L. FRIEDMAN:   No?

25             THE WITNESS:   Yeah.  It says June --

1          MR. DONOHUE:  No, that's --

2          THE WITNESS:  -- June '07 bonus wage.

3          MR. L. FRIEDMAN:  Okay.

4          MS. GIBSON:  Oh, June is --

5          MR. DONOHUE:  That is the same --

6          THE WITNESS:  Which are -- which is

7    different from the severance payroll.

8      Q.    (By Ms. Gibson) Okay.  Okay.  That's a -- that's

9    just one in which you are setting, what, regular bonuses for

10   employees?

11     A.    Yes.

12     Q.    Okay.

13          And were you -- were you also a participant

14   in the stay-bonus program to incentivize workers to stay on

15   despite the asset sale?

16          MR. DONOHUE:  I'm going to object,

17   Your Honor.  She's called it a stay-bonus program.  The

18   witness just testified it's a severance program.

19          MS. GIBSON:  Oh, he said that was a --

20          MR. DONOHUE:  He said the regular bonus --

21          THE COURT:  If that's your objection, he

22   can handle the question and you can go over that in your

23   cross-examination.

24     Q.    (By Ms. Gibson) Let's -- let's clari -- I'm going

25   to go back and let's clarify the stay bonus and severance

1    issue, okay.  When you are talking about a stay bonus you

2    are talking about an incentive to stay on and do a lot of

3    extra work toward the asset sale, correct?

4        A.    Extra work?  I'm trying to keep key employees from

5    leaving before the sale goes through so we can continue to

6    run the business.

7        Q.    Okay.  So stay bonus is to keep employees from

8    leaving before asset sale.  Is that what you said, before

9    the asset sale?

10       A.    Yes.

11       Q.    Okay.

12             Okay.  And once the companies were sold,

13    meaning Southwest Housing Management, Southwest Housing

14    Development, Affordable Housing Construction, at that point

15    all of the employees who were remaining would be severed

16    from employment, correct, with --

17       A.    With --

18       Q.    -- with those entities?

19       A.    With those entities, yes.

20       Q.    Okay.  And then --

21       A.    They -- they would be -- they would have been let

22    go and then another company picked them up if they were

23    going with the new company.

24       Q.    Okay.

25             And so whether someone was going to

1    continue to work for the purchaser or not, there was,

2    effectively, at the asset sale, a severance of the

3    employment relationship with the selling entities:

4    Southwest Housing Management, Development, and Affordable

5    Housing Construction?

6         A.    Yes.

7         Q.    Okay.  And so in that sense a stay bonus -- you

8    and Jeff sometimes called the stay bonuses also a severance

9    because it would be at the end of the day, at the end of

10   employment?

11        A.    That's what a sever -- yes, the severance payroll

12   is.

13        Q.    Okay.  So the stay bonus and severance due to the

14   sale are essentially the same thing, correct?

15        A.    I guess so.  I called it a severance.

16        Q.    Right.  So, a bonus to stay, paid at the end, is

17   also called a severance.  I mean, you're not talking about

18   something different than severance, are you?

19        A.    No.

20        Q.    Okay.

21              And y'all may have called them other words

22   at times too, like, retention bonuses or something?

23        A.    Possibly.

24        Q.    Okay.  But -- but you referred often to the stay

25   bonus as severance, correct?

1          A.   I called it severance, yes.

2          Q.   Okay.

3                    And you and Jeff Carpenter and Sara Reidy

4     were also intended to be part of the stay-bonus program,

5     correct?

6                    MR. DONOHUE:  Objection, Your Honor.

7     That -- that misrepresents what he just testified.  It's a

8     severance or severance bonus program.  That's what he called

9     it.

10                   THE COURT:  He can clarify.

11                   Overruled.

12                   THE WITNESS:  I discussed with Brian a

13    severance package for myself.

14         Q.   (By Ms. Gibson) Okay.  And was it your

15    understanding -- although I know you weren't present when

16    different deals were made, was it your understanding that

17    Jeff Carpenter and Sara Reidy were also part of that

18    program?

19         A.   I assumed that, yes.

20         Q.   Okay.

21                   And at one point you Emailed Jeff Carpenter

22    a copy of the agreement you were going to use, correct?

23         A.   I believe I did.

24                   MS. GIBSON:  Mr. Friedman.

25                   MR. L. FRIEDMAN:  Thank you.

1          Q.    (By Ms. Gibson) I'm handing you what's been marked
2     Exhibit 6.
3                    MR. DONOHUE:   Your Honor, and we certainly
4     object to this as violating the limine we just discussed.
5                    THE COURT:   Let me see it.
6                    MS. GIBSON:   Your Honor, this is an Email
7     to Jeff Carpenter saying here's the agreement I'm using.
8                    THE COURT:   Come on over here.
9                    (Sidebar conference held)
10         Q.    (By Ms. Gibson) Mr. Jones, if you would take a
11    look at Exhibit 5 [sic], is that a -- an accurate copy of an
12    Email -- oh, I'm sorry.   Six.
13                   THE COURT:   You said --
14                   THE WITNESS:   You haven't given it to me
15    yet.   I don't have a copy yet.
16                   MS. GIBSON:   Your Honor?
17                   THE COURT:   'Cause I'm sustaining.
18                   If there's something he doesn't remember,
19    you can use it to refresh his recollection.   I've sustained
20    the objection to the admission of the document.
21                   MS. GIBSON:   I -- I just -- I realize that.
22    I just wanted to make sure I formally offered it.
23                   THE COURT:   We'll do that after the jury
24    leaves.
25                   MS. GIBSON:   Okay.

1              THE COURT:  All right.

2              I have it written down for both of those.

3     We'll put it on the record in a minute.

4              MS. GIBSON:  Okay.

5         Q.   (By Ms. Gibson) Mr. Jones, during your tenure as

6     chief financial officer, did there come a time when the

7     business was bleeding money on Brian Potashnik and

8     Cheryl Potashnik's criminal defense attorneys?

9         A.   Yes.

10        Q.   Okay.  And about how much -- at some point that

11    reached, I think you testified, to about a million a month

12    toward their personal criminal defense attorneys.

13        A.   I think that was about right.  A couple months

14    that had reached really high.

15        Q.   Okay.  So not all the time, but there were

16    certainly a couple months when criminal defense fees for the

17    Potashniks had become really high?

18        A.   Yes.

19        Q.   And --

20             MS. GIBSON:  Your Honor, I think I need to

21    approach before the next question.  Sorry.

22             (Sidebar conference held)

23             MS. GIBSON:  Pass the witness.

24             THE COURT:  All right.

25             Mr. Donohue.

1          MR. DONOHUE:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3     BY MR. DONOHUE:

4          Q.   Mr. Jones, to be clear so there's no confusion,

5     you called the program that Ms. Gibson's asked you about a

6     severance program that you and Mr. Carpenter dealt with,

7     correct?

8          A.   Correct.

9          Q.   You didn't call it a -- what is the term she

10    used -- a stay-bonus program.  You didn't call it that, did

11    you?

12         A.   I don't believe I did, no.

13         Q.   Did you hear anybody else call -- call it a

14    stay-bonus program at the time that you were there at the

15    Southwest Housing entities?

16         A.   I can't recall.

17         Q.   All right.

18                    That's a term that Ms. Gibson has injected.

19    And injected, in fact, in your deposition here a couple of

20    weeks ago, correct?

21         A.   I believe so.

22         Q.   This million dollars of cash bleeding for criminal

23    defense attorneys, in truth, the property portfolios were

24    doing very poorly from 2004 through 2007, weren't they?

25         A.   Yes.

1      Q.    They were -- they were bleeding off -- they were

2  not covering -- the revenue from those property portfolios

3  was not covering the operating expenses?

4      A.    No.

5      Q.    So there was not a profit during any of those

6  years, '04 through '07, correct?

7      A.    Which company are you talking about?

8      Q.    I'm talking about Southwest Housing Management in

9  particular.

10     A.    Management, no.

11     Q.    Okay.  And that's the company that Mr. Carpenter

12  was head of, correct?

13     A.    Correct.

14     Q.    So there was no profit made in any of those years,

15  '04 through '07, and those portfolios were bleeding off each

16  of those -- well, they were bleeding off Southwest Housing

17  Management's opportunity to make a -- to make a profit,

18  right?

19     A.    Right.  The portfolio as a whole did not make

20  money.

21     Q.    So the portfolios themselves, the majority of

22  the -- the deficit, if you will, during that time, was that

23  from the portfolio's inability to cover the costs?

24     A.    Can you say that again?

25     Q.    Yes.  Was the majority of the bleeding off, as you

1    termed it, during that time frame due to the fact that the

2    portfolios were not making money?

3         A.    During which time, the three years?

4         Q.    Yes, sir.

5         A.    There was many times that Brian and Cheryl had put

6    in their own money to keep those entities going, yes.

7         Q.    So the Potashniks --

8         A.    On the properties.

9         Q.    -- themselves, individually, put in their monies

10   to try -- to try to make those portfolios perform?

11        A.    Yes.

12        Q.    Because Mr. Carpenter, during his tenure, those

13   portfolios were not performing; is that right?

14        A.    It was a hard leasing season, yes.  They did not

15   lease up like they were supposed to.

16        Q.    What was -- what was Mr. Carpenter's -- he was the

17   executive vice president of Southwest Housing Management

18   Company, Inc.; is that right?

19        A.    I believe his guard was president of the managing

20   company.

21        Q.    Right.  He was the president.

22              You didn't report to Mr. Carpenter, did

23   you?

24        A.    No.

25        Q.    You were the CFO, right?

212

1           A.    Correct.

2           Q.    Did he ever represent himself as being more than

3     just president of what you just stated, Southwest Housing

4     Management, that he was president of the entire

5     organization?

6           A.    Sometimes, yes.

7           Q.    When did he represent himself as being the

8     president of the entire organization?

9           A.    Well, he -- when?  On occasions when we were

10    having beers together.

11          Q.    Who is -- who is "we", you and Mr. Carpenter?  And

12    anyone else?

13          A.    And Deepak Sulakhe.

14          Q.    Who is Deepak Sulakhe?

15          A.    He is the head of -- the developer, head developer

16    for Southwest Housing Development.

17          Q.    All right.

18                Is that somebody that reported to

19    Mr. Carpenter, Deepak Sulakhe, that was head of Southwest

20    Housing Development?

21          A.    No.

22          Q.    Then how can Mr. Carpenter represent that he was

23    president over all three entities if you didn't report to

24    him and neither did Mr. Sulakhe?

25          A.    Jeff's -- because he's over the management

1    company, interject a lot on what type products are going

2    into the units, which was a development decision.

3    Construction, he helped on -- on certain construction issues

4    to make sure that the property would lease at a -- fairly

5    lease to the public.  He would make sure.

6        Q.   What you're -- but that was his role as president

7    of the Southwest Housing Management, right?

8        A.   That's what I thought, yes.

9        Q.   Right.  That was within his realm as South -- as

10   president of Southwest Housing Management was to work with

11   Southwest Housing Development as well as Affordable Housing

12   Construction, the other two Southwest Housing affiliated

13   entities?

14       A.   Correct.

15       Q.   But he wasn't president of those entities, was he?

16       A.   No.

17       Q.   Do you know how much he made a year, what his base

18   salary was?

19       A.   Yes.

20       Q.   How much?

21       A.   250-.  250,000 annual.

22       Q.   Okay.  And he was paid for -- for doing the -- for

23   being president of Southwest Housing Management and

24   interacting with those two other companies that you just

25   mentioned, correct?

1      A.    Yes.

2      Q.    That was part and parcel of what he was paid 200-

3 to $250,000 base salary a year for, right?

4      A.    Yes.

5      Q.    Getting back to Mr. Carpenter representing that he

6 was -- did he represent that he was president of all the

7 entities when you were having beer with Mr. Sulakhe?

8      A.    He said that his job role is more than just

9 management.

10     Q.    Did he consider himself -- put it this way.  The

11 organizational charts there at Southwest Housing, they

12 showed you as CFO, actually above Mr. Carpenter, right?

13     A.    The organizational chart, yes.

14     Q.    And Mr. Carpenter didn't like that, did he?

15     A.    No.

16     Q.    In fact, he voiced that to you that he considered

17 himself at least equal to or above you, the CFO?

18     A.    He didn't say that.  He said that he didn't report

19 to me, he reported to the Potashniks.

20     Q.    Was Mr. Carpenter -- was he indispensable there at

21 the Southwest Housing entity?  Was he replaceable?

22     A.    I feel everybody's replaceable.

23     Q.    Right.

24           In fact, he was let go around November 1st

25 or 2nd of 2007, wasn't he?

1        A.    Yes.

2        Q.    And somebody replaced him; is that right?

3        A.    No.   The management position had moved over to the

4    new purchaser.

5        Q    All right.   And did -- the transition still

6    occurred regardless if he was there or not?

7        A.    Correct.

8        Q.    The transition -- the sale to Cascade wasn't

9    dependent on the presence of Mr. Carpenter, was it?

10       A.    Depended on, no.

11       Q.    What were your overall job duties and

12   responsibilities as CFO?

13       A.    To make sure our records were kept correct and

14   keep tax returns filed on time, keep everybody informed on

15   financial positions.

16       Q.    All right.   And you prepared -- as CFO, you

17   prepared regular financial reports for the three entities;

18   is that right?

19       A.    Yes.

20       Q.    And supplied the heads of those three entities

21   with those financial reports, be they monthly or annual; is

22   that right?

23       A.    Yes.

24       Q.    The financial statements which would reflect

25   whether or not the companies were profitable per month and

216

1    annually; is that right?

2         A.    Yes.

3         Q.    And you supplied those to Mr. Carpenter as

4    president of Southwest Housing Management, right?

5         A.    Yes.

6         Q.    And those reflected whether or not the company was

7    making a profit every month and every year that you provided

8    those financial reports to him, right?

9         A.    Yes.

10        Q.    So he would have known that the company wasn't

11   making a profit; is that right?

12        A.    Yes.

13        Q.    So if, in fact, he had -- just assume with me, if

14   you will, that he had a discretionary bonus that was

15   dependent on the company objective, the company being

16   Southwest Housing Management, would a company objective not

17   be to make a profit every year?

18        A.    That is the objective of every company, yes.

19        Q.    That's the objective of every company is to be

20   profitable, right?

21        A.    Correct.

22        Q.    And that company objective was not met in any of

23   the three or four years that Mr. -- well, from February of

24   2004 all the way till he left, November 1st of '07?

25                  MS. GIBSON:   Object, cumulative.

1      Q.    (By Mr. Donohue) Is that right?

2                  THE COURT:   Excuse me.

3                  Overruled.

4      A.    The management entity did not make money, no.

5      Q.    (By Mr. Donohue) So, in the discretion of those

6    that made the decisions on paying out, for instance,

7    employee bonuses -- which would be the Potashniks, correct?

8      A.    Correct.

9      Q.    -- they would have the discretion to look at those

10    financial -- determine whether or not Southwest Housing

11    Management was in fact turning a profit and whether or not

12    to award Mr. Carpenter an annual bonus or not, right?

13     A.    That was at their discretion, yes.

14     Q.    Did Mr. Carpenter complain to you that he was --

15    that he -- that his employment agreement called for a

16    minimum bonus every year?  Did he ever make that kind of

17    statement to you?

18     A.    Actually, I believe that I saw that in his

19    employment agreement that there was a -- a bone -- an annual

20    bonus number.

21     Q.    All right.  And did you also notice that it was

22    discretionary on whether or not to award that, that bonus?

23     A.    I can't recall that.

24     Q.    Okay.

25                 Did you ever hear, perhaps when you were

1  having beer with Mr. Carpenter, that he claimed that he felt

2  like he should be paid a sales bonus from the proceeds of

3  the sale to Cascade?

4        A.    Yes.

5        Q.    What did he say about that?

6        A.    That he felt like he deserved a -- a large bonus.

7        Q.    All right.  He didn't say that he had an agreement

8  with Brian Potashnik or Cheryl Potashnik to be paid a bonus.

9  He just said he felt he should be paid a bonus, right?

10       A.    He said that he and Brian had an agreement.

11       Q.    He said that he and Brian had an understanding.

12       A.    An understanding or agree -- he said an agreement.

13       Q.    Do you recall telling me in your deposition that

14  he told you that -- and Deepak -- that he felt he had an

15  understanding --

16       A.    I believe --

17       Q.    -- with Mr. Potashnik?

18       A.    I believe those were my words, yes.

19       Q.    And that, to you, an understanding doesn't

20  necessarily mean an agreement.  That's the opinion of one

21  side and not the other?

22       A.    That's correct.

23       Q.    So, in Mr. Carpenter's opinion, he deserved -- he

24  felt like he should be paid a bonus from the sales proceeds

25  of the sale to Cascade?

1        A.    Correct.

2        Q.    And that's what he told you and Deepak Sulakhe

3   over beer, right?

4        A.    Yes.   Plus when we were discussing severance

5   payrolls, yes.   That's why I gave him a copy of my --

6        Q.    Right.

7        A.    -- document, what I was planning on using.

8        Q.    All right.

9              The severance pay -- the severance payroll,

10   that program, if you will, that Ms. Gibson asked you about,

11   that wasn't the Potashniks' idea, was it?

12       A.    No.   It was Jeff and my idea because we were

13   having key employees leave us.

14       Q.    Right.   It wasn't them that came to you and said

15   we're having key employees leave.   That was your idea, along

16   with Mr. Carpenter, that you approached the Potashniks

17   about, correct?

18       A.    Correct.   That was our job to make

19   recommendations.

20       Q.    Mr. Carpenter told you that -- did he tell you

21   about suing his prior employer before he joined Southwest

22   Housing?

23       A.    I heard that he had.

24       Q.    All right.   And did he tell you, also, that after

25   he left Southwest Housing that he was employed for a while,

1    at least, by American Housing Foundation, another property

2    management company?

3         A.   Yes.

4         Q.   And that he sued them too?

5         A.   Yes.

6         Q.   Do you recall that Mr. Carpenter was paid a

7    $50,000 advance against bonus in his first year there at

8    Southwest Housing Management?

9         A.   Yes.

10        Q.   And, in fact, do you recall -- did the company

11   also pay his taxes on that advance against bonus?

12        A.   Did the company pay his taxes?

13        Q.   Yes, sir.  If you remember.

14        A.   I don't -- I don't know if it was written that

15   way.

16        Q.   Have you ever heard the term "forgiveness loan"?

17        A.   Yes.

18        Q.   Where did you hear that term?

19        A.   In our deposition.

20             (Laughter)

21        Q.   So you heard that term from me about two weeks

22   ago?

23        A.   Yes.

24        Q.   The first time you'd ever heard it?

25        A.   I think so, yes.

1      Q.   All right.

2           Did you ever hear Mr. Carpenter call that

3    $50,000 advance a forgiveness loan; that Mr. Brian Potashnik

4    somehow had forgiven that advance against the loan?

5      A.   He had mentioned that it was for moving costs and

6    things like that and that it was to be forgiven, and I

7    couldn't let that 'cause it was a receivable on my books.  I

8    couldn't let it stand as a receivable on my books, so we had

9    to run it through our payroll, run it through payroll

10   through his payroll, to get it off my books.

11     Q.   All right.  Well, you say you couldn't let it

12   stand?

13     A.   Right.

14     Q.   And why not?

15     A.   You can't have forgiveness of loans without it

16   passing through payroll.

17     Q.   Would that jeop -- you're a certified public

18   accountant, right?

19     A.   Yes.

20     Q.   Would that jeopardize your license to permit that?

21     A.   Yes.

22           MR. DONOHUE:  May I approach, Your Honor?

23           THE COURT:  Certainly.

24           Approach the witness?

25           MR. DONOHUE:  Yes.

1          THE COURT:  All right.

2          MR. DONOHUE:  The witness.  I'm sorry.

3     Q.   (By Mr. Donohue) I'm going to hand you what's been

4  marked as Defendants' Exhibit Number 53, Mr. Jones.  We

5  covered this two weeks ago, also.

6     A.   Okay.

7     Q.   And I'll represent to you that this is a copy of

8  Plaintiff/Counter-defendant Jeffrey W. Carpenter's

9  objections and responses to defendants' counterclaim and the

10  first set of interrogatories that were served by counsel for

11  Mr. Carpenter on July 29th of 2008 in this very lawsuit.

12          MR. DONOHUE:  Your Honor, we would offer

13  Defendants' Exhibit Number 53 into evidence.

14          MS. GIBSON:  Your Honor, I --

15          THE COURT:  Is there any objection?

16          MS. GIBSON:  -- I object to admissibility

17  of these.  They could use them for impeachment, but he can

18  certainly ask him about them.

19          THE COURT:  Sustained.

20          We don't admit interrogatories in general,

21  but you can use them like you would a deposition.

22          MR. DONOHUE:  Okay.

23     Q.   (By Mr. Donohue) And just -- and with respect to

24  the question of Mr. Carpenter's job responsibilities as an

25  employee of Southwest Housing Management Corporation, Inc.,

1    did he spearhead daily operations of one of the fastest

2    growing multifamily developer, builder, and manager with

3    7100-plus new apartments constructed in Texas?  Was he the

4    spearhead?

5         A.   He was the president of the management company.

6         Q.   Okay.  What about --

7         A.   So he -- he was a strong leader in that field,

8    yes.

9         Q.   All right.  In management.  But what about

10   developer and builder?

11        A.   I believe we had other people in those roles.

12        Q.   So he didn't spearhead development, right?

13        A.   No.  That was Mr. Sulakhe.

14        Q.   That was Mr. Sulakhe that you had beer with?

15        A.   Yes.

16        Q.   And he didn't spearhead the construction, the

17   builder aspect of it either, did he?

18        A.   No.

19        Q.   So, if he swore to it, that's an untrue statement;

20   is that right?

21        A.   He could have felt that he spearheaded it.

22        Q.   But you were there and he did not spearhead

23   development or construction?

24        A.   When I was there I didn't see that he was

25   spearheading it.

Appendix 000622

1       Q.   And then, was he directly accountable for all
2  management-related operations in the communities, a company
3  with guiding development through Southwest Housing
4  Development Company?  Was he directly accountable for that?
5       A.   Yes.  He was directly accountable for making sure
6  that the properties operated correctly.
7       Q.   Did he guide development through Southwest Housing
8  Development, Inc.?
9       A.   In making recommendations of possible upgrades and
10  items inside the unit.
11       Q.   What about -- did he guide the accounting entities
12  to ensure ownership objectives were achieved?
13       A.   No.  That was my job.
14       Q.   So, if he said that -- that's another thing you
15  did where he was directly accountable for accounting
16  entities to ensure ownership objectives are achieved.  That
17  was your job, right?
18       A.   Right.
19       Q.   So, if he swore to that, that too would be an
20  untrue statement; is that correct?
21       A.   He received reports and questioned reports that we
22  put together.  So if that's what he feels is spearheading
23  accounting --
24       Q.   But that was your -- your job?
25       A.   That's my job.

1        Q.    It says that it collaborated with architects,

2   engineers, developers, and construction personnel on the

3   design of site, value engineering to control and reduce

4   construction and ongoing operational expenses.  Was that a

5   role that he had?

6        A.    Yes, he was involved with those aspects of it.  I

7   don't know if he made the final decision on them but he was

8   an integral part of making decisions along upgrades and

9   changes that may affect leasing.

10       Q.    And then it says that he originated and

11  implemented the development, slash, management acceptance

12  standards and procedures of all new construction units to

13  ensure ownership quality of product was acceptable.

14                  Did he originate the development acceptance

15  standards?

16       A.    That may have been before I was there.  I don't

17  know.

18       Q.    What was your understanding of his role there as

19  president of Southwest Housing Management?  Mr. Carpenter.

20       A.    His role was to run the management and all the

21  employees that are assisting.  I mean, it's -- it's a huge

22  job to keep a management company going.  So his job was to

23  operate the management company.

24       Q.    Okay.

25       A.    And all of its employees and train the employees.

1          Q.    For which he was handsomely paid every year by

2     Southwest Housing Management, right?

3          A.    He was paid to do that, yes.

4          Q.    Did Mr. Carpenter, in speaking with you and

5     Mr. Sulakhe in particular over beer, did he exaggerate his

6     own role there at Southwest Housing Management?

7                    MS. GIBSON:   Object to the --

8          Q.    (By Mr. Donohue) The Southwest Housing entities, I

9     should say.

10         A.    I firmly believe he believed it, so I don't --

11    what's your question?  I don't know what your question is.

12         Q.    Well, I guess -- in your mind, was it an

13    exaggeration?  I know that he believed it, but did you

14    believe it?

15         A.    Sometimes I thought it was a stretch because it

16    demeaned my -- what I did.

17         Q.    I'm sorry.  That last part, it demeaned what you

18    did?

19         A.    Oh, if -- if he was over me.  And he wasn't over

20    me.  It demeaned what I did.

21         Q.    So, in other words, his characterization of his

22    role there at Southwest Housing entities was demeaning to

23    you because you sure didn't report to him.  Is that what

24    you're saying?

25         A.    I'm saying -- yeah, I guess I am saying that.

1          THE COURT:   You have about four minutes
2     left, Mr. Donohue.
3          MR. DONOHUE:   All right.   Thank you,
4     Your Honor.
5          Q.   (By Mr. Donohue) Mr. Jones, in your experience in
6     real estate, should all agreements be in writing?
7          MS. GIBSON:   Object to relevance as to real
8     estate transactions.
9          THE COURT:   Sustained.
10          THE WITNESS:   Am I answering?
11          THE COURT:   No.
12          Q.   (By Mr. Donohue) Did Mr. Carpenter do anything
13     that you perceived that he wasn't paid to do, do anything
14     for the Southwest Housing entities that he wasn't paid to
15     do?
16          A.   No.   Jeff was a very hard worker.
17          Q.   And he was paid for his hard work; is that right?
18          A.   Yes.
19          MR. DONOHUE:   I'll pass the witness.
20          THE COURT:   Okay.
21          Ms. Gibson, you still have about eight
22     minutes.
23          MS. GIBSON:   Okay.
24               REDIRECT EXAMINATION
25     BY MS. GIBSON:

```
1          Q.    Whether you call the stay bonus or these bonuses a
2     severance or a stay bonus, the intent of both is to get
3     people to stay, correct?
4          A.    Correct.
5          Q.    All right.
6                And Jeff Carpenter was part of the
7     stay-bonus program or severance to, you know,
8     stay-to-get-severance program, whatever you want to call it,
9     as well as yourself and Sara Reidy, correct?
10         A.    I was under that impression, yes.
11         Q.    Okay.
12               And it was -- there was a lot of additional
13    work to do because of an asset sale, correct?
14         A.    Correct.
15         Q.    All right.
16               And Jeff Carpenter stayed, correct?
17         A.    Yes.
18         Q.    All right.
19               So, if he stayed and didn't get paid the
20    promised stay bonus, then there was something he did that he
21    didn't get paid for, correct?
22               MR. DONOHUE:  Objection, calls for
23    speculation.
24               THE COURT:  All right.  Overruled.
25               MR. DONOHUE:  Assumes facts not in
```

1      evidence, also.

2                          THE COURT:  Overruled.

3                          You can answer if --

4                          THE WITNESS:  I can answer that one?

5                          THE COURT:  If you know, you can answer.

6                          THE WITNESS:  Would you ask it again?

7                          MS. GIBSON:  Sure.  Sure, sure.

8          Q.   (By Ms. Gibson) Jeff Carpenter stayed --

9          A.   Uh-huh.

10         Q.   -- and you were both part of this bonus program.

11     If he stayed and didn't receive that bonus, then there is

12     something he did that he didn't get paid for.  He didn't get

13     paid the bonus promised to stay, correct?

14         A.   I didn't see an agreement, so I don't know if I

15     can answer that.

16         Q.   Well, I'm not asking you -- I know you weren't

17     there.  I'm just saying, if he had an agreement and we know

18     he stayed and he didn't get paid, then there is something

19     that he didn't get paid for.

20         A.   I guess you can conclude that.

21         Q.   All right.

22                          And would you have stayed on through the

23     asset sale if you weren't promised something more to do so?

24                          MR. DONOHUE:  Objection, calls for

25     speculation.

1                         THE WITNESS:  I would have been --

2                         THE COURT:  Excuse me.

3                         THE WITNESS:  Okay.

4                         THE COURT:  Overruled.

5                         Go ahead.  Answer the question.

6                         THE WITNESS:  I was -- yeah, I would have

7       started looking earlier than I started looking.

8            Q.   (By Ms. Gibson) Okay.  'Cause it was a lot of

9       extra work, right --

10           A.   It was extra work, yes.

11           Q.   -- for an asset sale?

12                     And about how many -- I know you're not

13      going to remember exact numbers, but about how many

14      apartment communities are we talking about?  Like, how big

15      was the operation?

16           A.   Well, they grew quite a bit by the time I was

17      there because we had so many construction jobs under --

18      under construction.  At one time we had 14 communities going

19      off at the same time.  Plus, we had -- I think it ended up

20      being about 9,000 units, something around there.

21           Q.   And I know you said that everyone's -- everyone is

22      replaceable, correct?

23           A.   Correct.

24           Q.   But you and Jeff Carpenter and Sara Reidy were

25      important to the asset sale, correct?

1    A.    Yes.

2    Q.    And around this time there was another motivation

3  or another motive to try and get employees to stay, because

4  the criminal investigation was in the news, correct?

5    A.    Correct.

6    Q.    In other words, if employees at your level, CFO,

7  or at Jeff's level, management of the management

8  corporation, or Sara Reidy over development, left, the

9  criminal issues that were all over the papers were probably

10  going to make it hard to get replacements --

11          MR. L. FRIEDMAN:  I'm going to object,

12  Your Honor, to the injection of facts not in evidence.

13          THE COURT:  The sidebar part is sustained.

14  You can ask him about the --

15          MR. L. FRIEDMAN:  Ask that it be stricken.

16          THE COURT:   -- the criminal investigation.

17  So rephrase your question.

18          MS. GIBSON:  Okay.

19    Q.    (By Ms. Gibson) It was -- it was particularly

20  important to motivate employees to stay at the time because

21  of the criminal investigation into the Potashniks, correct?

22    A.    Was that the only motivation?  I'm not sure if

23  that was the only motivation.

24    Q.    Oh, no.  No, I mean I -- I -- I agree --

25    A.    It's one of the reasons that we would want to --

1      Q.   Okay.

2      A.   -- get out in front of people leaving was that the

3  sale was taking so long to go through we needed to keep

4  people, plus the fact that there was a lot of negative stuff

5  coming out in the news.  So...

6      Q.   Okay.  And I know the stuff on the news was about

7  the criminal investigation?

8      A.   It was about -- yes.

9      Q.   Okay.

10          Ultimately, or as CFO, do you know who

11  ultimately would receive the proceeds from the asset sales

12  to Cascade?  Like, where did the money go?

13     A.   Into Southwest Development, I believe.

14     Q.   Okay.  And that was the repository for all of the

15  sellers?

16     A.   By that time the construction company was wound

17  down, so yes.

18     Q.   Okay.  And, ultimately, that money would go to

19  whom?

20     A.   Brian and Cheryl.

21     Q.   Okay.  Brian and Cheryl Potashnik?

22     A.   Yes.

23               MS. GIBSON:  How am I doing on time, Judge?

24               THE COURT:  You got about two minutes.

25               MS. GIBSON:  Okay.

1          THE COURT:   Mr. Donohue, you still have two

2     minutes.

3          MR. DONOHUE:   I still have two.   Thank you,

4     Your Honor.

5     Q.   (By Ms. Gibson) Mr. Donohue asked you a question

6     in which he assumes that Jeff Carpenter said he had filed a

7     lawsuit against other employers.   Do you recall that?

8          MR. DONOHUE:   Objection, Your Honor.

9     Misstates -- completely misstates my question.   There's no

10    assumption there.

11         THE COURT:   Okay.   He can handle the

12    question.   Overruled.

13    A.   Yes, I recall that.

14    Q.   (By Ms. Gibson) Okay.   And do you understand the

15    difference between filing a lawsuit and when at some point

16    you happen to work for an employer that goes into

17    bankruptcy, having to file a claim for your wages in

18    bankruptcy?

19    A.   Correct.

20    Q.   Okay.

21    A.   There's a difference.

22    Q.   Okay.

23         And were you aware that what Mr. Donohue

24    initially asked you about was actually a couple of employers

25    earlier, not -- not the place?

1          A.    No, I was not aware.

2          Q.    Okay.

3                And are you aware in that case that the

4     employer ultimately ended up --

5                MR. DONOHUE:  I'm going to object.

6     Obviously, this is injecting facts that are not in evidence

7     and lack of foundation.

8                THE COURT:  You'll have to establish that

9     with the witness if he knows those facts.  I mean, you're

10    testifying when you're saying that.  If it's true, I don't

11    know.

12         Q.    (By Ms. Gibson) You said that the management

13    entity didn't make money, correct?

14         A.    Correct.

15         Q.    But did the organization as a whole make money?

16         A.    Yes.

17         Q.    Okay.  And --

18         A.    The construction company made money.

19         Q.    Okay.  So, as between the management company, the

20    development company, and the construction company, the

21    organization as a whole was profitable between 2004 and

22    2007?

23         A.    Yes.  2007, I'm not -- I can't recall, but --

24         Q.    2007, is that the year that the companies were

25    hemorrhaging money on federal expense fees?

235

1        A.    Yes.

2        Q.    Okay.

3                     MS. GIBSON:   Pass the witness.

4                     THE COURT:   Okay.

5                     Mr. Donohue.

6                     MR. DONOHUE:   Thank you, Your Honor.

7                     RECROSS EXAMINATION

8   BY MR. DONOHUE:

9        Q.    This transition to Cascade and I guess the

10  management arm or the management affiliate was Pinnacle?

11       A.    Correct.

12       Q.    Right?

13       A.    A branch of Pinnacle, yes.

14       Q.    A branch of Pinnacle?

15       A.    Yes.

16       Q.    You were asked to go over to the new company, if

17  you will, the acquiring company; is that right?

18       A.    Yes.

19       Q.    As was Mr. Sulakhe, right?

20       A.    He was asked to consult, yes.   He was consultant.

21       Q.    As was most all the other employees there at

22  Southwest Housing, other than Mr. Carpenter, right?

23       A.    Correct.   They had -- they had a head management.

24       Q.    Well, they may have had it.   But if he was so

25  valuable, don't you think they could have found a place for

1    him at Cascade or Pinnacle?

2        A.    No.   No, in Pinnacle they couldn't have placed him

3    in that company.

4        Q.    The million dollars a month of bleeding that

5    you -- that you mentioned before, there were also other --

6    other expenses that were -- that were being incurred at that

7    point, including bond fees, right?

8        A.    Yes.

9        Q.    Transaction fees; is that correct?

10       A.    I can't recall.

11       Q.    What all -- what all were those expenses made up

12   of?

13       A.    A lot of lawyer fees.   There's also a lot of funds

14   having to go into the properties themselves.   Yeah, it was

15   just operations, closing down the operations costs.

16       Q.    But they weren't just to -- just to make a clear

17   picture, it wasn't simply criminal defense attorney fees

18   that were -- that were causing this bleeding off as you know

19   it?

20       A.    Correct.

21              MR. DONOHUE:  I'll pass the witness.

22              THE COURT:  All right.  Thank you.

23              Thank you, Mr. Jones.  You can step down,

24   but don't leave the courtroom yet.  If you want to step down

25   and have a seat over here, you're welcome to.

1          THE WITNESS:  Okay.

2          THE COURT:  Ladies and gentlemen, we're

3  going to stop for the day.  Let me give you just a couple

4  more instructions.  And, again, I'll give you instructions

5  throughout the course of the trial.

6          (Jury instructions given)

7          THE COURT:  We're going to start at 9:00

8  o'clock tomorrow.  So, if you'd be back in the jury room by

9  9:00, then hopefully we'll bring you out right then.

10          You're in the jury box now.  We'll ask you

11  to go to the jury room and Rick will take you out of the

12  courtroom.

13          We wish you a good afternoon and we'll see

14  you tomorrow morning.

15          (The jury exited the courtroom.)

16          THE COURT:  Y'all come on up.

17          MR. L. FRIEDMAN:  Your Honor, before we go

18  off the record I want to make a motion for mistrial.

19          THE COURT:  We're not off the record yet.

20          MR. L. FRIEDMAN:  All right.

21          THE COURT:  But I'll give you a chance.  We

22  still have some housekeeping to do.

23          You wanted to offer on the record

24  Exhibits 4 -- you didn't actually offer 5, but you can if

25  you want -- but at least 4 and 6?

```
 1                    MS. GIBSON:  Yes, 4 and 6.
 2                    MR. SANFORD:  You don't want to offer 5?
 3                    MS. GIBSON:  No.  It was -- it was a
 4       different deal.
 5                    THE COURT:  All right.
 6                    And if you'll put your objection,
 7       Mr. Donohue, on the record.
 8                    MR. DONOHUE:  All right.  Your Honor, our
 9       objection to these exhibits is that they violate the motion
10       in limine.  They go into amounts paid as well as deals made,
11       if you will, with other employees, the Southwest Housing
12       entities, which is not -- neither relevant or reasonably
13       calculated to lead to discovery of admissible evidence.
14       It's prejudicial.
15                    THE COURT:  All right.  Fair enough.
16                    The objection's sustained.  Four and five
17       [sic] are not admitted into evidence but will be left with
18       the court reporter so that they will be part of the
19       reporter's record, but not documents to go back to the jury.
20                    Mr. Jones is still here.  I wanted to keep
21       him here in case you needed to lay a predicate.
22                    You weren't objecting to the authenticity
23       of the documents.  It would have been Mr. Jones who
24       established that?
25                    MR. L. FRIEDMAN:  Mr. Jones?
```

1                        THE WITNESS:  No.

2                        THE COURT:  So, can we release Mr. Jones

3    now?

4                        MS. GIBSON:  Yeah, as long as they have --

5    well, do you have any objection?

6                        THE COURT:  Well, he put his objection on

7    the record.

8                        MS. GIBSON:  I mean other, other.

9                        Is that it?

10                       MR. DONOHUE:  Is that it to what?  I'm

11   sorry.

12                       THE COURT:  To four and six.

13                       MS. GIBSON:  Is that -- is that all your

14   objections?

15                       MR. DONOHUE:  To four and six, yes, that's

16   all my objections.

17                       MS. GIBSON:  Okay.

18                       THE COURT:  Okay.  All right.

19                       Thank you for coming, Mr. Jones.

20                       THE WITNESS:  Okay.  Thank you.

21                       (Mr. Jones exited the courtroom.)

22                       THE COURT:  Vikki, you ready?

23                       THE REPORTER:  Yes.

24                       THE COURT:  Mr. Friedman, you had a motion.

25

1                    DEFENDANTS' MOTION TO DISREGARD

2                         MR. L. FRIEDMAN:  All right.  Yeah.

3                         I'm going to ask the Court for an

4    instruction to disregard the comments --

5                         THE COURT:  Just a second.

6                         THE BAILIFF:  Jurors coming through.

7                         (Off the record)

8                         THE COURT:  All right, Vikki, we're back on

9    the record.

10                        Mr. Friedman?

11                        MR. L. FRIEDMAN:  Based on the comments

12   made by Ms. Gibson repeatedly violating the motion in limine

13   about the extent of which she was permitted to go into

14   reference to criminal investigation, I'd like the Court to

15   instruct the jury to disregard any reference to criminal

16   investigation.  Number one, as it pertains to Ms. Potashnik;

17   number two, anything beyond reference to that part of the

18   million dollars a month was bleeding through the company

19   went to criminal defense; and, number three, that they

20   should disregard the comment that Ms. Gibson made to the

21   criminal investigation and such was widely published in

22   newspapers and other publications.  I think that is

23   extremely prejudicial and will lead the jury to do

24   investigating on their own.

25                        THE COURT:  Okay.

1          And I instructed the jury to not do any

2    investigation.  I trust they'll follow that instruction, but

3    I'll consider instructing them again.  I don't usually do

4    that multiple times, but I'll consider that.  But -- and

5    I'll just take what you said under advisement.

6                    DEFENDANTS' MOTION FOR MISTRIAL

7               MR. L. FRIEDMAN:  Excuse me.

8               So, in light of that, if you're not going

9    to give them an instruction, then I'm going to ask the Court

10   to declare a mistrial; because I think that the proceedings,

11   the line of questioning by Ms. Gibson and continued

12   reference to criminal proceedings, criminality, and without

13   distinguishing Ms. Geiser Potashnik from the generalization

14   and the implication of all the defendants is prejudicial to

15   Ms. Geiser Potashnik and unfair to her.  So I ask the Court

16   to declare a mistrial.

17                        COURT'S RULING

18               THE COURT:  Okay.  That's denied.

19               MS. GIBSON:  Your Honor?

20               THE COURT:  Yes.

21               MS. GIBSON:  Response?

22               THE COURT:  Well, it's denied.

23               MS. GIBSON:  Oh.  All right.

24               MR. L. FRIEDMAN:  Declare a mistrial as to

25   all the defendants and not only --

1              MS. GIBSON:  I thought he had more than one
2   issue he was raising.
3              MR. L. FRIEDMAN:  No, with regard to
4   Ms. Potashnik.
5              MS. GIBSON:  Okay.
6              MR. L. FRIEDMAN:  Your Honor, it was the
7   mistrial to all the defendants.
8              THE COURT:  No, I understood.  I understood
9   your motion.
10             Motion's denied.  We're plowing through.
11             Mr. Donohue?
12             MR. DONOHUE:  Yes.  Your Honor, we would
13   offer Defendants' Exhibit 53.
14             Which I believe I gave you a copy of,
15   Ms. Gibson.  It's the interrogatories that are -- that are
16   verified by Mr. Carpenter.
17             THE COURT:  And I think your objection is
18   already on the record.
19             MS. GIBSON:  Yes.
20             THE COURT:  Okay.  And that -- that
21   objection is sustained and 53 will be provided to the court
22   reporter.  It will be a exhibit for the reporter's record
23   only, not to go back to the jury.
24             (Off the record)
25

```
1              COURT'S RULING ON DEPOSITION OBJECTIONS
2                   THE COURT:  In the deposition of
3    Jeffrey Robert Richards the objection on Page 18, Line 13,
4    is overruled.  And the objection on Page 9, Line 8, that
5    objection to leading is overruled.  The prior objection was
6    to form.  And the form-specific objection that he'd be
7    required to serve at trial off the record, Mr. Donohue told
8    me it called for speculation on the part of the witness.
9                   MR. DONOHUE:  That's right.
10                  THE COURT:  That's overruled.
11                  (End of proceedings)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  THE STATE OF TEXAS

2  COUNTY OF DALLAS

3      I, Vikki L. Ogden, Official Court Reporter in and for

4  the County Court at Law Number 5 of Dallas County, State of

5  Texas, do hereby certify that to the best of my ability the

6  above and foregoing contains a true and correct

7  transcription of all portions of evidence and other

8  proceedings requested in writing by counsel for the parties

9  to be included in the Reporter's Record, in the above-styled

10 and -numbered cause, all of which occurred in open court or

11 in chambers and were reported by me.

12     I further certify that the total cost for the

13 preparation of the Reporter's Record is $1,492.00 and will

14 be paid by Friedman & Feiger, LLP.

15     WITNESS MY OFFICIAL HAND this the 4th day of October,

16 2018.

17

18

19                          /S/ Vikki L. Ogden

20                          _____
                            VIKKI L. OGDEN, Texas CSR# 6309
                            Official Court Reporter
21                          Dallas County Court at Law No. 5
                            600 Commerce Street, Floor 5
22                          Dallas, Tx. 75202
                            (214)653-6443
23                          Certification Expires:  12/31/18

24

25

```
 1                    CAUSE NO. CC-08-02072-E

 2   JEFFREY W. CARPENTER,          )   IN THE DALLAS COUNTY
                                    )
 3                 Plaintiff,       )
                                    )
 4   VS                             )   COURT AT LAW NO. 5
                                    )
 5   SOUTHWEST HOUSING DEVELOPMENT  )
     COMPANY, INC., ET AL,          )
 6                                  )
                   Defendants.      )   DALLAS, TEXAS
 7   _____

 8

 9        I, Vikki L. Ogden, Official Court Reporter in and for

10   the County Court at Law No. 5 of Dallas County, Texas, do

11   hereby certify that the following exhibit constitutes a true

12   and complete duplicate of the original exhibit admitted into

13   evidence during the proceedings in the above-entitled and

14   -numbered cause as set out herein before the Honorable Mark

15   Greenberg, beginning January 23, 2018.

16        WITNESS MY OFFICIAL HAND on this the 19th day of

17   October, 2018.

18

19   1

20

21                         /S/ Vikki L. Ogden
                          _____
22                         Vikki L. Ogden, Texas CSR# 6309
                           Official Court Reporter
23                         Dallas County Court at Law No. 5
                           600 Commerce Street, Floor 5
24                         Dallas, Texas 75202
                           (214)653-6443
25
```

Gmail - SA

Page 1 of 3



Jeffrey Carpenter <jwc0101@gmail.com>

# SA

5 messages

---

**Jeffrey Carpenter <jwc0101@gmail.com>**
To: cpotashnik@southwesthousing.com, bpotashnik@southwesthousing.com

Thu, Nov 15, 2007 at 7:37 AM

Brian and Cheryl:

As you are well aware, from the day I joined the company on March 15, 2004, no one has been more committed and dedicated to the success of the company, or more protective and supportive of you, than I. As both of you repeatedly have acknowledged, and based on your commitments to me, I have on numerous occasions sacrificed my time, family life, vacation, and short term financial interests for the betterment of the company and your financial well-being. Indeed, I have stayed with the you and the company through extraordinarily difficult times and financial difficulty, stemming from Katrina, and other setbacks. Of course, as you also know, this was not done wholly altruistically, but was instead based on your express representations to me that your financial commitments to me, in the form of earned bonuses and other unpaid compensation, would be honored. Last year, after the Cascade transaction was announced and it became reasonably clear that I would not be retained after closing of that transaction, you implored me to stay with the company through that time, as that continuity and my continued services were essential to the success of that transaction. In exchange, you informed me that I would be entitled to receive at 3% of the proceeds of that transaction, net of certain costs, which based on the structure at that time would represent an amount in excess of $1,000,000.00; this is in addition to the unpaid annual bonuses. At various times thereafter, you repeatedly assured me that you would honor our agreement if I remained with the company and that I should trust you that it would get done, notwithstanding your failure to produce a written agreement. Up to the recent time, I have continued to rely on your repeated and express assurances that our agreements would be honored, and have continued to work for the company, passing on other opportunities, pursuant to your requests.

Upon the new management transition/consulting occurring on November 1 st, you informed me that the company no longer needed my services and advised that my employment was being terminated. Still, you advised that the company and you would honor your commitments to me, understanding that the timing and manner of payment were subject to the financial condition of the company and the closing of the Cascade transaction. You know, of course, how shocked I was to later receive a draft separation agreement that failed to recognize those commitments and, in fact, purported to release the company of liability for them.

While I fully understand that current circumstances make it difficult to fix the timing, manner and conditions of the company's and your financial commitments to me, that in no way justifies abandoning them, and I must respectfully insist that you and the company live up to your promises, on which I relied to my substantial detriment, financially and otherwise. Accordingly, I have taken the liberty of reworking and attach the draft separation agreement that you provided to incorporate those other elements. Of course, as I have repeatedly said, I am understanding of the Company's condition and the uncertain status of the Cascade transaction. As such, I am more than willing to explore mutually agreeable ways to address those issues while still preserving the spirit of our agreement and our mutual interest in the financial success of the company and this transaction. The attached document is a draft only and that once the substantive points are confirmed, I reserve the right to have it formally reviewed by an attorney to confirm that it is complete.

I would welcome the opportunity to discuss this with you and look forward to resolving this matter on mutually agreeable terms.

Sincerely,

Jeff

> DEFENDANTS'
> EXHIBIT NO.
> **024**
> 1·25·18

**CARPENTER 0074**

Appendix 000645

## EMPLOYMENT AGREEMENT

AGREEMENT (this "**Agreement**") made as of February 13, 2004, but effective as of the Employment Date (as hereinafter defined), between Southwest Housing Management Company, Inc., a Texas corporation (the "**Company**"), and Jeffrey W. Carpenter (the "**Employee**").

WHEREAS, the Company desires that the Employee be employed to serve as Executive Vice President with the Company, and the Employee desires to be so employed by the Company, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations and covenants contained in this Agreement, the parties agree as follows:

1. **Employment**.

The Company hereby employs the Employee and the Employee hereby accepts such employment, subject to the terms and conditions set forth in this Agreement, as its Executive Vice President.

2. **At-Will Employment**.

Employment under this Agreement shall begin as of March 15, 2004, the date hereof (the "**Employment Date**") and shall continue at the will of the Employee and/or the Company.  Employee understands and agrees that his employment is at will and may be terminated at any time, with or without notice or cause, by the Company or by himself.

3. **Duties**.

(a) The Employee shall perform the duties and functions assigned to him from time to time, in the sole discretion of the Company, and shall report to the President of the Company or such other person as directed by the President.

(b) The Employee agrees to devote his working time, attention and energies to the performance of the businesses of the Company and of any of its affiliates by which he may be employed, and the Employee shall not, directly or indirectly, alone or as a member of any partnership or other organization, or as an officer, director or employee of any other corporation, partnership or other organization, be actively engaged in or concerned with any other duties or pursuits which materially interfere with the performance of his duties under this Agreement.

4. **Compensation**.

(a) As compensation for the employment services to be rendered by the Employee under this Agreement, the Company agrees to pay, or cause to be paid, to the Employee a base salary at an annualized rate of $200,000.00, payable in equal installments bi-weekly.  This statement of annualized salary does not represent a contract

EMPLOYMENT AGREEMENT - page 1

*A2*

SHM 0106

1. Appendix 000646

for a year or any other specific period of time.

(b) Bonus structures will be reviewed and revised on an annual basis by the Company. In the first calendar year of employment, the minimum discretionary bonus potential will be $50,000.00, and will be based on achieving Company objectives. The maximum bonus potential in the first calendar year of employment will be $200,000, which will be determined based on overall profitability of the organization as a whole. A detailed bonus plan will be provided to the Employee within ninety days of the Employment Date. Any annual change(s) made to the bonus structure will be at the sole discretion of the Company. Employee must be employed by the Company at the end of the first calendar year for minimum discretionary bonus to be considered earned.

5. **Expenses**.

a. The Company shall pay or reimburse the Employee, subject to prior approval and upon presentment of such vouchers, receipts and other supporting information as the Company may require, for all reasonable business and travel expenses which may be incurred or paid by the Employee in connection with the employment of the Employee by the Company in accordance with the Company's standard policies then in effect. The Employee shall comply with such restrictions and shall keep such records as the Company may require of its Employees generally facilitating compliance with the requirements of the Internal Revenue Code of 1986, as amended from time to time, and regulations promulgated there under.

b. The Company shall reimburse the Employee the cost of relocation to the Dallas area in an amount not to exceed $36,000.00. Employee shall provide the Company with receipts and will receive reimbursement within fourteen days of submission of such receipts.

c. The Company shall provide the Employee with temporary housing in a corporate furnished apartment for a maximum period of ninety days.

6. **Insurance and Other Benefits**.

Employee shall be eligible for twenty days of total Paid Time Off per twelve month period. At the conclusion of 90 days of employment after Employee's Employment Date, Employee is eligible to participate in and receive any other benefits provided by the Company to other Employee employees, generally (including 401(k) plan participation, health insurance, dental coverage, life insurance and short and long-term disability insurance plans in accordance with the terms of such plans), all as determined from time to time by the Company. Company will reimburse the Employee for any COBRA insurance payments that may be incurred up through the date the Employee is eligible for Company benefits. Company shall pay Employee a monthly automobile allowance of $600.00. Employee will be eligible to participate in Company health club program. Company will adjust Employee's salary in the event the

EMPLOYMENT AGREEMENT - page 2

SHM 0107

Employee's share of the Company provided health coverage for the family exceeds $4,680.00.

7. **Termination of Employment; Effect of Termination**. Employee will not be entitled to any compensation or benefits pursuant to this Agreement effective upon the termination of employee's employment, the removal of Employee from the position of Executive Vice President, and/or upon the Employee's death, except as noted below. In the event of death of the Employee prior to the termination of his employment, the estate of the Employee shall thereupon be entitled to receive such portion of the Employee's annual salary and bonus as has been earned and unpaid through the date of his death.

a. In the event Company terminates Employee, Employee will receive severance in an amount equal to six weeks of base salary in a lump sum payable upon such termination.

8. **Representations and Agreements of the Employee**. (a)The Employee represents and warrants that he is free to enter into this Agreement and to perform the duties required under this Agreement, and that there are no employment contracts or understandings, restrictive covenants or other restrictions, whether written or oral, preventing the performance of his duties under this Agreement. Employee agrees to abide by all policies and practices of the Company as may be implemented from time to time.

(b) Employee acknowledges and agrees that all aspects of his terms, conditions and benefits not addressed herein are governed by the policies and practices of the Company as may be implemented from time to time in the sole discretion of the Company.

9. **Non-Competition and Non-Solicitation Covenants**. (a) The Employee acknowledges that, during the course of his employment by the Company, the Company will provide to Employee confidential or proprietary information, documents and other materials relating to the Company, its affiliates and their respective business which are not generally known to persons outside the Company (whether conceived or developed by the Employee or others) and confidential or proprietary information, documents and other materials entrusted to the Company by third parties, including, without limitation, any "know-how," trade secrets, customer lists, details of client or consultant contracts, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, business plans, acquisition plans of the Company or its affiliates that are valuable and not generally known to the competitors of the Company, whether or not in written or tangible form, and including all memoranda, notes, plans, reports, records, documents and other evidence thereof ("**Confidential Information**"). The Employee further acknowledges that during the course of his employment, he will be the recipient of goodwill generated by the Company's dealings with third parties.

(b) Employee agrees he will not directly or indirectly, during the term of

EMPLOYMENT AGREEMENT - page 3

SHM 0108

his employment by the Company, and thereafter, disclose to anyone, or use or otherwise exploit for his own benefit or for the benefit of anyone other than the Company or its affiliates, any Confidential Information. As a member of management, during the term of employment, the Employee will assume a pro-active role in educating subordinate employees regarding the appropriateness of language, behavior and the importance of confidentiality in business matters regarding the Company.

(c) Employee agrees that all Confidential Information conceived, discovered or made by Employee during the term of employment belongs to the Company. Employee will promptly disclose such Confidential Information to the Company and perform all actions reasonably requested by the Company to establish and confirm such ownership.

(d) All Confidential Information relating to the Company and its affiliates shall be the exclusive property of the Company and its affiliates, and Employee shall use all reasonable efforts to prevent any publication or disclosure thereof. Upon termination of Employee's employment with the Company, all documents, records, reports, writings and other similar documents containing Confidential Information, including copies thereof, then in Employee's possession or control shall be returned to and left with the Company.

(e) In addition, Employee shall not, directly or indirectly, during or for a period of one year after the termination of his employment, request or cause, directly or indirectly, any contracting party, supplier, vendor, investor, lender, municipality, government agency, quasi-governmental agency, or bond-issuing entity, or customer of the Company during the period of Employee's employment, to cancel or terminate any business relationship or dealings with the Company or any of its parents or affiliates.

(f) In addition, Employee shall not, directly or indirectly, during or for a period of one year after the termination of his employment, solicit, interfere with or entice, directly or indirectly, any employee (including any leased employee) of the Company, or any parent or affiliate, who worked for the Company (or its parent or affiliate) during the time that Employee worked for the Company (or its parent or affiliate), to leave the employment of the Company.

(g) If any portion of the restrictions set forth in this Section 9 should, for any reason whatsoever, be declared invalid by an arbitrator or court of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected. Employee acknowledges that the Company intends to expand its business into new geographic areas, that its sales and marketing prospects are for continued expansion into such areas, and that in his capacity as Senior Vice President of Property Management, he will have access to information and operations concerning such, and that therefore, the territorial, time and scope of activity limitations set forth in this Section 9 are reasonable and do not impose a greater restraint than is necessary for the adequate protection of the goodwill and other business interests of the Company. In the event any such limitation is deemed to be unreasonable by an arbitrator or court of competent jurisdiction, Employee and the Company agree that the arbitrator or court may reform the territorial, time and/or scope limitations of this Section 9.

(h) The existence of any claim or cause of action by Employee against the

EMPLOYMENT AGREEMENT - page 4

SHM 0109

Company shall not constitute a defense to the enforcement by the Company of the foregoing restrictive covenants.

10. **Alternative Dispute Resolution; Right to Injunction; Remedies**.

(a) Employee and the Company agree that in the event of any dispute or claim arising from or relating to this Agreement or the breach thereof, or to any other aspect of Employee's terms, conditions and/or benefits of employment or to any other aspect of his contacts with Company, the parties hereto shall use their best efforts to settle the dispute, claim, question, or disagreement. To this effect, they shall consult and negotiate with each other in good faith and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to both parties. If they do not reach such solution within a period of 30 days, then, upon written notice by either party to the other, such dispute or claim shall be submitted within the next 60 days to a one-half day mediation, with the mediation fee to be shared equally by the Employee and the Company, and with the mediator to be agreed upon by the Employer and the Company; provided, however, that if a mediator cannot be agreed upon, then one shall be appointed by the American Arbitration Association ("AAA") with all AAA and mediator fees to be shared equally by the Employee and the Company. If mediation is unsuccessful, then upon written notice by either party to the other and to AAA, within 30 days of the mediation, such dispute or claim shall be submitted for binding arbitration administered by AAA in accordance with the provisions of its Employment Dispute Arbitration Rules, except as provided in (b) below. Neither the Company nor the Employee may file any claim, complaint, charge or suit with any court or governmental agency against the other, or accept any damages or other relief as the result of any claim, complaint, charge or suit, except as provided in (b) below or as such restriction would otherwise be unlawful. All fees and costs up to $2000.00 charged by AAA and the arbitrator(s) shall be paid equally by the Employee and the Company; all fees and costs charged by AAA and the arbitrator(s) in excess thereof shall be paid by the Company. Each party shall bear its own attorneys' fees and costs of arbitration except as otherwise ordered by the arbitrator(s).

(b) The Employee recognizes that the services to be rendered by him under this Agreement integrally involve the training and Confidential Information provided by the Company, the loss of which cannot be adequately compensated for in damages. In the event of a breach of Section 9 or 10 of this Agreement by the Employee, the Company shall be entitled to seek temporary injunctive relief from a court of proper jurisdiction pending the final decision and judgment in the arbitration as to such alleged breach. The Company shall not seek an award of attorneys' fees or costs incurred in bringing an action pursuant to this provision (b).

11. **Assignment**.

The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company.

EMPLOYMENT AGREEMENT - page 5

SHM 0110

12. **Amendment or Alteration**.

No amendment or alteration of the terms of this Agreement shall be valid unless made in writing and signed by both of the parties to this Agreement.

13. **Governing Law**.

This Agreement shall be governed by the laws of the State of Texas applicable to agreements made and to be performed therein. Any mediation, lawsuit or other proceeding in connection with this Agreement or Employee's employment or relationship with the Company shall occur or be brought in Dallas County, Texas.

14. **Severability**.

The holding of any provision of this Agreement to be invalid or unenforceable by a court of competent jurisdiction shall not affect any other provision of this Agreement, which shall remain in full force and effect.

15. **Notices**.

Any notices required or permitted to be given under this Agreement shall be sufficient if in writing, and if delivered by hand, or sent by certified mail, return receipt requested, to the addresses set forth below or such other address as either party may from time to time designate in writing to the other, and shall be deemed given as of the date of the delivery or mailing.

16. **Waiver or Breach**.

It is agreed that a waiver by either party of a breach of any provision of this Agreement shall not operate, or be construed, as a waiver of any subsequent breach by that same party.

17. **Entire Agreement and Binding Effect**.

This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and shall be binding upon and inure to the benefit of the parties to this Agreement and their respective legal representatives, heirs, distributors, successors and assigns. Notwithstanding the foregoing, no prior agreements between the Employee and the Company relating to the confidentiality of information, trade secrets and patents shall be affected by this Agreement.

18. **Survival**.

Neither the termination of the Employee's employment nor the change in his job title or position shall affect the enforceability of Sections 9, 10 and 11 of this Agreement.

19. **Further Assurances**.

EMPLOYMENT AGREEMENT - page 6

SHM 0111

Appendix 000651

The parties agree to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

20. **Headings**.

The section headings appearing in this Agreement are for the purposes of easy reference and shall not be considered a part of this Agreement or in any way modify, demand or affect its provisions.

21. **Counterparts**.

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

EMPLOYMENT AGREEMENT - page 7

SHM 0112

Appendix 000652

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.

By: _____

Name: Brian Potashnik

Title: President

5910 North Central Expressway, Suite 1145
Dallas, Texas 75206
214/891-1402 phone
214/987-3477 fax

_____   2/25/04

Jeffrey W. Carpenter

EMPLOYMENT AGREEMENT - page 8

SHM 0113

Appendix 000653

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.

By:_____

Name: Brian Potashnik

Title: President

5910 North Central Expressway, Suite 1145
Dallas, Texas 75206
214/891-1402 phone
214/987-3477 fax

_____  2/25/04

Jeffrey W. Carpenter

EMPLOYMENT AGREEMENT - page 8

REPORTER'S RECORD

VOLUME 3 of 11

<u>Trial Court Cause No. CC-08-02072-E</u>

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| Plaintiff, | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) | |
| Defendants. | ) | DALLAS, TEXAS |

_____

TRIAL ON THE MERITS

_____


      On the 24th day of January, 2018, the following

proceedings came on to be heard within the presence

of a jury, in the above-entitled and -numbered cause;

and the following proceedings were had before the

HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

Dallas County, Texas:

      Proceedings reported by Computerized Stenotype Machine.

```
1                          APPEARANCES:

2

    MS. AMY GIBSON
3   SBN 00793801
    Gibson Wiley, PLLC
4   1500 Jackson Street, Suite 714
    Dallas, Texas 75201
5   (214)522-2121
    Attorneys for Plaintiff
6
            -AND-
7
    MR. BRIAN SANFORD
8   SBN 17630700
    Sanford Firm
9   1910 Pacific Avenue, Suite 15400
    Dallas, Texas 75201
10  (469)361-9111
    Attorney for Plaintiff
11
            -AND-
12
    MR. LAWRENCE "LARRY" FRIEDMAN
13  SBN 07469300
    MR. MICHAEL DONOHUE
14  SBN 05989380
    MR. JASON FRIEDMAN
15  SBN 24059784
    Friedman & Feiger, LLP
16  5301 Spring Valley Road, Suite 200
    Dallas, Texas 75254
17  (972)788-1400
    Attorneys for Defendants
18
            -AND-
19
    MR. RYAN HALE
20  SBN 24097784
    Hawkins Parnell Thackston & Young, LLP
21  4514 Cole Avenue, Suite 500
    Dallas, Texas 75205-5412
22  (214)780-5138
    Appellate Attorney for Defendants
23

24
    ALSO PRESENT:  Steve Page, AV Technician
25
```

```
1                        VOLUME 3

2     January 24, 2018                          PAGE

3     Proceedings ----------------------------    6

4     Defendants' Motion to Poll the Jury -----    6

5     Court's Ruling --------------------------    7

6
      PLAINTIFF'S
7     WITNESS:
                      Direct   Cross   Redirect   Recross
8     Cheryl Geiser      8      ---      ---        ---

9
10    Defendants' Motion for Mistrial ---------   121

      Court's Ruling --------------------------   121
11

12    PLAINTIFF'S
      WITNESSES:
13                    Direct   Cross   Redirect   Recross
      Cheryl Geiser    122      144      183        ---
14    Rick Graf        196      ---      ---        ---
      Brian Potashnik  199      ---      ---        ---
15

16    Defendants' Objection and Motion for Mistrial -   241

17    Court's Ruling --------------------------   242

18    Adjournment -----------------------------   243

19    Court Reporter's Certificate ------------   244

20

21

22

23

24

25
```

Appendix 000657

```
 1                        EXHIBIT INDEX

 2
         PLAINTIFF'S
 3       NO.              DESCRIPTION              OFFERED      ADMITTED

 4       8         Recap of Expenses and            14           14
                   Bonuses
 5
         9         Email                            18           18
 6
         10        Magazine Cover                   62           62
 7
         11        Letter of Intent                 66           67
 8
         12        Purchase and Sale                72           73
 9                 Agreement

10       13        Schedule A                       --           76

11       14        Email Cover Sheet                80           80

12       15        Escrow Agreement                 84           84
                   (First Amendment)
13
         16        Purchase and Sale                86           86
14                 Agreement
                   (First Amendment)
15
         17        Escrow Agreement                 89           89
16                 (Second Amendment)

17       18        Escrow Agreement                 89           90
                   (Third Amendment)
18
         19        Escrow Agreement                 91           91
19                 (Fourth Amendment)

20       20        Escrow Agreement                 92           --
                   (Fifth Amendment)
21
         21        Consulting and Asset             93           94
22                 Management Services
                   Agreement
23
         22        Separation Agreement             98           99
24
         23        Email                           123          123
25
         24        Email                           125          125
```

Appendix 000658

```
 1                        EXHIBIT INDEX (CONT'D)

 2

     PLAINTIFF'S
 3   NO.            DESCRIPTION            OFFERED      ADMITTED

 4   27             Escrow Agreement          138         138
                    (Sixth Amendment)
 5
     28             Escrow Agreement          138         138
 6                  (Seventh Amendment)

 7   29             Escrow Agreement          138         138
                    (Eighth Amendment)
 8
     30             Escrow Agreement          138         138
 9                  (Ninth Amendment)

10   31             Escrow Agreement          138         138
                    (Tenth Amendment)
11
     32             Email                     138         138
12
     33             Closing Memorandum        138         138
13
     34             Closing Memorandum        138         138
14

15


16
     DEFENDANTS'
17   NO.            DESCRIPTION            OFFERED      ADMITTED

18   24             Gmail                     162         163

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2                        January 24,  2018

3                        THE COURT:  All right.  We're on the

4    record.

5                        MR. L. FRIEDMAN:  Good morning, Your Honor.

6                        THE COURT:  Good morning.

7                  DEFENDANTS' MOTION TO POLL THE JURY

8                        MR. L. FRIEDMAN:  Your Honor, because

9    plaintiff's counsel had mentioned, I believe beyond the

10   scope of both the pleadings and in violation of the Court's

11   order in limine --

12                       THE BAILIFF:  Come on in.

13                       Got a jury coming through.

14                       (Off the record)

15                       THE COURT:  Go ahead, Mr. Friedman.

16                       MR. L. FRIEDMAN:  -- matters pertaining to

17   criminal investigation and criminal prosecution of Brian and

18   Cheryl Potashnik and then later on in the day mentioned --

19                       THE BAILIFF:  We have all seven now.

20                       MR. L. FRIEDMAN:  -- that the matter was

21   well publicized, I think it's appropriate that the Court

22   instruct the jury once again that the matter should not be

23   independently investigated or pursued on the Internet.  And

24   if the Court would, would ask the Court this morning to poll

25   the jurors individually and ask them whether or not they had

1    actually looked any of this up on the Internet.

2                        COURT'S RULING

3                    THE COURT:  All right.

4                    And the motion to individually poll the

5    jurors is denied, but I'll -- at the end of the day I'll

6    instruct the jurors again to not do any type of independent

7    research or anything like that.

8                    MR. L. FRIEDMAN:  We object to your ruling.

9                    THE COURT:  Okay.  And it's noted on the

10   record.

11                   Ms. Gibson, you're going to continue with

12   Ms. Geiser?

13                   Ms. Geiser, if you wouldn't mind coming

14   back up.

15                   (The jury entered the courtroom.)

16                   THE COURT:  Everybody have a seat, please.

17                   Welcome back and good morning, ladies and

18   gentlemen of the jury.

19                   We're going to continue with the trial.

20   When we stopped yesterday we had started Ms. Geiser's

21   depo' -- testimony but had not yet concluded it. So the

22   first thing we'll do this morning is continue with her

23   testimony until it is completed.

24                   We take one 15-minute break in the morning.

25   We take it around 10:20 or so.  But if you need a break

```
 1    before then, please let -- get my attention or Vikki's

 2    attention and we'll take a break whenever you need to.

 3                    In general, depending on how the day works

 4    out, we take one 15-minute break in the morning and we take

 5    two 10-minute breaks in the afternoon.  But if that schedule

 6    doesn't work for you very well, we can always change that up

 7    and, for example, take a break every hour on the hour if

 8    that would be more comfortable to you.  You'll have a better

 9    idea after today.

10                    Ms. Gibson, it's still your witness, and if

11    you'll pick up just where you left off.

12                    MS. GIBSON:  Yes, Your Honor.  May I move

13    the --

14                    THE COURT:  Sure.

15                    MS. GIBSON:  -- clipboard now that the

16    jury's in?

17                    Can everybody see?  Can you see,

18    Ms. Geiser?

19                    CHERYL GEISER,

20    having previously been sworn, testified as follows:

21                    DIRECT EXAMINATION (CONT'D)

22    BY MS. GIBSON:

23        Q.   Ms. Geiser --

24                    MS. GIBSON:  May I approach the easel,

25    Your Honor?
```

```
 1                    THE COURT:  Certainly.
 2        Q.   (By Ms. Gibson) -- do you agree that a handshake
 3   agreement is as good as a written one?
 4        A.   If both parties agree to all the terms and
 5   conditions of the agreement, then I agree that an oral
 6   agreement is as good as a written agreement.
 7        Q.   Okay.  And you remember telling me, "I agree that
 8   if both parties agree to the agreement, then it's an
 9   agreement"?
10        A.   Correct.
11        Q.   Okay.
12                    And you also had told --
13                    MR. L. FRIEDMAN:  Thank you.
14        Q.   (By Ms. Gibson) -- me, "And if they shake hands on
15   it and both parties have agreed, then it's an agreement",
16   correct?
17        A.   If both parties agree to the agreement, then I
18   agree that it's an agreement.
19        Q.   You said if they shake hands on it.  Do you
20   remember that?
21        A.   I'll take your word for it.
22        Q.   Let me refresh your memory.
23        A.   Okay.
24        Q.   I'm just going to hand you -- do you see the
25   highlighted portion?
```

1      A.    I said, "I agree that if both parties agree to the

2  agreement then it's an agreement."  You said, "Okay."  And I

3  say, "And if they shake on it and both parties have agreed,

4  then it's an agreement."

5      Q.    Okay.  So, if they shake on it and both parties

6  agree, that's an agreement.  Even though it's just oral,

7  correct?

8      A.    Yes.

9      Q.    Turning back to the beginning of Jeff Carpenter's

10  deposition, do you recall some discussion about his -- a

11  written employment agreement with Southwest Housing

12  Management?

13     A.    Yes.

14     Q.    And you recall your attorney discussing the claim

15  in this suit that no amendment or alteration of the terms of

16  that agreement could be valid unless in writing and signed

17  by the parties?

18     A.    I believe that's an excerpt from the agreement,

19  yes.

20     Q.    Okay.

21           Could you take a look at Exhibit 3?

22           THE COURT:  You've got to walk around the

23  court reporter.

24           MS. GIBSON:  I'm sorry.

25     Q.    (By Ms. Gibson) Do you recognize Exhibit 3?

Appendix 000664

1      A.    Yes.

2                 MR. L. FRIEDMAN:   Oh, thank you.

3      Q.    (By Ms. Gibson) Exhibit 3 is an Email from you to

4  Gaylon Hull and you're asking for -- you're asking for a

5  check for $50,000 for Jeff Carpenter?

6      A.    Yes.

7      Q.    Okay.   And this is in Jeff Carpenter's first year

8  of employment, correct, November 11, 2004?

9      A.    Yes.

10     Q.    Jeff Carpenter has not been there a full year yet,

11  correct?

12     A.    Correct.

13     Q.    Okay.

14                And you say that this is a loan against

15  bonus and moving expenses, correct?

16     A.    Yes.

17     Q.    Okay.   And moving expenses, you-all had agreed to

18  reimburse certain relocation expenses because you recruited

19  Jeff from another state to come work for y'all?

20     A.    Yes.   That's in his employment agreement.

21     Q.    Okay.

22                And then the check was actually paid from

23  Affordable Housing Construction?

24     A.    Uh-huh.

25     Q.    Okay.

1          And so the three parts of the operation of

2     the business -- the development arm, the construction arm,

3     and the management arm -- they sometimes loaned money to

4     each other; is that accurate?

5          A.    Yes.

6          Q.    Okay.   And is this an example of that?

7          A.    Yes.   It appears to be.

8          Q.    Okay.

9               MR. L. FRIEDMAN:   Can I just ask the

10     witness to move that microphone closer to her?

11               THE COURT:   Sure.

12               MR. L. FRIEDMAN:   Thank you.

13               THE WITNESS:   I try not to, like, sit all

14     the way up here.   I mean, do I need to sit all the way up

15     here?

16               THE COURT:   You can move the microphone as

17     close as you want.   The microphone moves.   If you want to

18     sit further back or closer up, that's up to you.   Put the

19     mike -- put the microphone wherever is closest to your

20     mouth.

21               THE WITNESS:   Okay.

22          Q.    (By Ms. Gibson) And, Ms. Potashnik, if you would

23     now turn to Exhibit 2.   If you take a look at Paragraph 4B,

24     you see the last line?   Employee must be employed by the

25     company at the end of the first calendar year for the

1    minimum bonus to be earned?

2         A.    Yes.

3         Q.    Okay.

4               And you-all orally agreed with

5    Jeff Carpenter to go ahead and advance 50,000 toward his

6    bonus and relocation costs even though it wasn't at the end

7    of the first calendar year, correct?

8         A.    We -- we did it, yeah.

9         Q.    Right.  And that was just an oral agreement,

10   correct?

11        A.    I guess so.

12        Q.    Okay.

13              And this contract wasn't modified or

14   amended in writing to accomplish that?

15        A.    No, it was not.

16        Q.    Okay.

17        A.    I guess it's in writing to the extent I write that

18   I need a check for Jeff and as a loan against his bonus and

19   moving expenses --

20        Q.    Okay.

21        A.    -- pursuant to his employment agreement.  So --

22        Q.    You wrote that.  But even though the contract said

23   that the first-year bonus would be paid at the end of the

24   year, there was an advance done just orally, correct?

25        A.    Well, it's in writing, pursuant to my Email.

1          Q.    Well, there's no -- there's no amendment to the
2    contract signed by all parties to accomplish that?
3          A.    To accomplish an advance, you're correct.
4          Q.    Okay.
5          A.    But he was advanced the bonus pursuant to a
6    written directive that I gave to my CFO.
7          Q.    Right, but you didn't amend the contract to do
8    that --
9          A.    Correct.
10         Q.    -- correct?
11               I'm handing you what's been marked
12   Plaintiff's Exhibit 8.  Do you see that this is a December
13   22nd, 2005 -- or do you recognize this document?
14         A.    I don't really recognize it 'cause I've seen it in
15   the course of this litigation, but I agree that it's
16   probably true that it's an Email from Keith to Jeff.
17         Q.    And you.  Do you see --
18         A.    Yes, I'm on there too.
19         Q.    Okay.
20               MS. GIBSON:  Plaintiff offers Exhibit 8.
21               THE COURT:  Any objection?
22               MR. L. FRIEDMAN:  No.
23               THE COURT:  Eight is admitted.
24         Q.    (By Ms. Gibson) Okay.  So, at the end of 2005,
25   here what's happening is you're addressing settling the

1    advance on bonus per the agreement we came up with?

2        A.    Say your question again, please.

3        Q.    Sure.

4              What's going on in Exhibit 8 is you-all are

5    settling the advance of bonus, okay, per the agreement we

6    came up with?

7        A.    That's what Keith says.  Attached is the recap of

8    Jeff's cost to be reimbursed and the settling of the advance

9    on bonus per the agreement we came up with.

10       Q.    Okay.

11       A.    Just an FYI.

12       Q.    And the -- the agreements on how to handle the

13   $50,000 advance is addressed on the next page.  That

14   agreement also wasn't in writing how you-all decided to

15   handle that.

16       A.    I don't really know if that's true.  We had an HR

17   department that possibly could have documented this in

18   Jeff's HR file.  But I know you're calling Devona Gray.  You

19   can ask her that question.

20       Q.    And -- but the agreement that y'all reached on how

21   to handle that bonus, there's no amendment to the employment

22   agreement signed by all parties?

23       A.    Not that I'm aware of, but there might have been

24   something in her -- in his employment file.

25       Q.    Okay.

1          You-all reached that agreement just orally,

2     but there may be some documentation of it somewhere?

3          A.   The oral -- we reached what agreement orally?

4          Q.   I'm sorry?

5          A.   What agreement did we reach orally?

6          Q.   How to handle -- how to handle the advance on

7     bonus in 2005.  You're talking about the settling of the

8     advance on bonus.

9          A.   Well, the settling of the advance on bonus, per

10    Keith's testimony yesterday, had to be run through payroll

11    to be properly treated.

12         Q.   Right, but --

13         A.   So --

14         Q.   Correct, because --

15              MR. L. FRIEDMAN:  I'm just going to ask

16    that Ms. Gibson allow the witness to finish her answer

17    before she asks the next question.

18         Q.   (By Ms. Gibson) I'm sorry.  I didn't mean to

19    interrupt you, if I did.  Go ahead, if you weren't finished.

20         A.   I'm just saying that per Keith's testimony

21    yesterday he had to run the bonus through payroll to be

22    compliant with whatever accounting principles that needed to

23    be complied with.  So that part was handled by Keith.

24         Q.   Okay.  But the agreement y'all reached on how to

25    handle it did not involve a modification or amendment?

1        A.   I don't know that's an agreement.  That's just how

2    it had to be handled.  So, as far as the bonus goes, I

3    don't -- that's just a legal accounting thing, I guess, that

4    Keith felt had to be done.

5        Q.   Per the agreement we came up with.

6        A.   And I don't know what he's referring to here.

7        Q.   Okay.  If -- if -- whatever he's referring to,

8    there's no amendment or modification signed by both parties

9    to amend the employment agreement, was there?

10       A.   I don't know what he's talking about, but I don't

11   recall seeing an amendment to the employment agreement, no.

12       Q.   Okay.  So that's something else that you-all

13   worked out orally, even though it may be documented

14   somewhere like on this Email; is that right?

15       A.   I don't really know.  I mean, his -- his

16   employment agreement, per Paragraph 5, Section B, talks

17   about reimbursement of up to 36 -- or not to exceed $36,000

18   in moving expenses, and he has moving expenses of 35,375.20.

19   So the only agreement would have been -- I don't know if

20   this is consistent with his employment agreement, so I

21   really don't know what Keith's talking about in that Email.

22       Q.   Okay.

23            I'm handing you what's been marked

24   Plaintiff's Exhibit 9.  Do you recognize that document?

25       A.   Okay.

1          Q.    Okay.  And that document is an Email string

2    between you and Devona Gray?

3          A.    Uh-huh.  Yes, it is.

4          Q.    About certain compensation for Jeff Carpenter?

5          A.    Yes.

6                    MS.  GIBSON:  Plaintiff admits -- or offers

7    Exhibit 9.

8                    THE COURT:  Any objection?

9                    MR.  DONOHUE:  Your Honor, if you give us

10   just a moment.  This is the first time that we've gotten any

11   of the exhibits from the plaintiff.

12                   MS.  GIBSON:  We gave -- we exchanged lists.

13                   MR.  L. FRIEDMAN:  No need to fight over it.

14   Just give us a second.

15                   (Pause)

16                   MR.  L. FRIEDMAN:  I don't have any

17   objection to it, Your Honor.

18                   THE COURT:  Nine -- nine is admitted.

19                   MR.  L. FRIEDMAN:  This is nine?

20                   THE COURT:  Yes.

21         Q.    (By Ms. Gibson) And do you see that you are

22   Emailing Devona Gray and you are saying you see that Jeff

23   had a title change and you're asking, "But didn't he get a

24   raise at some point," is that correct?

25         A.    I said -- or Devona says to me --

1      Q.   I'm -- I'm -- this is below her response where
2    you're sending --
3      A.   I don't like when you show small clips.  Can I see
4    the whole --
5      Q.   You have -- it's the same --
6      A.   Well, the jury needs to see the whole thing.
7      Q.   Well, Ms. Geiser, if I show the whole document,
8    people can't see it, okay.  But we're going to talk about
9    all of it and it's going to be offered in evidence, and they
10   can see the whole thing.
11          So, the initial -- in the initial Email you
12   are asking -- the Email on November 26, 2007, from you to
13   Devona Gray, you're asking if Jeff Carpenter got a raise at
14   some point, correct?
15     A.   This says from Devona to me.  From Devona Gray to
16   Cheryl Potashnik.
17     Q.   So look below that.  You see it's an Email string?
18     A.   Okay.
19     Q.   Okay.  Below that is your, it says, original
20   message?
21     A.   Uh-huh.
22     Q.   From Cheryl Potashnik, Monday, November 26, 2007,
23   at 10:00 a.m.?
24     A.   Okay.
25     Q.   Okay.

1             And you're asking, Didn't Jeff get a raise

2    at some point, correct?

3         A.    Uh-huh.   Yes.

4         Q.    Okay.

5             And then Devona Gray responds to you, to

6    that Email, on November 26, 2007.   And she says Jeff's

7    salary was increased to $210,826?

8         A.    Uh-huh.   Yes.

9         Q.    With the addition of $139.48 adjustment and a

10   $276.92 car allowance effective January 6, 2006.

11            Now, if -- if this was truly a raise in his

12   salary, that was done orally as well, correct?   In other

13   words, there was no modification to the original employment

14   agreement that set his salary at 200,000?

15        A.    Say that again, please.

16        Q.    Okay.   You see in Exhibit 2 that Jeff's

17   salary --

18        A.    Yes.

19        Q.    -- is $200,000?

20            MS. GIBSON:   I'm trying to get it to pop

21   up.

22            THE COURT:   You can zoom out some so it's

23   not -- the (inaudible) is not so good.

24        Q.    (By Ms. Gibson) All right.   You see the salary is

25   $200,000 in that loan?

1      A.   Yes.

2      Q.   And so, if Jeff Carpenter did actually get an

3  increase in his base salary, that's something you-all did

4  orally without a formal written modification to this

5  employment agreement, correct?

6      A.   I don't agree that it was done orally.  It was in

7  writing, because Devona would not have known all of this if

8  it wasn't in his HR file.  But it was not requested as an

9  amendment to the employment agreement.

10     Q.   Okay.

11     A.   I'll concede that.

12     Q.   All right.

13          So this is something else you-all just

14 agreed to without a formal amendment to the employment

15 agreement, correct?

16     A.   His salary was increased and it didn't result in

17 an amendment to the employment agreement, correct.

18     Q.   And while Mr. Carpenter worked at Southwest

19 Housing there were lots of things that you-all just handled

20 orally without formal writings --

21     A.   I would strongly disagree with that.

22     Q.   -- such as -- such as -- you disagree?

23     A.   Yes.

24     Q.   Okay.  Fine.

25     A.   I disagree because our business was highly

1    regulated.

2                    Every deal that closed had a volume of

3    closing documents that was several feet tall.  Every deal

4    was documented, the specifics of every deal was documented,

5    every point was negotiated, every point was documented, in

6    writing.  Our entities were audited in order for audit

7    opinions to be issued.  Every transaction had to have a

8    corresponding backup to it.  So I highly disagree with your

9    characterization of our business that a lot of things were

10   done orally.

11       Q.   Okay.  The -- so you're talking about your

12   agreements or deals on properties, your deals with vendors,

13   etcetera, correct?

14       A.   I'm talking in general.  The nature of our

15   business was not to enter into oral agreements.

16       Q.   When it came to employees at Southwest Housing

17   Management or Affordable Housing Construction or Southwest

18   Housing Development, when it comes to the relationship with

19   employees, particularly at the higher -- at the higher

20   levels, such as Jeff and Sara, a lot of things were handled

21   orally, such as performance reviews, correct?  And that's

22   one example.

23       A.   I don't know.  I don't know that we handled

24   performance reviews orally.

25       Q.   Did -- were there written performance reviews?

1      A.     There may have been.  We have a lot of people who

2   worked for the organization who were in charge of that type

3   of thing.  I don't recall.

4      Q.     Okay.

5             And you have heard your attorneys say in

6   this case that the agreement -- the agreements we're talking

7   about today would not be valid because they were not made in

8   writing and signed by both of the parties to the agreement.

9      A.     I'm not a lawyer, but I don't consider giving

10  someone a raise something that would have fallen under that

11  agreement.  But if that's the legal position, then I'm not

12  going to argue with it.

13     Q.     I'm just asking if -- if -- if you agree with that

14  position?

15     A.     Yes.

16     Q.     Okay.

17            Earlier you told me that you agree that if

18  they shake on it and both parties agree, that's an

19  agreement, even though it's oral?

20     A.     Yes.

21     Q.     Okay.

22            I'm handing you a pleading from this case.

23  Do you see a file stamp at the upper right corner?

24     A.     Yes.  Sorry.  I can't see.

25     Q.     Okay.  And you see at the back that your attorney

1    submitted this document, filed it with the court in this

2    case?

3         A.    Yes.

4         Q.    Okay.

5                        And you see Paragraph 3?

6         A.    Yes.

7         Q.    Okay.   And Paragraph 3 says defendants do not

8    dispute that under Texas law a written agreement not

9    required by law to be in writing may be modified by a later

10   oral agreement, even though it provides that it may only be

11   modified in writing.

12                  MR. L. FRIEDMAN:   Your Honor, I'm going to

13   object.   Calls for a legal conclusion.   This is a -- this is

14   part of the briefing to the Court.

15                  THE COURT:   What -- was this a -- what

16   is it?  Is this a pleading or is it a motion?

17                  MR. L. FRIEDMAN:   Pleading.   Reply to

18   motion for summary judgment.

19                  THE COURT:   Okay.

20                  You're asking her legal questions.

21   Admissions are in the petition and the answer, not in the

22   summary judgment responses.

23                  MR. L. FRIEDMAN:   And her position is

24   consistent.

25                  THE COURT:   You don't have to -- you can

1 tell the jury your position when it's your turn.

2   Q. (By Ms. Gibson) Would you -- would you take a look

3 at Exhibit 2 and identify -- well, let's do it this way.  In

4 Exhibit 2 you see that -- I'm just going to ask you

5 questions, just so you know, about what types of

6 compensation this agreement covers.

7   A. Okay.

8   Q. Okay.  And you see that the agreement covers a

9 $200,000 annual salary?

10   A. Yes.

11   Q. And as far as compensation at Paragraph 4B,

12 it covers a 50,000/200,000 bonus in the first year?

13   A. A minimum discretionary bonus potential would be

14 50,000.

15   Q. Okay.  Well, it covers bonuses for the first year?

16   A. Okay.

17   Q. Is that right?

18   A. Yes.

19   Q. Okay.  And it says --

20   A. But that -- that is -- the way you have that

21 written there is misleading because there's a word before

22 that that says minimum discretionary bonus potential will be

23 50,000.  There's nothing in the contract that ever says 50-

24 to $200,000 bonus.

25   Q. Okay, but it's a summary, so --

1          A.   Well, the summary is misleading because the word

2     "discretionary" is very prominently included in this

3     paragraph.

4                    MR. L. FRIEDMAN:  Your Honor --

5          Q.   (By Ms. Gibson) Ms. Geiser, if you --

6                    MR. L. FRIEDMAN:  Excuse me.

7          Q.   (By Ms. Gibson) -- if you disagree --

8                    MR. L. FRIEDMAN:  I want to object to

9     what's on the screen.  Lack of foundation.  It's not a

10    sponsored document.

11                    THE COURT:  It's a demonstrative exhibit.

12                    This is something you prepared?

13                    MS. GIBSON:  Yes.  It's actually

14    Jeff Carpenter's notes.

15                    THE COURT:  All right.

16                    And she can disagree with it if she chooses

17    to, and she just did.

18                    MR. L. FRIEDMAN:  And she has.

19                    THE COURT:  All right.

20         Q.   (By Ms. Gibson) All right.  So, Ms. Geiser, you --

21    you disagree with the way this part is phrased, correct?

22         A.   Yes.

23         Q.   Okay.

24                    So, fair to say that Exhibit 2 covers

25    annual bonus for the first year?

1          A.    In the first calendar year of employment the

2    minimum discretionary bonus potential will be $50,000 and

3    will be based on achieving company objectives.   That is the

4    full sentence.   The maximum bonus potential in the first

5    calendar year of employment the maximum will be $200,000,

6    which will be based on overall profitability of the

7    organization as a whole.   That is the full context of that

8    paragraph.

9          Q.    But my question is it covers bonuses for the first

10   year, correct?

11              MR. L. FRIEDMAN:   Your Honor, the document

12   speaks for itself.

13              THE COURT:   It's her question.   Overruled.

14         A.    Yes.

15         Q.    (By Ms. Gibson) And if you look back earlier in

16   the agreement you see that it covers reimbursement of

17   outstanding business expenses.   It's actually right below --

18         A.    It's right below.

19         Q.    -- right below where you were.

20         A.    Paragraph 5A, the company shall pay or reimburse

21   the employer subject to prior approval and upon presentment

22   of such vouchers received and other supporting information

23   as the company may require for all reasonable business and

24   travel expenses which may be incurred or paid by the

25   employee in connection with the employment of the employee

28

1    by the company in accordance with the company's standard

2    policies then in effect.

3         Q.   Okay.   Okay, so another type of compensation

4    it covers is reimbursement of outstanding business expenses?

5         A.   That's not compensation.   That's reimbursement.

6         Q.   Okay.   So you don't want to call that

7    compensation?

8         A.   Compensation is under Paragraph 4; expenses is

9    under Paragraph 5.   Reimbursement is covered in A,

10   relocation is covered in B, and temporary housing is covered

11   in C.   If it was compensation, it would be taxable.   If it's

12   an expense, it's a reimbursement.

13        Q.   Okay.

14             What does compensation mean to you for an

15   employee?

16        A.   Compensation is amounts that are paid to them that

17   are taxable.

18        Q.   Okay.   So you're distinguishing between

19   compensation --

20        A.   The contract -- the contract makes a distinction.

21   Section 4 is compensation.   Section 5 is expenses.

22        Q.   Well, you understand that on a -- people often

23   refer to their entire package with the employer as their

24   compensation, but you're -- is that right?

25        A.   But that's not what this says, okay.

1              MR. L. FRIEDMAN:  I'm going to object.

2              THE WITNESS:  Your question --

3              MR. L. FRIEDMAN:  Excuse me.  Excuse me.

4              THE COURT:  Stop.

5              MR. L. FRIEDMAN:  Number one, it's

6    misleading.  Number two, it assumes facts not in evidence.

7    And, number three, lack of foundation.

8              THE COURT:  Okay.  It's for

9    cross-examination.  Overruled.

10             She doesn't have to agree.

11        Q.   (By Ms. Gibson) Okay.  So you're distinguishing --

12        A.   I'm not distinguishing.  The contract

13   distinguishes.  Section 4 is compensation.  Section 5 is

14   expenses.

15        Q.   You're claiming the contract distinguishes

16   between --

17        A.   I'm not claiming it.  It says it.  Section --

18             THE COURT:  Let her finish her question.

19        Q.   (By Ms. Gibson) Just let me -- okay, all I'm

20   trying to get to is, things like reimbursement and housing

21   and insurance, those are benefits, correct?  Those are

22   employee benefits?

23        A.   I don't know that expense reimbursement is

24   employee benefit.  If he incurred expenses in conjunction

25   with his job, he's entitled to reimbursement.  So I don't --

```
 1        Q.    Okay.  So you believe --

 2        A.    -- see that as a compensation or a benefit.

 3              MR. L. FRIEDMAN:  I'm going to ask --

 4              THE COURT:  Okay.  Just --

 5              MR. L. FRIEDMAN:  I'm just going to ask

 6     everybody to do this one at a time 'cause I can't keep up.

 7              THE COURT:  You're doing fine.

 8              Go ahead, Ms. Gibson.

 9        Q.    (By Ms. Gibson) So you believe that reimbursement

10     for outstanding business expenses is just something in the

11     agreement, but it is neither compensation nor a benefit?

12        A.    Correct.

13        Q.    Okay.

14              And the agreement also covers reimbursement

15     of location -- relocation expenses up to $36,000?

16        A.    Yes.

17        Q.    And you see that the agreement also covers --

18     thanks, Brian -- temporary, furnished, corporate housing for

19     up to 90 days?

20        A.    For a maximum period of 90 days.

21        Q.    Okay.  That's the same as up to 90 days, right?

22        A.    I'm just reading off the agreement.

23        Q.    Okay.

24              Do you -- do you think there's a material

25     difference?  Is there an important difference?
```

1        A.   I'm obviously overly technical so, I mean, I make

2    a distinction because the word here is "maximum".

3        Q.   Okay.

4             So, instead of up to, you say it covers

5    temporary, furnished, corporate housing for a maximum of 90

6    days.   Okay.   And it covers 20 days of paid time off each

7    12-month period, the agreement does?

8        A.   Well, I have to find that section.   Where is that?

9    Oh, that's --

10       Q.   In number --

11       A.   -- that's in Section 6.

12       Q.   Under 6, yes.

13       A.   Under insurance and under benefits.

14       Q.   Right.

15       A.   An employee shall be eligible for 20 days of total

16   paid time off for a 12-month period.

17       Q.   Is that a yes?

18       A.   What?

19       Q.   The agreement in Exhibit 2, as far as compensation

20   and benefits, also covers 20 days of paid time off each

21   12-month period?

22       A.   Yes.

23             MR. L. FRIEDMAN:   It says insurance and

24   benefits.

25       Q.   (By Ms. Gibson) And the employment agreement also

Appendix 000685

1     provides the opportunity to enroll in health insurance,

2     dental insurance, life insurance, short-term disability,

3     long-term disability, and a 401k plan after 90 days?

4          A.   Yes.   At the conclusion of 90 days, employees

5     eligible to participate and receive other benefits.

6          Q.   Okay.

7                         And it covers reimbursement of COBRA

8     insurance expenses until benefits start?

9          A.   Yes.

10         Q.   Okay.

11                        And it covers a $600 monthly car allowance?

12         A.   Correct.

13         Q.   And the agreement covers a health club discount if

14    the employee wants to participate?

15         A.   Yes.

16         Q.   And if family-health-coverage premium costs exceed

17    $4,680 there will be an adjustment in salary to cover that?

18         A.   Company will adjust employee's salary in the event

19    the employee's share of the company-provided health coverage

20    for the family exceeds $4,680.

21         Q.   Okay.   So it covers an adjustment in salary to

22    cover family-healthcare-coverage premium costs over that

23    amount?

24         A.   Correct.

25         Q.   And the agreement covers six weeks' base salary as

1    severance if the company terminates employment?

2         A.   Correct.

3         Q.   And the agreement that is Exhibit 2 does not cover

4    any other types of compensation or benefits other than what

5    we've just talked about, correct?

6         A.   Correct.

7         Q.   So, at the time in 2004 when this initial

8    employment agreement was signed, no one anticipated an asset

9    sale, correct?

10        A.   I don't know that that's true.

11        Q.   Okay.  At the time the employment agreement was

12   signed in 2004 with Jeff Carpenter, no one had told

13   Jeff Carpenter that you-all wanted to sell the business?

14        A.   I didn't.  I don't know if anyone else did.

15        Q.   Okay, you did not?

16        A.   I did not.

17        Q.   Okay.

18             The agreement does not cover any

19   asset-sale-proceeds bonus?

20        A.   Right.

21        Q.   And is that you -- you're not sure whether or not

22   a sale was contemplated at the time?

23        A.   Correct.

24        Q.   And the agreement does not cover bonuses after

25   year one, correct?

1        A.   I don't know that -- that it doesn't cover bonuses

2   after year one.

3             It says bonus structures will be reviewed

4   and revised on an annual basis by the company, so it seems

5   to cover it beyond a year.

6        Q.   Well, as far as bonus-structure compensation, the

7   initial agreement only covered year one, correct?

8        A.   I don't think that's the context of that whole

9   paragraph.

10       Q.   Well, we're going to talk about the whole

11  paragraph, Ms. Geiser.  But as far as specific amounts,

12  it says -- it's talking about the first year?

13       A.   Correct.

14       Q.   Okay.  'Cause you see here it says in the first

15  calendar year of employment.  And the maximum potential is

16  also for the first calendar year of employment, correct?

17       A.   Right.

18       Q.   Okay.

19             And the agreement does say that a detailed

20  bonus plan will be provided later?

21       A.   Right.

22       Q.   And that indicates that any sep -- that you-all

23  contemplated from day one that there may be additional

24  agreements on bonuses?

25       A.   Yes.

1        Q.    Okay.   And the agreement doesn't say whether any

2  separate agreements on bonuses have to be in writing or

3  whether they can be oral, correct?

4        A.    I don't agree with that characterization.

5        Q.    It says the detailed bonus plan will be provided.

6  It doesn't say whether that plan will be in writing or

7  whether you-all will just provide it to Mr. Carpenter

8  orally.

9        A.    I mean, there's other provisions in the contract

10  that address that any changes to the contract have to be

11  made in writing, so I don't agree with your characterization

12  there.

13        Q.    Well, the -- this doesn't say that the agreement

14  will be amended, does it?  It says that there will be --

15  it indicates that from day one you-all contemplated future

16  separate agreements on bonuses, correct?

17        A.    No.

18        Q.    No?

19        A.    No.  It doesn't, no.

20        Q.    You disagree?

21        A.    Yes.

22        Q.    Okay.

23              Did you-all ever provide a written bonus

24  plan for Mr. Carpenter after the first year?

25        A.    No.

1      Q.    Okay.   You-all discussed those issues orally,
2    correct?
3      A.    Discussions of plans, but nothing was ever agreed
4    upon.
5      Q.    Well, that's your contention, but certainly there
6    were discussions about -- with Mr. Carpenter about catching
7    up on earned annual bonuses.   Do you recall that?
8      A.    There was discussions but there was never a bonus
9    plan that was agreed to.
10     Q.    And within the first 90 days of the employment
11   date neither you nor Mr. Potashnik nor any of the entities
12   provided what you agreed to provide here?
13     A.    That's correct.   We did not provide a detailed
14   bonus plan.
15     Q.    You-all just addressed that orally?   You
16   discussed --
17     A.    No.   We discussed it but it was never agreed to.
18   We never were able to come up with a detailed bonus plan.
19     Q.    I didn't -- I didn't ask that.   I said your
20   discussions about bonuses after year one were oral.
21     A.    Discussions were oral as far as I know.
22     Q.    If you will go back to the paragraph that you
23   referenced in Paragraph 12?
24     A.    Yes.
25     Q.    Okay.

1          It says no amendment or alteration of the

2     terms of this agreement shall be valid unless made in

3     writing and signed by both parties to this agreement,

4     correct?

5          A.   Yes.

6          Q.   Okay.  The terms of this agreement, as far as

7     compensation, are only what we just talked about?

8          A.   Yes.

9          Q.   Right?

10         A.   Right.

11         Q.   And so the -- any agreement for an

12     asset-sale-proceeds bonus would not need to amend or change

13     any of the compensation terms --

14         A.   The term "asset-sale-proceeds bonus" --

15         Q.   -- in the original agreement.

16         A.   -- is one that you've created.  That is not a term

17     that we used at our company.

18         Q.   You never talk -- you never used phrases talking

19     about bonusing people out of sale proceeds?

20         A.   Out of sale proceeds, but that's different than an

21     asset-sale-proceeds bonus --

22         Q.   Okay.

23         A.   -- as if it's a separate entity.

24         Q.   So you distinguished between bonusing people from

25     asset-sale proceeds and a sale-proceeds bonus?

1        A.    Yes.

2        Q.    Okay.

3              Any agreement about bonusing someone out of

4   asset-sale proceeds would not alter or modify any of the

5   compensation terms in Exhibit 2, would it?

6        A.    Say that again.

7        Q.    Any agreement to bonus Mr. Carpenter out of sale

8   proceeds would not need to amend or alter any of the

9   compensation in that original agreement?

10       A.    I don't know.

11       Q.    You don't know?  Well, you've testified earlier

12  that you're pretty technical, right?

13       A.    Yeah.

14       Q.    Okay.  So, if you look back to Paragraph 12 and

15  what has to be in writing, it is only if what you're doing

16  would amend or alter the terms of this agreement, correct?

17       A.    Okay.

18       Q.    And as far as compensation goes, what we went over

19  are the only terms of the agreement, correct?

20       A.    Correct.  Yes.

21       Q.    So bonusing someone out of sale proceeds could be

22  separately agreed without having to change or alter any of

23  those compensation terms --

24       A.    I just don't know if I agree with that because the

25  funds to pay any bonuses could have been taken from sales

1    proceeds.  So I don't -- I don't know that I agree with that
2    characterization.

3        Q.   I'm not -- can you help me understand your
4    reasoning?  I'm not understanding what you're trying to say.
5    Why do you disagree?

6        A.   Because this total discussion of compensation
7    never says the source of the funds to pay this will come
8    from anywhere.

9        Q.   No, what I'm saying is, if there's a bonus -- if
10   there were bonuses paid because people stayed on in
11   connection with the asset sale, that would not alter the
12   annual salary.  It would not alter or amend or modify the
13   first-year bonus.  It would not affect reimbursement of
14   expenses.  It would not need to alter relocation expense or
15   housing or PTO or insurance or COBRA or car allowance,
16   health club, health insurance, or severance, correct?

17       A.   Say that again.  Can you read it back to me?  I
18   don't --

19       Q.   An asset -- a bonus for people to stay on in light
20   of the asset sale, an agreement to that would not amend or
21   alter --

22       A.   But there was no agreement to that.

23       Q.   May I finish the question, please?

24       A.   Okay.

25       Q.   I'm not asking you to agree whether there was,

1   okay.  I'm just talking about what needs to be -- what needs
2   a writing, Ms. Geiser.
3                    Any bonus to Mr. Carpenter for staying in
4   light of the asset sale would not change or alter any of the
5   terms of this agreement as far as compensation goes,
6   correct?
7                    MR. L. FRIEDMAN:  I'm going to object to
8   the extent it calls for a legal conclusion.
9                    THE COURT:  Your position on the legal
10  conclusions aren't legal conclusions.
11                   Answer the question.
12                   THE WITNESS:  If there was a separate bonus
13  program separate from this employment agreement then I would
14  agree.
15      Q.    (By Ms. Gibson) Okay.  And the -- so you would
16  agree with me that bonuses after year one or any separate
17  bonus out of asset-sale proceeds does not need -- would not
18  need to be in writing, per your understanding, because
19  it wouldn't amend or alter the terms of this agreement as
20  it relates to compensation?
21      A.    Can you ask me that again?
22      Q.    Sure.
23                   Bonuses after year one and any bonus for
24  staying in light of the asset sale would not need to be in
25  writing and signed by both parties because that compensation

1    would do nothing to alter the terms of this agreement when

2    it comes to compensation?

3         A.   I don't know if that's true.  I mean, it says a

4    detailed bonus plan will be provided.  I mean, it's

5    contemplated in the agreement.  I don't know.

6         Q.   One thing we know for sure is that from day one on

7    this agreement there were future agreements contemplated,

8    correct?

9         A.   I don't know that it contemplates future

10    agreements.  It's something that would have been contained

11    in this agreement.

12         Q.   A detailed bonus plan will be provided to the

13    employee within --

14         A.   If it's contemplated in that agreement then I

15    think it's part of that agreement, but I don't know.

16         Q.   Well, that, a detailed bonus plan will be

17    provided, that's something to happen in the future, correct?

18         A.   As part of this agreement.

19         Q.   And so -- well, it doesn't say that.

20         A.   It's in the agreement.

21         Q.   The agreement says one will be provided --

22         A.   As part of the agreement.

23         Q.   -- but it doesn't -- it doesn't say what the terms

24    are --

25         A.   Okay.

1        Q.    -- right?

2        A.    Right.

3        Q.    Okay.

4              So, certainly, the parties contemplated

5    future deals as far as annual bonuses, correct?

6        A.    As part of this agreement.

7        Q.    The parties contemplated, from day one, future

8    agreements concerning bonuses, correct?

9        A.    As part of this agreement.

10              THE COURT:  Y'all are going back and forth.

11    You need to move on.

12        Q.    (By Ms. Gibson) And the agreement on the

13    moonlighting provision also says --

14        A.    What -- okay.

15        Q.    This is on 3B.

16        A.    Okay.

17        Q.    3B contemplates that Jeff Carpenter may, at some

18    point in the future, be employed by an affiliate of

19    Southwest Housing Management, correct?

20        A.    Can I read it?

21        Q.    Sure.

22              (Witness reading document)

23        A.    Okay.

24        Q.    So, from day one, the parties contemplated that

25    Jeff Carpenter might, in the future, do work or be employed

1    by one of Southwest Housing Management's affiliates,

2    correct?

3         A.   I would agree that that has -- it's written weird,

4    but I would agree that that's how this reads.

5         Q.   Okay.

6         A.   I don't know that Southwest Housing Management

7    ever contemplated that he would be employed by another

8    entity, but...

9         Q.   Well, it doesn't say he would or would not, but it

10   contemplates that that might -- that might be --

11        A.   As it's written.

12        Q.   -- something that could happen in the future --

13        A.   Uh-huh.

14        Q.   -- correct?

15        A.   As it's written, yes.

16        Q.   And the affiliates would be Southwest Housing

17   Development Company, correct?

18        A.   I mean, I guess --

19        Q.   One of them?

20        A.   -- the affiliates could be anything that was an

21   affiliate.

22        Q.   Okay.  Southwest Housing Development was an

23   affiliate, correct?

24        A.   It had an affiliated ownership, yes.

25        Q.   I'm sorry.  I couldn't -- I couldn't hear you.

1      A.    It had common ownership, correct.

2      Q.    And the construction arm of the business also was

3  an affiliate, correct?

4      A.    Affordable Housing Construction was also -- had a

5  common ownership, correct.

6      Q.    Okay.

7              So, from day one, when -- in 2004, when

8  Mr. Carpenter and you-all entered this agreement, the

9  agreement itself contemplated that there may be future

10  agreements, correct?

11      A.    I disagree.

12      Q.    Do you agree that if the parties shake on it and

13  both parties agree, there's an agreement, notwithstanding

14  what we were talking about in the employment contract?

15      A.    You're qualifying that question.  Can you ask

16  it to me directly?

17      Q.    Can I ask it to you how?

18      A.    Can you re-ask it to me?

19      Q.    Sure.

20              Do you believe that if the parties have a

21  written agreement, that if they strike a deal, if they shake

22  on it and both parties agree, that there is still an

23  agreement?

24      A.    I mean, as I said before, if both parties agree to

25  an agreement, then I agree that it's an agreement.

1        Q.    Okay.   Even if they had something different or

2    separate in writing already?

3        A.    I mean, I don't know, Ms. Gibson.   I'm not a

4    lawyer.   If a contract calls for a written -- everything has

5    to be in writing, then I would say everything has to be in

6    writing.   If, under Texas law, an oral agreement satisfies

7    that, if both parties agree and there's a meeting of the

8    minds and the terms are agreed to, then I would agree that's

9    an agreement.

10       Q.    And the truth is, during discussions with

11   employees about bonusing them out of asset-sale proceeds if

12   they would stay, you didn't go back and dust off their

13   employment agreements to look at while you had those

14   discussions, did you?

15       A.    That's incorrect.

16       Q.    You did?

17       A.    Not everybody had an employment agreement and so

18   everyone's situation is different.

19       Q.    All right.

20             For those people who did have a written

21   employment agreement, the truth is that during discussions

22   with them about bonusing them out of asset-sale proceeds if

23   they would stay, you were not looking at their written

24   employment agreement?

25             MR. L. FRIEDMAN:   Okay, this is --

1                        THE WITNESS:  I don't agree with that.

2                        MR. L. FRIEDMAN:  -- in violation of the

3     limine --

4                        MS. GIBSON:  Okay.

5                        MR. L. FRIEDMAN:  -- Your Honor.  We're

6     just talking about Mr. Carpenter.

7                        THE COURT:  Well, she talked about the

8     program, so --

9                        MR. L. FRIEDMAN:  And she hasn't

10    established any program.

11                       THE COURT:  Okay.

12                       MS. GIBSON:  With -- sorry.  With --

13                       THE COURT:  Objection's overruled.

14         Q.    (By Ms. Gibson) During any time in your

15    discussions with Mr. Carpenter, did you -- when you-all were

16    discussing about bonusing him out of the asset-sale proceeds

17    if he would stay, did you ever say, "But, Jeff, our

18    handshake deal is not going to be good unless it's in

19    writing and an amendment to your employment agreement?"

20         A.    Did I ever say those words that you just said?

21    No.

22         Q.    Okay.

23         A.    But I never use those words, so that's why I

24    didn't say that.

25         Q.    I mean, y'all discussed bonusing Jeff Carpenter

47

1    out of the asset-sale proceeds if he would stay.  And during

2    those discussions y'all never talked about the terms of this

3    written agreement, correct?

4         A.   I don't know if that's true or not.

5         Q.   Okay.  You don't recall one way or the other?

6         A.   I don't recall how character -- how we

7    characterized discussions.  And they were simply

8    discussions.  They weren't agreements and they were

9    discussions.

10        Q.   Ms. Geiser, at some point in deciding to sell the

11   business, you and Brian Potashnik considered the potential

12   for a mass exodus of employees before the asset sale

13   happened, correct?

14        A.   I know I did.  I can only speak for myself.

15        Q.   So you're saying that you did not discuss that

16   with Brian Potashnik?

17        A.   We had discussions about employees leaving and --

18   because how it normally happens in the property management

19   business is when a new company buys an apartment complex

20   they come in and get rid of all the onsite staff:  Property

21   manager; the maintenance people; that kind of thing.  The

22   majority of our employees, we're property level employees.

23   We have 60 properties.  There was probably an average of

24   five employees per property.  That's about 300 employees.

25   So that is where the mass exodus concern came in.

1                And we ultimately negotiated with the buyer

2     of our company to hire all of our employees.  So when the

3     transition happened everyone knew they would have a job and

4     everyone was retained.

5         Q.    Do you recall -- do you recall being at your

6     deposition, Ms. Geiser?  Correct?

7         A.    Yes.

8         Q.    Okay.  And in connection --

9                MS. GIBSON:  This is 58, 25.

10               MR. L. FRIEDMAN:  Give me a second.

11               (Pause)

12               Okay.

13        Q.    (By Ms. Gibson) And so, in your deposition, I

14     asked, "So, at some point, y'all considered the potential

15     for a max exodus of employees before the asset sale

16     happened?"

17               MR. L. FRIEDMAN:  Excuse me.  Fifty-eight,

18     twenty-five?

19               MS. GIBSON:  I'm sorry.  It's 58 on my

20     condensed.  It is 60, 25.  It's Page 58 at the top; it's

21     Page 60 at the bottom.

22               MR. L. FRIEDMAN:  Oh, I see.  Okay.  Give

23     me a second.

24               MS. GIBSON:  Okay.

25               MR. L. FRIEDMAN:  Okay, I'm here.

49

1        Q.    (By Ms. Gibson) Okay.  And you say, "Yeah.  There
2   was concern that employees would leave."  And I asked, "And
3   did you and Brian Potashnik consider how to prevent a mass
4   exodus of employees?"  And you said, "Yes."
5        A.    Yes.
6        Q.    And does that refresh your memory that you
7   discussed this matter with Brian Potashnik?
8        A.    I know we discussed it, yes.
9        Q.    And you were also concerned about important
10  employees leaving before you could get the asset sale done,
11  correct?
12       A.    Yes.
13       Q.    And at the time, you believed Jeff Carpenter,
14  Sara Reidy, and Keith Jones were important employees?
15       A.    Among others.
16       Q.    Correct.  I'm not saying they're the only ones.
17  Everyone's important in the business.  But at the time when
18  you're talking about trying to keep important employees,
19  keep them on, those important employees included
20  Jeff Carpenter, Keith Jones, and Sara Reidy, correct?
21       A.    Yes.
22       Q.    And what did you-all decide to do?  What did you
23  and Brian Potashnik decide to do to encourage these
24  important employees to stay, despite the potential for an
25  asset sale?

1    A.    We talked to the employees about the sale and we

2    let them know that if, at the end of the day, the sale was

3    successful and there was money left over at the end of the

4    day that we wanted them to participate in the success of the

5    sale and of the business.

6    Q.    And when you initially discussed these incentives

7    with important employees you were not concerned very much

8    about having money left over at the end of the day?

9    A.    I'm not sure I can go to my frame of mind at that

10   particular time.   The sale was very complicated.   It dragged

11   on for a long type, so it was hard to quantify what the

12   sales proceeds, the net proceeds, at the end of the day

13   would be.

14                There was an amendment.   I think the

15   contract was signed in April of '07.   By June, there was

16   already an amendment.   There was seven amendments

17   after that.   So it was a complicated process.   There was

18   adjustments upward for things happening, there were

19   adjustments downward for things happening, so I don't know.

20   Q.    You've heard that Mr. Carpenter believes his

21   agreement was a percentage of certain net seller's revenue

22   minus stay bonuses paid to other important employees.   And

23   if that's accurate, Mr. Carpenter's bonus would just

24   fluctuate with the deal, correct?

25   A.    I don't think that's accurate.

1          Q.    Well, when you have a percentage formula, if the

2     transaction turned out -- if it turns out that there was no

3     seller's revenue, the bonus would simply be zero, correct?

4          A.    I don't know because I remember seeing something

5     that Jeff wrote where he characterized it as if the sale --

6     net sales proceeds were supposed to be 28 but they were only

7     20, I would get a bonus based on the 28.  So I don't -- I

8     don't know that I can agree with you on that.

9          Q.    Well, that's -- that's something that Jeff

10    proposed after you-all told him you were not going to pay,

11    correct?

12         A.    I believe I saw that document in November of 20 --

13    November of 2007.  So that would have been after he left.

14         Q.    Do you agree with me --

15         A.    Because we never had an agreement.

16         Q.    I understand that's your position.

17         A.    Okay.

18         Q.    Okay.

19               The point of offering or telling employees

20    about your intent to bonus them out of the asset-sale

21    proceeds was to get them to stay, correct?

22         A.    They saw the potential on the horizon that if the

23    sale was successful that there would be an up side for them.

24    That was their decision.  There was no agreement.  There was

25    no promise to pay anything.  There was a hope that the

1    transaction would be successful; and at the end of the day,

2    if it was successful, they would benefit and participate in

3    the success.

4         Q.    Okay.  And you have testified that you were not

5    actually present when Brian Potashnik made the agreement

6    with or talked to Jeff about the sales-proceeds bonus.

7         A.    If that conversation occurred, I was not present.

8         Q.    You had talked to -- and Jeff Carpenter reported

9    to Brian Potashnik, correct?

10        A.    Yes.

11        Q.    And when it came to discussing bonusing

12   employee -- important employees out of sale proceeds, you

13   discussed that with the people that reported to you?  In

14   other words, such as Sara Reidy?

15        A.    I discussed it with Sara.

16        Q.    Okay.  And Brian Potashnik discussed it with

17   people who reported to him, like Jeff Carpenter?

18        A.    Any conversation that happened between Brian and

19   Jeff happened between Brian and Jeff.  I had a conversation

20   with Sara.  Sara and I were not only in a business

21   relationship, we had a personal friendship and we talked all

22   the time.

23        Q.    Y'all were very, very good friends --

24        A.    Yes.

25        Q.    -- correct?  Okay.

1              During Jeff Carpenter's employment, your

2     family and Jeff Carpenter's family did things like y'all had

3     Thanksgiving together once, correct?

4          A.    You pointed that out to me.  I don't remember it.

5     I'm not denying it happened.  It could have happened.

6          Q.    Okay.

7              And during Jeff Carpenter's employment you

8     repeatedly told him that you appreciated his hard work?

9          A.    That sounds like something I would say.

10         Q.    During Jeff Carpenter's employment, you never --

11    you never fired him for any reason at all?

12         A.    Correct.

13         Q.    You never wrote him up?

14         A.    Correct.

15         Q.    You never gave him any type of written discipline?

16         A.    I didn't.  I wasn't his direct report.  You

17    established that he reported to Brian.

18         Q.    Well, I understand, but you -- a lot of the

19    employees thought that you were one of the owners of the

20    companies, correct?

21         A.    That may be true.

22         Q.    Okay.

23              And did you hold yourself out to the public

24    as one of -- as an owner of the companies?

25         A.    The public knew that I worked for the company.

1    The public knew that I was married to Brian.  The public

2    knew what they knew, but to the public Brian was always the

3    owner of the company.  He was always the face of the

4    company.  Every interview, every grand opening that we ever

5    had at any of our properties was all Brian.

6         Q.    Did you, however, ever represent yourself to the

7    public as an owner of the company?

8         A.    It's possible, yeah.  Brian and I were a team,

9    so...

10        Q.    Okay.

11        A.    But he's on the cover there.  I'm only on the

12   insert.  I know that article you're going to show me.

13        Q.    Okay.  You saw me getting it out.

14        A.    I was pretty pissed about that.

15        Q.    All right.  You saw it and that refreshed your

16   memory.

17                     I am handing you --

18                     MR. L. FRIEDMAN:  If I'm not in it, I'm

19   going to object on the basis of relevance.

20                     (Laughter)

21                     THE COURT:  Noted.

22                     MR. L. FRIEDMAN:  Thank you.

23        Q.    (By Ms. Gibson) I'm handing you what has been

24   marked Plaintiff's Exhibit 10.  It's an excerpt from -- do

25   you recognize that as excerpt from marketing materials?

1      A.    Well, this was an article that was in <u>Multifamily</u>

2 <u>Executive</u> magazine, and we made copies of it or whatever to

3 insert into our marketing material.

4      Q.    Okay.  And you see in the article that the article

5 refers to you as a co-owner of the business?

6      A.    Yes.

7      Q.    When --

8      A.    But they didn't give me those articles to edit

9 either.  So, no, they don't give you that kind of editorial

10 review before they write articles about you.

11      Q.    So you're saying that the writer just got that

12 wrong?

13      A.    I was -- I mean, Brian was the owner of the

14 company.  I was an owner by virtue of my community property.

15 I was his wife.  I did a lot of work at the company.

16           So I did not own Southwest Housing

17 Management.  I did not own Southwest Housing Development.  I

18 didn't own -- I did own, through my entity, CLG Consulting,

19 several job or partnership interests in properties.

20           Once Brian and I got married, I was

21 required to sign personal guaranties on all the entities.

22 So ownership in our business is a little bit more

23 complicated than just a quote from an article.

24      Q.    Okay.  The article refers to you as a co-owner of

25 the business, though, correct?

1          A.    Yes.

2          Q.    Okay.   And you did have ownership in various

3     pieces of the business, correct?

4          A.    Like I said, my entity, CLG Consulting, owned, I

5     think, interest in six general or limited partnerships.

6          Q.    And in 2005 the FBI started a criminal

7     investigation that started with a raid at Southwest Housing

8     Management, correct?

9          A.    Yes.

10         Q.    And you and Brian Potashnik assured Jeff Carpenter

11    that you-all had done nothing wrong, correct?

12         A.    I'm sure we said words to that effect.

13         Q.    Okay.

14                    In connection with promises in connection

15    with the criminal investigation -- I'm sorry.   Let me strike

16    that.   I didn't say what kind of promises.

17                    In connection with promises about

18    compensation and promises that you-all had done nothing

19    wrong as far as the criminal investigation, you and Brian,

20    do you believe Jeff Carpenter was entitled to trust you?

21                    THE COURT:   To what?

22                    MS. GIBSON:   Trust you.

23                    MR. L. FRIEDMAN:   Objection.   The

24    question's compound and vague as to time.

25                    MS. GIBSON:   I'll break it up.

57

1          THE COURT:  All right.

2     Q.    (By Ms. Gibson) When it came to what y'all

3 discussed about what you intended to pay Jeff Carpenter, do

4 you believe Jeff Carpenter was entitled to trust you?

5     A.    We never talked about --

6          MR. L. FRIEDMAN:  Excuse me.

7          That question's confusing.  I mean, does

8 she mean by the employment contract, 'cause she hasn't laid

9 a foundation about any oral agreement with this witness?

10          THE COURT:  She's just asking whether --

11 objection's overruled.

12          Answer it if you can answer it.

13          THE WITNESS:  Can you ask me that question

14 again?

15          MS. GIBSON:  Sure.

16          THE WITNESS:  Sorry, Your Honor.  I didn't

17 mean to talk over you.

18     Q.    (By Ms. Gibson) For example, you testified

19 yesterday that you intended to pay Jeff Carpenter a bonus as

20 the asset-sale proceeds, correct?

21     A.    If and when there was money left over to pay those

22 bonuses.

23     Q.    But you intended to pay the bonus, correct?

24     A.    Some amount.

25     Q.    Well, you already testified that those discussions

58

1    about amounts, if there were any, were between Brian and

2    Jeff Carpenter, correct?

3         A.    Yes.

4         Q.    Okay.

5               Do you believe Jeff Carpenter was entitled

6    to trust your word when you said you intended to pay him a

7    bonus out of the asset-sale proceeds?

8         A.    Some amount, yes.

9         Q.    And Mr. Carpenter did everything you asked of him,

10   which was to say.

11        A.    Well, I didn't ask him to sue me before the sale

12   went through.  So, no, I don't think he did everything I

13   asked him to do.

14        Q.    Jeff Carpenter's work as far as you-all needing

15   him -- I'm -- so you're mad that Mr. Carpenter brought suit

16   over the agreement, correct?

17        A.    There was no agreement.  And you asked me a

18   question and I don't believe he did everything because -- or

19   however you asked me.  I think suing us before the sale went

20   through, trying to get a temporary restraining order to

21   interrupt the sale, were things that were inconsistent with

22   anything that a good employee would do.

23        Q.    But it's just not -- it's not true that

24   Jeff Carpenter tried to interrupt the sale.

25        A.    What's a TRO?

Appendix 000712

```
 1                    MR. L. FRIEDMAN:  Well, Your Honor, who's
 2      testifying here?
 3                    MS. GIBSON:  It's a question.
 4                    THE COURT:  Ask questions.
 5           Q.   (By Ms. Gibson) Ultimately, Ms. Geiser -- well,
 6      let me do this.
 7                    THE WITNESS:  Your Honor, can we take a
 8      break?
 9                    THE COURT:  I think she's about finished,
10      but we take a break at 10:20, which is just a couple
11      minutes.
12                    THE WITNESS:  Okay.
13                    THE COURT:  But she may be finished by
14      then.  We'll see.
15                    MS. GIBSON:  Okay.
16           Q.   (By Ms. Gibson) The intent of bonusing employees
17      out of sale proceeds was to get them to stay, correct?
18           A.   The intent of talking to the employees and letting
19      them know that if the sale went through there was upside for
20      them was motivation for them to stay.  If they chose to stay
21      on that basis, that was up to them.
22           Q.   Jeff Carpenter stayed as long as you-all needed
23      him to, correct?
24           A.   Jeff Carpenter stayed until we no longer needed
25      him and as long as he received his annualized salary of
```

1    $200,000 plus benefits.

2         Q.    And that date was October 31, 2007?

3         A.    On or about.

4         Q.    November 1, 2007, was the transfer of management

5    to the purchasers, correct?

6         A.    Yes.

7         Q.    Okay.  So Jeff had done everything that you-all

8    had asked him to do as far as staying to help make the asset

9    sale work as of the end of the day on October 31st, 2007?

10        A.    Jeff continued his employment until October 31st

11   of 2007.

12        Q.    He stayed.

13        A.    He continued his employment.  He continued doing

14   his functions for Southwest Housing.  He stayed on with the

15   company.  He received his paycheck for doing that.

16        Q.    You-all asked him to stay, didn't you?

17        A.    He stayed.

18        Q.    Did you ask him to stay on to do work as needed to

19   help make the asset sale happen?

20        A.    I asked Jeff to stay and continue his role with

21   the management company to maintain continuity for the sale

22   process to take place.

23        Q.    Okay.  You asked him to stay and he stayed.

24              On -- after his work was completed, on

25   November 1, 2007, you sent or you had someone send

1    Jeff Carpenter a proposed separation agreement in which he

2    would have to waive all of his legal rights --

3         A.   Well, I think you're --

4         Q.   -- what he will be --

5         A.   -- leaving out an important point, which is I was

6    responding to something he had --

7                   THE COURT:   Stop.   It sounds like you're

8    going on to a different -- I thought you were wrapping up.

9                   MS. GIBSON:   Okay.

10                  THE COURT:   You're going on to a different

11   subject.   We'll take our break.

12                  We'll take a 15-minute break, ladies and

13   gentlemen.   We'll see you back at 10:36.

14                  (The jury exited the courtroom.)

15                  (Recess taken)

16                  (The jury entered the courtroom.)

17                  THE COURT:   Welcome back.   Good morning

18   still, ladies and gentlemen.

19                  We'll continue with the trial.   Our witness

20   is Ms. Geiser.   The examining attorney is Ms. Gibson.   And

21   we'll go up until noon, the noon hour, just before the noon

22   hour before we take our next break.   And that break will be

23   an hour and 10 minutes for our lunch break.

24                  So, Ms. Gibson, if you'd pick up where you

25   left off.

1          Q.    (By Ms. Gibson) Ms. Geiser, could you take a look
2    back at Exhibit 10, please?
3          A.    Yes.
4          Q.    And is Exhibit 10 an accurate depiction of an
5    excerpt from an article from an interview with you and
6    Brian Potashnik?
7          A.    Yes.
8          Q.    And I realize you said you believe it's a mistake
9    that you are referenced as a co-owner?
10         A.    Right.
11         Q.    Okay.
12                    MS. GIBSON:  Plaintiff offers Exhibit 10.
13                    THE COURT:  Any objection?
14                    MR. L. FRIEDMAN:  No objection.
15                    THE COURT:  Ten is admitted.
16         Q.    (By Ms. Gibson) Ms. Potashnik, we had talked about
17   that you had asked Jeff Carpenter to stay on as long as
18   needed to help make the asset sale happen?
19         A.    Yes.
20         Q.    Okay.  And, in exchange for staying, the carrot
21   was a bonus out of the sale proceeds?
22         A.    Potentially.
23         Q.    And as we sit here today, although Jeff Carpenter
24   stayed, it's your position now, after the fact, that
25   Jeff Carpenter's salary was enough to cover everything; is

1    that right?

2         A.   Jeff was -- the discussions, as I understand them,

3    were that if he -- if there was proceeds remaining from the

4    sale to distribute to employees then he would have

5    participated in that.  Other than that, he received his

6    salary.

7         Q.   Is it your position, after the fact, today, as you

8    sit here, that Jeff's salary is all he was entitled to?

9         A.   I don't know what you mean by after the fact.

10   That was my position then and that's my position now.

11        Q.   Did you tell Jeff Carpenter, when you offered him

12   the carrot of a bonus out of the sale proceeds, if he would

13   stay on, that you were taking the position, though, that his

14   salary was going to cover everything and you would pay him

15   nothing?

16        A.   Like I said, the discussions were if there was

17   proceeds left when the sale went through that he would

18   participate in that.

19        Q.   Did you ever tell Jeff Carpenter it was your

20   belief that his salary covered his staying on, that that's

21   all he was entitled to?

22        A.   I don't remember having that conversation with

23   Jeff.

24        Q.   Okay.  That's your position today, though, now

25   that we're in a lawsuit?

1        A.      I think that's always been the position.

2        Q.      That's always been your position even when you

3   were offering a carrot to bonus out of sale proceeds if he

4   would stay?  It was your position that --

5        A.      I didn't offer a carrot.  Discussions were had.

6   The discussions were generally about if there were monies at

7   the end of the day; if the sale went through and it was

8   successful, that he would participate on some level at our

9   discretion or at Brian's discretion.  So I keep saying the

10  same thing.

11       Q.      Did you use those words with Jeff Carpenter in

12  these discussions?  Did you say that it would be at our

13  discretion, we may or may not pay you?  Did you ever tell

14  Jeff Carpenter that while he was employed?

15       A.      The discussions with Jeff were generally him

16  asserting certain things and me saying we can't make you

17  that deal, Jeff, we can't make that commitment.  The only

18  thing we tell you or I can tell you is at the end of the

19  day, if there are proceeds left after the sale, that you'll

20  participate.

21       Q.      The truth is, Ms. Geiser, you didn't start backing

22  out and saying we can't make that commitment until you had

23  already gotten everything you needed from Jeff at the end of

24  the day on October 31st.

25       A.      The truth is that I sat at Jeff Carpenter's

1  deposition where my lawyers asked him, "Did you have a deal

2  with Cheryl Potashnik?"  And he said, "No."  And my lawyer

3  asked, "Why are you suing Cheryl Potashnik?"  And the reason

4  was because her name appears on the closing statement or on

5  the sale agreement, and advice of counsel.

6            Jeff admitted that at his deposition that

7  he never had a deal with me.  And he never had a deal with

8  me.

9        Q.   I disagree, but Mr. Carpenter will testify, okay?

10       A.   And he has.

11       Q.   Well, you told Mr. Carpenter that you intended to

12  pay him a bonus, correct?

13       A.   If and when the sale went through.

14       Q.   Okay.

15            THE COURT:   You're asking the same

16  questions.

17            MS. GIBSON:   All right.

18            MR. L. FRIEDMAN:   Thank you.

19            What number?

20            MS. GIBSON:   Eleven.

21       Q.   (By Ms. Gibson) Ms. Geiser, I'm handing you what's

22  been marked Exhibit 11, going back through the timeline in

23  this case.  Do you recognize Exhibit 11 --

24       A.   Yes.

25       Q.   -- as a letter of intent to sell the business?

1          A.    Yes.

2          Q.    Okay.  And the date, what is the date of the

3     letter of intent?

4          A.    October 16th, 2006.

5          Q.    And at the time -- well, in looking -- in looking

6     at Exhibit 11, who's signatures --

7                     MR. L. FRIEDMAN:  Your Honor, I'm going to

8     object to the witness testifying about anything, an exhibit

9     that has not been admitted into evidence.

10                    MS. GIBSON:  I'm authenticating it still.

11                    THE COURT:  All right.

12                    Well, is there an objection to it?

13                    MR. L. FRIEDMAN:  Yeah, I object.  It's

14    hearsay.

15                    MS. GIBSON:  Well, let me offer it first.

16                    THE WITNESS:   The signatures are

17    Brian Potashnik's and mine.

18                    MS. GIBSON:  Okay.

19                    Plaintiff offers Exhibit 11.

20                    THE COURT:  Okay.

21                    And your -- your objection is hearsay?  She

22    said she --

23                    MR. L. FRIEDMAN:  Hearsay, lack of

24    foundation.

25                    THE COURT:  Anything else?

67

1           MS. GIBSON:  Is that it?

2           MR. L. FRIEDMAN:  No, sir.

3           THE COURT:  All right.

4           MS. GIBSON:  Your Honor --

5           THE COURT:  Overruled.  Eleven is admitted.

6      Q.   (By Ms. Gibson) And at the time you and

7   Brian Potashnik signed the letter of intent, when was the

8   anticipated close?

9      A.   This is a letter of intent, so we would have had

10  to then negotiate the purchase and sale agreement.  There

11  was no intent at that time.

12     Q.   When did you believe the sale was likely to close

13  at that time?

14     A.   Until you have a purchase and sale agreement, you

15  can't possibly know based on the letter of intent.  It's

16  impossible.

17     Q.   Did you believe that the close was likely

18  to happen the next summer?

19     A.   This is a letter of intent.  There's no way to

20  know.

21     Q.   Not just based on that.  I'm saying at the time

22  y'all signed that.

23     A.   I don't think there's any way to have known that.

24  This is just a letter of intent.

25     Q.   Okay, you don't think you knew at this time when

1    the sale was likely to close?

2         A.    This is just a letter of intent, so --

3         Q.    I understand, but I'm not asking just based on

4    that document.

5         A.    Well, you have to go to -- you have to go from

6    letter of intent to purchase and sale agreement, and then

7    that would dictate the closing date.

8         Q.    Okay.  Well, let me ask you -- let me ask you this

9    way.  Whether it was on October 16th, 2006, or at some later

10   point, the asset sale was initially anticipated to close in

11   summer of 2007, correct?

12        A.    The purchase and sale agreement was signed in

13   April of '07 and there's a very detailed discussion about

14   closing and when that would occur.  I don't recall there

15   being a date certain in it.  It talks about all the

16   different conditions that have to happen before the sale can

17   go through.

18                    I know that as early as June of '07 there

19   was already the first amendment to the contract.  So I don't

20   know that -- I can't sit here today and say that I believed

21   in April of '07, based on all the consents and various

22   things that had to happen to be able to close, that it could

23   possibly have closed in the summer.

24        Q.    My question was summer.

25        A.    Yeah.  I can't sit here today and say I

1    anticipated being in the summer.  I guess that was probably

2    our hope.

3         Q.   I thought you said April.

4         A.   It was signed in April 2007.  I think the hope was

5    that it would close by the summer, but I don't know that

6    there was a date certain in the contract.

7         Q.   I'm not asking you about a date certain.  I'm just

8    asking when you-all initially anticipated the deal would

9    close.

10              MR. L. FRIEDMAN:  Asked and answered,

11   Your Honor.

12              THE COURT:  Overruled.

13              THE WITNESS:  Again, I think the hope was

14   that it would close over the summer, but there was a lot of

15   things that needed to happen in order for that sale to go

16   through.  So it's very detailed once we got to the purchase

17   and sale agreement what things had to happen in order for

18   the sale to go through.  And as early as June of '07 there

19   was already an amendment.  I believe there was another one

20   in July.  So it became clear pretty early on that the

21   closing was going to drag out.

22        Q.   (By Ms. Gibson) Ms. Geiser, do you recall being at

23   your deposition?

24        A.   Yes.

25              MS. GIBSON:  Mr. Friedman, Page 85,

1    Line 16.   Let me know when you're there.

2                        (Pause)

3                        MR. L. FRIEDMAN:   I'm here.

4        Q.    (By Ms. Gibson) Ms. Geiser, at your deposition I

5    asked, "Going back in time, the asset sale to Cascade was

6    initially anticipated to close in spring or early summer of

7    2007, correct?"   And you say, "I don't know if it would have

8    been spring, but summer."

9        A.    Yeah.   I stand corrected because I was unclear, I

10   guess, on the dates at that time.   The actual sale contract

11   wasn't executed until the spring of '07, so it couldn't have

12   closed in the spring.   And the hope was, yeah, that it would

13   have closed by the summer.

14       Q.    Okay.

15                        So, initially, you-all anticipated close in

16   summer of 2007.   And so, less than a year --

17                        MR. L. FRIEDMAN:   I'm going to object.   It

18   misstates the witness's prior testimony.

19                        MS. GIBSON:   (Unintelligible).

20                        MR. L. FRIEDMAN:   Misstates the witness's

21   prior testimony.

22                        MS. GIBSON:   I haven't even asked the whole

23   question.

24                        THE COURT:   She hasn't asked the question.

25                        Ask your question.

1      Q.     (By Ms. Gibson) And so, the time between the

2   letter of intent to sell and the initial anticipated close

3   date was less than a year, correct?

4      A.     The time that the letter of intent was told to

5   when we thought the sale could potentially go through was

6   less than a year?

7      Q.     Right.

8      A.     That's probably true.

9      Q.     And in the letter of intent it identifies the

10  seller as multiple entities and persons.  Collectively, all

11  Southwest Housing entities or persons affiliated therewith,

12  correct?

13     A.     Yes.

14     Q.     Okay.  And were you one of the individual persons

15  referenced?

16     A.     Through my entity, yes.

17     Q.     Okay.  And is that why you -- and that's why you

18  signed the letter of intent?

19     A.     I believe that's why they had me sign the letter

20  of intent, yes, because some of the entities listed on

21  Schedule A were owned by my entity.

22            MS. GIBSON:  Mr. Friedman, this is 12.

23            MR. L. FRIEDMAN:  Thank you.

24     Q.     (By Ms. Gibson) I'm handing you Plaintiff's

25  Exhibit 12.  Do you recognize that document?

1          A.    Yes.

2          Q.    And is -- does Exhibit 12 appear to be an accurate

3     copy of an excerpt from the purchase and sale agreement?

4          A.    An excerpt from the purchase and sale agreement?

5          Q.    Well, the actual purchase and sale agreement had

6     lots of schedules and attachments, and so an excerpt in the

7     sense if it's just a purchase and sale --

8          A.    The main body of the agreement?

9          Q.    Right.

10         A.    Does --

11         Q.    Does it appear to be an accurate copy?

12         A.    I'm going to take your word for it.

13         Q.    Well, does it appear to you to be an accurate copy

14    of the agreement?

15         A.    I mean, I can sit here and read the agreement, but

16    I'm going to take your word for it that it's an accurate

17    copy of the agreement.

18         Q.    Okay.

19                    MS. GIBSON:  Plaintiff offers Exhibit 12.

20                    MR. L. FRIEDMAN:  Take the witness on voir

21    dire?

22                    THE COURT:  No.

23                    Do you have an objection to it?

24                    MR. L. FRIEDMAN:  Well, it's lack of

25    foundation and hearsay.  She didn't sign this agreement and

73

1      it's incomplete.

2                     THE COURT:  All right.  She says she agrees

3      to take Ms. Gibson's word for it that it was accurate.

4                     MR. L. FRIEDMAN:  It's incomplete,

5      Your Honor.

6                     THE COURT:  It's admitted.

7                     MR. L. FRIEDMAN:  Best evidence rule.

8                     THE COURT:  What is better?  You mean the

9      entire --

10                    MR. L. FRIEDMAN:  Well, a complete document

11     is better than selected --

12                    THE COURT:  Well, of course, but you

13     don't -- overruled.

14     Q.    (By Ms. Gibson) Ms. Geiser, if you'll take a look

15     at Page -- the page that ends in 322 on the bottom right.

16     A.    Say that again.

17     Q.    You see that there are Bates numbers in the bottom

18     right of the document?

19     A.    Okay.

20     Q.    Okay.  If you'll turn to the page that is 322.

21     A.    Oh, yeah.  It's the signature page?

22     Q.    Yes.

23                    And you see on the signature page of the

24     purchase and sale agreement it has the -- the top signatures

25     are the purchaser, correct, Cascade, Affordable Housing?

1          A.    Yes.

2          Q.    Okay.   And if we go down you see that the seller's

3     signature --

4          A.    Yes.

5          Q.    -- is Brian Potashnik?

6          A.    Uh-huh.

7          Q.    And you see that he is the authorized agent for

8     each of the sellers that are listed on the schedule?

9          A.    Listed on Schedule A hereof.

10         Q.    Right.

11               So, is -- is that accurate Brian Potashnik,

12    in connection with the asset sale, was acting as the

13    authorized agent for the sellers?

14         A.    Yeah.   I mean, I guess that's what the lawyers

15    worked out.   I -- I'm -- yes, that's what it says.

16         Q.    And you were one of the persons who was a seller,

17    as we just saw in the LOI --

18         A.    Correct.

19         Q.    -- through CLG, correct?

20         A.    Yes.

21         Q.    Yes?   Okay.

22               And so, in connection with the sale, that

23    would mean Brian Potashnik was also acting as the authorized

24    agent for you through your company?

25         A.    I guess.   I don't know how the lawyers came to

 1     that, but that must have been what they came up with.

 2          Q.    And the date for the purchase and sale agreement

 3     is what?

 4          A.    April 30th, 2007.

 5          Q.    And PSA is a term sometimes used as an

 6     abbreviation for purchase and sale agreement?

 7          A.    Yes.

 8          Q.    And at the time -- let me strike that.

 9                     MS. GIBSON:  Thirteen.

10                     MR. L. FRIEDMAN:  Thank you.

11                     THE WITNESS:  It gets progressively colder

12     in here.  It's freezing, right?

13                     THE COURT:  We'll work on that.

14                     THE WITNESS:  It starts off hot and then

15     it gets cold.

16          Q.    (By Ms. Gibson) I'm handing you Exhibit 13.  Does

17     Exhibit 13 appear to be an accurate copy of Schedule A

18     excerpt from the Southwest/Cascade seller asset purchase or

19     sale agreement?

20                     MR. L. FRIEDMAN:  Take the witness on voir

21     dire, Your Honor?

22                     THE COURT:  No.

23                     MR. L. FRIEDMAN:  There can't be two

24     Schedule A's to the same document.

25                     THE COURT:  She hasn't answered the

1    question yet.  Let Ms. Gibson ask her questions.

2                    THE WITNESS:  I'm going to, again, take

3    your word for it that this is an accurate copy of the

4    Schedule A to the Southwest/Cascade seller asset purchase

5    price for --

6                    MR. L. FRIEDMAN:  Your Honor, this is

7    hearsay, violates the best evidence rule, and it would be

8    misleading if we don't have the entire document and just one

9    schedule.

10                   THE COURT:  Well, you can offer the entire

11   document when you do your direction examination.

12                   MR. L. FRIEDMAN:  Okay.

13                   I don't even know what this is, Your Honor.

14   I'm looking at this --

15                   THE COURT:  Well, y'all come over here.

16                   (Sidebar conference held)

17                   THE COURT:  Vikki, we'll -- the objection

18   to Exhibit 13 is overruled.  It's admitted.  And we'll put

19   the objection on the record later.

20                   MS. GIBSON:  Okay.

21                   MR. L. FRIEDMAN:  Now, Your Honor?

22                   THE COURT:  No, later, once the jury leaves

23   at the end of the day.

24                   You already have the sub -- you already

25   have the legal objections on the record.  What she meant by

1    what you told me there we'll put on the record later.

2                    MS. GIBSON:  Okay.

3                    MR. L. FRIEDMAN:  Okay.  Thanks.

4         Q.    (By Ms. Gibson) All right.  Ms. Geiser, Schedule A

5    lists various sellers, correct?

6         A.    Yes.

7         Q.    Okay.  And you see that Brian Potashnik is one of

8    the sellers?

9         A.    Yes.

10        Q.    And you see that Southwest Housing Development is

11   also one of the sellers?

12        A.    Correct.

13        Q.    And you see that Southwest Housing Management

14   Corporation is also one of the sellers?

15        A.    Yes.

16        Q.    And you testified a moment ago that you were also

17   a seller in that some of the assets through one of your

18   companies was also part of the asset sale?

19        A.    Yes.

20        Q.    So all of the defendants in this case were sellers

21   in the asset sale, correct?

22        A.    I'm not sure about Affordable Housing, but it

23   could have been.

24        Q.    Affordable Housing Construction?

25        A.    Correct.

1          Q.    I believe if you'll take a look through you'll see

2     that Affordable Housing Construction is one of the sellers.

3          A.    Oh, yes.

4          Q.    You see that?

5          A.    Uh-huh.

6          Q.    Okay.  So all of the defendants in this case were

7     sellers in the asset sale, correct?

8          A.    Well, I was a seller indirectly through my entity.

9     I don't know that I'm ever listed by name.  I'd have to go

10    through this entity by entity.

11         Q.    Your name is listed in footnotes, I believe.

12         A.    Right, but it's not listed as a seller, A, B, C,

13    D, E.

14         Q.    But you were effectively a seller because a

15    company you owned, a sort of interest that you owned --

16         A.    Seller is a defined term.

17         Q.    -- selling --

18         A.    I personally was not a seller.  I'm a footnote as

19    an owner of the seller.

20         Q.    And, ultimately, at the end of the day, who got

21    the money in connection with your company?

22         A.    The company, CLG.

23         Q.    But you -- who were the employees of CLG?

24         A.    Myself.

25         Q.    Okay.  No one else?

1      A.    Correct.

2      Q.    You were the sole owner?

3      A.    Yes.

4      Q.    Okay.

5            Ultimately, any money that CLG got went to

6    you, correct?

7      A.    Ultimately, it went to the company.  How -- if

8    it ever went to me, I don't recall.

9      Q.    Well, no one else was earning money from the

10   company but you, correct?

11     A.    It went to the company.

12     Q.    Well, who got the money from the company?

13     A.    Either it was spent by the company or I got it.

14     Q.    And you testified earlier that the reason you

15   hadn't signed the letter of intent is you were one of the

16   persons that was considered to be a seller --

17     A.    No.  I --

18     Q.    -- under the letter of intent?

19     A.    No.  I was not a person.  I was the owner of an

20   entity that owned a G -- general partnership interest.  So

21   that was my connection.

22     Q.    Is it accurate to say that you financially

23   benefited from funds received from the asset sale?

24     A.    Yes.

25            MR. L. FRIEDMAN:  Thank you.

Appendix 000733

80

1                    MS. GIBSON:   You're welcome.

2        Q.   (By Ms. Gibson) Ms. Geiser, I'm handing you

3   Plaintiff's Exhibit 14.   Do you recognize Exhibit 14 as an

4   Email that you sent to Sara Reidy and Jeff Carpenter?

5        A.   Yes.

6                    MS. GIBSON:   Plaintiff offers Exhibit 14.

7                    THE COURT:   Any objection?

8                    MR. L. FRIEDMAN:   No objection, Your Honor.

9                    THE COURT:   Fourteen is admitted.

10       Q.   (By Ms. Gibson) And in Exhibit 14, the Email to

11  Sara Reidy and Jeff Carpenter, says celebration time, on

12  July 17, 2007, correct?

13       A.   Yes.

14       Q.   What's going on at that time that you're

15  celebrating?

16       A.   I don't really recall.

17       Q.   Do you recall that at that time -- do you recall

18  that at some point it looks like the asset sale wasn't going

19  to go through and then it was back on track with a payment

20  to the sellers?

21       A.   That's probably true.

22       Q.   Okay.   And is that -- is that what you believe

23  that Email is talking about?

24       A.   It might have been.

25       Q.   And do you recall you-all celebrated with

1    champagne in the office?

2        A.    You asked me that at my deposition.  I don't

3    remember that.

4        Q.    Okay.

5              And of all the people at the organization

6    from Affordable Housing Construction, Southwest Housing

7    Management, and Southwest Housing Development, the

8    celebration time Email you sent was to just Sara Reidy and

9    Jeff Carpenter.

10       A.    They may have been the only ones left in the

11   office.  It was 4:48.  Yeah.

12       Q.    Okay.  They worked -- what are the office hours?

13   Do you think --

14       A.    Whatever they were.

15       Q.    What?

16       A.    Whatever they were, the people worked the hours

17   that they worked.  I don't know that we had, necessarily,

18   set office hours.

19       Q.    Well, Jeff Carpenter was the executive vice

20   president of Southwest Housing Management, correct?

21       A.    Yes.

22       Q.    Sara Reidy was the executive vice president of

23   Southwest Housing Development, correct?

24       A.    If that was her title, I don't recall.  It could

25   be.

1      Q.   Okay.

2           Other than, perhaps, the CFO and yourself

3      and Brian Potashnik, they were the highest level employees

4      of their respective organizations?

5      A.   And Deepak Sulakhe.

6      Q.   Okay.

7           Do you think everyone else was gone by

8      4:48?

9      A.   Well, Deepak might have been out of town.  He was

10     a developer.  He could have been traveling.  I don't know.

11     Q.   Let me just ask you this.  Of all the people in

12     all the companies, why did you choose Jeff Carpenter and

13     Sara Reidy to celebrate with concerning the asset sale?

14     A.   I don't know.  I don't really remember that Email,

15     I don't remember celebrating, so I really can't go to my

16     frame of mind at the time.

17     Q.   Okay.

18          Would you take a look back at Exhibit 12,

19     please?  And if you'll look at Article 1.3 on Page 3.

20          MR. L. FRIEDMAN:  Which one?

21          MS. GIBSON:  1.3, earnest money. Okay?

22          MR. L. FRIEDMAN:  Which page again?

23          THE WITNESS:  Three.

24          MS. GIBSON:  Three.

25     Q.   (By Ms. Gibson) Tell me when you've got a chance

1    to read it.

2          A.    Which part?  Do you want me to read all of 1.3?

3          Q.    Yes.

4          A.    Okay.

5                      (Witness complied)

6          A.    Okay.

7          Q.    Okay.

8                      This paragraph is about earnest money,

9    correct, and --

10         A.    Paragraph 1.3 is titled earnest money.

11         Q.    Okay, is that different from it being earnest

12   money?

13         A.    It's titled earnest money.

14         Q.    Okay.

15                     And you see Paragraph 1.3, earnest money,

16   says that the earnest money shall either be applied against

17   the purchase price at closing or, if this agreement is

18   terminated prior to closing, paid to seller or refunded to

19   purchaser in accordance with the agreement.  Correct?

20         A.    That's what it says, yes.

21         Q.    Okay.  And so, if the asset sale actually goes

22   through and closes, anything that's earnest money is applied

23   toward the purchase price, correct?

24         A.    Yes.

25                     MR. L. FRIEDMAN:  Thank you.

1      Q.    (By Ms. Gibson) Ms. Geiser, I'm handing you what's

2  been marked Plaintiff's Exhibit 15.  Does that appear to you

3  to be an accurate copy of the first amendment to escrow

4  agreement?

5      A.    I'll take your word for it.

6            MR. L. FRIEDMAN:  Hearsay, lack of

7  foundation.

8            MS. GIBSON:  Well, I haven't offered

9  it yet.

10           Plaintiff offers Exhibit 15.

11           THE COURT:  The objections are on the

12 record.  Overruled.  Fifteen is admitted.

13     Q.    (By Ms. Gibson) Okay.  And you see in Exhibit 15

14 that the escrow agent is authorized and instructed to

15 release 1.85 million of the escrow funds to seller?

16     A.    Yes.

17     Q.    And this was the first payment to sellers in

18 connection with the asset sale?

19     A.    I don't know how to characterize this because the

20 asset sale hadn't -- the sale of the assets hadn't gone

21 through as of July 16, 2007.  I believe what happened was

22 Brian negotiated for seller to release an amount of money in

23 advance of the sale going through in order to ensure that

24 the closing would happen.  That's generally how I remember

25 it.

```
 1          Q.    But this is -- ultimately, the sale did close and
 2    go through, correct?
 3          A.    Yeah, but parts of it didn't go through for
 4    another year, so --
 5          Q.    But, ultimately, the asset sale happened?
 6          A.    The sale of -- the sale of 40 -- or 54 assets
 7    happened, yeah.
 8          Q.    Okay.  And this is the first -- 1.85 million is
 9    the first payment to seller?
10          A.    I think it's an advance, but the asset sale hadn't
11    happened.  So, again, I can't give you an answer other than
12    I don't remember how this was characterized.
13          Q.    It is paid in advance of the closing, Ms. Geiser,
14    but it was still the first payment to sellers that was
15    ultimately applied to the purchase price, correct?
16          A.    I would say that's accurate.
17          Q.    Okay.
18                    In other words, the sellers had to put up
19    more earnest money and pay that to you, correct -- or, I'm
20    sorry -- pay that to the sellers.
21                    THE COURT:  To the buyer.
22                    MS. GIBSON:  I'm sorry?
23                    THE COURT:  To the seller or the buyer?
24                    MS. GIBSON:  To the seller.
25                    Did I say buyer?
```

1              THE COURT:  No.  I misunderstood.

2              MS. GIBSON:  Okay.

3              THE WITNESS:  This amount was paid to the

4  seller.

5      Q.   (By Ms. Gibson) Okay.  And that was earnest money.

6              I'm going to -- I'm going to hand to you

7  Plaintiff's 16 and see if this maybe helps you.

8      A.   Okay.

9              MR. L. FRIEDMAN:  Thank you.

10     Q.   (By Ms. Gibson) I'm handing you Plaintiff's

11  Exhibit 16.  Does Exhibit 16 appear to be an accurate copy

12  of Amendment 1 to the purchase and sale agreement?

13     A.   I'll take your word for it.

14             MS. GIBSON:  Plaintiff offers Exhibit 16.

15             THE COURT:  Same?

16             MR. L. FRIEDMAN:  Hearsay and lack of

17  foundation, Your Honor.

18             THE COURT:  All right.  Overruled.  Sixteen

19  is admitted.

20     Q.   (By Ms. Gibson) And does anything in Amendment 1

21  help you?

22     A.   I'm going to have to read it.

23             (Witness reading)

24     Q.   Ms. Geiser, let me go ahead and give you 17.

25  Whoops, this is the second amendment to escrow agreement.

Appendix 000740

1      Does anything in that document help you?

2           A.    I need to read it and you just --

3           Q.    Okay.

4           A.    -- suggested you're going to give me something

5      else.  So, is there something else?

6           Q.    Oh, I -- this is the -- the next document is

7      another amendment to the escrow agreement, so I apologize.

8           A.    Well, these are technical, legal documents that I

9      haven't looked at in a long time, so I'm going to have to

10     read through it if you're going to question me on this.

11          Q.    Okay.

12                Do you have any reason to doubt that the

13     payment of 1.5 million reflected on this -- on Plaintiff's

14     15 is earnest money that was applied to the purchase price?

15          A.    One is an amendment to the purchase and sale

16     agreement, and then the other document is amendment to the

17     escrow agreement.  So I need to look at the document to make

18     sure we're talking about the same thing.

19          Q.    This is 15.  Do you have Exhibit 15 in front of

20     you?

21          A.    I do.

22          Q.    Okay.

23          A.    That's the first amendment to escrow agreement.

24          Q.    Do you have any reason to doubt that the

25     1.85-million payment was earnest money that was ultimately

1    applied towards the purchase price?

2         A.   Do I have any reason to doubt it?

3         Q.   Right.

4         A.   I think that's generally what happened.

5         Q.   Okay.

6              And the date, the effective date of this is

7    July 16, 2007?

8         A.   Yes.

9         Q.   And your Email in Exhibit 14, celebration time, is

10   dated the next day, July 17.

11        A.   Okay.

12        Q.   Okay.  Does that help you remember that that was

13   the day of the first payment received in connection with the

14   asset sale?

15        A.   That's where the buyer, if my memory serves,

16   released hard money into the transaction, yeah.

17        Q.   I'm handing you Exhibit 17.  Does Exhibit 17

18   appear to be an accurate copy of the second amendment to

19   escrow agreement?

20        A.   Yes.

21        Q.   Okay.

22              MS. GIBSON:  And plaintiff offers --

23              THE WITNESS:  Again, I'm taking your word

24   for it for all of these.

25              MS. GIBSON:  Okay.

1              Plaintiff offers Exhibit 17.

2              THE COURT:   Okay.

3              Same objection?

4              MR. L. FRIEDMAN:   Same objections,

5    Your Honor.

6              THE COURT:   All right.   Overruled.

7    Seventeen is admitted.

8         Q.   (By Ms. Gibson) And in the second amendment on

9    Exhibit 17 it says that the escrow agent is authorized and

10   instructed to release $925,000 of escrow funds to seller,

11   correct?

12        A.   Yes.

13        Q.   And that is also earnest money that was ultimately

14   applied to the purchase price?

15        A.   I guess, yeah.

16        Q.   Okay.  And this is August 15, 2007?

17        A.   Yes.

18        Q.   I'm handing you Exhibit 18.

19             MR. L. FRIEDMAN:   Thank you.

20        Q.   (By Ms. Gibson) Does Exhibit 18 appear to be an

21   accurate copy of the third amendment to the escrow

22   agreement?

23        A.   I'll take your word for it.

24             MS. GIBSON:   Plaintiff offers Exhibit 18.

25             THE COURT:   Same objection?

1                    MR. L. FRIEDMAN:  Same objections,

2      Your Honor.

3                    THE COURT:  All right.  Overruled.

4      Eighteen is admitted.

5          Q.   (By Ms. Gibson) And in the third amendment this is

6      dated September 17, 2007, correct?

7          A.   Yes.

8          Q.   And here another $925,000 is being paid to seller?

9          A.   Correct.

10         Q.   And that was also earnest money that was

11     ultimately applied toward the purchase price?

12         A.   I think so.

13         Q.   Ms. Geiser, do you know the total amount of

14     revenue that was paid to sellers?

15         A.   Revenue?

16         Q.   Revenue.

17                   MR. L. FRIEDMAN:  Object to the term

18     "revenue".

19                   THE COURT:  You're talking about the

20     revenue of what?

21                   MS. GIBSON:  In connection with the asset

22     sale.

23         Q.   (By Ms. Gibson) Do you know the total amount of

24     revenue to sellers?

25         A.   Can you define revenue?

1        Q.    Revenue would be monies paid to seller in

2    connection with the asset sale before any offsets; for

3    example, for closing costs.

4        A.    How much total money was paid to all the sellers

5    in the asset sale?  Is that your question?

6        Q.    Yeah.   Yes.

7        A.    I think it was 36 million, but I could be wrong.

8        Q.    Okay.

9              And so, I'm going to keep going through

10   these so we can see the exact numbers, okay, Ms. Geiser?

11       A.    Okay.

12       Q.    Ms. Geiser, I'm handing you Plaintiff's Exhibit

13   19.  Does that appear to be an accurate copy of the fourth

14   amendment to the escrow agreement?

15       A.    I'm taking your word for it.

16              MS. GIBSON:   Plaintiff offers Exhibit 19.

17              MR. L. FRIEDMAN:   Same objections,

18   Your Honor.

19              THE COURT:   All right.   Overruled and

20   admitted.

21       Q.    (By Ms. Gibson) And do you see in Exhibit 19 that,

22   again, another 925,000 is being paid to seller?

23       A.    Yes.

24       Q.    And that is also earnest money that will

25   ultimately be applied toward the purchase price?

1          A.    I believe so, yes.

2          Q.    Okay.

3                And the date on this is October 29, 2007?

4          A.    Yes.

5          Q.    I'm handing you Exhibit 20.

6                MR. L. FRIEDMAN:   Thank you.

7          Q.    (By Ms. Gibson) Does Exhibit 20 appear to be an

8     accurate copy of the fifth amendment to the escrow

9     agreement?

10         A.    I'll take your word for it.

11         Q.    Okay.   And in the fifth amendment to the escrow

12    agreement --

13                MS. GIBSON:   Oh, plaintiff offers Exhibit

14    20.

15                MR. L. FRIEDMAN:   Same objections,

16    Your Honor.

17                THE COURT:   All right.   Y'all come over

18    here just a minute.

19                (Sidebar conference held)

20         Q.    (By Ms. Gibson) Ms. Geiser, I'm just going to hand

21    you a stack and try to -- so we can get these totals.

22                MS. GIBSON:   You know what, Your Honor, why

23    don't I do this, just in the interest of time.   I'll move to

24    a different topic.

25                THE COURT:   Okay.

93

1          MS. GIBSON:  And I'll gather these together
2    over -- over the next break.
3          THE COURT:  Okay.
4          MS. GIBSON:  Speed it up.
5     Q.   (By Ms. Gibson) Ms. Geiser, do you recall that by
6    the end of October -- October 31, 2007 -- that Southwest
7    Housing Management had requested a backup of
8    Jeff Carpenter's laptop?
9     A.   I don't remember all the (unintelligible) about
10   Jeff's laptop.
11    Q.   Okay.  But that would have been the last day y'all
12   needed him, October 31, 2007?
13         MR. L. FRIEDMAN:  Thank you.  What number
14   is this?
15         MS. GIBSON:  Twenty-one.
16    Q.   (By Ms. Gibson) Correct?
17    A.   I think I can agree with you that the last day of
18   Jeff's employment was somewhere around October 31st.
19    Q.   I'm handing you what's been marked Plaintiff's
20   Exhibit 21.  Does Exhibit 21 appear to be an accurate copy
21   of the consulting and asset management services agreement?
22    A.   Yes.  I'll take your word for it.
23    Q.   Okay.
24         MS. GIBSON:  Plaintiff offers Exhibit 21.
25         THE COURT:  Any objection?

1              MR. L. FRIEDMAN:  Your Honor, I'm going to

2     say hearsay and lack of foundation and relevance.

3              THE COURT:  All right.  Overruled then.

4     Twenty-one is admitted.

5         Q.   (By Ms. Gibson) And the date of the agreement is

6     November 1, 2007?

7         A.   Yes.

8         Q.   And the gist of this agreement is to transfer

9     management function over to the purchaser?

10        A.   Yes.  The buyer's property management company was

11    assuming day-to-day management -- management functions.

12        Q.   Do you recall having a meeting earlier in the year

13    with Jeff Carpenter in which you-all just were dis -- you

14    and Jeff Carpenter were discussing that the annual bonuses

15    were separate from the asset-sale proceeds?

16             MR. L. FRIEDMAN:  What year?

17             THE COURT:  Earlier.

18             MS. GIBSON:  Earlier in the year.

19             THE COURT:  Of 2007.

20             MR. L. FRIEDMAN:  Of 2007 or this year?

21             THE COURT:  That's up to you.  His

22    objection is your question's ambiguous.

23             MR. L. FRIEDMAN:  Ambiguous and vague.

24             MS. GIBSON:  As to which year, sure.

25        Q.   (By Ms. Gibson) Ms. Geiser, do you remember

1    meeting with Jeff in the time frame of May 16, 2007, where

2    you were meet -- to meet with Jeff and Brian about a

3    sales-proceeds bonus and annual bonuses?

4         A.    I generally remember there was a meeting about

5    bonuses.

6         Q.    And during that meeting, do you recall saying to

7    Jeff, leaning over the table and saying "I would never screw

8    you" or words to that effect concerning the bonuses?

9         A.    I don't remember saying it on that date.  I do

10   remember telling Jeff that I would never screw him.  And

11   it never was my intention to screw him and I don't believe I

12   have screwed him.

13        Q.    Well, the context in which you looked Jeff in the

14   eye and said I will never screw you, the topic of discussion

15   was the bonuses owed to Jeff Carpenter, correct?

16        A.    Probably.

17        Q.    And those bonuses have not been paid?

18        A.    And they weren't agreed to.

19        Q.    So do you think you honored your word to

20   Jeff Carpenter that you would never screw him on the annual

21   bonuses and the sales-proceeds bonus?

22        A.    Yes.

23        Q.    How so?

24        A.    When Jeff left the company I offered him an

25   additional hundred and fifty thousand dollars in exchange

1    for -- as severance.  He was offered that in exchange for

2    signing a separation agreement.  He chose not to sign that

3    and he didn't take the money.

4             And then had the sale gone through and Jeff

5    hadn't sued us prior to the sale going through, I believe

6    that he would have gotten some amount of bonus at our

7    discretion at that time.  But he chose to not wait till the

8    sale went through and proactively sue us.  So, no, I don't

9    believe I screwed Jeff.

10        Q.   Jeff Carpenter did not bring suit until you

11   effectively told him to go jump in a lake on bonuses,

12   correct?

13        A.   That's not what I told him.

14             MR. L. FRIEDMAN:  Objection, argumentative.

15             Excuse me.

16             Argumentative.

17             THE COURT:  Sustained.

18             Rephrase the question.

19        Q.   (By Ms. Gibson) You had already informed

20   Jeff Carpenter that he would not be receiving an annual

21   bonus or a sales-proceeds bonus by the time he filed suit.

22        A.   I don't know that that's true.

23        Q.   You told him that he had no rights.

24        A.   You're taking my comments out of context, so we

25   can go through that whole Email that you're talking about;

1    that you and I both know you're talking about.

2         Q.   Email?  I don't know what you're talking about.

3    You mean the telephone transcript?

4         A.   Or the call, yeah.  The recorded conversation.

5                   THE WITNESS:  Your Honor, I really need to

6    use the restroom.

7                   THE COURT:  Okay.  We'll take a --  we'll

8    take a 10-minute break, ladies and gentlemen.

9                   (Recess taken)

10                  (The jury entered the courtroom.)

11                  THE COURT:  Welcome back.  Good morning

12   still, ladies and gentlemen.

13                  We'll go about 15 more minutes till about 5

14   after 12:00, and we'll take our lunch break then.

15                  And we'll ask Ms. Gibson to pick up where

16   she left off.

17        Q.   (By Ms. Gibson) Ms. Geiser, I'm handing you

18   Exhibit 22.

19        A.   Okay.

20                  MR. L. FRIEDMAN:  Which one is that?

21                  MS. GIBSON:  This is -- did I not give you

22   one already?

23                  MR. L. FRIEDMAN:  You may have.

24                  MS. GIBSON:  Okay.  I'll give you another

25   copy.

1              MR. L. FRIEDMAN:  Thank you.

2         Q.   (By Ms. Gibson) Ms. Geiser, do you recognize

3    Exhibit 22 as an Email from Keith Jones to Jeff Carpenter on

4    which you are copied?

5         A.   Yes.

6         Q.   And Keith Jones is attaching a separation

7    agreement?

8         A.   Correct.

9         Q.   And the date on this document --

10             MS. GIBSON:  Plaintiff offers --

11        Q.   (By Ms. Gibson) Does this appear to be an accurate

12   copy of the Email and separation agreement that was sent to

13   Jeff?

14        A.   I'll take your word for it.

15             MS. GIBSON:  Plaintiff offers Exhibit 22.

16             MR. L. FRIEDMAN:  I have no problem with

17   the cover sheet --

18             THE COURT:  All right.

19             MR. L. FRIEDMAN:  -- demonstrating that

20   Keith Jones sent a form to Mr. Carpenter --

21             THE COURT:  Right.

22             MR. L. FRIEDMAN:  -- but I think we covered

23   this in a limine that we're not going to publish --

24             THE COURT:  Right.

25             MR. L. FRIEDMAN:  -- Mr. Jones.

1          THE COURT:   Come over here.

2          (Sidebar conference held)

3          MR. L. FRIEDMAN:   All the separation

4    agreements look the same to me.

5          THE COURT:   Right.

6          Twenty-two is admitted.

7          MR. L. FRIEDMAN:   No objection, Your Honor.

8    Q.   (By Ms. Gibson) And the date on this Email is

9    November 1, 2007?

10   A.   Yes.

11   Q.   After 5:00?

12   A.   Yes.   5:22 p.m.

13   Q.   And so, this is the day after Jeff Carpenter had

14   completed everything y'all needed him to do for y'all as far

15   as staying on to help with the asset sale, correct?

16   A.   This is the day after Jeff's employment

17   terminated.   He stopped working and we stopped paying him.

18   Q.   But this is the day after you-all had received

19   from Jeff Carpenter everything that y'all needed from him as

20   far as him staying on to help make the asset sale happen.

21   A.   This was the day after --

22          MR. L. FRIEDMAN:   Asked and answered,

23   Your Honor.

24   A.   -- his last day of employment.

25   Q.   (By Ms. Gibson) When was the last day that you

1     needed Jeff Carpenter to stay on to help with the asset

2     sale?

3          A.    On the last day of his employment.

4          Q.    You recall the management transition was dated

5     November 1, correct?

6          A.    Yes.

7          Q.    And you didn't need Jeff to stay on once that

8     transition was in place, correct?

9          A.    Correct.

10         Q.    So the last day that you needed Jeff to stay on

11    was October 31st, 2007, correct?

12         A.    The last date of Jeff Carpenter's employment was,

13    I guess, October 31st, 2007.

14         Q.    Okay, but my question is October 31, 2007, was

15    also the last day that you-all needed Jeff to stay on to

16    help through the asset sale?

17         A.    Jeff's role was executive vice president of the

18    management company.  I characterize this as the day after

19    the last day of Jeff's employment.

20         Q.    Is there a reason you don't want to answer the

21    last day that you didn't need anything from Jeff

22    Carpenter --

23              MR. L. FRIEDMAN:  Argumentative.

24         Q.    (By Ms. Gibson) -- as far as helping with the

25    asset sale?

1          MR. L. FRIEDMAN:  Argumentative and asked

2     and answered.

3          THE COURT:  Overruled.

4          THE WITNESS:  I think you're putting words

5     in my mouth.

6          And the last day of Jeff's employment as

7     executive vice president of the management company where he

8     had a variety of roles was October 31st, 2007.  Management

9     transitioned to Pinnacle on or around November 1st, 2007.

10         Q.   (By Ms. Gibson) Okay.  To back up, you asked Jeff

11    to stay on, correct?

12         A.   Jeff's employment continued until the management

13    transition took place.

14         Q.   Because that's the last day you needed him,

15    correct?

16         A.   That's the last day of his employment.

17         THE COURT:  You're asking the same

18    question.  You're not going to agree to use the same words.

19         Q.   (By Ms. Gibson) Was -- was Jeff needed after

20    October 31st, 2007?

21         A.   No.

22         Q.   Okay.  So this is happening the first day that

23    defendants no longer need Jeff Carpenter to stay on,

24    correct?

25         A.   It's happening the day after the last day of

1    Carpenter's employment.

2         Q.    And that's after you got all the work you needed

3    out of Jeff, correct?

4         A.    I'm not going to use your words.

5              Jeff Carpenter's last day of employment

6    with Southwest Housing Management was October 31st of 2007.

7    That's the last day he received a paycheck or pay and that

8    was the last day he worked.

9         Q.    And what you are sending Jeff Carpenter, now that

10   his work is done, is called a separation agreement, correct?

11        A.    That is what Keith is sending him.

12        Q.    Well, someone directed Keith Jones to send this to

13   Jeff Carpenter.

14        A.    I don't really remember seeing this agreement.

15   It's unexecuted, so I really can't say anything about

16   it other than this is an Email from Keith to Jeff.  I am

17   copied and this is attached.  Keith was our CFO.  I didn't

18   handle everything.

19        Q.    You were -- you were copied on the Email

20   forwarding this document.  Did you object to it being sent

21   to Jeff?

22        A.    I don't remember this document.  I remember I'm

23   authenticating this Email.  I don't necessarily remember

24   this document being attached to it.

25        Q.    Do you recall --

1        A.      I'm taking your word for it that this was the

2   attachment.

3        Q.      You see that the separation agreement covers

4   Southwest Housing Management, Affordable Housing

5   Construction, and Southwest Housing Development and

6   Jeff Carpenter?

7        A.      I see that this draft agreement that you say was

8   attached to the Email states those things.

9        Q.      Okay.   And you see that what Jeff is being offered

10  in this is wages earned through the termination date?

11       A.      Uh-huh.   Yes.

12       Q.      Okay.

13                      And his last day of employment was actually

14  November 2nd, 2007.

15       A.      Okay.

16       Q.      Is that accurate?

17       A.      I don't know.

18       Q.      And it offers Jeff Carpenter some accrued PTO?

19       A.      Yes.

20       Q.      And as far as compensation it offers nothing else,

21  correct?

22       A.      Correct.

23       Q.      There is no mention of annual bonuses and there is

24  no mention of the bonus out of the sale proceeds from the

25  asset sale, correct?

1      A.    Correct.

2      Q.    So, for earned wages and PTO, this proposal

3  requests that Jeff Carpenter discharge and release the

4  company, which is defined via all the entities above, and a

5  whole lot of other people, including you, right?  You would

6  be included in this release?

7      A.    Where am I listed?

8      Q.    Well, it's all the companies and their successors,

9  affiliates, subsidiaries, etcetera, including officers

10  directors, employees.

11      A.    Where does it say that?

12      Q.    Take a look at -- this is in Paragraph 4.

13      A.    Okay.  Yeah, I am an employee.

14      Q.    And he's being asked to release any claims, any

15  cause of action whatsoever, known or unknown, that are based

16  upon facts occurring on or prior to the date of the

17  agreement?

18      A.    That's what this agreement says, yes.

19      Q.    And so this document is asking Jeff Carpenter to

20  give up the sale-proceeds bonus and any past-due annual

21  bonuses, correct?

22      A.    I don't think I read it that way.

23      Q.    Well, any claims that are based on facts occurring

24  on or prior to the date of this agreement?

25      A.    I don't -- I don't know.  I don't think he had a

105

1    claim because there are no amount -- no amounts were agreed
2    to.
3        Q.    No amounts are agreed to as to what?
4        A.    To what you just said.
5        Q.    Well, on the sales-proceeds bonus, any amounts
6    were discussed, that was something Brian Potashnik discussed
7    with Jeff Carpenter, correct?
8        A.    Right.
9        Q.    Okay.
10                And Jeff Carpenter --
11       A.    But not agreed to.
12       Q.    Well, you weren't there, were you?
13       A.    I was not there, but I was never told there was an
14   agreement by Brian or anybody else other than possibly Jeff.
15       Q.    Okay.
16                So, can you understand why an employee
17   would be upset if he's told that if he stays on you intend
18   to pay him a sales-proceed bonus with a specific formula and
19   then --
20       A.    I never told him that.
21       Q.    -- sent him a request?  I didn't say you did.
22       A.    You just said I said that.  Would you be upset
23   if --
24       Q.    Oh, I'm sorry.  You're right.  You're right.  I
25   started with "you intended".

1          Can you understand why an employee would be

2     upset if after you and Brian expressed to Jeff Carpenter

3     that you intended to pay him a bonus out of the sale

4     proceeds, he's done everything to honor his end of the

5     agreement through October 31st, and the very next day he is

6     sent a separation agreement asking him to give up all claims

7     in exchange for some payment of PTO and earned compensation?

8               MR. L. FRIEDMAN:   Objection, speculation,

9     lack of foundation, assumes facts not in evidence.

10              THE COURT:   You're asking her to say

11    does --

12              MR. GIBSON:   Can she understand.

13              THE COURT:   -- does she understand why he

14    was upset.   You're asking her to put herself in his mind.

15    That part of the objection, whichever part, is sustained.

16              MR. L. FRIEDMAN:   It was compound.   Can we

17    just break it down?

18              THE COURT:   I sustained the objection.   Let

19    her go on.

20              MR. L. FRIEDMAN:   Okay.   Thank you.

21         Q.   (By Ms. Gibson) Would you take a look at

22    Plaintiff's Exhibit 1, please?

23              (Pause)

24         A.   Is that this?

25              MR. L. FRIEDMAN:   What is 1?

```
1                    MS. GIBSON:  Exhibit 1 is the transcript,
2       the telephone transcript.
3                    THE WITNESS:  I don't have that.
4                    THE COURT:  You only have about three
5       minutes if you don't want to start that yet.
6                    MS. GIBSON:  I think --
7                    THE COURT:  Go ahead.
8                    MS. GIBSON:  This is going to take a while.
9       Would it be better just to go ahead and break?
10                   THE COURT:  We'll take our lunch break,
11      ladies and gentlemen.  We'll see you back in an hour and 10
12      minutes.
13                   (The jury exited the courtroom.)
14                   (Lunch recess taken)
15                   (The jury entered the courtroom.)
16                   THE COURT:  Welcome back.  Good afternoon,
17      ladies and gentlemen.
18                   We'll continue with the trial.  We'll go --
19      we'll take two 10-minute breaks this afternoon.  If you need
20      additional breaks, get my attention or get Vikki's attention
21      and we'll take a break whenever you need to.  But for now
22      we'll plan on the next break being in about an hour and 10
23      minutes or about 2:30.
24                   And we'll ask Ms. Gibson to pick up where
25      she left off with this witness.
```

1        Q.     (By Ms. Gibson) Ms. Geiser, before turning to

2    Exhibit 1, let's talk about a couple of general things.

3    First is just with respect to the organization as a whole,

4    meaning development, construction, and management entities.

5    Did you and Brian Potashnik share -- share control over how

6    things were run?

7        A.     I would say that Brian had the ultimate

8    decision-making authority, but we conferred on everything,

9    most things.

10       Q.     Okay.  So the two of you worked together in

11   operating the company but you think Brian Potashnik had the

12   ultimate say?

13       A.     Yes.

14       Q.     But you were able to assert some amount of

15   control --

16       A.     Yes.

17       Q.      -- as to what you wanted?

18              And the -- the proceeds from the asset

19   sale, even -- even after any debt was paid for the

20   companies, you know, just regular operating expenses, the

21   money left over went to you and Brian Potashnik?

22       A.     Can you repeat the question?

23       Q.     The money left over after the asset sale went to

24   you and Brian Potashnik?

25       A.     The money left over?

1       Q.    Right.

2       A.    Can you define that?

3       Q.    Meaning there's -- there's nothing else to pay;

4    here's -- here's the remainder.

5       A.    There were amounts that went to Brian and I

6    personally, if that's your question.

7       Q.    When we were talking earlier about you saying to

8    Jeff Carpenter "I would never screw you", do you also recall

9    during the same conversations about bonuses saying we really

10   appreciate all that you do and we know how hard you've

11   worked and the many extras you've done or words -- words

12   like that?

13      A.    I'm sure I said words to the effect of I

14   appreciate all you do.

15      Q.    And do you recall telling Jeff Carpenter when you

16   were discussing bonuses, "You've earned it"?

17      A.    No, I can't recall saying that.

18      Q.    Do you deny that?

19      A.    I may have said I believe he earned some amounts,

20   but not a specific amount.

21      Q.    If you would, please, turn to Plaintiff's Exhibit

22   1.

23                    Are you there?

24      A.    I am there.

25      Q.    This Exhibit 1 is a transcript of a conversation

1    between you and Jeff Carpenter?

2         A.    Incorrect.

3         Q.    What is it?

4         A.    It's a conversation between Jeff Carpenter and

5    Brian Potashnik.

6         Q.    Oh, I'm sorry.  You need to flip further.  Yours

7    is in there.

8         A.    All right.  Can you ask me the question again?

9         Q.    Sure.

10             Do you see included in Exhibit 1 is a

11   transcript of conversation between you and Jeff Carpenter?

12        A.    This is a transcript of a conversation that Jeff

13   secretly recorded between him and I, yes.

14        Q.    Okay.  And your recollect -- and this -- this

15   happened on November 2nd?

16        A.    I don't know.  I don't know.  Does it say November

17   2nd in here?

18        Q.    I -- I believe there are some references to dates.

19   But regardless of whether it was November 2nd or not, this

20   conversation happened shortly after the proposed separation

21   agreement was sent to Jeff Carpenter on November 1st,

22   correct?

23        A.    That's my general recollection, yes.

24        Q.    And it definitely happened after October 31st,

25   2007, when Jeff was no longer -- after which, Jeff was no

1    longer needed?

2          A.    I believe so, yes.

3          Q.    Okay.

4                      If you will take a look at the bottom box,

5    CP.  This is on the first page.

6          A.    Uh-huh.

7                      MS. GIBSON:  What happened to it?  Okay.

8          Q.    (By Ms. Gibson) Do you see you're -- you were

9    telling Jeff we've just told him -- well, the context is

10   Jeff is calling about the separation agreement sent to him

11   that's asking him to release all claims and causes of

12   action.  Is that the context of what he's calling about?

13         A.    Ask me the question again, please.

14         Q.    Sure.

15                     The context of this conversation is Jeff is

16   calling you and he is upset that he got -- he was just sent

17   a severance proposal that asked him to release all claims

18   and all his rights and didn't say anything about the bonus

19   from asset-sale proceeds or annual bonuses?

20         A.    It doesn't say anything about the bonuses up till

21   that point, but...

22         Q.    Well, it does.  It's the context of the

23   conversation?

24         A.    My memory is generally that, yes.

25         Q.    Okay.

112

1                     And you are telling -- just right above the

2      last box, you are telling Jeff Carpenter, "You don't have

3      any rights."

4          A.   I say, "You have conversations that we've had.

5      You have intentions that we've had.  You have what we intend

6      to do and what we want to do.  You don't have any rights.

7      That's about your employment and the legal rights you had

8      under your employment agreement and that type of thing."

9                     "It's a legal document.  It's not saying,

10     Jeff, you give up any hope of ever getting anything.  It's a

11     legal document.  It's what you have rights to.  And if you

12     think that you have any other rights or if you think that

13     you have other rights, then you shouldn't sign the

14     document."

15         Q.   Okay.

16         A.   That's the full context of that statement.

17         Q.   You read -- Ms. Geiser, you read the box below,

18     but I was asking you just up above that.  You said, "You

19     don't have any rights"?

20         A.   I said that.  That's correct, according to this --

21         Q.   Okay.

22         A.   -- transcript.

23         Q.   And when you said you don't have any rights,

24     you're saying -- you meant Jeff Carpenter.  You're telling

25     him he doesn't have any legal rights, correct?

Appendix 000766

113

```
1              A.    He doesn't have any rights.
2                    "That's about your employment and the
3    rights that you had under your employment agreement and that
4    type of thing.  It's a legal document.  It's not saying,
5    Jeff, you give up any hope of ever getting anything.  It's a
6    legal document.  It's what you have rights to.  And if you
7    think that you have other rights, then you shouldn't sign
8    the document."
9         Q.    My question is, in the box above where you say you
10   don't have any rights, you were talking about legal rights,
11   correct?
12        A.    I'm not a lawyer.  I qualify what I meant in
13   the --
14        Q.    Well, what type --
15        A.    -- in the paragraph below.
16        Q.    What type of rights are you talking about?
17        A.    Rights pursuant to the employment agreement.
18                    "You don't have any rights.  That's about
19   your employment and the rights you had under your employment
20   agreement and that type of thing.  It's a legal document."
21                    So then if you want to make the correlation
22   that it's legal rights, then you can make that correlation.
23        Q.    You previously told me that legal rights is what
24   you intended, didn't you, in your deposition?
25        A.    I'm giving you the full context now of what I
```

114

1     said.

2          Q.    I'm asking you if you previously told me that you

3     were referring to legal rights.

4          A.    In the context of how I say it here, yes.

5          Q.    Okay.

6                       Prior to October 31st, 2007, the last day

7     before management transitioned to the purchasers, had you

8     ever said something like that to Jeff Carpenter:  You don't

9     have any rights or you don't have any legal rights?

10         A.    I don't know.

11         Q.    What do you think is more likely true than not

12    true?

13                       MR. L. FRIEDMAN:  Objection, calls for

14    speculation.

15                       THE COURT:  Sustained.

16         Q.    (By Ms. Gibson) When you say to Jeff Carpenter,

17    "You have conversations that we've had", you're talking

18    about conversations about annual bonuses, in part?

19         A.    We've had -- we had conversations about bonuses,

20    correct.

21         Q.    Including annual bonuses?

22         A.    Bonuses in general, yes.

23         Q.    And the conversations that we've had, you are also

24    referring to discussions about a bonus out of sale proceeds

25    if Jeff Carpenter would stay on, correct?

1          A.     There were conversations that were had about
2     bonuses.
3          Q.     And did they include those bonuses?
4          A.     Like I said earlier, we had conversations about
5     bonuses.   And sales pro -- bonuses out of sales proceeds
6     would have been if and when the company sold, if the sale
7     was successful, if there was proceeds available at the time.
8                  There was not an agreement.   We didn't
9     agree.   There was no amount stipulated.   We had
10    conversations.
11         Q.     Well, you've already testified, though, that it
12    would have been Brian Potashnik who would have discussed
13    the -- the specifics on any bonus out of sales proceeds.
14         A.     That's correct.
15         Q.     Okay.
16                And when you say, "You have intentions that
17    we've had", you recall you are referring to your intent to
18    pay Jeff a bonus out of the sale proceeds for the asset sale
19    if he would stay on?
20         A.     Discretionary bonus after the sale went through,
21    if and when, and in the event it went through and there were
22    sales proceeds available at the end of the day.
23         Q.     You say, "You have what we intend to do and what
24    we want to do."   And what was that?
25         A.     Same answer.

<sup>116</sup>

1      Q.     Okay.

2             And then you again say that you don't have

3      any rights.  And in this context you're essentially telling

4      Jeff Carpenter, now that his work is done, that the only

5      rights he has are under the written employment agreement?

6      A.     Correct.

7      Q.     And you say to Jeff, "If you think you have other

8      rights, then you shouldn't sign the document."  You're

9      referring to the proposed separation agreement which he's

10     being asked to release all claims in exchange for PTO and

11     earned, past-due, regular salary?

12     A.     No, incorrect.  He was paid his PTO and his

13     severance under the employment agreement.  We didn't require

14     him to sign a separation agreement for that.  This was to

15     get an additional $150,000.  That's my memory.

16     Q.     Well, the separation agreement that you have in

17     front of you, it actually -- the initial draft asks that he

18     release all claims.

19     A.     But I told you I don't know about that draft.

20     You -- the first time I remember seeing that draft is in

21     this lawsuit, since you've given it to me.

22     Q.     But it is -- it is attached to an Email on which

23     you're copied?

24     A.     You say that.  I don't know that to be true.  I

25     said the Email was correct.  I don't know about the

1    attachment.  I don't recall seeing that attachment.

2        Q.   You know in this case we have asked you and the

3    entity defendants for certain documents similar to that.

4                MR. L. FRIEDMAN:  Objection, Your Honor.

5    She (inaudible) --

6                THE COURT:  Overruled.

7        Q.   (By Ms. Gibson) And, ultimately, although --

8    although some items were provided to us at some point in the

9    litigation, do you recall explaining to me that you got rid

10   of the hard drive that you had retained with business

11   information?

12       A.   After the company sold and I took a computer with

13   me, I had it for a couple years and then the hard drive

14   died.  So, at that point when I moved, I got rid of it.

15       Q.   Okay.  In your deposition you simply testified --

16       A.   Yeah.

17       Q.   -- you got rid of it.

18       A.   I forgot to add the fact to you that the thing had

19   died.  It was useless.

20       Q.   And so we're not able -- we weren't able to get

21   various business documents from you-all as a result,

22   correct?

23       A.   It's not because my hard drive died.  I mean, I

24   had -- I don't even know what was on that computer.

25                We had company Internet with all of the

1    documents, but all that stayed with -- or I don't even know

2    where it went when the closing occurred, so my one computer

3    wasn't repository of everything.

4         Q.    But it had some information on it?

5         A.    It -- it may have.  I don't know what I would have

6    kept on that hard drive, but it may have.

7         Q.    Where did you find what you produced in this case

8    after the closing?  Was it on that hard drive?

9         A.    I don't recall where everything -- everywhere I

10   looked for documents.  There was a lot of documents.

11        Q.    Okay.

12              If you will take a look at Page 2.

13        A.    Of?

14        Q.    Of the same document.

15        A.    Page 2 or Page 2 of my conversation?

16        Q.    Page 2 of your conversation.

17              Do you see the third box from the bottom?

18        A.    Yeah.

19        Q.    For you?

20        A.    Uh-huh.

21        Q.    And here you're saying you've got to be able to

22   see some preliminary on how this deal is going to shake out.

23   And I know you don't look forward to it, but you're

24   referring to the asset sale, this deal?

25        A.    Wait.  You said third box from --

1              THE COURT:  You can see it on the screen
2    there.
3              THE WITNESS:  Okay.
4              I'm just going to read it.  I'm just going
5    to read it from here.
6              MS. GIBSON:  Okay.  Have you read it?
7              THE WITNESS:  Well, I've got to read that
8    whole page.  Hold on.
9              (Witness reading)
10             THE WITNESS:  Okay.
11       Q.   (By Ms. Gibson) Okay.  So, in the first sentence
12   when you're talking about some preliminary on how this deal
13   is going to shake out, the deal you're referring to is the
14   asset sale?
15       A.   Yes.
16       Q.   And you're saying you need to know how that's
17   going to shake out before you can start making commitments
18   and go above and beyond that because you need to make sure
19   that when everything's said and done and shakes out and
20   everyone else gets paid, that Brian and I have a certain
21   amount of money that we can put toward our defense, correct?
22       A.   Yes, that's what it says.
23       Q.   Okay.
24             And when you referred to defense you were
25   talking about your criminal defense?

1          MR. L. FRIEDMAN:  Objection, in violation

2     of the motion in limine.

3          THE COURT:  Overruled.

4     A.   That's correct.

5     Q.   (By Ms. Gibson) Okay.

6          And is it fair to say that early on, back

7     in October of 2006 when the LOI is signed -- the letter of

8     intent is signed -- you didn't have that type of financial

9     concern or at least not as much?

10    A.   I wouldn't agree with that.

11    Q.   You wouldn't?

12    A.   No.

13    Q.   In about the -- about the month before,

14    indictments came down in the criminal proceeding, correct?

15    A.   The month before what?

16    Q.   What?

17    A.   The month before what?

18    Q.   In about the month -- so, November 1st is the

19    transition.  This conversation happened after that, correct,

20    you said?

21    A.   Yes.

22    Q.   And just, approximately, a month before

23    indictments had come down in the criminal proceeding,

24    correct?

25          MR. L. FRIEDMAN:  Objection, violation of

1    limine, irrelevant.

2                   MS. GIBSON:  It goes to the increased

3    concern about criminal defense costs.

4                   THE COURT:  Overruled.

5        A.    There were indictments in the case, yes.

6        Q.    (By Ms. Gibson) Okay.

7                   And once you and Brian Potashnik were

8    indicted you had a greater concern about paying your

9    criminal --

10                  MR. L. FRIEDMAN:  Objection, direct

11   violation of the limine.

12       Q.    (By Ms. Gibson) -- criminal defense attorney.

13                  MR. L. FRIEDMAN:  She was not convicted of

14   any crime or needs to know that.  I'm asking the Court give

15   a direct instruction.

16                  THE COURT:  Y'all come over here.

17                  DEFENDANTS' MOTION FOR MISTRIAL

18                  MR. L. FRIEDMAN:  And I'd move for

19   mistrial.

20                  (Sidebar conference held)

21                  MR. L. FRIEDMAN:  I need a ruling,

22   Your Honor.

23                  COURT'S RULING

24                  THE COURT:  All right.  The objection's

25   overruled; the motion's overruled.

1           MR. L. FRIEDMAN:  Motion's denied?

2           THE COURT:  Yes.

3           DIRECT EXAMINATION (CONT'D)

4      Q.   (By Ms. Gibson) Okay.  And then if you'll turn to

5    Page 4 of your conversation.

6           MR. L. FRIEDMAN:  Same objection,

7    Your Honor.  We just had this conversation.

8           MS. GIBSON:  Your Honor, it's her -- it's

9    her explanation to Jeff Carpenter.

10          MR. L. FRIEDMAN:  Same objection.  Doesn't

11   change the format.

12          THE COURT:  Come over here.

13          (Sidebar conference held)

14          MS. GIBSON:  Your Honor, it's pre-admitted.

15          MR. L. FRIEDMAN:  Your Honor, I'd like an

16   instruction --

17          THE COURT:  That's denied.

18          MR. L. FRIEDMAN:  That violated the limine.

19   I'd like an instruction to --

20          THE COURT:  Denied.

21          MR. L. FRIEDMAN:  -- disregard any evidence

22   that -- of an indictment or anything else with regard to

23   Ms. Potashnik.

24          THE COURT:  Okay.  It's denied.

25     Q.   (By Ms. Gibson) Ms. Potashnik, if you will take a

1    look at Exhibit 23.  Do you recognize Exhibit 23 as an Email

2    from you to Jeff Carpenter, and below that an Email from

3    Jeff Carpenter to you?

4         A.    Yes.

5         Q.    And this is on November 15, 2007?

6         A.    Yes.

7         Q.    And in Jeff Carpenter's Email to you, he says,

8    among other things -- oh, I'm sorry.

9                    MS. GIBSON:  Plaintiff offers Exhibit 23.

10                   THE COURT:  All right.

11                   Any objection?

12                   MR. L. FRIEDMAN:  Yes.

13                   This document would, if admitted, violate

14   the -- again, the motion in limine.  I may not have the same

15   objection with a redacted copy.

16                   THE COURT:  Bring it over here.

17                   (Sidebar conference held)

18                   THE COURT:  I'll overrule it.

19                   MR. L. FRIEDMAN:  I'll reserve --

20                   THE COURT:  Okay.

21                   MR. L. FRIEDMAN:  -- my oral objection

22   until the next break, Your Honor.

23                   THE COURT:  Fair enough.

24                   The objection's overruled and we'll put the

25   objection on the record at a later time, and 23 is admitted.

1          Q.     (By Ms. Gibson) And, Ms. Geiser, in this Email

2     Jeff Carpenter is saying -- zoom in a little bit -- he's

3     saying, "Last year, after the Cascade transaction was

4     announced and it became reasonably clear that I would not be

5     retained after closing of that transaction, you implored me

6     to stay with the company through that time, as that

7     continuity and my continued services were essential to the

8     success of that transaction.  In exchange, you informed me

9     that I would be entitled to receive, at three percent of the

10    proceeds of that transaction, net of certain costs; which,

11    based on the structure at that time, would represent an

12    amount in excess of 1 million.  This is in addition to the

13    unpaid annual bonuses."

14                    Do you recall receiving that?

15         A.     Do I recall receiving this Email?

16         Q.     Right.

17         A.     Yes.

18         Q.     Okay.

19                    And when -- when Jeff Carpenter is saying

20    you here, he doesn't -- he's not necessarily referring to

21    you individually because he's sending this Email to both you

22    and Brian.

23         A.     Yeah, I mean, I know he's not referring to me

24    because he's already said he didn't have a deal with me.  So

25    this isn't to me.

1  Q. Brian is the one that shook hands on it, correct?

2  A. I have no idea if that's true.  I was told about

3 that.

4  Q. And you later confirmed with him that you intended

5 to pay it?

6  A. There was no agreement or no handshake agreement.

7 I only agreed that if there was proceeds left at the end of

8 the sale, if and when the sale was successful, that there

9 would be something paid.

10  Q. And then you said, "We will take a look at this

11 and get back to you as soon as possible."

12  A. I received this from Jeff and I responded, "We

13 will take a look at this and get back to you as soon as

14 possible."

15  Q. Okay.

16   Would you please take a look at Exhibit 24?

17 Do you recognize Exhibit 24 as an Email from yourself to

18 Jeff Carpenter, dated December 11, 2007?

19  A. Yes.

20   MS. GIBSON:  Plaintiff offers Exhibit 24.

21   THE COURT:  Any objection?

22   MR. L. FRIEDMAN:  No objection, Your Honor.

23   THE COURT:  Twenty-four is admitted.

24  Q. (By Ms. Gibson) So, December 11th, you tell

25 Jeff Carpenter that you and Brian have honored his current

1    employment contract by paying out severance, correct?

2         A.   We, on behalf of the company, yes.

3         Q.   Okay, we.  More than just you and Brian or

4    everyone or who?

5         A.   We, on behalf of the company, Southwest Housing

6    Management.

7         Q.   Okay.

8              And then you say, "As you know, your

9    employment contract does not provide for you to receive any

10   bonus after termination."

11        A.   Correct.

12        Q.   And this is the first time you have ever said that

13   to Jeff Carpenter, correct?

14        A.   No.  That was in Jeff Carpenter's employment

15   agreement that he signed, so he's familiar with this clause.

16        Q.   In connection with discussing bonuses to encourage

17   employees to stay, you never told Jeff, oh, by the way,

18   we're going to end up saying you're not entitled to any

19   bonus after termination, did you?

20        A.   I didn't restate his employment agreement, no.

21        Q.   And then you say, I spoke with Brian and he told

22   me that he never -- that he never agreed to pay you three

23   percent of gross after the sale of the business, as you

24   proposed.  "As you're aware, the sale of the business has

25   not yet occurred."

1          A.    As you proposed in your draft separation

2    agreement.

3          Q.    Okay.

4                      And then you say that it is only the net

5    that will be shared.

6          A.    "If and when the sale occurs, it is only at that

7    time that we will be able to assess if any of the net

8    profits will be shared with various employees."

9          Q.    So my question is, are you -- are you disputing

10   that there was any agreement?

11         A.    Yes, I'm disputing there was any agreement.

12         Q.    Are you saying Brian denied that there was any

13   agreement at all?

14         A.    Yes.

15         Q.    Okay.  It wasn't just -- you're not claiming it

16   was just a gross versus net issue, correct?

17         A.    No.  I'm saying there's no deal.  And,

18   furthermore, any discussions about anything will be on a net

19   basis.

20         Q.    But are you saying Brian told you there was never

21   any deal at all?

22         A.    Correct.

23         Q.    The proposed severance that Jeff Carpenter sent to

24   you actually did not refer to three percent of the gross.

25   It was three percent of the net.  Do you recall that?

128

1          A.    Do you have that document?  We can look at it.

2          Q.    Sure.

3                     MR. L. FRIEDMAN:   Thank you.

4                     What number?

5                     MS. GIBSON:   SHM5.

6          Q.    (By Ms. Gibson) I just highlighted it for you.

7          A.    Okay.

8          Q.    And I'm just going to use that to refresh your

9    recollection.

10         A.     In the draft separation agreement that Jeff

11   sent --

12                    MR. L. FRIEDMAN:   I'm sorry.   Exhibit

13   number, please?

14                    MS. GIBSON:   I'm just seeing -- I'm just

15   refreshing her recollection on this.

16                    THE COURT:   But he wants to see the same

17   document she's looking at.

18                    MS. GIBSON:   I gave it to him.

19                    THE COURT:   Oh.

20                    MR. L. FRIEDMAN:   No, I have it.

21                    THE COURT:   It's not in evidence.

22                    MR. L. FRIEDMAN:   Okay.  I got it.

23                    THE WITNESS:   In the separation agreement

24   that Jeff --

25                    THE COURT:   Wait till she asks a question.

1            THE WITNESS:  Oh, sorry.

2       Q.    (By Ms. Gibson) Okay.  Do you see that when you

3  read that whole highlighted part that it is gross minus

4  normal closing costs?

5       A.    It says an amount in cash equal to three percent

6  of the gross compensation or consideration, whether in the

7  form of cash, stock, assumption of debt, fees, loans or

8  otherwise for the purchase of the company, less reasonable

9  cost of closing.

10      Q.    Okay.  That's in net.  That would be a net, not a

11  gross, correct?

12      A.    Anything that's less than the full amount is net,

13  yes.

14      Q.    Okay.

15            When you said in your Email that the

16  contract does not allow for Jeff to receive a bonus after

17  termination -- if you want to take a look at Exhibit 2, the

18  contract.

19      A.    Okay.

20      Q.    Okay.  You're referring to Paragraph 7?

21      A.    I went to Page 7.  I'm sorry.

22            Paragraph 7, Termination of Employment:

23  Effect of Termination?

24      Q.    Yes.

25      A.    Uh-huh.

1          Q.    Okay.   You see that it says employee will not be
2     entitled to any compensation or benefit pursuant to this
3     agreement effective on termination, correct?
4          A.    Yes.
5          Q.    Okay.   And you already went over all of the
6     compensation that was pursuant to this agreement earlier.
7     Do you remember that?
8          A.    Yes, I remember that part of the testimony.
9          Q.    Okay.
10               So the -- any handshake agreements on the
11    asset -- on an asset-sale bonus or annual bonuses after the
12    first year, those would be separate and not compensation
13    pursuant to this agreement, correct?
14         A.    I'm not following you.   Sorry.
15         Q.    Well, the only thing that severance is covering
16    here is that's what you get at the end in lieu of further
17    benefits pursuant to this agreement, right?
18         A.    Okay.
19         Q.    And the -- any asset-sale bonus would have been
20    separate from this agreement, correct?
21         A.    I -- I don't know what I --
22         Q.    Well -- I'm sorry.   Go ahead.
23         A.    There was no asset-sale bonus agreement.
24         Q.    If there was, you said you intended to pay.
25         A.    A bonus out of sales proceeds.   I didn't ever

1    intend to pay --

2         Q.   A bonus --

3         A.   -- an asset-sale bonus.  That's your words.

4         Q.   Okay.  I know.  You think asset sale -- I forget

5    that you think they're different.

6         A.   They are different.

7         Q.   A -- a bonus out of asset sale proceeds is not

8    compensation pursuant to that agreement that he would be

9    giving up.  That would be a separate deal, correct?

10        A.   I don't know if that's true or not.

11        Q.   Well, earlier you covered --

12                  THE COURT:  You --

13        Q.   (By Ms. Gibson) -- all of the compensation

14   pursuant to that agreement, right?

15        A.   Yes.

16        Q.   Okay.

17                  In connection with closing of the asset

18   sale, about $2.1 million is the total amount of bonuses to

19   other employees paid out of -- paid in connection with the

20   asset sale, correct?

21        A.   They were severance payments.

22        Q.   But -- but that's -- the severance payments, I

23   mean, you were here for Keith Jones' testimony, right?

24        A.   Yeah, and I believe he said they were severance

25   payments.

1     Q.   Right.  But those severance payments were what

2  you-all had intended to pay employees to stay.

3     A.   I don't really have a lot of memory of the

4  severance bonus plan or what was negotiated or with

5  employees that worked for Jeff.  That was more or less

6  something that Jeff and Keith handled.  I just know that

7  every employee received -- every -- certain employees

8  received amounts in connection with signing a separation

9  agreement when the sale went through and they were

10  transferred to the new buyer.

11     Q.   Okay.  And it was a severance because people were

12  no longer going to be working for the business?

13     A.   They were no longer going to be working for

14  Southwest Housing Management or whatever entity they worked

15  for.  They were going to be severed from our company and

16  then rehired by the buyer's company.

17     Q.   Okay.

18           You recall being in your deposition.

19  And I'm at Page 81, 3.  Do you recall that I asked you, Do

20  you know the total amount paid out in sale-proceeds bonuses

21  to employers other than your -- to employees other than

22  yourself and Brian?  And you say, "Yes."  And I say, "What's

23  the total?"  And then you say, "The total bonuses paid out

24  at sale were approximately 2.1 million."

25     A.   Correct.

1          Q.    And the 2.1 million paid out, that you said were

2     paid out in sale-proceeds bonuses, that --

3          A.    Paid out of the proceeds from the sale.

4          Q.    I'm sorry?

5          A.    Paid out of proceeds from the sale.

6          Q.    Okay.  Well, in the question you didn't take issue

7     with sales-proceeds bonus --

8          A.    Sorry I forgot to take issue with you --

9          Q.    -- but you do now.

10         A.    -- on that particular time --

11         Q.    Okay.

12         A.    -- because I've taken issue with it --

13         Q.    The total is -- is 2.1 million?

14         A.    Uh-huh.

15         Q.    And those payouts were not pursuant to any

16    writing, correct?

17         A.    I don't know if that's true as it related to

18    everybody.

19         Q.    Okay.  Were the majority of those bonuses paid out

20    based on oral --

21              MR. L. FRIEDMAN:  Objection.

22              MS. GIBSON:  I'm sorry.  Let me start over.

23         Q.    (By Ms. Gibson) Were the majority of those bonuses

24    out of the asset-sale proceeds paid even though there wasn't

25    a writing?

1           MR. L. FRIEDMAN:  Objection, irrelevant.

2           THE COURT:  Sustained.

3           Y'all come back over here.

4           (Sidebar conference held)

5           MR. L. FRIEDMAN:  May I have a ruling,

6    Your Honor?

7           THE COURT:  It's on the record.  I've

8    already sustained that objection.

9           MR. L. FRIEDMAN:  Thank you.

10   Q.    (By Ms. Gibson) And, Ms. Geiser, you recall that

11   in this case we requested the actual hard numbers so that we

12   could do the calculation of payouts ourself?

13          MR. L. FRIEDMAN:  Asked and answered.

14   Q.    (By Ms. Gibson) Do you recall that?

15          MR. L. FRIEDMAN:  Asked and answered,

16   Your Honor.

17          MS. GIBSON:  Not on this.

18          MR. L. FRIEDMAN:  Well, she has the hard

19   number.

20          THE COURT:  Go ahead.

21          Overruled.

22   A.    I'm sure you did.

23   Q.    (By Ms. Gibson) Okay.  And the response was you

24   couldn't find them, correct?

25   A.    I -- you'd have to ask my lawyers.  I turned

1    everything I had over to them.  I did what I was asked to

2    do.  I don't know.

3        Q.    Okay.

4              Ms. Geiser, would you take a look at

5    Exhibits 27 through 34 that are in a stack in front of you?

6        A.    All right.

7        Q.    Okay.

8              What -- what I'm going to do here in the

9    interest of time is I'm going to go through each amendment

10   or closing statement in front of you and just ask if you can

11   confirm the amount paid to sellers.

12       A.    You mean you want me to look at the document and

13   say if that's the number?

14                 MR. L. FRIEDMAN:  Can we have a copy of it?

15                 MS. GIBSON:  I gave them to you ahead of

16   time.

17                 MR. DONOHUE:  Is it 25?

18                 MS. GIBSON:  No.  I gave you a stack of

19   them.  You see them?

20                 MR. L. FRIEDMAN:  Show me what it is.

21                 (Pause)

22                 MS. GIBSON:  I gave you -- if it helps you,

23   I just -- I gave you a stack.

24                 MR. DONOHUE:  I have those.  I did have a

25   stack, but --

136

1                    MR. L. FRIEDMAN:  I have eight, nine, ten.

2                    MS. GIBSON:  Okay.

3                    You have them?

4                    MR. DONOHUE:  Starting with 23, you gave us

5          those.  Oh, you're talking about the amendments.  Okay.

6                    MR. L. FRIEDMAN:  I have seven, eight,

7          nine, and ten.  What do you have?

8                    MS. GIBSON:  Okay.

9                    MR. L. FRIEDMAN:  What are you looking at?

10                   MS. GIBSON:  It's -- it's 27 to 34.

11                   MR. L. FRIEDMAN:  But what's that?  Six I

12         don't have.

13                   MS. GIBSON:  Six?

14                   MR. L. FRIEDMAN:  Oh, here it is.  Okay.

15                   MS. GIBSON:  You have six.  Okay.  All

16         right.

17         Q.    (By Ms. Gibson) So, what I'm going to do is

18         start -- we already went through some of the amendments.

19         I'm just going to show you on the screen the amendment and

20         the amount and just ask you to confirm that that amount was

21         paid.

22                   Well, first of all, do those exhibits

23         appear to be accurate copies of amendments to the escrow

24         agreements; and then in the last couple of documents, an

25         Email from Keith Jones with seller's closing statements and

Appendix 000790

1    a July 17th, 2008 closing memorandum?

2                    MR. DONOHUE:   Ours aren't marked

3    number-wise.  Is that all one exhibit or --

4                    MS. GIBSON:   No, separate.

5                    MR. L. FRIEDMAN:   You've given us unmarked,

6    so we have no way of knowing which exhibit you're speaking

7    of.

8                    MS. GIBSON:   They're -- they're in order

9    starting with 27.

10                   MR. L. FRIEDMAN:   Number six is

11   twenty-seven?

12                   MS. GIBSON:   Here.  I'll trade you --

13                   MR. L. FRIEDMAN:   Okay.  Good.

14                   MS. GIBSON:   -- if that's a problem.  There

15   you go.

16                   MR. DONOHUE:   Thank you.

17       Q.   (By Ms. Gibson) Have you had a chance to look?

18       A.   Yeah.

19                   What was your question?

20       Q.   Do Exhibits 27 through 34 appear to be accurate

21   copies of various amendments to the escrow agreement, and

22   then at the back a closing memorandum and an Email from

23   Keith Jones with seller's closing memo?

24       A.   Yeah, I guess so.

25       Q.   Okay.

1                    MS. GIBSON:  Plaintiff offers Exhibits 27

2      through 34.

3                    MR. L. FRIEDMAN:  Lack of foundation,

4      hearsay, Your Honor.

5                    THE COURT:  Okay.  Overruled.  Twenty-seven

6      through thirty-four are admitted.

7           Q.   (By Ms. Gibson) If you will take a look at the

8      sixth amendment.

9           A.   Okay.

10          Q.   Proceeds paid to seller of 1.85 million?

11          A.   Okay.

12          Q.   And that was earnest money applied to the purchase

13     price?

14          A.   I'm going to say yes, qualified yes.  I don't

15     remember all the details of the sale, but I'm going to go

16     with that.

17          Q.   Okay.

18                    Escrow amendment seven, $925,000 paid to

19     sellers?

20          A.   Yes.

21          Q.   And that was also earnest money applied to the

22     purchase price?

23          A.   Again, same answer.

24          Q.   Escrow amendment eight, $925,000 to sellers?

25          A.   Same answer.

1          Q.    And so that's a yes?

2          A.    Yes.   And I'm qualifying it with your

3     characterizing it as earnest money and I'm not sure if

4     that's an accurate characterization, but I'm accepting

5     it for now.

6          Q.    Okay.

7                     And escrow amendment nine, $925,000 paid to

8     sellers?

9          A.    Yes.

10         Q.    Escrow amendment 10, $925,000 paid to sellers?

11         A.    Yes.

12         Q.    Seller's closing statement, Phase 1, the -- the

13    net amount to sellers [sic] after closing costs was

14    17,000 -- or, I'm sorry -- 17,584,388.30, as shown on the

15    screen.

16         A.    Okay.

17                     (Pause)

18                     Hang on a second.

19         Q.    Okay.

20                     (Pause)

21         A.    Okay.   Can you ask me the question again?

22         Q.    Sure.

23                     With respect to seller's closing statement,

24    Phase 1, the net proceeds to seller after closing costs was

25    $17,584,388.38 -- or, and 30 cents.

1       A.    Net cash to seller first closing, 17,584,388.30.

2       Q.    And the Bank of America payment was not a closing

3    cost, correct, looking at the same seller's closing

4    statement?

5       A.    I mean, I guess it depends how you define closing

6    cost.

7       Q.    Well, the Bank of America payment was -- was owed

8    by the businesses regardless of the asset sale, correct?

9       A.    I don't know if that's really true.  It was -- in

10   order for Bank of America to consent to the sale of that

11   asset to Cascade they required that payment.  So I don't

12   know what would have happened if the sale didn't happen or

13   if that asset wasn't transferred.

14      Q.    Okay.  Do you recall telling me at your deposition

15   that that payment would have been owed regardless of the

16   asset sale?

17      A.    Yeah, but I thought more about it.  And as I sit

18   here today and I'm refreshing my memory, we probably would

19   have had to make separate negotiations with Bank of America.

20   So I'm just not sure.

21      Q.    Okay.  Well, according to -- if you'll take a look

22   at the second page of that closing statement.

23      A.    The second page of what closing -- oh, okay.

24      Q.    I'm sorry.  The second page of the exhibit.

25      A.    Yeah.

1     Q.    Do you see that there's a line item for seller's

2  closing costs and certain other closing costs below,

3  commissions and costs?

4     A.    Uh-huh.

5     Q.    And you see that the Bank of America payment is

6  not included in closing costs?

7     A.    Correct.

8     Q.    Okay.

9     A.    But it wasn't.  It wasn't a cost of closing but it

10 was a cost of the deal to get the deal done, to get the

11 consent.

12    Q.    Okay.  It was not a closing cost, correct?

13    A.    Not as defined by that narrow statement, no.

14    Q.    Okay.

15             If you'll take a look at closing memo,

16 Phase 2, the net payment to sellers after closing costs was

17 $2,314,644 --

18    A.    Wait, wait, wait, wait.

19    Q.    -- .09?

20    A.    Wait.  I don't have that.  I have two of the first

21 closing.

22    Q.    You don't have Carpenter 588 to 589 marked as one

23 of those exhibits?

24    A.    Are you talking about this one?

25    Q.    Yes.

1        A.    Okay, then I do have that.  It's just in a

2   different format than this one.

3        Q.    All right.  No, but we -- it's -- we produced

4   it to you, didn't we?

5        A.    Okay.  What's your question?

6        Q.    Okay, the question is the closing memo for Phase 2

7   the net to seller after closing costs is $2,314,644.09?

8        A.    Okay.

9        Q.    Is that accurate?

10        A.    It says, "Following the closing, escrow agent will

11   wire 2,314,644.09 to seller based on wire instructions to be

12   provided by seller representing the net proceeds due seller

13   with respect to the sale."

14        Q.    Okay.  It's net proceeds.

15        A.    Okay.

16        Q.    Okay.  And the --

17        A.    Sorry.  It's been a long time since I, you know,

18   went through this in detail.

19        Q.    That's okay.

20        A.    So I'm just making sure I'm clear.

21        Q.    So the total -- and this is including things that

22   we went over before lunch --

23        A.    Uh-huh.

24        Q.    -- ends up being just shy of 33 million net to

25   sellers.  Does that sound about right?

1        A.    Does what sound about right?

2        Q.    Just shy of 33 million net to sellers after

3   closing costs.

4        A.    Are you asking me do I think that those totals

5   equal that?

6        Q.    No.  I'm just saying, Does that -- does that sound

7   about right to you?  Does that look off to you?

8        A.    I don't recall if there was a subsequent closing

9   to the second closing.

10        Q.    I will represent to you that there are, but there

11   were no additional net payments to sellers.

12        A.    Okay.

13        Q.    According to those closing memos.

14        A.    All right.  So that's 33 million.  I said 34

15   million.  Pretty close.

16        Q.    Okay.

17              MS. GIBSON:  Your Honor, I'd like to pass

18   the witness --

19              THE COURT:  Okay.

20              MS. GIBSON:  -- but may I have a brief

21   bathroom break?

22              THE COURT:  Sure.

23              We'll take a -- we'll take our 10-minute

24   break, ladies and gentlemen.  We'll see you back in 10

25   minutes.

144

1                    (The jury exited the courtroom.)

2                    (Recess taken)

3                    (The jury entered the courtroom.)

4                    THE COURT:  Welcome back.  Good afternoon,

5       ladies and gentlemen.

6                    We'll continue with the testimony of this

7       witness and we'll ask Mr. Friedman to begin his questioning.

8       We will go for about an hour and 10 minutes before we take

9       that second afternoon break.  So that will be about 3:35.

10                   MR. L. FRIEDMAN:  Your Honor, if you don't

11      mind, I'm going to stand because --

12                   THE COURT:  All right.  However you're most

13      comfortable.

14                   MR. L. FRIEDMAN:  -- I can't properly see

15      the witness --

16                   THE COURT:  That's fine.

17                   MR. L. FRIEDMAN:  -- with the screen blown

18      up.  Thank you.

19                         CROSS-EXAMINATION

20      BY MR. L. FRIEDMAN:

21           Q.   Okay.  Ms. Geiser Potashnik?

22           A.   I think that's right.

23           Q.   Bring that microphone just a little bit closer to

24      you.

25           A.   Okay, now you got me confused.  It's Geiser

1    Potashnik.   That's correct.

2         Q.    All right.   That's good.

3               Ms. Potashnik, all of these transactions

4    took place at least 10 years ago; is that correct?

5         A.    Yes.

6         Q.    And negotiations with Mr. Carpenter took place

7    longer than that?

8         A.    Conversations with Mr. Carpenter, yes.

9         Q.    Yeah.   In other words, I wrote down some dates I

10   want to go over with you, but --

11              MR. L. FRIEDMAN:   May I approach the easel,

12   Your Honor?

13              THE COURT:   Certainly.

14              MR. L. FRIEDMAN:   Thank you.

15        Q.    (By Mr. L. Friedman) -- your negotiations with

16   Mr. Carpenter started prior to the time he signed his

17   employment contract on February 4th, 2004; is that correct?

18        A.    Yes.   Yes.

19        Q.    And then the employment contract that we've been

20   talking about is dated February 4th?

21        A.    I think that's right.

22        Q.    Correct?

23        A.    Yeah.

24        Q.    And I don't want to belabor the point but I do

25   want to go over just a few things in that contract.

1      JUROR NUMBER 5:  Can we turn that a little
2  bit?  We can't see it.
3      MR. L. FRIEDMAN:  Oh, I'm so sorry.  It's
4  all about me, if I can see it.
5      JUROR NUMBER 5:  That looks good.  That's
6  better.  There you go.
7      THE WITNESS:  Now I can't see it, Steve.
8      MR. L. FRIEDMAN:  Can you see it?
9      THE WITNESS:  Can you see it?
10      MR. L. FRIEDMAN:  Yeah.
11      THE WITNESS:  I can see it.
12      MR. L. FRIEDMAN:  Judge, can you see it?
13      THE COURT:  Uh-huh.
14      MR. L. FRIEDMAN:  Okay.  I apologize.
15      Q.   (By Mr. L. Friedman) Cheryl, I'm going to try to
16  go quickly and not take my hour and 10 minutes.
17      MR. L. FRIEDMAN:  Let me use the Elmo,
18  'cause I think it'll go faster.
19      What do I need to do?
20      MR. DONOHUE:  Tap the screen.
21      Q.   (By Mr. L. Friedman) Okay.  So this is the exhibit
22  we've been talking about yesterday and today.  This is
23  Mr. Carpenter's employment contract, correct?
24      A.   Correct.
25      Q.   And just briefly, contract is between Southwest

147

1    Housing Management and Mr. Carpenter, correct?

2         A.   Yes.

3         Q.   And it was your testimony or isn't it your

4    testimony that that's the only written employment contract

5    or only written contract, employment or not, between any of

6    the entities and Mr. Carpenter?

7         A.   Yes.

8         Q.   Correct?

9         A.   Correct.

10        Q.   Let's -- let's go down to Paragraph 2, At-Will

11   Employment.  I think you've testified what at-will

12   employment means.  And weren't you present at

13   Mr. Carpenter's last deposition when he testified that

14   before he signed this agreement he read it, he understood

15   it, and he intended to comply with every term of this

16   agreement and then signed it?

17        A.   Yes.  That's my memory.

18        Q.   You heard him say that?

19        A.   I did.

20        Q.   At his deposition a week or 10 days ago?

21        A.   Correct.

22        Q.   With regard to duties, his duties were to perform

23   whatever it is Mr. Potashnik, as the president of the

24   company, told him to do.  And I don't mean hard labor.  I

25   mean manage this company or work on the financials with

1    Keith Jones or work on the development with Sara Reidy and
2    things like it.
3           A.   Correct.
4           Q.   Okay.
5                     And for that you paid him a very generous
6    $2,000-a-year [sic] salary?
7           A.   $200,000.
8           Q.   I'm sorry.  $200,000-a-year salary?
9           A.   Yes.
10          Q.   I was thinking about the allowance that my wife
11   gives me.
12                     So you paid Mr. Carpenter's salary every
13   day that he worked.  I say "you".  Southwest Management paid
14   Mr. Carpenter's salary every day that he worked for
15   Southwest Management; is that correct?
16          A.   Yes.
17          Q.   Southwest Management paid his salary from the day
18   he began employment until the day he finished?
19          A.   Correct.
20          Q.   And if you recall -- and I'll show you some
21   documents in a minute -- he was terminated on October 31st,
22   2007, but he was paid through November 2nd, 2007.  Do you
23   remember that?
24          A.   Vaguely.
25          Q.   All right.  Well, let me come back to that.

1        A.    Okay.

2        Q.    But he was paid for every day he worked for the

3    company?

4        A.    Yes.

5        Q.    Did good work; got good pay?

6        A.    Yes.

7        Q.    Now, this agreement covers bonuses, as we've

8    talked about ad -- ad finitum.   And the only bonus that was

9    guaranteed was the first year's bonus, minimum of $50,000?

10        A.    It was discretionary.

11        Q.    Discretionary and you paid it?

12        A.    Correct.

13        Q.    All right.

14              The rest of the bonuses were also

15    discretionary, correct?

16        A.    Yes.

17        Q.    And we -- what does discretionary mean to you?

18        A.    At your discretion.   It's subjective.

19        Q.    Okay, subjective.   So Southwest Management made

20    the decision to pay it or not to pay it at the end of every

21    year?

22        A.    Correct.

23        Q.    So, Mr. Carpenter started March 2004.   Come the

24    end of 2004 or in March 2005, Southwest Management had a

25    chance to look at the company, see whether he was leasing up

1    the properties, whether the company was profitable, and

2    either pay him or not pay him a bonus --

3         A.   Right.

4         Q.   -- correct?

5         A.   Yes.

6         Q.   And Southwest Management didn't pay Mr. Carpenter

7    a bonus in 2004, 2000 -- I'm sorry -- 2005, 2006, and 2007;

8    is that correct?

9         A.   I don't think -- I don't think we did.

10        Q.   All right.  But they paid him the $50,000?

11        A.   That I've seen proof of, yes.

12        Q.   Okay.

13             And he was reimbursed for his expenses,

14   correct?

15        A.   Yes.

16        Q.   And paid time off and health insurance, got COBRA

17   when he left, and all that stuff, right?

18        A.   Yes.

19        Q.   On termination, I think you addressed that before.

20             Is there anything unclear about Paragraph 7

21   where it says employee will not be entitled to any

22   compensation or benefits pursuant to this agreement

23   effective upon the termination of employee's employment, the

24   removal of the employee from the position of executive vice

25   president, and/or upon the employee's death, as noted below?

151

1        A.     That's clear.

2        Q.     And is there anything unclear about, in the event

3   company terminates employee, employee will receive severance

4   in an amount equal to six weeks of base salary and a lump

5   sum payable upon such termination?

6        A.     That's clear.

7        Q.     And to your knowledge, Southwest Management --

8   Southwest Housing Management paid Mr. Carpenter six weeks of

9   base salary and a lump sum upon his termination?

10       A.     Yes.

11       Q.     In compliance with the terms of this agreement?

12       A.     Correct.   And he accepted that money.

13       Q.     And he accepted the money.

14              Now I'm going to Paragraph 12, which we've

15   talked about over and over again.   The agreement between

16   Mr. Carpenter and Southwest Housing Management was no

17   amendment or alteration of the terms of this agreement shall

18   be valid unless made in writing and signed by both of the

19   parties to this agreement.   Meaning Southwest Housing

20   Management and Mr. Carpenter, correct?

21       A.     Yes.

22       Q.     Not Santa Claus, not Disneyland, not Affordable

23   Housing, not Development, not anybody else.   If -- if there

24   was any change in the terms of this agreement it had to be

25   signed by Mr. Carpenter and Southwest Housing Management,

1    correct?

2         A.    Yes.

3         Q.    The agreement goes on to say on Paragraph 17 --

4    which we hadn't focused on or which Ms. Gibson hadn't

5    focused on -- was this.  It says -- it's entitled <u>Entire</u>

6    <u>Agreement and Binding Effect</u>.  And it says --

7              (Coughing)

8              MR. L. FRIEDMAN:  Somebody need water?

9         Q.    (By Mr. L. Friedman) It says, "This agreement

10   contains the entire agreement of the parties with respect to

11   the subject matter hereof and shall be binding upon and

12   inure to the benefit of the parties to this agreement and

13   their legal representatives, heirs, distributors, successors

14   and assigns."

15              But the important language in this sentence

16   is this agreement contains the entire agreement of the

17   parties with respect to the subject matter hereof.  Is that

18   correct?

19        A.    Yes.

20        Q.    And with regard to the subject matter of this

21   agreement of the employment relationship regarding

22   Mr. Carpenter, the subject matter has to do with employment,

23   at-will employment, specification of his duties, how he was

24   compensated, Paragraph Number 4.  4A is his salary and 4B

25   has to do with his bonus structures as an employee of

153

1   Southwest Housing Management.

2          A.    Right.

3          Q.    Do you agree with that?

4          A.    Yes.

5          Q.    And do you agree that bonuses, bonus structures,

6   and changing the bonus structures at the discretion of the

7   company is a subject of this agreement?

8          A.    Yes.

9          Q.    And would you interpret that to fall within

10  Paragraph 17 covered by this agreement?

11         A.    Yes.

12         Q.    All right.

13               Now, you were at Mr. Carpenter's deposition

14  when he testified.  And I think it's in his declaration,

15  which we'll put on in our case in chief.  Mr. Carpenter

16  testifies that he met with Brian Potashnik.

17               MR. L. FRIEDMAN:  Is it Geiser Potashnik?

18               MR. POTASHNIK:  No, not Potashnik, Geiser.

19         Q.    (By Mr. L. Friedman) He met with -- Ms. Potashnik

20  met with -- Mr. Carpenter alleges that he met with

21  Mr. Potashnik on October 13th, 2006, made a deal, shook his

22  hand, gave him a kiss, whatever, but left with a valid

23  enforceable agreement.  You were present when Mr. Carpenter

24  said that?

25         A.    Yes.

154

1      Q.    I mean, do you remember that or not?

2      A.    Generally, yes.

3      Q.    Yeah, said he had an agreement from that time on,

4  had a valid enforceable agreement.  So you would expect

5  Mr. Carpenter to act like someone who had a valid

6  enforceable agreement, right?

7      A.    Yes.

8      Q.    All the terms and conditions agreed upon with

9  Mr. Potashnik?

10      A.    Right.

11      Q.    I mean, you'd have to have all the terms and

12  conditions agreed upon to have a valid enforceable

13  agreement.  Would you -- would you agree with that?

14      A.    Yes.

15      Q.    So, going back to Exhibit Number 23 Ms. Gibson

16  highlighted a few minutes ago --

17      A.    I'm out of order.  Sorry.

18      Q.    What's that?

19      A.    My exhibits are out of order.

20      Q.    It's the November 15th Email string.

21            MR. DONOHUE:  Make sure it's been admitted.

22            MR. L. FRIEDMAN:  I'm sorry.  Has it been

23  admitted, Your Honor?

24            THE COURT:  Yes.

25            THE WITNESS:  Twenty-three I have.

1              MR. L. FRIEDMAN:  All right.  So I'll put

2       it up on the screen.  You can follow it on the screen or on

3       your platform.

4              Q.     (By Mr. L. Friedman) So this is a year after

5       Mr. Carpenter alleges that he had a valid, enforceable, oral

6       agreement with Mr. Potashnik.

7                       Mr. -- we pick -- we pick up at the top

8       here with your response to Mr. Carpenter's last Email -- I'm

9       sorry -- with your response to Mr. Carpenter's 7:30 a.m.

10      Email.  But Mr. Carpenter is Emailing you.  And in the

11      portions that weren't highlighted before in the middle of

12      the first paragraph, he says, "Last year, after the Cascade

13      transaction was announced and it became reasonably clear

14      that I would not be retained after closing of that

15      transaction, you implored me stay with the company through

16      that time,"

17                      "Through that time" meaning the closing?

18      Is that how you read it?

19             A.     Yes.

20             Q.     "as that continuity and my continued services were

21      essential to the success of that transaction.  In

22      exchange," -- am I reading that in exchange for staying

23      through the closing?

24             A.     Yes.

25             Q.     "you informed me that I would be entitled to

1    receive at three percent of the proceeds of that transaction

2    net of certain costs; which, based on the structure at that

3    time, would represent an amount in excess of $1 million."

4                         So, what do you get from that?  Number one,

5    it's November 15th, 2007, and Mr. Carpenter does not have

6    any evidence of an oral agreement as far as you know,

7    correct?

8         A.    Right.

9                    MS. GIBSON:  Object to leading.

10                   THE COURT:  Sustained.

11        Q.    (By Mr. L. Friedman) As of November 15th, 2007,

12   are you aware of any evidence Mr. Carpenter has of any oral

13   agreement?

14        A.    No.

15        Q.    And the November 15th, 2007 Email from

16   Mr. Carpenter are his self-serving words, correct?

17        A.    Correct.

18        Q.    Correct?

19                   And you say --

20                   MS. GIBSON:  Object to leading.  Sorry --

21                   THE COURT:  Sustained.

22                   MS. GIBSON:  -- I was a little late.

23                   THE COURT:  It's already asked and

24   answered.  Go ahead.

25        Q.    (By Mr. L. Friedman) And you say -- your response

1    is, "Jeff, we'll take a look at this and get back to you as

2    soon as possible," right?

3        A.    Yes.

4        Q.    You didn't say that was the deal, correct?

5        A.    Correct.

6        Q.    You didn't say Brian told me that was the deal?

7        A.    Correct.

8        Q.    There's no affirmation or confirmation whatsoever

9    affirming what Mr. Carpenter is proposing in this Email,

10   correct?

11       A.    Right.

12       Q.    Now Mr. Carpenter, if you look further down this

13   Email -- the man who alleges that he has a valid,

14   enforceable, oral agreement -- his next-to-the-last

15   paragraph says, second sentence, "Accordingly, I have taken

16   the liberty of reworking" -- reworking -- "and attached the

17   draft separation agreement that you provided to incorporate

18   those other elements."

19            "Of course, as I have repeatedly said, I'm

20   understanding of the company's condition and the uncertain

21   status of the Cascade transaction.  As such, I am more than

22   willing to explore mutually agreeable ways to address those

23   issues while still preserving the spirit of our agreement

24   and our mutual interest in the financial success of the

25   company and the transaction.  Attached document is a draft

1    only; and that once the substantive points are confirmed, I

2    reserve the right to have it formally reviewed by an

3    attorney to confirm that it is complete."

4                        So, first I ask you, does that sound like

5    it's coming from someone who has a valid, enforceable, oral

6    agreement?

7        A.    No.

8        Q.    When you received that Email, did you understand

9    it to come from someone who already had a valid,

10   enforceable, oral agree -- or any agreement?

11       A.    No.

12       Q.    Does that indicate to you that Mr. Carpenter is

13   attempting to get whatever agreement that he wants or still

14   negotiated in writing?

15       A.    Yes.

16       Q.    I mean, do you know why Mr. Carpenter is now

17   drafting an agreement and sending it to you?

18       A.    No.

19                        MR. L. FRIEDMAN:  And do we have that draft

20   separation agreement?

21       Q.    (By Mr. L. Friedman) All right.  And it appears

22   from that paragraph that Mr. Carpenter -- you can -- if you

23   recall, that's great; but if not, just read it with common

24   sense.  Does it -- do you have an understanding as to

25   whether or not Mr. Carpenter is still negotiating?

1          A.    It appears that way.

2          Q.    And not only that, if you could reach agreement,

3     he says he still wants to confirm by his lawyer.  Might

4     change again?

5          A.    Correct.

6          Q.    The same day he sent that separation agreement --

7     which I thought I had.

8                     And you were present during Mr. Carpenter's

9     testimony that he said he decided to file suit against you

10    and Brian and Southwest Housing Management and Development

11    and Affordable Housing Construction on December 15, 2007?

12         A.    Correct.  Right.

13         Q.    Did he tell you that?

14         A.    Did he tell me that prior to filing --

15         Q.    Well, December 15th, while he was still

16    negotiating with you, did he tell you, "I'm going to file

17    suit"?

18         A.    I don't believe so.

19         Q.    And then on March 8th -- 11th of 2008, he did file

20    suit?

21         A.    Correct.

22         Q.    And he filed suit at least a month before the

23    closing began?

24         A.    Yes.

25         Q.    Never gave you a chance to close your deal to see

1    if you would give him a bonus?

2         A.    Right.

3         Q.    And when he filed suit he did go attempt to get a

4    temporary restraining order to gather some proceeds for

5    himself, didn't he?

6         A.    That's my understanding.

7         Q.    All right.  And that was regardless of whether the

8    deal closed?

9                   MS. GIBSON:  Object to leading, continued

10   leading.

11                  THE COURT:  Sustained.

12        Q.    (By Mr. L. Friedman) In March of 2008, before the

13   deal closed, Mr. Carpenter wanted over a million dollars

14   earmarked for himself, correct?

15                  MS. GIBSON:  Object to leading.

16                  THE COURT:  You're still leading.

17                  MR. L. FRIEDMAN:  Okay.

18                  THE COURT:  Sustained.

19        Q.    (By Mr. L. Friedman) What did Mr. Carpenter want in

20   March of 2008?

21        A.    My memory is that he filed something with the

22   court to get a temporary restraining order.  I may be

23   screwing up the legal terminology, but asking the Court to

24   force the parties to put over a million dollars into an

25   escrow or something prior to the sale occurring.

Appendix 000814

1          Q.    All right.

2                And when he made that request, was that

3     before or after you and Mr. Potashnik, Southwest Housing

4     Management, Southwest Housing Development, and Affordable

5     Care Housing received any money?

6          A.    That was before, yes.

7          Q.    Okay.  And the same thing goes for any of the

8     other discretionary bonuses you gave to other employees in

9     the company --

10         A.    Let me just correct my --

11         Q.    -- before that --

12         A.    Let me correct my prior statement, then.  You

13    said, Is that prior to anybody receiving any money?  There

14    were those additional releases under the amended escrow

15    agreements, but this was -- that was prior to the

16    transaction being consummated, to the sale going through.

17         Q.    Well, let me make it more precise.  Was that

18    before or after the -- any other employees received any

19    discretionary bonuses?

20         A.    Before.

21         Q.    He wanted his first?

22         A.    Correct.

23         Q.    Now, I do have the separation agreement that went

24    along with this November 15th Email.  And in the separation

25    agreement that Mr. Carpenter drafted and sent to you --

162

```
 1                      MR. L. FRIEDMAN:  Do we have an exhibit
 2      number for that?
 3                      MR. DONOHUE:  Twenty-four, I think.
 4                      MR. L. FRIEDMAN:  I'm sorry.  Twenty-four?
 5                      MR. DONOHUE:  Defendants' Exhibit 24.
 6                      MS. GIBSON:  What?
 7                      MR. L. FRIEDMAN:  It's Defendants' Exhibit
 8      24.
 9                      And I'll -- I'll move for admission as
10      Defendants' Exhibit 24.
11                      MS. GIBSON:  I don't have a copy of what
12      you're talking about.
13                      MR. DONOHUE:  Here you go.
14                      MR. L. FRIEDMAN:  Do you have a copy?
15                      THE WITNESS:  Somehow, I have a copy.
16                      MR. L. FRIEDMAN:  Oh, let me -- may I
17      approach the witness, Your Honor?
18                      THE WITNESS:  I have a copy.
19                      THE COURT:  She has a copy.
20                      THE WITNESS:  It's attached to that Email.
21                      MS. GIBSON:  That's a different --
22                      THE WITNESS:  This is different?
23                      MS. GIBSON:  Well, it may not be a
24      different agreement but it's a different document and it has
25      my highlighting on it.
```

```
 1                         THE WITNESS:  Okay.
 2                         MS. GIBSON:  I just gave you my copy.
 3                         THE WITNESS:  All right.
 4                         Do you want it back?
 5                         MS. GIBSON:  Oh, no.  Just -- you can leave
 6     it up there.
 7                         THE COURT:  All right.  Go ahead, if you
 8     want to give her your document.
 9                         MS. GIBSON:  But in the interest of time,
10     we have no objection.
11                         THE COURT:  Okay.  It's not already in
12     evidence.  That's not the --
13                         MS. GIBSON:  No.  Just to 24 being
14     admitted.
15                         THE COURT:  All right.
16                         MR. L. FRIEDMAN:  No, Ms. Gibson didn't
17     offer it into evidence.
18                         THE COURT:  All right.  Defendants' 24 is
19     admitted.
20         Q.    (By Mr. L. Friedman) Along with the November 15th
21     Email --
22                         THE COURT:  Just a second.
23                         Did you -- Vikki, did you get that?
24                         THE REPORTER:  Yes, I did.
25                         THE COURT:  All right.
```

1          MR. L. FRIEDMAN:  Does she have it?

2          THE REPORTER:  Yes, I did.

3          THE WITNESS:  I think I have it.

4          MR. L. FRIEDMAN:  Let me give -- may I

5     approach, Your Honor?

6          THE COURT:  Certainly.

7          MR. L. FRIEDMAN:  Let me giver her the

8     exact same one I'm talking about.

9     Q.   (By Mr. L. Friedman) Along with the November 15th

10    Email was attached the written draft-separation agreement

11    that Mr. Carpenter was proposing to address to show

12    Brian Potashnik and Southwesthousing.com.  So you go to the

13    attachment -- or I go to the attachment.  Lo and behold, if

14    you look at Paragraph 5, Mr. Carpenter says, "In addition to

15    the foregoing amounts, employee will be paid within seven

16    days of the date of closing of any transaction as defined

17    above an amount in cash equal to three percent of the" --

18    this is important.  He is proposing --

19         MS. GIBSON:  I just object to the

20    commentary and continued leading.

21         THE COURT:  The sidebar objection is

22    sustained.

23         MR. L. FRIEDMAN:  All right.  I'm just

24    reading.

25    Q.   (By Mr. L. Friedman) "In addition to the foregoing

1    amounts, employee will be paid within seven days of the date

2    of closing of any transaction as defined above an amount in

3    cash equal to three percent of the gross compensation or

4    consideration, whether in the form of cash, stock,

5    assumption of debt, fees, loans, or otherwise, for the

6    purchase of the company, less reasonable costs of closing."

7              Now, does it say in there less other

8    employee bonuses?

9         A.   No.

10        Q.   Or -- or is that a different formula than you

11   heard Mr. Carpenter testify to in his deposition?

12        A.   It's different.

13        Q.   I see.

14             And Mr. Carpenter is attempting to get

15   what?  He's attempting to comply with Paragraph 12 of his

16   employment agreement.

17             MS. GIBSON:  Object to leading.

18             THE COURT:  Sustained.

19             MR. L. FRIEDMAN:  Okay.

20        Q.   (By Mr. L. Friedman) Well, as it pertains to the

21   terms of his employment agreement, do you have an

22   understanding of what Mr. Carpenter is attempting to do by

23   sending you a draft separation agreement for you and

24   Mr. Potashnik to sign?

25        A.   He's trying to get an agreement.

1      Q.    A written agreement?

2      A.    Correct.

3      Q.    Signed by the parties who signed his employment

4  contract?

5      A.    And others.

6      Q.    And others?

7      A.    Yes.

8      Q.    And he wants to bind more people than that?

9      A.    Correct.

10     Q.    So, while we're here, let's take a look at the

11 formula.  It looks to me like Mr. Carpenter is asking you

12 for a real estate commission or a type of commission on the

13 sale of the company.  Would you agree with that?

14                MS. GIBSON:  Object to leading.

15                THE COURT:  Sustained.

16     Q.    (By Mr. L. Friedman) Look at Paragraph 5 and tell

17 me what it appears to you that Mr. Carpenter is trying to

18 achieve.

19     A.    What he's trying to achieve?

20     Q.    Well, other than just get money.  I mean, could he

21 have -- could a formula like that reflect an understanding

22 of the transaction?

23                MS. GIBSON:  Object to leading.

24                THE COURT:  Overruled.

25     A.    The -- are you referring to the sales transaction?

1    Q.    (By Mr. L. Friedman) Yeah, the sales transaction.

2    A.    The sale was very complicated.  There was a lot of

3    adjustments.  And that, to me, is a very simplified way to

4    calculate anything associated with the sale.

5    Q.    So, for example, when he says less reasonable cost

6    of closing, could you determine -- could anybody determine

7    from this agreement what he meant by reasonable cost of

8    closing?

9    A.    No.

10    Q.    I mean, how many different kinds of costs of

11    closing was there in the final sales transaction, by

12    example?

13    A.    I mean, I -- I can pull out the closing statement.

14         (Pause)

15         On this closing memorandum it looks like

16    there was 19 different closing costs.

17    Q.    And what do they consist of?

18    A.    It says property due diligence, accounting

19    services, abstractor's certificate, recording fees, title

20    reports, wire fees, UCC searches, MMA DUS loan counsel,

21    Wells Fargo legal fees -- MMA DUS loan counsel for

22    Pleasanton -- Wells Fargo legal fees for the trustee,

23    Pleasant Hill housing counsel, San Antonio Housing Authority

24    and another entity, legal fees and costs -- MMA legal fees

25    and costs -- Capmark legal fees and costs, transaction

1    construction loan transfer fees, lender legal --

2                    THE WITNESS:   Am I going slow enough?

3    No.

4         A.    -- lender legal and transfer fees - Old Manor,

5    lender legal and transfer fees - Aldine Bendor, Travis

6    County Housing Finance Corporation consent fee - Old Manor,

7    SLP fees, HUB interest purchase, CAH Texas counsel, seller's

8    counsel, CAH counsel.

9         Q.    (By Mr. L. Friedman) Would you have been -- did

10   you or were you able to determine what Mr. Carpenter meant

11   was reasonable cost of closing from his draft of separation

12   agreement?

13        A.    No.

14        Q.    Did Mr. Potashnik ever tell you that he had

15   discussed reasonable costs of closing with Mr. Carpenter?

16        A.    No.

17        Q.    Do you think Mr. Potashnik would know what cost of

18   closing consisted of?

19        A.    He would have had a good idea, yes.

20        Q.    Of all the things he read on that sheet?

21        A.    I don't think any of us had a great idea that it

22   was going to be this, but yes.

23        Q.    Of the amount.  But the things that you read

24   Mr. Potashnik would certainly know about?

25        A.    Yes.

1          Q.    That was not a handshake/hug deal and say, okay,

2     here's a million dollars, was it?

3          A.    No.

4          Q.    Ms. Potashnik, look at Page 2 of the separation

5     agreement.   Just turn the page.

6                And look at the second full sentence on top

7     of the page.   Mr. Carpenter was writing you on November 15,

8     2017.   "The gross compensation amount for purposes of this

9     paragraph shall not exclude, and shall specifically include,

10    any amounts paid to or for the benefit of the Potashniks,

11    the company, and/or its stockholders in the form of fees,

12    bonuses, severance payments, loans, or otherwise."

13               Shall not exclude payments to the

14    Potashniks, the company, the stockholders, in the form of

15    fees, bonuses, severance payments, loans, or otherwise.

16    Again, no mention of other employee bonuses?

17         A.    Correct.

18         Q.    Now, as you know it from all the pleadings that

19    have been filed in this case and from Mr. Carpenter's

20    demands, that's not his position today, is it?

21         A.    It is not.

22         Q.    Today, as you know it, Mr. Carpenter is telling

23    this jury that the alleged, valid, enforceable, oral

24    agreement that he made with Mr. Potashnik on October 13,

25    2006, excludes other employee bonuses, that $2.1 million

Appendix 000823

170

1    number that Ms. Gibson had you testify to, correct?

2         A.    Yes.

3         Q.    Do you have an understanding of whether or not

4    Mr. Carpenter knows what deal he's trying to enforce?

5         A.    No.

6         Q.    And then, finally, the last sentence after that

7    after the highlight, Mr. Carpenter wrote, "In addition, the

8    gross compensation amount shall be deemed fully earned and

9    paid on the closing date of this transaction, regardless of

10   whether the terms of the transaction provide for payment

11   over time, any holdback of funds, or for reduction or other

12   downward adjustment of gross compensation amount in the

13   future."

14              In other words, Mr. Carpenter's state of

15   mind at the time was this new element to his valid,

16   enforceable, oral agreement.  Had you ever seen that before,

17   heard of it before?

18        A.    No.

19        Q.    But he says his compensation would be fully earned

20   and paid at the closing date.  And only at the closing date,

21   correct?

22        A.    That's what it says, yes.

23        Q.    And that was the November 15th, 2017 memo?

24        A.    Yes.

25        Q.    But he didn't work for Southwest Housing

1    Management on that date, on the date of the closing,

2    correct?

3         A.    Correct.

4         Q.    And he already sued you before the closing?

5         A.    That's right.

6         Q.    Correct?

7         A.    Yes.

8         Q.    And if that was Mr. Carpenter's understanding of

9    what his valid, enforceable, oral agreement was, that he

10   would fully earn his compensation on the date of the closing

11   and get paid at the closing, that he would not have

12   fulfilled the hug/handshake deal that he made, correct?

13        A.    Yes.

14                    (Sotto voce discussion held)

15        Q.    It's terrible when your son turns out smarter than

16   you.

17                    And let me call your attention to Paragraph

18   7.

19        A.    Is this of the same agreement?

20        Q.    The same separation agreement attached to the

21   November 15th, 2007 Email.

22                    Mr. Carpenter wrote, "In order to induce

23   employee to enter into this agreement, the Potashniks,

24   jointly and severally, hereby personally and

25   unconditionally guarantee payment to employee of all amounts

1    provided for herein strictly in accordance with this

2    agreement."

3                    Did I read that correctly?

4        A.    You did.

5        Q.    Mr. Carpenter says the inducement for him to enter

6    into this agreement, the separation agreement that he wrote,

7    was your personal guarantee that he'd be paid and

8    Mr. Potashnik's personal guarantee that he'd be paid,

9    correct?

10       A.    Correct.

11       Q.    Did you ever give Mr. Carpenter a personal

12   guarantee that he would be paid --

13       A.    No.

14       Q.    -- any amount of money at any time?

15       A.    No.   No.

16       Q.    Would you ever have given him a personal

17   guarantee?

18       A.    No.

19       Q.    Therefore, you didn't induce him to enter into

20   that agreement?

21       A.    Correct.

22       Q.    Or any agreement?

23       A.    That's right.

24       Q.    And did Mr. Potashnik ever tell you that he agreed

25   to personally guarantee any payments for Mr. Carpenter?

1          A.    No.

2          Q.    Any severance payments, any bonus payments, any

3     hugs, handshakes, or anything else?

4          A.    No personal guarantee ever.

5          Q.    All right.   Thank you.

6                     Now, with regard to the recorded telephone

7     conversation, you did not know at the time that you were

8     being recorded?

9          A.    Right.

10         Q.    But Mr. Carpenter had to know because he was

11    recording the conversation?

12         A.    Correct.

13         Q.    I counted -- and Mr. Carpenter transcribed the

14    conversation, correct?

15         A.    Yes.

16                     MS. GIBSON:   I'm going to object to this as

17    leading as to what you count -- as to what he counted.

18                     MR. L. FRIEDMAN:   Just laying a foundation.

19    But, okay --

20                     MS. GIBSON:   He said, "I counted."

21                     THE COURT:   All right.   It's not leading

22    yet.

23                     Go ahead, Mr. Friedman.

24         Q.    (By Mr. L. Friedman) You didn't transcribe the

25    conversation?

174

1          A.    I did not.

2          Q.    Okay.

3                I did count 58 times that Mr. Carpenter had

4     a chance or spoke during the conversation.  And you can take

5     my word for it or counsel can, or you can count the number

6     of times yourself.

7          A.    I'm going to count.

8          Q.    All right.

9          A.    Okay, I'm not going to count.

10         Q.    The number of times Mr. Carpenter spoke during

11    that conversation?

12         A.    I'm not going to count.  Sorry.

13         Q.    All right.

14                MR. L. FRIEDMAN:  Did we admit that as an

15    exhibit?

16                THE COURT:  Is it already in?  It's already

17    in.

18                MS. GIBSON:  Oh, that was pre-admitted by

19    agreement.

20                MR. L. FRIEDMAN:  You have it up there?

21                THE WITNESS:  Yes, I do.

22         Q.    (By Mr. L. Friedman) So you can either take my

23    word that it's 58 times or we'll just call it a lot of times

24    that Mr. Carpenter had a chance to speak.

25                Do you have it in front of you?

175

```
1         A.   I do.
2         Q.   Okay.
3              Now, when Ms. Gibson was examining you, she
4    had the chance but didn't go through every one of these
5    times when you spoke, but it's your understanding that JC
6    means Jeff Carpenter, correct?
7         A.   Yes.
8         Q.   And CP means?
9         A.   Myself, Cheryl Potashnik.
10        Q.   No Geiser.
11        A.   Right.
12        Q.   All right.
13             And during the course of that conversation,
14   did you ever agree to give Jeff Carpenter a severance bonus,
15   a pay-to-play bonus -- I forgot what she called it.
16             MR. J. FRIEDMAN:  Pay to stay.
17        Q.   (By Mr. L. Friedman) -- pay-to-stay bonus or
18   anything of that sort?
19        A.   I offered to give him a hundred and fifty thousand
20   dollars in additional severance.
21        Q.   You offered to give Jeff Carpenter a hundred and
22   fifty thousand dollars in addition to the contractual
23   severance that you paid him, that Southwest Housing
24   Management paid him, in accordance with his -- the terms of
25   his employment contract?
```

1      A.    Yes.

2      Q.    And during this conversation, on Page 2, three CPs

3    from the bottom where it starts with "And then", you want to

4    just read the CPs -- CP there?  You can read it out loud.

5    One of us has to read it out loud.

6      A.    Starting with "And then"?

7      Q.    Yeah, Cheryl Potashnik says on the conversation.

8      A.    "And then that's something you would have a legal

9    right to have.  And then, you know, like I've told you

10   before when we were on the phone with Keith, I've got to be

11   able to see some preliminary on how this deal is going to

12   shake out before I can start making commitments and go above

13   and beyond that, because I need to make sure that when all

14   is said and done and it shakes out and everybody else gets

15   paid that Brian and I have a certain amount of money that we

16   can put towards our defense."

17     Q.    And after you said that, what did Mr. Carpenter

18   say?

19     A.    "Right."

20     Q.    He says, "Right."

21     A.    Right.

22     Q.    And then you say?

23     A.    And until I know that I have -- sorry.  "And until

24   I know that I have that, I'm not making anymore commitments.

25   I did not know that.  Maybe within the next three to

1  four weeks."

2  And then it's inaudible, so --

3  Q.  Okay.

4  And then Mr. Carpenter, who knows the

5  conversation's being recorded, says?

6  A.  "Right."

7  Q.  And then you say?

8  A.  "But you have to understand that

9  there's investment banker fees, there's transfer fees on the

10  debt, there's legal fees, there's resized escrow costs, you

11  know, Skyline alone, Bank of America asking for $3 million."

12  That's Parmer.  It's supposed to say Parmer

13  a big part of a million dollars when we close.

14  Q.  Okay.

15  And then I -- we're not going to go through

16  all of this, but I want to go through the -- the next page

17  on top.  Mr. Carpenter says?

18  A.  "Uh hmm."

19  Q.  "Uh hmm."

20  And then you say -- let's just make this

21  the last one.  Let's just read the highlighted portions.

22  You say to Jeff Carpenter?

23  A.  And the last thing I want to do is make

24  commitments -- make you commitments that can't be kept,

25  because then you and I are going to get sideways and I don't

1    want to do that.  And I don't want inaudible.  But I really

2    want to work with you and make sure you're taken care, but

3    it's not going to be -- there's no point in making promises

4    that I can't keep and then we end up sideways with each

5    other.

6         Q.   Okay.  And then -- and then Jeff Carpenter says,

7    "Yeah, yeah, I understand that.  Just the way this reads

8    doesn't cover that."

9               And then just go to the next one.

10       A.   "That -- that doesn't cover anything having to do

11    with the sale because you don't have any rights under the

12    sale.  You have rights under your employment agreement."

13       Q.   Okay.  And what did you mean when you said that,

14    Mr. Carpenter didn't have any rights under the sale?  What

15    were you trying to convey to him at that time?

16       A.   That he didn't have a right -- any kind of right

17    to anything.  That anything paid out of the proceeds of the

18    sale would have been discretionary at the time that the sale

19    occurred.

20       Q.   Now, Mr. Carpenter had a lot of opportunities in

21    this telephone conversation to talk, didn't he?  You didn't

22    count them, but there's a lot of CPs.

23       A.   A lot of CPs --

24       Q.   JCs.

25       A.   -- and a lot of JCs, yeah.

1      Q.    I'm sorry.   There's a lot of CPs and a lot of JPs

2    [sic].

3                    MR.  DONOHUE:   JC.

4      Q.    (By Mr. L. Friedman) A lot of CPs --

5      A.    JC.

6      Q.    -- and a lot of JCs?

7      A.    Yes.

8      Q.    And there's four, five, six, seven pages of --

9    seven, yeah -- seven pages of transcript.   Goes on for seven

10   pages.   Lot of JCs.

11                  Mr.  Carpenter spoke a lot of times in that

12   conversation, didn't he?  At any point in that conversation,

13   did Mr. Carpenter say to you, "I have a valid, enforceable,

14   oral agreement with Brian Potashnik.   You know that."?

15     A.    No.

16     Q.    At any point in that conversation, did

17   Mr. Carpenter say to you, "Cheryl, you know my agreement

18   with Brian Potashnik.   It is A, B, C, D, and E."?

19     A.    No.

20     Q.    Are you reneging or won't you confirm it?

21     A.    No.

22     Q.    Had Mr. Carpenter at one -- any time during that

23   time that he was secretly recording -- said to you, you

24   know, I get a million dollars out of this deal, I get three

25   percent off the gross, less reasonable closing costs,

1    etcetera, what would you have said?

2         A.    I would have said I don't know where you're

3    getting that from.

4         Q.    Would you have agreed to it?

5         A.    No.

6         Q.    And did you ever hear Mr. Potashnik agree to

7    anything like that?

8         A.    No.

9         Q.    Or did Mr. Potashnik ever tell you he agreed to

10   anything like that?

11        A.    No.

12        Q.    And this conversation that Mr. Carpenter secretly

13   recorded -- on my little chart there -- was November 2nd,

14   2007, the last day he was paid for working at Southwest

15   Housing Management?

16        A.    Yes.

17        Q.    Correct?

18              So, there was no question in your mind on

19   that day that you had not made a commitment to

20   Mr. Carpenter, correct?

21        A.    Yes.

22        Q.    And there was no question in your mind --

23              MS. GIBSON:   Object --

24        Q.    (By Mr. L. Friedman) -- that you conveyed that, no

25   commitment, to Mr. Carpenter and he recorded it?

1              MS. GIBSON:  Object to the continued

2     leading.

3              THE COURT:  You're still leading the

4     witness.

5              MR. L. FRIEDMAN:  Okay.

6         Q.   (By Mr. L. Friedman) What was your clear message

7     to Mr. Carpenter in the conversation that he secretly

8     recorded on November 2nd, 2007?

9         A.   My clear message was that basically you have

10    rights under your employment agreement.  I'm offering an

11    additional hundred and fifty thousand dollars in severance,

12    or however you want to characterize it.  And other than

13    that, we have to wait until the closing and see how

14    everything shakes out.

15        Q.   And you can't make any other commitments?

16        A.   Correct.

17        Q.   Now, last line of questioning.  You have about 23,

18    24 exhibits in front of you that Ms. Gibson was kind enough

19    to show you and enter into evidence?

20        A.   There's, like, 35.

21        Q.   Thirty-five.

22        A.   Okay.

23        Q.   Is there any evidence on any one of those 35

24    documents that Cheryl Geiser Potashnik or Brian Potashnik

25    agreed, orally or in writing, to any employment deal, bonus,

1   salary, new car program, or anything else with

2   Jeff Carpenter?

3        A.   Nothing other than what's in his employment

4   agreement.

5        Q.   Other than the employment contract?

6        A.   Correct.

7        Q.   Is there any evidence on any of those documents of

8   a valid, enforceable, oral agreement between Jeff Carpenter

9   and Brian Potashnik?

10       A.   No.

11                  MR. L. FRIEDMAN:  Nothing further,

12   Your Honor.

13                  THE COURT:  Ms. Gibson?

14                  MS. GIBSON:  Thank you, Your Honor.

15                  THE WITNESS:  And can I -- can I go to the

16   restroom?

17                  THE COURT:  Sure.

18                  We'll take our 10-minute break, ladies and

19   gentlemen.  We'll see you back at 3:25.

20                  (The jury exited the courtroom.)

21                  (Recess taken)

22                  (The jury entered the courtroom.)

23                  THE COURT:  Welcome back and good afternoon

24   still, ladies and gentlemen.

25                  We'll continue.  Mr. Friedman had just

1    passed Ms. Geiser as a witness, so it goes back to

2    Ms. Gibson to ask any follow-up questions, and we'll proceed

3    when she's ready.

4                    REDIRECT EXAMINATION

5    BY MS. GIBSON:

6        Q.    Ms. Geiser, have you noticed during the course of

7    this case that I have a bad habit of saying okay after a

8    witness gives an answer?

9        A.    No, I haven't.

10       Q.    Okay.

11       A.    I mean, you just did it, so now I do notice it.

12                    (Laughter)

13       Q.    I didn't do it on purpose.

14                    You agree with me that it's normal

15   sometimes for people in conversation to say okay or uh-huh

16   or right?

17       A.    Yes.

18       Q.    And -- okay.  And that doesn't necessarily mean

19   that they agree with what the person has just said?

20       A.    I think I agree with that in a general sense.

21       Q.    And would you agree that the nature of enforcement

22   of an oral agreement is that it's not in writing?

23       A.    Enforcement?

24       Q.    I mean, that's why it's oral.

25       A.    Enforcement?  I don't follow you.

1          Q.    If -- if we're talking about an oral agreement,

2     obviously there's not going to be -- it's not going to be in

3     writing.

4          A.    Correct.

5          Q.    With -- with respect to the annual bonuses, you

6     describe them as discretionary but one end of the formula

7     says minimum discretionary, correct?

8          A.    Yeah, I believe so.

9          Q.    Okay.  And what does minimum mean to you?

10         A.    Minimum means minimum.  The -- it's been a long

11    day.  Okay, what does minimum mean?  The least possible.

12         Q.    The least possible.

13                    And even when someone has discretion to set

14    a bonus, once a number has been relayed to the employee that

15    discretion has been exercised, correct?

16         A.    Can you say that again?  I'm sorry.  I'm fading.

17         Q.    Once -- that's okay.  I'll try it -- we'll --

18    we'll get through this.

19         A.    Okay.

20         Q.    Once the number has been relayed to the employee,

21    the discretion has been exercised?

22         A.    I don't know that I agree with that statement.

23         Q.    Okay.

24                    Now, as of October 31st, 2007, Jeff is

25    staying -- had stayed as long as y'all needed him to,

1    correct?

2         A.   He stayed until the end of his employment.  We've

3    been over this a hundred times.

4         Q.   Well, okay.  You didn't need him anymore.  So, at

5    that point, once someone -- well, let me use a hypothetical

6    to avoid fights over agreements.

7              If you agree to pay me $25 to mow your lawn

8    and I mow the lawn, it's too late at that point for you to

9    try to back out of our agreement, correct?

10        A.   I believe that all agreements have to be agreed to

11   by both parties.  We went through this exhaustively in my

12   deposition.

13        Q.   Right.  But if we agreed that I was going to mow

14   your lawn for $25, once I've already mowed the lawn it's too

15   late for you to back out and say you're not going to pay,

16   right?

17        A.   If we agreed to the terms and conditions of you

18   mowing my lawn and we both agreed and you mowed my lawn,

19   then I would agree.

20        Q.   Okay.

21             With -- with respect to the document that

22   Mr. Friedman was asking you about where Jeff Carpenter sent

23   in his effort at a revised separation agreement --

24        A.   Yes.

25        Q.   Okay.  -- the truth is you had already told Jeff

1    he had no legal rights.  But at some point you said, "Why

2    don't you just send something to us", right?

3        A.    I'll have to look back at the timeline to make

4    sure that's correct.  Ask me again, please.

5        Q.    The truth is that although you already told Jeff

6    he didn't have any legal rights you told him to just go

7    ahead and send something to y'all?

8        A.    I may have.  I don't recall.

9        Q.    Okay.  And Jeff did that.  And I agree with you he

10   did a terrible job.  But Brian Potashnik and yourself had

11   earlier, before October 31st, promised that you-all would

12   document his deal in writing.  This is way -- I'm talking

13   about 2006.

14                    MR. L. FRIEDMAN:  Objection.  Assumes facts

15   not in evidence.

16                    THE COURT:  She's asking.  Overruled.

17                    THE WITNESS:  I don't recall.  But if

18   there's a document that I can look at to refresh my memory,

19   I will.

20       Q.    (By Ms. Gibson) I believe that you and

21   Brian Potashnik had orally promised, multiple occasions,

22   that you-all would have your attorneys document the deal.

23   Do you recall that?

24       A.    I don't recall.

25       Q.    Okay.

1                    Ultimately, though, you asked Jeff -- this

2      is after his -- he's done everything asked of him, you told

3      Jeff to try and put something together?

4           A.   I may have.  I just said that.  I don't recall.

5           Q.   And that would mean that Jeff has to scramble to

6      find an attorney or he has to consult the attorney called

7      Attorney Google, right?

8           A.   To put something in writing, no.  He doesn't have

9      to consult an attorney.

10          Q.   Well, you put it on Jeff to try and piece

11     something together and he's not an attorney, correct?

12                    MR. L. FRIEDMAN:  Objection, assumes facts

13     not in evidence.

14                    THE COURT:  Overruled.

15                    MR. L. FRIEDMAN:  Misstated the witness's

16     prior testimony.

17                    THE COURT:  She can handle the questions.

18                    If you don't agree, tell her you don't

19     agree.

20                    THE WITNESS:  He didn't need to get an

21     attorney to put something in writing.  That was his choice

22     if that's what he did.

23          Q.   (By Ms. Gibson) Okay.  Well --

24          A.   I'm not an attorney.

25          Q.   -- it looks from the -- it looks from the document

1    that -- that he tried to make it look more legal than just a

2    handshake deal, right?

3        A.    He tried to make it -- I mean, it was very all

4    encompassing.  I would agree with that.

5        Q.    Right.  And so, suddenly, just like attorneys do,

6    they want to deal with all these other things.  Like, what

7    happens if somebody dies, you know, what happens in this

8    event or that event.  And there's -- there's some of that

9    going on in that proposal, correct?

10       A.    Some of what?

11       Q.    Just trying to cover various possibilities that

12   were beyond the handshake deal.

13       A.    Well, there was no handshake deal, number one.

14   And, number two, all agreements have multiple provisions, as

15   we've been through today, and they have various meanings at

16   various times to various parties.  So I don't know what else

17   to say about that agreement.

18       Q.    Are you aware that legally the parties can agree

19   to some terms of an agreement and, even if they expect that

20   there might be some additional terms or try to negotiate

21   additional terms, a jury or the Court can still enforce

22   those -- the particular terms that they did agree on?

23       A.    You lost me.

24              MR. L. FRIEDMAN:  Excuse me.  I'm going to

25   object.  This calls for a legal conclusion --

 1                    THE COURT:  Okay.

 2                    MR. L. FRIEDMAN:  -- and it's compound.

 3                    THE COURT:  You're asking for legal

 4     conclusions.  And, really, you're going beyond the scope of

 5     his cross.

 6          Q.   (By Ms. Gibson) You talk about Jeff Carpenter

 7     filing suit before the deal actually closed.  Remember that?

 8          A.   Yes.

 9          Q.   Okay.  But the suit was filed after you had told

10     Jeff Carpenter that he had no legal rights and might get

11     zero, right?

12          A.   I didn't say you might get zero, but I said that

13     you have no legal rights, yes.

14          Q.   And you can understand why someone might be

15     concerned that what was going to happen is y'all were just

16     going to take the money and run?

17                    MR. L. FRIEDMAN:  Objection.  That's

18     argumentative.

19                    THE COURT:  Sustained.

20          Q.   (By Ms. Gibson) Now, there was a part of that

21     agreement that said it would not -- that other employee

22     bonuses would not come off of the payment.  Do you remember

23     that?

24          A.   What agreement are you referring to now?  What --

25     are we back to the draft --

1        Q.    Well, after --

2        A.    -- separation agreement?

3        Q.    -- after you told Jeff Carpenter to try and put

4    something together after he had already stayed as long as

5    needed, Mr. Friedman was asking you about the part of that

6    that said it would be without deduction of other bonuses.

7                    MR. L. FRIEDMAN:  I'm going to have to

8    object.  This misstates the witness's prior testimony.  She

9    didn't say she told Jeff Carpenter.

10                   THE COURT:  She was saying what she told

11   you.

12                   MR. L. FRIEDMAN:  I think she said she

13   didn't recall.

14                   THE COURT:  Repeat your question.

15                   MR. L. FRIEDMAN:  I'm objecting because the

16   preface to Ms. Gibson's question was after you told

17   Jeff Carpenter to send me something, and I think she said

18   she didn't recall.

19                   MS. GIBSON:  I thought you said you may

20   have.

21                   THE WITNESS:  I said, I may have.  I don't

22   recall.

23                   MS. GIBSON:  Okay.

24                   THE WITNESS:  I may have.

25                   MS. GIBSON:  All right.

1      Q.     (By Ms. Gibson) That's the document that I'm

2   referring to.

3      A.     Okay, we're back to the separation agreement that

4   was attached to Jeff's Email.  And what is the question?

5      Q.     Mr. Friedman was asking you questions where

6   it said without deduction for -- and I'm paraphrasing

7   because I don't have it in front of me -- but without

8   deduction for bonuses or payments to other employees.

9      A.     This agreement does not mention anything about

10   other employees' bonuses that I see in this document.

11      Q.     Okay.  Well, are you aware that Jeff Carpenter had

12   been working from a form that Keith Jones provided to him?

13      A.     I've become aware of that in the course of this

14   lawsuit, but --

15      Q.     And you're aware that Mr. Carpenter has already

16   said that in using that form he made a mistake on that

17   piece?

18              MR. L. FRIEDMAN:  Objection.  She assumes

19   facts not in evidence.

20      Q.     (By Ms. Gibson) You're aware of that?

21              THE COURT:  She's aware or not.

22              THE WITNESS:  I know that this came up in

23   his deposition, and I don't know if he was aware at the time

24   he wrote this or if he was aware at the time he filed his

25   initial lawsuit in which he talks about his alleged deal.  I

Appendix 000845

1    don't remember at what point in time he made that mistake.

2         Q.    (By Ms. Gibson) And he has made clear that the

3    formula did deduct other stay bonuses paid to other -- to

4    other employees?

5         A.    I don't think he has made that clear, no.

6         Q.    That's the problem --

7         A.    I mean, that was his testimony at his deposition.

8         Q.    Right.  And it doesn't -- in doing so, in making

9    that correction, it doesn't help Jeff Carpenter's damages.

10   In fact, it reduces them, correct?

11        A.    It just proves that he didn't have a deal.  He

12   couldn't articulate the deal.  He didn't have a deal.

13              It changed from this time.  It changed,

14   what, 11 times through the course of these 10 years.  His

15   deal has changed.  He said he made a mistake.  I don't agree

16   with that.

17              THE COURT:  Answer only the question she's

18   asking.

19        Q.    (By Ms. Gibson) Okay, I understand your position

20   in this case, Ms. Geiser.  But in correcting a mistake and

21   saying it was to be the opposite, including that bonuses

22   paid to other employees were to come off, that would

23   actually reduce Mr. Carpenter's damages, correct?

24        A.    Ultimately, yes.

25        Q.    Okay.  And in making that correction, because

1    that's what happened, he also opens himself up for you-all

2    to beat him up about it, correct?

3                    MR. L. FRIEDMAN:  Objection, argumentative.

4                    THE COURT:  Sustained.

5         Q.   (By Ms. Gibson) He had no incentive -- there was

6    no personal benefit to him to correct that issue to say

7    that, no, Brian had said the other employee bonuses were

8    coming off.

9                    MR. L. FRIEDMAN:  Objection, argumentative.

10   These are jury arguments, Your Honor.

11                   THE COURT:  Her question is did he have an

12   added incentive.  She can --

13                   MR. L. FRIEDMAN:  Calls for speculation.

14                   THE WITNESS:  I don't know.

15                   THE COURT:  Her answer is no.

16                   THE WITNESS:  It's "I don't know".

17        Q.   (By Ms. Gibson) Now --

18                   MR. L. FRIEDMAN:  I actually didn't hear

19   that.

20                   THE WITNESS:  I don't know.  I don't know.

21        Q.   (By Ms. Gibson) Okay.

22                   And when you -- when you said you cannot

23   say what reasonable cost of closing would be, you remember

24   that?

25        A.   Yes.

1       Q.      Okay.

2               In this case -- and I went through the

3    closing memos with you -- we used all of the sellers' listed

4    closing costs, correct?

5       A.      All of -- we used it in what context?

6       Q.      We deducted every single seller's closing costs in

7    our calculation of the net proceeds to seller.

8       A.      When we were going through your calculations?

9       Q.      Right.

10      A.      Yes.

11      Q.      Okay.  So we just accepted everything that

12   defendants claimed as a closing cost.

13      A.      Okay.

14      Q.      All right.  And so we didn't -- we didn't even try

15   to assess what was reasonable or what was normal.  We just

16   accepted all closing costs, correct?

17      A.      That's fine, but I think that's different than

18   where Larry was going when he was questioning me.

19              MR. L. FRIEDMAN:  Mr. Larry.

20              MS. GIBSON:  Pass the witness.

21              THE COURT:  All right.

22              Mr. Friedman?

23              MR. L. FRIEDMAN:  I have nothing further,

24   Your Honor.

25              THE COURT:  Thank you, Ms. Geiser.  You can

```
1     have a seat.
2                      THE WITNESS:  What do I do with these
3     documents?
4                      THE COURT:  You'll leave those there.
5                      Are you getting the next witness?
6                      MS. GIBSON:  Yes.
7                      (The witness entered the courtroom.)
8                      THE COURT:  All right.  Mr. Graf, if you'd
9     come all the way up here.
10                     Is this your witness or Mr. Sanford's?
11                     MS. GIBSON:  I'm sorry?
12                     THE COURT:  Is this your witness?
13                     MS. GIBSON:  It's my witness.
14                     THE COURT:  Okay.  Call your next witness.
15                     MS. GIBSON:  Plaintiff calls Rick Graf.
16                     THE COURT:  Mr. Graf, if you'd come all the
17    way over here behind the court reporter.  Don't step up
18    there until I swear you in.  And would you raise your right
19    hand.
20                     (Witness sworn)
21                     THE COURT:  All right.  Have a seat right
22    here.  Ms. Gibson will ask you questions first and then
23    either Mr. Friedman or Mr. Donohue.
24                     Ms. Gibson, whenever you're ready.
25                     And, ladies and gentlemen, we'll go about
```

1    another hour before we break for the day.

2                                RICK GRAF,

3    having been first duly sworn, testified as follows:

4                          DIRECT EXAMINATION

5    BY MS. GIBSON:

6         Q.    Mr. Graf, will you tell the jury your full name?

7         A.    Rick Graf.

8         Q.    And where do you work?

9         A.    I work at Pinnacle Property Management Services.

10        Q.    And you were involved in some of the process

11   concerning the asset sale to Cascade Affordable Housing that

12   is the asset sale from the Southwest Housing entities to

13   Cascade?

14        A.    That's correct.

15        Q.    Okay.

16              You were involved in due diligence?

17        A.    To some degree.

18        Q.    And at that -- at that point in time Pinnacle was

19   the -- the management arm for Cascade.  You -- in other

20   words, you managed -- Pinnacle managed the properties?

21        A.    Correct.

22        Q.    Okay.  And what was your position at that time?

23        A.    What period of time are we talking about?

24        Q.    At that time in --

25        A.    Do you have a date, please?

1    Q.    This would have been in, probably, 2 -- and tell
2    me if it changed, if your position changed -- but this would
3    have been in the period from 2006 through the summer of
4    2008.
5    A.    Yeah.  I was the regional president for Pinnacle's
6    central division.
7    Q.    And were you one of the highest level people for
8    that division?
9    A.    Yes.
10    Q.    And you met Jeff Carpenter at some point?
11    A.    Correct.
12    Q.    And you -- I'm not the saying the jobs were
13    identical, but you essentially had the equivalent of
14    Jeff Carpenter's job for Pinnacle.
15    A.    The positions were similar.
16    Q.    Okay.
17          And you were already in place and Pinnacle
18    was pretty happy with you?
19    A.    Presumably so.
20    Q.    Okay.  And they're still happy with you,
21    obviously.
22    A.    I've been there for a long time.
23    Q.    Okay.
24          And so, as a result, there was no need for
25    Pinnacle to bring on someone in Jeff Carpenter's position

198

1    because you were already doing that job.

2         A.   It would have been a duplicative position.

3         Q.   Okay.

4              And you were involved in due diligence to

5    some extent, but in connection with due diligence or the

6    asset sale in general, did you work with Jeff Carpenter at

7    times?

8         A.   At times.

9         Q.   Can you give us some examples of the types of

10   things you worked together on?

11        A.   It's been a long time ago, so my memory is not as

12   great as it should be on this.  But in typical situations we

13   would have collaborated on personnel matters, coordination

14   of meetings with those -- with the personnel that was

15   involved in the portfolio, some site specific activity.  I

16   don't recall exactly what that was, but I would consider

17   those to be typical collaborations.

18        Q.   And who did you, primarily, actually work with on

19   due diligence items from the Southwest Housing entities?

20        A.   There were a variety of people.  I wouldn't say

21   there was a primary person.

22              MS. GIBSON:  Pass the witness.

23              MR. L. FRIEDMAN:  I have nothing,

24   Your Honor.

25              THE COURT:  All right.  Thank you,

199

1        Mr. Graf.

2                      Can this witness be excused?

3                      MS. GIBSON:   Yes.

4                      THE COURT:   If you were subpoenaed, you're

5        released from your subpoena and you're free to leave the

6        courthouse now.   If you'd like to stay and observe the

7        trial, you can, but you're free to leave the courthouse now.

8                      THE WITNESS:   Thank you.

9                      All right.   Ms. Gibson.

10                      Y'all, don't stand up back there.   I was

11        just going to swear in the witness.

12                      MS. GIBSON:   Plaintiff calls Brian

13        Potashnik.

14                      THE COURT:   Mr. Potashnik, let me swear you

15        in before you step up there.

16                      THE WITNESS:   Okay.

17                      (Witness sworn)

18                      THE COURT:   Have a seat here.

19                      <u>BRIAN POTASHNIK,</u>

20        having been first duly sworn, testified as follows:

21                      DIRECT EXAMINATION

22        BY MS. GIBSON:

23        Q.    Mr. Potashnik, in considering an asset sale, when

24        you were considering selling Southwest Housing entities, did

25        you consider the potential of a mass exodus of employees?

Appendix 000853

1          A.    It may have been a consideration but it certainly
2     was not anything substantial, because it was an asset sale
3     and it wasn't an employee sale.  So we were selling assets.
4          Q.    So you're saying it was not an asset sale, we
5     weren't selling employees, we were selling assets?
6          A.    No, it was an asset sale.  In other words, we were
7     selling property.  So, whether I was part of the sale,
8     leading up to the sale, or what my participation or anybody
9     in the company's participation may have been was really not
10    something that was that important.  It may have been
11    discussed, though.
12         Q.    In considering an asset sale, did you consider
13    ways to prevent a mass exodus of employees?
14         A.    I don't recall.
15         Q.    Did you consider how to prevent important
16    employees from leaving?
17         A.    I don't recall.
18         Q.    Do you recall being at your deposition?
19         A.    Yes, ma'am.
20         Q.    Okay.  And do you recall at your deposition that
21    when I asked you --
22                    MR. L. FRIEDMAN:  Line and page, please?
23                    MS. GIBSON:  This is 33, 12.
24         Q.    (By Ms. Gibson) And I said, "In thinking about a
25    potential asset sale, did you consider the potential of a

1    mass exodus of employees?"  And you said, "No."

2         A.    Very well.

3         Q.    And you were pretty adamant about it?

4         A.    I'm not changing my answer.  I mean, I -- again,

5    it was not a consideration for me or of any importance to

6    this --

7         Q.    And --

8         A.    -- to the asset sale.  Because, as I said, we were

9    selling assets.

10        Q.    And consider --

11        A.    And we knew when selling those assets that it was

12   not important to the buyer to have any employees other than

13   those that were actually on site on the properties.

14        Q.    And at your deposition when I asked, "In

15   considering an asset sale, did you consider ways to prevent

16   a mass exodus of employees," you said, "No."

17        A.    Correct.

18        Q.    And when I asked at your deposition, "Did you

19   consider how to prevent important employees from leaving,"

20   you said, "No."

21        A.    That's correct.

22        Q.    And when you're saying now it may have been

23   discussed, is that because you found out that Cheryl Geiser

24   testified that you-all did in fact discuss those things?

25                   MR. L. FRIEDMAN:  Argumentative, Your

1    Honor.

2                    THE COURT:   Overruled.

3        A.    No.

4        Q.    (By Ms. Gibson) That's not why?

5        A.    No.

6        Q.    Okay.

7        A.    Ms. Gibson, this was 12 years ago, so excuse me if

8    my memory isn't as good as it should be to tell you exactly

9    what conversations I had in 2007 and 2006.

10       Q.    Well, you were pretty adamant with me at your

11   deposition when you said no, correct?

12                   MR. L. FRIEDMAN:   Argumentative, Your

13   Honor.

14                   THE COURT:   Sustained.

15                   You've asked that question.

16                   MS. GIBSON:   Okay.

17       Q.    (By Ms. Gibson) Do you believe retention of

18   important employees is important when you're trying to sell

19   a business?

20       A.    No.

21       Q.    Did you and Cheryl Geiser discuss the importance

22   of continuity in connection with potentially selling the

23   assets?

24       A.    No, not that I recall.

25       Q.    Are you saying you don't recall one way or the

1    other or are you saying that never happened?

2         A.    I don't recall.

3         Q.    One way or the other?

4                    MR. L. FRIEDMAN:  Argumentative.

5                    THE WITNESS:  I don't recall.

6                    MR. L. FRIEDMAN:  He's answered the

7    question.

8                    THE COURT:  Let her clear up what his

9    answer is.

10                    THE WITNESS:  I don't recall any

11   conversations pertaining to employees that may have occurred

12   in 2006 or 2007.  It's just too long ago.  And it was not of

13   any importance to me or to the buyer of the business or of

14   the assets to -- to maintain any employees.

15        Q.    (By Ms. Gibson) What do you think would happen if

16   you were trying to sell a business and important employees

17   leave?

18        A.    I think it's to the benefit of the seller because

19   it reduces their overhead and cost of doing business up

20   until the time that they transition the assets.

21        Q.    Well, this assumes you have a firm -- something

22   that's definitely going to close.  But when you're trying to

23   make your company attractive as a target for purchase --

24        A.    Uh-huh.

25        Q.    -- what do you think happens if important

1    employees leave?

2         A.   I think it becomes more attractive to a buyer.

3    It does to me.  I'm in the business world now 30 years.  And

4    when I identify an opportunity, it's always a better

5    opportunity when I can bring in my own staff.

6         Q.   Did -- and my question about continuity wasn't

7    about discussions with employees.  I had asked you, Did you

8    and Cheryl Geiser discuss the importance of continuity in

9    connection with potentially selling the assets?

10        A.   Are you asking me a question?  I'm sorry.  I

11   didn't -- I thought you were making a statement.  I didn't

12   get whether that was a question.

13        Q.   I thought you had said I don't remember any

14   discussions with employees about that issue, but my question

15   was about you and Cheryl Geiser.

16        A.   I'm sorry, Ms. Gibson.  What is the question?

17        Q.   Did you and Cheryl Geiser discuss the importance

18   of continuity in connection with potentially selling the

19   assets?

20        A.   I don't recall having those discussions.

21        Q.   Okay.  And you understand, Mr. Potashnik, there's

22   a difference between I don't recall one way or the other and

23   I don't recall because that never happened.  And so when you

24   say I don't recall, are you saying --

25                    MR. L. FRIEDMAN:  Your Honor, this is

1    argumentative.

2              THE COURT:  It's not.  Let her ask the

3    question.

4         A.   Yes, ma'am.

5         Q.   (By Ms. Gibson) So, when you say here I don't

6    recall, are you saying I don't recall one way or the other

7    or are you saying I don't recall, that never happened?

8         A.   I don't recall one way or the other or I don't

9    recall, that never happened, to me, are one in the same.

10        Q.   Okay.

11             Did you and Cheryl Geiser discuss ways to

12   retain employees and keep them from jumping ship in

13   connection with the potential asset sale?

14        A.   I don't recall.

15        Q.   Do you recall discussing with Cheryl Geiser

16   providing sales-proceeds bonuses to important employees as

17   an incentive for them to stay on despite the pending asset

18   sale?

19        A.   No.  We never had those discussions.

20        Q.   Do your recall discussing with Cheryl Geiser

21   bonusing employees out of the asset-sale proceeds as an

22   incentive to keep people on?

23        A.   No.

24        Q.   That never happened?

25        A.   I don't recall.

1          Q.    Well, you said no.

2          A.    Bonuses were never discussed.  I can tell you

3     that.

4          Q.    You never discussed bonusing any employees out of

5     the sale proceeds with Cheryl Geiser?

6          A.    No.

7          Q.    Do you recall telling Jeff Carpenter that you

8     needed him to be committed and keep his eye on the prize in

9     connection with an asset sale?

10         A.    No.

11         Q.    Do you deny that?

12         A.    I don't recall ever having that discussion.

13         Q.    In fact, your claim is that that never happened,

14    correct?

15         A.    My claim is exactly how I'm testifying today in

16    court.  Under my sworn testimony, I do not recall any

17    conversations having to do with bonuses with Cheryl Geiser

18    or with anybody in the company.  That was not something that

19    I recall ever having under the circumstances.

20         Q.    Do you recall telling Jeff Carpenter that if he

21    would stay committed and stay on, keep his eye on the prize,

22    that he would be paid a lucrative bonus from the sales

23    proceeds?

24         A.    No.

25         Q.    Are you saying that never happened?

1     A.    No.  I'm saying that I don't recall any

2     conversations having to do with anything regarding bonuses.

3         Q.    Do you recall at your deposition when I asked you,

4     "QUESTION:   Do you recall telling Jeff that you needed him

5     to be committed and keep his eye on the prize in connection

6     with an asset sale and that he would be paid a lucrative

7     bonus from sale proceeds?"  You said, "Never happened."

8         A.    May have never happened.

9         Q.    Okay.

10        A.    I mean, as far as I know --

11        Q.    So --

12        A.    -- as I'm telling you today, Ms. Gibson.  And I

13    respectfully would like you to know that these are

14    conversations that you are trying to put words in my mouth

15    that may have occurred over 10 years ago.  And to the best

16    of my recollection there was no discussion with

17    Jeff Carpenter or any employee regarding anything that has

18    to do with bonuses.

19        Q.    Okay.

20                Would you take a look, please, at

21    Plaintiff's Exhibit 1?

22                THE COURT:  You're probably going to have

23    to help him there.

24                THE WITNESS:  I -- if you have a copy of

25    it, I'll look at it.

1          THE COURT:  It's up there.  It's probably

2     at the very beginning.

3          But you may want to come and find it for

4     him.

5          THE WITNESS:  Is this the secretly recorded

6     conversation?

7          MS. GIBSON:  Yes --

8          THE WITNESS:  Okay.

9          MS. GIBSON:  -- it is.

10         THE WITNESS:  Yes.

11    Q.    (By Ms. Gibson) Found it?

12    A.    Yes.

13    Q.    You say during part of that -- this is -- you are

14    VP.  Do you see your part of the conversation at the top of

15    Page 2?

16    A.    Yes, ma'am.

17    Q.    Okay.

18         And when you're talking to Jeff, you say,

19    "Um, and as far as our agreement goes where we compensate

20    you, as we promised, it's going to depend on where we end up

21    in all of this."

22    A.    Yes, ma'am.

23    Q.    Okay.  And when you say "where we end up in all of

24    this", you are talking about the asset sale?

25    A.    I'm talking about the asset sale or the actual

1      refinancing of the properties.

2          Q.    Okay.

3          A.    Because at the time, as you recall from prior

4      testimony, the company was not performing financially.  The

5      properties were losing money and there was the potential

6      that we would be in a bankruptcy.  So reality was, was that

7      we had no idea whether we would have a sustainable business

8      or not.

9          Q.    And those are not concerns you had until 2007,

10     correct?

11         A.    No.  Those were concerns that we've always had.

12     When you run and operate a business, you're always concerned

13     about making sure that you have enough money coming in to

14     meet the expenses and obligations of the business and the

15     money that goes out.

16         Q.    So let me ask it a different way.  At the time the

17     letter of intent was signed with Cascade, you did not have

18     the same level of concern you did in November of 2007 about

19     where you would end up personally in all of this?

20         A.    That's not correct.

21         Q.    You had the same concerns?

22         A.    Yes, ma'am.

23         Q.    Okay.  Well, all right, we'll keep going.

24                  But you -- but you hear -- you testified, I

25     thought, that you never discussed any bonuses with

1    employees; is that --

2         A.    That's correct.

3         Q.    But here you're talking about your agreement where

4    we compensate you as promised and it depends on where we end

5    up in the asset sale?

6         A.    Yes, ma'am.

7                    And if you'd like me to explain, in that

8    conversation I am referring to the one agreement and the

9    only agreement that exists between Jeff Carpenter and myself

10   and Southwest Housing, and that is his employment agreement.

11   And at the time, that agreement was in jeopardy over the

12   fact that the company was losing significant amounts of

13   money and may not be able to honor its commitments under the

14   employment agreement.

15        Q.    Well, there's nothing, you know, under the

16   employment.   You're talking about the written employment

17   agreement?

18        A.    Yes, ma'am.   That's what I'm referring --

19        Q.    Okay.

20        A.    -- to in the conversation.

21        Q.    You're saying -- Jeff's calling you because he's

22   upset that the bonus out of the sales proceeds and the

23   annual bonuses weren't addressed in the proposed severance

24   from Southwest Housing, right?

25                    MR. L. FRIEDMAN:   Objection.

1          THE WITNESS:  No.

2          MR. L. FRIEDMAN:  Excuse me.

3          Objection, assumes facts not in evidence.

4   We haven't heard from Mr. Carpenter.

5          THE COURT:  We're not going to call

6   witnesses back and forth after one.  He can answer the

7   question or say he doesn't know.

8          THE WITNESS:  No.

9          Ms. Gibson, to clarify exactly what that

10  statement refers to, it is the one and only agreement that

11  exists between Jeff Carpenter and Southwest Housing and the

12  related entities, either orally or in writing.  And that is

13  the agreement that I was under the impression and the reason

14  why I answered the question as I did; that I felt was in

15  jeopardy of being honored because the company was

16  potentially going to go into bankruptcy.

17      Q.   (By Ms. Gibson) So, according to your theory, what

18  you're referring to is you're saying, Jeff, as far as our

19  agreement goes where we compensate you as we promised,

20  you're saying you might not pay his salary?

21      A.   It's not a theory.  It's reality.  We did not

22  know, because of the fact that the company was not

23  performing per our projections, whether or not we could

24  honor any of the written employment agreements that we have

25  with Jeff Carpenter or anybody else.

1      Q.    As of the time of this conversation,
2  Jeff Carpenter's work for Southwest Housing was over.
3      A.    Whether it was over or not is not relevant to the
4  fact that if there was a written agreement, which there was,
5  his employment agreement -- which may or may not have been
6  fully honored due to the fact that we had cash flow
7  issues -- obviously, there was some question as to the
8  sustainability of the business to be able to honor that
9  employment agreement.
10      Q.    But at this point --
11      A.    Which is the only agreement that exists.
12      Q.    But at this point Jeff Carpenter is not going to
13  be drawing a salary anymore under the written agreement,
14  correct?
15      A.    I -- I don't know what the terms of his employment
16  agreement were to be -- his employment agreement was
17  executed at the time of his employment in 2004.
18      Q.    But by October 31st, Jeff Carpenter was no longer
19  needed, due to the November 1st transfer of management to
20  Pinnacle, correct?
21      A.    I don't think that it was -- I don't think anybody
22  was needed at the time, Ms. Gibson.  I don't think it was a
23  relationship that was exclusive to any one employee.
24      Q.    But, Mr. Potashnik, if you're saying you're
25  referring to the employment agreement --

1        A.    Yes, ma'am.

2        Q.    -- Jeff Carpenter is done.  He's not working for

3    the entities anymore.

4        A.    Right, but he --

5        Q.    He's not drawing --

6        A.    I --

7        Q.    -- a salary.  He's not drawing --

8        A.    I get it.  I understood.  But what I'm pertaining

9    to is the fact that under the agreement that Mr. Carpenter

10   had with the company and the only agreement he had with the

11   company there was still money that was owed to him under

12   that employment agreement.  It may not have been salary, as

13   you point out, but it may have been other compensation

14   within that agreement.

15       Q.    You're talking about annual bonuses that were owed

16   to Mr. Carpenter?

17       A.    It possibly could have been.  But, again, as I

18   told you in my deposition, that was not an agreement that I

19   had reviewed or continually looked at.

20       Q.    Okay.

21       A.    But, obviously, what I'm telling you now is that

22   that is the agreement that I am referring to.  When I

23   said -- excuse me.  Could you please keep that up there so I

24   can explain this to you?

25       Q.    Do you need --

1       A.    As far as our agreement goes, which is the

2   employment agreement, where we compensate you as promised,

3   which is the written and duly executed employment agreement,

4   it's going to depend on where we end up.  And by that I

5   meant where we end up as a sustainable business being able

6   to meet our obligations, one of which was our employment

7   agreement with Mr. Carpenter.

8       Q.    And so you believe he may have -- was owed annual

9   bonuses.  That may have been what you were talking about?

10      A.    I don't believe anything other than we honor and

11   continued to honor and have never had a lawsuit from an

12   employee over compensation anything that was written and in

13   their employment agreement.

14      Q.    Okay.

15           So you deny that you were referring to any

16   bonus out of the asset-sale proceeds; is that correct?

17      A.    Let me repeat myself.  There was never any

18   discussions or intent to pay any bonuses, as far as I was

19   concerned.  Any compensation that was given to anybody out

20   of the proceeds from the sale would have been a severance,

21   not a bonus.  And a severance was our appreciation for any

22   time and effort, at our discretion, that we felt that

23   employee may have been responsible for for the success of

24   our company and its ongoing business.

25      Q.    Will you turn to Page 3, please?

1          A.    Page 3 of what?  What document?

2          Q.    Page 3 of the same conversation.

3          A.    Oh, the secretly recorded conversation.   Okay.

4          Q.    Okay.

5                You say, "I mean, I'm telling you that

6     we're -- we're going to dig ourselves out of this thing and

7     then hopefully, you know, at the end of the day, get

8     something out of it from Cascade and get the deal closed and

9     pay the costs that we have to defend ourselves and have

10    money left over so that we can, you know, give you a bonus,

11    give Sara a bonus, give Keith a bonus."

12                And you heard Keith Jones testify that

13    there was a program of bonuses to get people to stay?

14         A.    No.  I -- I heard Keith Jones testify that there

15    was no stay bonus.  Because I have never heard that

16    expression until you made it up here at trial or prior to

17    trial.  There's no --

18         Q.    You've never heard of a stay bonus?

19         A.    I never heard stay bonus, no.  I never have.

20                But that being said, the bonuses that you

21    refer to Keith Jones referred to as severance, which is what

22    I referred to it as and which is what it was.  And that was

23    only in the event that there was any proceeds left over, as

24    Cheryl pointed out, from the sale of the assets.

25         Q.    So, you heard Keith Jones explain that when he

1    spoke about the severance bonuses those were the same --

2          A.    No, no, no.

3          Q.    Sir, let me finish answering [sic] my question,

4    please, okay.

5                You heard Keith Jones testify that the

6    severance bonuses were the same thing as what I was calling

7    the stay bonuses?

8          A.    No, that's incorrect.

9          Q.    That's incorrect?

10         A.    He didn't say that.  He said what you stated as a

11   stay bonus was in fact severance.

12         Q.    He testified that he got that severance as an

13   incentive to stay.  Do you recall that?

14         A.    The severance, not severance bonus as you --

15         Q.    The amount in that severance --

16         A.    -- term it.

17         Q.    -- was his --

18         A.    Excuse me.

19         Q.    -- incentive to stay?

20         A.    Ms. Gibson, you are not going to get me to call

21   something that is severance a bonus because there were no

22   bonuses.

23         Q.    The truth is the bonuses from the asset-sale

24   proceeds to get Sara and Keith and Jeff Carpenter to stay is

25   exactly what you are talking about when you say -- refer to

1    our agreement and compensate Jeff Carpenter as promised.

2         A.    No, that is not the truth.

3                    In fact, could you go back to the last

4    statement you had on Page 3 so I can clarify exactly what it

5    is that you pointed out from my prior statement?

6         Q.    You -- you've already testified that it was only

7    per the written agreement.

8         A.    No.  I am saying -- could you please put it back

9    up so I can explain it?

10                   THE COURT:  It is her turn.

11                   MS. GIBSON:  You have it in front of you,

12   Mr. Potashnik.

13                   THE WITNESS:  I can't even pay my bills.

14   I'm trying to stay out of bankruptcy.  I have Bank of

15   America calling me now.  They're telling me they're ready to

16   put the company and me and Cheryl personally into

17   bankruptcy.

18                   Okay, so I would just want to clarify

19   the fact that in the statement that you took out two

20   sentences.  If you look at the statement in its entirety,

21   you'll see exactly what it is that I'm referring to.

22        Q.    (By Ms. Gibson) Mr. Potashnik -- and I'm not going

23   to show this part so we don't get into a spat, but --

24        A.    That's okay.

25        Q.    -- it was only about a month or so before this

1    conversation that you were indicted, correct?

2         A.   I -- I don't recall.

3         Q.   Do you recall that it happened --

4              MR. L. FRIEDMAN:   Objection, Your Honor.

5    It's another violation of the limine motion.

6              THE COURT:   It is not.   Overruled.

7         Q.   (By Ms. Gibson) You talked, at the bottom of

8    Page 3, about concerns about that, about the indictment.

9              MR. L. FRIEDMAN:   Same objection.

10             THE COURT:   Overruled.

11             And, by the way, you can have a running

12   objection on all of that.

13             MR. L. FRIEDMAN:   All right.   Thank you.

14        Q.   (By Ms. Gibson) Do you see that was suddenly a

15   concern?

16        A.   Obviously, it would have been a concern, but it

17   had nothing to do with any agreements.

18        Q.   Well, you're explaining to Jeff Carpenter your

19   concerns that you might not be able to honor your agreements

20   and pay him as promised, correct?

21        A.   I'm expressing my concern that the business was

22   not operating at a point where it could pay its expenses

23   under his employment agreement.   Any agreement that I was

24   referring to, as I pointed out, was his employment

25   agreement.   And anything that you term "bonus" or "stay

1    bonus" was a severance that was being paid at our discretion

2    subject to the success and proceeds that would be available

3    after the sale.

4        Q.   So, when you testified earlier that you had no

5    discussions with employees about bonuses from the asset

6    sale --

7                    MR. L. FRIEDMAN:  Asked and answered,

8    Your Honor.

9                    THE COURT:  She hasn't gotten her question

10   out yet.

11                   Go ahead, Ms. Gibson.

12       Q.   (By Ms. Gibson) Before we went over this

13   transcript, you had testified that you had no discussions

14   with employees about bonuses --

15       A.   None that --

16       Q.   -- out of --

17       A.   -- none that I recall.

18                   THE COURT:  Let her finish her question.

19                   THE WITNESS:  It's the same question.

20                   MR. L. FRIEDMAN:  Everybody has to

21   participate.  Let me be the objector.  Thank you.

22                   THE COURT:  She still hadn't gotten her

23   question out.

24                   MR. L. FRIEDMAN:  I'm waiting.  I didn't

25   want to waste a stand-up/sit-down.

1          THE COURT:  That's right.

2          Q.   (By Ms. Gibson) So, Mr. Potashnik, you testified

3     earlier that you had no discussions about bonuses from the

4     sale proceeds with employees, correct?

5          MR. L. FRIEDMAN:  Objection, asked and

6     answered.

7          THE COURT:  Overruled.

8          THE WITNESS:  To the best of my

9     recollection, I do not recall having any discussions

10    regarding bonuses.  And as I stated, it was never agreed or

11    intended to pay anybody anything other than severance.

12         Q.   (By Ms. Gibson) But we just talked about a

13    conversation in which you specifically discussed paying

14    bonuses out of asset-sale proceeds, correct?

15         A.   And as I stated, that was in reference to his

16    employment agreement.

17         Q.   Well, but on the next page you talked about the

18    asset sale and paying bonuses to Keith and Sara and Jeff out

19    of asset-sale proceeds --

20         A.   Correct.

21         Q.   -- correct?

22         A.   Which, they would have been owed under their

23    employment agreements.

24         Q.   All right.  So the truth is you did have

25    discussions with employees about bonuses out of asset-sale

1    proceeds?

2         A.    No.   The only discussions I had were in reference

3    to whether or not we would be capable of honoring any

4    agreements that we had with those employees as it pertained

5    to their employment agreement.

6                    So this conversation that you point out has

7    references to agreements.   That agreement is the employment

8    agreement under which I was obligated as an employer and

9    Jeff was obligated as an employee to do certain things.   And

10   we honored that agreement, so --

11        Q.    I thought -- I thought you just said that Jeff --

12   according to your interpretation, that Jeff Carpenter was

13   owed compensation under his employment agreement and that

14   was what you were talking about.

15        A.    That's exactly right.

16        Q.    Okay.   But then you said you honored the

17   agreement.

18        A.    Well, at the time.

19        Q.    Well, telling someone that they can't honor --

20        A.    Jeff rejected the severance that was offered to

21   him under his employment agreement and any discretionary

22   bonuses that were offered to him.

23        Q.    The offer the day after he finished his work

24   toward the asset sale was that he had to release all claims

25   in exchange for salary he had already earned and was owed

1     and some PTO and that's it.

2            A.    That's incorrect.  He was offered and rejected a

3     hundred and fifty thousand dollars of severance.

4            Q.    That was later.  The first document sent to Jeff

5     asked him to release all of his rights for just PTO and --

6            A.    That document was given to over a hundred

7     employees and signed happily by each and every one; none of

8     which have come back to file any kind of grievance against

9     us.

10           Q.    Those severances included the amounts for

11    incentives to stay --

12           A.    No, they did not.

13           Q.    -- correct?

14           A.    Incorrect.

15           Q.    They were significant --

16           A.    Absolutely incorrect.

17                 MR. L. FRIEDMAN:  Objection.  Objection,

18    violation of the limine.

19                 THE COURT:  He's the one bringing it up.

20                 MR. L. FRIEDMAN:  She's asking about it.

21                 THE WITNESS:  It's incorrect.  That's

22    incorrect.

23                 THE COURT:  Let's stay focused on

24    Mr. Carpenter, not other employees in that position.

25           Q.    (By Ms. Gibson) The severance agreements that you

1     had those employees sign were for -- strike that.  The
2     severance agreements that you had the employees sign, those
3     included confidentiality clauses?
4                    MR. L. FRIEDMAN:  Objection.  One,
5     it violates the limine motion.  And, two, it's irrelevant to
6     this case.
7                    THE COURT:  Sustained at this point.
8                    MS. GIBSON:  Your Honor, I know you want to
9     let -- I'm about to head into a different area.  I thought
10    you wanted to let the jurors go early.
11                    THE COURT:  You should go till a quarter
12    till.
13                    MS. GIBSON:  Till a quarter till?
14                    THE COURT:  Uh-huh.
15                    MS. GIBSON:  Okay.
16    Q.    (By Ms. Gibson) Do you recall telling
17    Jeff Carpenter at some point that he was not likely to have
18    a job with the purchaser after the sale?
19    A.    I don't recall.
20    Q.    You don't recall or that didn't happen?
21    A.    I don't recall.
22    Q.    Do you recall at your deposition when I asked you
23    you this question?  I said, "Do you recall telling
24    Jeff Carpenter at some point that he wasn't likely to have a
25    job with the purchaser after the sale?"  You said, "No."  I

1    said, "Do you deny that?"  You said, "Yes."

2         A.    Yes.  That's still my answer.

3         Q.    Are you changing your mind now?

4         A.    No.  I'm saying I don't recall and it didn't

5    happen.

6         Q.    Okay.  You're saying I don't recall --

7         A.    As far as I can recall --

8         Q.    -- that never happened?

9         A.    -- that conversation didn't happen, Ms. Gibson.

10        Q.    Okay.

11        A.    I don't know how else to answer it.  I'm sorry.

12        Q.    Do you -- and you just heard from Rick Graf.  He

13   was the highest level management person for Pinnacle.  You

14   heard him testify just now?

15        A.    Yes, ma'am.

16        Q.    Okay.  Sorry.  I can't see who's here during

17   testimony.

18        A.    I'm sorry?  I didn't understand what your last

19   statement was.

20        Q.    Oh, I just asked because I can't see who's here

21   during testimony.

22                    And Rick Graf essentially had the

23   equivalent position as Jeff Carpenter.

24                    Do you recall telling Jeff Carpenter that

25   he likely would not have a job because the purchaser's

225

1    management company already had someone in Jeff's position?

2        A.    As I just stated, I don't recall having any

3    conversation with any employees as to whether or not they

4    were going to be retained by the new company.  And, in fact,

5    the only conversations that I had were uniform to all

6    employees that Cascade was going to evaluate the employees

7    and make their own decision as to who they wanted to keep

8    and who they didn't.

9            So, could Jeff Carpenter have been a party

10   to that mass communication to all of the employees?  It's

11   quite possible.  Could the conversation have never taken

12   place?  Yes.

13           But it was very clear that anybody who was

14   going to stay with the company had to be interviewed by the

15   new company, and it was up to and incumbent upon the new

16   business to make a decision as to whether or not they wanted

17   those people to stay with them.

18       Q.    Mr. Potashnik, so, with respect to my original

19   question and you said you don't recall, that's a "no, never

20   happened" answer, right?

21           MR. L. FRIEDMAN:   Objection.

22   Argumentative, Your Honor.

23           THE COURT:   Overruled.

24           THE WITNESS:   I don't understand the

25   question, Ms. Gibson.

1          MS. GIBSON:  Okay.

2          THE WITNESS:  I'm sorry.

3          MS. GIBSON:  I'll ask it again.

4          THE WITNESS:  Okay.  Please.

5          MS. GIBSON:  You talked for a while after.

6     Q.   (By Ms. Gibson) Do you recall --

7     A.   Excuse me?

8     Q.   I said I'll ask it again.  You talked for a while

9     after.

10         Do you recall telling Jeff Carpenter that

11    he likely would not have a job because the purchaser's

12    management company already had someone in Jeff's position?

13    A.   I don't recall having any conversations with any

14    employees directly pertaining to whether or not they would

15    be employed.  And it would be incumbent upon them, if they

16    were going to be employed, to interview with the new

17    company; and it was up to the new business whether or not

18    they wanted to keep that employee.

19         And if there was a discussion with

20    Jeff Carpenter it would have been the same thing that I told

21    every employee, Ms. Gibson.  I don't know how else to put

22    it.  This was -- this was over 10 years ago, and there was

23    no hiding the fact that any employee that was going to stay

24    with the company had to go through the process of being

25    interviewed with the new company.

1          Q.    So, even though it was 10 years ago, when I asked
2     you this question at your deposition, "Do you recall telling
3     Jeff Carpenter that he likely would not have a job because
4     the purchaser's management company already had someone
5     in Jeff's position," you said with confidence, "No, it never
6     happened."
7                         MR. DONOHUE:   What page and line are you
8     on, Ms. Gibson?
9                         MS. GIBSON:   Thirty-seven.
10                        THE WITNESS:   To the best of my
11    recollection, that conversation, as stated I here today and
12    as I stated in my deposition, never happened.   And if
13    it did, it happened under the context as it did with all
14    employees.
15         Q.    (By Ms. Gibson) Do you recall asking
16    Jeff Carpenter to help you identify key employees that you
17    wanted to keep on, despite a potential for an asset sale?
18         A.    No.  I don't recall.
19         Q.    And saying, no, you don't recall, you're saying
20    it never happened?
21         A.    I'm telling you anywhere where I say that I don't
22    recall, I don't recall --
23         Q.    Well --
24         A.    -- you know.
25         Q.    -- we've gone over that there's a big difference

228

1    between I don't recall one way or another, it may have

2    happened, and saying I don't recall 'cause that never

3    happened.

4           A.    I don't know what --

5                       MR. L. FRIEDMAN:  Your Honor --

6                       THE WITNESS:  To me there's no difference.

7                       MR. L. FRIEDMAN:  He's asked.  She's asked

8    and answered.  The witness has said to him there's no

9    difference.

10                      THE COURT:  Y'all come over here.

11                      MR. L. FRIEDMAN:  Several times.

12                      (Sidebar conference held)

13          Q.    (By Ms. Gibson) Okay.  Mr. Potashnik, when I asked

14   you at your deposition, "Do you recall asking Jeff Carpenter

15   to help you identify key employees that you wanted to keep

16   on despite the potential for an asset sale," you said, "No,

17   it never happened", correct?

18          A.    Correct.

19                      MR. L. FRIEDMAN:  That's consist -- wait a

20   second.  It's consistent with what the witness just said.

21                      THE WITNESS:  Correct.

22                      MS. GIBSON:  He wouldn't --

23                      THE WITNESS:  No, I never recalled having

24   any discussions, as you pointed out from my deposition.  I'm

25   answering the question the same way I did in my deposition,

1     Ms. Gibson.  I don't know what else to say.

2                    With all due respect, it was 12 years ago.

3     I don't recall recall having conversations with any

4     employees individually about whether or not they would have

5     jobs or what the situation was, because I didn't know and it

6     was not incumbent upon me to be the one to either keep them

7     with the new company or let them go.  That was up to

8     Mr. Graf, who you just had on the stand.

9         Q.    (By Ms. Gibson) That wasn't the question we were

10    talking about.  We were talking about --

11        A.    Well, I'm trying to answer it so we can keep from

12    repeating the same question.

13                    THE COURT:  Let her ask the questions.

14        Q.    (By Ms. Gibson) What I have just put up was about

15    discussions about you wanting input from Jeff Carpenter --

16        A.    No, I didn't --

17        Q.    -- concerning other employees.

18        A.    I didn't.  I didn't ask for input.

19        Q.    Did you and Cheryl Geiser discuss -- wait.  Sorry.

20    I'm on the wrong page.  I'm going backwards.

21                    Do you recall telling Jeff Carpenter that

22    you wanted his input on the amount of sale-proceeds bonuses

23    to be paid to certain key corporate employees beneath the

24    executive level?

25        A.    No, Ms. Gibson.  Again, there were no discussions

230

1    regarding bonuses.  The only thing that would have been paid

2    to anybody over and above what their employment agreement

3    called for would have been a severance.  And I think

4    Mr. Jones made that clear.  I know that Ms. Geiser made that

5    clear.  And I hope that I am, in my testimony, doing the

6    same.

7        Q.    When I asked you this question at your deposition,

8    your answer was just, "No, never happened", right?

9        A.    Same answer I'm giving today.

10       Q.    Do you recall telling Jeff that you wanted his

11   bonus to be reduced by the key corporate employee bonuses

12   because that would give Jeff an incentive to choose an

13   amount that was high enough to keep them, but he wouldn't be

14   giving his favorite employees some astronomical bonus?

15       A.    No.  There's -- again, I don't know how many times

16   I have to answer the question.  There were no discussions

17   regarding anything that was not under a written,

18   agreed-upon, employment agreement that was offered to

19   anybody or discussed with anybody other than severance.  And

20   that is my answer in its entirety.  As many times as you

21   want to frame the question or ask the question, let's just

22   cut to the chase.  There was no discussions regarding

23   bonuses, period.

24       Q.    Mr. Potashnik, you know I'm going to continue to

25   ask the questions --

1        A.     Okay.

2        Q.     -- because we just showed a transcript where you

3    used the word "bonuses" about the employees.

4        A.     And if it was part and parcel of their employment

5    agreement, then the discussion may have taken place.  If

6    there was a duly executed employment agreement which had a

7    provision for a bonus, as I stated, it would have been

8    honored.  And it was a valid and binding agreement that we

9    would have to address in our operations of the business.

10       Q.     All right.  So what's the phrase you're using with

11   duly executed?  You're saying something would have to be

12   duly executed.

13       A.     I'm saying an employment contract signed by both

14   the employer and the employee.

15       Q.     So, is it your view that if you make promises to

16   employees you don't have to honor that unless it's in

17   writing?

18       A.     I never make promises to employees that were not

19   honored and not in writing.

20       Q.     Okay.  You said you never made promises that were

21   not honored and not in writing.

22       A.     Correct.  What's the question?

23       Q.     Are you saying -- I'm just trying to understand

24   what you just said.  Are you saying you never made a promise

25   that you didn't honor, whether it was oral or written?

1      A.   Are you talking about anything specific?  I mean,
2   are you saying, like, in life in general?
3      Q.   No, no, no.
4      A.   I mean, I don't -- I mean, give me some context
5   for this question --
6      Q.   I'm trying to understand --
7      A.   -- so I have a better way of answering it, please.
8      Q.   Mr. Potashnik, I'm just trying to understand the
9   answer you just gave ---
10     A.   Well, I'm trying to understand the question.
11     Q.   -- where you said --
12     A.   Maybe we're having a communication problem.
13               THE COURT:  Let her get her question out.
14     Q.   (By Ms. Gibson) And your answer was given in a
15   particular context, so let me try again to understand.
16     A.   Please.  Thank you, ma'am.
17     Q.   Are you saying you believe you can make promises
18   to employees and you don't have to honor it unless it is in
19   writing and duly executed?
20     A.   No, that's not correct.
21     Q.   Okay.
22               Do you agree with me that oral agreements
23   should be honored?
24     A.   Absolutely.
25     Q.   What types of oral agreements did you honor?  I'm

1    going to exclude severance payments from this question, but

2    can you give me some examples of oral promises that you

3    honored with employees while working at Southwest Housing as

4    far as compensation?

5        A.    As far as compensation.  Anytime you tell an

6    employee that they can leave work early, then you should

7    allow them to leave work early.  Anytime you tell them they

8    can have a day off or a sick day or a special-needs day for

9    a doctor, emergency, something that they verbally discussed

10   and asked your consent for without reducing it into writing,

11   and you -- you grant them the opportunity to leave early or

12   to take a day off.  I mean, those are things that,

13   naturally, in the course of business as a business owner

14   that you would do without having to reduce it into a written

15   contractual form.

16            And, obviously, there becomes a point in

17   running a business where there's limitation to what can

18   actually be "can I take the day off" and isn't it in your

19   best interest and the employee's interest to have it reduced

20   and agreed upon on its term and conditions in written form.

21       Q.    I believe my question was about compensation, so

22   let me try again.

23       A.    Yes.

24       Q.    What types of oral promises have you made to

25   employees with respect to compensation while you were

1   working with the Southwest Housing entities?

2       A.   Well, for instance, if somebody said I want to --

3   I want to take the day off but I don't want to lose the

4   salary for the day and, you know, I would certainly be

5   amenable under, you know, circumstances that were out of

6   that employee's control to not come to work, to pay them for

7   that day off.  I was, I think, very flexible for weddings,

8   funerals, special occasions, and things in one's life,

9   emergency circumstances, things that may not have been

10  traditionally covered by employers or under an employment

11  agreement to allow them the flexibility of being paid their

12  salary during that period of time.

13      Q.   With respect to bonuses, do you believe oral

14  handshake agreements are enforceable?

15      A.   Can you please explain to me?  I don't know what

16  context you're asking me that question.

17      Q.   When it comes to worker bonuses or employee

18  bonuses, do you believe oral agreements are enforceable?

19      A.   I believe that all agreements should be honored,

20  oral or written.  I don't see any distinction between the

21  two.  But I obviously believe that at some level that for

22  protection for both parties to an agreement it should be

23  reduced to writing.

24                 Does that make sense, Ms. Gibson?  Does

25  that answer your question?  I just want to make sure that

1   I'm answering your question.

2       Q.    Yeah.  I think I understood that one.

3       A.    Okay.   Good.

4       Q.    I'm not going to ask you about details; just in

5   general.  Did you discuss the sale-proceeds bonus with

6   Keith -- Keith Jones -- at some point in time?

7                   MR. L. FRIEDMAN:   Objection, relevance.

8                   MS. GIBSON:   It's part of the program.

9                   MR. L. FRIEDMAN:   There's no program.

10                  THE WITNESS:   There's no program.   There's

11  no program.

12                  MR. L. FRIEDMAN:   Lack of foundation.

13                  THE COURT:   All right.  Fair enough.   The

14  lack-of-predicate objection is sustained.

15      Q.    (By Ms. Gibson) You recall Keith Jones talking

16  about a program to offer bonuses to get employees to stay?

17      A.    I recall Keith Jones saying that there was no

18  stay-bonus program, as you seem to be --

19      Q.    I didn't say --

20      A.    No, no, no, you are very determined to get the

21  stay bonus, but the reality --

22                  THE COURT:   Mr. Potashnik, let her finish

23  her question.

24                  MR. L. FRIEDMAN:   Well, he was in the

25  middle of an answer when she interrupted him.

1            THE COURT:  He needs to answer questions,

2   not comment on her question.

3            Repeat your question, Ms. Gibson.

4            MR. L. FRIEDMAN:  So my request is we get

5   back to question and answer, and she let him --

6            THE COURT:  Right.

7            MR. L. FRIEDMAN:  -- finish before she

8   interrupts him, and he let her finish before he interrupts

9   her.

10            THE COURT:  Fair enough.

11            Stay with question and answer.

12            THE WITNESS:  Yes, Your Honor.

13            THE COURT:  And that's for both.

14            MS. GIBSON:  Absolutely.

15            THE WITNESS:  Yes, ma'am?

16   Q.   (By Ms. Gibson) You recall Keith Jones talking

17   about a program in place to offer bonuses to get people to

18   stay in light of the asset sale, correct?

19   A.   No.

20   Q.   You don't recall that.  All right.

21   A.   I recall Mr. Jones saying that there was no

22   stay-bonus program, but there was in fact potential

23   severance being paid to employees upon the sale of the

24   company.

25   Q.   Mr. Potashnik, I'm not using the stay bonus or

1     severance.  I'm just saying bonus.  Bonuses for you --

2          A.    Well, there's a -- there's a -- there's a big

3     difference --

4          Q.    I'm just saying --

5          A.    -- to me.  So I can't distinguish --

6          Q.    What word do you want -- what word do you want me

7     to use?

8          A.    Well, it depends on whether or not it's referred

9     to in the employment agreement as a bonus or if it's

10    referred to, in fact, by Mr. Jones in his testimony as what

11    it was, which was a severance.

12         Q.    My question is about bonuses offered to employees

13    to try and get them to stay.  You don't like the word

14    "bonus".  What word would you like me to use to --

15         A.    Ms. Gibson, your question was about Keith Jones

16    and what his testimony referred to.  And as I pointed out,

17    his --

18         Q.    Well, let me just ask --

19         A.    -- testimony referred to the fact that there was

20    no stay bonus but there was a severance paid to those

21    employees that were going to be with the company at the time

22    of the asset sale and beyond --

23         Q.    Okay.

24         A.    -- if, in fact, Cascade decided to keep them as

25    employees.

238

1      Q.    Let me try this way.  Do you agree that there is a

2  program in place to identify important employees and offer

3  them money as an incentive to stay as long as needed to help

4  make the asset sale happen?

5      A.    No.

6      Q.    You deny that?

7      A.    Yes.

8      Q.    Do you believe that businesses must live up to

9  their agreements with those who have lived up to their end

10  of the agreement?

11      A.    Yes.

12      Q.    Do you recall that you asked Jeff Carpenter to

13  help you take potential purchasers and investors on tour --

14  I'm sorry -- tours to market the sale of the assets?

15      A.    I don't recall that I ever -- ever asked

16  Mr. Carpenter to do anything outside of what is called for

17  in his employment agreement.  If it was part of his

18  responsibilities under the employment agreement, it may have

19  been something that he had been asked to do; but

20  it certainly was not with anybody that would have been,

21  quote, unquote, an investor.  That was my responsibility.  I

22  mean, I -- I took on a lot of responsibility running the

23  business, and one of the most important things to me was

24  personally taking investors.

25      Q.    So the answer is -- the answer you gave me --

1   well, let me just do this.

2                   It's Page 49, Line 21.  When I originally

3   asked you if you recall that you asked Jeff Carpenter to

4   help with potential purchasers and investors on tours to

5   market the sale of assets, you said no, correct?

6       A.   That's correct.

7       Q.   All right.

8                   Why are you making distinctions and saying,

9   well, I would only have asked him to do what was within the

10  scope of his employment --

11                  MR. L. FRIEDMAN:  By the way, that answer

12  was consistent with the one he gave on the witness stand.

13                  THE COURT:  Sidebar.

14                  THE WITNESS:  Okay, but I can -- I'm sorry,

15  Your Honor.

16                  THE COURT:  No, go ahead.  Answer her

17  question.

18                  THE WITNESS:  Okay.

19                  The answer to the question is -- and I

20  think Mr. Graf was a good witness to go on before me, being

21  with -- buying the company.

22                  As the president and owner of the business,

23  it was my responsibility to make sure that the people that

24  were responsible for buying the business were personally

25  taken to sites by myself.  Now, if a lower-level management

1    person like a Mr. Graf or somebody even lower than Mr. Graf

2    was asked to go look at a property, that's a completely

3    different issue.  But as it pertains to actual investors,

4    that was me.

5                      I take pride and responsibility for making

6    sure that I personally took investors to each and every

7    property.  I knew each and every property.  I knew all of

8    the employees in the company.  I pride myself on the fact

9    that I spent time not just with employees but the residents

10   of our properties.

11                      THE COURT:  You have about two minutes

12   left.

13        Q.   (By Ms. Gibson) How many properties did the

14   organization have in 2007/2008 time frame?

15        A.   I don't recall.

16        Q.   Was it over a hundred?

17        A.   No.

18        Q.   Less -- and by property, is that one set of a

19   property is one apartment complex unit?

20        A.   Yes.  That's how I would define it.

21        Q.   How many units were there?

22        A.   I don't recall the exact number of units.

23        Q.   Over a thousand?

24        A.   Yes.

25        Q.   Okay.  And it's your testimony you knew each and

1    every one of the tenants personally?

2         A.    No.  It's my testimony that I knew each and every

3    employee in most of the properties.  And I knew quite a few

4    of the tenants in the properties because I was on property

5    much of the time, but I am not making any statement to the

6    effect that I knew each and every resident of the

7    properties.  That would be impossible.

8         Q.    Sorry.  I thought that's what you said.  Okay.

9         A.    No, that's not what I said.

10                  MS. GIBSON:  I don't think I can use up

11   another minute.

12                  THE COURT:  Okay.  That's all right.

13                  You can have a seat over here,

14   Mr. Potashnik.

15                  Ladies and gentlemen, we'll break for the

16   afternoon in just a minute.  Please remember the

17   instructions I gave you yesterday.

18                  (Jury instructions given)

19                  THE COURT:  So we'll see you tomorrow

20   morning at 9:00 o'clock.

21                  (The jury exited the courtroom.)

22                  (Off the record)

23                  THE COURT:  We're on the record.

24        DEFENDANTS' OBJECTION AND MOTION FOR MISTRIAL

25                  MR. L. FRIEDMAN:  I would like to object to

1    the admission of Exhibit Number 23.  One, I think

2    Ms. Gibson violated our order in limine by introducing that

3    exhibit without redacting reference to criminal indictments

4    and by introducing that exhibit with reference to criminal

5    indictments plural.  Then the inference that's left with the

6    jury is that both Mr. and Mrs. Potashnik was indicted.  And

7    it's clear that the Court ruled that no mention of

8    Mrs. Potashnik's indictment conviction felony would be put

9    before the jury.

10                   I think it's prejudicial.  I think it could

11   be case determinative.

12                   And not only do I make the objection, I'm

13   asking the Court for a mistrial that --

14                   THE COURT:  All right.

15                   MR. L. FRIEDMAN:  -- on that basis.

16                        COURT'S RULING

17                   THE COURT:  And the motion for mistrial --

18   the objection's overruled; motion for mistrial is overruled.

19                   The rulings are already on the record, was

20   just put on the record what was said at sidebar.  And

21   Mr. Friedman summed up fairly what was said at sidebar, so

22   we'll take this as though those were the statements made

23   before the Court issued its ruling --

24                   MR. L. FRIEDMAN:  Thank you.

25                   THE COURT:  -- when the evidence came in.

1                        Did you want to talk to counsel, see if
2        there's anything else you want to put on?
3                        See y'all tomorrow morning at 9:00 o'clock.
4                        MR. L. FRIEDMAN:  We're good for today.
5                        (Plaintiff's Exhibit 34 marked for
6                        identification)
7                        (End of proceedings)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3         I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12        I further certify that the total cost for the

13   preparation of the Reporter's Record is $1,474.00 and will

14   be paid by Friedman & Feiger, LLP.

15        WITNESS MY OFFICIAL HAND this the 12th day of October,

16   2018.

17

18

19                           /S/ Vikki L. Ogden
                             _____
20                           VIKKI L. OGDEN, Texas CSR# 6309
                             Official Court Reporter
21                           Dallas County Court at Law No. 5
                             600 Commerce Street, Floor 5
22                           Dallas, Tx. 75202
                             (214)653-6443
23                           Certification Expires:  12/31/18

24

25

```
 1                        REPORTER'S RECORD

 2               TRIAL CAUSE NO. cc-08-02072-e

 3                         VOLUME 4 OF 11

 4  JEFFREY CARPENTER,          )      IN THE COUNTY COURT
                                )
 5       Plaintiff,             )
                                )
 6  VS.                         )      AT LAW NO. 5
                                )
 7  SOUTHWEST HOUSING           )
    DEVELOPMENT COMPANY, INC., )
 8  SOUTHWEST HOUSING           )
    MANAGEMENT COMPANY, INC.,   )
 9  AFFORDABLE HOUSING          )
    CONSTRUCTION, INC., BRIAN   )
10  POTASHNIK and CHERYL        )
    POTASHNIK,                  )
11                              )
         Defendants.            )      DALLAS COUNTY, TEXAS

12

13

    ----------------------------------------------------------
14

15                     TRIAL ON THE MERITS

16

17   ----------------------------------------------------------

18

19

20           On the  25th day of January, 2018, the

21  following proceedings came on to be heard in the above-

22  entitled and numbered cause before the Honorable Mark

23  Greenberg, Judge presiding, held in Dallas County, Texas

24

25               Proceedings reported by machine shorthand.
```

```
 1                    A P P E A R A N C E S

 2

 3       Ms. Amy Gibson
         GIBSON, WILEY, PLLC
 4       SBOT NO. 00793801
         1500 Jackson Street, Suite 714
 5       Dallas, Texas 75201
         PHONE:  (214) 522-2121
 6
         Mr. Brian Sanford
 7       THE SANFORD FIRM
         SBOT NO. 17630700
 8       1910 Pacific Avenue, Suite 15400
         Dallas, Texas  75201
 9       PHONE:  (469) 361-9111

10       ATTORNEYS FOR THE PLAINTIFF

11

12           AND

13

14       Mr. Lawrence Friedman
         SBOT NO. 07469300
15       Mr. Michael Donohue
         SBOT NO. 05989380
16       Mr. Jason Friedman
         SBOT NO. 24059784
17       FRIEDMAN & FEIGER ATTORNEYS AT LAW
         5301 Spring Valley Road, Suite 200
18       Dallas, Texas  75254
         PHONE:  (972) 788-1400
19
         Mr. Ryan Hale
20       HAWKINS, PARNELL, THACKSTON & YOUNG, LLP
         SBOT NO. 24097784
21       4514 Cole Avenue, Suite 500
         Dallas, Texas  75205
22       PHONE:  (214) 780-5100

23       ATTORNEYS FOR THE DEFENDANT

24

25
```

```
 1                      I N D E X

 2                      VOLUME 04

 3                 (TRIAL ON THE MERITS)

 4                                          Page   Vol.

 5   January 25, 2018

 6   Appearances . . . . . . . . . . . . . .   02     04

 7   Proceedings . . . . . . . . . . . . . .   05     04

 8   PLAINTIFF'S WITNESSES
                     Direct   Cross  V. Dire/S. Rosa   Vol.
 9   JEFF RICHARDS      07, 15   13,          --          04
     BRIAN POSTASHNIK   16,      --           --          04
10   PAUL COHEN         100, 108 106,         --          04
     VIKKI CARPENTER    112, 127 116, 128     --          04
11   JEFFREY CARPENTER  130,     --           --          04

12   DEFENDANT'S WITNESS
                     Direct   Cross      V. Dire/S. Rosa   Vol.
13   MARK JONES     65, 95   86, 97              --          04

14   Adjournment . . . . . . . . . . . . . . . . 233     04

15   Court Reporter's Certificate. . . . . . . . 234     04

16                  EXHIBIT INDEX

17   PLAINTIFF'S

18   NO.    DESCRIPTION         OFFERED    ADMITTED    VOL.

19   20.    Escrow Agreement      18         18         04

20   35.    E-mail                21         21         04

21   39.    Secretary of State Doc.  47      47         04

22   40.    Employee Handbook     33         33         04

23   40(a). Cert. of Termination  49         49         04

24   41.    E-mail                38         39         04

25   49.    E-Mail               185        185         04
```

```
1                        EXHIBIT INDEX (cont'd)

2    PLAINTIFF'S

3    NO.      DESCRIPTION          OFFERED      ADMITTED      VOL.

4    50.    E-Mail               193          193           04

5    51.    Hartfield's Note     202          202           04

6    52.    E-Mail               207                        04

7    DEFENDANT'S

8    14.    JC Personal Notes    121          122           04

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1               P R O C E E D I N G S

 2               (January 25, 2018)

 3               THE BAILIFF:  All rise.

 4               (Jury ushered in.)

 5               THE COURT:  Jurors, please have a seat as

 6    you're coming in.  Everybody can have a seat.

 7               Welcome back.  Good morning, ladies and

 8    gentlemen.  We'll continue with the trial.  We're going

 9    to -- first thing we're going to do this morning is

10    present some testimony to you by videotape deposition.

11    And I'll explain what the videotape deposition is to you

12    in just a moment.  We'll go about until 10:25 or so

13    before we take a break.  We'll take a 15-minute break,

14    but if you need an additional break, just let us know.

15    Our court reporter today is Georgina Ware.  She'll be

16    here today and Vikki will be back tomorrow.

17               A videotape deposition is sometimes when a

18    witness is not able to appear in person in a trial and we

19    play the deposition.  The deposition is taken outside the

20    presence of the Court and the jury, but the lawyers are

21    there and the court reporter is there and a videographer

22    is there.  The court reporter swears in the witness so

23    that the testimony is under oath.  And the court reporter

24    transcribes the proceedings so that we have a record of

25    it.
```

 1                    When we play a videotaped deposition, we ask

 2      the lawyers to edit the videotape deposition before we

 3      present it to the jury.  So as you see the videotape

 4      deposition, you'll see edits in it and that's because

 5      I've asked them to edit it, so that we're not playing

 6      more than we need to.  So you shouldn't make any

 7      assumptions that the edits are anything diabolical or

 8      anything like that.

 9                    Ms. Gibson, if you'll call your next

10      witness.

11                    MS. GIBSON:  Plaintiff calls Jeff Richards.

12                    THE COURT:  All right.  And this will be by

13      videotape deposition.

14                    Whenever you're ready.

15                    (Video is playing.)

16                    THE COURT:  Oh, and this is -- do we know

17      how long -- do you know how long this is?

18                    MR. SANFORD:  13 minutes, Your Honor.

19                    THE COURT:  32 minutes long?

20                    MS. GIBSON:  It's --

21                    MR. SANFORD:  Yes, sir, 13 minutes.

22                    THE COURT:  13 okay.

23                    (Video is playing.)

24                         JEFFREY RICHARDS,

25      having been first duly sworn, testified as follows:

```
 1                    DIRECT EXAMINATION

 2   BY MS. GIBSON:

 3        Q.   Mr. Richards, would you please tell us your full

 4   name.

 5        A.   Jeffrey Robert Richards.

 6        Q.   And you live and work in Arizona now?

 7        A.   That's correct.

 8        Q.   And that's where you're giving your deposition

 9   from?

10        A.   That's correct.

11        Q.   Would you please briefly describe your

12   educational background?

13        A.   I have a bachelor's degree in finance from

14   the -- from Arizona State University.

15        Q.   And did you attend seminary or divinity school?

16        A.   I took one class.

17        Q.   Okay.  You previously worked for American

18   Housing Foundation or one of its affiliates?

19        A.   Correct.

20        Q.   And what was the formal name of the entity you

21   worked for?

22        A.   American Housing Foundation.

23        Q.   Is it okay if I refer to that entity as AHF?

24        A.   Yes.

25        Q.   What was your job title at AHF when -- your last
```

1   job title at AHF?

2        A.   I don't know that I actually had a formal job

3   title, but if -- if you're interested in my

4   responsibilities, I spent most of my time trying to

5   renegotiate some pretty poor financing on some apartment

6   portfolios that had been acquired actually before I

7   arrived there.  We also spent, towards the end --

8   actually, Jeff Carpenter, who is the subject of this

9   proceeding, and I worked pretty closely together, trying

10  to streamline some operations, you know, kind of retool a

11  management company.  Just trying to fix some problems.

12       Q.   Okay.  And I take it you know who Jeff Carpenter

13  is?

14       A.   I do.

15       Q.   How is it that you first came to know who Jeff

16  Carpenter was?

17       A.   If -- if memory serves correctly, he was

18  actually referred to American Housing Foundation by some

19  folks outside the company who knew that we really were

20  looking for and needed someone with abilities as a

21  property manager.

22       Q.   And do you recall who referred Jeff to y'all?

23       A.   Don't remember the name, but I believe it was

24  actually one of our insurance agents in Denver.  It's

25  been a few years.  I don't remember all the names and

1   dates and stuff.

2       Q.   That's okay.  And once the -- once the referral

3   was made to AHF, when's the next time -- or what's the

4   next circumstance in which you met Jeff Carpenter?  What

5   was going on?

6       A.   Well, I don't remember.  I don't remember the

7   exact time frame or -- or date or anything, but we would

8   have contacted him probably -- probably through our

9   friend that recommended him to just get together for a

10  meet and greet and see if there was any compatibility or

11  mutual interest.

12      Q.   And ultimately was there compatibility and

13  mutual interest?

14      A.   Yeah.  I think we -- we felt like that on both

15  sides.  We -- or -- we certainly did on our side.

16      Q.   And so were you involved in efforts to recruit

17  Jeff Carpenter to come work at AHF?

18      A    I was.

19      Q.   Who else was involved on the AHF side?

20      A.   I know that our president, Steve Sterquell, was.

21      Q.   And what was your understanding of who Jeff

22  Carpenter was working for at the time y'all were

23  recruiting him?

24      A.   I don't remember the exact name of the company,

25  but it was -- I believe their name was Potashnik.

1    Q.   Okay.  You understood he was working for the

2    Potashniks?

3    A.   Yes.

4    Q.   And then I know you don't recall the date, but

5    over about what period of time, as in days or weeks or

6    months or years, did the recruitment efforts last?

7    A.   I'm going to -- I'm going to guess that it was

8    around seven months, maybe eight.  But again, I don't

9    remember the specific dates, but it would have been

10   something like that.  Between the time that we first met

11   and that he came on board, that's what you're asking me,

12   right?

13   Q.   Yes.

14   A.   Okay.

15   Q.   All right.  And in any event, it was several

16   months that the recruitment efforts lasted?

17   A.   Yes, it was.

18   Q.   And what did AHF decide about whether or not it

19   ulitmately wanted to hire Jeff Carpenter?

20   A.   We -- we really never wavered in our desire to

21   hire him.

22   Q.   And how soon in the process did AHF want Jeff

23   Carpenter to start work with it?

24   A.   Well, I would say almost immediately.

25   Q.   And did Jeff Carpenter actually start working

1    for AHF that soon?

2        A.   He didn't -- he didn't formally come on board,

3    but he did consult with us, as I recall, in putting

4    together some information for prospective lenders on the

5    properties that we were trying to refinance.

6        Q.   Do you -- do you recall that Jeff had to delay

7    his full-time start date with y'all?

8        A.   He did, yes.

9        Q.   And what was your understanding of why Jeff

10   Carpenter delayed his full-time start date?

11       A.   He had -- I don't remember the amount, but he

12   had a considerable amount of money he said that was

13   coming to him from his current employer and he just was

14   not in a position to leave yet.

15       Q.   And was it your understanding that if Jeff left

16   then that he would possibly lose out on getting that

17   considerable amount of money?

18       A.   That's my recollection.

19            MR. DONOHUE:  Objection.  Leading.

20       Q.   (By Ms. Gibson)  And the -- the considerable

21   amount of money you mentioned, your understanding was

22   that would be coming from who?

23       A.   From his then current employer.

24       Q.   Okay.  Did you have any involvement in setting

25   the AHF compensation package for Jeff Carpenter?

1    A.   No, I really didn't.  As I recall, Steve

2  Sterquell and Jeff handled that between themselves.

3    Q.   Okay.  And Steve Sterquell, I think you

4  mentioned, was the president?

5    A.   Correct.

6    Q.   And what ultimately happened to Steve Sterquell?

7    A.   He passed away in April of 2009.

8    Q.   And what happened to AHF eventually after Steve

9  Sterquell died?

10   A.   I don't have a complete answer for that because

11 I actually left the company about a month later.

12   Q.   Okay.  With respect to the considerable amount

13 of money you mentioned that was causing Jeff Carpenter to

14 delay his start date with AHF, what else, if anything,

15 did Jeff tell you about that?

16   A.   I really don't -- I really don't recall what the

17 specifics were with -- I actually don't recall what the

18 compensation drive from or -- we probably discussed it at

19 one point in time.  I just don't remember.

20   Q.   Okay.  What type of work are you currently

21 engaged in?

22   A.   I am now a residential real estate agent.  Just

23 within the last month.  Just -- just started that career

24 within the last month.

25   Q.   Okay.  Do you currently have any business

1   dealings with Jeff Carpenter?

2       A.   No.

3       Q.   Do you currently have any future plans to do

4   business with Jeff Carpenter?

5       A.   No.

6       Q.   Do you have any interest whatsoever in the

7   outcome of this lawsuit?

8       A.   No, except for Jeff has been a friend and -- but

9   we really haven't talked much in the last few years.

10                      CROSS-EXAMINATION

11  BY MR. DONOHUE:

12      Q.   Mr. Richards, this is Mike Donohue.  I represent

13  the Postashniks you already mentioned --

14      A.   Okay.

15      Q.   -- as well as the defenders in this lawsuit that

16  Mr. Carpenter has filed against them.

17           You say that you are -- you're a friend of

18  Jeff Carpenter?

19      A.   Well, I would count myself as one, although

20  we've -- we've talked very little in the last few years.

21      Q.   Okay.  And why would you count yourself as a

22  friend of Mr. Carpenter?

23      A.   Because at one time we were fairly close in

24  terms of business associates and we just -- we got along

25  well.

14

1    Q.   Okay.  And what time frame was this that you

2  were very close with Mr. Carpenter?

3    A.   Oh, as I said, we both left AHF in 2009.  We --

4  you know, we talked periodically after that, and then it

5  just seems like the times we talked got, you know, fewer

6  and farther between to where we --

7    Q.   Okay.

8    A.   -- we'd go like maybe a year without talking.

9    Q.   Okay.  And as I understand, you left about a

10 month after Mr. Sterquell passed away?

11   A.   Yeah, something like that.

12   Q.   And Mr. Carpenter left also about the same time

13 as you; is that right?

14   A.   Correct.

15   Q.   All right.  And then where did Mr. Carpenter go

16 after he left, after he left American Housing Foundation?

17   A.   I -- I don't recall specifically.

18   Q.   All right.  And when you worked with him, is

19 that the time frame that you said that you were fairly

20 close with him?

21   A.   Yes.

22   Q.   So that was back in, what, 2007 through 2009

23 time frame?

24   A.   Correct.

25   Q.   All right.  Have you kept up with him much since

1    then?

2        A.   As I said earlier, we -- we probably did a

3    better job of keeping up with each other early on after

4    our tenure at AHF, but really the last few years we've

5    had very little conversation amongst each other.

6        Q.   So after you left and Mr. Carpenter left,

7    American Housing Foundation continued; is that right?

8        A.   I believe that's correct, yeah.

9                    REDIRECT EXAMINATION

10   BY MS. GIBSON:

11       Q.   Mr. Richards, why did American Housing

12   Foundation want to hire Jeff Carpenter?

13       A.   We needed somebody that -- that people would

14   consider to be a fairly high profile professional

15   property management guy or girl.  It was -- it was

16   important to us in how we were kind of projecting or

17   branding ourselves in terms of refinancing the -- the

18   portfolio debt that we had.  And he came highly

19   recommended to us, so...

20       Q.   And -- and when you say you needed someone that

21   people would consider high profile experience, what --

22   what types of people are you talking about?

23       A.   Well, as I said, I believe that he was first

24   recommended by our -- one of our insurance agents in

25   Denver.  These guys, as I recall, did a lot of this type

1    of business, insuring, you know, large portfolios of --

2    of multifamily properties.  They knew of -- I can't

3    remember where they knew of him from, but they felt like

4    he would fit that bill.

5         Q.  Did it matter to lenders that y'all had someone

6    experienced in property management?

7         A.  Well, it did in this particular case.

8              THE COURT:  That's it?  Any other portions

9    you want to read from that?  Was that everything?

10             MS. GIBSON:  No, that's it.

11             THE COURT:  That concludes the that witness,

12   ladies and gentlemen.  We'll continue with

13   Mr. Potashnik's testimony now.

14             Mr. Potashnik, if you could come back up

15   here.  Just have a seat there (pointing).

16             Ms. Gibson, if you'll pick up where you left

17   off.

18             MS. GIBSON:  Okay.

19                  BRIAN POTASHNIK,

20   having been first duly sworn, testified as follows:

21                  DIRECT EXAMINATION

22   BY MS. GIBSON:

23        Q.   Mr. Potashnik, do you see a document marked

24   Exhibit 20 in front of you?

25        A.   Yes.

1    Q.   And does Exhibit 20 appear to be an accurate

2  copy of the Fifth Amendment to escrow agreement in

3  connection with the asset sales of Cascade?

4    A.   It doesn't look familiar to me.  I mean,

5  probably looked at it some -- at some point maybe, I

6  don't know.  This was signed ten years ago.  I --

7    Q.   Do you --

8    A.   I'm sorry.  But it's just something that I can't

9  absolutely say that I'm familiar with because it was from

10  November of 2007, so I apologize.  And it is an amendment

11  to an escrow agreement that I think I would need to see

12  before being affirmative as to whether or not this is a

13  proper and correct amendment to that agreement.

14    Q.   You see that the second page says -- has a

15  signature for each seller identified in the contract?

16    A.   Yes, ma'am.

17    Q.   And it says by Brian Potashnik as authorized

18  agent?

19    A.   Yes.

20    Q.   And do you recognize your signature on the

21  second page?

22    A.   Yes, I do.

23    Q.   Okay.  You realize that during this litigation,

24  we asked for your copy of the same documents, correct?

25    A.   I'm not aware.

1      Q.   You weren't?

2      A.   No.

3      Q.   Did you go look for your copy of the -- these

4  documents?

5      A.   No.

6              MS. GIBSON:  Plaintiff offers Exhibit 20.

7              THE COURT:  Any objection?

8              MR. FRIEDMAN:  No, sir.

9              THE COURT:  Okay.  20 is admitted.

10             (Plaintiff's Exhibit No. 20 is admitted.)

11             (Sotto voce discussion.)

12             MS. GIBSON:  Your Honor -- Your Honor, that

13 happened right when we changed tactics and that one got

14 missed, so...

15             THE COURT:  All right.  Very good.

16     Q.   (By Ms. Gibson)  Mr. Potashnik, I'm handing you

17 what's been marked Plaintiff's Exhibit 25.  If you'll

18 look through those.

19     A.   (Witness complies.)

20     Q.   Do those appear to be accurate copies of

21 organizational charts for various portions of the

22 organization?

23     A.   I don't know where these originated.  I have --

24 I've never seen those before.  So it would take me some

25 time and some ability to verify everything in order to

```
 1   tell you affirmatively that this is -- these are

 2   absolute.

 3       Q.   Do you recognize all the people on those

 4   organizational charts?

 5       A.   I have to read through it to tell you.  I

 6   recognize everybody on the front -- on the first page.

 7   Second page, yes.  I recognize everybody there.

 8       Q.   Well, do you mind before you read the whole

 9   thing, looking at the front page.

10       A.   (Witness complies.)

11       Q.   Does that hierarchy and salary and bonus

12   information appear to be accurate to you?

13       A.   I don't know.

14       Q.   I'm just going to grab this back, if that's

15   okay.  Thanks.

16       A.   Sure.

17       Q.   Mr. Potashnik, yesterday I had asked you some

18   questions about whether you ever had Jeff Carpenter lead

19   tours with potential purchasers.

20            And I believe your answer was no; do you

21   recall that?

22       A.   Yes, ma'am.

23       Q.   Okay.  And you said that never happened?

24       A.   I think to clarify my understanding of the

25   question or my interpretation of the question, potential
```

1   purchasers are those that are the decision makers, who

2   write the checks.  Now, obviously there are people at

3   lower levels that do due diligence, property inspections,

4   things of that nature.  So not everybody -- if you're

5   including them -- would have necessarily been somebody

6   that I would have taken to the property.  But investors,

7   purchasers, that would have been something that I would

8   have done or delegated to Mark Jones to do.

9        Q.   To who -- you would delegate tours to Mark

10  Jones?

11       A.   Yes.

12       Q.   Did you have -- ever have Jeff Carpenter handle

13  meetings with potential purchasers and investors on his

14  own?

15       A.   On his own, no.

16       Q.   I'm handing you Plaintiff's Exhibit 35.  I

17  realize the writing is small, but that is as big as they

18  could get it to print.

19            Do you recognize Exhibit 35 --

20            MS. GIBSON:  I'm sorry, Mr. Friedman.

21       Q.   (By Ms. Gibson) -- as an e-mail from you to Jeff

22  Carpenter?

23       A.   Yes.

24       Q.   Okay.  And -- and does this appear to be an

25  accurate copy of an e-mail that you sent to Jeff

 1   Carpenter on June 26th, 2006?

 2       A.   Yes.

 3       Q.   Okay.

 4            MS. GIBSON:  Plaintiff offers Exhibit 35.

 5            THE COURT:  Any objection?

 6            MR. FRIEDMAN:  No, sir.

 7            THE COURT:  35 is admitted.

 8            (Plaintiff's Exhibit No. 35 is admitted.)

 9       Q.   (By Ms. Gibson)  You see you're asking Jeff

10   Carpenter to handle a meeting in San Antonio?

11       A.   Yes, ma'am.

12       Q.   Okay.  And you provide some -- you've been

13   provide -- you forward to him some information about

14   Greystone and Company?

15       A.   No.  I forwarded him an e-mail that was sent to

16   me by the investment bankers, regarding a meeting with

17   Greystone.

18       Q.   Okay.  Who --

19       A.   So it was not -- that is not my e-mail to Jeff.

20   My e-mail to Jeff was me asking him that he had -- if he

21   would handle the meeting?

22       Q.   Correct.

23            And it just -- this information is

24   information that he then providing to you that you're

25   forwarding on?

1      A.   That's correct.

2      Q.   Okay.  And who was Greystone and Company?

3      A.   Well, as far as I was concerned, they were not a

4   potential investor or purchaser.  I knew of Greystone as

5   being a property management company and it was my opinion

6   that this was not an investor, purchaser that was a

7   potential candidate for the company and therefore didn't

8   feel that it was necessary for myself to be the one to

9   take them to properties.

10      Q.   So -- so help me understand, who --

11            THE WITNESS:  Bless you.

12            MR. FRIEDMAN:  Bless you.

13      Q.   (By Ms. Gibson)  What role did you consider

14   Greystone and Company to have?

15      A.   I didn't think that Greystone would be a

16   candidate that I would consider to be a purchaser or

17   investor.

18      Q.   Okay.  Well, was the meeting about potential

19   purchase?

20      A.   I don't recall what the meeting was about.  It

21   could have been about property management.  It could have

22   been about the potential purchase of one property.  It

23   could have been about potential purchase of all

24   property -- purchasing all properties.  I -- I just don't

25   recall, but I did not -- and can tell you that,

1  Greystone -- in my opinion, I would not consider then,

2  nor do I consider now, to be a candidate worthy of being

3  qualified to purchase anything from our portfolio.

4      Q.   Okay.  Well, you see the biography that was

5  forwarded about one of the attendees, Bill Guessford?

6      A.   Yes.

7      Q.   Okay.  And you see that he participates in the

8  analysis and purchase of new assets?

9      A.   Yes.  I also see before highlighting that he is

10  the managing director of their acquisitions and REO

11  division.  And I didn't consider them to be a worthy

12  candidate that I would qualify as an investor or

13  purchaser.

14      Q.   And you see --

15              MR. FRIEDMAN:  I'm try to be patient and

16  respectful, but all of this is irrelevant to the claims

17  that have been plead.

18              THE COURT:  All right.

19              MS. GIBSON:  Your Honor, it goes to that at

20  the time, Brian Potashnik thought that Jeff was important

21  to the asset sale.

22              THE COURT:  Overruled.

23      Q.   (By Ms. Gibson)  And who -- so you see there's

24  also another person listed who would be there.  Kelley

25  Heinsman, you see that?

24

1    A.   I don't know whether or not she was attending

2  that meeting or not.

3    Q.   Okay.  Well, she --

4    A.   I think that she was the one that sent the

5  e-mail, so that is why she --

6    Q.   Okay.

7    A.   -- put her name and -- the name of her company.

8  But I'm not aware that she attended that.  And, again, I

9  did not consider this to be a purchaser or investor of

10 any serious nature that would deserve any kind of

11 attention at my level or an executive level.

12   Q.   Okay.  So is it your testimony now that you did

13 ask Jeff Carpenter to handle meetings with potential

14 purchasers and investors if you didn't think they were

15 worthy?

16   A.   No.  I, again, don't know whether or not they

17 would qualify as being a purchaser or investor.  They may

18 have been a potential candidate to manage the portfolio.

19 Greystone is a management company.  So it could have been

20 a meeting relating them to taking over purely the

21 function of management or maybe management of one or two

22 assets in the portfolio.

23   Q.   Well, you see this company, RBC Capital Markets?

24   A.   Yes.

25   Q.   That company was retained by your organization

1    to help with the potential asset sale, correct?

2         A.   Yes.   That's correct.

3         Q.   All right.   So does that help refresh your

4    memory that this was a potential purchaser?

5         A.   No.   As a matter of fact, their role could have

6    been -- in many cases it was -- to make sure that the

7    company had a functioning third-party management company

8    potentially as a way to attract potential purchasers and

9    investors.

10        Q.   So --

11        A.   So it could have been a recommendation on their

12   part to bring the company up in its standards because we

13   were, again, losing money at the management company level

14   and to bring in a company like Greystone to become a more

15   attractive candidate to a potential purchaser and

16   investor is the recommendation of the investment bank.

17        Q.   RBC Capital Markets was -- one of the things

18   that it did was to help find potential purchasers in

19   connection with the asset sale, correct?

20        A.   Among many things, yes.   Among many things,

21   financing, management functions.

22        Q.   Mr. Potashnik, you -- you were the agent for all

23   of the sellers in the asset sale, correct?

24        A.   If -- again, I don't know whether or not I was

25   the agent of all the entities.   Again, this was ten years

1   ago.  So, please, you know, I need to have my memory

2   refreshed if that's the case.  And if that's what you're

3   saying, than it certainly could be the case.

4       Q.   Well -- well, for example, we just talked about

5   the Fifth Amendment to the escrow agreement.  And you see

6   on the second page it says that you're signing for each

7   seller identified in the contract by Brian Potashnik as

8   authorized agent.

9            Does that refresh your memory that you were

10  acting as authorized agent for the sellers?

11      A.   To simplify and answer your question, I was

12  ultimately the person who controlled the company and was

13  where the buck stop as you should probably put it.  I

14  mean, I don't doubt that I was the authorized agent for

15  all of the entities.  And if -- in some cases it might

16  have been Cheryl or somebody else, then I certainly don't

17  think that I was not ultimately the one that would be

18  responsible as the agent.

19      Q.   Okay.  So you -- you acknowledge that you were

20  the authorized agent for all of the sellers?

21      A.   As far as I know, that's the case, yes.

22      Q.   All right.  And do you recall Jeff Carpenter

23  trying to negotiate a higher percentage of sale proceeds

24  than 3 percent?

25      A.   No.

1    Q.   You recall him asking if -- if it could be 5

2    percent, instead of 3 percent?

3    A.   No.

4    Q.   Do you recall telling Jeff that that wasn't

5    going to happen because Cheryl had already -- Cheryl

6    Potashnik has already blessed the 3 percent deal and so

7    you were going to stick with that?

8    A.   No, there -- there was no deal.  No conversation

9    like that --

10   Q.   That you had --

11   A.   -- that wouldn't have occurred under any

12   circumstances, Ms. Gibson.

13   Q.   Okay.  I understand you've already testified

14   under oath that you never had any conversations with any

15   employees about any type of money to get them to stay,

16   correct?

17   A.   I am answering the question that you asked of

18   me.  You are the one who is making the statement.

19   Q.   Mr. Potashnik, you were -- you were the owner --

20   the ultimate owner of all three entities:  Affordable

21   Housing Construction, Southwest Housing Development and

22   Southwest Housing Management?

23   A.   As far as I know.

24   Q.   Okay.  During --

25   A.   It might have been some other legal structure,

1    but ultimately I was the owner.

2        Q.   Okay.

3        A.   And being married to Ms. Geiser, I obviously

4    felt that she was as much of an owner as I was.

5        Q.   Sure.   Sure.

6             And given that you were married to her,

7    y'all shared control over the organizations?

8        A.   I think we both had certain responsibilities

9    that differed in many ways, but ultimately we -- when it

10   came to decisions that impacted the company in any way,

11   we would get together and make decisions.

12       Q.   And, Mr. Potashnik, you were a director of each

13   of the entities:   Affordable Housing Construction,

14   Southwest Housing Development, Southwest Housing

15   Management?

16       A.   Yes, ma'am.

17       Q.   And Cheryl Potashnik was also considered to be

18   an officer as well?

19       A.   I don't know.   I'm not sure whether anybody

20   other than myself was an officer or director of any of

21   the entities.   So I would have to look at the corporate

22   books and records, which I haven't done in ten years.   So

23   pardon me for not knowing.

24       Q.   Okay.   You -- you understand that your attorneys

25   produced some corporate records in this case?

1     A.   I don't know what my attorneys produced.

2     Q.   Okay.  You haven't -- so you haven't reviewed

3   any corporate --

4     A.   No, ma'am.

5     Q.   -- record?

6          Okay.  Do you recall testifying that you had

7   a very strict -- very strict policies and procedures,

8   whereby if any agreements with any employees or with any

9   venders or any contractors take place, they are written

10  and vetted by legal counsel and duly executed?

11    A.   I'm sorry.  What was the question?

12    Q.   Sure.  Let me just ask it straight up.

13         It's your position that we, meaning the

14  organization, you and Cheryl, have very strict policies

15  and procedures, whereby any agreements with any employees

16  or with any venders or with any contractors take place,

17  they are written and vetted by legal counsel and duly

18  executed?

19    A.   I think that the statement you made is missing

20  one word and that word is should be.  Obviously running

21  an organization and having the number of properties and

22  employees that we did, at some of the levels within the

23  organization, there may not have been adherent to the

24  policy that we had hoped to have.  So I can tell you that

25  that was our best efforts.

1      Q.   Okay.  You recall being at your deposition?

2      A.   (No response.)

3      Q.   Yes?

4      A.   Yes, of course.

5              MS. GIBSON:  Page 41.

6              MR. FRIEDMAN:  What line?

7              MS. GIBSON:  16.

8      Q.   (By Ms. Gibson)  I'm trying to -- I accidentally

9  wrote on this.

10             You say in response to a question about --

11  so if any employee says otherwise, that employee is

12  lying.  And you say, Unless it is within their employment

13  agreement with the company, then it is not an agreement.

14  We have very strict policies and procedures, whereby if

15  any agreements with any employees or with any venders or

16  with any contractors take place, they are written and

17  vetted by legal counsel and duly executed.

18             Correct?

19      A.   Correct.  That's industry standard.  So I think

20  in business, in general, that's very standard.

21      Q.   Mr. Potashnik --

22      A.   Yes, Ms. Gibson.

23      Q.   -- this very strict policy about having things

24  in writing, fully vetted by attorneys and duly

25  executed --

 1       A.   Yes.

 2       Q.   -- that policy is not in writing anywhere, is

 3  it?

 4       A.   I don't know if it is or not, it could be.  I'm

 5  not -- I don't know whether it's in writing or not.  I

 6  think it's obviously something that is best business

 7  practices in the real estate industry and in any business

 8  as I said.

 9       Q.   Okay.  You think the strict policy about having

10  things in writing is oral?

11            MR. FRIEDMAN:  I'm not -- that question

12  wasn't clear to me.  I'm going to object to --

13       Q.   (By Ms. Gibson)  Do you understand?

14       A.   No.

15       Q.   Okay.  Your very strict policy about having

16  things in writing was not in writing, correct?  If it --

17       A.   I'm sorry.  I don't know, I just --

18            MR. FRIEDMAN:  Excuse me --

19            THE WITNESS:   -- answered that question.

20            MR. FRIEDMAN:  -- excuse me.  Asked and

21  answered.

22            THE COURT:  You just said you didn't

23  understand the last question, she --

24            MR. FRIEDMAN:  The last question was

25  unintelligible.  This question was --

```
 1                THE COURT:  You're objection is overruled.

 2                MS. GIBSON:  Mr. Friedman.

 3                MR. FRIEDMAN:  Thank you.

 4      Q.   (By Ms. Gibson)  Mr. Potashnik, I'm handing you

 5  what's been marked Plaintiff's Exhibit 40.

 6                Do you recognized Exhibit 40 as the employee

 7  handbook for Southwest Housing?  It actually says

 8  associate handbook?

 9      A.   Yes.

10      Q.   Okay.

11                MR. DONOHUE:  Clarification purposes,

12  Ms. Gibson, you handed us two exhibits, I believe.  Which

13  is 40?

14                MS. GIBSON:  Did I hand you -- okay.

15                MR. DONOHUE:  You handed us two of the same.

16                MS. GIBSON:  I think two of the same.

17  Sorry.

18      Q.   (By Ms. Gibson)  Mr. Potashnik, can you point me

19  to anywhere in the employee handbook that says

20  compensation agreements have to be put in writing, duly

21  executed and fully vetted by counsel?

22      A.   I would have to read it and I -- as I said --

23      Q.   How about if you --

24      A.   This is something that was published probably

25  in 2000, revised in 2007 and that's over ten years ago.
```

1    And I'm not trying to be difficult, but I would have to

2    go through it to see.  But I don't think that something

3    like that would be appropriate to put in an employee's

4    handbook.  This is simply something that lays out the

5    basic employment issues for people that work in the

6    company that they should adhere to.

7              MS. GIBSON:  Plaintiff offers Exhibit 40.

8              THE COURT:  Any objection?

9              MR. FRIEDMAN:  No objection, Your Honor.

10             THE COURT:  40 is admitted.

11             (Plaintiff's Exhibit No. 40 is admitted.)

12        Q.   (By Ms. Gibson)  Mr. Postashnik, do you recall

13   at the end of Mr. Carpenter's employment that you gave

14   him permission to take his lap -- to keep his laptop, to

15   take it with him?

16        A.   No.  He was never given permission to take

17   company property.

18        Q.   Okay.  And in connection with this case, you

19   have accused Mr. Carpenter of stealing the laptop,

20   correct?

21        A.   I don't think that I personally did anything

22   other than to report and request that the computer, which

23   was company property that Mr. Carpenter willfully took on

24   his own, be returned as it should have been.

25        Q.   Is it your contention that he stole it?

1       A.   I don't want to classify Mr. Carpenter as a

2   thief, but steals -- if that's your interpretation of

3   taking something that doesn't belong to you and not

4   returning it, then I guess I would agree with you.

5       Q.   Do you recall that before Jeff Carpenter

6   actually left, that Southwest Housing made a back-up copy

7   of what was on his laptop?

8       A.   No, I'm not aware of that.

9       Q.   If that happened, that's not consistent with

10  stealing a laptop, is it?

11      A.   I'm not aware of that.  But I think if you

12  physically take something that doesn't belong to you and

13  not return it, I would have to agree with you,

14  Ms. Gibson, that that would be stealing.

15      Q.   You asked Jeff Carpenter -- you told him he

16  could go ahead and keep it because --

17      A.   No, I didn't say that.

18      Q.   In -- in fact -- please, let me finish my

19  question.

20      A.   Yes.

21      Q.   The reason you gave Mr. Carpenter, for allowing

22  him to keep the laptop, is you might still need him to do

23  some additional things and you might still need his

24  assistance in connection with the criminal investigation?

25      A.   No, that's not correct.  I was never -- I never

1    gave Mr. Carpenter permission to take company property.

2    I was not requiring, nor asking or in need of

3    Mr. Carpenter's assistance in any way to help with

4    anything relating to any matters, business, personal,

5    professional, criminal, whatever they may be.

6         Q.   Absolutely never happened, right?

7         A.   Absolutely never happened.

8         Q.   And Mr. Carpenter's last day at Southwest

9    Housing was when?

10        A.   I don't recall.

11        Q.   Okay.  He wasn't there after November 2nd,

12   correct, of 2007?

13        A.   I'm not aware of the specific date that he left

14   the company.

15        Q.   Well, let's take a look at your own attorney's

16   chart.

17             You see that they say 11/02 is the last day

18   of employment?

19        A.   The charts are confusing because I think -- you

20   had a chart in your own opening statement that dates on

21   it too, but -- can I see that?

22        Q.   Well, two of the dates were incorrect and we

23   corrected that.

24        A.   Oh, I'm sorry.  So the dates that you had on

25   your opening statement were not correct?

1      Q.   No.   They were correct as far as his last day?

2      A.   Oh, okay.

3      Q.   But, Mr. Potashnik, this isn't -- this isn't

4  your closing argument.

5      A.   No, I'm not making closing, I'm just getting

6  confused by your questioning because I'm getting

7  different dates.   So I apologize.

8      Q.   I asked -- no one disputes that the last day

9  Jeff Carpenter was needed was October 31st, 2007, since

10  you're asking.   Because the management transition

11  agreement was -- became effective right here,

12  November 1st, management was transferred to the

13  purchaser --

14      A.   Are you asking a question?

15      Q.   But Mr. -- you asked me -- you said you were

16  confused and --

17      A.   Well, you're making a misstatement that's why

18  I --

19      Q.   -- and wanted clarification --

20           MR. FRIEDMAN:   Judge, I'm going to object to

21  the dialogue --

22           MS. GIBSON:   So --

23           MR. FRIEDMAN:   -- and ask to go back to

24  question and answer.

25           THE COURT:   Mr. Potashnik, let her you ask

1      the questions.

2                      THE WITNESS:  Okay.  Please, I --

3                      THE COURT:  And if you can answer them,

4      answer them.  If you can't, say you can't.

5                      THE WITNESS:  I --

6                      MR. FRIEDMAN:  I'm going to object to

7      counsel being argumentative with the witness.

8                      THE COURT:  Overruled.

9                      MR. FRIEDMAN:  Thank you.

10     Q.   (By Ms. Gibson)  Mr. Potashnik, I'm handing you

11     Plaintiff's Exhibit 41.

12                     Do you see on the first page of Exhibit 41

13     that there appears to be an e-mail from Devona Gray to

14     Jeff Carpenter?

15     A.   Yes.

16     Q.   Okay.  And Devona Gray, at the time, is listed

17     as human resources manager for Southwest Housing?

18     A.   Yes.

19     Q.   Okay.  Do you have any reason to doubt that that

20     is an accurate copy of an e-mail from Southwest Housing's

21     human resources manager to Jeff Carpenter?

22     A.   No, I have no reason to doubt that.

23     Q.   Okay.  And if you turn to the next page.

24     A.   (Witness complies.)

25     Q.   You see that there's an e-mail from Jeff

1   Carpenter to you?

2       A.   Excuse me.  I'm just finishing reading the first

3   page of the exhibit to refresh my memory.  Yes.

4       Q.   Okay.  And is that an accurate copy -- does that

5   appear to be an accurate copy of an e-mail to you?

6       A.   I don't -- I don't recall if it was or not.  I

7   don't know what the context of management section 42

8   agreement that it refers to in here.

9       Q.   Well, do you -- do you have any reason to doubt

10  that this e-mail -- that this is an accurate copy of an

11  e-mail to you?

12      A.   No.  I have no reason to doubt that it's an

13  e-mail to me.

14      Q.   Okay.  And --

15      A.   I'm just trying to understand what the context

16  of the e-mail is.  That's all.

17      Q.   And same -- same with the e-mail on the next

18  page, bates labeled Carpenter 953?

19      A.   Yes, ma'am.

20      Q.   Same with the next two e-mails to you, labeled

21  Carpenter 962 and 964?

22      A.   960 -- yes.

23      Q.   Okay.

24              MS. GIBSON:  Plaintiff's offers Exhibit 41.

25              THE COURT:  Any objection?

1          MR. FRIEDMAN:  No objection, Your Honor.

2          THE COURT:  41 is admitted.

3          (Plaintiff's Exhibit No. 41 is admitted.)

4     Q.   (By Ms. Gibson)  You see, Mr. Potashnik, that on

5  the first e-mail, Southwest Housing is still e-mailing

6  Jeff Carpenter on November 5th, 2007, about 401(k)

7  issues?

8     A.   Yes.

9     Q.   And so after Jeff Carpenter left -- as of

10  November 5th, Jeff Carpenter was not shut out from the

11  company's e-mail system, correct?

12     A.   I don't know.  I mean, if he somehow was able to

13  maintain some kind of communication with the stolen

14  laptop, then I think that's probably why.

15     Q.   And you see on the next document, this is on

16  November 5th, after he's gone, while you contend he's

17  stolen the laptop, he's e-mailing you information about

18  the business, correct?

19     A.   Well, I think that characterized his actions as

20  stealing, at which point I agree.

21     Q.   No --

22     A.   If he somehow was able to still access into our

23  e-mail system, then he may very well have been a party to

24  these e-mails.  I just don't know, Ms. Gibson.

25     Q.   Jeff Carpenter is attaching a master section 42

1   management agreement, right?

2       A.   Yes.  I'm sure that's something that we would

3   have liked to have had on our laptop that was -- should

4   have been kept at the company, instead of being taken

5   from the company.  So...

6       Q.   And you see that this surrounds Vegas, that's

7   the context?

8       A.   Yes.  I also see a date of October 29th on the

9   original message.

10      Q.   Sure.

11          That's Jeff's -- the earlier message,

12  Mr. Potashnik, right?

13      A.   Oh.

14      Q.   It's an e-mail string --

15      A.   Okay.

16      Q.   But Jeff Carpenter is sending you an attachment

17  on November 5, 2007.

18      A.   Or maybe it wouldn't have been necessary to have

19  that had we had the laptop that was our property.

20      Q.   You-all had some properties in Las Vegas?

21      A.   We had a property.

22      Q.   A property in Las Vegas?

23      A.   Yes.

24      Q.   Did you ever say, Jeff Carpenter, what are you

25  doing sending me business documents?  You're not supposed

1    to have those?

2        A.   I don't recall having any communication with

3    Mr. Carpenter.

4        Q.   The truth is you asked Jeff Carpenter to

5    continue to help you on matters after he left?

6        A.   No, that is absolutely false.

7        Q.   Using the laptop that had the documents he

8    needed on it?

9        A.   I had no communication nor did I ask or need to

10   have communication after he walked away from his job and

11   stole the company's computer, Ms. Gibson.

12       Q.   If you'll turn to the next page.

13       A.   (Witness complies.)

14            MR. FRIEDMAN:  Are we still on 41?

15            MS. GIBSON:  Yes.

16       Q.   (By Ms. Gibson)  This is another e-mail from

17   Jeff Carpenter to you concerning the organization's

18   business, correct?

19       A.   Yes.

20       Q.   Rosemont Casa Del Norte was one of the

21   organization's properties?

22       A.   That's correct.

23       Q.   And so Jeff is saying here are the agreements

24   that I sent to you previously, he's saying we can exclude

25   Nevada Hand, Cascade Affordable and any Pinnacle related

1   enteritis.  I have a call into Spencer.  And it goes on.

2          He's continuing to work with you even after

3   he left on business matters, correct?

4      A.   I see one-way e-mail communications and no

5   e-mail strings do I see where I made any response to

6   Mr. Carpenter on anything that you're referring to in

7   this exhibit, Ms. Gibson, or anything else for that

8   matter.

9      Q.   Did you -- did you ever --

10     A.   So I don't -- I mean, I really think that if you

11  are asking me a question whether we had engaged in some

12  kind of a relationship, whereby I had asked him to

13  perform certain functions or responsibilities after he

14  was terminated and stole the company's computer, I would

15  say that categorically that never happened.

16     Q.   Did you say -- did you ever say to Jeff after he

17  left, good grief, Jeff, why are you sending me company

18  documents and talking about business, you're not supposed

19  to have those?

20     A.   No.  Why would I?

21     Q.   You -- you wouldn't, Mr. Potashnik --

22     A.   Exactly.  That's what I'm saying, I was told

23  by --

24     Q.   -- because he didn't steal the laptop --

25     A.   -- I was told by my attorneys --

1  Q.  -- isn't that right?

2  THE COURT:  Wait --

3  THE WITNESS:  No, I -- okay.

4  THE COURT:  -- wait till she asks her

5  question and then you can answer.

6  THE WITNESS:  What's the question?

7  THE COURT:  Whether your --

8  Q.  (By Ms. Gibson)  You wouldn't, Mr. Potashnik,

9  because the truth is you gave Jeff Carpenter permission

10  to take that laptop?

11  A.  Ms. Gibson, the truth is -- is that by that time

12  we had informed our attorneys of the computer theft and

13  the termination and we were advised by legal counsel --

14  MR. FRIEDMAN:  All right.  I'm not going to

15  let him get into what he was advised by legal counsel.

16  THE COURT:  Okay.

17  MR. FRIEDMAN:  So I'm going to cut him off

18  right there.  Thank you.

19  THE WITNESS:  Okay.  We had no further

20  communication at that point, regarding any company

21  responsibilities as far as I know.  I certainly don't

22  recall.

23  Q.  (By Ms. Gibson)  So you see at the last page of

24  this exhibit, here's another e-mail from Jeff Carpenter

25  on Friday, November 9th, to you about Vegas property,

1    correct?

2         A.   Yes.

3         Q.   Okay.  And, again, he's talking about having

4    spoken a couple of times in the last few days with

5    Spencer at M and M; is that true?

6         A.   Any e-mails sent from Jeff Carpenter after he

7    was terminated and stole our company computer, I did not

8    even bother reading.  Trust me, that was not something

9    that was even worthy of my attention, Ms. Gibson.  That's

10   why you don't see any response from me on anything that

11   you're throwing at me that he communicated to me about.

12        Q.   He was continuing -- this discussion is about

13   the organization's business, correct?  Your

14   organization's business?

15        A.   It was a one-way discussion, Ms. Gibson.

16        Q.   You think that Jeff was just randomly trying to

17   help you for no reason?

18        A.   You see my response anywhere?  I -- I don't

19   believe that this was anything that deserved or warranted

20   my attention after this situation that took place upon

21   his termination of stealing the company's property.

22        Q.   Is it accurate to say that you never accused

23   Jeff Carpenter of stealing a laptop until in the middle

24   of this lawsuit?

25        A.   No.

1        Q.   No.

2             When did you?

3        A.   No.   I think when we realized that company

4   property was not being returned to us, that we drew the

5   conclusion that it was obviously stolen --

6        Q.   The truth --

7        A.   -- and at best, taken without any authorization

8   from us that he could have that property.   That was --

9   there was never any -- any authorization, at any level,

10  from anybody, that he could walk off with the company

11  computer, Ms. Gibson.

12       Q.   Did you -- so do you have some written document

13  from before this lawsuit was filed asking Jeff to return

14  that computer to you?

15       A.   Do -- do I personally.   I'm not aware that I did

16  that, but there may be.

17       Q.   Well --

18       A.   There may be.

19       Q.   And if there is, would it be on the hard

20  drive --

21       A.   I don't know.

22       Q.   That Mrs. Potashnik -- or that Ms. Geiser got

23  rid of?

24       A.   I don't know.

25       Q.   The truth is, Mr. Postashnik, ever since this

1    lawsuit was filed, you-all have done your level best to

2    make unfounded allegations against Mr. Carpenter, true?

3        A.   No, that isn't correct, Ms. Gibson.  There is

4    nothing that we are alleging that is untrue.

5        Q.   Mr. Potashnik, while this lawsuit was pending,

6    you dissolved Southwest Housing Development Company,

7    correct?

8        A.   I don't know.

9        Q.   Hand you Plaintiff's Exhibit 39.

10            Does Exhibit 39 appear to be an accurate

11   copy of records terminating the existence of Southwest

12   Housing Development?

13       A.   Yes.

14            MR. DONOHUE:  Do we already have a copy,

15   Ms. Gibson?

16            MS. GIBSON:  Yes.  Yes, I gave them to you

17   ahead of time.

18            THE WITNESS:  Oh, I'm sorry.  So what was

19   the question, Ms. Gibson?

20       Q.   (By Ms. Gibson)  The question was:  Does

21   Exhibit 39 appear to be an accurate copy of secretary of

22   state's documents terminating the existence of the

23   company --

24       A.   Yes, ma'am.

25       Q.   -- Southwest Housing Development?

```
 1        A.   Yes, ma'am.

 2        Q.   Okay.  Did you know at the time -- oh, I'm

 3   sorry.

 4             MS. GIBSON:  I offer Plaintiff's Exhibit 39.

 5             THE COURT:  Any objection?

 6             MR. FRIEDMAN:  No objection.

 7             THE COURT:  39 is admitted.

 8             (Plaintiff's Exhibit No. 39 is admitted.)

 9        Q.   (By Ms. Gibson)  When -- were you aware that

10   Texas law requires that companies who are dissolving,

11   give notice to people -- have claims against the company,

12   like Mr. Carpenter?

13        A.   I was not aware.

14        Q.   Did you give Mr. Carpenter any notice that you

15   were going to dissolve the company during this lawsuit?

16        A.   I don't know.

17        Q.   You don't know one way or the other?

18        A.   I don't know one way or the other.

19        Q.   And I'm handing you Plaintiff's Exhibit 40.

20             THE COURT:  40 is already in.

21             MS. GIBSON:  40 is in?

22             THE COURT:  Yeah.

23             MS. GIBSON:  I must have marked it wrong.

24             THE COURT:  40, I think, was a employee

25   handbook.
```

1                    THE WITNESS:  So it's -- was I looking at

2   the wrong document?

3                    MS. GIBSON:  I'll call this 40(a).

4                    THE WITNESS:  What's this one then?

5        Q.  (By Ms. Gibson)  What do you mean, what's this

6   one?

7        A.  Well, didn't you say you had the wrong date --

8                    THE COURT:  She was talking about the

9   document --

10                   THE WITNESS:  Oh, okay.  I just want to make

11  sure that we're on the same page.

12                   MS. GIBSON:  No, I just -- the judge was

13  just pointing out that I don't always count very well.

14                   MR. DONOHUE:  What page is that we have?

15                   MS. GIBSON:  So Exhibit 1 --

16                   MR. DONOHUE:  Do we have that?

17                   MS. GIBSON:  Yes, I gave you all --

18                   MR. FRIEDMAN:  Nothing is numbered, so we

19  have no way of correlating.

20                   THE WITNESS:  I -- I'm sorry because I'm

21  getting confused.  What --

22                   MR. FRIEDMAN:  May I approach, Your Honor,

23  to see what he's looking at?

24                   THE COURT:  Just tell me which one is 40(a)

25  that you showed me?

1            MS. GIBSON:  That's the certificate of

2   termination for Southwest Housing Management.  It says

3   the staffing --

4            MR. DONOHUE:  Okay.  Got it.

5            MS. GIBSON:  You see it?

6       Q.   (By Ms. Gibson)  Okay.  Does exhibit --

7   Mr. Potashnik, does Exhibit 40(a) appear to be an

8   accurate copy of secretary of state records, terminating

9   the existence of Southwest Housing Management?

10      A.   Yes, ma'am.

11      Q.   Okay.

12           MS. GIBSON:  And plaintiff offers

13   Exhibit 40(a).

14           THE COURT:  All right.  Any objection?

15           MR. FRIEDMAN:  No, sir.

16           THE COURT:  40(a) is admitted.

17           (Plaintiff's Exhibit No. 40(a) is admitted.)

18      Q.   (By Ms. Gibson)  And Southwest Housing

19   Management was dissolved and terminated during the

20   pendency of this lawsuit, correct?

21      A.   I don't know.

22      Q.   Did you give Jeff Carpenter, who had claims

23   against that entity at the time, notice that you were

24   dissolving the company and terminating this existence?

25      A.   Did -- did I personally?

1      Q.   Did you -- do you know of anyone who did?

2      A.   I don't know.  I didn't, but it may have been

3  done by my attorneys or by, you know, other people within

4  the company at the time.

5      Q.   Do you recall discussing annual bonuses with

6  Jeff Carpenter?

7      A.   No.

8      Q.   Do you deny ever discussed annual bonuses with

9  Jeff Carpenter?

10     A.   I don't deny it because at some point there was

11  discussions as it related to his employment agreement,

12  which clearly lays out the bonuses that we agreed upon,

13  that he was entitled to.  So in that context, I would say

14  that bonuses were discussed with Jeff Carpenter as they

15  related to his employment agreement, prior to him coming

16  on and joining the company.  It was a very painstaking

17  process of dotting the Is and crossing the Ts as you

18  pointed out to make sure that employment agreement, which

19  I'm referring to, had any of the discussions regarding

20  bonus, that were laid out at the time.

21     Q.   You're -- you said that the employment

22  agreement, you were dotting the Is and crossing the Ts on

23  it; is that what you were talking about?

24     A.   Well, I think that Mr. Carpenter did a good job

25  in negotiating every detail in having a written

1    memorialized agreement to enforce the issues that he

2    negotiated with us and that we agreed to, that are within

3    the scope of his employment agreement.

4         Q.   You provided the information for the employer in

5    the employment agreement, correct?  Okay.

6         A.   I don't understand the question, Ms. Gibson.

7         Q.   Well, you -- in connection with that agreement,

8    you provided the name of the employer, correct?

9         A.   Yes, ma'am.  I would say that that's --

10        Q.   Okay.

11        A.   -- an accurate depiction of what we provided,

12   the employment agreement.

13        Q.   All right.  And if you take a look at the last

14   page, you see the entity, this is Exhibit 2.

15        A.   (Witness complies.)

16        Q.   You see that you provided the entity names,

17   Southwest Housing Management Company Inc.?

18        A.   Yes.

19        Q.   Okay.  And you're aware that Southwest Housing

20   Management Company Inc. does not actually exist as a

21   legal entity?

22        A.   No, I'm not.  I'm not aware of that.

23        Q.   You just looked at secretary of state records

24   for the Southwest Housing Management Company.

25             You want to take at look at those again?

1      A.   Yes.

2           MR. FRIEDMAN:  Your Honor, that's asking him

3  for a legal conclusion, assumes facts not in evidence and

4  lack of foundation, company exists.

5           THE COURT:  She's asked him to look at it,

6  the document.  So let him look at the document.

7           MR. FRIEDMAN:  If the company didn't exist,

8  we wouldn't be here.

9           THE COURT:  Okay.

10           THE WITNESS:  Yes, ma'am.

11      Q.   (By Ms. Gibson)  And what was -- what's the name

12  on the secretary of state records?

13      A.   Well, to answer your question, to be clear, the

14  employment agreement dated 2004, the company that you're

15  speaking of was in existence.  The exhibit that you

16  provided to me, Exhibit 39 and 40 are stamped by the

17  secretary of state December 30th of 2010.  So could the

18  entity that entered into his employment agreement in 2004

19  no longer be in existence in 2010, after it was no longer

20  in business?  The answer to that is yes.

21      Q.   Ultimately, however, although you -- the

22  articles of incorporation are for a corporation, this is

23  a name that you-all sometimes used, company or

24  corporation?

25      A.   During the time of his -- of this existence,

1  yes, absolutely.

2      Q.   Okay.  Was this one of the agreements that was

3  fully vetted by counsel?

4      A.   I'm sure it probably was, but I don't recall.

5      Q.   Do you recall telling Jeff Carpenter that you

6  would try to catch up on past due earned annual bonuses?

7      A.   I don't recall.

8      Q.   You don't recall one way or the other?

9      A.   One way or the other, I don't recall.

10     Q.   Okay.  Do you recall telling Jeff Carpenter that

11  on top of catching up on past due annual bonuses that you

12  would try to get an additional 50,000, once something

13  happened with the McKinney properties or property?

14     A.   No, I don't recall.

15     Q.   You don't recall one way or the other?

16     A.   No.  I don't recall having those discussions.

17     Q.   Do you deny --

18     A.   One way or the other.

19     Q.   -- do you deny saying that?

20     A.   I don't recall.

21     Q.   Okay.  And do you recall telling Jeff that you

22  hoped to be able to get him another 50,000 from the

23  McKinney property?

24     A.   I don't recall those discussions --

25     Q.   You don't deny it though --

1    A.   -- Ms. Gibson.  I don't recall.

2    Q.   Do you deny it?

3    A.   I don't recall, that's my answer.

4    Q.   You don't recall either way?

5    A.   I don't recall either way, that is my answer.

6           MR. FRIEDMAN:  Okay.  This is argumentative,

7  Your Honor.

8    Q.   (By Ms. Gibson)  And you were --

9           MS. GIBSON:  We're already past it.

10   Q.   (By Ms. Gibson)  And you also mentioned that you

11 wanted to get Jeff Carpenter another 200,000 and you were

12 hoping that you could source that from the Vegas

13 property, somewhere between 100 and 200, on a deal that

14 was happening there?

15   A.   I can tell you that that was not a conversation

16 I recall having.

17   Q.   Okay.

18   A.   I mean, the company was losing money.  We were

19 not in a position to be throwing fifties and 100,000,

20 $200,000 out to employees.  That just was not something

21 that we were in a position to do or even think about

22 doing.

23   Q.   Well, Mr. Potashnik, you heard Keith Jones

24 testify that while the management company that manages

25 all of the properties will run negative, the organization

1  as a whole was profitable during the time --

2                 MR. FRIEDMAN:  Misstates Mr. Jones'

3  testimony.  He said the only company that was profitable

4  was the construction company.

5                 THE COURT:  Let the witness handle that.  If

6  he thinks he's misstated.

7      Q.  (By Ms. Gibson)  He said the organization, as a

8  whole, was profitable, which would include Southwest

9  Housing Managements, Southwest Housing Development and

10  Affordable Housing Construction?

11     A.   Unfortunately, Ms. Gibson, and as a result of

12  the company and the assets which were the basis of the

13  company not performing, it was collectively losing money.

14  And although there may have been a profitable entity

15  amongst the three, but collectively it was a company that

16  was losing money and needed to either go bankrupt or to

17  sell.

18     Q.   The financial condition of Southwest Housing

19  Management improved during Jeff Carpenter's tenure,

20  correct?

21     A.   No.

22     Q.   Jeff Carpenter also took some of the property

23  expenses in-house to Southwest Housing Management to save

24  you-all money in connection with your partnership

25  interest in the properties, correct?

 1      A.   No, that's not correct.  In fact, during

 2   Mr. Carpenter's tenure the management company was losing

 3   more money than it ever had, Ms. Gibson.

 4      Q.   What I'm talking about is -- for example,

 5   certain properties that you have a financial interest in,

 6   the actual apartment complex property sites had contracts

 7   that they were paying and Jeff Carpenter took those

 8   in-house, which saved money up to the organization as a

 9   whole?

10      A.   I don't know what contracts you're referring to

11   and I don't know what the economic impact or end result

12   of those contracts would have been to the company.  So

13   you're making an assumption that there was a particular

14   function or a manner in which business was done that was

15   somehow advantageous to us and I just cannot agree with

16   that statement.

17      Q.   He took marketing in-house?

18      A.   And could you expand on what you're -- what you

19   mean by "marketing"?  I don't --

20      Q.   Taking it in-house, as opposed to paying a

21   third-party vender, which is more expensive?

22      A.   Doing what?

23      Q.   Marketing.

24      A.   Well, what -- I mean, marketing encompasses a

25   wide range of functions within our organization.  I think

1    that you need to be more specific about what it was that

2    you're referring to because it's all encompassing.  I

3    really need to know more information about what

4    particular marketing aspects were being drawn in that you

5    refer to in-house that was a, somehow, savings to our

6    business.

7        Q.   What does marketing mean to you?

8        A.   It could mean a variety of things.

9        Q.   Okay.  So, for example, you-all had various

10   printed marketing materials for the properties, correct?

11       A.   Correct.  I'm sure marketing brochures --

12       Q.   Right?

13       A.   -- rental brochures, things like that.

14       Q.   Taking that as an example, Jeff Carpenter

15   brought that in-house, which increased some costs of the

16   management company, but saved money for the organization

17   as a whole?

18       A.   I don't recall us printing any -- or rental

19   brochures or marketing brochures in our -- in-house.  And

20   on also in the event that we had, unaware of the economic

21   benefit to the company and certainly not to me

22   personally.

23       Q.   Jeff Carpenter also took certain social services

24   provided on site, he brought those in-house as well,

25   correct?

```
 1        A.   No, I disagree with that statement.

 2              MS. GIBSON:  Your Honor, I --

 3              THE COURT:  You have about two minutes

 4   before the break.

 5              MS. GIBSON:  Great.  I think this is a good

 6   time.

 7              THE COURT:  Do you want to take it now?

 8              MS. GIBSON:  Yes.

 9              THE COURT:  Okay.  We'll take our 15-minute

10   break, ladies and gentlemen.

11              THE BAILIFF:  All rise.

12              (Jury ushered out.)

13              (A break was taken.)

14              THE COURT:  Go ahead, Ms. Gibson.

15              MS. GIBSON:  Plaintiffs reurge the ability

16   to ask and get into the stay bonuses that were paid to

17   other employees, with respect to some of them being oral

18   agreements.  We believe defendants have opened the door

19   through their testimony about everything needing to be in

20   writing.

21              THE COURT:  Okay.  And do you maintain your

22   earlier decision?

23              MR. FRIEDMAN:  Yes we do, Your Honor.

24              THE COURT:  Okay.

25              MS. GIBSON:  And what?
```

```
 1                    MR. SANFORD:  And nobody has ever sued
 2      them --
 3                    MS. GIBSON:  And that nobody has ever sued
 4      them --
 5                    MR. SANFORD:  -- for a bonus.
 6                    MS. GIBSON:  -- for a bonus.
 7                    THE COURT:  Well, then that's -- has someone
 8      else sued them other than Mr. --
 9                    MR. FRIEDMAN:  No.
10                    THE COURT:  -- Carpenter?
11                    MR. DONOHUE:  No.
12                    MS. GIBSON:  I don't know.
13                    THE COURT:  Okay.  Well, fair enough.  The
14      Court maintains its earlier ruling.  But the question --
15      and to go back to that, that was a nonresponse of -- he
16      should not have said that.  That was a violation of the
17      motion of limine too when he said, no one's filed a
18      grievance and no one's ever complained and all that,
19      trying to avoid getting into all of that.
20                    MS. GIBSON:  And just -- just to -- before
21      Jeff Carpenter is called, there will probably be another
22      issue I want to take up, but I need to get finished.
23                    MR. SANFORD:  One other thing, I think to
24      preserve error, we just have to make some kind of offer
25      of proof, proffer or something --
```

```
 1                    THE COURT:  He'll be here.  You can make an

 2   oral offer at the end of day or if that doesn't work out,

 3   Mr. Potashnik will still be here at the end of the day,

 4   you can do question and answer.

 5                    MS. GIBSON:  And Cheryl?

 6                    MR. SANFORD:  And Cheryl?

 7                    MS. GIBSON:  And Cheryl.

 8                    THE COURT:  All right.

 9                    MR. FRIEDMAN:  And me, I'll be here.

10                    (Sotto voce discussion.)

11                    THE BAILIFF:  All rise.

12                    (Jury ushered in.)

13                    THE COURT:  Jurors, please have a seat.

14                    Have a seat, Mr. Potashnik.

15                    Welcome back.  Again, morning still, ladies

16   and gentlemen.  We'll pick up where we left off with

17   Mr. Potashnik as a witness, Ms. Gibson is asking

18   questions.  And we'll ask her to pick up just where she

19   left off.

20                    Ms. Gibson -- and, of course, we'll go up to

21   the middle of the noon hour before we take our lunch

22   break.

23                    DIRECT EXAMINATION (cont'd)

24   BY MS. GIBSON:

25      Q.   Mr. Potashnik, as of October 31st, 2007 --
```

1            MS. GIBSON:  Let me strike that.

2       Q.   (By Ms. Gibson)  Do you agree with Ms. Geiser

3  that Jeff was not fired for any performance reasons?

4       A.   Yes.

5       Q.   Okay.  Do you agree with Ms. Geiser that at the

6  end of the day on October 31st, 2007, the organization

7  just didn't need Jeff Carpenter anymore because of the

8  management transition to the purchaser?

9       A.   Yes.

10       Q.   Do you agree with Ms. Geiser that Mr. Carpenter,

11  during his employment, was never disciplined?

12       A.   I'm not aware.

13       Q.   Do you agree with Ms. Geiser that during Jeff

14  Carpenter's employment he was never written up?

15       A.   I'm not aware.

16       Q.   Did you ever write up Mr. Carpenter?

17       A.   Me, personally, I did not.

18       Q.   Did you ever discipline Mr. Carpenter?

19       A.   Yes.

20       Q.   You have?  How many occasions?

21       A.   We had --

22       Q.   Well -- okay.

23       A.   I --

24       Q.   I like to let witnesses --

25       A.   -- can't tell you.  I don't know how many

1    occasions.

2         Q.   Okay.

3         A.   I don't recall.

4         Q.   At no time during Mr. Carpenter's employment did

5    you recommend that he be fired for performance, correct?

6         A.   Did I recommend to whom?

7         Q.   To anyone?

8         A.   I don't recall.

9         Q.   You don't recall one way or the other?

10        A.   No, I don't recall one way or the other.

11        Q.   Okay.  During Jeff Carpenter's employment, you

12   would, at times, meet with Jeff Carpenter at your home?

13        A.   It was not unusual for us to meet employees at

14   our home, many employees.

15        Q.   My question is:  During Jeff Carpenter's

16   employment, you sometimes met with him at your home?

17        A.   We may have and like I said, it would not be

18   unusual as we have met with many employees at our home.

19        Q.   During Jeff Carpenter's employment, your

20   families had Thanksgiving together?

21        A.   I don't recall.

22        Q.   Do you believe that Mr. Carpenter was entitled

23   to trust your word?

24        A.   Yes, absolutely.

25        Q.   Do you recall that the date that you found out,

```
 1   in late September, that you would be -- that you would be

 2   indicted?

 3        A.   No, I don't recall the date specific.

 4        Q.   It was close to the management transition,

 5   wasn't it, Mr. Potashnik?  It was close to

 6   November 1, 2007?

 7        A.   It may have been.

 8        Q.   And during the criminal investigation, you had

 9   maintained to Jeff Carpenter that you had done nothing

10   wrong, correct?

11             MR. FRIEDMAN:  You know, Judge, this is

12   violation of the limine.

13             THE COURT:  All right.

14             MR. FRIEDMAN:  Let's approach.

15             (Off-the-record discussion.)

16             MR. FRIEDMAN:  Ruling, please?

17             THE COURT:  Objection sustained.

18             MR. FRIEDMAN:  Thank you.

19        Q.   (By Ms. Gibson)  Mr. Potashnik, in connection

20   with the criminal proceedings, you ultimately plead

21   guilty, correct?

22        A.   I -- could you please expand on what you mean by

23   proceedings?  The criminal trial?  Criminal case?

24        Q.   Well, there was a criminal investigation of you?

25        A.   Oh, okay, yes.  Yes, I did ultimately plead
```

```
 1   guilty.

 2              MS. GIBSON:  Pass the witness.

 3              THE COURT:  Okay.  Mr. Friedman?

 4              MR. FRIEDMAN:  Nothing further.

 5              THE COURT:  Thank you, Mr. Potashnik.

 6              MR. FRIEDMAN:  Your Honor, we have -- had a

 7   witness fly in from Puerto Rico and has to go back to

 8   Puerto Rico so we want to put him on --

 9              What's his name?  Mark Jones.

10              THE COURT:  All right.  Have you conferred

11   with the other side?

12              MR. FRIEDMAN:  He just showed up.

13              MS. GIBSON:  Mark --

14              THE COURT:  If y'all come over here.

15              (Discussion off the record.)

16              THE COURT:  Ladies and gentlemen, we're

17   going to take a witness out of order.  It's still

18   Ms. Gibson's turn to call witnesses in the first

19   instance, but we're going to switch now for a witness who

20   will be unavailable at another time.  And asked

21   Mr. Donohue, I believe --

22              MS. GIBSON:  And --

23              THE COURT:  Mr. Donohue, you doing the

24   direct examination?  Mr. Donohue to call the next

25   witness.
```

```
 1                    MS. GIBSON:  -- and, Your Honor, can -- just
 2    to be clear, can you just clarify this is defendant's?
 3                    THE COURT:  That's what I was -- I hope that
 4    was clear.  This is defendant's witness, not -- not
 5    Mr. Carpenter's witness.
 6                    Mr. Jones, if you come over here (pointing).
 7    Before you step up there, I'm going to swear you in as a
 8    witness.  Raise your right hand.
 9                    (Witness sworn.)
10                    THE COURT:  Have a seat.
11                    Mr. Donohue, will ask you questions first.
12                            MARK JONES,
13    having been first duly sworn, testified as follows:
14                      DIRECT EXAMINATION
15    BY MR. DONOHUE:
16        Q.  Please state your full name.
17        A.  Mark Anthony Jones.
18        Q.  And, Mr. Jones, were you formerly employed by
19    any of the Southwest Housing entities?
20        A.  Yes.
21        Q.  All right.  Who were you employed by?
22        A.  By Brian and Cheryl Potashnik.
23        Q.  Okay.  And who are Brian and Cheryl Potashnik?
24        A.  The owners of Southwest Housing.
25        Q.  All right.  And what did you do for Brian and
```

1  Cheryl Potashnik at Southwest Housing?

2      A.   My role was vice president of the community

3  development.

4      Q.   And what did that entail?

5      A.   I work with Brian and Cheryl on the development

6  side, as well as the construction side, as well as work

7  with them on the management side of their business.  We

8  were a affordable housing developer.  And we owned family

9  practice -- I mean, family properties, as well as senior

10 properties.

11     Q.   All right.  And when did you start with the

12 Potashniks there at Southwest Housing?

13     A.   2001.

14     Q.   All right.  So you were there when Mr. Carpenter

15 was hired in 2004?

16     A.   Yes.

17     Q.   And what was Mr. Carpenter's -- Jeff Carpenter's

18 position there at Southwest Housing?

19     A.   He was hired as the president of the management

20 company.

21     Q.   Southwest Housing Management Company?

22     A.   That is correct.

23     Q.   And did you work with or interact with

24 Mr. Carpenter --

25     A.   Sure, I did.

1    Q.   -- at all?

2    A.   Yes, sir.

3    Q.   So you had an opportunity to observe him as the

4    president of Southwest Housing Management?

5    A.   Absolutely.

6    Q.   At the time -- now, Southwest Housing eventually

7    sold to Cascade Affordable Housing; is that right?

8    A.   Yes, they did.

9    Q.   All right.  Approximately when was that?

10   A.   2009, maybe.  '07, I don't remember exactly.

11   Q.   And what was your -- were you involved at all

12   with the sale of the company?

13   A.   Not directly involved.  It was very important

14   that we -- we had gotten a lot of negative press as of

15   late before the sale.

16   Q.   All right.

17   A.   And so it was very important to talk about --

18   the deal with our employees, our residents, they watch

19   the news.

20   Q.   All right.

21   A.   And so we talked with many of our residents and

22   many of our team members about the things that they were

23   seeing on -- on the news weren't necessarily true.

24   Q.   All right.  Were there discussions ongoing at

25   that time about the prospect of selling the company?

```
 1        A.    Sure.   Sure.

 2        Q.    All right.

 3        A.    When you're in the middle of something like

 4   that, it was a lot of rumors going around.

 5        Q.    All right.  Both with the employees as well

 6   as --

 7        A.    Everybody.

 8        Q.    -- the residents?

 9        A.    Yeah, everybody.

10        Q.    And the property managers themselves?

11        A.    Everybody.  Everybody gets -- get wind of all

12   kinds of things and so it's -- Brian and Cheryl tried to

13   mediate some of that, calm it down.  Brian personally

14   went around to the properties, talked with residents,

15   talked with property managers that we were facing this

16   and gone be fine.

17        Q.    All right.  And your role there at Southwest

18   Housing, did you interact much with Mr. Brian Potashnik,

19   himself?

20        A.    Absolutely, both Brian and Cheryl Potashnik.

21        Q.    All right.  On a -- on a pretty regular basis?

22        A.    We're family.

23        Q.    You're family?

24        A.    That's right.

25        Q.    What does that mean when you say --
```

1    A.   That means that Brian and Cheryl Potashnik came

2  into -- first of all I'm from Dallas, born and raised

3  here.  Went to high school here, grew up in the inner

4  city here, lived in apartments here.  I've been very

5  fortunate in my life to do better and to be able to come

6  back into a community that I call home and provide

7  affordable housing and provide the nicest, new apartments

8  that our community had seen in 25 years, was a very big

9  deal.

10          I was introduced to Brian Potashnik by

11  former mayor, Ron Kirk, who was a church member of mine

12  and who I helped on his campaign.  Brian was having a

13  ribbon cutting and Brian invited me, he introduced us.

14  That led to me having a contract with him because I was

15  doing other things.  I was installing cabling and

16  wiring -- at a company that I was installing cabling with

17  and he gave us a contract.  After we did -- we did the

18  contract, Brian approached me afterwards, knew that -- I

19  had some pretty good ties in relationship to the

20  political world and made me an offer.  But the thing that

21  made him more attractive to me is that he offered me an

22  opportunity to learn how to do this.

23    Q.   Okay.  And so was part of your job interacting

24  with the community there in the -- the area where this

25  affordable housing was being constructed, developed and

 1   then tenants were living?

 2       A.   Absolutely.  We -- many people have a negative

 3   connotation of apartments.  And one of the

 4   responsibilities I was charged with is to give them a

 5   better perception of apartments.  This wasn't the

 6   traditional apartments.  We were doing all kinds of

 7   things.  We were creating an environment that families,

 8   as well as seniors, were going to have a wonderful place

 9   to live.  The quality of life, they had never seen

10   anything to the quality we were building.

11       Q.   All right.  And did -- did Mr. or Mrs. Potashnik

12   have any role also, along with you, as far as mixing with

13   the community, both tenants, prospective tenants and the

14   property management people on site with the various

15   properties?

16       A.   On any given Sunday, you could find Brian and

17   Cheryl out at our apartments --

18       Q.   What --

19       A.   -- riding --

20       Q.   Go ahead.

21       A.   -- riding and visiting, looking, making sure

22   things were up to their standard.  Residents knew Brian

23   personally.  Many of them had his cell phone number and

24   they would use it too.

25       Q.   And what about when Mr. --

1      A.   I'm sorry.

2              THE COURT:   I'm sorry.

3              THE COURT REPORTER:   Sir, you may want to

4    move back a little bit.

5              THE WITNESS:   Oh, that's a lot of base,

6    Judge.

7              THE COURT:   All right.

8      Q.   (By Mr. Donohue)   When Mr. Carpenter came on

9    board, he was the president of Southwest Housing

10   Management?

11     A.   Yes, sir.

12     Q.   So he was overseeing managing the various

13   properties that the tenants lived in; is that right?

14     A.   That is correct.

15     Q.   All right.   And did Mr. Carpenter take a same or

16   similar -- or what kind of approach, if any, did

17   Mr. Carpenter take with respect to the residents of the

18   various communities?

19     A.   I think that Mr. Carpenter --

20              MS. GIBSON:   Object to relevance.

21   Performance is not at issue in this case.

22              MR. DONOHUE:   They sued for quantum of merit

23   also, Your Honor.   They put a value of his services.

24              THE COURT:   Overruled.

25     Q.   (By Mr. Donohue)   Mr. Jones, what kind of role,

1    if any, did Mr. Carpenter take with respect to the

2    various communities, the residents, the property

3    management, the property manager on site that you

4    observed?

5        A.   Mr. Carpenter was a manager.  He was the

6    president of the management company.  He was dedicated to

7    leasing up the properties, dedicated to his team in terms

8    of managing them, hiring managers, hiring leasing

9    managers, that was his role.

10       Q.   All right.  In the entire time that you were

11   there -- and you were there at Southwest Housing

12   Management until it sold to Cascade?

13       A.   That is correct.

14       Q.   All right.  Did you ever observe Mr. Carpenter

15   do anything above and beyond what his role was as

16   president of Southwest Housing Management?

17       A.   No.  He was -- he did his job.

18       Q.   He did his job?

19       A.   Yes, sir.

20       Q.   All right.  And do you know -- did you ever hear

21   him complain in your presence about not being paid his

22   salary for doing his job?

23       A.   No, I never heard that.

24       Q.   When the company was being considered to be

25   sold, do you -- being around Mr. Potashnik, and Mr.

1    Potashnik in particular, did he ever express any concerns

2    to you about people, employees in particular, leaving in

3    mass exodus?

4         A.   Leaving our company?

5         Q.   Yes.

6         A.   No, absolutely not.

7         Q.   He didn't express any concern about employees

8    leaving because the company was being sold or even the

9    fact that he got indicted?

10        A.   No.  Again -- can --

11             MR. FRIEDMAN:  Mr. Donohue.

12             THE WITNESS:  I'm sorry?

13             MR. FRIEDMAN:  Mr. Donohue --

14             THE WITNESS:  Yes.

15             MR. FRIEDMAN:  I'm sorry to interrupt.  I

16   thought you were searching for the name.

17             THE WITNESS:  No, I don't need his name.

18             MR. FRIEDMAN:  Neither do I.

19             THE WITNESS:  Yeah.  It was a very difficult

20   time.  Very difficult in our -- in our business.  Very

21   difficult time in Brian and Cheryl's life.  But Brian

22   assured them, he assured residents and he assured the

23   employees that we would deal with it.  It, being whatever

24   we had to face.

25        Q.   (By Mr. Donohue)  All right.  Did employees

1    leave in mass exodus?

2        A.   Absolutely not.

3        Q.   Was there any employees you know of that weren't

4    paid when they were looking to sell the company?

5        A.   No.  I don't know anything about nobody not

6    being paid.  Nobody said anything about not getting their

7    check.

8        Q.   Did you get the impression that employees were

9    wanting to leave the company?

10       A.   No, I didn't get that impression.

11       Q.   Did -- are you --

12       A.   I'm finished with that statement.

13       Q.   Okay.  Are you familiar with the term or ever

14   heard the term "stay bonus"?

15       A.   No, I never heard of that.

16       Q.   Did you ever discuss or hear Mr. Potashnik

17   discuss bonuses with the company?

18       A.   No.  But I will say this, Brian is a performance

19   person.  Perform --

20            THE COURT:  Wait for Mr. Donohue to ask the

21   question.

22       Q.   (By Mr. Donohue)  Okay.  So what you're saying

23   is perform and you'll be rewarded?

24       A.   That's the way that the model has been the whole

25   time I was there.

1      Q.   All right.  So if the company doesn't make

2  money, you can't expect Mr. Potashnik to reward somebody

3  if they don't -- if the company is not making money?

4      A.   Perform.

5      Q.   Would you consider that performance as making a

6  profit?

7      A.   Absolutely.

8      Q.   Were there -- did Mr. Potashnik or

9  Mrs. Potashnik ever express to you that there were

10  employees that were essential to stay with the company or

11  otherwise it would be less attractive to a suitor, to a

12  buyer?

13      A.   That didn't exist.  There was no one person that

14  made Southwest Housing, not even me.  Southwest Housing

15  was a -- was a corporation that started out a mom and pop

16  that grew into this mega affordable housing company.  And

17  it grew to that because of the risk that Brian and Cheryl

18  were willing to take.  Their ability to attract the kind

19  of talent that we were able to attract.  And so no one

20  person made those kinds of -- made that kind of impact on

21  our business.

22      Q.   All right.  Did Mr. Carpenter make such an

23  impact that you perceived -- or you ever heard either of

24  the Potashniks say don't leave Mr. Carpenter, we got to

25  have you for this upcoming sale --

1        A.    Mr. Donohue, no one person made that kind of

2   impact on our business.

3        Q.    And I take it including Mr. Carpenter?

4        A.    Absolutely.

5        Q.    What was your understanding of Mr. -- I know he

6   was the president of the management company, but --

7        A.    Yes.

8        Q.    -- what was your understanding, based on what

9   you observed him -- of him at work, was his role there at

10  the company?

11       A.    Well, my understanding of the reason that

12  Mr. Carpenter was hired is because we were trying to

13  move forward.  We had built a great model.  We weren't

14  looking for a savior.  We were looking for someone to

15  extend the success that we were having.  We had grew to a

16  great capacity and we were looking for, in the future,

17  it growing even bigger.  And so we needed somebody to

18  take that off of Mr. Potashnik's plate.

19       Q.    Do you have any understanding of how

20  Mr. Carpenter represented himself as far as the -- as

21  what you just expressed, coming into the company in 2004?

22       A.    He represented himself as the president of the

23  management company.

24       Q.    All right.  Did he represent himself in any way

25  as far as having the experience and the know-how to take

1    the company to the level that you're speaking of that it

2    was looking to be taken to?

3        A.   In terms of our management company, we thought

4    that -- Brian and Cheryl believed that he had the

5    expertise to do that.

6        Q.   Did that prove to be the case?

7        A.   I don't think it worked out that way.

8        Q.   Why not?

9        A.   Just because of -- I don't think that

10   Mr. Carpenter was very comfortable with the portfolio of

11   the people that we served.

12       Q.   What do you mean by that, the portfolio of the

13   people that we served?

14       A.   We -- we were predominately in a -- in minority

15   communities, which means that the majority of the tenants

16   who we served were minorities, which means that we were

17   trying to make it reflective of the people who lived

18   there, the people who worked there.  And so I don't

19   always think that Mr. Carpenter was very comfortable in

20   that environment.

21       Q.   All right.  What do you say as far as -- or why

22   do you say that he wasn't comfortable?  Was he just

23   different in his management style then -- or what?

24       A.   Yeah.  The Potashniks saw our business one way

25   and he was a numbers cruncher guy and he saw it another

1    way.

2         Q.   Well, how did the Potashniks see the business?

3         A.   They saw the business almost like a mission in

4    providing affordable housing or providing housing and the

5    services that we were attracting to people who -- who

6    were less fortunate.  And to the point that Mr. Potashnik

7    and I -- we catch phrase, a coined, it said that we

8    weren't in the apartment business, we were in the people

9    business.

10             We were being denied in a lot of the areas

11   around the city and other parts of the state.  People in

12   neighborhoods and homeowners were protesting us all

13   around and we had to put a face on this.  We had to put a

14   face on the kind of people that had an opportunity to

15   live on our properties and we did that.  They were nurses

16   assistants, they were one-year firefighters, they were

17   the bank tellers, they were the people who cleaned the --

18   who worked at nursing homes.  And so we had to put a face

19   on those people.  And once we were able to identify who

20   and who could afford to live there, we took away from

21   being in the apartment business and we were in the people

22   business.

23        Q.   All right.  And that is what you're saying was

24   the focus of the Potashniks?

25        A.   That's exactly what I'm saying.

1    Q.   And Mr. Carpenter wasn't so much into that, but

2 more of the number cruncher in the background?

3    A.   That's the way I believe Mr. Carpenter to be --

4 a-matter-of-fact guy, by the book, get the numbers done.

5    Q.   When investors -- potential investors and actual

6 investors came to Southwest Housing to view the sites,

7 who did Mr. Potashnik call on in the company to tour or

8 visit those properties with those investors or potential

9 investors?

10    A.   Many of the people who we were -- we were going

11 to do showcase property, I took them on tour, I took them

12 around.  I took the political people around.  We were

13 going into neighborhoods where we needed to -- we needed

14 political support.  Typically they would get to town and

15 I would get -- we would get one of our -- use one of our

16 buses and I would give them a tour.

17    Q.   All right.  And did Mr. Carpenter have any role,

18 in particular, with respect to investors or potential

19 investors as far as touring them around and showing them

20 the properties?

21    A.   It wouldn't have been --

22         MS. GIBSON:  Object to lack of foundation.

23         THE COURT:  All right.

24         MR. DONOHUE:  I'll withdraw the question.

25    Q.   (By Mr. Donohue)  Who lead the effort to house

1   Katrina evacuees?

2       A.   Who led the efforts to do what?

3       Q.   To house Hurricane Katrina evacuees?

4       A.   Brian Potashnik.  Brian Potashnik and I.

5       Q.   All right.  What -- what was your role and

6   Mr. Potashnik's in that evacuation for Hurricane Katrina?

7       A.   Brian and I flew to Houston after him getting a

8   call that there were seniors in the Astrodome floor

9   that -- we had just finished a couple of beautiful

10  proprieties.  They had just got the seal that Friday.  I

11  believe the hurricane hit that Saturday.  And we flew

12  it -- flew down and he took our buses and we started

13  bringing seniors from the Astrodome to our properties.

14      Q.   All right.  And were these properties all --

15  what -- when you say, "our properties," can you describe

16  what do you mean by "our property", were they finished,

17  were they constructed --

18      A.   We -- we just gotten the key to them.  Which

19  means that the city had just approved all the permits,

20  right to move in, we never started leasing or anything.

21  We just opened them up and started handing out keys to

22  seniors.

23      Q.   So these were brand new properties that --

24      A.   Yes, sir.

25      Q.   -- you're handing keys to Hurricane Katrina

```
 1   evacuees?

 2       A.   And I don't like the word "evacuee."  They were

 3   people who had -- a storm had hit in New Orleans and they

 4   needed a place to live, place to stay.

 5       Q.   People in need, due to the hurricane?

 6       A.   Absolutely.

 7       Q.   Okay.  What role did Mr. Carpenter play with

 8   respect to dealing with the Hurricane Katrina people that

 9   were in need --

10       A.   He had hired management --

11               MS. GIBSON:  Lack of foundation.

12               THE COURT:  You're also getting beyond the

13   scope of what you're telling me, you were -- the

14   relevance of --

15               MR. DONOHUE:  Your Honor, we anticipate

16   Mr. Carpenter will testify as far as additional

17   responsibilities in his quantum merit claim that he was

18   spearheading the evacuation for Hurricane Katrina and

19   Maria and that's what the scope is.

20               THE COURT:  Okay.  Go ahead.  The

21   objection's overruled.

22               MS. GIBSON:  Okay.

23               THE WITNESS:  What was the question?

24       Q.   (By Mr. Donohue)  Yes.  My question is:  What

25   role did Mr. Carpenter have and was he the spearhead with
```

1   respect to the -- the efforts made on behalf of Southwest

2   Housing and Mr. Potashnik for the hurricane?

3       A.   Mr. Carpenter had already put a management team

4   in place in Houston.  So he had fulfilled his obligation.

5   Once those people were in place, Brian and I went down

6   and we began to give them a place to live.

7       Q.   And Mr. Carpenter, was he spearheading that?

8       A.   What do you mean spearheading?  What does that

9   mean?

10      Q.   Was he leading that effort?

11      A.   No, Brian Potashnik.

12      Q.   I understand.

13           But what -- just to be clear, Mr. Carpenter

14  was not leading that effort?

15      A.   He was not there.

16      Q.   He wasn't even there?

17      A.   No, he wasn't there.

18      Q.   Was he there at all?  Did he go down to

19  Hurricane -- to Houston to deal with --

20      A.   I believe he did come down eventually.  We were

21  there a week.  I don't know when exactly he came.

22      Q.   All right.  Were there other Southwest Housing

23  employees other than Mr. Carpenter that came down either

24  initially or later?

25      A.   Yes.

1    Q.   So there was --

2    A.   Many -- many of our team members came down.

3    Q.   Was Mr. Carpenter essential for the properties

4  to perform?

5    A.   It was his job to make sure they performed.

6  When you say "essential," he was responsible for it.

7    Q.   Was he replaceable?

8    A.   Everybody's replaceable.

9    Q.   How did the employees feel about Mr. Carpenter?

10   A.   They worked for him.  They were willing to work

11  for him because Brian -- when Brian and Cheryl gives you

12  the endorsement, our staff was going to work with

13  whoever.

14   Q.   So because he was hired by Brian --

15   A.   And Cheryl Postashnik.

16   Q.   -- the employees worked for him?

17   A.   Absolutely.

18   Q.   You believe that was out of respect for

19  Mr. Carpenter or out of respect for Mr. Potashnik?

20   A.   In terms of -- I don't know what the -- the

21  reasoning for -- they respect protocol and they respect

22  the hierarchy of how our company was operated and ran.

23   Q.   What was the mood of the company at the time of

24  the investigation -- the FBI investigation and leading up

25  to the sale?

1      A.   Indifferent.  People didn't believe that this

2   was happening.  They couldn't believe that Brian and

3   Cheryl Potashnik had done anything wrong.

4      Q.   So there was no mass exodus of people?

5      A.   No, sir.

6      Q.   There was no mass exodus contemplated, at least

7   voiced to you or that you heard people leaving in droves?

8      A.   No, sir.

9      Q.   If Mr. Carpenter alleges that he took control of

10  the FBI investigation and the company hysteria, once this

11  FBI investigation began in June of 2009; would that be

12  true?

13     A.   When he took control of it?

14     Q.   Yes.

15     A.   What does that mean?

16     Q.   That he took control as far as responding to FBI

17  subpoenas and dealing with the criminal defense lawyers,

18  all of that?

19     A.   He was given direction by the Potashniks to give

20  whatever information the FBI wanted.  That is true.

21     Q.   So he followed the Postashnik's direction to

22  give the FBI whatever they needed?

23     A.   Absolutely.

24     Q.   So the -- the people in control in that, you're

25  saying is the Potashniks and not Mr. Carpenter --

1        A.    Absolutely --

2        Q.    -- he was just following directions?

3        A.    Yes, sir.  That is what I'm saying.

4        Q.    And was there any hysteria with the company?

5        A.    No.  There was -- it was too much --

6        Q.    You said it was indifferent?

7        A.    -- it was too much indifferent to be -- to have

8   hysteria.  We had a job to do.  And we had to do our

9   jobs, all of us.  We had to get our properties leased.

10  We had to service the residents in which lived on our

11  property.  We had a great deal of seniors -- senior

12  properties.  And seniors by themselves can be

13  challenging.  And so we had to deal with all that we had

14  to deal with on a day-to-day basis.  The extra of the

15  FBI's investigation was just that.

16       Q.    How did the employees feel about Mr. Potashnik

17  and Mrs. Potashnik?

18       A.    They feel -- they embraced Mr. Potashnik, all of

19  them did.  Both -- both of the Potashniks were embraced

20  by -- again, not just by employees, but by residents.

21       Q.    And that held true for all three of the

22  Southwest Housing entities?

23       A.    Yes, that's correct.

24       Q.    Do you recall flying to Las Vegas with

25  Mr. Potashnik and Paul Cohen and Aaron Goldstein at one

 1   point?

 2        A.   I don't remember.  I don't recall a flight.

 3   I've -- we've flown to Vegas before.  We've flown a

 4   number of places before.

 5        Q.   Did you ever -- were you ever present when Brian

 6   Potashnik supposedly discussed anyone -- with anyone that

 7   Mr. Carpenter was going to be given a significant bonus

 8   and become a part of the millionaire's club?

 9        A.   No, I never heard any of that.

10             MR. DONOHUE:  I'll pass the witness.

11             THE COURT:  Ms. Gibson?

12                    CROSS-EXAMINATION

13   BY MS. GIBSON:

14        Q.   Mr. Jones, given your relationship to the

15   Potashniks, and that y'all are family, is it fair to say

16   that you don't have anything bad to say about them?

17        A.   Oh, I got some bad stuff to say about Brian.

18   We've bumped heads a number of times, but that's what

19   families do.

20        Q.   Okay.  With -- with respect to the negative

21   press that was happening, if I understand you correctly,

22   employees really -- really trusted in the Potashniks,

23   nonetheless?

24        A.   Yes, ma'am.

25        Q.   Okay.

 1          A.   I believe that to be true.

 2          Q.   All right.  If Mrs. Potashnik testified that

 3     they discussed the need to try and keep groups of

 4     important employees on because of the asset sale, would

 5     you have any reason to doubt that?

 6                    MR. DONOHUE:  Objection.  Vague.

 7                    THE COURT:  Overruled.

 8                    If you don't understand the question tell

 9     her.

10                    MS. GIBSON:  You can answer.

11                    THE WITNESS:  Can I -- oh.

12                    THE COURT:  You can answer the question.

13                    THE WITNESS:  I believe that in the midst of

14     this sale, it was very important we showed some

15     stability.  And so be it, management, construction or

16     whatever.  But that -- there wasn't a number of people

17     leaving because Southwest Housing was a very, very good

18     place to work.

19          Q.   (By Ms. Gibson)  And if -- if Ms. -- I'm sorry.

20     I keep saying Potashnik.

21                    If Ms. Geiser testified that she intended to

22     pay employees bonuses out of sale proceeds as an

23     incentive for them to stay on, would you have any

24     doubt --

25                    MR. DONOHUE:  Your Honor, this --

```
 1        Q.   (By Ms. Gibson)  -- would you have any reason to

 2   doubt that?

 3                MR. DONOHUE:  -- this is encroaching on the

 4   limine --

 5                MS. GIBSON:  No.

 6                THE COURT:  Overruled.

 7                THE WITNESS:  Okay.  First of all, who's

 8   Ms. Geiser?

 9                THE COURT:  Mrs. Potashnik.

10        Q.   (By Ms. Gibson)  Mrs. Potashnik.

11        A.   And so the question is:  Mrs. Potashnik did

12   what?

13        Q.   If Mrs. Potashnik testified that she -- that she

14   and Brian intended to pay employees out of sale proceeds

15   as an incentive to get people to stay on, would you have

16   any doubt about that?

17                MR. DONOHUE:  Objection.  Misstates

18   Ms. Geiser's testimony.

19                THE COURT:  Overruled.

20                THE WITNESS:  I would have no reason to

21   believe that -- if she said that, I would have no reason

22   not to doubt her, if she said that.

23        Q.   (By Ms. Gibson)  Okay.  And if -- everyone in

24   an organization is important, correct?

25        A.   I believe that.
```

1    Q.  But among everyone who's doing their job, there

2  are some people who are treated as more key than others?

3    A.  I agree with that.

4    Q.  And even though the employees believed in the

5  Potashniks during the criminal investigation, if key

6  employees left, it might be hard to hire new people

7  because of the negative press at the time, correct?

8    A.  Well, if key employees leave the sale of a

9  business, the new -- the new company who's buying the

10  business typically have their own people in place.

11    Q.  Correct.

12         But if --

13    A.  So how does that -- how does that effect it?

14    Q.  But you had talked about the importance of

15  stability --

16    A.  I do.

17    Q.  -- leading up to the asset sale?

18    A.  That's right.

19    Q.  And if they're -- if important employees left,

20  leading up to the asset sale, it might be harder -- not

21  impossible -- but harder to replace -- to replace them

22  because of all the negative press at the time?

23    A.  It may be harder to replace them to who?

24    Q.  At -- before the asset sale, at Southwest

25  Housing?

1       A.   From my knowledge of our business, the most

2   important thing to that asset sale is that there was not

3   a mass exit of renters, not employees.

4       Q.   But you -- you need employees to help keep

5   apartments leased up?

6       A.   But you -- you need people paying rent.

7       Q.   Correct.

8            And --

9       A.   Because everybody else can be replaced.  It's a

10  lot more difficult -- remember, the quality of what we

11  built attracted both renters and people who wanted to

12  work.  So attracting help was not an issue.  People

13  wanted to work in this very nice, new environment.  And

14  the reason they wanted to work in this very nice, new

15  environment is because many of them were close to home.

16  Our community and the properties that we built were in

17  the homes -- or in the areas in which the employees

18  worked and where they lived.  And so it wasn't that

19  difficult to attract new work.

20      Q.   And you're talking about at the site level, at

21  the apartment complexes, themselves?

22      A.   I'm saying at any level.

23      Q.   Okay.

24      A.   We didn't have -- we didn't have any finding an

25  employee issue.

1      Q.   Okay.  So for example, if the chief financial

2   officer left, you don't think there would be any problem

3   getting a new CFO in light of the negative press?

4      A.   No, ma'am, I don't think so.

5      Q.   Okay.  How often did you see Jeff Carpenter?

6      A.   Once, twice a week.

7      Q.   Once or twice a week?

8      A.   Yeah.

9      Q.   And in what -- what were y'all doing once or

10   twice a week?

11      A.   We were passing each other.  We office in the

12   same office.

13      Q.   Okay.  So you would see Jeff Carpenter once or

14   twice a week, passing each other in the office?

15      A.   For the most part.

16      Q.   What else?  Anything else?

17      A.   That was -- most of the time where I saw him in

18   or out of the office.  I was -- I spent most of my time

19   out on the properties, visiting the properties, visiting

20   construction sites, that kind of thing.  So when I came

21   to the office or whatever, a day or two I would see Jeff

22   there.

23      Q.   All right.  And so is it fair -- is it fair to

24   say that you and Jeff did not actually see each other

25   very often while you worked together?

1      A.   That's pretty accurate.

2      Q.   Okay.  So would it be fair to say, you -- you

3  don't know -- you weren't with Jeff to see what he did

4  most of his time?

5      A.   I did not share the office with Jeff.

6      Q.   And where -- what was your -- did you have a

7  territory or an area you covered or did you cover all of

8  Texas?

9      A.   I covered wherever the Potashniks owned

10  property.

11      Q.   I'm sorry.  I couldn't hear you.

12      A.   I covered wherever the Potashniks owned

13  property.

14      Q.   Okay.  In Texas?

15      A.   Wherever.

16      Q.   Vegas?

17      A.   Wherever.

18      Q.   Okay.  You talked about the company growing --

19      A.   In the beginning.

20      Q.   Right.

21      A.   Yes, ma'am.

22      Q.   From small to much larger?

23      A.   Yes, ma'am.

24      Q.   And you said that Jeff Carpenter was kind of a

25  numbers guy?

1       A.   I believe it -- yes.

2       Q.   By the book, get the numbers done?

3       A.   Huh?

4       Q.   By the book, get the numbers done?

5       A.   Yes.

6       Q.   Okay.  But if that's what he was doing, do you

7  have any doubt that the Potashniks hired him to be that

8  person, to be the numbers person?

9       A.   I do believe that's why they hired him.

10      Q.   Okay.  You talked -- you talked about tours,

11  taking -- taking political people around?

12      A.   Yes, ma'am.

13      Q.   Was that -- was that in connection with the

14  asset sale or something -- or just a regular part of your

15  job?

16      A.   That's everybody, asset sale, people in general.

17  Nobody can tell the Southwest Housing story better than

18  me.

19      Q.   Okay.

20      A.   One, because I lived it.  Number two, my -- my

21  grandmother lived on one of our properties.

22      Q.   And when it came to touring or meeting with

23  potential purchasers or investors, did you play a role in

24  that?

25      A.   I didn't meet them.  At Brian and Cheryl's

1    direction, I gave them tours.  I talked about what we do.

2    I talked about the way we do what we do.

3        Q.   Do you know whether or not they also, at times,

4    asked Jeff Carpenter to meet with potential purchasers

5    and investors?

6        A.   That wouldn't surprise me if they did.

7        Q.   Okay.  You -- you talked about efforts and

8    Hurricane Katrina --

9        A.   Uh-huh.

10       Q.   -- to help people out because you-all had

11   available properties?

12       A.   Yes, ma'am.

13       Q.   And you said that Jeff -- I think -- did you say

14   Jeff Carpenter was never there?

15       A.   No, I didn't say he was never there.  I said I

16   don't know when he came.  I said that Jeff had hired

17   staff in place in Houston.  And when Brian and I went

18   there, the staff was in place for us to be able to give

19   the keys and allow people to have a place to live.

20       Q.   Are you aware that although -- you know, I don't

21   know the -- I don't know the time line for Katrina --

22       A.   Nor do I.

23       Q.   -- but are you aware that Jeff Carpenter

24   ultimately spent quite a bit of time in Houston, helping

25   out?

1          A.   No.   I wasn't aware of him spending quite a bit

2     of time there.   I wasn't aware of Jeff spending quite a

3     bit of time of -- any of our properties.

4          Q.   Okay.   Mr. Jones, you talked a little bit about

5     Jeff Carpenter's role for management.   Can you explain a

6     little bit further about what your understanding of his

7     job duties were?

8          A.   Well, president of the management company is

9     very overlapping.   That's exactly what -- our management

10    company was growing by leaps and bounds.   He hired

11    people, he put things in place.   They were going.   They

12    were going and going.   We were building new properties.

13    On average, we may have been doing five to ten new

14    developments a year.   He was consulting back and forth

15    with the management company -- or with the development

16    company and construction on how this would be built and

17    how that would be built.   And so he had a vast job.   It

18    was a big job, managing the management company.

19                    MS. GIBSON:   Pass the witness.

20                    THE COURT:   Mr. Donohue?

21                    MR. DONOHUE:   Yes.

22                    REDIRECT EXAMINATION

23    BY MR. DONOHUE:

24         Q.   What you described, Mr. Jones, that was part and

25    parcel of his role -- Mr. Carpenter's role as a president

1    of Southwest Housing Management, right?

2        A.    Absolutely.

3        Q.    Same goes for anything he was doing with respect

4    to hiring staff to go down to Hurricane Katrina?

5        A.    That's correct.

6        Q.    And doing so at the direction of the Potashniks?

7        A.    That's correct.

8        Q.    Which he was paid for?

9        A.    I wouldn't think -- he wasn't doing it for free.

10       Q.    Right.

11             Did you ever hear Mr. Carpenter claim that

12   he had some kind of agreement with Brian Potashnik to be

13   paid a million dollars or something like that, close to

14   a million-dollar bonus?

15       A.    I never heard anything like that.

16       Q.    When you said that you were not aware of

17   Mr. Carpenter spending quite a bit of time at any of the

18   properties?

19       A.    Yes.

20       Q.    He didn't go out to the properties?

21       A.    He went out to them, but not very frequently.

22   He spent most of his time in the office.  Anytime that

23   there was a meeting with -- a manager's meeting, they

24   came to the office, to the corporate office.

25       Q.    All right.  So he didn't get to know the

1  residents?

2      A.   No, nobody knew who he was.

3      Q.   So the residents didn't even know who

4  Mr. Carpenter was?

5      A.   No.

6      Q.   What about the people on site, the property

7  managers?

8      A.   Oh, the property managers knew who he was

9  because many of them were either hired by him or someone

10  in his staff.

11      Q.   Okay.  Mr. Carpenter wasn't a key -- was he key

12  to stay with Southwest Housing for the transition --

13  transaction to occur with Cascade?

14      A.   He was key in continuing to get his paycheck.

15  So part of him continuing to work there was important, if

16  he wanted to work there.

17      Q.   But he wasn't a key player to the transaction?

18      A.   Brian -- Brian and Cheryl Potashnik are the --

19  were the key -- were the key to Southwest Housing.

20      Q.   And, in fact, Cascade Affordable Housing didn't

21  even hire Mr. Carpenter after this transition, did they?

22      A.   I'm not aware of them hiring him.

23          MR. DONOHUE:  I'll pass the witness.

24          THE COURT:  Ms. Gibson?

25              RECROSS EXAMINATION

1    BY MS. GIBSON:

2       Q.   Mr. Jones, during your employment, did Brian

3    Potashnik ever talk with you about not sharing salary

4    information, compensation information with other

5    employees?

6       A.   Nobody tells an employee not to talk about their

7    salary.   That's just one of those common sense things

8    that we do.

9       Q.   Okay.  As far as you're concerned, Mr. Jones,

10   the only key people in connection with the asset sale

11   were Brian Potashnik and Cheryl Potashnik, correct?

12      A.   In my opinion, yes.

13      Q.   Okay.  Beneath Brian Potashnik and Cheryl

14   Potashnik, who were the next level, key people -- while

15   recognizing that everyone down to the -- to every level,

16   you know, needs to be there.

17      A.   Right.

18      Q.   But beneath Brian and Cheryl, who would you say

19   were some of the more important players?

20      A.   Well, at the point of somebody selling something

21   that they own, only the owners are important.

22      Q.   Only the owners?

23      A.   Absolutely.

24      Q.   Okay.

25              MS. GIBSON:  Pass the witness.

```
 1                    THE COURT:  Mr. Donohue?

 2                    MR. DONOHUE:  No further questions.

 3                    THE COURT:  Thank you, Mr. Jones.  You're

 4   free to leave the courthouse.

 5                    THE WITNESS:  Thank you.

 6                    THE COURT:  Ms. Gibson, did you want to call

 7   Mr. Cohen?

 8                    MS. GIBSON:  I'm sorry.  Oh, yes, Your

 9   Honor.  Plaintiff calls Paul Cohen.

10                    THE COURT:  All right.  Go out and get him.

11                    MR. FRIEDMAN:  What's the name of the next

12   witness?

13                    THE COURT:  Paul Cohen.

14                    MR. FRIEDMAN:  Thank you.

15                    THE COURT:  What's that?

16                    MR. FRIEDMAN:  I said, thank you.

17                    THE COURT:  Oh, you're welcome.

18                    Mr. Cohen, if you come all the way back here

19   (pointing).  Mr. Cohen, you may have been sworn in

20   before, but I'm going to swear you in again so the jury

21   sees that you're sworn in.  Raise your right hand.

22                    (Witness sworn.)

23                    THE COURT:  Have a seat.  And Ms. Gibson

24   will ask you questions first.

25                              PAUL COHEN,
```

1    having been first duly sworn, testified as follows:

2                    DIRECT EXAMINATION

3    BY MS. GIBSON:

4        Q.   Mr. Cohen --

5                    MR. FRIEDMAN:  We're now back on the

6    plaintiff's witnesses?

7                    THE COURT:  Yes.

8        Q.   (By Ms. Gibson)  Mr. Cohen, I'll be short.

9             I've talked to you twice, correct?

10       A.   I believe that's correct.

11       Q.   Okay.  And the first time that I talked -- and I

12   know things change between the two conversations and I'll

13   address both, just so you know.  But the first time that

14   I talked to you, you had -- you had said that you

15   remember being on some type of Lear jet with Jeff

16   Carpenter and Brian Potashnik and somebody else that --

17   not Aaron?

18                   MR. FRIEDMAN:  Your Honor --

19       Q.   (By Ms. Gibson)  Do you recall that?

20                   MR. FRIEDMAN:  -- these questions are

21   leading.

22                   THE COURT:  Overruled.

23       Q.   (By Ms. Gibson)  Do you recall that?

24       A.   I recall us having a conversation.  You asked

25   me, did I recall being on the jet with Brian going to Las

1    Vegas -- that we were going to go to Las Vegas and you

2    said that Jeff was on the plane and he was going to work

3    in Las Vegas.  What else did you ask me?  You asked me --

4    you said, Don't you remember the conversation, where you

5    said welcome to the millionaire's club.  I said, I don't

6    remember that conversation.

7              And, you know, as I think about it, I can

8    put -- I've been on several planes with Brian.  Brian is

9    a friend of mine.  We used to go to Las Vegas a couple of

10   times.  We went with -- a couple different -- a couple of

11   different times.  So I -- it's hard for me -- since

12   you're asking me something that occurred so long ago,

13   which specific trip it was.  I mean, there was people on

14   the plane.

15             The only thing I can tell you for sure, is I

16   was on the plane, Brian Potashnik was on the plane.  And

17   one of the trips, another friend of ours, [MD Wyatt] was

18   on the plane, [Mitch farmberg] was on the plane.  I don't

19   know if it was the same -- it was several different

20   trips.  I cannot tell you other than those four people --

21   oh, a guy named Kyle on was on the plane.  Other than

22   those specific people, even with your cajoling, I don't

23   remember.  I cannot tell you with certainty who else was

24   on that plane.

25        Q.   Right.

```
 1              And that's -- that's the second time -- you

 2   talked to me about that the second time that I talked to

 3   you.  But the first time, you recall that you said, you

 4   know, I don't remember the congratulations, but I do

 5   remember us being on the plane and Brian was talking

 6   about the asset sale and the money that everyone was

 7   going to make --

 8      A.   I wouldn't characterize that conversation that

 9   way.

10      Q.   What?

11      A.   I would not characterize our conversation that

12   way.  You had asked me, says -- come on, you remember,

13   you remember.

14      Q.   I --

15      A.   Brian -- you said to Jeff, welcome to the

16   millionaire's club and you were pushing me to say I

17   remember it.  And I'm like, look, ten years ago, I can't

18   remember specific dates, places or conversations.

19      Q.   Mr. Cohen, you recall that I told you that that

20   was okay that you didn't remember it.

21      A.   Yes, I do remember that.

22      Q.   I never said, come on, you remember.

23      A.   That I specifically remember.

24      Q.   I never said, come on, you remember, come on,

25   you remember.
```

1      A.   That's how I remember you --

2      Q.   I was just checking on whether you did and told

3   you it was okay if you didn't, correct?

4      A.   No.  I pretty much remember the way it was.

5   That's what I remember.  You asked me the question --

6      Q.   And later you called me and said, I just want

7   you to know, I've thought about it some more and I

8   don't -- I don't think now I can place Jeff on the plane;

9   do you remember that?

10      A.   In our second conversation, I said, I cannot

11   place anyone on the plane, but the individuals I

12   mentioned to you previously.  That I didn't want to get

13   pressed into a situation where I was testifying, yeah, I

14   remember him on the plane or don't remember him on the

15   plane because that wouldn't be accurate.

16      Q.   And the first time I talked to you, you asked me

17   can you -- because I wasn't telling you much about the

18   case, you said, can you at least tell me did Jeff get

19   stiffed or he -- did he just get less than -- you know,

20   less than the full amount.

21          Do you remember asking me that question?

22      A.   I remember asking you what the case was about

23   and whether or not -- when we talked about it.  And I

24   said, so -- and I did, I asked -- I said so did he -- I

25   didn't know the details of -- of his employment, when he

1    left, stayed.  I mean, that's --

2        Q.  Sure.

3        A.  I'm friends with people, I don't get into their

4    business.  And I did ask you, I asked you, like, what's

5    this case about.  What happened and -- that would be

6    somewhat accurate I don't know if I would use those exact

7    words --

8        Q.  And when -- and when I wasn't saying a whole lot

9    because you're a witness, you asked me, can you at least

10   tell me did Jeff get stiffed or did he just get less.

11           Do you recall that?

12       A.  Something to that effect.

13       Q.  Okay.

14       A.  Yeah.

15       Q.  And do you recall without me asking you

16   anything, you said, man, Jeff was integral to that sale

17   or something like that?

18       A.  No.

19       Q.  Do you recall in the second time you called me,

20   when you said, you know, I thought about it and now I'm

21   going to tell you I'm not going to be able to place Jeff

22   on the plane.  And in the second phone call you said, I

23   shouldn't have -- I shouldn't have said integral.  And

24   I'm sorry.  I can't say that word for some reason,

25   integral (pronunciation).

1    A.   I know what you mean.

2    Q.   I should have just said everybody's important.

3         Do you recall that?

4    A.   I remember telling you that everybody's

5    important.  You asked me specifically, can you say -- you

6    said can you say that Jeff was important to the company

7    and I think I replied, like, well, everybody's important

8    to the company, at least in my experience.

9    Q.   All right.  But one other thing that you said in

10   the second conversation is you said, I thought about it,

11   and I shouldn't have -- I shouldn't have said integral.

12        Do you recall that in the second

13   conversation?

14   A.   No.  I remember in the second conversation

15   saying I thought about it and I don't want to get stuck

16   in placing specific people on the -- on the plane.

17   Q.   Between the time -- and you were very good

18   friends with Brian Potashnik?

19   A.   Yes.

20   Q.   And you still are today?

21   A.   Well, I haven't seen him in about five years

22   until I walked into the court.

23   Q.   Well --

24   A.   It's a heck of a place to reconnect, I think.

25   But we were very friendly.  Brian's a -- yeah, I've known

1  Brian and Cheryl for a long time and they're good people.

2      Q.  And -- and --

3      A.  By the way, I've known Jeff for at least -- when

4  he started working there for a number of years, seemed

5  like a nice guy too.

6      Q.  Do you remember asking me --

7          MS. GIBSON:  Strike that.

8      Q.  (By Ms. Gibson)  Between the time -- the first

9  time that I talked to you and the second time, did you

10  talk with Cheryl Potashnik, Brian Potashnik or any of

11  their attorneys or anyone affiliated with their defense

12  in this case?

13     A.  Between the first two conversations?

14     Q.  Yes.

15     A.  No.

16         MS. GIBSON:  Pass the witness.

17         THE COURT:  Mr. -- who's witness?

18  Mr. Donohue?

19         MR. DONOHUE:  Yes.

20              CROSS-EXAMINATION

21  BY MR. DONOHUE:

22     Q.  Mr. Cohen, would you say that Ms. Gibson was

23  trying to get you to say something that didn't happen or

24  you didn't remember?

25     A.  I wouldn't characterize it that way.  I think

1    she was trying to joggle my memory by saying, don't you

2    remember this conversation, don't you remember that

3    conversation.

4        Q.   So when you tell her that you don't recall that

5    and then you even told her you don't remember if Jeff was

6    on the plane or not, she kept egging you on that -- don't

7    you remember, that this is what was said about, welcome

8    to the millionaire's club or something to that effect?

9        A.   I think she was advocating her client's point.

10   And she did ask me, like, don't you remember the

11   conversation, don't you -- welcome -- something like

12   that, welcome to the millionaire's club.

13       Q.   So you were clear with her that you didn't

14   remember any of that, couldn't remember if her client was

15   on the plane?

16            MS. GIBSON:   Object.   Misstates his

17   testimony.

18       Q.   (By Mr. Donohue)   And she subpoenaed you here

19   anyway --

20            THE COURT:   Mr. Donohue, she has an

21   objection, you got to respond --

22            MS. GIBSON:   That's okay.   I'll withdraw it.

23   Keep going.

24            THE COURT:   Okay.   Go ahead.

25            THE WITNESS:   Okay.   Go ahead.

1     Q.   (By Mr. Donohue)  Yeah.

2          Again, you told Ms. Gibson that you didn't

3   remember any of that, didn't even remember if her client

4   was on the plane and she subpoenaed you here after she

5   asked you several times, did you remember this and you

6   told her initially you don't recall that at all, right?

7     A.   That's correct.

8          MR. DONOHUE:  I'll pass the witness.

9          THE COURT:  Ms. Gibson?

10                   REDIRECT EXAMINATION

11   BY MS. GIBSON:

12    Q.   Mr. Cohen, do you recall that I told you it was

13   perfectly fine if you didn't remember?

14    A.   Yes.

15    Q.   And I was just going to give you some details to

16   try and jog your memory, if that worked, correct?

17    A.   You -- I answered yes, to the first part.  The

18   second part of the question was -- is where -- we were

19   having conversation then --

20    Q.   Right.  And so --

21    A.   -- I -- suggested, don't you remember this,

22   don't you remember that.  I said, no.

23    Q.   For example, I said, Do you remember the private

24   jet and you said --

25    A.   Yes.

1    Q.    -- was it a Lear jet, you know, some number.

2          Is that type of conversation, right?

3    A.    Yeah.  You asked me if --

4    Q.    Okay.

5    A.    -- we on a private jet.

6    Q.    And it wasn't --

7    A.    You asked me my conversation with Jeff the night

8    before my supposed deposition, when he asked him,

9    remember it was a Citation X and that was the only thing

10   I remember was, no, it was a Lear jet because I remember

11   Brian asking the pilot to do what's called an executive

12   take off.  A lot of us don't fly those planes very often.

13   So that -- the only thing I do remember is specifically

14   was the type of jet, we took off.

15   Q.    But it was -- you were calling in the second

16   conversation to let me know that you had thought about

17   some things and you had -- and you had changed your mind

18   on a couple of -- on a couple of things --

19   A.    I don't think I changed my mind.  I think I

20   called you to clarify things to say, hey, if you're

21   expecting me to put specifically on a trip, me and Brian

22   and Jeff together, that I couldn't do that.  That was the

23   context of the second conversation.

24   Q.    Right.  And so one part of the second

25   conversation --

1    A.   And I'm not saying he wasn't there, I'm just

2  telling you ten years ago, you know, --

3    Q.   Right.

4    A.   -- I remember, you know, Brian and Aaron and

5  those guys.

6    Q.   Right.

7           So in the first conversation you thought he

8  was and then later you said I thought about it --

9    A.   Well, in the first conversation you were telling

10 me he was.

11   Q.   Well, you -- at that point you said --

12   A.   I didn't -- I didn't affirmatively say he wasn't

13 because it was -- you know, I get the subpoena, I called

14 down to see what's going on and that's when we had the

15 conversation.

16           MS. GIBSON:  Pass the witness.

17           THE COURT:  Mr. Donohue?

18           MR. DONOHUE:  No further questions.

19           THE COURT:  All right.  Thank you,

20 Mr. Cohen.  You're free -- you're released from your

21 subpoena and you're free to leave the courthouse.

22           THE WITNESS:  Thank you.

23           THE COURT:  Let me see you-all over here.

24           (Discussion off the record.)

25           THE COURT:  Ladies and gentlemen, we'll take

```
 1   our lunch break in just a moment and we'll take an hour
 2   and ten minutes for lunch.  I do want to remind you of
 3   our schedule.  I mentioned this on the first day, but it
 4   may not have sunk in that we're in trial Monday through
 5   Thursday.  We're not on trial on Fridays.  So after
 6   today, we won't see you again until -- until Monday
 7   morning.  And we'll go up until near the 5 o'clock hour
 8   today.  So we'll see you back after lunch, which would be
 9   in an hour and ten minutes or about at 1 o'clock.
10             MR. FRIEDMAN:  Judge, if they want to come
11   and watch you tomorrow.
12             THE COURT:  You sure can.  You are welcome
13   to come here and watch the hearings and the other cases.
14             THE BAILIFF:  All rise.
15             (Jury is ushered out.)
16             (Break taken.)
17             THE BAILIFF:  All rise.
18             (Jury ushered in.)
19             THE COURT:  Everybody have a seat, please.
20             Welcome back.  Good afternoon, ladies and
21   gentlemen.  We'll continue with the trial.  We'll go
22   about an hour and ten minutes or so.  We'll go till about
23   2:15 before we take a break.  But, of course, if you need
24   a break before then, let us know.
25             We'll ask, Ms. Gibson, to call her next
```

```
 1   witness.

 2                MS. GIBSON:  Jeff Carpenter calls Vikki

 3   Carpenter.

 4                THE COURT:  Ms. Carpenter -- Ms. Carpenter,

 5   if you will come up here, ma'am.  Before you step up on

 6   those stairs, I'm going to swear you in.

 7                (Witness sworn.)

 8                THE COURT:  Have a seat right here and talk

 9   into the microphone and Ms. Gibson will ask you questions

10   first.

11                      VIKKI CARPENTER,

12   having been first duly sworn, testified as follows:

13                     DIRECT EXAMINATION

14   BY MS. GIBSON:

15      Q.   Can you tell the jury your full name.

16      A.   Vikki L. Carpenter.

17      Q.   And you're Jeff Carpenter's wife?

18      A.   Yes.

19      Q.   Did Jeff Carpenter ever tell you anything about

20   bonuses in connection with his work for the Potashniks?

21      A.   Yes.

22      Q.   What did he tell you?

23      A.   That he was expecting a yearly bonus based upon

24   his performance with the companies.

25      Q.   And with respect to the -- the -- any -- any
```

1    bonus out of the asset sale, did he tell you about that?

2        A.   Yes.  He was very excited because he was

3    expecting to get 3 percent based off the sale of the

4    assets.

5        Q.   And you -- you didn't know the full formula?

6        A.   No.

7        Q.   Okay.  Just the 3 percent?

8        A.   Just 3 percent.

9        Q.   Okay.  And did you have an understanding of what

10   that had been estimated to be before the asset sale

11   happened?

12       A.   Approximately $1,000,000.

13       Q.   And did you and Jeff Carpenter discuss anything

14   about any past due annual bonuses?

15       A.   Yes.  Being that he hadn't been paid any bonuses

16   from the time that he had started with the company.

17       Q.   Okay.  Did he tell you anything else about that?

18       A.   I'm not sure what you mean.

19       Q.   I mean, is that the extent of the conversation?

20       A.   Yes.  As far as I know that's where -- just that

21   he hadn't been paid any of his bonuses.

22       Q.   And did you have -- during Jeff Carpenter's

23   tenure working for the Potashniks, did you have any

24   conversations with Cheryl Potashnik about Jeff?

25       A.   On a couple of occasions, we had met at the

1    elevator or had been at their home or at Cafe Express and

2    she expressed how much that they love Jeff and that they

3    couldn't go without -- work without him, especially after

4    the FBI had raided the offices and they needed somebody

5    to take control.

6        Q.   I'm sorry.  I couldn't hear the last --

7        A.   They needed somebody to take control.

8        Q.   Did you and Cheryl talk about anything else

9    about Jeff?

10       A.   Just that.

11       Q.   If --

12       A.   They just loved him and they thought he was

13   great to work around and he was really asset to the

14   company.

15       Q.   And did -- before, you know -- for a while, did

16   Jeff talk to you about feeling -- feelings being mutual

17   as far as the Potashniks?

18       A.   Oh, yes.  I think that they enjoyed working with

19   him as much as he enjoyed working with them.

20       Q.   Was Jeff working a lot while he worked for the

21   Potashniks?

22       A.   A lot, yes.  A lot of late nights and weekends.

23       Q.   Did that cause any issues at home?

24       A.   Somewhat, yes, because he just wasn't available.

25       Q.   And did -- did his level of work cause some --

115

```
 1    some yelling fights?

 2        A.   Yelling fights, yes, some sleeping on the couch

 3    occasionally.

 4        Q.   Okay.  And during this time frame, if you wanted

 5    to spend additional time with your husband, what types of

 6    things would you do?

 7        A.   Well, I would -- because he was working weekends

 8    so often, we would -- you'd have to go out and look at

 9    properties, check by evenings.  So we would drive

10    properties in the evening to check the lighting.  And

11    during the weekends, we would go around and visit with

12    the property managers and the staff and see how everybody

13    was doing and just generally check over the condition of

14    the property when we were out and about.  And we did that

15    on -- probably at least two weekends a month.  So about

16    half of the time.

17        Q.   And did -- did you and Jeff do any volunteer

18    work in connection with Hurricane Katrina?

19        A.   Yes.  Jeff was down at the Astrodome and when

20    they were sending up some of the new residents, I was

21    going around to every store from Fort Worth to Grapevine

22    to Garland picking up pillows and blankets and toothpaste

23    and toothbrushes, towels, any personal items that we

24    could get, diapers for babies to have there for the

25    guests when they got there.
```

1       Q.   Did you -- did you do anything else?  Were there

2   any other times that you remember where you spent time

3   with Jeff on -- in connection with his work similar to

4   touring properties on weekends, anything else like that?

5       A.   I would come into the office and spend some time

6   with him, occasionally.  I'd say maybe once a month.  But

7   he was also so busy that I'd usually just sat -- sit

8   there and not -- it wasn't as quality of a time as I

9   would desire.

10              MS. GIBSON:  Pass the witness.

11              THE COURT:  Mr. Friedman?

12                   CROSS-EXAMINATION

13   BY MR. FRIEDMAN:

14       Q.   Good afternoon, Ms. Carpenter.  My name is Jason

15   Friedman.

16              How are you today?

17       A.   Very well, thank you.

18       Q.   And we've never met; is that correct?

19       A.   No.

20       Q.   And what did you do today to prepare for your

21   testimony?

22       A.   I really didn't have too much preparation for

23   this testimony.

24       Q.   Did you review any documents?

25       A.   No.

1      Q.   Did you read Mr. Carpenter's deposition?

2      A.   No.

3      Q.   Did you speak with Ms. Gibson?

4      A.   Yes.

5      Q.   And how many times did you do that?

6      A.   Well, maybe twice.

7      Q.   You testified today that Mr. Carpenter told you

8  he was expecting a yearly bonus; is that correct?

9      A.   Yes.

10      Q.   And what year did he tell you that?

11      A.   From the very beginning when he started with the

12  company.

13      Q.   So his first day on the job?

14      A.   So -- so when he got his employment contract, he

15  was very excited to be working for the company -- for the

16  company and he was sharing with me what to look forward

17  to as far as salary, bonuses, et cetera.

18      Q.   So would it be accurate to say your testimony

19  is, he was excited about the possibility to get a bonus?

20      A.   More of a probability to get a bonus.

21      Q.   Probability?

22      A.   Yes.

23      Q.   He told you it was a guaranteed bonus?

24      A.   He did not say it was a guaranteed bonus, but it

25  was anticipated that he would have a yearly bonus.

```
 1        Q.   Were you aware that Mr. Carpenter received a

 2   bonus in his first year of employment?

 3        A.   No.

 4        Q.   He didn't inform you of that?

 5        A.   No.

 6        Q.   So in 2005, did Mr. Carpenter tell you he

 7   received a bonus?

 8        A.   No.

 9        Q.   Did he tell you he didn't receive one?

10        A.   No, there -- we didn't really talk about the

11   bonus or a bonus in 2005, no.

12        Q.   And he never came and complained, I didn't get

13   my yearly bonus in 2005?

14        A.   No.

15        Q.   2004?

16        A.   No.

17        Q.   2006?

18        A.   No.

19        Q.   2007?

20        A.   Yes.

21        Q.   And you testified today that Ms. --

22   Mr. Carpenter told you he was expecting $1,000,000?

23        A.   Yes.

24        Q.   And what was that date of that conversation?

25        A.   I don't know exactly the date, but I -- it was
```

1    after he had taken a trip to Las Vegas with the group of

2    gentlemen, Brian included, and they were going to look at

3    the property in Vegas.  And when he came back he said, It

4    looks like we're going to be millionaires.

5        Q.  So he came home and said, Honey, we're going to

6    be millionaires?

7        A.  Well, not like that.  I mean, he was excited

8    with the -- with the knowledge that he was -- going to be

9    based on the 3 percent on the sale of the assets.

10       Q.  And what else did he tell you about the -- his

11   formula?

12       A.  I don't know what his formula was, but I just

13   know it was 3 percent of the sale of the properties.

14       Q.  Did he tell you what properties?

15       A.  I would assume they were all of the properties.

16       Q.  And, Ms. Carpenter, you have no firsthand

17   knowledge of what Mr. Carpenter actually did when he was

18   at the office; is that correct?

19       A.  I had worked for Jeff for years before that, so

20   I knew what type of work that he did.  And I've worked in

21   property management industries so I know fairly well what

22   is required of the job and what he did, yes.

23       Q.  And did you work with him at Brisben Company?

24       A.  Yes.

25       Q.  And you -- so you're aware he sued Brisben

1    Company; is that correct?

2        A.   Yes.

3        Q.   Did you sue Brisben Company?

4        A.   No.

5        Q.   Ms. Carpenter, in 2007, what was your annual

6    household budget?

7        A.   I didn't really have a budget.  It was if we

8    needed something or wanted something, we pretty much were

9    able to do it.

10       Q.   Just did it?

11       A.   Well, that's if we could afford it.

12       Q.   Were you aware that Mr. Carpenter states that

13   your -- your budget at the time was between 300 and

14   350,000 a year in 2007?

15       A.   I thought it was less than that.

16       Q.   What did you think it was?

17       A.   Around 250.

18       Q.   And how did you base that budget?  How'd you

19   come up with that budget?

20       A.   Well, I didn't spend every penny of the money

21   that we made.  So some of it went to 401Ks and savings,

22   so I'm not -- I don't have an idea of what -- the total

23   amount that was earned, what the split of it was.

24       Q.   And part of the budget was for Mr. Carpenter's

25   legal fees for his other suits, correct?

```
 1                    MS. GIBSON:  Object.  Assumes facts not in
 2    evidence.  Object to showing something that hasn't been
 3    admitted.
 4                    Or has it?  Jason, has that been --
 5                    THE COURT:  You can't publish something
 6    until it's admitted into evidence.
 7                    MR. FRIEDMAN:  It's admitted, it's your
 8    document.
 9                    MS. GIBSON:  I know we produced it.
10                    MR. FRIEDMAN:  May I approach the witness?
11                    THE COURT:  Sure.  Did you put a exhibit
12    sticker on it?
13                    THE WITNESS:  It says, Exhibit 1.
14                    MR. DONOHUE:  The exhibit sticker is
15    actually at the bottom.  It shows what exhibit it is.
16                    MR. FRIEDMAN:  Defendant's Exhibit 14.
17                    MS. GIBSON:  Jason if you just -- I just
18    want to make the record clear, I'm not -- you don't have
19    to establish a predicate, you can just offer it.  I'm not
20    going to object.  I just want to make sure the record is
21    right.
22                    THE COURT:  Are you offering this?
23                    MR. FRIEDMAN:  So, Your Honor, I'm going to
24    move to offer Defendant's Exhibit No. 14.
25                    THE COURT:  No objection?
```

1              14 is admitted.

2              (Defendant's Exhibit No. 14 is admitted.)

3      Q.   (By Mr. Friedman)  Ms. Carpenter, do you

4    recognize this document?

5      A.   No, I don't.

6      Q.   Your -- you see at the top where it says, JC

7    personal notes to discuss personal financial items with

8    Ryan?

9      A.   Right, I see that.

10     Q.   You've never seen this before?

11     A.   No, I have not.

12     Q.   Your husband in here states -- you see number

13   three?

14     A.   Uh-huh.

15     Q.   My personal budget is 300 to 350 per ANN?

16     A.   Okay.

17     Q.   So you weren't aware of that?

18     A.   No.

19     Q.   And then above it, he talks about depleting

20   savings due from the lack of bonus and increased wage

21   dollars --

22     A.   Okay.

23     Q.   -- that I needed to pay my personal lawsuit

24   expense.

25              Are you aware of that lawsuit?

1    A.   No, not really, I wasn't.

2    Q.   You weren't aware of it?

3    A.   No.  I mean, I know there was a lawsuit, but I

4  didn't know that it came out of this.

5    Q.   Not this lawsuit.  I'm just talking about a

6  different one.

7    A.   Okay.  I'm sorry.  No, I don't.

8    Q.   You're not aware of it?

9    A.   No.  Well, wait a minute.  Are you -- you're

10  talking about Brisben?

11    Q.   Was that going on in 2007?

12    A.   I believe it had ended previous to that, yes.

13    Q.   So you're not sure what other lawsuit he would

14  have been referring to?

15    A.   No.

16    Q.   Has Mr. Carpenter had any employment that you

17  know of that he made more money than he made under his

18  written employment agreement with Southwest Housing

19  Management?

20    A.   I think when he moved on to AHF, he was making

21  more money.

22    Q.   How much was he making there?

23    A.   I want to say probably 350 to 400.

24    Q.   And how long did he work there?

25    A.   Until Mr. Sterquell passed.  So I think that was

1    about a year, a year and a half.  I'm not sure of the

2    dates.

3        Q.   So do you know why he left?

4        A.   Because the company was being dissolved and --

5    after Steve's death.

6        Q.   And are you aware of where he was employed after

7    that?

8              MS. GIBSON:  Object.  Relevance.

9              THE COURT:  What's the relevance?

10             MR. FRIEDMAN:  Just his financial condition.

11             THE COURT:  You're asking after this?  After

12   the Southwest --

13             MS. GIBSON:  He's asking after the first

14   employment after.

15             THE COURT:  After he worked at Southwest?

16             MS. GIBSON:  Right.

17             THE COURT:  Okay.  Sustained.

18       Q.   (Mr. Friedman)  Ms. Carpenter, do you know the

19   names of the other employers Mr. Carpenter has sued?

20       A.   I know --

21             MS. GIBSON:  Object.  Relevance.

22             THE COURT:  What's the relevance?

23             MR. FRIEDMAN:  I'm trying to determine if --

24             THE COURT:  Well, there's -- who they were

25   and what the nature was are not relevant.  If that's

1   where his money is going, that's where his money is

2   going.

3                MR. FRIEDMAN:  Well, it's the state of mind

4   at the time.

5                THE COURT:  Objection's sustained.

6       Q.   (By Mr. Friedman)  Ms. Carpenter, did

7   Mr. Carpenter tell you that he got paid six weeks

8   severance from Southwest Housing Management?

9       A.   No.

10      Q.   Did he tell you that he turned down $150,000

11  severance --

12      A.   No.

13      Q.   -- at Southwest Housing Management?

14      A.   No.

15      Q.   He didn't tell you that?

16      A.   No.

17      Q.   Are you familiar with his employment agreement?

18      A.   No, not -- not well.

19      Q.   So he didn't tell you that any changes to his

20  employment agreement had to be in writing?

21      A.   No.

22      Q.   Did he tell you that he attempted to amend his

23  employment agreement in writing?

24      A.   I'm sorry.  I don't understand the question.

25      Q.   Did Mr. Carpenter talk to you about or tell you

1 that he's going to submit a proposed amendment to his

2 employment agreement to Brian or Cheryl Potashnik?

3   A. No, I think he already had an agreement.

4   Q. So would you be surprised that after he told you

5 that, he was trying to get them to sign an agreement?

6   A. I would be surprised that he was trying to get

7 them to sign an agreement about that, yes.

8   Q. Would you be surprised to know that he secretly

9 recorded them, trying to get them to agree to a

10 agreement?

11   A. I would not be surprised, no.  I suggested that

12 it might be a good idea.

13   Q. So you suggested it?

14   A. Yes.

15   Q. And what was your extent of your discussions

16 about the secret recording?

17   A. Just that I thought it might be a good idea for

18 him to have Brian and Cheryl's voices confirming that

19 they had made a deal.

20   Q. And before he went about doing the recording,

21 did y'all discuss maybe bringing up the deal on the

22 recordings since he would be the only one to know --

23   A. No, I think it was more about his bonuses

24 than -- than the deal.  Maybe I didn't word that

25 properly.

1    Q.   So the point of the recording was he was trying

2  to record them to discuss his employment bonuses under

3  his contract?

4    A.   Yeah.

5    Q.   Thank you, Ms. Carpenter, for your time.

6         MR. FRIEDMAN:  I'll pass the witness.

7         THE COURT:  Thank you, Mr. Friedman.

8         Ms. Gibson?

9              REDIRECT EXAMINATION

10 BY MS. GIBSON:

11   Q.   Ms. Carpenter, you were referring to a deal just

12 a moment ago, talking to -- or the deal.

13         Can you -- could you just explain what you

14 meant by that?

15   A.   As far as, what, the recording or --

16   Q.   I just -- I just didn't -- I just want to

17 understand what you -- you talked about employment --

18 certain employment bonuses that were still owed?

19   A.   Right.

20   Q.   And you also referenced "the deal" and I just --

21 I just need some help understanding what you meant by

22 "the deal."

23   A.   The 3-percent bonus that he was to receive

24 for -- after the sale of the company.

25         MS. GIBSON:  Pass the witness.

 1                    THE COURT:  Mr. Friedman?

 2                    RECROSS EXAMINATION

 3   BY MR. FRIEDMAN:

 4      Q.   Ms. Carpenter, did you listen to the

 5   recordings --

 6      A.   No.

 7      Q.   -- after?

 8      A.   No.

 9      Q.   Did you read the transcripts after?

10      A.   No.

11      Q.   Were you the one who typed out the transcripts?

12      A.   No.

13      Q.   Do you know who that was?

14      A.   My daughter.

15      Q.   So would you agree with me that up until the

16   time of the recording, you would agree with me, there was

17   no confirmation of any kind that Jeff Carpenter had a

18   deal?

19      A.   I believe that there was because they said that

20   there was.

21      Q.   And you had no firsthand knowledge about the

22   deal; is that correct?

23      A.   Other than what I had heard from my husband, no.

24      Q.   You didn't hear anything from Brian or Cheryl

25   Potashnik, correct?

```
 1        A.   Other than they loved him.

 2        Q.   And, Ms. Carpenter, what did Brian say to you

 3   when he came back and said neither Brian nor Cheryl

 4   confirmed any agreement?

 5        A.   What -- I never talked to Brian.  I never that

 6   had a conversation --

 7        Q.   I meant Jeff?

 8        A.   What did I say to Jeff?  I couldn't believe it.

 9   Because I always thought that Brian was a man of his word

10   and --

11        Q.   And he --

12        A.   -- that --

13        Q.   -- did he give you his word?  Brian gave you his

14   word?

15        A.   No, I did not talk to Brian.  But I'm saying

16   when you -- said to Jeff, did Jeff say to me -- that's

17   why I couldn't believe that -- that the deal didn't go --

18   or we weren't going to get the -- the payout from the

19   sale of the properties.

20        Q.   And if Mr. Carpenter got the payout, do you

21   think he would have told you?

22        A.   Oh, yeah.

23             MR. FRIEDMAN:  Pass the witness.

24             THE COURT:  Ms. Gibson?

25             MS. GIBSON:  Pass the witness.
```

```
 1                    THE COURT:  All right.  Thank you,
 2   Ms. Carpenter.  If you'll have a seat back over there
 3   with Mr. Carpenter.
 4                    Ms. Gibson, it's still your case.
 5                    MS. GIBSON:  I'm sorry?
 6                    THE COURT:  It's still your -- if you'll
 7   call your next witness, please.
 8                    MS. GIBSON:  Okay.  Plaintiff calls Jeff
 9   Carpenter.
10                    THE COURT:  Mr. Carpenter, if you'd come up
11   here, sir.  Before you step up there, let me swear you
12   in.
13                    THE WITNESS:  Yes, sir.
14                    (Witness sworn.)
15                    THE COURT:  Have a seat right here,
16   Ms. Gibson will ask you questions first.
17                    And we're still going to about 45 minutes
18   before we take a break.
19                         JEFFREY CARPENTER,
20   having been first duly sworn, testified as follows:
21                       DIRECT EXAMINATION
22   BY MS. GIBSON:
23      Q.  Would you please tell the jury your full name.
24      A.  Jeffrey Wayne Carpenter.
25      Q.  And, Mr. Carpenter, to clear something up, can
```

1    you -- can you take a look at Exhibit 1 in front of you.

2         A.   Yes, ma'am.

3         Q.   It's in the tall -- it should be on top of the

4    tall stack.

5         A.   It's right here.

6         Q.   Well -- so I think -- I think that exhibit, it

7    has an Exhibit 1 sticker right here (pointing), but this

8    is actually Defendant's 14?

9         A.   It's -- oh, I see.

10        Q.   Okay.  So if you'll just look right beside it.

11        A.   Here (pointing)?

12        Q.   You see Exhibit 1?

13        A.   Exhibit 1, yes.

14        Q.   Okay.  You have seen the transcript that your

15   daughter typed?

16        A.   Yes, ma'am.

17        Q.   Okay.  Is Exhibit 1 the -- the transcript that

18   your daughter typed?

19        A.   Yes, ma'am.  Wait a minute.  No, this is -- is

20   not the one that my daughter typed.

21        Q.   Okay.

22        A.   This is where we had a -- a third-party

23   professional type so there would be no conflict of --

24   excuse me -- any conflict of any interest.

25        Q.   How did -- how does -- how is it that you came

 1  to work for the Potashniks?

 2      A.   Very interesting.  I was ready to make a move

 3  from the company I was with.  I just came back from a job

 4  interview that -- and I received a phone call from Deepak

 5  Suilakhe, who worked for this Brian and Cheryl as -- in

 6  development.  And we had a telephone conversation and it

 7  probably lasted 30 minutes and he gave me a rundown on

 8  the Potashniks and Southwest Housing and it was

 9  intriguing.

10      Q.   And how did you feel about Brian Potashnik and

11  Cheryl Potashnik when you started working there and

12  decided to go work there?

13      A.   Well, I was very excited.  We relocated from Las

14  Vegas to Dallas.  One of the hardest parts at that time

15  was housing.  But I was very excited about the challenge.

16  The company was growing very rapidly.  It needed

17  professional guidance, you know, help, my expertise is in

18  the management area.  And the company grew from an

19  entrepreneurial company, from deal to deal to deal, next

20  thing you know you got a very large company.

21              And, I believe, when I came on board, they

22  had 25 apartment communities and that took them from

23  about 5500 units -- and one year later, due to the

24  efforts of the development doing their job and

25  construction doing their job, they delivered another 13

1    properties and brought the total count to 8,000 units.

2    So in a one-year time period with me coming on board,

3    needing to make modifications to the management

4    operations, we had a very large assortment amount of

5    growth at that time.

6        Q.   And you're -- what -- can you briefly describe

7    what your job was at Southwest Housing?

8        A.   Yes.  It was -- it was to run the day-to-day

9    operations of the management company, which entailed the

10   related -- correlated to the site -- the different

11   apartment communities.  As a management company, there's

12   a lot of pieces to a management company because of

13   being -- excuse me -- tax credit, there's a lot of

14   federal regulations and a lot of different missing --

15   different other pieces.  As well as with the growing

16   company.  I was asked to help facilitate some

17   institutional, if you will, cohesiveness in the corporate

18   office as well, in the central servicing site because

19   they didn't have that running smoothly.

20       Q.   And what is central services?

21       A.   Central services typically would be I -- IT

22   department, HR, it could be asset -- asset management,

23   you can consider it to be -- some decide -- say it's

24   accounting, some keep accounting separate.  But it was

25   additional services, payroll.  But those type of

1   expertise, specific tasks, that are needed for an

2   organization.

3        Q.   Okay.  And when you -- will you take a look at

4   Exhibit 2, your initialed employment agreement?

5        A.   Yes, ma'am.

6        Q.   You see -- would you go to Paragraph 4(b).

7        A.   Yes, ma'am.

8        Q.   You see that the bonus potential in year one is

9   based on achieving company objectives?

10       A.   Yes, I see that.

11       Q.   And you should be able to see it, Jeff, on your

12   screen up there.

13       A.   Yeah -- oh, I didn't realize it.  Pardon me.

14   Yes.

15       Q.   And company was -- who was the company in this

16   agreement?

17       A.   Southwest Housing Management.

18       Q.   And then --

19       A.   -- Corp. Inc.

20       Q.   -- and then in the other end of -- of the first

21   year bonus is based on overall profitability of the

22   organization as a whole?

23       A.   Yes.

24       Q.   And what -- what does -- what does "organization

25   as a whole" refer to?

1      A.   Well, it was my understanding and from the very

2  first dialogue was the company is an owner -- owner,

3  developer, contractor and manager of apartment industry,

4  full service, if you will.  So it embraces all those

5  elements, those companies together, as a whole, for the

6  success of the organization.

7      Q.   And did you and Brian Potashnik talk about

8  where -- where he wanted you to be on regular

9  compensation each year?

10      A.   Yes, he wanted me -- and I expressed that I

11  wanted to be where I left when I left Brisben Companies

12  shortly before at -- so starting.  We were a much larger

13  company, but I wanted -- I was excited about the

14  companies because with the information, the due

15  diligence, financial records of the previous year and the

16  growth pattern, what was in their pipeline of growth, it

17  excited me, it gave me an -- it gives the company an

18  opportunity to grow as well as earn more money.  I did

19  not go to work there for $200,000 salary.  I did not

20  necessarily go there for 200,000 maximum bonus.  I went

21  there to create wealth and that was very well known.

22      Q.   Okay.  And what do you mean by that?

23      A.   It -- to -- where -- I knew what it took or

24  would take for performance from what I saw.  It was

25  not -- you know, bewitched-type thing, you know, you

1    wiggle your nose and it's fixed.  It was going to be a

2    long process.  And with that, there should -- there would

3    be rewards for that and the overall organization -- as

4    long as they -- we continued the growth program, there

5    would be substantial profitability in the companies.

6        Q.   Okay.  So you're talking about wealth for the

7    organization?

8        A.   Yes.

9        Q.   Okay.  And did Brian --

10       A.   Not -- excuse me.  Not the management company.

11       Q.   Right.

12       A.   Okay.

13       Q.   I -- right.

14            Did Brian Potashnik tell you a number of the

15   range he expected you to be in on your regular annual

16   compensation?

17       A.   On my annual compensation?

18       Q.   I'm sorry.  I should clarify.

19            I'm talking about before you start -- when

20   you're talking to Brian Potashnik, before you started

21   work at Southwest Housing Management, did he -- did he

22   discuss his expectations for where you would be on annual

23   salary and bonus, combined?

24       A.   Yes.  We discussed it.  We discussed it.  Based

25   it off of my previous employer, where I was making

137

1    200,000 salary a year and $200,000 bonus was my average.

2         Q.   Okay.  And--

3         A.   So that was a starting point.  This was a

4    smaller organization, but it had plenty of needs of -- of

5    a turnaround and there was a tremendous amount of growth

6    happening, so it needed that.  So that was a starting

7    point.

8              MR. FRIEDMAN:  I'm going to object as being

9    nonresponsive.

10             THE COURT:  Try and limit your responses to

11   the question that's asked.  And I'm not sure whether that

12   was or not.

13        Q.   (By Ms. Gibson)  And when -- when the agreement

14   says based on achieving company objectives, did anyone at

15   Southwest Housing ever give you specific objectives that

16   you needed to meet?

17        A.   No, ma'am.

18        Q.   Okay.  Did Brian Potashnik or Cheryl Potashnik

19   ever tell you, though, that you were not meeting their

20   expectations?

21        A.   Never.

22        Q.   Throughout the course of your tenure at

23   Southwest Housing, did Brian Potashnik and Cheryl

24   Potashnik ever tell you that you were meeting their

25   expectations?

```
 1        A.   Yes.   They were pleased -- pleased with the
 2   work.   We had some challenges on several different --
 3              MR. FRIEDMAN:   I'm going to object to
 4   everything after "yes" as being nonresponsive, Your
 5   Honor.
 6        Q.   (By Ms. Gibson)   Can you give me a few examples?
 7              MS. GIBSON:   Oh, I'm sorry.   I didn't --
 8              THE COURT:   Go ahead.
 9        Q.   (By Ms. Gibson)   Can you give me a few examples?
10        A.   There was a couple of apartment -- several
11   apartment communities that were challenging that needed
12   extra attention, which we gave and needed -- they -- they
13   were challenging for many reasons.   One, maybe they
14   should have never been built.   They -- was a bad
15   locations, there was a bad structure --
16        Q.   But --
17        A.   -- of the deal or whatever.   But we worked
18   collaboratively.   We worked and developed a plan to turn
19   those apartment communities around --
20        Q.   My -- I'm sorry.   I --
21              MR. FRIEDMAN:   I'm going to object to the
22   last answer as being nonresponsive.
23        Q.   (By Ms. Gibson)   I gave -- I asked -- I asked a
24   bad question, Mr. Carpenter.
25        A.   Okay.
```

1    Q.   When I was saying can you give us a few

2    examples, you had said -- I was talking about Brian

3    Potashnik and Cheryl Potashnik telling you at various

4    points that you were meeting expectations.  And I'm

5    sorry, I didn't mean examples of what they were happy

6    about.  I meant, can you give examples of the types of

7    things they said to you.

8    A.   Oh, we appreciate all the hard work that you --

9    you do, we know that you go above and beyond, you work

10   exceptionally hard and we know that it's a hard -- hard

11   job --

12   Q.   And --

13   A.   -- early on.

14   Q.   -- why was it important that -- to you that the

15   first-year bonus, the high end, was based on overall

16   profitability of the organization as a whole?

17   A.   Well, part of my due diligence was -- they

18   shared with me their development lists, their financial

19   statements on all the apartment -- or all of the

20   entities, development, management, construction.  And the

21   management company, given the infancy of that and given

22   the growth there was -- it was literally impossible for

23   that -- for the management company to make money.  It

24   would lose money.  So therefore the construction company

25   was profitable.  Development company was profitable.

1    Thus looking at the business as a one-company-type

2    business.

3        Q.   And so with respect to Southwest Housing

4    Management, you -- and profitability, can you give me one

5    example of why it was not -- it was not possible or

6    intended to be profitable?

7        A.   Well, you have to develop an infrastructure to

8    be able to manage the properties that were in existence

9    and the properties that were coming on board.  In that

10   short period of time, it was a 52 percent increase, going

11   from 5 to 8,000 -- 5500 to 8,000 units, 2500.  Great job

12   by construction, great job by development.  Massive

13   issues for management to -- to absorb all that.

14   Particularly when you don't have the infrastructure and

15   the right people in place.  So that's only part of it.

16              But -- so we had -- you had to -- we had to

17   put the infrastructure in place.  We had to change some

18   people.  But at the same time we weren't collecting any

19   fees.

20       Q.   Okay.  So that would be a second example.

21              Can you -- can you give us one example of

22   how taking something -- well, let me back up.

23              Did you ever take contracted vender work

24   in-house at Southwest Housing?

25       A.   Yes, we did.

1    Q.   Okay.  Can you give us one example of how that

2    impacts profitability of Southwest Housing Management

3    versus the organization as a whole, including the

4    individual --

5    A.   Yeah I --

6    Q.   -- properties?

7    A.   -- have a great example that it was done fairly

8    shortly.  The product that Brian and Cheryl, the

9    companies were building were absolutely gorgeous.  The

10   sign company they were using at the time did granite

11   signage.  It looked good.  However, it wasn't lasting,

12   nor the signage did not have the word "apartments" on it.

13          So here we're in a condo-driven market, in

14   Texas.  So you look at our apartment communities, they

15   kind of look like condos.  You don't know if they're

16   condos, you don't know if they're apartments.  So -- and

17   there was fault -- they were faulty workmanship.  So I

18   found a vender that was able to deliver a better

19   product -- a much better product, deliverable and savings

20   on that paid for my marketing director.  So here we were

21   contracting out -- prior to me coming on board, they were

22   contracting out with the marketing consultant for

23   advertising and PR and so forth and I was able to bring

24   that in-house, essentially free, just by the savings that

25   we were making on development signage, you know, the main

```
 1   ID signage.

 2        Q.   Okay.

 3        A.   Does that make sense?

 4        Q.   Sure.

 5             And can you give us one example of where

 6   taking some service for the organization in-house,

 7   meaning done at Southwest Housing Management, would hurt

 8   Southwest Housing Management financially, but still

 9   ultimately, financially benefit the Potashniks?

10        A.   I have to apologize.  I'm not sure I understand

11   the question.

12        Q.   That's okay.  You get to tell me when I ask bad

13   questions okay, Jeff.

14             Social services, was that in-house or

15   contracted when you started?

16        A.   It was -- social services was being done by a

17   third party, contracted.  I believe in -- please don't

18   hold me to the letter of law, but I believe Cheryl was

19   involved in helping start the nonprofit that provided

20   these social programs that we provided to our residents

21   at the particular properties.  And what was happening was

22   they created such a hierarchy -- arch or hierarchy that

23   most of the money was going to the -- to the people of

24   the organization.  It wasn't fondling (sic) through down

25   to -- the benefits to the residents.  And the Potashniks
```

1    realized that so we took that in-house.  And I believe

2    in 2005, alone, that on a financial statement, it was

3    close to 900 -- I'll call it $995,000 of payroll and

4    related expenses that hit the books.

5        Q.   Okay.  But did taking that in-house ultimately

6    help the income of Brian and Cheryl Potashnik?

7        A.   Ultimately, yes, and gave the proper services

8    that was needed to -- and deserving to our residents, our

9    clients.

10       Q.   Okay.  Your -- if you could take a look at

11   Exhibit 2.

12       A.   (Witness complies.)

13       Q.   The -- the contract talks about a detailed bonus

14   plan being provided, "a detailed bonus" -- whoops.  "A

15   detailed bonus plan will be provided within 90 days of

16   employment".

17       A.   Yes, ma'am.

18       Q.   Okay.  And was -- was any written plan ever

19   provided to you?

20       A.   No, ma'am, never.

21       Q.   When you initially signed this, were you --

22   okay.

23            But you -- you continued to work with the

24   Potashniks after that?

25       A.   Yes.  Once I start --

 1            MR. FRIEDMAN:  I'm going to object to

 2   everything after "yes" as being nonresponsive.

 3            THE COURT:  Okay.

 4            Ask your next question.

 5      Q.  (By Ms. Gibson)  And -- so when you didn't get

 6   the bonus plan in the first 90 days, what was the

 7   discussion like with whoever, Brian or Cheryl, or whoever

 8   you may have talked about with it?

 9      A.  It was -- it was not mentioned on the 90th --

10   91st day.  It was mentioned probably a few months later,

11   when I kind of realized it.  And it -- we talked about

12   putting something together.  However, it just never

13   happened, you know.  And I think part of it is we were

14   all so very, very busy.

15      Q.  And --

16      A.  And it didn't -- I was more focused on the --

17   our clients, our residents --

18            MR. FRIEDMAN:  I'm going to object to

19   everything after --

20            MS. GIBSON:  And --

21            MR. FRIEDMAN:  -- "later" as being

22   nonresponsive.

23            THE COURT:  Overruled.

24      Q.  (By Ms. Gibson)  So initially -- so after

25   signing the initial employment agreement, did you ever

```
 1   talk about the agreement with the Potashniks in the first

 2   couple of years, about the terms of it?

 3       A.   Not the terms, no.

 4       Q.   Did you have oral discussions about the annual

 5   bonuses?

 6       A.   Yes.  I brought it up that we're past -- past

 7   due -- it was not the first --

 8            MR. FRIEDMAN:  Object to everything after

 9   "yes" as being nonresponsive.

10            THE COURT:  Overruled.

11       Q.   (By Ms. Gibson)  Go ahead.

12       A.   I didn't approach after the first year.  I

13   approached it the second -- second year.  Again, we were

14   so ingrained on reestablishing and rebuilding with the --

15   the growth that was provided to us by development and

16   construction that wasn't my number one worry.  It

17   probably shouldn't -- should have been.  I should have

18   looked at -- through it myself, but --

19            MR. FRIEDMAN:  Object to being --

20            THE WITNESS:  -- I didn't.

21            MR. FRIEDMAN:  -- nonresponsive.  She asked

22   him about conversations, not about therapy sessions.

23            THE COURT:  State your objection.  Say it's

24   objection, nonresponsive.

25            MR. FRIEDMAN:  Nonresponsive.
```

```
 1                    THE COURT:  Overruled.

 2                    MR. FRIEDMAN:  All right.  Thank you.

 3                    THE COURT:  Break up your questions,

 4    Ms. Gibson.

 5                    MS. GIBSON:  Okay.

 6        Q.   (By Ms. Gibson)  So, Jeff, when I -- when I ask

 7    a question, I know you're anticipating what the next one

 8    is and I'll try to be better about them --

 9        A.   Okay.

10        Q.   -- but that's why he's objecting.

11        A.   Oh, I'm sorry.

12        Q.   Like, I'll say, Did you have a discussion and

13    you'll go ahead and tell me what the discussion was.

14        A.   Okay.

15        Q.   So I think that's what Mr. Friedman's issue is.

16                    And after you moved to Texas --

17        A.   Yes, ma'am.

18        Q.   -- you also, in the early time frame, had your

19    Vegas home for sale?

20        A.   My -- my family was still living in Vegas

21    because we didn't find a house until October of '04 and

22    then they eventually moved -- yes, we did have our Vegas

23    house still.

24        Q.   And ultimately was it sold?

25        A.   Ultimately, yes.
```

1      Q.   Okay.  And did you make a good profit?

2      A.   Yes, we did.

3      Q.   And in the first two -- so in your initial term

4  of employment, you weren't -- you weren't hurting for

5  money?

6      A.   Not at that time, no.  Vegas was good to me.

7      Q.   So in your -- when you were closing on a home in

8  Dallas, do you recall a discussion with Brian Potashnik

9  about a payment to help you out?

10     A.   Yes, ma'am.

11     Q.   Okay.  And how -- tell me about the

12 conversation?

13     A.   Explained the conversation being that we have a

14 house that we're prepared to buy, but we're -- have to do

15 a bridge loan and we're short on cash and would there be

16 a possibility that the company could help me out.

17     Q.   Okay.  And --

18     A.   And they did.

19     Q.   And what did -- what did Brian say in response,

20 other than he would help you out?  What did he do for

21 you?

22     A.   He -- he gave -- gave me the moneys.

23     Q.   Okay.  How much?

24     A.   50,000.

25     Q.   Okay.  And when -- when that happened, did you

1   appreciate it?

2       A.   Very much so.

3       Q.   And when that happened, pursuant to your written

4   agreement --

5               MR. FRIEDMAN:   Thank you.

6       Q.   (By Ms. Gibson)  -- there was -- you were

7   supposed to be employed at the end of the first year to

8   get the minimum of 50, right?

9       A.   That's what it says, yes.

10      Q.   Okay.  But you and -- in connection with your

11  conversations with Brian, did y'all document -- did you

12  amend your contract or anything for that initial $50,000

13  payment?

14      A.   No, it was oral.  It was a discussion and he

15  agreed to it and soon thereafter, I received a check.

16      Q.   Okay.  And initially what did Brian Potashnik

17  tell you about the 50,000?

18      A.   The phrase was, it was a forgiveness loan.   In

19  other words, it wasn't -- wouldn't necessarily apply to

20  my annual bonuses.

21      Q.   Okay.  What -- what is the effect of that?

22  What's a forgiveness loan?

23      A.   That -- that it wasn't going to -- that I didn't

24  have to repay it back.

25      Q.   Okay.  And -- but that's what -- whose idea was

1    that, the forgiveness loan?

2        A.   Brian.

3        Q.   Okay.  And later, did you find out that --

4    whether or not that is okay to do?

5        A.   Yes, I did.

6        Q.   What'd you find out?

7        A.   Well, I had to pay taxes on that -- that money

8    and it went against normal accounting practices.

9        Q.   Okay.  So ultimately, that was settled out to

10   treat it as, you know, normal -- normal income --

11       A.   Right.

12       Q.   -- right?

13            Okay.  And also where did that first check

14   come from?  Did it come from Southwest Housing

15   Management?

16       A.   No, ma'am.  It came from Affordable Housing

17   Construction.

18       Q.   Okay.  And so that's something that had to be

19   settled out on the books as well?

20       A.   Yes, ma'am.

21       Q.   Okay.  So you talked about various things that

22   might increase overhead for Southwest Housing Management,

23   but, ultimately, make more money for the Potashniks and

24   the organization as a whole.

25            During your tenure, was the organization, as

1    a whole, profitable?

2        A.   Yes.

3        Q.   Could you explain that?

4        A.   Yes.   The -- the construction company was the

5    largest moneymaker.   During the time period with the --

6    with the pipeline as well as development, were the two

7    entities that were profitable.

8        Q.   Okay.   And can you give me -- or not can you.

9    Would you please give me one example of something that

10   you worked with construction on that would save money for

11   the organization?

12       A.   Working with construction.   Well, we talked

13   about the signage, we did various value engineering on

14   the properties.   The -- the apartment communities

15   sometimes had an enormous amount of land that were not

16   necessarily the "Class A" property location.   And there

17   would be a design -- a site plan designed for the

18   property.   And I worked closely with development,

19   particularly Greg Moss, and we would -- a lot of times

20   rework the site plan with the engineers, if they could,

21   and -- and -- but it also worked closely with

22   construction and with some of the contractors, like

23   landscaping contractors.

24            Because if you have a property that is 250

25   units and it's built on 55 acres, you don't want to be

1    mowing 55 acres.  Maybe not all that's usable.  But let's

2    say 40 of it is, but I only need 30 of it.  So, you know,

3    we thought ahead so we could be -- didn't have that

4    additional burden put on the property, you know, forever.

5        Q.  Okay.

6        A.  That was very important.

7        Q.  And so your first anniversary dates -- well,

8    let's -- let's back up a moment.

9            What was your start date at Southwest

10   Housing?

11       A.  March 15th of 2004.

12       Q.  Okay.  So 03/15/04 is your start date.

13           And so around -- just not long after your

14   first anniversary date, what's the next significant event

15   that happened at work?

16       A.  The -- the next unfortunate event was the day

17   after Father's Day and the FBI raided the corporate

18   office.

19       Q.  Okay.  And the day after Father's Day was --

20       A.  And that -- and that was, I believe, June 20th

21   of 2005.

22       Q.  Okay.  And did you have a conversation at this

23   time with the Potashniks about this issue?

24       A.  No.  Brian and Cheryl were not available

25   during -- at that time.  They came at the time when we

152

```
1    were having cake for Father's Day.  So it was probably
2    about 12:30, noonish.  And I had not heard -- I was
3    surprised that Brian and Cheryl weren't there because
4    they always participated in, you know, celebrations,
5    birthdays, team effort.  And, I believe, I had heard --
6                    MR. FRIEDMAN:  I'm going to object to this
7    as being nonresponsive to the question asked.
8                    THE COURT:  All you have to do is say
9    nonresponsive.
10                   Break up your questions, Ms. Gibson.
11                   MS. GIBSON:  Sure.
12   Q.   (By Ms. Gibson)  So when the FBI raid happened,
13   the Potashniks weren't there.
14                   Who dealt with the FBI?
15   A.   I did.
16   Q.   Okay.  That day?
17   A.   Face to face.
18   Q.   Okay.  And after that, did the company have to
19   respond to requests for documents and things of that
20   nature?
21   A.   Yes.  To my understanding, there was a variety
22   of subpoenas that went to different people that had to do
23   different things, but I had a very long list for my
24   portion.
25   Q.   Okay.  So --
```

```
 1                    THE COURT REPORTER:  I'm sorry.  For your

 2  what?

 3                    THE WITNESS:  For my portion.

 4     Q.   (By Ms. Gibson)  Okay.

 5     A.   Under my control or area of expertise.

 6     Q.   All right.  And so your portion, are you talking

 7  about management documents?

 8     A.   Yes, ma'am.

 9     Q.   Okay.  You handled that.

10          Do you know who handled documents for the

11  construction arm?  If there were?

12     A.   If there -- I'm not sure if there really was a

13  construction arm.  If so, it would have been -- when they

14  came in, they --

15     Q.   So -- so --

16                    MR. FRIEDMAN:  Nonresponsive, Your Honor.

17                    THE COURT:  Break up your questions.

18                    MS. GIBSON:  I'm on to the next question.

19                    THE WITNESS:  Okay.

20     Q.   (By Ms. Gibson)  So did the development company

21  receive any subpoenas, to your knowledge?

22     A.   I'm not sure.

23     Q.   Okay.

24     A.   I'm not sure who was subpoenaed and what, if

25  they were.
```

154

1       Q.   Did the Potashniks talk to you about your role

2    in handling whatever was needed for the FBI investigation

3    as far as the management?

4       A.   Well, it couldn't come at a -- at a more

5    opportune time at the corporate office.  Simply that

6    we're having cake and ice cream --

7       Q.   Well, wait.  I'm sorry, Jeff.

8       A.   Yes, ma'am.

9       Q.   I'm just trying to avoid hearing from --

10      A.   Okay.

11      Q.   -- Mr. Friedman.

12              MR. FRIEDMAN:  Well, if you ask him

13   questions, you wouldn't hear from me at all.

14              THE COURT:  Okay.  Keep your sidebar --

15              MS. GIBSON:  Mr. Friedman, I'm --

16              MR. FRIEDMAN:  Well, sidebar was directed to

17   me, Your Honor.

18              THE COURT:  You're --

19              MR. FRIEDMAN:  And I'm just doing my job

20   like Mr. Carpenter did his.

21              THE COURT:  Have a seat.

22      Q.   (By Mr. Gibson)  I don't even remember what I

23   asked you.  Let me go back.  I'm asking in connection

24   with the entire investigation.

25              As far as requests for information, did you

```
1    have a discussion about the Potashniks, overall, about

2    what your role would be?

3        A.   I participated -- we had in-house counsel at the

4    time --

5               MR. FRIEDMAN:  I'm going to object to being

6    nonresponsive.

7               MS. GIBSON:  I'm just asking about if he had

8    discussions with the Potashniks.

9               THE COURT:  Can you answer, yes or no?

10              THE WITNESS:  Yes.

11              THE COURT:  Okay.

12       Q.   (By Ms. Gibson)  Okay.  What were your

13   discussions with the Potashniks on that issue?

14       A.   Primarily, to keep everybody focused.

15       Q.   Okay.

16       A.   Not to worry.  We did a promotional campaign the

17   very next day, Southwest Housing solid as a rock was on

18   everyone's desk the next morning at the corporate office.

19   And we, you know, kept everybody motivated.

20       Q.   Okay.  And at the time, did you believe in Brian

21   and Cheryl Potashnik?

22       A.   Oh, absolutely.

23       Q.   Did you -- can you -- could you trust them?

24       A.   Yes, ma'am.

25       Q.   And did you continue to support them?
```

1       A.   Yes.

2       Q.   And then not very long after that, what's the

3   next big event that happened?

4       A.   What was it --

5       Q.   Just a few months later, what happened?

6       A.   Oh, yeah, Hurricane Katrina and Rita hit at the

7   end of August, first -- first of September.

8       Q.   Okay.  So you think August, September of '05,

9   Katrina and Rita?

10      A.   Yes.

11      Q.   And what did -- what -- what did -- I'm not

12  asking about you in particular, but what did the

13  organization, as a whole, decide to do when the

14  hurricanes hit?

15      A.   I believe we were very proactive.  We had a

16  discussion to -- and compassionate for the victims and we

17  wanted to -- from a professional, business side, as well

18  as personal, business side, we wanted to be able to

19  support and help the victims as much as possible and we

20  did.  And we did that by -- through housing, through

21  making arrangements with doctors and nurses, having buses

22  that -- for the senior properties in Houston.

23          To -- as Mark Jones proudly mentioned,

24  backing up two brand new elderly buses and putting

25  seniors in apartments, working with Gallery Furniture,

1   building furniture over the weekend so we can furnish

2   apartments for them.  It was a -- it was a business

3   decision, it was a humanitarian decision that Brian made

4   and Cheryl made and I certainly agreed with it as well.

5       Q.   Okay.  And what -- without telling me everything

6   you did personally to help in Katrina, can you give me,

7   like, two -- two examples of your role?

8       A.   Well, besides a lot of coordination, I was in

9   the field.  I was in Houston a great deal of the time.

10  After the evacuees -- I'm sorry -- the victims were kind

11  of processed into Houston, they started coming into

12  Dallas, Cheryl and a -- and a group of our managers here

13  worked through the weekend, on Labor Day weekend, I

14  believe, it was.  A lot with DHA opened up and they

15  created Section 8 vouchers for the people so they could

16  provide housing.

17           We took care of a tremendous amount of

18  donations.  We had people going to get essential needs,

19  as kind of -- my wife said from blankets, pillows,

20  bedding, you know, personal utensils, I mean, I had

21  people in my -- my personal truck that I took to our

22  properties and the teddy bear the little girl had was

23  still wet.  It was a very sad, very troubling time for

24  those people --

25      Q.   Okay.

1          A.   -- for the people.

2          Q.   And then -- so your anniversary date -- your

3     next anniversary date would have been 3 -- I can't talk.

4     About March of '06, your anniversary.

5               At this point, what's going on with annual

6     bonuses by this anniversary?

7          A.   Well, about this time is when I had sales

8     proceeds coming in from my house in Las Vegas.  I was not

9     strapped for cash.  We were very busy for what I first

10    started with, all the properties in the growth and

11    everything.  But we had Katrina, and with Katrina it

12    was --

13               MR. FRIEDMAN:  Objection.  Nonresponsive,

14    Your Honor.

15               THE WITNESS:  -- a nightmare.

16               MS. GIBSON:  Okay.

17               THE COURT:  Break up your questions,

18    Ms. Gibson.

19         Q.   (By Ms. Gibson)  And what was the next major

20    event that happened?  So it's March of '06 -- let me ask

21    this:  What happens in May of '06?

22         A.   May of '06 I was very surprised, Brian calls

23    me --

24         Q.   Well, can you just give us the shorthand --

25         A.   Yes.

1      Q.   -- of what happened in May of '06 and then I can

2  ask you more about details.

3      A.   Yes.  Brian asked me to come to his house, he

4  wanted to have a conversation.

5      Q.   Okay.  And did -- did you go to his house?

6      A.   Yes, ma'am.

7      Q.   Okay.  Just tell me about the initial arrival,

8  what your conversation was, just the first few moments.

9      A.   Hello, greetings, Brian had a drink in his hand,

10  smoking a cigarette and said, You know, it's -- it's

11  been -- been a long year or last year's been pretty hard

12  and there's some -- something I want to talk to you

13  about.  I mean, in general, that was -- that was it.

14      Q.   Okay.

15      A.   Just open pleasantries and it was outside on the

16  front patio.

17      Q.   All right.  Did you ask him -- did you ask why

18  you were being called to his house?

19      A.   Well, he told me.

20      Q.   Okay.  And ultimately what was the gist of what

21  happened during your discussion?

22      A.   Brian said him and Cheryl had given a lot of

23  thought, that they were planning to put the company and

24  the properties up for sale.  And they said they're

25  selling the business.

1       Q.   All right.  And what else did Brian tell you

2   about selling the business?

3       A.   After a little bit of shock, he continued, said,

4   You know, this will be a -- this will be good for the

5   Potashnik family and the Carpenter family, that we worked

6   really hard and should reap some of the -- basically,

7   some of the rewards.  But that we do not have a buyer,

8   we're just -- kind of just now getting into the process

9   through a broker, that I need to know -- I need you to --

10   to be very focused, you're going to be on the front

11   lines, if you will --

12              MR. FRIEDMAN:  Your Honor, can we go to

13   question and answer?

14              THE COURT:  Okay.  Well, she -- her question

15   was:  What was the gist of the conversation.

16              But you need to look for a stopping point

17   because we're getting to our 2:15 break.

18              MS. GIBSON:  Okay.  We can go ahead and

19   stop.

20              THE COURT:  We'll take our ten-minute break,

21   ladies and gentlemen.

22              THE BAILIFF:  All rise.

23              (Jury ushered out.)

24              (Break was taken.)

25              THE BAILIFF:  All rise.

```
 1                    (Jury ushered in.)

 2              THE COURT:  Everyone have a seat, please.

 3              Have a seat, Mr. Carpenter.

 4              Welcome back.  We'll continue with

 5   Mr. Carpenter's testimony.  Ms. Gibson is the attorney

 6   asking questions.  We'll go about an hour or so before we

 7   take another break.  And we'll go until about 4:30 today,

 8   before we stop for the day.  And, again, we'll resume on

 9   Monday, not on Friday.

10              Ms. Gibson?

11                DIRECT EXAMINATION (cont'd)

12   BY MS. GIBSON:

13       Q.  Mr. Carpenter --

14       A.  Yes, ma'am.

15       Q.  -- so during the discussion at the Potashnik's

16   home, what's the gist of -- or the ultimate end of what

17   Brian told you?

18       A.  Selling the company, would definitely like for

19   me to stay.

20       Q.  And did he offer you anything to stay --

21              MR. FRIEDMAN:  Your Honor, can I just ask

22   the witness to speak into the microphone so we can all

23   hear.

24              THE WITNESS:  My apologies.

25              MR. FRIEDMAN:  No, don't mind apologizing.
```

1    If I have better hearing, it'd be all right.

2              THE WITNESS:  It was to stay on board, that

3    there would be a lot to do, I would be very involved in

4    the due -- particularly when it comes -- once we select a

5    buyer, be in a very -- actively involved in the due

6    diligence and communications between our teams and their

7    teams and so forth.  So he made -- that you're very

8    important, key player to making this successful.

9        Q.   (By Ms. Gibson)  Okay.  And did Brian Potashnik

10   say -- did he offer anything in exchange for you to stay?

11   Did he tell you what would happen if you stayed?

12       A.   Yes.  He said once we get further down the line

13   and we pick a horse, so to speak, and we know the numbers

14   better, that we'll put together a very lucrative bonus

15   program for you, for your efforts.

16       Q.   Okay.  So at this point in time, if I understand

17   you correctly, there was no -- there was no actual

18   purchaser yet?

19       A.   That's correct.

20       Q.   Okay.  And so did he also talk to you about, not

21   the amount of the bonus, but in general whether --

22   whether it would be significant or not?

23       A.   It -- it would be significant.  He said it would

24   be a really good day for the Potashniks and the Carpenter

25   family and in the -- in the millions was the impression

1   and what was given.  I remember very clearly, my daughter

2   just graduated, the day before my parents were in town

3   so...

4       Q.   Okay.  And at one point I think you thought the

5   date was around May 22nd.  But what did you ultimate --

6               MR. FRIEDMAN:  I'm going to object to

7   leading, Your Honor.

8       Q.   (By Ms. Gibson)  What did you ultimate -- well,

9   let me just ask it this way:  What did you ultimately

10  decide on -- on what you think the approximate date of

11  this meeting was?

12      A.   Well --

13              MR. FRIEDMAN:  She told him to date so I'm

14  going to object to --

15              MS. GIBSON:  No.

16              MR. FRIEDMAN:  -- in the future to leading.

17              THE WITNESS:  It was --

18              THE COURT:  All right.  Well --

19              THE WITNESS:  -- it was Sunday, May 21st.  I

20  believe that was a Sunday.

21      Q.   (By Ms. Gibson)  Okay.

22      A.   Saturday, the 20th, was my daughter's graduation

23  from high school.

24      Q.   Okay.  And did you go back and look at anything

25  to try and -- try and nail down a date.

1      A.   I'm sorry?

2      Q.   Did you go back and look at anything to try and

3   figure out what the date was?

4      A.   Yes.

5      Q.   Okay.

6              MR. FRIEDMAN:  Your Honor, we're just going

7   to take Ms. Gibson's word for it.  We don't have to spend

8   time on it.

9              THE COURT:  That it's May 20th or 21st?

10             MR. FRIEDMAN:  Whatever she testified to.

11             THE COURT:  Don't do that.

12             MS. GIBSON:  He testified it was the 21st.

13             THE COURT:  She -- he said whatever you

14   testified to.

15             If you're saying you'll take whatever

16   Mr. Carpenter testified to, we'll move on for the record.

17     Q.   (By Ms. Gibson)  Okay.  So at some point

18   earlier, you had thought it was a different date, but

19   only a day difference?

20     A.   Yes, ma'am.

21     Q.   Okay.  And with respect to what your role would

22   be in helping with the sale, can you give me the -- just

23   the gist, the summary -- the executive summary of what

24   Brian said he wanted you to be doing.

25     A.   Participate in selling Southwest Housing to

1    potential buyers.  Brian, obviously, took -- takes the

2    lead on that, being involved with that, keeping the teams

3    motivated.  And we had a lot of properties that were

4    lease up.  We had a lot of new product coming on board

5    that we didn't -- did not want to lose -- as quote, we

6    did not want to lose eye on the prize.  And that you

7    would be working very -- very closely, once we pick a

8    purchaser through the due diligence process and the many

9    interactions that needed to take place.  You and -- to

10   coordinate -- and with your team.

11        Q.   Okay.  And at the time that Brian tells you this

12   is -- you know, what he intends to do for you, what was

13   your understanding of Brian's position with respect to

14   Southwest Housing Management?  Like, who was he at

15   Southwest Housing Management?  What was his position?

16        A.   Who, Brian?

17        Q.   Yes.

18        A.   The president.

19        Q.   Okay.  And was he also an owner?

20        A.   Yes.

21        Q.   Or that was your understanding?

22        A.   Yes.

23        Q.   Okay.  And with respect to Southwest Housing

24   Development at the time you-all had this conversation,

25   what was your understanding of Brian Potashnik's position

1   with respect to development?

2       A.    President and owner.

3       Q.    Okay.   And at the time Brian Potashnik is

4   telling you about what's going to happen, what was your

5   understanding of Brian Potashnik's position with respect

6   to Affordable Housing Construction?

7       A.    Brian was the president and -- and owner of it

8   as well.   And all -- all the entities, those three

9   businesses would be sold with the properties.

10      Q.    Okay.

11      A.    Essentially getting out of the business.

12      Q.    And what are -- what types of -- well, let me

13  just cut to the chase.

14            Did Brian Potashnik ask you to meet with

15  potential purchasers and their investors?

16      A.    Yes.

17      Q.    Okay.   What did he -- can you give us an example

18  of what he asked you to do in that regard?

19      A.    To -- to tour them and, as we would call it, a

20  dog and pony show, sell the communities, you know, give

21  them the history of the properties, stop, meet the staff,

22  let them walk around, get a feel for the properties that

23  they would be purchasing, answer any questions that they

24  would have.   And I did that individually on two different

25  occasions.

1     Q.   Okay.  And was -- was anyone else with you when

2  you were marketing to these purchasers?

3     A.   Only the potential purchasers.

4     Q.   Okay.  Although I'm not saying other people

5  didn't also do tours, but with respect to the marketing

6  to potential purchasers that Brian asked you to do, of

7  all of the people and all of the companies, did he select

8  anyone but you to do those?

9     A.   I can't -- I --

10     Q.   To go with you?

11     A.   To go with me?

12     Q.   Right.

13     A.   No.

14     Q.   At the -- toward the bottom of that stack, Jeff,

15  is Exhibit 35.

16     A.   That's too far.

17     Q.   I'll find it for you.

18     A.   I'm almost there.  34, the one I need a

19  microscope to read?

20     Q.   Yes.  Sorry.  I tried to expand it.

21          Okay.  On Exhibit 35 that we discussed with

22  Brian.  This is in June of 2006.  Brian Potashnik is

23  asking you to handle a meeting in San Antonio for

24  Greystone and Company?

25     A.   Yes, ma'am.

```
 1      Q.   Who was Greystone and Company in relation to the

 2  asset sale?

 3      A.   They were a potential purchaser.

 4      Q.   And at the bottom of this e-mail, you see

 5  there's contact information for RBC Capital Markets?

 6      A.   Yes.

 7      Q.   Who was RBC Capital Markets --

 8               MS. GIBSON:   Strike that.

 9      Q.   (By Ms. Gibson)  What was RBC Capital Markets'

10  role as far as this Greystone tour?

11      A.   They were the -- I'll probably get the

12  terminology wrong, but they were the investment broker.

13  They were the ones that guided and steered Brian on

14  selling the business.  So they were helping brokering the

15  sale, if you will, as well as other advice, investment

16  advice and so forth.

17      Q.   And did --

18      A.   And --

19      Q.   Go ahead.

20      A.   And Kelley Heinsman was one of the people and

21  one other person that I recall.

22      Q.   Okay.  And in connection with this tour, RBC

23  Capital Markets, were they bringing in potential

24  purchasers for the Potashniks?

25      A.   Yes.
```

1  Q. Did Brian Potashnik ever tell you in connection

2 with marketing Greystone that he wasn't interested in

3 them?

4  A. I don't recall.  They were not chosen.

5  Q. Okay.  So fairly immediately then in 06/06,

6 you're marketing the property to a prospective purchaser.

7    Okay.  Then by -- what -- in connection with

8 the promise about a lucrative bonus coming, if you'll

9 stay and the asset sale happens, what's the next big

10 event in your conversations with Brian?

11  A. That was when he informed me that he picked a

12 horse, if you will.  He picked a company that they

13 thought they would -- could close and would close.  I

14 believe he mentioned they weren't the -- it wasn't the

15 highest price, but it was confident in closing.

16  Q. Okay.

17  A. And that was Cascade Pinnacle --

18  Q. All right.

19  A. -- who ultimately brought the property --

20 properties.

21  Q. Okay.  And so when did he tell you that?

22  A. That was on October 13th of 2006.

23  Q. Okay.  Whoops -- my highlighter won't work.

24    And so -- and does Brian say anything to you

25 on October 13th about getting into specifics on the

1   bonus?

2       A.   Yes.   That's when he informed me of the

3   lucrative bonus and we walked through it.   And it was

4   simple math, if you will.   It was based on an LOI that

5   was getting ready to be signed and my bonus was going to

6   be 3 percent of the gross sales price, minus -- in

7   Brian's terms -- normal closing costs, including, like,

8   broker fees, title fees, legal fees, those types of

9   things like that.

10                  MR. FRIEDMAN:   Sorry.   I didn't get it.

11                  THE WITNESS:   For instance, broker's fees,

12  normal closing costs, related closing costs.

13                  MR. FRIEDMAN:   Broker's fees, you said

14  something else?

15                  THE WITNESS:   Broker's fees, title fees,

16  legal fees.   And then also lets the -- during this

17  conversation, sales proceeds, bonus, severance, whatever

18  you want to call it, of other employees would be deducted

19  before my 3 percent.   My 3 percent would be calculated

20  off that.

21      Q.   (By Ms. Gibson)   Did Brian Potashnik explain to

22  you why he wanted this last one to come off of the -- to

23  come out of the gross?

24      A.   Well, it helped -- we were going to put together

25  a program, pay-to-stay severance, sales proceeds bonus,

1  whatever you want to call it, for other people and it was

2  motivational to -- not to make some people real high that

3  would, you know, give away the farm -- which I would

4  never do.  But it was also to make it fair and reasonable

5  and I agreed with that, I understood that.

6      Q.   Okay.  And was another consideration that you

7  still -- because you needed the sale to go through, you

8  also would still give enough to get people to stay?

9      A.   Yes.

10     Q.   And you talk about the gross.

11              Gross what?

12     A.   Gross dollar amount, the sale amount.

13     Q.   Okay.

14     A.   I believe at that time we were using 36,000,000

15 off of the LOI.

16     Q.   Okay.  And this is based on an LOI that was --

17     A.   Letter of intent.

18     Q.   -- not yet signed?

19     A.   It was signed a few days later, yeah.

20     Q.   Okay.  So that should be accurate.  Say about to

21 be signed.  And I'm sorry.

22              What was -- what was the total you were

23 working off of on the gross?

24     A.   The 36,000,000.

25     Q.   Okay.  So at this time it was expected to

1  be 36,000,000 gross and at the time of -- as of

2  October 13, 2006, did you know when this would close?

3      A.   Not exactly.  It was a slow -- it was an

4  archer's process, detailed process, but it was supposed

5  to close -- ideally it was going to close in late spring,

6  early summer of 2007.

7      Q.   Okay.  So --

8      A.   That was the target.

9      Q.   Okay.  And did y'all -- did y'all -- did Brian

10 explain the math to you beyond the 36,000,000 gross?

11     A.   No.  We -- we didn't need to -- I mean --

12     Q.   Well --

13     A.   I mean, we walked through the math.

14     Q.   Right.  You walked through the math.

15          Tell us -- tell us how you walked through

16 the math.

17     A.   Well, it was 36,000,000, we assumed -- we took

18 assumption that normal closing costs would be

19 approximately $1,000,000.  We used -- we used

20 another $1,000,000 for other employee bonuses.  So that

21 effectively, it would have been 3 percent of 34,000,000,

22 which would be the amount of $1,020,000.

23     Q.   Okay.  And so 1,020,000 is the estimate.

24          And the estimated close, did you say, early

25 spring or summer?

1       A.   It was actually April, May.

2       Q.   Okay.

3       A.   And then kept getting delayed.

4       Q.   But no one knew that as of October 13th?

5       A.   That's correct.

6       Q.   And then at some point, did you receive a copy

7   of the LOI?

8       A.   Yes, I did.  Brian gave me a copy.

9       Q.   Okay.  And I'm just going to -- well, can you

10  take a look at Exhibit 11.

11      A.   Okay.

12      Q.   And you see that is the Cascade letter of

13  intent?

14      A.   Yes, ma'am.

15      Q.   All right.  And the date on that is

16  October 16, 2006?

17              MR. FRIEDMAN:  I'm sorry.

18              THE WITNESS:  Yes.

19      Q.   (By Ms. Gibson)  And then if you turn to the

20  page that's marked 7 in the lower right-hand corner.

21      A.   Yes.

22      Q.   You see that both Cheryl Potashnik and Brian

23  Potashnik signed this on the same day?

24      A.   Yes, ma'am.

25      Q.   Okay.  So how many days after your discussion

1    with Brian is this about?

2        A.   Three, two and a half, depending on what time of

3    the day.

4        Q.   Three, two and a half.  And --

5        A.   13th through the 16th.

6        Q.   Okay.  Did you -- if Brian Potashnik is telling

7    you that you're going to get a bonus off of the --

8    essentially the seller proceeds, minus certain amounts,

9    did you think he had authority to speak for the sellers?

10       A.   Yes, ma'am.

11       Q.   And the sellers in Exhibit 11 include all of the

12   Southwest Housing entities or persons affiliated with

13   them, right?

14       A.   That's --

15       Q.   Paragraph 1?

16       A.   That's correct.

17       Q.   Okay.  And as far as you know, who are the

18   persons affiliated that this is referring to?

19       A.   Brian and Cheryl.

20       Q.   And we -- we talked -- you heard from Rick Graf?

21       A.   Yes, ma'am.

22       Q.   Okay.  And who is he at -- what was his

23   position?

24       A.   Rick was the divisional president of the central

25   region of Pinnacle Property Management Services Inc., I

175

```
 1   believe is the full name.

 2        Q.   He did, basically, what you did for the

 3   purchaser?

 4        A.   Yes.

 5        Q.   And --

 6        A.   Large company.

 7        Q.   When -- when was your first face-to-face meeting

 8   with Rick?

 9        A.   That was December 7th --

10        Q.   Okay.

11        A.   -- of '06.

12        Q.   And where did y'all meet?

13        A.   We met by our office at Rock Fish restaurant.

14        Q.   What's the gist of what y'all talked about?

15        A.   It was to get acquainted.  Rick -- I knew Rick,

16   Rick knew me.  So it was some face-to-face time.  We

17   talked about the -- the work that's ahead for both of us,

18   started -- talked very general about all the due

19   diligence, who some of the players would be involved in

20   the due diligence and went into those type of details.

21   And it was -- it was business, but it was also casual,

22   just to get to know each other.

23        Q.   Okay.  And so as of December 7, 2006, what were

24   your thoughts about whether you were going to have a job

25   with the purchaser after the sale?
```

1     A.   Well, being in the business as long as I have

2  and knowing Pinnacle's size and what Rick did, my own

3  assumption was that there would not be a position for me.

4     Q.   Okay.  And did --

5     A.   And it was later confirmed.

6     Q.   Okay.  And what was the reason you weren't going

7  to have a position?

8     A.   Because they already have a Jeff Carpenter.

9     Q.   Okay.  They already -- they already have their

10 own guy?

11    A.   That's right.

12    Q.   They got a guy?

13    A.   They got a guy and didn't need another one.

14    Q.   And -- but before we go -- before I go further

15 in the timeline, some of those dates are pretty specific.

16         How is it that you were able to note some of

17 these specific dates?  Just generally.

18    A.   Generally, off my Blackberry.

19    Q.   Off your Blackberry calendar?

20    A.   Off my calendar.

21    Q.   Off your -- your -- that's an Outlook calendar?

22    A.   I'm sorry.  Outlook calendar.

23    Q.   Okay.

24    A.   Blackberry to Outlook calendar.

25    Q.   Okay.  A calendar.

```
 1              And then did you take any notes once things

 2   started to go south with the Potashniks?

 3        A.   Yes, I did.

 4        Q.   Okay.

 5        A.   But not at that time.

 6        Q.   All right.

 7        A.   I was excited.

 8        Q.   Right, right.

 9              Not in this time frame --

10        A.   Right.

11        Q.   -- right?

12              You did -- so far through all of this, did

13   you trust the Potashniks?

14        A.   100 percent.

15        Q.   Okay.  And at the -- at the first meeting -- the

16   very first meeting at the Potashnik's home --

17        A.   Yes, ma'am.

18        Q.   -- the one that happened in May, did -- did you

19   and Brian Potashnik shake -- shake hands --

20        A.   Yes, ma'am.

21        Q.   -- in talking about the deal?

22        A.   Yes, we did.

23        Q.   Can you just -- you don't have to give a

24   demonstration, but it was -- can you kind of demonstrate

25   what the shake was like.
```

1        A.   Well, we were standing, shook and then kind of

2   did the little bump on the -- on the shoulder

3   (demonstrating).   It was a little pat because it was --

4   as he said, this will be a really good day for the

5   Potashniks and the Carpenters.

6        Q.   Okay.   And when you met with Brian Potashnik and

7   he announced the specific formula --

8        A.   Yes, ma'am.

9        Q.   -- did you shake hands at that point as well?

10       A.   Yeah.   Yes, we did.

11       Q.   And what -- what was -- at what point, if you

12   remember, did Brian Potashnik let you know that you

13   probably were not going to have a job with the purchaser?

14       A.   It was -- it was probably shortly after Rick and

15   I met.   It was kind of like the writing was on the wall.

16   I would say, mid December.

17       Q.   Okay.   And in -- in December of 2006 and in the

18   later month, did you and Brian Potashnik discuss, in

19   addition to updates on what was going on with the asset

20   sale, trying to have someone memorialize your handshake

21   deal in writing?

22       A.   Yes.   When Brian made that offer, I -- I

23   accepted, we shook hands.   He said that it will be put in

24   writing Randy Alligood would be their attorney.   I think

25   it was Rodney Gazelle (phonetic) would be putting it in

1   writing.  And he said it would be a good day to see your

2   name on the closing statement.

3       Q.  And ultimately -- so you thought that people --

4   or did that make you think that people getting stay

5   bonuses might be on the closing statement?

6       A.  Maybe a couple of people, but I was -- I was

7   happy about me so I was --

8       Q.  Okay.

9       A.  When Brian said that, I didn't go much further

10  than that.

11      Q.  All right.  All right.  And Brian -- when Brian

12  said that he would have Randy Alligood go ahead and

13  document your deal.

14              Who was Randy Alligood?

15      A.  Randy Alligood was legal counsel for -- I may be

16  incorrect, but for all the companies that maybe -- maybe

17  Brian and Cheryl personally.  I'm not sure, but he was

18  very involved in the company business -- company

19  businesses.

20      Q.  Okay.  And -- but at this point in time, had you

21  and Brian Potashnik ever had an issue with keeping your

22  handshake deals?

23      A.  No.

24              MR. FRIEDMAN:  What point in time is that?

25              THE WITNESS:  December.

1               MS. GIBSON:  This is all the way through

2    December.

3               MR. FRIEDMAN:  December 31st?

4               THE WITNESS:  Yeah, December.

5               MR. FRIEDMAN:  Okay.  Thank you.

6               THE WITNESS:  No, I hadn't.  I mean, things

7    were good, working hard.

8         Q.   (By Ms. Gibson)  And you -- had you had any

9    issues with working just based on oral discussions with

10   Brian, even without a handshake?

11        A.   Yes.  We -- we would have -- you know, run into

12   each other either in the hallway a lot of times.  A

13   couple of times we met in the parking lot.  Brian had a

14   lot on his plate for various reasons and I would inquire

15   about the memorializing of the agreement.  And he said

16   that it was being worked on, that the attorneys are busy

17   with the sale as well as criminal defense.  And I -- I

18   started becoming more concerned and frustrated just

19   because I was told one thing and another thing was

20   happening.

21        Q.   Well, that's -- but that's --

22        A.   Mid January.

23        Q.   And we'll --

24        A.   Okay.  Sorry.

25        Q.   We'll go -- we'll go into the future.

 1                  Now, you -- have you discussed annual

 2     bonuses with Brian Potashnik at this point in December

 3     of 2006?

 4        A.   Brian was so difficult to get a hold of to -- to

 5     be able to have lengthy discussions, no, I did not bring

 6     it up.  I mean, it was -- not at that time.

 7        Q.   And at a --

 8        A.   There was a lot going on.

 9                  MR. FRIEDMAN:  I didn't hear that.

10                  THE WITNESS:  There was a lot going on.

11        Q.   (By Ms. Gibson)  Okay.  And you -- he had just

12     promised you a big stay bonus?

13                  MR. FRIEDMAN:  Leading, leading, leading.

14                  THE COURT:  Don't lead.

15                  MS. GIBSON:  Okay.

16        Q.   (By Ms. Gibson)  Now -- and -- and, you know,

17     generally, you know, you said you were pretty happy with

18     the Potashniks.

19                  Now, did you though at some point, butt

20     heads on occasion at work over issues?

21        A.   I do not ever recall butting heads regarding

22     work.  Only as it relates to trying to memorialize my

23     agreement, why we're here.

24        Q.   Okay.

25        A.   No, no.

1    Q.   When -- on October 13, 2006, when you and Brian

2  shook hands on the -- on the deal, where you had a

3  specific amount --

4    A.   Yes, ma'am.

5         MR. FRIEDMAN:  I'm sorry.  That was a yes or

6  no?

7         MS. GIBSON:  Yeah -- no, no, no.  Sorry.  I

8  just --

9         MR. FRIEDMAN:  I didn't hear the answer.

10        THE COURT:  Repeat your question.

11        MS. GIBSON:  Sure.  Sure.

12   Q.   (By Ms. Gibson)  Oh, when you and Brian shook

13  hands on the deal on October 13th, 2006, did Brian

14  Potashnik tell you that the deal had to be in writing?

15   A.   No.

16   Q.   Why were there then discussions about just

17  memorializing the deal you had?

18   A.   Well, I wanted it memorialized because it's --

19  it was a little bit easier, but it was also about past

20  earned bonuses that haven't been paid out.

21   Q.   What was also -- what do you mean?

22   A.   I wanted the commitment of earned bonuses from

23  prior years to be acknowledged and to be paid out.  So

24  there was a -- let's call it "the sales proceeds" or

25  "severance bonus," the 3 percent, plus the outstanding

1   earned bonuses, annual bonuses.

2      Q.   Okay.  And -- and so did -- what did Brian tell

3   you about memorializing your annual bonuses for up until

4   that point?

5              MR. FRIEDMAN:  Vegas?  The time?  When was

6   this?  Is this on October 13th or some other time?

7              MS. GIBSON:  No, some other time.  I'll

8   rephrase it.

9              THE WITNESS:  No, this is --

10             MS. GIBSON:  I'll rephrase it.

11             THE COURT:  Let her ask the question.

12     Q.   (By Ms. Gibson)  When you talk about wanting to

13  also memorialize bonuses that were annual, before you

14  asked about memorializing that, what had your discussions

15  with Brian Potashnik been, generally?

16             MR. FRIEDMAN:  What's the point in time,

17  Your Honor?

18             MS. GIBSON:  The point in time is before

19  they talked about memorializing the annual bonuses and

20  years after year one.

21             THE WITNESS:  The time frame would be

22  January, 2007, time frame.  I trust -- believed in Brian

23  as Mark Jones says -- as passionate as he is about

24  Southwest Housing Company and the Potashniks, I was the

25  same way.  Loved what I was doing, loved what we did.  I

1  was getting -- you know, after the holidays thinking more

2  about it --

3          MR. FRIEDMAN:  I'm going to object as being

4  nonresponsive.

5          THE COURT:  All right.  Break up the

6  questions, Ms. Gibson.

7          MS. GIBSON:  Okay.  Sure.

8          THE WITNESS:  My apologies.

9      Q.  (By Ms. Gibson)  At some point, you received a

10  copy of an LOI?

11      A.  Yes, ma'am.

12      Q.  Okay.  And do you recall what date that was?

13      A.  Brian handed me a copy and Keith Jones, I

14  believe, e-mailed me a copy.  It was either that day or

15  the day after, it was within a couple of days.  I can't

16  give the exact date.

17      Q.  Okay.  I'm handing you Plaintiff's Exhibit 49.

18          Do you recognize that document?

19      A.  Now, I can give you that date.

20      Q.  But, first I have to --

21      A.  Yes.

22      Q.  -- I have to offer this.

23      A.  Yes.  I -- it's e-mail --

24      Q.  Go ahead.

25      A.  It's an e-mail to Keith Jones to Sara Reidy and

1    myself, regarding the LOI document.

2        Q.   Okay.  And so Keith Jones sends you a copy of

3    the LOI in January --

4                MS. GIBSON:  Oh, I'm sorry.  I'll offer

5    Plaintiff's 49.

6                THE COURT:  Any objection?

7                MR. FRIEDMAN:  No objection, Your Honor.

8                THE COURT:  49 is admitted.

9                (Plaintiff's Exhibit No. 49 is admitted.)

10       Q.   (By Ms. Gibson)  And the LOI copy that he's

11   sending you, is that the same letter of intent that we

12   went over earlier, signed a few days after your --

13       A.   Yeah.

14       Q.   -- conversation with Brian on October?

15       A.   Yes, ma'am.

16               MR. FRIEDMAN:  This is the signed letter of

17   intent, Your Honor?

18               THE COURT:  It's whatever you have, she just

19   admitted it.

20               MR. FRIEDMAN:  No, no, we admitted a

21   transmittal e-mail, but nothing attached.

22               MS. GIBSON:  He just testified that it was

23   the same letter of intent that we just talked about.

24               MR. FRIEDMAN:  We talked about two.  It's

25   the signed letter of intent.

```
 1                    THE WITNESS:  I --

 2                    THE COURT:  Okay.  Let her ask the question

 3     then you cross-examine him afterwards.

 4        Q.   (By Ms. Gibson)  And so at this point in

 5     January, why -- do you recall why Keith is sending you a

 6     copy of the LOI?

 7        A.   He was -- office next to Cheryl to --

 8                    MR. FRIEDMAN:  Objection.  Hearsay.

 9                    THE COURT:  Do you recall why he sent you

10     the -- why Keith Ellison -- Jones did?

11                    MS. GIBSON:  Yes.

12                    THE COURT:  Okay.  Overruled.

13                    THE WITNESS:  He was sharing that we have

14     the signed document that most likely that sale -- a deal

15     was going to go place, even though there was a lot of

16     things to make it happen, for it to come.

17        Q.   (By Ms. Gibson)  Okay.  And so this e-mail is in

18     January.  So on 01/17/07 when Keith Jones sends the LOI,

19     what's the anticipated closing date at this point for the

20     asset sale?

21                    MR. FRIEDMAN:  Objection.

22                    THE WITNESS:  The same as we discussed.

23        Q.   (By Ms. Gibson)  Okay.  And that was?

24        A.   The -- targeting April, May of '07.

25        Q.   Okay.  And you talked earlier about -- at some
```

1    point, wanting to talk to Brian Potashnik again about

2    memorializing your handshake deal.  And I thought you

3    said that -- that heated up in January; was that right?

4         A.   Yes.  Earlier in January, before I received the

5    LOI, Brian and I talked.  I -- I said, I'm faithfully --

6    basically the conversation, I'm faithfully committed to

7    the task at hand, but I keep getting put off, being told

8    that it's going to be happening, it's being -- happening

9    and it's not happening.  And I -- I must have been a

10   little bit more straightforward about it because I was in

11   Las Vegas working at our property there, Casa Del Norte,

12   it was going through a rehab, construction company was

13   doing the rehab.  And the construction company actually

14   pulled off.  And so the rehab was being lead by Mark

15   Harding, who was my director of facilities and

16   maintenance and myself with the site team so...

17        Q.   Let me just stop you for a minute.

18        A.   Yes, ma'am.

19        Q.   And I'll go to that event.

20             So you're -- you're in Las Vegas and you

21   said Casa Del Norte, is that one of the --

22        A.   That's the name of the apartment community.

23        Q.   The apartment community in Vegas?

24        A.   (Witness nods head.)

25        Q.   And where did you and -- when did this happen,

1   approximately?

2        A.   Brian --

3        Q.   No, I'm sorry.  No, no, no.  I had just asked

4   whether you were working.

5             So did you meet with Brian to talk about

6   the 3-percent handshake deal --

7        A.   Yes.

8        Q.   -- while you were in Vegas?

9        A.   Yes.

10       Q.   Okay.  Approximately -- around when did y'all

11  meet for that?

12       A.   I believe we met 7:30, 8 o'clock.  We met at the

13  Venetian Hotel.

14       Q.   Oh, I'm -- I'm sorry.  I meant approximately

15  when, meaning, like, what -- what approximate date?

16       A.   Oh --

17       Q.   Not what time.

18       A.   -- it was prior to the LOI.  It was, I believe,

19  the 12th --

20       Q.   Okay.

21       A.   -- of January.

22       Q.   All right.  And how did that meeting come about?

23       A.   I had previous discussions before I left town

24  because I was at Casa Del Norte for a little while.  And

25  I don't know -- Brian felt compelled to come out to meet

```
1   with me face to face.  And we met at the Venetian and

2   there's an Asian-styled restaurant.  I don't know if it's

3   Chinese or whatever.  And we had dinner and talked --

4   talked about what was going on at the property and

5   then --

6        Q.   Okay.

7        A.   -- the proceeds bonus.

8        Q.   Okay.  So Brian flew out to meet you to talk

9   about this?

10       A.   Yes, ma'am.

11       Q.   And he flew out -- is that because you wanted --

12  you were saying this needs to get memorialized, our deal

13  needs to be put down in writing; is that why he flew out

14  there?

15       A.   I was -- I was surprised that he was coming out,

16  but that was the gist of it, yes, to -- to make sure I

17  didn't lose focus.  He wanted to make sure that I'm on

18  pace and -- and committed.

19       Q.   Okay.  And tell me what -- what you and Brian

20  Potashnik discussed about documenting your deal in

21  writing?

22       A.   We -- we talked why it wasn't done when it was

23  said that it was going to be done by the -- our attorneys

24  and just given the reasons why they were too busy to do

25  it.  And I was pretty adamant that, am I not important
```

1    enough that -- that it can't be done because it should be

2    very simple to do, for matter of a few minutes.  Brian

3    stated that, Jeff, if it's that important to you, you

4    know, I'll write it on the back of a napkin.  And I said,

5    Okay.  And we didn't because it was nice place and it was

6    clothe napkins.  But he said that, I'll -- he stated that

7    he'll follow-up on it and he said, If you would like to

8    try to put it in writing, feel free to do it and submit

9    it to me as well to help expedite.

10       Q.  Okay.  And at this point, you -- did you still

11   trust -- you -- at this point, were you still trusting

12   Brian Potashnik to keep his word?

13       A.  Yes, I was.  I mean, someone flies out there

14   just to have dinner with me to --

15                MR. FRIEDMAN:  Nonresponsive.

16                THE WITNESS:  Yes.

17       Q.  (By Ms. Gibson)  Okay.  And what's the reason

18   you decided to go ahead at that point and trust Brian to

19   honor his word?  What you were just about to say?

20       A.  Well, I believe in our mission.  I believed in

21   what was going on.  I was pleased with the -- the sales

22   proceeds bonus, as a matter of the oral consummating to

23   the written, so forth.  But I was impressed that Brian

24   took the time to hop on a plane to come out and talk to

25   me individually.

1      Q.   Now, as we sit here today, you wish you'd ruined

2  one of those clothe napkins?

3      A.   Yes.

4      Q.   Okay.  But at the time -- at that time, you --

5  you decided to trust Brian?

6      A.   Yes, ma'am.

7      Q.   Okay.

8      A.   He mentioned he'd have it to me in a couple of

9  days.

10          MS. GIBSON:  Your Honor, I'm going to need

11  to approach?

12          THE COURT:  Okay.

13          (Off-the-record discussion.)

14      Q.   (By Ms. Gibson)  Now, Mr. Carpenter, did you --

15  did Brian Potashnik also have some talk in the presence

16  of you and Sara Reidy about memorializing deals in

17  writing?

18      A.   We had that conversation, but I don't believe it

19  was covered that evening.

20      Q.   Okay.  So at some other point, did Brian

21  Potashnik meet with two or three of you about

22  memorializing --

23      A.   Yes.

24      Q.   -- the deal?

25      A.   Cheryl and Brian met with Keith, Sara and myself

```
 1    in Cheryl's office and told us that.

 2                 MR. FRIEDMAN:  All right.  Can we approach,

 3    Your Honor?

 4        Q.   (By Ms. Gibson)  Told us --

 5                 MR. FRIEDMAN:  Can we approach?

 6        Q.   (By Ms. Gibson)  Told us you could do what?

 7                 THE COURT:  Approach.

 8                 (Off-the-record discussion.)

 9        Q.   (By Ms. Gibson)  All right.  Mr. Carpenter, I'm

10    handing you what's been marked as Plaintiff's Exhibit 50.

11                 Do you recognize Exhibit 50 as a

12    January 17, 2007, e-mail to you from Keith Jones?

13        A.   Yes.  But it's in a much different font, so

14    I'm -- I'm assuming that the content is the same.

15        Q.   I --

16                 MR. FRIEDMAN:  Well, let me take the witness

17    on voir dire, Your Honor.  He recognize it or not.

18                 THE COURT:  Cross-examination, he said he

19    recognized it.

20                 THE WITNESS:  It -- it appears to be.

21        Q.   (By Ms. Gibson)  Okay.  The font just looks a

22    little strange?

23        A.   Yeah, the font's totally different.

24        Q.   Okay.

25                 MR. FRIEDMAN:  Your Honor --
```

```
 1                    MS. GIBSON:   And Plaintiffs offer

 2    Exhibit 50.

 3                    MR. FRIEDMAN:   -- I think voir dire would be

 4    appropriate.   I mean, the subject says amendment to

 5    employment agreement to a blank document and what's

 6    attached is not a blank document.

 7                    THE COURT:   Okay.   Overruled.   But your --

 8    we'll put your substantive objection and that objection

 9    too on the record at a later time.

10                    MR. FRIEDMAN:   Okay.   Thank you.

11                    THE COURT:   50 is admitted.

12                    (Plaintiff's Exhibit No. 50 is admitted.)

13                    MR. FRIEDMAN:   50?

14                    THE COURT:   50.

15     Q.   (By Ms. Gibson)  So on January 17, 2007, Keith

16    Jones is sending you a form for what?

17     A.   It was --

18     Q.   Why is he sending you a form?

19                    THE COURT:   The question is:   What is the

20    form for, not --

21                    MR. FRIEDMAN:   The purpose of the form.

22                    THE WITNESS:   The purpose of the form was we

23    were informed to try to expedite memorializing each

24    individual severance bonus program, whatever you want to

25    call it.   We don't know who -- anything about each
```

```
 1   other's.

 2       Q.   (By Ms. Gibson)  Okay.

 3       A.   Keith was using --

 4       Q.   Okay.  Well --

 5            MR. FRIEDMAN:  This is exactly what --

 6            MS. GIBSON:  No further --

 7            THE COURT:  Okay.

 8            MR. FRIEDMAN:  This is --

 9            MS. GIBSON:  No further on that.

10            THE COURT:  Let her ask the questions.

11            MR. FRIEDMAN:  She needs to follow your

12   instructions.

13            THE COURT:  Okay.  Let her ask the question.

14   Answer only the questions she's asking you,

15   Mr. Carpenter.

16            THE WITNESS:  Yes, sir.

17       Q.   (By Ms. Gibson)  Okay.  And so ultimately, did

18   you end up using this form?

19       A.   I used this form as the basis, yes.

20       Q.   Okay.  And if you look at the form, you see in

21   Paragraph 2 --

22       A.   Yes, ma'am.

23       Q.   -- it says -- the form says, "Without

24   withholding or deduction of any kind" --

25            MR. FRIEDMAN:  Your Honor --
```

1      Q.   (By Ms. Gibson)  -- "and without" --

2            MR. FRIEDMAN:  -- I would object to this as

3   hearsay.  This is not offered for the truth of the matter

4   asserted.  This is only offered for the purpose that a

5   form was transmitted.

6            MS. GIBSON:  Your Honor, there's --

7            THE COURT:  If it's not offered for the

8   truth of the matter asserted, it's not hearsay.

9            MS. GIBSON:  And it -- it's a contract.  It

10  doesn't have facts, do this, do that.

11           MR. FRIEDMAN:  This is not a contract.  It's

12  a form --

13           MS. GIBSON:  I'm sorry.

14           MR. FRIEDMAN:  -- and it's what's in the

15  form is not true, it's just a form.

16           THE COURT:  Objection's overruled.  And

17  that's her point, is that it's a form.

18     Q.   (By Ms. Gibson)  So in this form that you were

19  provided, part of it says, "Without deduction for any

20  compensation paid to any other employees of any of the

21  employer entities."

22           You see that?

23     A.   Yes, ma'am.

24     Q.   Okay.  Now, that was not your -- you were having

25  deductions --

```
 1                MR. FRIEDMAN:  Your Honor, I'm not going to
 2   let her lead.
 3        Q.  (By Ms. Gibson)  Were --
 4                MR. FRIEDMAN:  I'm not going to let him
 5   lead -- her lead through this.
 6                THE COURT:  Okay.
 7                Rephrase your question.
 8                You said --
 9                MR. FRIEDMAN:  Leading.
10                THE COURT:  Sustained.
11                Rephrase your question.
12                MS. GIBSON:  Sure.
13        Q.  (By Ms. Gibson)  Is that statement accurate for
14   your handshake deal?
15        A.  No, ma'am.
16        Q.  Okay.  But -- in ultimately using the form, did
17   you pick up that language?
18                MR. FRIEDMAN:  Leading.
19                THE COURT:  It's not leading.
20                MS. GIBSON:  It's not leading.
21                MR. FRIEDMAN:  She suggested the answer,
22   Your Honor.
23                THE COURT:  You have to have -- your
24   objection is overruled.
25                THE WITNESS:  Would you mind repeating?
```

```
 1      Q.   (By Ms. Gibson)  Okay.  In ultimately using the
 2   form that Keith Jones provided to you, did -- did that
 3   language get picked up?
 4      A.   No.  I --
 5      Q.   You --
 6           MR. FRIEDMAN:  Nothing after no is
 7   responsive.
 8      Q.   (By Ms. Gibson)  So -- so --
 9      A.   I used that language and I shouldn't have --
10      Q.   Okay.
11           MS. GIBSON:  Go ahead.
12           THE COURT:  Ask your question.
13           MS. GIBSON:  Okay.
14      Q.   (By Ms. Gibson)  Did you accidentally pick up
15   this language when you were using this form?
16      A.   Yes, ma'am.
17      Q.   But as far as your discussions with Brian
18   Potashnik, did the formula remain the same?
19      A.   (No response.)
20      Q.   As far as your oral discussions with Brian
21   Potashnik?
22      A.   Yes.
23      Q.   Okay.  And so Brian -- Brian knew what your
24   formula was?
25      A.   Yes, ma'am.
```

1    Q.   And then -- but before -- before you decide to

2  use Keith Jones' document -- and I'm just going to write

3  this while I ask you the question.  I'm going to write

4  this e-mail up here while I ask you this question.  Okay.

5    A.   Okay.

6    Q.   Don't think I'm writing about this question.

7         After this, though, before you decided to

8  use this form, did you try to find an attorney to write

9  it down?

10   A.   Yes, I did.

11   Q.   Okay.  And who -- who'd you first talk to about

12 finding someone who might be able to do that?

13   A.   It was our tenant landlord attorney -- oh,

14 gosh -- Greg --

15   Q.   It's okay if you don't remember his name.

16   A.   It may be Mallar (phonetic), I can't remember

17 his last name for sure.

18   Q.   Okay.  And --

19   A.   It's in my phone.

20   Q.   -- and he -- to give you the names of a few

21 attorneys?

22   A.   Yes, ma'am.

23   Q.   Okay.  And who did you ultimately talk to?

24   A.   I spoke to Mr. Will Hartsfield.

25   Q.   Okay.

```
 1                  THE COURT REPORTER:  I'm sorry.  Could you
 2   repeat the name?
 3                  THE WITNESS:  Mr. Will Hartsfield.
 4       Q.   (By Ms. Gibson)  And how long -- well, did you
 5   have an understanding of Will Hartsfield's background,
 6   professional background?
 7       A.   That he was a very sophisticated and Harvard-ish
 8   in employment law attorney.
 9       Q.   Okay.  And after meeting with Mr. Hartsfield
10   about trying to get him to maybe document the deal, what
11   was your feeling about using Mr. Hartsfield to do it?
12       A.   It was just way too complicated and it would
13   have been a book so...
14       Q.   Okay.
15       A.   I did not use him.
16                  THE COURT:  If you're coming to a different
17   subject, we still have that second -- that last
18   ten-minute break.
19                  MS. GIBSON:  Okay.  Well, this is a good
20   time.  Sure.
21                  THE COURT:  All right.  We'll take a
22   ten-minute break, ladies and gentlemen.
23                  THE BAILIFF:  All rise.
24                  (Jury ushered out.)
25                  (Break was taken.)
```

```
 1                    THE BAILIFF:  All rise.

 2                    (Jury ushered in.)

 3                    THE COURT:  Everybody have a seat, please.

 4                    Have a seat, Mr. Carpenter.

 5                    THE WITNESS:  Thank you.

 6                    THE COURT:  Welcome back, ladies and

 7     gentlemen.  We'll continue with the trial and we'll go up

 8     until around 4:30 or so before we stop for the day.

 9                    Ms. Gibson, if you'd pick up where you left

10     off.

11                    MS. GIBSON:  Sure.

12                        DIRECT EXAMINATION (cont'd)

13     BY MS. GIBSON:

14         Q.  Mr. Carpenter, when did you meet with Will

15     Hartsfield --

16         A.  March --

17         Q.  -- to document your deal?

18         A.  -- March 7th, 2007.

19         Q.  Okay.  I'm handing you what's been marked

20     Plaintiff's 51.  Ignore this, please (pointing).  Okay.

21         A.  Okay.

22         Q.  And with respect to the 3-percent handshake

23     deal, what generally were you asking Mr. Hartsfield to

24     do?  What'd y'all talk about on the 3 percent deal?

25         A.  Well, I told him -- pardon me.  I told him about
```

1   our handshake deal, gave him the particulars, the formula

2   and so forth and walked -- walked through the process of

3   the deal.

4       Q.  And although you -- you didn't -- Will

5   Hartsfield didn't end up documenting the deal?

6       A.  No, ma'am.

7       Q.  Okay.  And why was -- you know, how did that

8   come about?  Why?  As far as what y'all discussed.

9       A.  He -- Will being very thorough, he was throwing

10  all different types of language of if I die and --

11              MR. FRIEDMAN:  I'm going to --

12              THE WITNESS:  -- just a whole bunch of legal

13  stuff that I --

14              MR. FRIEDMAN:  -- object to anything that

15  Hartsfield says as being hearsay.

16              THE COURT:  Don't tell us what

17  Mr. Hartsfield said.

18              But repeat your question.

19              And answer whatever her question was.

20              MS. GIBSON:  Okay.

21      Q.  (By Ms. Gibson)  And at the end of the -- you

22  know, after you met with Mr. Hartsfield, he gave you

23  notes that he took about your 3-percent deal?

24      A.  Yes.

25      Q.  Okay.

1     A.   Yes, it was documented.

2     Q.   Okay.  Whose handwriting is on Exhibit 51?

3     A.   Mr. Hartsfield.

4     Q.   Okay.  And that's what was given to you --

5     A.   Yes, ma'am.

6     Q.   -- on the 3-percent deal?

7     A.   Yes, ma'am.

8     Q.   Okay.

9               MS. GIBSON:  Plaintiffs offers Exhibit 51.

10              MR. FRIEDMAN:  I've seen this, Judge.  It

11    has no name on it, no date or anything like that, white

12    piece of paper, not on a stationary.  So lack of

13    foundation, hearsay, unauthenticated and best evidence

14    rule.

15              THE COURT:  That's not --

16              MR. FRIEDMAN:  You want to look at it?

17              THE COURT:  No, I saw it.  Move forward.

18              MS. GIBSON:  Your Honor, we're not offering

19    it for the truth of the matter.  It's simply the notes on

20    the 3-percent deal that Will Hartsfield gave to

21    Mr. Carpenter.

22              THE COURT:  All right.  And, ladies and

23    gentlemen, you can consider the document as being a copy

24    of the document that Mr. Hartsfield gave Mr. Carpenter

25    and not for the truth of the matter asserted therein.

```
 1                    (Plaintiff's Exhibit No. 51 is admitted.)

 2                    MR. FRIEDMAN:  Based on what Mr. Carpenter

 3    told Mr. Hartsfield not to document.

 4                    THE COURT:  You said based on what

 5    Mr. Carpenter not to document?

 6                    MR. FRIEDMAN:  What Mr. Carpenter told

 7    Mr. Hartsfield not to document.  He had a chance to have

 8    a lawyer document it and didn't.

 9                    THE COURT:  Okay.  That's your cross-

10    examination.

11        Q.   (By Ms. Gibson)  All right.  Since -- since

12    Mr. Friedman just made that comment, Mr. Carpenter, let's

13    talk about that for a quick moment.  Well, no, we'll

14    cover it in this.

15                    Okay.  And so the first line of these notes

16    say, "Since May of last year"?

17        A.   (No response.)

18        Q.   Yes?

19        A.   Yes.

20        Q.   Okay.  "Owns earned bonus" or "owes earned

21    bonus"?

22        A.   Yes.

23        Q.   Okay.  And then it also says, "1,000,000," and

24    "simplier the better"?

25        A.   Yes.
```

1      Q.   Okay.  With respect to "simplier the better,"

2   how quickly did you want this deal memorialized?

3      A.   I was hoping to have it in a day or two from

4   Mr. Hartsfield.

5      Q.   And after talking with him, what was your

6   impression about whether it would be simple?

7      A.   It would not be simple and it would not be near

8   that time frame.

9      Q.   Okay.  Did you anticipate it would be worst than

10  what Mr. Friedman has talked about, that you submitted to

11  the Potashniks ultimately?  Even worse than that?

12     A.   My -- my attorney skills -- I'm sure his

13  document would have been very thorough and very expensive

14  and much better than what I submitted in my --

15     Q.   Okay.  But not -- but you were looking for

16  simple?

17     A.   Yes.

18     Q.   Okay.  And what -- what is the next line?

19  'Cause I have no idea.  Do you know what that is?

20     A.   I don't know --

21     Q.   Okay.

22     A.   -- unless he's abbreviating something.  I don't

23  know.

24     Q.   Okay.  Then there's something about a car

25  accident.  That -- that doesn't have anything to do with

1    your 3-percent deal?

2        A.   Well, he was considering if we write up and if

3    you were in a car accident, type of scenario.

4        Q.   Oh, what if -- oh, okay.  All kinds of

5    possibilities?

6        A.   Yes.

7        Q.   All right.  What if you're in a car accident?

8        A.   Yeah, all the what-ifs.

9        Q.   Okay.  There's a sale of the company and

10   discussion of who stays.

11           And then can you help me out with the next

12   line, "sale price," what?

13       A.   The sale price and -- I would -- I don't know if

14   it's a six, I don't know if it's a one in there.

15       Q.   Okay.

16       A.   What it is --

17       Q.   It looks like 36 M?

18       A.   Yeah.

19       Q.   Okay.

20       A.   That would have been correct.

21       Q.   And then it says, "3 percent about a million"?

22       A.   Yes, ma'am.

23       Q.   Car accident again.  And then it says,

24   "Restructured."

25           What was -- was that about the 3 percent

```
 1   or --
 2        A.   I don't -- I don't recall.
 3        Q.   Okay.  And then the next line just says,
 4   "Selling interest in real estate"?
 5        A.   That -- it was a footnote to him, I -- I'm
 6   assuming.
 7        Q.   And then, "no job for him"?
 8        A.   Yes.  I told him my story that I would be out of
 9   employment at the end of my deal.
10        Q.   Because Rick Graf is already there?
11        A.   Yes, ma'am.
12        Q.   Okay.  Okay.  And during your discussions with
13   Will Hartsfield or at least some time close to your
14   meeting, it came -- it somehow came to your attention
15   that your written employment agreement has a severance --
16   termination severance provision?
17        A.   Yes, ma'am.
18        Q.   Okay.  So at around this time frame, you -- you
19   were going to potentially address that and -- when
20   memorializing the document?
21        A.   Yes.
22        Q.   Okay.  But prior, you know -- before all of this
23   is happening, had you ever even thought about looking at
24   your employment agreement on the -- on the 3-percent
25   deal?
```

```
 1        A.   No.

 2        Q.   Mr. Carpenter, I'm handing you Plaintiff's 52.

 3             THE COURT:  You got to walk around the court

 4   reporter.

 5             MS. GIBSON:  I apologize.

 6             MR. FRIEDMAN:  Thank you.

 7        Q.   (By Ms. Gibson)  Do you recognize Exhibit 52 as

 8   an e-mail from -- from yourself to your work e-mail

 9   address at Southwest Housing?

10        A.   Yeah.  Notes to myself, yes.

11        Q.   Okay.  And then there are also notes to discuss

12   on the next two pages --

13        A.   Yes.

14        Q.   -- as part of the e-mail?

15        A.   Yes.

16        Q.   Okay.

17             MS. GIBSON:  Plaintiff offers Exhibit 52.

18             THE COURT:  Any objection?

19             MR. FRIEDMAN:  Just one minute, Judge.

20             THE COURT:  All right.

21             MR. FRIEDMAN:  Has something been redacted

22   from this document, Your Honor?

23             THE WITNESS:  I don't think it printed

24   correctly.

25             MS. GIBSON:  No, no.  Actually the first
```

1   time I only printed the first page, not realizing there

2   was more to it.  It's just the way it is.

3                   MR. FRIEDMAN:  Give us one second to make

4   sure it's not violating the limine.

5                   THE COURT:  All right.

6                   MR. DONOHUE:  Your Honor, there are at least

7   two entries we see that violate the limine order.

8                   THE COURT:  Georgina, we'll hold off on

9   Exhibit 52.

10                  (Sotto voce discussion.)

11      Q.   (By Ms. Gibson)  Mr. Carpenter, would you put 51

12   aside for now.

13      A.   (Witness complies.)

14                  MR. FRIEDMAN:  52.

15                  THE COURT:  52.

16                  THE WITNESS:  52.

17      Q.   (By Ms. Gibson)  52, I'm sorry.

18      A.   Yes, I gave it to the judge, Your Honor.

19      Q.   And without getting into any details,

20   Mr. Carpenter, as to specific people or -- or anything

21   like that, did Brian Potashnik ask you to help identify

22   key or important employees that reported to you?

23      A.   Yes.

24      Q.   Okay.  And did he -- and what was -- and did he

25   ask you to help with the -- whether you call it a stay

```
 1   severance bonus program or pay-to-stay bonus program, did
 2   he ask you to participate in that for people that
 3   reported to you?
 4        A.   Yes, he suggested it --
 5        Q.   Okay.
 6        A.   -- and made some suggestions.
 7        Q.   And made some -- and did you talk to Brian
 8   Potashnik periodically about that process for those
 9   employees?
10        A.   We -- we spoke about it --
11        Q.   I don't want you to get into details, but --
12        A.   We spoke about that day and we followed up on
13   it.
14        Q.   Okay.  And ultimately, after you met with Will
15   Hartsfield about trying to memorialize your deal --
16        A.   Yes, ma'am.
17        Q.   -- when's the next time after March 7th that you
18   met with Brian Potashnik?
19        A.   That'd been March 14th.
20        Q.   And, please, tell me if I accidentally get a
21   year wrong when I'm writing.
22             Where do you and Brian meet?
23        A.   I believe it was a Wednesday, we met at, I
24   believe, 7 o'clock, Cobies.
25        Q.   Okay.  And what'd y'all talk about?
```

1    A.   I had a laundry list.   The document that was

2  taken away, Exhibit 52 --

3    Q.   Don't -- don't talk about that.

4    A.   I can't talk about that?

5    Q.   Please don't.   No.

6    A.   Okay.   I had a list of business and personal

7  concerns, as well as following up on the status of the

8  business issues, earned bonus, you know -- payment of

9  earned bonuses, as well as the 3 percent.   Those were the

10  three biggies for me.

11    Q.   Okay.   So you talked about the 3 percent and

12  overdue annual bonuses?

13    A.   Right.

14    Q.   Turning to the annual bonuses for a moment.

15         Did Brian Potashnik at some point, did he --

16  did the Potashniks ever come back with a final total on

17  what you were owed in past due annual bonuses, the final

18  total?

19    A.   Brian came back with 400.

20    Q.   Well, what -- but, I mean, at some point had you

21  asked them to take a look at what you thought you had

22  earned?

23    A.   Yes, I gave a recommendation.

24    Q.   Okay.   And what did they say in response?

25    A.   I will get back to you in a couple of days.

1    Q.   Okay.  And did they ever do that?

2    A.   No.

3    Q.   Okay.  So on the annual bonuses, though, some

4  point you said Brian did give you some numbers?

5    A.   Yes.

6    Q.   Okay.  So when you and Brian were talking about

7  annual bonuses in years not covered under your employment

8  agreement, meaning after year one --

9    A.   Yes, ma'am.

10    Q.   -- what range had y'all operated under, if you

11  did at all?  What was the range y'all had discussed?

12    A.   From 50 to 200.

13    Q.   Okay.  And so did that range ever change as far

14  as your oral discussions about annual bonuses as to what

15  you were working with?

16    A.   No, 'cause I never got feedback from my written.

17  So orally that's it.

18    Q.   All right.  That was -- you -- that's the range

19  y'all always discussed --

20    A.   Yeah.

21    Q.   -- on oral?

22         Okay.  And did Brian Potashnik ever

23  acknowledge to you while you were working that annual

24  bonuses were earned and past due?

25    A.   Yes.

1    Q.  Okay.  Did Brian Potashnik ever talk to you

2  about catching up?

3    A.  Yes.

4    Q.  And what did Brian Potashnik tell you about

5  trying to catch up with you on past due annual bonuses?

6    A.  There was a couple of properties that were ready

7  to close in permanent financing, bringing -- developer

8  fees, there was --

9    Q.  Okay.  Let's -- let's talk --

10    A.  It's in -- it's in four parts.

11    Q.  Okay.  So he'd catch up on developer fees -- I

12  mean, I'm sorry.  From developer fees?

13    A.  Right, sources.

14          MR. FRIEDMAN:  I'm not hearing him.

15          MS. GIBSON:  Sources.

16          THE WITNESS:  Sources.

17          MR. FRIEDMAN:  Thank you.

18    Q.  (By Ms. Gibson)  Okay.  It looks like I spelled

19  fancy catch up, but that's catch up.  Added developer

20  fees.

21          What else did he tell you?

22    A.  The McKinney land sale, $50,000.

23    Q.  And is -- you said the McKinney land what?

24    A.  Sale.

25    Q.  Sale.

```
 1                    And is this another -- is this also a

 2   source --

 3       A.   Yes.

 4       Q.   -- to catch up from?

 5                    Okay.  And what else?

 6       A.   50,000 for Fair -- Fair Way Apartments.

 7       Q.   And is that also a source --

 8       A.   Yes, ma'am.

 9       Q.   -- from which he's going to catch up?

10       A.   Yes, ma'am.

11       Q.   And what -- what else?

12       A.   And then he gave a range of 100 to 200,000 from

13   the Vegas property.

14       Q.   Okay.  And was trying to catch up on past due

15   annual bonuses from the McKinney and Fair Way and Vegas

16   deals, separate from him telling you he would catch up

17   on -- out of developer funds?

18       A.   Those were four sources of funds that were

19   anticipated to come in shortly.

20       Q.   Okay.  And so what -- what number are you --

21   what -- what number do we put here for catching up out of

22   developer?

23       A.   I'm not sure.

24       Q.   Okay.  Did you understand that there was a

25   minimum?
```

1      A.   Yes.

2      Q.   Okay.   What was the minimum?

3      A.   Fifty --

4      Q.   Okay.

5      A.   -- thousand.

6      Q.   And they paid you 50,000 in year one, right?

7      A.   Correct.

8      Q.   Okay.   And so we're talking about year two and

9   year three?

10     A.   At that time, yes.

11     Q.   Okay.   And so the minimum there would be what?

12     A.   100 or --

13     Q.   Okay.

14     A.   100 there.

15     Q.   And you -- you said, "developer funds."

16          Can you explain what that source is?

17     A.   Once the -- the property hit stabilization and

18   other benchmarks and it goes to permanent financing,

19   depending on how the deal is structured, there's --

20   that's when the developer gets payment in some deals and

21   depending on some others.   But that's when their income

22   comes in from the property.

23     Q.   Okay.   And is that also called "developer fees"?

24     A.   Yes.

25     Q.   Okay.   And so was the catch up from developer

1  fees separate from trying to catch up in these amounts,

2  at least starting from these other sources?

3      A.   That was my understanding.

4      Q.   Okay.  Going back to your meeting on

5  March 14th, 2007, what was Brian Potashnik's reaction?

6  What did he say in response to you discussing

7  the 3-percent handshake deal and overdue annual bonus

8  payments?

9      A.   He -- he -- he understood.  I mean, I had the

10 notes, we walked through those.  And it was -- I don't

11 want to say it was affirmative, like, yesterday the okay

12 issue.  But we went through everything.  And he said,

13 Well, let me have a day or two to -- to analyze it and

14 I'll get back to you.

15     Q.   Okay.

16     A.   And that -- it was a long -- it was a full page

17 list of items.

18     Q.   Okay.  And you -- you dropped off with Brian

19 Potashnik certain documents?

20     A.   Yes.

21     Q.   Okay.  Without saying what the details of them

22 were, one was your effort to memorialize the deal?

23     A.   Yes, ma'am.

24     Q.   Okay.  And you used the form that Keith Jones

25 gave you?

1        A.   Yes, ma'am.

2        Q.   And -- and attorney -- attorney Ms. -- or

3    Mr. Internet?  Did you use the Internet as well?

4        A.   I don't believe so, but --

5        Q.   Okay.

6        A.   -- who knows.  I don't believe so.

7        Q.   All right.  And you dropped off some notes with

8    them?

9        A.   Yes.

10       Q.   And the third item you dropped off with him was

11   spreadsheets as to what you thought was owed on earned

12   bonuses?

13       A.   Earned bonuses, you know -- it was earned

14   bonuses as well as any pay increases, based on

15   performance if we get into that discussion.

16       Q.   Okay.

17       A.   Since there hasn't been any review of any type

18   and we were behind.

19       Q.   And the -- the purchase at this point in time

20   how close do you think -- or as far as your recollection,

21   how close did you feel y'all were to final purchase and

22   sale agreement and closings to start happening?

23       A.   I believe the purchase sales agreement was

24   signed in April.  Brian stopped by and gave me a draft

25   copy to -- to peruse beforehand so it was -- it was

1   nearing quickly.

2       Q.   And at some point, did Brian and Cheryl talk to

3   you about staying all the way through closing?  I

4   don't -- and I'm not saying in this time frame.  I'm

5   saying ever, had they talked to you about staying on all

6   the way through closing?

7       A.   It was -- no.

8       Q.   When -- so by now, though, you know and Brian's

9   told you that you're not going to have a job with the

10  purchaser and you don't think the close is about to

11  happen.

12           So are you looking for a job?

13      A.   Yes.  I was getting calls and as -- from search

14  firms, as well as contacts out in the business arena?

15      Q.   All right.  And you saw the video deposition of

16  Jeff Richards this morning?

17      A.   Yes, ma'am, with American Housing Foundation.

18      Q.   Okay.  And he was one of the people that

19  recruited you to go over to American Housing?

20      A.   Yes.  He was my first contact.  He mentioned I

21  was referred by a group in Denver, who was Lockton

22  Insurance, but we got brought into Southwest --

23      Q.   Okay.

24      A.   -- and used in the past.

25      Q.   And when was your first meeting with Jeff

1    Richards?

2         A.   I believe it was April 24th.

3         Q.   Okay.  So 04/24/of '07 is first meeting with

4    Jeff Richards.

5              And did you agree with Jeff Richards that

6    y'all hit it off early on?

7         A.   Personalities, we -- we hit it on very good.

8    I -- I liked Jeff.  I mean, philos -- his business

9    philosophy, his personal philosophies -- faith based.

10   American Housing Foundation was a 501(C)3, so it was

11   taking what we were already doing at Southwest Housing

12   and putting some more sugar on it --

13        Q.   Okay.

14        A.   -- as well as through that program.

15        Q.   And do you agree with Jeff Richards when he

16   testified that they -- they wanted you to come on over

17   pretty early?

18        A.   Yes, they did.

19        Q.   Okay.  And you did not agree to take the job,

20   did you?

21        A.   That's correct.

22        Q.   Okay.  Why didn't you immediately go over to

23   Affordable Housing -- no.  What's it called American --

24        A.   American Housing Foundation.

25        Q.   Thank you.  American Housing Foundation.

1      Why did you not go over immediately?

2      A.   Due to the oral agreement of 3 percent and as

3  well as getting paid for the back earned bonuses.  I was

4  a man of my word.  I said I would, you know, stay and be

5  committed and I was -- wasn't willing to walk away from

6  that and walk away from Brian and Cheryl because there

7  was a lot going on in addition to just selling the

8  property.

9      Q.   And was your base salary at Jeff Richards'

10  company going to be higher, lower or the same as what you

11  were earning at Southwest Housing Management?

12      A.   It was -- it was higher, quite substantially.

13  Do you want the number?

14      Q.   Well, I was talking about this -- I'm just

15  talking about salary, not the whole compensation package.

16      A.   My salary was 259,000 a year, plus --

17      Q.   Okay.  At Jeff Richards' company?

18      A.   Yes.

19      Q.   Okay.

20      A.   Plus a very detailed four-part bonus program.

21      Q.   Okay.  And if -- if you set aside the 3-percent

22  handshake deal -- because obviously that was worth a

23  lot -- and just compared the salary and bonus structure

24  at Southwest Housing Management and the salary and bonus

25  structure at Jeff Richards' company, which was the higher

1    comp package?

2        A.   Oh, American Housing Foundation by far.

3        Q.   And so was there -- if you -- if you weren't

4    expecting a large stay bonus, would there be any reason

5    for you not to go over to Jeff Richards --

6        A.   No --

7        Q.   -- company?

8        A.   -- I would have left -- I would have left.

9        Q.   And then while all this is going on, are things

10   really busy still at the company?

11       A.   Yes, very busy.

12       Q.   Okay.  And can you -- can you give us just the

13   nutshell, short version of, you know, kind of what was

14   going on that was still keeping y'all really busy in this

15   time frame?

16       A.   Besides the normal course of business with

17   additional new product coming on line from development

18   and construction, we're still dealing with Katrina, Rita

19   on a daily basis, working hand in hand with city

20   governments and FEMA, trying to get paid was a big chore.

21   Plus the due diligence, starting up at that point in time

22   for the -- because the PSA was signed, I believe, at the

23   end of April and we -- we were already preparing for

24   that.  So once it was signed, we -- we started and it was

25   very meticulous.

1    Q.   And with respect to due diligence, without

2  getting into the details of what people have to do for

3  due diligence, can you just give us a bird's-eye view of

4  how much had to be covered -- how much area had to be

5  covered as far as due diligence?  In other words, as far

6  as -- where was due diligence taken place?

7    A.   A wide variety.  Not only just on management, I

8  mean, the accounting was affected.  A lot of accounting

9  reports, past histories from Sara, development, finance,

10  you know, projections and the status of the deal from the

11  general make up of -- from day one, what's the -- the

12  evolution of that property.

13           On the management side, we had tons of

14  physical inspections for fair housing, for accessology,

15  different types of permits that were required.  They were

16  exceptionally thorough.  I believe, there was

17  probably 17, 18 different types of due diligence details

18  that needed middle management to site-level management

19  assistance or walk-through and directions.  We had a -- a

20  lot of physical inspections in the apartments of the

21  residents and we had to obviously mentor them properly as

22  well.

23    Q.   Okay.  What do you mean by, mentor the residents

24  properly?

25    A.   Well, keep them comfortable.

1      Q.   Okay.

2      A.   You know, they -- you know, people -- as Mark

3   Jones mentioned, people get concerned about a sale.  We

4   had a very good product.  We were all very proud of it

5   and people do get concerned as -- from employees, as well

6   as the residents.  And we needed to continue to go

7   upwards, not any dips along the way.

8      Q.   And at some point in time, was there a leak?

9      A.   (No response.)

10      Q.   To -- a leak of the purchase before formal

11   announcement?

12      A.   Yes.  I -- there -- there was a leak.  I mean,

13   when you have that many people involved, you -- you could

14   only give so many stories of why there's so many

15   inspections so forth.  I believe there was an

16   announcement that I wrote with Brian, Cheryl,

17   collaborated on something about -- I think it was in

18   September-ish, early September of a potential --

19      Q.   Okay.  And --

20      A.   -- I -- excuse me.  I don't remember if that was

21   just to the employees or to the residents or both.  We

22   did have -- every time you go into a residents'

23   apartment, you have to give them notification.

24      Q.   And, Mr. Carpenter, rather than having you look

25   through the exhibits, I'm just going to give you my copy

1   of Exhibit 12.

2          Can you tell me what the actual date was on

3   the purchase and sale agreement?

4      A.   April 30th, 2007.

5      Q.   Okay.  And then in addition, on top of the due

6   diligence issues, were you personally still working with

7   Mike Uhl, responding to -- responding to provide

8   documents in connection with the criminal investigation?

9      A.   Yes, ma'am.

10     Q.   Okay.  So that's still going on?

11     A.   Yeah.  The first subpoena we sent, the second

12   subpoena came in, you know --

13     Q.   Okay.

14     A.   The last -- the last delivery of documents -- I

15   think, there was four legal cases and it was delivered to

16   them on April 24th.  I finished it.

17     Q.   You --

18     A.   We delivered the last of the documents --

19          MR. FRIEDMAN:  There's no question before

20   the witness, Your Honor.

21     Q.   (By Ms. Gibson)  Okay.  And did you --

22          MR. FRIEDMAN:  I'm going to object as being

23   nonresponsive.

24     Q.   (By Ms. Gibson)  Did you--

25          THE COURT:  Okay.  Break up your questions.

1   Q.   (By Ms. Gibson)  Did you say -- I'm sorry.  Did

2   you say you finished on April 24th or is that when Mike

3   Uhl requested some more documents --

4             MR. FRIEDMAN:  Leading --

5   Q.   (By Ms. Gibson)  -- or both?

6             MR. FRIEDMAN:  -- and asked and answered.

7   He said, April 24th.

8             THE COURT:  Overruled.

9             Just clarify.

10            THE WITNESS:  Let me do clarify.  That was

11  when we were noted of the second subpoena.

12  Q.   (By Ms. Gibson)  Okay.  And so that work was --

13  that additional work was starting --

14  A.   Yes, ma'am.

15  Q.   -- in this time frame as well?

16            When is -- when is the next time you met

17  with Brian about your handshake deal?

18  A.   We met on May 14th of 2007 --

19  Q.   Okay.

20  A.   -- at Cindi's New York Deli restaurant,

21  breakfast meeting.

22  Q.   How do I spell Cindi's?  I've been there.

23  A.   C-I-N-D-Y, apostrophe, S (sic).

24  Q.   Oh, okay.  What -- what did you-all discuss at

25  that -- at that meeting, with respect to your deal?

1      A.   We spoke about both sides catching up on the

2    FBI, everybody was going, as far as sales transaction,

3    they had not gotten to the written confirmation or

4    memorializing yet.  And surprisingly Brian changed our

5    oral agreement, which I became very angry about, saying

6    that the 3 percent included my past earned bonuses for

7    the first time.

8      Q.   Okay.  And what -- so what'd you tell Brian?

9      A.   I said, It's -- I slammed my hand on the table

10   and I said, It's completely unacceptable.  It was not

11   part of the deal.  And he said, You know, there's another

12   person in the office that needs to bless it.  He said,

13   Cheryl.  And he said, If you want to get in our cars

14   right now and go meet with Cheryl, we'll go do so.  We

15   paid the check, we left to go to Cheryl's office to clear

16   the air, so to speak.  I showed up, Brian --

17     Q.   Okay.  Stop there and I'll ask another question.

18     A.   Sorry.

19     Q.   It's okay.  This is -- this is not normal --

20     A.   Okay.

21     Q.   -- the way this works.

22          And so then -- so do you and Brian -- how

23   did y'all leave it?  Where are you headed?  How do you

24   separate at Cindi's?

25     A.   We were -- we were headed back to the corporate

```
 1   office and we were going to meet up with Cheryl in her

 2   office and --

 3        Q.   And what happened next?

 4        A.   And Brian didn't show back up to the office and

 5   Cheryl tried calling him.  And ultimately, we sat up a

 6   time to meet on two days later, on May 16th.  The three

 7   of us in Cheryl's office.

 8        Q.   So that -- so on May 16th in Cheryl's office --

 9   and y'all meet to try to resolve the situation --

10             MS. GIBSON:  Well, Your Honor, this meeting

11   may take a while to talk about and I think you wanted to

12   end at 4:30?

13             THE COURT:  Right.  You're exactly right.

14             Ladies and gentlemen, we'll stop for the

15   day.  Please remember the instructions I gave you

16   previously.  We'll see you Monday morning at 9 o'clock.

17   We wish you a good afternoon.

18             THE WITNESS:  Thank you, sir.

19             THE BAILIFF:  All rise.

20             (Jury ushered out.)

21             THE COURT:  Okay.  We are on the record, but

22   outside the presence of the jury.  During the course of

23   Mr. Potashnik's testimony, Ms. Gibson approached the

24   Court sidebar and wanted to -- and said she wanted to go

25   ask him questions about oral agreements with other
```

```
 1   members of the Southwest entities and asked whether or

 2   not other people have been sued and I told her she could

 3   not ask questions along either of those lines.  So she'll

 4   put on an offer of proof at this time.

 5               MS. GIBSON:  About?

 6               THE COURT:  About what -- you were going to

 7   ask --

 8               MS. GIBSON:  I thought --

 9               THE COURT:  -- what you expected him to say.

10               MS. GIBSON:  Okay.  I thought -- I thought

11   you said about something about lawsuits.

12               THE COURT:  You said you wanted to ask him

13   whether anyone had sued Southwest over not being paid

14   other than Mr. Carpenter.

15               MS. GIBSON:  I --

16               THE COURT:  Okay.  You don't have put --

17               MR. SANFORD:  Let me start.  Let me start.

18               MS. GIBSON:  No, I'm sorry.  What I wanted

19   to offer was -- that was I think an example of what --

20   how I thought he opened the door in one way.  But we just

21   wanted to proffer for both Cheryl and Brian --

22               THE COURT:  All right.

23               MS. GIBSON:  -- just what they would have

24   said about whether the other stay bonuses for other

25   people -- whether some of them were oral.
```

```
 1                    THE COURT:  Okay.

 2                    MR. SANFORD:  And they --

 3                    THE COURT:  And what they would have said.

 4                    MS. GIBSON:  And what they would have said.

 5                    MR. SANFORD:  They would have said --

 6                    MS. GIBSON:  And they would -- I'm sorry.

 7    And they would have said -- I think Cheryl Potashnik

 8    would have said that a substantial amount or all of them

 9    were oral.  And Brian Potashnik would have said at least

10    some of them were oral.

11                    MR. SANFORD:  And they -- they had meetings.

12    I think Brian Potashnik had a meeting with Sara, Keith

13    and Jeff about their oral bonus and they received their

14    oral bonus in the end.  And also that any parts that have

15    been redacted would be offered, it's -- redacted parts as

16    well.

17                    THE COURT:  Any parts of what?

18                    MR. SANFORD:  Exhibit --

19                    MS. GIBSON:  Exhibit 51.

20                    THE COURT:  All right.

21                    MR. SANFORD:  -- 51.

22                    THE COURT:  Okay.

23                    MS. GIBSON:  And my understanding the

24    defendants have agreed that -- to allow us to make this

25    oral proffer rather than --
```

1                    THE COURT:  Question and answer.

2                    MS. GIBSON:  -- question and answer.

3                    THE COURT:  All right.

4                    MR. SANFORD:  And we re urge the Court to

5    please allow us to present that testimony again?

6                    THE COURT:  Okay.  Anything else?

7                    MS. GIBSON:  Is that right, Mr. Donohue?

8                    MR. DONOHUE:  We -- obviously we object

9    to --

10                   MS. GIBSON:  No, no.  If -- will you please

11   confirm that it's right -- the defendants agree that we

12   can do an oral proffer?

13                   MR. DONOHUE:  That you can make an oral

14   proffer, yes.

15                   THE COURT:  Okay.  And you maintain the

16   objection to sidebar?

17                   MR. DONOHUE:  I do.

18                   THE COURT:  And the objection's sustained

19   and we put that on the record several times.

20                   MR. HALE:  I'm sorry, Your Honor, can we --

21   I apologize for interrupting.  Could we get all of our

22   objections on record, based on your --

23                   THE COURT:  It's all in a motion in limine.

24                   MR. DONOHUE:  It violates the order in

25   limine in respect to other employees' agreements.

1          THE COURT:  Right.  And it would result in

2    trying a case within a case.

3          Then your objection to Exhibit 50.

4          MR. FRIEDMAN:  Here I am, Your Honor.  So

5    Exhibit 50 is a e-mail with an attachment.  The e-mail

6    itself is from Keith Jones to Jeff Carpenter dated

7    January 17th, 2007.  And Mr. Carpenter identified that as

8    an e-mail that he got from Keith Jones.  It is subject,

9    document Keith is using and then it says amendment to

10   employment agreement, blank doc.

11         Well, if you turn to the attachment, it's a

12   three-page attachment.  And the first thing that

13   Mr. Carpenter says is, I don't recognize this.  It's

14   different font and, you know, agree it's --

15         THE COURT:  I think he was saying it was a

16   different font from the e-mail, not for the attachment.

17         MR. FRIEDMAN:  No.  It's for the -- here.

18   It's for the attachment.

19         MS. GIBSON:  You're -- for clarification, he

20   was saying the attachment is correct, but the font is

21   darker.  And that is true.  There are multiple copies of

22   this document and some are easier to read, some are -- we

23   don't know why.  That's just how they're printing.

24         MR. FRIEDMAN:  Not the way I understood it.

25   But anyway, I don't think that the foundation was made

1    for this document in the first place.  Number two, I

2    think this -- admission of this document violated the

3    Court's motion in limine because -- I'm sorry -- order in

4    limine because it is prejudicial to the defendants in

5    this case because it clearly gives the jury the

6    impression that another employee got a percentage bonus

7    from the defendants in this case.

8         Page 2 of this agreement has a paragraph

9    where it says Keith Jones will receive a blank percent of

10   compensation and so forth and so forth.  So I think this

11   is misleading.  I think that leaves the jury with the

12   wrong impression.  I think that's what we tried to avoid

13   from the beginning of the case.

14        So for all of those reasons, I'd like to ask

15   the Court to consider reversing its order and calling

16   this as an exhibit that goes back to the jury.  No

17   problem with Page 1, but I don't think the amendment that

18   we're -- is something that ought to go to the jury.

19        THE COURT:  All right.  Fair enough.  And I

20   think maybe it wasn't on the record, but the argument and

21   the Court's reasoning was that we're not trying a case

22   within a case.  But that went to a different issue in the

23   case and that is why Mr. Carpenter may or may not have

24   had inconsistent statements in some of the -- the

25   documents he presented to Mr. Potashnik or to Southwest.

1   So I think it just goes to a different issue.  It's

2   certainly not my rule.  It's not going to change my

3   ruling in limine.  But your objection is on the record,

4   noted on the record, overruled.  And that's the same

5   objection we had at sidebar at the time it was offered in

6   the first place.

7               MR. HALE:  Your Honor, if I could just add

8   one more thing to our objection?

9               THE COURT:  Sure.

10              MR. HALE:  I think that it could have been

11  also taken care of, if we just redacted Keith Jones'

12  name.  We got their identifying information and said this

13  is, you know, incorrect document for whatever reason.  I

14  don't think that would have been misleading at all.  I

15  think that would have still gotten across their point

16  without identifying Keith Jones as receiving the bonus.

17              THE COURT:  All right.  Mr. Friedman

18  proposed that also at sidebar and the Court -- plaintiffs

19  did not agree and I rejected that.  That was a suggestion

20  also on the sidebar and that was overruled.

21              MR. FRIEDMAN:  So for all of those reasons,

22  I'm going to ask the Court for a mistrial.

23              THE COURT:  All right.  That's denied.

24              MR. FRIEDMAN:  All right.  Thank you.

25              (Sotto voce discussion.)

```
 1                    THE COURT:  Did you want to read
 2     something -- did you want to read into the record what
 3     your redacted 51 so you can just --
 4                    MR. FRIEDMAN:  Yeah.
 5                    THE COURT:  All right.
 6                    MS. GIBSON:  Sure.  Ready?  The redactions
 7     from Exhibit 51 are two others to get percent, nothing
 8     signed for any of three and some people not paid.
 9                    THE COURT:  Okay.  And for the record the
10     original Exhibit 51 will remain with the court reporter
11     and will be part of the court reporter's record.  And the
12     document that counsel brings on Monday, that will be
13     redacted and scanned and will be marked 51 (a) or 51
14     alternate or whatever.  And that will be the one that
15     goes back to the jury room or else the court reporter can
16     figure out the system, if she wants.
17                    All right.
18                    (Proceedings adjourned.)
19
20
21
22
23
24
25
```

```
 1    THE STATE OF TEXAS      )
      COUNTY OF DALLAS        )
 2

 3              I, Georgina Ware, Deputy Official Court

 4    Reporter in and for the County Court at Law No. 5 of

 5    Dallas County, State of Texas, do hereby certify that the

 6    above and foregoing contains a true and correct

 7    transcription of all portions of evidence and other

 8    proceedings requested in writing by counsel for the

 9    parties to be included in this volume of the Reporter's

10    Record, in the above-styled and -numbered cause, all of

11    which occurred in open court or in chambers and were

12    reported by me.

13              I further certify that this Reporter's

14    Record of the proceedings truly and correctly reflects

15    the exhibits, if any, admitted by the respective parties.

16              I further certify that the total cost for

17    the preparation of the Reporter's Record is $ 1365.80 and

18    was paid/will be paid by FRIEDMAN & FEIGER.

19              WITNESS MY OFFICIAL HAND this the 20th day

20    Of October, 2018.

21                        /s/ Georgina Ware
                          _____

22                        GEORGINA WARE, Texas CSR 8436
                          Expiration Date 12/31/18
23                        Deputy Official Court Reporter
                          County Court at Law No. 5
24                        Dallas County, Texas
                          P.O. Box 3821
25                        Cedar Hill, Texas 75106
                          (214) 586-2862
```

Georgina Ware
Certified Shorthand Reporter

Appendix 001132

REPORTER'S RECORD

VOLUME 5 of 11

Trial Court Cause No. CC-08-02072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| Plaintiff, | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) | |
| Defendants. | ) | DALLAS, TEXAS |

_____

TRIAL ON THE MERITS

_____

On the 29th day of January, 2018, the following proceedings came on to be heard within the presence of a jury, in the above-entitled and -numbered cause; and the following proceedings were had before the HONORABLE MARK GREENBERG, Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

```
1                              APPEARANCES:

2

     MS. AMY GIBSON
3    SBN 00793801
     Gibson Wiley, PLLC
4    1500 Jackson Street, Suite 714
     Dallas, Texas 75201
5    (214)522-2121
     Attorney for Plaintiff
6
              -AND-
7
     MR. BRIAN SANFORD
8    SBN 17630700
     Sanford Firm
9    1910 Pacific Avenue, Suite 15400
     Dallas, Texas 75201
10   (469)361-9111
     Attorney for Plaintiff
11
              -AND-
12
     MR. LAWRENCE "LARRY" FRIEDMAN
13   SBN 07469300
     MR. MICHAEL DONOHUE
14   SBN 05989380
     MR. JASON FRIEDMAN
15   SBN 24059784
     Friedman & Feiger, LLP
16   5301 Spring Valley Road, Suite 200
     Dallas, Texas 75254
17   (972)788-1400
     Attorneys for Defendants
18
              -AND-
19
     MR. RYAN HALE
20   SBN 24097784
     Hawkins Parnell Thackston & Young, LLP
21   4514 Cole Avenue, Suite 500
     Dallas, Texas 75205-5412
22   (214)780-5138
     Appellate Attorney for Defendants
23

24
     ALSO PRESENT:  Steve Page, A/V Technician
25
```

```
1                            VOLUME 5

2      January 29, 2018                              PAGE

3      Proceedings ------------------------------     6

4
       PLAINTIFF'S
5      WITNESS:
                            Direct    Cross   Redirect     Recross
6      Jeffrey Carpenter      6        83       ---          ---

7
       Adjournment ------------------------------    214
8
       Court Reporter's Certificate ------------------    215
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              EXHIBIT INDEX

 2
         PLAINTIFF'S
 3       NO.                 DESCRIPTION           OFFERED      ADMITTED

 4       36                  Franchise Tax Report      28          29

 5       37                  Franchise Tax Report      28          29

 6       38                  Franchise Tax Report      28          29

 7       51-1                Handwritten List          30          30

 8       52                  Notes                     44          45

 9       53                  Expense Report             9          10

10       54                  Expense Report             9          10

11       55                  Declaration of            14          14
                             Sandy Dixon
12
         56                  Certificate of            26          26
13                           Non-Foreign Status

14       57                  Certificate of            26          26
                             Non-Foreign Status
15
         58                  Email                     33          34
16
         59                  Memorandum of Agreement   36          37
17
         60                  Email                     39          39
18
         61                  Explanatory Note          43          43
19
         62                  Email                     49          49
20
         63                  Amendment to Employment   52          52
21                           Agreement

22       64                  Email                     58          59

23       65                  Email                     58          59

24       66                  Email                     58          59

25       67                  Email                     62          63
```

```
1                      EXHIBIT INDEX (Cont'd)

2

     PLAINTIFF'S
3    NO.              DESCRIPTION          OFFERED      ADMITTED

4    68               Email                   76           76

5    69               Summary (Demonstrative) 78           --

6

7    DEFENDANTS'
     NO.              DESCRIPTION          OFFERED      ADMITTED

8    4                Employment Agreement    124          125

9
     13               Amendment to            163          163
10                    Employment Agreement

11   24               Email                   163          163

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appendix 001137

```
 1                    P R O C E E D I N G S
 2                    January 29, 2018
 3              (The jury entered the courtroom.)
 4              THE COURT:  Welcome back.  Good morning,
 5    ladies and gentlemen.
 6                    We're going to start right into the trial.
 7    Our witness, when we stopped on Thursday, was Mr. Carpenter.
 8    We were still on his direct examination, which means that
 9    the attorney calling the witness is still asking questions.
10    So we'll ask Ms. Gibson to pick up where she left off.  And
11    we'll go until about 10:20 or 10:25 before we take a break.
12                    And, Ms. Gibson, if you'd just pick up
13    where you left off.
14              MS. GIBSON:  Sure.
15              JEFFREY W. CARPENTER,
16    having been previously sworn, testified as follows:
17              DIRECT EXAMINATION (Cont'd)
18    BY MS. GIBSON:
19         Q.   Mr. Carpenter, before we get back into the
20    timeline, you heard Ms. Geiser say that your salary covers
21    everything?
22         A.   Yes.
23              MR. L. FRIEDMAN:  I'm going to object to --
24         Q.   (By Ms. Gibson) And with respect --
25              MR. L. FRIEDMAN:  -- to the
```

7

1    mischaracterization of Ms. Geiser Potashnik's testimony.

2               THE COURT:  Ladies and gentlemen, remember

3    whatever the attorneys say is not evidence.  It's up to you

4    to recall the evidence.

5               MR. L. FRIEDMAN:  Thank you, Your Honor.

6    Q.   (By Ms. Gibson) And do you recall Mark Jones

7    talking about various people who live in the communities,

8    our nurses, our firefighters, our teachers --

9    A.   Yes.

10    Q.   -- people who just need a fresh start?

11               If -- if that was the case that salary

12    always covers everyone's work, would anyone, whether you or

13    the people living in those communities, ever be entitled to

14    a raise if salary covered everything?

15    A.   They're -- in the tax group program there is --

16               MR. L. FRIEDMAN:  I'm going to object to

17    that as being nonresponsive.

18    Q.   (By Ms. Gibson) Just generally --

19    A.   Generally.

20    Q.   -- as far as people who work?

21    A.   Yes.

22    Q.   And if salary always covered everything, would

23    anyone ever be able to enforce any bonus?

24    A.   No.

25    Q.   That goes for you or anyone else?

1      A.    Correct.

2      Q.    And with respect to modifications to a written

3  agreement having to be in writing, have you learned at some

4  point whether or not that's accurate for this type of

5  employment agreement?

6           MR. L. FRIEDMAN:  I'm going to object to

7  that question because it calls for this witness to opine

8  about a legal conclusion, which is the province of the

9  Court.

10          THE COURT:  That's right.  Sustained.

11     Q.    (By Ms. Gibson) Mr. Carpenter, I'm handing you

12  Plaintiff's Exhibit 53 and 54.

13          MR. L. FRIEDMAN:  Thank you.

14     Q.    (By Ms. Gibson) And the one I just handed -- is

15  the short one 53?

16     A.    54.

17     Q.    Okay.

18          MR. L. FRIEDMAN:  I'm sorry.  Which is

19  which?

20          THE WITNESS:  Fifty-four is --

21          MS. GIBSON:  The long one is 53.

22          THE WITNESS:  -- the stapled one.

23          MR. L. FRIEDMAN:  The long one is 53?

24          MS. GIBSON:  Yes.

25     Q.    (By Ms. Gibson) And so, Mr. Carpenter, do you

```
 1    recognize these as expense reports --
 2                    MR. L. FRIEDMAN:  I apologize.
 3        Q.   (By Ms. Gibson) -- while you were working at --
 4                    MR. L. FRIEDMAN:  Pardon me.  Was this on
 5    the exhibit list, Your Honor?
 6                    MS. GIBSON:  Your Honor, this was a
 7    supplement.  It was in response to testimony.
 8                    THE COURT:  You produced it?
 9                    MS. GIBSON:  Oh, yes.
10                    THE COURT:  It's a document produced.
11                    MR. L. FRIEDMAN:  Was it produced before
12    last night, Your Honor?
13                    MS. GIBSON:  Oh, yes.
14                    MR. L. FRIEDMAN:  All right.
15                    MS. GIBSON:  Long time ago.
16        Q.   (By Ms. Gibson) And do you recognize Exhibits 53
17    and 54, Mr. Carpenter, as copies of your expense reports at
18    Southwest Housing?
19        A.   Yes.
20                    MS. GIBSON:  Offer Exhibits 53 and 54.
21                    THE COURT:  All right.
22                    Any objection?
23                    MR. L. FRIEDMAN:  Give me one second.
24    Mr. Donohue is going to look this over.
25                    No objection, Your Honor.
```

1              THE COURT:  53 and 54 are admitted.

2      Q.    (By Ms. Gibson) If you take a look at the first

3  page of Exhibit 53, is this an expense report for time on

4  Katrina relief efforts?

5      A.    Yes, ma'am.

6      Q.    And it shows initially you were in Dallas?

7      A.    Yes.  The -- excuse me.

8              MR. L. FRIEDMAN:  I'm going to object to

9  everything after yes as being nonresponsive, Your Honor.

10             MS. GIBSON:  Okay.

11     Q.    (By Ms. Gibson) Will you briefly explain what you

12  were doing and where?

13     A.    This expense report relates to purchases made in

14  behalf of victims that we housed at Meadow Lane and Cedar

15  Crest Apartments.

16     Q.    In the Dallas area?

17     A.    Yes.  Yes, ma'am.

18     Q.    And if you'll look at the second page of Exhibit

19  53 you see that this is an expense report for time elsewhere

20  in connection with relief efforts?

21     A.    Yes, ma'am.

22     Q.    Okay.  And where were you, as far as these expense

23  reports go?

24     A.    Austin and Houston.  Houston, primarily.

25     Q.    And if you look at the next page, what were you

1    doing here?

2         A.   This was an extended stay at the property in Las

3    Vegas, Casa Del Norte, that we were finishing up the

4    construction rehab on.

5         Q.   Okay.  And you're --

6         A.   The management site.

7         Q.   The meeting with City of Dallas and FEMA, who

8    attended that from Southwest Housing, if you remember?

9         A.   I don't have that page.  Is that -- am I supposed

10   to have that page?

11        Q.   It's on the next page of Exhibit 53.

12                  (Pause)

13        Q.   You can just look at the screen.

14        A.   It's not on it.  But that's my -- that's me.

15        Q.   Okay.

16                  And if you take a look at Exhibit 54, this

17   is a different event unrelated to Katrina, correct?

18        A.   Yes.  That's the one I was referring to Villareal.

19        Q.   Okay.  And where are you?

20        A.   In Las Vegas.

21        Q.   All right.

22                  This is in January of 2007?

23        A.   Yes, ma'am.

24        Q.   And it's just -- is this when you -- is this time

25   frame when you met with Brian and talked about putting the

1    deal on a napkin?

2                        MR. L. FRIEDMAN:  Objection, leading.

3                        THE COURT:  Sustained.

4        Q.    (By Ms. Gibson) In connection -- did you meet with

5    Brian during this time frame when you were in Las Vegas?

6        A.    Yes, ma'am.

7        Q.    And did that include a meeting about asking Brian

8    to memorialize your deal?

9        A.    Yes, ma'am.

10       Q.    And where did that take place?

11       A.    At the Venetian Hotel in a oriental restaurant.

12   There's a lot of restaurants.  I'm not sure of the name.

13       Q.    Okay.  And what was the gist of that meeting

14   again?

15       A.    It was confirmation for me to stay focused and

16   motivated.  I expressed to Brian we've met several times;

17   that things haven't been delivered.  And he felt the need,

18   apparently, to come out to talk to me to make sure that I

19   was comfortable and that the deal that we had, the

20   three-percent deal, is commitment, is a deal, a oral

21   agreement.  And we talked about, again, possibly -- or the

22   potential of memorializing it.  And he mentioned that

23   it should be done in a few days, he'll take care of it.

24                        And this is the dinner of where, if I -- do

25   you want me to write it on the back of a napkin?  I

1      basically said sure, but they were linen napkins and we
2      couldn't.  So we said we'll reconvene in a few days.
3              Q.    Mr. Carpenter, we have talked a lot about
4      different entities during this trial.  But when you were
5      actually working at Southwest Housing, who -- put aside
6      legal stuff -- who did you consider your agreements to be
7      with?
8              A.    Southwest Housing.
9              Q.    Okay.
10             A.    Can --
11             Q.    Can what?
12             A.    Can we kind of use Southwest Housing collectively
13     as one company --
14             Q.    Okay.
15             A.    -- With different divisions?
16             Q.    All right.  And what about Brian and Cheryl?
17             A.    I'm sorry.  I don't understand your question.
18             Q.    Well, for example, your written agreement with
19     Southwest Housing Management, do you recall saying you felt
20     like that was with Brian and Cheryl?
21                   MR. L. FRIEDMAN:  Leading, Your Honor.
22                   MS. GIBSON:  It's --
23                   THE COURT:  Overruled.
24             A.    Yes.  Yes, I do.
25             Q.    (By Ms. Gibson) Okay.

1          And to clear up a couple of things, do you
2    recall that the other side asked your wife if your daughter
3    had transcribed the phone recording?
4          A.   Yes, ma'am.
5          Q.   I'm going to hand you what's been marked Exhibit
6    55.   Do you recognize Exhibit 55 as what is separately
7    marked Exhibit 17 that defendants used during a deposition
8    in this case?
9               MR. L. FRIEDMAN:   Can we approach,
10   Your Honor?
11              THE COURT:   Yeah.   Okay.
12              (Sidebar conference held)
13         Q.   (By Ms. Gibson) Mr. Carpenter, do you recognize
14   Exhibit 55 as Exhibit 17 that defendants used during your
15   deposition?
16         A.   Yes, ma'am.
17         Q.   Okay.   And the top of the transcript that we've
18   elsewhere used in this case says --
19              MS. GIBSON:   Or plaintiff offers Exhibit
20   55.
21              MR. L. FRIEDMAN:   We have no objection,
22   Your Honor.
23              THE COURT:   All right.   55 is admitted.
24         Q.   (By Ms. Gibson) And you see that on top of it is
25   the declaration of Sandy Dixon?

15

1        A.    Yes, ma'am.

2        Q.    And it says that she personally transcribed the

3 recording?

4        A.    Yes.

5        Q.    And it clarifies that what -- what we've been

6 using here is -- is that from your daughter or Sandy?

7        A.    From Sandy.

8        Q.    Do you recall, Mr. Carpenter, some discussion

9 about Cheryl thought you got a raise early on?  Didn't we

10 give Jeff Carpenter a raise?

11       A.    I found that out somewhat recently, yes.

12       Q.    Okay.  But have you looked at the numbers?

13       A.    Yes.

14       Q.    Okay.

15              And this is Exhibit 9.  I realize you don't

16 have all of the exhibits in front of you, but Cheryl

17 Potashnik thought you got a raise.  You see this here?

18       A.    Yes.

19       Q.    Okay.

20              And if so, that would have been oral?

21       A.    Yes, ma'am.

22       Q.    Or would it have been?  Okay.

23              And up here the indication is your salary

24 was increased with the addition of an adjustment of about

25 $139, and then 276 and change car allowance.  You see that?

1          A.    Yes, ma'am.

2          Q.    And, ultimately, did you look down and try to

3    determine if this was truly a raise?

4          A.    Yes, I did.

5          Q.    Okay.  And was it truly a raise?

6          A.    No.

7          Q.    What was the -- the car allowance was just being

8    embedded into your salary?

9          A.    Yes.

10         Q.    And what was the 139.48 adjustment?

11         A.    I never figured it out.

12         Q.    Well, you see here on the second page there's a

13   reference to car, an adjustment, and insurance?

14         A.    Okay.

15         Q.    Okay.  Does that refresh your memory that this was

16   a premium --

17         A.    Yes.

18         Q.    -- correction?

19         A.    I do now, yes.

20         Q.    Okay.

21               Do you recall talking about the $50,000

22   advance against bonus?

23         A.    Yes, ma'am.

24         Q.    Okay.  And you were paid that bonus in your --

25   what year of your employment?

```
 1          A.    First year.

 2          Q.    In your first year.

 3                And you initially -- did you initially

 4    think you needed to repay it?

 5          A.    No.

 6          Q.    Okay.   Because -- and who told you that, if

 7    anyone?

 8          A.    Brian.

 9          Q.    Okay.   That was his idea?

10          A.    It came from Brian, so yes.

11          Q.    And you recall this is Exhibit 8; that,

12    ultimately, Keith Jones had to reconcile that?

13          A.    Yes, ma'am.

14          Q.    And it was treated as an advance on bonus?

15          A.    Yes.

16          Q.    Okay.   So -- also, during this time frame, you got

17    paid another amount at -- not this time frame but in your

18    first year you got paid something in addition to the 50,000?

19          A.    Yes.

20          Q.    And what was that?

21          A.    Twenty-five thousand to cover the taxes for the

22    fifty thousand for the previous year.

23          Q.    Okay.

24                And on Exhibit 8, was that ultimately part

25    of the reconciliation?
```

1          A.    Yes.

2          Q.    Okay.   And is -- was that 25-, after taxes,

3     applied toward expenses?

4          A.    Yes, it was.

5          Q.    Now, you remember when your wife Vikki testified?

6          A.    Yes.

7          Q.    So what's the deal, Jeff?  Are you hiding bonuses

8     from your wife?

9          A.    Not at all.

10         Q.    Okay.

11                    And at the time that this got reconciled,

12    what was going on as far as where Vikki was?

13         A.    I believe that that was the time she was in

14    Phoenix taking care of both of her parents, who were --

15    excuse me -- in the hospital.  She left for emergency and

16    was -- ended up being gone for nearly six months.

17         Q.    Okay.

18                    Now, with respect to the timeline in this

19    case, in October of 2006, when Brian Potashnik originally

20    announced the three-percent formula if you would stay on --

21         A.    Yes.

22         Q.    -- at that point in time, when did y'all

23    anticipate the sale would close?

24         A.    We were anticipating early spring 2007; the March,

25    April time frame.

1      Q.    And at that time then, when did you anticipate
2   your end date would be?
3      A.    At that time.
4      Q.    Okay.   And that event is called what?
5      A.    The closing.
6      Q.    The closing.   Okay.
7            So at that time, was it your -- at that
8   time, Brian and Cheryl Potashnik were asking you to stay
9   through that point?
10           MR. L. FRIEDMAN:   Your Honor, counsel's
11   just testifying.   Can we get to question and answer in a
12   narrative form?   I object 'cause it's leading.
13           MS. GIBSON:   I'll rephrase it.
14           THE COURT:   All right.
15     Q.    (By Ms. Gibson) Did they ask -- at that point in
16   time, did they ask you to stay through --
17           MR. L. FRIEDMAN:   It is leading.
18           THE COURT:   Overruled.
19     Q.    (By Ms. Gibson) At that point in time, had they
20   asked you to stay through the initial closing?
21           MR. L. FRIEDMAN:   Leading.
22           THE COURT:   Overruled.
23     A.    They asked me to stay through the transaction of
24   the management transition.
25     Q.    (By Ms. Gibson) Well, but this is in October of

1      2006.  I'm not asking -- so let me back up.

2                      MR. L. FRIEDMAN:  Leading, Your Honor.

3      He's obviously --

4                      THE COURT:  She doesn't --

5                      MR. L. FRIEDMAN:  He's obviously not

6      keeping up with the script, so she has to ask questions.

7                      MS. GIBSON:  Your Honor, I object to the

8      commentary.

9                      THE COURT:  The objection to the commentary

10     is sustained; the objection to leading is overruled.

11     Q.    (By Ms. Gibson) Later, by the end, okay, by the

12     time that management was going to transition on or about

13     November 1, 2007, at that point things had changed.  So as

14     far as the timeline on how long you were asked to stay on,

15     when you and Brian initially shook hands on the deal, how

16     long were they asking you to stay when he announced the

17     three percent?

18     A.    Through the time period of April, May of 2007ish.

19     Q.    Okay.  Which would have been what event?

20     A.    The Cascade Southwest Housing closing.

21     Q.    Okay.

22                      And then at some point, did you realize

23     whether or not you were going to have a job with the

24     purchaser?

25     A.    Yes.  I realized I was not going to be employed

1    with the purchaser.

2         Q.    And then at some later point after you and Brian

3    shook hands, did anyone ask you to maybe stay on for a

4    little while longer, potentially, to be picked up?

5         A.    It was unknown, but there was a potential that

6    once the transition of the two -- of the management company

7    merging that I may be needed for a short period of time to

8    smooth out any rough edges, if you will.

9         Q.    Okay.  And that -- would that have been temporary

10   or permanent?

11        A.    That would have been very temporary; probably 30-,

12   60-day time frame.

13        Q.    And then by the time you're hitting October of

14   2007, at that point, at what point did they think you would

15   be needed to help make the sale happen?

16        A.    At that point, I met with Brian on October 12.

17   And without going into the details there, he said I

18   fulfilled my requirements for the earned bonuses as well as

19   the three-percent deal.  And that was also when he gave me

20   permission to keep my laptop to stay in communication.  We

21   were working on the sale in the --

22             MR. L. FRIEDMAN:  Object to this as being

23   nonresponsive, Your Honor.

24             THE COURT:  Break up your questions.

25             MS. GIBSON:  Okay.

1        Q.    (By Ms. Gibson) So -- so at that point after

2    Brian -- so after Brian says you could leave then or stay

3    on, did you later also talk to Cheryl Potashnik?

4        A.    I spoke to Cheryl.

5        Q.    And how long did Cheryl ask you to stay on?

6        A.    Cheryl asked me to stay on through the management

7    transition.  That was according to -- I believe that it was

8    in consulting asset management agreement that they worked

9    out with Pinnacle, which was a takeover of the transition of

10   the employees and the staff, which would have happened

11   November 1st, 2007.

12       Q.    And so by the end, what date was your work

13   essentially done as far as what they asked you to do?

14       A.    Essentially done the day before, October 31st.

15       Q.    Okay.

16              Now, I want to talk a little bit about the

17   initial time in October of 2006 when Brian has announced the

18   three-percent formula.  At some point, did you attempt to

19   negotiate anything higher?

20       A.    Yes, I did.

21       Q.    And did you meet with Brian about that?

22       A.    Yes.  I met with Brian in his office.

23       Q.    And what was the gist of that conversation?

24       A.    I spoke to him -- appreciated the sales proceeds

25   bonus that he laid out from the original conversations that

1    I had at his house.  I thought it would be more, so I asked

2    for five percent rather than three percent.

3        Q.   And what did he tell you?

4        A.   He said he can't do that; that there's another

5    person down at the far end of the hallway that's already

6    approved the three percent and that that's --

7               MR. L. FRIEDMAN:  Your Honor, it

8    violates -- this violates the limine and it's hearsay.

9               MS. GIBSON:  This is from Brian Potashnik.

10    It's an admission.

11               THE COURT:  What was the question?

12               MS. GIBSON:  I -- we were asking -- he was

13    talking about -- I don't remember exactly what the question

14    was.

15               THE COURT:  Ask the question again then.

16               MS. GIBSON:  Okay.

17        Q.   (By Ms. Gibson) And in response to -- in response

18    to your request to raise the deal to five percent rather

19    than three percent, what was Brian Potashnik's response to

20    you?

21        A.   His response was that we had to stay with three

22    percent; that he -- there's another person down at the end

23    of the hall --

24               MR. L. FRIEDMAN:  Okay, this violates the

25    limine.

```
 1                      THE COURT:  How?
 2                      MR. L. FRIEDMAN:  Well, because we're not
 3   talking about anybody else but Mr. Carpenter.
 4                      THE COURT:  He's been saying he's
 5   negotiating -- renegotiating his bonus.
 6                      You're talking about your bonus, right?
 7                      MS. GIBSON:  Yes.
 8                      THE WITNESS:  Yes, sir.
 9                      MR. L. FRIEDMAN:  He's about to talk about
10   somebody else.
11                      THE COURT:  Don't talk about anyone else's
12   and don't ask about anyone else's.
13        Q.   (By Ms. Gibson) Well, let me clear this up and
14   I'll ask you the question again.  Okay?
15        A.   Okay.
16        Q.   Who is the person down at the end of the hall?
17        A.   Cheryl Potashnik.
18        Q.   Now, in response to your request to negotiate for
19   a higher five percent rather than three percent, what was
20   Brian Potashnik's response to you?
21        A.   That it would have to stay at three percent,
22   that's what we talked about, that's what I approved, and
23   we've committed to it.
24        Q.   Okay.  And you -- and just because of the
25   interruption I need you to repeat.  What -- what did he say
```

1    to you about Cheryl Potashnik down the hall as far as why he
2    wouldn't raise it to five percent?
3         A.   He said that he has another person that he has to
4    approve or work -- work through.  She can -- it's been
5    approved at three percent and that's what we discussed,
6    that's what we talked about, and I can't do five percent.  I
7    can't do anymore than that.
8         Q.   Okay.  So as of around shortly after Brian
9    Potashnik announced the three-percent deal in October of
10   2006, did you believe Cheryl Potashnik had also approved the
11   deal?
12        A.   Yes, ma'am.
13        Q.   Okay.  And did you believe Brian Potashnik had
14   authority to speak for her?
15        A.   Yes.
16        Q.   Okay.
17             And if Brian -- whether or not you know who
18   all the sellers are, if Brian Potashnik is offering you a
19   cut of sellers' proceeds, who do you believe he's acting on
20   behalf of?
21        A.   The sellers.
22        Q.   I'm handing you what's been marked Plaintiff's
23   Exhibit 56 and 57.
24             MR. L. FRIEDMAN:  Is this the new one?
25   Brian?

26

```
 1                    MR. DONOHUE:  What?

 2                    (Soto voce conversation held)

 3                    MS. GIBSON:  No.

 4        Q.    (By Ms. Gibson) You have seen -- Mr. Carpenter,

 5   you're aware in this case that we've subpoenaed documents

 6   from Cascade Affordable Housing?

 7        A.    Yes, ma'am.

 8        Q.    And you see the Bates label at the bottom, CAH-SW

 9   and numbers?

10        A.    Yes, ma'am.

11        Q.    Okay.  Is that consistent with the Bates label

12   that's on the documents we got from them?

13        A.    Yes.

14        Q.    Okay.  Does this appear to be an accurate copy of

15   responsive materials from that document on the closing?

16        A.    Yes.

17                    MS. GIBSON:  Plaintiff offers 56 and 57.

18                    THE COURT:  Any objection?

19                    MR. L. FRIEDMAN:  No, sir.

20                    THE COURT:  56 and 57 are admitted.

21        Q.    (By Ms. Gibson) You see in Exhibit 56 there's a

22   certificate that has to be signed, apparently, according to

23   the language, in order to -- for the purchaser to give money

24   to the seller?

25        A.    Yes.
```

1       Q.    And this is in connection with the asset sale?

2       A.    Yes, ma'am.

3       Q.    All right.

4             And you see at the bottom Cheryl Potashnik

5   is signing individually as the seller?

6       A.    Yes.

7       Q.    Okay.

8             And Exhibit 57 is the same type of

9   certificate but for Brian Potashnik is the seller?

10      A.    Yes, ma'am.

11      Q.    Okay.  And so does that confirm -- at least, does

12  it confirm in your mind that they were individual sellers in

13  the asset sale?

14      A.    Yes, ma'am.

15      Q.    And with respect to Brian Potashnik's position,

16  did you understand -- did you believe he was an owner?

17      A.    Yes.

18      Q.    And did you believe he was an officer?

19      A.    Yes.

20      Q.    Did you know if he was also a director of the

21  entities?

22      A.    I don't think I ever gave that much thought, but I

23  would say yes.

24      Q.    Okay.

25            I'm handing you Plaintiff's Exhibits 36,

1    37, 38.  Do those appear to be -- do those name the entities

2    involved in this case, Southwest Housing Management,

3    Southwest Housing Development, Affordable Housing

4    Construction?

5        A.    Yes.

6                MR. L. FRIEDMAN:  Which is which?

7        Q.    (By Ms. Gibson) Can you -- would you read off --

8        A.    Yes.

9        Q.    -- for Exhibit 36?

10       A.    Thirty-six is Southwest Housing Development

11   Company.

12       Q.    Okay.  Thirty-seven?

13       A.    Affordable Housing Construction, Incorporated.

14       Q.    And 38?

15       A.    Southwest Housing Management Company, Inc.

16       Q.    And do those appear to be Secretary of State

17   records?

18       A.    Yes.

19                MS. GIBSON:  Plaintiff offers 36, 37, and

20   38.

21                THE COURT:  Any objection?

22                MR. L. FRIEDMAN:  One moment, please.

23                (Pause)

24                MR. L. FRIEDMAN:  Lack of foundation,

25   Your Honor.  Improper authentication or not proper

```
 1    authentication.
 2                    MS. GIBSON:  Your Honor, they produced them
 3    to us in this case.
 4                    MR. L. FRIEDMAN:  Same objection.  Lack of
 5    foundation --
 6                    THE COURT:  Let me see, Mr. Carpenter.  Is
 7    there --
 8                    THE WITNESS:  Excuse me?
 9                    MS. GIBSON:  I'll also request that the
10    Court take judicial notice.
11                    THE COURT:  They're governmental records.
12                    MR. L. FRIEDMAN:  If they are.  If they
13    are.  And we don't know if they're complete.  There's no
14    certification from the Secretary of State.
15                    THE COURT:  The objection's overruled.  The
16    Court finds they're self-authenticating.  That's 36, 37, 38
17    are admitted.
18        Q.    (By Ms. Gibson) Okay.  Mr. Carpenter, going back
19    to where we were yesterday talking about Will Hartsfield --
20        A.    Yes.
21        Q.    -- we had talked about some notes.  I'm handing
22    you Plaintiff's Exhibit 51-1.  Does 51-1 appear to be an
23    accurate copy of the notes that were Exhibit 51 yesterday
24    and that he gave to you?
25        A.    Yes, ma'am.
```

```
 1        Q.    Okay.   Although there are now some redactions on
 2   it?
 3        A.    Yes, three.
 4                   MR. DONOHUE:   Is that the redacted one --
 5                   MS. GIBSON:   Yes.
 6                   MR. DONOHUE:   -- that you sent last night?
 7                   MS. GIBSON:   Yes.   And I just gave you a
 8   copy.
 9                   Plaintiff offers Exhibit 51-1.
10                   MR. L. FRIEDMAN:   My understanding is we
11   were going to substitute the other one for this one -- this
12   one for the other one.
13                   THE COURT:   Right.   Fifty-one is part of
14   the reporter's record and 51A [sic] is admitted into
15   evidence for the jury.   It's already in.
16                   MS. GIBSON:   Okay.  I'm sorry.  I called it
17   51-1.  It should be 51 --
18                   THE COURT:   However you're marking it.
19                   MS. GIBSON:   Okay.  I marked it 51-1.
20                   THE COURT:   Okay, that's fine.
21        Q.    (By Ms. Gibson) Okay.   And we talked about car
22   accidents.   What was restructured?   Or what is -- what is
23   this referring to?  Do you see this many car accidents?
24        A.    Yes.   Car accident twice.
25                   MR. L. FRIEDMAN:   This calls for
```

1    speculation on the part of this witness.

2              MS. GIBSON:  I'm just asking about in

3    connection with your discussion.

4              MR. L. FRIEDMAN:  It's not his notes.

5              THE COURT:  If you know, you can answer; if

6    you don't, don't speculate.

7         A.   I can't recall a hundred percent.

8         Q.   (By Ms. Gibson) Okay.  And then when it talks

9    about selling interest in real estate --

10        A.   Yes.

11        Q.   -- who are you referring to selling an interest in

12   real estate?

13        A.   The Potashniks.

14        Q.   Okay.  Did your agreement involve you selling or

15   receiving an interest in real estate?

16        A.   No.

17        Q.   And no job for him, what is that referring to?

18        A.   That means at the end of the day that I would be

19   unemployed.

20        Q.   Okay.  And past promises?

21        A.   Past promises refers to acknowledged earned

22   bonuses that have been -- that have not been paid.

23        Q.   And --

24        A.   And --

25        Q.   Go ahead.

1      A.    -- and I was promised many times, multiple times,

2    and time and time again.

3      Q.    Okay.

4            And paid at closing, what does that refer

5    to?

6      A.    That refers to when Brian and I initially spoke

7    about the three percent.  He made a comment that it will be

8    a great day to, you know, see Jeff Carpenter's name on the

9    closings statements of the sales transaction.

10     Q.    Okay.

11           And do you recall I asked you if you had --

12   if you had done some Internet research on, like, legal

13   agreements, sample agreements?

14     A.    Yes.

15     Q.    Okay.  And did you take -- did you look into that

16   and see if Vikki Carpenter, your wife, did some Internet

17   research on sample legal agreements?

18     A.    Yeah, she did.

19     Q.    I'm handing you Plaintiff's 58.  Do you recognize,

20   Mr. Carpenter, Plaintiff's 58 as an Email between you and

21   Will Hartsfield and yourself and Vikki Carpenter?

22     A.    Yes, ma'am.

23     Q.    With some attached notes --

24     A.    Yes.

25     Q.    -- in your handwriting?

33

```
1                    MS. GIBSON:  Plaintiff offers 58.
2                    THE COURT:  Any objection?
3                    MR. L. FRIEDMAN:  Was this on the exhibit
4        list?
5                    MS. GIBSON:  Yes.
6                    MR. L. FRIEDMAN:  Will you identify the
7        document you sent over last night?
8                    MS. GIBSON:  I don't have them memorized.
9        It's on the list.  These are the Will Hartsfield documents.
10                   MR. L. FRIEDMAN:  Give us a minute,
11       Your Honor.
12                   (Pause)
13                   MR. L. FRIEDMAN:  She sent over a bunch of
14       new documents last night.  I just want to make sure.
15                   MS. GIBSON:  They're not new.
16                   MR. L. FRIEDMAN:  Yes, they're new.
17                   MS. GIBSON:  They're produced.
18                   (Pause)
19                   MR. DONOHUE:  You say Will Hartsfield's
20       documents?
21                   MS. GIBSON:  Yes.
22                   MR. L. FRIEDMAN:  It'd be Number 58.
23                   MR. DONOHUE:  There are no numbers on this
24       list other than what we put on them.
25                   THE COURT:  Well, is there an objection to
```

Appendix 001165

1    the substance of that document?

2              MR. L. FRIEDMAN:  Yes.  These were not on

3    her exhibit list.  Therefore, it would be irrelevant and

4    surprise.

5              MS. GIBSON:  Your Honor, I disagree, and

6    these were produced a long time ago to the other side.

7              MR. DONOHUE:  It just refers to Hartsfield

8    notes, which was 51-1, I believe.

9              MR. L. FRIEDMAN:  Not on the exhibit list,

10   Your Honor.

11             THE COURT:  She's produced them, she said.

12             MR. L. FRIEDMAN:  She --

13             MR. DONOHUE:  It has no Bates stamp.  We

14   cannot tell they've been produced.

15             THE COURT:  Bring it over here.

16             (Sidebar conference held)

17             THE COURT:  The objection to 58 is

18   overruled and 58's admitted.

19        Q.   (By Ms. Gibson) So you see at the bottom of the

20   Email that's your -- is that your Email to Will Hartsfield

21   about meeting at his office?

22        A.   Yes, ma'am.

23        Q.   And then there's an Email between yourself and

24   your -- is it between yourself and your wife or is that just

25   to yourself?

```
1              A.    My wife, yes.
2              Q.    And y'all are discussing different clauses to add?
3              A.    Yes, ma'am.
4              Q.    And so death benefit, some issues about developer
5       fees, being sure you stay through closing, right?
6              A.    Yes, ma'am.
7              Q.    Okay.   And then here you also mentioned if
8       employment's terminated between now and closing you still
9       get paid?
10             A.    Yes.
11             Q.    And is -- are these some of the things that y'all
12      were looking at either through Will Hartsfield or on the
13      Internet?
14             A.    On the Internet first.   And I took those notes
15      with me when I met with Will on the 7th of March.
16             Q.    Okay.
17                   Although y'all are talking about different
18      terms like what -- or additional terms like what if somebody
19      dies, does any of this change your handshake deal with
20      Mr. Potashnik on behalf of the sellers?
21             A.    No, ma'am.
22             Q.    We -- going back, we had talked about, in the
23      timeline, you meeting -- or AHF pursuing you?
24             A.    Yes, ma'am.
25             Q.    Okay.
```

1                    And in connection with -- and you had

2     delayed your -- your offer.  Ultimately, you got an offer?

3          A.    Yes.

4          Q.    Okay.  And why did you delay starting with

5     American Housing Foundation?

6          A.    Because of the oral agreement that I had with

7     Brian for the three percent as well as the paid annual

8     bonuses.

9          Q.    Okay.

10         A.    I wasn't willing to walk away from that.

11         Q.    And, ultimately, you -- or does Exhibit 59 look to

12    be an accurate copy of the memorandum, of a memorandum of

13    agreement with AHF?

14         A.    Yes.

15         Q.    And they had started pursuing you about when?

16         A.    I believe I met Jeff Richards April 24th of '07.

17         Q.    So --

18         A.    For the first time.

19         Q.    Okay, sometime in April of 2007?

20         A.    Yes, ma'am.

21         Q.    All right.

22                    MS. GIBSON:  Plaintiff offers Exhibit 59.

23                    THE COURT:  All right.

24                    Any objection?

25                    MR. L. FRIEDMAN:  Yes.

1            THE COURT:  All right.

2            MR. L. FRIEDMAN:  This is surprise, never

3  seen it before, not produced ever before.

4            MS. GIBSON:  That's not accurate.

5            MR. L. FRIEDMAN:  No Bates number on it.

6            MS. GIBSON:  In fact, there is a label on

7  the documents that were produced and copied that says it's

8  about a job search and offers.

9            THE COURT:  All right.  Objection's

10  overruled.  Fifty-nine is admitted.

11      Q.    (By Ms. Gibson) Okay, do you see, Mr. Carpenter,

12  that at the top of the page you're entering an agreement --

13  we're fast forwarding here -- on October 3rd of 2007?

14      A.    Yes.

15      Q.    With American Housing Foundation, right?

16      A.    Yes.

17      Q.    Okay.

18            But still, even though you're agreeing at

19  this point, when is your employment targeted to begin?

20      A.    November 1, 2007.

21      Q.    Okay.  And what is --

22      A.    But only targeted.

23      Q.    Right.  And what is the significance of November

24  1, 2007?

25      A.    That was the transition of management of Pinnacle

1    with Southwest Housing employees.  And, consequently, I'd be

2    with unemployed.

3        Q.   Okay.  And there's a caveat here.  And what is

4    that?

5        A.   The need to be flexible with the full-time start

6    date.  May be necessary to enable a smooth and thorough

7    transition of the sale of ownership interest with existing

8    employer.

9        Q.   And was -- if you put aside the three-percent sale

10   proceeds bonus, was this -- was the offer at American

11   Housing Foundation more or less than at Southwest Housing?

12       A.   More.

13       Q.   And why did you -- why did you make the start date

14   flexible?

15       A.   To ensure that I fulfilled my requirement and

16   commitments to the three-percent arrangement agreement that

17   we had.

18       Q.   Okay.  And if the closing had lasted -- if you had

19   been asked to stay on longer than through the management

20   transition, would you have done so?

21       A.   Yes, ma'am.

22       Q.   I'm handing you Plaintiff's Exhibit 60.  Do you

23   recognize Exhibit 60 as an Email from Steve Sterquell to

24   you?

25       A.   Yes, ma'am.

1      Q.    Okay.   And he's making you certain offers

2    concerning the job at American Housing Foundation?

3      A.    Yes, ma'am.

4                MS. GIBSON:   Plaintiff offers Exhibit 60.

5                THE COURT:   Any objection?

6                MR. L. FRIEDMAN:   Same objections as

7    before, Your Honor.   Not produced, surprise --

8                THE COURT:   Right.   Overruled.

9                MR. L. FRIEDMAN:   -- relevance, lack of

10   foundation.

11               THE COURT:   Okay.   Overruled.   Sixty is

12   admitted.

13     Q.    (By Ms. Gibson) And who is Steve Sterquell?

14     A.    The president and founder of American Housing

15   Foundation.

16     Q.    Okay.   And so after the conversation he's talking

17   about -- he talks about salary?

18     A.    Yes.

19     Q.    Okay.   And that's 250,000?

20     A.    Actually, it's 259-.

21     Q.    Well, you see it says this amount will be

22   increased 9,000 to offset auto allowance?

23     A.    Right.

24     Q.    Okay.

25     A.    Yes.

40

1          Q.    So your base is what?

2          A.    250-.

3          Q.    And then ultimately ends up being 259- for auto

4     allowance?

5          A.    Correct.

6          Q.    Okay.   And is that higher or lower than what your

7     base was, including car allowance, at Southwest Housing?

8          A.    Slightly higher.

9          Q.    Okay.

10         A.    I mean significantly higher.

11         Q.    And the acquisition bonus, could you briefly

12    explain what is being offered here?

13         A.    Yes.   We were growing the portfolio and --

14         Q.    Well, just -- sorry.   But just back up.   Can you

15    just explain what the bonus is and what it's paid from?

16         A.    One was an acquisition bonus paid at closing for

17    purchasing of new properties to the portfolio.

18         Q.    Okay.   And how much would you get on each new

19    property?

20         A.    Ten thousand for market rate and student deals and

21    fifteen percent for tax credit developments.

22         Q.    Okay.   And so that's for each.

23               When you say each property, does that mean

24    each apartment complex?

25         A.    Yes, ma'am.

41

```
1           Q.    And the operation performance bonus, can you
2    briefly explain what is being offered here?
3                       MR. L. FRIEDMAN:   Your Honor, relevance.
4                       MS. GIBSON:   Your Honor, the relevance is
5    the amount he was being offered that shows --
6                       THE COURT:   You don't -- you're -- the
7    document speaks for itself.   Are you going through the
8    entire document?
9                       MS. GIBSON:   Well --
10                      THE COURT:   He's already said that this was
11   for more.
12                      MS. GIBSON:   I'm not going through family
13   health benefits.   I just want to explain the bonus structure
14   a little bit.
15                      MR. L. FRIEDMAN:   They're not seeking
16   damages for this portion of their case.
17                      MS. GIBSON:   No.   It just explains --
18                      THE COURT:   I understand.   The objection's
19   overruled.   Go ahead.
20          Q.    (By Ms. Gibson) Okay.   Your operations performance
21   bonus?
22          A.    Rate is 10 percent or 5,000 on all properties that
23   have distributable cash flow.   So any property that had
24   distributable cash flow over 5,000 -- greater than 10
25   percent, $5,000, I would get $5,000 per property.
```

1   Q. Okay.  And compared to your bonus range between

2 50- and 200,000 at Southwest Housing, your annual bonus

3 range, was the bonus potential here higher or lower at AHF

4 compared -- let me try that again.  Was the bonus structure

5 potential at American Housing Foundation potentially higher

6 or was it lower than your annual bonuses at Southwest?

7   A. Higher.

8   Q. Ultimately, Mr. Carpenter, what happened to

9 Steve Sterquell?

10   A. He was killed in an automobile accident on April

11 1st, 2009.

12   Q. Okay.  And you -- did you leave after that?

13   A. Yes, I did.

14   Q. And did Jeff Richards, who we heard testify by

15 video here, did he also leave around the same time?

16   A. Yes, ma'am.

17   Q. And, ultimately, what happened to the company

18 after Steve Sterquell died?

19   A. It went into receivership and to bankruptcy.

20   Q. I'm handing you Plaintiff's Exhibit 60.  Do you

21 recognize --

22      MR. L. FRIEDMAN:  Wait.  This is 61.

23      MS. GIBSON:  I'm sorry.  Sixty-one.

24   Q. (By Ms. Gibson) Do you recognize Exhibit 61 as

25 part of a claim you filed with the bankruptcy court --

43

1           A.    Yes, ma'am.

2           Q.    -- for American Housing Foundation?  Okay.

3                 MS. GIBSON:  And plaintiff offers Exhibit

4     61.

5                 THE COURT:  Any objection?

6                 MR. L. FRIEDMAN:  Same objection,

7     Your Honor.  It's brand new.  I've been produced hearsay.

8     Lack of foundation.

9                 MS. GIBSON:  Your Honor, it's what -- it's

10    part of the filing with the bankruptcy court.

11                MR. L. FRIEDMAN:  It appears that it is.

12    Nevertheless, it's not been produced.

13                MS. GIBSON:  That's not accurate.

14                MR. L. FRIEDMAN:  Not on her exhibit list.

15    No Bates stamp.

16                THE COURT:  Fair enough.

17                Overruled.  Sixty-one is admitted.

18          Q.    (By Ms. Gibson) And as far as the bonus structure

19    in Exhibit 61, how -- what is the bonus portion of what you

20    had earned at that point that was still owed?

21          A.    Number -- number three was $130,000, but we split

22    it into two payments.  So I received the one.  April 1st was

23    the day that I was supposed to be paid that extra 65-.

24          Q.    Okay, so 65- still owed?

25          A.    Sixty-five- owed.  The operations bonus totaled

1    337,500 and --

2         Q.    Did you mean 337, 500?

3         A.    Right.

4         Q.    Okay.  Now, so you talked to Will Hartsfield and

5    shortly thereafter you meet with Jeff Richards with American

6    Housing Foundation.  But in the meantime, in March of '13,

7    you ultimately have a meeting with Brian Potashnik?

8         A.    Yes, on the 14th.

9         Q.    Okay.

10              MR. L. FRIEDMAN:  Thank you.

11        Q.    (By Ms. Gibson) I'm handing you what's been

12   previously marked Plaintiff's Exhibit 52.  Do you recognize

13   Exhibit 52 as notes to yourself to discuss with Brian?

14        A.    Yes, ma'am.

15        Q.    Okay.  And these are sent to your Southwest

16   Housing work Email?

17        A.    Yes.  It was to me, from me.

18        Q.    All right.

19              MS. GIBSON:  Plaintiff offers Exhibit 52.

20              THE COURT:  All right.  Any objection?

21              MS. GIBSON:  Has it been admitted?

22              THE COURT:  It came up before.  It wasn't

23   admitted or it wasn't offered then.

24              MR. L. FRIEDMAN:  You know, Your Honor, I

25   have the same objections that I've made before to these

45

1      newly produced documents.

2                   MS. GIBSON:  This is -- this is not just

3      not newly produced; it's on the exhibit list.

4                   THE COURT:  All right.  Okay.  Overruled.

5      Fifty-two is admitted.

6           Q.    (By Ms. Gibson) Okay.  So on -- what's the date

7      here?

8           A.    March 13th.

9           Q.    Okay.  And these are what?

10          A.    They're my notes to myself to remind me of

11     different topics to discuss with Brian.  So they're --

12          Q.    Okay.

13          A.    -- discussion points.

14          Q.    And do you recall when Brian Potashnik said that

15     stay bonus and stay and pay was something I made up?

16          A.    Yes, I do remember him saying that.

17          Q.    And here in your notes to discuss with Brian,

18     under transition items, what did you note at the time?

19          A.    Personnel -- one, personnel decisions,

20     stay-and-pay incentives.

21          Q.    Okay.  And in addition to your three-percent

22     agreement to stay, without getting into details of anybody's

23     deal, did you have some responsibility for staying, what you

24     call stay-and-pay incentives?

25          A.    Yes, ma'am.

1    Q.    Okay.  And what -- what were the group of
2  employees you were responsible for?
3    A.    I was responsible for corporate management
4  personnel.
5    Q.    All right.  And --
6    A.    Whether they were in the corporate office or
7  satellite offices that we had.
8    Q.    Okay.  And what was -- without telling us any one
9  specific deal, what was your role in setting stay-and-pay
10  incentives for corporate employees?
11    A.    Brian initially made some recommendations -- made
12  a recommendation, which I thought was over generous.
13    Q.    Well, we're not talking about specific employee
14  deals.
15    A.    Okay.
16    Q.    Okay.  In general, just for the entire group,
17  what -- what was your role in setting stay-and-pay
18  incentives?
19    A.    Setting -- setting the retention, stay and pay,
20  severance bonus, whatever we want to call it.  And I worked
21  with Keith Jones as well, and we -- to present it to Brian
22  and Cheryl.
23    Q.    Okay.  And did you also play a role in selecting
24  who would receive a stay-and-pay --
25    A.    Yes.

47

1          Q.     -- incentive?

2          A.     Yes, ma'am.

3          Q.     Okay.  Is this the same thing or different from

4     what Keith Jones called severance?

5          A.     No.   Same thing.

6          Q.     Same thing.

7                       And what was the purpose of setting these

8     stay-and-pay incentives?

9          A.     Well, it was very important for retention of

10    employees.  Very nervous about the new company coming on

11    board and bringing their own people.  But also to keep the

12    eye on the ball so they'd be motivated and focused to

13    continue to do their job and continue to stay on course, the

14    right course.

15         Q.     Okay.  And is this in connection with the asset

16    sale?

17         A.     And may I add to keep the continuity flowing

18    properly?

19         Q.     Okay.  What do you mean by continuity?

20         A.     The integrity of Southwest Housing until Cascade

21    or Pinnacle took control.

22         Q.     Okay.  And then --

23         A.     To maintain the standards.

24         Q.     -- and then you also refer -- you also refer to

25    this as a stay plan?

1      A.    Yes.

2      Q.    Is that the same thing?

3      A.    Yes.

4      Q.    Okay.   And is this part of the plan or program to

5    pay severance or stay bonuses that Keith Jones testified

6    about?

7                      MR. L. FRIEDMAN:   Leading.

8                      THE COURT:   Overruled.

9      A.    Yes.

10     Q.    (By Ms. Gibson) All right.   Mr. Carpenter, do you

11   recall when Brian Potashnik testified that he never had you

12   lead any tours for prospective sellers or investors?

13     A.    Yes.

14     Q.    I'm sorry.   Respective purchasers?

15     A.    Yes, I recall him saying that I was not involved.

16     Q.    Okay.   And were you, in fact, involved in that?

17     A.    Yes, I was.

18     Q.    Okay.

19                 I'm handing you what's been marked

20   Plaintiff's Exhibit 62.   Do you recognize Plaintiff's 62 as

21   an Email from Basil Rallis to you on April 12th, 2007?

22     A.    Yes, I do.

23     Q.    And is this in connection with something you

24   received during the course of your work in connection with

25   the asset sale?

```
 1          A.    Yes, ma'am.

 2          Q.    Okay.

 3                     MS. GIBSON:  Plaintiff offers Exhibit 62.

 4                     THE COURT:  All right.  Any objection?

 5                     MR. L. FRIEDMAN:  Same objections,

 6     Your Honor.

 7                     THE COURT:  Overruled.  Sixty-two is

 8     admitted.

 9          Q.    (By Ms. Gibson) So this Email is from Basil Rallis

10     at Cascadeaffordable.com?

11          A.    Yes.

12          Q.    Who is Basil Rallis?

13          A.    He was, for the most part, I believe -- I don't

14     know what his title was, but he was the transaction person

15     for Cascade.  He was the developer, the purchaser, the

16     leader of putting the deal together for Cascade.

17          Q.    Okay.  And so as of April 12, 2007, he's Emailing

18     you about a tour?

19          A.    Yes, ma'am.

20          Q.    Okay.  And he's talking to you about the details

21     of coming to Dallas.  Did you ultimately take Basil Rallis

22     to tour Cascade Affordable Housing?

23          A.    No.

24                     On the 18th, I had my pickup truck and I

25     had a full truck.  I had four people.  Stan Harrelson, who
```

1    is a principal and signer of all the Cascade documents, was

2    in the front seat.  There are two representatives from their

3    investment group, I believe -- and I may be wrong -- Idaho

4    Insured Teachers Retirement, something like that.  And the

5    other gentleman I think -- I don't remember.  He could have

6    been with RBC.  I just don't remember --

7        Q.    Okay.

8        A.    -- who the other person was.  But I definitely

9    recall Stan and the two people from the investor side.

10       Q.    All right.  So Stan Harrelson is the person who

11   actually, ultimately, signed the purchase agreement for

12   Cascade?

13       A.    Yes, ma'am.

14       Q.    Okay.  And the other -- and some of the other

15   folks were investors for the potential purchaser?

16       A.    Yes, ma'am.

17       Q.    Okay.  And did you ultimately meet with

18   Brian Potashnik?  Or when's the next time -- in March.

19   I'm sorry.  In March, did you meet with Brian Potashnik?

20       A.    Yes, I met with Brian once -- pardon me -- excuse

21   me -- on March 14th, 2007, at Kuby's for breakfast.

22       Q.    And at this meeting, did you drop off some

23   documents?

24       A.    Yes.

25       Q.    And generally speaking, what were those documents?

1        A.    They -- they were a full page of additional

2   discussion points that we went through.  There was an

3   attachment to my thoughts on past earned bonuses as -- and I

4   believe that was it.  I think -- or, no, there was also a

5   poorly written amendment to the employment agreement for the

6   three-percent --

7        Q.    All right.

8        A.    -- handshake deal.

9        Q.    I'm handing you Plaintiff's Exhibit 64.

10                  MR. DONOHUE:   Your Honor, on exhibit

11   Plaintiff's 63 --

12                  THE COURT:   Uh-huh.

13                  MR. DONOHUE:   -- there are redactions that

14   are needed.

15                  MS. GIBSON:   Your Honor, I looked at that

16   but defendants have already offered the same document as

17   Defendants' 14.

18                  THE COURT:   Is it in evidence?

19                  MS. GIBSON:   I believe it was.

20                  MR. L. FRIEDMAN:   You know, we pointed

21   it out and ask that it be substituted by --

22                  MS. GIBSON:   This was when Mr. Friedman

23   started to show it and then offered it and I had no

24   objection.  This is in connection with questioning Ms. Vikki

25   Carpenter.

1           MR. L. FRIEDMAN:  May we approach?  The

2    Court said we could redact it.

3                (Sidebar conference held)

4       Q.   (By Ms. Gibson) Okay, and in Exhibit 63 this is

5    your effort to document the handshake deal and what you --

6                MS. GIBSON:  Oh, plaintiff offers 63.

7                THE COURT:  63 is admitted after the

8    redaction and 14 will be substituted with the 14-1 or 14A.

9                MR. DONOHUE:  Thank you, Your Honor.

10      Q.   (By Ms. Gibson) With -- is this your effort at

11   memorializing agreements or what you thought you were owed

12   in past-due bonuses?

13      A.   Yes, ma'am.

14      Q.   Okay.

15                And did you also, you or your wife, use

16   sample agreements from the Internet and try and put them

17   together?

18      A.   Not -- not this particular one.

19      Q.   Okay.

20      A.   Or may have -- it may have been something small,

21   but I used a format from a former colleague.

22      Q.   Okay.  And so part of the format you used here is

23   from the form that Keith Jones sent to you in January?

24      A.   Yes.

25      Q.   Okay.  And in connection with using this form, did

1  you make a mistake in the three-percent calculation?

2       A.   Yes, I did.

3       Q.   Okay.

4            MR. L. FRIEDMAN:  I'm sorry.

5       Q.   (By Ms. Gibson) And --

6            MR. L. FRIEDMAN:  I'm sorry.  What did he

7  say?

8            MS. GIBSON:  He said, yes, I did make a

9  mistake.

10      Q.   (By Ms. Gibson) Okay.  And is this the mistake?

11      A.   Yes, it is.

12      Q.   Okay.  And you also tried to add or get something

13  more; for example, capping closing costs at a maximum of

14  three percent?

15      A.   Yes.  That's stemming from our -- Brian and my

16  original calculation of what we anticipated closing costs

17  would be for the transaction at the time.

18      Q.   Okay.  You're talking about --

19      A.   So I used that.

20      Q.   Are you talking about in October of 2006 when

21  Brian Potashnik announced the formula?

22      A.   Yes.

23           MR. L. FRIEDMAN:  Leading.

24      A.   Yes, ma'am.

25      Q.   (By Ms. Gibson) Okay.  And at that time, had

1    you-all --

2                    MR. L. FRIEDMAN:  I didn't get a ruling.

3                    THE COURT:  Objection's sustained.

4         Q.    (By Ms. Gibson) At that time, did Brian give you

5    an estimate?

6         A.    Yes.

7         Q.    And the estimate -- the estimate he gave you was

8    based on what in connection with closing costs?

9         A.    Three percent of the transaction for normal

10   closing costs, broker fees, title, legal, etcetera,

11   etcetera.

12        Q.    All right.  And with respect to annual bonuses

13   you're asking for 600,000?

14        A.    Yes.

15        Q.    Okay.  And is that what you -- is that what Brian

16   had told you or is that -- what is that number?

17        A.    That is what I proposed since we were unable to

18   get together for -- to get really into the details of my

19   compensation I had a game plan, and that was a proposal.

20        Q.    Okay.  And did Brian Potashnik tell you that he

21   would ultimately give you a total number?

22        A.    Yes.

23        Q.    Did he ever actually do that as far as a final

24   total?

25        A.    Not -- not directly.

1        Q.    And if you will turn to the page that's Bates

2    labeled Carpenter 13, do you see on Paragraph 3?

3        A.    Yes.

4        Q.    These are notes you left with Brian?

5        A.    Went over and left with him, yes.  I was actually

6    trying to catch a plane.  I was supposed to be on vacation

7    that week and --

8                    MR. L. FRIEDMAN:  Everything after went

9    over and left with Brian is nonresponsive, Your Honor.

10                    THE COURT:  Overruled.

11                    You've got a couple minutes before our

12   morning break.

13                    MS. GIBSON:  Okay.

14       Q.    (By Ms. Gibson) The -- do you recall the other

15   side questioning your wife about this document?

16       A.    Yes.

17       Q.    And they implied that you wanted the bonuses in

18   order to pay lawsuit expense and tax lien and family

19   obligations?

20       A.    Yes, that's what they said.

21       Q.    Okay.  Is that what the document actually says at

22   3A?

23       A.    No, it doesn't.

24       Q.    Okay.  What does it actually say?

25       A.    It says I was depleting my savings due from the

1    lack of bonuses and increased wage salaries that I needed to

2    pay my personal lawsuit expenses, tax lien, and daily family

3    obligations as a result of payment deferral.

4         Q.    Okay.   So those had already been paid.   You just

5    paid them out of savings?

6         A.    Yes, ma'am.

7         Q.    Okay.

8                    MS. GIBSON:   And I think that might be a

9    good place to stop.

10                    THE COURT:   Very good.

11                    We'll take a 15-minute break, ladies and

12    gentlemen.   We'll see you back in 15 minutes.

13                    (The jury exited the courtroom.)

14                    (Recess taken)

15                    (The jury entered the courtroom.)

16                    THE COURT:   Welcome back.   Good morning

17    still, ladies and gentlemen.

18                    We'll continue with the trial.

19    Mr. Carpenter is the witness; Ms. Gibson is asking

20    questions.   And we'll go up till near the noon hour before

21    we take our lunch break.

22                    Ms. Gibson, if you'll pick up where you

23    left off.

24         Q.    (By Ms. Gibson) Mr. Carpenter, in the notes that

25    you left with Brian Potashnik underneath your employment

57

1   agreement --

2      A.    Yes.    The amendment employment agreement.

3      Q.    -- do you note specific amounts of annual bonuses

4   that Brian Potashnik has said you've earned?

5      A.    Yes.

6      Q.    Okay.    And what are those amounts?

7      A.    Fairway, 50,000; McKinney, 50,000; Vegas, a

8   hundred- to 200,000.

9      Q.    And on top of that, had Mr. Potashnik said whether

10  or not he believed he owed you additional past-due bonuses

11  on top of those amounts?

12     A.    From the very beginning, Brian anticipated me to

13  be at the top of the range.

14             MR. L. FRIEDMAN:   I'm sorry.   I just don't

15  hear him.

16             Can you move that microphone --

17             MS. GIBSON:   Can you lean in?

18             MR. L. FRIEDMAN:   -- closer to yourself?

19             THE WITNESS:   Yes, sir.

20             MR. L. FRIEDMAN:   Thank you.

21             THE WITNESS:   I said, from conversations,

22  Brian anticipated me to be at the top of the higher end of

23  the range.

24     Q.    (By Ms. Gibson) And the -- had he -- in addition

25  to the 50,000 from McKinney, the 50,000 from Fairway, and

1    the 100- to 200- you hoped to source from Vegas, do your

2    notes indicate that he also is acknowledging additional

3    past-due bonuses?

4         A.    Yes.

5         Q.    And the -- on top of Fairway, Vegas, and McKinney,

6    where is he hoping to source the additional bonuses from?

7         A.    That would be developer fees --

8         Q.    Okay.

9         A.    -- coming in.

10        Q.    And the spreadsheet that you left with Brian, why

11   are you using those numbers?

12        A.    Those were the numbers that I felt at the time for

13   annual increase and bonuses earned for the period of time.

14        Q.    Okay.  So --

15        A.    It was for -- it was for discussion purposes to

16   work toward an agreed number.

17        Q.    Okay.

18              If you would take a look at Exhibit 64, 65,

19   and 66, please.  Mr. Carpenter, these documents have been

20   redacted.  But other than the redactions, do you recognize

21   64, 65, and 66 as Emails between you and Keith Jones while

22   you worked at Southwest Housing?

23        A.    Yes, ma'am.

24        Q.    Okay.

25              MS. GIBSON:  Plaintiff offers 64, 65, and

1    66.

2                 THE COURT:   Any objection?

3                 MR. L. FRIEDMAN:   Well, let's see which is

4    which, Your Honor.

5                 MS. GIBSON:   They're numbered for you.

6                 MR. L. FRIEDMAN:   Okay.   No objection as

7    redacted, Your Honor.

8                 THE COURT:   Those three are admitted.

9      Q.   (By Ms. Gibson) In the first Email on 64 the title

10   is severance payroll?

11               (Pause)

12      A.   Yes.   Yes, ma'am.   I'm sorry.

13      Q.   And without getting into the details of anyone's

14   particular deals, what is Keith Jones asking you to do here?

15      A.   To suggest and/or to confirm what I would think in

16   one of my employee's severance allowance -- stay, retention

17   bonus, whatever we're calling it -- should be.

18      Q.   Okay.

19      A.   So we could collectively put together a

20   corporate -- you know, a full corporate list.

21      Q.   Okay.   And the second page is redacted but

22   it would have the names and what the recommendations are?

23                 MR. L. FRIEDMAN:   Objection, leading.

24   Violation of the limine.

25                 THE COURT:   Don't lead the witness.

1    Q.    (By Ms. Gibson) What -- without getting into

2    details of anyone's deal, what, generally, is on the second

3    page?

4    A.    It's very simple form.  It was the name of the

5    employee, their position, and their hire date.  And we had

6    two columns of severance that we were looking at proposing.

7    Q.    Okay.  And when you talk about severance, is that

8    the same or different from the stay bonus program?

9                MR. L. FRIEDMAN:  I think that question's

10   been asked and answered.

11               THE COURT:  Overruled.

12   A.    It's the same.

13   Q.    (By Ms. Gibson) Okay.  And on Exhibit 65, you and

14   Keith Jones, the subject is bonus wages spreadsheet.

15               (Pause)

16               Are you not seeing it in front of you?

17   A.    I'm sorry.  Would you mind asking the question

18   again?

19   Q.    Sure.

20   A.    I'm trying to -- since it's redacted and so small,

21   I can barely read anything.

22   Q.    Okay.  Well, you can take a look at the screen.

23   A.    Okay.

24   Q.    Or that screen in front of you.

25   A.    All right.

1      Q.    Do you see this Keith Jones Email about bonus
2   wages spreadsheets?
3      A.    Yes.
4      Q.    Okay.  And he's asking you to check people for
5   management.  Is this the same stay bonus program or is it
6   different?
7              (Pause)
8      A.    I'm -- I'm not a hundred percent certain, but I
9   think it's a different analysis of how to track the stay or
10  severance by using the percentage of salary versus --
11     Q.    Okay, don't --
12     A.    Okay.
13     Q.    -- don't talk -- sorry.
14     A.    Okay.
15     Q.    Don't talk about deals.
16              Okay, but is it still an evaluation --
17     A.    I believe so.
18     Q.    -- in connection with that program?  Okay.
19     A.    Yes.
20     Q.    And Exhibit 65 -- or 66.  And this is -- is this
21  just your response to him on the same incentive bonus
22  program?
23     A.    Yes, ma'am.  It would have been updated at his
24  request.
25     Q.    And then as far as the timeline goes, do you

1    ultimately end up meeting with Brian after May 14th when he

2    didn't show at the office?

3         A.   I'm sorry?

4         Q.   I'm going back to the timeline.

5         A.   Okay.

6         Q.   I believe when we had finished yesterday you had

7    just talked about that you and Cheryl Potashnik and

8    Brian Potashnik were going to head back to the office and

9    Brian didn't show up.

10        A.   That's correct.  Brian and I had the breakfast

11   meeting.

12        Q.   Okay.  And then when was your next meeting with

13   Brian?

14        A.   It was supposed to have been once we got back to

15   the office.  But it ended up being, I believe, a couple --

16   two days, a couple days later.

17        Q.   Okay.

18             I'm handing you Plaintiff's Exhibit 67.  Do

19   you recognize Exhibit 67 as additional notes to yourself in

20   preparation for that meeting?

21        A.   Yes, ma'am.

22             MR. L. FRIEDMAN:  Do I have 67?

23             MS. GIBSON:  Plaintiff offers 67.

24             MR. L. FRIEDMAN:  Thank you.

25             Same objections, Your Honor, as I've stated

1    before.

2                    THE COURT:  All right.  Overruled.  67's

3    admitted.

4                    MS. GIBSON:  Okay.

5        Q.   (By Ms. Gibson) And so in connection with the

6    May 12, 2007 meeting you are discussing some of the same

7    things?

8        A.   Yes.

9        Q.   Okay.  Then what happens on a couple days later?

10   Do you have what date that is?  You said a couple days after

11   Brian didn't show at the office.

12       A.   May 16th.

13       Q.   About?  Okay.

14                    And tell us what happens, the gist of what

15   happened in that meeting.

16       A.   The three of us were supposed to get together to

17   make sure we're all on the same page and consummate the

18   earned bonuses being separate from the three-percent bonus

19   program.

20                    At the beginning of the meeting,

21   unfortunately, there was a phone call that related to the

22   FBI investigation and it was very serious tension.  Brian

23   was on the phone with Mike Uhl, criminal attorney, and ended

24   up leaving the --

25                    MR. L. FRIEDMAN:  Your Honor, this is

1    nonresponsive --

2         A.    -- building.

3                   MR. L. FRIEDMAN:  -- to the question

4    and it's narrative.

5                   THE COURT:  Break up your question.

6                   MS. GIBSON:  Okay.

7         Q.    (By Ms. Gibson) And after that phone call, what

8    did Brian do?

9         A.    He left.  He left the office.

10        Q.    Okay.  Did Cheryl Potashnik stay?

11        A.    Yes, she did.

12        Q.    Okay.  And what did -- what did you and Cheryl

13   talk about?

14        A.    Well, after she composed herself -- she was upset,

15   her crying -- she said I understand that we wanted to talk

16   about the bonuses, your earned bonuses that hadn't been paid

17   out versus the three-percent bonuses are to be separate

18   bonuses.  And she confirmed that they are separate bonuses.

19        Q.    Okay.  And what else did she say about what you

20   were owed?

21        A.    Well, that she would review the information that I

22   gave Brian.  I gave it also to her.  That she would get back

23   to me.  And we continued the dialog.

24                   I expressed, you know, conversation,

25   conversation, but no delivery from my end.  And she said

65

 1    that, Jeff, I would never screw you.  You've earned it.  I

 2    appreciate what you do.  You go above and beyond and you're

 3    a good employee and a good friend.  She validated.

 4         Q.   Okay.  And, you know, at the time you were talking

 5    to Will Hartsfield about documenting the deal and you were

 6    concerned about the written agreement with Southwest

 7    Housing, at some point did you research whether oral

 8    agreements were enforceable?

 9         A.   Yes, I did.

10         Q.   Okay, in the time frame.  And what did you find

11    out?

12              MR. L. FRIEDMAN:  Objection, Your Honor.

13    It calls for a legal conclusion.

14              MS. GIBSON:  It's his own research.

15              THE COURT:  It's still a legal conclusion.

16    Sustained.

17         Q.   (By Ms. Gibson) And then what is -- what's the

18    next thing that happened in connection with the asset sale?

19         A.   The next good thing, a month transpires.  Brian

20    and Cheryl battle, continue battling with Cascade.  And,

21    finally, the amendments to the PSA, purchase sales

22    agreement, was implemented.  And the first wire transfer

23    came in on July 17, 2007.  I believe it was for $1,850,000

24    of earnest money.  And that's the Email that Cheryl sent to

25    Sara and myself saying it's celebration time.

66

1    Q.    Okay.  And what did y'all do to celebrate, just
2  briefly?
3    A.    Briefly, went in all smiles.  Sara said, you know,
4  Cheryl, I need your corporate card or I need a credit card.
5  And Sara and I went to Sigel's and we bought a bottle of
6  Cristal champagne and came back and we had a little
7  celebration in Cheryl's office.
8    Q.    Okay.  Then when was the formal announcement to
9  other employees about the sale?
10   A.    That was the latter part of September around the
11  20th.
12   Q.    Okay.  Were you involved in that?
13   A.    Yes.  I helped coordinate and was involved, but
14  not much.  Stefan (phonetic) was very involved.
15   Q.    And then, without getting into details please,
16  what -- what significant event happens, if any, in late
17  September, early October of 2007?
18   A.    I received a call from Brian to meet him and
19  Cheryl.  I believe Jack Potashnik was there and was giving
20  me a update of the FBI investigation and informed that
21  indictments may be -- may be issued anytime now and that we
22  need to make sure that we keep a good face on the company.
23   Q.    And -- I'm sorry.  When was that?
24   A.    That would have been the 29th and 1st time frame.
25   Q.    Okay.  And then with respect to the management

1   trans -- potential management transition for the asset sale,

2   what is the next event that happened?

3        A.   There was -- there was a big -- the take-over was

4   announced that they have an agreement for November 1st

5   transition, and the next big conversation was Brian and I

6   having one on October 12, 2007.

7        Q.   Okay, okay.  So -- so now management transition is

8   targeted for when?

9        A.   November 1st transition.  Not closing but

10  transition of the management.

11       Q.   Okay.  And when is this meeting announcing the

12  target date for transition?

13       A.   It -- it was the first part of October.  October

14  4th or October 8th.  I think there was a meeting with the

15  corporate level people.

16       Q.   All right.

17            And then you started to talk about a

18  meeting with Brian Potashnik.  Around when that -- when did

19  the -- after this, when did the meeting with Brian Potashnik

20  happen?

21       A.   Brian and I met on October 12th at his house early

22  in the morning after he took his children to school.

23       Q.   Okay.

24            And during this meeting, what does

25  Brian Potashnik tell you, if anything, about your -- what

1    y'all have been discussing about your deals?

2         A.    Well, Brian was giving me an update of what was

3    going on.  I made -- I asked how much longer would I need

4    to -- how much longer will you need me with the change in

5    person -- you know, change in the management around the 1st.

6    But most of the conversation was about the three-percent

7    bonus, memorializing that or making sure that that's still

8    confirmed, as well as the unpaid bonuses.   Brian

9    acknowledged that I earned both; that he said that as far as

10   he's concerned, as of this day, that I fulfilled my

11   obligation.

12              He -- he knew that I had a company chasing

13   me and he mentioned American Housing Foundation by name was

14   soliciting me.   And so we talked a little bit about that.

15   We talked about the Vegas rehab and the sale.

16              MR. L. FRIEDMAN:   Objection, Your Honor.

17   This is nonresponsive.   Can we return to narrative?

18              THE COURT:   Break up your questions.

19              MS. GIBSON:   I'm moving up.

20        Q.    (By Ms. Gibson) Did he tell you on the job with

21   American Housing Foundation, did he tell you whether --

22   whether you could go or stay?  Or what'd he say about that?

23        A.    He said that I could go at any time; that it would

24   not impact our agreements as of that day.

25        Q.    Okay.   What do you mean by you could take the job

69

1    or stay and it wouldn't impact your agreements?

2         A.    That I fulfilled my requirement for the

3    three-percent sales proceeds bonus effective that day with

4    Brian.

5         Q.    Did he tell you whether or not you would still get

6    paid if you decided to go ahead and at that point go to

7    American Housing Foundation?

8         A.    Yes, he did.

9         Q.    What did he say?

10        A.    He said that I would be paid.

11        Q.    Even if you --

12        A.    And I said I earned it.  I fulfilled -- I

13   fulfilled my obligation.  He said -- in fact, he said, You

14   should take the job.

15        Q.    Okay.  And when he said paid, is that even if you

16   left?

17        A.    Yes.

18        Q.    Okay.  And during that conversation, did

19   Brian Potashnik tell you anything about, if you left, about

20   your phone and laptop?

21        A.    Yes.

22        Q.    What did he say?

23        A.    He said that I could keep those.

24        Q.    Okay.

25              Okay.  Did you -- did you stay?

1           A.    Yes, I --

2           Q.    Okay.

3           A.    -- I stayed, yes.

4           Q.    That's good.

5                 Then what's the next meeting you had about

6     Brian and Cheryl about your sale proceeds bonus and unpaid

7     annual bonuses?

8           A.    On October 21st, we met for dinner at a little

9     pizza restaurant near their house.   And --

10          Q.    And what were you told about the three-percent

11    deal, the past-due annual bonuses?

12          A.    That I would get paid but -- I get paid when they

13    get paid.   Basically, at closing.

14          Q.    Okay.   And did Cheryl say anything else to you

15    about that?

16          A.    She once again said that I would -- I would never

17    screw you -- screw over you.   That word.

18          Q.    Okay.   And did she saying anything about your

19    value as an employee during that meeting?

20          A.    Yes.   She said I was a very valuable employee as

21    well as a friend.

22          Q.    Okay.

23                And then when's the next meeting?   We're

24    getting close to transition.   What's the next meeting you

25    have about how long you need to stay?

1          A.     Spoke to Cheryl on the 29th of October and asked

2     her what else do you need from me as far as transitioning

3     the company, because everything is running smooth.   Just

4     wrapping up some of the payroll information, for the most

5     part.   And she asked me if I could stay through the -- until

6     the consulting asset management agreement takes place; which

7     was supposed to be implemented on November 1st.   And I said

8     that I would.

9          Q.     Okay.

10                      And the management transition happened

11    when?

12         A.     November 1st.

13         Q.     Okay.   And so your work was -- your agreement to

14    stay was fully done when?

15         A.     According to -- Brian was accepting it as fully

16    done on the 12th but definitely as of 11/1 or October 31st.

17         Q.     Okay.

18                      And then after that, did you stick around

19    for the rest of the week?

20         A.     Yes.

21         Q.     Okay.   And --

22         A.     November 1st I believe was Thursday.   The 2nd was

23    Friday.

24         Q.     And then what's the next significant event that

25    happened?

72

```
 1          A.    Well, on the 1st, late in the afternoon after 5:00

 2   o'clock -- excuse me -- I received an Email from

 3   Keith Jones.   Basically, it was my termination paperwork and

 4   severance package or severance agreement.

 5          Q.    Okay.

 6          A.    Excuse me.   Separation agreement.

 7          Q.    Okay.   Same thing, though, as far as separating

 8   from the company?

 9          A.    Yes.

10          Q.    Okay.

11                And did that -- did that document they sent

12   you confirm your deal?

13          A.    No, not at all.

14          Q.    What did it do?

15          A.    It basically said I had no rights to any of the

16   agreements and that I would not be paid whether it's earned,

17   you know.   After my dismissal there would be no more

18   payments of anything.

19          Q.    And what did they offer you in that proposed

20   separation agreement?

21          A.    At first they offered $50,000.

22          Q.    I mean what -- what pay items were in that

23   agreement that Keith Jones sent to you?

24          A.    Oh, it was -- it was standard.   It was PTO, any

25   accrued vacation.   I believe my deal had my written
```

73

1    employment agreement, had six weeks automatic severance when

2    I would leave the company.  It mentioned COBRA.  And the

3    separation agreement basically took -- would wipe out all

4    the agreements that I have with Brian and Cheryl and the

5    whole reason why I stayed.

6         Q.    Okay.  When you say it would wipe out all of your

7    agreements, is that because it's requiring you to release --

8         A.    Yes.

9         Q.    -- all claims?

10              Did you sign it?

11        A.    No.

12        Q.    After that, did you continue to try and work

13   something out with the Potashniks?

14        A.    Yes, I did.

15        Q.    Okay.  And, ultimately, what did -- what happened

16   with that?

17        A.    Cheryl and I -- I gave it another try and

18   submitted not the best of documents, but --

19              MR. L. FRIEDMAN:  I'm sorry.  I didn't hear

20   that.

21              THE WITNESS:  I said I submitted -- I

22   believe I submitted another try at memorializing the

23   situation.  Cheryl said that she was going to -- that

24   it would take her a few days before she could get to it.

25              MR. L. FRIEDMAN:  This is nonresponsive,

74

1    Your Honor.

2                    THE COURT:  What was your question?

3                    MS. GIBSON:  I don't know.

4                    THE COURT:  Break it up then.

5        Q.   (By Ms. Gibson) And so Cheryl asked you -- she

6    asked you to send a proposal to her?

7        A.   Yes.

8        Q.   Okay.  And had y'all worked that out, would that

9    have been a new deal?

10       A.   Yes, it would have.

11       Q.   Okay.  Did you still have a deal at that point,

12   your handshake deal with Brian?

13       A.   Yes.

14       Q.   And the --you know, we talked earlier about the

15   formula, that you picked up -- the formula picked up some

16   language from the form Keith Jones gave you?

17       A.   Yes, ma'am.

18       Q.   Okay.  Did you ultimately correct that formula?  I

19   mean here in this case have you corrected the formula.

20       A.   Through whether -- through the -- through the

21   legal proceedings or deposition, yeah.

22       Q.   And -- but notwithstanding that mistake, had you

23   and Brian Potashnik always talked about three percent of the

24   total of sellers' gross revenue --

25                    MR. L. FRIEDMAN:  Your Honor, this is

1     leading.

2                         MS. GIBSON:  I'm asking about what they

3     talked about on formula.

4                         MR. L. FRIEDMAN:  No, she's telling him the

5     answer.

6                         THE COURT:  Right.

7                         MR. L. FRIEDMAN:  He can read the answer

8     himself.

9                         THE COURT:  Right.

10    Q.    (By Ms. Gibson) What had you -- notwithstanding

11    that document, what was the formula on the three percent

12    that you and Brian had always talked about?

13    A.    Three percent gross sales, minus normal closing

14    costs, minus any sales proceeds bonuses to selected

15    employees.  Thus, the net proceeds.

16    Q.    Okay.

17                        MR. L. FRIEDMAN:  I'm sorry.  Selected

18    employees and what else?

19                        THE WITNESS:  Thus, that would give us the

20    net proceeds.

21    Q.    (By Ms. Gibson) And did it help you or hurt you to

22    make that correction?

23    A.    Hurt.  It hurt me because it deducts a significant

24    amount of dollars that was paid out to -- for severances or

25    bonuses or whatever we're calling it.

```
 1        Q.    And was that the truth of your deal?
 2        A.    Yes.
 3        Q.    Mr. Carpenter, I am handing you Plaintiff's
 4   Exhibit 68.
 5                   MR. L. FRIEDMAN:  Thank you.
 6        Q.    (By Ms. Gibson) Do you recognize Exhibit 68 as an
 7   Email from Brad Bloomer to you while you worked at Southwest
 8   Housing?
 9        A.    Yes, I do.
10                   MS. GIBSON:  Plaintiff offers Exhibit 68.
11                   THE COURT:   Any objection?
12                   MR. L. FRIEDMAN:   No objection.
13                   Whoa, whoa, whoa.  Same objection,
14   Your Honor.
15                   THE COURT:   All right.
16                   MR. L. FRIEDMAN:   This came in for the
17   first time last night.  Same objection.
18                   MS. GIBSON:  It's not.  It was produced
19   long ago.  It's CO096124.
20                   MR. L. FRIEDMAN:   Not on the exhibit list.
21   No Bates stamp came in last night.  Same objection.
22                   THE COURT:   Overruled.  Sixty-eight is
23   admitted.
24        Q.    (By Ms. Gibson) Okay.  So this Email from
25   Brad Bloomer is on October 31, 2007.  And who is
```

77

```
 1    Brad Bloomer?
 2         A.    Head of IT.
 3         Q.    Okay.
 4               And what is he asking you to do?
 5         A.    Please keep in mind that we need to make a backup
 6    of your laptop before you take it with you.
 7         Q.    Okay.  And did Southwest Housing make a backup
 8    copy of your laptop before you took it with you?
 9         A.    Yes.  They cloned it.
10         Q.    With respect to the damages calculation, did you
11    see me run through those with Cheryl Potashnik Geiser on the
12    three percent?
13         A.    Yes.
14         Q.    Okay.  And I'm handing you what's been marked
15    Exhibit 69.
16               MR. L. FRIEDMAN:  Thank you.
17         Q.    (By Ms. Gibson) If you'll take a look at Exhibit
18    69, is that an accurate summary of all of the calculations
19    from the Cascade closing documents and Cheryl Potashnik as
20    to your damages calculation for the three percent?
21               MR. L. FRIEDMAN:  Objection, Your Honor.
22    Lack of foundation.
23               THE COURT:  He hasn't answered the question
24    yet.
25               MR. L. FRIEDMAN:  This is a compilation.
```

1    It doesn't contain the documents that were the source of

2    these numbers.

3                    THE COURT:  All right.

4                    Is this a document created for litigation

5    or an original document?

6                    MS. GIBSON:  No.  This is a -- this is a --

7    it's a demonstrative but it's also a summary of voluminous

8    documents with --

9                    THE COURT:  You can use it as a

10   demonstrative then, but are you offering it into evidence?

11                   MS. GIBSON:  I was going to offer it as

12   a -- I offer 69 as a summary of voluminous records.

13                   MR. L. FRIEDMAN:  As a demonstrative, I

14   have no objection.

15                   THE COURT:  All right.

16                   MR. L. FRIEDMAN:  As a summary, we're

17   entitled to the documents that these figures would derive

18   from.

19                   THE COURT:  Okay.

20                   MS. GIBSON:  And they're -- they're listed.

21                   THE COURT:  Let me give you a ruling.  The

22   objection's sustained, but you can use it as a summary.

23                   MS. GIBSON:  Okay.

24                   THE COURT:  As a demonstrative summary.

25                   MR. L. FRIEDMAN:  Thank you.

79

1             MS. GIBSON:  Okay.

2        Q.   (By Ms. Gibson) And this, the net proceeds to

3   seller after closing costs, based on all of these closing

4   amendments, do you agree with that total?

5        A.   Yes.

6        Q.   Okay.  And you -- and on the total for stay

7   bonuses paid to other employees you used what

8   Cheryl Potashnik testified to?

9        A.   Yes, during the --

10       Q.   Okay.

11       A.   -- deposition.

12       Q.   And you know -- you have an understanding in this

13   case that we asked for those numbers from documents from the

14   other side?

15       A.   Yes.

16             MR. L. FRIEDMAN:  Objection, leading.

17       Q.   (By Ms. Gibson) Did they --

18             MR. L. FRIEDMAN:  Leading.  Leading and

19   violates the limine.

20             THE COURT:  All right.

21             The total doesn't violate the limine.

22   Overruled.

23       A.   No, we did not receive the information from the

24   other side.

25       Q.   (By Ms. Gibson) And so the -- what's the total net

1    sales price?

2         A.    I'm sorry?

3         Q.    What -- at the top of that document, what are the

4    total sellers' net proceeds?

5                     MR. L. FRIEDMAN:  Can I take the witness on

6    voir dire?

7                     THE COURT:  Overruled.

8         Q.    (By Ms. Gibson) So, Jeff --

9         A.    Yes.

10        Q.    -- on Exhibit 69, what is the total --

11        A.    Oh.

12        Q.    -- at the top, net sale proceeds to sellers?

13        A.    $32,999,032.39.

14        Q.    Okay.  And what was the amount of stay bonuses

15   paid to others from Cheryl Potashnik's testimony?

16        A.    2,100,000.

17        Q.    Okay.  And in connection with the net sale

18   proceeds, did you undertake to investigate whether closing

19   costs were reasonable or anything else?

20        A.    We looked at them, but it was --

21                    MR. L. FRIEDMAN:  I only think of two

22   answers to that question, Your Honor.

23                    MS. GIBSON:  It's okay.  I'll --

24                    MR. L. FRIEDMAN:  Nonresponsive.

25        Q.    (By Ms. Gibson) Jeff, just did you -- well, let me

1    ask it this way.  Did you use all or less than all of the

2    closing costs that Southwest Housing listed on the

3    closing --

4         A.   We used all closing costs listed.

5              MR. L. FRIEDMAN:  Objection, leading.

6              THE COURT:  Overruled.

7         Q.   (By Ms. Gibson) Okay.  And if you take the formula

8    of three percent, what is the total of the three percent?

9    What's the three percent amount come down to?

10        A.   926,970.

11             MR. L. FRIEDMAN:  I'm sorry.  Can you give

12   it to me again?

13             THE WITNESS:  926,970.

14        Q.   (By Ms. Gibson) Sorry.  Let me write that again.

15             Okay.  And we have gone over your annual

16   bonuses calculation before, but what is the total on annual

17   bonuses past due based on what Brian said before you left?

18        A.   Brian -- 400,000.

19             MR. L. FRIEDMAN:  I'm sorry.  What was the

20   400,000?

21             MS. GIBSON:  Annual.  Past-due annual

22   bonuses based on what Brian Potashnik said before he left.

23        Q.   (By Ms. Gibson) Jeff, you -- you ultimately

24   recorded Brian and Cheryl after you got that proposed

25   separation agreement releasing all of your claims?

1      A.    Yes.

2      Q.    You remember that?  Okay.

3            What was your intent in doing that?

4      A.    My intent was only to see why they sent me the

5    separation agreement that would basically nullify all of our

6    agreements.

7      Q.    Why, during that conversation, did you not speak

8    up and defend yourself and say this was the deal?

9      A.    I was stunned.  I was dumbfounded.  I was hurt.  I

10   was angry.  I had a lot of different emotions.

11           I probably should have, but I was

12   listening.

13     Q.    And you continued to forward some -- even then you

14   continued to forward some work materials to Brian Potashnik?

15     A.    Yes.

16     Q.    Okay.  What was the subject matter of what you

17   were sending?

18     A.    It had to do with the sale of Las Vegas.

19     Q.    Las Vegas what?

20     A.    The Las Vegas apartment community.

21           MS. GIBSON:  Pass the witness.

22           THE COURT:  All right.

23           Mr. Friedman?

24           MR. L. FRIEDMAN:  Yeah.  Thank you.

25

```
1                        CROSS-EXAMINATION
2    BY MR. L. FRIEDMAN:
3         Q.    Mr. Carpenter, how are you?
4         A.    Fine.   Thank you.
5                   MR. L. FRIEDMAN:  Your Honor, I just want
6    to move my easel up here --
7                   THE COURT:  All right.
8                   MR. L. FRIEDMAN:  -- if you don't mind.
9                   (The easel is being moved.)
10                  MR. L. FRIEDMAN:  I want you to be able to
11   see it too.
12                  THE COURT:  That's fine.
13                  You may want Mr. Donohue to see it.
14                  MR. L. FRIEDMAN:  He knows it by heart.
15        Q.    (By Mr. L. Friedman) Mr. Carpenter?
16        A.    Yes, sir.
17        Q.    You have a remarkable memory.
18        A.    Thank you.
19        Q.    You agree with me, right?
20        A.    I have a good memory.
21                  THE COURT:  You have to speak into the
22   microphone.
23                  His question was do you agree with him.
24                  THE WITNESS:  Yes.
25        Q.    (By Mr. L. Friedman) You have a remarkable memory
```

84

1   of dates and details; isn't that correct?

2                  MR. L. FRIEDMAN:  Can I have my markers?

3        A.    For the items discussed, yes.

4        Q.    (By Mr. L. Friedman) And a remarkable memory for

5   what's happened over the past 10 years in this case or

6   longer, 14 years?

7        A.    Yes.  Very memorable to me.

8        Q.    Dates, times, places, and exactly what was said?

9        A.    Yes.

10       Q.    Tell me what the date was that you made your deal,

11   alleged deal, with Brian Potashnik.  And let's see if you

12   can do it without looking at your script.

13                  MS. GIBSON:  Object.  Vague as to which

14   deal.

15                  THE COURT:  Let me -- don't --

16                  MR. L. FRIEDMAN:  Well, I'm not asking him

17   to read anything.  I just wanted to see if he can do it by

18   memory.

19                  THE COURT:  Then ask him to --

20                  MR. L. FRIEDMAN:  This is the most

21   important question he has.

22                  THE COURT:  Okay.  Fair enough.

23                  Don't approach the witness without

24   asking --

25                  MR. L. FRIEDMAN:  All right.

```
 1                         THE COURT:  -- and go grabbing things from
 2    him.
 3                         He's asking you to not look at --
 4         Q.    (By Mr. L. Friedman) Without looking at your
 5    script, can you tell me the date you made your deal, alleged
 6    deal, with Brian Potashnik?
 7         A.    On or around -- he told me the --
 8         Q.    I didn't ask you on or around.  I asked you what
 9    is the date you made this very important deal with
10    Brian Potashnik.  You've had 10 years to think about it.
11    You've told this story a hundred times.  You've told it
12    three or four times since this trial started.
13                         MS. GIBSON:  Object to --
14                         THE COURT:  Let him answer your first
15    question.
16                         MR. GIBSON:  -- counsel --
17         Q.    (By Mr. L. Friedman) What is the date you made
18    your deal, alleged deal, with Brian Potashnik?
19                         MS. GIBSON:  Object.  Vague as to which --
20                         THE COURT:  Overruled.  We're here for a
21    specific --
22                         THE WITNESS:  Can I please express it
23    was -- I want to say it was May 14th?
24                         MR. L. FRIEDMAN:  Okay.
25                         Today is January 29th?
```

1              THE COURT:   Yes.

2         Q.    (By Mr. L. Friedman) All right.  So I'm going to

3    date this January 29th, '18.

4              And the deal was -- you said May 14th.

5    That's the deal, May 14th?

6         A.    Yes.

7         Q.    The deal was May 14th.

8              And if you would tell me again what the

9    ingredients of that -- May 14, 2000?

10        A.    '6.

11        Q.    All right.  And what were the ingredients of the

12   deal you made, the alleged oral deal that you're trying to

13   enforce in this case?  Just list them for me, one, two,

14   three, four, five, without reading anything.

15        A.    One moment, please.

16        Q.    Sure.  Take 10 years if you need.

17              THE COURT:   Mr. Friedman.

18              MS. GIBSON:   Object to the commentary.

19              THE COURT:   Sustained.

20        A.    The deal date of the three percent was not May

21   14th.  It was October 13th, I believe.

22        Q.    (By Mr. L. Friedman) All right.  Change your mind

23   now?

24              MS. GIBSON:   Object to the --

25              MR. L. FRIEDMAN:   This is

 1    cross-examination.  I'm asking the witness if he's changed

 2    his mind.

 3                    THE COURT:  Okay.  Let him answer.

 4        A.    Yes.

 5        Q.    (By Mr. L. Friedman) I'm going to cross out May

 6    14th.  And what date would you like me to put in, put on the

 7    board now, without reading your script?

 8        A.    I don't have anything in front of me.

 9        Q.    Okay.

10        A.    October 13th.

11        Q.    What year?

12        A.    '06.

13        Q.    And what are the ingredients of the deal you're

14    trying to enforce in this case?

15        A.    The three-percent sale proceeds bonus.

16        Q.    One, three percent of sales proceeds.  Is that

17    accurate?

18        A.    Minus --

19        Q.    Hold it.  Can't write that fast.

20        A.    You may want to put net after of three percent.

21        Q.    I want to know what the deal is you made with

22    Brian on May 14 through October 13, 2006, as you made it

23    that day.  You hugged, you shook, you bump?  What was the

24    deal you made that day?

25        A.    Okay, I'll give you the formula.

1      Q.    Okay.

2      A.    Three percent of the sales proceeds minus --

3      Q.    All right, I'm going to say minus.

4      A.    -- in Brian's terms, normal closing cost.

5      Q.    Normal closing cost.

6      A.    Of which we estimated, approximately, three

7  percent.

8      Q.    On that day?

9      A.    On that day.

10      Q.    You and Brian agreed that the normal closing costs

11  would be three percent of what?

12      A.    Of the sales price.

13      Q.    All right.  Estimated three percent.

14             What else?

15      A.    Minus sales proceeds bonuses, severance --

16      Q.    Wait a second.  Minus what else?

17      A.    Whatever we want to call it.  Minus sales proceeds

18  or severance bonuses paid to corporate employees.

19      Q.    All right.  We're still on October 13, 2006.

20             Is there anything else that comprised the

21  agreement you made, alleged that you made with

22  Brian Potashnik on October 13, 2006?

23      A.    Well, we're using the sale amount based off of a

24  proposed LOI of $36 million to determine that.

25      Q.    I just want to know the ingredients of the deal

Appendix 001220

1    you made.

2         A.    Well, that is very important to the deal to get

3    down to the dollar amount.  So if it's 36 million at that

4    time and ultimately the PSA was 37 million, we used 36 --

5         Q.    Just give me list one, two, three.  Is there

6    anything else?

7         A.    The sales proceeds bonus to me was calculated to

8    be, approximately, plus or minus 1,020,000.

9         Q.    Are there any other minuses that you agreed to,

10   allegedly agreed to with Brian Potashnik on October 13,

11   2006?

12        A.    No.

13        Q.    So with regard to your alleged three percent I can

14   draw a line here and then put plus -- what do you call the

15   other bonus?  Performance bonus?  What did you call it on

16   October 13th, 2006?

17        A.    The sales proceeds bonus.

18        Q.    All right.

19              Then you were about to tell me some other

20   bonus.

21        A.    Well, the --

22        Q.    We're not looking.

23        A.    I'm not.  I'm just moving, sir --

24        Q.    Okay.

25        A.    -- 'cause I can't see it.

```
1          Q.    Let's put it to where you can see it.

2          A.    Thank you.

3          Q.    Let's move it back so your lawyer can see it.

4          A.    During that conversation we focused on the

5    three-percent sales proceeds bonus and just briefly skirted

6    the outstanding earned bonuses.

7          Q.    Okay.  So there was no agreement with regard to

8    earned bonuses on that day?

9          A.    On that particular day.

10         Q.    Okay.   No agreement regarding earned bonuses on

11   that day.

12                Mr. Carpenter, your testimony today is that

13   this board that I've written represents the agreement that

14   you are here to enforce against the defendants in this case,

15   correct?

16         A.    Yes.

17         Q.    And that's your testimony today?

18         A.    Yes.

19         Q.    And your testimony to this jury is that you have

20   been consistent in your attempts to enforce this agreement

21   that you allege you made with Brian Potashnik on October 13,

22   2006?

23         A.    I have --

24         Q.    Only asked if you'd been consistent --

25         A.    No, I haven't been consistent.
```

1      Q.    -- to enforce this agreement.

2      A.    I've made a mistake in proposing when they asked

3    me to put it in writing, when they said they were going to

4    put it in writing.  I have left off the severance bonus paid

5    to corporate employees.  That was left off on the proposal.

6              MR. L. FRIEDMAN:  I'm going to say that --

7    I'm going to object as being nonresponsive.

8              THE COURT:  Okay.  Do your best to answer

9    only the question.  His question was have you been

10   consistent.

11             MR. L. FRIEDMAN:  Let me ask it

12   differently.

13     Q.    (By Mr. L. Friedman) Mr. Carpenter, you have not

14   been consistent in attempting to enforce the agreement you

15   allege you made with Brian Potashnik on October 13th, 2006.

16   Isn't that true?

17     A.    I have made an error.

18     Q.    Okay.  For whatever reason, you haven't been

19   consistent; isn't that correct?

20     A.    As I said, I made an error on the bonus.

21     Q.    I'm going to take that as a yes.  You have not

22   been consistent.

23             So I'm going to say since October 13, 2006,

24   one, not consistent.  Two, made mistakes, correct?

25     A.    Regarding?

1      Q.     You've made mistakes in attempting to enforce what
2  you say was an oral agreement you made on October 13th,
3  2006.   You admit you made mistakes.
4      A.     I made mistakes trying to memorialize it that the
5  company was supposed to do.
6      Q.     Wasn't my question.   My question is you made
7  mistakes trying to enforce what you've testified to today
8  was the oral agreement you made with Brian Potashnik on
9  October 13, 2006.
10     A.     I have not made mistakes on the oral agreement.
11 Only when I have attempted to play lawyer and put it in
12 writing.
13     Q.     Wasn't my question.   My question is you've made
14 mistakes in your efforts to enforce the agreement that you
15 made with Brian Potashnik on October 13, 2006; isn't that
16 correct?
17     A.     I have made an error.
18     Q.     Okay.   So to be accurate I'm going to put down
19 made error.
20            Have you made more than one error?
21     A.     Regarding the three-percent calculation?
22     Q.     Your attempts to -- no.   You have made more than
23 one error in your attempts to enforce the agreement you
24 claim you made with Brian Potashnik on October 6 [sic],
25 2006 -- no, I'm sorry, October 13, 2006.   You've made

1      several mistakes, haven't you?

2           A.   With me, I made errors in trying to memorialize

3      it --

4           Q.   All right.

5           A.   -- on my own, yes.

6           Q.   So I'm going to put down made errors.   And that's

7      accurate.   You've made errors, right?   Correct?   Accurate?

8           A.   Yeah.

9           Q.   Okay.

10               Okay.   You've made counteroffers to

11     Brian Potashnik; isn't that correct?

12          A.   No, sir.

13          Q.   Since October 13th, 2013 [sic], when you allege

14     you've made this oral agreement --

15               THE COURT:   You said 2013.

16          Q.   (By Mr. L. Friedman) Since October 13th, 2006,

17     you've made counteroffers to Brian Potashnik that are

18     different from what you allege your agreement was on that

19     date; isn't that correct?

20          A.   No.

21          Q.   Okay.

22          A.   Only to try to memorialize.

23          Q.   Is it your testimony today in front of the jury

24     that you've never made a counteroffer to Brian Potashnik

25     after October 13th, 2006?   Yes or no?

1          A.    No.   Payout different.

2          Q.    Okay, no counteroffer.

3                Mr. Carpenter, you made different proposals

4    to Brian Potashnik since you allege you made an oral

5    agreement him on October 13th, 2006.

6          A.    That is what I was referring to as errors in where

7    I should not have played legal.   If Brian --

8                MR. L. FRIEDMAN:   I'm just going to object

9    to that as being nonresponsive.

10               THE COURT:   Okay.

11               His question is that you made different

12   proposals.

13         Q.    (By Mr. L. Friedman) It is true, sir, that since

14   you -- the oral agreement you allege you made with

15   Brian Potashnik on October 13th, 2006, you have made

16   proposals to him containing different terms than the terms

17   you just testified to to this jury that you agreed to on

18   October 13th, 2006.   Isn't that true?

19         A.    Yes.

20         Q.    Yeah.   So made proposals.

21         A.    At that given time.

22         Q.    And since October 13, 2006, you continued to

23   negotiate with Brian Potashnik about the terms of a deal

24   with you relating to your employment.   Isn't that true?

25         A.    I do not agree with that.

1          Q.    So I'm going to put down your testimony today is
2     you did not continue to negotiate.   Is that accurate?
3          A.    I didn't -- what was the question again?
4          Q.    Since October 13, 2006, on the date you allege you
5     made your deal with Brian Potashnik --
6          A.    Uh-huh.
7          Q.    -- for the terms that you testified, one, two,
8     three --
9          A.    Right.
10          Q.    -- you continued to negotiate with Brian Potashnik
11     about additional terms?
12          A.    No.   Suggest -- suggested examples of how to
13     memorialize it, yes, but I'm steadfast to the -- to the
14     three-percent formula.
15          Q.    Okay.
16                You continued to negotiate with
17     Brian Potashnik from October 13, 2006, by introducing
18     different or additional terms to the agreement that you
19     allege you made with him; isn't that correct?
20          A.    That was only -- that was requested by the
21     Potashniks of what I felt -- what I felt that was reasonable
22     at the time.
23          Q.    So I'm going to put down ES for that.   Isn't that
24     correct?
25          A.    I remain to the original agreement when they've

1    asked to put it down in writing when they were supposed to

2    put it in writing, not me.  There has been modifications at

3    that time.

4         Q.    Okay.  Who was supposed to put the -- this

5    agreement in writing that you allege you made with

6    Brian Potashnik?

7         A.    Well, one, I didn't allege.  Brian made the deal

8    with me.

9         Q.    Okay.

10        A.    For number one.

11        Q.    All right.  So when we talk about that October 13,

12   2006 deal you allege you made, if I say it or not, you

13   understand that I'm saying I allege it?

14        A.    Okay.

15        Q.    You allege it, because I represent Brian and

16   Cheryl Potashnik and all the defendants.  And I'll

17   understand that you say you made it, okay?

18        A.    Okay.

19        Q.    Who --

20        A.    I was --

21        Q.    -- who was supposed to memorialize it after you

22   were --

23        A.    The -- the --

24        Q.    Who did you agree would memorialize it on the --

25   at the time you made -- allegedly made this deal with

97

1    Brian Potashnik?

2         A.    Brian said it would be memorialized, put in

3    writing, and he mentioned Randy Alligood --

4         Q.    Okay.

5         A.    -- would be doing it.

6         Q.    So I'm going to put -- if I put BP, will you know

7    that's Brian Potashnik?

8         A.    Yes.

9         Q.    'Cause if I spell out Potashnik I won't have room

10   for anything else.

11              But I want to finish.  Are you saying to

12   the jury you didn't negotiate new or additional terms with

13   Brian Potashnik since October 13th, 2006?  You did attempt

14   to negotiate additional, isn't that correct, for whatever

15   reason?

16        A.    I gave suggestions based on the situation at that

17   time.  I put it in writing.  I did not do a great job, I

18   admit, but it never was intended --

19        Q.    Your lawyer said it was a bad job.

20        A.    Excuse me.  It was a horrible job.  So put that on

21   the record.  But it was never intended to change the deal

22   itself.

23        Q.    Okay, we're going to get to that.  But -- so I'm

24   going to say you suggested additional and different terms.

25   Would that be accurate?

98

1          A.   Well, I didn't know how -- no terms -- none of

2     those terms were ever proposed because I never received it

3     in writing.  So it was only a suggestion.

4          Q.   I'm just looking for a truthful answer.

5          A.   I gave a truthful answer.

6          Q.   It's true that since October 13, 2006, you, for

7     whatever reason, suggested additional and different terms to

8     the oral agreement you allege you made on October 13th,

9     2006.  That's correct, isn't it?

10          A.   I suggested some bad memorializing.

11          Q.   You suggested additional and different terms;

12     isn't that correct?

13          A.   Not ultimately.  Not intentionally.

14          Q.   You unintentionally suggested additional and

15     different terms.  Is that how you want to put it?

16          A.   If that -- that's fine.

17          Q.   Is that what you did?  When you suggested

18     additional and different terms, are you telling the jury it

19     was unintentional?  I'll write it down.

20          A.   The unintentional piece was leaving out the other

21     employees.  The other part that I believe you're referring

22     to is the payout, and I did give suggestions on how the

23     payout would be different than a hundred percent in closing,

24     as Brian said my name would be on the closing documents.

25          Q.   Well, you had the personal guarantees, things like

1     that.  I mean, you added additional terms, didn't you?

2          A.   I added horrible additional terms.

3          Q.   Okay.  And you added different terms; isn't that

4     correct?  Different terms than you allege you made on

5     October 13th, 2006?

6          A.   Yes.

7          Q.   Okay.  So I'm going to put --

8          A.   Considering if they were ever read.

9          Q.   I don't hear you.

10              -- added additional and different terms.

11    Do you want me to put horrible in there or is that a good

12    enough shortcut?

13         A.   Well, it's somewhat hard to say what's additional

14    and what's different from what I would have received from

15    the Potashniks if Randy Alligood would have submitted -- if

16    I would have had it submitted.  So I don't know what's

17    different.

18         Q.   We'll get to that one.  We'll give you a chance to

19    go over that.

20              Let's look at this for a minute.  Can you

21    see this?

22              MR. L. FRIEDMAN:  Can everybody see that?

23              Did we start here today?  Kuby?  I don't

24    think so.

25         Q.   (By Mr. L. Friedman) Did we start here today?

1    Jeff Richards?

2         A.    I don't believe we did.

3         Q.    Or we started May 16th.  We did this today, right?

4         A.    I believe so.

5         Q.    Let me ask you.  What was the significance of

6    January 6, 2006?  Why was that date significant?

7                   (Pause)

8         A.    January 6, '06.  If it is, I don't recall.

9         Q.    All right.

10        A.    I did not memorize the timeline.

11        Q.    And what about May 21st, 2006?  Why is that a

12   significant date?

13        A.    Oh, that was the day that I received a phone call

14   from Brian to meet at his house, and that's when he told me

15   about that he was selling the company and the assets.

16        Q.    But you didn't make your deal on that day,

17   correct?

18        A.    No, sir.  It came later once he was -- because he

19   needed my involvement in it.

20        Q.    And on October 13, 2006, there was no signed LOI;

21   is that correct?

22        A.    That's correct.  I believe the LOI was a few days

23   later.  However I drafted the LOI was available.

24        Q.    I'm going to -- okay, a draft of the LOI was

25   available but it was unsigned and it was still a draft,

1    correct?

2          A.    Right.

3          Q.    And on December 7, 2006, why was that a

4    significant date?

5          A.    I'm sorry.  Which day?

6          Q.    December 7th, 2006.

7          A.    That was Pearl Harbor Day.

8          Q.    Yeah, that's right.  Any other significance?

9          A.    It may have been the date that I met with

10   Rick Graf.  I'm not exactly sure.

11         Q.    And January 17th, 2007?

12         A.    As I said, I did not memorize the timeline.

13   However, the timeline was built based off the notes, also

14   confirmed by my calendar.  I feel comfortable with the

15   accuracy of the dates, for the most part.

16         Q.    You and Ms. Gibson and David Wiley built the

17   timeline?

18         A.    No.  I built the timeline.

19         Q.    With Ms. Gibson's help.  You didn't type this.

20         A.    Yes, I did.

21         Q.    It's your font?

22         A.    It's on my computer, yes.

23         Q.    And you typed it?

24         A.    Yes.

25         Q.    And you reviewed it with Ms. Gibson?

1        A.    Yes.

2        Q.    'Cause I noticed when you were testifying she had

3    a copy and asked you questions and then you had a copy that

4    you were reading from, right?

5        A.    Yes.

6        Q.    That's the truth, isn't it?  Because when she --

7        A.    I did not deny that.

8        Q.    -- because when she -- you don't deny that.

9    Because when she asked you about these dates you were able

10   to read off of that script and tell her precisely what

11   happened on those dates.  Isn't that true?

12       A.    Well --

13       Q.    Isn't that true, sir?

14       A.    To some degree.

15       Q.    Yeah.  Because when she asked you what happened on

16   December 7th, 2006, you looked down at your timeline.  And

17   what did you say?

18       A.    First meeting with Rick Graf.

19       Q.    Yeah, 'cause that's what it says on your script.

20       A.    Yeah.  I also just mentioned it to you when you

21   asked me that.

22       Q.    Yeah.  And then --

23       A.    December 7th, that was --

24       Q.    -- and then when she asked you --

25       A.    -- the meeting with Rick Graf as well.

Appendix 001234

1      Q.    When she asked you about March 7, 2007, what did
2  you say?
3      A.    Well, let me check that.
4      Q.    Yeah.   Please do.
5      A.    Which date?
6      Q.    March 7, 2007.
7      A.    It's the day that I met with Mr. Hartsfield.
8      Q.    Yeah.   That's what it says on the script, right?
9      A.    It's not a script.   Timeline.
10     Q.    Excuse me.   Timeline.
11            And so forth and so on.   And I -- I counted
12  40 different entries on this timeline that enabled you to
13  testify when Ms. Gibson asked you questions.   Am I accurate
14  on that count?
15     A.    If that's the correct amount.
16     Q.    You can count it.
17            THE COURT:   We're not counting.
18     Q.    (By Mr. L. Friedman) Mr. Carpenter, without this
19  timeline, you would not have been able to testify as
20  accurately or at all the way you've testified here this
21  morning.   Isn't that true?
22     A.    I would say it gave me a 10 percent, 15 percent
23  edge, maybe.
24     Q.    Or maybe more?
25     A.    Because early on --

1        Q.    Or maybe more?  You agree with me it may be a

2    little more?

3        A.    Maybe not.

4        Q.    But maybe more?

5        A.    No, sir.  These were --

6        Q.    All right.

7                    MR. L. FRIEDMAN:  I'm going to stop now,

8    Your Honor.

9                    THE COURT:  Okay.

10                   Ladies and gentlemen, we'll take our lunch

11    break.  We'll take an hour and 10 minutes for lunch.  We'll

12    see you back at 5 after 1:00.

13                   (The jury exited the courtroom.)

14                   (Lunch recess taken)

15                   (The jury entered the courtroom.)

16                   THE COURT:  Welcome back.  Good afternoon,

17    ladies and gentlemen.

18                   We're going to just pick up right where we

19    left off.  Our witness is Mr. Carpenter; Mr. Friedman is the

20    examining attorney.

21                   And, Mr. Friedman, if you'd pick up where

22    you left off.

23                   MR. L. FRIEDMAN:  If I could, I would.

24                   THE COURT:  All right.

25        Q.    (By Mr. L. Friedman) Mr. Carpenter, during the

1   break, to save a little time, I made a list of your

2   immediate prior employment before you joined Southwest

3   Management Company.  And if you would confirm -- I'm

4   sorry -- if you would confirm that prior to working at

5   Southwest Management Company you were regional vice

6   president with Village Green Companies.

7          A.   Correct.

8          Q.   And just briefly, what did you do at Village Green

9   Companies?

10         A.   We were in 11 states.  I ran 10 of the 11 states.

11         Q.   Property management?

12         A.   Property management.

13         Q.   Okay.

14              And, approximately, a little less than two

15   years at Elkor Properties?

16         A.   Property management in rehab.

17         Q.   Okay, as president?

18         A.   Acquisition rehab.

19         Q.   As president?

20         A.   Yes.

21         Q.   And then a little under -- it was eight years, a

22   little under or over?

23         A.   I think it was slightly under.

24         Q.   President of National Realty Management.  Briefly

25   you do that?

106

1        A.      That's correct.  I was recruited from Elkor to

2    National Realty.

3        Q.      Again, property management?

4        A.      Property management.  Very similar company as

5    Southwest Housing.

6        Q.      Okay.  And then two years you were senior vice

7    president of -- is it Fore Property?

8        A.      Fore Property Company.

9        Q.      Management -- Fore Property Company in Las Vegas;

10   is that correct?

11       A.      Yes.

12       Q.      And what were your duties and responsibilities

13   there?

14       A.      Property management.

15       Q.      Okay.  So --

16       A.      And recruited to here from --

17       Q.      And recruited to Southwest Management.

18              So before you got to Southwest Management

19   you had a lot of good property-management experience?

20       A.      Yes, sir.

21       Q.      A lot of good senior-executive experience?

22       A.      Yes.

23       Q.      And you would classify yourself as a sophisticated

24   businessman as you entered your employment with Southwest

25   Management Company?

107

1          A.   I would say yes.

2          Q.   Okay.  So -- and that was the case when you

3     negotiated your employment contract.  You were a

4     sophisticated businessman?

5                    (Pause)

6                    Correct?

7          A.   Hope so.

8          Q.   Yeah.  It wasn't the first contract you'd ever

9     negotiated?

10         A.   No.

11         Q.   And you represented to Southwest Management that

12    you would give them your best efforts --

13         A.   Yes.

14         Q.   -- while you worked there?  And what does best

15    efforts mean, sir?

16         A.   All the skills, the talent, the -- the effort, the

17    commitment that it took to try to make the company

18    successful.

19         Q.   That's full-time?

20         A.   More than full-time, yes.

21         Q.   And exclusive?

22         A.   And exclusive.

23         Q.   So I'm just going to put full-time and exclusive.

24                    Now, going back to the deal that you

25    allegedly made with Brian Potashnik on October 13th, 2006, I

1      didn't put down you said three percent of sales proceeds;

2      which, at the time, on October 13, 2006, I think you said

3      was $36 million?

4              A.    That was the LOI that we had at hand.

5              Q.    Was -- did you and Brian agree to that?

6              A.    That was the number we used as calculation.

7              Q.    You used 36 million?

8              A.    Used 36- and then deducted 2 million for the other

9      costs.  So, actually, 34- net.

10             Q.    Closing cost $2,000,000?

11             A.    Between the two.  Between those two minuses we

12     used 2 million as an example.

13             Q.    Okay.  So 2 million.  Okay.

14                   And I was going to ask you if the deal that

15     you made with Brian Potashnik had a beginning date and an

16     ending date?

17             A.    It did.

18             Q.    And what is the beginning date?

19             A.    The beginning date was the date, for the most

20     part, of the LOI, the letter of -- letter-of-intent time

21     frame.

22             Q.    Can you put a date on it?

23             A.    I believe it was October 16th, 2006.

24             Q.    And did it have an ending date?

25             A.    It had an anticipated ending date of April, May,

1    of 2007.   That was anticipated close date.

2         Q.    And that's what you agreed to with Mr. Potashnik;

3    is that right?

4         A.    At that time, yes.

5         Q.    Okay.

6                    Now, did you ever testify under oath that

7    the beginning date that -- as part of the deal you made with

8    Mr. Potashnik, the beginning date was October 13th, 2006,

9    and the ending date was October 31st, 2007?

10        A.    I used October 12th, 2007 --

11        Q.    Just wasn't my question.   My question is, Have you

12   ever testified under oath at a prior time in this case that

13   the beginning date of your alleged agreement with

14   Mr. Potashnik was October 13th, 2006, and the ending date

15   was October 31st, 2007?

16        A.    With the delay and extensions, I did commit to

17   October 31st.

18        Q.    You did testify under oath --

19        A.    Yes.

20        Q.    -- of those two beginning dates --

21        A.    Due to the extraordinary extenuating circumstances

22   of the delays.

23        Q.    Maybe I didn't make myself clear.   Did you testify

24   that part of the agreement you made with Mr. Potashnik on

25   October 13th, 2006, had a beginning date and an ending date;

110

1    and that beginning date was October 13th, 2006, and the

2    ending date was October 31st, 2007, on that date?

3        A.    No, we did not specify that particular date.

4        Q.    Okay.  So let me pull up your deposition.

5        A.    As I recall.

6        Q.    Okay.

7                    MR. L. FRIEDMAN:  Do we have a line and

8    page?

9                    MR. J. FRIEDMAN:   Page 83.

10                   MR. L. FRIEDMAN:   Page 83 of

11   Mr. Carpenter's deposition taken January 18th, 2018.

12                   And the lines?

13                   MS. GIBSON:  Sixteen to twenty-four.

14                   MR. L. FRIEDMAN:  Lines 16 to 24.

15                   Wait till Ms. Gibson gets there.

16       Q.    (By Mr. L. Friedman) Okay.  If you remember, I was

17   examining you.

18       A.    That's what I look like?

19             (Video playing)

20       Q.    "You said there was a valid contractual agreement.

21   Is there a beginning date, as you stated there was, that you

22   can give me in the terms of month, date, year?"

23       A.    "A pure official, October thir -- started October

24   13, 2006; ended October 31, 2007."

25       Q.    "Okay.  So we have a start date, October 13th,

111

1    2006; and we have an end date, October 31, 2007, correct?"

2        A.    "Yes."

3                    (Video ended)

4        Q.    (By Mr. L. Friedman) Okay.  So, Mr. Carpenter,

5    does that refresh your memory that approximately two weeks

6    ago when I took your deposition and asked you the same

7    question your sworn testimony at your deposition was that

8    the beginning date was October 13th, 2006, and the end date

9    was October 31st, 2007?

10       A.    Yes.  With the extensions and the delay in the

11   closings, the due diligence, the PSA being drafted, I

12   committed to those dates.  Brian said my responsibilities

13   were ended October 12th, as discussed earlier.

14                MR. L. FRIEDMAN:  I'm going to object to

15   all of this as being nonresponsive, Your Honor.

16                THE COURT:  All right.

17                Answer only the question he's asking.

18   Remember Ms. Gibson will have a chance to ask you more

19   questions.

20                THE WITNESS:  Okay.  Thank you.

21       Q.    (By Mr. L. Friedman) Now, do you remember the

22   dates, without looking at anything, that you entered into

23   your employment agreement with Southwest Housing?

24       A.    Like, 2/24 of '04.

25       Q.    Okay, February of '04.

1                    MR. L. FRIEDMAN:  Do we have that

2      employment agreement, Mr. Page?

3           Q.   (By Mr. L. Friedman) And if I could call your

4      attention to Defendants' Exhibit Number 2, if you look at

5      it on the screen or the hard copy in front of you.

6           A.   I don't have a hard copy.

7           Q.   I'm sorry.  Defendants' Exhibit Number 4.  Screen

8      or the hard copy in front of you.

9           A.   There's no hard copy in front of me.

10                    THE COURT:  You can look at the screen.

11                    THE WITNESS:  I'm sorry.  With the

12     trifocals it would be easier --

13                    THE COURT:  Okay.

14                    THE WITNESS:  -- with paper rather than

15     screen.

16          Q.   (By Mr. L. Friedman) Okay.  Let me hand you

17     Defendants' Exhibit Number 4.

18          A.   Okay.  Thank you, sir.

19          Q.   Okay.  Do you remember this employment agreement?

20     And that's the one you signed on or about February 25th,

21     2004, correct?

22          A.   Yes.

23          Q.   I want to go through this quickly.  And the two

24     parties to this agreement are yourself, Jeffrey W.

25     Carpenter, which is defined as the employee.  You're the

113

1      employee, correct?

2             A.    Yes.

3             Q.    And Southwest Housing Management, which is defined

4      as the company.

5                   So your employment agreement is with

6      Southwest Housing Management, not with Southwest Housing

7      Development, not with Affordable Housing Construction and

8      not with any other company or person, correct?

9             A.    As it's stated, yes.

10            Q.    Say it again.

11            A.    As stated, yes.

12            Q.    Yeah.   And your employment agreement was not with

13     Cheryl Potashnik, correct?

14            A.    It was with Brian, but Cheryl worked on it.

15            Q.    I'm sorry.   Say it again.

16            A.    I said it was with Brian Potashnik but Cheryl

17     worked on the agreement.

18            Q.    You and Cheryl and Brian negotiated this

19     agreement?

20            A.    Yes.

21            Q.    Yeah.   The terms of this agreement were hard

22     bargained for, weren't they?

23            A.    I don't recall at the time.

24            Q.    You spent two or three or four weeks bargaining

25     for every term in this agreement; isn't that true?

114

1          A.   I do not recall that.

2          Q.   Oh, but you do recall you negotiated this

3    agreement with Cheryl and Brian?

4          A.   Yes.

5          Q.   Okay.  And you will acknowledge that this

6    agreement is not with Cheryl Potashnik or Brian Potashnik

7    individually?

8          A.   It's with the -- the management company.

9          Q.   Yeah.  Okay, good.

10              Calling your attention to Paragraph Number

11   2, you'll acknowledge that it states specifically that this

12   is an at-will employment contract?

13         A.   Yes.

14         Q.   Correct?

15              And at-will means company can fire you or

16   terminate you at any time and you can leave at any time?

17         A.   Yes, sir.

18         Q.   All right.  And that's one of the provisions that

19   you bargained for to be part of this agreement, correct?

20         A.   No, sir.  That was probably standard language in

21   the agreement.

22         Q.   Okay, well, let's approach it differently.  You

23   read this agreement before you signed it, correct?

24         A.   Yes.

25         Q.   And you understood it?

1       A.    Yes.

2       Q.    And you intended to comply with each and every

3    term in this agreement when you signed it?

4       A.    Yes.

5       Q.    Okay.  And you understood this and agreed to abide

6    by these terms?

7       A.    Yes.

8       Q.    Okay.

9             MR. L. FRIEDMAN:  Let's go to the next one.

10      Q.    (By Mr. L. Friedman) Number three is duties.

11   Quickly, the employee shall perform the duties and functions

12   assigned to him from time to time, in the sole discretion of

13   the company, and shall report to the president of the

14   company or such other person as directed by the president.

15             I read that correctly?

16      A.    Yes.

17      Q.    And your job as executive vice president, for a

18   salary of $200,000 a year, was to do what the company asked

19   you to do, correct?

20      A.    Yes.

21      Q.    And the company would express itself through the

22   president, Brian Potashnik?

23      A.    Yes.

24      Q.    Or such other person as directed by the president,

25   Brian Potashnik, correct?

116

1      A.   Yes.

2      Q.   So if he said do this task for Mark Jones, that

3  would be something that would fit into this description?

4      A.   Yes.

5      Q.   Yeah.  Okay.

6           Then it says employee agrees to devote his

7  working time, attention, and energies to the performance of

8  the business of the company and any of its affiliates

9  which -- by which he may be employed.  And the employee

10  shall not, directly or indirectly, alone or as a member of

11  any partnership or other organization or as an officer,

12  director or employee of any other corporation, partnership

13  or other organization, be actively engaged in or concerned

14  with any other duties or pursuits which materially interfere

15  with the performance of his duties under this agreement.

16           I read that correctly, right?

17      A.   A mouthful.  Yes.

18      Q.   Yeah.

19           And where it says here you agree to devote

20  your working time, attention, and energies to the

21  performance of the business of the company, that consistent

22  with what we talked about being your best efforts, correct?

23      A.   That and for the general company as a whole.  Yes.

24      Q.   And when you say general company as a whole you're

25  talking about --

1          A.     The organization as a whole.

2          Q.     Excuse me.  -- you're talking about someone other

3     than the contracting party.  Is that what you're -- is that

4     what you're alluding to?

5          A.     I'm alluding to the Southwest Housing was

6     recognized as a comparable entity that we had different

7     divisions within the company.

8          Q.     Yeah.  And that's why it says that in the

9     performance of the business of the company and any of its

10    affiliates by which he may be employed.  So, in other words,

11    at the time you signed this agreement you contemplated that

12    you may do assignments for Southwest Housing Development or

13    Affordable Housing Construction or some other Southwest

14    company, correct?

15         A.     Well, or be employed by, yes.

16         Q.     Yeah.  Okay, good.

17                And, also, that you would not be actively

18    engaged in or concerned with any other duties or pursuits

19    which materially interfere with the performance of your

20    duties under this agreement.  So when Jeff Richards

21    testified that while you were working for Southwest Housing

22    Management you were also consulting for American Housing

23    Foundation, wouldn't that be something that materially

24    interfered with the performance of your duties under this

25    agreement, sir?

118

1          A.    Absolutely not.

2          Q.    Now -- now, you don't deny the fact that you were

3    consulting for American Housing Foundation, your future

4    employer, while you were being paid a $200,000-a-year salary

5    by Southwest Management, do you?

6          A.    I disagree with Jeff Richards' use of the term of

7    consulting.

8          Q.    I see.  So you disagree with the witness you

9    brought here when he testified under oath that you were

10   consulting with American Housing Foundation while you were

11   working for Southwest Management Company, correct?

12         A.    In that regard, yes.

13         Q.    Okay.

14               So let's look at one of the exhibits that

15   we have here.

16               MR. L. FRIEDMAN:  Where's that -- no --

17   bankruptcy proof of claim?

18         Q.    (By Mr. L. Friedman) So --

19               MR. L. FRIEDMAN:  May I approach,

20   Your Honor?

21               THE COURT:  Certainly.

22         Q.    (By Mr. L. Friedman) -- Exhibit 61, which your

23   lawyer introduced, is it up there?

24               MR. L. FRIEDMAN:  Do you have that on

25   the -- yeah.  I think that's been admitted.

```
1                    THE COURT:  Uh-huh.
2                    THE WITNESS:  I jump from 52 to -- here it
3    is.
4                    MR. L. FRIEDMAN:  Okay.
5        Q.   (By Mr. L. Friedman) So Exhibit 61 is --
6                    MR. L. FRIEDMAN:  Put that up on the
7    screen, Steve, please.
8        Q.   (By Mr. L. Friedman) -- your exhibit.
9                    (Off the record)
10                   MR. L. FRIEDMAN:  Well, do you have it?
11   Just give me the Email.  I'll put it up here.
12       Q.   (By Mr. L. Friedman) Okay, this is Exhibit 61.
13   Your lawyer admitted it this morning as a group of exhibits
14   and the cover sheet is signed by you.
15       A.   Uh-huh.
16       Q.   It's your signature, right?
17       A.   (Coughing).  Excuse me.  Yes sir.
18       Q.   And this was a cover sheet transmitting documents
19   that you submitted to the U.S. Bankruptcy Court in Amarillo,
20   Texas, under oath, correct?
21       A.   Yes.
22       Q.   You have to answer verbally.
23       A.   Yes.
24       Q.   In order for you to recover against your
25   succeeding employer for a claim for unpaid wages and unpaid
```

120

1      bonuses, correct?

2          A.    Yes.

3          Q.    And then I turn to Page 1 of your proof of claim

4      signed by you on the bottom.   Is that your signature, sir?

5          A.    Yes.

6          Q.    And you wrote in Jeffrey W. Carpenter?

7          A.    Yes.

8          Q.    That's your printing.

9                      And then I look.   The document is entitled

10     Proof of Claim, correct?

11         A.    Yes.

12         Q.    Filed October 8, 2009.   U.S. Bankruptcy Court for

13     the northern district of Texas, right?

14         A.    Yes.

15         Q.    So if you look in the middle of the first page on

16     the claim that you made against American Housing Foundation,

17     you're claiming wages based on a debt that was incurred from

18     10/24/07 to 4/7/09, correct?

19         A.    No, sir.

20         Q.    It doesn't say that?

21         A.    That's what it says, but you said wages, and I

22     don't --

23         Q.    Okay, well, let's see.

24         A.    It's -- it would be, probably, reimbursement

25     for --

1          Q.    Sir, sir, the debt was incurred from 10/24/07 to

2     4/7/09.  Is that what it says?

3          A.    Yes, it is.

4          Q.    Then you checked -- you checked the box.  Where am

5     I?  You checked the box.

6                    THE COURT:  Are you asking, I think?

7                    THE WITNESS:  Immediately above it.

8          Q.    (By Mr. L. Friedman) You checked the box.  It says

9     check this box if you have an unsecured priority claim.  You

10    checked that box, right, right there?  Is that your X?

11    That's your X.

12         A.    I'm not sure.  My attorney did it.  But the

13    X right above the date that was --

14         Q.    Sir.

15         A.    -- incurred --

16         Q.    Sir.

17         A.    -- was mine.

18         Q.    Sir, that's your X or someone made that X on your

19    behalf.  Because after you read this and understood it and

20    signed it Jeff Carpenter, you knew someone made that X on

21    your behalf, right?

22         A.    I didn't.

23         Q.    Oh, "I didn't"?

24         A.    I signed it but I didn't make the X.  I signed

25    what --

1          Q.    Okay.

2          A.    -- the bankruptcy attorney told me to sign.

3          Q.    All right.   Bankruptcy attorney did it and the

4     bankruptcy knew you were making a claim for what, sir?

5     Here's the other X.   Say it.

6          A.    Wages, salaries, commissions up to 4300 earned

7     within 90 days before filings of bankruptcy petition.

8          Q.    Okay.   So you were making a claim for wages,

9     salaries or commission earned between 10/24/07 through April

10    7th, '09.   And you will admit, sir, that your prior

11    testimony said that you were paid by Southwest Management up

12    through and including November 2nd, 2007, correct?

13         A.    Yes, but your information's inaccurate.

14               MR. L. FRIEDMAN:   Well, first, I'm going to

15    object to everything after yes as being unresponsive.   And,

16    second, I'll just say the document speaks for itself.

17               THE WITNESS:   Well, the document doesn't

18    speak for itself.   The X --

19               MR. L. FRIEDMAN:   Is there an echo?

20               THE WITNESS:   -- X right above --

21               THE COURT:   Wait for him to ask a question.

22         Q.    (By Mr. L. Friedman) Is there an echo?

23               The X right above says "other".   Expense

24    report on behalf of AHF and JWC paid out of pocket, travel,

25    furnishings (that is in possession of AHF), and other

123

1    acceptable business-related expenses.

2                   So what you're telling the jury is that you

3    incurred business-related expenses for AHF while you were

4    working full-time and being paid a full-time salary for

5    Southwest Management, correct?

6    A.    I worked a weekend doing a report.

7    Q.    That's not the question I asked you.

8    A.    I don't agree with your assessment.

9    Q.    You worked for Affordable -- American Housing

10   Foundation while you're being paid by Southwest Management.

11   That's the truth, isn't it?

12   A.    No, sir.

13   Q.    And you never disclosed it to Brian or Cheryl

14   Potashnik, did you?

15   A.    Well, no, sir.  Brian Potashnik said my job was

16   completed 10/12.

17   Q.    Wasn't my question.  My question was you never

18   disclosed this to Brian or Cheryl Potashnik.  You kept it a

19   secret from them, correct?

20   A.    I did analysis on the weekend.

21   Q.    Sir, you never disclosed it to Brian Potashnik.

22   A.    I never disclosed it to Brian.

23   Q.    Thank you.

24                   And you were not only claiming expenses,

25   sir, because the truth of the matter is your total claim was

1       $420,499.28.  Isn't that true?  And I can only think of two

2       answers.  Yes, it is; or, no, it's not.

3              A.   That is the truth.

4              Q.   Thank you.

5                    Let's go back to the employment contract.

6              A.   Detailed on the front page.

7              Q.   There's no question in front of you, sir.

8                    MR. L. FRIEDMAN:  Oh, Your Honor,

9       Mr. Donohue, my better half, reminds me to ask the Court to

10      admit Defendants' 4.

11                   THE COURT:  Defendants' 4?

12                   MR. L. FRIEDMAN:  The employment agreement

13      under our --

14                   THE COURT:  Wasn't it already in?

15                   MR. L. FRIEDMAN:  -- under our label.

16                   THE COURT:  Okay.

17                   MS. GIBSON:  It's already admitted by both

18      parties by agreement as 2 --

19                   MR. L. FRIEDMAN:  Okay.

20                   MS. GIBSON:  -- but I have no problem.

21                   THE COURT:  All right.

22                   Did you want that in as Defendants' 4?

23                   MR. L. FRIEDMAN:  Well, let's admit it as 4

24      because Mr. Donohue said to do it.

25                   THE COURT:  Okay.  Fair enough.

1    Defendants' 4 is admitted.

2                  MR. L. FRIEDMAN:  And I'm a compliant

3    lawyer.

4                  Okay, go to A first, Compensation A.

5         Q.   (By Mr. L. Friedman) All right.  This calls for

6    $200,000-a-year annual salary.  And to be clear, you're not

7    making a claim for salary in this case; is that correct,

8    sir?

9         A.   That's correct.

10        Q.   Okay.

11                 Let's go to B.  Now, B, I'd like to go

12   through this quickly.  I believe you testified you received

13   $50,000 bonus for year one.  And you'll acknowledge that.

14   We don't have to talk about it anymore.

15        A.   I conceded, yes.

16        Q.   Okay, so we don't have to talk about year one?

17        A.   Correct.

18        Q.   Going -- so your -- your claim is for bonuses in

19   year two, three-and-a-half?

20        A.   Correct.

21        Q.   Correct?

22                 And you'll work with me here.  It says a

23   detailed bonus plan will be provided to employee within 90

24   days of the employment date.  And everybody agrees that was

25   not provided to you?

126

1       A.     Correct.

2       Q.     Correct?

3              And then it says annual changes made to the

4    bonus structure will be at the -- help me with this -- sole

5    discretion of the company.

6       A.     That's what it says.

7       Q.     And there's no disagreement about the language

8    "sole discretion of the company", correct?

9       A.     No.

10      Q.     And, in fact, you made it a point to say in your

11   interrogatory responses you and Cheryl Potashnik discussed

12   it while you were negotiating your employment contract and

13   she insisted that that language be in your contract?

14      A.     She did.

15      Q.     Okay.  And that's how it got there?

16      A.     Yes.

17      Q.     All right.

18             And it wound up in your petition on several

19   occasions?

20      A.     Yes.

21      Q.     Okay.  So you'll agree with me now that for years

22   two, three, and then a half or up to October 31st, any bonus

23   to go to you would be at the sole discretion of the company,

24   Southwest Housing Management.  That's our starting point,

25   sole discretion of the company, correct?

1        A.     Sole discretion of the company based on the

2     profitability of the organization as a whole, yes, sir.

3                      MR. L. FRIEDMAN:  Okay.  Go ahead.  Let's

4     go to the next one.  Next paragraph.  Okay.

5        Q.     (By Mr. L. Friedman) This is another provision you

6     agreed to:  Termination of employment and the effect of

7     termination.  Employee will not be entitled to any

8     compensation or benefits pursuant to this agreement

9     effective upon termination of employee's employment, the

10    removal of employee from the position of executive vice

11    president and/or upon employee's death, except as noted

12    below.

13                      So we agree that you as the employee were

14    not entitled, according to this contract, to any

15    compensation or benefits effective upon your termination,

16    correct?

17       A.     That's (clearing throat) -- pardon me.

18       Q.     You need water?

19       A.     Yes.

20                      MR. L. FRIEDMAN:  Can we have a bottle of

21    water for him?

22                      THE WITNESS:  I have some.

23                      MR. L. FRIEDMAN:  He's got it.

24                      Take your time.

25                      THE WITNESS:  That is what the pair -- or

1    the sentence says.  However, if I may, I don't believe
2    that's in accordance with Texas law.
3                   MR. L. FRIEDMAN:  I'm going to object to
4    anything after that's what the sentence says.  About to give
5    a legal conclusion.
6                   THE COURT:  Sustained.
7        Q.    (By Mr. L. Friedman) All right.  A -- Paragraph 7a
8    says, In the event company terminates employee, employee
9    will receive severance in an amount equal to six weeks of
10   base salary in a lump sum payable upon such termination.
11                  Did I read that correctly?
12       A.    Yes, sir.
13       Q.    And, in fact, on or about October 31, 2007, when
14   you were terminated -- you with me?
15       A.    When my position was eliminated, yes.
16       Q.    When you were terminated -- I don't need help with
17   the questions.  When you were terminated you received and
18   accepted six weeks of base salary upon your termination as
19   severance, correct?
20       A.    As stated in the agreement, yes.
21       Q.    No, you accepted six weeks of salary.  You took
22   the check, you deposited it in your account, and you used
23   the money, correct?
24       A.    Yes.  I noted that before.
25       Q.    There we are.

129

1                    And, in fact, Mr. and Mrs. Potashnik

2      offered you an additional $150,000 severance, which you

3      turned down, correct?

4           A.    Yes, because of the agreement that I had.

5                    MR. L. FRIEDMAN:  Everything after yes is

6      nonresponsive.  Your lawyer gets a chance to follow up.

7                    THE WITNESS:  Okay.

8                    MR. L. FRIEDMAN:  Next.

9           Q.    (By Mr. L. Friedman) All confidential information

10     relating to the company and its affiliates are the exclusive

11     property of the company and its affiliates, and employee

12     shall use all reasonable efforts to prevent any publication

13     or disclosure thereof.

14                   We don't have an argument that the

15     confidential information of Southwest Housing Management and

16     related companies belong to Southwest Housing Management and

17     their related companies?

18          A.    No.

19          Q.    Okay.  And --

20          A.    The Southwest Housing information is Southwest,

21     yes.

22          Q.    Right.

23                   And to this day you still have Southwest

24     Housing Management's information, confidential information

25     in your possession.

130

1          A.    Permitted and --

2          Q.    Sir.

3          A.    -- with permission --

4          Q.    Sir.

5          A.    -- from the owner.

6          Q.    You have Southwest Housing's confidential

7     information in your possession?

8          A.    Yes.

9          Q.    And you've never returned it?

10         A.    I was given permission.

11         Q.    It's yes or no.  Everybody knows what you're going

12    to say.  The answer to my question is, yes, you've never

13    returned it, correct?

14         A.    I have not returned the gift, no.

15         Q.    Thank you.

16               Let's go to the next one.  Okay, also in

17    your contract was a provision for alternative dispute

18    resolution:  Right to injunction; remedies.  You'll agree

19    with me that alternative dispute resolution means let's find

20    a way to resolve our disputes without going to court --

21         A.    Yes.

22         Q.    -- correct?

23         A.    Uh-huh.

24         Q.    And according to the contract you negotiated,

25    read, understood and signed and agreed to comply with, in

1    the event of any dispute or claim arising from or relating

2    to this agreement or breach thereof -- here's the important

3    language -- or to any other aspect of employee's terms,

4    conditions or benefits of employment or any other aspect of

5    his contracts with the company, the parties shall use their

6    best efforts to settle this dispute, claim, question or

7    disagreement.

8                    Now, you'll agree with me that that

9    language would include this alleged oral agreement you had

10   with Brian Potashnik?

11        A.   I would have to rely on my counsel for that

12   determination.

13        Q.   I can't get an agreement from you based on your

14   knowledge and experience and your understanding of this

15   contract when you signed it that you were bound to negotiate

16   in good faith before you took another step?  That's the

17   truth.  You had an obligation to negotiate, correct?

18        A.   The step we took --

19        Q.   Sir --

20        A.   I took legal advice.

21        Q.   -- all I'm asking you is you had an obligation to

22   negotiate and you didn't do it, correct?  Whether you did it

23   on legal advice --

24        A.   Not in this fashion.  Not in this fashion, no.

25        Q.   Okay.

1          And then it says, After consulting and

2     negotiating with each other in good faith and recognizing

3     their mutual interests, attempting to reach a just and

4     equitable solution satisfactory to both parties.  If they do

5     not reach a solution within a 30-day -- within a period of

6     30 days, then, upon written notice by either party to the

7     other, such dispute or claim shall be submitted within the

8     next 60 days to a one-and-a-half-day mediation with a

9     mediation fee -- I'm sorry -- to a one-half day mediation,

10    with the mediation fee to be shared equally by the

11    employee, that's you, and the company, Southwest Housing

12    Management, and with the mediator to be agreed on by the

13    employer and the company.

14          Mr. Carpenter, you didn't go to mediation

15    or give notice you wanted to go to mediation before you

16    filed this lawsuit; isn't that correct?

17    A.    I took the advice of my attorney.

18    Q.    You may have, but you didn't give notice and you

19    didn't go to mediation before you filed this lawsuit,

20    correct?

21    A.    No, but I'd been to mediation twice.

22    Q.    After you filed the lawsuit this Court ordered

23    this case to mediation, right?

24    A.    Yes.

25    Q.    But you didn't follow the strict terms of this

1   contract that you read, understood, and whose terms you
2   agreed to comply with, correct?
3        A.   I agreed with my attorney, though.
4        Q.   Yeah.
5        A.   Counsel.
6        Q.   You just felt like you didn't have to.
7        A.   I agreed with legal counsel.
8        Q.   And after mediation, after mediation, you're
9   advised to go to the American Arbitration Association.  But
10  you didn't do that either before you filed your lawsuit,
11  correct?
12       A.   I believe that's correct.
13       Q.   All right.  Let's move on to something -- oh, and
14  by the way, how many lawyers have you had in this case, sir?
15       A.   Three.
16       Q.   Rogge Dunn and his law firm?
17       A.   Yes.
18       Q.   Gardere Wynne and that big law firm?
19       A.   Yes.
20       Q.   And Ms. Gibson, David Wiley, and Brian Sanford?
21       A.   Yes.
22       Q.   The best lawyers you've had so far?
23       A.   Absolutely.
24       Q.   Thank you.  No dispute about that, right?
25       A.   No dispute.

1    Q.    Okay.

2          Paragraph 12, you agreed no amendment or

3    alteration of the terms of this agreement shall be valid

4    unless made in writing and signed by both of the parties to

5    this agreement.  We don't have a dispute that this language

6    requires a writing signed by both parties if you want to

7    amend this agreement, correct?

8    A.    If we want to amend this agreement but not the

9    other agreement, not the oral agreement.

10         MR. L. FRIEDMAN:  Object to everything

11   after this agreement as being nonresponsive.

12         THE COURT:  Try to limit your response to

13   the question he's asking --

14   Q.    (By Mr. L. Friedman) But your claim --

15         THE COURT:  -- Mr. Cameron -- Carpenter.

16   Q.    (By Mr. L. Friedman) -- is that your alleged oral

17   agreement has nothing to do with this, correct?

18   A.    Correct.

19   Q.    Even though Paragraph 17 of this agreement that

20   you read, understood, bargained for, negotiated and signed

21   says on Paragraph 17 the entire agreement and binding

22   effect.  This agreement contains the entire agreement of the

23   parties with respect to -- it doesn't say your employment.

24   It says with respect to the subject matter hereof and shall

25   be binding upon and inure to the benefit of the parties to

135

1    this agreement and their respective legal representatives.

2                    The subject matter, that means everything

3    in the agreement, correct?

4         A.   As it relates to what's in writing there, yes.

5         Q.   That means your employment.  That means your

6    compensation.  That means your benefits.

7         A.   But not to the three-percent sales proceeds bonus.

8         Q.   That means bonus.  That means the subject,

9    everything.  You'd agree with that?

10        A.   I disagree with you.

11        Q.   You disagree.

12                   Okay, let's go on.  And there's your

13   signature, Mr. Potashnik's signature on behalf of Southwest

14   Housing Management Company.

15                   All right, next.  So building a timeline, I

16   have February 13th when the original agreement was --

17   effective date of the original agreement to be signed and

18   then October 13th, 2006, based on your testimony.

19        A.   I'm -- pardon me.  February 13th is what?

20        Q.   My understanding is that was the effective date of

21   your employment contract.

22        A.   I signed it 2/25/04.

23        Q.   Yes, but go back to the first paragraph, sir.

24        A.   Understood.  Okay.

25                   MR. L. FRIEDMAN:  Pull it up.

Appendix 001267

1          Q.    (By Mr. L. Friedman) This is the agreement you

2    bargained for.   You made the effective date February 13th,

3    2004 -- or made as of date.   I'm sorry.   But I'll put any

4    date you want.

5          A.    I said I agree with you.

6          Q.    We can agree it was made as of?

7          A.    I said I agree.

8          Q.    Okay.   Let's go -- let's go on.

9                We used your date for the alleged oral

10   agreement, October 13th, 2006.   I footnoted that's what you

11   said, also, in your declaration which you filed in this

12   case.

13                    (Off the record)

14                    (Sotto voce discussion held between defense

15                    attorneys and A/V technician)

16               MR. L. FRIEDMAN:   Thanks.

17         Q.    (By Mr. L. Friedman) Sorry for the delay.

18               Okay.   Now going to your alleged oral

19   agreement.   Mr. Carpenter, have you ever testified under

20   oath that the alleged oral agreement between you and

21   Mr. Potashnik contained the following ingredients:   Three

22   percent of the net proceeds of the sale of the companies and

23   the assets; everything listed in the purchase sale

24   agreement -- and the company documents would be considered

25   gross proceeds -- minus normal closing costs, minus

1    retention bonuses?  Other employees to be identified later.

2    That number would also be deducted before my number would be

3    calculated.  That would give the net proceeds number.  I

4    would receive three percent of that net proceeds number,

5    gross minus normal closing costs, minus other key employees.

6         A.    Yes.

7         Q.    And that's different than what you told the jury

8    your agreement was this morning.  Okay, 'cause this morning

9    you said it was three percent of sales proceeds on October

10   13th.  This was at your deposition.

11              At your deposition on January 18, 2018, you

12   testified a little differently.  Three percent of the net

13   proceeds of the sale of the companies -- that's all the

14   companies -- and the assets, everything in the purchase and

15   sale agreement.  And as of -- I'll submit to you that as of

16   October 13, 2006, there was no purchasing sale agreement.

17   You'll agree with that?

18        A.    I agree.

19        Q.    Minus normal closing costs.  Undefined.  It's

20   never been defined, normal closing costs?

21        A.    Just -- just what Brian mentioned.

22        Q.    You didn't know what normal closing costs were on

23   October 13th, 2006, correct?

24        A.    I used all closing costs.  So whether they're

25   normal or low or high, I used all closing costs.

1          MR. L. FRIEDMAN:  I'm going to object as

2   being nonresponsive.

3          THE COURT:  Okay.  Sustained.

4     Q.    (By Mr. L. Friedman) When you and Brian allegedly

5   made this oral agreement on October 13, 2006, there was no

6   way to know accurately what normal closing costs would be?

7     A.    That's -- that's true.  It was estimated.

8     Q.    And there was no way to know what the sales

9   proceeds would be, what the gross sales proceeds would be or

10  what the net sales proceeds would be, correct?

11    A.    Well, the gross we -- yes.

12    Q.    There was no purchase and sales agreement.

13    A.    We conceptually -- and we based it on the NOI.

14  The NOI is the 36 million, plus a million.  The PSA came in

15  at 37 million.

16    Q.    Wasn't my question.  My question was, on October

17  13th, 2006, there was not a signed LOI, letter of intent,

18  and there was no purchase and sale agreement.  So on October

19  13th, 2006, there was no way for you and Brian Potashnik to

20  know for sure what gross or net proceeds of a sale would be.

21  Isn't that true, sir?

22    A.    I would agree with that.

23    Q.    Thank you.

24    A.    Three --

25    Q.    Let's go to your testimony --

1          A.    Whether three percent --

2          Q.    You've answered the question.   Thank you.

3                So at your deposition two weeks ago you

4    said retention bonuses, other employees would be identified.

5    That number would also be deducted before my number.   Here

6    you were talking about corporate employees, your earlier

7    testimony.   And that would give the net proceeds number and

8    I would receive three percent of that number, net proceeds

9    number, gross minus normal closing costs, minus other key

10   employees.   And that was where you testified about the

11   beginning date being October 13th, 2006, and the ending date

12   being October 31, 2007.

13               Do you remember that?

14         A.    I remember that.

15         Q.    Okay.   Let's move on.

16               Now, after that, in March of 2007, March

17   14th, 2007, you sent -- you drafted -- don't -- I'm not

18   looking at the script.   This is just what you know.

19         A.    Okay.

20         Q.    On March 14th, 2007, you drafted an amended

21   employment agreement and sent it to Brian Potashnik,

22   correct?

23         A.    At his request, yes.

24         Q.    All right.   And do you remember what that amended

25   employment agreement contained?

1          A.    I know it contained the error -- an error of

2    deducting the other employees.  I don't remember all the

3    other contents to it.

4          Q.    Okay.  So let's look at it.  Let's look at the

5    whole agreement first.

6                So you recognize document Defendants'

7    Exhibit Number 13?

8          A.    Vaguely, yes.

9          Q.    And this was the first attempt by anybody to write

10   down the oral agreement that you allege you made with

11   Brian Potashnik on October 13th, 2007 [sic]?

12         A.    This is the first attempt that was requested for

13   me to make an oral attempt at.

14         Q.    Yeah.  I'm sorry.  It's October 13th, 2006.

15               But this was the first attempt by

16   anybody -- and this was you -- made to write down your

17   alleged oral agreement with Brian Potashnik made on October

18   13, 2006, correct?

19         A.    I don't know.  I can't speak for anybody else.

20         Q.    All right.  This was your first attempt to write

21   down the oral agreement you say you made with

22   Brian Potashnik --

23         A.    That Brian Potashnik --

24         Q.    -- five months before?

25         A.    -- would be, yes.  Yes.

1          Q.    So you call it -- you know, don't say writing down
2    oral agreement.  You don't say new agreement, correct?
3          A.    Correct.
4          Q.    You say amendment to employment agreement.  That's
5    what you called it five months after this alleged oral
6    agreement.  And you start out, This amendment to employment
7    agreement is executed as of the date below, recited by and
8    between Jeffrey W. Carpenter --
9                      Same as the employee in the employment
10   agreement, correct?
11         A.    Yes.
12         Q.    -- on the one hand and Southwest Housing --
13   oops -- Development Company.
14                      That wasn't part of the oral agreement,
15   correct?
16         A.    No.  As I mentioned --
17         Q.    I'm going to take everything after no as being
18   nonresponsive.
19                      Then Southwest Housing Management Company,
20   that was the company defined in the employment agreement,
21   correct?
22         A.    Yes.
23         Q.    And that was your --
24         A.    Wait.
25         Q.    -- employer --

142

1        A.    Pardon me.   Would you mind repeating that

2   question?

3        Q.    Sure.   Southwest Management -- excuse me --

4   Southwest Housing Management Company was defined as the

5   company in your written employment agreement?

6        A.    Yes.

7        Q.    And it was your employer as set forth in your

8   written employment agreement?

9        A.    Yes.

10        Q.    And the next party of this amendment to employment

11   agreement is Affordable Housing Construction, Inc.   And that

12   wasn't a party to your employment agreement, correct?

13        A.    As I mentioned, I made a mistake in tying it into

14   the employment agreement for the three percent.

15        Q.    Okay.   So you made a mistake tying it into the

16   employment agreement.   You made a mistake by adding new

17   parties to this agreement.

18        A.    The three -- the three percent was based on all

19   the companies being sold, plus the assets.

20        Q.    Well, it's interesting, because you didn't mention

21   that when you made a hug deal, bump deal with

22   Brian Potashnik on October 13th that you made it with

23   Affordable Housing Construction and Southwest Development

24   Company as well.   Did you leave that out?

25        A.    He informed me --

143

1    Q.    Did you leave that out --

2    A.    -- that he was selling --

3    Q.    -- is my question.

4    A.    He informed me that he was selling all the

5    entities.

6    Q.    He may have, but did you leave out the part where

7    Brian Potashnik said I am authorized to represent Southwest

8    Housing Management Company, Affordable Housing Corporation,

9    Cheryl Potashnik, Southwest Management Company, and every

10   single partnership, all 55 partnerships that are included in

11   our family of companies and I'm going to bind them in making

12   this oral agreement?  Did you leave that out?

13   A.    Yes, I would say I left that out --

14   Q.    And you're telling --

15   A.    -- expecting it --

16   Q.    And you're telling --

17   A.    -- to come from the other side.

18   Q.    And you're telling this jury that that's what

19   Brian Potashnik said to you on October 13th, 2006?

20   A.    He told me he was selling all the companies and

21   all the property assets.

22   Q.    Right.  But he never said to you that he was

23   authorized and representing Cheryl Potashnik, Affordable

24   Housing Construction, Southwest Housing Development Company,

25   and all of the partnerships that actually owned all the

1    assets that Southwest Housing Management managed.  Isn't
2    that true?
3         A.   He didn't say that.  However --
4         Q.   Thank you.  I'm going to take he didn't say that
5    as the response and anything after --
6         A.   However, that --
7         Q.   -- that as nonresponsive.  That's the only
8    question I asked you, sir.
9              MR. L. FRIEDMAN:  Let's move to the next
10   one.  No, the next paragraph.  I wasn't -- I wasn't clear,
11   Mr. Page.  I'm sorry.  That's what happens when I get
12   excited.  No, you missed a paragraph.
13        Q.   (By Mr. L. Friedman) Then you say in the agreement
14   you wrote, Whereas, employee and employer entered into that
15   certain employment agreement dated February 13th, 2004;
16   signed February 25th, 2004, with employment date beginning
17   March 15th, 2004.  And you defined the employment agreement
18   that you just testified to you made a mistake by including
19   in the title you make that employment agreement a part of
20   this agreement.  Isn't that true, sir?
21        A.   I told you I made a mistake in doing this draft.
22        Q.   Well --
23        A.   As it is just a draft.
24        Q.   Now you made three mistakes.  You included it in
25   the title, you added additional parties, and you

145

1    incorporated the employment agreement into the body of the

2    agreement, correct?

3          A.   Yes, and it was never accepted.

4               MR. L. FRIEDMAN:  Okay.  I'm going to take

5    everything after yes as being nonresponsive, Your Honor.

6               THE COURT:  Okay.  Objection's sustained.

7          Q.   (By Mr. L. Friedman) Then we go to the second

8    whereas.  Whereas, employee and employer entities desire for

9    employee to remain employed by the employer until the

10   employer entities, affiliates, successors or assigns sell to

11   (or merger with or similar transaction) Cascade Affordable

12   Housing and/or its affiliates (Cascade).

13              So five months after you made this alleged

14   oral agreement with Brian Potashnik you believed that your

15   agreement required you to remain employed by employer until

16   the employer entities sells to Cascade.  That was the deal

17   you thought you made, stay employed until the seller sold to

18   Cascade?

19         A.   Yes, with --

20         Q.   Correct?

21         A.   Yes, with the --

22         Q.   Thank you.

23         A.   -- proper time frame.

24              MR. L. FRIEDMAN:  I take everything after

25   yes as being nonresponsive.

Appendix 001277

146

1                   THE COURT:   Sustained.

2                   Limit your response to his questions,

3     Mr. Carpenter.

4          Q.   (By Mr. L. Friedman) But then it goes on.  It says

5     the employer entities' interests in the partnership projects

6     and/or assets to be sold, as defined in the letter of intent

7     dated October 16th, 2006, or the sale of employer entities,

8     affiliates -- or the sale of employer entities, affiliates,

9     successors or assigns, plus any furniture, fixtures, and

10    equipment owned by employer.  That's an add-on, correct?

11    That's new.

12                  Plus any furniture, fixtures, and equipment

13    owned by employer.  That's a new term, correct?

14         A.   He said he's selling everything, so...

15         Q.   But you just added that to be sure, right?  It

16    wasn't on the board this morning, right?

17         A.   No, I did not break it out --

18         Q.   Okay.

19         A.   -- on the board this morning.

20         Q.   So that's a new term.

21                  It says -- then it says, Or the sale to,

22    merger or similar transaction with any other company or any

23    individual other than Cascade by employer.  That means that

24    not only did you want everybody to pay you upon a sale with

25    Cascade, but in addition you wanted to be paid on the sale

Appendix 001278

1    to, merger or similar transaction with any other company in

2    the world.  If the Cascade deal didn't go through and the

3    sale was to any other company in the world, you still wanted

4    to get paid.  Now surely you'll agree that's a new term?

5         A.   If Cascade didn't close and another company was

6    selected, I wanted the same terms.

7         Q.   Okay.  Forever.

8         A.   As agreed upon.

9         Q.   Forever.

10        A.   As agreed upon.

11        Q.   No, forever.  There's no limit to that clause,

12   correct?  It doesn't end in a year, doesn't expire on its

13   own terms.  That's forever.  And no matter how big Southwest

14   companies get, correct?  That's what it says, right?

15        A.   That's what it says.

16        Q.   Thank you.

17                  And that wasn't agreed to on October 13,

18   2006.  That's a new term.

19        A.   The company details were not presented --

20        Q.   I can't hear you.  I just can't hear you.

21        A.   I said the company details were not presented to

22   me, so --

23        Q.   Well, that's a new term.

24        A.   -- you're correct.

25        Q.   Thank you.

1           MR. L. FRIEDMAN:  Let's go to the next one.

2      Q.   (By Mr. L. Friedman) Paragraph 2 of your

3   employment agreement you say, In addition to his consistent

4   compensation under the agreement -- which you've defined as

5   your employment agreement -- employee will be paid on the

6   closing date of the sale (and as recorded/identified in any

7   purchase, sale, merger or similar type of agreement and

8   recorded at the title company for the sale) from the

9   employer entities -- again, encompassing a whole bunch of

10  companies -- a compensation in the amount of three percent

11  minimum.

12          Now it's three percent minimum.  Didn't say

13  three percent minimum this morning.  Did you leave that out?

14     A.   Three percent is three percent.

15     Q.   But it's not three percent minimum.  Three percent

16  minimum means that you could get more.

17     A.   Well, initially, I bargained for more and lost

18  that --

19     Q.   Sir --

20     A.   -- argument.

21     Q.   -- you didn't have an agreement for a minimum of

22  three percent.  Your alleged agreement was three percent.

23  So this document you were trying to get Brian Potashnik or

24  whoever to sign certainly wasn't accurate and certainly had

25  additional and different terms, correct?

149

1       A.    Wasn't trying to get them to sign.  I was just

2  trying to move the process along.

3       Q.    Okay, you call it move the process along, but I

4  call it it has additional and different terms.  Do you agree

5  with that?

6       A.    I'll acquiesce to it.

7       Q.    Thank you.  I'll take that as agreement.

8             Three percent of the compensation played --

9  paid to the employer entities.  Now I have without deduction

10  for any compensation paid to any other employees of any of

11  the employment [sic] entities.  So --

12       A.    Absolute error.

13       Q.    -- here I've got minus closing costs and minus

14  severance bonuses, minus severance bonuses you testified to

15  under oath.  And here you testified to under oath this

16  morning and at your deposition two weeks ago.  And here,

17  five months after the alleged oral agreement, your alleged

18  agreement is without deduction for any compensation paid to

19  any other employees of any of the employer entities.

20  Meaning every Southwest entity, including the partnerships

21  or affiliated entity.  You're talking about 50 or 60

22  different entities, correct?

23       A.    There was 55 --

24       Q.    Pardon me?

25       A.    -- yeah.

150

1        Q.    Pardon me?

2        A.    Yes.

3        Q.    Okay.

4              And compensation provided in this paragraph

5    shall be paid to employee whether or not he remains an

6    employee of employer through the date of the sale.  So I'm

7    assuming by that time you knew that you were not going to be

8    employed through the date of the sale and that's why you put

9    that in there, correct?

10       A.    Yes.

11       Q.    Okay.  That was a yes?

12       A.    Yes.

13       Q.    All right.  So that's a new term.

14       A.    And that's --

15       Q.    That's a new term.

16       A.    -- the big error that I admitted to.

17       Q.    Say that again.

18       A.    I said, And that's the big error that I admitted

19   to.

20       Q.    Okay.  So that's a new term.  Whether or not you

21   remain an employee of employer through the date of the sale,

22   that's a new term.  You didn't testify to that this morning,

23   correct?

24             (No verbal response)

25             Mr. Carpenter, some of these questions are

Appendix 001282

1    easy.  You didn't testify to that this morning?

2                    (Witness is reading the screen)

3        A.    In reality, the sale took place much after.

4        Q.    Sir, that wasn't my question.  My question was,

5    when I asked you what the ingredients were for your alleged

6    oral agreement, you didn't tell me about that this morning.

7    You didn't tell the jury about that this morning, correct?

8        A.    Uh-huh.  Very simple.  I'm keeping it simplified,

9    yes.

10       Q.    Okay.  You didn't testify to it when you had all

11   the time in the world at your deposition on January 18th,

12   2018, correct?

13       A.    Correct.

14             MS. GIBSON:  Jeff, will you pull your mike

15   in toward you so we can hear you better, please?

16                    (Witness complied)

17       A.    Correct.

18             MS. GIBSON:  Thanks.

19             THE WITNESS:  Sorry.

20             MR. L. FRIEDMAN:  Let's move on.

21       Q.    (By Mr. L. Friedman) Then on the amendment to

22   employment contract that you drafted, Additionally, the

23   employer entitles -- I'm sorry -- Additionally, the employer

24   entities also acknowledge that employee is to be paid

25   compensation for unpaid and past-due earnings of income

1    compensation (including wages and bonuses) in the amount of

2    $600,000.

3              Now, this morning you testified there was

4    no agreement regarding earned bonuses on October 13th, 2006.

5    Did you make a different agreement with Mr. Potashnik

6    between October 13th, 2006, and March '07 when you wrote

7    this amendment supposedly to reflect your oral agreement?

8    It's a yes-or-no question.

9    A.   Yes.

10    Q.   Okay.  You're claiming there were two oral

11    agreements now; is that right?

12    A.   I'm sorry.  You confused me.

13    Q.   All right.  Maybe I confused myself.

14              This morning when I asked you about unpaid

15    bonuses under your employment contract, you said there was

16    no agreement regarding unpaid bonuses on October 13th, 2006.

17    Do you remember that testimony?

18    A.   Yes.

19    Q.   I wrote it down.

20              Now, five months later, on March 14th,

21    2007, you add a term that says you're claiming 600,000 from

22    the period of March 15th, 2004, through March 14th, 2007.

23    That's a new term that wasn't included in the alleged oral

24    agreement you made with Brian Potashnik on October 13th,

25    2006, correct?

153

1        A.    That is the information that I submitted on March

2    14, 2007, to be reviewed and discussed.  So I had that

3    attachment, so that's the number that I used for discussion

4    purposes.

5                MR. L. FRIEDMAN:  I'm going to object to

6    that as being nonresponsive.

7                THE COURT:  Try and limit your response

8    just to the question he's asking.

9        Q.    (By Mr. L. Friedman) Here's my question.  That's a

10   new term, correct?

11       A.    Which is a new term?

12       Q.    You're asking for $600,000 bonus, but that was

13   never agreed to by Mr. Potashnik, correct?

14       A.    Not at the time.

15       Q.    Okay.  At the time you asked for the $600,000 in

16   bonus.  According to the Paragraph 4b of your employment

17   contract, that was not agreed to by Mr. Potashnik, correct?

18       A.    Not at that time.

19       Q.    And, in fact, you're asking for it for the period

20   of March 15th, 2004, through March 14th, 2007.  But at that

21   point you already knew you had received your $50,000 bonus

22   for the year 2004 to 2005.  Isn't that true, sir?

23       A.    Yes, it is.

24       Q.    So you were double dipping, correct?

25       A.    I don't recall so.  So it's an error.

1     Q.    It's another error?

2     A.    If so.

3     Q.    Okay, chocked full of errors.

4     A.    Again, a draft.

5     Q.    Okay, it's a draft of errors.

6           This amount is to be paid as follows:

7     150,000 to be paid by March 31st, 2007.  That was

8     three-and-a-half weeks later, correct?

9     A.    Yes.

10    Q.    As a sign of good faith as employee's immediate

11    financial need is urgent and the remaining 450 -- 450,000 to

12    be paid at the closing of the sale (and as

13    recorded/identified in the purchase, sale, merger or similar

14    type agreement and recorded at the title company for the

15    sale).

16          That wasn't agreed to by Mr. Potashnik.

17    That's a new term.

18    A.    There's no official guideline.  I put that in

19    there, yes.

20    Q.    Yeah.

21          In the event that the sale from the

22    employer entities to Cascade does not happen, the balance

23    due to employee would be paid out within 30 days of the

24    cancellation of any transaction agreement, written or

25    verbal, with Cascade.  The compensation provided in this

155

1    paragraph shall be paid to employee whether or not he

2    remains an employee of employer through the date of the

3    sale.

4              So all of that is something new and

5    different that you shoved in there that was not agreed to on

6    October 13th, 2006, correct?

7        A.   It was a suggestion, yes.

8        Q.   Yeah, suggestion.

9              So you weren't only trying to write down

10   this alleged oral agreement, you were now negotiating with

11   Mr. Potashnik for a different deal, correct?

12       A.   Not for a different deal.  Just trying to con --

13   clear up and confirm our deal --

14       Q.   Well --

15       A.   -- more clearly.

16       Q.   -- you didn't have a deal for the 600,000,

17   correct?  You said that already.

18       A.   Yeah.

19       Q.   And you didn't have the deal --

20       A.   Nor did I not have it either.

21       Q.   Well, you weren't 10 feet tall that day, were you?

22       A.   No.

23       Q.   And you're not going to be, right?

24       A.   But I wasn't told no either.

25       Q.   Okay, well, you might be.

156

1           You never got this agreement signed, back

2      signed, did you?

3           A.    No, sir.

4           Q.    You never got a counter proposal, did you?

5           A.    No, sir.

6           Q.    All right.  The employer entities, jointly and

7      severally, hereby irrevocably and unconditionally guarantee

8      the payment to employee of the sums provided in numbered

9      Paragraph 2 hereof.

10               So you wanted Mr. Potashnik,

11     Cheryl Potashnik, and the other Southwest entities to

12     guarantee you $600,000; a hundred fifty thousand to be paid

13     three-and-a-half weeks later, unconditionally, irrevocably,

14     whether or not you remained an employee through the date of

15     the sale.  That's what you're asking for?

16          A.    Yes.

17          Q.    And even including a bonus for the year that you'd

18     already been bonused, correct?

19          A.    Yes.

20          Q.    And you'll agree with me none of this is reflected

21     in the alleged oral agreement that you made with

22     Mr. Potashnik?  You have to say it.

23          A.    Correct.

24          Q.    Thank you.

25               MR. L. FRIEDMAN:  Go to the next one.

1          THE COURT:   You've got about two minutes
2    before the next afternoon break.
3          MR. L. FRIEDMAN:   We can take a break.
4          THE COURT:   We'll take our next 10-minute
5    break, ladies and gentlemen, our first 10-minute break of
6    the afternoon.
7          (The jury exited the courtroom.)
8          (Recess taken)
9          (The jury entered the courtroom.)
10          THE COURT:   Welcome back.   Good afternoon,
11   ladies and gentlemen.
12          We'll continue with Mr. Carpenter's
13   testimony.   The attorney asking questions is Mr. Friedman.
14   We'll ask him to pick up where he left off.
15      Q.    (By Mr. L. Friedman) Mr. Carpenter?
16      A.    Yes.
17      Q.    Have you ever testified under oath that you made
18   this oral deal with Brian Potashnik on May 6th, 2006?
19      A.    I may have messed up the date and said May 6.   It
20   was the initial -- I may have used the wrong date.
21      Q.    Well --
22      A.    I'm not sure.
23      Q.    -- let me ask you a better question.   When I took
24   your deposition on March 16, 2010, did you testify that you
25   made your alleged oral deal with Brian Potashnik on March

1   16th, 2010?

2                    THE COURT:  I think you messed up the

3   dates, though.

4                    MR. L. FRIEDMAN:  I'm sorry.

5        Q.   (By Mr. L. Friedman) When I took your deposition

6   on March 16th, 2010, did you testify that you made your

7   alleged deal with Brian Potashnik on May 6th, 2006?

8        A.   I may have.  I don't recall.

9        Q.   And at that time, sir, did you testify under oath

10  that the deal was based on a $30 million -- $37 million

11  gross sales price?

12       A.   As I mentioned --

13       Q.   It's yes or no.

14       A.   Yes, 37 million.

15                   MR. L. FRIEDMAN:  Let me play the

16  deposition, Your Honor.

17                   THE COURT:  Okay.

18                   MR. L. FRIEDMAN:  It's the first

19  deposition.  Page 52, Lines 10 -- I'm sorry.

20                   MS. GIBSON:  He said yes.  He said yes.

21                   MR. L. FRIEDMAN:  He said he doesn't

22  remember testifying that on March 16th, 2010 --

23                   MS. GIBSON:  Oh, that one.

24                   THE COURT:  That's all right.  Go ahead.

25                   MS. GIBSON:  That's okay.

1              MR. L. FRIEDMAN:  Page 251, Line 10, to

2      252, Line 19.

3              (Video playing)

4      Q.    "Mr. Carpenter, when did you reach an agreement

5      with Mr. Potashnik and starting at three percent

6      compensation on the so-called sale of the general

7      partnership properties?"

8      A.    "It was in the time frame of May -- I believe May

9      of '06 at lunch at Cafe de Brazil, I believe."

10     Q.    "And can you describe what was said?"

11     A.    "Well, it was following up.  We have several

12     different offers.  Discussed what we want to do.  The key

13     ingredient in promoting this, you know, development

14     construction.  You know, they're pretty much done."

15              "You're going to be the face of the

16     company.  You'll be meeting with -- doing the property

17     tours.  You'll be doing, you know, actually, due diligence

18     in selling of the company and so forth.  And you're --

19     you're a key proponent of why we're in the position to sell

20     the company, and with that we'd like to compensate you three

21     percent of the sales price.  And there was a stipulation

22     with that, and that was less normal closing costs; which I

23     estimated was close to, basically, a million dollars 'cause

24     I think at the time we said the offer was 37 million."

25     Q.    "What was your response?"

1      A.   "I was -- I was pleased with that knowing that we

2  still had unresolved issues with the -- you know, for my

3  agreement.  But would liked to have had more.  I know I

4  contributed a great deal but I was -- I was comfortable with

5  it."

6      Q.   "Did you accept his offer?"

7      A.   "Yes, I did."

8           (Video ended)

9      Q.   (By Mr. L. Friedman) Mr. Carpenter, do you

10  remember that testimony?

11      A.   Vaguely and do now.

12      Q.   And do you remember that it was your lawyer,

13  Doug Haloftis, that did the examination, not me?

14      A.   I really don't recall.

15      Q.   Your lawyer was asking those questions, not me.

16  And in response you said three percent compensation on the

17  so-called sale of the general partnership, the general

18  partnership.  You said lunch at -- during lunch at Cafe de

19  Brazil.  Three percent compensation of the sales price, less

20  normal closing costs.

21           At the time you estimated it at $1 million

22  and you said nothing about adding or subtracting employee

23  bonuses.  Remember that?

24      A.   I made that mistake, yes.

25      Q.   Another mistake.

161

1        A.    I made that mistake, yes.

2        Q.    And, Mr. Carpenter, this October 13th, 2006

3   meeting happened at a different cafe, didn't it?

4        A.    Yes.   It was Cafe Express.

5        Q.    Okay.   So this one was Cafe Express.

6        A.    Got the restaurants wrong.

7        Q.    And March 16, alleged oral agreement, Cafe de

8   Brazil, no mention of employee severance, 37 million.   It's

9   a little different than what you testified to this morning,

10  isn't it, Mr. Carpenter?

11       A.    A little bit.

12       Q.    And you said this was mistake.   Cafe de Brazil

13  alleged oral agreement was a mistake?

14       A.    Yes.   It was Cafe Express.

15       Q.    And when you gave your deposition in 2010 that was

16  actually three-and-a-half years after you were terminated by

17  Southwest Housing Management, correct?

18       A.    Yes.

19       Q.    And it was eight years ago?

20       A.    Yes.

21       Q.    So you would think that your memory would have

22  been better about these events eight years ago than it is

23  today?

24       A.    My homework is a lot better today than it was back

25  then.

1          Q.    Wasn't my question.   My question is you would

2     think that your memory of this great event was better

3     three-and-a-half years after the so-called alleged agreement

4     with Mr. Potashnik than it would be today.

5          A.    You could assume that.

6          Q.    Isn't it true, sir?

7          A.    Yes.

8          Q.    Okay.

9                So then the next event comes when you send

10    an Email on November 15, 2007.

11               MR. L. FRIEDMAN:   No, let's see the whole

12    Email, please.

13         Q.    (By Mr. L. Friedman) And this is an Email you

14    send --

15               MR. L. FRIEDMAN:   Let's do the two and

16    the -- yeah.

17         Q.    (By Mr. L. Friedman) -- from Jeffrey Carpenter.

18    And that's your Email address, correct?

19         A.    Yes.

20         Q.    And dated Thursday, November 15th, 2007, at

21    7:37 a.m., to Cheryl Potashnik and Brian Potashnik of

22    southwesthousing.com, correct?

23         A.    Yes.

24         Q.    Okay.  So --

25               MR. L. FRIEDMAN:   What exhibit is this,

Appendix 001294

1    Mike?

2                    MR. DONOHUE:   24.

3                    MR. L. FRIEDMAN:   Defendants' Exhibit 24.

4    Do we need to have this admitted?

5                    MR. DONOHUE:   Same if given to the jury.

6    Yes.

7                    MR. L. FRIEDMAN:   Your Honor, I'd move for

8    admission of Defendants' 3 and 24.

9                    THE COURT:   Any objection?

10                   MS. GIBSON:   What are they?

11                   MR. L. FRIEDMAN:   This is 24.

12                   Brian says it's 13.

13                   MR. DONOHUE:   I'm sorry, Your Honor.  It's

14   13.

15                   MR. L. FRIEDMAN:   Brian's right.

16                   MS. GIBSON:   No, not to 24.

17                   THE COURT:   Twenty-four is admitted.

18                   MR. L. FRIEDMAN:   That's your copy.

19                   MS. GIBSON:   Okay.  Thanks.

20                   MR. L. FRIEDMAN:   Thirteen is the amendment

21   to employment agreement.

22                   MS. GIBSON:   Yeah, that's fine.  No

23   objection.

24                   THE COURT:   Thirteen is admitted.

25        Q.    (By Mr. L. Friedman) So you send this Email --

```
1           A.    Pardon me.   Pardon me.

2           Q.    I'm sorry.

3           A.    Pardon me.   Do you have an extra copy, by any

4     chance?

5                       MR. L. FRIEDMAN:   Yeah?

6                       MR. DONOHUE:   Yes.

7                       MR. L. FRIEDMAN:   May I approach,

8     Your Honor?

9                       THE COURT:   Certainly.

10          Q.   (By Mr. L. Friedman) I'm handing you Defendants'

11    Exhibit 13 -- I'm sorry -- 13 and 24.

12          A.    I'll try to look a little closer.

13          Q.    That's all right.

14                      We're on this Email, November 15th, 2007.

15          A.    Okay.

16          Q.    And --

17                      MR. L. FRIEDMAN:   Can I see the whole thing

18    first?

19          Q.   (By Mr. L. Friedman) Okay.   And then we're going

20    to go in the middle of the first full paragraph.

21                      MR. L. FRIEDMAN:   Well, let me see the

22    first paragraph.   Can you do the whole first paragraph?

23    Yeah, perfect.   Let's do it a little higher, if you don't

24    mind.   Yeah, perfect.

25          Q.   (By Mr. L. Friedman) So first full paragraph
```

165

1    starting, one, two, three, four, five,six, seven, eight,

2    nine lines from the top, sentence on the right-hand side you

3    write "last year".  You follow me?

4         A.   Yes, sir.

5         Q.   So you write, "Last year, after the Cascade

6    transaction was announced and it became reasonably clear

7    that I would not be retained after closing of that

8    transaction, you implored me to stay with the company

9    through that time," -- through the closing, right?  You have

10   to answer verbally.

11        A.   The closing as we knew it at that time, yes.

12        Q.   All right.

13             -- "as that continuity and my continued

14   services were essential to the success of that transaction."

15             this was your writing, right?

16        A.   Yes.

17        Q.   In exchange, you informed me that I would be

18   entitled to receive at three percent of the proceeds of the

19   transaction, net certain costs, which based on the structure

20   at that time would represent an amount in excess of

21   $1 million.  This is in addition to the unpaid annual

22   bonuses.

23             So this explanation is a little different

24   than your other explanations of this three-percent proposed

25   bonus, correct?

1        A.    Yes.

2        Q.    And in this Email your understanding of your deal,

3    alleged deal with Mr. Potashnik, was that you would have to

4    stay through the closing.   'Cause it says in exchange for

5    staying through the closing you would get three percent of

6    the proceeds, et cetera.   That was your understanding when

7    you wrote this Email, correct?

8        A.    Yes.   Poor language --

9        Q.    Okay.

10       A.    -- but yes.

11       Q.    Yes, poor language.   Thank you.

12              So let's go and see what you have attached

13   to this Email.   So attached to this Email you prepared a

14   document called separation agreement.   Am I right?

15       A.    Yes.

16       Q.    Okay.   This is another document you prepared on

17   November -- or -- and sent to the Potashniks November 15th,

18   2007.   It's a week after you were terminated, correct?

19       A.    Two weeks.

20       Q.    All right.   Two weeks after you were terminated.

21   Approximately, two weeks.   And, certainly, if you had an

22   oral agreement with Mr. Potashnik you'd know what that oral

23   agreement was two weeks after the agreement, correct?

24       A.    Yes.

25       Q.    Okay.

Appendix 001298

1          So in this separation agreement that you

2     prepare it says the separation agreement -- and you define

3     that as agreement -- is entered into by and between

4     Southwest Housing Management, Affordable Housing

5     Construction, and Southwest Housing Development, their

6     affiliates, subsidiaries, parents, partners, assigns and

7     related entities which are collectively referred to herein

8     as the company.   These are new entities again that you're

9     now defining as the company, correct?

10         A.    Yes.

11         Q.    And Brian Potashnik and Cheryl Potashnik (together

12    referred to herein as the Potashniks), on the one hand, and

13    then Jeff Carpenter, who is you, would be the employee,

14    correct?

15         A.    Yes.

16         Q.    Let me just take an aside.   You have testified

17    previously under oath that you never made an agreement with

18    Cheryl Potashnik, correct?

19         A.    I don't recall if I did or did not, quite

20    honestly.

21         Q.    You've testified under oath that Cheryl Potashnik

22    never agreed to anything, bonus, salary, severance, anything

23    with you.   Didn't you?

24         A.    I do not recall that.

25         Q.    Okay.   Well, let's take a minute.

1              MR. L. FRIEDMAN:  Can you find that?

2         A.    Perhaps so.

3         Q.    (By Mr. L. Friedman) All right.  Let's come

4    back -- I have that, but let's come back to that.

5              MR. L. FRIEDMAN:  If you wouldn't mind,

6    Mr. Page, finding that.

7         Q.    (By Mr. L. Friedman) Okay.  So now we have who

8    you're proposing the parties to this agreement would be.

9    Let's go to the next -- go down to Paragraph 4.  Now you say

10   the company and the Potashniks acknowledge that employee has

11   earned and is owed unpaid annual wages and bonuses in the

12   amount of $600,000.

13             Did I read that correctly?

14        A.    Yes.

15        Q.    You didn't mean wages, 'cause you'd been paid all

16   your wages, correct?

17        A.    Correct.

18        Q.    And bonuses, we established already you've been

19   paid the 2004/2005 bonus, correct?

20        A.    Yes.

21        Q.    And there was -- there's been no agreement as to

22   any bonuses under the employment contract, correct?

23        A.    Only my suggestions.

24        Q.    Yeah.  And as you said, there's been no agreement

25   as to any bonuses under the employee contract.  You say you

1    have a separate, second, oral agreement with Brian Potashnik

2    as to bonuses, correct?

3         A.   Yes.

4         Q.   What's the date of that agreement?

5         A.   I don't -- I don't know the exact date.  It was

6    after March 14th of '07.  I don't recall off the top of my

7    head.

8         Q.   Let's come back to that.

9              I'm going to put down no wage claim, no

10   claim for bonus under employment contract, separate oral

11   agreement with -- I'll put down BP for Brian Potashnik.  You

12   know that's Brian Potashnik.  Okay, 3:00 o'clock today,

13   separate oral agreement.  So we'll come back to that.

14             So on November 15, 2007, couple, two, three

15   weeks after you were terminated, you say the company and the

16   Potashniks acknowledge that employee has earned and is now

17   owed unpaid annual wages and bonuses in the amount of

18   $600,000.

19             We've now established that you're not owed

20   any wages, correct?

21        A.   Correct.

22        Q.   This amount shall be paid to employee, less

23   applicable withholdings, according to the following

24   schedule:  300,000 shall be paid to employee upon the

25   earliest of the first closing of any of the Potashniks'

1    companies' interests in any project partnerships as outlined

2    in the PSA with Cascade Affordable Housing, LLC, and/or its

3    affiliates; the sale of any land held by the company,

4    including but not limited to the Las Vegas owned community;

5    or December 15, 2007; and 300,000 shall be paid to employee

6    on the earlier to occur of the second closing as outlined in

7    the PSA --

8              PSA is purchase and sales agreement, right?

9    A.    Yes, sir.

10   Q.    -- with Cascade Affordable Housing, LLC, and/or

11   its affiliates or any successor in interest thereto; and

12   February 15, 2008.

13             Now, none of that was agreed to.  All of

14   these are new terms or different terms, correct?

15   A.    Yes, different from --

16   Q.    The alleged oral agreement?

17   A.    Or "the oral agreement", yes.

18   Q.    Okay.

19             Then you go on to say, Provided, however,

20   that the event of the closing of the sale or transfer of the

21   company or any other transaction that results in the sale or

22   transfer of all or a majority of the company's assets, a

23   merger of the company with another entity, or otherwise

24   results in a change in control or transfer of majority

25   ownership of the company, which shall include but expressly

1    is not limited to the second closing of the PSA with Cascade

2    Affordable Housing, LLC, within one year of the date of this

3    agreement -- you define it as transaction -- then all unpaid

4    portions of the amount provided in this paragraph shall

5    become immediately due and payable within seven days of the

6    closing of such instruction.

7                    All of this is new or different from your

8    last oral agreement with Brian Potashnik, correct?

9         A.    Yes.

10        Q.    Okay.

11                   Let's go to the next paragraph.  Now,

12   again, November 15th, couple, three weeks after -- two,

13   three weeks after your termination in 2007.

14                   In addition to the foregoing amounts,

15   employee will be paid within seven days of the date of

16   closing of any transaction defined above an amount in cash

17   equal to three percent of the gross compensation or

18   consideration, whether in the form of cash, stock,

19   assumption of debt, fees, loans or otherwise, for the

20   purchase of the company --

21                   That's all new, isn't it?

22        A.    Yes, it's --

23        Q.    Okay.

24        A.    -- new language.

25        Q.    All right.

1               -- less reasonable costs of closing.  In

2      the event that a transaction is effected that results in a

3      sale or transfer of less than 100 percent of the company

4      outstanding stock or assets, then the gross compensation

5      amount for purposes of this paragraph shall be calculated as

6      if a transfer of a hundred percent of the company being

7      made.

8               Did I read that properly?

9      A.   I don't know.  I lost that last part.

10     Q.   In the event that a transaction is effected that

11     results in a sale or transfer of less than a hundred percent

12     of the company's outstanding stock or assets, then the gross

13     compensation amount for purposes of this paragraph shall be

14     calculated as if a transfer of a hundred percent of the

15     company will be made.

16               You wrote that?

17     A.   Yes.

18     Q.   Sent it to the Potashniks.  They never agree to

19     it, correct?

20     A.   At their request for another draft opinion, yes.

21               MR. L. FRIEDMAN:  That wasn't my question.

22     I object as being nonresponsive.

23               THE COURT:  Sustained.  The question is did

24     they agree to it.

25     Q.   (By Mr. L. Friedman) The Potashniks never agreed

1    to it, correct?

2         A.    Correct.

3         Q.    And these weren't -- these terms in Paragraph 5

4    were not contained in your alleged agreement with

5    Brian Potashnik, correct?

6         A.    No.

7         Q.    All right.

8                Mr. Carpenter, you made no agreement with

9    Brian Potashnik about the sale or transfer of anything less

10   than a hundred percent of the stock or assets of the gross

11   compensation amount for the purposes of the sale of the

12   company; isn't that correct?  These were just added terms.

13        A.    Added terms.

14        Q.    Okay.

15        A.    Playing lawyer.

16        Q.    You're playing lawyer.  You took the time and

17   thought to put into this agreement, correct?  You had to.

18        A.    Google information, yes.

19        Q.    Yeah, but you didn't -- you didn't get these terms

20   from Google information.  You didn't get these terms from

21   Google information.  These are terms that you thought about,

22   wrote down, made a couple of drafts, and then sent it to the

23   Potashniks, correct?

24        A.    I did some research, yes.

25        Q.    Okay.  But one thing you didn't put in here was

1    any mention of severance bonuses paid to the employees,

2    correct?

3         A.   I admitted that the draft is incorrect.

4         Q.   The severance agreement that you drafted is not

5    correct either?

6         A.   I made that same mistake throughout.

7         Q.   Okay.  Severance agreement not correct; the

8    employment agreement not correct, correct?

9         A.   Yes.

10        Q.   November 15th Email not correct, right?

11        A.   Well, I didn't read the whole thing but --

12        Q.   Your formula is not correct.

13                  MS. GIBSON:  And where are you, Larry?

14                  MR. L. FRIEDMAN:  In the middle of the

15   page.

16                  MS. GIBSON:  No, what --

17                  THE COURT:  We're talking.

18                  MS. GIBSON:  The top?  Okay.

19                  MR. L. FRIEDMAN:  After the November 15th

20   Email, middle of the page.

21                  MS. GIBSON:  Okay.  Okay.  Twenty-four?

22                  MR. L. FRIEDMAN:  Right.

23        Q.   (By Mr. L. Friedman) Your expression of your

24   three-percent deal is correct or not?

25        A.   I'm miscuing my own information here.  This --

 1    approximately a million dollars, this is in addition to
 2    unpaid annual bonuses.  So I was including the annual
 3    bonuses to be deducted to get to the million.  It may not be
 4    worded properly but that's the contents.
 5         Q.   A million dollars off of a $37 million gross?
 6         A.   Yes.
 7         Q.   So is that correct or different?
 8         A.   That's correct.
 9         Q.   And is that the same as your testimony this
10    morning?
11         A.   I believe so.
12         Q.   All right.
13              Okay.  Let's move on.  So this part about
14    the gross compensation amount for purposes of this paragraph
15    shall not include [sic] and shall specifically include any
16    amounts paid or for the benefit of the Potashniks, the
17    company, and/or its stockholders in the form of fees,
18    bonuses, severance payments, loans or otherwise, correct?
19         A.   Correct.
20         Q.   And let me go back to you said you never made --
21    you didn't know if you ever made a deal with Cheryl
22    Potashnik.  You didn't know if you made an agreement with
23    Cheryl Potashnik, correct?
24         A.   That's correct.
25         Q.   And that's not what you testified in your

1    deposition.  Cheryl Potashnik was a -- what was she for

2    Southwest Management?

3         A.    We considered her to be the owner.

4         Q.    She was the COO or director or what?  What was her

5    title?

6         A.    Mostly, we -- it was recognized as owner and I've

7    heard COO.  Quite honestly, I didn't know.

8         Q.    Okay.

9               Mr. Carpenter, you were the executive vice

10   president, the senior operating officer of Southwest

11   Management for three-and-a-half years.

12        A.    That's correct.

13        Q.    The only one you reported to was Brian Potashnik;

14   is that correct?

15        A.    That's correct.

16        Q.    All right.  And you're telling this jury that you

17   worked there with Cheryl Potashnik for three-and-a-half

18   years and you don't know what her title was?

19        A.    I believe she testified that sometimes she had a

20   title, sometimes she didn't.  It was COO, as owner.

21   Certainly respected her as being a co-owner.

22        Q.    Sir, I didn't ask you that question.

23               MR. L. FRIEDMAN:  I object as being

24   nonresponsive.

25               THE COURT:  Repeat your question.

1      Q.    (By Mr. L. Friedman) You worked at Southwest

2  Housing Management for three-and-a-half years.  During that

3  period of time, did you learn what Mrs. Potashnik's title

4  was?

5      A.    Co-owner.  And I've heard COO as well.

6      Q.    Let's do it this way.  You know that

7  Mrs. Potashnik was an employee of Southwest Housing

8  Management, correct?

9      A.    At the beginning, yes.

10     Q.    She -- Mrs. Potashnik worked for Southwest Housing

11 Management, correct?

12     A.    I'm not sure if she did the whole entire time that

13 I was there, no.

14     Q.    She worked at Southwest Housing Management

15 in 2007.  She was an employee of Southwest Housing

16 Management in 2004 when you joined the company.

17     A.    That I remember.

18     Q.    She was an employee of Southwest Housing

19 Management in 2005 when you were executive vice president of

20 the company?

21     A.    '5, '6, '7, remembering payroll reports, I don't

22 recall Cheryl being on those.

23     Q.    Okay.  So you're telling this --

24     A.    I may be wrong, but I do not recall Cheryl --

25     Q.    You're telling this jury that you worked there

1   three-and-a-half years and you don't know if Brian or Cheryl

2   were employees of Southwest Housing Management or any other

3   company with the prefix Southwest in front of it; is that

4   right?

5       A.   I knew that they --

6       Q.   I'm just asking you one question.  Was Brian or

7   Cheryl Potashnik an employee of any company that you know

8   of?

9       A.   Yes.   Brian was an employee.

10      Q.   Of what company?

11      A.   He owned all the companies.

12      Q.   And Cheryl was an employee of what company?

13      A.   Of SGL and perhaps the management company, but she

14   was one of the sellers.

15      Q.   Sir, I'm only asking you during the time you

16   worked there you acknowledge that Brian Potashnik was an

17   employee of Southwest Management, Southwest Development, and

18   Affordable Housing Construction, correct?

19      A.   Yes.

20      Q.   And with regard to Mrs. Potashnik you're telling

21   the jury you don't know whether she was an employee of

22   Southwest Management, correct, Southwest Housing Management?

23      A.   I'd say a hundred percent I'm not sure.

24      Q.   Do you know whether she was an employee of any

25   Southwest company during the time you worked there?

1          A.    I believe she was.

2          Q.    And what company was that, sir?

3          A.    I believe she was probably prorated out for all

4     the companies, which would make her, probably, a portion of

5     Southwest Housing Management as well.

6          Q.    Okay.  So to your knowledge Mrs. Potashnik was an

7     employee of all the Southwest companies but at least a pro

8     rata employee of Southwest Housing Management?

9          A.    That would be my assumption.  That's what I

10    recall.

11         Q.    All right.  You don't remember never making any

12    agreement with Ms. Potashnik?

13         A.    I remember having a conversation with her and she

14    said I've earned my bonuses and she agreed with the

15    three-percent --

16              MR. L. FRIEDMAN:  All right, I'm going to

17    object to this --

18         A.    -- agreement.

19              MR. L. FRIEDMAN:  -- as nonresponsive.

20         A.    So, yes, we did --

21              MR. L. FRIEDMAN:  I'm going to object to it

22    all as being nonresponsive.

23              THE COURT:  Repeat your question.

24              He said, yes, they did have an agreement.

25              MR. L. FRIEDMAN:  Okay.  I'm going to play

1    Mr. Carpenter's deposition, Volume 2, second deposition.

2                    MS. GIBSON:  All right.

3                    MR. L. FRIEDMAN:  Page 111, Line 14 to 20.

4    Page 115, Line 21 to 25.

5                    MS. GIBSON:  Whoa, whoa, whoa.  111 what?

6                    MR. L. FRIEDMAN:  111, 14 to 20.

7                    MS. GIBSON:  Uh-huh.

8                    MR. L. FRIEDMAN:  115, 21 to 25.  Or is it

9    23?  116 -- Page 116, 1 to 10.  And Page 151, Lines 3 to 8.

10                    Wait for Ms. Gibson.

11                    MS. GIBSON:  Okay.

12                    MR. L. FRIEDMAN:  Okay.  Go ahead.

13                    (Video playing)

14       Q.    "Cheryl Potashnik wasn't present with your meeting

15    with Brian --"

16       A.    "She was not present, correct."

17       Q.    "-- on October 13th, 2006?"

18       A.    "That's correct."

19       Q.    "Cheryl Potashnik didn't make a valid and forcible

20    agreement with you on October 13th, 2006?  Correct?"

21       A.    "That is correct."

22       Q.    "I want to know from you -- I asked you to list

23    the reasons that you claim you have a lawsuit or have a

24    claim against Cheryl Potashnik."

25       A.    "Cheryl Potashnik is -- is listed -- or CLG is

1   listed as one of the -- or a portion of the sellers, as she

2   received proceeds from the sale as detailed in the

3   Hexter-Fair disclosure memorandum closing document.   I

4   believe it was the -- the last closing."

5        Q.    "Okay.   What else?"

6        A.    "Related documents to the -- legal documents

7   related to the closing."

8        Q.    "Okay.   What other reason is there that you're

9   suing Cheryl Potashnik?"

10       A.    "As advice to counsel."

11       Q.    "Did you, face to face, have an agreement with

12  Cheryl Potashnik where you said, Cheryl, do you agree to be

13  part of the amendment to my employment contract

14  individually?  Did you have that conversation with Cheryl

15  and did she agree?"

16       A.    "No, I did not have that conversation."

17             (Video ended)

18       Q.    (By Mr. L. Friedman) Mr. Carpenter, does that

19  refresh your memory that you never made any oral agreement

20  with Cheryl Potashnik regarding salary, wages, or bonuses?

21       A.    Yes.   The way it was put there, yes.

22       Q.    All right.   Thank you.

23             And to finish up with this Email, at the

24  bottom of your Email you say the attached document is a

25  draft only and that once the substantive points are

1    confirmed I reserve the right to have it formally reviewed

2    by an attorney to confirm it is complete.   That's your

3    language, correct?

4         A.   Yes, ma'am -- or sir.

5         Q.   I'm sorry.   Say it again.

6         A.   I said, yes, sir.

7         Q.   Okay.

8              So on November 15th, 2007, you're sending

9    Brian and Cheryl Potashnik a new deal -- new terms, new

10   deal -- and you're telling them it's only a draft; and once

11   you and the Potashniks agree to the substantive points then

12   you reserve the right to have some lawyer confirm that it's

13   complete, right?

14        A.   Yes.

15        Q.   And the implication is it's not complete, correct?

16        A.   No.   I'm still waiting on the response.

17        Q.   Okay, no response from the Potashniks to this

18   Email for your separation agreement?

19        A.   Well, actually, there was a response saying that

20   they would be look -- reviewing it.

21        Q.   Let me put it differently.   No agreement by the

22   Potashniks to your Email or your separation agreement.   They

23   never agreed to it.

24        A.   That's my version.   No, they never agreed to it;

25   nor did I agree to their version.

183

1    Q.    Did they send you a written version of the

2    separation agreement?

3    A.    Yes.

4    Q.    They sent you -- did they give you a severance

5    agreement for $150,000?

6    A.    They gave me a separate -- pardon me -- I believe

7    it was called a separation agreement.

8    Q.    On November 1st?

9    A.    Yes.

10    Q.    And offered you $150,000?

11    A.    Yes.

12    Q.    And you turned it down?

13    A.    I turned it down because of --

14    Q.    I didn't say because.   You turned it down?

15    A.    Yes, I did.

16    Q.    Because you wanted more?

17    A.    I wanted what I was earned --

18    Q.    You wanted more?

19    A.    I wanted what I was earned and what I was told we

20    had an agreement for.

21          MR. L. FRIEDMAN:  I'm going to object to

22    all of that as being nonresponsive.

23          THE COURT:  Sustained.

24          Limit your response to his question.

25    Q.    (By Mr. L. Friedman) All right, let's move on.

1              You also stuck in a guarantee here.  In

2     order to induce employee to enter into this agreement, the

3     Potashniks jointly and severally, hereby personally and

4     unconditionally, guarantee payment to employee of all

5     amounts provided for herein strictly in accordance with this

6     agreement.

7              Nobody agreed to that.  Not Affordable

8     Housing, not management development, the Potashniks.  Nobody

9     agreed to that?

10         A.   That's correct.

11         Q.   That's something new you put in this agreement?

12         A.   That was one of the things I put in the agreement,

13    yes.

14         Q.   And that was never agreed to?

15         A.   That detail was not in the discussion.

16         Q.   All right.  Let's move on.

17              Now, this is an interesting provision.

18    Paragraph 15 of the separation -- of your separation

19    agreement you put in a no amendment unless it's writing

20    provision; is that correct?

21         A.   It appears that I did.

22         Q.   You put if -- if they agree to this agreement

23    nobody could modify it.  Actually, I'll read the words.  No

24    attempted modification or waiver of any of the provisions of

25    this agreement shall be binding on either party unless in

1    writing and signed by both employee and company.

2                      That's what you wanted in this agreement?

3         A.   If it encompassed --

4         Q.   I'm just asking if you wanted that in the

5    agreement.  That's why you put it in there?

6         A.   If it encompassed the oral and the unpaid bonuses,

7    yes.

8                      MR. L. FRIEDMAN:  Objection, nonresponsive.

9                      THE COURT:  Repeat your question.

10        Q.   (By Mr. L. Friedman) You put this language in your

11   separation agreement because you specifically wanted it in

12   there, correct?

13        A.   Or it was in the template.

14        Q.   If it was in the template or if it was in the

15   Encyclopedia Brittanica or Wikipedia, you took it, you read

16   it, you understood it, and you put it in the separation

17   agreement that you drafted, correct?

18        A.   Yes.

19        Q.   Because you wanted it there, correct?

20        A.   The Potashniks wanted it.

21        Q.   You wanted it there, correct?

22        A.   I had an oral agreement that we're trying to

23   consummate.  So, yes, I --

24                      MR. L. FRIEDMAN:  I'm going to object --

25        A.   -- tried to put it in.

1          MR. L. FRIEDMAN:  -- as being

2    nonresponsive.

3          THE COURT:  Okay.

4          His question is did you want it there.  You

5    can answer yes or no or tell him you can't answer it yes or

6    no.

7          THE WITNESS:  I can't answer it

8    appropriately.

9          MR. L. FRIEDMAN:  All right.  Go to the

10   next one.

11   Q.    (By Mr. L. Friedman) In December of 2007, you

12   decided to sue the Potashniks, correct?

13   A.    Yes.

14   Q.    You didn't tell them that, but you made that

15   decision?

16   A.    I'm not sure if I gave forewarning or not --

17   Q.    All right.

18   A.    -- for everyone.

19   Q.    And in March 11th of 2008, you filed a sworn

20   plaintiff's original petition at the courthouse, correct?

21   A.    If that information's correct, yes.

22   Q.    See the petition.  Whole petition, first thing.

23   This is a copy of the plaintiff's original petition, a

24   petition for temporary restraining order and injunction that

25   you filed March 8th -- I'm sorry -- March 11th, 2008.

1      It says Jeffrey W. Carpenter, plaintiff, versus Southwest

2      Housing Development, Inc., Southwest Housing Management

3      Company, Inc., Affordable Housing Construction, Inc.,

4      Brian Potashnik and Cheryl Potashnik, even though you've

5      never made an agreement with Cheryl Potashnik.

6                      Did I read that correctly?

7          A.   Yes.

8          Q.   And you filed it in County Court at Law Number 5,

9      which is this court, and that's why we're here today.

10         A.   Yes.

11         Q.   Correct?

12                     Now, let's turn to the last page where the

13     verification is, okay.  And on the back of that petition,

14     see where it says verification?

15         A.   Yes.

16         Q.   You swear before a notary public.

17                     MR. L. FRIEDMAN:  Let's go down to the

18     bottom.  Nope, all factual averments.

19                     MR. PAGE:  Right there?

20                     MR. L. FRIEDMAN:  Yeah.  Perfect.

21         Q.   (By Mr. L. Friedman) You swore that all factual

22     statements, averments or statements, contained in Paragraphs

23     20, 21, 22, 25, 26, 27, and 30 through 35 of this document,

24     plaintiff's original petition, are within your personal

25     knowledge and true and correct.

1            You signed it Jeffrey Carpenter?

2       A.   Yes, I signed it.

3       Q.   March 11th, 2008, notarized by Gloria A.

4  Hernandez, correct?

5       A.   Yes.

6       Q.   Before this petition was signed you worked on it

7  with your lawyers at the time, Rogge Dunn?

8       A.   Briefly.  I was in the hospital most of the time,

9  but yes.

10       Q.   You worked on it with your lawyers?

11       A.   Rogge Dunn spearheaded it, yes.

12       Q.   You read this petition before you signed it,

13  correct?

14       A.   I assume, yes.

15       Q.   You understood the petition before you signed it?

16       A.   Yes.

17       Q.   And you swore that the statements in Paragraphs

18  20, 21, 22, 25, 26, 27, and 30 through 35 were within your

19  personal knowledge and true and correct?

20       A.   That's what it says.

21       Q.   And do you know what personal knowledge is?

22       A.   Yes.

23       Q.   What is it?

24       A.   That I'm personally aware of the situation.

25       Q.   Saw it, felt it, heard it, touched it?

1          A.   Right.

2          Q.   Is that your understanding?

3          A.   Yes, sir.

4          Q.   Okay.

5                    So we go to paragraph --

6                    MR. L. FRIEDMAN:   Next paragraph.

7          Q.   (By Mr. L. Friedman) We go to Paragraph 26, one of

8     the paragraphs you swore to.   And it says, When the sale

9     process began, one or more of the defendants agreed to pay

10    plaintiff three percent of the gross sale, less normal

11    closing costs of brokerage fees, attorney's fees related to

12    the sale -- not the criminal case -- title fees and other

13    normal closing costs.   The agreement was made in

14    consideration for, in part, plaintiff remaining an employee

15    of one or more of the defendants to assist in effectuating

16    the sale.   That means closing, doesn't it?

17         A.   Yes.

18         Q.   All right.

19                   Now, that's not the same formula you

20    testified to this morning, is it?

21         A.   No, it's not.

22         Q.   And that doesn't say anything about employee

23    severance or bonuses, does it?

24         A.   That's the part that's missing, yes.

25         Q.   Well, that's one part that's missing.

1        You swore on March 8th -- March 11th, 2008,

2    that that was within your personal knowledge and true and

3    correct.

4        So we have normal closing costs, not the

5    criminal case -- that was a material term that you used at

6    the time -- and stayed till closing.  And nothing about

7    severance bonuses, correct?

8        (No verbal response)

9    Q.    Correct?

10   A.    Yes, from what you just said.

11   Q.    No mention of severance bonus.  Yes.  Exclude

12   criminal case.  I'm just going to put stay period.  End of

13   closing required.

14       And that was the truth or that was what you

15   swore to on March 8 [sic], 2011 [sic], correct?

16   A.    Yes.

17   Q.    Let's see what else was in your petition.

18   Anything else?

19       Let's move on.  Next thing was your

20   deposition, March 16th, 2010, and we've already talked about

21   that.  You said the deal was made on May 6, 2006.  Lunch

22   was -- at a lunch at Cafe de Brazil.  We already talked

23   about this.

24   A.    I believe I said on or about May 6.

25   Q.    Okay, on or about May 6.

1              Let's look at Mr. Carpenter's first amended

2    petition, July 19th, 2013.   Paragraph 22 of your first

3    amended petition, that's five years later.   Approximately,

4    five years later.

5              Paragraph 22 of your first amended petition

6    says, During Mr. Carpenter's employment tenure,

7    Brian Potashnik offered that Mr. Carpenter would receive at

8    least three percent of the net proceeds from the sale of

9    Southwest Housing entities' assets if he would stay on and

10   assist in effectuating the asset sale.   Your words.

11             The net proceeds formula was gross

12   compensation from the sale transaction minus closing costs,

13   the brokerage fees, attorney's fees relating to the sale

14   transaction fees, title fees of the normal closing costs,

15   and any compensation paid from the sale proceeds to any

16   other employees.

17             Now, that's not the same formula that we've

18   seen anywhere else before.   You agree with that,

19   Mr. Carpenter?

20        A.   I agree to the corporate employees.

21        Q.   So it's not the same as any other formula and now

22   says nothing about criminal fees, correct?   Left out

23   criminal fees?

24        A.   Criminal fees was never part of the true formula.

25        Q.   All right, but it was in your sworn petition,

1    right?

2         A.    My attorneys put it in there, yes.

3         Q.    Is that an excuse?

4         A.    Yeah.

5         Q.    You read it, you proofed it, you swore to it.

6    You're blaming your lawyers?

7         A.    Yeah.

8         Q.    Okay.   And I'll go back and write blaming lawyers.

9               And added any compensation paid to any

10   other employees, correct?

11        A.    Yes.

12        Q.    Any comp paid to any other employees.   Okay.

13              MR. L. FRIEDMAN:   Let's go to the next one.

14   Well, show the first page of that.   That was Jeffrey W.

15   Carpenter's first amended petition and then that was

16   Paragraph 22.

17              MR. DONOHUE:   Move these two petitions into

18   evidence.

19              MR. L. FRIEDMAN:   Say it again.

20              MR. DONOHUE:   You want to move -- ask for

21   admittance of these two petitions.

22              MR. L. FRIEDMAN:   Asking for admission of

23   the two petitions.

24              MS. GIBSON:   Your Honor, just like anything

25   else I'd like to admit like that, it's not appropriate,

1    other than to use for impeachment.

2              THE COURT:  Objection's sustained.  We

3    don't admit the petitions or the interrogatories.

4              MR. L. FRIEDMAN:  Note my objection.

5              Your Honor, the original petition was a

6    sworn statement.

7              THE COURT:  We'll take it up.

8              MR. L. FRIEDMAN:  Let's move on.  Let's go

9    to the next one.  I defer to your current wisdom.

10             THE COURT:  Okay.

11       Q.    (By Mr. L. Friedman) On July 22nd, 2013,

12   Mr. Carpenter, you filed a sworn declaration with this

13   court.  Do you remember that?

14       A.    Yes.

15       Q.    Defendants' Exhibit Number 43.

16             MR. L. FRIEDMAN:  May I approach the

17   witness, Your Honor?

18             THE COURT:  Certainly.

19             What number was it?

20             MR. L. FRIEDMAN:  Number 43.

21             I'm handing this to you, Mr. Carpenter,

22   Number 43.

23             Let's show the whole thing and then the

24   signature.

25       Q.    (By Mr. L. Friedman) So this is a document

194

```
 1    entitled Declaration of Jeffrey Carpenter.  Remember this?
 2         A.   Vaguely, yes.
 3         Q.   Well, you prepared this declaration, didn't you?
 4         A.   Yes.
 5         Q.   With the help of your lawyers?
 6         A.   It's been a while.  Yes.
 7         Q.   Okay.  And it's a how-many-page document?
 8    Eleven-page document, right?
 9         A.   Yes.
10              MR. L. FRIEDMAN:  Let's turn to the last
11    page so you can see his signature.
12         Q.   (By Mr. L. Friedman) And you signed this on the
13    last page --
14         A.   Yes.
15         Q.   -- correct?
16              And the paragraph above it says, My name is
17    Jeffrey Wayne Carpenter.  My date of birth is November 2nd,
18    1958.  My address is 7246 Mimosa Lane, Dallas, Texas 75230.
19    And then you say, I declare under penalty of perjury that
20    the foregoing is true and correct.  Executed in Dallas
21    County, Texas, on the 22nd of July, 2013.
22              And then is that your signature above the
23    printed letters Jeffrey W. Carpenter?
24         A.   That is my signature.
25         Q.   Okay.  So you swore under penalty of perjury
```

1    everything in this declaration was true and correct?

2         A.    Yes.

3         Q.    You read this declaration before you signed it,

4    correct?

5         A.    Yes.

6         Q.    You understood it before you signed it?

7         A.    I believe so.

8         Q.    You prepared this declaration, correct?

9         A.    With my attorney's counsel.

10        Q.    So this was not prepared by you but it was signed

11   by you?

12        A.    I think it was a collaborative effort.

13        Q.    So it was prepared by you and your attorney but

14   not signed by your attorney?

15        A.    I can't say for sure, but I believe so.

16        Q.    Refresh my memory who your attorney was at the

17   time.

18        A.    I'm not sure.

19        Q.    All right.

20              Let's look at what -- what you declared

21   under penalty of perjury was true and correct.  Looking at

22   Paragraph 5, try to go through this quickly and just pick

23   out portions.

24              Middle of Paragraph 5 you say, I had

25   further discussions about the details of compensation with

1      Mrs. Potashnik, who explained that Mr. Potashnik normally

2      handled these issues but that she was stepping in because

3      Mr. Potashnik was not available to do it.  Mr. Potashnik and

4      I discussed and agreed -- I'm sorry -- Mrs. Potashnik and I

5      discussed and agreed that there would be a minimal annual

6      bonus, even though she insisted on leaving the word

7      "discretionary" in the phrase "minimum discretionary bonus

8      potential".

9                      That was in connection with preparing your

10     original employment agreement in February 2004, correct?

11          A.    Yes.

12          Q.    Okay.  And that's your language?

13          A.    I don't know about that.

14          Q.    That's your language or your lawyer's language,

15     but you swore it was true and correct under penalty of

16     perjury?

17          A.    I thought you were referring to the discretionary

18     mention in my employment agreement.

19          Q.    Well, this -- these two sentences that I

20     highlighted refers to your negotiations with Mrs. Potashnik

21     leading up to the signing of your original employment

22     agreement.

23          A.    Okay.

24          Q.    Now, is that correct?

25          A.    Yes.

1   Q. And you say under penalty of perjury that you had

2 further discussions about the details of compensation with

3 Mrs. Potashnik, who explained that Mr. Potashnik normally

4 handled these issues; that she was stepping in because

5 Mr. Potashnik Was not available to do it.  Is that true?

6   A. That's true.

7   Q. And then you said Mrs. Potashnik and I discussed

8 and agreed there would be a minimum annual bonus, even

9 though she insisted on leaving the word "discretionary" in

10 the phrase "minimum discretionary potential bonus".  That's

11 correct, isn't it?

12   A. Yes.

13   Q. And you agreed to leave the word "discretionary"

14 in the bonus provision of your original employment contract?

15   A. Not wanting to, but yes.

16   Q. Okay.

17     Let's go to the next paragraph.

18     MS. GIBSON:  And, Your Honor, just for a

19 moment, I think Larry should really only be using this for

20 impeachment.  I'm just -- I don't mind if I get the same

21 consideration.

22     THE COURT:  It's -- you'll get the same

23 consideration --

24     MS. GIBSON:  Okay.

25     THE COURT:  -- if you're talking about this

1    document --

2                    MS. GIBSON:  Okay.

3                    THE COURT:  -- or any affidavit.

4                    Okay, go ahead, Mr. Friedman.

5        Q.    (By Mr. L. Friedman) Paragraph 17 says, The

6    initial offer happened during a meeting at Brian Potashnik's

7    home that I believe took place on May 22nd, 2006.

8        A.    It does not say that.

9        Q.    Well, read that first sentence.

10       A.    It says took place on or around --

11       Q.    I apologize.

12       A.    -- May 22nd, 2006.

13       Q.    I apologize.  I do apologize.

14                   So the declaration that you and your lawyer

15   worked on, correct?

16       A.    Yes.

17       Q.    And I'm assuming you were very candid with your

18   lawyer about the facts in this case?

19       A.    Yes.

20       Q.    So you say the oral agreement occurred on or about

21   May 22nd, 2006, correct?

22       A.    Yes.

23       Q.    The lawyer got that information from you, 'cause

24   your lawyer wasn't there, correct?

25       A.    That's correct.

1          Q.     And your lawyer relied on you giving her truthful

2     information?

3          A.     Yes, and I can verify why.

4          Q.     Okay.

5                 Let's go to the next one.   Paragraph 19

6     says, On or about October 13, 2006, Brian Potashnik and I

7     met at Cafe Express and discussed the sales-related issues

8     and the sales proceeds bonus that I would receive.   He, at

9     this time, had a better handle on the potential sales price.

10    Mr. Potashnik informed me that I would receive a minimum of

11    three percent of the net proceeds, with the net proceeds

12    based on gross compensation from the sale transaction minus

13    closing costs of brokerage fees, attorney's fees related to

14    the sale transaction, title fees, other normal closing

15    costs, and any compensation paid from the sale proceeds to

16    any other employees.   We estimated closing costs -- now it

17    says not to exceed three percent -- of the total sales price

18    and that I would receive around $1,020,000 from the sales

19    proceeds.

20                Did I read that accurately?

21         A.     Yes.

22         Q.     Is that a little different than your prior

23    testimony?

24         A.     Very slightly different.

25         Q.     Yeah, just a little different.

1              Now we have closing costs not to exceed

2       three percent, right?  Did I read that correctly?

3            A.    Yes.

4                 MS. GIBSON:  Yeah, I object to his

5       characterization of what it says.

6                 MR. L. FRIEDMAN:  I'm sorry.  I just didn't

7       hear.

8                 MS. GIBSON:  You're talking about the

9       estimate.  We "estimated" a closing cost --

10                MR. L. FRIEDMAN:  Estimated closing costs

11      not to exceed three percent.  Okay, I stand corrected.

12           Q.    (By Mr. L. Friedman) The estimated closing costs

13      not to exceed three percent is a new term that we've not

14      seen before, correct?

15           A.    I can't say if we have or haven't.  I remember the

16      conversation quite well --

17           Q.    Mr. Carpenter, in all of the previous times you

18      have told this story in these court proceedings you have

19      never before mentioned the term "estimated cost not to

20      exceed three percent"; isn't that correct?

21           A.    I -- I don't believe it's correct.  I believe in

22      some other forms that we have similar language.  But for the

23      most part we say normal --

24           Q.    That's what you're telling the jury today; that

25      you believe normal closing costs means the same as estimated

1    cost not to exceed three percent?

2         A.    That was the discussion that Brian and I had.

3         Q.    And you left that out when I asked you what the

4    terms of your agreement were this morning, right?

5         A.    No, sir.  Again, it was estimated.

6         Q.    Then you said, I asked Mr. Potashnik to put the

7    agreement in writing.  Mr. Potashnik and Randy Alligood, the

8    Southwest Housing attorney, would be putting it together.

9                    Randy Alligood was not the only Southwest

10   Housing attorney, was he?

11        A.    No.

12        Q.    Southwest Housing had dozens of attorneys at that

13   time, correct?

14        A.    Yes, but Randy was the go-to person.

15        Q.    Just wasn't my question.  My question is another

16   lawyer could have been asked to put that in writing if that

17   was the deal.

18        A.    That may be the case but that's what I was told,

19   it was Randy Alligood.

20                    MR. L. FRIEDMAN:  I'm going to object to

21   all of it as being nonresponsive.

22                    THE COURT:  What was your question again?

23                    MR. L. FRIEDMAN:  Another lawyer could have

24   been asked by Mr. Potashnik --

25                    THE COURT:  He said that may be the case.

1   After that it was nonresponsive.

2        Q.   (By Mr. L. Friedman) At the time the specific

3   amount and formula were agreed upon -- well, you've already

4   testified that the specific amount was not agreed upon,

5   correct?  On October 13, 2006, a specific amount that --

6        A.   The formula was --

7        Q.   -- you would get was not agreed upon.

8        A.   The formula was --

9        Q.   Your testimony is that a formula was agreed upon

10  but not a specific amount --

11       A.   That's correct.

12       Q.   -- correct?

13            So that's not accurate.   Somebody misstated

14  that, right?

15       A.   Yes.

16       Q.   Another mistake?

17       A.   Apparently.

18       Q.   Paragraph 19.

19            Okay.  And then it says, Mr. Potashnik

20  again implored me to stay on, claiming that continuity in my

21  continued services were essential to the success of the

22  transaction.  Meaning you're claiming Mr. Potashnik wanted

23  you to stay on through the closing, correct?

24       A.   Yes.

25       Q.   All right.  Let's move on.

203

1                    THE COURT:  We still have another afternoon

2     break.  It depends on how long --

3                    MR. L. FRIEDMAN:  Sure.  This is good.

4                    THE COURT:  We'll take our 10-minute break,

5     ladies and gentlemen.

6                    (The jury exited the courtroom.)

7                    (Recess taken)

8                    (The jury entered the courtroom.)

9                    THE COURT:  Welcome back.  Good afternoon,

10    ladies and gentlemen.

11                   We'll continue with the trial.

12    Mr. Carpenter is our witness; Mr. Friedman is the examining

13    attorney.  And we're going to go 30 more minutes, until 4:35

14    or so, before we stop for the day.

15                   Mr. Friedman.

16                   MR. L. FRIEDMAN:  Yes.  Thank you very

17    much.

18                   Whatever the judge says goes.

19        Q.    (By Mr. L. Friedman) Mr. Carpenter, has there been

20    any other occasions where you've recited a different oral

21    agreement than the one you recited earlier today when I

22    asked you to tell the jury what agreement you made on

23    October -- when you made the agreement and what agreement

24    you made?

25        A.    Not that I'm aware of.

1      Q.    Do you recall filing or sending sworn

2  interrogatory answers to the defendants on August 16, 2013?

3      A.   No, I don't.

4             MR. L. FRIEDMAN:  Let's see if Mr. Page can

5  help me on this one.

6      Q.   (By Mr. L. Friedman) So on August 16, 2013 --

7             MR. L. FRIEDMAN:  I don't have a full

8  screen, Mr. Page.  No discounts if it doesn't have a screen.

9      Q.   (By Mr. L. Friedman) So this is a document

10  entitled Jeffrey Carpenter's Objections and Answers to

11  Southwest Housing Management Company, Inc.'s First Set of

12  Interrogatories.  Do you remember this?

13      A.   I can't say I do.

14      Q.   Okay.  Let's go to the back.

15             MR. L. FRIEDMAN:  Do we have a signature on

16  here?

17             This was signed by Ms. Gibson.  And do you

18  have a signature for -- this was submitted on

19  Mr. Carpenter's behalf.  Okay.

20             Let's go to Interrogatory Number 2 and the

21  answer to Number 2.

22             Do you have the full text, 'cause I don't

23  see a full text?  Would you like me to try the Elmo?

24             Still not complete.

25      Q.   (By Mr. L. Friedman) Okay.  So Interrogatory

1    Number 2, Mr. Carpenter, as you can see, asks you to please

2    give a complete and chronological account of all

3    communications which took place between you, Southwest

4    Housing Management Company, Inc., related to your contention

5    that Southwest Housing Management owes you the amount of

6    $150,000 in owed bonuses as alleged in plaintiff's original

7    petition.  And then there's some objections.  Now let's go

8    down to the response.

9              Good objections.

10             And then in your answer to Number 2 --

11             MR. L. FRIEDMAN:  I still need a full

12    screen.  Can you raise it up so the jury can see it?  Okay,

13    good.  Can you make it bigger?

14             Make it bigger so I can see it.

15             (Pause)

16             MR. L. FRIEDMAN:  Good.  Thank you.

17    Q.    (By Mr. L. Friedman) So in your answer to

18    Interrogatory Number 2 you say, During my employment tenure,

19    Brian Potashnik offered that I would receive at least three

20    percent, at least three percent of the net proceeds from the

21    sale of the Southwest Housing operational units' assets and

22    Ms. Potashnik's and -- Ms. Potashnik's and his partnership

23    interest assets in the apartment communities -- and you

24    define that as sales proceeds bonus -- if I would stay on

25    and assist in effectuating the asset sale -- and that was a

1    new component -- as long as needed.  I accepted the offer

2    and committed to stay as long as needed.  That is, until the

3    management leadership changed or the closing of the asset

4    sale or other date when I was no longer needed.

5                    Mr. Potashnik and I agreed that net

6    proceeds formula was gross compensation from the sale

7    transaction minus closing cost of brokerage fees, attorney's

8    fees related to the sale transaction, title fees, other

9    normal closing costs, and any compensation paid from the

10   sale proceeds of any other employees.  The initial offer did

11   not specify the specific percentage or formula.  The

12   specific percentage and formula were agreed later when

13   Mr. Potashnik had a better handle on the likely sales price

14   for the Southwest Housing assets and his and Ms. Potashnik's

15   Affordable Housing assets, the partnerships that owned the

16   properties.

17                    You see that, sir?

18   A.    Yes.

19   Q.    So that's a lot different than the renditions

20   we've seen, the many renditions we've seen throughout the

21   day.  Do you agree?

22   A.    It's slightly different.

23   Q.    Well, okay.

24                    So let's look at it.  So in your

25   interrogatory response, Interrogatory Response Number 2, you

1      now say at least three percent of net proceeds.

2                          And now we see a new term, "operational

3      units' assets".   What is that?

4           A.    The main companies.

5           Q.    Operational units' assets means the main

6      companies.   And who would those be?

7           A.    Development construction management.

8           Q.    But that term hasn't been used before, correct?

9           A.    No, sir.

10          Q.    And Mrs. Potashnik's and his partnership, is that

11     just a mistake?  Should that be Mr. Potashnik or should it

12     be her partnership interest?

13          A.    It should be Mister.

14          Q.    Okay.   So this is only Mr. Potashnik's partnership

15     interest?

16          A.    Wait a minute.

17                          (Pause)

18          A.    Yes.

19          Q.    Okay.

20                          And what did you mean in this answer when

21     you said partnership interest?  That's new to the equation.

22          A.    That's -- that's individual asset --

23          Q.    You talking about the 50, 60 --

24          A.    The 55 communities.

25          Q.    So that's in addition to the assets of Southwest

1   Management, Southwest Development, and Affordable Housing

2   Construction?

3        A.   Yes, in addition.

4        Q.   So that's new, correct?

5        A.   No.  Just said a different way.

6        Q.   Said a different way.

7             Okay.  I would say it on effectuating the

8   sale for as long as needed.  As long as needed is a new

9   term, correct?

10       A.   It's a new term, but at that time we had a target

11  date, target time frame.

12       Q.   No, but as long as needed was not something that

13  you're alleging Mr. and Mrs. Potashnik agreed.  That's

14  something you unilaterally put in here.

15       A.   I don't believe so.

16       Q.   I mean, there was no -- you didn't meet with the

17  Potashniks after you filed this lawsuit and then entered

18  into some new oral agreement, correct?

19       A.   They asked me to stay on --

20       Q.   Just my question, you never asked and made any

21  other oral agreements, correct?

22       A.   No, I did.

23       Q.   Okay.  So this is a new term that we've not seen

24  before in all of your other renditions of your oral

25  agreement, correct?

1        A.   It's worded differently, yes.

2        Q.   Okay.   For as long as needed.   And I'm going to

3   say worded differently.   And you're going to tell this jury

4   that that means the same as stay through closing?

5        A.   Well, not if we continue to read on I won't.

6        Q.   And then it says, Until the management leadership

7   changed or the closing of the asset sale or other date when

8   I was no longer needed.

9             Mr. Potashnik and I agreed that net

10   proceeds formula was gross compensation for the sale

11   transaction minus closing cost of brokerage fees, attorney's

12   fees related to the sale transaction, title fees of the

13   normal closing costs, and any compensation paid from the

14   sale proceeds to any other employees.

15             Did I get that right?

16        A.   Yes.

17        Q.   Now you want to tell this jury that for as long as

18   needed is a new term or it means the same as stay until

19   closing?

20        A.   Well, it's a what-if scenario until the management

21   leadership changed or the asset -- closing of the asset

22   sale --

23        Q.   Okay.

24        A.   -- or other date.   So it's a moving target, so to

25   speak.

```
 1        Q.    So you'll agree it's a new term?

 2                MS. GIBSON:  I'm sorry.  What did you say?

 3        Q.    (By Mr. L. Friedman) I said, Mr. Carpenter, you

 4    will agree that that's an added term or a different term or

 5    a new term, correct?

 6        A.    A different term, yes.

 7        Q.    All right.  I'll put down a different term.

 8        A.    Or explanation.

 9        Q.    All right.  I'll put down both.

10              Different term, explanation, but it's

11    nothing that you agreed to with Mr. Potashnik.  You didn't

12    have a what-if scenario when you made the alleged oral

13    agreement with Mr. Potashnik, correct?

14        A.    Well, we did have an agreement for me to help

15    assist in closing the sale.  And it -- depending on the time

16    frame, it was going to be either the sales closing or until

17    my time is no longer needed, knowing that I was not going to

18    have a position to go to.  So it was a floating target.

19        Q.    All right.  None of that was agreed to when you

20    had the bump, shake, oral agreement with Mr. Potashnik in

21    October 13, 2006?

22        A.    We had -- we had a targeted frame of closing in,

23    as I said before, in April, May of 2007.  And as we got

24    closer to that it became more of a moving target.

25                MR. L. FRIEDMAN:  I'm going to object to
```

1    the rest of it as being nonresponsive.

2         Q.    (By Mr. L. Friedman) Now, this says initial offer

3    did not specify the specific percentage of formula.  So

4    according to this answer in October of 2006, October 13th,

5    2006, you didn't have a specific formula.  Or is this wrong?

6    Is this a mistake too?

7         A.    No.  What I believe the slide is saying is when

8    Mr. Potashnik told me he was selling the business that we

9    didn't have the details worked out at that point in time.

10        Q.    And so there was no agreement when he told you

11   they were selling -- that you were selling the business --

12   that he was selling the business?

13        A.    That he was selling the business and wanted me to

14   stay --

15        Q.    But there was no agreement --

16        A.    -- and do my job.

17        Q.    -- when Mr. Potashnik first told you he was

18   selling the business?

19        A.    Not on that date, no.  May --

20        Q.    And when was that?

21        A.    May --

22        Q.    You're looking at your script.  Please don't look

23   at your script.  Look at me.  Can you answer without looking

24   at your script?

25        A.    Yes, I can.

212

1      Q.    All right.  Well, what was the date?

2      A.    May 21st, the day after my daughter's --

3      Q.    Okay.

4      A.    -- high school graduation.

5      Q.    Thank you.  Congratulations.

6            But there was no agreement on May 21st,

7      2006?

8      A.    A lucrative bonus program was going to be put in

9      place once we got farther down the road.

10     Q.    Mr. Carpenter --

11     A.    So there was no --

12            MR. L. FRIEDMAN:  I'm going to object --

13     A.    -- there was no --

14            MR. L. FRIEDMAN:  -- to all of this being

15     nonresponsive.

16            THE COURT:  Repeat your question.

17     Q.    (By Mr. L. Friedman) Mr. Carpenter, there was no

18     agreement between you and Mr. Potashnik on May 26, 2006, or

19     anytime prior to October 13th, 2006?

20     A.    May 21st.  Correct.

21     Q.    Because you say the initial offer did not specify

22     the specific percentage or formula, and the specific

23     percentage or formula were agreed later when Mr. Potashnik

24     had a better annual on the likely sales price for the

25     Southwest Housing assets and his and Ms. Potashnik's

1    Affordable Housing assets, the partnerships that owned the

2    properties.

3                   Now, adding the partnerships to this

4    formula is also something new; isn't that correct?

5        A.    It's new for today, yes.

6        Q.    Well, it's new for every time that you have stated

7    what the formula was.  You had never stated that before, had

8    you?

9        A.    Well, they're -- they're selling the partnerships

10   of the assets.  So, again, it's verbiage.

11       Q.    But this is the first time you used that verbiage,

12   correct?

13       A.    The dialogue is appropriate for --

14       Q.    No, I'm just asking about the verbiage, sir.

15       A.    Yes.

16       Q.    It's the first time you used that verbiage?

17       A.    Yes.

18       Q.    Because you're continuing to negotiate with

19   Mr. Potashnik, correct?

20       A.    No, sir, not after --

21       Q.    You were trying to tighten the deal.

22       A.    -- my five -- asking for five percent I was not

23   trying to renegotiate the deal.

24       Q.    Okay.  So what's the date of your asking for five

25   percent, sir?

1          A.     It was the next business day after October 13th.

2          Q.     All right.   So October 14th you were still

3    negotiating, correct?

4          A.     I believe so.

5          Q.     So I'm going to put down here October 14th.

6                 And that was the day you asked

7    Mr. Potashnik for five percent and Mr. Potashnik says no,

8    correct?

9          A.     Yes.

10         Q.     Interrogatories.   Okay.

11                MR. L. FRIEDMAN:   This might be a good

12   place to stop before I get into a new topic.

13                THE COURT:   We'll stop for the day, ladies

14   and gentlemen.   We'll see you tomorrow morning at 9:00

15   o'clock.

16                MR. L. FRIEDMAN:   Thank you, Your Honor.

17                (The jury exited the courtroom.)

18                (End of proceedings)

19

20

21

22

23

24

25

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3         I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12        I further certify that the total cost for the

13   preparation of the Reporter's Record is $1,730.00 and will

14   be paid by Friedman & Feiger, LLP.

15        WITNESS MY OFFICIAL HAND this the 19th day of February,

16   2018.

17

18

19                           /S/ Vikki L. Ogden
                             _____
20                           VIKKI L. OGDEN, Texas CSR# 6309
                             Official Court Reporter
21                           Dallas County Court at Law No. 5
                             600 Commerce Street, Floor 5
22                           Dallas, Tx. 75202
                             (214)653-6443
23                           Certification Expires:  12/31/18

24

25

REPORTER'S RECORD (EXCERPT)

VOLUME 6 of 11

Trial Court Cause No. CC-08-02072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| Plaintiff, | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) | |
| Defendants. | ) | DALLAS, TEXAS |

TRIAL ON THE MERITS

On the 30th day of January, 2018, the following proceedings came on to be heard within the presence of a jury, in the above-entitled and -numbered cause; and the following proceedings were had before the HONORABLE MARK GREENBERG, Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

```
 1                        APPEARANCES:

 2

      MS. AMY GIBSON
 3    SBN 00793801
      Gibson Wiley, PLLC
 4    1500 Jackson Street, Suite 714
      Dallas, Texas 75201
 5    (214)522-2121
      Attorney for Plaintiff
 6
              -AND-
 7
      MR. BRIAN SANFORD
 8    SBN 17630700
      Sanford Firm
 9    1910 Pacific Avenue, Suite 15400
      Dallas, Texas 75201
10    (469)361-9111
      Attorney for Plaintiff
11
              -AND-
12
      MR. LAWRENCE "LARRY" FRIEDMAN
13    SBN 07469300
      MR. MICHAEL DONOHUE
14    SBN 05989380
      MR. JASON FRIEDMAN
15    SBN 24059784
      Friedman & Feiger, LLP
16    5301 Spring Valley Road, Suite 200
      Dallas, Texas 75254
17    (972)788-1400
      Attorneys for Defendants
18
              -AND-
19
      MR. RYAN HALE
20    SBN 24097784
      Hawkins Parnell Thackston & Young, LLP
21    4514 Cole Avenue, Suite 500
      Dallas, Texas 75205-5412
22    (214)780-5138
      Appellate Attorney for Defendants
23


24
      ALSO PRESENT:  Steve Page, A/V Technician
25
```

```
 1                              VOLUME 6

 2    January 30, 2018                                      PAGE

 3    Proceedings ------------------------------------    5

 4
      PLAINTIFF'S
 5    WITNESS:
                           Direct    Cross    Redirect    Recross
 6    Jeffrey Carpenter      --      5, 85      99         136

 7
      DEFENDANTS'
 8    WITNESS:
                           Direct    Cross    Redirect    Recross
 9    Deepak Sulahke         64       78        84         ---

10
      Adjournment --------------------------------------    142
11
      Court Reporter's Certificate ------------------    143
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appendix 001350

```
1                          EXHIBIT INDEX

2
    PLAINTIFF'S
3   NO.              DESCRIPTION        OFFERED      ADMITTED

4   70               Jeff Carpenter's     115          116
                     Notes
5

6

7
    DEFENDANTS'
8   NO.              DESCRIPTION        OFFERED      ADMITTED

9   25               Email                94           95

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

                     P R O C E E D I N G S

                       January 30, 2018

                 (The jury entered the courtroom.)

                 THE COURT:  Welcome back.  Good morning,

ladies and gentlemen.

                 We'll start right into the trial.  When we

stopped yesterday Mr. Carpenter was the witness and

Mr. Friedman was the examining attorney, and we'll ask him

to pick up where he left off.

                 MR. L. FRIEDMAN:  Are these the same

people?

                 THE COURT:  Yeah, same people.  I believe

so.

                 JEFFREY W. CARPENTER,

having been previously sworn, testified as follows:

                 CROSS-EXAMINATION (Cont'd)

BY MR. L. FRIEDMAN:

     Q.   All right.  Yesterday, Mr. Carpenter, we -- I

referred you to a couple of the petitions that you filed in

this case, and I'd like to go back to the second amended

petition that was filed -- or you filed in this case.  Do

you recall Jeffrey W. Carpenter's second amended petition?

     A.   I can't say I recall it, but --

     Q.   But it was filed on your behalf?

     A.   Yes, yes.

1          Q.    Let's go to Paragraph 28.  Now, in your petition
2     you filed, read it, understood before you filed it.
3     Paragraph says, The provisions in the 2004 agreement --
4     assuming referring to your employment agreement -- providing
5     that the employer make decisions in the employer's sole
6     discretion include --
7                    MR. L. FRIEDMAN:  And I redacted,
8     Your Honor, the portion that purports to explain the law in
9     the state of Texas.
10         Q.    (By Mr. L. Friedman) But that's what you wrote or
11    was written on your behalf, an acknowledgement that the --
12         A.    Yes.
13         Q.    -- employer may make decisions in the employer's
14    sole discretion?
15         A.    Yes.
16         Q.    Yes?
17         A.    Yes.
18         Q.    All right.  Now let's go to the third amended
19    petition.  Okay, do you remember the third amended petition?
20         A.    No, sir, but there it is.
21         Q.    Yeah.  Another petition filed by you or on your
22    behalf, correct?
23         A.    Yes.
24         Q.    Okay.
25                    MR. L. FRIEDMAN:  So what was that

1    paragraph, 29?

2                    (Pause)

3                    MR. L. FRIEDMAN:  I'm sorry, 28.

4        Q.    (By Mr. L. Friedman) And, again, you state the

5    provisions in the 2004 agreement providing that the employer

6    may make decisions in the employer's sole discretion

7    include -- then there was a statement of the law that I

8    redacted.  The Court will -- the Court will instruct the

9    jury about the law.  But that was your statement made on

10   your behalf in your petition, correct?

11       A.    Yes.

12       Q.    That the employer may make decisions in the

13   employer's sole discretion, correct?

14       A.    Yes.

15       Q.    Okay.

16                    Now let's go to November 2nd in 2007, your

17   last day of pay right after you were terminated by Southwest

18   Housing Management, the day you recorded -- secretly

19   recorded two conversations with -- one conversation with

20   Brian Potashnik and the other conversation with

21   Cheryl Potashnik.  Which conversation was recorded first?

22       A.    Brian.

23       Q.    All right.  Go ahead.  Let's go to Brian

24   Potashnik's, the transcript of Brian Potashnik's recorded

25   conversation.  And let me call your attention to the

1   highlighted portion on Page 1 where you say, Well, um, I was

2   going to call you last night but, uh, I wanted to talk to

3   you today just to, uh, follow up about, you know, our verbal

4   agreements and so forth.   Keith sent me a separation

5   agreement last night.   Then Brian says, Uh-huh.

6                       Did I read that correctly?  You'll stop

7   me --

8         A.    Yes.

9         Q.    -- if I'm reading it, any of this, incorrectly.

10   Is that acceptable?

11         A.    Yes.

12         Q.    Then going on a couple of boxes down you say, As

13   the deals close, you know, we're -- we're going to make

14   honor on our word, what we said and, you know, as we've

15   talked, that we'll continue to put this in writing.  Well, I

16   get this severance agreement and it basically says I sign my

17   life away for the 30 days and that there's, you know -- that

18   I have nothing to stand on, you know.

19                       And then Brian responds in the same

20   conversation.  He says, Well, I mean, I don't know what to

21   say.  I mean, it's -- I don't even know, other than the fact

22   that our attorneys are requiring us that anybody that's

23   leaving that's getting, uh, paid severance to have that

24   signed.

25                       Did you understand at the time he was

1    referring to the severance agreement that was presented to

2    you?

3         A.    Yes.   And I did not agree with it, but yes.

4         Q.    And that's what Cheryl told me, so I think that's

5    what you're talking about.   Uh-huh.

6               And as far as our agreement goes where we

7    compensate you as we promised, it's going to depend on where

8    we end up in all of this.   You know, I mean, we've got Bank

9    of America calling me right now and telling me they're ready

10   to foreclose on Skyline because there's a $3 million gap in

11   the financing and the property's been performing so poorly,

12   you know.   And that's not to mention, you know, other deals

13   that are getting resized.

14               Do you know what resized is?

15        A.    Yes.

16        Q.    What is it?   What does resized mean?   Will you

17   explain that to the jury?

18        A.    It's where the initial loan -- the amount of the

19   loan, due to various reasons, the property did not perform

20   up to a certain number for the permanent financing.   So

21   there had to be an adjustment made.

22        Q.    Adjustment in the loan?

23        A.    Adjustment in the loan, yes.

24        Q.    Okay.

25        A.    Due to various reasons.

10

```
1        Q.    Say it again.

2        A.    Due to various reasons.

3        Q.    Yeah, due to various reasons.

4              And then it continues.  So we don't even

5   know where we're going to end up in terms of what we end up

6   getting out of this, if anything, you know.  I mean, I don't

7   know how to make a commitment, you know, based on not

8   knowing whether or not, you know, Cheryl and I are going to

9   end up with anything other than being in bankruptcy.  I

10  mean, that's the reality.  Jeff, Cascade still hasn't closed

11  on one deal -- hasn't closed one deal.  And then you say,

12  Uh-huh.

13             Then Brian goes on to say, You know, and

14  when they do close, who knows what the price will be.  Who

15  knows what, you know, it would be since that, um, um, things

16  like Skyline now and Heather Bend --

17             Those are apartment complexes, correct?

18       A.    Yes, sir.

19       Q.    -- and Heather Bend and, you know, Aldine and all

20  these deals that are resizing.  You know, where are we going

21  to end up?  I mean, uh, it's, uh -- it's not a good

22  situation.  I mean, it's not like we're sitting here, you

23  know, sitting on a mountain of cash.  Not to mention the

24  fact, you know, our legal fees have just -- have just been

25  astronomical in defending ourselves and defending the
```

1    company.  And, you know, that's the cost of doing business,

2    Jeff.

3                I mean, there's just no -- there's just no

4    way it can be looked at any other way, you know.  I mean,

5    you know, I didn't go and rob a bank, you know.  This is

6    something that's directly related to the business.  We're

7    trying to negotiate with them now on these, you know, Dallas

8    deals that they think might be tainted and, I mean, it's --

9    it's just a big mess.  You say, Uh-huh.

10                And then Brian says, So, you know, if I

11   don't know where we stand and where we're going to end up as

12   opposed to where -- whether or not we would be bringing an

13   indictment and, you know, Basil telling me done deal, what

14   am I supposed do?  I mean, I don't understand.  What -- what

15   is it I'm supposed to do?  And then you say, Do for me?

16   Brian says, Yeah.

17                So then a couple lines down Brian says, I

18   can't even pay my bills.  I can't, you know -- I'm trying to

19   stay out of bankruptcy.  I have Bank of America calling me

20   now and telling me, you know, they're ready to put the

21   company and me and Cheryl into personal bankruptcy.  I mean,

22   what do you want me to do?

23                I mean, I'm telling you that we're -- we're

24   going to dig ourselves out of this thing and then hopefully,

25   you know, at the end of the day get something out of it from

1    Cascade and get the deal closed and pay the costs that we

2    have to defend ourselves and have money left over so that we

3    can, you know, give you a bonus.  But, you know, I mean,

4    right now nobody's asking and nobody is, you know --

5    everybody understands the situation.  You know, I -- I

6    don't -- I don't know what else to tell you.

7                    I know -- I mean, if you don't want to sign

8    something that you think is detrimental to you in some way,

9    then don't sign it.  But I don't know what else to tell you,

10   you know.  And then you say, Uh-huh.

11                   Does this sound like Brian has a handle on

12   what the final numbers are going to be after the sale?

13       A.    Not -- not a hundred percent, no.

14       Q.    All right.

15       A.    But I believe he had an idea.

16       Q.    I'll take not at a hundred percent as an answer.

17                   Then Brian says, I mean, you have Cheryl

18   and I both committed to you that when things work themselves

19   out there will be a bonus if there's anything there at the

20   end of the day that we have where we can, you know, actually

21   give out bonuses.  And it has to be done, you know, on a

22   level of trust.  And, you know, it would be absolutely

23   impossible to put anything in writing because there's so

24   many moving parts to this.

25                   Did you understand when Brian said that if

Appendix 001359

13

1    things work out there would be a bonus for you, and the "if"

2    meant that if things work out there was no certain

3    commitment when he stated that?  Did you understand that

4    when Brian said there was a condition?  There was no

5    commitment; there was a condition?

6         A.    There was an agreement that we had --

7         Q.    Just wasn't my question.  My question is yes or

8    no.

9               Did you understand when Brian said if

10   things work out that he meant there was a condition

11   precedent to your getting any money?  Things had to work out

12   first; and then if there was money at the end, he and Cheryl

13   would take a look at it.  There would have to be trust and

14   he wouldn't put anything in writing.

15        A.    But they asked me to sign the separation agreement

16   that there wouldn't be.

17        Q.    It just wasn't my question.

18               MR. L. FRIEDMAN:  I object to being

19   nonresponsive.

20               THE WITNESS:  Yeah.

21        Q.    (By Mr. L. Friedman) Did you understand at this

22   point in the conversation --

23        A.    Oh, I understood --

24        Q.    -- they weren't going to make a commitment for any

25   bonus and that the best they could do was give you $150,000

14

1    and then wait and see if things worked out and then at their

2    discretion decide later on to give you anymore money?  Did

3    you understand that that's what they were saying?

4         A.   I understood and did not agree.

5         Q.   Okay.  And you didn't agree but you understood

6    it and disagreed?

7         A.   I understood what they were saying.

8         Q.   And disagreed?

9         A.   And disagreed.

10        Q.   Okay.  Let's go on.

11                  Then you said, Uh-huh.  And Brian said, I

12   mean, that's the reality.  And I don't -- I don't know what

13   else to say other than, you know, it's obvious based on

14   what's going on that that's the situation that we're in.  I

15   mean -- and, you know, it -- it s-u-c-k-s because obviously

16   at this point we thought we'd have everything closed and we

17   would have some money.

18                  So you understood as of November 2nd, 2007,

19   nothing was closed, there was no closing, or everything --

20        A.   I'm sorry?

21        Q.   I'm sorry.

22        A.   I'm sorry.  What date did you say?

23        Q.   As of November 2nd --

24        A.   Okay.

25        Q.   -- 2007, when you secretly recorded these

15

1    conversations, you knew that everything wasn't closed?

2        A.    That's correct.

3        Q.    And Brian and Cheryl had no money from the

4    closing?

5        A.    Correct.

6        Q.    Okay.  Let's go on.

7              You say again, Uh-huh.  Brian says, It just

8    goes on and on.  And then you say, Well, it certainly has

9    definitely not been uncomplicated.  And then Brian says,

10   Well, it's beyond complicated.  It's just a cluster f-u-c-k

11   is what it is.  And that's the whole problem right now.  We

12   just have no idea where this thing is going to, uh, to

13   settle out, you know.

14             And you understood when Brian said he had

15   no idea where this thing was going to settle out that he

16   meant that he didn't know whether there would be any money

17   at the end for him and Cheryl, let alone any money to

18   distribute on a discretionary basis to any other employees?

19   You understood that's what he was saying, even though you

20   may disagree?

21       A.    I disagree but I understand where -- I understand

22   what he was trying to --

23       Q.    Yeah.

24       A.    But I disagree.

25       Q.    And you understood that in this conversation you

16

1   secretly recorded Brian was not making any commitment to

2   you?

3          A.    He failed other commitments, so I didn't believe

4   it.

5          Q.    I just -- I didn't hear.

6                He wasn't making the commitment to you,

7   correct?  You understood he wasn't making a commitment to

8   you in this secretly recorded conversation, correct?

9          A.    If he got paid, I got paid, is what it says.

10         Q.    At his discretion.

11         A.    It didn't say that.

12         Q.    You understood that's what he -- that's what he

13  meant?

14         A.    No.

15         Q.    All right.  So this goes on.

16                Brian says, I mean, you're going to have to

17  talk to her about that because I don't -- I don't see how

18  you can possibly put something like this in writing right

19  now because the way things are, you know.  I mean, why don't

20  you explain to me how it can be done because, you know, it's

21  an impossibility.

22                You understood that the word

23  "impossibility", when Brian said it, meant he could not make

24  a commitment to you at that time?  You understood it but you

25  disagreed with it, correct?

Appendix 001363

17

1        A.    I understood he did not want to.  He certainly
2   could have.
3        Q.    But he wasn't going to.
4        A.    He didn't.
5        Q.    You understood he wasn't going to make a
6   commitment to pay you anything, severance bonus or anything
7   else in the future at the closing.  I mean, there was no
8   question when this conversation finished you didn't have a
9   commitment from Brian Potashnik.
10       A.    Not necessarily.  I don't necessarily agree with
11  that.
12       Q.    You're telling this jury that after this
13  conversation you still thought you had a commitment from
14  Brian Potashnik?
15       A.    Sir, I had --
16       Q.    It's just a yes-or-no question.
17       A.    I disagree.
18       Q.    You disagree that it's yes or no?
19       A.    I disagree with how it's being phrased, and yes.
20       Q.    So Brian then goes on to say, I mean, talk to
21  Sara.  And at this point that's the best we can do.  I mean,
22  there's not going to be anything else because there's no way
23  of being able to memorialize anything that's in that, you
24  know.
25              So at least at this point you understood

18

1    that there was never going to be anything in writing in the

2    form of a commitment to pay you anymore money, correct?

3        A.    That's what he's implying.

4        Q.    No.  You understood from the words Brian used in

5    the conversation that you secretly recorded that he was

6    never going to put anything in writing to commitment himself

7    and Cheryl to pay you anymore money as of November 2nd,

8    2007.  You understood that?

9        A.    In that particular sentence, yes.

10       Q.    Yeah, but you under -- not only from that

11   sentence.  You understood it from the whole conversation.

12       A.    There's other parts of the conversation and also

13   in Cheryl's that says the discussion will continue and we

14   will try to memorialize.  Yes, there is.

15       Q.    So what you're saying to the jury is you left this

16   conversation with the impression that Brian Potashnik was

17   still committed to pay you severance or a bonus at the

18   closing of the Cascade transaction?

19       A.    I felt he was legally obligated and --

20       Q.    That wasn't my question.  My question was, Did

21   Brian -- Brian Potashnik didn't make it clear to you that he

22   was never going to put anything in writing to commit to pay

23   you anymore money in this conversation?

24       A.    He didn't, no.

25       Q.    Okay.

Appendix 001365

1       A.      He did not.

2       Q.      Then you say, Maybe it's just memorializing what

3  you just said.  And Brian says, How do you memorialize when

4  someone says trust me?  You say, Brian, you told me, what, a

5  dozen times we're going to have it memorialized.  And Brian

6  says, With what?

7              Now your answer to that was, What's that?

8  And then Brian says, What?  Memorialize what?  You say,

9  The -- the bonus structure, the current --

10              And Brian says, The bonus structure.  You

11  say, The bonus structure.  And then Brian says, Of what?

12              Now, Mr. Carpenter, wasn't this an

13  opportune time when Brian says "of what" for you to say,

14  Brian, you know we had a deal as of October 16th, 2006,

15  where you promised to pay me?  We have a valid, enforceable,

16  oral agreement where you promised to pay me any one of the

17  combination of -- of alleged oral agreements that you'd

18  testified about during this trial.

19              Wasn't that a perfect opportunity for you

20  to say to Brian Potashnik, Brian, you promised to pay me a,

21  b, c, d, and e, right?

22       A.      It would have been time to reemphasize that.

23       Q.      Right, but you didn't do it.

24       A.      I didn't do it, but there was a clear

25  understanding --

1        Q.    I'll take "I didn't do it".

2        A.    -- what we were talking about.

3        Q.    I'll take "I didn't do it".

4              And then Brian says the bonus structure.

5    And you said, yeah, the bonus structure.  And then Brian

6    says, Of what?  And you didn't say anything.

7              Brian's asked you.  He said, Of what?  What

8    are you talking about?  Wasn't that another opportunity for

9    you to say, yeah, Brian, you know, the deal we made?  We

10   hugged, we bumped, we man bumped.

11             Wasn't that an opportunity for you to say,

12   Come on, Brian, you know the deal we made?  But you didn't

13   do it, did you?

14       A.    Not at that point in that conversation, no.

15       Q.    So Brian goes on to say, We -- we don't know where

16   this thing is going to end up.  I -- that's what I'm

17   going -- that's what I'm trying to explain to you.  We don't

18   know if there's going to be any money to bonus.  I mean, we

19   are completely under water right now.  How can I make a

20   commitment on a bonus when I can't even pay the bills?

21             I mean, I've got Bank of America forcing me

22   into bankruptcy over Skyline.  That's just one deal, you

23   know.  And I'm stuck in litigation with NAPICO, you know.

24   You've got all these other deals, you know, Aldine Bender

25   and, you know, all the tax issues that relate to the

1    exemptions on these deals.  All the, you know,

2    b-u-l-l-s-h-i-t with Charter Mac and now they're, you know,

3    harping about, you know, we don't have any money to resize

4    Heather Bend, you know.

5                    I mean, at the end of the day, you know, we

6    may be in a position where we have to file bankruptcy.  And

7    the only thing that we're going to have to hold onto, if we

8    can even hold onto it, is our house.  Which, we would

9    probably need to figure out a way to sell it or do something

10   just to pay lawyers to keep our freedom.  So how do you

11   memorialize what there is to memorialize?  And your response

12   is, Uh-huh.

13        A.    I listened.

14        Q.    That was another opportunity for you to say but,

15   Brian, we had a deal.  Wasn't it?

16        A.    Brian knew we had a deal.

17        Q.    No, that wasn't my question.  My question was that

18   was another opportunity for you to say but, Brian, you

19   remember on October 16th, 2006 --

20        A.    I did not -- I did not clearly state that.

21        Q.    And you didn't say it.

22                    And, Mr. Carpenter, you were the only one

23   who knew this conversation was being recorded, correct?

24        A.    That's true.

25        Q.    You were the only one who knew you were making a

1  record that was likely to turn up in a court somewhere down

2  the road.  And this was your opportunity to get it on the

3  record, but you didn't do it.

4      A.   I wanted to know why they lied to me about the

5  separation agreement.

6      Q.   You didn't ask that either, did you?  You didn't

7  ask that question, did you?

8      A.   I believe I did.

9      Q.   Well, you show me where you asked it.  But you

10  never asked Brian to confirm --

11     A.   The next sentence, sir.

12     Q.   There's no question.

13          You never asked Brian to confirm this

14  so-called oral agreement that you allege you made on October

15  16th, 2006, did you?  You didn't in this conversation?

16     A.   During this conversation --

17     Q.   All right.  So Brian says --

18     A.   -- implies --

19     Q.   -- well, I guess, you know -- okay, Brian says, I

20  mean, we're trying to dig ourselves out of this thing for

21  everybody's benefit.  But we're so upside down right now and

22  there's so many issues outstanding that we need to get

23  cleared up before we know where we stand; that there's no

24  way that you can put anything like that in writing.  It's

25  impossible.  If we could, we would, but we can't.

1          Then you say, But on the separation
2     agreement I'm supposed to waive everything?  Brian says,
3     I -- I don't know -- I don't even remember that -- I don't
4     even know what it is.  I mean, it's a...
5          And then you say, Well, I didn't either
6     until last night.
7          So neither one of you know what you're
8     talking about at this point?
9     A.    Not true.
10    Q.    Okay.  It says what it says, right?
11         Then Brian says, Well, I guess, you know,
12    Cheryl's been advised that, you know, when employees leave,
13    if they're getting something, you know, if they're getting
14    any severance, that it's something that they need to sign in
15    order to get it.  Okay?  It's a legal issue, you know.  And
16    it's been told to her by the lawyers that, you know, if
17    someone's leaving the company and they're getting a
18    severance that they need to sign it and it's typical.  And
19    if not -- and if it's not, you know, I don't know what else
20    to say.
21         So you say, All right.
22         All right.  Okay.  I agree.  You say, All
23    right.  Then Brian says --
24    A.    I understood what he said.  I didn't agree with
25    him.

24

1          Q.    I'm sorry.  Say it again.

2          A.    I said I understood what he said.  I did not agree

3     with it.

4          Q.    Okay.  So all right doesn't mean I agree.  It just

5     means --

6          A.    It was just something like, yeah, right, just like

7     I said.

8          Q.    It wasn't yeah, right.  It was all right.

9          A.    Same -- same thing.

10         Q.    Okay, same thing.

11         A.    It was acknowledgement of the BS.

12         Q.    It's like stay bonus means severance, right?

13         A.    Yes.

14         Q.    Pay to stay means severance?

15         A.    Pay to stay meant severance or retention.

16         Q.    Right.

17                     And, by the way, nowhere in this secretly

18    recorded conversation, when you were the only one who knew

19    it was being recorded, did you use the term "pay to stay",

20    correct?

21         A.    I may not.  I don't recall.

22         Q.    And nowhere in this conversation on November 2nd,

23    2007, did you use the term "stay bonus", correct?

24         A.    When?

25         Q.    On November 2nd, 2007, the last day you were paid

25

1      by Southwest Housing Management, you didn't use either term,

2      "stay bonus" or "pay to stay", correct?

3          A.   No.  I used our agreement.

4          Q.   Because stay bonus and pay to stay were terms that

5      you made up during the course of this litigation --

6          A.   Not true.

7          Q.   -- to make it sound better.

8          A.   Not true.  Pay stay bonuses is very well published

9      in --

10         Q.   In where?

11         A.   You can Google it.  You can look it up.

12         Q.   No, I want to know where it's well published.

13     Name me one publication.

14         A.   Google it.  There's an article that says

15     pay-and-stay bonuses.

16         Q.   One publication that you can name --

17         A.   Entrepreneurial magazine.

18         Q.   All right, <u>Entrepreneur</u> magazine.  I'm going to

19     look at that.

20         A.   And I believe that's a short article that can be

21     understood.

22         Q.   Okay.  We'll go look.

23              Then Brian says, You know?  I mean, let's

24     see if we can turn some of this s-h-i-t around and make --

25              MR. POTASHNIK:  I'm sorry.

```
 1          Q.    (By Mr. L. Friedman) -- and make --
 2                     MR. L. FRIEDMAN:  Clean it up, man.
 3          Q.    (By Mr. L. Friedman) -- and make some of these
 4     things go away so that, you know --
 5                     MR. L. FRIEDMAN:  Stop saying you know.
 6                     MR. POTASHNIK:  I know.
 7          Q.    (By Mr. L. Friedman) -- we can take care of
 8     Jeff Carpenter.  All right?
 9                     And then you said speechless.  Or maybe you
10     were speechless.  I don't know.
11          A.    Correct.
12          Q.    Then Brian says, Wow.  All I can say is, is that
13     we're doing our best to try to dig ourselves out of this.
14     And until I get some clarity as to where we stand and the
15     fact that we're not going to get in a position of having to
16     bankrupt the company and ourselves personally and lose
17     everything, we'll be in a better position to, you and I,
18     have discussions about bonuses.  But right now, you know,
19     I -- it's not something that we can do if we had the money.
20                     Is there anything about that last
21     sentence --
22                     MR. L. FRIEDMAN:  Go back, please,
23     Mr. Page.
24          Q.    (By Mr. L. Friedman) Is there anything about that
25     last statement by Brian Potashnik that you weren't clear
```

1   about?  See where it says, "I mean"?

2               MR. L. FRIEDMAN:  Yeah, right there.

3        Q.   (By Mr. L. Friedman) Anything about that?

4        A.   I'm sorry.  I don't know where you're looking at.

5        Q.   I don't think that was the last sentence.

6               MR. L. FRIEDMAN:  More on the bottom.  Next

7   page.  "I mean".  See where it says, "I mean"?

8        Q.   (By Mr. L. Friedman) Yeah.  It's impossible.  If

9   we could, we would, but we can't.

10               All right, let's move on to the next one.

11        A.   That wasn't what we were just looking at.

12        Q.   I don't think that was the last one.

13        A.   That wasn't what we were just looking at.  It's

14   the BP there.

15        Q.   Which one?

16        A.   One of them.  I can't see it that far.

17               MR. L. FRIEDMAN:  You just get confused by

18   all the dirty words?

19        Q.   (By Mr. L. Friedman) So Mr. Potashnik says, But

20   right now, you know, it's not something that we can do.

21   It's just not something that we can do if we had the money.

22               All right.  And then you said, Well, I --

23   you know, I certainly understand.

24               You understood.  You agreed with him.

25        A.   I understood the money -- the challenges in the

1      money situation at that time.

2           Q.    Yeah, but what you didn't say was, Brian, that's

3      not acceptable.  I want you -- I am holding you to this

4      so-called, alleged, oral agreement we made on October 16th,

5      2006, and I want you to confirm our agreement.  You didn't

6      say that, did you?

7           A.    No, I didn't.

8           Q.    You didn't say you owe me -- we had a -- you

9      didn't say we had a second oral agreement as to unpaid

10     bonuses.  Remember you testified about that yesterday?

11          A.    Yes, sir.

12          Q.    You didn't say that either.  You didn't say you

13     owe me unpaid bonuses.

14          A.    That's what the topic was about.

15          Q.    Okay.  When was that second oral agreement about

16     unpaid bonuses?  Remember you testified about that

17     yesterday?

18          A.    Yes.  It was after the March 14th and Aprilish

19     time frame, I believe.

20          Q.    Remember you testified yesterday that the bonuses

21     you were seeking were not pursuant to --

22                MR. L. FRIEDMAN:  Did I have a black one?

23          Q.    (By Mr. L. Friedman) -- were not pursuant to your

24     employment contract but they were pursuant to a separate

25     alleged -- second oral agreement you had with Mr. Potashnik?

1    You remember that?

2         A.   Yes, sir.

3         Q.   Okay, so second oral agreement.  And what do you

4    call these bonuses that the second oral agreement is about?

5         A.   Earned, unpaid, annual bonuses.

6         Q.   Earned, unpaid, annual bonuses.  And not for 2004

7    to 2005, correct?

8         A.   Correct.

9         Q.   So we're just talking about 2005 to '6, right?

10        A.   Yes.

11        Q.   2006 to '7?

12        A.   Yes.

13        Q.   And 10 months of 2007?

14        A.   At -- at that point we --

15        Q.   No, you cut off in March.  So it would be April,

16   May, June, July, August, September, October, November.

17   Eight months in 2007?

18        A.   Right.

19        Q.   Okay.  So tell me the date of this alleged oral

20   agreement.

21        A.   Prior to -- it was during the period of March,

22   April time frame.

23        Q.   What year is that?

24        A.   Of '07.

25        Q.   Do you remember the exact date?  Without looking

1    at the script, do you remember the exact date?

2         A.    I don't have it.

3         Q.    What happened to that script?

4         A.    What's that?

5         Q.    What happened to the script?

6         A.    It's here but I'm not looking at it.

7         Q.    Okay.

8                   March, April '07 --

9         A.    On the March 13th notes, Brian -- from Brian's

10   mouth --

11        Q.    No, my only question is, Do you remember the date

12   that you allegedly made this alleged second oral agreement

13   about the earned, unpaid, annual bonuses?

14        A.    Prior to March 14th.

15        Q.    Can I cross out April?

16        A.    Yes.

17        Q.    And I'm going to put prior.  That little mark

18   means prior.  Okay.

19        A.    That's fine.

20        Q.    You good with it?

21                   Prior to March 14th.  But you don't

22   remember the date?

23        A.    It was from discussions prior to March 14th

24   because it was included in the March 14th notice.

25        Q.    Okay.

1                    Do you remember who you made the oral

2      agreement with?

3           A.   Brian Potashnik.

4           Q.   Okay.   Do you remember where you made it?

5           A.   That particular discussion --

6           Q.   Was it one place or ten places or one discussion

7      or ninety discussions?

8           A.   It was previous discussions but it was one

9      discussion where it was laid out, and it was actually during

10     a drive while we were -- Brian was venting or needed to get

11     out of the office and we took a drive together.

12          Q.   And you drove from where to where?  From where to

13     where?

14          A.   We drove by one or two of the properties and we --

15     Brian stopped to get a pack of cigarettes.

16          Q.   Okay.   Drove from the office to which property,

17     sir?

18          A.   Let's see.  I think we went by -- it was out west.

19     I think we went by Ash Creek, I believe.  I'm not a hundred

20     percent sure.

21          Q.   Anywhere else?

22          A.   I believe possibly Scyene.

23          Q.   I'm sorry.  Say the next one.

24          A.   Scyene.

25          Q.   You have to spell that for me.

32

```
1          A.   S-y-c-e-n --

2          Q.   S-y.

3          A.   c-e-n-e.

4          Q.   c-e?

5          A.   c.

6          Q.   e.

7          A.   e-n-e.

8          Q.   n-e.

9                    Anywhere else?

10         A.   Possibly, but those are the two that I recall.

11         Q.   The third one?

12         A.   As I mentioned, I'm not sure.  Those two I recall.

13         Q.   Okay.   Maybe a third?

14         A.   Possibly.

15         Q.   Your car or Brian's car?

16         A.   Brian's Suburban.

17         Q.   Okay.

18                   And what are the words that Brian used that

19    you believe indicated his consent to any bonuses?

20         A.   That we -- that we owe you earned -- we owe you

21    bonuses.  You've earned them.  We can pay your bone -- some

22    bonus monies as developer fees come in as well as monies

23    from the land sale in McKinney, the sale of Fairway, and

24    also from Las Vegas.

25         Q.   And how much money did Brian agree to in that car
```

Appendix 001379

1    ride?

2         A.    Four hundred thousand dollars.  And that's what I

3    used as a claim.

4         Q.    400,000?

5         A.    Yes.

6         Q.    Okay.

7         A.    Less than what I proposed.

8         Q.    Four hundred thousand agreed, and you said yes?

9         A.    Yes.

10        Q.    Oral agreement, correct?

11        A.    Is that a question?

12        Q.    Yeah.  Was it an --

13        A.    Yes.

14        Q.    -- oral agreement?

15        A.    Yes.

16        Q.    Never written down, never signed by you and Brian?

17        A.    Correct.

18        Q.    And it was clear to you at that time, right?

19        A.    Yes.

20              Probably 95 percent of all discussions were

21    oral.

22        Q.    I'm sorry.  Say it again.

23        A.    I said probably 95 percent of all of our

24    discussions, if not 98 percent of all of our discussions,

25    were in an oral fashion.

1      Q.    The discussions were orally.  Can I write that

2   down?

3      A.    As well as agreement.

4      Q.    Mr. Carpenter, from the time you made this alleged

5   second oral agreement, which is before March 14, 2007, for

6   $400,000 -- 2007, right?

7      A.    Yes.

8      Q.    -- did you ever ask or request in this legal

9   proceeding more than $400,000 in bonuses?

10     A.    In -- yes, in my --

11     Q.    I'll accept a yes.

12     A.    Yes.

13     Q.    Isn't it true, sir, that after you claim you made

14   this alleged oral agreement -- and by oral agreement you

15   mean meeting of the minds, correct?

16     A.    Yes.

17     Q.    You were clear that you asked for $400,000 in

18   earned, unpaid, annual bonus and you were clear that

19   Brian Potashnik said, yes, I agree to pay you 400,000 annual

20   bonus?

21     A.    Yes.

22     Q.    And even though you were clear that you had a

23   solid agreement for $400,000 annual bonus, after March 14th

24   or after -- before March 14th, 2007, you made claim in this

25   case for more than $400,000; isn't that correct?

1          A.     Yes.   As time extended, yes.

2          Q.     How much more did you claim for in this lawsuit

3     based on this oral agreement?

4          A.     Well, I never actually claimed.  I suggested for

5     discussion 600,000.

6          Q.     Okay.  Here's my question.  You testified

7     yesterday you had no contract claim, right?  Do remember

8     that testimony?

9                      (No verbal response)

10              You testified yesterday you had no claim

11     for bonuses under your employment agreement.  You confirmed

12     that 30 minutes ago.  Do you remember that testimony?

13          A.     Yes.

14          Q.     Okay.  You testified yesterday and just confirmed

15     it that the basis of your claim for a bonus is this second

16     oral agreement, right?

17          A.     Yes.

18          Q.     So you're trying to recover $400,000 that you

19     claim was agreed to, correct?

20          A.     Yes.

21          Q.     That doesn't include the bonus for 2004, 2005,

22     which we've now uncovered that you've been paid for.

23          A.     Right.

24          Q.     But you originally claimed the $50,000 bonus for

25     2004, 2005, in this lawsuit?

1        A.    I'm sorry.  Repeat that.

2        Q.    When you filed this lawsuit in 2008, you were

3   claiming the $50,000 alleged bonus for the 2004, 2005.

4        A.    But we cleared up that --

5        Q.    No, I cleared it up.  I cleared it up.

6        A.    We cleared it up.

7              MS. GIBSON:  Object to arguing with the

8   witness.

9              THE COURT:  Sustained.

10             THE WITNESS:  That was the bonus.

11       Q.    (By Mr. L. Friedman) Okay.  So you're not claiming

12   the $50,000 anymore?

13       A.    That's what we decided on previously, yes.

14       Q.    So now -- now we're looking at the rest of it, and

15   it's based on this $400,000 agreement.

16       A.    However, as of March, I stay through November.

17   There is that gap.

18       Q.    Sir --

19       A.    But as of March that was the --

20       Q.    Okay.  So you added $200,000 for the next eight

21   months?

22       A.    No.  I --

23       Q.    Go ahead.

24       A.    As I said previously, I submitted a proposal to

25   sit down to discuss performance, to discuss unpaid bonuses,

1    as well as any increase in salary.  And I gave a sheet and I

2    was using $200,000.  Actually, I was using 80 percent of

3    $200,000, as well as 200,000.

4    Q.    Sir, in this lawsuit you have claimed various

5    numbers as an earned, unpaid, annual bonus.  Isn't that

6    true?

7    A.    Yes.  I tried to renego -- or basically was

8    renegotiating.

9    Q.    Yeah.  You tried to --

10    A.    Since there was --

11    Q.    -- renegotiate.

12    A.    -- since my time was greatly expended.

13    Q.    Yeah.

14    And you've claimed 650,000 at one point,

15    correct?

16    A.    I don't believe so.

17    Q.    You claimed 600,000 at one point, correct?

18    A.    I believe so.

19    Q.    What other numbers have you claimed in this

20    lawsuit for these unearned, unpaid, annual bonus?

21    A.    I don't have that calculation --

22    Q.    But you've claimed other numbers?

23    A.    -- from -- it would be less than that.

24    Q.    Okay.  Can I put down other numbers?

25    A.    Less than that.

```
1        Q.    Okay, other numbers less?

2        A.    Less, yes.

3        Q.    Other amounts less, correct?

4        A.    Yes.

5        Q.    Less than 600-.   Okay.

6              Let's go back to finish this.   After you

7    said I certainly understand, Brian says, you know, it's not

8    like we don't want to do it.

9        A.    My apologies.   Where are we?

10       Q.    I'm sorry.   Right here on the bottom.

11             I stole Mr. Page's pointer last night.   I

12   realized it when I got home.

13       A.    Okay.

14       Q.    It says, You know, it's not like we don't want to

15   do it.   And even if we did want to do it, we don't have it.

16   Secondly, you know, this is not a situation that anybody's

17   ever expected would happen or that we would -- that we would

18   be in right now.   And you're just going to have to, you

19   know, trust us that when or if things get to the point where

20   they turn out positive for us that, you know, at that point

21   in time we'll bonus out based on, you know, I don't know,

22   whatever, whatever's left over.   I don't know what that is,

23   you know, not with what's going on right now.

24             You knew from that comment again that

25   Brian Potashnik was not going to commit to pay you any money
```

1   other than the six weeks' severance that you were paid

2   pursuant to your employment agreement, correct?

3       A.   He was breaching our oral agreement.

4               MR. L. FRIEDMAN:  I'm going to object to

5   that as being unresponsive.

6               THE COURT:  Answer only the question

7   Mr. Friedman's asking.

8       Q.   (By Mr. L. Friedman) Yeah, based on

9   Mr. Potashnik's statement in this secretly recorded

10  telephone conversation, you knew he wasn't going to make a

11  commitment to pay you anymore money than the six weeks you

12  were supposed to be paid pursuant to your employment

13  agreement with Southwest Housing Management, correct?

14      A.   At that time.

15      Q.   And the $150,000 severance that you were offered,

16  correct?

17      A.   That came later.  This was November 2nd.

18      Q.   Okay, at that time.  Let's move on.

19      A.   At that particular time.

20      Q.   Anything else on this transcript that -- then

21  after another um, you [sic] say, A few weeks ago you came

22  here and told me that you would take -- this is Brian -- A

23  few weeks ago, you came here and told me that you've taken

24  another job.

25               This is November 2nd, 2007.

1              Okay.  That you were going to work for a
2    American Housing.  Okay.  And at that point in time I told
3    you that whether you went to work for them or not or whoever
4    it was that you went to work for that if things out tracked,
5    if things turned out where we end up with something, okay.
6    But it's not a good situation right now and it's not a
7    situation where it can even be put in writing.  I mean, it's
8    impossible, you know.
9              Mr. Carpenter, when you told Brian
10   Potashnik prior to the time you were terminated by
11   American -- by Southwest Housing Management -- when you told
12   Brian Potashnik that you had been offered a job by American
13   Housing, Brian Potashnik told you to take the job, didn't
14   he?
15        A.   Yes, he did, on October 12th.
16        Q.   On October 12th, 2007, before the management
17   transition on October 31st, before any closing, you told
18   Brian Potashnik that you had another job with American
19   Housing.  And he said take the job, correct?
20        A.   Correct.
21        Q.   So if you were so essential to the closing of the
22   transaction and if you were so essential to the transition
23   of management and this deal couldn't get done without your
24   presence, why would Mr. Potashnik say take the job?
25        A.   Because I pretty much had -- had resolved and

1    taken care of most of the duties that needed to be done.

2    And Brian was not into the details; Cheryl was.  And I spoke

3    with Cheryl and Cheryl asked me to stay through until the

4    transition.

5         Q.    Till the management transition?

6         A.    Till the management transition, based on the

7    consulting asset management agreement with Pinnacle, which

8    began --

9         Q.    Well, she asked you --

10        A.    -- on November 1st.

11        Q.    -- she asked you to stay another two weeks?

12        A.    Yes.

13        Q.    Now, when you say management transition, let's

14   make that clear.  On October 31st, 2007, what you say is a

15   management transition was simply the signing of a management

16   transition agreement; isn't that true?

17        A.    No, sir.  That was -- that was the time that all

18   of the Southwest Housing corporate employees and perhaps the

19   site employees -- I don't recall -- were converting to

20   Pinnacle, leaving Southwest Housing company and becoming

21   employees or at least under the direction of Pinnacle

22   management.

23        Q.    The truth of the matter is, Mr. Carpenter, on

24   October 31st, 2007, number one, there was no mass exodus?

25        A.    Thank you.

1        Q.    Correct?

2        A.    Yes.

3        Q.    Number two, there was no change in management.

4    All the employees that had been at Southwest Housing stayed

5    at Southwest Housing.

6        A.    The stay-and-pay bonus program worked, yes.

7        Q.    The stay-and-pay program that you conjured up four

8    years later worked?

9        A.    No.   That you discussed with Brian the day that --

10       Q.    Okay, good.

11       A.    -- that I tried to renegotiate a five percent.

12       Q.    No new employees showed up for work on November

13   1st?

14       A.    Not for Southwest Housing.

15       Q.    Your presence wasn't essential on November 1st or

16   October 1st or September 1st; isn't that true?

17       A.    I would call that BS.   No, sir.

18       Q.    Okay.

19                  Okay.   Let's go on.   Conversation, now

20   we're up to Cheryl.   Do you remember secretly recording a

21   conversation with Cheryl?

22       A.    Yes.

23       Q.    And you did that because, obviously, you didn't

24   get what you wanted from your secretly recorded conversation

25   with Brian?

1          A.    No, sir.

2          Q.    Right?

3          A.    No, sir.

4          Q.    Well, Mr. Carpenter, if you had gotten everything

5    you wanted from your secretly recorded conversation with

6    Brian, you wouldn't have needed to secretly record a

7    conversation with Cheryl; isn't that correct?

8          A.    Perhaps, Michael --

9          Q.    Mr. Carpenter, just my questions.

10         A.    I can't answer that.

11         Q.    All right.   So you say -- okay, you say, You

12   ready?   Forty-nine today.

13                    See it?

14         A.    Yes.

15         Q.    And then Cheryl says, You are?   And you say, Yep.

16   Cheryl says, Happy birthday.

17                    And then you say, Well, it says here

18   it waives all those rights.   And Cheryl says, Well, Jeff,

19   you don't currently have any rights.

20                    Now, at that time you were referring to the

21   severance agreement that was delivered to you by Southwest

22   Housing Management, correct?

23         A.    Yes.

24         Q.    And that was the one you refused to sign?

25         A.    Yes.

 1      Q.   Cheryl says, Well, Jeff, you don't have any

 2   rights.  And, Jeff, you said, Okay.  Cheryl says, You don't

 3   have any rights.  You confirmed that again.  You said, Okay.

 4                    Am I reading that wrong?

 5      A.   Only an admission that I hear what she's saying,

 6   not that I agree with it.

 7      Q.   Did I misread that?

 8      A.   Just what I said.  No, you didn't misread it, but

 9   okay doesn't mean that I'm agreeing with it.  It just means

10   I heard her.

11      Q.   But okay means okay.  You'll acknowledge that?

12      A.   No.  Okay means that I heard what she said.

13      Q.   Okay, but that's not what you said.  You just said

14   okay.

15      A.   I heard what she said and acknowledged that I

16   heard what she said.

17      Q.   Okay.  But you'll admit that's not what you said.

18      A.   I wasn't looking for an argument.

19      Q.   But you were the only one who knew this was a

20   secret recording?

21      A.   Yes.

22      Q.   So you could have said what you're thinking or

23   what you meant or even said something to set up

24   Mrs. Potashnik, which you were trying to do, right?

25      A.   No, I wasn't trying to do that nor was that -- nor

45

1    was that ever my intention.

2         Q.    You were trying to set her up.  That's why you

3    secretly recorded the conversation.

4         A.    I wanted to know why, with the two oral agreements

5    and even the written agreement and the promises that were

6    given, why I was sent a separation agreement that nullified

7    all of that.

8         Q.    But you never asked that --

9         A.    And --

10        Q.    You never asked that question.

11        A.    I did prior -- I did prior to this conversation.

12        Q.    You just -- you just forgot to record that

13   conversation.

14        A.    I was listening more than talking.  I was -- I was

15   hurt, I was angry --

16        Q.    All this is nonresponsive.

17        A.    -- I was betrayed.

18        Q.    All this is nonresponsive.

19              So let me get it straight.  You had already

20   asked the question and knew the answer to the question you

21   wanted to know the answer to, but then you secretly recorded

22   Mrs. Potashnik so you could get the answer again on tape,

23   correct?  Yes or no?

24        A.    No.

25        Q.    You just said you'd already asked the question and

1    gotten the answer.  Do you want to change that testimony?

2         A.    I wanted to know why I was getting the

3    separation --

4         Q.    The only question is, Do you want to change that

5    testimony?

6         A.    Which -- I'm sorry.  What testimony?

7         Q.    You just said --

8                   THE COURT:  (Inaudible).

9                   MR. L. FRIEDMAN:  Pardon me?

10                  THE COURT:  You're going in a circle.  You

11   have to keep on going.

12                  MR. L. FRIEDMAN:  I'm trying to get a

13   straight answer.

14        Q.    (By Mr. L. Friedman) All right, let's move on.

15                  You said, Okay.  You don't have any rights.

16   You said okay again.

17                  MR. L. FRIEDAM:  Let's move this -- can we

18   move this higher, Steve?

19        Q.    (By Mr. L. Friedman) You have conversations that

20   we've had, says Cheryl.  You have intentions that we've had.

21   You have what we intend to do and what we want to do.  You

22   don't have any rights.  That's about your employment and the

23   rights that you had under your employment agreement and that

24   type of thing.

25                  You understood she was referring to the

1    severance agreement, correct?

2        A.    Yes.

3        Q.    Then it says -- Ms. Potashnik says, It's a legal

4    document.  It's not saying, Jeff, you give up any hope of

5    ever getting anything.  It's a legal document.  It's what

6    you have rights to.  And if you think you have other rights,

7    then you shouldn't sign the document.

8              Okay?  So --

9        A.    No, sir, if you're asking a question.

10       Q.    Well, no.  My question is you understood that

11   Ms. Potashnik said you have legal rights under your

12   employment agreement and legal rights under the severance

13   agreement, and after that it was up to the discretion of the

14   Potashniks as to whether or not you would ever get anymore

15   money.

16       A.    Those documents differed from the oral agreements

17   I had and took away my rights.

18       Q.    The document, the severance agreement that you

19   were handed, differed from discussions you had with the

20   Potashniks and, as you say, negotiations you've had with the

21   Potashniks, right?  Right?

22       A.    Early on in negotiation, yes.

23       Q.    Yeah, 'cause you continued to negotiate with the

24   Potashniks.  You were always negotiating with the

25   Potashniks, right?

1      A.    Does not change the oral agreement.

2      Q.    But you were always negotiating with the

3  Potashniks?

4      A.    No.  They were always putting me off in time for

5  me to do the job that they asked me to do.  And I had

6  completed the job and now they're telling me that thank

7  you --

8      Q.    I'm going to object to all that as being

9  nonresponsive.  Your lawyer will get a chance to ask about

10  all this.

11          You continued to negotiate and have

12  discussions about this subject matter with the Potashniks

13  about the bonus, about the three-percent bonus, about the

14  earned -- unearned, employment-agreement bonus.  You kept

15  discussing it and renegotiating it with the Potashniks.

16      A.    We discussed it.

17      Q.    Thank you.

18          Then you say, yeah, it does -- let's go on

19  Page 2.

20          Then after an uh-huh, Cheryl says, Uh, and

21  we can go through that.  We can definitely do that but, you

22  know, what my proposal to you today was going to be is that

23  what I can build into that agreement for you after the --

24  and your transcriber couldn't pick that word up -- of your

25  employment so you have something to have as, um, an

1    agreement to pay in addition to the 20-, the one-month

2    severance, and your PTO, paid time off bank, and all that

3    stuff.  You say, Uh-huh.  To pay three years of bonus, the

4    minimum bonus, even though I -- I'm not having to.

5                    I'm not -- I'm not saying that there was a

6    minimum bonus, but the original employment agreement talked

7    about $50,000.  So to build into your agreement -- uh-huh --

8    the leader of the sale employment at the end of the year and

9    you would be guaranteed 150,000 pursuant to that agreement.

10   And you say, Uh-huh.

11                   You understood Ms. Potashnik was offering

12   you $150,000 severance at that time, correct?

13       A.    In lieu of our other agreement.

14       Q.    Didn't say that.  You understood she was offering

15   you $150,000 at that time?

16       A.    And that's it.

17       Q.    Correct?

18       A.    And that was it.

19       Q.    And then you say, Uh-huh.  And then she says, And

20   then there's something you would have a legal right to have.

21                   Meaning the 150,000, correct?

22       A.    I believe so.

23       Q.    And she says, And then, you know, like I've told

24   you before when we were on the phone with Keith --

25                   Meaning Keith Jones, correct?

50

1      A.   Yes.

2      Q.   The man you called to testify here, correct?

3      A.   Yes.

4      Q.   -- I've got to be able to see some preliminary on

5 how this deal is going to shake out before I can start

6 making commitments and go above and beyond that because I

7 need to make sure that when all is said and done and

8 it shakes out and everybody else gets paid, that Brian and I

9 have money, a certain amount of money that we can put

10 towards our defense.

11           So let's stop there for a minute.

12           So, first of all, after Ms. Potashnik was

13 willing or offered to guarantee you $150,000 in your

14 severance agreement, that wasn't it.  She said, And then you

15 might get more.  Isn't that what she was saying here?

16      A.   That's not what the -- she --

17      Q.   Isn't --

18      A.   Provided by the written document agreement.  I

19 don't believe she believed in oral agreements at that time.

20 I'm not sure.  However --

21      Q.   Sir, sir --

22      A.   -- they were trying to get me to settle for

23 $150,000.

24      Q.   Sir, all I'm saying is, isn't what she's saying

25 here let me see how this shakes out and then you can get

1   more?  The door wasn't closed by Mrs. Potashnik, correct?

2        A.    Nor was it closed by Brian.

3        Q.    Okay.

4              Then you said, Right.

5              MR. L. FRIEDMAN:  Next.  Let's go next.

6        Q.    (By Mr. L. Friedman) Cheryl says, And until I know

7   that I have that, I'm not making anymore commitments.

8              So understood by the time of this

9   conversation November 2nd, 2007, that both Brian and Cheryl

10  were not going to make any commitments beyond the $150,000

11  that they had offered you, correct?

12       A.    We have already had a commitment prior to.

13       Q.    Sir, my only question is that it was clear to you

14  from both of the conversations you secretly recorded neither

15  Brian or Cheryl was not going to make anymore commitments

16  other than the living up to the terms of the employment

17  agreement and then offering you $150,000 severance.  That

18  was clear to you on November 2nd, 2007?

19       A.    Yes.

20       Q.    Then Cheryl -- then you said, Right.  And then

21  Cheryl said, But you have to understand there's investment

22  banker fees, there's transfer fees on the debt, there's

23  legal fees, there's resized escrow costs, you know, Skyline

24  alone, Bank of America asking for 3 million.  Phamer --

25              Is that Phamer?

1              A.     Parmer.

2                        MS. POTASHNIK:  It should be Parmer.

3              Q.     (By Mr. L. Friedman) Palmer.  Parmer or Palmer, a

4        big part of the million dollars when we close.  You then

5        say --

6                        MR. L. FRIEDMAN:  Let's go to the next one.

7              Q.     (By Mr. L. Friedman) You say, Uh-huh.

8                        And then in the next conversation Cheryl

9        says, And the last thing I want to do is make you

10       commitments that can't be kept because then you and I are

11       going to get sideways, and I don't want do that.  I don't

12       want -- "(inaudible)".  But if your intention is to do that,

13       let's do that now.  Then, you know, we should just stop

14       talking and you should do it.  But I really want to work

15       with you and make sure you're taken care of, but it's not

16       going to be -- there's no point in making promises I can't

17       keep and then we end up sideways with each other.

18                        When Ms. Potashnik said that, you

19       understood she wasn't going to make you a commitment to pay

20       you anything more than the 150-, correct?

21             A.     Yes.

22             Q.     You understand that she wanted to see how the

23       money shook out at the -- when the deal closed?

24             A.     Yes.

25             Q.     And you wanted -- and you knew that she wanted to

1    leave the door open to pay you more money on the

2    discretionary basis when the deal closed?

3        A.   So they say.

4        Q.   And that want wasn't acceptable to you?

5        A.   Well, considering I've been lied to many times --

6        Q.   And you lied to them.

7        A.   No, sir.

8        Q.   And you lied to them.

9        A.   No, sir.

10       Q.   So my only question is that wasn't acceptable to

11   you?

12       A.   It was not acceptable.

13       Q.   Okay.

14            So then you say, Yeah, yeah, I understand.

15   Just the way this reads doesn't cover it.

16            Meaning the severance agreement, right?

17       A.   Right.

18       Q.   Cheryl says, That -- that doesn't cover anything

19   having to do with the sale because you don't have any rights

20   under the sale.  You have rights under your employment

21   agreement.  You then say, Uh-huh.

22            What you didn't say is, But, Cheryl, even

23   though I never made an agreement with you, you know I have

24   two oral agreements with Brian.  I've got one for

25   three-percent proceeds bonus and I've got a second oral

1    agreement made before March 14th, 2007, for an earned,

2    unpaid, annual bonus.  You never said that in this

3    conversation at all with Cheryl?

4         A.   No, I did not.

5         Q.   But you could have?

6         A.   I could have.

7         Q.   And could have made a record of it?

8         A.   Yeah.  As you can see, I didn't speak much --

9         Q.   Had you had that deal with Cheryl, you could have

10   got her on tape agreeing to it, right?

11        A.   I wasn't trying to entrap anybody.  I was trying

12   to listen about the separation agreement; that both parties

13   knew of the agreement.

14        Q.   You weren't?  I'm sorry.  You were secretly

15   recording Brian and Cheryl Potashnik on tape but you weren't

16   trying to entrap anybody.  Is that your statement?

17        A.   I wanted to know why they sent me the separation

18   agreement.

19        Q.   No, no.  Is that your statement?

20        A.   I wanted to know why they sent me the separation

21   agreement.

22        Q.   Okay.  Even though you had already asked the

23   question before and you had already gotten the answer

24   before; which was your earlier testimony today, correct?

25        A.   I'm not exactly sure what you just said.

1     Q.   Are you sure what you said today?

2     A.   Yes.

3     Q.   All right.  Then you said, Yeah, I understand

4  that.  Just the way this reads doesn't cover that.  Cheryl

5  says, That -- that doesn't cover anything having to do with

6  the sale because you don't have any rights under the sale.

7  You have rights under your employment agreement.  You said,

8  Uh-huh.  Cheryl says, And I have obligations as your

9  employer.

10          MR. L. FRIEDMAN:  Let's go forward.

11    Q.   (By Mr. L. Friedman) Cheryl says, You know,

12  it looked one way July 15th or June 15th, whichever.  I

13  don't remember the exact time frame.  But, you know,

14  anticipating another six months of overhead and all the

15  obligations that go along with them, you know, it really

16  starts to eat away at what's going to be left.

17          You knew that Cheryl was focused on the

18  end, what was going to be left when the deal closed?

19    A.   Yes, as well as I.

20    Q.   I'll take yes.

21          MR. L. FRIEDMAN:  Let's go further.

22    Q.   (By Mr. L. Friedman) You say, Uh-huh.  And then

23  Cheryl says, And, uh, so I mean that the, uh -- the lack of

24  putting things in writing up to this point has just been not

25  knowing what to put in a way that works for everybody.  And

1    I haven't been able to, you know, figure out -- figure

2    it out to a point where I'm not afraid that we're leaving

3    ourselves short.  And that's why, if I can start to see, I

4    can type up a closing statement and how the bottom line is

5    going to look.

6                    I can -- "(inaudible)".  I mean, I want to

7    see it.  If it's a negative at the bottom where we actually

8    have to owe them, you know.  And then you say, No, I

9    understand that portion of it.

10                   What you didn't say, sir, is regardless of

11   the deal closing, you still owe me my unearned --

12                   MR. L. FRIEDMAN:  Sorry, David.

13       Q.    (By Mr. L. Friedman) -- unpaid annual bonus,

14   right?

15       A.    Right.

16       Q.    You didn't stand up for your unearned second oral

17   agreement, right?

18       A.    No, I did not in that discussion.

19       Q.    All right, let's move on.

20       A.    I was in shock.

21       Q.    I'm in shock myself.

22       A.    Good.  Both of us are.

23       Q.    If you -- then Cheryl says, If you want to mark

24   up -- If you want to mark that agreement up -- you say,

25   Uh-huh -- Cheryl says, I'll look at it, you know, but that's

57

1    our standard agreement.

2                    MR. L. FRIEDMAN:  Let's go ahead.

3        Q.   (By Mr. L. Friedman) And Cheryl says, Things

4    haven't been good around here for a long time.  And you say,

5    Oh, we had money coming.  We had some money coming.  We

6    closed a lot of deals.  And Cheryl says, But, Jeff, you

7    don't understand that that doesn't mean that things are

8    good.  That just means that there's money coming in.  That

9    doesn't mean that the money coming in is enough to cover the

10   money that's due out.  I mean --

11                   And then you say, Well.  Cheryl says, In

12   2005 or back in 2004 when we -- Deepak and the allotment

13   group was working to get those pre-allotment loans and all

14   those deals, I mean, it looked like with those

15   predevelopment loans we wouldn't have a problem then.  You

16   said, Uh-huh.

17                   MR. L. FRIEDMAN:  Let's move forward.

18       Q.   (By Mr. L. Friedman) You know the name of a real

19   estate -- I'm sorry.  You know the nature of -- of real

20   estate --

21                   MR. L. FRIEDMAN:  I work alone.

22       Q.   (By Mr. L. Friedman) You know the nature of -- of

23   real estate and the allotment business is that you never

24   have any cash.  It's a very illiquid.

25                   You know, I regret some of the decisions

```
 1    that we made and deals that we did and things like that, but
 2    I don't think you can really appreciate how much money has
 3    been --
 4              And then you say, Well, I've been doing
 5    this --
 6              Cheryl says, -- lost.
 7              So you understood at that time that
 8    management wasn't flush with money.  Isn't that true, sir?
 9         A.   Management was never going to be flush with money
10    the way --
11         Q.   Thank you.  I'll take that answer.
12         A.   -- the way it was --
13         Q.   I'll take that answer.
14              MR. L. FRIEDMAN:  The rest of it's
15    unresponsive, Judge.
16         Q.   (By Mr. L. Friedman) Then you say, Well.  So, you
17    know, under -- I understand the -- the floating, uh,
18    barometer with the sale and all of that and the percentage
19    of everything.  I would like to have a more firmer
20    commitment, you know, on those three years, which I think is
21    very reasonable.
22              Now, you say want a more firmer commitment
23    on those three years.  What three years were you referring
24    to, sir?
25         A.   '5, '6, '7.
```

Appendix 001405

1      Q.    2005, 2006.  2006 to 2007, and the eight months of

2    2007?

3      A.    Yes.

4      Q.    Two-and-a-half years?

5      A.    Yes.

6      Q.    Now, if you had this alleged second oral

7    agreement, wouldn't that have been the time to say, But,

8    Cheryl, Brian and I have an oral agreement that we made

9    prior to March 14th, 2007?  I want you and Brian to live up

10    to that commitment.  Wasn't that the time to say it, sir?

11      A.    That would have been another time for me to say

12    it.

13      Q.    But, instead, you said -- you didn't say I have an

14    agreement.  You said I would like to have a more firmer

15    commitment.  That's what you said, right?

16      A.    Yes.  We just met the other day and discussed it

17    in more detail.

18      Q.    Sir, my question was only you wanted a more firmer

19    commitment.

20             MR. L. FRIEDMAN:  Everything after that is

21    nonresponsive, Your Honor.

22      Q.    (By Mr. L. Friedman) Cheryl said in response to

23    your question for a more firmer commitment, Well, and like I

24    said, I'd be willing to give you a minimum guarantee of the

25    baseline fixed rate, which is 150,000.  Beyond that, I'm not

1    going to, today, put anything in writing.  I can't.  And

2    then you say, But if things improve, it could -- would be

3    considered on the back end.

4              You're asking Cheryl to consider paying you

5    more money on the back end; isn't that correct?

6    A.   As she already --

7    Q.   Sir --

8    A.   -- insinuated --

9    Q.   Sir, sir, isn't it correct you're asking her to

10   consider paying you more money on the back end?

11   A.   Yes, as stated previously.

12   Q.   When you were the only one who knew there was

13   going to be a record of whatever deal you thought you had,

14   you're asking her to consider at her discretion paying you

15   more money on the back end.  Consider, right?

16   A.   No.  To honor the oral agreements.

17   Q.   Did I miss that?  Is that in this conversation?

18   A.   You just asked the question and I --

19   Q.   You're asking her to consider at her discretion

20   whether or not to pay you, whether to pay more money at the

21   back end?

22   A.   Those were her words, previous.

23   Q.   No, those were your words, sir.

24   A.   Those were her words previously on this screen

25   that we discussed a minute ago.

1      Q.   Let me see.

2           What you didn't say was I'd like you to

3    honor your commitment, right?

4      A.   I did not say to honor the oral agreements,

5    correct.

6      Q.   With Brian.  With Brian?

7      A.   With Brian.

8      Q.   And confirming your testimony yesterday -- well,

9    first, you didn't remember it and then you saw it in your

10   deposition -- you never had any agreement with Cheryl

11   Potashnik.  You never made any agreement with Cheryl

12   Potashnik.  That's what you testified to yesterday.

13     A.   I said she knew of the agreement.

14     Q.   Okay, she knew of it, but you never had any

15   agreement with Cheryl Potashnik --

16     A.   Correct.

17     Q.   -- correct?  Correct?

18     A.   Correct.

19     Q.   All right.  So she was willing to give you a

20   guarantee of 150,000.  Beyond that, she was not going to put

21   anything in writing.  But that was not acceptable to you?

22     A.   No, sir.

23     Q.   Okay.  Let's go on.  Let's try to finish this.

24           Whatever.  I'm not going to -- I'm not

25   going to b-u-l-l-s-h-i-t you, Jeff.  I've told you.  I'm not

1    going to.  You can come and look at whatever you want to

2    look at.  If you want to see Brian and my savings account

3    and every transaction we've had since then to keep this

4    company afloat, you can see it.  I'm peeved.  I'm not

5    b-u-l-l-s-h-i-t-t-i-n-g you.  And then you say, I -- I

6    understand that.

7              You knew at that time that Brian and Cheryl

8    had put their own money back in the company to keep

9    it afloat, didn't you?

10        A.   For their defense, yes.

11        Q.   Sir, you knew at the time that Brian and Cheryl

12   put their own money in the company to cover operating costs?

13        A.   Operating cost or defense.  I don't know how it

14   was divided.

15        Q.   No.  I know you just said -- I know you're saying

16   defense, but that money went into the general account and it

17   was spent just like all the other money in the company.

18        A.   I can't confirm that but I can assume that.

19        Q.   You can assume that.  So you really didn't mean

20   defense.  You just said it to --

21        A.   No.

22        Q.   -- to incite the jury.

23        A.   No.  No, no, no, no.  Defense.

24        Q.   All right.

25        A.   'Cause it was --

1      Q.    All right.  Well, you've already --

2      A.    -- in Brian's --

3      Q.    -- answered the question.

4      A.    It was already told.

5      Q.    You've already answered the question.

6            You said, I understand that.  Cheryl says,

7      I'm sorry that it's happened, you know.  You know, when --

8      when you take a company like ours that relies on development

9      business and you stop doing development, it's not pretty.

10     You said, I absolutely agree.  It's been certainly both

11     "(inaudible)" and understand that part of it.  Cheryl said,

12     As I do.  I mean, you know --

13           And you say, I mean, all we needed to do

14     was to keep three deals a year going.

15           Three development deals, right?

16     A.    Yes.

17     Q.    And Cheryl says, I don't know if that was true,

18     but I don't know if three deals is the number.

19           And I think that's the end of the

20     conversation.

21           MR. L. FRIEDMAN:  Is this the time you want

22     to take your morning break, Your Honor?

23           THE COURT:   Yeah.

24           We'll take our 15-minute break, ladies and

25     gentlemen.

1          (The jury exited the courtroom.)

2          (Recess taken)

3          (The jury entered the courtroom.)

4          THE COURT:  Welcome back.  Good morning.

5   Good morning still, ladies and gentlemen.

6          We're going to -- we're still on

7   Mr. Carpenter's testimony but we're going to take a witness

8   out of order, and so we'll ask Mr. Donohue to call the next

9   witness.

10         MR. DONOHUE:  Yes, Your Honor.  The

11  defendants call Deepak Sulahke.

12         THE WITNESS:  Yes.

13         THE COURT:  And Mr. Suhlahke's at the

14  witness stand.  I swore him in before, earlier in the trial.

15  So his testimony, like all the witnesses, is under oath.

16         So, Mr. Donohue, if you'll pick up or start

17  where you'd like.

18         MR. DONOHUE:  Thank you, Your Honor.

19         DEEPAK SULAHKE,

20  having been previously sworn, testified as follows:

21         DIRECT EXAMINATION

22  BY MR. DONOHUE:

23     Q.    Please state your full name.

24     A.    Deepak B. Sulahke.

25     Q.    And, Mr. Sulahke, you formerly worked for

1    Southwest Housing?

2        A.    Yes, I do [sic].

3        Q.    You still do or you did?

4        A.    I did.

5        Q.    You did.  Okay.

6                    And what -- in what capacity did you work

7    for Southwest Housing?

8        A.    Started off as vice president and at some point

9    became senior vice president of development and finance.

10       Q.    And, specifically, you worked for the development

11   arm --

12       A.    Yes.

13       Q.    -- of Southwest Housing Development Company; is

14   that right?

15       A.    Correct.

16       Q.    What time period did you work for Southwest

17   Housing Development?

18       A.    I think it was June of 2003 to May of 2008.

19       Q.    And May of 2008, is that when the Cascade sale or

20   acquisition took place?

21       A.    Yes.

22       Q.    And you left at that point?

23       A.    The company stopped.  So I didn't leave.

24       Q.    The company just ceased doing business.

25       A.    Ceased to exist, so...

Appendix 001412

1          Q.    All right, sir.

2          A.    Okay.

3          Q.    And what did you do as -- as the -- for Southwest

4    Housing Development as senior vice president of development?

5    What did you do?

6          A.    I headed the development team.  So we brought new

7    business in and we put together deals and, you know, closed

8    the deals and handed over -- you know, handed over deals for

9    construction.  And then management took over, so...

10         Q.    All right.

11               Did you work at all with Affordable

12   construction, the construction arm of Southwest Housing?

13         A.    I didn't work for them but there was a lot of

14   coordination between my team and their team.

15         Q.    All right.  So you didn't work for them but you

16   coordinated with them?

17         A.    Uh-huh.  Yes.

18         Q.    And then as a separate company there was Southwest

19   Housing Management Company; is that right?

20         A.    Correct.

21         Q.    All right.  Did you -- did you work at all with

22   them?

23         A.    Yeah.  There was coordination work with them, yes.

24         Q.    All right.

25               And then at some point in time you came to

1    know Jeffrey Carpenter?

2        A.    I did.

3        Q.    All right.  And that was before you were with

4    Southwest Housing Development; is that right?

5        A.    Yes.

6        Q.    When did you know -- or come to know

7    Mr. Carpenter?

8        A.    I think it was sometime around 2000 -- 2001 or

9    2002 at my previous job.  Jeff headed the management team

10   there and I -- I came to know of him then.

11       Q.    All right.  And what was the name of that company?

12       A.    Fore Property Company.

13       Q.    F-o-r-e?

14       A.    F-o-r-e, yes.

15       Q.    All right.

16             And Mr. Carpenter worked there too for the

17   management --

18       A.    Management company, yes.

19       Q.    All right.

20             And then you went to Southwest Housing

21   Development in 2003.  At some point, did you refer

22   Mr. Carpenter to the Southwest Housing organization?

23       A.    I did.

24       Q.    All right.  And at some point Mr. -- Mr. Carpenter

25   actually took your referral and came on with Southwest

1    Housing Management; is that right?

2         A.   Correct.

3         Q.   And what was your understanding of Mr. Carpenter's

4    job responsibilities there as executive vice president for

5    Southwest Housing Management?

6                   MS. GIBSON:   Object.   Lack of foundation.

7                   THE COURT:   Overruled.

8         Q.   (By Mr. Donohue) Did you have an understanding

9    what --

10        A.   Yeah.   Yes.   Jeff's duties included, you know, to

11   head the management team, to make sure that the properties

12   were getting up, you know, were operating property --

13   properly and, you know, the lease was going well and the

14   properties were -- you know, he was responsible for

15   day-to-day operations of the property.

16        Q.   All right.

17                   In your position there as senior -- in

18   charge of development there at Southwest Housing

19   Development, who did you report to?

20        A.   Brian Potashnik.

21        Q.   All right.   And who did Mr. Carpenter report to?

22        A.   Brian Potashnik.

23        Q.   Brian Potashnik was the head of each of those

24   separate companies?

25        A.   Correct.

1        Q.    Now, at some point in time -- well, tell me.  What

2    was your relationship like with Mr. Carpenter?  I know you

3    worked and coordinated with Southwest Housing Management

4    there in your position at Southwest Housing Development, but

5    did you have any other relationship, business or personal or

6    otherwise, with Mr. Carpenter?

7        A.    Yes.  Jeff was a neighbor.  I mean, he lived just

8    five homes down the street, and so we would meet on -- you

9    know, we used to meet off -- off work.  And, you know, we

10   would go have drinks together and, you know, meet on a

11   regular basis, so...

12       Q.    All right.  So you just lived five houses down,

13   what, on Mimosa Street?

14       A.    Yeah.

15       Q.    And where would you have drinks?

16       A.    Trinity Hall.  And there was one, I think.  And

17   subsequently, you know, we would meet up at Sherlock.

18       Q.    Sherlock's?

19       A.    Yeah.

20       Q.    Did Mr. Jones, Keith Jones, also join you from

21   time to time?

22       A.    Yes.  Sure did.  Yes.

23       Q.    So the three of you would have beer or whatever it

24   was that you were drinking there at Sherlock's?

25       A.    Yes.

70

1       Q.   And did there come a time that you understand that

2   Mr. Carpenter ended up suing the Southwest Housing entities

3   and both Potashniks?

4       A.   Yes.

5       Q.   Did he ask you to join the lawsuit?

6       A.   At some point he urged us to.  Yes, he did.

7       Q.   All right.

8               I'll represent to you that the actual

9   lawsuit was filed in March of 2008.

10      A.   Uh-huh.

11      Q.   Before the closing, when you left in April or May

12   of 2008, did he ask you to join the lawsuit before or after

13   he actually filed it in March of '08?

14      A.   Before.  Before he filed the lawsuit.

15      Q.   Before he filed it.

16               Did he ask Mr. Jones to join in the

17   lawsuit?

18      A.   My recollection is that it came up at one of

19   our -- you know, one of our meetings at these -- at Trinity

20   or Sherlock's.  I don't recall exactly where, but I think

21   it came up, you know, when we were drinking.  It came up,

22   yes.

23      Q.   All right.

24      A.   So my recollection is Keith was there, but --

25      Q.   All right, Keith was there when Mr. Carpenter

1    asked you to join him in the lawsuit?

2         A.   Correct.

3         Q.   All right.  Did he ask Mr. Jones?  Or do you

4    recall?

5         A.   My recollection is that it came up at the table,

6    yeah.

7         Q.   So rather than directed just to you it was

8    directed to the table, to the both of you?

9         A.   Correct.

10        Q.   All right.  And what did you tell Mr. Carpenter?

11        A.   I said I don't need to.  I said I don't -- I don't

12   have any need to do that.  So I declined.

13        Q.   Go ahead.  I'm sorry.

14        A.   I declined.  I declined to join the lawsuit.

15        Q.   Did Mr. Jones?  Do you recall?  Did he have any

16   response to Mr. Carpenter's inquiry about joining the

17   lawsuit?

18        A.   I don't -- I don't recall what Mr. Jones said but

19   I think he declined as well.  But I really can't speak for

20   him.  I know that I declined, so...

21        Q.   All right.

22             Now, your deposition was taken in this case

23   by me in July of 2010.  Do you remember that?

24        A.   Yes.

25        Q.   All right.  And I'll represent to you that the

1    deposition of Mr. Carpenter, his first deposition in this

2    case, was taken in March; that same year, March of 2010.

3         A.   Okay.

4         Q.   All right?

5         A.   Uh-huh.

6         Q.   Between the time that Mr. Carpenter left Southwest

7    Housing and his deposition was taken in March of 2010, did

8    you have any discussions with Mr. Carpenter about what --

9    about his feeling or his belief or anything along that lines

10   that he was owed any bonus from the sales proceeds of the

11   sold companies?

12        A.   It's come up numerous times, numerous times.  And

13   he's referred -- he made representation that he was informed

14   that he -- that he was going to get a, you know, quote,

15   unquote, a piece of the deal.  So I don't know -- and he --

16   he would ask me what that meant.  Meaning he would try to

17   figure out what exactly that meant, that entailed, so...

18        Q.   All right.  So before his deposition was taken he

19   even asked you that he, what, felt like he had a piece of

20   the deal or what?

21        A.   He told me that he was represented -- it was

22   represented to him that he would have a piece of the deal.

23        Q.   All right.  Did he ever tell you what that piece

24   of the deal would be?

25        A.   No.

1     Q.    Did he ever ask you that, hey, do you think this

2     percentage or that percentage is fair?

3     A.    Correct.

4           He would -- you know, I think he was -- my

5     recollection is he was trying to figure out what that

6     percentage, what that piece of the deal actually meant.  So

7     he was trying to figure out if it was one percent or five

8     percent or ten percent or -- so it was -- you know, I think,

9     you know -- and most of the times that it came up it was he

10    was trying to figure out exactly what that meant.  So if

11    there was, I don't recall him telling me that there was a

12    set number, so...

13    Q.    All right.  He never told you a set percentage

14    before his deposition was taken in March of 2010.  But he

15    said that, what, he felt he had a piece of the deal?

16    A.    Yes.

17    Q.    All right.

18          And he never told you before his deposition

19    was taken what percentage, if any, he said that piece of the

20    deal is or should be or what he felt he should get?

21    A.    No.

22    Q.    All right.

23          He didn't say one percentage, three

24    percent, five percent, ten percent?

25    A.    No.  He -- you know, I mean, he would -- he would

74

1    try to figure out what that meant so that -- you know, he

2    has asked me if it was one percent or five percent or -- you

3    know, so it's -- he has thrown up that number, but the

4    number came out more as a question to me, you know, as what

5    exactly it meant when someone offered a piece of the deal.

6         Q.    So he was asking you -- did he ask you, Do you

7    think one percent or five percent --

8         A.    Yes.

9         Q.    -- or three percent would be fair?

10        A.    Correct.   That's exactly how it was, yes.

11        Q.    So he asked you what he [sic] thought -- what you

12   thought would be a fair percentage of the deal?

13        A.    Correct.

14        Q.    He didn't tell you that he had been promised a

15   percentage of the deal?

16        A.    No, he did not.

17        Q.    He didn't tell you that back in 2006, supposedly,

18   that Brian Potashnik had agreed to pay him three percent of

19   the deal?

20        A.    No, he did not.

21        Q.    That never came up?   He never -- never said that?

22        A.    No.

23        Q.    What about after his deposition was taken and you

24   read his deposition?

25                   Do you recall reading his deposition?

75

1        A.    Yeah.   That's the first thing that struck [sic]

2    out was I think there might have -- the first thing that

3    struck [sic] out was the three percent seemed like it was a

4    very set number from his deposition; that that's what was

5    offered to him by Brian.   But that's something that had

6    never come up when we -- when I went with him.   So I think I

7    made a note of it and said that that number was never --

8    never ever discussed with me.

9        Q.    Okay.   So after you read the deposition you were

10   struck in the deposition when he said he had three percent

11   of the deal?

12       A.    Correct.

13       Q.    And, in fact, you brought that up to Mr. Carpenter

14   after his deposition that, hey, you've never told me that

15   you had three percent of the deal?

16       A.    Yes.

17       Q.    And then what did he say?

18       A.    He declined.   He said that that's what I had,

19   so...

20       Q.    Although he'd never told you before his deposition

21   that that's what he had?

22       A.    Correct.

23       Q.    In fact, he was asking you what do you think is a

24   fair percentage?

25       A.    Yes.

1      Q.    When he went to -- did he ever say before his

2   deposition five percent, does five percent sound like a fair

3   deal?

4      A.    Well, he's asked me.  He's thrown out various

5   numbers, you know.  And he says, Do you think one percent or

6   five percent or ten percent?  He said, What does it mean

7   when -- when I'm going to get a piece of the deal?  So...

8      Q.    All right.  And what did you tell him in response

9   when he was inquiring with you as far as these percentages

10  of the deal?

11     A.    I told him that even one percent was too high for

12  someone at his position.  That's my belief.  And I mentioned

13  that in my deposition because what the market is offering,

14  you know, that even that was a pretty high number.

15                    And I felt that, you know, one should value

16  your own self rather than -- when someone else calls you a

17  partner, he's basically trying to encourage you.  He's

18  trying to help you out, you know, and make you feel like

19  this is part of your team.  Just because he's called you a

20  partner doesn't mean it's a financial, you know,

21  relationship.

22                    And I kind of tried to help him out, at

23  least mention to him that, you know, market -- the market

24  for what his position is, is that what he has in his money

25  was way too much.  And I have had discussions with him that,

1    you know, that what they were offering of his work, what

2    other people were getting paid --

3         Q.   I don't want to go there, Mr. Sulahke.  I don't

4    want to go there.   Thank you very much.

5                        Let me ask you.   In observing what

6    Mr. Carpenter did as executive vice president for Southwest

7    Housing Management, did you ever observe him do anything

8    over and above what his job was for Southwest Housing

9    Management?

10        A.   Well, it's doing -- during the raid, I think there

11   was one -- I will -- you know, I mean, overall, the

12   coordination and everything else is typical of what a

13   management person would do.   But I do think that he has

14   helped out during the FBI raids and all that, you know; that

15   he did, you know --

16        Q.   All right.

17        A.   -- that he did work on it.

18        Q.   And was it your understanding that he did so at

19   the direction of the Potashniks?

20        A.   Correct.   He did so.

21        Q.   All right.

22                        But there were others that helped out as

23   far as gathering information that would have been

24   subpoenaed, that time frame?

25        A.   Yes.

Appendix 001424

78

1      Q.    But it wasn't just him alone?

2      A.    No.  Yeah, there was a team working on it.  Yes.

3      Q.    And same thing with the disaster that took place

4   down in Houston with Katrina --

5      A.    Uh-huh.

6      Q.    -- as well as Rita.  I understand that there was

7   a -- there was an overall team effort at the Southwest

8   Housing organization to help out those victims?

9      A.    Correct.

10      Q.    And it was including Mr. Carpenter as well as

11   others?

12      A.    Yes, but all at the direction of Brian.  Yes.

13      Q.    And it was financed.  It was all paid for by the

14   Potashniks, wasn't it?

15      A.    Correct.

16                MR. DONOHUE:  I'll pass the witness.

17                THE COURT:  Ms. Gibson.

18                    CROSS-EXAMINATION

19   BY MS. GIBSON:

20      Q.    Mr. Sulahke, when you talk about Jeff saying, you

21   know, when he was mentioning five percent in connection with

22   the cut of the deal, do you recall that?

23      A.    I'm sorry?

24      Q.    When you were -- when you were saying that

25   Jeff Carpenter was asking you, like, would five percent be

Appendix 001425

1   reasonable --

2          A.    Yeah.   It wasn't, like, five percent, you know.

3   It was, like, is one percent reasonable or three percent

4   reasonable or five percent.

5          Q.    Right.

6          A.    So it wasn't, like, a set number.

7          Q.    What -- what time frame?  Can you pinpoint a time

8   frame when this discussion happened?

9          A.    This was when -- this was when the sale was

10  determined.   I mean it was when we -- when we were headed

11  towards the sale.   When the -- you know, when Brian and

12  Cheryl decided to sell the company.   So at that point in

13  time, you know, we started having some discussions on it.

14         Q.    So at the point in time Brian and Cheryl decided

15  to start the company -- or sell the company?

16         A.    Shortly after that, yes.

17         Q.    Okay, shortly after that.

18               And are you aware that after -- after

19  Brian Potashnik offered Jeff three percent -- I mean,

20  there's a formula -- three percent under a certain formula,

21  that Jeff went back and asked about whether he could get

22  five percent instead?

23         A.    No, I was never informed.   I was never told about

24  that.

25         Q.    Okay.   But all of this was at the beginning when

1    Brian and Cheryl initially decided to sell the business.

2    That's the time frame you're talking about?

3         A.   No, no.  This was when they decided.  This is

4    after they decided to sell the business.

5         Q.   Okay.  In that time frame?

6         A.   Yes.

7         Q.   Okay.

8              You talked about someone calling

9    Jeff Carpenter a partner.  What are you talking about?

10        A.   That's what he represented to me that he was.

11   That he was, you know, being referred to as represented as a

12   partner, so...

13        Q.   Brian Potashnik had?

14        A.   Yeah.  That's what Jeff told me, yes.

15        Q.   Referred to him as a partner.  Okay.

16             And you said at one point that

17   Jeff Carpenter asked you to join this lawsuit?

18        A.   Yes.

19        Q.   And you said that Keith Jones was there?

20        A.   Yes.

21        Q.   All right.  Are you --

22        A.   Oh, that was once, but there were -- this happened

23   a couple, two, three times at least, so...

24        Q.   Okay.

25             Are you aware that when Keith Jones was

1    asked, "Did Jeff ever ask you or Deepak or anyone else that

2    you know of to consider or sue Brian or Cheryl Potashnik or

3    the Southwest entities," he said no?

4         A.   I can tell you -- like I said, I can tell you what

5    I was asked.  And I was asked to join the lawsuit and I

6    declined.

7         Q.   Are you aware that when Keith Jones was asked --

8    who you claim was there -- the question he never mentioned

9    that, hey, will you join me too, anything along those lines,

10   that he said no?

11        A.   No.

12        Q.   Were you aware of that?

13        A.   No.

14        Q.   Mr. Sulahke, you recommended Jeff Carpenter for

15   hire at Southwest Housing?

16        A.   I did.

17        Q.   Okay.

18             And you asked Jeff Carpenter to help you

19   out with work even after -- for your company even after he

20   left Southwest Housing?

21        A.   Very little.  And I chose not to continue with

22   that any further.

23        Q.   Okay.  But you said very little, so --

24        A.   Yeah.

25        Q.   -- so the answer is yes --

1      A.   Yes.

2      Q.   -- to help on some projects?

3           Do you recall sitting with Jeff at your

4  house on the couch that's parallel to the fireplace and

5  saying to Jeff you heard from Brian that Jeff may not have

6  to work again due to the asset sale payment to Jeff or words

7  to that effect?

8      A.   That's -- yes.

9      Q.   Did Jeff Carpenter work hard in his job at

10  Southwest Housing?

11      A.   Yeah.  He was there.  He was there a lot, but so

12  were all the executives.  I mean, we all worked very hard,

13  so...

14      Q.   And without getting into details, are bonuses part

15  of the reason you work -- people worked extra hard?

16      A.   No.

17           MR. DONOHUE:   Objection, Your Honor.

18  Violates the order in limine.

19           MS. GIBSON:   I'm not asking for details,

20  just working hard.

21           THE COURT:   Objection's sustained.

22           MS. GIBSON:   Okay.

23      Q.   (By Ms. Gibson) Do you remember that at some point

24  when you were having lunch with Rick Fore, Rick asked about

25  Jeff and Rick told you that Jeff was one of the best

1    operators he had -- he had ever experienced --

2                    MR. DONOHUE:   Objection.

3        Q.   (By Ms. Gibson) -- or words to that -- along those

4    lines?

5        A.   No.   I don't recall that.

6                    MR. DONOHUE:   Objection.   Objection.   Calls

7    for hearsay.

8                    MS. GIBSON:   Okay.   He already said he does

9    not recall.

10                   THE WITNESS:   No.

11       Q.   (By Ms. Gibson) Okay.   But you do recall sitting

12   on the couch in front of the fireplace and saying you heard

13   from Brian that Jeff may not need to work again due to the

14   asset sale payment to him?

15       A.   I don't know whether the asset sale but, you know,

16   he just said Jeff may not have to work again, you know,

17   if -- if the transactions went well, so...

18       Q.   And by the transactions you're talking about the

19   sale?

20       A.   The exact verbiage I don't know, but he did say

21   something to the effect that Jeff might not have to work

22   again.

23                   MS. GIBSON:   Pass the witness.

24                   THE COURT:   Mr. Donohue.

25                   MR. DONOHUE:   Thank you, Your Honor.

1                    REDIRECT EXAMINATION

2  BY MR. DONOHUE:

3        Q.    Neither of the Potashniks ever tell you that they

4  had -- that Mr. Carpenter had a piece of the deal, did they?

5        A.    No, never.

6        Q.    Did Mr. Carpenter ever represent to you, whether

7  it be exaggeration or hyperbole, that he was an effective --

8  that he was, in effect, the president of all the Southwest

9  entities?

10       A.    Yes.

11                    MS. GIBSON:  I'm going to object to leading

12  and beyond the scope.  It's an entirely new topic.

13                    THE COURT:  I don't know whether it was --

14  I'm not sure who's witness it is, if it's an adverse

15  witness, but y'all are beyond the scope of her examination.

16                    MR. DONOHUE:  I'll pass the witness.

17                    THE COURT:  Ms. Gibson?

18                    MS. GIBSON:  Nothing further.

19                    THE COURT:  All right.

20                    Thank you, Mr. Sulahke.  You are free to

21  leave the courthouse and you're released from the subpoena.

22                    We're going back to Mr. Carpenter.

23                    Mr. Friedman?

24                    MR. L. FRIEDMAN:  Yes.  May I just have a

25  moment?

85

```
 1                    (Off the record)
 2                    JEFFREY CARPENTER,
 3    having been previously sworn, testified as follows:
 4                    CROSS-EXAMINATION (CONT'D)
 5    BY MR. L. FRIEDMAN:
 6        Q.    Mr. Carpenter, I took your deposition for the
 7    first time on March 16th, 2010.  And that was after you
 8    testified today that you had this oral agreement with
 9    Brian Potashnik to pay you a hundred -- $400,000.  Remember
10    when I took your deposition in 2010?
11        A.    Vaguely.
12        Q.    When I asked you about -- to tell me the amount of
13    money you were claiming for your earned, unpaid, annual
14    bonuses, you couldn't tell me the amount.  Do you remember
15    that?
16        A.    Not off the top of my head, no, sir.
17        Q.    All right.
18                    MR. L. FRIEDMAN:  Would you play
19    that section for me, please?  Page and line?  Yeah.
20                    MR. PAGE:  It's Page 12, Line 6, through
21    Page 13, Line --
22                    MR. L. FRIEDMAN:  Page 12, Line 6, through
23    13, Line 9.  March 16, 2010 deposition.
24                    Wait.
25                    Ms. Gibson, you there?
```

Appendix 001432

1          MS. GIBSON:  Yes.  Go ahead.

2              (Video playing)

3      Q.   "Mr. Carpenter, with regard to what I'm calling

4  claim number one, March 2004 to March 2005, can you give me

5  a specific dollar amount of your claim today?"

6      A.   "I can give you a range.  I cannot give you a

7  specific dollar amount."

8      Q.   "All right.  You've given me the range, but I'm

9  asking you for a specific dollar amount of your claim.  Can

10  you give me a specific dollar amount of your claim?"

11     A.   "No, I cannot."

12     Q.   "Okay.  With regard to claim number two, what I'm

13  calling claim number two, March of 2005 to March of 2006,

14  can you give me a specific dollar amount of your claim,

15  sir?"

16     A.   "No, sir."

17     Q.   "With regard to what I'm calling claim number

18  three, March of 2006 to March of 2007, can you give me a

19  specific dollar amount of your claim, sir?"

20     A.   "No, sir.  And I can tell you why for all three of

21  those, 'cause it's the same."

22              "Go ahead."

23     Q.   "The fun part about being a lawyer is that I get

24  to ask the questions."

25     A.   "Very good."

1      Q.    "Thank you."

2                  "With regard to claim number four, can you

3      give -- what I'm calling claim number four from March of '07

4      to November 2nd, 2007, can you give me a specific amount of

5      your claim?"

6      A.    "No, sir."

7                  (Video ended)

8      Q.    (By Mr. L. Friedman)  All right.  Do you recall

9      giving that testimony in March of 2010, sir?

10     A.    As just seen, yes.

11     Q.    So in March of 2010 you could not state the amount

12     of your bonus claim, correct?  Isn't that correct?

13     A.    From what was shown on the screen, yes.

14     Q.    Now, also, you remember these personal notes that

15     you wrote in your Email to Cheryl and Brian Potashnik of

16     November 15th, 230 -- 2007.

17                  MR. L. FRIEDMAN:  Do you have that,

18     Defendants' Number 24?  Show the whole thing through.

19     Q.    (By Mr. L. Friedman)  We've discussed this Email

20     before?

21     A.    Yes.

22     Q.    Do you have it in front of you?

23     A.    I was looking for it.

24     Q.    Go ahead.  Take a minute.

25     A.    This is it.

1        Q.      Now, November 15th, 2007, is two weeks after your

2    employment was terminated by Southwest Housing Management,

3    correct?

4        A.      Yes.

5        Q.      And that was after -- supposedly, eight months

6    after you had this second oral agreement with Brian

7    Potashnik for earned, unpaid, annual bonuses where he and

8    you supposedly agreed to an amount of $400,000, correct?

9        A.      Yes.

10       Q.      All right.  So there's the date.

11              MR. L. FRIEDMAN:  Let's see the to and

12   from, please.

13       Q.      (By Mr. L. Friedman) And you identify that as your

14   Email, correct?

15       A.      Yes.

16       Q.      And on Page 4 of your Email or attached to this

17   Email is a separation agreement that you've previously

18   testified --

19              MR. L. FRIEDMAN:  Let's go to the

20   separation agreement attached.

21       Q.      (By Mr. L. Friedman) -- that you've previously

22   testified you drafted, correct?

23       A.      Yes.

24              MR. L. FRIEDMAN:  Go to Paragraph 4.  Bring

25   it to the top of the screen, please.

1          Q.     (By Mr. L. Friedman) So in that Paragraph 4 you
2    say the company and the Potashniks acknowledge that employee
3    has earned and is owed unpaid annual wages and bonuses in
4    the amount of $600,000.   See that?
5          A.     Yes.
6          Q.     You wrote that?
7          A.     Yes.
8          Q.     You wrote that eight months after you claimed you
9    had an oral agreement with Brian Potashnik?
10         A.     Yes.
11         Q.     For $400,000?
12         A.     Yes.
13         Q.     Is that another mistake?
14         A.     No.
15         Q.     Still negotiating?
16         A.     Negotiating that one, yes.
17         Q.     You didn't have a firm agreement.   You were still
18   negotiating that, right?
19         A.     That was firm.  I was negotiating for more.
20         Q.     You wanted more.
21         A.     I wanted more, based on my agreement.
22         Q.     I'm going to put down 11/15/07 wanted more.
23                Okay.   So, also, on November 15th -- I'm
24   sorry.   On March 14th, you send personal notes.
25                Do you have the personal notes?

Appendix 001436

1      A.    I just had them.   Those personal notes?

2      Q.    Yeah.

3            MS. GIBSON:   Those aren't redacted.   Just

4   FYI.

5            MR. L. FRIEDMAN:   Well, let's go to the

6   employment agreement.   I'm sorry.   Let's go to the schedule

7   on Page 3 of those personal notes.

8      Q.    (By Mr. L. Friedman) Now, these personal notes

9   were dated March 14th, 2007, right?

10     A.    Yes.

11     Q.    And that was, what, a day or two or three after

12  your supposed -- your drive with Mr. Potashnik?

13     A.    Yes, sir.

14     Q.    How many days?   One day?   Three days?

15     A.    A few days.

16     Q.    A few days.

17           A few days after your drive with

18  Mr. Potashnik you handed him a schedule showing him the

19  bonuses that you're entitled to, right?

20     A.    No, sir.

21     Q.    It says --

22     A.    I showed him --

23     Q.    -- unearned --

24     A.    -- what I was --

25     Q.    Excuse me.

```
1              Showed unearned bonuses unpaid, wage
2    difference unpaid, annual bonuses paid, you acknowledge the
3    first-year bonus, due 600,000.  Isn't that what you said,
4    due 600,000?
5         A.   This was part of the discussion for, basically, a
6    performance review and what I brought in as a document for
7    discussion, yes.
8         Q.   So after you made -- your testimony is that after
9    you made your oral agreement for a three-percent bonus and
10   after you made --
11             MR. L. FRIEDMAN:  Sorry, Judge.
12        Q.   (By Mr. L. Friedman) -- after you made an oral
13   agreement for the earned, unpaid, annual bonus you're still
14   negotiating with Brian Potashnik for more?
15        A.   At that time, yes.
16        Q.   At that time was a few days after you'd made your
17   second oral agreement, according to you?
18        A.   Yes.  And --
19        Q.   I'll take yes.
20        A.   -- I confirmed --
21        Q.   I'll take yes as an answer.
22        A.   -- that as well.
23        Q.   Let's go to the employment agreement, amended
24   employment agreement, which you also sent to Brian Potashnik
25   on March 14th.  Do you remember that?
```

1         A.     Vaguely.

2                MR. L. FRIEDMAN:  Okay, let's go to the

3     amended employment agreement.

4                (Pause)

5                Am I waiting on you, Mr. Page, or are you

6     waiting on me?

7         Q.    (By Mr. L. Friedman) So this is a copy of the

8     amended employment agreement that you submitted to

9     Brian Potashnik on March 14th, 2007, a few days after your

10    alleged oral agreement for $400,000 on the unpaid, earned,

11    annual bonus.  Remember this?

12        A.     Yes.

13        Q.     And if we look at Page 2 right over here --

14               MR. L. FRIEDMAN:  Can we pull this

15    paragraph up?

16        Q.    (By Mr. L. Friedman) -- you mention not the

17    400,000 that allegedly you agreed to orally a couple days

18    before.  You've now, in your prepared amended oral

19    agreement -- I'm sorry -- amended employment agreement

20    you're saying to Mr. Potashnik the employer entities also

21    acknowledge that employee is to be paid compensation for

22    unpaid and past-due earnings of income compensation,

23    including wages and bonuses in the amount of $600,000 from

24    the period of March 15th, 2004, to March 14th, 2007.

25               Remember that?

1           A.   Yes.

2           Q.   So you've already testified you're not claiming

3    any wages in this lawsuit, right?

4           A.   Correct.

5           Q.   And you've already testified that within a few

6    days before you sent this to Mr. Potashnik you had agreed on

7    a $400,000 earned, unpaid, bonus number?

8           A.   Yes.

9           Q.   So here you were still, what, negotiating for

10   more?

11          A.   I believe I was due more and I presented that.

12          Q.   Were you negotiating for more?

13          A.   I was negotiating for more.

14          Q.   So your --

15          A.   And I was asked --

16          Q.   Sir.

17          A.   -- to put this proposal together.

18          Q.   I'll take -- I'll take more.  More is enough.

19          A.   Okay.

20          Q.   So your alleged oral agreement with Mr. Potashnik

21   wasn't final, right?

22          A.   It was final up to the 400,000.

23          Q.   It was final, except you wanted more?

24          A.   Correct.

25               MR. L. FRIEDMAN:  You can take that down.

94

```
1          Q.    (By Mr. L. Friedman) Now --
2                      MR. L. FRIEDMAN:  Has this been admitted?
3                      MR. DONOHUE:   (Inaudible).
4                      MR. L. FRIEDMAN:  Does he have a copy?
5                      MR. DONOHUE:  No.
6                      MR. L. FRIEDMAN:  Your Honor, may I
7     approach the witness?
8                      THE COURT:  Okay.
9                      MR. L. FRIEDMAN:  I'll give you a copy of
10    Defendants' 6.
11                     MS. GIBSON:  Thank you.
12         Q.    (By Mr. L. Friedman) Mr. Carpenter, do you
13    recognize Defendants' 6?
14                     MR. DONOHUE:  Defendants' 25.
15                     MR. L. FRIEDMAN:  I'm sorry.  Defendants'
16    25.  I was confused because it says Exhibit 6.
17         Q.    (By Mr. L. Friedman) It's Defendants' 25.
18         A.    Just one moment.
19                     (Pause)
20         A.    Yes.
21                     MR. L. FRIEDMAN:  Now I'll move for
22    admission of 25, Your Honor.
23                     MS. GIBSON:  There seems to be a random
24    document attached to it.
25                     THE COURT:  That shouldn't be attached?
```

1              MS. GIBSON:  That should not be attached.

2              THE COURT:  Let me see it, Mr. --

3              MR. DONOHUE:  Your Honor, we agree.  There

4    is a random document that needs to come off and does not

5    need to be part of that exhibit.  It's the last page.

6              THE COURT:  Other than that, was there an

7    objection?

8              MS. GIBSON:  No.

9              THE COURT:  Okay, 25 is admitted.

10             MR. L. FRIEDMAN:  So let's -- would you put

11   it up, Mr. Page?

12      Q.    (By Mr. L. Friedman) Let's just go to the second

13   page.  The second page of this exhibit, Carpenter 083 --

14   there you go -- reflects the same Email from you to the

15   Potashniks that we discussed earlier in your testimony,

16   correct?

17      A.    Yes, sir.

18      Q.    And the third page of this exhibit, 084, is

19   Cheryl Potashnik's Email of 12/11/07 back to you?

20      A.    Yes, sir.

21      Q.    All right.

22             Now, in this Email Cheryl says -- this is

23   December 11th, 2007.  This is about five weeks after your

24   termination at Southwest Housing Management, right?

25      A.    Yes, sir.

96

1      Q.    All right.

2            Cheryl says, Jeff, as you are aware, we

3      have honored your current employment contract by paying you

4      six weeks severance equal to six weeks base salary.

5            As required by law, you and your eligible

6      dependents are also entitled to elect COBRA benefits.

7      Devona Gray has contacted you recently regarding this and

8      you will be receiving the paperwork shortly.

9            However, as you know, your employment

10     contract does not provide for you to receive any bonus after

11     termination.  I spoke with Brian and he told me that he

12     never agreed to pay you three percent of gross after the

13     sale of the business, as you proposed in your draft

14     separation agreement.

15           As you are aware, the sale of the business

16     has not yet occurred.  If and when the sale occurs, it is

17     only at that time that we will be able to assess if any of

18     the net profits will be shared with various employees.  For

19     this reason as well as other factors involved, we cannot

20     make any promises or enter into any specific agreements with

21     anyone for possible future payments relating to the future

22     sale of the business.

23           Also, we have not agreed to pay you 600,000

24     for unpaid wages and bonuses, as you have also proposed in

25     your draft separation agreement.  Such payments would not be

1    consistent with your employment contract.  Finally, I would
2    like to remind you of your obligations under Paragraph 9 of
3    your employment agreement.
4              Then Cheryl says, If you are still
5    interested in our reasonable offer to pay you $150,000 in
6    accordance with the separation agreement we previously
7    provided to you, please let me know by December 17th, 2007.
8              Mr. Carpenter, the message that
9    Cheryl Potashnik is conveying here is the same message that
10   she gave you in the secretly recorded conversation that you
11   recorded on November 2nd, 2007, correct?
12        A.   Somewhat.
13        Q.   Yeah.  She said not going to make any commitments,
14   correct?
15        A.   Yes.
16        Q.   Going to wait till the -- sees what the sales
17   proceeds are, correct?
18        A.   Yes.
19        Q.   And specifically rejects your proposal or
20   negotiations for 600,000 in unpaid wages and/or bonuses,
21   right?
22        A.   Yes.
23        Q.   Now, by December 11, 2007, you were paid all of
24   your wages?
25        A.   Yes.

1    Q.    But yet you're still making claims for wages?

2    A.    No.

3    Q.    All right.

4    A.    I was making claim for the oral agreements.

5    Q.    I'm going to accept -- I accept no.

6              Now, when I took your deposition two weeks

7    ago, do you recall testifying that your three-percent bonus

8    was based off of the Cascade LOI?  It included three percent

9    of the gross sales price minus normal closing costs,

10   including broker's fees, title fees, legal fees, things like

11   that.  And then, also, minus other employees' bonuses before

12   your three percent would be calculated.

13             Do you remember that?

14   A.    Yes.

15   Q.    So, as of two weeks ago, your testimony --

16   according to your testimony, is that other employees'

17   bonuses would be deducted from a calculation before your

18   bonus was calculated, correct?

19   A.    That's correct.

20   Q.    All right.

21             I'm going to write that down, sir, then

22   pass the witness.

23             MR. L. FRIEDMAN:  Mr. Page, what was the

24   date of that?  Was it 3/18?

25             MS. GIBSON:  Let me know when you're ready,

1    Larry.

2              MR. L. FRIEDMAN:  Okay.

3              The deposition was 3/18?

4              MR. PAGE:  3/16.

5              MR. L. FRIEDMAN:  I'm sorry.  January 16.

6              MS. GIBSON:  It was the 15th.

7              MR. DONOHUE:  Yeah, it was 15th.

8              MR. L. FRIEDMAN:  So we'll go January 15.

9              MR. DONOHUE:  15th, 2018.

10   Q.   (By Mr. L. Friedman) Deduct payments to other

11   employees before J.C.'s -- you know it's Jeff Carpenter?

12   A.   Yes.

13   Q.   -- before Jeff Carpenter's bonus is calculated.

14   That's correct, isn't it?

15   A.   That's -- that was the agreement.

16   Q.   All right.

17              MR. L. FRIEDMAN:  I'll pass the witness,

18   Your Honor.

19              THE COURT:  Ms. Gibson.

20                   REDIRECT EXAMINATION

21   BY MS. GIBSON:

22   Q.   Mr. Carpenter, looking at -- Mr. Friedman has

23   talked about various words used to describe this latter

24   deduction.  What type of bonus are you talking about?  What

25   type of employee bonus is coming off?

1          A.     It was the -- whether we're calling it stay bonus,

2     retention bonus, or severance bonus of the corporate-related

3     people.

4          Q.     Okay.

5                 Mr. Carpenter, you said you're not seeking

6     wages.  What -- what are you talking about when you talk

7     about wages?

8          A.     My annual compensation of 200,000.

9          Q.     Salary --

10         A.     Salary.

11         Q.     -- is what that means?

12         A.     Yes.

13         Q.     Okay.

14                Mr. Friedman spent some time talking about

15    your written agreement with Southwest Housing and that

16    amendments and modifications had to be in writing.  Remember

17    that?

18         A.     Yes, ma'am.

19         Q.     We're going to talk about that for a moment.

20                And if you would, because I think this

21    exhibit is on the bench up here, just look along on your

22    screen with me, okay?

23         A.     Oh, okay.

24         Q.     Under Paragraph 3, duties --

25                THE WITNESS:  Pardon me.  That easel is --

1           MR. DONOHUE:  I'll move it.

2           THE WITNESS:  -- in my way now.

3           MS. GIBSON:  I'm sorry?

4           MR. DONOHUE:  I'll move it back.

5           THE WITNESS:  The easel is in my way.

6    Sorry.

7                Thank you.

8           Q.   (By Ms. Gibson) Okay.  You see in Paragraph 3B

9    that this contract anticipates that at some point in the

10   future you may be employed for affiliates of Southwest

11   Housing Management?

12          A.   That is correct.

13          Q.   Okay.

14               And does that paragraph contemplate there

15   may be some separate deals in the future?

16          A.   Yes.

17          Q.   And if you look back on day one under this

18   employment agreement, you see that the bonus range is only

19   for the first year?

20          A.   Yes, ma'am.

21          Q.   Calendar year of employment?

22          A.   Yes.

23          Q.   And they're going to provide a separate detailed

24   bonus plan within 90 days?

25          A.   Yes.

1    Q.   Okay.  That -- was that done?

2    A.   No, it was not.

3    Q.   Okay.

4         So from day one this document contemplated

5    you may have future separate deals, though --

6    A.   Yes.

7    Q.   -- on bonuses?

8         Okay.  Does anything in this employment

9    agreement say that a separate bonus plan would have to be an

10   amendment to the employment agreement?

11   A.   No.

12   Q.   Okay.  And, in fact, this document, does it appear

13   to refer to future separate deals?

14   A.   No.

15   Q.   The detailed bonus -- well, I realize it only

16   covers the first calendar year.  But with respect to talking

17   about a future plan being provided, does it contemplate

18   future deals?

19   A.   Yes, it does.

20   Q.   And as for getting your oral handshake agreements

21   in writing, Brian Potashnik and Cheryl Potashnik, did they

22   say they would do that?

23                  MR. L. FRIEDMAN:  Leading.

24                  THE COURT:  Overruled.

25                  THE WITNESS:  Multiple times.  Many times.

1          Q.     (By Ms. Gibson) Okay.

2                 And as far as how long you were going to

3    stay with -- stay despite the asset sale and not having a

4    job, did -- did the Potashniks ever ultimately get

5    everything out of you that they asked you to do?

6          A.     Yes.

7          Q.     Okay.

8                 Did the Potashniks ever say to you, Jeff,

9    stop, we don't have an agreement, you don't need to stay?

10         A.     No.

11         Q.     I'm talking about before the end of your work.

12         A.     No.

13         Q.     Okay.

14                Did they ever say, Jeff, you don't need to

15   work so hard because we don't have a deal, we're not

16   actually going to pay you the three-percent bonus or the

17   annual bonuses?

18                MR. L. FRIEDMAN:  Leading, Your Honor.

19                THE COURT:  Overruled.

20                THE WITNESS:  No.  Absolutely not.

21         Q.     (By Ms. Gibson) Okay.

22                Everyone wanted this to be in writing, but

23   did Brian Potashnik or Cheryl Potashnik ever say it had to

24   be in writing to be enforceable?

25         A.     No.

1          Q.   Did they ever say before you had completed your

2     work for them that all you were going to get was severance

3     under the written agreement?

4          A.   Never.

5          Q.   That was brought up first after --

6          A.   Yes.

7          Q.   -- they got the work out of you?  Okay.

8                    Before you finished and did everything they

9     asked you to, did they ever tell you, Jeff, you have no

10    legal right before October 31st?

11         A.   Cheryl -- Cheryl did in conversation a week

12    before.

13         Q.   Okay.

14         A.   Saying that I had no legal right.

15         Q.   Right, but when was your work done?  Well,

16    let's --

17         A.   Per Brian, October 12th; per Cheryl's request,

18    October 31st.

19         Q.   Okay.

20                   And what you're referring to where Cheryl

21    says no legal rights, when did that conversation occur?

22    Wasn't it around your birthday?

23         A.   Yes.

24         Q.   When was your birthday?

25         A.   November 2nd.

105

1          Q.    Okay, so that happened before or after --

2          A.    After.

3          Q.    -- they got everything out of you that they

4     needed?

5          A.    After.

6          Q.    Okay.

7          A.    After my employment.

8          Q.    Before October 31st or the earlier date where

9     Brian said you've done everything requested and you can take

10    another job and you would get paid, before either of those

11    dates, did they ever say during all of these conversations

12    about annual bonuses and three percent, Jeff, you have no

13    legal rights?

14         A.    No.

15         Q.    Instead, am I correct that -- what are some of the

16    phrases they did say to you during meetings before October

17    31st?  What were they saying about your annual bonuses and

18    your three percent?

19         A.    That they were earned.  That they were earned.

20    Thank you.  You worked -- you did above and beyond.

21         Q.    Did they ever pull out --

22         A.    It was accolades.

23         Q.    Okay.

24         A.    I never had any disagreements or -- only until

25    this.

1     Q.    Before October 31st, 2007, did they ever pull out

2  your written employment agreement with Southwest Housing

3  Management and say, Jeff, these provisions, you know, we're

4  not going to give you anything?

5     A.    No.

6     Q.    Okay.

7           They only pulled out that document when?

8  They only started talking about it when, just generally?

9     A.    My -- my last day.

10    Q.    Is that November 2nd?

11    A.    Yes.

12    Q.    Okay, let's talk about the timeline.  Do you

13  recall Larry Friedman asking you about the transcript

14  telephone conversation?

15    A.    Right.

16    Q.    Okay.  So -- and you can use your outline for

17  dates with me, okay.  This is not a memory test.

18    A.    Okay.

19    Q.    So get that if you need it.

20          When did Brian Potashnik say that you would

21  get paid, whether you leave now or later, on both your

22  annual bonuses and three-percent sale proceeds?

23    A.    October 12th.

24    Q.    Okay.

25    A.    At his house in the courtyard.

1      Q.   All right.  Okay.  And did he tell you your

2   work -- whether or not your work was done as far as he was

3   concerned?

4      A.   Yes.

5      Q.   Did he tell you whether or not all of the bonuses

6   were fully earned?

7      A.   Yes.

8      Q.   Okay.

9           And then Cheryl Potashnik, what was the

10   date all work was done per her request to you?

11      A.   At the time the transition took place of the

12   management of Pinnacle taking over, which was November 1st.

13   So, essentially, my last day would have been October 31st.

14      Q.   Okay, so October 31st.

15           And then what do you get the evening of

16   November 1st after they got everything they wanted out of

17   you?

18      A.   Standard -- a standard severance agreement saying

19   that any -- no monies will be paid after termination and I

20   have no -- I'm paraphrasing -- I have -- they have no

21   obligations to any of the agreements.

22      Q.   Okay.  And so that's when you get the separation

23   agreement asking to release all rights.  And then what's the

24   date of the transcripts of the conversation --

25           MR. L. FRIEDMAN:  Usually, we make these

1    boards after the witness testified.

2                    MS. GIBSON:  I'm scrolling --

3                    MR. L. FRIEDMAN:  Not before he testifies

4    so he can get his answers from the board.

5                    MS. GIBSON:  I'm scrolling it up.  I just

6    accidentally did it too far.

7                    MR. L. FRIEDMAN:  Okay.

8        Q.   (By Ms. Gibson) What's the date of the transcripts

9    of conversations that you were talking about?

10       A.   The vid -- or the call that I recorded?

11       Q.   Yes.

12       A.   November 2nd.

13       Q.   Okay.  So that conversation happens on the 2nd.

14   And the separation agreement that they sent on the 1st, that

15   asks you to release everything?

16       A.   Yes.

17       Q.   You see that?

18                    And the only thing they put in here was

19   wages earned through employee's termination date and some

20   PTO, right?

21       A.   Correct.

22       Q.   So, as of November 1st, did you feel like the

23   Potashniks had firmly --

24                    MR. L. FRIEDMAN:  Leading.

25       Q.   (By Ms. Gibson) As of No -- when's the first time

1    you had a firm conviction in your heart that the Potashniks

2    were reneging on their agreement?

3                    MR. L. FRIEDMAN:  Leading.

4                    THE COURT:  Overruled.

5                    THE WITNESS:  Without any conviction at

6    all, November 1st, when I received that document.

7         Q.    (By Ms. Gibson) Okay.

8                    And then Mr. Friedman asked you about a

9    December 11, 2007 Email from Cheryl Potashnik saying that

10   you're not entitled to any bonuses after you're gone.

11        A.    That's correct.

12        Q.    Okay.  And that was -- okay.

13                   And so all of these events, whether

14   suddenly pointing to your agreement, talking about we can't

15   commit, you have no legal rights, giving you only PTO and

16   some past-due wages, all of that happened after what -- did

17   that -- all of that happened before or after you had done

18   everything that both of them asked you for?

19        A.    After I performed the --

20        Q.    At any -- at any point before October 12, did

21   Brian Potashnik tell you you didn't have a deal?

22        A.    No.

23        Q.    At any point prior to October 31, 2007, did

24   Cheryl Potashnik ever say anything about you didn't have a

25   deal?

1          A.     No.

2          Q.     Did they sit back and did they see that you were

3    working hard?

4          A.     They had to, yes.

5          Q.     Did they acknowledge that?

6          A.     Yes.

7          Q.     They let you do it?

8          A.     Absolutely.

9          Q.     Did they know you expected to be paid both the

10   annual bonuses and the three-percent deal?

11         A.     Absolutely.  And as outlined.

12         Q.     And --

13                MS. GIBSON:  Do you have a redacted of your

14   D14?

15                MR. L. FRIEDMAN:  No, but (inaudible) --

16                MS. GIBSON:  Okay.

17                MR. L. FRIEDMAN:  Want the redacted?

18                MS. GIBSON:  Yeah.

19                Mark out whatever you want to mark out and

20   I'll ask about that in a minute.

21         Q.     (By Ms. Gibson) Okay.  You recall Mr. Friedman

22   saying that you were negotiating a new deal with Cheryl on

23   severance, you were attempting to negotiate a deal?

24         A.     On the unearned --

25         Q.     After --

1        A.    -- on the unearned bonuses.

2        Q.    Right.  After October 31st.  Do you recall

3   Mr. Friedman talking to you about that?

4        A.    Yes.

5        Q.    Okay.

6              Who asked you to draft something up?

7        A.    Cheryl.

8        Q.    Okay.  At that point, was your work done or not?

9        A.    It was completed.

10        Q.    Okay.  And so if y'all managed to work something

11   out after that, that would have been a new deal?

12        A.    Yes.

13        Q.    The $600,000 that you had left for them or you

14   calculate certain amounts, what did that represent at the

15   time when you dropped that off with Brian in March of '07?

16        A.    It represented the maximum earned or maximum bonus

17   potential, annual bonus potential.

18        Q.    Okay.  Did you feel like you deserved it?

19        A.    I did.  I worked around the clock seven days a

20   week.

21        Q.    Okay.

22              Did you believe your deal was still in

23   place at that time with Brian?

24        A.    Absolutely.

25        Q.    Okay.

112

1              And did Brian ever get back with you on the

2       proposal, the 600,000?

3       A.    No.

4       Q.    Okay.  And so had he said he would get back with

5       you and let you know the final total amount on annual

6       bonuses?

7       A.    Yes.  Then and --

8       Q.    Okay.

9       A.    -- and other occasions.

10             MS. GIBSON:  Larry, I've got a redacted

11      one.  I didn't realize I redacted it.

12             MR. L. FRIEDMAN:  Sorry.

13             MS. GIBSON:  That's okay.

14      Q.    (By Ms. Gibson) This is on your personal notes?

15      A.    Yes, ma'am.

16      Q.    This is Exhibit 63.  This is also part of what you

17      dropped off with Brian?

18      A.    This is what I reviewed.  Gave Brian a copy.  We

19      reviewed it at the restaurant.

20      Q.    Okay.

21      A.    And --

22      Q.    So, as of 3 --

23      A.    -- and then gave a copy to Cheryl as well.

24      Q.    Okay.

25             So, as of 3/14/2007, in your notes you talk

Appendix 001459

1      about certain amounts that came from Brian's mouth,

2      including extra bonuses were told of Fairway, 50,000;

3      McKinney, 50,000; Vegas, 100- to 200,000?

4              A.   Yes, ma'am.

5              Q.   Do you see that?

6              A.   Yes.

7              Q.   Okay.

8                        Now, on Vegas, Vegas would be the source of

9      the money?

10             A.   Yes.

11             Q.   Okay.

12                       But did Brian acknowledge to you that he

13     owed you on additional bonuses 200,000, but he -- but he

14     said he hoped to get a hundred- to 200- out of Vegas?

15             A.   Yes.

16             Q.   And on top of that, do you know in what you

17     dropped off to him that he acknowledged that there were

18     separate earned bonuses in there that would be coming to you

19     from conversions that he would apply as well?

20             A.   Yes.

21             Q.   Okay.   And so does that indicate or not indicate

22     that he intended to pay you more than the 300,000 that are

23     specifically mentioned?

24             A.   Yes, more.

25             Q.   And so for those numbers, what -- how did you get

114

1    another 50,000 and 50,000?

2        A.   Well, with that attachment was the chart of the

3    600,000 proposal; you know, the maximum proposal.

4        Q.   During all of your discussions, though, what had

5    y'all discussed as the lowest amount?

6        A.   400,000.

7        Q.   The lowest amount, the minimum you would ever get.

8    Not just these numbers.  The minimum under the range.

9        A.   Well, the lowest, according to the agreement,

10    would be 50,000 a year.

11        Q.   Okay, and is that where you're getting the

12    additional hundred thousand, this two-year minimum on the

13    dollars that he --

14        A.   Yes.

15        Q.   -- intended to pay you out of conversion on top of

16    this?

17        A.   Yes.

18        Q.   And that was the oral deal out of Brian's mouth as

19    of March of 2007?

20        A.   Yes, prior to that meeting.

21        Q.   And do you recall that Mr. Friedman accused me of

22    giving you -- what's he call it?  What does he call your --

23    your notes?  I can't think of it right now.

24               MR. SANFORD:  Script.

25        Q.   (By Ms. Gibson) Script.

115

1          A.    Script.

2          Q.    He accused me of giving you a script?

3          A.    Right.

4          Q.    Okay.

5                I am handing you what's been marked as

6     Plaintiff's Exhibit 70.  Do you recognize Exhibit 70 as

7     notes that you personally took?

8          A.    Yes.

9          Q.    Or typed up, I guess?

10         A.    Yes.

11         Q.    And when did you type up these notes?

12         A.    Shortly after my being finished.  Actually, it was

13    the 3rd of November through the 5th of November.

14         Q.    Okay, sometime between November 3rd and November

15    5?

16         A.    Yes.

17               MS. GIBSON:  Plaintiff --

18         A.    It was three days.

19               MS. GIBSON:  Plaintiff offers Exhibit 70.

20               THE COURT:   Any objection?

21               MS. GIBSON:  It is -- I already redacted

22    it.

23               MR. DONOHUE:  I was going to say I haven't

24    looked through to see about redactions.

25               Subject to any further redactions, we'd

Appendix 001462

1    have no objection.

2                    MS. GIBSON:  Okay.

3                    Plaintiff offers Exhibit 70.

4                    THE COURT:  It's -- 70 is admitted but not

5    published until we can look at it in more detail.

6                    MR. DONOHUE:  Very good.  Thank you,

7    Your Honor.

8                    MS. GIBSON:  It is -- may I go ahead and

9    portion publish --

10                   THE COURT:  Yeah.

11                   MS. GIBSON:  -- portions?  Okay.

12       Q.    (By Ms. Gibson) All right.  And you see in the

13   notes that you took shortly after the Potashniks plead to

14   back out, you see you talked about during this time period

15   Brian and I met at Cafe Express?

16       A.    Yes.

17       Q.    Okay.  And you said what about what you said you

18   would receive?

19       A.    Three percent from the gross compensation from the

20   sale transaction, less closing costs, brokerage fees,

21   attorney fees related to the transaction, title fees, and

22   other normal closing costs.  And less any deductions of any

23   compensation paid to any other employees, referring to

24   corporate.

25       Q.    Okay.

1            And when you -- you used -- you know, when
2    you use different words in the last deduction, is there
3    actually a different meaning?
4        A.    No.
5        Q.    What does it all mean?  What's the last deduction?
6        A.    That --
7        Q.    What type of bonuses are being deducted, what type
8    of compensation?
9        A.    Oh, the retention stay or severance.
10       Q.    Okay.
11       A.    Whatever terminology we're giving to the corporate
12   office.
13       Q.    Okay.
14            And then during -- during that
15   conversation, the two of you tried to run an estimate?
16       A.    Yes.
17       Q.    Okay.
18       A.    Brian's very good with figures, I'm pretty good,
19   and we ran through them.
20       Q.    Okay.   And the estimate was how much?
21       A.    A million 20, based -- that was based off the LOI,
22   which was 36 million.  It actually kind of had the caveat of
23   37 million.  We were using -- ultimately, we brought it down
24   to 34 million to get to that number, a million 20.
25       Q.    Okay.

1          A.    And that's based off 34 million.

2          Q.    And then if you -- if we flip further here, you

3    talk about something that happened on October 12th.    And is

4    that around the date that you were talking about?

5                     MR. L. FRIEDMAN:    What page?

6                     MS. GIBSON:    I'm sorry.    Bates 37.

7          Q.    (By Ms. Gibson) Is that what you were talking

8    about when he said you could go?

9          A.    Yes.

10          Q.    Okay.    And that you would get paid either way?

11          A.    That's correct.

12          Q.    Whether you left sooner or later?

13          A.    Yes.

14          Q.    Jeff, let's say one of the -- just as an example,

15    let's say one of the teachers living in one of the apartment

16    communities, she has an agreement for salary and a certain

17    amount of bonus, okay.    If she asks for more, does that mean

18    she doesn't have a deal for her existing salary and bonus?

19          A.    No.

20          Q.    Let's talk about the final results on the

21    three-percent deal.    If the asset sale was a complete loss

22    and there was no revenue to sellers, how much would you get?

23          A.    Zero.

24          Q.    Even though that was the case, though, did Cheryl

25    and Brian Potashnik want to make sure, though, that there

1    was enough money for them personally?  Is that what they're

2    referring to in the November 2nd conversations in the

3    transcript?

4          A.    I believe so, yes.

5          Q.    At one point you talked about a more firm

6    commitment.  Do you recall that?

7          A.    Yes.

8          Q.    Did you have a firm commitment on a handshake

9    three-percent deal --

10         A.    Yes, we did.

11         Q.    -- even though you asked for something more firm?

12         A.    Yes.

13         Q.    Did you have a firm commitment from

14   Brian Potashnik on at least some amount of annual bonus

15   money?

16         A.    Yes.

17         Q.    And so on the percentage deal, other than attempts

18   to add the wherefore, whereas, lawyer language, you can

19   document that deal even if you don't know what the future

20   is?

21         A.    Oh, absolutely.

22         Q.    Okay.  And the only reason you couldn't is if you

23   wanted to make sure you got -- an individual got what they

24   needed first?

25         A.    Yes.

1     Q.    And Mr. Friedman had talked about the end date for

2  your work being October 31, 2007?

3     A.    Yes.

4     Q.    And -- but when you reached the handshake

5  agreement with Brian Potashnik on the three-percent,

6  sale-proceeds-formula bonus, what was the anticipated close

7  date for the sale?

8     A.    April -- excuse me -- April, May of 2007.

9     Q.    Okay.  And did you clarify during your deposition

10  that October 31, 2000 -- the October -- that October 31,

11  2007, wasn't even something that was foreseeable at the time

12  you and Brian made --

13     A.    Correct.

14     Q.    -- the handshake deal?

15     A.    Correct.  I'm not in the foreseeable.  Not

16  mentioned; not foreseen.

17     Q.    Okay.  Do you recall Mr. Friedman accusing you of

18  going to work for another company in your last week of

19  employment?

20     A.    Yes.

21     Q.    Okay, let's talk about that for a minute.  If you

22  take a look at either Plaintiff's 2 or Defendants' Exhibit

23  4, do you see the moonlighting provision?

24     A.    Yes.

25     Q.    Simply requires you to be -- to not do anything

1    that would materially interfere with the performance of your

2    duties.

3         A.    That's what it says --

4         Q.    Okay.

5         A.    -- yes.

6         Q.    Consulting -- consulting for American Housing

7    Foundation, how much of that happened before you left?

8         A.    A weekend.

9         Q.    One weekend.  Off the clock?

10        A.    Off the clock.

11        Q.    All right.

12        A.    Touring local properties.

13        Q.    Okay.

14              And Mr. Friedman then claimed that your own

15    exhibit proved that you had gone.  Do you remember that?

16        A.    Yes.

17        Q.    Let's take a look at the exhibit.  This is Exhibit

18    61, but I'm just going to ask you to look on the screen.

19    You see it says time period is for services performed and

20    rendered from January 1, 2008, to March 31, 2009?

21        A.    Yes.

22        Q.    On Line 4.

23              Okay.  Mr. Friedman didn't point that part

24    out?

25        A.    Correct.

1      Q.    And -- but the time frame is for unpaid wages for

2    March 31, 2009, to April 7, 2009?

3      A.    Correct.

4      Q.    Okay.  Mr. Friedman didn't point out that part

5    either, did he?

6      A.    No, sir -- no, ma'am.

7      Q.    That's okay.  You can call me sir.

8            And if you go to the next page, do you see

9    there's a date, debt incurred, starting October 24, 2007?

10     A.    Yes.

11     Q.    Okay.  And you see on one of these pages -- this

12   is hard to read, but it talks about something that closed in

13   October of 2007?

14     A.    Yes.

15     Q.    A wire transfer on 10/14/07?

16     A.    Yes.

17     Q.    Okay.  What was that from AHF?

18     A.    That was a hundred-unit property that was going

19   through a complete rehab in Amarillo, an acquisition.

20     Q.    Okay.  Did they give you credit for that even

21   though you weren't working there?

22     A.    I wasn't working there.  I wasn't doing anything

23   with it.  But being close to the start date, they gave that

24   to me as a gift.

25     Q.    Well --

1       A.   A credit.

2       Q.   -- it's -- they gave you credit on it?

3       A.   They gave me credit because I'll be -- I would be

4   working on it.

5       Q.   Okay.

6            And if we back up on the claim form,

7   it clarifies above, under basis for claim, that you are

8   seeking wages, salaries, and compensation -- woops.  Sorry.

9   Your social is on there.  I'll take that off.  Unpaid

10  compensation for services performed March 31, 2009, to April

11  7, 2009?

12      A.   Correct.

13      Q.   Right?

14           Mr. Friedman didn't point that out either?

15      A.   Correct.

16      Q.   And you see that there is also a claim down here

17  for wages, salaries, or commissions of a certain amount

18  earned within 90 days before the filing?

19      A.   Yes.

20      Q.   Okay.  And the filing is October 8, 2009?

21      A.   Yes.

22      Q.   Okay.

23           So as far as comp for actual work, was all

24  of this after you left Southwest Housing?

25      A.   Yes.

1      Q.    Okay.

2      A.    Absolutely.

3      Q.    They just gave you credit for a deal because you

4  were about to come over?

5      A.    Yes.  I believe it was October 31st.

6      Q.    And by early October of 2007, had Brian already

7  given you permission to go if you wanted?

8      A.    On October 12th, yes.

9      Q.    Okay.  You remember Mr. Friedman talking about

10  sole discretion?

11      A.    Yes.

12      Q.    Okay.  But when -- whether it's sole discretion or

13  not and regardless of what the standards are --

14                  (Reporter sneezed)

15                  MR. L. FRIEDMAN:  Bless you.

16      Q.    (By Ms. Gibson) -- did Brian --

17                  MS. GIBSON:  Sorry.  Bless you.

18                  THE WITNESS:  Bless you.

19      Q.    (By Ms. Gibson) Whether or not bonuses were

20  discretionary and whether or not they got to set the amount,

21  regardless of what the standards are for earning it, did

22  Brian tell you he earned it -- you had earned it?

23      A.    Yes.

24      Q.    Okay.  And did Brian give you some specific

25  numbers that we just talked about, the Fairway, McKinney --

1        A.    Yes.

2        Q.    -- Vegas numbers?  Okay.

3              And so even though they're sole discretion,

4     has Brian, at that point, exercised his discretion?

5        A.    Yes.

6        Q.    Okay.

7              And regardless of what the standards are,

8     regardless of company performance, regardless of financially

9     how well the businesses were doing, did he tell you those

10    bonuses were earned?

11       A.    Yes.

12             MS. GIBSON:  Your Honor, I thought I would

13    be able to finish real quick.

14             THE COURT:  You want to take a lunch break?

15             MS. GIBSON:  Yeah, that's what I was

16    thinking.  I was hoping I could get done.

17             THE COURT:  We'll take an hour and 10

18    minutes for lunch, ladies and gentlemen.  We'll see you back

19    at 1:15.

20             (The jury exited the courtroom.)

21             (Lunch recess taken)

22             (The jury entered the courtroom.)

23             THE COURT:  Welcome back.  Good afternoon,

24    ladies and gentlemen.

25             We'll continue with the trial.

1    Mr. Carpenter is the witness; Ms. Gibson is the attorney

2    asking questions on redirect.  And we'll go an hour and 10

3    minutes, until about 2:25, before we take a break.

4                    Ms. Gibson, if you'd pick up where you left

5    off.

6                    MS. GIBSON:  Thank you.

7        Q.   (By Ms. Gibson) Mr. Carpenter, do you recall

8    Mr. Friedman saying that you still retain confidential

9    information on the laptop as of today?

10       A.   Yes.

11       Q.   Okay.  Let's talk about that for a minute.

12                   I'm handing you a little notebook thing.

13   Do you recognize the name on it?

14       A.   Yes.  TERIS.

15       Q.   Okay.  Who -- briefly, what did TERIS do in this

16   case?

17       A.   TERIS cloned the computer based on certain agreed

18   upon (witness cleared throat) -- excuse me -- key words that

19   both sides of counsel agreed upon.

20                   MR. L. FRIEDMAN:  I'm going to bet this is

21   about to violate the limine, Judge.

22                   THE COURT:  Okay.

23                   MS. GIBSON:  What?  I don't -- I don't know

24   how.

25                   MR. L. FRIEDMAN:  I'm going to bet this --

1          Q.    (By Ms. Gibson) And where --

2                     MR. L. FRIEDMAN:   -- is about to get into

3     discovery matters.

4                     THE COURT:   Come over here.

5                     (Sidebar conference held)

6                     THE COURT:   Vikki, the objection's

7     overruled.

8          Q.    (By Ms. Gibson) And after TERIS imaged that laptop

9     based on the parties' chosen search terms, did both parties

10    get a copy?

11         A.    Yes.

12         Q.    Okay.  And as for the laptop itself, where has

13    it been since this lawsuit started?

14         A.    Primarily, under lock and key with my attorneys.

15         Q.    Mr. Friedman asked you about going to ADR.  Do you

16    recall that?

17         A.    No, I do not.

18         Q.    Alternative Dispute Resolution?

19         A.    Okay.

20         Q.    Before filing suit?

21         A.    Oh, okay.  As part of the employment agreement?

22         Q.    Right.

23                    Let's talk about that for a moment.  Did

24    you -- in the telephone transcript on November 2nd, did

25    Cheryl Potashnik practically invite you to go ahead and sue

1    if that's what you wanted to do?

2         A.    Yes.

3         Q.    And with respect to that provision of the

4    agreement, had the Potashniks affirmatively informed you

5    that they didn't intend to --

6                   MR. L. FRIEDMAN:  Leading, Your Honor.

7    Suggesting the answer.

8                   MS. GIBSON:  Let me rephrase that.

9         Q.    (By Ms. Gibson) Had the Potashniks repudiated the

10   deal with you before that provision would have been

11   triggered to go to ADR?

12                  MR. L. FRIEDMAN:  Still.

13                  THE COURT:  Overruled.

14                  THE WITNESS:  Yes.

15        Q.    (By Ms. Gibson) Do you recall Mr. Friedman asking

16   you about a provision in the written employment agreement

17   talking about this is the entire agreement of the parties?

18        A.    Yes.

19        Q.    Okay.  And you recall Mr. Friedman saying that the

20   effective date of that agreement was in February of 2004?

21        A.    Yes.

22        Q.    Okay.  As of February of 2004 -- or I'm sorry.  As

23   of the time the parties said that was their entire

24   agreement, as of what date would that be the entire

25   agreement?

1          A.    I believe their one date -- I think it was

2     February 13; I'm not exactly sure -- was the -- on the

3     first, second line on the front page of the '04.   Both

4     parties didn't sign until 2/25/04.   I didn't start working

5     until March 15th of '04.

6          Q.    Okay.   And was one of those the effective date of

7     when that was the entire agreement?

8          A.    I assume so, yes.

9          Q.    Okay.   Did anything in that contract say this was

10    the entire agreement all the way into the future forever?

11         A.    No.

12         Q.    And, in fact, did the agreement contemplate

13    that there would be future separate deals --

14         A.    Yes, it did.

15         Q.    -- concerning --

16               DO you recall Mr. Friedman asking you if

17    Brian Potashnik said I am authorized to represent certain

18    sellers in the asset sale?

19         A.    Yes.

20         Q.    Did he need to say those exact words to you?

21         A.    No.

22         Q.    Okay.

23               What was your understanding of who owned

24    every entity involved in this lawsuit?

25         A.    Brian Potashnik.

1      Q.    What was your understanding as to whether Brian

2    was an officer of each of the entities in this lawsuit who

3    sold assets in the asset sale?

4      A.    Brian Potashnik.

5      Q.    And did you see that he was listed as agent for

6    sellers in the purchase and sale agreement?

7      A.    Yes, I did.

8      Q.    Okay.

9            And what did he say about whether or not

10   Cheryl Potashnik had blessed the three-percent deal?

11     A.    That she agreed to it.

12     Q.    Okay.  And when -- when was that?  When did he

13   tell you that?

14     A.    When I tried to renegotiate for five percent.

15   Basically, the following day.

16     Q.    And in connection -- Mr. -- who had you been

17   informed, early on, mainly handled compensation issues?

18     A.    I'm sorry.  Would you mind repeating?

19     Q.    Early on -- well, let me just do this.  Remember

20   Mr. Friedman used portions of your declaration?

21     A.    Yes.

22     Q.    Okay.  And, of course, also in that -- and here

23   you talk further about why all of the five defendants were

24   parties to the three-percent deal?

25     A.    Yes.

1        Q.    Okay.  And you say that was clear based on

2    additional work you were to do and did do to benefit each of

3    them --

4        A.    Yes.

5        Q.    -- in efforts to sell?  Okay.

6                     That's the Southwest Housing and the

7    Potashniks --

8        A.    Affordable Housing assets.

9        Q.    Okay.  And also your discussions with the

10   Potashniks?

11       A.    Yes, ma'am.

12       Q.    Okay.

13                    And, also, Mr. Potashnik was the highest

14   level person at all of the entities, and you had been

15   informed early on that he usually handled compensation

16   agreements?

17       A.    Yes.

18       Q.    Who told you that he -- who told you that he

19   usually handled compensation agreements?

20       A.    Cheryl Potashnik.

21       Q.    Okay.  So did Brian Potashnik appear to have

22   authority to make a deal on seller -- certain formula seller

23   proceeds?

24       A.    Yes, ma'am.

25       Q.    And Mr. Friedman also played various clips from

```
 1    your deposition?

 2         A.    Yes.

 3         Q.    Okay.

 4              But you also remember various other points

 5    in your deposition that clarify these things.  For example,

 6    when he said at least on December 11, 2000 --

 7              MR. L. FRIEDMAN:  Your Honor, I know she's

 8    not going to read from his deposition.

 9              THE COURT:  She's -- are you reading what

10    Mr. Friedman introduced?

11              MS. GIBSON:  No.  No.  I'm just showing

12    that there are other portions --

13              THE COURT:  Okay.  You can ask him if he

14    recalls and see if he needs his memory refreshed.

15              MS. GIBSON:  Okay.

16         Q.   (By Ms. Gibson) Do you recall saying that what the

17    Potashniks said on December 11, 2007, was a lie that there

18    was -- when they said there was no deal?

19         A.    Yes.

20              MR. L. FRIEDMAN:  Line and page, please.

21              MS. GIBSON:  I'm sorry.  132 -- oh, this is

22    in the 2010 volume.  Let me know when you're there.

23              MR. L. FRIEDMAN:  Do we have that?

24              MS. GIBSON:  Okay.

25              MR. L. FRIEDMAN:  Hold on.
```

```
 1                    MR. DONOHUE:  132?

 2                    MS. GIBSON:  Yeah.

 3                    MR. L. FRIEDMAN:  Your Honor, she can't

 4      impeach her own witness.  She can just ask him the

 5      questions.

 6                    THE COURT:  That's -- you're the one that

 7      asked for page and line.  That's why I told her -- asked her

 8      if he remembers what he said, if she needs it to refresh his

 9      memory.

10                    MR. L. FRIEDMAN:  Okay.

11                    MS. GIBSON:  That's what I thought I was

12      doing.  Does he remember what he said --

13                    THE COURT:  That's what you were doing.

14      Keep going.

15                    MS. GIBSON:  Okay.

16                    Are y'all ready?

17                    MR. L. FRIEDMAN:  Yeah.

18                    MS. GIBSON:  Okay.

19          Q.    (By Ms. Gibson) And do you remember in response to

20      Mr. Friedman saying you just didn't have the deal on

21      December 11th, would you agree with that, do you recall what

22      you said?

23          A.    Yes.  I did not agree with that.

24          Q.    Okay.  Do you recall saying, no, we had a deal?

25          A.    No, we -- yes, I recall we had a deal.
```

134

1      Q.    Okay.

2            Do you recall whether or not you disagreed

3  with the Potashniks' statement that the payments you were

4  requesting would not be consistent with your employment

5  contract?

6      A.    Yes.

7      Q.    What did you say?

8      A.    That they could be modified orally and they still

9  need to be discussed.

10     Q.    Okay.  And do you recall also saying her

11 interpretation, I disagree?

12     A.    I do.

13               MR. L. FRIEDMAN:  Line and page, please?

14               MS. GIBSON:  That was 136, 25 to 1 and 5.

15 And I'm moving to 159 to 10 to 17.

16               MR. L. FRIEDMAN:  I'm sorry.  159, 17?

17               MS. GIBSON:  Yes.

18               MR. L. FRIEDMAN:  Thank you.

19               MS. GIBSON:  Wait, 159, 10 to 17.

20               MR. L. FRIEDMAN:  Okay.

21     Q.    (By Ms. Gibson) And do you recall Mr. Friedman

22 asking, Well, you had no deal for a bonus 'cause you

23 couldn't get it in writing and you couldn't get Brian or

24 Cheryl or Southwest Housing or anyone else to agree with it?

25 Isn't that the truth?

1              Do you recall your answer?

2      A.    I disagreed with that statement.

3      Q.    And do you recall saying I disagree?

4      A.    I disagree.

5              MS. GIBSON:  And I'm now at Page 174, 18 to

6      25.

7              (Pause)

8              MS. GIBSON:  Are you there?

9              MR. L. FRIEDMAN:  Yes.

10     Q.    (By Ms. Gibson) And do you recall Mr. Friedman

11     asking you, But the truth is nobody knew if Cheryl Potashnik

12     or Brian Potashnik said, Jeff Carpenter, we have a deal?

13     Isn't that the truth?

14              And do you recall exactly what you said to

15     that answer?

16     A.    I disagreed with that.

17     Q.    Okay.  Do you recall saying that is not the truth?

18     We had a deal.  We had a deal.

19     A.    That's correct.

20     Q.    Okay.  And these are only a few examples?

21     A.    Yes, ma'am.

22              MS. GIBSON:  Pass the witness.

23              THE COURT:  All right.

24              Mr. Friedman?

25              MR. L. FRIEDMAN:  Sure.  Just briefly.

RECROSS EXAMINATION

BY MR. L. FRIEDMAN:

Q.    Mr. Carpenter, all of these examples from your deposition were examples when you disagreed with me when I was examining you, not Brian or Cheryl Potashnik, correct?

A.    Questions that you asked, though.

Q.    Questions I asked you, correct?

A.    On behalf of the Potashniks.

Q.    Yeah.  These weren't examples of telling the Potashniks at the time of those conversations you're wrong, we have a deal?

A.    I don't understand what you're saying.

Q.    The passages your lawyer was referring to in your deposition was you telling me at the deposition you disagreed with my questions, correct?

A.    In reference to the Potashniks and you representing the Potashniks as if they asked the question, yes.

Q.    Yes.  Correct.  Thank you.

Number two, you keep saying that the Potashniks never denied your deal, right?

A.    Correct.

Q.    Well, if there wasn't any deal, they didn't have to deny it, correct?

A.    Pardon me?

1      Q.   If there was no oral agreements, they didn't have

2  to deny there was an oral agreement, correct?

3      A.   I had an oral -- I have an oral agreement --

4      Q.   I know that's your contention, but that wasn't my

5  question.

6      A.   I don't understand your question.  I'm sorry.

7      Q.   Let me clarify it.

8      A.   Thank you.

9      Q.   If there were not two oral agreements, as you

10  allege, the Potashniks didn't have to deny there were two

11  oral agreements, correct?

12      A.   I guess you could take that stance, yes.

13      Q.   Okay.

14              And when you had the opportunity to

15  confront the Potashniks in those two secretly recorded

16  conversations with your two alleged oral agreements, you

17  didn't confront them, correct?

18      A.   I did not confront them.  My goal and purpose was

19  to --

20      Q.   I'll take that -- I'll take that as an answer.

21               Even though your wife Vikki Carpenter told

22  you to go get your deal recorded?

23      A.   She did not say deal.

24      Q.   She said go get your agreement on tape.  It was

25  her suggestion to record the Potashniks to get your deal on

1    tape.  Isn't that true, sir?

2         A.    She knew that --

3         Q.    Sir --

4         A.    -- we had a deal and the separation agreement --

5         Q.    Sir, is it true --

6         A.    -- was --

7         Q.    -- or not?  It's the only question.

8         A.    The way you're presenting it is untrue.

9         Q.    Okay.

10              Did Mrs. Potashnik make -- I'm sorry.  Did

11   Mrs. Carpenter make the suggestion that you go record your

12   conversations with Brian and Cheryl Potashnik?

13        A.    I believe she did.

14        Q.    Well, you heard her testify she did.

15        A.    Yes, but I'm not exactly clear if she did or

16   didn't.

17        Q.    Okay.  So you don't believe --

18        A.    We were talking.

19        Q.    -- you don't believe her testimony?

20        A.    That's not true.

21        Q.    You were here when she testified.

22        A.    That's not true.  We --

23        Q.    You accept her testimony when she testified from

24   where you're sitting that she told you to go record these

25   conversations?

1         A.    She knew I was very upset.

2         Q.    Sir, my only question is, Mrs. Carpenter told you

3    to record conversations with Brian and Cheryl Potashnik?

4         A.    Yes.

5         Q.    And you followed her instructions, yes?

6         A.    To find out why the separation --

7         Q.    Sir, you followed her instructions.  Yes or no?

8         A.    Yes.

9         Q.    Okay.

10              How many conversations with Brian Potashnik

11   did you record?

12        A.    As I stated before, just the one.

13        Q.    How many conversations with Cheryl Potashnik did

14   you record?

15        A.    Just the one.

16        Q.    Okay.  And in those conversations you never

17   confronted them with either one of your alleged oral

18   agreements, correct?

19        A.    We -- I referred --

20        Q.    It's just a yes or --

21        A.    -- and discussed the agreements.

22        Q.    It's a yes-or-no question.

23        A.    I did not bring up the agreements specifically.

24   That was not the goal.

25        Q.    Thank you.

```
 1                    Now, you own a laptop yourself?
 2        A.   Yes.
 3        Q.   You own a cell phone?
 4        A.   Yes.
 5        Q.   Did you own a cell phone in 2007?
 6        A.   I don't recall.  No, I don't think so.
 7        Q.   Did you own --
 8        A.   Only the one that Brian gave me, yes.
 9        Q.   Did you have a cell phone on the days that you
10   allege these oral agreements took place?
11        A.   Yes.
12        Q.   Okay.  But even though you had a cell phone on
13   those days and the day after, you didn't send a text to
14   Brian or Cheryl or an Email to Brian or Cheryl saying thank
15   you for this agreement or I'm confirming this agreement and
16   here are the ingredients, one, two, three, four, five, six.
17   You never did that, did you?
18        A.   I did it in an attempt --
19        Q.   Sir --
20        A.   -- with the severance agreement --
21        Q.   Sir --
22        A.   -- that was requested.
23        Q.   Sir --
24        A.   That's --
25                    MR. L. FRIEDMAN:  Unresponsive, Your Honor.
```

1           THE COURT:  Okay, listen to his question.
2   Answer only his question, please.
3       Q.   (By Mr. L. Friedman) I'm not trying to fight with
4   you.  I'm just saying you never sent a text to Brian and
5   Cheryl when you made the agreement or a day afterwards
6   confirming your agreement.  Isn't that true?
7       A.   Only in the separation agreement.  That's true.
8       Q.   And you never sent a text or Email to Brian and
9   Cheryl when you made your first or second oral agreement;
10  isn't that true?
11      A.   Not detailing the agreement.
12      Q.   All right.  That's all I'm asking you.
13           And isn't it also true that you've never
14  testified about your second oral agreement until today?
15      A.   You'd know better than I.  I'm not sure.
16      Q.   I do know better than you, but the question is you
17  never testified about that second oral agreement until
18  today.  Today was the first time you ever mentioned it;
19  isn't that true?
20      A.   Oh, the -- yes, the 400.  Yes.
21           MR. L. FRIEDMAN:  I have nothing further,
22  Your Honor.
23           THE COURT:  All right.  Thank you.
24           Ms. Gibson?
25           MS. GIBSON:  Plaintiff rests.

142

1                      THE COURT:  You're passing this witness,

2        though?

3                      MS. GIBSON:  Oh, yeah.

4                      THE COURT:  Okay.

5                      Thank you, Mr. Carpenter.

6                      (End of proceedings)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

143

1   THE STATE OF TEXAS

2   COUNTY OF DALLAS

3        I, Vikki L. Ogden, Official Court Reporter in and for

4   the County Court at Law Number 5 of Dallas County, State of

5   Texas, do hereby certify that to the best of my ability the

6   above and foregoing contains a true and correct

7   transcription of all portions of evidence and other

8   proceedings requested in writing by counsel for the parties

9   to be included in the Reporter's Record, in the above-styled

10  and -numbered cause, all of which occurred in open court or

11  in chambers and were reported by me.

12       I further certify that the total cost for the

13  preparation of the Reporter's Record is $939.50 and will be

14  paid by Friedman & Feiger, LLP.

15       WITNESS MY OFFICIAL HAND this the 27th day of February,

16  2018.

17

18

19                              /S/ Vikki L. Ogden
                                _____
20                              VIKKI L. OGDEN, Texas CSR# 6309
                                Official Court Reporter
21                              Dallas County Court at Law No. 5
                                600 Commerce Street, Floor 5
22                              Dallas, Tx. 75202
                                (214)653-6443
23                              Certification Expires:  12/31/18

24

25

Appendix 001490

1                 REPORTER'S RECORD (EXCERPT)

2                   VOLUME 7 of 11

3          <u>Trial Court Cause No. CC-08-02072-E</u>

4   JEFFREY W. CARPENTER,        )  IN THE DALLAS COUNTY
                             )

5          Plaintiff,        )

6   VS                    )  COURT AT LAW NO. 5

7   SOUTHWEST HOUSING DEVELOPMENT  )
   COMPANY, INC., ET AL,       )

8          Defendants.      )  DALLAS, TEXAS

9   ————————————————————————————————————

10

11               TRIAL ON THE MERITS

12   ————————————————————————————————————

13

14     On the 30th day of January, 2018, the following

15   proceedings came on to be heard within the presence

16   of a jury, in the above-entitled and -numbered cause;

17   and the following proceedings were had before the

18   HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19   Dallas County, Texas:

20     Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25

```
 1                         APPEARANCES:

 2

     MS. AMY GIBSON
 3   SBN 00793801
     Gibson Wiley, PLLC
 4   1500 Jackson Street, Suite 714
     Dallas, Texas 75201
 5   (214)522-2121
     Attorney for Plaintiff
 6
                -AND-
 7
     MR. BRIAN SANFORD
 8   SBN 17630700
     Sanford Firm
 9   1910 Pacific Avenue, Suite 15400
     Dallas, Texas 75201
10   (469)361-9111
     Attorney for Plaintiff
11
                -AND-
12
     MR. LAWRENCE "LARRY" FRIEDMAN
13   SBN 07469300
     MR. MICHAEL DONOHUE
14   SBN 05989380
     MR. JASON FRIEDMAN
15   SBN 24059784
     Friedman & Feiger, LLP
16   5301 Spring Valley Road, Suite 200
     Dallas, Texas 75254
17   (972)788-1400
     Attorneys for Defendants
18
                -AND-
19
     MR. RYAN HALE
20   SBN 24097784
     Hawkins Parnell Thackston & Young, LLP
21   4514 Cole Avenue, Suite 500
     Dallas, Texas 75205-5412
22   (214)780-5138
     Appellate Attorney for Defendants
23


24
     ALSO PRESENT:  Steve Page, A/V Technician
25
```

```
1                          VOLUME 7

2     January 30, 2018                              PAGE

3     Proceedings ----------------------------------    4

4

5     DEFENDANTS'
      WITNESS:
                      Direct   Cross   Redirect   Recross
6     Aaron Goldstein    5       6        7         --

7
      Plaintiff Rests ------------------------------    8
8
      Defendants' Motions for Directed Verdict ------   8
9
      Court's Rulings ------------------------------   21
10
      Both Sides Close -----------------------------   22
11
      Plaintiff's Motions --------------------------   24
12
      Defendants' Motions for Directed Verdict ------  28
13
      Court's Ruling -------------------------------   34
14
      Defendants' Motions for Directed Verdict ------  36
15
      Court's Ruling -------------------------------   44
16
      Defendants' Motion for Directed Verdict -------  44
17
      Court's Ruling -------------------------------   46
18
      Defendants' Motion for Directed Verdict -------  46
19
      Court's Ruling -------------------------------   48
20
      Defendants' Motion for Directed Verdict -------  48
21
      Court's Ruling -------------------------------   49
22
      Adjournment ----------------------------------   49
23
      Court Reporter's Certificate -----------------   50
24

25
```

```
1                    P R O C E E D I N G S
2                      January 30, 2018
3                 THE COURT:  Let me see you on the side over
4     here first.
5                 (Sidebar conference held)
6                 THE COURT:  Plaintiff's not resting.  We're
7     calling a witness out of order.
8                 All right.
9                 (The witness entered the courtroom.)
10                THE COURT:  Mr. Goldstein, if you'd come
11    all the way up here.
12                Mr. Friedman, is this your witness?
13                MR. J. FRIEDMAN:  Yes, Your Honor.
14                THE COURT:  Okay.  If you'd go ahead and
15    call your witness.
16                MR. J. FRIEDMAN:  I call Mr. Goldstein.
17                THE COURT:  All right.
18                Mr. Goldstein, if you'd come from all the
19    way over here.  Just have a seat back here.
20                MR. L. FRIEDMAN:  For the record,
21    Your Honor, I was Mr. Friedman first.
22                THE COURT:  There's a passel of
23    Mr. Friedmans.
24                Just have a seat right here.
25                This next witness, Mr. Goldstein, was
```

1        already sworn in.  We swore him in outside your presence,

2        but his testimony is under oath just like all the witnesses.

3                    Whenever you're ready.

4                        AARON GOLDSTEIN,

5        having been previously sworn, testified as follows:

6                    DIRECT EXAMINATION

7        BY MR. J. FRIEDMAN:

8            Q.   Good afternoon, Mr. Goldstein.  My name's

9        Jason Friedman.

10                   We've never spoken before; is that correct?

11           A.   No.

12           Q.   And you understand you're a witness in this case,

13       correct?

14           A.   Yes.

15           Q.   And were you contacted by plaintiff's counsel,

16       Ms. Gibson?

17           A.   Yes.

18           Q.   How many times were you contacted by her?

19           A.   I believe it was just once.  On a Friday, the day

20       I got subpoenaed.  I believe so.

21           Q.   And what -- what was that conversation?

22           A.   She wanted to know if I recalled a conversation I

23       had with Jeff or she said I had with Jeff in his backyard

24       when I was doing some landscaping at their house.

25           Q.   And did you remember the conversation?

1      A.    No, I did not.  She said it was about 10 or 11

2  years ago.  There's no way I can recall that.

3      Q.    And what did she tell you happened?

4      A.    She asked if I recalled congratulating Jeff on the

5  sale of the company.  But I told her, I'm sorry, I don't

6  recall that.  If I did it, you know, I don't recall that.

7      Q.    Was that it?  Was that all you told Ms. Gibson?

8      A.    I told her something that was that important I

9  felt should have been written down.  I'm sure it was in

10  writing somewhere or an Email, if we had Email back that

11  long ago.  And she said, no, there wasn't anything in

12  writing.  And I just think something that important would

13  have been.  And I think that was the extent of it.  We

14  talked only for a few minutes.

15            I asked her if she was going to depose me

16  to find out if I recalled anything.  And she said, no, that

17  I just have -- I'd go as a witness and I'd have to show up

18  in court.

19      Q.    All right.  Thank you for your time.

20            MR. J. FRIEDMAN:  I'll pass the witness.

21            THE COURT:  All right.

22            Ms. Gibson.

23                CROSS-EXAMINATION

24  BY MS. GIBSON:

25      Q.    Mr. Goldstein, are you aware that oral agreements

1      are enforceable in Texas?

2              A.    I think you told me that.

3                          MR. J. FRIEDMAN:  I object, Your Honor.

4                          MS. GIBSON:  Okay.

5                          MR. J. FRIEDMAN:  Calls for a legal

6      conclusion.

7                          THE COURT:  It does, but --

8                          MS. GIBSON:  He answered.  I'm done.

9                          THE COURT:  Okay.  Fair enough.  You pass

10     the witness?

11                         MS. GIBSON:  Pass the witness.

12                         THE COURT:  Okay.

13                         Thank you, Mr. Goldstein.

14                         THE WITNESS:  Thank you.

15                         THE COURT:  Or did you have anything?

16     Mr. Friedman, any redirect?

17                         MR. J. FRIEDMAN:  Yes, a couple questions,

18     Your Honor.

19                         REDIRECT EXAMINATION

20     BY MR. J. FRIEDMAN:

21             Q.    Was Ms. Gibson aggressive when trying to put words

22     in your mouth?

23             A.    No.

24             Q.    No?

25             A.    No.  She just wanted to know if I recalled the

1    conversation.

2         Q.   Okay.   Thank you.

3                   THE COURT:   Very good.

4                   Pass the witness?   All right, thank you.

5                   Ladies and gentlemen, we'll take about a

6    20-minute break, maybe 25 minutes.   We'll see how long.   And

7    we'll take a 20-minute break.

8                   (The jury exited the courtroom.)

9                   THE COURT:   Y'all come on up.

10                  Vikki, let's get on the record that

11   plaintiffs rest.   Is that right, Ms. Gibson?

12                  MS. GIBSON:   Yes.

13                  THE COURT:   All right.

14                  (Lengthy pause)

15                  THE COURT:   We're off the record right now.

16                  (Off the record)

17                  THE COURT:   We're on the record now.

18                  THE REPORTER:   Okay.

19            DEFENDANTS' MOTIONS FOR DIRECTED VERDICT

20                  MR. L. FRIEDMAN:   Thank you, Your Honor.

21                  Let's address a couple of things that are

22   obvious.   I'd like to move for a directed verdict in favor

23   of Cheryl Potashnik.   The witness testified that he had no

24   agreement with Cheryl Potashnik, period.   I don't think

25   there's any evidence that there was any agreement with

 1    Cheryl Potashnik; and, therefore, no causation, no
 2    liability, no breach of contract, no damages.
 3                    THE COURT:  Okay.  What's your theory
 4    against Ms. Potashnik?
 5                    MS. GIBSON:  With Ms. Potashnik it's -- she
 6    is only involved in a few claims and it all concerns the
 7    asset sale.  And with respect to her, Mr. Carpenter
 8    testified that Brian Potashnik had authority or apparent
 9    authority to act on her behalf in making the deal for all
10    sellers.  We also offered evidence that she identified
11    herself as a seller in the asset sale.
12                    MR. HALE:  Your Honor, if I may?
13                    Oh, I'm sorry.  I didn't mean to interrupt
14    you.  Pardon me.
15                    MS. GIBSON:  So part of it is based on
16    documents that say Brian was the agent for sellers.  Part of
17    it is for documents she signed saying she was a seller
18    individually.
19                    THE COURT:  Even if she's a seller, how
20    does that make her liable?
21                    MS. GIBSON:  No, I'm -- I'm pointing out
22    that the documents show that Brian Potashnik was acting as
23    agent for all the sellers and she was one of the sellers.
24    And, therefore, Brian had apparent authority to act on her
25    behalf in connection with the sale.  He -- he was the agent.

Appendix 001499

10

```
1                    THE COURT:  You're not suing for the sale.
2      You're suing for the commission.  Not the commission, the
3      bonus.
4                    MS. GIBSON:  Correct, but the -- the
5      percentage was in connection with the sale.  And, also, on
6      top of that, Brian Potashnik had said no to the five percent
7      because -- because he said Cheryl had already blessed the
8      three percent.
9                    In addition to that, Cheryl Potashnik had
10     informed Mr. Carpenter that it is Brian that would normally
11     handle the compensation agreements.
12                   THE COURT:  Right.
13                   MS. GIBSON:  And then, also, in addition to
14     that, at various points along the way when they were talking
15     about that deal, she affirmed and said it was due and owed.
16                   THE COURT:  But even -- even assuming all
17     of this is like if the CEO guy, Jones, if he were to affirm
18     that, you know, you're right, it's due and owing, he's still
19     not -- he's not the one you sued.
20                   MS. GIBSON:  Well, that -- that's just a
21     piece of it.
22                   THE COURT:  All right.
23                   MS. GIBSON:  But all he said in his
24     deposition testimony about her is, no, she wasn't in the
25     meeting that day when he shook hands with Brian, but I
```

1   submitted on an actual or apparent authority theory.

2                    THE COURT:   Uh-huh.

3                    MS. GIBSON:   And then the other two are

4   that she was part -- as a seller, she was part of a joint

5   enterprise, joint venture.   And if -- if they are, then she

6   is responsible for the individual entities in it.   And if

7   not -- and we are not submitting -- we're not submitting an

8   alter ego claim against her.

9                    THE COURT:   Okay.   And we'll come back to

10  that.

11                   MR. L. FRIEDMAN:   Let me just ask.   Will --

12  will you voluntarily agree to dismiss Cheryl Potashnik?

13                   THE COURT:   Just what?

14                   MR. L. FRIEDMAN:   I'm just going to ask if

15  she'll voluntarily agree to submit -- to dismiss

16  Cheryl Potashnik.

17                   THE COURT:   Okay.   Well, she just argued

18  against it.   I may still -- I'm going to rule on that in a

19  second.

20                   MR. L. FRIEDMAN:   Okay.   May we respond to

21  her argument?

22                   THE COURT:   No.

23                   MR. L. FRIEDMAN:   Okay.

24                   Number two, I'd like to move for directed

25  verdict on the basis of their entire breach-of-contract

12

```
1    claim because the evidence has been that according to
2    Mr. Carpenter he is not suing to recover under the contract.
3    He is simply suing to recover under two oral agreements:
4    One oral agreement, the -- I call it the HUD oral agreement
5    between him and Brian Potashnik in March of 2006; and then
6    the -- this new oral agreement I heard of today.  But I
7    specifically asked them whether, on both agreements, whether
8    they were outside the -- the --
9                    THE COURT:  I think that's the way she
10   submitted it.
11                   She -- you're not suing on the written
12   contract.
13                   MS. GIBSON:  Well, the way we submitted
14   it, it's up to the jury to decide whether it was a separate
15   deal or a modification of the original deal.
16                   THE COURT:  Whatever it is, it's not a
17   written modification.  It's -- you're not suing on the
18   written contract.
19                   MS. GIBSON:  Well, yes, but the only way
20   it would come in with the written contract is if -- is if
21   the oral deal was considered a modification of the written
22   agreement.
23                   THE COURT:  I think that's something we
24   take up in the jury charge.
25                   MR. L. FRIEDMAN:  Let me just say, reading
```

Appendix 001502

13

```
 1     the petition, it's my understanding that they are suing for
 2     breach of contract.  But I could be wrong.
 3                      Are you not suing for breach of contract?
 4                      MS. GIBSON:  Breach of the agreement.
 5                      THE COURT:  Breach of the oral contract.
 6                      MR. L. FRIEDMAN:  Well, my direct -- my
 7     motion is directed towards breach.  There's no breach of the
 8     written employment contract.
 9                      THE COURT:  Okay.
10                      MR. L. FRIEDMAN:  Per Mr. Carpenter.
11                      There was no testimony about --
12                      MS. GIBSON:  And --
13                      MR. L. FRIEDMAN:  Go ahead.
14                      MS. GIBSON:  Go ahead.
15                      And I was just going to say on the prior
16     issue, the instructions, leave it to the jury whether it's
17     just an oral agreement or an oral modification.
18                      THE COURT:  Okay.
19                      MR. HALE:  Your Honor, he stated that he's
20     not suing; that he doesn't believe it's part of the written
21     contract.
22                      MR. L. FRIEDMAN:  Yeah, he --
23                      THE COURT:  I think y'all are kind of -- I
24     understand what both of y'all are saying.  I think I have a
25     handle on it.  I think it's a jury charge issue.
```

1           MR. L. FRIEDMAN:  And I don't think there's

2   any evidence with regard -- particularly, alter ego.  And

3   the other one was joint enterprise.

4               And what was the other one?

5           THE COURT:  Joint venture.

6           MR. L. FRIEDMAN:  Joint venture.

7               I don't think there's any evidence for any

8   of that stuff.

9           THE COURT:  All right.  Just -- anything

10  else?

11          MR. L. FRIEDMAN:  What else?

12          MS. GIBSON:  Not unless you want me to

13  respond to joint venture, joint enterprise.

14          THE COURT:  Yeah.

15          MR. HALE:  Your Honor, we'd also like to

16  move for a directed verdict on other claims for unpaid

17  annual bonuses.  And all the claims that he's stating he was

18  owed so far he said were outside of the written agreement.

19  I think he stated that pretty directly.  And each time he

20  said that he confirmed the deal or whatever it was.  It was

21  always for bonuses he had earned in the past.  So, there was

22  no new consideration provided by him.  It was just a

23  gratuitous promise.

24          THE COURT:  Go ahead, Mr. Friedman.

25          MR. L. FRIEDMAN:  One other thing.  On the

1    statute of frauds, Mr. Carpenter testified clearly -- I

2    wrote it down on the board -- that with regard to even his

3    alleged oral agreement, that our position is there was no

4    oral agreement.  But even his alleged oral agreement had a

5    start date of October 13th, 2006, and had an end date of

6    October 31, 2007, any contract for performance of more than

7    one year is -- is -- fails because of the statute of frauds.

8    And we think that his testimony was clear and his -- that --

9    at least, oral agreement number one fails on the basis of

10   the statute of frauds.

11                    THE COURT:  All right.  Anything else?

12                    MR. HALE:  Yes, Your Honor.  I think you

13   were going to talk about the Vanegas case, it seemed like.

14                    THE COURT:  What?

15                    MR. HALE:  I know that she wanted to

16   distinguish, I believe, the -- or I'm sorry, maybe not.

17                    (Laughter)

18                    THE COURT:  No.

19                    MR. HALE:  Maybe I'm getting too far into

20   this.

21                    THE COURT:  You're assuming I read

22   something there.  You're giving me a lot more credit than I

23   deserve there.

24                    Anything you wanted to say in response to

25   their arguments?

16

```
 1                    MS. GIBSON:  Sure.

 2                    With respect to consideration, the Texas

 3        Supreme Court, in Vanegas, made very clear that continued

 4        service is appropriate consideration to support new

 5        compensation.  As I said, that the -- well, if that wasn't

 6        the rule, nobody's -- you know, people cannot get paid their

 7        wages.

 8                    And on the statute of frauds the test looks

 9        at whether the agreement could even remotely possibly be

10        completed in a year when the deal is made.  They don't look

11        at whether it actually took longer than that.  And so it's

12        undisputed in this case that when Brian Potashnik announced

13        the specific formula in October of 2006 the anticipated

14        close date was spring or summer of 2007.  And courts are

15        clear that even if it ultimately takes longer it's that you

16        just look at it in the beginning.  And if it's remotely

17        possible, however probable even that may be, it's still

18        outside statute of frauds.

19                    MR. L. FRIEDMAN:  More?

20                    MR. HALE:  I'm sorry.

21                    MR. L. FRIEDMAN:  No evidence of quantum

22        meruit.  Mr. Carpenter testified that he was paid his

23        generous $200,000 salary until his last day of employment;

24        in fact, two days beyond his last day of employment, which

25        was October 31st, 2006.  He was paid through November 2nd,
```

Appendix 001506

1    2006.  So there's no room there for quantum meruit because

2    he was paid in full for the services, his salary for the

3    performance of his job.

4                    With regard to the winding-up claim,

5    there's no evidence that --

6                    THE COURT:  I don't think she submitted

7    anything about winding up.

8                    MR. L. FRIEDMAN:  No winding up?

9                    MS. GIBSON:  Not separately.

10                   MR. L. FRIEDMAN:  All right.

11                   MS. GIBSON:  It's the winding up facts are

12   part of the alter ego claim against Brian Potashnik.

13                   MR. L. FRIEDMAN:  All right, so winding up

14   on all three of those.

15                   Joint employer is gone too?

16                   THE COURT:  Joint enterprise is in there.

17                   MS. GIBSON:  Right.  Joint employer is out.

18                   MR. L. FRIEDMAN:  Joint employer is out.

19                   And joint enterprise?

20                   THE COURT:  Is there.

21                   MR. L. FRIEDMAN:  I don't think there's any

22   evidence of a joint enterprise.  In fact, to the contrary,

23   the evidence was all of these companies were independent

24   companies, operated independently although related, and that

25   both Brian Potashnik and Cheryl Potashnik were employees of

1    those companies.

2                    THE COURT:  All right.  Anything else?

3                    MS. GIBSON:  Not unless you want me to

4    respond to that.

5                    Oh, oh, on quantum meruit I would point out

6    that the Texas Supreme Court, in the same case, literally

7    said that staying is a valuable service on its own.

8                    MR. HALE:  Your Honor -- I'm sorry.

9                    MR. L. FRIEDMAN:  I'm just saying staying

10   but staying after a period of time.  Mr. Carpenter was

11   employed, did all of his jobs as an employee, and was paid

12   as an employee through his last day of employment.  So

13   staying and getting paid, you know, at the end of every

14   employment period everybody was even.  If he worked, he got

15   paid.  He worked, he got paid.  He worked, he got paid.

16                   MS. GIBSON:  Vanegas is a stay-and-pay

17   case.

18                   MR. HALE:  Your Honor --

19                   THE COURT:  And for Vikki, Vanegas is

20   V-a-n-e-g-a-s.

21                   THE REPORTER:  Thank you.

22                   MR. HALE:  Your Honor, I have a copy for

23   you, if you'd like.

24                   THE COURT:  I have it.

25                   MR. HALE:  Okay.

Appendix 001508

1                      If I could -- I'm sorry.  That's yours.

2              MR. L. FRIEDMAN:  No, go ahead.

3              MR. HALE:  If I could just briefly

4    distinguish Vanegas.  In that case what they were saying is

5    that bonuses, a promise of bonus in the future to an

6    employee who would stay until a specified date or until a

7    specified event, as long as they stayed through that date

8    and didn't leave the company before then they would be

9    entitled to a bonus.  Now, they said up until that point

10   when you stay until the specified date it's a losery because

11   either party can quit or be fired at any time because of

12   applicable employment.  So I think that's distinguishable

13   from saying that, you know, the past-due bonus especially

14   there was no promise for him to stay.

15                      He didn't say, yes, I'll stay till X date

16   and then be entitled to these past bonuses.  He's

17   consistently said these are bonuses I've already earned in

18   previous years.  So by the time they're promised to him it

19   was completely gratuitous.  There was no consideration --

20   there was no new consideration offered.  It was for work he

21   had already performed and that he was not entitled to under

22   the contract.  And he specifically said I'm not suing under

23   the contract for this; this was a separate deal for past

24   earned bonuses.

25                      I think even in the jury charge it says

1    these are past earned bonuses.

2                    MS. GIBSON:  Past due.

3                    MR. HALE:  Well, he said past -- I mean, he

4    said past earning consistently.

5                    MS. GIBSON:  I believe -- so, in the --

6                    THE COURT:  All right.  We're going to

7    have -- I'll give you a ruling on that.  We'll take up more

8    argument on quantum meruit at a later time.

9                    Anything else?  Any just general grounds?

10   Any from the defendant?

11                   MR. L. FRIEDMAN:  I think we're good,

12   general grounds, because I don't think they -- they -- I

13   don't think they have proven the claims that they have pled.

14   I don't think there's sufficient evidence to go to the jury.

15                   THE COURT:  All right.

16                   MR. HALE:  Your Honor, I think there's no

17   evidence, I believe, to several of the claims.

18                   MS. GIBSON:  I just want to point out the

19   general bonus and consideration is in the red boxes --

20                   THE COURT:  Okay.

21                   MS. GIBSON:  -- in Vanegas.

22                   MR. L. FRIEDMAN:  Let me change my comment.

23   I don't think there's any evidence of the claims that

24   they've pled to take them to the jury.

25

21

1           COURT'S RULINGS

2                    THE COURT:  Fair enough.  We're going to

3       the jury on something, though.  We're not waiting 10 years

4       and going to the jury.

5                    But motion for directed verdict for

6       Cheryl Potashnik, now known as Cheryl Geiser, is granted.

7       The remainder of the motions for directed verdict are denied

8       with the exception of joint venture and joint enterprise

9       that the Court will take under advisement.  We'll talk about

10      those more later.  And that's without prejudice to reurging

11      the same motion after the defense rests.

12                   MR. L. FRIEDMAN:  Thank you, Judge.

13                   THE COURT:  And also in the jury charge.

14                   MS. GIBSON:  And just for clarification,

15      are you saying Cheryl Potashnik is out for joint venture and

16      joint enterprise?

17                   THE COURT:  Well, I'm taking that under

18      advisement, but I think she is.  We'll have to argue about

19      that since I'm taking joint enterprise and joint venture

20      under advisement.  I'm not ruling on that right now.

21                   MR. L. FRIEDMAN:  Thank you.

22                   THE COURT:  And the -- we're going to start

23      back up in a couple minutes.  Who are you calling first?

24                   MR. L. FRIEDMAN:  Let me just consult with

25      Mike Donohue.

```
1                    (Off the record)
2                    MR. FRIEDMAN:  All right.  I've been
3     outvoted, so we're going to rest as well.
4                    THE COURT:  Okay.
5                    You got that on the record?
6                    THE REPORTER:  Yes, I do.
7                    THE COURT:  If y'all have a seat, I'll let
8     the jury go and we might --
9                    MR. L. FRIEDMAN:  I don't think --
10                   THE COURT:  -- take a break and --
11                   MR. L. FRIEDMAN:  I don't think Ms. Gibson
12    rested on the record.
13                   THE COURT:  Huh?
14                   MR. L. FRIEDMAN:  I don't think Ms. Gibson
15    rested on the record.
16                   THE COURT:  He's rested; you closed.  She
17    did rest on the record.
18                   MS. GIBSON:  I close.
19                   THE COURT:  And you close.
20                   MR. L. FRIEDMAN:  And we close as well.
21                   THE COURT:  All right.
22                   Y'all have a seat and we'll let the jury
23    go.
24                   (The jury entered the courtroom.)
25                   THE COURT:  Welcome back.  Good afternoon,
```

23

1    ladies and gentlemen.

2              Let me tell you where we're at in the trial

3    and let me tell you I'm going to release you for the day in

4    just a minute, also.  We have concluded the evidentiary

5    portion of the trial.  That means no more witnesses will be

6    called to testify, no more documents will be admitted into

7    evidence.  The remaining portions of the case are the

8    Court's charge and the closing arguments.

9              The Court's charge is a written document

10   that contains legal instructions and definitions and jury

11   questions.  It's the jury questions that you must answer in

12   order to return a verdict.  We're going to do the Court's

13   charge tomorrow morning followed by the closing arguments.

14   The Court's charge and the closing arguments together take a

15   little bit over two hours.  With a break, it takes about two

16   hours and 15 minutes.

17             We're going to start tomorrow morning at

18   9:30.  And if we're able to start at 9:30, if everyone's

19   here and ready to go at 9:30, you'll get the case to begin

20   your deliberations a little bit after the noon hour.

21             The reason we're stopping at this point

22   today, because we're finished with the evidence, there's not

23   really enough time to get the case in today.  But in order

24   to finish the Court's charge it takes working with the

25   attorneys, letting them put all their objections on the

```
 1    record and gathering up all the exhibits.  And that usually
 2    takes up more than an hour.  So, instead of having you wait
 3    for the hour or so and then seeing if we can get in today,
 4    we're going to release you early, ask you to report back at
 5    9:30.  And you'll get the case to deliberate, again,
 6    tomorrow a little bit after the noon hour.
 7                    (Jury instructions given)
 8                    THE COURT:  We wish you a good afternoon.
 9    We'll see you tomorrow morning at 9:30 and we hope to start
10    at 9:30 sharp tomorrow.
11                    (The jury exited the courtroom.)
12                    (Recess taken)
13                    THE COURT:  Both sides have rested and
14    closed.  We'll ask first, counsel for plaintiff, if she has
15    any motions to make.
16                    PLAINTIFF'S MOTION
17                    MS. GIBSON:  Yes, Your Honor.
18                    Initially, we move for the Court to decide
19    as a matter of law that there was valid consideration to
20    support the agreements.  On the oral agreement, staying is
21    valid consideration.  And with respect to annual bonuses,
22    continued service is -- and, you know, working harder is
23    valid consideration for those under the Texas Supreme Court
24    case in Vanegas, and the issue is as a matter of law.
25                    And, second, we move as a matter of law
```

1    that the written employment agreement in this case with
2    Southwest Housing Management, which is at-will expressly and
3    also expressly states that it is not to be considered an
4    agreement for any term such as the one here, that as a
5    matter of law that may be orally modified even though the
6    document says it cannot.  And that is because if the
7    original contract is not subject to the statute of frauds
8    it can be orally modified even despite contrary language.
9                     THE COURT:   Okay.  Anything else?
10                    MS. GIBSON:   That's it.
11                    THE COURT:   Mr. Friedman?
12                    MR. L. FRIEDMAN:   May I respond?
13                    THE COURT:   Yes.
14                    MR. L. FRIEDMAN:   Yes.
15                    Your Honor, there has been no evidence of
16    consideration.  The only thing Mr. Carpenter testified to
17    was that he did his job and he was paid to do his job.  He
18    worked until October 31st, 2007.  He was paid two days after
19    his job until November 2nd, 2007.  That's what the evidence
20    showed.
21                    All the things he claims constituted
22    consideration for his work in terms of helping out on the
23    due diligence, answering subpoenas, you know, sitting at his
24    desk answering subpoenas, instructing other people to help
25    out on the due diligence, that was all part of his job as

26

1    executive vice president of southwest management --

2    Southwest Housing Management.  There was no -- nothing extra

3    over the top that he did that wasn't instructed by

4    Brian Potashnik, president of the company and for the

5    company.  And, frankly, there was no evidence that supports

6    anything outside of that.

7              The other thing is -- and this is a

8    surprise to me -- Mr. Carpenter testified that he wasn't

9    making any claims under his employment contract.  So we

10   didn't have to worry about modifying it anymore.  These

11   claims that he was making were two separate oral agreements.

12             THE COURT:  Okay.

13             MR. L. FRIEDMAN:  And -- and so their --

14   their concerns about whether oral agreement may be modified

15   are disingenuous at best because Mr. -- Mr. Carpenter

16   testified the March 17th, 2006 agreement with regard to the

17   three percent, alleged three-percent bonus, was one oral

18   agreement, standalone.  And then somewhere around March 14th

19   the other oral agreement with re -- 2007, with regard to the

20   severance bonus, was another standalone agreement.  If you

21   remember, that's the one driving in the car with --

22             THE COURT:  Right.

23             MR. HALE:  October 13.

24             MR. L. FRIEDMAN:  October 13th.

25             MR. HALE:  2007.

1          MR. L. FRIEDMAN:  2007.

2          So what I'm saying is that no consideration

3    was proven on the record and there's no argument for the

4    plaintiff under the contract, employment contract.

5          THE COURT:  All right.  The first ground

6    was that if there was valid consideration.  That's purely a

7    legal issue.  It's not the motion for directed verdict.

8    It's something to be raised either as an objection like

9    Mr. Friedman's doing to a question being submitted because

10   there's no evidence to support the question or it's

11   something to be raised post-verdict either saying that there

12   was no evidence to support a jury answer.

13          So I'm going to withhold stating a ruling

14   on a legal question like that until we get to a proper form.

15   And same thing with the written employment agreement whether

16   it may be orally modified.  That's -- if you're submitting a

17   question on that and Mr. Friedman objects to something about

18   the written employment agreement being modified, then --

19   then I'll rule on his objection.  It's just not -- it's just

20   not a motion to be made at the close of testimony like that.

21          MR. L. FRIEDMAN:  Okay.  Thank you.

22          THE COURT:  Did you have any?

23          MR. HALE:  Your Honor, I was also wanting

24   to see for -- as to Cheryl Potashnik.

25          THE COURT:  Uh-huh.

28

1          MR. HALE:  Did you state she's dismissed as

2     to -- from the case?

3          THE COURT:  I haven't -- we haven't ruled

4     on -- we're going to get to these last couple questions

5     about joint venture and when we go through the jury charge,

6     and then I'll say she's dismissed from all the contract

7     quantum-meruit claims or any oral-agreement claims.

8          MR. HALE:  Okay.

9          THE COURT:  And I'm still not entirely

10    clear on the joint venture and joint enterprise, so that's

11    what I'll reserve ruling on.

12          But did you -- you want her to just adopt

13    your previous arguments, 'cause you didn't present any

14    evidence after the last argument?  The close of evidence was

15    close of evidence.

16          MR. L. FRIEDMAN:  Yeah, I have a couple

17    more.

18          THE COURT:  Okay.

19          DEFENDANTS' MOTIONS FOR DIRECTED VERDICT

20          MR. L. FRIEDMAN:  I'd like to move for

21    directed verdict on Brian Potashnik individually because

22    there's been no evidence that Brian Potashnik acted

23    individually.  He -- at all times he acted as president of

24    Southwest Housing Management Company.  And the testimony has

25    been consistent that Mr. Carpenter has dealt with him as

29

1    president of Southwest Management Company.   The

2    employment -- the amended employment contract that

3    Mr. Carpenter drafted was drafted under the imprimatur of

4    southwest management -- Southwest Housing Management

5    Company's signature of Brian Potashnik as president.

6              The severance agreement that Mr. Carpenter

7    drafted and presented to the Potashniks was also drafted

8    with the signature line for Brian Potashnik as president of

9    Southwest Housing Management, and all of the Emails and

10   other conversations were had with Brian Potashnik in the

11   context of him as president of Southwest Housing Management.

12   There was no evidence whatsoever that he acted individually.

13             In addition, reference to the letter of

14   intent that Mr. Carpenter made reference to on letter to the

15   closing statements all indicated that Brian Potashnik acted

16   with regard to Mr. Carpenter as president of Southwest

17   Housing Management.

18             THE COURT:   Okay.

19             Ms. Gibson.

20             MS. GIBSON:   With respect to that,

21   obviously, Brian is not individually in the -- the annual

22   bonus claim.   But as to three percent, Brian was repeatedly

23   listed as a seller in the asset sale.   He was the agent for

24   the sellers.   And what he was offering was a percentage of

25   the sellers' proceeds, and that includes -- that would

1    include him.

2                    MR. HALE:  Your Honor --

3                    MS. GIBSON:  In addition to the other

4    entities, he's also the owner and the president and sole

5    director of all of the entity defendants who are sellers in

6    the asset sale.

7                    MR. HALE:  That was not in an individual

8    capacity.  You have to expressly waive your capacity in such

9    an agreement.  And, in any event, it has nothing to do with

10   the agreement between the parties.  So, unless

11   Brian Potashnik expressly says I'm making this personal

12   guarantee to you, then there's no -- you know, there's no

13   promise there.  That's a promise from Southwest Housing.

14                   MS. GIBSON:  If he's -- if he's offering a

15   cut of the sellers' proceeds, he has to be acting for the

16   sellers to make that deal.  And he individually, not through

17   any entity, is listed all over as a seller in that asset

18   sale.

19                   THE COURT:  Okay.  Just to be clear,

20   though, we're not talking about the annual bonuses.  We're

21   talking about the three percent --

22                   MS. GIBSON:  Correct.

23                   THE COURT:  -- that stayed employed -- the

24   stay bonus.

25                   MR. L. FRIEDMAN:  And just one more point.

```
1                   THE COURT:  All right.
2                   MR. L. FRIEDMAN:  Brian Potashnik signed
3    Mr. Carpenter's employment agreement as a -- as the
4    president of Southwest Housing, southwest management --
5    excuse me -- Southwest Housing Management.  And, also,
6    Brian Potashnik acted as sellers' agent for the purposes of
7    the closing only.  It's not like he acted as the sellers'
8    agent all the time for every purpose.
9                   THE COURT:  All right.
10                  MR. HALE:  Excuse me, Your Honor.
11                  Yes, under the -- I believe it's the Texas
12   Business Organizations Code --
13                  THE COURT:  Uh-huh.
14                  MR. HALE:  -- also within the statute of
15   frauds, if you're going to assume the debt of another
16   entity, for instance, Brian Potashnik in his individual
17   capacity, that also has to be in writing.
18                  THE COURT:  That's not what her argument
19   is.
20                  But as far as, say, there's an oral
21   contract with three percent, is it your argument, part of
22   your argument, that Mr. Potashnik, when he negotiated that,
23   he was saying this oral -- new oral agreement -- 'cause
24   you're saying it's not just with us, that oral agreement's
25   not just with the management company --
```

```
 1                    MS. GIBSON:  Right.
 2                    THE COURT:  -- that -- that Mr. Carpenter's
 3       working for.  It's with all of the entities.  Are you saying
 4       that when he negotiated that agreement he negotiated it so
 5       that the agreement was between Mr. Carpenter on the one hand
 6       and the Potashniks and Southwest Housing, Southwest
 7       Development, all the other defendants on the others?
 8                    MS. GIBSON:  Correct.  Yes.  Those
 9       identified as sellers, yes.
10                    THE COURT:  Okay.  All right.
11                    MR. L. FRIEDMAN:  So, if -- if plaintiff's
12       claim comes under the employment contract now, then only two
13       parties can amend that contract.
14                    THE COURT:  She's not -- that's not her
15       claim for the -- for the three-percent bonuses.
16       Three-percent bonus does not come under the employment
17       contract.  It's a separate oral agreement that their
18       contention was made not between the parties to the
19       employment agreement -- although, they are in common -- but
20       additional parties.
21                    MR. L. FRIEDMAN:  Okay.  And there was --
22       I'm sorry.
23                    THE COURT:  Go ahead.
24                    MR. L. FRIEDMAN:  Are you finished?
25                    THE COURT:  All right.  Go ahead.
```

Appendix 001522

33

1             MR. L. FRIEDMAN:  I'd like to move for

2      directed verdict on behalf of Southwest Housing Development

3      and Affordable Housing Construction because there was no

4      evidence that any agreement was made between Mr. Carpenter

5      and those two defendants.

6             THE COURT:  Okay.

7             Do you want to address that?

8             MS. GIBSON:  I'm sorry.

9             THE COURT:  He said we're talking about a

10     separate agreement.

11            MS. GIBSON:  Right.

12            THE COURT:  We're not looking at employment

13     agreement.

14            MS. GIBSON:  Right.

15            THE COURT:  We're not looking at the

16     employment relationship between Mr. Carpenter and Southwest

17     Housing Management; looking at the separate oral agreement

18     where you just told me that Mr. Potashnik negotiated a

19     contract with Mr. Carpenter.  And the parties to that

20     contract were Mr. Carpenter on the one hand and who on the

21     other hand, and you told me -- you just told me why it was

22     Brian Potashnik, but tell me which of the Southwest entities

23     and why the Southwest entities.

24            MS. GIBSON:  Oh, sure.

25            So, for Southwest Housing Development

34

```
1    and -- Southwest Housing Development and Affordable Housing
2    Construction --
3                THE COURT:  Right.
4                MS. GIBSON:  -- as well as Southwest
5    Housing Management.  He was an owner of each of them.  He
6    was the sole director of each of those entities.  He was
7    also the president of each entity.  He was also the agent
8    for sellers.  And, again, all of those entities are
9    repeatedly listed as sellers in the asset sale.
10                          COURT'S RULING
11                THE COURT:  Motion for directed verdict,
12    the motion's denied.
13                There was reference.  I don't have it.  I
14    don't have a transcript here, but there was references to
15    him calling the -- all of the entities together, the
16    Southwest entities, when he was -- this is his testimony,
17    I'm not agreeing or disagreeing with anything.  -- when he
18    was negotiating this extra contract.  But we'll get a jury
19    response to that.  And if the record doesn't support that,
20    we'll look at that.
21                MR. L. FRIEDMAN:  Note my objection,
22    Your Honor.
23                MR. HALE:  Your Honor, is that to -- so,
24    are you saying that's denied as to Mr. Potashnik as well?
25                THE COURT:  Yes.
```

```
1                    MR. J. FRIEDMAN:  For the three percent?
2                    THE COURT:  Yes.
3                    MR. J. FRIEDMAN:  And what about the
4     employment contract?
5                    THE COURT:  For the employment contract,
6     the bonuses, she's not asking that Mr. Potashnik be held
7     separately liable for that.
8                    MR. L. FRIEDMAN:  The -- their claim for
9     unpaid annual bonuses is only against Southwest Housing
10    Management, not against any of the other defendants.  Is
11    that -- is that clear?
12                   THE COURT:  Is that right?
13                   MS. GIBSON:  Yeah.  Absolutely.
14                   THE COURT:  That's right.  All right.
15                   MR. L. FRIEDMAN:  And our motion for
16    directed verdict against Development and Construction is
17    denied?
18                   THE COURT:  Yes.
19                   MR. L. FRIEDMAN:  And you have the --
20                   THE COURT:  For -- on the three percent.
21    Right.
22                   MR. L. FRIEDMAN:  On the three percent.
23    And the balance of claims, a directed verdict for
24    Cheryl Potashnik is under advisement at the moment?
25                   THE COURT:  Right.  Until we get to the
```

 1    charge of the Court.  Right.  The charge conference.

 2                    MR. L. FRIEDMAN:  You got more?

 3                    MR. HALE:  So -- I'm sorry, Your Honor.

 4    Did you say you were not going to rule on the no

 5    consideration for the annual bonuses?

 6                    THE COURT:  Right.  You can make that

 7    objection.  If you make that objection to --

 8                    MR. HALE:  Yes, Your Honor.

 9                    THE COURT:  When that question comes up,

10    we'll hear your objection.

11                    MR. HALE:  Okay.

12                    THE COURT:  I don't want to preview what my

13    ruling would probably be, although you're probably guessing

14    what it is.

15                    MS. GIBSON:  And --

16                    THE COURT:  Go ahead.

17                    MS. GIBSON:  Go ahead.

18              DEFENDANTS' MOTIONS FOR DIRECTED VERDICT

19                    MR. L. FRIEDMAN:  I have to move for

20    directed verdict on the claim of joint and several

21    responsibility under winding up this governing person's

22    under Development and Management because there was no

23    evidence that any of the defendants were winding up.  And,

24    in fact, the contrary is true.  Those companies didn't wind

25    up.

1          THE COURT:  I thought -- and this is still

2     in, but didn't you tell me you were not submitting the

3     winding-up claim?

4          MS. GIBSON:  So, we did not submit a

5     separate winding-up claim.  But the fact that they -- that

6     Brian dissolved two of the entities in the middle of the

7     lawsuit when he was supposed to give claims to people like

8     Jeff Carpenter --

9          THE COURT:  Uh-huh.

10          MS. GIBSON:  -- that's part of the evidence

11     on alter ego.

12          Now, I did talk to Ryan and I realize we --

13     that's only against the domestic entities.

14          THE COURT:  Uh-huh.

15          MS. GIBSON:  I believe it's Construction

16     that's foreign.  So that won't be part of that.

17          THE COURT:  All right.  We'll take that up

18     when we get to it.  So that's under advisement.

19          MS. GIBSON:  And, Your Honor, one issue on

20     the oral modification of an employment agreement.  The Texas

21     Supreme Court, in Miller versus Riata, makes this an easy

22     call; and I think the jury needs to be instructed that --

23     that --

24          THE COURT:  All I'm saying is you have that

25     instruction in here.  When we get to that, Mr. Friedman is

1      going to object to it.

2                      MS. GIBSON:  Okay.

3                      THE COURT:  And that's the time to take

4      this up.  It's not a motion for a directed verdict.

5                      MS. GIBSON:  Okay.

6                      THE COURT:  And, you know, like I said,

7      some things we may submit and get an answer on 'cause we

8      don't want to try this twice.  Some things are clear to me;

9      some things are not as clear.  And for things not as clear

10     you want to err on the side of getting a jury answer.  And

11     it's a lot easier to take away a jury answer than to retry

12     the case if I have to.

13                     MS. GIBSON:  No, I --

14                     THE COURT:  I'm not saying I'm doing that.

15                     MS. GIBSON:  -- I understand now.  I

16     misunderstood.  I thought you were going to -- I got it now.

17                     MR. L. FRIEDMAN:  So, I move for directed

18     verdict on the claim of joint venture, joint enterprise, or

19     limited lia -- or limited partnership against all the

20     defendants.  There was simply no evidence to support that

21     claim whatsoever.

22                     THE COURT:  All right.  Let me go ahead and

23     ask you about one of the things in there then, 'cause for

24     joint enterprise you said that -- that there was an

25     agreement, express or implied, with respect to the

1     enterprise or endeavor.  Is it your intention that the

2     agreement was express or implied or both?

3                    MS. GIBSON:  I would say both, but the

4     underlying agreement is the --

5                    THE COURT:  Who expressed it?

6                    MS. GIBSON:  It's -- well, I say it's

7     partly, but the written part is the sale agreement.  That is

8     sort of the venture that everyone was coming together to do.

9     They were sharing costs, they were sharing losses, they were

10    sharing profits.  And the concept behind it is just,

11    essentially, an agency one where each becomes the agent of

12    the other and is responsible for each others' acts.

13                   And the joint venture I -- some of the

14    courts are unclear which way to submit it, so we would end

15    up electing.  But it's the same concept and different

16    elements.  And so, the joint-venture submission, that one

17    would have to be based on the written sale agreement to

18    show --

19                   THE COURT:  Did you present any evidence

20    that there's -- did you move on joint venture just then?

21                   MR. L. FRIEDMAN:  I'm sorry.  Say it again.

22                   THE COURT:  Did you -- we were talking

23    about joint enterprise before.  Did you also move on joint

24    venture?

25                   MR. L. FRIEDMAN:  I did.

```
1                    THE COURT:  Okay.
2                    MR. L. FRIEDMAN:  I moved on joint venture,
3      joint enterprise, and limited partnership.  But I'll say
4      this, there was no evidence implied, certainly, and no
5      evidence expressed that there was anything shared;
6      that profits were shared by anybody, that the losses were
7      shared or costs were shared, nothing.
8                    MS. GIBSON:  Your Honor, we submitted the
9      purchase and sale agreement.
10                   THE COURT:  Uh-huh.
11                   MS. GIBSON:  That, in the writing itself,
12     meets all the elements for both, as well as the closing
13     documents showing that they shared revenue.  But the
14     purchase and sale agreement specifically addresses things
15     like sharing losses --
16                   THE COURT:  Uh-huh.
17                   MS. GIBSON:  -- sharing indemnification
18     obligations --
19                   THE COURT:  Right.
20                   MS. GIBSON:  -- which could be a loss,
21     sharing costs and sharing profits.  And, in fact, all the
22     money went into Development to be -- to be held for all of
23     the sellers.  And it was distributed later.
24                   THE COURT:  All right.
25                   We talked about joint enterprise.  All
```

1    right.

2              On joint venture, one of the elements is a

3    mutual right of control or management of the venture.

4              MS. GIBSON:  So, the -- with respect to

5    that one, it is -- the key is it is a right to control, not

6    actual control, and whether someone has a voice.  But as a

7    practical matter, Brian Potashnik, as the sole director, the

8    sole owner and an officer of all of the entities or the

9    three entity defendants in the case, he was the voice for

10   all of them.

11             THE COURT:  Okay.  Do you have to show --

12   I'm asking.  I don't know.  Do you have to show that

13   Affordable Housing Construction had a right to control

14   Southwest Housing Development?

15             MS. GIBSON:  No.  They have to have a right

16   to be heard.  In other words, I believe the exact language

17   is -- and this was changed in a 2002 supreme court case.  I

18   can't recall the name right now.  -- where they clarify that

19   it is the right to control is having a voice, not actually

20   controlling everyone.

21             THE COURT:  Okay.  Same question then.

22   Having a voice, is there evidence that Affordable Housing --

23   do you have to show that Affordable Housing -- I understand

24   your argument with Brian Potashnik.

25             MS. GIBSON:  Uh-huh.

1              THE COURT:  He owns them all.  But do you
2    have to show that Affordable Housing Construction has a
3    voice in the management of Southwest Housing Development?
4              MS. GIBSON:  No.  I have to show that they
5    have a voice in connection with the joint venture, which is
6    the asset sale.
7              THE COURT:  No, I'm asking you about --
8    okay.  All right.
9              MS. GIBSON:  Versus day-to-day management.
10             THE COURT:  Okay, 'cause your question is
11   only in connection with the asset sale.
12             MS. GIBSON:  Absolutely.
13             THE COURT:  Okay.
14             And what's the legal effect of those two
15   questions if it's only regarding the asset sale?
16             MS. GIBSON:  All of those questions the
17   legal effect is the underlying concept that there's a joint
18   venture in agency and they each become the agent for the
19   other and they become obligated for both each others' debts
20   incurred in connection with trying to accomplish the goal,
21   as well as -- as well as each others' torts.  But that's not
22   at issue.
23             THE COURT:  Okay.
24             MR. HALE:  Your Honor --
25             MS. GIBSON:  Torts are not at issue.

43

```
1    It's -- it's an agency theory, essentially.
2                   THE COURT:  Right.  But the debt would --
3                   MS. GIBSON:  Would only be the
4    three-percent deal.
5                   THE COURT:  All right.
6                   MS. GIBSON:  Any -- it would not be --
7                   THE COURT:  So these two questions only
8    relate then to the parties who are found liable on the
9    three-percent deal.
10                  MS. GIBSON:  Correct.
11                  THE COURT:  Okay.
12                  MR. HALE:  Your Honor, I don't believe
13   there's any evidence --
14                  MS. GIBSON:  Well, it -- yeah, it would be
15   whether additional agents are responsible only on three
16   percent.
17                  THE COURT:  Okay.
18                  MR. HALE:  Does it -- I mean, even if it's
19   under that theory, there's no evidence that Affordable
20   Housing or Development had any voice in the asset.  I mean,
21   what we're looking about -- looking at here is just an
22   agreement to sell assets.
23                  THE COURT:  Okay.
24                  MR. HALE:  There's no evidence of --
25
```

```
 1                        COURT'S RULING
 2                   THE COURT:  It's motion for directed
 3     verdict looking at the evidence in the light most favorable
 4     to the -- to the party seeking the relief.  The motion is
 5     denied except for Cheryl Potashnik, now known as
 6     Cheryl Geiser, for those two because I've already determined
 7     as a matter of law that she wasn't a party to that
 8     three-percent agreement.  And those two questions only
 9     relate to the three-percent agreement.
10                   So, yeah, your question before, was she out
11     of the entire case; and the answer is, yes, she's out of the
12     entire case.
13                        MS. GIBSON:  Thank you, Your Honor.
14                        THE COURT:  All right.  Any other directed
15     verdicts?
16                        MR. HALE:  What else?  We've already
17     covered --
18                        MR. L. FRIEDMAN:  Have we covered joint
19     employer and Development, Management, Construction bonus?
20     Have we taken that out of the case?
21                        MS. GIBSON:  I'm not submitting that.
22                        MR. L. FRIEDMAN:  Okay, so I'm taking that
23     out.
24              DEFENDANTS' MOTION FOR DIRECTED VERDICT
25                        MR. L. FRIEDMAN:  I'm going to move for
```

45

1    directed verdict on all three.

2                    THE COURT:  She's not submitting that.

3                    MR. L. FRIEDMAN:  She's not submitting it?

4                    THE COURT:  Right.

5                    MR. L. FRIEDMAN:  We're taking it out?

6                    MS. GIBSON:  Well, I am submitting it but

7    not for Cheryl; only for Brian.

8                    THE COURT:  It's not in here.  Or is it?

9    Did I miss it?

10                   MS. GIBSON:  It is.  It's at the very end.

11                   THE COURT:  Oh, here it is.  I'm sorry.  It

12   is in here.  All right.

13                   MR. L. FRIEDMAN:  Well, there's been no

14   evidence of alter ego.  Their claim is Brian made the deal

15   and/or the company, Southwest Housing Management, made the

16   deal; but no evidence that Brian is the company or the

17   company is Brian or they act interchangeably or there's no

18   corporate entity.  Absolutely no evidence.

19                   MS. GIBSON:  By the way, Your Honor, in the

20   charge we realize there's a mistake.  The "if" after

21   Brian Potashnik is responsible --

22                   THE COURT:  Right.

23                   MS. GIBSON:  -- needs to link to that first

24   paragraph only.  So we're going to fix that if he used the

25   entity for the purpose.

1            So this type of alter ego claim is not the

2    common-law type.  It is a statutory claim and that he used

3    the entity for the purpose of perpetrating and didn't

4    perpetrate an actual fraud on Jeff Carpenter primarily for

5    the direct personal benefit of Brian Potashnik.  That is the

6    claim.  The others are instructions on the law that allows

7    us to explain why we believe he perpetrated a fraud.

8                      COURT'S RULING

9            THE COURT:  All right.

10            As far as the -- you can object when we get

11    to the charge conference to that question.  But as far as

12    directed verdict, directed verdict is denied.

13            DEFENDANTS' MOTION FOR DIRECTED VERDICT

14            MR. L. FRIEDMAN:  And with regard to the

15    entire case, Your Honor, I move for directed verdict on the

16    balance of the claims because Mr. Carpenter's testimony or

17    his claims were that with regard to the three-percent bonus

18    his latest iteration of his deal as of this morning was that

19    before he gets any money deduction from the gross price

20    would include reasonable closing costs and payment to other

21    employees before Mr. Carpenter's bonus is calculated.  And

22    his previous testimony was that other bonuses were paid,

23    balance of the money went to Brian and Cheryl Potashnik.

24    Well, he also testified that they were employees.  So, based

25    on all of the evidence and testimony, the money -- whatever

1    money there was, the net proceeds did go to the employees.

2    Money that went to the employees should be deducted before

3    Mr. --

4                    THE COURT:  They did.  We argued over that

5    document many times.

6                    MR. L. FRIEDMAN:  There was nothing left.

7                    THE COURT:  No, no, no, no, no, there

8    was -- go ahead and finish your argument.

9                    MR. L. FRIEDMAN:  According to

10   Mr. Carpenter, after money went to all the employees.

11                   THE COURT:  All right.

12                   MR. L. FRIEDMAN:  All the employees.  I

13   went over that ad hominem with him.

14                   THE COURT:  After -- you're saying the 33-,

15   $34 million went to all the employees?

16                   MR. L. FRIEDMAN:  No.  No.

17                   MS. GIBSON:  I think he's arguing --

18                   MR. L. FRIEDMAN:  The net proceeds.

19                   MS. GIBSON:  -- Mr. Potashnik's are

20   employees.

21                   MR. L. FRIEDMAN:  No, I'm not arguing.  I'm

22   basing my argument on the evidence of Mr. Carpenter's

23   testimony that Brian Potashnik was an employee and

24   Cheryl Potashnik was an employee, and the balance of the

25   money went to Brian and Cheryl Potashnik.  That's the only

```
1    evidence on file, on record.
2                        COURT'S RULING
3                THE COURT:  All right.  Well, I think if it
4    wasn't -- I think his testimony was -- and maybe he said
5    it differently, different ways -- is talking about the
6    particular specific bonuses that were on a document admitted
7    into evidence, not -- of course, once the company is sold,
8    the money's distributed one way or the other.
9                    I understand your motion for directed
10   verdict.  Motion's denied.
11               MR. HALE:  So, Your Honor, we want to
12   address the question of consideration --
13               THE COURT:  Right.
14               MR. HALE:  -- in connection with --
15               MR. L. FRIEDMAN:  And what about statute of
16   limitations [sic]?
17               THE COURT:  Statute of frauds?
18               MR. L. FRIEDMAN:  Statute of frauds.  I'm
19   sorry.
20               THE COURT:  Same thing.  There's a statute
21   of frauds question in here, and you can object to it or --
22            DEFENDANTS MOTION FOR DIRECTED VERDICT
23               MR. L. FRIEDMAN:  I move for directed
24   verdict on statute of frauds.
25
```

```
1                        COURT'S RULING
2                 THE COURT:  Okay, and that's denied.  You
3    presented some argument on that already.
4                 MR. L. FRIEDMAN:  Yeah.  Okay.
5                 THE COURT:  Anything else on directed
6    verdicts?
7                 We'll go off the record.
8                 (Off the record)
9                 THE COURT:  And tell me your last name.
10                MR. HALE:  Hale, H-a-l-e.
11                THE COURT:  All right.  You have a copy of
12   the draft we're working from?
13                MR. HALE:  Here we go.  Yes, Your Honor.
14                (End of proceedings)
15
16
17
18
19
20
21
22
23
24
25
```

1   THE STATE OF TEXAS

2   COUNTY OF DALLAS

3       I, Vikki L. Ogden, Official Court Reporter in and for

4   the County Court at Law Number 5 of Dallas County, State of

5   Texas, do hereby certify that to the best of my ability the

6   above and foregoing contains a true and correct

7   transcription of all portions of evidence and other

8   proceedings requested in writing by counsel for the parties

9   to be included in the Reporter's Record, in the above-styled

10  and -numbered cause, all of which occurred in open court or

11  in chambers and were reported by me.

12      I further certify that the total cost for the

13  preparation of the Reporter's Record is $310.00 and will be

14  paid by Friedman & Feiger, LLP.

15      WITNESS MY OFFICIAL HAND this the 16th day of October,

16  2018.

17

18

19                          /S/ Vikki L. Ogden
                            _____
20                          VIKKI L. OGDEN, Texas CSR# 6309
                            Official Court Reporter
21                          Dallas County Court at Law No. 5
                            600 Commerce Street, Floor 5
22                          Dallas, Tx. 75202
                            (214)653-6443
23                          Certification Expires:  12/31/18

24

25

REPORTER'S RECORD (EXCERPT)

VOLUME 8 of 11

Trial Court Cause No. CC-08-02072-E

| | |
|---|---|
| JEFFREY W. CARPENTER, ) | IN THE DALLAS COUNTY |
| Plaintiff, ) | |
| VS ) | COURT AT LAW NO. 5 |
| SOUTHWEST HOUSING DEVELOPMENT ) COMPANY, INC., ET AL, ) | |
| Defendants. ) | DALLAS, TEXAS |

CHARGE CONFERENCE

On the 30th day of January, 2018, the following proceedings came on to be heard outside the presence of a jury, in the above-entitled and -numbered cause; and the following proceedings were had before the HONORABLE MARK GREENBERG, Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

```
1                              APPEARANCES:

2

    MS. AMY GIBSON
3   SBN 00793801
    Gibson Wiley, PLLC
4   1500 Jackson Street, Suite 714
    Dallas, Texas 75201
5   (214)522-2121
    Attorney for Plaintiff
6
                 -AND-
7
    MR. BRIAN SANFORD
8   SBN 17630700
    Sanford Firm
9   1910 Pacific Avenue, Suite 15400
    Dallas, Texas 75201
10  (469)361-9111
    Attorney for Plaintiff
11
                 -AND-
12
    MR. LAWRENCE "LARRY" FRIEDMAN
13  SBN 07469300
    MR. MICHAEL DONOHUE
14  SBN 05989380
    MR. JASON FRIEDMAN
15  SBN 24059784
    Friedman & Feiger, LLP
16  5301 Spring Valley Road, Suite 200
    Dallas, Texas 75254
17  (972)788-1400
    Attorneys for Defendants
18
                 -AND-
19
    MR. RYAN HALE
20  SBN 24097784
    Hawkins Parnell Thackston & Young, LLP
21  4514 Cole Avenue, Suite 500
    Dallas, Texas 75205-5412
22  (214)780-5138
    Appellate Attorney for Defendants
23

24

25
```

Appendix 001542

```
 1                        VOLUME 8

 2   January 30, 2018                                    PAGE

 3   Proceedings -----------------------------------      4

 4   Adjournment -----------------------------------     60

 5   Court Reporter's Certificate ------------------     61

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
 1                    P R O C E E D I N G S

 2                    January 30, 2018

 3              THE COURT:  We're on the record.  This is

 4    the charge conference.

 5                    The draft we're working from is the one

 6    prepared by Ms. Gibson; but it's the charge of the Court,

 7    not Ms. Gibson, of course.  And -- but since it's the one

 8    she's working from, she should not have any objections to

 9    it.

10                    But the first one is, Ms. Gibson, you'll

11    take out from the style of the case Cheryl Potashnik now

12    known as Cheryl Geiser, okay.

13              MS. GIBSON:  From the style?

14              THE COURT:  Yeah, from the style.

15              MS. GIBSON:  I will.

16              THE COURT:  Or if you can Email that to me

17    I'll do that now.  Can you Email to me what you have?

18              MS. GIBSON:  Yeah, but I did agree to make

19    some changes based on what Ryan said, so I'd be happy to go

20    ahead and do it.

21              THE COURT:  All right.

22              MS. GIBSON:  I won't forget.

23              THE COURT:  Okay.

24                    Okay, Mr. Hale, any objections to the

25    instructions on Pages 1 through 4?
```

 1                    MR. HALE:  No, Your Honor.

 2                    THE COURT:  All right.

 3                    To the definitions on Page 5?

 4                    MR. HALE:  No, Your Honor.

 5                    And may I also state on the record that

 6     we're making these objections on behalf of all defendants

 7     which we represent; which is Southwest Housing Management,

 8     Corporation, Southwest Housing Development, and Affordable

 9     Housing?

10                    THE COURT:  And let me put on --

11                    MR. L. FRIEDMAN:  Affordable Housing

12     Construction and Brian Potashnik.

13                    MR. HALE:  And Brian Potashnik.  Yes,

14     Your Honor.

15                    THE COURT:  Let me put on the record that

16     throughout the trial, in addition to having a running

17     objection on several things, an objection by one defendant

18     was good for all defendants.

19                    MR. L. FRIEDMAN:  Thank you, sir.

20                    THE COURT:  Okay, we're up to Question

21     Number 1 on Page 6.  This question is about the annual

22     bonuses.  And this is questions only between Southwest

23     Housing and Jeff Carpenter.

24                    Do you have an objection to this one?

25                    MR. HALE:  Yes, Your Honor.

1          So, first of all, it does not have a date
2     in there, so it doesn't say when this promise was made.  So
3     I think that's particularly important in this case,
4     especially considering that we're saying that the
5     consideration that Southwest Housing would have given would
6     have been consideration for work already performed.
7          And I think there's also a Castille problem
8     with this.  Because if she's saying it's for any past
9     report -- because it's unclear of the time period.  We don't
10    know whether it's for past or future work.  So if she's
11    saying it's all for past work then there's no consideration.
12    But if it's ambiguous then there's no way to know whether
13    there would be properly awarding compensation with -- that
14    was supported by consideration or compensation that's
15    illusory.
16              THE COURT:  All right.
17              MR. L. FRIEDMAN:  The threshold has to be
18    did they make an oral agreement.
19              THE COURT:  Well, he asked that.  Did
20    Jeff Carpenter and Southwest Housing Management agree that
21    Southwest Housing Management would pay one or more annual
22    bonuses to Jeff Carpenter?
23          Do you have a problem with putting the date
24    in there when this agreement was made?
25              MS. GIBSON:  I do, but I did tell Ryan that

```
 1    I would -- I would reword it to make clear that we're not
 2    talking about year-one bonuses.
 3                    THE COURT:   Okay.
 4                    MS. GIBSON:   So that there's a time frame.
 5                    THE COURT:   So you would phrase it to
 6    Jeff Carpenter, Southwest Housing Management, agree that
 7    Southwest Housing Management would pay an annual bonus for
 8    2005-2006, 2006-2007?
 9                    MS. GIBSON:   I will probably do it more
10    like one more annual bonuses after year one to
11    Jeff Carpenter, because Brian --
12                    THE COURT:   After 2004?
13                    MS. GIBSON:   So that would be -- year one
14    would have been -- yeah, it would be after 2004.
15                    THE COURT:   Okay.  I think you have to --
16    if you're doing that, I think you have to put a date.  You
17    have to tell them what agreement you're talking about.
18                    MR. HALE:   Your Honor --
19                    MS. GIBSON:   Okay.  What if I -- so here's
20    the thing.  Brian didn't divide -- when he gave numbers, he
21    didn't divide it up by years.
22                    THE COURT:   Right.
23                    MS. GIBSON:   So how about if I just put for
24    X time period?
25                    THE COURT:   Okay.
```

```
1                    MR. HALE:  Well, Your Honor, I think we
2       still have to know when it was promised, when they promised
3       to pay, because that -- I mean, if it wasn't promised until
4       after the fact and you're saying this is all compensation
5       that you've -- you know, for the work you've done in
6       previous years, that's not supported by any consideration.
7       He's not being required to do anything.  He wasn't owed that
8       compensation under any agreement.  He said he's not suing --
9                    THE COURT:  All right.
10                   MR. HALE:  -- under the employment
11      agreement.
12                   THE COURT:  Can you put a Question 1A; that
13      if you found there was an agreement in response to
14      Question 1 and do you find that that agreement was entered
15      into?
16                   MS. GIBSON:  Well, I don't think it's
17      needed or fits the facts.  And here's why.  It's just like
18      any bonus where they say, yes, we are going to pay you.
19                   THE COURT:  I understand that.  But if
20      that's their point on appeal was that, you know, that there
21      was no consideration because it was the date of the
22      agreement was -- unless you want to stipulate as to a date
23      of agreement; that the date of agreement was after the date
24      that the bonuses were earned.
25                   MS. GIBSON:  On consideration --
```

```
1                    THE COURT:  Uh-huh.
2                    MS. GIBSON:  -- I am a hundred percent
3      comfortable based on Texas Supreme Court cases that that is
4      not an issue.
5                    MR. L. FRIEDMAN:  But can I say again?
6                    THE COURT:  Uh-huh.
7                    MR. L. FRIEDMAN:  This whole case is about
8      this alleged oral agreement on October 13th, 2006.  Isn't
9      that the first question?
10                   THE COURT:  We're not rearranging the
11     questions but, yeah, that's the bigger claim.
12                   MR. L. FRIEDMAN:  No, but I mean isn't this
13     question, Do you find that an agreement was made on October
14     13th, 2006?
15                   THE COURT:  We're on a different contract
16     right now.  That's not -- this is the annual bonus, not the
17     three-percent bonus.
18                   MR. L. FRIEDMAN:  Okay.
19                   MR. HALE:  Your Honor, I think this is
20     definitely -- this is quite different from the Vanegas case
21     that she's --
22                   THE COURT:  Right.
23                   MR. HALE:  -- referring to.  In this case
24     what they're saying and what he's testified to is that on
25     March 14th, 2007, he was promised bonuses based on past
```

```
 1    years.
 2                    THE COURT:  Okay.
 3                    Well, it's a charge conference.  She
 4    submitted a question to me.  You can object to the question,
 5    which you have, or you can submit another question, which
 6    you haven't.
 7                    Is there anything else you want to tell me
 8    about this question or any submission that you want to give
 9    me tomorrow accepted --
10                    MR. L. FRIEDMAN:  I do.
11                    THE COURT:  Huh?
12                    MR. L. FRIEDMAN:  I do.
13                    According to Mr. Carpenter's testimony
14    earlier today -- I know it's been a long day.
15                    THE COURT:  Yep.
16                    MR. L. FRIEDMAN:  That's why I wrote it
17    down.
18                    -- he alleges for the first time a second
19    oral agreement for these bonuses, these very bonuses on
20    March 14th, 2007.  Isn't that the threshold question?  Do
21    you find that Mr. Carpenter made an agreement as of March --
22    on March -- on or around March 14, 2007?
23                    That's the agreement he wants this Court
24    to -- this jury to enforce.  It's not any agreement.  It's
25    that agreement.
```

```
 1                         THE COURT:  Do you agree with that change?

 2                         MS. GIBSON:  No.

 3                         THE COURT:  Okay.

 4                 We'll move on, but at her peril.

 5                         MS. GIBSON:  Just one note.  Ryan asked me

 6      to consider saying promise to pay because that may fit

 7      unilateral contracts better.

 8                         THE COURT:  All right.  Where are you?

 9                         MS. GIBSON:  Question 1.

10                         THE COURT:  No, what part is this?

11                         MS. GIBSON:  Rather than agree, say promise

12      to pay.

13                         THE COURT:  Okay.

14                         MS. GIBSON:  And so I told him I would

15      consider that.

16                         THE COURT:  All right.

17                         MR. HALE:  Again, I think that just -- I

18      think it goes to the fact that it's a unilateral contract

19      that's not supported by any consideration.

20                         THE COURT:  I think that's fair.

21                         MR. L. FRIEDMAN:  So what are we going to

22      do?

23                         THE COURT:  We're going to Question 2.

24                         MR. HALE:  I'm sorry, Your Honor.  Can I

25      make one more objection?
```

1          THE COURT:  Sure.

2          MR. HALE:  Also, as far as Question 1, he

3    stated in -- after this offer was apparently made to him,

4    that he turned around and made a counter offer and asked for

5    $600,000 instead.  So, as a matter of law, that constitutes

6    a rejection of the original offer to pay him.

7          THE COURT:  She has something in here

8    about -- well, you can argue that.  If there was an

9    instruction you want, you can -- you can offer that now.

10         MR. L. FRIEDMAN:  But don't you think a sub

11   question ought to be, If you find that there was an offer,

12   do you find that there was a counter offer for $600,000?

13         THE COURT:  The question -- she had it as

14   agreement.  You wanted promise to pay.  Nobody wanted offer;

15   wanted promise to pay.

16         MR. L. FRIEDMAN:  I want offer.

17         THE COURT:  Well, y'all are going to have

18   to get together and decide what you want to do.  We'll do

19   the charge conference.

20         MS. GIBSON:  The issue in these cases is

21   the acceptance in these cases.  There's no back and forth.

22   You accept by doing the act that is requested.

23         MR. HALE:  There was no act requested for

24   the annual bonuses.

25         MS. GIBSON:  Work hard.  Work harder, stay

1    focused.

2                      (More than one person speaking at a time)

3                      MR. HALE:   You didn't (inaudible) until

4    March 14th, 2007, after he'd already worked.

5                      THE COURT:   (Inaudible).

6                      MS. GIBSON:   Oh, okay, I got you.

7                      THE COURT:   The objections to Question

8    Number 1 are overruled and we'll go to Question Number 2.

9                      MR. L. FRIEDMAN:   And you'll note our

10   objection?

11                     THE COURT:   Yes.   Of course.

12                     Question 2, Did Southwest Housing

13   Management fail to comply with the -- we're going to change

14   agreement to promise to pay.

15                     MS. GIBSON:   I'm going to -- I want to

16   double check on that, but I'll consider it.   I don't know

17   that --

18                     THE COURT:   This is the charge conference.

19   Y'all are going to the -- I told the jurors 9:30 because I

20   have a trial before, not --

21                     MS. GIBSON:   Okay.

22                     THE COURT:   -- because we're meeting

23   beforehand.

24                     MS. GIBSON:   Yeah, I'll go with it.

25                     THE COURT:   All right.

1            But you may have an objection, Mr. Friedman
2    or Mr. Hale.
3            MR. L. FRIEDMAN:  Where are we?
4            THE COURT:   Question 2.
5            MR. HALE:  Question 2.  So it's the one,
6    Did Southwest Housing Management fail to comply with the
7    agreement?
8            THE COURT:  Right.
9            MR. L. FRIEDMAN:  That assumes there was an
10   agreement.
11           THE COURT:  Right.  So your objections to
12   Question 1 carry over to Question 2.  If I made the wrong
13   ruling on Question 1 it also knocks out Question 2.
14           MR. L. FRIEDMAN:  Yes.
15           MR. HALE:  I think this is also -- you
16   know, again, with the, you know, the Castille problem it's
17   all -- all of this is past, if what she's arguing is that
18   it's all past consideration.
19           THE COURT:  Everything she's arguing is
20   not -- is past lost compensation.  She may not be arguing
21   the consideration was all in the past since she's arguing
22   that it was staying for some period of time.  But the
23   damages are past lost compensation.  Everything's in the
24   past now.
25           MR. HALE:  But before -- but he was never

1    promised bonuses before that point.

2                    THE COURT:  I understand.

3                    And so if the jury answers this yes, you

4    can come in and argue on JNOV that their answer yes was of

5    no effect because the agreement or promise to pay failed for

6    want of consideration.  Ms. Gibson disagrees with you.

7    Y'all have a disagreement on the law.  I say get a jury

8    answer and we'll figure it out.  Although, I think agreeing

9    to stay when there was a likelihood of people leaving

10   because of the problems they were having, to do something to

11   encourage people to stay was important.

12                   MR. HALE:  Your Honor, that wasn't -- that

13   wasn't offered in consideration for this.  He said this was

14   a separate oral agreement from the stay bonus, as you

15   referred to it.

16                   THE COURT:  All right.

17                   MR. HALE:  He said all of this was just for

18   past work.  He wasn't -- he never said he was required to

19   stay.

20                   THE COURT:  I understand.

21                   MR. HALE:  He didn't say he was required to

22   do anything.  There was no condition imposed on him.  It was

23   just a gratuitous promise saying I will pay you for these

24   past few years an extra bonus on top.  He wasn't required to

25   do anything, forebear from doing anything.  There was -- it

1    was completely separate from his, you know, alleged oral

2    agreement or a stay bonus, as he refers to it, which is

3    completely distinguishable from Vanegas.

4                    MR. L. FRIEDMAN:  Let me go back to 1.  So

5    in 1, are we designating the years for 1?

6                    THE COURT:  No.

7                    MR. L. FRIEDMAN:  Well, you have to

8    designate the years because he's already --

9                    THE COURT:  That's the first point of error

10   on appeal if --

11                   MR. L. FRIEDMAN:  Well, no, no.

12                   THE COURT:  -- we get this wrong.

13                   MR. L. FRIEDMAN:  But he's already claimed

14   that he's got the bonus for the first year.  So when you say

15   did Southwest Housing pay one or more annual bonuses, he's

16   already paid the first year.

17                   THE COURT:  She's not going to get up there

18   and argue for the first year.  She's going to have to argue

19   how to answer these questions.  She's going to say $400,000,

20   not $600,000.  He may have said some inconsistent things

21   throughout there, but Ms. Gibson is not going to say

22   something inconsistent with what she's arguing to me and

23   what she's argued to the jury.

24                   MR. L. FRIEDMAN:  Well, why should we --

25   why should we have to explain it to the jury when we can

17

1    just say 2005, 2006, and eight months for 2007?

2                        THE COURT:    Okay, we're moving on.

3                        MR. L. FRIEDMAN:    All right.  I object to 1

4    and I object to 2 for the same reason.

5                        THE COURT:    And Question Number 3.

6                        MR. L. FRIEDMAN:    Ruling, please.

7                        THE COURT:    Both are overruled.

8                        You can take out that answer separately in

9    dollars and cents.    Take out the word "separately".    There's

10   only one answer.

11                       MS. GIBSON:    Oh, yeah.    Thanks.

12                       THE COURT:    Okay.    Mr. Friedman, any

13   objection to this?    Understanding that you've objected to

14   Questions 1 and 2, this is -- if those objections are

15   meritorious, then --

16                       MR. L. FRIEDMAN:    Yeah.

17                       THE COURT:    -- the answer to this would

18   be --

19                       MR. L. FRIEDMAN:    Same objection would be

20   for 3 because, one, the first year was paid and he

21   acknowledged that.    And if these are performance bonuses

22   then the jury's entitled to decide what his performance was,

23   as he's testified to, for years two, three, and a half.    And

24   he testified he did different performances in different

25   years.

18

```
1                    THE COURT:  Okay.  Just make sure -- you're
2    talking about a liquidated amount in this question.  You're
3    not talking about quantum.  You're saying he was promised an
4    amount, a separate agreement, 'cause the employment
5    agreement says, you know, a range amount.
6                    You're talking about a liquidated amount
7    here.  You're only going to get up there and ask for one
8    number.  You're not going to say, you know, the range was
9    this or this, pick a number in between there depending on
10   how well he did his job.
11                   MS. GIBSON:  Almost correct.  I'm going to
12   say he agreed to continue the range; and when Brian named
13   the number, finally, this was the number.
14                   THE COURT:  Right.  You're saying -- you're
15   asking only for the number that Mr. Carpenter said and
16   named.  You're not saying --
17                   MS. GIBSON:  Right.
18                   THE COURT:  -- look at his performance and
19   pick a number within there.
20                   MS. GIBSON:  Correct.
21                   MR. L. FRIEDMAN:  She's only going to ask
22   for $400,000.
23                   THE COURT:  That's right.  That's right.
24   $400,000.
25                   MS. GIBSON:  That's right.
```

19

```
1                   MR. HALE:  Your Honor, I don't believe that
2      we've got any -- I don't believe there's -- I believe
3      there's no evidence of any promise during every year between
4      the beginning of employment to March 2017 where he said I
5      will pay you bonuses in the future.  There's just no
6      evidence of that.
7                   MS. GIBSON:  It's all over the documents.
8                   THE COURT:  And you have those objections
9      on Question -- this is just a damages question.  This is a
10     form of the question.  If you're right on that, you've
11     objected to Questions 1 and 2.  If those objections are
12     meritorious and I'm wrong, whatever the answer to Question
13     3, is of no effect.
14                  MR. HALE:  Okay.
15                  THE COURT:  Because there was no
16     consideration.  So it was really just a form of the
17     question.  Other than taking out the word "separately",
18     Question 3 is fine.
19                  MR. L. FRIEDMAN:  I'm going to make the
20     objection that Question 3 doesn't designate the specific
21     dates for performance and doesn't designate a specific
22     amount.  Did he comply with the agreement and does he get
23     $400,000?
24                  THE COURT:  Okay.  Those are inherent.
25     Those are in Questions 1 and 2, not the years.  But I
```

1      understand your objection.  I'll note your objection.

2                        MR. L. FRIEDMAN:  I'll renew my objections

3      to 1, 2, and 3.

4                        THE COURT:  Okay.

5                        MR. L. FRIEDMAN:  Ruling, please.

6                        THE COURT:  Overruled.

7                        We're up to Question 4.  And in Question 4

8      you're going to put the specific day in October because that

9      will go to the statute-of-frauds question.

10                       MS. GIBSON:  I don't want to put the date

11     because I think Jeff said on or around, but I'm happy to

12     put -- I'm happy to put October 1 in the statute-of-frauds

13     question.

14                       MR. L. FRIEDMAN:  You know, he didn't

15     say --

16                       MR. HALE:  There's no evidence for October

17     1.

18                       MR. L. FRIEDMAN:  He didn't say on or

19     around.  He said -- one time he said May 22nd, 2006.

20                       THE COURT:  Correct.  That was a mistake.

21     He corrected himself.  It's going to be all the way at the

22     beginning on the first page.  Right there.

23                       MR. L. FRIEDMAN:  October 13, 2006, is what

24     it was.

25                       THE COURT:  Okay.  All right.

1          So add 13 to that.

2          MS. GIBSON:  Okay.

3          MR. L. FRIEDMAN:  October 13, 2006.

4          MS. GIBSON:  Okay.

5          MR. HALE:  Your Honor, I believe, also,

6    there's that as long as needed.  I think that was not what

7    he originally agreed.  I don't think that's what they agreed

8    to on October 13th, 2006.

9          MR. DONOHUE:  It was until closing.

10         MR. HALE:  It was until closing, which they

11   projected to be on a certain date, but it was tied to the

12   asset closing.

13         MR. L. FRIEDMAN:  Cheryl said through

14   closing.

15         MS. GIBSON:  It's --

16         MR. L. FRIEDMAN:  The verified petition

17   said through closing.

18         MS. GIBSON:  Your Honor, it's always been

19   as long as needed.  As of October, they anticipated that

20   would be closing, but that -- what they needed is how long

21   they needed him to stay changed over time.

22         THE COURT:  Okay, and that meant for a

23   certain period of time.

24         MS. GIBSON:  Well, but it wasn't.  It was

25   as long as needed.

```
 1                    MR. L. FRIEDMAN:  It wasn't.  It was
 2     through closing.
 3                    MS. GIBSON:  It was an indefinite period of
 4     time when they agreed.
 5                    THE COURT:  Okay.  Well, not to make
 6     arguments for you-all, but she's saying that's the contract.
 7     If you're saying it wasn't as long as needed, why not argue
 8     that in closing that it wasn't for as long as needed?  So
 9     the answer to this question is, no, it was for some
10     determined period of time.  And so they haven't
11     established -- they have to establish everything in Number 1
12     and Number 2 of that question and they haven't done that.
13                    MR. L. FRIEDMAN:  Sure, but why mislead the
14     jury?  Why give it the respect of --
15                    THE COURT:  'Cause --
16                    MR. L. FRIEDMAN:  -- the Court's charge?
17                    THE COURT:  -- it's me commenting on the
18     weight of the evidence if there's conflicting evidence on
19     there.  So, again, you know, you can -- this is the way
20     she's submitting it.  I don't mind submitting it something
21     more generically.  You know, Jeff Carpenter stayed --
22                    MR. L. FRIEDMAN:  To help make the asset
23     sale happen.
24                    THE COURT:  Oh, that kind of benefits them,
25     but that's fine with me too.
```

```
1                    MR. HALE:  Your Honor, I believe --
2                    MR. DONOHUE:  I believe they're against
3      it.
4                    MR. HALE:  I believe when they -- what he
5      stated about October -- sorry.  I'm repeating myself.
6                    MR. L. FRIEDMAN:  At the closing.  It was
7      in the verified petition, Your Honor, that he would stay
8      till the closing.
9                    MR. DONOHUE:  Till the sale was effectuated
10     is what it said in the verified petition.
11                   THE COURT:  Take out "as long as needed".
12     If Jeff Carpenter would stay --
13                   MS. GIBSON:  On to help make the asset
14     sale?
15                   MR. L. FRIEDMAN:  No.  We don't like that
16     one.  No.  We don't like it.
17                   THE COURT:  All right.
18                   MR. L. FRIEDMAN:  We don't like it unless
19     you put till the closing.
20                   THE COURT:  Well -- well --
21                   MR. HALE:  They have an instruction in
22     there about modification.
23                   THE COURT:  He can't -- he can't control
24     when your closing occurred.
25                   MR. L. FRIEDMAN:  That's exactly it.  We
```

1    accept hers unless you add "till the closing".

2                    THE COURT:   Okay.   We'll leave it.

3                    Go ahead.   Keep your objection.   You had a

4    good objection.   Put your objection on the record and I'll

5    overrule that, the way he said it in the first place.

6                    MR. L. FRIEDMAN:   Who remembers that?

7                    THE COURT:   It's on the record.   Then I'll

8    overrule that --

9                    MR. HALE:   Your Honor, I --

10                    THE COURT:   -- and leave it like it is.

11                    MR. HALE:   Excuse me, Your Honor.   Sorry.

12                    Just one more objection.   So in the first

13    part of the question right there, the first two sentences,

14    it's worded as a bilateral agreement saying they agreed that

15    if he stayed on, where it was really a unilateral agreement.

16    So, I mean, maybe it's just semantics, but I think that

17    could potentially be misleading.

18                    THE COURT:   Why do you say it was

19    unilateral?

20                    MR. HALE:   It could only be accepted by

21    performance.

22                    MS. GIBSON:   He stayed.   That's

23    performance.

24                    THE COURT:   Well, his testimony or theory

25    is it was a negotiated deal.

1          MS. GIBSON:  Well -- sorry.

2          MR. HALE:  Well, if we're -- well, if we're

3   saying it's -- so if on October -- and what the testimony

4   said was on October 13th, 2006, when they originally entered

5   into this alleged agreement, that he stated he would stay on

6   until the close of the asset sale, which he projected would

7   be in April or May.

8          THE COURT:  Right.

9          MR. HALE:  So that was the original --

10   whether it was modified later and changed to reasonably

11   needed, I believe there's an instruction in there about

12   modifications.

13          THE COURT:  Right.

14          MR. HALE:  But at that time he said I will

15   sty on until the asset sale.  So if -- or that he wanted him

16   to stay on until the asset sale.  So if it's a bilateral

17   agreement then it's him saying I promise I will stay on till

18   the asset sale if you promise to pay me this amount.  It's a

19   unilateral agreement if he says if you stay on until the

20   asset sale I'll pay you this much.  So it's -- I mean --

21          THE COURT:  Where is the word "they" that

22   you want to change to --

23          MR. HALE:  Oh, I'm sorry.  Southwest.

24          THE COURT:  All right.

25          MR. HALE:  Yes, and I also object that "did

1    any of the defendants".  I think it should be Southwest

2    Housing Management.

3                    THE COURT:  That's not what his theory is.

4    And there's a place for them to answer yes for Southwest

5    Management or any of the others.

6                    MR. HALE:  But given that he worked for

7    Southwest Housing Management, he wasn't included.

8                    THE COURT:  I understand your argument.

9    You have to understand their argument, too, where --

10                   MR. HALE:  Yes, sir.

11                   THE COURT:  -- you know --

12                   MR. L. FRIEDMAN:  Never employed and never

13   paid --

14                   THE COURT:  Right.

15                   MR. L. FRIEDMAN:  -- by any company other

16   than Southwest Housing Management.

17                   THE COURT:  That will be in your closing.

18                   Okay, any other objections to Question 4?

19                   MR. HALE:  So you said we will include the

20   date in there, Your Honor?

21                   THE COURT:  Yeah, October 13.

22                   MR. L. FRIEDMAN:  All of our -- a ruling on

23   all of our objections?

24                   THE COURT:  So far, overruled.

25                   MR. HALE:  Did you say you --

1          THE COURT:  Except for I'm taking out --
2    we'll take out Cheryl Potashnik in the answer and
3    Cheryl Geiser on Page 11.
4          MS. GIBSON:  I have her already marked out
5    of everything.
6          THE COURT:  Okay.
7          MR. HALE:  So with regard to the vice
8    principal, so you want all of that in there, correct?
9          MS. GIBSON:  Yes.
10         MR. HALE:  And what about person as a
11   manager?
12         MS. GIBSON:  Yes.
13         MR. L. FRIEDMAN:  Well, we don't need all
14   that.  Did any of the -- you're asking if any of the
15   defendants, and you're listing the defendants.
16         MR. HALE:  When did this go to the --
17         THE COURT:  I think you can say as a matter
18   of law that Brian Potashnik is a vice principal.
19         MS. GIBSON:  Okay.
20         MR. HALE:  But, Your Honor, again, this
21   would be to go to our argument that Brian Potashnik didn't
22   enter that agreement; Southwest Housing did.
23         THE COURT:  I know, but her theory is that
24   Brian Potashnik entered into that agreement on behalf of all
25   of what he called the Southwest entities.  I know that you

1   disagree with what they're saying, but that's why you have

2   four things here.

3             If the jury agrees that it was only

4   Southwest Management, they'll only answer Southwest

5   Management.  If the jury thinks it was none of them, they'll

6   answer none of them.

7             MR. L. FRIEDMAN:  Leave it in.

8             THE COURT:  Leave in the vice principal?

9             MR. L. FRIEDMAN:  Yeah, leave it in.

10            THE COURT:  That was on -- we're up to Page

11   12 now, Question 5, and this would be a question that

12   defendants want.

13            MS. GIBSON:  No.  I put it in there because

14   once -- in this type of contract where you accept by doing

15   what's asked --

16            THE COURT:  Uh-huh.

17            MS. GIBSON:  -- once -- once whoever,

18   employee, laborer, has substantially performed --

19            THE COURT:  Uh-huh.

20            MS. GIBSON:  -- the other side can't

21   revoke.  Like, can't wait till you mow 60 percent of the

22   yard.  And so that's why I asked that question.

23            MR. L. FRIEDMAN:  That's not the case here.

24   Because if you mow the front lawn and you pay and you mow

25   the side lawn and you pay and you mow the back lawn and you

```
 1    pay, you can revoke if the other side lawn is left unmowed.
 2    There's a difference.  And that's what happened here.
 3                        On the 1st and 15th of the month,
 4    Mr. Carpenter was paid his generous $200,000-a-year salary.
 5                   MS. GIBSON:  That's just a consideration
 6    argument.  But I think -- I think he knows what I'm talking
 7    about.  Even if it was just I'm going to pay you a hundred
 8    dollars to walk across the bridge and someone gets 90
 9    percent along the way, it's too late to revoke.
10                   THE COURT:  Your argument to the jury is
11    going to be answer this question no.
12                   MS. GIBSON:  Right.
13                   THE COURT:  And what is your argument to
14    the jury if this question were --
15                   MR. L. FRIEDMAN:  Answer this question no.
16                   THE COURT:  I don't think you need the
17    question.
18                   MR. L. FRIEDMAN:  I think it's confusing.
19    It's just unnecessary.
20                   MS. GIBSON:  Well, the way it helps is that
21    way if defendants claim that actually the Potashniks
22    withdrew the offer, their counter offers of some date, that
23    answer makes it clear factually the date after --
24                   THE COURT:  That may be an instruction in
25    the liability question of whether or not there was an
```

1    agreement that, you know, the agreement is something like

2    that.  But I don't -- I don't mind that being in there if

3    y'all are both answering it the same way.  But I don't think

4    that question's necessary since neither of y'all are arguing

5    repudiation.  One side's arguing there's an agreement; the

6    other side is arguing that there's not.

7                    MR. L. FRIEDMAN:  Correct.

8                    I think we can take it out.

9                    THE COURT:  All right.

10                   You'll renumber Question 6 to 5, and be

11   sure and check the predicate questions too.

12                   MS. GIBSON:  I will.

13                   THE COURT:  All right.

14                   For each defendant for whom you answered

15   yes in the previous question.  Did defendant fail to comply

16   with the agreement?  And, again, you have your objections on

17   the record as to all of the predicate questions.  So this

18   would just, again, be --

19                   MR. L. FRIEDMAN:  We would renew it.  We

20   would renew all of those objections, Your Honor.

21                   THE COURT:  Okay.  And those are overruled

22   and Question 5 will be submitted as is with the changing in

23   the number.

24                   MR. HALE:  (Indecipherable)?

25                   THE COURT:  It was Question 6.  We're going

31

```
1    to do Question 5 now.
2                    MR.  HALE:   And is that -- that's including
3    Brian Potashnik as well?
4                    THE COURT:   Yes.
5                    MR.  HALE:   As an individual?
6                    THE COURT:   Yes, because this -- her
7    argument, Ms. Gibson's argument, is that Brian Potashnik
8    individually entered into that contract.
9                    MR.  HALE:   Okay.
10                   THE COURT:   Okay, I'm going to refer to
11   these as the number you have here, even though you're going
12   to change the number now.  So we'll go to Question 7.
13                   MR.  L.  FRIEDMAN:   Wait one second.
14                   (Pause)
15                   MR.  L.  FRIEDMAN:   Okay.
16                   THE COURT:   Okay.  And Question 7 you're
17   going to --
18                   MR.  L.  FRIEDMAN:   The answer to your
19   question, okay, we go to 7.
20                   THE COURT:   Right.  No, I wasn't saying
21   that you're okay with Question 7.
22                   MR.  HALE:   I'm sorry, Your Honor.  Can I
23   just get one more objection --
24                   THE COURT:   All right.
25                   MR.  HALE:   -- on the record for Question 6
```

1    or any questions that include Brian Potashnik?

2                    I believe the Texas Supreme Court has said

3    that unless there's proof that you've signed in your

4    individual capacity -- or that there has to be proof that

5    you signed and clearly entered in agreement in writing in

6    your individual capacity in order to bind yourself and not a

7    company.  And they've offered no evidence of that

8    whatsoever.

9                    THE COURT:  It's an oral agreement and it

10   was his testimony.

11                   I realize it's contested.  And there's only

12   two parties who are actually there.  You know, it's kind

13   of -- you know, when there's only two parties there one

14   party says one thing, the other party says the other, you

15   know, we're looking at the evidence in the light most

16   favorable to the party seeking that question.

17                   MR. L. FRIEDMAN:  How long did you give us

18   for closing, Your Honor?

19                   THE COURT:  Forty-five minutes.

20                   MR. L. FRIEDMAN:  An hour?  Can I buy

21   minutes from Ms. Gibson?

22                   THE COURT:  Five minutes.

23                   MR. L. FRIEDMAN:  Can I buy Gibson --

24   minutes from Ms. Gibson?

25                   MS. GIBSON:  It's going to cost you.

1                     THE COURT:  Donation to do that -- we'll

2     talk about that at the end here.

3                     MR. L. FRIEDMAN:  No, that's enough.

4     That's fine.

5                     THE COURT:  Question 7, you'll add October

6     13th?

7                     MS. GIBSON:  Yes.

8                     THE COURT:  Okay.

9                     And with that, is there anything else that

10    you want to add to Question 7?

11                    MR. L. FRIEDMAN:  Yeah.  It's not a good

12    question.

13                    MR. HALE:  Well, because here it's tying

14    into the asset sale closing.  And in the previous question

15    where it's saying what was his performance that he had to do

16    under the contract, and it said stay as long as needed.

17                    MR. L. FRIEDMAN:  His question needs to

18    say, What was the term of the contract?  What was the

19    beginning and what was the end?

20                    MS. GIBSON:  No.

21                    MR. HALE:  So it should be tied to what his

22    performance had to be.

23                    THE COURT:  It's whether it was possible

24    for the performance to be within a year.

25                    MR. HALE:  Right.  And that doesn't say

1    anything about performance.  It just says with the asset

2    sale.  It's kind of (indecipherable) in the background.

3                  THE COURT:  Okay.

4                  MS. GIBSON:  It's undisputed that that

5    would have been the end of the deal as of October 13th as

6    far as "as long as needed".

7                  THE COURT:  Okay.

8                  MR. L. FRIEDMAN:  No.  My recollection --

9                  THE COURT:  In the previous question, did

10   you use the words "asset sale closing" or --

11                 MS. GIBSON:  No.  We used "as long as

12   needed".

13                 THE COURT:  To what?

14                 MS. GIBSON:  To --

15                 THE COURT:  To make the asset sale happen?

16                 MS. GIBSON:  Yes.  Which --

17                 THE COURT:  I think that's real similar.

18                 MS. GIBSON:  Well, I'll change it to --

19   okay.

20                 MR. HALE:  So are we changing it to match

21   what his performance was supposed to be?  Because I think

22   the question is, did they contemplate that his -- what he

23   was required to do to fulfill the contract.

24                 THE COURT:  Right.

25                 MR. HALE:  So it should mirror what his --

1    what the "if" question was.

2                  MR. DONOHUE:  They say as long as needed as

3    opposed to until closing.  The two don't jive.

4                  MS. GIBSON:  Well, this -- this issue is a

5    question of law for the Court, and so it's appropriate to

6    just submit a factual question.

7                  THE COURT:  I'll -- if it's -- and y'all

8    told me that before.  If it's a question for the Court, I'll

9    make an independent determination and we'll treat this as

10   advisory.  But it should be the same language as in

11   Subparagraph 2, Question 4.

12                 MR. L. FRIEDMAN:  Judge, I don't know that

13   you need an advisory opinion.

14                 MS. GIBSON:  Okay, so it would be --

15                 MR. L. FRIEDMAN:  Let's just take it out.

16                 MS. GIBSON:  -- okay, was the asset sale

17   expected -- take it out?

18                 MR. L. FRIEDMAN:  Take it out.  We don't

19   need an advisory opinion.

20                 MS. GIBSON:  Okay.

21                 MR. HALE:  You don't want a

22   statute-of-frauds question?

23                 MR. L. FRIEDMAN:  Well, I do want a

24   statute-of-frauds question but I don't want this

25   statute-of-frauds question.

```
 1                    MR. HALE:  Your Honor, could we -- could we
 2      have an opportunity to quickly put together our own
 3      statute --
 4                    THE COURT:  No.
 5                    MR. HALE:  -- or proposal?
 6                    MR. L. FRIEDMAN:  The question is, did the
 7      alleged oral agreement or did the -- you know, I guess it's
 8      an alleged oral agreement -- was it performable within one
 9      year?
10                    THE COURT:  That's fine with me too.  Was
11      the October 13, 2006 agreement that you found in response to
12      Question Number 4 performable within one year?
13                    MR. L. FRIEDMAN:  Yeah.
14                    MR. SANFORD:  Possibly performable.
15                    THE COURT:  Possibly performable in one
16      year.
17                    MS. GIBSON:  No.  I disagree with that
18      submission because I think the jury needs to find facts and
19      the Court can apply the law.
20                    If I submitted a question on was
21      it performable within a year, I'm going to need instruction
22      saying look at the beginning; it doesn't matter if it's
23      improbable, blah, blah, blah.  Because otherwise jurors get
24      confused and think, well, it ended up taking two years and
25      so I'm going to find that it wasn't.
```

37

```
1                        MR. L. FRIEDMAN:  It's just advisory.
2                        THE COURT:  That's why I said possibly.
3                        All right, this is fine.  Leave it like
4      that.  If you want to change it, you know, Email them
5      tonight.
6                        MS. GIBSON:  Okay.
7                        MR. L. FRIEDMAN:  Well, I'd like to change
8      it to was the agreement made on October 13th possibly
9      performable.
10                       MS. GIBSON:  I have the same problem with
11     that type of question.
12                       MR. DONOHUE:  But that's not prefaced --
13                       THE COURT:  That's inherent in the question
14     since it's predicated on --
15                       MR. L. FRIEDMAN:  All right.
16                       THE COURT:  -- answering yes to Question
17     Number 4.  In Question Number 4 they have to find that there
18     was an agreement made on October the 13th --
19                       MR. L. FRIEDMAN:  Leave it as the asset
20     sale possible.
21                       MR. HALE:  Leave it?  Okay.
22                       MR. L. FRIEDMAN:  No, no, was the asset
23     sale closing possibly performable in less than a year.  But
24     it really wasn't the asset sale.  Was the agreement --
25                       THE COURT:  How about the agreement you
```

1  found in response to Question Number 4 possibly performable

2  in less than a year?

3           MR. HALE:  Yeah.

4           MS. GIBSON:  No, I don't think that

5  appropriately instructs the jury without further

6  instructions.  And it's the court's looking at the same --

7  you know, no matter -- however -- I mean, if I get to put in

8  the instruction saying, However and probable, you don't look

9  at this at the end, you only look at the beginning, that can

10  be done.  But this is a lot cleaner.  And then the Court can

11  decide based on this answer.

12          MR. L. FRIEDMAN:  This is not about

13  performance.  This is about the agreement that was made.

14  The testimony couldn't have been clearer.  He had a start

15  date and he had an ending date.

16          MS. GIBSON:  That's exactly why --

17          MR. L. FRIEDMAN:  I know the plaintiff

18  doesn't like it and they can argue against it, but at least

19  one version of Mr. Carpenter's facts was here's the

20  beginning and here's the end.

21          THE COURT:  All right.  We'll do it.

22          They have to -- Questions 4 and 7 have to

23  be the same.  So you can say, Do you find that the -- if you

24  answered -- Do you find that the agreement you found in

25  response to Question Number 4 --

1                    MS. GIBSON:  Well, how about --

2                    THE COURT:  -- was either expected to be

3     performed within a year or possibly performable within a

4     year or could have been performed within a year?

5                    MS. GIBSON:  How about if I just -- as of

6     October 13th, 2006, was the asset sale expected to happen

7     less than a year later?

8                    MR. L. FRIEDMAN:  No.

9                    THE COURT:  It's the same thing you have

10    here.

11                   MR. L. FRIEDMAN:  No.

12                   MS. GIBSON:  Well, I just matched the

13    language.

14                   MR. L. FRIEDMAN:  I like -- I think we go

15    with your language, Judge.

16                   MS. GIBSON:  Judge, they're going to argue

17    that you look at this at the end of the day, not the

18    beginning.  And so I don't want the jurors confused that

19    just because it took more than a year --

20                   THE COURT:  But you have the word

21    "expected" there or possibly performable.

22                   MS. GIBSON:  Are you not asking me to

23    change this?

24                   THE COURT:  I'm saying if you -- I want you

25    to use the same language in Question 7 as you do with 4.  So

1    one way to do that is, Was the agreement you found in

2    Question Number 4 possibly performable?  Not was it actually

3    performed, but was it possibly performable in less than a

4    year.

5                     MS. GIBSON:  Okay.  I'm going to want to

6    instruct them, then, that more specifically that you

7    don't --

8                     THE COURT:  Possibly is a commonly --

9                     MR. L. FRIEDMAN:  She can argue --

10                    THE COURT:  -- commonly used word.

11                    MR. L. FRIEDMAN:  She can argue that all

12   day long.

13                    THE COURT:  And, again, if that's an

14   advisory one, we're just looking to see what they think

15   about it.

16                    MS. GIBSON:  Okay.

17                    THE COURT:  We'll go to Question Number 8.

18   And recognizing, of course, that you have objections to the

19   predicate questions.  It's -- again, it's --

20                    MR. L. FRIEDMAN:  So we'll renew all of our

21   objections --

22                    THE COURT:  All right.

23                    MR. L. FRIEDMAN:  -- we've made so far as

24   to questions previous to Question 8 for Question 8.

25                    THE COURT:  All right.  And those are

1    overruled.

2                    As to the form of Question 8, is there any

3    objection?

4                    MR. HALE:  Yes, Your Honor.

5                    I believe we need somewhere to have a date

6    of breach, you know, for any of the questions seeking

7    damages, not just was there a breach.

8                    MS. GIBSON:  Why?

9                    THE COURT:  Why?

10                   MR. HALE:  If we're going to start

11   calculating interest or from date of breach, then we need to

12   know --

13                   THE COURT:  I'm talking about --

14   considering how old this case is, you're talking about

15   substantial prejudgment interest, but I think that's

16   something that we can figure out.  And at some point you

17   filed a lawsuit.  At some point there was a rejection; we're

18   not paying you anything.

19                   MR. HALE:  Yes.

20                   THE COURT:  The finance code addresses all

21   of that.

22                   MR. L. FRIEDMAN:  Well, Your Honor, there's

23   been multiple different testimony from Mr. Carpenter as to

24   when that -- those alleged agreements were made.

25                   THE COURT:  I'm the one that calculates the

1   interest, not the jury, and I'll look at that in the light

2   most favorable to you if I have to.

3                  MR. L. FRIEDMAN:  All right.

4                  THE COURT:  But the very last date would be

5   the date the lawsuit was filed.  That was almost 10 years

6   ago.

7                  Okay, Question Number 9.

8                  MR. L. FRIEDMAN:  Question Number 8, I have

9   an issue --

10                 THE COURT:  Okay.

11                 MR. L. FRIEDMAN:  -- because

12  Mr. Carpenter's given many formulas with regard to Sub A,

13  but the formula he gave this morning that I went over twice

14  with him had nothing to do with selected employees and

15  there's been no evidence --

16                 MS. GIBSON:  Stop.  Just time out.

17                 MR. L. FRIEDMAN:  -- there's been no

18  evidence --

19                 MS. GIBSON:  I took that one out.

20                 THE COURT:  Okay.

21                 MS. GIBSON:  I took the word out.  I

22  realized that was in there.  It's just stay -- stay

23  bonuses --

24                 MR. L. FRIEDMAN:  Okay, if you took it out,

25  then you took it out.  We don't need to talk about it.  So

43

1    it says two employees.

2              THE COURT:   The language should be the same

3    as in the predicate question, which was probably Question 4.

4              MS. GIBSON:   Right.   Okay.   I'll make sure.

5              MR. L. FRIEDMAN:   He said other employees

6    this morning or just employees.

7              THE COURT:   Okay.   Question Number 9.   This

8    is your quantum meruit --

9              MS. GIBSON:   Yes.

10             THE COURT:   -- one where -- did you have

11   some objections to those?

12             MR. HALE:   Yes, Your Honor.

13             So for these -- excuse me.   All of the work

14   that he's allegedly performed was covered under his

15   employment agreement, so he's -- I mean, anything that he's

16   doing in pursuit of, you know, or for whatever reason, he's

17   doing all of that under his at-will employment agreement.

18   So there's no additional amount of money he's entitled to

19   just because he doesn't have an enforceable -- if it ends up

20   that he doesn't have an enforceable agreement, then he's

21   entitled to nothing.   He's entitled to his paycheck.

22             THE COURT:   Okay.   Let me ask you this:

23   That if the jury answers yes to the question about annual

24   bonus and they answer yes to the question about the stay

25   bonus, is there any scenario where you can recover on the

1    quantum meruit?

2                    MS. GIBSON:  Recover, no.  However, in

3    case -- the reason I submitted it this way is we may want to

4    elect between agreement or quantum meruit or --

5                    THE COURT:  If they say there's an

6    agreement, you can't elect quantum meruit.  We have to go by

7    agreement.

8                    MS. GIBSON:  I'm sorry.  You're right.

9                    The other issue is if for some reason they

10   come up with some argument as to why, you know, the

11   agreements are not enforceable as a matter of law, we still

12   have a finding on quantum meruit --

13                   THE COURT:  All right.

14                   MS. GIBSON:  -- and they'll have to retry

15   this case.

16                   THE COURT:  As long as you understand that

17   if they answer yes to the annual bonus and yes to -- if they

18   answer yes to all three, you don't get quantum meruit

19   because you're governed by the contract, not an equitable

20   theory of recovery.

21                   MS. GIBSON:  I agree.

22                   MR. HALE:  And I'm sorry.  I just wanted to

23   make sure.  So Cheryl is out of this, correct?

24                   THE COURT:  Right.

25                   MR. L. FRIEDMAN:  We object to the

1    inclusion of this question at all.  We think she's got to

2    make the election right now.

3                    THE COURT:  Okay, and I'll overrule that.

4                    MR. L. FRIEDMAN:  And the other thing is I

5    want to make this objection as to all the questions so far.

6                    Mr. Carpenter, at the beginning of the

7    case, talked about this -- these [sic] three-percent bonus

8    as a stay bonus or pay-to-stay bonus.  As this case evolved

9    as of this morning, it was severance bonus.  I think the

10   reference in these questions ought to be -- I'm sorry, it

11   wasn't severance bonus.  It was severance pay.  I think the

12   reference in these questions ought not to be bonus but ought

13   to be referred to in the words that Mr. Carpenter himself

14   used, which was severance.  And that's a big deal.

15                   MS. GIBSON:  He used -- he described other

16   people talking about the stay bonuses by just different

17   names.

18                   THE COURT:  Okay.

19                   Whatever you called it, we didn't have to

20   call it anything because annual bonus, we agree, is some

21   type of defined term.

22                   MR. L. FRIEDMAN:  Annual bonus.

23                   THE COURT:  The stay -- what you're talking

24   about is the stay bonus or --

25                   MR. L. FRIEDMAN:  No, the three -- I call

1    it the three percent.

2              THE COURT:  Three-percent bonus, whatever.

3              MR. L. FRIEDMAN:  The alleged three-percent

4    bonus.

5              THE COURT:  The question that we're asking

6    the jury is not was there a stay bonus.  The question we're

7    asking the jury was, Was there an agreement with this

8    particular bonus; three percent minus this, minus this?  So

9    it doesn't matter what you call it.  They have to find all

10   of the elements that are in Question Number 4.

11             So you don't have to call it stay bonus,

12   you don't have to call it severance bonus, you don't have to

13   call it anything.  You don't even have to call it a bonus.

14   It's was there an agreement or a promise to pay.

15             MR. L. FRIEDMAN:  I think it should say was

16   there an agreement to pay instead of --

17             THE COURT:  Well, your counsel argued

18   promise to pay.  Or that may be for a different question.

19             MR. L. FRIEDMAN:  I'm just saying agreement

20   to pay, not bonus.

21             THE COURT:  It doesn't say bonus in

22   Question 4.

23             MR. L. FRIEDMAN:  Well, I'm sorry.  I'm not

24   reading 4.  I apologize, Your Honor.

25             MR. DONOHUE:  So 4 says agree?

47

1                          THE COURT:  Agree.

2                          MR. L. FRIEDMAN:  As long as it doesn't say

3     bonus.

4                          THE COURT:  It does not.

5                          MR. L. FRIEDMAN:  Okay.

6                          THE COURT:  We're on Question 10, which is

7     the damages for quantum meruit.

8                          MR. HALE:  I'm sorry, Your Honor.  I'm

9     sorry.  For Question 9 I just wanted to get in one other

10    objection.

11                         THE COURT:  Sure.

12                         MR. HALE:  I object to Brian Potashnik

13    being included.  I think any of the services he rendered

14    were pursuant to his job and at the instruction of Southwest

15    Management Company and benefited the company, Southwest

16    Management.

17                         THE COURT:  All right.  Well, that may be a

18    problem.  Not for Brian in particular.

19                         But your annual bonus question is only for

20    Southwest Housing Development and your stay bonus was for

21    all the defendants.  So your quantum meruit would have to be

22    linked to one or the other.  So you can do a Question 9 and

23    a Question 9A.

24                         MS. GIBSON:  Okay.

25                         MR. L. FRIEDMAN:  I'm going to make a

1    specific objection to exclude Brian Potashnik from any of

2    these questions on the basis of my arguments that I made in

3    the directed verdict and any previous arguments I've made at

4    this charge conference.

5                        THE COURT:   Okay.   And that's overruled.

6                        Are you going to -- but you'll make that

7    change and send that to opposing counsel, the separate

8    quantum meruit linking one to Question 1.   You would have

9    to -- you would have to -- you can't do what you're trying

10   to do.   Because to do that you would have to say, If you

11   answered no to Question Number 1, do you find that there was

12   an equitable right to recover.

13                       MS. GIBSON:   Right.   I understand.   I have

14   submitted one because some of the time frame overlaps.   But,

15   yeah, no, I agree with -- I agree with Ryan, also.

16                       THE COURT:   All right.

17                       MS. GIBSON:   And you.

18                       THE COURT:   Okay.

19                       We're on Question Number 10.   Again, I

20   understand that you made objections to Question Number 9,

21   and those were incorporated here.   Any other objection to

22   10?

23                       MR. HALE:   Will this be also split into 10,

24   10A?

25                       THE COURT:   Right.   Right.   Exactly.

1           And you can put those one after the other
2     or you can put them both, both damages.  You put the damage
3     after each one or you can put both damages after the two.
4                   MS. GIBSON:  Okay.
5                   THE COURT:  All right.
6                   And y'all have got lots of objections to
7     Number 11.
8                   MR. L. FRIEDMAN:  I just object to it in
9     its entirety.  I think it's unnecessary and it's confusing
10    for the jury.
11                  THE COURT:  Okay, I'm going to overrule the
12    objection, see what the jury says.
13                  MR. HALE:  Your Honor, I also would just
14    like to add onto that and, as we've discussed before, our
15    objection.  But they haven't shown that any of the entities
16    had an equal right to control any of the other entities.
17    There's been no evidence that Affordable Housing
18    Construction has the right to control or a voice in the
19    direction of Southwest Housing Development or Southwest
20    Housing Management has a voice in the direction and control.
21                  THE COURT:  We talked about that where she,
22    Ms. Gibson, made her argument.  But remember Question 11 is
23    not in the day-to-day business did one have a right to
24    control the other.  It was in connection with the asset sale
25    only.

1          I'm not sure what the legal effect of the

2    answer is.  I don't want to opine on that now, but I don't

3    want to not have an answer to this if I need to know this in

4    order to enter a judgment.  So I'm going to get an answer to

5    this question.

6                    MR. HALE:  Okay.  Thank you.

7                    I'm sorry.  I just want to give one last

8    objection.  So we just object that there's no evidence as to

9    any of the entities or to Brian Potashnik --

10                   THE COURT:  All right.

11                   MR. HALE:  -- that they engaged in a joint

12   enterprise.

13                   THE COURT:  All right.  That's overruled.

14                   And same objection for 12?

15                   MR. HALE:  Yes, Your Honor, same

16   objections.  And, again, there was no evidence of a mutual

17   right to have control over management of the venture and

18   there's no evidence to support that Affordable Housing

19   Construction was a joint venture with Southwest Housing

20   Development for -- I suppose it's for the purpose of

21   piercing the corporate veil.  And this is an especially high

22   burden for a breach-of-contract case.  No evidence

23   whatsoever.

24                   MR. L. FRIEDMAN:  Same objections.  I think

25   it's confusing to the jury and there's no evidence on the

1    record that would support submission of this question to the

2    jury.

3                       MR. HALE:  I don't think there's any

4    evidence that anything Affordable Housing Construction has

5    done -- I mean --

6                       THE COURT:  There's -- are you sure you

7    want to submit both of these?  Because you run the risk that

8    if one applies the other doesn't, and they answer yes to one

9    and no to the other and it's not the way you want it.

10                      MS. GIBSON:  I'll take that risk.

11                      THE COURT:  You'll take joint venture out?

12                      MS. GIBSON:  No.

13                      I'll -- I'll go ahead and take the risk.  I

14   think it's safer to --

15                      THE COURT:  All right.

16                      MS. GIBSON:  -- I think it's safer to

17   submit both.

18                      THE COURT:  Okay.

19                      MR. HALE:  Your Honor, can I also make one

20   more objection --

21                      THE COURT:  Uh-huh.

22                      MR. HALE:  -- on the record?

23                      I just want to point out that this also

24   poses, you know, a Castille problem where if Brian Potashnik

25   is found not to be a joint venture because there's no

1    evidence that he was engaging in a joint venture, then, you

2    know, the entire -- it spoils the entire question.

3                    THE COURT:  Why?

4                    MR. HALE:  Because it's an unrecoverable

5    theory.

6                    THE COURT:  But that's good for you.

7                    MR. HALE:  I just wanted to make sure my

8    objection was on the record.

9                    THE COURT:  All right.

10                   MR. L. FRIEDMAN:  Are we taking

11   Cheryl Potashnik out?

12                   THE COURT:  Yes, in Question 13.

13                   You had objections to this one also.

14                   MS. GIBSON:  And before y'all start, I

15   agree with defendants that the -- where there's an if and

16   dash at the top --

17                   THE COURT:  Right.

18                   MS. GIBSON:  -- I'm going to link that to

19   the first paragraph to make that clear.

20                   MR. HALE:  Your Honor, I also -- also

21   object to including that Brian Potashnik was a governing

22   person of Affordable Housing Construction if that's --

23                   THE COURT:  That has to go somewhere.

24   That's not in any -- is that part of it that he was a

25   governing person?

```
 1                    MS. GIBSON:  No.  That's why I'm linking it
 2      to Brian Potashnik used the entity for the purpose of --
 3                    THE COURT:  So you're saying the Court's
 4      instructing the jury that Brian Potashnik was a governing
 5      person?
 6                    MS. GIBSON:  I'm happy to give a
 7      definition, but Brian Potashnik lists himself as, quote,
 8      governing person on the Secretary of State records that we
 9      offered.
10                    MR. HALE:  I think it's improper to include
11      evidence in the -- in the jury charge.  I think it's a
12      nudging instruction that pushes them towards finding, you
13      know, in favor that he was responsible for the conduct of
14      the entity.
15                    THE COURT:  Right.
16                    MR. HALE:  I think that should be addressed
17      in closing argument.
18                    MS. GIBSON:  Well, I'm happy to define
19      governing person.
20                    THE COURT:  Well, but you still have to
21      make it a question like you do the first part where you
22      say -- where you have it after "if".  Brian Potashnik is
23      responsible "if", and you must find that Brian Potashnik was
24      a governing person.
25                    MS. GIBSON:  So -- so the question on alter
```

1    ego is just perpetrate fraud.

2                    THE COURT:   Uh-huh.

3                    MS. GIBSON:   The rest of these things are

4    instruction.

5                    THE COURT:   But it's not -- the way the

6    first one reads, it's not an instruction.

7                    MS. GIBSON:   Right.   Right.   What I would

8    do is say I would take a governing person must.

9                    THE COURT:   Okay.

10                    MS. GIBSON:   Which is down a few.   And I

11   would put the definition of governing person underneath

12   that.

13                    THE COURT:   Okay.

14                    MR. L. FRIEDMAN:   I think the question is,

15   Did Brian Potashnik use these companies to perpetrate a

16   fraud on what's his name, on Carpenter?

17                    THE COURT:   Why don't we make everything

18   else --

19                    MR. L. FRIEDMAN:   Why are we making this

20    so tricky?

21                    THE COURT:   'Cause she wants in here the --

22   about not sending notice.

23                    MR. HALE:   Your Honor, I would also object

24   to the inclusion of the winding.   They haven't stated what

25   significance.   They haven't put on any evidence of what

1  significance this has.

2          MR. L. FRIEDMAN:  And they haven't put on

3  any evidence of any of these companies winding up.

4          MR. HALE:  I mean, maybe they stated

5  it happened.  Well, apparently, it happened; but they

6  haven't showed any detriment to him or why that should be a

7  reason for piercing the corporate veil and making

8  Brian Potashnik individually responsible for the action of

9  the corporation.  Just to say he didn't say they're winding

10  up, there's -- he hasn't shown any detriment.

11          THE COURT:  The question right now is, Is

12  Brian Potashnik responsible for the conduct of the entities

13  named below?  If the question only read after that,

14  Brian Potashnik is responsible for the conduct of an entity

15  if Brian Potashnik used the entity for the purpose of

16  perpetrating and did perpetrate an actual fraud on

17  Jeff Carpenter primarily for the direct personal benefit of

18  Brian Potashnik.

19          MR. L. FRIEDMAN:  Yeah.

20          THE COURT:  If it stopped there, what would

21  you argue the legal effect of that question is?

22          MR. L. FRIEDMAN:  That's the question.

23  That's what she's trying to get at.  We don't need all the

24  rest of this stuff.

25          THE COURT:  Will you agree that if they

56

```
 1    find that he committed -- perpetrated an actual fraud on
 2    Brian Potashnik?
 3                    MR. L. FRIEDMAN:  If Brian Potashnik used
 4    the company --
 5                    THE COURT:  Right.
 6                    MR. L. FRIEDMAN:  -- to perpetrate an
 7    actual fraud for the direct personal benefit of
 8    Brian Potashnik.
 9                    THE COURT:  Okay.  Then he would be
10    individually liable for the company's acts.
11                    MR. L. FRIEDMAN:  I got it.  Yes.
12                    THE COURT:  All right.  That seems --
13                    MR. L. FRIEDMAN:  Do you agree with that?
14                    THE COURT:  -- reasonable to me.
15                    MS. GIBSON:  Just leave it at that?
16                    THE COURT:  That gives you more leeway.
17    Right.
18                    MS. GIBSON:  Okay.
19                    MR. L. FRIEDMAN:  Mike, put your two cents
20    in.
21                    MR. DONOHUE:  If that alone -- because the
22    second paragraph from the bottom, the governing person
23    must (unintelligible) -- send written notice to the winding
24    up of each known claimant against the domestic entity.
25    Well, if she -- if the evidence is that that notice wasn't
```

1       sent, then that in and of itself makes Brian Potashnik

2       responsible for the conduct of --

3                       MR. L. FRIEDMAN:  That's not what the case

4       law says.

5                       MS. GIBSON:  No.  No, that's just one part

6       of it.

7                       MR. DONOHUE:  That's what it seems to say.

8                       MR. L. FRIEDMAN:  I would just have one

9       question.

10                      MR. DONOHUE:  That's a factor that might be

11      considered.

12                      MS. GIBSON:  Okay.

13                      MR. HALE:  Yeah, it doesn't say --

14                      MR. DONOHUE:  That, in and of itself, does

15      not -- you know --

16                      MS. GIBSON:  Do y'all agree to take them

17      out and just submit the question?

18                      MR. L. FRIEDMAN:  Yeah.

19                      MS. GIBSON:  Okay.  Done.

20                      MR. L. FRIEDMAN:  Okay.  What else?

21                      THE COURT:  That's all.

22                      MR. HALE:  Yeah, Your Honor, I'd also

23      object to Question 13 that there's -- I'm sorry.

24                      THE COURT:  Go ahead.

25                      MR. HALE:  Real quick get this on the

1    record.

2                    And so there's -- I stated before there's

3    no evidence whatsoever that he attempted to perpetrate an

4    actual fraud on Jeff Carpenter.  Jeff Carpenter hasn't

5    alleged that he attempted to perpetrate fraud on him.

6    There's -- he hasn't stated that there was some motivation

7    or any mental state or anything like that saying why he was

8    trying to do this.  All he said was I didn't get paid.  And

9    he wasn't happy about it.

10                   There's been no evidence as to fraud,

11   though.  You know, that's a heightened showing.

12                   THE COURT:  Sure.

13                   MR. HALE:  Especially for a

14   breach-of-contract case, which are far less likely to be --

15   to set aside the alter ego rather than -- or set aside the

16   corporate forum rather than negligence cases.  And here

17   there's been no evidence at all that he's attempted to do

18   it primarily for his direct personal benefit and doing it to

19   defraud Jeff Carpenter.

20                   MS. GIBSON:  Your Honor, with respect to

21   the claim about fraud, quite frankly, courts are split on

22   whether you just have to show deception or all the elements

23   of fraud.  But the Dallas Court of Appeals says you do not

24   need to show the element to the regular fraud claim, just

25   some sort of deception.

59

1              MR. HALE:  Didn't we say this was -- I

2      mean, but this is what you're saying are the correct

3      elements, right?

4              MS. GIBSON:  Correct.  The Dallas Court of

5      Appeals has interpreted those very elements to say that

6      it just requires some sort of deception.  It does not

7      require our traditional elements of a fraud claim.  But I --

8      I did want the judge to also know the courts are split; that

9      there's where Dallas is right now.

10              THE COURT:  Sure.

11              We follow Dallas.

12              MR. HALE:  I disagree, Your Honor.  I think

13      they still have to show actual fraud.  That's the language

14      in --

15              THE COURT:  She is.  She's submitting

16      actual fraud.  She's submitting a higher burden than she

17      says the Dallas courts require.

18              MR. HALE:  (Unintelligible).

19              MR. L. FRIEDMAN:  All right.  For the

20      record, would you rule on his objections, Your Honor?

21              THE COURT:  His objection is overruled.

22              MS. GIBSON:  Well, just to be clear, actual

23      fraud is the language that the Dallas Court of Appeals

24      interpreted, so I'm not -- I'm not actually choosing the

25      higher burden.

1                    MR. HALE:  Yes, yes.  No, I was just

2        wanting to say there was no evidence of it.

3                    MR. L. FRIEDMAN:  Who's going to redo the

4        charge?

5                    THE COURT:  We'll go off the record.

6                    (Off the record)

7                    MR. HALE:  I couldn't remember if I got an

8        objection -- there's one critical objection I wanted to get

9        on the record.  I'm not sure if I did before.  It was to

10       Question 5 about substantial performance.

11                   THE COURT:  Uh-huh.

12                   MR. HALE:  Substantial performance is not

13       an element for unilateral contracts to pay bonus agreements

14       to employees in the future because it's the At-Will

15       Doctrine.  They can terminate them up to the day before it's

16       due.  And because there's no good-faith requirement --

17                   THE COURT:  She just had Question 5.

18                   MR. HALE:  Question 5 is now gone?

19                   MS. GIBSON:  Yes.

20                   MR. HALE:  Okay.

21                   I don't think I have an objection then,

22       Your Honor.

23                   (Off the record)

24                   (End of proceedings)

25

Appendix 001600

1   THE STATE OF TEXAS

2   COUNTY OF DALLAS

3        I, Vikki L. Ogden, Official Court Reporter in and for

4   the County Court at Law Number 5 of Dallas County, State of

5   Texas, do hereby certify that to the best of my ability the

6   above and foregoing contains a true and correct

7   transcription of all portions of evidence and other

8   proceedings requested in writing by counsel for the parties

9   to be included in the Reporter's Record, in the above-styled

10  and -numbered cause, all of which occurred in open court or

11  in chambers and were reported by me.

12       I further certify that the total cost for the

13  preparation of the Reporter's Record is $742.00 and will be

14  paid by Friedman & Feiger, LLP.

15       WITNESS MY OFFICIAL HAND this the 6th day of February,

16  2018.

17

18

19                           /S/ Vikki L. Ogden

20                           _____
                             VIKKI L. OGDEN, Texas CSR# 6309
                             Official Court Reporter
21                           Dallas County Court at Law No. 5
                             600 Commerce Street, Floor 5
22                           Dallas, Tx. 75202
                             (214)653-6443
23                           Certification Expires:  12/31/18

24

25

Appendix 001601

REPORTER'S RECORD

VOLUME 9 of 11

Trial Court Cause No. CC-08-02072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| Plaintiff, | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) | |
| Defendants. | ) | DALLAS, TEXAS |

TRIAL ON THE MERITS

On the 31st day of January, 2018, the following proceedings came on to be heard within the presence of a jury, in the above-entitled and -numbered cause; and the following proceedings were had before the HONORABLE MARK GREENBERG, Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

2

```
1                              APPEARANCES:

2

3    MS. AMY GIBSON
     SBN 00793801
     Gibson Wiley, PLLC
4    1500 Jackson Street, Suite 714
     Dallas, Texas 75201
5    (214)522-2121
     Attorney for Plaintiff
6
                 -AND-
7
     MR. BRIAN SANFORD
8    SBN 17630700
     Sanford Firm
9    1910 Pacific Avenue, Suite 15400
     Dallas, Texas 75201
10   (469)361-9111
     Attorney for Plaintiff
11
                 -AND-
12
     MR. LAWRENCE "LARRY" FRIEDMAN
13   SBN 07469300
     MR. MICHAEL DONOHUE
14   SBN 05989380
     MR. JASON FRIEDMAN
15   SBN 24059784
     Friedman & Feiger, LLP
16   5301 Spring Valley Road, Suite 200
     Dallas, Texas 75254
17   (972)788-1400
     Attorneys for Defendants
18
                 -AND-
19
     MR. RYAN HALE
20   SBN 24097784
     Hawkins Parnell Thackston & Young, LLP
21   4514 Cole Avenue, Suite 500
     Dallas, Texas 75205-5412
22   (214)780-5138
     Appellate Attorney for Defendants
23


24
     ALSO PRESENT:  Steve Page, A/V Technician
25
```

Appendix 001603

1                        VOLUME 9

2       January 31, 2018                              <u>PAGE</u>

3       Proceedings ----------------------------------      4

4       Defendants' Request to Reopen Charge Conference     6

5       Court's Ruling -------------------------------      7

6       Defendants' Bill of Exception ------------------    7

7       Court's Ruling -------------------------------     16

8       Alternate Juror Dismissed ---------------------    17

9       Closing Argument by Ms. Gibson ----------------    22

10      Defendants' Objection and Motion for Mistrial -    36

11      Court's Ruling -------------------------------     37

12      Defendants' Objection -------------------------    37

13      Court's Ruling -------------------------------     38

14      Closing Argument by Mr. L. Friedman -----------    38

15      Rebuttal Argument by Ms. Gibson ---------------    68

16      Deliberations Held ----------------------------    78

17      Jury Questions --------------------------------    78

18      Adjournment -----------------------------------    81

19      Court Reporter's Certificate ------------------    82

20

21

22

23

24

25

1                        P R O C E E D I N G S

2                        January 31, 2018

3                 THE COURT:  All right.  We are back on the

4       record, outside the presence of the jury.

5                        Yesterday afternoon we had the charge

6       conference, and at the end of the charge conference

7       Mr. Hale tendered a requested instruction which I marked

8       refused.  But he did that after we had gone off the record,

9       so I'll let him put that on the record.

10                 MR. HALE:  Yes, Your Honor.

11                        On behalf of all defendants, we offer our

12      proposed question for quantum meruit, unclean hands,

13      stating, "If you answer yes to a question regarding quantum

14      meruit, you also find that Jeff Carpenter's fraudulent

15      actions in connection with this agreement should bar him

16      from recovering on this claim.  Answer yes or no."

17                 THE COURT:  All right.  Ms. Gibson, you

18      object to that --

19                 MS. GIBSON:  Yes.

20                 THE COURT:  -- question?  All right.

21                 MR. HALE:  And, Your Honor, we'd like to

22      say we did plead unclean hands in our live pleadings and we

23      put on evidence showing that he has withheld, I believe,

24      documents that he reserved and confidential information he

25      was required to return.  And he's withheld a laptop.

1          I believe a cell phone, also?

2          MR. L. FRIEDMAN:  Yeah.

3          MR. HALE:  A cell phone.  And he also --

4    confidential documents.  And he also began employment at a

5    new job before his current employment was complete and did

6    not inform Southwest Housing or any of the defendants or his

7    employer of his new job.

8          THE COURT:  Okay.  And all those factual

9    matters you raised may be relevant to this issue and other

10   issues.  I'm not saying don't argue those, but I'm saying

11   this is not a proper question, not in the pattern jury

12   charge.  I've marked it rejected.  I meant marked it

13   refused.

14              So I put rejected or refused and I dated

15   it as of yesterday.  And I had this filed with the clerk's

16   office, so that is part of the record now and that is part

17   of the charge conference.

18              The charge conference, other than that --

19              MR. L. FRIEDMAN:  And I'd like to propose a

20   stipulation.

21              THE COURT:  Let me finish.

22              And the charge conference, other than that,

23   is concluded.  If there's still things that the attorneys

24   want to put on the record, I'll let them do that.

25              What was your stipulation?

```
1                    MR. L. FRIEDMAN:  Well, I think the charge
2        is too long and too complicated, so I'd like to propose a
3        stipulation to Ms. Gibson that we're prepared to give up our
4        question on the statute of --
5                    THE BAILIFF:  Jurors coming through.
6                    (Jurors passed through the courtroom.)
7                    MR. L. FRIEDMAN:  -- on the statute of
8        frauds if she would give up her question on the joint
9        venture and the joint enterprise.  That would eliminate
10       three questions from this lengthy jury charge.
11                   MS. GIBSON:  No, thanks.
12                   MR. L. FRIEDMAN:  Say it again.
13                   MS. GIBSON:  No, thank you.
14                   MR. L. FRIEDMAN:  Will you give up one of
15       them?
16                   MS. GIBSON:  No.
17                   THE COURT:  All right.  Mr. Hale, again,
18       the charge conference is over, but you had a number of
19       suggestions afterwards that you wanted to put on record.
20           DEFENDANTS' REQUEST TO REOPEN CHARGE CONFERENCE
21                   MR. HALE:  Yes, Your Honor.
22                   Your Honor, first we'd like to request that
23       you reopen the formal jury charge conference so that we may
24       reconcile a few things that we were still working on last
25       night and to propose additional instructions that we believe
```

1    are necessary to provide clarity in which we've pled and

2    argued throughout the trial.

3                    THE COURT:  Is that opposed?

4                    MS. GIBSON:  Yes.

5                         COURT'S RULING

6                    THE COURT:  That's denied.

7            DEFENDANTS' BILL OF EXCEPTION

8                    MR. HALE:  Let me first go ahead and tender

9    Question 1, changes to Question 1.  So, the first change

10   we'd like to make is that it was "Did Jeff Carpenter and

11   Southwest Housing Management orally agree," with emphasis on

12   orally 'cause we just wanted to clarify because of the

13   nature of the case.  There have been -- they've pled that it

14   was -- alternatively, that it was under a written contract.

15   And we think it would be misleading to the jury not knowing

16   which contracts they would be awarding damages under or

17   enforcing.

18                   And after that we have two proposed

19   instructions we tender to the court.  The first proposed

20   instruction --

21                   MR. L. FRIEDMAN:  Can we get a ruling on

22   each one?

23                   THE COURT:  The ruling is that the charge

24   conference is over and you're putting on more of a bill of

25   exception what you're arguing now, but I'll rule on

1   everything at the end.

2                    MR. L. FRIEDMAN:  All right.

3                    MR. HALE:  Yes, Your Honor.

4                    And then we have two proposed instructions

5   underneath.  The first one is an instruction regarding

6   mutual assent; and the second instruction is whether or not

7   the counter offers -- and to the effect that those have on

8   the original offer.

9                    That is Question 1.  Would you like me to

10  tender that to the Court, Your Honor?

11                   THE COURT:  No.  Just go through all of

12  them.

13                   MR. HALE:  Go through all of them?

14                   THE COURT:  Right.

15                   MR. HALE:  Okay.

16                   MR. L. FRIEDMAN:  Do you want to read that

17  into the record?

18                   MR. HALE:  Do you mind if I read it into

19  the record?

20                   THE COURT:  No.  Go ahead.  I want you to

21  preserve your record.

22                   MR. HALE:  Thank you.

23                   So, for Question 1, for the first part we

24  would like to change it to modify it.  And we believe

25  it should be included -- included within the question to

1    say, Did Jeff Carpenter and Southwest Housing Management

2    orally agree on or about March 14th, 2007, that Southwest

3    Housing Management would pay one or more annual bonuses to

4    Jeff Carpenter covering the period from March 15, 2005,

5    through March 15, 2007.

6            Underneath that we have two proposed

7    instructions.  The first one is the contract requires that

8    both parties mutually assent to the terms of the agreement.

9    For there to be mutual assent, the parties must agree on the

10   essential terms of the contract and must express to each

11   other their agreement to the same terms.  To be enforceable,

12   the contract must be reasonably definite and certain.  The

13   contract cannot leave other necessary terms to be agreed

14   upon later.

15           The second part is an acceptance must not

16   change the terms of an offer.  If it does, the offer is

17   rejected.  Acceptance must be identical with the offer in

18   order to grant the binding contract.  Material change in a

19   proposed contract constitutes a counter offer which must be

20   accepted by the other party.

21           THE COURT:  Okay.

22           MR. HALE:  And for -- moving to the next

23   one for Question 2, we ask that the Court clarify that this

24   was shown on the oral agreement.  So it would state, Did

25   Southwest Housing Management fail to comply with the oral

1    agreement to pay Jeff Carpenter one or more annual bonuses

2    covering the period from March 15, 2005, through March 15,

3    2007.  Answer yes or no.

4               And we believe that the inclusion of the

5    word "oral" is necessary, as they've sued alternatively

6    under an oral and written contract.  And we believe that

7    it will be unclear to the jury if we did not include the

8    word "oral".

9               For Question 3, again, we add the oral to

10    it.  And we ask the Court to include, "What sum of money, if

11    any, if paid now in cash, would fairly and reasonably

12    compensate Jeff Carpenter for his damages, if any, that

13    resulted from such failure to comply with the oral agreement

14    to pay Jeff Carpenter one or more annual bonuses covering

15    the period from March 15, 2005, through March 15, 2007?"

16               And we also object to the inclusion of you

17    are instructed that any monetary recovery from such annual

18    bonus is subject to federal income taxes.

19               THE COURT:  You didn't mention that when we

20    were -- when we're off the record.  Why are you objecting to

21    that?

22               MR. HALE:  Well, we believe it would be --

23    I mean, it would be subject to federal income taxes

24    regardless of whether it was awarded to him or given to him,

25    you know, back in 2007 or given to him now.  So it would be

1 the same.

2     THE COURT:  The Civil Practice and Remedies

3 Code tells me I'm supposed to instruct the jury on that.

4     MR. HALE:  Okay.

5     THE COURT:  Maybe I'm wrong about that.

6 But if there was something else, okay, tell me that.

7     MR. HALE:  We just thought that that was -

8 would nudge the jury into believing that they needed to

9 award additional damages even though it would have been

10 subject to federal income tax.

11     THE COURT:  Yeah, I didn't think it was

12 good to add that in the Civil Practice and Remedies thing.

13 That's contained in personal injury so it's not subject to

14 federal income taxes.  Sometimes they award less because of

15 that.  But income is income.  People have to pay taxes on

16 income.

17     MR. HALE:  Yes, Your Honor.

18     For Question 4, we would ask to include the

19 word "less proceeds-sales bonuses paid to selected

20 employees" in part one of Question 4.  And then again for

21 the proposed instructions, the same as the two from the

22 previous question stating a contract requires both parties

23 mutually assent to the terms of the agreement for there to

24 be mutual assent.

25     The parties must agree to the essential

12

1    terms of the contract, unless expressed to each other their
2    agreement to the same essential terms.  To be enforceable,
3    contract must be reasonably definite and certain.  Contract
4    cannot leave open necessary terms to be agreed upon later.
5                    Acceptance must not change the terms of an
6    offer.  If it does, the offer is rejected.  Acceptance must
7    be identical with the offer in order to make a binding
8    contract.  Material change in a proposed contract
9    constitutes a counter offer which must be accepted by the
10   other party.
11                   Question 6, we ask that it be -- we object
12   to the exclusion of the word "oral" and ask that the
13   instructions say, As of October 13th, 2006, with the oral
14   agreement found in Question 4, possibly performable in less
15   than one year.  Answer yes or no.
16                   For Question 7, same objection to the
17   omission of the word "oral".  We ask that it state, From
18   such failure to comply with such oral agreement.
19                   And we would also object to the inclusion
20   of you are instructed that any monetary recovery from such
21   sale-proceeds payment is subject to federal income taxes.
22   And we believe that's misleading because whether it's --
23   it would have been subject to federal income taxes then and
24   now would impermissibly nudge the jury into awarding more
25   damages than Jeff Carpenter would otherwise be entitled to.

1          THE COURT:  Okay.

2          MR.  HALE:  For Question 8, we object to the

3   omission of "as long as needed" to request that we believe

4   the correct jury charge should state, Did Jeff Carpenter

5   perform compensable work staying on as long as needed to

6   help make the asset sale happen, etcetera.

7          THE COURT:  That's what it says.

8          MR.  HALE:  Oh, sorry.  Excuse me,

9   Your Honor.

10          For Question 12 -- do we already have a

11   predicate for Question 12?

12          MS.  GIBSON:  There is no predicate for

13   Question 12.

14          MR.  HALE:  Okay.

15          Your Honor, we would request to include a

16   predicate "Only answer this question if you answered yes to

17   Question 4.  Otherwise, do not answer this question."  We

18   object to the omission of that predicate to the finding.

19          And we'd also ask for -- we object to the

20   omission of the -- to state and to ask for the inclusion

21   that it state, "In order to find that a joint enterprise

22   exists, you must find all of the following elements by a

23   preponderance of the evidence:  The persons or entities

24   concerned have, one, an agreement either express or implied

25   with respect to the enterprise or endeavor; and, two, a

14

1    common purpose; and, three, a community interest in the

2    final purpose of the enterprise among the members of the

3    group; and, four, an equal right to a voice in the direction

4    of the enterprise, which gives an equal right of control."

5                    And the reason we ask for that predicate or

6    introductory part to the statement I just gave is so that

7    it clarifies to the jury that these are conjunctive findings

8    that they must make, rather than disjunctive where they

9    can't find three out of four as opposed to all four.

10                   THE BAILIFF:  Juror coming through.

11                   (Juror passed through the courtroom)

12                   THE COURT:  Okay.

13                   MR. HALE:  For Question 13, we object to

14   the omission of the predicate question and ask that the

15   Court approve the statement "Only answer this question if

16   you answered yes to Question 4.  Otherwise, do not answer

17   this question."  And, again, we ask for -- to clarify that

18   this is conjunctive rather than disjunctive, to include the

19   statement that "In order to find that a joint venture exists

20   you must find all the following elements by a preponderance

21   of the evidence:  The persons or entities concerned have,

22   one, community of interest in the venture; two, an agreement

23   to share profits; three, an express agreement to share

24   losses; and, four, a mutual right of control or management

25   of the venture."

1          And we believe without the beginning of

2    that statement clarifying that these are conjunctive rather

3    than disjunctive it might be misleading to the jury and they

4    might conclude that only three of the four elements are

5    there and that's sufficient to find a joint venture.  So we

6    ask for clarification on that point.

7               THE COURT:  And on Question 14?

8               MR. HALE:  Question 14, we ask for the

9    inclusion of the introductory predicate only answer -- and

10   ask that the question state, "Only answer this question if

11   you answered yes to Question 4.  Otherwise, do not answer

12   this question."

13              THE COURT:  All right.  Anything else?

14              MR. HALE:  Let me check my notes real

15   quick.  I believe that is everything.

16              Your Honor, did I -- sorry.  Let me double

17   check real quick.

18              I believe I have one other thing,

19   Your Honor.  I can't remember if I did this.  I'll just read

20   this into the record --

21              THE COURT:  All right.

22              MR. HALE:  -- quickly.  And we also ask

23   that -- or request the -- or object to the admission of and

24   request the conclusion of Question 4A that would follow

25   Question 4 stating, "If you answered yes to Question 4 and

16

1    you also find that Jeff Carpenter stayed on as long as

2    needed to help make the asset sale happen, answer yes or

3    no."   And I believe I already stated that.

4                THE COURT:  All right.

5                MR. HALE:  Oh, wait.  I'm sorry.  And we

6    also believe that without the Court making that finding

7    that, you know, that would result in the exclusion of an

8    important element of their cause of action.  It's necessary

9    and we believe it should be included.

10               THE COURT:  You're not agreeing to

11   anything?

12              MS. GIBSON:  Correct.

13              MR. HALE:  And we also believe there's been

14   evidence from Brian Potashnik, Cheryl Geiser Potashnik, as

15   well as Keith Jones and Mark Jones stating that

16   Jeff Carpenter was not a necessary or key employee to effect

17   the sale of the assets.  So, you know, whether he stays on

18   as long as needed, you know, we believe that's a disputed

19   fact issue because he's not necessarily needed for the asset

20   sale to happen.

21              THE COURT:  Okay.  All right.  Anything

22   else?

23              MR. HALE:  No, Your Honor.

24               COURT'S RULING

25              THE COURT:  All those are on the record and

1     they're rejected by the Court.

2                           Off the record.

3                           (Off the record)

4                           (Recess taken)

5                           THE COURT:   Mr. Bell, I don't know whether

6     this is good news or bad news, but you were our alternate

7     juror.   Had we lost a juror during the course of the trial,

8     we would have had to substitute you in.   We don't like using

9     alternates, but this is a case, as you know, that goes back

10    several years.   And we -- this was -- circumstances of this

11    case were it was -- it would have been hard to try a second

12    time.   So we needed to make sure that we got through this

13    with six jurors.

14                           So the option is up to you now.   If you

15    want to stay and listen to the closing arguments, you can.

16    You can't join in the deliberations with other jurors.   Most

17    times -- we don't often use alternates, but most times they

18    don't want to stay for the closing arguments.

19                           JUROR NUMBER 7:   I think I'm going to pass.

20                           (Laughter)

21                           THE COURT:   Okay.

22                           Although you won't get to decide the case,

23    I want you to know your service was important.   The

24    attorneys here want to join me in thanking you also.

25                           The restrictions I placed on you, with the

18

1    sole exception of this, you can't talk to any of these

2    jurors about the facts of the case or your views of the case

3    while they're still serving as jurors.  Once the trial is

4    over, if you got to be close to one of the other jurors,

5    you're certainly welcome to call them and discuss it and

6    find out whatever you wanted to find.

7              After the jury returns a verdict, there's

8    no restriction on you not talking to the attorneys or the

9    attorneys talking to you.  If they call you, you're

10   certainly welcome to talk to them.  If you don't want to

11   talk to them, you don't have to.  It's a hundred percent up

12   to you.

13             If the attorneys think there's been some

14   type of jury misconduct, they have the right to ask for an

15   affidavit from you.  But, again, that's 100 percent up to

16   you.  If you want to cooperate with them, you can; if you

17   don't want to, hundred percent up to you.

18             And you are welcome at this point to go

19   back and tell the jurors that you're the alternate juror,

20   that you're leaving now.  If there's someone back there that

21   you want to call you after they return a verdict, you can,

22   you know, give them your phone number.  If you want our

23   bailiff to call, you can give him your number and he'll call

24   after the verdict is returned.

25             But, again, you can't discuss the facts of

1    case with them at this point.

2                        We thank you.

3                        JUROR NUMBER 7:   Thank you very much.

4                        MR. DONOHUE:   Thank you for your service.

5                        MR. SANFORD:   Thank you.

6                        MS. GIBSON:   Thank you.

7                        (Off the record)

8                        (Recess taken)

9                        (The jury entered the courtroom.)

10                       THE COURT:   Welcome back and good morning,

11   ladies and gentlemen.

12                       We're entering the final stage of the

13   trial.   The remaining portions of the trial are the Court's

14   charge and the closing arguments.

15                       The Court's charge is a written document.

16   It contains legal instructions and definitions.   And the

17   legal instructions and definitions give you guidance on

18   answering the jury questions.   It's your answers to the jury

19   questions that will constitute the verdict.   And after you

20   return a verdict I take your verdict and reduce that to a

21   judgment, and it's the judgment that closes the case.

22                       As you can see, the Court's charge is 23

23   pages for this particular case.   What we're going to do

24   first today is go over the first 21 pages of the Court's

25   charge.   That's all the instructions, definitions, and jury

1   questions.

2                    Then we'll have the closing arguments.

3   Each side will have 45 minutes for closing argument.  And

4   then after the closing arguments we'll go over the last two

5   pages of the Court's charge.  One page has instructions for

6   presiding juror and the other is called the verdict

7   certificate page, where you certify your verdict after you

8   answer the jury questions.

9                    So the first thing we're going to do is go

10  over the first 21 pages of the Court's charge.  The rules of

11  court require me to read the charge aloud to you.  That way

12  it becomes part of the record and also gives me assurance

13  that you've heard the instructions and definitions at least

14  once.  And it also allows you to hear the jury questions

15  before you hear the closing arguments so that you'll put

16  into some perspective what the closing argument is.

17                   So we're going to start on Page 1 at the

18  top of the page where it says ladies and gentlemen of the

19  jury.

20                   (Charge read aloud)

21                   THE COURT:  And then you'll see on Page 22

22  is the page of instructions for the presiding juror and

23  Page 23 is the verdict certificate page, and we'll go over

24  those two pages with you after the closing arguments.

25                   We'll now turn to the closing arguments.

1    The closing arguments, like the opening statements in the

2    case, are not evidence.  They're argument.  The closing

3    arguments provide an opportunity for the attorneys to argue

4    to you what they believe the evidence showed.

5              The attorneys have 45 minutes to present a

6    closing argument.  By rule of court, the attorney for the

7    plaintiff, the party with the burden of proof, gets to go

8    first and last.  What that means is that Ms. Gibson, who

9    represents Mr. Carpenter, will break up her time.  And this

10   is an approximation:  She'll first go -- she'll break up her

11   45 minutes, approximately 25 minutes and 20 minutes.  So you

12   will hear first from her the 25 minutes.

13             Then we're going to take a break.  And then

14   when you come back from the break we'll hear from

15   Mr. Friedman or Mr. Donohue for up to 45 minutes.  After

16   that we'll go back to Ms. Gibson for her rebuttal, which

17   will be approximately 20 minutes.  After that we'll go over

18   the last two pages of the Court's charge.  After that we'll

19   ask that you retire to the jury room.

20             So, again, the next thing we're going to do

21   is the first portion of plaintiff's closing argument

22   presented by Ms. Gibson, and should go about 25 minutes.

23   And after that we'll take a break.

24             Is everyone okay going 25 minutes?

25             MS. GIBSON:  Your Honor, before we begin,

1     may we move the flip charts?

2                        THE COURT:   Sure.

3                        MS. GIBSON:   Can everybody see?   Can y'all

4     see?

5                        Larry, can you see?

6                        MR. L. FRIEDMAN:   Yes, ma'am.

7                        MS. GIBSON:   Okay.

8                        THE COURT:   Did you want a warning at 25

9     minutes or before 25 minutes?

10                        MS. GIBSON:   I'm sorry?

11                        THE COURT:   Did you want a warning at 25 or

12    before 25?

13                        MS. GIBSON:   Before, please.

14                        PLAINTIFF'S CLOSING ARGUMENT

15                        MS. GIBSON:   Good morning.

16                        In -- in a little while you-all will go

17    into the deliberation room to decide this case and you will

18    have three jobs.   Your first job will be to answer the

19    questions that Judge Greenberg gives you.   You're second job

20    will be to make sure all other jurors are following the law.

21    If another juror does not follow the law during

22    deliberations, you have the right to tell the bailiff so

23    that he can inform the judge.   And your third job in

24    deliberations will -- to be able to explain why you feel the

25    way you do when answering -- when answering the questions in

1    the charge.  So, during my closing, I'd like to give you

2    some ways to help you do that.

3                    First, recall that the rules we are here

4    for are the business financial safety rules.  Businesses

5    must live up to their agreements with those who have lived

6    up to theirs to protect businesses, workers, and families

7    from harm.  Safety Rule Number 2, those who operate

8    businesses in Texas must honor Texas law about enforcement

9    of oral agreements, especially handshake agreements, to

10   protect businesses, workers, and their families from harm.

11                   In this case everyone agrees that in Texas

12   oral agreements can be enforceable.  You've heard from

13   Cheryl Potashnik that if it's a handshake and the parties

14   agree, that's an agreement.  The Court has also instructed

15   you that despite the language in the written employment

16   agreement with Southwest Housing Management that that

17   agreement -- oops, too far.

18                   THE COURT:  I think you turned up -- you

19   should turn on the light here.  There you go.

20                   MS. GIBSON:  The written agreement may be

21   modified by a later oral agreement, even though it provides

22   that it can be modified only in writing.  That is Texas law

23   that supports oral handshake deals.

24                   You remember talking in jury selection

25   about some of the bigness -- biggest commitments that we

24

1    make in life are oral, and this case will be about whether

2    we put the honor back in a handshake deal.   You will decide.

3              In some of the beginning instructions from

4    the Court, I'd like to talk about a few of those.   One is

5    preponderance of the evidence.   The definition explains that

6    this is the greater weight of the credible evidence

7    presented in the case.   If you do not find that a

8    preponderance of the evidence supports a yes answer, then

9    answer no.   Preponderance of evidence is not measured by the

10   number of witnesses and number of documents.

11             But, importantly, at the end the Court has

12   summarized what preponderance of evidence means.   In sum,

13   it just means that you must find that the fact or the

14   answers to the question is more likely true than not true.

15   What does that mean?   We make decisions based on more likely

16   true than not true every day.   It comes down to what you

17   feel in your gut.   If you feel probably this happened, that

18   is enough to meet the burden.   Although the burden is only

19   more likely true than not true, however, we believe we will

20   show that we have shown you much more than needed to meet

21   that burden that something probably happened.

22             Additionally, you're entitled to consider

23   circumstantial evidence.   In fact, in oral-agreement cases

24   that is generally how -- always how these cases are decided.

25   All you need to do is look -- you may find a fact if it can

1    be fairly and reasonably inferred from other facts.  This is

2    akin to having a puzzle that has a missing puzzle piece or

3    two missing puzzle pieces.  You can see how everything fits

4    by what -- the facts surrounding it.

5                    And we also use this type of evidence every

6    day.  For example, when you-all came up for jury selection I

7    didn't see you come in downstairs.  I wasn't there, I didn't

8    see it, but I know reasonably that you-all went through a

9    metal detector and security to get inside because I know the

10   program and the policy in place in the courthouse.  That's

11   an example of how we reasonably infer facts every day, even

12   when someone wasn't there to witness.

13                   Question 1, Did Jeff Carpenter and

14   Southwest Housing Management agree to pay annual bonuses to

15   Jeff Carpenter covering the period from March 15, 2005,

16   through March 15, 2007?  You saw the instruction on

17   authority and apparent authority and vice principal.  All of

18   those instructions go to something fairly simple; and that

19   is, Brian Potashnik, who was the owner of Southwest Housing

20   Management, he was the president of Southwest Housing

21   Management, and he was a director of Southwest Housing

22   Management.  And the Secretary of State records are in the

23   exhibits if anyone wants to check.  He had the authority to

24   enter deals on behalf of that company.

25                   He is -- you don't need authority, apparent

1    authority, and vice principal to find that he had the power

2    to act.  You only need one.  And the easiest way to answer

3    this question is that Brian Potashnik was a corporate

4    officer.  That means that what Brian Potashnik says and the

5    deals he makes are the acts of the company he is speaking

6    for; here, Southwest Housing Management.

7                    Now, was there a deal for the annual

8    bonuses after year one?  Take a look back at the employment

9    agreement.  From day one, the agreement contemplates -- why

10   does this -- why is this light not coming on?

11                   THE COURT:  Rick, will you check that

12   background light?

13                   MS. GIBSON:  It says back light on.

14                   From day one, the parties contemplated that

15   there might be future deals when this agreement was signed.

16   First of all, it contemplated that at some point

17   Jeff Carpenter might be employed by affiliates of the

18   company.  That would mean at some point he might be doing

19   work for Affordable Housing Construction and for the

20   development arm of the company.

21                   Thank you so much.

22                   Second, when it comes to the bonuses, the

23   original agreement only covered the first calendar year with

24   a range between a minimum discretionary bonus of 50,000

25   upward to, potentially, 200,000.  But from the beginning the

1    agreement contemplated that the parties would later agree as
2    to future bonuses.  In other words, there would be -- they
3    contemplated from day one that there could be a separate
4    future deal.  Although no bonus plan was actually provided
5    in writing, as the agreement required, Brian Potashnik and
6    Jeff Carpenter discussed bonuses after year one orally.

7                  Additionally, you may conclude that the
8    oral deal on bonuses was either a separate oral deal or that
9    it modified this contract.  You decide.  Either way, you get
10   to the same result because the original contract only
11   covered bonuses in the first year and certain other items
12   that are not at issue in this case.  It did not cover the
13   three-percent deal.  Certainly, no asset sale was
14   contemplated at that time, and bonuses after year one were
15   orally discussed and agreed to with Brian Potashnik.

16                  You heard the testimony that
17   Brian Potashnik and Jeff Carpenter continued to use the same
18   range, the 50,000 to 200,000, in their discussions.  They
19   continued to use 50,000 as the minimum, and they did this
20   orally.  And recall that things -- that's how things were
21   done here initially as far as orally.

22                  Initially, for example, the advance on
23   bonus of $50,000, that advance was given before the bonus
24   was due; and, yet, there was no written modification to the
25   agreement.  That was handled orally.

1            As another example, recall that
2   Cheryl Potashnik believed that Jeff got a raise at some
3   point.  And although it wasn't truly a raise, she thought it
4   was; and that was done orally without any written
5   modification to the original employment agreement.
6            With respect to the agreement with
7   Brian Potashnik, that is in Exhibit 63.  These are notes of
8   a conversation with Brian Potashnik on March 14, 2007.  And
9   here they discuss earned bonuses and dollars that were to
10  come from the -- from conversions to be applied to earned
11  bonuses.  Now, he doesn't say a number there, but their
12  discussions were that 50,000 would be the minimum.  And then
13  he talked about extra bonuses out of Fairway and 50,000;
14  McKinney property for 50,000; and Vegas between 100- and
15  200,000.  Now, on the Vegas property, Brian Potashnik is
16  acknowledging that he believes Jeff Carpenter has earned
17  200-, but hopes to fund that from a deal on Vegas
18  properties.
19            And from that -- and that's Exhibit 63 --
20  the numbers are -- this is not for year one.  But in year
21  two, the 50,000 minimum; year three, 50,000 minimum.  And
22  then the total of the numbers that came from
23  Brian Potashnik's mouth in the prior exhibit, 50,000,
24  50,000, and 200,000, totals 400-.
25            It is undisputed that Jeff Carpenter was

1    not paid those bonuses.  So, with respect to failure to

2    comply with the agreement, the answer is yes.  And with

3    respect to the damages question the answer is 400,000.

4    Again, taken from what Brian Potashnik agreed with

5    Jeff Carpenter in March of 2007 was already earned and owed

6    at that point.

7                 With respect to Question 4, this is -- this

8    is the three-percent deal, which is a separate oral deal, or

9    you can find that it orally modified the original agreement.

10   You decide.

11                Again, the instruction is that the written

12   agreement with Southwest Housing Management may be modified

13   later, even though it provides that it can only be modified

14   in writing.

15                The parties involved in the asset sale were

16   all people for whom or entities for whom Brian Potashnik was

17   a vice principal, because he was an officer of each of them

18   and they were all sellers in the asset sale.  And these are

19   Affordable Housing Construction, Southwest Housing

20   Development, Southwest Housing Management, and

21   Brian Potashnik.  They are all listed as sellers in the

22   attachment to the purchase and sale agreements.  Brian had

23   the power to bind all of them to promise three percent of

24   certain -- of certain asset-sale proceeds pursuant to the

25   formula.

1          Now, one -- in addition, we know that

2     the -- we know from the PSA that the sellers are listed on

3     the schedule.

4          Now, Jeff was to stay on as long as needed.

5     There's a timeline, however, on what is as long as needed.

6     What did that mean?  Recall that originally closing was

7     anticipated.  The specific agreement was struck on October

8     13th, 2006.  It's undisputed that at that time the closing

9     was anticipated for spring or summer of 2007.  So,

10     originally, as long as needed was anticipated to be through

11     closing the following spring or summer.

12          Then at one point there was an indication

13     that JC, Jeff Carpenter, may be picked up for transition.

14     And that's just the period of time after the sale has

15     happened when someone stays on temporarily to make sure

16     that the purchaser has everything they need and that things

17     are going smoothly.  However, ultimately, as long as needed

18     ended up being, Brian says, on October 12, 2007, that Jeff

19     can leave and get paid either way on annual bonuses and

20     three percent.  His work is done.

21          Cheryl Potashnik asked him to stay through

22     transition to new management with the purchaser, and that

23     date is October 31st.  So, as long as needed changed over

24     time and ultimately ended up being through October 31, 2007;

25     because the next day, on November 1st, the management

1    transferred to the purchaser and his work was done.  Though,

2    Brian said that his work was done on October 12th, by

3    October 12th of '07.

4              With respect to an agreement, if somebody

5    asks how do we know there was actually an agreement, we know

6    from undisputed testimony that there was a stay program in

7    place.  The only person who denies that there was a stay

8    program in place is Brian Potashnik.  Brian Potashnik

9    contradicted Cheryl Potashnik's testimony that before they

10   sold the business they considered incentives to get

11   employees to stay.  It was important for continuity and

12   there was also a criminal investigation going on, which

13   meant they needed people to stay.

14              So, imagine a want ad and how difficult

15   it might be for them to get a replacement that late in the

16   day with criminal proceedings goings on.  The ad would

17   essentially call for someone who was highly qualified to

18   come on as the company is about to sell its assets and while

19   the company is being investigated criminally and the

20   criminal investigation is all over the news.  That's another

21   reason they needed them to stay.

22              Brian Potashnik denies there were bonuses

23   with anyone.  He consistently says, Never happened.

24   Brian Potashnik's credibility is at issue here.  Why else

25   was there an agreement?

1              Jeff Carpenter turned down a job with

2      higher pay.  You heard Jeff Richards, who testified by

3      video, say that they wanted to hire Jeff immediately but

4      Jeff stayed for months because he was expecting large

5      compensation for -- with his current employer and he might

6      risk losing that if he left.

7              We also know that Jeff participated in the

8      program, stay and pay.  Or whether you call it severance,

9      whether you call it stay bonus, it all means the same thing.

10             You heard from Keith Jones.  And although

11     accused of making up that language, Exhibit 52 and others

12     talk about Jeff's own participation in the stay-and-pay

13     incentives and the stay plan.  Jeff Carpenter was actually

14     helping decide stay bonuses for people lower than his level.

15             To believe that Jeff Carpenter -- there was

16     no agreement made with him when he was also part of the

17     program in setting those bonuses, you would have to believe,

18     for example, that someone paid all of their first string

19     sports team but didn't want to pay, didn't make an agreement

20     with one of their starting quarterbacks.

21             Also, in May 2006, when Brian Potashnik

22     announces the sale, at this point there's no number.  But

23     you heard from Deepak Sulakhe say that he heard from Brian

24     that Jeff Carpenter might not have to work again if the

25     transaction works out.  That explains references.  And those

1    are just a few examples of how we know there was an

2    agreement.

3              With respect to the damages on that

4    agreement, it's undisputed, of course, on violation that he

5    was not paid.  You have the calculation from the closing

6    documents:  Net sale proceeds to seller after closing

7    amount; deducted the amount of bonuses paid to other

8    employees; total bonuses paid out at sale were approximately

9    2.1 million; and the damages answer on the three-percent

10   formula is $926,970.

11             With respect to the question -- and,

12   importantly, when you are answering these questions we are

13   going to ask you to say the same number for several

14   questions, but you don't need to worry about whether there

15   will be a double recovery.  Jeff Carpenter can only recover

16   one amount one time, but that is handled with the Court

17   after you render your verdict.

18             You will be asked about compensable work in

19   connection with the asset sale, whether Jeff rendered

20   valuable services.  The point of those questions is if

21   someone ends an agreement, ends an agreement early, or if

22   you find there was no agreement, if Jeff Carpenter performed

23   valuable services, he can still get compensation.

24             One question is excluding the asset sale

25   happened.  This is just annual bonuses for working harder.

1    The other question is his services in making the asset sale
2    happen, and that goes to the three-percent deal.  The
3    reasonable value of that is what Brian Potashnik said it
4    was; originally, about $1,020,000.  But we've reduced that
5    to be the same as the amount for the original agreement.
6    And the valuable services he performed was that he stayed.
7    He stayed as long as needed.
8              With respect to joint -- the question on
9    joint enterprise, this is talking about the asset sale.  And
10   the answer is yes for each defendant.  They had an
11   agreement.  It was expressed.
12             The agreement included sharing costs,
13   it included sharing profits, and it included sharing losses.
14   For example, it expressly has them share in operating
15   deficits, it expressly has them share in the profits, and
16   they also split the costs.  They split the cost 50-50.  So
17   that we know, had this been a total loss, which it wasn't,
18   they would have expressly shared in those losses.
19             THE COURT:  You have about three minutes
20   left in your first 25.
21             MS. GIBSON:  Okay.
22             With respect to the question on joint
23   venture, this is also in connection with the asset sale.
24   Affordable Housing Construction, Southwest Housing
25   Development, Southwest Housing Management, and

1    Brian Potashnik are all listed as sellers on the schedule to
2    the purchase and sale agreement.  All of them had an
3    agreement that we just talked about that had the same
4    interest.  That was to get the asset sold to a purchaser.
5                    They had an agreement to share profits, the
6    agreement to share losses that we just went over, and a
7    mutual right of control or management of the venture because
8    Brian Potashnik was the owner, officer, and director of all
9    these three companies.  He is the one who controlled each
10   one.
11                   And, finally, noted on the timeline, 10/12
12   is when Brian says Jeff will get paid whether he leaves now
13   or later.  That's on both agreements.  The work's done as
14   far as he's concerned.
15                   As of October 31st, all work is done for
16   Cheryl Potashnik due to the management transition to seller.
17   And then, after the defendants got everything they wanted
18   from Jeff and all of his work is done, that is the first
19   time they sent a separation agreement asking him to release
20   all his rights for far less, pennies on the dollar, as to
21   what they had agreed to with Brian Potashnik.  And it is
22   only after that, in transcripts of conversations, that they
23   are saying Jeff Carpenter has no legal rights.  At no time
24   were words like that said until the defendants got
25   everything they needed.

1           And, finally, they deny the deal and say

2      the written agreement prevents any bonuses to be paid in

3      December of that year.

4           Thank you.

5           THE COURT:  All right.  You conclude your

6      argument?

7           Ladies and gentlemen, we'll take our

8      morning break.  We'll take a 15-minute break.  We'll see you

9      at 15 minutes -- about 10:43.

10          (The jury exited the courtroom.)

11          (Recess taken)

12          THE COURT:  We're on the record but outside

13     the presence of the jury.  Mr. Hale wanted to put an

14     objection to Ms. Gibson's closing argument on the record.

15               DEFENDANTS' OBJECTION AND MOTION FOR MISTRIAL

16          MR. HALE:  Yes, Your Honor.

17          On behalf of all defendants, we object to

18     the reference to it being in the news or all over the news

19     that there was an FBI investigation into Southwest Housing

20     or any of the other defendants.  We believe that it

21     encourages -- or it does encourage the jury to consider

22     evidence that's outside the record.  It's prejudicial to a

23     substantial right of the defendants to have the case tried

24     only on the evidence before them.  And by making references

25     to the FBI investigation or the news is highly inflammatory

37

1    and it encourages the jury to decide the case on an

2    emotional rather than on a logical basis.  And for that

3    reason we ask for an instruction to disregard any references

4    to the FBI investigation or it being in the news -- I'm

5    sorry -- just to the FBI investigation being in the news and

6    also ask for mistrial.

7                        COURT'S RULING

8              THE COURT:  Okay.  And both those are

9    denied.

10             (Off the record)

11                  DEFENDANTS' OBJECTION

12             MR. HALE:  One more objection.

13             THE COURT:  All right.

14             MR. HALE:  We object to references to other

15   employees' bonuses.  We're trying the case here on whether

16   Jeff Carpenter had an agreement and he received an annual

17   bonus.  This would encourage the jury to decide the case on

18   evidence that's not before them and facts that aren't

19   relevant.  It violates the motion in limine and the Court's

20   ruling that there would be no references to other employees'

21   bonuses.  So we believe that it -- well, it does require or

22   encourages the jury to decide the case on an improper basis

23   and assume that because other employees may have gotten

24   bonuses that Jeff Carpenter would have been promised a bonus

25   as well.  It's also a violation of the motion in limine.

```
 1                         COURT'S RULING
 2              THE COURT:  All right.  It's overruled.
 3              MR. HALE:  All right.  Thank you,
 4    Your Honor.
 5              (The jury entered the courtroom.)
 6              THE COURT:  Welcome back and good morning
 7    still, ladies and gentlemen.
 8                   We'll continue with the closing statements
 9    [sic].  We have concluded the first portion of plaintiff's
10    closing statement -- closing argument.  So we'll hear now
11    from Mr. Friedman for up to 45 minutes.  And then after that
12    we'll hear for -- from Ms. Gibson for her rebuttal argument,
13    which will be about -- it's between 20 and 21 minutes that
14    she has left.  Then we'll go over those last two pages in
15    the charge.  Then we'll ask that you deliberate.
16                   But the next thing we'll do is the closing
17    argument for defendants presented by Mr. Friedman.
18                   And, Mr. Friedman, whenever you're ready.
19              DEFENDANTS' CLOSING ARGUMENT
20              MR. L. FRIEDMAN:  All right.
21              I'm back.
22              May it please the Court.
23              THE COURT:  Counsel.
24              MR. L. FRIEDMAN:  Counsel.
25                   Ladies and gentlemen of the jury, once
```

1    again, I'm very proud to represent my friends, my long-term

2    friends, Cheryl and Brian Potashnik, and the Southwest

3    Management, Affordable Housing Construction, and Southwest

4    Development.   Cheryl Potashnik is no longer in the case.

5                    This is an important case, as I said at the

6    beginning, and you've heard a lot of evidence.   A lot of

7    things have passed by you from the witness stand in the last

8    couple of days.   And I want to thank you for your service, I

9    want to thank you for your attention, and I want to thank

10   you for your effort; because there have been a lot of

11   boards, there have been 30, 40 pieces of evidence, and

12   it hasn't all been easy to take in.   But I've watched you

13   and I know that you've paid attention.

14                    What I want to remind you is that the

15   plaintiffs have the burden of proof.   The plaintiffs have to

16   prove each and every element of their case by credible

17   evidence; not just by a board, not just by a PowerPoint, and

18   not just by Mr. Carpenter's self-serving Emails to himself.

19                    You know, I listened carefully to the

20   testimony of Mr. Carpenter and I watched the evidence that

21   was presented by Mr. Carpenter, and most of it -- or let me

22   take it back -- all of it came from Mr. Carpenter.   It was

23   Mr. Carpenter's Emails to himself, it was documents that

24   Mr. Carpenter generated, it was documents that Mr. Carpenter

25   sent to the Potashniks.   It was comments that Mr. Carpenter

1    made to Mr. Sulakhe, comments that Mr. Carpenter made to

2    Keith Jones, comments that Mr. Carpenter made to Mark Jones.

3    But there's no evidence that Brian Potashnik or

4    Cheryl Potashnik ever agreed to any agreement with regarding

5    [sic] bonus, compensation, severance, beyond what was in the

6    employment contract with Mr. Carpenter.

7                    This is not about safety rules.  You didn't

8    hear any evidence about safety rules.  This is not about a

9    gut feeling.  This is about evidence that you heard from the

10   stand.

11                   Ms. Gibson would like you to follow your

12   feelings.  That's not what the judge instructed you to do.

13   This -- your decision will be based on credible evidence.

14   And I'm going to summarize this for you and show you that

15   what Mr. Carpenter said was not credible evidence starting

16   from the beginning when he filed this lawsuit and starting

17   from the way he conducted himself in this courtroom from the

18   beginning of the case.

19                   Number one, he wasn't the lead witness.

20   Plaintiffs usually get up and tell their story.  They want

21   their story to be told.  They lead chin first.  That's not

22   what he did.  He wanted to hear what Brian Potashnik would

23   say; then he wanted to hear what Cheryl Potashnik would say

24   so that he could cover up whatever they had to say.  He

25   wanted to hear what Keith Jones had to say so that he, if

1    necessary, could contradict those people.

2                    It's important to note that none of the

3    witnesses Mr. Carpenter called supported his case.   None of

4    the witnesses that we called supported Mr. Carpenter's case.

5                    If you look at Deepak Sulakhe, who was here

6    the other day, he said Mr. Carpenter thought very highly of

7    himself.

8                    Mr. Carpenter asked him for advice about

9    what kind of compensation or what kind of severance he

10   should ask the Potashniks for.   Should I ask for one

11   percent?  Should I ask for three percent?  Do you think five

12   percent is too much?  That's not the communications of

13   someone who had an oral agreement back in March of 2006.

14   Those aren't the questions that somebody who already had an

15   agreement would be asking someone in Mr. Sulakhe's position.

16                   Aaron Goldstein, someone that Mr. Carpenter

17   said he bragged to about being a millionaire, Mr. Goldstein

18   said, I don't remember anything, I don't remember that

19   conversation, I don't remember Mr. Carpenter bragging to me.

20   Paul Cohen said the same thing.

21                   Mr. Carpenter said he was on the plane to

22   Vegas.   Mr. Carpenter bragged to him that he was going to be

23   a millionaire.   Probably something somebody would remember.

24   Common people becoming a millionaire, it's a big event.   In

25   fact, it's a big event for Mr. Carpenter.

1        If I was going to become a millionaire, I'd

2   remember it.  It's like being in your house during an

3   earthquake.  You remember that day.  You remember where you

4   were, you remember what you were wearing, you remember where

5   your slippers were, and you remember how you escaped from

6   your house.  Not Mr. Carpenter.

7        He gave 10 different versions of what the

8   oral agreement was.  He added to it, he subtracted to

9   it, and he gave you different dates.

10       In fact, he changed the theory of the case

11  from the beginning when he started a couple days ago.  When

12  he came here this was a contract case.  He wanted to

13  persuade you that there was an oral modification of his

14  contract, of his employment agreement.  Then as the case

15  went on and he heard the testimony, as of yesterday he said

16  from the witness stand, "I have no contract claim.  I have

17  no contract claim."  I wrote it down.  He said, "I have no

18  contract claim.  I'm not asking for relief under the

19  employment agreement."

20       What he said was I have two oral agreements

21  that I'm trying to enforce, and let me tell you about my

22  second oral agreement.  I don't know if you saw me.  I was

23  quite surprised because, notwithstanding other people in

24  this courtroom, I've now known Mr. Carpenter for over 10

25  years and I never heard anything about a second oral

1    agreement until yesterday.

2              Because two things that Mr. Carpenter and I

3    agreed on, one is that the only contract he ever had with

4    Southwest Management was the employment agreement signed by

5    both parties, Southwest Management and Mr. Carpenter; and,

6    two, he can't recover a dime under that contract.  He and I

7    agree to both of those things.

8              Now, at the beginning, I'm going to

9    summarize the case and show you the pleadings.  He was

10   telling you that he was due a bonus for the 2004/2005

11   period, his first year.  And it wasn't until I

12   cross-examined him that he admitted, oh, yeah, I got that

13   bonus, I got that $50,000.

14             And I said, Mr. Carpenter, not only did you

15   get that $50,000, but the Potashniks were generous enough to

16   give you another 25,000 to pay the taxes on that 50,000;

17   isn't that true? He said, Oh, yeah, that's right.  So

18   you're not asking for the $50,000 bonus for the first year?

19   He said, No, I'm not.  So now we're only asking for bonuses

20   for years two and years three and maybe eight months at the

21   end?  He said, That's right, two years and eight months at

22   the end.

23             When you get your jury charge you'll see

24   that he's not even asking for the eight months at the end.

25   He's now asking for 2005 to 2006 and 2006 to 2007.  And for

1    that he's asking you to award him about 600,000, which he

2    was asking for; about 200,000, which he was asking for; but

3    400,000, which is his new number, because Mr. Carpenter

4    admitted he renegotiates because he wanted more.  That's

5    what this is about.

6                 This whole case is about Mr. Carpenter.  He

7    wanted more.  He wanted more when he sued his first employer

8    or the previous employer, Brisbane.  After he separated from

9    his previous employer, he sued them because he wanted more.

10   And after he left Southwest Housing Management, sued his

11   next employer because he wanted more.

12                Now, I don't know what Mr. Carpenter's

13   personal problems are.  He put in his personal notes that he

14   had a tax lien and litigation expenses.  He had personal

15   financial problems, problems with his wife and family.

16   That's really not our business but, obviously, there was

17   something going on that forced him to try to get more money

18   from Southwest Housing and the Potashniks.

19                But one thing I do know is he didn't have

20   the first oral agreement and didn't have the second oral

21   agreement.  Because every time he proposed to get his

22   so-called oral agreement in writing, gave his proposed

23   amendment to employment contract to the Potashniks, they

24   refused to sign it.  Gave his draft severance agreement to

25   the Potashniks, they refused to sign it.  Every time he made

1    an effort to get something signed by the Potashniks they

2    just said no.  And the reason they said no was they didn't

3    agree to it.

4               There was never an oral agreement.  There

5    was never any agreement.  And no witness, no witness, no

6    third-party witness, substantiated any agreement other than

7    the employment agreement with Mr. Carpenter.

8               And I submit to you, based on

9    Mr. Carpenter's credibility and the circumstantial evidence

10   surrounding his credibility, not even Mr. Carpenter believed

11   he had an agreement, because he flip-flopped back and forth.

12   I made that agreement on March 6th, he said.  No, no, I made

13   it on October 13th.  No, no, I asked for 400,000.  No, no, I

14   asked for 600,000.

15              But I did and I didn't.  I wasn't sure and

16   I didn't know.  If he had made that agreement, he would

17   know.

18              You know, Mark Twain said if you tell the

19   truth you don't have to remember anything, because if you

20   tell the truth you know it.  You were there, you saw it, you

21   heard it, you smelled it, and you just repeat the truth over

22   and over again.  You tell the same story over and over and

23   over again.  But if you lie, you don't remember what you

24   said.  You don't remember what you said last time, you don't

25   remember what you said the time before, and you don't

1    remember what you said the time before that.  And that's how

2    you get caught and that's how you get tripped up, and that's

3    how Mr. Carpenter wound up here with at least 10 different

4    versions of what he calls a definitive agreement.

5              You know, oral contracts are legal in the

6    state of Texas if people agree, if there's a meeting of the

7    minds; if two people agree on the same material terms, they

8    know what the agreement is, they know how much the agreement

9    is, they know when it's going to be paid, they know what the

10   terms are, and they agreed to it.  It just never happened.

11             He never had a meeting of the minds with

12   Brian Potashnik for a lot of reasons.  Brian Potashnik was

13   busy.  Brian Potashnik was preoccupied.

14             And Brian Potashnik didn't believe that an

15   employee that worked for his company -- and he did his job.

16   Nobody's saying he didn't do his job.  But an executive

17   employee that was generously paid $200,000 plus a car

18   allowance, plus health insurance, plus paid time off, plus,

19   plus, plus, would get a million-dollar bonus after working

20   three-and-a-half years.  There were employees -- there were

21   other employees that were worthy in that company.

22             And you heard from Mr. Sulakhe, when he

23   read Mr. Carpenter's deposition and found -- and heard what

24   Mr. Carpenter claimed the deal was.  He was surprised.  He

25   was shocked.  Because he said that an employee in that

47

1    position, executive vice president of the company, didn't

2    merit that kind of bonus.

3              Now, look, this isn't General Motors.  This

4    is not Exxon Mobil.  This is an affordable housing company.

5    This an affordable housing company who uses their money to

6    build affordable housing projects for low-income families.

7    That million dollars could have been put to better use than

8    giving it away to an executive vice president.

9              Mr. Carpenter was offered a

10   hundred-fifty-thousand-dollar severance when he left, but he

11   turned it down.  Not because he didn't think it was a good

12   bonus; because he needed more.  He needed more.  He turned

13   down the hundred and fifty-thousand dollars.  It's not

14   credible.

15             So, I'm going to briefly go through the

16   case.  I know you've heard the evidence more than once --

17   probably sick of it by now -- so maybe I only have to hear

18   it one more time.

19             I've prepared a timeline.  I'm going to

20   give it to you just for illustrative purposes.  We're going

21   to collect it before you go and deliberate.

22             In fact, would you just pass it?

23             I've prepared a timeline.  I've made the

24   boxes on the timeline -- the dates and boxes -- different

25   colors to indicate every time Mr. Carpenter changed his

 1    story.   So, quickly, he had an employment agreement on
 2    February 13th, 2004.
 3                   Steve, I don't think we need to go through
 4    it.
 5                   You remember the employment agreement.
 6    It said what Mr. Carpenter's duties were.   It said that no
 7    amendment can be had unless it's in writing and signed by
 8    both parties.   It encompassed the subject matter of his
 9    employment.   It encompassed the bonuses in Paragraph 4B.
10                   And if you remember at the beginning of the
11    case, Ms. Gibson and Mr. Carpenter were arguing that the
12    bonuses were not discretionary; that 4B entitled
13    Mr. Carpenter to bonuses for all three-and-a-half years.
14    But now at the end of the case, with the testimony and
15    evidence in, they've now acknowledged that the only bonus
16    he's entitled to under the contract was year one and that
17    the rest of the years were discretionary by the employer and
18    they're not asking for a bonus under the contract.   They're
19    only asking for a bonus now pursuant to a second oral
20    agreement, which we've heard about for the first time
21    yesterday.   And let me put that to bed.
22                   "What are the details?" I asked him.   He
23    said, "Well, I don't know the date.   It happened somewhere
24    before March 14, 2007."
25                   "Where were you?"   "We were driving

49

1    somewhere.   Maybe the Ash Creek Apartments and maybe the

2    Scyene Apartments and maybe one more.   I don't remember."

3                    What were the details?   You know, we had an

4    oral agreement for $400,000.   Was it written?   No.   Was

5    it signed?   No.

6                    Were you renegotiating?   Yeah, I was

7    renegotiating, just like I was renegotiating when I asked

8    for different amounts less than 400,000.

9                    Mr. Carpenter was always a moving target

10   because he just wanted more.

11                   The second time, on May 6, 2006, Carpenter

12   alleges that an oral agreement was made at Cafe de Brazil,

13   and I didn't learn about that till I took Mr. Carpenter's

14   deposition later on.

15                   What was that deposition again?

16                   MR. DONOHUE:   May 15th of 2010.

17                   MR. L. FRIEDMAN:   May 15, 2010.

18                   So, in 2010 -- play that clip we played

19   during trial -- 2010, when I took his deposition and asked

20   him when he made his oral agreement --

21                   (Audio clip playing)

22      "Q.   Mr. Potashnik, concerning the three-percent

23   compensation on the so-called sale of the --"

24                   MR. L. FRIEDMAN:   I'm sorry.   This was his

25   lawyer examining him.

```
 1                    (Audio clip resumed)

 2         "Q.    -- during the time frame of May -- I believe May

 3    of '06 at lunch at --"

 4         "A.    Cafe de Brazil, I believe."

 5         "Q.    And can you describe what was said?"

 6         "A.    Well, he was following up with, you know, here,

 7    we have several different offers.  We discussed what we want

 8    to do.  You're the key ingredient in doing -- in promoting

 9    this."

10                    "You know, development and construction,

11    you know, they're pretty much done.  You're going to be the

12    face of the company.  You'll be meeting with -- doing the

13    property tours.  You'll be doing, you know, actually, the

14    due diligence, the selling of the -- of the company and so

15    forth."

16                    "And you're -- you're a key proponent of

17    why we're in the position to sell the company.  And with

18    that we would like to compensate you three percent of the

19    sales price.  And there was a stipulation with that, and

20    that was less normal closing costs, which I estimated was

21    close to a mill -- basically, a million dollars.  'Cause I

22    think at the time he said the offer was 37 million."

23         "Q.    What was your response?"

24         "A.    I was -- I was pleased with that, knowing that we

25    still had unresolved issues with, you know, 4B of my
```

1    agreement.  But I would like to have more.  I know I
2    contributed a great deal, but I was -- I was comfortable
3    with it."
4        "Q.   Did you accept his offer?"
5        "A.   Yes, I did."
6              (Audio clip stopped)
7              MR. L. FRIEDMAN:  So, in May of 2010, which
8    was eight years ago, he said his oral agreement happened in
9    March 14th --  I'm sorry -- May of 2006 and it happened at
10   Cafe de Brazil.  And the bonuses he was looking for was
11   pursuant to Paragraph 4B of his employment contract.
12             So, last week when I had my first
13   opportunity to cross-examine Mr. Carpenter and ask him about
14   the same deal, I said, "When did you make your oral
15   agreement?"  He said, "That oral agreement was October 13th,
16   2006."  I said, "Are you sure?"
17             No, first he said May 14th, 2006.  And I
18   said, "Are you sure?"  He said, "No, no, no.  That oral
19   agreement was October 13th, 2006."  And I said, "Are you
20   sure?"  And he said, "Yeah.  Absolutely."
21             And I said, "Where did that happen?"  He
22   said, "Cafe Express.  And I remembered that deposition."  I
23   said, "Are you sure about that?"  He said, "Oh, yeah, I
24   remember that."  And I said, "Well, what was that deal?"
25   And he said, "Three percent of the sales proceeds minus

52

1    normal closing costs."  And then he added, "Severance

2    bonuses -- minus severance bonuses paid to corporate

3    employees."

4              No corporate employees because that's not

5    what it says on the jury charge and that's not what

6    Mr. Carpenter testified to several times later.  He

7    testified to all employees, he testified to any employees,

8    he testified to select employees.  And that's what happens

9    when you don't tell the truth.  You don't remember the story

10   you told before.

11              So then we move on.  October 13th, when

12   Mr. Carpenter alleges his oral agreement, you recall the

13   next significant date.  I'm moving more quickly now.  On

14   March 14, 2007, Mr. Carpenter sends his amended employment

15   agreement to Mr. and Mrs. Potashnik.  And that's the first

16   time he said -- testified -- that he ever puts this oral

17   agreement in writing.

18              Let's do this quickly.  Let's see it, the

19   amended employment agreement.

20              So the significance here is that he says

21   they desire for employee to remain employed by employer

22   until the employer entities sell the sale to Cascade.  So,

23   in other words, when he first put it in writing he says,

24   "I'm going to stay till the end.  I'm going to stay till the

25   closing."

1          In the closest time to this alleged oral

2    agreement Mr. Carpenter says my deal was to stay till the

3    closing.  Now, you know that that's changed.  And now the

4    current story is, well, I only had to stay till I was

5    needed, and I decide when I was needed.

6          Let's -- let's move on.

7          Is there a "three percent" definition here?

8    I know there is.  Go to that in the amended agreement.

9          On top, he talks about three percent of his

10   gross compensation, including any fees or loans paid to

11   employer -- which is new -- less closing costs of brokerage

12   fees, attorney's fees, title fees, and all the normal

13   closing costs with all related closing costs -- new term --

14   capped at a maximum of three percent of the compensation

15   paid to employer, but without deduction, without deducting

16   any compensation paid to any other employees of any employer

17   entities.  The reason that's important is he changes the

18   "without deducting" to "with deducting" on all subsequent

19   iterations of his alleged oral employment agreement.  That

20   changes over and over again.

21         And, again, the description of who -- who

22   is involved, here it says any other employees.  Over there

23   he said corporate employees.  And you'll see over -- over

24   other times he said selected employees.  And if it's

25   selected employees then you know it could never agree to the

1   term because there's no evidence that anybody selected any

2   employees.

3               So we move on.  Focusing on the evidence,

4   Mr. Carpenter's terminated October 31st.  He secretly

5   records two conversations with Mr. and Mrs. Potashnik

6   because he's instructed by his wife to do so.  She wants him

7   to get the deal on tape.

8               And we've been over these recorded

9   conversations.  He has over 80 opportunities to speak.  And

10  the one thing he doesn't do in these recorded conversations

11  is confront the Potashniks and say, you know, Brian, we made

12  that oral agreement on either May 6, 2006, or he could say

13  October 13, 2006, Cafe de Brazil, Cafe Express, or he could

14  pick another restaurant, and here's what the terms are.  He

15  never says it because he knows if he says it Brian or Cheryl

16  is going to say, "What are you talking about?  We don't have

17  a deal."  So he skirts around and he goes around and around

18  and around.

19              And the two things you get out of those

20  conversations is both Brian and Cheryl say, "Look, man, we

21  can't make any commitments right now.  Everything's influx.

22  We don't know how it's going to shake out, but give us some

23  room and, you know, maybe at the end we'll pay you some

24  money."  Both Brian, both -- and Cheryl -- separate

25  conversations, tell him the same thing, but he doesn't give

1    up because he needs more.

2                This November 15th Email is the smoking

3    gun, so let's pull it up.  It's Jeff Carpenter's Email to

4    Cheryl.  And what does he say?  He says, "Last year, after

5    the Cascade transaction was announced and it became

6    reasonably clear that I would not be retained after closing

7    of that transaction, you implored me to stay with the

8    company through that time."

9                I asked him, "What does that time mean,

10   stay till the closing?"  He said, "Yes, that's what

11   it means.  And that continuity, my continued services, were

12   essential to the success of the transaction."

13               In exchange -- I ask him, "In exchange for

14   staying till the closing?"  He said, "Yeah."

15               You informed me that I would be entitled to

16   receive at three percent of the proceeds of that transaction

17   net of certain costs which, based on the structure at that

18   time, would represent an amount equal to $1 million.  This

19   in addition to the unpaid taxes, unpaid annual bonuses.

20   Asked him if that was accurate.  He said yes.

21               Of course, because he didn't tell the

22   truth, he left out any reference to paid bonuses or

23   compensation or any payments to employees, no matter how he

24   described it.  But the important thing here is in his own

25   words in his self-serving Email with the Potashniks on

1    November 15th, 2007, eight months, October -- oh, I'm sorry.

2    Five weeks after he was terminated he expresses that his

3    deal was to stay till closing.  Now that's changed over the

4    course of this trial.  Now he says all I had to do was stay

5    until I was needed.  That was the oral agreement.  But he

6    didn't think that was the oral agreement a couple weeks

7    after he supposedly made that oral agreement.

8                    THE COURT:  You've gone 25 minutes.

9                    MR. L. FRIEDMAN:  Thank you.

10                   Go ahead.  Next.

11                   Separation agreement, the same thing.  He

12   sends it over there the same day.

13                   We're going to do this quickly.  Let's go

14   to the green part.

15                   It's Mr. Carpenter saying that he's -- he

16   has earned $600,000, but he needs it immediately.  He needs

17   the money immediately.  Pay me now, pay the rest a couple of

18   days, 90 days.  I need it now.  And then I'll be paid the

19   rest --

20                   Let's go to three-percent combination.

21                   He also adds the term he wants the

22   Potashniks to unconditionally guarantee this personally.

23   That was never -- that was never part of the oral -- of any

24   oral agreement, no meetings of the minds.  They never had a

25   meetings of the minds and now Mr. Carpenter is adding on.

1   This is what he'd like to have.  It's not what they agreed

2   to.

3              No one ever talked about personal

4   guarantees.  And now he says the formula is the gross

5   compensation shall not include and shall specifically

6   include any amounts for the benefit of the Potashniks, the

7   company, its stockholders, in the form of fees, bonuses,

8   severance, payments, loans or otherwise.  Where'd that come

9   from?  It certainly wasn't in the oral agreement.

10              No credibility.  If you don't tell the

11   truth, you can't remember what you said before.  And this

12   story changes over and over again.

13              Mr. Page, his sworn petition, I think this

14   is the last one we're going to show and then we'll just talk

15   about it.

16              His sworn petition, if you remember how we

17   got here, he filed this lawsuit on March 8th, 2008.

18              Can we pull it up?

19              Mr. Carpenter swore at the time he filed

20   this lawsuit this was true and correct.  Remember the

21   declaration at the end, last page under penalty of perjury?

22              We'll come back to 26.  Let's go to the --

23   Mr. Carpenter signed and had notarized all factual averments

24   of statements contained in these paragraphs: 20; 21; 22; 25;

25   and 26.  We're going to come back to 26.

1          Plaintiff's original petition are within my
2     personal knowledge and true and correct.  That's how he
3     opened the door to this lawsuit.  So let's go to Paragraph
4     26.  Let's see what was true and correct at the time he
5     filed this lawsuit.  He says, When the sales process began,
6     one or more of the defendants agreed to pay me three percent
7     of the gross sale, less normal closing costs, brokerage
8     fees, attorney's fees related to the sale -- new term, not
9     criminal case -- title fees and normal closing costs.  This
10    agreement was -- or agreement was made in consideration for,
11    in part, plaintiff's remaining an employee of one or more of
12    the defendants to assist in effectuating the sale.
13          I asked him when he was on the stand, "Does
14    that mean stay till closing?"  He said, "Yeah."
15          He swore that this was true.  And by the
16    way, never mentioned anything about paying employees.  This
17    was in 2008 when he had a better -- better memory of that
18    so-called oral deal than he had last week, 10 years later.
19    But I guess that was true then.  This, maybe, is true now
20    about the criminal case, closing costs.  Mr. Carpenter will
21    say whatever he has to say to get more because that's all
22    this is about, getting Mr. Carpenter more.
23          But let's -- let's move forward.
24          So then he talks about the minimum of
25    150,000 in owed bonuses he wants placed in the registry of

1    the court.   So, in March of 2008, he was seeking $150,000 in

2    bonuses.   But because he wanted more, that figure has --

3    grew to 600,000.   Except now he can't justify it, so he's

4    asking for 400,000.

5                         Let's move on to the next, next item on

6    your timeline.

7                         Mr. Carpenter's deposition, if you

8    recall -- I'm not going to play it, Steve -- you remember I

9    asked him how much his claim was for on those bonuses.   I

10   said, "Can you give me an amount?"   He said, "No, I can't.

11   I can't identify an amount what those bonuses were for."

12                        His first amended petition he had a new

13   definition for his three percent, his claim for a

14   three-percent fee.   At that time he said minus compensation

15   to any employee.

16                        The declaration is interesting, which I

17   showed you, because that was the first time we learn in 2013

18   that he was claiming he made this oral agreement with

19   Mr. Potashnik on October 13th, 2006.

20                        THE COURT:   You have 15 minutes left.

21                        MR. L. FRIEDMAN:   Okay.

22                        Carpenter's interrogatory responses, he now

23   has operational unit assets to the gross sales price.

24   Second amended petition, he gets rid of the formula

25   altogether.   Third amended petition, no formula, but he now

60

1    admits that the bonuses are at the sole discretion of the

2    employer.  And then when I took his deposition two weeks ago

3    he said, man, I added new terms, I made mistakes, I was

4    still negotiating, and basically admitted he had no deal.

5                I pinned him down.  I said, "All of these

6    things are not consistent."  Yeah.  I said, "You made

7    errors."  Yeah.  I said, "You made counter offers."  He

8    said, "No, no, no, I didn't make any counter offers."  But

9    he did.

10               I said, "You made proposals."  He said,

11   "Yeah."  I said, "You included additional and different

12   terms."  He said, "Yeah."  And I -- and then he said

13   Brian Potashnik was supposed to put it in writing.

14               And then last but not least, Carpenter's

15   testimony yesterday was shocking.

16               Pull up that board.

17               It's the same board from over there.

18   Mr. Page put it up here.

19               For the first time we learn a second oral

20   agreement when he realized he couldn't recover under the

21   contract.  He had a second oral agreement in the car ride,

22   and that was not for the 2004/2005 bonus because he already

23   admitted that he had been paid for that.  But it was now for

24   the 2005/2006, 2006/2007 and eight months for 2007.

25   Yesterday, he was claiming for two years and eight months.

1    He's not claiming that today when you look at your jury

2    charge.

3                    He acknowledged he had absolutely no

4    contract claim.  So when Ms. Gibson said you can decide if

5    it's a modification to the contract or you can decide if it

6    was an oral agreement, that's not what Mr. Carpenter said.

7    He said, "I have no contract claim."  I was clear about it.

8    I wanted to know before we got here, contract claim, oral

9    agreement, 'cause I knew there was no oral agreements.

10                   Said to him, "You renegotiated?"  And he

11   did.  And I said, "What was the purpose here?"  He said,

12   "Well, I just wanted more."

13                   Let me go to the jury charge 'cause I think

14   that's important, and use my remaining time on the jury

15   charge.

16                   Go to Question Number 1.  So, Question

17   Number 1, I wouldn't mind going to the beginning of the

18   question.   Page back.

19                   The question is:  Did Jeff Carpenter and

20   Southwest Housing agree -- and every time you see agree,

21   according to Mr. Carpenter, he is talking about an oral

22   agreement.  He has eliminated his contract claim.  So every

23   time you see agree, he is only talking about the two oral

24   agreements he is seeking to enforce.

25                   Did Mr. Carpenter and Southwest Housing

1  Management -- not Brian Potashnik, not Development, not

2  Affordable Care, not a mother in Florida, only Southwest

3  Housing Management -- did Jeff Carpenter and Southwest

4  Housing Management agree that Southwest Housing Management

5  would pay one or more annual bonuses to Jeff Carpenter

6  covering the period from March 15th, 2009, to March 15,

7  2007?  And the answer's no.  The answer is no because none

8  of the witnesses, no third-party witness, not Keith Jones,

9  not Mark Jones, not Deepak Sulakhe, not any of the

10  third-party witnesses tendered any evidence that there was

11  an agreement.  Mr. Potashnik denied it, Cheryl Potashnik

12  denied it, and the only person that said there was a promise

13  was Mr. Carpenter.  And I'm arguing that Mr. Carpenter

14  doesn't have a little credibility.  He has no credibility.

15          He has changed his story so many times.

16  He's beyond mistakes.  He's beyond errors.  He has earned

17  the category of liar.

18          The answer to Number 1 is no.

19          Number 2, if you answered answered yes to

20  Number 1, then you would answer Number 2.  But for Number 2

21  it's -- the answer would be no answer, NA, no answer.

22          And if you follow me, I'll get you home by

23  3:00 o'clock today.

24          So the answer to two is no answer, NA.

25  Three, again, if you answered yes to Question Number 2, then

63

1    you have to answer this.  But the answer here, again, is NA,

2    no answer, or no or no answer.

3                    Question Number 4 -- one and four are the

4    key questions here -- did any of the defendants named below

5    and Jeff Carpenter agree on October 13th, 2006, to pay

6    Jeff Carpenter three percent of the total of gross

7    asset-sale revenue to sellers, less normal closing costs,

8    less sale-proceeds bonuses made to employees if

9    Jeff Carpenter would stay as long as needed to help make the

10   asset sale happen?  The answer's no.

11                   The answer's no for a couple of reasons.

12   Number one, Jeff Carpenter didn't know when he made this

13   agreement.  He testified in his deposition -- and which was

14   incorporated into evidence that you saw -- that it happened

15   in May of 2006.  Then he testified here that it happened on

16   October 13th, 2007.  That's not credible.  And there could

17   be no meeting of the minds if he had this agreement occur in

18   two different places, so it's impossible to have an

19   agreement.

20                   In addition -- did I lose the question?

21   Can you go back?

22                   In addition, if you look at the number one

23   where it says three percent of the gross asset-sale revenue

24   to sellers, Mr. Carpenter has changed that definition no

25   less than 10 different times.  And if he didn't know what

1    the agreement was there is no way that Southwest Management

2    could ever agree with him or anybody could ever agree with

3    him on what an oral agreement was.  There's no way.

4              He said three percent of the assets.  He

5    says three percent of the operational units.  He included

6    the general-partnership interests.  He said selected

7    employees, he said corporate employees, and at one point he

8    said without employees.  So, if he himself didn't know what

9    that agreement was, there could be no agreement in addition.

10             The only testimony you got from Brian and

11   Cheryl Potashnik from that witness stand was they didn't say

12   yes.  They never consented.  And I think that's credible

13   testimony consistent with what you heard.

14             And number two, again, if Jeff Carpenter

15   would stay as long as needed.  And you saw in Jeff

16   Carpenter's own words, his own Emails, back when he didn't

17   know he'd be scrutinized, that his deal was to stay till

18   closing, not as long as needed.  As long as needed was

19   something he changed during this trial so that he could get

20   more.

21             Let's go to the next one.

22             So the answer to 4 is no, no, no, and no.

23             Go back.

24             Because none -- none of these people or

25   entities could have entered into an oral agreement with

1    Mr. Carpenter.  And every time you see agreement, remember,

2    according to Mr. Carpenter, he's only here to enforce two

3    oral agreements; one on the so-called bonuses and the other

4    one on the three percent from the proceeds.

5                    And I will remind you Keith Jones, the CFO

6    and a CPA, never heard the term "pay to stay", never heard

7    the term "stay bonus".  Mark Jones, the community

8    development person, never heard the term "stay bonus", never

9    heard the term "pay to stay".

10                   After they testified, you'll recall

11   Mr. Carpenter started to say, well, they're interchangeable;

12   stay bonus, severance, pay to stay, severance, it's the

13   same.  That's what I meant.  And by yesterday he was calling

14   it severance too.  He was very flexible.

15                   THE COURT:  You have five minutes.

16                   MR. L. FRIEDMAN:  Thank you very much.

17                   So, on 5 -- 5, okay -- for each defendant

18   for whom you answered yes in Question 4, did that defendant

19   also fail to comply with such agreement, there wasn't any

20   agreement.  You have to answer no, no, no, no.  Please no,

21   no, no, no.

22                   Number 6, as of October 13th, 2006, was the

23   agreement found in question possibly performable in less

24   than one year? I think it was.  I don't think it was

25   performable in less than one year.  I think it was possibly

1    performable in less than one year.  So you decide on that

2    and you make your own decision.

3                    Next question, 7, what sum of money, if

4    any, if paid now in cash, would fairly and reasonably

5    compensate Jeff Carpenter for his damages, if any, that

6    resuled from such failure to comply with such oral

7    agreement?  The answer has to be zero because there was

8    never an oral agreement.  There wasn't an oral agreement

9    number one; there wasn't an oral agreement number two.

10                   And remember, when I say oral agreement,

11   both parties had to agree on all the terms of an oral

12   agreement.  Both parties had to have a meeting of the minds

13   on all the material terms.  That means time, price, payment,

14   all of it.  And the evidence doesn't support a meeting of

15   the minds.

16                   Number 8, did Jeff Carpenter perform

17   compensable work to stay on as long as he needed to help

18   make the asset sale happen for any of the below-named

19   defendants?  The answer's no.  Jeff Carpenter was paid well,

20   he worked well, and he didn't do anything outside his work

21   assignments.  You heard from Deepak Sulakhe and you heard

22   from Mark Jones he did what he was paid to do.

23                   Did he answer subpoenas?  Yes.

24   Brian Potashnik asked him to answer subpoenas.

25                   Did he go to Houston?  Yes, he did.  He did

1   some good work in Houston.  But he didn't do anything

2   outside the scope of his employment, and for that work he

3   doesn't get a bonus.  So the answer to that is no.

4            Question 11 -- I'm sorry -- Question 9,

5   what is the reasonable value of such compensable work at the

6   time and place it was performed?  The answer is zero or no

7   answer.

8            Number 12 -- I didn't know what this was

9   about -- if any of the defendants were engaged in a joint

10  enterprise in connection with the asset sale.  You heard no

11  evidence of anything about a joint enterprise connection

12  with the asset sale, nothing, zero.  So you have to answer

13  this question with no, no, no, and no.  No evidence about an

14  enterprise or endeavor, no enterprise about a common

15  purpose, no enterprise about community or pecuniary

16  interest, no enterprise about equal rights or the voice of

17  an enterprise, nothing.  You have to answer that no.

18           Same thing goes with Question Number 13.

19  It's virtually the same question.  There was no evidence in

20  this trial that addresses Question Number 13.

21           And the same thing with 14.  Is

22  Brian Potashnik responsible for the conduct of the entities

23  named below?  The answer is no.  Those entities are

24  separate, independent.  The entities act on their own.

25  Brian Potashnik is responsible for his conduct; these

1    entities are responsible for their own conduct.

2                    I'm going to give you back a little time.

3    And, ladies and gentlemen, truly, on behalf of the

4    Potashniks, Mike Donohue, Jason Friedman, Steve Page, our

5    paralegal Sarah Balog, Carla Williamson, appreciate your

6    time and effort.  You've been -- you've been great.  Thank

7    you very much.

8                    THE COURT:  Thank you, Mr. Friedman.

9                    Ms. Gibson, you get the last word as

10   between the attorneys.

11                   MR. L. FRIEDMAN:  I forgot to mention the

12   script, but y'all remember that.

13                   THE COURT:  You still have about 21

14   minutes.

15                   MS. GIBSON:  Thank you.

16                   I'm just going to get this back up.

17                     REBUTTAL ARGUMENT

18                   MS. GIBSON:  What defendants are saying in

19   this case is why this case has consequences.  For example,

20   one, the argument is because Jeff Carpenter has salary, even

21   though he stayed on as long as the Potashniks asked him to

22   and did everything requested of him, it is undisputed that

23   he worked hard; that the Potashniks continually said when

24   they discussed the bonuses, "I would never screw you."  And

25   now at the end of the day they say his salary covered

1    everything.

2                What Jeff Carpenter gave, when you look at

3    Question 8, the valuable service he gave was he stayed.  He

4    stayed.  He turned down a more lucrative job offer.  And

5    what defendants' argument means is that for everybody, for

6    everyone, including those Mark Jones talked about -- the

7    teachers, the nurses, the firefighters, whoever it is --

8    that argument means no one would ever be able to be entitled

9    to a raise, to a promised bonus, or to anything additional

10   compensation because the argument is your salary covers

11   everything.  And at the end of the day the employer can deny

12   what it promised someone and that person did all of the

13   work.

14                Now, I'm not going to have enough time to

15   address everything I disagree with with Mr. Friedman.  But

16   Mr. Friedman said to look at self-serving, who's

17   self-serving and what's credible evidence.

18                Deepak Sulakhe said around the time that

19   they decided to sell the company -- this is in May of

20   2006 -- it was Brian that -- he repeated something Jeff said

21   to him.  Deepak said Brian Potashnik told him at this

22   time -- this is before they had the seller, before they had

23   a price -- Brian told Deepak that Jeff may not need to work

24   again if this transaction goes through.  Brian was obviously

25   promising something.

1           Jeff Richards testified that even though
2    they immediately wanted to hire Jeff Carpenter for more
3    money, more base salary, and more bonuses, Jeff Carpenter
4    turned it down because he needed to stay in order to get a
5    large compensation package.
6           And you've heard from Cheryl Potashnik.
7    Cheryl Potashnik said that they intended to pay Jeff
8    Carpenter a bonus out of the asset-sale proceeds; that they
9    did have a stay program because continuity was important.
10   And the intent of offering those stay bonuses was to get
11   people to stay on, despite the asset sale.  And, in
12   addition, there were criminal proceedings going on.
13          Keith Jones said that he and Jeff Carpenter
14   were both part of the stay program, which is equivalent to
15   the severance program.  He testified -- the CFO testified
16   that Jeff Carpenter and Keith Jones worked together on the
17   program to set other people's stay bonuses.
18          Mr. Friedman says if you lie you don't
19   remember what you said, and he takes issue with
20   Jeff Carpenter.  Jeff Carpenter, though, covered a lot of
21   ground.  He's been accused of using different words, but
22   you'll see that even though he said it in different words
23   they mean the same thing.  And that is human not to pair it,
24   the same words, every time for the same meaning.
25          For example, selected employees were part

1    of the stay-bonus program.  Stay bonus -- stay bonuses paid

2    to employees is the same program and the same employees.  If

3    you call it selected corporate employees, that's who was

4    part of the stay program beneath Jeff Carpenter.

5              Severance and pay to stay, Keith Jones

6    admitted that those two words or phrases mean the same

7    thing.  Cafe Express versus Cafe Brazil, this is human to do

8    that.

9              But Brian Potashnik reminds me of one of

10   those squeeze dolls.  All he says is "never happened".  Stay

11   program that Cheryl Potashnik said existed, Keith Jones said

12   was the plan, he says that never happened.  Brian Potashnik,

13   like the squeeze doll, says discussions of severance never

14   happened with any employees.  Brian Potashnik said

15   Jeff Carpenter ultimately wasn't that important and he never

16   had him tour with perspective purchasers; but we showed you

17   the Emails where Jeff Carpenter is marketing the sale to

18   prospective purchasers, including Cascade, that ultimately

19   bought the assets.

20             We've talked about some of the biggest

21   commitments we make in life are oral, and that includes

22   Brian Potashnik's oral promise to tell the truth under oath.

23   If you want to look at credibility, look at who's telling

24   the truth as between Brian Potashnik, who's the one that

25   looked Jeff in the face and shook hands on it.  Who's

1    telling the truth is between those two.

2              You will see from the notes.  Look at

3    Exhibit 70.  Jeff may get some dates wrong every once in a

4    while, he may confuse Cafe Express with Cafe Brazil, but his

5    story has been generally consistent.

6              Now, there was a time when Jeff Carpenter

7    made a mistake in the formula, but look at Exhibit 50.  This

8    is where it started.  January 17, Keith Jones forwards a

9    form document.  Subject:  Document Keith is using.  That's

10   where this language got picked up.  It says without

11   deduction for any compensation paid to any other employees

12   from any of the employer entities.  That formula continued.

13   And when Jeff realized the mistake he corrected it, because

14   that's what honest people do.

15             He had no incentive to make that correction

16   other than that's the right thing to do.  Because making the

17   correction to offset bonuses paid to other employees, it

18   reduced his damages and it gave Friedman a chance to say he

19   was lying.  But still he didn't stick with the mistake.  He

20   corrected it because that is the right thing to do.  And

21   that is why stay bonuses come off of the formula.  It

22   originated from the form Keith Jones gave to Mr. Carpenter.

23             They also say that Jeff said even at the

24   end that the stay date for him was until closing.  But if

25   you look at the document used, he said last year after the

1    transaction was announced.  That's when he thought he needed

2    to stay until closing.

3                We've already gone over the timeline.  It's

4    the Potashniks, not Jeff, who changed as long as needed till

5    closing.  Then they want to make it come up through

6    transition.  He's willing to work with them on that.  Then

7    Brian Potashnik says you can leave, you'll get paid either

8    way, and Cheryl asked him to stay through transition and he

9    does so.  They changed as long as needed, not Jeff

10   Carpenter, and he did what they asked him to do.

11               With respect to claims that the parties

12   were still negotiating, this is not a deal where we were

13   trading documents back and forth before we start what we're

14   doing.  The handshake deal was made with Brian Potashnik and

15   Jeff stayed and continued to work.  It is Brian Potashnik

16   who said he would document it in writing at Jeff's request.

17   Brian never said it had to be in writing.  And after not

18   fulfilling that promise, they asked Jeff to take a stab at

19   it, and he did a bad job.

20               If Jeff suggested something more, that

21   doesn't mean you don't enforce the deal made on a handshake

22   deal.  For example, if someone asks me to mow their lawn and

23   I start mowing it and I'm partly through and I decide and

24   say could I have a little more, that doesn't mean we didn't

25   have a deal.

1            If a secretary says I have this salary and

2    bonus and they shake hands on it and she continues to work

3    and do what they asked her, if she says I think I should be

4    entitled to more, that doesn't change the deal on her salary

5    and bonus.  If it did, it would have consequences for

6    everyone; because that would mean anytime anyone asks for an

7    additional term for something more that would mean they have

8    nothing, nothing under the prior deal.  And that would have

9    consequences beyond this case.

10            Here, Jeff accepted Brian's handshake deal

11   by staying on.  That act accepted the deal.  And parties can

12   talk about additional terms or propose later additional

13   terms, but that doesn't prevent you from enforcing the terms

14   Brian agreed on on October 13, 2006, when he entered the

15   handshake deal.

16            Mr. Friedman say this whole case is about

17   Jeff Carpenter, but the rules involved in this case are

18   bigger than Jeff Carpenter.  They apply to folks like those

19   Mark Jones talked about living in affordable housing.  It's

20   nurses, it's teachers, it's firefighters, it's those who a

21   need fresh start for their American dream.  The rule

22   concerning handshake deals in Texas applies to everyone.

23   Whether you are slapping tar on a roof or you are an

24   executive, that rule protects everyone.

25            According to the Potashniks, they can enter

1    those agreements, those handshake deals, never say no, never

2    say stop, never say I don't think your agreement covers this

3    or we think we have an out until after the employee has done

4    all the work.  According to the defendants, whether or not

5    an employee gets paid isn't based on the rules we have in

6    Texas.  It is based on their whim and whether they decide to

7    do it or not.

8                    It is the defendants -- it's

9    Brian Potashnik who said he would put this in writing.  They

10   let Jeff Carpenter work all the way through the date they

11   needed him, told him he would get paid either way, and then

12   only after they got all that did they say no deal.  At no

13   time did anyone say no deal before.

14                   Cheryl Potashnik says she looked Jeff in

15   the eye and said, "I would never screw you on this."  If

16   there was no deal, there's not a need to say that type of

17   thing.  We know how hard you've worked.  You've earned it.

18                   With respect to the reasonable value of

19   services performing compensable work, this is Question 8.

20   When you look at this question, valuable materials

21   furnished, valuable services.  On that question the valuable

22   services are that Jeff stayed but the defendant didn't pay.

23                   Even if you find there was no agreement,

24   the answer to Question 8 and to the one similar for annual

25   bonuses should be that his staying was a valuable service

76

1    for which he should be compensated.  It's Brian Potashnik

2    that put a value on those services.  And in this case that's

3    just over $927,000.  That's actually lower than what Brian

4    initially said he was willing to pay, because the original

5    estimate was $1,020,000.  That is a specific amount and

6    shows that there was a formula at that time.

7              Now, as to discrepancies between the two

8    deals, keep in mind there are two times that this was talked

9    about.  The first one was when Brian met in May of 2006 at

10   his home with Jeff Carpenter.  That's when he announces he's

11   selling the business.  That's when he's telling

12   Deepak Sulakhe that Jeff may never have to work again if

13   things go through.  It's later, the October deal, remember.

14   This was around the time, the letter of intent, and that is

15   in the exhibits.

16             You have the date.  It was shortly before

17   that on October 13th they met at Cafe Express.  He informed

18   me that I would receive three percent minimum for all gross

19   compensation from the sale transaction, less closing cost of

20   brokerage fees, attorney's fees related to the transaction,

21   other normal closing costs, and less any deductions for any

22   compensation paid to any other employees.

23             Now, the reason he used minimum here is

24   because they had -- they had estimated a certain amount of

25   closing costs and Jeff is putting that in there.  But this

1    exhibit, this is Exhibit 70, Jeff wrote these notes shortly

2    after the deal went south.

3             If you look through those notes and other

4    documents in the case you will find that Jeff, like most

5    humans, sometimes used different words for the same thing.

6    He and Keith Jones, working together on the stay-bonus

7    programs at times, called them different things; but the

8    Emails are in evidence as between Jeff and Keith working to

9    set those bonuses for other people.  Sometimes people get

10   dates wrong; sometimes they use the wrong word.

11            In fact, if you look at the closing

12   documents for the -- the closing memos for the asset sale

13   you'll see that in this multimillion-dollar deal at the top

14   of the escrow documents you'll see in 2008 they start to get

15   dates wrong.  That is human.  What's not human is someone

16   like Brian Potashnik, who's like a squeeze doll, and Jeff

17   says never happened, never happened, never happened.

18            We called them first so they got a chance

19   to tell their story first.  Mr. Friedman would have you

20   believe we called them first because we wanted to hear what

21   they said, but you saw me impeach Brian Potashnik

22   and Cheryl Potashnik with their depositions.  They've given

23   their depositions.  Jeff knew what they were already going

24   to say.  This was not a surprise.

25            At bottom line in this case, the rules that

1     get applied here apply to everyone to protect everyone.  And

2     those rules only help people if jurors choose to enforce

3     them.  You are the conscience of the community in this case

4     and you can put the honor back in handshake deals in Texas.

5                        Thank you.

6                        THE COURT:  Thank you, Ms. Gibson.

7                        Ladies and gentlemen, that concludes the

8     closing arguments.  We're going to go over these last two

9     pages of the charge.  Then we'll ask that you retire to the

10    jury room.

11                       Please go to Page 22, the second-to-last

12    page in the charge.  This page contains instructions for the

13    presiding juror.  We'll start at the top of the page.

14                       (Remainder of charge read aloud)

15                       THE COURT:  So we're going to ask you to go

16    back there, and Rick will bring to you everything that I

17    just said.  Leave those -- these things here, leave those

18    with Rick.  Leave them on the ledge there.

19                       (The jury exited the courtroom.)

20                       (Deliberations held)

21                       (Lunch recess taken)

22                           JURY QUESTIONS

23                       THE COURT:  Mr. Friedman is suggesting that

24    I would say give the terms ordinary meaning.

25                       MS. GIBSON:  Okay.

Appendix 001679

```
1                    THE COURT:  Do you object to that?

2                    If there's an instruction in there, usually

3   I put the instruction, "If the word has a legal definition,

4   use that; otherwise, give it its ordinary meaning."

5                    MS. GIBSON:  I think that's in there.  I

6   think that's in the charge.

7                    THE COURT:  Okay.

8                    I would just say please re-read the charge.

9                    MS. GIBSON:  I just thought the general --

10  I thought the general instruction said that.

11                   THE COURT:  It probably did.

12                   I instruct you to use the word in a way

13  that is different from its ordinary meaning.  Use the

14  meaning I gave you, which would be the proper legal

15  definition.  It didn't say, otherwise, give it the --

16                   MS. GIBSON:  I think that implies ordinary

17  meaning.

18                   THE COURT:  Right.  It does.

19                   MR. L. FRIEDMAN:  The charge conference has

20  been closed, Judge.

21                   (Laughter)

22                   MR. L. FRIEDMAN:  You can put your

23  objection on the record.

24                   (Laughter)

25                   MR. L. FRIEDMAN:  Jump in a lake.
```

Appendix 001680

80

```
1                    THE COURT:  Jump -- that's right.
2                    Okay.  You ready, Vikki?
3                    The jury sent out a question.  "Could we
4       get a clarified explanation of the term 'possibly
5       performable'?"  That's in reference to Question 6.  And my
6       response is, "Thank you for your question.  You should give
7       those terms their ordinary meaning."
8                    And no objection from plaintiff?
9                    MS. GIBSON:  No objection.
10                   THE COURT:  And there was a slight
11      objection from --
12                   MR. L. FRIEDMAN:  Yeah.  No, we object,
13      Your Honor.  We think that the proper response should be to
14      instruct the jury to reread the charge.  So we'd have to
15      object.  Please note my objection.
16                   THE COURT:  All right.  The objection's
17      noted on the record.
18                   MR. L. FRIEDMAN:  And the ruling, please?
19                   THE COURT:  Your ruling [sic] is overruled.
20      I'm going to --
21                   MR. L. FRIEDMAN:  My objection is
22      overruled.  I don't make rulings.
23                   (Laughter)
24                   THE COURT:  Okay.
25                   MR. L. FRIEDMAN:  You make rulings.
```

81

```
1                    THE COURT:  I think you've got me -- you
2        had me worn down.
3                    MR. L. FRIEDMAN:  But if you want me to
4        overrule your ruling, I'm available for volunteer work.
5                    (Off the record)
6                    (Deliberations resumed)
7                    (End of proceedings)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3        I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12       I further certify that the total cost for the

13   preparation of the Reporter's Record is $502.00 and will be

14   paid by Friedman & Feiger, LLP.

15       WITNESS MY OFFICIAL HAND this the 22nd day of October,

16   2018.

17

18

19                              /S/ Vikki L. Ogden

20                              _____
                                VIKKI L. OGDEN, Texas CSR# 6309
                                Official Court Reporter
21                              Dallas County Court at Law No. 5
                                600 Commerce Street, Floor 5
22                              Dallas, Tx. 75202
                                (214)653-6443
23                              Certification Expires:  12/31/18

24

25

1                       REPORTER'S RECORD

2                       VOLUME 10 of 11

3             Trial Court Cause No. CC-08-02072-E

4    JEFFREY W. CARPENTER,        )  IN THE DALLAS COUNTY
                          )
5            Plaintiff,       )
                          )
6    VS                    )  COURT AT LAW NO. 5
                          )
7    SOUTHWEST HOUSING DEVELOPMENT    )
    COMPANY, INC., ET AL,        )
8                         )
            Defendants.      )  DALLAS, TEXAS
9   ————————————————————————————————————

10                   TRIAL ON THE MERITS

11

12   ————————————————————————————————————

13

14       On the 1st day of February, 2018, the following

15   proceedings came on to be heard within the presence

16   of a jury, in the above-entitled and -numbered cause;

17   and the following proceedings were had before the

18   HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19   Dallas County, Texas:

20       Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25

2

```
1                          APPEARANCES:

2

    MS. AMY GIBSON
3   SBN 00793801
    Gibson Wiley, PLLC
4   1500 Jackson Street, Suite 714
    Dallas, Texas 75201
5   (214)522-2121
    Attorney for Plaintiff
6
              -AND-
7
    MR. BRIAN SANFORD
8   SBN 17630700
    Sanford Firm
9   1910 Pacific Avenue, Suite 15400
    Dallas, Texas 75201
10  (469)361-9111
    Attorney for Plaintiff
11
              -AND-
12
    MR. LAWRENCE "LARRY" FRIEDMAN
13  SBN 07469300
    MR. MICHAEL DONOHUE
14  SBN 05989380
    MR. JASON FRIEDMAN
15  SBN 24059784
    Friedman & Feiger, LLP
16  5301 Spring Valley Road, Suite 200
    Dallas, Texas 75254
17  (972)788-1400
    Attorneys for Defendants
18
              -AND-
19
    MR. RYAN HALE
20  SBN 24097784
    Hawkins Parnell Thackston & Young, LLP
21  4514 Cole Avenue, Suite 500
    Dallas, Texas 75205-5412
22  (214)780-5138
    Appellate Attorney for Defendants
23

24
    ALSO PRESENT:  Steve Page, A/V Technician
25
```

```
1                          VOLUME 10

2   February 1,  2018                              PAGE
```

```
3   Proceedings ------------------------------      4

4   Deliberations Continued ------------------      4

5   Jury Questions ---------------------------      4

6   Defendants' Request to Poll the Jury ----      9

7   Court's Ruling ---------------------------     10

8   Defendants' Motion for Mistrial ---------     10

9   Court's Ruling ---------------------------     10

10  Verdict ----------------------------------     10

11  Jury Polled ------------------------------     14

12  Adjournment ------------------------------     17

13  Court Reporter's Certificate ------------     18
```

```
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2                    February 1, 2018
3                    (Deliberations continued)
4                    (Mr. Sanford and Mr. L. Friedman are not
5                    present in the courtroom.)
6                    JURY QUESTIONS
7                    THE COURT:  Question 8 is the quantum
8     meruit.
9                    MS. GIBSON:  Quantum meruit for the asset
10    sale?
11                   THE COURT:  For the asset sale.
12                   MS. GIBSON:  Okay.
13                   THE COURT:  What was the -- the jury's
14    question was, "What was the final bonus calculation from the
15    three-percent deal?"  My general instruction would be to use
16    your best collective memory.
17                   MR. J. FRIEDMAN:  Yeah.
18                   MS. GIBSON:  Can you -- would you tell them
19    if they disagree that they can ask the court reporter
20    to check them?  If they disagree on the testimony, that they
21    can ask the court reporter?
22                   MR. DONOHUE:  I don't think -- I'd say I
23    think either -- use your best collective memory is the
24    answer.
25                   MR. J. FRIEDMAN:  They could have taken
```

1   notes.

2               THE COURT:   And the information is back

3   there, 'cause you -- you put into evidence the document,

4   redacted document with the total with the employee bonuses.

5               MS. GIBSON:   I got overruled on that.

6   Their objection was sustained on that one.

7               THE COURT:   Only on the --

8               MS. GIBSON:   Demonstrative?

9               THE COURT:   Only on the -- maybe we didn't

10  get in.  It was the line item was sustained, not the total

11  number.

12              MS. GIBSON:   Yeah.

13              MR. J. FRIEDMAN:   What were we saying?

14              THE COURT:   All right, and Question 8.

15  "Is Question 8 in reference to the three-percent deal?"

16              MR. J. FRIEDMAN:   What's Question 8?

17              THE COURT:   Question 8 is the quantum

18  meruit to the three-percent deal.

19              MR. J. FRIEDMAN:   Well, the quantum meruit

20  is if they don't have a contract.  And she has two

21  contracts, so I don't --

22              MS. GIBSON:   I just would ask that they

23  give the same number.

24              THE COURT:   That they gave the same number?

25              MS. GIBSON:   No, no, no.  I used the same

1      numbers.  I think that's what they're asking about.

2                      MR. J. FRIEDMAN:  No.

3                      THE COURT:  No.

4                      MR. J. FRIEDMAN:  The question is, is it

5      the three-percent deal.  And she only has one quantum meruit

6      question.  She has two contracts --

7                      MS. GIBSON:  No.  On this one I'm happy for

8      you to --

9                      THE COURT:  To say --

10                     MS. GIBSON:  -- to say whatever you want on

11     that.

12                     THE COURT:  I would say give the question

13     it's plain ordinary meaning.

14                     MS. GIBSON:  Okay.

15                     THE COURT:  They won't send any questions

16     out after this because this is the third one that we didn't

17     answer now.  Maybe that's two.

18                     (Mr. L. Friedman entered the courtroom.)

19                     MR. J. FRIEDMAN:  Well, there's two.

20                     MR. L. FRIEDMAN:  Wait, wait, wait, wait,

21     wait.  What's the question?

22                     THE COURT:  Your objection is already

23     waived.

24                     MR. L. FRIEDMAN:  No.  What's the question?

25     Maybe we can send them back a question.

```
 1                          "What was the final bonus" -- what?
 2                          MR. DONOHUE:  Calculation.
 3                          MR. L. FRIEDMAN:  -- "from the
 4        three-percent deal?  Thank you for your question.  You
 5        should use your best collective memory."
 6                          Okay, what's the next one?
 7                          THE COURT:  It's Question 8 in reference to
 8        the three-percent deal, and Question 8 is the quantum meruit
 9        question about the asset sale.
10                          MR. L. FRIEDMAN:  I'm sorry.  Say it again.
11                          THE COURT:  It's Question 8 in reference to
12        the three-percent deal.
13                          MS. GIBSON:  It's quantum meruit.
14                          THE COURT:  And that question to Question 8
15        is the question regarding quantum meruit related to the
16        asset sale.
17                          MR. L. FRIEDMAN:  And what's the answer?
18                          THE COURT:  You should give the question --
19        "You should interpret the question according to the ordinary
20        meaning of the question."
21                          MR. L. FRIEDMAN:  Okay.  It is what it is.
22                          THE COURT:  And it would probably have been
23        shorter to write it is what is.
24                          (Laughter)
25                          (Off the record)
```

1                     (Mr. L. Friedman and Mr. J. Friedman are

2                     not present in the courtroom.)

3           THE COURT:   You ready?

4               We are on the record and the -- we're

5    outside the presence of the jury.

6               The jury's in the jury room deliberating.

7    They sent out two questions.   The first question was, "What

8    was the final bonus calculation from the three-percent

9    deal?"  In that response I gave them as a response, "Thank

10   you for your question.  You should use your best collective

11   memory as to the evidence."  And defendant had no objection

12   to that response but plaintiff had a request for a further

13   instruction.

14          MS. GIBSON:   Plaintiff's request for a

15   further instruction is that if any jurors disagree about

16   what the testimony was as to the three-percent deal, final

17   calculation, that they may ask that the court reporter look

18   it up and give them the answer.

19          THE COURT:   And that request is overruled

20   for the time being.  If they keep sending out questions,

21   we'll look at that.

22               And then the second question is, "Is

23   Question 8 in reference to the three-percent deal?"  I said,

24   "Thank you for your question.  You should interpret the

25   question according to the ordinary meaning of the question."

1    It's not a very good response, but you had no objection to

2    that.

3                    MR. HALE:   No.

4                    MS. GIBSON:   No objection.

5                    THE COURT:   All right.

6                    (Off the record)

7                    (Recess taken)

8                    (The jury entered the courtroom.)

9                    THE COURT:   All right.   Mr. Friedman, did

10   you want to put something on the record?

11              DEFENDANTS' REQUEST TO POLL THE JURY

12                    MR. L. FRIEDMAN:   Yes, Your Honor.

13                    Standing at the bench before, when the

14   questions -- the last two questions were asked, I heard

15   through the doors that a loud voice from the jury room

16   comments about FBI raid and such.   And I think it's

17   appropriate, given the number of times that Ms. Gibson had

18   referred to the press and the widely publicized events that

19   occurred behind the conviction, felony conviction of

20   Mr. Potashnik and referring the jury to that during the

21   trial, I wanted to ask the Court to poll the jurors

22   individually and ask them if any one of them had actually

23   gone and done their own independent research about the

24   matter.

25

10

```
 1                         COURT'S RULING
 2              THE COURT:  All right, and that motion's
 3   denied.
 4                  DEFENDANTS' MOTION FOR MISTRIAL
 5              MR. L. FRIEDMAN:  And then --
 6              THE COURT:  I'm sorry.
 7              MR. L. FRIEDMAN:  -- and then as a result
 8   I'd like to ask for another mistrial.
 9                         COURT'S RULING
10              THE COURT:  Okay.  And that's denied also.
11              Let's bring them in.
12              (The jury entered the courtroom.)
13              THE COURT:  Welcome back and good morning,
14   ladies and gentlemen.
15              Who was our presiding juror?
16              JUROR NUMBER 1:  I am, Your Honor.
17              THE COURT:  Thank you.  Is it Ms. Serachi
18   (phonetic)?
19              JUROR NUMBER 1:  Ciraci.
20              THE COURT:  Ciraci.  I'm sorry.
21              JUROR NUMBER 1:  That's close.
22                            VERDICT
23              THE COURT:  I'm going to read the jury
24   questions and your responses so that your verdict becomes
25   part of the record in the case.
```

1              Question Number 1 asked, Did Jeff Carpenter

2    and Southwest Housing Management agree that Southwest

3    Housing Management would pay one or more annual bonuses to

4    Jeff Carpenter covering the period of March 15, 2005,

5    through March 15, 2007?  To that question you responded no.

6              Question Number 2 asked -- because of your

7    response to Question Number 1 you were not required to

8    answer Question Number 2, and you did not.  Because of your

9    response to Question Number 2 you were not required

10   to answer Question Number 3, and you did not.

11             Question Number 4 asked, Did any of the

12   defendants below and Jeff Carpenter agree on October 13,

13   2006, to pay Jeff Carpenter, one, three percent of the total

14   of gross asset-sale revenue to sellers, less normal closing

15   costs, less sale-proceed bonuses paid to employees; two, if

16   Jeff Carpenter would stay as long as needed on to help make

17   the asset sale happen?  To that you responded yes as to

18   Affordable Housing Construction; yes as to Southwest Housing

19   Development; yes as to Southwest Housing Management; and yes

20   as to Brian Potashnik.

21             Question Number 5 asks, For each defendant

22   for whom you answered yes in Question 4, did that defendant

23   also fail to comply with the agreement?  As to Affordable

24   Housing Construction you responded yes; as to Southwest

25   Housing Management -- Development -- you responded yes;  as

12

1   to Southwest Housing Management you responded yes; as to

2   Brian Potashnik you responded yes.

3              Question Number 6 asked, As of October 13,

4   2006, was the agreement found in Question 4 possibly

5   performable in less than one year?  You responded yes.

6              Question Number 7 asked, What sum of money,

7   if any, if paid now in cash, would fairly and reasonably

8   compensate Jeff Carpenter for his damages, if any, that

9   resulted from such failure to comply with the agreement?  To

10  that you responded $928,020.76.  That's 928, comma, 020,

11  point 76.

12             Question Number 8 asked, Did Jeff Carpenter

13  perform compensable work staying on as long as needed to

14  help make the asset sale happen for any of the named-below

15  defendants for which he was not compensated?  As to

16  Afford -- as to all defendants you responded no.  Because of

17  your response to Question 8 you were not required to answer

18  Question 9, and you did not.

19             Question Number 10 asked, Did Jeff

20  Carpenter perform compensable work for Southwest Housing

21  Management for which he was not compensated, excluding any

22  staying on to help make the asset sale happen?  To that you

23  respond no.  Because of your response to Question Number 10

24  you did not need to answer Question Number 11, and you did

25  not.

13

1              Question Number 12 asked, Which, if any, of

2     the defendants were engaged in a joint enterprise in

3     connection with the asset sale?  As to Affordable Housing

4     Construction you responded no; as to Southwest Housing

5     Development you responded no; as to Southwest Housing

6     Management you responded no; as to Brian Potashnik you

7     responded no.

8              Question 13 asked, Which, if any, of the

9     defendants were engaged in a joint venture in connection

10    with the asset sale?  As to Affordable Housing you responded

11    no; as to Southwest Housing Development you responded no; as

12    to Southwest Housing Management you responded no; as to

13    Brian Potashnik you responded no.

14             Question 14 asked, Is Brian Potashnik

15    responsible for the conduct of the entities named below?

16    And as to Affordable Housing Construction you responded yes;

17    as to Southwest Housing Development you responded yes; as to

18    Southwest Housing Management you responded yes.

19             And then going to the certificate page you

20    had two options.  The first option was our verdict is

21    unanimous; and the second option was your verdict is

22    not unanimous.  The five of you agreed to each and every

23    answer and have signed the certificate below, and you opted

24    for the second choice.  And so five of you joined in the

25    verdict.

 1              You could have had six agree on some
 2    answers but you didn't have six agree on all, but the five
 3    who joined in the verdict each joined in every question that
 4    was answered; is that correct?
 5                   JUROR NUMBER 1:  That's correct,
 6    Your Honor.
 7                   THE COURT:  Okay.
 8                   And I'm going to poll the jury and I'm
 9    going to ask if you joined in the verdict.  And if you
10    joined in the verdict, if you would say yes loud enough for
11    the court reporter to -- to hear you.  If you did not, if
12    you would say no loud enough for the court reporter to hear
13    you.  I'm going to refer to you by numbers.
14                       JURY POLLED
15                   THE COURT:  Ms. Ciraci, being number one,
16    Juror Number 1, did you join in that verdict?
17                   JUROR NUMBER 1:  Yes, sir.
18                   THE COURT:  Juror Number 2, did you join in
19    that verdict?
20                   JUROR NUMBER 2:  Yes.
21                   THE COURT:  Juror Number 3, did you join in
22    that verdict?
23                   JUROR NUMBER 3:  Yes.
24                   THE COURT:  Juror Number 4, did you join in
25    that verdict?

15

```
1                      JUROR NUMBER 4:   Yes.
2                      THE COURT:   Juror Number 5, did you join in
3     that verdict?
4                      JUROR NUMBER 5:   Yes.
5                      THE COURT:   Juror Number 6, did you join in
6     that verdict?
7                      JUROR NUMBER 6:   No.
8                      THE COURT:   Okay.   Very good.
9                      Ladies and gentlemen, we thank you.   This
10    concludes your jury service.   We thank you very much.
11                     I thank you.   Our court reporter -- the
12    official court reporter for this court is Vikki Ogden.   She
13    joins me in thanking you.   And our bailiff for all of our
14    trials is Rick Wilson.   He joins me in thanking you.   The
15    attorneys thank you.   Most importantly, the parties to the
16    lawsuit thank you.
17                     (Mr. Donohue is entered the courtroom.)
18                     You know that the events underlying this
19    case occurred more than 10 years ago.   So one thing that
20    everyone agrees on, whether they prevailed in the suit or
21    not, is that this is a case that needed to be resolved.   And
22    because of your jury service we are able to resolve this
23    case.   We will take your verdict and reduce it to a judgment
24    and the judgment will close this case.   And for that we
25    thank you very much.
```

16

1          Any restriction I placed on you to not

2     discuss the case with anyone else is, of course, lifted at

3     this point.  You're welcome to discuss the case with the

4     attorneys and the parties to the lawsuit.  You're welcome to

5     discuss the case with anyone else once you leave the

6     courthouse, but that is 100 percent up to you.  If you want

7     to discuss the case with them, you're welcome to.  If you

8     don't want to discuss the case to [sic] them, you don't have

9     to.  It's 100 percent up to you.

10          The law allows the attorneys to request

11    from you an affidavit if they believe an affidavit is called

12    for.  If they suspect jury misconduct, if you want to

13    cooperate with the attorney, you're certainly welcome to do

14    that.  If you do not want to cooperate with the attorney,

15    you need not.  Again, that is 100 percent up to you, but

16    that is an instruction I am required to give you by law.

17          With that I think, again, we're going to

18    thank you and we're going to break.  You're in the jury box

19    now.  We're going to ask you to go back to the jury room.

20          If you want to talk to anybody out here, go

21    from the jury room right back out here.  If you don't want

22    to talk to anybody, the bailiff takes you out through this

23    side hallway and you'll just kind of go around everybody.

24          So we'll ask you to come back to the jury

25    room now.

1                          (Off the record)

2                          (End of proceedings)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  THE STATE OF TEXAS

2  COUNTY OF DALLAS

3       I, Vikki L. Ogden, Official Court Reporter in and for

4  the County Court at Law Number 5 of Dallas County, State of

5  Texas, do hereby certify that to the best of my ability the

6  above and foregoing contains a true and correct

7  transcription of all portions of evidence and other

8  proceedings requested in writing by counsel for the parties

9  to be included in the Reporter's Record, in the above-styled

10  and -numbered cause, all of which occurred in open court or

11  in chambers and were reported by me.

12       I further certify that the total cost for the

13  preparation of the Reporter's Record is $118.00 and will be

14  paid by Friedman & Feiger, LLP.

15       WITNESS MY OFFICIAL HAND this the 21st day of October,

16  2018.

17

18

19                           /S/ Vikki L. Ogden

20                           VIKKI L. OGDEN, Texas CSR# 6309
                             Official Court Reporter
21                           Dallas County Court at Law No. 5
                             600 Commerce Street, Floor 5
22                           Dallas, Tx. 75202
                             (214)653-6443
23                           Certification Expires:  12/31/18

24

25

# Exhibit 8

# jury verdict

**Presiding Juror**

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | In the County Court |
| | § | |
| Southwest Housing | § | of Dallas County |
| Development Company, Inc.; | § | |
| Southwest Housing | § | at Law N° 5 |
| Management Corporation, | § | |
| Inc. a/k/a and d/b/a Southwest | § | |
| Housing Management | § | |
| Company, Inc.; Affordable | § | |
| Housing Construction, Inc.; | § | |
| Brian Potashnik, | § | |
| | § | |
| *Defendants.* | § | |

FILED
2010 FEB -1 AM 10: 52
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

---

## CHARGE OF THE COURT

---

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

CC-08-02072-E
CCC
CHARGE OF COURT
1748785

Appendix 001703

Here are the instructions for answering the questions.

1.    Do not let bias, prejudice, or sympathy play any part in your decision.

2.    Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

Some of the exhibits may contain redactions. The portions of those exhibits have been redacted because I have excluded the redacted portions from the evidence. You should disregard any redactions just as you would disregard any other evidence that I have excluded from the record.

3.    You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.    If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.    All the questions and answers are important. No one should say that any question or answer is not important.

6.    Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

Preponderance of the evidence means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

Appendix 001704

A fact may be established by direct evidence or by circumstantial evidence or both.  A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken.  A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Certain testimony has been presented to you through a deposition.  A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. This deposition testimony is entitled to the same consideration as if the witness had been present and had testified from the witness stand in court.

7.    Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision.  Answer each question carefully without considering who will win.  Do not discuss or consider the effect your answers will have.

8.    Do not answer questions by drawing straws or by any method of chance.

9.    Some questions might ask you for a dollar amount.  Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

In answering questions about damages, answer each question separately.  Do not increase or reduce the amount in one answer because of your answer to any other question about damages.  Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not consider attorneys' fees. Do not guess about attorneys' fees.

10.    Do not trade your answers.  For example, do not say, "I will answer this question your way if you answer another question my way."

11.    The answers to the questions must be based on the decision of at least five of the six jurors. The same five jurors must agree on every answer. Do not agree to be bound by a vote of anything less than five jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

Appendix 001706

## DEFINITIONS

As used in this Charge of the Court,  Southwest Housing Development means Southwest Housing Development Company, Inc.

As used in this Charge of the Court, Southwest Housing Management means Defendants Southwest Housing Management Corporation, Inc., also known as and doing business as Southwest Housing Management Company, Inc.

As used in this Charge of the Court, Affordable Housing Construction means Affordable Housing Construction, Inc.

Appendix 001707

## QUESTION 1

Did Jeff Carpenter and Southwest Housing Management agree that Southwest Housing Management would pay one or more annual bonuses to Jeff Carpenter covering the period from March 15, 2005 through March 15, 2007?

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

**Authority** for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. More than one person may have a party's actual authority.

**Apparent authority** exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists. More than one person may have a party's apparent authority.

When a **vice-principal** of a corporation commits some act, that act may be deemed to be the act of the corporation itself. A corporation can have more than one vice-principal. A person is a "vice-principal" if—

Appendix 001708

1.     that person is a corporate officer; or

2.     that person has authority to employ, direct, and discharge an employee of a corporation; or

3.     the corporation has confided to that person the management of the whole or a department or division of the business of the corporation.

A person is a manager or is employed in a managerial capacity if—

1.     that person has authority to employ, direct, and discharge an employee of a corporation; or

2.     a corporation has confided to that person the management of the whole or a department or division of the business of a corporation.

Answer "Yes" or "No."

Answer: ___NO___

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 2

Did Southwest Housing Management fail to comply with the agreement to pay Jeff Carpenter one or more annual bonuses covering the period from March 15, 2005 through March 15, 2007?

Answer "Yes" or "No."

Answer: ___NA___

Appendix 001710

If you answered "Yes" to Question 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with the agreement to pay Jeff Carpenter one or more annual bonuses covering the period from March 15, 2005 through March 15, 2007?

You are instructed that any monetary recovery for such annual bonus is subject to federal income taxes.

Consider the following elements of damages, if any, and none other.

   a. past lost compensation in the form of annual bonuses

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer _____NA_____

Appendix 001711

## QUESTION 4

Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
2. if Jeff Carpenter would stay as long as needed on to help make the asset sale happen

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

**Authority** for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. More than one person may have a party's actual authority.

**Apparent authority** exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists. More than one person may have a party's apparent authority.

Appendix 001712

When a **vice-principal** of a corporation commits some act, that act may be deemed to be the act of the corporation itself. A corporation can have more than one vice-principal. A person is a "vice-principal" if—

1. that person is a corporate officer; or

2. that person has authority to employ, direct, and discharge an employee of a corporation; or

3. the corporation has confided to that person the management of the whole or a department or division of the business of the corporation.

A person is a manager or is employed in a managerial capacity if—

1. that person has authority to employ, direct, and discharge an employee of a corporation; or

2. a corporation has confided to that person the management of the whole or a department or division of the business of a corporation.

Answer "Yes" or "No" for each:

Affordable Housing Construction      YES

Southwest Housing Development      YES

Southwest Housing Management      YES

Brian Potashnik      YES

If you answered "Yes" to Question 4 for any defendant, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 5

For each defendant for whom you answered "Yes" in Question 4, did that defendant also fail to comply with such agreement?

Answer "Yes" or "No" for each defendant for whom you answered "Yes" in Question 4:

Affordable Housing Construction      _YES_

Southwest Housing Development      _YES_

Southwest Housing Management      _YES_

Brian Potashnik      _YES_

If you answered "Yes" to Question 4 for any defendant, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 6**

As of October 13, 2006, was the agreement found in Question 4 possibly performable in less than one year?

Answer "Yes" or "No."

Answer: ___YES___

Appendix 001715

If you answered "Yes" to Question 5 for any defendant, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 7

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with such agreement?

You are instructed that any monetary recovery for such sale proceeds payment is subject to federal income taxes.

Consider the following elements of damages, if any, and none other.

a. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer: _____ $928,020.76 _____

## QUESTION 8

Did Jeff Carpenter perform compensable work staying on as long as needed to help make the asset sale happen for any of the below-named defendants for which he was not compensated?

Jeff Carpenter performed compensable work if he rendered valuable services or furnished valuable materials to a defendant; that defendant accepted, used, and benefited from the services or materials; and, under the circumstances, that defendant was reasonably notified that Jeff Carpenter expected to be compensated for the services or materials.

Answer "Yes" or "No" for each:

Affordable Housing Construction          NO

Southwest Housing Development          NO

Southwest Housing Management          NO

Brian Potashnik          NO

If you answered "Yes" to Question 8, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 9

What is the reasonable value of such compensable work at the time and place it was performed?

Answer in dollars and cents, if any.

Answer: ____NA_____

## QUESTION 10

Did Jeff Carpenter perform compensable work for Southwest Housing Management for which he was not compensated, excluding any staying on to help make the asset sale happen?

Jeff Carpenter performed compensable work if he rendered valuable services or furnished valuable materials to a defendant; that defendant accepted, used, and benefited from the services or materials; and, under the circumstances, that defendant was reasonably notified that Jeff Carpenter expected to be compensated for the services or materials.

Answer "Yes" or "No":

Answer: ___NO___

Appendix 001719

If you answered "Yes" to Question 10, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 11**

What is the reasonable value of such compensable work at the time and place it was performed?

Answer in dollars and cents, if any.

Answer: ___NA_____

Appendix 001720

## QUESTION 12

Which, if any, of the defendants were engaged in a joint enterprise in connection with the asset sale?

A "joint enterprise" exists if the persons or entities concerned have (1) an agreement, either express or implied, with respect to the enterprise or endeavor; and (2) a common purpose; and (3) a community of pecuniary interest in the common purpose of the enterprise, among the members of the group; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

Answer "Yes" or "No" for each:

Affordable Housing Construction _____NO_____

Southwest Housing Development _____NO_____

Southwest Housing Management _____NO_____

Brian Potashnik _____NO_____

Appendix 001721

## QUESTION 13

Which, if any, of the defendants were engaged in a joint venture in connection with the asset sale?

A "joint venture" exists if the persons or entities concerned have (1) a community of interest in the venture, (2) an agreement to share profits, (3) an express agreement to share losses, and (4) a mutual right of control or management of the venture.

Answer "Yes" or "No" for each:

Affordable Housing Construction        NO

Southwest Housing Development        NO

Southwest Housing Management        NO

Brian Potashnik        NO

Appendix 001722

## QUESTION 14

Is Brian Potashnik responsible for the conduct of the entities named below?

Brian Potashnik is "responsible" for the conduct of an entity if—

Brian Potashnik used the entity for the purpose of perpetrating and did perpetrate an actual fraud on Jeff Carpenter primarily for the direct personal benefit of Brian Potashnik.

Answer "Yes" or "No" for each:

Affordable Housing Construction     _YES_

Southwest Housing Development     _YES_

Southwest Housing Management     _YES_

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

1.    have the complete charge read aloud if it will be helpful to your deliberations;

2.    preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

3.    give written questions or comments to the bailiff who will give them to the judge;

4.    write down the answers you agree on;

5.    get the signatures for the verdict certificate; and

6.    notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror?  If you do not, please tell me now.

You may answer the questions on a vote of five jurors.  The same five jurors must agree on every answer in the charge.  This means you may not have one group of five jurors agree on one answer and a different group of five jurors agree on another answer.

If five jurors agree on every answer, those five jurors sign the verdict.  If all six of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

All jurors should deliberate on every question.  You may end up with all six of you agreeing on some answers, while only five of you agree on other answers.  But when you sign the verdict, only those five who agree on every question will sign the verdict.

You are again instructed that it is your duty not to communicate with, or permit yourselves to be addressed by, any other person about any subject relating to the case.

*Submitted by —*
*Mark Greenberg*
*Judge Presiding*
*January 31, 2019*

## Verdict Certificate

Check one:

_____ Our verdict is unanimous. All six of us have agreed to each and every answer. The presiding juror has signed the certificate for all six of us.


_____     _____
Signature of Presiding Juror    Printed Name of Presiding Juror


__✓__ Our verdict is not unanimous. Five of us have agreed to each and every answer and have signed the certificate below.


      Signature                    Name Printed

1. _Samantha Ciraci_            Samantha Ciraci
2. _Norma Parson_               Norma Parson
3. _Lisa Billingsley_           Lisa Billingsley
4. _L. Josephs_                 Lauryn Josephs
5. _Jimmy Nguyen_               Jimmy Nguyen

IS question 8 in reference to the 3rd deal?

Thank you for your questions. You should interpret the question according to the ordinary meaning of the question.

/s/

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS
2018 FEB -1 AM 9:49

---

What was the final bonus cake violation from the 3% deal?

Thank you for your question. You should use your best collective memory as to the evidence.

/s/

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS
2018 FEB -1 AM 9:49

In reference to question #6 on page 13 —

Could we get a clarified explanation of the term "possibly performable"?

Thank you for your question. You should give those words their ordinary meaning.

Mark Greenberg

2018 JAN 31 AM 8: 53

DALLAS COUNTY, TEXAS
COUNTY CLERK
JOHN F. WARREN
FILED

# Exhibit 9

# final judgment

Case 3:23-cv-00769-N   Document 29   Filed 08/02/23   Page 1729 of 1959   PageID 2774



# MARK GREENBERG
## JUDGE, COUNTY COURT AT LAW #5

Larry Friedman / Michael Donahue / Jason H. Friedman 214-346-4240
Amy Gibson / David Wiley 214-522-2126
Brian Sanford 214-919-0113
Robert Gilbreath 214-780-5200

Re: Carpenter v. Southwest Housing, et al., Cause no. CC- 08-02072-E

Attached is a courtesy copy of the court's judgment.

Signed December 17, 2018.

Judge presiding

Geo. Allen Courts Building, 600 Commerce Street, Fifth Floor, Dallas, Texas 75202
(214) 653-6441

Appendix 001729

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | In the County Court |
| | § | |
| Southwest Housing | § | of Dallas County |
| Development Company, Inc.; | § | |
| Southwest Housing | § | at Law № 5 |
| Management Corporation, | § | |
| Inc. a/k/a and d/b/a Southwest | § | |
| Housing Management | § | |
| Company, Inc.; Affordable | § | |
| Housing Construction, Inc.; | § | |
| Brian Potashnik; and | § | |
| Cheryl Potashnik n/k/a | § | |
| Cheryl Geiser, | § | |
| | § | |
| *Defendants.* | § | |

## FINAL JUDGMENT

This case was called to jury trial on January 23, 2018. Jeffrey W.
Carpenter appeared in person and through counsel and announced ready for
trial. Brian Potashnik and Cheryl Potashnik n/k/a Cheryl Geiser appeared in
person and through counsel and announced ready for trial. Southwest Housing
Development Company, Inc., Southwest Housing Management Corporation,
Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and

Affordable Housing Construction, Inc. appeared through their representatives and through their counsel and announced ready for trial.

Before jury trial, during a motions hearing, four counter-plaintiffs — Cheryl Potashnik n/k/a Cheryl Geiser, Brian Potashnik, Southwest Housing Development Company, Inc., and Affordable Housing Construction, Inc. — announced their intent to voluntarily dismiss all their counterclaims against Jeffrey W. Carpenter, which they originally filed on April 7, 2008. This dismissal was accomplished with the September 9, 2015 filing of *Defendants' First Amended Answer and Defendant's First Amended Counterclaim Against Jeffrey W. Carpenter*, in which only Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. continued to pursue counterclaims. Before jury trial, on the record, Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. dismissed with prejudice all remaining counterclaims against Jeffrey W. Carpenter.

After close of evidence and before closing arguments in the jury trial, the Court granted the motion of Cheryl Potashnik n/k/a Cheryl Geiser for directed verdict on the claims against her. Cheryl Potashnik n/k/a Cheryl Geiser and Jeffrey W. Carpenter were each unsuccessful on the counterclaims and claims between them. As a result, no costs are awarded to Cheryl Potashnik n/k/a

Appendix 001731

Cheryl Geiser. The Court also finds good cause not to award costs to Cheryl Potashnik n/k/a Cheryl Geiser. First, Cheryl Potashnik n/k/a Cheryl Geiser and Jeffrey W. Carpenter were each unsuccessful on the counterclaims and claims between them. Second, awarding costs to Cheryl Potashnik n/k/a Cheryl Geiser would, as a practical matter under the circumstances, burden Jeffrey W. Carpenter with paying shared defense costs for the four defendants against whom he was successful. All defendants shared the same legal counsel. All defendants shared the same liability insurance carrier. With few exceptions, all defendants asserted the same defenses. For all oral depositions that Cheryl Potashnik n/k/a Cheryl Geiser initiated, all defendants jointly noticed and took those depositions. All defendants counted as one side — or one party — for purposes of paying for court-ordered mediations.

A jury and one alternate juror, consisting of 7 citizens good and true, were empaneled and sworn and thereafter heard the admissible evidence. Having retained the original 6 jurors during the course of the trial, the Court dismissed the alternate juror before deliberations. The Court then submitted its Charge to the jury, which was followed by the closing arguments of the lawyers. Thereafter, on February 1, 2018, the jury returned a five-to-one verdict in favor of Jeffrey W. Carpenter and against Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing

Appendix 001732

Management Corporation, Inc. a/k/a and d/b/a Southwest Housing
Management Company, Inc., and Affordable Housing Construction, Inc. on
certain claims. The Court then received and accepted the jury's verdict, which
is incorporated by reference as if fully set forth herein.

Before jury trial, all parties agreed to try to the Court the issue of
attorneys' fees under Texas Civil Practice and Remedies Code Chapter 38.
That portion of the case was called to trial on November 15, 2018. Jeffrey W.
Carpenter appeared in person and through his counsel and announced ready
for trial. Brian Potashnik, Southwest Housing Development Company, Inc.,
Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest
Housing Management Company, Inc., and Affordable Housing Construction,
Inc. appeared through their counsel and announced ready for trial. The Court
heard the admissible evidence and the arguments of counsel and took judicial
notice as appropriate. At the conclusion of the presentation, the Court
announced its ruling on the record, noting that a written judgment would
follow.

Having considered the verdict of the jury, the Court's ruling on attorneys'
fees, the admissible evidence, the record in this case, the arguments of counsel,
and the previous orders of the Court, it is hereby

ORDERED, ADJUDGED and DECREED that Jeffrey W. Carpenter do have and recover of and from Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc., jointly and severally:

a.   actual damages in the amount of $928,020.76;

b.   prejudgment interest on actual damages [$928,020.76] at the rate of 5.25% per annum simple interest from March 11, 2008 through the day before the date of this Judgment;

c.   reasonable attorneys' fees in the amount of $820,818.00 for the prosecution of this case through the day before the date of this Judgment for Plaintiff Jeffrey W. Carpenter's breach of contract claim against Defendants Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc.;

d.   costs of court; and

e.   postjudgment interest on all of the amounts above at the rate of 5.25% per annum, compounded annually, from the date of this Judgment until the date this Judgment is satisfied.

It is further ORDERED, ADJUDGED and DECREED, that if any defendant other than Defendant Cheryl Potashnik n/k/a Cheryl Geiser unsuccessfully appeals this Judgment, then Jeffrey W. Carpenter shall additionally recover from such unsuccessful appealing defendant — or jointly and severally from such unsuccessful appealing defendants if more than one such defendant unsuccessfully appeals — the following amounts, representing

conditional and reasonable attorneys' fees that would be incurred by Jeffrey

W. Carpenter in any such appeal:

   a.   $86,625.00 for an appeal to the Dallas Court of Appeals,
        excluding oral argument and rehearing response;

   b.   an additional $9,900.00 for oral argument, if any, before the
        Dallas Court of Appeals;

   c.   an additional $9,900.00 for a response to a motion for
        rehearing, if the Dallas Court of Appeals requests that
        Jeffrey W. Carpenter file such a response;

   d.   an additional $32,175.00 for a petition for review or
        response to a petition for review filed with the Supreme
        Court of Texas;

   e.   an additional $37,125.00 for merits briefing, if the Supreme
        Court of Texas requests briefing on the merits;

   f.   an additional $14,850.00 for oral argument, if any, before
        the Supreme Court of Texas; and

   g.   an additional $7,425.00 for a response to a motion for
        rehearing, if the Supreme Court of Texas requests that
        Jeffrey W. Carpenter file such a response.

All other relief requested by any individual or entity in this case and not

specifically granted herein or previously disposed of is DENIED.

This Judgment finally disposes of all parties and all claims and is

appealable.

Appendix 001735

The Court ORDERS execution to issue for this Judgment.


Signed this ___17___ day of _D ec em ber_____, 2018.


_Mark Greenberg_____
Mark Greenberg
Judge, Dallas County Court at Law No. 5

# Exhibit 10

# *Stowers* letter



**Gibson Wiley PLLC**
ATTORNEYS & COUNSELORS AT LAW

February 11, 2016

**VIA EMAIL**

Mr. Jason Friedman                    **Offer of Compromise Subject**
Friedman & Feiger, L.L.P.             **to Texas Rule of Evidence 408**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254

>       Re:   ***Carpenter v. Southwest Housing Development Company, Inc. et. al.***
>             **Cause No. CC-08-2072-E**
>             **Dallas County Court at Law No. 5**

Dear Mr. Friedman:

I represent and write on behalf of Jeff Carpenter to extend a *Stowers* demand in the above-referenced lawsuit.  Please forward this demand to your clients, the liability insurer that is providing your clients with a defense in this case, and to any claim administrator acting on behalf of that insurer.

This *Stowers* demand uses the following defined terms and phrases.

1. <u>policy</u>:  means the complete Private Choice Encore! Policy under which a liability insurer has provided, and is providing, a defense to your clients in this lawsuit;

2. <u>insureds</u>:  has the same meaning that Insureds has in the policy;

3. <u>insurer</u>:  means the liability insurer that is providing your clients with a defense in the lawsuit;

4. <u>lawsuit</u>:  refers to the above-captioned lawsuit;

5. <u>arbitration</u>:  refers to the arbitration proceeding that was consolidated into the lawsuit.

Appendix 001738

Mr. Jason Friedman
February 11, 2016
Page 2 of 3

Jeffrey W. Carpenter agrees to completely and fully release Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. d/b/a Southwest Housing Management Company, Inc., Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., Brian Potashnik, Cheryl Potashnik, and all other insureds of and from (1) any and all claims, counterclaims, liability theories, damages, and other relief (a) asserted in the lawsuit, (b) arising out of the same subject matter and that could have been asserted in the lawsuit, (c) asserted in the arbitration, or (d) arising out of the same subject matter and that could have been asserted in the arbitration, and (2) any potential third-party claims to all or part of the Settlement Payment, for the following consideration:

1.      Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. d/b/a Southwest Housing Management Company, Inc., Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., Brian Potashnik, and Cheryl Potashnik completely and fully release Jeffrey W. Carpenter of and from any and all claims, counterclaims, liability theories, damages, and other relief (a) asserted in the lawsuit, (b) arising out of the same subject matter and that could have been asserted in the lawsuit, (c) asserted in the arbitration, or (d) arising out of the same subject matter and that could have been asserted in the arbitration.

2.      Payment from or on behalf of the insurer in the following amount — remaining policy limits as of February 12, 2016 at 11:59 p.m. local time in Dallas, Texas *minus* $50,000.00 (the difference is the Settlement Payment) — and made payable jointly to Jeffrey W. Carpenter and the Gibson Wiley PLLC IOLTA Trust Account.

Jeffrey W. Carpenter will accomplish the above-described release of any potential third-party claims to all or part of the Settlement Payment as follows. Jeffrey W. Carpenter represents that no individual or entity has asserted or may assert any lien or other claim to the Settlement Proceeds, other than as follows:

(A)     Gibson Wiley PLLC has an assignment in the amount of any unpaid attorneys' fees and advanced expenses in this case, but that assignment will be extinguished with the Settlement Payment; and

Mr. Jason Friedman
February 11, 2016
Page 3 of 3

(B)   Gardere Wynne Sewell, LLP claims a contract right to have unpaid attorneys' fees and expenses deducted from the Settlement Payment, but Jeffrey W. Carpenter has directed his attorneys' to withhold from his share of the recovery and maintain in the Gibson Wiley PLLC IOLTA Trust Account — until agreement is reached with Gardere Wynne Sewell PLLC on the just amount owed — the total amount of unpaid attorneys' fees and expenses reflected on Gardere Wynne Sewell, LLP invoices sent to him for payment.

Jeffrey W. Carpenter represents that Clouse Dunn Khoshbin LLP has released any claim to attorneys' fees or expenses in this case and will provide the insurer with the communication reflecting same.  Jeffrey W. Carpenter represents that neither the lawsuit nor the arbitration has ever involved medical care or treatment and that he has never been enrolled in, or otherwise received payments from, Medicare or Medicaid.

This offer will be deemed revoked as to your clients at 6:00 p.m. local time in Dallas, Texas on February 18, 2016.  If your clients all agree to the release in consideration paragraph 1 and all consent to the total settlement, they need to provide written notice to the insurer.  This offer will then be deemed revoked as to the insurer at 6:00 p.m. local time in Dallas, Texas on March 18, 2016.

Separate letters should assist the insurer or claim administrator in evaluating this *Stowers* demand and will follow.  In the meantime, let me know if anyone needs any information from me in order to reasonably assess this *Stowers* demand.

Sincerely,

Amy E. Gibson



**Gibson Wiley PLLC**
ATTORNEYS & COUNSELORS AT LAW

February 17, 2016

**VIA EMAIL**

Mr. Jason Friedman                                    **Offer of Compromise Subject**
Friedman & Feiger, L.L.P.                          **to Texas Rule of Evidence 408**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254

> **Re:**   ***Carpenter v. Southwest Housing Development Company, Inc. et. al.***
> **Cause No. CC-08-2072-E**
> **Dallas County Court at Law No. 5**

Dear Mr. Friedman:

I represent and write on behalf of Jeff Carpenter to clarify the *Stowers* demand dated February 11, 2016.

The February 11, 2016 letter stated: "This offer will be deemed revoked as to your clients at 6:00 p.m. local time in Dallas, Texas on February 18, 2016. If your clients all agree to the release in consideration paragraph 1 and all consent to the total settlement, they need to provide written notice to the insurer. . . ."

I did not intend revocation if your clients provided written notice to the insurance carrier of their consent to the settlement proposal. The above-quoted portion of the February 11, 2016 letter is revised to state:

"This offer will be deemed revoked as to your clients at 6:00 p.m. local time in Dallas, Texas on February 18, 2016, unless your clients, before that date and time, inform the insurance carrier or the claim administrator acting on behalf of the insurance carrier in writing that they all consent to the settlement proposal."

Sincerely,

Amy E. Gibson

Appendix 001741

# Exhibit 11

# *Stowers* letter coverage analysis

**G W**

**Gibson Wiley PLLC**
ATTORNEYS & COUNSELORS AT LAW

March 11, 2016

**VIA EMAIL**

Mr. Steven Knight
Chamberlain, Hrdlicka, White, Williams & Aughtry
1200 Smith Street, 14th Floor
Houston, Texas 77002-4310
steven.knight@chamberlainlaw.com

**VIA EMAIL**

Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
jhfriedman@fflawoffice.com

> **Re:** ***Carpenter v. Southwest Housing Development Company, Inc. et. al.***
> **Cause No. CC-08-2072-E**
> **Dallas County Court at Law No. 5**

Dear Mr. Knight and Mr. Friedman:

This letter is a follow-up to a written *Stowers* demand.   This letter addresses the first *Stowers* element — the claim against the insured is within the scope of coverage.  It focuses on two such claims (1) repudiation and breach of an oral pay-to-stay employment agreement, and (2) a related alternative claim for quantum meruit.[1]  It does so because covered loss with respect to either of these covered claims independently exceeds remaining policy limits. [2]

---

[1]   *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, at highlighted portions.

[2]   This letter omits all internal quotation marks and citations in quoted language from judicial opinions, omits all citing references, and omits all quoting references.  All emphasis are supplied unless otherwise noted.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 2 of 32

This letter is divided into two parts: (1) analysis of coverage provisions and (2) analysis of exclusions. The division tracks the familiar burdens in insurance coverage litigation. The insured must establish initial coverage. The insurance carrier must establish application of any "language of exclusion" or "exception to coverage."[3]

| defined terms and phrases |
|---|

This letter uses the following defined terms and phrases.

| term or phrase | definition |
|---|---|
| policy | Private Choice Encore! Policy number 00 KB 0229269-07 that Twin City Fire Insurance Company issued to Southwest Housing Management |
| SH Development | Southwest Housing Development Company, Inc. |
| SH Management | Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. |
| AH Construction | Affordable Housing Construction, Inc. |

---

[3]    *See* TEX. INS. CODE § 554.002 ("In a suit to recover under an insurance or [HMO] contract, the insurer or [HMO] has the burden of proof as to any avoidance or affirmative defense that the Texas Rules of Civil Procedure require to be affirmatively pleaded. Language of exclusion in the contract or an exception to coverage claimed by the insurer or [HMO] constitutes an avoidance or an affirmative defense.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 3 of 32

<div style="border:1px solid black; text-align:center; font-weight:bold;">

employment practices liability coverage part
— initial coverage established

</div>

## 1.    EPL coverage part general structure

This letter considers the general coverage structure in light of contract interpretation principles that require courts to consider the policy as a whole. Most EPL insurance policies are highly variable in the coverage provided and the particular language used. As a result, coverage often turns on basic principles of contract interpretation and the language of the particular policy.[4]

The EPL coverage part at issue has a comparatively low aggregate limit — $1 million that erodes with attorneys' fees and expenses paid to defend. The policy has a comparatively high premium — more than $33,000 — for such low aggregate limits per coverage part on a claims-made policy. The EPL coverage part may partially explain this. It covers what many other insurance policies do not[5] — *e.g.,* punitive damages, intentional wrongdoing, breach of oral employment contracts, breach of implied employment contracts, and some breaches of written employment contracts.

A normal initial reaction is that insurance policies do not cover these types of claims. Most commercial general liability policies, auto policies, homeowner policies, errors and omissions policies, and directors and officers liability policies do not cover these types of claims. But insurance carriers developed and marketed EPL policies to

---

[4]    L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INS. LAW Ch. 28, at 28-1 (2015) ("Although a standardized policy exists, most insurers have used proprietary and distinct wording. Based on these two factors, the courts have developed relatively little case law to guide counsel on the meaning of particular EPL policy terms. Because the law is often specific to one insurer's wording, cases may or may not prove persuasive when applied to disputes involving another insurer's wording. Basic principals [*sic*] of contract interpretation will sometimes prove to be the greatest value to coverage counsel.").

[5]    *See, e.g., id.* at § 28.02[2][g], p. 28-22 ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 4 of 32

cover gaps in other types of insurance policies.[6]  Even then, many EPL policies do not cover these types of claims.  This EPL policy is different.  This EPL policy does cover these types of claims.

### 2.  The EPL coverage part insuring agreement

The EPL coverage part insuring agreement states:



> **I.  INSURING AGREEMENTS**
>
> **(A)  Employment Practices Liability**
>
> The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

The EPL insuring agreement is quite broad. It covers loss resulting from the employment practices claim itself — in this case, loss resulting from the lawsuit itself.  It covers far more than loss resulting from a particular type of occurrence.  It covers far more than loss resulting from a particular type of injury.

### Insureds

Defendants SH Management, SH Development, and AH Construction are all insureds under the policy, based on the attached coverage analysis.[7]  Defendants Brian Potashnik and Cheryl Potashnik are both insureds under the policy, based on the attached coverage analysis including supporting evidence.[8]

---

[6]     *See* JEFFREY W. STEMPLE, LAW OF INSURANCE CONTRACT DISPUTES § 21.06, at 21-47 to 21-48.

[7]     *See* Exhibit 3.

[8]     *See* Exhibit 4.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 5 of 32

### Employment practices claim

This case involves an employment practices claim, based on the attached coverage analysis including supporting evidence.[9]  The employment practices claim in this case is the lawsuit itself.[10]

### First made against the insureds during relevant period

This case involves an employment practices claim first made against the insureds during the policy period or extended reporting period, based on the attached coverage analysis including supporting evidence.[11]

*remainder of page intentionally left blank*

---

[9]  *See* Exhibit 5; *see also* additional exhibits cited in the coverage analysis.

[10]  *See id.*

[11]  *See* Exhibit 6.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 6 of 32

### Employment practices wrongful act

Twin City defines *employment practices wrongful act* as follows.

> (D) **"Employment Practices Wrongful Act"** means a **Wrongful Act** involving any:
>
> (1) wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;
>
> (2) sexual or other workplace harassment, including quid pro quo and hostile work environment;
>
> (3) employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;
>
> (4) invasion of privacy, employment-related defamation (including libel and slander) or any employment-related misrepresentation;
>
> (5) **Retaliation**;
>
> (6) breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or
>
> (7) violation of the Family and Medical Leave Act.
>
> To the extent that an **Employment Practices Claim** alleges an **Employment Practices Wrongful Act** described above, **"Employment Practices Wrongful Act"** also means a **Wrongful Act** related to the above involving any:
>
> (1) employment-related wrongful infliction of emotional distress or mental anguish;
>
> (2) failure to create, provide for or enforce adequate or consistent employment-related policies or procedures; or
>
> (3) negligent retention, supervision, hiring or training.

Twin City defines *wrongful act* as follows.

> (O) **"Wrongful Act"** means any actual or alleged:
>
> (1) error, misstatement, misleading statement, act, omission, neglect or breach of duty; or
>
> (2) matter claimed against an **Insured Person** solely by reason of their serving in such capacity.

These definitions are quite broad — consistent with the broad insuring agreement. Employment practices wrongful acts cover legal violations that range from negligence to intentional conduct to malicious conduct. Wrongful acts cover every type of breach of duty — *e.g.*, tort duties, contract duties, implied contract duties, statutory duties, regulatory duties, etc.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 7 of 32

Repudiation and breach of the oral pay-to-stay employment agreement is an *employment practices wrongful act*. It is covered as acts, omissions, and breach of duty involving breach of an oral employment contract.[12]

The related alternative quantum meruit claim is also an *employment practices wrongful act*. It is covered as acts, omissions, and breach of duty involving breach of an implied employment contract.[13] A treatise further explains why quantum meruit involves an implied contract:

> The requirement of mutual assent is fundamental to the creation of a true contract []. But quasi contracts are not dependent on the assent of the parties because they are implied in law. A quasi contract is an enforceable obligation that is created by law, without regard to any expression of assent by the parties []. Quasi contractual obligations are created by law for reasons of justice, honesty, and fair dealing without any expression of assent and sometimes even against a clear expression of dissent.[14]

**Covered loss**

Language of exclusion and exceptions to coverage remain what they are — language of exclusion and exceptions to coverage — no matter where they appear in the policy.[15] So, this letter splits the *loss* definition between covered loss and excluded loss.

---

[12]    *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, pp. 11-14 ¶¶ 33-38.

[13]    *See id.* at p. 14 ¶ 39; *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) ("Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received."); *Campbell v. Northwestern Nat'l Life Ins. Co.*, 573 S.W.2d 496, 498 (Tex. 1978) ("Nevertheless, the right to recover in quantum meruit does not grow out of the contract, but is independent of it. This right is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.").

[14]    *See* 2-21A DORSANEO, TEXAS LITIG. GUIDE § 21A.01 (2005).

[15]    *See* LD. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INS. LAW Ch. 28 § 28.01[7][a], at 28-29 (describing placement of exclusionary language in a definition or insuring agreement as "sleight-of-hand").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 8 of 32

Twin City defines the covered *loss* as follows.



> (I)   "**Loss**" means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.
>
> **Loss** shall include punitive and exemplary damages, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, or the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

The covered loss is quite broad — consistent with the broad insuring agreement. It covers *the amount* that the insureds are legally obligated to pay as a result of a *claim*.  It is "without limitation" — *i.e.*, it does not limit *the amount* to a particular type of relief, type of harm, type of payment, type of expense, or other type of amount.

Twin City defines *claim* as follows.



> (B)   "**Claim**" means any:
>
> (1)   **Employment Practices Claim**; or
>
> (2)   **Third Party Claim**.

This case does not involve a third party claim.  As demonstrated above, this case involves an employment practices claim.[16]  The employment practices claim in this case is the lawsuit itself.[17]

The lawsuit alleges repudiation and breach of an oral pay-to-stay employment agreement and an alternative claim for quantum meruit.  The law permits compensation in the form of back pay, costs of court, attorneys' fees, prejudgment interest, and postjudgment interest.[18]  All of these *amounts* fall within the definition of covered *loss.*

---

[16]   *See supra* at p. 5, employment practices claim section.

[17]   *See id.*

[18]   *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48 (relief requested); Tex. Pattern Jury Charges, Business, Consumer, Insurance, Employment 115.3 (2014) (question on contract damages); *id. at* 115.7 (question on quantum meruit damages); Tex. Civ. Prac. Rem. Code § 38.001 ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor; . . . or (8) an oral or written contract.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 9 of 32

## 3.    Initial coverage conclusion and invitation

The above establishes initial coverage as to each part of the EPL coverage part insuring agreement.  If you have any questions or need additional information, please let me know, and I will do what I reasonably can to answer the question and provide the information.  If you believe any additional issue needs to be addressed to establish initial coverage, please let me know, and I will address the issue.

<div style="border:1px solid black; background-color:#c6efce; text-align:center; font-weight:bold;">

**employment practices liability
— no applicable exclusions**

</div>

## 1.    EPL exclusions general structure

This letter considers the general coverage and exclusion structure in light of contract interpretation principles that require courts to consider the policy as a whole.  Again, the EPL coverage part at issue has a comparatively low aggregate limit — $1 million that erodes with attorneys' fees and expenses paid to defend.  The policy has a comparatively high premium — more than $33,000 — for such low aggregate limits per coverage part on a claims-made policy.  The EPL coverage part may partially explain this. It covers what many other insurance policies do not[19] — *e.g.,* punitive damages, intentional wrongdoing, breach of oral employment contracts, breach of implied employment contracts, and some breaches of written employment contracts.

Again, a normal initial reaction is that insurance policies do not cover these types of claims.  Most commercial general liability policies, auto policies, homeowner policies, errors and omissions policies, and directors and officers liability policies do not cover these types of claims.  But insurance carriers developed and marketed EPL policies to cover gaps in other types of insurance policies.[20]  Even then, many EPL policies do not

---

[19]    *See, e.g.,* L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INS. LAW Ch. 28, at § 28.02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

[20]    *See* JEFFREY W. STEMPLE, LAW OF INSURANCE CONTRACT DISPUTES § 21.06, at 21-47 to 21-48.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 10 of 32

cover these types of claims.  This EPL policy is different.  This EPL policy does cover these types of claims.

As to exclusions, "[t]he only broad generalization to make about cases considering EPL exclusions is that courts usually have relied upon state canons of construction to resolve disputes over the meaning of a particular exclusion."[21]  That generalization holds true for language of exclusion and exceptions to coverage in this EPL coverage part.

The policy's overall exclusion structure involves some overlap.  For example, the exclusion for non-monetary relief overlaps with the exclusion for future compensation for any person hired, promoted, or reinstated.  The overlap exists because hire, promotion, and reinstatement are all forms of excluded non-monetary relief.[22]  The coverage analysis therefore permits some overlap in the scope of exclusions.

## 2.    Excluded loss

Twin City excludes the following types of loss.

Loss shall not include:

(1)   Taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

(2)   non-monetary relief;

(3)   future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**;

(4)   **Stock Benefits**; or

(5)   salaries, wages, or bonuses except as a component of a front or back pay award.

---

[21]    L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INS. LAW Ch. 28 § 28.01[1][e], at 28-12 (2015).

[22]    *See, e.g., Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (noting that monetary relief may be ordered in lieu of reinstatement to employment position: "In cases in which reinstatement is not viable . . . courts have ordered front pay as a substitute for reinstatement.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 11 of 32

Again, the covered loss is quite broad — consistent with the broad insuring agreement.  Covered loss means *the amount* that the insureds are legally obligated to pay as a result of a *claim*.[23]  The claim in this case is the lawsuit itself.[24]   The covered loss is "without limitation" — *i.e.*, it does not limit *the amount* to a particular type of relief, type of harm, type of payment, type of expense, or other type of amount.[25]

The lawsuit alleges repudiation and breach of an oral pay-to-stay employment agreement and an alternative claim for quantum meruit.  The law permits compensation in the form of back pay, costs of court, attorneys' fees, prejudgment interest, and postjudgment interest.[26]  None of these *amounts* are excluded loss.

### Excluded loss 1: taxes, fines, penalties

> (1)   taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

The amount the insureds are legally obligated to pay as a result of the lawsuit does not include taxes, fines or penalties imposed by law, or matters of the same kind or class that may deemed uninsurable under Texas law.[27]   Courts must limit the phrase "matters that may be deemed uninsurable under Texas law" to items of the same kind or class as the specific terms that the phrase follows — *i.e.*, taxes and fines or penalties imposed by law.

---

[23]     *See supra* at p. 8.

[24]     *See supra* at p. 5, employment practices claim section.

[25]     *See supra* at p. 8.

[26]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48 (relief requested); TEXAS PATTERN JURY CHARGES, BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT 115.3 (2014) (question on contract damages); *id.* at 115.7 (question on quantum meruit damages); TEX. CIV. PRAC. REM. CODE § 38.001 ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor; . . . or (8) an oral or written contract.").

[27]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48 (relief requested).

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 12 of 32

The Texas Supreme Court explained:

Where specific and particular enumerations of persons or things ... are followed by general words, the general words are not to be construed in their widest meaning or extent but are to be treated as limited and applying only to persons or things of the same kind or class as those expressly mentioned.[28]

The above interpretation of this exclusion is reasonable and consistent with contract rules of construction.  If Twin City comes up with a conflicting but reasonable interpretation, then a court must find for the insureds, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."[29]

If Twin City claims more broadly that any of the covered loss or covered claims is void against public policy, it must overcome the Texas Constitution's protection of the freedom to contract[30] and the "compelling public policy to enforce legal agreements."[31] Moreover, such a claim would disavow coverage for the express coverage sold to policyholders.  Such a claim would open the door individual, collective, and class actions for violations of states' consumer protection laws, states' insurance laws, and common law claims for misrepresentation.

---

[28]     *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987).

[29]     *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").

[30]     TEX. CONST. art. 1 § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.").

[31]     *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 140 (Tex. 2004) ("What the dissent ignores is that there is a compelling public policy reason to enforce legal agreements freely made."); *see also El Paso Field Servs., L.P. v. Mastec N. Am., Inc.*, 389 S.W.3d 802, 811-12 (Tex. 2012) ("We have long recognized Texas' strong public policy in favor of preserving the freedom of contract.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 13 of 32

### Excluded loss 2: non-monetary relief

> (2) non-monetary relief.

The lawsuit does not seek non-monetary relief.[32]

### Excluded loss 3: future compensation for hire, promotion, reinstatement

> (3) future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**;

The lawsuit does not seek hire, promotion, or reinstatement.[33]

### Excluded loss 4: defined stock benefits

> (4) **Stock Benefits**; or

Twin City defines stock benefits as "any offering, plan or agreement" between an insured entity and any employee that "grants stock, stock options or stock appreciation rights" in the insured entity to the employee, "including, without limitation, restricted stock or any other stock grant" with the exception of "employee stock ownership plans or employee stock purchase plans."[34]  The amount the insureds are legally obligated to pay as a result of the lawsuit does not include stock benefits of any kind.[35]

---

[32]     *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[33]     *See generally id.*

[34]     *See* EPL Coverage Part II(K).

[35]     *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 14 of 32

**Excluded loss 5: salaries, wages, or bonuses that are not back pay**

> (5)   salaries, wages, or bonuses: except as a component of a front or back pay award.

The amount the insureds are legally obligated to pay as a result of the lawsuit does *not* include front pay.[36]   The amount the insureds are legally obligated to pay as a result of the lawsuit *does*, however, include back pay.[37]   The amount the insureds are legally obligated to pay as a result of the lawsuit does *not* include salaries, wages, or bonuses *other than* as a component of back pay.[38]

### *Undefined back pay and ordinary meaning*

Twin City does not define *back pay* in the policy.  As a result, courts must look to the ordinary meaning of *back pay*.[39]   A variety of definitions listed below and attached[40] show that back pay is simply (1) owed but unpaid compensation for past performance or (2) owed but unpaid compensation for performance that would have occurred in the past but for some obstacle.[41]   The sales proceeds payment is owed but unpaid compensation for past performance — back pay.

---

[36]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48.

[37]     *See id.*

[38]     *See id.*

[39]     *See RSUI Indem. Co. v. Lynd Co*., 466 S.W.3d 113, 118 (Tex. 2015) ("Unless the policy dictates otherwise, we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."); *see also Edinburg Consol. Indep. Sch. Dist. v. INA*, 806 S.W.2d 910, 913 (Tex. App.—Corpus Christi 1991, no writ) (looking to dictionary for meaning of undefined term in insurance policy).

[40]     *See* Exhibit 7.

[41]     Some types of stock benefits are excluded losses.  They are therefore excluded from the ordinary meaning of back pay.  But the amount the insureds are legally obligated to pay as a result of the lawsuit in this case does *not* include any form of stock benefits.  *See supra* at p. 13.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 15 of 32

| source | definition |
|---|---|
| about.com<br>job search and employment glossary | Back pay is the difference between what an employee was paid and the amount he or she should have been paid.<br><br>Withheld wages may have been from actual hours worked, pay increases or promotions, or for work that could have otherwise been completed if there had not been some obstacle. |
| Cambridge English Business Dictionary | income that should have been paid or was expected at an earlier time:<br>*Those workers are due a total of approximately $500,000 in back pay, according to union officials.* |
| Collins English Dictionary | 1. (Industrial Relations & HR Terms) pay received by an employee from an increase awarded retrospectively<br><br>*note: there was no second definition* |
| Dictionary.com | noun<br>1. pay received by an employee from an increase awarded retrospectively<br><br>Collins English Dictionary - Complete & Unabridged 2012 Digital Edition<br>© William Collins Sons & Co. Ltd. 1979, 1986 © HarperCollins<br>Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012<br><br>Examples from the Web for back pay |

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 16 of 32

| | Contemporary Examples |
|---|---|
| | Those employees may or may not get *back pay* when the shutdown ends. How the Government Shutdown Hurts National Security Josh Rogin September 29, 2013 |
| | Historical Examples |
| | On May 18, 1872, Congress passed a law for the restitution of *back pay*. A History of Trade Unionism in the United States Selig Perlman |
| | With the *back pay* during his absence, the sum amounted to about $15,000. Booker T. Washington Emmett J. Scott and Lyman Beecher Stowe . . . |
| | Give the boys thirty-day orders on the Company for the *back pay*. The Gilded Age, Complete Mark Twain and Charles Dudley Warner |
| | Meanwhile, I must begin to-morrow to cry like a poor devil about the *back pay*. Wood Rangers Mayne Reid |
| | Then I got the *back pay*, of course, but I ought to have had it before. Captain Jinks, Hero Ernest Crosby |

Appendix 001758

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 17 of 32

| | Look at a single class of these collections,—the *back pay* of sick men. The Atlantic Monthly, Volume 15, No. 88, February, 1865  Various |
| --- | --- |
| | But the possible loss of his *back pay* would be a catastrophe.  Billy and the Big Stick Richard Harding Davis |
| | Washington now showed his sagacity in quelling the fears of the soldiers regarding their *back pay*.  Comic History of the United States  Bill Nye |
| | Contemporary definitions for back pay |
| | noun a payment due for previously done work; also, salary overdue from a past pay period. Also written backpay; also called back payment, back salary, back wages |
| | Word Origin 1804-09 |
| | Dictionary.com's 21st Century Lexicon Copyright © 2003-2014 Dictionary.com, LLC |
| Encyclopedia.com Oxford Pocket Dictionary of Current English | • n. payment for work done in the past that was withheld at the time, usually because of a dispute: Hickman should be provided backpay plus any expenses. |
| Macmillan Dictionary | money that is owed to someone who works for a company but that has not been paid yet |

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 18 of 32

| Oxford University Press | noun<br>Payment for work done in the past that was withheld at the time, or for work that could have been done had the worker not been prevented from doing so:<br>*Hickman should be provided back pay plus any expenses* |
| --- | --- |
| Wiktionary | 1. A withheld payment for work which has already been completed, or which could have been completed had the employee not been prevented from doing so. |
| Investor Words | [*definition of back payment*]<br><br>1. a payment which is due but has not yet been paid<br>2. the act of paying money which is owed |

The ordinary meaning of back pay is also consistent with the meaning of back pay in employment anti-discrimination and anti-retaliation statutes. The "essential nature" of the statutory *back pay* remedy is "identical to a common law suit for back wages for breach of contract."[42]

The back pay in this case is fully earned — Jeff fulfilled his end of the bargain. But the ordinary meaning of back pay may involve (1) earned compensation or (2) unearned compensation that would have been earned absent the unlawful conduct. When an employer has paid females less than males for the same work, the back pay is earned — the work has been done. When an employer fires a female precisely because she is a

---

[42]   *See Kolb v. Goldring, Inc.*, 694 F.2d 869, 871-72 (1st Cir. 1982) (Age Discrimination in Employment Act) (". . . [I]n its 'essential nature' an ADEA action is identical to a common law suit for back wages for breach of contract. . . . Thus cases like this one call for a simple tabulation of 'items of pecuniary or economic loss such as wages, fringe, and other job-related benefits.'"). The *Kolb* court was addressing the portion of the statute that permits back pay and explaining that such portion did not permit compensation in the form of mental anguish and similar harms.

female, the back pay is unearned but would have been earned absent the unlawful conduct. The policy does not distinguish between earned and unearned back pay. It covers both and excludes neither.

### *Salaries, wages, or bonuses still has meaning*

The above interpretation is consistent with the policy as a whole. And it still gives meaning to the *salaries, wages, or bonuses* portion of the exclusion for *salaries, wages, or bonuses except as a component of a front pay or back pay award.* To understand this, one needs to step away from this particular case and look at the policy as a whole as applied to a variety of situations. The below examples assume that basic requirements for coverage have been met, such as notice and consent to settle.

### *(1) consent decree training, monitoring, reporting*

The policy defines *employment practices claim* to include formal administrative and regulatory proceedings.[43] Jill files a charge of discrimination for race discrimination [pay disparity because of race] with the Equal Employment Opportunity Commission. The EEOC finds cause to believe a pattern or practice of discrimination has occurred. The case settles for (1) $8.4 million in back pay for all affected employees and (2) a consent decree mandating significant nationwide training, monitoring, and reporting intended to stop the discrimination. The employer must hire numerous trainers and additional personnel to meet its consent decree obligations to train, monitor, and report. ✔The policy covers the back pay subject to relevant limits. The policy excludes salaries, wages, and bonuses for new hires needed to meet consent decree obligations, because those salaries, wages, and bonuses are not a component of back pay or front pay.

### *(2) mitigation efforts*

A wrongfully terminated employee usually has a duty to mitigate damages. He usually must use reasonable diligence to find substantially equivalent work.[44] Jack is a company executive and is wrongfully terminated. He has trouble finding substantially

---

[43]     *See* EPL Coverage Part II(C)(3).

[44]     *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 394 (5th Cir. 2003) (discussing duty to mitigate damages under Age Discrimination in Employment Act).

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 20 of 32

equivalent work and accepts a much lower paying job.  He is now too busy to continue to search for substantially equivalent work.  So, he hires Mitt at an annual salary of $125,000 to work full-time to help him find substantially equivalent work.  A wrongful termination lawsuit is filed.  A jury awards (1) $500,000 in back pay for what Jack would have earned in the past if the employer had not unlawfully terminated him and (2) $125,000 for the salary paid to Mitt to help mitigate damages.  ✔The policy covers the back pay subject to relevant limits.  The policy excludes the salary paid to Mitt to help mitigate damages, because that salary is not a component of back pay or front pay.


### (3) hiring temporary workers in order to meet legal obligation

The policy defines *employment practices claim* to include a demand letter.[45]  Julia is an Apache helicopter pilot in the National Guard of the United States.  She receives orders for 60 days of active duty to assist in search and rescue efforts after a disaster.  Her private-sector employer says it cannot do without her and has to let her go.  It receives a demand letter that explains the Uniformed Services Employment and Reemployment Rights Act.[46]  The case settles.  Among other settlement terms, the employer agrees to restore Julia to her position upon return from active duty.  But the employer must hire a temporary worker to temporarily fill her position in order to have her position available upon return.  ✔The policy excludes wages that will be paid to the temporary worker, because those wages are not a component of back pay or front pay.


### (4) disability accommodations

Josh is on active military duty and suffers total hearing loss due to an explosion.  He starts work years later with a company that provides interpreters to diplomats and military forces.  He requests a sign language interpreter for meetings.  The employer says it cannot afford to take an interpreter out of service at lost revenue of about $700 per hour.  It says he should find an outside interpreter and offers a small stipend to help offset costs.  He files a charge of discrimination with the EEOC for failure to provide a reasonable accommodation to an otherwise qualified individual with a disability.[47]  The

---

[45]     *See* EPL Coverage Part II(C)(1).

[46]     *See Petty v. Nashville County*, 687 F.3d 710, 716-19 (6th Cir. 2012) (addressing basic reemployment rights under USERRA).

[47]     *See EEOC v. Creative Networks, LLC*, 912 F. Supp. 2d 828 (D. Ariz. 2012) (interpreter as accommodation case).

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 21 of 32

case settles.  Among other settlement terms, the employer hires an outside sign language interpreter at an annual salary of $50,000 to provide services for Josh and other employees with severe hearing impairments. ✔The policy excludes the interpreter salary, because it is not a component of back pay or front pay.[48]

### (5) miscellaneous other wage claims as damages that are not back pay or front pay

Jane is an executive assistant for a construction company.  She openly opposes the president's sexual harassment of young women who work at the company.  The president reacts with a campaign of retaliation against her, including vandalism of her home and thinly-veiled physical threats.[49]  So she hires Bob as a full-time, live-in bodyguard at an annual salary of $35,000.  The company ignores her requests that the retaliation stop.  Her working conditions become so intolerable that she feels compelled to resign.  A retaliation lawsuit is filed.  A jury finds constructive discharge and awards (1) $237,000 in back pay for what Jane would have earned in the past if the employer had not constructively discharged her and (2) $35,000 for the salary paid to Bob the bodyguard. ✔The policy covers the back pay subject to relevant limits.  The policy excludes the salary paid to Bob the bodyguard, because it is not a component of a back pay or front pay award.

The above are just a few examples and are more than sufficient to demonstrate that the exclusion for *salaries, wages, or bonuses* [except as a component of a front pay or back pay award] still has meaning.  Although some of the examples overlap somewhat with the exclusion for non-monetary relief, the policy's overall exclusion structure involves precisely that type of overlap as explained above.

---

[48]    The policy excludes costs associated with accommodations.  But it separately refers to *costs* and *salaries, wages, and bonuses*, indicating that each has a different meaning.  Costs may be costs other than salaries, wages, and bonuses — such as the cost of installing a wheelchair ramp.  Or the policy may have some overlap here as it does with some of the other exclusions.

[49]    *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) ("We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 22 of 32

*Conclusion*

The above interpretation of this exclusion is reasonable and consistent with contract rules of construction. If Twin City comes up with a conflicting but reasonable interpretation, then a court must find for the insureds, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."[50]

**3.    Exclusions from indemnity and defense coverage**

Twin City wholly excludes the following types of claims.



III.  EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

(A)  The Insurer shall not pay **Loss** for any **Claim**

(1)  for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

(2)  based upon, arising from, or in any way related to any:

(a)  prior or pending demand, suit or proceeding against any **Insureds** as of; or

(b)  audit initiated by the Office of Federal Contract Compliance Programs before,

the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit, proceeding, or audit;

(3)  based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

(4)  based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

(5)  for breach of any **Independent Contractor Agreement**; or

(6)  for violation of the National Labor Relations Act or any similar law;

None of these exclusions apply. The claim in this case is the lawsuit itself.[51]

---

[50]    *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").

[51]    *See supra* at p. 5, employment practices claim section & p. 8.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 23 of 32

### Exclusion 1: bodily injury, sickness, property damage

> (1)   for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

The lawsuit is *not for* bodily injury, sickness, disease, death, or damage or destruction of any tangible property.[52]

### Exclusion 2a: prior or pending

> (2)   based upon, arising from, or in any way related to any:
>
> (a)   prior or pending demand, suit or proceeding against any **Insureds** as of; or
>
> (b)   audit initiated by the Office of Federal Contract Compliance Programs before,
>
> the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit, proceeding, or audit;

The applicable *prior or pending date* in the declarations is March 4, 2006.  The lawsuit is not in any way related to any prior or pending demand, suit, or proceeding against any insured as of March 4, 2006.  SH Management, SH Development, and AH Construction first repudiated the oral pay-to-stay employment agreement in late 2007 — well into the policy period.[53]

### Exclusion 2b: audit

The lawsuit is not in any way related to any audit of the Office of Federal Contract Compliance Programs at any time.[54]

---

[52]   *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[53]   *See id*. at p. 13 ¶ 37.

[54]   *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 24 of 32

### Exclusion 3: other insurer notice before policy inception

> **(3)** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy.

The policy *inception date* in the declarations is March 4, 2007.  The lawsuit is not in any way related to any fact, circumstance, or situation that — before March 4, 2007 — was the subject of notice given under any other insurance policy.  It could not have been.  SH Management, SH Development, and AH Construction first repudiated the oral pay-to-stay employment agreement in late 2007 — well into the policy period.[55]

### Exclusion 4: contractual assumption of liability for another's conduct

> **(4)** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

The lawsuit is not in any way related to *the liability of others* assumed under any contract or agreement.[56]  The insured entity defendants' own conduct and *own liability* are at issue with repudiation and breach of the oral pay-to-stay employment agreement and alternative claim for quantum meruit.[57]

---

[55]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 13 ¶ 37.

[56]     *See generally* Comment, *Effect of Clause in Liability Policy Excluding Coverage for Contractual Indemnity Liability*, 25 Fordham L. Rev. 714 (1956) (explaining this type of exclusion).

[57]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, pp. 4-6 ¶¶ 11-13, 16-18 & pp. 11-14 ¶¶ 33-39.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 25 of 32

### Exclusions 5: independent contractor agreements

> (5)   for breach of any Independent Contractor Agreement; or

Twin City defines "independent contractor agreement" as "any express contract or agreement between an Independent Contractor and an Insured Entity specifying the terms of the Insured Entity's engagement of such Independent Contractor."[58]   This lawsuit is *not for* breach of any independent contractor agreement.[59]

### Exclusion 6: National Labor Relations Act

> (6)   for violation of the National Labor Relations Act or any similar law.

This lawsuit is *not for* violation of the National Labor Relations Act or any similar law.[60]   In fact, Jeff could not possibly have pursued an NLRA claim in light of his employment duties with SH Management, SH Development, and AH Construction.[61]

*remainder of page intentionally left blank*

---

[58]      *See* EPL Coverage Part II(F).

[59]      *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[60]      *See generally id.*

[61]      *See National Labor Relations Bd. v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 708 (2001) ("Under the National Labor Relations Act, employees are deemed to be 'supervisors' and thereby excluded from the protections of the Act if, *inter alia,* they exercise 'independent judgment' in 'responsibly . . . direct[ing]' other employees 'in the interest of the employer.'").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 26 of 32

## 4.    Exclusions from indemnity and defense coverage with exception of retaliation

Twin City wholly excludes the following types of claims with the exception of retaliation claims.

> (B)  Other than an **Employment Practices Claim** for **Retaliation**, the Insurer shall not pay **Loss** for any **Claim**:
>
> (1)  based upon, arising from, or in any way related to any:
>
> (a)  discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or
>
> (b)  direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;
>
> (2)  based upon, arising from, or in any way related to any workers' compensation, unemployment compensation, disability benefits, or social security law, or any similar law;
>
> (3)  for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or
>
> (4)  for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:
>
> (a)  overtime wages; or
>
> (b)  minimum wages.

None of these exclusions apply.  The claim in this case is the lawsuit itself.[62]

**Exclusion 1: pollutants**

This lawsuit is not in any way related to pollutants.[63]

**Exclusion 2: workers' compensation, unemployment, disability benefits**

This lawsuit is not in any way related to workers' compensation, unemployment compensation, disability benefits, social security, or any similar laws.[64]

---

[62]    *See supra* at p. 5, employment practices claim section & p. 8.

[63]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[64]    *See generally id.*

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 27 of 32

Workers' compensation laws generally protect individuals who work for a subscriber employer and suffer physical injury or sickness in the course and scope of employment.[65]   These laws provide certain medical, income, death, and burial benefits based on the compensable injury or sickness.[66]   Unemployment compensation laws generally provide benefits to qualified individuals who are able to work but are partially or totally unemployed for defined acceptable reasons.[67]

Disability benefits laws generally govern disability insurance policies and state disability benefits statutes.[68]   Disability insurance policies typically provide partial income replacement benefits during periods of partial or total disability (1) from the insured's own occupation or (2) from any occupation that is consistent with the insured's training, experience, and education — due to physical injury or illness.[69]   Social security laws govern various forms of social security benefits including disability benefits for disability from any gainful activity in the national economy.[70]

The common thread in these laws is some form of income replacement benefits during periods when an individual is unable to work.   This common thread defines "similar laws."

---

[65]     *See* TEX. LAB. CODE §§ 401.001 *et. seq.* (Texas Workers' Compensation Act).

[66]     *See id.* at § 401.011.

[67]     *See* TEX. LAB. CODE §§ 201.001 *et. seq.* (Texas Unemployment Compensation Act).

[68]     *See, e.g. Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663 (Tex. 1987) (interpreting long-term disability insurance policy).

[69]     *See, e.g., Holland v. International Paper Co. Retirement Plan*,  576 F.3d 240, 244 (5th Cir. 2009) (quoting any occupation language); *Burtch v. Hartford Life & Accident Ins. Co.*, No. 08-30513 (5th Cir. March 19, 2009) (per curiam) (addressing own occupation standard).

[70]     *See, e.g., Phillips v. Barnhart*, 357 F.3d 1232, 1237-1240 (11th Cir. 2004) (discussing burdens in social security disability case).

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 28 of 32

### Exclusion 3: ERISA, WARN Act, OSHA, COBRA

> **(3)** for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

This lawsuit is *not for* violation of the Employee Retirement Income Security Act, the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act, or any similar law.[71] This exclusion only looks to whether the lawsuit is *for* a violation of one of these statutes or a similar law [other than retaliation].  The lawsuit is not.[72]

ERISA governs certain (1) employer-sponsored employee welfare benefit plans and (2) employer-sponsored employee pension benefit plans [in addition to Section 510 termination claims that the policy covers].[73]  Welfare benefit plans do not include payroll practices such as compensation for employee performance.[74]  Pension benefit plans do not include bonus programs for employee performance, unless bonuses are systematically deferred (1) to termination or beyond or (2) so as to provide retirement benefits.[75]  A covered *plan* also requires an ongoing administrative program — *i.e.,* plans do not include (1) a stand-alone employee benefit or (2) payments due upon the happening of an event, even if payments must be calculated and paid to numerous employees.[76]

---

[71]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[72]    *See generally id.*

[73]    *See* Exhibit 8, Department of Labor Publication Excerpts; 29 U.S.C. §§ 1002 *et. seq.*

[74]    *See* 29 C.F.R. § 2510.3-1(b)(1) (payroll practice compensation for employee performance not welfare benefit plan).

[75]    *See* 29 C.F.R. § 2510.3-2(c) (bonus programs not pension benefit plans).

[76]    *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 4-5, 6-8, 12 (1987) (state statute that required severance payments in event of plant closure at plant employing at least 100 employees did not constitute a welfare benefit *plan* because it did not require an ongoing administrative scheme); *Peace v. American Gen. Life Ins. Co.*, 462 F.3d 437, 440 (5th Cir. 2006) ("An employee benefit encapsulated in an ERISA plan differs from a stand-alone employee benefit.")

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 29 of 32

The WARN Act requires covered employers to provide 60 days' advance notice of a plant closing or mass layoff.[77]   OSHA requires covered employers to (1) provide a workplace free of known hazards likely to cause death or serious physical injury and (2) comply with safety regulations.[78]   And COBRA requires covered employers to offer continuation of group health coverage upon certain qualifying events.[79]

Similar laws generally mean state laws that parallel the federal counterpart or fill gaps in the federal counterpart.  For example, Texas has a health insurance continuation of coverage law that fills a gap in COBRA coverage — the Small Employer Health Insurance Availability Act.

### Exclusion 4: Fair Labor Standards Act



(4)   for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:

   (a)   overtime wages; or

   (b)   minimum wages

This lawsuit is *not for* violation of the Fair Labor Standards Act or any similar law.[80]   This exclusion only looks to whether the lawsuit is *for* a violation of the Fair Labor Standards Act or similar law [other than the Equal Pay Act or anti-retaliation protections].  The lawsuit is not.[81]

---

[77]   *See* Exhibit 8, Department of Labor Publication Excerpts; 29 U.S.C. §§ 2101 *et. seq.*

[78]   *See* Exhibit 8; 29 U.S.C. § 654.

[79]   *See* Exhibit 8; 29 U.S.C. §§ 1161 *et. seq.*

[80]   *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[81]   *See generally id.*

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 30 of 32

The FLSA governs payment of overtime wages, payment of minimum wage, restrictions on child labor, and provision of breaks for nursing mothers [in addition to anti-retaliation laws that the policy covers].[82]  It does not govern promised compensation unless the issue involves a minimum wage or overtime violation.[83]

## 5.  Exclusions from indemnity coverage

Twin City provides a defense but excludes indemnity coverage for the following types of claims.



None of these exclusions apply.  The claim in this case is the lawsuit itself.[84]

### Exclusion 1: employment termination severance payments

This lawsuit is *not for* employment termination severance payments.[85] The oral pay-to-stay employment agreement was not an oral pay-to-go agreement. The sale proceeds payment was compensation to stay.  It was not compensation to *leave*.  It was not compensation to *sever employment*.

---

[82]     *See* Exhibit 8, Department of Labor Publication Excerpts; 29 U.S.C. §§ 201 *et. seq.*

[83]     *See* Exhibit 8.

[84]     *See supra* at p. 5, employment practices claim section & p. 8.

[85]     *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 31 of 32

It was not compensation on account of a termination from employment.  It was not due upon employment termination.  Moreover, the sales proceeds payment was earned compensation. In contrast, a severance payment on account of termination is *not* earned compensation.

### Exclusion 2: costs associated with accommodations

> (2)  for costs associated with providing any accommodations required by the Americans With Disabilities Act or any similar law.

This lawsuit is *not for* costs associated with providing any accommodations required by the Americans with Disabilities Act or any similar law.[86]

### Exclusion 3: defined benefits

> (3)  for **Benefits**, provided that this exclusion shall not apply to any **Employment Practices Claim** for wrongful termination, dismissal or discharge of employment; or

The policy defines benefits as "any form of compensation *other than* salaries, wages, bonuses, or Stock Benefits."[87]  This lawsuit is *not for* benefits as defined in the policy.[88]

### Exclusion 4: liability incurred for breach of written contract

> (4)  based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.

This lawsuit — with respect to the *oral* pay-to-stay employment agreement and alternative claim for quantum meruit — is not in any way related to *liability incurred for breach* of any written employment contract.

---

[86]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[87]    *See* EPL Coverage Part II(A).

[88]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 32 of 32

SH Development and AH Construction had no written employment agreement with Jeff at all.  That should end the coverage analysis.  Second, the written contract between SH Management and Jeff does not address the asset sale, any potential future sale of assets, or the pay-to-stay agreement.  So, no words in that written contract could result in *liability incurred for breach* of that written contract with respect to the oral pay-to-stay employment agreement.

The exclusion does *not* exclude a lawsuit that is in any way *related to* a written employment contract. It only excludes *liability incurred for breach* of a written employment agreement.[89]  The above interpretation of this exclusion is reasonable and consistent with contract rules of construction.  If Twin City comes up with a conflicting but reasonable interpretation, then a court must find for the insureds, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."[90]

If you need any additional information, please let me know, and I will do what I reasonably can to provide the information.  If you believe any additional coverage issue needs to be addressed, please let me know, I will try to address it.

Sincerely,

*Amy Gibson*

Amy E. Gibson

---

[89]     *See National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("An intent to exclude coverage must be expressed in clear and unambiguous language. National Union knew that the plane had dual controls. If National Union wanted to exclude simultaneous piloting from the scope of coverage, then it was incumbent upon it to expressly and clearly state the exclusion in the policy. Having failed to do so, National Union cannot now complain.").

[90]     *See id.* ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").

# Exhibits

# Operative petition

# Jeffrey W. Carpenter's Second Amended Petition

FILED
10/5/2015 11:53:41 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | IN THE COUNTY COURT |
| | § | |
| SOUTHWEST HOUSING | § | AT LAW NO. 5 |
| DEVELOPMENT COMPANY, INC.; | § | |
| SOUTHWEST HOUSING | § | DALLAS COUNTY, TEXAS |
| MANAGEMENT CORPORATION, | § | |
| INC. a/k/a and d/b/a SOUTHWEST | § | |
| HOUSING MANAGEMENT | § | |
| COMPANY, INC.; AFFORDABLE | § | |
| HOUSING CONSTRUCTION, INC.; | § | |
| BRIAN POTASHNIK; and | § | |
| CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| SOUTHWEST HOUSING | § | |
| MANAGEMENT CORPORATION, | § | |
| INC., | § | |
| | § | |
| Counter-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JEFFREY W. CARPENTER, | § | |
| | § | |
| Counter-Defendant. | § | |

**JEFFREY W. CARPENTER'S SECOND AMENDED PETITION**

Jeffrey W. Carpenter — through undersigned counsel — files his Second Amended Petition and respectfully states as follows.

## DISCOVERY PLAN

1.      Jeffrey W. Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## INTRODUCTION

2.      This is an unlawful employment practices case involving refusal to pay earned compensation.

## PARTIES

3.      Jeffrey W. Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.

4.      Southwest Housing Development Company, Inc. ("SH Development") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Development has filed an answer in this civil action.

5.      Southwest Housing Management *Corporation*, Inc. ("SH Management") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Management was also known as — and was doing business as and using as an assumed or common name — Southwest Housing Management *Company*, Inc. ("SH Management Company").  Examples include, but are not limited to, the following.  SH Management sometimes used the name SH

Management Company in its Texas Franchise Tax Public Information Reports that it filed with the Texas Secretary of State.  SH Management used the name SH Management Company on an agreement that it is at issue in this civil action.  SH Management was originally named in this civil action in its assumed or common name, as permitted under Texas Rule of Civil Procedure 28.  SH Management filed an answer in its true name in response to those allegations.  Texas permits substitution of the true name through an amended petition.

6.      Affordable Housing Construction, Inc. ("AH Construction") is a Nevada corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  AH Construction has filed an answer in this civil action.

7.      Brian Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Brian Potashnik has filed an answer in this civil action.

8.      Cheryl Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Cheryl Potashnik has filed an answer in this civil action.

## JURISDICTION

9.      This Court has subject matter jurisdiction over this civil action because Jeffrey W. Carpenter seeks damages within its jurisdictional limits and because the claims asserted herein are not subject to exclusive jurisdiction in another court.  This Court has personal jurisdiction over all parties in this civil action because (1) all parties have entered a general appearance before it, (2) all parties have maintained continuous and systematic ties to Texas that make them

Appendix 001779

at home in Texas, and (3) the claims asserted herein arose from all parties' purposeful activities in Texas and the exercise of jurisdiction is reasonable.

## VENUE

10.     Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(2) because the individual defendants' residence was in Dallas County, Texas at the time the causes of action asserted herein accrued.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(3) because the corporate defendants each maintained their principal office in Dallas County, Texas at the time the causes of action asserted herein accrued.

## VICE-PRINCIPAL STATUS

11.     A "vice principal" is someone who fits within at least one of the following categories: (1) corporate officers, or (2) others who represent the corporation in its corporate capacity, or (3) those who have authority to employ, direct, or discharge employees of the corporation, or (4) those engaged in the performance of non-delegable or absolute duties of the corporation, or (5) those to whom the corporation has entrusted the management of the whole or a department or division of the business.  The acts and omissions of a "vice principal" are the acts and omissions of the corporation itself.  A corporation may have more than one vice principal.

Appendix 001780

12.     Brian Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  Examples include, but are not limited to, the following.  Mr. Potashnik was the only person serving on the Board of Directors for SH Development, SH Management, and AH Construction [according to Texas Secretary of State records] when he engaged in his acts and omissions at issue in this civil action.  Mr. Potashnik was also a corporate officer of SH Development, SH Management, and AH Construction when he engaged in his acts and omissions at issue in this civil action.

13.     Brian Potashnik acted as a vice principal for SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed his intent to pay more than the minimum Annual Bonuses and promised to get same done.  Mr. Potashnik acted as a vice principal for SH Development, SH Management, and AH Construction when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

14.     Cheryl Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  For example, the website for SH Development, SH Management, and AH Construction listed Ms. Potashnik as a corporate officer at the times she engaged in her acts and omissions at issue in this civil action.

15.     Cheryl Potashnik acted as a vice principal for SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed her intent to pay more than the minimum Annual Bonuses and promised to get same done.  Ms. Potashnik acted as a vice principal for SH

Development, SH Management, and AH Construction when she confirmed that the Sale Proceeds Payment was earned and was due.

## ACTUAL OR APPARENT AUTHORITY

16.    A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.  Actual authority arises from a party's agreement that another act on behalf and for the benefit of the party.  This authority includes whatever else is proper, usual, and necessary to do what was expressly authorized.  More than one person may have actual authority to do something.

17.    Apparent authority exists if a party (1) knowingly permits another to hold himself or herself out as having authority or (2) through lack of ordinary care, gives another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his or her detriment.  Apparent authority may exist without actual authority.  More than one person may have apparent authority to do something.

18.    Brian Potashnik had actual or apparent authority to act on behalf of SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed his intent to pay more than the minimum Annual Bonuses and promised to get same done.  Mr. Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Cheryl Potashnik, and himself when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

19.    Cheryl Potashnik had actual or apparent authority to act on behalf of SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed her intent to pay more than the minimum Annual Bonuses and promised to get same done.  Ms. Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Brian Potashnik, and herself when she confirmed that the Sale Proceeds Payment was earned and was due.

### FIRST CLAIM FOR RELIEF:
### FAILURE TO COMPLY WITH & REPUDIATION OF AGREEMENT — <u>ANNUAL BONUSES</u>

20.    An employer must comply with its agreements to pay bonuses to its employees. When interpreting an agreement, the facts and circumstances surrounding execution of the agreement may be considered in most cases.  When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases.  A written agreement may be orally modified, even if the written agreement states otherwise, as long as the underlying agreement is not within the statute of frauds.

21.    An agreement may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing.  The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.  When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its obligation by failing to set the amount.

22.      **Failure to comply and repudiation:** The following is not intended to be exhaustive or to state all facts.  To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth.  Brian Potashnik helped recruit Jeffrey W. Carpenter ("Jeff") to join SH Management.  Brian Potashnik worked out (1) a base salary amount and (2) bonus range amounts with a minimum bonus and a maximum bonus.  Brian Potashnik expressed that the salary and bonus range were intended to place Jeff in the range of $400,000 in earnings a year [in addition to fringe benefits].  SH Management later hired Jeff as its Executive Vice President with employment beginning March 15, 2004.

23.      Brian Potashnik — as President of SH Management *Company* — had signed a written employment agreement in that regard (the "2004 Agreement").  SH Management Company agreed therein to a $200,000 base salary.  SH Management Company agreed therein to a bonus range in the first calendar year of employment that included a $50,000 minimum and a $200,000 maximum.  SH Management Company agreed therein to provide a more detailed bonus plan within the first 90 days of employment.  SH Management Company agreed therein to review and revise the bonus structure on an annual basis.

24.      SH Management did not provide a more detailed bonus plan.  SH Management did not revise the bonus structure on an annual basis.  SH Management did not eliminate the bonus plan.  Brian Potashnik and Cheryl Potashnik both confirmed at various points during the employment tenure that Jeff was owed and had earned — *i.e.,* fully performed and met their requirements for — annual bonuses for more than just the first year (the "Annual Bonuses").  Brian Potashnik and Cheryl Potashnik both expressed at various points during the employment tenure their intent to pay more than the minimum Annual Bonuses and promised to get it done

[*i.e.,* to pay same]. SH Management did not pay the Annual Bonuses. SH Management eventually repudiated the agreement for Annual Bonuses in late 2007.  SH Management caused Jeff to suffer damages as a result.

25.     **Oral modification or oral agreement:**  What the parties said and did in light of the surrounding circumstances, including the course of dealing, demonstrates oral modification of the 2004 Agreement or a separate oral agreement to a bonus structure with a $50,000 minimum and a $200,000 maximum in each calendar year of employment.   Under Texas law, the 2004 Agreement could be orally modified despite language in the agreement to the contrary. Oral agreements on compensation — whether considered a modification to the 2004 Agreement or a new agreement to matters not address in the 2004 Agreement — were not unusual as a matter of practice for SH Management.

26.     **Pro rata Annual Bonus for last partial year of employment:**  SH Management unilaterally terminated Jeff's employment without good cause in light of an impending conclusion to an asset sale.  SH Management caused Jeff's last day of work to be on or about November 2, 2007.  Thus, for the last annual bonus, SH Management owes Jeff a pro rata share of the Annual Bonus based on the months he worked in the relevant calendar year.  This is sometimes called a *Riata Cadillac* claim, based on the Texas Supreme Court opinion in *Miller v. Riata Cadillac Co*.

27.     **Prevention of performance, prevention of condition, and limited right to revoke:**  Whether the agreement for Annual Bonuses is considered bilateral or unilateral, SH Management could not lawfully prevent performance or a condition to receiving an Annual Bonus and thereby avoid its payment obligations.  For example, SH Management could not

lawfully avoid payment of the last annual bonus by unilaterally terminating Jeff's employment without good cause and then claiming Jeff was not entitled to the last annual bonus because he was not employed on the distribution date.  To the extent the agreement was a unilateral agreement, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that SH Management could not revoke the offer at that point.

28.     **Sole discretion:**   The provisions in the 2004 Agreement providing that the employer may make decisions in the employer's "sole discretion" include — as a matter of law — the requirement of "good faith" in connection with any such decisions.

29.     **Termination of employment:**  Under Texas law, SH Management cannot legally refuse to pay earned compensation after termination, regardless of whether or not the 2004 Agreement contains language to the contrary and regardless of whether or not earned compensation was payable at an earlier or later date.

30.     **Alternative pleading of ambiguity:**   Pleading in the alternative only, the following provisions of the 2004 Agreement are ambiguous under the circumstances in fact and in law: (1) the ¶ 4(b) provision referring to "the minimum discretionary bonus potential" and "the maximum bonus potential," and (2) the ¶ 7 provision claiming the employee is not entitled to compensation pursuant to the 2004 Agreement effective upon termination of employment, and (3) the ¶ 3 provisions describing duties and acceptable and unacceptable moonlighting.

31.     The ¶ 4(b) provision allows discretion within the minimum and maximum bonus range but no discretion as to payment of a minimum bonus.   When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its

obligation by failing to set the amount. The ¶ 7 provision does not — and legally cannot — reduce or eliminate the obligation to pay earned compensation. The ¶ 7 provision does not state that the severance payment requires any release of claims and does not state that the severance payment is in lieu of earned compensation. The ¶ 3 provisions contemplate that affiliates of SH Management Company may also employ Jeff and that such employment would be a permissible working time, attention, and energies.

32.     **Additional Responsible [Liable] Person — Brian Potashnik:** Texas Secretary of State records and Texas Comptroller records show by omission that SH Management Company never existed or operated as a legal entity in Texas. The 2004 Agreement represented that SH Management Company was a Texas corporation. If SH Management *Company* is not an assumed name for SH Management, then Brian Potashnik signed the 2004 Agreement as the President of a non-existent company — SH Management *Company* — and thus signed in his individual capacity and is individually responsible for failure to comply with the 2004 Agreement. Alternatively, if SH Management *Company* is not an assumed name for SH Management, then SH Management had exclusively an oral agreement with Jeff for the Annual Bonuses.

<div align="center">
**SECOND CLAIM FOR RELIEF:**
**FAILURE TO COMPLY WITH & REPUDIATION OF ORAL AGREEMENT —**
**SALE PROCEEDS PAYMENT**
</div>

33.     An employer must comply with its agreements to pay employees for work. A written agreement is of no higher legal significance than an oral agreement. When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases. An agreement

Appendix 001787

may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing. The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.

34. **Failure to comply and repudiation:** The following is not intended to be exhaustive or to state all facts. To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth. In May of 2006, Brian Potashnik was at home when he met with Jeff. Brian Potashnik expressed that he had good news and was selling the business. Brian Potashnik explained that Jeff might not have a job after the asset sale but that he needed Jeff to stay on and help make the asset sale happen. Brian Potashnik expressed that, other than himself and his wife Cheryl, Jeff was the most important person needed to make the sale happen. Brian Potashnik said that if Jeff stayed on and assisted in effectuating the asset sale for as long as needed, Jeff would be paid a bonus from the sale proceeds — Brian Potashnik worked out the formula further down the line (the "Sale Proceeds Payment").

35. Brian Potashnik and Cheryl Potashnik saw that Jeff accepted and stayed on and got to work to make the asset sale happen. Around six months later, Brian Potashnik and Cheryl Potashnik saw that a potential purchaser had signed a letter of intent for the multi-million dollar asset sale. Brian Potashnik then met with Jeff. Brian Potashnik expressed that Jeff probably would not have a job after the sale but that he still needed Jeff to stay on as long as needed to help make the asset sale happen. Brian Potashnik told Jeff the formula for calculating the Sale Proceeds Payment and estimated the Sale Proceeds Payment at more than $1 million.

36. Brian Potashnik and Cheryl Potashnik saw that Jeff stayed on and continued to work to make the sale happen. Brian Potashnik and Cheryl Potashnik learned that Jeff turned

Appendix 001788

down or deferred other employment in order to stay on.  Brian Potashnik and Cheryl Potashnik saw that the asset sale would involve assets for several sellers — SH Development, SH Management, AH Construction, Cheryl Potashnik, Brian Potashnik, and entities that each of them owned or controlled.  At various points, Brian Potashnik and Cheryl Potashnik expressed that the Sale Proceeds Payment was due to Jeff.

37.     Over a year later as the asset sale looked more certain and a target management transition date was announced, Cheryl Potashnik thanked Jeff for his work and told him that he would only be needed through the end of the week.  In other words, Cheryl Potashnik confirmed that Jeff had fully performed his obligations under the agreement for the Sale Proceeds Payment. Jeff's last day of work was on or about November 2, 2007.  SH Development, SH Management, AH Construction, Cheryl Potashnik, and Brian Potashnik all received proceeds from the asset sale.  SH Development, SH Management, AH Construction, Cheryl Potashnik, and Brian Potashnik did not pay the Sale Proceeds Payment.  Brian Potashnik and Cheryl Potashnik eventually repudiated the agreement for the Sale Proceeds Bonus in late 2007.  These sellers caused Mr. Carpenter to suffer damages as a result.

38.     **Prevention of performance, prevention of condition, and limited right to revoke:**  Whether the agreement for the Sale Proceeds Payment is considered bilateral or unilateral, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik could not lawfully prevent performance or a condition to receiving the Sale Proceeds Payment and thereby avoid their payment obligations.  For example, none of them could lawfully avoid payment by unilaterally terminating Jeff's employment without good cause before the asset sale concluded and then claim Jeff was not entitled to Sale Proceeds Payment because he

was not employed on the distribution date.  Jeff fully performed under the agreement before his employment ended and thus earned Sale Proceeds Payment before his employment ended. Pleading in the alternative only, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that the offer could not be revoked at that point. Pleading further in the alternative only, Mr. Carpenter is entitled to a pro rata share of Sale Proceeds Payment based on *Riata Cadillac* principles.

## ALTERNATIVE THIRD CLAIM FOR RELIEF:
### *QUANTUM MERUIT*

39.   Pleading in the alternative only, in the event of a finding that there is no enforceable agreement for the Annual Bonuses or Sale Proceeds Payment, or in the event of a finding that there is no agreement as to a specific term, Jeff is entitled to recovery under the theory of *quantum meruit* for the reasonable value of his services provided to SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik and to prevent unjust enrichment.  Jeff conferred valuable services under such circumstances as reasonably notified these persons and entities that he, in performing such services for them, expected to be paid for those services, and they benefited from those services.

## ALTERNATIVE FOURTH CLAIM FOR RELIEF:
### PROMISSORY ESTOPPEL

40.   Pleading in the alternative only, Jeff is entitled to recovery of the Annual Bonuses and Sale Proceeds Payment under the theory of promissory estoppel.  As to the Annual Bonuses, SH Management and [alternatively] Brian Potashnik in his individual capacity promised the bonuses to Jeff under circumstances that made reliance on that promise foreseeable, and Jeff

relied on that promise to his detriment.  As to Sale Proceeds Payment, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik promised Sale Proceeds Payment to Jeff under circumstances that made reliance on that promise foreseeable, and Jeff relied on that promise to his detriment.

## ADDITIONAL JOINT RESPONSIBILITY [LIABILITY]

### Winding Up — Individual Liability for All Obligations of Entities

41.     Brian Potashnik and Cheryl Potashnik, as governing persons or officers or directors of SH Development and SH Management are individually responsible [and liable] for the claims asserted against these entities in this civil action.  SH Development and SH Management completed the process of winding up [also known as dissolution or termination of existence] without providing the statutorily required notice to Jeff.  At the time of termination and winding up, Jeff had a claim [which is defined per statute to include a contingent and unliquidated claim] pending against these entities.  The lack of required notice renders Mr. Potashnik and Ms. Potashnik individually liable for obligations for which these entities are liable.

### Joint Employer

42.     SH Development, SH Management Corporation, and Affordable Housing are responsible [and liable] for failure to comply with the annual bonus agreement and agreement for a bonus from net proceeds of the asset sale, based on the joint employer doctrine.  Although typically applied in discrimination cases, this doctrine recognizes that more than one entity may employ a person.  For example, Affordable Housing issued at least one employment

Appendix 001791

compensation check to Mr. Carpenter, but "Southwest Housing Management" was listed as the employer on W2 forms; the same principals from each of these entities had the power to hire and fire Mr. Carpenter; the Southwest Housing website listed employees of these entities as employees of the same entity; on information and belief, payroll for all entities' employees was handled through one entity [with possible reconciliation between entities at a later date]; and overall, these entities were treated as a single unit as a practical matter for employment issues.

### Joint Venture, Joint Enterprise, or Implied Partnership — Bonus from Net Proceeds of Asset Sale

43.     SH Development, SH Management, and AH Construction are responsible [and liable] for failure to comply with the agreement for a bonus from net proceeds of the asset sale, based on the joint venture, joint enterprise, or implied partnership doctrine.  These entities had an agreement, a common purpose, a community of pecuniary interest, and an equal right of control concerning the asset sale and efforts to reach an asset sale [as to control, the same principals — Brian Potashnik and/or Cheryl Potashnik controlled each entity].  On information and belief, each entity was a party to the final asset sale agreement — precisely the end to the means of the agreement made with Mr. Carpenter concerning a bonus to stay on to help effectuate the sale of the Southwest Housing entities' assets.

## Alter Ego

44.     Brian Potashnik and Cheryl Potashnik are responsible [and liable] for failure to comply with the annual bonus agreement and agreement for a bonus from net proceeds of the asset sale, based on alter ego as outlined in the Texas Business Organizations Code [and its predecessor to the extent applicable].  They caused the corporate form to be used for the purpose of perpetrating and did perpetrate an actual fraud on Mr. Carpenter primarily for the direct personal benefit of each of them.  For example, SH Development and SH Management — which they controlled — conducted a winding up and terminated their existence after the asset sale and failed to provide the statutorily required notice to Mr. Carpenter, whose lawsuit was pending at the time.  As another example, they stated that asset sale proceeds were needed to help fund their individual defense of pending criminal charges.  As another example, Mr. Potashnik signed Mr. Carpenter's initial employment agreement as an officer of an apparently non-existent entity and yet represented in that agreement that the entity was a Texas corporation.

## ATTORNEYS' FEES

45.     As a result of the conduct described above, Mr. Carpenter had to hire attorneys to pursue the claims asserted herein.  Mr. Carpenter has agreed to pay his attorneys a reasonable fee.  Mr. Carpenter seeks to recover reasonable and necessary attorneys' fees incurred in connection with this action, including all appeals, pursuant to the provisions of the Texas Civil Practice and Remedies Code, including claims for a contract and personal services.

## CONDITIONS PRECEDENT

46.     All conditions precedent to filing suit and to recovery on the claims asserted herein have occurred, been performed, or been waived.

## JURY DEMAND

47.     Mr. Carpenter requests a jury trial on all issues triable of right [or choice] by a jury.  He has paid the required jury fee.

## RELIEF REQUESTED

48.     Based on the foregoing, Jeffrey Carpenter requests the following relief:

    (A)     judgment on all counts of the petition;

    (B)     back pay [past wages];

    (C)     costs of court and attorneys' fees;

    (E)     pre-judgment and post-judgment interest as allowed by law; and

    (F)     such other and further relief, in law or in equity, to which he may show himself justly entitled.

Respectfully submitted,


_/s/ Amy Gibson_____
Amy Gibson
Texas State Bar No. 00793801
David L. Wiley
Texas State Bar No. 24029901

**Gibson Wiley PLLC**
1500 Jackson Street #714
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126
Email Addresses:

amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR JEFFREY
CARPENTER

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 5, 2015, a true copy of Jeffrey W. Carpenter's

Second Amended Petition was served on all other parties through their lead attorneys of record

as follows:

### <u>VIA TEXAS E-FILE SYSTEM</u>

Mr. Lawrence J. Friedman
Mr. Michael Donohue
Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
lfriedman@fflawoffice.com
mdonohue@fflawoffice.com
jhfriedman@fflawoffice.com


_/s/ Amy Gibson_____
Amy E. Gibson

Appendix 001796

# Excerpts from Purchase and Sale Agreement

# PURCHASE AND SALE AGREEMENT

## By and Among

## CASCADE AFFORDABLE HOUSING LLC

## and

## SELLERS (as listed on Schedule A)

### Dated April 30, 2007

50806446.4
ORL1\CORPSEC\917721.7
31220/0055 RMA ts 4/30/2007 4:53 PM

CONFIDENTIAL
CAH-SW000268

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "Agreement"), dated as of April 26, 2007, is made by and among Cascade Affordable Housing LLC, a Washington limited liability company (the "Purchaser"), and the Sellers listed on Schedule A attached hereto (individually and/or collectively as the context may require, the "Seller"). Unless otherwise indicated, all capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in Exhibit A attached hereto and made a part hereof.

## RECITALS

A.   Seller is engaged in the business (the "Business") of sponsoring, developing and managing each of the multi-family residential projects identified by project name and address on Schedule A (the "Projects").

B.   Each Project is owned and operated by a limited partnership as set forth on Schedule A (collectively, the "Project Partnerships"), and Seller, pursuant to certain limited partnership agreements for certain Project Partnerships (together with partnership agreements from all other Project Partnerships, the "Project Partnership Agreements") owns partnership interests in certain Project Partnerships as set forth on Schedule A (collectively, the "Partnership Interests").

C.   In consideration for its services in connection with the Projects, Seller receives or is entitled to receive various payments, including, but not limited to, cash distributions, property management fees, incentive management fees, asset management fees, tax credit fees, principal amortization payments, disposition fees, sale and refinancing proceeds, repayment of operating deficit loans and deferred development fees (collectively, with all contractual rights associated therewith, the "Economic Interests," and together with the Partnership Interests, other than any interests excluded from the transaction contemplated hereby pursuant to the terms of this Agreement, the "Purchased Assets"). The Seller of each Economic Interest (which Economic Interest is separate from a Partnership Interest) and a description of such Economic Interest is also set forth on Schedule A.

D.   Seller has issued various guarantees and/or indemnities and has other obligations in connection with the Projects and the Purchased Assets, including, without limitation, guarantees relating to operating deficits, repurchase events, tax credit compliance and recapture, permanent loan closing, loan obligations, general partner obligations, developer obligations, environmental indemnities and other contractual obligations (altogether, the "Seller Obligations").

E.   Substantially all of the items listed on Exhibit B attached hereto, to the extent within Seller's possession or control, are or will be available within thirty (30) days of the date hereof on the Southwest Website (the "Web Docs"). The items listed on Exhibit C attached hereto (the "Office Docs") will be available for review at the offices of Seller or at the Project locations during the time period beginning on the date hereof and ending at the termination or expiration of this Agreement. Altogether, the Web Docs, the Office Docs, the Title Docs (defined below) and such other information as Seller shall disclose

1

Appendix 001799  CONFIDENTIAL
CAH-SW000272

to Purchasers in writing during the Due Diligence Period shall be referred to as the "Disclosures."

F.   Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Purchased Assets and Purchaser desires to assume those Seller Obligations which constitute Future Obligations (defined below) and such other Seller Obligations as may be necessary to permit Seller and/or its Affiliates to be released from all Seller Obligations.

G.   Purchaser desires to assume the lease for the space located at 5910 North Central Expressway, Suite 1145, Dallas, Texas (the "Leased Space").

H.   Purchaser desires to assume the lease for seven (7) copy machines (the "Copy Lease").

**NOW, THEREFORE**, in consideration of the foregoing Recitals (which are hereby incorporated by reference), the representations, warranties, agreements and conditions hereafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF INTERESTS; CLOSING

1.1     Agreement to Purchase and Sell. On the Closing Date, upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, assign, transfer, convey and deliver the Purchased Assets to the Purchaser, free and clear of all Liens other than (i) Liens in favor of Other Partners and Project Partnership lenders for the purpose of securing obligations of Seller to the Other Partners and Project Partnership lenders arising under the Disclosures, and (ii) the Liens that are revealed by a UCC search of each Seller (the "UCC Search") but to which Purchaser does not object during the Due Diligence Period (provided that Purchaser shall not object to the Liens described in (i) above), (iii) the Liens listed on Schedule 1.1 (collectively, the "Permitted Interest Liens"), and Purchaser shall purchase the Purchased Assets from Seller and assume the Seller Obligations (except as otherwise provided herein). Purchaser also agrees that, to the extent required by the provider of a Required Consent as a condition to the granting of such Required Consent and/or release of Seller from all Seller Obligations, Purchaser shall cause Cascade Holdings to guarantee any Seller Obligations. Purchaser may designate within ten (10) days (or such earlier date if requested by the provider of a Request Consent) of Closing various Affiliates of Purchaser as Purchaser's designees to take title to the various Purchased Assets and/or to assume the Seller Obligations to be assumed by Purchaser under this Agreement and to assume the lease of the Leased Space and the Copy Lease.

1.2     Purchase Price, Allocation and Tax Treatment. The aggregate consideration to be paid by Purchaser to Seller (the "Purchase Price") shall be an amount equal to THIRTY SEVEN MILLION DOLLARS ($37,000,000) (the "Base Price"), subject to adjustment in connection with the removal of Removed Projects in accordance with the terms of this Agreement; plus or minus the Proration Adjustment, calculated in accordance with Section 1.4.

2

Appendix 000800 CONFIDENTIAL
CAH-SW000273

8.11    Expenses.  Except as expressly provided otherwise in this Agreement, Seller and Purchaser shall each bear their own respective transaction fees and expenses (including fees and expenses of legal counsel, accountants, investment bankers, brokers, finders or other representatives and consultants) incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby.

8.12    Construction.  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent and no rule of strict construction shall be applied against any Party.

8.13    Mutual Drafting.  The parties hereto are sophisticated and have been represented by attorneys throughout the transactions contemplated hereby who have carefully negotiated the provisions hereof.  As a consequence, the parties do not intend that the presumptions of laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement or any agreement or instrument executed in connection herewith, and therefore waive their effects.

8.14    Prevailing Party.  The prevailing party in any action brought to enforce the remedies reserved to the parties, respectively, hereunder shall be entitled to recover reasonable attorneys' fees and court costs in addition to any other relief.

8.15    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

8.16    Schedules and Exhibits.  Each of the Schedules referenced in this Agreement and within the control of Seller that are not already attached hereto shall be prepared by Seller and delivered to Buyer in substantially final form within thirty (30) days of the date hereof; provided, that within ten (10) days of the date hereof, the parties shall use reasonable efforts to agree upon Schedules A and 1.4(b). Purchaser and Seller shall use reasonable efforts to agree upon the form of each of the Exhibits which are not attached hereto no later than 30 days from the date hereof. If the parties are not able to agree on the Schedules and Exhibits within the time periods provided above, then either Purchaser or Seller shall have the right to terminate this Agreement (upon notice which must be given, if at all, within five (5) days of the end of the time periods above), in which case the Earnest Money shall be refunded to Purchaser and neither party shall have any further obligation hereunder.

*(Remainder of this Page Intentionally Left Blank)*

*(Signature Page Follows)*

50

Appendix 00080
CONFIDENTIAL
CAH-SW000321

APR-30-2007 MON 04:18 PM                          FAX NO.                          P. 01

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

BUYER:                          CASCADE AFFORDABLE HOUSING LLC, a
                                Washington limited liability company

                                By: _____
                                    Name: STAN HARRELSON
                                    Its:  MANAGER

BUYER'S INDEMNITOR:             CASCADE HOLDINGS LLC, a Washington
                                limited liability company

                                By: _____
                                    Name: STAN MANAGER
                                    Its:  MANAGER

SELLER:                         FOR EACH OF THE SELLERS LISTED ON
                                SCHEDULE A HEREOF

                                By: _____
                                    Brian Potashnik, authorized agent

SELLER'S INDEMNITOR:            SOUTHWEST GUARANTOR LLC

                                By: _____
                                    Brian Potashnik, sole member

51

OR:1\CORP\SEC\917721.7
31220/0050 RMA ts 4/30/2007 4:53 PM

CONFIDENTIAL
CAH-SW000322

## SCHEDULE A

### Southwest Cascade
### Seller/Asset/Purchase Price Allocation[1][2][3]

---

[1]   With respect to any partnership interest, unless footnoted otherwise, it will be a direct transfer of the partnership interest and will include any and all interests in the applicable partnership and all rights associated herewith or arising therefrom, including, without limitation, any and all rights relating to ownership, control, management, consent, allocations, credit, distributions and fees.

    With respect to Developer Fees, unless otherwise footnoted, this will include assignment of all of Seller's rights under the Development Agreement.

[2]   Generally, Seller and Buyer agreed that the tax treatment will be capital gain for the sale of GP interests and Class B interests and ordinary income for developer fees and management rights. However, a portion (i.e., that portion attributable to depreciation taken) of the amounts paid for partnership interests will be taxed at 25%. Please check with the accountants.

[3]   We still need to identify which assets will be excluded. For example, will we exclude unpaid contractor fees, development deficit loans, operating deficit loans, rights to disbursements from certain reserves?

ORL1\CORPSEC\860291.3
31220\0056 RMA ts 4/30/2007 9:11 AM

Appendix 001303 CONFIDENTIAL
CAH-SW000001

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 1. | MHMR Senior Housing, L.P. | a. MHMR Senior Housing Development Corporation | a. General Partner Interest[1] | [$        ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$        ] |
| | | c. Southwest Housing Development Corporation[2] | c. Loan Receivable[3] | [$        ] |
| | | | | [$        ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] and Loan Receivable [3][5] | |

---

[1] Intentionally left blank. 

[2] This is a typo. This entity does not exist.

[3] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4] Includes deferred management fee.

[5] Includes receivable from Partnership for items that should have been paid by Partnership.

Appendix 001804
CONFIDENTIAL
CAH-SW000002

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 2. | Greenville Senior Housing, L.P. | a. Greenville Senior Housing Development Corporation | a General Partner Interest[1] | [$          ] |
|  |  | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
|  |  | c. Southwest Housing Development Company, Inc. | c. Development Fee | [$          ] |
|  |  | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$          ] |

---

[1]  Cheryl Potashnik HUB.

[2]  Includes deferred management fee.  Subject to A/P to Partnership for overpayment of management fee.

CONFIDENTIAL
CAH-SW000003

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 3. | Texas Hampton Senior Housing, L.P. | a. Texas Hampton Senior Housing Development Corporation | a. General Partner Interest | [$           ] |
| | | b. Brian Potashnik | b. Class B Limited Partner Interest | [$           ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable [1] | [$           ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] and Loan Receivable [1][3] | [$           ] |

---

[1]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]   Includes deferred management fee.

[3]   Includes receivable from Partnership for items that should have been paid by Partnership.

Appendix 001806   CONFIDENTIAL
CAH-SW000004

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 4. | The Parks at Westmoreland Senior Housing, L.P. | a. The Parks at Westmoreland Senior Housing Development Corporation | a. General Partner Interest[1] | [$            ] |
| | | | b. Class B Limited Interest | [$            ] |
| | | b. Brian Potashnik. | c. Development Fee | [$            ] |
| | | c. Southwest Housing Development Company, Inc. | | |
| | | | d. Property Management Rights[2] and Loan Receivable[3] | [$            ] |
| | | d. Southwest Housing Management Corporation | | |

---

[1]  There is an assignment of future cash flow to a church.

[2]  Includes deferred management fee.

[3]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001807  CONFIDENTIAL
CAH-SW000005

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 5. | Hillsboro Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$        ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$        ] |

---

[1] HUB deal.  Villas Buenas, Inc. is owner of GP.  Possible buyout by Cheryl.

ORL1\CORPSEC\660291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000006

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 6. | Chattanooga Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[2] and Loan Receivable[3] | [$          ] |

---

[1] HUB deal.  El Dorado Housing Development Corp. is owner of GP.  Cheryl has contract to purchase.

[2] Includes deferred management fee.

[3] Includes receivable from Partnership for items that should have been paid by Partnership.

Appendix 001809

CONFIDENTIAL
CAH-SW000007

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 7. | Knollwood Villas, L.P. | a. Knollwood Villas Development Corporation | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Partner Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] and Loan Receivable[3] | [$          ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2] Includes deferred management fee. Subject to A/P to Partnership for overpayment of management fee.

[3] Includes receivable from Partnership for items that should have been paid by Partnership.

Appendix 0018-10 CONFIDENTIAL
CAH-SW000008

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 8. | TX Bluffview Housing, L.P. | a.  TX Bluffview Housing Development Corporation | a.  General Partner Interest | [$     ] |
| | | b.  Brian Potashnik | b.  Class B Limited Interest | [$     ] |
| | | c.  Southwest Housing Development Company, Inc. | c.  Development Fee and Loan Receivable[1] | [$     ] |
| | | d.  Southwest Housing Management Corporation | d.  Property Management Rights | [$     ] |

---

[1]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

Appendix 0018-1

CONFIDENTIAL
CAH-SW000009

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 9. | Arbors Housing Partners, Ltd.[1][5] | a. Arbors Creekside LLC | a. Class B Limited Interest | [$        ] |
| | | b Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivables[2] | [$        ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] and Loan Receivable[2][4] | [$        ] |

---

[1]   Intentionally left blank.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   Includes receivable from Partnership for items that should have been paid by Partnership.

[5]   There is also an amount due to construction company, which is excluded from this transaction.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000010

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 10. | TX Hillside Apartments, L.P.[4] | a. TX Hillside Development Corporation | a. General Partner Interest[1] | [$ ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$ ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[2] | [$ ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] and Loan Receivable | [$ ] |

---

[1]   Subject to a donation of cash flow to a church.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   There is a small tract of land which is part of the Project which may need to be transferred.

Appendix 001813

CONFIDENTIAL
CAH-SW000011

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 11. | Colorado Creekside Housing, L.P.[3] | a. Colorado Creekside Housing Development, Inc. | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$          ] |

---

[1]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]   Includes receivable from Partnership for items that should have been paid by Partnership.

[3]   There is an amount due to the construction company which is excluded from this transaction.

Appendix 001814

CONFIDENTIAL
CAH-SW000012

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 12. | Highland Gardens, L.P.[2] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$            ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[1] | [$            ] |

---

[1]   Includes deferred management fee.

[2]   HUB deal.  Casa Linda Development Corp. is owner of GP.  Possible buyout by Cheryl.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000013

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 13. | Tahoe Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$            ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$            ] |

---

[1]   HUB deal.  El Dorado Housing Development Corp. is owner of GP.  Cheryl has contract to purchase.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 14. | Oak Hollow Housing, L.P. | a. Oak Hollow Housing Development Corporation | a. General Partner Interest[1] | [$        ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$        ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[2] and Loan Receivable[3] | [$        ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] | [$        ] |

---

[1]   Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated."  If so, we need to discuss how this will occur.

[2]   See Charter Workout docs.

[3]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]   Includes deferred management fee.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 15. | Pleasant Valley Villas Housing, L.P.[4] | a. Pleasant Valley Villas Development, L.L.C. | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[1] and Loan Receivable[2] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] | [$          ] |

[1]   See Charter Workout docs.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   This is a fee due to contractor, which is excluded from this transaction.

Appendix 001818   CONFIDENTIAL
CAH-SW000016

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 16. | Clarkridge Villas Housing, L.P. | a. Clarkridge Villas Development, L.L.C. | a. General Partner Interest[1] | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[2] and Voluntary Loan[3] and Loan Receivable[4] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[5] | [$          ] |

---

[1]   Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated."  If so, we need to discuss how this will occur.

[2]   Cash developer fee stays with Southwest.

[3]   See Charter Workout docs.

[4]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[5]   Includes deferred management fee.

ORL1\CORPSEC\860291.3
31220\0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000017

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 17. | Heatherwilde Villas Housing, L.P. | a. Heatherwilde Villas Development, L.L.C. | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[1] and Voluntary Loan[2] and Loan Receivable[3] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] | [$          ] |

---

[1]  Cash developer fee stays with Southwest.

[2]  See Charter Workout docs.  Also, when $1.5 million collateral account is used to resize debt, then that amount will become a voluntary loan.

[3]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]  Includes deferred management fee.

ORL1\CORPSEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000018

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 18. | Primrose SA II Housing, L.P. | a. Brian Potashnik | a. Class B Limited Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivables[1] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[2] | [$          ] |

---

[1]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]  Includes deferred management fee.

Appendix 001821   CONFIDENTIAL
CAH-SW000019

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 19. | Southern Oaks Housing, L.P. | a. Southern Oaks Housing Development, L.L.C. | a. General Partner Interest[1] | [$           ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$           ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[2] and Voluntary Loan[3] and Loan Receivable[4] | [$           ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[5] | [$           ] |

---

[1] Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated." If so, we need to discuss how this will occur.

[2] Cash developer fee stays with Southwest.

[3] See Charter Workout docs.

[4] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[5] Includes deferred management fee.

Appendix 001822   CONFIDENTIAL
CAH-SW000020

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 20. | Hickory Trace Housing, L.P. | a. Hickory Trace Development, L.L.C. | a. General Partner Interest | [$                    ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$                    ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[1] | [$                    ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$                    ] |

---

[1]   See Charter Mac Workout docs.

[2]   Includes deferred management fee.

ORL1\CORPSEC\60291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000021

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 21. | Escondido Housing, L.P. | a. Escondido Housing Development, L.L.C. | a. General Partner Interest | [$            ] |
|  |  | b. Brian Potashnik. | b. Class B Limited Interest | [$            ] |
|  |  | c. Southwest Housing Development Company, Inc. | c. Development Fee[1] and Loan Receivable[2] | [$            ] |
|  |  | d. Southwest Housing Management Corporation | d. Property Management Rights[3] | [$            ] |

---

[1]  Cash developer fee stays with Southwest.  25% of entire Developer Fee is paid to HSI.  See Letter Agreement.

[2]  May be paid off with final capital contribution.

[3]  Includes deferred management fee.

ORL1\CORPSEC\660291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000022

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 22. | Texas Birchwood Apartments, L.P.[1] | a. Texas Birchwood Properties Corporation | a. General Partner Interest | [$        ] |
| | | b. Southwest Housing Management Corporation | b Property Management Rights | [$        ] |

---

[1]  Napico deal (in dispute).

ORL1\CORPSEC\860291.3
31220/0055 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000023

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 23. | Texas-Estrada Apartments, L.P.[1][5] | a. Southwest Housing Investment, Inc. | a. General Partner Interest[2] | [$          ] |
| | | b Southwest Housing Management Corporation | b Property Management Rights[3][4] | [$          ] |

---

[1]   Napico deal (in dispute).

[2]   Need to research whether we need HSI's consent to transfer as HSI is 49% owner in Southwest Housing Investment, Inc.  Need Southwest Housing Investment, Inc. governing documents.  Does HSI have dissenter or appraisal rights?

[3]   Includes deferred management fee.

[4]   Subject to A/P to Partnership for overpayment of management fees.

[5]   There is a balance due to the contractor which is excluded from this transaction.

Appendix 001826   CONFIDENTIAL
CAH-SW000024

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 24. | Texas Brook Apartments L.P.[1] | a. Texas Brook Properties Corporation | a. General Partner Interest | [$              ] |
| | | b. Texas Brook Properties Corporation/Brian Potashnik | b. Development Fee | [$              ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[2][3] | [$              ] |

---

[1]  Napico deal (in dispute).

[2]  Includes deferred management fee.

[3]  Subject to A/P to Partnership for overpayment of management fees.

ORL1\CORPSEC\880291.3
31220\0055 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000025

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 25. | Texas Melody Apartments L.P.[1] | a. Texas Melody Properties Corporation | a. General Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc./Texas Melody Properties Corporation/ Brian Potashnik | b. Development Fee and Voluntary Loan | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1] Napico deal (in dispute).

ORL1\CORPSEC\860291.3
31220/0055 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000026

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 26. | Texas Kirnwood Properties Corporation[1] | a. Texas Kirnwood Properties Corporation | a. General Partner Interest | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$          ] |

---

[1]   Napico deal (in dispute).

ORL1\CORPSEC\880291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

Appendix 001920        CONFIDENTIAL
CAH-SW000027

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 27. | Arlington Senior Housing L.P.[1] | a. Arlington Senior Housing Development Corporation | a. General Partner Interest | [$            ] |
| | | b. <mark>Southwest Housing Development</mark> Company, Inc./Arlington Senior Housing Development Corporation/<mark>Brian Potashnik</mark> | b. Development Fee and Loan Receivable[2] | [$            ] |
| | | c. <mark>Southwest Housing Management</mark> Corporation | c. Property Management Rights[3] | [$            ] |

---

[1]   Napico deal (in dispute).

[2]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

Appendix 001830

CONFIDENTIAL
CAH-SW000028

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 28. | Heatherwilde Estates Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2][3] | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$          ] |

---

[1]   Does Mr. Leopold have authority to consent (on behalf of the General Partner) to the change in the property manager.

[2]   16.28% of Development Fee is paid to Housing Authority of Bexar County after Developer (although Master Agreement says non-Southwest entity is developer, Partnership Agreement says Southwest Housing Development Company, Inc. is a subcontractor of the developer -- need subcontractor agreement) receives the full development fee.

[3]   Need to determine from docs if Southwest is entitled to any portion of the GP cash flow (not in Partnership Agreement, Master Agreement or Incentive Management Agreement).

ORL1\CORP\SEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000029

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 29. | Pleasant Valley Courtyards Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2] and Loan Receivable[3] | [$              ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$              ] |

---

[1]   HUB deal. Cheryl has contract to buyout.

[2]   Need docs to determine Southwest's interest in GP and Developer fees. Likely similar to Heatherwilde.

[3]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents. May be paid from perm loan proceeds which closed in third quarter, 2006.

CONFIDENTIAL
CAH-SW000030

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 30. | Primrose Houston I Development, L.P. | a. Primrose Houston I Development, L.L.C. | a General Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Deferred Development Fee and Loan Receivable[1] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001833

CONFIDENTIAL
CAH-SW000031

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 31. | Primrose Houston South Housing, L.P. | a. Primrose Houston South Development, L.L.C. | a. General Partner Interest | [$           ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[1] | [$           ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$           ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 32. | TX Hampton Villas, L.P. | a. Arlington Villas SLP, L.L.C. | a. Class B Limited Interest | [$              ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$              ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$              ] |

---

[1] Master Agreement provides that Tarrant County Housing Partnership, Inc. receives 20% of the development fee as paid.  The Master Agreement also provides that SHDC receives the General Partner's Asset Management Fee, 20% of the General Partner's interest in cash flow and 5% of the General Partner's interest in capital proceeds.  Need final Master Agreement to verify.

Appendix 001835      CONFIDENTIAL
CAH-SW000033

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 33. | Parmer Villas Housing, L.P. | a. Parmer Villas Development, L.L.C. | a. General Partner Interest | [$          ] |
|  |  | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[1] | [$          ] |
|  |  | c. Southwest Housing Management Corporation | c. Property Management Rights[2] | [$          ] |
|  |  | d. Affordable Housing Construction, Inc. | d. Contractor's Profit | [$          ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2] Includes deferred management fee.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000034

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 34. | Primrose SA IV Housing, L.P.[4][5] | a. Jefferson Plaza SLP, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] and Loan Receivable[2] | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] | [$            ] |

---

[1] Master Agreement provides that 20% of deferred developer fee is shared with Our Casas, as paid. Master Agreement also provides that SHDC receives the GP Asset Management Fee, 20% of the GP's interest in cash flow and 10% of the GP's interest in capital proceeds.

[2] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3] Includes deferred management fee.

[4] Loan extension may require change in underwriting criteria.

[5] Potential admission of SAHA which would change cash flow splits.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 35. | TX Acme A South Housing, L.P.[3] | a. TX Acme A South SLP, L.L.C. | a. Class B Limited Interest | [$           ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$           ] |
| | | c. Southwest Housing Development Company, Inc./Brian Potashnik | c. Guaranty Fee[2] | [$           ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$           ] |

---

[1]   Subject to amounts to be shared with HSI.

[2]   Pursuant to the Master Agreement, a $500,000 guarantee fee is to be paid from cash flow and capital proceeds after the developer fee is paid.

[3]   Unpaid Contractor fee is excluded.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 36. | TX Pleasanton Housing, L.P.[3] | a. TX Pleasanton Housing SLP, L.L.C. | a. Class B Limited Interest[1] | [$        ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[2] | [$        ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$        ] |

---

[1]   Master Agreement provides that Class B gets 50% of the GP's and Class B's collective interest in cash flow and 85% of the GP's and Class B's collective interest in capital proceeds.

[2]   Pursuant to the Master Agreement, SAAH gets first $100,000 of Developer Fee, then SHDC gets the next $400,000 and then SAAH gets 20% and SHDC gets 80%.

[3]   Potential replacement of SAAH with SAHA, which will change cash flow splits.

Appendix 001839 CONFIDENTIAL
CAH-SW000037

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 37. | TX Garth Housing, L.P. | a. TX Garth Development, L.L.C. | a. Class B Limited Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

Appendix 001940

CONFIDENTIAL
CAH-SW000038

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 38. | TX Crist Housing, L.P. | a.  TX Crist Development SLP, L.L.C. | a.  Class B Limited Interest | [$         ] |
| | | b.  Primrose at Crist Development Company, LLC[1] | b.  Development Fee | [$         ] |
| | | c.  Southwest Housing Management Corporation | c.  Property Management Rights | [$         ] |

---

[1] Since SW owns only 75% of Primrose at Crist Development Company LLC, then I suggest Southwest Housing Development Company, Inc. sell its 75% interest therein.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001841

CONFIDENTIAL
CAH-SW000039

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 39. | TX John West Housing, L.P. | a. TX John West Development SLP, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$            ] |
| | | c. Southwest Housing Development Company, Inc./Brian Potashnik | c. Guaranty Fee[2] | [$            ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$            ] |

---

[1]  Master Agreement provides that HSI gets paid $50,000 at closing, then SHDC gets next payments until SHDC has received $283,333 and then HSI gets 15% and SHDC gets 85%.

[2]  Pursuant to the Master Agreement, a $500,000 guarantee fee is to be paid from cash flow and capital proceeds after the developer fee is paid.

Appendix 001842   CONFIDENTIAL
CAH-SW000040

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 40. | Arbor Woods Housing, LP | a. Arbor Woods Housing Development, L.L.C. | a. General Partner Interest[1] | [$           ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[2] | [$           ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$           ] |

---

[1]  Cheryl Potashnik HUB deal.

[2]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001843

CONFIDENTIAL
CAH-SW000041

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 41. | TX Pasadena Housing, L.P. | a TX Pasadena Development, L.L.C. | a. Class B Limited Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

Appendix 001844   CONFIDENTIAL
CAH-SW000042

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 42. | TX Laureland Housing, L.P. | a. TX Laureland Development SLP, L.L.C. | a. Class B Limited Interest[1] | [$        ] |
| | | b. Laureland Development Company, LLC[2] | b. Development Fee | [$        ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$        ] |

---

[1]  Class B gets 50% of the GP's and Class B's collective interest in cash flow and capital proceeds.

[2]  Since Southwest Housing Development Company, Inc. owns 80% of Laureland Development Company, LLC, then I suggest Southwest Housing Development Company, Inc. sell its 80% member interest therein.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000043

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 43. | TX Scyene Housing, L.P. | a. TX Scyene Development SLP, L.L.C. | a. Class B Limited Interest[1] | [$            ] |
| | | b. Scyene Development Company, LLC[2] | b. Development Fee | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

---

[1]   Class B gets 50% of the GP's and Class B's collective interest in cash flow and capital proceeds.

[2]   Since Southwest Housing Development Company, Inc. owns 80% of Laureland Development Company, LLC, then I suggest Southwest Housing Development Company, Inc. sell its 80% member interest therein.

ORL1\CORPSEC\60291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

Appendix 001846

CONFIDENTIAL
CAH-SW000044

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 44. | Primrose Houston 7 Housing, L.P.[2] | a. Primrose Skyline Apartments SLP, L.L.C. | a. Class B Limited Interest | [$ ] |
|  |  | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$ ] |
|  |  | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

---

[1]   Subject to amounts to be shared with SETH.  Also, cash developer fee stays with Southwest.  City of Houston HOME loan pending.

[2]   Appraisal District has appealed tax exemption decision of lower court in favor of Partnership.

ORL1\CORPSEC\660291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001847

CONFIDENTIAL
CAH-SW000045

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 45. | TX Tenison Housing, L.P. | a.  TX Tenison Development, LLC | a.  General Partner Interest[1] | [$        ] |
| | | b.  CLG Consulting, Inc. | b.  Development Fee[2] | [$        ] |
| | | c.  Southwest Housing Management Corporation | c.  Property Management Rights | [$        ] |

---

[1]  Cheryl Potashnik HUB deal.

[2]  Subject to amounts to be shared with HSI.

ORL1\CORPSEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

Appendix 001848

CONFIDENTIAL
CAH-SW000046

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 46. | TX Palacio Housing, L.P.[1][4] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2] | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[3] | [$          ] |

---

[1]   MAUC deal.

[2]   Subject to amounts to be shared with MAUC owned co-developer.  Also, cash developer fee stays with Southwest.

[3]   To include rights to cash flow under the Partnership Agreement, Incentive Management Fee under the Incentive Management Agreement and the Partnership Management Fee under the Partnership Management Agreement.

[4]   Reimbursement to Southwest under Reimbursement Agreement are excluded from this transaction.

CONFIDENTIAL
CAH-SW000047

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 47. | New Braunfels 2 Housing, L.P.[2] | a. New Braunfels 2 SLP, L.L.C. | a. Class B Limited Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1]  Subject to amounts to be shared with SAHFC.

[2]  Potential for public housing units.

Appendix 001850
CONFIDENTIAL
CAH-SW000048

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 48. | TX Aldine-Bender Housing, L.P.[1] | a. TX Aldine-Bender Development, L.L.C. | a Class B Limited Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1]   Potential buyout of non profit GP.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001851

CONFIDENTIAL
CAH-SW000049

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 49. | TX Old Manor Housing, L.P. | a. TX Old Manor Housing SLP, L.L.C. | a. Class B Limited Partner Interest | [$              ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$              ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[1] | [$              ] |
| | | d. Affordable Housing Construction, Inc. | d. Contractor Profit | [$              ] |

---

[1]   Subject to amounts to be shared with HSI.

ORL1\CORPSEC\660281.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001852

CONFIDENTIAL
CAH-SW000050

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 50. | TX Bammel Housing, L.L.C. | a. TX Bammel Development, L.L.C. | a. Special Class B Partner Interest | [$ ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001853

CONFIDENTIAL
CAH-SW000051

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 51. | Clark 05 Housing, L.P.[1] | a.  Clark 05 SLP, L.L.C. | a.  Class B Limited Partner Interest | [$          ] |
| | | b.  Southwest Housing Development Company, Inc. | b.  Development Fee | [$          ] |
| | | c.  Southwest Housing Management Corporation | c.  Property Management Rights | [$          ] |

---

[1]   Potential for public housing units.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000052

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 52. | Cedar Hill Senior Housing, L.P. | a. Cedar Hill Senior Housing Development, L.L.C. | a. General Partner Interest[1] | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1] Cheryl Potashnik HUB.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 001855

CONFIDENTIAL
CAH-SW000053

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 53. | TX Timbercreek Housing, L.P. [1] | a. Southwest Housing Development Company, Inc. | a. Deferred Development Fee | [$              ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$              ] |

---

[1]   HUB deal.  GP is owned by B&L Development, Inc.  Potential buyout by Cheryl.

Appendix 001856

CONFIDENTIAL
CAH-SW000054

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 54. | Laredo Vista, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Deferred Development Fee | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights and Loan Receivable[2] | [$          ] |

---

[1]   HUB deal.  GP is owned by Villas Buenas, Inc.  Potential buyout by Cheryl.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000055

# Coverage analysis

## insureds — entity defendants

## Insureds — Entity Defendants

SH Management is an insured because it is the named entity.

SH Development  and AH Construction are insureds because each is a named subsidiary.

---

**Common Terms & Conditions § II(K)**

(K)  "Insureds" shall have the meaning specified for such term in each Coverage Part.

---

**EPL Coverage Part § II(H)**

(H) "Insureds" means any:

(1) **Insured Entity**; or

(2) **Insured Person**.

---

EPL Coverage Part does not define Insured Entity

---

**Common Terms & Conditions § II(I)**

(I) "Insured Entity" means:

(1) the **Named Entity**; or

(2) any **Subsidiary**.

Insured Entity shall include any such entity as a Debtor in Possession.

---

EPL Coverage Part does not define Named Entity

---

**Common Terms & Conditions § II(P)**

(P) "Named Entity" means the entity named in ITEM 1 of the Declarations.

ITEM 1 of the Declarations lists SH Management as the Named Entity

Common Terms & Conditions § II(I)

(I) "Insured Entity" means:

(1) the **Named Entity**; or

(2) any **Subsidiary**.

Insured Entity shall include any such entity as a Debtor in Possession.

EPL Coverage Part does not define Subsidiary

Common Terms & Conditions § II(T) defines Subsidiary, but the un-amended definition is not necessary due to an endorsement.

Endorsement No. 1

COMMON TERMS AND CONDITIONS, section  II. COMMON DEFINITIONS, (T) "Subsidiary", is amended  by the addition of the following:

 Subsidiary also means:
AFFORDABLE HOUSING CONSTRUCTION, INC.
SOUTHWEST HOUSING INVESTMENTS
SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.

# Coverage analysis

## insureds — individual defendants

## Insureds — Individual Defendants

Cheryl Potashnik is an insured because she was a manager of at least one insured entity. For example, the website for SH Management, SH Development, and AH Construction listed her as Chief Operating Officer.

Brian Potashnik is an insured because he was a manager of at least one insured entity. For example, Texas Secretary of State records show that he was a Director of SH Management, SH Development, and AH Construction and that he was the President of SH Management, SH Development, and AH Construction.

Common Terms & Conditions § II(K)

(K)  "Insureds" shall have the meaning specified for such term in each Coverage Part.

EPL Coverage Part § II(H)

(H) "Insureds" means any:

(1) **Insured Entity**; or

(2) **Insured Person**.

EPL Coverage Part § II(G)

(G) "Insured Person" means any:

(1) **Employee;**

(2) **Manager**; or

(3) [not at issue in this case]

EPL Coverage Part does not define Manager

Common Terms & Conditions § II(O)

(O)  "Manager" means any natural person who is a past, present or future:

Appendix 001862

(1)  duly elected or appointed director, officer, member of the board of managers or management committee member of an Insured Entity;

(2) [not at issue in this case]; or

(3) [not at issue in this case].

# Entity defendants' website excerpt

## Leadership

**Founder and President – Brian Potashnik** began his professional career as a tax advantage specialist for Merrill Lynch. He founded Southwest Housing in 1993 in response to the growing demand for high-quality affordable housing by seniors and families living on low to moderate incomes. Over the last decade, he has developed over 12,000 multifamily apartments and town homes. Today he balances his time between the boardroom, construction sites and properties, talking to lenders, equity partners, employees and residents to ensure that every Southwest Housing community is exemplary.

**Chief Operating Officer - Cheryl Potashnik** has a Masters Degree from UCLA in Urban Planning. Familiar with affordable housing and economic development goals from the public perspective, Cheryl put her expertise to work on the private side with Southwest Housing. Today she works to leverage the company's resources by forming strategic partnerships with housing authorities, housing finance corporations and nonprofits.

**Chief Financial Officer – Keith Jones** brings over 20 years of broad-based accounting experience to Southwest Housing. He started his career in 1983 at the accounting firm of McCarthy, Rose & Mills and most recently was Chief Financial Officer for Alpha-Barnes. His responsibilities at Southwest Housing encompass tax and financial reporting for each of the company's divisions utilizing his experience to structure efficient, innovative accounting and tax procedures. His responsibilities also include analysis of new projects and ongoing evaluation of financial variables for each Southwest Housing project. Keith is a member of the Texas Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

**Executive Vice President - Jeffery Carpenter** spearheads the day-to-day marketing, management, maintenance and compliance operations of the company. Jeff works closely with the development and construction teams to assist in market evaluations, product design and value engineering for long-term ownership of the apartment communities. Jeff has been directly involved in all phases of multi-family residential real estate, including development and construction, for over 26 years. During his career, he has been responsible for the leasing, marketing and management of over 100,000 apartments from new construction, LIHTC and luxury class "A" apartments to extensive rehabs in 32 states.

**Senior Vice President of Development & Finance - Deepak P. Sulakhe** joined Southwest Housing in June 2003. As VP of Development & Finance, he is responsible for bringing in new business to the company. Since joining the team, he has was responsible for all development activities from acquisition to closing of 16 projects of nearly 3,000 affordable apartment homes (including family and senior housing) distributed over several major metropolitan areas. The developed units have used various tax exempt bond programs including Fannie Mae and FHA credit enhancements, private placement bonds, etc. Equity through the sale of Housing Tax Credits was obtained by various investors. Prior to joining Southwest Housing, Deepak was Development Director at Fore Property Company. Here, he developed over 2,000 apartment units in several states and was responsible for all activities from acquisition to conversion. Deepak is a member of the Urban Land Institute and the National Association of Home Builders. Deepak has degrees in Master of Science in Land and Real Estate Development from Texas A&M University, Master of Architecture (Urban Design) from University of Oklahoma, and Bachelor of Architecture from Bangalore University. He was a recipient of an Alumni Sponsored Scholarship at Texas A&M University for outstanding academic performance.

**Executive Vice President of Development Finance - Sara Reidy** has more than 20 years of experience in the Accounting/Finance industry. She joined Southwest Housing in 1998 and has held numerous positions including Account Manager, Controller and Vice President of Corporate Finance. In her current position, she works closely with investors and lenders from the closing of a development, funding of all equity and conversion of the permanent loan. She is responsible for financial oversight of projects under development including the monitoring of project spending, construction status and lease up activity. In addition, Sara works with auditors to certify the costs associated with a development and is responsible for certification to the state agencies.

In April 2005, Sara received her certifica[...] Housing Development Finance professional (HDFP) from the National Development Council.

Return to Top

CARPENTER 0103

Appendix 001865

# SH Management

## Texas Franchise Tax Public Information Reports

06139412312 0002
Do not write in the space above

a. T Code ■ 13196

This report MUST be filed to
satisfy franchise tax requirements

**TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT** ■

c. Taxpayer identification number
1-75-2541771-7

d. Report year
2006

Corporation name and address

llullulululullluullu
SOUTHWEST HOUSING MANAGEMENT CORPORATION
5910 N CENTRAL EXPY STE 1145
DALLAS TX 75206-5146

e. PIR / IND ■   1   4 ■

Secretary of State file number or, if none,
Comptroller unchartered number

Item k on Franchise    g. ■
Tax Report, Form 05-142     0131348300

*Please mark through any incorrect information, and type or print the correct information.*

*The following information MUST be provided for the Secretary of State (SOS) by each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for
Sections A, B, and C, if necessary. The information will be available for public inspection.*

○ Blacken this circle completely if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

Corporation's principal office

Principal place of business

*1 7 5 2 5 4 1 7 7 1 7 9 6 4*

*Please sign below!* Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | ☐ YES | |
| MAILING ADDRESS 3424 CORNELL DALLAS, TX 75205 | | | |
| BRIAN POTASHNIK | DIRECTOR | ☒ YES | |
| MAILING ADDRESS 3424 CORNELL DALLAS, TX 75205 | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company.  Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent: WARREN KIRSHENBAUM
Office: 5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change this
information. Changes can also be made on-line at
*http://www.sos.state.tx.us/corp/sosda/index.shtml*

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related corporation or limited liability company.

sign here ►   Officer, director, or other authorized person      Title *Agent for*    Date *5-12-06*    Daytime phone (Area code and number) *214-891-7848*

0246827

Comptroller 05 - 102
of Public (Rev.4-05/24)

13196    a. T Code ■    3333

**TEXAS FRANCHISE TAX**
**PUBLIC INFORMATION REPORT**
*MUST be filed to satisfy franchise tax requirements*

Corporation name and address

| | Do not write in the space above |
|---|---|
| c. Taxpayer identification number ■ 30117242096 | d. Report year ■ 2006 |

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145
DALLAS, TX                              75206

e. PIR / IND  [1] ■   [4] ■

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■
Item k on Franchise    0131348380
Tax Report Form 05-142

*If the preprinted information is not correct, please type or print the correct information.*

*The following information MUST be provided for the Secretary of State (SOS) by each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

[ ] Check here if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

Corporation's principal office

5910 N CENTRAL EXPRESSWAY,    DALLAS, TX 75206
Principal place of business

5910 N CENTRAL EXPRESSWAY,    DALLAS, TX 75206

*Please sign below!* Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

**SECTION A.** Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | X YES | |
| MAILING ADDRESS 3424 CORNELL    DALLAS, TX 75205 | | | |
| CHERYL POTASHNIK | SRVP | YES | |
| MAILING ADDRESS 3424 CORNELL    DALLAS, TX 75205 | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |

**SECTION B.** List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |
| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |

**SECTION C.** List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |

Registered agent and registered office currently on file. *(See Instructions if you need to make changes.)*

Agent:  BRIAN POTASHNIK
Office:  5910 N CENTRAL EXPRESSWAY,1145
         DALLAS, TX   75206

[ ] Check here if you need forms to change this information. Changes can also be made on-line at http://www.sos.state.tx.us/corp/sosda/index.shtml

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this corporation or limited liability company or a related corporation.

sign here ▶

Officer, director or other authorized person    Title    Date    Daytime phone (Area code and number)
9/15/06    214 891 7878

5Y5212 2,000

6RC0OM   7704   09/14/2006 14:17:12 V05-7.7

07140135640

a. T Code ■ 13196

*This report MUST be filed to satisfy franchise tax requirements*

05 FORM (11-06/28)

Do not write in the space above

| | |
|---|---|
| c. Taxpayer identification number ■ 1-75-2541771-7 | d. Report year ■ 2007 |

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

Corporation name and address

|ılıılıılıılıılıılıılıılıılıı|

SOUTHWEST HOUSING MANAGEMENT CORPORATION
5910 N CENTRAL EXPY STE 1145
DALLAS TX 75206-5146


2348

e. PIR / IND ☒ 1   ☐ 4

Secretary of State file number or, if none, Comptroller unchartered number

Item k on Franchise
Tax Report, Form 05-142    g. ■ 0131348300

*Please mark through any incorrect information, and type or print the correct information.*

*The following information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

○ Blacken this circle completely if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

***Please sign below!*** Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

| Corporation's principal office | |
|---|---|
| Principal place of business | |

**SECTION A.** Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | ☐ YES | |
| MAILING ADDRESS 3424 CORNELL DALLAS, TX 75205 | | | |
| NAME CHERYL POTASHNIK | SENIOR VP | ☐ YES | |
| MAILING ADDRESS 3424 CORNELL DALLAS, TX 75205 | | | |
| NAME BRIAN POTASHNIK | DIRECTOR | ☒ YES | |
| MAILING ADDRESS 3424 CORNELL DALLAS, TX 75205 | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |

**SECTION B.** List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.** List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent: KEITH R JONES
Office: 5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change the registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ► | Officer, director or other authorized person | Title Agent | Date 5/14/07 | Daytime phone (Area code and number) |
|---|---|---|---|---|

0538526

13196

a. T Code ■

*This report MUST be filed to satisfy franchise tax requirements*

Comptroller 05-102
FORM

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

| c. Taxpayer identification number | d. Report year |
|---|---|
| ■ 3-01172-4209-6 | ■ 2007 |

Corporation name and address

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145
DALLAS, TX                          75206

e. PIR / IND     [1]   [4]
                  ■      ■

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■
*Item k on Franchise*     013134830 0
*Tax Report, Form 05-142*

*Please mark through any incorrect information, and type or print the correct information.*

The following information is required by Section 171.203 of the Tax Code for each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets
for Sections A, B, and C, if necessary. The information will be available for public inspection.

☐ Check this box if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

Corporation's principal office

5910 N CENTRAL EXPRESSWAY,     DALLAS, TX 75206
Principal place of business

5910 N CENTRAL EXPRESSWAY,     DALLAS, TX 75206

**Please sign below!** Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

**SECTION A.** Name, title, and mailing address of each officer and director.

| NAME | | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
|---|---|---|---|---|
| BRIAN POTASHNIK | | PRESIDENT | X  YES | |
| MAILING ADDRESS | | | | |
| 3424 CORNELL | DALLAS, TX 75205 | | | |
| NAME | | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
| CHERYL POTASHNIK | | SRVP | YES | |
| MAILING ADDRESS | | | | |
| 3424 CORNELL | DALLAS, TX 75205 | | | |
| NAME | | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
| | | | YES | |
| MAILING ADDRESS | | | | |
| NAME | | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
| | | | YES | |
| MAILING ADDRESS | | | | |
| NAME | | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
| | | | YES | |
| MAILING ADDRESS | | | | |

**SECTION B.** List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
| | | | |

**SECTION C.** List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent:     BRIAN POTASHNIK
Office:    5910 N CENTRAL EXPRESSWAY,1145
           DALLAS, TX   75206

☐ Check this box if you need forms to change the
registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Officer, director, or other authorized person | Title | Date | Daytime phone *(Area code and number)* |
|---|---|---|---|---|
| | | President | 2-21-07 | 214-891-7811 |

6Y5212 2.000     06982P    7704    09/16/2007 13:17:35 V06-7.6

Appendix 001870

780701  05-102
04-17-08  (1-08/28)

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT
*(To be filed by Corporations and Limited Liability Companies (LLCS))*
**This report MUST be filed to satisfy franchise tax requirements**

■ **Tcode** 13196

■ Taxpayer number
17525417717

■ Report year
2008

You have certain rights under Chapter 552 and 559, Government Code,
to review, request, and correct information we have on file about you.
Contact us at: (512) 463-4600, or (800) 252-1381, toll free nationwide.

Taxpayer name
SOUTHWEST HOUSING MANAGEMENT COMPANY, IN

Mailing address
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145

City
DALLAS

State
TX

ZIP Code
75206

Plus 4

Secretary of State file number
or Comptroller file number
0131348300

☐ Check box if there are currently no changes or additions to the information displayed in Section A of this report. Then complete Sections B and C.

Entity's principal office
5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206

Principal place of business
5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206

**Please sign below!**

Officer, director and member information is reported as of the date a Public Information
Report is completed. The information is updated annually as part of the franchise tax
report. There is no requirement or procedure for supplementing the information as
officers, directors, or members change throughout the year.

*1752541771708*

**SECTION A.** Name, title and mailing address of each officer, director or member.

Name
BRIAN POTASHNIK

Title
PRESIDENT

Director
☒ YES

Term expiration

m m d d y y

Mailing address
5910 N CENTRAL EXPWY

City
DALLAS

State
TX

ZIP Code
75206

Name

Title

Director
☐ YES

Term expiration

m m d d y y

Mailing address

City

State

ZIP Code

Name

Title

Director
☐ YES

Term expiration

m m d d y y

Mailing address

City

State

ZIP Code

**SECTION B.** Enter the information required for each corporation or LLC, if any, in which this reporting entity owns an interest of ten percent (10%) or more.

Name of owned (subsidiary) corporation or limited liability company
NONE

State of formation

Texas SOS file number, if any

Percentage of Ownership

Name of owned (subsidiary) corporation or limited liability company

State of formation

Texas SOS file number, if any

Percentage of Ownership

**SECTION C.** Enter the information required for each corporation or LLC, if any, that owns an interest of ten percent (10%) or more in this reporting entity.

Name of owned (parent) corporation or limited liability company
NONE

State of formation

Texas SOS file number, if any

Percentage of Ownership

Registered agent and registered office currently on file. (See instructions if you need to make changes)

Agent: KEITH R. JONES

☐ Check box if you need forms to change the registered agent or registered office information.

Office: 5910 N CENTRAL EXPWY, 1145

City
DALLAS

State
TX

ZIP Code
75206

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use
additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to
each person named in this report who is an officer, director or member and who is not currently employed by this, or a related, corporation or limited liability company.

sign
here ▶



Title
*President*

Date
11-10-08

Area code and phone number

**Texas Comptroller Official Use Only**



VE/DE ☐   PIR IND ☐

# SH Development

# Texas Franchise Tax Public Information Reports

Comptroller
of Public     05 - 102
Accounts      (Rev.1-05/24)

3333

13196            a.  T Code  ■ 13976            b. ■

Do not write in the space above

**TEXAS FRANCHISE TAX**
**PUBLIC INFORMATION REPORT**
*MUST be filed to satisfy franchise tax requirements*

c. Taxpayer identification number

■ 17526353810

d. Report year
■ 2006

Corporation name and address

SOUTHWEST HOUSING DEVELOPMENT COMPANY, I
5910 NORTH CENTRAL EXPRESSWAY, SUITE 114
DALLAS          TX    75206

e. PIR / IND

Secretary of State file number or, if none,
Comptroller unchartered number

Item k on Franchise    0138624790
Tax Report Form 05-142

If the preprinted information is not correct, please type or print the correct information.

The following information MUST be provided for the Secretary of State (SOS) by each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for
Sections A, B, and C, if necessary. The information will be available for public inspection.

☐ Check here if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

**Please sign below!**    Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

Corporation's principal office

5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206

Principal place of business

5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206

**SECTION A.   Name, title, and mailing address of each officer and director.**

| NAME | TITLE | DIRECTOR | | Term expiration (mm-dd-yyyy) |
|------|-------|----------|---|------------------------------|
| BRIAN POTASHNIK | PRESIDENT | X YES | | |
| MAILING ADDRESS | | | | |
| 5910 NORTH CENTRAL EXPRES        DALLAS, TX 75206 | | | | |
| NAME | TITLE | DIRECTOR YES | | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | | |
| NAME | TITLE | DIRECTOR YES | | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | | |
| NAME | TITLE | DIRECTOR YES | | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | | |
| NAME | TITLE | DIRECTOR YES | | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|----------------------------------------|------------------------|-----------------------|---------------------|
| NONE | | | |
| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|-------------------------------------|------------------------|-----------------------|---------------------|
| NONE | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent:   BRIAN POTASHNIK
Office:  5910 N CENTRAL EXPRESSWAY,1145
         DALLAS, TX 75206

☐ Check here if you need forms to change this
information. Changes can also be made on-line at
*http://www.sos.state.tx.us/corp/sosda/index.shtml*

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this corporation or limited liability company or a related corporation.

sign
here ►

Officer, director, or other authorized person    Title    Agent for    Date 9/15/06    Daytime phone (Area code and number) 214 891 7848

5Y5212 2.000    THO

Appendix 001873

a. T Code ■ 13196

05-102
(11-06/28)

This report MUST be filed to
satisfy franchise tax requirements

Do not write in the space above

**TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT**

c. Taxpayer identification number
■ 1-75-2635381-2

d. Report year
2007

Corporation name and address

SOUTHWEST HOUSING DEVELOPMENT COMPANY INC
5910 N CENTRAL EXPY STE 1145
DALLAS TX 75206-5146

e. PIR / IND   X   1     4

Secretary of State file number or, if none,
Comptroller unchartered number

Item k on Franchise
Tax Report, Form 05-142   g. ■ 0138624700

Please mark through any incorrect information, and type or print the correct information.

The following information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

○ Blacken this circle completely if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

| Corporation's principal office | |
| Principal place of business | |

*Please sign below!* Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | ☐ YES | |
| MAILING ADDRESS  5910 NORTH CENTRAL EXPRES DALLAS, TX 75206 | | | |
| BRIAN POTASHNIK | DIRECTOR | X YES | |
| MAILING ADDRESS  5910 NORTH CENTRAL EXPRES DALLAS, TX 75206 | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation owns an interest of ten percent (10%) or more.  Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company.  Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent:  KEITH R JONES
Office:  5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change the registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ► | Officer, director, or other authorized person | Title  Agent | Date  3/12/2007 | Daytime phone (Area code and number) |

Appendix 001874

0538591

Comptroller
of Public
Accounts
FORM
05 - 102
(11-06/26)

b. ■

13196        a. T Code ■        *This report MUST be filed to
satisfy franchise tax requirements*

**TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT**

c. Taxpayer identification number  ■ 17526353812

d. Report year  ■ 2007

Corporation name and address

SOUTHWEST HOUSING DEVELOPMENT COMPANY, I
5910 NORTH CENTRAL EXPRESSWAY, SUITE 114
DALLAS            TX   75206

e. PIR / IND    ☐ 1    ☐ 4

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■
Item k on Franchise    0138624790
Tax Report, Form 05-142

*Please mark through any incorrect information, and type or print the correct information.*

*The following information is required by Section 171.203 of the Tax Code for each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets
for Sections A, B, and C, if necessary. The information will be available for public inspection.*

☐ Check this box if there are currently no *changes to* the information preprinted in
Section A of this report. Then, complete Sections B and C.

*Please sign below!*  Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

Corporation's principal office
5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206

Principal place of business
5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | | Term expiration *(mm-dd-yyyy)* |
|------|-------|----------|--|-------------------------------|
| BRIAN POTASHNIK | PRESIDENT | X | YES | |
| MAILING ADDRESS  5910 NORTH CENTRAL EXPRES     DALLAS, TX 75206 | | | | |
| NAME | TITLE | DIRECTOR | YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | | |
| NAME | TITLE | DIRECTOR | YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | | |
| NAME | TITLE | DIRECTOR | YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | | |
| NAME | TITLE | DIRECTOR | YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |

Registered agent and registered office currently on file.  *(See instructions if you need to make changes.)*

Agent:   BRIAN POTASHNIK
Office:   5910 N CENTRAL EXPRESSWAY,1145
         DALLAS, TX 75206

☐ Check this box if you need forms to change the
registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

sign
here ➤

Officer, director, or other authorized person

Title  *President*

Date  *11-30-07*

Daytime phone *(Area code and number)*  214-891-7811

6Y5212 2.000        THO

Appendix 001875

# AH Construction

# Texas Franchise Tax Public Information Reports

a. T Code ■ 13196

05-102
FORM (12-05/25)

*This report MUST be filed to satisfy franchise tax requirements*

Do not write in the space above

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

c. Taxpayer identification number
■ 1-75-2606210-8

d. Report year
2006

Corporation name and address

AFFORDABLE HOUSING CONSTRUCTION INC
5910 N CENTRAL EXPY STE 114S
DALLAS TX 75206-5146

e. PIR / IND  1 ■  4 ■

Secretary of State file number or, if none, Comptroller unchartered number

Item k on Franchise Tax Report, Form 05-142
g. ■ 0010587106

Please mark through any incorrect information, and type or print the correct information.

*The following information MUST be provided for the Secretary of State (SOS) by each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

○ Blacken this circle completely if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

*Please sign below!* Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

| Corporation's principal office |
| Principal place of business |

## SECTION A. Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | ☐ YES | |
| MAILING ADDRESS 5910 NORTH CENTRAL EXPRESSWAY SUITE 114 DALLAS, TX 75206 | | | |
| BRIAN POTASHNIK | DIRECTOR | ☒ YES | |
| MAILING ADDRESS 5910 NORTH CENTRAL EXPRESSWAY SUITE 114 DALLAS, TX 75206 | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | |
| MAILING ADDRESS | | | |

## SECTION B. List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |
| | | | |

## SECTION C. List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent: WARREN KIRSHENBAUM
Office: 5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change this information. Changes can also be made on-line at **http://www.sos.state.tx.us/corp/sosda/index.shtml**

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Officer, director, or other authorized person | Title CFO | Date 5-5-06 | Daytime phone (Area code and number) 214 8877848 |




Appendix 001877

0021895

05 - 102 (Rev.1-05/24)

13196   a. T Code ■ 13196   3333
FMAH634
9309

**TEXAS FRANCHISE TAX**
**PUBLIC INFORMATION REPORT**
*MUST be filed to satisfy franchise tax requirements*

2H51 - 972/671-7166

Do not write in the space above

| c. Taxpayer identification number | d. Report year |
|---|---|
| ■ 17526062108 | ■ 2006 |

Corporation name and address

AFFORDABLE HOUSING CONSTRUCTION INC
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1/14
DALLAS                TX      75206

e. PIR / IND    [X] 1    [ ] 4

Secretary of State file number or, if none,
Comptroller unchartered number

| Item k on Franchise | g. ■ 0010587186 |
| Tax Report Form 05-142 | |

*If the preprinted information is not correct, please type or print the correct information.*

*The following information MUST be provided for the Secretary of State (SOS) by each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

[ ] Check here if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

Corporation's principal office

Principal place of business

*75260631006*

**Please sign below!**   Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | [X] YES | |
| MAILING ADDRESS | | | |
| 5910 N.CENTRAL EXPY;SUITE   DALLAS, TEXAS 75206 | | | |
| Keith R Jones | Treasurer | [ ] YES | |
| MAILING ADDRESS | | | |
| 5910 N. Central Expwy   Dallas Tx 75206 | | | |
| NAME | TITLE | [ ] YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | [ ] YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | [ ] YES | |
| MAILING ADDRESS | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|

Registered agent and registered office currently on file.  *(See instructions if you need to make changes.)*

Agent:
Office:

[ ] Check here if you need forms to change this information. Changes can also be made on-line at *http://www.sos.state.tx.us/corp/sosda/index.shtml*

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this corporation or limited liability company or a related corporation.

**sign here** ▶   Officer, director, or other authorized person   Title: Treasurer   Date: 2/7/07   Daytime phone (Area code and number) 214 891 7848

5Y52122.000

Appendix 001878

07300426171 0003

Comptroller 05 - 102
of Public (11-2005)
FORM

13196    a. T Code ■    3333

This report MUST be filed to
satisfy franchise tax requirements

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

Corporation name and address

| c. Taxpayer identification number | d. Report year |
|---|---|
| ■ 752606210 8 | ■ 2007 |

**AFFORDABLE HOUSING CONSTRUCTION INC**
**5910 NORTH CENTRAL EXPRESSWAY, SUITE 114**
**DALLAS                    TX    75206**

e. PIR / IND    □ 1 ■    □ 4 ■

Secretary of State file number or, if none,
Comptroller unchartered number

Item k on Franchise    g. ■ 0010587186
Tax Report, Form 05-142

Please mark through any incorrect information, and type and print the correct information.

*The following information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

□ Check this box if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

*752606210 07*

***Please sign below!*** Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

Corporation's principal office

Principal place of business

**SECTION A.**  Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | X YES | |

MAILING ADDRESS
5910 N.CENTRAL EXPY;SUITE      DALLAS, TEXAS 75206

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| | | YES | |

MAILING ADDRESS

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| | | YES | |

MAILING ADDRESS

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| | | YES | |

MAILING ADDRESS

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| | | YES | |

MAILING ADDRESS

**SECTION B.**  List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.**  List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file.  *(See instructions if you need to make changes.)*

Agent:

Office:                                           □ Check this box if you need forms to change the
registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here | Officer, director or other authorized person | Title *President* | Date *10-12-07* | Daytime phone (Area code and number) *214-891-7511* |
|---|---|---|---|---|

6Y5212 2.000    THO

780701
04-17-08

05-102
(1-08/28)

■ Tcode   13196

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT
*(To be filed by Corporations and Limited Liability Companies (LLCS))*
**This report MUST be filed to satisfy franchise tax requirements**

■ Taxpayer number
17526062108

■ Report year
2008

**You have certain rights** under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at: (512) 463-4600, or (800) 252-1381, toll free nationwide.

Taxpayer name
**AFFORDABLE HOUSING CONSTRUCTION INC**

Mailing address
**5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145**

| City | State | ZIP Code | Plus 4 | Secretary of State file number or Comptroller file number |
|------|-------|----------|--------|-----------|
| DALLAS | TX | 75206 | | 0010587106 |

☐ Check box if there are currently no changes or additions to the information displayed in Section A of this report. Then complete Sections B and C.

Entity's principal office
**5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206**

Principal place of business
**5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206**

**Please sign below!**

Officer, director and member information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or members change throughout the year.

\*1752606210808\*

**SECTION A.** Name, title and mailing address of each officer, director or member.

| Name | Title | Director | | m m d d y y |
|------|-------|----------|--|-------------|
| BRIAN POTASHNIK | PRESIDENT | ☒ YES | Term expiration | |

Mailing address
5910 N CENTRAL EXPWY

| City | State | ZIP Code |
|------|-------|----------|
| DALLAS | TX | 75206 |

| Name | Title | Director | | m m d d y y |
|------|-------|----------|--|-------------|
| | | ☐ YES | Term expiration | |

Mailing address | City | State | ZIP Code

| Name | Title | Director | | m m d d y y |
|------|-------|----------|--|-------------|
| | | ☐ YES | Term expiration | |

Mailing address | City | State | ZIP Code

**SECTION B.** Enter the information required for each corporation or LLC, if any, in which this reporting entity owns an interest of ten percent (10%) or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|------|------|------|------|
| NONE | | | |
| | | | |

**SECTION C.** Enter the information required for each corporation or LLC, if any, that owns an interest of ten percent (10%) or more in this reporting entity.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|------|------|------|------|
| NONE | | | |

Registered agent and registered office currently on file. (See instructions if you need to make changes)

Agent:  **WARREN KIRSHENBAUM**

☒ Check box if you need forms to change the registered agent or registered office information.

| Office: | 5910 N CENTRAL EXPWY, 1145 | City | State | ZIP Code |
|---------|----------------------------|------|-------|----------|
| | | DALLAS | TX | 75206 |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, or member and who is not currently employed by this, or a related, corporation or limited liability company.



sign
here ▶

Title *President*   Date *11-10-08*   Area code and phone number

**Texas Comptroller Official Use Only**

| VE/DE | ☐ | PIR IND | ☐ |

1019

Appendix 001880

00001975865

AFFORDABLE HOUSING CONSTRUCTION
ATTACHMENT TO 2008 TEXAS FRANCHISE TAX REPORT

FEDERAL IDENTIFICATION NUMBER          75-2606210

TEXAS TAXPAYER NUMBER                  17526062108

SECRETARY OF STATE FILE NUMBER          10587106

# Coverage analysis

## employment practices claim

# Employment practices claim

This case involves an employment practices claim because this civil proceeding was commenced with service of the original petition on behalf of an employee of at least one insured entity in his capacity as an employee.

EPL Coverage Part II(C)

(C) "Employment Practices Claim" means any:

(1)     written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

(2)     civil proceeding commenced by the service of a complaint or similar pleading;

(3)     [not at issue in this case]; or

(4)     [not at issue in this case]

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

[additional employment practices claims and exclusion for proceedings under collective bargaining agreement not at issue in this case]

This is a civil proceeding commenced with the service of an original petition.  Although the petition also constitutes a written demand as defined in the policy, no written demand analysis is necessary in light of the employment practices claim definition part (2).

Appendix 001883

EPL Coverage Part II(C)

(C) "Employment Practices Claim" means any:

(1)     written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

(2)     civil proceeding commenced by the service of a complaint or similar pleading;

(3)     [not at issue in this case]; or

(4)     [not at issue in this case]

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

[additional employment practices claims and exclusion for proceedings under collective bargaining agreement not at issue in this case]

EPL Coverage Part does not define Employee

Common Terms & Conditions § II(F)

(F) "Employee" means any past, present, or future:

(1)     employee of an Insured Entity in such person's capacity as an employee, including any part time, seasonal, temporary, leased, or loaned employee; or

(2)     [not at issue in this case].

**Capacity as employee**

This civil proceeding was commenced on behalf of Jeff Carpenter in his capacity as an employee.  For example, the petition alleges that SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik were all joint employers of Jeff with respect to the asset sale and the sale proceeds payment.[1]

---

[1]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, at pp. 15-16 ¶ 42.

**Employee**

The policy only requires that the claimant be an employee of *an* insured entity — *i.e.*, at least one insured entity.  All parties in this case agree that SH Management employed Jeff.  That is sufficient for purposes of coverage.  But Jeff was also an employee of insured entities SH Development and AH Construction in connection with the asset sale and the sale proceeds payment.[2]  An employee may have more than one employer even while performing a single action and even without the joint employer doctrine.[3]

### *Ordinary meaning*

The policy defines employee to include former part-time and temporary employees [in addition to former full-time employees].  The policy defines employee in a circular manner — it uses the term *employee* to define the term *employee*.  It does not further define employee.  As a result, courts must look to the ordinary meaning of *employee*.[4]

The ordinary meaning of employee is one who works for another for compensation, as shown in the attached definitions.[5]  The policy separately defines independent contractor, which requires an express independent contractor agreement.  As a result, this coverage analysis excludes from the ordinary meaning of employee that definition of independent contractor.

Jeff was an employee of insured entities SH Management, SH Development, and AH Construction within the ordinary meaning of the term *employee*.  Insured entities SH

---

[2]     This coverage analysis address only insured entities as employers due to the policy definition of employment practices claim.  But Jeff was also an employee of Brian Potashnik and Cheryl Potashnik in connection with the asset sale and sale proceeds payment.  Brian Potashnik and Cheryl Potashnik are individual insureds and were also sellers in the asset sale.

[3]     *See* RESTATEMENT (SECOND) AGENCY § 226 ("A person may be the servant of two masters, [who are] not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.").

[4]     *See RSUI Indem. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) ("Unless the policy dictates otherwise, we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."); *see also Edinburg Consol. Indep. Sch. Dist. v. INA*, 806 S.W.2d 910, 913 (Tex. App.—Corpus Christi 1991, no writ) (looking to dictionary for meaning of undefined term in insurance policy).

[5]     *See* Exhibit 5A.

Management, SH Development, and AH Construction were all sellers in the asset sale.[6] Jeff's work in staying on as long as needed to help make the asset sale happen was work for each of these sellers. The compensation was to be the sale proceeds payment.

### Vice principal

The above is sufficient for purposes of the *employee* coverage analysis. The following vice principal analysis simply makes clear that insureds and sellers SH Management, SH Development, and AH Construction requested the asset sale work from Jeff and entered the pay-to-stay employment agreement.

The acts and omissions of a vice principal are the acts and omissions of the corporation itself.[7] A vice principal includes corporate officers and others who represent the corporation in its corporate capacity, among other categories of people.[8]

Brian Potashnik was a vice principal — an officer and director — of SH Management, SH Development, and AH Construction.[9] Brian Potashnik was a vice principal of these entities at the time he entered the oral pay-to-stay employment agreement with Jeff and throughout the remainder of Jeff's employment in working to help make the asset sale happen.[10] The acts of Brian Potashnik in making this employment agreement *were* the acts of SH Management, SH Development, and AH Construction.

### Agency

The following agency analysis simply provides a second reason that insureds and sellers SH Management, SH Development, and AH Construction requested the asset sale work from Jeff and entered the pay-to-stay employment agreement. Sellers SH Management, SH Development, and AH Construction expressly named Brian Potashnik as their agent in connection with the asset sale.[11] So, Brian Potashnik also had express, implied, or

---

[6]     *See* Exhibit 2, Excerpts from Purchase and Sale Agreement.

[7]     *See Bennett v. Reynolds*, 315 S.W.3d 867, 883 (Tex. 2010) ("When actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself.").

[8]      *See id.* at 884.

[9]     *See* Exhibits 4B-4D.

[10]     *See id.*; *see also generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, pp. 4-5 ¶¶ 11-13 & pp. 11-14 ¶¶ 33-38.

[11]     *See* Exhibit 2, Excerpts from Purchase and Sale Agreement, at signature page (agent for sellers) & schedule (identifying sellers).

apparent authority to enter the oral pay-to-stay employment agreement with Jeff on behalf of sellers SH Management, SH Development, and AH Construction.[12]

---

[12] *See* TEX. PATTERN JURY CHARGES, BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT 101.4 (2014) ("A party's conduct includes the conduct of another who acts with the party's authority or apparent authority. Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.").

# Dictionary definitions of employee

# employee

## em·ploy·ee

*n.*
A person who works for another in return for financial or other compensation.
American Heritage® Dictionary of the English Language, Fifth Edition. Copyright © 2011 by Houghton Mifflin Harcourt Publishing Company. Published by Houghton Mifflin Harcourt Publishing Company. All rights reserved.

# employee

*or*

# employe

*n*
(Industrial Relations & HR Terms) a person who is hired to work for another or for a business, firm, etc, in return for payment. Also called (esp formerly): **employé**
Collins English Dictionary – Complete and Unabridged, 12th Edition 2014 © HarperCollins Publishers 1991, 1994, 1998, 2000, 2003, 2006, 2007, 2009, 2011, 2014

# em•ploy•ee

# or em•ploy•e

(ɛmˈplɔɪ i, ɛm plɔɪˈi, ˌɛm plɔɪˈi)

*n.*
a person who has been hired to work for another.
[1825–35; < French *employé* employed, past participle of *employer* to employ; see -ee]
Random House Kernerman Webster's College Dictionary, © 2010 K Dictionaries Ltd. Copyright 2005, 1997, 1991 by Random House, Inc. All rights reserved.



SINCE 1828

# employee

*noun* em·ploy·ee \im-ˌplȯi(i)-ˈē, (ˌ)em-; im-ˈplȯi(i)-ˌē, em-\

## Simple Definition of *employee*

- : a person who works for another person or for a company for wages or a salary

## Full Definition of *employee*

1. : one employed by another usually for wages or salary and in a position below the executive level

## Examples of *employee* in a sentence

1. A good boss listens to his *employees*.
2. The company has more than 2,000 *employees* worldwide.

# Coverage analysis

## employment practices claim first made within relevant time period

## Employment practices claim first made
## against the insureds during relevant period

This case involves an employment practices claim first made against the insureds during the policy period or extended reporting period.

The policy period is March 4, 2007 through June 5, 2008. A Texas endorsement also provides an automatic 30-day extended reporting period after the end of the policy period. It states:

> **Endorsement No. 8**
>
> IX. EXTENDED REPORTING PERIOD
>
> (A) Upon **Termination of Coverage**, the **Named Entity** shall be entitled to an automatic extended reporting period ("Automatic Extended Reporting Period") of thirty (30) days from the end of the Policy Period to report Claims under this Policy.

> **Endorsement No. 8**
>
> (W) **Termination of Coverage**, whether undertaken by the **Insurer** or the **Insured** at any time, means:
>
> (1) cancellation or nonrenewal of a policy, other than for nonpayment of premium; or
> (2) decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured**.

The named entity SH Management is the named agent for all insureds in connection with the extended reporting period:

> **Common Terms and Conditions § XX**
>
> **XX. AUTHORIZATION OF NAMED ENTITY**
>
> The **Named Entity** shall act on behalf of all **Insureds** with respect to all matters under this Policy, including, without limitation, giving and receiving of notices regarding Claims, cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Policy.

The employment practices claim in this case is the lawsuit commenced with service of an original petition.  This claim was made within the policy period and within the automatic extended reporting period.

March 11, 2008:        file-stamp on original petition[1]

March 20, 2008:        service date for insureds SH Management, SH Development, and AH Construction[2]

March 21, 2008:        service date for insureds Brian Potashnik and Cheryl Potashnik[3]

---

[1]        *See* Exhibit 6A.

[2]        *See* Exhibit 6B.

[3]        *See* Exhibit 6B.

# Original petition
# file-stamp

CAUSE NO. _____

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHWEST HOUSING DEVELOPMENT | § | AT LAW NO. 5 |
| COMPANY, INC.; SOUTHWEST | § | |
| HOUSING MANAGEMENT COMPANY, | § | |
| INC.; AFFORDABLE HOUSING | § | |
| CONSTRUCTION, INC.; BRIAN | § | |
| POTASHNIK; and CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |



## PLAINTIFF'S ORIGINAL PETITION AND PETITION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

TO THE HONORABLE JUDGE OF THE COURT:

Jeffrey W. Carpenter files this Original Petition and Petition for Temporary Restraining Order and Injunction complaining of Defendants and would show the court the following:

### I.
### LEVEL III DISCOVERY CONTROL PLAN

1.      Discovery is intended to be conducted under Level III pursuant to Texas Rule of Civil Procedure 190.4.

### II.
### PARTIES

2.      Plaintiff Jeffrey W. Carpenter is an individual residing in Dallas, Dallas County, Texas.

3.      Defendant Southwest Housing Development Company, Inc. ("SWHD") is a Texas corporation with its principal place of business in Dallas County, Texas.

4.      Defendant Southwest Housing Management Company, Inc. ("SWHM") is a Texas

---

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                          page 1
R:\6\0646\60881\SubsPldgs\Petition.doc

Appendix 001895

# Returns of service

Form No. 412 - **CITATION**  **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

**AFFORDABLE HOUSING CONSTRUCTION, INC.**
**SERVE WARREN KIRSHENBAUM REG AGENT**
**5910 N CENTRAL EXPWY SUITE 1145**
**DALLAS TX 75206**

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street Suite 101, Dallas, Texas 75202.

**PLAINTIFF**
**JEFFREY W. CARPENTER**

**VS.**
**AFFORDABLE HOUSING CONSTRUCTION, INC.**

**DEFENDANT**, filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

**WITNESS: JOHN WARREN**, Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court, Dallas County Court at Law No. 5, Dallas County, Texas.

By _____ Deputy
FANNITTA FLORES

---

ATTY

**CITATION**

CC-08-02072-E

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
Dallas County, Texas

JEFFREY W. CARPENTER
Plaintiff

vs.

AFFORDABLE HOUSING CONSTRUCTION , INC.
Defendant

AFFORDABLE HOUSING
CONSTRUCTION, INC.
SERVE WARREN KIRSHENBAUM REG
AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX, 75206

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

R ROGGE DUNN
1201 ELM STREET
SUITE 5200
DALLAS     TX  75270
214-220-3888

NO OFFICE
COLLECT

## OFFICER'S RETURN

Came to hand on the 19th day of March A.D., 20 08, at 10:26 o'clock A M., and executed by delivering to Affordable Housing Construction, Inc. by delivering to Keith Jones, Treasure authorized to accept at 5910 N. Central Expwy, Suite 1145, Dallas, Texas 75206

on the 20th day of March A.D., 20 08, at 2:50 o'clock P. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

**Fees**

| | | Dallas County, Texas |
| --- | --- | --- |
| Serving: _____ | $ _____ | |
| Mileage _____ | $ _____ | By: _____ Deputy |
| Notary _____ | $ _____ | Dennis S. Hinshaw |
| Total | $ _____ | Supreme Court No. SC000000628 |

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said _____ Dennis S. Hinshaw _____

before me this 21st day of March , 20 08 , to certify which witness my hand and seal of office.

Notary Public _____ Dallas County _____ Texas

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM 10:26

Appendix 001898

Form No. 412 - **CITATION**     **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

**SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.**
**SERVE KEITH R JONES REG AGENT**
**5910 N CENTRAL EXPWY SUITE 1145**
**DALLAS TX 75206**

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street Suite 101, Dallas, Texas 75202.

PLAINTIFF
**JEFFREY W. CARPENTER**

VS.
**SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.**

**DEFENDANT,** filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

**WITNESS:  JOHN WARREN,** Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court, Dallas County Court at Law No. 5, Dallas County, Texas.

By _____, Deputy
FANNITTA FLORES

---

ATTY

**CITATION**

CC-08-02072-E

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
**Dallas County, Texas**

**JEFFREY W. CARPENTER**
Plaintiff
vs.

SOUTHWEST HOUSING DEVELOPMENT
COMPANY, INC.
Defendant

SOUTHWEST HOUSING DEVELOPMENT
COMPANY, INC.
SERVE KEITH R JONES REG AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX 75206

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

**Attorney for Plaintiff**

R ROGGE DUNN
1201 ELM STREET
SUITE 5300
DALLAS          TX 75270
214-220-XXXX

NO OFFICER'S FEES HAVE BEEN
COLLECTED BY DALLAS COUNTY CLERK

Appendix 001899

## OFFICER'S RETURN

Came to hand on the __19th__ day of __March__ A.D. , 20 __08__ , at __10:30__ o'clock __A__. M. and executed by delivering to __Southwest Housing Development Company, Inc. by delivering to Keith R. Jones, it's reg. agent at 5910 N. Central Expwy, Suite 1145, Dallas, Texas 75206__
on the __20th__ day of __March__ A.D. , 20 __08__, at __2:50__ o'clock __P__. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

**Fees**

| | |
|---|---|
| Serving: _____ | $_____ |
| Mileage _____ | $_____ |
| Notary _____ | $_____ |
| **Total** | $_____ |



Dallas County, Texas

By: _____ , Deputy
Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said __Dennis S. Hinshaw__ _____

before me this __21st__ day of __March__ ,20 __08__, to certify which witness my hand and seal of office.

_____
Notary Public ____Dallas____ County ____Texas____

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM 10:30

Form No. 412 - **CITATION**      **THE STATE OF TEXAS**

| | ATTY |
|---|---|
| | **CITATION** |
| | CC-08-02072-E |

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.
SERVE KEITH R JONES REG AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX 75206

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street Suite 101, Dallas, Texas 75202.

PLAINTIFF
JEFFREY W. CARPENTER

VS.
SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.

DEFENDANT, filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

WITNESS:  JOHN WARREN, Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court,  Dallas County Court at Law No. 5, Dallas County, Texas.

By _____ Deputy
              FANNITTA FLORES

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
Dallas County, Texas

JEFFREY W. CARPENTER
Plaintiff
vs.

SOUTHWEST HOUSING MANAGEMENT
COMPANY, INC.
Defendant

SOUTHWEST HOUSING MANAGEMENT
COMPANY, INC.
SERVE KEITH R JONES REG AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX 75206

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

R ROGGE DUNN
1201 ELM STREET
SUITE 5200
DALLAS        TX 75270
214-220-3888

NO OFFICER'S FEES TO BE
COLLECTED BY DALLAS CO.

Appendix 001901

## OFFICER'S RETURN

Came to hand on the <u>19th</u> day of <u>March</u> A.D. 20 <u>08</u>, at <u>10:28</u> o'clock <u>A</u> M. and executed by delivering to <u>Southwest Housing Management Company, Inc. by delivering to Keith R. Jones, it's registered agent at 5910 N. Central Expwy, Suite 1145, Dallas, Texas 75206</u>
on the <u>20th</u> day of <u>March</u> A.D., 20 <u>08</u>, at <u>2:50</u> o'clock <u>P</u> M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

**Fees**

| | | |
|---|---|---|
| Serving: | $ | |
| Mileage | $ | |
| Notary | $ | |
| **Total** | $ | |

<u>Dallas</u> County, Texas

By: _____ , ~~Deputy~~
Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said <u>Dennis S. Hinshaw</u>

before me this <u>21st</u> day of <u>March</u> ,20 <u>08</u>, to certify which witness my hand and seal of office.

Notary Public <u>Dallas</u> County <u>Texas</u>

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM10:28

Appendix 001902

Form No. 412 - **CITATION** **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

BRIAN POTASHNIK    *35 P*
4419 HIGHLAND DRIVE
DALLAS TX 75205

"You have been sued.' You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street Suite 101, Dallas, Texas 75202.

PLAINTIFF
JEFFREY W. CARPENTER

VS.
BRIAN POTASHNIK

DEFENDANT, filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

WITNESS: JOHN WARREN, Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court, Dallas County Court at Law No. 5, Dallas County, Texas.

By _____ Deputy
FANNITTA FLORES

| | |
|---|---|
| | ATTY |
| | **CITATION** |
| | CC-08-02072-E |
| | IN THE COUNTY COURT OF DALLAS |
| | County Court at Law No. 5 |
| | **Dallas County, Texas** |
| | JEFFREY W. CARPENTER |
| | Plaintiff |
| | vs. |
| | BRIAN POTASHNIK |
| | Defendant |

BRIAN POTASHNIK
4419 HIGHLAND DRIVE
DALLAS TX 73205

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

R ROGGE DUNN
1201 ELM STREET
SUITE 5200
DALLAS        TX 75270
214-220-3888

NO OFFICER'S FEES HAVE BEEN
COLLECTED BY DALLAS COUNTY CLERK

## OFFICER'S RETURN

Came to hand on the __19th__ day of __March__ A.D., 20 __08__, at __10:24__ o'clock __A__. M. and executed by delivering to __Brian Potashnik at 4419 Highland Drive, Dallas, Texas 75205__

on the __21st__ day of __March__ A.D., 20 __08__, at __8:27__ o'clock __A__. M. the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

**Fees**

| | | |
|---|---|---|
| Serving: _____ | $_____ | |
| Mileage _____ | $_____ | |
| Notary _____ | $_____ | |
| **Total** | $_____ | |



Dallas County, Texas

By: _____ , Deputy

Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said _____ Dennis S. Hinshaw _____

before me this __21st__ day of __March__ ,20 __08__ , to certify which witness my hand and seal of office.

Notary Public _____ Dallas _____ County _____ Texas

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM 10:24

Form No. 412 - **CITATION**    **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

**CHERYL POTASHNIK**
**4419 HIGHLAND DRIVE**
**DALLAS TX 75205**

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street Suite 101, Dallas, Texas 75202.

**PLAINTIFF**
**JEFFREY W. CARPENTER**

**VS.**
**CHERYL POTASHNIK**

**DEFENDANT,** filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

**WITNESS: JOHN WARREN**, Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court, Dallas County Court at Law No. 5, Dallas County, Texas.

By _____ Deputy
FANNITTA FLORES

| ATTY |
|---|
| **CITATION** |
| CC-08-02072-E |

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
Dallas County, Texas

JEFFREY W. CARPENTER
Plaintiff

VS.

CHERYL POTASHNIK
Defendant

CHERYL POTASHNIK
4419 HIGHLAND DRIVE
DALLAS TX 75205

ISSUED THIS
13th day of March, 2008.

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

R ROGGE DUNN
1201 ELM STREET
SUITE 5200
DALLAS        TX 75270
214-220-3888

**NO OFFICER'S FEES HAVE BEEN
COLLECTED BY DALLAS COUNTY CLERK**

## OFFICER'S RETURN

Came to hand on the **19th** day of **March** A.D. , 20 **08** , at **10:22** o'clock **A** . M. and executed by delivering to **Cheryl Potashnik** at 4419 Highland Drive, Dallas, Texas 75205

on the **21st** day of **March** A.D. , 20 **08** , at **8:27** o'clock **A** . M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

**Fees**

| | | |
|---|---|---|
| Serving: | \_\_\_\_\_ | $_____ |
| Mileage | \_\_\_\_\_ | $_____ |
| Notary | \_\_\_\_\_ | $_____ |
| **Total** | | $_____ |



Dallas County, Texas

By: _____ , ~~Deputy~~

Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said _____ **Dennis S. Hinshaw** _____

before me this **21st** day of **March** ,20 **08** , to certify which witness my hand and seal of office.

Notary Public _____**Dallas**_____ County \_\_\_\_**Texas**\_\_\_\_

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'03 MAR 19 AM10:22

# Dictionary definitions

## back pay

About.com
About Careers
Job Searching

. . .

Job Search Basics
Job Search Assistance
Job Search and Employment Glossary
   Employment Glossary Terms Starting With B

# What is Back Pay?



By Alison Doyle
Job Searching Expert

Back pay is the difference between what an employee was paid and the amount he or she should have been paid.

Withheld wages may have been from actual hours worked, pay increases or promotions, or for work that could have otherwise been completed if there had not been some obstacle.



# back pay

*n*

**1.** (Industrial Relations & HR Terms) pay received by an employee from an increase awarded retrospectively

**Collins English Dictionary – Complete and Unabridged** © HarperCollins Publishers 1991, 1994, 1998, 2000, 2003

# back pay

noun

1.

pay received by an employee from an increase awarded retrospectively

Collins English Dictionary - Complete & Unabridged 2012 Digital Edition
© William Collins Sons & Co. Ltd. 1979, 1986 © HarperCollins Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012

## Examples from the Web for back pay

## Contemporary Examples

Those employees may or may not get *back pay* when the shutdown ends.   How the Government Shutdown Hurts National Security  Josh Rogin  September 29, 2013

## Historical Examples

On May 18, 1872, Congress passed a law for the restitution of *back pay*.   A History of Trade Unionism in the United States  Selig Perlman

With the *back pay* during his absence, the sum amounted to about $15,000.   Booker T. Washington  Emmett J. Scott and Lyman Beecher Stowe

But if I fail to return, my master makes my *back pay* with cold stripes.   God Wills It!  William Stearns Davis

Give the boys thirty-day orders on the Company for the *back pay*. The Gilded Age, Complete Mark Twain and Charles Dudley Warner

Meanwhile, I must begin to-morrow to cry like a poor devil about the *back pay*. Wood Rangers Mayne Reid

Then I got the *back pay*, of course, but I ought to have had it before. Captain Jinks, Hero Ernest Crosby

Look at a single class of these collections,—the *back pay* of sick men. The Atlantic Monthly, Volume 15, No. 88, February, 1865 Various

But the possible loss of his *back pay* would be a catastrophe. Billy and the Big Stick Richard Harding Davis

Washington now showed his sagacity in quelling the fears of the soldiers regarding their *back pay*. Comic History of the United States Bill Nye

## Contemporary definitions for back pay

### noun
a payment due for previously done work; also, salary overdue from a past pay period. Also written backpay; also called back payment, back salary, back wages

### Word Origin
1804-09

Dictionary.com's 21st Century Lexicon
Copyright © 2003-2014 Dictionary.com, LLC

backpay – Dictionary definition of backpay | Encyclopedia.com: FREE online dictionary

**ENCYCLOPEDIA•COM**

# backpay

TOOLS

**The Oxford Pocket Dictionary of Current English** | 2009 | 233 words
© The Oxford Pocket Dictionary of Current English 2009, originally published by Oxford University Press 2009.

**back·pay** / ˈbakˌpā; ˌbakˈpā/
- n. payment for work done in the past that was withheld at the time, usually because of a dispute: *Hickman should be provided backpay plus any expenses.*

## Cite this article

Pick a style below, and copy the text for your bibliography.

| MLA | Chicago | APA |
|-----|---------|-----|

"backpay." The Oxford Pocket Dictionary of Current English. 2009. *Encyclopedia.com.* 4 Sep. 2015
<http://www.encyclopedia.com>.



**back pay** - definition and synonyms

money that is owed to someone who works for a company but that has not been paid yet



# back pay

Definition of *back pay* in English:

**noun**

Payment for work done in the past that was withheld at the time, or for work that could have been done had the worker not been prevented from doing so:

*Hickman should be provided back pay plus any expenses*



**Wiktionary**
[ˈwɪkʃənɹɪ] *n.*,
a wiki-based Open
Content dictionary

Entry    Discussion    Citations                Read    Edit    History

Main Page
Community portal
Preferences
Requested entries
Recent changes
Random entry
Help
Donations
Contact us

Tools

What links here
Related changes
Upload file
Special pages
Permanent link
Page information
Cite this page
Add definition

Visibility

Show translations

Languages

Print/export

Create a book
Download as PDF
Printable version

Feedback

If you have time,
leave us a note.

# backpay

Contents  [hide]

1 English
  1.1 Alternative forms
  1.2 Noun
    1.2.1 Translations
  1.3 Anagrams

## English    [edit]

## Alternative forms    [edit]

- back pay

## Noun    [edit]

**backpay** (*plural* **backpays**)

1. A withheld payment for work which has already been completed, or which could have been completed had the employee not been prevented from doing so.

### Translations    [edit]

| withheld payment for work | [show ▼] |
|---|---|

## Anagrams    [edit]

- payback , pay back

| Categories : | English lemmas | English nouns | English countable nouns |
|---|---|---|---|

This page was last modified on 24 July 2015, at 05:58.

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy.

Privacy policy    About Wiktionary    Disclaimers    Developers    Mobile view




What is Back Payment? definition and meaning



InvestorWords

Home    Articles    Tips    Videos    Browse by Subject    Term of the Day    Join Now    Login

**Nearby Terms**

back on the shelf
back out
back pay
back rent
back stop
back taxes

# back payment

Save to Favorites

**Definition**

noun

1. a payment which is due but has not yet been paid

2. the act of paying money which is owed

Print    Cite / Link

# Department of Labor

publication excerpts

# Employee Retirement Income Security Act



## Compliance Assistance

The Employee Retirement Income Security Act of 1974 (ERISA) is a federal law that sets minimum standards for retirement and health benefit plans in private industry. ERISA does not require any employer to establish a plan. It only requires that those who establish plans must meet certain minimum standards.

ERISA covers retirement, health and other welfare benefit plans (e.g., life, disability and apprenticeship plans). Among other things, ERISA provides that those individuals who manage plans (and other fiduciaries) must meet certain standards of conduct. The law also contains detailed provisions for reporting to the government and disclosure to participants. There also are provisions aimed at assuring that plan funds are protected and that participants who qualify receive their benefits.

ERISA has also been expanded to include new health laws. The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) amended ERISA to provide for the continuation of health care coverage for employees and their beneficiaries (for a limited period of time) if certain events would otherwise result in a reduction in benefits. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) amended ERISA to make health care coverage more portable and secure for employees.

EBSA's compliance assistance information will assist employers and employee benefit plan officials in understanding and complying with the requirements of ERISA as it applies to the administration of employee retirement, health and other welfare benefit plans.

### Contact EBSA
- Comuníquese con EBSA

### About EBSA
- Mission Statement
- Organization Chart
- EBSA Offices
- ERISA Advisory Council
- CHIP Working Group

### FAQs

### Consumer Information
- Health Plans
- Retirement Plans
- Retirement Savings

### Laws & Regulations
- Final Rules
- Notices
- Proposed Rules
- Public Comments

### Technical Guidance

### Technical Guidance

**Exemptions**
- EXPRO Exemptions
- Granted Class Exemptions
- Individual Exemptions

**Interpretations**
- Advisory Opinions
- Field Assistance Bulletins
- Information Letters
- Technical Releases

### Laws And Regulations
- Statutes (United States Code)
- Executive Orders
- Code of Federal Regulations
- Unified Agenda of Federal Regulations
- Federal Register Documents
- Amicus Briefs Under ERISA

### Quick Links

benefit plans.

**Technical Guidance**
- Advisory Opinions
- Exemptions
- Field Bulletins
- Information Letters
- Interpretive Bulletins
- Technical Releases
- EO 12866 Guidance

**Compliance Assistance**
- Abandoned Plans
- Apprenticeship Plans
- Correction Programs
- Fiduciary Education
- For Health Plans
- For Retirement Plans
- For Small Employers
- Reporting and Filing
- 403(b) Plans
- Webcasts

## For Apprenticeship and Training Plans

- Apprenticeship and Training Plans
- Field Assistance Bulletin 2012-01
- Fiduciary Responsibilities under an Apprenticeship and Training Plans

## For Health Plans

- Health Benefits Advisor interactive Website assists employers in understanding and complying with federal group health plan laws
- Health Benefits Laws Self Compliance Tools
- Reporting/Disclosure Guide For Employee Benefit Plans – A quick reference tool for certain basic reporting and disclosure requirements under ERISA
- Understanding Your Fiduciary Responsibilities Under A Group Health Plan provides an overview of the basic fiduciary responsibilities applicable to health plans under ERISA

## Affordable Care Act

- Regulations and Guidance

## COBRA

- HHS Bulletin Allowing COBRA Qualified Beneficiaries to Enroll in the Health Insurance Marketplace
- HHS Fact Sheet on Losing Job-Based Coverage
- COBRA Continuation Coverage
- An Employer's Guide to Group Health Continuation Coverage Under COBRA – The Consolidated Omnibus Budget Reconciliation Act of 1986 | en español
- COBRA Continuation Health Coverage FAQs provide a general explanation of COBRA requirements, outline the rules that apply to health plans for employees in the private sector, and spotlight benefits under the law
- Final regulations on the COBRA notice provisions of Part 6 of Title I of ERISA
- COBRA Model General Notice | en español
- COBRA Model Election Notice | en español

**Quick Links**
- Subscribe to this Page
- Summary of Major DOL Laws
- Consumer Information
- Employment Law Guide



**Webcasts**
- Getting It Right - Know Your Fiduciary Responsibilities Archive – Part I | Part II | Part III
- ACA Compliance Assistance Webcast Archive

**Upcoming Seminar Locations**
- Phoenix AZ
- Bangor ME

**Previous Seminar Locations**

Appendix 001920

- COBRA Model Election Notice | en español

# HIPAA

- Compliance Assistance Guide – Health Benefits Coverage Under Federal Law includes general descriptions of the four health care laws and FAQs. It also includes a self-compliance tool that can help to determine compliance with HIPAA, MHPA, the Newborns' Act, and WHCRA with compliance tips that relate to common mistakes. This publication also includes a chart summarizing the laws' notice requirements and provides model language that can be used to comply | Single Document Version large file

- HIPAA FAQs – The Health Insurance Portability and Accountability Act of 1996 (HIPAA), amended the Employee Retirement Income Security Act to provide new rights and protections for participants and beneficiaries in group health plans

- HIPAA Nondiscrimination Requirements FAQs on final regulations issued on the nondiscrimination provisions under HIPAA

- Final Regulations for HIPAA Health Coverage Portability

- Model Certificate of Group Health Plan Coverage | en español

- Request For Information on Benefit-Specific Waiting Periods Under HIPAA

- Notice of Proposed Rulemaking for Health Coverage Portability: Tolling Certain Time Periods and Interaction With the FMLA Under HIPAA

- Nondiscrimination & Wellness Programs in Health Coverage in the Group Market – Final rules governing the HIPAA provisions regarding nondiscrimination based on a health factor and wellness program provisions for group health plans

- Notice of Changes under HIPAA to COBRA Continuation Coverage under Group Health Plans provides information to employers and operators of private-sector health plans about new requirements to notify workers of new changes in their continuation health benefit coverage, as required by HIPAA

- Health Disclosure and Claims Issues: FY 2001 Compliance Project Report – A review of group health plans for compliance with Part 7 of ERISA

## Genetic Information Nondiscrimination Act of 2008

- Fact Sheet
- FAQs on the Genetic Information Nondiscrimination Act
- Interim Final Rules with Request for Comment
- Research Exception Form

**Previous Seminar Locations**

| | | |
|---|---|---|
| Albany NY | Dover DE | Orlando FL |
| Albuquerque NM | Durham NC | Overland Park KS |
| Anchorage AK | Fargo ND | Pierre SD |
| Annapolis MD | Harrisburg PA | Plantation FL |
| Arlington VA | Hartford CT | Portland ME |
| Atlanta GA | Helena MT | Portland OR |
| Austin TX | Indianapolis IN | Raleigh NC |
| Baton Rouge LA | Jackson MS | Richmond VA |
| Billings MT | Lansing MI | Rutland City VT |
| Birmingham AL | Las Vegas NV | Salem OR |
| Boise ID | Laurel MD | Salt Lake City UT |
| Burlington VT | Little Rock AR | San Antonio TX |
| Camp Hill PA | Los Angeles CA | San Diego CA |
| Carlisle PA | Louisville KY | Santa Fe NM |
| Casper WY | Madison WI | Savannah GA |
| Chandler AZ | Manchester NH | Seattle WA |
| Charleston WV | Mesa AZ | Shreveport LA |
| Chicago IL | Minneapolis MN | St. Louis MO |
| Cincinnati OH | Nashville TN | Tallahassee FL |
| Columbia SC | New Orleans LA | Troy NY |
| Columbus OH | New York NY | Tulsa OK |
| Concord NH | Newark NJ | Warwick RI |
| Denver CO | Oklahoma City OK | Washington DC |
| Des Moines IA | Omaha NE | |

Appendix 001921

- Research Exception Form

## Mental Health Parity and Addiction Equity Act of 2008

- Final Regulation
- FAQs about ACA Implementation Part XVII and Mental Health Parity Implementation
- MHPAEA Fact Sheet
- FAQ on Mental Health Parity and Addiction Equity Act
- FAQs on Mental Health Parity Implementation (ACA FAQs Part V)
- FAQs on Mental Health Parity Implementation (ACA FAQs Part VII)
- Interim Final Rule

## Children's Health Insurance Program

- Fact Sheet
- Children's Health Insurance Program Working Goup
- Model Notice for Employers Regarding Premium Assistance Opportunities MS Word Format | Printer Friendly Version. Also available in Spanish MS Word Format | Printer Friendly Version
- Federal Register Notice

## Multiple Employer Welfare Arrangements

- Multiple Employer Welfare Arrangements Under ERISA (MEWA) – A booklet addressing many questions concerning the effect of ERISA on federal and state regulation of MEWAs
- How to Protect Your Employees when Purchasing Health Insurance  – Tips that employers can use to help ensure that employees have the health care coverage they need
- The Form M-1 Online Filing System is an electronic filing system for the Form M-1 annual report for multiple employer welfare arrangements.  The system allows filers to complete the form and submit it at no cost.  This system is an example of an E-Government initiative which uses improved technology to make it easier for citizens and businesses to interact with the government
- Form M-1 Annual Report – This form is required to be filed under section 101(g) and section 734 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), and 29 CFR 2520.101-2
- MEWA regulations/guidance under the ACA

Appendix 001922

- MEWA regulations/guidance under the ACA

## Claims Procedure

- Group Health and Disability Plans Benefit Claims Procedure Regulation – A booklet on the rules that apply to group health and disability benefit claims
- Claims Procedure Final Rule – Final regulations revising the minimum requirements for benefit claims procedures of employee benefit plans covered by Title I of the ERISA

 **Back to Top**

# For Retirement Plans

- Model Notice of Multiemployer Plan in Critical Status - The PPA of 2006 amended ERISA and the IRC to require that sponsors of multiemployer defined benefit pension plans that are in endangered or critical status provide notice to participants. The Model Notice is intended to facilitate compliance with this notification requirement.
- Meeting Your Fiduciary Responsibilities – To meet their responsibilities as plan sponsors, employers need to understand some basic rules, specifically the Employee Retirement Income Security Act (ERISA).  ERISA sets standards of conduct for those who manage an employee benefit plan and its assets (called fiduciaries).  This publication provides an overview of the basic fiduciary responsibilities applicable to retirement plans under the law
- Selecting An Auditor For Your Employee Benefit Plan – Federal law requires employee benefit plans with 100 or more participants to have an audit as part of their obligation to file the Form 5500.  This booklet will assist plan administrators in selecting an auditor and reviewing the audit work and report
- Selecting And Monitoring Pension Consultants – Tips For Plan Fiduciaries – ERISA requires that fiduciaries of employee benefit plans administer and manage their plans prudently and in the interest of the plan's participants and beneficiaries. In carrying out these responsibilities, plan fiduciaries often rely heavily on pension consultants and other professionals for help. Findings included in a report by the SEC released in May 2005, however, raise serious questions concerning whether some pension consultants are fully disclosing potential conflicts of interest that may affect the objectivity of the advice they are providing to their pension plan clients
- Tips For Selecting And Monitoring Service Providers For Your Employee Benefit Plan – Business owners are responsible for ensuring that their 401(k) plans comply with Federal law and rely on other professionals to assist them with their plan duties. Selecting a service provider is one of the most important responsibilities of a plan sponsor
- Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries - Target date retirement funds (also called target date funds or TDFs) have become an increasingly popular investment option in 401(k) plans and similar employee-directed retirement plans. EBSA prepared the following general guidance to assist plan fiduciaries in selecting and monitoring TDFs and other investment options in 401(k) and similar participant-directed individual account plans.
- FAQs on the Small Pension Plan Audit Waiver Regulation – FAQs on how to determine whether a plan meets the conditions for the audit waiver requirements under the amended regulation

Appendix 001-923

- [Reporting And Disclosure Guide For Employee Benefit Plans](#) – A quick reference tool for certain basic reporting and disclosure requirements under ERISA
- [401(k) Plan Fees Disclosure Tool](#) – A form developed by banking, insurance and mutual fund trade groups to provide employers with a way to collect and compare investment fees and administrative costs of competing providers of plan services, now available in [MS Word format](#). This form was not developed by the Department and was not designed to ensure compliance with the Department's [regulations on service provider fee disclosure to plans](#) or [plan fee disclosure to 401(k) plan participants and beneficiaries](#).
- [Pension Plans and ERISA](#) – FAQs that describe the provisions of the federal pension law
- [Cash Balance Pension Plans FAQs](#) – FAQs that describe basic information about cash balance plans
- [QDRO's - An Overview](#) – QDRO's are domestic relations orders that recognize the existence of an alternate payee's right to receive benefits payable to a participant under a pension plan
- [Determining Qualified Status and Paying Benefits](#) – Outlines a plan administrator's duties, requirements for qualification for QDRO's
- [Drafting QDRO's](#) – Outlines the procedure for dividing pension benefits, defines survivor benefits, and explains the form of payment for QDRO's
- [Voluntary Correction Programs](#)
- [Employee Plans News](#) – A publication of the Employee Plans office of the Tax Exempt and Government Entities Operating Division of the IRS.  This quarterly newsletter provides information about current developments and upcoming events within the retirement plans arena

## Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans

- [Final Rule](#)
- [Fact Sheet](#)
- [Model Chart](#)
- [DOL No-Action Letter Request](#)
- [SEC No-Action Letter](#)

## Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans – Timing of Annual Disclosure

- [Direct Final Rule](#)
- [Proposed Rule](#)
- [Fact Sheet](#)

Appendix 001924

## Service Provider Disclosures Under Section 408(b)(2)

- Final Rule
- Fact Sheet
- Changes to Final Fee Disclosure Rule
- Sample Guide
- Fee Disclosure Failure Notice

## Lifetime Income Illustration

- Advance Notice of Proposed Rulemaking
- Fact Sheet
- Calculator
- Joint Income Lifetime Hearing Notice
- Hearing Transcript: September 14, 2010 | September 15, 2010
- Written testimony
- Request For Information
- Request For Information Comments
- Lifetime Income Literature Review: Designing Better Pension Benefits Statements
- Proposed Information Collection Request - Survey Regarding Pension Benefit Statements
- Proposed Information Collection Request Comments

 **Back to Top**

---

## For 401(k) Plans

- Meeting Your Fiduciary Responsibilities – To meet their responsibilities as plan sponsors, employers need to understand some basic rules, specifically the Employee Retirement Income Security Act (ERISA). ERISA sets standards of conduct for those who manage an employee benefit plan and its assets (called fiduciaries). This publication provides an overview of the basic fiduciary responsibilities applicable to retirement plans under the law

- Understanding Retirement Plan Fees And Expenses – This booklet will help retirement plan sponsors better understand and evaluate their plan's fees and expenses. While the focus is on fees and expenses involved with 401(k) plans, many of the principles discussed in the booklet also will have application to all types of retirement plans

- Selecting An Auditor For Your Employee Benefit Plan – Federal law requires employee benefit plans with 100 or more participants to have an audit as part of their obligation to file the Form 5500. This booklet will assist plan administrators in selecting an auditor and reviewing the audit work and report

# Worker Adjustment and Retraining Notification Act



**UNITED STATES**
**DEPARTMENT OF LABOR**

All DOL   Search EBSA   Advanced Search

SEARCH

A to Z | Site Map | FAQs | Forms | About DOL | Contact Us |

**Office of the Assistant Secretary for Policy**

DOL Home > elaws Advisors > Employment Law Guide A Companion to the *FirstStep* Employment Law Advisor

**elaws®** - **Employment Law Guide** A Companion to the *FirstStep* Employment Law Advisor

## Other Workplace Standards: Notices for Plant Closings and Mass Layoffs

- Who Is Covered
- Basic Provisions/Requirements
- Employee Rights
- Recordkeeping, Reporting, Notices and Posters
  - Notices and Posters
  - Recordkeeping
  - Reporting
- Penalties/Sanctions
- Relation to State, Local, and Other Federal Laws
- Compliance Assistance Available
- DOL Contacts

Return to Table of Contents

**Related Information**

Compliance Assistance By Law
- The Worker Adjustment and Retraining Notification Act (WARN)

DOL Agency Assistance
- ETA Layoff-Related Services

Updated: September 2009

**Worker Adjustment and Retraining Notification Act (WARN)**
(**29 USC §2101 et seq.** ; **20 CFR Part 639**)

Appendix 001927

**Worker Adjustment and Retraining Notification Act (WARN)**
**(29 USC §2101 et seq. ; 20 CFR Part 639)**

## Who is Covered

The Worker Adjustment and Retraining Notification (WARN) Act is administered by the Employment and Training Administration (ETA). WARN generally covers employers with 100 or more employees, not counting those who have worked less than six months in the last 12 months and those who work less than 20 hours per week, or those employers with 100 or more employees, including part-time workers, who in the aggregate work at least 4,000 hours per week, exclusive of overtime. Regular federal, state, and local government entities that provide public services are not covered. Employees entitled to notice under WARN include managers and supervisors as well as hourly and salaried workers.

## Basic Provisions/Requirements

WARN protects workers, their families, and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice gives workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain other jobs and, if necessary, to enter skill training or retraining that will allow these workers to compete successfully in the job market. WARN also provides for notice to state dislocated worker units so that they can promptly offer dislocated worker assistance.

A covered plant closing occurs when a facility or operating unit is shut down for more than six months, or when 50 or more employees lose their jobs during any 30-day period at a single site of employment. A covered mass layoff occurs when 50 to 499 employees are affected during any 30-day period at a single employment site (or for certain multiple related layoffs, during a 90-day period), if these employees represent at least 33 percent of the employer's workforce where the layoff will occur, and the layoff results in an employment loss for more than six months. If the layoff affects 500 or more workers, the 33 percent rule does not apply.

WARN does not apply to closure of temporary facilities, or the completion of an activity when the workers were hired only for the duration of that activity. WARN also provides for less than 60 days notice when the layoffs resulted from closure of a faltering company, unforeseeable business circumstances, or natural disaster.

## Employee Rights

Workers or their representatives, and units of local government may bring individual or class action suits. U.S. district courts enforce WARN requirements. The court may allow reasonable attorney's fees as part of any final judgment.

# Occupational Safety and Health Act

 

**OSHA®**
Occupational Safety
and Health Administration

U.S. Department of Labor

# Job Safety and Health
# IT'S THE LAW!

## All workers have the right to:

- A safe workplace.

- Raise a safety or health concern with your employer or OSHA, or report a work-related injury or illness, without being retaliated against.

- Receive information and training on job hazards, including all hazardous substances in your workplace.

- Request an OSHA inspection of your workplace if you believe there are unsafe or unhealthy conditions. OSHA will keep your name confidential. You have the right to have a representative contact OSHA on your behalf.

- Participate (or have your representative participate) in an OSHA inspection and speak in private to the inspector.

- File a complaint with OSHA within 30 days (by phone, online or by mail) if you have been retaliated against for using your rights.

- See any OSHA citations issued to your employer.

- Request copies of your medical records, tests that measure hazards in the workplace, and the workplace injury and illness log.

*This poster is available free from OSHA.*

## Employers must:

- Provide employees a workplace free from recognized hazards. It is illegal to retaliate against an employee for using any of their rights under the law, including raising a health and safety concern with you or with OSHA, or reporting a work-related injury or illness.

- Comply with all applicable OSHA standards.

- Report to OSHA all work-related fatalities within 8 hours, and all inpatient hospitalizations, amputations and losses of an eye within 24 hours.

- Provide required training to all workers in a language and vocabulary they can understand.

- Prominently display this poster in the workplace.

- Post OSHA citations at or near the place of the alleged violations.

FREE ASSISTANCE to identify and correct hazards is available to small and medium-sized employers, without citation or penalty, through OSHA-supported consultation programs in every state.

### *Contact OSHA. We can help.*



# Consolidated Omnibus Budget Reconciliation Act



HOME / POPULAR TOPICS / HEALTH PLANS & BENEFITS

## Health Plans & Benefits: Continuation of Health Coverage - COBRA

### Continuation of Health Coverage  COBRA

- DOL Web Pages on This Topic

The Consolidated Omnibus Budget Reconciliation Act (COBRA) gives workers and their families who lose their health benefits the right to choose to continue group health benefits provided by their group health plan for limited periods of time under certain circumstances such as voluntary or involuntary job loss, reduction in the hours worked, transition between jobs, death, divorce, and other life events. Qualified individuals may be required to pay the entire premium for coverage up to 102 percent of the cost to the plan.

COBRA generally requires that group health plans sponsored by employers with 20 or more employees in the prior year offer employees and their families the opportunity for a temporary extension of health coverage (called continuation coverage) in certain instances where coverage under the plan would otherwise end.

**Subtopics**

- Child Care Assistance
- Compliance Assistance
- Consumer Information on Health Plans
- Continuation of Health Coverage (COBRA)
- Employee Retirement Income Security Act (ERISA)
- Fiduciary Responsibilities
- Health Benefits Education
- Mental Health Benefits
- Newborns' & Mothers' Protections (Newborns' Act)

COBRA outlines how employees and family members may elect continuation coverage. It also requires employers and plans to provide notice.

- Participant Rights
- Plan Information
- Portability of Health Coverage (HIPAA)
- Womens' Health & Cancer Rights Protections

# DOL Web Pages on This Topic

COBRA Continuation Coverage Assistance Under The American Recovery And Reinvestment Act Of 2009 (ARRA) Provides information and guidance for premium reductions and additional election opportunities for health benefits under the ARRA.

Frequently Asked Questions: COBRA Continuation Health Coverage Provides answers to commonly asked questions about COBRA.

Health Benefits Under the Consolidated Omnibus Budget Reconciliation Act (COBRA) (PDF)Provides a detailed overview of the major provisions of COBRA.

Consumer Information on Health Plans Provides fact sheets, booklets, and other health plan information from the Department's Employee Benefits Security Administration (EBSA).

Compliance Assistance Provides publications and other materials to assist employers and employee benefit plan practitioners in understanding and complying with the requirements of ERISA as it applies to the administration of employee pension and welfare benefit plans.

Portability of Health Coverage (HIPAA) Frequently Asked Questions Provides answers to questions including "what is HIPAA?" and "how does crediting for prior coverage work under HIPAA?"

Your Employer's Bankruptcy: How Will it Affect Your Employee Benefits? Provides information on bankruptcys effect on pension and group health plans.

Your Health Plan and HIPAA ... Making the Law Work for You Provides information about major provisions of the Health Insurance Portability and Accountability Act, the Newborns' and Mothers' Health Protection Act, the Mental Health Parity Act, and the Women's Health and Cancer Rights Act.

Retirement and Health Care Coverage...Questions and Answers for Dislocated Workers Provides answers to common questions asked by dislocated workers about their pension and health benefits.

Top 10 Ways to Make Your Health Benefits Work for You (Español) Provides information to help you make informed decisions about health plans.

# Fair Labor Standards Act

  Find it in DOL 

**elaws - employment laws assistance for workers and small businesses**

DOL HOME / ELAWS HOME / FAIR LABOR STANDARDS ACT ADVISOR

⭐**Was this page helpful?**

 - Fair Labor Standards Act Advisor

**What does the Fair Labor Standards Act require?**

The Fair Labor Standards Act's (FLSA) basic requirements are:

- Payment of the minimum wage;
- Overtime pay for time worked over 40 hours in a workweek;
- Restrictions on the employment of children; and
- Recordkeeping.

The FLSA has been amended on many occasions since 1938. Currently, workers covered by the FLSA are entitled to the minimum wage and overtime pay at a rate of not less than one and one-half times their regular rate of pay after 40 hours of work in a workweek. Various minimum wage exceptions apply under specific circumstances to workers with disabilities, full-time students, youth under age 20 in their first 90 days of employment, tipped employees and student-learners. Special rules apply to state and local government employment involving fire protection and law enforcement activities, volunteer services, and compensatory time off (instead of cash overtime pay). Employers are required to keep records on wages, hours, and other items which are generally maintained as an ordinary business practice.

The FLSA child labor provisions are designed to protect the educational opportunities of youth and prohibit their employment in jobs and under conditions detrimental to their health or safety. The child labor provisions include some restrictions on hours of work for youth under 16 years of age and lists of hazardous occupations too dangerous for young workers to perform. See YouthRules! for additional information on child labor rules for teens, parents, educators and employers

Wages required by the FLSA are due on the regular payday for the pay period covered. Deductions made from wages for such items as cash or merchandise shortages, employer-required uniforms, and tools of the trade, are not legal if they reduce the wages of employees below the minimum wage or reduce the amount of overtime pay due under the FLSA.

In order for the FLSA to apply, there must be an employment relationship between an "employer" and an "employee." The FLSA also contains some exemptions from these basic rules. Some apply to specific types of businesses and others to specific kinds of work.

Continue



UNITED STATES
DEPARTMENT OF LABOR

Career & Internships | Contact Us

200 Constitution Ave. NW
Washington DC 20210
1-866-4-USA-DOL
1-866-487-2365
TTY
www.dol.gov

**ABOUT THE SITE**
Freedom of Information Act
Privacy & Security Statement
Disclaimers
Important Web Site Notices
Plug-ins Used by DOL
RSS Feeds from DOL
Accessibility Statement

**LABOR DEPARTMENT**
Español
A to Z Index
Agencies
Office of Inspector General
Leadership Team
Contact Us
Subscribe to the DOL Newsletter
Read The DOL Newsletter

**FEDERAL GOVERNMENT**
White House
Affordable Care Act
Disaster Recovery Assistance
USA.gov
Disability.gov
Plain Writing Act
Recovery Act
No Fear Act

  

## UNITED STATES DEPARTMENT OF LABOR

Find it in DOL

**elaws - employment laws assistance for workers and small businesses**

DOL HOME  /  ELAWS HOME  /  FAIR LABOR STANDARDS ACT ADVISOR

★Was this page helpful?

 - Fair Labor Standards Act Advisor

**What does the Fair Labor Standards Act *NOT* require?**

There are a number of employment practices which the FLSA does not regulate. For example, **the FLSA does not require**:

(1) vacation, holiday, severance, or sick pay;
(2) meal or rest periods, holidays off, or vacations;
(3) premium pay for weekend or holiday work;
(4) pay raises or fringe benefits;
(5) a discharge notice, reason for discharge, or immediate payment of final wages to terminated employees; and
(6) pay stubs or "W-2"s.

The FLSA does not provide wage payment or collection procedures for an employee's usual or promised wages or for commissions in excess of those required by the FLSA. Also, the FLSA does not limit the number of hours in a day, or days in a week, an employee may be required or scheduled to work, including overtime hours, if the employee is at least 16 years old. However, some states do have laws covering some of these issues, such as meal or rest periods, or discharge notices.

The above matters, which are not covered by the FLSA, are generally for agreement between the employer and the employees or their authorized representatives.

Appendix 001937

# Exhibit 12

# *Original Petition and Jury Demand*

FILED
3/9/2023 11:25 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Case 3:23-cv-00769-N   Document 29   Filed 08/02/23   Page 1939 of 1959   PageID 2984

CAUSE NO. CC-23-01483-C

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | In the County Court |
| *v.* | § | |
| | § | At Law Nº |
| Twin City Fire Insurance Company, | § | |
| | § | Dallas County, Texas |
| *Defendant*. | § | |

## ORIGINAL PETITION AND JURY DEMAND

### DISCOVERY PLAN

1.      Jeff Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

### INTRODUCTION AND NOTICE OF RELATED CASE: DALLAS COUNTY COURT AT LAW NO. 5

2.      This case appears to be a *related case* as described in Local Civil Rules 1.06, 1.07(a), and maybe 1.07(d).[1] It arises out of an earlier jury verdict and judgment in favor of Jeff Carpenter in Dallas County Court at Law No. 5, Cause Number CC-08-2072-E, styled

---

[1] Local Civ. R. 1.06 ("… pending case is so related to another case previously filed in or disposed of by another Court of Dallas County … that a transfer of the later case to such other Court would facilitate orderly and efficient disposition of the litigation …"); Local Civ. R. 1.07(a) ("Any case arising out of the same transaction or occurrence as an earlier case …."); Local Civ. R. 1.07(d) ("Any suit concerning which the duty of an insurer to defend was involved in the earlier suit.").

Appendix 001939

*Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik.*

3.     In that earlier case, defendants' liability insurance carrier rejected a reasonable opportunity to settle for less than remaining policy limits. It did so even though policy limits were eroding toward zero with every penny of litigation costs and every dollar of attorneys' fees. Ultimately, four of its insureds were hit with an adverse jury verdict and a judgment that exceeded remaining policy limits by around $2 million.

4.     The defendant insureds appealed to the Fifth Court of Appeals and the Texas Supreme Court but were not successful. The judgment was affirmed and remains unsatisfied. Dallas County Court at Law No. 5 ordered turnover of the defendant insureds' common law *Stowers* claim against their liability insurance carrier, along with associated rights and privileges, to Jeff Carpenter. The present case involves that *Stowers* claim.

## PARTIES

5.     Twin City Fire Insurance Company is licensed to conduct multiple lines of insurance business in Texas, according to the Texas Department of Insurance. It was licensed to conduct business in Texas, and did conduct business in Texas, at the time the claims asserted herein accrued. It may be served with process through its registered agent in Texas as follows:

CT Corporation System
1999 Bryan Street
Suite 900
Dallas, Texas 75201

6.      Jeff Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued and who continues to reside in Dallas County, Texas.

## JURISDICTION

7.      The Court has subject matter jurisdiction over this case because (1) Jeff Carpenter seeks damages within its jurisdictional limits and (2) the asserted claims are not subject to exclusive jurisdiction in any other court.

8.      The Court has personal jurisdiction over Twin City Fire Insurance Company ("Twin City") because (1) the asserted claims arose directly from Twin City's acts and omissions in Texas, and (2) Twin City's affiliations with Texas are so continuous and systematic that Twin City is "essentially at home" in Texas.

## VENUE

9.      Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because all or a substantial part of the events and omissions giving rise to the asserted claims occurred in Dallas County, Texas. This case involves a liability insurance

company's negligence in Dallas County, Texas in rejecting a reasonable opportunity to set-tle within policy limits. It involves a jury verdict and judgment in Dallas County, Texas against the defendant insureds in excess of policy limits.

## SOME *STOWERS* FUNDAMENTALS

### basic negligence duty and reason for rule

10.    When insurance companies have the right to control settlement of claims against their insureds, they owe their insureds a *Stowers* duty. The *Stowers* opinion explains that the insurance company is:[2]

> held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages.

This duty sounds in negligence, has been around for almost a century, and is similar to other areas of law in which a right of control gives rise to a legal duty.[3]

---

[2] *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved).

[3] *See, e.g., Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) ("Having undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the [] house while performing its contract with the builder.").

11.     The ultimate issue in a *Stowers* case is whether a settlement offer is such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to a judgment higher than the policy limits. The *Stowers* negligence standard is flexible and depends on context. Here is an example. The *Stowers* duty usually arises only with a settlement offer within policy limits. But it may also arise with a settlement offer above policy limits when the insured agrees to pay the excess.[4]

12.     The *Stowers* duty is born of insurance companies who want to save money for themselves to the detriment of insureds. If a policy limit is the maximum insurance company risk — whether a case settles or goes to trial —, then why settle at all? Why not gamble the insured's personal finances and take a chance at trial? Even if odds of a defense win are slim. Even if trial could expose the insured to damages higher than policy limits.

### insurer excuses: coverage dispute is no excuse

13.     Sometimes an insurance company admits a duty to defend but decides there is no indemnity coverage and so rejects a reasonable settlement offer within policy limits. In those situations, the insurance carrier "risks significant potential liability for bad-faith insurance practices [*Stowers*] if it does not ultimately prevail in its coverage contest."[5]

---

[4] *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 n.13 (Tex. 1994) ("We do not reach the question of when, if ever, a *Stowers* duty may be triggered if an insured provides notice of his or her willingness to accept a reasonable demand above the policy limits, and to fund the settlement, such that the insurer's share of the settlement would remain within the policy limits.").

[5] *Excess Underwriters at Lloyds, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 46 (Tex. 2008).

When it comes to the *Stowers* duty, the insurance carrier "bear[s] the risk that its point of view [on coverage] might have been incorrect, which could result in liability for any excess judgment."[6]

14.     So, a good faith dispute about insurance coverage is not a defense to *Stowers* liability. Reasonable doubt about insurance coverage is not a defense. Uncertainty about insurance coverage is not a defense. That a reasonable liability insurance carrier would con-test coverage is not a defense. A mistaken belief that there is no coverage is not a defense.

### insurer excuses: not knowing all facts is no excuse

15.     Not knowing all the facts, or even most of the facts, does not mean there is no *Stowers* duty.[7] The question is whether, based on facts the insurer knew or should have known at the time, a settlement offer is such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to a judgment higher than the policy limits.

---

[6] *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 850 (Tex. 1994).

[7] *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, C.A. No. 3:10-CV-2048-D, n.10 (N.D. Tex. March 5, 2013) (citing references omitted) ("There is no per se requirement that an insurer know all, or even most, of the facts of the case in order to have a *Stowers* duty.").

### ABBREVIATED BACKGROUND: THE LIABILITY INSURANCE POLICY

### Twin City Fire Insurance Company



16.     The Hartford Financial Services Group, Inc. operates through subsidiaries under the brand name *The Hartford*. Twin City Fire Insurance Company ("Twin City") is one of those subsidiaries and uses *The Hartford* brand. It is part of the Hartford Fire & Casualty Group and is licensed to conduct multiple lines of insurance business in Texas.

### the named insureds

17.     Twin City issues a liability insurance policy under which named insureds include all the defendants in the earlier case:

---

[8] photograph credit: [www.vacuumglassllc.com/the-hartford](www.vacuumglassllc.com/the-hartford)

Appendix 001945

| defendant insureds | abbreviated name |
|---|---|
| Southwest Housing Development Company, Inc. | SH Development |
| Affordable Housing Construction, Inc. | AH Construction |
| Southwest Housing Management Corporation, Inc. *a/k/a* and *d/b/a* Southwest Housing Management Company, Inc. | SH Management |
| Brian Potashnik | Brian |
| Cheryl Potashnik | Cheryl |

**control over defense and settlement**

18.     Twin City controls the defense of its insureds.[9] It also controls settlement of claims against its insureds. It forbids its insureds, under any circumstances, from entering any settlement agreement without its prior written consent:[10]

> **(C)** The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

---

[9] Policy Common Terms & Conditions § VII(A) ("The Insurer shall have the right and duty to defend any Claim for which the Insureds give notice to the Insurer, even if such Claim is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate."); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 846 (Tex. 1994) (describing this policy provision as giving insurance carrier control over the insured's defense).

[10] Policy Common Terms & Conditions § VII(C).

### deductible then $1 million eroding policy limits

19.     The policy has a $75,000 deductible and a $1 million aggregate limit of liability.[11] Defense costs are part of that $1 million limit:[12]



Once the deductible is met, policy limits erode toward zero with every penny of litigation costs and every dollar of attorneys' fees.[13]

### employment practices liability coverage

20.     At the time, the policy has a relatively high premium for such low aggregate policy limits. The employment practices liability ("EPL") coverage may partially explain this. The EPL part of the policy covers what many other insurance policies do not[14] — such as punitive damages, intentional misconduct, failure to comply with implied employment agreements, and failure to comply with  oral employment agreements.

---

[11] Policy Declarations, Item 5: Liability Coverage Part Elections.

[12] Policy Common Terms & Conditions § VI(A).

[13] *Id.* & Policy Common Terms & Conditions § II(E).

[14] *See, e.g.,* L.D. Simmons, II & Lowndes C. Quinlan, *New Appleman on Insurance Law* § 28.02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

21.     Most other types of insurance policies — such as commercial general liability, auto, homeowners, errors and omissions, and directors and officers liability — do not cover these types of claims. But insurance companies developed and marketed EPL policies to cover gaps in other types of insurance policies.[15]

### duty to defend, duty to indemnify, and reservation of rights

22.     Policy premiums pay for two overarching forms of EPL coverage: (1) defense costs including attorneys' fees, and (2) liability for damages, also called indemnity. As to defense costs, Twin City owes the insureds a duty to defend. As to liability for damages, Twin City owes the insureds a duty to indemnify.

23.     In the earlier case, Twin City admits it has a duty to defend. After the defendant insureds meet the $75,000 deductible, Twin City defends under a reservation of rights on indemnity coverage. In the reservation of rights letter, Twin City wrongly claims lack of coverage on even dirt simple coverage issues, showing a lack of reasonable insurer conduct.

### ABBREVIATED BACKGROUND: FACTS TWIN CITY KNEW OR SHOULD HAVE KNOWN

24.     What follows is factual information Twin City knew, or should have known, at the time it rejected a reasonable settlement offer within policy limits.

---

[15] *See* Jeffrey W. Stemple, *Law of Insurance Contract Disputes* § 21.06, at 21-47 to 21-48.

**nature of insureds' business**

25.     The defendant insureds are in the affordable housing industry throughout Texas and a few other states. They work together to (1) develop or acquire sites for affordable housing communities, (2) construct new affordable housing units, and (3) manage continuing operation of the affordable housing community properties.



**decision to sell business, oral 3% pay-to-stay agreement**

26.     Brian and Cheryl Potashnik decide to sell their business. Brian — the highest-level person over all business entities — promises lucrative additional pay to executive Jeff Carpenter if Jeff will stay on to help make the asset sale happen. There will be a lot more work, such as due diligence and working to retain other important employees in the interim

---

[16] Potter's House at Primrose Senior Housing, photograph credit: www.apartment-guide.com/apartments/Texas/Dallas/Potters-House-at-Primrose-Senior-Housing/156183/

before any asset sale happens. Other than the Potashniks, Jeff will be the most important person to effectuate the sale and will often serve as the "face" of the companies.

27.     Once a letter of intent to sell assets is signed, Brian offers Jeff 3% of net proceeds from the asset sale if Jeff will continue to stay on as long as needed to help make the asset sale happen. The 3% is the total of: gross asset sale revenue to sellers, less normal closing costs, less sales proceeds bonuses paid to other employees [latter pay-to-stay incentives to be decided by Jeff]. They estimate the 3% deal at just over $1 million. The agreement is oral. They shake hands on the deal.

28.     Jeff stays on as long as needed. He delays start at a new job to stay on. He knows he will not have a job with the asset purchaser because the purchaser already has someone in his position. An asset sale agreement goes forward. The anticipated asset sale price is around $37 million. A separate agreement is signed to transfer asset management to the purchaser — including management of the affordable housing community properties. At that point, Brian and Cheryl inform their executive Jeff that he has completed his end of the bargain in staying on and is no longer needed.

<div align="center">

**criminal investigation of owners
and importance of pay-to-stay deal**

</div>

29.     Before the decision to sell the business, the FBI raids the business and criminally investigates Brian and Cheryl Potashnik. The Potashniks deny any criminal wrongdoing. Employees including Jeff believe and trust them. Logically, preventing employee

mass exodus due to the criminal investigation, coupled with the potential sale of the business, is important to attracting buyers for any actual sale of the business. Logically, preventing mass exodus of key employees like Jeff is even more important.

### failure to comply with oral 3% deal and motive for doing so

30.     Once Brian and Cheryl confirm that Jeff kept his end of the bargain and will no longer be needed or employed, they quickly back off the oral 3% deal. They've recently been indicted on criminal charges. They're concerned about the asset sale and whether they will have enough money left over to fund their own criminal defense.



---

[17] Photograph credit of Brian and Cheryl outside federal courthouse: Paul O'Donnell, published in the *The Dallas Morning News*, March 19, 2012.

31.     Brian says to Jeff in part:

Um, and as far as our agreement goes, where we compensate you, as we promised, it's gonna depend on where we end up in all of this.

\*\*\*

I mean, I'm telling you that we're, we're going to dig ourselves out of this thing and then hopefully, you know, at the end of the day, get something out of it from Cascade [asset purchaser] and get the deal closed and pay the costs that we have to defend ourselves [in criminal proceedings] and have money left over so that we can, you know, give you a bonus, …

\*\*\*

I mean, you have Cheryl and I both committed to you that when things work themselves out that there will be a bonus if there's anything there at the end of the day that we have where we can you know, actually give out bonuses …

\*\*\*

I mean, and, you know, it sucks because obviously, at this point, we thought we'd have everything closed and that we would have some money. Um, we didn't think we would get, you know, would have been indicted. You know, I've been hearing for two years plus from Mike Uhl [criminal defense attorney] that you're not gonna get indicted, don't worry. They don't have a case. They don't have a case. You know.

\*\*\*

It's a cluster fuck is what it is. And that's the whole problem right now. We just have no idea where this thing is going to uh, to settle out, you know. And I have the additional pressure, as does Cheryl on top of it, of not knowing where we're going to end up. You know, in our own lives personally and being separated as a family, God forbid and you know, I mean, I just don't uh, I don't know what to tell you.

\*\*\*

We're, we're just trying to pay bills – trying to stay out of prison. I mean, what more can I tell you?

32.     Cheryl also does not appear to know or care that Texas enforces oral agree-

ments and says to Jeff in part:

> You have conversations that we've had. You have intentions that we've had.
> You have what we intend to do and what we wanna do. You don't have any
> rights.
>
>            \*\*\*
>
> So, you know, at the end of the day, you could not, you know, $37 million
> [asset sale price] goes like that. You know, it sounds like a lot of money, but
> on the business side and with all the contingent liability. You know, it's scary.
>
>            \*\*\*
>
> You know it looked one way July 15th or June 15th whenever, I don't remem-
> ber the exact time frame. But, you know, anticipating another six months of
> overhead and all the obligations that go along with it um, you know, it really
> starts to eat away at what's gonna be left.
>
>            \*\*\*
>
> You know, and then it was like when, when we got indicted all of a sudden it
> was like oh my God. (inaudible 8:19 – 8:30) But, you know, there's just so
> much concern about what everybody's gonna do an how they're gonna react.

### lawsuit, insured defendants' loss on summary judgment

33.     During the earlier case, the defendant insureds filed motions for summary

judgment — a total of at least 4 motions for summary judgment. They claimed there was

no evidence sufficient for a jury to return a verdict in Jeff's favor. The Court denied the

motions.

### reasonable settlement offer within policy limits,
### Twin City rejection, and consequences for insureds

34.     Twin City receives a reasonable settlement offer within policy limits. The

settlement offer is within coverage, within policy limits, and offers an unconditional and

full release of all insureds on all claims. The defendant insureds request and instruct Twin City to accept the offer.

35.     Twin City also receives warnings about common mistakes in *Stowers* evaluations, an extensive written coverage analysis showing that the oral handshake agreement claim [among others] is clearly covered, and additional information.

36.     After multiple extensions of time to consider the *Stowers* settlement offer, Twin City rejects the *Stowers* settlement offer and offers nothing to resolve the case — *i.e.*, zero. The highest settlement offer from the defense through multiple pretrial mediations is $100,000. The jury returns a verdict in favor of Jeff against four insureds for past earned wages due under an oral agreement. The jurors refer to this as the 3% deal. After a bench trial on attorneys' fees, the trial court renders a judgment that now exceeds $2 million. The defendant insureds appeal to the Fifth Court of Appeals and the Texas Supreme Court but are not successful.

37.     Twin City had the right under Texas law to seek a declaration on coverage before the harm occurred[18] — rejection of the *Stowers* offer and denial of coverage. The purpose is to clarify the parties' rights *before* harm occurs.[19] Twin City had about five years

---

[18] Tex. Civ. Prac. Rem. Code § 37.004(b) ("A contract may be construed either before or after there has been a breach.").

[19] *See* Tex. Civ. Prac. Rem. Code § 37.008 ("The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy

to do so before the *Stowers* offer. It chose not to do so. It ignored coverage analysis provided to it. It rejected a full-release settlement offer within policy limits. It instead exposed its insureds to a multi-million-dollar final judgment that was more than 3 times the settlement offer. It chose to exhaust its policy limits on an unsuccessful defense rather than a full-release settlement. Its policy limits are now zero. Its later conduct also shows lack of reasonableness, intent, and motive.

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF *STOWERS* DUTY

38.     The above allegations are incorporated herein.

39.     Jeff has standing to bring this claim pursuant to a turnover order.

40.     Twin City received and rejected a reasonable settlement offer, such that an ordinarily prudent insurer would accept the settlement offer, considering the likelihood and degree of the insureds' potential exposure to a judgment higher than the policy limits.

41.     The oral handshake agreement claim against the insureds [among others] was within the scope of policy coverage.

42.     The settlement offer was within policy limits and included a full release of all insureds on all claims.

_____

giving rise to the proceeding.'').

43.     The insureds agreed to dismiss their counterclaims and instructed Twin City to accept the settlement offer.

44.     The jury verdict and judgment resulted in covered damages far higher than policy limits.

45.     This petition seeks all foreseeable damages to the insureds as a result of the *Stowers* violation, including but limited to the amount of the judgment in excess of policy limits.

## EQUITABLE RELIEF

46.     Due to apparent systemic problems at Twin City, there is a reasonable likelihood that Twin City practices will result in noncompliance with the *Stowers* duty in the future. Twin City has not taken steps to show that it is unlikely to violate the law in the future.

## PUNITIVE DAMAGES

47.     The harm Twin City caused to its insureds resulted from malice or gross negligence. *Malice* means a specific intent to cause substantial injury or harm to the insureds. *Gross negligence* means an act or omission by Twin City:

> (1) which when viewed objectively from the standpoint of Twin City at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

Appendix 001956

(2) of which Twin City has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

48.     Twin City was actually aware that the foreseeable consequences of its conduct could or would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of an insurance claim — such as death, grievous physical injury, or financial ruin.

## CONDITIONS PRECEDENT

49.     All conditions precedent to filing suit and to recovery on the asserted claims have occurred, been performed, or been waived.

## JURY DEMAND

50.     Jeff requests a jury trial on all issues triable of right or choice by a jury.

## NO FEDERAL CLAIMS

51.     Jeff does not assert any claim, cause of action, or request for relief under any federal law in this original petition.

## REMEDIES REQUESTED

52.     Texas Rule of Civil Procedure 47 requires an original petition to select among specified ranges of potential relief. This original petition selects the range in Texas Rule of Civil Procedure 47(c)(4). This range may change over time. Jeff is free to suggest more or

less based on the evidence. The jury is free to find more or less at trial based on the evidence.

53.     This is because the rule is just meant to identify any expedited actions and the nature of the case at the time of filing. The rule does not affect a party's substantive rights.

54.     Jeff respectfully requests all appropriate legal and equitable remedies that may be available to him, including:

A.     judgment on the *Stowers* claim asserted herein;

B.     upon a finding that Twin City violated the *Stowers* duty, appropriate injunctive relief prohibiting Twin City from engaging in the systemic insurance practices that led to the violation — with the specifics to be tailored to the systemic problems, deficiencies, and gaps that the evidence shows;

C.     the following additional equitable relief as may be appropriate:

(1) requiring Twin City to provide training and otherwise modify its insurance practices in a way that reduces the risk of future violations of the *Stowers* duty — with the specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows;

(2) ordering all non-monetary equitable relief that may be appropriate to remedy the harm from a *Stowers* violation;

D.     all damages that the *Stowers* violation proximately caused;

E.     punitive damages as may be appropriate under Texas law;

F.     costs under the Texas Rules of Civil Procedure;

G.     prejudgment interest as allowed by law;

Appendix 001958

H.      postjudgment interest as allowed by law.


Respectfully submitted,


*/s/ Amy Gibson*

_____

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jeff Carpenter*