UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | Civil Action No. 3:23-cv-00769-N |
| | § | |
| Twin City Fire Insurance Company, | § | |
| | § | |
| *Defendant.* | § | |

**BRIEF IN SUPPORT OF PLAINTIFF JEFF CARPENTER'S
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................  2

TABLE OF AUTHORITIES.............................................................................  6

CONTEXT: NATURE OF THE CASE..............................................................  11

CONTEXT: SOME *STOWERS* FUNDAMENTALS...........................................  12

INDEX OF ABBREVIATIONS IN BRIEF...........................................................  13

LOCAL RULE 56.4(A)(1) SUMMARY OF REASONS TO DENY MOTION...........................  15

A.    Twin City interprets the policy in a manner that would
      re-write the policy to favor it, adding non-existent policy language
      to policy exclusion clauses...............................................................  15

B.    Twin City selectively relies on *disputed* facts from the transcript of an
      8-day jury trial — disputed facts that are contrary to jury *findings*...................  15

C.    Objections to unsupported labeling, spin, and personal attacks.................  16

JUDICIAL NOTICE OF STATE COURT PROCEEDINGS........................................  17

FOUND FACTS SHOWING SUMMARY JUDGMENT NOT WARRANTED.................  18

ALTERNATIVELY, MATERIAL FACTS SHOWING FACT ISSUE FOR JURY.....................  19

A.    The policy's general structure.........................................................  19

B.    EPLI policies cover what others do not, like employment agreements
      — and coverage is often dependent on specific
      insurer-selected policy language.......................................................  20

C.    Policy: broad coverage for *loss* resulting from *employment practices claim*.........  22

D.    Policy: narrow indemnity exclusion for
      *employment termination severance payments*.......................................  23

E.    Policy: salaries, wages, bonuses exclusion carves out *back pay awards*.............  23

F.      Prior case: failure to comply with oral agreement……………………………      24

G.      Prior case: rejection of severance due to existing pay-to-stay agreement……      27

H.      Prior case: unsuccessful defense at trial: arguing no agreement
        and this was all just a failed severance negotiation……………………………...      28

ARGUMENT AND AUTHORITIES..................................................................................      31

A.      The *employment termination severance payments* exclusion:
        What it means is a question of law —
        whether it applies is a fact question Twin City must prove...........................      32

        1.      The meaning of the exclusion has three components:
                length of service, employment termination,
                and exchange for a release of claims....................................................      32

        2.      The phrase *employment termination* modifies *severance payment* —
                and is not to be read out altogether as surplusage................................      33

        3.      Whether the exclusion applies is a question of fact
                 — and favors insureds...........................................................................      34

        a.      Facts *actually established* may not be relitigated:
                Collateral estoppel prevents re-trying whether
                pay was for anything other than for staying.......................................      35

                (1)     Whether pay was for staying, or something else,
                        was raised and determined...........................................................      36

                (2)     The issue determined was essential:
                        Staying was the only condition for pay — going was not —
                        and it is what the jury found Mr. Carpenter did.......................      37

                (3)     Privity exists on the issue...........................................................      38

        b.      A reasonable juror could find the exclusion inapplicable —
                because payment was based on an event
                rather than length of service.................................................................      38

c.     A reasonable juror could find the exclusion inapplicable —
       because payment was due or payable
       on something other than termination.................................................. 39

d.     A reasonable juror could find the exclusion inapplicable —
       because payment was conditioned on something
       other than a release of claims.............................................................. 40

e.     Twin City relies on labeling — but a reasonably juror
       could find the essence of the payment is what matters,
       rather than its label.............................................................................. 40

f.     Even if payment for staying was *severance payment* —
       even beyond peradventure or as a matter of law —
       a reasonable juror could still find coverage........................................ 42

B.     The *back pay award* clause: What it means is a question of law —
       whether it applies is a fact question and
       a reasonable juror could find a *back pay award*................................. 43

       1.     *Back pay* can mean either earned or unearned income...................... 45

       2.     *Back pay* can mean either earned or unearned pay —
              regardless of the underlying violation of law
              that an award of it remedies................................................................. 46

       3.     Twin City's interpretation — applying *back pay* only
              to discrimination and wrongful termination claims —
              would make oral agreement coverage moot......................................... 48

       4.     A reasonable interpretation gives meaning to the difference
              between *salaries, wages, or bonuses* in the exclusion —
              and those within the exception.............................................................. 50

       a.     example: consent decree training,
              monitoring, reporting............................................................................ 50

       b.     example: mitigation efforts.................................................................... 51

       c.     example: hiring temporary workers in order to
              meet legal obligation.............................................................................. 52

d.      example: disability accommodations......................................................   52

e.      example: other wage claims as damages that
        are not back pay or front pay...............................................................   53

5.      A reasonable juror could find the pay for staying
        in the verdict and judgment are *components of a back pay award*............   54

C.      Moral hazard is inapplicable...............................................................................   56

CONCLUSION............................................................................................................   57

## TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Protective Ins. Co.*,
661 S.W.2d 291 (Tex. App.—Houston [1st Dist.] 1983, no writ)

*Am. Physicians Ins. Exch. v. Garcia*,
876 S.W.2d 842 (Tex. 1994)

*British Gen. Ins. Co. v. Boone*,
67 S.W.2d 353 (Tex. Civ. App.—El Paso 1934)

*Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
334 S.W.3d 217 (Tex. 2011)

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)

*Carolina Cas. Ins. Co. v. Sowell*,
603 F. Supp. 2d 914 (N.D. Tex. 2009)

*Cook Indus., Inc. v. Cmty. Grain, Inc.*,
614 F.2d 978 (5th Cir. 1980)

*Covington Specialty Ins. Co. v. USAI LP*,
No. 3:13-CV-3271-N (N.D. Tex. 2020)

*Curtis v. Loether*,
415 U.S. 189 (1974)

*Edinburg Consol. Indep. Sch. Dist. v. INA*,
806 S.W.2d 910 (Tex. App.—Corpus Christi 1991, no writ)

*EEOC v. Creative Networks, LLC*,
912 F. Supp. 2d 828 (D. Ariz. 2012)

*Enserch Corp. v. Shand Morahan & Co., Inc.*,
952 F.2d 1485 (5th Cir. 1992)

*Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*,
    955 S.W.2d 81 (Tex. 1997)

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986)

*Forbau v. Aetna Life Ins. Co.*,
    876 S.W.2d 132 (Tex. 1994)

*Frazier v. Glen Falls Indem. Co.*,
    278 S.W.2d 388 (Tex. Civ. App.—Fort Worth 1955, writ ref'd n.r.e.)

*Frymire v. Ampex Corp.*,
    61 F.3d 757 (10th Cir. 1995), *cert. denied,* 116 S. Ct. 1588 (1996)

*G.A. Stowers Furniture Co. v. Am. Indem. Co.*,
    15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved)

*Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*,
    538 F.3d 365 (5th Cir. 2008)

*Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*,
    143 F.3d 192 (5th Cir. 1998)

*Kolb v. Goldring, Inc.*,
    694 F.2d 869 (1st Cir. 1982)

*Laxton v. Gap Inc.*,
    333 F.3d 572 (5th Cir. 2003)

*Loc. Union No. 1992 v. The Okonite Co.*,
    189 F.3d 339 (3rd Cir. 1999)

*Lubbock Cnty. Hosp. Dist. v. Nat'l Union Fire Ins. Co.*,
    143 F.3d 239 (5th Cir. 1998)

*Massey v. Whittaker Corp., Winters Indus. Div.*,
    661 F. Supp. 1151 (N.D. Ohio 1987)

*Mid-Continent Cas. Co. v. Bay Rock Operating Co.*,
    614 F.3d 105 (5th Cir. 2010)

*Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*,
    No. 4:09-cv-0422 (S.D. Tex.)

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.*,
    811 S.W.2d 552 (Tex. 1991)

*Nautilus Ins. Co. v. Zamora*,
    114 F.3d 536 (5th Cir. 1997)

*Patterson v. P.H.P. Healthcare Corp.*,
    90 F.3d 927 (5th Cir. 1996)

*Petty v. Nashville Cnty.*,
    687 F.3d 710 (6th Cir. 2012)

*Potashnik v. Carpenter*,
    No. 05-19-00238-CV (Tex. App.—Dallas 2020, pet. denied)

*Prophet Equity LP v. Twin City Fire Ins. Co.*,
    No. 05-17-00927-CV, 2019 WL 3886651 (Tex. App.—Dallas 2019, no pet.)

*Ramsay v. Maryland Am. Gen. Ins. Co.,*
    533 S.W.2d 344 (Tex. 1976)

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)

*Royal Indem. Co. v. Marshall*,
    378 S.W.2d 364 (Tex. Civ. App.—Austin 1964),
    *rev'd on other grounds*, 388 S.W.2d 176 (Tex. 1965)

*RSUI Indem. Co. v. Lynd Co.*,
    466 S.W.3d 113 (Tex. 2015)

*Swicegood v. Med. Protective Co.*,
    No. 3:95–cv–0335–D, 2003 WL 22234928 (N.D. Tex. 2007)

*Tolan v. Cotton*,
    572 U.S. 650 (2014)

*Twin City Fire Ins. Co. v. Carpenter*,
    No. 3:21-cv-1077-G (N.D. Tex. 2021)

*Wells v. Minn. Life Ins. Co.*,
    885 F.3d 885 (5th Cir. 2018)

*West v. Nabors Drilling USA, Inc.*,
    330 F.3d 379 (5th Cir. 2003)

*Word of Life Church of El Paso v. State Farm. Lloyds*,
    No. 18-50108, 2019 WL 1324845 (5th Cir. 2019)

**Statutes**

Tex. Ins. Code § 554.002

**Books**

THE AMERICAN-HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th Ed. 2022)

Antonin Scalia & Bryan A. Garner,
    READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012)

Charles Martin,
    Chasing Fireflies: A Novel of Discovery (2007)

JEFFREY W. STEMPLE,
    LAW OF INSURANCE CONTRACT DISPUTES

L.D. SIMMONS, II & LOWNDES C. QUINLAN,
    NEW APPLEMAN ON INS. LAW (2015)

**Articles**

Joni Hersch and Erin E. Meyers,
  *Employment Practices Liability Insurance and Ex Post Moral Hazard*,
  106 Cornell L. Rev. 947 (2021)

Towers Watson 2014 Global M&A Retention Survey:
  How Companies Use Agreements to Keep Top Talent

## CONTEXT: NATURE OF THE CASE

This is a *Stowers* case.[1] It arises out of an earlier jury verdict and judgment in favor of Jeff Carpenter in Dallas County Court at Law No. 5, Cause Number CC-08-2072-E, styled *Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik.*[2]

In that prior case, defendants' liability insurance carrier — Twin City — rejected a reasonable opportunity to settle for less than remaining policy limits.[3] It did so even though policy limits were eroding toward zero with every penny of litigation costs and every dollar of attorneys' fees.[4] Ultimately, four of its insureds were hit with an adverse jury verdict and a judgment that exceeded remaining policy limits by around $2 million.[5]

---

[1] *See G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved).

[2] App., pp. 1939-1940 ¶ 2 [Original Petition and Jury Demand in this case, before removal].

[3] *Id.* at 1940 ¶ 3.

[4] *Id.*

[5] *Id.*

The defendant insureds appealed to the Fifth Court of Appeals and the Texas Supreme Court but were not successful.[6] The judgment was affirmed and remains unsatisfied.[7] Dallas County Court at Law No. 5 ordered turnover of the defendant insureds' common law *Stowers* claim against their liability insurance carrier — Twin City —, along with associated rights and privileges, to Jeff.[8] The present case involves that *Stowers* claim.[9]

### CONTEXT: SOME *STOWERS* FUNDAMENTALS

When insurance companies have the right to control settlement of claims against their insureds, they owe their insureds a *Stowers* duty. The *Stowers* opinion explains that the insurance company is:[10]

> held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages.

---

[6] App., p. 1940 ¶ 4.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved).

This duty sounds in negligence, has been around for almost a century, and is similar to other areas of law in which a right of control gives rise to a legal duty.[11] So, the ultimate issue in a *Stowers* case is whether a settlement offer is such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the potential harm to the insured, such as exposure to a judgment higher than policy limits.

The *Stowers* duty is born of insurance companies who want to save money for themselves to the detriment of insureds. If a policy limit is the maximum insurance company risk — whether a case settles or goes to trial —, then why settle at all? Why not gamble the insured's personal finances and take a chance at trial? Even if odds of a defense win are slim. Even if trial could expose the insured to damages higher than policy limits.

## INDEX OF ABBREVIATIONS IN BRIEF

This brief uses the following abbreviations:

| abbreviation | meaning |
| --- | --- |
| App. | Appendix in Support of Jeff Carpenter's Motion for Summary Judgment |
| Twin City | Defendant Twin City Fire Insurance Company |

---

[11] *Compare, e.g., Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) ("Having undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the [] house while performing its contract with the builder.").

| Motion | Twin City Fire Insurance Company's Motion for Summary Judgment [ECF Doc. 19] |
|---|---|
| Twin City's Brief | Twin City Insurance [*sic*] Company's Brief in Support of Its Motion for Summary Judgment [ECF Doc. 20] |
| prior case | *Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik,* Dallas County Court at Law No. 5, Cause Number CC-08-2072-E |
| policy | Private Choice Encore! Policy number 00 KB 0229269-07 that Twin City issued to the defendant-insureds |
| EPL | employment practices liability |
| EPLI | employment practices liability insurance |
| SH Development | Southwest Housing Development Company, Inc. — a defendant and insured in the prior case |
| SH Management | Southwest Housing Management Corporation, Inc. *a/k/a* and *d/b/a* Southwest Housing Management Company, Inc. — a defendant and insured in the prior case |
| AH Construction | Affordable Housing Construction, Inc. — a defendant and insured in the prior case |

## LOCAL RULE 56.4(A)(1) SUMMARY OF REASONS TO DENY MOTION

**A.    Twin City interprets the policy in a manner that would re-write the policy to favor it, adding non-existent policy language to exclusion clauses.**

Twin City's interpretation of the policy violates well-established rules of construction. Its interpretation would re-write the policy. Its interpretation would add, to the policy's exclusion clauses, desired language that does not actually exist in the written policy itself. It's interpretation would also largely eviscerate express indemnity coverage concerning oral agreement claims. And those are just examples of violations of established construction rules.

**B.    Twin City selectively relies on *disputed* facts from the transcript of an 8-day jury trial — disputed facts that are contrary to jury *findings*.**

The jury found that the insured-defendants violated an agreement to pay Jeff "if [he] would stay as long as needed [] to help make the asset sale happen."[12] The prior case was not about employment termination severance payments.[13] The oral pay-to-stay employment agreement was not an oral pay-to-go agreement. The sale proceeds payment was compensation to stay … and continue to work hard and do extra work like due diligence and being the face of the companies while the owners were under criminal indictment. It was not compensation to leave. It was not compensation to sever employment.

---

[12] Appendix, p. 1712.

[13] *See, e.g.,* Appendix, p. 1772-1773 & citing references and discussion.

Twin City does *not* claim that any facts supporting its motion are undisputed. It recites its relied-upon facts under the heading *Relevant Background*.[14] It selectively cites disputed facts from the transcript of an 8-day jury trial. It ignores the facts *found* by the jury — a jury that was presented with the disputed trial facts that Twin City cites.

## C.   Objections to unsupported labeling, spin, and personal attacks.

The attorney who signed Twin City's Brief also represented Twin City in rejecting the *Stowers* offer in the prior case.[15] Twin City's Brief uses labels and spin that suit its arguments but do not fit the facts. For example, its opening sentence says Jeff "sued Twin City's insured (Carpenter's employer) for breach of an oral agreement to pay him a severance package."[16] But severance never appears in the petition.[17] Because that was never what the prior case was about. The petition speaks of staying to help effectuate a potential asset sale and a promised sales proceeds payment as the incentive to do that.[18] In short, the labels and word choice in Twin City's Brief are often wrong. Jeff objects to all unsupported statements, labels, and spin in Twin City's Brief.

---

[14] Twin City's Brief [ECF Doc. 20], p. 1.

[15] *Compare* Twin City's Brief [ECF Doc. 20], p. 25 *with e.g.,* App. 1743.

[16] *See* Twin City's Brief [ECF Doc. 20], p. 1.

[17] *See, e.g.,* App., pp. 1176-1796 (operative petition at time of *Stowers* offer, describing stay compensation as sales proceeds bonus and seeking "back pay [past wages]").

[18] *See generally id.*

Twin City also lashes out at Jeff and his counsel. It does so with vitriolic advocacy, heavy with adjectives and unsupported assertions.[19] It did so with litigation too: It sued Jeff, after judgment in the prior case, for a declaration of non-liability and lost.[20] Jeff objects to all unsupported attacks in Twin City's Brief.

## JUDICIAL NOTICE OF STATE COURT PROCEEDINGS

Jeff respectfully requests that the Court take judicial notice[21] of public records from state court proceedings in the prior case.

---

[19] *See, e.g.,* Defendant's Second Amended Answer [Doc. 18], pp. 7-8 ¶ 56, PageID 387-388 ("despite Plaintiff's attempts to mischaracterize"); Twin City's Brief [Doc. 20], p. 10, PageID 403 ("Throughout the trial, Carpenter's attorney bizarrely attempted to get witnesses to"); *id.* at 11, PageID 404 ("Carpenter's attorney began to realize that her effort to mischaracterize the severance payment dispute as a dispute over a 'stay bonus' was causing a credibility problem."); *id.* ("Carpenter's misguided attempt to circumvent").

[20] *See Twin City Fire Ins. Co. v. Carpenter*, No. 3:21-cv-1077-G [Doc. 22] (N.D. Tex. July 26, 2021) (Fish, J.) (dismissing Twin City's lawsuit against Jeff Carpenter) (included at App., pp. 84-94).

[21] *See* Fed. R. Evid. 201(b) (courts may take judicial notice of facts (1) "generally known within the trial court's territorial jurisdiction" or (2) that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also* 2 Robert P. Mosteller et. al., *McCormick on Evidence* § 330, pp. 650-51 (8th ed. 2020).

## FOUND FACTS SHOWING SUMMARY JUDGMENT NOT WARRANTED[22]

The facts found by the jury preclude summary judgment. The jury found the existence and violation of this agreement:[23]

QUESTION 4

Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
2. if Jeff Carpenter would stay as long as needed on to help make the asset sale happen

So, the jury found that the agreement was to stay as long as needed to work to make the asset sale happen. Not to leave. Not to sever employment.

The jury also found that Jeff was owed compensation for that work — *i.e.*, back pay.[24]

---

[22] Unless otherwise noted, Jeff Carpenter's attorneys have supplied all emphases, omitted all internal quotation marks and internal citations from case quotations, and omitted all citing and quoting references from case citations.

[23] App., pp. 1712-1714.

[24] *See id.* at 1716.

ALTERNATIVELY, MATERIAL FACTS SHOWING FACT ISSUE FOR JURY

## A.     The policy's general structure

Twin City controls the defense of its insureds.[25] It also controls settlement of claims against its insureds. It forbids its insureds, under any circumstances, from entering any settlement agreement without its prior written consent:[26]

> (C) The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

The policy has a $75,000 deductible and a $1 million aggregate limit of liability.[27] Defense costs are part of that $1 million limit:[28]

> **V.     DEFENSE COSTS**
>
> Solely with respect to all **Liability Coverage Parts:**
>
> (A) **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

---

[25] App., p. 19, Policy Common Terms & Conditions § VII(A) ("The Insurer shall have the right and duty to defend any Claim for which the Insureds give notice to the Insurer, even if such Claim is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate."); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 846 (Tex. 1994) (describing this policy provision as giving insurance carrier control over the insured's defense).

[26] App., p. 19, Policy Common Terms & Conditions § VII(C).

[27] *Id.* at 9, Policy Declarations, Item 5: Liability Coverage Part Elections.

[28] *Id.* at 18, Policy Common Terms & Conditions § V(A) & *id.* at 15 (defining defense costs).

So, once the deductible is met, policy limits erode toward zero with every penny of litigation costs and every dollar of attorneys' fees.

Policy premiums pay for two overarching forms of EPL coverage: (1) defense costs including attorneys' fees, and (2) liability for damages, also called indemnity.[29] As to defense costs, Twin City owes the insureds a duty to defend. As to liability for damages, Twin City owes the insureds a duty to indemnify.

**B.     EPLI policies cover what others do not, like employment agreements — and coverage is often dependent on specific insurer-selected policy language.**

At the time, the policy has a relatively high premium for such low aggregate policy limits.[30] The employment practices liability ("EPL") coverage may partially explain this. The EPL part of the policy covers what many other insurance policies do not[31] — such as punitive damages, intentional misconduct, failure to comply with implied employment agreements, and failure to comply with oral employment agreements.

---

[29] *See generally* App, pp. 26-31 (employment practices coverage including defense costs and indemnity).

[30] *Compare* App., p. 8 ($33,706 premium) *with* App., p. 9 (limit of liability).

[31] *See, e.g.,* L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INSURANCE LAW § 28.02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

Most traditional liability insurance policies — like commercial general liability, auto, homeowners, errors and omissions, and directors and officers policies — do not cover certain claims: *e.g.*, punitive damages, intentional acts, breach of oral agreements, breach of implied agreements, or breach of any type of employment agreement.[32]

Employment practices liability insurance is different. It covers what many other insurance policies do not. Insurance companies like Twin City developed and marketed EPLI policies to cover gaps in other types of insurance policies.[33]

Most EPLI policies are highly variable in the coverage provided. And the particular language used. So, coverage often turns on basic principles of contract interpretation and particular policy language — rather than decades-developed bodies of coverage-term-specific precedent.[34] In short, Twin City sells a policy that covers what many other insurance policies do not, and coverage is specific to the policy language used.

---

[32] *See generally*, Joni Hersch and Erin E. Meyers, *Employment Practices Liability Insurance and Ex Post Moral Hazard*, 106 CORNELL L. REV. 947, 958-967 (2021) (discussing "EPLI History" and "The EPLI Market Today").

[33] *See* JEFFREY W. STEMPLE, LAW OF INSURANCE CONTRACT DISPUTES § 21.06, at pp. 21-47 to 21-48.

[34] L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INSURANCE LAW Ch. 28, at 28-1 (2015) ("Although a standardized policy exists, most insurers have used proprietary and distinct wording. Based on these two factors, the courts have developed relatively little case law to guide counsel on the meaning of particular EPL policy terms. Because the law is often specific to one insurer's wording, cases may or may not prove persuasive when applied to disputes involving another insurer's wording. Basic principals [*sic*] of contract interpretation will sometimes prove to be the greatest value to coverage counsel.").

## C.      Policy: broad coverage for *loss* resulting from *employment practices claim*

The policy covers *loss* resulting from an *employment practices claim*:[35]

> **I.    INSURING AGREEMENTS**
>
> **(A) Employment Practices Liability**
>
> > The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

So, it covers more than loss resulting from a particular type of occurrence or a particular type of injury.[36] It covers loss resulting from what insureds are obligated to pay as a result of an *employment practices claim* — which is defined to include a civil proceeding brought by or on behalf of an employee:[37]

> **(C)  "Employment Practices Claim"** means any:
>
> **(1)**  written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;
>
> **(2)**  civil proceeding commenced by the service of a complaint or similar pleading;
>
> **(3)**  formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document; or
>
> **(4)**  arbitration proceeding commenced by a demand for arbitration,
>
> by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

---

[35] App., p. 26.

[36] *Id.*

[37] *Id.*

### D.    Policy: narrow indemnity exclusion for *employment termination severance payments*

The policy has a narrow indemnity exclusion for *employment termination severance payments*:[38]

> **(C)**   Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:
>
>   **(1)**   for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement;

The policy does not define *employment termination severance payments*. But the policy language itself ties severance to *termination* of employment.

### E.    Policy: salaries, wages, bonuses exclusion carves out *back pay awards*

The policy states that *loss* "shall not include":[39]

> **(5)**   salaries, wages, or bonuses, except as a component of a front or back pay award.

So, the policy covers salaries, wages, or bonuses as a *component of* a *back pay award*. The policy does not define back pay. It has no cabining language on the scope of what a back pay award may include.

---

[38] App., p. 30.

[39] *See id.* at 27.

**F.    Prior case: failure to comply with oral pay-to-stay agreement**

The quoted language that follows is how the Dallas Court of Appeals describes what happened: "Brian and Cheryl Potashnik[] operated the various appellant companies which developed, owned, and managed affordable housing complexes. In 2006, Brian and Cheryl decided to sell their business. At that time, Jeff Carpenter was the executive vice president of Southwest Housing Management Corporation, Inc."[40]

"Brian and Cheryl wanted Carpenter and other key employees to stay on until the transfer of management to the ultimate purchaser for the purposes of continuity, which was important to the asset sale. According to Cheryl, when they informed Carpenter and other key employees of their plans to sell, they told them that if the sale was successful and there was money left over at the end of the day, they wanted them to participate in the success of the sale. At trial, Cheryl also admitted she told Carpenter that they intended to pay him a bonus if and when the sale went through. Carpenter similarly testified that in May 2006, when Brian and Cheryl told him about their plans to sell, Brian told him this would be good for both families and that they worked hard and should reap some of the rewards."[41]

---

[40] App., p. 97.

[41] *Id.*

"According to Carpenter, Brian told him he wanted Carpenter to stay because there was a lot to do and Carpenter would be involved in the due diligence and communication between the teams once a buyer was selected. Brian further told Carpenter that once they selected a buyer and knew the numbers better, they would put together a very lucrative bonus program for Carpenter's efforts. Brian and Carpenter shook hands after that first conversation about the sale. Another executive testified at trial that Brian later told him that if the transactions went well, Carpenter might not have to work again."[42]

"Carpenter testified that on October 13, 2006, Brian informed him that a buyer had been selected. Brian then indicated to Carpenter his bonus would be based on the letter of intent they were about to sign with the buyer. Carpenter testified that he and Brian 'walked through' the numbers that were based on three percent of the gross sales price of $36 million minus normal closing costs and minus sale proceed bonuses paid to other key employees. Carpenter and Brian did the math and estimated a stay bonus of around $1,020,000. They shook hands after Brian explained the bonus formula."[43]

"At that time, the anticipated closing date for the transaction was spring/summer 2007. The next business day, Carpenter approached Brian to ask about increasing the bonus from three percent to five percent. Brian rejected the idea of five percent, stating it would have

[42] App., pp. 97-98.

[43] *Id.* at 98.

to stay at three percent because that was what was approved, 'we've committed to it,' and he could not do any more than that."[44]

"At some point while the sale was pending, Carpenter and the sellers learned definitively that Carpenter would not have a position with the buyer because the buyer had its own person for Carpenter's job. Subsequently, Carpenter was approached by another company that tried to recruit him immediately with a higher starting base salary than he was earning at the time. Nevertheless, Carpenter testified he declined the offer because he was 'a man of his word,' said he would stay on, and was not willing to walk away from the three percent stay bonus and back-earned bonuses.[] At trial, Jeff Richards, the recruiter for the company, confirmed Carpenter would not start the new job immediately because he had a considerable amount of money coming to him from his current employer if he stayed on."[45]

"In late September/early October 2007, Carpenter learned from Brian and Cheryl that criminal indictments were looming against them and the business was losing up to $1 million per month on their personal legal defense fees.[] The sale of the business, which was initially expected to close in the spring/summer of 2007, was delayed, and the management transition from appellants to the new buyer was set for November 1, 2007."[46]

---

[44] App., p. 98.

[45] *Id.* at 98-99.

[46] *Id.* at 99.

"At trial, Cheryl confirmed that they wanted Carpenter to stay on, so they intended to pay him a bonus to work through a certain point in connection with the asset sale which ultimately was the point in which the management of the business was transferred to the new buyer."[47]

"Carpenter testified that he met with Brian on October 12, 2007 at which time Brian acknowledged that Carpenter had earned both his three percent bonus as well as the back-earned bonuses."[48]

"On October 21, 2007, Carpenter met Brian and Cheryl for dinner and they told him he would get paid when they get paid, i.e., at the closing. Cheryl again reassured Carpenter she 'would never screw [him].' Cheryl testified that October 31, 2007 was the last day they needed Carpenter to stay on to help with the asset sale. It is undisputed that Carpenter worked for appellants through October 31, 2007."[49]

## G.    Prior case: rejection of severance due to existing pay-to-stay agreement

The Dallas Court of Appeals continued. "The next day, on November 1, Carpenter received his termination paperwork/severance agreement offering him $50,000 and no

---

[47] App., p. 99.

[48] *Id.* at 99-100.

[49] *Id.* at 100.

other payments if he released all potential claims against appellants. Carpenter did not sign the agreement and ultimately filed this breach of contract lawsuit."[50]

## H.    Prior case: unsuccessful defense at trial: arguing no agreement and this was all just a failed severance negotiation

Common problems with an anticipated or pending corporate sale are (1) preventing employee talent from jumping ship, (2) incentivizing employees to continue to work hard — to attract a buyer or keep the buyer on a successful track post-acquisition, and (3) incentivizing employees to do extra work like due diligence and transition work.[51] At trial, Keith Jones, the Chief Financial Officer of one of the insured defendants, testifies about a plan to address the problem: "I'm trying to keep key employees from leaving before the sale goes through so we can continue to run the business."[52] The plan is to offer other employees bonuses, and Jeff would help develop that plan.[53]

---

[50] App., p. 100.

[51] *Cf.* App., p. 114 (Towers Watson 2014 Global M&A Retention Survey: How Companies Use Agreements to Keep Top Talent) ("The importance of retaining key talent during a merger or acquisition — and for many years after the merger — has become a given.").

[52] *See* App., p. 603 (trial transcript).

[53] *See* App., pp. 597-98 (trial transcript) ("Q. (By Ms. Gibson) Mr. Jones, during your tenure as chief financial officer, you worked with Jeff Carpenter in connection with identifying … — identifying employees for purposes of a stay-bonus program to help incentivize key or important employees to stay? A. Yes. Q. Okay. And the two of you helped — with respect to that stay-bonus program, you and Jeff Carpenter – what group of employees? You know, what's the pool of employees from which you were identifying important people? A. Office staff that we needed to maintain through the transition of sale. Q. Okay. And in connection with that bonus program — and I'm not going to get into amounts — you and Jeff also worked on identifying what amounts to pay those important employees in connection with the stay-bonus program, correct? A. I guess that it was just truly

At trial, Jeff testifies that in doing so he is incentivized to right-size those stay payments to others — because under *his* already-existing agreement, amounts paid to other employees would reduce the amount he would receive.[54] In contrast, at trial, the defendant insureds argue there was *no* agreement reached with Jeff to pay him for staying: That this was all just an unconsummated *severance* negotiation.[55]

After hearing each side, the jury found there was an agreement to pay Jeff. And the *only* condition they found for payment was Jeff staying as long as needed to help make the asset sale happen:[56]

---

based upon what people's salaries were. So we were offering amounts for staying.").

[54] *See* App., pp. 1068-69 (Jeff Carpenter: "Broker's fees, title fees, legal fees. And then also lets the — during this conversation, sales proceeds, bonus, severance, whatever you want to call it, of other employees would be deducted before my 3 percent. My 3 percent would be calculated off that. Q. (By Ms. Gibson) Did Brian Potashnik explain to you why he wanted this last one to come off of the – to come out of the gross? A. Well, it helped — we were going to put together a program, pay-to-stay severance, sales proceeds bonus, whatever you want to call it, for other people and it was motivational to — not to make some people real high that would, you know, give away the farm — which I would never do. But it was also to make it fair and reasonable and I agreed with that, I understood that. Q. Okay. And was another consideration that you still — because you needed the sale to go through, you also would still give enough to get people to stay? A. Yes.").

[55] *See id.* at 1645-46 (closing argument by defense: "Because every time he proposed to get his so-called oral agreement in writing, gave his proposed amendment to employment contract to the Potashniks, they refused to sign it. Gave his draft severance agreement to the Potashniks, they refused to sign it. Every time he made an effort to get something signed by the Potashniks they just said no. And the reason they said no was they didn't agree to it. There was never an oral agreement. There was never any agreement.").

[56] *See id.* at pp. 1712-13.

QUESTION 4

Did any of the defendants named below and Jeff Carpenter ==agree== on October 13, 2006 ==to pay== Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
2. ==if Jeff Carpenter would stay== as long as needed on to help make the asset sale happen

So, the jury found in Jeff Carpenter's favor on the issue — "yes," this was the agreement. Neither severing nor terminating employment nor anything else was a condition of payment. And the trial court entered judgment accordingly.[57]

Twin City rejected an opportunity to settle litigation against its insureds — before trial and for less than remaining policy limits.[58] Instead, Twin City spent those limits on defense and appellate bonds. After Twin City rejected the settlement opportunity, their insureds lost that litigation and are now liable for a judgment in excess of $3 million dollars: They lost at trial and each level of appeal.[59] The underlying facts of the case have been discussed by several courts — with opinions included in the supporting appendix.

---

[57] *See* App., pp. 1729-36 (judgment).

[58] *See id.* at 1940 (petition) & pp. 17367-41 (*Stowers* letters).

[59] *See id.* at 1729-36 (final judgment); *Potashnik v. Carpenter*, No. 05-19-00238-CV, pp. 2-3 (Tex. App.—Dallas, Aug. 27, 2020, pet. denied) (included in Appendix as Exhibit 5).

## ARGUMENT AND AUTHORITIES[60]

The meaning of *employment termination severance payments* and *back pay award* are questions of law.[61] "Although the interpretation of a contract is normally a question of law for the Court, that interpretation frequently depends heavily on the resolution of factual disputes. And it is the function of the trier of fact to resolve such factual disputes."[62]

Under Texas law, "the maxims of contract interpretation regarding insurance policies operate squarely in favor of the insured."[63] Undefined terms are given their ordinary meaning "as they are commonly understood by the average laymen."[64] If, after applying the rules of construction, a policy provision is "subject to two or more reasonable interpretations, [then] that provision is ambiguous."[65] Then, courts adopt the insured's construction, "as long as that construction is not unreasonable, even if the construction urged by the insurer appears more reasonable or a more accurate reflection of the parties' intent."[66]

---

[60] Unless otherwise noted, Jeff Carpenter's attorneys have supplied all emphases, omitted all internal quotation marks and internal citations from case quotations, and omitted all citing and quoting references from case citations.

[61] *Nautilus Ins. Co. v. Zamora*, 114 F.3d 536, 538 (5th Cir. 1997) (applying Texas law: "The interpretation of an insurance contract and its exclusions is a question of law which we review de novo.").

[62] *Cook Indus., Inc. v. Cmty. Grain, Inc.*, 614 F.2d 978, 980 (5th Cir. 1980).

[63] *Lubbock Cnty. Hosp. Dist. v. National Union Fire Ins. Co.*, 143 F.3d 239, 242 (5th Cir. 1998).

[64] *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 890 (5th Cir. 2018) (applying Texas law).

[65] *Id.*

[66] *Lubbock Cnty. Hosp. Dist.*, 143 F.3d at 242; *see Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson*

The Supreme Court of Texas notes: "It is a settled rule that policies of insurance will be interpreted and construed liberally in favor of the insured and strictly against the insurer, and *especially so when dealing with exceptions and words of limitation*."[67] The Fifth Circuit says: "Exclusions are narrowly construed, and all reasonable inferences must be drawn in the insured's favor."[68] In sum, interpretation is a question of law that (1) itself favors coverage and (2) "frequently depends heavily" on a jury to resolve underlying factual disputes. Which all makes this case ill-suited for resolution via defendants' motion.

### A.   The *employment termination severance payments* exclusion: What it means is a question of law — whether it applies is a fact question Twin City must prove.

#### 1.   The meaning of the exclusion has three components: length of service, employment termination, and exchange for a release of claims.

*Severance payment*, as Twin City concedes, means "an allowance usually based on length of service that is payable to an employee on termination of employment."[69] The United States Department of Labor defines it similarly: "Severance pay is often granted to

---

*Energy Co., Inc.*, 811 S.W.2d 552, 555 (Tex. 1991) ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent. In particular, exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured.").

[67] *Ramsay v. Md. Am. General Ins. Co.,* 533 S.W.2d 344, 349 (Tex. 1976).

[68] *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 370 (5th Cir. 2008).

[69] *See* Twin City's Brief, ECF Doc. p. 19, PageID 412 ("'Severance pay,' as explained earlier, is 'an allowance usually based on length of service that is payable to an employee on termination of employment.'") (citing https://www.merriam-webster.com/dictionary/severance).

employees upon termination of employment. It is usually based on length of employment for which an employee is eligible upon termination."[70] It is commonly given in exchange for a release of claims.[71] So, *severance payment* is payment that is (1) usually based on length of service; (2) due or payable on termination; and (3) commonly for a release of claims.

### 2.    The phrase *employment termination* modifies *severance payment* — and is not to be read out altogether as surplusage.

> *If possible, every word and every provision is to be given effect (verba cum effectu sunt accipienda). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.*

> —Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012)

A modifier is "a word or phrase that is used with another word or phrase to limit or add to its meaning."[72] The addition of the modifying phrase *employment termination* means not every *severance payment* is excluded from coverage — only those for *employment termination*. Interpreting it otherwise renders the additional phrase *employment termination* mere surplusage. That violates the surplusage canon of construction. It changes the clause by read-

---

[70] https://www.dol.gov/general/topic/benefits-other/severancepay

[71] *See Loc. Union No. 1992 v. The Okonite Co.*, 189 F.3d 339 (3rd Cir. 1999) ("The requirement that employees sign a release as a condition of receiving severance pay is a common provision in modern severance agreements. 'An employee release is a contract in which a discharged employee abandons claims against a former employer after they have arisen, in exchange for benefits such as severance pay.'").

[72] https://dictionary.cambridge.org/us/dictionary/english/modifier

ing out part of it: "~~employment termination~~ severance payment." So, while *severance payment* alone means payment due or payable on termination — *employment termination severance payment* means employment termination is a condition for payment. That is, only those *severance payments* that are for *employment termination* are excluded from coverage. Pay for staying — as opposed to *employment termination* [*i.e.,* pay for going] — is covered.

3.   **Whether the exclusion applies is a question of fact — and favors insureds.**

The *employment termination severance payments* clause is a coverage exclusion.[73] Under Texas law, as this Court recently recognized in denying summary judgment, insurers bear the burden of proving applicability of an exclusion as an affirmative defense.[74] So, Twin

---

[73] *See* Defendant's Appendix [Doc. 21], p. 30 ("III. EXCLUSIONS APPLICABLE TO ALL IN-SURING AGREEMENTS … (C) Other than Defense Costs, the Insurer shall not pay Loss for any Claim: (1) for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement; … .").

[74] TEX. INS. CODE § 554.002 ("BURDEN OF PROOF AND PLEADING. In a suit to recover under an insurance or health maintenance organization contract, the insurer or health maintenance organization has the burden of proof as to any avoidance or affirmative defense that the Texas Rules of Civil Procedure require to be affirmatively pleaded. Language of exclusion in the contract or an exception to coverage claimed by the insurer or health maintenance organization constitutes an avoidance or an affirmative defense."); *see also Covington Specialty Ins. Co. v. USAI LP*, No. 3:13-CV-3271-N [Doc. 45], pp. 5, 9, PageID 861, 865 (N.D. Tex. May 4, 2020) (Godbey, J.) ("[T]he burden of proving that the exclusion applies rests with the insurance company. … The Court determines that [insurance company] failed to meet its burden to show that the auto exclusion applies. Accordingly, the Court denies [insurance company]'s motion for summary judgment.").

City could only have it decided via summary judgment by proving it beyond peradventure — beyond uncertainty or doubt; a heavy burden.[75]

Even without that higher *peradventure* standard, under the applicable standard of review for a summary judgment motion, trial courts:

(1)  "should give credence to the evidence favoring the nonmovant"[76] — *i.e.*, the "evidence of the nonmovant is to be believed;"[77]

(2)  "must draw all reasonable inferences in favor of" the nonmovant;[78]

---

[75] *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) ("In the usual case, the party who seeks a summary judgment must show by affidavit or other evidentiary materials that there is no genuine dispute as to any fact material to resolution of the motion. He must establish thereby the existence or nonexistence of enough of the essential elements of a claim and its related defenses to permit disposition of the claim as a matter of law. Thus, if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.") (emphasis in original); *Word of Life Church of El Paso v. State Farm. Lloyds*, No. 18-50108, p. 12, 2019 WL 1324845 (5th Cir. Mar. 22, 2019) (per curiam) (unpublished) ("Unlike the general coverage question, [the insurance company] has the burden of proof of an exclusion. Thus, it cannot rely on any failures of proof by [insured] to prevail on a summary judgment: it must prove that there are no genuine issues of material fact and that it is entitled to prevail as a matter of law."); *Covington Specialty Ins. Co. v. USAI LP*, No. 3:13-CV-3271-N [Doc. 45], pp. 3, 9, PageID 859, 865 (N.D. Tex. May 4, 2020) (Godbey, J.) ("When a party bears the burden of proof on an issue, she 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [her] favor.' … The Court determines that [insurance company] failed to meet its burden to show that the auto exclusion applies."); *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 936 (N.D. Tex. 2009) (Fitzwater, J.) ("The court has noted that the beyond peradventure standard is heavy."); THE AMERICAN-HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2022) (defining *peradventure* to mean "chance or uncertainty; doubt.").

[76] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

[77] *Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

[78] *Reeves*, 530 U.S. at 150.

(3)    "must disregard all evidence favorable to the [movant] that the jury is not required to believe;"[79]

(4)    must not make credibility determinations;[80]

(5)    must not weigh the evidence.[81]

It is error to disregard important evidence favorable to the nonmovant.[82] Courts may only give credence to evidence favoring the movant if that evidence is (1) "uncontradicted and unimpeached" *and* (2) "comes from disinterested witnesses [or, presumably, the opposing party]."[83] In sum, though exclusion *interpretation* is a legal question, exclusion *application* is a fact question — and one disfavoring summary judgment.

---

[79] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

[80] *Id*. at 150.

[81] *Id*.

[82] *See id.* at 152 ("… [T]he Court of Appeals misapplied the standard of review dictated by Rule 50. Again, the court disregarded critical evidence favorable to petitioner …."); *id*. at 150 (noting that the "standard for granting summary judgment mirrors the standard for judgment as a matter of law [under Rule 50], such that the inquiry under each is the same."). *See also Tolan*, 572 U.S. at 651 ("In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' … For that reason, we vacate its decision ….").

[83] *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003) ("The court gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses."); *see also Reeves*, 530 U.S. at 151 ("… [T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.").

### a.   Facts *actually established* may not be relitigated: Collateral estoppel pre-vents re-trying whether pay was for anything other than for staying.

Although the question of whether an exclusion affirmative defense applies is one of fact, not all facts remain open after a lawsuit establishing liability of an insured.[84] Facts conclu-sively determined — i.e., those "actually established" — may not be relitigated.[85] A fact is conclusively determined, for example, if collateral estoppel applies to it.[86] The Fifth Circuit states the test for collateral estoppel in an insurance coverage case:

An insurer in a coverage case will be barred from re-litigating a particular issue from the underlying liability case if: (1) the issue raised in the coverage suit was raised and

---

[84] *See, e.g., Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 334 S.W.3d 217, 219 (Tex. 2011) ("On the other hand, the insurer's duty to indemnify is determined based on the facts actually established in the underlying suit."); *see also Word of Life Church of El Paso*, No. 18-50108, p. 10 ("Unlike the duty to defend, the duty to indemnify turns on the 'facts actually established' in the underlying litigation."); *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997) ("For example, a plaintiff pleading both negligent and intentional con-duct may trigger an insurer's duty to defend, but *a finding* that the insured acted intentionally and not negligently may negate the insurer's duty to indemnify.").

[85] *See, e.g., Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1495 (5th Cir. 1992) (in an indemnity suit, trial court should limit evidence to "prevent a full-blown retrial of the [underlying] lawsuit"); *Swicegood v. Med. Protective Co.*, No. 3:95–cv–0335–D, 2003 WL 22234928, at *13, 14 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.) ("The court has located no case that suggests that a coverage suit should consist of a retrial of all or even substantial parts of an indemnity suit that has been fully tried. … This well-settled principle would have little meaning if the trial of an indemnity suit served as nothing more than a warm-up match for the coverage trial. … The court predicts that the Texas Supreme Court will hold that new evidence can be introduced at a coverage trial when the proof is necessary to resolve a controlling coverage question that was not conclusively decided in the indemnity suit.").

[86] *See, e.g., Swicegood*, 2003 WL 22234928, at *14 ("By 'not conclusively decided' the court means the issue was not determined in a way that binds all affected parties in the coverage case (e.g., via collateral estoppel). An undecided issue could include one that the parties in the indemnity case had no reason to litigate, e.g., an exclusion from coverage, where the burden of proof would be on a non-party insurer.").

determined in the liability suit; (2) the issue determined in the liability suit was essential to the judgment in the liability suit; and (3) the necessary requirement of privity exists between the insurer and the insured. The requisite degree of privity between an insurer and its insured can exist if: (1) the insurer controlled the insured's defense in the liability suit; and (2) the insurer and the insured do not hold conflicting positions with respect to the issue determined in the liability suit.[87]

In sum, the doctrine applies to facts essential and determined — where privity exists — in the underlying case: Otherwise, for an insurance exclusion, the issue is still an open fact question for the insurer to prove at trial as an affirmative defense.

### (1)    Whether pay was for staying, or something else, was raised and determined.

All the same trial evidence Twin City cites was before the jury. The trial transcript itself references the phrase "to stay" over 150 times.[88] Likewise, it references the word "severance" over 150 times.[89] In both arguments and objections, the insured's defense counsel disputed whether pay was for staying or for severance.[90] In short, the issue of whether pay was for staying — or for something else — was raised.

---

[87] *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110-111 (5th Cir. 2010) (ruling that insurer was collaterally estopped).

[88] *See generally* App., pp. 127-1701 (trial transcript, word searchable for phrase).

[89] *See id.*

[90] *See, e.g.,* App., p. 552 ("[Defense counsel, in opening]: Pay to stay, another term that was used in the Affordable Housing business — stay to pay or whatever it was — are not terms that were commonly used. They weren't used by Mr. and Mrs. Potashnik. That's something that was made up as a catchy phrase in this lawsuit."); *id.* at 599 ("[Defense counsel] Your Honor, I'm going to go ahead and object to this whole line of questioning calling this a stay bonus."); *id.* at 601 ("[Defense counsel]: I'm going to object, Your Honor. She's called it a stay-bonus program. The witness

The issue was also determined. On whether the agreement was to pay if Jeff would stay, the jury answered yes to the following question:[91]

> QUESTION 4
>
> Did any of the defendants named below and Jeff Carpenter ==agree== on October 13, 2006 ==to pay== Jeff Carpenter:
>
> 1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
> 2. ==if Jeff Carpenter would stay== as long as needed on to help make the asset sale happen

So, after hearing all the evidence Twin City cites, the jury finds the agreement was for pay to "stay as long as needed on to help make the asset sale happen." In short, pay for staying and continuing to work hard toward the asset sale.

> **(2)     The issue determined was essential: Staying was the only condition for pay — going was not — and it is what the jury found Mr. Carpenter did.**

Had the jury determined that there was no pay to stay agreement, the defendant insureds would have no liability now. Staying would not matter otherwise. Staying "as long

---

just testified it's a severance program."); *id.* at 1371 ("[Defense counsel examination of Jeff Carpenter]: Q. Because stay bonus and pay to stay were terms that you made up during the course of this litigation — A. Not true."); *id.* at 1665 ("[Defense counsel, in closing]: And I will remind you Keith Jones, the CFO and a CPA, never heard the term 'pay to stay', never heard the term 'stay bonus'. Mark Jones, the community development person, never heard the term 'stay bonus', never heard the term 'pay to stay'.").

[91] *See* App., pp. 1712-1713.

as needed on to help make the asset sale happen" was the essential — the *only* — condition for payment. Liability for the jury's decision on this essential issue is the loss here.

### (3)   Privity exists on the issue.

Twin City controlled the insured's defense.[92] On the issue of whether pay was for staying or for severing employment, privity remained between Twin City and the insureds — just like privity exists in *Bay Rock*.[93] In an effort to avoid liability, the defendant insureds in the prior case argued that any agreement being discussed was for severance pay rather than just to stay. Just like Twin City does here. Their positions on the issue were aligned in the prior case on this issue. So, whether pay was for staying or for severance was conclusively determined — i.e., "actually established" — and may not be relitigated.

### b.   A reasonable juror could find the exclusion inapplicable — because payment was based on an event rather than length of service.

Even if it were not collaterally estopped — and the issue were open to be relitigated despite verdict and appeals — Twin City still does not meet the *peradventure* standard on

---

[92] *See* App., p. 19 (Policy Common Terms & Conditions § VII(A)) ("The Insurer shall have the right and duty to defend any Claim for which the Insureds give notice to the Insurer, even if such Claim is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate."); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 846 (Tex. 1994) (describing this policy provision language as giving insurance carrier control over the insured's defense).

[93] *See Bay Rock*, 614 F.3d at 109, 111 ("Mid–Continent defended Bay Rock in the state court action under a reservation of rights letter. … [W]e conclude that Mid–Continent was in privity with Bay Rock, and, as a result, Mid–Continent is collaterally estopped from re-litigating St. Paul's right of subrogation."); *see also* Twin City's Brief, ECF Doc. p. 9, PageID 402 ("Twin City agreed to pay Southwest's defense costs under a full reservation of rights.").

its affirmative defense. Under the definition on which both sides agree,[94] a reasonable juror could find that *severance payment* is usually based on length of service. Like two weeks salary for every year of employment. A reasonable juror could find payment here was based on a contingent event [i.*e.,* the asset sale happening] rather than length of service. So, because it was based on something other than length of service — and length of service is *usual* for severance payment — a reasonable juror could find the agreement here was for something other than *severance payment*. Or was conditioned on something other than *employment termination*. Under the *peradventure* standard, that alone ends the issue.

### c.     A reasonable juror could find the exclusion inapplicable — because payment was due or payable on something other than termination.

Also, or alternatively, a reasonable juror could find the exclusion inapplicable for a different reason. Under the definition on which both sides agree,[95] a reasonable juror could find that because *severance payments* are due or payable on termination. But that here, under the jury's verdict, payment was neither due nor payable on termination. It was not triggered by termination at all. A reasonable juror could find payment here was for something different. A reasonable juror could find that *staying* was the condition for payment here, rather than termination. So, for this alternative or additional reason, a reasonable juror could find

---

[94] *See* Twin City's Brief, ECF Doc. p. 19, PageID 412 ("'Severance pay,' as explained earlier, is 'an allowance usually based on length of service that is payable to an employee on termination of employment.'") (citing https://www.merriam-webster.com/dictionary/severance).

[95] *See id.*

the loss here is for something other than *employment termination severance payment*. Under the *peradventure* standard, that too ends the issue.

> **d.      A reasonable juror could find the exclusion inapplicable — because payment was conditioned on something other than a release of claims.**

Also, or alternatively, a reasonable juror could find the exclusion inapplicable for another reason. A reasonable jury could find that because *severance payment* is commonly exchanged for a release of claims —payment here lacked a release — this was something other than severance payment.[96] Under the *peradventure* standard, that too ends the issue.

> **e.      Twin City relies on labeling — but a reasonably juror could find the essence of the payment is what matters, rather than its label.**

*You can put your boots in the oven, but that doesn't make them biscuits. - You can say whatever you want about something, but that doesn't change what it is.*

— Charles Martin, Chasing Fireflies: A Novel of Discovery

Much of Twin City's contention is that people used the word "severance" at trial — so, as a matter of law, it must be. A reasonable juror could reject all of that testimony.[97] A reasonable juror could see that counsel-references to the word was just addressing a witness

---

[96] *See Loc. Union No. 1992 v. The Okonite Co.*, 189 F.3d 339 (3rd Cir. 1999) ("The requirement that employees sign a release as a condition of receiving severance pay is a common provision in modern severance agreements. 'An employee release is a contract in which a discharged employee abandons claims against a former employer after they have arisen, in exchange for benefits such as severance pay.'").

[97] *Reeves*, 530 U.S. at 151 ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

reference. A reasonable juror might look further, beyond labels, into the essence of the pay agreement with Jeff. A reasonable juror could reject the notion that labeling — *i.e.*, referencing or naming or calling it *severance* — is what matters.

A reasonable juror might conclude that people were referencing *severance* because there was an effort to roll employee claims over stay bonuses *into* releases contained within severance agreements. A reasonable juror may conclude that effort does not convert the stay agreement into a severance agreement.

A reasonable juror could conclude that those scheming to buy releases in exchange for just paying something already promised [like PTO or pay to stay], might find calling it *severance* more palatable. As if the employee is getting something different than just PTO or a stay bonus already owed.

A reasonable juror could find witnesses were calling it something it was not — and for a self-serving but nefarious purpose: To imply there was no agreement to pay for staying, only a failed *severance* negotiation via which Jeff would release claims for money [as defense argued at trial]. The jury in the underlying suit did not believe it — as evidenced by that jury's verdict. A reasonable juror here could determine that despite all that talk of severance programs and failed severance negotiation, the agreement at issue stood alone, apart from all of it, and was enforceable: An agreement to pay for staying to help make the asset sale happen and nothing else. Regardless of how labeled.

> **f.   Even if payment for staying was *severance payment* — even beyond per-adventure or as a matter of law — a reasonable juror could still find coverage.**

Twin City apparently cites *Stout*, *Goldman*, *Claybrook*, *Baker*, *Jennings*, *Drake*, *Heidgerd*, *Kostrzewski*, and *AMAX*, for the unremarkable notion that sometimes businesses will try to roll incentive pay like pay-to-stay bonuses into a severance agreement. Or promise to pay a severance benefit to entice employees to stay. But none of that means pay for staying is necessarily — as a matter of law and in all cases — *severance payment*. Beyond peradventure. None of those cases say so.

And none stand for the notion that, as a matter of law, the only way businesses may promise pay-to-stay bonuses is via severance agreements. Or that just because some businesses try to roll promised pay-to-stay bonuses into severance agreements — that, as a matter of law, all pay-to-stay bonuses are always and necessarily severance payments. None of these cases say such a thing. At most, these cases just show that sometimes such bonuses are rolled into severance agreements. But it no more means that such bonuses are always severance payments than it would mean that paid time off (PTO) or sales commissions are always severance payment as a matter of law.

Besides, even if pay to stay bonuses were always and only *severance payment* as a matter of law [it is not] this still misses a modifying phrase here: *employment termination*. A reason-

able juror could still find it was something other than *employment termination severance payment*. For all the above reasons, Twin City fails to prove its affirmative defense beyond all peradventure.

**B.      The *back pay award* clause: What it means is a question of law — whether it applies is a fact question and a reasonable juror could find a *back pay award*.**

As before, policy interpretation is a question of law that (1) favors coverage and (2) "frequently depends heavily" on a jury to resolve underlying factual disputes.[98] As before, while interpretation of an insurance clause is a question of law [which may itself depend heavily on facts to be decided by a jury], application of a policy is a question of fact.[99]

---

[98] *See supra* at notes 61-66 and cases cited therein; *see also Nautilus Ins. Co. v. Zamora*, 114 F.3d 536, 538 (5th Cir. 1997) (applying Texas law: "The *interpretation* of an insurance contract and its exclusions is a question of law which we review de novo.").

[99] *See, e.g., Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*, No. 4:09-cv-0422 [Doc. 109], p. 34 (S.D. Tex. Sept. 29, 2016) ("'Determination of what constitutes a breach of the cooperation clause of a liability policy is usually a question of fact.'") (quoting *Frazier v. Glen Falls Indem. Co.*, 278 S.W.2d 388, 391 (Tex. Civ. App.—Fort Worth 1955, writ ref'd n.r.e.)); *Aetna Cas. & Sur. Co. v. Protective Ins. Co.*, 661 S.W.2d 291, 292 (Tex. App.—Houston [1st Dist.] 1983, no writ) ("The coverage question is whether there was any evidence raising a fact issue whether Atlas was a 'borrower' of the truck within the meaning of the 'loading and unloading' coverage provisions of the insurance policy issued by Aetna."); *Royal Indem. Co. v. Marshall*, 378 S.W.2d 364, 368 (Tex. Civ. App.—Austin 1964) ("Whether or not these facts and circumstances constituted 'storage' within the meaning of the policy was, we believe, a question of fact."), *rev'd on other grounds*, 388 S.W.2d 176 (Tex. 1965); *British Gen. Ins. Co. v. Boone*, 67 S.W.2d 353, 353 (Tex. Civ. App.—El Paso 1934) ("These cases and *Chimene v. Baker*, supra, support the view that the testimony presents an issue of fact as to the fireproof quality of the safe in question, within the meaning of the policy.").

The *employment practices liability coverage part* of the policy states *loss shall not include*:[100]

> **(5)**   salaries, wages, or bonuses, <mark>except as a component of a front or back pay award.</mark>

The *loss shall not include* phrase makes *salaries, wages, or bonuses* an exclusion or limiting language — that Twin City bears the burden of proving as an affirmative defense.[101] If Twin City does so, the *except* language flips the burden of proving applicability of the exception back to the insured, but with "all doubt resolved in the insured's favor."[102] With, of course, all the usual summary judgment standards — cited before — favoring the non-movant.

---

[100] *See* App., p. 28 (policy).

[101] *See Prophet Equity LP v. Twin City Fire Ins. Co.*, No. 05-17-00927-CV, pp. 25-26, 2019 WL 3886651 (Tex. App.—Dallas Aug. 19, 2019, no pet.) (mem. op.) ("Twin City insists that the phrase 'Loss shall not include … variable compensation' is not an exclusion; rather, it is merely part of the 'loss' definition and thereby a precondition to coverage. But the insurance code does not require that language of exception or exclusion fall only within a policy's designated exclusions section. In fact, the statute is clear that whenever an insurer seeks to rely on such language, regardless of where it appears in the policy, the insurer has the burden of proof. Here, even if the language at issue is not technically an exclusion, it is nonetheless limiting language that excepts certain enumerated items from coverage. Thus, Twin City had the burden to establish its application.") (citing Texas Insurance Code § 554.002).

[102] *See Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998) ("The insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy. Once the insurer has proven that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion. … Even so, all doubt is resolved in the insured's favor.") (citing *Telepak v. United Servs. Auto. Ass'n*, 887 S.W.2d 506, 507 (Tex. App.—San Antonio 1994, writ denied)).

So, the issue of law [*i.e.,* interpretation] for this Court is to interpret what *component of a back pay award* means. The issue of fact [*i.e.,* application] for a jury to decide is whether the verdict and judgment for past due pay-to-stay compensation in the prior case is a *component of* a *back pay award*.

### 1.   *Back pay* can mean either earned or unearned income.

The policy leaves *back pay* undefined. As a result, courts must look to the ordinary meaning of *back pay*.[103] A variety of definitions show that *back pay* is simply (1) owed but unpaid compensation for past performance or (2) owed but unpaid compensation for performance that would have occurred in the past but for some obstacle:



---

[103] *See RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) ("Unless the policy dictates otherwise, we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."); *see also Edinburg Consol. Indep. Sch. Dist. v. INA*, 806 S.W.2d 910, 913 (Tex. App.—Corpus Christi 1991, no writ) (looking to dictionary for meaning of undefined term in insurance policy).

[104]   https://www.encyclopedia.com/humanities/dictionaries-thesauruses-pictures-and-press-releases/backpay

[105] https://www.merriam-webster.com/dictionary/back%20pay

[106] https://dictionary.cambridge.org/us/dictionary/english/back-pay

In short, it covers both earned and unearned pay — and excludes neither.

This also fits the purpose of back pay, which is "to make the injured party whole."[107] Limiting back pay to unearned income — pay that would have been earned but for some wrongful act — makes it a partial remedy. Because it would exclude pay already earned but unpaid. For example, when an employer has paid females less than males for the same work, the back pay is earned: The work has been done. When an employer fires a female precisely because she is a female, the back pay is unearned but would have been earned absent the unlawful conduct. Both are back pay. And both are recoverable to "make the injured party whole." The policy here fails to distinguish between earned and unearned back pay. It covers both and excludes neither.

> **2.** ***Back pay* can mean either earned or unearned pay — regardless of the underlying violation of law that an award of it remedies.**

None of these ordinary meanings of the phrase *back pay* limit it to violation of statutory anti-discrimination employment laws. At base, Twin City's contention is that a *back pay award* can remedy violation of those statutory employment laws, so it cannot remedy breach of an agreement to pay an employee. This is illogical. Of course, what a *back pay award* can and cannot remedy does not change what *back pay* means. Any more than whether a mop can clean up milk or water — or is more often used to clean up one or the

---

[107] *See Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 935 (5th Cir. 1996) ("[A]n award of back pay is … designed to make the injured party whole … .").

other — changes it from being a mop. But even setting aside the lack of any such remedy-based definitional limitation in the ordinary meaning of the phrase. And setting aside the lack of any such limitation in the policy. And setting aside that what it can or cannot remedy does not define what it is. Twin City is still wrong about what it can remedy: A back pay award can remedy either.

In fact, courts note a back pay remedy for breach of an employment agreement mirrors the remedy for violating statutory employment laws.[108] The difference being that a back pay award is a legal remedy for breach of an employment agreement — it is an equitable one for violation of a statutory employment law.[109] But again, how courts use a *back pay award* as a remedy for which violations of law, misses the larger point about its *definition*. Under its

---

[108] *See, e.g., Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995) (Worker Adjustment and Retraining Notification Act) ("WARN remedy of back pay mirrors the type of remedy afforded those who fall victim to an implied contract breach—giving individuals what they would have been entitled to had there been no breach."), *cert. denied,* 116 S. Ct. 1588 (1996); *Kolb v. Goldring, Inc.*, 694 F.2d 869, 871-72 (1st Cir. 1982) (Age Discrimination in Employment Act) ("… [I]n its 'essential nature' an ADEA action is identical to a common law suit for back wages for breach of contract. … Thus cases like this one call for a simple tabulation of 'items of pecuniary or economic loss such as wages, fringe, and other job-related benefits.'").

[109] *See Massey v. Whittaker Corp., Winters Indus. Div.*, 661 F. Supp. 1151, 1153 (N.D. Ohio 1987) ("The plaintiff has requested a remedy in the form of backpay on the breach of contract issue. Back pay is a legal remedy because it will compensate the plaintiff for the wages he would have earned if the defendant had not breached the employment agreement and terminated the plaintiff's employment. Although back pay is an equitable remedy for the purposes of Title VII of the Civil Rights Act of 1964, the characterization of back pay as an equitable remedy is based on the specific statutory language in Title VII. *See Curtis v. Loether,* 415 U.S. 189, 196-97, 94 S. Ct. 1005, 1009-10, 39 L.Ed.2d 260 (1974). In the absence of such specific statutory language, back pay that forms part of an award for compensatory damages in a § 301 [breach of collective bargaining agreement] action is more properly classified as legal relief and not as equitable relief.").

ordinary and generally accepted meaning, the phrase covers earned and unearned pay. Regardless of the violations of law to which it is applied as a remedy.

### 3.   Twin City's interpretation — applying *back pay* only to discrimination and wrongful termination claims — would make oral agreement coverage moot.

*This court is bound to read all parts of a contract together to ascertain the agreement of the parties. Moreover, each part of the contract should be given effect.*

— Justice John Cornyn,
*Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994)

The *employment practices liability coverage* part of the policy covers losses resulting from an *employment practices wrongful act*.[110] This is defined to include, in addition to wrongful dismissal and discrimination claims, breach of oral agreements.[111] Under Twin City's proposed interpretation, such a covered breach of an oral agreement would cover nothing. It would not cover *salaries, wages, or bonuses*, because those are excluded. And those could never be part of the exception for *a component of a front or back pay award*. Because, under

---

[110] *See* App., p. 26 (policy) ("I. INSURING AGREEMENTS (A) Employment Practices Liability The Insurer shall pay Loss on behalf of the Insureds resulting from an Employment Practices Claim first made against the Insureds during the Policy Period or Extended Reporting Period, if applicable, for an Employment Practices Wrongful Act by the Insureds.").

[111] *See id.* at 27 (policy) ("II. DEFINITIONS … The following terms, whether used in the singular or plural, shall have the meanings specified below: … (D) 'Employment Practices Wrongful Act' means a Wrongful Act involving any: … (6) breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; … .").

Twin City's theory, *back pay awards* are — by some unwritten definition — only for wrongful termination and employment discrimination claims. And never breach of oral employment agreements. Which means the covered claim for breach of oral employment agreements covers no awards against an insured for such breach.

Twin City's preferred interpretation renders such coverage for agreements empty. Because it could never cover an *award* for salaries, wages, or bonuses against an insured for breach of such a covered agreement. Had it intended to limit meaning of the phrase *back pay* — or the term *award* — only to discrimination or wrongful dismissal cases, Twin City's policy could have easily defined it that way. Or it could have excluded oral agreements from coverage altogether. But Texas law governing interpretation of policies, referenced above, forbids writing-in any of this now. As the policy is structured, it covers equally *wrongful dismissal* and *employment discrimination* and *breach of any oral, written, or implied employment* contract. And without any distinction as to which the phrase *back pay award* may apply.

4.    **A reasonable interpretation gives meaning to the difference between *salaries, wages, or bonuses* in the exclusion — and those within the exception.**

*The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.*

— Antonin Scalia & Bryan A. Garner,
Reading Law: The Interpretation of Legal Texts 155 (2012)

That back pay covers earned and unearned pay — and excludes neither — is more consistent with the policy as a whole. Because it gives reasonable interpretation and application to the differences between the exclusion and its exception. To understand this, one can step away from this particular case and look at the policy as a whole as applied to a variety of situations. The below examples assume basic requirements for coverage, such as notice and consent to settle.

a.    **example: consent decree training, monitoring, reporting**

The policy defines *employment practices claim* to include formal administrative and regulatory proceedings.[112] Jill files a charge of discrimination for race discrimination [pay disparity because of race] with the Equal Employment Opportunity Commission. The EEOC finds cause to believe a pattern or practice of discrimination has occurred. The case settles

---

[112] *See* App., p. 26 (policy EPL Coverage Part II(C)(3): "'Employment Practices Claim' means any: … (3) formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document;").

for (1) $8.4 million in back pay for all affected employees and (2) a consent decree mandating significant nationwide training, monitoring, and reporting intended to stop the discrimination. The employer must hire numerous trainers and additional personnel to meet its consent decree obligations to train, monitor, and report. ✔The policy covers the back pay subject to relevant limits. The policy excludes salaries, wages, and bonuses for new hires needed to meet consent decree obligations, because those salaries, wages, and bonuses are not a *component* of back pay or front pay.

### b.    example: mitigation efforts

A wrongfully terminated employee usually has a duty to mitigate damages. He usually must use reasonable diligence to find substantially equivalent work.[113] Jack is a company executive and is wrongfully terminated. He has trouble finding substantially equivalent work and accepts a much lower paying job. He is now too busy to continue to search for substantially equivalent work. So, he hires Mitt at an annual salary of $125,000 to work full-time to help him find substantially equivalent work. A wrongful termination lawsuit is filed. A jury awards (1) $500,000 in back pay for what Jack would have earned in the past if the employer had not unlawfully terminated him and (2) $125,000 for the salary paid to Mitt to help mitigate damages. ✔The policy covers the back pay subject to relevant limits. The policy excludes the salary paid to Mitt to help mitigate damages, because that salary is not

---

[113] *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 394 (5ᵗʰ Cir. 2003) (discussing duty to mitigate damages under Age Discrimination in Employment Act).

a component of back pay or front pay.

### c.     example: hiring temporary workers in order to meet legal obligation

The policy defines *employment practices claim* to include a demand letter.[114] Julia is an Apache helicopter pilot in the National Guard of the United States. She receives orders for 60 days of active duty to assist in search and rescue efforts after a disaster. Her private-sector employer says it cannot do without her and has to let her go. It receives a demand letter that explains the Uniformed Services Employment and Reemployment Rights Act.[115] The case settles. Among other settlement terms, the employer agrees to restore Julia to her position upon return from active duty. But the employer must hire a temporary worker to temporarily fill her position in order to have her position available upon return.  ✔The policy excludes wages that will be paid to the temporary worker, because those wages are not a component of back pay or front pay.

### d.     example: disability accommodations

Josh is on active military duty and suffers total hearing loss due to an explosion. He starts work years later with a company that provides interpreters to diplomats and military

---

[114] *See* App., p. 25 (policy EPL Coverage Part II(C)(1): "'Employment Practices Claim' means any: (1) written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;").

[115] *See Petty v. Nashville Cnty.*, 687 F.3d 710, 716-19 (6th Cir. 2012) (addressing basic reemployment rights under USERRA).

forces. He requests a sign language interpreter for meetings. The employer says it cannot afford to take an interpreter out of service at lost revenue of about $700 per hour. It says he should find an outside interpreter and offers a small stipend to help offset costs. He files a charge of discrimination with the EEOC for failure to provide a reasonable accommodation to an otherwise qualified individual with a disability.[116] The case settles. Among other settlement terms, the employer hires an outside sign language interpreter at an annual salary of $50,000 to provide services for Josh and other employees with severe hearing impairments. ✔The policy excludes the interpreter salary, because it is not a component of back pay or front pay.[117]

### e.   example: other wage claims as damages that are not back pay or front pay

Jane is an executive assistant for a construction company. She openly opposes the president's sexual harassment of young women who work at the company. The president reacts with a campaign of retaliation against her, including vandalism of her home and thinly veiled physical threats.[118] So she hires Bob as a full-time, live-in bodyguard at an annual salary of $35,000. The company ignores her requests that the retaliation stop. Her

---

[116] *See EEOC v. Creative Networks, LLC*, 912 F. Supp. 2d 828 (D. Ariz. 2012) (interpreter as accommodation case).

[117] The policy excludes costs associated with accommodations. But it separately refers to *costs* and *salaries, wages, and bonuses*, indicating that each has a different meaning. Costs may be costs other than salaries, wages, and bonuses — such as the cost of installing a wheelchair ramp. Or the policy may have some overlap here as it does with some of the other exclusions.

[118] *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) ("We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related

working conditions become so intolerable that she feels compelled to resign. A retaliation lawsuit is filed. A jury finds constructive discharge and awards (1) $237,000 in back pay for what Jane would have earned in the past if the employer had not constructively discharged her and (2) $35,000 for the salary paid to Bob the bodyguard. ✔The policy covers the back pay subject to relevant limits. The policy excludes the salary paid to Bob the bodyguard, because it is not a component of a back pay or front pay award.

All these examples show the exclusion for *salaries, wages, or bonuses* [except as a component of a front pay or back pay award] has meaning separate and apart from when those same things become a component of a front pay or back pay award. That interpretation is reasonable because it gives meaning to the difference between *salaries, wages, or bonuses* in the exclusion — and those within the exception. So neither wholly swallows the other.

### 5. A reasonable juror could find the pay for staying in the verdict and judgment are *components of* a *back pay award*.

As noted, whether the pay for staying, as reflected in the verdict and judgment here, are *components of a back pay award* is for a jury to decide. For numerous reasons, a reasonable juror could do so. For example, a reasonable juror could find that in the prayer of his Third Amended Petition, Jeff specifically sought the remedy of "back pay [past wages]."[119] A reasonable juror could find that since the jury in the underlying case awarded payment for

---

to employment or occur at the workplace.").

[119] *See* Third Amended Petition filed on July 5, 2016 in the prior case, *Carpenter v. Southwest Housing*

staying that the jury in fact awarded the very thing sought.

As another example, a reasonable juror might find that — given the dirt simple definition of what *back pay* means — the verdict and judgment awarded it: earned pay for staying fits that definition. Because, a reasonable jury could conclude, the pay for staying in the agreement already found to exist was "payment for work done in the past that was withheld at the time" within the meaning of the Oxford University Press definition.[120] Or "money that is owed to a worker from an earlier time" within the meaning of the Merriam-Webster definition.[121] Or "income that should been paid or was expected at an earlier time" within the meaning of the Cambridge Dictionary definition.[122]

As another example, a reasonable juror might find that Twin City's complaint about labeling [*i.e.*, that the verdict and judgment did not *label* the award as one for back pay] misses the point. A reasonable juror might analogize: Boots, even without the label "boots" scrawled on them, are still boots. A reasonable juror might reason that what matters is what it is — earned pay to "stay as long as needed on to help make the asset sale happen." In

---

*Dev. Co., Inc.*, Cause No. CC-08-2072-E, p. 22, ¶ 51(C) (County Court at Law No. 5, Dallas County, Texas) ("back pay [past wages];").

[120] https://www.encyclopedia.com/humanities/dictionaries-thesauruses-pictures-and-press-releases/backpay

[121] https://www.merriam-webster.com/dictionary/back%20pay

[122] https://dictionary.cambridge.org/us/dictionary/english/back-pay

short, earned pay. Which fits the ordinary and generally accepted definitions above.

For any or all of these reasons, a reasonable jury could find — based on the record evidence from the prior case — that money awarded in the verdict and judgment from the previous trial was, in fact, a *component of* a *back pay award*. And so, under the applicable standards disfavoring it, summary judgment for Twin City is improper on the issue.

### C.    Moral hazard is inapplicable.

The policy expressly covers oral agreements. Twin City mentions moral hazard by way of footnote[123] — without any dedicated briefing on the issue and without including the issue in the required local rules summary.[124] Twin City does not contend that its coverage of oral agreements is a moral hazard. Twin City sold the policy expressly covering oral agreements. Twin City fails to cite any relevant or binding or Texas or Fifth Circuit precedent on the issue. Nor does Twin City contend or argue that Texas law prohibits the insurance it sold — coverage for breaching oral agreements. Instead, and by way of footnote, Twin City's

---

[123] *See* motion, p. 7, PageID 400.

[124] Local Civil Rule 56.3 ("(a) Except as provided in subsection (b) of this rule, a motion for summary judgment must, in addition to the contents required by Fed. R. Civ. P. 56(a), (1) on the first page, under the heading 'summary,' state concisely the elements of each claim or defense as to which summary judgment is sought, and (2) if the motion is accompanied by an appendix and it is necessary to cite support for an assertion about the absence or presence of a genuine dispute of fact, comply with LR 56.5(c). (b) A moving party may satisfy the requirements of subsection (a) of this rule by stating in its motion that each of the required matters will be set forth in the party's brief.").

contention appears to be that some other states have banned coverage for breach of contracts and overtime: So, the contention ostensibly goes, the exception to the exclusion here is inapplicable. This is illogical. Without Twin City at least contending or arguing that Texas law prohibits coverage Twin City sold, there is no moral hazard here to address. And the mere existence of the possibility that moral hazard may exist somewhere in the ether, has no bearing on interpretation or application of exclusions or exceptions here.

## Conclusion

For the foregoing reasons, Jeff Carpenter respectfully requests that the Court deny the motion.

Respectfully submitted,


*/s/ Amy Gibson*

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jeff Carpenter*

CERTIFICATE OF SERVICE

The undersigned certifies that, on August 3, 2023, before 2:30 a.m. local time in Dallas, she filed the *Brief in Support of Plaintiff Jeff Carpenter's Response to Defendant's Motion for Summary Judgment* with the United States District Court for the Northern District of Texas through the CM/ECF system, such that defendant should be served with a copy of the filed document as follows:

**VIA CM/ECF SYSTEM**

Ms. Christine Kirchner
c.kirchner@chamberlainlaw.com
Mr. Steven J. Knight
steven.knight@chamberlainlaw.com
Mr. Chris M. Lemons
chris.lemons@chamberlainlaw.com

Chamberlain Hrdlicka, White, Williams & Aughtry
1200 Smith Street #1400
Houston, Texas 77002

*Attorneys for Twin City Fire Insurance Company*

Mr. Michael W. Johnston
johnston@johnstonlegalgroup.com

Johnston Legal Group PC
1616 Wabash Avenue
Fort Worth, Texas 76107-6598

*Local Counsel for Twin City Fire Insurance Company*

*/s/ Amy Gibson*

_____
Amy E. Gibson