IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | |
| | § | Civil Action No. 3:23-CV-00769-N |
| Twin City Fire Insurance Company, | § | |
| | § | Jury Demand |
| *Defendant.* | § | |

---

## BRIEF IN SUPPORT OF PLAINTIFF JEFF CARPENTER'S MOTION FOR SUMMARY JUDGMENT

---

### LOCAL RULE 56.3(a) SUMMARY[1]

This is a *Stowers* case.[2] The *Stowers* duty involves liability insurers' duty to settle third-party claims against their insureds when it would be reasonably prudent to do so.[3] Twin City has now admitted liability on all *Stowers* elements other than policy coverage.[4] Policy coverage is the only issue that remains to be decided in this case.

Carpenter seeks summary judgment on policy coverage. This includes (1) judgment on core coverage that Twin City has never disputed — *i.e.*, basic policy coverage before reaching exclusions, and (2) judgment on the only two coverage exclusions that Twin City has pleaded.[5]

---

[1] Unless otherwise noted, Jeff Carpenter's attorneys have supplied all emphases, have omitted from quotations all internal quotation marks, internal footnotes, and internal citations, and have omitted from legal citations all citing and quoting references.

This brief is paginated to match ECF document pagination.

The contemporaneously filed *Appendix in Support of Plaintiff Jeff Carpenter's Motion for Summary Judgment* is abbreviated as "App."

[2] *See generally* App., pp. 29-30 (exhibit cover and title page for original petition), pp. 30-31 ¶¶ 2-4 (introduction including nature of case), pp. 33-47 ¶¶ 10-45 (pleaded *Stowers* allegations).

[3] *See* App., p. 10 n.1 (March 4, 2024 Memorandum Opinion and Order).

[4] App., pp. 11-12 (exhibit cover and title page for Stipulation), pp. 13-14 (admitted liability).

[5] *See* App., pp. 51-52 (exhibit cover and title page for second amended answer), pp. 58-60 ¶¶ 56-62 (pleading various iterations of two policy exclusions as affirmative defenses), p. 63 (exhibit cover for insurance policy), p. 87 (loss exclusion for "salaries, wages, or bonuses, except as a component of a front or back pay award"), p. 89 (indemnity exclusion for "employment termination severance payments").

## TABLE OF CONTENTS

LOCAL RULE 56.3(a) SUMMARY ................................................................................

TABLE OF CONTENTS ................................................................................................

TABLE OF AUTHORITIES ...........................................................................................

PROCEDURAL HISTORY & CURRENT STATUS .............................................................

    A.    Context: nature of *Stowers* duty ......................................................

    B.    Prior case and turnover of insureds' *Stowers* claims to Carpenter .........................

    C.    This case — the *Stowers* claim ...............................................

    D.    Admitted liability on all *Stowers* elements other than policy coverage ....................

    E.    Prior merits rulings in this case..........................................................
        1.    injunctive relief and punitive damages ...........................................
        2.    interpretation and application of policy exclusions ....................................

    F.    This motion as concluding case at district court level..............................................

CONCLUSIVE FINDINGS IN PRIOR CASE .....................................................................

    A.    Jury verdict on existence of pay-to-stay agreement.................................................

    B.    Jury verdict on failure to comply with pay-to-stay agreement.................................

    C.    Jury verdict on owed compensation .........................................................

    D.    Final judgment — joint and several liability.............................................................

ARGUMENT AND AUTHORITIES ..................................................................................

    A.    Policy interpretation rules — favor insureds ...........................................

    B.    Found facts in prior case as conclusive on indemnity coverage ...............................

    C.    Employment practices liability insurance —
        covering what many other types of insurance do not ...............................................

D.     Core basic coverage that Twin City has never disputed ........................................
     1.     defendants in prior case as policy insureds ..................................................
     2.     control over settlement sufficient to give rise to *Stowers* duty.....................
     3.     policy — EPL coverage.................................................................................

E.     Loss exclusion for salaries, wages, or bonuses
     except as a component of a *back pay award* ........................................................
     1.     prior ruling adopting Carpenter's interpretation as reasonable ...................
     2.     ordinary meaning of *back pay*.......................................................................
     3.     Carpenter's interpretation
           — still gives meaning to exclusion for *salaries, wages, or bonuses*.................
     4.     factual application — back pay as a matter of law .......................................

F.     The *employment termination severance payments* exclusion ........................................
     1.     prior ruling adopting Carpenter's interpretation as reasonable ...................
     2.     ordinary meaning of *severance payment*..........................................................
     3.     Phrase *employment termination* modifies *severance payment*...........................
     4.     factual application — back pay as a matter of law .......................................

REQUEST FOR JUDICIAL NOTICE .................................................................................

CONCLUSION .................................................................................................................

TABLE OF AUTHORITIES

**Cases**

*Am. Physicians Ins. Exch. v. Garcia,*
    876 S.W.2d 842 (Tex. 1994) ...............................................

*Amstar Corp. v. S. Pac. Transp. Co. of Tex. & La.,*
    607 F.2d 1100 (5th Cir. 1979) ...............................................

*Barnett v. Aetna Life Ins. Co.,*
    723 S.W.2d 663 (Tex. 1987) ...............................................

*Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,*
    334 S.W.3d 217 (Tex. 2011) ...............................................

*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.,*
    S.W.3d 716 (Tex. 2014) ...............................................

*G.A. Stowers Furniture Co. v. Am. Indem. Co.,*
    15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved) ...........................................

*Gemini Ins. Co. v. Idem. Ins. Co. of N. Am.,*
    No. 23-20026, 2024 WL 138596 (5th Cir. Jan. 12. 2024) ......................................

*Guideone Elite Ins. Co. v. Fielder Rd. Baptist Church,*
    197 S.W.3d 305 (Tex. 2006) ...............................................

*In re Farmers Tex. Cnty. Mut. Ins. Co.,*
    621 S.W.3d 261 (Tex. 2021) ...............................................

*Lubbock Cnty. Hosp. Dist. v. Nat'l Union Fire Ins. Co.,*
    143 F.3d 239 (5th Cir. 1998) ...............................................

*Ramsay v. Md. Am. Gen. Ins. Co.,*
    533 S.W.2d 344 (Tex. 1976) ...............................................

*Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,*
    77 S.W.3d 253 (Tex. 2002) ...............................................

*Sw. Airlines Co. v. Liberty Ins. Underwriters, Inc.,*
    90 F.4th 847 (5th Cir. 2024) ...............................................

*Swicegood v. Med. Protective Co.*,
   No. 3:95-CV-0335-D, 2003 WL 22234928 (N.D. Tex. Sept. 19, 2003) .............................

*Wells v. Minn. Life Ins. Co.*,
   885 F.3d 885 (5ᵗʰ Cir. 2018) ...................................................................................

**Statutes and Rules**

Fed. R. Evid. 201(b) ...................................................................................................

**Other**

Joni Hersch and Erin E. Meyers,
   *Employment Practices Liability Insurance and Ex Post Moral Hazard*,
   106 Cornell L. Rev. 947 (2021) ..............................................................................

2 Robert P. Mosteller et. al.,
   McCormick on Evidence (8ᵗʰ ed. 2020)..............................................................

L.D. Simmons, II & Lowndes C. Quinlan,
   New Appleman on Insurance Law (2015) .........................................................

Jeffrey W. Stemple,
   Law of Insurance Contract Disputes (1999) ...................................................

Restatement (Second) Agency ............................................................................

**PROCEDURAL HISTORY & CURRENT STATUS**

**A.      Context: nature of *Stowers* duty**

When liability insurers have the right to control settlement of claims against their insureds, they owe their insureds a *Stowers* duty. The original *Stowers* opinion explains that the liability insurance company is:

> held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages.

*G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved).

The duty sounds in negligence and is similar to other areas of law in which a right of control gives rise to a legal duty. *See, e.g., Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) ("Having undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the [] house while performing its contract with the builder.").

**B.        Prior case and turnover of insureds' *Stowers* claims to Carpenter**

This case arises from an earlier jury verdict and judgment in favor of Carpenter in Dallas County Court at Law No. 5, Cause Number CC-08-2072-E, styled *Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik* (the "prior case").[6]

The liable defendant-insureds appealed to the Dallas Court of Appeals and the Texas Supreme Court but were not successful.[7] The jury findings and judgment were affirmed, and the judgment remains unsatisfied.[8]

The trial court in the prior case then ordered turnover to Carpenter of the liable defendant-insureds' *Stowers* claims against their liability insurer Twin City.[9]

---

[6] App., p. 12 (Stipulation), pp. 314-315 (exhibit cover and caption page for jury charge in prior case), pp. 16, 18 (cover page and caption for Final Judgment in prior case).

[7] App., pp. 355-360 (Dallas Court of Appeals opinion affirming jury findings and final judgment), pp. 361-363 (Texas Supreme Court denial of petition for review and denial of motion for rehearing), pp. 364-366 (mandate concluding prior case).

[8] *See supra* note 7. *Compare* App., p. 31 ¶ 4 (original petition) ("4. The defendant insureds appealed to the Fifth Court of Appeals and the Texas Supreme Court but were not successful. The judgment was affirmed and remains unsatisfied. ….") *with* App., p. 52 ¶ 4 (second amended answer) ("4. Twin City admits the allegations in paragraph 4 with the exception of the phrase 'associated rights and privileges' which is vague and therefore denied.").

[9] App., p. 12 (title page for Stipulation), pp. 25-27 (stipulation attachment cover page and relevant language in turnover order).

C.    **This case — the *Stowers* claim**

This case presents the *Stowers* claim. Carpenter sued Twin City in state court and asserted a

single cause of action — violation of the *Stowers* duty.[10] Twin City removed the case to this Court.[11]

Although Carpenter was never actually insured with Twin City, he assumes the role of the "in-

sureds" because he is asserting the insureds' rights pursuant to a turnover order.[12]

D.    **Admitted liability on all *Stowers* elements other than policy coverage**

Twin City has now admitted liability on all elements of the *Stowers* claim other than policy

coverage.[13] The parties agree that the *Stowers* elements are: (1) the third-party claim against the

insured is within the scope of coverage; (2) the settlement offer is within policy limits; (3) the set-

tlement offer terms are such that an ordinarily prudent insurer would accept the offer, considering

the likelihood and degree of the insured's potential exposure to an excess judgment; and (4) dam-

ages that the *Stowers* violation proximately caused.[14] *See also In re Farmers Tex. Cnty. Mut. Ins. Co.*,

621 S.W.3d 261, 267 (Tex. 2021) (stating liability elements and noting that liability renders insurer

responsible "for the entire amount of the judgment, including that part exceeding the insured's

policy limits"); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994) (stating lia-

bility elements and noting the "*Stowers* remedy of shifting the risk of an excess judgment onto the

---

[10] App., p. 12 (Stipulation). *See generally* App., pp. 29-50 (original petition).

[11] App., p. 12 (Stipulation).

[12] App., p. 10 n.2 (March 4, 2024 Memorandum Opinion and Order), pp. 25-28 (turnover order).

[13] App., pp. 11-12 (exhibit cover and title page for Stipulation), pp. 13-14 (admitted liability).

[14] *See* App., p. 13 (Stipulation).

insurer").

In a filed stipulation that the parties and their attorneys signed, Twin City stipulated and admitted to *Stowers* elements 2, 3, and 4 outlined above:[15]

**Twin City Stipulation and Admission**

Based on the foregoing, and to bring the Lawsuit proceedings more expeditiously to final and appealable judgment in the district court, Twin City stipulates and admits in Carpenter's favor on all remaining elements other than insurance coverage — *i.e.*, all remaining elements other than "(1) the third party's claim against the insured is within the scope of coverage." Twin City stipulates and admits (2) Jeff Carpenter's settlement demand in the Prior Case was within policy limits; (3) assuming coverage *arguendo*, the terms of that demand were "such that an ordinarily

prudent insurer would accept it," considering the likelihood and degree of the insured's potential exposure to an excess judgment;" and (4) assuming coverage *arguendo*, the *Stowers* violation proximately caused the damages reflected in the attached Final Judgment but reduced as appropriate for the bond that was posted and paid in the Prior Case.

The Stipulation has two attachments: (1) the final judgment in the prior case, and (2) the turnover order in the prior case.[16]

## E.   Prior merits rulings in this case

### 1.   injunctive relief and punitive damages

This Court granted Twin City's motion to dismiss Carpenter's requests for injunctive relief and punitive damages [ECF No. 50].

---

[15] App., pp. 13-14 (admitted liability), p. 15 (party and attorney signatures).

[16] App., p. 12 (stipulation stating final judgment is attached), pp. 16-24 (final judgment), p. 13 (stipulation stating final turnover order is attached), pp. 25-28 (turnover order).

2.      interpretation and application of policy exclusions

This Court denied Twin City's summary judgment motion on two coverage exclusions: (1) a loss exclusion for "salaries, wages, or bonuses, except as a component of a front or back pay award" and (2) an indemnity exclusion for "employment termination severance payments" [ECF No. 51].[17]

In doing so, it found Carpenter's interpretation of each exclusion to be reasonable.[18] It also made some findings in connection with application of policy exclusions to the facts.[19] Carpenter addresses the context and specifics of those reasonable interpretations and findings in the argument section. And he includes undisputed evidence to independently support the Court's prior rulings.

---

[17] *See generally* App., pp. 6-10 (March 4, 2024 Memorandum Opinion and Order).

[18] *See* App., p. 10 ("Carpenter interprets 'back pay' as compensation owed but not given for some kind of employment duty or performance. [] This is a reasonable interpretation of an undefined term, so the Court will use Carpenter's interpretation of 'back pay.'"), p. 8 (finding exclusion for *employment termination severance payments* "can also be reasonably read, as Carpenter[] proposes, to exclude only payments given in exchange for termination of employment, usually related to a waiver of claims and with the end of employment being the 'trigger' for receiving the funds").

[19] *See, e.g.*, App., p. 10 ("Carpenter can show that he performed the requested work by staying .... Carpenter can also show that he was not compensated as promised for staying .... Twin City has not and cannot rebut these facts."); p. 9 ("The agreement was for a payment to stay on and perform additional work, not a payment to leave the company."); p. 9 ("Because Carpenter had to perform additional work to receive the payment at issue, the payment was in exchange for something other than termination, and thus was not a severance payment."), p. 9 ("The agreement between Carpenter and his employer required Carpenter to stay with the company .... Because there is something other than termination given in exchange for the money offered to Carpenter, the payment was not a severance as a matter of law.").

Carpenter's briefing and evidence in support of the present motion will have some overlap and repetition from Carpenter's summary judgment response on the coverage issue. That overlap and repetition are intended to protect this Court's ruling on coverage.

## F.      This motion as concluding case at district court level

This motion is intended to conclude the policy coverage issue, and hence the case, at the district court level. It appears to be the most appropriate vehicle to do so. Possible alternatives, such as an agreed final judgment or a joint request for ruling under Rule 56(f)(1), might not preserve appeal rights, even with express preservation language. *See Amstar Corp. v. S. Pac. Transp. Co. of Tex. & La.*, 607 F.2d 1100, 1100 (5ᵗʰ Cir. 1979) (per curiam) ("Although the consent judgment contained a recognition that the plaintiff wished to appeal the issue of the limitation of damages, the fact that both parties freely consented to the entry of a final judgment precludes an appeal from it."), *cert. denied*, 449 U.S. 924 (1980).

## CONCLUSIVE FINDINGS IN PRIOR CASE

## A.      Jury verdict on existence of pay-to-stay agreement

The jury found a pay-to-stay agreement in connection with a potential asset sale:[20]

---

[20] App., pp. 314-315 (exhibit cover and title page for jury charge and verdict), p. 319 (abbreviations for insured-defendants), pp. 324, 325 (question and answer on existence of pay-to-stay agreement), p. 337 (juror signature page). The jury found against Carpenter on other claims that are not at issue in this case.

**QUESTION 4**

Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
2. if Jeff Carpenter would stay as long as needed on to help make the asset sale happen

\*\*\*

Answer "Yes" or "No" for each:

Affordable Housing Construction    ___YES___

Southwest Housing Development    ___YES___

Southwest Housing Management    ___YES___

Brian Potashnik    ___YES___

In questions submitted during deliberations, the jury called this agreement as the "3% deal."[21]

So, the jury found that each of these defendants had an agreement with Carpenter. It found that Carpenter's duty in the deal was to "stay as long as needed to help make the asset sale happen." It found that defendants' duty in the deal was to pay certain net proceeds from asset sale revenue *if* Carpenter did so.

The Dallas Court of Appeals previously ruled that this agreement to stay "as long as needed" was sufficiently definite to be enforceable.[22]

---

[21] App., p. 338.

[22] *See, e.g.*, App., p. 359 (defense position and court ruling), pp. 359-360 ("That the parties did not

**B.      Jury verdict on failure to comply with pay-to-stay agreement**

The jury found that each of these defendants failed to comply with the pay-to-stay agreement:[23]

> If you answered "Yes" to Question 4 for any defendant, then answer the following question. Otherwise, do not answer the following question.
>
> **QUESTION 5**
>
> For each defendant for whom you answered "Yes" in Question 4, did that defendant also fail to comply with such agreement?
>
> Answer "Yes" or "No" for each defendant for whom you answered "Yes" in Question 4:
>
> Affordable Housing Construction          YES
>
> Southwest Housing Development          YES
>
> Southwest Housing Management          YES
>
> Brian Potashnik          YES

So, the jury necessarily found that Carpenter did his part — stay as long as needed to help make the asset sale happen. And it found that these defendants did *not* do their part — pay Carpenter for staying and continuing to work toward the asset sale.

---

have a specific date on which Carpenter's performance would end does not render the agreement too indefinite to be enforceable. Carpenter also testified that when Brian informed him that he was going to sell the business, he told Carpenter that he wanted Carpenter to stay and do his job. Brian specifically told Carpenter that Carpenter would be involved in the due diligence and communication between the teams once a buyer was selected. Based on the evidence, a reasonable jury could have determined that the parties agreed that if Carpenter continued to do his job and perform these other responsibilities until the asset sale closed *or* he was no longer needed, he would be entitled to the three percent bonus. … Brian and Cheryl confirmed to Carpenter that he sufficiently performed his obligations and would get paid his three percent bonus at closing, when they got paid.").

[23] App., p. 326.

## C.     Jury verdict on owed compensation

The jury found compensation was owed for failure to comply with the pay-to-stay agreement — in other words, back pay:[24]

> If you answered "Yes" to Question 5 for any defendant, then answer the following question. Otherwise, do not answer the following question.
>
> **QUESTION 7**
>
> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with such agreement?
>
> ...
>
> Consider the following elements of damages, if any, and none other.
>
> a. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
>
> ...
>
> Answer in dollars and cents for damages, if any:
>
> Answer: ___$928,020.76___

---

[24] App., p. 328.

**D.      Final judgment — joint and several liability**

The trial court rendered judgment on the jury's verdict and its own findings after an attorneys' fees bench trial.[25] The judgment imposes joint and several liability on each liable defendant.[26] The jury verdict and judgment exceeded remaining policy limits.[27] Again, Twin City has admitted liability on all *Stowers* elements other than coverage.[28]

ARGUMENT AND AUTHORITIES

**A.      Policy interpretation rules — favor insureds**

Policy interpretation is a question of law. *Gemini Ins. Co. v. Idem. Ins. Co. of N. Am.*, No. 23-20026, 2024 WL 138596, *3 (5th Cir. Jan. 12, 2024) (per curiam). Texas law applies. *Id.*

"Under Texas law, the maxims of contract interpretation regarding insurance policies operate squarely in favor of the insured." *Lubbock Cnty. Hosp. Dist. v. Nat'l Union Fire Ins. Co.*, 143 F.3d 239, 242 (5th Cir. 1998); *accord* App., p. 8 (March 4, 2024 Memorandum Opinion and Order). "It is a settled rule that policies of insurance will be interpreted and construed liberally in favor of the insured and strictly against the insurer, and especially so when dealing with exceptions and words of limitation." *Ramsay v. Md. Am. Gen. Ins. Co.,* 533 S.W.2d 344, 349 (Tex. 1976).

---

[25] App., p. 18 (title page), pp. 22-23 (damages findings).

[26] App., p. 22.

[27] *See* App., p. 52 ¶ 3 (second amended answer) ("3. .... Twin City admits the state court entered an adverse verdict against the defendants in an amount that exceeded the remaining policy limits ....").

[28] App., pp. 13-14 (admitted liability stipulation).

Undefined terms are given their "plain and ordinary meaning" as "commonly understood by the average laymen in preference to a technical meaning as understood by members of a profession." *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 890 (5th Cir. 2018) (applying Texas law). And that inquiry begins "with the dictionary." *Sw. Airlines Co. v. Liberty Ins. Underwriters, Inc.*, 90 F.4th 847, 852 (5th Cir. 2024).

Since the insurer normally chooses the policy language, when "the language chosen is susceptible of more than one construction, such policies should be construed strictly against the insurer and liberally in favor of the insured." *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987). An "even more stringent construction is required" when addressing "an exception or limitation on [] liability under the policy." *Id.* Courts "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties intent." *Id.*; *accord* App., p. 8 (March 4, 2024 Memorandum Opinion and Order).

## B.    Found facts in prior case as conclusive on indemnity coverage

The "facts actually established in the underlying suit control the duty to indemnify." *Guideone Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006); *accord Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 334 S.W.3d 217, 219 (Tex. 2011) (per curiam); *see also Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110-111 (5th Cir. 2010) (ruling that insurer was collaterally estopped).

So, facts the jury decided in the prior case are conclusive on the indemnity issue and may not be relitigated. *See, e.g.*, *Swicegood v. Med. Protective Co.*, No. 3:95-CV-0335-D, 2003 WL 22234928,

*13 (N.D. Tex. Sept. 19, 2003) ("The court has located no case that suggests that a coverage suit should consist of a retrial of all or even substantial parts of an indemnity suit that has been fully tried."). A "well-settled principle" — *i.e.*, facts actually established in the underlying suit control the duty to indemnify — "would have little meaning if the trial of an indemnity suit served as nothing more than a warm-up match for the coverage trial." *Id.*

## C.   Employment practices liability insurance — covering what many other types of insurance do not

Most traditional liability insurance policies — like commercial, auto, homeowners, errors and omissions, and directors and officers policies — do not cover things like punitive damages, intentional misconduct, and failure to comply with agreements. *See generally* Joni Hersch and Erin E. Meyers, *Employment Practices Liability Insurance and Ex Post Moral Hazard*, 106 CORNELL L. REV. 947, 966-967 (2021) (discussing punitive damages and intentional conduct).

Employment practices liability ("EPL") insurance is different. *See id.* Insurers developed and marketed EPL policies to cover gaps in other types of liability insurance policies. *See* JEFFREY W. STEMPLE, LAW OF INSURANCE CONTRACT DISPUTES § 21.06, pp. 21-47 to 21-48 (1999).

EPL insurance policies, including the policy at issue, cover what many other types of liability insurance policies do not — such as intentional misconduct, punitive damages, and breach of contract.[29] *See, e.g.,* L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INSURANCE LAW

---

[29] *See* App., p. 63 (exhibit cover for policy), p. 86 (covered employment practices wrongful acts including intentional conduct like sexual harassment, discrimination, breach of contract, and wrongful infliction of emotional distress), p. 87 (covered loss including punitive damages).

§ 28.App., 02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

Most EPL insurance policies vary in coverage provided and particular language used. So, coverage often turns on basic principles of contract interpretation — rather than decades-developed bodies of coverage-term-specific precedent. *Id.* at Ch. 28, at 28-1 ("Although a standardized policy exists, most insurers have used proprietary and distinct wording. …Because the law is often specific to one insurer's wording, cases may or may not prove persuasive when applied to disputes involving another insurer's wording. Basic [principles] of contract interpretation will sometimes prove to be the greatest value to coverage counsel.").

## D.     Core basic coverage that Twin City has never disputed

Twin City has never disputed core coverage — *i.e.*, basic policy coverage before reaching exclusions.

### 1.     defendants in prior case as policy insureds

Twin City issued a liability insurance policy under which insureds include all the defendants found liable in the prior case:[30]

---

[30] *Compare* App., p. 36 ¶ 17 (original petition) ("17. Twin City issues a liability insurance policy under which named insureds include all the defendants in the earlier case:…") *with* App., p. 54 ¶ 17 (second amended answer) ("17. Twin City admits the allegation in paragraph 17."). *See also* App., pp. 101-102 (exhibit cover and first page of coverage analysis letter), p. 105 (analysis of entity insured and individual insured coverage), pp. 217-219 (visual of policy analysis for entity insureds), pp. 220-222 (visual of policy analysis for individual insureds), pp. 225-240 (evidence showing Brian Potashnik as director, officer, or manager of insured entities and so individually insured), p. 63 (exhibit cover for policy), p. 65 (naming SH Management as insured), p. 91 (endorsement naming SH Development and AH Construction as insureds).

| defendant-insureds | abbreviated name |
|---|---|
| Southwest Housing Development Company, Inc. | SH Development |
| Affordable Housing Construction, Inc. | AH Construction |
| Southwest Housing Management Corporation, Inc. *a/k/a* and *d/b/a* Southwest Housing Management Company, Inc. | SH Management |
| Brian Potashnik | Brian |

**2.      control over settlement sufficient to give rise to *Stowers* duty**

Twin City had sufficient control over settlement to give rise to a *Stowers* duty. *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 77 S.W.3d 253, 263-264 (Tex. 2002) (policy provision requiring insurer consent to settle gives insurer control over settlement and gives rise to *Stowers* duty); *Am. Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 846 (Tex. 1994) (describing policy provision as giving insurance carrier control over the insured's defense).

Twin City controlled the defense of its insureds.[31] It controlled settlement of claims against its insureds. It forbade its insureds, under any circumstances, from entering any settlement agreement without its prior written consent:[32]

---

[31] App., p. 78 (policy common terms & conditions § VII(A) ("The Insurer shall have the right and duty to defend any Claim for which the Insureds give notice to the Insurer, even if such Claim is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate.").

[32] App., p. 78 (policy common terms & conditions § VII(C)).

> **(C)** The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

### 3.    policy — EPL coverage

The EPL coverage part insuring agreement states:[33]

> **EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**
>
> **I.    INSURING AGREEMENTS**
>
> **(A)  Employment Practices Liability**
>
> The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

The EPL insuring agreement is broad. It covers loss resulting from the employment practices claim itself — in this case, loss resulting from the lawsuit itself. It covers far more than loss resulting from a particular type of occurrence. It covers far more than loss resulting from a particular type of injury.

### (a)    employment practices claim

The prior case involved an *employment practices claim* because it was a civil proceeding commenced with service of a petition on behalf of an employee of at least one insured entity in his capacity as an employee. The policy defines *employment practices claim* to include, among other things, a lawsuit:[34]

---

[33] App., p. 85.

[34] App., p. 85; *see also* App., pp. 253-254 (original petition cover page with file stamp in prior case), pp. 255-265 (returns of service in prior case), pp. 241-246 (coverage analysis including visuals).

> **(C)** **"Employment Practices Claim"** means any:
>
>     **(1)** written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;
>
>     **(2)** civil proceeding commenced by the service of a complaint or similar pleading;
>
> ***
>
> by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

### (b)      by or on behalf of employee

The policy requires employee status with respect to only one insured entity, as shown immediately above. It defines employee similarly:[35]

> **(F)** **"Employee"** means any past, present, or future:
>
>     **(1)** employee of an **Insured Entity** in such person's capacity as an employee, including any part time, seasonal, temporary, leased, or loaned employee; or
>
>     **(2)** volunteer with an **Insured Entity** in such person's capacity as a volunteer.

It is undisputed that Carpenter was employed with named insured SH Management.[36] Because the final judgment imposes joint and several liability,[37] no more is needed to show coverage.

---

[35] App., p. 74.

[36] *See, e.g.*, App., p. 441 (defense opening) (claiming "the only agreement that was made by Mr. Carpenter was with his employer, … Southwest Housing Management Corporation."); App., p. 464 (Cheryl Geiser Potashnik) ("So, yes, I said we, but it was we in the context of his employment with Southwest Housing Management."); App., pp. 1459 (employment agreement between Carpenter and SH Management).

[37] *See supra* CONCLUSIVE FINDINGS IN PRIOR CASE Part D.

But the jury found an agreement with defendant-insureds SH Management, SH Development, AH Construction, and Brian Potashnik.[38] In other words, he was an employee of all those insureds in connection with working to help make the asset sale happen. An employee may have more than one employer even while performing a single action and even without the joint employer doctrine.[39] *See* RESTATEMENT (SECOND) AGENCY § 226 ("A person may be the servant of two masters, [who are] not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.").

### (c)    first made against insureds within policy period

The original petition against the defendant-insureds was filed March 11, 2008[40] and served on all defendant-insureds between March 20, 2008 and March 21, 2008.[41] The policy period was March 4, 2007 through May 5, 2008.[42]

---

[38] *See supra* CONCLUSIVE FINDINGS IN PRIOR CASE Parts A-C.

[39] *See also* App., p. 790 (Brian Potashnik) ("Q. Okay. So you -- you acknowledge that you were the authorized agent for all of the sellers? A. As far as I know, that's the case, yes.").

[40] App., pp. 253-254 (original petition cover page in prior case with March 11, 2008 file stamp).

[41] App., pp. 255-265 (returns of service in prior case).

[42] App., p. 65 (policy effective date of March 4, 2007), p. 64 (endorsement extending expiration date through May 5, 2008); *see also* App., pp. 250-252 (coverage analysis with visuals).

**(d)** **employment practices wrongful act —
oral pay-to-stay agreement**

The policy defines employment practices wrongful act to include, among other things, specific

coverage for any wrongful act involving failure to comply with an oral agreement:[43]

> **(D)** **"Employment Practices Wrongful Act"** means a **Wrongful Act** involving any:
>
> ***
>
> **(6)** breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

The policy defines wrongful act to include any actual or alleged breach of duty:[44]

> **(O)** **"Wrongful Act"** means any actual or alleged:
>
> **(1)** error, misstatement, misleading statement, act, omission, neglect or breach of duty; or
>
> **(2)** matter claimed against an **Insured Person** solely by reason of their serving in such capacity.

Carpenter pursued and prevailed against the defendant-insureds for failure to comply with an

oral pay-to-stay agreement.[45] It is undisputed that the agreement was oral.[46] As explained in part

(b) above, it was an oral employment agreement concerning the asset sale.

---

[43] App., p. 86.

[44] App., p. 88.

[45] *See* App., pp. 340-341 (exhibit cover and title page for amended petition in prior case), pp. 349-351 (oral pay-to-stay agreement basic allegations); *see supra* Conclusive Findings in Prior Case.

[46] *See, e.g.*, App., pp. 382-392 (plaintiff counsel voir dire) (jury selection about bias toward oral handshake agreements versus written agreement); App., p. 395 (defense counsel voir dire) ("You've already heard from Ms. Gibson, and you can surmise this is a case about an oral contract. Mr. Carpenter believes, alleges, that he had an oral contract."), p. 396 ("this case is about an oral contract"); App., p. 545 (Cheryl Geiser Potashnik) ("Q. [] And you have heard your attorneys say in this case that the agreement -- the agreements we're talking about today would not be valid because they were not made in writing and signed by both of the parties to the agreement. ... Q. I'm just asking if -- if -- if you agree with that position? A. Yes."), p. 580 (Cheryl Geiser Potashnik)

(e)    **covered loss**

Language of exclusion and exceptions to coverage remain what they are — language of exclusion and exceptions to coverage — no matter where they appear in the policy. *See* L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INSURANCE LAW Ch. 28 § 28.01[7][a], at 28-29 (describing placement of exclusionary language in a definition or insuring agreement as "sleight-of-hand"). So, Carpenter splits the loss definition between covered loss and excluded loss.

The policy defines loss coverage as the damages from a claim:[47]

> (l)    **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

The policy defines claim to include an employment practices wrongful act,[48] which was addressed above:

> (B)    **"Claim"** means any:
>    (1)    **Employment Practices Claim**; or
>    (2)    **Third Party Claim**.

In sum, Carpenter has established core basic coverage as a matter of law.

---

("Q. Okay. Do you believe Jeff Carpenter was entitled to trust your word when you said you intended to pay him a bonus out of the asset-sale proceeds? A. Some amount, yes."), p. 571 (Cheryl Geiser Potashnik) ("Q. And at the time, you believed Jeff Carpenter, Sara Reidy, and Keith Jones were important employees? A. Among others.").

[47] App., p. 87; *see also* App., pp. 108-109 (policy coverage analysis on this issue).

[48] App., p. 85.

### E.      Loss exclusion for salaries, wages, or bonuses except as a component of a *back pay award*

The EPL policy states that *loss shall not include*:[49]

> **(5)**   salaries, wages, or bonuses, except as a component of a front or back pay award.

Regardless of burdens of proof for this exclusion,[50] Carpenter has established that the exclusion does not apply as a matter of law.

#### 1.      prior ruling adopting Carpenter's interpretation as reasonable

Carpenter interprets *back pay* as compensation owed but not given for some kind of work duty or performance. This Court previously found Carpenter's interpretation of *back pay* to be reasonable[51] and so used that interpretation as required under Texas law.

---

[49] App., p. 87.

[50] *Compare Prophet Equity LP v. Twin City Fire Ins. Co.*, No. 05-17-00927-CV, 2019 WL 3886651, **13-14 (Tex. App.—Dallas Aug. 19, 2019, no pet.) ("Twin City insists that the phrase 'Loss shall not include … variable compensation' is not an exclusion; rather, it is merely part of the 'loss' definition and thereby a precondition to coverage. … [I]t is nonetheless limiting language that excepts certain enumerated items from coverage. Thus, Twin City had the burden to establish its application.") (citing Texas Insurance Code § 554.002) *with Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998) (Texas law) ("The insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy. Once the insurer has proven that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion. … Even so, all doubt is resolved in the insured's favor.").

[51] *See* App., p. 10 ("Carpenter interprets 'back pay' as compensation owed but not given for some kind of employment duty or performance. [] This is a reasonable interpretation of an undefined term, so the Court will use Carpenter's interpretation of 'back pay.'").

### 2.    ordinary meaning of back pay

The policy does not define *back pay*. Courts look to the ordinary meaning of *back pay* starting with dictionary definitions.[52] A variety of definitions show that *back pay* is simply (1) owed but unpaid compensation for past performance or (2) owed but unpaid compensation for performance that would have occurred in the past but for some obstacle:[53]





In fact, the back pay remedy for breach of an employment agreement mirrors the remedy for violating statutory employment laws. *See, e.g., Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995) (Worker Adjustment and Retraining Notification Act) ("WARN remedy of back pay mirrors the type of remedy afforded those who fall victim to an implied contract breach—giving individuals what they would have been entitled to had there been no breach."), *cert. denied,* 116 S. Ct. 1588 (1996); *Kolb v. Goldring, Inc.*, 694 F.2d 869, 871-72 (1st Cir. 1982) (Age Discrimination in

---

[52] *See supra* ARGUMENT AND AUTHORITIES Part A (policy interpretation rules).

[53] *See, e.g.,* https://www.encyclopedia.com/humanities/dictionaries-thesauruses-pictures-and-press-releases/backpay; https://www.merriam-webster.com/dictionary/back%20pay; https://dictionary.cambridge.org/us/dictionary/english/back-pay

Employment Act) ("… [I]n its 'essential nature' an ADEA action is identical to a common law suit for back wages for breach of contract. … Thus cases like this one call for a simple tabulation of 'items of pecuniary or economic loss such as wages, fringe, and other job-related benefits.'").

### 3.   Carpenter's interpretation — still gives meaning to *salaries, wages, or bonuses*

*The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.*

> — Antonin Scalia & Bryan A. Garner,
> Reading Law: The Interpretation of Legal Texts 155 (2012)

Carpenter's interpretation of back pay is consistent with the policy as a whole. To understand this, one can step away from this particular case and look at the policy as applied to a variety of situations.

### (a)   example: consent decree training, monitoring, reporting

The policy defines *employment practices claim* to include formal administrative and regulatory proceedings.[54] Jill files a charge of discrimination for race discrimination [pay disparity because of race] with the Equal Employment Opportunity Commission. The EEOC finds cause to believe a pattern or practice of discrimination has occurred. The case settles for (1) $8.4 million in back pay for all affected employees and (2) a consent decree mandating significant nationwide training, monitoring, and reporting intended to stop the discrimination. The employer must hire numerous trainers and additional personnel to meet its consent decree obligations. ✓The policy covers the back pay subject to relevant limits. The policy excludes salaries, wages, and bonuses for new hires

---

[54] App., p. 85.

needed to meet consent decree obligations, because those salaries, wages, and bonuses are not a *component* of back pay or front pay.

### (b)    example: mitigation efforts

A wrongfully terminated employee usually has a duty to mitigate damages. He usually must use reasonable diligence to find substantially equivalent work.[55] Jack is a company executive and is wrongfully terminated. He has trouble finding substantially equivalent work and accepts a much lower paying job. He is now too busy to continue to search for substantially equivalent work. So, he hires Mitt at an annual salary of $125,000 to work full-time to help him find substantially equivalent work. A wrongful termination lawsuit is filed.  A jury awards (1) $500,000 in back pay for what Jack would have earned in the past if the employer had not unlawfully terminated him and (2) $125,000 for the salary paid to Mitt to help mitigate damages. ✔The policy covers the back pay subject to relevant limits. The policy excludes the salary paid to Mitt to help mitigate damages, because that salary is not a component of back pay or front pay.

### (c)    example: hiring temporary workers in order to meet legal obligation

The policy defines *employment practices claim* to include a demand letter.[56] Julia is an Apache helicopter pilot in the National Guard of the United States. She receives orders for 60 days of active duty to assist in search and rescue efforts after a disaster. Her private-sector employer says it

---

[55] *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 394 (5th Cir. 2003) (discussing duty to mitigate damages under Age Discrimination in Employment Act).

[56] *See* App., p. 25 (policy EPL Coverage Part II(C)(1): "'Employment Practices Claim' means any: (1) written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;").

cannot do without her and has to let her go. It receives a demand letter that explains the Uniformed Services Employment and Reemployment Rights Act.[57] The case settles. Among other settlement terms, the employer agrees to restore Julia to her position upon return from active duty. But the employer must hire a temporary worker to temporarily fill her position in order to have her position available upon return. ✔The policy excludes wages that will be paid to the temporary worker, because those wages are not a component of back pay or front pay.

### (d)    example: disability accommodations

Josh is on active military duty and suffers total hearing loss due to an explosion. He starts work years later with a company that provides interpreters to diplomats and military forces. He requests a sign language interpreter for meetings. The employer says it cannot afford to take an interpreter out of service at lost revenue of about $700 per hour. It says he should find an outside interpreter and offers a small stipend to help offset costs. He files a charge of discrimination with the EEOC for failure to provide a reasonable accommodation to an otherwise qualified individual with a disability.[58] The case settles. Among other settlement terms, the employer hires an outside sign language interpreter at an annual salary of $50,000 to provide services for Josh and other employees with severe hearing impairments. ✔The policy excludes the interpreter salary, because it is not a component of back pay or front pay.[59]

---

[57] *See Petty v. Nashville Cnty.*, 687 F.3d 710, 716-19 (6th Cir. 2012) (addressing basic reemployment rights under USERRA).

[58] *See EEOC v. Creative Networks, LLC*, 912 F. Supp. 2d 828 (D. Ariz. 2012) (interpreter as accommodation case).

[59] The policy excludes costs associated with accommodations. But it separately refers to *costs* and *salaries, wages, and bonuses*, indicating that each has a different meaning. Costs may be costs other

**(e)      example: other wage claims as damages that are not back pay or front pay**

Jane is an executive assistant for a construction company. She openly opposes the president's sexual harassment of young women who work at the company. The president reacts with a campaign of retaliation against her, including vandalism of her home and thinly veiled physical threats.[60] So she hires Bob as a full-time, live-in bodyguard at an annual salary of $35,000. The company ignores her requests that the retaliation stop. Her working conditions become so intolerable that she feels compelled to resign. A retaliation lawsuit is filed. A jury finds constructive discharge and awards (1) $237,000 in back pay for what Jane would have earned in the past if the employer had not constructively discharged her and (2) $35,000 for the salary paid to Bob the bodyguard. ✔The policy covers the back pay subject to relevant limits. The policy excludes the salary paid to Bob the bodyguard, because it is not a component of a back pay or front pay award.

All these examples show the exclusion for *salaries, wages, or bonuses* [except as a component of a front pay or back pay award] has meaning separate and apart from when those same things become a component of a front pay or back pay award. That interpretation is reasonable because it gives meaning to the difference between *salaries, wages, or bonuses* in the exclusion — and those within the exception. So neither wholly swallows the other.

---

than salaries, wages, and bonuses — such as the cost of installing a wheelchair ramp. Or the policy may have some overlap here as it does with some of the other exclusions.

[60] *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) ("We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.").

4.       factual application — back pay as a matter of law

This Court previously made some findings in connection with application of this policy exclusion to the facts. For example, the Court noted: "Carpenter can show that he performed the requested work by staying …. Carpenter can also show that he was not compensated as promised for staying …. Twin City has not and cannot rebut these facts."[61]

The jury findings in the prior case are conclusive.[62] The jury found that each of 4 defendant-insureds had an agreement with Carpenter. It found that Carpenter's duty in the deal was to "stay as long as needed to help make the asset sale happen." It found that defendants' duty in the deal was to pay certain net proceeds from asset sale revenue *if* Carpenter did so.

The jury necessarily found that Carpenter did his part — stay as long as needed to help make the asset sale happen. And it found that these defendants did *not* do their part — pay Carpenter for staying and continuing to work toward the asset sale. The Texas Supreme Court has recognized that staying is enough to earn such compensation. *See generally Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 304 (Tex. 2009) ("By remaining with the company, the employees gave valuable consideration.").

---

[61] App., p. 10 p. 9.

[62] *See supra* CONCLUSIVE FINDINGS IN PRIOR CASE Parts A-C (jury findings) & ARGUMENT AND AUTHORITIES Part B (factual findings in prior case as conclusive).

**F.      The *employment termination severance payments* exclusion**

The EPL policy has an indemnity exclusion for *employment termination severance payments*:[63]

> **(C)** Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:
>
>      **(1)** for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement;

Carpenter has established that the exclusion does not apply as a matter of law.

### 1.      prior ruling adopting Carpenter's interpretation as reasonable

Carpenter interprets *employment termination severance payments* as excluding only payments given in exchange for termination of employment, usually related to a waiver of claims and with the end of employment being the 'trigger' for receiving the funds. This Court previously found Carpenter's interpretation to be reasonable[64] and so used that interpretation as required under Texas law.

### 2.      ordinary meaning of *severance payment*

*Severance payment* means "an allowance usually based on length of service that is payable to an employee on termination of employment."[65] The United States Department of Labor defines it

---

[63] App., p. 87.

[64] *See* App., p. 8 (finding exclusion for *employment termination severance payments* "can also be reasonably read, as Carpenter[] proposes, to exclude only payments given in exchange for termination of employment, usually related to a waiver of claims and with the end of employment being the 'trigger' for receiving the funds").

[65] https://www.merriam-webster.com/dictionary/severance).

similarly: "Severance pay is often granted to employees upon termination of employment. It is usually based on length of employment for which an employee is eligible upon termination."[66]

It is commonly given in exchange for a release of claims. *See Loc. Union No. 1992 v. The Okonite Co.*, 189 F.3d 339 (3rd Cir. 1999) ("The requirement that employees sign a release as a condition of receiving severance pay is a common provision in modern severance agreements. 'An employee release is a contract in which a discharged employee abandons claims against a former employer after they have arisen, in exchange for benefits such as severance pay.'").

### 3.    Phrase *employment termination* modifies *severance payment*

*If possible, every word and every provision is to be given effect (verba cum effectu sunt accipienda). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.*

—Antonin Scalia & Bryan A. Garner, READING LAW:
THE INTERPRETATION OF LEGAL TEXTS 174 (2012)

A modifier is "a word or phrase that is used with another word or phrase to limit or add to its meaning."[67] The addition of the modifying phrase *employment termination* means not every *severance payment* is excluded from coverage — only those for *employment termination*.

Interpreting the exclusion otherwise renders the additional phrase *employment termination* mere surplusage. That violates the surplusage canon of construction. It changes the clause by reading out part of it: "~~employment termination~~ severance payment." So, while *severance payment* alone

---

[66] https://www.dol.gov/general/topic/benefits-other/severancepay

[67] https://dictionary.cambridge.org/us/dictionary/english/modifier

means payment due or payable on termination — *employment termination severance payment* means employment termination is a condition for payment. That is, only those *severance payments* that are for *employment termination* are excluded from coverage. Pay for staying — as opposed to *employment termination* [*i.e.,* pay for going] — is covered.

### 4.    factual application — back pay as a matter of law

This Court previously made some findings in connection with application of this policy exclusion to the facts. For example, it noted the following. "The agreement was for a payment to stay on and perform additional work, not a payment to leave the company."[68] "Because Carpenter had to perform additional work to receive the payment at issue, the payment was in exchange for something other than termination, and thus was not a severance payment."[69] "The agreement between Carpenter and his employer required Carpenter to stay with the company .... Because there is something other than termination given in exchange for the money offered to Carpenter, the payment was not a severance as a matter of law."[70]

The jury findings in the prior case are conclusive.[71] The jury found that each of 4 defendant-insureds had an agreement with Carpenter. It found that Carpenter's duty in the deal was to stay,

---

[68] App., p. 9.

[69] App., p. 9.

[70] App., p. 9.

[71] *See supra* CONCLUSIVE FINDINGS IN PRIOR CASE Parts A-C (jury findings) & ARGUMENT AND AUTHORITIES Part B (factual findings in prior case as conclusive).

not to leave. It found that defendants' duty in the deal was to pay certain net proceeds from asset sale revenue *if* Carpenter did so.

The agreement was not dependent on whether Carpenter would have a job with the asset purchaser. Had he continued in his job with the asset purchaser [or not], he was still owed compensation if he met his end of the deal.

The jury necessarily found that Carpenter did his part — stay as long as needed to help make the asset sale happen. And it found that these defendants did *not* do their part — pay Carpenter for staying and continuing to work toward the asset sale. Again, the Texas Supreme Court has recognized that staying is enough to earn such compensation. *See generally Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 304 (Tex. 2009) ("By remaining with the company, the employees gave valuable consideration.").

In fact, the insured-defendants in the prior case argued at trial that Carpenter *rejected* a *severance* plan payment on termination … because he claimed he was owed compensation under the pay-to-stay deal.[72] They were arguing that Carpenter should have been limited to the employer severance

---

[72] *See, e.g.*, App., p. 447 (defense opening) ("The severance agreement included a check for six weeks' base salary and severance of $150,000, and severance of $150,000 which was in their discretion. And Mr. Carpenter turned it down. He said, no, I'm not doing it. I'm entitled to a bonus from the proceeds of the sale."); App., pp. 617-618 (Cheryl Geiser Potashnik) ("A. When Jeff left the company I offered him an additional hundred and fifty thousand dollars in exchange for -- as severance. He was offered that in exchange for signing a separation agreement. He chose not to sign that and he didn't take the money."); App., pp. 743-744 (Brian Potashnik) ("Q. The offer the day after he finished his work toward the asset sale was that he had to release all claims in exchange for salary he had already earned and was owed and some PTO and that's it. A. That's incorrect. He was offered and rejected a hundred and fifty thousand dollars of severance.").

plan at 6 weeks' salary.[73] The jury didn't buy that argument and found a pay-to-stay agreement.

## REQUEST FOR JUDICIAL NOTICE

Carpenter respectfully requests that the Court take judicial notice of public filings included as exhibits in the Appendix and authenticated in a declaration.[74] *See* FED. R. EVID. 201(b) (courts may take judicial notice of facts (1) "generally known within the trial court's territorial jurisdiction" or (2) that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); 2 ROBERT P. MOSTELLER ET. AL., McCORMICK ON EVIDENCE § 330, pp. 650-51 (8th ed. 2020).

## CONCLUSION

Based on the foregoing, Jeff Carpenter respectfully requests that the Court (1) grant summary judgment in his favor on policy coverage and (2) grant such other and further relief, whether legal or equitable, to which he may show himself justly entitled.

---

[73] *See, e.g.*, App., p. 447 (defense opening) (arguing that Carpenter was only entitled to the company severance — "then it says in the event company terminates employee, employee will receive severance in an amount equal to six weeks' base salary in a lump sum payable upon such termination."); App., p. 752 (Brian Potashnik) ("The only thing that would have been paid to anybody over and above what their employment agreement called for would have been a severance.").

[74] *See* App., pp. 1553-1556 (declaration).

Respectfully submitted,


*/s/ Amy Gibson*

_____

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jeff Carpenter*

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on July 12, 2024, she filed the *Brief in Support of Plaintiff Jeff Carpenter's Motion for Summary Judgment* with the United States District Court for the Northern District of Texas through the CM/ECF system, such that defendant should be served with a copy of the filed document as follows:

**VIA CM/ECF SYSTEM**

Ms. Christine Kirchner
c.kirchner@chamberlainlaw.com
Mr. Steven J. Knight
steven.knight@chamberlainlaw.com
Mr. Chris M. Lemons
chris.lemons@chamberlainlaw.com

Chamberlain Hrdlicka, White, Williams & Aughtry
1200 Smith Street #1400
Houston, Texas 77002

*Attorneys for Twin City Fire Insurance Company*

Mr. Michael W. Johnston
johnston@johnstonlegalgroup.com

Johnston Legal Group PC
1616 Wabash Avenue
Fort Worth, Texas 76107-6598

*Local Counsel for Twin City Fire Insurance Company*

*/s/ Amy Gibson*

—————————————————
Amy E. Gibson