IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | |
| | § | Civil Action No. 3:23-CV-00769-N |
| Twin City Fire Insurance Company, | § | |
| | § | Jury Demand |
| *Defendant*. | § | |

---

**APPENDIX IN SUPPORT OF PLAINTIFF JEFF CARPENTER'S
MOTION FOR SUMMARY JUDGMENT**

---

Exhibits are bookmarked. Portions of exhibits are highlighted.

To avoid overlapping, unreadable ECF document headers, prior filings in this case were downloaded without the ECF header and included here without the ECF header. But the original ECF document number is noted in the index of exhibits description and the exhibit label.

Appendix 0001

## INDEX OF EXHIBITS

EXHIBIT 1
March 4, 2024 Memorandum Opinion and Order 2024 WL 946963 ...................................0006

EXHIBIT 2
May 7, 2024 Stipulation [ECF No. 54]................................................................................0011
    final judgment in prior case (attachment to stipulation) ................................................0016
    turnover order in prior case (attachment to stipulation)................................................0025

EXHIBIT 3
Original Petition and Jury Demand [ECF No. 1-2] ............................................................0029

EXHIBIT 4
Second Amended Answer and Affirmative Defenses [ECF No. 18]....................................0051

EXHIBIT 5
Twin City insurance policy excerpts —
    the complete employment practices liability insurance agreement................................0063

EXHIBIT 6
March 11, 2016 policy coverage analysis with original exhibits...........................................0101

EXHIBIT 7
M&A retention survey — pay-to-stay agreements ..............................................................0297

EXHIBIT 8
Jury charge with verdict and juror notes............................................................................0314

EXHIBIT 9
Third amended petition in prior case .................................................................................0340

EXHIBIT 10
Dallas Court of Appeals opinion affirming
    jury findings and final trial court judgment in prior case................................................0355

EXHIBIT 11
Texas Supreme Court denial of petition for review and
    denial of motion for rehearing in prior case ..................................................................0361

EXHIBIT 12
Mandate concluding prior case ..............................................................................0364

*Exhibits 13-14 will be filed as an attachment due to file size limitations but still sequentially numbered*

EXHIBIT 13
Jury trial transcript excerpts in prior case —
     the complete presentation to the jury ..........................................................0367

EXHIBIT 14
Declaration of Amy Gibson ....................................................................................1553

Respectfully submitted,


*/s/ Amy Gibson*

_____

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jeff Carpenter*

Appendix 0004

### CERTIFICATE OF SERVICE

The undersigned certifies that, on July 12, 2024, she filed the *Appendix in Support of Plaintiff Jeff Carpenter's Motion for Summary Judgment* with the United States District Court for the Northern District of Texas through the CM/ECF system, such that defendant should be served with a copy of the filed document as follows:

**<u>VIA CM/ECF SYSTEM</u>**

Ms. Christine Kirchner
c.kirchner@chamberlainlaw.com
Mr. Steven J. Knight
steven.knight@chamberlainlaw.com
Mr. Chris M. Lemons
chris.lemons@chamberlainlaw.com

Chamberlain Hrdlicka, White, Williams & Aughtry
1200 Smith Street #1400
Houston, Texas 77002

*Attorneys for Twin City Fire Insurance Company*

Mr. Michael W. Johnston
johnston@johnstonlegalgroup.com

Johnston Legal Group PC
1616 Wabash Avenue
Fort Worth, Texas 76107-6598

*Local Counsel for Twin City Fire Insurance Company*

*/s/ Amy Gibson*

_____
Amy E. Gibson

# Appendix Exhibit 1

## March 4, 2024 Memorandum Opinion and Order
## 2024 WL 946963

This Court signed two opinions on different issues on the same day. This is the opinion that denies Twin City's summary judgment motion on two insurance policy exclusions.

2024 WL 946963
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Jeffrey W. CARPENTER, Plaintiff,

v.

TWIN CITY FIRE INSURANCE CO., Defendant.

Civil Action No. 3:23-CV-0769-N
|
Signed March 4, 2024

**Attorneys and Law Firms**

Amy E. Gibson, David L. Wiley, Gibson Wiley PLLC, Dallas, TX, for Plaintiff.

Christine Kirchner, Christopher Michael Lemons, Steven Jon Knight, Chamberlain Hrdlicka White Williams & Aughtry PC, Houston, TX, Michael Wayne Johnston, Johnston Legal Group PC, Fort Worth, TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

David C. Godbey, Chief United States District Judge

 **\*1**  This Order addresses Defendant Twin City Fire Insurance Co.'s ("Twin City") motion for summary judgment [20] on Plaintiff Jeff Carpenter's claim for *Stowers* liability. Because Twin City is not entitled to judgment as a matter of law on the issue of coverage, the Court denies this motion.

**I. ORIGINS OF THE MOTION**

This case arises out of a *Stowers* claim [1] brought by Plaintiff Jeff Carpenter against Defendant Twin City Fire Insurance Company. In a separate case, Carpenter sued his employer for breach of contract. Pl.'s Original Petition at ¶ 2 [1-2]. Carpenter's employer was selling the company that Carpenter worked for. *Id.* at ¶ 26. The sale would result in the termination of Carpenter's position. *Id.* at ¶ 28. Carpenter alleged that his employer promised to give him a percentage of the profits from the sale if he would stay on in his position until the sale closed to help with the transition. *Id.* at ¶ 27. In the previous litigation, Carpenter alleged that once the sale occurred, his employer reneged on the agreement and did not compensate him. *Id.* at ¶ 30-32. Carpenter's employer was insured by

Twin City. *Id.* at ¶ 17. Carpenter offered to settle his case against his employer within the limits of his employer's insurance policy with Twin City, but Twin City declined the settlement offer. *Id.* at ¶ 34–36. Carpenter prevailed at trial against his employer. Final Judgment, Pl.'s Appx. at 1732 [29]. The jury found that there was an agreement between the parties and that Carpenter's employer violated that agreement. Jury Verdict, Pl.'s Appx at 1712–13 [29]. The jury awarded damages that exceeded the limits of the insurance policy. Final Judgment, Pl.'s Appx. at 1735 [29]. This gave rise to the *Stowers* claim at issue in the present litigation. To help recover the judgment against Carpenter's employer, the court in that proceeding assigned the employer's *Stowers* claim to Carpenter via turnover order. Turnover Order, Def.'s Appx. at 29–31 [40]. Carpenter then initiated the present proceeding against Twin City, bringing the assigned *Stowers* claim as well as seeking punitive damages and injunctive relief. Twin City removed the case to federal court. Notice of Removal [1]. Twin City moved to dismiss Carpenter's claims for punitive damages and injunctive relief. Def.'s Motion to Dismiss [34]. The Court granted this motion. Order [50]. Twin City now moves for summary judgment on Carpenter's remaining claim for *Stowers* liability. Def.'s Motion [19].

**II. LEGAL STANDARD FOR
SUMMARY JUDGMENT**

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

 **\*2**  When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support

Appendix 0007

an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). Factual controversies are resolved in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

## III. THE COURT DENIES SUMMARY JUDGMENT

To survive a motion for summary judgment, Twin City, as the movant, must show that no genuine issue of material fact exists, and that the undisputed facts entitle him to judgment as a matter of law. The Court finds that Twin City has not shown that the law requires judgment in his favor on the issue of coverage. Twin City has not adequately shown that the undisputed facts require a finding that Twin City owed no *Stowers* duty to its insured to settle the original case with Carpenter within policy limits. Accordingly, Twin City is not entitled to summary judgment and its motion is denied.

### *A. Ambiguous Terms in Insurance Contracts Are Interpreted in Favor of the Insured*

The parties disagree about the correct interpretation of the policy at issue in this case. The insurance policy states that Twin City "shall not pay Loss for any Claim for employment termination severance payments." Insurance Policy, Def.'s Appx. at 30 [21]. Twin City argues that the agreement between Carpenter and his employer that gave rise to the underlying litigation was a severance agreement and was therefore not covered by the policy. Carpenter disagrees. Pursuant to Texas law, the undefined provisions of the insurance policy at issue in this litigation such as "severance

agreement" and "back pay" must be defined according to Carpenter's reasonable interpretation.

Under Texas law, the rules of construction for insurance policies generally operate in favor of the insured. *Lubbock Cnty Hosp. Dist. v. Nat'l Union Fire Ins. Co.*, 143 F.3d 239, 242 (5th Cir. 1998). A court must adopt the insured's construction of the provision, "as long as that construction is not unreasonable, even if the construction urged by the insurer appears more reasonable or a more accurate reflection of the parties' intent." *Lubbock Cnty Hosp.*, 143 F.3d at 242 (quoting *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)). Exclusions from coverage in a policy "are narrowly construed, and all reasonable inferences must be drawn in the insured's favor." *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 370 (5th Cir. 2008).

**\*3** There are multiple reasonable interpretations of the policy provisions at issue. The policy says, "Other than Defense Costs, the Insurer shall not pay Loss for any Claim ... for employment termination severance payments ...." Insurance Policy, Def.'s Appx. at 30 [21]. This can be read, as Twin City proposes, to exclude any payment paid out to an employee on termination of employment, usually as a reward or incentive for length of service. Def.'s Brief at 9–10 [20]. However, it can also be reasonably read, as Carpenter[2] proposes, to exclude only payments given in exchange for termination of employment, usually related to a waiver of claims and with the end of employment being the "trigger" for receiving the funds. Pl.'s Response at 33–34 [28]. The use of the phrase "employment termination" in front of "severance payments" further demonstrates the reasonableness of Carpenter's interpretation. It is reasonable for the insured to read this phrase to mean that a severance payment is something that comes as the result of employment termination. Under this definition, the end of the employment, and not any other condition, is what prompts a severance payment. This is a reasonable reading of this exclusion because nothing in the same section or any adjoining section otherwise limits or defines "severance" in a way that makes this reading unreasonable or illogical.

Whether the insured's reading is the reading intended or understood by Twin City in drafting this policy, and whether this reading is the "most reasonable" possible reading, are irrelevant for the purpose of analyzing an insurance policy in Texas. Under Texas law, Carpenter's reasonable interpretation acts as the correct interpretation of the insurance policy.

Accordingly, for the purposes of this order, a severance agreement is an agreement promising a monetary reward to an employee on the condition of that employee's termination. Using this definition, Twin City is not entitled to judgment as a matter of law that the agreement was for severance pay and thus was outside the scope of coverage.

### B. Twin City Is Not Entitled to Judgment As a Matter of Law on the Issue of Severance

Defining a severance payment as one that is made in exchange for an employee's termination, Twin City has not carried its burden to show that, as a matter of law, the payment owed to Carpenter is a severance payment and therefore outside the scope of coverage. While the parties have presented conflicting characterizations of the agreement, the facts surrounding the agreement are largely undisputed. Carpenter's employer promised Carpenter 3% of the money received by selling the company if he stayed with the company until the sale was complete. Trial Transcript, Def.'s Appx. at 206–09 [21]; Dallas Ct. App. Opinion, Pl.'s Appx. at 97–99 [29]. The only issue left to resolve is whether the 3% figure is a severance payment. The agreement was for a payment to stay on and perform additional work, not a payment to leave the company. Twin City therefore has not carried its burden to show that as a matter of law the agreement at issue was a severance payment.

For the payment to be excluded from coverage, Twin City must show that as a matter of law the agreement was for a severance payment. To do this, Twin City must show that, applying the insured's reasonable definition of "severance" to the facts surrounding the agreement, the agreement between the parties must be a severance. Twin City has not carried this burden. The parties have used inconsistent terminology in reference to the agreement at issue. The same agreement has at varying times been called a "stay bonus," a "stay-to-get-severance program," and a "severance." Trial Transcript, Def.'s App 211, 223 [21]. However, what is important is not the terminology used by the parties but whether content of the agreement is consistent with a severance as defined by the insured. Under the reasonable interpretation of the insured, a severance payment is one that is given in exchange for the termination of an employee's employment. Because Carpenter had to perform additional work to receive the payment at issue, the payment was in exchange for something other than termination, and thus was not a severance payment.

**\*4** The sale of the company would terminate Carpenter's position because there was already someone in his role at the acquiring company. Pl.'s Original Petition at ¶ 28 [1-2]. However, the mere fact that the sale terminated his position did not entitle Carpenter to receive the agreed-upon payment. The agreement between Carpenter and his employer required Carpenter to stay with the company and assist in the transition and sale. Dallas Ct. App. Opinion, Pl.'s Appx. at 97–98 [29]. Because there is something other than termination given in exchange for the money offered to Carpenter, the payment was not a severance as a matter of law. Additionally, Carpenter put forth evidence that it was not definitively known that he would not have a position after the sale until "some point while the sale was pending." *Id.* at 98–99. This further demonstrates that the agreement was not a severance because, at the time Carpenter and his employer reached an agreement about the payment he was to receive, the parties did not yet know that Carpenter would be terminated. Finally, although other courts have called agreements similar to the one at issue severance agreements, none of these courts mandate that every agreement of this kind be termed as a severance agreement. *See, e.g., Stout v. Smithfield Bioenergy, LLC*, 2020 WL 5487843 (N.D. Tex. 2010); *Goldman v. White Rose Distributing Co.*, 936 S.W.2d 707 (Tex. 1997).

The payment in question does not meet definition of "severance" as determined by Carpenter's reasonable interpretation of the policy because it was not predicated on the termination of Carpenter's employment. Twin City has therefore not proven that the agreement is excluded from coverage as a matter of law. Accordingly, Twin City is not entitled to summary judgment on the issue of coverage.

### C. Twin City Is Not Entitled to Judgment As a Matter of Law on the Issue of the Back Pay Exception

Twin City argues that even if the Court agrees with Carpenter that the payment was not a severance but was instead a bonus offered as an incentive to stay with the company, the payment is nonetheless excluded from coverage. Def.'s Brief at 13–14 [20]. The policy excludes coverage for certain types of payments, including salaries, wages, or bonuses. Insurance Policy, Def.'s Appx. at 28. However, the policy includes an exception to this exclusion for these types of payments if they are paid as "a component of a front or back pay award." *Id.* Carpenter argues that, although the money owed to him is a bonus, it is not excluded from coverage because it fits into the back pay exception. Pl.'s Response Brief at 44–45 [30].

Appendix 0009

Twin City argues that, as a matter of law, the money owed to Carpenter is not back pay. Def.'s Brief at 10–12 [20]. The Court holds that Twin City has not shown that as a matter of law the money owed to Carpenter does not constitute back pay.

Carpenter interprets "back pay" as compensation owed but not given for some kind of employment duty or performance. Def.'s Response at 45 [28]. This is a reasonable interpretation of an undefined term, so the Court will use Carpenter's interpretation of "back pay." Under this interpretation, to show that something is back pay a party must show he rendered a service but was not compensated. Carpenter has adequate facts to meet these requirements. Carpenter can show that he performed the requested work by staying at the company until the sale occurred to help with the transition. Dallas Ct. App. Opinion, Pl.'s Appx. at 99 [29]. Carpenter can also show that he was not compensated as promised for staying until the sale. Jury Verdict, Pl.'s Appx. at 1714. Twin City has not and cannot rebut these facts. Accordingly, Twin City has not shown that as a matter of law the payment owed to Carpenter is not back pay. Therefore, even if the agreement between Carpenter and his employer was barred by the severance exclusion, it could still be covered under the back pay exception. Thus, Twin City has not shown that as

a matter of law the underlying dispute was outside the scope of coverage.

## IV. CONCLUSION

The ambiguous terms in the insurance policy must be interpreted in favor of the insured's reasonable understanding. Using Carpenter's reasonable interpretation of the term "severance agreement," Twin City has not shown that as a matter of law the agreement between Carpenter and his employer does not meet this definition. Likewise, Twin City has not shown as a matter of law that, if the agreement is a severance agreement, it cannot the back pay exception under Carpenter's reasonable interpretation of the term. Because Twin City has not shown as a matter of law that the agreement between Carpenter and his employer is not within the scope of the insurance coverage provided by Twin City, there is a remaining issue of fact as to whether Twin City violated its duties under *Stowers*, so Twin City is not entitled to judgment as a matter of law. Accordingly, the Court denies summary judgment.

## All Citations

Slip Copy, 2024 WL 946963

## Footnotes

1    A *Stowers* claims arises when an insurer violates its duty to settle third-party claims against its insureds when it would be reasonably prudent to accept the settlement. *In re Farmers Tex. Cnty Mut. Ins. Co.*, 621 S.W.3d 261, 267 (Tex. 2021). The duty was first recognized in *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved).

2    Although not actually insured by Twin City, Carpenter assumes the role of "the insured" for the purposes of this litigation because he is asserting the rights of the insured via turnover order.

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appendix 0010

# Appendix Exhibit 2

# May 7, 2024 Stipulation [ECF No. 54]

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | |
| | § | Civil Action No. 3:23-CV-00769-N |
| Twin City Fire Insurance Company, | § | |
| | § | Jury Demand |
| *Defendant.* | § | |

---

## STIPULATION

---

### RECITALS

WHEREAS, on March 9, 2023, Jeff Carpenter sued Twin City Fire Insurance Company in Dallas County Court at Law No. 3 (the "Lawsuit"), asserting a single cause of action: violation of liability insurers' common-law *Stowers* duty. The Lawsuit sought this relief: judgment on the *Stowers* claim, non-monetary equitable relief including injunctive relief, damages that the *Stowers* violation proximately caused, punitive damages, costs, prejudgment interest, and postjudgment interest.

WHEREAS, on April 11, 2023, Twin City removed the Lawsuit to the United States District Court for the Northern District of Texas, Dallas Division, where it is currently pending under Civil Action No. 3:23-CV-00769-N.

WHEREAS, the Lawsuit arises from an earlier jury verdict and judgment in favor of Jeff Carpenter in Dallas County Court at Law No. 5, Cause Number CC-08-2072-E, styled *Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik* (the "Prior Case").

WHEREAS, the Final Judgment in the Prior Case is attached.

Appendix 0012

WHEREAS, the trial court in the Prior Case ordered turnover to Jeff Carpenter of the defendant-insureds' *Stowers* claims against Twin City. It did so after all appeals were exhausted in the Prior Case.

WHEREAS, the Turnover Order in the Prior Case is attached.

WHEREAS, the elements of a *Stowers* claim are (1) the third party's claim against the insured is within the scope of coverage; (2) the settlement demand is within policy limits; (3) the terms of the demand are "such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment;" and (4) damages that the *Stowers* violation proximately caused. *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.2d 261, 267 (2021); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994).

WHEREAS, a February 2, 2024 order in the Lawsuit granted Twin City's motion to dismiss with prejudice the following requested relief: injunctive relief and punitive damages [ECF No. 50].

WHEREAS, a March 4, 2024 order in the Lawsuit denied Twin City's motion for summary judgment on the issue of insurance coverage (1) under a policy exclusion for employment termination severance payments and (2) under a policy exclusion for salaries, wages, or bonuses except as a component of a back pay award [ECF No. 51].

WHEREAS, based on current rulings in the Lawsuit, the following elements remain in the Lawsuit: (1) the third party's claim against the insured is within the scope of coverage; (2) the settlement demand is within policy limits; (3) the terms of the demand are "such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment;" and (4) damages that the *Stowers* violation proximately caused.

## AGREEMENT

NOW, THEREFORE, Jeff Carpenter and Twin City Fire Insurance Company agree as follows.

### Twin City Stipulation and Admission

Based on the foregoing, and to bring the Lawsuit proceedings more expeditiously to final and appealable judgment in the district court, Twin City stipulates and admits in Carpenter's favor on all remaining elements other than insurance coverage — *i.e.*, all remaining elements other than "(1) the third party's claim against the insured is within the scope of coverage." Twin City stipulates and admits (2) Jeff Carpenter's settlement demand in the Prior Case was within policy limits; (3) assuming coverage *arguendo*, the terms of that demand were "such that an ordinarily

2

Appendix 0013

prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment;" and (4) assuming coverage *arguendo*, the *Stowers* violation proximately caused the damages reflected in the attached Final Judgment but reduced as appropriate for the bond that was posted and paid in the Prior Case.

### Agreement

To expedite the district court's adjudication of the coverage issue, the parties agree on the following procedure. Carpenter will file a motion for summary judgment on the coverage issue. Twin City's response is due 7 calendar days after the motion is filed. Any reply is due 7 calendar days after the response is filed. Within 3 calendar days after the close of briefing, the parties will jointly request a status conference and expedited ruling on the motion. The parties agree to file a joint motion to stay all remaining deadlines pending a ruling on the motion.

If the district court wholly grants summary judgment in favor of Carpenter, the parties will jointly submit a proposed final judgment, or, if they cannot agree on the form of the judgment, the parties will submit separate versions of a final judgment.

By entering into this agreement Twin City does not waive, but expressly preserves, its right to appeal the order denying its motion for summary judgment, any order granting Carpenter's motion for summary judgment, and any resulting final judgment, the substance and content of which Twin City disagrees.

By entering this agreement, Jeff Carpenter does not waive, and instead expressly preserves, his right to appeal any order dismissing [or granting judgment on] availability of punitive damages and injunctive relief.

3

Appendix 0014

Upon the entry of final judgment in the Lawsuit, either party may pursue appeal.

AGREED:

| TWIN CITY FIRE INSURANCE COMPANY | JEFF CARPENTER |
|---|---|
| By: _Joseph Coppola_ | By: _[signature]_ |
| Printed Name: Joseph Coppola | |
| Its: AVP - HGSFL | |

Respectfully submitted,

/s/ _Amy Cole_                             /s/ _Steve Knight_

Ms. Amy E. Gibson                          Ms. Christine Kirchner
Texas Bar No. 00793801                     Texas Bar No. 00784403
amy@gwfirm.com                             c.kirchner@chamberlainlaw.com

Mr. David L. Wiley                         Mr. Steven J. Knight
Texas Bar No. 24029901                     Texas Bar No. 24012975
david@gwfirm.com                           steven.knight@chamberlainlaw.com

Gibson Wiley PLLC                          Chamberlain Hrdlicka, White,
1500 Jackson Street #109                     Williams & Aughtry
Dallas, Texas 75201-4923                   1200 Smith Street #1400
T: (214) 522-2121                          Houston, Texas 77002
F: (214) 522-2126                          T: (713) 658-1818

*Attorneys for Jeff Carpenter*            *Attorneys for Twin City Fire Insurance Company*

4

Appendix 0015

# final judgment in prior case (attachment to stipulation)



# MARK GREENBERG
## JUDGE, COUNTY COURT AT LAW #5

Larry Friedman / Michael Donahue / Jason H. Friedman 214-346-4240
Amy Gibson / David Wiley 214-522-2126
Brian Sanford 214-919-0113
Robert Gilbreath 214-780-5200

Re: Carpenter v. Southwest Housing, et al., Cause no. CC- 08-02072-E

Attached is a courtesy copy of the court's judgment.

Signed December 17, 2018.

_Mark Greenberg_
Judge presiding

Geo. Allen Courts Building, 600 Commerce Street, Fifth Floor, Dallas, Texas 75202
(214) 653-6441

Appendix 0017

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | In the County Court |
| | § | |
| Southwest Housing | § | of Dallas County |
| Development Company, Inc.; | § | |
| Southwest Housing | § | at Law N° 5 |
| Management Corporation, | § | |
| Inc. a/k/a and d/b/a Southwest | § | |
| Housing Management | § | |
| Company, Inc.; Affordable | § | |
| Housing Construction, Inc.; | § | |
| Brian Potashnik; and | § | |
| Cheryl Potashnik n/k/a | § | |
| Cheryl Geiser, | § | |
| | § | |
| *Defendants.* | § | |

## FINAL JUDGMENT

This case was called to jury trial on January 23, 2018. Jeffrey W. Carpenter appeared in person and through counsel and announced ready for trial. Brian Potashnik and Cheryl Potashnik n/k/a Cheryl Geiser appeared in person and through counsel and announced ready for trial. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and

Affordable Housing Construction, Inc. appeared through their representatives and through their counsel and announced ready for trial.

Before jury trial, during a motions hearing, four counter-plaintiffs — Cheryl Potashnik n/k/a Cheryl Geiser, Brian Potashnik, Southwest Housing Development Company, Inc., and Affordable Housing Construction, Inc. — announced their intent to voluntarily dismiss all their counterclaims against Jeffrey W. Carpenter, which they originally filed on April 7, 2008. This dismissal was accomplished with the September 9, 2015 filing of *Defendants' First Amended Answer and Defendant's First Amended Counterclaim Against Jeffrey W. Carpenter*, in which only Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. continued to pursue counterclaims. Before jury trial, on the record, Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. dismissed with prejudice all remaining counterclaims against Jeffrey W. Carpenter.

After close of evidence and before closing arguments in the jury trial, the Court granted the motion of Cheryl Potashnik n/k/a Cheryl Geiser for directed verdict on the claims against her. Cheryl Potashnik n/k/a Cheryl Geiser and Jeffrey W. Carpenter were each unsuccessful on the counterclaims and claims between them. As a result, no costs are awarded to Cheryl Potashnik n/k/a

Cheryl Geiser.  The Court also finds good cause not to award costs to Cheryl Potashnik n/k/a Cheryl Geiser. First, Cheryl Potashnik n/k/a Cheryl Geiser and Jeffrey W. Carpenter were each unsuccessful on the counterclaims and claims between them.  Second, awarding costs to Cheryl Potashnik n/k/a Cheryl Geiser would, as a practical matter under the circumstances, burden Jeffrey W. Carpenter with paying shared defense costs for the four defendants against whom he was successful.  All defendants shared the same legal counsel. All defendants shared the same liability insurance carrier. With few exceptions, all defendants asserted the same defenses.  For all oral depositions that Cheryl Potashnik n/k/a Cheryl Geiser initiated, all defendants jointly noticed and took those depositions.  All defendants counted as one side — or one party — for purposes of paying for court-ordered mediations.

A jury and one alternate juror, consisting of 7 citizens good and true, were empaneled and sworn and thereafter heard the admissible evidence. Having retained the original 6 jurors during the course of the trial, the Court dismissed the alternate juror before deliberations.  The Court then submitted its Charge to the jury, which was followed by the closing arguments of the lawyers.  Thereafter, on February 1, 2018, the jury returned a five-to-one verdict in favor of Jeffrey W. Carpenter and against Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing

Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc. on certain claims. The Court then received and accepted the jury's verdict, which is incorporated by reference as if fully set forth herein.

Before jury trial, all parties agreed to try to the Court the issue of attorneys' fees under Texas Civil Practice and Remedies Code Chapter 38. That portion of the case was called to trial on November 15, 2018. Jeffrey W. Carpenter appeared in person and through his counsel and announced ready for trial. Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc. appeared through their counsel and announced ready for trial. The Court heard the admissible evidence and the arguments of counsel and took judicial notice as appropriate. At the conclusion of the presentation, the Court announced its ruling on the record, noting that a written judgment would follow.

Having considered the verdict of the jury, the Court's ruling on attorneys' fees, the admissible evidence, the record in this case, the arguments of counsel, and the previous orders of the Court, it is hereby

ORDERED, ADJUDGED and DECREED that Jeffrey W. Carpenter do have and recover of and from Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc., jointly and severally:

a.   actual damages in the amount of $928,020.76;

b.   prejudgment interest on actual damages [$928,020.76] at the rate of 5.25% per annum simple interest from March 11, 2008 through the day before the date of this Judgment;

c.   reasonable attorneys' fees in the amount of $820,818.00 for the prosecution of this case through the day before the date of this Judgment for Plaintiff Jeffrey W. Carpenter's breach of contract claim against Defendants Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc.;

d.   costs of court; and

e.   postjudgment interest on all of the amounts above at the rate of 5.25% per annum, compounded annually, from the date of this Judgment until the date this Judgment is satisfied.

It is further ORDERED, ADJUDGED and DECREED, that if any defendant other than Defendant Cheryl Potashnik n/k/a Cheryl Geiser unsuccessfully appeals this Judgment, then Jeffrey W. Carpenter shall additionally recover from such unsuccessful appealing defendant — or jointly and severally from such unsuccessful appealing defendants if more than one such defendant unsuccessfully appeals — the following amounts, representing

conditional and reasonable attorneys' fees that would be incurred by Jeffrey W. Carpenter in any such appeal:

a. $86,625.00 for an appeal to the Dallas Court of Appeals, excluding oral argument and rehearing response;

b. an additional $9,900.00 for oral argument, if any, before the Dallas Court of Appeals;

c. an additional $9,900.00 for a response to a motion for rehearing, if the Dallas Court of Appeals requests that Jeffrey W. Carpenter file such a response;

d. an additional $32,175.00 for a petition for review or response to a petition for review filed with the Supreme Court of Texas;

e. an additional $37,125.00 for merits briefing, if the Supreme Court of Texas requests briefing on the merits;

f. an additional $14,850.00 for oral argument, if any, before the Supreme Court of Texas; and

g. an additional $7,425.00 for a response to a motion for rehearing, if the Supreme Court of Texas requests that Jeffrey W. Carpenter file such a response.

All other relief requested by any individual or entity in this case and not specifically granted herein or previously disposed of is DENIED.

This Judgment finally disposes of all parties and all claims and is appealable.

The Court ORDERS execution to issue for this Judgment.

Signed this __17__ day of __December__, 2018.

_Mark Greenberg_

Mark Greenberg
Judge, Dallas County Court at Law No. 5

# turnover order in prior case (attachment to stipulation)

CAUSE NO. CC-08-2072-E

| Jeffrey W. Carpenter, | § | |
| | § | |
| *Judgment Creditor,* | § | |
| | § | |
| v. | § | In the County Court |
| | § | |
| Southwest Housing | § | at Law Nº 5 |
| Development Company, Inc.; | § | |
| Southwest Housing | § | Dallas, County, Texas |
| Management Corporation, | § | |
| Inc. a/k/a and d/b/a Southwest | § | |
| Housing Management | § | |
| Company, Inc.; Affordable | § | |
| Housing Construction, Inc.; | § | |
| and Brian Potashnik, | § | |
| | § | |
| *Judgment Debtors.* | § | |

## ORDER GRANTING AMENDED MOTION
## FOR TURNOVER OF *STOWERS* CLAIM

On _April 30, 2021_ , the Court held a hearing by submission on Jeff

Carpenter's Amended Motion for a Turnover Order.  Having considered the motion,

the pleadings on file, the evidence, and argument presented at that hearing, the

Court is of the opinion that this motion should be, and hereby is, GRANTED.

The Court FINDS that (1) Jeff Carpenter is a judgment creditor of the Judgment

Debtors listed above for the final judgment in this case; (2) the final judgment

remains unsatisfied; (3) the Judgment Debtors own a cause of action or causes of

action against their insurance carrier concerning liability for the final judgment in

CC-08-02072-E
COTO
ORDER - TURNOVER
2423441



Appendix 0026

this case; (4) the right to prosecute and recover on any such cause(s) of action cannot readily be attached or levied on by ordinary legal process and that right is not exempt under any statute from attachment, execution, or seizure; and (5) Judgment Debtors may have rights of access from their insurers, attorneys, and representatives to records and information and they should share those rights with Jeff Carpenter as a judgment creditor to aid in the evaluation and any prosecution of those claims.

The Court is of the opinion that Jeff Carpenter is entitled to the right to have liquidated all common law causes of action Judgment Debtors may own under *G. A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved) and its progeny, to see if they might satisfy, in whole or in part, the judgment in this case. So, in aid of the judgment in this case, IT IS ORDERED, ADJUDGED AND DECREED that any claims Judgment Debtors own under *Stowers* arising out of or related to this case are immediately TURNED OVER to Judgment Creditor Jeff Carpenter. This specifically includes, without limitation, those concerning Private Choice Encore! Policy number 00KB 0229269-07 that Twin City Fire Insurance Company issued.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Judgment Creditor Jeff Carpenter shall immediately have an equal right of access — co-extensive to that held by each and every Judgment Debtor — to information and documents related to the above-referenced claims. This specifically includes, without limitation, information and documents from each and every of Judgment Debtors'

individual insurers, attorneys, and representatives. It also specifically includes, without limitation, all insurance claim files and evaluations of coverage and communications between each and every Judgment Debtor and each and every of their insurers via their respective counsel. So, all current and former counsel for Judgment Debtors should immediately make all such information and documents equally available to Judgment Creditor Jeff Carpenter, via his counsel of record in this civil action, as they are available to any Judgment Debtor.

IT IS FURTHER ORDERED that Jeff Carpenter is immediately GRANTED — a right co-extensive with Judgment Debtors to assert or waive the attorney-client privilege and any work product exemption arising from or concerning communications to, from, or among Twin City Fire Insurance Company and any of its adjusters or their representatives, agents, or attorneys, concerning this case.

IT IS FURTHER ORDERED that this Order shall become effective on today's date. IT IS SO ORDERED this ___30___ day of April, 2021, by

The Honorable Mark Greenberg
Dallas County Court Judge

Appendix 0028

# Appendix Exhibit 3

## Original Petition and Jury Demand
## [ECF No. 1-2]

FILED
3/9/2023 11:25 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Case 3:23-cv-00769-N   Document 57   Filed 07/12/24   Page 30 of 366   PageID 3613

CAUSE NO. CC-23-01483-C

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | In the County Court |
| *v.* | § | |
| | § | At Law Nº |
| Twin City Fire Insurance Company, | § | |
| | § | Dallas County, Texas |
| *Defendant*. | § | |

---

## ORIGINAL PETITION AND JURY DEMAND

---

### DISCOVERY PLAN

1.      Jeff Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

### INTRODUCTION AND NOTICE OF RELATED CASE:
### DALLAS COUNTY COURT AT LAW NO. 5

2.      This case appears to be a *related case* as described in Local Civil Rules 1.06, 1.07(a), and maybe 1.07(d).[1] It arises out of an earlier jury verdict and judgment in favor of Jeff Carpenter in Dallas County Court at Law No. 5, Cause Number CC-08-2072-E, styled

---

[1] Local Civ. R. 1.06 ("… pending case is so related to another case previously filed in or disposed of by another Court of Dallas County … that a transfer of the later case to such other Court would facilitate orderly and efficient disposition of the litigation …"); Local Civ. R. 1.07(a) ("Any case arising out of the same transaction or occurrence as an earlier case …."); Local Civ. R. 1.07(d) ("Any suit concerning which the duty of an insurer to defend was involved in the earlier suit.").

*Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik.*

3.      In that earlier case, defendants' liability insurance carrier rejected a reasonable opportunity to settle for less than remaining policy limits. It did so even though policy limits were eroding toward zero with every penny of litigation costs and every dollar of attorneys' fees. Ultimately, four of its insureds were hit with an adverse jury verdict and a judgment that exceeded remaining policy limits by around $2 million.

4.      The defendant insureds appealed to the Fifth Court of Appeals and the Texas Supreme Court but were not successful. The judgment was affirmed and remains unsatisfied. Dallas County Court at Law No. 5 ordered turnover of the defendant insureds' common law *Stowers* claim against their liability insurance carrier, along with associated rights and privileges, to Jeff Carpenter. The present case involves that *Stowers* claim.

## PARTIES

5.      Twin City Fire Insurance Company is licensed to conduct multiple lines of insurance business in Texas, according to the Texas Department of Insurance. It was licensed to conduct business in Texas, and did conduct business in Texas, at the time the claims asserted herein accrued. It may be served with process through its registered agent in Texas as follows:

CT Corporation System
1999 Bryan Street
Suite 900
Dallas, Texas 75201

6.      Jeff Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued and who continues to reside in Dallas County, Texas.

## JURISDICTION

7.      The Court has subject matter jurisdiction over this case because (1) Jeff Carpenter seeks damages within its jurisdictional limits and (2) the asserted claims are not subject to exclusive jurisdiction in any other court.

8.      The Court has personal jurisdiction over Twin City Fire Insurance Company ("Twin City") because (1) the asserted claims arose directly from Twin City's acts and omissions in Texas, and (2) Twin City's affiliations with Texas are so continuous and systematic that Twin City is "essentially at home" in Texas.

## VENUE

9.      Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because all or a substantial part of the events and omissions giving rise to the asserted claims occurred in Dallas County, Texas. This case involves a liability insurance

company's negligence in Dallas County, Texas in rejecting a reasonable opportunity to set-tle within policy limits. It involves a jury verdict and judgment in Dallas County, Texas against the defendant insureds in excess of policy limits.

### SOME *STOWERS* FUNDAMENTALS

### basic negligence duty and reason for rule

10.     When insurance companies have the right to control settlement of claims against their insureds, they owe their insureds a *Stowers* duty. The *Stowers* opinion explains that the insurance company is:[2]

> held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages.

This duty sounds in negligence, has been around for almost a century, and is similar to other areas of law in which a right of control gives rise to a legal duty.[3]

---

[2] *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved).

[3] *See, e.g., Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) ("Having undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the [] house while performing its contract with the builder.").

11.     The ultimate issue in a *Stowers* case is whether a settlement offer is such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to a judgment higher than the policy limits. The *Stowers* negligence standard is flexible and depends on context. Here is an example. The *Stowers* duty usually arises only with a settlement offer within policy limits. But it may also arise with a settlement offer above policy limits when the insured agrees to pay the excess.[4]

12.     The *Stowers* duty is born of insurance companies who want to save money for themselves to the detriment of insureds. If a policy limit is the maximum insurance company risk — whether a case settles or goes to trial —, then why settle at all? Why not gamble the insured's personal finances and take a chance at trial? Even if odds of a defense win are slim. Even if trial could expose the insured to damages higher than policy limits.

### insurer excuses: coverage dispute is no excuse

13.     Sometimes an insurance company admits a duty to defend but decides there is no indemnity coverage and so rejects a reasonable settlement offer within policy limits. In those situations, the insurance carrier "risks significant potential liability for bad-faith insurance practices [*Stowers*] if it does not ultimately prevail in its coverage contest."[5]

---

[4] *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 n.13 (Tex. 1994) ("We do not reach the question of when, if ever, a *Stowers* duty may be triggered if an insured provides notice of his or her willingness to accept a reasonable demand above the policy limits, and to fund the settlement, such that the insurer's share of the settlement would remain within the policy limits.").

[5] *Excess Underwriters at Lloyds, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 46 (Tex. 2008).

When it comes to the *Stowers* duty, the insurance carrier "bear[s] the risk that its point of view [on coverage] might have been incorrect, which could result in liability for any excess judgment."[6]

14.    So, a good faith dispute about insurance coverage is not a defense to *Stowers* liability. Reasonable doubt about insurance coverage is not a defense. Uncertainty about insurance coverage is not a defense. That a reasonable liability insurance carrier would contest coverage is not a defense. A mistaken belief that there is no coverage is not a defense.

### insurer excuses: not knowing all facts is no excuse

15.    Not knowing all the facts, or even most of the facts, does not mean there is no *Stowers* duty.[7] The question is whether, based on facts the insurer knew or should have known at the time, a settlement offer is such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to a judgment higher than the policy limits.

---

[6] *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 850 (Tex. 1994).

[7] *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, C.A. No. 3:10-CV-2048-D, n.10 (N.D. Tex. March 5, 2013) (citing references omitted) ("There is no per se requirement that an insurer know all, or even most, of the facts of the case in order to have a *Stowers* duty.").

## ABBREVIATED BACKGROUND: THE LIABILITY INSURANCE POLICY

### Twin City Fire Insurance Company



16.    The Hartford Financial Services Group, Inc. operates through subsidiaries under the brand name *The Hartford*. Twin City Fire Insurance Company ("Twin City") is one of those subsidiaries and uses *The Hartford* brand. It is part of the Hartford Fire & Casualty Group and is licensed to conduct multiple lines of insurance business in Texas.

### the named insureds

17.    Twin City issues a liability insurance policy under which named insureds include all the defendants in the earlier case:

---

[8] photograph credit: www.vacuumglassllc.com/the-hartford

| defendant insureds | abbreviated name |
|---|---|
| Southwest Housing Development Company, Inc. | SH Development |
| Affordable Housing Construction, Inc. | AH Construction |
| Southwest Housing Management Corporation, Inc. *a/k/a* and *d/b/a* Southwest Housing Management Company, Inc. | SH Management |
| Brian Potashnik | Brian |
| Cheryl Potashnik | Cheryl |

**control over defense and settlement**

18.     Twin City controls the defense of its insureds.[9] It also controls settlement of claims against its insureds. It forbids its insureds, under any circumstances, from entering any settlement agreement without its prior written consent:[10]

> **(C)** The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

---

[9] Policy Common Terms & Conditions § VII(A) ("The Insurer shall have the right and duty to defend any Claim for which the Insureds give notice to the Insurer, even if such Claim is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate."); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 846 (Tex. 1994) (describing this policy provision as giving insurance carrier control over the insured's defense).

[10] Policy Common Terms & Conditions § VII(C).

**deductible then $1 million eroding policy limits**

19.    The policy has a $75,000 deductible and a $1 million aggregate limit of liability.[11] Defense costs are part of that $1 million limit:[12]

> V.    **DEFENSE COSTS**
>
> Solely with respect to all **Liability Coverage Parts:**
>
> **(A)** **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

Once the deductible is met, policy limits erode toward zero with every penny of litigation costs and every dollar of attorneys' fees.[13]

**employment practices liability coverage**

20.    At the time, the policy has a relatively high premium for such low aggregate policy limits. The employment practices liability ("EPL") coverage may partially explain this. The EPL part of the policy covers what many other insurance policies do not[14] — such as punitive damages, intentional misconduct, failure to comply with implied employment agreements, and failure to comply with  oral employment agreements.

---

[11] Policy Declarations, Item 5: Liability Coverage Part Elections.

[12] Policy Common Terms & Conditions § VI(A).

[13] *Id.* & Policy Common Terms & Conditions § II(E).

[14] *See, e.g.,* L.D. Simmons, II & Lowndes C. Quinlan, *New Appleman on Insurance Law* § 28.02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

21.     Most other types of insurance policies — such as commercial general liability, auto, homeowners, errors and omissions, and directors and officers liability — do not cover these types of claims. But insurance companies developed and marketed EPL policies to cover gaps in other types of insurance policies.[15]

### duty to defend, duty to indemnify, and reservation of rights

22.     Policy premiums pay for two overarching forms of EPL coverage: (1) defense costs including attorneys' fees, and (2) liability for damages, also called indemnity. As to defense costs, Twin City owes the insureds a duty to defend. As to liability for damages, Twin City owes the insureds a duty to indemnify.

23.     In the earlier case, Twin City admits it has a duty to defend. After the defendant insureds meet the $75,000 deductible, Twin City defends under a reservation of rights on indemnity coverage. In the reservation of rights letter, Twin City wrongly claims lack of coverage on even dirt simple coverage issues, showing a lack of reasonable insurer conduct.

### ABBREVIATED BACKGROUND: FACTS
### TWIN CITY KNEW OR SHOULD HAVE KNOWN

24.     What follows is factual information Twin City knew, or should have known, at the time it rejected a reasonable settlement offer within policy limits.

---

[15] *See* Jeffrey W. Stemple, *Law of Insurance Contract Disputes* § 21.06, at 21-47 to 21-48.

**nature of insureds' business**

25.    The defendant insureds are in the affordable housing industry throughout Texas and a few other states. They work together to (1) develop or acquire sites for affordable housing communities, (2) construct new affordable housing units, and (3) manage continuing operation of the affordable housing community properties.



16

**decision to sell business, oral 3% pay-to-stay agreement**

26.    Brian and Cheryl Potashnik decide to sell their business. Brian — the highest-level person over all business entities — promises lucrative additional pay to executive Jeff Carpenter if Jeff will stay on to help make the asset sale happen. There will be a lot more work, such as due diligence and working to retain other important employees in the interim

---

16 Potter's House at Primrose Senior Housing, photograph credit: www.apartment-guide.com/apartments/Texas/Dallas/Potters-House-at-Primrose-Senior-Housing/156183/

before any asset sale happens. Other than the Potashniks, Jeff will be the most important person to effectuate the sale and will often serve as the "face" of the companies.

27.     Once a letter of intent to sell assets is signed, Brian offers Jeff 3% of net proceeds from the asset sale if Jeff will continue to stay on as long as needed to help make the asset sale happen. The 3% is the total of: gross asset sale revenue to sellers, less normal closing costs, less sales proceeds bonuses paid to other employees [latter pay-to-stay incentives to be decided by Jeff]. They estimate the 3% deal at just over $1 million. The agreement is oral. They shake hands on the deal.

28.     Jeff stays on as long as needed. He delays start at a new job to stay on. He knows he will not have a job with the asset purchaser because the purchaser already has someone in his position. An asset sale agreement goes forward. The anticipated asset sale price is around $37 million. A separate agreement is signed to transfer asset management to the purchaser — including management of the affordable housing community properties. At that point, Brian and Cheryl inform their executive Jeff that he has completed his end of the bargain in staying on and is no longer needed.

### criminal investigation of owners<br>and importance of pay-to-stay deal

29.     Before the decision to sell the business, the FBI raids the business and criminally investigates Brian and Cheryl Potashnik. The Potashniks deny any criminal wrongdoing. Employees including Jeff believe and trust them. Logically, preventing employee

<mark>mass exodus due to the criminal investigation, coupled with the potential sale of the business, is important to attracting buyers for any actual sale of the business.</mark> Logically, preventing mass exodus of key employees like Jeff is even more important.

### failure to comply with oral 3% deal and motive for doing so

30.     Once Brian and Cheryl confirm that Jeff kept his end of the bargain and will no longer be needed or employed, they quickly back off the oral 3% deal. They've recently been indicted on criminal charges. They're concerned about the asset sale and whether they will have enough money left over to fund their own criminal defense.



---

[17] Photograph credit of Brian and Cheryl outside federal courthouse: Paul O'Donnell, published in the *The Dallas Morning News*, March 19, 2012.

31.    Brian says to Jeff in part:

Um, and as far as our agreement goes, where we compensate you, as we promised, it's gonna depend on where we end up in all of this.

\*\*\*

I mean, I'm telling you that we're, we're going to dig ourselves out of this thing and then hopefully, you know, at the end of the day, get something out of it from Cascade [asset purchaser] and get the deal closed and pay the costs that we have to defend ourselves [in criminal proceedings] and have money left over so that we can, you know, give you a bonus, …

\*\*\*

I mean, you have Cheryl and I both committed to you that when things work themselves out that there will be a bonus if there's anything there at the end of the day that we have where we can you know, actually give out bonuses …

\*\*\*

I mean, and, you know, it sucks because obviously, at this point, we thought we'd have everything closed and that we would have some money. Um, we didn't think we would get, you know, would have been indicted. You know, I've been hearing for two years plus from Mike Uhl [criminal defense attorney] that you're not gonna get indicted, don't worry. They don't have a case. They don't have a case. You know.

\*\*\*

It's a cluster fuck is what it is. And that's the whole problem right now. We just have no idea where this thing is going to uh, to settle out, you know. And I have the additional pressure, as does Cheryl on top of it, of not knowing where we're going to end up. You know, in our own lives personally and being separated as a family, God forbid and you know, I mean, I just don't uh, I don't know what to tell you.

\*\*\*

We're, we're just trying to pay bills – trying to stay out of prison. I mean, what more can I tell you?

32.     Cheryl also does not appear to know or care that Texas enforces oral agreements and says to Jeff in part:

> You have conversations that we've had. You have intentions that we've had. You have what we intend to do and what we wanna do. You don't have any rights.
>
> ***
>
> So, you know, at the end of the day, you could not, you know, $37 million [asset sale price] goes like that. You know, it sounds like a lot of money, but on the business side and with all the contingent liability. You know, it's scary.
>
> ***
>
> You know it looked one way July 15th or June 15th whenever, I don't remember the exact time frame. But, you know, anticipating another six months of overhead and all the obligations that go along with it um, you know, it really starts to eat away at what's gonna be left.
>
> ***
>
> You know, and then it was like when, when we got indicted all of a sudden it was like oh my God. (inaudible 8:19 – 8:30) But, you know, there's just so much concern about what everybody's gonna do an how they're gonna react.

**lawsuit, insured defendants' loss on summary judgment**

33.     During the earlier case, the defendant insureds filed motions for summary judgment — a total of at least 4 motions for summary judgment. They claimed there was no evidence sufficient for a jury to return a verdict in Jeff's favor. The Court denied the motions.

**reasonable settlement offer within policy limits,**
**Twin City rejection, and consequences for insureds**

34.     Twin City receives a reasonable settlement offer within policy limits. The settlement offer is within coverage, within policy limits, and offers an unconditional and

full release of all insureds on all claims. The defendant insureds request and instruct Twin City to accept the offer.

35.     Twin City also receives warnings about common mistakes in *Stowers* evaluations, an extensive written coverage analysis showing that the oral handshake agreement claim [among others] is clearly covered, and additional information.

36.     After multiple extensions of time to consider the *Stowers* settlement offer, Twin City rejects the *Stowers* settlement offer and offers nothing to resolve the case — *i.e.*, zero. The highest settlement offer from the defense through multiple pretrial mediations is $100,000. The jury returns a verdict in favor of Jeff against four insureds for past earned wages due under an oral agreement. The jurors refer to this as the 3% deal. After a bench trial on attorneys' fees, the trial court renders a judgment that now exceeds $2 million. The defendant insureds appeal to the Fifth Court of Appeals and the Texas Supreme Court but are not successful.

37.     Twin City had the right under Texas law to seek a declaration on coverage before the harm occurred[18] — rejection of the *Stowers* offer and denial of coverage. The purpose is to clarify the parties' rights *before* harm occurs.[19] Twin City had about five years

---

[18] Tex. Civ. Prac. Rem. Code § 37.004(b) ("A contract may be construed either before or after there has been a breach.").

[19] *See* Tex. Civ. Prac. Rem. Code § 37.008 ("The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy

to do so before the *Stowers* offer. It chose not to do so. It ignored coverage analysis provided to it. It rejected a full-release settlement offer within policy limits. It instead exposed its insureds to a multi-million-dollar final judgment that was more than 3 times the settlement offer. It chose to exhaust its policy limits on an unsuccessful defense rather than a full-release settlement. Its policy limits are now zero. Its later conduct also shows lack of reasonableness, intent, and motive.

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF *STOWERS* DUTY

38.     The above allegations are incorporated herein.

39.     Jeff has standing to bring this claim pursuant to a turnover order.

40.     Twin City received and rejected a reasonable settlement offer, such that an ordinarily prudent insurer would accept the settlement offer, considering the likelihood and degree of the insureds' potential exposure to a judgment higher than the policy limits.

41.     The oral handshake agreement claim against the insureds [among others] was within the scope of policy coverage.

42.     The settlement offer was within policy limits and included a full release of all insureds on all claims.

---

giving rise to the proceeding.'').

43.    The insureds agreed to dismiss their counterclaims and instructed Twin City to accept the settlement offer.

44.    The jury verdict and judgment resulted in covered damages far higher than policy limits.

45.    This petition seeks all foreseeable damages to the insureds as a result of the *Stowers* violation, including but limited to the amount of the judgment in excess of policy limits.

### EQUITABLE RELIEF

46.    Due to apparent systemic problems at Twin City, there is a reasonable likelihood that Twin City practices will result in noncompliance with the *Stowers* duty in the future. Twin City has not taken steps to show that it is unlikely to violate the law in the future.

### PUNITIVE DAMAGES

47.    The harm Twin City caused to its insureds resulted from malice or gross negligence. *Malice* means a specific intent to cause substantial injury or harm to the insureds. *Gross negligence* means an act or omission by Twin City:

(1) which when viewed objectively from the standpoint of Twin City at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(2) of which Twin City has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

48.     Twin City was actually aware that the foreseeable consequences of its conduct could or would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of an insurance claim — such as death, grievous physical injury, or financial ruin.

## CONDITIONS PRECEDENT

49.     All conditions precedent to filing suit and to recovery on the asserted claims have occurred, been performed, or been waived.

## JURY DEMAND

50.     Jeff requests a jury trial on all issues triable of right or choice by a jury.

## NO FEDERAL CLAIMS

51.     Jeff does not assert any claim, cause of action, or request for relief under any federal law in this original petition.

## REMEDIES REQUESTED

52.     Texas Rule of Civil Procedure 47 requires an original petition to select among specified ranges of potential relief. This original petition selects the range in Texas Rule of Civil Procedure 47(c)(4). This range may change over time. Jeff is free to suggest more or

less based on the evidence. The jury is free to find more or less at trial based on the evidence.

53.     This is because the rule is just meant to identify any expedited actions and the nature of the case at the time of filing. The rule does not affect a party's substantive rights.

54.     Jeff respectfully requests all appropriate legal and equitable remedies that may be available to him, including:

   A.     judgment on the *Stowers* claim asserted herein;

   B.     upon a finding that Twin City violated the *Stowers* duty, appropriate injunctive relief prohibiting Twin City from engaging in the systemic insurance practices that led to the violation — with the specifics to be tailored to the systemic problems, deficiencies, and gaps that the evidence shows;

   C.     the following additional equitable relief as may be appropriate:

      (1) requiring Twin City to provide training and otherwise modify its insurance practices in a way that reduces the risk of future violations of the *Stowers* duty — with the specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows;

      (2) ordering all non-monetary equitable relief that may be appropriate to remedy the harm from a *Stowers* violation;

   D.     all damages that the *Stowers* violation proximately caused;

   E.     punitive damages as may be appropriate under Texas law;

   F.     costs under the Texas Rules of Civil Procedure;

   G.     prejudgment interest as allowed by law;

Appendix 0049

H.      postjudgment interest as allowed by law.


Respectfully submitted,


*/s/ Amy Gibson*

_____

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jeff Carpenter*

Appendix 0050

# Appendix Exhibit 4

# Second Amended Answer and Affirmative Defenses [ECF No. 18]

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-00769-N |
| | § | |
| TWIN CITY FIRE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| *Defendant.* | § | |

**DEFENDANT TWIN CITY FIRE INSURANCE COMPANY SECOND AMENDED
ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S ORIGINAL PETITION**

Twin City Fire Insurance Company ("Twin City") files its Second Amended Answer and

Affirmative Defenses to Plaintiff's Original Petition (Doc. 1-2).

**FIRST AMENDED ANSWER**

1.     Twin City denies that discovery will be conducted under Level 3 of the Texas Rules

of Civil Procedure as asserted in paragraph 1 since the case has been removed to federal court.

2.     Twin City denies that this is a related case for purposes of the Dallas County local

rules as alleged in paragraph 2. Regardless, that rule is not applicable due to the removal to federal

court.

3.     Twin City denies that it the settlement offer was reasonable as alleged in the first

sentence of paragraph 3. Twin City admits that the policy was eroding as alleged in the second

sentence of paragraph 3. Twin City admits the state court entered an adverse verdict against the

defendants in an amount that exceeded the remaining policy limits as indicated in the third sentence

of paragraph 3.

4.     Twin City admits the allegations in paragraph 4 with the exception of the phrase

"associated rights and privileges" which is vague and therefore denied.

EX
A

Appendix 0052

5.      Twin City admits the allegations in paragraph 5.

6.      Twin City admits the allegations in paragraph 6.

7.      Twin City denies the state court jurisdictional allegations in paragraph 7 as this case has been removed to federal court.

8.      Twin City admits it is subject to personal jurisdiction in Texas as alleged in paragraph 8.

9.      Twin City denies the venue allegations in the first sentence of paragraph 9 as this case has been removed to federal court. Twin City denies the allegations in the second sentence of paragraph 9. Twin City admits the allegations in the third sentence of paragraph 9.

10.     To the extent paragraph 10 contains Plaintiff's interpretation of case law and/or legal conclusions, no response is required. To the extent an answer is required, Twin City denies the allegations because they are not a complete and accurate statement of the law. By way of example, no *Stowers* duty arises where, as here, the claim is not covered by the policy.

11.      To the extent paragraph 11 contains Plaintiff's interpretation of case law and/or legal conclusions, no response is required. To the extent an answer is required, Twin City denies the allegations because they are not a complete and accurate statement of the law. By way of example, no *Stowers* duty arises where, as here, the claim is not covered by the policy.

12.     Paragraph 12 appears to be a series of hypothetical questions rather than allegations that are subject to admissions or denials. Further, to the extent paragraph 12 contains allegations rather than hypothetical questions, they appear to involve Plaintiff's interpretation of case law and/or legal conclusions, no response is required. To the extent an answer is required, Twin City denies the allegations because they are not a complete and accurate statement of the law. By way of example, no *Stowers* duty arises where, as here, the claim is not covered by the policy.

Appendix 0053

13.     To the extent paragraph 13 contains Plaintiff's interpretation of case law and/or legal conclusions, no response is required. To the extent an answer is required, Twin City denies the allegations because they are not a complete and accurate statement of the law. By way of example, no *Stowers* duty arises where, as here, the claim is not covered by the policy.

14.     To the extent paragraph 14 contains Plaintiff's interpretation of case law and/or legal conclusions, no response is required. To the extent an answer is required, Twin City denies the allegations because they are not a complete and accurate statement of the law. By way of example, no *Stowers* duty arises where, as here, the claim is not covered by the policy.

15.     To the extent paragraph 15 contains Plaintiff's interpretation of case law and/or legal conclusions, no response is required. To the extent an answer is required, Twin City denies the allegations because they are not a complete and accurate statement of the law. By way of example, no *Stowers* duty arises where, as here, the claim is not covered by the policy.

16.     Twin City admits the first and second sentences of paragraph 16. Twin City denies it is part of the Hartford Fire & Casualty Group, but admits the remaining allegations.

17.     Twin City admits the allegation in paragraph 17.

18.     The first and second sentences of paragraph 18 are vague and ambiguous as it is not known what Plaintiff means by "control," "its insureds," and "any circumstance." As such, Twin City denies the allegations. The quoted language from the policy appears accurate, so Twin City admits the allegations in that respect.

19.     Twin City admits that the Employment Practices Liability ("EPL") coverage part in the insurance policy issued to Southwest Housing Management has deductible and limit alleged in paragraph 19, but denies that other coverage parts have the same deductibles and limits. Twin City admits that the policy is an eroding policy as alleged in paragraph 19 but denies the remaining allegations in that paragraph.

3

Appendix 0054

20.   Twin City denies the allegation in paragraph 20.

21.   Twin City can neither admit nor deny the allegations in paragraph 21 as it avers no specific allegations towards any of Twin City's conduct or any facts pertinent to the claims made the basis of this lawsuit. To the extent necessary, Twin City denies the allegations in paragraph 21.

22.   Twin City can neither admit nor deny the allegations in the first sentence of paragraph 22 as it avers no specific allegations towards any of Twin City's conduct or any facts pertinent to the claims made the basis of this lawsuit. Further, it is unclear whether Plaintiff's allegations target the underlying defendants or encompass all of Twin City's insureds. The duty to defend and the duty to indemnify are determined on a case-by-case basis. To the extent a response is required, Twin City admits it owed a duty to defend the defendants in the underlying case, but Twin City denies it owed a duty to indemnify because the claim is not covered by the policy.

23.   Twin City admits the allegation in paragraph 23 that it had a duty to defend, but otherwise denies the allegations in that paragraph.

24.   Twin City can neither admit nor deny the allegations in paragraph 24 as it avers no specific allegations towards any of Twin City's conduct or any facts pertinent to the claims made the basis of this lawsuit. To the extent a response is required, Twin City denies the allegations in paragraph 24.

25.   Twin City admits that is was generally aware of the nature of the insureds' business as alleged in paragraph 25 but may not have known all of the particular details.

26.   Twin City admits the allegation in the first sentence of paragraph 26. Twin City denies the remaining allegations in paragraph 26 in light of paragraph 24.

27.   Twin City denies the allegations in paragraph 27 in light of paragraph 24.

28.     Twin City admits that it was aware that Plaintiff stayed with the company through the asset sale and that Plaintiff's employment with the company came to an end, but otherwise denies the allegations in paragraphs 28 in light of paragraph 24.

29.     Twin City admits that it was aware of a criminal investigation into the Potashniks and that employee retention was likely important to the company but otherwise denies the allegations in paragraph 29 in light of paragraph 24.

30.     Twin City denies the allegations in the first and third sentences of paragraph 30 in light of paragraph 24. Twin City admits that it was aware the owners were accused of the charges as alleged in the second sentence of paragraph 30.

31.     Twin City admits that it was aware that Plaintiff had general discussions with his employer about the employer paying unspecified amounts of discretionary bonuses as indicated in paragraph 31, though it denies that it was aware of all such discussions.

32.     Twin City denies the allegations in paragraph 32 in light of paragraph 24.

33.     Twin City admits the allegations in paragraph 33, according to the docket sheet in the Underlying Case.

34.     Twin City admits that Plaintiff made a settlement offer within policy limits that included a release and that counsel for the defendant asked that it be accepted but otherwise denies the allegations in paragraph 34, including that the offer was reasonable and within coverage. Plaintiff's claim is not covered.

35.     Twin City admits that that Plaintiff's counsel sent letters in support of the settlement demand but otherwise denies the allegations in paragraph 35.

36.     Twin City admits that Plaintiff extended the time to respond to the demand and that the demand was not accepted, but otherwise denies the allegations in the first sentence of paragraph

Appendix 0056

36.  Twin City denies the allegations in the second, third, and fourth sentences of paragraph 36. Twin City admits the allegations in the fifth and sixth sentences of paragraph 36.

37.   Twin City admits that it did not file a declaratory judgment action before Plaintiff issued its settlement demand as alleged in paragraph 37, but denies the remaining allegations.

38.   No response is required for paragraph 38 as it contains no allegations.  To the extent required, Twin City denies the allegations in paragraph 38 and reasserts its admissions and denials to set forth in paragraphs 2-37.

39.   Twin City is investigating Plaintiff's standing, as it was not involved the turnover proceedings. Accordingly, Twin City denies the allegations in paragraph 39.

40.   Twin City denies the allegations in paragraph 40.

41.   Twin City denies the allegations in paragraph 41.

42.   Twin City admits the allegations in paragraph 42.

43.   Twin City admits the allegations in paragraph 43.

44.   Twin City denies the allegations in paragraph 44.

45.   No response is required for paragraph 45 as it contains no allegations. To the extent required, Twin City denies Plaintiff is entitled to damages or relief of any kind.

46.   Twin City denies the allegations in paragraph 46. Twin City denies that Plaintiff is entitled to damages or relief of any kind.

47.   Twin City denies the allegations in Paragraph 47, including subparts (1)–(2). Twin City denies that Plaintiff is entitled to damages or relief of any kind.

48.   Twin City denies the allegations in paragraph 48.

49.    Twin City denies the allegations in paragraph 49. Specifically, Plaintiff has not established that the claims he asserted against the underlying defendants were covered under the

6

Appendix 0057

policy as a precondition to recovery. Further, Plaintiff has not established that he provided or forwarded a valid *Stowers* demand since his claims are not covered.

50.     Paragraph 50 is Plaintiff's jury demand to which no response is required.

51.     Twin City admits Plaintiff has not asserted a federal law claim as alleged in paragraph 51.

52.     To the extent that paragraph 52 contains Plaintiff's interpretation of a Texas Rule of Civil Procedure and legal conclusions, no response is required. To the extent a response is required, Twin City denies the allegations in paragraph 52. Twin City further denies that Plaintiff is entitled to damages or relief of any kind.

53.     To the extent paragraph 53 contains Plaintiff's interpretation of a Texas Rule of Civil Procedure and legal conclusions, no response is required. To the extent a response is required, Twin City denies the allegations in Paragraph 53.

54.     Paragraph 54 is Plaintiff's request for relief, to which no response is required. To the extent a response is required, Twin City denies that Plaintiff is entitled to the requested relief or any other relief from Defendant, including subparts A–H.

55.     Twin City denies all allegations not expressly admitted in its Answer and to which the Court deems a response necessary.

### AFFIRMATIVE DEFENSES

56.     Twin City specifically and affirmatively pleads that Plaintiff's claims are either not covered or are excluded. The Policy expressly provides that Twin City shall not pay for employment termination severance payments unless "such payments are negotiated with and consented to by [Twin City] as part of a settlement." Trial testimony in the underlying case from both Plaintiff and Twin City's insureds firmly established that the payment to which Plaintiff claims he is entitled was a severance payment, which is unambiguously excluded, despite

7

Appendix 0058

Plaintiff's attempts to mischaracterize the severance payment as a "stay bonus."  Further, Twin City clearly never negotiated or consented to pay Plaintiff's severance payment as part of a settlement.

57.     Twin City specifically and affirmatively pleads that Plaintiff's claims are either not covered losses or the alleged losses are excluded. Specifically, under the Policy, Twin City agreed to pay "Loss," which includes defense costs when the insured is confronted with a written demand for monetary damages. But under no circumstance is Twin City obligated to fund bonus agreements its insured makes with its employee. That would create a classic uninsurable moral hazard. To be sure, the Policy's definition of "Loss" expressly excludes: " salaries,   wages,   or bonuses, except as a component of a front or back pay award." Obviously, the jury's award of contract damages for the unpaid bonus is not "back pay"—an equitable remedy in employment discrimination cases. In the underlying lawsuit, the phrase "back pay" is not mentioned in the jury charge; it is not mentioned in the jury verdict; it is not mentioned in the final judgment; it is not mentioned in the parties' appellate filings; and it is not mentioned in the court of appeals' opinion.

58.     Twin City specifically and affirmatively asserts Plaintiff's claims are not within the scope of coverage afforded under Policy No. KB 0229269 ("Policy") or are excluded from coverage under the Policy. Therefore, no *Stowers* duty was ever triggered as a matter of law.

59.     Plaintiff failed to provide or forward an adequate *Stowers* demand to Twin City because Plaintiff's claims in the underlying case were not covered claims.  Therefore, no *Stowers* duty was ever triggered as a matter of law.

60.     Plaintiff has failed to comply with one or more provisions of the Policy that serve as a condition precedent to recovery. These failures include but are not limited to showing a loss within the coverage of the Policy.

Appendix 0059

61.     Twin City specifically and affirmatively pleads that Plaintiff's claims do not meet the definition of "Loss" under the Policy and are therefore not covered claims.

62.     Twin City specifically and affirmatively pleads that Plaintiff's claims for an underpaid severance package are not covered as a "Loss" or "Defense Cost" under the Policy.

63.     Twin City specifically and affirmatively pleads that Plaintiff's claims are precluded by the moral hazard risk and public policy.

64.     If the turnover order is enforceable, Twin City specifically and affirmatively pleads that Plaintiff lacks standing to any claim other than a common law *Stowers* claim, and thus lacks standing to assert any claim for punitive damages, claims for injunctive relief, or any equitable relief. Plaintiff is a stranger to the insurance contract between the underlying defendants and Twin City and is not in privity of contract with Twin City. Plaintiff's claims have no basis in law or fact and should be dismissed.

65.     Twin City invokes all rights, privileges, protections, and immunities contained within Chapter 41 of the Texas Civil Practices and Remedies Code. Twin City specifically denies and disputes each and every allegation of gross negligence and denies that Plaintiff is entitled to an award of punitive or exemplary damages from Twin City.

66.     Twin City reserves the right to amend this Answer to plead additional affirmative defenses as discovery proceeds in the case.

### CONCLUSION

For these reasons, Defendant Twin City Fire Insurance Company respectfully requests that the Court enter judgment that Plaintiff take nothing, the Court assess costs against Plaintiff, and the Court award Twin City all other relief to which it is entitled.

9

Appendix 0060

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.


By: */s/Christine Kirchner*
    CHRISTINE KIRCHNER
    State Bar No. 00784403
    c.kirchner@chamberlainlaw.com
    STEVEN J. KNIGHT
    State Bar No. 24012975
    steven.knight@chamberlainlaw.com
    CHRIS M. LEMONS
    State Bar No. 24094799
    chris.lemons@chamberlainlaw.com
    CHAMBERLAIN, HRDLICKA, WHITE,
      WILLIAMS & AUGHTRY, P.C.
    1200 Smith Street, Suite 1400
    Houston, Texas 77002
    (713) 658-1818

COUNSEL FOR TWIN CITY FIRE INSURANCE COMPANY


    MICHAEL W. JOHNSTON
    State Bar No. 10840300
    johnston@johnstonlegalgroup.com
    JOHNSTON LEGAL GROUP P.C.
    1616 Wabash Avenue
    Fort Worth, Texas 76107-6598
    (817) 820-0825

LOCAL COUNSEL FOR TWIN CITY FIRE INSURANCE
COMPANY

10

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record via facsimile, hand delivery, electronic mail, and/or certified mail on June 9, 2023 as follows:

Amy E. Gibson
amy@gwfirm.com
David L. Wiley
david@gwfirm.com
**GIBSON WILEY PLLC**
1500 Jackson Street # 109
Dallas, Texas 75201

*/s/Christine Kirchner*
Christine Kirchner

11

Appendix 0062

# Appendix Exhibit 5

# Twin City insurance policy excerpts

These excerpts constitute the complete employment practices liability insurance agreement. These excerpts exclude irrelevant coverage parts like kidnapping and ransom.

Endorsement No.:  14

This endorsement, effective on          3/04/08          at 12:01 A.M. standard time, forms a part of

Policy No.   00 KB 0229269-07          of the   TWIN CITY FIRE INSURANCE CO.

Issued to   SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLICY CHANGE

| | | | | | |
|---|---|---|---|---|---|
| 1. | ☐ | Policy Premium Changed To: $ | 9. | ☐ | Deductible/Retention Changed To: |
| 2. | ☐ | Insured's Name Changed To: (see description or endorsement listed below) | 10. | ☒ | Expiration Date Is Changed To:   05/05/2008 |
| 3. | ☐ | Insured's Address Changed To: (see description or endorsement listed below) | 11. | ☐ | Additional Insured(s) or Subject(s) of coverage deleted |
| 4. | ☐ | Anniversary Date Is Changed To: | 12. | ☐ | Policy Provision(s) Added |
| 5. | ☐ | Additional Insured(s) or Subject(s) of coverage added | 13. | ☐ | Policy Provision(s) Deleted |
| 6. | ☒ | Additional Premium: $ 5,730 | 14. | ☐ | Exercise Discovery Period, Extended Reporting Period or Tail Coverage Option |
| 7. | ☐ | Return Premium: $ | 15. | ☐ | Other (see description or endorsement listed below) |
| 8. | ☐ | Limit of Liability Changed To: $ | | | |

**Description of Policy Changes:**

IT IS HEREBY AGREED AND UNDERSTOOD THAT EFFECTIVE 03/04/2008 THE POLICY IS EXTENDED TO 05/05/2008 FOR AN ADDITIONAL PREMIUM OF $5,730.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Name and number of Endorsement(s) made part of the policy:**

© 2002, The Hartford

Appendix 0064



# Hartford Financial Products

### Policy Separator Page

| | |
|---|---|
| **Insured Name:** | SOUTHWEST HOUSING MANAGEMENT |
| **Policy Number:** | KB 0229269 |
| **Effective Date:** | 3/04/2007 |
| Department: | H53     MIDDLE MARKET CORE BUSINESS |
| Underwriter: | SUSAN CARLEY |
| Job User: | Barber, Billie |
| Job Number: | 570289 |
| Job Name: | EPLPRINT |
| Date Printed: | 3/08/2007       14:33:30 |



THE
HARTFORD

Date:   MARCH 8, 2007

        LORRAINE A KEHM
        LOCKTON COMPANIES OF COLORADO,
        INC.
        8110 EAST UNION AVE
        SUITE 700
        DENVER, CO 80237-2984

**RE**:   SOUTHWEST HOUSING MANAGEMENT

        **POLICY NUMBER**:   00 KB 0229269-07   3/04/2007

Dear   LORRAINE,

Enclosed please find an original and your copy of the policy for the above captioned account.

Thank you very much.

Sincerely,

SUSAN CARLEY

Enclosures

RN 00 R055 00 1098

TWIN CITY FIRE INSURANCE CO.
INDIANAPOLIS, IN 46268-0930
,

a stock insurance company, herein
called the Insurer



# PRIVATE CHOICE ENCORE! POLICY

## DECLARATIONS

**Policy Number:**      00 KB 0229269-07

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5: LIABILITY COVERAGE PARTS ELECTIONS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE, PROVIDED THAT SUCH NOTICE IS GIVEN NOT LATER THAN 60 DAYS AFTER ANY MANAGER BECOMES AWARE THAT SUCH CLAIM HAS BEEN MADE. DEFENSE COSTS ARE APPLIED AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**ITEM 1: Named Entity and Address:**

SOUTHWEST HOUSING MANAGEMENT
5910 NORTH CENTRAL EXPRESSWAY
SUITE #1145
DALLAS, TX 75206

**ITEM 2: Producer's Name and Address:**

81227
LOCKTON COMPANIES OF COLORADO,
INC.
8110 EAST UNION AVE
DENVER, CO 80237-2984

**ITEM 3: Policy Period:**

**(A)**   Inception Date:          3/04/07

**(B)**   Expiration Date:         3/04/08
12:01 a.m. local time at the address shown in ITEM 1

**ITEM 4: Premium:**          $33,706

**ITEM 5:** **Liability Coverage Part Elections:**

Only those Coverage Parts and Coverage Features that are designated with an "X" are included under this Policy

☐ Combined Aggregate Limit of Liability For All Coverage Parts $ ___N/A___

☐ Defense Outside the Limit of Liability

| COVERAGE PART | AGGREGATE LIMIT OF LIABILITY | DEDUCTIBLE | PRIOR OR PENDING DATE | COVERAGE FEATURES |
|---|---|---|---|---|
| ☐ Directors, Officers and Entity Liability | $ NOT COVERED | Insured Person Liability $ 0 <br><br> Corporate Reimbursement $ NOT COVERED | NOT COVERED | ☐ **Entity Liability Coverage** Deductible: $ NOT COVERED <br> Prior or Pending Date: NOT COVERED |
| ☒ Employment Practices Liability | $ 1,000,000 | $ 75,000 | 03/04/06 | ☐ **Third Party Liability Coverage** Sublimit of Liability: $ NOT COVERED <br> Deductible: $ NOT COVERED <br> Prior or Pending Date: NOT COVERED |
| ☒ Fiduciary Liability | $ 1,000,000 | $ 2,500 | 03/04/06 | ☒ **Settlement Program Coverage** Deductible: $ 0 <br> Prior or Pending Date: 03/04/06 |
| ☐ Miscellaneous Professional Liability | $ NOT COVERED | $ NOT COVERED | NOT COVERED | ☐ Retroactive Date: NOT COVERED |

**ITEM 6:** **Non-Liability Coverage Part Elections:**

Only those Coverage Parts that are designated with an "X" are included under this Policy

| COVERAGE PART | LIMIT(S) OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| ☒ Crime | See Crime Coverage Part Dec. Page, Form No. PE00H11701 0904 | See Crime Coverage Part Dec. Page, Form No. PE00H11701 0904 |
| ☒ Kidnap and Ransom/Extortion | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. PE00H17101 0904 | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. PE00H17101 0904 |

Appendix 0068

**ITEM 7:**  **Extended Reporting Period:**

    **(A)** Duration:      12 MONTHS

    **(B)** Premium*:      100%

    * Premium for the Extended Reporting Period elected shall be the indicated percentage of the sum of the annual premium specified for all Liability Coverage Parts, plus the annualized amounts of any additional premiums charged during the Policy Period.

**ITEM 8:**  **Endorsements:**

    This Policy includes the following endorsements at issuance:

    SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**ITEM 9:**  **Address For Notices to Insurer:**

| For Claims other than Kidnap and Ransom/Extortion: | For all notices other than Claims: |
|---|---|
| The Hartford | The Hartford |
| Claims Department | Compliance Department |
| Hartford Financial Products | Hartford Financial Products |
| 2 Park Ave., 5th Floor | 2 Park Ave., 5th Floor |
| New York, New York 10016 | New York, New York 10016 |

For Kidnap and Ransom/Extortion Claims see Kidnap and Ransom/Extortion Coverage Part Declarations.

This Policy shall not be valid unless countersigned by the Insurer's duly authorized representative.

**Date of Issue:** _____    **Countersigned by:** _____

                                                           **Authorized Representative**

Appendix 0069

# PRIVATE CHOICE ENCORE! POLICY
## CRIME COVERAGE PART DECLARATIONS



In return for the payment of the premium, and subject to all the terms of this Coverage Part, we agree with you to provide the insurance stated in this Coverage Part.

**1.    Coverages, Limits of Insurance and Deductibles:**
Insuring Agreements, Limits of Insurance and Deductible Amounts shown below are subject to all of the terms of this Coverage Part that apply.

| Insuring Agreements Forming Part of This Coverage Part | Limit(s) of Insurance | Deductible Amount(s) |
|---|---|---|
| 1.   Employee Theft | $ 1,000,000 | $ 25,000 |
| 2.   Depositors Forgery or Alteration | $ 1,000,000 | $ 25,000 |
| 3.   Inside The Premises - *Money, Securities and Other Property* | $ 1,000,000 | $ 25,000 |
| 4.   Outside The Premises - *Money, Securities and Other Property* | $ 1,000,000 | $ 25,000 |
| 5.   Computer and Funds Transfer Fraud | $ 1,000,000 | $ 25,000 |
| 6.   Money Orders and Counterfeit Currency | $ 50,000 | $ 0 |

**2.    Cancellation of Prior Insurance:** By acceptance of this Coverage Part you give us notice canceling prior policies or bonds numbered _____N/A_____. The cancellation(s) is effective at the time this Coverage Part becomes effective.

**3.    Form Numbers of Endorsements Forming Part of This Coverage Part When Issued:**

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

00 KB 0229269-07    3/04/07

Appendix 0070

# PRIVATE CHOICE ENCORE! POLICY
## KIDNAP AND RANSOM/EXTORTION COVERAGE PART
## DECLARATIONS



**THE HARTFORD**

In return for the payment of the premium, and subject to all the terms of this Coverage Part, we agree with you to provide the insurance stated in this Coverage Part.

**1.  Coverages, Limits of Insurance and Deductibles:**
Insuring Agreements, Limits of Insurance and Deductible Amounts shown below are subject to all of the terms of this Coverage Part that apply.

| Insuring Agreements Forming Part of This Coverage Part | Limit(s) of Insurance | Deductible Amount(s) |
|---|---|---|
| A.  Kidnap/Ransom/Extortion | $  1,000,000 | $  0 |
| B.  Expense | $  1,000,000 | $  0 |
| C.  Custody/Delivery | $  1,000,000 | $  0 |
| D.  Personal Accidental Death, Dismemberment & Disability Loss | | |
| (i)  Loss of Extremity | $  250,000 | $  0 |
| (ii)  All Other Personal Accidental Death, Dismemberment & Disability Loss | $  500,000 | $  0 |
| Coverage Part Limit of Insurance (Maximum Limit of Insurance for all loss under this Coverage Part): | $  N/A | |

**2.  Independent Security Consultant:**        Control Risks Group

**3.  Notice under Section IV. General Agreements, (B) Conditions Precedent to Liability must be addressed to the Insurer's Independent Security Consultant:**

Control Risks Group
1600 K Street, NW
Suite 1600
Washington, DC 20006
Telephone (202) 449-3330 (main number – 9:00am-5:00pm EST)
011 44 20 7481 1851 (emergency number, London, England)
011 44 20 7970 2100 (main number, London, England)

(All Control Risks Group phone numbers accept collect calls.)

and to:

The Hartford
Attn: Joseph Coppola
Hartford Financial Products
Claims Department – Middle Market
2 Park Ave., 5th Floor
New York, New York  10016
212-277-0970

**4.  Form Numbers of Endorsements Forming Part of This Coverage Part When Issued:**

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**5.  Cancellation of Prior Insurance:** By acceptance of this Coverage Part you give us notice canceling prior policies or bonds numbered ____N/A____. The cancellation(s) is effective at the time this Coverage Part becomes effective.

PE 00 H171 01 0904   00 KB 0229269-07   3/04/07   © 2004, The Hartford                    Page 1 of 1

Appendix 0071

GU 207
(6-78)

# ENDORSEMENT

This endorsement, effective on   3/04/07                    at 12:01 A.M. standard time, forms a part of

Policy No.  00 KB 0229269-07        of the        TWIN CITY FIRE INSURANCE CO.

Issued to   SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

### SCHEDULE OF FORMS AND ENDORSEMENTS

|    |           |       |                                                                              |
|----|-----------|-------|------------------------------------------------------------------------------|
|    | RN00N02600 | 5/93  | IN WITNESS PAGE                                                             |
|    | PE00H01202 | 9/04  | PRIVATE CHOICE ENCORE! POLICY                                               |
|    | PE00H01400 | 5/02  | EMPLOYMENT PRACTICES LIABILITY COVERAGE PART                               |
|    | PE00H01500 | 5/02  | FIDUCIARY LIABILITY COVERAGE PART                                          |
|    | PE00H11801 | 9/04  | CRIME COVERAGE PART                                                         |
|    | PE00H17201 | 9/04  | KIDNAP AND RANSOM/EXTORTION COVERAGE PART                                   |
| 1  | PE00H07401 | 8/05  | ADD SUBSIDIARY ENDORSEMENT                                                  |
| 2  | PE00H11100 | 3/04  | HIPAA COVERAGE (INCLUDING SUBLIMIT FOR PENALTIES)                          |
| 3  | PE00H12800 | 4/04  | JOINT INSURED                                                               |
| 4  | PE00H16000 | 4/04  | JOINT VENTURE, GENERAL PARTNERSHIP, LIMITED PARTNERSHIP OR LIMITED LIABILITY COMPANY |
| 5  | PE00H17500 | 4/04  | AMEND TERRITORY                                                             |
| 6  | PE00H24300 | 11/05 | ENCORE! PLUS ENDORSEMENT (COMMON TERMS AND CONDITIONS)                     |
| 7  | PE00M02400 | 9/04  | SPECIFIC INDIVIDUAL CLAIMANT EXCLUSION                                      |
| 8  | PE42H05201 | 5/04  | TEXAS AMENDATORY - COMMON TERMS AND CONDITIONS ENDORSEMENT                 |
| 9  | PE42H08800 | 5/04  | TEXAS NUCLEAR LIABILITY EXCLUSION                                           |
| 10 | PE00H24700 | 1/06  | AMEND EMPLOYEE BENEFIT PLANS PROVISIONS                                     |
| 11 | PE00H23900 | 4/05  | GENETIC MAKEUP ENDORSEMENT                                                  |
| 12 | HR42H00300 | 6/05  | TEXAS CANCELLATION AND NONRENEWAL ENDORSEMENT                              |

Rev. Ed. Date (04/02)
GU 207 (6-78)

Appendix 0072

**GU 207**
**(6-78)**

# ENDORSEMENT

This endorsement, effective on   3/04/07   at 12:01 A.M. standard time, forms a part of

Policy No.   00 KB 0229269-07   of the   TWIN CITY FIRE INSURANCE CO.

Issued to   SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

SCHEDULE OF FORMS AND ENDORSEMENTS

| 13 | PE42H17700 | 9/04 | TEXAS CHANGES |
| | HG00H05600 | 4/06 | IMPORTANT NOTICE TO POLICYHOLDERS - TERRORISM RISK INSURANCE ACT |
| | RN42N01400 | 1/93 | IMPORTANT NOTICE |
| | RN42R03001 | 10/98 | TEXAS NOTICE |

Rev. Ed. Date (04/02)
GU 207 (6-78)

Appendix 0073

# PRIVATE CHOICE ENCORE! POLICY

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5: COVERAGE ELECTIONS PROVIDES CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE, PROVIDED THAT SUCH NOTICE IS GIVEN NOT LATER THAN 60 DAYS AFTER ANY MANAGER BECOMES AWARE THAT SUCH CLAIM HAS BEEN MADE. DEFENSE COSTS ARE APPLIED AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

## COMMON TERMS AND CONDITIONS

**I.      TERMS AND CONDITIONS**

(A)   All Coverage Parts included in this Policy are subject to the following Common Terms and Conditions. If any provision in these Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

(B)   Except as otherwise provided by specific reference to other Coverage Parts, the terms and conditions of each Coverage Part shall apply only to such Coverage Part.

**II.     COMMON DEFINITIONS**

The following terms, whether used in the singular or plural, shall have the meanings specified below:

(A)   **"Affiliate"** means any insurance company controlling, controlled by or under common control with the Insurer.

(B)   **"Application"** means the application for this Policy, including any materials or information submitted therewith, such application shall be on file with the Insurer and deemed a part of and attached hereto, as if physically attached hereto. **"Application"** also means an application for any policy in an uninterrupted series of policies issued by the Insurer, or an **Affiliate**, of which this Policy is a renewal or replacement.

(C)   **"Claim"** shall have the meaning specified for such term in each Coverage Part.

(D)   **"Debtor in Possession"** means a "debtor in possession" as such term is defined in Chapter 11 of the United States Bankruptcy Code as well as any equivalent status under any similar law.

(E)   **"Defense Costs"** means reasonable and necessary legal fees and expenses incurred in the investigation, defense or appeal of a **Claim**. **Defense Costs** shall include the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds. **Defense Costs** shall not include salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**.

(F)   **"Employee"** means any past, present, or future:

(1)   employee of an **Insured Entity** in such person's capacity as an employee, including any part time, seasonal, temporary, leased, or loaned employee; or

(2)   volunteer with an **Insured Entity** in such person's capacity as a volunteer.

However, for purposes of the Crime Coverage Part, see the definition of **Employee** within the Crime Coverage Part, Section IV. DEFINITIONS, (D) Employee. For purposes of the Kidnap and

Appendix 0074

Ransom/Extortion Coverage Part, see the definition of **Employee** within the Kidnap and Ransom/Extortion Coverage Part, Section II. DEFINITIONS, (B) Employee.

**(G)** "**ERISA**" means the Employee Retirement Income Security Act of 1974.

**(H)** "**Financial Insolvency**" means the status of an **Insured Entity** as a result of:

    **(1)** the appointment of any conservator, liquidator, receiver, rehabilitator, trustee, or similar official to control, supervise, manage or liquidate such **Insured Entity**; or

    **(2)** such **Insured Entity** becoming a **Debtor in Possession**.

**(I)** "**Insured Entity**" means:

    **(1)** the **Named Entity**; or

    **(2)** any **Subsidiary**.

**Insured Entity** shall include any such entity as a **Debtor in Possession**.

**(J)** "**Insured Person**" shall have the meaning specified for such term in each Coverage Part.

**(K)** "**Insureds**" shall have the meaning specified for such term in each Coverage Part.

**(L)** "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

**(M)** "**Liability Coverage Part**" means the Directors, Officers and Entity Liability, Employment Practices Liability, Fiduciary Liability and Miscellaneous Professional Liability Coverage Parts, if included in ITEM 5 of the Declarations.

**(N)** "**Loss**" shall have the meaning specified for such term in each Coverage Part.

**(O)** "**Manager**" means any natural person who is a past, present or future:

    **(1)** duly elected or appointed director, officer, member of the board of managers or management committee member of an **Insured Entity;**

    **(2)** in-house general counsel of an **Insured Entity;** or

    **(3)** executive of an **Insured Entity** created outside the United States of America to the extent that such executive holds a position equivalent to those described in (1) or (2),

For purposes of the Kidnap and Ransom/Extortion Coverage Part, see the definition of **Manager** within the Kidnap and Ransom/Extortion Coverage Part, Section II. DEFINITIONS, (P) Manager.

in such person's capacity in such position.

**(P)** "**Named Entity**" means the entity named in ITEM 1 of the Declarations.

**(Q)** "**Non-Liability Coverage Part**" means the Crime and Kidnap and Ransom/Extortion Coverage Parts in ITEM 6 of the Declarations.

**(R)** "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 3 of the Declarations or any earlier cancellation date.

Appendix 0075

**(S)** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, odors, noise, lead, oil or oil product, radiation, asbestos or asbestos-containing product, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes, without limitation, material to be recycled, reconditioned or reclaimed.

**(T)** **"Subsidiary"** means any:

    **(1)** corporation in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the outstanding securities representing the right to vote for the election of the board of directors of such corporation;

    **(2)** limited liability company in which and so long as the **Named Entity** owns or controls, directly or indirectly, the right to elect, appoint or designate more than 50% of such entity's managers;

    **(3)** corporation operated as a joint venture in which and so long as the **Named Entity** owns or controls, directly or indirectly, exactly 50% of the issued and outstanding voting stock and which, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock of such corporation, the **Named Entity** solely controls the management and operation of such corporation; or

    **(4)** foundation, charitable trust or political action committee in which and so long as such entity or organization is controlled by the **Named Entity** or any **Subsidiary** as defined (1) through (3) above.

**(U)** **"Wrongful Act"** shall have the meaning specified for such term in each Coverage Part.

## III.   COVERAGE EXTENSIONS

### (A)  Spousal Liability Coverage

Coverage shall apply to the lawful spouse of an **Insured Person** for a **Claim** made against such spouse, provided that:

    **(1)** such **Claim** arises solely out of:

        **(a)** such person's status as the spouse of an **Insured Person;** or

        **(b)** such spouse's ownership of property sought as recovery for a **Wrongful Act;**

    **(2)** the **Insured Person** is named in such **Claim** together with the spouse; and

    **(3)** coverage of the spouse shall be on the same terms and conditions, including any applicable Deductible, as apply to coverage of the **Insured Person** for such **Claim**.

No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse.

### (B)  Estates and Legal Representatives

In the event of the death, incapacity or bankruptcy of an **Insured Person,** any **Claim** made against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** shall be deemed to be a **Claim** made against such **Insured Person**. No coverage shall apply to any **Claim** for a **Wrongful Act** of such estate, heirs, legal representatives or assigns.

## IV.   LIMIT OF LIABILITY

Solely with respect to all **Liability Coverage Parts:**

Appendix 0076

**(A)** The Limit of Liability for each Coverage Part in ITEM 5 of the Declarations shall be the maximum aggregate amount that the Insurer shall pay under such Coverage Part for all **Loss** from all **Claims** covered under such Coverage Part.

**(B)** Notwithstanding the above, if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

   **(1)** such single Limit of Liability shall be the maximum aggregate amount that the Insurer shall pay for all **Loss** from all **Claims** covered under all included Coverage Parts combined; and

   **(2)** any amount specified as a Limit of Liability for any individual Coverage Part in ITEM 5 of the Declarations shall be subject to, part of, and not in addition to, the amount stated as the Combined Aggregate Limit of Liability For All Coverage Parts.

## V.   DEFENSE COSTS

Solely with respect to all **Liability Coverage Parts:**

**(A)** **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

**(B)** Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then payment of **Defense Costs** shall be in addition to any applicable Limit of Liability, provided that:

   **(1)** if a Limit of Liability is specified for any individual Coverage Part in ITEM 5 of the Declarations, then the maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under such Coverage Part shall be 50% of such Limit of Liability;

   **(2)** if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

      **(a)** the single maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under all included Coverage Parts combined shall be 50% of such Limit of Liability; and

      **(b)** any amount of **Defense Costs** available for any individual Coverage Part shall be subject to, part of, and not in addition to, the single maximum amount of **Defense Costs** available for all included Coverage Parts combined specified in (a) above; and

   **(3)** if the amount available for **Defense Costs** in (1) or (2) above is exhausted by the payment of **Defense Costs**, then **Defense Costs** shall be paid by the Insurer out of any remaining applicable Limit of Liability until the exhaustion of the applicable Limit of Liability.

## VI.   DEDUCTIBLE

Solely with respect to all **Liability Coverage Parts:**

**(A)** The Insurer shall pay **Loss** in excess of the Deductible applicable to each **Claim** as specified in ITEM 5 of the Declarations.

**(B)** The Deductible shall be borne by the **Insureds** uninsured at the **Insureds'** own risk.

**(C)** Any **Defense Costs** incurred by the Insurer shall apply to the Deductible. The **Insureds** shall reimburse the Insurer upon request for any amounts paid regarding a **Claim** that are within the applicable Deductible for such **Claim.**

Appendix 0077

(D) If a **Claim** is covered under more than one Coverage Part, the applicable Deductible for each Coverage Part shall be applied separately to such **Claim**, provided that the maximum Deductible applied to such **Claim** shall not exceed the highest of such applicable Deductibles.

(E) No Deductible shall apply to **Loss** incurred by any **Insured Person** that an **Insured Entity** is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is not able to do so by reason of **Financial Insolvency**.

(F) If an **Insured Entity** is permitted or required by common or statutory law to indemnify an **Insured Person** for any **Loss**, or to advance **Defense Costs** on their behalf, and does not do so other than because of **Financial Insolvency**, then such **Insured Entity** and the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the Deductible that would have applied if such indemnification had been made.

(G) If a **Subsidiary** is unable to indemnify an **Insured Person** for any **Loss**, or to advance **Defense Costs** on their behalf, because of **Financial Insolvency**, then the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the applicable Deductible that would have applied if such indemnification had been made.

## VII.   DEFENSE AND SETTLEMENT

Solely with respect to all **Liability Coverage Parts:**

(A) The Insurer shall have the right and duty to defend any **Claim** for which the **Insureds** give notice to the Insurer, even if such **Claim** is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate.

(B) The Insurer's duty to defend any **Claim** shall cease upon exhaustion of any applicable Limit of Liability.

Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer's duty to defend any **Claim** shall cease upon exhaustion of the maximum aggregate amount of **Defense Costs** available under Section V. DEFENSE COSTS, and any applicable Limit of Liability.

If any Limit of Liability is exhausted, the premium for this Policy shall be deemed fully earned.

(C) The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

(D) The Insurer may, with the written consent of the **Insureds**, settle any **Claim** for a monetary amount that the Insurer deems reasonable.

(E) Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer may settle any **Claim** for a monetary amount that the Insurer deems reasonable and the consent of the **Insureds** shall not be required to settle a **Claim**.

(F) The **Insureds** shall give to the Insurer all information and cooperation as the Insurer may reasonably request.

## VIII.   NOTICE OF CLAIM

Solely with respect to all **Liability Coverage Parts:**

(A) As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable, provided that such notice shall be given not later than sixty (60) days

Appendix 0078

after any **Manager** becomes aware that such **Claim** has been made. Such notice shall specify the Coverage Part under which notice is being given.

**(B)** If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period** on the date that the Insurer receives the above notice.

## IX.   EXTENDED REPORTING PERIOD

**(A)** If any **Liability Coverage Part** is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under this Policy (the "Extended Reporting Period").

**(B)** To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor.   The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within sixty (60) days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

**(C)** The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

**(D)** The Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the **Policy Period**.

**(E)** Coverage during the Extended Reporting Period shall apply to **Claims** made for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity. No coverage shall apply for any **Wrongful Act** occurring after such time.

**(F)** There is no separate or additional Limit of Liability for the Extended Reporting Period.

## X.   INTERRELATIONSHIP OF CLAIMS

Solely with respect to all **Liability Coverage Parts**:

All **Claims** based upon, arising from or in any way related to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

**(A)** any of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**;

**(B)** notice of any **Wrongful Act** described above was given to the Insurer under this Policy pursuant to Section VIII. NOTICE OF CLAIM (B); or

**(C)** notice of any **Wrongful Act** described above was given under any prior insurance policy.

## XI.   ALLOCATION

Solely with respect to all **Liability Coverage Parts**:

Appendix 0079

If **Loss** is incurred that is partially covered and partially not covered by this Policy, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters or because a **Claim** is made against both covered and uncovered parties, such **Loss** shall be allocated as follows:

**(A)** 100% of **Defense Costs** shall be allocated to covered **Loss**; and

**(B)** **Loss** other than **Defense Costs** shall be allocated between covered and non-covered

**Loss** based upon the relative legal exposure of the parties to such matters.

## XII.   OTHER INSURANCE

If **Loss** arising from any **Claim** is insured under any other valid and collectible policy or policies, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## XIII.   CANCELLATION

**(A)** The Insurer may cancel this Policy for non-payment of premium by sending not less than 10 days notice to the **Named Entity**. This Policy may not otherwise be cancelled by the Insurer.

**(B)** Except as provided in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity, the **Insureds** may cancel this Policy by sending written notice of cancellation to the Insurer. Such notice shall be effective upon receipt by the Insurer unless a later cancellation time is specified therein.

**(C)** If the Insurer cancels this Policy, unearned premium shall be calculated on a pro rata basis. If the **Insureds** cancel this Policy, unearned premium shall be calculated at the Insurer's customary short rates. Payment of any unearned premium shall not be a condition precedent to the effectiveness of a cancellation. The Insurer shall make payment of any unearned premium as soon as practicable.

## XIV.   CHANGES IN EXPOSURE

Solely with respect to all **Liability Coverage Parts**:

**(A) Mergers and New Subsidiaries**

If, before or during the **Policy Period**, any **Insured Entity**:

**(1)** merges with another entity such that the **Insured Entity** is the surviving entity; or

**(2)** acquires a **Subsidiary**,

then such newly merged or acquired entity and its subsidiaries, managers, directors, officers, and employees shall be **Insureds** to the extent such entities and persons would otherwise qualify as **Insureds** under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring after such merger or acquisition. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before such transaction or for any **Interrelated Wrongful Acts** thereto.

If the fair value of the assets of any newly merged or acquired entity exceed 25% of the total assets of the **Named Entity** as reflected in its most recent consolidated audited financial statements prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage under the **Liability Coverage Parts** for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

**(B) Takeover of Named Entity**

If, during the **Policy Period**:

**(1)** the **Named Entity** merges into or consolidates with another entity such that the **Named Entity** is not the surviving entity; or

**(2)** more than 50% of the securities representing the right to vote for the **Named Entity's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert,

then coverage shall continue under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring before such transaction. No coverage shall be available for any **Wrongful Act** occurring after such transaction. Upon such transaction, this Policy shall not be cancelled and the entire premium for this Policy shall be deemed fully earned.

The **Insureds** shall give the Insurer written notice of such transaction as soon as practicable, but not later than ninety (90) days after the effective date of such transaction.

**(C) Loss of Subsidiary Status**

If, before or during the **Policy Period**, any entity ceases to be a **Subsidiary**, then coverage shall be available under the **Liability Coverage Parts** for such **Subsidiary** and its **Insured Persons**, but only for a **Wrongful Act** of such **Insureds** occurring before such transaction. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after such transaction.

## XV.   SUBROGATION

The Insurer shall be subrogated to all of the **Insureds'** rights of recovery regarding any payment of **Loss** by the Insurer under this Policy. The **Insureds** shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of any documents necessary to enable the Insurer to effectively bring suit in the name of the **Insureds**. The **Insureds** shall do nothing to prejudice the Insurer's position or any potential or actual rights of recovery.

## XVI.   APPLICATION

**(A)** The **Insureds** represent that the declarations and statements contained in the **Application** are true, accurate and complete. This Policy is issued in reliance upon the **Application**. If the **Application** contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by the Insurer, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented.

**(B)** For the purpose of determining coverage:

**(1)** knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and

**(2)** knowledge possessed by the **Named Entity's** chairman of the board, chief executive officer, chief operating officer, or chief financial officer or anyone signing the **Application** shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity**.

## XVII.   ACTION AGAINST THE INSURER

Solely with respect to all **Liability Coverage Parts**:

**(A)** No action shall be taken against the Insurer unless there shall have been full compliance with all the terms and conditions of this Policy.

Appendix 0081

**(B)** No person or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against the **Insureds** nor shall the Insurer be impleaded by the **Insureds** in any such **Claim**.

Solely with respect to the **Crime Coverage Part**:

**(A)** No legal action shall be taken against the Insurer involving loss unless the **Insured** has complied with all the terms of this Policy; and

**(B)** No legal action shall be taken against the Insurer involving loss until ninety (90) days after the **Insured** has filed proof of loss with us; and

**(C)** No legal action shall be taken against the Insurer involving loss unless such action is brought within two (2) years from the date that the **Insured** discovers such loss.

Solely with respect to the Kidnap And Ransom/Extortion Coverage Part:

No suit, action or proceeding for recovery of any claim under this Policy shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy shall have been complied with and the same be commenced within twenty-four (24) months after a claim for actual loss or expenses has been reported to the Insurer by the **Insured**.

**XVIII.   ASSIGNMENT**

Assignment of interest under this Policy shall not bind the Insurer without its consent as specified in a written endorsement issued by the Insurer to form a part of this Policy.

**XIX.   BANKRUPTCY OR INSOLVENCY**

Bankruptcy or insolvency of any **Insureds** shall not relieve the Insurer of any of its obligations under this Policy.

**XX.   AUTHORIZATION OF NAMED ENTITY**

The **Named Entity** shall act on behalf of all **Insureds** with respect to all matters under this Policy, including, without limitation, giving and receiving of notices regarding **Claims**, cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Policy.

**XXI.   CHANGES**

This Policy shall not be changed or modified except in a written endorsement issued by the Insurer to form a part of this Policy.

**XXII.   ENTIRE AGREEMENT**

This Policy, including the Declarations, Common Terms and Conditions, included Coverage Part(s), **Application** and any written endorsements attached hereto, constitute the entire agreement between the **Insureds** and the Insurer relating to this insurance.

**XXIII.   NOTICES**

**(A)** All notices to the **Insureds** shall be sent to the **Named Entity** at the address specified in ITEM 1 of the Declarations.

**(B)** All notices to the Insurer shall be sent to the address specified in ITEM 9 of the Declarations. Any such notice shall be effective upon receipt by the Insurer at such address.

**XXIV.   HEADINGS**

Appendix 0082

The headings of the various sections of this Policy are intended for reference only and shall not be part of the terms and conditions of coverage.

**XXV.   REFERENCES TO LAWS**

**(A)** Wherever this Policy mentions any law, including, without limitation, any statute, Act or Code of the United States of America, such mention shall be deemed to include all amendments of, and all rules or regulations promulgated under, such law.

**(B)** Wherever this Policy mentions any law or laws, including, without limitation, any statute, Act or Code of the United States of America, and such mention is followed by the phrase "or any similar law", such phrase shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, statutes and any rules or regulations promulgated under such statutes as well as common law.

**XXVI.   COVERAGE TERRITORY**

Coverage under this Policy applies worldwide.

Appendix 0083



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

<div align="center">

**TWIN CITY FIRE INSURANCE COMPANY**
HOME OFFICE - INDIANAPOLIS, INDIANA
ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
(A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

</div>

Brian S. Becker, Secretary                    David Zwiener, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN

00 KB 0229269-07    3/04/07

Appendix 0084

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**

## I.   INSURING AGREEMENTS

### (A)   Employment Practices Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

### (B)   Third Party Liability (Elective)

If Third Party Liability Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Third Party Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to the Third Party Liability Coverage Sublimit of Liability, Deductible, and Prior or Pending Date in Item 5 of the Declarations. Such Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this Coverage Part.

## II.   DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

### (A)   "Benefits" means any form of compensation other than salaries, wages, bonuses, or **Stock Benefits**.

### (B)   "Claim" means any:

    **(1)**   **Employment Practices Claim**; or

    **(2)**   **Third Party Claim**.

### (C)   "Employment Practices Claim" means any:

    **(1)**   written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

    **(2)**   civil proceeding commenced by the service of a complaint or similar pleading;

    **(3)**   formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document; or

    **(4)**   arbitration proceeding commenced by a demand for arbitration,

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

"Employment Practices Claim" also means an audit conducted by the United States of America Office of Federal Contract Compliance Programs commenced by the receipt of a notice of violation, order to show cause, or a written demand for monetary or injunctive relief.

©2002, The Hartford
    00 KB 0229269-07   3/04/07

Appendix 0085

"**Employment Practices Claim**" also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Employment Practices Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

"**Employment Practices Claim**" shall not include any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.

(D) "**Employment Practices Wrongful Act**" means a **Wrongful Act** involving any:

   (1) wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

   (2) sexual or other workplace harassment, including quid pro quo and hostile work environment;

   (3) employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;

   (4) invasion of privacy, employment-related defamation (including libel and slander) or any employment-related misrepresentation;

   (5) **Retaliation**;

   (6) breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

   (7) violation of the Family and Medical Leave Act.

To the extent that an **Employment Practices Claim** alleges an **Employment Practices Wrongful Act** described above, "**Employment Practices Wrongful Act**" also means a **Wrongful Act** related to the above involving any:

   (1) employment-related wrongful infliction of emotional distress or mental anguish;

   (2) failure to create, provide for or enforce adequate or consistent employment-related policies or procedures; or

   (3) negligent retention, supervision, hiring or training.

(E) "**Independent Contractor**" means any natural person working in the capacity of an independent contractor pursuant to an **Independent Contractor Agreement.**

(F) "**Independent Contractor Agreement**" means any express contract or agreement between an **Independent Contractor** and an **Insured Entity** specifying the terms of the **Insured Entity's** engagement of such **Independent Contractor.**

(G) "**Insured Person**" means any:

   (1) **Employee**;

   (2) **Manager**; or

   (3) regarding Insuring Agreement (A), an **Independent Contractor** provided that within 30 days of an **Employment Practices Claim** having been made against such **Independent Contractor** that the **Insured Entity** agrees in writing to indemnify such **Independent Contractor** for any **Loss** arising out of such **Claim.**

**(H)** **"Insureds"** means any:

    **(1)** **Insured Entity**; or

    **(2)** **Insured Person.**

**(I)** **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

    **Loss** shall include punitive and exemplary damages, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, or the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

    **Loss** shall not include:

    **(1)** taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

    **(2)** non-monetary relief;

    **(3)** future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**;

    **(4)** **Stock Benefits**; or

    **(5)** salaries, wages, or bonuses, except as a component of a front or back pay award.

**(J)** **Retaliation** means negative treatment of an **Employee** or **Independent Contractor** based upon such person:

    **(1)** exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

    **(2)** refusing to violate any law;

    **(3)** assisting, testifying in, or cooperating with a proceeding or investigation regarding alleged violations of law by an **Insured Entity;**

    **(4)** disclosing or threatening to disclose alleged violations of law to a superior or to any governmental agency; or

    **(5)** filing any claim against an **Insured Entity** under the Federal False Claims Act or any similar "whistle blower" laws.

**(K)** **"Stock Benefits"** means any offering, plan or agreement between an **Insured Entity** and any **Employee** that grants stock, stock options or stock appreciation rights in the **Insured Entity** to such person, including, without limitation, restricted stock or any other stock grant. **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans.

**(L)** **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of an **Insured Entity. Third Party** shall not include **Employees.**

**(M)** **"Third Party Claim"** means any:

    **(1)** written demand for monetary damages or non-monetary relief commenced by the receipt of such demand;

Appendix 0087

**(2)** civil proceeding commenced by the service of a complaint or similar pleading;

**(3)** formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; or

**(4)** arbitration proceeding commenced by the filing of a demand for arbitration,

by or on behalf of a **Third Party**.

"**Third Party Claim**" also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Third Party Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**(N)** "**Third Party Wrongful Act**" means a **Wrongful Act** involving any:

**(1)** discrimination against a **Third Party** based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law; or

**(2)** sexual harassment against a **Third Party**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

**(O)** "**Wrongful Act**" means any actual or alleged:

**(1)** error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

**(2)** matter claimed against an **Insured Person** solely by reason of their serving in such capacity.


## III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)** The Insurer shall not pay **Loss** for any **Claim**:

**(1)** for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

**(2)** based upon, arising from, or in any way related to any:

  **(a)** prior or pending demand, suit or proceeding against any **Insureds** as of; or

  **(b)** audit initiated by the Office of Federal Contract Compliance Programs before,

  the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit, proceeding, or audit;

**(3)** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

**(4)** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

**(5)** for breach of any **Independent Contractor Agreement**; or

**(6)** for violation of the National Labor Relations Act or any similar law.

**(B)** Other than an **Employment Practices Claim** for **Retaliation**, the Insurer shall not pay **Loss** for any **Claim**:

    **(1)** based upon, arising from, or in any way related to any:

        **(a)** discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

        **(b)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

    **(2)** based upon, arising from, or in any way related to any workers' compensation, unemployment compensation, disability benefits, or social security law, or any similar law;

    **(3)** for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

    **(4)** for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:

        **(a)** overtime wages; or

        **(b)** minimum wages.

**(C)** Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

    **(1)** for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement;

    **(2)** for costs associated with providing any accommodations required by the Americans With Disabilities Act or any similar law;

    **(3)** for **Benefits**, provided that this exclusion shall not apply to any **Employment Practices Claim** for wrongful termination, dismissal or discharge of employment; or

    **(4)** based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.


**IV. EXCLUSION APPLICABLE TO INSURING AGREEMENT (B)**

The Insurer shall not pay **Loss** for any **Third Party Claim** based upon, arising from or in any way related to any price discrimination or violation of any anti-trust law or any similar law designed to protect competition or prevent unfair trade practices.


**V. OTHER INSURANCE**

    **(A)** The coverage provided under this Policy for any **Employment Practices Claim** shall be primary.

    **(B)** Notwithstanding the above, the coverage provided under this Policy for any **Employment Practices Claim** made against a temporary, leased or loaned **Employee** or an **Independent Contractor** shall be excess of the amount of any deductible, retention and limits of liability under any other policy or policies applicable to such **Claim**, whether such other policy or policies are stated to be primary, contributory, excess, contingent or

Appendix 0089

otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## VI.   COORDINATION OF COVERAGE

If this Coverage Part and either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part are included under this Policy, and a **Claim** is covered under this Coverage Part and any such other Coverage Part, **Loss** shall be first covered and paid under this Coverage Part.

If notice of a **Claim** has been given under either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part and a determination is made by the Insurer that such **Claim** would be covered under this Coverage Part if notice had been given under this Coverage Part, then the **Insureds** shall be deemed to have given notice of such **Claim** under this Coverage Part at the same time that notice was given under such other Coverage Part.

## VII.  CHANGES IN EXPOSURE

**(A)**  This section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)**  In addition to the asset percentage size limit for automatic coverage of any newly merged or acquired entity specified in Common Terms and Conditions Section XIV. Changes in Exposure (A), if the number of employees of a newly merged or acquired entity exceeds 25% of the number of employees of all **Insured Entities** combined prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

## VIII. DEDUCTIBLE WAIVER

Regarding a **Claim** that is a class action civil proceeding, no Deductible shall apply to **Defense Costs** incurred in connection with such **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Deductible otherwise applicable to such **Claim**, if a:

**(A)**  final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)**  complete and final settlement with prejudice;

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

Appendix 0090

ENDORSEMENT NO:   1

This endorsement, effective 12:01 am,      3/04/07          forms part
of policy number   00 KB 0229269-07

issued to:      SOUTHWEST HOUSING MANAGEMENT

by:      TWIN CITY FIRE INSURANCE CO.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ADD SUBSIDIARY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**COMMON TERMS AND CONDITIONS**, section **II. COMMON DEFINITIONS, (T) "Subsidiary"**, is amended by the addition of the following:

**Subsidiary** also means:
AFFORDABLE HOUSING CONSTRUCTION, INC.
SOUTHWEST HOUSING INVESTMENTS
SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H074 01 0805          © 2005, The Hartford          Page 1 of 1

Appendix 0091

ENDORSEMENT NO:  6

This endorsement, effective 12:01 am,   3/04/07          forms part
of policy number     00 KB 0229269-07

issued to:     SOUTHWEST HOUSING MANAGEMENT

by:            TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## ENCORE! PLUS ENDORSEMENT
## (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

**COMMON TERMS AND CONDITIONS**, are amended as follows:

1.  Section **II., COMMON DEFINITIONS,** is amended by the addition of the following:

    **(v )**  **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

2.  Section **II., COMMON DEFINITIONS, (I), Insured Entity,** is amended by the addition of the following:

    **Insured Entity** shall also include any such entity as a general partner of a limited partnership in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the limited partnership interest and such **Insured Entity** is the sole general partner.

3.  Section **III., COVERAGE EXTENSIONS, (A), Spousal Liability Coverage,** is deleted and replaced with the following:

    **(A) Spousal/Domestic Partner Liability Coverage**

    Coverage shall apply to the lawful spouse or **Domestic Partner** of an **Insured Person** for a **Claim** made against such spouse or **Domestic Partner**, provided that:

    **(1)** such **Claim** arises solely out of:

        **(a)** such person's status as the spouse or **Domestic Partner** of an **Insured Person**; or

        **(b)** such spouse or **Domestic Partner's** ownership of property sought as recovery for a **Wrongful Act**;

    **(2)** the **Insured Person** is named in such **Claim** together with the spouse or **Domestic Partner**; and

    **(3)** coverage of the spouse or **Domestic Partner** shall be on the same terms and conditions, including any applicable Deductible, as apply to coverage of the **Insured Person** for such **Claim**.

    No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse or **Domestic Partner**.

4.  Section **VIII., NOTICE OF CLAIM, (A),** is deleted and replaced with the following:

    **(A)** As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the termination of the **Policy Period**, or Extended Reporting Period as described in Section IX. Such notice shall specify the Coverage Part under which notice is being given.

All other terms and conditions remain unchanged.

David Zwiener, President

Appendix 0092

ENDORSEMENT NO:   7

This endorsement, effective 12:01 am,      3/04/07                                    forms part
of policy number      00 KB 0229269-07

issued to:      SOUTHWEST HOUSING MANAGEMENT

by:      TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIFIC INDIVIDUAL CLAIMANT EXCLUSION

## EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, (A),** is amended to include the following:

(7  ) brought by, or on behalf of, the individual(s) listed below, and/or the estate, beneficiaries, heirs, legal
representatives, and assigns of such individual(s):
CHRISTINE SULLIVAN

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 M024 00 0904                          © 2004, The Hartford                          Page 1 of 1

Appendix 0093

ENDORSEMENT NO:    8

**This endorsement, effective 12:01 am,**        3/04/07                                    **forms part**
**of policy number**      00 KB 0229269-07

**issued to:**        SOUTHWEST HOUSING MANAGEMENT

**by:**        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS AMENDATORY

## COMMON TERMS AND CONDITIONS ENDORSEMENT

Solely with respect to all **Liability Coverage Parts**:

I.   **Extended Reporting Period**

A.   It is hereby understood and agreed that the following paragraphs are added to Section **II. COMMON DEFINITIONS**:

(W )  **Termination of Coverage**, whether undertaken by the Insurer or the **Insured** at any time, means:

(1)  cancellation or nonrenewal of a policy, other than for nonpayment of premium; or

(2)  decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured**.

B.   It is hereby understood and agreed upon that Section **IX. EXTENDED REPORTING PERIOD** is deleted and replaced by:

IX.   **EXTENDED REPORTING PERIOD**

(A)  Upon **Termination of Coverage**, the Named Entity shall be entitled to an automatic extended reporting period ("Automatic Extended Reporting Period") of thirty (30) days from the end of the **Policy Period** to report **Claims** under this Policy.

(B)  If this Policy is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under this Policy (the "Optional Extended Reporting Period").

(C)  To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor. The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within 60 days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

(D)  The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

Appendix 0094

**(E)** The Optional Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the Automatic Extended Reporting Period, but the duration will not be less than twelve (12) months.

**(F)** Coverage during the Automatic Extended Reporting Period or the Optional Extended Reporting Period shall apply to **Claims** made for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described in Section XIV. CHANGES IN EXPOSURE (B). No coverage shall apply for any **Wrongful Act** occurring after such time.

**(G)** There is no separate or additional Limit of Liability for the Extended Reporting Period.

All other terms and conditions remain unchanged.

David Zwiener, President

Appendix 0095

ENDORSEMENT NO: 11

| | |
|---|---|
| **This endorsement, effective 12:01 am,**    3/04/07 | **forms part** |
| **of policy number**    00 KB 0229269-07 | |

**issued to:**    SOUTHWEST HOUSING MANAGEMENT

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## GENETIC MAKEUP ENDORSEMENT

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, Section **II**, DEFINITIONS, **(D) (3),** is deleted and replaced by the following:

(3)   employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, genetic makeup or refusal to submit to genetic makeup testing, or other protected status established under federal, state or local law;

All other terms and conditions remain unchanged.

David Zwiener, President

Appendix 0096

ENDORSEMENT NO:   12

This endorsement, effective 12:01 am,   3/04/07   forms part
of policy number   00 KB 0229269-07

issued to:   SOUTHWEST HOUSING MANAGEMENT

by:   TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### TEXAS CANCELLATION AND NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

I.   The Cancellation provision of this Policy is deleted and replaced by the following:

NOTICE OF CANCELLATION

A.   This Policy may be canceled by the **Insured** by surrender thereof to the **Insurer** or any of its authorized agents or by mailing to the **Insurer** a written notice stating when thereafter the cancellation shall be effective.

B.   The **Insurer** may cancel this Policy at any time during the term of this Policy only for nonpayment of premium.

C.   The **Insurer** shall deliver or mail to the **Insured** a written notice of cancellation at the address shown on this Policy not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reasons(s) for cancellation.

D.   The **Insurer** may not cancel this Policy based solely on the fact that the **Insured** is an elected official.

E.   If this Policy shall be cancelled by the **Insured**, the **Insurer** shall retain the customary short rate proportion of the premium hereon, except as otherwise provided in this Policy. If the **Insurer** cancels this Policy, the **Insurer** shall retain the pro rata proportion of the premium hereon.

II.   The following provision is added:

NOTICE OF NONRENEWAL

A.   The **Insurer** may refuse to renew this Policy by delivering or mailing to the **Insured** a written Notice of Nonrenewal at the address shown on this Policy. Such written notice shall state the reason(s) for nonrenewal. The Notice of Nonrenewal must be delivered or mailed not later than the 60th day before the date on which this Policy expires. If the notice is delivered or mailed later than the 60th day before the date on which this Policy expires, the coverage shall remain in effect until the 61st day after the date on which the notice is delivered or mailed. Earned premium for any period of coverage that extends beyond the expiration date of this Policy shall be computed pro rata based on the previous year's rates.

B.   The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

HR 42 H003 00 0605   © 2005, The Hartford   Page 1 of 2

C.   The **Insurer** may not refuse to renew this Policy based solely on the fact that the **Insured** is an elected official.

All other terms and conditions remain unchanged.

David Zwiener, President

**IMPORTANT NOTICE**

To obtain information or make a complaint:

You may contact your agent.

You may call The Hartford Insurance Group at the toll-free telephone number for information or to make a complaint at:

**1-800-392-7805**

You may also write to The Hartford.

**The Hartford
Hartford Plaza
Hartford, CT. 06115**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

**1-800-252-3439**

You may write the Texas Department of Insurance

P.O. Box 149104
Austin, TX 78714-9104
Fax Number (512) 475-1771

**PREMIUM OR CLAIMS DISPUTES: Should you have a dispute concerning your premium or about a claim you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.**

**ATTACH THIS NOTICE TO YOUR POLICY: This notice is for information only and does not become a part or condition of the attached document.**

ILNP 85 16 06 92 TX
RN 42 N014 0000093KB  0229269-07   3/04/07

---

**AVISO IMPORTANTE**

Para obtener informacion o para someter una queja.

Puede comunicarse con su agente.

Usted puede llamar al numero de telefono gratis de The Hartford Insurance Group para informacion o para someter una queja al

**1-800-392-7805**

Usted tambien puede escribir a The Hartford.

**The Hartford
Hartford Plaza
Hartford, CT. 06115**

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas

P.O. Box 149104
Austin, TX 78714-9104
Fax Number (512) 475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS: Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI)**

**UNA ESTE AVISO A SU POLIZA: Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.**

Appendix 0099

Dear Insured:

Your insurance coverage is offered through one of the member insurance companies of The Hartford Insurance Group. The Hartford Insurance Companies recognize that minimizing the exposure to loss is a major concern for each policyholder. We maintain a fully staffed Loss Control Department which can assist you in identifying and reducing such loss exposure. If you are interested in obtaining more information on the nature of these loss control services, please contact your insurance producer or:

      The Hartford
      Hartford Plaza
      Hartford, CT  06115

      Telephone – (860)–547-4707


Please contact me if you require any other information.

RN 42 R030 01 1098
      00  KB  0229269–07    3/04/07

Appendix 0100

# Appendix Exhibit 6

## March 11, 2016 policy coverage analysis with original exhibits

This coverage analysis was sent to Twin City in connection with the *Stowers* settlement offer.



**Gibson Wiley PLLC**
ATTORNEYS & COUNSELORS AT LAW

March 11, 2016

**VIA EMAIL**

Mr. Steven Knight
Chamberlain, Hrdlicka, White, Williams & Aughtry
1200 Smith Street, 14th Floor
Houston, Texas 77002-4310
steven.knight@chamberlainlaw.com

**VIA EMAIL**

Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
jhfriedman@fflawoffice.com

> Re:   *Carpenter v. Southwest Housing Development Company, Inc. et. al.*
>       **Cause No. CC-08-2072-E**
>       **Dallas County Court at Law No. 5**

Dear Mr. Knight and Mr. Friedman:

This letter is a follow-up to a written *Stowers* demand.  This letter addresses the first *Stowers* element — the claim against the insured is within the scope of coverage.  It focuses on two such claims (1) repudiation and breach of an oral pay-to-stay employment agreement, and (2) a related alternative claim for quantum meruit.[1]  It does so because covered loss with respect to either of these covered claims independently exceeds remaining policy limits.[2]

---

[1]      *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, at highlighted portions.

[2]      This letter omits all internal quotation marks and citations in quoted language from judicial opinions, omits all citing references, and omits all quoting references.  All emphasis are supplied unless otherwise noted.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 2 of 32

This letter is divided into two parts: (1) analysis of coverage provisions and (2) analysis of exclusions. The division tracks the familiar burdens in insurance coverage litigation. The insured must establish initial coverage. The insurance carrier must establish application of any "language of exclusion" or "exception to coverage."[3]

| defined terms and phrases |
|:-:|

This letter uses the following defined terms and phrases.

| term or phrase | definition |
|---|---|
| policy | Private Choice Encore! Policy number 00 KB 0229269-07 that Twin City Fire Insurance Company issued to Southwest Housing Management |
| SH Development | Southwest Housing Development Company, Inc. |
| SH Management | Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. |
| AH Construction | Affordable Housing Construction, Inc. |

---

[3]     *See* TEX. INS. CODE § 554.002 ("In a suit to recover under an insurance or [HMO] contract, the insurer or [HMO] has the burden of proof as to any avoidance or affirmative defense that the Texas Rules of Civil Procedure require to be affirmatively pleaded. Language of exclusion in the contract or an exception to coverage claimed by the insurer or [HMO] constitutes an avoidance or an affirmative defense.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 3 of 32

<div style="border:1px solid black; text-align:center;">

**employment practices liability coverage part
— initial coverage established**

</div>

## 1.     EPL coverage part general structure

This letter considers the general coverage structure in light of contract interpretation principles that require courts to consider the policy as a whole. Most EPL insurance policies are highly variable in the coverage provided and the particular language used.   As a result, coverage often turns on basic principles of contract interpretation and the language of the particular policy.[4]

The EPL coverage part at issue has a comparatively low aggregate limit — $1 million that erodes with attorneys' fees and expenses paid to defend. The policy has a comparatively high premium — more than $33,000 — for such low aggregate limits per coverage part on a claims-made policy. The EPL coverage part may partially explain this. It covers what many other insurance policies do not[5] — *e.g.,* punitive damages, intentional wrongdoing, breach of oral employment contracts, breach of implied employment contracts, and some breaches of written employment contracts.

A normal initial reaction is that insurance policies do not cover these types of claims. Most commercial general liability policies, auto policies, homeowner policies, errors and omissions policies, and directors and officers liability policies do not cover these types of claims. But insurance carriers developed and marketed EPL policies to

---

[4]     L.D. Simmons, II & Lowndes C. Quinlan, New Appleman on Ins. Law Ch. 28, at 28-1 (2015) ("Although a standardized policy exists, most insurers have used proprietary and distinct wording. Based on these two factors, the courts have developed relatively little case law to guide counsel on the meaning of particular EPL policy terms. Because the law is often specific to one insurer's wording, cases may or may not prove persuasive when applied to disputes involving another insurer's wording. Basic principals [*sic*] of contract interpretation will sometimes prove to be the greatest value to coverage counsel.").

[5]     *See, e.g., id.* at § 28.02[2][g], p. 28-22 ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 4 of 32

cover gaps in other types of insurance policies.[6]  Even then, many EPL policies do not cover these types of claims.  This EPL policy is different.  This EPL policy does cover these types of claims.

2.      **The EPL coverage part insuring agreement**

The EPL coverage part insuring agreement states:

> **I.   INSURING AGREEMENTS**
>
> **(A)  Employment Practices Liability**
>
> The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

The EPL insuring agreement is quite broad. It covers loss resulting from the employment practices claim itself — in this case, loss resulting from the lawsuit itself.  It covers far more than loss resulting from a particular type of occurrence.  It covers far more than loss resulting from a particular type of injury.

**Insureds**

Defendants SH Management, SH Development, and AH Construction are all insureds under the policy, based on the attached coverage analysis.[7]  Defendants Brian Potashnik and Cheryl Potashnik are both insureds under the policy, based on the attached coverage analysis including supporting evidence.[8]

---

[6]      *See* JEFFREY W. STEMPLE, LAW OF INSURANCE CONTRACT DISPUTES § 21.06, at 21-47 to 21-48.

[7]      *See* Exhibit 3.

[8]      *See* Exhibit 4.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 5 of 32

### Employment practices claim

This case involves an employment practices claim, based on the attached coverage analysis including supporting evidence.[9]   The employment practices claim in this case is the lawsuit itself.[10]

### First made against the insureds during relevant period

This case involves an employment practices claim first made against the insureds during the policy period or extended reporting period, based on the attached coverage analysis including supporting evidence.[11]

*remainder of page intentionally left blank*

---

[9]      *See* Exhibit 5; *see also* additional exhibits cited in the coverage analysis.

[10]      *See id*.

[11]      *See* Exhibit 6.

Appendix 0106

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 6 of 32

### Employment practices wrongful act

Twin City defines *employment practices wrongful act* as follows.

(D) **"Employment Practices Wrongful Act"** means a **Wrongful Act** involving any:

(1) wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

(2) sexual or other workplace harassment, including quid pro quo and hostile work environment;

(3) employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;

(4) invasion of privacy, employment-related defamation (including libel and slander) or any employment-related misrepresentation;

(5) **Retaliation**;

(6) breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

(7) violation of the Family and Medical Leave Act.

To the extent that an **Employment Practices Claim** alleges an **Employment Practices Wrongful Act** described above, **"Employment Practices Wrongful Act"** also means a **Wrongful Act** related to the above involving any:

(1) employment-related wrongful infliction of emotional distress or mental anguish;

(2) failure to create, provide for or enforce adequate or consistent employment-related policies or procedures; or

(3) negligent retention, supervision, hiring or training.

Twin City defines *wrongful act* as follows.

(O) **"Wrongful Act"** means any actual or alleged:

(1) error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

(2) matter claimed against an **Insured Person** solely by reason of their serving in such capacity.

These definitions are quite broad — consistent with the broad insuring agreement. Employment practices wrongful acts cover legal violations that range from negligence to intentional conduct to malicious conduct. Wrongful acts cover every type of breach of duty — *e.g.*, tort duties, contract duties, implied contract duties, statutory duties, regulatory duties, etc.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 7 of 32

Repudiation and breach of the oral pay-to-stay employment agreement is an *employment practices wrongful act*. It is covered as acts, omissions, and breach of duty involving breach of an oral employment contract.[12]

The related alternative quantum meruit claim is also an *employment practices wrongful act*. It is covered as acts, omissions, and breach of duty involving breach of an implied employment contract.[13] A treatise further explains why quantum meruit involves an implied contract:

> The requirement of mutual assent is fundamental to the creation of a true contract []. But quasi contracts are not dependent on the assent of the parties because they are implied in law. A quasi contract is an enforceable obligation that is created by law, without regard to any expression of assent by the parties []. Quasi contractual obligations are created by law for reasons of justice, honesty, and fair dealing without any expression of assent and sometimes even against a clear expression of dissent.[14]

**Covered loss**

Language of exclusion and exceptions to coverage remain what they are — language of exclusion and exceptions to coverage — no matter where they appear in the policy.[15] So, this letter splits the *loss* definition between covered loss and excluded loss.

---

[12]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, pp. 11-14 ¶¶ 33-38.

[13]     *See id.* at p. 14 ¶ 39; *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) ("Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received."); *Campbell v. Northwestern Nat'l Life Ins. Co.*, 573 S.W.2d 496, 498 (Tex. 1978) ("Nevertheless, the right to recover in quantum meruit does not grow out of the contract, but is independent of it. This right is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.").

[14]     *See* 2-21A Dorsaneo, Texas Litig. Guide § 21A.01 (2005).

[15]     *See* LD. Simmons, II & Lowndes C. Quinlan, New Appleman on Ins. Law Ch. 28 § 28.01[7][a], at 28-29 (describing placement of exclusionary language in a definition or insuring agreement as "sleight-of-hand").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 8 of 32

Twin City defines the covered *loss* as follows.

> (I)   "**Loss**" means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**; including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.
>
> **Loss** shall include punitive and exemplary damages, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, or the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

The covered loss is quite broad — consistent with the broad insuring agreement. It covers *the amount* that the insureds are legally obligated to pay as a result of a *claim*. It is "without limitation" — *i.e.*, it does not limit *the amount* to a particular type of relief, type of harm, type of payment, type of expense, or other type of amount.

Twin City defines *claim* as follows.

> (B)   "**Claim**" means any:
>
>    (1)   **Employment Practices Claim**; or
>
>    (2)   **Third Party Claim**.

This case does not involve a third party claim. As demonstrated above, this case involves an employment practices claim.[16] The employment practices claim in this case is the lawsuit itself.[17]

The lawsuit alleges repudiation and breach of an oral pay-to-stay employment agreement and an alternative claim for quantum meruit. The law permits compensation in the form of back pay, costs of court, attorneys' fees, prejudgment interest, and postjudgment interest.[18] All of these *amounts* fall within the definition of covered *loss*.

---

16      *See supra* at p. 5, employment practices claim section.

17      *See id.*

18      *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48 (relief requested); TEX. PATTERN JURY CHARGES, BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT 115.3 (2014) (question on contract damages); *id. at* 115.7 (question on quantum meruit damages); TEX. CIV. PRAC. REM. CODE § 38.001 ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor; . . . or (8) an oral or written contract.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 9 of 32

### 3.    Initial coverage conclusion and invitation

The above establishes initial coverage as to each part of the EPL coverage part insuring agreement.  If you have any questions or need additional information, please let me know, and I will do what I reasonably can to answer the question and provide the information.  If you believe any additional issue needs to be addressed to establish initial coverage, please let me know, and I will address the issue.

<div style="border:1px solid black; background-color:#d9ead3; padding:10px; text-align:center;">

**employment practices liability
— no applicable exclusions**

</div>

### 1.    EPL exclusions general structure

This letter considers the general coverage and exclusion structure in light of contract interpretation principles that require courts to consider the policy as a whole. Again, the EPL coverage part at issue has a comparatively low aggregate limit — $1 million that erodes with attorneys' fees and expenses paid to defend.  The policy has a comparatively high premium — more than $33,000 — for such low aggregate limits per coverage part on a claims-made policy.  The EPL coverage part may partially explain this. It covers what many other insurance policies do not[19] — *e.g.,* punitive damages, intentional wrongdoing, breach of oral employment contracts, breach of implied employment contracts, and some breaches of written employment contracts.

Again, a normal initial reaction is that insurance policies do not cover these types of claims.  Most commercial general liability policies, auto policies, homeowner policies, errors and omissions policies, and directors and officers liability policies do not cover these types of claims.  But insurance carriers developed and marketed EPL policies to cover gaps in other types of insurance policies.[20]  Even then, many EPL policies do not

---

[19]    *See, e.g.,* L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INS. LAW Ch. 28, at § 28.02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims.").

[20]    *See* JEFFREY W. STEMPLE, LAW OF INSURANCE CONTRACT DISPUTES § 21.06, at 21-47 to 21-48.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 10 of 32

cover these types of claims.  This EPL policy is different.  This EPL policy does cover these types of claims.

As to exclusions, "[t]he only broad generalization to make about cases considering EPL exclusions is that courts usually have relied upon state canons of construction to resolve disputes over the meaning of a particular exclusion."[21]  That generalization holds true for language of exclusion and exceptions to coverage in this EPL coverage part.

The policy's overall exclusion structure involves some overlap.  For example, the exclusion for non-monetary relief overlaps with the exclusion for future compensation for any person hired, promoted, or reinstated.  The overlap exists because hire, promotion, and reinstatement are all forms of excluded non-monetary relief.[22]  The coverage analysis therefore permits some overlap in the scope of exclusions.

## 2.    Excluded loss

Twin City excludes the following types of loss.



Loss shall not include:

(1)   Taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

(2)   non-monetary relief;

(3)   future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**;

(4)   **Stock Benefits**; or

(5)   salaries, wages, or bonuses except as a component of a front or back pay award.

---

[21]    L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INS. LAW Ch. 28 § 28.01[1][e], at 28-12 (2015).

[22]    *See, e.g., Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (noting that monetary relief may be ordered in lieu of reinstatement to employment position: "In cases in which reinstatement is not viable . . . courts have ordered front pay as a substitute for reinstatement.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 11 of 32

Again, the covered loss is quite broad — consistent with the broad insuring agreement. Covered loss means *the amount* that the insureds are legally obligated to pay as a result of a *claim*.[23] The claim in this case is the lawsuit itself.[24] The covered loss is "without limitation" — *i.e.*, it does not limit *the amount* to a particular type of relief, type of harm, type of payment, type of expense, or other type of amount.[25]

The lawsuit alleges repudiation and breach of an oral pay-to-stay employment agreement and an alternative claim for quantum meruit. The law permits compensation in the form of back pay, costs of court, attorneys' fees, prejudgment interest, and postjudgment interest.[26] None of these *amounts* are excluded loss.

**Excluded loss 1: taxes, fines, penalties**



(1)   taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

The amount the insureds are legally obligated to pay as a result of the lawsuit does not include taxes, fines or penalties imposed by law, or matters of the same kind or class that may deemed uninsurable under Texas law.[27] Courts must limit the phrase "matters that may be deemed uninsurable under Texas law" to items of the same kind or class as the specific terms that the phrase follows — *i.e.*, taxes and fines or penalties imposed by law.

---

[23]   *See supra* at p. 8.

[24]   *See supra* at p. 5, employment practices claim section.

[25]   *See supra* at p. 8.

[26]   *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48 (relief requested); TEXAS PATTERN JURY CHARGES, BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT 115.3 (2014) (question on contract damages); *id.* at 115.7 (question on quantum meruit damages); TEX. CIV. PRAC. REM. CODE § 38.001 ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor; . . . or (8) an oral or written contract.").

[27]   *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48 (relief requested).

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 12 of 32

The Texas Supreme Court explained:

Where specific and particular enumerations of persons or things ... are followed by general words, the general words are not to be construed in their widest meaning or extent but are to be treated as limited and applying only to persons or things of the same kind or class as those expressly mentioned.[28]

The above interpretation of this exclusion is reasonable and consistent with contract rules of construction. If Twin City comes up with a conflicting but reasonable interpretation, then a court must find for the insureds, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."[29]

If Twin City claims more broadly that any of the covered loss or covered claims is void against public policy, it must overcome the Texas Constitution's protection of the freedom to contract[30] and the "compelling public policy to enforce legal agreements."[31] Moreover, such a claim would disavow coverage for the express coverage sold to policyholders. Such a claim would open the door individual, collective, and class actions for violations of states' consumer protection laws, states' insurance laws, and common law claims for misrepresentation.

---

[28]   *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987).

[29]   *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").

[30]   TEX. CONST. art. 1 § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.").

[31]   *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 140 (Tex. 2004) ("What the dissent ignores is that there is a compelling public policy reason to enforce legal agreements freely made."); *see also El Paso Field Servs., L.P. v. Mastec N. Am., Inc.*, 389 S.W.3d 802, 811-12 (Tex. 2012) ("We have long recognized Texas' strong public policy in favor of preserving the freedom of contract.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 13 of 32

### Excluded loss 2: non-monetary relief

> (2)   non-monetary relief.

The lawsuit does not seek non-monetary relief.[32]

### Excluded loss 3: future compensation for hire, promotion, reinstatement

> (3)   future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**.

The lawsuit does not seek hire, promotion, or reinstatement.[33]

### Excluded loss 4: defined stock benefits

> (4)   **Stock Benefits**; or

Twin City defines stock benefits as "any offering, plan or agreement" between an insured entity and any employee that "grants stock, stock options or stock appreciation rights" in the insured entity to the employee, "including, without limitation, restricted stock or any other stock grant" with the exception of "employee stock ownership plans or employee stock purchase plans."[34]  The amount the insureds are legally obligated to pay as a result of the lawsuit does not include stock benefits of any kind.[35]

---

[32]   *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[33]   *See generally id.*

[34]   *See* EPL Coverage Part II(K).

[35]   *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 14 of 32

**Excluded loss 5: salaries, wages, or bonuses that are not back pay**

(5)   salaries, wages, or bonuses, except as a component of a front or back pay award

    The amount the insureds are legally obligated to pay as a result of the lawsuit does *not* include front pay.[36]  The amount the insureds are legally obligated to pay as a result of the lawsuit *does*, however, include back pay.[37]  The amount the insureds are legally obligated to pay as a result of the lawsuit does *not* include salaries, wages, or bonuses *other than* as a component of back pay.[38]

### *Undefined back pay and ordinary meaning*

    Twin City does not define *back pay* in the policy.  As a result, courts must look to the ordinary meaning of *back pay*.[39]  A variety of definitions listed below and attached[40] show that back pay is simply (1) owed but unpaid compensation for past performance or (2) owed but unpaid compensation for performance that would have occurred in the past but for some obstacle.[41]  The sales proceeds payment is owed but unpaid compensation for past performance — back pay.

---

[36]    *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 18 ¶ 48.

[37]    *See id.*

[38]    *See id.*

[39]    *See RSUI Indem. Co. v. Lynd Co*., 466 S.W.3d 113, 118 (Tex. 2015) ("Unless the policy dictates otherwise, we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."); *see also Edinburg Consol. Indep. Sch. Dist. v. INA*, 806 S.W.2d 910, 913 (Tex. App.—Corpus Christi 1991, no writ) (looking to dictionary for meaning of undefined term in insurance policy).

[40]    *See* Exhibit 7.

[41]    Some types of stock benefits are excluded losses.  They are therefore excluded from the ordinary meaning of back pay.  But the amount the insureds are legally obligated to pay as a result of the lawsuit in this case does *not* include any form of stock benefits.  *See supra* at p. 13.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 15 of 32

| source | definition |
|--------|------------|
| about.com<br>job search and employment glossary | Back pay is the difference between what an employee was paid and the amount he or she should have been paid.<br><br>Withheld wages may have been from actual hours worked, pay increases or promotions, or for work that could have otherwise been completed if there had not been some obstacle. |
| Cambridge English Business Dictionary | income that should have been paid or was expected at an earlier time:<br>*Those workers are due a total of approximately $500,000 in back pay, according to union officials.* |
| Collins English Dictionary | 1. (Industrial Relations & HR Terms) pay received by an employee from an increase awarded retrospectively<br><br>*note: there was no second definition* |
| Dictionary.com | noun<br>1. pay received by an employee from an increase awarded retrospectively<br><br>Collins English Dictionary - Complete & Unabridged 2012 Digital Edition<br>© William Collins Sons & Co. Ltd. 1979, 1986 © HarperCollins<br>Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012<br><br>Examples from the Web for back pay |

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 16 of 32

| | |
|---|---|
| | Contemporary Examples |
| | Those employees may or may not get *back pay* when the shutdown ends.  How the Government Shutdown Hurts National Security Josh Rogin September 29, 2013 |
| | Historical Examples |
| | On May 18, 1872, Congress passed a law for the restitution of *back pay*.  A History of Trade Unionism in the United States Selig Perlman |
| | With the *back pay* during his absence, the sum amounted to about $15,000.  Booker T. Washington Emmett J. Scott and Lyman Beecher Stowe . . . |
| | Give the boys thirty-day orders on the Company for the *back pay*.  The Gilded Age, Complete Mark Twain and Charles Dudley Warner |
| | Meanwhile, I must begin to-morrow to cry like a poor devil about the *back pay*.  Wood Rangers Mayne Reid |
| | Then I got the *back pay*, of course, but I ought to have had it before.  Captain Jinks, Hero Ernest Crosby |

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 17 of 32

| | Look at a single class of these collections,—the *back pay* of sick men. The Atlantic Monthly, Volume 15, No. 88, February, 1865  Various<br><br>But the possible loss of his *back pay* would be a catastrophe.  Billy and the Big Stick Richard Harding Davis<br><br>Washington now showed his sagacity in quelling the fears of the soldiers regarding their *back pay*.  Comic History of the United States  Bill Nye<br><br>Contemporary definitions for back pay<br><br>noun<br>a payment due for previously done work; also, salary overdue from a past pay period. Also written backpay; also called back payment, back salary, back wages<br><br>Word Origin<br>1804-09<br><br>Dictionary.com's 21st Century Lexicon Copyright © 2003-2014 Dictionary.com, LLC |
| Encyclopedia.com<br>Oxford Pocket Dictionary of Current English | • n. payment for work done in the past that was withheld at the time, usually because of a dispute: Hickman should be provided backpay plus any expenses. |
| Macmillan Dictionary | money that is owed to someone who works for a company but that has not been paid yet |

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 18 of 32

| | |
|---|---|
| Oxford University Press | noun<br>Payment for work done in the past that was withheld at the time, or for work that could have been done had the worker not been prevented from doing so:<br>*Hickman should be provided back pay plus any* expenses |
| Wiktionary | 1. A withheld payment for work which has already been completed, or which could have been completed had the employee not been prevented from doing so. |
| Investor Words | [*definition of back payment*]<br><br>1. a payment which is due but has not yet been paid<br>2. the act of paying money which is owed |

    The ordinary meaning of back pay is also consistent with the meaning of back pay in employment anti-discrimination and anti-retaliation statutes. The "essential nature" of the statutory *back pay* remedy is "identical to a common law suit for back wages for breach of contract."[42]

    The back pay in this case is fully earned — Jeff fulfilled his end of the bargain. But the ordinary meaning of back pay may involve (1) earned compensation or (2) unearned compensation that would have been earned absent the unlawful conduct. When an employer has paid females less than males for the same work, the back pay is earned — the work has been done. When an employer fires a female precisely because she is a

---

[42]     *See Kolb v. Goldring, Inc.*, 694 F.2d 869, 871-72 (1st Cir. 1982) (Age Discrimination in Employment Act) (". . . [I]n its 'essential nature' an ADEA action is identical to a common law suit for back wages for breach of contract. . . . Thus cases like this one call for a simple tabulation of 'items of pecuniary or economic loss such as wages, fringe, and other job-related benefits.'"). The *Kolb* court was addressing the portion of the statute that permits back pay and explaining that such portion did not permit compensation in the form of mental anguish and similar harms.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 19 of 32

female, the back pay is unearned but would have been earned absent the unlawful conduct.  The policy does not distinguish between earned and unearned back pay.  It covers both and excludes neither.

### Salaries, wages, or bonuses still has meaning

The above interpretation is consistent with the policy as a whole.  And it still gives meaning to the *salaries, wages, or bonuses* portion of the exclusion for *salaries, wages, or bonuses except as a component of a front pay or back pay award*.  To understand this, one needs to step away from this particular case and look at the policy as a whole as applied to a variety of situations.  The below examples assume that basic requirements for coverage have been met, such as notice and consent to settle.

### (1) consent decree training, monitoring, reporting

The policy defines *employment practices claim* to include formal administrative and regulatory proceedings.[43]  Jill files a charge of discrimination for race discrimination [pay disparity because of race] with the Equal Employment Opportunity Commission.  The EEOC finds cause to believe a pattern or practice of discrimination has occurred.  The case settles for (1) $8.4 million in back pay for all affected employees and (2) a consent decree mandating significant nationwide training, monitoring, and reporting intended to stop the discrimination.  The employer must hire numerous trainers and additional personnel to meet its consent decree obligations to train, monitor, and report.  ✔The policy covers the back pay subject to relevant limits.  The policy excludes salaries, wages, and bonuses for new hires needed to meet consent decree obligations, because those salaries, wages, and bonuses are not a component of back pay or front pay.

### (2) mitigation efforts

A wrongfully terminated employee usually has a duty to mitigate damages.  He usually must use reasonable diligence to find substantially equivalent work.[44]  Jack is a company executive and is wrongfully terminated.  He has trouble finding substantially

---

[43]     *See* EPL Coverage Part II(C)(3).

[44]     *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 394 (5th Cir. 2003) (discussing duty to mitigate damages under Age Discrimination in Employment Act).

equivalent work and accepts a much lower paying job.  He is now too busy to continue to search for substantially equivalent work.  So, he hires Mitt at an annual salary of $125,000 to work full-time to help him find substantially equivalent work.  A wrongful termination lawsuit is filed.  A jury awards (1) $500,000 in back pay for what Jack would have earned in the past if the employer had not unlawfully terminated him and (2) $125,000 for the salary paid to Mitt to help mitigate damages.  ✔The policy covers the back pay subject to relevant limits.  The policy excludes the salary paid to Mitt to help mitigate damages, because that salary is not a component of back pay or front pay.


### (3) hiring temporary workers in order to meet legal obligation

The policy defines *employment practices claim* to include a demand letter.[45]  Julia is an Apache helicopter pilot in the National Guard of the United States.  She receives orders for 60 days of active duty to assist in search and rescue efforts after a disaster.  Her private-sector employer says it cannot do without her and has to let her go.  It receives a demand letter that explains the Uniformed Services Employment and Reemployment Rights Act.[46]  The case settles.  Among other settlement terms, the employer agrees to restore Julia to her position upon return from active duty.  But the employer must hire a temporary worker to temporarily fill her position in order to have her position available upon return.  ✔The policy excludes wages that will be paid to the temporary worker, because those wages are not a component of back pay or front pay.


### (4) disability accommodations

Josh is on active military duty and suffers total hearing loss due to an explosion.  He starts work years later with a company that provides interpreters to diplomats and military forces.  He requests a sign language interpreter for meetings.  The employer says it cannot afford to take an interpreter out of service at lost revenue of about $700 per hour.  It says he should find an outside interpreter and offers a small stipend to help offset costs.  He files a charge of discrimination with the EEOC for failure to provide a reasonable accommodation to an otherwise qualified individual with a disability.[47]  The

---

[45]     *See* EPL Coverage Part II(C)(1).

[46]     *See Petty v. Nashville County*, 687 F.3d 710, 716-19 (6th Cir. 2012) (addressing basic reemployment rights under USERRA).

[47]     *See EEOC v. Creative Networks, LLC*, 912 F. Supp. 2d 828 (D. Ariz. 2012) (interpreter as accommodation case).

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 21 of 32

case settles. Among other settlement terms, the employer hires an outside sign language interpreter at an annual salary of $50,000 to provide services for Josh and other employees with severe hearing impairments. ✔The policy excludes the interpreter salary, because it is not a component of back pay or front pay.[48]

### (5) miscellaneous other wage claims as damages that are not back pay or front pay

Jane is an executive assistant for a construction company. She openly opposes the president's sexual harassment of young women who work at the company. The president reacts with a campaign of retaliation against her, including vandalism of her home and thinly-veiled physical threats.[49] So she hires Bob as a full-time, live-in bodyguard at an annual salary of $35,000. The company ignores her requests that the retaliation stop. Her working conditions become so intolerable that she feels compelled to resign. A retaliation lawsuit is filed. A jury finds constructive discharge and awards (1) $237,000 in back pay for what Jane would have earned in the past if the employer had not constructively discharged her and (2) $35,000 for the salary paid to Bob the bodyguard. ✔The policy covers the back pay subject to relevant limits. The policy excludes the salary paid to Bob the bodyguard, because it is not a component of a back pay or front pay award.

The above are just a few examples and are more than sufficient to demonstrate that the exclusion for *salaries, wages, or bonuses* [except as a component of a front pay or back pay award] still has meaning. Although some of the examples overlap somewhat with the exclusion for non-monetary relief, the policy's overall exclusion structure involves precisely that type of overlap as explained above.

---

[48]    The policy excludes costs associated with accommodations. But it separately refers to *costs* and *salaries, wages, and bonuses*, indicating that each has a different meaning. Costs may be costs other than salaries, wages, and bonuses — such as the cost of installing a wheelchair ramp. Or the policy may have some overlap here as it does with some of the other exclusions.

[49]    *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) ("We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 22 of 32

*Conclusion*

The above interpretation of this exclusion is reasonable and consistent with contract rules of construction.  If Twin City comes up with a conflicting but reasonable interpretation, then a court must find for the insureds, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."[50]

**3.     Exclusions from indemnity and defense coverage**

Twin City wholly excludes the following types of claims.



None of these exclusions apply.  The claim in this case is the lawsuit itself.[51]

---

[50]     *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").

[51]     *See supra* at p. 5, employment practices claim section & p. 8.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 23 of 32

### Exclusion 1: bodily injury, sickness, property damage

> (1)  for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

The lawsuit is *not for* bodily injury, sickness, disease, death, or damage or destruction of any tangible property.[52]

### Exclusion 2a: prior or pending

> (2)  based upon, arising from, or in any way related to any:
>
>     (a)  prior or pending demand, suit or proceeding against any **Insureds** as of; or
>
>     (b)  audit initiated by the Office of Federal Contract Compliance Programs before,
>
> the applicable Prior or Pending Date in item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit, proceeding, or audit;

The applicable *prior or pending date* in the declarations is March 4, 2006. The lawsuit is not in any way related to any prior or pending demand, suit, or proceeding against any insured as of March 4, 2006. SH Management, SH Development, and AH Construction first repudiated the oral pay-to-stay employment agreement in late 2007 — well into the policy period.[53]

### Exclusion 2b: audit

The lawsuit is not in any way related to any audit of the Office of Federal Contract Compliance Programs at any time.[54]

---

[52]  *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[53]  *See id*. at p. 13 ¶ 37.

[54]  *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 24 of 32

### Exclusion 3: other insurer notice before policy inception

> (3)  based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

The policy *inception date* in the declarations is March 4, 2007.  The lawsuit is not in any way related to any fact, circumstance, or situation that — before March 4, 2007 — was the subject of notice given under any other insurance policy.  It could not have been. SH Management, SH Development, and AH Construction first repudiated the oral pay-to-stay employment agreement in late 2007 — well into the policy period.[55]

### Exclusion 4: contractual assumption of liability for another's conduct

> (4)  based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

The lawsuit is not in any way related to *the liability of others* assumed under any contract or agreement.[56]  The insured entity defendants' own conduct and *own liability* are at issue with repudiation and breach of the oral pay-to-stay employment agreement and alternative claim for quantum meruit.[57]

---

[55]    *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, p. 13 ¶ 37.

[56]    *See generally* Comment, *Effect of Clause in Liability Policy Excluding Coverage for Contractual Indemnity Liability*, 25 FORDHAM L. REV. 714 (1956) (explaining this type of exclusion).

[57]    *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, pp. 4-6 ¶¶ 11-13, 16-18 & pp. 11-14 ¶¶ 33-39.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 25 of 32

### Exclusions 5: independent contractor agreements

> (5)   for breach of any Independent Contractor Agreement: or

Twin City defines "independent contractor agreement" as "any express contract or agreement between an Independent Contractor and an Insured Entity specifying the terms of the Insured Entity's engagement of such Independent Contractor."[58]   This lawsuit is *not for* breach of any independent contractor agreement.[59]

### Exclusion 6: National Labor Relations Act

> (6)   for violation of the National Labor Relations Act or any similar law.

This lawsuit is *not for* violation of the National Labor Relations Act or any similar law.[60]   In fact, Jeff could not possibly have pursued an NLRA claim in light of his employment duties with SH Management, SH Development, and AH Construction.[61]

*remainder of page intentionally left blank*

---

[58]      *See* EPL Coverage Part II(F).

[59]      *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[60]      *See generally id.*

[61]      *See National Labor Relations Bd. v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 708 (2001) ("Under the National Labor Relations Act, employees are deemed to be 'supervisors' and thereby excluded from the protections of the Act if, *inter alia,* they exercise 'independent judgment' in 'responsibly . . . direct[ing]' other employees 'in the interest of the employer.'").

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 26 of 32

### 4.    Exclusions from indemnity and defense coverage with exception of retaliation

Twin City wholly excludes the following types of claims with the exception of retaliation claims.



(B)   Other than an **Employment Practices Claim** for **Retaliation**, the Insurer shall not pay **Loss** for any **Claim**:

    (1)   based upon, arising from, or in any way related to any:

        (a)   discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

        (b)   direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

    (2)   based upon, arising from, or in any way related to any workers' compensation, unemployment compensation, disability benefits, or social security law, or any similar law;

    (3)   for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

    (4)   for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:

        (a)   overtime wages; or

        (b)   minimum wages.

None of these exclusions apply.  The claim in this case is the lawsuit itself.[62]

### Exclusion 1: pollutants

This lawsuit is not in any way related to pollutants.[63]

### Exclusion 2: workers' compensation, unemployment, disability benefits

This lawsuit is not in any way related to workers' compensation, unemployment compensation, disability benefits, social security, or any similar laws.[64]

---

[62]    *See supra* at p. 5, employment practices claim section & p. 8.

[63]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[64]    *See generally id.*

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 27 of 32

Workers' compensation laws generally protect individuals who work for a subscriber employer and suffer physical injury or sickness in the course and scope of employment.[65]  These laws provide certain medical, income, death, and burial benefits based on the compensable injury or sickness.[66]  Unemployment compensation laws generally provide benefits to qualified individuals who are able to work but are partially or totally unemployed for defined acceptable reasons.[67]

Disability benefits laws generally govern disability insurance policies and state disability benefits statutes.[68]  Disability insurance policies typically provide partial income replacement benefits during periods of partial or total disability (1) from the insured's own occupation or (2) from any occupation that is consistent with the insured's training, experience, and education — due to physical injury or illness.[69]  Social security laws govern various forms of social security benefits including disability benefits for disability from any gainful activity in the national economy.[70]

The common thread in these laws is some form of income replacement benefits during periods when an individual is unable to work.  This common thread defines "similar laws."

---

[65]     *See* TEX. LAB. CODE §§ 401.001 *et. seq.* (Texas Workers' Compensation Act).

[66]     *See id.* at § 401.011.

[67]     *See* TEX. LAB. CODE §§ 201.001 *et. seq.* (Texas Unemployment Compensation Act).

[68]     *See, e.g. Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663 (Tex. 1987) (interpreting long-term disability insurance policy).

[69]     *See, e.g., Holland v. International Paper Co. Retirement Plan*,  576 F.3d 240, 244 (5th Cir. 2009) (quoting any occupation language); *Burtch v. Hartford Life & Accident Ins. Co.*, No. 08-30513 (5th Cir. March 19, 2009) (per curiam) (addressing own occupation standard).

[70]     *See, e.g., Phillips v. Barnhart*, 357 F.3d 1232, 1237-1240 (11th Cir. 2004) (discussing burdens in social security disability case).

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 28 of 32

### Exclusion 3: ERISA, WARN Act, OSHA, COBRA

> **(3)** for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

    This lawsuit is *not for* violation of the Employee Retirement Income Security Act, the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act, or any similar law.[71] This exclusion only looks to whether the lawsuit is *for* a violation of one of these statutes or a similar law [other than retaliation]. The lawsuit is not.[72]

    ERISA governs certain (1) employer-sponsored employee welfare benefit plans and (2) employer-sponsored employee pension benefit plans [in addition to Section 510 termination claims that the policy covers].[73] Welfare benefit plans do not include payroll practices such as compensation for employee performance.[74] Pension benefit plans do not include bonus programs for employee performance, unless bonuses are systematically deferred (1) to termination or beyond or (2) so as to provide retirement benefits.[75] A covered *plan* also requires an ongoing administrative program — *i.e.,* plans do not include (1) a stand-alone employee benefit or (2) payments due upon the happening of an event, even if payments must be calculated and paid to numerous employees.[76]

---

[71]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[72]    *See generally id.*

[73]    *See* Exhibit 8, Department of Labor Publication Excerpts; 29 U.S.C. §§ 1002 *et. seq.*

[74]    *See* 29 C.F.R. § 2510.3-1(b)(1) (payroll practice compensation for employee performance not welfare benefit plan).

[75]    *See* 29 C.F.R. § 2510.3-2(c) (bonus programs not pension benefit plans).

[76]    *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 4-5, 6-8, 12 (1987) (state statute that required severance payments in event of plant closure at plant employing at least 100 employees did not constitute a welfare benefit *plan* because it did not require an ongoing administrative scheme); *Peace v. American Gen. Life Ins. Co.*, 462 F.3d 437, 440 (5th Cir. 2006) ("An employee benefit encapsulated in an ERISA plan differs from a stand-alone employee benefit.")

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 29 of 32

The WARN Act requires covered employers to provide 60 days' advance notice of a plant closing or mass layoff.[77]   OSHA requires covered employers to (1) provide a workplace free of known hazards likely to cause death or serious physical injury and (2) comply with safety regulations.[78]   And COBRA requires covered employers to offer continuation of group health coverage upon certain qualifying events.[79]

Similar laws generally mean state laws that parallel the federal counterpart or fill gaps in the federal counterpart.  For example, Texas has a health insurance continuation of coverage law that fills a gap in COBRA coverage — the Small Employer Health Insurance Availability Act.

### Exclusion 4: Fair Labor Standards Act



(4)   for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:

(a)   overtime wages; or

(b)   minimum wages

This lawsuit is *not for* violation of the Fair Labor Standards Act or any similar law.[80]   This exclusion only looks to whether the lawsuit is *for* a violation of the Fair Labor Standards Act or similar law [other than the Equal Pay Act or anti-retaliation protections].  The lawsuit is not.[81]

---

[77]      *See* Exhibit 8, Department of Labor Publication Excerpts; 29 U.S.C. §§ 2101 *et. seq.*

[78]      *See* Exhibit 8; 29 U.S.C. § 654.

[79]      *See* Exhibit 8; 29 U.S.C. §§ 1161 *et. seq.*

[80]      *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[81]      *See generally id.*

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 30 of 32

The FLSA governs payment of overtime wages, payment of minimum wage, restrictions on child labor, and provision of breaks for nursing mothers [in addition to anti-retaliation laws that the policy covers].[82]  It does not govern promised compensation unless the issue involves a minimum wage or overtime violation.[83]

## 5.   Exclusions from indemnity coverage

Twin City provides a defense but excludes indemnity coverage for the following types of claims.

> **(C)**  Other than **Defense Costs**, the insurer shall not pay **Loss** for any **Claim**:
>
> **(1)**  for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the insurer as part of a settlement;
>
> **(2)**  for costs associated with providing any accommodations required by the Americans With Disabilities Act or any similar law;
>
> **(3)**  for **Benefits**, provided that this exclusion shall not apply to any **Employment Practices Claim** for wrongful termination, dismissal or discharge of employment; or
>
> **(4)**  based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.

None of these exclusions apply.  The claim in this case is the lawsuit itself.[84]

### Exclusion 1: employment termination severance payments

This lawsuit is *not for* employment termination severance payments.[85]  The oral pay-to-stay employment agreement was not an oral pay-to-go agreement. The sale proceeds payment was compensation to stay.  It was not compensation to *leave*.  It was not compensation to *sever employment*.

---

[82]      *See* Exhibit 8, Department of Labor Publication Excerpts; 29 U.S.C. §§ 201 *et. seq.*

[83]      *See* Exhibit 8.

[84]      *See supra* at p. 5, employment practices claim section & p. 8.

[85]      *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 31 of 32

It was not compensation on account of a termination from employment.  It was not due upon employment termination.  Moreover, the sales proceeds payment was earned compensation. In contrast, a severance payment on account of termination is *not* earned compensation.

### Exclusion 2: costs associated with accommodations

> (2)  for costs associated with providing any accommodations required by the Americans With Disabilities Act or any similar law.

This lawsuit is *not for* costs associated with providing any accommodations required by the Americans with Disabilities Act or any similar law.[86]

### Exclusion 3: defined benefits

> (3)  for **Benefits**, provided that this exclusion shall not apply to any **Employment Practices Claim** for wrongful termination, dismissal or discharge of employment; or

The policy defines benefits as "any form of compensation *other than* salaries, wages, bonuses, or Stock Benefits."[87]  This lawsuit is *not for* benefits as defined in the policy.[88]

### Exclusion 4: liability incurred for breach of written contract

> (4)  based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.

This lawsuit — with respect to the *oral* pay-to-stay employment agreement and alternative claim for quantum meruit — is not in any way related to *liability incurred for breach* of any written employment contract.

---

[86]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

[87]    *See* EPL Coverage Part II(A).

[88]    *See generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition.

Mr. Steven Knight
Mr. Jason Friedman
March 11, 2016
Page 32 of 32

SH Development and AH Construction had no written employment agreement with Jeff at all.  That should end the coverage analysis.  Second, the written contract between SH Management and Jeff does not address the asset sale, any potential future sale of assets, or the pay-to-stay agreement.  So, no words in that written contract could result in *liability incurred for breach* of that written contract with respect to the oral pay-to-stay employment agreement.

The exclusion does *not* exclude a lawsuit that is in any way *related to* a written employment contract. It only excludes *liability incurred for breach* of a written employment agreement.[89]   The above interpretation of this exclusion is reasonable and consistent with contract rules of construction.  If Twin City comes up with a conflicting but reasonable interpretation, then a court must find for the insureds, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."[90]

If you need any additional information, please let me know, and I will do what I reasonably can to provide the information.  If you believe any additional coverage issue needs to be addressed, please let me know, I will try to address it.

Sincerely,

*Amy Gibson*

Amy E. Gibson

---

[89]     *See National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("An intent to exclude coverage must be expressed in clear and unambiguous language. National Union knew that the plane had dual controls. If National Union wanted to exclude simultaneous piloting from the scope of coverage, then it was incumbent upon it to expressly and clearly state the exclusion in the policy. Having failed to do so, National Union cannot now complain.").

[90]     *See id.* ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").

# Exhibits

# Operative petition

# Jeffrey W. Carpenter's Second Amended Petition

FILED
10/5/2015 11:53:41 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| **JEFFREY W. CARPENTER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **IN THE COUNTY COURT** |
| | § | |
| **SOUTHWEST HOUSING** | § | **AT LAW NO. 5** |
| **DEVELOPMENT COMPANY, INC.;** | § | |
| **SOUTHWEST HOUSING** | § | **DALLAS COUNTY, TEXAS** |
| **MANAGEMENT CORPORATION,** | § | |
| **INC. a/k/a and d/b/a SOUTHWEST** | § | |
| **HOUSING MANAGEMENT** | § | |
| **COMPANY, INC.; AFFORDABLE** | § | |
| **HOUSING CONSTRUCTION, INC.;** | § | |
| **BRIAN POTASHNIK; and** | § | |
| **CHERYL POTASHNIK,** | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **SOUTHWEST HOUSING** | § | |
| **MANAGEMENT CORPORATION,** | § | |
| **INC.,** | § | |
| | § | |
| **Counter-Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **JEFFREY W. CARPENTER,** | § | |
| | § | |
| **Counter-Defendant.** | § | |

**JEFFREY W. CARPENTER'S SECOND AMENDED PETITION**

Jeffrey W. Carpenter — through undersigned counsel — files his Second Amended

Petition and respectfully states as follows.

Appendix 0136

## DISCOVERY PLAN

1.      Jeffrey W. Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## INTRODUCTION

2.      This is an unlawful employment practices case involving refusal to pay earned compensation.

## PARTIES

3.      Jeffrey W. Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.

4.      Southwest Housing Development Company, Inc. ("SH Development") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Development has filed an answer in this civil action.

5.      Southwest Housing Management *Corporation*, Inc. ("SH Management") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Management was also known as — and was doing business as and using as an assumed or common name — Southwest Housing Management *Company*, Inc. ("SH Management Company").  Examples include, but are not limited to, the following.  SH Management sometimes used the name SH

==Management Company in its Texas Franchise Tax Public Information Reports that it filed with the Texas Secretary of State.  SH Management used the name SH Management Company on an agreement that it is at issue in this civil action.  SH Management was originally named in this civil action in its assumed or common name, as permitted under Texas Rule of Civil Procedure 28.  SH Management filed an answer in its true name in response to those allegations.  Texas permits substitution of the true name through an amended petition.==

6.      ==Affordable Housing Construction, Inc. ("AH Construction")== is a Nevada corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  AH Construction has filed an answer in this civil action.

7.      ==Brian Potashnik== is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Brian Potashnik has filed an answer in this civil action.

8.      ==Cheryl Potashnik== is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Cheryl Potashnik has filed an answer in this civil action.

## JURISDICTION

9.      This Court has subject matter jurisdiction over this civil action because Jeffrey W. Carpenter seeks damages within its jurisdictional limits and because the claims asserted herein are not subject to exclusive jurisdiction in another court.  This Court has personal jurisdiction over all parties in this civil action because (1) all parties have entered a general appearance before it, (2) all parties have maintained continuous and systematic ties to Texas that make them

at home in Texas, and (3) the claims asserted herein arose from all parties' purposeful activities in Texas and the exercise of jurisdiction is reasonable.

## VENUE

10.     Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(2) because the individual defendants' residence was in Dallas County, Texas at the time the causes of action asserted herein accrued.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(3) because the corporate defendants each maintained their principal office in Dallas County, Texas at the time the causes of action asserted herein accrued.

## VICE-PRINCIPAL STATUS

11.     A "vice principal" is someone who fits within at least one of the following categories: (1) corporate officers, or (2) others who represent the corporation in its corporate capacity, or (3) those who have authority to employ, direct, or discharge employees of the corporation, or (4) those engaged in the performance of non-delegable or absolute duties of the corporation, or (5) those to whom the corporation has entrusted the management of the whole or a department or division of the business.  The acts and omissions of a "vice principal" are the acts and omissions of the corporation itself.  A corporation may have more than one vice principal.

Appendix 0139

12.      Brian Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  Examples include, but are not limited to, the following.  Mr. Potashnik was the only person serving on the Board of Directors for SH Development, SH Management, and AH Construction [according to Texas Secretary of State records] when he engaged in his acts and omissions at issue in this civil action.  Mr. Potashnik was also a corporate officer of SH Development, SH Management, and AH Construction when he engaged in his acts and omissions at issue in this civil action.

13.      Brian Potashnik acted as a vice principal for SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed his intent to pay more than the minimum Annual Bonuses and promised to get same done.  Mr. Potashnik acted as a vice principal for SH Development, SH Management, and AH Construction when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

14.      Cheryl Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  For example, the website for SH Development, SH Management, and AH Construction listed Ms. Potashnik as a corporate officer at the times she engaged in her acts and omissions at issue in this civil action.

15.      Cheryl Potashnik acted as a vice principal for SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed her intent to pay more than the minimum Annual Bonuses and promised to get same done.  Ms. Potashnik acted as a vice principal for SH

Development, SH Management, and AH Construction when she confirmed that the Sale Proceeds Payment was earned and was due.

## ACTUAL OR APPARENT AUTHORITY

16.     A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.  Actual authority arises from a party's agreement that another act on behalf and for the benefit of the party.  This authority includes whatever else is proper, usual, and necessary to do what was expressly authorized.  More than one person may have actual authority to do something.

17.     Apparent authority exists if a party (1) knowingly permits another to hold himself or herself out as having authority or (2) through lack of ordinary care, gives another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his or her detriment.  Apparent authority may exist without actual authority.  More than one person may have apparent authority to do something.

18.     Brian Potashnik had actual or apparent authority to act on behalf of SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed his intent to pay more than the minimum Annual Bonuses and promised to get same done.  Mr. Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Cheryl Potashnik, and himself when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

19.     Cheryl Potashnik had actual or apparent authority to act on behalf of SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed her intent to pay more than the minimum Annual Bonuses and promised to get same done.  Ms. Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Brian Potashnik, and herself when she confirmed that the Sale Proceeds Payment was earned and was due.

**FIRST CLAIM FOR RELIEF:**
**FAILURE TO COMPLY WITH & REPUDIATION OF AGREEMENT —**
**ANNUAL BONUSES**

20.     An employer must comply with its agreements to pay bonuses to its employees. When interpreting an agreement, the facts and circumstances surrounding execution of the agreement may be considered in most cases.  When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases.  A written agreement may be orally modified, even if the written agreement states otherwise, as long as the underlying agreement is not within the statute of frauds.

21.     An agreement may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing.  The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.  When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its obligation by failing to set the amount.

22.     **Failure to comply and repudiation:** The following is not intended to be exhaustive or to state all facts.  To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth.  Brian Potashnik helped recruit Jeffrey W. Carpenter ("Jeff") to join SH Management.  Brian Potashnik worked out (1) a base salary amount and (2) bonus range amounts with a minimum bonus and a maximum bonus.  Brian Potashnik expressed that the salary and bonus range were intended to place Jeff in the range of $400,000 in earnings a year [in addition to fringe benefits].  SH Management later hired Jeff as its Executive Vice President with employment beginning March 15, 2004.

23.     Brian Potashnik — as President of SH Management *Company* — had signed a written employment agreement in that regard (the "2004 Agreement").  SH Management Company agreed therein to a $200,000 base salary.  SH Management Company agreed therein to a bonus range in the first calendar year of employment that included a $50,000 minimum and a $200,000 maximum.  SH Management Company agreed therein to provide a more detailed bonus plan within the first 90 days of employment.  SH Management Company agreed therein to review and revise the bonus structure on an annual basis.

24.     SH Management did not provide a more detailed bonus plan.  SH Management did not revise the bonus structure on an annual basis.  SH Management did not eliminate the bonus plan.  Brian Potashnik and Cheryl Potashnik both confirmed at various points during the employment tenure that Jeff was owed and had earned — *i.e.,* fully performed and met their requirements for — annual bonuses for more than just the first year (the "Annual Bonuses").  Brian Potashnik and Cheryl Potashnik both expressed at various points during the employment tenure their intent to pay more than the minimum Annual Bonuses and promised to get it done

[*i.e.,* to pay same]. SH Management did not pay the Annual Bonuses. SH Management eventually repudiated the agreement for Annual Bonuses in late 2007. SH Management caused Jeff to suffer damages as a result.

25.      **Oral modification or oral agreement:**  What the parties said and did in light of the surrounding circumstances, including the course of dealing, demonstrates oral modification of the 2004 Agreement or a separate oral agreement to a bonus structure with a $50,000 minimum and a $200,000 maximum in each calendar year of employment.   Under Texas law, the 2004 Agreement could be orally modified despite language in the agreement to the contrary. Oral agreements on compensation — whether considered a modification to the 2004 Agreement or a new agreement to matters not address in the 2004 Agreement — were not unusual as a matter of practice for SH Management.

26.      **Pro rata Annual Bonus for last partial year of employment:**  SH Management unilaterally terminated Jeff's employment without good cause in light of an impending conclusion to an asset sale.  SH Management caused Jeff's last day of work to be on or about November 2, 2007.  Thus, for the last annual bonus, SH Management owes Jeff a pro rata share of the Annual Bonus based on the months he worked in the relevant calendar year.  This is sometimes called a *Riata Cadillac* claim, based on the Texas Supreme Court opinion in *Miller v. Riata Cadillac Co*.

27.      **Prevention of performance, prevention of condition, and limited right to revoke:**  Whether the agreement for Annual Bonuses is considered bilateral or unilateral, SH Management could not lawfully prevent performance or a condition to receiving an Annual Bonus and thereby avoid its payment obligations.  For example, SH Management could not

lawfully avoid payment of the last annual bonus by unilaterally terminating Jeff's employment without good cause and then claiming Jeff was not entitled to the last annual bonus because he was not employed on the distribution date.   To the extent the agreement was a unilateral agreement, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that SH Management could not revoke the offer at that point.

28.   **Sole discretion:**   The provisions in the 2004 Agreement providing that the employer may make decisions in the employer's "sole discretion" include — as a matter of law — the requirement of "good faith" in connection with any such decisions.

29.   **Termination of employment:**   Under Texas law, SH Management cannot legally refuse to pay earned compensation after termination, regardless of whether or not the 2004 Agreement contains language to the contrary and regardless of whether or not earned compensation was payable at an earlier or later date.

30.   **Alternative pleading of ambiguity:**   Pleading in the alternative only, the following provisions of the 2004 Agreement are ambiguous under the circumstances in fact and in law: (1) the ¶ 4(b) provision referring to "the minimum discretionary bonus potential" and "the maximum bonus potential," and (2) the ¶ 7 provision claiming the employee is not entitled to compensation pursuant to the 2004 Agreement effective upon termination of employment, and (3) the ¶ 3 provisions describing duties and acceptable and unacceptable moonlighting.

31.   The ¶ 4(b) provision allows discretion within the minimum and maximum bonus range but no discretion as to payment of a minimum bonus.   When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its

obligation by failing to set the amount. The ¶ 7 provision does not — and legally cannot — reduce or eliminate the obligation to pay earned compensation. The ¶ 7 provision does not state that the severance payment requires any release of claims and does not state that the severance payment is in lieu of earned compensation. The ¶ 3 provisions contemplate that affiliates of SH Management Company may also employ Jeff and that such employment would be a permissible working time, attention, and energies.

32.     **Additional Responsible [Liable] Person — Brian Potashnik:** Texas Secretary of State records and Texas Comptroller records show by omission that SH Management Company never existed or operated as a legal entity in Texas. The 2004 Agreement represented that SH Management Company was a Texas corporation. If SH Management *Company* is not an assumed name for  SH Management, then Brian Potashnik signed the 2004 Agreement as the President of a non-existent company — SH Management *Company* — and thus signed in his individual capacity and is individually responsible for failure to comply with the 2004 Agreement. Alternatively, if SH Management *Company* is not an assumed name for  SH Management, then SH Management had exclusively an oral agreement with Jeff for the Annual Bonuses.

<mark>**SECOND CLAIM FOR RELIEF:**
**FAILURE TO COMPLY WITH & REPUDIATION OF ORAL AGREEMENT —**
**SALE PROCEEDS PAYMENT**</mark>

33.     <mark>An employer must comply with its agreements to pay employees for work. A written agreement is of no higher legal significance than an oral agreement. When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases. An agreement</mark>

may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing. The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.

34.   **Failure to comply and repudiation:**   The following is not intended to be exhaustive or to state all facts. To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth. In May of 2006, Brian Potashnik was at home when he met with Jeff. Brian Potashnik expressed that he had good news and was selling the business. Brian Potashnik explained that Jeff might not have a job after the asset sale but that he needed Jeff to stay on and help make the asset sale happen. Brian Potashnik expressed that, other than himself and his wife Cheryl, Jeff was the most important person needed to make the sale happen. Brian Potashnik said that if Jeff stayed on and assisted in effectuating the asset sale for as long as needed, Jeff would be paid a bonus from the sale proceeds — Brian Potashnik worked out the formula further down the line (the "Sale Proceeds Payment").

35.   Brian Potashnik and Cheryl Potashnik saw that Jeff accepted and stayed on and got to work to make the asset sale happen. Around six months later, Brian Potashnik and Cheryl Potashnik saw that a potential purchaser had signed a letter of intent for the multi-million dollar asset sale. Brian Potashnik then met with Jeff. Brian Potashnik expressed that Jeff probably would not have a job after the sale but that he still needed Jeff to stay on as long as needed to help make the asset sale happen. Brian Potashnik told Jeff the formula for calculating the Sale Proceeds Payment and estimated the Sale Proceeds Payment at more than $1 million.

36.   Brian Potashnik and Cheryl Potashnik saw that Jeff stayed on and continued to work to make the sale happen. Brian Potashnik and Cheryl Potashnik learned that Jeff turned

down or deferred other employment in order to stay on.  Brian Potashnik and Cheryl Potashnik saw that the asset sale would involve assets for several sellers — SH Development, SH Management, AH Construction, Cheryl Potashnik, Brian Potashnik, and entities that each of them owned or controlled.  At various points, Brian Potashnik and Cheryl Potashnik expressed that the Sale Proceeds Payment was due to Jeff.

37.     Over a year later as the asset sale looked more certain and a target management transition date was announced, Cheryl Potashnik thanked Jeff for his work and told him that he would only be needed through the end of the week.  In other words, Cheryl Potashnik confirmed that Jeff had fully performed his obligations under the agreement for the Sale Proceeds Payment.  Jeff's last day of work was on or about November 2, 2007.  SH Development, SH Management, AH Construction, Cheryl Potashnik, and Brian Potashnik all received proceeds from the asset sale.  SH Development, SH Management, AH Construction, Cheryl Potashnik, and Brian Potashnik did not pay the Sale Proceeds Payment.  Brian Potashnik and Cheryl Potashnik eventually repudiated the agreement for the Sale Proceeds Bonus in late 2007.  These sellers caused Mr. Carpenter to suffer damages as a result.

38.     **Prevention of performance, prevention of condition, and limited right to revoke:**  Whether the agreement for the Sale Proceeds Payment is considered bilateral or unilateral, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik could not lawfully prevent performance or a condition to receiving the Sale Proceeds Payment and thereby avoid their payment obligations.  For example, none of them could lawfully avoid payment by unilaterally terminating Jeff's employment without good cause before the asset sale concluded and then claim Jeff was not entitled to Sale Proceeds Payment because he

Appendix 0148

was not employed on the distribution date.  Jeff fully performed under the agreement before his employment ended and thus earned Sale Proceeds Payment before his employment ended. Pleading in the alternative only, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that the offer could not be revoked at that point. Pleading further in the alternative only, Mr. Carpenter is entitled to a pro rata share of Sale Proceeds Payment based on *Riata Cadillac* principles.

## ALTERNATIVE THIRD CLAIM FOR RELIEF:
### *QUANTUM MERUIT*

39.     Pleading in the alternative only, in the event of a finding that there is no enforceable agreement for the Annual Bonuses or Sale Proceeds Payment, or in the event of a finding that there is no agreement as to a specific term, Jeff is entitled to recovery under the theory of *quantum meruit* for the reasonable value of his services provided to SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik and to prevent unjust enrichment.  Jeff conferred valuable services under such circumstances as reasonably notified these persons and entities that he, in performing such services for them, expected to be paid for those services, and they benefited from those services.

## ALTERNATIVE FOURTH CLAIM FOR RELIEF:
### PROMISSORY ESTOPPEL

40.     Pleading in the alternative only, Jeff is entitled to recovery of the Annual Bonuses and Sale Proceeds Payment under the theory of promissory estoppel.  As to the Annual Bonuses, SH Management and [alternatively] Brian Potashnik in his individual capacity promised the bonuses to Jeff under circumstances that made reliance on that promise foreseeable, and Jeff

relied on that promise to his detriment.  As to Sale Proceeds Payment, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik promised Sale Proceeds Payment to Jeff under circumstances that made reliance on that promise foreseeable, and Jeff relied on that promise to his detriment.

## ADDITIONAL JOINT RESPONSIBILITY [LIABILITY]

### Winding Up — Individual Liability for All Obligations of Entities

41.      Brian Potashnik and Cheryl Potashnik, as governing persons or officers or directors of SH Development and SH Management are individually responsible [and liable] for the claims asserted against these entities in this civil action.  SH Development and SH Management completed the process of winding up [also known as dissolution or termination of existence] without providing the statutorily required notice to Jeff.  At the time of termination and winding up, Jeff had a claim [which is defined per statute to include a contingent and unliquidated claim] pending against these entities.  The lack of required notice renders Mr. Potashnik and Ms. Potashnik individually liable for obligations for which these entities are liable.

### Joint Employer

42.      SH Development, SH Management Corporation, and Affordable Housing are responsible [and liable] for failure to comply with the annual bonus agreement and agreement for a bonus from net proceeds of the asset sale, based on the joint employer doctrine.  Although typically applied in discrimination cases, this doctrine recognizes that more than one entity may employ a person.  For example, Affordable Housing issued at least one employment

compensation check to Mr. Carpenter, but "Southwest Housing Management" was listed as the employer on W2 forms; the same principals from each of these entities had the power to hire and fire Mr. Carpenter; the Southwest Housing website listed employees of these entities as employees of the same entity; on information and belief, payroll for all entities' employees was handled through one entity [with possible reconciliation between entities at a later date]; and overall, these entities were treated as a single unit as a practical matter for employment issues.

**Joint Venture, Joint Enterprise, or Implied Partnership —
Bonus from Net Proceeds of Asset Sale**

43.     SH Development, SH Management, and AH Construction are responsible [and liable] for failure to comply with the agreement for a bonus from net proceeds of the asset sale, based on the joint venture, joint enterprise, or implied partnership doctrine.  These entities had an agreement, a common purpose, a community of pecuniary interest, and an equal right of control concerning the asset sale and efforts to reach an asset sale [as to control, the same principals — Brian Potashnik and/or Cheryl Potashnik controlled each entity].  On information and belief, each entity was a party to the final asset sale agreement — precisely the end to the means of the agreement made with Mr. Carpenter concerning a bonus to stay on to help effectuate the sale of the Southwest Housing entities' assets.

Appendix 0151

## Alter Ego

44.     Brian Potashnik and Cheryl Potashnik are responsible [and liable] for failure to comply with the annual bonus agreement and agreement for a bonus from net proceeds of the asset sale, based on alter ego as outlined in the Texas Business Organizations Code [and its predecessor to the extent applicable].  They caused the corporate form to be used for the purpose of perpetrating and did perpetrate an actual fraud on Mr. Carpenter primarily for the direct personal benefit of each of them.  For example, SH Development and SH Management — which they controlled — conducted a winding up and terminated their existence after the asset sale and failed to provide the statutorily required notice to Mr. Carpenter, whose lawsuit was pending at the time.  As another example, they stated that asset sale proceeds were needed to help fund their individual defense of pending criminal charges.  As another example, Mr. Potashnik signed Mr. Carpenter's initial employment agreement as an officer of an apparently non-existent entity and yet represented in that agreement that the entity was a Texas corporation.

## ATTORNEYS' FEES

45.     As a result of the conduct described above, Mr. Carpenter had to hire attorneys to pursue the claims asserted herein.  Mr. Carpenter has agreed to pay his attorneys a reasonable fee.  Mr. Carpenter seeks to recover reasonable and necessary attorneys' fees incurred in connection with this action, including all appeals, pursuant to the provisions of the Texas Civil Practice and Remedies Code, including claims for a contract and personal services.

## **CONDITIONS PRECEDENT**

46.     All conditions precedent to filing suit and to recovery on the claims asserted herein have occurred, been performed, or been waived.

## **JURY DEMAND**

47.     Mr. Carpenter requests a jury trial on all issues triable of right [or choice] by a jury.  He has paid the required jury fee.

## **RELIEF REQUESTED**

48.     Based on the foregoing, Jeffrey Carpenter requests the following relief:

(A)     judgment on all counts of the petition;

(B)     back pay [past wages];

(C)     costs of court and attorneys' fees;

(E)     pre-judgment and post-judgment interest as allowed by law; and

(F)     such other and further relief, in law or in equity, to which he may show himself justly entitled.

Appendix 0153

Respectfully submitted,


_/s/ Amy Gibson_____
Amy Gibson
Texas State Bar No. 00793801
David L. Wiley
Texas State Bar No. 24029901

**Gibson Wiley PLLC**
1500 Jackson Street #714
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126
Email Addresses:

amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR JEFFREY
CARPENTER

Appendix 0154

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 5, 2015, a true copy of Jeffrey W. Carpenter's

Second Amended Petition was served on all other parties through their lead attorneys of record

as follows:

**<u>VIA TEXAS E-FILE SYSTEM</u>**

Mr. Lawrence J. Friedman
Mr. Michael Donohue
Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
lfriedman@fflawoffice.com
mdonohue@fflawoffice.com
jhfriedman@fflawoffice.com

<span style="padding-left:3em">*/s/ Amy Gibson*_____</span>
<span style="padding-left:3em">Amy E. Gibson</span>

Appendix 0155

# Excerpts from Purchase and Sale Agreement

PURCHASE AND SALE AGREEMENT

By and Among

CASCADE AFFORDABLE HOUSING LLC

and

SELLERS (as listed on Schedule A)

Dated April 30, 2007

50806446.4
ORL1\CORPSEC\917721.7
31220/0055 RMA ts 4/30/2007 4:53 PM

Appendix 0157   CONFIDENTIAL
CAH-SW000268

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "Agreement"), dated as of April 26, 2007, is made by and among Cascade Affordable Housing LLC, a Washington limited liability company (the "Purchaser"), and the Sellers listed on Schedule A attached hereto (individually and/or collectively as the context may require, the "Seller"). Unless otherwise indicated, all capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in Exhibit A attached hereto and made a part hereof.

## R E C I T A L S

A.   Seller is engaged in the business (the "Business") of sponsoring, developing and managing each of the multi-family residential projects identified by project name and address on Schedule A (the "Projects").

B.   Each Project is owned and operated by a limited partnership as set forth on Schedule A (collectively, the "Project Partnerships"), and Seller, pursuant to certain limited partnership agreements for certain Project Partnerships (together with partnership agreements from all other Project Partnerships, the "Project Partnership Agreements") owns partnership interests in certain Project Partnerships as set forth on Schedule A (collectively, the "Partnership Interests").

C.   In consideration for its services in connection with the Projects, Seller receives or is entitled to receive various payments, including, but not limited to, cash distributions, property management fees, incentive management fees, asset management fees, tax credit fees, principal amortization payments, disposition fees, sale and refinancing proceeds, repayment of operating deficit loans and deferred development fees (collectively, with all contractual rights associated therewith, the "Economic Interests," and together with the Partnership Interests, other than any interests excluded from the transaction contemplated hereby pursuant to the terms of this Agreement, the "Purchased Assets"). The Seller of each Economic Interest (which Economic Interest is separate from a Partnership Interest) and a description of such Economic Interest is also set forth on Schedule A.

D.   Seller has issued various guarantees and/or indemnities and has other obligations in connection with the Projects and the Purchased Assets, including, without limitation, guarantees relating to operating deficits, repurchase events, tax credit compliance and recapture, permanent loan closing, loan obligations, general partner obligations, developer obligations, environmental indemnities and other contractual obligations (altogether, the "Seller Obligations").

E.   Substantially all of the items listed on Exhibit B attached hereto, to the extent within Seller's possession or control, are or will be available within thirty (30) days of the date hereof on the Southwest Website (the "Web Docs"). The items listed on Exhibit C attached hereto (the "Office Docs") will be available for review at the offices of Seller or at the Project locations during the time period beginning on the date hereof and ending at the termination or expiration of this Agreement. Altogether, the Web Docs, the Office Docs, the Title Docs (defined below) and such other information as Seller shall disclose

1

Appendix 058   CONFIDENTIAL
CAH-SW000272

to Purchasers in writing during the Due Diligence Period shall be referred to as the "Disclosures."

F.    Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Purchased Assets and Purchaser desires to assume those Seller Obligations which constitute Future Obligations (defined below) and such other Seller Obligations as may be necessary to permit Seller and/or its Affiliates to be released from all Seller Obligations.

G.    Purchaser desires to assume the lease for the space located at 5910 North Central Expressway, Suite 1145, Dallas, Texas (the "Leased Space").

H.    Purchaser desires to assume the lease for seven (7) copy machines (the "Copy Lease").

**NOW, THEREFORE**, in consideration of the foregoing Recitals (which are hereby incorporated by reference), the representations, warranties, agreements and conditions hereafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF INTERESTS; CLOSING

1.1    Agreement to Purchase and Sell. On the Closing Date, upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, assign, transfer, convey and deliver the Purchased Assets to the Purchaser, free and clear of all Liens other than (i) Liens in favor of Other Partners and Project Partnership lenders for the purpose of securing obligations of Seller to the Other Partners and Project Partnership lenders arising under the Disclosures, and (ii) the Liens that are revealed by a UCC search of each Seller (the "UCC Search") but to which Purchaser does not object during the Due Diligence Period (provided that Purchaser shall not object to the Liens described in (i) above), (iii) the Liens listed on Schedule 1.1 (collectively, the "Permitted Interest Liens"), and Purchaser shall purchase the Purchased Assets from Seller and assume the Seller Obligations (except as otherwise provided herein). Purchaser also agrees that, to the extent required by the provider of a Required Consent as a condition to the granting of such Required Consent and/or release of Seller from all Seller Obligations, Purchaser shall cause Cascade Holdings to guarantee any Seller Obligations. Purchaser may designate within ten (10) days (or such earlier date if requested by the provider of a Request Consent) of Closing various Affiliates of Purchaser as Purchaser's designees to take title to the various Purchased Assets and/or to assume the Seller Obligations to be assumed by Purchaser under this Agreement and to assume the lease of the Leased Space and the Copy Lease.

1.2    Purchase Price, Allocation and Tax Treatment. The aggregate consideration to be paid by Purchaser to Seller (the "Purchase Price") shall be an amount equal to THIRTY SEVEN MILLION DOLLARS ($37,000,000) (the "Base Price"), subject to adjustment in connection with the removal of Removed Projects in accordance with the terms of this Agreement; plus or minus the Proration Adjustment, calculated in accordance with Section 1.4.

2

Appendix ONE 59 CONFIDENTIAL
CAH-SW000273

8.11    Expenses.  Except as expressly provided otherwise in this Agreement, Seller and Purchaser shall each bear their own respective transaction fees and expenses (including fees and expenses of legal counsel, accountants, investment bankers, brokers, finders or other representatives and consultants) incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby.

8.12    Construction.  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent and no rule of strict construction shall be applied against any Party.

8.13    Mutual Drafting.  The parties hereto are sophisticated and have been represented by attorneys throughout the transactions contemplated hereby who have carefully negotiated the provisions hereof.  As a consequence, the parties do not intend that the presumptions of laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement or any agreement or instrument executed in connection herewith, and therefore waive their effects.

8.14    Prevailing Party.  The prevailing party in any action brought to enforce the remedies reserved to the parties, respectively, hereunder shall be entitled to recover reasonable attorneys' fees and court costs in addition to any other relief.

8.15    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

8.16    Schedules and Exhibits.  Each of the Schedules referenced in this Agreement and within the control of Seller that are not already attached hereto shall be prepared by Seller and delivered to Buyer in substantially final form within thirty (30) days of the date hereof; provided, that within ten (10) days of the date hereof, the parties shall use reasonable efforts to agree upon Schedules A and 1.4(b).  Purchaser and Seller shall use reasonable efforts to agree upon the form of each of the Exhibits which are not attached hereto no later than 30 days from the date hereof. If the parties are not able to agree on the Schedules and Exhibits within the time periods provided above, then either Purchaser or Seller shall have the right to terminate this Agreement (upon notice which must be given, if at all, within five (5) days of the end of the time periods above), in which case the Earnest Money shall be refunded to Purchaser and neither party shall have any further obligation hereunder.

*(Remainder of this Page Intentionally Left Blank)*

*(Signature Page Follows)*

50

Appendix 0160    CONFIDENTIAL
CAH-SW000321

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

BUYER:                          CASCADE AFFORDABLE HOUSING LLC, a
                                Washington limited liability company

                          By: _____
                                Name:  STAN HARRELSON
                                Its:   MANAGER

BUYER'S INDEMNITOR:             CASCADE HOLDINGS LLC, a Washington
                                limited liability company

                          By: _____
                                Name:  STAN MANAGER
                                Its:   MANAGER

SELLER:                         FOR EACH OF THE SELLERS LISTED ON
                                SCHEDULE A HEREOF

                          By: _____
                                Brian Potashnik, authorized agent

SELLER'S INDEMNITOR:            SOUTHWEST GUARANTOR LLC

                          By: _____
                                Brian Potashnik, sole member

51

OR.1\CORP\SEC\817721.7
31220\0058 RMA bi 4/30/2007 4:53 PM

CONFIDENTIAL
CAH-SW000322

## SCHEDULE A

**Southwest Cascade**
**Seller/Asset/Purchase Price Allocation**[1][2][3]

---

[1] With respect to any partnership interest, unless footnoted otherwise, it will be a direct transfer of the partnership interest and will include any and all interests in the applicable partnership and all rights associated herewith or arising therefrom, including, without limitation, any and all rights relating to ownership, control, management, consent, allocations, credit, distributions and fees.

With respect to Developer Fees, unless otherwise footnoted, this will include assignment of all of Seller's rights under the Development Agreement.

[2] Generally, Seller and Buyer agreed that the tax treatment will be capital gain for the sale of GP interests and Class B interests and ordinary income for developer fees and management rights. However, a portion (i.e., that portion attributable to depreciation taken) of the amounts paid for partnership interests will be taxed at 25%. Please check with the accountants.

[3] We still need to identify which assets will be excluded. For example, will we exclude unpaid contractor fees, development deficit loans, operating deficit loans, rights to disbursements from certain reserves?

ORL1\CORPSEC\860291.3
31220\C056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000001

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 1. | MHMR Senior Housing, L.P. | a. MHMR Senior Housing Development Corporation | a. General Partner Interest[1] | [$           ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$           ] |
| | | c. Southwest Housing Development Corporation[2] | c. Loan Receivable[3] | [$           ] |
| | | | | [$           ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] and Loan Receivable[3 5] | |

---

[1]   Intentionally left blank. 

[2]   This is a typo. This entity does not exist.

[3]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]   Includes deferred management fee.

[5]   Includes receivable from Partnership for items that should have been paid by Partnership.

Appendix 01-63

CONFIDENTIAL
CAH-SW000002

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 2. | Greenville Senior Housing, L.P. | a. Greenville Senior Housing Development Corporation | a General Partner Interest[1] | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$          ] |

---

[1]   Cheryl Potashnik HUB.

[2]   Includes deferred management fee.  Subject to A/P to Partnership for overpayment of management fee.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000003

|   | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 3. | Texas Hampton Senior Housing, L.P. | a. Texas Hampton Senior Housing Development Corporation | a. General Partner Interest | [$              ] |
|   |   | b. Brian Potashnik | b. Class B Limited Partner Interest | [$              ] |
|   |   | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable [1] | [$              ] |
|   |   | d. Southwest Housing Management Corporation | d. Property Management Rights[2] and Loan Receivable [1] [3] | [$              ] |

---

[1]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]  Includes deferred management fee.

[3]  Includes receivable from Partnership for items that should have been paid by Partnership.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000004

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 4. | The Parks at Westmoreland Senior Housing, L.P. | a.  The Parks at Westmoreland Senior Housing Development Corporation | a.  General Partner Interest[1] | [$        ] |
| | | | b.  Class B Limited Interest | [$        ] |
| | | b.  Brian Potashnik. | c.  Development Fee | [$        ] |
| | | c.  Southwest Housing Development Company, Inc. | d.  Property Management Rights[2] and Loan Receivable[3] | [$        ] |
| | | d.  Southwest Housing Management Corporation | | |

---

[1]  There is an assignment of future cash flow to a church.

[2]  Includes deferred management fee.

[3]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0166

CONFIDENTIAL
CAH-SW000005

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 5. | Hillsboro Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$          ] |

---

[1] HUB deal. Villas Buenas, Inc. is owner of GP. Possible buyout by Cheryl.

ORL1\CORPSEC\660291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000006

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 6. | Chattanooga Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[2] and Loan Receivable[3] | [$          ] |

---

[1] HUB deal.  El Dorado Housing Development Corp. is owner of GP.  Cheryl has contract to purchase.

[2] Includes deferred management fee.

[3] Includes receivable from Partnership for items that should have been paid by Partnership.

ORL1\CORPSEC\860291.3
31220/0055 RMA ts 4/30/2007 9:11 AM

Appendix 0168

CONFIDENTIAL
CAH-SW000007

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 7. | Knollwood Villas, L.P. | a. Knollwood Villas Development Corporation | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Partner Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] and Loan Receivable[3] | [$          ] |

---

[1]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]   Includes deferred management fee.  Subject to A/P to Partnership for overpayment of management fee.

[3]   Includes receivable from Partnership for items that should have been paid by Partnership.

Appendix ONF69 & CONFIDENTIAL
CAH-SW000008

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 8. | TX Bluffview Housing, L.P. | a. TX Bluffview Housing Development Corporation | a. General Partner Interest | [$ ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$ ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$ ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$ ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000009

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 9. | Arbors Housing Partners, Ltd.[1][5] | a. Arbors Creekside LLC | a. Class B Limited Interest | [$        ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivables[2] | [$        ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] and Loan Receivable[2][4] | [$        ] |

---

[1]   Intentionally left blank.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   Includes receivable from Partnership for items that should have been paid by Partnership.

[5]   There is also an amount due to construction company, which is excluded from this transaction.

Appendix 0171
CONFIDENTIAL
CAH-SW000010

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 10. | TX Hillside Apartments, L.P.[4] | a. TX Hillside Development Corporation | a. General Partner Interest[1] | [$            ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$            ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[2] | [$            ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] and Loan Receivable | [$            ] |

---

[1]   Subject to a donation of cash flow to a church.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   There is a small tract of land which is part of the Project which may need to be transferred.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 11. | Colorado Creekside Housing, L.P.[3] | a. Colorado Creekside Housing Development, Inc. | a. General Partner Interest | [$       ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$       ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$       ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$       ] |

---

[1]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]  Includes receivable from Partnership for items that should have been paid by Partnership.

[3]  There is an amount due to the construction company which is excluded from this transaction.

Appendix 0173   CONFIDENTIAL
CAH-SW000012

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 12. | Highland Gardens, L.P.[2] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[1] | [$          ] |

---

[1]    Includes deferred management fee.

[2]    HUB deal.  Casa Linda Development Corp. is owner of GP.  Possible buyout by Cheryl.

Appendix 0174

CONFIDENTIAL
CAH-SW000013

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 13. | Tahoe Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$          ] |

---

[1]   HUB deal.  El Dorado Housing Development Corp. is owner of GP.  Cheryl has contract to purchase.

Appendix 0175   CONFIDENTIAL
CAH-SW000014

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 14. | Oak Hollow Housing, L.P. | a.  Oak Hollow Housing Development Corporation | a.  General Partner Interest[1] | [$           ] |
| | | b.  Brian Potashnik | b.  Class B Limited Interest | [$           ] |
| | | c.  Southwest Housing Development Company, Inc. | c.  Development Fee and Voluntary Loan[2] and Loan Receivable[3] | [$           ] |
| | | d.  Southwest Housing Management Corporation | d.  Property Management Rights[4] | [$           ] |

---

[1]   Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated."  If so, we need to discuss how this will occur.

[2]   See Charter Workout docs.

[3]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]   Includes deferred management fee.

Appendix ON 76 CONFIDENTIAL
CAH-SW000015

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 15. | Pleasant Valley Villas Housing, L.P.[4] | a. Pleasant Valley Villas Development, L.L.C. | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[1] and Loan Receivable[2] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] | [$          ] |

---

[1]  See Charter Workout docs.

[2]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]  Includes deferred management fee.

[4]  This is a fee due to contractor, which is excluded from this transaction.

ORL1\CORPSEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000016

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 16. | Clarkridge Villas Housing, L.P. | a. Clarkridge Villas Development, L.L.C. | a. General Partner Interest[1] | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[2] and Voluntary Loan[3] and Loan Receivable[4] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[5] | [$          ] |

---

[1]   Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated." If so, we need to discuss how this will occur.

[2]   Cash developer fee stays with Southwest.

[3]   See Charter Workout docs.

[4]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[5]   Includes deferred management fee.

CONFIDENTIAL
CAH-SW000017

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 17. | Heatherwilde Villas Housing, L.P. | a. Heatherwilde Villas Development, L.L.C. | a. General Partner Interest | [$            ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$            ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[1] and Voluntary Loan[2] and Loan Receivable[3] | [$            ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] | [$            ] |

---

[1]    Cash developer fee stays with Southwest.

[2]    See Charter Workout docs.  Also, when $1.5 million collateral account is used to resize debt, then that amount will become a voluntary loan.

[3]    May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]    Includes deferred management fee.

CONFIDENTIAL
CAH-SW000018

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 18. | Primrose SA II Housing, L.P. | a. Brian Potashnik | a. Class B Limited Interest | [$              ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivables[1] | [$              ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[2] | [$              ] |

---

[1]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]  Includes deferred management fee.

Appendix 0180
CONFIDENTIAL
CAH-SW000019

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 19. | Southern Oaks Housing, L.P. | a. Southern Oaks Housing Development, L.L.C. | a. General Partner Interest[1] | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[2] and Voluntary Loan[3] and Loan Receivable[4] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[5] | [$          ] |

---

[1] Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated." If so, we need to discuss how this will occur.

[2] Cash developer fee stays with Southwest.

[3] See Charter Workout docs.

[4] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[5] Includes deferred management fee.

CONFIDENTIAL
CAH-SW000020

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 20. | Hickory Trace Housing, L.P. | a. Hickory Trace Development, L.L.C. | a. General Partner Interest | [$          ] |
|  |  | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
|  |  | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[1] | [$          ] |
|  |  | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$          ] |

---

[1]   See Charter Mac Workout docs.

[2]   Includes deferred management fee.

CONFIDENTIAL
CAH-SW000021

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 21. | Escondido Housing, L.P. | a. Escondido Housing Development, L.L.C. | a. General Partner Interest | [$            ] |
| | | b. Brian Potashnik. | b. Class B Limited Interest | [$            ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[1] and Loan Receivable[2] | [$            ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] | [$            ] |

---

[1]   Cash developer fee stays with Southwest.  25% of entire Developer Fee is paid to HSI.  See Letter Agreement.

[2]   May be paid off with final capital contribution.

[3]   Includes deferred management fee.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0183    CONFIDENTIAL
CAH-SW000022

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 22. | Texas Birchwood Apartments, L.P.[1] | a. Texas Birchwood Properties Corporation | a. General Partner Interest | [$          ] |
| | | b. Southwest Housing Management Corporation | b Property Management Rights | [$          ] |

---

[1]   Napico deal (in dispute).

ORL1\CORPSEC\850291.3
31220/0055 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000023

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 23. | Texas-Estrada Apartments, L.P.[1] [5] | a. Southwest Housing Investment, Inc.<br><br>b Southwest Housing Management Corporation | a. General Partner Interest[2]<br><br>b Property Management Rights[3] [4] | [$            ]<br><br>[$            ] |

---

[1]   Napico deal (in dispute).

[2]   Need to research whether we need HSI's consent to transfer as HSI is 49% owner in Southwest Housing Investment, Inc.  Need Southwest Housing Investment, Inc. governing documents.  Does HSI have dissenter or appraisal rights?

[3]   Includes deferred management fee.

[4]   Subject to A/P to Partnership for overpayment of management fees.

[5]   There is a balance due to the contractor which is excluded from this transaction.

Appendix 0185   CONFIDENTIAL
CAH-SW000024

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 24. | Texas Brook Apartments L.P.[1] | a. Texas Brook Properties Corporation | a. General Partner Interest | [$           ] |
| | | b. Texas Brook Properties Corporation/Brian Potashnik | b. Development Fee | [$           ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[2][3] | [$           ] |

---

[1]   Napico deal (in dispute).

[2]   Includes deferred management fee.

[3]   Subject to A/P to Partnership for overpayment of management fees.

ORL1\CORPSEC\880291.3
31220\0055 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000025

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 25. | Texas Melody Apartments L.P.[1] | a. Texas Melody Properties Corporation | a. General Partner Interest | [$                ] |
| | | b. Southwest Housing Development Company, Inc./Texas Melody Properties Corporation/ Brian Potashnik | b. Development Fee and Voluntary Loan | [$                ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$                ] |

---

[1]   Napico deal (in dispute).

Appendix 0187   CONFIDENTIAL
CAH-SW000026

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 26. | Texas Kirnwood Properties Corporation[1] | a. Texas Kirnwood Properties Corporation | a. General Partner Interest | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$          ] |

---

[1] Napico deal (in dispute).

ORL1\CORPSEC\880291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

Appendix 0188

CONFIDENTIAL
CAH-SW000027

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 27. | Arlington Senior Housing L.P.[1] | a. Arlington Senior Housing Development Corporation | a. General Partner Interest | [$ ] |
| | | b. Southwest Housing Development Company, Inc./Arlington Senior Housing Development Corporation/Brian Potashnik | b. Development Fee and Loan Receivable[2] | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] | [$ ] |

---

[1]  Napico deal (in dispute).

[2]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]  Includes deferred management fee.

Appendix ON 89   CONFIDENTIAL
CAH-SW000028

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 28. | Heatherwilde Estates Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2][3] | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$          ] |

---

[1]  Does Mr. Leopold have authority to consent (on behalf of the General Partner) to the change in the property manager.

[2]  16.28% of Development Fee is paid to Housing Authority of Bexar County after Developer (although Master Agreement says non-Southwest entity is developer, Partnership Agreement says Southwest Housing Development Company, Inc. is a subcontractor of the developer -- need subcontractor agreement) receives the full development fee.

[3]  Need to determine from docs if Southwest is entitled to any portion of the GP cash flow (not in Partnership Agreement, Master Agreement or Incentive Management Agreement).

ORL1\CORP\SEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

Appendix 0190

CONFIDENTIAL
CAH-SW000029

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 29. | Pleasant Valley Courtyards Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2] and Loan Receivable[3] | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$          ] |

---

[1]  HUB deal. Cheryl has contract to buyout.

[2]  Need docs to determine Southwest's interest in GP and Developer fees.  Likely similar to Heatherwilde.

[3]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.  May be paid from perm loan proceeds which closed in third quarter, 2006.

ORL1\CORPSEC\860291.3
31220/0055 RMA ts 4/30/2007 9:11 AM

Appendix 0191

CONFIDENTIAL
CAH-SW000030

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 30. | Primrose Houston I Development, L.P. | a. Primrose Houston I Development, L.L.C. | a  General Partner Interest | [$           ] |
| | | b. Southwest Housing Development Company, Inc. | b.  Deferred Development Fee and Loan Receivable[1] | [$           ] |
| | | c. Southwest Housing Management Corporation | c.  Property Management Rights | [$           ] |

---

[1]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

Appendix 0192

CONFIDENTIAL
CAH-SW000031

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 31. | Primrose Houston South Housing, L.P. | a. Primrose Houston South Development, L.L.C. | a. General Partner Interest | [$         ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[1] | [$         ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$         ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0058 RMA ts 4/30/2007 9:11 AM

Appendix 0193

CONFIDENTIAL
CAH-SW000032

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 32. | TX Hampton Villas, L.P. | a. Arlington Villas SLP, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

---

[1] Master Agreement provides that Tarrant County Housing Partnership, Inc. receives 20% of the development fee as paid. The Master Agreement also provides that SHDC receives the General Partner's Asset Management Fee, 20% of the General Partner's interest in cash flow and 5% of the General Partner's interest in capital proceeds. Need final Master Agreement to verify.

CONFIDENTIAL
CAH-SW000033

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 33. | Parmer Villas Housing, L.P. | a. Parmer Villas Development, L.L.C. | a. General Partner Interest | [$ ] |
|  |  | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[1] | [$ ] |
|  |  | c. Southwest Housing Management Corporation | c. Property Management Rights[2] | [$ ] |
|  |  | d. Affordable Housing Construction, Inc. | d. Contractor's Profit | [$ ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2] Includes deferred management fee.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 34. | Primrose SA IV Housing, L.P.[4] [5] | a. Jefferson Plaza SLP, L.L.C. | a. Class B Limited Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] and Loan Receivable[2] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] | [$          ] |

---

[1]   Master Agreement provides that 20% of deferred developer fee is shared with Our Casas, as paid.  Master Agreement also provides that SHDC receives the GP Asset Management Fee, 20% of the GP's interest in cash flow and 10% of the GP's interest in capital proceeds.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   Loan extension may require change in underwriting criteria.

[5]   Potential admission of SAHA which would change cash flow splits.

Appendix 0196   CONFIDENTIAL
CAH-SW000035

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 35. | TX Acme A South Housing, L.P.[3] | a. TX Acme A South SLP, L.L.C. | a. Class B Limited Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$          ] |
| | | c. Southwest Housing Development Company, Inc./Brian Potashnik | c. Guaranty Fee[2] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$          ] |

---

[1]  Subject to amounts to be shared with HSI.

[2]  Pursuant to the Master Agreement, a $500,000 guarantee fee is to be paid from cash flow and capital proceeds after the developer fee is paid.

[3]  Unpaid Contractor fee is excluded.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 36. | TX Pleasanton Housing, L.P.[3] | a. TX Pleasanton Housing SLP, L.L.C. | a. Class B Limited Interest[1] | [$       ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[2] | [$       ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$       ] |

---

[1]    Master Agreement provides that Class B gets 50% of the GP's and Class B's collective interest in cash flow and 85% of the GP's and Class B's collective interest in capital proceeds.

[2]    Pursuant to the Master Agreement, SAAH gets first $100,000 of Developer Fee, then SHDC gets the next $400,000 and then SAAH gets 20% and SHDC gets 80%.

[3]    Potential replacement of SAAH with SAHA, which will change cash flow splits.

Appendix 0198    CONFIDENTIAL
CAH-SW000037

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 37. | TX Garth Housing, L.P. | a. TX Garth Development, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

Appendix 01-99

CONFIDENTIAL
CAH-SW000038

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 38. | TX Crist Housing, L.P. | a. TX Crist Development SLP, L.L.C. | a. Class B Limited Interest | [$ ] |
| | | b. Primrose at Crist Development Company, LLC[1] | b. Development Fee | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

---

[1] Since SW owns only 75% of Primrose at Crist Development Company LLC, then I suggest Southwest Housing Development Company, Inc. sell its 75% interest therein.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0200

CONFIDENTIAL
CAH-SW000039

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 39. | TX John West Housing, L.P. | a. TX John West Development SLP, L.L.C. | a. Class B Limited Interest | [$      ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$      ] |
| | | c. Southwest Housing Development Company, Inc./Brian Potashnik | c. Guaranty Fee[2] | [$      ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$      ] |

---

[1]    Master Agreement provides that HSI gets paid $50,000 at closing, then SHDC gets next payments until SHDC has received $283,333 and then HSI gets 15% and SHDC gets 85%.

[2]    Pursuant to the Master Agreement, a $500,000 guarantee fee is to be paid from cash flow and capital proceeds after the developer fee is paid.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0201

CONFIDENTIAL
CAH-SW000040

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 40. | Arbor Woods Housing, LP | a.  Arbor Woods Housing Development, L.L.C. | a.  General Partner Interest[1] | [$        ] |
| | | b.  Southwest Housing Development Company, Inc. | b.  Development Fee and Loan Receivable[2] | [$        ] |
| | | c.  Southwest Housing Management Corporation | c.  Property Management Rights | [$        ] |

---

[1]  Cheryl Potashnik HUB deal.

[2]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0055 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000041

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 41. | TX Pasadena Housing, L.P. | a  TX Pasadena Development, L.L.C. | a.  Class B Limited Interest | [$          ] |
| | | b.  Southwest Housing Development Company, Inc. | b.  Development Fee | [$          ] |
| | | c.  Southwest Housing Management Corporation | c.  Property Management Rights | [$          ] |

Appendix 0203    CONFIDENTIAL
CAH-SW000042

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 42. | TX Laureland Housing, L.P. | a. TX Laureland Development SLP, L.L.C. | a. Class B Limited Interest[1] | [$              ] |
|  |  | b. Laureland Development Company, LLC[2] | b. Development Fee | [$              ] |
|  |  | c. Southwest Housing Management Corporation | c. Property Management Rights | [$              ] |

---

[1] Class B gets 50% of the GP's and Class B's collective interest in cash flow and capital proceeds.

[2] Since Southwest Housing Development Company, Inc. owns 80% of Laureland Development Company, LLC, then I suggest Southwest Housing Development Company, Inc. sell its 80% member interest therein.

ORL1\CORPSEC\660291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000043

Appendix 0204

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 43. | TX Scyene Housing, L.P. | a. TX Scyene Development SLP, L.L.C. | a. Class B Limited Interest[1] | [$ ] |
| | | b. Scyene Development Company, LLC[2] | b. Development Fee | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

---

[1] Class B gets 50% of the GP's and Class B's collective interest in cash flow and capital proceeds.

[2] Since Southwest Housing Development Company, Inc. owns 80% of Laureland Development Company, LLC, then I suggest Southwest Housing Development Company, Inc. sell its 80% member interest therein.

ORL1\CORPSEC\60291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0205   CONFIDENTIAL
CAH-SW000044

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 44. | Primrose Houston 7 Housing, L.P.[2] | a. Primrose Skyline Apartments SLP, L.L.C. | a. Class B Limited Interest | [$              ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$              ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$              ] |

---

[1]  Subject to amounts to be shared with SETH.  Also, cash developer fee stays with Southwest.  City of Houston HOME loan pending.

[2]  Appraisal District has appealed tax exemption decision of lower court in favor of Partnership.

Appendix 0206   CONFIDENTIAL
CAH-SW000045

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 45. | TX Tenison Housing, L.P. | a. TX Tenison Development, LLC | a. General Partner Interest[1] | [$ ] |
|  |  | b. CLG Consulting, Inc. | b. Development Fee[2] | [$ ] |
|  |  | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

---

[1] Cheryl Potashnik HUB deal.

[2] Subject to amounts to be shared with HSI.

ORL1\CORPSEC\860291.3
31220/0056 RMA ls 4/30/2007 9:11 AM

Appendix 0207

CONFIDENTIAL
CAH-SW000046

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 46. | TX Palacio Housing, L.P.[1][4] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2] | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[3] | [$          ] |

---

[1]    MAUC deal.

[2]    Subject to amounts to be shared with MAUC owned co-developer.  Also, cash developer fee stays with Southwest.

[3]    To include rights to cash flow under the Partnership Agreement, Incentive Management Fee under the Incentive Management Agreement and the Partnership Management Fee under the Partnership Management Agreement.

[4]    Reimbursement to Southwest under Reimbursement Agreement are excluded from this transaction.

Appendix 0208
CONFIDENTIAL
CAH-SW000047

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 47. | New Braunfels 2 Housing, L.P.[2] | a. New Braunfels 2 SLP, L.L.C. | a. Class B Limited Partner Interest | [$          ] |
|  |  | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$          ] |
|  |  | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1]    Subject to amounts to be shared with SAHFC.

[2]    Potential for public housing units.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0209

CONFIDENTIAL
CAH-SW000048

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 48. | TX Aldine-Bender Housing, L.P.[1] | a. TX Aldine-Bender Development, L.L.C. | a Class B Limited Partner Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b Development Fee | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

---

[1]  Potential buyout of non profit GP.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0210

CONFIDENTIAL
CAH-SW000049

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 49. | TX Old Manor Housing, L.P. | a.  TX Old Manor Housing SLP, L.L.C. | a.  Class B Limited Partner Interest | [$          ] |
| | | b.  Southwest Housing Development Company, Inc. | b.  Development Fee[1] | [$          ] |
| | | c.  Southwest Housing Management Corporation | c.  Property Management Rights[1] | [$          ] |
| | | d.  Affordable Housing Construction, Inc. | d.  Contractor Profit | [$          ] |

---

[1]  Subject to amounts to be shared with HSI.

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 50. | TX Bammel Housing, L.L.C. | a. TX Bammel Development, L.L.C. | a. Special Class B Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

Appendix 0212   CONFIDENTIAL
CAH-SW000051

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 51. | Clark 05 Housing, L.P.[1] | a. Clark 05 SLP, L.L.C. | a. Class B Limited Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1]   Potential for public housing units.

Appendix 0213

CONFIDENTIAL
CAH-SW000052

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 52. | Cedar Hill Senior Housing, L.P. | a. Cedar Hill Senior Housing Development, L.L.C. | a. General Partner Interest[1] | [$ ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

---

[1]   Cheryl Potashnik HUB.

CONFIDENTIAL
CAH-SW000053

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 53. | TX Timbercreek Housing, L.P. [1] | a. Southwest Housing Development Company, Inc. | a. Deferred Development Fee | [$       ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$       ] |

---

[1]    HUB deal. GP is owned by B&L Development, Inc. Potential buyout by Cheryl.

Appendix 0215    CONFIDENTIAL
CAH-SW000054

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 54. | Laredo Vista, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Deferred Development Fee | [$ ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights and Loan Receivable[2] | [$ ] |

---

[1]  HUB deal.  GP is owned by Villas Buenas, Inc.  Potential buyout by Cheryl.

[2]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\860291.3
31220/0056 RMA ts 4/30/2007 9:11 AM

Appendix 0216

CONFIDENTIAL
CAH-SW000055

# Coverage analysis

## insureds — entity defendants

## Insureds — Entity Defendants

SH Management is an insured because it is the named entity.

SH Development  and AH Construction are insureds because each is a named subsidiary.

---

Common Terms & Conditions § II(K)

(K)  "Insureds" shall have the meaning specified for such term in each Coverage Part.

---

EPL Coverage Part § II(H)

(H) "Insureds" means any:

(1) **Insured Entity**; or

(2) **Insured Person**.

---

EPL Coverage Part does not define Insured Entity

---

Common Terms & Conditions § II(I)

(I) "Insured Entity" means:

(1) the **Named Entity**; or

(2) any **Subsidiary**.

Insured Entity shall include any such entity as a Debtor in Possession.

---

EPL Coverage Part does not define Named Entity

---

Common Terms & Conditions § II(P)

(P) "Named Entity" means the entity named in ITEM 1 of the Declarations.

ITEM 1 of the Declarations lists SH Management as the Named Entity

Common Terms & Conditions § II(I)

(I) "Insured Entity" means:

(1) the **Named Entity**; or

(2) any **Subsidiary**.

Insured Entity shall include any such entity as a Debtor in Possession.

EPL Coverage Part does not define Subsidiary

Common Terms & Conditions § II(T) defines Subsidiary, but the un-amended definition is not necessary due to an endorsement.

Endorsement No. 1

COMMON TERMS AND CONDITIONS, section  II. COMMON DEFINITIONS, (T) "Subsidiary", is amended  by the addition of the following:

 Subsidiary also means:
AFFORDABLE HOUSING CONSTRUCTION, INC.
SOUTHWEST HOUSING INVESTMENTS
SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.

# Coverage analysis

## insureds — individual defendants

## Insureds — Individual Defendants

Cheryl Potashnik is an insured because she was a manager of at least one insured entity. For example, the website for SH Management, SH Development, and AH Construction listed her as Chief Operating Officer.

Brian Potashnik is an insured because he was a manager of at least one insured entity. For example, Texas Secretary of State records show that he was a Director of SH Management, SH Development, and AH Construction and that he was the President of SH Management, SH Development, and AH Construction.

Common Terms & Conditions § II(K)

(K) "Insureds" shall have the meaning specified for such term in each Coverage Part.

EPL Coverage Part § II(H)

(H) "Insureds" means any:

(1) **Insured Entity**; or

(2) **Insured Person**.

EPL Coverage Part § II(G)

(G) "Insured Person" means any:

(1) **Employee;**

(2) **Manager**; or

(3) [not at issue in this case]

EPL Coverage Part does not define Manager

Common Terms & Conditions § II(O)

(O) "Manager" means any natural person who is a past, present or future:

Appendix 0221

(1)  duly elected or appointed director, officer, member of the board of managers or management committee member of an Insured Entity;

(2) [not at issue in this case]; or

(3) [not at issue in this case].

# Entity defendants' website excerpt

## Leadership

**Founder and President – Brian Potashnik** began his professional career as a tax advantage specialist for Merrill Lynch. He founded Southwest Housing in 1993 in response to the growing demand for high-quality affordable housing by seniors and families living on low to moderate incomes. Over the last decade, he has developed over 12,000 multifamily apartments and town homes. Today he balances his time between the boardroom, construction sites and properties, talking to lenders, equity partners, employees and residents to ensure that every Southwest Housing community is exemplary.

**Chief Operating Officer - Cheryl Potashnik** has a Masters Degree from UCLA in Urban Planning. Familiar with affordable housing and economic development goals from the public perspective, Cheryl put her expertise to work on the private side with Southwest Housing. Today she works to leverage the company's resources by forming strategic partnerships with housing authorities, housing finance corporations and nonprofits.

**Chief Financial Officer – Keith Jones** brings over 20 years of broad-based accounting experience to Southwest Housing. He started his career in 1983 at the accounting firm of McCarthy, Rose & Mills and most recently was Chief Financial Officer for Alpha-Barnes. His responsibilities at Southwest Housing encompass tax and financial reporting for each of the company's divisions utilizing his experience to structure efficient, innovative accounting and tax procedures. His responsibilities also include analysis of new projects and ongoing evaluation of financial variables for each Southwest Housing project. Keith is a member of the Texas Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

**Executive Vice President - Jeffery Carpenter** spearheads the day-to-day marketing, management, maintenance and compliance operations of the company. Jeff works closely with the development and construction teams to assist in market evaluations, product design and value engineering for long-term ownership of the apartment communities. Jeff has been directly involved in all phases of multi-family residential real estate, including development and construction, for over 26 years. During his career, he has been responsible for the leasing, marketing and management of over 100,000 apartments from new construction, LIHTC and luxury class "A" apartments to extensive rehabs in 32 states.

**Senior Vice President of Development & Finance - Deepak P. Sulakhe** joined Southwest Housing in June 2003. As VP of Development & Finance, he is responsible for bringing in new business to the company. Since joining the team, he has was responsible for all development activities from acquisition to closing of 16 projects of nearly 3,000 affordable apartment homes (including family and senior housing) distributed over several major metropolitan areas. The developed units have used various tax exempt bond programs including Fannie Mae and FHA credit enhancements, private placement bonds, etc. Equity through the sale of Housing Tax Credits was obtained by various investors. Prior to joining Southwest Housing, Deepak was Development Director at Fore Property Company. Here, he developed over 2,000 apartment units in several states and was responsible for all activities from acquisition to conversion. Deepak is a member of the Urban Land Institute and the National Association of Home Builders. Deepak has degrees in Master of Science in Land and Real Estate Development from Texas A&M University, Master of Architecture (Urban Design) from University of Oklahoma, and Bachelor of Architecture from Bangalore University. He was a recipient of an Alumni Sponsored Scholarship at Texas A&M University for outstanding academic performance.

**Executive Vice President of Development Finance - Sara Reidy** has more than 20 years of experience in the Accounting/Finance industry. She joined Southwest Housing in 1998 and has held numerous positions including Account Manager, Controller and Vice President of Corporate Finance. In her current position, she works closely with investors and lenders from the closing of a development, funding of all equity and conversion of the permanent loan. She is responsible for financial oversight of projects under development including the monitoring of project spending, construction status and lease up activity. In addition, Sara works with auditors to certify the costs associated with a development and is responsible for certification to the state agencies.

In April 2005, Sara received her certifica[...]Housing Development Finance professional (HDFP) from the National Development Council.

Return to Top

1

CARPENTER 0103

Appendix 0224

# SH Management

## Texas Franchise Tax Public Information Reports

06139412312 0002

Do not write in the space above

a. T Code ■ 13196

*This report MUST be filed to satisfy franchise tax requirements*

**TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT** ■

c. Taxpayer identification number
1-75-2541771-7

d. Report year
2006

Corporation name and address

SOUTHWEST HOUSING MANAGEMENT CORPORATION
5910 N CENTRAL EXPY STE 1145
DALLAS TX 75206-5146

e. PIR / IND  1  4
■  ■

Secretary of State file number or, if none, Comptroller unchartered number

Item k on Franchise Tax Report, Form 05-142   g. ■   0131348300

*Please mark through any incorrect information, and type or print the correct information.*

The following information MUST be provided for the Secretary of State (SOS) by each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

○ Blacken this circle completely if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

Corporation's principal office

Principal place of business

*Please sign below!* Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

**SECTION A.** Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | YES | |
| MAILING ADDRESS 3424 CORNELL DALLAS, TX 75205 | | | |
| BRIAN POTASHNIK | DIRECTOR | X YES | |
| MAILING ADDRESS 3424 CORNELL DALLAS, TX 75205 | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |

**SECTION B.** List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C.** List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*
Agent: WARREN KIRSHENBAUM
Office: 5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change this information. Changes can also be made on-line at http://www.sos.state.tx.us/corp/sosda/index.shtml

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

sign here ► | Officer, director, or other authorized person | Title Agent for | Date 5-12-06 | Daytime phone (Area code and number) 214-991-7849

Appendix 0226
0246827

Comptroller 05 - 102
of Public (Rev. 1-05/30)

13196    a. T Code ■    3333

**TEXAS FRANCHISE TAX**
**PUBLIC INFORMATION REPORT**
*MUST be filed to satisfy franchise tax requirements*

Corporation name and address

Do not write in the space above

| c. Taxpayer identification number | d. Report year |
|---|---|
| ■ 30117242096 | ■ 2006 |

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145
DALLAS, TX       75206

e. PIR / IND   ☐ 1 ■   ☐ 4 ■

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■
Item k on Franchise    0131348380
Tax Report Form 05-142

*If the preprinted information is not correct, please type or print the correct information.*

The following information MUST be provided for the Secretary of State (SOS) by each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for
Sections A, B, and C, if necessary. The information will be available for public inspection.

☐ Check here if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.



**Please sign below!**   Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

Corporation's principal office

5910 N CENTRAL EXPRESSWAY,   DALLAS, TX 75206
Principal place of business

5910 N CENTRAL EXPRESSWAY,   DALLAS, TX 75206

**SECTION A.**   Name, title, and mailing address of each officer and director.



| NAME: | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | X   YES | |
| MAILING ADDRESS: | | | |
| 3424 CORNELL    DALLAS, TX 75205 | | | |
| NAME: | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| CHERYL POTASHNIK | SRVP | YES | |
| MAILING ADDRESS: | | | |
| 3424 CORNELL    DALLAS, TX 75205 | | | |
| NAME: | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| | | YES | |
| MAILING ADDRESS: | | | |
| NAME: | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| | | YES | |
| MAILING ADDRESS: | | | |
| NAME: | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| | | YES | |
| MAILING ADDRESS: | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |
| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company. Enter the information requested for each corporation or limited liability company.

| Name of owned (parent) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent:   BRIAN POTASHNIK
Office:   5910 N CENTRAL EXPRESSWAY, 1145
       DALLAS, TX   75206

☐ Check here if you need forms to change this
information. Changes can also be made on-line at
http://www.sos.state.tx.us/corp/sosda/index.shtml

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this corporation or a related corporation.

| sign here ► | Officer, director or other authorized person | Date | Daytime phone (Area code and number) |
|---|---|---|---|
| | | 9/15/06 | 214 891-7878 |

5Y5212 2,000

6RC00M   7704   09/14/2006 14:17:12 V05-7.7

05-102
(11-06/26)

a. T Code ■ 13196

*This report MUST be filed to satisfy franchise tax requirements*

Do not write in the space above

**TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT**

| c. Taxpayer identification number | d. Report year |
|---|---|
| ■ 1-75-2541771-7 | ■ 2007 |

Corporation name and address

SOUTHWEST HOUSING MANAGEMENT CORPORATION
5910 N CENTRAL EXPY STE 1145
DALLAS TX 75206-5146

2348

e. PIR / IND  ☒ 1   ☐ 4

Secretary of State file number or, if none,
Comptroller unchartered number

*Item k on Franchise Tax Report, Form 05-142*  g. ■ 0131348300

\* 1 7 5 2 5 4 1 7 7 1 7 7 \*

Please mark through any incorrect information, and type or print the correct information.

The following information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

○ Blacken this circle completely if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

*Please sign below!*  Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

| Corporation's principal office |
|---|
| Principal place of business |

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | ☐ YES | |
| MAILING ADDRESS  3424 CORNELL DALLAS, TX 75205 | | | |
| CHERYL POTASHNIK | SENIOR VP | ☐ YES | |
| MAILING ADDRESS  3424 CORNELL DALLAS, TX 75205 | | | |
| BRIAN POTASHNIK | DIRECTOR | ☒ YES | |
| MAILING ADDRESS  3424 CORNELL DALLAS, TX 75205 | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more.  Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company.  Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent: KEITH R JONES
Office: 5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change the registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ► | Officer, director or other authorized person | Title  Agent | Date  5/14/07 | Daytime phone (Area code and number) |
|---|---|---|---|---|

Appendix 0228

0538526

071 A0133360 40

13196

a. T Code ■

This report MUST be filed to
satisfy franchise tax requirements

**TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT**

Corporation name and address

| c. Taxpayer identification number | d. Report year |
|---|---|
| ■ 3-01172-4209-6 | ■ 2007 |

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145
DALLAS, TX                    75206

e. PIR / IND    [1]    [4]

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■
*Item k on Franchise
Tax Report, Form 05-142*    0131348300

*Please mark through any incorrect information, and type or print the correct information.*

The following information is required by Section 171.203 of the Tax Code for each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets
for Sections A, B, and C, if necessary. The information will be available for public inspection.

Check this box if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

**Please sign below!**    Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

Corporation's principal office

5910 N CENTRAL EXPRESSWAY,     DALLAS, TX 75206
Principal place of business

5910 N CENTRAL EXPRESSWAY,     DALLAS, TX 75206

**SECTION A.**  Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | X   YES | |
| MAILING ADDRESS | | | |
| 3424 CORNELL            DALLAS, TX   75205 | | | |
| CHERYL POTASHNIK | SRVP | YES | |
| MAILING ADDRESS | | | |
| 3424 CORNELL            DALLAS, TX 75205 | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | YES | |
| MAILING ADDRESS | | | |

**SECTION B.**  List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
| | | | |

**SECTION C.**  List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |

Registered agent and registered office currently on file.  *(See instructions if you need to make changes.)*

Agent:     BRIAN POTASHNIK
Office:    5910 N CENTRAL EXPRESSWAY,1145
           DALLAS, TX    75206

Check this box if you need forms to change the
registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Officer, director, or other authorized person | Title | Date | Daytime phone (Area code and number) |
|---|---|---|---|---|
| | | President | 9-31-07 | 214 895 7811 |

6Y5212 2.00

06982P    7704    09/16/2007 13:17:35 V06-7.6

780701
04-17-08

05-102
(1-08/28)

■ Tcode 13196

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT
*(To be filed by Corporations and Limited Liability Companies (LLCS))*
**This report MUST be filed to satisfy franchise tax requirements**

■ **Taxpayer number**
17525417717

■ **Report year**
2008

**You have certain rights** under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at: (512) 463-4600, or (800) 252-1381, toll free nationwide.

Taxpayer name
**SOUTHWEST HOUSING MANAGEMENT COMPANY, IN**
Mailing address
**5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145**

| City | State | ZIP Code | Plus 4 | Secretary of State file number or Comptroller file number |
|------|-------|----------|--------|-----|
| **DALLAS** | **TX** | **75206** | | **0131348300** |

☐ Check box if there are currently no changes or additions to the information displayed in Section A of this report. Then complete Sections B and C.

Entity's principal office
**5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206**
Principal place of business
**5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206**

**Please sign below!** | Officer, director and member information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or members change throughout the year.

**SECTION A.** Name, title and mailing address of each officer, director or member.

*1752541771708*

| Name | Title | Director | | m m d d y y |
|------|-------|----------|---|-----|
| **BRIAN POTASHNIK** | **PRESIDENT** | ☒ YES | Term expiration | |
| Mailing address **5910 N CENTRAL EXPWY** | City **DALLAS** | State **TX** | | ZIP Code **75206** |
| Name | Title | ☐ YES | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code |
| Name | Title | ☐ YES | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code |

**SECTION B.** Enter the information required for each corporation or LLC, if any, in which this reporting entity owns an interest of ten percent (10%) or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|------|------|------|------|
| **NONE** | | | |
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |

**SECTION C.** Enter the information required for each corporation or LLC, if any, that owns an interest of ten percent (10%) or more in this reporting entity.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|------|------|------|------|
| **NONE** | | | |

Registered agent and registered office currently on file. (See instructions if you need to make changes)

Agent: **KEITH R. JONES** ☐ Check box if you need to change the registered agent or registered office information.

| Office: **5910 N CENTRAL EXPWY, 1145** | City **DALLAS** | State **TX** | ZIP Code **75206** |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or member and who is not currently employed by this, or a related, corporation or limited liability company.



**sign here** ▶

Title *President*  Date *11-10-08*  Area code and phone number

**Texas Comptroller Official Use Only**



| VE/DE ☐ | PIR IND ☐ |

1019
Appendix 0230

# SH Development

## Texas Franchise Tax Public Information Reports

Comptroller of Public Accounts   05 - 102   (Rev.1-05/24)

3333

13196   a. T Code   13196   b. ■

# TEXAS FRANCHISE TAX
## PUBLIC INFORMATION REPORT
*MUST be filed to satisfy franchise tax requirements*

Do not write in the space above

c. Taxpayer identification number   ■ 17526353810

d. Report year   ■ 2006

Corporation name and address

SOUTHWEST HOUSING DEVELOPMENT COMPANY, I
5910 NORTH CENTRAL EXPRESSWAY, SUITE 114
DALLAS                      TX    75206

e. PIR / IND   ■ 1   □ 4

Secretary of State file number or, if none,
Comptroller unchartered number

Item k on Franchise   0138624790
Tax Report Form 05-142

*If the preprinted information is not correct, please type or print the correct information.*

*The following information MUST be provided for the Secretary of State (SOS) by each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

☐ Check here if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

**Please sign below!**   Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

| Corporation's principal office |
| --- |
| 5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206 |
| Principal place of business |
| 5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206 |

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
| --- | --- | --- | --- |
| BRIAN POTASHNIK | PRESIDENT | X YES | |
| MAILING ADDRESS | | | |
| 5910 NORTH CENTRAL EXPRES        DALLAS, TX 75206 | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration *(mm-dd-yyyy)* |
| MAILING ADDRESS | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
| --- | --- | --- | --- |
| NONE | | | |
| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
| --- | --- | --- | --- |
| NONE | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent:   BRIAN POTASHNIK
Office:   5910 N CENTRAL EXPRESSWAY,1145
         DALLAS, TX 75206

☐ Check here if you need forms to change this information. Changes can also be made on-line at *http://www.sos.state.tx.us/corp/sosda/index.shtml*

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this corporation or limited liability company or a related corporation.

sign here ►   Officer, director, or other authorized person _____   Title _____   Date _____   Daytime phone *(Area code and number)*

5Y5212 2.000   1HO

Appendix 0232

a. T Code ■ 13196

**b.** ■ 3355

**FORM** 05-102 (11-06/28)

*This report MUST be filed to satisfy franchise tax requirements*

Do not write in the space above

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

| c. Taxpayer identification number | d. Report year |
|---|---|
| 1-75-2635381-2 | 2007 |

Corporation name and address

SOUTHWEST HOUSING DEVELOPMENT COMPANY INC
5910 N CENTRAL EXPY STE 1145
DALLAS TX 75206-5146

e. PIR / IND ☒ 1 ☐ 4

Secretary of State file number or, if none, Comptroller unchartered number

Item k on Franchise
Tax Report, Form 05-142    **g.** ■ 0138624700

Please mark through any incorrect information, and type or print the correct information.

The following information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

○ Blacken this circle completely if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

*Please sign below!* Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

| Corporation's principal office |
|---|
| Principal place of business |

**SECTION A.** Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | ☐ YES | |
| MAILING ADDRESS 5910 NORTH CENTRAL EXPRES DALLAS, TX 75206 | | | |
| BRIAN POTASHNIK | DIRECTOR | ☒ YES | |
| MAILING ADDRESS 5910 NORTH CENTRAL EXPRES DALLAS, TX 75206 | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | ☐ YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |

**SECTION B.** List each corporation or limited liability company, if any, in which this reporting corporation owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.** List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent: KEITH R JONES
Office: 5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change the registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Officer, director or other authorized person | Title Agent | Date 5/14/07 | Daytime phone (Area code and number) 214 /  848 |
|---|---|---|---|---|

0538591

Comptroller
of Public
Accounts
FORM
05 - 102
(11-06/26)

3333

b. ■

13196    a. T Code ■    *This report MUST be filed to
satisfy franchise tax requirements*

**TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT**

c. Taxpayer identification number
■ 17526353812

d. Report year
■ 2007

Corporation name and address

SOUTHWEST HOUSING DEVELOPMENT COMPANY, I
5910 NORTH CENTRAL EXPRESSWAY, SUITE 114
DALLAS          TX    75206

e. PIR / IND          □ 1          □ 4

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■
Item k on Franchise          0138624790
Tax Report, Form 05-142

*Please mark through any incorrect information, and type or print the correct information.*

*The following information is required by Section 171.203 of the Tax Code for each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets
for Sections A, B, and C, if necessary. The information will be available for public inspection.*

□ Check this box if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

*Please sign below!*    Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

Corporation's principal office
5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206

Principal place of business
5910 N CENTRAL EXPRESSWAY STE 1145 DALLAS TX 75206

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | X YES | |
| MAILING ADDRESS 5910 NORTH CENTRAL EXPRES     DALLAS, TX 75206 | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR YES | Term expiration (mm-dd-yyyy) |
| MAILING ADDRESS | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| NONE | | | |

Registered agent and registered office currently on file.   *(See instructions if you need to make changes.)*

Agent:   BRIAN POTASHNIK
Office:   5910 N CENTRAL EXPRESSWAY,1145
DALLAS, TX 75206

□ Check this box if you need forms to change the
registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

sign
here ▶

Officer, director, or other authorized person

Title    *President*

Date    '1-30-07

Daytime phone (Area code and number)    214-891-7811

6Y5212 2.000          THO

Appendix 0234

# AH Construction

# Texas Franchise Tax Public Information Reports

a. T Code ■ 13196

*This report MUST be filed to satisfy franchise tax requirements*

FORM 05-102 (12-05/26)

Do not write in the space above

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

| c. Taxpayer identification number | d. Report year |
|---|---|
| ■ 1-75-2606210-8 | ■ 2006 |

Corporation name and address

AFFORDABLE HOUSING CONSTRUCTION INC
5910 N CENTRAL EXPY STE 1145
DALLAS TX 75206-5146

e. PIR / IND    1    4
■    ■

Secretary of State file number or, if none,
Comptroller unchartered number

Item k on Franchise
Tax Report, Form 05-142    g. ■ 0010587106

Please mark through any incorrect information, and type or print the correct information.

*The following information MUST be provided for the Secretary of State (SOS) by each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

○ Blacken this circle completely if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

**Please sign below!** Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

Corporation's principal office

Principal place of business

**SECTION A.** Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | ☐ YES | |
| MAILING ADDRESS | | | |
| 5910 NORTH CENTRAL EXPRESSWAY SUITE 114 DALLAS, TX 75206 | | | |

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | DIRECTOR | X YES | |
| MAILING ADDRESS | | | |
| 5910 NORTH CENTRAL EXPRESSWAY SUITE 114 DALLAS, TX 75206 | | | |

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| | | ☐ YES | |
| MAILING ADDRESS | | | |

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| | | ☐ YES | |
| MAILING ADDRESS | | | |

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| | | ☐ YES | |
| MAILING ADDRESS | | | |

**SECTION B.** List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
| | | | |

**SECTION C.** List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes.)*

Agent: WARREN KIRSHENBAUM
Office: 5910 N. CENTRAL EXPY, STE 1145
DALLAS, TX 75206

○ Blacken this circle if you need forms to change this information. Changes can also be made on-line at *http://www.sos.state.tx.us/corp/sosda/index.shtml*

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Title | Date | Daytime phone (Area code and number) |
|---|---|---|---|
| | CFO | 5-5-06 | 214-361-7848 |

Appendix 0236

0021895

05 - 102
(Rev.1-05/24)

Employee
of Public
Accounts
FORM

3333
FMAH634
9309
2H51 - 972/671-7166
02 -

b. ■

13196   a. T Code ■ **13196**

**TEXAS FRANCHISE TAX**
**PUBLIC INFORMATION REPORT**
*MUST be filed to satisfy franchise tax requirements*

Do not write in the space above

c. Taxpayer identification number
■ 17526062108

d. Report year
■ 2006

Corporation name and address

e. PIR / IND   ☒ 1   ☐ 4

AFFORDABLE HOUSING CONSTRUCTION INC
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1/14
DALLAS                    TX   75206

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■
Item k on Franchise       0010587186
Tax Report Form 05-142

*If the preprinted information is not correct, please type or print the correct information.*

*The following information MUST be provided for the Secretary of State (SOS) by each corporation or limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.*

☐ Check here if there are currently no changes to the information preprinted in Section A of this report. Then, complete Sections B and C.

Corporation's principal office

Principal place of business

*Please sign below!* Officer and director information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers and directors change throughout the year.

**SECTION A.**   Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
|---|---|---|---|
| BRIAN POTASHNIK | PRESIDENT | X   YES | |
| MAILING ADDRESS | | | |
| 5910 N.CENTRAL EXPY;SUITE      DALLAS, TEXAS 75206 | | | |
| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| Keith R Jones | Treasurer | YES | |
| MAILING ADDRESS | | | |
| 5910 N. Central Expwy     Dallas Tx 75206 | | | |
| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| | | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| | | YES | |
| MAILING ADDRESS | | | |
| NAME | TITLE | DIRECTOR | Term expiration (mm-dd-yyyy) |
| | | YES | |
| MAILING ADDRESS | | | |

**SECTION B.**   List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |
| Name of owned (subsidiary) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
| | | | |

**SECTION C.**   List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation | State of incorporation | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file.  *(See instructions if you need to make changes.)*

Agent:
Office:

☐ Check here if you need forms to change this information. Changes can also be made on-line at *http://www.sos.state.tx.us/corp/sosda/index.shtml*

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer or director and who is not currently employed by this corporation or limited liability company or a related corporation.

sign
here ■

Officer, director, or other authorized person

Title
Treasurer

Date
2/7/07

Daytime phone (Area code and number)
214 891 7848

5Y52122.000      FHO

Appendix 0237

0730042617I 0003

13196

Comptroller
of Public
Form 05 - 102
(06/95)    3333

a. T Code ■

This report MUST be filed to
satisfy franchise tax requirements

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

c. Taxpayer identification number

■ 752606210 8

d. Report year

■ 2007

Corporation name and address

AFFORDABLE HOUSING CONSTRUCTION INC
5910 NORTH CENTRAL EXPRESSWAY, SUITE 114
DALLAS                    TX    75206

e. PIR / IND   □ 1 ■   □ 4 ■

Secretary of State file number or, if none,
Comptroller unchartered number

g. ■  0010587186

Item k on Franchise
Tax Report, Form 05-142

Please mark through any incorrect information, and type or print the correct information.

The following information is required by Section 171.203 of the Tax Code for each corporation or
limited liability company that files a Texas Corporation Franchise Tax Report. Use additional sheets
for Sections A, B, and C, if necessary. The information will be available for public inspection.

*7526062I007*

□ Check this box if there are currently no changes to the information preprinted in
Section A of this report. Then, complete Sections B and C.

*Please sign below!*  Officer and director
information is reported
as of the date a Public Information Report is
completed. The information is updated annually
as part of the franchise tax report. There is no
requirement or procedure for supplementing the
information as officers and directors change
throughout the year.

Corporation's principal office

Principal place of business

**SECTION A.**  Name, title, and mailing address of each officer and director.

| NAME | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
|------|-------|----------|-------------------------------|
| BRIAN POTASHNIK | PRESIDENT | X YES | |

MAILING ADDRESS

5910 N.CENTRAL EXPY;SUITE          DALLAS, TEXAS 75206

| NAME | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
|------|-------|----------|-------------------------------|
| | | YES | |

MAILING ADDRESS

| NAME | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
|------|-------|----------|-------------------------------|
| | | YES | |

MAILING ADDRESS

| NAME | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
|------|-------|----------|-------------------------------|
| | | YES | |

MAILING ADDRESS

| NAME | TITLE | DIRECTOR | Term expiration *(mm-dd-yyyy)* |
|------|-------|----------|-------------------------------|
| | | YES | |

MAILING ADDRESS

**SECTION B.**  List each corporation or limited liability company, if any, in which this reporting corporation or limited liability company owns an interest of ten
percent (10%) or more. Enter the information requested for each corporation or limited liability company.

| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |

**SECTION C.**  List each corporation or limited liability company, if any, that owns an interest of ten percent (10%) or more in this reporting corporation or limited
liability company. Enter the information requested for each corporation or limited liability company.

| Name of owning (parent) corporation or limited liability company | State of inc./organization | Texas SOS file number | Percentage Interest |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file.  *(See instructions if you need to make changes.)*

Agent:
Office:

□ Check this box if you need forms to change the
registered agent or registered office information.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has
been mailed to each person named in this report who is an officer or director and who is not currently employed by this, or a related, corporation or limited liability company.

sign
here

| Officer, director or other authorized person | Title | Date | Daytime phone (Area code and number) |
|---|---|---|---|
| X | President | 10-12-07 | 214-891-7811 |

6Y5212 2.000      THO

Appendix 0238

00001975865

780701 04-17-08   05-102 (1-08/28)   ■ Tcode 13196

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT
*(To be filed by Corporations and Limited Liability Companies (LLCS))*
**This report MUST be filed to satisfy franchise tax requirements**

■ Taxpayer number
17526062108

■ Report year
2008

**You have certain rights** under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at: (512) 463-4600, or (800) 252-1381, toll free nationwide.

Taxpayer name
**AFFORDABLE HOUSING CONSTRUCTION INC**

Mailing address
5910 NORTH CENTRAL EXPRESSWAY, SUITE 1145

| City | State | ZIP Code | Plus 4 | Secretary of State file number or Comptroller file number |
|------|-------|----------|--------|-----------------------------------------------------------|
| DALLAS | TX | 75206 | | 0010587106 |

☐ Check box if there are currently no changes or additions to the information displayed in Section A of this report. Then complete Sections B and C.

Entity's principal office
5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206

Principal place of business
5910 N CENTRAL EXPWY, SUITE 1145, DALLAS, TX 75206

**Please sign below!**

Officer, director and member information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or members change throughout the year.

*1752606210808*

**SECTION A.** Name, title and mailing address of each officer, director or member.

| Name | Title | Director | | m m d d y y |
|------|-------|----------|--|-------------|
| BRIAN POTASHNIK | PRESIDENT | ☒ YES | Term expiration | |
| Mailing address 5910 N CENTRAL EXPWY | City DALLAS | State TX | | ZIP Code 75206 |
| Name | Title | ☐ YES | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code |
| Name | Title | ☐ YES | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code |

**SECTION B.** Enter the information required for each corporation or LLC, if any, in which this reporting entity owns an interest of ten percent (10%) or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|---------------------------------------------------------------------|--------------------|-------------------------------|-------------------------|
| NONE | | | |
| | | | |

**SECTION C.** Enter the information required for each corporation or LLC, if any, that owns an interest of ten percent (10%) or more in this reporting entity.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|------------------------------------------------------------------|--------------------|-------------------------------|-------------------------|
| NONE | | | |

Registered agent and registered office currently on file. (See instructions if you need to make changes)

Agent: **WARREN KIRSHENBAUM**

☒ Check box if you need forms to change the registered agent or registered office information.

| Office: | 5910 N CENTRAL EXPWY, 1145 | City DALLAS | State TX | ZIP Code 75206 |
|---------|----------------------------|-------------|----------|----------------|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, or member and who is not currently employed by this, or a related, corporation or limited liability company.



**sign here** ▶

Title *President* Date 11-10-08 Area code and phone number

**Texas Comptroller Official Use Only**

| VE/DE | ☐ | PIR IND | ☐ |
|-------|---|---------|---|

1019

Appendix 0239

00001975865

AFFORDABLE HOUSING CONSTRUCTION
ATTACHMENT TO 2008 TEXAS FRANCHISE TAX REPORT

FEDERAL IDENTIFICATION NUMBER          75-2606210

TEXAS TAXPAYER NUMBER                  17526062108

SECRETARY OF STATE FILE NUMBER          10587106

# Coverage analysis

## employment practices claim

## Employment practices claim

This case involves an employment practices claim because this civil proceeding was commenced with service of the original petition on behalf of an employee of at least one insured entity in his capacity as an employee.

EPL Coverage Part II(C)

(C) "Employment Practices Claim" means any:

(1)      written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

(2)      civil proceeding commenced by the service of a complaint or similar pleading;

(3)      [not at issue in this case]; or

(4)      [not at issue in this case]

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

[additional employment practices claims and exclusion for proceedings under collective bargaining agreement not at issue in this case]

This is a civil proceeding commenced with the service of an original petition.  Although the petition also constitutes a written demand as defined in the policy, no written demand analysis is necessary in light of the employment practices claim definition part (2).

EPL Coverage Part II(C)

(C) "Employment Practices Claim" means any:

(1)     written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

(2)     civil proceeding commenced by the service of a complaint or similar pleading;

(3)     [not at issue in this case]; or

(4)     [not at issue in this case]

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

[additional employment practices claims and exclusion for proceedings under collective bargaining agreement not at issue in this case]

EPL Coverage Part does not define Employee

Common Terms & Conditions § II(F)

(F) "Employee" means any past, present, or future:

(1)     employee of an Insured Entity in such person's capacity as an employee, including any part time, seasonal, temporary, leased, or loaned employee; or

(2)     [not at issue in this case].

**Capacity as employee**

This civil proceeding was commenced on behalf of Jeff Carpenter in his capacity as an employee.  For example, the petition alleges that SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik were all joint employers of Jeff with respect to the asset sale and the sale proceeds payment.[1]

---

[1]     *See* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, at pp. 15-16 ¶ 42.

**Employee**

The policy only requires that the claimant be an employee of *an* insured entity — *i.e.*, at least one insured entity.  All parties in this case agree that SH Management employed Jeff.  That is sufficient for purposes of coverage.  But Jeff was also an employee of insured entities SH Development and AH Construction in connection with the asset sale and the sale proceeds payment.[2]  An employee may have more than one employer even while performing a single action and even without the joint employer doctrine.[3]

>    *Ordinary meaning*

The policy defines employee to include former part-time and temporary employees [in addition to former full-time employees].  The policy defines employee in a circular manner — it uses the term *employee* to define the term *employee*.  It does not further define employee.  As a result, courts must look to the ordinary meaning of *employee*.[4]

The ordinary meaning of employee is one who works for another for compensation, as shown in the attached definitions.[5]  The policy separately defines independent contractor, which requires an express independent contractor agreement.  As a result, this coverage analysis excludes from the ordinary meaning of employee that definition of independent contractor.

Jeff was an employee of insured entities SH Management, SH Development, and AH Construction within the ordinary meaning of the term *employee*.  Insured entities SH

---

[2]    This coverage analysis address only insured entities as employers due to the policy definition of employment practices claim.  But Jeff was also an employee of Brian Potashnik and Cheryl Potashnik in connection with the asset sale and sale proceeds payment.  Brian Potashnik and Cheryl Potashnik are individual insureds and were also sellers in the asset sale.

[3]    *See* RESTATEMENT (SECOND) AGENCY § 226 ("A person may be the servant of two masters, [who are] not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.").

[4]    *See RSUI Indem. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) ("Unless the policy dictates otherwise, we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."); *see also Edinburg Consol. Indep. Sch. Dist. v. INA*, 806 S.W.2d 910, 913 (Tex. App.—Corpus Christi 1991, no writ) (looking to dictionary for meaning of undefined term in insurance policy).

[5]    *See* Exhibit 5A.

Management, SH Development, and AH Construction were all sellers in the asset sale.[6] Jeff's work in staying on as long as needed to help make the asset sale happen was work for each of these sellers.  The compensation was to be the sale proceeds payment.

### Vice principal

The above is sufficient for purposes of the *employee* coverage analysis.  The following vice principal analysis simply makes clear that insureds and sellers SH Management, SH Development, and AH Construction requested the asset sale work from Jeff and entered the pay-to-stay employment agreement.

The acts and omissions of a vice principal are the acts and omissions of the corporation itself.[7]  A vice principal includes corporate officers and others who represent the corporation in its corporate capacity, among other categories of people.[8]

Brian Potashnik was a vice principal — an officer and director — of SH Management, SH Development, and AH Construction.[9]  Brian Potashnik was a vice principal of these entities at the time he entered the oral pay-to-stay employment agreement with Jeff and throughout the remainder of Jeff's employment in working to help make the asset sale happen.[10]  The acts of Brian Potashnik in making this employment agreement *were* the acts of SH Management, SH Development, and AH Construction.

### Agency

The following agency analysis simply provides a second reason that insureds and sellers SH Management, SH Development, and AH Construction requested the asset sale work from Jeff and entered the pay-to-stay employment agreement.  Sellers SH Management, SH Development, and AH Construction expressly named Brian Potashnik as their agent in connection with the asset sale.[11]  So, Brian Potashnik also had express, implied, or

---

[6]     *See* Exhibit 2, Excerpts from Purchase and Sale Agreement.

[7]     *See Bennett v. Reynolds*, 315 S.W.3d 867, 883 (Tex. 2010) ("When actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself.").

[8]      *See id.* a*t* 884.

[9]     *See* Exhibits 4B-4D.

[10]     *See id.*; *see also generally* Exhibit 1, Jeffrey W. Carpenter's Second Amended Petition, pp. 4-5 ¶¶ 11-13 & pp. 11-14 ¶¶ 33-38.

[11]     *See* Exhibit 2, Excerpts from Purchase and Sale Agreement, at signature page (agent for sellers) & schedule (identifying sellers).

apparent authority to enter the oral pay-to-stay employment agreement with Jeff on behalf of sellers SH Management, SH Development, and AH Construction.[12]

---

[12] *See* TEX. PATTERN JURY CHARGES, BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT 101.4 (2014) ("A party's conduct includes the conduct of another who acts with the party's authority or apparent authority. Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.").

# Dictionary definitions of employee

# employee

## em·ploy·ee

*n.*
A person who works for another in return for financial or other compensation.
American Heritage® Dictionary of the English Language, Fifth Edition. Copyright © 2011 by Houghton Mifflin Harcourt Publishing Company. Published by Houghton Mifflin Harcourt Publishing Company. All rights reserved.

# employee

*or*

# employe

*n*
(Industrial Relations & HR Terms) a person who is hired to work for another or for a business, firm, etc, in return for payment. Also called (esp formerly): **employé**
Collins English Dictionary – Complete and Unabridged, 12th Edition 2014 © HarperCollins Publishers 1991, 1994, 1998, 2000, 2003, 2006, 2007, 2009, 2011, 2014

# em•ploy•ee

# or em•ploy•e

(ɛmˈplɔɪ i, ɛm plɔɪˈi, ˌɛm plɔɪˈi)

*n.*
a person who has been hired to work for another.
[1825–35; < French *employé* employed, past participle of *employer* to employ; see -ee]
Random House Kernerman Webster's College Dictionary, © 2010 K Dictionaries Ltd. Copyright 2005, 1997, 1991 by Random House, Inc. All rights reserved.



SINCE 1828

# employee

*noun* em·ploy·ee \im-ˌplȯi(i)-ˈē, (ˌ)em-; im-ˈplȯi(i)-ˌē, em-\

## Simple Definition of *employee*

* : a person who works for another person or for a company for wages or a salary

## Full Definition of *employee*

1. : one employed by another usually for wages or salary and in a position below the executive level

## Examples of *employee* in a sentence

1. A good boss listens to his *employees*.
2. The company has more than 2,000 *employees* worldwide.

# Coverage analysis

## employment practices claim first made within relevant time period

## Employment practices claim first made
## against the insureds during relevant period

This case involves an employment practices claim first made against the insureds during the policy period or extended reporting period.

The policy period is March 4, 2007 through June 5, 2008.  A Texas endorsement also provides an automatic 30-day extended reporting period after the end of the policy period.  It states:

---

Endorsement No. 8

IX. EXTENDED REPORTING PERIOD

(A)  Upon  **Termination of Coverage**, the **Named Entity** shall be entitled to an automatic extended reporting period ("Automatic Extended Reporting Period") of thirty (30) days from the end of the  Policy Period to report Claims under this Policy.

---

Endorsement No. 8

(W) **Termination of Coverage**, whether undertaken by the **Insurer** or the **Insured** at any time, means:

(1) cancellation or nonrenewal of a policy, other than for nonpayment of premium; or
(2) decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured**.

---

The named entity SH Management is the named agent for all insureds in connection with the extended reporting period:

---

Common Terms and Conditions § XX

**XX. AUTHORIZATION OF NAMED ENTITY**

The **Named Entity** shall act on behalf of all **Insureds** with respect to all matters under this Policy, including, without limitation, giving and receiving of notices regarding Claims, cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Policy.

---

Appendix 0251

The employment practices claim in this case is the lawsuit commenced with service of an original petition.  This claim was made within the policy period and within the automatic extended reporting period.

March 11, 2008:        file-stamp on original petition[1]

March 20, 2008:        service date for insureds SH Management, SH Development, and AH Construction[2]

March 21, 2008:        service date for insureds Brian Potashnik and Cheryl Potashnik[3]

---

[1]        *See* Exhibit 6A.

[2]        *See* Exhibit 6B.

[3]        *See* Exhibit 6B.

Appendix 0252

# Original petition file-stamp

CAUSE NO. _____

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHWEST HOUSING DEVELOPMENT | § | AT LAW NO. 5 |
| COMPANY, INC.; SOUTHWEST | § | |
| HOUSING MANAGEMENT COMPANY, | § | |
| INC.; AFFORDABLE HOUSING | § | |
| CONSTRUCTION, INC.; BRIAN | § | |
| POTASHNIK; and CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |



## PLAINTIFF'S ORIGINAL PETITION AND PETITION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

TO THE HONORABLE JUDGE OF THE COURT:

Jeffrey W. Carpenter files this Original Petition and Petition for Temporary Restraining Order and Injunction complaining of Defendants and would show the court the following:

### I.
### LEVEL III DISCOVERY CONTROL PLAN

1.     Discovery is intended to be conducted under Level III pursuant to Texas Rule of Civil Procedure 190.4.

### II.
### PARTIES

2.     Plaintiff Jeffrey W. Carpenter is an individual residing in Dallas, Dallas County, Texas.

3.     Defendant Southwest Housing Development Company, Inc. ("SWHD") is a Texas corporation with its principal place of business in Dallas County, Texas.

4.     Defendant Southwest Housing Management Company, Inc. ("SWHM") is a Texas

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc

page 1

Appendix 0254

# Returns of service

Form No. 412 - **CITATION**      **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

AFFORDABLE  HOUSING CONSTRUCTION, INC.
SERVE WARREN KIRSHENBAUM REG AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX 75206

"You have been sued.  You may employ an attorney.  If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you."  Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street  Suite 101, Dallas, Texas 75202.

PLAINTIFF
JEFFREY W. CARPENTER

VS.
AFFORDABLE HOUSING CONSTRUCTION, INC.

DEFENDANT, filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

WITNESS:  JOHN WARREN, Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court,  Dallas County Court at Law No. 5, Dallas County, Texas.

By _____ Deputy
      FANNITTA FLORES

---

ATTY

**CITATION**

CC-08-02072-E

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
Dallas County, Texas

JEFFREY W. CARPENTER
Plaintiff

VS.

AFFORDABLE HOUSING CONSTRUCTION , INC.
Defendant

AFFORDABLE  HOUSING
CONSTRUCTION, INC.
SERVE WARREN KIRSHENBAUM REG
AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX, 75206

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

R ROGGE DUNN
1201 ELM STREET
SUITE 5200
DALLAS      TX  75270
214-220-3888

NO OFFICE... ...
COLLECT... ...

Appendix 0256

## OFFICER'S RETURN

Came to hand on the 19th day of March A.D., 20 08 at 10:26 o'clock A M., and executed by delivering to Affordable Housing Construction, Inc. by delivering to Keith Jones, Treasure authorized to accept at 5910 N. Central Expwy, Suite 1145, Dallas, Texas 75206 on the 20th day of March A.D., 20 08, at 2:50 o'clock P. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

**Fees**

| | | |
|---|---|---|
| Serving: | $ | |
| Mileage | $ | |
| Notary | $ | |
| **Total** | $ | |

Dallas County, Texas

By: _____ Deputy

Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said   Dennis S. Hinshaw

before me this 21st day of March ,20 08 , to certify which witness my hand and seal of office.

_Meissa Wooley_

Notary Public   Dallas   County   Texas

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM 10:26

Appendix 0257

Form No. 412 - **CITATION**    **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

> **SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.**
> **SERVE KEITH R JONES REG AGENT**
> **5910 N CENTRAL EXPWY SUITE 1145**
> **DALLAS TX 75206**

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street Suite 101, Dallas, Texas 75202.

PLAINTIFF
**JEFFREY W. CARPENTER**

VS.
**SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.**

**DEFENDANT,** filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

**WITNESS: JOHN WARREN,** Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court, Dallas County Court at Law No. 5, Dallas County, Texas.

By _____, Deputy
FANNITTA FLORES

---

ATTY

**CITATION**

CC-08-02072-E

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
**Dallas County, Texas**

JEFFREY W. CARPENTER
Plaintiff
vs.

SOUTHWEST HOUSING DEVELOPMENT
COMPANY, INC.
Defendant

SOUTHWEST HOUSING DEVELOPMENT
COMPANY, INC.
SERVE KEITH R JONES REG AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX 75206

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

**Attorney for Plaintiff**

R ROGGE DUNN
1201 ELM STREET
SUITE 5300
DALLAS      TX 75270
214-220-3888

NO OFFICER'S FEES HAVE BEEN
COLLECTED BY DALLAS COUNTY CLERK

Appendix 0258

## OFFICER'S RETURN

Came to hand on the ___19th___ day of ___March___ A.D. , 20 _08_ , at _10:30_ o'clock __A__. M. and executed by delivering to Southwest Housing Development Company, Inc. by delivering to Keith R. Jones, it's reg. agent at 5910 N. Central Expwy, Suite 1145, Dallas, Texas 75206

on the _20th_ day of ___March___ A.D. , 20 _08_ , at _2:50_ o'clock _P_. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

|       | Fees  |      |
|-------|-------|------|
| Serving: | _____ | $ _____ |
| Mileage | _____ | $ _____ |
| Notary | _____ | $ _____ |
| **Total** |  | $ _____ |

_Dallas_ County, Texas



By: _____ , Deputy
Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said ___Dennis S. Hinshaw___

before me this _21st_ day of ___March___ ,20 _08_, to certify which witness my hand and seal of office.

_Melissa Wooley_

Notary Public _Dallas_ County _Texas_

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM 10:30

Appendix 0259

Form No. 412 - **CITATION**    **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

**SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.**
**SERVE KEITH R JONES REG AGENT**
**5910 N CENTRAL EXPWY SUITE 1145**
**DALLAS TX 75206**

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you."   Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street  Suite 101, Dallas, Texas 75202.

**PLAINTIFF**
**JEFFREY W. CARPENTER**

**VS.**
**SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.**

**DEFENDANT,** filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

**WITNESS: JOHN WARREN,** Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court,  Dallas County Court at Law No. 5, Dallas County, Texas.

By _____. Deputy
FANNITTA FLORES

---

| ATTY |
| --- |
| **CITATION** |
| CC-08-02072-E |

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
Dallas County, Texas

JEFFREY W. CARPENTER
Plaintiff

vs.

SOUTHWEST HOUSING MANAGEMENT
COMPANY, INC.
Defendant

SOUTHWEST HOUSING MANAGEMENT
COMPANY, INC.
SERVE KEITH R JONES REG AGENT
5910 N CENTRAL EXPWY SUITE 1145
DALLAS TX 75206

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

| R ROGGE DUNN |
| --- |
| 1201 ELM STREET |
| SUITE 5200 |
| DALLAS        TX 75270 |
| 214-220-3888 |

NO OFFICER'S FEES TO BE
COLLECTED

Appendix 0260

## OFFICER'S RETURN

Came to hand on the __19th__ day of __March__ A.D. 20 __08__, at __10:28__ o'clock __A__. M. and executed by delivering to Southwest Housing Management Company, Inc. by delivering to Keith R. Jones, it's registered agent at 5910 N. Central Expwy, Suite 1145, Dallas, Texas 75206

on the __20th__ day of __March__ A.D., 20 __08__, at __2:50__ o'clock __P__. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

**Fees**

| | | |
|---|---|---|
| Serving: | $ | |
| Mileage | $ | |
| Notary | $ | |
| **Total** | $ | |

Dallas County, Texas

By: _____, Deputy
Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said __Dennis S. HInshaw__ _____

before me this __21st__ day of __March__ ,20 __08__ , to certify which witness my hand and seal of office.

Notary Public __Dallas__ County __Texas__

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM10:28

Form No. 412 - **CITATION**     **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

BRIAN POTASHNIK     *35 P*
4419 HIGHLAND DRIVE
DALLAS TX 75205

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street  Suite 101, Dallas, Texas 75202.

PLAINTIFF
JEFFREY W. CARPENTER

VS.

BRIAN POTASHNIK

DEFENDANT, filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

WITNESS: **JOHN WARREN**, Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court,  Dallas County Court at Law No. 5, Dallas County, Texas.

By                                      Deputy
FANNITTA FLORES

| ATTY |
| --- |
| **CITATION** |
| CC-08-02072-E |

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
Dallas County, Texas

JEFFREY W. CARPENTER
Plaintiff

vs.

BRIAN POTASHNIK
Defendant

BRIAN POTASHNIK
4419 HIGHLAND DRIVE
DALLAS TX 75205

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

R ROGGE DUNN
1201 ELM STREET
SUITE 5200
DALLAS       TX  75270
214-220-3888

NO OFFICER'S FEES HAVE BEEN
COLLECTED BY DALLAS COUNTY CLERK

**OFFICER'S RETURN**

Came to hand on the _19th_ day of _March_ A.D., 20 _08_, at _10:24_ o'clock _A_. M. and executed by delivering to _Brian Potashnik at 4419 Highland Drive, Dallas, Texas 75205_

on the _21st_ day of _March_ A.D., 20 _08_, at _8:27_ o'clock _A_. M. the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

| **Fees** | | |
|---|---|---|
| Serving: | S | |
| Mileage | S | |
| Notary | S | |
| **Total** | S | |

Dallas County, Texas



By: _____, Deputy
Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said _____ Dennis S. Hinshaw _____

before me this _21st_ day of _March_ ,20 _08_ , to certify which witness my hand and seal of office.

Notary Public _____ Dallas _____ County _____ Texas

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'08 MAR 19 AM 10:24

Form No. 412 - **CITATION**     **THE STATE OF TEXAS**

CAUSE NO. **CC-08-02072-E**
COUNTY COURT OF DALLAS COUNTY COURT AT LAW NO. 5
Dallas County, Texas

TO:

**CHERYL POTASHNIK**
**4419 HIGHLAND DRIVE**
**DALLAS TX 75205**

"You have been sued. You may employ an attorney. If you or your attorney do not file a
WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday
next following the expiration of twenty days after you were served this citation and
petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of
County Court at Law No. 5 of Dallas County, Texas, at the Court House of said
County 600 Commerce Street  Suite 101, Dallas, Texas 75202.

**PLAINTIFF**
**JEFFREY W. CARPENTER**

**VS.**
**CHERYL POTASHNIK**

**DEFENDANT**, filed in said Court on the 11th day of March, 2008, a copy of which accompanies this citation.

**WITNESS:  JOHN WARREN**, Clerk of the County Courts of Dallas County, Texas.
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this
13th day of March, 2008 A.D.

JOHN WARREN, Clerk, County Court,  Dallas County Court at Law No. 5, Dallas County, Texas.

By _____ Deputy
FANNITTA FLORES

| ATTY |
|---|
| **CITATION** |
| CC-08-02072-E |

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 5
Dallas County, Texas

JEFFREY W. CARPENTER
Plaintiff

vs.

CHERYL POTASHNIK
Defendant

CHERYL POTASHNIK
4419 HIGHLAND DRIVE
DALLAS TX 75205

ISSUED THIS
13th day of March, 2008

John F. Warren, County Clerk
BY: FANNITTA FLORES, Deputy

Attorney for Plaintiff

R ROGGE DUNN
1201 ELM STREET
SUITE 5200
DALLAS      TX  75270
214-220-3888

2008 MAR 25  AM 10: 18

NO OFFICER'S FEES HAVE BEEN
COLLECTED BY DALLAS COUNTY CLERK

Appendix 0264

## OFFICER'S RETURN

Came to hand on the 19th day of March A.D., 20 08, at 10:22 o'clock A. M. and executed by delivering to Cheryl Potashnik at 4419 Highland Drive, Dallas, Texas 75205

on the 21st day of March A.D., 20 08, at 8:27 o'clock A. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of original petition with date of service marked thereon.

### Fees

Serving: _____ $_____
Mileage _____ $_____
Notary _____ $_____
         **Total** $_____

Dallas County, Texas



By: _____, Deputy

Dennis S. Hinshaw
Supreme Court No. SC000000628

Lawyers Civil Process, Inc.
400 S. Houston Street, Suite 105
Dallas, Texas 75202

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

Signed and sworn to by the said _____ Dennis S. Hinshaw _____

before me this 21st day of _____ March _____, 20 08, to certify which witness my hand and seal of office.

Notary Public _____ Dallas _____ County _____ Texas

MELISSA WOOLEY
MY COMMISSION EXPIRES
December 4, 2008

'03 MAR 19 AM 10:22

# Dictionary definitions

## back pay

About.com
About Careers
Job Searching

. . .

Job Search Basics
Job Search Assistance
Job Search and Employment Glossary
     Employment Glossary Terms Starting With B

# What is Back Pay?



By Alison Doyle
Job Searching Expert

Back pay is the difference between what an employee was paid and the amount he or she should have been paid.

Withheld wages may have been from actual hours worked, pay increases or promotions, or for work that could have otherwise been completed if there had not been some obstacle.



# back pay

*n*

**1.** (Industrial Relations & HR Terms) pay received by an employee from an increase awarded retrospectively

**Collins English Dictionary – Complete and Unabridged** © HarperCollins Publishers 1991, 1994, 1998, 2000, 2003

# back pay

noun

1.

pay received by an employee from an increase awarded retrospectively

Collins English Dictionary - Complete & Unabridged 2012 Digital Edition
© William Collins Sons & Co. Ltd. 1979, 1986 © HarperCollins Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012

## Examples from the Web for back pay

## Contemporary Examples

Those employees may or may not get *back pay* when the shutdown ends.   How the Government Shutdown Hurts National Security  Josh Rogin  September 29, 2013

## Historical Examples

On May 18, 1872, Congress passed a law for the restitution of *back pay*.   A History of Trade Unionism in the United States  Selig Perlman

With the *back pay* during his absence, the sum amounted to about $15,000.   Booker T. Washington  Emmett J. Scott and Lyman Beecher Stowe

But if I fail to return, my master makes my *back pay* with cold stripes.   God Wills It!  William Stearns Davis

Give the boys thirty-day orders on the Company for the *back pay*.   The Gilded Age, Complete   Mark Twain and Charles Dudley Warner

Meanwhile, I must begin to-morrow to cry like a poor devil about the *back pay*.   Wood Rangers   Mayne Reid

Then I got the *back pay*, of course, but I ought to have had it before.   Captain Jinks, Hero   Ernest Crosby

Look at a single class of these collections,—the *back pay* of sick men.   The Atlantic Monthly, Volume 15, No. 88, February, 1865   Various

But the possible loss of his *back pay* would be a catastrophe.   Billy and the Big Stick   Richard Harding Davis

Washington now showed his sagacity in quelling the fears of the soldiers regarding their *back pay*.   Comic History of the United States   Bill Nye

## Contemporary definitions for back pay

### noun
a payment due for previously done work; also, salary overdue from a past pay period. Also written backpay; also called back payment, back salary, back wages

### Word Origin
1804-09

Dictionary.com's 21st Century Lexicon
Copyright © 2003-2014 Dictionary.com, LLC

backpay – Dictionary definition of backpay | Encyclopedia.com: FREE online dictionary



# backpay



**The Oxford Pocket Dictionary of Current English** | 2009 | 233 words
© The Oxford Pocket Dictionary of Current English 2009, originally published by Oxford University Press 2009.

**back·pay** / 'bak,pā; ,bak'pā/

• n. payment for work done in the past that was withheld at the time, usually because of a dispute: *Hickman should be provided backpay plus any expenses.*

## Cite this article

Pick a style below, and copy the text for your bibliography.

| MLA | Chicago | APA |
|-----|---------|-----|

"backpay." The Oxford Pocket Dictionary of Current English. 2009. *Encyclopedia.com.* 4 Sep. 2015

<http://www.encyclopedia.com>.



## back pay - definition and synonyms

money that is owed to someone who works for a
company but that has not been paid yet



# back pay

Definition of *back pay* in English:

**noun**

Payment for work done in the past that was withheld at the time, or for work that could have been done had the worker not been prevented from doing so:

*Hickman should be provided back pay plus any expenses*

backpay - Wiktionary

Preferences   Create account   Log in

Wiktionary
[ˈwɪkʃənɹɪ] *n.*,
a wiki-based Open
Content dictionary

Entry   Discussion   Citations          Read   Edit   History

# backpay

## Contents   [hide]

1 English
  1.1 Alternative forms
  1.2 Noun
    1.2.1 Translations
  1.3 Anagrams

Main Page
Community portal
Preferences
Requested entries
Recent changes
Random entry
Help
Donations
Contact us

Tools

What links here
Related changes
Upload file
Special pages
Permanent link
Page information
Cite this page
Add definition

Visibility

Show translations

Languages

Print/export

Create a book
Download as PDF
Printable version

Feedback

If you have time,
leave us a note.

# English   [edit]

## Alternative forms   [edit]

- back pay

## Noun   [edit]

**backpay** (*plural* **backpays**)

1. A withheld payment for work which has already been completed, or which could have been
   completed had the employee not been prevented from doing so.

## Translations   [edit]

| withheld payment for work | [show] ▼ |
|---|---|

## Anagrams   [edit]

- payback , pay back

| Categories : English lemmas | English nouns | English countable nouns |
|---|---|---|

This page was last modified on 24 July 2015, at 05:58.

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy.

Privacy policy   About Wiktionary   Disclaimers   Developers   Mobile view




Appendix 0274

What is Back Payment? definition and meaning



InvestorWords

Home    Articles    Tips    Videos    Browse by Subject    Term of the Day          Join Now    Login

**Nearby Terms**

back on the shelf
back out
back pay
back rent
back stop
back taxes

# back payment

Save to Favorites

**Definition**

noun

1. a payment which is due but has not yet been paid

2. the act of paying money which is owed

Print    Cite / Link

# Department of Labor

# publication excerpts

# Employee Retirement Income Security Act



# UNITED STATES DEPARTMENT OF LABOR

○ All DOL  ● EBSA   Advanced Search

SEARCH

A to Z | Site Map | FAQs | Forms | About DOL | Contact Us | Español

**Employee Benefits Security Administration**     ➕ SHARE ▪▪▪     ★ Was this page helpful?

DOL > EBSA > Compliance Assistance

## Compliance Assistance

The Employee Retirement Income Security Act of 1974 (ERISA) is a federal law that sets minimum standards for retirement and health benefit plans in private industry. ERISA does not require any employer to establish a plan. It only requires that those who establish plans must meet certain minimum standards.

ERISA covers retirement, health and other welfare benefit plans (e.g., life, disability and apprenticeship plans). Among other things, ERISA provides that those individuals who manage plans (and other fiduciaries) must meet certain standards of conduct. The law also contains detailed provisions for reporting to the government and disclosure to participants. There also are provisions aimed at assuring that plan funds are protected and that participants who qualify receive their benefits.

ERISA has also been expanded to include new health laws. The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) amended ERISA to provide for the continuation of health care coverage for employees and their beneficiaries (for a limited period of time) if certain events would otherwise result in a reduction in benefits. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) amended ERISA to make health care coverage more portable and secure for employees.

EBSA's compliance assistance information will assist employers and employee benefit plan officials in understanding and complying with the requirements of ERISA as it applies to the administration of employee retirement, health and other welfare benefit plans.

### Contact EBSA
- Comuníquese con EBSA

### About EBSA
- Mission Statement
- Organization Chart
- EBSA Offices
- ERISA Advisory Council
- CHIP Working Group

### FAQs

### Consumer Information
- Health Plans
- Retirement Plans
- Retirement Savings

### Laws & Regulations
- Final Rules
- Notices
- Proposed Rules
- Public Comments

### Technical Guidance

### Technical Guidance

**Exemptions**
- EXPRO Exemptions
- Granted Class Exemptions
- Individual Exemptions

**Interpretations**
- Advisory Opinions
- Field Assistance Bulletins
- Information Letters
- Technical Releases

### Laws And Regulations
- Statutes (United States Code)
- Executive Orders
- Code of Federal Regulations
- Unified Agenda of Federal Regulations
- Federal Register Documents
- Amicus Briefs Under ERISA

### Quick Links

benefit plans.

**Technical Guidance**

- Advisory Opinions
- Exemptions
- Field Bulletins
- Information Letters
- Interpretive Bulletins
- Technical Releases
- EO 12866 Guidance

**Compliance Assistance**

- Abandoned Plans
- Apprenticeship Plans
- Correction Programs
- Fiduciary Education
- For Health Plans
- For Retirement Plans
- For Small Employers
- Reporting and Filing
- 403(b) Plans
- Webcasts

## For Apprenticeship and Training Plans

- Apprenticeship and Training Plans
- Field Assistance Bulletin 2012-01
- Fiduciary Responsibilities under an Apprenticeship and Training Plans

## For Health Plans

- Health Benefits Advisor interactive Website assists employers in understanding and complying with federal group health plan laws
- Health Benefits Laws Self Compliance Tools
- Reporting/Disclosure Guide For Employee Benefit Plans – A quick reference tool for certain basic reporting and disclosure requirements under ERISA
- Understanding Your Fiduciary Responsibilities Under A Group Health Plan provides an overview of the basic fiduciary responsibilities applicable to health plans under ERISA

## Affordable Care Act

- Regulations and Guidance

## COBRA

- HHS Bulletin Allowing COBRA Qualified Beneficiaries to Enroll in the Health Insurance Marketplace
- HHS Fact Sheet on Losing Job-Based Coverage
- COBRA Continuation Coverage
- An Employer's Guide to Group Health Continuation Coverage Under COBRA – The Consolidated Omnibus Budget Reconciliation Act of 1986 | en español
- COBRA Continuation Health Coverage FAQs provide a general explanation of COBRA requirements, outline the rules that apply to health plans for employees in the private sector, and spotlight benefits under the law
- Final regulations on the COBRA notice provisions of Part 6 of Title I of ERISA
- COBRA Model General Notice | en español
- COBRA Model Election Notice | en español

### Quick Links

- Subscribe to this Page
- Summary of Major DOL Laws
- Consumer Information
- Employment Law Guide



### Webcasts

- Getting It Right - Know Your Fiduciary Responsibilities Archive – Part I | Part II | Part III
- ACA Compliance Assistance Webcast Archive

### Upcoming Seminar Locations

- Phoenix AZ
- Bangor ME

### Previous Seminar Locations

- [COBRA Model Election Notice](#) | [en español](#)

## HIPAA

- [Compliance Assistance Guide](#) – Health Benefits Coverage Under Federal Law includes general descriptions of the four health care laws and FAQs. It also includes a self-compliance tool that can help to determine compliance with HIPAA, MHPA, the Newborns' Act, and WHCRA with compliance tips that relate to common mistakes. This publication also includes a chart summarizing the laws' notice requirements and provides model language that can be used to comply | [Single Document Version large file](#)
- [HIPAA FAQs](#) – The Health Insurance Portability and Accountability Act of 1996 (HIPAA), amended the Employee Retirement Income Security Act to provide new rights and protections for participants and beneficiaries in group health plans
- [HIPAA Nondiscrimination Requirements FAQs](#) on final regulations issued on the nondiscrimination provisions under HIPAA
- [Final Regulations for HIPAA Health Coverage Portability](#)
- [Model Certificate of Group Health Plan Coverage](#) | [en español](#)
- [Request For Information on Benefit-Specific Waiting Periods Under HIPAA](#)
- [Notice of Proposed Rulemaking for Health Coverage Portability: Tolling Certain Time Periods and Interaction With the FMLA Under HIPAA](#)
- [Nondiscrimination & Wellness Programs in Health Coverage in the Group Market](#) – Final rules governing the HIPAA provisions regarding nondiscrimination based on a health factor and wellness program provisions for group health plans
- [Notice of Changes under HIPAA to COBRA Continuation Coverage under Group Health Plans](#) provides information to employers and operators of private-sector health plans about new requirements to notify workers of new changes in their continuation health benefit coverage, as required by HIPAA
- [Health Disclosure and Claims Issues: FY 2001 Compliance Project Report](#) – A review of group health plans for compliance with Part 7 of ERISA

## Genetic Information Nondiscrimination Act of 2008

- [Fact Sheet](#)
- [FAQs on the Genetic Information Nondiscrimination Act](#)
- [Interim Final Rules with Request for Comment](#)
- [Research Exception Form](#)

**Previous Seminar Locations**

| | | |
|---|---|---|
| Albany NY | Dover DE | Orlando FL |
| Albuquerque NM | Durham NC | Overland Park KS |
| Anchorage AK | Fargo ND | Pierre SD |
| Annapolis MD | Harrisburg PA | Plantation FL |
| Arlington VA | Hartford CT | Portland ME |
| Atlanta GA | Helena MT | Portland OR |
| Austin TX | Indianapolis IN | Raleigh NC |
| Baton Rouge LA | Jackson MS | Richmond VA |
| Billings MT | Lansing MI | Rutland City VT |
| Birmingham AL | Las Vegas NV | Salem OR |
| Boise ID | Laurel MD | Salt Lake City UT |
| Burlington VT | Little Rock AR | San Antonio TX |
| Camp Hill PA | Los Angeles CA | San Diego CA |
| Carlisle PA | Louisville KY | Santa Fe NM |
| Casper WY | Madison WI | Savannah GA |
| Chandler AZ | Manchester NH | Seattle WA |
| Charleston WV | Mesa AZ | Shreveport LA |
| Chicago IL | Minneapolis MN | St. Louis MO |
| Cincinnati OH | Nashville TN | Tallahassee FL |
| Columbia SC | New Orleans LA | Troy NY |
| Columbus OH | New York NY | Tulsa OK |
| Concord NH | Newark NJ | Warwick RI |
| Denver CO | Oklahoma City OK | Washington DC |
| Des Moines IA | Omaha NE | |

Appendix 0280

- Research Exception Form

# Mental Health Parity and Addiction Equity Act of 2008

- Final Regulation
- FAQs about ACA Implementation Part XVII and Mental Health Parity Implementation
- MHPAEA Fact Sheet
- FAQ on Mental Health Parity and Addiction Equity Act
- FAQs on Mental Health Parity Implementation (ACA FAQs Part V)
- FAQs on Mental Health Parity Implementation (ACA FAQs Part VII)
- Interim Final Rule

# Children's Health Insurance Program

- Fact Sheet
- Children's Health Insurance Program Working Goup
- Model Notice for Employers Regarding Premium Assistance Opportunities MS Word Format | Printer Friendly Version. Also available in Spanish MS Word Format | Printer Friendly Version
- Federal Register Notice

# Multiple Employer Welfare Arrangements

- Multiple Employer Welfare Arrangements Under ERISA (MEWA) – A booklet addressing many questions concerning the effect of ERISA on federal and state regulation of MEWAs
- How to Protect Your Employees when Purchasing Health Insurance – Tips that employers can use to help ensure that employees have the health care coverage they need
- The Form M-1 Online Filing System is an electronic filing system for the Form M-1 annual report for multiple employer welfare arrangements. The system allows filers to complete the form and submit it at no cost. This system is an example of an E-Government initiative which uses improved technology to make it easier for citizens and businesses to interact with the government
- Form M-1 Annual Report – This form is required to be filed under section 101(g) and section 734 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), and 29 CFR 2520.101-2
- MEWA regulations/guidance under the ACA

- MEWA regulations/guidance under the ACA

- Group Health and Disability Plans Benefit Claims Procedure Regulation – A booklet on the rules that apply to group health and disability benefit claims
- Claims Procedure Final Rule – Final regulations revising the minimum requirements for benefit claims procedures of employee benefit plans covered by Title I of the ERISA

 **Back to Top**

---

## For Retirement Plans

- Model Notice of Multiemployer Plan in Critical Status - The PPA of 2006 amended ERISA and the IRC to require that sponsors of multiemployer defined benefit pension plans that are in endangered or critical status provide notice to participants. The Model Notice is intended to facilitate compliance with this notification requirement.
- Meeting Your Fiduciary Responsibilities – To meet their responsibilities as plan sponsors, employers need to understand some basic rules, specifically the Employee Retirement Income Security Act (ERISA).  ERISA sets standards of conduct for those who manage an employee benefit plan and its assets (called fiduciaries).  This publication provides an overview of the basic fiduciary responsibilities applicable to retirement plans under the law
- Selecting An Auditor For Your Employee Benefit Plan – Federal law requires employee benefit plans with 100 or more participants to have an audit as part of their obligation to file the Form 5500.  This booklet will assist plan administrators in selecting an auditor and reviewing the audit work and report
- Selecting And Monitoring Pension Consultants – Tips For Plan Fiduciaries – ERISA requires that fiduciaries of employee benefit plans administer and manage their plans prudently and in the interest of the plan's participants and beneficiaries. In carrying out these responsibilities, plan fiduciaries often rely heavily on pension consultants and other professionals for help. Findings included in a report by the SEC released in May 2005, however, raise serious questions concerning whether some pension consultants are fully disclosing potential conflicts of interest that may affect the objectivity of the advice they are providing to their pension plan clients
- Tips For Selecting And Monitoring Service Providers For Your Employee Benefit Plan – Business owners are responsible for ensuring that their 401(k) plans comply with Federal law and rely on other professionals to assist them with their plan duties. Selecting a service provider is one of the most important responsibilities of a plan sponsor
- Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries - Target date retirement funds (also called target date funds or TDFs) have become an increasingly popular investment option in 401(k) plans and similar employee-directed retirement plans. EBSA prepared the following general guidance to assist plan fiduciaries in selecting and monitoring TDFs and other investment options in 401(k) and similar participant-directed individual account plans.
- FAQs on the Small Pension Plan Audit Waiver Regulation – FAQs on how to determine whether a Appendix 0282 conditions for the audit waiver requirements under the amended regulation

- Reporting And Disclosure Guide For Employee Benefit Plans – A quick reference tool for certain basic reporting and disclosure requirements under ERISA

- 401(k) Plan Fees Disclosure Tool – A form developed by banking, insurance and mutual fund trade groups to provide employers with a way to collect and compare investment fees and administrative costs of competing providers of plan services, now available in MS Word format. This form was not developed by the Department and was not designed to ensure compliance with the Department's regulations on service provider fee disclosure to plans or plan fee disclosure to 401(k) plan participants and beneficiaries.
- Pension Plans and ERISA – FAQs that describe the provisions of the federal pension law
- Cash Balance Pension Plans FAQs – FAQs that describe basic information about cash balance plans
- QDRO's - An Overview – QDRO's are domestic relations orders that recognize the existence of an alternate payee's right to receive benefits payable to a participant under a pension plan
- Determining Qualified Status and Paying Benefits – Outlines a plan administrator's duties, requirements for qualification for QDRO's
- Drafting QDRO's – Outlines the procedure for dividing pension benefits, defines survivor benefits, and explains the form of payment for QDRO's
- Voluntary Correction Programs
- Employee Plans News – A publication of the Employee Plans office of the Tax Exempt and Government Entities Operating Division of the IRS. This quarterly newsletter provides information about current developments and upcoming events within the retirement plans arena

## Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans

- Final Rule
- Fact Sheet
- Model Chart
- DOL No-Action Letter Request
- SEC No-Action Letter

## Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans – Timing of Annual Disclosure

- Direct Final Rule
- Proposed Rule
- Fact Sheet

Appendix 0283

## Service Provider Disclosures Under Section 408(b)(2)

- Final Rule
- Fact Sheet
- Changes to Final Fee Disclosure Rule
- Sample Guide
- Fee Disclosure Failure Notice

## Lifetime Income Illustration

- Advance Notice of Proposed Rulemaking
- Fact Sheet
- Calculator
- Joint Income Lifetime Hearing Notice
- Hearing Transcript: September 14, 2010 | September 15, 2010
- Written testimony
- Request For Information
- Request For Information Comments
- Lifetime Income Literature Review: Designing Better Pension Benefits Statements
- Proposed Information Collection Request - Survey Regarding Pension Benefit Statements
- Proposed Information Collection Request Comments

 **Back to Top**

---

## For 401(k) Plans

- Meeting Your Fiduciary Responsibilities – To meet their responsibilities as plan sponsors, employers need to understand some basic rules, specifically the Employee Retirement Income Security Act (ERISA).  ERISA sets standards of conduct for those who manage an employee benefit plan and its assets (called fiduciaries).  This publication provides an overview of the basic fiduciary responsibilities applicable to retirement plans under the law
- Understanding Retirement Plan Fees And Expenses – This booklet will help retirement plan sponsors better understand and evaluate their plan's fees and expenses.  While the focus is on fees and expenses involved with 401(k) plans, many of the principles discussed in the booklet also will have application to all types of retirement plans
- Selecting An Auditor For Your Employee Benefit Plan – Federal law requires employee benefit plans with 100 or more participants to have an audit as part of their obligation to file the Form 5500.  This booklet will assist plan administrators in selecting an auditor and reviewing the audit work and report

# Worker Adjustment and Retraining Notification Act



# UNITED STATES DEPARTMENT OF LABOR

○ All DOL  ● Search EBSA  Advanced Search

[ SEARCH ]

A to Z | Site Map | FAQs | Forms | About DOL | Contact Us |

**Office of the Assistant Secretary for Policy**

DOL Home > elaws Advisors > Employment Law Guide A Companion to the *FirstStep* Employment Law Advisor

**elaws®** - Employment Law Guide A Companion to the *FirstStep* Employment Law Advisor

## Other Workplace Standards: Notices for Plant Closings and Mass Layoffs

- Who Is Covered
- Basic Provisions/Requirements
- Employee Rights
- Recordkeeping, Reporting, Notices and Posters
  - Notices and Posters
  - Recordkeeping
  - Reporting
- Penalties/Sanctions
- Relation to State, Local, and Other Federal Laws
- Compliance Assistance Available
- DOL Contacts

Return to Table of Contents

**Related Information**

Compliance Assistance By Law
- The Worker Adjustment and Retraining Notification (WARN)

DOL Agency Assistance
- ETA Layoff-Related Services

Updated: September 2009

**Worker Adjustment and Retraining Notification Act (WARN)**
(**29 USC §2101 et seq.** ; **20 CFR Part 639**)

Appendix 0286

**Worker Adjustment and Retraining Notification Act (WARN)**
**(29 USC §2101 et seq. ; 20 CFR Part 639)**

# Who is Covered

The Worker Adjustment and Retraining Notification (WARN) Act is administered by the Employment and Training Administration (ETA). WARN generally covers employers with 100 or more employees, not counting those who have worked less than six months in the last 12 months and those who work less than 20 hours per week, or those employers with 100 or more employees, including part-time workers, who in the aggregate work at least 4,000 hours per week, exclusive of overtime. Regular federal, state, and local government entities that provide public services are not covered. Employees entitled to notice under WARN include managers and supervisors as well as hourly and salaried workers.

# Basic Provisions/Requirements

WARN protects workers, their families, and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice gives workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain other jobs and, if necessary, to enter skill training or retraining that will allow these workers to compete successfully in the job market. WARN also provides for notice to state dislocated worker units so that they can promptly offer dislocated worker assistance.

A covered plant closing occurs when a facility or operating unit is shut down for more than six months, or when 50 or more employees lose their jobs during any 30-day period at a single site of employment. A covered mass layoff occurs when 50 to 499 employees are affected during any 30-day period at a single employment site (or for certain multiple related layoffs, during a 90-day period), if these employees represent at least 33 percent of the employer's workforce where the layoff will occur, and the layoff results in an employment loss for more than six months. If the layoff affects 500 or more workers, the 33 percent rule does not apply.

WARN does not apply to closure of temporary facilities, or the completion of an activity when the workers were hired only for the duration of that activity. WARN also provides for less than 60 days notice when the layoffs resulted from closure of a faltering company, unforeseeable business circumstances, or natural disaster.

# Employee Rights

Workers or their representatives, and units of local government may bring individual or class action suits. U.S. district courts enforce WARN requirements. The court may allow reasonable attorney's fees as part of any final judgment.

Appendix 0287

# Occupational Safety and Health Act



**Occupational Safety
and Health Administration**

U.S. Department of Labor

# Job Safety and Health
# IT'S THE LAW!

## All workers have the right to:

- A safe workplace.

- Raise a safety or health concern with your employer or OSHA, or report a work-related injury or illness, without being retaliated against.

- Receive information and training on job hazards, including all hazardous substances in your workplace.

- Request an OSHA inspection of your workplace if you believe there are unsafe or unhealthy conditions. OSHA will keep your name confidential. You have the right to have a representative contact OSHA on your behalf.

- Participate (or have your representative participate) in an OSHA inspection and speak in private to the inspector.

- File a complaint with OSHA within 30 days (by phone, online or by mail) if you have been retaliated against for using your rights.

- See any OSHA citations issued to your employer.

- Request copies of your medical records, tests that measure hazards in the workplace, and the workplace injury and illness log.

*This poster is available free from OSHA.*

## Employers must:

- Provide employees a workplace free from recognized hazards. It is illegal to retaliate against an employee for using any of their rights under the law, including raising a health and safety concern with you or with OSHA, or reporting a work-related injury or illness.

- Comply with all applicable OSHA standards.

- Report to OSHA all work-related fatalities within 8 hours, and all inpatient hospitalizations, amputations and losses of an eye within 24 hours.

- Provide required training to all workers in a language and vocabulary they can understand.

- Prominently display this poster in the workplace.

- Post OSHA citations at or near the place of the alleged violations.

FREE ASSISTANCE to identify and correct hazards is available to small and medium-sized employers, without citation or penalty, through OSHA-supported consultation programs in every state.

### Contact OSHA. We can help.

**1-800-321-OSHA (6742)** • **TTY 1-877-889-5627** • www.osha.gov

Appendix 0289



# Consolidated Omnibus Budget Reconciliation Act



## Department Of Labor

HOME / POPULAR TOPICS / HEALTH PLANS & BENEFITS

Health Plans & Benefits: Continuation of Health Coverage - COBRA

## Continuation of Health Coverage  COBRA

- DOL Web Pages on This Topic

The Consolidated Omnibus Budget Reconciliation Act (COBRA) gives workers and their families who lose their health benefits the right to choose to continue group health benefits provided by their group health plan for limited periods of time under certain circumstances such as voluntary or involuntary job loss, reduction in the hours worked, transition between jobs, death, divorce, and other life events. Qualified individuals may be required to pay the entire premium for coverage up to 102 percent of the cost to the plan.

COBRA generally requires that group health plans sponsored by employers with 20 or more employees in the prior year offer employees and their families the opportunity for a temporary extension of health coverage (called continuation coverage) in certain instances where coverage under the plan would otherwise end.

### Subtopics

- Child Care Assistance
- Compliance Assistance
- Consumer Information on Health Plans
- Continuation of Health Coverage (COBRA)
- Employee Retirement Income Security Act (ERISA)
- Fiduciary Responsibilities
- Health Benefits Education
- Mental Health Benefits
- Newborns' & Mothers' Protections (Newborns' Act)

Appendix 0291

COBRA outlines how employees and family members may elect continuation coverage. It also requires employers and plans to provide notice.

- Participant Rights
- Plan Information
- Portability of Health Coverage (HIPAA)
- Womens' Health & Cancer Rights Protections

# DOL Web Pages on This Topic

COBRA Continuation Coverage Assistance Under The American Recovery And Reinvestment Act Of 2009 (ARRA) Provides information and guidance for premium reductions and additional election opportunities for health benefits under the ARRA.

Frequently Asked Questions: COBRA Continuation Health Coverage Provides answers to commonly asked questions about COBRA.

Health Benefits Under the Consolidated Omnibus Budget Reconciliation Act (COBRA) (PDF)Provides a detailed overview of the major provisions of COBRA.

Consumer Information on Health Plans Provides fact sheets, booklets, and other health plan information from the Department's Employee Benefits Security Administration (EBSA).

Compliance Assistance Provides publications and other materials to assist employers and employee benefit plan practitioners in understanding and complying with the requirements of ERISA as it applies to the administration of employee pension and welfare benefit plans.

Portability of Health Coverage (HIPAA) Frequently Asked Questions Provides answers to questions including "what is HIPAA?" and "how does crediting for prior coverage work under HIPAA?"

Your Employer's Bankruptcy: How Will it Affect Your Employee Benefits? Provides information on bankruptcys effect on pension and group health plans.

Your Health Plan and HIPAA ... Making the Law Work for You Provides information about major provisions of the Health Insurance Portability and Accountability Act, the Newborns' and Mothers' Health Protection Act, the Mental Health Parity Act, and the Women's Health and Cancer Rights Act.

Retirement and Health Care Coverage...Questions and Answers for Dislocated Workers Provides answers to common questions asked by dislocated workers about their pension and health benefits.

Top 10 Ways to Make Your Health Benefits Work for You (Español) Provides information to help you make informed decisions about health plans.

# Fair Labor Standards Act

  

UNITED STATES
DEPARTMENT OF LABOR

Find it in DOL

**elaws - employment laws assistance for workers and small businesses**

⭐**Was this page helpful?**

DOL HOME   /   ELAWS HOME   /   FAIR LABOR STANDARDS ACT ADVISOR

 - Fair Labor Standards Act Advisor

**What does the Fair Labor Standards Act require?**

The Fair Labor Standards Act's (FLSA) basic requirements are:

- Payment of the minimum wage;
- Overtime pay for time worked over 40 hours in a workweek;
- Restrictions on the employment of children; and
- Recordkeeping.

The FLSA has been amended on many occasions since 1938. Currently, workers covered by the FLSA are entitled to the minimum wage and overtime pay at a rate of not less than one and one-half times their regular rate of pay after 40 hours of work in a workweek. Various minimum wage exceptions apply under specific circumstances to workers with disabilities, full-time students, youth under age 20 in their first 90 days of employment, tipped employees and student-learners. Special rules apply to state and local government employment involving fire protection and law enforcement activities, volunteer services, and compensatory time off (instead of cash overtime pay). Employers are required to keep records on wages, hours, and other items which are generally maintained as an ordinary business practice.

Appendix 0294

The FLSA child labor provisions are designed to protect the educational opportunities of youth and prohibit their employment in jobs and under conditions detrimental to their health or safety. The child labor provisions include some restrictions on hours of work for youth under 16 years of age and lists of hazardous occupations too dangerous for young workers to perform. See YouthRules! for additional information on child labor rules for teens, parents, educators and employers

Wages required by the FLSA are due on the regular payday for the pay period covered. Deductions made from wages for such items as cash or merchandise shortages, employer-required uniforms, and tools of the trade, are not legal if they reduce the wages of employees below the minimum wage or reduce the amount of overtime pay due under the FLSA.

In order for the FLSA to apply, there must be an employment relationship between an "employer" and an "employee." The FLSA also contains some exemptions from these basic rules. Some apply to specific types of businesses and others to specific kinds of work.

Continue



UNITED STATES
DEPARTMENT OF LABOR

Career & Internships I Contact Us

200 Constitution Ave. NW
Washington DC 20210
1-866-4-USA-DOL
1-866-487-2365
TTY
www.dol.gov

**ABOUT THE SITE**
Freedom of Information Act
Privacy & Security Statement
Disclaimers
Important Web Site Notices
Plug-ins Used by DOL
RSS Feeds from DOL
Accessibility Statement

**LABOR DEPARTMENT**
Español
A to Z Index
Agencies
Office of Inspector General
Leadership Team
Contact Us
Subscribe to the DOL Newsletter
Read The DOL Newsletter

**FEDERAL GOVERNMENT**
White House
Affordable Care Act
Disaster Recovery Assistance
USA.gov
Disability.gov
Plain Writing Act
Recovery Act
No Fear Act

 UNITED STATES
DEPARTMENT OF LABOR



Find it in DOL

**elaws - employment laws assistance for workers and small businesses**

DOL HOME / ELAWS HOME / FAIR LABOR STANDARDS ACT ADVISOR

★Was this page helpful?

#  - Fair Labor Standards Act Advisor

**What does the Fair Labor Standards Act *NOT* require?**

There are a number of employment practices which the FLSA does not regulate. For example, **the FLSA does not require**:

(1) vacation, holiday, severance, or sick pay;
(2) meal or rest periods, holidays off, or vacations;
(3) premium pay for weekend or holiday work;
(4) pay raises or fringe benefits;
(5) a discharge notice, reason for discharge, or immediate payment of final wages to terminated employees; and
(6) pay stubs or "W-2"s.

The FLSA does not provide wage payment or collection procedures for an employee's usual or promised wages or for commissions in excess of those required by the FLSA. Also, the FLSA does not limit the number of hours in a day, or days in a week, an employee may be required or scheduled to work, including overtime hours, if the employee is at least 16 years old. However, some states do have laws covering some of these issues, such as meal or rest periods, or discharge notices.

The above matters, which are not covered by the FLSA, are generally for agreement between the employer and the employees or their authorized representatives.

# Appendix Exhibit 7

## M&A retention survey: pay-to-stay agreements

This article explains the use of one type of "pay-to-stay" incentive compensation.



# 2014 Global M&A Retention Survey

**How Companies Use Agreements to Keep Top Talent**



Appendix 0298



# 2014 Global M&A Retention Survey

How Companies Use Agreements to Keep Top Talent



## Contents

| | |
|---|---|
| Introduction | 2 |
| Key Findings | 3 |
| Why Retention Matters | 4 |
| Lessons From the Top: What High-Retention Companies Do Differently | 5 |
| Best Practice: Identify Retention Candidates That Matter to the Deal | 6 |
| Best Practice: Focus Initial Retention Efforts on Senior Leaders | 6 |
| Best Practice: Cash Is King | 7 |
| Retention Bonuses Grow in Popularity | 8 |
| Best Practice: Balance Pay to Stay With Pay to Perform | 8 |
| What's the Right Budget for Retention Bonuses? | 9 |
| Beyond the Bonus: Keeping Employees Over the Long Term | 10 |
| Towers Watson's Views | 11 |
| About the Survey | 12 |

Appendix 0300



# *Introduction*

The **importance of retaining key talent during a merger or acquisition** — and for many years after the merger — has become a given. **Many deals are based on the premise that these employees will continue to create the capability being acquired,** enhance and expand customer relationships, and lead teams to higher levels of performance. As a result, acquirers around the world are increasingly focused on pre-integration and integration efforts to identify these employees, and take steps to ensure they remain with the newly combined organization.

Yet respondents to Towers Watson's 2014 Global M&A Retention Study say that they still haven't found the perfect retention strategy. While a majority (68%) of respondents report that over 80% of employees who sign a retention agreement stay for the full retention period, fewer than half (43%) say they retained that same level of retention one year later.

In truth, a magic key — one that works for all top talent — may not exist. The disruption that comes with an acquisition or merger, coupled with an improving job market in many regions, can prompt high-performing employees to decide that the risks of staying on with the new organization are simply too high and that better opportunities lie elsewhere. In some cases, they may simply choose not to wait to see how things turn out.

**To understand what employers do to retain key staff during a transaction, we conducted a global study of 248 organizations in 14 countries. (See page 12 for further information about the survey.) In this survey (our second), we focus on the effectiveness of retention agreements — one of the tactics most frequently used to keep talent.** Our first study, conducted in 2012, took a broader look at the factors that lead to the successful retention of talent.

As in 2012, we focus on the half of our respondents that are most successful at retaining top talent to see how their actions compare to less successful companies.



## How We Define High-Retention Companies

We define high-retention companies as those that reported retention rates over **60%** for the full retention period. Low-retention companies are those that reported retention rates of **40%** or less.

Appendix 0301

## Key Findings

- **Who is targeted for retention?**
  Employees' ability to affect the success of the transaction is the most commonly cited factor for determining retention eligibility — this criterion topped high-potential status, job function, job level and job title.

- **When are retention agreements signed?**
  Just over half of senior leaders targeted for retention agreements are asked to sign at or before the initial signing, whereas close to a third of other employees are asked to sign after close.

- **What information is being used to identify retention agreement recipients?**
  Buyers most frequently turn to the target's senior leaders (76%) and unit leaders (50%) to identify employees appropriate for retention agreements.

- **What is the most common type of retention award?**
  Cash bonuses — generally expressed as a percentage of base salary — are the most common type of financial award in retention agreements for senior leaders (75%) and other employees (81%).

- **How are retention payouts set, measured and awarded?**
  Just over one-half of retention budgets are 2% or less of the total purchase price of the acquired company, and these costs are largely borne by the buyer (67%).

  Retention agreements typically use a combination of pay-to-stay and pay-to-perform metrics for senior leaders, but nonexecutives are most likely to receive exclusively time-based agreements.

  For agreements that include performance metrics, payouts for both senior leaders and other employees are most commonly based on the performance of the acquired company, but payouts for senior leaders are also frequently measured on the entire company's performance as well as on their ability to achieve synergy targets.

  Over a quarter (27%) of respondents provide higher retention awards to employees who otherwise benefit financially from the transaction (through acceleration of incentive awards and/or proceeds from stock owned at the time of the sale) as a way to strengthen their incentive to stay. In contrast, 16% of companies said that acquired employees who earned substantial compensation as a result of the deal received smaller retention awards.

  On average, senior leaders receive far larger payouts and have longer retention periods than do other employees.

  Vesting schedules vary; they are either prorated or are fully vested at the end of the retention period.

- **Does the retention rate remain high following the conclusion of the retention plan?**
  A high percentage (68%) of employers report that employees who signed retention agreements stayed for the full retention period in the majority of cases, but this high retention rate is maintained by less than half (43%) in the following year.

  Key employees understand their value in the marketplace. Most employees who left before the end of the retention period were either uncomfortable with the new culture or their new role, or were aggressively pursued by competitors.



**Figure 1. Business reasons or objectives for the transition**

Consolidate and strengthen competitive position — 51, 40, 60

Expand into new geographic markets — 42, 31, 50

Expand into new lines of business — 40, 41, 38

Acquire new technology — 34, 42, 26

Acquire talent/new capabilities — 33, 32, 34

Optimize cost infrastructure (improve economies of scale) — 21, 17, 24

Transform the way of doing business — 13, 12, 14

Other reason(s) — 3, 2, 5

■ n = 248    ■ U.S. n = 115    ■ Non-U.S. n = 133

**Figure 2. Most respondents believe their transaction achieved its strategic objectives**

Strategic objectives (n = 199) — 46, 38, 16

Talent objectives (n = 194) — 27, 41, 28, 4

Financial objectives (n = 171) — 23, 47, 26, 3, 1

■ Highly successful   ■ Mostly successful   ■ Somewhat successful   ■ Not very successful   ■ Not at all successful

## Why Retention Matters

Regardless of the reasons for a transaction *(Figure 1),* most respondents believe their transaction was highly or mostly successful in achieving its objectives *(Figure 2).* However, high-retention companies were more likely to rate their transactions as successful with respect to their strategic objectives (88%) than were low-retention companies (67%). U.S. organizations making global transactions were slightly more likely to rate their transactions as strategically successful compared to those making purely domestic transactions (94% versus 82%).

"Retaining key talent is one of the biggest factors influencing the success of the transaction."
— 2014 survey participant

Appendix 0303

**Lessons From the Top**

# What High-Retention Companies Do Differently

The fact that **88%** of high-retention companies rate their transaction as highly or mostly successful in terms of meeting their strategic objectives, compared to **67%** of low-retention companies, points to the critical impact that talent retention can have on deal success. High-retention companies behave differently from others in six critical ways.



**1.** They are more likely than others to **identify eligible employees** for retention based on their ability to affect the success of the transaction (**73%** for high-retention firms versus **33%** for low-retention firms).



**2.** They are more likely to **tap into** the target's senior leadership for information about which employees to keep (**66%** versus **27%**).

**3.** They are significantly more likely than low-retention companies to include **management discretion** (that is, the opinion of the target's leadership) in the retention-agreement selection process (**32%** versus **8%**).



**4.** They focus on cash bonuses rather than other forms of retention awards. **Cash bonuses** (exclusively or with other forms of compensation) are more likely to be included in retention agreements used by high-retention firms (**80%** for senior leadership, **89%** for other employees) compared to low-retention firms (**50%** and **55%**, respectively).

**5.** They are less likely than low-retention companies to rely on data from the target's HR systems to identify retention candidates. Job description data are used by only **28%** of high-retention companies, compared to **58%** of low-retention companies, and reporting-level information is used by just **36%** of high-retention companies, compared to **67%** of low-retention companies.

**6.** They offer **retention target value** that is higher than low-retention acquirers. For senior leaders, the median value of the retention plan among high-retention companies is **60%** of base salary, versus **35%** for low-retention companies. A similar difference exists for retention packages offered to nonexecutives (**28%** versus **16%**).

### Other key practices of high-retention companies:

- They identify retention candidates as early as possible.
- They employ a global retention philosophy and strategy but allow for local and regional variations.
- They secure retention agreements with senior leaders before other employees.
- They realize the importance of retention bonuses but also focus on other factors, including culture, the role of managers and other factors, to keep top talent.
- High-retention firms are more likely to use retention agreements that combine pay-to-stay and pay-to-perform metrics.

Appendix 0304

"Ensure the business understands the acquisition objectives and targets employees who can drive those results."

— 2014 survey participant

**Figure 3. Individuals with high potential and those critical to the success of the deal are prime candidates for retention agreements**



## Best Practice: Identify Retention Candidates That Matter to the Deal

By a wide margin, the people with the ability to affect the success of the transaction are most likely to be offered retention agreements *(Figure 3)*. High-retention companies are more likely than others to identify these employees for retention (73% compared to 33% of low-retention companies). Senior leaders of the acquired company are not the only employees who fall into this group. It also includes those with the specialized skills needed to keep the organization up and running during the sometimes-chaotic early months. Who these people are depends on the organization and its goals, but they can range from sales staff to customer service, to technical staff and other key contributors.

In our experience, acquirers look at many job families and employee levels in establishing retention bonus participation. Clearly, it's more efficient to take the steps necessary to keep key talent than it is to find, hire and integrate new talent during or just after an acquisition. And in regions, industries and specific job categories where the competition for talent is fierce, keeping the right people becomes even more critical to success.

Employees are chosen for retention agreements most commonly through direct input by the target company leaders. Identification of key talent by the target's leaders is used by 76% of respondents and is considered the most useful strategy by 62% of them. Pure data-driven criteria such as salary grade structures, performance ratings or job descriptions are seen as not nearly as useful to acquirers when selecting retention plan participants.

## Best Practice: Focus Initial Retention Efforts on Senior Leaders

There are several compelling reasons to start the retention process by focusing on senior leaders. First, they tend to be a limited group of people who are aware of the transaction and responsible for getting the deal done. Therefore, it's critical for them to be completely on board and aligned with the goals and strategies of the acquisition. To do this effectively, they can't be distracted by concerns

"Discuss retention sooner with senior executives, and provide more details up front about the options being provided and the value to the employee."

— 2014 survey participant

Appendix 0305

about their own futures, so it's often helpful to provide them with a clear personal stake in the success of the new company.

In fact, data from the survey show that, globally, companies are very focused on their leaders: 32% of respondents said senior leaders are asked to sign retention agreements before the initial merger signing and 22% at the initial merger agreement signing. By contrast, only 12% of respondents said that other employees are asked to sign retention agreements before the initial merger signing and 14% at the initial signing (Figure 4).

With that said, earlier timing for the signing of retention agreements does not appear to actually improve retention rates. In fact, low-retention companies are more likely than high-retention companies to concentrate agreement signings around the time of the initial merger signing.

The data show several other critical differences between retention agreements for senior leaders and those for other employees:

- In addition to cash, which respondents provide to both leaders (75%) and other employees (81%), companies are much more likely to provide other incentives to leaders, including time-vested shares and stock options.
- For companies that include time-based (i.e., pay-to-stay) metrics in their retention agreements, senior leaders have longer retention periods than other employees. A retention period of over 18 months after close was imposed on senior leaders by 41% of companies with pay-to-stay provisions, while only 24% of companies imposed this on other employees.
- Average award size for senior leaders dwarfs that for other employees. The median retention bonus value as a percentage of base salary is 49% of base salary for senior leaders, versus 27% for other employees.

## Best Practice: Cash Is King

While a combination of cash and other types of awards is common, cash prevails (Figure 5). This is especially true among high-retention companies. In the U.S., high-retention companies are much more likely to provide cash bonuses (80% for senior leaders, 89% for others) than low-retention companies (50% and 55%, respectively), while low-retention companies are more likely to include bonus guarantees (50% for senior leadership) and stock options (58% for senior leadership) compared to high-retention companies (18% and 27%, respectively).



**Figure 4. Senior leaders are asked to sign retention agreements before other employees**

Senior leadership (n = 218) · Other employees (n = 198)

- Before the initial signing: 32 / 12
- At the initial signing: 22 / 14
- Between the initial signing and the close: 26 / 29
- At the close: 9 / 12
- After the close: 10 / 31
- Other time: 1 / 2

**Figure 5. Cash bonuses are by far the most common financial award used in retention agreements**

Senior leadership (n = 220) · Other employees (n = 197)

- Cash retention bonuses: 75 / 81
- Time-vested full shares/share units: 33 / 16
- Stock options: 32 / 4
- Increases in base pay: 26 / 20
- Guaranteed payment of regular bonus: 23 / 21
- Performance-vested full shares/share units: 16 / 6
- Other type(s) of financial awards: 6 / 6

Appendix 0306

# Retention Bonuses Grow in Popularity

The use of various types of bonuses and equity has grown since our 2012 survey, while the use of annual bonus guarantees has stayed about the same. Two years ago, 74% of participants reported using retention bonuses for either senior leadership or other employees, or both, compared to 83% today. In 2012, 47% reported using equity grants (i.e., stock options or time-vested full shares/share units or performance-vested full shares/share units) compared to 56% today. Also in 2012, 25% reported using bonus guarantees in retention agreements, slightly lower than the 27% using them today.

Cash is an attractive retention reward for nonexecutive employees because it provides a higher degree of certainty during a transition period that is fraught with risk. With cash awards, employees know what they will receive, and it's easier for them to determine whether the award makes staying worthwhile. It's interesting to note that companies with low retention rates most frequently cited the following reasons for employee departures: retention package not generous enough (36%), displeased with new pay structure (36%) and displeased with new benefit structure (36%). Clearly, a more generous retention package like those paid by high-retention companies is more likely to keep key employees at the company for the full retention period.

There are some notable differences by region in the form of retention payments. U.S.-based companies are slightly more likely to use cash bonuses with nonexecutives than non-U.S.-based companies (88% versus 74%), and are also more likely to make full share/share unit grants to both senior leaders (42% versus 29%) and nonexecutives (22% versus 9%). In contrast, non-U.S. companies reported using base pay increases for nonexecutives (35% versus 21%) and guaranteed payment of regular bonuses (27% versus 18% for senior leaders, and 28% versus 14% for nonexecutives) to a greater degree than U.S. respondents.

Target retention plan values also differ based on geography. U.S. respondents provide significantly larger average award sizes for senior leadership compared to non-U.S. respondents (65% of base salary versus 39% at the median). This difference was not as significant for awards made to those below the senior leadership level (30% of base salary for U.S. companies, 25% for non-U.S. companies).

## Best Practice: Balance Pay to Stay With Pay to Perform

Including performance metrics in a retention agreement is tempting, especially given stakeholders' expectations of quick and measurable financial success for a merger or acquisition. Some companies are even forgoing pay-to-stay agreements in favor of those that are based purely on financial performance.

Notably, only 1% of respondents to our 2012 survey had retention agreements that were purely performance based, whereas 14% and 16% of respondents report using such agreements today (for senior leadership and other employees, respectively). In 2012, 46% of the retention agreements for acquisitions were purely time-based, and 51% were a combination of time and performance measures. Currently, only 35% are purely time-based, and 48% use a combination of time and performance measures.

*"Next time, we'll develop performance–based criteria for mid-level employees."*

*— 2014 survey participant*

Appendix 0307

This shift toward more performance-based pay has not appeared to improve retention rates. In 2014, high-retention respondents are more likely to use combination agreements of pay-to-stay and pay-to-perform metrics (59%), while low-retention firms are more likely to use purely performance-based agreements (42%).

While the theory behind performance-based metrics makes sense, overusing them can backfire. Employees who are measured on metrics that are unattainable or out of their control are more likely to forgo the bonus opportunity and seek employment elsewhere. Alternatively, they may stay with the company but feel less engaged in their work than they might have been had the performance measures been easier to meet when they were established.

The challenge is to get the right balance between encouraging top performance and setting reasonable performance metrics — that is, those that reflect the employee's job level, role, skills and the degree to which he or she can reasonably be expected to influence company performance.

# What's the Right Budget for Retention Bonuses?

Although the median cost of a retention plan relative to the deal size is just under 2% globally *(Figure 6),* that statistic tells only part of the story. The higher the deal value, in general, the lower the relative size of the retention budget. Most companies reach for a sweet spot that encourages retention by an optimal number of key employees — not the maximum number of employees — so that individual values can be meaningful to the participant without overspending in the aggregate. With that said, it is also possible to both underspend and overspend at the individual level: Too little and there's no incentive to stay; too much and employees' focus turns to the bonus payout date.

In addition, companies need to understand the role of the purchase price in keeping top executives. Some companies don't provide a retention bonus for top executives who are already going to profit from the company's sale. Their rationale: Why provide an additional bonus to an executive who may be making a significant profit on the sale of the company — especially if that profit dwarfs the bonus? The retention bonus won't keep the executive who plans to leave, making it a needless expense.



**Figure 6. The median retention budget is just under 2% of the total transaction cost**



| | |
|---|---|
| Less than 1% | 29 |
| 1% to 2% | 23 |
| 3% to 5% | 28 |
| 6% to 10% | 14 |
| 11% to 20% | 4 |
| Greater than 20% | 2 |

*"Provide clear, up-front and honest communication to employees (from both the acquired and acquiring companies) so that expectations are set realistically."*

*— 2014 survey participant*

Appendix 0308

## Beyond the Bonus: Keeping Employees Over the Long Term

While 68% of respondents indicated they are able to retain a high percentage of employees (over 80%) for the full retention period, fewer than half (43%) maintain that rate one year later. This raises a crucial question: How well are companies using the retention period to build employee engagement, develop and communicate a positive culture, work individually with key employees to keep them on board for the long term — and help ensure the success of the merger over a longer period?

Retention bonuses are important — at least for the length of the retention period — but they're only part of the equation. In our consulting experience, personal outreach by leaders and managers, strategic promotions of some individuals and employees' participation on task forces are also beneficial. And let's not forget the role of total rewards — particularly learning and development, and career opportunities for high-potential candidates, and a reward philosophy that clearly differentiates high performers.

Local and regional customs also come into play after a deal. Multinational acquirers that build a culture and compensation philosophy that is global but allows for regional and local variations can make key employees feel comfortable — and wanted — in the new environment.

In fact, the factors that are critical for retaining and engaging employees are the same whether or not a company is in the midst of a merger or acquisition. Our 2014 Global Workforce Study, which garnered responses from more than 32,000 employees in 31 markets, shows the importance of these workplace attributes in driving retention, and reinforces the link between high rates of retention and employee engagement. For example, respondents said:

- The top drivers of employee attraction and retention continue to reflect the fundamentals — pay, security and career advancement.
- Sustainable engagement requires strong leaders and managers. In companies where both leaders and managers are perceived by employees as effective, 72% of employees are highly engaged.
- Inspiring and motivating employees is the most important driver of leadership effectiveness.

Organizations keen to retain top talent during and after a merger could increase their success rate by focusing on cultural issues, including a clear articulation of the employment deal and frequent communication from senior leadership, combined with manager training that emphasizes people skills. They would also do well to pay attention to career development and pay differentiation for top performers.

> "Address behavioral motivators to retention, not just money, and actively manage a succession plan to backfill everyone with a retention bonus."
> — 2014 survey participant

Appendix 0309



*Towers Watson's Views*

Develop a thoughtful retention strategy that is based on the deal objectives. It's almost impossible to be dogmatic about a retention strategy; there are simply too many unknowns. But companies can go a long way toward positioning the transaction for success by:

- Starting with a clear strategy that reflects the business goals of the transaction
- Identifying the roles and functions most critical to success
- Setting a budget for retention bonuses
- Assigning roles and responsibilities for developing and administering the process

Once the framework is in place, necessary exceptions can be made. These exceptions will likely be more frequent in cross-border mergers where differences in culture and regulations will need to be accommodated.

Finally, it's also important to avoid developing customized deals for many people, because such an approach is time-consuming and, as our data show, does not help overall retention.

Retention should start with executives. By solidifying retention agreements with senior leaders first, companies can keep them engaged in the merger process. The behavior of senior leaders is critical to the retention and engagement of employees. Easing their concerns early will help to roll out an effective retention strategy for their teams. While agreements don't necessarily need to be signed before close, don't wait too long. They should be completed very quickly after the merger.

Develop different retention plans for senior leaders and other employees. The strategies for these two groups should be developed separately, taking into consideration such factors as bonus size and form (with an emphasis on cash for nonexecutives), length of retention period (generally, longer for executives) and the degree to which performance metrics should be part of the agreement (a greater emphasis on performance for executives).

Think beyond the bonus. Finally, companies should pay close attention to the factors that will keep employees for the long term, including career development, pay differentiation for top performers and a clearly articulated employment deal. Helping new employees understand the corporate culture can be especially important when a large company acquires a smaller one, where the culture may have been very different.

Appendix 0310

**Figure 7. Industry breakdown**

| | 0% | 10% | 20% | 30% |

Manufacturing **22**

High Technology **12**

Financial Services, excluding Insurance **11**

Communications/Media/Telecommunications **9**

Health Care, excluding Pharmaceuticals **6**

Insurance **6**

Energy **4**

Food and Beverage **4**

Pharmaceuticals **4**

Natural Resources **3**

Professional and Business Services **3**

Aerospace and Defense **2**

Property and Construction **2**

Utilities **2**

Wholesale **2**

Auto and Transport Equipment **1**

Retail **1**

Tourism and Leisure **1**

Transportation **1**

Charities and Nonprofit **0**

Education **0**

Government **0**

Other **3**

**Base: Total respondents (n = 248)**

## About the Survey

The 2014 Global M&A Retention Study examines the structure, use and effectiveness of retention agreements during an acquisition or merger, with a particular focus on the financial elements of those agreements. Survey participants responded in terms of one particular merger or acquisition their company had initiated or completed within the past two years.

To qualify for the survey, organizations had to employ least 500 people (1,000 if based in the U.S.), have completed either a merger or acquisition within the past two years, and used employee retention agreements for at least one of those transactions.

The survey had 248 respondents from 14 different countries (Australia, Belgium, Brazil, Canada, Germany, Indonesia, Japan, Malaysia, Mexico, the Netherlands, Singapore, South Korea, the U.K. and the U.S.). They represented virtually every industry *(Figure 7)*. Sixty-nine percent of responding companies are publicly held. Thirty-two percent of transactions were global, and 10% were regional.



**Figure 8. Headquarters location**

| | 0% | 10% | 20% | 30% | 40% | 50% |

United States **50** / **46**

Japan **10** / **10**

Canada **9** / **8**

Southeast Asia (Indonesia, Malaysia, Singapore) **7** / **11**

Brazil **7** / **8**

United Kingdom **4** / **7**

Germany **3** / **2**

Netherlands **2** / **4**

Mexico **1** / **2**

Other **7** / **2**

■ Company headquarters   ■ Respondent location

**Base: Total respondents (n = 248)**

Appendix 0311



## About Towers Watson

Towers Watson is a leading global professional services
company that helps organizations improve performance
through effective people, risk and financial management.
With more than 14,000 associates around the world,
we offer consulting, technology and solutions in the
areas of benefits, talent management, rewards, and
risk and capital management.

Copyright © 2014 Towers Watson. All rights reserved.
TW-NA-2014-37760

**towerswatson.com**

 /company/towerswatson     @towerswatson     /towerswatson



Appendix 0313

# Appendix Exhibit 8

# Jury charge with verdict and juror notes

Juror names are redacted.

**Presiding Juror**

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | In the County Court |
| v. | § | |
| | § | of Dallas County |
| Southwest Housing | § | |
| Development Company, Inc.; | § | at Law Nº 5 |
| Southwest Housing | § | |
| Management Corporation, | § | |
| Inc. a/k/a and d/b/a Southwest | § | |
| Housing Management | § | |
| Company, Inc.; Affordable | § | |
| Housing Construction, Inc.; | § | |
| Brian Potashnik, | § | |
| | § | |
| *Defendants.* | § | |

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS
2010 FEB -1 AM 10: 52

---

## CHARGE OF THE COURT

---

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Page 1 of 23

CC-08-02072-E
CCC
CHARGE OF COURT
1740765

Appendix 0315

Here are the instructions for answering the questions.

1.     Do not let bias, prejudice, or sympathy play any part in your decision.

2.     Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions.  Do not consider or discuss any evidence that was not admitted in the courtroom.

Some of the exhibits may contain redactions.  The portions of those exhibits have been redacted because I have excluded the redacted portions from the evidence.  You should disregard any redactions just as you would disregard any other evidence that I have excluded from the record.

3.     You are to make up your own minds about the facts.  You are the sole judges of the credibility of the witnesses and the weight to give their testimony.  But on matters of law, you must follow all of my instructions.

4.     If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.     All the questions and answers are important.  No one should say that any question or answer is not important.

6.     Answer "yes" or "no" to all questions unless you are told otherwise.  A "yes" answer must be based on a preponderance of the evidence.  Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

Preponderance of the evidence means the greater weight of credible evidence presented in this case.  If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no."  A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence.  For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

Appendix 0316

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Certain testimony has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. This deposition testimony is entitled to the same consideration as if the witness had been present and had testified from the witness stand in court.

7.     Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.     Do not answer questions by drawing straws or by any method of chance.

9.     Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not consider attorneys' fees. Do not guess about attorneys' fees.

10.     Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.     The answers to the questions must be based on the decision of at least five of the six jurors. The same five jurors must agree on every answer. Do not agree to be bound by a vote of anything less than five jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

Appendix 0318

## DEFINITIONS

As used in this Charge of the Court, Southwest Housing Development means Southwest Housing Development Company, Inc.

As used in this Charge of the Court, Southwest Housing Management means Defendants Southwest Housing Management Corporation, Inc., also known as and doing business as Southwest Housing Management Company, Inc.

As used in this Charge of the Court, Affordable Housing Construction means Affordable Housing Construction, Inc.

Appendix 0319

## QUESTION 1

Did Jeff Carpenter and Southwest Housing Management agree that Southwest Housing Management would pay one or more annual bonuses to Jeff Carpenter covering the period from March 15, 2005 through March 15, 2007?

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

**Authority** for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. More than one person may have a party's actual authority.

**Apparent authority** exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists. More than one person may have a party's apparent authority.

When a **vice-principal** of a corporation commits some act, that act may be deemed to be the act of the corporation itself. A corporation can have more than one vice-principal. A person is a "vice-principal" if—

Appendix 0320

1.   that person is a corporate officer; or

2.   that person has authority to employ, direct, and discharge an employee of a corporation; or

3.   the corporation has confided to that person the management of the whole or a department or division of the business of the corporation.

A person is a manager or is employed in a managerial capacity if—

1.   that person has authority to employ, direct, and discharge an employee of a corporation; or

2.   a corporation has confided to that person the management of the whole or a department or division of the business of a corporation.

Answer "Yes" or "No."

Answer: ___NO___

Appendix 0321

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 2

Did Southwest Housing Management fail to comply with the agreement to pay Jeff Carpenter one or more annual bonuses covering the period from March 15, 2005 through March 15, 2007?

Answer "Yes" or "No."

Answer: ___NA___

If you answered "Yes" to Question 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with the agreement to pay Jeff Carpenter one or more annual bonuses covering the period from March 15, 2005 through March 15, 2007?

You are instructed that any monetary recovery for such annual bonus is subject to federal income taxes.

Consider the following elements of damages, if any, and none other.

    a.  past lost compensation in the form of annual bonuses

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer    **NA**

## QUESTION 4

Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
2. if Jeff Carpenter would stay as long as needed on to help make the asset sale happen

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

**Authority** for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. More than one person may have a party's actual authority.

**Apparent authority** exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists. More than one person may have a party's apparent authority.

When a **vice-principal** of a corporation commits some act, that act may be deemed to be the act of the corporation itself.  A corporation can have more than one vice-principal.  A person is a "vice-principal" if—

1. that person is a corporate officer; or

2. that person has authority to employ, direct, and discharge an employee of a corporation; or

3. the corporation has confided to that person the management of the whole or a department or division of the business of the corporation.

A person is a manager or is employed in a managerial capacity if—

1. that person has authority to employ, direct, and discharge an employee of a corporation; or

2. a corporation has confided to that person the management of the whole or a department or division of the business of a corporation.

Answer "Yes" or "No" for each:

Affordable Housing Construction    YES

Southwest Housing Development    YES

Southwest Housing Management    YES

Brian Potashnik    YES

Appendix 0325

If you answered "Yes" to Question 4 for any defendant, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 5**

For each defendant for whom you answered "Yes" in Question 4, did that defendant also fail to comply with such agreement?

Answer "Yes" or "No" for each defendant for whom you answered "Yes" in Question 4:

Affordable Housing Construction _____YES_____

Southwest Housing Development _____YES_____

Southwest Housing Management _____YES_____

Brian Potashnik _____YES_____

Appendix 0326

If you answered "Yes" to Question 4 for any defendant, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 6**

As of October 13, 2006, was the agreement found in Question 4 possibly performable in less than one year?

Answer "Yes" or "No."

Answer: ___YES___

Appendix 0327

If you answered "Yes" to Question 5 for any defendant, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 7

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with such agreement?

You are instructed that any monetary recovery for such sale proceeds payment is subject to federal income taxes.

Consider the following elements of damages, if any, and none other.

a. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer:    $928,020.76

## QUESTION 8

Did Jeff Carpenter perform compensable work staying on as long as needed to help make the asset sale happen for any of the below-named defendants for which he was not compensated?

Jeff Carpenter performed compensable work if he rendered valuable services or furnished valuable materials to a defendant; that defendant accepted, used, and benefited from the services or materials; and, under the circumstances, that defendant was reasonably notified that Jeff Carpenter expected to be compensated for the services or materials.

Answer "Yes" or "No" for each:

Affordable Housing Construction      NO

Southwest Housing Development      NO

Southwest Housing Management      NO

Brian Potashnik      NO

Appendix 0329

If you answered "Yes" to Question 8, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 9

What is the reasonable value of such compensable work at the time and place it was performed?

Answer in dollars and cents, if any.

Answer: _____NA_____

Appendix 0330

## QUESTION 10

Did Jeff Carpenter perform compensable work for Southwest Housing Management for which he was not compensated, excluding any staying on to help make the asset sale happen?

Jeff Carpenter performed compensable work if he rendered valuable services or furnished valuable materials to a defendant; that defendant accepted, used, and benefited from the services or materials; and, under the circumstances, that defendant was reasonably notified that Jeff Carpenter expected to be compensated for the services or materials.

Answer "Yes" or "No":

Answer: __NO_____

Appendix 0331

If you answered "Yes" to Question 10, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 11

What is the reasonable value of such compensable work at the time and place it was performed?

Answer in dollars and cents, if any.

Answer: ___NA_____

Appendix 0332

## QUESTION 12

Which, if any, of the defendants were engaged in a joint enterprise in connection with the asset sale?

A "joint enterprise" exists if the persons or entities concerned have (1) an agreement, either express or implied, with respect to the enterprise or endeavor; and (2) a common purpose; and (3) a community of pecuniary interest in the common purpose of the enterprise, among the members of the group; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

Answer "Yes" or "No" for each:

Affordable Housing Construction        __NO__

Southwest Housing Development        __NO__

Southwest Housing Management        __NO__

Brian Potashnik        __NO__

Appendix 0333

## QUESTION 13

Which, if any, of the defendants were engaged in a joint venture in connection with the asset sale?

A "joint venture" exists if the persons or entities concerned have (1) a community of interest in the venture, (2) an agreement to share profits, (3) an express agreement to share losses, and (4) a mutual right of control or management of the venture.

Answer "Yes" or "No" for each:

Affordable Housing Construction      NO

Southwest Housing Development      NO

Southwest Housing Management      NO

Brian Potashnik      NO

Appendix 0334

## QUESTION 14

Is Brian Potashnik responsible for the conduct of the entities named below?

Brian Potashnik is "responsible" for the conduct of an entity if—

Brian Potashnik used the entity for the purpose of perpetrating and did perpetrate an actual fraud on Jeff Carpenter primarily for the direct personal benefit of Brian Potashnik.

Answer "Yes" or "No" for each:


Affordable Housing Construction _____YES_____

Southwest Housing Development _____YES_____

Southwest Housing Management _____YES_____

Appendix 0335

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

     1.    have the complete charge read aloud if it will be helpful to your deliberations;

     2.    preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

     3.    give written questions or comments to the bailiff who will give them to the judge;

     4.    write down the answers you agree on;

     5.    get the signatures for the verdict certificate; and

     6.    notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror?  If you do not, please tell me now.

You may answer the questions on a vote of five jurors.  The same five jurors must agree on every answer in the charge. This means you may not have one group of five jurors agree on one answer and a different group of five jurors agree on another answer.

If five jurors agree on every answer, those five jurors sign the verdict.  If all six of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

All jurors should deliberate on every question.  You may end up with all six of you agreeing on some answers, while only five of you agree on other answers.  But when you sign the verdict, only those five who agree on every answer will sign the verdict.

You are again instructed that it is your duty not to communicate with, or permit yourselves to be addressed by, any other person about any subject relating to the case.

*Submitted by —*
*(Mark Greenberg*
*Judge Presiding*
*January 3, 2018*

Appendix 0336

## Verdict Certificate

Check one:

_____ Our verdict is unanimous.  All six of us have agreed to each and every answer.  The presiding juror has signed the certificate for all six of us.

_____   _____
Signature of Presiding Juror   Printed Name of Presiding Juror

___✓___ Our verdict is not unanimous.  Five of us have agreed to each and every answer and have signed the certificate below.

Signature                     Name Printed

<span style="color:red; font-size:3em;">redacted</span>

Appendix 0337

Is question 8 in reference to the 3rd deal?

Thank you for your questions. You should interpret the question according to the ordinary meaning of the question.

What was the final bonus cake violation from the 3% deal?

Thank you for your question. You should use your best collective memory as to the evidence.

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2018 FEB -1  AM 9:49

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2018 FEB -1  AM 9:49

Appendix 0338

In reference to question #6 on page 13 —

Could we get a clarified explanation of the term "possibly performable"?

Thank you for your question. ⊕ You should give those words their ordinary meaning.

Mark Greenberg

2018 JAN 31   AM 8:53

DALLAS COUNTY, TEXAS
COUNTY CLERK
JOHN F. WARREN
FILED

Appendix 0339

# Appendix Exhibit 9

# excerpts from third amended petition in prior case

FILED
7/5/2016 6:50:10 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | IN THE COUNTY COURT |
| | § | |
| SOUTHWEST HOUSING | § | AT LAW NO. 5 |
| DEVELOPMENT COMPANY, INC.; | § | |
| SOUTHWEST HOUSING | § | DALLAS COUNTY, TEXAS |
| MANAGEMENT CORPORATION, | § | |
| INC. a/k/a and d/b/a SOUTHWEST | § | |
| HOUSING MANAGEMENT | § | |
| COMPANY, INC.; AFFORDABLE | § | |
| HOUSING CONSTRUCTION, INC.; | § | |
| BRIAN POTASHNIK; and | § | |
| CHERYL POTASHNIK n/k/a | § | |
| CHERYL GEISER, | § | |
| | § | |
| Defendants. | § | |

| | |
|---|---|
| SOUTHWEST HOUSING | § |
| MANAGEMENT CORPORATION, | § |
| INC., | § |
| | § |
| Counter-Plaintiff, | § |
| | § |
| v. | § |
| | § |
| JEFFREY W. CARPENTER, | § |
| | § |
| Counter-Defendant. | § |

**JEFFREY CARPENTER'S THIRD AMENDED PETITION
AND JURY DEMAND**

Jeffrey Carpenter — through undersigned counsel — files his Third Amended Petition and Jury Demand and respectfully states as follows.

## DISCOVERY PLAN

1.      Jeffrey Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## NATURE OF THE CASE

2.      This is an unlawful employment practices case involving refusal to pay earned compensation.

## PARTIES

3.      Jeffrey Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued and who currently resides in Dallas County, Texas.

4.      Southwest Housing Development Company, Inc. ("SH Development") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Development has filed an answer in this civil action.

Appendix 0342

5.    Southwest Housing Management *Corporation*, Inc. ("SH Management") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Management was also known as — and was doing business as and using as an assumed or common name — Southwest Housing Management *Company*, Inc. ("SH Management Company").  Examples include, but are not limited to, the following.  SH Management sometimes used the name SH Management Company in its Texas Franchise Tax Public Information Reports that it filed with the Texas Secretary of State.  SH Management used the name SH Management Company on an agreement that it is at issue in this civil action.  SH Management was originally named in this civil action in its assumed or common name, as permitted under Texas Rule of Civil Procedure 28.  SH Management filed an answer in its true name in response to those allegations.  Texas permits substitution of the true name through an amended petition.

6.    Affordable Housing Construction, Inc. ("AH Construction") is a Nevada corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records. AH Construction has filed an answer in this civil action.

7.    Brian Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Brian Potashnik has filed an answer in this civil action.

Appendix 0343

8.     Cheryl Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Cheryl Potashnik has filed an answer in this civil action.  Cheryl Potashnik is now known as Cheryl Geiser.

## **JURISDICTION**

9.     This Court has subject matter jurisdiction over this civil action because Jeffrey Carpenter seeks damages within its jurisdictional limits and because the claims asserted herein are not subject to exclusive jurisdiction in another court. This Court has personal jurisdiction over the Defendants in this civil action because (1) the Defendants have each entered a general appearance before it, (2) the claims asserted in this civil action arose directly from the Defendants' acts and omissions in Texas, and (3) the Defendants' affiliations with Texas are so continuous and systematic as to render each "essentially at home" in Texas.

## **VENUE**

10.     Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(2) because the individual defendants' residence was in Dallas County, Texas at the time the causes of action asserted herein accrued.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(3) because the corporate defendants each maintained

Appendix 0344

their principal office in Dallas County, Texas at the time the causes of action asserted herein accrued.

## **VICE-PRINCIPAL STATUS**

11.    A "vice principal" is someone who fits within at least one of the following categories: (1) corporate officers, or (2) others who represent the corporation in its corporate capacity, or (3) those who have authority to employ, direct, or discharge employees of the corporation, or (4) those engaged in the performance of non-delegable or absolute duties of the corporation, or (5) those to whom the corporation has entrusted the management of the whole or a department or division of the business.  The acts and omissions of a "vice principal" are the acts and omissions of the corporation itself.  A corporation may have more than one vice principal.

12.    Brian Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  Examples include, but are not limited to, the following.  Brian Potashnik was the only person serving on the Board of Directors for SH Development, SH Management, and AH Construction [according to Texas Secretary of State records] when he engaged in his acts and omissions at issue in this civil action.  Brian Potashnik was also a corporate officer of SH Development, SH Management, and AH Construction when he engaged in his acts and omissions at issue in this civil action.

Appendix 0345

13.    Brian Potashnik acted as a vice principal for SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Brian Potashnik acted as a vice principal for SH Development, SH Management, and AH Construction when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

14.    Cheryl Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  Examples include, but are not limited to, the following example.  The website for SH Development, SH Management, and AH Construction listed Cheryl Potashnik as a corporate officer at the times she engaged in her acts and omissions at issue in this civil action.

15.    Cheryl Potashnik acted as a vice principal for SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Cheryl Potashnik acted as a vice principal for SH Development, SH Management, and AH Construction when she confirmed that the Sale Proceeds Payment was earned and was due.

Appendix 0346

## ACTUAL OR APPARENT AUTHORITY

16.     A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.  Actual authority arises from a party's agreement that another act on behalf and for the benefit of the party.  This authority includes whatever else is proper, usual, and necessary to do what was expressly authorized.  More than one person may have actual authority to do something.

17.     Apparent authority exists if a party (1) knowingly permits another to hold himself or herself out as having authority or (2) through lack of ordinary care, gives another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his or her detriment.  Apparent authority may exist without actual authority.  More than one person may have apparent authority to do something.

18.     Brian Potashnik had actual or apparent authority to act on behalf of SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Brian Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Cheryl Potashnik, and himself when (1) he agreed to the terms of the

Appendix 0347

Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

19.     Cheryl Potashnik had actual or apparent authority to act on behalf of SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Cheryl Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Brian Potashnik, and herself when she confirmed that the Sale Proceeds Payment was earned and was due.

## FIRST CLAIM FOR RELIEF:
## FAILURE TO COMPLY WITH & REPUDIATION OF AGREEMENT — ANNUAL BONUSES

20.     An employer must comply with its agreements to pay bonuses to its employees.   When interpreting an agreement, the facts and circumstances surrounding execution of the agreement may be considered in most cases.  When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases.  A written agreement may be orally modified, even if the written agreement states otherwise, as long as the underlying agreement is not within the statute of frauds.

Appendix 0348

## SECOND CLAIM FOR RELIEF:
## FAILURE TO COMPLY WITH & REPUDIATION OF ORAL AGREEMENT —
## SALE PROCEEDS PAYMENT

33.    An employer must comply with its agreements to pay employees for work.    A written agreement is of no higher legal significance than an oral agreement.  When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases.  An agreement may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing.  The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.

34.    **Failure to comply and repudiation:**  The following is not intended to be exhaustive or to state all facts.  To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth.  In May of 2006, Brian Potashnik was at home when he met with Jeff.  Brian Potashnik expressed that he had good news and was selling the business.  Brian Potashnik explained that Jeff might not have a job after the asset sale but that he needed Jeff to stay on and help make the asset sale happen.  Brian Potashnik said that if Jeff stayed on for as long as needed to help make the asset sale happen, Jeff would be paid a bonus from the sale proceeds.  Brian Potashnik determined the formula later (the "Sale Proceeds Payment").

Appendix 0349

35.     Brian Potashnik and Cheryl Potashnik saw that Jeff accepted and stayed on and got to work to help make the asset sale happen.  Around six months later, Brian Potashnik and Cheryl Potashnik signed a letter of intent for a multi-million dollar asset sale.   Brian Potashnik thereafter met with Jeff.   Brian Potashnik expressed that Jeff probably would not have a job after the sale but that he still needed Jeff to stay on as long as needed to help make the asset sale happen. Brian Potashnik told Jeff the formula for calculating the Sale Proceeds Payment. Brian Potashnik and Jeff estimated the Sale Proceeds Payment at more than $1 million.

36.     Brian Potashnik and Cheryl Potashnik saw that Jeff stayed on and continued to work to make the sale happen.   Around six months later, Brian Potashnik signed a Purchase and Sale Agreement as "authorized agent" for "each of the sellers" listed — which included SH Development, SH Management, AH Construction, Brian Potashnik, Cheryl Potashnik, and entities that each of them owned or controlled.   At various points, Brian Potashnik and Cheryl Potashnik expressed that the Sale Proceeds Payment was due to Jeff.

37.     Brian Potashnik and Cheryl Potashnik ultimately learned that Jeff had deferred the start date of other employment in order to stay on as long as needed to help make the asset sale happen.  As the asset sale looked more certain and agreement was reached to transition management to the purchaser, Cheryl Potashnik thanked Jeff for his work and told Jeff that he would only be needed

Appendix 0350

through the end of the week.  In other words, Cheryl Potashnik confirmed that Jeff had fully performed his obligations under the agreement for the Sale Proceeds Payment.

38.    Brian Potashnik signed an agreement effective November 1, 2007 to transition management to the asset purchaser.    Brian Potashnik and Cheryl Potashnik caused Jeff's last day of work to be on or about November 2, 2007.  Brian Potashnik and Cheryl Potashnik repudiated the agreement for the Sale Proceeds Payment in late 2007.    Defendants and sellers in the assets sale — SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik — received more than $33 million in net profits from the asset sale. These defendant sellers caused Jeff to suffer damages as a result of their conduct.

39.    **Prevention of performance, prevention of condition, and limited right to revoke:**  Whether the agreement for the Sale Proceeds Payment is considered bilateral or unilateral, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik could not lawfully prevent performance or a condition to receiving the Sale Proceeds Payment and thereby avoid their payment obligations.  For example, none of them could lawfully avoid payment by unilaterally terminating Jeff's employment without good cause before the asset sale concluded and then claim Jeff was not entitled to the Sale Proceeds Payment because he was not employed on the distribution date.   Jeff fully performed his end of the bargain before his employment ended — he stayed.  Jeff

thus earned the Sale Proceeds Payment before his employment ended.  Pleading in the alternative only, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that the offer could not be revoked at that point.  Pleading further in the alternative only, Jeff is entitled to a pro rata share of the Sale Proceeds Payment based on *Riata Cadillac* principles.

### ALTERNATIVE THIRD CLAIM FOR RELIEF: *QUANTUM MERUIT*

40.    Pleading in the alternative only, Jeff is entitled to recover Annual Bonuses under the theory of *quantum meruit* for the reasonable value of his services provided to SH Management and [alternatively] Brian Potashnik to prevent unjust enrichment.  Pleading further in the alternative only, Jeff is entitled to recover a Sale Proceeds Payment under the theory of *quantum meruit* for the reasonable value of his services provided to defendant sellers SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik to prevent unjust enrichment.  For both Annual Bonuses and a Sale Proceeds Payment, Jeff conferred valuable services under such circumstances as reasonably notified these persons and entities that he, in performing such services for them, expected to be paid for those services, and they benefited from those services.

Appendix 0352

Respectfully submitted,

*/s/ Amy Gibson*

_____

Amy Gibson
Texas State Bar No. 00793801
David L. Wiley
Texas State Bar No. 24029901

**Gibson Wiley PLLC**
1500 Jackson Street #714
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126
Email:
amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR JEFFREY
CARPENTER

Appendix 0353

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on July 5, 2016, a true copy of Jeffrey Carpenter's Third Amended Petition and Jury Demand was served on all other parties through their lead attorneys of record as follows:

### <u>VIA TEXAS E-FILE SYSTEM</u>

Mr. Lawrence J. Friedman
Mr. Michael Donohue
Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
<u>lfriedman@fflawoffice.com</u>
<u>mdonohue@fflawoffice.com</u>
<u>jhfriedman@fflawoffice.com</u>

*/s/ Amy Gibson*

Amy E. Gibson

Appendix 0354

# Appendix Exhibit 10

## Dallas Court of Appeals opinion affirming jury findings and final trial court judgment in prior case

Potashnik v. Carpenter, Not Reported in S.W. Rptr. (2020)

Case 3:23-cv-00769-N   Document 57   Filed 07/12/24   Page 356 of 366   PageID 3939

2020 WL 5056558
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Dallas.

Brian POTASHNIK, Southwest Housing
Development Company, Inc., Southwest
Housing Management Corporation,
Inc. a/k/a and d/b/a Southwest Housing
Management Company, Inc., and Affordable
Housing Construction, Inc., Appellants

v.

Jeffrey W. CARPENTER, Appellee

No. 05-19-00238-CV
|
Opinion Filed August 27, 2020

On Appeal from the County Court at Law No. 5, Dallas
County, Texas, Trial Court Cause No. CC-08-02072-E,
Honorable Mark Greenberg, Judge

**Attorneys and Law Firms**

R. Michael Northrup, Sim Israeloff, Cowles & Thompson,
P.C., Robert B. Gilbreath, Hawkins Parnell & Young LLP,
Dallas, TX, for Appellants.

David Linwayne Wiley, Amy Gibson, Gibson Wiley PLLC,
Dallas, TX, for Appellee.

Before Justices Partida-Kipness, Nowell, and Evans

MEMORANDUM OPINION

Opinion by Justice Evans

**\*1** After an eight-day jury trial, Brian Potashnik, Southwest
Housing Development Company, Inc., Southwest Housing
Management Corporation, Inc., a/k/a and d/b/a Southwest
Housing Management Company, Inc., and Affordable
Housing Construction, Inc. appeal from an adverse judgment
on Jeffrey W. Carpenter's breach of contract claim against
them. In two issues, appellants challenge the legal sufficiency

of the evidence to support the jury's finding that the parties
formed an enforceable agreement. After reviewing the record,
we affirm the trial court's judgment for the reasons that follow.

BACKGROUND

Brian and Cheryl Potashnik[1] operated the various appellant
companies which developed, owned, and managed affordable
housing complexes. In 2006, Brian and Cheryl decided to
sell their business. At that time, Jeff Carpenter was the
executive vice president of Southwest Housing Management
Corporation, Inc. Brian and Cheryl wanted Carpenter and
other key employees to stay on until the transfer of
management to the ultimate purchaser for the purposes of
continuity, which was important to the asset sale. According
to Cheryl, when they informed Carpenter and other key
employees of their plans to sell, they told them that if the
sale was successful and there was money left over at the end
of the day, they wanted them to participate in the success of
the sale. At trial, Cheryl also admitted she told Carpenter that
they intended to pay him a bonus if and when the sale went
through. Carpenter similarly testified that in May 2006, when
Brian and Cheryl told him about their plans to sell, Brian told
him this would be good for both families and that they worked
hard and should reap some of the rewards. According to
Carpenter, Brian told him he wanted Carpenter to stay because
there was a lot to do and Carpenter would be involved in the
due diligence and communication between the teams once
a buyer was selected. Brian further told Carpenter that once
they selected a buyer and knew the numbers better, they would
put together a very lucrative bonus program for Carpenter's
efforts. Brian and Carpenter shook hands after that first
conversation about the sale. Another executive testified at
trial that Brian later told him that if the transactions went well,
Carpenter might not have to work again.

Carpenter testified that on October 13, 2006, Brian informed
him that a buyer had been selected. Brian then indicated to
Carpenter his bonus would be based on the letter of intent
they were about to sign with the buyer. Carpenter testified
that he and Brian "walked through" the numbers that were
based on three percent of the gross sales price of $36 million
minus normal closing costs and minus sale proceed bonuses
paid to other key employees. Carpenter and Brian did the math
and estimated a stay bonus of around $1,020,000. They shook
hands after Brian explained the bonus formula. At that time,
the anticipated closing date for the transaction was spring/
summer 2007. The next business day, Carpenter approached

Appendix 0356

Potashnik v. Carpenter, Not Reported in S.W. Rptr. (2020)

Case 3:23-cv-00769-N   Document 57   Filed 07/12/24   Page 357 of 366   PageID 3940

Brian to ask about increasing the bonus from three percent to five percent. Brian rejected the idea of five percent, stating it would have to stay at three percent because that was what was approved, "we've committed to it," and he could not do any more than that.

**\*2** At some point while the sale was pending, Carpenter and the sellers learned definitively that Carpenter would not have a position with the buyer because the buyer had its own person for Carpenter's job. Subsequently, Carpenter was approached by another company that tried to recruit him immediately with a higher starting base salary than he was earning at the time. Nevertheless, Carpenter testified he declined the offer because he was "a man of his word," said he would stay on, and was not willing to walk away from the three percent stay bonus and back-earned bonuses.[2] At trial, Jeff Richards, the recruiter for the company, confirmed Carpenter would not start the new job immediately because he had a considerable amount of money coming to him from his current employer if he stayed on.

In late September/early October 2007, Carpenter learned from Brian and Cheryl that criminal indictments were looming against them and the business was losing up to $1 million per month on their personal legal defense fees.[3] The sale of the business, which was initially expected to close in the spring/ summer of 2007, was delayed, and the management transition from appellants to the new buyer was set for November 1, 2007. At trial, Cheryl confirmed that they wanted Carpenter to stay on, so they intended to pay him a bonus to work through a certain point in connection with the asset sale which ultimately was the point in which the management of the business was transferred to the new buyer.

Carpenter testified that he met with Brian on October 12, 2007 at which time Brian acknowledged that Carpenter had earned both his three percent bonus as well as the back-earned bonuses. On October 21, 2007, Carpenter met Brian and Cheryl for dinner and they told him he would get paid when they get paid, i.e., at the closing. Cheryl again reassured Carpenter she "would never screw [him]." Cheryl testified that October 31, 2007 was the last day they needed Carpenter to stay on to help with the asset sale. It is undisputed that Carpenter worked for appellants through October 31, 2007. The next day, on November 1, Carpenter received his termination paperwork/severance agreement offering him $50,000 and no other payments if he released all potential claims against appellants. Carpenter

did not sign the agreement and ultimately filed this breach of contract lawsuit.

After a jury trial consisting of five days of testimony from various witnesses and other evidence, the jury answered the following question in Carpenter's favor:

QUESTION 4

Did any of" the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees

2. if Jeff Carpenter would stay as long as needed on[sic] to help make the asset sale happen

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

The trial court rendered judgment on the jury's verdict in favor of Carpenter, awarding him $928,020.76 in actual damages plus pre- and post-judgment interest, attorney's fees, and conditional appellate attorney's fees. Appellants then filed this appeal challenging the legal sufficiency of the evidence to support the jury's affirmative finding in question four.

ANALYSIS

**\*3** In their two issues on appeal, appellants contend the evidence is legally insufficient to support the jury's "yes" answer to Question 4. Because appellants challenge the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that there is no evidence to support the finding. *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). Evidence is legally sufficient to support a jury's verdict when

Potashnik v. Carpenter, Not Reported in S.W. Rptr. (2020)

Case 3:23-cv-00769-N   Document 57   Filed 07/12/24   Page 358 of 366   PageID 3941

it would allow reasonable and fair-minded jurors to reach the challenged finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When we review a finding for legal sufficiency, we consider the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See id.*

In their first issue, appellants argue there is no evidence to support the jury's finding that the parties formed a contract on October 13, 2006. They contend Carpenter's own admission that he asked Brian for five percent of sales revenue on the next day, October 14, 2006, "is fatal to the jury's finding that the parties reached an agreement on October 13." Appellants specifically rely on the following Carpenter testimony to establish conclusively the parties never reached an agreement on October 13:

> Q. So what's the date of your asking for five percent, sir?
>
> A. It was the next business day after October 13th.
>
> Q. So October 14 you were still negotiating, correct?
>
> A. I believe so.

Appellants assert this evidence demonstrates as a matter of law there was no meeting of the minds to prove the parties agreed that Carpenter would be paid three percent of gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees. We do not agree that this lone statement by Carpenter, taken out of context and ignoring multiple days of testimony and numerous admissions by Brian and Cheryl, precludes the jury's finding.

To prove the existence of a valid contract, a party must establish an offer was made, the other party accepted the offer, the parties had a meeting of the minds on the essential terms of the contract (mutual assent), each party consented to the terms, and the parties executed and delivered the contract with the intent that it be mutual and binding. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). An action for breach of contract may involve disputes on any combination of these requirements, as well as a number of defenses that can be asserted by a defendant. *Id.* Here, appellants challenge the legal sufficiency of the evidence with respect to the mutual assent or meeting of the minds requirement to contract formation. Whether the parties reached an agreement is a question of fact. *See Parker*

*Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Carpenter testified that on October 13, 2006, Brian informed him of the specifics of the bonus he would receive and they walked through the math. The bonus was based on the letter of intent that was going to be signed and would equal three percent of the gross sales price of $36 million minus normal closing costs, including items like broker fees, title fees, legal fees, and bonuses or severances paid to other employees. Carpenter testified they estimated his bonus to be about $1,020,000. At that time, the two shook hands on the deal. Brian never stated the deal had to be in writing. Cheryl also admitted that they intended to pay Carpenter a bonus out of sales proceeds when the sale went through. According to Carpenter, the next day he went to Brian's office and asked to raise the percentage from three percent to five percent. Brian responded that "it would have to stay at three percent, that's what we talked about, that's what I approved, and we've committed to it." Carpenter also testified that Brian said "he has another person that he has to approve or ... work through. She can – it's been approved at three percent and that's what we discussed, that's what we talked about, and I can't do five percent." There is no evidence that Carpenter rejected the three percent on which they had already agreed. In addition to this evidence, the jury heard testimony from Cheryl that, to encourage key employees to stay on through the sale, they talked to the employees and "let them know that if, at the end of the day, the sale was successful and there was money left over at the end of the day that we wanted them to participate in the success of the sale and of the business." Carpenter also testified that Brian told him that if he stayed, and when they settled on a buyer, "we'll put together a very lucrative bonus program for you for your efforts."

 **\*4**  According to Carpenter, when he and Brian were in Las Vegas around January 12, 2007 they discussed putting the deal in writing, and Brian said it was going to be done but attorneys were too busy. Brian then stated to Carpenter, "Jeff if it's that important to you, you know, I'll write it on the back of a napkin." But there were only cloth napkins available so Carpenter decided to trust Brian on the oral deal. Moreover, Carpenter stated that, on October 12, 2007, Brian told him that Carpenter had fulfilled his obligation and had earned his three-percent bonus and back-earned bonuses as of that day. Another executive, Deepak Sulakhe, testified that Brian told him that if the transaction went well, Carpenter might not have to work again.

Potashnik v. Carpenter, Not Reported in S.W. Rptr. (2020)

Case 3:23-cv-00769-N   Document 57   Filed 07/12/24   Page 359 of 366   PageID 3942

Carpenter's testimony that he attempted to get Brian to agree to a five percent bonus after they agreed to three percent the day before is not conclusive evidence that the parties were still negotiating and thus never reached an agreement. Instead, the jury could have viewed Carpenter's statement as seeking a modification of the original agreement that Brian rejected. At best, this testimony could be viewed as conflicting with other evidence. In a legal sufficiency analysis, we assume the jury resolved conflicting testimony in a manner favorable to the verdict. *See City of Keller*, 168 S.W.3d at 819. We resolve appellants' first issue against them.

In their second issue, appellants contend that because the terms of the purported agreement are too indefinite, it is unenforceable as a matter of law. Specifically, appellants argue that evidence Carpenter "would stay on as long as needed to make the asset sale happen" in exchange for three percent of undefined gross asset sale revenue to sellers minus undefined normal closing costs was, at best, a promise to work together and not an enforceable contract because the agreement does not reflect a meeting of the minds on the services to be provided.

We agree with appellants that in order to be legally enforceable, a contract must be sufficiently definite in its terms to allow a court to understand what a promisor undertook. *See T.O. Stanley Boot Co. Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). The parties must agree to the material terms of the contract before a contract can be enforced and where an essential term is open for future negotiation, there is no binding contract. *Id*. But a contract need only be definite and certain as to those terms that are essential and material to the agreement. *Fischer v. CTMI L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). When a material or essential term is missing or not certain when the contract was allegedly formed, the contract will fail for indefiniteness. *See Marx v. FDP, LP*, 474 S.W.3d 368, 376 (Tex. App.—San Antonio 2015, pet. denied).

In analyzing whether a contract is sufficiently definite to be enforceable, we are guided by the following five basic principles: (1) we may not rewrite the parties' contract; (2) because the law disfavors forfeitures, whenever the contract language is reasonably susceptible to an interpretation that is sufficiently definite, we will apply that interpretation, (3) we will imply terms that can be reasonably implied, (4) terms that appear indefinite may be given precision by usage of trade or by course of dealing between parties, and (5) partial performance under an agreement may remove uncertainty and

establish an enforceable contract; in fact, a party's actions "[i]n reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed." *Fischer*, 479 S.W.3d at 239–40 (internal citations omitted).

In support of their position, appellants focus on the meaning of Carpenter's promise to stay on to "help make the asset sale happen" after Brian and Cheryl informed him they were selling the companies. They argue the meaning of the promise cannot be ascertained because it provides no objective criteria or guidelines by which a court can measure Carpenter's efforts. After reviewing the record before us, we conclude that the evidence was legally sufficient to establish the material terms of the agreement between appellants and Carpenter were sufficiently definite and clear, no terms were left open for future negotiation, and the parties mutually agreed to the material terms.

**\*5** To the extent that appellants rely on Carpenter's testimony that he was still negotiating on October 14 to conclusively establish there was no meeting of the minds, we have already considered and rejected this argument in our resolution of their first issue.

Appellants also argue the duration for Carpenter's performance was also indefinite because of Carpenter's testimony that:

A. Well, we did have an agreement for me to help assist in closing the sale. And it -- depending on the time frame, it was going to be either the sales closing or until my time is no longer needed, knowing that I was not going to have a position to go to. So it was a floating target.

Q. All right. None of that was agreed to when you had the bump, shake, oral agreement with Mr. Potashnik in October 13, 2006?

A. We had -- we had a targeted frame of closing in, as I said before, in April, May of 2007. And as we got closer to that it became more of a moving target.

They assert this testimony establishes that the parties did not agree on the time for performance or how long Carpenter had to stay on. We do not agree. That the parties did not have a specific date on which Carpenter's performance would end does not render the agreement too indefinite to be enforceable. Carpenter also testified that when Brian informed him that he was going to sell the business, he told Carpenter that he wanted Carpenter to stay and do his job. Brian specifically told Carpenter that Carpenter would be involved in the due

Appendix 0359

Potashnik v. Carpenter, Not Reported in S.W. Rptr. (2020)

Case 3:23-cv-00769-N  Document 57  Filed 07/12/24  Page 360 of 366  PageID 3943

diligence and communication between the teams once a buyer was selected. Based on the evidence, a reasonable jury could have determined that the parties agreed that if Carpenter continued to do his job and perform these other responsibilities until the asset sale closed or he was no longer needed, he would be entitled to the three percent bonus. Carpenter and others testified that even when Carpenter was offered another job at a more lucrative base salary, he did not quit his position but instead stayed through October 31, 2007, the day before the management transition to the buyer. Moreover, there was evidence that about ten days earlier, on October 21, 2007, Brian and Cheryl confirmed to Carpenter that he sufficiently performed his obligations and would get paid his three percent bonus at closing, when they got paid.

We likewise are unpersuaded by appellants' argument that the agreement's payment term was not clear or definite enough to be enforceable because there was no understanding as to how "normal closing costs" were to be determined. Carpenter testified that Brian and he estimated the amount of normal closing costs to be about $1 million when they went through the math to calculate the bonus on October 13 and there is no indication that these costs would not be able to be ascertained with specificity at the time of the closing of the asset purchase agreement when the bonus was to be paid.

The supreme court's decision in *Vanegas v. American Energy Services* also supports our conclusion that an enforceable contract exists. 302 S.W.3d 299, 303–04 (Tex. 2009). In *Vanegas*, the supreme court concluded the employer's promise to pay employees a five percent bonus from sale/merger proceeds was enforceable upon the employees' performance of staying until the sale. *Id.* at 304. The court reasoned whether the promise was illusory at the time it was made is irrelevant; what matters is whether the promise is enforceable by the time of breach. *Id.* at 303. We conclude the material terms of the contract are sufficiently definite to enable a court to determine the parties' respective obligations and provide a remedy for the contract's breach. Accordingly, we resolve appellants' second issue against them.

CONCLUSION

**\*6** Based on the record before us, we conclude the evidence was legally sufficient to support the jury's finding of an enforceable contract. Accordingly, we affirm the trial court's judgment.

**All Citations**

Not Reported in S.W. Rptr., 2020 WL 5056558

Footnotes

1    Cheryl's legal last name is Geiser, but she used Potashnik in business during the relevant time period.

2    The jury found against Carpenter on the back-earned annual bonuses.

3    The FBI had previously searched appellants' offices in 2005, but Brian and Cheryl assured Carpenter they had done nothing wrong.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Exhibit 11

## Texas Supreme Court denial of petition for review and denial of motion for rehearing in prior case

## IN THE SUPREME COURT OF TEXAS

-- -- -- --

NO. 20-0763

BRIAN POTASHNIK, SOUTHWEST
HOUSING DEVELOPMENT
COMPANY, INC., SOUTHWEST        §
HOUSING MANAGEMENT             §            **Dallas County,**
CORPORATION, INC. A/K/A AND     §
D/B/A SOUTHWEST HOUSING         §            **5th District.**
MANAGEMENT COMPANY, INC.,       §
AND AFFORDABLE HOUSING          §
CONSTRUCTION, INC.
v.
JEFFREY W. CARPENTER

**January 22, 2021**

Petitioners' petition for review, filed herein in the above numbered and styled case, having been duly considered, is ordered, and hereby is, denied.

**March 5, 2021**

Petitioners' motion for rehearing of petition for review, filed herein in the above numbered and styled case, having been duly considered, is ordered, and hereby is, denied.



I, BLAKE A. HAWTHORNE, Clerk of the Supreme Court of Texas, do hereby certify that the above is a true and correct copy of the orders of the Supreme Court of Texas in the case numbered and styled as above, as the same appear of record in the minutes of said Court under the date shown.

It is further ordered that petitioners, BRIAN POTASHNIK, SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., SOUTHWEST HOUSING MANAGEMENT CORPORATION, INC. A/K/A AND D/B/A SOUTHWEST HOUSING MANAGEMENT COMPANY, INC., AND AFFORDABLE HOUSING CONSTRUCTION, INC., pay all costs incurred on this petition.

WITNESS my hand and seal of the Supreme Court of Texas, at the City of Austin, this the 5th day of March, 2021.



Blake A. Hawthorne, Clerk

By Monica Zamarripa, Deputy Clerk

Appendix 0363

# Appendix Exhibit 12

# Mandate concluding prior case



## Court of Appeals
## Fifth District of Texas at Dallas

### MANDATE

**TO THE COUNTY COURT AT LAW NO. 5 OF DALLAS COUNTY, GREETINGS:**

Before the Court of Appeals for the Fifth District of Texas, on the 27th day of August 2020, the cause on appeal to revise or reverse the judgment between

BRIAN POTASHNIK, SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., SOUTHWEST HOUSING MANAGEMENT CORPORATION, INC. A/K/A AND D/B/A SOUTHWEST HOUSING MANAGEMENT COMPANY, INC., AND AFFORDABLE HOUSING CONSTRUCTION, INC., Appellants

No. 05-19-00238-CV          V.

JEFFREY W. CARPENTER, Appellee

On Appeal from the County Court at Law No. 5, Dallas County, Texas Trial Court Cause No. CC-08-02072-E.
Opinion delivered by Justice Evans, Justices Partida-Kipness and Nowell participating.

was determined; and this Court made its order in these words:

    We **VACATE** our judgment dated August 27, 2020.  This is now the judgment of the Court.  In accordance with this Court's opinion of August 27, 2020, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Jeffrey W. Carpenter recover his costs of this appeal and the full amount of the trial court's judgment from appellants Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. A/K/A and D/B/A Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc. and from U.S. Specialty Insurance Company in the amount of $214,625.00 as surety on appellants Brian Potashnik, Southwest Housing Development Company, Inc. and Affordable Housing Construction, Inc.'s, supersedeas bond.

**WHEREFORE, WE COMMAND YOU** to observe the order of the Court of Appeals for the Fifth District of Texas, in this behalf, and have it duly obeyed and executed.

**WITNESS** the HON ROBERT D. BURNS, III, Chief Justice of the Court of Appeals, with the Seal thereof affixed, at the City of Dallas, this 11th day of March 2021.

_____
Lisa Matz, Clerk

Appendix 0366