# Appendix Exhibit 13

# jury trial transcript excerpts in prior case

These excerpts include the complete presentation to the jury other than most trial exhibits and trial visuals. These excerpts exclude pretrial hearings, most bench conferences, the charge conference, and most of jury selection.

REPORTER'S RECORD

VOLUME 2 of 11

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
LISA MATZ
Clerk

Trial Court Cause No. CC-08-02072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| | ) | |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) ) | |
| | ) | |
| Defendants. | ) | DALLAS, TEXAS |

_____

TRIAL ON THE MERITS

_____

On the 23rd day of January, 2018, the following proceedings came on to be heard within the presence of a jury, in the above-entitled and -numbered cause; and the following proceedings were had before the HONORABLE MARK GREENBERG, Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

APPEARANCES:


MS. AMY GIBSON
SBN 00793801
Gibson Wiley, PLLC
1500 Jackson Street, Suite 714
Dallas, Texas 75201
(214)522-2121
Attorneys for Plaintiff

        -AND-

MR. BRIAN SANFORD
SBN 17630700
Sanford Firm
1910 Pacific Avenue, Suite 15400
Dallas, Texas 75201
(469)361-9111
Attorney for Plaintiff

        -AND-

MR. LAWRENCE "LARRY" FRIEDMAN
SBN 07469300
MR. MICHAEL DONOHUE
SBN 05989380
MR. JASON FRIEDMAN
SBN 24059784
Friedman & Feiger, LLP
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972)788-1400
Attorneys for Defendants

        -AND-

MR. RYAN HALE
SBN 24097784
Hawkins Parnell Thackston & Young, LLP
4514 Cole Avenue, Suite 500
Dallas, Texas 75205-5412
(214)780-5138
Appellate Attorney for Defendants


ALSO PRESENT:  Steve Page, AV Technician

```
1                    P R O C E E D I N G S
2                    January 23, 2018
3                    (Conference held off the record)
4                    MOTIONS IN LIMINE (CONT'D)
5                    THE COURT:  Go ahead.  You put a good
6      amount of this on the record yesterday.  Go ahead and make
7      your argument.
8                    MR. L. FRIEDMAN:  Is Ryan here?
9                    MR. DONOHUE:  Yeah.
10                   MR. L. FRIEDMAN:  Let Ryan make it.
11                   You know Ryan Hale, our appellate lawyer.
12                   MR. HALE:  Good morning, Your Honor.
13                   MR. L. FRIEDMAN:  The smartest one in the
14     group.
15                   MR. HALE:  Yes, Your Honor.  So, as you saw
16     in our motion, we really think that presenting evidence of
17     the criminal investigation, the FBI investigation, and the
18     raid or anything related to the criminal proceedings really
19     doesn't have any relevance as to whether the parties
20     actually formed an oral agreement.  If anything, it's, I
21     believe, intended to be inflammatory and just to sort of
22     assume what they're trying to prove in the first place.
23                   THE COURT:  Ms. Gibson?  And you made
24     arguments on this yesterday, too --
25                   MS. GIBSON:  Yes, Your Honor.
```

Appendix 0370

1              MS. GIBSON:  I'm sorry.

2              THE COURT:  And we're off the record.

3              (Off the record)

4              (Recess taken)

5              MS. GIBSON:  I'm sorry.  I think we have

6    just, like, three exhibits to pre-admit.

7              THE COURT:  All right.

8              MS. GIBSON:  I apologize.

9              One -- and if y'all will confirm this is

10   Plaintiff's Exhibit 1 -- these are transcripts of a

11   telephone recording.  Also, Exhibit 2, which is the

12   employment agreement.  I believe Plaintiff's 3 is the Email

13   from Cheryl.

14             Mike, will you double check and confirm

15   that for me that we agreed on Plaintiff's 3?

16             MR. DONOHUE:  Yeah.

17             We have no objection to this.

18             THE COURT:  And you didn't have an

19   objection to 1 or 2?

20             MR. DONOHUE:  I'm sorry.  What was 1?

21             THE COURT:  The transcript between

22   Potashnik --

23             MR. L. FRIEDMAN:  The uncertified

24   transcripts --

25             MR. DONOHUE:  No objection.  They are what

```
 1    they are.
 2                    THE COURT:  They are what they are.  I
 3    agree.
 4                    One, two, and three are admitted.
 5                    MS. GIBSON:  And I believe that is it for
 6    this morning.
 7                    THE COURT:  Very good.
 8                    MR. L. FRIEDMAN:  And, Your Honor, may I
 9    approach and hand you the two exhibits that were admitted on
10    the motion in limine?
11                    THE COURT:  For the reporter's record.
12                    (Off the record)
13                    (Recess taken)
14                    (The jury entered the courtroom.)
15                    THE COURT:  Good morning, ladies and
16    gentlemen.
17                    (No response)
18                    THE COURT:  Let me try again.  Good
19    morning, ladies and gentlemen.
20                    (The jury panel responded.)
21                    THE COURT:  My name is Mark Greenberg.  I'm
22    the presiding judge in this court.  Welcome to County Court
23    at Law Number 5.
24                    The case before you is the case of
25    Jeffrey Carpenter vs. Southwest Housing and several other
```

24

```
1    defendants.
2                  The first thing we'll do is ask the
3    attorneys to introduce themselves and tell you who they
4    represent.  We're going to start over here to your left with
5    Ms. Gibson.
6                  MS. GIBSON:  Amy Gibson and Brian Sanford,
7    and we represent Jeff Carpenter.
8                  THE COURT:  All right.  Thank you.
9                  Mr. Friedman.
10                  MR. L. FRIEDMAN:  My name is
11    Larry Friedman.  My law firm is Friedman & Feiger.  I
12    represent Cheryl Potashnik Geiser.  I represent
13    Brian Potashnik.
14                  Did I say that right?
15                  I represent Cheryl Geiser Potashnik, both
16    of them, Geiser Potashnik and Potashnik Geiser.  And I
17    represent Southwest Housing Management, Southwest Housing
18    Development, and Affordable Housing Construction.  And with
19    me today are my two good partners, Michael Donohue and
20    Jason Friedman, who is also my son.  And we have issues.
21                  (Laughter)
22                  THE COURT:  All right.  Thank you, Counsel.
23                  MR. L. FRIEDMAN:  This is Steve Page.  He's
24    our presentation specialist.
25                  THE COURT:  All right.  Thank you.
```

Appendix 0373

1  <mark>JURY INSTRUCTIONS</mark>

2  THE COURT:  And let me introduce you --

3  you've already met our bailiff, Rick Wilson -- let me also

4  introduce you to Vikki Ogden, who's over here to your left,

5  our left.  Vikki's the court reporter for this trial.  She's

6  the official court reporter for this court.  It will be her

7  job to transcribe all the proceedings, including everything

8  that happens during this jury selection process.  So during

9  the course of this proceeding, if she doesn't hear one of

10  your responses, she may ask you to speak up or to hold up

11  your number so she can make sure that she gets everything

12  taken down.

13  The -- when people come into the

14  courtroom -- and I know it's already been a little bit of a

15  long morning for you -- the things they want to know are

16  these:  They want to know what type of case this involves.

17  This is a business dispute.  The attorneys will tell you a

18  little bit more about the nature of the case when they give

19  you -- when they start their portion of the jury selection

20  when they ask you questions.  In order to put their

21  questions in some perspective to the jury they will give you

22  a little bit of a background of what their contentions are

23  in the case.

24  But the purpose of jury selection is not to

25  go into details about facts of the case, so you really won't

1    learn the entire nature of the case until after we pick the

2    jury and we have the opening statements.  But you'll hear a

3    little bit about the nature of the case once the attorneys

4    begin their portion of jury selection.

5                    The second thing the people who come in

6    here want to know is how long the trial will be.  The trial

7    is going to be seven to ten days.  I know that's a long

8    time, but this is a complex case.  It involves a substantial

9    amount of issues.  And I've spent a good amount of time with

10   the attorneys and I believe that that's a fair estimate.

11                   That is just an estimate, though.  It's

12   hard to predict the length of the trial.  We haven't tried

13   this case a previous time to be able to time out and measure

14   it.  It really depends on a lot of different factors.  But

15   if their estimate is seven to ten days, we're in trial

16   Monday through Thursday, four days a week.  So if it does go

17   past the seven days or eight days it will probably go into a

18   third week.

19                   The earliest we ever start is 9:00 o'clock.

20   Sometimes we start at 9:30 in the morning and the latest we

21   ever go is 5:30 in the afternoon; although, we prefer to

22   stop by 5:00 o'clock or before 5:00 o'clock.  But if we

23   start late some days because of other proceedings in the

24   court, at 9:30 -- I'll start at 9:30.  Then we may go past

25   5:00 o'clock.

1          So the one thing you want to know is the

2   nature of the case.  Can't tell you too much right now about

3   that.  The second thing you want to know is how long the

4   trial is.  I can only give you a rough estimate there.  Then

5   the third thing people want to know is how long will you be

6   there on those hard benches.  That's also a little bit up in

7   the air.

8          In just a minute we're going to start the

9   jury selection process.  Each attorney will have one hour to

10  ask you questions.  We're going to have a lunch break in

11  between.

12          We're going to start off with Ms. Gibson.

13  We'll see what time she finishes.  Then we may start

14  Mr. Friedman's portion of jury selection.  And we'll break

15  his up.  We'll take a lunch break.  And when you come back

16  from the lunch break we'll finish up the examination.

17          The reason I can't tell you exactly how

18  long the process will take is we don't know how many people

19  we're going to need to talk to after the attorneys finish

20  their portion of jury selection.  For example, because of

21  the length of the trial, some of you will have some

22  conflicts that prevent you from serving the length of the

23  trial.  We want to hear what you have to say, but we need to

24  talk to you individually about that.  So those type of

25  things depend on how many people we need to talk to.

1          But remember throughout the course of the

2   jury selection that we will talk to you individually after

3   the attorneys ask questions.  So if there's something on

4   your mind, if you don't want to answer a question that they

5   ask if it involves some matter of privacy or if you're

6   really worried about the length of the trial and you have

7   some conflicts, you have small children at home who might be

8   unattended, we're going to talk to you after the attorneys

9   finish asking all of their questions.

10          So those are the three things people want

11  to know most.  And I know it's a little bit frustrating that

12  I didn't give you a really solid answer to any of those

13  three things, but that's the nature of lawsuits.

14          This portion of trial is referred to as

15  jury selection.  You may have heard the term downstairs,

16  "voir dire", and they both mean jury selection.  This is the

17  portion of the trial where the attorneys spend some time

18  with you to make sure there's nothing about this particular

19  case that makes it difficult for you to be a fair and

20  impartial juror.

21          When you were down in the central jury room

22  they played a video.  If you watched that video, you saw

23  that a retired judge swore in a mock jury.  If you watched

24  that, you saw that there was three parts to the juror's

25  oath.

29

1           The juror's oath is that you will render a

2     true verdict.   A true verdict is a good-faith verdict on

3     your part.   It's a verdict that is accurate, as best you can

4     determine what is accurate.   It is not a rush to judgment.

5     It is not a verdict based upon a coin flip or any method of

6     chance.

7           These parties have been waiting a long time

8     for their day in court.   What they deserve is a jury who

9     will render a true verdict and not a rush to judgment.

10          The second part of the juror's oath is that

11    you will base your verdict only on the evidence presented

12    during the course of the trial.   The evidence is sworn

13    testimony that comes from the witness stand or documents

14    admitted into evidence.   So, the attorneys may want to ask

15    you a few questions to make sure there's nothing about this

16    particular case that makes it difficult for you to base your

17    verdict only on the evidence; that you don't have some

18    knowledge of the facts in this case from outside the

19    evidence that might sway your decisions in this case.

20          And the third part of the juror's oath is

21    that you will follow the law as given to you by the Court.

22    Throughout the course of the trial and particularly at the

23    end of the case I will give you instructions in law.

24          At the end of the case I'll give you what's

25    called the charge of the Court.   The charge of the Court

1   will have all the legal instructions and definitions that

2   you will need to know in order to answer jury questions.

3   And it's your answers to the jury questions that make up the

4   verdict, and then I take your verdict and convert that to a

5   judgment.  But the instructions and definitions that I give

6   you in the jury form are not mine or this court only.

7   They're the law that applies to all cases like this that are

8   tried in the state of Texas.

9               Just as an example, one of the instructions

10  I will give you is what the burden of proof is.  I will tell

11  you that the burden of proof, in order to even answer a

12  question yes, you must find that the yes answer is supported

13  by a preponderance of the evidence.  And I will give you a

14  definition of preponderance of the evidence.  It means the

15  greater weight and degree of credible or believable

16  evidence.  For you to find that a fact is true, you must

17  find that it is more likely true than not true.

18              So, the attorneys may want to ask you

19  questions to make sure that you will follow the evidence --

20  the law in the case, this case.  And remember the law in

21  this case is the very same law that applies throughout cases

22  like this throughout the state of Texas.  So, even if you

23  think the law should be different, recognize that these

24  attorneys have instructed their clients in a valiant way to

25  their case with the idea that this jury will follow the law

1    in the case just as I'm sworn to do, just as they're sworn

2    to do, also.

3                    Again, each side will have one hour to ask

4    you questions.  When they ask you questions they're not

5    trying to pry.  They're trying to represent their clients.

6    And they will, of course, represent their clients with great

7    skill and distinction.

8                    When they ask a question there is no right

9    answer to their question.  There's no wrong answers.

10   There's only honest answers.  The best way for you to help

11   these attorneys represent their clients is for you to give

12   them honest answers to their questions.

13                   So, I've taken up enough of your time.  We

14   want to get the process started.

15                   The attorney for the party that brings the

16   lawsuit, the party with the burden of proof, gets to go

17   first in asking questions during jury selection or on voir

18   dire examination.  Ms. Gibson represents Mr. Carpenter, so I

19   will turn it over to her and let her begin asking questions.

20                   (Prospective Juror 5 was dismissed in

21                    the central jury room.)

22                   PLAINTIFF'S VOIR DIRE

23                   MS. GIBSON:  Thank you.

24   Good morning.

25                   (The jury panel responded.)

1            This case is a business dispute over some

2    handshake agreements.  And I'm not going to go into a lot of

3    the facts or the details of the case.  Is that okay with

4    y'all?

5            So what do you think is going to happen now

6    at this stage during jury selection?  Does anyone think that

7    I am going to drag private stuff out of you?  Okay.  If

8    anyone does, that's understandable.  But here's the deal:

9    If I ask any question and the answer is too private, you

10   know, don't go there, you let me know and I will not dig in

11   or go further.

12           Is there anyone here who thinks I'm not

13   doing my job if I don't dig into that personal private stuff

14   that somebody doesn't want to talk about?  All right, I see

15   no hands.

16           As you heard, Judge Greenberg has given me

17   a limited amount of time to question you.  So, is it okay

18   with you if I don't specifically ask each person each

19   question and don't get to talk to all of you an equal amount

20   of time?  Is that okay?

21           I'm first going to ask just about if anyone

22   personally knows any of the people who might be involved in

23   this case.

24           (Several "no" responses made by the panel)

25           VENIRE PERSON 4:  Yes.

1    of commitments we make in life that are oral?

2                    VENIRE PERSON 29:  Wedding bells.

3                    MS. GIBSON:  What?

4                    VENIRE PERSON 29:  Wedding bells.

5                    MS. GIBSON:  Wedding bells.

6            How about when you-all were sworn in this

7    morning?  You took an oath.  You did that orally.

8            Can anyone else give an example of some of

9    the big commitments we make in life that are oral and not in

10   writing?

11                   VENIRE PERSON 14:  To God.

12                   MS. GIBSON:  To God.  Many people declare

13   their faith to God and that is oral.

14                   Any other examples?

15                   VENIRE PERSON 12:  Hippocratic.

16   Hippocratic oath.

17                   MS. GIBSON:  Ah, the hippocratic oath for

18   doctors, oral.  Okay.

19                   Some people feel that handshake agreements

20   should be enforceable when it comes to business.  Other

21   people feel that only a written agreement should be

22   enforceable and the person who did not document the deal has

23   only themselves to blame.  Which way do you lean?

24                   VENIRE PERSON 28:  I've watched Judge Judy

25   now that I am --

69

1                          MR. L. FRIEDMAN:  I didn't hear.  Say that

2         again.

3                          VENIRE PERSON 28:  I watch a lot of

4         Judge Judy now that I'm retired, and it has to be on paper

5         with a signature.

6                          MS. GIBSON:  Okay.  So you feel -- so you

7         feel it has to be in writing and signed?

8                          VENIRE PERSON 28:  Absolutely.

9                          MS. GIBSON:  Anyone on the first row also

10        lean toward it has to be in writing, and if you didn't get

11        it in writing you have only yourself to blame?  Juror 8, 4,

12        3, 2, and 6.  Thank you.

13                         How about on the second row?  Who leans

14        toward it has to be in writing and if you don't document the

15        deal you have only yourself to blame?  Nineteen, seventeen,

16        sixteen, fifteen, fourteen, thirteen, eleven.

17                         Some people feel so strongly about the need

18        to get an agreement in writing that once they hear a case

19        about an oral handshake agreement they don't need to hear

20        anything more before they think the defense should prevail.

21        Who leans that way, even if just a little?

22                         VENIRE PERSON 28:  Can you explain that?

23                         MS. GIBSON:  Sure.

24                         Some people feel so strongly that an

25        agreement must be in writing that the only thing they need

Appendix 0383

1  to hear in a case to decide for defendants is that the case

2  is about an oral handshake agreement.  Who feels that

3  strongly on the first row?  How about on the second row?

4  Third row?

5  VENIRE PERSON 28:  I apologize.  I'm from

6  another country.  I mean, I speak English well, but it's not

7  my first language.

8  I still feel that it has to be in writing.

9  MS. GIBSON:  Okay.

10  Twenty-two.

11  And who on the next row feels that

12  strongly?  Thirty-seven, thirty-eight, thirty-nine, forty.

13  Who feels --

14  VENIRE PERSON 19:  So I'd just add the

15  caveat that to me it has to be in writing if it's a

16  substantial amount of money that's involved.  If you're

17  walking around with a builder and you go, can you fix that

18  spot over there and he says he's going to fix it, okay.

19  MS. GIBSON:  Okay.

20  VENIRE PERSON 19:  But if it's a half

21  million dollars it should be in writing.

22  MS. GIBSON:  Okay.  And do you feel pretty

23  strongly about that?

24  VENIRE PERSON 19:  Yes.

25  MS. GIBSON:  Okay.  And that's -- that's an

```
 1    opinion you came into this courtroom with?
 2                    VENIRE PERSON 19:  It's an opinion I have,
 3    the way I conduct business myself at work.
 4                    MS. GIBSON:  Sure.  And do you feel so
 5    strongly that if the amount is significant that you couldn't
 6    consider a handshake agreement for a large amount of money?
 7                    VENIRE PERSON 19:  It would be very hard
 8    for me to.
 9                    MS. GIBSON:  Okay.
10                    If you were the plaintiff in this case,
11    would you want you on the jury?
12                    VENIRE PERSON 28:  What?
13                    MS. GIBSON:  Would you want you on the
14    jury?
15                    VENIRE PERSON 19:  If it's all about a
16    handshake deal and it's a large sum of money, no, I probably
17    wouldn't.
18                    MS. GIBSON:  Okay.
19                    VENIRE PERSON 20:  I probably wouldn't
20    either.  I put everything in writing in an Email for
21    facility management, whether it's fire safety or general
22    contractor.  So I don't -- an agreement, like, holographic
23    or without a contract, to me is kind of -- I won't even say
24    what I think it is.  It's that strong.
25                    MS. GIBSON:  Okay.
```

```
1              VENIRE PERSON 20:  I'm not saying I
2    couldn't judge it, but -- or be on the jury -- but, myself,
3    I would never be in that situation, I don't think.
4              MS. GIBSON:  Okay.  So, for you two, as far
5    as fairness, if you were -- if the rules were that you were
6    the plaintiff in a handshake case, would you want you on
7    your jury?
8              MR. L. FRIEDMAN:  I'm going to ask that
9    counsel clarify it and ask one juror at a time.
10             THE COURT:  Sure.
11             MS. GIBSON:  I'm asking Juror Number 20.
12             THE COURT:  Were you asking Juror 20?
13             MS. GIBSON:  Yes.
14             VENIRE PERSON 20:  So, on the plaintiff's
15   side, you're asking?
16             MS. GIBSON:  Yeah.
17             If you were a plaintiff -- I know you
18   wouldn't be there, as you said, but if you were a plaintiff
19   on a handshake deal, would you want you on your jury panel?
20             MR. L. FRIEDMAN:  I'm going to object to
21   the question.
22             THE COURT:  What's your objection?
23             MR. L. FRIEDMAN:  Putting the jury in the
24   shoes of the plaintiff.
25             MS. GIBSON:  Your Honor, it's permissible
```

Appendix 0386

73

1   for jury selection.

2                   THE COURT:   Okay.   Go ahead.

3                   Overruled.

4                   VENIRE PERSON 20:   I would say no.

5                   MS. GIBSON:   Anyone have strong feelings on

6   the first row about having an agreement in writing if you're

7   going to come to the court?   Jurors 2, 3, 4, 6, 8.

8                   Juror 2, tell us about that.

9                   VENIRE PERSON 2:   You mean if everybody

10  cannot agree on anything, handshake or verbal?   But anything

11  that involves money, involves anything, like, you know, has

12  to be on paper, at least some sort of documentation.

13                  MS. GIBSON:   Okay.

14                  Okay.   Juror 3?

15                  VENIRE PERSON 3:   Yeah.   Right.   Proof.

16  'Cause I can tell you anything and then go back on it, and

17  we'll end up in court and I don't have anything to show for

18  it.

19                  MS. GIBSON:   Okay.

20                  Is there anyone on the first row that feels

21  so strongly about having an agreement in writing that you

22  don't think you could be fair or maybe you aren't the right

23  juror for a case over a handshake agreement?

24                  Juror 8, you feel that strongly?   Yes?

25                  VENIRE PERSON 8:   Yeah.   I feel everything

1    should be set in stone.

2                        MS. GIBSON:  Okay.

3                        Juror 3, you feel that way?

4                        VENIRE PERSON 3:  Yes.

5                        MS. GIBSON:  Juror 4.

6                        Anyone else on the first row?

7                        VENIRE PERSON 6:  Yes.

8                        MS. GIBSON:  Juror 6.  All right.

9                        For -- for those of you who -- well, can

10   you put your cards back up if you just said you felt that

11   strongly, on the first row, including Juror 2?

12                        (The first row complied.)

13                        MS. GIBSON:  You-all feel so strongly about

14   having an agreement in writing that you might not be the

15   best juror for a handshake agreement case?

16                        VENIRE PERSON 3:  Will we know a lot of

17   details?

18                        MS. GIBSON:  So, who said -- I'll --

19   I'll -- I'm going to come back to you.  Who said absolutely?

20   Juror 8.

21                        Juror 4, tell us about that.

22                        VENIRE PERSON 4:  In my line of work you

23   have to document everything.  If verbal is agreed it can

24   destroy relationships.

25                        MS. GIBSON:  Okay.

75

```
1                    Juror 3, you agree with Juror 4?
2                    VENIRE PERSON 3:  Uh-huh.
3                    MS. GIBSON:  Okay.  And you don't feel like
4      you -- you could be really fair in a handshake oral
5      agreement case; is that right?
6                    VENIRE PERSON 3:  No.
7                    MS. GIBSON:  Okay.
8                    And -- and just to confirm, who else on the
9      first row feels so strongly about written agreements that
10     they don't feel like they could be fair to the plaintiff in
11     a case over a handshake oral agreement?  Juror 6.
12                   And who -- Juror 3, you said yes to that as
13     well?  Is that yes, just for the court reporter?
14                   VENIRE PERSON 3:  Repeat the question
15     again.  I'm sorry.
16                   MS. GIBSON:  Sure.
17                   You feel so strongly about getting written
18     agreements in writing that you could not be fair in a case
19     over an oral handshake agreement?
20                   VENIRE PERSON 3:  Right.  Yes.
21                   MS. GIBSON:  Okay.
22                   Who on the first row feels the same way as
23     Juror 3, who hasn't already answered?
24                   Okay.  Row two, how many of you feel so
25     strongly about having an agreement in writing that you don't
```

76

1    think you would be the right juror or could be completely

2    fair in a case that's over an oral handshake deal?  Okay,

3    hold your cards up.  Juror 20, 19, 16, 15, 14, 13.

4                    Juror 13, tell us about that.

5                    VENIRE PERSON 13:  You know, I've seen what

6    a handshake thing and people doing a handshake -- I didn't

7    do that.  So, to me, it had to be written in order to, okay,

8    here you -- you read there, you sign there, and then they

9    cannot change it.

10                   MS. GIBSON:  Row three, how many of you

11   feel so strongly that an agreement ought to be writing that

12   you don't feel you would be the right juror or could be fair

13   in a case about an oral handshake agreement?  Juror 28, 26,

14   25.

15                   Twenty-five, kind of?

16                   VENIRE PERSON 25:  Are you asking about the

17   opposite as well?

18                   VENIRE PERSON 17:  See, I'm on the fence

19   too.

20                   MS. GIBSON:  Juror 17, you're saying either

21   way?

22                   VENIRE PERSON 17:  Yeah.

23                   MS. GIBSON:  Okay.

24                   Who -- and I'm going to come back to you in

25   a second, sir.  Who else on the third row feels so -- felt

1    so strongly about written agreements that they don't feel

2    like they could be fair in an oral handshake case?  Juror

3    22.

4                    Is there anybody else that I missed on row

5    three?  How about row four?  Jurors 39 and 37.

6                    Juror 17, you said either way.  What did

7    you mean by that?

8                    VENIRE PERSON 17:  It would mean it would

9    just -- know what the situation was and what -- what you're

10    doing with it.

11                    MS. GIBSON:  Okay.

12                    VENIRE PERSON 17:  I mean, I personally

13    think it should be in writing, but it just depends.

14                    MS. GIBSON:  Okay.

15                    And, sir?

16                    VENIRE PERSON 25:  I was just talking about

17    the verbal agreement.

18                    MS. GIBSON:  So you feel strongly about the

19    verbal agreement?

20                    VENIRE PERSON 25:  The verbal agreement,

21    yes.

22                    MS. GIBSON:  How are we doing on time?

23                    THE COURT:  You have six minutes left.

24                    MS. GIBSON:  Okay.

25                    Jeff Carpenter has a medical condition that

1              All right.  I think my time is about up and
2    I want to respect that deadline, but thank y'all for your
3    time.
4              THE COURT:  All right.  Thank you,
5    Ms. Gibson.
6              Is everyone okay going another 20 minutes
7    or so?
8              (Multiple panel members said yes.)
9              THE COURT:  All right.  Very good.
10             Mr. Friedman?
11             MR. L. FRIEDMAN:  I would prefer to break
12   now.
13             THE COURT:  It's really better if you can
14   do 20 minutes.
15             MR. L. FRIEDMAN:  All right.  If it's
16   better for you, it's better for me.
17             THE COURT:  All right.
18             MR. L. FRIEDMAN:  I need to stretch.
19             May I, Your Honor?
20             THE COURT:   Please.
21             MR. L. FRIEDMAN:  All right.
22                  DEFENDANTS' VOIR DIRE
23             MR. L. FRIEDMAN:  Again, my name is
24   Larry Friedman, and I am honored to represent Cheryl and
25   Brian Potashnik, Southwest Housing Management Company,

83

1    Affordable Housing Construction, and Southwest Housing

2    Development.

3                 The Potashniks, including Cheryl Potashnik

4    Geiser and Cheryl Geisner [sic] -- Geisner [sic]

5    Potashnik -- not only are clients of mine but they're good

6    friends.  I've known them for over 20 years and I know them

7    to be good people, and I'm here defending them in this case.

8                 Voir dire, the French word, means speak the

9    truth.  And it's one opportunity that the lawyers in this

10   case have to speak with the jury directly.  The next time we

11   get to face the actual jury we will give opening statements,

12   which will be a statement of what we hope to prove or intend

13   to prove during the case.  And then the last time we get to

14   address the jury will be closing arguments, which will be a

15   summary of what we believe we proved during the case.  But

16   this is really the only time when we get to have a back and

17   forth with the jury.

18                 There are no right or wrong answers.  This

19   is just an opportunity to get to know the jurors, potential

20   jurors, and find out if you're the right juror for this

21   case.

22                 What do we want to know?  Whether you have

23   any lifetime prejudices or biases that carry forward into

24   this case.  Everybody has prejudices; everybody has biases.

25                 If you remember our first president,

1    George Bush, he hated broccoli.  Hated it, choked on it,

2    fell over it, would never order it.  And if he saw a menu

3    item that said steak and broccoli, he wouldn't order it.  He

4    had a prejudice against broccoli.

5              We Dallas Cowboy fans, we hate the God damn

6    Eagles.

7              (Laughter)

8              MR. L. FRIEDMAN:  Anytime their name comes

9    up, anytime we see anything with an E on it, we hate them.

10   We hope they lose.  We hope they trip and fall and all go

11   get the flu right before the playoff game.  That's just the

12   way it is and it's been forever.  We have a prejudice.

13             And we love the Cowboys.  Whether they have

14   a winning season or losing season, we love the Cowboys.  We

15   proudly wear their star.  We wear it all around the world.

16   That's our prejudice.

17             And our biases, for those of you who have

18   children or grandchildren, we're always biased in favor of

19   our kids.

20             You know, I watch the news like all of you,

21   and they parade the criminal defendant in front of the

22   court.  And that person, man or woman, has robbed 34 banks,

23   wounded 17 people, and that person's mother comes in front

24   of the TV cameras and say, "Not my Billy.  He was a good

25   boy."  Because every mother, every father, has a bias

1    towards their child.  So, every one of us comes to court

2    with a prejudice or a bias.  And that's really what this is

3    all about.  It's really a dialogue.

4              And I will tell you, for those of you who

5    have not spoken up or had your say, there's an old adage

6    that we lawyers believe in; which is, if you talk, you walk.

7    The more you talk, the more likely it is you walk.  And if

8    you have nothing to say, you stay; the more likely it is you

9    stay.  So, I encourage everybody to talk as much as you can.

10   Let us get to know who you are, what your thoughts are, what

11   your beliefs are.  And then we can -- we can determine

12   whether or not you're a good juror for this case.  And

13   that's really -- that's -- that's all it's about.

14             We already thank you for your service and

15   we believe in the jury system.  We appreciate your being

16   here.  And for those of you who ultimately get picked for

17   the jury, we're going to have even more deeper thanks for

18   you.

19             You've already heard from Ms. Gibson, and

20   you can surmise this is a case about an oral contract.

21   Mr. Carpenter believes, alleges, that he had an oral

22   contract.  It's not clear on who he identifies, but probably

23   with Mr. Potashnik, for over-a-million-dollar bonus.

24   Mr. Potashnik denies it.  Mrs. Potashnik denies it, who

25   worked for the company.

1          I don't think you'll hear from anyone else

2     who will support Mr. Carpenter's story and I don't think

3     you'll see any evidence that wasn't formulated by anyone

4     other than Mr. Carpenter, but this case is about an oral

5     contract.  And the jury that gets chosen will have to decide

6     whether or not Mr. Carpenter, who's a sophisticated

7     businessman who was hired by Southwest Management Company by

8     virtue of a written employment contract -- you'll be able to

9     see that written employment contract.  And in that written

10    employment contract there's a clause that says no other

11    agreements regarding your employment -- I'm paraphrasing --

12    can be made by -- by the parties unless it's signed in

13    writing by both parties.

14          Nevertheless, Mr. Carpenter alleges that

15    Mr. Potashnik was gracious enough to give him a

16    million-dollar -- he calls it a bonus -- outside of a

17    agreement.  And, basically, that's what the case is.  So

18    that's why Ms. Gibson asked you about it and that's why it's

19    important to focus on your thoughts and comments about

20    following rules, contractual agreements, and things like

21    that.

22          I've been trying not to go over the same

23    things that Ms. Gibson went over.  I'm going to try not to

24    take up my full hour and give you back some time.

25          I want to talk about motorcycles because I

1   had two Harley -- what's your bike?

2                    VENIRE PERSON 7:  I have a Harley and a

3   Honda Gold Wing.

4                    MR. L. FRIEDMAN:  Oh, man, I had -- you

5   been to Sturgis?  Four times.

6                    Sturgis is the big motorcycle rally in

7   Sturgis --

8                    VENIRE PERSON 14:  I know.  I'm from

9   California.

10                   MR. L. FRIEDMAN:  From LA?

11                   But I've have been there four times and I

12   rode Harleys until I fell on my head and had twenty-three

13   stitches.  And then my wife retired me from riding Harleys.

14   I bought another Harley and hid it from her.  She found it,

15   sold it, kept the money.  And I bought another Harley and

16   hid it from her.  She found it and sold it, kept the money,

17   and then I got tired of playing that game.

18                   (Laughter)

19                   MR. L. FRIEDMAN:  So, I am retired from the

20   Harley-Davidson business.

21                   Let me ask you a general question.  How

22   many of you have had experience with written contracts in

23   your business?  So let me take the first row first.  I know

24   that, Mr. Short, you're an attorney.

25                   VENIRE PERSON 1:  Yes.

1            MR. L. FRIEDMAN:  And let me just ask you

2     what kind of attorney you were.

3            VENIRE PERSON 1:  Just civil.

4            MR. L. FRIEDMAN:  So you've written

5     contracts?

6            VENIRE PERSON 1:  Yes.

7            MR. L. FRIEDMAN:  You've enforced

8     contracts?

9            VENIRE PERSON 1:  Yes.

10           MR. L. FRIEDMAN:  And over the course of

11    your -- you look like you have (unintelligible), so I'm

12    saying your short career as an attorney -- you recognize the

13    importance of having agreements in writing?

14           VENIRE PERSON 1:  It's important.  It's

15    not -- not every case is the same.

16           MR. L. FRIEDMAN:  But it's important?

17           VENIRE PERSON 1:  It's important.

18           MR. L. FRIEDMAN:  And you've had experience

19    negotiating contracts?

20           VENIRE PERSON 1:  Not a whole lot.  That's

21    not the general part of my practice.

22           MR. L. FRIEDMAN:  Okay.

23           So, let me continue.  Anyone else on the

24    first row had their own personal experience, their spouse or

25    anyone in their family or anyone that they live with

1   negotiating contracts?

2                    Mr. Page's friend.  By the way, that's not

3   always an asset.

4                    (Laughter)

5                    VENIRE PERSON 4:  Understood.

6                    Every year we have to sign teacher

7   contracts set forth by the school board.  And right now

8   we're working on -- in addition to the house, we're working

9   on a contract we have right now.

10                   MR. L. FRIEDMAN:  Okay.  And for major

11  commitments your experience is that the major commitments

12  for complicated or large money matters are always in

13  writing?

14                   VENIRE PERSON 4:  Yes.

15                   MR. L. FRIEDMAN:  And by knowing Mr. Page,

16  that doesn't mean that if the Court instructs you to follow

17  the law, the Court gives you instructions, that you wouldn't

18  follow.  You would follow the Court's instructions at the

19  end of the case?

20                   VENIRE PERSON 4:  Yes, sir.

21                   MR. L. FRIEDMAN:  And knowing Mr. Page

22  could be an asset or a liability.  We haven't explored that.

23                   Okay.  Could you be fair and listen to the

24  evidence presented from the jury box?

25                   VENIRE PERSON 4:  Uh-huh.

1              MR. L. FRIEDMAN:  And you'd follow the

2    Court's instructions, correct?

3              VENIRE PERSON 4:  Yes.

4              MR. L. FRIEDMAN:  And, Mr. Brock?

5              VENIRE PERSON 6:  I'm the maintenance

6    manager in the food industry, so I negotiate the contracts

7    for refrigeration companies and stuff like that, building

8    grounds.

9              MR. L. FRIEDMAN:  You've had a lot of

10   experience negotiating contracts.  And would you -- would

11   you agree that the important matters usually get reduced to

12   writing?

13             VENIRE PERSON 6:  Well, in the food

14   industry it's not in writing.  It doesn't happen.

15             MR. L. FRIEDMAN:  It doesn't happen.

16   That's because of --

17             VENIRE PERSON 6:  Audits.  Audits.

18             MR. L. FRIEDMAN:  Audits and health and

19   things like that.  Okay, well, that's good.

20             VENIRE PERSON 7:  I had a -- excuse me -- I

21   had a handshake deal on a house and we went over the

22   contract.  We were moving forward with it and the lady,

23   about three-and-a-half weeks into the contract, pulled the

24   contract out from under me and kind of threw me to the

25   wayside and I lost about $1500 in the process.  And it was a

1   handshake deal on the house.  The contract was legal and

2   binding but she had the right to pull it out from under me,

3   and that has still left a wound, see.

4                 MR. L. FRIEDMAN:  Can we still sue her?

5                 (Laughter)

6                 MR. L. FRIEDMAN:  I've got a card.

7                 VENIRE PERSON 6:  I think the house is way

8   gone by now.  So it's --

9                 MR. L. FRIEDMAN:  All right.

10                 VENIRE PERSON 6:  -- lost one.

11                 MR. L. FRIEDMAN:  How about you?

12   Ms. Poindexter --

13                 VENIRE PERSON 8:  Yes.

14                 MR. L. FRIEDMAN:  -- did you say you had

15   experience with contracts?

16                 VENIRE PERSON 8:  No.

17                 MR. L. FRIEDMAN:  Okay.  Good.

18                 And, Ms. -- Mrs. Ciraci?

19                 VENIRE PERSON 9:  Yes.

20                 MR. L. FRIEDMAN:  Yeah.  What about you?

21                 VENIRE PERSON 9:  A lot of our vendors are

22   musicians, comedians, and things like that.  So I've dealt

23   with explaining to them what happens if their contracts from

24   me (inaudible) as the state institutions cannot have and

25   need to be changed.  But other than that I don't have a

1    whole lot of contracts beyond lease agreements.

2                    MR. L. FRIEDMAN:  But you have some

3    experience.

4                    And, Ms. Parson?

5                    VENIRE PERSON 10:  I'm with the funeral

6    business.  We have to do contracts because of the State and

7    it has to be in writing.

8                    MR. L. FRIEDMAN:  And what's the name of

9    the funeral business that you work for?

10                   VENIRE PERSON 10:  I work for Laurel Land.

11                   MR. L. FRIEDMAN:  Then you know the Byrum

12   Funeral Home?

13                   VENIRE PERSON 10:  It was, at that time

14   frame, Stewart.

15                   MR. L. FRIEDMAN:  Yeah, 'cause that's a

16   client of mine.  Do you know them, the Byrum Funeral Home?

17                   VENIRE PERSON 10:  Who?

18                   MR. L. FRIEDMAN:  Byrum Funeral Home.

19                   VENIRE PERSON 10:  I know them in

20   Lancaster.

21                   MR. L. FRIEDMAN:  Yes.

22                   VENIRE PERSON 10:  I know of them.

23                   MR. L. FRIEDMAN:  And that wouldn't, the

24   fact that I represent them and they probably get my

25   business?

```
 1                    VENIRE PERSON 10:  They're greater north
 2    Dallas.
 3                    MR. L. FRIEDMAN:  So let me ask this
 4    general question.  Based on what you've heard so far, is
 5    anybody here leaning towards the plaintiff?  Was that a
 6    sneeze or a --
 7                    VENIRE PERSON 25:  I'm sorry.  I was
 8    yawning.
 9                    MR. L. FRIEDMAN:  This is like an auction.
10                    (Laughter)
11                    MR. L. FRIEDMAN:  If you raise your card,
12    you're it.
13                    VENIRE PERSON 25:  It's the wrong sign.
14                    MR. L. FRIEDMAN:  If you scratch your nose,
15    you bought it.  That's 300,000.
16                    (Laughter)
17                    MR. L. FRIEDMAN:  So this is real life.
18    You've only heard one side.  So, based on what Ms. Gibson
19    has said, is anybody here leaning towards the plaintiff?
20                    Does anybody here feel like if somebody
21    brought a lawsuit, you know, they have an advantage?  If
22    somebody lost money or claims they lost money, that they
23    have an advantage coming to the courthouse?  Is there
24    anybody here that feels that way?
25                    Is there anybody here -- let me ask the
```

1     first -- the front row -- that doesn't feel they could be

2     fair or doesn't feel that they would follow the Court's

3     instructions and follow the law and be impartial listening

4     to the evidence in the jury box?

5                 VENIRE PERSON 8:  All I have to say is that

6     I feel everything should be set in stone, which is in

7     writing.  That's the way I feel.

8                 MR. L. FRIEDMAN:  Right.  But if the Court

9     instructs you that you're only to consider evidence from the

10    jury box and gives you instructions about what it is

11    you're -- you're to consider, in other words, what the

12    formation of an oral contract is, what the formation of a

13    agreement is, and what the burden of proof is, you would be

14    able -- you would follow the Court's instructions?

15                You have to answer verbally so --

16                 VENIRE PERSON 8:  Oh, possibly.

17                 MR. L. FRIEDMAN:  -- Vikki can pick it up.

18                 You're not sure about it?  Okay, we'll --

19    we can talk privately.

20                 So, as to Jurors 1 through 7, minus 5,

21    everybody here feels like they can listen to the evidence

22    impartially.

23                 Let me ask the second row.  Everybody here

24    feel they could follow the Court's instruction, be

25    impartial, can listen to the evidence from the jury box?  Is

1   there anyone in the second row?  Second row feel that they

2   can't?  So everybody from Juror 11 through 19 -- we'll go

3   with 20, 18 through 20.

4                    I'm going to talk to you, 19 and 20.

5                    VENIRE PERSON 20:  So, everything I do at

6   work.

7                    MR. L. FRIEDMAN:  I wanted a consensus.

8   No, I'm just paraphrasing to put in --

9                    VENIRE PERSON 19:  Yeah.  So, serving

10  contractually bounds, and all in writing, and there's

11  nothing in my line of work you get that's not --

12                    MR. L. FRIEDMAN:  And remind me again --

13                    VENIRE PERSON 19:  IT.

14                    MR. L. FRIEDMAN:  So you're in IT.

15                    VENIRE PERSON 19:  So IT contracts,

16  performance based.  If it's not in writing, it's not going

17  to be enforceable.

18                    MR. L. FRIEDMAN:  And why is it that people

19  in your --

20                    VENIRE PERSON 19:  Because a lot of times

21  they don't -- there's -- you've got to have terms.  And most

22  terms, those contracts have performance based, and so you've

23  got to know where you are on the way on a software contract.

24                    MR. L. FRIEDMAN:  And you're an honest

25  person.

Appendix 0405

1               VENIRE PERSON 19:  Yeah.

2               MR. L. FRIEDMAN:  All right.  Thank you.

3               You have a bachelors degree.

4               Someone else that we did the --

5               UNIDENTIFIED VENIRE PERSON:  Yes.

6               MR. L. FRIEDMAN:  And as someone in your

7   position, notwithstanding everything you said, if the judge

8   instructs you to follow the law, to listen to the evidence

9   from the jury box and follow his instructions --

10               UNIDENTIFIED VENIRE PERSON:  Yeah.  It

11   would be a difficulty to sell, but I could.

12               MR. L. FRIEDMAN:  And I've got Mr. Gillett.

13               VENIRE PERSON 20:  Yes.

14               MR. L. FRIEDMAN:  I love your razors.  I'm

15   not the first one that said that.

16               Tell me about yourself.

17               VENIRE PERSON 20:  I'm facility manager and

18   I -- yesterday, I had a diesel for backup generators.  I

19   didn't know I had a poorly written contract before we ever

20   make the actual agreement part of the contract, and they

21   couldn't even answer it.  And this is a contract on Email.

22   So, oral contracts for me can be -- even 20 grand will not

23   be acceptable.  So compensation for a million is almost

24   laughable, and I'm surprised y'all are in court.

25               MR. L. FRIEDMAN:  You're not the only one.

Appendix 0406

1    But how many people hate Emails?  I get thousands a day.

2                         And have you been to Cummins, Indiana?  Got

3    a leg up on you because I have been to Cummins, Indiana.

4    It's a relatively -- it's small geographically and Cummins

5    engines is in there.  It's like Mayberry:  The Cummins bank;

6    Cummins barber shop; Cummins city mall.  And it's an

7    interesting place.  I'd go back.

8                         Now, you're sophisticated, do a lot of

9    business, and you're here today, correct?

10                   VENIRE PERSON 20:  Yes.

11                   MR. L. FRIEDMAN:  If the judge instructs

12   you to follow the law and listen to the evidence that comes

13   in from the witness stand only, you could do that?

14                   VENIRE PERSON 20:  I think you asked that a

15   few minutes ago and I said no.

16                   MR. L. FRIEDMAN:  I didn't ask you.

17                   VENIRE PERSON 20:  Oh, I'm sorry.

18                   MR. L. FRIEDMAN:  I asked you about the

19   razors.  But, look, could you be impartial and follow his

20   instruction?  That's the question to you, Mr. Gillett.

21                   VENIRE PERSON 20:  I would find it hard,

22   difficult.

23                   MR. L. FRIEDMAN:  But not impossible.

24   Difficult is one thing; possible is something else.

25                   VENIRE PERSON 20:  Okay.

1           MR. L. FRIEDMAN:  I'm going to put you down

2     as hard.

3           VENIRE PERSON 20:  That's fine.

4           THE COURT:  Y'all come over here just a

5     minute.

6           (Off the record)

7           THE COURT:  Ladies and gentlemen, we'll

8     take our lunch break.  We'll take an hour and 10 minutes for

9     lunch.

10          As I mentioned earlier, throughout the

11    course of the trial I'll give instructions in law.

12          (Jury instructions given)

13          THE COURT:  So it is 12:17 now.  If you'll

14    be back in the hallway at 1:15, Rick, our bailiff, will

15    bring you in.

16          Please remember your numbers.  Please

17    remember what row you're on.  Please remember who's seated

18    next to you.  That way, when he brings you in, you'll be

19    able to get seated quite quickly.

20          (The jury exited the courtroom.)

21          (Lunch recess taken)

22          THE COURT:  Mr. Romano, so English is your

23    first language?

24          VENIRE PERSON 24:  Yes.  Yes, sir.

25          THE COURT:  Do you speak Spanish -- do you

1    speak Spanish before English or English before Spanish?

2                VENIRE PERSON 24:   A little -- little

3    English.

4                THE COURT:   Okay.   Did you understand all

5    the questions that Ms. Gibson asked?

6                VENIRE PERSON 24:   No, sir.

7                THE COURT:   Okay.   All right.

8                We're going to excuse you as a juror now.

9    We'll take your juror badge and Vikki will take you out

10   through the clerk's office over here.

11              (Off the record)

12              (The jury entered the courtroom.)

13              THE COURT:   Welcome back.   Good afternoon

14   now, ladies and gentlemen.

15              Could I ask everybody on the front row to

16   hold up your numbered cards?

17              (Row 1 complied)

18              THE COURT:   Thank you.   Put those down.

19              Everybody on the second row, would you hold

20   up your numbered cards, please?

21              (Row 2 complied)

22               THE COURT:   Thank you.

23              And everybody on the third row,

24   Mr. Romano's not here, so it should be 21, 22, 23, then go

25   to 25.

```
 1                    (Row 3 held up their juror cards.)

 2                    THE COURT:  Very good.  Thank you.

 3                    On the fourth row?

 4                    (Row 4 held up their juror cards.)

 5                    THE COURT:  On the fifth row?

 6                    (Row 5 held up their juror cards.)

 7                    THE COURT:  Very good.  Thank you-all.

 8                    Again, welcome back.  Good afternoon,

 9      ladies and gentlemen.

10                    When we stopped just before lunch,

11      Mr. Friedman was conducting his voir dire examination or

12      jury selection examination.  We'll ask him to continue, to

13      pick up just where he left off.

14                    Mr. Friedman, sir, whenever you're ready.

15                    MR. L. FRIEDMAN:  Thank you.

16                    DEFENDANTS' VOIR DIRE (CONT'D)

17                    MR. L. FRIEDMAN:  Okay.  I just have a few

18      more questions and to a couple of particular jurors.

19                    So I looked over my notes and your jury

20      cards at lunchtime.  And I just wanted to ask Mr. Short,

21      because you're an attorney and I know you have a background,

22      a long background of practicing civil law.  Based on all of

23      your experience as a lawyer practicing somewhat in this

24      field, do you think it would be difficult for you to be

25      impartial listening to this case?
```

1           VENIRE PERSON 1:  I've served on probably

2      half a dozen juries before, so I don't see how it would be

3      any different than any of the others.

4           MR. L. FRIEDMAN:  I didn't ask you directly

5      but I wanted to ask you about that.

6           And then help me with the pronunciation,

7      Ms. Van.

8           VENIRE PERSON 11:  Vanantwerp.

9           MR. L. FRIEDMAN:  Vanantwerp.

10          This case does involve some charitable

11     corporations, 501(c)(3) independent foundation.  I even

12     think some of the partners in the 60-property portfolio may

13     be charitable foundations.  Is -- is the fact that we may be

14     dealing with the subject of charitable foundations, will

15     that affect your ability to be impartial in this case?

16          VENIRE PERSON 11:  No, sir.

17          MR. L. FRIEDMAN:  Okay.

18          Ms. Billingsley, the cooker.

19          VENIRE PERSON 17:  That's me.

20          MR. L. FRIEDMAN:  Did you bring anything

21     back from lunch?

22          VENIRE PERSON 17:  I should have.

23          MR. L. FRIEDMAN:  You are healthy.  Some

24     brownies.

25          I have you down for saying something like

1    didn't go one way or another or something like that.  What's

2    your kind of -- what's your thought and opinion and feelings

3    about that?

4                    VENIRE PERSON 17:  I think it really just

5    depends on the situation.  I would need more information

6    before I was able to make a decision.

7                    MR. L. FRIEDMAN:  So you would be willing

8    to listen to the evidence that you heard in court?

9                    VENIRE PERSON 17:  Yes.

10                   MR. L. FRIEDMAN:  You would be willing to

11   judge it fairly?

12                   VENIRE PERSON 17:  Yes.

13                   MR. L. FRIEDMAN:  You'd be willing to

14   follow the Court's instructions?

15                   VENIRE PERSON 17:  Yes.

16                   MR. L. FRIEDMAN:  And make your decision

17   impartially, based on the evidence?

18                   VENIRE PERSON 17:  Correct.

19                   MR. L. FRIEDMAN:  Okay.  Good with that.

20                   And then, Ms. Baker, same thing with you.

21                   VENIRE PERSON 18:  Yes, I could.

22                   MR. L. FRIEDMAN:  You'd be willing to

23   listen to the evidence, be impartial?

24                   VENIRE PERSON 18:  Right.

25                   MR. L. FRIEDMAN:  Make your decision based

1    upon --

2                    VENIRE PERSON 18:   The evidence.

3                    MR. L. FRIEDMAN:   -- the evidence?

4           And I don't have you down as an opinion one

5    way or another about oral agreements.   Did you have one?

6                    VENIRE PERSON 18:   No.   It would have to be

7    based on all of the information at hand.

8                    MR. L. FRIEDMAN:   And have you ever made an

9    oral agreement or anyone in your family?

10                   VENIRE PERSON 18:   Yes.

11                   MR. L. FRIEDMAN:   And what type was that?

12                   VENIRE PERSON 18:   Probably with my kids.

13   Ask them to do something and compromise.   My kids are

14   adults.   If I say I'm going to do something, to me that's an

15   oral agreement.

16                   MR. L. FRIEDMAN:   And did you reserve the

17   right to smack them in the pants if they didn't follow the

18   instruction?

19                   VENIRE PERSON 18:   Probably so.

20                   MR. L. FRIEDMAN:   I'm a big believer in

21   smacking them in the pants.   Five of my kids are lawyers, my

22   oldest daughter runs her own business, and they got there by

23   me smacking them in the pants.   So something I did worked.

24           What about business agreements?   Do you

25   have a thought or feeling or opinion about whether or not

104

1    business agreements should be in writing?

2                    VENIRE PERSON 18:  I do.  I'm a birth

3    registrar and I do birth certificates at a hospital, and to

4    me that's a written agreement.  There's, like, gray area in

5    there, but I do believe that what's written should stand

6    firm.

7                    MR. L. FRIEDMAN:  Okay.

8                    And, Mr. Crawford, Number 23, I may not

9    have taken good notes, but I did get your opinions or

10   thoughts or feelings about written agreements and oral

11   agreements.

12                   VENIRE PERSON 23:  Yeah.  So, with me

13   personally, I've made a few, I guess, handshake agreements.

14   I'm a metal fabricator, and on certain things I've done oral

15   agreements, but that was more due to the relation of the

16   person; so, a close friend or relative, never a -- an actual

17   entity where I'm making a profit.

18                   MR. L. FRIEDMAN:  Do you have an opinion or

19   a feeling or a thought about an oral agreement, alleged oral

20   agreement between employer and employee?

21                   VENIRE PERSON 23:  Can you expand on that?

22                   MR. L. FRIEDMAN:  Yeah.  I mean should

23   those types of agreements be in writing or orally is okay?

24                   VENIRE PERSON 23:  It's a difficult thing

25   to determine.  I guess if you're talking specifically about

1    this situation, don't know anything about it.  And so, going

2    off of that, all we know is the sum of money.  And that, you

3    can't really make a decision off that, because I'm sure the

4    underlying evidence of everything there may or may not have

5    an influence on how someone decides their point of view.

6    So, at this time I can't say that I have a determination in

7    whatever has gone on.

8                    MR. L. FRIEDMAN:  And would the sum of

9    money make a difference to you if it was an alleged oral

10   agreement for over a million dollars?  I mean, would that be

11   significant to you to have in writing?

12                   VENIRE PERSON 23:  To an extent.

13   Personally, for me there would have to be more of a

14   relationship between the people.

15                   MR. L. FRIEDMAN:  Okay.  Fair enough.

16                   And, Ms. Billingsly, what about you?  Do

17   you have an opinion?  If an agreement had to do with

18   business, would you lean more one way or another with regard

19   to whether it should be oral or written?

20                   VENIRE PERSON 17:  I would think it should

21   be written.

22                   MR. L. FRIEDMAN:  And what about you,

23   Ms. Baker?

24                   VENIRE PERSON 18:  I would think it should

25   be written.  That's --

1          MR. L. FRIEDMAN:  How much time do I have

2    left, Judge?

3          THE COURT:  You have till 2:07, about 37

4    minutes.

5          MR. L. FRIEDMAN:  Well, I think as a -- as

6    a present to you, Judge, I'm going to give you back all that

7    time.

8          THE COURT:  Very good.

9          MR. L. FRIEDMAN:  I've had enough.  Thank

10   you.

11         THE COURT:  I'll take it.

12         Ladies and gentlemen, that concludes the

13   portion of jury selection where the attorneys ask you

14   questions.  The final portion of jury selection is some

15   individual questions.  The people we need to talk to fall

16   into one or more of several categories.  We need to talk to

17   any juror who wanted to answer a question but, for whatever

18   reason, did not answer a question.

19         We often have jurors who are shy about

20   speaking in front of a group.  Perfectly understandable.

21   Sometimes an attorney asks a question and you didn't want to

22   answer in front of the entire group.  That's perfectly

23   understandable.

24         If for whatever reason you wanted to answer

25   a question but didn't, we want to hear -- still hear what

1    you have to say.  It was not speak then or forever hold your

2    peace, but this will be speak now or forever hold your

3    peace.  We need to know what's on your mind if you haven't

4    shared that already.

5                    We also need to talk to any jurors who have

6    any matter of privacy to bring to my attention.  This would

7    most often involve matters of medical privacy.

8                    We don't go more than about an hour and 15

9    minutes without taking a break, but we often have jurors who

10   are uncomfortable going that length of time without taking a

11   break.  They'd rather take a very predictable break every

12   hour on the hour for 10 minutes.  That's something we can

13   accommodate.

14                   Sometimes we have jurors who are taking

15   medication and the medication affects their ability to

16   concentrate or to follow the evidence or to even stay awake.

17   We don't want to ask you to not take your medication in

18   order to serve on this jury, but we don't want to ask those

19   type of questions in front of the entire jury panel.  That's

20   a privacy matter.  But that would be an example of a medical

21   condition that we cannot accommodate.  But if you have some

22   matter of privacy like that, a medical condition or a

23   religious conviction against sitting in judgment of others,

24   we want to talk to you privately and see if it's something

25   we can accommodate or not.

1          And the third group -- and this would be

2     the largest group -- is we need to talk to any juror who

3     cannot commit -- cannot commit to being here for the length

4     of the trial.  The trial may be seven to ten trial days, and

5     we're in trial four days a week, Monday through Thursday.

6     On Fridays we hear motions in all of our other cases.

7          Sometimes we'll start at 9:00 o'clock.

8     Most often we'll start at 9:00 o'clock.  On some days we may

9     start at 9:30.  Most days we're going to try and stop by

10    5:00 o'clock, but we may go up until 5:30 on some days,

11    particularly if we have a witness who's not available at

12    another time.  Or if it's right in the middle of the

13    examination, sometimes it's not fair to cut off an

14    attorney's questioning, let the attorney go home and -- let

15    the witness go home and study up a little bit more and then

16    come back and ask the questions.

17          Fairness to the parties requires that we

18    let the questioning continue a little bit past 5:00 o'clock.

19    But we certainly recognize that there will be a lot of

20    information.  We don't want to overload you with

21    information, so we want to keep the day at a length where it

22    will allow you to make a fair and true judgment in the case.

23          The type of -- the reasons that you may not

24    be able to serve include you have small children at home or

25    you're the primary caregiver of an elderly parent and the

109

1    children or the parent may be unattended, may be in danger

2    by your jury service.  If -- if you have prepaid tickets to

3    a vacation, if you have a surgery planned, if you have, you

4    know, an important doctor's appointment, those type of

5    things, those are the type of things we need to know about

6    in order to determine whether or not we can excuse you as a

7    juror.

8                    If you have a business reason, most often

9    business reasons do not allow me to excuse you as a juror,

10   but we will certainly hear what you have to say.  Sometimes

11   we have people who have been unemployed for a period of time

12   and just started a job this week.  We don't want you to

13   endanger a job that you just started.  So I'm not saying

14   there's no reason if it's a business reason.  It's something

15   we'll hear and we'll make a determination.

16                   So having said -- and -- and if there's --

17   if there's just something you wanted to report and you

18   haven't reported it yet, we'll do that too.  You can tell us

19   that too.

20                   So, on the first row, Jurors 1 through 10,

21   is there anybody who knows that they need to report

22   something to the Court, you wanted to answer a question, you

23   have some privacy matter, you have a conflict with the

24   length or the timing of the trial?  On the front row?  You

25   got to raise up your cards.  Juror Number 3.

1          Anyone else on the front row?

2          On the second row?  Sixteen, thirteen.

3  Okay.

4          And, Mr. Gillett, if you'd stay behind,

5  'cause I wanted to determine if Julie Mingus is the same one

6  that's in this case.  If you'd stay behind also.

7          On the third row?  Twenty-two and

8  twenty-five.  Anyone else?

9          On the fourth row?  Thirty-seven,

10  thirty-eight, thirty-nine.

11          On the last row?  Forty-one, forty-one --

12  forty-one, forty-four, forty-five.

13          Okay, we're going to take a break here.

14  The break's going to be about 30 minutes.  If you raised

15  your card, please stay behind.  If you didn't raise your

16  card, we're going to see you back at about 5 after 2:00.  it

17  may be a little bit longer.  It depends on how long it takes

18  for us to talk to everyone.

19          If you raised your card, please stay

20  behind.  If you didn't raise your card but you want to

21  report something, stay behind.

22          So, Juror Number 2, you stay behind too.

23  All right?

24          (The jury panel exited the courtroom.)

25          THE COURT:    All right.  The attorneys,

111

```
1    Ms. Gibson, Mr. Friedman, we're going to do this in the jury

2    room.  You can bring everyone you want or no one that you

3    want.

4                    (Off the record)

5                    INDIVIDUAL VOIR DIRE

6              THE COURT:  If you'll come in here.

7              (Venire Person 2 entered the jury room.)

8              What did you want to tell us, sir?

9              VENIRE PERSON 2:  I have two jobs and I

10   work overnight and daytime.  And on this one is my first

11   time working on Tuesdays and it's my second week.  Last week

12   I was absent for a doctor appointment and today for the

13   jury, and I also --

14             THE COURT:  If you are serving as a juror,

15   will you still be working the overnight job?

16             VENIRE PERSON 2:  Yeah.

17             THE COURT:  So you can't even say that

18   you'd be awake through the entire trial?

19             VENIRE PERSON 2:  I can't.

20             THE COURT:  Thank you for sharing that with

21   us.

22             (Venire Person 2 exited the jury room.)

23             MR. L. FRIEDMAN:  Judge, I didn't hear what

24   he said.

25             THE COURT:  He said he has a overnight job
```

Appendix 0421

```
1                    MR. L. FRIEDMAN:   Yes.

2                    THE COURT:   Okay.

3                    For all of you, including the AV person

4    whose name you should know now but I already forgot, you can

5    stay -- you can come back up here or you go all the way to

6    the very back row.   Once we get the jurors in the box and

7    release the other jurors, you can come back over here.   But

8    if you want to go to the very last row, you can do that, or

9    you can come up here with counsel.

10                   (Off the record)

11                   (The jury panel entered the courtroom.)

12                   THE COURT:   Welcome back.   Good afternoon,

13   ladies and gentlemen.

14                   I'm going to read the names -- we're going

15   to have six jurors and one alternate, but we're going to

16   refer to everybody as a juror.   We're going to read your

17   names first, make sure you're present in the courtroom.

18   Then we're going to bring seven jurors up to the jury box

19   and swear them in as jurors.   Once they're sworn in, we're

20   going to wish the rest of you a good day.

21                   Juror Number 1, just let me know right now

22   that you're present in the courtroom.   Or, if you wanted to

23   get up and start making your way toward Rick, that's fine

24   too.

25                   (Jury announced and sworn in)
```

1          THE COURT:  Members of the jury, the first
2     portion of trial is jury selection.  We've completed that
3     portion of trial.

4          As you learned during jury selection, the
5     attorneys did not go into detail about the facts of the
6     case.  They only gave you a very general overview what was
7     at issue.  During opening statements, though, they can argue
8     to you what they believe the evidence in the case will be.
9     What the attorneys argue in opening statements is not
10    evidence.  It's argument.

11         The oath you just took was to base your
12    verdict only on the evidence presented during the course of
13    the trial.  Evidence is sworn testimony that comes from the
14    witness stand or sworn testimony that comes from a
15    deposition -- I will explain that to you when we get to
16    it -- or information contained in documents that are
17    admitted into evidence.  All the documents that are admitted
18    into evidence will go back to the jury room with you when
19    the case is over and you begin your deliberations.  So you
20    don't need to worry about trying to memorize information on
21    a document if there's a date or a number there.  You'll have
22    the actual document itself.

23         So, what the attorney says is not evidence.
24    And by allowing the attorneys to highlight for you what they
25    think the evidence will be, it will make it easier for you

1    to follow the evidence once we start calling witnesses to

2    the witness stand and presenting documents to you that have

3    been admitted into evidence.

4              Each side will have 30 minutes for an

5    opening statement.  The attorney for the plaintiff, because

6    the burden of proof is on the plaintiff, goes first in

7    giving an opening statement.  Ms. Gibson most likely will

8    give the opening statement for the plaintiff.

9              Is everybody okay going for an hour before

10   we take a break?

11             Okay, Ms. Gibson, you're up, ma'am.

12             MS. GIBSON:  Your Honor, may I just move

13   the flip chart first?

14             Is over here okay --

15             THE COURT:  Yeah.

16             MS. GIBSON:  -- so that everyone can see?

17             Can everyone see?  Can all of you see?

18             Mr. Friedman, can you see?

19             MR. L. FRIEDMAN:  Yes.

20             PLAINTIFF'S OPENING STATEMENT

21             MS. GIBSON:  Good afternoon.

22             What brings us to the Dallas County

23   courthouse today are the business financial safety rules

24   that protect us all from harm.  These safety rules, like all

25   safety rules, only protect us if juries choose to enforce

1   them.

2          Safety Rule Number 1, businesses must live

3   up to their agreements with those who have lived up to

4   theirs, to protect businesses, workers, and families from

5   harm.

6          Safety Rule Number 2, those who operate

7   businesses in Texas must honor Texas law about enforcement

8   of oral agreements, especially handshake agreements, to

9   protect businesses, workers, and their families from

10  financial harm.  In Texas, oral agreements can be

11  enforceable.

12         Now let me tell you the story of what

13  happened in this case.  Brian Potashnik and Cheryl Potashnik

14  operate companies that build, own, and manage apartment

15  complexes throughout Texas and elsewhere.  Brian Potashnik

16  and Cheryl Potashnik discussed selling the business.

17  Brian Potashnik and Cheryl Potashnik discussed the potential

18  for a mass exodus of employees before the asset sale

19  happened.

20         Brian Potashnik and Cheryl Potashnik

21  discussed how to get important employees to stay on as long

22  as needed for the asset sale.  Brian Potashnik and

23  Cheryl Potashnik discussed bonuses as an incentive to get

24  important employees to stay on.

25         Let me take you to May of 2006.

1    Brian Potashnik meets at his home with his executive vice

2    president of one of the companies.  Brian Potashnik

3    announces plans to sell the business.  Brian Potashnik says

4    he needs his vice president to stay on as long as needed to

5    help make sure the asset sale goes through.  Brian Potashnik

6    says that if the vice president stays as long as needed then

7    the vice president will be paid a lucrative bonus from the

8    sale proceeds.

9              Brian Potashnik says he will work out a

10   specific formula for the bonus later, once he has a better

11   idea of what the asset-sale price might be.  Brian Potashnik

12   and his vice president shake hands.  Brian Potashnik and

13   Cheryl Potashnik then receive oral updates from this vice

14   president about routine operations, due diligence work, and

15   employee morale.

16             Brian Potashnik asks this vice president,

17   for example, to handle some tours to market the business for

18   potential purchasers and investors.  About six months later,

19   Brian Potashnik and Cheryl Potashnik sign a letter of intent

20   to sell the company's assets, including -- and their

21   individual assets related to the business.

22             Brian Potashnik again meets with his vice

23   president of the management company.  Brian Potashnik says

24   the vice president definitely will not have a job with the

25   purchaser after the sale.  This is because the purchaser

1  already has a management company and someone in the vice

2  president's same position.  Brian Potashnik says he still

3  needs his vice president to stay on as long as needed, even

4  though he likely will not have a job with the purchaser

5  after the sale.

6          Brian Potashnik, at this point, explains

7  the specific bonus formula for his vice president.

8  Brian Potashnik and his vice president estimate the bonus at

9  $1,020,000.  Brian Potashnik and his vice president shake

10  hands on the deal.  Brian Potashnik and Cheryl Potashnik

11  anticipate at this time that the sale will close within less

12  than a year.

13          Brian Potashnik and Cheryl Potashnik see

14  that the vice president stays on and continues to work to

15  make the asset sale happen.  Brian Potashnik learns that the

16  vice president delays a job offer in order to stay on with

17  them as long as needed.  Over a year later, Brian Potashnik

18  and Cheryl Potashnik say the sale is about to happen.  The

19  management transition to the purchaser to take over

20  management functions has been signed.  As a result, they

21  explain that the vice president's work is complete and he is

22  no longer needed and free to go find other employment.

23          Cheryl Potashnik thanks the employee for

24  his work.  Cheryl Potashnik assures the employee that he

25  will be paid once the asset sale goes through.  A day or so

140

1    later, Brian Potashnik and Cheryl Potashnik tell the now

2    former vice president that they might not pay the asset-sale

3    bonus.  Brian Potashnik and Cheryl Potashnik say they are

4    worried about whether there will be enough money to meet

5    their personal needs.

6             A few weeks later, Cheryl Potashnik tells

7    the former vice president that she checked with

8    Brian Potashnik and Brian Potashnik never promised the

9    bonus.  Brian Potashnik closes the sale.  Brian Potashnik

10   and Cheryl Potashnik and all of the companies receive a

11   total of more than 30 million in net asset-sales proceeds,

12   meaning asset-sale revenue minus their closing cost.

13            The vice president is Jeff Carpenter.  The

14   simple truth is keeping wages that a worker has earned is

15   stealing.  These defendants are here today because they

16   chose to violate the safety rules requiring businesses and

17   business people live up to their agreements.

18            All of the defendants in this case sold

19   assets in the asset sale.  None of the defendants lived up

20   to the agreement with Jeff Carpenter.

21            Southwest Housing Management is also here

22   today because it never paid certain annual bonuses that were

23   still owed to Jeff Carpenter.  And the final reason these

24   defendants are here today is because the defendants have

25   refused to be accountable for the harm they've caused.

141

1              Before we came to trial we had to determine

2      a few things.  First, we had to determine whether an oral

3      handshake agreement is legally enforceable in Texas.   And

4      the law in Texas is that if the agreement --

5              MR. L. FRIEDMAN:  I object to her

6      instructing the jury about the law within the province of

7      the Court.

8              MS. GIBSON:  This is what I anticipate in

9      the charge.

10             THE COURT:  Well, preface it that way.

11             MS. GIBSON:  Okay.

12             I anticipate that the Court will charge

13     you.  In other words, give you instructions that a contract

14     that is possibly performable within a year is enforceable in

15     Texas as an oral agreement.  I anticipate that the Court

16     will also instruct you that when you decide whether the

17     agreement can possibly be performed within a year that you

18     look at the beginning of the deal, not at the end of the

19     deal.  So if, at beginning of the deal, it looks like it

20     could be performed even possibly within a year, an oral

21     agreement is enforceable even if it ultimately took more

22     than a year to finish the work.

23             And you will see in this case that

24     Jeff Carpenter finished his obligations on October 31, 2006.

25     Management transfer to the purchaser happened November 1,

1     2006.  And at the time of the original deal struck earlier

2     in October of 2006 when Brian Potashnik announced his

3     specific bonus formula and they shook on the deal, they

4     anticipated that the asset sale would happen spring or

5     summer of 2007, unless at the outset the agreement could

6     possibly be performed within a year.  Those types of oral

7     agreements in Texas are just as enforceable as written.

8                     We also had to determine -- that's seven

9     and eight.  Is that right?  We also had to determine did

10    Brian Potashnik have the authority to make this deal on

11    behalf of the sellers in the asset sale, but you will see

12    that the asset-sale documents list Brian Potashnik as the

13    agent for all of the sellers.  Brian Potashnik was an owner,

14    an officer, of each of the three defendants:  Southwest

15    Housing Development; Affordable Housing Construction; and

16    Southwest Housing Management.  Those were the three

17    businesses they used in the organization to build apartment

18    complexes from site selection to construction to management.

19                    Brian Potashnik, in making a deal to and

20    offering a deal for a percentage of certain proceeds that

21    the sellers would receive, necessarily appeared to be acting

22    on behalf of all the sellers; in addition to the written

23    documents stating that Brian Potashnik was the agent for all

24    of the sellers in the asset sale.

25                    We also had to determine before we came

1    here is there evidence of an agreement.  This is a handshake

2    agreement that, obviously, is not in writing.  And we found

3    that we could.

4                    For example, Cheryl Potashnik concedes that

5    they intended to pay Jeff Carpenter a sales-proceed bonus

6    from the asset sale.  You will hear evidence that

7    Brian Potashnik and Cheryl Potashnik put a program in place

8    to set asset-sale bonuses for employees.

9                    And, in fact, they asked -- or

10   Brian Potashnik asked Jeff Carpenter to help set those

11   bonuses for key employees that reported to Mr. Carpenter.

12   He was asked to identify them and to help set the amount of

13   their bonuses.  These are sometimes known as stay bonuses or

14   stay-and-pay bonuses.  The intent is to get important people

15   to stay, rather than jumping ship, to make the target more

16   attractive and make sure the asset sale happens.

17                    Further, Jeff Carpenter, it's undisputed,

18   was not going to have a job with the purchaser after the

19   asset sale happened.  And, yet, Jeff Carpenter delayed a job

20   offer for months in order to stay on and fulfill his end of

21   the bargain.  You will hear that Cheryl Potashnik, shortly

22   before Jeff's work was over or around that time, looked him

23   in the eye and said, We would never screw you; and referring

24   to the past-due annual bonuses and the stay-bonus percentage

25   of proceeds from the asset sale.

144

1           We also had to determine why the defendants

2    did not pay Jeff Carpenter, because other employees were

3    paid their stay bonuses even though their agreements were

4    also oral agreements.

5                    MR. L. FRIEDMAN:  Objection, Your Honor,

6    violates the limine.

7                    THE COURT:  Sustained.

8                    MS. GIBSON:  We -- we also had to look at

9    what the motivation was to not pay Jeff Carpenter.

10   Jeff Carpenter left at an earlier date than some of the

11   other employees.  Jeff Carpenter was to get the highest

12   bonus amount of any of the employees, at least so far as

13   Brian Potashnik had told him.

14                   MR. L. FRIEDMAN:  Objection, Your Honor.

15   She continues to violate the limine.

16                   THE COURT:  You can say that there was a

17   program.  You can't talk about other -- what other people

18   were or were not getting or supposed to get, only if there

19   was a program.  So, objection's sustained.

20                   MS. GIBSON:  Okay.

21                   You will also hear that there was no

22   dispute about whether or not there was actually a handshake

23   agreement until the defendants had gotten what they needed

24   from Jeff Carpenter.  And they had started to become

25   concerned about finances for two reasons:  First, they were

 1    concerned because the deal had not closed yet; and, second,

 2    they were concerned because they were having to pay

 3    attorneys to defend them against -- they were having to pay

 4    criminal defense attorneys surrounding --

 5                        MR. L. FRIEDMAN:  Your Honor --

 6                        MS. GIBSON:  -- investigation --

 7                        MR. L. FRIEDMAN:  -- another violation of

 8    limine.

 9                        THE COURT:  It's not.  I said she can go

10    into that.

11                        Overruled.  Go ahead.

12                        MS. GIBSON:  Okay.

13                        They were concerned about the bills and the

14    amount of money they were having to pay to their criminal

15    defense attorneys in connection with a criminal --

16                        MR. L. FRIEDMAN:  That is a violation of

17    the limine.  Objection.

18                        THE COURT:  We'll take it up off the

19    record, but the objection's overruled.

20                        MS. GIBSON:  Jeff Carpenter, we also had to

21    determine what to do and how to assess later attacks on

22    Jeff Carpenter that have happened throughout this case.  And

23    when we looked into it you will see there is evidence that

24    this is just what people do when they don't want to pay

25    money pursuant to an agreement.  Suddenly, the person

146

1   doesn't deserve it or suddenly someone deserves the money

2   more.

3                    But you will hear that Jeff Carpenter

4   completed his work.  It is undisputed that he was not fired

5   for performance.  It is undisputed that he was not

6   disciplined.  The attacks on Mr. Carpenter happened after he

7   stood up for himself concerning the handshake deal on the

8   sale-proceeds bonus.  For example, at one point

9   Jeff Carpenter was accused of stealing a laptop, but you

10  will see that Jeff Carpenter is continuing to Email the

11  Potashniks -- or at least Brian Potashnik -- after he left

12  employment to help make the asset sale go through.  That and

13  other type of evidence is inconsistent with someone who has

14  stolen a laptop and left.

15                    We also had to determine whether a written

16  agreement with one of the defendants affects the agreements

17  at issue in this case.  And the answer is no.  The only

18  written employment agreement is with Southwest Housing

19  Management, none of the other defendants or individuals

20  involved in the asset sale.

21                    You will also see that the agreement from

22  the beginning contemplated the possibility of future

23  separate deals.  For example, the agreement --

24                    THE COURT:  Do you want Rick to help you or

25  you know what --

1          MS. GIBSON:  I am just -- it was still on

2     defendants'.  I had to switch it to plaintiff's.

3          THE COURT:  All right.

4          MS. GIBSON:  The original deal contemplated

5     the agreement with Southwest Housing Management that, in

6     addition here, there would be future agreements concerning

7     bonuses separate and apart from this agreement.  Nor does

8     the agreement say whether later agreements about bonuses

9     have to be in writing or may be oral.  The agreement also

10    anticipates that in the future Mr. Carpenter may be

11    employed with any of the affiliates of Southwest Housing

12    Management.  In other words, he would be allowed at some

13    point.  He was allowed in the future to do work for the

14    other entities and the organization.

15          We also had to look at whether a contract

16    that says it cannot be modified in writing can actually be

17    modified in writing.  And I anticipate that you will be

18    charged what the law is in cases like this one.  Parties can

19    orally modify an agreement even if the agreement says that

20    modifications must be in writing.  But more important, here

21    the writing is necessary if they need to amend or alter the

22    terms of this agreement.

23          The asset-sale bonus did not require a

24    change in the compensation terms that were covered under

25    this agreement.  The annual bonuses after year one did not

1   require any change in the compensation covered in this

2   agreement because this agreement only covers the limited

3   types of compensation.

4                    Your Honor, how am I doing on time?

5                    THE COURT:   You have till 3:12, so you have

6   eight more minutes.

7                    MS. GIBSON:   Okay.

8                    The agreement, the written agreement, is

9   only with Southwest Housing Management.   Covered salary.   It

10  covered year-one annual bonus.   It covered expense

11  reimbursement.   It covered relocation expenses because

12  Mr. Carpenter was recruited to move to Dallas for this job.

13  The written agreement covered temporary housing for that

14  relocation.

15                   It covered PTO.   It covered insurance.   It

16  covered car allowance.   It covered severance.   And it

17  covered health club and a certain adjustment in salary

18  concerning health insurance premiums.

19                   The separate deal on the bonus for the

20  asset-sale proceeds was for Jeff Carpenter to stay.   They

21  asked him to stay.   And if he did so, they would pay the

22  bonus.

23                   The stay-to-pay bonus doesn't require a

24  change in any of the types of benefits covered under their

25  written agreement, whether it's considered a separate deal

149

1     or an oral handshake modification of this deal, because at

2     the time that the written agreement was entered into no

3     asset sale was on the horizon or contemplated.  As a result,

4     you will see that Paragraph 12 doesn't apply because there's

5     no need to amend or alter those compensation terms with a

6     separate agreement.

7                 Defendants also later claim that a

8     particular paragraph barred the compensation.  Now, the

9     defendants didn't claim this until they became concerned

10    about the sale -- the asset sale not having closed yet and

11    their criminal defense fees that they were incurring.

12                This provision says employee will not be

13    entitled to any compensation or benefits pursuant to this

14    agreement on termination except as noted below, and then

15    they offer six weeks' base salary.  But, again, this is

16    talking about pursuant to this agreement, which is what's

17    covered under the agreement; which is salary, the annual

18    bonuses for the first year, and several other items, none of

19    which involved the stay-and-pay/asset-sale bonus or annual

20    bonuses after year one.

21                Once defendant started hinting or

22    indicating that they might not pay the bonus they had

23    promised all along and just about a day after defendants got

24    everything they needed from Jeff Carpenter to help make the

25    asset sale happen, Jeff Carpenter recorded a conversation

1    with Cheryl Potashnik and Brian Potashnik.  He did so

2    without their knowledge in the hopes that they would say

3    something confirming the oral agreement.

4              Now, we had to look at -- even though the

5    defendant said you have what we intended to do, you have our

6    discussion, you have what we have promised, Jeff Carpenter

7    at no time during the conversation stood up for himself and

8    said this was our agreement, this was the formula, and

9    documented that way on the telephone call why didn't this

10   happen.  And you will hear that Jeff Carpenter was stunned,

11   generally speaking, that Cheryl Potashnik was suddenly

12   saying he had no legal rights.  You will also hear that his

13   intent was simply to record and see what they might say on

14   their own.

15             With respect to damages in this case, you

16   will see that the calculation of the asset-sale bonus was

17   pursuant to a formula and it was -- Brian, do you see the

18   marker?

19             MR. SANFORD:  Here.

20             MS. GIBSON:  Thanks.

21             The formula was three percent of a certain

22   number, which was calculated with seller's revenue, minus

23   normal closing costs, minus the amount of stay bonuses paid

24   out to other selected key employees.  And that amount totals

25   just over $900,000.  It was originally estimated at

1    $1,020,000, but using the actual numbers the bonus was a

2    little over $900,000.

3              THE COURT:  You have about one minute left.

4              MS. GIBSON:  Okay.

5              And with respect to -- now, with respect to

6    the annual bonuses, you will see that the number was based

7    on words from Brian Potashnik's as to what he thought was

8    owed.  That number is $400,000.

9              Thank you.

10           THE COURT:  Thank you, Ms. Gibson.

11           Mr. Friedman?

12           MR. L. FRIEDMAN:  Yes, sir.  I'm going to

13    move over there.

14             DEFENDANTS' OPENING STATEMENT

15           MR. L. FRIEDMAN:  May it please the Court.

16           THE COURT:  Counsel.

17           MR. L. FRIEDMAN:  Counsel, ladies and

18    gentlemen of the jury, I'm back.

19             Again, I represent Brian and Cheryl

20    Potashnik and the three corporate defendants:  Southwest

21    Housing Management; Southwest Housing Development;

22    Affordable Housing Construction; Brian Potashnik; and

23    Cheryl Potashnik.

24             This case is only about one thing, whether

25    or not Mr. Carpenter can avoid the signed written contract

1    that he entered into with Southwest Housing Management, his
2    employer, and create an oral contract.
3              You'll not hear any evidence about safety
4    rules or pay and stay.  In fact, you won't hear any evidence
5    from anyone who was present when an oral contract was made.
6    You won't hear evidence from anyone who says they witnessed
7    an oral contract.
8              And you'll hear evidence from
9    Mrs. Potashnik and Mr. Potashnik when they say they didn't
10   make an oral contract.  And the writing surrounding
11   Mr. Carpenter's claims that there was an oral contract from
12   Mr. and Mrs. Potashnik will say we can't make a commitment
13   to you now until the business closes and we see what the net
14   proceeds are; and then, yeah, we'd like to pay employees
15   some severance.  And that's consistent.  The deposition was
16   consistent of the Potashniks from the beginning, over and
17   over and over again.
18             What you will hear from Mr. Carpenter is
19   something about a meeting that only he remembers that
20   happened on October 13th, 2006, where he remembers a
21   formula.  I've narrowed it down.  I heard testimony.
22             You'll hear the evidence from the witness
23   stand that Mr. Carpenter didn't plead for what he sued in
24   this lawsuit 10 years ago.  That's right, this lawsuit's
25   been pending for 10 years, since March 11th, 2008.

1    Mr. Carpenter has held this lawsuit over the Potashniks'

2    head for 10 years hoping, waiting, and leveraging for

3    settlement.  But it hasn't come because the Potashniks never

4    made a deal with him.  They weren't going to pay him for

5    some promise that they didn't make, and that's why we're

6    here 10 years later.

7                    Mr. Carpenter's made up this story and it's

8    not even believable.  The evidence that we'll present to you

9    will show you it's a fabricated story and there was no

10   agreement beyond the written employment contract for any

11   additional compensation.

12                   Pay to stay, another term that was used in

13   the Affordable Housing business -- stay to pay or whatever

14   it was -- are not terms that were commonly used.  They

15   weren't used by Mr. and Mrs. Potashnik.  That's something

16   that was made up as a catchy phrase in this lawsuit.

17                   Let me have the employment contract, if you

18   don't mind.

19                   The only written agreement that was made by

20   Mr. Carpenter -- the only agreement that was made by

21   Mr. Carpenter was with his employer, Southwest

22   Management -- Southwest Housing Management Corporation.

23                   Now, lest you think that the Potashniks are

24   some big conglomerate or inherited their money or something

25   like that, the truth of the matter is that Brian Potashnik

1    started this company in 1993, by myself, with no money and

2    no employees.  A year later he hired Cheryl Potashnik.

3                   But in 1994 -- just hold that there -- but

4    in 1994 they acquired a rundown property in Carrollton,

5    Texas.  It was already an Affordable Housing project.  It

6    wasn't being used to its potential.  It had been seriously

7    run down.  Brian and Cheryl Potashnik bought that

8    property -- or Brian bought the property -- and Brian and

9    Cheryl renovated it.  And that's how they got into the

10   Affordable Housing business with one single property.

11                  Since 1994, they acquired one property at a

12   time, one or two properties a year, up until about the year

13   2000, 2001, when they really got to know their business and

14   their business took off.  From 2001 to 2008, when they sold

15   their business -- and these dates are all wrong.  I'm going

16   to hold Ms. Gibson and Mr. Carpenter to these dates.  To

17   2008, when they sold their business, they built -- they

18   built hard, blood, sweat, and tears, hard labor -- they

19   built a company with some 60 properties and I think it's

20   about 12,000 apartment units.  They built them.

21                  They got to a point when they needed more

22   expertise than the two of them had.  And as they grew

23   they -- they acquired more property managers and more

24   people.  And at some point in 2004 they hired Mr. Carpenter.

25                  Now, Mr. Carpenter is not a babe in the

1    woods.  Mr. Carpenter had serious experience in property

2    management.  Mr. Carpenter owned his own company, he had

3    been executive vice president at the other housing

4    management companies, and he knew the business and he

5    represented himself to know the property management

6    business, which he did.  Mr. Carpenter's an excellent

7    property manager and did a good job for the Potashniks.  It

8    wasn't perfect, it wasn't perfect, but he did good.

9                   And you will see -- go back to the slide,

10   if you don't mind -- when we show you the employment

11   contract that in the employment contract -- can you blow up

12   the duties -- you will see that Mr. Carpenter agreed and

13   that his testimony will be that he read that contract before

14   he signed it, he understood it before he signed it, and he

15   intended to comply with each and every provision in the

16   contract when he signed it.  So there's no wiggle room here

17   for Mr. Carpenter, and he agreed to perform the duties and

18   functions assigned to him by Mr. Potashnik.

19                   Now, with regard to the Southwest

20   companies, there was Southwest Development.  The development

21   would find the properties, get it ready for construction.

22   There was Affordable Housing Construction.  That was a

23   construction company that would come in and build the

24   apartment complexes.  And then there was Southwest

25   Management, which is the company that Mr. Carpenter worked

1 for.

2      Southwest Housing Management would manage

3 the properties.  That was a big job.  So now they have a lot

4 of employees.  You'll hear from Mr. Potashnik or

5 Mrs. Potashnik about the number of employees in that

6 company.

7      So, when they hired Mr. Carpenter, he

8 signed this contract.  And 3(a) says he takes his

9 instructions, the job duties comes from the company, he

10 reported to Mr. Potashnik.

11      Let me go to the next paragraph, quote two,

12 two, Paragraph 2.  Can you do that for me?

13      Paragraph 2, Mr. Carpenter agreed that he

14 was an at-will employee, and he continued to be an at-will

15 employee for his entire employment with the company.  That

16 means he could be hired, he could be fired at any time; but,

17 likewise, he could leave at any time.  And every day that he

18 worked for Southwest Housing Management he was an at-will

19 employee that could be hired and fired at any time.

20      Let's go to compensation, number four.

21 Now, for the executive position that he had he was paid

22 $200,000, $200,000 a year, which was an executive salary and

23 a lot of money.  It's not only a lot of money because it's a

24 lot of money, it's a lot of money because in the Southwest

25 Housing business they were paying for expertise that

157

1    Mr. Carpenter had.

2                    Let's move forward on the contract.

3    Paragraph 4A is the $200,000 salary and Paragraph 4B talks

4    about any bonus he would get with regard to his employment

5    at Southwest Housing Management, the only employer he ever

6    had during the three-and-a-half years he worked for the

7    Southwest Management, the only contract he ever signed.  And

8    I think he got one check from Affordable Housing which was

9    trued up at the end of the year by accounting.  But other

10   than that, every check he got in three-and-a-half years was

11   from Southwest Housing Management.

12                    But in it -- and I'll show you the full

13   paragraph on every document that we present to you, not just

14   one line at a time -- but the full paragraph not only

15   addresses Mr. Carpenter's bonus in his first year of

16   $50,000, which he received, but it also talks about bonus --

17   bonuses in future years, which could be changed at the sole

18   discretion of the company.

19                    And you-all know what sole discretion

20   means; that it's up to the employer to decide at the end of

21   every year whether Mr. Carpenter got a bonus.  And it says

22   it will determine on the basis of overall profitability of

23   the organization as a whole.  And as you heard from

24   Ms. Gibson, the organization as a whole, particularly

25   Southwest Management, was abusing money.

1          Now, we're going to show you evidence

2     that -- notwithstanding what Ms. Gibson just told you --

3     that Ms. Potashnik's position all the time was that they

4     couldn't make a commitment to Mr. Carpenter.  They'd like

5     to.  They'd like to give him -- give him severance, but they

6     couldn't (unintelligible).  Same thing with Mr. Potashnik.

7          And I'm glad she brought up these

8     tape-recorded conversations, because the day of his last day

9     at the company Mr. Carpenter secret -- secretly recorded two

10    conversations:  One with Mr. Potashnik on the telephone and

11    the other one in person with Mrs. Potashnik.

12         And during those conversations -- I counted

13    it up and I think there was some -- about eighty times in

14    the two conversations when he had an opportunity to speak.

15    Eighty times he had an opportunity to say to the Potashniks,

16    What about that deal you promised me?  What about that deal

17    for an extra stay-to-pay bonus and three percent or two

18    percent of -- of the sales proceeds, less the brokerage fees

19    and less the closing costs, and that you promised to pay me

20    at close?  Eighty times he had an opportunity -- over eighty

21    times he had an opportunity to say that on tape when he knew

22    he was the only one recording the conversation, and eighty

23    times he didn't take the opportunity to nail down

24    Mrs. Potashnik or Mr. Potashnik on that tape recording.

25         Now, why was he tape recording the

1    conversation?  He'll have to explain that again to you.

2                        What was the purpose of that recording?  He

3    wanted to get evidence of his deal, which he didn't believe

4    he had up until the day he left the company.  And he didn't

5    get it on the phone because he knew he didn't have a deal.

6                        Now, when he left the company -- go to the

7    termination provision, please -- you'll see evidence that

8    when he left the company -- go up a little bit, please.

9    Termination.  Next, please.  There you go.

10                       So you'll see evidence that when he left

11   the company, notwithstanding it says the employee will not

12   be entitled to any compensation or benefits pursuant to this

13   agreement, effective upon termination of employee's

14   employment, but then it says in the event company terminates

15   employee, employee will receive severance in an amount equal

16   to six weeks' base salary in a lump sum payable upon such

17   termination.  Southwest Housing Management, through the

18   Potashniks, handed him a severance agreement on the day he

19   was -- his last day.

20                       The severance agreement included a check

21   for six weeks' base salary and severance of $150,000, and

22   severance of $150,000 which was in their discretion.  And

23   Mr. Carpenter turned it down.  He said, no, I'm not doing

24   it.  I'm entitled to a bonus from the proceeds of the sale.

25                       Now, remember the Potashniks had spent 16

1    years building this business.  They put money into it, they

2    signed personal guaranties, they sacrificed themselves and

3    their family.  They divorced in 2014, maybe as a result of

4    some of these pressures.  They're still friends and they

5    still raise their two college-age boys together.  They may

6    not be friends with me when this is over with, but they're

7    still friends with each other.

8            But they offered Mr. Carpenter over

9    $150,000 as severance and he said, no, he wasn't going to

10   take it.  So why wasn't he going to take it?  Well, in the

11   course of the last 10 years we uncovered some personal notes

12   that Mr. Carpenter had written to himself.

13           Do we have those notes on there,

14   Steve?

15           And in those personal notes, which we'll

16   offer into evidence, you will see that --

17           MS. GIBSON:  Your Honor, I'm going to

18   object to showing exhibits --

19           THE COURT:  You can't show a document --

20           MS. GIBSON:  -- that haven't been

21   pre-admitted.

22           THE COURT:  -- unless it's already been

23   admitted into evidence.

24           MR. L. FRIEDMAN:  Oh, okay.

25           In the document that's entitled

1    Mr. Carpenter's personal notes, which is dated March 14th,

2    2007, Mr. Carpenter writing by himself that he was by

3    himself, ostensibly for no other purpose than keeping notes,

4    writes that the $200,000-a-year salary wasn't enough for

5    him; that his budget, his living budget, was 300- to 350,000

6    and he couldn't make ends meet.  He needed money.  He needed

7    more money.

8                    He had a tax lien on his house.  He had

9    sued his former employer when he left and he was paying

10   lawyers in that lawsuit, and he had a bunch of expenses at

11   home that he couldn't cover.  So you'll ask yourself what's

12   the motivation for this lawsuit.  The motivation for this

13   lawsuit is Mr. Carpenter wants more money and Mr. Carpenter

14   wants money that he didn't earn.  A hundred fifty thousand

15   dollars is a good severance for somebody who had worked

16   there three-and-a-half years.

17                   Now, we'll show you evidence that

18   Mr. Carpenter never -- not only never reached an agreement

19   with Mr. Potashnik, over the last 10 years he changed what

20   he stated was his original agreement.  The agreement he put

21   first in his original petition is different than the

22   agreement he stated later on in sworn pleadings, different

23   than the agreement he set forth in a declaration, and

24   different than the agreement he stated later on.  We'll show

25   you that over the years Mr. Carpenter couldn't even keep his

1    deals straight.

2                   In addition, we'll show you that all during

3    this period of time Mr. Carpenter sought the written

4    agreement that he knew -- go to Paragraph 12, please -- that

5    he knew he had to have in order to make it binding and

6    enforceable, because Paragraph 12 of his written employment

7    contract with Southwest Management Company -- Southwest

8    Manage -- Southwest Housing Management required him.   No

9    amendment or alteration of the terms of this agreement shall

10   be valid unless made in writing and signed by both parties

11   to this agreement.

12                   And you'll have to ask yourself -- this

13   will show you so much evidence that Mr. Carpenter continued

14   to try to get Brian or Cheryl Potashnik to sign in writing.

15   He wrote an amendment to this contract himself and handed it

16   to them with an agreement he wanted, which he now claims was

17   an oral agreement.   You have to ask yourself, Why did he

18   want a written agreement if he had a valid, enforceable,

19   oral agreement?   And why did he draft an amendment to that

20   contract if this so-called oral agreement had nothing to do

21   with that contract?

22                   So Mr. Carpenter's own conduct over the

23   period of time isn't consistent with someone who claims that

24   on October 13th, 2006, they had a valid, binding, and

25   enforceable agreement.

1              Now, with regard to the statute of

2    limitations' -- cause we anticipate that you will be asked a

3    statute-of-limitations question -- according to

4    Mr. Carpenter, he made his deal with Brian Potashnik on

5    October 13th, 2006.  And when asked about it, he will

6    testify that that agreement had a beginning and had an end.

7    And he testified the beginning was October 13th, 2006, and

8    he testified that the end was October 31, 2007, and his last

9    day of employment was -- I think he was terminated on

10   November 1st and then his last day of employment was

11   November 2nd.

12             That agreement, if it was made -- which we

13   say it wasn't made, but if the agreement that Mr. Carpenter

14   has concocted to get us here today is what he says it was,

15   it was performable in over a year and prohibited by the

16   statute of frauds under the laws of the State of Texas.  So

17   it couldn't have been performed.

18             So, ladies and gentlemen, we're going to

19   ask you to listen carefully to the evidence because we

20   believe that the plaintiffs will try to distract you and

21   talk about safety rules or what other employees were doing

22   or this or that.  But the only issue in this case -- and

23   we'll present evidence directly on point -- the only issue

24   in this case is did Mr. Carpenter make an agreement with

25   Mr. Potashnik.  If so, what were the terms of the agreement?

1    Did Mr. Potashnik ever agree to it?  And we think the

2    evidence will show it just never happened.  It never

3    happened and it can't be enforceable.

4                     And when you get to know Mr. Potashnik a

5    little bit, nobody who built that business over 15 or 16

6    years would make an agreement to give an employee that

7    worked there for three years a million-dollar bonus on a

8    handshake on a verbal agreement.  If he had made that

9    agreement, which he didn't, it would have been in writing,

10   and it wasn't.

11                     So, thank you for your time and attention.

12   I know this has been a long day, and we'll be presenting

13   evidence to you.

14                     THE COURT:  All right.  Thank you,

15   Mr. Friedman and Ms. Gibson.

16                     Members of the jury, that concludes the

17   opening statements.  The next phase of trial is the

18   evidentiary phase of trial where witnesses are called to the

19   witness stand and testimony is presented to you under oath.

20   Before we do that, we'll take a 10-minute break.

21                     At the end of the day I'll give you some

22   instructions that will govern your entire course of the

23   trial.  But the instruction I'll give you right now is that

24   if you want to call home and tell people that you're serving

25   on the jury, you can do that if you have a mobile phone.

1    But all you can do right now is tell them that you're on the

2    jury and you may go as late as 5:30 today.  We'll see how it

3    goes.

4                    But we'll see you back in 10 minutes.  This

5    is the jury room here.  Rick will show you where that is and

6    we'll see you back in 10 minutes.

7                    (The jury exited the courtroom.)

8                    THE COURT:  Mr. Friedman, your attention,

9    please.

10                   Ms. Gibson, just to clarify it, all this I

11   know was clear on the record about other employees' bonuses.

12   You can say there's a program but you can't compare and

13   contrast other employees.  You can't say what other

14   structure was for another employee or whether they got

15   theirs or not because then we're trying a case within a case

16   and showing why this one's different.

17                   If there's a program you can do, you can't

18   say other people got it or what other people's situation

19   was.

20                   MS. GIBSON:  Your Honor, clarification, the

21   other people who got paid, that came off of -- that's part

22   of his damages formula.

23                   THE COURT:  Well, I'll look at that.  We're

24   not trying a case within a case is what I'm saying.  You

25   can't compare and contrast, if that's what you're doing.

1    it's already 4:00 o'clock.

2                    (Off the record)

3                    MR. HALE:  Yes, Your Honor.  If we don't

4    already have one, can I have a running objection to the

5    motions -- or excuse me -- for the reason stated in our

6    motion in limine regarding the criminal investigation

7    saying that it's not relevant to whether there was a

8    formation of a contract?

9                    THE COURT:  You can have a running

10   objection on that from the beginning, on up and through the

11   trial.  So I've already granted a running objection.  But if

12   I didn't, I'm granting it now retroactive to the beginning

13   of trial.

14                   MR. HALE:  Thank you, Your Honor.

15                   MR. L. FRIEDMAN:  Thank you, Your Honor.

16                   (The jury entered the courtroom.)

17                   THE COURT:  All right.  Welcome back and

18   good afternoon, members of the jury.

19                   We're going to start the evidentiary phase

20   of the trial where witnesses are called to the witness stand

21   and testimony is presented to you under oath.  All this, the

22   beginning of the trial -- and we like to start things off

23   smoothly -- we're going to take this a little bit out of

24   order.

25                   The first witness that the -- the

1    plaintiffs call witnesses in the first instance.  The first

2    witness they call, we're going to go with her for about 30

3    minutes.  Then we're going to stop her testimony and call

4    another witness because that witness is not available

5    tomorrow.  He's out of the country, so we want to make sure

6    we get his testimony today.  So we're going to have one

7    witness for about 30 minutes, then another witness.  And

8    when you come back tomorrow we'll finish up that first

9    witness.

10             So, Ms. Gibson, it's your witness, I'm

11   taking it.  If you'd call your first witness.

12             MS. GIBSON:  Your Honor, plaintiffs call

13   Cheryl Geiser.

14             THE COURT:  Ms. Geiser, if you'd come up

15   here, ma'am.

16             And before you step up on those steps I'm

17   going to swear you in.

18             (Witness sworn)

19             THE COURT:  Have a seat here right in front

20   of you.  Ms. Gibson will ask you questions first.

21             If you don't hear a question or a response,

22   let us know and we'll ask the attorney to repeat the

23   question or the witness to repeat the response.

24             Ms. Gibson.

25

1                          CHERYL GEISER,

2       having been first duly sworn, testified as follows:

3                       DIRECT EXAMINATION

4       BY MS. GIBSON:

5            Q.    Please tell us your full name.

6            A.    Cheryl Lorraine Geiser.

7            Q.    Your maiden name is Geiser?

8            A.    Yes.

9            Q.    Okay.  And you were formerly known as

10      Cheryl Potashnik?

11           A.    Yes, in certain circumstances.

12           Q.    Okay.

13                 You've never actually changed your last

14      name to Potashnik but you used that last name while you were

15      married to Brian Potashnik --

16           A.    Correct.

17           Q.    -- correct?

18                 MR. L. FRIEDMAN:  Your Honor, can I just

19      ask the witness to pull the microphone up --

20                 THE COURT:  Yeah.

21                 MR. L. FRIEDMAN:  -- closer to her?

22                 THE COURT:  Just pull it to you there.

23                 THE WITNESS:  Like that?

24                 MR. L. FRIEDMAN:  You can pull it.  Yeah,

25      good.  Thank you.

1      Q.    (By Ms. Gibson) And you generally use the last
2  name Potashnik just for business purposes?
3      A.    Yes.
4      Q.    Can you explain to the jury what at-will
5  employment is?
6      A.    My understanding of at-will employment in Texas is
7  that an employer or employee can hire and fire at will -- or
8  an employer can hire an fire at will; an employee could stay
9  on their job or leave at will.
10     Q.    Okay.
11            So, Jeff Carpenter did not have to stay as
12 long as needed to help make the asset sale happen, correct?
13     A.    I don't understand the question.
14     Q.    What part of it are you having trouble with and
15 I'll work with you?
16            MR. L. FRIEDMAN:  Objection, argumentative.
17            THE COURT:  Overruled.
18            MS. GIBSON:  I'm just --
19            THE WITNESS:  Can you ask me again,
20 please?
21            MS. GIBSON:  Sure.
22     Q.    (By Ms. Gibson) Jeff Carpenter did not have to
23 stay on as long as needed to help make the asset sale
24 happen --
25            MR. L. FRIEDMAN:  Objection.

1          Q.   (By Ms. Gibson) -- correct?

2                    MR. L. FRIEDMAN:  It assumes facts not in

3     evidence.

4                    THE COURT:  Overruled.

5          A.   Jeff Carpenter did not have to stay employed with

6     the company.  Correct.

7          Q.   (By Ms. Gibson) Okay.  But Jeff Carpenter did

8     stay, correct?

9          A.   Jeff Carpenter stayed employed with the company

10    until he left the company, yes.

11         Q.   And he stayed all the way through the transition

12    to the purchaser's management company taking over

13    management?

14         A.   Yes.

15         Q.   Okay.

16                    And I made a mistake in opening.  Someone

17    tried to correct me, but I want to talk to you about some

18    dates.  So I got those two wrong.

19                    In -- can you see this, Ms. Geiser?

20         A.   Yes.

21         Q.   Okay.

22                    MS. GIBSON:  And can every -- Mr. Friedman,

23    can everyone see?

24         Q.   (By Ms. Gibson) In October of 2006, when did

25    you-all contemplate that the asset sale was going to go

1    through?

2                    MR. L. FRIEDMAN:  Wait, wait.

3                    I'm going to object to her marking that

4    exhibit because she's now assuming facts not in evidence.

5                    Well, what's happening?

6                    THE COURT:  It's not an exhibit.  It's a

7    demonstrative.

8                    MS. GIBSON:  Right.

9                    THE COURT:  It's not been admitted in

10   evidence.

11                   MR. L. FRIEDMAN:  Okay.

12                   THE COURT:  And we probably won't be

13   admitting demonstratives.

14       Q.   (By Ms. Gibson) In October of 2006 the asset sale

15   was anticipated to happen in spring of 2007 or summer of

16   2007, correct?

17       A.   I'm sorry.  I have to think about this.  Oh, let

18   me think.  In October of '06 -- I'm just not having a good

19   memory on the dates of when the purchase and sale agreement

20   was signed.

21       Q.   The -- do you recall originally, regardless of

22   October 6, that originally the closing was anticipated to

23   happen in spring or summer of 2007?

24       A.   I do remember that the -- the length of time that

25   the sale was anticipated to take was shorter than how it

179

1    actually turned out.

2         Q.    Okay.

3               And the management transition date -- and

4    I -- I accidentally wrote down the wrong year, meaning

5    '07 -- the management transition date was November 1, 2007,

6    correct?

7         A.    Somewhere thereabouts, yes.

8         Q.    Okay.   And so, at the end -- as of the end of the

9    day on October 31st, 2007, you-all no longer needed

10   Jeff Carpenter, correct?

11        A.    And that was the last day of his employment.

12   Correct.

13        Q.    Okay.   And you no longer needed him as of then

14   because of the transition to new management?

15        A.    Correct.

16        Q.    Okay.

17               Ms. Geiser, is it fair to say that you

18   intended to pay Jeff Carpenter an asset-sale-proceeds bonus?

19        A.    I intended, if there was money left at the end of

20   the sale, that some amount would be paid.

21        Q.    Okay.

22               Do you recall giving your deposition in

23   this case, Ms. Geiser?

24        A.    Yes.

25        Q.    Okay.   And you recall that I was there?

1      A.   Yes.

2      Q.   And do you recall that at your deposition, when I

3   asked you --

4                  MR. L. FRIEDMAN:  Line and page?

5                  MS. GIBSON:  84, 15-18.

6                  MR. L. FRIEDMAN:  Excuse me.

7      Q.   (By Ms. Gibson) When I asked you that question at

8   deposition, "So, is it fair to say that you intended to pay

9   Jeff Carpenter a sales-proceeds bonus," you answered, "Yes"?

10     A.   Yes.

11     Q.   And you wanted Jeff Carpenter to stay on working

12  through a certain point in connection with the asset sale?

13     A.   Yes.

14     Q.   And that point was the point in which management

15  transitioned to Pinnacle, which was the management arm of

16  the purchaser in the asset sale?

17     A.   That management transition was not originally

18  contemplated in the purchase and sale agreement, so that was

19  a conflict that came up later in time, as I remember.

20     Q.   Okay.  But, ultimately, you wanted Jeff Carpenter

21  to stay on working through a certain point in the asset

22  sale, correct?

23     A.   Yes.

24     Q.   And that point, ultimately, was the point in which

25  management transitioned to Pinnacle, correct?

1        A.    Yeah.   That's fair.

2        Q.    Okay.   And Pinnacle was the shorthand name for the

3   management arm of the purchaser, correct?

4        A.    I don't recall if Pinnacle was the management arm

5   of the purchaser, but it was the management company that the

6   purchaser had designated that would take over the management

7   of the portfolio that they were purchasing.

8        Q.    Okay.

9              And Jeff Carpenter stayed on until

10   management was transitioned to Pinnacle --

11        A.    Correct.

12        Q.    -- correct?

13              And once Jeff Carpenter had done that,

14   y'all did not need him to stay on anymore, correct?

15        A.    Correct.

16        Q.    The gist of the management transfer agreement was

17   that the seller's management services concerning the

18   Affordable Housing properties was being transferred to the

19   purchaser's management team?

20        A.    Say that again, please.

21        Q.    Sure.   The gist of that agreement on the

22   management transfer --

23        A.    Uh-huh.

24        Q.    -- of November 1, 2007 --

25        A.    Uh-huh.

1          Q.     -- was that the seller's management services

2     concerning the Affordable Housing properties was being

3     transferred to the purchaser's management team, correct?

4          A.     Yes.

5          Q.     In other words, Pinnacle took over management of

6     the apartment complexes from Southwest Housing Management at

7     that point?

8          A.     Yes.

9          Q.     You wanted Jeff Carpenter to stay on until that

10    point for purposes of continuity, to continue his role in

11    managing properties and providing you and Brian Potashnik

12    with that continuity, correct?

13         A.     The continuity was provided to the company,

14    Southwest Housing Management, and to the portfolio of the

15    property.  I would not say that it was to Brian and I

16    personally.

17         Q.     Okay.

18               MR. L. FRIEDMAN:  Can I just get that

19    microphone closer to the witness, please?

20         Q.     (By Ms. Gibson) Ms. Geiser, is that how you spoke

21    to Jeff Carpenter when he -- when he worked with you?  Did

22    you specifically delineate between saying we, Brian and I,

23    or saying Southwest Housing Development Company requests

24    that you -- or Southwest Housing Management requests that

25    you stay on?

183

1           A.     I think it depended on the circumstance.

2           Q.     What circumstance does it depend on?

3           A.     I can't sit here today and say what circumstances

4      it depended on.

5           Q.     So, is it your testimony then that you-all spoke

6      more formally than just saying "we", we would like you to

7      stay on?

8           A.     Probably in that context I would have been saying

9      we --

10                 MR. L. FRIEDMAN:  Objection, calls for

11     speculation.

12                 THE COURT:  Overruled.

13          A.     -- we in the context of speaking on behalf of the

14     company.  So, yes, I said we, but it was we in the context

15     of his employment with Southwest Housing Management.

16          Q.     (By Ms. Gibson) Okay.

17                 And do you recall -- you recall your

18     deposition, correct?

19          A.     Uh-huh.

20          Q.     And I was there --

21          A.     Yes.

22          Q.     -- right?

23                 And when I asked you the question -- this

24     is 54, 9-10.

25                 MR. L. FRIEDMAN:  Line and page, please?

184

1              THE COURT:  She just said it.

2              MS. GIBSON:  54, 9-10.

3              MR. L. FRIEDMAN:  I need a chance to look

4     at it before she publishes it.

5              THE COURT:  Okay.

6         Q.   (By Ms. Gibson) I asked you, "Why did you want

7     Jeff Carpenter to stay on until that transfer of management

8     to the purchaser," and you said, "For continuity."

9         A.   Correct.

10        Q.   All right.  You didn't make distinctions at that

11    time between different entities or different companies,

12    correct?

13        A.   I don't know that it was the same question.  I can

14    look at it again.

15             MS. GIBSON:  I don't remember what I just

16    said.  Can you read it back?

17             THE COURT:  No.

18             MS. GIBSON:  Okay, okay.

19        Q.   (By Ms. Gibson) I believe what I had said is, at

20    the -- when you answered the question in deposition, you

21    weren't making fine distinctions between different corporate

22    entities, correct, in connection with that question?

23             MR. L. FRIEDMAN:  Improper impeachment.

24             THE COURT:  Overruled.

25             THE WITNESS:  Can I see the question again?

Appendix 0465

1              MS. GIBSON:  Sure.

2              The question is --

3              THE WITNESS:  The question that you asked

4    me at deposition?

5              MS. GIBSON:  Sure.

6         Q.   (By Ms. Gibson) So the question that I had asked

7    you is, "Why did you want Jeff Carpenter to stay on until

8    that transfer of management to the purchaser," and you said,

9    "For continuity."

10        A.   Can I see the part above that?

11        Q.   Sure.

12             MR. L. FRIEDMAN:  Optional completeness,

13   Your Honor?

14             THE COURT:  She's not through yet, and it's

15   her witness right now.

16        Q.   (By Ms. Gibson) Okay.  So, can you see there what

17   is above?  What's right above that is, But the gist of the

18   agreement was that seller's management services

19   concerning --

20             MR. L. FRIEDMAN:  There's no question to

21   impeach her on.

22             THE COURT:  She just asked her --

23             MS. GIBSON:  She asked me a question.  I

24   think I'm entitled to try and answer.

25             THE COURT:  Objection's overruled.  Go

Appendix 0466

1    ahead.

2         Q.    (By Ms. Gibson) -- concerning these Affordable

3    Housing properties was being transferred to the purchaser's

4    management team.

5         A.    Yes.

6         Q.    Why did you want Jeff Carpenter -- and you said

7    some more there.   Pinnacle took over managing the properties

8    that Southwest Housing Management was managing up till that

9    point.   Why did you want Jeff Carpenter to stay on until

10   that transfer of management to the purchaser?   And you said

11   for continuity.

12        A.    Correct.

13        Q.    Okay.   And then you --

14        A.    But I qualified --

15             MR. L. FRIEDMAN:   And I'd like to read --

16        Q.    (By Ms. Gibson) And then you explained --

17             MR. L. FRIEDMAN:   -- the optional

18   completeness down to Line 22.

19             THE COURT:   Let her finish.

20             MS. GIBSON:   Okay.

21        Q.    (By Ms. Gibson) And so there you are not

22   distinguishing between various --

23        A.    Well, you mentioned --

24        Q.    -- different entities --

25        A.    -- Southwest Housing Managing [sic] prior in that

Appendix 0467

1    question, and I was speaking as it related to Southwest

2    Housing Management.

3        Q.    Ms. Geiser, my --

4                    MR. L. FRIEDMAN:  Optional completeness.

5    It's right there in the deposition.

6        Q.    (By Ms. Gibson) -- my original question included

7    the rest of that.

8                    THE COURT:  Excuse me.

9                    MS. GIBSON:  Yes.

10                   THE COURT:  There's an objection.

11                   You can do optional completeness in your

12   own examination of her.  She asked that part to be read that

13   she just read.

14                   MR. L. FRIEDMAN:  Thank you.

15                   MS. GIBSON:  Okay.

16       Q.    (By Ms. Gibson) And you also said that you wanted

17   Jeff Carpenter to stay on until that point to continue his

18   role in managing properties and providing you and

19   Brian Potashnik with that continuity, correct?

20       A.    The company was provide -- the continuity was

21   provided to the company.

22       Q.    And -- okay.

23                   You said the continuity was only provided

24   to whom?

25       A.    To the company.

1          Q.    Okay.

2                      And you -- you obviously recall being at

3      your deposition?

4          A.    Yes.

5          Q.    Okay.

6                      And so, what I had asked you is that you

7      also said you wanted Jeff Carpenter to continue in his role

8      in managing properties and providing you and Brian Potashnik

9      with that continuity.  And you said it was only the

10     Southwest Housing Management Corporation?

11         A.    As I sit here today, the continuity that was being

12     provided was to the company, Jeff's role as the executive

13     vice president of the management team.

14         Q.    Okay.

15                     At your deposition -- this is 54, 14-18 --

16     you had said for continuity.  And I asked, Any other reason?

17     You say, We wanted Jeff to continue.

18         A.    Providing the management company with --

19                     MR. L. FRIEDMAN:  Excuse me.  I do object

20     because, first of all, it's improper impeachment.  Second of

21     all, this wasn't the question she asked.

22                     THE COURT:  Okay.  This is what she just

23     wanted to read to the jury --

24                     MR. L. FRIEDMAN:  It was, but it wasn't

25     prefaced with an improper question, and this is not

1    inconsistent with this witness's just before testimony.

2                    THE COURT:   Okay.

3                    MS. GIBSON:   Your Honor, I --

4                    THE COURT:   Stop, stop, stop.

5                    MS. GIBSON:   Sorry.

6                    THE COURT:   Objection's overruled.   Go

7    ahead.

8                    MS. GIBSON:   Okay.

9         Q.    (By Ms. Gibson) And you said, We wanted Jeff to

10   continue.   Do you see above the highlighted line?

11        A.    Uh-huh.

12        Q.    Who are you referring to when you say we?

13        A.    Providing the management company with that

14   continuity.

15        Q.    Well, you say we wanted Jeff to continue.   Who is

16   we?

17        A.    We is Brian and Cheryl.

18        Q.    Okay.

19                    And you also said to continue his role as

20   executive vice president with the management company, to

21   continue managing the properties, and providing us with that

22   continuity.

23        A.    And I qualify that and I say providing the

24   management company with that continuity.

25        Q.    Okay.   Well, who are you referring to by "us".   Is

1     that you and Brian again?

2          A.    Yes.

3          Q.    Okay.

4                     And at the time of these events you

5     believed that that type of continuity was important to the

6     asset sale, correct?

7          A.    Yes.

8          Q.    And, of course, not just with Jeff Carpenter, but

9     with other key employees as well?

10         A.    Yes.

11         Q.    In the time leading up to the asset sale you

12    learned at some point that Jeff Carpenter was not likely to

13    have a job with the purchaser after the asset sale?

14         A.    Correct.

15         Q.    And Jeff Carpenter was not likely to have a job

16    with the purchaser after the asset sale because the

17    purchaser's management company already had someone in

18    Jeff Carpenter's -- in Jeff Carpenter's equivalent position,

19    correct?

20         A.    Whether it was a similar position or equivalent,

21    yes, that's correct.

22         Q.    Jeff Carpenter's employment ended because

23    Jeff Carpenter was no longer needed after y'all transitioned

24    property management, correct?

25         A.    Yes.

1       Q.    With the management transition on November 1,

2    2007, Jeff Carpenter had done all that was asked of him, as

3    far as staying on, by the end of the day on October 31,

4    2007, correct?

5       A.    Yes.

6       Q.    You believe your word is important to you?

7       A.    Yes.

8       Q.    You think it's important to honor your word?

9       A.    Yes.

10      Q.    Do you concede that businesses must live up to

11   their agreements with those who have lived up to theirs?

12                 MR. L. FRIEDMAN:   Argumentative,

13   Your Honor.

14                 THE COURT:   Overruled.

15      A.    I believe that businesses enter into agreements;

16   the terms of which both parties agreed to.

17      Q.    (By Ms. Gibson) Do you concede that businesses

18   must live up to their agreements with those who have lived

19   up to their end of the bargain?

20                 MR. L. FRIEDMAN:   Asked and answered.

21      A.    I believe that businesses enter into agreements

22   where both parties agree to the terms and conditions of the

23   agreement.

24      Q.    (By Ms. Gibson) Ms. Geiser, one more time.

25                 THE COURT:   You've asked it twice.  You've

1    got to move on.

2                        MS. GIBSON:  Okay.

3        Q.    (By Ms. Gibson) Do you concede that those who

4    operate businesses in Texas must honor Texas law about

5    enforcement of oral agreements?

6                        MR. L. FRIEDMAN:  Calls for legal

7    conclusion, lack of foundation.

8                        THE COURT:  Overruled.

9                        THE WITNESS:  Can you ask me that question

10   again?

11                       MS. GIBSON:  Sure.

12       Q.    (By Ms. Gibson) Do you concede that those who

13   operate businesses in Texas must honor Texas law about

14   enforcement of oral agreements?

15                       MR. L. FRIEDMAN:  Argumentative.

16                       THE COURT:  Overruled.

17       A.    I'm not a lawyer, but I would answer yes.

18       Q.    (By Ms. Gibson) At one point you were an employee

19   of SH Management, correct?

20       A.    I was an employee of Southwest Housing Management.

21       Q.    Okay.  I'm sorry.  That's my abbreviation.

22                       Southwest Housing Management, correct?

23       A.    Yes.

24       Q.    Okay.  And you did not have a written employment

25   agreement at the time, correct?

1      A.    From the time I started in 1994, no, I did not

2   have a written employment agreement.

3      Q.    Okay.  And you expected that your agreements would

4   be honored, even if not in writing?

5      A.    I don't know what you mean by that question.

6      Q.    Did you expect that your oral agreements would be

7   honored even though you did not have a written employment

8   agreement?

9      A.    I don't know what you mean by oral agreement.

10      Q.    For pay.  For pay.

11      A.    I don't believe a salary negotiation or a salary

12   relationship, a payroll relationship between an employer and

13   employee, is a oral agreement.

14      Q.    Have you ever had an oral agreement for pay?

15      A.    I don't know what that means, an oral agreement

16   for pay.

17      Q.    In salary?  You don't know what an oral agreement

18   is?

19      A.    For pay.

20      Q.    For pay?

21      A.    Yeah.

22      Q.    All right.

23            Have you --

24      A.    I had many jobs where I haven't had a written

25   agreement and -- yes.

1      Q.   Okay.  And was it your expectation that the

2    employers would honor your agreement even though it wasn't

3    in writing?

4      A.   I believe that employers have to honor their

5    payroll obligations to their employees, yes.

6      Q.   You say payroll obligations.  Are you

7    distinguishing that from oral agreements for bonuses?

8      A.   I believe that if there is an agreement both

9    parties agree to the terms of the agreement and they're

10   obligated to comply with it.

11     Q.   Okay.

12          So, you have testified that you intended to

13   pay Jeff Carpenter an annual asset-sale-proceeds bonus.

14          MR. L. FRIEDMAN:  Objection, misstates

15   witness's testimony, assumes facts not in evidence.

16          THE COURT:  If you don't agree, tell her

17   you don't agree with what she said.

18          THE WITNESS:  Yes, I don't agree with the

19   way you characterized that.

20          MS. GIBSON:  Well, earlier when I said, Is

21   it fair to say you intended to pay Jeff Carpenter an

22   asset-sale-proceeds bonus, I believe you said yes.

23          MR. L. FRIEDMAN:  It misstates the

24   witness's prior testimony and assumes facts not in evidence.

25          THE WITNESS:  The intention would have been

1    to pay Jeff an amount out of the proceeds from the sale.

2    That term asset-sale-proceed bonus is a term that I feel

3    like you've adopted, but that's not a term that I'm

4    comfortable with.

5         Q.   (By Ms. Gibson) Okay, what term are you

6    comfortable with?

7         A.   A bonus out of the proceeds of the sale.

8         Q.   Okay.  Instead of asset-sale-proceeds bonus, you

9    want me to say bonus out of what?

10        A.   The proceeds of the sale.

11        Q.   Out of proceeds of sale.  Okay.

12             So you intended to pay Jeff Carpenter a

13   bonus out of proceeds of the sale, correct?

14        A.   Yes.

15        Q.   And the point of this bonus was you wanted

16   Jeff Carpenter to stay on working, correct?

17        A.   No.

18        Q.   No?

19        A.   No.

20        Q.   You did not want Jeff Carpenter to stay on working

21   to a certain point in connection with the asset sale?

22        A.   No, I did.

23        Q.   Okay.  So you wanted Jeff to stay on working and

24   Jeff stayed?

25        A.   Yes.

1        Q.    Okay.   And he stayed as long as needed?

2        A.    He stayed as long as we paid his salary and until

3    we no longer needed him.

4        Q.    What do you mean as long as we paid his salary?

5        A.    Well, if we had stopped paying his salary he

6    wouldn't have stayed.

7        Q.    Well, he stayed on as long as you asked him to;

8    isn't that right?

9        A.    And as long as I think he needed to pay his salary

10   and the company continued to pay his salary.

11       Q.    I don't understand what your distinction is.

12       A.    Well, what is your distinction?

13       Q.    Jeff stayed on as long as you asked him to?

14       A.    Yes.

15       Q.    Okay.   All right.

16             In the time leading up to the asset sale --

17             MR. DONOHUE:   Your Honor, if I may, just --

18   not to interrupt, but it's almost --

19             THE COURT:   She started at quarter of 2:00,

20   so you have two minutes left.

21             MR. DONOHUE:   Thank you.

22             THE COURT:   More than that.   You have about

23   three minutes left.

24             MS. GIBSON:   Okay.   I will -- this may be a

25   good time to go ahead and break to let the other witness --

Appendix 0477

1                     THE COURT:  All right.

2                     Ms. Geiser, thank you, ma'am.

3                     MS. GIBSON:  -- in.

4                     THE COURT:  We're going to ask you to sit

5       back here with Mr. Potashnik and we'll finish you up

6       tomorrow morning.

7                     If you'd go ahead and call, for the record,

8       your next witness.

9                     Mr. Donohue, would you get -- Rick, would

10      you get Mr. Jones from outside, wherever he's at.

11                    MS. GIBSON:  I just need to switch the

12      chairs.

13                    (The witness entered the courtroom.)

14                    THE COURT:  Mr. Jones, if you'd come all

15      the way up here, sir.  Mr. Jones, if you'd just come have a

16      seat up here.

17                    MS. GIBSON:  We are on Plaintiff's 4?

18                    THE COURT:  Four, I think, is next.

19                    Just have a seat.

20                    Mr. Jones was sworn in this morning before

21      you-all got here.  So his testimony, like all the witnesses,

22      is under oath.

23                    And, again, if you'd call him for the

24      record, Ms. Gibson.

25                    MS. GIBSON:  I'm sorry?

1          THE COURT:  If you'd call the witness for

2     the record.

3          MS. GIBSON:  Oh, yes.  The plaintiff calls

4     Keith Jones.

5          THE COURT:  All right.  Very good.  He's on

6     the stand.

7                         KEITH JONES,

8     having been first duly sworn, testified as follows:

9                      DIRECT EXAMINATION

10    BY MS. GIBSON:

11        Q.   Mr. Jones, you are the former chief financial

12    officer for the business, the businesses that

13    Brian Potashnik and Cheryl Potashnik ran?

14        A.   The three Southwest Housing companies, yes.

15        Q.   Okay.  And your salary was allocated across one or

16    more of those entities?

17        A.   Yes.

18        Q.   Okay.  Was it allocated across all three?

19        A.   Yes.

20        Q   All right.

21             And during your tenure as CFO, you -- you

22    worked with Jeff Carpenter on setting sale-proceeds bonuses

23    for other employees as part of the -- as -- let me -- let me

24    say that again.  You worked -- well, let me just do this.

25    I'm handing you what's been marked Exhibit 4.  Do you

1    recognize Exhibit 4, Mr. Jones?

2         A.    Yes.

3         Q.    And is Exhibit 4 an accurate copy of an Email that

4    you sent to Jeff Carpenter while you were employed as CFO?

5                   MR. L. FRIEDMAN:  Let's approach,

6    Your Honor.

7                   MR. DONOHUE:   May we approach?

8                   THE COURT:  Okay.

9                   (Sidebar conference held)

10        Q.    (By Ms. Gibson) Mr. Jones --

11                  MR. L. FRIEDMAN:  Was the ruling on the

12   record?

13                  THE COURT:  It is -- well, I don't know.

14   There was an offer on the record, but four is not admitted

15   at this time.  We'll put the objection on the record at a

16   later time.

17                  MR. L. FRIEDMAN:  Thank you.

18        Q.    (By Ms. Gibson) Mr. Jones, during your tenure as

19   chief financial officer, you worked with Jeff Carpenter in

20   connection with identifying --

21                  MS. GIBSON:  And I'm not going to ask

22   specifics, Your Honor.

23        Q.    (By Ms. Gibson) -- identifying employees for

24   purposes of a stay-bonus program to help incentivize key or

25   important employees to stay?

1     A.    Yes.

2     Q.    Okay.

3           And the two of you helped -- with respect

4     to that stay-bonus program, you and Jeff Carpenter -- what

5     group of employees?  You know, what's the pool of employees

6     from which you were identifying important people?

7     A.    Office staff that we needed to maintain through

8     the transition of sale.

9     Q.    Okay.

10          And in connection with that bonus

11    program -- and I'm not going to get into amounts -- you and

12    Jeff also worked on identifying what amounts to pay those

13    important employees in connection with the stay-bonus

14    program, correct?

15    A.    I guess that it was just truly based upon what

16    people's salaries were.  So we were offering amounts for

17    staying.

18    Q.    Correct.  But you and Jeff were discussing what

19    amounts those should be, correct?

20    A.    Yes.

21    Q.    All right.

22    A.    Along with Cheryl.

23    Q.    Sure.  You-all were making recommendations on

24    amounts pursuant to the stay-bonus program and then

25    submitting that to Brian Potashnik or Cheryl Potashnik?

1     A.    Yes.

2     Q.    And does -- does the document in front of you

3  refresh your recollection that you were working on that

4  stay-bonus program at least as of April 25, 2007?

5     A.    Yes.

6              MR. DONOHUE:   Your Honor, I'm going to go

7  ahead and object to this whole line of questioning calling

8  this a stay bonus.

9              THE COURT:   Well, it's his words.

10             MR. L. FRIEDMAN:   His words, and then she's

11 asking to read from the document that's not even in

12 evidence.

13             THE COURT:   It's one lawyer, one witness.

14 It's Mr. Donohue's witness, I'm taking it.

15    Q.    (By Ms. Gibson) And I am handing you what's been

16 marked Plaintiff's Exhibit 5.

17             MS. GIBSON:   And this is the same issue,

18 Your Honor.  I just -- I just need to be -- make it -- make

19 their objection formal.

20             THE REPORTER:   Walk behind me, please.

21    Q.    (By Ms. Gibson) I'm handing you --

22             THE COURT:   You've got to walk around the

23 court reporter.

24             MS. GIBSON:   Oh, I'm sorry.

25    Q.    (By Ms. Gibson) -- Exhibit 5.

1              And does that -- is Exhibit 5 another

2    document concerning the stay-bonus program?

3         A.    Yes.   One says severance payroll and one says July

4    7th bonus wages.

5         Q.    Okay.   And on the stay-bonus program --

6                   MR. DONOHUE:   Your Honor, I believe the

7    witness is looking at a document that has not been

8    introduced into evidence.

9                   THE COURT:   You can show him the document

10   to refresh his memory if he needs his memory refreshed.   He

11   hasn't said that he needs his memory refreshed yet.

12                   THE WITNESS:   These are --

13                   THE COURT:   They have an objection to

14   that --

15                   THE WITNESS:   Okay.

16                   THE COURT:   -- document, as you know.   So

17   ask him questions if he doesn't remember something.

18                   MR. DONOHUE:   My concern, Your Honor, is

19   just which document he's looking at.   I don't believe --

20                   THE COURT:   It's the one in your hand.

21                   MS. GIBSON:   Oh.   I thought I handed it to

22   you.   I apologize if I didn't.

23                   MR. DONOHUE:   Is it the same document?

24                   MR. L. FRIEDMAN:   No?

25                   THE WITNESS:   Yeah.   It says June --

1          MR. DONOHUE:  No, that's --

2          THE WITNESS:  -- June '07 bonus wage.

3          MR. L. FRIEDMAN:  Okay.

4          MS. GIBSON:  Oh, June is --

5          MR. DONOHUE:  That is the same --

6          THE WITNESS:  Which are -- which is

7     different from the severance payroll.

8          Q.   (By Ms. Gibson) Okay.  Okay.  That's a -- that's

9     just one in which you are setting, what, regular bonuses for

10    employees?

11         A.   Yes.

12         Q.   Okay.

13              And were you -- were you also a participant

14    in the stay-bonus program to incentivize workers to stay on

15    despite the asset sale?

16         MR. DONOHUE:  I'm going to object,

17    Your Honor.  She's called it a stay-bonus program.  The

18    witness just testified it's a severance program.

19         MS. GIBSON:  Oh, he said that was a --

20         MR. DONOHUE:  He said the regular bonus --

21         THE COURT:  If that's your objection, he

22    can handle the question and you can go over that in your

23    cross-examination.

24         Q.   (By Ms. Gibson) Let's -- let's clari -- I'm going

25    to go back and let's clarify the stay bonus and severance

1    issue, okay.  When you are talking about a stay bonus you

2    are talking about an incentive to stay on and do a lot of

3    extra work toward the asset sale, correct?

4         A.    Extra work?  I'm trying to keep key employees from

5    leaving before the sale goes through so we can continue to

6    run the business.

7         Q.    Okay.  So stay bonus is to keep employees from

8    leaving before asset sale.  Is that what you said, before

9    the asset sale?

10        A.    Yes.

11        Q.    Okay.

12              Okay.  And once the companies were sold,

13   meaning Southwest Housing Management, Southwest Housing

14   Development, Affordable Housing Construction, at that point

15   all of the employees who were remaining would be severed

16   from employment, correct, with --

17        A.    With --

18        Q.    -- with those entities?

19        A.    With those entities, yes.

20        Q.    Okay.  And then --

21        A.    They -- they would be -- they would have been let

22   go and then another company picked them up if they were

23   going with the new company.

24        Q.    Okay.

25              And so whether someone was going to

1    continue to work for the purchaser or not, there was,

2    effectively, at the asset sale, a severance of the

3    employment relationship with the selling entities:

4    Southwest Housing Management, Development, and Affordable

5    Housing Construction?

6         A.    Yes.

7         Q.    Okay.  And so in that sense a stay bonus -- you

8    and Jeff sometimes called the stay bonuses also a severance

9    because it would be at the end of the day, at the end of

10   employment?

11        A.    That's what a sever -- yes, the severance payroll

12   is.

13        Q.    Okay.  So the stay bonus and severance due to the

14   sale are essentially the same thing, correct?

15        A.    I guess so.  I called it a severance.

16        Q.    Right.  So, a bonus to stay, paid at the end, is

17   also called a severance.  I mean, you're not talking about

18   something different than severance, are you?

19        A.    No.

20        Q.    Okay.

21              And y'all may have called them other words

22   at times too, like, retention bonuses or something?

23        A.    Possibly.

24        Q.    Okay.  But -- but you referred often to the stay

25   bonus as severance, correct?

1          A.   I called it severance, yes.

2          Q.   Okay.

3                    And you and Jeff Carpenter and Sara Reidy

4     were also intended to be part of the stay-bonus program,

5     correct?

6                    MR. DONOHUE:  Objection, Your Honor.

7     That -- that misrepresents what he just testified.  It's a

8     severance or severance bonus program.  That's what he called

9     it.

10                   THE COURT:  He can clarify.

11                   Overruled.

12                   THE WITNESS:  I discussed with Brian a

13    severance package for myself.

14         Q.   (By Ms. Gibson) Okay.  And was it your

15    understanding -- although I know you weren't present when

16    different deals were made, was it your understanding that

17    Jeff Carpenter and Sara Reidy were also part of that

18    program?

19         A.   I assumed that, yes.

20         Q.   Okay.

21                   And at one point you Emailed Jeff Carpenter

22    a copy of the agreement you were going to use, correct?

23         A.   I believe I did.

24                   MS. GIBSON:  Mr. Friedman.

25                   MR. L. FRIEDMAN:  Thank you.

Appendix 0487

1          Q.     (By Ms. Gibson) I'm handing you what's been marked
2     Exhibit 6.
3                      MR. DONOHUE:   Your Honor, and we certainly
4     object to this as violating the limine we just discussed.
5                      THE COURT:   Let me see it.
6                      MS. GIBSON:   Your Honor, this is an Email
7     to Jeff Carpenter saying here's the agreement I'm using.
8                      THE COURT:   Come on over here.
9                      (Sidebar conference held)
10         Q.     (By Ms. Gibson) Mr. Jones, if you would take a
11    look at Exhibit 5 [sic], is that a -- an accurate copy of an
12    Email -- oh, I'm sorry.   Six.
13                     THE COURT:   You said --
14                     THE WITNESS:   You haven't given it to me
15    yet.   I don't have a copy yet.
16                     MS. GIBSON:   Your Honor?
17                     THE COURT:   'Cause I'm sustaining.
18                     If there's something he doesn't remember,
19    you can use it to refresh his recollection.   I've sustained
20    the objection to the admission of the document.
21                     MS. GIBSON:   I -- I just -- I realize that.
22    I just wanted to make sure I formally offered it.
23                     THE COURT:   We'll do that after the jury
24    leaves.
25                     MS. GIBSON:   Okay.

```
1                    THE COURT:  All right.
2                    I have it written down for both of those.
3       We'll put it on the record in a minute.
4                    MS. GIBSON:  Okay.
5          Q.   (By Ms. Gibson) Mr. Jones, during your tenure as
6       chief financial officer, did there come a time when the
7       business was bleeding money on Brian Potashnik and
8       Cheryl Potashnik's criminal defense attorneys?
9          A.   Yes.
10         Q.   Okay.  And about how much -- at some point that
11      reached, I think you testified, to about a million a month
12      toward their personal criminal defense attorneys.
13         A.   I think that was about right.  A couple months
14      that had reached really high.
15         Q.   Okay.  So not all the time, but there were
16      certainly a couple months when criminal defense fees for the
17      Potashniks had become really high?
18         A.   Yes.
19         Q.   And --
20                   MS. GIBSON:  Your Honor, I think I need to
21      approach before the next question.  Sorry.
22                   (Sidebar conference held)
23                   MS. GIBSON:  Pass the witness.
24                   THE COURT:  All right.
25                   Mr. Donohue.
```

1          MR. DONOHUE:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. DONOHUE:

4          Q.   Mr. Jones, to be clear so there's no confusion,

5    you called the program that Ms. Gibson's asked you about a

6    severance program that you and Mr. Carpenter dealt with,

7    correct?

8          A.   Correct.

9          Q.   You didn't call it a -- what is the term she

10   used -- a stay-bonus program.  You didn't call it that, did

11   you?

12         A.   I don't believe I did, no.

13         Q.   Did you hear anybody else call -- call it a

14   stay-bonus program at the time that you were there at the

15   Southwest Housing entities?

16         A.   I can't recall.

17         Q.   All right.

18              That's a term that Ms. Gibson has injected.

19   And injected, in fact, in your deposition here a couple of

20   weeks ago, correct?

21         A.   I believe so.

22         Q.   This million dollars of cash bleeding for criminal

23   defense attorneys, in truth, the property portfolios were

24   doing very poorly from 2004 through 2007, weren't they?

25         A.   Yes.

1          Q.    They were -- they were bleeding off -- they were

2    not covering -- the revenue from those property portfolios

3    was not covering the operating expenses?

4          A.    No.

5          Q.    So there was not a profit during any of those

6    years, '04 through '07, correct?

7          A.    Which company are you talking about?

8          Q.    I'm talking about Southwest Housing Management in

9    particular.

10         A.    Management, no.

11         Q.    Okay.  And that's the company that Mr. Carpenter

12   was head of, correct?

13         A.    Correct.

14         Q.    So there was no profit made in any of those years,

15   '04 through '07, and those portfolios were bleeding off each

16   of those -- well, they were bleeding off Southwest Housing

17   Management's opportunity to make a -- to make a profit,

18   right?

19         A.    Right.  The portfolio as a whole did not make

20   money.

21         Q.    So the portfolios themselves, the majority of

22   the -- the deficit, if you will, during that time, was that

23   from the portfolio's inability to cover the costs?

24         A.    Can you say that again?

25         Q.    Yes.  Was the majority of the bleeding off, as you

1    termed it, during that time frame due to the fact that the

2    portfolios were not making money?

3        A.    During which time, the three years?

4        Q.    Yes, sir.

5        A.    There was many times that Brian and Cheryl had put

6    in their own money to keep those entities going, yes.

7        Q.    So the Potashniks --

8        A.    On the properties.

9        Q.    -- themselves, individually, put in their monies

10    to try -- to try to make those portfolios perform?

11        A.    Yes.

12        Q.    Because Mr. Carpenter, during his tenure, those

13    portfolios were not performing; is that right?

14        A.    It was a hard leasing season, yes.  They did not

15    lease up like they were supposed to.

16        Q.    What was -- what was Mr. Carpenter's -- he was the

17    executive vice president of Southwest Housing Management

18    Company, Inc.; is that right?

19        A.    I believe his guard was president of the managing

20    company.

21        Q.    Right.  He was the president.

22              You didn't report to Mr. Carpenter, did

23    you?

24        A.    No.

25        Q.    You were the CFO, right?

1       A.    Correct.

2       Q.    Did he ever represent himself as being more than

3   just president of what you just stated, Southwest Housing

4   Management, that he was president of the entire

5   organization?

6       A.    Sometimes, yes.

7       Q.    When did he represent himself as being the

8   president of the entire organization?

9       A.    Well, he -- when?  On occasions when we were

10  having beers together.

11      Q.    Who is -- who is "we", you and Mr. Carpenter?  And

12  anyone else?

13      A.    And Deepak Sulakhe.

14      Q.    Who is Deepak Sulakhe?

15      A.    He is the head of -- the developer, head developer

16  for Southwest Housing Development.

17      Q.    All right.

18            Is that somebody that reported to

19  Mr. Carpenter, Deepak Sulakhe, that was head of Southwest

20  Housing Development?

21      A.    No.

22      Q.    Then how can Mr. Carpenter represent that he was

23  president over all three entities if you didn't report to

24  him and neither did Mr. Sulakhe?

25      A.    Jeff's -- because he's over the management

1    company, interject a lot on what type products are going

2    into the units, which was a development decision.

3    Construction, he helped on -- on certain construction issues

4    to make sure that the property would lease at a -- fairly

5    lease to the public.  He would make sure.

6       Q.   What you're -- but that was his role as president

7    of the Southwest Housing Management, right?

8       A.   That's what I thought, yes.

9       Q.   Right.  That was within his realm as South -- as

10   president of Southwest Housing Management was to work with

11   Southwest Housing Development as well as Affordable Housing

12   Construction, the other two Southwest Housing affiliated

13   entities?

14      A.   Correct.

15      Q.   But he wasn't president of those entities, was he?

16      A.   No.

17      Q.   Do you know how much he made a year, what his base

18   salary was?

19      A.   Yes.

20      Q.   How much?

21      A.   250-.  250,000 annual.

22      Q.   Okay.  And he was paid for -- for doing the -- for

23   being president of Southwest Housing Management and

24   interacting with those two other companies that you just

25   mentioned, correct?

1      A.   Yes.

2      Q.   That was part and parcel of what he was paid 200-

3 to $250,000 base salary a year for, right?

4      A.   Yes.

5      Q.   Getting back to Mr. Carpenter representing that he

6 was -- did he represent that he was president of all the

7 entities when you were having beer with Mr. Sulakhe?

8      A.   He said that his job role is more than just

9 management.

10      Q.   Did he consider himself -- put it this way.  The

11 organizational charts there at Southwest Housing, they

12 showed you as CFO, actually above Mr. Carpenter, right?

13      A.   The organizational chart, yes.

14      Q.   And Mr. Carpenter didn't like that, did he?

15      A.   No.

16      Q.   In fact, he voiced that to you that he considered

17 himself at least equal to or above you, the CFO?

18      A.   He didn't say that.  He said that he didn't report

19 to me, he reported to the Potashniks.

20      Q.   Was Mr. Carpenter -- was he indispensable there at

21 the Southwest Housing entity?  Was he replaceable?

22      A.   I feel everybody's replaceable.

23      Q.   Right.

24            In fact, he was let go around November 1st

25 or 2nd of 2007, wasn't he?

1      A.   Yes.

2      Q.   And somebody replaced him; is that right?

3      A.   No.   The management position had moved over to the

4  new purchaser.

5      Q    All right.   And did -- the transition still

6  occurred regardless if he was there or not?

7      A.   Correct.

8      Q.   The transition -- the sale to Cascade wasn't

9  dependent on the presence of Mr. Carpenter, was it?

10     A.   Depended on, no.

11     Q.   What were your overall job duties and

12 responsibilities as CFO?

13     A.   To make sure our records were kept correct and

14 keep tax returns filed on time, keep everybody informed on

15 financial positions.

16     Q.   All right.   And you prepared -- as CFO, you

17 prepared regular financial reports for the three entities;

18 is that right?

19     A.   Yes.

20     Q.   And supplied the heads of those three entities

21 with those financial reports, be they monthly or annual; is

22 that right?

23     A.   Yes.

24     Q.   The financial statements which would reflect

25 whether or not the companies were profitable per month and

216

1    annually; is that right?

2         A.    Yes.

3         Q.    And you supplied those to Mr. Carpenter as

4    president of Southwest Housing Management, right?

5         A.    Yes.

6         Q.    And those reflected whether or not the company was

7    making a profit every month and every year that you provided

8    those financial reports to him, right?

9         A.    Yes.

10        Q.    So he would have known that the company wasn't

11   making a profit; is that right?

12        A.    Yes.

13        Q.    So if, in fact, he had -- just assume with me, if

14   you will, that he had a discretionary bonus that was

15   dependent on the company objective, the company being

16   Southwest Housing Management, would a company objective not

17   be to make a profit every year?

18        A.    That is the objective of every company, yes.

19        Q.    That's the objective of every company is to be

20   profitable, right?

21        A.    Correct.

22        Q.    And that company objective was not met in any of

23   the three or four years that Mr. -- well, from February of

24   2004 all the way till he left, November 1st of '07?

25                    MS. GIBSON:   Object, cumulative.

1          Q.     (By Mr. Donohue) Is that right?

2                        THE COURT:   Excuse me.

3                        Overruled.

4          A.     The management entity did not make money, no.

5          Q.     (By Mr. Donohue) So, in the discretion of those

6     that made the decisions on paying out, for instance,

7     employee bonuses -- which would be the Potashniks, correct?

8          A.     Correct.

9          Q.     -- they would have the discretion to look at those

10    financial -- determine whether or not Southwest Housing

11    Management was in fact turning a profit and whether or not

12    to award Mr. Carpenter an annual bonus or not, right?

13         A.     That was at their discretion, yes.

14         Q.     Did Mr. Carpenter complain to you that he was --

15    that he -- that his employment agreement called for a

16    minimum bonus every year?  Did he ever make that kind of

17    statement to you?

18         A.     Actually, I believe that I saw that in his

19    employment agreement that there was a -- a bone -- an annual

20    bonus number.

21         Q.     All right.  And did you also notice that it was

22    discretionary on whether or not to award that, that bonus?

23         A.     I can't recall that.

24         Q.     Okay.

25                        Did you ever hear, perhaps when you were

1    having beer with Mr. Carpenter, that he claimed that he felt
2    like he should be paid a sales bonus from the proceeds of
3    the sale to Cascade?
4         A.    Yes.
5         Q.    What did he say about that?
6         A.    That he felt like he deserved a -- a large bonus.
7         Q.    All right.  He didn't say that he had an agreement
8    with Brian Potashnik or Cheryl Potashnik to be paid a bonus.
9    He just said he felt he should be paid a bonus, right?
10        A.    He said that he and Brian had an agreement.
11        Q.    He said that he and Brian had an understanding.
12        A.    An understanding or agree -- he said an agreement.
13        Q.    Do you recall telling me in your deposition that
14   he told you that -- and Deepak -- that he felt he had an
15   understanding --
16        A.    I believe --
17        Q.    -- with Mr. Potashnik?
18        A.    I believe those were my words, yes.
19        Q.    And that, to you, an understanding doesn't
20   necessarily mean an agreement.  That's the opinion of one
21   side and not the other?
22        A.    That's correct.
23        Q.    So, in Mr. Carpenter's opinion, he deserved -- he
24   felt like he should be paid a bonus from the sales proceeds
25   of the sale to Cascade?

1      A.    Correct.

2      Q.    And that's what he told you and Deepak Sulakhe

3  over beer, right?

4      A.    Yes.   Plus when we were discussing severance

5  payrolls, yes.   That's why I gave him a copy of my --

6      Q.    Right.

7      A.    -- document, what I was planning on using.

8      Q.    All right.

9            The severance pay -- the severance payroll,

10  that program, if you will, that Ms. Gibson asked you about,

11  that wasn't the Potashniks' idea, was it?

12      A.    No.   It was Jeff and my idea because we were

13  having key employees leave us.

14      Q.    Right.   It wasn't them that came to you and said

15  we're having key employees leave.   That was your idea, along

16  with Mr. Carpenter, that you approached the Potashniks

17  about, correct?

18      A.    Correct.   That was our job to make

19  recommendations.

20      Q.    Mr. Carpenter told you that -- did he tell you

21  about suing his prior employer before he joined Southwest

22  Housing?

23      A.    I heard that he had.

24      Q.    All right.   And did he tell you, also, that after

25  he left Southwest Housing that he was employed for a while,

1    at least, by American Housing Foundation, another property

2    management company?

3        A.    Yes.

4        Q.    And that he sued them too?

5        A.    Yes.

6        Q.    Do you recall that Mr. Carpenter was paid a

7    $50,000 advance against bonus in his first year there at

8    Southwest Housing Management?

9        A.    Yes.

10        Q.    And, in fact, do you recall -- did the company

11    also pay his taxes on that advance against bonus?

12        A.    Did the company pay his taxes?

13        Q.    Yes, sir.  If you remember.

14        A.    I don't -- I don't know if it was written that

15    way.

16        Q.    Have you ever heard the term "forgiveness loan"?

17        A.    Yes.

18        Q.    Where did you hear that term?

19        A.    In our deposition.

20            (Laughter)

21        Q.    So you heard that term from me about two weeks

22    ago?

23        A.    Yes.

24        Q.    The first time you'd ever heard it?

25        A.    I think so, yes.

1      Q.    All right.

2            Did you ever hear Mr. Carpenter call that

3      $50,000 advance a forgiveness loan; that Mr. Brian Potashnik

4      somehow had forgiven that advance against the loan?

5      A.    He had mentioned that it was for moving costs and

6      things like that and that it was to be forgiven, and I

7      couldn't let that 'cause it was a receivable on my books.  I

8      couldn't let it stand as a receivable on my books, so we had

9      to run it through our payroll, run it through payroll

10     through his payroll, to get it off my books.

11     Q.    All right.  Well, you say you couldn't let it

12     stand?

13     A.    Right.

14     Q.    And why not?

15     A.    You can't have forgiveness of loans without it

16     passing through payroll.

17     Q.    Would that jeop -- you're a certified public

18     accountant, right?

19     A.    Yes.

20     Q.    Would that jeopardize your license to permit that?

21     A.    Yes.

22                 MR. DONOHUE:  May I approach, Your Honor?

23                 THE COURT:  Certainly.

24                 Approach the witness?

25                 MR. DONOHUE:  Yes.

1          THE COURT:  All right.

2          MR. DONOHUE:  The witness.  I'm sorry.

3     Q.   (By Mr. Donohue) I'm going to hand you what's been

4     marked as Defendants' Exhibit Number 53, Mr. Jones.  We

5     covered this two weeks ago, also.

6     A.   Okay.

7     Q.   And I'll represent to you that this is a copy of

8     Plaintiff/Counter-defendant Jeffrey W. Carpenter's

9     objections and responses to defendants' counterclaim and the

10    first set of interrogatories that were served by counsel for

11    Mr. Carpenter on July 29th of 2008 in this very lawsuit.

12         MR. DONOHUE:  Your Honor, we would offer

13    Defendants' Exhibit Number 53 into evidence.

14         MS. GIBSON:  Your Honor, I --

15         THE COURT:  Is there any objection?

16         MS. GIBSON:  -- I object to admissibility

17    of these.  They could use them for impeachment, but he can

18    certainly ask him about them.

19         THE COURT:  Sustained.

20         We don't admit interrogatories in general,

21    but you can use them like you would a deposition.

22         MR. DONOHUE:  Okay.

23    Q.   (By Mr. Donohue) And just -- and with respect to

24    the question of Mr. Carpenter's job responsibilities as an

25    employee of Southwest Housing Management Corporation, Inc.,

1    did he spearhead daily operations of one of the fastest

2    growing multifamily developer, builder, and manager with

3    7100-plus new apartments constructed in Texas?  Was he the

4    spearhead?

5         A.   He was the president of the management company.

6         Q.   Okay.   What about --

7         A.   So he -- he was a strong leader in that field,

8    yes.

9         Q.   All right.   In management.   But what about

10   developer and builder?

11        A.   I believe we had other people in those roles.

12        Q.   So he didn't spearhead development, right?

13        A.   No.   That was Mr. Sulakhe.

14        Q.   That was Mr. Sulakhe that you had beer with?

15        A.   Yes.

16        Q.   And he didn't spearhead the construction, the

17   builder aspect of it either, did he?

18        A.   No.

19        Q.   So, if he swore to it, that's an untrue statement;

20   is that right?

21        A.   He could have felt that he spearheaded it.

22        Q.   But you were there and he did not spearhead

23   development or construction?

24        A.   When I was there I didn't see that he was

25   spearheading it.

1    Q.    And then, was he directly accountable for all
2    management-related operations in the communities, a company
3    with guiding development through Southwest Housing
4    Development Company?  Was he directly accountable for that?
5    A.    Yes.  He was directly accountable for making sure
6    that the properties operated correctly.
7    Q.    Did he guide development through Southwest Housing
8    Development, Inc.?
9    A.    In making recommendations of possible upgrades and
10   items inside the unit.
11   Q.    What about -- did he guide the accounting entities
12   to ensure ownership objectives were achieved?
13   A.    No.  That was my job.
14   Q.    So, if he said that -- that's another thing you
15   did where he was directly accountable for accounting
16   entities to ensure ownership objectives are achieved.  That
17   was your job, right?
18   A.    Right.
19   Q.    So, if he swore to that, that too would be an
20   untrue statement; is that correct?
21   A.    He received reports and questioned reports that we
22   put together.  So if that's what he feels is spearheading
23   accounting --
24   Q.    But that was your -- your job?
25   A.    That's my job.

1          Q.   It says that it collaborated with architects,
2    engineers, developers, and construction personnel on the
3    design of site, value engineering to control and reduce
4    construction and ongoing operational expenses.  Was that a
5    role that he had?
6          A.   Yes, he was involved with those aspects of it.  I
7    don't know if he made the final decision on them but he was
8    an integral part of making decisions along upgrades and
9    changes that may affect leasing.
10         Q.   And then it says that he originated and
11   implemented the development, slash, management acceptance
12   standards and procedures of all new construction units to
13   ensure ownership quality of product was acceptable.
14              Did he originate the development acceptance
15   standards?
16         A.   That may have been before I was there.  I don't
17   know.
18         Q.   What was your understanding of his role there as
19   president of Southwest Housing Management?  Mr. Carpenter.
20         A.   His role was to run the management and all the
21   employees that are assisting.  I mean, it's -- it's a huge
22   job to keep a management company going.  So his job was to
23   operate the management company.
24         Q.   Okay.
25         A.   And all of its employees and train the employees.

1      Q.    For which he was handsomely paid every year by

2   Southwest Housing Management, right?

3      A.    He was paid to do that, yes.

4      Q.    Did Mr. Carpenter, in speaking with you and

5   Mr. Sulakhe in particular over beer, did he exaggerate his

6   own role there at Southwest Housing Management?

7                    MS. GIBSON:   Object to the --

8      Q.    (By Mr. Donohue) The Southwest Housing entities, I

9   should say.

10     A.    I firmly believe he believed it, so I don't --

11  what's your question?  I don't know what your question is.

12     Q.    Well, I guess -- in your mind, was it an

13  exaggeration?  I know that he believed it, but did you

14  believe it?

15     A.    Sometimes I thought it was a stretch because it

16  demeaned my -- what I did.

17     Q.    I'm sorry.  That last part, it demeaned what you

18  did?

19     A.    Oh, if -- if he was over me.  And he wasn't over

20  me.  It demeaned what I did.

21     Q.    So, in other words, his characterization of his

22  role there at Southwest Housing entities was demeaning to

23  you because you sure didn't report to him.  Is that what

24  you're saying?

25     A.    I'm saying -- yeah, I guess I am saying that.

1          THE COURT:   You have about four minutes
2    left, Mr. Donohue.
3          MR. DONOHUE:   All right.   Thank you,
4    Your Honor.
5      Q.    (By Mr. Donohue) Mr. Jones, in your experience in
6    real estate, should all agreements be in writing?
7          MS. GIBSON:   Object to relevance as to real
8    estate transactions.
9          THE COURT:   Sustained.
10          THE WITNESS:   Am I answering?
11          THE COURT:   No.
12      Q.    (By Mr. Donohue) Did Mr. Carpenter do anything
13    that you perceived that he wasn't paid to do, do anything
14    for the Southwest Housing entities that he wasn't paid to
15    do?
16      A.    No.   Jeff was a very hard worker.
17      Q.    And he was paid for his hard work; is that right?
18      A.    Yes.
19          MR. DONOHUE:   I'll pass the witness.
20          THE COURT:   Okay.
21          Ms. Gibson, you still have about eight
22    minutes.
23          MS. GIBSON:   Okay.
24                REDIRECT EXAMINATION
25    BY MS. GIBSON:

Appendix 0508

```
 1        Q.   Whether you call the stay bonus or these bonuses a
 2   severance or a stay bonus, the intent of both is to get
 3   people to stay, correct?
 4        A.   Correct.
 5        Q.   All right.
 6             And Jeff Carpenter was part of the
 7   stay-bonus program or severance to, you know,
 8   stay-to-get-severance program, whatever you want to call it,
 9   as well as yourself and Sara Reidy, correct?
10        A.   I was under that impression, yes.
11        Q.   Okay.
12             And it was -- there was a lot of additional
13   work to do because of an asset sale, correct?
14        A.   Correct.
15        Q.   All right.
16             And Jeff Carpenter stayed, correct?
17        A.   Yes.
18        Q.   All right.
19             So, if he stayed and didn't get paid the
20   promised stay bonus, then there was something he did that he
21   didn't get paid for, correct?
22             MR. DONOHUE:  Objection, calls for
23   speculation.
24             THE COURT:  All right.  Overruled.
25             MR. DONOHUE:  Assumes facts not in
```

1     evidence, also.

2                        THE COURT:  Overruled.

3                        You can answer if --

4                        THE WITNESS:  I can answer that one?

5                        THE COURT:  If you know, you can answer.

6                        THE WITNESS:  Would you ask it again?

7                        MS. GIBSON:  Sure.  Sure, sure.

8          Q.    (By Ms. Gibson) Jeff Carpenter stayed --

9          A.    Uh-huh.

10         Q.    -- and you were both part of this bonus program.

11    If he stayed and didn't receive that bonus, then there is

12    something he did that he didn't get paid for.  He didn't get

13    paid the bonus promised to stay, correct?

14         A.    I didn't see an agreement, so I don't know if I

15    can answer that.

16         Q.    Well, I'm not asking you -- I know you weren't

17    there.  I'm just saying, if he had an agreement and we know

18    he stayed and he didn't get paid, then there is something

19    that he didn't get paid for.

20         A.    I guess you can conclude that.

21         Q.    All right.

22                        And would you have stayed on through the

23    asset sale if you weren't promised something more to do so?

24                        MR. DONOHUE:  Objection, calls for

25    speculation.

1                        THE WITNESS:  I would have been --

2                        THE COURT:   Excuse me.

3                        THE WITNESS:   Okay.

4                        THE COURT:   Overruled.

5                        Go ahead.   Answer the question.

6                        THE WITNESS:   I was -- yeah, I would have

7       started looking earlier than I started looking.

8            Q.   (By Ms. Gibson) Okay.   'Cause it was a lot of

9       extra work, right --

10           A.   It was extra work, yes.

11           Q.   -- for an asset sale?

12                And about how many -- I know you're not

13      going to remember exact numbers, but about how many

14      apartment communities are we talking about?  Like, how big

15      was the operation?

16           A.   Well, they grew quite a bit by the time I was

17      there because we had so many construction jobs under --

18      under construction.   At one time we had 14 communities going

19      off at the same time.   Plus, we had -- I think it ended up

20      being about 9,000 units, something around there.

21           Q.   And I know you said that everyone's -- everyone is

22      replaceable, correct?

23           A.   Correct.

24           Q.   But you and Jeff Carpenter and Sara Reidy were

25      important to the asset sale, correct?

1      A.    Yes.

2      Q.    And around this time there was another motivation

3  or another motive to try and get employees to stay, because

4  the criminal investigation was in the news, correct?

5      A.    Correct.

6      Q.    In other words, if employees at your level, CFO,

7  or at Jeff's level, management of the management

8  corporation, or Sara Reidy over development, left, the

9  criminal issues that were all over the papers were probably

10 going to make it hard to get replacements --

11              MR. L. FRIEDMAN:   I'm going to object,

12 Your Honor, to the injection of facts not in evidence.

13              THE COURT:   The sidebar part is sustained.

14 You can ask him about the --

15              MR. L. FRIEDMAN:   Ask that it be stricken.

16              THE COURT:   -- the criminal investigation.

17 So rephrase your question.

18              MS. GIBSON:   Okay.

19     Q.    (By Ms. Gibson) It was -- it was particularly

20 important to motivate employees to stay at the time because

21 of the criminal investigation into the Potashniks, correct?

22     A.    Was that the only motivation?  I'm not sure if

23 that was the only motivation.

24     Q.    Oh, no.  No, I mean I -- I -- I agree --

25     A.    It's one of the reasons that we would want to --

1      Q.    Okay.

2      A.    -- get out in front of people leaving was that the

3   sale was taking so long to go through we needed to keep

4   people, plus the fact that there was a lot of negative stuff

5   coming out in the news.  So...

6      Q.    Okay.  And I know the stuff on the news was about

7   the criminal investigation?

8      A.    It was about -- yes.

9      Q.    Okay.

10              Ultimately, or as CFO, do you know who

11   ultimately would receive the proceeds from the asset sales

12   to Cascade?  Like, where did the money go?

13      A.    Into Southwest Development, I believe.

14      Q.    Okay.  And that was the repository for all of the

15   sellers?

16      A.    By that time the construction company was wound

17   down, so yes.

18      Q.    Okay.  And, ultimately, that money would go to

19   whom?

20      A.    Brian and Cheryl.

21      Q.    Okay.  Brian and Cheryl Potashnik?

22      A.    Yes.

23              MS. GIBSON:  How am I doing on time, Judge?

24              THE COURT:  You got about two minutes.

25              MS. GIBSON:  Okay.

1           THE COURT:  Mr. Donohue, you still have two

2     minutes.

3           MR. DONOHUE:  I still have two.  Thank you,

4     Your Honor.

5     Q.    (By Ms. Gibson) Mr. Donohue asked you a question

6     in which he assumes that Jeff Carpenter said he had filed a

7     lawsuit against other employers.  Do you recall that?

8           MR. DONOHUE:  Objection, Your Honor.

9     Misstates -- completely misstates my question.  There's no

10    assumption there.

11          THE COURT:  Okay.  He can handle the

12    question.  Overruled.

13    A.    Yes, I recall that.

14    Q.    (By Ms. Gibson) Okay.  And do you understand the

15    difference between filing a lawsuit and when at some point

16    you happen to work for an employer that goes into

17    bankruptcy, having to file a claim for your wages in

18    bankruptcy?

19    A.    Correct.

20    Q.    Okay.

21    A.    There's a difference.

22    Q.    Okay.

23          And were you aware that what Mr. Donohue

24    initially asked you about was actually a couple of employers

25    earlier, not -- not the place?

1        A.    No, I was not aware.

2        Q.    Okay.

3              And are you aware in that case that the

4    employer ultimately ended up --

5              MR. DONOHUE:  I'm going to object.

6    Obviously, this is injecting facts that are not in evidence

7    and lack of foundation.

8              THE COURT:  You'll have to establish that

9    with the witness if he knows those facts.  I mean, you're

10   testifying when you're saying that.  If it's true, I don't

11   know.

12       Q.    (By Ms. Gibson) You said that the management

13   entity didn't make money, correct?

14       A.    Correct.

15       Q.    But did the organization as a whole make money?

16       A.    Yes.

17       Q.    Okay.  And --

18       A.    The construction company made money.

19       Q.    Okay.  So, as between the management company, the

20   development company, and the construction company, the

21   organization as a whole was profitable between 2004 and

22   2007?

23       A.    Yes.  2007, I'm not -- I can't recall, but --

24       Q.    2007, is that the year that the companies were

25   hemorrhaging money on federal expense fees?

```
1            A.    Yes.

2            Q.    Okay.

3                       MS. GIBSON:  Pass the witness.

4                       THE COURT:  Okay.

5                       Mr. Donohue.

6                       MR. DONOHUE:  Thank you, Your Honor.

7                       RECROSS EXAMINATION

8     BY MR. DONOHUE:

9            Q.    This transition to Cascade and I guess the

10    management arm or the management affiliate was Pinnacle?

11           A.    Correct.

12           Q.    Right?

13           A.    A branch of Pinnacle, yes.

14           Q.    A branch of Pinnacle?

15           A.    Yes.

16           Q.    You were asked to go over to the new company, if

17    you will, the acquiring company; is that right?

18           A.    Yes.

19           Q.    As was Mr. Sulakhe, right?

20           A.    He was asked to consult, yes.  He was consultant.

21           Q.    As was most all the other employees there at

22    Southwest Housing, other than Mr. Carpenter, right?

23           A.    Correct.  They had -- they had a head management.

24           Q.    Well, they may have had it.  But if he was so

25    valuable, don't you think they could have found a place for
```

1    him at Cascade or Pinnacle?

2         A.    No.   No, in Pinnacle they couldn't have placed him

3    in that company.

4         Q.    The million dollars a month of bleeding that

5    you -- that you mentioned before, there were also other --

6    other expenses that were -- that were being incurred at that

7    point, including bond fees, right?

8         A.    Yes.

9         Q.    Transaction fees; is that correct?

10        A.    I can't recall.

11        Q.    What all -- what all were those expenses made up

12   of?

13        A.    A lot of lawyer fees.   There's also a lot of funds

14   having to go into the properties themselves.   Yeah, it was

15   just operations, closing down the operations costs.

16        Q.    But they weren't just to -- just to make a clear

17   picture, it wasn't simply criminal defense attorney fees

18   that were -- that were causing this bleeding off as you know

19   it?

20        A.    Correct.

21              MR. DONOHUE:   I'll pass the witness.

22              THE COURT:   All right.   Thank you.

23              Thank you, Mr. Jones.   You can step down,

24   but don't leave the courtroom yet.   If you want to step down

25   and have a seat over here, you're welcome to.

Appendix 0517

```
 1                    THE WITNESS:  Okay.
 2                    THE COURT:  Ladies and gentlemen, we're
 3        going to stop for the day.  Let me give you just a couple
 4        more instructions.  And, again, I'll give you instructions
 5        throughout the course of the trial.
 6                    (Jury instructions given)
 7                    THE COURT:  We're going to start at 9:00
 8        o'clock tomorrow.  So, if you'd be back in the jury room by
 9        9:00, then hopefully we'll bring you out right then.
10                    You're in the jury box now.  We'll ask you
11        to go to the jury room and Rick will take you out of the
12        courtroom.
13                    We wish you a good afternoon and we'll see
14        you tomorrow morning.
15                    (The jury exited the courtroom.)
16                    THE COURT:  Y'all come on up.
17                    MR. L. FRIEDMAN:  Your Honor, before we go
18        off the record I want to make a motion for mistrial.
19                    THE COURT:  We're not off the record yet.
20                    MR. L. FRIEDMAN:  All right.
21                    THE COURT:  But I'll give you a chance.  We
22        still have some housekeeping to do.
23                    You wanted to offer on the record
24        Exhibits 4 -- you didn't actually offer 5, but you can if
25        you want -- but at least 4 and 6?
```

1                     MS. GIBSON:  Yes, 4 and 6.

2                     MR. SANFORD:  You don't want to offer 5?

3                     MS. GIBSON:  No.  It was -- it was a

4     different deal.

5                     THE COURT:  All right.

6                     And if you'll put your objection,

7     Mr. Donohue, on the record.

8                     MR. DONOHUE:  All right.  Your Honor, our

9     objection to these exhibits is that they violate the motion

10    in limine.  They go into amounts paid as well as deals made,

11    if you will, with other employees, the Southwest Housing

12    entities, which is not -- neither relevant or reasonably

13    calculated to lead to discovery of admissible evidence.

14    It's prejudicial.

15                    THE COURT:  All right.  Fair enough.

16                    The objection's sustained.  Four and five

17    [sic] are not admitted into evidence but will be left with

18    the court reporter so that they will be part of the

19    reporter's record, but not documents to go back to the jury.

20                    Mr. Jones is still here.  I wanted to keep

21    him here in case you needed to lay a predicate.

22                    You weren't objecting to the authenticity

23    of the documents.  It would have been Mr. Jones who

24    established that?

25                    MR. L. FRIEDMAN:  Mr. Jones?

```
 1                        THE WITNESS:  No.
 2                        THE COURT:  So, can we release Mr. Jones
 3     now?
 4                        MS. GIBSON:  Yeah, as long as they have --
 5     well, do you have any objection?
 6                        THE COURT:  Well, he put his objection on
 7     the record.
 8                        MS. GIBSON:  I mean other, other.
 9                        Is that it?
10                        MR. DONOHUE:  Is that it to what?  I'm
11     sorry.
12                        THE COURT:  To four and six.
13                        MS. GIBSON:  Is that -- is that all your
14     objections?
15                        MR. DONOHUE:  To four and six, yes, that's
16     all my objections.
17                        MS. GIBSON:  Okay.
18                        THE COURT:  Okay.  All right.
19                        Thank you for coming, Mr. Jones.
20                        THE WITNESS:  Okay.  Thank you.
21                        (Mr. Jones exited the courtroom.)
22                        THE COURT:  Vikki, you ready?
23                        THE REPORTER:  Yes.
24                        THE COURT:  Mr. Friedman, you had a motion.
25
```

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3        I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12       I further certify that the total cost for the

13   preparation of the Reporter's Record is $1,492.00 and will

14   be paid by Friedman & Feiger, LLP.

15       WITNESS MY OFFICIAL HAND this the 4th day of October,

16   2018.

17

18

19                              /S/ Vikki L. Ogden

20                              _____
                                VIKKI L. OGDEN, Texas CSR# 6309
                                Official Court Reporter
21                              Dallas County Court at Law No. 5
                                600 Commerce Street, Floor 5
22                              Dallas, Tx. 75202
                                (214)653-6443
23                              Certification Expires:  12/31/18

24

25

1        <u>CAUSE NO. CC-08-02072-E</u>

2  JEFFREY W. CARPENTER,      )  IN THE DALLAS COUNTY
                       )
3         Plaintiff,     )
                       )
4  VS                  )  COURT AT LAW NO. 5
                       )
5  SOUTHWEST HOUSING DEVELOPMENT  )
  COMPANY, INC., ET AL,      )
6                       )
         Defendants.    )  DALLAS, TEXAS
7  _____

8

9     I, Vikki L. Ogden, Official Court Reporter in and for

10  the County Court at Law No. 5 of Dallas County, Texas, do

11  hereby certify that the following exhibit constitutes a true

12  and complete duplicate of the original exhibit admitted into

13  evidence during the proceedings in the above-entitled and

14  -numbered cause as set out herein before the Honorable Mark

15  Greenberg, beginning January 23, 2018.

16     WITNESS MY OFFICIAL HAND on this the 19th day of

17  October, 2018.

18

19  1

20

21                 /S/ Vikki L. Ogden
                 _____
22                 Vikki L. Ogden, Texas CSR# 6309
                 Official Court Reporter
23                 Dallas County Court at Law No. 5
                 600 Commerce Street, Floor 5
24                 Dallas, Texas 75202
                 (214)653-6443

25

REPORTER'S RECORD

VOLUME 4 of 14

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
LISA MATZ
Clerk

Trial Court Cause No. CC-08-02072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| | ) | |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) | |
| | ) | |
| Defendants. | ) | DALLAS, TEXAS |

TRIAL ON THE MERITS

On the 24th day of January, 2018, the following proceedings came on to be heard within the presence of a jury, in the above-entitled and -numbered cause; and the following proceedings were had before the HONORABLE MARK GREENBERG, Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

1                              APPEARANCES:

2

3     MS. AMY GIBSON
      SBN 00793801
      Gibson Wiley, PLLC
4     1500 Jackson Street, Suite 714
      Dallas, Texas 75201
5     (214)522-2121
      Attorneys for Plaintiff

6
              -AND-
7

8     MR. BRIAN SANFORD
      SBN 17630700
      Sanford Firm
9     1910 Pacific Avenue, Suite 15400
      Dallas, Texas 75201
10    (469)361-9111
      Attorney for Plaintiff

11
              -AND-
12

13    MR. LAWRENCE "LARRY" FRIEDMAN
      SBN 07469300
      MR. MICHAEL DONOHUE
14    SBN 05989380
      MR. JASON FRIEDMAN
15    SBN 24059784
      Friedman & Feiger, LLP
16    5301 Spring Valley Road, Suite 200
      Dallas, Texas 75254
17    (972)788-1400
      Attorneys for Defendants

18
              -AND-
19

20    MR. RYAN HALE
      SBN 24097784
      Hawkins Parnell Thackston & Young, LLP
21    4514 Cole Avenue, Suite 500
      Dallas, Texas 75205-5412
22    (214)780-5138
      Appellate Attorney for Defendants

23

24
      ALSO PRESENT:  Steve Page, AV Technician
25

```
1                              VOLUME 4

2     January 24, 2018                                    PAGE

3     Proceedings ----------------------------------      6

4     Defendants' Motion to Poll the Jury -----------     6

5     Court's Ruling --------------------------------     7

6
      PLAINTIFF'S
7     WITNESS:
                        Direct    Cross    Redirect    Recross
8     Cheryl Geiser        8       ---       ---        ---

9
      Defendants' Motion for Mistrial ---------------    121

10    Court's Ruling --------------------------------   121

11

12    PLAINTIFF'S
      WITNESSES:
13                      Direct    Cross    Redirect    Recross
      Cheryl Geiser      122      144       183        ---
14    Rick Graf          196      ---       ---        ---
      Brian Potashnik    199      ---       ---        ---

15

16    Defendants' Objection and Motion for Mistrial -    241

17    Court's Ruling --------------------------------   242

18    Adjournment -----------------------------------   243

19    Court Reporter's Certificate ------------------   244

20

21

22

23

24

25
```

```
 1                          EXHIBIT INDEX

 2
       PLAINTIFF'S
 3     NO.             DESCRIPTION          OFFERED      ADMITTED

 4     8               Recap of Expenses and    14          14
                       Bonuses
 5
       9               Email                    18          18
 6
       10              Magazine Cover           62          62
 7
       11              Letter of Intent         66          67
 8
       12              Purchase and Sale        72          73
 9                     Agreement

10     13              Schedule A               --          76

11     14              Email Cover Sheet        80          80

12     15              Escrow Agreement         84          84
                       (First Amendment)
13
       16              Purchase and Sale        86          86
14                     Agreement
                       (First Amendment)
15
       17              Escrow Agreement         89          89
16                     (Second Amendment)

17     18              Escrow Agreement         89          90
                       (Third Amendment)
18
       19              Escrow Agreement         91          91
19                     (Fourth Amendment)

20     20              Escrow Agreement         92          --
                       (Fifth Amendment)
21
       21              Consulting and Asset     93          94
22                     Management Services
                       Agreement
23
       22              Separation Agreement     98          99
24
       23              Email                    123        123
25
       24              Email                    125        125
```

```
1                        EXHIBIT INDEX (CONT'D)

2

   PLAINTIFF'S
3  NO.            DESCRIPTION           OFFERED      ADMITTED

4  27             Escrow Agreement        138          138
                  (Sixth Amendment)
5
   28             Escrow Agreement        138          138
6                 (Seventh Amendment)

7  29             Escrow Agreement        138          138
                  (Eighth Amendment)
8
   30             Escrow Agreement        138          138
9                 (Ninth Amendment)

10 31             Escrow Agreement        138          138
                  (Tenth Amendment)
11
   32             Email                   138          138
12
   33             Closing Memorandum      138          138
13
   34             Closing Memorandum      138          138
14

15

16
   DEFENDANTS'
17 NO.            DESCRIPTION           OFFERED      ADMITTED

18 24             Gmail                   162          163

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2                      January 24, 2018

3              THE COURT:  All right.  We're on the

4     record.

5              MR. L. FRIEDMAN:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7         DEFENDANTS' MOTION TO POLL THE JURY

8              MR. L. FRIEDMAN:  Your Honor, because

9     plaintiff's counsel had mentioned, I believe beyond the

10    scope of both the pleadings and in violation of the Court's

11    order in limine --

12             THE BAILIFF:  Come on in.

13             Got a jury coming through.

14             (Off the record)

15             THE COURT:  Go ahead, Mr. Friedman.

16             MR. L. FRIEDMAN:  -- matters pertaining to

17    criminal investigation and criminal prosecution of Brian and

18    Cheryl Potashnik and then later on in the day mentioned --

19             THE BAILIFF:  We have all seven now.

20             MR. L. FRIEDMAN:  -- that the matter was

21    well publicized, I think it's appropriate that the Court

22    instruct the jury once again that the matter should not be

23    independently investigated or pursued on the Internet.  And

24    if the Court would, would ask the Court this morning to poll

25    the jurors individually and ask them whether or not they had
```

1    actually looked any of this up on the Internet.

2                         COURT'S RULING

3                THE COURT:  All right.

4                And the motion to individually poll the

5    jurors is denied, but I'll -- at the end of the day I'll

6    instruct the jurors again to not do any type of independent

7    research or anything like that.

8                MR. L. FRIEDMAN:  We object to your ruling.

9                THE COURT:  Okay.  And it's noted on the

10   record.

11               Ms. Gibson, you're going to continue with

12   Ms. Geiser?

13               Ms. Geiser, if you wouldn't mind coming

14   back up.

15               (The jury entered the courtroom.)

16               THE COURT:  Everybody have a seat, please.

17               Welcome back and good morning, ladies and

18   gentlemen of the jury.

19               We're going to continue with the trial.

20   When we stopped yesterday we had started Ms. Geiser's

21   depo' -- testimony but had not yet concluded it. So the

22   first thing we'll do this morning is continue with her

23   testimony until it is completed.

24               We take one 15-minute break in the morning.

25   We take it around 10:20 or so.  But if you need a break

```
1    before then, please let -- get my attention or Vikki's
2    attention and we'll take a break whenever you need to.
3                In general, depending on how the day works
4    out, we take one 15-minute break in the morning and we take
5    two 10-minute breaks in the afternoon.  But if that schedule
6    doesn't work for you very well, we can always change that up
7    and, for example, take a break every hour on the hour if
8    that would be more comfortable to you.  You'll have a better
9    idea after today.
10               Ms. Gibson, it's still your witness, and if
11   you'll pick up just where you left off.
12               MS. GIBSON:  Yes, Your Honor.  May I move
13   the --
14               THE COURT:  Sure.
15               MS. GIBSON:  -- clipboard now that the
16   jury's in?
17               Can everybody see?  Can you see,
18   Ms. Geiser?
19                      CHERYL GEISER,
20   having previously been sworn, testified as follows:
21                 DIRECT EXAMINATION (CONT'D)
22   BY MS. GIBSON:
23      Q.   Ms. Geiser --
24               MS. GIBSON:  May I approach the easel,
25   Your Honor?
```

```
 1                     THE COURT:  Certainly.
 2        Q.   (By Ms. Gibson) -- do you agree that a handshake
 3   agreement is as good as a written one?
 4        A.   If both parties agree to all the terms and
 5   conditions of the agreement, then I agree that an oral
 6   agreement is as good as a written agreement.
 7        Q.   Okay.  And you remember telling me, "I agree that
 8   if both parties agree to the agreement, then it's an
 9   agreement"?
10        A.   Correct.
11        Q.   Okay.
12                  And you also had told --
13                  MR. L. FRIEDMAN:  Thank you.
14        Q.   (By Ms. Gibson) -- me, "And if they shake hands on
15   it and both parties have agreed, then it's an agreement",
16   correct?
17        A.   If both parties agree to the agreement, then I
18   agree that it's an agreement.
19        Q.   You said if they shake hands on it.  Do you
20   remember that?
21        A.   I'll take your word for it.
22        Q.   Let me refresh your memory.
23        A.   Okay.
24        Q.   I'm just going to hand you -- do you see the
25   highlighted portion?
```

1    A.   I said, "I agree that if both parties agree to the

2    agreement then it's an agreement."  You said, "Okay."  And I

3    say, "And if they shake on it and both parties have agreed,

4    then it's an agreement."

5    Q.   Okay.  So, if they shake on it and both parties

6    agree, that's an agreement.  Even though it's just oral,

7    correct?

8    A.   Yes.

9    Q.   Turning back to the beginning of Jeff Carpenter's

10   deposition, do you recall some discussion about his -- a

11   written employment agreement with Southwest Housing

12   Management?

13   A.   Yes.

14   Q.   And you recall your attorney discussing the claim

15   in this suit that no amendment or alteration of the terms of

16   that agreement could be valid unless in writing and signed

17   by the parties?

18   A.   I believe that's an excerpt from the agreement,

19   yes.

20   Q.   Okay.

21            Could you take a look at Exhibit 3?

22            THE COURT:  You've got to walk around the

23   court reporter.

24            MS. GIBSON:  I'm sorry.

25   Q.   (By Ms. Gibson) Do you recognize Exhibit 3?

1      A.    Yes.

2            MR. L. FRIEDMAN:  Oh, thank you.

3      Q.    (By Ms. Gibson) Exhibit 3 is an Email from you to

4   Gaylon Hull and you're asking for -- you're asking for a

5   check for $50,000 for Jeff Carpenter?

6      A.    Yes.

7      Q.    Okay.  And this is in Jeff Carpenter's first year

8   of employment, correct, November 11, 2004?

9      A.    Yes.

10     Q.    Jeff Carpenter has not been there a full year yet,

11  correct?

12     A.    Correct.

13     Q.    Okay.

14            And you say that this is a loan against

15  bonus and moving expenses, correct?

16     A.    Yes.

17     Q.    Okay.  And moving expenses, you-all had agreed to

18  reimburse certain relocation expenses because you recruited

19  Jeff from another state to come work for y'all?

20     A.    Yes.  That's in his employment agreement.

21     Q.    Okay.

22            And then the check was actually paid from

23  Affordable Housing Construction?

24     A.    Uh-huh.

25     Q.    Okay.

1        And so the three parts of the operation of

2  the business -- the development arm, the construction arm,

3  and the management arm -- they sometimes loaned money to

4  each other; is that accurate?

5        A.    Yes.

6        Q.    Okay.  And is this an example of that?

7        A.    Yes.  It appears to be.

8        Q.    Okay.

9             MR. L. FRIEDMAN:  Can I just ask the

10  witness to move that microphone closer to her?

11             THE COURT:  Sure.

12             MR. L. FRIEDMAN:  Thank you.

13             THE WITNESS:  I try not to, like, sit all

14  the way up here.  I mean, do I need to sit all the way up

15  here?

16             THE COURT:  You can move the microphone as

17  close as you want.  The microphone moves.  If you want to

18  sit further back or closer up, that's up to you.  Put the

19  mike -- put the microphone wherever is closest to your

20  mouth.

21             THE WITNESS:  Okay.

22        Q.    (By Ms. Gibson) And, Ms. Potashnik, if you would

23  now turn to Exhibit 2.  If you take a look at Paragraph 4B,

24  you see the last line?  Employee must be employed by the

25  company at the end of the first calendar year for the

13

1    minimum bonus to be earned?

2        A.    Yes.

3        Q.    Okay.

              And you-all orally agreed with

5    Jeff Carpenter to go ahead and advance 50,000 toward his

6    bonus and relocation costs even though it wasn't at the end

7    of the first calendar year, correct?

8        A.    We -- we did it, yeah.

9        Q.    Right.  And that was just an oral agreement,

10   correct?

11       A.    I guess so.

12       Q.    Okay.

              And this contract wasn't modified or

14   amended in writing to accomplish that?

15       A.    No, it was not.

16       Q.    Okay.

17       A.    I guess it's in writing to the extent I write that

18   I need a check for Jeff and as a loan against his bonus and

19   moving expenses --

20       Q.    Okay.

21       A.    -- pursuant to his employment agreement.  So --

22       Q.    You wrote that.  But even though the contract said

23   that the first-year bonus would be paid at the end of the

24   year, there was an advance done just orally, correct?

25       A.    Well, it's in writing, pursuant to my Email.

Appendix 0535

1     Q.    Well, there's no -- there's no amendment to the

2   contract signed by all parties to accomplish that?

3     A.    To accomplish an advance, you're correct.

4     Q.    Okay.

5     A.    But he was advanced the bonus pursuant to a

6   written directive that I gave to my CFO.

7     Q.    Right, but you didn't amend the contract to do

8   that --

9     A.    Correct.

10    Q.    -- correct?

11          I'm handing you what's been marked

12  Plaintiff's Exhibit 8.  Do you see that this is a December

13  22nd, 2005 -- or do you recognize this document?

14    A.    I don't really recognize it 'cause I've seen it in

15  the course of this litigation, but I agree that it's

16  probably true that it's an Email from Keith to Jeff.

17    Q.    And you.  Do you see --

18    A.    Yes, I'm on there too.

19    Q.    Okay.

20          MS. GIBSON:  Plaintiff offers Exhibit 8.

21          THE COURT:  Any objection?

22          MR. L. FRIEDMAN:  No.

23          THE COURT:  Eight is admitted.

24    Q.    (By Ms. Gibson) Okay.  So, at the end of 2005,

25  here what's happening is you're addressing settling the

1    advance on bonus per the agreement we came up with?

2         A.    Say your question again, please.

3         Q.    Sure.

4                What's going on in Exhibit 8 is you-all are

5    settling the advance of bonus, okay, per the agreement we

6    came up with?

7         A.    That's what Keith says.  Attached is the recap of

8    Jeff's cost to be reimbursed and the settling of the advance

9    on bonus per the agreement we came up with.

10        Q.    Okay.

11        A.    Just an FYI.

12        Q.    And the -- the agreements on how to handle the

13   $50,000 advance is addressed on the next page.  That

14   agreement also wasn't in writing how you-all decided to

15   handle that.

16        A.    I don't really know if that's true.  We had an HR

17   department that possibly could have documented this in

18   Jeff's HR file.  But I know you're calling Devona Gray.  You

19   can ask her that question.

20        Q.    And -- but the agreement that y'all reached on how

21   to handle that bonus, there's no amendment to the employment

22   agreement signed by all parties?

23        A.    Not that I'm aware of, but there might have been

24   something in her -- in his employment file.

25        Q.    Okay.

16

1            You-all reached that agreement just orally,

2      but there may be some documentation of it somewhere?

3            A.    The oral -- we reached what agreement orally?

4            Q.    I'm sorry?

5            A.    What agreement did we reach orally?

6            Q.    How to handle -- how to handle the advance on

7      bonus in 2005.  You're talking about the settling of the

8      advance on bonus.

9            A.    Well, the settling of the advance on bonus, per

10     Keith's testimony yesterday, had to be run through payroll

11     to be properly treated.

12           Q.    Right, but --

13           A.    So --

14           Q.    Correct, because --

15                 MR. L. FRIEDMAN:  I'm just going to ask

16     that Ms. Gibson allow the witness to finish her answer

17     before she asks the next question.

18           Q.    (By Ms. Gibson) I'm sorry.  I didn't mean to

19     interrupt you, if I did.  Go ahead, if you weren't finished.

20           A.    I'm just saying that per Keith's testimony

21     yesterday he had to run the bonus through payroll to be

22     compliant with whatever accounting principles that needed to

23     be complied with.  So that part was handled by Keith.

24           Q.    Okay.  But the agreement y'all reached on how to

25     handle it did not involve a modification or amendment?

1        A.    I don't know that's an agreement.  That's just how

2    it had to be handled.  So, as far as the bonus goes, I

3    don't -- that's just a legal accounting thing, I guess, that

4    Keith felt had to be done.

5        Q.    Per the agreement we came up with.

6        A.    And I don't know what he's referring to here.

7        Q.    Okay.  If -- if -- whatever he's referring to,

8    there's no amendment or modification signed by both parties

9    to amend the employment agreement, was there?

10       A.    I don't know what he's talking about, but I don't

11   recall seeing an amendment to the employment agreement, no.

12       Q.    Okay.  So that's something else that you-all

13   worked out orally, even though it may be documented

14   somewhere like on this Email; is that right?

15       A.    I don't really know.  I mean, his -- his

16   employment agreement, per Paragraph 5, Section B, talks

17   about reimbursement of up to 36 -- or not to exceed $36,000

18   in moving expenses, and he has moving expenses of 35,375.20.

19   So the only agreement would have been -- I don't know if

20   this is consistent with his employment agreement, so I

21   really don't know what Keith's talking about in that Email.

22       Q.    Okay.

23             I'm handing you what's been marked

24   Plaintiff's Exhibit 9.  Do you recognize that document?

25       A.    Okay.

1          Q.     Okay.   And that document is an Email string

2     between you and Devona Gray?

3          A.     Uh-huh.   Yes, it is.

4          Q.     About certain compensation for Jeff Carpenter?

5          A.     Yes.

6                 MS. GIBSON:  Plaintiff admits -- or offers

7     Exhibit 9.

8                 THE COURT:   Any objection?

9                 MR. DONOHUE:   Your Honor, if you give us

10    just a moment.   This is the first time that we've gotten any

11    of the exhibits from the plaintiff.

12                MS. GIBSON:   We gave -- we exchanged lists.

13                MR. L. FRIEDMAN:   No need to fight over it.

14    Just give us a second.

15                (Pause)

16                MR. L. FRIEDMAN:   I don't have any

17    objection to it, Your Honor.

18                THE COURT:   Nine -- nine is admitted.

19                MR. L. FRIEDMAN:   This is nine?

20                THE COURT:   Yes.

21         Q.     (By Ms. Gibson) And do you see that you are

22    Emailing Devona Gray and you are saying you see that Jeff

23    had a title change and you're asking, "But didn't he get a

24    raise at some point," is that correct?

25         A.     I said -- or Devona says to me --

1          Q.   I'm -- I'm -- this is below her response where
2     you're sending --
3          A.   I don't like when you show small clips.  Can I see
4     the whole --
5          Q.   You have -- it's the same --
6          A.   Well, the jury needs to see the whole thing.
7          Q.   Well, Ms. Geiser, if I show the whole document,
8     people can't see it, okay.  But we're going to talk about
9     all of it and it's going to be offered in evidence, and they
10    can see the whole thing.
11               So, the initial -- in the initial Email you
12    are asking -- the Email on November 26, 2007, from you to
13    Devona Gray, you're asking if Jeff Carpenter got a raise at
14    some point, correct?
15         A.   This says from Devona to me.  From Devona Gray to
16    Cheryl Potashnik.
17         Q.   So look below that.  You see it's an Email string?
18         A.   Okay.
19         Q.   Okay.  Below that is your, it says, original
20    message?
21         A.   Uh-huh.
22         Q.   From Cheryl Potashnik, Monday, November 26, 2007,
23    at 10:00 a.m.?
24         A.   Okay.
25         Q.   Okay.

1             And you're asking, Didn't Jeff get a raise

2   at some point, correct?

3        A.    Uh-huh.   Yes.

4        Q.    Okay.

5             And then Devona Gray responds to you, to

6   that Email, on November 26, 2007.   And she says Jeff's

7   salary was increased to $210,826?

8        A.    Uh-huh.   Yes.

9        Q.    With the addition of $139.48 adjustment and a

10  $276.92 car allowance effective January 6, 2006.

11            Now, if -- if this was truly a raise in his

12  salary, that was done orally as well, correct?   In other

13  words, there was no modification to the original employment

14  agreement that set his salary at 200,000?

15       A.    Say that again, please.

16       Q.    Okay.   You see in Exhibit 2 that Jeff's

17  salary --

18       A.    Yes.

19       Q.    -- is $200,000?

20            MS. GIBSON:   I'm trying to get it to pop

21  up.

22            THE COURT:   You can zoom out some so it's

23  not -- the (inaudible) is not so good.

24       Q.    (By Ms. Gibson) All right.   You see the salary is

25  $200,000 in that loan?

Appendix 0542

1      A.   Yes.

2      Q.   And so, if Jeff Carpenter did actually get an

3   increase in his base salary, that's something you-all did

4   orally without a formal written modification to this

5   employment agreement, correct?

6      A.   I don't agree that it was done orally.  It was in

7   writing, because Devona would not have known all of this if

8   it wasn't in his HR file.  But it was not requested as an

9   amendment to the employment agreement.

10      Q.   Okay.

11      A.   I'll concede that.

12      Q.   All right.

13           So this is something else you-all just

14   agreed to without a formal amendment to the employment

15   agreement, correct?

16      A.   His salary was increased and it didn't result in

17   an amendment to the employment agreement, correct.

18      Q.   And while Mr. Carpenter worked at Southwest

19   Housing there were lots of things that you-all just handled

20   orally without formal writings --

21      A.   I would strongly disagree with that.

22      Q.   -- such as -- such as -- you disagree?

23      A.   Yes.

24      Q.   Okay.  Fine.

25      A.   I disagree because our business was highly

1    regulated.

2              Every deal that closed had a volume of

3    closing documents that was several feet tall.  Every deal

4    was documented, the specifics of every deal was documented,

5    every point was negotiated, every point was documented, in

6    writing.  Our entities were audited in order for audit

7    opinions to be issued.  Every transaction had to have a

8    corresponding backup to it.  So I highly disagree with your

9    characterization of our business that a lot of things were

10   done orally.

11       Q.   Okay.  The -- so you're talking about your

12   agreements or deals on properties, your deals with vendors,

13   etcetera, correct?

14       A.   I'm talking in general.  The nature of our

15   business was not to enter into oral agreements.

16       Q.   When it came to employees at Southwest Housing

17   Management or Affordable Housing Construction or Southwest

18   Housing Development, when it comes to the relationship with

19   employees, particularly at the higher -- at the higher

20   levels, such as Jeff and Sara, a lot of things were handled

21   orally, such as performance reviews, correct?  And that's

22   one example.

23       A.   I don't know.  I don't know that we handled

24   performance reviews orally.

25       Q.   Did -- were there written performance reviews?

1    A.    There may have been.  We have a lot of people who
2  worked for the organization who were in charge of that type
3  of thing.  I don't recall.
4    Q.    Okay.
5              And you have heard your attorneys say in
6  this case that the agreement -- the agreements we're talking
7  about today would not be valid because they were not made in
8  writing and signed by both of the parties to the agreement.
9    A.    I'm not a lawyer, but I don't consider giving
10  someone a raise something that would have fallen under that
11  agreement.  But if that's the legal position, then I'm not
12  going to argue with it.
13    Q.    I'm just asking if -- if -- if you agree with that
14  position?
15    A.    Yes.
16    Q.    Okay.
17              Earlier you told me that you agree that if
18  they shake on it and both parties agree, that's an
19  agreement, even though it's oral?
20    A.    Yes.
21    Q.    Okay.
22              I'm handing you a pleading from this case.
23  Do you see a file stamp at the upper right corner?
24    A.    Yes.  Sorry.  I can't see.
25    Q.    Okay.  And you see at the back that your attorney

24

1    submitted this document, filed it with the court in this

2    case?

3        A.    Yes.

4        Q.    Okay.

5              And you see Paragraph 3?

6        A.    Yes.

7        Q.    Okay.   And Paragraph 3 says defendants do not

8    dispute that under Texas law a written agreement not

9    required by law to be in writing may be modified by a later

10   oral agreement, even though it provides that it may only be

11   modified in writing.

12             MR. L. FRIEDMAN:   Your Honor, I'm going to

13   object.  Calls for a legal conclusion.  This is a -- this is

14   part of the briefing to the Court.

15             THE COURT:   What -- was this a -- what

16   is it?  Is this a pleading or is it a motion?

17             MR. L. FRIEDMAN:   Pleading.   Reply to

18   motion for summary judgment.

19             THE COURT:   Okay.

20             You're asking her legal questions.

21   Admissions are in the petition and the answer, not in the

22   summary judgment responses.

23             MR. L. FRIEDMAN:   And her position is

24   consistent.

25             THE COURT:   You don't have to -- you can

1    tell the jury your position when it's your turn.

2        Q.    (By Ms. Gibson) Would you -- would you take a look

3    at Exhibit 2 and identify -- well, let's do it this way.  In

4    Exhibit 2 you see that -- I'm just going to ask you

5    questions, just so you know, about what types of

6    compensation this agreement covers.

7        A.    Okay.

8        Q.    Okay.  And you see that the agreement covers a

9    $200,000 annual salary?

10       A.    Yes.

11       Q.    And as far as compensation at Paragraph 4B,

12   it covers a 50,000/200,000 bonus in the first year?

13       A.    A minimum discretionary bonus potential would be

14   50,000.

15       Q.    Okay.  Well, it covers bonuses for the first year?

16       A.    Okay.

17       Q.    Is that right?

18       A.    Yes.

19       Q.    Okay.  And it says --

20       A.    But that -- that is -- the way you have that

21   written there is misleading because there's a word before

22   that that says minimum discretionary bonus potential will be

23   50,000.  There's nothing in the contract that ever says 50-

24   to $200,000 bonus.

25       Q.    Okay, but it's a summary, so --

1          A.   Well, the summary is misleading because the word

2    "discretionary" is very prominently included in this

3    paragraph.

4                    MR. L. FRIEDMAN:  Your Honor --

5          Q.   (By Ms. Gibson) Ms. Geiser, if you --

6                    MR. L. FRIEDMAN:  Excuse me.

7          Q.   (By Ms. Gibson) -- if you disagree --

8                    MR. L. FRIEDMAN:  I want to object to

9    what's on the screen.  Lack of foundation.  It's not a

10   sponsored document.

11                   THE COURT:  It's a demonstrative exhibit.

12                   This is something you prepared?

13                   MS. GIBSON:  Yes.  It's actually

14   Jeff Carpenter's notes.

15                   THE COURT:  All right.

16                   And she can disagree with it if she chooses

17   to, and she just did.

18                   MR. L. FRIEDMAN:  And she has.

19                   THE COURT:  All right.

20         Q.   (By Ms. Gibson) All right.  So, Ms. Geiser, you --

21   you disagree with the way this part is phrased, correct?

22         A.   Yes.

23         Q.   Okay.

24                   So, fair to say that Exhibit 2 covers

25   annual bonus for the first year?

Appendix 0548

1   A. In the first calendar year of employment the

2 minimum discretionary bonus potential will be $50,000 and

3 will be based on achieving company objectives.  That is the

4 full sentence.  The maximum bonus potential in the first

5 calendar year of employment the maximum will be $200,000,

6 which will be based on overall profitability of the

7 organization as a whole.  That is the full context of that

8 paragraph.

9   Q. But my question is it covers bonuses for the first

10 year, correct?

11     MR. L. FRIEDMAN:  Your Honor, the document

12 speaks for itself.

13     THE COURT:  It's her question.  Overruled.

14   A. Yes.

15   Q. (By Ms. Gibson) And if you look back earlier in

16 the agreement you see that it covers reimbursement of

17 outstanding business expenses.  It's actually right below --

18   A. It's right below.

19   Q. -- right below where you were.

20   A. Paragraph 5A, the company shall pay or reimburse

21 the employer subject to prior approval and upon presentment

22 of such vouchers received and other supporting information

23 as the company may require for all reasonable business and

24 travel expenses which may be incurred or paid by the

25 employee in connection with the employment of the employee

1   by the company in accordance with the company's standard

2   policies then in effect.

3        Q.   Okay.   Okay, so another type of compensation

4   it covers is reimbursement of outstanding business expenses?

5        A.   That's not compensation.   That's reimbursement.

6        Q.   Okay.   So you don't want to call that

7   compensation?

8        A.   Compensation is under Paragraph 4; expenses is

9   under Paragraph 5.   Reimbursement is covered in A,

10  relocation is covered in B, and temporary housing is covered

11  in C.   If it was compensation, it would be taxable.   If it's

12  an expense, it's a reimbursement.

13       Q.   Okay.

14            What does compensation mean to you for an

15  employee?

16       A.   Compensation is amounts that are paid to them that

17  are taxable.

18       Q.   Okay.   So you're distinguishing between

19  compensation --

20       A.   The contract -- the contract makes a distinction.

21  Section 4 is compensation.   Section 5 is expenses.

22       Q.   Well, you understand that on a -- people often

23  refer to their entire package with the employer as their

24  compensation, but you're -- is that right?

25       A.   But that's not what this says, okay.

29

1                    MR. L. FRIEDMAN:  I'm going to object.

2                    THE WITNESS:  Your question --

3                    MR. L. FRIEDMAN:  Excuse me.  Excuse me.

4                    THE COURT:  Stop.

5                    MR. L. FRIEDMAN:  Number one, it's

6     misleading.  Number two, it assumes facts not in evidence.

7     And, number three, lack of foundation.

8                    THE COURT:  Okay.  It's for

9     cross-examination.  Overruled.

10                   She doesn't have to agree.

11         Q.   (By Ms. Gibson) Okay.  So you're distinguishing --

12         A.   I'm not distinguishing.  The contract

13    distinguishes.  Section 4 is compensation.  Section 5 is

14    expenses.

15         Q.   You're claiming the contract distinguishes

16    between --

17         A.   I'm not claiming it.  It says it.  Section --

18                   THE COURT:  Let her finish her question.

19         Q.   (By Ms. Gibson) Just let me -- okay, all I'm

20    trying to get to is, things like reimbursement and housing

21    and insurance, those are benefits, correct?  Those are

22    employee benefits?

23         A.   I don't know that expense reimbursement is

24    employee benefit.  If he incurred expenses in conjunction

25    with his job, he's entitled to reimbursement.  So I don't --

1    Q.    Okay.  So you believe --

2    A.    -- see that as a compensation or a benefit.

3              MR. L. FRIEDMAN:  I'm going to ask --

4              THE COURT:  Okay.  Just --

5              MR. L. FRIEDMAN:  I'm just going to ask

6    everybody to do this one at a time 'cause I can't keep up.

7              THE COURT:  You're doing fine.

8              Go ahead, Ms. Gibson.

9    Q.    (By Ms. Gibson) So you believe that reimbursement

10   for outstanding business expenses is just something in the

11   agreement, but it is neither compensation nor a benefit?

12   A.    Correct.

13   Q.    Okay.

14             And the agreement also covers reimbursement

15   of location -- relocation expenses up to $36,000?

16   A.    Yes.

17   Q.    And you see that the agreement also covers --

18   thanks, Brian -- temporary, furnished, corporate housing for

19   up to 90 days?

20   A.    For a maximum period of 90 days.

21   Q.    Okay.  That's the same as up to 90 days, right?

22   A.    I'm just reading off the agreement.

23   Q.    Okay.

24             Do you -- do you think there's a material

25   difference?  Is there an important difference?

31

1          A.    I'm obviously overly technical so, I mean, I make

2     a distinction because the word here is "maximum".

3          Q.    Okay.

4                So, instead of up to, you say it covers

5     temporary, furnished, corporate housing for a maximum of 90

6     days.   Okay.   And it covers 20 days of paid time off each

7     12-month period, the agreement does?

8          A.    Well, I have to find that section.   Where is that?

9     Oh, that's --

10         Q.    In number --

11         A.    -- that's in Section 6.

12         Q.    Under 6, yes.

13         A.    Under insurance and under benefits.

14         Q.    Right.

15         A.    An employee shall be eligible for 20 days of total

16    paid time off for a 12-month period.

17         Q.    Is that a yes?

18         A.    What?

19         Q.    The agreement in Exhibit 2, as far as compensation

20    and benefits, also covers 20 days of paid time off each

21    12-month period?

22         A.    Yes.

23               MR. L. FRIEDMAN:   It says insurance and

24    benefits.

25         Q.    (By Ms. Gibson) And the employment agreement also

1    provides the opportunity to enroll in health insurance,

2    dental insurance, life insurance, short-term disability,

3    long-term disability, and a 401k plan after 90 days?

4         A.    Yes.   At the conclusion of 90 days, employees

5    eligible to participate and receive other benefits.

6         Q.    Okay.

7                   And it covers reimbursement of COBRA

8    insurance expenses until benefits start?

9         A.    Yes.

10         Q.    Okay.

11                   And it covers a $600 monthly car allowance?

12         A.    Correct.

13         Q.    And the agreement covers a health club discount if

14    the employee wants to participate?

15         A.    Yes.

16         Q.    And if family-health-coverage premium costs exceed

17    $4,680 there will be an adjustment in salary to cover that?

18         A.    Company will adjust employee's salary in the event

19    the employee's share of the company-provided health coverage

20    for the family exceeds $4,680.

21         Q.    Okay.   So it covers an adjustment in salary to

22    cover family-healthcare-coverage premium costs over that

23    amount?

24         A.    Correct.

25         Q.    And the agreement covers six weeks' base salary as

1    severance if the company terminates employment?

2         A.    Correct.

3         Q.    And the agreement that is Exhibit 2 does not cover

4    any other types of compensation or benefits other than what

5    we've just talked about, correct?

6         A.    Correct.

7         Q.    So, at the time in 2004 when this initial

8    employment agreement was signed, no one anticipated an asset

9    sale, correct?

10        A.    I don't know that that's true.

11        Q.    Okay.  At the time the employment agreement was

12   signed in 2004 with Jeff Carpenter, no one had told

13   Jeff Carpenter that you-all wanted to sell the business?

14        A.    I didn't.  I don't know if anyone else did.

15        Q.    Okay, you did not?

16        A.    I did not.

17        Q.    Okay.

18              The agreement does not cover any

19   asset-sale-proceeds bonus?

20        A.    Right.

21        Q.    And is that you -- you're not sure whether or not

22   a sale was contemplated at the time?

23        A.    Correct.

24        Q.    And the agreement does not cover bonuses after

25   year one, correct?

1        A.    I don't know that -- that it doesn't cover bonuses

2    after year one.

3              It says bonus structures will be reviewed

4    and revised on an annual basis by the company, so it seems

5    to cover it beyond a year.

6        Q.    Well, as far as bonus-structure compensation, the

7    initial agreement only covered year one, correct?

8        A.    I don't think that's the context of that whole

9    paragraph.

10       Q.    Well, we're going to talk about the whole

11   paragraph, Ms. Geiser.  But as far as specific amounts,

12   it says -- it's talking about the first year?

13       A.    Correct.

14       Q.    Okay.  'Cause you see here it says in the first

15   calendar year of employment.  And the maximum potential is

16   also for the first calendar year of employment, correct?

17       A.    Right.

18       Q.    Okay.

19              And the agreement does say that a detailed

20   bonus plan will be provided later?

21       A.    Right.

22       Q.    And that indicates that any sep -- that you-all

23   contemplated from day one that there may be additional

24   agreements on bonuses?

25       A.    Yes.

35

1          Q.    Okay.  And the agreement doesn't say whether any

2    separate agreements on bonuses have to be in writing or

3    whether they can be oral, correct?

4          A.    I don't agree with that characterization.

5          Q.    It says the detailed bonus plan will be provided.

6    It doesn't say whether that plan will be in writing or

7    whether you-all will just provide it to Mr. Carpenter

8    orally.

9          A.    I mean, there's other provisions in the contract

10   that address that any changes to the contract have to be

11   made in writing, so I don't agree with your characterization

12   there.

13         Q.    Well, the -- this doesn't say that the agreement

14   will be amended, does it?  It says that there will be --

15   it indicates that from day one you-all contemplated future

16   separate agreements on bonuses, correct?

17         A.    No.

18         Q.    No?

19         A.    No.  It doesn't, no.

20         Q.    You disagree?

21         A.    Yes.

22         Q.    Okay.

23               Did you-all ever provide a written bonus

24   plan for Mr. Carpenter after the first year?

25         A.    No.

Appendix 0557

1     Q.   Okay.   You-all discussed those issues orally,

2  correct?

3     A.   Discussions of plans, but nothing was ever agreed

4  upon.

5     Q.   Well, that's your contention, but certainly there

6  were discussions about -- with Mr. Carpenter about catching

7  up on earned annual bonuses.   Do you recall that?

8     A.   There was discussions but there was never a bonus

9  plan that was agreed to.

10    Q.   And within the first 90 days of the employment

11 date neither you nor Mr. Potashnik nor any of the entities

12 provided what you agreed to provide here?

13    A.   That's correct.   We did not provide a detailed

14 bonus plan.

15    Q.   You-all just addressed that orally?   You

16 discussed --

17    A.   No.   We discussed it but it was never agreed to.

18 We never were able to come up with a detailed bonus plan.

19    Q.   I didn't -- I didn't ask that.   I said your

20 discussions about bonuses after year one were oral.

21    A.   Discussions were oral as far as I know.

22    Q.   If you will go back to the paragraph that you

23 referenced in Paragraph 12?

24    A.   Yes.

25    Q.   Okay.

1                    It says no amendment or alteration of the

2    terms of this agreement shall be valid unless made in

3    writing and signed by both parties to this agreement,

4    correct?

5        A.    Yes.

6        Q.    Okay.  The terms of this agreement, as far as

7    compensation, are only what we just talked about?

8        A.    Yes.

9        Q.    Right?

10        A.    Right.

11        Q.    And so the -- any agreement for an

12    asset-sale-proceeds bonus would not need to amend or change

13    any of the compensation terms --

14        A.    The term "asset-sale-proceeds bonus" --

15        Q.    -- in the original agreement.

16        A.    -- is one that you've created.  That is not a term

17    that we used at our company.

18        Q.    You never talk -- you never used phrases talking

19    about bonusing people out of sale proceeds?

20        A.    Out of sale proceeds, but that's different than an

21    asset-sale-proceeds bonus --

22        Q.    Okay.

23        A.    -- as if it's a separate entity.

24        Q.    So you distinguished between bonusing people from

25    asset-sale proceeds and a sale-proceeds bonus?

1          A.     Yes.

2          Q.     Okay.

3                 Any agreement about bonusing someone out of

4    asset-sale proceeds would not alter or modify any of the

5    compensation terms in Exhibit 2, would it?

6          A.     Say that again.

7          Q.     Any agreement to bonus Mr. Carpenter out of sale

8    proceeds would not need to amend or alter any of the

9    compensation in that original agreement?

10         A.     I don't know.

11         Q.     You don't know?  Well, you've testified earlier

12   that you're pretty technical, right?

13         A.     Yeah.

14         Q.     Okay.  So, if you look back to Paragraph 12 and

15   what has to be in writing, it is only if what you're doing

16   would amend or alter the terms of this agreement, correct?

17         A.     Okay.

18         Q.     And as far as compensation goes, what we went over

19   are the only terms of the agreement, correct?

20         A.     Correct.  Yes.

21         Q.     So bonusing someone out of sale proceeds could be

22   separately agreed without having to change or alter any of

23   those compensation terms --

24         A.     I just don't know if I agree with that because the

25   funds to pay any bonuses could have been taken from sales

39

1    proceeds.  So I don't -- I don't know that I agree with that

2    characterization.

3        Q.    I'm not -- can you help me understand your

4    reasoning?  I'm not understanding what you're trying to say.

5    Why do you disagree?

6        A.    Because this total discussion of compensation

7    never says the source of the funds to pay this will come

8    from anywhere.

9        Q.    No, what I'm saying is, if there's a bonus -- if

10   there were bonuses paid because people stayed on in

11   connection with the asset sale, that would not alter the

12   annual salary.  It would not alter or amend or modify the

13   first-year bonus.  It would not affect reimbursement of

14   expenses.  It would not need to alter relocation expense or

15   housing or PTO or insurance or COBRA or car allowance,

16   health club, health insurance, or severance, correct?

17       A.    Say that again.  Can you read it back to me?  I

18   don't --

19       Q.    An asset -- a bonus for people to stay on in light

20   of the asset sale, an agreement to that would not amend or

21   alter --

22       A.    But there was no agreement to that.

23       Q.    May I finish the question, please?

24       A.    Okay.

25       Q.    I'm not asking you to agree whether there was,

1    okay.  I'm just talking about what needs to be -- what needs
2    a writing, Ms. Geiser.
3              Any bonus to Mr. Carpenter for staying in
4    light of the asset sale would not change or alter any of the
5    terms of this agreement as far as compensation goes,
6    correct?
7              MR. L. FRIEDMAN:  I'm going to object to
8    the extent it calls for a legal conclusion.
9              THE COURT:  Your position on the legal
10   conclusions aren't legal conclusions.
11             Answer the question.
12             THE WITNESS:  If there was a separate bonus
13   program separate from this employment agreement then I would
14   agree.
15        Q.   (By Ms. Gibson) Okay.  And the -- so you would
16   agree with me that bonuses after year one or any separate
17   bonus out of asset-sale proceeds does not need -- would not
18   need to be in writing, per your understanding, because
19   it wouldn't amend or alter the terms of this agreement as
20   it relates to compensation?
21        A.   Can you ask me that again?
22        Q.   Sure.
23             Bonuses after year one and any bonus for
24   staying in light of the asset sale would not need to be in
25   writing and signed by both parties because that compensation

1    would do nothing to alter the terms of this agreement when

2    it comes to compensation?

3         A.   I don't know if that's true.  I mean, it says a

4    detailed bonus plan will be provided.  I mean, it's

5    contemplated in the agreement.  I don't know.

6         Q.   One thing we know for sure is that from day one on

7    this agreement there were future agreements contemplated,

8    correct?

9         A.   I don't know that it contemplates future

10   agreements.  It's something that would have been contained

11   in this agreement.

12        Q.   A detailed bonus plan will be provided to the

13   employee within --

14        A.   If it's contemplated in that agreement then I

15   think it's part of that agreement, but I don't know.

16        Q.   Well, that, a detailed bonus plan will be

17   provided, that's something to happen in the future, correct?

18        A.   As part of this agreement.

19        Q.   And so -- well, it doesn't say that.

20        A.   It's in the agreement.

21        Q.   The agreement says one will be provided --

22        A.   As part of the agreement.

23        Q.   -- but it doesn't -- it doesn't say what the terms

24   are --

25        A.   Okay.

42

```
1        Q.    -- right?

2        A.    Right.

3        Q.    Okay.

4                    So, certainly, the parties contemplated

5    future deals as far as annual bonuses, correct?

6        A.    As part of this agreement.

7        Q.    The parties contemplated, from day one, future

8    agreements concerning bonuses, correct?

9        A.    As part of this agreement.

10                   THE COURT:  Y'all are going back and forth.

11   You need to move on.

12       Q.    (By Ms. Gibson) And the agreement on the

13   moonlighting provision also says --

14       A.    What -- okay.

15       Q.    This is on 3B.

16       A.    Okay.

17       Q.    3B contemplates that Jeff Carpenter may, at some

18   point in the future, be employed by an affiliate of

19   Southwest Housing Management, correct?

20       A.    Can I read it?

21       Q.    Sure.

22                   (Witness reading document)

23       A.    Okay.

24       Q.    So, from day one, the parties contemplated that

25   Jeff Carpenter might, in the future, do work or be employed
```

1  by one of Southwest Housing Management's affiliates,

2  correct?

3       A.   I would agree that that has -- it's written weird,

4  but I would agree that that's how this reads.

5       Q.   Okay.

6       A.   I don't know that Southwest Housing Management

7  ever contemplated that he would be employed by another

8  entity, but...

9       Q.   Well, it doesn't say he would or would not, but it

10  contemplates that that might -- that might be --

11       A.   As it's written.

12       Q.   -- something that could happen in the future --

13       A.   Uh-huh.

14       Q.   -- correct?

15       A.   As it's written, yes.

16       Q.   And the affiliates would be Southwest Housing

17  Development Company, correct?

18       A.   I mean, I guess --

19       Q.   One of them?

20       A.   -- the affiliates could be anything that was an

21  affiliate.

22       Q.   Okay.  Southwest Housing Development was an

23  affiliate, correct?

24       A.   It had an affiliated ownership, yes.

25       Q.   I'm sorry.  I couldn't -- I couldn't hear you.

44

1          A.    It had common ownership, correct.

2          Q.    And the construction arm of the business also was

3    an affiliate, correct?

4          A.    Affordable Housing Construction was also -- had a

5    common ownership, correct.

6          Q.    Okay.

7                So, from day one, when -- in 2004, when

8    Mr. Carpenter and you-all entered this agreement, the

9    agreement itself contemplated that there may be future

10   agreements, correct?

11         A.    I disagree.

12         Q.    Do you agree that if the parties shake on it and

13   both parties agree, there's an agreement, notwithstanding

14   what we were talking about in the employment contract?

15         A.    You're qualifying that question.   Can you ask

16   it to me directly?

17         Q.    Can I ask it to you how?

18         A.    Can you re-ask it to me?

19         Q.    Sure.

20               Do you believe that if the parties have a

21   written agreement, that if they strike a deal, if they shake

22   on it and both parties agree, that there is still an

23   agreement?

24         A.    I mean, as I said before, if both parties agree to

25   an agreement, then I agree that it's an agreement.

Appendix 0566

1          Q.    Okay.   Even if they had something different or

2     separate in writing already?

3          A.    I mean, I don't know, Ms. Gibson.   I'm not a

4     lawyer.   If a contract calls for a written -- everything has

5     to be in writing, then I would say everything has to be in

6     writing.   If, under Texas law, an oral agreement satisfies

7     that, if both parties agree and there's a meeting of the

8     minds and the terms are agreed to, then I would agree that's

9     an agreement.

10         Q.    And the truth is, during discussions with

11    employees about bonusing them out of asset-sale proceeds if

12    they would stay, you didn't go back and dust off their

13    employment agreements to look at while you had those

14    discussions, did you?

15         A.    That's incorrect.

16         Q.    You did?

17         A.    Not everybody had an employment agreement and so

18    everyone's situation is different.

19         Q.    All right.

20               For those people who did have a written

21    employment agreement, the truth is that during discussions

22    with them about bonusing them out of asset-sale proceeds if

23    they would stay, you were not looking at their written

24    employment agreement?

25               MR. L. FRIEDMAN:   Okay, this is --

46

1                    THE WITNESS:  I don't agree with that.

2                    MR. L. FRIEDMAN:  -- in violation of the

3    limine --

4                    MS. GIBSON:  Okay.

5                    MR. L. FRIEDMAN:  -- Your Honor.  We're

6    just talking about Mr. Carpenter.

7                    THE COURT:  Well, she talked about the

8    program, so --

9                    MR. L. FRIEDMAN:  And she hasn't

10   established any program.

11                   THE COURT:  Okay.

12                   MS. GIBSON:  With -- sorry.  With --

13                   THE COURT:  Objection's overruled.

14       Q.   (By Ms. Gibson) During any time in your

15   discussions with Mr. Carpenter, did you -- when you-all were

16   discussing about bonusing him out of the asset-sale proceeds

17   if he would stay, did you ever say, "But, Jeff, our

18   handshake deal is not going to be good unless it's in

19   writing and an amendment to your employment agreement?"

20       A.   Did I ever say those words that you just said?

21   No.

22       Q.   Okay.

23       A.   But I never use those words, so that's why I

24   didn't say that.

25       Q.   I mean, y'all discussed bonusing Jeff Carpenter

1    out of the asset-sale proceeds if he would stay.   And during

2    those discussions y'all never talked about the terms of this

3    written agreement, correct?

4         A.   I don't know if that's true or not.

5         Q.   Okay.   You don't recall one way or the other?

6         A.   I don't recall how character -- how we

7    characterized discussions.   And they were simply

8    discussions.   They weren't agreements and they were

9    discussions.

10        Q.   Ms. Geiser, at some point in deciding to sell the

11   business, you and Brian Potashnik considered the potential

12   for a mass exodus of employees before the asset sale

13   happened, correct?

14        A.   I know I did.   I can only speak for myself.

15        Q.   So you're saying that you did not discuss that

16   with Brian Potashnik?

17        A.   We had discussions about employees leaving and --

18   because how it normally happens in the property management

19   business is when a new company buys an apartment complex

20   they come in and get rid of all the onsite staff:   Property

21   manager; the maintenance people; that kind of thing.   The

22   majority of our employees, we're property level employees.

23   We have 60 properties.   There was probably an average of

24   five employees per property.   That's about 300 employees.

25   So that is where the mass exodus concern came in.

1              And we ultimately negotiated with the buyer

2     of our company to hire all of our employees.  So when the

3     transition happened everyone knew they would have a job and

4     everyone was retained.

5          Q.   Do you recall -- do you recall being at your

6     deposition, Ms. Geiser?  Correct?

7          A.   Yes.

8          Q.   Okay.  And in connection --

9                    MS. GIBSON:  This is 58, 25.

10                   MR. L. FRIEDMAN:  Give me a second.

11                   (Pause)

12                   Okay.

13         Q.   (By Ms. Gibson) And so, in your deposition, I

14    asked, "So, at some point, y'all considered the potential

15    for a max exodus of employees before the asset sale

16    happened?"

17                   MR. L. FRIEDMAN:  Excuse me.  Fifty-eight,

18    twenty-five?

19                   MS. GIBSON:  I'm sorry.  It's 58 on my

20    condensed.  It is 60, 25.  It's Page 58 at the top; it's

21    Page 60 at the bottom.

22                   MR. L. FRIEDMAN:  Oh, I see.  Okay.  Give

23    me a second.

24                   MS. GIBSON:  Okay.

25                   MR. L. FRIEDMAN:  Okay, I'm here.

1          Q.     (By Ms. Gibson) Okay.  And you say, "Yeah.  There

2     was concern that employees would leave."  And I asked, "And

3     did you and Brian Potashnik consider how to prevent a mass

4     exodus of employees?"  And you said, "Yes."

5          A.     Yes.

6          Q.     And does that refresh your memory that you

7     discussed this matter with Brian Potashnik?

8          A.     I know we discussed it, yes.

9          Q.     And you were also concerned about important

10    employees leaving before you could get the asset sale done,

11    correct?

12         A.     Yes.

13         Q.     And at the time, you believed Jeff Carpenter,

14    Sara Reidy, and Keith Jones were important employees?

15         A.     Among others.

16         Q.     Correct.  I'm not saying they're the only ones.

17    Everyone's important in the business.  But at the time when

18    you're talking about trying to keep important employees,

19    keep them on, those important employees included

20    Jeff Carpenter, Keith Jones, and Sara Reidy, correct?

21         A.     Yes.

22         Q.     And what did you-all decide to do?  What did you

23    and Brian Potashnik decide to do to encourage these

24    important employees to stay, despite the potential for an

25    asset sale?

50

1        A.    We talked to the employees about the sale and we

2   let them know that if, at the end of the day, the sale was

3   successful and there was money left over at the end of the

4   day that we wanted them to participate in the success of the

5   sale and of the business.

6        Q.    And when you initially discussed these incentives

7   with important employees you were not concerned very much

8   about having money left over at the end of the day?

9        A.    I'm not sure I can go to my frame of mind at that

10  particular time.  The sale was very complicated.  It dragged

11  on for a long type, so it was hard to quantify what the

12  sales proceeds, the net proceeds, at the end of the day

13  would be.

14             There was an amendment.  I think the

15  contract was signed in April of '07.  By June, there was

16  already an amendment.  There was seven amendments

17  after that.  So it was a complicated process.  There was

18  adjustments upward for things happening, there were

19  adjustments downward for things happening, so I don't know.

20       Q.    You've heard that Mr. Carpenter believes his

21  agreement was a percentage of certain net seller's revenue

22  minus stay bonuses paid to other important employees.  And

23  if that's accurate, Mr. Carpenter's bonus would just

24  fluctuate with the deal, correct?

25       A.    I don't think that's accurate.

1          Q.    Well, when you have a percentage formula, if the

2    transaction turned out -- if it turns out that there was no

3    seller's revenue, the bonus would simply be zero, correct?

4          A.    I don't know because I remember seeing something

5    that Jeff wrote where he characterized it as if the sale --

6    net sales proceeds were supposed to be 28 but they were only

7    20, I would get a bonus based on the 28.  So I don't -- I

8    don't know that I can agree with you on that.

9          Q.    Well, that's -- that's something that Jeff

10   proposed after you-all told him you were not going to pay,

11   correct?

12         A.    I believe I saw that document in November of 20 --

13   November of 2007.  So that would have been after he left.

14         Q.    Do you agree with me --

15         A.    Because we never had an agreement.

16         Q.    I understand that's your position.

17         A.    Okay.

18         Q.    Okay.

19                    The point of offering or telling employees

20   about your intent to bonus them out of the asset-sale

21   proceeds was to get them to stay, correct?

22         A.    They saw the potential on the horizon that if the

23   sale was successful that there would be an up side for them.

24   That was their decision.  There was no agreement.  There was

25   no promise to pay anything.  There was a hope that the

1    transaction would be successful; and at the end of the day,

2    if it was successful, they would benefit and participate in

3    the success.

4         Q.   Okay.  And you have testified that you were not

5    actually present when Brian Potashnik made the agreement

6    with or talked to Jeff about the sales-proceeds bonus.

7         A.   If that conversation occurred, I was not present.

8         Q.   You had talked to -- and Jeff Carpenter reported

9    to Brian Potashnik, correct?

10        A.   Yes.

11        Q.   And when it came to discussing bonusing

12   employee -- important employees out of sale proceeds, you

13   discussed that with the people that reported to you?  In

14   other words, such as Sara Reidy?

15        A.   I discussed it with Sara.

16        Q.   Okay.  And Brian Potashnik discussed it with

17   people who reported to him, like Jeff Carpenter?

18        A.   Any conversation that happened between Brian and

19   Jeff happened between Brian and Jeff.  I had a conversation

20   with Sara.  Sara and I were not only in a business

21   relationship, we had a personal friendship and we talked all

22   the time.

23        Q.   Y'all were very, very good friends --

24        A.   Yes.

25        Q.   -- correct?  Okay.

1          During Jeff Carpenter's employment, your

2    family and Jeff Carpenter's family did things like y'all had

3    Thanksgiving together once, correct?

4          A.    You pointed that out to me.  I don't remember it.

5    I'm not denying it happened.  It could have happened.

6          Q.    Okay.

7               And during Jeff Carpenter's employment you

8    repeatedly told him that you appreciated his hard work?

9          A.    That sounds like something I would say.

10         Q.    During Jeff Carpenter's employment, you never --

11    you never fired him for any reason at all?

12         A.    Correct.

13         Q.    You never wrote him up?

14         A.    Correct.

15         Q.    You never gave him any type of written discipline?

16         A.    I didn't.  I wasn't his direct report.  You

17    established that he reported to Brian.

18         Q.    Well, I understand, but you -- a lot of the

19    employees thought that you were one of the owners of the

20    companies, correct?

21         A.    That may be true.

22         Q.    Okay.

23               And did you hold yourself out to the public

24    as one of -- as an owner of the companies?

25         A.    The public knew that I worked for the company.

1    The public knew that I was married to Brian.  The public

2    knew what they knew, but to the public Brian was always the

3    owner of the company.  He was always the face of the

4    company.  Every interview, every grand opening that we ever

5    had at any of our properties was all Brian.

6        Q.    Did you, however, ever represent yourself to the

7    public as an owner of the company?

8        A.    It's possible, yeah.  Brian and I were a team,

9    so...

10       Q.    Okay.

11       A.    But he's on the cover there.  I'm only on the

12   insert.  I know that article you're going to show me.

13       Q.    Okay.  You saw me getting it out.

14       A.    I was pretty pissed about that.

15       Q.    All right.  You saw it and that refreshed your

16   memory.

17                    I am handing you --

18                    MR. L. FRIEDMAN:  If I'm not in it, I'm

19   going to object on the basis of relevance.

20                    (Laughter)

21                    THE COURT:  Noted.

22                    MR. L. FRIEDMAN:  Thank you.

23       Q.    (By Ms. Gibson) I'm handing you what has been

24   marked Plaintiff's Exhibit 10.  It's an excerpt from -- do

25   you recognize that as excerpt from marketing materials?

1      A.   Well, this was an article that was in <u>Multifamily</u>

2  <u>Executive</u> magazine, and we made copies of it or whatever to

3  insert into our marketing material.

4      Q.   Okay.  And you see in the article that the article

5  refers to you as a co-owner of the business?

6      A.   Yes.

7      Q.   When --

8      A.   But they didn't give me those articles to edit

9  either.  So, no, they don't give you that kind of editorial

10 review before they write articles about you.

11     Q.   So you're saying that the writer just got that

12 wrong?

13     A.   I was -- I mean, Brian was the owner of the

14 company.  I was an owner by virtue of my community property.

15 I was his wife.  I did a lot of work at the company.

16          So I did not own Southwest Housing

17 Management.  I did not own Southwest Housing Development.  I

18 didn't own -- I did own, through my entity, CLG Consulting,

19 several job or partnership interests in properties.

20          Once Brian and I got married, I was

21 required to sign personal guaranties on all the entities.

22 So ownership in our business is a little bit more

23 complicated than just a quote from an article.

24     Q.   Okay.  The article refers to you as a co-owner of

25 the business, though, correct?

1      A.   Yes.

2      Q.   Okay.   And you did have ownership in various

3  pieces of the business, correct?

4      A.   Like I said, my entity, CLG Consulting, owned, I

5  think, interest in six general or limited partnerships.

6      Q.   And in 2005 the FBI started a criminal

7  investigation that started with a raid at Southwest Housing

8  Management, correct?

9      A.   Yes.

10      Q.   And you and Brian Potashnik assured Jeff Carpenter

11  that you-all had done nothing wrong, correct?

12      A.   I'm sure we said words to that effect.

13      Q.   Okay.

14           In connection with promises in connection

15  with the criminal investigation -- I'm sorry.   Let me strike

16  that.   I didn't say what kind of promises.

17           In connection with promises about

18  compensation and promises that you-all had done nothing

19  wrong as far as the criminal investigation, you and Brian,

20  do you believe Jeff Carpenter was entitled to trust you?

21                THE COURT:   To what?

22                MS. GIBSON:   Trust you.

23                MR. L. FRIEDMAN:   Objection.   The

24  question's compound and vague as to time.

25                MS. GIBSON:   I'll break it up.

```
1                    THE COURT:  All right.

2          Q.    (By Ms. Gibson) When it came to what y'all

3    discussed about what you intended to pay Jeff Carpenter, do

4    you believe Jeff Carpenter was entitled to trust you?

5          A.    We never talked about --

6                    MR. L. FRIEDMAN:  Excuse me.

7                    That question's confusing.  I mean, does

8    she mean by the employment contract, 'cause she hasn't laid

9    a foundation about any oral agreement with this witness?

10                   THE COURT:  She's just asking whether --

11   objection's overruled.

12                   Answer it if you can answer it.

13                   THE WITNESS:  Can you ask me that question

14   again?

15                   MS. GIBSON:  Sure.

16                   THE WITNESS:  Sorry, Your Honor.  I didn't

17   mean to talk over you.

18         Q.    (By Ms. Gibson) For example, you testified

19   yesterday that you intended to pay Jeff Carpenter a bonus as

20   the asset-sale proceeds, correct?

21         A.    If and when there was money left over to pay those

22   bonuses.

23         Q.    But you intended to pay the bonus, correct?

24         A.    Some amount.

25         Q.    Well, you already testified that those discussions
```

1   about amounts, if there were any, were between Brian and

2   Jeff Carpenter, correct?

3        A.    Yes.

4        Q.    Okay.

5             Do you believe Jeff Carpenter was entitled

6   to trust your word when you said you intended to pay him a

7   bonus out of the asset-sale proceeds?

8        A.    Some amount, yes.

9        Q.    And Mr. Carpenter did everything you asked of him,

10  which was to say.

11       A.    Well, I didn't ask him to sue me before the sale

12  went through.  So, no, I don't think he did everything I

13  asked him to do.

14       Q.    Jeff Carpenter's work as far as you-all needing

15  him -- I'm -- so you're mad that Mr. Carpenter brought suit

16  over the agreement, correct?

17       A.    There was no agreement.  And you asked me a

18  question and I don't believe he did everything because -- or

19  however you asked me.  I think suing us before the sale went

20  through, trying to get a temporary restraining order to

21  interrupt the sale, were things that were inconsistent with

22  anything that a good employee would do.

23       Q.    But it's just not -- it's not true that

24  Jeff Carpenter tried to interrupt the sale.

25       A.    What's a TRO?

```
 1                    MR. L. FRIEDMAN:  Well, Your Honor, who's
 2    testifying here?
 3                    MS. GIBSON:  It's a question.
 4                    THE COURT:  Ask questions.
 5        Q.   (By Ms. Gibson) Ultimately, Ms. Geiser -- well,
 6    let me do this.
 7                    THE WITNESS:  Your Honor, can we take a
 8    break?
 9                    THE COURT:  I think she's about finished,
10    but we take a break at 10:20, which is just a couple
11    minutes.
12                    THE WITNESS:  Okay.
13                    THE COURT:  But she may be finished by
14    then.  We'll see.
15                    MS. GIBSON:  Okay.
16        Q.   (By Ms. Gibson) The intent of bonusing employees
17    out of sale proceeds was to get them to stay, correct?
18        A.   The intent of talking to the employees and letting
19    them know that if the sale went through there was upside for
20    them was motivation for them to stay.  If they chose to stay
21    on that basis, that was up to them.
22        Q.   Jeff Carpenter stayed as long as you-all needed
23    him to, correct?
24        A.   Jeff Carpenter stayed until we no longer needed
25    him and as long as he received his annualized salary of
```

1    $200,000 plus benefits.

2         Q.    And that date was October 31, 2007?

3         A.    On or about.

4         Q.    November 1, 2007, was the transfer of management

5    to the purchasers, correct?

6         A.    Yes.

7         Q.    Okay.  So Jeff had done everything that you-all

8    had asked him to do as far as staying to help make the asset

9    sale work as of the end of the day on October 31st, 2007?

10        A.    Jeff continued his employment until October 31st

11   of 2007.

12        Q.    He stayed.

13        A.    He continued his employment.  He continued doing

14   his functions for Southwest Housing.  He stayed on with the

15   company.  He received his paycheck for doing that.

16        Q.    You-all asked him to stay, didn't you?

17        A.    He stayed.

18        Q.    Did you ask him to stay on to do work as needed to

19   help make the asset sale happen?

20        A.    I asked Jeff to stay and continue his role with

21   the management company to maintain continuity for the sale

22   process to take place.

23        Q.    Okay.  You asked him to stay and he stayed.

24              On -- after his work was completed, on

25   November 1, 2007, you sent or you had someone send

61

```
1    Jeff Carpenter a proposed separation agreement in which he
2    would have to waive all of his legal rights --
3         A.   Well, I think you're --
4         Q.   -- what he will be --
5         A.   -- leaving out an important point, which is I was
6    responding to something he had --
7                   THE COURT:  Stop.  It sounds like you're
8    going on to a different -- I thought you were wrapping up.
9                   MS. GIBSON:  Okay.
10                  THE COURT:  You're going on to a different
11   subject.  We'll take our break.
12                  We'll take a 15-minute break, ladies and
13   gentlemen.  We'll see you back at 10:36.
14                  (The jury exited the courtroom.)
15                  (Recess taken)
16                  (The jury entered the courtroom.)
17                  THE COURT:  Welcome back.  Good morning
18   still, ladies and gentlemen.
19                  We'll continue with the trial.  Our witness
20   is Ms. Geiser.  The examining attorney is Ms. Gibson.  And
21   we'll go up until noon, the noon hour, just before the noon
22   hour before we take our next break.  And that break will be
23   an hour and 10 minutes for our lunch break.
24                  So, Ms. Gibson, if you'd pick up where you
25   left off.
```

1          Q.    (By Ms. Gibson) Ms. Geiser, could you take a look
2     back at Exhibit 10, please?
3          A.    Yes.
4          Q.    And is Exhibit 10 an accurate depiction of an
5     excerpt from an article from an interview with you and
6     Brian Potashnik?
7          A.    Yes.
8          Q.    And I realize you said you believe it's a mistake
9     that you are referenced as a co-owner?
10         A.    Right.
11         Q.    Okay.
12                    MS. GIBSON:  Plaintiff offers Exhibit 10.
13                    THE COURT:  Any objection?
14                    MR. L. FRIEDMAN:  No objection.
15                    THE COURT:  Ten is admitted.
16         Q.    (By Ms. Gibson) Ms. Potashnik, we had talked about
17    that you had asked Jeff Carpenter to stay on as long as
18    needed to help make the asset sale happen?
19         A.    Yes.
20         Q.    Okay.  And, in exchange for staying, the carrot
21    was a bonus out of the sale proceeds?
22         A.    Potentially.
23         Q.    And as we sit here today, although Jeff Carpenter
24    stayed, it's your position now, after the fact, that
25    Jeff Carpenter's salary was enough to cover everything; is

1    that right?

2         A.   Jeff was -- the discussions, as I understand them,

3    were that if he -- if there was proceeds remaining from the

4    sale to distribute to employees then he would have

5    participated in that.  Other than that, he received his

6    salary.

7         Q.   Is it your position, after the fact, today, as you

8    sit here, that Jeff's salary is all he was entitled to?

9         A.   I don't know what you mean by after the fact.

10   That was my position then and that's my position now.

11        Q.   Did you tell Jeff Carpenter, when you offered him

12   the carrot of a bonus out of the sale proceeds, if he would

13   stay on, that you were taking the position, though, that his

14   salary was going to cover everything and you would pay him

15   nothing?

16        A.   Like I said, the discussions were if there was

17   proceeds left when the sale went through that he would

18   participate in that.

19        Q.   Did you ever tell Jeff Carpenter it was your

20   belief that his salary covered his staying on, that that's

21   all he was entitled to?

22        A.   I don't remember having that conversation with

23   Jeff.

24        Q.   Okay.  That's your position today, though, now

25   that we're in a lawsuit?

1       A.   I think that's always been the position.

2       Q.   That's always been your position even when you

3   were offering a carrot to bonus out of sale proceeds if he

4   would stay?  It was your position that --

5       A.   I didn't offer a carrot.  Discussions were had.

6   The discussions were generally about if there were monies at

7   the end of the day; if the sale went through and it was

8   successful, that he would participate on some level at our

9   discretion or at Brian's discretion.  So I keep saying the

10  same thing.

11      Q.   Did you use those words with Jeff Carpenter in

12  these discussions?  Did you say that it would be at our

13  discretion, we may or may not pay you?  Did you ever tell

14  Jeff Carpenter that while he was employed?

15      A.   The discussions with Jeff were generally him

16  asserting certain things and me saying we can't make you

17  that deal, Jeff, we can't make that commitment.  The only

18  thing we tell you or I can tell you is at the end of the

19  day, if there are proceeds left after the sale, that you'll

20  participate.

21      Q.   The truth is, Ms. Geiser, you didn't start backing

22  out and saying we can't make that commitment until you had

23  already gotten everything you needed from Jeff at the end of

24  the day on October 31st.

25      A.   The truth is that I sat at Jeff Carpenter's

65

1    deposition where my lawyers asked him, "Did you have a deal

2    with Cheryl Potashnik?"  And he said, "No."  And my lawyer

3    asked, "Why are you suing Cheryl Potashnik?"  And the reason

4    was because her name appears on the closing statement or on

5    the sale agreement, and advice of counsel.

6              Jeff admitted that at his deposition that

7    he never had a deal with me.  And he never had a deal  with

8    me.

9         Q.   I disagree, but Mr. Carpenter will testify, okay?

10        A.   And he has.

11        Q.   Well, you told Mr. Carpenter that you intended to

12   pay him a bonus, correct?

13        A.   If and when the sale went through.

14        Q.   Okay.

15             THE COURT:  You're asking the same

16   questions.

17             MS. GIBSON:  All right.

18             MR. L. FRIEDMAN:  Thank you.

19             What number?

20             MS. GIBSON:  Eleven.

21        Q.   (By Ms. Gibson) Ms. Geiser, I'm handing you what's

22   been marked Exhibit 11, going back through the timeline in

23   this case.  Do you recognize Exhibit 11 --

24        A.   Yes.

25        Q.   -- as a letter of intent to sell the business?

66

1          A.    Yes.

2          Q.    Okay.   And the date, what is the date of the

3     letter of intent?

4          A.    October 16th, 2006.

5          Q.    And at the time -- well, in looking -- in looking

6     at Exhibit 11, who's signatures --

7                    MR. L. FRIEDMAN:   Your Honor, I'm going to

8     object to the witness testifying about anything, an exhibit

9     that has not been admitted into evidence.

10                   MS. GIBSON:   I'm authenticating it still.

11                   THE COURT:   All right.

12                   Well, is there an objection to it?

13                   MR. L. FRIEDMAN:   Yeah, I object.   It's

14    hearsay.

15                   MS. GIBSON:   Well, let me offer it first.

16                   THE WITNESS:   The signatures are

17    Brian Potashnik's and mine.

18                   MS. GIBSON:   Okay.

19                   Plaintiff offers Exhibit 11.

20                   THE COURT:   Okay.

21                   And your -- your objection is hearsay?   She

22    said she --

23                   MR. L. FRIEDMAN:   Hearsay, lack of

24    foundation.

25                   THE COURT:   Anything else?

1          MS. GIBSON:  Is that it?

2          MR. L. FRIEDMAN:  No, sir.

3          THE COURT:  All right.

4          MS. GIBSON:  Your Honor --

5          THE COURT:  Overruled.  Eleven is admitted.

6      Q.   (By Ms. Gibson) And at the time you and

7   Brian Potashnik signed the letter of intent, when was the

8   anticipated close?

9      A.   This is a letter of intent, so we would have had

10  to then negotiate the purchase and sale agreement.  There

11  was no intent at that time.

12     Q.   When did you believe the sale was likely to close

13  at that time?

14     A.   Until you have a purchase and sale agreement, you

15  can't possibly know based on the letter of intent.  It's

16  impossible.

17     Q.   Did you believe that the close was likely

18  to happen the next summer?

19     A.   This is a letter of intent.  There's no way to

20  know.

21     Q.   Not just based on that.  I'm saying at the time

22  y'all signed that.

23     A.   I don't think there's any way to have known that.

24  This is just a letter of intent.

25     Q.   Okay, you don't think you knew at this time when

1   the sale was likely to close?

2       A.   This is just a letter of intent, so --

3       Q.   I understand, but I'm not asking just based on

4   that document.

5       A.   Well, you have to go to -- you have to go from

6   letter of intent to purchase and sale agreement, and then

7   that would dictate the closing date.

8       Q.   Okay.  Well, let me ask you -- let me ask you this

9   way.  Whether it was on October 16th, 2006, or at some later

10  point, the asset sale was initially anticipated to close in

11  summer of 2007, correct?

12      A.   The purchase and sale agreement was signed in

13  April of '07 and there's a very detailed discussion about

14  closing and when that would occur.  I don't recall there

15  being a date certain in it.  It talks about all the

16  different conditions that have to happen before the sale can

17  go through.

18               I know that as early as June of '07 there

19  was already the first amendment to the contract.  So I don't

20  know that -- I can't sit here today and say that I believed

21  in April of '07, based on all the consents and various

22  things that had to happen to be able to close, that it could

23  possibly have closed in the summer.

24      Q.   My question was summer.

25      A.   Yeah.  I can't sit here today and say I

69

1   anticipated being in the summer.  I guess that was probably

2   our hope.

3       Q.   I thought you said April.

4       A.   It was signed in April 2007.  I think the hope was

5   that it would close by the summer, but I don't know that

6   there was a date certain in the contract.

7       Q.   I'm not asking you about a date certain.  I'm just

8   asking when you-all initially anticipated the deal would

9   close.

10              MR. L. FRIEDMAN:  Asked and answered,

11   Your Honor.

12              THE COURT:  Overruled.

13              THE WITNESS:  Again, I think the hope was

14   that it would close over the summer, but there was a lot of

15   things that needed to happen in order for that sale to go

16   through.  So it's very detailed once we got to the purchase

17   and sale agreement what things had to happen in order for

18   the sale to go through.  And as early as June of '07 there

19   was already an amendment.  I believe there was another one

20   in July.  So it became clear pretty early on that the

21   closing was going to drag out.

22       Q.   (By Ms. Gibson) Ms. Geiser, do you recall being at

23   your deposition?

24       A.   Yes.

25              MS. GIBSON:  Mr. Friedman, Page 85,

1    Line 16.  Let me know when you're there.

2                    (Pause)

3                    MR. L. FRIEDMAN:  I'm here.

4         Q.    (By Ms. Gibson) Ms. Geiser, at your deposition I

5    asked, "Going back in time, the asset sale to Cascade was

6    initially anticipated to close in spring or early summer of

7    2007, correct?"  And you say, "I don't know if it would have

8    been spring, but summer."

9         A.    Yeah.  I stand corrected because I was unclear, I

10   guess, on the dates at that time.  The actual sale contract

11   wasn't executed until the spring of '07, so it couldn't have

12   closed in the spring.  And the hope was, yeah, that it would

13   have closed by the summer.

14        Q.    Okay.

15                    So, initially, you-all anticipated close in

16   summer of 2007.  And so, less than a year --

17                    MR. L. FRIEDMAN:  I'm going to object.  It

18   misstates the witness's prior testimony.

19                    MS. GIBSON:  (Unintelligible).

20                    MR. L. FRIEDMAN:  Misstates the witness's

21   prior testimony.

22                    MS. GIBSON:  I haven't even asked the whole

23   question.

24                    THE COURT:  She hasn't asked the question.

25                    Ask your question.

71

```
 1          Q.     (By Ms. Gibson) And so, the time between the
 2    letter of intent to sell and the initial anticipated close
 3    date was less than a year, correct?
 4          A.     The time that the letter of intent was told to
 5    when we thought the sale could potentially go through was
 6    less than a year?
 7          Q.     Right.
 8          A.     That's probably true.
 9          Q.     And in the letter of intent it identifies the
10    seller as multiple entities and persons.   Collectively, all
11    Southwest Housing entities or persons affiliated therewith,
12    correct?
13          A.     Yes.
14          Q.     Okay.   And were you one of the individual persons
15    referenced?
16          A.     Through my entity, yes.
17          Q.     Okay.   And is that why you -- and that's why you
18    signed the letter of intent?
19          A.     I believe that's why they had me sign the letter
20    of intent, yes, because some of the entities listed on
21    Schedule A were owned by my entity.
22                 MS. GIBSON:   Mr. Friedman, this is 12.
23                 MR. L. FRIEDMAN:   Thank you.
24          Q.     (By Ms. Gibson) I'm handing you Plaintiff's
25    Exhibit 12.   Do you recognize that document?
```

1          A.     Yes.

2          Q.     And is -- does Exhibit 12 appear to be an accurate

3     copy of an excerpt from the purchase and sale agreement?

4          A.     An excerpt from the purchase and sale agreement?

5          Q.     Well, the actual purchase and sale agreement had

6     lots of schedules and attachments, and so an excerpt in the

7     sense if it's just a purchase and sale --

8          A.     The main body of the agreement?

9          Q.     Right.

10         A.     Does --

11         Q.     Does it appear to be an accurate copy?

12         A.     I'm going to take your word for it.

13         Q.     Well, does it appear to you to be an accurate copy

14    of the agreement?

15         A.     I mean, I can sit here and read the agreement, but

16    I'm going to take your word for it that it's an accurate

17    copy of the agreement.

18         Q.     Okay.

19                       MS. GIBSON:   Plaintiff offers Exhibit 12.

20                       MR. L. FRIEDMAN:   Take the witness on voir

21    dire?

22                       THE COURT:   No.

23                       Do you have an objection to it?

24                       MR. L. FRIEDMAN:   Well, it's lack of

25    foundation and hearsay.   She didn't sign this agreement and

73

1       it's incomplete.

2                       THE COURT:  All right.  She says she agrees

3       to take Ms. Gibson's word for it that it was accurate.

4                       MR. L. FRIEDMAN:  It's incomplete,

5       Your Honor.

6                       THE COURT:  It's admitted.

7                       MR. L. FRIEDMAN:  Best evidence rule.

8                       THE COURT:  What is better?  You mean the

9       entire --

10                      MR. L. FRIEDMAN:  Well, a complete document

11      is better than selected --

12                      THE COURT:  Well, of course, but you

13      don't -- overruled.

14          Q.   (By Ms. Gibson) Ms. Geiser, if you'll take a look

15      at Page -- the page that ends in 322 on the bottom right.

16          A.   Say that again.

17          Q.   You see that there are Bates numbers in the bottom

18      right of the document?

19          A.   Okay.

20          Q.   Okay.  If you'll turn to the page that is 322.

21          A.   Oh, yeah.  It's the signature page?

22          Q.   Yes.

23                      And you see on the signature page of the

24      purchase and sale agreement it has the -- the top signatures

25      are the purchaser, correct, Cascade, Affordable Housing?

Appendix 0595

74

1       A.    Yes.

2       Q.    Okay.   And if we go down you see that the seller's

3   signature --

4       A.    Yes.

5       Q.    -- is Brian Potashnik?

6       A.    Uh-huh.

7       Q.    And you see that he is the authorized agent for

8   each of the sellers that are listed on the schedule?

9       A.    Listed on Schedule A hereof.

10      Q.    Right.

11            So, is -- is that accurate Brian Potashnik,

12  in connection with the asset sale, was acting as the

13  authorized agent for the sellers?

14      A.    Yeah.   I mean, I guess that's what the lawyers

15  worked out.   I -- I'm -- yes, that's what it says.

16      Q.    And you were one of the persons who was a seller,

17  as we just saw in the LOI --

18      A.    Correct.

19      Q.    -- through CLG, correct?

20      A.    Yes.

21      Q.    Yes?   Okay.

22            And so, in connection with the sale, that

23  would mean Brian Potashnik was also acting as the authorized

24  agent for you through your company?

25      A.    I guess.   I don't know how the lawyers came to

1      that, but that must have been what they came up with.

2          Q.     And the date for the purchase and sale agreement

3      is what?

4          A.     April 30th, 2007.

5          Q.     And PSA is a term sometimes used as an

6      abbreviation for purchase and sale agreement?

7          A.     Yes.

8          Q.     And at the time -- let me strike that.

9                 MS. GIBSON:  Thirteen.

10                MR. L. FRIEDMAN:  Thank you.

11                THE WITNESS:  It gets progressively colder

12     in here.  It's freezing, right?

13                THE COURT:  We'll work on that.

14                THE WITNESS:  It starts off hot and then

15     it gets cold.

16         Q.     (By Ms. Gibson) I'm handing you Exhibit 13.  Does

17     Exhibit 13 appear to be an accurate copy of Schedule A

18     excerpt from the Southwest/Cascade seller asset purchase or

19     sale agreement?

20                MR. L. FRIEDMAN:  Take the witness on voir

21     dire, Your Honor?

22                THE COURT:  No.

23                MR. L. FRIEDMAN:  There can't be two

24     Schedule A's to the same document.

25                THE COURT:  She hasn't answered the

1    question yet.  Let Ms. Gibson ask her questions.

2                        THE WITNESS:  I'm going to, again, take

3    your word for it that this is an accurate copy of the

4    Schedule A to the Southwest/Cascade seller asset purchase

5    price for --

6                        MR. L. FRIEDMAN:  Your Honor, this is

7    hearsay, violates the best evidence rule, and it would be

8    misleading if we don't have the entire document and just one

9    schedule.

10                       THE COURT:  Well, you can offer the entire

11   document when you do your direction examination.

12                       MR. L. FRIEDMAN:  Okay.

13                       I don't even know what this is, Your Honor.

14   I'm looking at this --

15                       THE COURT:  Well, y'all come over here.

16                       (Sidebar conference held)

17                       THE COURT:  Vikki, we'll -- the objection

18   to Exhibit 13 is overruled.  It's admitted.  And we'll put

19   the objection on the record later.

20                       MS. GIBSON:  Okay.

21                       MR. L. FRIEDMAN:  Now, Your Honor?

22                       THE COURT:  No, later, once the jury leaves

23   at the end of the day.

24                       You already have the sub -- you already

25   have the legal objections on the record.  What she meant by

77

1    what you told me there we'll put on the record later.

2                    MS. GIBSON:  Okay.

3                    MR. L. FRIEDMAN:  Okay.  Thanks.

4         Q.   (By Ms. Gibson) All right.  Ms. Geiser, Schedule A

5    lists various sellers, correct?

6         A.   Yes.

7         Q.   Okay.  And you see that Brian Potashnik is one of

8    the sellers?

9         A.   Yes.

10        Q.   And you see that Southwest Housing Development is

11   also one of the sellers?

12        A.   Correct.

13        Q.   And you see that Southwest Housing Management

14   Corporation is also one of the sellers?

15        A.   Yes.

16        Q.   And you testified a moment ago that you were also

17   a seller in that some of the assets through one of your

18   companies was also part of the asset sale?

19        A.   Yes.

20        Q.   So all of the defendants in this case were sellers

21   in the asset sale, correct?

22        A.   I'm not sure about Affordable Housing, but it

23   could have been.

24        Q.   Affordable Housing Construction?

25        A.   Correct.

Appendix 0599

1      Q.   I believe if you'll take a look through you'll see

2    that Affordable Housing Construction is one of the sellers.

3      A.   Oh, yes.

4      Q.   You see that?

5      A.   Uh-huh.

6      Q.   Okay.  So all of the defendants in this case were

7    sellers in the asset sale, correct?

8      A.   Well, I was a seller indirectly through my entity.

9    I don't know that I'm ever listed by name.  I'd have to go

10   through this entity by entity.

11     Q.   Your name is listed in footnotes, I believe.

12     A.   Right, but it's not listed as a seller, A, B, C,

13   D, E.

14     Q.   But you were effectively a seller because a

15   company you owned, a sort of interest that you owned --

16     A.   Seller is a defined term.

17     Q.   -- selling --

18     A.   I personally was not a seller.  I'm a footnote as

19   an owner of the seller.

20     Q.   And, ultimately, at the end of the day, who got

21   the money in connection with your company?

22     A.   The company, CLG.

23     Q.   But you -- who were the employees of CLG?

24     A.   Myself.

25     Q.   Okay.  No one else?

1      A.    Correct.

2      Q.    You were the sole owner?

3      A.    Yes.

4      Q.    Okay.

5            Ultimately, any money that CLG got went to

6      you, correct?

7      A.    Ultimately, it went to the company.  How -- if

8      it ever went to me, I don't recall.

9      Q.    Well, no one else was earning money from the

10     company but you, correct?

11     A.    It went to the company.

12     Q.    Well, who got the money from the company?

13     A.    Either it was spent by the company or I got it.

14     Q.    And you testified earlier that the reason you

15     hadn't signed the letter of intent is you were one of the

16     persons that was considered to be a seller --

17     A.    No.  I --

18     Q.    -- under the letter of intent?

19     A.    No.  I was not a person.  I was the owner of an

20     entity that owned a G -- general partnership interest.  So

21     that was my connection.

22     Q.    Is it accurate to say that you financially

23     benefited from funds received from the asset sale?

24     A.    Yes.

25            MR. L. FRIEDMAN:  Thank you.

1          MS. GIBSON:  You're welcome.

2     Q.   (By Ms. Gibson) Ms. Geiser, I'm handing you

3  Plaintiff's Exhibit 14.  Do you recognize Exhibit 14 as an

4  Email that you sent to Sara Reidy and Jeff Carpenter?

5     A.   Yes.

6          MS. GIBSON:  Plaintiff offers Exhibit 14.

7          THE COURT:  Any objection?

8          MR. L. FRIEDMAN:  No objection, Your Honor.

9          THE COURT:  Fourteen is admitted.

10    Q.   (By Ms. Gibson) And in Exhibit 14, the Email to

11 Sara Reidy and Jeff Carpenter, says celebration time, on

12 July 17, 2007, correct?

13    A.   Yes.

14    Q.   What's going on at that time that you're

15 celebrating?

16    A.   I don't really recall.

17    Q.   Do you recall that at that time -- do you recall

18 that at some point it looks like the asset sale wasn't going

19 to go through and then it was back on track with a payment

20 to the sellers?

21    A.   That's probably true.

22    Q.   Okay.  And is that -- is that what you believe

23 that Email is talking about?

24    A.   It might have been.

25    Q.   And do you recall you-all celebrated with

1    champagne in the office?

2        A.    You asked me that at my deposition.  I don't

3    remember that.

4        Q.    Okay.

5              And of all the people at the organization

6    from Affordable Housing Construction, Southwest Housing

7    Management, and Southwest Housing Development, the

8    celebration time Email you sent was to just Sara Reidy and

9    Jeff Carpenter.

10       A.    They may have been the only ones left in the

11   office.  It was 4:48.  Yeah.

12       Q.    Okay.  They worked -- what are the office hours?

13   Do you think --

14       A.    Whatever they were.

15       Q.    What?

16       A.    Whatever they were, the people worked the hours

17   that they worked.  I don't know that we had, necessarily,

18   set office hours.

19       Q.    Well, Jeff Carpenter was the executive vice

20   president of Southwest Housing Management, correct?

21       A.    Yes.

22       Q.    Sara Reidy was the executive vice president of

23   Southwest Housing Development, correct?

24       A.    If that was her title, I don't recall.  It could

25   be.

1      Q.    Okay.

2            Other than, perhaps, the CFO and yourself

3      and Brian Potashnik, they were the highest level employees

4      of their respective organizations?

5      A.    And Deepak Sulakhe.

6      Q.    Okay.

7            Do you think everyone else was gone by

8      4:48?

9      A.    Well, Deepak might have been out of town.  He was

10     a developer.  He could have been traveling.  I don't know.

11     Q.    Let me just ask you this.  Of all the people in

12     all the companies, why did you choose Jeff Carpenter and

13     Sara Reidy to celebrate with concerning the asset sale?

14     A.    I don't know.  I don't really remember that Email,

15     I don't remember celebrating, so I really can't go to my

16     frame of mind at the time.

17     Q.    Okay.

18           Would you take a look back at Exhibit 12,

19     please?  And if you'll look at Article 1.3 on Page 3.

20               MR. L. FRIEDMAN:  Which one?

21               MS. GIBSON:  1.3, earnest money. Okay?

22               MR. L. FRIEDMAN:  Which page again?

23               THE WITNESS:  Three.

24               MS. GIBSON:  Three.

25     Q.    (By Ms. Gibson) Tell me when you've got a chance

```
 1    to read it.
 2         A.    Which part?  Do you want me to read all of 1.3?
 3         Q.    Yes.
 4         A.    Okay.
 5                   (Witness complied)
 6         A.    Okay.
 7         Q.    Okay.
 8               This paragraph is about earnest money,
 9    correct, and --
10         A.    Paragraph 1.3 is titled earnest money.
11         Q.    Okay, is that different from it being earnest
12    money?
13         A.    It's titled earnest money.
14         Q.    Okay.
15               And you see Paragraph 1.3, earnest money,
16    says that the earnest money shall either be applied against
17    the purchase price at closing or, if this agreement is
18    terminated prior to closing, paid to seller or refunded to
19    purchaser in accordance with the agreement.  Correct?
20         A.    That's what it says, yes.
21         Q.    Okay.  And so, if the asset sale actually goes
22    through and closes, anything that's earnest money is applied
23    toward the purchase price, correct?
24         A.    Yes.
25               MR. L. FRIEDMAN:  Thank you.
```

1          Q.    (By Ms. Gibson) Ms. Geiser, I'm handing you what's

2     been marked Plaintiff's Exhibit 15.  Does that appear to you

3     to be an accurate copy of the first amendment to escrow

4     agreement?

5          A.    I'll take your word for it.

6                    MR. L. FRIEDMAN:  Hearsay, lack of

7     foundation.

8                    MS. GIBSON:  Well, I haven't offered

9     it yet.

10                    Plaintiff offers Exhibit 15.

11                    THE COURT:  The objections are on the

12     record.  Overruled.  Fifteen is admitted.

13          Q.    (By Ms. Gibson) Okay.  And you see in Exhibit 15

14     that the escrow agent is authorized and instructed to

15     release 1.85 million of the escrow funds to seller?

16          A.    Yes.

17          Q.    And this was the first payment to sellers in

18     connection with the asset sale?

19          A.    I don't know how to characterize this because the

20     asset sale hadn't -- the sale of the assets hadn't gone

21     through as of July 16, 2007.  I believe what happened was

22     Brian negotiated for seller to release an amount of money in

23     advance of the sale going through in order to ensure that

24     the closing would happen.  That's generally how I remember

25     it.

1          Q.    But this is -- ultimately, the sale did close and

2     go through, correct?

3          A.    Yeah, but parts of it didn't go through for

4     another year, so --

5          Q.    But, ultimately, the asset sale happened?

6          A.    The sale of -- the sale of 40 -- or 54 assets

7     happened, yeah.

8          Q.    Okay.  And this is the first -- 1.85 million is

9     the first payment to seller?

10         A.    I think it's an advance, but the asset sale hadn't

11    happened.  So, again, I can't give you an answer other than

12    I don't remember how this was characterized.

13         Q.    It is paid in advance of the closing, Ms. Geiser,

14    but it was still the first payment to sellers that was

15    ultimately applied to the purchase price, correct?

16         A.    I would say that's accurate.

17         Q.    Okay.

18               In other words, the sellers had to put up

19    more earnest money and pay that to you, correct -- or, I'm

20    sorry -- pay that to the sellers.

21               THE COURT:  To the buyer.

22               MS. GIBSON:  I'm sorry?

23               THE COURT:  To the seller or the buyer?

24               MS. GIBSON:  To the seller.

25               Did I say buyer?

86

1                    THE COURT:  No.  I misunderstood.

2                    MS. GIBSON:  Okay.

3                    THE WITNESS:  This amount was paid to the

4    seller.

5        Q.   (By Ms. Gibson) Okay.  And that was earnest money.

6                    I'm going to -- I'm going to hand to you

7    Plaintiff's 16 and see if this maybe helps you.

8        A.   Okay.

9                    MR. L. FRIEDMAN:  Thank you.

10       Q.   (By Ms. Gibson) I'm handing you Plaintiff's

11   Exhibit 16.  Does Exhibit 16 appear to be an accurate copy

12   of Amendment 1 to the purchase and sale agreement?

13       A.   I'll take your word for it.

14                   MS. GIBSON:  Plaintiff offers Exhibit 16.

15                   THE COURT:  Same?

16                   MR. L. FRIEDMAN:  Hearsay and lack of

17   foundation, Your Honor.

18                   THE COURT:  All right.  Overruled.  Sixteen

19   is admitted.

20       Q.   (By Ms. Gibson) And does anything in Amendment 1

21   help you?

22       A.   I'm going to have to read it.

23                   (Witness reading)

24       Q.   Ms. Geiser, let me go ahead and give you 17.

25   Whoops, this is the second amendment to escrow agreement.

1    Does anything in that document help you?

2            A.    I need to read it and you just --

3            Q.    Okay.

4            A.    -- suggested you're going to give me something

5    else.  So, is there something else?

6            Q.    Oh, I -- this is the -- the next document is

7    another amendment to the escrow agreement, so I apologize.

8            A.    Well, these are technical, legal documents that I

9    haven't looked at in a long time, so I'm going to have to

10   read through it if you're going to question me on this.

11           Q.    Okay.

12                 Do you have any reason to doubt that the

13   payment of 1.5 million reflected on this -- on Plaintiff's

14   15 is earnest money that was applied to the purchase price?

15           A.    One is an amendment to the purchase and sale

16   agreement, and then the other document is amendment to the

17   escrow agreement.  So I need to look at the document to make

18   sure we're talking about the same thing.

19           Q.    This is 15.  Do you have Exhibit 15 in front of

20   you?

21           A.    I do.

22           Q.    Okay.

23           A.    That's the first amendment to escrow agreement.

24           Q.    Do you have any reason to doubt that the

25   1.85-million payment was earnest money that was ultimately

88

1    applied towards the purchase price?

2            A.    Do I have any reason to doubt it?

3            Q.    Right.

4            A.    I think that's generally what happened.

5            Q.    Okay.

6                        And the date, the effective date of this is

7    July 16, 2007?

8            A.    Yes.

9            Q.    And your Email in Exhibit 14, celebration time, is

10   dated the next day, July 17.

11           A.    Okay.

12           Q.    Okay.  Does that help you remember that that was

13   the day of the first payment received in connection with the

14   asset sale?

15           A.    That's where the buyer, if my memory serves,

16   released hard money into the transaction, yeah.

17           Q.    I'm handing you Exhibit 17.  Does Exhibit 17

18   appear to be an accurate copy of the second amendment to

19   escrow agreement?

20           A.    Yes.

21           Q.    Okay.

22                        MS. GIBSON:  And plaintiff offers --

23                        THE WITNESS:  Again, I'm taking your word

24   for it for all of these.

25                        MS. GIBSON:  Okay.

1            Plaintiff offers Exhibit 17.

2            THE COURT:  Okay.

3            Same objection?

4            MR. L. FRIEDMAN:  Same objections,

5   Your Honor.

6            THE COURT:  All right.  Overruled.

7   Seventeen is admitted.

8       Q.   (By Ms. Gibson) And in the second amendment on

9   Exhibit 17 it says that the escrow agent is authorized and

10  instructed to release $925,000 of escrow funds to seller,

11  correct?

12      A.   Yes.

13      Q.   And that is also earnest money that was ultimately

14  applied to the purchase price?

15      A.   I guess, yeah.

16      Q.   Okay.  And this is August 15, 2007?

17      A.   Yes.

18      Q.   I'm handing you Exhibit 18.

19            MR. L. FRIEDMAN:  Thank you.

20      Q.   (By Ms. Gibson) Does Exhibit 18 appear to be an

21  accurate copy of the third amendment to the escrow

22  agreement?

23      A.   I'll take your word for it.

24            MS. GIBSON:  Plaintiff offers Exhibit 18.

25            THE COURT:  Same objection?

1            MR. L. FRIEDMAN:  Same objections,

2    Your Honor.

3            THE COURT:  All right.  Overruled.

4    Eighteen is admitted.

5        Q.   (By Ms. Gibson) And in the third amendment this is

6    dated September 17, 2007, correct?

7        A.   Yes.

8        Q.   And here another $925,000 is being paid to seller?

9        A.   Correct.

10        Q.   And that was also earnest money that was

11    ultimately applied toward the purchase price?

12        A.   I think so.

13        Q.   Ms. Geiser, do you know the total amount of

14    revenue that was paid to sellers?

15        A.   Revenue?

16        Q.   Revenue.

17            MR. L. FRIEDMAN:  Object to the term

18    "revenue".

19            THE COURT:  You're talking about the

20    revenue of what?

21            MS. GIBSON:  In connection with the asset

22    sale.

23        Q.   (By Ms. Gibson) Do you know the total amount of

24    revenue to sellers?

25        A.   Can you define revenue?

1          Q.    Revenue would be monies paid to seller in

2     connection with the asset sale before any offsets; for

3     example, for closing costs.

4          A.    How much total money was paid to all the sellers

5     in the asset sale?  Is that your question?

6          Q.    Yeah.    Yes.

7          A.    I think it was 36 million, but I could be wrong.

8          Q.    Okay.

9                And so, I'm going to keep going through

10    these so we can see the exact numbers, okay, Ms. Geiser?

11         A.    Okay.

12         Q.    Ms. Geiser, I'm handing you Plaintiff's Exhibit

13    19.   Does that appear to be an accurate copy of the fourth

14    amendment to the escrow agreement?

15         A.    I'm taking your word for it.

16                    MS. GIBSON:   Plaintiff offers Exhibit 19.

17                    MR. L. FRIEDMAN:   Same objections,

18    Your Honor.

19                    THE COURT:   All right.   Overruled and

20    admitted.

21         Q.    (By Ms. Gibson) And do you see in Exhibit 19 that,

22    again, another 925,000 is being paid to seller?

23         A.    Yes.

24         Q.    And that is also earnest money that will

25    ultimately be applied toward the purchase price?

1          A.    I believe so, yes.

2          Q.    Okay.

3                And the date on this is October 29, 2007?

4          A.    Yes.

5          Q.    I'm handing you Exhibit 20.

6                MR. L. FRIEDMAN:   Thank you.

7          Q.    (By Ms. Gibson) Does Exhibit 20 appear to be an

8    accurate copy of the fifth amendment to the escrow

9    agreement?

10         A.    I'll take your word for it.

11         Q.    Okay.   And in the fifth amendment to the escrow

12   agreement --

13               MS. GIBSON:   Oh, plaintiff offers Exhibit

14   20.

15               MR. L. FRIEDMAN:   Same objections,

16   Your Honor.

17               THE COURT:   All right.   Y'all come over

18   here just a minute.

19               (Sidebar conference held)

20         Q.    (By Ms. Gibson) Ms. Geiser, I'm just going to hand

21   you a stack and try to -- so we can get these totals.

22               MS. GIBSON:   You know what, Your Honor, why

23   don't I do this, just in the interest of time.   I'll move to

24   a different topic.

25               THE COURT:   Okay.

93

1                    MS. GIBSON:  And I'll gather these together

2       over -- over the next break.

3                    THE COURT:  Okay.

4                    MS. GIBSON:  Speed it up.

5       Q.   (By Ms. Gibson) Ms. Geiser, do you recall that by

6       the end of October -- October 31, 2007 -- that Southwest

7       Housing Management had requested a backup of

8       Jeff Carpenter's laptop?

9       A.   I don't remember all the (unintelligible) about

10      Jeff's laptop.

11      Q.   Okay.  But that would have been the last day y'all

12      needed him, October 31, 2007?

13                   MR. L. FRIEDMAN:  Thank you.  What number

14      is this?

15                   MS. GIBSON:  Twenty-one.

16      Q.   (By Ms. Gibson) Correct?

17      A.   I think I can agree with you that the last day of

18      Jeff's employment was somewhere around October 31st.

19      Q.   I'm handing you what's been marked Plaintiff's

20      Exhibit 21.  Does Exhibit 21 appear to be an accurate copy

21      of the consulting and asset management services agreement?

22      A.   Yes.  I'll take your word for it.

23      Q.   Okay.

24                   MS. GIBSON:  Plaintiff offers Exhibit 21.

25                   THE COURT:  Any objection?

1          MR. L. FRIEDMAN:  Your Honor, I'm going to

2   say hearsay and lack of foundation and relevance.

3          THE COURT:  All right.  Overruled then.

4   Twenty-one is admitted.

5     Q.   (By Ms. Gibson) And the date of the agreement is

6   November 1, 2007?

7     A.   Yes.

8     Q.   And the gist of this agreement is to transfer

9   management function over to the purchaser?

10    A.   Yes.  The buyer's property management company was

11   assuming day-to-day management -- management functions.

12    Q.   Do you recall having a meeting earlier in the year

13   with Jeff Carpenter in which you-all just were dis -- you

14   and Jeff Carpenter were discussing that the annual bonuses

15   were separate from the asset-sale proceeds?

16          MR. L. FRIEDMAN:  What year?

17          THE COURT:  Earlier.

18          MS. GIBSON:  Earlier in the year.

19          THE COURT:  Of 2007.

20          MR. L. FRIEDMAN:  Of 2007 or this year?

21          THE COURT:  That's up to you.  His

22   objection is your question's ambiguous.

23          MR. L. FRIEDMAN:  Ambiguous and vague.

24          MS. GIBSON:  As to which year, sure.

25    Q.   (By Ms. Gibson) Ms. Geiser, do you remember

1    meeting with Jeff in the time frame of May 16, 2007, where

2    you were meet -- to meet with Jeff and Brian about a

3    sales-proceeds bonus and annual bonuses?

4         A.   I generally remember there was a meeting about

5    bonuses.

6         Q.   And during that meeting, do you recall saying to

7    Jeff, leaning over the table and saying "I would never screw

8    you" or words to that effect concerning the bonuses?

9         A.   I don't remember saying it on that date. I do

10   remember telling Jeff that I would never screw him.   And

11   it never was my intention to screw him and I don't believe I

12   have screwed him.

13        Q.   Well, the context in which you looked Jeff in the

14   eye and said I will never screw you, the topic of discussion

15   was the bonuses owed to Jeff Carpenter, correct?

16        A.   Probably.

17        Q.   And those bonuses have not been paid?

18        A.   And they weren't agreed to.

19        Q.   So do you think you honored your word to

20   Jeff Carpenter that you would never screw him on the annual

21   bonuses and the sales-proceeds bonus?

22        A.   Yes.

23        Q.   How so?

24        A.   When Jeff left the company I offered him an

25   additional hundred and fifty thousand dollars in exchange

96

1    for -- as severance.  He was offered that in exchange for

2    signing a separation agreement.  He chose not to sign that

3    and he didn't take the money.

4              And then had the sale gone through and Jeff

5    hadn't sued us prior to the sale going through, I believe

6    that he would have gotten some amount of bonus at our

7    discretion at that time.  But he chose to not wait till the

8    sale went through and proactively sue us.  So, no, I don't

9    believe I screwed Jeff.

10   Q.    Jeff Carpenter did not bring suit until you

11   effectively told him to go jump in a lake on bonuses,

12   correct?

13   A.    That's not what I told him.

14              MR. L. FRIEDMAN:  Objection, argumentative.

15              Excuse me.

16              Argumentative.

17              THE COURT:  Sustained.

18              Rephrase the question.

19   Q.    (By Ms. Gibson) You had already informed

20   Jeff Carpenter that he would not be receiving an annual

21   bonus or a sales-proceeds bonus by the time he filed suit.

22   A.    I don't know that that's true.

23   Q.    You told him that he had no rights.

24   A.    You're taking my comments out of context, so we

25   can go through that whole Email that you're talking about;

1    that you and I both know you're talking about.

2         Q.   Email?  I don't know what you're talking about.

3    You mean the telephone transcript?

4         A.   Or the call, yeah.  The recorded conversation.

5              THE WITNESS:  Your Honor, I really need to

6    use the restroom.

7              THE COURT:  Okay.  We'll take a --  we'll

8    take a 10-minute break, ladies and gentlemen.

9              (Recess taken)

10             (The jury entered the courtroom.)

11             THE COURT:  Welcome back.  Good morning

12   still, ladies and gentlemen.

13             We'll go about 15 more minutes till about 5

14   after 12:00, and we'll take our lunch break then.

15             And we'll ask Ms. Gibson to pick up where

16   she left off.

17        Q.   (By Ms. Gibson) Ms. Geiser, I'm handing you

18   Exhibit 22.

19        A.   Okay.

20             MR. L. FRIEDMAN:  Which one is that?

21             MS. GIBSON:  This is -- did I not give you

22   one already?

23             MR. L. FRIEDMAN:  You may have.

24             MS. GIBSON:  Okay.  I'll give you another

25   copy.

1           MR. L. FRIEDMAN:  Thank you.

2      Q.   (By Ms. Gibson) Ms. Geiser, do you recognize

3  Exhibit 22 as an Email from Keith Jones to Jeff Carpenter on

4  which you are copied?

5      A.   Yes.

6      Q.   And Keith Jones is attaching a separation

7  agreement?

8      A.   Correct.

9      Q.   And the date on this document --

10          MS. GIBSON:  Plaintiff offers --

11     Q.   (By Ms. Gibson) Does this appear to be an accurate

12  copy of the Email and separation agreement that was sent to

13  Jeff?

14     A.   I'll take your word for it.

15          MS. GIBSON:  Plaintiff offers Exhibit 22.

16          MR. L. FRIEDMAN:  I have no problem with

17  the cover sheet --

18          THE COURT:  All right.

19          MR. L. FRIEDMAN:  -- demonstrating that

20  Keith Jones sent a form to Mr. Carpenter --

21          THE COURT:  Right.

22          MR. L. FRIEDMAN:  -- but I think we covered

23  this in a limine that we're not going to publish --

24          THE COURT:  Right.

25          MR. L. FRIEDMAN:  -- Mr. Jones.

1            THE COURT:   Come over here.

2            (Sidebar conference held)

3            MR. L. FRIEDMAN:   All the separation

4    agreements look the same to me.

5            THE COURT:   Right.

6            Twenty-two is admitted.

7            MR. L. FRIEDMAN:   No objection, Your Honor.

8        Q.    (By Ms. Gibson) And the date on this Email is

9    November 1, 2007?

10       A.    Yes.

11       Q.    After 5:00?

12       A.    Yes.   5:22 p.m.

13       Q.    And so, this is the day after Jeff Carpenter had

14   completed everything y'all needed him to do for y'all as far

15   as staying on to help with the asset sale, correct?

16       A.    This is the day after Jeff's employment

17   terminated.   He stopped working and we stopped paying him.

18       Q.    But this is the day after you-all had received

19   from Jeff Carpenter everything that y'all needed from him as

20   far as him staying on to help make the asset sale happen.

21       A.    This was the day after --

22            MR. L. FRIEDMAN:   Asked and answered,

23   Your Honor.

24       A.    -- his last day of employment.

25       Q.    (By Ms. Gibson) When was the last day that you

1    needed Jeff Carpenter to stay on to help with the asset

2    sale?

3         A.   On the last day of his employment.

4         Q.   You recall the management transition was dated

5    November 1, correct?

6         A.   Yes.

7         Q.   And you didn't need Jeff to stay on once that

8    transition was in place, correct?

9         A.   Correct.

10        Q.   So the last day that you needed Jeff to stay on

11   was October 31st, 2007, correct?

12        A.   The last date of Jeff Carpenter's employment was,

13   I guess, October 31st, 2007.

14        Q.   Okay, but my question is October 31, 2007, was

15   also the last day that you-all needed Jeff to stay on to

16   help through the asset sale?

17        A.   Jeff's role was executive vice president of the

18   management company.  I characterize this as the day after

19   the last day of Jeff's employment.

20        Q.   Is there a reason you don't want to answer the

21   last day that you didn't need anything from Jeff

22   Carpenter --

23             MR. L. FRIEDMAN:  Argumentative.

24        Q.   (By Ms. Gibson) -- as far as helping with the

25   asset sale?

1          MR. L. FRIEDMAN:  Argumentative and asked

2     and answered.

3          THE COURT:  Overruled.

4          THE WITNESS:  I think you're putting words

5     in my mouth.

6          And the last day of Jeff's employment as

7     executive vice president of the management company where he

8     had a variety of roles was October 31st, 2007.  Management

9     transitioned to Pinnacle on or around November 1st, 2007.

10         Q.   (By Ms. Gibson) Okay.  To back up, you asked Jeff

11    to stay on, correct?

12         A.   Jeff's employment continued until the management

13    transition took place.

14         Q.   Because that's the last day you needed him,

15    correct?

16         A.   That's the last day of his employment.

17         THE COURT:  You're asking the same

18    question.  You're not going to agree to use the same words.

19         Q.   (By Ms. Gibson) Was -- was Jeff needed after

20    October 31st, 2007?

21         A.   No.

22         Q.   Okay.  So this is happening the first day that

23    defendants no longer need Jeff Carpenter to stay on,

24    correct?

25         A.   It's happening the day after the last day of

Appendix 0623

102

1    Carpenter's employment.

2         Q.    And that's after you got all the work you needed

3    out of Jeff, correct?

4         A.    I'm not going to use your words.

5              Jeff Carpenter's last day of employment

6    with Southwest Housing Management was October 31st of 2007.

7    That's the last day he received a paycheck or pay and that

8    was the last day he worked.

9         Q.    And what you are sending Jeff Carpenter, now that

10   his work is done, is called a separation agreement, correct?

11        A.    That is what Keith is sending him.

12        Q.    Well, someone directed Keith Jones to send this to

13   Jeff Carpenter.

14        A.    I don't really remember seeing this agreement.

15   It's unexecuted, so I really can't say anything about

16   it other than this is an Email from Keith to Jeff.  I am

17   copied and this is attached.  Keith was our CFO.  I didn't

18   handle everything.

19        Q.    You were -- you were copied on the Email

20   forwarding this document.  Did you object to it being sent

21   to Jeff?

22        A.    I don't remember this document.  I remember I'm

23   authenticating this Email.  I don't necessarily remember

24   this document being attached to it.

25        Q.    Do you recall --

1       A.    I'm taking your word for it that this was the

2  attachment.

3       Q.    You see that the separation agreement covers

4  Southwest Housing Management, Affordable Housing

5  Construction, and Southwest Housing Development and

6  Jeff Carpenter?

7       A.    I see that this draft agreement that you say was

8  attached to the Email states those things.

9       Q.    Okay.  And you see that what Jeff is being offered

10 in this is wages earned through the termination date?

11      A.    Uh-huh.  Yes.

12      Q.    Okay.

13            And his last day of employment was actually

14 November 2nd, 2007.

15      A.    Okay.

16      Q.    Is that accurate?

17      A.    I don't know.

18      Q.    And it offers Jeff Carpenter some accrued PTO?

19      A.    Yes.

20      Q.    And as far as compensation it offers nothing else,

21 correct?

22      A.    Correct.

23      Q.    There is no mention of annual bonuses and there is

24 no mention of the bonus out of the sale proceeds from the

25 asset sale, correct?

1    A.    Correct.

2    Q.    So, for earned wages and PTO, this proposal

3    requests that Jeff Carpenter discharge and release the

4    company, which is defined via all the entities above, and a

5    whole lot of other people, including you, right?  You would

6    be included in this release?

7    A.    Where am I listed?

8    Q.    Well, it's all the companies and their successors,

9    affiliates, subsidiaries, etcetera, including officers

10   directors, employees.

11   A.    Where does it say that?

12   Q.    Take a look at -- this is in Paragraph 4.

13   A.    Okay.  Yeah, I am an employee.

14   Q.    And he's being asked to release any claims, any

15   cause of action whatsoever, known or unknown, that are based

16   upon facts occurring on or prior to the date of the

17   agreement?

18   A.    That's what this agreement says, yes.

19   Q.    And so this document is asking Jeff Carpenter to

20   give up the sale-proceeds bonus and any past-due annual

21   bonuses, correct?

22   A.    I don't think I read it that way.

23   Q.    Well, any claims that are based on facts occurring

24   on or prior to the date of this agreement?

25   A.    I don't -- I don't know.  I don't think he had a

1    claim because there are no amount -- no amounts were agreed

2    to.

3         Q.    No amounts are agreed to as to what?

4         A.    To what you just said.

5         Q.    Well, on the sales-proceeds bonus, any amounts

6    were discussed, that was something Brian Potashnik discussed

7    with Jeff Carpenter, correct?

8         A.    Right.

9         Q.    Okay.

10                   And Jeff Carpenter --

11        A.    But not agreed to.

12        Q.    Well, you weren't there, were you?

13        A.    I was not there, but I was never told there was an

14   agreement by Brian or anybody else other than possibly Jeff.

15        Q.    Okay.

16                   So, can you understand why an employee

17   would be upset if he's told that if he stays on you intend

18   to pay him a sales-proceed bonus with a specific formula and

19   then --

20        A.    I never told him that.

21        Q.    -- sent him a request?  I didn't say you did.

22        A.    You just said I said that.  Would you be upset

23   if --

24        Q.    Oh, I'm sorry.  You're right.  You're right.  I

25   started with "you intended".

1              Can you understand why an employee would be
2    upset if after you and Brian expressed to Jeff Carpenter
3    that you intended to pay him a bonus out of the sale
4    proceeds, he's done everything to honor his end of the
5    agreement through October 31st, and the very next day he is
6    sent a separation agreement asking him to give up all claims
7    in exchange for some payment of PTO and earned compensation?
8              MR. L. FRIEDMAN:  Objection, speculation,
9    lack of foundation, assumes facts not in evidence.
10             THE COURT:  You're asking her to say
11   does --
12             MR. GIBSON:  Can she understand.
13             THE COURT:  -- does she understand why he
14   was upset.  You're asking her to put herself in his mind.
15   That part of the objection, whichever part, is sustained.
16             MR. L. FRIEDMAN:  It was compound.  Can we
17   just break it down?
18             THE COURT:  I sustained the objection.  Let
19   her go on.
20             MR. L. FRIEDMAN:  Okay.  Thank you.
21        Q.   (By Ms. Gibson) Would you take a look at
22   Plaintiff's Exhibit 1, please?
23             (Pause)
24        A.   Is that this?
25             MR. L. FRIEDMAN:  What is 1?

197

1              MS. GIBSON:  Exhibit 1 is the transcript,

2    the telephone transcript.

3              THE WITNESS:  I don't have that.

4              THE COURT:  You only have about three

5    minutes if you don't want to start that yet.

6              MS. GIBSON:  I think --

7              THE COURT:  Go ahead.

8              MS. GIBSON:  This is going to take a while.

9    Would it be better just to go ahead and break?

10             THE COURT:  We'll take our lunch break,

11   ladies and gentlemen.  We'll see you back in an hour and 10

12   minutes.

13                  (The jury exited the courtroom.)

14                  (Lunch recess taken)

15                  (The jury entered the courtroom.)

16             THE COURT:  Welcome back.  Good afternoon,

17   ladies and gentlemen.

18             We'll continue with the trial.  We'll go --

19   we'll take two 10-minute breaks this afternoon.  If you need

20   additional breaks, get my attention or get Vikki's attention

21   and we'll take a break whenever you need to.  But for now

22   we'll plan on the next break being in about an hour and 10

23   minutes or about 2:30.

24             And we'll ask Ms. Gibson to pick up where

25   she left off with this witness.

1          Q.    (By Ms. Gibson) Ms. Geiser, before turning to

2     Exhibit 1, let's talk about a couple of general things.

3     First is just with respect to the organization as a whole,

4     meaning development, construction, and management entities.

5     Did you and Brian Potashnik share -- share control over how

6     things were run?

7          A.    I would say that Brian had the ultimate

8     decision-making authority, but we conferred on everything,

9     most things.

10         Q.    Okay.  So the two of you worked together in

11    operating the company but you think Brian Potashnik had the

12    ultimate say?

13         A.    Yes.

14         Q.    But you were able to assert some amount of

15    control --

16         A.    Yes.

17         Q.     -- as to what you wanted?

18                    And the -- the proceeds from the asset

19    sale, even -- even after any debt was paid for the

20    companies, you know, just regular operating expenses, the

21    money left over went to you and Brian Potashnik?

22         A.    Can you repeat the question?

23         Q.    The money left over after the asset sale went to

24    you and Brian Potashnik?

25         A.    The money left over?

1          Q.    Right.

2          A.    Can you define that?

3          Q.    Meaning there's -- there's nothing else to pay;

4    here's -- here's the remainder.

5          A.    There were amounts that went to Brian and I

6    personally, if that's your question.

7          Q.    When we were talking earlier about you saying to

8    Jeff Carpenter "I would never screw you", do you also recall

9    during the same conversations about bonuses saying we really

10   appreciate all that you do and we know how hard you've

11   worked and the many extras you've done or words -- words

12   like that?

13         A.    I'm sure I said words to the effect of I

14   appreciate all you do.

15         Q.    And do you recall telling Jeff Carpenter when you

16   were discussing bonuses, "You've earned it"?

17         A.    No, I can't recall saying that.

18         Q.    Do you deny that?

19         A.    I may have said I believe he earned some amounts,

20   but not a specific amount.

21         Q.    If you would, please, turn to Plaintiff's Exhibit

22   1.

23               Are you there?

24         A.    I am there.

25         Q.    This Exhibit 1 is a transcript of a conversation

110

1    between you and Jeff Carpenter?

2         A.    Incorrect.

3         Q.    What is it?

4         A.    It's a conversation between Jeff Carpenter and

5    Brian Potashnik.

6         Q.    Oh, I'm sorry.  You need to flip further.  Yours

7    is in there.

8         A.    All right.  Can you ask me the question again?

9         Q.    Sure.

10               Do you see included in Exhibit 1 is a

11   transcript of conversation between you and Jeff Carpenter?

12        A.    This is a transcript of a conversation that Jeff

13   secretly recorded between him and I, yes.

14        Q.    Okay.  And your recollect -- and this -- this

15   happened on November 2nd?

16        A.    I don't know.  I don't know.  Does it say November

17   2nd in here?

18        Q.    I -- I believe there are some references to dates.

19   But regardless of whether it was November 2nd or not, this

20   conversation happened shortly after the proposed separation

21   agreement was sent to Jeff Carpenter on November 1st,

22   correct?

23        A.    That's my general recollection, yes.

24        Q.    And it definitely happened after October 31st,

25   2007, when Jeff was no longer -- after which, Jeff was no

1      longer needed?

2          A.    I believe so, yes.

3          Q.    Okay.

4                   If you will take a look at the bottom box,

5      CP.  This is on the first page.

6          A.    Uh-huh.

7                   MS. GIBSON:   What happened to it?  Okay.

8          Q.    (By Ms. Gibson) Do you see you're -- you were

9      telling Jeff we've just told him -- well, the context is

10     Jeff is calling about the separation agreement sent to him

11     that's asking him to release all claims and causes of

12     action.  Is that the context of what he's calling about?

13         A.    Ask me the question again, please.

14         Q.    Sure.

15                  The context of this conversation is Jeff is

16     calling you and he is upset that he got -- he was just sent

17     a severance proposal that asked him to release all claims

18     and all his rights and didn't say anything about the bonus

19     from asset-sale proceeds or annual bonuses?

20         A.    It doesn't say anything about the bonuses up till

21     that point, but...

22         Q.    Well, it does.  It's the context of the

23     conversation?

24         A.    My memory is generally that, yes.

25         Q.    Okay.

112

1                    And you are telling -- just right above the

2       last box, you are telling Jeff Carpenter, "You don't have

3       any rights."

4            A.   I say, "You have conversations that we've had.

5       You have intentions that we've had.  You have what we intend

6       to do and what we want to do.  You don't have any rights.

7       That's about your employment and the legal rights you had

8       under your employment agreement and that type of thing."

9                    "It's a legal document.  It's not saying,

10      Jeff, you give up any hope of ever getting anything.  It's a

11      legal document.  It's what you have rights to.  And if you

12      think that you have any other rights or if you think that

13      you have other rights, then you shouldn't sign the

14      document."

15           Q.   Okay.

16           A.   That's the full context of that statement.

17           Q.   You read -- Ms. Geiser, you read the box below,

18      but I was asking you just up above that.  You said, "You

19      don't have any rights"?

20           A.   I said that.  That's correct, according to this --

21           Q.   Okay.

22           A.   -- transcript.

23           Q.   And when you said you don't have any rights,

24      you're saying -- you meant Jeff Carpenter.  You're telling

25      him he doesn't have any legal rights, correct?

113

```
1        A.   He doesn't have any rights.
2                  "That's about your employment and the
3    rights that you had under your employment agreement and that
4    type of thing.  It's a legal document.  It's not saying,
5    Jeff, you give up any hope of ever getting anything.  It's a
6    legal document.  It's what you have rights to.  And if you
7    think that you have other rights, then you shouldn't sign
8    the document."
9        Q.   My question is, in the box above where you say you
10   don't have any rights, you were talking about legal rights,
11   correct?
12       A.   I'm not a lawyer.  I qualify what I meant in
13   the --
14       Q.   Well, what type --
15       A.   -- in the paragraph below.
16       Q.   What type of rights are you talking about?
17       A.   Rights pursuant to the employment agreement.
18                  "You don't have any rights.  That's about
19   your employment and the rights you had under your employment
20   agreement and that type of thing.  It's a legal document."
21                  So then if you want to make the correlation
22   that it's legal rights, then you can make that correlation.
23       Q.   You previously told me that legal rights is what
24   you intended, didn't you, in your deposition?
25       A.   I'm giving you the full context now of what I
```

114

1    said.

2        Q.    I'm asking you if you previously told me that you

3    were referring to legal rights.

4        A.    In the context of how I say it here, yes.

5        Q.    Okay.

6              Prior to October 31st, 2007, the last day

7    before management transitioned to the purchasers, had you

8    ever said something like that to Jeff Carpenter:  You don't

9    have any rights or you don't have any legal rights?

10       A.    I don't know.

11       Q.    What do you think is more likely true than not

12   true?

13             MR. L. FRIEDMAN:  Objection, calls for

14   speculation.

15             THE COURT:  Sustained.

16       Q.    (By Ms. Gibson) When you say to Jeff Carpenter,

17   "You have conversations that we've had", you're talking

18   about conversations about annual bonuses, in part?

19       A.    We've had -- we had conversations about bonuses,

20   correct.

21       Q.    Including annual bonuses?

22       A.    Bonuses in general, yes.

23       Q.    And the conversations that we've had, you are also

24   referring to discussions about a bonus out of sale proceeds

25   if Jeff Carpenter would stay on, correct?

1        A.    There were conversations that were had about

2   bonuses.

3        Q.    And did they include those bonuses?

4        A.    Like I said earlier, we had conversations about

5   bonuses.   And sales pro -- bonuses out of sales proceeds

6   would have been if and when the company sold, if the sale

7   was successful, if there was proceeds available at the time.

8              There was not an agreement.   We didn't

9   agree.   There was no amount stipulated.   We had

10  conversations.

11       Q.    Well, you've already testified, though, that it

12  would have been Brian Potashnik who would have discussed

13  the -- the specifics on any bonus out of sales proceeds.

14       A.    That's correct.

15       Q.    Okay.

16             And when you say, "You have intentions that

17  we've had", you recall you are referring to your intent to

18  pay Jeff a bonus out of the sale proceeds for the asset sale

19  if he would stay on?

20       A.    Discretionary bonus after the sale went through,

21  if and when, and in the event it went through and there were

22  sales proceeds available at the end of the day.

23       Q.    You say, "You have what we intend to do and what

24  we want to do."   And what was that?

25       A.    Same answer.

116

1       Q.    Okay.

2               And then you again say that you don't have

3       any rights.  And in this context you're essentially telling

4       Jeff Carpenter, now that his work is done, that the only

5       rights he has are under the written employment agreement?

6       A.    Correct.

7       Q.    And you say to Jeff, "If you think you have other

8       rights, then you shouldn't sign the document."  You're

9       referring to the proposed separation agreement which he's

10      being asked to release all claims in exchange for PTO and

11      earned, past-due, regular salary?

12      A.    No, incorrect.  He was paid his PTO and his

13      severance under the employment agreement.  We didn't require

14      him to sign a separation agreement for that.  This was to

15      get an additional $150,000.  That's my memory.

16      Q.    Well, the separation agreement that you have in

17      front of you, it actually -- the initial draft asks that he

18      release all claims.

19      A.    But I told you I don't know about that draft.

20      You -- the first time I remember seeing that draft is in

21      this lawsuit, since you've given it to me.

22      Q.    But it is -- it is attached to an Email on which

23      you're copied?

24      A.    You say that.  I don't know that to be true.  I

25      said the Email was correct.  I don't know about the

Appendix 0638

1    attachment.  I don't recall seeing that attachment.

2         Q.    You know in this case we have asked you and the

3    entity defendants for certain documents similar to that.

4              MR. L. FRIEDMAN:  Objection, Your Honor.

5    She (inaudible) --

6              THE COURT:  Overruled.

7         Q.    (By Ms. Gibson) And, ultimately, although --

8    although some items were provided to us at some point in the

9    litigation, do you recall explaining to me that you got rid

10   of the hard drive that you had retained with business

11   information?

12        A.    After the company sold and I took a computer with

13   me, I had it for a couple years and then the hard drive

14   died.  So, at that point when I moved, I got rid of it.

15        Q.    Okay.  In your deposition you simply testified --

16        A.    Yeah.

17        Q.    -- you got rid of it.

18        A.    I forgot to add the fact to you that the thing had

19   died.  It was useless.

20        Q.    And so we're not able -- we weren't able to get

21   various business documents from you-all as a result,

22   correct?

23        A.    It's not because my hard drive died.  I mean, I

24   had -- I don't even know what was on that computer.

25              We had company Internet with all of the

118

1    documents, but all that stayed with -- or I don't even know

2    where it went when the closing occurred, so my one computer

3    wasn't repository of everything.

4         Q.    But it had some information on it?

5         A.    It -- it may have.  I don't know what I would have

6    kept on that hard drive, but it may have.

7         Q.    Where did you find what you produced in this case

8    after the closing?  Was it on that hard drive?

9         A.    I don't recall where everything -- everywhere I

10   looked for documents.  There was a lot of documents.

11        Q.    Okay.

12              If you will take a look at Page 2.

13        A.    Of?

14        Q.    Of the same document.

15        A.    Page 2 or Page 2 of my conversation?

16        Q.    Page 2 of your conversation.

17              Do you see the third box from the bottom?

18        A.    Yeah.

19        Q.    For you?

20        A.    Uh-huh.

21        Q.    And here you're saying you've got to be able to

22   see some preliminary on how this deal is going to shake out.

23   And I know you don't look forward to it, but you're

24   referring to the asset sale, this deal?

25        A.    Wait.  You said third box from --

119

1          THE COURT:  You can see it on the screen
2     there.
3          THE WITNESS:  Okay.
4          I'm just going to read it.  I'm just going
5     to read it from here.
6          MS. GIBSON:  Okay.  Have you read it?
7          THE WITNESS:  Well, I've got to read that
8     whole page.  Hold on.
9          (Witness reading)
10         THE WITNESS:  Okay.
11    Q.   (By Ms. Gibson) Okay.  So, in the first sentence
12    when you're talking about some preliminary on how this deal
13    is going to shake out, the deal you're referring to is the
14    asset sale?
15    A.   Yes.
16    Q.   And you're saying you need to know how that's
17    going to shake out before you can start making commitments
18    and go above and beyond that because you need to make sure
19    that when everything's said and done and shakes out and
20    everyone else gets paid, that Brian and I have a certain
21    amount of money that we can put toward our defense, correct?
22    A.   Yes, that's what it says.
23    Q.   Okay.
24         And when you referred to defense you were
25    talking about your criminal defense?

1              MR. L. FRIEDMAN:  Objection, in violation

2     of the motion in limine.

3              THE COURT:  Overruled.

4        A.   That's correct.

5        Q.   (By Ms. Gibson) Okay.

6              And is it fair to say that early on, back

7     in October of 2006 when the LOI is signed -- the letter of

8     intent is signed -- you didn't have that type of financial

9     concern or at least not as much?

10       A.   I wouldn't agree with that.

11       Q.   You wouldn't?

12       A.   No.

13       Q.   In about the -- about the month before,

14    indictments came down in the criminal proceeding, correct?

15       A.   The month before what?

16       Q.   What?

17       A.   The month before what?

18       Q.   In about the month -- so, November 1st is the

19    transition.  This conversation happened after that, correct,

20    you said?

21       A.   Yes.

22       Q.   And just, approximately, a month before

23    indictments had come down in the criminal proceeding,

24    correct?

25              MR. L. FRIEDMAN:  Objection, violation of

```
 1    limine, irrelevant.
 2                   MS. GIBSON:  It goes to the increased
 3    concern about criminal defense costs.
 4                   THE COURT:  Overruled.
 5        A.    There were indictments in the case, yes.
 6        Q.    (By Ms. Gibson) Okay.
 7                   And once you and Brian Potashnik were
 8    indicted you had a greater concern about paying your
 9    criminal --
10                   MR. L. FRIEDMAN:  Objection, direct
11    violation of the limine.
12        Q.    (By Ms. Gibson) -- criminal defense attorney.
13                   MR. L. FRIEDMAN:  She was not convicted of
14    any crime or needs to know that.  I'm asking the Court give
15    a direct instruction.
16                   THE COURT:  Y'all come over here.
17                   DEFENDANTS' MOTION FOR MISTRIAL
18                   MR. L. FRIEDMAN:  And I'd move for
19    mistrial.
20                   (Sidebar conference held)
21                   MR. L. FRIEDMAN:  I need a ruling,
22    Your Honor.
23                   COURT'S RULING
24                   THE COURT:  All right.  The objection's
25    overruled; the motion's overruled.
```

122

```
 1                    MR. L. FRIEDMAN:  Motion's denied?
 2                    THE COURT:  Yes.
 3                    DIRECT EXAMINATION (CONT'D)
 4          Q.   (By Ms. Gibson) Okay.  And then if you'll turn to
 5     Page 4 of your conversation.
 6                    MR. L. FRIEDMAN:  Same objection,
 7     Your Honor.  We just had this conversation.
 8                    MS. GIBSON:  Your Honor, it's her -- it's
 9     her explanation to Jeff Carpenter.
10                    MR. L. FRIEDMAN:  Same objection.  Doesn't
11     change the format.
12                    THE COURT:  Come over here.
13                    (Sidebar conference held)
14                    MS. GIBSON:  Your Honor, it's pre-admitted.
15                    MR. L. FRIEDMAN:  Your Honor, I'd like an
16     instruction --
17                    THE COURT:  That's denied.
18                    MR. L. FRIEDMAN:  That violated the limine.
19     I'd like an instruction to --
20                    THE COURT:  Denied.
21                    MR. L. FRIEDMAN:  -- disregard any evidence
22     that -- of an indictment or anything else with regard to
23     Ms. Potashnik.
24                    THE COURT:  Okay.  It's denied.
25          Q.   (By Ms. Gibson) Ms. Potashnik, if you will take a
```

Appendix 0644

1    look at Exhibit 23.  Do you recognize Exhibit 23 as an Email

2    from you to Jeff Carpenter, and below that an Email from

3    Jeff Carpenter to you?

4          A.    Yes.

5          Q.    And this is on November 15, 2007?

6          A.    Yes.

7          Q.    And in Jeff Carpenter's Email to you, he says,

8    among other things -- oh, I'm sorry.

9                     MS. GIBSON:  Plaintiff offers Exhibit 23.

10                    THE COURT:  All right.

11                    Any objection?

12                    MR. L. FRIEDMAN:  Yes.

13                    This document would, if admitted, violate

14    the -- again, the motion in limine.  I may not have the same

15    objection with a redacted copy.

16                    THE COURT:  Bring it over here.

17                    (Sidebar conference held)

18                    THE COURT:  I'll overrule it.

19                    MR. L. FRIEDMAN:  I'll reserve --

20                    THE COURT:  Okay.

21                    MR. L. FRIEDMAN:  -- my oral objection

22    until the next break, Your Honor.

23                    THE COURT:  Fair enough.

24                    The objection's overruled and we'll put the

25    objection on the record at a later time, and 23 is admitted.

1          Q.    (By Ms. Gibson) And, Ms. Geiser, in this Email

2     Jeff Carpenter is saying -- zoom in a little bit -- he's

3     saying, "Last year, after the Cascade transaction was

4     announced and it became reasonably clear that I would not be

5     retained after closing of that transaction, you implored me

6     to stay with the company through that time, as that

7     continuity and my continued services were essential to the

8     success of that transaction.  In exchange, you informed me

9     that I would be entitled to receive, at three percent of the

10    proceeds of that transaction, net of certain costs; which,

11    based on the structure at that time, would represent an

12    amount in excess of 1 million.  This is in addition to the

13    unpaid annual bonuses."

14               Do you recall receiving that?

15         A.    Do I recall receiving this Email?

16         Q.    Right.

17         A.    Yes.

18         Q.    Okay.

19               And when -- when Jeff Carpenter is saying

20    you here, he doesn't -- he's not necessarily referring to

21    you individually because he's sending this Email to both you

22    and Brian.

23         A.    Yeah, I mean, I know he's not referring to me

24    because he's already said he didn't have a deal with me.  So

25    this isn't to me.

1    Q.    Brian is the one that shook hands on it, correct?

2    A.    I have no idea if that's true.  I was told about

3    that.

4    Q.    And you later confirmed with him that you intended

5    to pay it?

6    A.    There was no agreement or no handshake agreement.

7    I only agreed that if there was proceeds left at the end of

8    the sale, if and when the sale was successful, that there

9    would be something paid.

10    Q.    And then you said, "We will take a look at this

11    and get back to you as soon as possible."

12    A.    I received this from Jeff and I responded, "We

13    will take a look at this and get back to you as soon as

14    possible."

15    Q.    Okay.

16          Would you please take a look at Exhibit 24?

17    Do you recognize Exhibit 24 as an Email from yourself to

18    Jeff Carpenter, dated December 11, 2007?

19    A.    Yes.

20          MS. GIBSON:  Plaintiff offers Exhibit 24.

21          THE COURT:  Any objection?

22          MR. L. FRIEDMAN:  No objection, Your Honor.

23          THE COURT:  Twenty-four is admitted.

24    Q.    (By Ms. Gibson) So, December 11th, you tell

25    Jeff Carpenter that you and Brian have honored his current

1    employment contract by paying out severance, correct?

2          A.    We, on behalf of the company, yes.

3          Q.    Okay, we.  More than just you and Brian or

4    everyone or who?

5          A.    We, on behalf of the company, Southwest Housing

6    Management.

7          Q.    Okay.

8                And then you say, "As you know, your

9    employment contract does not provide for you to receive any

10   bonus after termination."

11         A.    Correct.

12         Q.    And this is the first time you have ever said that

13   to Jeff Carpenter, correct?

14         A.    No.  That was in Jeff Carpenter's employment

15   agreement that he signed, so he's familiar with this clause.

16         Q.    In connection with discussing bonuses to encourage

17   employees to stay, you never told Jeff, oh, by the way,

18   we're going to end up saying you're not entitled to any

19   bonus after termination, did you?

20         A.    I didn't restate his employment agreement, no.

21         Q.    And then you say, I spoke with Brian and he told

22   me that he never -- that he never agreed to pay you three

23   percent of gross after the sale of the business, as you

24   proposed.  "As you're aware, the sale of the business has

25   not yet occurred."

Appendix 0648

1      A.    As you proposed in your draft separation

2  agreement.

3      Q.    Okay.

4            And then you say that it is only the net

5  that will be shared.

6      A.    "If and when the sale occurs, it is only at that

7  time that we will be able to assess if any of the net

8  profits will be shared with various employees."

9      Q.    So my question is, are you -- are you disputing

10  that there was any agreement?

11      A.    Yes, I'm disputing there was any agreement.

12      Q.    Are you saying Brian denied that there was any

13  agreement at all?

14      A.    Yes.

15      Q.    Okay.  It wasn't just -- you're not claiming it

16  was just a gross versus net issue, correct?

17      A.    No.  I'm saying there's no deal.  And,

18  furthermore, any discussions about anything will be on a net

19  basis.

20      Q.    But are you saying Brian told you there was never

21  any deal at all?

22      A.    Correct.

23      Q.    The proposed severance that Jeff Carpenter sent to

24  you actually did not refer to three percent of the gross.

25  It was three percent of the net.  Do you recall that?

1          A.    Do you have that document?  We can look at it.

2          Q.    Sure.

3                    MR. L. FRIEDMAN:   Thank you.

4                    What number?

5                    MS. GIBSON:   SHM5.

6          Q.    (By Ms. Gibson) I just highlighted it for you.

7          A.    Okay.

8          Q.    And I'm just going to use that to refresh your

9     recollection.

10         A.     In the draft separation agreement that Jeff

11    sent --

12                   MR. L. FRIEDMAN:   I'm sorry.   Exhibit

13    number, please?

14                   MS. GIBSON:   I'm just seeing -- I'm just

15    refreshing her recollection on this.

16                   THE COURT:   But he wants to see the same

17    document she's looking at.

18                   MS. GIBSON:   I gave it to him.

19                   THE COURT:   Oh.

20                   MR. L. FRIEDMAN:   No, I have it.

21                   THE COURT:   It's not in evidence.

22                   MR. L. FRIEDMAN:   Okay.  I got it.

23                   THE WITNESS:   In the separation agreement

24    that Jeff --

25                   THE COURT:   Wait till she asks a question.

1          THE WITNESS:  Oh, sorry.

2     Q.    (By Ms. Gibson) Okay.  Do you see that when you

3  read that whole highlighted part that it is gross minus

4  normal closing costs?

5     A.    It says an amount in cash equal to three percent

6  of the gross compensation or consideration, whether in the

7  form of cash, stock, assumption of debt, fees, loans or

8  otherwise for the purchase of the company, less reasonable

9  cost of closing.

10    Q.    Okay.  That's in net.  That would be a net, not a

11  gross, correct?

12    A.    Anything that's less than the full amount is net,

13  yes.

14    Q.    Okay.

15          When you said in your Email that the

16  contract does not allow for Jeff to receive a bonus after

17  termination -- if you want to take a look at Exhibit 2, the

18  contract.

19    A.    Okay.

20    Q.    Okay.  You're referring to Paragraph 7?

21    A.    I went to Page 7.  I'm sorry.

22          Paragraph 7, Termination of Employment;

23  Effect of Termination?

24    Q.    Yes.

25    A.    Uh-huh.

1          Q.    Okay.  You see that it says employee will not be

2     entitled to any compensation or benefit pursuant to this

3     agreement effective on termination, correct?

4          A.    Yes.

5          Q.    Okay.  And you already went over all of the

6     compensation that was pursuant to this agreement earlier.

7     Do you remember that?

8          A.    Yes, I remember that part of the testimony.

9          Q.    Okay.

10               So the -- any handshake agreements on the

11    asset -- on an asset-sale bonus or annual bonuses after the

12    first year, those would be separate and not compensation

13    pursuant to this agreement, correct?

14         A.    I'm not following you.  Sorry.

15         Q.    Well, the only thing that severance is covering

16    here is that's what you get at the end in lieu of further

17    benefits pursuant to this agreement, right?

18         A.    Okay.

19         Q.    And the -- any asset-sale bonus would have been

20    separate from this agreement, correct?

21         A.    I -- I don't know what I --

22         Q.    Well -- I'm sorry.  Go ahead.

23         A.    There was no asset-sale bonus agreement.

24         Q.    If there was, you said you intended to pay.

25         A.    A bonus out of sales proceeds.  I didn't ever

1    intend to pay --

2         Q.    A bonus --

3         A.    -- an asset-sale bonus.  That's your words.

4         Q.    Okay.  I know.  You think asset sale -- I forget

5    that you think they're different.

6         A.    They are different.

7         Q.    A -- a bonus out of asset sale proceeds is not

8    compensation pursuant to that agreement that he would be

9    giving up.  That would be a separate deal, correct?

10        A.    I don't know if that's true or not.

11        Q.    Well, earlier you covered --

12              THE COURT:   You --

13        Q.    (By Ms. Gibson) -- all of the compensation

14   pursuant to that agreement, right?

15        A.    Yes.

16        Q.    Okay.

17              In connection with closing of the asset

18   sale, about $2.1 million is the total amount of bonuses to

19   other employees paid out of -- paid in connection with the

20   asset sale, correct?

21        A.    They were severance payments.

22        Q.    But -- but that's -- the severance payments, I

23   mean, you were here for Keith Jones' testimony, right?

24        A.    Yeah, and I believe he said they were severance

25   payments.

1        Q.    Right.  But those severance payments were what

2    you-all had intended to pay employees to stay.

3        A.    I don't really have a lot of memory of the

4    severance bonus plan or what was negotiated or with

5    employees that worked for Jeff.  That was more or less

6    something that Jeff and Keith handled.  I just know that

7    every employee received -- every -- certain employees

8    received amounts in connection with signing a separation

9    agreement when the sale went through and they were

10   transferred to the new buyer.

11       Q.    Okay.  And it was a severance because people were

12   no longer going to be working for the business?

13       A.    They were no longer going to be working for

14   Southwest Housing Management or whatever entity they worked

15   for.  They were going to be severed from our company and

16   then rehired by the buyer's company.

17       Q.    Okay.

18             You recall being in your deposition.

19   And I'm at Page 81, 3.  Do you recall that I asked you, Do

20   you know the total amount paid out in sale-proceeds bonuses

21   to employers other than your -- to employees other than

22   yourself and Brian?  And you say, "Yes."  And I say, "What's

23   the total?"  And then you say, "The total bonuses paid out

24   at sale were approximately 2.1 million."

25       A.    Correct.

1          Q.    And the 2.1 million paid out, that you said were

2    paid out in sale-proceeds bonuses, that --

3          A.    Paid out of the proceeds from the sale.

4          Q.    I'm sorry?

5          A.    Paid out of proceeds from the sale.

6          Q.    Okay.  Well, in the question you didn't take issue

7    with sales-proceeds bonus --

8          A.    Sorry I forgot to take issue with you --

9          Q.    -- but you do now.

10         A.    -- on that particular time --

11         Q.    Okay.

12         A.    -- because I've taken issue with it --

13         Q.    The total is -- is 2.1 million?

14         A.    Uh-huh.

15         Q.    And those payouts were not pursuant to any

16    writing, correct?

17         A.    I don't know if that's true as it related to

18    everybody.

19         Q.    Okay.  Were the majority of those bonuses paid out

20    based on oral --

21                    MR. L. FRIEDMAN:  Objection.

22                    MS. GIBSON:  I'm sorry.  Let me start over.

23         Q.    (By Ms. Gibson) Were the majority of those bonuses

24    out of the asset-sale proceeds paid even though there wasn't

25    a writing?

1                    MR. L. FRIEDMAN:  Objection, irrelevant.

2                    THE COURT:  Sustained.

3                    Y'all come back over here.

4                    (Sidebar conference held)

5                    MR. L. FRIEDMAN:  May I have a ruling,

6     Your Honor?

7                    THE COURT:  It's on the record.  I've

8     already sustained that objection.

9                    MR. L. FRIEDMAN:  Thank you.

10         Q.    (By Ms. Gibson) And, Ms. Geiser, you recall that

11    in this case we requested the actual hard numbers so that we

12    could do the calculation of payouts ourself?

13                   MR. L. FRIEDMAN:  Asked and answered.

14         Q.    (By Ms. Gibson) Do you recall that?

15                   MR. L. FRIEDMAN:  Asked and answered,

16    Your Honor.

17                   MS. GIBSON:  Not on this.

18                   MR. L. FRIEDMAN:  Well, she has the hard

19    number.

20                   THE COURT:  Go ahead.

21                   Overruled.

22         A.    I'm sure you did.

23         Q.    (By Ms. Gibson) Okay.  And the response was you

24    couldn't find them, correct?

25         A.    I -- you'd have to ask my lawyers.  I turned

Appendix 0656

135

```
 1      everything I had over to them.  I did what I was asked to
 2      do.  I don't know.
 3          Q.    Okay.
 4                Ms. Geiser, would you take a look at
 5      Exhibits 27 through 34 that are in a stack in front of you?
 6          A.    All right.
 7          Q.    Okay.
 8                What -- what I'm going to do here in the
 9      interest of time is I'm going to go through each amendment
10      or closing statement in front of you and just ask if you can
11      confirm the amount paid to sellers.
12          A.    You mean you want me to look at the document and
13      say if that's the number?
14                MR. L. FRIEDMAN:  Can we have a copy of it?
15                MS. GIBSON:  I gave them to you ahead of
16      time.
17                MR. DONOHUE:  Is it 25?
18                MS. GIBSON:  No.  I gave you a stack of
19      them.  You see them?
20                MR. L. FRIEDMAN:  Show me what it is.
21                (Pause)
22                MS. GIBSON:  I gave you -- if it helps you,
23      I just -- I gave you a stack.
24                MR. DONOHUE:  I have those.  I did have a
25      stack, but --
```

| | |
|---|---|
| 1 | MR. L. FRIEDMAN:  I have eight, nine, ten. |
| 2 | MS. GIBSON:  Okay. |
| 3 | You have them? |
| 4 | MR. DONOHUE:  Starting with 23, you gave us |
| 5 | those.  Oh, you're talking about the amendments.  Okay. |
| 6 | MR. L. FRIEDMAN:  I have seven, eight, |
| 7 | nine, and ten.  What do you have? |
| 8 | MS. GIBSON:  Okay. |
| 9 | MR. L. FRIEDMAN:  What are you looking at? |
| 10 | MS. GIBSON:  It's -- it's 27 to 34. |
| 11 | MR. L. FRIEDMAN:  But what's that?  Six I |
| 12 | don't have. |
| 13 | MS. GIBSON:  Six? |
| 14 | MR. L. FRIEDMAN:  Oh, here it is.  Okay. |
| 15 | MS. GIBSON:  You have six.  Okay.  All |
| 16 | right. |
| 17 | Q.  (By Ms. Gibson) So, what I'm going to do is |
| 18 | start -- we already went through some of the amendments. |
| 19 | I'm just going to show you on the screen the amendment and |
| 20 | the amount and just ask you to confirm that that amount was |
| 21 | paid. |
| 22 | Well, first of all, do those exhibits |
| 23 | appear to be accurate copies of amendments to the escrow |
| 24 | agreements; and then in the last couple of documents, an |
| 25 | Email from Keith Jones with seller's closing statements and |

1      a July 17th, 2008 closing memorandum?

2                      MR. DONOHUE:  Ours aren't marked

3      number-wise.  Is that all one exhibit or --

4                      MS. GIBSON:  No, separate.

5                      MR. L. FRIEDMAN:  You've given us unmarked,

6      so we have no way of knowing which exhibit you're speaking

7      of.

8                      MS. GIBSON:  They're -- they're in order

9      starting with 27.

10                     MR. L. FRIEDMAN:  Number six is

11     twenty-seven?

12                     MS. GIBSON:  Here.  I'll trade you --

13                     MR. L. FRIEDMAN:  Okay.  Good.

14                     MS. GIBSON:  -- if that's a problem.  There

15     you go.

16                     MR. DONOHUE:  Thank you.

17         Q.    (By Ms. Gibson) Have you had a chance to look?

18         A.    Yeah.

19                     What was your question?

20         Q.    Do Exhibits 27 through 34 appear to be accurate

21     copies of various amendments to the escrow agreement, and

22     then at the back a closing memorandum and an Email from

23     Keith Jones with seller's closing memo?

24         A.    Yeah, I guess so.

25         Q.    Okay.

1                      MS. GIBSON:  Plaintiff offers Exhibits 27

2      through 34.

3                      MR. L. FRIEDMAN:  Lack of foundation,

4      hearsay, Your Honor.

5                      THE COURT:  Okay.  Overruled.  Twenty-seven

6      through thirty-four are admitted.

7          Q.    (By Ms. Gibson) If you will take a look at the

8      sixth amendment.

9          A.    Okay.

10         Q.    Proceeds paid to seller of 1.85 million?

11         A.    Okay.

12         Q.    And that was earnest money applied to the purchase

13     price?

14         A.    I'm going to say yes, qualified yes.  I don't

15     remember all the details of the sale, but I'm going to go

16     with that.

17         Q.    Okay.

18                    Escrow amendment seven, $925,000 paid to

19     sellers?

20         A.    Yes.

21         Q.    And that was also earnest money applied to the

22     purchase price?

23         A.    Again, same answer.

24         Q.    Escrow amendment eight, $925,000 to sellers?

25         A.    Same answer.

139

1          Q.    And so that's a yes?

2          A.    Yes.   And I'm qualifying it with your

3    characterizing it as earnest money and I'm not sure if

4    that's an accurate characterization, but I'm accepting

5    it for now.

6          Q.    Okay.

7                     And escrow amendment nine, $925,000 paid to

8    sellers?

9          A.    Yes.

10         Q.    Escrow amendment 10, $925,000 paid to sellers?

11         A.    Yes.

12         Q.    Seller's closing statement, Phase 1, the -- the

13   net amount to sellers [sic] after closing costs was

14   17,000 -- or, I'm sorry -- 17,584,388.30, as shown on the

15   screen.

16         A.    Okay.

17                     (Pause)

18                     Hang on a second.

19         Q.    Okay.

20                     (Pause)

21         A.    Okay.   Can you ask me the question again?

22         Q.    Sure.

23                     With respect to seller's closing statement,

24   Phase 1, the net proceeds to seller after closing costs was

25   $17,584,388.38 -- or, and 30 cents.

140

1          A.     Net cash to seller first closing, 17,584,388.30.

2          Q.     And the Bank of America payment was not a closing

3     cost, correct, looking at the same seller's closing

4     statement?

5          A.     I mean, I guess it depends how you define closing

6     cost.

7          Q.     Well, the Bank of America payment was -- was owed

8     by the businesses regardless of the asset sale, correct?

9          A.     I don't know if that's really true.  It was -- in

10    order for Bank of America to consent to the sale of that

11    asset to Cascade they required that payment.  So I don't

12    know what would have happened if the sale didn't happen or

13    if that asset wasn't transferred.

14         Q.     Okay.  Do you recall telling me at your deposition

15    that that payment would have been owed regardless of the

16    asset sale?

17         A.     Yeah, but I thought more about it.  And as I sit

18    here today and I'm refreshing my memory, we probably would

19    have had to make separate negotiations with Bank of America.

20    So I'm just not sure.

21         Q.     Okay.  Well, according to -- if you'll take a look

22    at the second page of that closing statement.

23         A.     The second page of what closing -- oh, okay.

24         Q.     I'm sorry.  The second page of the exhibit.

25         A.     Yeah.

1        Q.    Do you see that there's a line item for seller's
2    closing costs and certain other closing costs below,
3    commissions and costs?
4        A.    Uh-huh.
5        Q.    And you see that the Bank of America payment is
6    not included in closing costs?
7        A.    Correct.
8        Q.    Okay.
9        A.    But it wasn't.  It wasn't a cost of closing but it
10   was a cost of the deal to get the deal done, to get the
11   consent.
12       Q.    Okay.  It was not a closing cost, correct?
13       A.    Not as defined by that narrow statement, no.
14       Q.    Okay.
15             If you'll take a look at closing memo,
16   Phase 2, the net payment to sellers after closing costs was
17   $2,314,644 --
18       A.    Wait, wait, wait, wait.
19       Q.    -- .09?
20       A.    Wait.  I don't have that.  I have two of the first
21   closing.
22       Q.    You don't have Carpenter 588 to 589 marked as one
23   of those exhibits?
24       A.    Are you talking about this one?
25       Q.    Yes.

1          A.     Okay, then I do have that.  It's just in a

2     different format than this one.

3          Q.     All right.  No, but we -- it's -- we produced

4     it to you, didn't we?

5          A.     Okay.  What's your question?

6          Q.     Okay, the question is the closing memo for Phase 2

7     the net to seller after closing costs is $2,314,644.09?

8          A.     Okay.

9          Q.     Is that accurate?

10         A.     It says, "Following the closing, escrow agent will

11    wire 2,314,644.09 to seller based on wire instructions to be

12    provided by seller representing the net proceeds due seller

13    with respect to the sale."

14         Q.     Okay.  It's net proceeds.

15         A.     Okay.

16         Q.     Okay.  And the --

17         A.     Sorry.  It's been a long time since I, you know,

18    went through this in detail.

19         Q.     That's okay.

20         A.     So I'm just making sure I'm clear.

21         Q.     So the total -- and this is including things that

22    we went over before lunch --

23         A.     Uh-huh.

24         Q.     -- ends up being just shy of 33 million net to

25    sellers.  Does that sound about right?

1        A.    Does what sound about right?

2        Q.    Just shy of 33 million net to sellers after

3    closing costs.

4        A.    Are you asking me do I think that those totals

5    equal that?

6        Q.    No.  I'm just saying, Does that -- does that sound

7    about right to you?  Does that look off to you?

8        A.    I don't recall if there was a subsequent closing

9    to the second closing.

10        Q.    I will represent to you that there are, but there

11    were no additional net payments to sellers.

12        A.    Okay.

13        Q.    According to those closing memos.

14        A.    All right.  So that's 33 million.  I said 34

15    million.  Pretty close.

16        Q.    Okay.

17                MS. GIBSON:  Your Honor, I'd like to pass

18    the witness --

19                THE COURT:  Okay.

20                MS. GIBSON:  -- but may I have a brief

21    bathroom break?

22                THE COURT:  Sure.

23                We'll take a -- we'll take our 10-minute

24    break, ladies and gentlemen.  We'll see you back in 10

25    minutes.

1              (The jury exited the courtroom.)

2              (Recess taken)

3              (The jury entered the courtroom.)

4              THE COURT:   Welcome back.   Good afternoon,

5    ladies and gentlemen.

6              We'll continue with the testimony of this

7    witness and we'll ask Mr. Friedman to begin his questioning.

8    We will go for about an hour and 10 minutes before we take

9    that second afternoon break.   So that will be about 3:35.

10             MR. L. FRIEDMAN:   Your Honor, if you don't

11   mind, I'm going to stand because --

12             THE COURT:   All right.   However you're most

13   comfortable.

14             MR. L. FRIEDMAN:   -- I can't properly see

15   the witness --

16             THE COURT:   That's fine.

17             MR. L. FRIEDMAN:   -- with the screen blown

18   up.   Thank you.

19             CROSS-EXAMINATION

20   BY MR. L. FRIEDMAN:

21        Q.   Okay.   Ms. Geiser Potashnik?

22        A.   I think that's right.

23        Q.   Bring that microphone just a little bit closer to

24   you.

25        A.   Okay, now you got me confused.   It's Geiser

Appendix 0666

1    Potashnik.  That's correct.

2        Q.    All right.  That's good.

3              Ms. Potashnik, all of these transactions

4    took place at least 10 years ago; is that correct?

5        A.    Yes.

6        Q.    And negotiations with Mr. Carpenter took place

7    longer than that?

8        A.    Conversations with Mr. Carpenter, yes.

9        Q.    Yeah.  In other words, I wrote down some dates I

10   want to go over with you, but --

11             MR. L. FRIEDMAN:  May I approach the easel,

12   Your Honor?

13             THE COURT:  Certainly.

14             MR. L. FRIEDMAN:  Thank you.

15       Q.    (By Mr. L. Friedman) -- your negotiations with

16   Mr. Carpenter started prior to the time he signed his

17   employment contract on February 4th, 2004; is that correct?

18       A.    Yes.  Yes.

19       Q.    And then the employment contract that we've been

20   talking about is dated February 4th?

21       A.    I think that's right.

22       Q.    Correct?

23       A.    Yeah.

24       Q.    And I don't want to belabor the point but I do

25   want to go over just a few things in that contract.

```
 1                    JUROR NUMBER 5:  Can we turn that a little
 2      bit?  We can't see it.
 3                    MR. L. FRIEDMAN:  Oh, I'm so sorry.  It's
 4      all about me, if I can see it.
 5                    JUROR NUMBER 5:  That looks good.  That's
 6      better.  There you go.
 7                    THE WITNESS:  Now I can't see it, Steve.
 8                    MR. L. FRIEDMAN:  Can you see it?
 9                    THE WITNESS:  Can you see it?
10                    MR. L. FRIEDMAN:  Yeah.
11                    THE WITNESS:  I can see it.
12                    MR. L. FRIEDMAN:  Judge, can you see it?
13                    THE COURT:  Uh-huh.
14                    MR. L. FRIEDMAN:  Okay.  I apologize.
15          Q.   (By Mr. L. Friedman) Cheryl, I'm going to try to
16      go quickly and not take my hour and 10 minutes.
17                    MR. L. FRIEDMAN:  Let me use the Elmo,
18      'cause I think it'll go faster.
19                    What do I need to do?
20                    MR. DONOHUE:  Tap the screen.
21          Q.   (By Mr. L. Friedman) Okay.  So this is the exhibit
22      we've been talking about yesterday and today.  This is
23      Mr. Carpenter's employment contract, correct?
24          A.   Correct.
25          Q.   And just briefly, contract is between Southwest
```

1       Housing Management and Mr. Carpenter, correct?

2           A.   Yes.

3           Q.   And it was your testimony or isn't it your

4       testimony that that's the only written employment contract

5       or only written contract, employment or not, between any of

6       the entities and Mr. Carpenter?

7           A.   Yes.

8           Q.   Correct?

9           A.   Correct.

10          Q.   Let's -- let's go down to Paragraph 2, At-Will

11      Employment.  I think you've testified what at-will

12      employment means.  And weren't you present at

13      Mr. Carpenter's last deposition when he testified that

14      before he signed this agreement he read it, he understood

15      it, and he intended to comply with every term of this

16      agreement and then signed it?

17          A.   Yes.  That's my memory.

18          Q.   You heard him say that?

19          A.   I did.

20          Q.   At his deposition a week or 10 days ago?

21          A.   Correct.

22          Q.   With regard to duties, his duties were to perform

23      whatever it is Mr. Potashnik, as the president of the

24      company, told him to do.  And I don't mean hard labor.  I

25      mean manage this company or work on the financials with

1    Keith Jones or work on the development with Sara Reidy and

2    things like it.

3         A.   Correct.

4         Q.   Okay.

5              And for that you paid him a very generous

6    $2,000-a-year [sic] salary?

7         A.   $200,000.

8         Q.   I'm sorry.  $200,000-a-year salary?

9         A.   Yes.

10        Q.   I was thinking about the allowance that my wife

11   gives me.

12             So you paid Mr. Carpenter's salary every

13   day that he worked.  I say "you".  Southwest Management paid

14   Mr. Carpenter's salary every day that he worked for

15   Southwest Management; is that correct?

16        A.   Yes.

17        Q.   Southwest Management paid his salary from the day

18   he began employment until the day he finished?

19        A.   Correct.

20        Q.   And if you recall -- and I'll show you some

21   documents in a minute -- he was terminated on October 31st,

22   2007, but he was paid through November 2nd, 2007.  Do you

23   remember that?

24        A.   Vaguely.

25        Q.   All right.  Well, let me come back to that.

Appendix 0670

1          A.    Okay.

2          Q.    But he was paid for every day he worked for the

3    company?

4          A.    Yes.

5          Q.    Did good work; got good pay?

6          A.    Yes.

7          Q.    Now, this agreement covers bonuses, as we've

8    talked about ad -- ad finitum.  And the only bonus that was

9    guaranteed was the first year's bonus, minimum of $50,000?

10         A.    It was discretionary.

11         Q.    Discretionary and you paid it?

12         A.    Correct.

13         Q.    All right.

14               The rest of the bonuses were also

15   discretionary, correct?

16         A.    Yes.

17         Q.    And we -- what does discretionary mean to you?

18         A.    At your discretion.  It's subjective.

19         Q.    Okay, subjective.  So Southwest Management made

20   the decision to pay it or not to pay it at the end of every

21   year?

22         A.    Correct.

23         Q.    So, Mr. Carpenter started March 2004.  Come the

24   end of 2004 or in March 2005, Southwest Management had a

25   chance to look at the company, see whether he was leasing up

150

1    the properties, whether the company was profitable, and

2    either pay him or not pay him a bonus --

3         A.   Right.

4         Q.   -- correct?

5         A.   Yes.

6         Q.   And Southwest Management didn't pay Mr. Carpenter

7    a bonus in 2004, 2000 -- I'm sorry -- 2005, 2006, and 2007;

8    is that correct?

9         A.   I don't think -- I don't think we did.

10        Q.   All right.  But they paid him the $50,000?

11        A.   That I've seen proof of, yes.

12        Q.   Okay.

13             And he was reimbursed for his expenses,

14   correct?

15        A.   Yes.

16        Q.   And paid time off and health insurance, got COBRA

17   when he left, and all that stuff, right?

18        A.   Yes.

19        Q.   On termination, I think you addressed that before.

20             Is there anything unclear about Paragraph 7

21   where it says employee will not be entitled to any

22   compensation or benefits pursuant to this agreement

23   effective upon the termination of employee's employment, the

24   removal of the employee from the position of executive vice

25   president, and/or upon the employee's death, as noted below?

1          A.    That's clear.

2          Q.    And is there anything unclear about, in the event

3    company terminates employee, employee will receive severance

4    in an amount equal to six weeks of base salary and a lump

5    sum payable upon such termination?

6          A.    That's clear.

7          Q.    And to your knowledge, Southwest Management --

8    Southwest Housing Management paid Mr. Carpenter six weeks of

9    base salary and a lump sum upon his termination?

10         A.    Yes.

11         Q.    In compliance with the terms of this agreement?

12         A.    Correct.  And he accepted that money.

13         Q.    And he accepted the money.

14               Now I'm going to Paragraph 12, which we've

15    talked about over and over again.  The agreement between

16    Mr. Carpenter and Southwest Housing Management was no

17    amendment or alteration of the terms of this agreement shall

18    be valid unless made in writing and signed by both of the

19    parties to this agreement.  Meaning Southwest Housing

20    Management and Mr. Carpenter, correct?

21         A.    Yes.

22         Q.    Not Santa Claus, not Disneyland, not Affordable

23    Housing, not Development, not anybody else.  If -- if there

24    was any change in the terms of this agreement it had to be

25    signed by Mr. Carpenter and Southwest Housing Management,

1    correct?

2         A.    Yes.

3         Q.    The agreement goes on to say on Paragraph 17 --

4    which we hadn't focused on or which Ms. Gibson hadn't

5    focused on -- was this.  It says -- it's entitled <u>Entire</u>

6    <u>Agreement and Binding Effect</u>.  And it says --

7              (Coughing)

8              MR. L. FRIEDMAN:  Somebody need water?

9         Q.    (By Mr. L. Friedman) It says, "This agreement

10   contains the entire agreement of the parties with respect to

11   the subject matter hereof and shall be binding upon and

12   inure to the benefit of the parties to this agreement and

13   their legal representatives, heirs, distributors, successors

14   and assigns."

15              But the important language in this sentence

16   is this agreement contains the entire agreement of the

17   parties with respect to the subject matter hereof.  Is that

18   correct?

19        A.    Yes.

20        Q.    And with regard to the subject matter of this

21   agreement of the employment relationship regarding

22   Mr. Carpenter, the subject matter has to do with employment,

23   at-will employment, specification of his duties, how he was

24   compensated, Paragraph Number 4.  4A is his salary and 4B

25   has to do with his bonus structures as an employee of

1    Southwest Housing Management.

2         A.    Right.

3         Q.    Do you agree with that?

4         A.    Yes.

5         Q.    And do you agree that bonuses, bonus structures,

6    and changing the bonus structures at the discretion of the

7    company is a subject of this agreement?

8         A.    Yes.

9         Q.    And would you interpret that to fall within

10   Paragraph 17 covered by this agreement?

11        A.    Yes.

12        Q.    All right.

13             Now, you were at Mr. Carpenter's deposition

14   when he testified.  And I think it's in his declaration,

15   which we'll put on in our case in chief.  Mr. Carpenter

16   testifies that he met with Brian Potashnik.

17             MR. L. FRIEDMAN:  Is it Geiser Potashnik?

18             MR. POTASHNIK:  No, not Potashnik, Geiser.

19        Q.    (By Mr. L. Friedman) He met with -- Ms. Potashnik

20   met with -- Mr. Carpenter alleges that he met with

21   Mr. Potashnik on October 13th, 2006, made a deal, shook his

22   hand, gave him a kiss, whatever, but left with a valid

23   enforceable agreement.  You were present when Mr. Carpenter

24   said that?

25        A.    Yes.

1        Q.    I mean, do you remember that or not?

2        A.    Generally, yes.

3        Q.    Yeah, said he had an agreement from that time on,

4    had a valid enforceable agreement.  So you would expect

5    Mr. Carpenter to act like someone who had a valid

6    enforceable agreement, right?

7        A.    Yes.

8        Q.    All the terms and conditions agreed upon with

9    Mr. Potashnik?

10       A.    Right.

11       Q.    I mean, you'd have to have all the terms and

12   conditions agreed upon to have a valid enforceable

13   agreement.  Would you -- would you agree with that?

14       A.    Yes.

15       Q.    So, going back to Exhibit Number 23 Ms. Gibson

16   highlighted a few minutes ago --

17       A.    I'm out of order.  Sorry.

18       Q.    What's that?

19       A.    My exhibits are out of order.

20       Q.    It's the November 15th Email string.

21               MR. DONOHUE:  Make sure it's been admitted.

22               MR. L. FRIEDMAN:  I'm sorry.  Has it been

23   admitted, Your Honor?

24               THE COURT:  Yes.

25               THE WITNESS:  Twenty-three I have.

1               MR. L. FRIEDMAN:  All right.  So I'll put

2      it up on the screen.   You can follow it on the screen or on

3      your platform.

4          Q.    (By Mr. L. Friedman) So this is a year after

5      Mr. Carpenter alleges that he had a valid, enforceable, oral

6      agreement with Mr. Potashnik.

7               Mr. -- we pick -- we pick up at the top

8      here with your response to Mr. Carpenter's last Email -- I'm

9      sorry -- with your response to Mr. Carpenter's 7:30 a.m.

10     Email.  But Mr. Carpenter is Emailing you.  And in the

11     portions that weren't highlighted before in the middle of

12     the first paragraph, he says, "Last year, after the Cascade

13     transaction was announced and it became reasonably clear

14     that I would not be retained after closing of that

15     transaction, you implored me stay with the company through

16     that time,"

17               "Through that time" meaning the closing?

18     Is that how you read it?

19         A.    Yes.

20         Q.    "as that continuity and my continued services were

21     essential to the success of that transaction.   In

22     exchange," -- am I reading that in exchange for staying

23     through the closing?

24         A.    Yes.

25         Q.    "you informed me that I would be entitled to

156

1   receive at three percent of the proceeds of that transaction

2   net of certain costs; which, based on the structure at that

3   time, would represent an amount in excess of $1 million."

4           So, what do you get from that?  Number one,

5   it's November 15th, 2007, and Mr. Carpenter does not have

6   any evidence of an oral agreement as far as you know,

7   correct?

8       A.   Right.

9           MS. GIBSON:  Object to leading.

10           THE COURT:  Sustained.

11       Q.   (By Mr. L. Friedman) As of November 15th, 2007,

12   are you aware of any evidence Mr. Carpenter has of any oral

13   agreement?

14       A.   No.

15       Q.   And the November 15th, 2007 Email from

16   Mr. Carpenter are his self-serving words, correct?

17       A.   Correct.

18       Q.   Correct?

19           And you say --

20           MS. GIBSON:  Object to leading.  Sorry --

21           THE COURT:  Sustained.

22           MS. GIBSON:  -- I was a little late.

23           THE COURT:  It's already asked and

24   answered.  Go ahead.

25       Q.   (By Mr. L. Friedman) And you say -- your response

1    is, "Jeff, we'll take a look at this and get back to you as

2    soon as possible," right?

3          A.    Yes.

4          Q.    You didn't say that was the deal, correct?

5          A.    Correct.

6          Q.    You didn't say Brian told me that was the deal?

7          A.    Correct.

8          Q.    There's no affirmation or confirmation whatsoever

9    affirming what Mr. Carpenter is proposing in this Email,

10   correct?

11         A.    Right.

12         Q.    Now Mr. Carpenter, if you look further down this

13   Email -- the man who alleges that he has a valid,

14   enforceable, oral agreement -- his next-to-the-last

15   paragraph says, second sentence, "Accordingly, I have taken

16   the liberty of reworking" -- reworking -- "and attached the

17   draft separation agreement that you provided to incorporate

18   those other elements."

19                "Of course, as I have repeatedly said, I'm

20   understanding of the company's condition and the uncertain

21   status of the Cascade transaction.  As such, I am more than

22   willing to explore mutually agreeable ways to address those

23   issues while still preserving the spirit of our agreement

24   and our mutual interest in the financial success of the

25   company and the transaction.  Attached document is a draft

1   only; and that once the substantive points are confirmed, I

2   reserve the right to have it formally reviewed by an

3   attorney to confirm that it is complete."

4                    So, first I ask you, does that sound like

5   it's coming from someone who has a valid, enforceable, oral

6   agreement?

7        A.   No.

8        Q.   When you received that Email, did you understand

9   it to come from someone who already had a valid,

10  enforceable, oral agree -- or any agreement?

11       A.   No.

12       Q.   Does that indicate to you that Mr. Carpenter is

13  attempting to get whatever agreement that he wants or still

14  negotiated in writing?

15       A.   Yes.

16       Q.   I mean, do you know why Mr. Carpenter is now

17  drafting an agreement and sending it to you?

18       A.   No.

19                    MR. L. FRIEDMAN:  And do we have that draft

20  separation agreement?

21       Q.   (By Mr. L. Friedman) All right.  And it appears

22  from that paragraph that Mr. Carpenter -- you can -- if you

23  recall, that's great; but if not, just read it with common

24  sense.  Does it -- do you have an understanding as to

25  whether or not Mr. Carpenter is still negotiating?

1          A.    It appears that way.

2          Q.    And not only that, if you could reach agreement,

3     he says he still wants to confirm by his lawyer.   Might

4     change again?

5          A.    Correct.

6          Q.    The same day he sent that separation agreement --

7     which I thought I had.

8                     And you were present during Mr. Carpenter's

9     testimony that he said he decided to file suit against you

10    and Brian and Southwest Housing Management and Development

11    and Affordable Housing Construction on December 15, 2007?

12         A.    Correct.  Right.

13         Q.    Did he tell you that?

14         A.    Did he tell me that prior to filing --

15         Q.    Well, December 15th, while he was still

16    negotiating with you, did he tell you, "I'm going to file

17    suit"?

18         A.    I don't believe so.

19         Q.    And then on March 8th -- 11th of 2008, he did file

20    suit?

21         A.    Correct.

22         Q.    And he filed suit at least a month before the

23    closing began?

24         A.    Yes.

25         Q.    Never gave you a chance to close your deal to see

Appendix 0681

1    if you would give him a bonus?

2        A.    Right.

3        Q.    And when he filed suit he did go attempt to get a

4    temporary restraining order to gather some proceeds for

5    himself, didn't he?

6        A.    That's my understanding.

7        Q.    All right.   And that was regardless of whether the

8    deal closed?

9                    MS. GIBSON:   Object to leading, continued

10   leading.

11                   THE COURT:   Sustained.

12       Q.    (By Mr. L. Friedman) In March of 2008, before the

13   deal closed, Mr. Carpenter wanted over a million dollars

14   earmarked for himself, correct?

15                   MS. GIBSON:   Object to leading.

16                   THE COURT:   You're still leading.

17                   MR. L. FRIEDMAN:   Okay.

18                   THE COURT:   Sustained.

19       Q.    (By Mr. L. Friedman) What did Mr. Carpenter want in

20   March of 2008?

21       A.    My memory is that he filed something with the

22   court to get a temporary restraining order.   I may be

23   screwing up the legal terminology, but asking the Court to

24   force the parties to put over a million dollars into an

25   escrow or something prior to the sale occurring.

1        Q.   All right.

2             And when he made that request, was that

3   before or after you and Mr. Potashnik, Southwest Housing

4   Management, Southwest Housing Development, and Affordable

5   Care Housing received any money?

6        A.   That was before, yes.

7        Q.   Okay.  And the same thing goes for any of the

8   other discretionary bonuses you gave to other employees in

9   the company --

10        A.   Let me just correct my --

11        Q.   -- before that --

12        A.   Let me correct my prior statement, then.  You

13   said, Is that prior to anybody receiving any money?  There

14   were those additional releases under the amended escrow

15   agreements, but this was -- that was prior to the

16   transaction being consummated, to the sale going through.

17        Q.   Well, let me make it more precise.  Was that

18   before or after the -- any other employees received any

19   discretionary bonuses?

20        A.   Before.

21        Q.   He wanted his first?

22        A.   Correct.

23        Q.   Now, I do have the separation agreement that went

24   along with this November 15th Email.  And in the separation

25   agreement that Mr. Carpenter drafted and sent to you --

1              MR. L. FRIEDMAN:  Do we have an exhibit
2    number for that?
3              MR. DONOHUE:  Twenty-four, I think.
4              MR. L. FRIEDMAN:  I'm sorry.  Twenty-four?
5              MR. DONOHUE:  Defendants' Exhibit 24.
6              MS. GIBSON:  What?
7              MR. L. FRIEDMAN:  It's Defendants' Exhibit
8    24.
9              And I'll -- I'll move for admission as
10   Defendants' Exhibit 24.
11             MS. GIBSON:  I don't have a copy of what
12   you're talking about.
13             MR. DONOHUE:  Here you go.
14             MR. L. FRIEDMAN:  Do you have a copy?
15             THE WITNESS:  Somehow, I have a copy.
16             MR. L. FRIEDMAN:  Oh, let me -- may I
17   approach the witness, Your Honor?
18             THE WITNESS:  I have a copy.
19             THE COURT:  She has a copy.
20             THE WITNESS:  It's attached to that Email.
21             MS. GIBSON:  That's a different --
22             THE WITNESS:  This is different?
23             MS. GIBSON:  Well, it may not be a
24   different agreement but it's a different document and it has
25   my highlighting on it.

```
 1                       THE WITNESS:  Okay.

 2                       MS. GIBSON:  I just gave you my copy.

 3                       THE WITNESS:  All right.

 4                       Do you want it back?

 5                       MS. GIBSON:  Oh, no.  Just -- you can leave

 6      it up there.

 7                       THE COURT:  All right.  Go ahead, if you

 8      want to give her your document.

 9                       MS. GIBSON:  But in the interest of time,

10      we have no objection.

11                       THE COURT:  Okay.  It's not already in

12      evidence.  That's not the --

13                       MS. GIBSON:  No.  Just to 24 being

14      admitted.

15                       THE COURT:  All right.

16                       MR. L. FRIEDMAN:  No, Ms. Gibson didn't

17      offer it into evidence.

18                       THE COURT:  All right.  Defendants' 24 is

19      admitted.

20          Q.   (By Mr. L. Friedman) Along with the November 15th

21      Email --

22                       THE COURT:  Just a second.

23                       Did you -- Vikki, did you get that?

24                       THE REPORTER:  Yes, I did.

25                       THE COURT:  All right.
```

1           MR. L. FRIEDMAN:  Does she have it?

2           THE REPORTER:  Yes, I did.

3           THE WITNESS:  I think I have it.

4           MR. L. FRIEDMAN:  Let me give -- may I

5      approach, Your Honor?

6           THE COURT:  Certainly.

7           MR. L. FRIEDMAN:  Let me giver her the

8      exact same one I'm talking about.

9      Q.    (By Mr. L. Friedman) Along with the November 15th

10     Email was attached the written draft-separation agreement

11     that Mr. Carpenter was proposing to address to show

12     Brian Potashnik and Southwesthousing.com.  So you go to the

13     attachment -- or I go to the attachment.  Lo and behold, if

14     you look at Paragraph 5, Mr. Carpenter says, "In addition to

15     the foregoing amounts, employee will be paid within seven

16     days of the date of closing of any transaction as defined

17     above an amount in cash equal to three percent of the" --

18     this is important.  He is proposing --

19          MS. GIBSON:  I just object to the

20     commentary and continued leading.

21          THE COURT:  The sidebar objection is

22     sustained.

23          MR. L. FRIEDMAN:  All right.  I'm just

24     reading.

25     Q.    (By Mr. L. Friedman) "In addition to the foregoing

1    amounts, employee will be paid within seven days of the date

2    of closing of any transaction as defined above an amount in

3    cash equal to three percent of the gross compensation or

4    consideration, whether in the form of cash, stock,

5    assumption of debt, fees, loans, or otherwise, for the

6    purchase of the company, less reasonable costs of closing."

7              Now, does it say in there less other

8    employee bonuses?

9         A.    No.

10        Q.    Or -- or is that a different formula than you

11   heard Mr. Carpenter testify to in his deposition?

12        A.    It's different.

13        Q.    I see.

14              And Mr. Carpenter is attempting to get

15   what?  He's attempting to comply with Paragraph 12 of his

16   employment agreement.

17              MS. GIBSON:  Object to leading.

18              THE COURT:  Sustained.

19              MR. L. FRIEDMAN:  Okay.

20        Q.    (By Mr. L. Friedman) Well, as it pertains to the

21   terms of his employment agreement, do you have an

22   understanding of what Mr. Carpenter is attempting to do by

23   sending you a draft separation agreement for you and

24   Mr. Potashnik to sign?

25        A.    He's trying to get an agreement.

1        Q.    A written agreement?

2        A.    Correct.

3        Q.    Signed by the parties who signed his employment

4    contract?

5        A.    And others.

6        Q.    And others?

7        A.    Yes.

8        Q.    And he wants to bind more people than that?

9        A.    Correct.

10       Q.    So, while we're here, let's take a look at the

11   formula.  It looks to me like Mr. Carpenter is asking you

12   for a real estate commission or a type of commission on the

13   sale of the company.  Would you agree with that?

14                 MS. GIBSON:  Object to leading.

15                 THE COURT:  Sustained.

16       Q.    (By Mr. L. Friedman) Look at Paragraph 5 and tell

17   me what it appears to you that Mr. Carpenter is trying to

18   achieve.

19       A.    What he's trying to achieve?

20       Q.    Well, other than just get money.  I mean, could he

21   have -- could a formula like that reflect an understanding

22   of the transaction?

23                 MS. GIBSON:  Object to leading.

24                 THE COURT:  Overruled.

25       A.    The -- are you referring to the sales transaction?

Appendix 0688

1      Q.    (By Mr. L. Friedman) Yeah, the sales transaction.

2      A.    The sale was very complicated.  There was a lot of

3  adjustments.  And that, to me, is a very simplified way to

4  calculate anything associated with the sale.

5      Q.    So, for example, when he says less reasonable cost

6  of closing, could you determine -- could anybody determine

7  from this agreement what he meant by reasonable cost of

8  closing?

9      A.    No.

10     Q.    I mean, how many different kinds of costs of

11  closing was there in the final sales transaction, by

12  example?

13     A.    I mean, I -- I can pull out the closing statement.

14            (Pause)

15            On this closing memorandum it looks like

16  there was 19 different closing costs.

17     Q.    And what do they consist of?

18     A.    It says property due diligence, accounting

19  services, abstractor's certificate, recording fees, title

20  reports, wire fees, UCC searches, MMA DUS loan counsel,

21  Wells Fargo legal fees -- MMA DUS loan counsel for

22  Pleasanton -- Wells Fargo legal fees for the trustee,

23  Pleasant Hill housing counsel, San Antonio Housing Authority

24  and another entity, legal fees and costs -- MMA legal fees

25  and costs -- Capmark legal fees and costs, transaction

1    construction loan transfer fees, lender legal --

2                    THE WITNESS:   Am I going slow enough?

3    No.

4        A.    -- lender legal and transfer fees - Old Manor,

5    lender legal and transfer fees - Aldine Bendor, Travis

6    County Housing Finance Corporation consent fee - Old Manor,

7    SLP fees, HUB interest purchase, CAH Texas counsel, seller's

8    counsel, CAH counsel.

9        Q.    (By Mr. L. Friedman) Would you have been -- did

10   you or were you able to determine what Mr. Carpenter meant

11   was reasonable cost of closing from his draft of separation

12   agreement?

13       A.    No.

14       Q.    Did Mr. Potashnik ever tell you that he had

15   discussed reasonable costs of closing with Mr. Carpenter?

16       A.    No.

17       Q.    Do you think Mr. Potashnik would know what cost of

18   closing consisted of?

19       A.    He would have had a good idea, yes.

20       Q.    Of all the things he read on that sheet?

21       A.    I don't think any of us had a great idea that it

22   was going to be this, but yes.

23       Q.    Of the amount.   But the things that you read

24   Mr. Potashnik would certainly know about?

25       A.    Yes.

1        Q.    That was not a handshake/hug deal and say, okay,

2    here's a million dollars, was it?

3        A.    No.

4        Q.    Ms. Potashnik, look at Page 2 of the separation

5    agreement.   Just turn the page.

6              And look at the second full sentence on top

7    of the page.   Mr. Carpenter was writing you on November 15,

8    2017.   "The gross compensation amount for purposes of this

9    paragraph shall not exclude, and shall specifically include,

10   any amounts paid to or for the benefit of the Potashniks,

11   the company, and/or its stockholders in the form of fees,

12   bonuses, severance payments, loans, or otherwise."

13             Shall not exclude payments to the

14   Potashniks, the company, the stockholders, in the form of

15   fees, bonuses, severance payments, loans, or otherwise.

16   Again, no mention of other employee bonuses?

17       A.    Correct.

18       Q.    Now, as you know it from all the pleadings that

19   have been filed in this case and from Mr. Carpenter's

20   demands, that's not his position today, is it?

21       A.    It is not.

22       Q.    Today, as you know it, Mr. Carpenter is telling

23   this jury that the alleged, valid, enforceable, oral

24   agreement that he made with Mr. Potashnik on October 13,

25   2006, excludes other employee bonuses, that $2.1 million

1    number that Ms. Gibson had you testify to, correct?

2        A.    Yes.

3        Q.    Do you have an understanding of whether or not

4    Mr. Carpenter knows what deal he's trying to enforce?

5        A.    No.

6        Q.    And then, finally, the last sentence after that

7    after the highlight, Mr. Carpenter wrote, "In addition, the

8    gross compensation amount shall be deemed fully earned and

9    paid on the closing date of this transaction, regardless of

10    whether the terms of the transaction provide for payment

11    over time, any holdback of funds, or for reduction or other

12    downward adjustment of gross compensation amount in the

13    future."

14              In other words, Mr. Carpenter's state of

15    mind at the time was this new element to his valid,

16    enforceable, oral agreement.  Had you ever seen that before,

17    heard of it before?

18        A.    No.

19        Q.    But he says his compensation would be fully earned

20    and paid at the closing date.  And only at the closing date,

21    correct?

22        A.    That's what it says, yes.

23        Q.    And that was the November 15th, 2017 memo?

24        A.    Yes.

25        Q.    But he didn't work for Southwest Housing

1    Management on that date, on the date of the closing,

2    correct?

3        A.    Correct.

4        Q.    And he already sued you before the closing?

5        A.    That's right.

6        Q.    Correct?

7        A.    Yes.

8        Q.    And if that was Mr. Carpenter's understanding of

9    what his valid, enforceable, oral agreement was, that he

10   would fully earn his compensation on the date of the closing

11   and get paid at the closing, that he would not have

12   fulfilled the hug/handshake deal that he made, correct?

13       A.    Yes.

14                  (Sotto voce discussion held)

15       Q.    It's terrible when your son turns out smarter than

16   you.

17                  And let me call your attention to Paragraph

18   7.

19       A.    Is this of the same agreement?

20       Q.    The same separation agreement attached to the

21   November 15th, 2007 Email.

22                  Mr. Carpenter wrote, "In order to induce

23   employee to enter into this agreement, the Potashniks,

24   jointly and severally, hereby personally and

25   unconditionally guarantee payment to employee of all amounts

172

1    provided for herein strictly in accordance with this

2    agreement."

3              Did I read that correctly?

4         A.   You did.

5         Q.   Mr. Carpenter says the inducement for him to enter

6    into this agreement, the separation agreement that he wrote,

7    was your personal guarantee that he'd be paid and

8    Mr. Potashnik's personal guarantee that he'd be paid,

9    correct?

10        A.   Correct.

11        Q.   Did you ever give Mr. Carpenter a personal

12   guarantee that he would be paid --

13        A.   No.

14        Q.   -- any amount of money at any time?

15        A.   No.  No.

16        Q.   Would you ever have given him a personal

17   guarantee?

18        A.   No.

19        Q.   Therefore, you didn't induce him to enter into

20   that agreement?

21        A.   Correct.

22        Q.   Or any agreement?

23        A.   That's right.

24        Q.   And did Mr. Potashnik ever tell you that he agreed

25   to personally guarantee any payments for Mr. Carpenter?

```
1          A.    No.

2          Q.    Any severance payments, any bonus payments, any

3    hugs, handshakes, or anything else?

4          A.    No personal guarantee ever.

5          Q.    All right.   Thank you.

6                      Now, with regard to the recorded telephone

7    conversation, you did not know at the time that you were

8    being recorded?

9          A.    Right.

10         Q.    But Mr. Carpenter had to know because he was

11   recording the conversation?

12         A.    Correct.

13         Q.    I counted -- and Mr. Carpenter transcribed the

14   conversation, correct?

15         A.    Yes.

16               MS. GIBSON:   I'm going to object to this as

17   leading as to what you count -- as to what he counted.

18               MR. L. FRIEDMAN:   Just laying a foundation.

19   But, okay --

20               MS. GIBSON:   He said, "I counted."

21               THE COURT:   All right.   It's not leading

22   yet.

23                      Go ahead, Mr. Friedman.

24         Q.    (By Mr. L. Friedman) You didn't transcribe the

25   conversation?
```

1      A.   I did not.

2      Q.   Okay.

3           I did count 58 times that Mr. Carpenter had

4  a chance or spoke during the conversation.  And you can take

5  my word for it or counsel can, or you can count the number

6  of times yourself.

7      A.   I'm going to count.

8      Q.   All right.

9      A.   Okay, I'm not going to count.

10     Q.   The number of times Mr. Carpenter spoke during

11  that conversation?

12     A.   I'm not going to count.  Sorry.

13     Q.   All right.

14           MR. L. FRIEDMAN:  Did we admit that as an

15  exhibit?

16           THE COURT:  Is it already in?  It's already

17  in.

18           MS. GIBSON:  Oh, that was pre-admitted by

19  agreement.

20           MR. L. FRIEDMAN:  You have it up there?

21           THE WITNESS:  Yes, I do.

22     Q.   (By Mr. L. Friedman) So you can either take my

23  word that it's 58 times or we'll just call it a lot of times

24  that Mr. Carpenter had a chance to speak.

25           Do you have it in front of you?

Appendix 0696

1          A.    I do.

2          Q.    Okay.

3                Now, when Ms. Gibson was examining you, she

4    had the chance but didn't go through every one of these

5    times when you spoke, but it's your understanding that JC

6    means Jeff Carpenter, correct?

7          A.    Yes.

8          Q.    And CP means?

9          A.    Myself, Cheryl Potashnik.

10         Q.    No Geiser.

11         A.    Right.

12         Q.    All right.

13               And during the course of that conversation,

14   did you ever agree to give Jeff Carpenter a severance bonus,

15   a pay-to-play bonus -- I forgot what she called it.

16               MR. J. FRIEDMAN:  Pay to stay.

17         Q.    (By Mr. L. Friedman) -- pay-to-stay bonus or

18   anything of that sort?

19         A.    I offered to give him a hundred and fifty thousand

20   dollars in additional severance.

21         Q.    You offered to give Jeff Carpenter a hundred and

22   fifty thousand dollars in addition to the contractual

23   severance that you paid him, that Southwest Housing

24   Management paid him, in accordance with his -- the terms of

25   his employment contract?

1      A.    Yes.

2      Q.    And during this conversation, on Page 2, three CPs

3   from the bottom where it starts with "And then", you want to

4   just read the CPs -- CP there?  You can read it out loud.

5   One of us has to read it out loud.

6      A.    Starting with "And then"?

7      Q.    Yeah, Cheryl Potashnik says on the conversation.

8      A.    "And then that's something you would have a legal

9   right to have.  And then, you know, like I've told you

10  before when we were on the phone with Keith, I've got to be

11  able to see some preliminary on how this deal is going to

12  shake out before I can start making commitments and go above

13  and beyond that, because I need to make sure that when all

14  is said and done and it shakes out and everybody else gets

15  paid that Brian and I have a certain amount of money that we

16  can put towards our defense."

17     Q.    And after you said that, what did Mr. Carpenter

18  say?

19     A.    "Right."

20     Q.    He says, "Right."

21     A.    Right.

22     Q.    And then you say?

23     A.    And until I know that I have -- sorry.  "And until

24  I know that I have that, I'm not making anymore commitments.

25  I did not know that.  Maybe within the next three to

1    four weeks."

2                    And then it's inaudible, so --

3    Q.   Okay.

4                    And then Mr. Carpenter, who knows the

5    conversation's being recorded, says?

6    A.   "Right."

7    Q.   And then you say?

8    A.   "But you have to understand that

9    there's investment banker fees, there's transfer fees on the

10   debt, there's legal fees, there's resized escrow costs, you

11   know, Skyline alone, Bank of America asking for $3 million."

12                    That's Parmer.  It's supposed to say Parmer

13   a big part of a million dollars when we close.

14   Q.   Okay.

15                    And then I -- we're not going to go through

16   all of this, but I want to go through the -- the next page

17   on top.  Mr. Carpenter says?

18   A.   "Uh hmm."

19   Q.   "Uh hmm."

20                    And then you say -- let's just make this

21   the last one.  Let's just read the highlighted portions.

22   You say to Jeff Carpenter?

23   A.   And the last thing I want to do is make

24   commitments -- make you commitments that can't be kept,

25   because then you and I are going to get sideways and I don't

1    want to do that.  And I don't want inaudible.  But I really

2    want to work with you and make sure you're taken care, but

3    it's not going to be -- there's no point in making promises

4    that I can't keep and then we end up sideways with each

5    other.

6        Q.    Okay.  And then -- and then Jeff Carpenter says,

7    "Yeah, yeah, I understand that.  Just the way this reads

8    doesn't cover that."

9                    And then just go to the next one.

10       A.    "That -- that doesn't cover anything having to do

11   with the sale because you don't have any rights under the

12   sale.  You have rights under your employment agreement."

13       Q.    Okay.  And what did you mean when you said that,

14   Mr. Carpenter didn't have any rights under the sale?  What

15   were you trying to convey to him at that time?

16       A.    That he didn't have a right -- any kind of right

17   to anything.  That anything paid out of the proceeds of the

18   sale would have been discretionary at the time that the sale

19   occurred.

20       Q.    Now, Mr. Carpenter had a lot of opportunities in

21   this telephone conversation to talk, didn't he?  You didn't

22   count them, but there's a lot of CPs.

23       A.    A lot of CPs --

24       Q.    JCs.

25       A.    -- and a lot of JCs, yeah.

Appendix 0700

179

```
 1          Q.    I'm sorry.   There's a lot of CPs and a lot of JPs

 2     [sic].

 3                     MR.  DONOHUE:   JC.

 4          Q.    (By Mr. L. Friedman) A lot of CPs --

 5          A.    JC.

 6          Q.    -- and a lot of JCs?

 7          A.    Yes.

 8          Q.    And there's four, five, six, seven pages of --

 9     seven, yeah -- seven pages of transcript.   Goes on for seven

10     pages.   Lot of JCs.

11                     Mr.  Carpenter spoke a lot of times in that

12     conversation, didn't he?  At any point in that conversation,

13     did Mr. Carpenter say to you, "I have a valid, enforceable,

14     oral agreement with Brian Potashnik.   You know that."?

15          A.    No.

16          Q.    At any point in that conversation, did

17     Mr. Carpenter say to you, "Cheryl, you know my agreement

18     with Brian Potashnik.   It is A, B, C, D, and E."?

19          A.    No.

20          Q.    Are you reneging or won't you confirm it?

21          A.    No.

22          Q.    Had Mr. Carpenter at one -- any time during that

23     time that he was secretly recording -- said to you, you

24     know, I get a million dollars out of this deal, I get three

25     percent off the gross, less reasonable closing costs,
```

Appendix 0701

1    etcetera, what would you have said?

2         A.    I would have said I don't know where you're

3    getting that from.

4         Q.    Would you have agreed to it?

5         A.    No.

6         Q.    And did you ever hear Mr. Potashnik agree to

7    anything like that?

8         A.    No.

9         Q.    Or did Mr. Potashnik ever tell you he agreed to

10   anything like that?

11        A.    No.

12        Q.    And this conversation that Mr. Carpenter secretly

13   recorded -- on my little chart there -- was November 2nd,

14   2007, the last day he was paid for working at Southwest

15   Housing Management?

16        A.    Yes.

17        Q.    Correct?

18              So, there was no question in your mind on

19   that day that you had not made a commitment to

20   Mr. Carpenter, correct?

21        A.    Yes.

22        Q.    And there was no question in your mind --

23              MS. GIBSON:   Object --

24        Q.    (By Mr. L. Friedman) -- that you conveyed that, no

25   commitment, to Mr. Carpenter and he recorded it?

1          MS. GIBSON:  Object to the continued

2   leading.

3          THE COURT:  You're still leading the

4   witness.

5          MR. L. FRIEDMAN:  Okay.

6     Q.   (By Mr. L. Friedman) What was your clear message

7   to Mr. Carpenter in the conversation that he secretly

8   recorded on November 2nd, 2007?

9     A.   My clear message was that basically you have

10  rights under your employment agreement.  I'm offering an

11  additional hundred and fifty thousand dollars in severance,

12  or however you want to characterize it.  And other than

13  that, we have to wait until the closing and see how

14  everything shakes out.

15    Q.   And you can't make any other commitments?

16    A.   Correct.

17    Q.   Now, last line of questioning.  You have about 23,

18  24 exhibits in front of you that Ms. Gibson was kind enough

19  to show you and enter into evidence?

20    A.   There's, like, 35.

21    Q.   Thirty-five.

22    A.   Okay.

23    Q.   Is there any evidence on any one of those 35

24  documents that Cheryl Geiser Potashnik or Brian Potashnik

25  agreed, orally or in writing, to any employment deal, bonus,

1      salary, new car program, or anything else with

2      Jeff Carpenter?

3          A.    Nothing other than what's in his employment

4      agreement.

5          Q.    Other than the employment contract?

6          A.    Correct.

7          Q.    Is there any evidence on any of those documents of

8      a valid, enforceable, oral agreement between Jeff Carpenter

9      and Brian Potashnik?

10         A.    No.

11                    MR. L. FRIEDMAN:  Nothing further,

12     Your Honor.

13                    THE COURT:  Ms. Gibson?

14                    MS. GIBSON:  Thank you, Your Honor.

15                    THE WITNESS:  And can I -- can I go to the

16     restroom?

17                    THE COURT:  Sure.

18                    We'll take our 10-minute break, ladies and

19     gentlemen.  We'll see you back at 3:25.

20                    (The jury exited the courtroom.)

21                    (Recess taken)

22                    (The jury entered the courtroom.)

23                    THE COURT:  Welcome back and good afternoon

24     still, ladies and gentlemen.

25                    We'll continue.  Mr. Friedman had just

1    passed Ms. Geiser as a witness, so it goes back to

2    Ms. Gibson to ask any follow-up questions, and we'll proceed

3    when she's ready.

4                        REDIRECT EXAMINATION

5    BY MS. GIBSON:

6        Q.    Ms. Geiser, have you noticed during the course of

7    this case that I have a bad habit of saying okay after a

8    witness gives an answer?

9        A.    No, I haven't.

10       Q.    Okay.

11       A.    I mean, you just did it, so now I do notice it.

12                   (Laughter)

13       Q.    I didn't do it on purpose.

14             You agree with me that it's normal

15   sometimes for people in conversation to say okay or uh-huh

16   or right?

17       A.    Yes.

18       Q.    And -- okay.  And that doesn't necessarily mean

19   that they agree with what the person has just said?

20       A.    I think I agree with that in a general sense.

21       Q.    And would you agree that the nature of enforcement

22   of an oral agreement is that it's not in writing?

23       A.    Enforcement?

24       Q.    I mean, that's why it's oral.

25       A.    Enforcement?  I don't follow you.

1    Q.   If -- if we're talking about an oral agreement,
2    obviously there's not going to be -- it's not going to be in
3    writing.
4    A.   Correct.
5    Q.   With -- with respect to the annual bonuses, you
6    describe them as discretionary but one end of the formula
7    says minimum discretionary, correct?
8    A.   Yeah, I believe so.
9    Q.   Okay.  And what does minimum mean to you?
10   A.   Minimum means minimum.  The -- it's been a long
11   day.  Okay, what does minimum mean?  The least possible.
12   Q.   The least possible.
13            And even when someone has discretion to set
14   a bonus, once a number has been relayed to the employee that
15   discretion has been exercised, correct?
16   A.   Can you say that again?  I'm sorry.  I'm fading.
17   Q.   Once -- that's okay.  I'll try it -- we'll --
18   we'll get through this.
19   A.   Okay.
20   Q.   Once the number has been relayed to the employee,
21   the discretion has been exercised?
22   A.   I don't know that I agree with that statement.
23   Q.   Okay.
24            Now, as of October 31st, 2007, Jeff is
25   staying -- had stayed as long as y'all needed him to,

1    correct?

2        A.    He stayed until the end of his employment.  We've

3    been over this a hundred times.

4        Q.    Well, okay.  You didn't need him anymore.  So, at

5    that point, once someone -- well, let me use a hypothetical

6    to avoid fights over agreements.

7                    If you agree to pay me $25 to mow your lawn

8    and I mow the lawn, it's too late at that point for you to

9    try to back out of our agreement, correct?

10       A.    I believe that all agreements have to be agreed to

11   by both parties.  We went through this exhaustively in my

12   deposition.

13       Q.    Right.  But if we agreed that I was going to mow

14   your lawn for $25, once I've already mowed the lawn it's too

15   late for you to back out and say you're not going to pay,

16   right?

17       A.    If we agreed to the terms and conditions of you

18   mowing my lawn and we both agreed and you mowed my lawn,

19   then I would agree.

20       Q.    Okay.

21                    With -- with respect to the document that

22   Mr. Friedman was asking you about where Jeff Carpenter sent

23   in his effort at a revised separation agreement --

24       A.    Yes.

25       Q.    Okay.  -- the truth is you had already told Jeff

1     he had no legal rights.  But at some point you said, "Why

2     don't you just send something to us", right?

3          A.    I'll have to look back at the timeline to make

4     sure that's correct.  Ask me again, please.

5          Q.    The truth is that although you already told Jeff

6     he didn't have any legal rights you told him to just go

7     ahead and send something to y'all?

8          A.    I may have.  I don't recall.

9          Q.    Okay.  And Jeff did that.  And I agree with you he

10    did a terrible job.  But Brian Potashnik and yourself had

11    earlier, before October 31st, promised that you-all would

12    document his deal in writing.  This is way -- I'm talking

13    about 2006.

14              MR. L. FRIEDMAN:  Objection.  Assumes facts

15    not in evidence.

16              THE COURT:  She's asking.  Overruled.

17              THE WITNESS:  I don't recall.  But if

18    there's a document that I can look at to refresh my memory,

19    I will.

20         Q.    (By Ms. Gibson) I believe that you and

21    Brian Potashnik had orally promised, multiple occasions,

22    that you-all would have your attorneys document the deal.

23    Do you recall that?

24         A.    I don't recall.

25         Q.    Okay.

Appendix 0708

1                    Ultimately, though, you asked Jeff -- this

2     is after his -- he's done everything asked of him, you told

3     Jeff to try and put something together?

4          A.   I may have.  I just said that.  I don't recall.

5          Q.   And that would mean that Jeff has to scramble to

6     find an attorney or he has to consult the attorney called

7     Attorney Google, right?

8          A.   To put something in writing, no.  He doesn't have

9     to consult an attorney.

10         Q.   Well, you put it on Jeff to try and piece

11    something together and he's not an attorney, correct?

12                    MR. L. FRIEDMAN:  Objection, assumes facts

13    not in evidence.

14                    THE COURT:  Overruled.

15                    MR. L. FRIEDMAN:  Misstated the witness's

16    prior testimony.

17                    THE COURT:  She can handle the questions.

18                    If you don't agree, tell her you don't

19    agree.

20                    THE WITNESS:  He didn't need to get an

21    attorney to put something in writing.  That was his choice

22    if that's what he did.

23         Q.   (By Ms. Gibson) Okay.  Well --

24         A.   I'm not an attorney.

25         Q.   -- it looks from the -- it looks from the document

1    that -- that he tried to make it look more legal than just a

2    handshake deal, right?

3        A.   He tried to make it -- I mean, it was very all

4    encompassing.  I would agree with that.

5        Q.   Right.  And so, suddenly, just like attorneys do,

6    they want to deal with all these other things.  Like, what

7    happens if somebody dies, you know, what happens in this

8    event or that event.  And there's -- there's some of that

9    going on in that proposal, correct?

10       A.   Some of what?

11       Q.   Just trying to cover various possibilities that

12   were beyond the handshake deal.

13       A.   Well, there was no handshake deal, number one.

14   And, number two, all agreements have multiple provisions, as

15   we've been through today, and they have various meanings at

16   various times to various parties.  So I don't know what else

17   to say about that agreement.

18       Q.   Are you aware that legally the parties can agree

19   to some terms of an agreement and, even if they expect that

20   there might be some additional terms or try to negotiate

21   additional terms, a jury or the Court can still enforce

22   those -- the particular terms that they did agree on?

23       A.   You lost me.

24            MR. L. FRIEDMAN:  Excuse me.  I'm going to

25   object.  This calls for a legal conclusion --

1            THE COURT:  Okay.

2            MR. L. FRIEDMAN:  -- and it's compound.

3            THE COURT:  You're asking for legal

4    conclusions.  And, really, you're going beyond the scope of

5    his cross.

6        Q.   (By Ms. Gibson) You talk about Jeff Carpenter

7    filing suit before the deal actually closed.  Remember that?

8        A.   Yes.

9        Q.   Okay.  But the suit was filed after you had told

10   Jeff Carpenter that he had no legal rights and might get

11   zero, right?

12       A.   I didn't say you might get zero, but I said that

13   you have no legal rights, yes.

14       Q.   And you can understand why someone might be

15   concerned that what was going to happen is y'all were just

16   going to take the money and run?

17            MR. L. FRIEDMAN:  Objection.  That's

18   argumentative.

19            THE COURT:  Sustained.

20       Q.   (By Ms. Gibson) Now, there was a part of that

21   agreement that said it would not -- that other employee

22   bonuses would not come off of the payment.  Do you remember

23   that?

24       A.   What agreement are you referring to now?  What --

25   are we back to the draft --

1          Q.    Well, after --

2          A.    -- separation agreement?

3          Q.    -- after you told Jeff Carpenter to try and put

4     something together after he had already stayed as long as

5     needed, Mr. Friedman was asking you about the part of that

6     that said it would be without deduction of other bonuses.

7                    MR. L. FRIEDMAN:  I'm going to have to

8     object.  This misstates the witness's prior testimony.  She

9     didn't say she told Jeff Carpenter.

10                    THE COURT:  She was saying what she told

11    you.

12                    MR. L. FRIEDMAN:  I think she said she

13    didn't recall.

14                    THE COURT:  Repeat your question.

15                    MR. L. FRIEDMAN:  I'm objecting because the

16    preface to Ms. Gibson's question was after you told

17    Jeff Carpenter to send me something, and I think she said

18    she didn't recall.

19                    MS. GIBSON:  I thought you said you may

20    have.

21                    THE WITNESS:  I said, I may have.  I don't

22    recall.

23                    MS. GIBSON:  Okay.

24                    THE WITNESS:  I may have.

25                    MS. GIBSON:  All right.

1          Q.     (By Ms. Gibson) That's the document that I'm

2     referring to.

3          A.     Okay, we're back to the separation agreement that

4     was attached to Jeff's Email.  And what is the question?

5          Q.     Mr. Friedman was asking you questions where

6     it said without deduction for -- and I'm paraphrasing

7     because I don't have it in front of me -- but without

8     deduction for bonuses or payments to other employees.

9          A.     This agreement does not mention anything about

10    other employees' bonuses that I see in this document.

11         Q.     Okay.  Well, are you aware that Jeff Carpenter had

12    been working from a form that Keith Jones provided to him?

13         A.     I've become aware of that in the course of this

14    lawsuit, but --

15         Q.     And you're aware that Mr. Carpenter has already

16    said that in using that form he made a mistake on that

17    piece?

18                MR. L. FRIEDMAN:  Objection.  She assumes

19    facts not in evidence.

20         Q.     (By Ms. Gibson) You're aware of that?

21                THE COURT:  She's aware or not.

22                THE WITNESS:  I know that this came up in

23    his deposition, and I don't know if he was aware at the time

24    he wrote this or if he was aware at the time he filed his

25    initial lawsuit in which he talks about his alleged deal.  I

1    don't remember at what point in time he made that mistake.

2         Q.    (By Ms. Gibson) And he has made clear that the

3    formula did deduct other stay bonuses paid to other -- to

4    other employees?

5         A.    I don't think he has made that clear, no.

6         Q.    That's the problem --

7         A.    I mean, that was his testimony at his deposition.

8         Q.    Right.  And it doesn't -- in doing so, in making

9    that correction, it doesn't help Jeff Carpenter's damages.

10   In fact, it reduces them, correct?

11        A.    It just proves that he didn't have a deal.  He

12   couldn't articulate the deal.  He didn't have a deal.

13              It changed from this time.  It changed,

14   what, 11 times through the course of these 10 years.  His

15   deal has changed.  He said he made a mistake.  I don't agree

16   with that.

17              THE COURT:  Answer only the question she's

18   asking.

19        Q.    (By Ms. Gibson) Okay, I understand your position

20   in this case, Ms. Geiser.  But in correcting a mistake and

21   saying it was to be the opposite, including that bonuses

22   paid to other employees were to come off, that would

23   actually reduce Mr. Carpenter's damages, correct?

24        A.    Ultimately, yes.

25        Q.    Okay.  And in making that correction, because

193

1    that's what happened, he also opens himself up for you-all

2    to beat him up about it, correct?

3                    MR. L. FRIEDMAN:  Objection, argumentative.

4                    THE COURT:  Sustained.

5        Q.    (By Ms. Gibson) He had no incentive -- there was

6    no personal benefit to him to correct that issue to say

7    that, no, Brian had said the other employee bonuses were

8    coming off.

9                    MR. L. FRIEDMAN:  Objection, argumentative.

10   These are jury arguments, Your Honor.

11                   THE COURT:  Her question is did he have an

12   added incentive.  She can --

13                   MR. L. FRIEDMAN:  Calls for speculation.

14                   THE WITNESS:  I don't know.

15                   THE COURT:  Her answer is no.

16                   THE WITNESS:  It's "I don't know".

17       Q.    (By Ms. Gibson) Now --

18                   MR. L. FRIEDMAN:  I actually didn't hear

19   that.

20                   THE WITNESS:  I don't know.  I don't know.

21       Q.    (By Ms. Gibson) Okay.

22                   And when you -- when you said you cannot

23   say what reasonable cost of closing would be, you remember

24   that?

25       A.    Yes.

1        Q.      Okay.

2                        In this case -- and I went through the

3    closing memos with you -- we used all of the sellers' listed

4    closing costs, correct?

5        A.      All of -- we used it in what context?

6        Q.      We deducted every single seller's closing costs in

7    our calculation of the net proceeds to seller.

8        A.      When we were going through your calculations?

9        Q.      Right.

10       A.      Yes.

11       Q.      Okay.  So we just accepted everything that

12   defendants claimed as a closing cost.

13       A.      Okay.

14       Q.      All right.  And so we didn't -- we didn't even try

15   to assess what was reasonable or what was normal.  We just

16   accepted all closing costs, correct?

17       A.      That's fine, but I think that's different than

18   where Larry was going when he was questioning me.

19                        MR. L. FRIEDMAN:  Mr. Larry.

20                        MS. GIBSON:  Pass the witness.

21                        THE COURT:  All right.

22                        Mr. Friedman?

23                        MR. L. FRIEDMAN:  I have nothing further,

24   Your Honor.

25                        THE COURT:  Thank you, Ms. Geiser.  You can

1    have a seat.

2                    THE WITNESS:  What do I do with these

3    documents?

4                    THE COURT:  You'll leave those there.

5                    Are you getting the next witness?

6                    MS. GIBSON:  Yes.

7                    (The witness entered the courtroom.)

8                    THE COURT:  All right.  Mr. Graf, if you'd

9    come all the way up here.

10                   Is this your witness or Mr. Sanford's?

11                   MS. GIBSON:  I'm sorry?

12                   THE COURT:  Is this your witness?

13                   MS. GIBSON:  It's my witness.

14                   THE COURT:  Okay.  Call your next witness.

15                   MS. GIBSON:  Plaintiff calls Rick Graf.

16                   THE COURT:  Mr. Graf, if you'd come all the

17   way over here behind the court reporter.  Don't step up

18   there until I swear you in.  And would you raise your right

19   hand.

20                   (Witness sworn)

21                   THE COURT:  All right.  Have a seat right

22   here.  Ms. Gibson will ask you questions first and then

23   either Mr. Friedman or Mr. Donohue.

24                   Ms. Gibson, whenever you're ready.

25                   And, ladies and gentlemen, we'll go about

```
 1    another hour before we break for the day.
 2                              RICK GRAF,
 3    having been first duly sworn, testified as follows:
 4                        DIRECT EXAMINATION
 5    BY MS. GIBSON:
 6         Q.   Mr. Graf, will you tell the jury your full name?
 7         A.   Rick Graf.
 8         Q.   And where do you work?
 9         A.   I work at Pinnacle Property Management Services.
10         Q.   And you were involved in some of the process
11    concerning the asset sale to Cascade Affordable Housing that
12    is the asset sale from the Southwest Housing entities to
13    Cascade?
14         A.   That's correct.
15         Q.   Okay.
16              You were involved in due diligence?
17         A.   To some degree.
18         Q.   And at that -- at that point in time Pinnacle was
19    the -- the management arm for Cascade.  You -- in other
20    words, you managed -- Pinnacle managed the properties?
21         A.   Correct.
22         Q.   Okay.  And what was your position at that time?
23         A.   What period of time are we talking about?
24         Q.   At that time in --
25         A.   Do you have a date, please?
```

1          Q.    This would have been in, probably, 2 -- and tell

2     me if it changed, if your position changed -- but this would

3     have been in the period from 2006 through the summer of

4     2008.

5          A.    Yeah.  I was the regional president for Pinnacle's

6     central division.

7          Q.    And were you one of the highest level people for

8     that division?

9          A.    Yes.

10         Q.    And you met Jeff Carpenter at some point?

11         A.    Correct.

12         Q.    And you -- I'm not the saying the jobs were

13    identical, but you essentially had the equivalent of

14    Jeff Carpenter's job for Pinnacle.

15         A.    The positions were similar.

16         Q.    Okay.

17               And you were already in place and Pinnacle

18    was pretty happy with you?

19         A.    Presumably so.

20         Q.    Okay.  And they're still happy with you,

21    obviously.

22         A.    I've been there for a long time.

23         Q.    Okay.

24               And so, as a result, there was no need for

25    Pinnacle to bring on someone in Jeff Carpenter's position

Appendix 0719

1    because you were already doing that job.

2         A.    It would have been a duplicative position.

3         Q.    Okay.

4               And you were involved in due diligence to

5    some extent, but in connection with due diligence or the

6    asset sale in general, did you work with Jeff Carpenter at

7    times?

8         A.    At times.

9         Q.    Can you give us some examples of the types of

10   things you worked together on?

11        A.    It's been a long time ago, so my memory is not as

12   great as it should be on this.   But in typical situations we

13   would have collaborated on personnel matters, coordination

14   of meetings with those -- with the personnel that was

15   involved in the portfolio, some site specific activity.   I

16   don't recall exactly what that was, but I would consider

17   those to be typical collaborations.

18        Q.    And who did you, primarily, actually work with on

19   due diligence items from the Southwest Housing entities?

20        A.    There were a variety of people.   I wouldn't say

21   there was a primary person.

22               MS. GIBSON:   Pass the witness.

23               MR. L. FRIEDMAN:   I have nothing,

24   Your Honor.

25               THE COURT:   All right.   Thank you,

1     Mr. Graf.

2                         Can this witness be excused?

3                         MS. GIBSON:  Yes.

4                         THE COURT:  If you were subpoenaed, you're

5     released from your subpoena and you're free to leave the

6     courthouse now.  If you'd like to stay and observe the

7     trial, you can, but you're free to leave the courthouse now.

8                         THE WITNESS:  Thank you.

9                         All right.  Ms. Gibson.

10                        Y'all, don't stand up back there.  I was

11    just going to swear in the witness.

12                        MS. GIBSON:  Plaintiff calls Brian

13    Potashnik.

14                        THE COURT:  Mr. Potashnik, let me swear you

15    in before you step up there.

16                        THE WITNESS:  Okay.

17                        (Witness sworn)

18                        THE COURT:  Have a seat here.

19                        ==BRIAN POTASHNIK,==

20    having been first duly sworn, testified as follows:

21                        DIRECT EXAMINATION

22    BY MS. GIBSON:

23         Q.   Mr. Potashnik, in considering an asset sale, when

24    you were considering selling Southwest Housing entities, did

25    you consider the potential of a mass exodus of employees?

1      A.    It may have been a consideration but it certainly

2    was not anything substantial, because it was an asset sale

3    and it wasn't an employee sale.   So we were selling assets.

4      Q.    So you're saying it was not an asset sale, we

5    weren't selling employees, we were selling assets?

6      A.    No, it was an asset sale.   In other words, we were

7    selling property.   So, whether I was part of the sale,

8    leading up to the sale, or what my participation or anybody

9    in the company's participation may have been was really not

10   something that was that important.   It may have been

11   discussed, though.

12     Q.    In considering an asset sale, did you consider

13   ways to prevent a mass exodus of employees?

14     A.    I don't recall.

15     Q.    Did you consider how to prevent important

16   employees from leaving?

17     A.    I don't recall.

18     Q.    Do you recall being at your deposition?

19     A.    Yes, ma'am.

20     Q.    Okay.   And do you recall at your deposition that

21   when I asked you --

22               MR. L. FRIEDMAN:   Line and page, please?

23               MS. GIBSON:   This is 33, 12.

24     Q.    (By Ms. Gibson) And I said, "In thinking about a

25   potential asset sale, did you consider the potential of a

1    mass exodus of employees?"  And you said, "No."

2        A.    Very well.

3        Q.    And you were pretty adamant about it?

4        A.    I'm not changing my answer.  I mean, I -- again,

5    it was not a consideration for me or of any importance to

6    this --

7        Q.    And --

8        A.    -- to the asset sale.  Because, as I said, we were

9    selling assets.

10        Q.    And consider --

11        A.    And we knew when selling those assets that it was

12    not important to the buyer to have any employees other than

13    those that were actually on site on the properties.

14        Q.    And at your deposition when I asked, "In

15    considering an asset sale, did you consider ways to prevent

16    a mass exodus of employees," you said, "No."

17        A.    Correct.

18        Q.    And when I asked at your deposition, "Did you

19    consider how to prevent important employees from leaving,"

20    you said, "No."

21        A.    That's correct.

22        Q.    And when you're saying now it may have been

23    discussed, is that because you found out that Cheryl Geiser

24    testified that you-all did in fact discuss those things?

25                    MR. L. FRIEDMAN:  Argumentative, Your

1    Honor.

2              THE COURT:   Overruled.

3         A.   No.

4         Q.   (By Ms. Gibson) That's not why?

5         A.   No.

6         Q.   Okay.

7         A.   Ms. Gibson, this was 12 years ago, so excuse me if

8    my memory isn't as good as it should be to tell you exactly

9    what conversations I had in 2007 and 2006.

10        Q.   Well, you were pretty adamant with me at your

11   deposition when you said no, correct?

12             MR. L. FRIEDMAN:   Argumentative, Your

13   Honor.

14             THE COURT:   Sustained.

15             You've asked that question.

16             MS. GIBSON:   Okay.

17        Q.   (By Ms. Gibson) Do you believe retention of

18   important employees is important when you're trying to sell

19   a business?

20        A.   No.

21        Q.   Did you and Cheryl Geiser discuss the importance

22   of continuity in connection with potentially selling the

23   assets?

24        A.   No, not that I recall.

25        Q.   Are you saying you don't recall one way or the

Appendix 0724

1        other or are you saying that never happened?

2                A.    I don't recall.

3                Q.    One way or the other?

4                        MR. L. FRIEDMAN:   Argumentative.

5                        THE WITNESS:   I don't recall.

6                        MR. L. FRIEDMAN:   He's answered the

7        question.

8                        THE COURT:   Let her clear up what his

9        answer is.

10                       THE WITNESS:   I don't recall any

11       conversations pertaining to employees that may have occurred

12       in 2006 or 2007.   It's just too long ago.   And it was not of

13       any importance to me or to the buyer of the business or of

14       the assets to -- to maintain any employees.

15               Q.    (By Ms. Gibson) What do you think would happen if

16       you were trying to sell a business and important employees

17       leave?

18               A.    I think it's to the benefit of the seller because

19       it reduces their overhead and cost of doing business up

20       until the time that they transition the assets.

21               Q.    Well, this assumes you have a firm -- something

22       that's definitely going to close.   But when you're trying to

23       make your company attractive as a target for purchase --

24               A.    Uh-huh.

25               Q.    -- what do you think happens if important

1   employees leave?

2        A.   I think it becomes more attractive to a buyer.

3   It does to me.  I'm in the business world now 30 years.   And

4   when I identify an opportunity, it's always a better

5   opportunity when I can bring in my own staff.

6        Q.   Did -- and my question about continuity wasn't

7   about discussions with employees.  I had asked you, Did you

8   and Cheryl Geiser discuss the importance of continuity in

9   connection with potentially selling the assets?

10       A.   Are you asking me a question?  I'm sorry.  I

11  didn't -- I thought you were making a statement.  I didn't

12  get whether that was a question.

13       Q.   I thought you had said I don't remember any

14  discussions with employees about that issue, but my question

15  was about you and Cheryl Geiser.

16       A.   I'm sorry, Ms. Gibson.  What is the question?

17       Q.   Did you and Cheryl Geiser discuss the importance

18  of continuity in connection with potentially selling the

19  assets?

20       A.   I don't recall having those discussions.

21       Q.   Okay.  And you understand, Mr. Potashnik, there's

22  a difference between I don't recall one way or the other and

23  I don't recall because that never happened.  And so when you

24  say I don't recall, are you saying --

25                   MR. L. FRIEDMAN:  Your Honor, this is

Appendix 0726

1    argumentative.

2             THE COURT:  It's not.  Let her ask the

3    question.

4        A.   Yes, ma'am.

5        Q.   (By Ms. Gibson) So, when you say here I don't

6    recall, are you saying I don't recall one way or the other

7    or are you saying I don't recall, that never happened?

8        A.   I don't recall one way or the other or I don't

9    recall, that never happened, to me, are one in the same.

10        Q.   Okay.

11             Did you and Cheryl Geiser discuss ways to

12    retain employees and keep them from jumping ship in

13    connection with the potential asset sale?

14        A.   I don't recall.

15        Q.   Do you recall discussing with Cheryl Geiser

16    providing sales-proceeds bonuses to important employees as

17    an incentive for them to stay on despite the pending asset

18    sale?

19        A.   No.  We never had those discussions.

20        Q.   Do your recall discussing with Cheryl Geiser

21    bonusing employees out of the asset-sale proceeds as an

22    incentive to keep people on?

23        A.   No.

24        Q.   That never happened?

25        A.   I don't recall.

1     Q.    Well, you said no.

2     A.    Bonuses were never discussed.  I can tell you

3   that.

4     Q.    You never discussed bonusing any employees out of

5   the sale proceeds with Cheryl Geiser?

6     A.    No.

7     Q.    Do you recall telling Jeff Carpenter that you

8   needed him to be committed and keep his eye on the prize in

9   connection with an asset sale?

10     A.    No.

11     Q.    Do you deny that?

12     A.    I don't recall ever having that discussion.

13     Q.    In fact, your claim is that that never happened,

14   correct?

15     A.    My claim is exactly how I'm testifying today in

16   court.  Under my sworn testimony, I do not recall any

17   conversations having to do with bonuses with Cheryl Geiser

18   or with anybody in the company.  That was not something that

19   I recall ever having under the circumstances.

20     Q.    Do you recall telling Jeff Carpenter that if he

21   would stay committed and stay on, keep his eye on the prize,

22   that he would be paid a lucrative bonus from the sales

23   proceeds?

24     A.    No.

25     Q.    Are you saying that never happened?

1        A.     No.  I'm saying that I don't recall any

2    conversations having to do with anything regarding bonuses.

3        Q.     Do you recall at your deposition when I asked you,

4    "QUESTION:  Do you recall telling Jeff that you needed him

5    to be committed and keep his eye on the prize in connection

6    with an asset sale and that he would be paid a lucrative

7    bonus from sale proceeds?"  You said, "Never happened."

8        A.     May have never happened.

9        Q.     Okay.

10        A.     I mean, as far as I know --

11        Q.     So --

12        A.     -- as I'm telling you today, Ms. Gibson.  And I

13    respectfully would like you to know that these are

14    conversations that you are trying to put words in my mouth

15    that may have occurred over 10 years ago.  And to the best

16    of my recollection there was no discussion with

17    Jeff Carpenter or any employee regarding anything that has

18    to do with bonuses.

19        Q.     Okay.

20              Would you take a look, please, at

21    Plaintiff's Exhibit 1?

22                    THE COURT:  You're probably going to have

23    to help him there.

24                    THE WITNESS:  I -- if you have a copy of

25    it, I'll look at it.

1          THE COURT:  It's up there.  It's probably

2     at the very beginning.

3          But you may want to come and find it for

4     him.

5          THE WITNESS:  Is this the secretly recorded

6     conversation?

7          MS. GIBSON:  Yes --

8          THE WITNESS:  Okay.

9          MS. GIBSON:  -- it is.

10         THE WITNESS:  Yes.

11    Q.    (By Ms. Gibson) Found it?

12    A.    Yes.

13    Q.    You say during part of that -- this is -- you are

14    VP.  Do you see your part of the conversation at the top of

15    Page 2?

16    A.    Yes, ma'am.

17    Q.    Okay.

18         And when you're talking to Jeff, you say,

19    "Um, and as far as our agreement goes where we compensate

20    you, as we promised, it's going to depend on where we end up

21    in all of this."

22    A.    Yes, ma'am.

23    Q.    Okay.  And when you say "where we end up in all of

24    this", you are talking about the asset sale?

25    A.    I'm talking about the asset sale or the actual

1    refinancing of the properties.

2         Q.    Okay.

3         A.    Because at the time, as you recall from prior

4    testimony, the company was not performing financially.  The

5    properties were losing money and there was the potential

6    that we would be in a bankruptcy.  So reality was, was that

7    we had no idea whether we would have a sustainable business

8    or not.

9         Q.    And those are not concerns you had until 2007,

10   correct?

11        A.    No.  Those were concerns that we've always had.

12   When you run and operate a business, you're always concerned

13   about making sure that you have enough money coming in to

14   meet the expenses and obligations of the business and the

15   money that goes out.

16        Q.    So let me ask it a different way.  At the time the

17   letter of intent was signed with Cascade, you did not have

18   the same level of concern you did in November of 2007 about

19   where you would end up personally in all of this?

20        A.    That's not correct.

21        Q.    You had the same concerns?

22        A.    Yes, ma'am.

23        Q.    Okay.  Well, all right, we'll keep going.

24              But you -- but you hear -- you testified, I

25   thought, that you never discussed any bonuses with

Appendix 0731

1    employees; is that --

2         A.    That's correct.

3         Q.    But here you're talking about your agreement where

4    we compensate you as promised and it depends on where we end

5    up in the asset sale?

6         A.    Yes, ma'am.

7                      And if you'd like me to explain, in that

8    conversation I am referring to the one agreement and the

9    only agreement that exists between Jeff Carpenter and myself

10   and Southwest Housing, and that is his employment agreement.

11   And at the time, that agreement was in jeopardy over the

12   fact that the company was losing significant amounts of

13   money and may not be able to honor its commitments under the

14   employment agreement.

15        Q.    Well, there's nothing, you know, under the

16   employment.  You're talking about the written employment

17   agreement?

18        A.    Yes, ma'am.  That's what I'm referring --

19        Q.    Okay.

20        A.    -- to in the conversation.

21        Q.    You're saying -- Jeff's calling you because he's

22   upset that the bonus out of the sales proceeds and the

23   annual bonuses weren't addressed in the proposed severance

24   from Southwest Housing, right?

25                    MR. L. FRIEDMAN:  Objection.

```
 1                    THE WITNESS:   No.

 2                    MR. L. FRIEDMAN:   Excuse me.

 3                    Objection, assumes facts not in evidence.

 4      We haven't heard from Mr. Carpenter.

 5                    THE COURT:   We're not going to call

 6      witnesses back and forth after one.   He can answer the

 7      question or say he doesn't know.

 8                    THE WITNESS:   No.

 9                    Ms. Gibson, to clarify exactly what that

10      statement refers to, it is the one and only agreement that

11      exists between Jeff Carpenter and Southwest Housing and the

12      related entities, either orally or in writing.   And that is

13      the agreement that I was under the impression and the reason

14      why I answered the question as I did; that I felt was in

15      jeopardy of being honored because the company was

16      potentially going to go into bankruptcy.

17         Q.   (By Ms. Gibson) So, according to your theory, what

18      you're referring to is you're saying, Jeff, as far as our

19      agreement goes where we compensate you as we promised,

20      you're saying you might not pay his salary?

21         A.   It's not a theory.   It's reality.   We did not

22      know, because of the fact that the company was not

23      performing per our projections, whether or not we could

24      honor any of the written employment agreements that we have

25      with Jeff Carpenter or anybody else.
```

1      Q.    As of the time of this conversation,

2  Jeff Carpenter's work for Southwest Housing was over.

3      A.    Whether it was over or not is not relevant to the

4  fact that if there was a written agreement, which there was,

5  his employment agreement -- which may or may not have been

6  fully honored due to the fact that we had cash flow

7  issues -- obviously, there was some question as to the

8  sustainability of the business to be able to honor that

9  employment agreement.

10     Q.    But at this point --

11     A.    Which is the only agreement that exists.

12     Q.    But at this point Jeff Carpenter is not going to

13 be drawing a salary anymore under the written agreement,

14 correct?

15     A.    I -- I don't know what the terms of his employment

16 agreement were to be -- his employment agreement was

17 executed at the time of his employment in 2004.

18     Q.    But by October 31st, Jeff Carpenter was no longer

19 needed, due to the November 1st transfer of management to

20 Pinnacle, correct?

21     A.    I don't think that it was -- I don't think anybody

22 was needed at the time, Ms. Gibson.  I don't think it was a

23 relationship that was exclusive to any one employee.

24     Q.    But, Mr. Potashnik, if you're saying you're

25 referring to the employment agreement --

213

1        A.    Yes, ma'am.

2        Q.    -- Jeff Carpenter is done.  He's not working for

3   the entities anymore.

4        A.    Right, but he --

5        Q.    He's not drawing --

6        A.    I --

7        Q.    -- a salary.  He's not drawing --

8        A.    I get it.  I understood.  But what I'm pertaining

9   to is the fact that under the agreement that Mr. Carpenter

10  had with the company and the only agreement he had with the

11  company there was still money that was owed to him under

12  that employment agreement.  It may not have been salary, as

13  you point out, but it may have been other compensation

14  within that agreement.

15       Q.    You're talking about annual bonuses that were owed

16  to Mr. Carpenter?

17       A.    It possibly could have been.  But, again, as I

18  told you in my deposition, that was not an agreement that I

19  had reviewed or continually looked at.

20       Q.    Okay.

21       A.    But, obviously, what I'm telling you now is that

22  that is the agreement that I am referring to.  When I

23  said -- excuse me.  Could you please keep that up there so I

24  can explain this to you?

25       Q.    Do you need --

Appendix 0735

1          A.    As far as our agreement goes, which is the

2     employment agreement, where we compensate you as promised,

3     which is the written and duly executed employment agreement,

4     it's going to depend on where we end up.  And by that I

5     meant where we end up as a sustainable business being able

6     to meet our obligations, one of which was our employment

7     agreement with Mr. Carpenter.

8          Q.    And so you believe he may have -- was owed annual

9     bonuses.  That may have been what you were talking about?

10         A.    I don't believe anything other than we honor and

11    continued to honor and have never had a lawsuit from an

12    employee over compensation anything that was written and in

13    their employment agreement.

14         Q.    Okay.

15              So you deny that you were referring to any

16    bonus out of the asset-sale proceeds; is that correct?

17         A.    Let me repeat myself.  There was never any

18    discussions or intent to pay any bonuses, as far as I was

19    concerned.  Any compensation that was given to anybody out

20    of the proceeds from the sale would have been a severance,

21    not a bonus.  And a severance was our appreciation for any

22    time and effort, at our discretion, that we felt that

23    employee may have been responsible for for the success of

24    our company and its ongoing business.

25         Q.    Will you turn to Page 3, please?

215

```
1          A.    Page 3 of what?  What document?

2          Q.    Page 3 of the same conversation.

3          A.    Oh, the secretly recorded conversation.  Okay.

4          Q.    Okay.

5                You say, "I mean, I'm telling you that

6     we're -- we're going to dig ourselves out of this thing and

7     then hopefully, you know, at the end of the day, get

8     something out of it from Cascade and get the deal closed and

9     pay the costs that we have to defend ourselves and have

10    money left over so that we can, you know, give you a bonus,

11    give Sara a bonus, give Keith a bonus."

12                And you heard Keith Jones testify that

13    there was a program of bonuses to get people to stay?

14         A.    No.  I -- I heard Keith Jones testify that there

15    was no stay bonus.  Because I have never heard that

16    expression until you made it up here at trial or prior to

17    trial.  There's no --

18         Q.    You've never heard of a stay bonus?

19         A.    I never heard stay bonus, no.  I never have.

20                But that being said, the bonuses that you

21    refer to Keith Jones referred to as severance, which is what

22    I referred to it as and which is what it was.  And that was

23    only in the event that there was any proceeds left over, as

24    Cheryl pointed out, from the sale of the assets.

25         Q.    So, you heard Keith Jones explain that when he
```

1    spoke about the severance bonuses those were the same --

2         A.    No, no, no.

3         Q.    Sir, let me finish answering [sic] my question,

4    please, okay.

5              You heard Keith Jones testify that the

6    severance bonuses were the same thing as what I was calling

7    the stay bonuses?

8         A.    No, that's incorrect.

9         Q.    That's incorrect?

10        A.    He didn't say that.  He said what you stated as a

11   stay bonus was in fact severance.

12        Q.    He testified that he got that severance as an

13   incentive to stay.  Do you recall that?

14        A.    The severance, not severance bonus as you --

15        Q.    The amount in that severance --

16        A.    -- term it.

17        Q.    -- was his --

18        A.    Excuse me.

19        Q.    -- incentive to stay?

20        A.    Ms. Gibson, you are not going to get me to call

21   something that is severance a bonus because there were no

22   bonuses.

23        Q.    The truth is the bonuses from the asset-sale

24   proceeds to get Sara and Keith and Jeff Carpenter to stay is

25   exactly what you are talking about when you say -- refer to

1    our agreement and compensate Jeff Carpenter as promised.

2         A.   No, that is not the truth.

3              In fact, could you go back to the last

4    statement you had on Page 3 so I can clarify exactly what it

5    is that you pointed out from my prior statement?

6         Q.   You -- you've already testified that it was only

7    per the written agreement.

8         A.   No.  I am saying -- could you please put it back

9    up so I can explain it?

10             THE COURT:  It is her turn.

11             MS. GIBSON:  You have it in front of you,

12   Mr. Potashnik.

13             THE WITNESS:  I can't even pay my bills.

14   I'm trying to stay out of bankruptcy.  I have Bank of

15   America calling me now.  They're telling me they're ready to

16   put the company and me and Cheryl personally into

17   bankruptcy.

18             Okay, so I would just want to clarify

19   the fact that in the statement that you took out two

20   sentences.  If you look at the statement in its entirety,

21   you'll see exactly what it is that I'm referring to.

22        Q.   (By Ms. Gibson) Mr. Potashnik -- and I'm not going

23   to show this part so we don't get into a spat, but --

24        A.   That's okay.

25        Q.   -- it was only about a month or so before this

218

1    conversation that you were indicted, correct?

2         A.    I -- I don't recall.

3         Q.    Do you recall that it happened --

4                   MR. L. FRIEDMAN:  Objection, Your Honor.

5    It's another violation of the limine motion.

6                   THE COURT:  It is not.  Overruled.

7         Q.    (By Ms. Gibson) You talked, at the bottom of

8    Page 3, about concerns about that, about the indictment.

9                   MR. L. FRIEDMAN:  Same objection.

10                   THE COURT:  Overruled.

11                   And, by the way, you can have a running

12    objection on all of that.

13                   MR. L. FRIEDMAN:  All right.  Thank you.

14         Q.    (By Ms. Gibson) Do you see that was suddenly a

15    concern?

16         A.    Obviously, it would have been a concern, but it

17    had nothing to do with any agreements.

18         Q.    Well, you're explaining to Jeff Carpenter your

19    concerns that you might not be able to honor your agreements

20    and pay him as promised, correct?

21         A.    I'm expressing my concern that the business was

22    not operating at a point where it could pay its expenses

23    under his employment agreement.  Any agreement that I was

24    referring to, as I pointed out, was his employment

25    agreement.  And anything that you term "bonus" or "stay

Appendix 0740

1    bonus" was a severance that was being paid at our discretion

2    subject to the success and proceeds that would be available

3    after the sale.

4         Q.   So, when you testified earlier that you had no

5    discussions with employees about bonuses from the asset

6    sale --

7                   MR. L. FRIEDMAN:  Asked and answered,

8    Your Honor.

9                   THE COURT:  She hasn't gotten her question

10   out yet.

11                  Go ahead, Ms. Gibson.

12        Q.   (By Ms. Gibson) Before we went over this

13   transcript, you had testified that you had no discussions

14   with employees about bonuses --

15        A.   None that --

16        Q.   -- out of --

17        A.   -- none that I recall.

18                  THE COURT:  Let her finish her question.

19                  THE WITNESS:  It's the same question.

20                  MR. L. FRIEDMAN:  Everybody has to

21   participate.  Let me be the objector.  Thank you.

22                  THE COURT:  She still hadn't gotten her

23   question out.

24                  MR. L. FRIEDMAN:  I'm waiting.  I didn't

25   want to waste a stand-up/sit-down.

1          THE COURT:   That's right.

2     Q.   (By Ms. Gibson) So, Mr. Potashnik, you testified

3 earlier that you had no discussions about bonuses from the

4 sale proceeds with employees, correct?

5          MR. L. FRIEDMAN:   Objection, asked and

6 answered.

7          THE COURT:   Overruled.

8          THE WITNESS:   To the best of my

9 recollection, I do not recall having any discussions

10 regarding bonuses.   And as I stated, it was never agreed or

11 intended to pay anybody anything other than severance.

12     Q.   (By Ms. Gibson) But we just talked about a

13 conversation in which you specifically discussed paying

14 bonuses out of asset-sale proceeds, correct?

15     A.   And as I stated, that was in reference to his

16 employment agreement.

17     Q.   Well, but on the next page you talked about the

18 asset sale and paying bonuses to Keith and Sara and Jeff out

19 of asset-sale proceeds --

20     A.   Correct.

21     Q.   -- correct?

22     A.   Which, they would have been owed under their

23 employment agreements.

24     Q.   All right.   So the truth is you did have

25 discussions with employees about bonuses out of asset-sale

1    proceeds?

2         A.    No.   The only discussions I had were in reference

3    to whether or not we would be capable of honoring any

4    agreements that we had with those employees as it pertained

5    to their employment agreement.

6                   So this conversation that you point out has

7    references to agreements.   That agreement is the employment

8    agreement under which I was obligated as an employer and

9    Jeff was obligated as an employee to do certain things.   And

10   we honored that agreement, so --

11        Q.    I thought -- I thought you just said that Jeff --

12   according to your interpretation, that Jeff Carpenter was

13   owed compensation under his employment agreement and that

14   was what you were talking about.

15        A.    That's exactly right.

16        Q.    Okay.   But then you said you honored the

17   agreement.

18        A.    Well, at the time.

19        Q.    Well, telling someone that they can't honor --

20        A.    Jeff rejected the severance that was offered to

21   him under his employment agreement and any discretionary

22   bonuses that were offered to him.

23        Q.    The offer the day after he finished his work

24   toward the asset sale was that he had to release all claims

25   in exchange for salary he had already earned and was owed

1       and some PTO and that's it.

2            A.    That's incorrect.   He was offered and rejected a

3       hundred and fifty thousand dollars of severance.

4            Q.    That was later.   The first document sent to Jeff

5       asked him to release all of his rights for just PTO and --

6            A.    That document was given to over a hundred

7       employees and signed happily by each and every one; none of

8       which have come back to file any kind of grievance against

9       us.

10           Q.    Those severances included the amounts for

11      incentives to stay --

12           A.    No, they did not.

13           Q.    -- correct?

14           A.    Incorrect.

15           Q.    They were significant --

16           A.    Absolutely incorrect.

17                      MR. L. FRIEDMAN:  Objection.   Objection,

18      violation of the limine.

19                      THE COURT:  He's the one bringing it up.

20                      MR. L. FRIEDMAN:  She's asking about it.

21                      THE WITNESS:  It's incorrect.   That's

22      incorrect.

23                      THE COURT:  Let's stay focused on

24      Mr. Carpenter, not other employees in that position.

25           Q.    (By Ms. Gibson) The severance agreements that you

1    had those employees sign were for -- strike that.  The

2    severance agreements that you had the employees sign, those

3    included confidentiality clauses?

4                    MR. L. FRIEDMAN:  Objection.  One,

5    it violates the limine motion.  And, two, it's irrelevant to

6    this case.

7                    THE COURT:  Sustained at this point.

8                    MS. GIBSON:  Your Honor, I know you want to

9    let -- I'm about to head into a different area.  I thought

10   you wanted to let the jurors go early.

11                   THE COURT:  You should go till a quarter

12   till.

13                   MS. GIBSON:  Till a quarter till?

14                   THE COURT:  Uh-huh.

15                   MS. GIBSON:  Okay.

16       Q.   (By Ms. Gibson) Do you recall telling

17   Jeff Carpenter at some point that he was not likely to have

18   a job with the purchaser after the sale?

19       A.   I don't recall.

20       Q.   You don't recall or that didn't happen?

21       A.   I don't recall.

22       Q.   Do you recall at your deposition when I asked you

23   you this question?  I said, "Do you recall telling

24   Jeff Carpenter at some point that he wasn't likely to have a

25   job with the purchaser after the sale?"  You said, "No."  I

1    said, "Do you deny that?"  You said, "Yes."

2         A.    Yes.   That's still my answer.

3         Q.    Are you changing your mind now?

4         A.    No.  I'm saying I don't recall and it didn't

5    happen.

6         Q.    Okay.   You're saying I don't recall --

7         A.    As far as I can recall --

8         Q.    -- that never happened?

9         A.    -- that conversation didn't happen, Ms. Gibson.

10        Q.    Okay.

11        A.    I don't know how else to answer it.  I'm sorry.

12        Q.    Do you -- and you just heard from Rick Graf.  He

13   was the highest level management person for Pinnacle.  You

14   heard him testify just now?

15        A.    Yes, ma'am.

16        Q.    Okay.  Sorry.  I can't see who's here during

17   testimony.

18        A.    I'm sorry?  I didn't understand what your last

19   statement was.

20        Q.    Oh, I just asked because I can't see who's here

21   during testimony.

22              And Rick Graf essentially had the

23   equivalent position as Jeff Carpenter.

24              Do you recall telling Jeff Carpenter that

25   he likely would not have a job because the purchaser's

1    management company already had someone in Jeff's position?

2        A.    As I just stated, I don't recall having any

3    conversation with any employees as to whether or not they

4    were going to be retained by the new company.  And, in fact,

5    the only conversations that I had were uniform to all

6    employees that Cascade was going to evaluate the employees

7    and make their own decision as to who they wanted to keep

8    and who they didn't.

9              So, could Jeff Carpenter have been a party

10   to that mass communication to all of the employees?  It's

11   quite possible.  Could the conversation have never taken

12   place?  Yes.

13             But it was very clear that anybody who was

14   going to stay with the company had to be interviewed by the

15   new company, and it was up to and incumbent upon the new

16   business to make a decision as to whether or not they wanted

17   those people to stay with them.

18       Q.    Mr. Potashnik, so, with respect to my original

19   question and you said you don't recall, that's a "no, never

20   happened" answer, right?

21             MR. L. FRIEDMAN:   Objection.

22   Argumentative, Your Honor.

23             THE COURT:   Overruled.

24             THE WITNESS:   I don't understand the

25   question, Ms. Gibson.

1          MS. GIBSON:  Okay.

2          THE WITNESS:  I'm sorry.

3          MS. GIBSON:  I'll ask it again.

4          THE WITNESS:  Okay.  Please.

5          MS. GIBSON:  You talked for a while after.

6     Q.   (By Ms. Gibson) Do you recall --

7     A.   Excuse me?

8     Q.   I said I'll ask it again.  You talked for a while

9     after.

10          Do you recall telling Jeff Carpenter that

11    he likely would not have a job because the purchaser's

12    management company already had someone in Jeff's position?

13    A.   I don't recall having any conversations with any

14    employees directly pertaining to whether or not they would

15    be employed.  And it would be incumbent upon them, if they

16    were going to be employed, to interview with the new

17    company; and it was up to the new business whether or not

18    they wanted to keep that employee.

19          And if there was a discussion with

20    Jeff Carpenter it would have been the same thing that I told

21    every employee, Ms. Gibson.  I don't know how else to put

22    it.  This was -- this was over 10 years ago, and there was

23    no hiding the fact that any employee that was going to stay

24    with the company had to go through the process of being

25    interviewed with the new company.

1      Q.    So, even though it was 10 years ago, when I asked

2    you this question at your deposition, "Do you recall telling

3    Jeff Carpenter that he likely would not have a job because

4    the purchaser's management company already had someone

5    in Jeff's position," you said with confidence, "No, it never

6    happened."

7                    MR. DONOHUE:   What page and line are you

8    on, Ms. Gibson?

9                    MS. GIBSON:   Thirty-seven.

10                   THE WITNESS:   To the best of my

11    recollection, that conversation, as stated I here today and

12    as I stated in my deposition, never happened.   And if

13    it did, it happened under the context as it did with all

14    employees.

15      Q.    (By Ms. Gibson) Do you recall asking

16    Jeff Carpenter to help you identify key employees that you

17    wanted to keep on, despite a potential for an asset sale?

18      A.    No.   I don't recall.

19      Q.    And saying, no, you don't recall, you're saying

20    it never happened?

21      A.    I'm telling you anywhere where I say that I don't

22    recall, I don't recall --

23      Q.    Well --

24      A.    -- you know.

25      Q.    -- we've gone over that there's a big difference

1    between I don't recall one way or another, it may have

2    happened, and saying I don't recall 'cause that never

3    happened.

4         A.    I don't know what --

5                   MR. L. FRIEDMAN:  Your Honor --

6                   THE WITNESS:  To me there's no difference.

7                   MR. L. FRIEDMAN:  He's asked.  She's asked

8    and answered.  The witness has said to him there's no

9    difference.

10                  THE COURT:  Y'all come over here.

11                  MR. L. FRIEDMAN:  Several times.

12                  (Sidebar conference held)

13        Q.    (By Ms. Gibson) Okay.  Mr. Potashnik, when I asked

14   you at your deposition, "Do you recall asking Jeff Carpenter

15   to help you identify key employees that you wanted to keep

16   on despite the potential for an asset sale," you said, "No,

17   it never happened", correct?

18        A.    Correct.

19                  MR. L. FRIEDMAN:  That's consist -- wait a

20   second.  It's consistent with what the witness just said.

21                  THE WITNESS:  Correct.

22                  MS. GIBSON:  He wouldn't --

23                  THE WITNESS:  No, I never recalled having

24   any discussions, as you pointed out from my deposition.  I'm

25   answering the question the same way I did in my deposition,

1    Ms. Gibson.  I don't know what else to say.

2               With all due respect, it was 12 years ago.

3    I don't recall recall having conversations with any

4    employees individually about whether or not they would have

5    jobs or what the situation was, because I didn't know and it

6    was not incumbent upon me to be the one to either keep them

7    with the new company or let them go.  That was up to

8    Mr. Graf, who you just had on the stand.

9       Q.  (By Ms. Gibson) That wasn't the question we were

10   talking about.  We were talking about --

11      A.  Well, I'm trying to answer it so we can keep from

12   repeating the same question.

13              THE COURT:  Let her ask the questions.

14      Q.  (By Ms. Gibson) What I have just put up was about

15   discussions about you wanting input from Jeff Carpenter --

16      A.  No, I didn't --

17      Q.  -- concerning other employees.

18      A.  I didn't.  I didn't ask for input.

19      Q.  Did you and Cheryl Geiser discuss -- wait.  Sorry.

20   I'm on the wrong page.  I'm going backwards.

21              Do you recall telling Jeff Carpenter that

22   you wanted his input on the amount of sale-proceeds bonuses

23   to be paid to certain key corporate employees beneath the

24   executive level?

25      A.  No, Ms. Gibson.  Again, there were no discussions

1    regarding bonuses.  The only thing that would have been paid

2    to anybody over and above what their employment agreement

3    called for would have been a severance.  And I think

4    Mr. Jones made that clear.  I know that Ms. Geiser made that

5    clear.  And I hope that I am, in my testimony, doing the

6    same.

7         Q.    When I asked you this question at your deposition,

8    your answer was just, "No, never happened", right?

9         A.    Same answer I'm giving today.

10        Q.    Do you recall telling Jeff that you wanted his

11   bonus to be reduced by the key corporate employee bonuses

12   because that would give Jeff an incentive to choose an

13   amount that was high enough to keep them, but he wouldn't be

14   giving his favorite employees some astronomical bonus?

15        A.    No.  There's -- again, I don't know how many times

16   I have to answer the question.  There were no discussions

17   regarding anything that was not under a written,

18   agreed-upon, employment agreement that was offered to

19   anybody or discussed with anybody other than severance.  And

20   that is my answer in its entirety.  As many times as you

21   want to frame the question or ask the question, let's just

22   cut to the chase.  There was no discussions regarding

23   bonuses, period.

24        Q.    Mr. Potashnik, you know I'm going to continue to

25   ask the questions --

1       A.      Okay.

2       Q.      -- because we just showed a transcript where you

3  used the word "bonuses" about the employees.

4       A.      And if it was part and parcel of their employment

5  agreement, then the discussion may have taken place.  If

6  there was a duly executed employment agreement which had a

7  provision for a bonus, as I stated, it would have been

8  honored.  And it was a valid and binding agreement that we

9  would have to address in our operations of the business.

10      Q.      All right.  So what's the phrase you're using with

11  duly executed?  You're saying something would have to be

12  duly executed.

13      A.      I'm saying an employment contract signed by both

14  the employer and the employee.

15      Q.      So, is it your view that if you make promises to

16  employees you don't have to honor that unless it's in

17  writing?

18      A.      I never make promises to employees that were not

19  honored and not in writing.

20      Q.      Okay.  You said you never made promises that were

21  not honored and not in writing.

22      A.      Correct.  What's the question?

23      Q.      Are you saying -- I'm just trying to understand

24  what you just said.  Are you saying you never made a promise

25  that you didn't honor, whether it was oral or written?

1    A.   Are you talking about anything specific?  I mean,

2    are you saying, like, in life in general?

3    Q.   No, no, no.

4    A.   I mean, I don't -- I mean, give me some context

5    for this question --

6    Q.   I'm trying to understand --

7    A.   -- so I have a better way of answering it, please.

8    Q.   Mr. Potashnik, I'm just trying to understand the

9    answer you just gave ---

10   A.   Well, I'm trying to understand the question.

11   Q.   -- where you said --

12   A.   Maybe we're having a communication problem.

13            THE COURT:  Let her get her question out.

14   Q.   (By Ms. Gibson) And your answer was given in a

15   particular context, so let me try again to understand.

16   A.   Please.  Thank you, ma'am.

17   Q.   Are you saying you believe you can make promises

18   to employees and you don't have to honor it unless it is in

19   writing and duly executed?

20   A.   No, that's not correct.

21   Q.   Okay.

22            Do you agree with me that oral agreements

23   should be honored?

24   A.   Absolutely.

25   Q.   What types of oral agreements did you honor?  I'm

1    going to exclude severance payments from this question, but

2    can you give me some examples of oral promises that you

3    honored with employees while working at Southwest Housing as

4    far as compensation?

5        A.   As far as compensation.  Anytime you tell an

6    employee that they can leave work early, then you should

7    allow them to leave work early.  Anytime you tell them they

8    can have a day off or a sick day or a special-needs day for

9    a doctor, emergency, something that they verbally discussed

10   and asked your consent for without reducing it into writing,

11   and you -- you grant them the opportunity to leave early or

12   to take a day off.  I mean, those are things that,

13   naturally, in the course of business as a business owner

14   that you would do without having to reduce it into a written

15   contractual form.

16              And, obviously, there becomes a point in

17   running a business where there's limitation to what can

18   actually be "can I take the day off" and isn't it in your

19   best interest and the employee's interest to have it reduced

20   and agreed upon on its term and conditions in written form.

21       Q.   I believe my question was about compensation, so

22   let me try again.

23       A.   Yes.

24       Q.   What types of oral promises have you made to

25   employees with respect to compensation while you were

1    working with the Southwest Housing entities?

2        A.    Well, for instance, if somebody said I want to --

3    I want to take the day off but I don't want to lose the

4    salary for the day and, you know, I would certainly be

5    amenable under, you know, circumstances that were out of

6    that employee's control to not come to work, to pay them for

7    that day off.  I was, I think, very flexible for weddings,

8    funerals, special occasions, and things in one's life,

9    emergency circumstances, things that may not have been

10   traditionally covered by employers or under an employment

11   agreement to allow them the flexibility of being paid their

12   salary during that period of time.

13       Q.    With respect to bonuses, do you believe oral

14   handshake agreements are enforceable?

15       A.    Can you please explain to me?  I don't know what

16   context you're asking me that question.

17       Q.    When it comes to worker bonuses or employee

18   bonuses, do you believe oral agreements are enforceable?

19       A.    I believe that all agreements should be honored,

20   oral or written.  I don't see any distinction between the

21   two.  But I obviously believe that at some level that for

22   protection for both parties to an agreement it should be

23   reduced to writing.

24               Does that make sense, Ms. Gibson?  Does

25   that answer your question?  I just want to make sure that

1      I'm answering your question.

2          Q.   Yeah.  I think I understood that one.

3          A.   Okay.  Good.

4          Q.   I'm not going to ask you about details; just in

5      general.  Did you discuss the sale-proceeds bonus with

6      Keith -- Keith Jones -- at some point in time?

7                    MR. L. FRIEDMAN:  Objection, relevance.

8                    MS. GIBSON:  It's part of the program.

9                    MR. L. FRIEDMAN:  There's no program.

10                   THE WITNESS:  There's no program.  There's

11     no program.

12                   MR. L. FRIEDMAN:  Lack of foundation.

13                   THE COURT:  All right.  Fair enough.  The

14     lack-of-predicate objection is sustained.

15         Q.   (By Ms. Gibson) You recall Keith Jones talking

16     about a program to offer bonuses to get employees to stay?

17         A.   I recall Keith Jones saying that there was no

18     stay-bonus program, as you seem to be --

19         Q.   I didn't say --

20         A.   No, no, no, you are very determined to get the

21     stay bonus, but the reality --

22                   THE COURT:  Mr. Potashnik, let her finish

23     her question.

24                   MR. L. FRIEDMAN:  Well, he was in the

25     middle of an answer when she interrupted him.

236

1          THE COURT:  He needs to answer questions,
2     not comment on her question.
3          Repeat your question, Ms. Gibson.
4          MR. L. FRIEDMAN:  So my request is we get
5     back to question and answer, and she let him --
6          THE COURT:  Right.
7          MR. L. FRIEDMAN:  -- finish before she
8     interrupts him, and he let her finish before he interrupts
9     her.
10          THE COURT:  Fair enough.
11          Stay with question and answer.
12          THE WITNESS:  Yes, Your Honor.
13          THE COURT:  And that's for both.
14          MS. GIBSON:  Absolutely.
15          THE WITNESS:  Yes, ma'am?
16     Q.    (By Ms. Gibson) You recall Keith Jones talking
17     about a program in place to offer bonuses to get people to
18     stay in light of the asset sale, correct?
19     A.    No.
20     Q.    You don't recall that.  All right.
21     A.    I recall Mr. Jones saying that there was no
22     stay-bonus program, but there was in fact potential
23     severance being paid to employees upon the sale of the
24     company.
25     Q.    Mr. Potashnik, I'm not using the stay bonus or

1    severance.  I'm just saying bonus.  Bonuses for you --

2         A.    Well, there's a -- there's a -- there's a big

3    difference --

4         Q.    I'm just saying --

5         A.    -- to me.  So I can't distinguish --

6         Q.    What word do you want -- what word do you want me

7    to use?

8         A.    Well, it depends on whether or not it's referred

9    to in the employment agreement as a bonus or if it's

10   referred to, in fact, by Mr. Jones in his testimony as what

11   it was, which was a severance.

12        Q.    My question is about bonuses offered to employees

13   to try and get them to stay.  You don't like the word

14   "bonus".  What word would you like me to use to --

15        A.    Ms. Gibson, your question was about Keith Jones

16   and what his testimony referred to.  And as I pointed out,

17   his --

18        Q.    Well, let me just ask --

19        A.    -- testimony referred to the fact that there was

20   no stay bonus but there was a severance paid to those

21   employees that were going to be with the company at the time

22   of the asset sale and beyond --

23        Q.    Okay.

24        A.    -- if, in fact, Cascade decided to keep them as

25   employees.

1        Q.    Let me try this way.  Do you agree that there is a

2    program in place to identify important employees and offer

3    them money as an incentive to stay as long as needed to help

4    make the asset sale happen?

5        A.    No.

6        Q.    You deny that?

7        A.    Yes.

8        Q.    Do you believe that businesses must live up to

9    their agreements with those who have lived up to their end

10   of the agreement?

11       A.    Yes.

12       Q.    Do you recall that you asked Jeff Carpenter to

13   help you take potential purchasers and investors on tour --

14   I'm sorry -- tours to market the sale of the assets?

15       A.    I don't recall that I ever -- ever asked

16   Mr. Carpenter to do anything outside of what is called for

17   in his employment agreement.  If it was part of his

18   responsibilities under the employment agreement, it may have

19   been something that he had been asked to do; but

20   it certainly was not with anybody that would have been,

21   quote, unquote, an investor.  That was my responsibility.  I

22   mean, I -- I took on a lot of responsibility running the

23   business, and one of the most important things to me was

24   personally taking investors.

25       Q.    So the answer is -- the answer you gave me --

1   well, let me just do this.

2                   It's Page 49, Line 21.  When I originally

3   asked you if you recall that you asked Jeff Carpenter to

4   help with potential purchasers and investors on tours to

5   market the sale of assets, you said no, correct?

6       A.    That's correct.

7       Q.    All right.

8                   Why are you making distinctions and saying,

9   well, I would only have asked him to do what was within the

10  scope of his employment --

11                  MR. L. FRIEDMAN:  By the way, that answer

12  was consistent with the one he gave on the witness stand.

13                  THE COURT:  Sidebar.

14                  THE WITNESS:  Okay, but I can -- I'm sorry,

15  Your Honor.

16                  THE COURT:  No, go ahead.  Answer her

17  question.

18                  THE WITNESS:  Okay.

19                  The answer to the question is -- and I

20  think Mr. Graf was a good witness to go on before me, being

21  with -- buying the company.

22                  As the president and owner of the business,

23  it was my responsibility to make sure that the people that

24  were responsible for buying the business were personally

25  taken to sites by myself.  Now, if a lower-level management

1    person like a Mr. Graf or somebody even lower than Mr. Graf

2    was asked to go look at a property, that's a completely

3    different issue.  But as it pertains to actual investors,

4    that was me.

5                    I take pride and responsibility for making

6    sure that I personally took investors to each and every

7    property.  I knew each and every property.  I knew all of

8    the employees in the company.  I pride myself on the fact

9    that I spent time not just with employees but the residents

10   of our properties.

11                   THE COURT:  You have about two minutes

12   left.

13        Q.    (By Ms. Gibson) How many properties did the

14   organization have in 2007/2008 time frame?

15        A.    I don't recall.

16        Q.    Was it over a hundred?

17        A.    No.

18        Q.    Less -- and by property, is that one set of a

19   property is one apartment complex unit?

20        A.    Yes.  That's how I would define it.

21        Q.    How many units were there?

22        A.    I don't recall the exact number of units.

23        Q.    Over a thousand?

24        A.    Yes.

25        Q.    Okay.  And it's your testimony you knew each and

1    every one of the tenants personally?

2         A.    No.  It's my testimony that I knew each and every

3    employee in most of the properties.  And I knew quite a few

4    of the tenants in the properties because I was on property

5    much of the time, but I am not making any statement to the

6    effect that I knew each and every resident of the

7    properties.  That would be impossible.

8         Q.    Sorry.  I thought that's what you said.  Okay.

9         A.    No, that's not what I said.

10                  MS. GIBSON:  I don't think I can use up

11   another minute.

12                  THE COURT:  Okay.  That's all right.

13                  You can have a seat over here,

14   Mr. Potashnik.

15                  Ladies and gentlemen, we'll break for the

16   afternoon in just a minute.  Please remember the

17   instructions I gave you yesterday.

18                  (Jury instructions given)

19                  THE COURT:  So we'll see you tomorrow

20   morning at 9:00 o'clock.

21                  (The jury exited the courtroom.)

22                  (Off the record)

23                  THE COURT:  We're on the record.

24         DEFENDANTS' OBJECTION AND MOTION FOR MISTRIAL

25                  MR. L. FRIEDMAN:  I would like to object to

Appendix 0763

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3         I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12        I further certify that the total cost for the

13   preparation of the Reporter's Record is $1,474.00 and will

14   be paid by Friedman & Feiger, LLP.

15        WITNESS MY OFFICIAL HAND this the 12th day of October,

16   2018.

17

18

19                             /S/ Vikki L. Ogden

20                             _____
                               VIKKI L. OGDEN, Texas CSR# 6309
                               Official Court Reporter
21                             Dallas County Court at Law No. 5
                               600 Commerce Street, Floor 5
22                             Dallas, Tx. 75202
                               (214)653-6443
23                             Certification Expires:  12/31/18

24

25

REPORTER'S RECORD

COA NO. 05-19-00238-CV

TRIAL CAUSE NO. cc-08-02072-e

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
LISA MATZ
Clerk

VOLUME 5 OF 14

| | | |
|---|---|---|
| JEFFREY CARPENTER, | ) | IN THE COUNTY COURT |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| VS. | ) | AT LAW NO. 5 |
| | ) | |
| SOUTHWEST HOUSING | ) | |
| DEVELOPMENT COMPANY, INC., | ) | |
| SOUTHWEST HOUSING | ) | |
| MANAGEMENT COMPANY, INC., | ) | |
| AFFORDABLE HOUSING | ) | |
| CONSTRUCTION, INC., BRIAN | ) | |
| POTASHNIK and CHERYL | ) | |
| POTASHNIK, | ) | |
| | ) | |
|    Defendants. | ) | DALLAS COUNTY, TEXAS |

-----------------------------------------------------------

TRIAL ON THE MERITS

-----------------------------------------------------------

On the  25th day of January, 2018, the
following proceedings came on to be heard in the above-
entitled and numbered cause before the Honorable Mark
Greenberg, Judge presiding, held in Dallas County, Texas

Proceedings reported by machine shorthand.

```
 1                    A P P E A R A N C E S

 2

 3      Ms. Amy Gibson
        GIBSON, WILEY, PLLC
 4      SBOT NO. 00793801
        1500 Jackson Street, Suite 714
 5      Dallas, Texas 75201
        PHONE:  (214) 522-2121
 6
        Mr. Brian Sanford
 7      THE SANFORD FIRM
        SBOT NO. 17630700
 8      1910 Pacific Avenue, Suite 15400
        Dallas, Texas  75201
 9      PHONE:  (469) 361-9111

10      ATTORNEYS FOR THE PLAINTIFF

11

12           AND

13

14      Mr. Lawrence Friedman
        SBOT NO. 07469300
15      Mr. Michael Donohue
        SBOT NO. 05989380
16      Mr. Jason Friedman
        SBOT NO. 24059784
17      FRIEDMAN & FEIGER ATTORNEYS AT LAW
        5301 Spring Valley Road, Suite 200
18      Dallas, Texas  75254
        PHONE:  (972) 788-1400
19
        Mr. Ryan Hale
20      HAWKINS, PARNELL, THACKSTON & YOUNG, LLP
        SBOT NO. 24097784
21      4514 Cole Avenue, Suite 500
        Dallas, Texas  75205
22      PHONE:  (214) 780-5100

23      ATTORNEYS FOR THE DEFENDANT

24

25
```

```
 1                        I N D E X

 2                       VOLUME 04

 3                  (TRIAL ON THE MERITS)

 4                                          Page    Vol.

 5   January 25, 2018

 6   Appearances . . . . . . . . . . . . .    02      05

 7   Proceedings . . . . . . . . . . . . .    05      05

 8   PLAINTIFF'S WITNESSES
                      Direct   Cross  V. Dire/S. Rosa   Vol.
 9   JEFF RICHARDS      07, 15   13,          --         05
     BRIAN POSTASHNIK   16,      --           --         05
10   PAUL COHEN         100, 108 106,         --         05
     VIKKI CARPENTER    112, 127 116, 128     --         05
11   JEFFREY CARPENTER 130,      --           --         05

12   DEFENDANT'S WITNESS
                      Direct   Cross      V. Dire/S. Rosa   Vol.
13   MARK JONES      65, 95   86, 97             --         05

14   Adjournment . . . . . . . . . . . . . . . 233      05

15   Court Reporter's Certificate. . . . . . . 234      05

16                     EXHIBIT INDEX

17   PLAINTIFF'S

18   NO.     DESCRIPTION          OFFERED    ADMITTED    VOL.

19   20.    Escrow Agreement        18         18        05

20   35.    E-mail                  21         21        05

21   39.    Secretary of State Doc. 47         47        05

22   40.    Employee Handbook       33         33        05

23   40(a). Cert. of Termination    49         49        05

24   41.    E-mail                  38         39        05

25   49.    E-Mail                 185        185        05
```

```
 1                    EXHIBIT INDEX (cont'd)

 2   PLAINTIFF'S

 3   NO.      DESCRIPTION          OFFERED      ADMITTED     VOL.

 4   50.      E-Mail               193          193          05

 5   51.      Hartfield's Note     202          202          05

 6   52.      E-Mail               207                       05

 7   DEFENDANT'S

 8   14.      JC Personal Notes    121          122          05

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                    (January 25, 2018)

 3                    THE BAILIFF:  All rise.

 4                    (Jury ushered in.)

 5                    THE COURT:  Jurors, please have a seat as

 6       you're coming in.  Everybody can have a seat.

 7                    Welcome back.  Good morning, ladies and

 8       gentlemen.  We'll continue with the trial.  We're going

 9       to -- first thing we're going to do this morning is

10       present some testimony to you by videotape deposition.

11       And I'll explain what the videotape deposition is to you

12       in just a moment.  We'll go about until 10:25 or so

13       before we take a break.  We'll take a 15-minute break,

14       but if you need an additional break, just let us know.

15       Our court reporter today is Georgina Ware.  She'll be

16       here today and Vikki will be back tomorrow.

17                    A videotape deposition is sometimes when a

18       witness is not able to appear in person in a trial and we

19       play the deposition.  The deposition is taken outside the

20       presence of the Court and the jury, but the lawyers are

21       there and the court reporter is there and a videographer

22       is there.  The court reporter swears in the witness so

23       that the testimony is under oath.  And the court reporter

24       transcribes the proceedings so that we have a record of

25       it.
```

```
 1              When we play a videotaped deposition, we ask
 2    the lawyers to edit the videotape deposition before we
 3    present it to the jury.  So as you see the videotape
 4    deposition, you'll see edits in it and that's because
 5    I've asked them to edit it, so that we're not playing
 6    more than we need to.  So you shouldn't make any
 7    assumptions that the edits are anything diabolical or
 8    anything like that.
 9              Ms. Gibson, if you'll call your next
10    witness.
11              MS. GIBSON:  Plaintiff calls Jeff Richards.
12              THE COURT:  All right.  And this will be by
13    videotape deposition.
14              Whenever you're ready.
15              (Video is playing.)
16              THE COURT:  Oh, and this is -- do we know
17    how long -- do you know how long this is?
18              MR. SANFORD:  13 minutes, Your Honor.
19              THE COURT:  32 minutes long?
20              MS. GIBSON:  It's --
21              MR. SANFORD:  Yes, sir, 13 minutes.
22              THE COURT:  13 okay.
23              (Video is playing.)
24                   JEFFREY RICHARDS,
25    having been first duly sworn, testified as follows:
```

```
 1                    DIRECT EXAMINATION

 2   BY MS. GIBSON:

 3       Q.   Mr. Richards, would you please tell us your full

 4   name.

 5       A.   Jeffrey Robert Richards.

 6       Q.   And you live and work in Arizona now?

 7       A.   That's correct.

 8       Q.   And that's where you're giving your deposition

 9   from?

10       A.   That's correct.

11       Q.   Would you please briefly describe your

12   educational background?

13       A.   I have a bachelor's degree in finance from

14   the -- from Arizona State University.

15       Q.   And did you attend seminary or divinity school?

16       A.   I took one class.

17       Q.   Okay.  You previously worked for American

18   Housing Foundation or one of its affiliates?

19       A.   Correct.

20       Q.   And what was the formal name of the entity you

21   worked for?

22       A.   American Housing Foundation.

23       Q.   Is it okay if I refer to that entity as AHF?

24       A.   Yes.

25       Q.   What was your job title at AHF when -- your last
```

1    job title at AHF?

2        A.   I don't know that I actually had a formal job

3    title, but if -- if you're interested in my

4    responsibilities, I spent most of my time trying to

5    renegotiate some pretty poor financing on some apartment

6    portfolios that had been acquired actually before I

7    arrived there.  We also spent, towards the end --

8    actually, Jeff Carpenter, who is the subject of this

9    proceeding, and I worked pretty closely together, trying

10   to streamline some operations, you know, kind of retool a

11   management company.  Just trying to fix some problems.

12       Q.   Okay.  And I take it you know who Jeff Carpenter

13   is?

14       A.   I do.

15       Q.   How is it that you first came to know who Jeff

16   Carpenter was?

17       A.   If -- if memory serves correctly, he was

18   actually referred to American Housing Foundation by some

19   folks outside the company who knew that we really were

20   looking for and needed someone with abilities as a

21   property manager.

22       Q.   And do you recall who referred Jeff to y'all?

23       A.   Don't remember the name, but I believe it was

24   actually one of our insurance agents in Denver.  It's

25   been a few years.  I don't remember all the names and

1   dates and stuff.

2        Q.   That's okay.  And once the -- once the referral

3   was made to AHF, when's the next time -- or what's the

4   next circumstance in which you met Jeff Carpenter?  What

5   was going on?

6        A.   Well, I don't remember.  I don't remember the

7   exact time frame or -- or date or anything, but we would

8   have contacted him probably -- probably through our

9   friend that recommended him to just get together for a

10  meet and greet and see if there was any compatibility or

11  mutual interest.

12       Q.   And ultimately was there compatibility and

13  mutual interest?

14       A.   Yeah.  I think we -- we felt like that on both

15  sides.  We -- or -- we certainly did on our side.

16       Q.   And so were you involved in efforts to recruit

17  Jeff Carpenter to come work at AHF?

18       A    I was.

19       Q.   Who else was involved on the AHF side?

20       A.   I know that our president, Steve Sterquell, was.

21       Q.   And what was your understanding of who Jeff

22  Carpenter was working for at the time y'all were

23  recruiting him?

24       A.   I don't remember the exact name of the company,

25  but it was -- I believe their name was Potashnik.

1      Q.   Okay.  You understood he was working for the

2  Potashniks?

3      A.   Yes.

4      Q.   And then I know you don't recall the date, but

5  over about what period of time, as in days or weeks or

6  months or years, did the recruitment efforts last?

7      A.   I'm going to -- I'm going to guess that it was

8  around seven months, maybe eight.  But again, I don't

9  remember the specific dates, but it would have been

10  something like that.  Between the time that we first met

11  and that he came on board, that's what you're asking me,

12  right?

13      Q.   Yes.

14      A.   Okay.

15      Q.   All right.  And in any event, it was several

16  months that the recruitment efforts lasted?

17      A.   Yes, it was.

18      Q.   And what did AHF decide about whether or not it

19  ulitmately wanted to hire Jeff Carpenter?

20      A.   We -- we really never wavered in our desire to

21  hire him.

22      Q.   And how soon in the process did AHF want Jeff

23  Carpenter to start work with it?

24      A.   Well, I would say almost immediately.

25      Q.   And did Jeff Carpenter actually start working

1   for AHF that soon?

2      A.   He didn't -- he didn't formally come on board,

3   but he did consult with us, as I recall, in putting

4   together some information for prospective lenders on the

5   properties that we were trying to refinance.

6      Q.   Do you -- do you recall that Jeff had to delay

7   his full-time start date with y'all?

8      A.   He did, yes.

9      Q.   And what was your understanding of why Jeff

10  Carpenter delayed his full-time start date?

11     A.   He had -- I don't remember the amount, but he

12  had a considerable amount of money he said that was

13  coming to him from his current employer and he just was

14  not in a position to leave yet.

15     Q.   And was it your understanding that if Jeff left

16  then that he would possibly lose out on getting that

17  considerable amount of money?

18     A.   That's my recollection.

19          MR. DONOHUE:  Objection.  Leading.

20     Q.   (By Ms. Gibson)  And the -- the considerable

21  amount of money you mentioned, your understanding was

22  that would be coming from who?

23     A.   From his then current employer.

24     Q.   Okay.  Did you have any involvement in setting

25  the AHF compensation package for Jeff Carpenter?

1    A.   No, I really didn't.  As I recall, Steve

2  Sterquell and Jeff handled that between themselves.

3    Q.   Okay.  And Steve Sterquell, I think you

4  mentioned, was the president?

5    A.   Correct.

6    Q.   And what ultimately happened to Steve Sterquell?

7    A.   He passed away in April of 2009.

8    Q.   And what happened to AHF eventually after Steve

9  Sterquell died?

10   A.   I don't have a complete answer for that because

11 I actually left the company about a month later.

12   Q.   Okay.  With respect to the considerable amount

13 of money you mentioned that was causing Jeff Carpenter to

14 delay his start date with AHF, what else, if anything,

15 did Jeff tell you about that?

16   A.   I really don't -- I really don't recall what the

17 specifics were with -- I actually don't recall what the

18 compensation drive from or -- we probably discussed it at

19 one point in time.  I just don't remember.

20   Q.   Okay.  What type of work are you currently

21 engaged in?

22   A.   I am now a residential real estate agent.  Just

23 within the last month.  Just -- just started that career

24 within the last month.

25   Q.   Okay.  Do you currently have any business

1     dealings with Jeff Carpenter?

2         A.   No.

3         Q.   Do you currently have any future plans to do

4     business with Jeff Carpenter?

5         A.   No.

6         Q.   Do you have any interest whatsoever in the

7     outcome of this lawsuit?

8         A.   No, except for Jeff has been a friend and -- but

9     we really haven't talked much in the last few years.

10                        CROSS-EXAMINATION

11    BY MR. DONOHUE:

12        Q.   Mr. Richards, this is Mike Donohue.  I represent

13    the Postashniks you already mentioned --

14        A.   Okay.

15        Q.   -- as well as the defenders in this lawsuit that

16    Mr. Carpenter has filed against them.

17              You say that you are -- you're a friend of

18    Jeff Carpenter?

19        A.   Well, I would count myself as one, although

20    we've -- we've talked very little in the last few years.

21        Q.   Okay.  And why would you count yourself as a

22    friend of Mr. Carpenter?

23        A.   Because at one time we were fairly close in

24    terms of business associates and we just -- we got along

25    well.

1    Q.   Okay.  And what time frame was this that you

2    were very close with Mr. Carpenter?

3    A.   Oh, as I said, we both left AHF in 2009.  We --

4    you know, we talked periodically after that, and then it

5    just seems like the times we talked got, you know, fewer

6    and farther between to where we --

7    Q.   Okay.

8    A.   -- we'd go like maybe a year without talking.

9    Q.   Okay.  And as I understand, you left about a

10   month after Mr. Sterquell passed away?

11   A.   Yeah, something like that.

12   Q.   And Mr. Carpenter left also about the same time

13   as you; is that right?

14   A.   Correct.

15   Q.   All right.  And then where did Mr. Carpenter go

16   after he left, after he left American Housing Foundation?

17   A.   I -- I don't recall specifically.

18   Q.   All right.  And when you worked with him, is

19   that the time frame that you said that you were fairly

20   close with him?

21   A.   Yes.

22   Q.   So that was back in, what, 2007 through 2009

23   time frame?

24   A.   Correct.

25   Q.   All right.  Have you kept up with him much since

1    then?

2         A.   As I said earlier, we -- we probably did a

3    better job of keeping up with each other early on after

4    our tenure at AHF, but really the last few years we've

5    had very little conversation amongst each other.

6         Q.   So after you left and Mr. Carpenter left,

7    American Housing Foundation continued; is that right?

8         A.   I believe that's correct, yeah.

9                    REDIRECT EXAMINATION

10   BY MS. GIBSON:

11        Q.   Mr. Richards, why did American Housing

12   Foundation want to hire Jeff Carpenter?

13        A.   We needed somebody that -- that people would

14   consider to be a fairly high profile professional

15   property management guy or girl.  It was -- it was

16   important to us in how we were kind of projecting or

17   branding ourselves in terms of refinancing the -- the

18   portfolio debt that we had.  And he came highly

19   recommended to us, so...

20        Q.   And -- and when you say you needed someone that

21   people would consider high profile experience, what --

22   what types of people are you talking about?

23        A.   Well, as I said, I believe that he was first

24   recommended by our -- one of our insurance agents in

25   Denver.  These guys, as I recall, did a lot of this type

1    of business, insuring, you know, large portfolios of --

2    of multifamily properties.  They knew of -- I can't

3    remember where they knew of him from, but they felt like

4    he would fit that bill.

5         Q.  Did it matter to lenders that y'all had someone

6    experienced in property management?

7         A.  Well, it did in this particular case.

8              THE COURT:  That's it?  Any other portions

9    you want to read from that?  Was that everything?

10             MS. GIBSON:  No, that's it.

11             THE COURT:  That concludes the that witness,

12   ladies and gentlemen.  We'll continue with

13   Mr. Potashnik's testimony now.

14             Mr. Potashnik, if you could come back up

15   here.  Just have a seat there (pointing).

16             Ms. Gibson, if you'll pick up where you left

17   off.

18             MS. GIBSON:  Okay.

19                     BRIAN POTASHNIK,

20   having been first duly sworn, testified as follows:

21                   DIRECT EXAMINATION

22   BY MS. GIBSON:

23        Q.   Mr. Potashnik, do you see a document marked

24   Exhibit 20 in front of you?

25        A.   Yes.

1    Q.   And does Exhibit 20 appear to be an accurate

2  copy of the Fifth Amendment to escrow agreement in

3  connection with the asset sales of Cascade?

4    A.   It doesn't look familiar to me.  I mean,

5  probably looked at it some -- at some point maybe, I

6  don't know.  This was signed ten years ago.  I --

7    Q.   Do you --

8    A.   I'm sorry.  But it's just something that I can't

9  absolutely say that I'm familiar with because it was from

10  November of 2007, so I apologize.  And it is an amendment

11  to an escrow agreement that I think I would need to see

12  before being affirmative as to whether or not this is a

13  proper and correct amendment to that agreement.

14    Q.   You see that the second page says -- has a

15  signature for each seller identified in the contract?

16    A.   Yes, ma'am.

17    Q.   And it says by Brian Potashnik as authorized

18  agent?

19    A.   Yes.

20    Q.   And do you recognize your signature on the

21  second page?

22    A.   Yes, I do.

23    Q.   Okay.  You realize that during this litigation,

24  we asked for your copy of the same documents, correct?

25    A.   I'm not aware.

1      Q.   You weren't?

2      A.   No.

3      Q.   Did you go look for your copy of the -- these

4   documents?

5      A.   No.

6               MS. GIBSON:  Plaintiff offers Exhibit 20.

7               THE COURT:  Any objection?

8               MR. FRIEDMAN:  No, sir.

9               THE COURT:  Okay.  20 is admitted.

10              (Plaintiff's Exhibit No. 20 is admitted.)

11              (Sotto voce discussion.)

12              MS. GIBSON:  Your Honor -- Your Honor, that

13  happened right when we changed tactics and that one got

14  missed, so...

15              THE COURT:  All right.  Very good.

16      Q.   (By Ms. Gibson)  Mr. Potashnik, I'm handing you

17  what's been marked Plaintiff's Exhibit 25.  If you'll

18  look through those.

19      A.   (Witness complies.)

20      Q.   Do those appear to be accurate copies of

21  organizational charts for various portions of the

22  organization?

23      A.   I don't know where these originated.  I have --

24  I've never seen those before.  So it would take me some

25  time and some ability to verify everything in order to

1    tell you affirmatively that this is -- these are

2    absolute.

3        Q.   Do you recognize all the people on those

4    organizational charts?

5        A.   I have to read through it to tell you.  I

6    recognize everybody on the front -- on the first page.

7    Second page, yes.  I recognize everybody there.

8        Q.   Well, do you mind before you read the whole

9    thing, looking at the front page.

10       A.   (Witness complies.)

11       Q.   Does that hierarchy and salary and bonus

12   information appear to be accurate to you?

13       A.   I don't know.

14       Q.   I'm just going to grab this back, if that's

15   okay.  Thanks.

16       A.   Sure.

17       Q.   Mr. Potashnik, yesterday I had asked you some

18   questions about whether you ever had Jeff Carpenter lead

19   tours with potential purchasers.

20            And I believe your answer was no; do you

21   recall that?

22       A.   Yes, ma'am.

23       Q.   Okay.  And you said that never happened?

24       A.   I think to clarify my understanding of the

25   question or my interpretation of the question, potential

1   purchasers are those that are the decision makers, who

2   write the checks.  Now, obviously there are people at

3   lower levels that do due diligence, property inspections,

4   things of that nature.  So not everybody -- if you're

5   including them -- would have necessarily been somebody

6   that I would have taken to the property.  But investors,

7   purchasers, that would have been something that I would

8   have done or delegated to Mark Jones to do.

9       Q.   To who -- you would delegate tours to Mark

10  Jones?

11      A.   Yes.

12      Q.   Did you have -- ever have Jeff Carpenter handle

13  meetings with potential purchasers and investors on his

14  own?

15      A.   On his own, no.

16      Q.   I'm handing you Plaintiff's Exhibit 35.  I

17  realize the writing is small, but that is as big as they

18  could get it to print.

19           Do you recognize Exhibit 35 --

20           MS. GIBSON:  I'm sorry, Mr. Friedman.

21      Q.   (By Ms. Gibson) -- as an e-mail from you to Jeff

22  Carpenter?

23      A.   Yes.

24      Q.   Okay.  And -- and does this appear to be an

25  accurate copy of an e-mail that you sent to Jeff

1   Carpenter on June 26th, 2006?

2      A.   Yes.

3      Q.   Okay.

4            MS. GIBSON:  Plaintiff offers Exhibit 35.

5            THE COURT:  Any objection?

6            MR. FRIEDMAN:  No, sir.

7            THE COURT:  35 is admitted.

8            (Plaintiff's Exhibit No. 35 is admitted.)

9      Q.   (By Ms. Gibson)  You see you're asking Jeff

10  Carpenter to handle a meeting in San Antonio?

11     A.   Yes, ma'am.

12     Q.   Okay.  And you provide some -- you've been

13  provide -- you forward to him some information about

14  Greystone and Company?

15     A.   No.  I forwarded him an e-mail that was sent to

16  me by the investment bankers, regarding a meeting with

17  Greystone.

18     Q.   Okay.  Who --

19     A.   So it was not -- that is not my e-mail to Jeff.

20  My e-mail to Jeff was me asking him that he had -- if he

21  would handle the meeting?

22     Q.   Correct.

23            And it just -- this information is

24  information that he then providing to you that you're

25  forwarding on?

```
 1        A.   That's correct.

 2        Q.   Okay.  And who was Greystone and Company?

 3        A.   Well, as far as I was concerned, they were not a

 4   potential investor or purchaser.  I knew of Greystone as

 5   being a property management company and it was my opinion

 6   that this was not an investor, purchaser that was a

 7   potential candidate for the company and therefore didn't

 8   feel that it was necessary for myself to be the one to

 9   take them to properties.

10        Q.   So -- so help me understand, who --

11             THE WITNESS:  Bless you.

12             MR. FRIEDMAN:  Bless you.

13        Q.   (By Ms. Gibson)  What role did you consider

14   Greystone and Company to have?

15        A.   I didn't think that Greystone would be a

16   candidate that I would consider to be a purchaser or

17   investor.

18        Q.   Okay.  Well, was the meeting about potential

19   purchase?

20        A.   I don't recall what the meeting was about.  It

21   could have been about property management.  It could have

22   been about the potential purchase of one property.  It

23   could have been about potential purchase of all

24   property -- purchasing all properties.  I -- I just don't

25   recall, but I did not -- and can tell you that,
```

1  Greystone -- in my opinion, I would not consider then,

2  nor do I consider now, to be a candidate worthy of being

3  qualified to purchase anything from our portfolio.

4      Q.  Okay.  Well, you see the biography that was

5  forwarded about one of the attendees, Bill Guessford?

6      A.  Yes.

7      Q.  Okay.  And you see that he participates in the

8  analysis and purchase of new assets?

9      A.  Yes.  I also see before highlighting that he is

10  the managing director of their acquisitions and REO

11  division.  And I didn't consider them to be a worthy

12  candidate that I would qualify as an investor or

13  purchaser.

14      Q.  And you see --

15          MR. FRIEDMAN:  I'm try to be patient and

16  respectful, but all of this is irrelevant to the claims

17  that have been plead.

18          THE COURT:  All right.

19          MS. GIBSON:  Your Honor, it goes to that at

20  the time, Brian Potashnik thought that Jeff was important

21  to the asset sale.

22          THE COURT:  Overruled.

23      Q.  (By Ms. Gibson)  And who -- so you see there's

24  also another person listed who would be there.  Kelley

25  Heinsman, you see that?

1     A.   I don't know whether or not she was attending

2  that meeting or not.

3     Q.   Okay.  Well, she --

4     A.   I think that she was the one that sent the

5  e-mail, so that is why she --

6     Q.   Okay.

7     A.   -- put her name and -- the name of her company.

8  But I'm not aware that she attended that.  And, again, I

9  did not consider this to be a purchaser or investor of

10  any serious nature that would deserve any kind of

11  attention at my level or an executive level.

12     Q.   Okay.  So is it your testimony now that you did

13  ask Jeff Carpenter to handle meetings with potential

14  purchasers and investors if you didn't think they were

15  worthy?

16     A.   No.  I, again, don't know whether or not they

17  would qualify as being a purchaser or investor.  They may

18  have been a potential candidate to manage the portfolio.

19  Greystone is a management company.  So it could have been

20  a meeting relating them to taking over purely the

21  function of management or maybe management of one or two

22  assets in the portfolio.

23     Q.   Well, you see this company, RBC Capital Markets?

24     A.   Yes.

25     Q.   That company was retained by your organization

1    to help with the potential asset sale, correct?

2        A.   Yes.   That's correct.

3        Q.   All right.   So does that help refresh your

4    memory that this was a potential purchaser?

5        A.   No.   As a matter of fact, their role could have

6    been -- in many cases it was -- to make sure that the

7    company had a functioning third-party management company

8    potentially as a way to attract potential purchasers and

9    investors.

10       Q.   So --

11       A.   So it could have been a recommendation on their

12   part to bring the company up in its standards because we

13   were, again, losing money at the management company level

14   and to bring in a company like Greystone to become a more

15   attractive candidate to a potential purchaser and

16   investor is the recommendation of the investment bank.

17       Q.   RBC Capital Markets was -- one of the things

18   that it did was to help find potential purchasers in

19   connection with the asset sale, correct?

20       A.   Among many things, yes.   Among many things,

21   financing, management functions.

22       Q.   Mr. Potashnik, you -- you were the agent for all

23   of the sellers in the asset sale, correct?

24       A.   If -- again, I don't know whether or not I was

25   the agent of all the entities.   Again, this was ten years

1   ago.  So, please, you know, I need to have my memory

2   refreshed if that's the case.  And if that's what you're

3   saying, than it certainly could be the case.

4       Q.   Well -- well, for example, we just talked about

5   the Fifth Amendment to the escrow agreement.  And you see

6   on the second page it says that you're signing for each

7   seller identified in the contract by Brian Potashnik as

8   authorized agent.

9            Does that refresh your memory that you were

10   acting as authorized agent for the sellers?

11      A.   To simplify and answer your question, I was

12   ultimately the person who controlled the company and was

13   where the buck stop as you should probably put it.  I

14   mean, I don't doubt that I was the authorized agent for

15   all of the entities.  And if -- in some cases it might

16   have been Cheryl or somebody else, then I certainly don't

17   think that I was not ultimately the one that would be

18   responsible as the agent.

19      Q.   Okay.  So you -- you acknowledge that you were

20   the authorized agent for all of the sellers?

21      A.   As far as I know, that's the case, yes.

22      Q.   All right.  And do you recall Jeff Carpenter

23   trying to negotiate a higher percentage of sale proceeds

24   than 3 percent?

25      A.   No.

1    Q.   You recall him asking if -- if it could be 5

2    percent, instead of 3 percent?

3    A.   No.

4    Q.   Do you recall telling Jeff that that wasn't

5    going to happen because Cheryl had already -- Cheryl

6    Potashnik has already blessed the 3 percent deal and so

7    you were going to stick with that?

8    A.   No, there -- there was no deal.  No conversation

9    like that --

10   Q.   That you had --

11   A.   -- that wouldn't have occurred under any

12   circumstances, Ms. Gibson.

13   Q.   Okay.  I understand you've already testified

14   under oath that you never had any conversations with any

15   employees about any type of money to get them to stay,

16   correct?

17   A.   I am answering the question that you asked of

18   me.  You are the one who is making the statement.

19   Q.   Mr. Potashnik, you were -- you were the owner --

20   the ultimate owner of all three entities:  Affordable

21   Housing Construction, Southwest Housing Development and

22   Southwest Housing Management?

23   A.   As far as I know.

24   Q.   Okay.  During --

25   A.   It might have been some other legal structure,

1    but ultimately I was the owner.

2        Q.   Okay.

3        A.   And being married to Ms. Geiser, I obviously

4    felt that she was as much of an owner as I was.

5        Q.   Sure.   Sure.

6             And given that you were married to her,

7    y'all shared control over the organizations?

8        A.   I think we both had certain responsibilities

9    that differed in many ways, but ultimately we -- when it

10   came to decisions that impacted the company in any way,

11   we would get together and make decisions.

12       Q.   And, Mr. Potashnik, you were a director of each

13   of the entities:   Affordable Housing Construction,

14   Southwest Housing Development, Southwest Housing

15   Management?

16       A.   Yes, ma'am.

17       Q.   And Cheryl Potashnik was also considered to be

18   an officer as well?

19       A.   I don't know.   I'm not sure whether anybody

20   other than myself was an officer or director of any of

21   the entities.   So I would have to look at the corporate

22   books and records, which I haven't done in ten years.   So

23   pardon me for not knowing.

24       Q.   Okay.   You -- you understand that your attorneys

25   produced some corporate records in this case?

1       A.   I don't know what my attorneys produced.

2       Q.   Okay.  You haven't -- so you haven't reviewed

3  any corporate --

4       A.   No, ma'am.

5       Q.   -- record?

6            Okay.  Do you recall testifying that you had

7  a very strict -- very strict policies and procedures,

8  whereby if any agreements with any employees or with any

9  venders or any contractors take place, they are written

10  and vetted by legal counsel and duly executed?

11      A.   I'm sorry.  What was the question?

12      Q.   Sure.  Let me just ask it straight up.

13           It's your position that we, meaning the

14  organization, you and Cheryl, have very strict policies

15  and procedures, whereby any agreements with any employees

16  or with any venders or with any contractors take place,

17  they are written and vetted by legal counsel and duly

18  executed?

19      A.   I think that the statement you made is missing

20  one word and that word is should be.  Obviously running

21  an organization and having the number of properties and

22  employees that we did, at some of the levels within the

23  organization, there may not have been adherent to the

24  policy that we had hoped to have.  So I can tell you that

25  that was our best efforts.

1    Q.   Okay.  You recall being at your deposition?

2    A.   (No response.)

3    Q.   Yes?

4    A.   Yes, of course.

5              MS. GIBSON:  Page 41.

6              MR. FRIEDMAN:  What line?

7              MS. GIBSON:  16.

8    Q.   (By Ms. Gibson)  I'm trying to -- I accidentally

9    wrote on this.

10             You say in response to a question about --

11   so if any employee says otherwise, that employee is

12   lying.  And you say, Unless it is within their employment

13   agreement with the company, then it is not an agreement.

14   We have very strict policies and procedures, whereby if

15   any agreements with any employees or with any venders or

16   with any contractors take place, they are written and

17   vetted by legal counsel and duly executed.

18             Correct?

19   A.   Correct.  That's industry standard.  So I think

20   in business, in general, that's very standard.

21   Q.   Mr. Potashnik --

22   A.   Yes, Ms. Gibson.

23   Q.   -- this very strict policy about having things

24   in writing, fully vetted by attorneys and duly

25   executed --

```
 1        A.    Yes.

 2        Q.    -- that policy is not in writing anywhere, is

 3   it?

 4        A.    I don't know if it is or not, it could be.  I'm

 5   not -- I don't know whether it's in writing or not.  I

 6   think it's obviously something that is best business

 7   practices in the real estate industry and in any business

 8   as I said.

 9        Q.    Okay.  You think the strict policy about having

10   things in writing is oral?

11              MR. FRIEDMAN:  I'm not -- that question

12   wasn't clear to me.  I'm going to object to --

13        Q.    (By Ms. Gibson)  Do you understand?

14        A.    No.

15        Q.    Okay.  Your very strict policy about having

16   things in writing was not in writing, correct?  If it --

17        A.    I'm sorry.  I don't know, I just --

18              MR. FRIEDMAN:  Excuse me --

19              THE WITNESS:   -- answered that question.

20              MR. FRIEDMAN:  -- excuse me.  Asked and

21   answered.

22              THE COURT:  You just said you didn't

23   understand the last question, she --

24              MR. FRIEDMAN:  The last question was

25   unintelligible.  This question was --
```

1              THE COURT:  You're objection is overruled.

2              MS. GIBSON:  Mr. Friedman.

3              MR. FRIEDMAN:  Thank you.

4     Q.   (By Ms. Gibson)  Mr. Potashnik, I'm handing you

5  what's been marked Plaintiff's Exhibit 40.

6              Do you recognized Exhibit 40 as the employee

7  handbook for Southwest Housing?  It actually says

8  associate handbook?

9     A.   Yes.

10    Q.   Okay.

11             MR. DONOHUE:  Clarification purposes,

12 Ms. Gibson, you handed us two exhibits, I believe.  Which

13 is 40?

14             MS. GIBSON:  Did I hand you -- okay.

15             MR. DONOHUE:  You handed us two of the same.

16             MS. GIBSON:  I think two of the same.

17 Sorry.

18    Q.   (By Ms. Gibson)  Mr. Potashnik, can you point me

19 to anywhere in the employee handbook that says

20 compensation agreements have to be put in writing, duly

21 executed and fully vetted by counsel?

22    A.   I would have to read it and I -- as I said --

23    Q.   How about if you --

24    A.   This is something that was published probably

25 in 2000, revised in 2007 and that's over ten years ago.

1   And I'm not trying to be difficult, but I would have to

2   go through it to see.  But I don't think that something

3   like that would be appropriate to put in an employee's

4   handbook.  This is simply something that lays out the

5   basic employment issues for people that work in the

6   company that they should adhere to.

7        MS. GIBSON:  Plaintiff offers Exhibit 40.

8        THE COURT:  Any objection?

9        MR. FRIEDMAN:  No objection, Your Honor.

10       THE COURT:  40 is admitted.

11       (Plaintiff's Exhibit No. 40 is admitted.)

12   Q.   (By Ms. Gibson)  Mr. Postashnik, do you recall

13   at the end of Mr. Carpenter's employment that you gave

14   him permission to take his lap -- to keep his laptop, to

15   take it with him?

16   A.   No.  He was never given permission to take

17   company property.

18   Q.   Okay.  And in connection with this case, you

19   have accused Mr. Carpenter of stealing the laptop,

20   correct?

21   A.   I don't think that I personally did anything

22   other than to report and request that the computer, which

23   was company property that Mr. Carpenter willfully took on

24   his own, be returned as it should have been.

25   Q.   Is it your contention that he stole it?

1    A.   I don't want to classify Mr. Carpenter as a

2    thief, but steals -- if that's your interpretation of

3    taking something that doesn't belong to you and not

4    returning it, then I guess I would agree with you.

5    Q.   Do you recall that before Jeff Carpenter

6    actually left, that Southwest Housing made a back-up copy

7    of what was on his laptop?

8    A.   No, I'm not aware of that.

9    Q.   If that happened, that's not consistent with

10   stealing a laptop, is it?

11   A.   I'm not aware of that.  But I think if you

12   physically take something that doesn't belong to you and

13   not return it, I would have to agree with you,

14   Ms. Gibson, that that would be stealing.

15   Q.   You asked Jeff Carpenter -- you told him he

16   could go ahead and keep it because --

17   A.   No, I didn't say that.

18   Q.   In -- in fact -- please, let me finish my

19   question.

20   A.   Yes.

21   Q.   The reason you gave Mr. Carpenter, for allowing

22   him to keep the laptop, is you might still need him to do

23   some additional things and you might still need his

24   assistance in connection with the criminal investigation?

25   A.   No, that's not correct.  I was never -- I never

1    gave Mr. Carpenter permission to take company property.

2    I was not requiring, nor asking or in need of

3    Mr. Carpenter's assistance in any way to help with

4    anything relating to any matters, business, personal,

5    professional, criminal, whatever they may be.

6        Q.   Absolutely never happened, right?

7        A.   Absolutely never happened.

8        Q.   And Mr. Carpenter's last day at Southwest

9    Housing was when?

10       A.   I don't recall.

11       Q.   Okay.  He wasn't there after November 2nd,

12   correct, of 2007?

13       A.   I'm not aware of the specific date that he left

14   the company.

15       Q.   Well, let's take a look at your own attorney's

16   chart.

17            You see that they say 11/02 is the last day

18   of employment?

19       A.   The charts are confusing because I think -- you

20   had a chart in your own opening statement that dates on

21   it too, but -- can I see that?

22       Q.   Well, two of the dates were incorrect and we

23   corrected that.

24       A.   Oh, I'm sorry.  So the dates that you had on

25   your opening statement were not correct?

1    Q.   No.   They were correct as far as his last day?

2    A.   Oh, okay.

3    Q.   But, Mr. Potashnik, this isn't -- this isn't

4  your closing argument.

5    A.   No, I'm not making closing, I'm just getting

6  confused by your questioning because I'm getting

7  different dates.  So I apologize.

8    Q.   I asked -- no one disputes that the last day

9  Jeff Carpenter was needed was October 31st, 2007, since

10  you're asking.  Because the management transition

11  agreement was -- became effective right here,

12  November 1st, management was transferred to the

13  purchaser --

14    A.   Are you asking a question?

15    Q.   But Mr. -- you asked me -- you said you were

16  confused and --

17    A.   Well, you're making a misstatement that's why

18  I --

19    Q.   -- and wanted clarification --

20        MR. FRIEDMAN:  Judge, I'm going to object to

21  the dialogue --

22        MS. GIBSON:  So --

23        MR. FRIEDMAN:  -- and ask to go back to

24  question and answer.

25        THE COURT:  Mr. Potashnik, let her you ask

```
 1    the questions.

 2                THE WITNESS:  Okay.  Please, I --

 3                THE COURT:  And if you can answer them,

 4    answer them.  If you can't, say you can't.

 5                THE WITNESS:  I --

 6                MR. FRIEDMAN:  I'm going to object to

 7    counsel being argumentative with the witness.

 8                THE COURT:  Overruled.

 9                MR. FRIEDMAN:  Thank you.

10       Q.   (By Ms. Gibson)  Mr. Potashnik, I'm handing you

11    Plaintiff's Exhibit 41.

12                Do you see on the first page of Exhibit 41

13    that there appears to be an e-mail from Devona Gray to

14    Jeff Carpenter?

15       A.   Yes.

16       Q.   Okay.  And Devona Gray, at the time, is listed

17    as human resources manager for Southwest Housing?

18       A.   Yes.

19       Q.   Okay.  Do you have any reason to doubt that that

20    is an accurate copy of an e-mail from Southwest Housing's

21    human resources manager to Jeff Carpenter?

22       A.   No, I have no reason to doubt that.

23       Q.   Okay.  And if you turn to the next page.

24       A.   (Witness complies.)

25       Q.   You see that there's an e-mail from Jeff
```

1   Carpenter to you?

2       A.   Excuse me.  I'm just finishing reading the first

3   page of the exhibit to refresh my memory.  Yes.

4       Q.   Okay.  And is that an accurate copy -- does that

5   appear to be an accurate copy of an e-mail to you?

6       A.   I don't -- I don't recall if it was or not.  I

7   don't know what the context of management section 42

8   agreement that it refers to in here.

9       Q.   Well, do you -- do you have any reason to doubt

10  that this e-mail -- that this is an accurate copy of an

11  e-mail to you?

12      A.   No.  I have no reason to doubt that it's an

13  e-mail to me.

14      Q.   Okay.  And --

15      A.   I'm just trying to understand what the context

16  of the e-mail is.  That's all.

17      Q.   And same -- same with the e-mail on the next

18  page, bates labeled Carpenter 953?

19      A.   Yes, ma'am.

20      Q.   Same with the next two e-mails to you, labeled

21  Carpenter 962 and 964?

22      A.   960 -- yes.

23      Q.   Okay.

24              MS. GIBSON:  Plaintiff's offers Exhibit 41.

25              THE COURT:  Any objection?

1          MR. FRIEDMAN:  No objection, Your Honor.

2          THE COURT:  41 is admitted.

3          (Plaintiff's Exhibit No. 41 is admitted.)

4      Q.  (By Ms. Gibson)  You see, Mr. Potashnik, that on

5  the first e-mail, Southwest Housing is still e-mailing

6  Jeff Carpenter on November 5th, 2007, about 401(k)

7  issues?

8      A.  Yes.

9      Q.  And so after Jeff Carpenter left -- as of

10  November 5th, Jeff Carpenter was not shut out from the

11  company's e-mail system, correct?

12      A.  I don't know.  I mean, if he somehow was able to

13  maintain some kind of communication with the stolen

14  laptop, then I think that's probably why.

15      Q.  And you see on the next document, this is on

16  November 5th, after he's gone, while you contend he's

17  stolen the laptop, he's e-mailing you information about

18  the business, correct?

19      A.  Well, I think that characterized his actions as

20  stealing, at which point I agree.

21      Q.  No --

22      A.  If he somehow was able to still access into our

23  e-mail system, then he may very well have been a party to

24  these e-mails.  I just don't know, Ms. Gibson.

25      Q.  Jeff Carpenter is attaching a master section 42

1    management agreement, right?

2        A.   Yes.  I'm sure that's something that we would

3    have liked to have had on our laptop that was -- should

4    have been kept at the company, instead of being taken

5    from the company.  So...

6        Q.   And you see that this surrounds Vegas, that's

7    the context?

8        A.   Yes.  I also see a date of October 29th on the

9    original message.

10       Q.   Sure.

11            That's Jeff's -- the earlier message,

12   Mr. Potashnik, right?

13       A.   Oh.

14       Q.   It's an e-mail string --

15       A.   Okay.

16       Q.   But Jeff Carpenter is sending you an attachment

17   on November 5, 2007.

18       A.   Or maybe it wouldn't have been necessary to have

19   that had we had the laptop that was our property.

20       Q.   You-all had some properties in Las Vegas?

21       A.   We had a property.

22       Q.   A property in Las Vegas?

23       A.   Yes.

24       Q.   Did you ever say, Jeff Carpenter, what are you

25   doing sending me business documents?  You're not supposed

1    to have those?

2         A.   I don't recall having any communication with

3    Mr. Carpenter.

4         Q.   The truth is you asked Jeff Carpenter to

5    continue to help you on matters after he left?

6         A.   No, that is absolutely false.

7         Q.   Using the laptop that had the documents he

8    needed on it?

9         A.   I had no communication nor did I ask or need to

10   have communication after he walked away from his job and

11   stole the company's computer, Ms. Gibson.

12        Q.   If you'll turn to the next page.

13        A.   (Witness complies.)

14             MR. FRIEDMAN:  Are we still on 41?

15             MS. GIBSON:  Yes.

16        Q.   (By Ms. Gibson)  This is another e-mail from

17   Jeff Carpenter to you concerning the organization's

18   business, correct?

19        A.   Yes.

20        Q.   Rosemont Casa Del Norte was one of the

21   organization's properties?

22        A.   That's correct.

23        Q.   And so Jeff is saying here are the agreements

24   that I sent to you previously, he's saying we can exclude

25   Nevada Hand, Cascade Affordable and any Pinnacle related

1      enteritis.  I have a call into Spencer.  And it goes on.

2                      He's continuing to work with you even after

3      he left on business matters, correct?

4          A.   I see one-way e-mail communications and no

5      e-mail strings do I see where I made any response to

6      Mr. Carpenter on anything that you're referring to in

7      this exhibit, Ms. Gibson, or anything else for that

8      matter.

9          Q.   Did you -- did you ever --

10         A.   So I don't -- I mean, I really think that if you

11     are asking me a question whether we had engaged in some

12     kind of a relationship, whereby I had asked him to

13     perform certain functions or responsibilities after he

14     was terminated and stole the company's computer, I would

15     say that categorically that never happened.

16         Q.   Did you say -- did you ever say to Jeff after he

17     left, good grief, Jeff, why are you sending me company

18     documents and talking about business, you're not supposed

19     to have those?

20         A.   No.  Why would I?

21         Q.   You -- you wouldn't, Mr. Potashnik --

22         A.   Exactly.  That's what I'm saying, I was told

23     by --

24         Q.   -- because he didn't steal the laptop --

25         A.   -- I was told by my attorneys --

1        Q.   -- isn't that right?

2                 THE COURT:  Wait --

3                 THE WITNESS:  No, I -- okay.

4                 THE COURT:  -- wait till she asks her

5    question and then you can answer.

6                 THE WITNESS:  What's the question?

7                 THE COURT:  Whether your --

8        Q.   (By Ms. Gibson)  You wouldn't, Mr. Potashnik,

9    because the truth is you gave Jeff Carpenter permission

10   to take that laptop?

11       A.   Ms. Gibson, the truth is -- is that by that time

12   we had informed our attorneys of the computer theft and

13   the termination and we were advised by legal counsel --

14                MR. FRIEDMAN:  All right.  I'm not going to

15   let him get into what he was advised by legal counsel.

16                THE COURT:  Okay.

17                MR. FRIEDMAN:  So I'm going to cut him off

18   right there.  Thank you.

19                THE WITNESS:  Okay.  We had no further

20   communication at that point, regarding any company

21   responsibilities as far as I know.  I certainly don't

22   recall.

23       Q.   (By Ms. Gibson)  So you see at the last page of

24   this exhibit, here's another e-mail from Jeff Carpenter

25   on Friday, November 9th, to you about Vegas property,

1    correct?

2        A.   Yes.

3        Q.   Okay.  And, again, he's talking about having

4    spoken a couple of times in the last few days with

5    Spencer at M and M; is that true?

6        A.   Any e-mails sent from Jeff Carpenter after he

7    was terminated and stole our company computer, I did not

8    even bother reading.  Trust me, that was not something

9    that was even worthy of my attention, Ms. Gibson.  That's

10   why you don't see any response from me on anything that

11   you're throwing at me that he communicated to me about.

12       Q.   He was continuing -- this discussion is about

13   the organization's business, correct?  Your

14   organization's business?

15       A.   It was a one-way discussion, Ms. Gibson.

16       Q.   You think that Jeff was just randomly trying to

17   help you for no reason?

18       A.   You see my response anywhere?  I -- I don't

19   believe that this was anything that deserved or warranted

20   my attention after this situation that took place upon

21   his termination of stealing the company's property.

22       Q.   Is it accurate to say that you never accused

23   Jeff Carpenter of stealing a laptop until in the middle

24   of this lawsuit?

25       A.   No.

1        Q.   No.

2             When did you?

3        A.   No.   I think when we realized that company

4   property was not being returned to us, that we drew the

5   conclusion that it was obviously stolen --

6        Q.   The truth --

7        A.   -- and at best, taken without any authorization

8   from us that he could have that property.  That was --

9   there was never any -- any authorization, at any level,

10  from anybody, that he could walk off with the company

11  computer, Ms. Gibson.

12       Q.   Did you -- so do you have some written document

13  from before this lawsuit was filed asking Jeff to return

14  that computer to you?

15       A.   Do -- do I personally.  I'm not aware that I did

16  that, but there may be.

17       Q.   Well --

18       A.   There may be.

19       Q.   And if there is, would it be on the hard

20  drive --

21       A.   I don't know.

22       Q.   That Mrs. Potashnik -- or that Ms. Geiser got

23  rid of?

24       A.   I don't know.

25       Q.   The truth is, Mr. Postashnik, ever since this

1    lawsuit was filed, you-all have done your level best to

2    make unfounded allegations against Mr. Carpenter, true?

3         A.   No, that isn't correct, Ms. Gibson.  There is

4    nothing that we are alleging that is untrue.

5         Q.   Mr. Potashnik, while this lawsuit was pending,

6    you dissolved Southwest Housing Development Company,

7    correct?

8         A.   I don't know.

9         Q.   Hand you Plaintiff's Exhibit 39.

10             Does Exhibit 39 appear to be an accurate

11   copy of records terminating the existence of Southwest

12   Housing Development?

13        A.   Yes.

14             MR. DONOHUE:  Do we already have a copy,

15   Ms. Gibson?

16             MS. GIBSON:  Yes.  Yes, I gave them to you

17   ahead of time.

18             THE WITNESS:  Oh, I'm sorry.  So what was

19   the question, Ms. Gibson?

20        Q.   (By Ms. Gibson)  The question was:  Does

21   Exhibit 39 appear to be an accurate copy of secretary of

22   state's documents terminating the existence of the

23   company --

24        A.   Yes, ma'am.

25        Q.   -- Southwest Housing Development?

```
 1        A.   Yes, ma'am.

 2        Q.   Okay.  Did you know at the time -- oh, I'm

 3   sorry.

 4             MS. GIBSON:  I offer Plaintiff's Exhibit 39.

 5             THE COURT:  Any objection?

 6             MR. FRIEDMAN:  No objection.

 7             THE COURT:  39 is admitted.

 8             (Plaintiff's Exhibit No. 39 is admitted.)

 9        Q.   (By Ms. Gibson)  When -- were you aware that

10   Texas law requires that companies who are dissolving,

11   give notice to people -- have claims against the company,

12   like Mr. Carpenter?

13        A.   I was not aware.

14        Q.   Did you give Mr. Carpenter any notice that you

15   were going to dissolve the company during this lawsuit?

16        A.   I don't know.

17        Q.   You don't know one way or the other?

18        A.   I don't know one way or the other.

19        Q.   And I'm handing you Plaintiff's Exhibit 40.

20             THE COURT:  40 is already in.

21             MS. GIBSON:  40 is in?

22             THE COURT:  Yeah.

23             MS. GIBSON:  I must have marked it wrong.

24             THE COURT:  40, I think, was a employee

25   handbook.
```

```
 1                    THE WITNESS:  So it's -- was I looking at

 2   the wrong document?

 3                    MS. GIBSON:  I'll call this 40(a).

 4                    THE WITNESS:  What's this one then?

 5       Q.   (By Ms. Gibson)  What do you mean, what's this

 6   one?

 7       A.   Well, didn't you say you had the wrong date --

 8                    THE COURT:  She was talking about the

 9   document --

10                    THE WITNESS:  Oh, okay.  I just want to make

11   sure that we're on the same page.

12                    MS. GIBSON:  No, I just -- the judge was

13   just pointing out that I don't always count very well.

14                    MR. DONOHUE:  What page is that we have?

15                    MS. GIBSON:  So Exhibit 1 --

16                    MR. DONOHUE:  Do we have that?

17                    MS. GIBSON:  Yes, I gave you all --

18                    MR. FRIEDMAN:  Nothing is numbered, so we

19   have no way of correlating.

20                    THE WITNESS:  I -- I'm sorry because I'm

21   getting confused.  What --

22                    MR. FRIEDMAN:  May I approach, Your Honor,

23   to see what he's looking at?

24                    THE COURT:  Just tell me which one is 40(a)

25   that you showed me?
```

1          MS. GIBSON:  That's the certificate of

2     termination for Southwest Housing Management.  It says

3     the staffing --

4               MR. DONOHUE:  Okay.  Got it.

5               MS. GIBSON:  You see it?

6     Q.   (By Ms. Gibson)  Okay.  Does exhibit --

7     Mr. Potashnik, does Exhibit 40(a) appear to be an

8     accurate copy of secretary of state records, terminating

9     the existence of Southwest Housing Management?

10    A.   Yes, ma'am.

11    Q.   Okay.

12              MS. GIBSON:  And plaintiff offers

13    Exhibit 40(a).

14              THE COURT:  All right.  Any objection?

15              MR. FRIEDMAN:  No, sir.

16              THE COURT:  40(a) is admitted.

17              (Plaintiff's Exhibit No. 40(a) is admitted.)

18    Q.   (By Ms. Gibson)  And Southwest Housing

19    Management was dissolved and terminated during the

20    pendency of this lawsuit, correct?

21    A.   I don't know.

22    Q.   Did you give Jeff Carpenter, who had claims

23    against that entity at the time, notice that you were

24    dissolving the company and terminating this existence?

25    A.   Did -- did I personally?

1    Q.   Did you -- do you know of anyone who did?

2    A.   I don't know.  I didn't, but it may have been

3  done by my attorneys or by, you know, other people within

4  the company at the time.

5    Q.   Do you recall discussing annual bonuses with

6  Jeff Carpenter?

7    A.   No.

8    Q.   Do you deny ever discussed annual bonuses with

9  Jeff Carpenter?

10   A.   I don't deny it because at some point there was

11  discussions as it related to his employment agreement,

12  which clearly lays out the bonuses that we agreed upon,

13  that he was entitled to.  So in that context, I would say

14  that bonuses were discussed with Jeff Carpenter as they

15  related to his employment agreement, prior to him coming

16  on and joining the company.  It was a very painstaking

17  process of dotting the Is and crossing the Ts as you

18  pointed out to make sure that employment agreement, which

19  I'm referring to, had any of the discussions regarding

20  bonus, that were laid out at the time.

21   Q.   You're -- you said that the employment

22  agreement, you were dotting the Is and crossing the Ts on

23  it; is that what you were talking about?

24   A.   Well, I think that Mr. Carpenter did a good job

25  in negotiating every detail in having a written

1    memorialized agreement to enforce the issues that he

2    negotiated with us and that we agreed to, that are within

3    the scope of his employment agreement.

4        Q.   You provided the information for the employer in

5    the employment agreement, correct?  Okay.

6        A.   I don't understand the question, Ms. Gibson.

7        Q.   Well, you -- in connection with that agreement,

8    you provided the name of the employer, correct?

9        A.   Yes, ma'am.  I would say that that's --

10       Q.   Okay.

11       A.   -- an accurate depiction of what we provided,

12   the employment agreement.

13       Q.   All right.  And if you take a look at the last

14   page, you see the entity, this is Exhibit 2.

15       A.   (Witness complies.)

16       Q.   You see that you provided the entity names,

17   Southwest Housing Management Company Inc.?

18       A.   Yes.

19       Q.   Okay.  And you're aware that Southwest Housing

20   Management Company Inc. does not actually exist as a

21   legal entity?

22       A.   No, I'm not.  I'm not aware of that.

23       Q.   You just looked at secretary of state records

24   for the Southwest Housing Management Company.

25              You want to take at look at those again?

1        A.   Yes.

2             MR. FRIEDMAN:  Your Honor, that's asking him

3    for a legal conclusion, assumes facts not in evidence and

4    lack of foundation, company exists.

5             THE COURT:  She's asked him to look at it,

6    the document.  So let him look at the document.

7             MR. FRIEDMAN:  If the company didn't exist,

8    we wouldn't be here.

9             THE COURT:  Okay.

10            THE WITNESS:  Yes, ma'am.

11       Q.   (By Ms. Gibson)  And what was -- what's the name

12   on the secretary of state records?

13       A.   Well, to answer your question, to be clear, the

14   employment agreement dated 2004, the company that you're

15   speaking of was in existence.  The exhibit that you

16   provided to me, Exhibit 39 and 40 are stamped by the

17   secretary of state December 30th of 2010.  So could the

18   entity that entered into his employment agreement in 2004

19   no longer be in existence in 2010, after it was no longer

20   in business?  The answer to that is yes.

21       Q.   Ultimately, however, although you -- the

22   articles of incorporation are for a corporation, this is

23   a name that you-all sometimes used, company or

24   corporation?

25       A.   During the time of his -- of this existence,

1    yes, absolutely.

2        Q.   Okay.  Was this one of the agreements that was

3    fully vetted by counsel?

4        A.   I'm sure it probably was, but I don't recall.

5        Q.   Do you recall telling Jeff Carpenter that you

6    would try to catch up on past due earned annual bonuses?

7        A.   I don't recall.

8        Q.   You don't recall one way or the other?

9        A.   One way or the other, I don't recall.

10       Q.   Okay.  Do you recall telling Jeff Carpenter that

11   on top of catching up on past due annual bonuses that you

12   would try to get an additional 50,000, once something

13   happened with the McKinney properties or property?

14       A.   No, I don't recall.

15       Q.   You don't recall one way or the other?

16       A.   No.  I don't recall having those discussions.

17       Q.   Do you deny --

18       A.   One way or the other.

19       Q.   -- do you deny saying that?

20       A.   I don't recall.

21       Q.   Okay.  And do you recall telling Jeff that you

22   hoped to be able to get him another 50,000 from the

23   McKinney property?

24       A.   I don't recall those discussions --

25       Q.   You don't deny it though --

1    A.   -- Ms. Gibson.  I don't recall.

2    Q.   Do you deny it?

3    A.   I don't recall, that's my answer.

4    Q.   You don't recall either way?

5    A.   I don't recall either way, that is my answer.

6              MR. FRIEDMAN:  Okay.  This is argumentative,

7    Your Honor.

8    Q.   (By Ms. Gibson)  And you were --

9              MS. GIBSON:  We're already past it.

10   Q.   (By Ms. Gibson)  And you also mentioned that you

11   wanted to get Jeff Carpenter another 200,000 and you were

12   hoping that you could source that from the Vegas

13   property, somewhere between 100 and 200, on a deal that

14   was happening there?

15   A.   I can tell you that that was not a conversation

16   I recall having.

17   Q.   Okay.

18   A.   I mean, the company was losing money.  We were

19   not in a position to be throwing fifties and 100,000,

20   $200,000 out to employees.  That just was not something

21   that we were in a position to do or even think about

22   doing.

23   Q.   Well, Mr. Potashnik, you heard Keith Jones

24   testify that while the management company that manages

25   all of the properties will run negative, the organization

1    as a whole was profitable during the time --

2                    MR. FRIEDMAN:  Misstates Mr. Jones'

3    testimony.  He said the only company that was profitable

4    was the construction company.

5                    THE COURT:  Let the witness handle that.  If

6    he thinks he's misstated.

7        Q.  (By Ms. Gibson)  He said the organization, as a

8    whole, was profitable, which would include Southwest

9    Housing Managements, Southwest Housing Development and

10   Affordable Housing Construction?

11       A.  Unfortunately, Ms. Gibson, and as a result of

12   the company and the assets which were the basis of the

13   company not performing, it was collectively losing money.

14   And although there may have been a profitable entity

15   amongst the three, but collectively it was a company that

16   was losing money and needed to either go bankrupt or to

17   sell.

18       Q.  The financial condition of Southwest Housing

19   Management improved during Jeff Carpenter's tenure,

20   correct?

21       A.  No.

22       Q.  Jeff Carpenter also took some of the property

23   expenses in-house to Southwest Housing Management to save

24   you-all money in connection with your partnership

25   interest in the properties, correct?

Appendix 0819

1     A.   No, that's not correct.  In fact, during

2  Mr. Carpenter's tenure the management company was losing

3  more money than it ever had, Ms. Gibson.

4     Q.   What I'm talking about is -- for example,

5  certain properties that you have a financial interest in,

6  the actual apartment complex property sites had contracts

7  that they were paying and Jeff Carpenter took those

8  in-house, which saved money up to the organization as a

9  whole?

10     A.   I don't know what contracts you're referring to

11  and I don't know what the economic impact or end result

12  of those contracts would have been to the company.  So

13  you're making an assumption that there was a particular

14  function or a manner in which business was done that was

15  somehow advantageous to us and I just cannot agree with

16  that statement.

17     Q.   He took marketing in-house?

18     A.   And could you expand on what you're -- what you

19  mean by "marketing"?  I don't --

20     Q.   Taking it in-house, as opposed to paying a

21  third-party vender, which is more expensive?

22     A.   Doing what?

23     Q.   Marketing.

24     A.   Well, what -- I mean, marketing encompasses a

25  wide range of functions within our organization.  I think

1    that you need to be more specific about what it was that

2    you're referring to because it's all encompassing.  I

3    really need to know more information about what

4    particular marketing aspects were being drawn in that you

5    refer to in-house that was a, somehow, savings to our

6    business.

7         Q.   What does marketing mean to you?

8         A.   It could mean a variety of things.

9         Q.   Okay.  So, for example, you-all had various

10   printed marketing materials for the properties, correct?

11        A.   Correct.  I'm sure marketing brochures --

12        Q.   Right?

13        A.   -- rental brochures, things like that.

14        Q.   Taking that as an example, Jeff Carpenter

15   brought that in-house, which increased some costs of the

16   management company, but saved money for the organization

17   as a whole?

18        A.   I don't recall us printing any -- or rental

19   brochures or marketing brochures in our -- in-house.  And

20   on also in the event that we had, unaware of the economic

21   benefit to the company and certainly not to me

22   personally.

23        Q.   Jeff Carpenter also took certain social services

24   provided on site, he brought those in-house as well,

25   correct?

```
 1        A.   No, I disagree with that statement.

 2                  MS. GIBSON:  Your Honor, I --

 3                  THE COURT:  You have about two minutes

 4   before the break.

 5                  MS. GIBSON:  Great.  I think this is a good

 6   time.

 7                  THE COURT:  Do you want to take it now?

 8                  MS. GIBSON:  Yes.

 9                  THE COURT:  Okay.  We'll take our 15-minute

10   break, ladies and gentlemen.

11                  THE BAILIFF:  All rise.

12                  (Jury ushered out.)

13                  (A break was taken.)

14                  THE COURT:  Go ahead, Ms. Gibson.

15                  MS. GIBSON:  Plaintiffs reurge the ability

16   to ask and get into the stay bonuses that were paid to

17   other employees, with respect to some of them being oral

18   agreements.  We believe defendants have opened the door

19   through their testimony about everything needing to be in

20   writing.

21                  THE COURT:  Okay.  And do you maintain your

22   earlier decision?

23                  MR. FRIEDMAN:  Yes we do, Your Honor.

24                  THE COURT:  Okay.

25                  MS. GIBSON:  And what?
```

```
 1                MR. SANFORD:  And nobody has ever sued

 2   them --

 3                MS. GIBSON:  And that nobody has ever sued

 4   them --

 5                MR. SANFORD:  -- for a bonus.

 6                MS. GIBSON:  -- for a bonus.

 7                THE COURT:  Well, then that's -- has someone

 8   else sued them other than Mr. --

 9                MR. FRIEDMAN:  No.

10                THE COURT:  -- Carpenter?

11                MR. DONOHUE:  No.

12                MS. GIBSON:  I don't know.

13                THE COURT:  Okay.  Well, fair enough.  The

14   Court maintains its earlier ruling.  But the question --

15   and to go back to that, that was a nonresponse of -- he

16   should not have said that.  That was a violation of the

17   motion of limine too when he said, no one's filed a

18   grievance and no one's ever complained and all that,

19   trying to avoid getting into all of that.

20                MS. GIBSON:  And just -- just to -- before

21   Jeff Carpenter is called, there will probably be another

22   issue I want to take up, but I need to get finished.

23                MR. SANFORD:  One other thing, I think to

24   preserve error, we just have to make some kind of offer

25   of proof, proffer or something --
```

```
 1                    THE COURT:  He'll be here.  You can make an

 2    oral offer at the end of day or if that doesn't work out,

 3    Mr. Potashnik will still be here at the end of the day,

 4    you can do question and answer.

 5                    MS. GIBSON:  And Cheryl?

 6                    MR. SANFORD:  And Cheryl?

 7                    MS. GIBSON:  And Cheryl.

 8                    THE COURT:  All right.

 9                    MR. FRIEDMAN:  And me, I'll be here.

10                    (Sotto voce discussion.)

11                    THE BAILIFF:  All rise.

12                    (Jury ushered in.)

13                    THE COURT:  Jurors, please have a seat.

14                    Have a seat, Mr. Potashnik.

15                    Welcome back.  Again, morning still, ladies

16    and gentlemen.  We'll pick up where we left off with

17    Mr. Potashnik as a witness, Ms. Gibson is asking

18    questions.  And we'll ask her to pick up just where she

19    left off.

20                    Ms. Gibson -- and, of course, we'll go up to

21    the middle of the noon hour before we take our lunch

22    break.

23                    DIRECT EXAMINATION (cont'd)

24    BY MS. GIBSON:

25       Q.  Mr. Potashnik, as of October 31st, 2007 --
```

```
 1              MS. GIBSON:  Let me strike that.

 2       Q.  (By Ms. Gibson)  Do you agree with Ms. Geiser

 3  that Jeff was not fired for any performance reasons?

 4       A.  Yes.

 5       Q.  Okay.  Do you agree with Ms. Geiser that at the

 6  end of the day on October 31st, 2007, the organization

 7  just didn't need Jeff Carpenter anymore because of the

 8  management transition to the purchaser?

 9       A.  Yes.

10       Q.  Do you agree with Ms. Geiser that Mr. Carpenter,

11  during his employment, was never disciplined?

12       A.  I'm not aware.

13       Q.  Do you agree with Ms. Geiser that during Jeff

14  Carpenter's employment he was never written up?

15       A.  I'm not aware.

16       Q.  Did you ever write up Mr. Carpenter?

17       A.  Me, personally, I did not.

18       Q.  Did you ever discipline Mr. Carpenter?

19       A.  Yes.

20       Q.  You have?  How many occasions?

21       A.  We had --

22       Q.  Well -- okay.

23       A.  I --

24       Q.  I like to let witnesses --

25       A.  -- can't tell you.  I don't know how many
```

1   occasions.

2        Q.   Okay.

3        A.   I don't recall.

4        Q.   At no time during Mr. Carpenter's employment did

5   you recommend that he be fired for performance, correct?

6        A.   Did I recommend to whom?

7        Q.   To anyone?

8        A.   I don't recall.

9        Q.   You don't recall one way or the other?

10       A.   No, I don't recall one way or the other.

11       Q.   Okay.  During Jeff Carpenter's employment, you

12   would, at times, meet with Jeff Carpenter at your home?

13       A.   It was not unusual for us to meet employees at

14   our home, many employees.

15       Q.   My question is:  During Jeff Carpenter's

16   employment, you sometimes met with him at your home?

17       A.   We may have and like I said, it would not be

18   unusual as we have met with many employees at our home.

19       Q.   During Jeff Carpenter's employment, your

20   families had Thanksgiving together?

21       A.   I don't recall.

22       Q.   Do you believe that Mr. Carpenter was entitled

23   to trust your word?

24       A.   Yes, absolutely.

25       Q.   Do you recall that the date that you found out,

```
 1   in late September, that you would be -- that you would be

 2   indicted?

 3        A.   No, I don't recall the date specific.

 4        Q.   It was close to the management transition,

 5   wasn't it, Mr. Potashnik?  It was close to

 6   November 1, 2007?

 7        A.   It may have been.

 8        Q.   And during the criminal investigation, you had

 9   maintained to Jeff Carpenter that you had done nothing

10   wrong, correct?

11             MR. FRIEDMAN:  You know, Judge, this is

12   violation of the limine.

13             THE COURT:  All right.

14             MR. FRIEDMAN:  Let's approach.

15             (Off-the-record discussion.)

16             MR. FRIEDMAN:  Ruling, please?

17             THE COURT:  Objection sustained.

18             MR. FRIEDMAN:  Thank you.

19        Q.   (By Ms. Gibson)  Mr. Potashnik, in connection

20   with the criminal proceedings, you ultimately plead

21   guilty, correct?

22        A.   I -- could you please expand on what you mean by

23   proceedings?  The criminal trial?  Criminal case?

24        Q.   Well, there was a criminal investigation of you?

25        A.   Oh, okay, yes.  Yes, I did ultimately plead
```

```
 1  guilty.

 2              MS. GIBSON:  Pass the witness.

 3              THE COURT:  Okay.  Mr. Friedman?

 4              MR. FRIEDMAN:  Nothing further.

 5              THE COURT:  Thank you, Mr. Potashnik.

 6              MR. FRIEDMAN:  Your Honor, we have -- had a

 7  witness fly in from Puerto Rico and has to go back to

 8  Puerto Rico so we want to put him on --

 9              What's his name?  Mark Jones.

10              THE COURT:  All right.  Have you conferred

11  with the other side?

12              MR. FRIEDMAN:  He just showed up.

13              MS. GIBSON:  Mark --

14              THE COURT:  If y'all come over here.

15              (Discussion off the record.)

16              THE COURT:  Ladies and gentlemen, we're

17  going to take a witness out of order.  It's still

18  Ms. Gibson's turn to call witnesses in the first

19  instance, but we're going to switch now for a witness who

20  will be unavailable at another time.  And asked

21  Mr. Donohue, I believe --

22              MS. GIBSON:  And --

23              THE COURT:  Mr. Donohue, you doing the

24  direct examination?  Mr. Donohue to call the next

25  witness.
```

```
 1                  MS. GIBSON:  -- and, Your Honor, can -- just
 2   to be clear, can you just clarify this is defendant's?
 3                  THE COURT:  That's what I was -- I hope that
 4   was clear.  This is defendant's witness, not -- not
 5   Mr. Carpenter's witness.
 6                  Mr. Jones, if you come over here (pointing).
 7   Before you step up there, I'm going to swear you in as a
 8   witness.  Raise your right hand.
 9                  (Witness sworn.)
10                  THE COURT:  Have a seat.
11                  Mr. Donohue, will ask you questions first.
12                           MARK JONES,
13   having been first duly sworn, testified as follows:
14                        DIRECT EXAMINATION
15   BY MR. DONOHUE:
16       Q.  Please state your full name.
17       A.  Mark Anthony Jones.
18       Q.  And, Mr. Jones, were you formerly employed by
19   any of the Southwest Housing entities?
20       A.  Yes.
21       Q.  All right.  Who were you employed by?
22       A.  By Brian and Cheryl Potashnik.
23       Q.  Okay.  And who are Brian and Cheryl Potashnik?
24       A.  The owners of Southwest Housing.
25       Q.  All right.  And what did you do for Brian and
```

1  Cheryl Potashnik at Southwest Housing?

2    A.  My role was vice president of the community

3  development.

4    Q.  And what did that entail?

5    A.  I work with Brian and Cheryl on the development

6  side, as well as the construction side, as well as work

7  with them on the management side of their business.  We

8  were a affordable housing developer.  And we owned family

9  practice -- I mean, family properties, as well as senior

10  properties.

11    Q.  All right.  And when did you start with the

12  Potashniks there at Southwest Housing?

13    A.  2001.

14    Q.  All right.  So you were there when Mr. Carpenter

15  was hired in 2004?

16    A.  Yes.

17    Q.  And what was Mr. Carpenter's -- Jeff Carpenter's

18  position there at Southwest Housing?

19    A.  He was hired as the president of the management

20  company.

21    Q.  Southwest Housing Management Company?

22    A.  That is correct.

23    Q.  And did you work with or interact with

24  Mr. Carpenter --

25    A.  Sure, I did.

```
 1        Q.   -- at all?

 2        A.   Yes, sir.

 3        Q.   So you had an opportunity to observe him as the

 4   president of Southwest Housing Management?

 5        A.   Absolutely.

 6        Q.   At the time -- now, Southwest Housing eventually

 7   sold to Cascade Affordable Housing; is that right?

 8        A.   Yes, they did.

 9        Q.   All right.  Approximately when was that?

10        A.   2009, maybe.  '07, I don't remember exactly.

11        Q.   And what was your -- were you involved at all

12   with the sale of the company?

13        A.   Not directly involved.  It was very important

14   that we -- we had gotten a lot of negative press as of

15   late before the sale.

16        Q.   All right.

17        A.   And so it was very important to talk about --

18   the deal with our employees, our residents, they watch

19   the news.

20        Q.   All right.

21        A.   And so we talked with many of our residents and

22   many of our team members about the things that they were

23   seeing on -- on the news weren't necessarily true.

24        Q.   All right.  Were there discussions ongoing at

25   that time about the prospect of selling the company?
```

```
 1        A.   Sure.  Sure.

 2        Q.   All right.

 3        A.   When you're in the middle of something like

 4   that, it was a lot of rumors going around.

 5        Q.   All right.  Both with the employees as well

 6   as --

 7        A.   Everybody.

 8        Q.   -- the residents?

 9        A.   Yeah, everybody.

10        Q.   And the property managers themselves?

11        A.   Everybody.  Everybody gets -- get wind of all

12   kinds of things and so it's -- Brian and Cheryl tried to

13   mediate some of that, calm it down.  Brian personally

14   went around to the properties, talked with residents,

15   talked with property managers that we were facing this

16   and gone be fine.

17        Q.   All right.  And your role there at Southwest

18   Housing, did you interact much with Mr. Brian Potashnik,

19   himself?

20        A.   Absolutely, both Brian and Cheryl Potashnik.

21        Q.   All right.  On a -- on a pretty regular basis?

22        A.   We're family.

23        Q.   You're family?

24        A.   That's right.

25        Q.   What does that mean when you say --
```

 1      A.   That means that Brian and Cheryl Potashnik came

 2   into -- first of all I'm from Dallas, born and raised

 3   here.  Went to high school here, grew up in the inner

 4   city here, lived in apartments here.  I've been very

 5   fortunate in my life to do better and to be able to come

 6   back into a community that I call home and provide

 7   affordable housing and provide the nicest, new apartments

 8   that our community had seen in 25 years, was a very big

 9   deal.

10            I was introduced to Brian Potashnik by

11   former mayor, Ron Kirk, who was a church member of mine

12   and who I helped on his campaign.  Brian was having a

13   ribbon cutting and Brian invited me, he introduced us.

14   That led to me having a contract with him because I was

15   doing other things.  I was installing cabling and

16   wiring -- at a company that I was installing cabling with

17   and he gave us a contract.  After we did -- we did the

18   contract, Brian approached me afterwards, knew that -- I

19   had some pretty good ties in relationship to the

20   political world and made me an offer.  But the thing that

21   made him more attractive to me is that he offered me an

22   opportunity to learn how to do this.

23      Q.   Okay.  And so was part of your job interacting

24   with the community there in the -- the area where this

25   affordable housing was being constructed, developed and

1    then tenants were living?

2         A.   Absolutely.   We -- many people have a negative

3    connotation of apartments.   And one of the

4    responsibilities I was charged with is to give them a

5    better perception of apartments.   This wasn't the

6    traditional apartments.   We were doing all kinds of

7    things.   We were creating an environment that families,

8    as well as seniors, were going to have a wonderful place

9    to live.   The quality of life, they had never seen

10   anything to the quality we were building.

11        Q.   All right.   And did -- did Mr. or Mrs. Potashnik

12   have any role also, along with you, as far as mixing with

13   the community, both tenants, prospective tenants and the

14   property management people on site with the various

15   properties?

16        A.   On any given Sunday, you could find Brian and

17   Cheryl out at our apartments --

18        Q.   What --

19        A.   -- riding --

20        Q.   Go ahead.

21        A.   -- riding and visiting, looking, making sure

22   things were up to their standard.   Residents knew Brian

23   personally.   Many of them had his cell phone number and

24   they would use it too.

25        Q.   And what about when Mr. --

```
 1        A.   I'm sorry.

 2              THE COURT:  I'm sorry.

 3              THE COURT REPORTER:  Sir, you may want to

 4   move back a little bit.

 5              THE WITNESS:  Oh, that's a lot of base,

 6   Judge.

 7              THE COURT:  All right.

 8        Q.   (By Mr. Donohue)  When Mr. Carpenter came on

 9   board, he was the president of Southwest Housing

10   Management?

11        A.   Yes, sir.

12        Q.   So he was overseeing managing the various

13   properties that the tenants lived in; is that right?

14        A.   That is correct.

15        Q.   All right.  And did Mr. Carpenter take a same or

16   similar -- or what kind of approach, if any, did

17   Mr. Carpenter take with respect to the residents of the

18   various communities?

19        A.   I think that Mr. Carpenter --

20              MS. GIBSON:  Object to relevance.

21   Performance is not at issue in this case.

22              MR. DONOHUE:  They sued for quantum of merit

23   also, Your Honor.  They put a value of his services.

24              THE COURT:  Overruled.

25        Q.   (By Mr. Donohue)  Mr. Jones, what kind of role,
```

1    if any, did Mr. Carpenter take with respect to the

2    various communities, the residents, the property

3    management, the property manager on site that you

4    observed?

5        A.   Mr. Carpenter was a manager.  He was the

6    president of the management company.  He was dedicated to

7    leasing up the properties, dedicated to his team in terms

8    of managing them, hiring managers, hiring leasing

9    managers, that was his role.

10       Q.   All right.  In the entire time that you were

11   there -- and you were there at Southwest Housing

12   Management until it sold to Cascade?

13       A.   That is correct.

14       Q.   All right.  Did you ever observe Mr. Carpenter

15   do anything above and beyond what his role was as

16   president of Southwest Housing Management?

17       A.   No.  He was -- he did his job.

18       Q.   He did his job?

19       A.   Yes, sir.

20       Q.   All right.  And do you know -- did you ever hear

21   him complain in your presence about not being paid his

22   salary for doing his job?

23       A.   No, I never heard that.

24       Q.   When the company was being considered to be

25   sold, do you -- being around Mr. Potashnik, and Mr.

1  Potashnik in particular, did he ever express any concerns

2  to you about people, employees in particular, leaving in

3  mass exodus?

4       A.   Leaving our company?

5       Q.   Yes.

6       A.   No, absolutely not.

7       Q.   He didn't express any concern about employees

8  leaving because the company was being sold or even the

9  fact that he got indicted?

10      A.   No.  Again -- can --

11                MR. FRIEDMAN:  Mr. Donohue.

12                THE WITNESS:  I'm sorry?

13                MR. FRIEDMAN:  Mr. Donohue --

14                THE WITNESS:  Yes.

15                MR. FRIEDMAN:  I'm sorry to interrupt.  I

16  thought you were searching for the name.

17                THE WITNESS:  No, I don't need his name.

18                MR. FRIEDMAN:  Neither do I.

19                THE WITNESS:  Yeah.  It was a very difficult

20  time.  Very difficult in our -- in our business.  Very

21  difficult time in Brian and Cheryl's life.  But Brian

22  assured them, he assured residents and he assured the

23  employees that we would deal with it.  It, being whatever

24  we had to face.

25      Q.   (By Mr. Donohue)  All right.  Did employees

1    leave in mass exodus?

2        A.   Absolutely not.

3        Q.   Was there any employees you know of that weren't

4    paid when they were looking to sell the company?

5        A.   No.  I don't know anything about nobody not

6    being paid.  Nobody said anything about not getting their

7    check.

8        Q.   Did you get the impression that employees were

9    wanting to leave the company?

10       A.   No, I didn't get that impression.

11       Q.   Did -- are you --

12       A.   I'm finished with that statement.

13       Q.   Okay.  Are you familiar with the term or ever

14   heard the term "stay bonus"?

15       A.   No, I never heard of that.

16       Q.   Did you ever discuss or hear Mr. Potashnik

17   discuss bonuses with the company?

18       A.   No.  But I will say this, Brian is a performance

19   person.  Perform --

20               THE COURT:  Wait for Mr. Donohue to ask the

21   question.

22       Q.   (By Mr. Donohue)  Okay.  So what you're saying

23   is perform and you'll be rewarded?

24       A.   That's the way that the model has been the whole

25   time I was there.

1    Q.   All right.  So if the company doesn't make

2    money, you can't expect Mr. Potashnik to reward somebody

3    if they don't -- if the company is not making money?

4    A.   Perform.

5    Q.   Would you consider that performance as making a

6    profit?

7    A.   Absolutely.

8    Q.   Were there -- did Mr. Potashnik or

9    Mrs. Potashnik ever express to you that there were

10   employees that were essential to stay with the company or

11   otherwise it would be less attractive to a suitor, to a

12   buyer?

13   A.   That didn't exist.  There was no one person that

14   made Southwest Housing, not even me.  Southwest Housing

15   was a -- was a corporation that started out a mom and pop

16   that grew into this mega affordable housing company.  And

17   it grew to that because of the risk that Brian and Cheryl

18   were willing to take.  Their ability to attract the kind

19   of talent that we were able to attract.  And so no one

20   person made those kinds of -- made that kind of impact on

21   our business.

22   Q.   All right.  Did Mr. Carpenter make such an

23   impact that you perceived -- or you ever heard either of

24   the Potashniks say don't leave Mr. Carpenter, we got to

25   have you for this upcoming sale --

1          A.   Mr. Donohue, no one person made that kind of

2     impact on our business.

3          Q.   And I take it including Mr. Carpenter?

4          A.   Absolutely.

5          Q.   What was your understanding of Mr. -- I know he

6     was the president of the management company, but --

7          A.   Yes.

8          Q.   -- what was your understanding, based on what

9     you observed him -- of him at work, was his role there at

10    the company?

11         A.   Well, my understanding of the reason that

12    Mr. Carpenter was hired is because we were trying to

13    move forward.  We had built a great model.  We weren't

14    looking for a savior.  We were looking for someone to

15    extend the success that we were having.  We had grew to a

16    great capacity and we were looking for, in the future,

17    it growing even bigger.  And so we needed somebody to

18    take that off of Mr. Potashnik's plate.

19         Q.   Do you have any understanding of how

20    Mr. Carpenter represented himself as far as the -- as

21    what you just expressed, coming into the company in 2004?

22         A.   He represented himself as the president of the

23    management company.

24         Q.   All right.  Did he represent himself in any way

25    as far as having the experience and the know-how to take

1    the company to the level that you're speaking of that it

2    was looking to be taken to?

3        A.   In terms of our management company, we thought

4    that -- Brian and Cheryl believed that he had the

5    expertise to do that.

6        Q.   Did that prove to be the case?

7        A.   I don't think it worked out that way.

8        Q.   Why not?

9        A.   Just because of -- I don't think that

10   Mr. Carpenter was very comfortable with the portfolio of

11   the people that we served.

12       Q.   What do you mean by that, the portfolio of the

13   people that we served?

14       A.   We -- we were predominately in a -- in minority

15   communities, which means that the majority of the tenants

16   who we served were minorities, which means that we were

17   trying to make it reflective of the people who lived

18   there, the people who worked there.  And so I don't

19   always think that Mr. Carpenter was very comfortable in

20   that environment.

21       Q.   All right.  What do you say as far as -- or why

22   do you say that he wasn't comfortable?  Was he just

23   different in his management style then -- or what?

24       A.   Yeah.  The Potashniks saw our business one way

25   and he was a numbers cruncher guy and he saw it another

1    way.

2        Q.   Well, how did the Potashniks see the business?

3        A.   They saw the business almost like a mission in

4    providing affordable housing or providing housing and the

5    services that we were attracting to people who -- who

6    were less fortunate.  And to the point that Mr. Potashnik

7    and I -- we catch phrase, a coined, it said that we

8    weren't in the apartment business, we were in the people

9    business.

10            We were being denied in a lot of the areas

11   around the city and other parts of the state.  People in

12   neighborhoods and homeowners were protesting us all

13   around and we had to put a face on this.  We had to put a

14   face on the kind of people that had an opportunity to

15   live on our properties and we did that.  They were nurses

16   assistants, they were one-year firefighters, they were

17   the bank tellers, they were the people who cleaned the --

18   who worked at nursing homes.  And so we had to put a face

19   on those people.  And once we were able to identify who

20   and who could afford to live there, we took away from

21   being in the apartment business and we were in the people

22   business.

23       Q.   All right.  And that is what you're saying was

24   the focus of the Potashniks?

25       A.   That's exactly what I'm saying.

1      Q.   And Mr. Carpenter wasn't so much into that, but

2   more of the number cruncher in the background?

3      A.   That's the way I believe Mr. Carpenter to be --

4   a-matter-of-fact guy, by the book, get the numbers done.

5      Q.   When investors -- potential investors and actual

6   investors came to Southwest Housing to view the sites,

7   who did Mr. Potashnik call on in the company to tour or

8   visit those properties with those investors or potential

9   investors?

10      A.   Many of the people who we were -- we were going

11   to do showcase property, I took them on tour, I took them

12   around.  I took the political people around.  We were

13   going into neighborhoods where we needed to -- we needed

14   political support.  Typically they would get to town and

15   I would get -- we would get one of our -- use one of our

16   buses and I would give them a tour.

17      Q.   All right.  And did Mr. Carpenter have any role,

18   in particular, with respect to investors or potential

19   investors as far as touring them around and showing them

20   the properties?

21      A.   It wouldn't have been --

22           MS. GIBSON:  Object to lack of foundation.

23           THE COURT:  All right.

24           MR. DONOHUE:  I'll withdraw the question.

25      Q.   (By Mr. Donohue)  Who lead the effort to house

1  Katrina evacuees?

2      A.   Who led the efforts to do what?

3      Q.   To house Hurricane Katrina evacuees?

4      A.   Brian Potashnik.  Brian Potashnik and I.

5      Q.   All right.  What -- what was your role and

6  Mr. Potashnik's in that evacuation for Hurricane Katrina?

7      A.   Brian and I flew to Houston after him getting a

8  call that there were seniors in the Astrodome floor

9  that -- we had just finished a couple of beautiful

10 proprieties.  They had just got the seal that Friday.  I

11 believe the hurricane hit that Saturday.  And we flew

12 it -- flew down and he took our buses and we started

13 bringing seniors from the Astrodome to our properties.

14     Q.   All right.  And were these properties all --

15 what -- when you say, "our properties," can you describe

16 what do you mean by "our property", were they finished,

17 were they constructed --

18     A.   We -- we just gotten the key to them.  Which

19 means that the city had just approved all the permits,

20 right to move in, we never started leasing or anything.

21 We just opened them up and started handing out keys to

22 seniors.

23     Q.   So these were brand new properties that --

24     A.   Yes, sir.

25     Q.   -- you're handing keys to Hurricane Katrina

1    evacuees?

2        A.   And I don't like the word "evacuee."  They were

3    people who had -- a storm had hit in New Orleans and they

4    needed a place to live, place to stay.

5        Q.   People in need, due to the hurricane?

6        A.   Absolutely.

7        Q.   Okay.  What role did Mr. Carpenter play with

8    respect to dealing with the Hurricane Katrina people that

9    were in need --

10       A.   He had hired management --

11               MS. GIBSON:  Lack of foundation.

12               THE COURT:  You're also getting beyond the

13   scope of what you're telling me, you were -- the

14   relevance of --

15               MR. DONOHUE:  Your Honor, we anticipate

16   Mr. Carpenter will testify as far as additional

17   responsibilities in his quantum merit claim that he was

18   spearheading the evacuation for Hurricane Katrina and

19   Maria and that's what the scope is.

20               THE COURT:  Okay.  Go ahead.  The

21   objection's overruled.

22               MS. GIBSON:  Okay.

23               THE WITNESS:  What was the question?

24       Q.   (By Mr. Donohue)  Yes.  My question is:  What

25   role did Mr. Carpenter have and was he the spearhead with

1  respect to the -- the efforts made on behalf of Southwest

2  Housing and Mr. Potashnik for the hurricane?

3     A.   Mr. Carpenter had already put a management team

4  in place in Houston.  So he had fulfilled his obligation.

5  Once those people were in place, Brian and I went down

6  and we began to give them a place to live.

7     Q.   And Mr. Carpenter, was he spearheading that?

8     A.   What do you mean spearheading?  What does that

9  mean?

10    Q.   Was he leading that effort?

11    A.   No, Brian Potashnik.

12    Q.   I understand.

13         But what -- just to be clear, Mr. Carpenter

14 was not leading that effort?

15    A.   He was not there.

16    Q.   He wasn't even there?

17    A.   No, he wasn't there.

18    Q.   Was he there at all?  Did he go down to

19 Hurricane -- to Houston to deal with --

20    A.   I believe he did come down eventually.  We were

21 there a week.  I don't know when exactly he came.

22    Q.   All right.  Were there other Southwest Housing

23 employees other than Mr. Carpenter that came down either

24 initially or later?

25    A.   Yes.

1       Q.   So there was --

2       A.   Many -- many of our team members came down.

3       Q.   Was Mr. Carpenter essential for the properties

4   to perform?

5       A.   It was his job to make sure they performed.

6   When you say "essential," he was responsible for it.

7       Q.   Was he replaceable?

8       A.   Everybody's replaceable.

9       Q.   How did the employees feel about Mr. Carpenter?

10      A.   They worked for him.  They were willing to work

11  for him because Brian -- when Brian and Cheryl gives you

12  the endorsement, our staff was going to work with

13  whoever.

14      Q.   So because he was hired by Brian --

15      A.   And Cheryl Postashnik.

16      Q.   -- the employees worked for him?

17      A.   Absolutely.

18      Q.   You believe that was out of respect for

19  Mr. Carpenter or out of respect for Mr. Potashnik?

20      A.   In terms of -- I don't know what the -- the

21  reasoning for -- they respect protocol and they respect

22  the hierarchy of how our company was operated and ran.

23      Q.   What was the mood of the company at the time of

24  the investigation -- the FBI investigation and leading up

25  to the sale?

1    A.   Indifferent.  People didn't believe that this

2  was happening.  They couldn't believe that Brian and

3  Cheryl Potashnik had done anything wrong.

4    Q.   So there was no mass exodus of people?

5    A.   No, sir.

6    Q.   There was no mass exodus contemplated, at least

7  voiced to you or that you heard people leaving in droves?

8    A.   No, sir.

9    Q.   If Mr. Carpenter alleges that he took control of

10  the FBI investigation and the company hysteria, once this

11  FBI investigation began in June of 2009; would that be

12  true?

13    A.   When he took control of it?

14    Q.   Yes.

15    A.   What does that mean?

16    Q.   That he took control as far as responding to FBI

17  subpoenas and dealing with the criminal defense lawyers,

18  all of that?

19    A.   He was given direction by the Potashniks to give

20  whatever information the FBI wanted.  That is true.

21    Q.   So he followed the Postashnik's direction to

22  give the FBI whatever they needed?

23    A.   Absolutely.

24    Q.   So the -- the people in control in that, you're

25  saying is the Potashniks and not Mr. Carpenter --

```
 1        A.   Absolutely --

 2        Q.   -- he was just following directions?

 3        A.   Yes, sir.  That is what I'm saying.

 4        Q.   And was there any hysteria with the company?

 5        A.   No.  There was -- it was too much --

 6        Q.   You said it was indifferent?

 7        A.   -- it was too much indifferent to be -- to have

 8   hysteria.  We had a job to do.  And we had to do our

 9   jobs, all of us.  We had to get our properties leased.

10   We had to service the residents in which lived on our

11   property.  We had a great deal of seniors -- senior

12   properties.  And seniors by themselves can be

13   challenging.  And so we had to deal with all that we had

14   to deal with on a day-to-day basis.  The extra of the

15   FBI's investigation was just that.

16        Q.   How did the employees feel about Mr. Potashnik

17   and Mrs. Potashnik?

18        A.   They feel -- they embraced Mr. Potashnik, all of

19   them did.  Both -- both of the Potashniks were embraced

20   by -- again, not just by employees, but by residents.

21        Q.   And that held true for all three of the

22   Southwest Housing entities?

23        A.   Yes, that's correct.

24        Q.   Do you recall flying to Las Vegas with

25   Mr. Potashnik and Paul Cohen and Aaron Goldstein at one
```

1   point?

2       A.   I don't remember.  I don't recall a flight.

3   I've -- we've flown to Vegas before.  We've flown a

4   number of places before.

5       Q.   Did you ever -- were you ever present when Brian

6   Potashnik supposedly discussed anyone -- with anyone that

7   Mr. Carpenter was going to be given a significant bonus

8   and become a part of the millionaire's club?

9       A.   No, I never heard any of that.

10            MR. DONOHUE:  I'll pass the witness.

11            THE COURT:  Ms. Gibson?

12                CROSS-EXAMINATION

13   BY MS. GIBSON:

14       Q.   Mr. Jones, given your relationship to the

15   Potashniks, and that y'all are family, is it fair to say

16   that you don't have anything bad to say about them?

17       A.   Oh, I got some bad stuff to say about Brian.

18   We've bumped heads a number of times, but that's what

19   families do.

20       Q.   Okay.  With -- with respect to the negative

21   press that was happening, if I understand you correctly,

22   employees really -- really trusted in the Potashniks,

23   nonetheless?

24       A.   Yes, ma'am.

25       Q.   Okay.

1      A.   I believe that to be true.

2      Q.   All right.  If Mrs. Potashnik testified that

3  they discussed the need to try and keep groups of

4  important employees on because of the asset sale, would

5  you have any reason to doubt that?

6               MR. DONOHUE:  Objection.  Vague.

7               THE COURT:  Overruled.

8               If you don't understand the question tell

9  her.

10              MS. GIBSON:  You can answer.

11              THE WITNESS:  Can I -- oh.

12              THE COURT:  You can answer the question.

13              THE WITNESS:  I believe that in the midst of

14  this sale, it was very important we showed some

15  stability.  And so be it, management, construction or

16  whatever.  But that -- there wasn't a number of people

17  leaving because Southwest Housing was a very, very good

18  place to work.

19     Q.   (By Ms. Gibson)  And if -- if Ms. -- I'm sorry.

20  I keep saying Potashnik.

21              If Ms. Geiser testified that she intended to

22  pay employees bonuses out of sale proceeds as an

23  incentive for them to stay on, would you have any

24  doubt --

25              MR. DONOHUE:  Your Honor, this --

```
 1        Q.  (By Ms. Gibson)  -- would you have any reason to

 2   doubt that?

 3               MR. DONOHUE:  -- this is encroaching on the

 4   limine --

 5               MS. GIBSON:  No.

 6               THE COURT:  Overruled.

 7               THE WITNESS:  Okay.  First of all, who's

 8   Ms. Geiser?

 9               THE COURT:  Mrs. Potashnik.

10        Q.  (By Ms. Gibson)  Mrs. Potashnik.

11        A.  And so the question is:  Mrs. Potashnik did

12   what?

13        Q.  If Mrs. Potashnik testified that she -- that she

14   and Brian intended to pay employees out of sale proceeds

15   as an incentive to get people to stay on, would you have

16   any doubt about that?

17               MR. DONOHUE:  Objection.  Misstates

18   Ms. Geiser's testimony.

19               THE COURT:  Overruled.

20               THE WITNESS:  I would have no reason to

21   believe that -- if she said that, I would have no reason

22   not to doubt her, if she said that.

23        Q.  (By Ms. Gibson)  Okay.  And if -- everyone in

24   an organization is important, correct?

25        A.  I believe that.
```

1    Q.   But among everyone who's doing their job, there

2  are some people who are treated as more key than others?

3    A.   I agree with that.

4    Q.   And even though the employees believed in the

5  Potashniks during the criminal investigation, if key

6  employees left, it might be hard to hire new people

7  because of the negative press at the time, correct?

8    A.   Well, if key employees leave the sale of a

9  business, the new -- the new company who's buying the

10  business typically have their own people in place.

11    Q.   Correct.

12         But if --

13    A.   So how does that -- how does that effect it?

14    Q.   But you had talked about the importance of

15  stability --

16    A.   I do.

17    Q.   -- leading up to the asset sale?

18    A.   That's right.

19    Q.   And if they're -- if important employees left,

20  leading up to the asset sale, it might be harder -- not

21  impossible -- but harder to replace -- to replace them

22  because of all the negative press at the time?

23    A.   It may be harder to replace them to who?

24    Q.   At -- before the asset sale, at Southwest

25  Housing?

1      A.   From my knowledge of our business, the most

2  important thing to that asset sale is that there was not

3  a mass exit of renters, not employees.

4      Q.   But you -- you need employees to help keep

5  apartments leased up?

6      A.   But you -- you need people paying rent.

7      Q.   Correct.

8           And --

9      A.   Because everybody else can be replaced.  It's a

10  lot more difficult -- remember, the quality of what we

11  built attracted both renters and people who wanted to

12  work.  So attracting help was not an issue.  People

13  wanted to work in this very nice, new environment.  And

14  the reason they wanted to work in this very nice, new

15  environment is because many of them were close to home.

16  Our community and the properties that we built were in

17  the homes -- or in the areas in which the employees

18  worked and where they lived.  And so it wasn't that

19  difficult to attract new work.

20      Q.   And you're talking about at the site level, at

21  the apartment complexes, themselves?

22      A.   I'm saying at any level.

23      Q.   Okay.

24      A.   We didn't have -- we didn't have any finding an

25  employee issue.

1    Q.   Okay.  So for example, if the chief financial

2  officer left, you don't think there would be any problem

3  getting a new CFO in light of the negative press?

4    A.   No, ma'am, I don't think so.

5    Q.   Okay.  How often did you see Jeff Carpenter?

6    A.   Once, twice a week.

7    Q.   Once or twice a week?

8    A.   Yeah.

9    Q.   And in what -- what were y'all doing once or

10  twice a week?

11    A.   We were passing each other.  We office in the

12  same office.

13    Q.   Okay.  So you would see Jeff Carpenter once or

14  twice a week, passing each other in the office?

15    A.   For the most part.

16    Q.   What else?  Anything else?

17    A.   That was -- most of the time where I saw him in

18  or out of the office.  I was -- I spent most of my time

19  out on the properties, visiting the properties, visiting

20  construction sites, that kind of thing.  So when I came

21  to the office or whatever, a day or two I would see Jeff

22  there.

23    Q.   All right.  And so is it fair -- is it fair to

24  say that you and Jeff did not actually see each other

25  very often while you worked together?

1    A.   That's pretty accurate.

2    Q.   Okay.  So would it be fair to say, you -- you

3  don't know -- you weren't with Jeff to see what he did

4  most of his time?

5    A.   I did not share the office with Jeff.

6    Q.   And where -- what was your -- did you have a

7  territory or an area you covered or did you cover all of

8  Texas?

9    A.   I covered wherever the Potashniks owned

10  property.

11    Q.   I'm sorry.  I couldn't hear you.

12    A.   I covered wherever the Potashniks owned

13  property.

14    Q.   Okay.  In Texas?

15    A.   Wherever.

16    Q.   Vegas?

17    A.   Wherever.

18    Q.   Okay.  You talked about the company growing --

19    A.   In the beginning.

20    Q.   Right.

21    A.   Yes, ma'am.

22    Q.   From small to much larger?

23    A.   Yes, ma'am.

24    Q.   And you said that Jeff Carpenter was kind of a

25  numbers guy?

1      A.   I believe it -- yes.

2      Q.   By the book, get the numbers done?

3      A.   Huh?

4      Q.   By the book, get the numbers done?

5      A.   Yes.

6      Q.   Okay.  But if that's what he was doing, do you

7  have any doubt that the Potashniks hired him to be that

8  person, to be the numbers person?

9      A.   I do believe that's why they hired him.

10     Q.   Okay.  You talked -- you talked about tours,

11 taking -- taking political people around?

12     A.   Yes, ma'am.

13     Q.   Was that -- was that in connection with the

14 asset sale or something -- or just a regular part of your

15 job?

16     A.   That's everybody, asset sale, people in general.

17 Nobody can tell the Southwest Housing story better than

18 me.

19     Q.   Okay.

20     A.   One, because I lived it.  Number two, my -- my

21 grandmother lived on one of our properties.

22     Q.   And when it came to touring or meeting with

23 potential purchasers or investors, did you play a role in

24 that?

25     A.   I didn't meet them.  At Brian and Cheryl's

1   direction, I gave them tours.  I talked about what we do.

2   I talked about the way we do what we do.

3        Q.   Do you know whether or not they also, at times,

4   asked Jeff Carpenter to meet with potential purchasers

5   and investors?

6        A.   That wouldn't surprise me if they did.

7        Q.   Okay.  You -- you talked about efforts and

8   Hurricane Katrina --

9        A.   Uh-huh.

10       Q.   -- to help people out because you-all had

11  available properties?

12       A.   Yes, ma'am.

13       Q.   And you said that Jeff -- I think -- did you say

14  Jeff Carpenter was never there?

15       A.   No, I didn't say he was never there.  I said I

16  don't know when he came.  I said that Jeff had hired

17  staff in place in Houston.  And when Brian and I went

18  there, the staff was in place for us to be able to give

19  the keys and allow people to have a place to live.

20       Q.   Are you aware that although -- you know, I don't

21  know the -- I don't know the time line for Katrina --

22       A.   Nor do I.

23       Q.   -- but are you aware that Jeff Carpenter

24  ultimately spent quite a bit of time in Houston, helping

25  out?

 1      A.   No.   I wasn't aware of him spending quite a bit

 2   of time there.   I wasn't aware of Jeff spending quite a

 3   bit of time of -- any of our properties.

 4      Q.   Okay.   Mr. Jones, you talked a little bit about

 5   Jeff Carpenter's role for management.   Can you explain a

 6   little bit further about what your understanding of his

 7   job duties were?

 8      A.   Well, president of the management company is

 9   very overlapping.   That's exactly what -- our management

10   company was growing by leaps and bounds.   He hired

11   people, he put things in place.   They were going.   They

12   were going and going.   We were building new properties.

13   On average, we may have been doing five to ten new

14   developments a year.   He was consulting back and forth

15   with the management company -- or with the development

16   company and construction on how this would be built and

17   how that would be built.   And so he had a vast job.   It

18   was a big job, managing the management company.

19            MS. GIBSON:   Pass the witness.

20            THE COURT:   Mr. Donohue?

21            MR. DONOHUE:   Yes.

22                   REDIRECT EXAMINATION

23   BY MR. DONOHUE:

24      Q.   What you described, Mr. Jones, that was part and

25   parcel of his role -- Mr. Carpenter's role as a president

1    of Southwest Housing Management, right?

2        A.   Absolutely.

3        Q.   Same goes for anything he was doing with respect

4    to hiring staff to go down to Hurricane Katrina?

5        A.   That's correct.

6        Q.   And doing so at the direction of the Potashniks?

7        A.   That's correct.

8        Q.   Which he was paid for?

9        A.   I wouldn't think -- he wasn't doing it for free.

10       Q.   Right.

11            Did you ever hear Mr. Carpenter claim that

12   he had some kind of agreement with Brian Potashnik to be

13   paid a million dollars or something like that, close to

14   a million-dollar bonus?

15       A.   I never heard anything like that.

16       Q.   When you said that you were not aware of

17   Mr. Carpenter spending quite a bit of time at any of the

18   properties?

19       A.   Yes.

20       Q.   He didn't go out to the properties?

21       A.   He went out to them, but not very frequently.

22   He spent most of his time in the office.  Anytime that

23   there was a meeting with -- a manager's meeting, they

24   came to the office, to the corporate office.

25       Q.   All right.  So he didn't get to know the

1    residents?

2        A.   No, nobody knew who he was.

3        Q.   So the residents didn't even know who

4    Mr. Carpenter was?

5        A.   No.

6        Q.   What about the people on site, the property

7    managers?

8        A.   Oh, the property managers knew who he was

9    because many of them were either hired by him or someone

10   in his staff.

11       Q.   Okay.  Mr. Carpenter wasn't a key -- was he key

12   to stay with Southwest Housing for the transition --

13   transaction to occur with Cascade?

14       A.   He was key in continuing to get his paycheck.

15   So part of him continuing to work there was important, if

16   he wanted to work there.

17       Q.   But he wasn't a key player to the transaction?

18       A.   Brian -- Brian and Cheryl Potashnik are the --

19   were the key -- were the key to Southwest Housing.

20       Q.   And, in fact, Cascade Affordable Housing didn't

21   even hire Mr. Carpenter after this transition, did they?

22       A.   I'm not aware of them hiring him.

23               MR. DONOHUE:  I'll pass the witness.

24               THE COURT:  Ms. Gibson?

25                       RECROSS EXAMINATION

1    BY MS. GIBSON:

2        Q.   Mr. Jones, during your employment, did Brian

3    Potashnik ever talk with you about not sharing salary

4    information, compensation information with other

5    employees?

6        A.   Nobody tells an employee not to talk about their

7    salary.   That's just one of those common sense things

8    that we do.

9        Q.   Okay.   As far as you're concerned, Mr. Jones,

10   the only key people in connection with the asset sale

11   were Brian Potashnik and Cheryl Potashnik, correct?

12       A.   In my opinion, yes.

13       Q.   Okay.   Beneath Brian Potashnik and Cheryl

14   Potashnik, who were the next level, key people -- while

15   recognizing that everyone down to the -- to every level,

16   you know, needs to be there.

17       A.   Right.

18       Q.   But beneath Brian and Cheryl, who would you say

19   were some of the more important players?

20       A.   Well, at the point of somebody selling something

21   that they own, only the owners are important.

22       Q.   Only the owners?

23       A.   Absolutely.

24       Q.   Okay.

25            MS. GIBSON:   Pass the witness.

```
 1                    THE COURT:  Mr. Donohue?

 2                    MR. DONOHUE:  No further questions.

 3                    THE COURT:  Thank you, Mr. Jones.  You're

 4   free to leave the courthouse.

 5                    THE WITNESS:  Thank you.

 6                    THE COURT:  Ms. Gibson, did you want to call

 7   Mr. Cohen?

 8                    MS. GIBSON:  I'm sorry.  Oh, yes, Your

 9   Honor.  Plaintiff calls Paul Cohen.

10                    THE COURT:  All right.  Go out and get him.

11                    MR. FRIEDMAN:  What's the name of the next

12   witness?

13                    THE COURT:  Paul Cohen.

14                    MR. FRIEDMAN:  Thank you.

15                    THE COURT:  What's that?

16                    MR. FRIEDMAN:  I said, thank you.

17                    THE COURT:  Oh, you're welcome.

18                    Mr. Cohen, if you come all the way back here

19   (pointing).  Mr. Cohen, you may have been sworn in

20   before, but I'm going to swear you in again so the jury

21   sees that you're sworn in.  Raise your right hand.

22                    (Witness sworn.)

23                    THE COURT:  Have a seat.  And Ms. Gibson

24   will ask you questions first.

25                                PAUL COHEN,
```

```
 1    having been first duly sworn, testified as follows:

 2                      DIRECT EXAMINATION

 3    BY MS. GIBSON:

 4        Q.   Mr. Cohen --

 5                 MR. FRIEDMAN:  We're now back on the

 6    plaintiff's witnesses?

 7                 THE COURT:  Yes.

 8        Q.   (By Ms. Gibson)  Mr. Cohen, I'll be short.

 9             I've talked to you twice, correct?

10        A.   I believe that's correct.

11        Q.   Okay.  And the first time that I talked -- and I

12    know things change between the two conversations and I'll

13    address both, just so you know.  But the first time that

14    I talked to you, you had -- you had said that you

15    remember being on some type of Lear jet with Jeff

16    Carpenter and Brian Potashnik and somebody else that --

17    not Aaron?

18                 MR. FRIEDMAN:  Your Honor --

19        Q.   (By Ms. Gibson)  Do you recall that?

20                 MR. FRIEDMAN:  -- these questions are

21    leading.

22                 THE COURT:  Overruled.

23        Q.   (By Ms. Gibson)  Do you recall that?

24        A.   I recall us having a conversation.  You asked

25    me, did I recall being on the jet with Brian going to Las
```

1   Vegas -- that we were going to go to Las Vegas and you

2   said that Jeff was on the plane and he was going to work

3   in Las Vegas.  What else did you ask me?  You asked me --

4   you said, Don't you remember the conversation, where you

5   said welcome to the millionaire's club.  I said, I don't

6   remember that conversation.

7             And, you know, as I think about it, I can

8   put -- I've been on several planes with Brian.  Brian is

9   a friend of mine.  We used to go to Las Vegas a couple of

10  times.  We went with -- a couple different -- a couple of

11  different times.  So I -- it's hard for me -- since

12  you're asking me something that occurred so long ago,

13  which specific trip it was.  I mean, there was people on

14  the plane.

15            The only thing I can tell you for sure, is I

16  was on the plane, Brian Potashnik was on the plane.  And

17  one of the trips, another friend of ours, [MD Wyatt] was

18  on the plane, [Mitch farmberg] was on the plane.  I don't

19  know if it was the same -- it was several different

20  trips.  I cannot tell you other than those four people --

21  oh, a guy named Kyle on was on the plane.  Other than

22  those specific people, even with your cajoling, I don't

23  remember.  I cannot tell you with certainty who else was

24  on that plane.

25      Q.   Right.

```
 1              And that's -- that's the second time -- you

 2   talked to me about that the second time that I talked to

 3   you.  But the first time, you recall that you said, you

 4   know, I don't remember the congratulations, but I do

 5   remember us being on the plane and Brian was talking

 6   about the asset sale and the money that everyone was

 7   going to make --

 8        A.   I wouldn't characterize that conversation that

 9   way.

10        Q.   What?

11        A.   I would not characterize our conversation that

12   way.  You had asked me, says -- come on, you remember,

13   you remember.

14        Q.   I --

15        A.   Brian -- you said to Jeff, welcome to the

16   millionaire's club and you were pushing me to say I

17   remember it.  And I'm like, look, ten years ago, I can't

18   remember specific dates, places or conversations.

19        Q.   Mr. Cohen, you recall that I told you that that

20   was okay that you didn't remember it.

21        A.   Yes, I do remember that.

22        Q.   I never said, come on, you remember.

23        A.   That I specifically remember.

24        Q.   I never said, come on, you remember, come on,

25   you remember.
```

1      A.   That's how I remember you --

2      Q.   I was just checking on whether you did and told

3  you it was okay if you didn't, correct?

4      A.   No.   I pretty much remember the way it was.

5  That's what I remember.   You asked me the question --

6      Q.   And later you called me and said, I just want

7  you to know, I've thought about it some more and I

8  don't -- I don't think now I can place Jeff on the plane;

9  do you remember that?

10     A.   In our second conversation, I said, I cannot

11 place anyone on the plane, but the individuals I

12 mentioned to you previously.   That I didn't want to get

13 pressed into a situation where I was testifying, yeah, I

14 remember him on the plane or don't remember him on the

15 plane because that wouldn't be accurate.

16     Q.   And the first time I talked to you, you asked me

17 can you -- because I wasn't telling you much about the

18 case, you said, can you at least tell me did Jeff get

19 stiffed or he -- did he just get less than -- you know,

20 less than the full amount.

21          Do you remember asking me that question?

22     A.   I remember asking you what the case was about

23 and whether or not -- when we talked about it.   And I

24 said, so -- and I did, I asked -- I said so did he -- I

25 didn't know the details of -- of his employment, when he

1   left, stayed.  I mean, that's --

2       Q.   Sure.

3       A.   I'm friends with people, I don't get into their

4   business.  And I did ask you, I asked you, like, what's

5   this case about.  What happened and -- that would be

6   somewhat accurate I don't know if I would use those exact

7   words --

8       Q.   And when -- and when I wasn't saying a whole lot

9   because you're a witness, you asked me, can you at least

10  tell me did Jeff get stiffed or did he just get less.

11           Do you recall that?

12      A.   Something to that effect.

13      Q.   Okay.

14      A.   Yeah.

15      Q.   And do you recall without me asking you

16  anything, you said, man, Jeff was integral to that sale

17  or something like that?

18      A.   No.

19      Q.   Do you recall in the second time you called me,

20  when you said, you know, I thought about it and now I'm

21  going to tell you I'm not going to be able to place Jeff

22  on the plane.  And in the second phone call you said, I

23  shouldn't have -- I shouldn't have said integral.  And

24  I'm sorry.  I can't say that word for some reason,

25  integral (pronunciation).

1      A.   I know what you mean.

2      Q.   I should have just said everybody's important.

3           Do you recall that?

4      A.   I remember telling you that everybody's

5  important.  You asked me specifically, can you say -- you

6  said can you say that Jeff was important to the company

7  and I think I replied, like, well, everybody's important

8  to the company, at least in my experience.

9      Q.   All right.  But one other thing that you said in

10  the second conversation is you said, I thought about it,

11  and I shouldn't have -- I shouldn't have said integral.

12           Do you recall that in the second

13  conversation?

14      A.   No.  I remember in the second conversation

15  saying I thought about it and I don't want to get stuck

16  in placing specific people on the -- on the plane.

17      Q.   Between the time -- and you were very good

18  friends with Brian Potashnik?

19      A.   Yes.

20      Q.   And you still are today?

21      A.   Well, I haven't seen him in about five years

22  until I walked into the court.

23      Q.   Well --

24      A.   It's a heck of a place to reconnect, I think.

25  But we were very friendly.  Brian's a -- yeah, I've known

1   Brian and Cheryl for a long time and they're good people.

2       Q.   And -- and --

3       A.   By the way, I've known Jeff for at least -- when

4   he started working there for a number of years, seemed

5   like a nice guy too.

6       Q.   Do you remember asking me --

7               MS. GIBSON:   Strike that.

8       Q.   (By Ms. Gibson)  Between the time -- the first

9   time that I talked to you and the second time, did you

10  talk with Cheryl Potashnik, Brian Potashnik or any of

11  their attorneys or anyone affiliated with their defense

12  in this case?

13      A.   Between the first two conversations?

14      Q.   Yes.

15      A.   No.

16              MS. GIBSON:   Pass the witness.

17              THE COURT:   Mr. -- who's witness?

18  Mr. Donohue?

19              MR. DONOHUE:   Yes.

20                   CROSS-EXAMINATION

21  BY MR. DONOHUE:

22      Q.   Mr. Cohen, would you say that Ms. Gibson was

23  trying to get you to say something that didn't happen or

24  you didn't remember?

25      A.   I wouldn't characterize it that way.  I think

1   she was trying to joggle my memory by saying, don't you

2   remember this conversation, don't you remember that

3   conversation.

4       Q.   So when you tell her that you don't recall that

5   and then you even told her you don't remember if Jeff was

6   on the plane or not, she kept egging you on that -- don't

7   you remember, that this is what was said about, welcome

8   to the millionaire's club or something to that effect?

9       A.   I think she was advocating her client's point.

10  And she did ask me, like, don't you remember the

11  conversation, don't you -- welcome -- something like

12  that, welcome to the millionaire's club.

13      Q.   So you were clear with her that you didn't

14  remember any of that, couldn't remember if her client was

15  on the plane?

16              MS. GIBSON:   Object.   Misstates his

17  testimony.

18      Q.   (By Mr. Donohue)   And she subpoenaed you here

19  anyway --

20              THE COURT:   Mr. Donohue, she has an

21  objection, you got to respond --

22              MS. GIBSON:   That's okay.   I'll withdraw it.

23  Keep going.

24              THE COURT:   Okay.   Go ahead.

25              THE WITNESS:   Okay.   Go ahead.

1 Q. (By Mr. Donohue) Yeah.

2   Again, you told Ms. Gibson that you didn't

3 remember any of that, didn't even remember if her client

4 was on the plane and she subpoenaed you here after she

5 asked you several times, did you remember this and you

6 told her initially you don't recall that at all, right?

7 A. That's correct.

8   MR. DONOHUE: I'll pass the witness.

9   THE COURT: Ms. Gibson?

10     REDIRECT EXAMINATION

11 BY MS. GIBSON:

12 Q. Mr. Cohen, do you recall that I told you it was

13 perfectly fine if you didn't remember?

14 A. Yes.

15 Q. And I was just going to give you some details to

16 try and jog your memory, if that worked, correct?

17 A. You -- I answered yes, to the first part.  The

18 second part of the question was -- is where -- we were

19 having conversation then --

20 Q. Right.  And so --

21 A. -- I -- suggested, don't you remember this,

22 don't you remember that.  I said, no.

23 Q. For example, I said, Do you remember the private

24 jet and you said --

25 A. Yes.

1    Q.   -- was it a Lear jet, you know, some number.

2              Is that type of conversation, right?

3    A.   Yeah.  You asked me if --

4    Q.   Okay.

5    A.   -- we on a private jet.

6    Q.   And it wasn't --

7    A.   You asked me my conversation with Jeff the night

8    before my supposed deposition, when he asked him,

9    remember it was a Citation X and that was the only thing

10   I remember was, no, it was a Lear jet because I remember

11   Brian asking the pilot to do what's called an executive

12   take off.  A lot of us don't fly those planes very often.

13   So that -- the only thing I do remember is specifically

14   was the type of jet, we took off.

15   Q.   But it was -- you were calling in the second

16   conversation to let me know that you had thought about

17   some things and you had -- and you had changed your mind

18   on a couple of -- on a couple of things --

19   A.   I don't think I changed my mind.  I think I

20   called you to clarify things to say, hey, if you're

21   expecting me to put specifically on a trip, me and Brian

22   and Jeff together, that I couldn't do that.  That was the

23   context of the second conversation.

24   Q.   Right.  And so one part of the second

25   conversation --

1      A.   And I'm not saying he wasn't there, I'm just

2  telling you ten years ago, you know, --

3      Q.   Right.

4      A.   -- I remember, you know, Brian and Aaron and

5  those guys.

6      Q.   Right.

7           So in the first conversation you thought he

8  was and then later you said I thought about it --

9      A.   Well, in the first conversation you were telling

10  me he was.

11      Q.   Well, you -- at that point you said --

12      A.   I didn't -- I didn't affirmatively say he wasn't

13  because it was -- you know, I get the subpoena, I called

14  down to see what's going on and that's when we had the

15  conversation.

16           MS. GIBSON:  Pass the witness.

17           THE COURT:  Mr. Donohue?

18           MR. DONOHUE:  No further questions.

19           THE COURT:  All right.  Thank you,

20  Mr. Cohen.  You're free -- you're released from your

21  subpoena and you're free to leave the courthouse.

22           THE WITNESS:  Thank you.

23           THE COURT:  Let me see you-all over here.

24           (Discussion off the record.)

25           THE COURT:  Ladies and gentlemen, we'll take

```
 1    our lunch break in just a moment and we'll take an hour

 2    and ten minutes for lunch.  I do want to remind you of

 3    our schedule.  I mentioned this on the first day, but it

 4    may not have sunk in that we're in trial Monday through

 5    Thursday.  We're not on trial on Fridays.  So after

 6    today, we won't see you again until -- until Monday

 7    morning.  And we'll go up until near the 5 o'clock hour

 8    today.  So we'll see you back after lunch, which would be

 9    in an hour and ten minutes or about at 1 o'clock.

10              MR. FRIEDMAN:  Judge, if they want to come

11    and watch you tomorrow.

12              THE COURT:  You sure can.  You are welcome

13    to come here and watch the hearings and the other cases.

14              THE BAILIFF:  All rise.

15              (Jury is ushered out.)

16              (Break taken.)

17              THE BAILIFF:  All rise.

18              (Jury ushered in.)

19              THE COURT:  Everybody have a seat, please.

20              Welcome back.  Good afternoon, ladies and

21    gentlemen.  We'll continue with the trial.  We'll go

22    about an hour and ten minutes or so.  We'll go till about

23    2:15 before we take a break.  But, of course, if you need

24    a break before then, let us know.

25              We'll ask, Ms. Gibson, to call her next
```

1   witness.

2                    MS. GIBSON:  Jeff Carpenter calls Vikki

3   Carpenter.

4                    THE COURT:  Ms. Carpenter -- Ms. Carpenter,

5   if you will come up here, ma'am.  Before you step up on

6   those stairs, I'm going to swear you in.

7                    (Witness sworn.)

8                    THE COURT:  Have a seat right here and talk

9   into the microphone and Ms. Gibson will ask you questions

10  first.

11                        VIKKI CARPENTER,

12  having been first duly sworn, testified as follows:

13                       DIRECT EXAMINATION

14  BY MS. GIBSON:

15      Q.   Can you tell the jury your full name.

16      A.   Vikki L. Carpenter.

17      Q.   And you're Jeff Carpenter's wife?

18      A.   Yes.

19      Q.   Did Jeff Carpenter ever tell you anything about

20  bonuses in connection with his work for the Potashniks?

21      A.   Yes.

22      Q.   What did he tell you?

23      A.   That he was expecting a yearly bonus based upon

24  his performance with the companies.

25      Q.   And with respect to the -- the -- any -- any

1    bonus out of the asset sale, did he tell you about that?

2         A.   Yes.   He was very excited because he was

3    expecting to get 3 percent based off the sale of the

4    assets.

5         Q.   And you -- you didn't know the full formula?

6         A.   No.

7         Q.   Okay.   Just the 3 percent?

8         A.   Just 3 percent.

9         Q.   Okay.   And did you have an understanding of what

10   that had been estimated to be before the asset sale

11   happened?

12        A.   Approximately $1,000,000.

13        Q.   And did you and Jeff Carpenter discuss anything

14   about any past due annual bonuses?

15        A.   Yes.   Being that he hadn't been paid any bonuses

16   from the time that he had started with the company.

17        Q.   Okay.   Did he tell you anything else about that?

18        A.   I'm not sure what you mean.

19        Q.   I mean, is that the extent of the conversation?

20        A.   Yes.   As far as I know that's where -- just that

21   he hadn't been paid any of his bonuses.

22        Q.   And did you have -- during Jeff Carpenter's

23   tenure working for the Potashniks, did you have any

24   conversations with Cheryl Potashnik about Jeff?

25        A.   On a couple of occasions, we had met at the

```
1   elevator or had been at their home or at Cafe Express and

2   she expressed how much that they love Jeff and that they

3   couldn't go without -- work without him, especially after

4   the FBI had raided the offices and they needed somebody

5   to take control.

6        Q.   I'm sorry.  I couldn't hear the last --

7        A.   They needed somebody to take control.

8        Q.   Did you and Cheryl talk about anything else

9   about Jeff?

10        A.   Just that.

11        Q.   If --

12        A.   They just loved him and they thought he was

13   great to work around and he was really asset to the

14   company.

15        Q.   And did -- before, you know -- for a while, did

16   Jeff talk to you about feeling -- feelings being mutual

17   as far as the Potashniks?

18        A.   Oh, yes.  I think that they enjoyed working with

19   him as much as he enjoyed working with them.

20        Q.   Was Jeff working a lot while he worked for the

21   Potashniks?

22        A.   A lot, yes.  A lot of late nights and weekends.

23        Q.   Did that cause any issues at home?

24        A.   Somewhat, yes, because he just wasn't available.

25        Q.   And did -- did his level of work cause some --
```

1    some yelling fights?

2        A.   Yelling fights, yes, some sleeping on the couch

3    occasionally.

4        Q.   Okay.  And during this time frame, if you wanted

5    to spend additional time with your husband, what types of

6    things would you do?

7        A.   Well, I would -- because he was working weekends

8    so often, we would -- you'd have to go out and look at

9    properties, check by evenings.  So we would drive

10   properties in the evening to check the lighting.  And

11   during the weekends, we would go around and visit with

12   the property managers and the staff and see how everybody

13   was doing and just generally check over the condition of

14   the property when we were out and about.  And we did that

15   on -- probably at least two weekends a month.  So about

16   half of the time.

17       Q.   And did -- did you and Jeff do any volunteer

18   work in connection with Hurricane Katrina?

19       A.   Yes.  Jeff was down at the Astrodome and when

20   they were sending up some of the new residents, I was

21   going around to every store from Fort Worth to Grapevine

22   to Garland picking up pillows and blankets and toothpaste

23   and toothbrushes, towels, any personal items that we

24   could get, diapers for babies to have there for the

25   guests when they got there.

1    Q.  Did you -- did you do anything else?  Were there

2  any other times that you remember where you spent time

3  with Jeff on -- in connection with his work similar to

4  touring properties on weekends, anything else like that?

5    A.  I would come into the office and spend some time

6  with him, occasionally.  I'd say maybe once a month.  But

7  he was also so busy that I'd usually just sat -- sit

8  there and not -- it wasn't as quality of a time as I

9  would desire.

10           MS. GIBSON:  Pass the witness.

11           THE COURT:  Mr. Friedman?

12                  CROSS-EXAMINATION

13  BY MR. FRIEDMAN:

14    Q.  Good afternoon, Ms. Carpenter.  My name is Jason

15  Friedman.

16           How are you today?

17    A.  Very well, thank you.

18    Q.  And we've never met; is that correct?

19    A.  No.

20    Q.  And what did you do today to prepare for your

21  testimony?

22    A.  I really didn't have too much preparation for

23  this testimony.

24    Q.  Did you review any documents?

25    A.  No.

1    Q.   Did you read Mr. Carpenter's deposition?

2    A.   No.

3    Q.   Did you speak with Ms. Gibson?

4    A.   Yes.

5    Q.   And how many times did you do that?

6    A.   Well, maybe twice.

7    Q.   You testified today that Mr. Carpenter told you

8  he was expecting a yearly bonus; is that correct?

9    A.   Yes.

10    Q.   And what year did he tell you that?

11    A.   From the very beginning when he started with the

12  company.

13    Q.   So his first day on the job?

14    A.   So -- so when he got his employment contract, he

15  was very excited to be working for the company -- for the

16  company and he was sharing with me what to look forward

17  to as far as salary, bonuses, et cetera.

18    Q.   So would it be accurate to say your testimony

19  is, he was excited about the possibility to get a bonus?

20    A.   More of a probability to get a bonus.

21    Q.   Probability?

22    A.   Yes.

23    Q.   He told you it was a guaranteed bonus?

24    A.   He did not say it was a guaranteed bonus, but it

25  was anticipated that he would have a yearly bonus.

```
 1        Q.   Were you aware that Mr. Carpenter received a
 2   bonus in his first year of employment?
 3        A.   No.
 4        Q.   He didn't inform you of that?
 5        A.   No.
 6        Q.   So in 2005, did Mr. Carpenter tell you he
 7   received a bonus?
 8        A.   No.
 9        Q.   Did he tell you he didn't receive one?
10        A.   No, there -- we didn't really talk about the
11   bonus or a bonus in 2005, no.
12        Q.   And he never came and complained, I didn't get
13   my yearly bonus in 2005?
14        A.   No.
15        Q.   2004?
16        A.   No.
17        Q.   2006?
18        A.   No.
19        Q.   2007?
20        A.   Yes.
21        Q.   And you testified today that Ms. --
22   Mr. Carpenter told you he was expecting $1,000,000?
23        A.   Yes.
24        Q.   And what was that date of that conversation?
25        A.   I don't know exactly the date, but I -- it was
```

1    after he had taken a trip to Las Vegas with the group of

2    gentlemen, Brian included, and they were going to look at

3    the property in Vegas.  And when he came back he said, It

4    looks like we're going to be millionaires.

5         Q.  So he came home and said, Honey, we're going to

6    be millionaires?

7         A.  Well, not like that.  I mean, he was excited

8    with the -- with the knowledge that he was -- going to be

9    based on the 3 percent on the sale of the assets.

10        Q.  And what else did he tell you about the -- his

11   formula?

12        A.  I don't know what his formula was, but I just

13   know it was 3 percent of the sale of the properties.

14        Q.  Did he tell you what properties?

15        A.  I would assume they were all of the properties.

16        Q.  And, Ms. Carpenter, you have no firsthand

17   knowledge of what Mr. Carpenter actually did when he was

18   at the office; is that correct?

19        A.  I had worked for Jeff for years before that, so

20   I knew what type of work that he did.  And I've worked in

21   property management industries so I know fairly well what

22   is required of the job and what he did, yes.

23        Q.  And did you work with him at Brisben Company?

24        A.  Yes.

25        Q.  And you -- so you're aware he sued Brisben

```
 1    Company; is that correct?

 2        A.   Yes.

 3        Q.   Did you sue Brisben Company?

 4        A.   No.

 5        Q.   Ms. Carpenter, in 2007, what was your annual

 6    household budget?

 7        A.   I didn't really have a budget.  It was if we

 8    needed something or wanted something, we pretty much were

 9    able to do it.

10        Q.   Just did it?

11        A.   Well, that's if we could afford it.

12        Q.   Were you aware that Mr. Carpenter states that

13    your -- your budget at the time was between 300 and

14    350,000 a year in 2007?

15        A.   I thought it was less than that.

16        Q.   What did you think it was?

17        A.   Around 250.

18        Q.   And how did you base that budget?  How'd you

19    come up with that budget?

20        A.   Well, I didn't spend every penny of the money

21    that we made.  So some of it went to 401Ks and savings,

22    so I'm not -- I don't have an idea of what -- the total

23    amount that was earned, what the split of it was.

24        Q.   And part of the budget was for Mr. Carpenter's

25    legal fees for his other suits, correct?
```

1                MS. GIBSON:  Object.  Assumes facts not in

2   evidence.  Object to showing something that hasn't been

3   admitted.

4                Or has it?  Jason, has that been --

5                THE COURT:  You can't publish something

6   until it's admitted into evidence.

7                MR. FRIEDMAN:  It's admitted, it's your

8   document.

9                MS. GIBSON:  I know we produced it.

10               MR. FRIEDMAN:  May I approach the witness?

11               THE COURT:  Sure.  Did you put a exhibit

12   sticker on it?

13               THE WITNESS:  It says, Exhibit 1.

14               MR. DONOHUE:  The exhibit sticker is

15   actually at the bottom.  It shows what exhibit it is.

16               MR. FRIEDMAN:  Defendant's Exhibit 14.

17               MS. GIBSON:  Jason if you just -- I just

18   want to make the record clear, I'm not -- you don't have

19   to establish a predicate, you can just offer it.  I'm not

20   going to object.  I just want to make sure the record is

21   right.

22               THE COURT:  Are you offering this?

23               MR. FRIEDMAN:  So, Your Honor, I'm going to

24   move to offer Defendant's Exhibit No. 14.

25               THE COURT:  No objection?

```
 1                    14 is admitted.

 2                    (Defendant's Exhibit No. 14 is admitted.)

 3        Q.   (By Mr. Friedman)  Ms. Carpenter, do you

 4   recognize this document?

 5        A.   No, I don't.

 6        Q.   Your -- you see at the top where it says, JC

 7   personal notes to discuss personal financial items with

 8   Ryan?

 9        A.   Right, I see that.

10        Q.   You've never seen this before?

11        A.   No, I have not.

12        Q.   Your husband in here states -- you see number

13   three?

14        A.   Uh-huh.

15        Q.   My personal budget is 300 to 350 per ANN?

16        A.   Okay.

17        Q.   So you weren't aware of that?

18        A.   No.

19        Q.   And then above it, he talks about depleting

20   savings due from the lack of bonus and increased wage

21   dollars --

22        A.   Okay.

23        Q.   -- that I needed to pay my personal lawsuit

24   expense.

25                    Are you aware of that lawsuit?
```

 1      A.   No, not really, I wasn't.

 2      Q.   You weren't aware of it?

 3      A.   No.   I mean, I know there was a lawsuit, but I

 4  didn't know that it came out of this.

 5      Q.   Not this lawsuit.   I'm just talking about a

 6  different one.

 7      A.   Okay.   I'm sorry.   No, I don't.

 8      Q.   You're not aware of it?

 9      A.   No.   Well, wait a minute.   Are you -- you're

10  talking about Brisben?

11      Q.   Was that going on in 2007?

12      A.   I believe it had ended previous to that, yes.

13      Q.   So you're not sure what other lawsuit he would

14  have been referring to?

15      A.   No.

16      Q.   Has Mr. Carpenter had any employment that you

17  know of that he made more money than he made under his

18  written employment agreement with Southwest Housing

19  Management?

20      A.   I think when he moved on to AHF, he was making

21  more money.

22      Q.   How much was he making there?

23      A.   I want to say probably 350 to 400.

24      Q.   And how long did he work there?

25      A.   Until Mr. Sterquell passed.   So I think that was

1   about a year, a year and a half.  I'm not sure of the

2   dates.

3       Q.   So do you know why he left?

4       A.   Because the company was being dissolved and --

5   after Steve's death.

6       Q.   And are you aware of where he was employed after

7   that?

8                MS. GIBSON:  Object.  Relevance.

9                THE COURT:  What's the relevance?

10               MR. FRIEDMAN:  Just his financial condition.

11               THE COURT:  You're asking after this?  After

12   the Southwest --

13               MS. GIBSON:  He's asking after the first

14   employment after.

15               THE COURT:  After he worked at Southwest?

16               MS. GIBSON:  Right.

17               THE COURT:  Okay.  Sustained.

18       Q.   (Mr. Friedman)  Ms. Carpenter, do you know the

19   names of the other employers Mr. Carpenter has sued?

20       A.   I know --

21               MS. GIBSON:  Object.  Relevance.

22               THE COURT:  What's the relevance?

23               MR. FRIEDMAN:  I'm trying to determine if --

24               THE COURT:  Well, there's -- who they were

25   and what the nature was are not relevant.  If that's

```
 1    where his money is going, that's where his money is
 2    going.
 3              MR. FRIEDMAN:  Well, it's the state of mind
 4    at the time.
 5              THE COURT:  Objection's sustained.
 6         Q.  (By Mr. Friedman)  Ms. Carpenter, did
 7    Mr. Carpenter tell you that he got paid six weeks
 8    severance from Southwest Housing Management?
 9         A.  No.
10         Q.  Did he tell you that he turned down $150,000
11    severance --
12         A.  No.
13         Q.  -- at Southwest Housing Management?
14         A.  No.
15         Q.  He didn't tell you that?
16         A.  No.
17         Q.  Are you familiar with his employment agreement?
18         A.  No, not -- not well.
19         Q.  So he didn't tell you that any changes to his
20    employment agreement had to be in writing?
21         A.  No.
22         Q.  Did he tell you that he attempted to amend his
23    employment agreement in writing?
24         A.  I'm sorry.  I don't understand the question.
25         Q.  Did Mr. Carpenter talk to you about or tell you
```

1    that he's going to submit a proposed amendment to his

2    employment agreement to Brian or Cheryl Potashnik?

3        A.   No, I think he already had an agreement.

4        Q.   So would you be surprised that after he told you

5    that, he was trying to get them to sign an agreement?

6        A.   I would be surprised that he was trying to get

7    them to sign an agreement about that, yes.

8        Q.   Would you be surprised to know that he secretly

9    recorded them, trying to get them to agree to a

10   agreement?

11       A.   I would not be surprised, no.  I suggested that

12   it might be a good idea.

13       Q.   So you suggested it?

14       A.   Yes.

15       Q.   And what was your extent of your discussions

16   about the secret recording?

17       A.   Just that I thought it might be a good idea for

18   him to have Brian and Cheryl's voices confirming that

19   they had made a deal.

20       Q.   And before he went about doing the recording,

21   did y'all discuss maybe bringing up the deal on the

22   recordings since he would be the only one to know --

23       A.   No, I think it was more about his bonuses

24   than -- than the deal.  Maybe I didn't word that

25   properly.

1    Q.   So the point of the recording was he was trying

2  to record them to discuss his employment bonuses under

3  his contract?

4    A.   Yeah.

5    Q.   Thank you, Ms. Carpenter, for your time.

6         MR. FRIEDMAN:  I'll pass the witness.

7         THE COURT:  Thank you, Mr. Friedman.

8         Ms. Gibson?

9              REDIRECT EXAMINATION

10 BY MS. GIBSON:

11   Q.   Ms. Carpenter, you were referring to a deal just

12 a moment ago, talking to -- or the deal.

13        Can you -- could you just explain what you

14 meant by that?

15   A.   As far as, what, the recording or --

16   Q.   I just -- I just didn't -- I just want to

17 understand what you -- you talked about employment --

18 certain employment bonuses that were still owed?

19   A.   Right.

20   Q.   And you also referenced "the deal" and I just --

21 I just need some help understanding what you meant by

22 "the deal."

23   A.   The 3-percent bonus that he was to receive

24 for -- after the sale of the company.

25        MS. GIBSON:  Pass the witness.

1          THE COURT:  Mr. Friedman?

2               RECROSS EXAMINATION

3  BY MR. FRIEDMAN:

4     Q.  Ms. Carpenter, did you listen to the

5  recordings --

6     A.  No.

7     Q.  -- after?

8     A.  No.

9     Q.  Did you read the transcripts after?

10    A.  No.

11    Q.  Were you the one who typed out the transcripts?

12    A.  No.

13    Q.  Do you know who that was?

14    A.  My daughter.

15    Q.  So would you agree with me that up until the

16  time of the recording, you would agree with me, there was

17  no confirmation of any kind that Jeff Carpenter had a

18  deal?

19    A.  I believe that there was because they said that

20  there was.

21    Q.  And you had no firsthand knowledge about the

22  deal; is that correct?

23    A.  Other than what I had heard from my husband, no.

24    Q.  You didn't hear anything from Brian or Cheryl

25  Potashnik, correct?

1      A.   Other than they loved him.

2      Q.   And, Ms. Carpenter, what did Brian say to you

3  when he came back and said neither Brian nor Cheryl

4  confirmed any agreement?

5      A.   What -- I never talked to Brian.  I never that

6  had a conversation --

7      Q.   I meant Jeff?

8      A.   What did I say to Jeff?  I couldn't believe it.

9  Because I always thought that Brian was a man of his word

10  and --

11      Q.   And he --

12      A.   -- that --

13      Q.   -- did he give you his word?  Brian gave you his

14  word?

15      A.   No, I did not talk to Brian.  But I'm saying

16  when you -- said to Jeff, did Jeff say to me -- that's

17  why I couldn't believe that -- that the deal didn't go --

18  or we weren't going to get the -- the payout from the

19  sale of the properties.

20      Q.   And if Mr. Carpenter got the payout, do you

21  think he would have told you?

22      A.   Oh, yeah.

23            MR. FRIEDMAN:  Pass the witness.

24            THE COURT:  Ms. Gibson?

25            MS. GIBSON:  Pass the witness.

```
 1                THE COURT:  All right.  Thank you,

 2  Ms. Carpenter.  If you'll have a seat back over there

 3  with Mr. Carpenter.

 4                Ms. Gibson, it's still your case.

 5                MS. GIBSON:  I'm sorry?

 6                THE COURT:  It's still your -- if you'll

 7  call your next witness, please.

 8                MS. GIBSON:  Okay.  Plaintiff calls Jeff

 9  Carpenter.

10                THE COURT:  Mr. Carpenter, if you'd come up

11  here, sir.  Before you step up there, let me swear you

12  in.

13                THE WITNESS:  Yes, sir.

14                (Witness sworn.)

15                THE COURT:  Have a seat right here,

16  Ms. Gibson will ask you questions first.

17                And we're still going to about 45 minutes

18  before we take a break.

19                     JEFFREY CARPENTER,

20  having been first duly sworn, testified as follows:

21                     DIRECT EXAMINATION

22  BY MS. GIBSON:

23      Q.  Would you please tell the jury your full name.

24      A.  Jeffrey Wayne Carpenter.

25      Q.  And, Mr. Carpenter, to clear something up, can
```

1    you -- can you take a look at Exhibit 1 in front of you.

2         A.   Yes, ma'am.

3         Q.   It's in the tall -- it should be on top of the

4    tall stack.

5         A.   It's right here.

6         Q.   Well -- so I think -- I think that exhibit, it

7    has an Exhibit 1 sticker right here (pointing), but this

8    is actually Defendant's 14?

9         A.   It's -- oh, I see.

10        Q.   Okay.  So if you'll just look right beside it.

11        A.   Here (pointing)?

12        Q.   You see Exhibit 1?

13        A.   Exhibit 1, yes.

14        Q.   Okay.  You have seen the transcript that your

15   daughter typed?

16        A.   Yes, ma'am.

17        Q.   Okay.  Is Exhibit 1 the -- the transcript that

18   your daughter typed?

19        A.   Yes, ma'am.  Wait a minute.  No, this is -- is

20   not the one that my daughter typed.

21        Q.   Okay.

22        A.   This is where we had a -- a third-party

23   professional type so there would be no conflict of --

24   excuse me -- any conflict of any interest.

25        Q.   How did -- how does -- how is it that you came

1    to work for the Potashniks?

2       A.   Very interesting.  I was ready to make a move

3    from the company I was with.  I just came back from a job

4    interview that -- and I received a phone call from Deepak

5    Suilakhe, who worked for this Brian and Cheryl as -- in

6    development.  And we had a telephone conversation and it

7    probably lasted 30 minutes and he gave me a rundown on

8    the Potashniks and Southwest Housing and it was

9    intriguing.

10      Q.   And how did you feel about Brian Potashnik and

11   Cheryl Potashnik when you started working there and

12   decided to go work there?

13      A.   Well, I was very excited.  We relocated from Las

14   Vegas to Dallas.  One of the hardest parts at that time

15   was housing.  But I was very excited about the challenge.

16   The company was growing very rapidly.  It needed

17   professional guidance, you know, help, my expertise is in

18   the management area.  And the company grew from an

19   entrepreneurial company, from deal to deal to deal, next

20   thing you know you got a very large company.

21            And, I believe, when I came on board, they

22   had 25 apartment communities and that took them from

23   about 5500 units -- and one year later, due to the

24   efforts of the development doing their job and

25   construction doing their job, they delivered another 13

1    properties and brought the total count to 8,000 units.

2    So in a one-year time period with me coming on board,

3    needing to make modifications to the management

4    operations, we had a very large assortment amount of

5    growth at that time.

6        Q.   And you're -- what -- can you briefly describe

7    what your job was at Southwest Housing?

8        A.   Yes.   It was -- it was to run the day-to-day

9    operations of the management company, which entailed the

10   related -- correlated to the site -- the different

11   apartment communities.  As a management company, there's

12   a lot of pieces to a management company because of

13   being -- excuse me -- tax credit, there's a lot of

14   federal regulations and a lot of different missing --

15   different other pieces.  As well as with the growing

16   company.  I was asked to help facilitate some

17   institutional, if you will, cohesiveness in the corporate

18   office as well, in the central servicing site because

19   they didn't have that running smoothly.

20       Q.   And what is central services?

21       A.   Central services typically would be I -- IT

22   department, HR, it could be asset -- asset management,

23   you can consider it to be -- some decide -- say it's

24   accounting, some keep accounting separate.  But it was

25   additional services, payroll.  But those type of

1   expertise, specific tasks, that are needed for an

2   organization.

3        Q.   Okay.   And when you -- will you take a look at

4   Exhibit 2, your initialed employment agreement?

5        A.   Yes, ma'am.

6        Q.   You see -- would you go to Paragraph 4(b).

7        A.   Yes, ma'am.

8        Q.   You see that the bonus potential in year one is

9   based on achieving company objectives?

10       A.   Yes, I see that.

11       Q.   And you should be able to see it, Jeff, on your

12   screen up there.

13       A.   Yeah -- oh, I didn't realize it.  Pardon me.

14  Yes.

15       Q.   And company was -- who was the company in this

16  agreement?

17       A.   Southwest Housing Management.

18       Q.   And then --

19       A.   -- Corp. Inc.

20       Q.   -- and then in the other end of -- of the first

21  year bonus is based on overall profitability of the

22  organization as a whole?

23       A.   Yes.

24       Q.   And what -- what does -- what does "organization

25  as a whole" refer to?

1    A.   Well, it was my understanding and from the very

2  first dialogue was the company is an owner -- owner,

3  developer, contractor and manager of apartment industry,

4  full service, if you will.  So it embraces all those

5  elements, those companies together, as a whole, for the

6  success of the organization.

7    Q.   And did you and Brian Potashnik talk about

8  where -- where he wanted you to be on regular

9  compensation each year?

10   A.   Yes, he wanted me -- and I expressed that I

11  wanted to be where I left when I left Brisben Companies

12  shortly before at -- so starting.  We were a much larger

13  company, but I wanted -- I was excited about the

14  companies because with the information, the due

15  diligence, financial records of the previous year and the

16  growth pattern, what was in their pipeline of growth, it

17  excited me, it gave me an -- it gives the company an

18  opportunity to grow as well as earn more money.  I did

19  not go to work there for $200,000 salary.  I did not

20  necessarily go there for 200,000 maximum bonus.  I went

21  there to create wealth and that was very well known.

22   Q.   Okay.  And what do you mean by that?

23   A.   It -- to -- where -- I knew what it took or

24  would take for performance from what I saw.  It was

25  not -- you know, bewitched-type thing, you know, you

1   wiggle your nose and it's fixed.  It was going to be a

2   long process.  And with that, there should -- there would

3   be rewards for that and the overall organization -- as

4   long as they -- we continued the growth program, there

5   would be substantial profitability in the companies.

6       Q.   Okay.  So you're talking about wealth for the

7   organization?

8       A.   Yes.

9       Q.   Okay.  And did Brian --

10      A.   Not -- excuse me.  Not the management company.

11      Q.   Right.

12      A.   Okay.

13      Q.   I -- right.

14           Did Brian Potashnik tell you a number of the

15  range he expected you to be in on your regular annual

16  compensation?

17      A.   On my annual compensation?

18      Q.   I'm sorry.  I should clarify.

19           I'm talking about before you start -- when

20  you're talking to Brian Potashnik, before you started

21  work at Southwest Housing Management, did he -- did he

22  discuss his expectations for where you would be on annual

23  salary and bonus, combined?

24      A.   Yes.  We discussed it.  We discussed it.  Based

25  it off of my previous employer, where I was making

Appendix 0900

1   200,000 salary a year and $200,000 bonus was my average.

2        Q.   Okay.  And--

3        A.   So that was a starting point.  This was a

4   smaller organization, but it had plenty of needs of -- of

5   a turnaround and there was a tremendous amount of growth

6   happening, so it needed that.  So that was a starting

7   point.

8             MR. FRIEDMAN:  I'm going to object as being

9   nonresponsive.

10             THE COURT:  Try and limit your responses to

11   the question that's asked.  And I'm not sure whether that

12   was or not.

13        Q.   (By Ms. Gibson)  And when -- when the agreement

14   says based on achieving company objectives, did anyone at

15   Southwest Housing ever give you specific objectives that

16   you needed to meet?

17        A.   No, ma'am.

18        Q.   Okay.  Did Brian Potashnik or Cheryl Potashnik

19   ever tell you, though, that you were not meeting their

20   expectations?

21        A.   Never.

22        Q.   Throughout the course of your tenure at

23   Southwest Housing, did Brian Potashnik and Cheryl

24   Potashnik ever tell you that you were meeting their

25   expectations?

 1      A.   Yes.  They were pleased -- pleased with the

 2  work.  We had some challenges on several different --

 3           MR. FRIEDMAN:  I'm going to object to

 4  everything after "yes" as being nonresponsive, Your

 5  Honor.

 6      Q.   (By Ms. Gibson)  Can you give me a few examples?

 7           MS. GIBSON:  Oh, I'm sorry.  I didn't --

 8           THE COURT:  Go ahead.

 9      Q.   (By Ms. Gibson)  Can you give me a few examples?

10      A.   There was a couple of apartment -- several

11  apartment communities that were challenging that needed

12  extra attention, which we gave and needed -- they -- they

13  were challenging for many reasons.  One, maybe they

14  should have never been built.  They -- was a bad

15  locations, there was a bad structure --

16      Q.   But --

17      A.   -- of the deal or whatever.  But we worked

18  collaboratively.  We worked and developed a plan to turn

19  those apartment communities around --

20      Q.   My -- I'm sorry.  I --

21           MR. FRIEDMAN:  I'm going to object to the

22  last answer as being nonresponsive.

23      Q.   (By Ms. Gibson)  I gave -- I asked -- I asked a

24  bad question, Mr. Carpenter.

25      A.   Okay.

1      Q.   When I was saying can you give us a few

2  examples, you had said -- I was talking about Brian

3  Potashnik and Cheryl Potashnik telling you at various

4  points that you were meeting expectations.  And I'm

5  sorry, I didn't mean examples of what they were happy

6  about.  I meant, can you give examples of the types of

7  things they said to you.

8      A.   Oh, we appreciate all the hard work that you --

9  you do, we know that you go above and beyond, you work

10  exceptionally hard and we know that it's a hard -- hard

11  job --

12      Q.   And --

13      A.   -- early on.

14      Q.   -- why was it important that -- to you that the

15  first-year bonus, the high end, was based on overall

16  profitability of the organization as a whole?

17      A.   Well, part of my due diligence was -- they

18  shared with me their development lists, their financial

19  statements on all the apartment -- or all of the

20  entities, development, management, construction.  And the

21  management company, given the infancy of that and given

22  the growth there was -- it was literally impossible for

23  that -- for the management company to make money.  It

24  would lose money.  So therefore the construction company

25  was profitable.  Development company was profitable.

1  Thus looking at the business as a one-company-type

2  business.

3      Q.   And so with respect to Southwest Housing

4  Management, you -- and profitability, can you give me one

5  example of why it was not -- it was not possible or

6  intended to be profitable?

7      A.   Well, you have to develop an infrastructure to

8  be able to manage the properties that were in existence

9  and the properties that were coming on board.  In that

10  short period of time, it was a 52 percent increase, going

11  from 5 to 8,000 -- 5500 to 8,000 units, 2500.  Great job

12  by construction, great job by development.  Massive

13  issues for management to -- to absorb all that.

14  Particularly when you don't have the infrastructure and

15  the right people in place.  So that's only part of it.

16          But -- so we had -- you had to -- we had to

17  put the infrastructure in place.  We had to change some

18  people.  But at the same time we weren't collecting any

19  fees.

20      Q.   Okay.  So that would be a second example.

21          Can you -- can you give us one example of

22  how taking something -- well, let me back up.

23          Did you ever take contracted vender work

24  in-house at Southwest Housing?

25      A.   Yes, we did.

1    Q.   Okay.  Can you give us one example of how that

2    impacts profitability of Southwest Housing Management

3    versus the organization as a whole, including the

4    individual --

5    A.   Yeah I --

6    Q.   -- properties?

7    A.   -- have a great example that it was done fairly

8    shortly.  The product that Brian and Cheryl, the

9    companies were building were absolutely gorgeous.  The

10   sign company they were using at the time did granite

11   signage.  It looked good.  However, it wasn't lasting,

12   nor the signage did not have the word "apartments" on it.

13            So here we're in a condo-driven market, in

14   Texas.  So you look at our apartment communities, they

15   kind of look like condos.  You don't know if they're

16   condos, you don't know if they're apartments.  So -- and

17   there was fault -- they were faulty workmanship.  So I

18   found a vender that was able to deliver a better

19   product -- a much better product, deliverable and savings

20   on that paid for my marketing director.  So here we were

21   contracting out -- prior to me coming on board, they were

22   contracting out with the marketing consultant for

23   advertising and PR and so forth and I was able to bring

24   that in-house, essentially free, just by the savings that

25   we were making on development signage, you know, the main

1    ID signage.

2         Q.   Okay.

3         A.   Does that make sense?

4         Q.   Sure.

5              And can you give us one example of where

6    taking some service for the organization in-house,

7    meaning done at Southwest Housing Management, would hurt

8    Southwest Housing Management financially, but still

9    ultimately, financially benefit the Potashniks?

10        A.   I have to apologize.  I'm not sure I understand

11   the question.

12        Q.   That's okay.  You get to tell me when I ask bad

13   questions okay, Jeff.

14             Social services, was that in-house or

15   contracted when you started?

16        A.   It was -- social services was being done by a

17   third party, contracted.  I believe in -- please don't

18   hold me to the letter of law, but I believe Cheryl was

19   involved in helping start the nonprofit that provided

20   these social programs that we provided to our residents

21   at the particular properties.  And what was happening was

22   they created such a hierarchy -- arch or hierarchy that

23   most of the money was going to the -- to the people of

24   the organization.  It wasn't fondling (sic) through down

25   to -- the benefits to the residents.  And the Potashniks

```
 1    realized that so we took that in-house.  And I believe

 2    in 2005, alone, that on a financial statement, it was

 3    close to 900 -- I'll call it $995,000 of payroll and

 4    related expenses that hit the books.

 5         Q.   Okay.  But did taking that in-house ultimately

 6    help the income of Brian and Cheryl Potashnik?

 7         A.   Ultimately, yes, and gave the proper services

 8    that was needed to -- and deserving to our residents, our

 9    clients.

10         Q.   Okay.  Your -- if you could take a look at

11    Exhibit 2.

12         A.   (Witness complies.)

13         Q.   The -- the contract talks about a detailed bonus

14    plan being provided, "a detailed bonus" -- whoops.  "A

15    detailed bonus plan will be provided within 90 days of

16    employment".

17         A.   Yes, ma'am.

18         Q.   Okay.  And was -- was any written plan ever

19    provided to you?

20         A.   No, ma'am, never.

21         Q.   When you initially signed this, were you --

22    okay.

23              But you -- you continued to work with the

24    Potashniks after that?

25         A.   Yes.  Once I start --
```

```
 1              MR. FRIEDMAN:  I'm going to object to
 2   everything after "yes" as being nonresponsive.
 3              THE COURT:  Okay.
 4              Ask your next question.
 5       Q.  (By Ms. Gibson)  And -- so when you didn't get
 6   the bonus plan in the first 90 days, what was the
 7   discussion like with whoever, Brian or Cheryl, or whoever
 8   you may have talked about with it?
 9       A.  It was -- it was not mentioned on the 90th --
10   91st day.  It was mentioned probably a few months later,
11   when I kind of realized it.  And it -- we talked about
12   putting something together.  However, it just never
13   happened, you know.  And I think part of it is we were
14   all so very, very busy.
15       Q.  And --
16       A.  And it didn't -- I was more focused on the --
17   our clients, our residents --
18              MR. FRIEDMAN:  I'm going to object to
19   everything after --
20              MS. GIBSON:  And --
21              MR. FRIEDMAN:  -- "later" as being
22   nonresponsive.
23              THE COURT:  Overruled.
24       Q.  (By Ms. Gibson)  So initially -- so after
25   signing the initial employment agreement, did you ever
```

1    talk about the agreement with the Potashniks in the first

2    couple of years, about the terms of it?

3         A.   Not the terms, no.

4         Q.   Did you have oral discussions about the annual

5    bonuses?

6         A.   Yes.  I brought it up that we're past -- past

7    due -- it was not the first --

8              MR. FRIEDMAN:  Object to everything after

9    "yes" as being nonresponsive.

10             THE COURT:  Overruled.

11        Q.   (By Ms. Gibson)  Go ahead.

12        A.   I didn't approach after the first year.  I

13   approached it the second -- second year.  Again, we were

14   so ingrained on reestablishing and rebuilding with the --

15   the growth that was provided to us by development and

16   construction that wasn't my number one worry.  It

17   probably shouldn't -- should have been.  I should have

18   looked at -- through it myself, but --

19             MR. FRIEDMAN:  Object to being --

20             THE WITNESS:  -- I didn't.

21             MR. FRIEDMAN:  -- nonresponsive.  She asked

22   him about conversations, not about therapy sessions.

23             THE COURT:  State your objection.  Say it's

24   objection, nonresponsive.

25             MR. FRIEDMAN:  Nonresponsive.

```
 1                    THE COURT:  Overruled.

 2                    MR. FRIEDMAN:  All right.  Thank you.

 3                    THE COURT:  Break up your questions,

 4   Ms. Gibson.

 5                    MS. GIBSON:  Okay.

 6        Q.   (By Ms. Gibson)  So, Jeff, when I -- when I ask

 7   a question, I know you're anticipating what the next one

 8   is and I'll try to be better about them --

 9        A.   Okay.

10        Q.   -- but that's why he's objecting.

11        A.   Oh, I'm sorry.

12        Q.   Like, I'll say, Did you have a discussion and

13   you'll go ahead and tell me what the discussion was.

14        A.   Okay.

15        Q.   So I think that's what Mr. Friedman's issue is.

16                    And after you moved to Texas --

17        A.   Yes, ma'am.

18        Q.   -- you also, in the early time frame, had your

19   Vegas home for sale?

20        A.   My -- my family was still living in Vegas

21   because we didn't find a house until October of '04 and

22   then they eventually moved -- yes, we did have our Vegas

23   house still.

24        Q.   And ultimately was it sold?

25        A.   Ultimately, yes.
```

1     Q.   Okay.  And did you make a good profit?

2     A.   Yes, we did.

3     Q.   And in the first two -- so in your initial term

4  of employment, you weren't -- you weren't hurting for

5  money?

6     A.   Not at that time, no.  Vegas was good to me.

7     Q.   So in your -- when you were closing on a home in

8  Dallas, do you recall a discussion with Brian Potashnik

9  about a payment to help you out?

10    A.   Yes, ma'am.

11    Q.   Okay.  And how -- tell me about the

12 conversation?

13    A.   Explained the conversation being that we have a

14 house that we're prepared to buy, but we're -- have to do

15 a bridge loan and we're short on cash and would there be

16 a possibility that the company could help me out.

17    Q.   Okay.  And --

18    A.   And they did.

19    Q.   And what did -- what did Brian say in response,

20 other than he would help you out?  What did he do for

21 you?

22    A.   He -- he gave -- gave me the moneys.

23    Q.   Okay.  How much?

24    A.   50,000.

25    Q.   Okay.  And when -- when that happened, did you

1    appreciate it?

2         A.   Very much so.

3         Q.   And when that happened, pursuant to your written

4    agreement --

5              MR. FRIEDMAN:   Thank you.

6         Q.   (By Ms. Gibson)  -- there was -- you were

7    supposed to be employed at the end of the first year to

8    get the minimum of 50, right?

9         A.   That's what it says, yes.

10        Q.   Okay.  But you and -- in connection with your

11   conversations with Brian, did y'all document -- did you

12   amend your contract or anything for that initial $50,000

13   payment?

14        A.   No, it was oral.  It was a discussion and he

15   agreed to it and soon thereafter, I received a check.

16        Q.   Okay.  And initially what did Brian Potashnik

17   tell you about the 50,000?

18        A.   The phrase was, it was a forgiveness loan.   In

19   other words, it wasn't -- wouldn't necessarily apply to

20   my annual bonuses.

21        Q.   Okay.  What -- what is the effect of that?

22   What's a forgiveness loan?

23        A.   That -- that it wasn't going to -- that I didn't

24   have to repay it back.

25        Q.   Okay.  And -- but that's what -- whose idea was

1    that, the forgiveness loan?

2         A.   Brian.

3         Q.   Okay.  And later, did you find out that --

4    whether or not that is okay to do?

5         A.   Yes, I did.

6         Q.   What'd you find out?

7         A.   Well, I had to pay taxes on that -- that money

8    and it went against normal accounting practices.

9         Q.   Okay.  So ultimately, that was settled out to

10   treat it as, you know, normal -- normal income --

11        A.   Right.

12        Q.   -- right?

13             Okay.  And also where did that first check

14   come from?  Did it come from Southwest Housing

15   Management?

16        A.   No, ma'am.  It came from Affordable Housing

17   Construction.

18        Q.   Okay.  And so that's something that had to be

19   settled out on the books as well?

20        A.   Yes, ma'am.

21        Q.   Okay.  So you talked about various things that

22   might increase overhead for Southwest Housing Management,

23   but, ultimately, make more money for the Potashniks and

24   the organization as a whole.

25             During your tenure, was the organization, as

1   a whole, profitable?

2      A.   Yes.

3      Q.   Could you explain that?

4      A.   Yes.  The -- the construction company was the

5   largest moneymaker.  During the time period with the --

6   with the pipeline as well as development, were the two

7   entities that were profitable.

8      Q.   Okay.  And can you give me -- or not can you.

9   Would you please give me one example of something that

10   you worked with construction on that would save money for

11   the organization?

12      A.   Working with construction.  Well, we talked

13   about the signage, we did various value engineering on

14   the properties.  The -- the apartment communities

15   sometimes had an enormous amount of land that were not

16   necessarily the "Class A" property location.  And there

17   would be a design -- a site plan designed for the

18   property.  And I worked closely with development,

19   particularly Greg Moss, and we would -- a lot of times

20   rework the site plan with the engineers, if they could,

21   and -- and -- but it also worked closely with

22   construction and with some of the contractors, like

23   landscaping contractors.

24            Because if you have a property that is 250

25   units and it's built on 55 acres, you don't want to be

1    mowing 55 acres.  Maybe not all that's usable.  But let's

2    say 40 of it is, but I only need 30 of it.  So, you know,

3    we thought ahead so we could be -- didn't have that

4    additional burden put on the property, you know, forever.

5         Q.   Okay.

6         A.   That was very important.

7         Q.   And so your first anniversary dates -- well,

8    let's -- let's back up a moment.

9              What was your start date at Southwest

10   Housing?

11        A.   March 15th of 2004.

12        Q.   Okay.  So 03/15/04 is your start date.

13             And so around -- just not long after your

14   first anniversary date, what's the next significant event

15   that happened at work?

16        A.   The -- the next unfortunate event was the day

17   after Father's Day and the FBI raided the corporate

18   office.

19        Q.   Okay.  And the day after Father's Day was --

20        A.   And that -- and that was, I believe, June 20th

21   of 2005.

22        Q.   Okay.  And did you have a conversation at this

23   time with the Potashniks about this issue?

24        A.   No.  Brian and Cheryl were not available

25   during -- at that time.  They came at the time when we

152

1   were having cake for Father's Day.  So it was probably

2   about 12:30, noonish.  And I had not heard -- I was

3   surprised that Brian and Cheryl weren't there because

4   they always participated in, you know, celebrations,

5   birthdays, team effort.  And, I believe, I had heard --

6                 MR. FRIEDMAN:  I'm going to object to this

7   as being nonresponsive to the question asked.

8                 THE COURT:  All you have to do is say

9   nonresponsive.

10                Break up your questions, Ms. Gibson.

11                MS. GIBSON:  Sure.

12       Q.  (By Ms. Gibson)  So when the FBI raid happened,

13   the Potashniks weren't there.

14                Who dealt with the FBI?

15       A.  I did.

16       Q.  Okay.  That day?

17       A.  Face to face.

18       Q.  Okay.  And after that, did the company have to

19   respond to requests for documents and things of that

20   nature?

21       A.  Yes.  To my understanding, there was a variety

22   of subpoenas that went to different people that had to do

23   different things, but I had a very long list for my

24   portion.

25       Q.  Okay.  So --

```
 1                    THE COURT REPORTER:  I'm sorry.  For your
 2   what?
 3                    THE WITNESS:  For my portion.
 4      Q.   (By Ms. Gibson)  Okay.
 5      A.   Under my control or area of expertise.
 6      Q.   All right.  And so your portion, are you talking
 7   about management documents?
 8      A.   Yes, ma'am.
 9      Q.   Okay.  You handled that.
10           Do you know who handled documents for the
11   construction arm?  If there were?
12      A.   If there -- I'm not sure if there really was a
13   construction arm.  If so, it would have been -- when they
14   came in, they --
15      Q.   So -- so --
16                    MR. FRIEDMAN:  Nonresponsive, Your Honor.
17                    THE COURT:  Break up your questions.
18                    MS. GIBSON:  I'm on to the next question.
19                    THE WITNESS:  Okay.
20      Q.   (By Ms. Gibson)  So did the development company
21   receive any subpoenas, to your knowledge?
22      A.   I'm not sure.
23      Q.   Okay.
24      A.   I'm not sure who was subpoenaed and what, if
25   they were.
```

1    Q.   Did the Potashniks talk to you about your role

2    in handling whatever was needed for the FBI investigation

3    as far as the management?

4    A.   Well, it couldn't come at a -- at a more

5    opportune time at the corporate office.  Simply that

6    we're having cake and ice cream --

7    Q.   Well, wait.  I'm sorry, Jeff.

8    A.   Yes, ma'am.

9    Q.   I'm just trying to avoid hearing from --

10    A.   Okay.

11    Q.   -- Mr. Friedman.

12            MR. FRIEDMAN:  Well, if you ask him

13    questions, you wouldn't hear from me at all.

14            THE COURT:  Okay.  Keep your sidebar --

15            MS. GIBSON:  Mr. Friedman, I'm --

16            MR. FRIEDMAN:  Well, sidebar was directed to

17    me, Your Honor.

18            THE COURT:  You're --

19            MR. FRIEDMAN:  And I'm just doing my job

20    like Mr. Carpenter did his.

21            THE COURT:  Have a seat.

22    Q.   (By Mr. Gibson)  I don't even remember what I

23    asked you.  Let me go back.  I'm asking in connection

24    with the entire investigation.

25            As far as requests for information, did you

```
 1   have a discussion about the Potashniks, overall, about

 2   what your role would be?

 3       A.   I participated -- we had in-house counsel at the

 4   time --

 5            MR. FRIEDMAN:  I'm going to object to being

 6   nonresponsive.

 7            MS. GIBSON:  I'm just asking about if he had

 8   discussions with the Potashniks.

 9            THE COURT:  Can you answer, yes or no?

10            THE WITNESS:  Yes.

11            THE COURT:  Okay.

12       Q.   (By Ms. Gibson)  Okay.  What were your

13   discussions with the Potashniks on that issue?

14       A.   Primarily, to keep everybody focused.

15       Q.   Okay.

16       A.   Not to worry.  We did a promotional campaign the

17   very next day, Southwest Housing solid as a rock was on

18   everyone's desk the next morning at the corporate office.

19   And we, you know, kept everybody motivated.

20       Q.   Okay.  And at the time, did you believe in Brian

21   and Cheryl Potashnik?

22       A.   Oh, absolutely.

23       Q.   Did you -- can you -- could you trust them?

24       A.   Yes, ma'am.

25       Q.   And did you continue to support them?
```

1      A.   Yes.

2      Q.   And then not very long after that, what's the

3  next big event that happened?

4      A.   What was it --

5      Q.   Just a few months later, what happened?

6      A.   Oh, yeah, Hurricane Katrina and Rita hit at the

7  end of August, first -- first of September.

8      Q.   Okay.  So you think August, September of '05,

9  Katrina and Rita?

10     A.   Yes.

11     Q.   And what did -- what -- what did -- I'm not

12  asking about you in particular, but what did the

13  organization, as a whole, decide to do when the

14  hurricanes hit?

15     A.   I believe we were very proactive.  We had a

16  discussion to -- and compassionate for the victims and we

17  wanted to -- from a professional, business side, as well

18  as personal, business side, we wanted to be able to

19  support and help the victims as much as possible and we

20  did.  And we did that by -- through housing, through

21  making arrangements with doctors and nurses, having buses

22  that -- for the senior properties in Houston.

23          To -- as Mark Jones proudly mentioned,

24  backing up two brand new elderly buses and putting

25  seniors in apartments, working with Gallery Furniture,

1    building furniture over the weekend so we can furnish

2    apartments for them.  It was a -- it was a business

3    decision, it was a humanitarian decision that Brian made

4    and Cheryl made and I certainly agreed with it as well.

5        Q.   Okay.  And what -- without telling me everything

6    you did personally to help in Katrina, can you give me,

7    like, two -- two examples of your role?

8        A.   Well, besides a lot of coordination, I was in

9    the field.  I was in Houston a great deal of the time.

10   After the evacuees -- I'm sorry -- the victims were kind

11   of processed into Houston, they started coming into

12   Dallas, Cheryl and a -- and a group of our managers here

13   worked through the weekend, on Labor Day weekend, I

14   believe, it was.  A lot with DHA opened up and they

15   created Section 8 vouchers for the people so they could

16   provide housing.

17            We took care of a tremendous amount of

18   donations.  We had people going to get essential needs,

19   as kind of -- my wife said from blankets, pillows,

20   bedding, you know, personal utensils, I mean, I had

21   people in my -- my personal truck that I took to our

22   properties and the teddy bear the little girl had was

23   still wet.  It was a very sad, very troubling time for

24   those people --

25       Q.   Okay.

1       A.   -- for the people.

2       Q.   And then -- so your anniversary date -- your

3   next anniversary date would have been 3 -- I can't talk.

4   About March of '06, your anniversary.

5                At this point, what's going on with annual

6   bonuses by this anniversary?

7       A.   Well, about this time is when I had sales

8   proceeds coming in from my house in Las Vegas.  I was not

9   strapped for cash.  We were very busy for what I first

10  started with, all the properties in the growth and

11  everything.  But we had Katrina, and with Katrina it

12  was --

13                MR. FRIEDMAN:  Objection.  Nonresponsive,

14  Your Honor.

15                THE WITNESS:  -- a nightmare.

16                MS. GIBSON:  Okay.

17                THE COURT:  Break up your questions,

18  Ms. Gibson.

19      Q.   (By Ms. Gibson)  And what was the next major

20  event that happened?  So it's March of '06 -- let me ask

21  this:  What happens in May of '06?

22      A.   May of '06 I was very surprised, Brian calls

23  me --

24      Q.   Well, can you just give us the shorthand --

25      A.   Yes.

1      Q.   -- of what happened in May of '06 and then I can

2    ask you more about details.

3      A.   Yes.  Brian asked me to come to his house, he

4    wanted to have a conversation.

5      Q.   Okay.  And did -- did you go to his house?

6      A.   Yes, ma'am.

7      Q.   Okay.  Just tell me about the initial arrival,

8    what your conversation was, just the first few moments.

9      A.   Hello, greetings, Brian had a drink in his hand,

10   smoking a cigarette and said, You know, it's -- it's

11   been -- been a long year or last year's been pretty hard

12   and there's some -- something I want to talk to you

13   about.  I mean, in general, that was -- that was it.

14     Q.   Okay.

15     A.   Just open pleasantries and it was outside on the

16   front patio.

17     Q.   All right.  Did you ask him -- did you ask why

18   you were being called to his house?

19     A.   Well, he told me.

20     Q.   Okay.  And ultimately what was the gist of what

21   happened during your discussion?

22     A.   Brian said him and Cheryl had given a lot of

23   thought, that they were planning to put the company and

24   the properties up for sale.  And they said they're

25   selling the business.

```
 1      Q.   All right.  And what else did Brian tell you

 2  about selling the business?

 3      A.   After a little bit of shock, he continued, said,

 4  You know, this will be a -- this will be good for the

 5  Potashnik family and the Carpenter family, that we worked

 6  really hard and should reap some of the -- basically,

 7  some of the rewards.  But that we do not have a buyer,

 8  we're just -- kind of just now getting into the process

 9  through a broker, that I need to know -- I need you to --

10  to be very focused, you're going to be on the front

11  lines, if you will --

12              MR. FRIEDMAN:  Your Honor, can we go to

13  question and answer?

14              THE COURT:  Okay.  Well, she -- her question

15  was:  What was the gist of the conversation.

16              But you need to look for a stopping point

17  because we're getting to our 2:15 break.

18              MS. GIBSON:  Okay.  We can go ahead and

19  stop.

20              THE COURT:  We'll take our ten-minute break,

21  ladies and gentlemen.

22              THE BAILIFF:  All rise.

23              (Jury ushered out.)

24              (Break was taken.)

25              THE BAILIFF:  All rise.
```

```
 1                    (Jury ushered in.)

 2               THE COURT:  Everyone have a seat, please.

 3               Have a seat, Mr. Carpenter.

 4               Welcome back.  We'll continue with

 5  Mr. Carpenter's testimony.  Ms. Gibson is the attorney

 6  asking questions.  We'll go about an hour or so before we

 7  take another break.  And we'll go until about 4:30 today,

 8  before we stop for the day.  And, again, we'll resume on

 9  Monday, not on Friday.

10               Ms. Gibson?

11                    DIRECT EXAMINATION (cont'd)

12  BY MS. GIBSON:

13      Q.  Mr. Carpenter --

14      A.  Yes, ma'am.

15      Q.  -- so during the discussion at the Potashnik's

16  home, what's the gist of -- or the ultimate end of what

17  Brian told you?

18      A.  Selling the company, would definitely like for

19  me to stay.

20      Q.  And did he offer you anything to stay --

21               MR. FRIEDMAN:  Your Honor, can I just ask

22  the witness to speak into the microphone so we can all

23  hear.

24               THE WITNESS:  My apologies.

25               MR. FRIEDMAN:  No, don't mind apologizing.
```

1   If I have better hearing, it'd be all right.

2          THE WITNESS:  It was to stay on board, that

3   there would be a lot to do, I would be very involved in

4   the due -- particularly when it comes -- once we select a

5   buyer, be in a very -- actively involved in the due

6   diligence and communications between our teams and their

7   teams and so forth.  So he made -- that you're very

8   important, key player to making this successful.

9       Q.  (By Ms. Gibson)  Okay.  And did Brian Potashnik

10  say -- did he offer anything in exchange for you to stay?

11  Did he tell you what would happen if you stayed?

12      A.  Yes.  He said once we get further down the line

13  and we pick a horse, so to speak, and we know the numbers

14  better, that we'll put together a very lucrative bonus

15  program for you, for your efforts.

16      Q.  Okay.  So at this point in time, if I understand

17  you correctly, there was no -- there was no actual

18  purchaser yet?

19      A.  That's correct.

20      Q.  Okay.  And so did he also talk to you about, not

21  the amount of the bonus, but in general whether --

22  whether it would be significant or not?

23      A.  It -- it would be significant.  He said it would

24  be a really good day for the Potashniks and the Carpenter

25  family and in the -- in the millions was the impression

1   and what was given.  I remember very clearly, my daughter

2   just graduated, the day before my parents were in town

3   so...

4        Q.   Okay.  And at one point I think you thought the

5   date was around May 22nd.  But what did you ultimate --

6             MR. FRIEDMAN:  I'm going to object to

7   leading, Your Honor.

8        Q.   (By Ms. Gibson)  What did you ultimate -- well,

9   let me just ask it this way:  What did you ultimately

10  decide on -- on what you think the approximate date of

11  this meeting was?

12       A.   Well --

13            MR. FRIEDMAN:  She told him to date so I'm

14  going to object to --

15            MS. GIBSON:  No.

16            MR. FRIEDMAN:  -- in the future to leading.

17            THE WITNESS:  It was --

18            THE COURT:  All right.  Well --

19            THE WITNESS:  -- it was Sunday, May 21st.  I

20  believe that was a Sunday.

21       Q.   (By Ms. Gibson)  Okay.

22       A.   Saturday, the 20th, was my daughter's graduation

23  from high school.

24       Q.   Okay.  And did you go back and look at anything

25  to try and -- try and nail down a date.

1      A.   I'm sorry?

2      Q.   Did you go back and look at anything to try and

3   figure out what the date was?

4      A.   Yes.

5      Q.   Okay.

6           MR. FRIEDMAN:  Your Honor, we're just going

7   to take Ms. Gibson's word for it.  We don't have to spend

8   time on it.

9           THE COURT:  That it's May 20th or 21st?

10          MR. FRIEDMAN:  Whatever she testified to.

11          THE COURT:  Don't do that.

12          MS. GIBSON:  He testified it was the 21st.

13          THE COURT:  She -- he said whatever you

14   testified to.

15          If you're saying you'll take whatever

16   Mr. Carpenter testified to, we'll move on for the record.

17     Q.   (By Ms. Gibson)  Okay.  So at some point

18   earlier, you had thought it was a different date, but

19   only a day difference?

20     A.   Yes, ma'am.

21     Q.   Okay.  And with respect to what your role would

22   be in helping with the sale, can you give me the -- just

23   the gist, the summary -- the executive summary of what

24   Brian said he wanted you to be doing.

25     A.   Participate in selling Southwest Housing to

1    potential buyers.  Brian, obviously, took -- takes the

2    lead on that, being involved with that, keeping the teams

3    motivated.  And we had a lot of properties that were

4    lease up.  We had a lot of new product coming on board

5    that we didn't -- did not want to lose -- as quote, we

6    did not want to lose eye on the prize.  And that you

7    would be working very -- very closely, once we pick a

8    purchaser through the due diligence process and the many

9    interactions that needed to take place.  You and -- to

10   coordinate -- and with your team.

11        Q.   Okay.  And at the time that Brian tells you this

12   is -- you know, what he intends to do for you, what was

13   your understanding of Brian's position with respect to

14   Southwest Housing Management?  Like, who was he at

15   Southwest Housing Management?  What was his position?

16        A.   Who, Brian?

17        Q.   Yes.

18        A.   The president.

19        Q.   Okay.  And was he also an owner?

20        A.   Yes.

21        Q.   Or that was your understanding?

22        A.   Yes.

23        Q.   Okay.  And with respect to Southwest Housing

24   Development at the time you-all had this conversation,

25   what was your understanding of Brian Potashnik's position

1   with respect to development?

2       A.   President and owner.

3       Q.   Okay.  And at the time Brian Potashnik is

4   telling you about what's going to happen, what was your

5   understanding of Brian Potashnik's position with respect

6   to Affordable Housing Construction?

7       A.   Brian was the president and -- and owner of it

8   as well.  And all -- all the entities, those three

9   businesses would be sold with the properties.

10      Q.   Okay.

11      A.   Essentially getting out of the business.

12      Q.   And what are -- what types of -- well, let me

13  just cut to the chase.

14           Did Brian Potashnik ask you to meet with

15  potential purchasers and their investors?

16      A.   Yes.

17      Q.   Okay.  What did he -- can you give us an example

18  of what he asked you to do in that regard?

19      A.   To -- to tour them and, as we would call it, a

20  dog and pony show, sell the communities, you know, give

21  them the history of the properties, stop, meet the staff,

22  let them walk around, get a feel for the properties that

23  they would be purchasing, answer any questions that they

24  would have.  And I did that individually on two different

25  occasions.

```
 1        Q.   Okay.  And was -- was anyone else with you when

 2   you were marketing to these purchasers?

 3        A.   Only the potential purchasers.

 4        Q.   Okay.  Although I'm not saying other people

 5   didn't also do tours, but with respect to the marketing

 6   to potential purchasers that Brian asked you to do, of

 7   all of the people and all of the companies, did he select

 8   anyone but you to do those?

 9        A.   I can't -- I --

10        Q.   To go with you?

11        A.   To go with me?

12        Q.   Right.

13        A.   No.

14        Q.   At the -- toward the bottom of that stack, Jeff,

15   is Exhibit 35.

16        A.   That's too far.

17        Q.   I'll find it for you.

18        A.   I'm almost there.  34, the one I need a

19   microscope to read?

20        Q.   Yes.  Sorry.  I tried to expand it.

21             Okay.  On Exhibit 35 that we discussed with

22   Brian.  This is in June of 2006.  Brian Potashnik is

23   asking you to handle a meeting in San Antonio for

24   Greystone and Company?

25        A.   Yes, ma'am.
```

1      Q.   Who was Greystone and Company in relation to the

2    asset sale?

3      A.   They were a potential purchaser.

4      Q.   And at the bottom of this e-mail, you see

5    there's contact information for RBC Capital Markets?

6      A.   Yes.

7      Q.   Who was RBC Capital Markets --

8              MS. GIBSON:   Strike that.

9      Q.   (By Ms. Gibson)  What was RBC Capital Markets'

10   role as far as this Greystone tour?

11     A.   They were the -- I'll probably get the

12   terminology wrong, but they were the investment broker.

13   They were the ones that guided and steered Brian on

14   selling the business.  So they were helping brokering the

15   sale, if you will, as well as other advice, investment

16   advice and so forth.

17     Q.   And did --

18     A.   And --

19     Q.   Go ahead.

20     A.   And Kelley Heinsman was one of the people and

21   one other person that I recall.

22     Q.   Okay.  And in connection with this tour, RBC

23   Capital Markets, were they bringing in potential

24   purchasers for the Potashniks?

25     A.   Yes.

1      Q.    Did Brian Potashnik ever tell you in connection

2  with marketing Greystone that he wasn't interested in

3  them?

4      A.    I don't recall.   They were not chosen.

5      Q.    Okay.   So fairly immediately then in 06/06,

6  you're marketing the property to a prospective purchaser.

7              Okay.   Then by -- what -- in connection with

8  the promise about a lucrative bonus coming, if you'll

9  stay and the asset sale happens, what's the next big

10 event in your conversations with Brian?

11     A.    That was when he informed me that he picked a

12 horse, if you will.   He picked a company that they

13 thought they would -- could close and would close.   I

14 believe he mentioned they weren't the -- it wasn't the

15 highest price, but it was confident in closing.

16     Q.    Okay.

17     A.    And that was Cascade Pinnacle --

18     Q.    All right.

19     A.    -- who ultimately brought the property --

20 properties.

21     Q.    Okay.   And so when did he tell you that?

22     A.    That was on October 13th of 2006.

23     Q.    Okay.   Whoops -- my highlighter won't work.

24              And so -- and does Brian say anything to you

25 on October 13th about getting into specifics on the

Georgina Ware
Certified Shorthand Rep      Appendix 0933

1   bonus?

2       A.   Yes.   That's when he informed me of the

3   lucrative bonus and we walked through it.   And it was

4   simple math, if you will.   It was based on an LOI that

5   was getting ready to be signed and my bonus was going to

6   be 3 percent of the gross sales price, minus -- in

7   Brian's terms -- normal closing costs, including, like,

8   broker fees, title fees, legal fees, those types of

9   things like that.

10              MR. FRIEDMAN:   Sorry.   I didn't get it.

11              THE WITNESS:   For instance, broker's fees,

12  normal closing costs, related closing costs.

13              MR. FRIEDMAN:   Broker's fees, you said

14  something else?

15              THE WITNESS:   Broker's fees, title fees,

16  legal fees.   And then also lets the -- during this

17  conversation, sales proceeds, bonus, severance, whatever

18  you want to call it, of other employees would be deducted

19  before my 3 percent.   My 3 percent would be calculated

20  off that.

21      Q.   (By Ms. Gibson)  Did Brian Potashnik explain to

22  you why he wanted this last one to come off of the -- to

23  come out of the gross?

24      A.   Well, it helped -- we were going to put together

25  a program, pay-to-stay severance, sales proceeds bonus,

1   whatever you want to call it, for other people and it was

2   motivational to -- not to make some people real high that

3   would, you know, give away the farm -- which I would

4   never do.  But it was also to make it fair and reasonable

5   and I agreed with that, I understood that.

6       Q.   Okay.  And was another consideration that you

7   still -- because you needed the sale to go through, you

8   also would still give enough to get people to stay?

9       A.   Yes.

10      Q.   And you talk about the gross.

11               Gross what?

12      A.   Gross dollar amount, the sale amount.

13      Q.   Okay.

14      A.   I believe at that time we were using 36,000,000

15  off of the LOI.

16      Q.   Okay.  And this is based on an LOI that was --

17      A.   Letter of intent.

18      Q.   -- not yet signed?

19      A.   It was signed a few days later, yeah.

20      Q.   Okay.  So that should be accurate.  Say about to

21  be signed.  And I'm sorry.

22               What was -- what was the total you were

23  working off of on the gross?

24      A.   The 36,000,000.

25      Q.   Okay.  So at this time it was expected to

1   be 36,000,000 gross and at the time of -- as of

2   October 13, 2006, did you know when this would close?

3       A.   Not exactly.  It was a slow -- it was an

4   archer's process, detailed process, but it was supposed

5   to close -- ideally it was going to close in late spring,

6   early summer of 2007.

7       Q.   Okay.  So --

8       A.   That was the target.

9       Q.   Okay.  And did y'all -- did y'all -- did Brian

10  explain the math to you beyond the 36,000,000 gross?

11      A.   No.  We -- we didn't need to -- I mean --

12      Q.   Well --

13      A.   I mean, we walked through the math.

14      Q.   Right.  You walked through the math.

15           Tell us -- tell us how you walked through

16  the math.

17      A.   Well, it was 36,000,000, we assumed -- we took

18  assumption that normal closing costs would be

19  approximately $1,000,000.  We used -- we used

20  another $1,000,000 for other employee bonuses.  So that

21  effectively, it would have been 3 percent of 34,000,000,

22  which would be the amount of $1,020,000.

23      Q.   Okay.  And so 1,020,000 is the estimate.

24           And the estimated close, did you say, early

25  spring or summer?

1        A.   It was actually April, May.

2        Q.   Okay.

3        A.   And then kept getting delayed.

4        Q.   But no one knew that as of October 13th?

5        A.   That's correct.

6        Q.   And then at some point, did you receive a copy

7   of the LOI?

8        A.   Yes, I did.  Brian gave me a copy.

9        Q.   Okay.  And I'm just going to -- well, can you

10  take a look at Exhibit 11.

11       A.   Okay.

12       Q.   And you see that is the Cascade letter of

13  intent?

14       A.   Yes, ma'am.

15       Q.   All right.  And the date on that is

16  October 16, 2006?

17            MR. FRIEDMAN:  I'm sorry.

18            THE WITNESS:  Yes.

19       Q.   (By Ms. Gibson)  And then if you turn to the

20  page that's marked 7 in the lower right-hand corner.

21       A.   Yes.

22       Q.   You see that both Cheryl Potashnik and Brian

23  Potashnik signed this on the same day?

24       A.   Yes, ma'am.

25       Q.   Okay.  So how many days after your discussion

1    with Brian is this about?

2        A.   Three, two and a half, depending on what time of

3    the day.

4        Q.   Three, two and a half.  And --

5        A.   13th through the 16th.

6        Q.   Okay.  Did you -- if Brian Potashnik is telling

7    you that you're going to get a bonus off of the --

8    essentially the seller proceeds, minus certain amounts,

9    did you think he had authority to speak for the sellers?

10       A.   Yes, ma'am.

11       Q.   And the sellers in Exhibit 11 include all of the

12   Southwest Housing entities or persons affiliated with

13   them, right?

14       A.   That's --

15       Q.   Paragraph 1?

16       A.   That's correct.

17       Q.   Okay.  And as far as you know, who are the

18   persons affiliated that this is referring to?

19       A.   Brian and Cheryl.

20       Q.   And we -- we talked -- you heard from Rick Graf?

21       A.   Yes, ma'am.

22       Q.   Okay.  And who is he at -- what was his

23   position?

24       A.   Rick was the divisional president of the central

25   region of Pinnacle Property Management Services Inc., I

```
 1    believe is the full name.

 2        Q.   He did, basically, what you did for the

 3    purchaser?

 4        A.   Yes.

 5        Q.   And --

 6        A.   Large company.

 7        Q.   When -- when was your first face-to-face meeting

 8    with Rick?

 9        A.   That was December 7th --

10        Q.   Okay.

11        A.   -- of '06.

12        Q.   And where did y'all meet?

13        A.   We met by our office at Rock Fish restaurant.

14        Q.   What's the gist of what y'all talked about?

15        A.   It was to get acquainted.  Rick -- I knew Rick,

16    Rick knew me.  So it was some face-to-face time.  We

17    talked about the -- the work that's ahead for both of us,

18    started -- talked very general about all the due

19    diligence, who some of the players would be involved in

20    the due diligence and went into those type of details.

21    And it was -- it was business, but it was also casual,

22    just to get to know each other.

23        Q.   Okay.  And so as of December 7, 2006, what were

24    your thoughts about whether you were going to have a job

25    with the purchaser after the sale?
```

```
 1        A.   Well, being in the business as long as I have

 2   and knowing Pinnacle's size and what Rick did, my own

 3   assumption was that there would not be a position for me.

 4        Q.   Okay.  And did --

 5        A.   And it was later confirmed.

 6        Q.   Okay.  And what was the reason you weren't going

 7   to have a position?

 8        A.   Because they already have a Jeff Carpenter.

 9        Q.   Okay.  They already -- they already have their

10   own guy?

11        A.   That's right.

12        Q.   They got a guy?

13        A.   They got a guy and didn't need another one.

14        Q.   And -- but before we go -- before I go further

15   in the timeline, some of those dates are pretty specific.

16             How is it that you were able to note some of

17   these specific dates?  Just generally.

18        A.   Generally, off my Blackberry.

19        Q.   Off your Blackberry calendar?

20        A.   Off my calendar.

21        Q.   Off your -- your -- that's an Outlook calendar?

22        A.   I'm sorry.  Outlook calendar.

23        Q.   Okay.

24        A.   Blackberry to Outlook calendar.

25        Q.   Okay.  A calendar.
```

```
 1              And then did you take any notes once things
 2  started to go south with the Potashniks?
 3      A.   Yes, I did.
 4      Q.   Okay.
 5      A.   But not at that time.
 6      Q.   All right.
 7      A.   I was excited.
 8      Q.   Right, right.
 9              Not in this time frame --
10      A.   Right.
11      Q.   -- right?
12              You did -- so far through all of this, did
13  you trust the Potashniks?
14      A.   100 percent.
15      Q.   Okay.  And at the -- at the first meeting -- the
16  very first meeting at the Potashnik's home --
17      A.   Yes, ma'am.
18      Q.   -- the one that happened in May, did -- did you
19  and Brian Potashnik shake -- shake hands --
20      A.   Yes, ma'am.
21      Q.   -- in talking about the deal?
22      A.   Yes, we did.
23      Q.   Can you just -- you don't have to give a
24  demonstration, but it was -- can you kind of demonstrate
25  what the shake was like.
```

1      A.   Well, we were standing, shook and then kind of

2  did the little bump on the -- on the shoulder

3  (demonstrating).  It was a little pat because it was --

4  as he said, this will be a really good day for the

5  Potashniks and the Carpenters.

6      Q.   Okay.  And when you met with Brian Potashnik and

7  he announced the specific formula --

8      A.   Yes, ma'am.

9      Q.   -- did you shake hands at that point as well?

10      A.   Yeah.  Yes, we did.

11      Q.   And what -- what was -- at what point, if you

12  remember, did Brian Potashnik let you know that you

13  probably were not going to have a job with the purchaser?

14      A.   It was -- it was probably shortly after Rick and

15  I met.  It was kind of like the writing was on the wall.

16  I would say, mid December.

17      Q.   Okay.  And in -- in December of 2006 and in the

18  later month, did you and Brian Potashnik discuss, in

19  addition to updates on what was going on with the asset

20  sale, trying to have someone memorialize your handshake

21  deal in writing?

22      A.   Yes.  When Brian made that offer, I -- I

23  accepted, we shook hands.  He said that it will be put in

24  writing Randy Alligood would be their attorney.  I think

25  it was Rodney Gazelle (phonetic) would be putting it in

1  writing.  And he said it would be a good day to see your

2  name on the closing statement.

3      Q.  And ultimately -- so you thought that people --

4  or did that make you think that people getting stay

5  bonuses might be on the closing statement?

6      A.  Maybe a couple of people, but I was -- I was

7  happy about me so I was --

8      Q.  Okay.

9      A.  When Brian said that, I didn't go much further

10 than that.

11     Q.  All right.  All right.  And Brian -- when Brian

12 said that he would have Randy Alligood go ahead and

13 document your deal.

14          Who was Randy Alligood?

15     A.  Randy Alligood was legal counsel for -- I may be

16 incorrect, but for all the companies that maybe -- maybe

17 Brian and Cheryl personally.  I'm not sure, but he was

18 very involved in the company business -- company

19 businesses.

20     Q.  Okay.  And -- but at this point in time, had you

21 and Brian Potashnik ever had an issue with keeping your

22 handshake deals?

23     A.  No.

24          MR. FRIEDMAN:  What point in time is that?

25          THE WITNESS:  December.

1            MS. GIBSON:  This is all the way through

2  December.

3            MR. FRIEDMAN:  December 31st?

4            THE WITNESS:  Yeah, December.

5            MR. FRIEDMAN:  Okay.  Thank you.

6            THE WITNESS:  No, I hadn't.  I mean, things

7  were good, working hard.

8       Q.   (By Ms. Gibson)  And you -- had you had any

9  issues with working just based on oral discussions with

10  Brian, even without a handshake?

11       A.   Yes.  We -- we would have -- you know, run into

12  each other either in the hallway a lot of times.  A

13  couple of times we met in the parking lot.  Brian had a

14  lot on his plate for various reasons and I would inquire

15  about the memorializing of the agreement.  And he said

16  that it was being worked on, that the attorneys are busy

17  with the sale as well as criminal defense.  And I -- I

18  started becoming more concerned and frustrated just

19  because I was told one thing and another thing was

20  happening.

21       Q.   Well, that's -- but that's --

22       A.   Mid January.

23       Q.   And we'll --

24       A.   Okay.  Sorry.

25       Q.   We'll go -- we'll go into the future.

1           Now, you -- have you discussed annual

2  bonuses with Brian Potashnik at this point in December

3  of 2006?

4      A.   Brian was so difficult to get a hold of to -- to

5  be able to have lengthy discussions, no, I did not bring

6  it up.  I mean, it was -- not at that time.

7      Q.   And at a --

8      A.   There was a lot going on.

9           MR. FRIEDMAN:  I didn't hear that.

10          THE WITNESS:  There was a lot going on.

11     Q.   (By Ms. Gibson)  Okay.  And you -- he had just

12  promised you a big stay bonus?

13          MR. FRIEDMAN:  Leading, leading, leading.

14          THE COURT:  Don't lead.

15          MS. GIBSON:  Okay.

16     Q.   (By Ms. Gibson)  Now -- and -- and, you know,

17  generally, you know, you said you were pretty happy with

18  the Potashniks.

19          Now, did you though at some point, butt

20  heads on occasion at work over issues?

21     A.   I do not ever recall butting heads regarding

22  work.  Only as it relates to trying to memorialize my

23  agreement, why we're here.

24     Q.   Okay.

25     A.   No, no.

1    Q.   When -- on October 13, 2006, when you and Brian

2  shook hands on the -- on the deal, where you had a

3  specific amount --

4    A.   Yes, ma'am.

5         MR. FRIEDMAN:  I'm sorry.  That was a yes or

6  no?

7         MS. GIBSON:  Yeah -- no, no, no.  Sorry.  I

8  just --

9         MR. FRIEDMAN:  I didn't hear the answer.

10        THE COURT:  Repeat your question.

11        MS. GIBSON:  Sure.  Sure.

12   Q.   (By Ms. Gibson)  Oh, when you and Brian shook

13  hands on the deal on October 13th, 2006, did Brian

14  Potashnik tell you that the deal had to be in writing?

15   A.   No.

16   Q.   Why were there then discussions about just

17  memorializing the deal you had?

18   A.   Well, I wanted it memorialized because it's --

19  it was a little bit easier, but it was also about past

20  earned bonuses that haven't been paid out.

21   Q.   What was also -- what do you mean?

22   A.   I wanted the commitment of earned bonuses from

23  prior years to be acknowledged and to be paid out.  So

24  there was a -- let's call it "the sales proceeds" or

25  "severance bonus," the 3 percent, plus the outstanding

1    earned bonuses, annual bonuses.

2        Q.   Okay.  And -- and so did -- what did Brian tell

3    you about memorializing your annual bonuses for up until

4    that point?

5              MR. FRIEDMAN:  Vegas?  The time?  When was

6    this?  Is this on October 13th or some other time?

7              MS. GIBSON:  No, some other time.  I'll

8    rephrase it.

9              THE WITNESS:  No, this is --

10             MS. GIBSON:  I'll rephrase it.

11             THE COURT:  Let her ask the question.

12        Q.   (By Ms. Gibson)  When you talk about wanting to

13   also memorialize bonuses that were annual, before you

14   asked about memorializing that, what had your discussions

15   with Brian Potashnik been, generally?

16             MR. FRIEDMAN:  What's the point in time,

17   Your Honor?

18             MS. GIBSON:  The point in time is before

19   they talked about memorializing the annual bonuses and

20   years after year one.

21             THE WITNESS:  The time frame would be

22   January, 2007, time frame.  I trust -- believed in Brian

23   as Mark Jones says -- as passionate as he is about

24   Southwest Housing Company and the Potashniks, I was the

25   same way.  Loved what I was doing, loved what we did.  I

1   was getting -- you know, after the holidays thinking more

2   about it --

3               MR. FRIEDMAN:  I'm going to object as being

4   nonresponsive.

5               THE COURT:  All right.  Break up the

6   questions, Ms. Gibson.

7               MS. GIBSON:  Okay.  Sure.

8               THE WITNESS:  My apologies.

9       Q.   (By Ms. Gibson)  At some point, you received a

10   copy of an LOI?

11      A.   Yes, ma'am.

12      Q.   Okay.  And do you recall what date that was?

13      A.   Brian handed me a copy and Keith Jones, I

14   believe, e-mailed me a copy.  It was either that day or

15   the day after, it was within a couple of days.  I can't

16   give the exact date.

17      Q.   Okay.  I'm handing you Plaintiff's Exhibit 49.

18               Do you recognize that document?

19      A.   Now, I can give you that date.

20      Q.   But, first I have to --

21      A.   Yes.

22      Q.   -- I have to offer this.

23      A.   Yes.  I -- it's e-mail --

24      Q.   Go ahead.

25      A.   It's an e-mail to Keith Jones to Sara Reidy and

1    myself, regarding the LOI document.

2        Q.   Okay.  And so Keith Jones sends you a copy of

3    the LOI in January --

4                MS. GIBSON:  Oh, I'm sorry.  I'll offer

5    Plaintiff's 49.

6                THE COURT:  Any objection?

7                MR. FRIEDMAN:  No objection, Your Honor.

8                THE COURT:  49 is admitted.

9                (Plaintiff's Exhibit No. 49 is admitted.)

10       Q.   (By Ms. Gibson)  And the LOI copy that he's

11   sending you, is that the same letter of intent that we

12   went over earlier, signed a few days after your --

13       A.   Yeah.

14       Q.   -- conversation with Brian on October?

15       A.   Yes, ma'am.

16                MR. FRIEDMAN:  This is the signed letter of

17   intent, Your Honor?

18                THE COURT:  It's whatever you have, she just

19   admitted it.

20                MR. FRIEDMAN:  No, no, we admitted a

21   transmittal e-mail, but nothing attached.

22                MS. GIBSON:  He just testified that it was

23   the same letter of intent that we just talked about.

24                MR. FRIEDMAN:  We talked about two.  It's

25   the signed letter of intent.

```
 1                    THE WITNESS:  I --

 2                    THE COURT:  Okay.  Let her ask the question

 3    then you cross-examine him afterwards.

 4       Q.  (By Ms. Gibson)  And so at this point in

 5    January, why -- do you recall why Keith is sending you a

 6    copy of the LOI?

 7       A.  He was -- office next to Cheryl to --

 8                    MR. FRIEDMAN:  Objection.  Hearsay.

 9                    THE COURT:  Do you recall why he sent you

10    the -- why Keith Ellison -- Jones did?

11                    MS. GIBSON:  Yes.

12                    THE COURT:  Okay.  Overruled.

13                    THE WITNESS:  He was sharing that we have

14    the signed document that most likely that sale -- a deal

15    was going to go place, even though there was a lot of

16    things to make it happen, for it to come.

17       Q.  (By Ms. Gibson)  Okay.  And so this e-mail is in

18    January.  So on 01/17/07 when Keith Jones sends the LOI,

19    what's the anticipated closing date at this point for the

20    asset sale?

21                    MR. FRIEDMAN:  Objection.

22                    THE WITNESS:  The same as we discussed.

23       Q.  (By Ms. Gibson)  Okay.  And that was?

24       A.  The -- targeting April, May of '07.

25       Q.  Okay.  And you talked earlier about -- at some
```

1    point, wanting to talk to Brian Potashnik again about

2    memorializing your handshake deal.  And I thought you

3    said that -- that heated up in January; was that right?

4         A.   Yes.  Earlier in January, before I received the

5    LOI, Brian and I talked.  I -- I said, I'm faithfully --

6    basically the conversation, I'm faithfully committed to

7    the task at hand, but I keep getting put off, being told

8    that it's going to be happening, it's being -- happening

9    and it's not happening.  And I -- I must have been a

10   little bit more straightforward about it because I was in

11   Las Vegas working at our property there, Casa Del Norte,

12   it was going through a rehab, construction company was

13   doing the rehab.  And the construction company actually

14   pulled off.  And so the rehab was being lead by Mark

15   Harding, who was my director of facilities and

16   maintenance and myself with the site team so...

17        Q.   Let me just stop you for a minute.

18        A.   Yes, ma'am.

19        Q.   And I'll go to that event.

20             So you're -- you're in Las Vegas and you

21   said Casa Del Norte, is that one of the --

22        A.   That's the name of the apartment community.

23        Q.   The apartment community in Vegas?

24        A.   (Witness nods head.)

25        Q.   And where did you and -- when did this happen,

1   approximately?

2      A.  Brian --

3      Q.  No, I'm sorry.  No, no, no.  I had just asked

4   whether you were working.

5           So did you meet with Brian to talk about

6   the 3-percent handshake deal --

7      A.  Yes.

8      Q.  -- while you were in Vegas?

9      A.  Yes.

10      Q.  Okay.  Approximately -- around when did y'all

11  meet for that?

12      A.  I believe we met 7:30, 8 o'clock.  We met at the

13  Venetian Hotel.

14      Q.  Oh, I'm -- I'm sorry.  I meant approximately

15  when, meaning, like, what -- what approximate date?

16      A.  Oh --

17      Q.  Not what time.

18      A.  -- it was prior to the LOI.  It was, I believe,

19  the 12th --

20      Q.  Okay.

21      A.  -- of January.

22      Q.  All right.  And how did that meeting come about?

23      A.  I had previous discussions before I left town

24  because I was at Casa Del Norte for a little while.  And

25  I don't know -- Brian felt compelled to come out to meet

1    with me face to face.  And we met at the Venetian and

2    there's an Asian-styled restaurant.  I don't know if it's

3    Chinese or whatever.  And we had dinner and talked --

4    talked about what was going on at the property and

5    then --

6        Q.   Okay.

7        A.   -- the proceeds bonus.

8        Q.   Okay.  So Brian flew out to meet you to talk

9    about this?

10       A.   Yes, ma'am.

11       Q.   And he flew out -- is that because you wanted --

12   you were saying this needs to get memorialized, our deal

13   needs to be put down in writing; is that why he flew out

14   there?

15       A.   I was -- I was surprised that he was coming out,

16   but that was the gist of it, yes, to -- to make sure I

17   didn't lose focus.  He wanted to make sure that I'm on

18   pace and -- and committed.

19       Q.   Okay.  And tell me what -- what you and Brian

20   Potashnik discussed about documenting your deal in

21   writing?

22       A.   We -- we talked why it wasn't done when it was

23   said that it was going to be done by the -- our attorneys

24   and just given the reasons why they were too busy to do

25   it.  And I was pretty adamant that, am I not important

 1   enough that -- that it can't be done because it should be

 2   very simple to do, for matter of a few minutes.  Brian

 3   stated that, Jeff, if it's that important to you, you

 4   know, I'll write it on the back of a napkin.  And I said,

 5   Okay.  And we didn't because it was nice place and it was

 6   clothe napkins.  But he said that, I'll -- he stated that

 7   he'll follow-up on it and he said, If you would like to

 8   try to put it in writing, feel free to do it and submit

 9   it to me as well to help expedite.

10      Q.  Okay.  And at this point, you -- did you still

11   trust -- you -- at this point, were you still trusting

12   Brian Potashnik to keep his word?

13      A.  Yes, I was.  I mean, someone flies out there

14   just to have dinner with me to --

15           MR. FRIEDMAN:  Nonresponsive.

16           THE WITNESS:  Yes.

17      Q.  (By Ms. Gibson)  Okay.  And what's the reason

18   you decided to go ahead at that point and trust Brian to

19   honor his word?  What you were just about to say?

20      A.  Well, I believe in our mission.  I believed in

21   what was going on.  I was pleased with the -- the sales

22   proceeds bonus, as a matter of the oral consummating to

23   the written, so forth.  But I was impressed that Brian

24   took the time to hop on a plane to come out and talk to

25   me individually.

1      Q.   Now, as we sit here today, you wish you'd ruined

2  one of those clothe napkins?

3      A.   Yes.

4      Q.   Okay.  But at the time -- at that time, you --

5  you decided to trust Brian?

6      A.   Yes, ma'am.

7      Q.   Okay.

8      A.   He mentioned he'd have it to me in a couple of

9  days.

10          MS. GIBSON:  Your Honor, I'm going to need

11  to approach?

12          THE COURT:  Okay.

13          (Off-the-record discussion.)

14      Q.   (By Ms. Gibson)  Now, Mr. Carpenter, did you --

15  did Brian Potashnik also have some talk in the presence

16  of you and Sara Reidy about memorializing deals in

17  writing?

18      A.   We had that conversation, but I don't believe it

19  was covered that evening.

20      Q.   Okay.  So at some other point, did Brian

21  Potashnik meet with two or three of you about

22  memorializing --

23      A.   Yes.

24      Q.   -- the deal?

25      A.   Cheryl and Brian met with Keith, Sara and myself

1   in Cheryl's office and told us that.

2            MR. FRIEDMAN:  All right.  Can we approach,

3   Your Honor?

4       Q.  (By Ms. Gibson)  Told us --

5            MR. FRIEDMAN:  Can we approach?

6       Q.  (By Ms. Gibson)  Told us you could do what?

7            THE COURT:  Approach.

8            (Off-the-record discussion.)

9       Q.  (By Ms. Gibson)  All right.  Mr. Carpenter, I'm

10  handing you what's been marked as Plaintiff's Exhibit 50.

11           Do you recognize Exhibit 50 as a

12  January 17, 2007, e-mail to you from Keith Jones?

13      A.  Yes.  But it's in a much different font, so

14  I'm -- I'm assuming that the content is the same.

15      Q.  I --

16           MR. FRIEDMAN:  Well, let me take the witness

17  on voir dire, Your Honor.  He recognize it or not.

18           THE COURT:  Cross-examination, he said he

19  recognized it.

20           THE WITNESS:  It -- it appears to be.

21      Q.  (By Ms. Gibson)  Okay.  The font just looks a

22  little strange?

23      A.  Yeah, the font's totally different.

24      Q.  Okay.

25           MR. FRIEDMAN:  Your Honor --

 1                    MS. GIBSON:  And Plaintiffs offer

 2    Exhibit 50.

 3                    MR. FRIEDMAN:  -- I think voir dire would be

 4    appropriate.  I mean, the subject says amendment to

 5    employment agreement to a blank document and what's

 6    attached is not a blank document.

 7                    THE COURT:  Okay.  Overruled.  But your --

 8    we'll put your substantive objection and that objection

 9    too on the record at a later time.

10                    MR. FRIEDMAN:  Okay.  Thank you.

11                    THE COURT:  50 is admitted.

12                    (Plaintiff's Exhibit No. 50 is admitted.)

13                    MR. FRIEDMAN:  50?

14                    THE COURT:  50.

15         Q.  (By Ms. Gibson)  So on January 17, 2007, Keith

16    Jones is sending you a form for what?

17         A.  It was --

18         Q.  Why is he sending you a form?

19                    THE COURT:  The question is:  What is the

20    form for, not --

21                    MR. FRIEDMAN:  The purpose of the form.

22                    THE WITNESS:  The purpose of the form was we

23    were informed to try to expedite memorializing each

24    individual severance bonus program, whatever you want to

25    call it.  We don't know who -- anything about each

```
 1   other's.

 2       Q.   (By Ms. Gibson)  Okay.

 3       A.   Keith was using --

 4       Q.   Okay.  Well --

 5                MR. FRIEDMAN:  This is exactly what --

 6                MS. GIBSON:  No further --

 7                THE COURT:  Okay.

 8                MR. FRIEDMAN:  This is --

 9                MS. GIBSON:  No further on that.

10                THE COURT:  Let her ask the questions.

11                MR. FRIEDMAN:  She needs to follow your

12   instructions.

13                THE COURT:  Okay.  Let her ask the question.

14   Answer only the questions she's asking you,

15   Mr. Carpenter.

16                THE WITNESS:  Yes, sir.

17       Q.   (By Ms. Gibson)  Okay.  And so ultimately, did

18   you end up using this form?

19       A.   I used this form as the basis, yes.

20       Q.   Okay.  And if you look at the form, you see in

21   Paragraph 2 --

22       A.   Yes, ma'am.

23       Q.   -- it says -- the form says, "Without

24   withholding or deduction of any kind" --

25                MR. FRIEDMAN:  Your Honor --
```

1    Q.   (By Ms. Gibson)  -- "and without" --

2              MR. FRIEDMAN:  -- I would object to this as

3    hearsay.  This is not offered for the truth of the matter

4    asserted.  This is only offered for the purpose that a

5    form was transmitted.

6              MS. GIBSON:  Your Honor, there's --

7              THE COURT:  If it's not offered for the

8    truth of the matter asserted, it's not hearsay.

9              MS. GIBSON:  And it -- it's a contract.  It

10   doesn't have facts, do this, do that.

11             MR. FRIEDMAN:  This is not a contract.  It's

12   a form --

13             MS. GIBSON:  I'm sorry.

14             MR. FRIEDMAN:  -- and it's what's in the

15   form is not true, it's just a form.

16             THE COURT:  Objection's overruled.  And

17   that's her point, is that it's a form.

18    Q.   (By Ms. Gibson)  So in this form that you were

19   provided, part of it says, "Without deduction for any

20   compensation paid to any other employees of any of the

21   employer entities."

22             You see that?

23    A.   Yes, ma'am.

24    Q.   Okay.  Now, that was not your -- you were having

25   deductions --

```
 1                    MR. FRIEDMAN:  Your Honor, I'm not going to

 2   let her lead.

 3        Q.  (By Ms. Gibson)  Were --

 4                    MR. FRIEDMAN:  I'm not going to let him

 5   lead -- her lead through this.

 6                    THE COURT:  Okay.

 7                    Rephrase your question.

 8                    You said --

 9                    MR. FRIEDMAN:  Leading.

10                    THE COURT:  Sustained.

11                    Rephrase your question.

12                    MS. GIBSON:  Sure.

13        Q.  (By Ms. Gibson)  Is that statement accurate for

14   your handshake deal?

15        A.  No, ma'am.

16        Q.  Okay.  But -- in ultimately using the form, did

17   you pick up that language?

18                    MR. FRIEDMAN:  Leading.

19                    THE COURT:  It's not leading.

20                    MS. GIBSON:  It's not leading.

21                    MR. FRIEDMAN:  She suggested the answer,

22   Your Honor.

23                    THE COURT:  You have to have -- your

24   objection is overruled.

25                    THE WITNESS:  Would you mind repeating?
```

1      Q.   (By Ms. Gibson)  Okay.  In ultimately using the

2  form that Keith Jones provided to you, did -- did that

3  language get picked up?

4      A.   No.  I --

5      Q.   You --

6           MR. FRIEDMAN:  Nothing after no is

7  responsive.

8      Q.   (By Ms. Gibson)  So -- so --

9      A.   I used that language and I shouldn't have --

10      Q.   Okay.

11           MS. GIBSON:  Go ahead.

12           THE COURT:  Ask your question.

13           MS. GIBSON:  Okay.

14      Q.   (By Ms. Gibson)  Did you accidentally pick up

15  this language when you were using this form?

16      A.   Yes, ma'am.

17      Q.   But as far as your discussions with Brian

18  Potashnik, did the formula remain the same?

19      A.   (No response.)

20      Q.   As far as your oral discussions with Brian

21  Potashnik?

22      A.   Yes.

23      Q.   Okay.  And so Brian -- Brian knew what your

24  formula was?

25      A.   Yes, ma'am.

1     Q.   And then -- but before -- before you decide to

2  use Keith Jones' document -- and I'm just going to write

3  this while I ask you the question.  I'm going to write

4  this e-mail up here while I ask you this question.  Okay.

5     A.   Okay.

6     Q.   Don't think I'm writing about this question.

7           After this, though, before you decided to

8  use this form, did you try to find an attorney to write

9  it down?

10     A.   Yes, I did.

11     Q.   Okay.  And who -- who'd you first talk to about

12  finding someone who might be able to do that?

13     A.   It was our tenant landlord attorney -- oh,

14  gosh -- Greg --

15     Q.   It's okay if you don't remember his name.

16     A.   It may be Mallar (phonetic), I can't remember

17  his last name for sure.

18     Q.   Okay.  And --

19     A.   It's in my phone.

20     Q.   -- and he -- to give you the names of a few

21  attorneys?

22     A.   Yes, ma'am.

23     Q.   Okay.  And who did you ultimately talk to?

24     A.   I spoke to Mr. Will Hartsfield.

25     Q.   Okay.

1          THE COURT REPORTER:  I'm sorry.  Could you

2   repeat the name?

3          THE WITNESS:  Mr. Will Hartsfield.

4     Q.   (By Ms. Gibson)  And how long -- well, did you

5   have an understanding of Will Hartsfield's background,

6   professional background?

7     A.   That he was a very sophisticated and Harvard-ish

8   in employment law attorney.

9     Q.   Okay.  And after meeting with Mr. Hartsfield

10  about trying to get him to maybe document the deal, what

11  was your feeling about using Mr. Hartsfield to do it?

12    A.   It was just way too complicated and it would

13  have been a book so...

14    Q.   Okay.

15    A.   I did not use him.

16          THE COURT:  If you're coming to a different

17  subject, we still have that second -- that last

18  ten-minute break.

19          MS. GIBSON:  Okay.  Well, this is a good

20  time.  Sure.

21          THE COURT:  All right.  We'll take a

22  ten-minute break, ladies and gentlemen.

23          THE BAILIFF:  All rise.

24          (Jury ushered out.)

25          (Break was taken.)

1            THE BAILIFF:  All rise.

2            (Jury ushered in.)

3            THE COURT:  Everybody have a seat, please.

4            Have a seat, Mr. Carpenter.

5            THE WITNESS:  Thank you.

6            THE COURT:  Welcome back, ladies and

7   gentlemen.  We'll continue with the trial and we'll go up

8   until around 4:30 or so before we stop for the day.

9            Ms. Gibson, if you'd pick up where you left

10  off.

11           MS. GIBSON:  Sure.

12                DIRECT EXAMINATION (cont'd)

13  BY MS. GIBSON:

14     Q.  Mr. Carpenter, when did you meet with Will

15  Hartsfield --

16     A.  March --

17     Q.  -- to document your deal?

18     A.  -- March 7th, 2007.

19     Q.  Okay.  I'm handing you what's been marked

20  Plaintiff's 51.  Ignore this, please (pointing).  Okay.

21     A.  Okay.

22     Q.  And with respect to the 3-percent handshake

23  deal, what generally were you asking Mr. Hartsfield to

24  do?  What'd y'all talk about on the 3 percent deal?

25     A.  Well, I told him -- pardon me.  I told him about

1   our handshake deal, gave him the particulars, the formula

2   and so forth and walked -- walked through the process of

3   the deal.

4       Q.   And although you -- you didn't -- Will

5   Hartsfield didn't end up documenting the deal?

6       A.   No, ma'am.

7       Q.   Okay.  And why was -- you know, how did that

8   come about?  Why?  As far as what y'all discussed.

9       A.   He -- Will being very thorough, he was throwing

10  all different types of language of if I die and --

11              MR. FRIEDMAN:  I'm going to --

12              THE WITNESS:  -- just a whole bunch of legal

13  stuff that I --

14              MR. FRIEDMAN:  -- object to anything that

15  Hartsfield says as being hearsay.

16              THE COURT:  Don't tell us what

17  Mr. Hartsfield said.

18              But repeat your question.

19              And answer whatever her question was.

20              MS. GIBSON:  Okay.

21      Q.   (By Ms. Gibson)  And at the end of the -- you

22  know, after you met with Mr. Hartsfield, he gave you

23  notes that he took about your 3-percent deal?

24      A.   Yes.

25      Q.   Okay.

1        A.   Yes, it was documented.

2        Q.   Okay.  Whose handwriting is on Exhibit 51?

3        A.   Mr. Hartsfield.

4        Q.   Okay.  And that's what was given to you --

5        A.   Yes, ma'am.

6        Q.   -- on the 3-percent deal?

7        A.   Yes, ma'am.

8        Q.   Okay.

9                  MS. GIBSON:  Plaintiffs offers Exhibit 51.

10                 MR. FRIEDMAN:  I've seen this, Judge.  It

11   has no name on it, no date or anything like that, white

12   piece of paper, not on a stationary.  So lack of

13   foundation, hearsay, unauthenticated and best evidence

14   rule.

15                 THE COURT:  That's not --

16                 MR. FRIEDMAN:  You want to look at it?

17                 THE COURT:  No, I saw it.  Move forward.

18                 MS. GIBSON:  Your Honor, we're not offering

19   it for the truth of the matter.  It's simply the notes on

20   the 3-percent deal that Will Hartsfield gave to

21   Mr. Carpenter.

22                 THE COURT:  All right.  And, ladies and

23   gentlemen, you can consider the document as being a copy

24   of the document that Mr. Hartsfield gave Mr. Carpenter

25   and not for the truth of the matter asserted therein.

1              (Plaintiff's Exhibit No. 51 is admitted.)

2              MR. FRIEDMAN:  Based on what Mr. Carpenter

3    told Mr. Hartsfield not to document.

4              THE COURT:  You said based on what

5    Mr. Carpenter not to document?

6              MR. FRIEDMAN:  What Mr. Carpenter told

7    Mr. Hartsfield not to document.  He had a chance to have

8    a lawyer document it and didn't.

9              THE COURT:  Okay.  That's your cross-

10   examination.

11        Q.  (By Ms. Gibson)  All right.  Since -- since

12   Mr. Friedman just made that comment, Mr. Carpenter, let's

13   talk about that for a quick moment.  Well, no, we'll

14   cover it in this.

15             Okay.  And so the first line of these notes

16   say, "Since May of last year"?

17        A.  (No response.)

18        Q.  Yes?

19        A.  Yes.

20        Q.  Okay.  "Owns earned bonus" or "owes earned

21   bonus"?

22        A.  Yes.

23        Q.  Okay.  And then it also says, "1,000,000," and

24   "simplier the better"?

25        A.  Yes.

1      Q.   Okay.  With respect to "simplier the better,"

2  how quickly did you want this deal memorialized?

3      A.   I was hoping to have it in a day or two from

4  Mr. Hartsfield.

5      Q.   And after talking with him, what was your

6  impression about whether it would be simple?

7      A.   It would not be simple and it would not be near

8  that time frame.

9      Q.   Okay.  Did you anticipate it would be worst than

10  what Mr. Friedman has talked about, that you submitted to

11  the Potashniks ultimately?  Even worse than that?

12      A.   My -- my attorney skills -- I'm sure his

13  document would have been very thorough and very expensive

14  and much better than what I submitted in my --

15      Q.   Okay.  But not -- but you were looking for

16  simple?

17      A.   Yes.

18      Q.   Okay.  And what -- what is the next line?

19  'Cause I have no idea.  Do you know what that is?

20      A.   I don't know --

21      Q.   Okay.

22      A.   -- unless he's abbreviating something.  I don't

23  know.

24      Q.   Okay.  Then there's something about a car

25  accident.  That -- that doesn't have anything to do with

1   your 3-percent deal?

2       A.   Well, he was considering if we write up and if

3   you were in a car accident, type of scenario.

4       Q.   Oh, what if -- oh, okay.  All kinds of

5   possibilities?

6       A.   Yes.

7       Q.   All right.  What if you're in a car accident?

8       A.   Yeah, all the what-ifs.

9       Q.   Okay.  There's a sale of the company and

10  discussion of who stays.

11              And then can you help me out with the next

12  line, "sale price," what?

13      A.   The sale price and -- I would -- I don't know if

14  it's a six, I don't know if it's a one in there.

15      Q.   Okay.

16      A.   What it is --

17      Q.   It looks like 36 M?

18      A.   Yeah.

19      Q.   Okay.

20      A.   That would have been correct.

21      Q.   And then it says, "3 percent about a million"?

22      A.   Yes, ma'am.

23      Q.   Car accident again.  And then it says,

24  "Restructured."

25              What was -- was that about the 3 percent

```
 1   or --

 2        A.   I don't -- I don't recall.

 3        Q.   Okay.  And then the next line just says,

 4   "Selling interest in real estate"?

 5        A.   That -- it was a footnote to him, I -- I'm

 6   assuming.

 7        Q.   And then, "no job for him"?

 8        A.   Yes.  I told him my story that I would be out of

 9   employment at the end of my deal.

10        Q.   Because Rick Graf is already there?

11        A.   Yes, ma'am.

12        Q.   Okay.  Okay.  And during your discussions with

13   Will Hartsfield or at least some time close to your

14   meeting, it came -- it somehow came to your attention

15   that your written employment agreement has a severance --

16   termination severance provision?

17        A.   Yes, ma'am.

18        Q.   Okay.  So at around this time frame, you -- you

19   were going to potentially address that and -- when

20   memorializing the document?

21        A.   Yes.

22        Q.   Okay.  But prior, you know -- before all of this

23   is happening, had you ever even thought about looking at

24   your employment agreement on the -- on the 3-percent

25   deal?
```

```
1        A.   No.

2        Q.   Mr. Carpenter, I'm handing you Plaintiff's 52.

3              THE COURT:  You got to walk around the court

4   reporter.

5              MS. GIBSON:  I apologize.

6              MR. FRIEDMAN:  Thank you.

7        Q.   (By Ms. Gibson)  Do you recognize Exhibit 52 as

8   an e-mail from -- from yourself to your work e-mail

9   address at Southwest Housing?

10       A.   Yeah.  Notes to myself, yes.

11       Q.   Okay.  And then there are also notes to discuss

12  on the next two pages --

13       A.   Yes.

14       Q.   -- as part of the e-mail?

15       A.   Yes.

16       Q.   Okay.

17             MS. GIBSON:  Plaintiff offers Exhibit 52.

18             THE COURT:  Any objection?

19             MR. FRIEDMAN:  Just one minute, Judge.

20             THE COURT:  All right.

21             MR. FRIEDMAN:  Has something been redacted

22  from this document, Your Honor?

23             THE WITNESS:  I don't think it printed

24  correctly.

25             MS. GIBSON:  No, no.  Actually the first
```

1    time I only printed the first page, not realizing there

2    was more to it.  It's just the way it is.

3                    MR. FRIEDMAN:  Give us one second to make

4    sure it's not violating the limine.

5                    THE COURT:  All right.

6                    MR. DONOHUE:  Your Honor, there are at least

7    two entries we see that violate the limine order.

8                    THE COURT:  Georgina, we'll hold off on

9    Exhibit 52.

10                   (Sotto voce discussion.)

11        Q.  (By Ms. Gibson)  Mr. Carpenter, would you put 51

12   aside for now.

13        A.  (Witness complies.)

14                   MR. FRIEDMAN:  52.

15                   THE COURT:  52.

16                   THE WITNESS:  52.

17        Q.  (By Ms. Gibson)  52, I'm sorry.

18        A.  Yes, I gave it to the judge, Your Honor.

19        Q.  And without getting into any details,

20   Mr. Carpenter, as to specific people or -- or anything

21   like that, did Brian Potashnik ask you to help identify

22   key or important employees that reported to you?

23        A.  Yes.

24        Q.  Okay.  And did he -- and what was -- and did he

25   ask you to help with the -- whether you call it a stay

```
 1    severance bonus program or pay-to-stay bonus program, did
 2    he ask you to participate in that for people that
 3    reported to you?
 4         A.   Yes, he suggested it --
 5         Q.   Okay.
 6         A.   -- and made some suggestions.
 7         Q.   And made some -- and did you talk to Brian
 8    Potashnik periodically about that process for those
 9    employees?
10         A.   We -- we spoke about it --
11         Q.   I don't want you to get into details, but --
12         A.   We spoke about that day and we followed up on
13    it.
14         Q.   Okay.  And ultimately, after you met with Will
15    Hartsfield about trying to memorialize your deal --
16         A.   Yes, ma'am.
17         Q.   -- when's the next time after March 7th that you
18    met with Brian Potashnik?
19         A.   That'd been March 14th.
20         Q.   And, please, tell me if I accidentally get a
21    year wrong when I'm writing.
22              Where do you and Brian meet?
23         A.   I believe it was a Wednesday, we met at, I
24    believe, 7 o'clock, Cobies.
25         Q.   Okay.  And what'd y'all talk about?
```

1    A.   I had a laundry list.  The document that was

2    taken away, Exhibit 52 --

3    Q.   Don't -- don't talk about that.

4    A.   I can't talk about that?

5    Q.   Please don't.  No.

6    A.   Okay.  I had a list of business and personal

7    concerns, as well as following up on the status of the

8    business issues, earned bonus, you know -- payment of

9    earned bonuses, as well as the 3 percent.  Those were the

10   three biggies for me.

11   Q.   Okay.  So you talked about the 3 percent and

12   overdue annual bonuses?

13   A.   Right.

14   Q.   Turning to the annual bonuses for a moment.

15        Did Brian Potashnik at some point, did he --

16   did the Potashniks ever come back with a final total on

17   what you were owed in past due annual bonuses, the final

18   total?

19   A.   Brian came back with 400.

20   Q.   Well, what -- but, I mean, at some point had you

21   asked them to take a look at what you thought you had

22   earned?

23   A.   Yes, I gave a recommendation.

24   Q.   Okay.  And what did they say in response?

25   A.   I will get back to you in a couple of days.

1    Q.   Okay.  And did they ever do that?

2    A.   No.

3    Q.   Okay.  So on the annual bonuses, though, some

4  point you said Brian did give you some numbers?

5    A.   Yes.

6    Q.   Okay.  So when you and Brian were talking about

7  annual bonuses in years not covered under your employment

8  agreement, meaning after year one --

9    A.   Yes, ma'am.

10   Q.   -- what range had y'all operated under, if you

11 did at all?  What was the range y'all had discussed?

12   A.   From 50 to 200.

13   Q.   Okay.  And so did that range ever change as far

14 as your oral discussions about annual bonuses as to what

15 you were working with?

16   A.   No, 'cause I never got feedback from my written.

17 So orally that's it.

18   Q.   All right.  That was -- you -- that's the range

19 y'all always discussed --

20   A.   Yeah.

21   Q.   -- on oral?

22        Okay.  And did Brian Potashnik ever

23 acknowledge to you while you were working that annual

24 bonuses were earned and past due?

25   A.   Yes.

1    Q.   Okay.  Did Brian Potashnik ever talk to you

2  about catching up?

3    A.   Yes.

4    Q.   And what did Brian Potashnik tell you about

5  trying to catch up with you on past due annual bonuses?

6    A.   There was a couple of properties that were ready

7  to close in permanent financing, bringing -- developer

8  fees, there was --

9    Q.   Okay.  Let's -- let's talk --

10    A.   It's in -- it's in four parts.

11    Q.   Okay.  So he'd catch up on developer fees -- I

12  mean, I'm sorry.  From developer fees?

13    A.   Right, sources.

14              MR. FRIEDMAN:  I'm not hearing him.

15              MS. GIBSON:  Sources.

16              THE WITNESS:  Sources.

17              MR. FRIEDMAN:  Thank you.

18    Q.   (By Ms. Gibson)  Okay.  It looks like I spelled

19  fancy catch up, but that's catch up.  Added developer

20  fees.

21              What else did he tell you?

22    A.   The McKinney land sale, $50,000.

23    Q.   And is -- you said the McKinney land what?

24    A.   Sale.

25    Q.   Sale.

```
1                    And is this another -- is this also a
2   source --
3        A.   Yes.
4        Q.   -- to catch up from?
5                    Okay.  And what else?
6        A.   50,000 for Fair -- Fair Way Apartments.
7        Q.   And is that also a source --
8        A.   Yes, ma'am.
9        Q.   -- from which he's going to catch up?
10       A.   Yes, ma'am.
11       Q.   And what -- what else?
12       A.   And then he gave a range of 100 to 200,000 from
13  the Vegas property.
14       Q.   Okay.  And was trying to catch up on past due
15  annual bonuses from the McKinney and Fair Way and Vegas
16  deals, separate from him telling you he would catch up
17  on -- out of developer funds?
18       A.   Those were four sources of funds that were
19  anticipated to come in shortly.
20       Q.   Okay.  And so what -- what number are you --
21  what -- what number do we put here for catching up out of
22  developer?
23       A.   I'm not sure.
24       Q.   Okay.  Did you understand that there was a
25  minimum?
```

1      A.   Yes.

2      Q.   Okay.  What was the minimum?

3      A.   Fifty --

4      Q.   Okay.

5      A.   -- thousand.

6      Q.   And they paid you 50,000 in year one, right?

7      A.   Correct.

8      Q.   Okay.  And so we're talking about year two and

9  year three?

10      A.   At that time, yes.

11      Q.   Okay.  And so the minimum there would be what?

12      A.   100 or --

13      Q.   Okay.

14      A.   100 there.

15      Q.   And you -- you said, "developer funds."

16           Can you explain what that source is?

17      A.   Once the -- the property hit stabilization and

18  other benchmarks and it goes to permanent financing,

19  depending on how the deal is structured, there's --

20  that's when the developer gets payment in some deals and

21  depending on some others.  But that's when their income

22  comes in from the property.

23      Q.   Okay.  And is that also called "developer fees"?

24      A.   Yes.

25      Q.   Okay.  And so was the catch up from developer

1    fees separate from trying to catch up in these amounts,

2    at least starting from these other sources?

3        A.   That was my understanding.

4        Q.   Okay.  Going back to your meeting on

5    March 14th, 2007, what was Brian Potashnik's reaction?

6    What did he say in response to you discussing

7    the 3-percent handshake deal and overdue annual bonus

8    payments?

9        A.   He -- he -- he understood.  I mean, I had the

10   notes, we walked through those.  And it was -- I don't

11   want to say it was affirmative, like, yesterday the okay

12   issue.  But we went through everything.  And he said,

13   Well, let me have a day or two to -- to analyze it and

14   I'll get back to you.

15       Q.   Okay.

16       A.   And that -- it was a long -- it was a full page

17   list of items.

18       Q.   Okay.  And you -- you dropped off with Brian

19   Potashnik certain documents?

20       A.   Yes.

21       Q.   Okay.  Without saying what the details of them

22   were, one was your effort to memorialize the deal?

23       A.   Yes, ma'am.

24       Q.   Okay.  And you used the form that Keith Jones

25   gave you?

1    A.   Yes, ma'am.

2    Q.   And -- and attorney -- attorney Ms. -- or

3  Mr. Internet?  Did you use the Internet as well?

4    A.   I don't believe so, but --

5    Q.   Okay.

6    A.   -- who knows.  I don't believe so.

7    Q.   All right.  And you dropped off some notes with

8  them?

9    A.   Yes.

10   Q.   And the third item you dropped off with him was

11  spreadsheets as to what you thought was owed on earned

12  bonuses?

13   A.   Earned bonuses, you know -- it was earned

14  bonuses as well as any pay increases, based on

15  performance if we get into that discussion.

16   Q.   Okay.

17   A.   Since there hasn't been any review of any type

18  and we were behind.

19   Q.   And the -- the purchase at this point in time

20  how close do you think -- or as far as your recollection,

21  how close did you feel y'all were to final purchase and

22  sale agreement and closings to start happening?

23   A.   I believe the purchase sales agreement was

24  signed in April.  Brian stopped by and gave me a draft

25  copy to -- to peruse beforehand so it was -- it was

1  nearing quickly.

2      Q.   And at some point, did Brian and Cheryl talk to

3  you about staying all the way through closing?  I

4  don't -- and I'm not saying in this time frame.  I'm

5  saying ever, had they talked to you about staying on all

6  the way through closing?

7      A.   It was -- no.

8      Q.   When -- so by now, though, you know and Brian's

9  told you that you're not going to have a job with the

10  purchaser and you don't think the close is about to

11  happen.

12           So are you looking for a job?

13      A.   Yes.  I was getting calls and as -- from search

14  firms, as well as contacts out in the business arena?

15      Q.   All right.  And you saw the video deposition of

16  Jeff Richards this morning?

17      A.   Yes, ma'am, with American Housing Foundation.

18      Q.   Okay.  And he was one of the people that

19  recruited you to go over to American Housing?

20      A.   Yes.  He was my first contact.  He mentioned I

21  was referred by a group in Denver, who was Lockton

22  Insurance, but we got brought into Southwest --

23      Q.   Okay.

24      A.   -- and used in the past.

25      Q.   And when was your first meeting with Jeff

1   Richards?

2       A.   I believe it was April 24th.

3       Q.   Okay.  So 04/24/of '07 is first meeting with

4   Jeff Richards.

5            And did you agree with Jeff Richards that

6   y'all hit it off early on?

7       A.   Personalities, we -- we hit it on very good.

8   I -- I liked Jeff.  I mean, philos -- his business

9   philosophy, his personal philosophies -- faith based.

10  American Housing Foundation was a 501(C)3, so it was

11  taking what we were already doing at Southwest Housing

12  and putting some more sugar on it --

13      Q.   Okay.

14      A.   -- as well as through that program.

15      Q.   And do you agree with Jeff Richards when he

16  testified that they -- they wanted you to come on over

17  pretty early?

18      A.   Yes, they did.

19      Q.   Okay.  And you did not agree to take the job,

20  did you?

21      A.   That's correct.

22      Q.   Okay.  Why didn't you immediately go over to

23  Affordable Housing -- no.  What's it called American --

24      A.   American Housing Foundation.

25      Q.   Thank you.  American Housing Foundation.

```
 1              Why did you not go over immediately?
 2       A.   Due to the oral agreement of 3 percent and as
 3  well as getting paid for the back earned bonuses.  I was
 4  a man of my word.  I said I would, you know, stay and be
 5  committed and I was -- wasn't willing to walk away from
 6  that and walk away from Brian and Cheryl because there
 7  was a lot going on in addition to just selling the
 8  property.
 9       Q.   And was your base salary at Jeff Richards'
10  company going to be higher, lower or the same as what you
11  were earning at Southwest Housing Management?
12       A.   It was -- it was higher, quite substantially.
13  Do you want the number?
14       Q.   Well, I was talking about this -- I'm just
15  talking about salary, not the whole compensation package.
16       A.   My salary was 259,000 a year, plus --
17       Q.   Okay.  At Jeff Richards' company?
18       A.   Yes.
19       Q.   Okay.
20       A.   Plus a very detailed four-part bonus program.
21       Q.   Okay.  And if -- if you set aside the 3-percent
22  handshake deal -- because obviously that was worth a
23  lot -- and just compared the salary and bonus structure
24  at Southwest Housing Management and the salary and bonus
25  structure at Jeff Richards' company, which was the higher
```

1    comp package?

2        A.   Oh, American Housing Foundation by far.

3        Q.   And so was there -- if you -- if you weren't

4    expecting a large stay bonus, would there be any reason

5    for you not to go over to Jeff Richards --

6        A.   No --

7        Q.   -- company?

8        A.   -- I would have left -- I would have left.

9        Q.   And then while all this is going on, are things

10   really busy still at the company?

11       A.   Yes, very busy.

12       Q.   Okay.  And can you -- can you give us just the

13   nutshell, short version of, you know, kind of what was

14   going on that was still keeping y'all really busy in this

15   time frame?

16       A.   Besides the normal course of business with

17   additional new product coming on line from development

18   and construction, we're still dealing with Katrina, Rita

19   on a daily basis, working hand in hand with city

20   governments and FEMA, trying to get paid was a big chore.

21   Plus the due diligence, starting up at that point in time

22   for the -- because the PSA was signed, I believe, at the

23   end of April and we -- we were already preparing for

24   that.  So once it was signed, we -- we started and it was

25   very meticulous.

1      Q.   And with respect to due diligence, without

2   getting into the details of what people have to do for

3   due diligence, can you just give us a bird's-eye view of

4   how much had to be covered -- how much area had to be

5   covered as far as due diligence?  In other words, as far

6   as -- where was due diligence taken place?

7      A.   A wide variety.  Not only just on management, I

8   mean, the accounting was affected.  A lot of accounting

9   reports, past histories from Sara, development, finance,

10  you know, projections and the status of the deal from the

11  general make up of -- from day one, what's the -- the

12  evolution of that property.

13          On the management side, we had tons of

14  physical inspections for fair housing, for accessology,

15  different types of permits that were required.  They were

16  exceptionally thorough.  I believe, there was

17  probably 17, 18 different types of due diligence details

18  that needed middle management to site-level management

19  assistance or walk-through and directions.  We had a -- a

20  lot of physical inspections in the apartments of the

21  residents and we had to obviously mentor them properly as

22  well.

23     Q.   Okay.  What do you mean by, mentor the residents

24  properly?

25     A.   Well, keep them comfortable.

1      Q.   Okay.

2      A.   You know, they -- you know, people -- as Mark

3   Jones mentioned, people get concerned about a sale.  We

4   had a very good product.  We were all very proud of it

5   and people do get concerned as -- from employees, as well

6   as the residents.  And we needed to continue to go

7   upwards, not any dips along the way.

8      Q.   And at some point in time, was there a leak?

9      A.   (No response.)

10     Q.   To -- a leak of the purchase before formal

11   announcement?

12     A.   Yes.  I -- there -- there was a leak.  I mean,

13   when you have that many people involved, you -- you could

14   only give so many stories of why there's so many

15   inspections so forth.  I believe there was an

16   announcement that I wrote with Brian, Cheryl,

17   collaborated on something about -- I think it was in

18   September-ish, early September of a potential --

19     Q.   Okay.  And --

20     A.   -- I -- excuse me.  I don't remember if that was

21   just to the employees or to the residents or both.  We

22   did have -- every time you go into a residents'

23   apartment, you have to give them notification.

24     Q.   And, Mr. Carpenter, rather than having you look

25   through the exhibits, I'm just going to give you my copy

1  of Exhibit 12.

2         Can you tell me what the actual date was on

3  the purchase and sale agreement?

4     A.  April 30th, 2007.

5     Q.  Okay.  And then in addition, on top of the due

6  diligence issues, were you personally still working with

7  Mike Uhl, responding to -- responding to provide

8  documents in connection with the criminal investigation?

9     A.  Yes, ma'am.

10    Q.  Okay.  So that's still going on?

11    A.  Yeah.  The first subpoena we sent, the second

12  subpoena came in, you know --

13    Q.  Okay.

14    A.  The last -- the last delivery of documents -- I

15  think, there was four legal cases and it was delivered to

16  them on April 24th.  I finished it.

17    Q.  You --

18    A.  We delivered the last of the documents --

19         MR. FRIEDMAN:  There's no question before

20  the witness, Your Honor.

21    Q.  (By Ms. Gibson)  Okay.  And did you --

22         MR. FRIEDMAN:  I'm going to object as being

23  nonresponsive.

24    Q.  (By Ms. Gibson)  Did you--

25         THE COURT:  Okay.  Break up your questions.

 1      Q.   (By Ms. Gibson)  Did you say -- I'm sorry.  Did

 2   you say you finished on April 24th or is that when Mike

 3   Uhl requested some more documents --

 4              MR. FRIEDMAN:  Leading --

 5      Q.   (By Ms. Gibson)  -- or both?

 6              MR. FRIEDMAN:  -- and asked and answered.

 7   He said, April 24th.

 8              THE COURT:  Overruled.

 9              Just clarify.

10              THE WITNESS:  Let me do clarify.  That was

11   when we were noted of the second subpoena.

12      Q.   (By Ms. Gibson)  Okay.  And so that work was --

13   that additional work was starting --

14      A.   Yes, ma'am.

15      Q.   -- in this time frame as well?

16              When is -- when is the next time you met

17   with Brian about your handshake deal?

18      A.   We met on May 14th of 2007 --

19      Q.   Okay.

20      A.   -- at Cindi's New York Deli restaurant,

21   breakfast meeting.

22      Q.   How do I spell Cindi's?  I've been there.

23      A.   C-I-N-D-Y, apostrophe, S (sic).

24      Q.   Oh, okay.  What -- what did you-all discuss at

25   that -- at that meeting, with respect to your deal?

225

1          A.   We spoke about both sides catching up on the

2    FBI, everybody was going, as far as sales transaction,

3    they had not gotten to the written confirmation or

4    memorializing yet.  And surprisingly Brian changed our

5    oral agreement, which I became very angry about, saying

6    that the 3 percent included my past earned bonuses for

7    the first time.

8          Q.   Okay.  And what -- so what'd you tell Brian?

9          A.   I said, It's -- I slammed my hand on the table

10   and I said, It's completely unacceptable.  It was not

11   part of the deal.  And he said, You know, there's another

12   person in the office that needs to bless it.  He said,

13   Cheryl.  And he said, If you want to get in our cars

14   right now and go meet with Cheryl, we'll go do so.  We

15   paid the check, we left to go to Cheryl's office to clear

16   the air, so to speak.  I showed up, Brian --

17         Q.   Okay.  Stop there and I'll ask another question.

18         A.   Sorry.

19         Q.   It's okay.  This is -- this is not normal --

20         A.   Okay.

21         Q.   -- the way this works.

22              And so then -- so do you and Brian -- how

23   did y'all leave it?  Where are you headed?  How do you

24   separate at Cindi's?

25         A.   We were -- we were headed back to the corporate

1   office and we were going to meet up with Cheryl in her

2   office and --

3       Q.   And what happened next?

4       A.   And Brian didn't show back up to the office and

5   Cheryl tried calling him.  And ultimately, we sat up a

6   time to meet on two days later, on May 16th.  The three

7   of us in Cheryl's office.

8       Q.   So that -- so on May 16th in Cheryl's office --

9   and y'all meet to try to resolve the situation --

10              MS. GIBSON:  Well, Your Honor, this meeting

11  may take a while to talk about and I think you wanted to

12  end at 4:30?

13              THE COURT:  Right.  You're exactly right.

14              Ladies and gentlemen, we'll stop for the

15  day.  Please remember the instructions I gave you

16  previously.  We'll see you Monday morning at 9 o'clock.

17  We wish you a good afternoon.

18              THE WITNESS:  Thank you, sir.

19              THE BAILIFF:  All rise.

20              (Jury ushered out.)

21              THE COURT:  Okay.  We are on the record, but

22  outside the presence of the jury.  During the course of

23  Mr. Potashnik's testimony, Ms. Gibson approached the

24  Court sidebar and wanted to -- and said she wanted to go

25  ask him questions about oral agreements with other

```
 1  THE STATE OF TEXAS      )
    COUNTY OF DALLAS        )
 2

 3              I, Georgina Ware, Deputy Official Court

 4  Reporter in and for the County Court at Law No. 5 of

 5  Dallas County, State of Texas, do hereby certify that the

 6  above and foregoing contains a true and correct

 7  transcription of all portions of evidence and other

 8  proceedings requested in writing by counsel for the

 9  parties to be included in this volume of the Reporter's

10  Record, in the above-styled and -numbered cause, all of

11  which occurred in open court or in chambers and were

12  reported by me.

13              I further certify that this Reporter's

14  Record of the proceedings truly and correctly reflects

15  the exhibits, if any, admitted by the respective parties.

16              I further certify that the total cost for

17  the preparation of the Reporter's Record is $ 1365.80 and

18  was paid/will be paid by FRIEDMAN & FEIGER.

19              WITNESS MY OFFICIAL HAND this the 20th day

20  Of October, 2018.

21                         /s/ Georgina Ware
                           _____
22                         GEORGINA WARE, Texas CSR 8436
                           Expiration Date 12/31/18
23                         Deputy Official Court Reporter
                           County Court at Law No. 5
24                         Dallas County, Texas
                           P.O. Box 3821
25                         Cedar Hill, Texas 75106
                           (214) 586-2862
```

REPORTER'S RECORD

VOLUME 6 of 14

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
LISA MATZ
Clerk

Trial Court Cause No. CC-08-02072-E

JEFFREY W. CARPENTER,                 )    IN THE DALLAS COUNTY
                                      )
              Plaintiff,              )
                                      )
VS                                    )    COURT AT LAW NO. 5
                                      )
SOUTHWEST HOUSING DEVELOPMENT         )
COMPANY, INC., ET AL,                 )
                                      )
              Defendants.             )    DALLAS, TEXAS
_____

TRIAL ON THE MERITS
_____

        On the 29th day of January, 2018, the following

proceedings came on to be heard within the presence

of a jury, in the above-entitled and -numbered cause;

and the following proceedings were had before the

HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

Dallas County, Texas:

        Proceedings reported by Computerized Stenotype Machine.

```
1                          APPEARANCES:

2

   MS. AMY GIBSON
3  SBN 00793801
   Gibson Wiley, PLLC
4  1500 Jackson Street, Suite 714
   Dallas, Texas 75201
5  (214)522-2121
   Attorney for Plaintiff
6
              -AND-
7
   MR. BRIAN SANFORD
8  SBN 17630700
   Sanford Firm
9  1910 Pacific Avenue, Suite 15400
   Dallas, Texas 75201
10 (469)361-9111
   Attorney for Plaintiff
11
              -AND-
12
   MR. LAWRENCE "LARRY" FRIEDMAN
13 SBN 07469300
   MR. MICHAEL DONOHUE
14 SBN 05989380
   MR. JASON FRIEDMAN
15 SBN 24059784
   Friedman & Feiger, LLP
16 5301 Spring Valley Road, Suite 200
   Dallas, Texas 75254
17 (972)788-1400
   Attorneys for Defendants
18
              -AND-
19
   MR. RYAN HALE
20 SBN 24097784
   Hawkins Parnell Thackston & Young, LLP
21 4514 Cole Avenue, Suite 500
   Dallas, Texas 75205-5412
22 (214)780-5138
   Appellate Attorney for Defendants
23

24
   ALSO PRESENT:  Steve Page, A/V Technician
25
```

```
 1                          VOLUME 6

 2    January 29, 2018                              PAGE

 3    Proceedings ------------------------------     6

 4
      PLAINTIFF'S
 5    WITNESS:
                          Direct   Cross   Redirect    Recross
 6    Jeffrey Carpenter     6       83       ---         ---

 7
      Adjournment -----------------------------   214
 8
      Court Reporter's Certificate ------------   215
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBIT INDEX

 2
       PLAINTIFF'S
 3     NO.                DESCRIPTION            OFFERED      ADMITTED

 4     36                 Franchise Tax Report      28          29

 5     37                 Franchise Tax Report      28          29

 6     38                 Franchise Tax Report      28          29

 7     51-1               Handwritten List          30          30

 8     52                 Notes                     44          45

 9     53                 Expense Report             9          10

10     54                 Expense Report             9          10

11     55                 Declaration of            14          14
                          Sandy Dixon
12
       56                 Certificate of            26          26
13                        Non-Foreign Status

14     57                 Certificate of            26          26
                          Non-Foreign Status
15
       58                 Email                     33          34
16
       59                 Memorandum of Agreement   36          37
17
       60                 Email                     39          39
18
       61                 Explanatory Note          43          43
19
       62                 Email                     49          49
20
       63                 Amendment to Employment   52          52
21                        Agreement

22     64                 Email                     58          59

23     65                 Email                     58          59

24     66                 Email                     58          59

25     67                 Email                     62          63
```

Appendix 0995

```
 1                    EXHIBIT INDEX (Cont'd)

 2

     PLAINTIFF'S
 3   NO.              DESCRIPTION          OFFERED    ADMITTED

 4   68               Email                   76         76

 5   69               Summary (Demonstrative) 78         --

 6

 7   DEFENDANTS'
     NO.              DESCRIPTION          OFFERED    ADMITTED
 8
     4                Employment Agreement    124        125
 9
     13               Amendment to            163        163
10                    Employment Agreement

11   24               Email                   163        163

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S
 2                   January 29, 2018
 3              (The jury entered the courtroom.)
 4              THE COURT:  Welcome back.  Good morning,
 5    ladies and gentlemen.
 6                   We're going to start right into the trial.
 7    Our witness, when we stopped on Thursday, was Mr. Carpenter.
 8    We were still on his direct examination, which means that
 9    the attorney calling the witness is still asking questions.
10    So we'll ask Ms. Gibson to pick up where she left off.  And
11    we'll go until about 10:20 or 10:25 before we take a break.
12                   And, Ms. Gibson, if you'd just pick up
13    where you left off.
14              MS. GIBSON:  Sure.
15                   JEFFREY W. CARPENTER,
16    having been previously sworn, testified as follows:
17              DIRECT EXAMINATION (Cont'd)
18    BY MS. GIBSON:
19        Q.    Mr. Carpenter, before we get back into the
20    timeline, you heard Ms. Geiser say that your salary covers
21    everything?
22        A.    Yes.
23              MR. L. FRIEDMAN:  I'm going to object to --
24        Q.    (By Ms. Gibson) And with respect --
25              MR. L. FRIEDMAN:  -- to the
```

1    mischaracterization of Ms. Geiser Potashnik's testimony.

2                    THE COURT:  Ladies and gentlemen, remember

3    whatever the attorneys say is not evidence.  It's up to you

4    to recall the evidence.

5                    MR. L. FRIEDMAN:  Thank you, Your Honor.

6         Q.    (By Ms. Gibson) And do you recall Mark Jones

7    talking about various people who live in the communities,

8    our nurses, our firefighters, our teachers --

9         A.    Yes.

10        Q.    -- people who just need a fresh start?

11                    If -- if that was the case that salary

12   always covers everyone's work, would anyone, whether you or

13   the people living in those communities, ever be entitled to

14   a raise if salary covered everything?

15        A.    They're -- in the tax group program there is --

16                    MR. L. FRIEDMAN:  I'm going to object to

17   that as being nonresponsive.

18        Q.    (By Ms. Gibson) Just generally --

19        A.    Generally.

20        Q.    -- as far as people who work?

21        A.    Yes.

22        Q.    And if salary always covered everything, would

23   anyone ever be able to enforce any bonus?

24        A.    No.

25        Q.    That goes for you or anyone else?

1      A.      Correct.

2      Q.      And with respect to modifications to a written

3   agreement having to be in writing, have you learned at some

4   point whether or not that's accurate for this type of

5   employment agreement?

6                MR. L. FRIEDMAN:  I'm going to object to

7   that question because it calls for this witness to opine

8   about a legal conclusion, which is the province of the

9   Court.

10                THE COURT:  That's right.  Sustained.

11      Q.      (By Ms. Gibson) Mr. Carpenter, I'm handing you

12   Plaintiff's Exhibit 53 and 54.

13                MR. L. FRIEDMAN:  Thank you.

14      Q.      (By Ms. Gibson) And the one I just handed -- is

15   the short one 53?

16      A.      54.

17      Q.      Okay.

18                MR. L. FRIEDMAN:  I'm sorry.  Which is

19   which?

20                THE WITNESS:  Fifty-four is --

21                MS. GIBSON:  The long one is 53.

22                THE WITNESS:  -- the stapled one.

23                MR. L. FRIEDMAN:  The long one is 53?

24                MS. GIBSON:  Yes.

25      Q.      (By Ms. Gibson) And so, Mr. Carpenter, do you

1    recognize these as expense reports --

2                    MR. L. FRIEDMAN:  I apologize.

3         Q.    (By Ms. Gibson) -- while you were working at --

4                    MR. L. FRIEDMAN:  Pardon me.  Was this on

5    the exhibit list, Your Honor?

6                    MS. GIBSON:  Your Honor, this was a

7    supplement.  It was in response to testimony.

8                    THE COURT:  You produced it?

9                    MS. GIBSON:  Oh, yes.

10                   THE COURT:  It's a document produced.

11                   MR. L. FRIEDMAN:  Was it produced before

12   last night, Your Honor?

13                   MS. GIBSON:  Oh, yes.

14                   MR. L. FRIEDMAN:  All right.

15                   MS. GIBSON:  Long time ago.

16        Q.    (By Ms. Gibson) And do you recognize Exhibits 53

17   and 54, Mr. Carpenter, as copies of your expense reports at

18   Southwest Housing?

19        A.    Yes.

20                   MS. GIBSON:  Offer Exhibits 53 and 54.

21                   THE COURT:  All right.

22                   Any objection?

23                   MR. L. FRIEDMAN:  Give me one second.

24   Mr. Donohue is going to look this over.

25                   No objection, Your Honor.

10

1                    THE COURT:   53 and 54 are admitted.

2         Q.   (By Ms. Gibson) If you take a look at the first

3    page of Exhibit 53, is this an expense report for time on

4    Katrina relief efforts?

5         A.   Yes, ma'am.

6         Q.   And it shows initially you were in Dallas?

7         A.   Yes.  The -- excuse me.

8                    MR. L. FRIEDMAN:   I'm going to object to

9    everything after yes as being nonresponsive, Your Honor.

10                   MS. GIBSON:   Okay.

11        Q.   (By Ms. Gibson) Will you briefly explain what you

12   were doing and where?

13        A.   This expense report relates to purchases made in

14   behalf of victims that we housed at Meadow Lane and Cedar

15   Crest Apartments.

16        Q.   In the Dallas area?

17        A.   Yes.  Yes, ma'am.

18        Q.   And if you'll look at the second page of Exhibit

19   53 you see that this is an expense report for time elsewhere

20   in connection with relief efforts?

21        A.   Yes, ma'am.

22        Q.   Okay.  And where were you, as far as these expense

23   reports go?

24        A.   Austin and Houston.  Houston, primarily.

25        Q.   And if you look at the next page, what were you

Appendix 1001

1    doing here?

2         A.   This was an extended stay at the property in Las

3    Vegas, Casa Del Norte, that we were finishing up the

4    construction rehab on.

5         Q.   Okay.  And you're --

6         A.   The management site.

7         Q.   The meeting with City of Dallas and FEMA, who

8    attended that from Southwest Housing, if you remember?

9         A.   I don't have that page.  Is that -- am I supposed

10   to have that page?

11        Q.   It's on the next page of Exhibit 53.

12                  (Pause)

13        Q.   You can just look at the screen.

14        A.   It's not on it.  But that's my -- that's me.

15        Q.   Okay.

16                  And if you take a look at Exhibit 54, this

17   is a different event unrelated to Katrina, correct?

18        A.   Yes.  That's the one I was referring to Villareal.

19        Q.   Okay.  And where are you?

20        A.   In Las Vegas.

21        Q.   All right.

22                  This is in January of 2007?

23        A.   Yes, ma'am.

24        Q.   And it's just -- is this when you -- is this time

25   frame when you met with Brian and talked about putting the

12

1    deal on a napkin?

2                    MR. L. FRIEDMAN:  Objection, leading.

3                    THE COURT:  Sustained.

4    Q.    (By Ms. Gibson) In connection -- did you meet with

5    Brian during this time frame when you were in Las Vegas?

6    A.    Yes, ma'am.

7    Q.    And did that include a meeting about asking Brian

8    to memorialize your deal?

9    A.    Yes, ma'am.

10   Q.    And where did that take place?

11   A.    At the Venetian Hotel in a oriental restaurant.

12   There's a lot of restaurants.  I'm not sure of the name.

13   Q.    Okay.  And what was the gist of that meeting

14   again?

15   A.    It was confirmation for me to stay focused and

16   motivated.  I expressed to Brian we've met several times;

17   that things haven't been delivered.  And he felt the need,

18   apparently, to come out to talk to me to make sure that I

19   was comfortable and that the deal that we had, the

20   three-percent deal, is commitment, is a deal, a oral

21   agreement.  And we talked about, again, possibly -- or the

22   potential of memorializing it.  And he mentioned that

23   it should be done in a few days, he'll take care of it.

24                    And this is the dinner of where, if I -- do

25   you want me to write it on the back of a napkin?  I

13

1    basically said sure, but they were linen napkins and we

2    couldn't.  So we said we'll reconvene in a few days.

3        Q.    Mr. Carpenter, we have talked a lot about

4    different entities during this trial.  But when you were

5    actually working at Southwest Housing, who -- put aside

6    legal stuff -- who did you consider your agreements to be

7    with?

8        A.    Southwest Housing.

9        Q.    Okay.

10       A.    Can --

11       Q.    Can what?

12       A.    Can we kind of use Southwest Housing collectively

13   as one company --

14       Q.    Okay.

15       A.    -- With different divisions?

16       Q.    All right.  And what about Brian and Cheryl?

17       A.    I'm sorry.  I don't understand your question.

18       Q.    Well, for example, your written agreement with

19   Southwest Housing Management, do you recall saying you felt

20   like that was with Brian and Cheryl?

21              MR. L. FRIEDMAN:  Leading, Your Honor.

22              MS. GIBSON:  It's --

23              THE COURT:  Overruled.

24       A.    Yes.  Yes, I do.

25       Q.    (By Ms. Gibson) Okay.

1          And to clear up a couple of things, do you
2   recall that the other side asked your wife if your daughter
3   had transcribed the phone recording?
4          A.   Yes, ma'am.
5          Q.   I'm going to hand you what's been marked Exhibit
6   55.   Do you recognize Exhibit 55 as what is separately
7   marked Exhibit 17 that defendants used during a deposition
8   in this case?
9               MR. L. FRIEDMAN:   Can we approach,
10  Your Honor?
11              THE COURT:   Yeah.   Okay.
12              (Sidebar conference held)
13         Q.   (By Ms. Gibson) Mr. Carpenter, do you recognize
14  Exhibit 55 as Exhibit 17 that defendants used during your
15  deposition?
16         A.   Yes, ma'am.
17         Q.   Okay.   And the top of the transcript that we've
18  elsewhere used in this case says --
19              MS. GIBSON:   Or plaintiff offers Exhibit
20  55.
21              MR. L. FRIEDMAN:   We have no objection,
22  Your Honor.
23              THE COURT:   All right.   55 is admitted.
24         Q.   (By Ms. Gibson) And you see that on top of it is
25  the declaration of Sandy Dixon?

1          A.     Yes, ma'am.

2          Q.     And it says that she personally transcribed the

3    recording?

4          A.     Yes.

5          Q.     And it clarifies that what -- what we've been

6    using here is -- is that from your daughter or Sandy?

7          A.     From Sandy.

8          Q.     Do you recall, Mr. Carpenter, some discussion

9    about Cheryl thought you got a raise early on?  Didn't we

10   give Jeff Carpenter a raise?

11         A.     I found that out somewhat recently, yes.

12         Q.     Okay.  But have you looked at the numbers?

13         A.     Yes.

14         Q.     Okay.

15                And this is Exhibit 9.  I realize you don't

16   have all of the exhibits in front of you, but Cheryl

17   Potashnik thought you got a raise.  You see this here?

18         A.     Yes.

19         Q.     Okay.

20                And if so, that would have been oral?

21         A.     Yes, ma'am.

22         Q.     Or would it have been?  Okay.

23                And up here the indication is your salary

24   was increased with the addition of an adjustment of about

25   $139, and then 276 and change car allowance.  You see that?

1          A.    Yes, ma'am.

2          Q.    And, ultimately, did you look down and try to

3    determine if this was truly a raise?

4          A.    Yes, I did.

5          Q.    Okay.  And was it truly a raise?

6          A.    No.

7          Q.    What was the -- the car allowance was just being

8    embedded into your salary?

9          A.    Yes.

10         Q.    And what was the 139.48 adjustment?

11         A.    I never figured it out.

12         Q.    Well, you see here on the second page there's a

13   reference to car, an adjustment, and insurance?

14         A.    Okay.

15         Q.    Okay.  Does that refresh your memory that this was

16   a premium --

17         A.    Yes.

18         Q.    -- correction?

19         A.    I do now, yes.

20         Q.    Okay.

21               Do you recall talking about the $50,000

22   advance against bonus?

23         A.    Yes, ma'am.

24         Q.    Okay.  And you were paid that bonus in your --

25   what year of your employment?

Appendix 1007

17

1          A.    First year.

2          Q.    In your first year.

3                And you initially -- did you initially

4     think you needed to repay it?

5          A.    No.

6          Q.    Okay.   Because -- and who told you that, if

7     anyone?

8          A.    Brian.

9          Q.    Okay.   That was his idea?

10         A.    It came from Brian, so yes.

11         Q.    And you recall this is Exhibit 8; that,

12    ultimately, Keith Jones had to reconcile that?

13         A.    Yes, ma'am.

14         Q.    And it was treated as an advance on bonus?

15         A.    Yes.

16         Q.    Okay.   So -- also, during this time frame, you got

17    paid another amount at -- not this time frame but in your

18    first year you got paid something in addition to the 50,000?

19         A.    Yes.

20         Q.    And what was that?

21         A.    Twenty-five thousand to cover the taxes for the

22    fifty thousand for the previous year.

23         Q.    Okay.

24                And on Exhibit 8, was that ultimately part

25    of the reconciliation?

18

1       A.   Yes.

2       Q.   Okay.  And is -- was that 25-, after taxes,

3   applied toward expenses?

4       A.   Yes, it was.

5       Q.   Now, you remember when your wife Vikki testified?

6       A.   Yes.

7       Q.   So what's the deal, Jeff?  Are you hiding bonuses

8   from your wife?

9       A.   Not at all.

10       Q.   Okay.

11            And at the time that this got reconciled,

12   what was going on as far as where Vikki was?

13       A.   I believe that that was the time she was in

14   Phoenix taking care of both of her parents, who were --

15   excuse me -- in the hospital.  She left for emergency and

16   was -- ended up being gone for nearly six months.

17       Q.   Okay.

18            Now, with respect to the timeline in this

19   case, in October of 2006, when Brian Potashnik originally

20   announced the three-percent formula if you would stay on --

21       A.   Yes.

22       Q.   -- at that point in time, when did y'all

23   anticipate the sale would close?

24       A.   We were anticipating early spring 2007; the March,

25   April time frame.

Appendix 1009

1    Q.    And at that time then, when did you anticipate

2    your end date would be?

3    A.    At that time.

4    Q.    Okay.   And that event is called what?

5    A.    The closing.

6    Q.    The closing.   Okay.

7              So at that time, was it your -- at that

8    time, Brian and Cheryl Potashnik were asking you to stay

9    through that point?

10             MR. L. FRIEDMAN:   Your Honor, counsel's

11   just testifying.   Can we get to question and answer in a

12   narrative form?   I object 'cause it's leading.

13             MS. GIBSON:   I'll rephrase it.

14             THE COURT:   All right.

15   Q.    (By Ms. Gibson) Did they ask -- at that point in

16   time, did they ask you to stay through --

17             MR. L. FRIEDMAN:   It is leading.

18             THE COURT:   Overruled.

19   Q.    (By Ms. Gibson) At that point in time, had they

20   asked you to stay through the initial closing?

21             MR. L. FRIEDMAN:   Leading.

22             THE COURT:   Overruled.

23   A.    They asked me to stay through the transaction of

24   the management transition.

25   Q.    (By Ms. Gibson) Well, but this is in October of

1    2006.  I'm not asking -- so let me back up.

2                    MR. L. FRIEDMAN:  Leading, Your Honor.

3    He's obviously --

4                    THE COURT:  She doesn't --

5                    MR. L. FRIEDMAN:  He's obviously not

6    keeping up with the script, so she has to ask questions.

7                    MS. GIBSON:  Your Honor, I object to the

8    commentary.

9                    THE COURT:  The objection to the commentary

10   is sustained; the objection to leading is overruled.

11       Q.    (By Ms. Gibson) Later, by the end, okay, by the

12   time that management was going to transition on or about

13   November 1, 2007, at that point things had changed.  So as

14   far as the timeline on how long you were asked to stay on,

15   when you and Brian initially shook hands on the deal, how

16   long were they asking you to stay when he announced the

17   three percent?

18       A.    Through the time period of April, May of 2007ish.

19       Q.    Okay.  Which would have been what event?

20       A.    The Cascade Southwest Housing closing.

21       Q.    Okay.

22                    And then at some point, did you realize

23   whether or not you were going to have a job with the

24   purchaser?

25       A.    Yes.  I realized I was not going to be employed

1    with the purchaser.

2          Q.    And then at some later point after you and Brian

3    shook hands, did anyone ask you to maybe stay on for a

4    little while longer, potentially, to be picked up?

5          A.    It was unknown, but there was a potential that

6    once the transition of the two -- of the management company

7    merging that I may be needed for a short period of time to

8    smooth out any rough edges, if you will.

9          Q.    Okay.  And that -- would that have been temporary

10   or permanent?

11         A.    That would have been very temporary; probably 30-,

12   60-day time frame.

13         Q.    And then by the time you're hitting October of

14   2007, at that point, at what point did they think you would

15   be needed to help make the sale happen?

16         A.    At that point, I met with Brian on October 12.

17   And without going into the details there, he said I

18   fulfilled my requirements for the earned bonuses as well as

19   the three-percent deal.  And that was also when he gave me

20   permission to keep my laptop to stay in communication.  We

21   were working on the sale in the --

22                    MR. L. FRIEDMAN:  Object to this as being

23   nonresponsive, Your Honor.

24                    THE COURT:  Break up your questions.

25                    MS. GIBSON:  Okay.

1      Q.    (By Ms. Gibson) So -- so at that point after

2  Brian -- so after Brian says you could leave then or stay

3  on, did you later also talk to Cheryl Potashnik?

4      A.    I spoke to Cheryl.

5      Q.    And how long did Cheryl ask you to stay on?

6      A.    Cheryl asked me to stay on through the management

7  transition.  That was according to -- I believe that it was

8  in consulting asset management agreement that they worked

9  out with Pinnacle, which was a takeover of the transition of

10  the employees and the staff, which would have happened

11  November 1st, 2007.

12      Q.    And so by the end, what date was your work

13  essentially done as far as what they asked you to do?

14      A.    Essentially done the day before, October 31st.

15      Q.    Okay.

16            Now, I want to talk a little bit about the

17  initial time in October of 2006 when Brian has announced the

18  three-percent formula.  At some point, did you attempt to

19  negotiate anything higher?

20      A.    Yes, I did.

21      Q.    And did you meet with Brian about that?

22      A.    Yes.  I met with Brian in his office.

23      Q.    And what was the gist of that conversation?

24      A.    I spoke to him -- appreciated the sales proceeds

25  bonus that he laid out from the original conversations that

1    I had at his house.  I thought it would be more, so I asked

2    for five percent rather than three percent.

3         Q.    And what did he tell you?

4         A.    He said he can't do that; that there's another

5    person down at the far end of the hallway that's already

6    approved the three percent and that that's --

7                   MR. L. FRIEDMAN:  Your Honor, it

8    violates -- this violates the limine and it's hearsay.

9                   MS. GIBSON:  This is from Brian Potashnik.

10   It's an admission.

11                  THE COURT:  What was the question?

12                  MS. GIBSON:  I -- we were asking -- he was

13   talking about -- I don't remember exactly what the question

14   was.

15                  THE COURT:  Ask the question again then.

16                  MS. GIBSON:  Okay.

17        Q.    (By Ms. Gibson) And in response to -- in response

18   to your request to raise the deal to five percent rather

19   than three percent, what was Brian Potashnik's response to

20   you?

21        A.    His response was that we had to stay with three

22   percent; that he -- there's another person down at the end

23   of the hall --

24                  MR. L. FRIEDMAN:  Okay, this violates the

25   limine.

```
 1                    THE COURT:  How?
 2                    MR. L. FRIEDMAN:  Well, because we're not
 3       talking about anybody else but Mr. Carpenter.
 4                    THE COURT:  He's been saying he's
 5       negotiating -- renegotiating his bonus.
 6                    You're talking about your bonus, right?
 7                    MS. GIBSON:  Yes.
 8                    THE WITNESS:  Yes, sir.
 9                    MR. L. FRIEDMAN:  He's about to talk about
10       somebody else.
11                    THE COURT:  Don't talk about anyone else's
12       and don't ask about anyone else's.
13         Q.    (By Ms. Gibson) Well, let me clear this up and
14       I'll ask you the question again.  Okay?
15         A.    Okay.
16         Q.    Who is the person down at the end of the hall?
17         A.    Cheryl Potashnik.
18         Q.    Now, in response to your request to negotiate for
19       a higher five percent rather than three percent, what was
20       Brian Potashnik's response to you?
21         A.    That it would have to stay at three percent,
22       that's what we talked about, that's what I approved, and
23       we've committed to it.
24         Q.    Okay.  And you -- and just because of the
25       interruption I need you to repeat.  What -- what did he say
```

Appendix 1015

1    to you about Cheryl Potashnik down the hall as far as why he

2    wouldn't raise it to five percent?

3         A.   He said that he has another person that he has to

4    approve or work -- work through.  She can -- it's been

5    approved at three percent and that's what we discussed,

6    that's what we talked about, and I can't do five percent.  I

7    can't do anymore than that.

8         Q.   Okay.  So as of around shortly after Brian

9    Potashnik announced the three-percent deal in October of

10   2006, did you believe Cheryl Potashnik had also approved the

11   deal?

12        A.   Yes, ma'am.

13        Q.   Okay.  And did you believe Brian Potashnik had

14   authority to speak for her?

15        A.   Yes.

16        Q.   Okay.

17             And if Brian -- whether or not you know who

18   all the sellers are, if Brian Potashnik is offering you a

19   cut of sellers' proceeds, who do you believe he's acting on

20   behalf of?

21        A.   The sellers.

22        Q.   I'm handing you what's been marked Plaintiff's

23   Exhibit 56 and 57.

24             MR. L. FRIEDMAN:  Is this the new one?

25   Brian?

26

```
1                    MR. DONOHUE:  What?

2                    (Soto voce conversation held)

3                    MS. GIBSON:  No.

4         Q.   (By Ms. Gibson) You have seen -- Mr. Carpenter,

5    you're aware in this case that we've subpoenaed documents

6    from Cascade Affordable Housing?

7         A.   Yes, ma'am.

8         Q.   And you see the Bates label at the bottom, CAH-SW

9    and numbers?

10        A.   Yes, ma'am.

11        Q.   Okay.  Is that consistent with the Bates label

12   that's on the documents we got from them?

13        A.   Yes.

14        Q.   Okay.  Does this appear to be an accurate copy of

15   responsive materials from that document on the closing?

16        A.   Yes.

17                   MS. GIBSON:  Plaintiff offers 56 and 57.

18                   THE COURT:  Any objection?

19                   MR. L. FRIEDMAN:  No, sir.

20                   THE COURT:  56 and 57 are admitted.

21        Q.   (By Ms. Gibson) You see in Exhibit 56 there's a

22   certificate that has to be signed, apparently, according to

23   the language, in order to -- for the purchaser to give money

24   to the seller?

25        A.   Yes.
```

Appendix 1017

1        Q.    And this is in connection with the asset sale?

2        A.    Yes, ma'am.

3        Q.    All right.

4              And you see at the bottom Cheryl Potashnik

5    is signing individually as the seller?

6        A.    Yes.

7        Q.    Okay.

8              And Exhibit 57 is the same type of

9    certificate but for Brian Potashnik is the seller?

10       A.    Yes, ma'am.

11       Q.    Okay.  And so does that confirm -- at least, does

12   it confirm in your mind that they were individual sellers in

13   the asset sale?

14       A.    Yes, ma'am.

15       Q.    And with respect to Brian Potashnik's position,

16   did you understand -- did you believe he was an owner?

17       A.    Yes.

18       Q.    And did you believe he was an officer?

19       A.    Yes.

20       Q.    Did you know if he was also a director of the

21   entities?

22       A.    I don't think I ever gave that much thought, but I

23   would say yes.

24       Q.    Okay.

25              I'm handing you Plaintiff's Exhibits 36,

28

1      37, 38.   Do those appear to be -- do those name the entities

2      involved in this case, Southwest Housing Management,

3      Southwest Housing Development, Affordable Housing

4      Construction?

5           A.   Yes.

6                     MR. L. FRIEDMAN:   Which is which?

7           Q.   (By Ms. Gibson) Can you -- would you read off --

8           A.   Yes.

9           Q.   -- for Exhibit 36?

10          A.   Thirty-six is Southwest Housing Development

11     Company.

12          Q.   Okay.   Thirty-seven?

13          A.   Affordable Housing Construction, Incorporated.

14          Q.   And 38?

15          A.   Southwest Housing Management Company, Inc.

16          Q.   And do those appear to be Secretary of State

17     records?

18          A.   Yes.

19                     MS. GIBSON:   Plaintiff offers 36, 37, and

20     38.

21                     THE COURT:   Any objection?

22                     MR. L. FRIEDMAN:   One moment, please.

23                     (Pause)

24                     MR. L. FRIEDMAN:   Lack of foundation,

25     Your Honor.   Improper authentication or not proper

1    authentication.

2                    MS. GIBSON:  Your Honor, they produced them

3    to us in this case.

4                    MR. L. FRIEDMAN:  Same objection.  Lack of

5    foundation --

6                    THE COURT:  Let me see, Mr. Carpenter.  Is

7    there --

8                    THE WITNESS:  Excuse me?

9                    MS. GIBSON:  I'll also request that the

10   Court take judicial notice.

11                   THE COURT:  They're governmental records.

12                   MR. L. FRIEDMAN:  If they are.  If they

13   are.  And we don't know if they're complete.  There's no

14   certification from the Secretary of State.

15                   THE COURT:  The objection's overruled.  The

16   Court finds they're self-authenticating.  That's 36, 37, 38

17   are admitted.

18        Q.    (By Ms. Gibson) Okay.  Mr. Carpenter, going back

19   to where we were yesterday talking about Will Hartsfield --

20        A.    Yes.

21        Q.    -- we had talked about some notes.  I'm handing

22   you Plaintiff's Exhibit 51-1.  Does 51-1 appear to be an

23   accurate copy of the notes that were Exhibit 51 yesterday

24   and that he gave to you?

25        A.    Yes, ma'am.

1      Q.   Okay.  Although there are now some redactions on

2 it?

3      A.   Yes, three.

4           MR. DONOHUE:  Is that the redacted one --

5           MS. GIBSON:  Yes.

6           MR. DONOHUE:  -- that you sent last night?

7           MS. GIBSON:  Yes.  And I just gave you a

8 copy.

9           Plaintiff offers Exhibit 51-1.

10          MR. L. FRIEDMAN:  My understanding is we

11 were going to substitute the other one for this one -- this

12 one for the other one.

13          THE COURT:  Right.  Fifty-one is part of

14 the reporter's record and 51A [sic] is admitted into

15 evidence for the jury.  It's already in.

16          MS. GIBSON:  Okay.  I'm sorry.  I called it

17 51-1.  It should be 51 --

18          THE COURT:  However you're marking it.

19          MS. GIBSON:  Okay.  I marked it 51-1.

20          THE COURT:  Okay, that's fine.

21      Q.  (By Ms. Gibson) Okay.  And we talked about car

22 accidents.  What was restructured?  Or what is -- what is

23 this referring to?  Do you see this many car accidents?

24      A.   Yes.  Car accident twice.

25          MR. L. FRIEDMAN:  This calls for

1    speculation on the part of this witness.

2                    MS. GIBSON:  I'm just asking about in

3    connection with your discussion.

4                    MR. L. FRIEDMAN:  It's not his notes.

5                    THE COURT:  If you know, you can answer; if

6    you don't, don't speculate.

7        A.    I can't recall a hundred percent.

8        Q.    (By Ms. Gibson) Okay.  And then when it talks

9    about selling interest in real estate --

10       A.    Yes.

11       Q.    -- who are you referring to selling an interest in

12   real estate?

13       A.    The Potashniks.

14       Q.    Okay.  Did your agreement involve you selling or

15   receiving an interest in real estate?

16       A.    No.

17       Q.    And no job for him, what is that referring to?

18       A.    That means at the end of the day that I would be

19   unemployed.

20       Q.    Okay.  And past promises?

21       A.    Past promises refers to acknowledged earned

22   bonuses that have been -- that have not been paid.

23       Q.    And --

24       A.    And --

25       Q.    Go ahead.

1       A.   -- and I was promised many times, multiple times,

2  and time and time again.

3       Q.   Okay.

4              And paid at closing, what does that refer

5  to?

6       A.   That refers to when Brian and I initially spoke

7  about the three percent.  He made a comment that it will be

8  a great day to, you know, see Jeff Carpenter's name on the

9  closings statements of the sales transaction.

10      Q.   Okay.

11            And do you recall I asked you if you had --

12  if you had done some Internet research on, like, legal

13  agreements, sample agreements?

14      A.   Yes.

15      Q.   Okay.  And did you take -- did you look into that

16  and see if Vikki Carpenter, your wife, did some Internet

17  research on sample legal agreements?

18      A.   Yeah, she did.

19      Q.   I'm handing you Plaintiff's 58.  Do you recognize,

20  Mr. Carpenter, Plaintiff's 58 as an Email between you and

21  Will Hartsfield and yourself and Vikki Carpenter?

22      A.   Yes, ma'am.

23      Q.   With some attached notes --

24      A.   Yes.

25      Q.   -- in your handwriting?

```
 1                    MS. GIBSON:  Plaintiff offers 58.
 2                    THE COURT:  Any objection?
 3                    MR. L. FRIEDMAN:  Was this on the exhibit
 4      list?
 5                    MS. GIBSON:  Yes.
 6                    MR. L. FRIEDMAN:  Will you identify the
 7      document you sent over last night?
 8                    MS. GIBSON:  I don't have them memorized.
 9      It's on the list.  These are the Will Hartsfield documents.
10                    MR. L. FRIEDMAN:  Give us a minute,
11      Your Honor.
12                    (Pause)
13                    MR. L. FRIEDMAN:  She sent over a bunch of
14      new documents last night.  I just want to make sure.
15                    MS. GIBSON:  They're not new.
16                    MR. L. FRIEDMAN:  Yes, they're new.
17                    MS. GIBSON:  They're produced.
18                    (Pause)
19                    MR. DONOHUE:  You say Will Hartsfield's
20      documents?
21                    MS. GIBSON:  Yes.
22                    MR. L. FRIEDMAN:  It'd be Number 58.
23                    MR. DONOHUE:  There are no numbers on this
24      list other than what we put on them.
25                    THE COURT:  Well, is there an objection to
```

Appendix 1024

 1    the substance of that document?

 2              MR. L. FRIEDMAN:  Yes.  These were not on

 3    her exhibit list.  Therefore, it would be irrelevant and

 4    surprise.

 5              MS. GIBSON:  Your Honor, I disagree, and

 6    these were produced a long time ago to the other side.

 7              MR. DONOHUE:  It just refers to Hartsfield

 8    notes, which was 51-1, I believe.

 9              MR. L. FRIEDMAN:  Not on the exhibit list,

10    Your Honor.

11              THE COURT:  She's produced them, she said.

12              MR. L. FRIEDMAN:  She --

13              MR. DONOHUE:  It has no Bates stamp.  We

14    cannot tell they've been produced.

15              THE COURT:  Bring it over here.

16              (Sidebar conference held)

17              THE COURT:  The objection to 58 is

18    overruled and 58's admitted.

19        Q.    (By Ms. Gibson) So you see at the bottom of the

20    Email that's your -- is that your Email to Will Hartsfield

21    about meeting at his office?

22        A.    Yes, ma'am.

23        Q.    And then there's an Email between yourself and

24    your -- is it between yourself and your wife or is that just

25    to yourself?

1          A.    My wife, yes.

2          Q.    And y'all are discussing different clauses to add?

3          A.    Yes, ma'am.

4          Q.    And so death benefit, some issues about developer

5    fees, being sure you stay through closing, right?

6          A.    Yes, ma'am.

7          Q.    Okay.   And then here you also mentioned if

8    employment's terminated between now and closing you still

9    get paid?

10         A.    Yes.

11         Q.    And is -- are these some of the things that y'all

12   were looking at either through Will Hartsfield or on the

13   Internet?

14         A.    On the Internet first.   And I took those notes

15   with me when I met with Will on the 7th of March.

16         Q.    Okay.

17               Although y'all are talking about different

18   terms like what -- or additional terms like what if somebody

19   dies, does any of this change your handshake deal with

20   Mr. Potashnik on behalf of the sellers?

21         A.    No, ma'am.

22         Q.    We -- going back, we had talked about, in the

23   timeline, you meeting -- or AHF pursuing you?

24         A.    Yes, ma'am.

25         Q.    Okay.

1                   And in connection with -- and you had

2     delayed your -- your offer.   Ultimately, you got an offer?

3          A.     Yes.

4          Q.     Okay.   And why did you delay starting with

5     American Housing Foundation?

6          A.     Because of the oral agreement that I had with

7     Brian for the three percent as well as the paid annual

8     bonuses.

9          Q.     Okay.

10         A.     I wasn't willing to walk away from that.

11         Q.     And, ultimately, you -- or does Exhibit 59 look to

12    be an accurate copy of the memorandum, of a memorandum of

13    agreement with AHF?

14         A.     Yes.

15         Q.     And they had started pursuing you about when?

16         A.     I believe I met Jeff Richards April 24th of '07.

17         Q.     So --

18         A.     For the first time.

19         Q.     Okay, sometime in April of 2007?

20         A.     Yes, ma'am.

21         Q.     All right.

22                   MS. GIBSON:   Plaintiff offers Exhibit 59.

23                   THE COURT:   All right.

24                   Any objection?

25                   MR. L. FRIEDMAN:   Yes.

```
 1                    THE COURT:  All right.
 2                    MR. L. FRIEDMAN:  This is surprise, never
 3     seen it before, not produced ever before.
 4                    MS. GIBSON:  That's not accurate.
 5                    MR. L. FRIEDMAN:  No Bates number on it.
 6                    MS. GIBSON:  In fact, there is a label on
 7     the documents that were produced and copied that says it's
 8     about a job search and offers.
 9                    THE COURT:  All right.  Objection's
10     overruled.  Fifty-nine is admitted.
11         Q.    (By Ms. Gibson) Okay, do you see, Mr. Carpenter,
12     that at the top of the page you're entering an agreement --
13     we're fast forwarding here -- on October 3rd of 2007?
14         A.    Yes.
15         Q.    With American Housing Foundation, right?
16         A.    Yes.
17         Q.    Okay.
18                    But still, even though you're agreeing at
19     this point, when is your employment targeted to begin?
20         A.    November 1, 2007.
21         Q.    Okay.  And what is --
22         A.    But only targeted.
23         Q.    Right.  And what is the significance of November
24     1, 2007?
25         A.    That was the transition of management of Pinnacle
```

Appendix 1028

1    with Southwest Housing employees.  And, consequently, I'd be
2    with unemployed.
3         Q.    Okay.  And there's a caveat here.  And what is
4    that?
5         A.    The need to be flexible with the full-time start
6    date.  May be necessary to enable a smooth and thorough
7    transition of the sale of ownership interest with existing
8    employer.
9         Q.    And was -- if you put aside the three-percent sale
10   proceeds bonus, was this -- was the offer at American
11   Housing Foundation more or less than at Southwest Housing?
12        A.    More.
13        Q.    And why did you -- why did you make the start date
14   flexible?
15        A.    To ensure that I fulfilled my requirement and
16   commitments to the three-percent arrangement agreement that
17   we had.
18        Q.    Okay.  And if the closing had lasted -- if you had
19   been asked to stay on longer than through the management
20   transition, would you have done so?
21        A.    Yes, ma'am.
22        Q.    I'm handing you Plaintiff's Exhibit 60.  Do you
23   recognize Exhibit 60 as an Email from Steve Sterquell to
24   you?
25        A.    Yes, ma'am.

1          Q.    Okay.   And he's making you certain offers

2     concerning the job at American Housing Foundation?

3          A.    Yes, ma'am.

4                     MS. GIBSON:   Plaintiff offers Exhibit 60.

5                     THE COURT:   Any objection?

6                     MR. L. FRIEDMAN:   Same objections as

7     before, Your Honor.   Not produced, surprise --

8                     THE COURT:   Right.   Overruled.

9                     MR. L. FRIEDMAN:   -- relevance, lack of

10    foundation.

11                    THE COURT:   Okay.   Overruled.   Sixty is

12    admitted.

13         Q.    (By Ms. Gibson) And who is Steve Sterquell?

14         A.    The president and founder of American Housing

15    Foundation.

16         Q.    Okay.   And so after the conversation he's talking

17    about -- he talks about salary?

18         A.    Yes.

19         Q.    Okay.   And that's 250,000?

20         A.    Actually, it's 259-.

21         Q.    Well, you see it says this amount will be

22    increased 9,000 to offset auto allowance?

23         A.    Right.

24         Q.    Okay.

25         A.    Yes.

Appendix 1030

1          Q.    So your base is what?

2          A.    250-.

3          Q.    And then ultimately ends up being 259- for auto

4     allowance?

5          A.    Correct.

6          Q.    Okay.   And is that higher or lower than what your

7     base was, including car allowance, at Southwest Housing?

8          A.    Slightly higher.

9          Q.    Okay.

10         A.    I mean significantly higher.

11         Q.    And the acquisition bonus, could you briefly

12    explain what is being offered here?

13         A.    Yes.   We were growing the portfolio and --

14         Q.    Well, just -- sorry.   But just back up.   Can you

15    just explain what the bonus is and what it's paid from?

16         A.    One was an acquisition bonus paid at closing for

17    purchasing of new properties to the portfolio.

18         Q.    Okay.   And how much would you get on each new

19    property?

20         A.    Ten thousand for market rate and student deals and

21    fifteen percent for tax credit developments.

22         Q.    Okay.   And so that's for each.

23               When you say each property, does that mean

24    each apartment complex?

25         A.    Yes, ma'am.

Appendix 1031

1      Q.    And the operation performance bonus, can you

2  briefly explain what is being offered here?

3                  MR. L. FRIEDMAN:  Your Honor, relevance.

4                  MS. GIBSON:  Your Honor, the relevance is

5  the amount he was being offered that shows --

6                  THE COURT:  You don't -- you're -- the

7  document speaks for itself.  Are you going through the

8  entire document?

9                  MS. GIBSON:  Well --

10                 THE COURT:  He's already said that this was

11 for more.

12                 MS. GIBSON:  I'm not going through family

13 health benefits.  I just want to explain the bonus structure

14 a little bit.

15                 MR. L. FRIEDMAN:  They're not seeking

16 damages for this portion of their case.

17                 MS. GIBSON:  No.  It just explains --

18                 THE COURT:  I understand.  The objection's

19 overruled.  Go ahead.

20     Q.    (By Ms. Gibson) Okay.  Your operations performance

21 bonus?

22     A.    Rate is 10 percent or 5,000 on all properties that

23 have distributable cash flow.  So any property that had

24 distributable cash flow over 5,000 -- greater than 10

25 percent, $5,000, I would get $5,000 per property.

Appendix 1032

1          Q.    Okay.   And compared to your bonus range between

2     50- and 200,000 at Southwest Housing,  your annual bonus

3     range,  was the bonus potential here higher or lower at AHF

4     compared -- let me try that again.   Was the bonus structure

5     potential at American Housing Foundation potentially higher

6     or was it lower than your annual bonuses at Southwest?

7          A.    Higher.

8          Q.    Ultimately, Mr. Carpenter, what happened to

9     Steve Sterquell?

10         A.    He was killed in an automobile accident on April

11    1st, 2009.

12         Q.    Okay.   And you -- did you leave after that?

13         A.    Yes, I did.

14         Q.    And did Jeff Richards, who we heard testify by

15    video here, did he also leave around the same time?

16         A.    Yes, ma'am.

17         Q.    And, ultimately, what happened to the company

18    after Steve Sterquell died?

19         A.    It went into receivership and to bankruptcy.

20         Q.    I'm handing you Plaintiff's Exhibit 60.   Do you

21    recognize --

22                    MR. L. FRIEDMAN:  Wait.   This is 61.

23                    MS. GIBSON:  I'm sorry.   Sixty-one.

24         Q.    (By Ms. Gibson) Do you recognize Exhibit 61 as

25    part of a claim you filed with the bankruptcy court --

Appendix 1033

```
 1          A.    Yes, ma'am.

 2          Q.    -- for American Housing Foundation?  Okay.

 3                     MS. GIBSON:  And plaintiff offers Exhibit

 4    61.

 5                     THE COURT:  Any objection?

 6                     MR. L. FRIEDMAN:  Same objection,

 7    Your Honor.  It's brand new.  I've been produced hearsay.

 8    Lack of foundation.

 9                     MS. GIBSON:  Your Honor, it's what -- it's

10    part of the filing with the bankruptcy court.

11                     MR. L. FRIEDMAN:  It appears that it is.

12    Nevertheless, it's not been produced.

13                     MS. GIBSON:  That's not accurate.

14                     MR. L. FRIEDMAN:  Not on her exhibit list.

15    No Bates stamp.

16                     THE COURT:  Fair enough.

17                     Overruled.  Sixty-one is admitted.

18          Q.    (By Ms. Gibson) And as far as the bonus structure

19    in Exhibit 61, how -- what is the bonus portion of what you

20    had earned at that point that was still owed?

21          A.    Number -- number three was $130,000, but we split

22    it into two payments.  So I received the one.  April 1st was

23    the day that I was supposed to be paid that extra 65-.

24          Q.    Okay, so 65- still owed?

25          A.    Sixty-five- owed.  The operations bonus totaled
```

Appendix 1034

```
 1    337,500 and --

 2         Q.    Did you mean 337, 500?

 3         A.    Right.

 4         Q.    Okay.  Now, so you talked to Will Hartsfield and

 5    shortly thereafter you meet with Jeff Richards with American

 6    Housing Foundation.  But in the meantime, in March of '13,

 7    you ultimately have a meeting with Brian Potashnik?

 8         A.    Yes, on the 14th.

 9         Q.    Okay.

10               MR. L. FRIEDMAN:  Thank you.

11         Q.    (By Ms. Gibson) I'm handing you what's been

12    previously marked Plaintiff's Exhibit 52.  Do you recognize

13    Exhibit 52 as notes to yourself to discuss with Brian?

14         A.    Yes, ma'am.

15         Q.    Okay.  And these are sent to your Southwest

16    Housing work Email?

17         A.    Yes.  It was to me, from me.

18         Q.    All right.

19               MS. GIBSON:   Plaintiff offers Exhibit 52.

20               THE COURT:  All right.  Any objection?

21               MS. GIBSON:  Has it been admitted?

22               THE COURT:  It came up before.  It wasn't

23    admitted or it wasn't offered then.

24               MR. L. FRIEDMAN:  You know, Your Honor, I

25    have the same objections that I've made before to these
```

45

```
 1    newly produced documents.
 2                    MS. GIBSON:  This is -- this is not just
 3    not newly produced; it's on the exhibit list.
 4                    THE COURT:  All right.  Okay.  Overruled.
 5    Fifty-two is admitted.
 6         Q.   (By Ms. Gibson) Okay.  So on -- what's the date
 7    here?
 8         A.   March 13th.
 9         Q.   Okay.  And these are what?
10         A.   They're my notes to myself to remind me of
11    different topics to discuss with Brian.  So they're --
12         Q.   Okay.
13         A.   -- discussion points.
14         Q.   And do you recall when Brian Potashnik said that
15    stay bonus and stay and pay was something I made up?
16         A.   Yes, I do remember him saying that.
17         Q.   And here in your notes to discuss with Brian,
18    under transition items, what did you note at the time?
19         A.   Personnel -- one, personnel decisions,
20    stay-and-pay incentives.
21         Q.   Okay.  And in addition to your three-percent
22    agreement to stay, without getting into details of anybody's
23    deal, did you have some responsibility for staying, what you
24    call stay-and-pay incentives?
25         A.   Yes, ma'am.
```

Appendix 1036

1          Q.    Okay.   And what -- what were the group of

2     employees you were responsible for?

3          A.    I was responsible for corporate management

4     personnel.

5          Q.    All right.   And --

6          A.    Whether they were in the corporate office or

7     satellite offices that we had.

8          Q.    Okay.   And what was -- without telling us any one

9     specific deal, what was your role in setting stay-and-pay

10    incentives for corporate employees?

11         A.    Brian initially made some recommendations -- made

12    a recommendation, which I thought was over generous.

13         Q.    Well, we're not talking about specific employee

14    deals.

15         A.    Okay.

16         Q.    Okay.   In general, just for the entire group,

17    what -- what was your role in setting stay-and-pay

18    incentives?

19         A.    Setting -- setting the retention, stay and pay,

20    severance bonus, whatever we want to call it.   And I worked

21    with Keith Jones as well, and we -- to present it to Brian

22    and Cheryl.

23         Q.    Okay.   And did you also play a role in selecting

24    who would receive a stay-and-pay --

25         A.    Yes.

47

1          Q.     -- incentive?

2          A.     Yes, ma'am.

3          Q.     Okay.  Is this the same thing or different from

4    what Keith Jones called severance?

5          A.     No.  Same thing.

6          Q.     Same thing.

7                 And what was the purpose of setting these

8    stay-and-pay incentives?

9          A.     Well, it was very important for retention of

10   employees.  Very nervous about the new company coming on

11   board and bringing their own people.  But also to keep the

12   eye on the ball so they'd be motivated and focused to

13   continue to do their job and continue to stay on course, the

14   right course.

15         Q.     Okay.  And is this in connection with the asset

16   sale?

17         A.     And may I add to keep the continuity flowing

18   properly?

19         Q.     Okay.  What do you mean by continuity?

20         A.     The integrity of Southwest Housing until Cascade

21   or Pinnacle took control.

22         Q.     Okay.  And then --

23         A.     To maintain the standards.

24         Q.     -- and then you also refer -- you also refer to

25   this as a stay plan?

Appendix 1038

48

```
 1        A.    Yes.
 2        Q.    Is that the same thing?
 3        A.    Yes.
 4        Q.    Okay.  And is this part of the plan or program to
 5   pay severance or stay bonuses that Keith Jones testified
 6   about?
 7                        MR. L. FRIEDMAN:  Leading.
 8                        THE COURT:  Overruled.
 9        A.    Yes.
10        Q.    (By Ms. Gibson) All right.  Mr. Carpenter, do you
11   recall when Brian Potashnik testified that he never had you
12   lead any tours for prospective sellers or investors?
13        A.    Yes.
14        Q.    I'm sorry.  Respective purchasers?
15        A.    Yes, I recall him saying that I was not involved.
16        Q.    Okay.  And were you, in fact, involved in that?
17        A.    Yes, I was.
18        Q.    Okay.
19              I'm handing you what's been marked
20   Plaintiff's Exhibit 62.  Do you recognize Plaintiff's 62 as
21   an Email from Basil Rallis to you on April 12th, 2007?
22        A.    Yes, I do.
23        Q.    And is this in connection with something you
24   received during the course of your work in connection with
25   the asset sale?
```

1          A.    Yes, ma'am.

2          Q.    Okay.

3                    MS. GIBSON:   Plaintiff offers Exhibit 62.

4                    THE COURT:   All right.   Any objection?

5                    MR. L. FRIEDMAN:   Same objections,

6     Your Honor.

7                    THE COURT:   Overruled.   Sixty-two is

8     admitted.

9          Q.    (By Ms. Gibson) So this Email is from Basil Rallis

10    at Cascadeaffordable.com?

11         A.    Yes.

12         Q.    Who is Basil Rallis?

13         A.    He was, for the most part, I believe -- I don't

14    know what his title was, but he was the transaction person

15    for Cascade.   He was the developer, the purchaser, the

16    leader of putting the deal together for Cascade.

17         Q.    Okay.   And so as of April 12, 2007, he's Emailing

18    you about a tour?

19         A.    Yes, ma'am.

20         Q.    Okay.   And he's talking to you about the details

21    of coming to Dallas.   Did you ultimately take Basil Rallis

22    to tour Cascade Affordable Housing?

23         A.    No.

24                    On the 18th, I had my pickup truck and I

25    had a full truck.   I had four people.   Stan Harrelson, who

1    is a principal and signer of all the Cascade documents, was

2    in the front seat.  There are two representatives from their

3    investment group, I believe -- and I may be wrong -- Idaho

4    Insured Teachers Retirement, something like that.  And the

5    other gentleman I think -- I don't remember.  He could have

6    been with RBC.  I just don't remember --

7         Q.    Okay.

8         A.    -- who the other person was.  But I definitely

9    recall Stan and the two people from the investor side.

10        Q.    All right.  So Stan Harrelson is the person who

11   actually, ultimately, signed the purchase agreement for

12   Cascade?

13        A.    Yes, ma'am.

14        Q.    Okay.  And the other -- and some of the other

15   folks were investors for the potential purchaser?

16        A.    Yes, ma'am.

17        Q.    Okay.  And did you ultimately meet with

18   Brian Potashnik?  Or when's the next time -- in March.

19   I'm sorry.  In March, did you meet with Brian Potashnik?

20        A.    Yes, I met with Brian once -- pardon me -- excuse

21   me -- on March 14th, 2007, at Kuby's for breakfast.

22        Q.    And at this meeting, did you drop off some

23   documents?

24        A.    Yes.

25        Q.    And generally speaking, what were those documents?

1      A.    They -- they were a full page of additional

2   discussion points that we went through.  There was an

3   attachment to my thoughts on past earned bonuses as -- and I

4   believe that was it.  I think -- or, no, there was also a

5   poorly written amendment to the employment agreement for the

6   three-percent --

7      Q.    All right.

8      A.    -- handshake deal.

9      Q.    I'm handing you Plaintiff's Exhibit 64.

10               MR. DONOHUE:  Your Honor, on exhibit

11   Plaintiff's 63 --

12               THE COURT:  Uh-huh.

13               MR. DONOHUE:  -- there are redactions that

14   are needed.

15               MS. GIBSON:  Your Honor, I looked at that

16   but defendants have already offered the same document as

17   Defendants' 14.

18               THE COURT:  Is it in evidence?

19               MS. GIBSON:  I believe it was.

20               MR. L. FRIEDMAN:  You know, we pointed

21   it out and ask that it be substituted by --

22               MS. GIBSON:  This was when Mr. Friedman

23   started to show it and then offered it and I had no

24   objection.  This is in connection with questioning Ms. Vikki

25   Carpenter.

1              MR. L. FRIEDMAN:  May we approach?  The

2    Court said we could redact it.

3              (Sidebar conference held)

4    Q.    (By Ms. Gibson) Okay, and in Exhibit 63 this is

5    your effort to document the handshake deal and what you --

6              MS. GIBSON:  Oh, plaintiff offers 63.

7              THE COURT:  63 is admitted after the

8    redaction and 14 will be substituted with the 14-1 or 14A.

9              MR. DONOHUE:  Thank you, Your Honor.

10   Q.    (By Ms. Gibson) With -- is this your effort at

11   memorializing agreements or what you thought you were owed

12   in past-due bonuses?

13   A.    Yes, ma'am.

14   Q.    Okay.

15              And did you also, you or your wife, use

16   sample agreements from the Internet and try and put them

17   together?

18   A.    Not -- not this particular one.

19   Q.    Okay.

20   A.    Or may have -- it may have been something small,

21   but I used a format from a former colleague.

22   Q.    Okay.  And so part of the format you used here is

23   from the form that Keith Jones sent to you in January?

24   A.    Yes.

25   Q.    Okay.  And in connection with using this form, did

53

1    you make a mistake in the three-percent calculation?

2         A.   Yes, I did.

3         Q.   Okay.

4              MR. L. FRIEDMAN:   I'm sorry.

5         Q.   (By Ms. Gibson) And --

6              MR. L. FRIEDMAN:   I'm sorry.  What did he

7    say?

8              MS. GIBSON:   He said, yes, I did make a

9    mistake.

10        Q.   (By Ms. Gibson) Okay.  And is this the mistake?

11        A.   Yes, it is.

12        Q.   Okay.  And you also tried to add or get something

13   more; for example, capping closing costs at a maximum of

14   three percent?

15        A.   Yes.  That's stemming from our -- Brian and my

16   original calculation of what we anticipated closing costs

17   would be for the transaction at the time.

18        Q.   Okay.  You're talking about --

19        A.   So I used that.

20        Q.   Are you talking about in October of 2006 when

21   Brian Potashnik announced the formula?

22        A.   Yes.

23             MR. L. FRIEDMAN:   Leading.

24        A.   Yes, ma'am.

25        Q.   (By Ms. Gibson) Okay.  And at that time, had

1    you-all --

2                    MR. L. FRIEDMAN:  I didn't get a ruling.

3                    THE COURT:   Objection's sustained.

4        Q.    (By Ms. Gibson) At that time, did Brian give you

5    an estimate?

6        A.    Yes.

7        Q.    And the estimate -- the estimate he gave you was

8    based on what in connection with closing costs?

9        A.    Three percent of the transaction for normal

10   closing costs, broker fees, title, legal, etcetera,

11   etcetera.

12       Q.    All right.  And with respect to annual bonuses

13   you're asking for 600,000?

14       A.    Yes.

15       Q.    Okay.  And is that what you -- is that what Brian

16   had told you or is that -- what is that number?

17       A.    That is what I proposed since we were unable to

18   get together for -- to get really into the details of my

19   compensation I had a game plan, and that was a proposal.

20       Q.    Okay.  And did Brian Potashnik tell you that he

21   would ultimately give you a total number?

22       A.    Yes.

23       Q.    Did he ever actually do that as far as a final

24   total?

25       A.    Not -- not directly.

1        Q.    And if you will turn to the page that's Bates

2    labeled Carpenter 13, do you see on Paragraph 3?

3        A.    Yes.

4        Q.    These are notes you left with Brian?

5        A.    Went over and left with him, yes.  I was actually

6    trying to catch a plane.  I was supposed to be on vacation

7    that week and --

8                    MR. L. FRIEDMAN:  Everything after went

9    over and left with Brian is nonresponsive, Your Honor.

10                    THE COURT:  Overruled.

11                    You've got a couple minutes before our

12   morning break.

13                    MS. GIBSON:  Okay.

14       Q.    (By Ms. Gibson) The -- do you recall the other

15   side questioning your wife about this document?

16       A.    Yes.

17       Q.    And they implied that you wanted the bonuses in

18   order to pay lawsuit expense and tax lien and family

19   obligations?

20       A.    Yes, that's what they said.

21       Q.    Okay.  Is that what the document actually says at

22   3A?

23       A.    No, it doesn't.

24       Q.    Okay.  What does it actually say?

25       A.    It says I was depleting my savings due from the

56

1    lack of bonuses and increased wage salaries that I needed to

2    pay my personal lawsuit expenses, tax lien, and daily family

3    obligations as a result of payment deferral.

4         Q.    Okay.   So those had already been paid.   You just

5    paid them out of savings?

6         A.    Yes, ma'am.

7         Q.    Okay.

8                   MS. GIBSON:   And I think that might be a

9    good place to stop.

10                  THE COURT:   Very good.

11                  We'll take a 15-minute break, ladies and

12   gentlemen.   We'll see you back in 15 minutes.

13                       (The jury exited the courtroom.)

14                       (Recess taken)

15                       (The jury entered the courtroom.)

16                  THE COURT:   Welcome back.   Good morning

17   still, ladies and gentlemen.

18                  We'll continue with the trial.

19   Mr. Carpenter is the witness; Ms. Gibson is asking

20   questions.   And we'll go up till near the noon hour before

21   we take our lunch break.

22                  Ms. Gibson, if you'll pick up where you

23   left off.

24        Q.    (By Ms. Gibson) Mr. Carpenter, in the notes that

25   you left with Brian Potashnik underneath your employment

1    agreement --

2           A.    Yes.    The amendment employment agreement.

3           Q.    -- do you note specific amounts of annual bonuses

4    that Brian Potashnik has said you've earned?

5           A.    Yes.

6           Q.    Okay.    And what are those amounts?

7           A.    Fairway, 50,000; McKinney, 50,000; Vegas, a

8    hundred- to 200,000.

9           Q.    And on top of that, had Mr. Potashnik said whether

10   or not he believed he owed you additional past-due bonuses

11   on top of those amounts?

12          A.    From the very beginning, Brian anticipated me to

13   be at the top of the range.

14               MR. L. FRIEDMAN:  I'm sorry.  I just don't

15   hear him.

16               Can you move that microphone --

17               MS. GIBSON:  Can you lean in?

18               MR. L. FRIEDMAN:   -- closer to yourself?

19               THE WITNESS:  Yes, sir.

20               MR. L. FRIEDMAN:  Thank you.

21               THE WITNESS:  I said, from conversations,

22   Brian anticipated me to be at the top of the higher end of

23   the range.

24          Q.    (By Ms. Gibson) And the -- had he -- in addition

25   to the 50,000 from McKinney, the 50,000 from Fairway, and

1    the 100- to 200- you hoped to source from Vegas, do your

2    notes indicate that he also is acknowledging additional

3    past-due bonuses?

4         A.    Yes.

5         Q.    And the -- on top of Fairway, Vegas, and McKinney,

6    where is he hoping to source the additional bonuses from?

7         A.    That would be developer fees --

8         Q.    Okay.

9         A.    -- coming in.

10        Q.    And the spreadsheet that you left with Brian, why

11   are you using those numbers?

12        A.    Those were the numbers that I felt at the time for

13   annual increase and bonuses earned for the period of time.

14        Q.    Okay.  So --

15        A.    It was for -- it was for discussion purposes to

16   work toward an agreed number.

17        Q.    Okay.

18              If you would take a look at Exhibit 64, 65,

19   and 66, please.  Mr. Carpenter, these documents have been

20   redacted.  But other than the redactions, do you recognize

21   64, 65, and 66 as Emails between you and Keith Jones while

22   you worked at Southwest Housing?

23        A.    Yes, ma'am.

24        Q.    Okay.

25              MS. GIBSON:  Plaintiff offers 64, 65, and

Appendix 1049

1    66.

2                    THE COURT:   Any objection?

3                    MR. L. FRIEDMAN:   Well, let's see which is

4    which, Your Honor.

5                    MS. GIBSON:   They're numbered for you.

6                    MR. L. FRIEDMAN:   Okay.   No objection as

7    redacted, Your Honor.

8                    THE COURT:   Those three are admitted.

9        Q.   (By Ms. Gibson) In the first Email on 64 the title

10   is severance payroll?

11                   (Pause)

12       A.   Yes.   Yes, ma'am.   I'm sorry.

13       Q.   And without getting into the details of anyone's

14   particular deals, what is Keith Jones asking you to do here?

15       A.   To suggest and/or to confirm what I would think in

16   one of my employee's severance allowance -- stay, retention

17   bonus, whatever we're calling it -- should be.

18       Q.   Okay.

19       A.   So we could collectively put together a

20   corporate -- you know, a full corporate list.

21       Q.   Okay.   And the second page is redacted but

22   it would have the names and what the recommendations are?

23                   MR. L. FRIEDMAN:   Objection, leading.

24   Violation of the limine.

25                   THE COURT:   Don't lead the witness.

60

```
1        Q.    (By Ms. Gibson) What -- without getting into
2   details of anyone's deal, what, generally, is on the second
3   page?
4        A.    It's very simple form.  It was the name of the
5   employee, their position, and their hire date.  And we had
6   two columns of severance that we were looking at proposing.
7        Q.    Okay.  And when you talk about severance, is that
8   the same or different from the stay bonus program?
9                  MR. L. FRIEDMAN:  I think that question's
10  been asked and answered.
11                 THE COURT:  Overruled.
12       A.    It's the same.
13       Q.    (By Ms. Gibson) Okay.  And on Exhibit 65, you and
14  Keith Jones, the subject is bonus wages spreadsheet.
15                 (Pause)
16                 Are you not seeing it in front of you?
17       A.    I'm sorry.  Would you mind asking the question
18  again?
19       Q.    Sure.
20       A.    I'm trying to -- since it's redacted and so small,
21  I can barely read anything.
22       Q.    Okay.  Well, you can take a look at the screen.
23       A.    Okay.
24       Q.    Or that screen in front of you.
25       A.    All right.
```

61

1      Q.    Do you see this Keith Jones Email about bonus

2    wages spreadsheets?

3      A.    Yes.

4      Q.    Okay.  And he's asking you to check people for

5    management.  Is this the same stay bonus program or is it

6    different?

7                    (Pause)

8      A.    I'm -- I'm not a hundred percent certain, but I

9    think it's a different analysis of how to track the stay or

10   severance by using the percentage of salary versus --

11     Q.    Okay, don't --

12     A.    Okay.

13     Q.    -- don't talk -- sorry.

14     A.    Okay.

15     Q.    Don't talk about deals.

16              Okay, but is it still an evaluation --

17     A.    I believe so.

18     Q.    -- in connection with that program?  Okay.

19     A.    Yes.

20     Q.    And Exhibit 65 -- or 66.  And this is -- is this

21   just your response to him on the same incentive bonus

22   program?

23     A.    Yes, ma'am.  It would have been updated at his

24   request.

25     Q.    And then as far as the timeline goes, do you

1    ultimately end up meeting with Brian after May 14th when he

2    didn't show at the office?

3         A.   I'm sorry?

4         Q.   I'm going back to the timeline.

5         A.   Okay.

6         Q.   I believe when we had finished yesterday you had

7    just talked about that you and Cheryl Potashnik and

8    Brian Potashnik were going to head back to the office and

9    Brian didn't show up.

10        A.   That's correct.  Brian and I had the breakfast

11   meeting.

12        Q.   Okay.  And then when was your next meeting with

13   Brian?

14        A.   It was supposed to have been once we got back to

15   the office.  But it ended up being, I believe, a couple --

16   two days, a couple days later.

17        Q.   Okay.

18             I'm handing you Plaintiff's Exhibit 67.  Do

19   you recognize Exhibit 67 as additional notes to yourself in

20   preparation for that meeting?

21        A.   Yes, ma'am.

22             MR. L. FRIEDMAN:  Do I have 67?

23             MS. GIBSON:  Plaintiff offers 67.

24             MR. L. FRIEDMAN:  Thank you.

25             Same objections, Your Honor, as I've stated

1  before.

2              THE COURT:  All right.  Overruled.  67's

3  admitted.

4              MS. GIBSON:  Okay.

5      Q.   (By Ms. Gibson) And so in connection with the

6  May 12, 2007 meeting you are discussing some of the same

7  things?

8      A.   Yes.

9      Q.   Okay.  Then what happens on a couple days later?

10 Do you have what date that is?  You said a couple days after

11 Brian didn't show at the office.

12     A.   May 16th.

13     Q.   About?  Okay.

14              And tell us what happens, the gist of what

15 happened in that meeting.

16     A.   The three of us were supposed to get together to

17 make sure we're all on the same page and consummate the

18 earned bonuses being separate from the three-percent bonus

19 program.

20              At the beginning of the meeting,

21 unfortunately, there was a phone call that related to the

22 FBI investigation and it was very serious tension.  Brian

23 was on the phone with Mike Uhl, criminal attorney, and ended

24 up leaving the --

25              MR. L. FRIEDMAN:  Your Honor, this is

1    nonresponsive --

2         A.    -- building.

3              MR. L. FRIEDMAN:   -- to the question

4    and it's narrative.

5              THE COURT:   Break up your question.

6              MS. GIBSON:   Okay.

7         Q.    (By Ms. Gibson) And after that phone call, what

8    did Brian do?

9         A.    He left.  He left the office.

10        Q.    Okay.  Did Cheryl Potashnik stay?

11        A.    Yes, she did.

12        Q.    Okay.  And what did -- what did you and Cheryl

13   talk about?

14        A.    Well, after she composed herself -- she was upset,

15   her crying -- she said I understand that we wanted to talk

16   about the bonuses, your earned bonuses that hadn't been paid

17   out versus the three-percent bonuses are to be separate

18   bonuses.  And she confirmed that they are separate bonuses.

19        Q.    Okay.  And what else did she say about what you

20   were owed?

21        A.    Well, that she would review the information that I

22   gave Brian.  I gave it also to her.  That she would get back

23   to me.  And we continued the dialog.

24              I expressed, you know, conversation,

25   conversation, but no delivery from my end.  And she said

1    that, Jeff, I would never screw you.  You've earned it.  I

2    appreciate what you do.  You go above and beyond and you're

3    a good employee and a good friend.  She validated.

4        Q.   Okay.  And, you know, at the time you were talking

5    to Will Hartsfield about documenting the deal and you were

6    concerned about the written agreement with Southwest

7    Housing, at some point did you research whether oral

8    agreements were enforceable?

9        A.   Yes, I did.

10       Q.   Okay, in the time frame.  And what did you find

11   out?

12               MR. L. FRIEDMAN:  Objection, Your Honor.

13   It calls for a legal conclusion.

14               MS. GIBSON:  It's his own research.

15               THE COURT:  It's still a legal conclusion.

16   Sustained.

17       Q.   (By Ms. Gibson) And then what is -- what's the

18   next thing that happened in connection with the asset sale?

19       A.   The next good thing, a month transpires.  Brian

20   and Cheryl battle, continue battling with Cascade.  And,

21   finally, the amendments to the PSA, purchase sales

22   agreement, was implemented.  And the first wire transfer

23   came in on July 17, 2007.  I believe it was for $1,850,000

24   of earnest money.  And that's the Email that Cheryl sent to

25   Sara and myself saying it's celebration time.

1      Q.    Okay.  And what did y'all do to celebrate, just
2    briefly?
3      A.    Briefly, went in all smiles.  Sara said, you know,
4    Cheryl, I need your corporate card or I need a credit card.
5    And Sara and I went to Sigel's and we bought a bottle of
6    Cristal champagne and came back and we had a little
7    celebration in Cheryl's office.
8      Q.    Okay.  Then when was the formal announcement to
9    other employees about the sale?
10      A.    That was the latter part of September around the
11    20th.
12      Q.    Okay.  Were you involved in that?
13      A.    Yes.  I helped coordinate and was involved, but
14    not much.  Stefan (phonetic) was very involved.
15      Q.    And then, without getting into details please,
16    what -- what significant event happens, if any, in late
17    September, early October of 2007?
18      A.    I received a call from Brian to meet him and
19    Cheryl.  I believe Jack Potashnik was there and was giving
20    me a update of the FBI investigation and informed that
21    indictments may be -- may be issued anytime now and that we
22    need to make sure that we keep a good face on the company.
23      Q.    And -- I'm sorry.  When was that?
24      A.    That would have been the 29th and 1st time frame.
25      Q.    Okay.  And then with respect to the management

67

1    trans -- potential management transition for the asset sale,

2    what is the next event that happened?

3        A.    There was -- there was a big -- the take-over was

4    announced that they have an agreement for November 1st

5    transition, and the next big conversation was Brian and I

6    having one on October 12, 2007.

7        Q.    Okay, okay.  So -- so now management transition is

8    targeted for when?

9        A.    November 1st transition.  Not closing but

10   transition of the management.

11       Q.    Okay.  And when is this meeting announcing the

12   target date for transition?

13       A.    It -- it was the first part of October.  October

14   4th or October 8th.  I think there was a meeting with the

15   corporate level people.

16       Q.    All right.

17             And then you started to talk about a

18   meeting with Brian Potashnik.  Around when that -- when did

19   the -- after this, when did the meeting with Brian Potashnik

20   happen?

21       A.    Brian and I met on October 12th at his house early

22   in the morning after he took his children to school.

23       Q.    Okay.

24             And during this meeting, what does

25   Brian Potashnik tell you, if anything, about your -- what

68

1    y'all have been discussing about your deals?

2        A.    Well, Brian was giving me an update of what was

3    going on.  I made -- I asked how much longer would I need

4    to -- how much longer will you need me with the change in

5    person -- you know, change in the management around the 1st.

6    But most of the conversation was about the three-percent

7    bonus, memorializing that or making sure that that's still

8    confirmed, as well as the unpaid bonuses.  Brian

9    acknowledged that I earned both; that he said that as far as

10   he's concerned, as of this day, that I fulfilled my

11   obligation.

12              He -- he knew that I had a company chasing

13   me and he mentioned American Housing Foundation by name was

14   soliciting me.  And so we talked a little bit about that.

15   We talked about the Vegas rehab and the sale.

16              MR. L. FRIEDMAN:  Objection, Your Honor.

17   This is nonresponsive.  Can we return to narrative?

18              THE COURT:  Break up your questions.

19              MS. GIBSON:  I'm moving up.

20       Q.    (By Ms. Gibson) Did he tell you on the job with

21   American Housing Foundation, did he tell you whether --

22   whether you could go or stay?  Or what'd he say about that?

23       A.    He said that I could go at any time; that it would

24   not impact our agreements as of that day.

25       Q.    Okay.  What do you mean by you could take the job

1    or stay and it wouldn't impact your agreements?

2         A.    That I fulfilled my requirement for the

3    three-percent sales proceeds bonus effective that day with

4    Brian.

5         Q.    Did he tell you whether or not you would still get

6    paid if you decided to go ahead and at that point go to

7    American Housing Foundation?

8         A.    Yes, he did.

9         Q.    What did he say?

10        A.    He said that I would be paid.

11        Q.    Even if you --

12        A.    And I said I earned it.  I fulfilled -- I

13   fulfilled my obligation.  He said -- in fact, he said, You

14   should take the job.

15        Q.    Okay.  And when he said paid, is that even if you

16   left?

17        A.    Yes.

18        Q.    Okay.  And during that conversation, did

19   Brian Potashnik tell you anything about, if you left, about

20   your phone and laptop?

21        A.    Yes.

22        Q.    What did he say?

23        A.    He said that I could keep those.

24        Q.    Okay.

25              Okay.  Did you -- did you stay?

70

1          A.    Yes, I --

2          Q.    Okay.

3          A.    -- I stayed, yes.

4          Q.    That's good.

5                Then what's the next meeting you had about

6    Brian and Cheryl about your sale proceeds bonus and unpaid

7    annual bonuses?

8          A.    On October 21st, we met for dinner at a little

9    pizza restaurant near their house.   And --

10         Q.    And what were you told about the three-percent

11   deal, the past-due annual bonuses?

12         A.    That I would get paid but -- I get paid when they

13   get paid.   Basically, at closing.

14         Q.    Okay.   And did Cheryl say anything else to you

15   about that?

16         A.    She once again said that I would -- I would never

17   screw you -- screw over you.   That word.

18         Q.    Okay.   And did she saying anything about your

19   value as an employee during that meeting?

20         A.    Yes.   She said I was a very valuable employee as

21   well as a friend.

22         Q.    Okay.

23                And then when's the next meeting?   We're

24   getting close to transition.   What's the next meeting you

25   have about how long you need to stay?

1       A.    Spoke to Cheryl on the 29th of October and asked

2  her what else do you need from me as far as transitioning

3  the company, because everything is running smooth.  Just

4  wrapping up some of the payroll information, for the most

5  part.  And she asked me if I could stay through the -- until

6  the consulting asset management agreement takes place; which

7  was supposed to be implemented on November 1st.  And I said

8  that I would.

9       Q.    Okay.

10            And the management transition happened

11 when?

12      A.    November 1st.

13      Q.    Okay.  And so your work was -- your agreement to

14 stay was fully done when?

15      A.    According to -- Brian was accepting it as fully

16 done on the 12th but definitely as of 11/1 or October 31st.

17      Q.    Okay.

18            And then after that, did you stick around

19 for the rest of the week?

20      A.    Yes.

21      Q.    Okay.  And --

22      A.    November 1st I believe was Thursday.  The 2nd was

23 Friday.

24      Q.    And then what's the next significant event that

25 happened?

1        A.    Well, on the 1st, late in the afternoon after 5:00

2   o'clock -- excuse me -- I received an Email from

3   Keith Jones.   Basically, it was my termination paperwork and

4   severance package or severance agreement.

5        Q.    Okay.

6        A.    Excuse me.   Separation agreement.

7        Q.    Okay.   Same thing, though, as far as separating

8   from the company?

9        A.    Yes.

10        Q.    Okay.

11              And did that -- did that document they sent

12   you confirm your deal?

13        A.    No, not at all.

14        Q.    What did it do?

15        A.    It basically said I had no rights to any of the

16   agreements and that I would not be paid whether it's earned,

17   you know.   After my dismissal there would be no more

18   payments of anything.

19        Q.    And what did they offer you in that proposed

20   separation agreement?

21        A.    At first they offered $50,000.

22        Q.    I mean what -- what pay items were in that

23   agreement that Keith Jones sent to you?

24        A.    Oh, it was -- it was standard.   It was PTO, any

25   accrued vacation.   I believe my deal had my written

73

1    employment agreement, had six weeks automatic severance when

2    I would leave the company.  It mentioned COBRA.  And the

3    separation agreement basically took -- would wipe out all

4    the agreements that I have with Brian and Cheryl and the

5    whole reason why I stayed.

6        Q.    Okay.  When you say it would wipe out all of your

7    agreements, is that because it's requiring you to release --

8        A.    Yes.

9        Q.    -- all claims?

10             Did you sign it?

11       A.    No.

12       Q.    After that, did you continue to try and work

13   something out with the Potashniks?

14       A.    Yes, I did.

15       Q.    Okay.  And, ultimately, what did -- what happened

16   with that?

17       A.    Cheryl and I -- I gave it another try and

18   submitted not the best of documents, but --

19             MR. L. FRIEDMAN:  I'm sorry.  I didn't hear

20   that.

21             THE WITNESS:  I said I submitted -- I

22   believe I submitted another try at memorializing the

23   situation.  Cheryl said that she was going to -- that

24   it would take her a few days before she could get to it.

25             MR. L. FRIEDMAN:  This is nonresponsive,

Appendix 1064

1    Your Honor.

2                    THE COURT:   What was your question?

3                    MS. GIBSON:   I don't know.

4                    THE COURT:   Break it up then.

5        Q.    (By Ms. Gibson) And so Cheryl asked you -- she

6    asked you to send a proposal to her?

7        A.    Yes.

8        Q.    Okay.  And had y'all worked that out, would that

9    have been a new deal?

10       A.    Yes, it would have.

11       Q.    Okay.  Did you still have a deal at that point,

12   your handshake deal with Brian?

13       A.    Yes.

14       Q.    And the --you know, we talked earlier about the

15   formula, that you picked up -- the formula picked up some

16   language from the form Keith Jones gave you?

17       A.    Yes, ma'am.

18       Q.    Okay.  Did you ultimately correct that formula?  I

19   mean here in this case have you corrected the formula.

20       A.    Through whether -- through the -- through the

21   legal proceedings or deposition, yeah.

22       Q.    And -- but notwithstanding that mistake, had you

23   and Brian Potashnik always talked about three percent of the

24   total of sellers' gross revenue --

25                    MR. L. FRIEDMAN:   Your Honor, this is

1    leading.

2                    MS. GIBSON:  I'm asking about what they

3    talked about on formula.

4                    MR. L. FRIEDMAN:  No, she's telling him the

5    answer.

6                    THE COURT:  Right.

7                    MR. L. FRIEDMAN:  He can read the answer

8    himself.

9                    THE COURT:  Right.

10       Q.   (By Ms. Gibson) What had you -- notwithstanding

11   that document, what was the formula on the three percent

12   that you and Brian had always talked about?

13       A.   Three percent gross sales, minus normal closing

14   costs, minus any sales proceeds bonuses to selected

15   employees.  Thus, the net proceeds.

16       Q.   Okay.

17                    MR. L. FRIEDMAN:  I'm sorry.  Selected

18   employees and what else?

19                    THE WITNESS:  Thus, that would give us the

20   net proceeds.

21       Q.   (By Ms. Gibson) And did it help you or hurt you to

22   make that correction?

23       A.   Hurt.  It hurt me because it deducts a significant

24   amount of dollars that was paid out to -- for severances or

25   bonuses or whatever we're calling it.

76

```
 1        Q.    And was that the truth of your deal?

 2        A.    Yes.

 3        Q.    Mr. Carpenter, I am handing you Plaintiff's

 4   Exhibit 68.

 5                   MR. L. FRIEDMAN:   Thank you.

 6        Q.    (By Ms. Gibson) Do you recognize Exhibit 68 as an

 7   Email from Brad Bloomer to you while you worked at Southwest

 8   Housing?

 9        A.    Yes, I do.

10                   MS. GIBSON:   Plaintiff offers Exhibit 68.

11                   THE COURT:   Any objection?

12                   MR. L. FRIEDMAN:   No objection.

13                   Whoa, whoa, whoa.   Same objection,

14   Your Honor.

15                   THE COURT:   All right.

16                   MR. L. FRIEDMAN:   This came in for the

17   first time last night.   Same objection.

18                   MS. GIBSON:   It's not.   It was produced

19   long ago.   It's COO96124.

20                   MR. L. FRIEDMAN:   Not on the exhibit list.

21   No Bates stamp came in last night.   Same objection.

22                   THE COURT:   Overruled.   Sixty-eight is

23   admitted.

24        Q.    (By Ms. Gibson) Okay.   So this Email from

25   Brad Bloomer is on October 31, 2007.   And who is
```

Appendix 1067

77

1    Brad Bloomer?

2         A.    Head of IT.

3         Q.    Okay.

4               And what is he asking you to do?

5         A.    Please keep in mind that we need to make a backup

6    of your laptop before you take it with you.

7         Q.    Okay.   And did Southwest Housing make a backup

8    copy of your laptop before you took it with you?

9         A.    Yes.   They cloned it.

10        Q.    With respect to the damages calculation, did you

11   see me run through those with Cheryl Potashnik Geiser on the

12   three percent?

13        A.    Yes.

14        Q.    Okay.   And I'm handing you what's been marked

15   Exhibit 69.

16              MR. L. FRIEDMAN:   Thank you.

17        Q.    (By Ms. Gibson) If you'll take a look at Exhibit

18   69, is that an accurate summary of all of the calculations

19   from the Cascade closing documents and Cheryl Potashnik as

20   to your damages calculation for the three percent?

21              MR. L. FRIEDMAN:   Objection, Your Honor.

22   Lack of foundation.

23              THE COURT:   He hasn't answered the question

24   yet.

25              MR. L. FRIEDMAN:   This is a compilation.

Appendix 1068

78

1    It doesn't contain the documents that were the source of

2    these numbers.

3                    THE COURT:  All right.

4                    Is this a document created for litigation

5    or an original document?

6                    MS. GIBSON:  No.  This is a -- this is a --

7    it's a demonstrative but it's also a summary of voluminous

8    documents with --

9                    THE COURT:  You can use it as a

10   demonstrative then, but are you offering it into evidence?

11                   MS. GIBSON:  I was going to offer it as

12   a -- I offer 69 as a summary of voluminous records.

13                   MR. L. FRIEDMAN:  As a demonstrative, I

14   have no objection.

15                   THE COURT:  All right.

16                   MR. L. FRIEDMAN:  As a summary, we're

17   entitled to the documents that these figures would derive

18   from.

19                   THE COURT:  Okay.

20                   MS. GIBSON:  And they're -- they're listed.

21                   THE COURT:  Let me give you a ruling.  The

22   objection's sustained, but you can use it as a summary.

23                   MS. GIBSON:  Okay.

24                   THE COURT:  As a demonstrative summary.

25                   MR. L. FRIEDMAN:  Thank you.

79

1                    MS. GIBSON:   Okay.

2          Q.    (By Ms. Gibson) And this, the net proceeds to

3    seller after closing costs, based on all of these closing

4    amendments, do you agree with that total?

5          A.    Yes.

6          Q.    Okay.   And you -- and on the total for stay

7    bonuses paid to other employees you used what

8    Cheryl Potashnik testified to?

9          A.    Yes, during the --

10         Q.    Okay.

11         A.    -- deposition.

12         Q.    And you know -- you have an understanding in this

13   case that we asked for those numbers from documents from the

14   other side?

15         A.    Yes.

16                    MR. L. FRIEDMAN:   Objection, leading.

17         Q.    (By Ms. Gibson) Did they --

18                    MR. L. FRIEDMAN:   Leading.   Leading and

19   violates the limine.

20                    THE COURT:   All right.

21                    The total doesn't violate the limine.

22   Overruled.

23         A.    No, we did not receive the information from the

24   other side.

25         Q.    (By Ms. Gibson) And so the -- what's the total net

Appendix 1070

1    sales price?

2         A.    I'm sorry?

3         Q.    What -- at the top of that document, what are the

4    total sellers' net proceeds?

5                   MR. L. FRIEDMAN:  Can I take the witness on

6    voir dire?

7                   THE COURT:  Overruled.

8         Q.    (By Ms. Gibson) So, Jeff --

9         A.    Yes.

10        Q.    -- on Exhibit 69, what is the total --

11        A.    Oh.

12        Q.    -- at the top, net sale proceeds to sellers?

13        A.    $32,999,032.39.

14        Q.    Okay.  And what was the amount of stay bonuses

15   paid to others from Cheryl Potashnik's testimony?

16        A.    2,100,000.

17        Q.    Okay.  And in connection with the net sale

18   proceeds, did you undertake to investigate whether closing

19   costs were reasonable or anything else?

20        A.    We looked at them, but it was --

21                  MR. L. FRIEDMAN:  I only think of two

22   answers to that question, Your Honor.

23                  MS. GIBSON:  It's okay.  I'll --

24                  MR. L. FRIEDMAN:  Nonresponsive.

25        Q.    (By Ms. Gibson) Jeff, just did you -- well, let me

1    ask it this way.  Did you use all or less than all of the

2    closing costs that Southwest Housing listed on the

3    closing --

4        A.   We used all closing costs listed.

5             MR. L. FRIEDMAN:  Objection, leading.

6             THE COURT:  Overruled.

7        Q.   (By Ms. Gibson) Okay.  And if you take the formula

8    of three percent, what is the total of the three percent?

9    What's the three percent amount come down to?

10       A.   926,970.

11            MR. L. FRIEDMAN:  I'm sorry.  Can you give

12   it to me again?

13            THE WITNESS:  926,970.

14       Q.   (By Ms. Gibson) Sorry.  Let me write that again.

15            Okay.  And we have gone over your annual

16   bonuses calculation before, but what is the total on annual

17   bonuses past due based on what Brian said before you left?

18       A.   Brian -- 400,000.

19            MR. L. FRIEDMAN:  I'm sorry.  What was the

20   400,000?

21            MS. GIBSON:  Annual.  Past-due annual

22   bonuses based on what Brian Potashnik said before he left.

23       Q.   (By Ms. Gibson) Jeff, you -- you ultimately

24   recorded Brian and Cheryl after you got that proposed

25   separation agreement releasing all of your claims?

1      A.   Yes.

2      Q.   You remember that?  Okay.

3           What was your intent in doing that?

4      A.   My intent was only to see why they sent me the

5 separation agreement that would basically nullify all of our

6 agreements.

7      Q.   Why, during that conversation, did you not speak

8 up and defend yourself and say this was the deal?

9      A.   I was stunned.  I was dumbfounded.  I was hurt.  I

10 was angry.  I had a lot of different emotions.

11          I probably should have, but I was

12 listening.

13     Q.   And you continued to forward some -- even then you

14 continued to forward some work materials to Brian Potashnik?

15     A.   Yes.

16     Q.   Okay.  What was the subject matter of what you

17 were sending?

18     A.   It had to do with the sale of Las Vegas.

19     Q.   Las Vegas what?

20     A.   The Las Vegas apartment community.

21          MS. GIBSON:  Pass the witness.

22          THE COURT:  All right.

23          Mr. Friedman?

24          MR. L. FRIEDMAN:  Yeah.  Thank you.

25

```
 1                          CROSS-EXAMINATION
 2     BY MR. L. FRIEDMAN:
 3          Q.     Mr. Carpenter, how are you?
 4          A.     Fine.   Thank you.
 5                      MR. L. FRIEDMAN:  Your Honor, I just want
 6     to move my easel up here --
 7                      THE COURT:  All right.
 8                      MR. L. FRIEDMAN:  -- if you don't mind.
 9                      (The easel is being moved.)
10                      MR. L. FRIEDMAN:  I want you to be able to
11     see it too.
12                      THE COURT:  That's fine.
13                      You may want Mr. Donohue to see it.
14                      MR. L. FRIEDMAN:  He knows it by heart.
15          Q.     (By Mr. L. Friedman) Mr. Carpenter?
16          A.     Yes, sir.
17          Q.     You have a remarkable memory.
18          A.     Thank you.
19          Q.     You agree with me, right?
20          A.     I have a good memory.
21                      THE COURT:  You have to speak into the
22     microphone.
23                      His question was do you agree with him.
24                      THE WITNESS:  Yes.
25          Q.     (By Mr. L. Friedman) You have a remarkable memory
```

1   of dates and details; isn't that correct?

2              MR. L. FRIEDMAN:  Can I have my markers?

3       A.   For the items discussed, yes.

4       Q.   (By Mr. L. Friedman) And a remarkable memory for

5   what's happened over the past 10 years in this case or

6   longer, 14 years?

7       A.   Yes.  Very memorable to me.

8       Q.   Dates, times, places, and exactly what was said?

9       A.   Yes.

10      Q.   Tell me what the date was that you made your deal,

11  alleged deal, with Brian Potashnik.  And let's see if you

12  can do it without looking at your script.

13              MS. GIBSON:  Object.  Vague as to which

14  deal.

15              THE COURT:  Let me -- don't --

16              MR. L. FRIEDMAN:  Well, I'm not asking him

17  to read anything.  I just wanted to see if he can do it by

18  memory.

19              THE COURT:  Then ask him to --

20              MR. L. FRIEDMAN:  This is the most

21  important question he has.

22              THE COURT:  Okay.  Fair enough.

23              Don't approach the witness without

24  asking --

25              MR. L. FRIEDMAN:  All right.

```
 1                      THE COURT:  -- and go grabbing things from
 2      him.
 3                      He's asking you to not look at --
 4           Q.    (By Mr. L. Friedman) Without looking at your
 5      script, can you tell me the date you made your deal, alleged
 6      deal, with Brian Potashnik?
 7           A.    On or around -- he told me the --
 8           Q.    I didn't ask you on or around.  I asked you what
 9      is the date you made this very important deal with
10      Brian Potashnik.  You've had 10 years to think about it.
11      You've told this story a hundred times.  You've told it
12      three or four times since this trial started.
13                      MS. GIBSON:  Object to --
14                      THE COURT:  Let him answer your first
15      question.
16                      MR. GIBSON:  -- counsel --
17           Q.    (By Mr. L. Friedman) What is the date you made
18      your deal, alleged deal, with Brian Potashnik?
19                      MS. GIBSON:  Object.  Vague as to which --
20                      THE COURT:  Overruled.  We're here for a
21      specific --
22                      THE WITNESS:  Can I please express it
23      was -- I want to say it was May 14th?
24                      MR. L. FRIEDMAN:  Okay.
25                      Today is January 29th?
```

Appendix 1076

1              THE COURT:   Yes.

2        Q.    (By Mr. L. Friedman) All right.  So I'm going to

3   date this January 29th, '18.

4              And the deal was -- you said May 14th.

5   That's the deal, May 14th?

6        A.    Yes.

7        Q.    The deal was May 14th.

8              And if you would tell me again what the

9   ingredients of that -- May 14, 2000?

10       A.    '6.

11       Q.    All right.  And what were the ingredients of the

12   deal you made, the alleged oral deal that you're trying to

13   enforce in this case?  Just list them for me, one, two,

14   three, four, five, without reading anything.

15       A.    One moment, please.

16       Q.    Sure.   Take 10 years if you need.

17              THE COURT:   Mr. Friedman.

18              MS. GIBSON:   Object to the commentary.

19              THE COURT:   Sustained.

20       A.    The deal date of the three percent was not May

21   14th.  It was October 13th, I believe.

22       Q.    (By Mr. L. Friedman) All right.  Change your mind

23   now?

24              MS. GIBSON:   Object to the --

25              MR. L. FRIEDMAN:   This is

1    cross-examination.  I'm asking the witness if he's changed
2    his mind.
3                    THE COURT:  Okay.  Let him answer.
4         A.   Yes.
5         Q.   (By Mr. L. Friedman) I'm going to cross out May
6    14th.  And what date would you like me to put in, put on the
7    board now, without reading your script?
8         A.   I don't have anything in front of me.
9         Q.   Okay.
10        A.   October 13th.
11        Q.   What year?
12        A.   '06.
13        Q.   And what are the ingredients of the deal you're
14   trying to enforce in this case?
15        A.   The three-percent sale proceeds bonus.
16        Q.   One, three percent of sales proceeds.  Is that
17   accurate?
18        A.   Minus --
19        Q.   Hold it.  Can't write that fast.
20        A.   You may want to put net after of three percent.
21        Q.   I want to know what the deal is you made with
22   Brian on May 14 through October 13, 2006, as you made it
23   that day.  You hugged, you shook, you bump?  What was the
24   deal you made that day?
25        A.   Okay, I'll give you the formula.

88

1          Q.    Okay.

2          A.    Three percent of the sales proceeds minus --

3          Q.    All right, I'm going to say minus.

4          A.    -- in Brian's terms, normal closing cost.

5          Q.    Normal closing cost.

6          A.    Of which we estimated, approximately, three

7     percent.

8          Q.    On that day?

9          A.    On that day.

10          Q.    You and Brian agreed that the normal closing costs

11    would be three percent of what?

12          A.    Of the sales price.

13          Q.    All right.  Estimated three percent.

14                     What else?

15          A.    Minus sales proceeds bonuses, severance --

16          Q.    Wait a second.  Minus what else?

17          A.    Whatever we want to call it.  Minus sales proceeds

18    or severance bonuses paid to corporate employees.

19          Q.    All right.  We're still on October 13, 2006.

20                     Is there anything else that comprised the

21    agreement you made, alleged that you made with

22    Brian Potashnik on October 13, 2006?

23          A.    Well, we're using the sale amount based off of a

24    proposed LOI of $36 million to determine that.

25          Q.    I just want to know the ingredients of the deal

1   you made.

2       A.   Well, that is very important to the deal to get

3   down to the dollar amount.  So if it's 36 million at that

4   time and ultimately the PSA was 37 million, we used 36 --

5       Q.   Just give me list one, two, three.  Is there

6   anything else?

7       A.   The sales proceeds bonus to me was calculated to

8   be, approximately, plus or minus 1,020,000.

9       Q.   Are there any other minuses that you agreed to,

10  allegedly agreed to with Brian Potashnik on October 13,

11  2006?

12      A.   No.

13      Q.   So with regard to your alleged three percent I can

14  draw a line here and then put plus -- what do you call the

15  other bonus?  Performance bonus?  What did you call it on

16  October 13th, 2006?

17      A.   The sales proceeds bonus.

18      Q.   All right.

19           Then you were about to tell me some other

20  bonus.

21      A.   Well, the --

22      Q.   We're not looking.

23      A.   I'm not.  I'm just moving, sir --

24      Q.   Okay.

25      A.   -- 'cause I can't see it.

1          Q.    Let's put it to where you can see it.

2          A.    Thank you.

3          Q.    Let's move it back so your lawyer can see it.

4          A.    During that conversation we focused on the

5    three-percent sales proceeds bonus and just briefly skirted

6    the outstanding earned bonuses.

7          Q.    Okay.  So there was no agreement with regard to

8    earned bonuses on that day?

9          A.    On that particular day.

10         Q.    Okay.  No agreement regarding earned bonuses on

11   that day.

12               Mr. Carpenter, your testimony today is that

13   this board that I've written represents the agreement that

14   you are here to enforce against the defendants in this case,

15   correct?

16         A.    Yes.

17         Q.    And that's your testimony today?

18         A.    Yes.

19         Q.    And your testimony to this jury is that you have

20   been consistent in your attempts to enforce this agreement

21   that you allege you made with Brian Potashnik on October 13,

22   2006?

23         A.    I have --

24         Q.    Only asked if you'd been consistent --

25         A.    No, I haven't been consistent.

1    Q.    -- to enforce this agreement.

2    A.    I've made a mistake in proposing when they asked

3    me to put it in writing, when they said they were going to

4    put it in writing.  I have left off the severance bonus paid

5    to corporate employees.  That was left off on the proposal.

6            MR. L. FRIEDMAN:  I'm going to say that --

7    I'm going to object as being nonresponsive.

8            THE COURT:  Okay.  Do your best to answer

9    only the question.  His question was have you been

10   consistent.

11           MR. L. FRIEDMAN:  Let me ask it

12   differently.

13   Q.    (By Mr. L. Friedman) Mr. Carpenter, you have not

14   been consistent in attempting to enforce the agreement you

15   allege you made with Brian Potashnik on October 13th, 2006.

16   Isn't that true?

17   A.    I have made an error.

18   Q.    Okay.  For whatever reason, you haven't been

19   consistent; isn't that correct?

20   A.    As I said, I made an error on the bonus.

21   Q.    I'm going to take that as a yes.  You have not

22   been consistent.

23           So I'm going to say since October 13, 2006,

24   one, not consistent.  Two, made mistakes, correct?

25   A.    Regarding?

92

1          Q.    You've made mistakes in attempting to enforce what
2     you say was an oral agreement you made on October 13th,
3     2006.   You admit you made mistakes.
4          A.    I made mistakes trying to memorialize it that the
5     company was supposed to do.
6          Q.    Wasn't my question.   My question is you made
7     mistakes trying to enforce what you've testified to today
8     was the oral agreement you made with Brian Potashnik on
9     October 13, 2006.
10         A.    I have not made mistakes on the oral agreement.
11    Only when I have attempted to play lawyer and put it in
12    writing.
13         Q.    Wasn't my question.   My question is you've made
14    mistakes in your efforts to enforce the agreement that you
15    made with Brian Potashnik on October 13, 2006; isn't that
16    correct?
17         A.    I have made an error.
18         Q.    Okay.   So to be accurate I'm going to put down
19    made error.
20              Have you made more than one error?
21         A.    Regarding the three-percent calculation?
22         Q.    Your attempts to -- no.   You have made more than
23    one error in your attempts to enforce the agreement you
24    claim you made with Brian Potashnik on October 6 [sic],
25    2006 -- no, I'm sorry, October 13, 2006.   You've made

93

1     several mistakes, haven't you?

2          A.    With me, I made errors in trying to memorialize

3     it --

4          Q.    All right.

5          A.    -- on my own, yes.

6          Q.    So I'm going to put down made errors.  And that's

7     accurate.  You've made errors, right?  Correct?  Accurate?

8          A.    Yeah.

9          Q.    Okay.

10               Okay.  You've made counteroffers to

11    Brian Potashnik; isn't that correct?

12         A.    No, sir.

13         Q.    Since October 13th, 2013 [sic], when you allege

14    you've made this oral agreement --

15               THE COURT:  You said 2013.

16         Q.    (By Mr. L. Friedman) Since October 13th, 2006,

17    you've made counteroffers to Brian Potashnik that are

18    different from what you allege your agreement was on that

19    date; isn't that correct?

20         A.    No.

21         Q.    Okay.

22         A.    Only to try to memorialize.

23         Q.    Is it your testimony today in front of the jury

24    that you've never made a counteroffer to Brian Potashnik

25    after October 13th, 2006?  Yes or no?

1          A.    No.   Payout different.

2          Q.    Okay, no counteroffer.

3                Mr. Carpenter, you made different proposals

4    to Brian Potashnik since you allege you made an oral

5    agreement him on October 13th, 2006.

6          A.    That is what I was referring to as errors in where

7    I should not have played legal.  If Brian --

8                MR. L. FRIEDMAN:  I'm just going to object

9    to that as being nonresponsive.

10               THE COURT:  Okay.

11               His question is that you made different

12   proposals.

13         Q.    (By Mr. L. Friedman) It is true, sir, that since

14   you -- the oral agreement you allege you made with

15   Brian Potashnik on October 13th, 2006, you have made

16   proposals to him containing different terms than the terms

17   you just testified to to this jury that you agreed to on

18   October 13th, 2006.  Isn't that true?

19         A.    Yes.

20         Q.    Yeah.  So made proposals.

21         A.    At that given time.

22         Q.    And since October 13, 2006, you continued to

23   negotiate with Brian Potashnik about the terms of a deal

24   with you relating to your employment.  Isn't that true?

25         A.    I do not agree with that.

1    Q.    So I'm going to put down your testimony today is

2    you did not continue to negotiate.  Is that accurate?

3    A.    I didn't -- what was the question again?

4    Q.    Since October 13, 2006, on the date you allege you

5    made your deal with Brian Potashnik --

6    A.    Uh-huh.

7    Q.    -- for the terms that you testified, one, two,

8    three --

9    A.    Right.

10   Q.    -- you continued to negotiate with Brian Potashnik

11   about additional terms?

12   A.    No.  Suggest -- suggested examples of how to

13   memorialize it, yes, but I'm steadfast to the -- to the

14   three-percent formula.

15   Q.    Okay.

16         You continued to negotiate with

17   Brian Potashnik from October 13, 2006, by introducing

18   different or additional terms to the agreement that you

19   allege you made with him; isn't that correct?

20   A.    That was only -- that was requested by the

21   Potashniks of what I felt -- what I felt that was reasonable

22   at the time.

23   Q.    So I'm going to put down ES for that.  Isn't that

24   correct?

25   A.    I remain to the original agreement when they've

1    asked to put it down in writing when they were supposed to
2    put it in writing, not me.   There has been modifications at
3    that time.
4         Q.    Okay.   Who was supposed to put the -- this
5    agreement in writing that you allege you made with
6    Brian Potashnik?
7         A.    Well, one, I didn't allege.   Brian made the deal
8    with me.
9         Q.    Okay.
10        A.    For number one.
11        Q.    All right.   So when we talk about that October 13,
12   2006 deal you allege you made, if I say it or not, you
13   understand that I'm saying I allege it?
14        A.    Okay.
15        Q.    You allege it, because I represent Brian and
16   Cheryl Potashnik and all the defendants.   And I'll
17   understand that you say you made it, okay?
18        A.    Okay.
19        Q.    Who --
20        A.    I was --
21        Q.    -- who was supposed to memorialize it after you
22   were --
23        A.    The -- the --
24        Q.    Who did you agree would memorialize it on the --
25   at the time you made -- allegedly made this deal with

1    Brian Potashnik?

2         A.    Brian said it would be memorialized, put in

3    writing, and he mentioned Randy Alligood --

4         Q.    Okay.

5         A.    -- would be doing it.

6         Q.    So I'm going to put -- if I put BP, will you know

7    that's Brian Potashnik?

8         A.    Yes.

9         Q.    'Cause if I spell out Potashnik I won't have room

10   for anything else.

11              But I want to finish.  Are you saying to

12   the jury you didn't negotiate new or additional terms with

13   Brian Potashnik since October 13th, 2006?  You did attempt

14   to negotiate additional, isn't that correct, for whatever

15   reason?

16        A.    I gave suggestions based on the situation at that

17   time.  I put it in writing.  I did not do a great job, I

18   admit, but it never was intended --

19        Q.    Your lawyer said it was a bad job.

20        A.    Excuse me.  It was a horrible job.  So put that on

21   the record.  But it was never intended to change the deal

22   itself.

23        Q.    Okay, we're going to get to that.  But -- so I'm

24   going to say you suggested additional and different terms.

25   Would that be accurate?

98

1          A.    Well, I didn't know how -- no terms -- none of

2     those terms were ever proposed because I never received it

3     in writing.  So it was only a suggestion.

4          Q.    I'm just looking for a truthful answer.

5          A.    I gave a truthful answer.

6          Q.    It's true that since October 13, 2006, you, for

7     whatever reason, suggested additional and different terms to

8     the oral agreement you allege you made on October 13th,

9     2006.  That's correct, isn't it?

10         A.    I suggested some bad memorializing.

11         Q.    You suggested additional and different terms;

12    isn't that correct?

13         A.    Not ultimately.  Not intentionally.

14         Q.    You unintentionally suggested additional and

15    different terms.  Is that how you want to put it?

16         A.    If that -- that's fine.

17         Q.    Is that what you did?  When you suggested

18    additional and different terms, are you telling the jury it

19    was unintentional?  I'll write it down.

20         A.    The unintentional piece was leaving out the other

21    employees.  The other part that I believe you're referring

22    to is the payout, and I did give suggestions on how the

23    payout would be different than a hundred percent in closing,

24    as Brian said my name would be on the closing documents.

25         Q.    Well, you had the personal guarantees, things like

1    that.  I mean, you added additional terms, didn't you?

2         A.    I added horrible additional terms.

3         Q.    Okay.  And you added different terms; isn't that

4    correct?  Different terms than you allege you made on

5    October 13th, 2006?

6         A.    Yes.

7         Q.    Okay.  So I'm going to put --

8         A.    Considering if they were ever read.

9         Q.    I don't hear you.

10                   -- added additional and different terms.

11   Do you want me to put horrible in there or is that a good

12   enough shortcut?

13        A.    Well, it's somewhat hard to say what's additional

14   and what's different from what I would have received from

15   the Potashniks if Randy Alligood would have submitted -- if

16   I would have had it submitted.  So I don't know what's

17   different.

18        Q.    We'll get to that one.  We'll give you a chance to

19   go over that.

20                   Let's look at this for a minute.  Can you

21   see this?

22                   MR. L. FRIEDMAN:  Can everybody see that?

23                   Did we start here today?  Kuby?  I don't

24   think so.

25        Q.    (By Mr. L. Friedman) Did we start here today?

1   Jeff Richards?

2         A.    I don't believe we did.

3         Q.    Or we started May 16th.  We did this today, right?

4         A.    I believe so.

5         Q.    Let me ask you.  What was the significance of

6   January 6, 2006?  Why was that date significant?

7               (Pause)

8         A.    January 6, '06.  If it is, I don't recall.

9         Q.    All right.

10        A.    I did not memorize the timeline.

11        Q.    And what about May 21st, 2006?  Why is that a

12   significant date?

13        A.    Oh, that was the day that I received a phone call

14   from Brian to meet at his house, and that's when he told me

15   about that he was selling the company and the assets.

16        Q.    But you didn't make your deal on that day,

17   correct?

18        A.    No, sir.  It came later once he was -- because he

19   needed my involvement in it.

20        Q.    And on October 13, 2006, there was no signed LOI;

21   is that correct?

22        A.    That's correct.  I believe the LOI was a few days

23   later.  However I drafted the LOI was available.

24        Q.    I'm going to -- okay, a draft of the LOI was

25   available but it was unsigned and it was still a draft,

1    correct?

2         A.   Right.

3         Q.   And on December 7, 2006, why was that a

4    significant date?

5         A.   I'm sorry.  Which day?

6         Q.   December 7th, 2006.

7         A.   That was Pearl Harbor Day.

8         Q.   Yeah, that's right.  Any other significance?

9         A.   It may have been the date that I met with

10   Rick Graf.  I'm not exactly sure.

11        Q.   And January 17th, 2007?

12        A.   As I said, I did not memorize the timeline.

13   However, the timeline was built based off the notes, also

14   confirmed by my calendar.  I feel comfortable with the

15   accuracy of the dates, for the most part.

16        Q.   You and Ms. Gibson and David Wiley built the

17   timeline?

18        A.   No.  I built the timeline.

19        Q.   With Ms. Gibson's help.  You didn't type this.

20        A.   Yes, I did.

21        Q.   It's your font?

22        A.   It's on my computer, yes.

23        Q.   And you typed it?

24        A.   Yes.

25        Q.   And you reviewed it with Ms. Gibson?

1          A.    Yes.

2          Q.    'Cause I noticed when you were testifying she had

3    a copy and asked you questions and then you had a copy that

4    you were reading from, right?

5          A.    Yes.

6          Q.    That's the truth, isn't it?  Because when she --

7          A.    I did not deny that.

8          Q.    -- because when she -- you don't deny that.

9    Because when she asked you about these dates you were able

10   to read off of that script and tell her precisely what

11   happened on those dates.  Isn't that true?

12         A.    Well --

13         Q.    Isn't that true, sir?

14         A.    To some degree.

15         Q.    Yeah.  Because when she asked you what happened on

16   December 7th, 2006, you looked down at your timeline.  And

17   what did you say?

18         A.    First meeting with Rick Graf.

19         Q.    Yeah, 'cause that's what it says on your script.

20         A.    Yeah.  I also just mentioned it to you when you

21   asked me that.

22         Q.    Yeah.  And then --

23         A.    December 7th, that was --

24         Q.    -- and then when she asked you --

25         A.    -- the meeting with Rick Graf as well.

Appendix 1093

1      Q.   When she asked you about March 7, 2007, what did
2  you say?
3      A.   Well, let me check that.
4      Q.   Yeah.   Please do.
5      A.   Which date?
6      Q.   March 7, 2007.
7      A.   It's the day that I met with Mr. Hartsfield.
8      Q.   Yeah.   That's what it says on the script, right?
9      A.   It's not a script.   Timeline.
10     Q.   Excuse me.   Timeline.
11          And so forth and so on.   And I -- I counted
12  40 different entries on this timeline that enabled you to
13  testify when Ms. Gibson asked you questions.   Am I accurate
14  on that count?
15     A.   If that's the correct amount.
16     Q.   You can count it.
17          THE COURT:   We're not counting.
18     Q.   (By Mr. L. Friedman) Mr. Carpenter, without this
19  timeline, you would not have been able to testify as
20  accurately or at all the way you've testified here this
21  morning.   Isn't that true?
22     A.   I would say it gave me a 10 percent, 15 percent
23  edge, maybe.
24     Q.   Or maybe more?
25     A.   Because early on --

1          Q.    Or maybe more?  You agree with me it may be a

2    little more?

3          A.    Maybe not.

4          Q.    But maybe more?

5          A.    No, sir.  These were --

6          Q.    All right.

7                    MR. L. FRIEDMAN:  I'm going to stop now,

8    Your Honor.

9                    THE COURT:  Okay.

10                   Ladies and gentlemen, we'll take our lunch

11   break.  We'll take an hour and 10 minutes for lunch.  We'll

12   see you back at 5 after 1:00.

13                   (The jury exited the courtroom.)

14                   (Lunch recess taken)

15                   (The jury entered the courtroom.)

16                   THE COURT:  Welcome back.  Good afternoon,

17   ladies and gentlemen.

18                   We're going to just pick up right where we

19   left off.  Our witness is Mr. Carpenter; Mr. Friedman is the

20   examining attorney.

21                   And, Mr. Friedman, if you'd pick up where

22   you left off.

23                   MR. L. FRIEDMAN:  If I could, I would.

24                   THE COURT:  All right.

25         Q.    (By Mr. L. Friedman) Mr. Carpenter, during the

1    break, to save a little time, I made a list of your

2    immediate prior employment before you joined Southwest

3    Management Company.  And if you would confirm -- I'm

4    sorry -- if you would confirm that prior to working at

5    Southwest Management Company you were regional vice

6    president with Village Green Companies.

7         A.    Correct.

8         Q.    And just briefly, what did you do at Village Green

9    Companies?

10        A.    We were in 11 states.  I ran 10 of the 11 states.

11        Q.    Property management?

12        A.    Property management.

13        Q.    Okay.

14              And, approximately, a little less than two

15   years at Elkor Properties?

16        A.    Property management in rehab.

17        Q.    Okay, as president?

18        A.    Acquisition rehab.

19        Q.    As president?

20        A.    Yes.

21        Q.    And then a little under -- it was eight years, a

22   little under or over?

23        A.    I think it was slightly under.

24        Q.    President of National Realty Management.  Briefly

25   you do that?

106

1          A.    That's correct.  I was recruited from Elkor to
2     National Realty.
3          Q.    Again, property management?
4          A.    Property management.  Very similar company as
5     Southwest Housing.
6          Q.    Okay.  And then two years you were senior vice
7     president of -- is it Fore Property?
8          A.    Fore Property Company.
9          Q.    Management -- Fore Property Company in Las Vegas;
10    is that correct?
11         A.    Yes.
12         Q.    And what were your duties and responsibilities
13    there?
14         A.    Property management.
15         Q.    Okay.  So --
16         A.    And recruited to here from --
17         Q.    And recruited to Southwest Management.
18               So before you got to Southwest Management
19    you had a lot of good property-management experience?
20         A.    Yes, sir.
21         Q.    A lot of good senior-executive experience?
22         A.    Yes.
23         Q.    And you would classify yourself as a sophisticated
24    businessman as you entered your employment with Southwest
25    Management Company?

Appendix 1097

1          A.    I would say yes.

2          Q.    Okay.  So -- and that was the case when you

3    negotiated your employment contract.  You were a

4    sophisticated businessman?

5                    (Pause)

6                    Correct?

7          A.    Hope so.

8          Q.    Yeah.  It wasn't the first contract you'd ever

9    negotiated?

10         A.    No.

11         Q.    And you represented to Southwest Management that

12   you would give them your best efforts --

13         A.    Yes.

14         Q.    -- while you worked there?  And what does best

15   efforts mean, sir?

16         A.    All the skills, the talent, the -- the effort, the

17   commitment that it took to try to make the company

18   successful.

19         Q.    That's full-time?

20         A.    More than full-time, yes.

21         Q.    And exclusive?

22         A.    And exclusive.

23         Q.    So I'm just going to put full-time and exclusive.

24                    Now, going back to the deal that you

25   allegedly made with Brian Potashnik on October 13th, 2006, I

1    didn't put down you said three percent of sales proceeds;

2    which, at the time, on October 13, 2006, I think you said

3    was $36 million?

4            A.    That was the LOI that we had at hand.

5            Q.    Was -- did you and Brian agree to that?

6            A.    That was the number we used as calculation.

7            Q.    You used 36 million?

8            A.    Used 36- and then deducted 2 million for the other

9    costs.  So, actually, 34- net.

10           Q.    Closing cost $2,000,000?

11           A.    Between the two.  Between those two minuses we

12   used 2 million as an example.

13           Q.    Okay.  So 2 million.  Okay.

14                 And I was going to ask you if the deal that

15   you made with Brian Potashnik had a beginning date and an

16   ending date?

17           A.    It did.

18           Q.    And what is the beginning date?

19           A.    The beginning date was the date, for the most

20   part, of the LOI, the letter of -- letter-of-intent time

21   frame.

22           Q.    Can you put a date on it?

23           A.    I believe it was October 16th, 2006.

24           Q.    And did it have an ending date?

25           A.    It had an anticipated ending date of April, May,

1    of 2007.   That was anticipated close date.

2         Q.    And that's what you agreed to with Mr. Potashnik;

3    is that right?

4         A.    At that time, yes.

5         Q.    Okay.

6              Now, did you ever testify under oath that

7    the beginning date that -- as part of the deal you made with

8    Mr. Potashnik, the beginning date was October 13th, 2006,

9    and the ending date was October 31st, 2007?

10        A.    I used October 12th, 2007 --

11        Q.    Just wasn't my question.   My question is, Have you

12   ever testified under oath at a prior time in this case that

13   the beginning date of your alleged agreement with

14   Mr. Potashnik was October 13th, 2006, and the ending date

15   was October 31st, 2007?

16        A.    With the delay and extensions, I did commit to

17   October 31st.

18        Q.    You did testify under oath --

19        A.    Yes.

20        Q.    -- of those two beginning dates --

21        A.    Due to the extraordinary extenuating circumstances

22   of the delays.

23        Q.    Maybe I didn't make myself clear.   Did you testify

24   that part of the agreement you made with Mr. Potashnik on

25   October 13th, 2006, had a beginning date and an ending date;

1    and that beginning date was October 13th, 2006, and the

2    ending date was October 31st, 2007, on that date?

3        A.    No, we did not specify that particular date.

4        Q.    Okay.  So let me pull up your deposition.

5        A.    As I recall.

6        Q.    Okay.

7               MR. L. FRIEDMAN:  Do we have a line and

8    page?

9               MR. J. FRIEDMAN:   Page 83.

10              MR. L. FRIEDMAN:   Page 83 of

11   Mr. Carpenter's deposition taken January 18th, 2018.

12              And the lines?

13              MS. GIBSON:  Sixteen to twenty-four.

14              MR. L. FRIEDMAN:  Lines 16 to 24.

15              Wait till Ms. Gibson gets there.

16       Q.    (By Mr. L. Friedman) Okay.  If you remember, I was

17   examining you.

18       A.    That's what I look like?

19              (Video playing)

20       Q.    "You said there was a valid contractual agreement.

21   Is there a beginning date, as you stated there was, that you

22   can give me in the terms of month, date, year?"

23       A.    "A pure official, October thir -- started October

24   13, 2006; ended October 31, 2007."

25       Q.    "Okay.  So we have a start date, October 13th,

1   2006; and we have an end date, October 31, 2007, correct?"

2      A.    "Yes."

3                (Video ended)

4      Q.    (By Mr. L. Friedman) Okay.  So, Mr. Carpenter,

5   does that refresh your memory that approximately two weeks

6   ago when I took your deposition and asked you the same

7   question your sworn testimony at your deposition was that

8   the beginning date was October 13th, 2006, and the end date

9   was October 31st, 2007?

10      A.    Yes.  With the extensions and the delay in the

11   closings, the due diligence, the PSA being drafted, I

12   committed to those dates.  Brian said my responsibilities

13   were ended October 12th, as discussed earlier.

14                MR. L. FRIEDMAN:  I'm going to object to

15   all of this as being nonresponsive, Your Honor.

16                THE COURT:  All right.

17                Answer only the question he's asking.

18   Remember Ms. Gibson will have a chance to ask you more

19   questions.

20                THE WITNESS:  Okay.  Thank you.

21      Q.    (By Mr. L. Friedman) Now, do you remember the

22   dates, without looking at anything, that you entered into

23   your employment agreement with Southwest Housing?

24      A.    Like, 2/24 of '04.

25      Q.    Okay, February of '04.

1              MR. L. FRIEDMAN:  Do we have that

2    employment agreement, Mr. Page?

3         Q.   (By Mr. L. Friedman) And if I could call your

4    attention to Defendants' Exhibit Number 2, if you look at

5    it on the screen or the hard copy in front of you.

6         A.   I don't have a hard copy.

7         Q.   I'm sorry.  Defendants' Exhibit Number 4.  Screen

8    or the hard copy in front of you.

9         A.   There's no hard copy in front of me.

10             THE COURT:  You can look at the screen.

11             THE WITNESS:  I'm sorry.  With the

12   trifocals it would be easier --

13             THE COURT:  Okay.

14             THE WITNESS:  -- with paper rather than

15   screen.

16        Q.   (By Mr. L. Friedman) Okay.  Let me hand you

17   Defendants' Exhibit Number 4.

18        A.   Okay.  Thank you, sir.

19        Q.   Okay.  Do you remember this employment agreement?

20   And that's the one you signed on or about February 25th,

21   2004, correct?

22        A.   Yes.

23        Q.   I want to go through this quickly.  And the two

24   parties to this agreement are yourself, Jeffrey W.

25   Carpenter, which is defined as the employee.  You're the

1    employee, correct?

2         A.    Yes.

3         Q.    And Southwest Housing Management, which is defined

4    as the company.

5              So your employment agreement is with

6    Southwest Housing Management, not with Southwest Housing

7    Development, not with Affordable Housing Construction and

8    not with any other company or person, correct?

9         A.    As it's stated, yes.

10        Q.    Say it again.

11        A.    As stated, yes.

12        Q.    Yeah.  And your employment agreement was not with

13   Cheryl Potashnik, correct?

14        A.    It was with Brian, but Cheryl worked on it.

15        Q.    I'm sorry.  Say it again.

16        A.    I said it was with Brian Potashnik but Cheryl

17   worked on the agreement.

18        Q.    You and Cheryl and Brian negotiated this

19   agreement?

20        A.    Yes.

21        Q.    Yeah.  The terms of this agreement were hard

22   bargained for, weren't they?

23        A.    I don't recall at the time.

24        Q.    You spent two or three or four weeks bargaining

25   for every term in this agreement; isn't that true?

Appendix 1104

1          A.    I do not recall that.

2          Q.    Oh, but you do recall you negotiated this

3    agreement with Cheryl and Brian?

4          A.    Yes.

5          Q.    Okay.  And you will acknowledge that this

6    agreement is not with Cheryl Potashnik or Brian Potashnik

7    individually?

8          A.    It's with the -- the management company.

9          Q.    Yeah.  Okay, good.

10                Calling your attention to Paragraph Number

11   2, you'll acknowledge that it states specifically that this

12   is an at-will employment contract?

13         A.    Yes.

14         Q.    Correct?

15                And at-will means company can fire you or

16   terminate you at any time and you can leave at any time?

17         A.    Yes, sir.

18         Q.    All right.  And that's one of the provisions that

19   you bargained for to be part of this agreement, correct?

20         A.    No, sir.  That was probably standard language in

21   the agreement.

22         Q.    Okay, well, let's approach it differently.  You

23   read this agreement before you signed it, correct?

24         A.    Yes.

25         Q.    And you understood it?

1      A.    Yes.

2      Q.    And you intended to comply with each and every

3  term in this agreement when you signed it?

4      A.    Yes.

5      Q.    Okay.   And you understood this and agreed to abide

6  by these terms?

7      A.    Yes.

8      Q.    Okay.

9            MR. L. FRIEDMAN:  Let's go to the next one.

10     Q.    (By Mr. L. Friedman) Number three is duties.

11  Quickly, the employee shall perform the duties and functions

12  assigned to him from time to time, in the sole discretion of

13  the company, and shall report to the president of the

14  company or such other person as directed by the president.

15            I read that correctly?

16     A.    Yes.

17     Q.    And your job as executive vice president, for a

18  salary of $200,000 a year, was to do what the company asked

19  you to do, correct?

20     A.    Yes.

21     Q.    And the company would express itself through the

22  president, Brian Potashnik?

23     A.    Yes.

24     Q.    Or such other person as directed by the president,

25  Brian Potashnik, correct?

116

1          A.    Yes.

2          Q.    So if he said do this task for Mark Jones, that

3    would be something that would fit into this description?

4          A.    Yes.

5          Q.    Yeah.   Okay.

6                Then it says employee agrees to devote his

7    working time, attention, and energies to the performance of

8    the business of the company and any of its affiliates

9    which -- by which he may be employed.   And the employee

10   shall not, directly or indirectly, alone or as a member of

11   any partnership or other organization or as an officer,

12   director or employee of any other corporation, partnership

13   or other organization, be actively engaged in or concerned

14   with any other duties or pursuits which materially interfere

15   with the performance of his duties under this agreement.

16               I read that correctly, right?

17         A.    A mouthful.   Yes.

18         Q.    Yeah.

19               And where it says here you agree to devote

20   your working time, attention, and energies to the

21   performance of the business of the company, that consistent

22   with what we talked about being your best efforts, correct?

23         A.    That and for the general company as a whole.   Yes.

24         Q.    And when you say general company as a whole you're

25   talking about --

Appendix 1107

1          A.    The organization as a whole.

2          Q.    Excuse me.  -- you're talking about someone other

3     than the contracting party.  Is that what you're -- is that

4     what you're alluding to?

5          A.    I'm alluding to the Southwest Housing was

6     recognized as a comparable entity that we had different

7     divisions within the company.

8          Q.    Yeah.  And that's why it says that in the

9     performance of the business of the company and any of its

10    affiliates by which he may be employed.  So, in other words,

11    at the time you signed this agreement you contemplated that

12    you may do assignments for Southwest Housing Development or

13    Affordable Housing Construction or some other Southwest

14    company, correct?

15         A.    Well, or be employed by, yes.

16         Q.    Yeah.  Okay, good.

17               And, also, that you would not be actively

18    engaged in or concerned with any other duties or pursuits

19    which materially interfere with the performance of your

20    duties under this agreement.  So when Jeff Richards

21    testified that while you were working for Southwest Housing

22    Management you were also consulting for American Housing

23    Foundation, wouldn't that be something that materially

24    interfered with the performance of your duties under this

25    agreement, sir?

1          A.    Absolutely not.

2          Q.    Now -- now, you don't deny the fact that you were

3    consulting for American Housing Foundation, your future

4    employer, while you were being paid a $200,000-a-year salary

5    by Southwest Management, do you?

6          A.    I disagree with Jeff Richards' use of the term of

7    consulting.

8          Q.    I see.  So you disagree with the witness you

9    brought here when he testified under oath that you were

10   consulting with American Housing Foundation while you were

11   working for Southwest Management Company, correct?

12         A.    In that regard, yes.

13         Q.    Okay.

14               So let's look at one of the exhibits that

15   we have here.

16               MR. L. FRIEDMAN:  Where's that -- no --

17   bankruptcy proof of claim?

18         Q.    (By Mr. L. Friedman) So --

19               MR. L. FRIEDMAN:  May I approach,

20   Your Honor?

21               THE COURT:  Certainly.

22         Q.    (By Mr. L. Friedman) -- Exhibit 61, which your

23   lawyer introduced, is it up there?

24               MR. L. FRIEDMAN:  Do you have that on

25   the -- yeah.  I think that's been admitted.

1                    THE COURT:  Uh-huh.

2                    THE WITNESS:  I jump from 52 to -- here it

3      is.

4                    MR. L. FRIEDMAN:  Okay.

5          Q.   (By Mr. L. Friedman) So Exhibit 61 is --

6                    MR. L. FRIEDMAN:  Put that up on the

7      screen, Steve, please.

8          Q.   (By Mr. L. Friedman) -- your exhibit.

9                    (Off the record)

10                    MR. L. FRIEDMAN:  Well, do you have it?

11     Just give me the Email.  I'll put it up here.

12         Q.   (By Mr. L. Friedman) Okay, this is Exhibit 61.

13     Your lawyer admitted it this morning as a group of exhibits

14     and the cover sheet is signed by you.

15         A.   Uh-huh.

16         Q.   It's your signature, right?

17         A.   (Coughing).  Excuse me.  Yes sir.

18         Q.   And this was a cover sheet transmitting documents

19     that you submitted to the U.S. Bankruptcy Court in Amarillo,

20     Texas, under oath, correct?

21         A.   Yes.

22         Q.   You have to answer verbally.

23         A.   Yes.

24         Q.   In order for you to recover against your

25     succeeding employer for a claim for unpaid wages and unpaid

1    bonuses, correct?

2            A.    Yes.

3            Q.    And then I turn to Page 1 of your proof of claim

4    signed by you on the bottom.  Is that your signature, sir?

5            A.    Yes.

6            Q.    And you wrote in Jeffrey W. Carpenter?

7            A.    Yes.

8            Q.    That's your printing.

9                        And then I look.  The document is entitled

10   Proof of Claim, correct?

11           A.    Yes.

12           Q.    Filed October 8, 2009.  U.S. Bankruptcy Court for

13   the northern district of Texas, right?

14           A.    Yes.

15           Q.    So if you look in the middle of the first page on

16   the claim that you made against American Housing Foundation,

17   you're claiming wages based on a debt that was incurred from

18   10/24/07 to 4/7/09, correct?

19           A.    No, sir.

20           Q.    It doesn't say that?

21           A.    That's what it says, but you said wages, and I

22   don't --

23           Q.    Okay, well, let's see.

24           A.    It's -- it would be, probably, reimbursement

25   for --

1        Q.    Sir, sir, the debt was incurred from 10/24/07 to

2    4/7/09.  Is that what it says?

3        A.    Yes, it is.

4        Q.    Then you checked -- you checked the box.  Where am

5    I?  You checked the box.

6                    THE COURT:  Are you asking, I think?

7                    THE WITNESS:  Immediately above it.

8        Q.    (By Mr. L. Friedman) You checked the box.  It says

9    check this box if you have an unsecured priority claim.  You

10   checked that box, right, right there?  Is that your X?

11   That's your X.

12       A.    I'm not sure.  My attorney did it.  But the

13   X right above the date that was --

14       Q.    Sir.

15       A.    -- incurred --

16       Q.    Sir.

17       A.    -- was mine.

18       Q.    Sir, that's your X or someone made that X on your

19   behalf.  Because after you read this and understood it and

20   signed it Jeff Carpenter, you knew someone made that X on

21   your behalf, right?

22       A.    I didn't.

23       Q.    Oh, "I didn't"?

24       A.    I signed it but I didn't make the X.  I signed

25   what --

1        Q.     Okay.

2        A.     -- the bankruptcy attorney told me to sign.

3        Q.     All right.   Bankruptcy attorney did it and the

4    bankruptcy knew you were making a claim for what, sir?

5    Here's the other X.   Say it.

6        A.     Wages, salaries, commissions up to 4300 earned

7    within 90 days before filings of bankruptcy petition.

8        Q.     Okay.   So you were making a claim for wages,

9    salaries or commission earned between 10/24/07 through April

10   7th, '09.   And you will admit, sir, that your prior

11   testimony said that you were paid by Southwest Management up

12   through and including November 2nd, 2007, correct?

13       A.     Yes, but your information's inaccurate.

14              MR. L. FRIEDMAN:  Well, first, I'm going to

15   object to everything after yes as being unresponsive.   And,

16   second, I'll just say the document speaks for itself.

17              THE WITNESS:  Well, the document doesn't

18   speak for itself.   The X --

19              MR. L. FRIEDMAN:  Is there an echo?

20              THE WITNESS:  -- X right above --

21              THE COURT:  Wait for him to ask a question.

22       Q.     (By Mr. L. Friedman) Is there an echo?

23              The X right above says "other".   Expense

24   report on behalf of AHF and JWC paid out of pocket, travel,

25   furnishings (that is in possession of AHF), and other

Appendix 1113

123

1    acceptable business-related expenses.

2                    So what you're telling the jury is that you

3    incurred business-related expenses for AHF while you were

4    working full-time and being paid a full-time salary for

5    Southwest Management, correct?

6         A.    I worked a weekend doing a report.

7         Q.    That's not the question I asked you.

8         A.    I don't agree with your assessment.

9         Q.    You worked for Affordable -- American Housing

10   Foundation while you're being paid by Southwest Management.

11   That's the truth, isn't it?

12        A.    No, sir.

13        Q.    And you never disclosed it to Brian or Cheryl

14   Potashnik, did you?

15        A.    Well, no, sir.  Brian Potashnik said my job was

16   completed 10/12.

17        Q.    Wasn't my question.  My question was you never

18   disclosed this to Brian or Cheryl Potashnik.  You kept it a

19   secret from them, correct?

20        A.    I did analysis on the weekend.

21        Q.    Sir, you never disclosed it to Brian Potashnik.

22        A.    I never disclosed it to Brian.

23        Q.    Thank you.

24                    And you were not only claiming expenses,

25   sir, because the truth of the matter is your total claim was

124

1    $420,499.28.  Isn't that true?  And I can only think of two

2    answers.  Yes, it is; or, no, it's not.

3         A.    That is the truth.

4         Q.    Thank you.

5               Let's go back to the employment contract.

6         A.    Detailed on the front page.

7         Q.    There's no question in front of you, sir.

8               MR. L. FRIEDMAN:  Oh, Your Honor,

9    Mr. Donohue, my better half, reminds me to ask the Court to

10   admit Defendants' 4.

11              THE COURT:  Defendants' 4?

12              MR. L. FRIEDMAN:  The employment agreement

13   under our --

14              THE COURT:  Wasn't it already in?

15              MR. L. FRIEDMAN:  -- under our label.

16              THE COURT:  Okay.

17              MS. GIBSON:  It's already admitted by both

18   parties by agreement as 2 --

19              MR. L. FRIEDMAN:  Okay.

20              MS. GIBSON:  -- but I have no problem.

21              THE COURT:  All right.

22              Did you want that in as Defendants' 4?

23              MR. L. FRIEDMAN:  Well, let's admit it as 4

24   because Mr. Donohue said to do it.

25              THE COURT:  Okay.  Fair enough.

125

1    Defendants' 4 is admitted.

2                    MR. L. FRIEDMAN:   And I'm a compliant

3    lawyer.

4                    Okay, go to A first, Compensation A.

5        Q.   (By Mr. L. Friedman) All right.   This calls for

6    $200,000-a-year annual salary.   And to be clear, you're not

7    making a claim for salary in this case; is that correct,

8    sir?

9        A.   That's correct.

10       Q.   Okay.

11                   Let's go to B.   Now, B, I'd like to go

12   through this quickly.   I believe you testified you received

13   $50,000 bonus for year one.   And you'll acknowledge that.

14   We don't have to talk about it anymore.

15       A.   I conceded, yes.

16       Q.   Okay, so we don't have to talk about year one?

17       A.   Correct.

18       Q.   Going -- so your -- your claim is for bonuses in

19   year two, three-and-a-half?

20       A.   Correct.

21       Q.   Correct?

22                   And you'll work with me here.   It says a

23   detailed bonus plan will be provided to employee within 90

24   days of the employment date.   And everybody agrees that was

25   not provided to you?

126

1      A.    Correct.

2      Q.    Correct?

3              And then it says annual changes made to the

4    bonus structure will be at the -- help me with this -- sole

5    discretion of the company.

6      A.    That's what it says.

7      Q.    And there's no disagreement about the language

8    "sole discretion of the company", correct?

9      A.    No.

10      Q.    And, in fact, you made it a point to say in your

11    interrogatory responses you and Cheryl Potashnik discussed

12    it while you were negotiating your employment contract and

13    she insisted that that language be in your contract?

14      A.    She did.

15      Q.    Okay.  And that's how it got there?

16      A.    Yes.

17      Q.    All right.

18              And it wound up in your petition on several

19    occasions?

20      A.    Yes.

21      Q.    Okay.  So you'll agree with me now that for years

22    two, three, and then a half or up to October 31st, any bonus

23    to go to you would be at the sole discretion of the company,

24    Southwest Housing Management.  That's our starting point,

25    sole discretion of the company, correct?

1      A.    Sole discretion of the company based on the
2  profitability of the organization as a whole, yes, sir.
3                 MR. L. FRIEDMAN:  Okay.  Go ahead.  Let's
4  go to the next one.  Next paragraph.  Okay.
5      Q.   (By Mr. L. Friedman) This is another provision you
6  agreed to:  Termination of employment and the effect of
7  termination.  Employee will not be entitled to any
8  compensation or benefits pursuant to this agreement
9  effective upon termination of employee's employment, the
10  removal of employee from the position of executive vice
11  president and/or upon employee's death, except as noted
12  below.
13                 So we agree that you as the employee were
14  not entitled, according to this contract, to any
15  compensation or benefits effective upon your termination,
16  correct?
17      A.   That's (clearing throat) -- pardon me.
18      Q.   You need water?
19      A.   Yes.
20                 MR. L. FRIEDMAN:  Can we have a bottle of
21  water for him?
22                 THE WITNESS:  I have some.
23                 MR. L. FRIEDMAN:  He's got it.
24                 Take your time.
25                 THE WITNESS:  That is what the pair -- or

1    the sentence says.   However, if I may, I don't believe
2    that's in accordance with Texas law.
3                    MR. L. FRIEDMAN:   I'm going to object to
4    anything after that's what the sentence says.   About to give
5    a legal conclusion.
6                    THE COURT:   Sustained.
7        Q.    (By Mr. L. Friedman) All right.   A -- Paragraph 7a
8    says, In the event company terminates employee, employee
9    will receive severance in an amount equal to six weeks of
10   base salary in a lump sum payable upon such termination.
11                   Did I read that correctly?
12       A.    Yes, sir.
13       Q.    And, in fact, on or about October 31, 2007, when
14   you were terminated -- you with me?
15       A.    When my position was eliminated, yes.
16       Q.    When you were terminated -- I don't need help with
17   the questions.   When you were terminated you received and
18   accepted six weeks of base salary upon your termination as
19   severance, correct?
20       A.    As stated in the agreement, yes.
21       Q.    No, you accepted six weeks of salary.   You took
22   the check, you deposited it in your account, and you used
23   the money, correct?
24       A.    Yes.  I noted that before.
25       Q.    There we are.

129

1                          And, in fact, Mr. and Mrs. Potashnik

2          offered you an additional $150,000 severance, which you

3          turned down, correct?

4                A.    Yes, because of the agreement that I had.

5                          MR. L. FRIEDMAN:  Everything after yes is

6          nonresponsive.   Your lawyer gets a chance to follow up.

7                          THE WITNESS:   Okay.

8                          MR. L. FRIEDMAN:   Next.

9                Q.    (By Mr. L. Friedman) All confidential information

10         relating to the company and its affiliates are the exclusive

11         property of the company and its affiliates, and employee

12         shall use all reasonable efforts to prevent any publication

13         or disclosure thereof.

14                         We don't have an argument that the

15         confidential information of Southwest Housing Management and

16         related companies belong to Southwest Housing Management and

17         their related companies?

18               A.    No.

19               Q.    Okay.  And --

20               A.    The Southwest Housing information is Southwest,

21         yes.

22               Q.    Right.

23                         And to this day you still have Southwest

24         Housing Management's information, confidential information

25         in your possession.

Appendix 1120

1        A.    Permitted and --

2        Q.    Sir.

3        A.    -- with permission --

4        Q.    Sir.

5        A.    -- from the owner.

6        Q.    You have Southwest Housing's confidential

7   information in your possession?

8        A.    Yes.

9        Q.    And you've never returned it?

10        A.    I was given permission.

11        Q.    It's yes or no.  Everybody knows what you're going

12   to say.  The answer to my question is, yes, you've never

13   returned it, correct?

14        A.    I have not returned the gift, no.

15        Q.    Thank you.

16              Let's go to the next one.  Okay, also in

17   your contract was a provision for alternative dispute

18   resolution:  Right to injunction; remedies.  You'll agree

19   with me that alternative dispute resolution means let's find

20   a way to resolve our disputes without going to court --

21        A.    Yes.

22        Q.    -- correct?

23        A.    Uh-huh.

24        Q.    And according to the contract you negotiated,

25   read, understood and signed and agreed to comply with, in

1    the event of any dispute or claim arising from or relating

2    to this agreement or breach thereof -- here's the important

3    language -- or to any other aspect of employee's terms,

4    conditions or benefits of employment or any other aspect of

5    his contracts with the company, the parties shall use their

6    best efforts to settle this dispute, claim, question or

7    disagreement.

8                    Now, you'll agree with me that that

9    language would include this alleged oral agreement you had

10   with Brian Potashnik?

11        A.   I would have to rely on my counsel for that

12   determination.

13        Q.   I can't get an agreement from you based on your

14   knowledge and experience and your understanding of this

15   contract when you signed it that you were bound to negotiate

16   in good faith before you took another step?  That's the

17   truth.  You had an obligation to negotiate, correct?

18        A.   The step we took --

19        Q.   Sir --

20        A.   I took legal advice.

21        Q.   -- all I'm asking you is you had an obligation to

22   negotiate and you didn't do it, correct?  Whether you did it

23   on legal advice --

24        A.   Not in this fashion.  Not in this fashion, no.

25        Q.   Okay.

1                    And then it says, After consulting and

2      negotiating with each other in good faith and recognizing

3      their mutual interests, attempting to reach a just and

4      equitable solution satisfactory to both parties.  If they do

5      not reach a solution within a 30-day -- within a period of

6      30 days, then, upon written notice by either party to the

7      other, such dispute or claim shall be submitted within the

8      next 60 days to a one-and-a-half-day mediation with a

9      mediation fee -- I'm sorry -- to a one-half day mediation,

10     with the mediation fee to be shared equally by the

11     employee, that's you, and the company, Southwest Housing

12     Management, and with the mediator to be agreed on by the

13     employer and the company.

14                    Mr. Carpenter, you didn't go to mediation

15     or give notice you wanted to go to mediation before you

16     filed this lawsuit; isn't that correct?

17          A.   I took the advice of my attorney.

18          Q.   You may have, but you didn't give notice and you

19     didn't go to mediation before you filed this lawsuit,

20     correct?

21          A.   No, but I'd been to mediation twice.

22          Q.   After you filed the lawsuit this Court ordered

23     this case to mediation, right?

24          A.   Yes.

25          Q.   But you didn't follow the strict terms of this

133

1    contract that you read, understood, and whose terms you

2    agreed to comply with, correct?

3         A.   I agreed with my attorney, though.

4         Q.   Yeah.

5         A.   Counsel.

6         Q.   You just felt like you didn't have to.

7         A.   I agreed with legal counsel.

8         Q.   And after mediation, after mediation, you're

9    advised to go to the American Arbitration Association.   But

10   you didn't do that either before you filed your lawsuit,

11   correct?

12        A.   I believe that's correct.

13        Q.   All right.   Let's move on to something -- oh, and

14   by the way, how many lawyers have you had in this case, sir?

15        A.   Three.

16        Q.   Rogge Dunn and his law firm?

17        A.   Yes.

18        Q.   Gardere Wynne and that big law firm?

19        A.   Yes.

20        Q.   And Ms. Gibson, David Wiley, and Brian Sanford?

21        A.   Yes.

22        Q.   The best lawyers you've had so far?

23        A.   Absolutely.

24        Q.   Thank you.   No dispute about that, right?

25        A.   No dispute.

Appendix 1124

1    Q.   Okay.

2         Paragraph 12, you agreed no amendment or

3    alteration of the terms of this agreement shall be valid

4    unless made in writing and signed by both of the parties to

5    this agreement.  We don't have a dispute that this language

6    requires a writing signed by both parties if you want to

7    amend this agreement, correct?

8    A.   If we want to amend this agreement but not the

9    other agreement, not the oral agreement.

10        MR. L. FRIEDMAN:  Object to everything

11   after this agreement as being nonresponsive.

12        THE COURT:  Try to limit your response to

13   the question he's asking --

14   Q.   (By Mr. L. Friedman) But your claim --

15        THE COURT:  -- Mr. Cameron -- Carpenter.

16   Q.   (By Mr. L. Friedman) -- is that your alleged oral

17   agreement has nothing to do with this, correct?

18   A.   Correct.

19   Q.   Even though Paragraph 17 of this agreement that

20   you read, understood, bargained for, negotiated and signed

21   says on Paragraph 17 the entire agreement and binding

22   effect.  This agreement contains the entire agreement of the

23   parties with respect to -- it doesn't say your employment.

24   It says with respect to the subject matter hereof and shall

25   be binding upon and inure to the benefit of the parties to

1    this agreement and their respective legal representatives.

2                    The subject matter, that means everything

3    in the agreement, correct?

4          A.    As it relates to what's in writing there, yes.

5          Q.    That means your employment.  That means your

6    compensation.  That means your benefits.

7          A.    But not to the three-percent sales proceeds bonus.

8          Q.    That means bonus.  That means the subject,

9    everything.  You'd agree with that?

10         A.    I disagree with you.

11         Q.    You disagree.

12                    Okay, let's go on.  And there's your

13   signature, Mr. Potashnik's signature on behalf of Southwest

14   Housing Management Company.

15                    All right, next.  So building a timeline, I

16   have February 13th when the original agreement was --

17   effective date of the original agreement to be signed and

18   then October 13th, 2006, based on your testimony.

19         A.    I'm -- pardon me.  February 13th is what?

20         Q.    My understanding is that was the effective date of

21   your employment contract.

22         A.    I signed it 2/25/04.

23         Q.    Yes, but go back to the first paragraph, sir.

24         A.    Understood.  Okay.

25                    MR. L. FRIEDMAN:  Pull it up.

136

1        Q.    (By Mr. L. Friedman) This is the agreement you

2    bargained for.  You made the effective date February 13th,

3    2004 -- or made as of date.  I'm sorry.  But I'll put any

4    date you want.

5        A.    I said I agree with you.

6        Q.    We can agree it was made as of?

7        A.    I said I agree.

8        Q.    Okay.  Let's go -- let's go on.

9              We used your date for the alleged oral

10   agreement, October 13th, 2006.  I footnoted that's what you

11   said, also, in your declaration which you filed in this

12   case.

13              (Off the record)

14              (Sotto voce discussion held between defense

15              attorneys and A/V technician)

16              MR. L. FRIEDMAN:   Thanks.

17       Q.    (By Mr. L. Friedman) Sorry for the delay.

18              Okay.   Now going to your alleged oral

19   agreement.  Mr. Carpenter, have you ever testified under

20   oath that the alleged oral agreement between you and

21   Mr. Potashnik contained the following ingredients:   Three

22   percent of the net proceeds of the sale of the companies and

23   the assets; everything listed in the purchase sale

24   agreement -- and the company documents would be considered

25   gross proceeds -- minus normal closing costs, minus

137

1    retention bonuses?  Other employees to be identified later.

2    That number would also be deducted before my number would be

3    calculated.  That would give the net proceeds number.  I

4    would receive three percent of that net proceeds number,

5    gross minus normal closing costs, minus other key employees.

6         A.   Yes.

7         Q.   And that's different than what you told the jury

8    your agreement was this morning.  Okay, 'cause this morning

9    you said it was three percent of sales proceeds on October

10   13th.  This was at your deposition.

11             At your deposition on January 18, 2018, you

12   testified a little differently.  Three percent of the net

13   proceeds of the sale of the companies -- that's all the

14   companies -- and the assets, everything in the purchase and

15   sale agreement.  And as of -- I'll submit to you that as of

16   October 13, 2006, there was no purchasing sale agreement.

17   You'll agree with that?

18        A.   I agree.

19        Q.   Minus normal closing costs.  Undefined.  It's

20   never been defined, normal closing costs?

21        A.   Just -- just what Brian mentioned.

22        Q.   You didn't know what normal closing costs were on

23   October 13th, 2006, correct?

24        A.   I used all closing costs.  So whether they're

25   normal or low or high, I used all closing costs.

Appendix 1128

1          MR. L. FRIEDMAN:  I'm going to object as

2    being nonresponsive.

3          THE COURT:  Okay.  Sustained.

4     Q.    (By Mr. L. Friedman) When you and Brian allegedly

5    made this oral agreement on October 13, 2006, there was no

6    way to know accurately what normal closing costs would be?

7     A.    That's -- that's true.  It was estimated.

8     Q.    And there was no way to know what the sales

9    proceeds would be, what the gross sales proceeds would be or

10   what the net sales proceeds would be, correct?

11    A.    Well, the gross we -- yes.

12    Q.    There was no purchase and sales agreement.

13    A.    We conceptually -- and we based it on the NOI.

14   The NOI is the 36 million, plus a million.  The PSA came in

15   at 37 million.

16    Q.    Wasn't my question.  My question was, on October

17   13th, 2006, there was not a signed LOI, letter of intent,

18   and there was no purchase and sale agreement.  So on October

19   13th, 2006, there was no way for you and Brian Potashnik to

20   know for sure what gross or net proceeds of a sale would be.

21   Isn't that true, sir?

22    A.    I would agree with that.

23    Q.    Thank you.

24    A.    Three --

25    Q.    Let's go to your testimony --

1          A.    Whether three percent --

2          Q.    You've answered the question.   Thank you.

3                So at your deposition two weeks ago you

4     said retention bonuses, other employees would be identified.

5     That number would also be deducted before my number.   Here

6     you were talking about corporate employees, your earlier

7     testimony.   And that would give the net proceeds number and

8     I would receive three percent of that number, net proceeds

9     number, gross minus normal closing costs, minus other key

10    employees.   And that was where you testified about the

11    beginning date being October 13th, 2006, and the ending date

12    being October 31, 2007.

13                Do you remember that?

14         A.    I remember that.

15         Q.    Okay.   Let's move on.

16                Now, after that, in March of 2007, March

17    14th, 2007, you sent -- you drafted -- don't -- I'm not

18    looking at the script.   This is just what you know.

19         A.    Okay.

20         Q.    On March 14th, 2007, you drafted an amended

21    employment agreement and sent it to Brian Potashnik,

22    correct?

23         A.    At his request, yes.

24         Q.    All right.   And do you remember what that amended

25    employment agreement contained?

1          A.    I know it contained the error -- an error of

2     deducting the other employees.  I don't remember all the

3     other contents to it.

4          Q.    Okay.  So let's look at it.  Let's look at the

5     whole agreement first.

6                So you recognize document Defendants'

7     Exhibit Number 13?

8          A.    Vaguely, yes.

9          Q.    And this was the first attempt by anybody to write

10    down the oral agreement that you allege you made with

11    Brian Potashnik on October 13th, 2007 [sic]?

12         A.    This is the first attempt that was requested for

13    me to make an oral attempt at.

14         Q.    Yeah.  I'm sorry.  It's October 13th, 2006.

15               But this was the first attempt by

16    anybody -- and this was you -- made to write down your

17    alleged oral agreement with Brian Potashnik made on October

18    13, 2006, correct?

19         A.    I don't know.  I can't speak for anybody else.

20         Q.    All right.  This was your first attempt to write

21    down the oral agreement you say you made with

22    Brian Potashnik --

23         A.    That Brian Potashnik --

24         Q.    -- five months before?

25         A.    -- would be, yes.  Yes.

1        Q.    So you call it -- you know, don't say writing down
2    oral agreement.   You don't say new agreement, correct?
3        A.    Correct.
4        Q.    You say amendment to employment agreement.   That's
5    what you called it five months after this alleged oral
6    agreement.   And you start out, This amendment to employment
7    agreement is executed as of the date below, recited by and
8    between Jeffrey W. Carpenter --
9                   Same as the employee in the employment
10   agreement, correct?
11       A.    Yes.
12       Q.    -- on the one hand and Southwest Housing --
13   oops -- Development Company.
14                  That wasn't part of the oral agreement,
15   correct?
16       A.    No.   As I mentioned --
17       Q.    I'm going to take everything after no as being
18   nonresponsive.
19                  Then Southwest Housing Management Company,
20   that was the company defined in the employment agreement,
21   correct?
22       A.    Yes.
23       Q.    And that was your --
24       A.    Wait.
25       Q.    -- employer --

142

1     A.    Pardon me.   Would you mind repeating that

2  question?

3     Q.    Sure.   Southwest Management -- excuse me --

4  Southwest Housing Management Company was defined as the

5  company in your written employment agreement?

6     A.    Yes.

7     Q.    And it was your employer as set forth in your

8  written employment agreement?

9     A.    Yes.

10    Q.    And the next party of this amendment to employment

11 agreement is Affordable Housing Construction, Inc.   And that

12 wasn't a party to your employment agreement, correct?

13    A.    As I mentioned, I made a mistake in tying it into

14 the employment agreement for the three percent.

15    Q.    Okay.   So you made a mistake tying it into the

16 employment agreement.   You made a mistake by adding new

17 parties to this agreement.

18    A.    The three -- the three percent was based on all

19 the companies being sold, plus the assets.

20    Q.    Well, it's interesting, because you didn't mention

21 that when you made a hug deal, bump deal with

22 Brian Potashnik on October 13th that you made it with

23 Affordable Housing Construction and Southwest Development

24 Company as well.   Did you leave that out?

25    A.    He informed me --

143

1      Q.    Did you leave that out --

2      A.    -- that he was selling --

3      Q.    -- is my question.

4      A.    He informed me that he was selling all the

5   entities.

6      Q.    He may have, but did you leave out the part where

7   Brian Potashnik said I am authorized to represent Southwest

8   Housing Management Company, Affordable Housing Corporation,

9   Cheryl Potashnik, Southwest Management Company, and every

10  single partnership, all 55 partnerships that are included in

11  our family of companies and I'm going to bind them in making

12  this oral agreement?  Did you leave that out?

13     A.    Yes, I would say I left that out --

14     Q.    And you're telling --

15     A.    -- expecting it --

16     Q.    And you're telling --

17     A.    -- to come from the other side.

18     Q.    And you're telling this jury that that's what

19  Brian Potashnik said to you on October 13th, 2006?

20     A.    He told me he was selling all the companies and

21  all the property assets.

22     Q.    Right.  But he never said to you that he was

23  authorized and representing Cheryl Potashnik, Affordable

24  Housing Construction, Southwest Housing Development Company,

25  and all of the partnerships that actually owned all the

144

1    assets that Southwest Housing Management managed.  Isn't
2    that true?
3        A.    He didn't say that.  However --
4        Q.    Thank you.  I'm going to take he didn't say that
5    as the response and anything after --
6        A.    However, that --
7        Q.    -- that as nonresponsive.  That's the only
8    question I asked you, sir.
9              MR. L. FRIEDMAN:  Let's move to the next
10   one.  No, the next paragraph.  I wasn't -- I wasn't clear,
11   Mr. Page.  I'm sorry.  That's what happens when I get
12   excited.  No, you missed a paragraph.
13       Q.    (By Mr. L. Friedman) Then you say in the agreement
14   you wrote, Whereas, employee and employer entered into that
15   certain employment agreement dated February 13th, 2004;
16   signed February 25th, 2004, with employment date beginning
17   March 15th, 2004.  And you defined the employment agreement
18   that you just testified to you made a mistake by including
19   in the title you make that employment agreement a part of
20   this agreement.  Isn't that true, sir?
21       A.    I told you I made a mistake in doing this draft.
22       Q.    Well --
23       A.    As it is just a draft.
24       Q.    Now you made three mistakes.  You included it in
25   the title, you added additional parties, and you

1    incorporated the employment agreement into the body of the

2    agreement, correct?

3         A.   Yes, and it was never accepted.

4              MR. L. FRIEDMAN:  Okay.  I'm going to take

5    everything after yes as being nonresponsive, Your Honor.

6              THE COURT:  Okay.  Objection's sustained.

7         Q.   (By Mr. L. Friedman) Then we go to the second

8    whereas.  Whereas, employee and employer entities desire for

9    employee to remain employed by the employer until the

10   employer entities, affiliates, successors or assigns sell to

11   (or merger with or similar transaction) Cascade Affordable

12   Housing and/or its affiliates (Cascade).

13             So five months after you made this alleged

14   oral agreement with Brian Potashnik you believed that your

15   agreement required you to remain employed by employer until

16   the employer entities sells to Cascade.  That was the deal

17   you thought you made, stay employed until the seller sold to

18   Cascade?

19        A.   Yes, with --

20        Q.   Correct?

21        A.   Yes, with the --

22        Q.   Thank you.

23        A.   -- proper time frame.

24             MR. L. FRIEDMAN:  I take everything after

25   yes as being nonresponsive.

Appendix 1136

1              THE COURT:   Sustained.

2              Limit your response to his questions,

3    Mr. Carpenter.

4         Q.   (By Mr. L. Friedman) But then it goes on.  It says

5    the employer entities' interests in the partnership projects

6    and/or assets to be sold, as defined in the letter of intent

7    dated October 16th, 2006, or the sale of employer entities,

8    affiliates -- or the sale of employer entities, affiliates,

9    successors or assigns, plus any furniture, fixtures, and

10   equipment owned by employer.  That's an add-on, correct?

11   That's new.

12             Plus any furniture, fixtures, and equipment

13   owned by employer.  That's a new term, correct?

14        A.   He said he's selling everything, so...

15        Q.   But you just added that to be sure, right?  It

16   wasn't on the board this morning, right?

17        A.   No, I did not break it out --

18        Q.   Okay.

19        A.   -- on the board this morning.

20        Q.   So that's a new term.

21             It says -- then it says, Or the sale to,

22   merger or similar transaction with any other company or any

23   individual other than Cascade by employer.  That means that

24   not only did you want everybody to pay you upon a sale with

25   Cascade, but in addition you wanted to be paid on the sale

1    to, merger or similar transaction with any other company in
2    the world.  If the Cascade deal didn't go through and the
3    sale was to any other company in the world, you still wanted
4    to get paid.  Now surely you'll agree that's a new term?
5         A.   If Cascade didn't close and another company was
6    selected, I wanted the same terms.
7         Q.   Okay.  Forever.
8         A.   As agreed upon.
9         Q.   Forever.
10        A.   As agreed upon.
11        Q.   No, forever.  There's no limit to that clause,
12   correct?  It doesn't end in a year, doesn't expire on its
13   own terms.  That's forever.  And no matter how big Southwest
14   companies get, correct?  That's what it says, right?
15        A.   That's what it says.
16        Q.   Thank you.
17             And that wasn't agreed to on October 13,
18   2006.  That's a new term.
19        A.   The company details were not presented --
20        Q.   I can't hear you.  I just can't hear you.
21        A.   I said the company details were not presented to
22   me, so --
23        Q.   Well, that's a new term.
24        A.   -- you're correct.
25        Q.   Thank you.

148

1          MR. L. FRIEDMAN:  Let's go to the next one.

2     Q.    (By Mr. L. Friedman) Paragraph 2 of your

3  employment agreement you say, In addition to his consistent

4  compensation under the agreement -- which you've defined as

5  your employment agreement -- employee will be paid on the

6  closing date of the sale (and as recorded/identified in any

7  purchase, sale, merger or similar type of agreement and

8  recorded at the title company for the sale) from the

9  employer entities -- again, encompassing a whole bunch of

10  companies -- a compensation in the amount of three percent

11  minimum.

12          Now it's three percent minimum.  Didn't say

13  three percent minimum this morning.  Did you leave that out?

14     A.    Three percent is three percent.

15     Q.    But it's not three percent minimum.  Three percent

16  minimum means that you could get more.

17     A.    Well, initially, I bargained for more and lost

18  that --

19     Q.    Sir --

20     A.    -- argument.

21     Q.    -- you didn't have an agreement for a minimum of

22  three percent.  Your alleged agreement was three percent.

23  So this document you were trying to get Brian Potashnik or

24  whoever to sign certainly wasn't accurate and certainly had

25  additional and different terms, correct?

1        A.      Wasn't trying to get them to sign.  I was just

2    trying to move the process along.

3        Q.      Okay, you call it move the process along, but I

4    call it it has additional and different terms.  Do you agree

5    with that?

6        A.      I'll acquiesce to it.

7        Q.      Thank you.  I'll take that as agreement.

8                Three percent of the compensation played --

9    paid to the employer entities.  Now I have without deduction

10   for any compensation paid to any other employees of any of

11   the employment [sic] entities.  So --

12       A.      Absolute error.

13       Q.      -- here I've got minus closing costs and minus

14   severance bonuses, minus severance bonuses you testified to

15   under oath.  And here you testified to under oath this

16   morning and at your deposition two weeks ago.  And here,

17   five months after the alleged oral agreement, your alleged

18   agreement is without deduction for any compensation paid to

19   any other employees of any of the employer entities.

20   Meaning every Southwest entity, including the partnerships

21   or affiliated entity.  You're talking about 50 or 60

22   different entities, correct?

23       A.      There was 55 --

24       Q.      Pardon me?

25       A.      -- yeah.

1        Q.    Pardon me?

2        A.    Yes.

3        Q.    Okay.

4              And compensation provided in this paragraph

5    shall be paid to employee whether or not he remains an

6    employee of employer through the date of the sale.  So I'm

7    assuming by that time you knew that you were not going to be

8    employed through the date of the sale and that's why you put

9    that in there, correct?

10       A.    Yes.

11       Q.    Okay.  That was a yes?

12       A.    Yes.

13       Q.    All right.  So that's a new term.

14       A.    And that's --

15       Q.    That's a new term.

16       A.    -- the big error that I admitted to.

17       Q.    Say that again.

18       A.    I said, And that's the big error that I admitted

19    to.

20       Q.    Okay.  So that's a new term.  Whether or not you

21    remain an employee of employer through the date of the sale,

22    that's a new term.  You didn't testify to that this morning,

23    correct?

24              (No verbal response)

25              Mr. Carpenter, some of these questions are

Appendix 1141

1    easy.  You didn't testify to that this morning?

2                    (Witness is reading the screen)

3         A.   In reality, the sale took place much after.

4         Q.   Sir, that wasn't my question.  My question was,

5    when I asked you what the ingredients were for your alleged

6    oral agreement, you didn't tell me about that this morning.

7    You didn't tell the jury about that this morning, correct?

8         A.   Uh-huh.  Very simple.  I'm keeping it simplified,

9    yes.

10        Q.   Okay.  You didn't testify to it when you had all

11   the time in the world at your deposition on January 18th,

12   2018, correct?

13        A.   Correct.

14                  MS. GIBSON:  Jeff, will you pull your mike

15   in toward you so we can hear you better, please?

16                  (Witness complied)

17        A.   Correct.

18                  MS. GIBSON:  Thanks.

19                  THE WITNESS:  Sorry.

20                  MR. L. FRIEDMAN:  Let's move on.

21        Q.   (By Mr. L. Friedman) Then on the amendment to

22   employment contract that you drafted, Additionally, the

23   employer entitles -- I'm sorry -- Additionally, the employer

24   entities also acknowledge that employee is to be paid

25   compensation for unpaid and past-due earnings of income

Appendix 1142

1   compensation (including wages and bonuses) in the amount of

2   $600,000.

3                 Now, this morning you testified there was

4   no agreement regarding earned bonuses on October 13th, 2006.

5   Did you make a different agreement with Mr. Potashnik

6   between October 13th, 2006, and March '07 when you wrote

7   this amendment supposedly to reflect your oral agreement?

8   It's a yes-or-no question.

9        A.    Yes.

10       Q.    Okay.   You're claiming there were two oral

11  agreements now; is that right?

12       A.    I'm sorry.   You confused me.

13       Q.    All right.   Maybe I confused myself.

14                This morning when I asked you about unpaid

15  bonuses under your employment contract, you said there was

16  no agreement regarding unpaid bonuses on October 13th, 2006.

17  Do you remember that testimony?

18       A.    Yes.

19       Q.    I wrote it down.

20                Now, five months later, on March 14th,

21  2007, you add a term that says you're claiming 600,000 from

22  the period of March 15th, 2004, through March 14th, 2007.

23  That's a new term that wasn't included in the alleged oral

24  agreement you made with Brian Potashnik on October 13th,

25  2006, correct?

153

1          A.    That is the information that I submitted on March

2    14, 2007, to be reviewed and discussed.  So I had that

3    attachment, so that's the number that I used for discussion

4    purposes.

5                    MR. L. FRIEDMAN:  I'm going to object to

6    that as being nonresponsive.

7                    THE COURT:  Try and limit your response

8    just to the question he's asking.

9          Q.    (By Mr. L. Friedman) Here's my question.  That's a

10   new term, correct?

11         A.    Which is a new term?

12         Q.    You're asking for $600,000 bonus, but that was

13   never agreed to by Mr. Potashnik, correct?

14         A.    Not at the time.

15         Q.    Okay.  At the time you asked for the $600,000 in

16   bonus.  According to the Paragraph 4b of your employment

17   contract, that was not agreed to by Mr. Potashnik, correct?

18         A.    Not at that time.

19         Q.    And, in fact, you're asking for it for the period

20   of March 15th, 2004, through March 14th, 2007.  But at that

21   point you already knew you had received your $50,000 bonus

22   for the year 2004 to 2005.  Isn't that true, sir?

23         A.    Yes, it is.

24         Q.    So you were double dipping, correct?

25         A.    I don't recall so.  So it's an error.

154

1        Q.      It's another error?

2        A.      If so.

3        Q.      Okay, chocked full of errors.

4        A.      Again, a draft.

5        Q.      Okay, it's a draft of errors.

6                This amount is to be paid as follows:

7        150,000 to be paid by March 31st, 2007.   That was

8        three-and-a-half weeks later, correct?

9        A.      Yes.

10       Q.      As a sign of good faith as employee's immediate

11       financial need is urgent and the remaining 450 -- 450,000 to

12       be paid at the closing of the sale (and as

13       recorded/identified in the purchase, sale, merger or similar

14       type agreement and recorded at the title company for the

15       sale).

16               That wasn't agreed to by Mr. Potashnik.

17       That's a new term.

18       A.      There's no official guideline.  I put that in

19       there, yes.

20       Q.      Yeah.

21               In the event that the sale from the

22       employer entities to Cascade does not happen, the balance

23       due to employee would be paid out within 30 days of the

24       cancellation of any transaction agreement, written or

25       verbal, with Cascade.   The compensation provided in this

1    paragraph shall be paid to employee whether or not he

2    remains an employee of employer through the date of the

3    sale.

4                    So all of that is something new and

5    different that you shoved in there that was not agreed to on

6    October 13th, 2006, correct?

7         A.    It was a suggestion, yes.

8         Q.    Yeah, suggestion.

9                    So you weren't only trying to write down

10   this alleged oral agreement, you were now negotiating with

11   Mr. Potashnik for a different deal, correct?

12        A.    Not for a different deal.  Just trying to con --

13   clear up and confirm our deal --

14        Q.    Well --

15        A.    -- more clearly.

16        Q.    -- you didn't have a deal for the 600,000,

17   correct?  You said that already.

18        A.    Yeah.

19        Q.    And you didn't have the deal --

20        A.    Nor did I not have it either.

21        Q.    Well, you weren't 10 feet tall that day, were you?

22        A.    No.

23        Q.    And you're not going to be, right?

24        A.    But I wasn't told no either.

25        Q.    Okay, well, you might be.

1              You never got this agreement signed, back

2     signed, did you?

3          A.   No, sir.

4          Q.   You never got a counter proposal, did you?

5          A.   No, sir.

6          Q.   All right.  The employer entities, jointly and

7     severally, hereby irrevocably and unconditionally guarantee

8     the payment to employee of the sums provided in numbered

9     Paragraph 2 hereof.

10              So you wanted Mr. Potashnik,

11    Cheryl Potashnik, and the other Southwest entities to

12    guarantee you $600,000; a hundred fifty thousand to be paid

13    three-and-a-half weeks later, unconditionally, irrevocably,

14    whether or not you remained an employee through the date of

15    the sale.  That's what you're asking for?

16         A.   Yes.

17         Q.   And even including a bonus for the year that you'd

18    already been bonused, correct?

19         A.   Yes.

20         Q.   And you'll agree with me none of this is reflected

21    in the alleged oral agreement that you made with

22    Mr. Potashnik?  You have to say it.

23         A.   Correct.

24         Q.   Thank you.

25              MR. L. FRIEDMAN:  Go to the next one.

1              THE COURT:  You've got about two minutes
2    before the next afternoon break.
3              MR. L. FRIEDMAN:  We can take a break.
4              THE COURT:  We'll take our next 10-minute
5    break, ladies and gentlemen, our first 10-minute break of
6    the afternoon.
7              (The jury exited the courtroom.)
8              (Recess taken)
9              (The jury entered the courtroom.)
10             THE COURT:  Welcome back.  Good afternoon,
11   ladies and gentlemen.
12             We'll continue with Mr. Carpenter's
13   testimony.  The attorney asking questions is Mr. Friedman.
14   We'll ask him to pick up where he left off.
15        Q.   (By Mr. L. Friedman) Mr. Carpenter?
16        A.   Yes.
17        Q.   Have you ever testified under oath that you made
18   this oral deal with Brian Potashnik on May 6th, 2006?
19        A.   I may have messed up the date and said May 6.  It
20   was the initial -- I may have used the wrong date.
21        Q.   Well --
22        A.   I'm not sure.
23        Q.   -- let me ask you a better question.  When I took
24   your deposition on March 16, 2010, did you testify that you
25   made your alleged oral deal with Brian Potashnik on March

1    16th, 2010?

2                    THE COURT:  I think you messed up the

3    dates, though.

4                    MR. L. FRIEDMAN:  I'm sorry.

5         Q.   (By Mr. L. Friedman) When I took your deposition

6    on March 16th, 2010, did you testify that you made your

7    alleged deal with Brian Potashnik on May 6th, 2006?

8         A.   I may have.  I don't recall.

9         Q.   And at that time, sir, did you testify under oath

10   that the deal was based on a $30 million -- $37 million

11   gross sales price?

12        A.   As I mentioned --

13        Q.   It's yes or no.

14        A.   Yes, 37 million.

15                   MR. L. FRIEDMAN:  Let me play the

16   deposition, Your Honor.

17                   THE COURT:  Okay.

18                   MR. L. FRIEDMAN:  It's the first

19   deposition.  Page 52, Lines 10 -- I'm sorry.

20                   MS. GIBSON:  He said yes.  He said yes.

21                   MR. L. FRIEDMAN:  He said he doesn't

22   remember testifying that on March 16th, 2010 --

23                   MS. GIBSON:  Oh, that one.

24                   THE COURT:  That's all right.  Go ahead.

25                   MS. GIBSON:  That's okay.

1       MR. L. FRIEDMAN:  Page 251, Line 10, to

2  252, Line 19.

3            (Video playing)

4       Q.   "Mr. Carpenter, when did you reach an agreement

5  with Mr. Potashnik and starting at three percent

6  compensation on the so-called sale of the general

7  partnership properties?"

8       A.   "It was in the time frame of May -- I believe May

9  of '06 at lunch at Cafe de Brazil, I believe."

10      Q.   "And can you describe what was said?"

11      A.   "Well, it was following up.  We have several

12  different offers.  Discussed what we want to do.  The key

13  ingredient in promoting this, you know, development

14  construction.  You know, they're pretty much done."

15            "You're going to be the face of the

16  company.  You'll be meeting with -- doing the property

17  tours.  You'll be doing, you know, actually, due diligence

18  in selling of the company and so forth.  And you're --

19  you're a key proponent of why we're in the position to sell

20  the company, and with that we'd like to compensate you three

21  percent of the sales price.  And there was a stipulation

22  with that, and that was less normal closing costs; which I

23  estimated was close to, basically, a million dollars 'cause

24  I think at the time we said the offer was 37 million."

25      Q.   "What was your response?"

1       A.    "I was -- I was pleased with that knowing that we

2   still had unresolved issues with the -- you know, for my

3   agreement.  But would liked to have had more.  I know I

4   contributed a great deal but I was -- I was comfortable with

5   it."

6       Q.    "Did you accept his offer?"

7       A.    "Yes, I did."

8            (Video ended)

9       Q.    (By Mr. L. Friedman) Mr. Carpenter, do you

10  remember that testimony?

11      A.    Vaguely and do now.

12      Q.    And do you remember that it was your lawyer,

13  Doug Haloftis, that did the examination, not me?

14      A.    I really don't recall.

15      Q.    Your lawyer was asking those questions, not me.

16  And in response you said three percent compensation on the

17  so-called sale of the general partnership, the general

18  partnership.  You said lunch at -- during lunch at Cafe de

19  Brazil.  Three percent compensation of the sales price, less

20  normal closing costs.

21            At the time you estimated it at $1 million

22  and you said nothing about adding or subtracting employee

23  bonuses.  Remember that?

24      A.    I made that mistake, yes.

25      Q.    Another mistake.

1          A.    I made that mistake, yes.

2          Q.    And, Mr. Carpenter, this October 13th, 2006

3     meeting happened at a different cafe, didn't it?

4          A.    Yes.  It was Cafe Express.

5          Q.    Okay.  So this one was Cafe Express.

6          A.    Got the restaurants wrong.

7          Q.    And March 16, alleged oral agreement, Cafe de

8     Brazil, no mention of employee severance, 37 million.  It's

9     a little different than what you testified to this morning,

10    isn't it, Mr. Carpenter?

11         A.    A little bit.

12         Q.    And you said this was mistake.  Cafe de Brazil

13    alleged oral agreement was a mistake?

14         A.    Yes.  It was Cafe Express.

15         Q.    And when you gave your deposition in 2010 that was

16    actually three-and-a-half years after you were terminated by

17    Southwest Housing Management, correct?

18         A.    Yes.

19         Q.    And it was eight years ago?

20         A.    Yes.

21         Q.    So you would think that your memory would have

22    been better about these events eight years ago than it is

23    today?

24         A.    My homework is a lot better today than it was back

25    then.

Appendix 1152

1          Q.    Wasn't my question.   My question is you would

2     think that your memory of this great event was better

3     three-and-a-half years after the so-called alleged agreement

4     with Mr. Potashnik than it would be today.

5          A.    You could assume that.

6          Q.    Isn't it true, sir?

7          A.    Yes.

8          Q.    Okay.

9                So then the next event comes when you send

10    an Email on November 15, 2007.

11               MR. L. FRIEDMAN:   No, let's see the whole

12    Email, please.

13         Q.    (By Mr. L. Friedman) And this is an Email you

14    send --

15               MR. L. FRIEDMAN:   Let's do the two and

16    the -- yeah.

17         Q.    (By Mr. L. Friedman) -- from Jeffrey Carpenter.

18    And that's your Email address, correct?

19         A.    Yes.

20         Q.    And dated Thursday, November 15th, 2007, at

21    7:37 a.m., to Cheryl Potashnik and Brian Potashnik of

22    southwesthousing.com, correct?

23         A.    Yes.

24         Q.    Okay.  So --

25               MR. L. FRIEDMAN:   What exhibit is this,

1    Mike?

2                    MR. DONOHUE:   24.

3                    MR. L. FRIEDMAN:   Defendants' Exhibit 24.

4    Do we need to have this admitted?

5                    MR. DONOHUE:   Same if given to the jury.

6    Yes.

7                    MR. L. FRIEDMAN:   Your Honor, I'd move for

8    admission of Defendants' 3 and 24.

9                    THE COURT:   Any objection?

10                   MS. GIBSON:   What are they?

11                   MR. L. FRIEDMAN:   This is 24.

12                   Brian says it's 13.

13                   MR. DONOHUE:   I'm sorry, Your Honor.   It's

14   13.

15                   MR. L. FRIEDMAN:   Brian's right.

16                   MS. GIBSON:   No, not to 24.

17                   THE COURT:   Twenty-four is admitted.

18                   MR. L. FRIEDMAN:   That's your copy.

19                   MS. GIBSON:   Okay.   Thanks.

20                   MR. L. FRIEDMAN:   Thirteen is the amendment

21   to employment agreement.

22                   MS. GIBSON:   Yeah, that's fine.   No

23   objection.

24                   THE COURT:   Thirteen is admitted.

25        Q.    (By Mr. L. Friedman) So you send this Email --

Appendix 1154

164

```
1          A.    Pardon me.   Pardon me.

2          Q.    I'm sorry.

3          A.    Pardon me.   Do you have an extra copy, by any

4     chance?

5                     MR. L. FRIEDMAN:   Yeah?

6                     MR. DONOHUE:   Yes.

7                     MR. L. FRIEDMAN:   May I approach,

8     Your Honor?

9                     THE COURT:   Certainly.

10         Q.    (By Mr. L. Friedman) I'm handing you Defendants'

11    Exhibit 13 -- I'm sorry -- 13 and 24.

12         A.    I'll try to look a little closer.

13         Q.    That's all right.

14                    We're on this Email, November 15th, 2007.

15         A.    Okay.

16         Q.    And --

17                    MR. L. FRIEDMAN:   Can I see the whole thing

18    first?

19         Q.    (By Mr. L. Friedman) Okay.   And then we're going

20    to go in the middle of the first full paragraph.

21                    MR. L. FRIEDMAN:   Well, let me see the

22    first paragraph.   Can you do the whole first paragraph?

23    Yeah, perfect.   Let's do it a little higher, if you don't

24    mind.   Yeah, perfect.

25         Q.    (By Mr. L. Friedman) So first full paragraph
```

1    starting, one, two, three, four, five, six, seven, eight,

2    nine lines from the top, sentence on the right-hand side you

3    write "last year".  You follow me?

4         A.   Yes, sir.

5         Q.   So you write, "Last year, after the Cascade

6    transaction was announced and it became reasonably clear

7    that I would not be retained after closing of that

8    transaction, you implored me to stay with the company

9    through that time," -- through the closing, right?  You have

10   to answer verbally.

11        A.   The closing as we knew it at that time, yes.

12        Q.   All right.

13             -- "as that continuity and my continued

14   services were essential to the success of that transaction."

15             this was your writing, right?

16        A.   Yes.

17        Q.   In exchange, you informed me that I would be

18   entitled to receive at three percent of the proceeds of the

19   transaction, net certain costs, which based on the structure

20   at that time would represent an amount in excess of

21   $1 million.  This is in addition to the unpaid annual

22   bonuses.

23             So this explanation is a little different

24   than your other explanations of this three-percent proposed

25   bonus, correct?

1      A.    Yes.

2      Q.    And in this Email your understanding of your deal,

3   alleged deal with Mr. Potashnik, was that you would have to

4   stay through the closing.   'Cause it says in exchange for

5   staying through the closing you would get three percent of

6   the proceeds, et cetera.   That was your understanding when

7   you wrote this Email, correct?

8      A.    Yes.   Poor language --

9      Q.    Okay.

10     A.    -- but yes.

11     Q.    Yes, poor language.   Thank you.

12              So let's go and see what you have attached

13   to this Email.   So attached to this Email you prepared a

14   document called separation agreement.   Am I right?

15     A.    Yes.

16     Q.    Okay.   This is another document you prepared on

17   November -- or -- and sent to the Potashniks November 15th,

18   2007.   It's a week after you were terminated, correct?

19     A.    Two weeks.

20     Q.    All right.   Two weeks after you were terminated.

21   Approximately, two weeks.   And, certainly, if you had an

22   oral agreement with Mr. Potashnik you'd know what that oral

23   agreement was two weeks after the agreement, correct?

24     A.    Yes.

25     Q.    Okay.

1          So in this separation agreement that you
2    prepare it says the separation agreement -- and you define
3    that as agreement -- is entered into by and between
4    Southwest Housing Management, Affordable Housing
5    Construction, and Southwest Housing Development, their
6    affiliates, subsidiaries, parents, partners, assigns and
7    related entities which are collectively referred to herein
8    as the company.  These are new entities again that you're
9    now defining as the company, correct?

10        A.   Yes.

11        Q.   And Brian Potashnik and Cheryl Potashnik (together
12   referred to herein as the Potashniks), on the one hand, and
13   then Jeff Carpenter, who is you, would be the employee,
14   correct?

15        A.   Yes.

16        Q.   Let me just take an aside.  You have testified
17   previously under oath that you never made an agreement with
18   Cheryl Potashnik, correct?

19        A.   I don't recall if I did or did not, quite
20   honestly.

21        Q.   You've testified under oath that Cheryl Potashnik
22   never agreed to anything, bonus, salary, severance, anything
23   with you.  Didn't you?

24        A.   I do not recall that.

25        Q.   Okay.  Well, let's take a minute.

1              MR. L. FRIEDMAN:  Can you find that?

2       A.    Perhaps so.

3       Q.    (By Mr. L. Friedman) All right.  Let's come

4  back -- I have that, but let's come back to that.

5              MR. L. FRIEDMAN:  If you wouldn't mind,

6  Mr. Page, finding that.

7       Q.    (By Mr. L. Friedman) Okay.  So now we have who

8  you're proposing the parties to this agreement would be.

9  Let's go to the next -- go down to Paragraph 4.  Now you say

10  the company and the Potashniks acknowledge that employee has

11  earned and is owed unpaid annual wages and bonuses in the

12  amount of $600,000.

13              Did I read that correctly?

14       A.    Yes.

15       Q.    You didn't mean wages, 'cause you'd been paid all

16  your wages, correct?

17       A.    Correct.

18       Q.    And bonuses, we established already you've been

19  paid the 2004/2005 bonus, correct?

20       A.    Yes.

21       Q.    And there was -- there's been no agreement as to

22  any bonuses under the employment contract, correct?

23       A.    Only my suggestions.

24       Q.    Yeah.  And as you said, there's been no agreement

25  as to any bonuses under the employee contract.  You say you

169

1    have a separate, second, oral agreement with Brian Potashnik

2    as to bonuses, correct?

3        A.    Yes.

4        Q.    What's the date of that agreement?

5        A.    I don't -- I don't know the exact date.  It was

6    after March 14th of '07.  I don't recall off the top of my

7    head.

8        Q.    Let's come back to that.

9              I'm going to put down no wage claim, no

10   claim for bonus under employment contract, separate oral

11   agreement with -- I'll put down BP for Brian Potashnik.  You

12   know that's Brian Potashnik.  Okay, 3:00 o'clock today,

13   separate oral agreement.  So we'll come back to that.

14             So on November 15, 2007, couple, two, three

15   weeks after you were terminated, you say the company and the

16   Potashniks acknowledge that employee has earned and is now

17   owed unpaid annual wages and bonuses in the amount of

18   $600,000.

19             We've now established that you're not owed

20   any wages, correct?

21       A.    Correct.

22       Q.    This amount shall be paid to employee, less

23   applicable withholdings, according to the following

24   schedule:  300,000 shall be paid to employee upon the

25   earliest of the first closing of any of the Potashniks'

Appendix 1160

1    companies' interests in any project partnerships as outlined

2    in the PSA with Cascade Affordable Housing, LLC, and/or its

3    affiliates; the sale of any land held by the company,

4    including but not limited to the Las Vegas owned community;

5    or December 15, 2007; and 300,000 shall be paid to employee

6    on the earlier to occur of the second closing as outlined in

7    the PSA --

8                          PSA is purchase and sales agreement, right?

9        A.    Yes, sir.

10       Q.    -- with Cascade Affordable Housing, LLC, and/or

11   its affiliates or any successor in interest thereto; and

12   February 15, 2008.

13                         Now, none of that was agreed to.  All of

14   these are new terms or different terms, correct?

15       A.    Yes, different from --

16       Q.    The alleged oral agreement?

17       A.    Or "the oral agreement", yes.

18       Q.    Okay.

19                         Then you go on to say, Provided, however,

20   that the event of the closing of the sale or transfer of the

21   company or any other transaction that results in the sale or

22   transfer of all or a majority of the company's assets, a

23   merger of the company with another entity, or otherwise

24   results in a change in control or transfer of majority

25   ownership of the company, which shall include but expressly

Appendix 1161

1    is not limited to the second closing of the PSA with Cascade

2    Affordable Housing, LLC, within one year of the date of this

3    agreement -- you define it as transaction -- then all unpaid

4    portions of the amount provided in this paragraph shall

5    become immediately due and payable within seven days of the

6    closing of such instruction.

7            All of this is new or different from your

8    last oral agreement with Brian Potashnik, correct?

9        A.    Yes.

10       Q.    Okay.

11           Let's go to the next paragraph.  Now,

12   again, November 15th, couple, three weeks after -- two,

13   three weeks after your termination in 2007.

14           In addition to the foregoing amounts,

15   employee will be paid within seven days of the date of

16   closing of any transaction defined above an amount in cash

17   equal to three percent of the gross compensation or

18   consideration, whether in the form of cash, stock,

19   assumption of debt, fees, loans or otherwise, for the

20   purchase of the company --

21           That's all new, isn't it?

22       A.    Yes, it's --

23       Q.    Okay.

24       A.    -- new language.

25       Q.    All right.

172

1                        -- less reasonable costs of closing.  In

2       the event that a transaction is effected that results in a

3       sale or transfer of less than 100 percent of the company

4       outstanding stock or assets, then the gross compensation

5       amount for purposes of this paragraph shall be calculated as

6       if a transfer of a hundred percent of the company being

7       made.

8                        Did I read that properly?

9            A.   I don't know.  I lost that last part.

10           Q.   In the event that a transaction is effected that

11      results in a sale or transfer of less than a hundred percent

12      of the company's outstanding stock or assets, then the gross

13      compensation amount for purposes of this paragraph shall be

14      calculated as if a transfer of a hundred percent of the

15      company will be made.

16                       You wrote that?

17           A.   Yes.

18           Q.   Sent it to the Potashniks.  They never agree to

19      it, correct?

20           A.   At their request for another draft opinion, yes.

21                       MR. L. FRIEDMAN:  That wasn't my question.

22      I object as being nonresponsive.

23                       THE COURT:  Sustained.  The question is did

24      they agree to it.

25           Q.   (By Mr. L. Friedman) The Potashniks never agreed

Appendix 1163

1    to it, correct?

2         A.   Correct.

3         Q.   And these weren't -- these terms in Paragraph 5

4    were not contained in your alleged agreement with

5    Brian Potashnik, correct?

6         A.   No.

7         Q.   All right.

8              Mr. Carpenter, you made no agreement with

9    Brian Potashnik about the sale or transfer of anything less

10   than a hundred percent of the stock or assets of the gross

11   compensation amount for the purposes of the sale of the

12   company; isn't that correct?  These were just added terms.

13        A.   Added terms.

14        Q.   Okay.

15        A.   Playing lawyer.

16        Q.   You're playing lawyer.  You took the time and

17   thought to put into this agreement, correct?  You had to.

18        A.   Google information, yes.

19        Q.   Yeah, but you didn't -- you didn't get these terms

20   from Google information.  You didn't get these terms from

21   Google information.  These are terms that you thought about,

22   wrote down, made a couple of drafts, and then sent it to the

23   Potashniks, correct?

24        A.   I did some research, yes.

25        Q.   Okay.  But one thing you didn't put in here was

1    any mention of severance bonuses paid to the employees,

2    correct?

3         A.   I admitted that the draft is incorrect.

4         Q.   The severance agreement that you drafted is not

5    correct either?

6         A.   I made that same mistake throughout.

7         Q.   Okay.  Severance agreement not correct; the

8    employment agreement not correct, correct?

9         A.   Yes.

10        Q.   November 15th Email not correct, right?

11        A.   Well, I didn't read the whole thing but --

12        Q.   Your formula is not correct.

13                  MS. GIBSON:  And where are you, Larry?

14                  MR. L. FRIEDMAN:  In the middle of the

15   page.

16                  MS. GIBSON:  No, what --

17                  THE COURT:  We're talking.

18                  MS. GIBSON:  The top?  Okay.

19                  MR. L. FRIEDMAN:  After the November 15th

20   Email, middle of the page.

21                  MS. GIBSON:  Okay.  Okay.  Twenty-four?

22                  MR. L. FRIEDMAN:  Right.

23        Q.   (By Mr. L. Friedman) Your expression of your

24   three-percent deal is correct or not?

25        A.   I'm miscuing my own information here.  This --

1    approximately a million dollars, this is in addition to

2    unpaid annual bonuses.  So I was including the annual

3    bonuses to be deducted to get to the million.  It may not be

4    worded properly but that's the contents.

5         Q.    A million dollars off of a $37 million gross?

6         A.    Yes.

7         Q.    So is that correct or different?

8         A.    That's correct.

9         Q.    And is that the same as your testimony this

10   morning?

11        A.    I believe so.

12        Q.    All right.

13              Okay.  Let's move on.  So this part about

14   the gross compensation amount for purposes of this paragraph

15   shall not include [sic] and shall specifically include any

16   amounts paid or for the benefit of the Potashniks, the

17   company, and/or its stockholders in the form of fees,

18   bonuses, severance payments, loans or otherwise, correct?

19        A.    Correct.

20        Q.    And let me go back to you said you never made --

21   you didn't know if you ever made a deal with Cheryl

22   Potashnik.  You didn't know if you made an agreement with

23   Cheryl Potashnik, correct?

24        A.    That's correct.

25        Q.    And that's not what you testified in your

176

1    deposition.  Cheryl Potashnik was a -- what was she for

2    Southwest Management?

3         A.   We considered her to be the owner.

4         Q.   She was the COO or director or what?  What was her

5    title?

6         A.   Mostly, we -- it was recognized as owner and I've

7    heard COO.  Quite honestly, I didn't know.

8         Q.   Okay.

9                   Mr. Carpenter, you were the executive vice

10   president, the senior operating officer of Southwest

11   Management for three-and-a-half years.

12        A.   That's correct.

13        Q.   The only one you reported to was Brian Potashnik;

14   is that correct?

15        A.   That's correct.

16        Q.   All right.  And you're telling this jury that you

17   worked there with Cheryl Potashnik for three-and-a-half

18   years and you don't know what her title was?

19        A.   I believe she testified that sometimes she had a

20   title, sometimes she didn't.  It was COO, as owner.

21   Certainly respected her as being a co-owner.

22        Q.   Sir, I didn't ask you that question.

23                   MR. L. FRIEDMAN:  I object as being

24   nonresponsive.

25                   THE COURT:  Repeat your question.

Appendix 1167

1          Q.     (By Mr. L. Friedman) You worked at Southwest

2     Housing Management for three-and-a-half years.  During that

3     period of time, did you learn what Mrs. Potashnik's title

4     was?

5          A.     Co-owner.  And I've heard COO as well.

6          Q.     Let's do it this way.  You know that

7     Mrs. Potashnik was an employee of Southwest Housing

8     Management, correct?

9          A.     At the beginning, yes.

10         Q.     She -- Mrs. Potashnik worked for Southwest Housing

11    Management, correct?

12         A.     I'm not sure if she did the whole entire time that

13    I was there, no.

14         Q.     She worked at Southwest Housing Management

15    in 2007.  She was an employee of Southwest Housing

16    Management in 2004 when you joined the company.

17         A.     That I remember.

18         Q.     She was an employee of Southwest Housing

19    Management in 2005 when you were executive vice president of

20    the company?

21         A.     '5, '6, '7, remembering payroll reports, I don't

22    recall Cheryl being on those.

23         Q.     Okay.  So you're telling this --

24         A.     I may be wrong, but I do not recall Cheryl --

25         Q.     You're telling this jury that you worked there

1    three-and-a-half years and you don't know if Brian or Cheryl

2    were employees of Southwest Housing Management or any other

3    company with the prefix Southwest in front of it; is that

4    right?

5         A.    I knew that they --

6         Q.    I'm just asking you one question.  Was Brian or

7    Cheryl Potashnik an employee of any company that you know

8    of?

9         A.    Yes.   Brian was an employee.

10        Q.    Of what company?

11        A.    He owned all the companies.

12        Q.    And Cheryl was an employee of what company?

13        A.    Of SGL and perhaps the management company, but she

14   was one of the sellers.

15        Q.    Sir, I'm only asking you during the time you

16   worked there you acknowledge that Brian Potashnik was an

17   employee of Southwest Management, Southwest Development, and

18   Affordable Housing Construction, correct?

19        A.    Yes.

20        Q.    And with regard to Mrs. Potashnik you're telling

21   the jury you don't know whether she was an employee of

22   Southwest Management, correct, Southwest Housing Management?

23        A.    I'd say a hundred percent I'm not sure.

24        Q.    Do you know whether she was an employee of any

25   Southwest company during the time you worked there?

1          A.    I believe she was.

2          Q.    And what company was that, sir?

3          A.    I believe she was probably prorated out for all

4     the companies, which would make her, probably, a portion of

5     Southwest Housing Management as well.

6          Q.    Okay.  So to your knowledge Mrs. Potashnik was an

7     employee of all the Southwest companies but at least a pro

8     rata employee of Southwest Housing Management?

9          A.    That would be my assumption.  That's what I

10    recall.

11         Q.    All right.  You don't remember never making any

12    agreement with Ms. Potashnik?

13         A.    I remember having a conversation with her and she

14    said I've earned my bonuses and she agreed with the

15    three-percent --

16               MR. L. FRIEDMAN:  All right, I'm going to

17    object to this --

18         A.    -- agreement.

19               MR. L. FRIEDMAN:  -- as nonresponsive.

20         A.    So, yes, we did --

21               MR. L. FRIEDMAN:  I'm going to object to it

22    all as being nonresponsive.

23               THE COURT:  Repeat your question.

24               He said, yes, they did have an agreement.

25               MR. L. FRIEDMAN:  Okay.  I'm going to play

1    Mr. Carpenter's deposition, Volume 2, second deposition.

2                      MS. GIBSON:  All right.

3                      MR. L. FRIEDMAN:  Page 111, Line 14 to 20.

4    Page 115, Line 21 to 25.

5                      MS. GIBSON:  Whoa, whoa, whoa.  111 what?

6                      MR. L. FRIEDMAN:  111, 14 to 20.

7                      MS. GIBSON:  Uh-huh.

8                      MR. L. FRIEDMAN:  115, 21 to 25.  Or is it

9    23?  116 -- Page 116, 1 to 10.  And Page 151, Lines 3 to 8.

10                     Wait for Ms. Gibson.

11                     MS. GIBSON:  Okay.

12                     MR. L. FRIEDMAN:  Okay.  Go ahead.

13                     (Video playing)

14       Q.    "Cheryl Potashnik wasn't present with your meeting

15    with Brian --"

16       A.    "She was not present, correct."

17       Q.    "-- on October 13th, 2006?"

18       A.    "That's correct."

19       Q.    "Cheryl Potashnik didn't make a valid and forcible

20    agreement with you on October 13th, 2006?  Correct?"

21       A.    "That is correct."

22       Q.    "I want to know from you -- I asked you to list

23    the reasons that you claim you have a lawsuit or have a

24    claim against Cheryl Potashnik."

25       A.    "Cheryl Potashnik is -- is listed -- or CLG is

1    listed as one of the -- or a portion of the sellers, as she

2    received proceeds from the sale as detailed in the

3    Hexter-Fair disclosure memorandum closing document.  I

4    believe it was the -- the last closing."

5        Q.    "Okay.  What else?"

6        A.    "Related documents to the -- legal documents

7    related to the closing."

8        Q.    "Okay.  What other reason is there that you're

9    suing Cheryl Potashnik?"

10       A.    "As advice to counsel."

11       Q.    "Did you, face to face, have an agreement with

12   Cheryl Potashnik where you said, Cheryl, do you agree to be

13   part of the amendment to my employment contract

14   individually?  Did you have that conversation with Cheryl

15   and did she agree?"

16       A.    "No, I did not have that conversation."

17             (Video ended)

18       Q.    (By Mr. L. Friedman) Mr. Carpenter, does that

19   refresh your memory that you never made any oral agreement

20   with Cheryl Potashnik regarding salary, wages, or bonuses?

21       A.    Yes.  The way it was put there, yes.

22       Q.    All right.  Thank you.

23             And to finish up with this Email, at the

24   bottom of your Email you say the attached document is a

25   draft only and that once the substantive points are

1    confirmed I reserve the right to have it formally reviewed

2    by an attorney to confirm it is complete.  That's your

3    language, correct?

4         A.   Yes, ma'am -- or sir.

5         Q.   I'm sorry.  Say it again.

6         A.   I said, yes, sir.

7         Q.   Okay.

8              So on November 15th, 2007, you're sending

9    Brian and Cheryl Potashnik a new deal -- new terms, new

10   deal -- and you're telling them it's only a draft; and once

11   you and the Potashniks agree to the substantive points then

12   you reserve the right to have some lawyer confirm that it's

13   complete, right?

14        A.   Yes.

15        Q.   And the implication is it's not complete, correct?

16        A.   No.  I'm still waiting on the response.

17        Q.   Okay, no response from the Potashniks to this

18   Email for your separation agreement?

19        A.   Well, actually, there was a response saying that

20   they would be look -- reviewing it.

21        Q.   Let me put it differently.  No agreement by the

22   Potashniks to your Email or your separation agreement.  They

23   never agreed to it.

24        A.   That's my version.  No, they never agreed to it;

25   nor did I agree to their version.

1         Q.    Did they send you a written version of the
2    separation agreement?
3         A.    Yes.
4         Q.    They sent you -- did they give you a severance
5    agreement for $150,000?
6         A.    They gave me a separate -- pardon me -- I believe
7    it was called a separation agreement.
8         Q.    On November 1st?
9         A.    Yes.
10         Q.    And offered you $150,000?
11         A.    Yes.
12         Q.    And you turned it down?
13         A.    I turned it down because of --
14         Q.    I didn't say because.   You turned it down?
15         A.    Yes, I did.
16         Q.    Because you wanted more?
17         A.    I wanted what I was earned --
18         Q.    You wanted more?
19         A.    I wanted what I was earned and what I was told we
20    had an agreement for.
21              MR. L. FRIEDMAN:  I'm going to object to
22    all of that as being nonresponsive.
23              THE COURT:  Sustained.
24              Limit your response to his question.
25         Q.    (By Mr. L. Friedman) All right, let's move on.

1        You also stuck in a guarantee here.  In

2   order to induce employee to enter into this agreement, the

3   Potashniks jointly and severally, hereby personally and

4   unconditionally, guarantee payment to employee of all

5   amounts provided for herein strictly in accordance with this

6   agreement.

7        Nobody agreed to that.  Not Affordable

8   Housing, not management development, the Potashniks.  Nobody

9   agreed to that?

10       A.   That's correct.

11       Q.   That's something new you put in this agreement?

12       A.   That was one of the things I put in the agreement,

13   yes.

14       Q.   And that was never agreed to?

15       A.   That detail was not in the discussion.

16       Q.   All right.  Let's move on.

17            Now, this is an interesting provision.

18   Paragraph 15 of the separation -- of your separation

19   agreement you put in a no amendment unless it's writing

20   provision; is that correct?

21       A.   It appears that I did.

22       Q.   You put if -- if they agree to this agreement

23   nobody could modify it.  Actually, I'll read the words.  No

24   attempted modification or waiver of any of the provisions of

25   this agreement shall be binding on either party unless in

185

1    writing and signed by both employee and company.

2                        That's what you wanted in this agreement?

3         A.    If it encompassed --

4         Q.    I'm just asking if you wanted that in the

5    agreement.  That's why you put it in there?

6         A.    If it encompassed the oral and the unpaid bonuses,

7    yes.

8                        MR. L. FRIEDMAN:  Objection, nonresponsive.

9                        THE COURT:  Repeat your question.

10        Q.    (By Mr. L. Friedman) You put this language in your

11   separation agreement because you specifically wanted it in

12   there, correct?

13        A.    Or it was in the template.

14        Q.    If it was in the template or if it was in the

15   Encyclopedia Brittanica or Wikipedia, you took it, you read

16   it, you understood it, and you put it in the separation

17   agreement that you drafted, correct?

18        A.    Yes.

19        Q.    Because you wanted it there, correct?

20        A.    The Potashniks wanted it.

21        Q.    You wanted it there, correct?

22        A.    I had an oral agreement that we're trying to

23   consummate.  So, yes, I --

24                        MR. L. FRIEDMAN:  I'm going to object --

25        A.    -- tried to put it in.

1           MR. L. FRIEDMAN:  -- as being

2    nonresponsive.

3                THE COURT:  Okay.

4                His question is did you want it there.  You

5    can answer yes or no or tell him you can't answer it yes or

6    no.

7                THE WITNESS:  I can't answer it

8    appropriately.

9                MR. L. FRIEDMAN:  All right.  Go to the

10   next one.

11        Q.   (By Mr. L. Friedman) In December of 2007, you

12   decided to sue the Potashniks, correct?

13        A.   Yes.

14        Q.   You didn't tell them that, but you made that

15   decision?

16        A.   I'm not sure if I gave forewarning or not --

17        Q.   All right.

18        A.   -- for everyone.

19        Q.   And in March 11th of 2008, you filed a sworn

20   plaintiff's original petition at the courthouse, correct?

21        A.   If that information's correct, yes.

22        Q.   See the petition.  Whole petition, first thing.

23   This is a copy of the plaintiff's original petition, a

24   petition for temporary restraining order and injunction that

25   you filed March 8th -- I'm sorry -- March 11th, 2008.

1    It says Jeffrey W. Carpenter, plaintiff, versus Southwest

2    Housing Development, Inc., Southwest Housing Management

3    Company, Inc., Affordable Housing Construction, Inc.,

4    Brian Potashnik and Cheryl Potashnik, even though you've

5    never made an agreement with Cheryl Potashnik.

6                    Did I read that correctly?

7         A.    Yes.

8         Q.    And you filed it in County Court at Law Number 5,

9    which is this court, and that's why we're here today.

10        A.    Yes.

11        Q.    Correct?

12                    Now, let's turn to the last page where the

13   verification is, okay.  And on the back of that petition,

14   see where it says verification?

15        A.    Yes.

16        Q.    You swear before a notary public.

17                    MR. L. FRIEDMAN:  Let's go down to the

18   bottom.  Nope, all factual averments.

19                    MR. PAGE:  Right there?

20                    MR. L. FRIEDMAN:  Yeah.  Perfect.

21        Q.    (By Mr. L. Friedman) You swore that all factual

22   statements, averments or statements, contained in Paragraphs

23   20, 21, 22, 25, 26, 27, and 30 through 35 of this document,

24   plaintiff's original petition, are within your personal

25   knowledge and true and correct.

1              You signed it Jeffrey Carpenter?

2       A.    Yes, I signed it.

3       Q.    March 11th, 2008, notarized by Gloria A.

4    Hernandez, correct?

5       A.    Yes.

6       Q.    Before this petition was signed you worked on it

7    with your lawyers at the time, Rogge Dunn?

8       A.    Briefly.  I was in the hospital most of the time,

9    but yes.

10      Q.    You worked on it with your lawyers?

11      A.    Rogge Dunn spearheaded it, yes.

12      Q.    You read this petition before you signed it,

13   correct?

14      A.    I assume, yes.

15      Q.    You understood the petition before you signed it?

16      A.    Yes.

17      Q.    And you swore that the statements in Paragraphs

18   20, 21, 22, 25, 26, 27, and 30 through 35 were within your

19   personal knowledge and true and correct?

20      A.    That's what it says.

21      Q.    And do you know what personal knowledge is?

22      A.    Yes.

23      Q.    What is it?

24      A.    That I'm personally aware of the situation.

25      Q.    Saw it, felt it, heard it, touched it?

Appendix 1179

1        A.    Right.

2        Q.    Is that your understanding?

3        A.    Yes, sir.

4        Q.    Okay.

5              So we go to paragraph --

6              MR. L. FRIEDMAN:  Next paragraph.

7        Q.    (By Mr. L. Friedman) We go to Paragraph 26, one of

8   the paragraphs you swore to.  And it says, When the sale

9   process began, one or more of the defendants agreed to pay

10  plaintiff three percent of the gross sale, less normal

11  closing costs of brokerage fees, attorney's fees related to

12  the sale -- not the criminal case -- title fees and other

13  normal closing costs.  The agreement was made in

14  consideration for, in part, plaintiff remaining an employee

15  of one or more of the defendants to assist in effectuating

16  the sale.  That means closing, doesn't it?

17       A.    Yes.

18       Q.    All right.

19             Now, that's not the same formula you

20  testified to this morning, is it?

21       A.    No, it's not.

22       Q.    And that doesn't say anything about employee

23  severance or bonuses, does it?

24       A.    That's the part that's missing, yes.

25       Q.    Well, that's one part that's missing.

1                You swore on March 8th -- March 11th, 2008,

2      that that was within your personal knowledge and true and

3      correct.

4                So we have normal closing costs, not the

5      criminal case -- that was a material term that you used at

6      the time -- and stayed till closing.  And nothing about

7      severance bonuses, correct?

8                (No verbal response)

9      Q.    Correct?

10     A.    Yes, from what you just said.

11     Q.    No mention of severance bonus.  Yes.  Exclude

12     criminal case.  I'm just going to put stay period.  End of

13     closing required.

14               And that was the truth or that was what you

15     swore to on March 8 [sic], 2011 [sic], correct?

16     A.    Yes.

17     Q.    Let's see what else was in your petition.

18     Anything else?

19               Let's move on.  Next thing was your

20     deposition, March 16th, 2010, and we've already talked about

21     that.  You said the deal was made on May 6, 2006.  Lunch

22     was -- at a lunch at Cafe de Brazil.  We already talked

23     about this.

24     A.    I believe I said on or about May 6.

25     Q.    Okay, on or about May 6.

1          Let's look at Mr. Carpenter's first amended

2     petition, July 19th, 2013.  Paragraph 22 of your first

3     amended petition, that's five years later.  Approximately,

4     five years later.

5          Paragraph 22 of your first amended petition

6     says, During Mr. Carpenter's employment tenure,

7     Brian Potashnik offered that Mr. Carpenter would receive at

8     least three percent of the net proceeds from the sale of

9     Southwest Housing entities' assets if he would stay on and

10    assist in effectuating the asset sale.  Your words.

11         The net proceeds formula was gross

12    compensation from the sale transaction minus closing costs,

13    the brokerage fees, attorney's fees relating to the sale

14    transaction fees, title fees of the normal closing costs,

15    and any compensation paid from the sale proceeds to any

16    other employees.

17         Now, that's not the same formula that we've

18    seen anywhere else before.  You agree with that,

19    Mr. Carpenter?

20         A.   I agree to the corporate employees.

21         Q.   So it's not the same as any other formula and now

22    says nothing about criminal fees, correct?  Left out

23    criminal fees?

24         A.   Criminal fees was never part of the true formula.

25         Q.   All right, but it was in your sworn petition,

1    right?

2         A.    My attorneys put it in there, yes.

3         Q.    Is that an excuse?

4         A.    Yeah.

5         Q.    You read it, you proofed it, you swore to it.

6    You're blaming your lawyers?

7         A.    Yeah.

8         Q.    Okay.  And I'll go back and write blaming lawyers.

9               And added any compensation paid to any

10   other employees, correct?

11        A.    Yes.

12        Q.    Any comp paid to any other employees.  Okay.

13              MR. L. FRIEDMAN:  Let's go to the next one.

14   Well, show the first page of that.  That was Jeffrey W.

15   Carpenter's first amended petition and then that was

16   Paragraph 22.

17              MR. DONOHUE:  Move these two petitions into

18   evidence.

19              MR. L. FRIEDMAN:  Say it again.

20              MR. DONOHUE:  You want to move -- ask for

21   admittance of these two petitions.

22              MR. L. FRIEDMAN:  Asking for admission of

23   the two petitions.

24              MS. GIBSON:  Your Honor, just like anything

25   else I'd like to admit like that, it's not appropriate,

1    other than to use for impeachment.

2                    THE COURT:  Objection's sustained.  We

3    don't admit the petitions or the interrogatories.

4                    MR. L. FRIEDMAN:  Note my objection.

5                    Your Honor, the original petition was a

6    sworn statement.

7                    THE COURT:  We'll take it up.

8                    MR. L. FRIEDMAN:  Let's move on.  Let's go

9    to the next one.  I defer to your current wisdom.

10                   THE COURT:  Okay.

11        Q.    (By Mr. L. Friedman) On July 22nd, 2013,

12   Mr. Carpenter, you filed a sworn declaration with this

13   court.  Do you remember that?

14        A.    Yes.

15        Q.    Defendants' Exhibit Number 43.

16                   MR. L. FRIEDMAN:  May I approach the

17   witness, Your Honor?

18                   THE COURT:  Certainly.

19                   What number was it?

20                   MR. L. FRIEDMAN:  Number 43.

21                   I'm handing this to you, Mr. Carpenter,

22   Number 43.

23                   Let's show the whole thing and then the

24   signature.

25        Q.    (By Mr. L. Friedman) So this is a document

```
1    entitled Declaration of Jeffrey Carpenter.   Remember this?

2         A.    Vaguely, yes.

3         Q.    Well, you prepared this declaration, didn't you?

4         A.    Yes.

5         Q.    With the help of your lawyers?

6         A.    It's been a while.   Yes.

7         Q.    Okay.   And it's a how-many-page document?

8    Eleven-page document, right?

9         A.    Yes.

10                 MR. L. FRIEDMAN:   Let's turn to the last

11   page so you can see his signature.

12        Q.    (By Mr. L. Friedman) And you signed this on the

13   last page --

14        A.    Yes.

15        Q.    -- correct?

16                 And the paragraph above it says, My name is

17   Jeffrey Wayne Carpenter.   My date of birth is November 2nd,

18   1958.   My address is 7246 Mimosa Lane, Dallas, Texas 75230.

19   And then you say, I declare under penalty of perjury that

20   the foregoing is true and correct.   Executed in Dallas

21   County, Texas, on the 22nd of July, 2013.

22                 And then is that your signature above the

23   printed letters Jeffrey W. Carpenter?

24        A.    That is my signature.

25        Q.    Okay.   So you swore under penalty of perjury
```

Appendix 1185

1     everything in this declaration was true and correct?

2          A.    Yes.

3          Q.    You read this declaration before you signed it,

4     correct?

5          A.    Yes.

6          Q.    You understood it before you signed it?

7          A.    I believe so.

8          Q.    You prepared this declaration, correct?

9          A.    With my attorney's counsel.

10         Q.    So this was not prepared by you but it was signed

11    by you?

12         A.    I think it was a collaborative effort.

13         Q.    So it was prepared by you and your attorney but

14    not signed by your attorney?

15         A.    I can't say for sure, but I believe so.

16         Q.    Refresh my memory who your attorney was at the

17    time.

18         A.    I'm not sure.

19         Q.    All right.

20               Let's look at what -- what you declared

21    under penalty of perjury was true and correct.  Looking at

22    Paragraph 5, try to go through this quickly and just pick

23    out portions.

24               Middle of Paragraph 5 you say, I had

25    further discussions about the details of compensation with

1    Mrs. Potashnik, who explained that Mr. Potashnik normally

2    handled these issues but that she was stepping in because

3    Mr. Potashnik was not available to do it.  Mr. Potashnik and

4    I discussed and agreed -- I'm sorry -- Mrs. Potashnik and I

5    discussed and agreed that there would be a minimal annual

6    bonus, even though she insisted on leaving the word

7    "discretionary" in the phrase "minimum discretionary bonus

8    potential".

9              That was in connection with preparing your

10   original employment agreement in February 2004, correct?

11        A.   Yes.

12        Q.   Okay.  And that's your language?

13        A.   I don't know about that.

14        Q.   That's your language or your lawyer's language,

15   but you swore it was true and correct under penalty of

16   perjury?

17        A.   I thought you were referring to the discretionary

18   mention in my employment agreement.

19        Q.   Well, this -- these two sentences that I

20   highlighted refers to your negotiations with Mrs. Potashnik

21   leading up to the signing of your original employment

22   agreement.

23        A.   Okay.

24        Q.   Now, is that correct?

25        A.   Yes.

1      Q.     And you say under penalty of perjury that you had

2    further discussions about the details of compensation with

3    Mrs. Potashnik, who explained that Mr. Potashnik normally

4    handled these issues; that she was stepping in because

5    Mr. Potashnik Was not available to do it.  Is that true?

6      A.     That's true.

7      Q.     And then you said Mrs. Potashnik and I discussed

8    and agreed there would be a minimum annual bonus, even

9    though she insisted on leaving the word "discretionary" in

10   the phrase "minimum discretionary potential bonus".  That's

11   correct, isn't it?

12     A.     Yes.

13     Q.     And you agreed to leave the word "discretionary"

14   in the bonus provision of your original employment contract?

15     A.     Not wanting to, but yes.

16     Q.     Okay.

17            Let's go to the next paragraph.

18            MS. GIBSON:  And, Your Honor, just for a

19   moment, I think Larry should really only be using this for

20   impeachment.  I'm just -- I don't mind if I get the same

21   consideration.

22            THE COURT:  It's -- you'll get the same

23   consideration --

24            MS. GIBSON:  Okay.

25            THE COURT:  -- if you're talking about this

1    document --

2                    MS. GIBSON:  Okay.

3                    THE COURT:  -- or any affidavit.

4                    Okay, go ahead, Mr. Friedman.

5        Q.    (By Mr. L. Friedman) Paragraph 17 says, The

6    initial offer happened during a meeting at Brian Potashnik's

7    home that I believe took place on May 22nd, 2006.

8        A.    It does not say that.

9        Q.    Well, read that first sentence.

10       A.    It says took place on or around --

11       Q.    I apologize.

12       A.    -- May 22nd, 2006.

13       Q.    I apologize.  I do apologize.

14                    So the declaration that you and your lawyer

15   worked on, correct?

16       A.    Yes.

17       Q.    And I'm assuming you were very candid with your

18   lawyer about the facts in this case?

19       A.    Yes.

20       Q.    So you say the oral agreement occurred on or about

21   May 22nd, 2006, correct?

22       A.    Yes.

23       Q.    The lawyer got that information from you, 'cause

24   your lawyer wasn't there, correct?

25       A.    That's correct.

1          Q.    And your lawyer relied on you giving her truthful
2     information?
3          A.    Yes, and I can verify why.
4          Q.    Okay.
5               Let's go to the next one.   Paragraph 19
6     says, On or about October 13, 2006, Brian Potashnik and I
7     met at Cafe Express and discussed the sales-related issues
8     and the sales proceeds bonus that I would receive.   He, at
9     this time, had a better handle on the potential sales price.
10    Mr. Potashnik informed me that I would receive a minimum of
11    three percent of the net proceeds, with the net proceeds
12    based on gross compensation from the sale transaction minus
13    closing costs of brokerage fees, attorney's fees related to
14    the sale transaction, title fees, other normal closing
15    costs, and any compensation paid from the sale proceeds to
16    any other employees.   We estimated closing costs -- now it
17    says not to exceed three percent -- of the total sales price
18    and that I would receive around $1,020,000 from the sales
19    proceeds.
20               Did I read that accurately?
21         A.    Yes.
22         Q.    Is that a little different than your prior
23    testimony?
24         A.    Very slightly different.
25         Q.    Yeah, just a little different.

1           Now we have closing costs not to exceed

2     three percent, right?  Did I read that correctly?

3           A.   Yes.

4                 MS. GIBSON:  Yeah, I object to his

5     characterization of what it says.

6                 MR. L. FRIEDMAN:  I'm sorry.  I just didn't

7     hear.

8                 MS. GIBSON:  You're talking about the

9     estimate.  We "estimated" a closing cost --

10                MR. L. FRIEDMAN:  Estimated closing costs

11    not to exceed three percent.  Okay, I stand corrected.

12          Q.   (By Mr. L. Friedman) The estimated closing costs

13    not to exceed three percent is a new term that we've not

14    seen before, correct?

15          A.   I can't say if we have or haven't.  I remember the

16    conversation quite well --

17          Q.   Mr. Carpenter, in all of the previous times you

18    have told this story in these court proceedings you have

19    never before mentioned the term "estimated cost not to

20    exceed three percent"; isn't that correct?

21          A.   I -- I don't believe it's correct.  I believe in

22    some other forms that we have similar language.  But for the

23    most part we say normal --

24          Q.   That's what you're telling the jury today; that

25    you believe normal closing costs means the same as estimated

Appendix 1191

1    cost not to exceed three percent?

2         A.    That was the discussion that Brian and I had.

3         Q.    And you left that out when I asked you what the

4    terms of your agreement were this morning, right?

5         A.    No, sir.  Again, it was estimated.

6         Q.    Then you said, I asked Mr. Potashnik to put the

7    agreement in writing.  Mr. Potashnik and Randy Alligood, the

8    Southwest Housing attorney, would be putting it together.

9                   Randy Alligood was not the only Southwest

10   Housing attorney, was he?

11        A.    No.

12        Q.    Southwest Housing had dozens of attorneys at that

13   time, correct?

14        A.    Yes, but Randy was the go-to person.

15        Q.    Just wasn't my question.  My question is another

16   lawyer could have been asked to put that in writing if that

17   was the deal.

18        A.    That may be the case but that's what I was told,

19   it was Randy Alligood.

20                   MR. L. FRIEDMAN:  I'm going to object to

21   all of it as being nonresponsive.

22                   THE COURT:  What was your question again?

23                   MR. L. FRIEDMAN:  Another lawyer could have

24   been asked by Mr. Potashnik --

25                   THE COURT:  He said that may be the case.

1    After that it was nonresponsive.

2         Q.    (By Mr. L. Friedman) At the time the specific

3    amount and formula were agreed upon -- well, you've already

4    testified that the specific amount was not agreed upon,

5    correct?  On October 13, 2006, a specific amount that --

6         A.    The formula was --

7         Q.    -- you would get was not agreed upon.

8         A.    The formula was --

9         Q.    Your testimony is that a formula was agreed upon

10   but not a specific amount --

11        A.    That's correct.

12        Q.    -- correct?

13             So that's not accurate.  Somebody misstated

14   that, right?

15        A.    Yes.

16        Q.    Another mistake?

17        A.    Apparently.

18        Q.    Paragraph 19.

19             Okay.  And then it says, Mr. Potashnik

20   again implored me to stay on, claiming that continuity in my

21   continued services were essential to the success of the

22   transaction.  Meaning you're claiming Mr. Potashnik wanted

23   you to stay on through the closing, correct?

24        A.    Yes.

25        Q.    All right.  Let's move on.

```
 1                    THE COURT:  We still have another afternoon
 2     break.  It depends on how long --
 3                    MR. L. FRIEDMAN:  Sure.  This is good.
 4                    THE COURT:  We'll take our 10-minute break,
 5     ladies and gentlemen.
 6                    (The jury exited the courtroom.)
 7                    (Recess taken)
 8                    (The jury entered the courtroom.)
 9                    THE COURT:  Welcome back.  Good afternoon,
10     ladies and gentlemen.
11                    We'll continue with the trial.
12     Mr. Carpenter is our witness; Mr. Friedman is the examining
13     attorney.  And we're going to go 30 more minutes, until 4:35
14     or so, before we stop for the day.
15                    Mr. Friedman.
16                    MR. L. FRIEDMAN:  Yes.  Thank you very
17     much.
18                    Whatever the judge says goes.
19          Q.   (By Mr. L. Friedman) Mr. Carpenter, has there been
20     any other occasions where you've recited a different oral
21     agreement than the one you recited earlier today when I
22     asked you to tell the jury what agreement you made on
23     October -- when you made the agreement and what agreement
24     you made?
25          A.   Not that I'm aware of.
```

1      Q.    Do you recall filing or sending sworn

2    interrogatory answers to the defendants on August 16, 2013?

3      A.    No, I don't.

4            MR. L. FRIEDMAN:  Let's see if Mr. Page can

5    help me on this one.

6      Q.    (By Mr. L. Friedman) So on August 16, 2013 --

7            MR. L. FRIEDMAN:  I don't have a full

8    screen, Mr. Page.   No discounts if it doesn't have a screen.

9      Q.    (By Mr. L. Friedman) So this is a document

10   entitled Jeffrey Carpenter's Objections and Answers to

11   Southwest Housing Management Company, Inc.'s First Set of

12   Interrogatories.   Do you remember this?

13     A.    I can't say I do.

14     Q.    Okay.   Let's go to the back.

15           MR. L. FRIEDMAN:  Do we have a signature on

16   here?

17           This was signed by Ms. Gibson.   And do you

18   have a signature for -- this was submitted on

19   Mr. Carpenter's behalf.   Okay.

20           Let's go to Interrogatory Number 2 and the

21   answer to Number 2.

22           Do you have the full text, 'cause I don't

23   see a full text?  Would you like me to try the Elmo?

24           Still not complete.

25     Q.    (By Mr. L. Friedman) Okay.   So Interrogatory

1      Number 2, Mr. Carpenter, as you can see, asks you to please

2      give a complete and chronological account of all

3      communications which took place between you, Southwest

4      Housing Management Company, Inc., related to your contention

5      that Southwest Housing Management owes you the amount of

6      $150,000 in owed bonuses as alleged in plaintiff's original

7      petition.  And then there's some objections.  Now let's go

8      down to the response.

9                    Good objections.

10                   And then in your answer to Number 2 --

11                   MR. L. FRIEDMAN:  I still need a full

12     screen.  Can you raise it up so the jury can see it?  Okay,

13     good.  Can you make it bigger?

14                   Make it bigger so I can see it.

15                   (Pause)

16                   MR. L. FRIEDMAN:  Good.  Thank you.

17     Q.   (By Mr. L. Friedman) So in your answer to

18     Interrogatory Number 2 you say, During my employment tenure,

19     Brian Potashnik offered that I would receive at least three

20     percent, at least three percent of the net proceeds from the

21     sale of the Southwest Housing operational units' assets and

22     Ms. Potashnik's and -- Ms. Potashnik's and his partnership

23     interest assets in the apartment communities -- and you

24     define that as sales proceeds bonus -- if I would stay on

25     and assist in effectuating the asset sale -- and that was a

206

1   new component -- as long as needed.  I accepted the offer

2   and committed to stay as long as needed.  That is, until the

3   management leadership changed or the closing of the asset

4   sale or other date when I was no longer needed.

5                    Mr. Potashnik and I agreed that net

6   proceeds formula was gross compensation from the sale

7   transaction minus closing cost of brokerage fees, attorney's

8   fees related to the sale transaction, title fees, other

9   normal closing costs, and any compensation paid from the

10  sale proceeds of any other employees.  The initial offer did

11  not specify the specific percentage or formula.  The

12  specific percentage and formula were agreed later when

13  Mr. Potashnik had a better handle on the likely sales price

14  for the Southwest Housing assets and his and Ms. Potashnik's

15  Affordable Housing assets, the partnerships that owned the

16  properties.

17                    You see that, sir?

18       A.    Yes.

19       Q.    So that's a lot different than the renditions

20  we've seen, the many renditions we've seen throughout the

21  day.  Do you agree?

22       A.    It's slightly different.

23       Q.    Well, okay.

24                    So let's look at it.  So in your

25  interrogatory response, Interrogatory Response Number 2, you

Appendix 1197

1    now say at least three percent of net proceeds.

2                        And now we see a new term, "operational

3    units' assets".  What is that?

4           A.    The main companies.

5           Q.    Operational units' assets means the main

6    companies.  And who would those be?

7           A.    Development construction management.

8           Q.    But that term hasn't been used before, correct?

9           A.    No, sir.

10          Q.    And Mrs. Potashnik's and his partnership, is that

11   just a mistake?  Should that be Mr. Potashnik or should it

12   be her partnership interest?

13          A.    It should be Mister.

14          Q.    Okay.  So this is only Mr. Potashnik's partnership

15   interest?

16          A.    Wait a minute.

17                        (Pause)

18          A.    Yes.

19          Q.    Okay.

20                        And what did you mean in this answer when

21   you said partnership interest?  That's new to the equation.

22          A.    That's -- that's individual asset --

23          Q.    You talking about the 50, 60 --

24          A.    The 55 communities.

25          Q.    So that's in addition to the assets of Southwest

1  Management, Southwest Development, and Affordable Housing

2  Construction?

3      A.  Yes, in addition.

4      Q.  So that's new, correct?

5      A.  No.  Just said a different way.

6      Q.  Said a different way.

7          Okay.  I would say it on effectuating the

8  sale for as long as needed.  As long as needed is a new

9  term, correct?

10     A.  It's a new term, but at that time we had a target

11 date, target time frame.

12     Q.  No, but as long as needed was not something that

13 you're alleging Mr. and Mrs. Potashnik agreed.  That's

14 something you unilaterally put in here.

15     A.  I don't believe so.

16     Q.  I mean, there was no -- you didn't meet with the

17 Potashniks after you filed this lawsuit and then entered

18 into some new oral agreement, correct?

19     A.  They asked me to stay on --

20     Q.  Just my question, you never asked and made any

21 other oral agreements, correct?

22     A.  No, I did.

23     Q.  Okay.  So this is a new term that we've not seen

24 before in all of your other renditions of your oral

25 agreement, correct?

1          A.   It's worded differently, yes.

2          Q.   Okay.  For as long as needed.  And I'm going to

3     say worded differently.  And you're going to tell this jury

4     that that means the same as stay through closing?

5          A.   Well, not if we continue to read on I won't.

6          Q.   And then it says, Until the management leadership

7     changed or the closing of the asset sale or other date when

8     I was no longer needed.

9               Mr. Potashnik and I agreed that net

10    proceeds formula was gross compensation for the sale

11    transaction minus closing cost of brokerage fees, attorney's

12    fees related to the sale transaction, title fees of the

13    normal closing costs, and any compensation paid from the

14    sale proceeds to any other employees.

15               Did I get that right?

16         A.   Yes.

17         Q.   Now you want to tell this jury that for as long as

18    needed is a new term or it means the same as stay until

19    closing?

20         A.   Well, it's a what-if scenario until the management

21    leadership changed or the asset -- closing of the asset

22    sale --

23         Q.   Okay.

24         A.   -- or other date.  So it's a moving target, so to

25    speak.

Appendix 1200

1          Q.    So you'll agree it's a new term?

2                    MS. GIBSON:  I'm sorry.  What did you say?

3          Q.    (By Mr. L. Friedman) I said, Mr. Carpenter, you

4     will agree that that's an added term or a different term or

5     a new term, correct?

6          A.    A different term, yes.

7          Q.    All right.  I'll put down a different term.

8          A.    Or explanation.

9          Q.    All right.  I'll put down both.

10                    Different term, explanation, but it's

11    nothing that you agreed to with Mr. Potashnik.  You didn't

12    have a what-if scenario when you made the alleged oral

13    agreement with Mr. Potashnik, correct?

14         A.    Well, we did have an agreement for me to help

15    assist in closing the sale.  And it -- depending on the time

16    frame, it was going to be either the sales closing or until

17    my time is no longer needed, knowing that I was not going to

18    have a position to go to.  So it was a floating target.

19         Q.    All right.  None of that was agreed to when you

20    had the bump, shake, oral agreement with Mr. Potashnik in

21    October 13, 2006?

22         A.    We had -- we had a targeted frame of closing in,

23    as I said before, in April, May of 2007.  And as we got

24    closer to that it became more of a moving target.

25                    MR. L. FRIEDMAN:  I'm going to object to

1    the rest of it as being nonresponsive.

2        Q.    (By Mr. L. Friedman) Now, this says initial offer

3    did not specify the specific percentage of formula.  So

4    according to this answer in October of 2006, October 13th,

5    2006, you didn't have a specific formula.  Or is this wrong?

6    Is this a mistake too?

7        A.    No.  What I believe the slide is saying is when

8    Mr. Potashnik told me he was selling the business that we

9    didn't have the details worked out at that point in time.

10       Q.    And so there was no agreement when he told you

11   they were selling -- that you were selling the business --

12   that he was selling the business?

13       A.    That he was selling the business and wanted me to

14   stay --

15       Q.    But there was no agreement --

16       A.    -- and do my job.

17       Q.    -- when Mr. Potashnik first told you he was

18   selling the business?

19       A.    Not on that date, no.  May --

20       Q.    And when was that?

21       A.    May --

22       Q.    You're looking at your script.  Please don't look

23   at your script.  Look at me.  Can you answer without looking

24   at your script?

25       A.    Yes, I can.

1        Q.    All right.  Well, what was the date?

2        A.    May 21st, the day after my daughter's --

3        Q.    Okay.

4        A.    -- high school graduation.

5        Q.    Thank you.  Congratulations.

6              But there was no agreement on May 21st,

7    2006?

8        A.    A lucrative bonus program was going to be put in

9    place once we got farther down the road.

10       Q.    Mr. Carpenter --

11       A.    So there was no --

12             MR. L. FRIEDMAN:  I'm going to object --

13       A.    -- there was no --

14             MR. L. FRIEDMAN:  -- to all of this being

15   nonresponsive.

16             THE COURT:  Repeat your question.

17       Q.    (By Mr. L. Friedman) Mr. Carpenter, there was no

18   agreement between you and Mr. Potashnik on May 26, 2006, or

19   anytime prior to October 13th, 2006?

20       A.    May 21st.  Correct.

21       Q.    Because you say the initial offer did not specify

22   the specific percentage or formula, and the specific

23   percentage or formula were agreed later when Mr. Potashnik

24   had a better annual on the likely sales price for the

25   Southwest Housing assets and his and Ms. Potashnik's

213

1     Affordable Housing assets, the partnerships that owned the
2     properties.
3                    Now, adding the partnerships to this
4     formula is also something new; isn't that correct?
5          A.   It's new for today, yes.
6          Q.   Well, it's new for every time that you have stated
7     what the formula was.  You had never stated that before, had
8     you?
9          A.   Well, they're -- they're selling the partnerships
10    of the assets.  So, again, it's verbiage.
11         Q.   But this is the first time you used that verbiage,
12    correct?
13         A.   The dialogue is appropriate for --
14         Q.   No, I'm just asking about the verbiage, sir.
15         A.   Yes.
16         Q.   It's the first time you used that verbiage?
17         A.   Yes.
18         Q.   Because you're continuing to negotiate with
19    Mr. Potashnik, correct?
20         A.   No, sir, not after --
21         Q.   You were trying to tighten the deal.
22         A.   -- my five -- asking for five percent I was not
23    trying to renegotiate the deal.
24         Q.   Okay.  So what's the date of your asking for five
25    percent, sir?

214

1        A.    It was the next business day after October 13th.

2        Q.    All right.  So October 14th you were still

3    negotiating, correct?

4        A.    I believe so.

5        Q.    So I'm going to put down here October 14th.

6              And that was the day you asked

7    Mr. Potashnik for five percent and Mr. Potashnik says no,

8    correct?

9        A.    Yes.

10       Q.    Interrogatories.  Okay.

11             MR. L. FRIEDMAN:  This might be a good

12   place to stop before I get into a new topic.

13             THE COURT:  We'll stop for the day, ladies

14   and gentlemen.  We'll see you tomorrow morning at 9:00

15   o'clock.

16             MR. L. FRIEDMAN:  Thank you, Your Honor.

17             (The jury exited the courtroom.)

18             (End of proceedings)

19

20

21

22

23

24

25

Appendix 1205

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3         I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12        I further certify that the total cost for the

13   preparation of the Reporter's Record is $1,730.00 and will

14   be paid by Friedman & Feiger, LLP.

15        WITNESS MY OFFICIAL HAND this the 19th day of February,

16   2018.

17

18

19                            /S/ Vikki L. Ogden

20                            _____
                              VIKKI L. OGDEN, Texas CSR# 6309
                              Official Court Reporter
21                            Dallas County Court at Law No. 5
                              600 Commerce Street, Floor 5
22                            Dallas, Tx. 75202
                              (214)653-6443
23                            Certification Expires:  12/31/18

24

25

1          REPORTER'S RECORD (EXCERPT)

2              VOLUME 7 of 14                    FILED IN
                                          5th COURT OF APPEALS
3          Trial Court Cause No. CC-08-02072-E   DALLAS, TEXAS
                                          04/29/2019 6:14:22 PM
4    JEFFREY W. CARPENTER,          )    IN THE DALLAS COUNTY LISA MATZ
                                     )                        Clerk
5              Plaintiff,           )

6    VS                             )    COURT AT LAW NO. 5
                                     )
7    SOUTHWEST HOUSING DEVELOPMENT   )
     COMPANY, INC., ET AL,          )
8                                    )
               Defendants.          )    DALLAS, TEXAS
9    _____

10

11                 TRIAL ON THE MERITS

12   _____

13

14        On the 30th day of January, 2018, the following

15   proceedings came on to be heard within the presence

16   of a jury, in the above-entitled and -numbered cause;

17   and the following proceedings were had before the

18   HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19   Dallas County, Texas:

20        Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25

```
 1                        APPEARANCES:

 2
     MS. AMY GIBSON
 3   SBN 00793801
     Gibson Wiley, PLLC
 4   1500 Jackson Street, Suite 714
     Dallas, Texas 75201
 5   (214)522-2121
     Attorney for Plaintiff
 6
                 -AND-
 7
     MR. BRIAN SANFORD
 8   SBN 17630700
     Sanford Firm
 9   1910 Pacific Avenue, Suite 15400
     Dallas, Texas 75201
10   (469)361-9111
     Attorney for Plaintiff
11
                 -AND-
12
     MR. LAWRENCE "LARRY" FRIEDMAN
13   SBN 07469300
     MR. MICHAEL DONOHUE
14   SBN 05989380
     MR. JASON FRIEDMAN
15   SBN 24059784
     Friedman & Feiger, LLP
16   5301 Spring Valley Road, Suite 200
     Dallas, Texas 75254
17   (972)788-1400
     Attorneys for Defendants
18
                 -AND-
19
     MR. RYAN HALE
20   SBN 24097784
     Hawkins Parnell Thackston & Young, LLP
21   4514 Cole Avenue, Suite 500
     Dallas, Texas 75205-5412
22   (214)780-5138
     Appellate Attorney for Defendants
23

24
     ALSO PRESENT:  Steve Page, A/V Technician
25
```

Appendix 1208

```
1                        VOLUME 7

2    January 30, 2018                              PAGE

3    Proceedings ----------------------------------    5

4
     PLAINTIFF'S
5    WITNESS:
                        Direct    Cross    Redirect    Recross
6    Jeffrey Carpenter    --      5, 85      99          136

7
     DEFENDANTS'
8    WITNESS:
                        Direct    Cross    Redirect    Recross
9    Deepak Sulahke      64        78         84          ---

10
     Adjournment ----------------------------------   142
11
     Court Reporter's Certificate ------------------   143
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appendix 1209

```
 1                         EXHIBIT INDEX

 2

 3   PLAINTIFF'S
     NO.              DESCRIPTION        OFFERED    ADMITTED

 4   70               Jeff Carpenter's     115        116
                      Notes
 5

 6

 7

 8   DEFENDANTS'
     NO.              DESCRIPTION        OFFERED    ADMITTED

 9   25               Email                94         95

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

Appendix 1210

```
 1                   P R O C E E D I N G S
 2                   January 30, 2018
 3              (The jury entered the courtroom.)
 4              THE COURT:  Welcome back.  Good morning,
 5     ladies and gentlemen.
 6                   We'll start right into the trial.  When we
 7     stopped yesterday Mr. Carpenter was the witness and
 8     Mr. Friedman was the examining attorney, and we'll ask him
 9     to pick up where he left off.
10                   MR. L. FRIEDMAN:  Are these the same
11     people?
12                   THE COURT:  Yeah, same people.  I believe
13     so.
14                   JEFFREY W. CARPENTER,
15     having been previously sworn, testified as follows:
16                   CROSS-EXAMINATION (Cont'd)
17     BY MR. L. FRIEDMAN:
18          Q.   All right.  Yesterday, Mr. Carpenter, we -- I
19     referred you to a couple of the petitions that you filed in
20     this case, and I'd like to go back to the second amended
21     petition that was filed -- or you filed in this case.  Do
22     you recall Jeffrey W. Carpenter's second amended petition?
23          A.   I can't say I recall it, but --
24          Q.   But it was filed on your behalf?
25          A.   Yes, yes.
```

1      Q.    Let's go to Paragraph 28.  Now, in your petition

2  you filed, read it, understood before you filed it.

3  Paragraph says, The provisions in the 2004 agreement --

4  assuming referring to your employment agreement -- providing

5  that the employer make decisions in the employer's sole

6  discretion include --

7                    MR. L. FRIEDMAN:  And I redacted,

8  Your Honor, the portion that purports to explain the law in

9  the state of Texas.

10     Q.    (By Mr. L. Friedman) But that's what you wrote or

11  was written on your behalf, an acknowledgement that the --

12     A.    Yes.

13     Q.    -- employer may make decisions in the employer's

14  sole discretion?

15     A.    Yes.

16     Q.    Yes?

17     A.    Yes.

18     Q.    All right.  Now let's go to the third amended

19  petition.  Okay, do you remember the third amended petition?

20     A.    No, sir, but there it is.

21     Q.    Yeah.  Another petition filed by you or on your

22  behalf, correct?

23     A.    Yes.

24     Q.    Okay.

25                    MR. L. FRIEDMAN:  So what was that

1    paragraph, 29?

2              (Pause)

3              MR. L. FRIEDMAN:  I'm sorry, 28.

4    Q.    (By Mr. L. Friedman) And, again, you state the

5    provisions in the 2004 agreement providing that the employer

6    may make decisions in the employer's sole discretion

7    include -- then there was a statement of the law that I

8    redacted.  The Court will -- the Court will instruct the

9    jury about the law.  But that was your statement made on

10   your behalf in your petition, correct?

11   A.    Yes.

12   Q.    That the employer may make decisions in the

13   employer's sole discretion, correct?

14   A.    Yes.

15   Q.    Okay.

16              Now let's go to November 2nd in 2007, your

17   last day of pay right after you were terminated by Southwest

18   Housing Management, the day you recorded -- secretly

19   recorded two conversations with -- one conversation with

20   Brian Potashnik and the other conversation with

21   Cheryl Potashnik.  Which conversation was recorded first?

22   A.    Brian.

23   Q.    All right.  Go ahead.  Let's go to Brian

24   Potashnik's, the transcript of Brian Potashnik's recorded

25   conversation.  And let me call your attention to the

1    highlighted portion on Page 1 where you say, Well, um, I was

2    going to call you last night but, uh, I wanted to talk to

3    you today just to, uh, follow up about, you know, our verbal

4    agreements and so forth.   Keith sent me a separation

5    agreement last night.   Then Brian says, Uh-huh.

6                        Did I read that correctly?  You'll stop

7    me --

8         A.   Yes.

9         Q.   -- if I'm reading it, any of this, incorrectly.

10   Is that acceptable?

11        A.   Yes.

12        Q.   Then going on a couple of boxes down you say, As

13   the deals close, you know, we're -- we're going to make

14   honor on our word, what we said and, you know, as we've

15   talked, that we'll continue to put this in writing.   Well, I

16   get this severance agreement and it basically says I sign my

17   life away for the 30 days and that there's, you know -- that

18   I have nothing to stand on, you know.

19                        And then Brian responds in the same

20   conversation.   He says, Well, I mean, I don't know what to

21   say.   I mean, it's -- I don't even know, other than the fact

22   that our attorneys are requiring us that anybody that's

23   leaving that's getting, uh, paid severance to have that

24   signed.

25                        Did you understand at the time he was

Appendix 1214

9

1    referring to the severance agreement that was presented to

2    you?

3        A.   Yes.   And I did not agree with it, but yes.

4        Q.   And that's what Cheryl told me, so I think that's

5    what you're talking about.   Uh-huh.

6                 And as far as our agreement goes where we

7    compensate you as we promised, it's going to depend on where

8    we end up in all of this.   You know, I mean, we've got Bank

9    of America calling me right now and telling me they're ready

10   to foreclose on Skyline because there's a $3 million gap in

11   the financing and the property's been performing so poorly,

12   you know.   And that's not to mention, you know, other deals

13   that are getting resized.

14                 Do you know what resized is?

15       A.   Yes.

16       Q.   What is it?   What does resized mean?   Will you

17   explain that to the jury?

18       A.   It's where the initial loan -- the amount of the

19   loan, due to various reasons, the property did not perform

20   up to a certain number for the permanent financing.   So

21   there had to be an adjustment made.

22       Q.   Adjustment in the loan?

23       A.   Adjustment in the loan, yes.

24       Q.   Okay.

25       A.   Due to various reasons.

1          Q.     Say it again.

2          A.     Due to various reasons.

3          Q.     Yeah, due to various reasons.

4                 And then it continues.  So we don't even

5     know where we're going to end up in terms of what we end up

6     getting out of this, if anything, you know.  I mean, I don't

7     know how to make a commitment, you know, based on not

8     knowing whether or not, you know, Cheryl and I are going to

9     end up with anything other than being in bankruptcy.  I

10    mean, that's the reality.  Jeff, Cascade still hasn't closed

11    on one deal -- hasn't closed one deal.  And then you say,

12    Uh-huh.

13                Then Brian goes on to say, You know, and

14    when they do close, who knows what the price will be.  Who

15    knows what, you know, it would be since that, um, um, things

16    like Skyline now and Heather Bend --

17                Those are apartment complexes, correct?

18         A.     Yes, sir.

19         Q.     -- and Heather Bend and, you know, Aldine and all

20    these deals that are resizing.  You know, where are we going

21    to end up?  I mean, uh, it's, uh -- it's not a good

22    situation.  I mean, it's not like we're sitting here, you

23    know, sitting on a mountain of cash.  Not to mention the

24    fact, you know, our legal fees have just -- have just been

25    astronomical in defending ourselves and defending the

1    company.   And, you know, that's the cost of doing business,

2    Jeff.

3                 I mean, there's just no -- there's just no

4    way it can be looked at any other way, you know.   I mean,

5    you know, I didn't go and rob a bank, you know.   This is

6    something that's directly related to the business.   We're

7    trying to negotiate with them now on these, you know, Dallas

8    deals that they think might be tainted and, I mean, it's --

9    it's just a big mess.   You say, Uh-huh.

10                And then Brian says, So, you know, if I

11   don't know where we stand and where we're going to end up as

12   opposed to where -- whether or not we would be bringing an

13   indictment and, you know, Basil telling me done deal, what

14   am I supposed do?  I mean, I don't understand.   What -- what

15   is it I'm supposed to do?  And then you say, Do for me?

16   Brian says, Yeah.

17                So then a couple lines down Brian says, I

18   can't even pay my bills.   I can't, you know -- I'm trying to

19   stay out of bankruptcy.   I have Bank of America calling me

20   now and telling me, you know, they're ready to put the

21   company and me and Cheryl into personal bankruptcy.   I mean,

22   what do you want me to do?

23                I mean, I'm telling you that we're -- we're

24   going to dig ourselves out of this thing and then hopefully,

25   you know, at the end of the day get something out of it from

12

1      Cascade and get the deal closed and pay the costs that we

2      have to defend ourselves and have money left over so that we

3      can, you know, give you a bonus.  But, you know, I mean,

4      right now nobody's asking and nobody is, you know --

5      everybody understands the situation.  You know, I -- I

6      don't -- I don't know what else to tell you.

7                   I know -- I mean, if you don't want to sign

8      something that you think is detrimental to you in some way,

9      then don't sign it.  But I don't know what else to tell you,

10     you know.  And then you say, Uh-huh.

11                  Does this sound like Brian has a handle on

12     what the final numbers are going to be after the sale?

13          A.   Not -- not a hundred percent, no.

14          Q.   All right.

15          A.   But I believe he had an idea.

16          Q.   I'll take not at a hundred percent as an answer.

17                  Then Brian says, I mean, you have Cheryl

18     and I both committed to you that when things work themselves

19     out there will be a bonus if there's anything there at the

20     end of the day that we have where we can, you know, actually

21     give out bonuses.  And it has to be done, you know, on a

22     level of trust.  And, you know, it would be absolutely

23     impossible to put anything in writing because there's so

24     many moving parts to this.

25                  Did you understand when Brian said that if

Appendix 1218

1    things work out there would be a bonus for you, and the "if"

2    meant that if things work out there was no certain

3    commitment when he stated that?  Did you understand that

4    when Brian said there was a condition?  There was no

5    commitment; there was a condition?

6         A.    There was an agreement that we had --

7         Q.    Just wasn't my question.   My question is yes or

8    no.

9              Did you understand when Brian said if

10   things work out that he meant there was a condition

11   precedent to your getting any money?  Things had to work out

12   first; and then if there was money at the end, he and Cheryl

13   would take a look at it.  There would have to be trust and

14   he wouldn't put anything in writing.

15        A.    But they asked me to sign the separation agreement

16   that there wouldn't be.

17        Q.    It just wasn't my question.

18              MR. L. FRIEDMAN:  I object to being

19   nonresponsive.

20              THE WITNESS:  Yeah.

21        Q.    (By Mr. L. Friedman) Did you understand at this

22   point in the conversation --

23        A.    Oh, I understood --

24        Q.    -- they weren't going to make a commitment for any

25   bonus and that the best they could do was give you $150,000

14

1    and then wait and see if things worked out and then at their

2    discretion decide later on to give you anymore money?  Did

3    you understand that that's what they were saying?

4         A.   I understood and did not agree.

5         Q.   Okay.  And you didn't agree but you understood

6    it and disagreed?

7         A.   I understood what they were saying.

8         Q.   And disagreed?

9         A.   And disagreed.

10        Q.   Okay.  Let's go on.

11             Then you said, Uh-huh.  And Brian said, I

12   mean, that's the reality.  And I don't -- I don't know what

13   else to say other than, you know, it's obvious based on

14   what's going on that that's the situation that we're in.  I

15   mean -- and, you know, it -- it s-u-c-k-s because obviously

16   at this point we thought we'd have everything closed and we

17   would have some money.

18             So you understood as of November 2nd, 2007,

19   nothing was closed, there was no closing, or everything --

20        A.   I'm sorry?

21        Q.   I'm sorry.

22        A.   I'm sorry.  What date did you say?

23        Q.   As of November 2nd --

24        A.   Okay.

25        Q.   -- 2007, when you secretly recorded these

1   conversations, you knew that everything wasn't closed?

2        A.    That's correct.

3        Q.    And Brian and Cheryl had no money from the

4   closing?

5        A.    Correct.

6        Q.    Okay.   Let's go on.

7              You say again, Uh-huh.   Brian says, It just

8   goes on and on.   And then you say, Well, it certainly has

9   definitely not been uncomplicated.   And then Brian says,

10  Well, it's beyond complicated.   It's just a cluster f-u-c-k

11  is what it is.   And that's the whole problem right now.   We

12  just have no idea where this thing is going to, uh, to

13  settle out, you know.

14             And you understood when Brian said he had

15  no idea where this thing was going to settle out that he

16  meant that he didn't know whether there would be any money

17  at the end for him and Cheryl, let alone any money to

18  distribute on a discretionary basis to any other employees?

19  You understood that's what he was saying, even though you

20  may disagree?

21        A.    I disagree but I understand where -- I understand

22  what he was trying to --

23        Q.    Yeah.

24        A.    But I disagree.

25        Q.    And you understood that in this conversation you

1   secretly recorded Brian was not making any commitment to

2   you?

3        A.   He failed other commitments, so I didn't believe

4   it.

5        Q.   I just -- I didn't hear.

6             He wasn't making the commitment to you,

7   correct?  You understood he wasn't making a commitment to

8   you in this secretly recorded conversation, correct?

9        A.   If he got paid, I got paid, is what it says.

10       Q.   At his discretion.

11       A.   It didn't say that.

12       Q.   You understood that's what he -- that's what he

13   meant?

14       A.   No.

15       Q.   All right.  So this goes on.

16             Brian says, I mean, you're going to have to

17   talk to her about that because I don't -- I don't see how

18   you can possibly put something like this in writing right

19   now because the way things are, you know.  I mean, why don't

20   you explain to me how it can be done because, you know, it's

21   an impossibility.

22             You understood that the word

23   "impossibility", when Brian said it, meant he could not make

24   a commitment to you at that time?  You understood it but you

25   disagreed with it, correct?

1        A.    I understood he did not want to.  He certainly

2    could have.

3        Q.    But he wasn't going to.

4        A.    He didn't.

5        Q.    You understood he wasn't going to make a

6    commitment to pay you anything, severance bonus or anything

7    else in the future at the closing.  I mean, there was no

8    question when this conversation finished you didn't have a

9    commitment from Brian Potashnik.

10       A.    Not necessarily.  I don't necessarily agree with

11   that.

12       Q.    You're telling this jury that after this

13   conversation you still thought you had a commitment from

14   Brian Potashnik?

15       A.    Sir, I had --

16       Q.    It's just a yes-or-no question.

17       A.    I disagree.

18       Q.    You disagree that it's yes or no?

19       A.    I disagree with how it's being phrased, and yes.

20       Q.    So Brian then goes on to say, I mean, talk to

21   Sara.  And at this point that's the best we can do.  I mean,

22   there's not going to be anything else because there's no way

23   of being able to memorialize anything that's in that, you

24   know.

25                 So at least at this point you understood

1   that there was never going to be anything in writing in the

2   form of a commitment to pay you anymore money, correct?

3        A.   That's what he's implying.

4        Q.   No.  You understood from the words Brian used in

5   the conversation that you secretly recorded that he was

6   never going to put anything in writing to commitment himself

7   and Cheryl to pay you anymore money as of November 2nd,

8   2007.  You understood that?

9        A.   In that particular sentence, yes.

10       Q.   Yeah, but you under -- not only from that

11  sentence.  You understood it from the whole conversation.

12       A.   There's other parts of the conversation and also

13  in Cheryl's that says the discussion will continue and we

14  will try to memorialize.  Yes, there is.

15       Q.   So what you're saying to the jury is you left this

16  conversation with the impression that Brian Potashnik was

17  still committed to pay you severance or a bonus at the

18  closing of the Cascade transaction?

19       A.   I felt he was legally obligated and --

20       Q.   That wasn't my question.  My question was, Did

21  Brian -- Brian Potashnik didn't make it clear to you that he

22  was never going to put anything in writing to commit to pay

23  you anymore money in this conversation?

24       A.   He didn't, no.

25       Q.   Okay.

19

1        A.    He did not.

2        Q.    Then you say, Maybe it's just memorializing what

3   you just said.   And Brian says, How do you memorialize when

4   someone says trust me?  You say, Brian, you told me, what, a

5   dozen times we're going to have it memorialized.   And Brian

6   says, With what?

7                Now your answer to that was, What's that?

8   And then Brian says, What?  Memorialize what?  You say,

9   The -- the bonus structure, the current --

10               And Brian says, The bonus structure.   You

11  say, The bonus structure.   And then Brian says, Of what?

12               Now, Mr. Carpenter, wasn't this an

13  opportune time when Brian says "of what" for you to say,

14  Brian, you know we had a deal as of October 16th, 2006,

15  where you promised to pay me?  We have a valid, enforceable,

16  oral agreement where you promised to pay me any one of the

17  combination of -- of alleged oral agreements that you'd

18  testified about during this trial.

19               Wasn't that a perfect opportunity for you

20  to say to Brian Potashnik, Brian, you promised to pay me a,

21  b, c, d, and e, right?

22       A.    It would have been time to reemphasize that.

23       Q.    Right, but you didn't do it.

24       A.    I didn't do it, but there was a clear

25  understanding --

1      Q.    I'll take "I didn't do it".

2      A.    -- what we were talking about.

3      Q.    I'll take "I didn't do it".

4            And then Brian says the bonus structure.

5      And you said, yeah, the bonus structure.  And then Brian

6      says, Of what?  And you didn't say anything.

7            Brian's asked you.  He said, Of what?  What

8      are you talking about?  Wasn't that another opportunity for

9      you to say, yeah, Brian, you know, the deal we made?  We

10     hugged, we bumped, we man bumped.

11           Wasn't that an opportunity for you to say,

12     Come on, Brian, you know the deal we made?  But you didn't

13     do it, did you?

14     A.    Not at that point in that conversation, no.

15     Q.    So Brian goes on to say, We -- we don't know where

16     this thing is going to end up.  I -- that's what I'm

17     going -- that's what I'm trying to explain to you.  We don't

18     know if there's going to be any money to bonus.  I mean, we

19     are completely under water right now.  How can I make a

20     commitment on a bonus when I can't even pay the bills?

21           I mean, I've got Bank of America forcing me

22     into bankruptcy over Skyline.  That's just one deal, you

23     know.  And I'm stuck in litigation with NAPICO, you know.

24     You've got all these other deals, you know, Aldine Bender

25     and, you know, all the tax issues that relate to the

1    exemptions on these deals.  All the, you know,

2    b-u-l-l-s-h-i-t with Charter Mac and now they're, you know,

3    harping about, you know, we don't have any money to resize

4    Heather Bend, you know.

5                        I mean, at the end of the day, you know, we

6    may be in a position where we have to file bankruptcy.  And

7    the only thing that we're going to have to hold onto, if we

8    can even hold onto it, is our house.  Which, we would

9    probably need to figure out a way to sell it or do something

10   just to pay lawyers to keep our freedom.  So how do you

11   memorialize what there is to memorialize?  And your response

12   is, Uh-huh.

13        A.    I listened.

14        Q.    That was another opportunity for you to say but,

15   Brian, we had a deal.  Wasn't it?

16        A.    Brian knew we had a deal.

17        Q.    No, that wasn't my question.  My question was that

18   was another opportunity for you to say but, Brian, you

19   remember on October 16th, 2006 --

20        A.    I did not -- I did not clearly state that.

21        Q.    And you didn't say it.

22                        And, Mr. Carpenter, you were the only one

23   who knew this conversation was being recorded, correct?

24        A.    That's true.

25        Q.    You were the only one who knew you were making a

1    record that was likely to turn up in a court somewhere down

2    the road.  And this was your opportunity to get it on the

3    record, but you didn't do it.

4         A.    I wanted to know why they lied to me about the

5    separation agreement.

6         Q.    You didn't ask that either, did you?  You didn't

7    ask that question, did you?

8         A.    I believe I did.

9         Q.    Well, you show me where you asked it.  But you

10   never asked Brian to confirm --

11        A.    The next sentence, sir.

12        Q.    There's no question.

13              You never asked Brian to confirm this

14   so-called oral agreement that you allege you made on October

15   16th, 2006, did you?  You didn't in this conversation?

16        A.    During this conversation --

17        Q.    All right.  So Brian says --

18        A.    -- implies --

19        Q.    -- well, I guess, you know -- okay, Brian says, I

20   mean, we're trying to dig ourselves out of this thing for

21   everybody's benefit.  But we're so upside down right now and

22   there's so many issues outstanding that we need to get

23   cleared up before we know where we stand; that there's no

24   way that you can put anything like that in writing.  It's

25   impossible.  If we could, we would, but we can't.

1          Then you say, But on the separation
2     agreement I'm supposed to waive everything?  Brian says,
3     I -- I don't know -- I don't even remember that -- I don't
4     even know what it is.  I mean, it's a...
5          And then you say, Well, I didn't either
6     until last night.
7          So neither one of you know what you're
8     talking about at this point?
9     A.    Not true.
10    Q.    Okay.  It says what it says, right?
11         Then Brian says, Well, I guess, you know,
12    Cheryl's been advised that, you know, when employees leave,
13    if they're getting something, you know, if they're getting
14    any severance, that it's something that they need to sign in
15    order to get it.  Okay?  It's a legal issue, you know.  And
16    it's been told to her by the lawyers that, you know, if
17    someone's leaving the company and they're getting a
18    severance that they need to sign it and it's typical.  And
19    if not -- and if it's not, you know, I don't know what else
20    to say.
21         So you say, All right.
22         All right.  Okay.  I agree.  You say, All
23    right.  Then Brian says --
24    A.    I understood what he said.  I didn't agree with
25    him.

1       Q.    I'm sorry.  Say it again.

2       A.    I said I understood what he said.  I did not agree

3    with it.

4       Q.    Okay.  So all right doesn't mean I agree.  It just

5    means --

6       A.    It was just something like, yeah, right, just like

7    I said.

8       Q.    It wasn't yeah, right.  It was all right.

9       A.    Same -- same thing.

10      Q.    Okay, same thing.

11      A.    It was acknowledgement of the BS.

12      Q.    It's like stay bonus means severance, right?

13      A.    Yes.

14      Q.    Pay to stay means severance?

15      A.    Pay to stay meant severance or retention.

16      Q.    Right.

17            And, by the way, nowhere in this secretly

18   recorded conversation, when you were the only one who knew

19   it was being recorded, did you use the term "pay to stay",

20   correct?

21      A.    I may not.  I don't recall.

22      Q.    And nowhere in this conversation on November 2nd,

23   2007, did you use the term "stay bonus", correct?

24      A.    When?

25      Q.    On November 2nd, 2007, the last day you were paid

1    by Southwest Housing Management, you didn't use either term,

2    "stay bonus" or "pay to stay", correct?

3         A.    No.  I used our agreement.

4         Q.    Because stay bonus and pay to stay were terms that

5    you made up during the course of this litigation --

6         A.    Not true.

7         Q.    -- to make it sound better.

8         A.    Not true.  Pay stay bonuses is very well published

9    in --

10        Q.    In where?

11        A.    You can Google it.  You can look it up.

12        Q.    No, I want to know where it's well published.

13   Name me one publication.

14        A.    Google it.  There's an article that says

15   pay-and-stay bonuses.

16        Q.    One publication that you can name --

17        A.    Entrepreneurial magazine.

18        Q.    All right, Entrepreneur magazine.  I'm going to

19   look at that.

20        A.    And I believe that's a short article that can be

21   understood.

22        Q.    Okay.  We'll go look.

23              Then Brian says, You know?  I mean, let's

24   see if we can turn some of this s-h-i-t around and make --

25              MR. POTASHNIK:  I'm sorry.

Appendix 1231

```
 1         Q.    (By Mr. L. Friedman) -- and make --
 2               MR. L. FRIEDMAN:  Clean it up, man.
 3         Q.    (By Mr. L. Friedman) -- and make some of these
 4    things go away so that, you know --
 5               MR. L. FRIEDMAN:  Stop saying you know.
 6               MR. POTASHNIK:  I know.
 7         Q.    (By Mr. L. Friedman) -- we can take care of
 8    Jeff Carpenter.  All right?
 9               And then you said speechless.  Or maybe you
10    were speechless.  I don't know.
11         A.    Correct.
12         Q.    Then Brian says, Wow.  All I can say is, is that
13    we're doing our best to try to dig ourselves out of this.
14    And until I get some clarity as to where we stand and the
15    fact that we're not going to get in a position of having to
16    bankrupt the company and ourselves personally and lose
17    everything, we'll be in a better position to, you and I,
18    have discussions about bonuses.  But right now, you know,
19    I -- it's not something that we can do if we had the money.
20               Is there anything about that last
21    sentence --
22               MR. L. FRIEDMAN:  Go back, please,
23    Mr. Page.
24         Q.    (By Mr. L. Friedman) Is there anything about that
25    last statement by Brian Potashnik that you weren't clear
```

1   about?  See where it says, "I mean"?

2               MR. L. FRIEDMAN:  Yeah, right there.

3        Q.   (By Mr. L. Friedman) Anything about that?

4        A.   I'm sorry.  I don't know where you're looking at.

5        Q.   I don't think that was the last sentence.

6               MR. L. FRIEDMAN:  More on the bottom.  Next

7   page.  "I mean".  See where it says, "I mean"?

8        Q.   (By Mr. L. Friedman) Yeah.  It's impossible.  If

9   we could, we would, but we can't.

10               All right, let's move on to the next one.

11        A.   That wasn't what we were just looking at.

12        Q.   I don't think that was the last one.

13        A.   That wasn't what we were just looking at.  It's

14   the BP there.

15        Q.   Which one?

16        A.   One of them.  I can't see it that far.

17               MR. L. FRIEDMAN:  You just get confused by

18   all the dirty words?

19        Q.   (By Mr. L. Friedman) So Mr. Potashnik says, But

20   right now, you know, it's not something that we can do.

21   It's just not something that we can do if we had the money.

22               All right.  And then you said, Well, I --

23   you know, I certainly understand.

24               You understood.  You agreed with him.

25        A.   I understood the money -- the challenges in the

1    money situation at that time.

2         Q.    Yeah, but what you didn't say was, Brian, that's

3    not acceptable.   I want you -- I am holding you to this

4    so-called, alleged, oral agreement we made on October 16th,

5    2006, and I want you to confirm our agreement.   You didn't

6    say that, did you?

7         A.    No, I didn't.

8         Q.    You didn't say you owe me -- we had a -- you

9    didn't say we had a second oral agreement as to unpaid

10   bonuses.   Remember you testified about that yesterday?

11        A.    Yes, sir.

12        Q.    You didn't say that either.   You didn't say you

13   owe me unpaid bonuses.

14        A.    That's what the topic was about.

15        Q.    Okay.   When was that second oral agreement about

16   unpaid bonuses?   Remember you testified about that

17   yesterday?

18        A.    Yes.   It was after the March 14th and Aprilish

19   time frame, I believe.

20        Q.    Remember you testified yesterday that the bonuses

21   you were seeking were not pursuant to --

22              MR. L. FRIEDMAN:   Did I have a black one?

23        Q.    (By Mr. L. Friedman) -- were not pursuant to your

24   employment contract but they were pursuant to a separate

25   alleged -- second oral agreement you had with Mr. Potashnik?

1    You remember that?

2        A.    Yes, sir.

3        Q.    Okay, so second oral agreement.  And what do you

4    call these bonuses that the second oral agreement is about?

5        A.    Earned, unpaid, annual bonuses.

6        Q.    Earned, unpaid, annual bonuses.  And not for 2004

7    to 2005, correct?

8        A.    Correct.

9        Q.    So we're just talking about 2005 to '6, right?

10       A.    Yes.

11       Q.    2006 to '7?

12       A.    Yes.

13       Q.    And 10 months of 2007?

14       A.    At -- at that point we --

15       Q.    No, you cut off in March.  So it would be April,

16    May, June, July, August, September, October, November.

17    Eight months in 2007?

18       A.    Right.

19       Q.    Okay.  So tell me the date of this alleged oral

20    agreement.

21       A.    Prior to -- it was during the period of March,

22    April time frame.

23       Q.    What year is that?

24       A.    Of '07.

25       Q.    Do you remember the exact date?  Without looking

1    at the script, do you remember the exact date?

2         A.    I don't have it.

3         Q.    What happened to that script?

4         A.    What's that?

5         Q.    What happened to the script?

6         A.    It's here but I'm not looking at it.

7         Q.    Okay.

8                    March, April '07 --

9         A.    On the March 13th notes, Brian -- from Brian's

10   mouth --

11        Q.    No, my only question is, Do you remember the date

12   that you allegedly made this alleged second oral agreement

13   about the earned, unpaid, annual bonuses?

14        A.    Prior to March 14th.

15        Q.    Can I cross out April?

16        A.    Yes.

17        Q.    And I'm going to put prior.  That little mark

18   means prior.  Okay.

19        A.    That's fine.

20        Q.    You good with it?

21                    Prior to March 14th.  But you don't

22   remember the date?

23        A.    It was from discussions prior to March 14th

24   because it was included in the March 14th notice.

25        Q.    Okay.

1              Do you remember who you made the oral

2    agreement with?

3         A.   Brian Potashnik.

4         Q.   Okay.  Do you remember where you made it?

5         A.   That particular discussion --

6         Q.   Was it one place or ten places or one discussion

7    or ninety discussions?

8         A.   It was previous discussions but it was one

9    discussion where it was laid out, and it was actually during

10   a drive while we were -- Brian was venting or needed to get

11   out of the office and we took a drive together.

12        Q.   And you drove from where to where?  From where to

13   where?

14        A.   We drove by one or two of the properties and we --

15   Brian stopped to get a pack of cigarettes.

16        Q.   Okay.  Drove from the office to which property,

17   sir?

18        A.   Let's see.  I think we went by -- it was out west.

19   I think we went by Ash Creek, I believe.  I'm not a hundred

20   percent sure.

21        Q.   Anywhere else?

22        A.   I believe possibly Scyene.

23        Q.   I'm sorry.  Say the next one.

24        A.   Scyene.

25        Q.   You have to spell that for me.

```
1          A.    S-y-c-e-n --

2          Q.    S-y.

3          A.    c-e-n-e.

4          Q.    c-e?

5          A.    c.

6          Q.    e.

7          A.    e-n-e.

8          Q.    n-e.

9                      Anywhere else?

10         A.    Possibly, but those are the two that I recall.

11         Q.    The third one?

12         A.    As I mentioned, I'm not sure.  Those two I recall.

13         Q.    Okay.  Maybe a third?

14         A.    Possibly.

15         Q.    Your car or Brian's car?

16         A.    Brian's Suburban.

17         Q.    Okay.

18                      And what are the words that Brian used that

19    you believe indicated his consent to any bonuses?

20         A.    That we -- that we owe you earned -- we owe you

21    bonuses.  You've earned them.  We can pay your bone -- some

22    bonus monies as developer fees come in as well as monies

23    from the land sale in McKinney, the sale of Fairway, and

24    also from Las Vegas.

25         Q.    And how much money did Brian agree to in that car
```

1    ride?

2            A.    Four hundred thousand dollars.  And that's what I

3    used as a claim.

4            Q.    400,000?

5            A.    Yes.

6            Q.    Okay.

7            A.    Less than what I proposed.

8            Q.    Four hundred thousand agreed, and you said yes?

9            A.    Yes.

10           Q.    Oral agreement, correct?

11           A.    Is that a question?

12           Q.    Yeah.  Was it an --

13           A.    Yes.

14           Q.    -- oral agreement?

15           A.    Yes.

16           Q.    Never written down, never signed by you and Brian?

17           A.    Correct.

18           Q.    And it was clear to you at that time, right?

19           A.    Yes.

20                 Probably 95 percent of all discussions were

21    oral.

22           Q.    I'm sorry.  Say it again.

23           A.    I said probably 95 percent of all of our

24    discussions, if not 98 percent of all of our discussions,

25    were in an oral fashion.

Appendix 1239

34

1          Q.     The discussions were orally.   Can I write that
2     down?
3          A.     As well as agreement.
4          Q.     Mr. Carpenter, from the time you made this alleged
5     second oral agreement, which is before March 14, 2007, for
6     $400,000 -- 2007, right?
7          A.     Yes.
8          Q.     -- did you ever ask or request in this legal
9     proceeding more than $400,000 in bonuses?
10         A.     In -- yes, in my --
11         Q.     I'll accept a yes.
12         A.     Yes.
13         Q.     Isn't it true, sir, that after you claim you made
14     this alleged oral agreement -- and by oral agreement you
15     mean meeting of the minds, correct?
16         A.     Yes.
17         Q.     You were clear that you asked for $400,000 in
18     earned, unpaid, annual bonus and you were clear that
19     Brian Potashnik said, yes, I agree to pay you 400,000 annual
20     bonus?
21         A.     Yes.
22         Q.     And even though you were clear that you had a
23     solid agreement for $400,000 annual bonus, after March 14th
24     or after -- before March 14th, 2007, you made claim in this
25     case for more than $400,000; isn't that correct?

1        A.    Yes.   As time extended, yes.

2        Q.    How much more did you claim for in this lawsuit

3   based on this oral agreement?

4        A.    Well, I never actually claimed.   I suggested for

5   discussion 600,000.

6        Q.    Okay.   Here's my question.   You testified

7   yesterday you had no contract claim, right?   Do remember

8   that testimony?

9              (No verbal response)

10             You testified yesterday you had no claim

11   for bonuses under your employment agreement.   You confirmed

12   that 30 minutes ago.   Do you remember that testimony?

13       A.    Yes.

14       Q.    Okay.   You testified yesterday and just confirmed

15   it that the basis of your claim for a bonus is this second

16   oral agreement, right?

17       A.    Yes.

18       Q.    So you're trying to recover $400,000 that you

19   claim was agreed to, correct?

20       A.    Yes.

21       Q.    That doesn't include the bonus for 2004, 2005,

22   which we've now uncovered that you've been paid for.

23       A.    Right.

24       Q.    But you originally claimed the $50,000 bonus for

25   2004, 2005, in this lawsuit?

1          A.    I'm sorry.   Repeat that.

2          Q.    When you filed this lawsuit in 2008, you were

3    claiming the $50,000 alleged bonus for the 2004, 2005.

4          A.    But we cleared up that --

5          Q.    No, I cleared it up.   I cleared it up.

6          A.    We cleared it up.

7                    MS. GIBSON:   Object to arguing with the

8    witness.

9                    THE COURT:   Sustained.

10                    THE WITNESS:   That was the bonus.

11          Q.    (By Mr. L. Friedman) Okay.   So you're not claiming

12    the $50,000 anymore?

13          A.    That's what we decided on previously, yes.

14          Q.    So now -- now we're looking at the rest of it, and

15    it's based on this $400,000 agreement.

16          A.    However, as of March, I stay through November.

17    There is that gap.

18          Q.    Sir --

19          A.    But as of March that was the --

20          Q.    Okay.   So you added $200,000 for the next eight

21    months?

22          A.    No.   I --

23          Q.    Go ahead.

24          A.    As I said previously, I submitted a proposal to

25    sit down to discuss performance, to discuss unpaid bonuses,

1  as well as any increase in salary.  And I gave a sheet and I

2  was using $200,000.  Actually, I was using 80 percent of

3  $200,000, as well as 200,000.

4       Q.   Sir, in this lawsuit you have claimed various

5  numbers as an earned, unpaid, annual bonus.  Isn't that

6  true?

7       A.   Yes.  I tried to renego -- or basically was

8  renegotiating.

9       Q.   Yeah.  You tried to --

10      A.   Since there was --

11      Q.   -- renegotiate.

12      A.   -- since my time was greatly expended.

13      Q.   Yeah.

14                And you've claimed 650,000 at one point,

15  correct?

16      A.   I don't believe so.

17      Q.   You claimed 600,000 at one point, correct?

18      A.   I believe so.

19      Q.   What other numbers have you claimed in this

20  lawsuit for these unearned, unpaid, annual bonus?

21      A.   I don't have that calculation --

22      Q.   But you've claimed other numbers?

23      A.   -- from -- it would be less than that.

24      Q.   Okay.  Can I put down other numbers?

25      A.   Less than that.

1        Q.    Okay, other numbers less?

2        A.    Less, yes.

3        Q.    Other amounts less, correct?

4        A.    Yes.

5        Q.    Less than 600-.  Okay.

6                Let's go back to finish this.  After you

7 said I certainly understand, Brian says, you know, it's not

8 like we don't want to do it.

9        A.    My apologies.  Where are we?

10       Q.    I'm sorry.  Right here on the bottom.

11               I stole Mr. Page's pointer last night.  I

12 realized it when I got home.

13       A.    Okay.

14       Q.    It says, You know, it's not like we don't want to

15 do it.  And even if we did want to do it, we don't have it.

16 Secondly, you know, this is not a situation that anybody's

17 ever expected would happen or that we would -- that we would

18 be in right now.  And you're just going to have to, you

19 know, trust us that when or if things get to the point where

20 they turn out positive for us that, you know, at that point

21 in time we'll bonus out based on, you know, I don't know,

22 whatever, whatever's left over.  I don't know what that is,

23 you know, not with what's going on right now.

24               You knew from that comment again that

25 Brian Potashnik was not going to commit to pay you any money

1    other than the six weeks' severance that you were paid

2    pursuant to your employment agreement, correct?

3         A.    He was breaching our oral agreement.

4                   MR. L. FRIEDMAN:  I'm going to object to

5    that as being unresponsive.

6                   THE COURT:  Answer only the question

7    Mr. Friedman's asking.

8         Q.    (By Mr. L. Friedman) Yeah, based on

9    Mr. Potashnik's statement in this secretly recorded

10   telephone conversation, you knew he wasn't going to make a

11   commitment to pay you anymore money than the six weeks you

12   were supposed to be paid pursuant to your employment

13   agreement with Southwest Housing Management, correct?

14        A.    At that time.

15        Q.    And the $150,000 severance that you were offered,

16   correct?

17        A.    That came later.  This was November 2nd.

18        Q.    Okay, at that time.  Let's move on.

19        A.    At that particular time.

20        Q.    Anything else on this transcript that -- then

21   after another um, you [sic] say, A few weeks ago you came

22   here and told me that you would take -- this is Brian -- A

23   few weeks ago, you came here and told me that you've taken

24   another job.

25                   This is November 2nd, 2007.

1          Okay.  That you were going to work for a
2   American Housing.  Okay.  And at that point in time I told
3   you that whether you went to work for them or not or whoever
4   it was that you went to work for that if things out tracked,
5   if things turned out where we end up with something, okay.
6   But it's not a good situation right now and it's not a
7   situation where it can even be put in writing.  I mean, it's
8   impossible, you know.
9          Mr. Carpenter, when you told Brian
10  Potashnik prior to the time you were terminated by
11  American -- by Southwest Housing Management -- when you told
12  Brian Potashnik that you had been offered a job by American
13  Housing, Brian Potashnik told you to take the job, didn't
14  he?
15     A.    Yes, he did, on October 12th.
16     Q.    On October 12th, 2007, before the management
17  transition on October 31st, before any closing, you told
18  Brian Potashnik that you had another job with American
19  Housing.  And he said take the job, correct?
20     A.    Correct.
21     Q.    So if you were so essential to the closing of the
22  transaction and if you were so essential to the transition
23  of management and this deal couldn't get done without your
24  presence, why would Mr. Potashnik say take the job?
25     A.    Because I pretty much had -- had resolved and

1    taken care of most of the duties that needed to be done.

2    And Brian was not into the details; Cheryl was.   And I spoke

3    with Cheryl and Cheryl asked me to stay through until the

4    transition.

5            Q.    Till the management transition?

6            A.    Till the management transition, based on the

7    consulting asset management agreement with Pinnacle, which

8    began --

9            Q.    Well, she asked you --

10           A.    -- on November 1st.

11           Q.    -- she asked you to stay another two weeks?

12           A.    Yes.

13           Q.    Now, when you say management transition, let's

14   make that clear.   On October 31st, 2007, what you say is a

15   management transition was simply the signing of a management

16   transition agreement; isn't that true?

17           A.    No, sir.   That was -- that was the time that all

18   of the Southwest Housing corporate employees and perhaps the

19   site employees -- I don't recall -- were converting to

20   Pinnacle, leaving Southwest Housing company and becoming

21   employees or at least under the direction of Pinnacle

22   management.

23           Q.    The truth of the matter is, Mr. Carpenter, on

24   October 31st, 2007, number one, there was no mass exodus?

25           A.    Thank you.

1        Q.    Correct?

2        A.    Yes.

3        Q.    Number two, there was no change in management.

4   All the employees that had been at Southwest Housing stayed

5   at Southwest Housing.

6        A.    The stay-and-pay bonus program worked, yes.

7        Q.    The stay-and-pay program that you conjured up four

8   years later worked?

9        A.    No.  That you discussed with Brian the day that --

10       Q.    Okay, good.

11       A.    -- that I tried to renegotiate a five percent.

12       Q.    No new employees showed up for work on November

13   1st?

14       A.    Not for Southwest Housing.

15       Q.    Your presence wasn't essential on November 1st or

16   October 1st or September 1st; isn't that true?

17       A.    I would call that BS.  No, sir.

18       Q.    Okay.

19             Okay.  Let's go on.  Conversation, now

20   we're up to Cheryl.  Do you remember secretly recording a

21   conversation with Cheryl?

22       A.    Yes.

23       Q.    And you did that because, obviously, you didn't

24   get what you wanted from your secretly recorded conversation

25   with Brian?

1          A.    No, sir.

2          Q.    Right?

3          A.    No, sir.

4          Q.    Well, Mr. Carpenter, if you had gotten everything

5     you wanted from your secretly recorded conversation with

6     Brian, you wouldn't have needed to secretly record a

7     conversation with Cheryl; isn't that correct?

8          A.    Perhaps, Michael --

9          Q.    Mr. Carpenter, just my questions.

10          A.    I can't answer that.

11          Q.    All right.  So you say -- okay, you say, You

12     ready?  Forty-nine today.

13                    See it?

14          A.    Yes.

15          Q.    And then Cheryl says, You are?  And you say, Yep.

16     Cheryl says, Happy birthday.

17                    And then you say, Well, it says here

18     it waives all those rights.  And Cheryl says, Well, Jeff,

19     you don't currently have any rights.

20                    Now, at that time you were referring to the

21     severance agreement that was delivered to you by Southwest

22     Housing Management, correct?

23          A.    Yes.

24          Q.    And that was the one you refused to sign?

25          A.    Yes.

44

1          Q.    Cheryl says, Well, Jeff, you don't have any

2    rights.   And, Jeff, you said, Okay.   Cheryl says, You don't

3    have any rights.   You confirmed that again.   You said, Okay.

4                        Am I reading that wrong?

5          A.    Only an admission that I hear what she's saying,

6    not that I agree with it.

7          Q.    Did I misread that?

8          A.    Just what I said.   No, you didn't misread it, but

9    okay doesn't mean that I'm agreeing with it.   It just means

10   I heard her.

11         Q.    But okay means okay.   You'll acknowledge that?

12         A.    No.   Okay means that I heard what she said.

13         Q.    Okay, but that's not what you said.   You just said

14   okay.

15         A.    I heard what she said and acknowledged that I

16   heard what she said.

17         Q.    Okay.   But you'll admit that's not what you said.

18         A.    I wasn't looking for an argument.

19         Q.    But you were the only one who knew this was a

20   secret recording?

21         A.    Yes.

22         Q.    So you could have said what you're thinking or

23   what you meant or even said something to set up

24   Mrs. Potashnik, which you were trying to do, right?

25         A.    No, I wasn't trying to do that nor was that -- nor

1    was that ever my intention.

2         Q.    You were trying to set her up.   That's why you

3    secretly recorded the conversation.

4         A.    I wanted to know why, with the two oral agreements

5    and even the written agreement and the promises that were

6    given, why I was sent a separation agreement that nullified

7    all of that.

8         Q.    But you never asked that --

9         A.    And --

10        Q.    You never asked that question.

11        A.    I did prior -- I did prior to this conversation.

12        Q.    You just -- you just forgot to record that

13   conversation.

14        A.    I was listening more than talking.   I was -- I was

15   hurt, I was angry --

16        Q.    All this is nonresponsive.

17        A.    -- I was betrayed.

18        Q.    All this is nonresponsive.

19              So let me get it straight.   You had already

20   asked the question and knew the answer to the question you

21   wanted to know the answer to, but then you secretly recorded

22   Mrs. Potashnik so you could get the answer again on tape,

23   correct?  Yes or no?

24        A.    No.

25        Q.    You just said you'd already asked the question and

1    gotten the answer.  Do you want to change that testimony?

2        A.   I wanted to know why I was getting the

3    separation --

4        Q.   The only question is, Do you want to change that

5    testimony?

6        A.   Which -- I'm sorry.  What testimony?

7        Q.   You just said --

8               THE COURT:  (Inaudible).

9               MR. L. FRIEDMAN:  Pardon me?

10            THE COURT:  You're going in a circle.  You

11    have to keep on going.

12            MR. L. FRIEDMAN:  I'm trying to get a

13    straight answer.

14        Q.   (By Mr. L. Friedman) All right, let's move on.

15            You said, Okay.  You don't have any rights.

16    You said okay again.

17            MR. L. FRIEDAM:  Let's move this -- can we

18    move this higher, Steve?

19        Q.   (By Mr. L. Friedman) You have conversations that

20    we've had, says Cheryl.  You have intentions that we've had.

21    You have what we intend to do and what we want to do.  You

22    don't have any rights.  That's about your employment and the

23    rights that you had under your employment agreement and that

24    type of thing.

25            You understood she was referring to the

47

1   severance agreement, correct?

2       A.   Yes.

3       Q.   Then it says -- Ms. Potashnik says, It's a legal

4   document.  It's not saying, Jeff, you give up any hope of

5   ever getting anything.  It's a legal document.  It's what

6   you have rights to.  And if you think you have other rights,

7   then you shouldn't sign the document.

8                    Okay?  So --

9       A.   No, sir, if you're asking a question.

10      Q.   Well, no.  My question is you understood that

11  Ms. Potashnik said you have legal rights under your

12  employment agreement and legal rights under the severance

13  agreement, and after that it was up to the discretion of the

14  Potashniks as to whether or not you would ever get anymore

15  money.

16      A.   Those documents differed from the oral agreements

17  I had and took away my rights.

18      Q.   The document, the severance agreement that you

19  were handed, differed from discussions you had with the

20  Potashniks and, as you say, negotiations you've had with the

21  Potashniks, right?  Right?

22      A.   Early on in negotiation, yes.

23      Q.   Yeah, 'cause you continued to negotiate with the

24  Potashniks.  You were always negotiating with the

25  Potashniks, right?

1          A.    Does not change the oral agreement.

2          Q.    But you were always negotiating with the

3     Potashniks?

4          A.    No.  They were always putting me off in time for

5     me to do the job that they asked me to do.  And I had

6     completed the job and now they're telling me that thank

7     you --

8          Q.    I'm going to object to all that as being

9     nonresponsive.  Your lawyer will get a chance to ask about

10    all this.

11               You continued to negotiate and have

12    discussions about this subject matter with the Potashniks

13    about the bonus, about the three-percent bonus, about the

14    earned -- unearned, employment-agreement bonus.  You kept

15    discussing it and renegotiating it with the Potashniks.

16         A.    We discussed it.

17         Q.    Thank you.

18               Then you say, yeah, it does -- let's go on

19    Page 2.

20               Then after an uh-huh, Cheryl says, Uh, and

21    we can go through that.  We can definitely do that but, you

22    know, what my proposal to you today was going to be is that

23    what I can build into that agreement for you after the --

24    and your transcriber couldn't pick that word up -- of your

25    employment so you have something to have as, um, an

49

1    agreement to pay in addition to the 20-, the one-month

2    severance, and your PTO, paid time off bank, and all that

3    stuff.  You say, Uh-huh.  To pay three years of bonus, the

4    minimum bonus, even though I -- I'm not having to.

5                    I'm not -- I'm not saying that there was a

6    minimum bonus, but the original employment agreement talked

7    about $50,000.  So to build into your agreement -- uh-huh --

8    the leader of the sale employment at the end of the year and

9    you would be guaranteed 150,000 pursuant to that agreement.

10   And you say, Uh-huh.

11                   You understood Ms. Potashnik was offering

12   you $150,000 severance at that time, correct?

13        A.   In lieu of our other agreement.

14        Q.   Didn't say that.  You understood she was offering

15   you $150,000 at that time?

16        A.   And that's it.

17        Q.   Correct?

18        A.   And that was it.

19        Q.   And then you say, Uh-huh.  And then she says, And

20   then there's something you would have a legal right to have.

21                   Meaning the 150,000, correct?

22        A.   I believe so.

23        Q.   And she says, And then, you know, like I've told

24   you before when we were on the phone with Keith --

25                   Meaning Keith Jones, correct?

50

```
1        A.   Yes.

2        Q.   The man you called to testify here, correct?

3        A.   Yes.

4        Q.   -- I've got to be able to see some preliminary on

5   how this deal is going to shake out before I can start

6   making commitments and go above and beyond that because I

7   need to make sure that when all is said and done and

8   it shakes out and everybody else gets paid, that Brian and I

9   have money, a certain amount of money that we can put

10  towards our defense.

11              So let's stop there for a minute.

12              So, first of all, after Ms. Potashnik was

13  willing or offered to guarantee you $150,000 in your

14  severance agreement, that wasn't it.  She said, And then you

15  might get more.  Isn't that what she was saying here?

16       A.   That's not what the -- she --

17       Q.   Isn't --

18       A.   Provided by the written document agreement.  I

19  don't believe she believed in oral agreements at that time.

20  I'm not sure.  However --

21       Q.   Sir, sir --

22       A.   -- they were trying to get me to settle for

23  $150,000.

24       Q.   Sir, all I'm saying is, isn't what she's saying

25  here let me see how this shakes out and then you can get
```

51

1    more?  The door wasn't closed by Mrs. Potashnik, correct?

2         A.    Nor was it closed by Brian.

3         Q.    Okay.

4               Then you said, Right.

5               MR. L. FRIEDMAN:  Next.  Let's go next.

6         Q.    (By Mr. L. Friedman) Cheryl says, And until I know

7    that I have that, I'm not making anymore commitments.

8               So understood by the time of this

9    conversation November 2nd, 2007, that both Brian and Cheryl

10   were not going to make any commitments beyond the $150,000

11   that they had offered you, correct?

12        A.    We have already had a commitment prior to.

13        Q.    Sir, my only question is that it was clear to you

14   from both of the conversations you secretly recorded neither

15   Brian or Cheryl was not going to make anymore commitments

16   other than the living up to the terms of the employment

17   agreement and then offering you $150,000 severance.  That

18   was clear to you on November 2nd, 2007?

19        A.    Yes.

20        Q.    Then Cheryl -- then you said, Right.  And then

21   Cheryl said, But you have to understand there's investment

22   banker fees, there's transfer fees on the debt, there's

23   legal fees, there's resized escrow costs, you know, Skyline

24   alone, Bank of America asking for 3 million.  Phamer --

25               Is that Phamer?

1          A.     Parmer.

2                      MS.  POTASHNIK:   It should be Parmer.

3          Q.     (By Mr. L. Friedman) Palmer.   Parmer or Palmer,  a

4     big part of the million dollars when we close.   You then

5     say --

6                      MR. L. FRIEDMAN:   Let's go to the next one.

7          Q.     (By Mr. L. Friedman) You say, Uh-huh.

8                      And then in the next conversation Cheryl

9     says, And the last thing I want to do is make you

10     commitments that can't be kept because then you and I are

11     going to get sideways, and I don't want do that.   I don't

12     want -- "(inaudible)".   But if your intention is to do that,

13     let's do that now.   Then, you know, we should just stop

14     talking and you should do it.   But I really want to work

15     with you and make sure you're taken care of, but it's not

16     going to be -- there's no point in making promises I can't

17     keep and then we end up sideways with each other.

18                      When Ms. Potashnik said that, you

19     understood she wasn't going to make you a commitment to pay

20     you anything more than the 150-, correct?

21          A.     Yes.

22          Q.     You understand that she wanted to see how the

23     money shook out at the -- when the deal closed?

24          A.     Yes.

25          Q.     And you wanted -- and you knew that she wanted to

53

```
1      leave the door open to pay you more money on the
2      discretionary basis when the deal closed?
3           A.   So they say.
4           Q.   And that want wasn't acceptable to you?
5           A.   Well, considering I've been lied to many times --
6           Q.   And you lied to them.
7           A.   No, sir.
8           Q.   And you lied to them.
9           A.   No, sir.
10          Q.   So my only question is that wasn't acceptable to
11     you?
12          A.   It was not acceptable.
13          Q.   Okay.
14               So then you say, Yeah, yeah, I understand.
15     Just the way this reads doesn't cover it.
16               Meaning the severance agreement, right?
17          A.   Right.
18          Q.   Cheryl says, That -- that doesn't cover anything
19     having to do with the sale because you don't have any rights
20     under the sale.  You have rights under your employment
21     agreement.  You then say, Uh-huh.
22               What you didn't say is, But, Cheryl, even
23     though I never made an agreement with you, you know I have
24     two oral agreements with Brian.  I've got one for
25     three-percent proceeds bonus and I've got a second oral
```

Appendix 1259

1    agreement made before March 14th, 2007, for an earned,

2    unpaid, annual bonus.  You never said that in this

3    conversation at all with Cheryl?

4         A.   No, I did not.

5         Q.   But you could have?

6         A.   I could have.

7         Q.   And could have made a record of it?

8         A.   Yeah.  As you can see, I didn't speak much --

9         Q.   Had you had that deal with Cheryl, you could have

10   got her on tape agreeing to it, right?

11        A.   I wasn't trying to entrap anybody.  I was trying

12   to listen about the separation agreement; that both parties

13   knew of the agreement.

14        Q.   You weren't?  I'm sorry.  You were secretly

15   recording Brian and Cheryl Potashnik on tape but you weren't

16   trying to entrap anybody.  Is that your statement?

17        A.   I wanted to know why they sent me the separation

18   agreement.

19        Q.   No, no.  Is that your statement?

20        A.   I wanted to know why they sent me the separation

21   agreement.

22        Q.   Okay.  Even though you had already asked the

23   question before and you had already gotten the answer

24   before; which was your earlier testimony today, correct?

25        A.   I'm not exactly sure what you just said.

1      Q.    Are you sure what you said today?

2      A.    Yes.

3      Q.    All right.  Then you said, Yeah, I understand

4   that.  Just the way this reads doesn't cover that.  Cheryl

5   says, That -- that doesn't cover anything having to do with

6   the sale because you don't have any rights under the sale.

7   You have rights under your employment agreement.  You said,

8   Uh-huh.  Cheryl says, And I have obligations as your

9   employer.

10                 MR. L. FRIEDMAN:  Let's go forward.

11     Q.    (By Mr. L. Friedman) Cheryl says, You know,

12   it looked one way July 15th or June 15th, whichever.  I

13   don't remember the exact time frame.  But, you know,

14   anticipating another six months of overhead and all the

15   obligations that go along with them, you know, it really

16   starts to eat away at what's going to be left.

17                 You knew that Cheryl was focused on the

18   end, what was going to be left when the deal closed?

19     A.    Yes, as well as I.

20     Q.    I'll take yes.

21                 MR. L. FRIEDMAN:  Let's go further.

22     Q.    (By Mr. L. Friedman) You say, Uh-huh.  And then

23   Cheryl says, And, uh, so I mean that the, uh -- the lack of

24   putting things in writing up to this point has just been not

25   knowing what to put in a way that works for everybody.  And

1   I haven't been able to, you know, figure out -- figure

2   it out to a point where I'm not afraid that we're leaving

3   ourselves short.  And that's why, if I can start to see, I

4   can type up a closing statement and how the bottom line is

5   going to look.

6                  I can -- "(inaudible)".  I mean, I want to

7   see it.  If it's a negative at the bottom where we actually

8   have to owe them, you know.  And then you say, No, I

9   understand that portion of it.

10                  What you didn't say, sir, is regardless of

11  the deal closing, you still owe me my unearned --

12                  MR. L. FRIEDMAN:  Sorry, David.

13        Q.    (By Mr. L. Friedman) -- unpaid annual bonus,

14  right?

15        A.    Right.

16        Q.    You didn't stand up for your unearned second oral

17  agreement, right?

18        A.    No, I did not in that discussion.

19        Q.    All right, let's move on.

20        A.    I was in shock.

21        Q.    I'm in shock myself.

22        A.    Good.  Both of us are.

23        Q.    If you -- then Cheryl says, If you want to mark

24  up -- If you want to mark that agreement up -- you say,

25  Uh-huh -- Cheryl says, I'll look at it, you know, but that's

```
 1    our standard agreement.
 2              MR. L. FRIEDMAN:  Let's go ahead.
 3         Q.   (By Mr. L. Friedman) And Cheryl says, Things
 4    haven't been good around here for a long time.  And you say,
 5    Oh, we had money coming.  We had some money coming.  We
 6    closed a lot of deals.  And Cheryl says, But, Jeff, you
 7    don't understand that that doesn't mean that things are
 8    good.  That just means that there's money coming in.  That
 9    doesn't mean that the money coming in is enough to cover the
10    money that's due out.  I mean --
11              And then you say, Well.  Cheryl says, In
12    2005 or back in 2004 when we -- Deepak and the allotment
13    group was working to get those pre-allotment loans and all
14    those deals, I mean, it looked like with those
15    predevelopment loans we wouldn't have a problem then.  You
16    said, Uh-huh.
17              MR. L. FRIEDMAN:  Let's move forward.
18         Q.   (By Mr. L. Friedman) You know the name of a real
19    estate -- I'm sorry.  You know the nature of -- of real
20    estate --
21              MR. L. FRIEDMAN:  I work alone.
22         Q.   (By Mr. L. Friedman) You know the nature of -- of
23    real estate and the allotment business is that you never
24    have any cash.  It's a very illiquid.
25              You know, I regret some of the decisions
```

```
1    that we made and deals that we did and things like that, but
2    I don't think you can really appreciate how much money has
3    been --
4              And then you say, Well, I've been doing
5    this --
6              Cheryl says, -- lost.
7              So you understood at that time that
8    management wasn't flush with money.  Isn't that true, sir?
9         A.   Management was never going to be flush with money
10   the way --
11        Q.   Thank you.  I'll take that answer.
12        A.   -- the way it was --
13        Q.   I'll take that answer.
14             MR. L. FRIEDMAN:  The rest of it's
15   unresponsive, Judge.
16        Q.   (By Mr. L. Friedman) Then you say, Well.  So, you
17   know, under -- I understand the -- the floating, uh,
18   barometer with the sale and all of that and the percentage
19   of everything.  I would like to have a more firmer
20   commitment, you know, on those three years, which I think is
21   very reasonable.
22             Now, you say want a more firmer commitment
23   on those three years.  What three years were you referring
24   to, sir?
25        A.   '5, '6, '7.
```

59

1      Q.    2005, 2006.   2006 to 2007, and the eight months of

2      2007?

3      A.    Yes.

4      Q.    Two-and-a-half years?

5      A.    Yes.

6      Q.    Now, if you had this alleged second oral

7      agreement, wouldn't that have been the time to say, But,

8      Cheryl, Brian and I have an oral agreement that we made

9      prior to March 14th, 2007?  I want you and Brian to live up

10     to that commitment.  Wasn't that the time to say it, sir?

11     A.    That would have been another time for me to say

12     it.

13     Q.    But, instead, you said -- you didn't say I have an

14     agreement.  You said I would like to have a more firmer

15     commitment.  That's what you said, right?

16     A.    Yes.  We just met the other day and discussed it

17     in more detail.

18     Q.    Sir, my question was only you wanted a more firmer

19     commitment.

20           MR. L. FRIEDMAN:  Everything after that is

21     nonresponsive, Your Honor.

22     Q.    (By Mr. L. Friedman) Cheryl said in response to

23     your question for a more firmer commitment, Well, and like I

24     said, I'd be willing to give you a minimum guarantee of the

25     baseline fixed rate, which is 150,000.  Beyond that, I'm not

Appendix 1265

1    going to, today, put anything in writing.  I can't.  And

2    then you say, But if things improve, it could -- would be

3    considered on the back end.

4                    You're asking Cheryl to consider paying you

5    more money on the back end; isn't that correct?

6        A.    As she already --

7        Q.    Sir --

8        A.    -- insinuated --

9        Q.    Sir, sir, isn't it correct you're asking her to

10   consider paying you more money on the back end?

11       A.    Yes, as stated previously.

12       Q.    When you were the only one who knew there was

13   going to be a record of whatever deal you thought you had,

14   you're asking her to consider at her discretion paying you

15   more money on the back end.  Consider, right?

16       A.    No.  To honor the oral agreements.

17       Q.    Did I miss that?  Is that in this conversation?

18       A.    You just asked the question and I --

19       Q.    You're asking her to consider at her discretion

20   whether or not to pay you, whether to pay more money at the

21   back end?

22       A.    Those were her words, previous.

23       Q.    No, those were your words, sir.

24       A.    Those were her words previously on this screen

25   that we discussed a minute ago.

1      Q.   Let me see.

2                What you didn't say was I'd like you to

3      honor your commitment, right?

4      A.   I did not say to honor the oral agreements,

5      correct.

6      Q.   With Brian.  With Brian?

7      A.   With Brian.

8      Q.   And confirming your testimony yesterday -- well,

9      first, you didn't remember it and then you saw it in your

10     deposition -- you never had any agreement with Cheryl

11     Potashnik.  You never made any agreement with Cheryl

12     Potashnik.  That's what you testified to yesterday.

13     A.   I said she knew of the agreement.

14     Q.   Okay, she knew of it, but you never had any

15     agreement with Cheryl Potashnik --

16     A.   Correct.

17     Q.   -- correct?  Correct?

18     A.   Correct.

19     Q.   All right.  So she was willing to give you a

20     guarantee of 150,000.  Beyond that, she was not going to put

21     anything in writing.  But that was not acceptable to you?

22     A.   No, sir.

23     Q.   Okay.  Let's go on.  Let's try to finish this.

24                Whatever.  I'm not going to -- I'm not

25     going to b-u-l-l-s-h-i-t you, Jeff.  I've told you.  I'm not

```
 1    going to.  You can come and look at whatever you want to
 2    look at.  If you want to see Brian and my savings account
 3    and every transaction we've had since then to keep this
 4    company afloat, you can see it.  I'm peeved.  I'm not
 5    b-u-l-l-s-h-i-t-t-i-n-g you.  And then you say, I -- I
 6    understand that.
 7                    You knew at that time that Brian and Cheryl
 8    had put their own money back in the company to keep
 9    it afloat, didn't you?
10         A.    For their defense, yes.
11         Q.    Sir, you knew at the time that Brian and Cheryl
12    put their own money in the company to cover operating costs?
13         A.    Operating cost or defense.  I don't know how it
14    was divided.
15         Q.    No.  I know you just said -- I know you're saying
16    defense, but that money went into the general account and it
17    was spent just like all the other money in the company.
18         A.    I can't confirm that but I can assume that.
19         Q.    You can assume that.  So you really didn't mean
20    defense.  You just said it to --
21         A.    No.
22         Q.    -- to incite the jury.
23         A.    No.  No, no, no, no.  Defense.
24         Q.    All right.
25         A.    'Cause it was --
```

Appendix 1268

1          Q.    All right.  Well, you've already --

2          A.    -- in Brian's --

3          Q.    -- answered the question.

4          A.    It was already told.

5          Q.    You've already answered the question.

6                You said, I understand that.  Cheryl says,

7    I'm sorry that it's happened, you know.  You know, when --

8    when you take a company like ours that relies on development

9    business and you stop doing development, it's not pretty.

10   You said, I absolutely agree.  It's been certainly both

11   "(inaudible)" and understand that part of it.  Cheryl said,

12   As I do.  I mean, you know --

13               And you say, I mean, all we needed to do

14   was to keep three deals a year going.

15               Three development deals, right?

16         A.    Yes.

17         Q.    And Cheryl says, I don't know if that was true,

18   but I don't know if three deals is the number.

19               And I think that's the end of the

20   conversation.

21               MR. L. FRIEDMAN:  Is this the time you want

22   to take your morning break, Your Honor?

23               THE COURT:  Yeah.

24               We'll take our 15-minute break, ladies and

25   gentlemen.

```
 1                    (The jury exited the courtroom.)

 2                    (Recess taken)

 3                    (The jury entered the courtroom.)

 4                    THE COURT:  Welcome back.  Good morning.

 5       Good morning still, ladies and gentlemen.

 6                        We're going to -- we're still on

 7       Mr. Carpenter's testimony but we're going to take a witness

 8       out of order, and so we'll ask Mr. Donohue to call the next

 9       witness.

10                    MR. DONOHUE:  Yes, Your Honor.  The

11       defendants call Deepak Sulahke.

12                    THE WITNESS:  Yes.

13                    THE COURT:  And Mr. Suhlahke's at the

14       witness stand.  I swore him in before, earlier in the trial.

15       So his testimony, like all the witnesses, is under oath.

16                    So, Mr. Donohue, if you'll pick up or start

17       where you'd like.

18                    MR. DONOHUE:  Thank you, Your Honor.

19                        DEEPAK SULAHKE,

20       having been previously sworn, testified as follows:

21                    DIRECT EXAMINATION

22       BY MR. DONOHUE:

23            Q.    Please state your full name.

24            A.    Deepak B. Sulahke.

25            Q.    And, Mr. Sulahke, you formerly worked for
```

1    Southwest Housing?

2         A.    Yes, I do [sic].

3         Q.    You still do or you did?

4         A.    I did.

5         Q.    You did.  Okay.

6                    And what -- in what capacity did you work

7    for Southwest Housing?

8         A.    Started off as vice president and at some point

9    became senior vice president of development and finance.

10        Q.    And, specifically, you worked for the development

11   arm --

12        A.    Yes.

13        Q.    -- of Southwest Housing Development Company; is

14   that right?

15        A.    Correct.

16        Q.    What time period did you work for Southwest

17   Housing Development?

18        A.    I think it was June of 2003 to May of 2008.

19        Q.    And May of 2008, is that when the Cascade sale or

20   acquisition took place?

21        A.    Yes.

22        Q.    And you left at that point?

23        A.    The company stopped.  So I didn't leave.

24        Q.    The company just ceased doing business.

25        A.    Ceased to exist, so...

66

1          Q.   All right, sir.

2          A.   Okay.

3          Q.   And what did you do as -- as the -- for Southwest

4    Housing Development as senior vice president of development?

5    What did you do?

6          A.   I headed the development team.  So we brought new

7    business in and we put together deals and, you know, closed

8    the deals and handed over -- you know, handed over deals for

9    construction.  And then management took over, so...

10         Q.   All right.

11              Did you work at all with Affordable

12   construction, the construction arm of Southwest Housing?

13         A.   I didn't work for them but there was a lot of

14   coordination between my team and their team.

15         Q.   All right.  So you didn't work for them but you

16   coordinated with them?

17         A.   Uh-huh.  Yes.

18         Q.   And then as a separate company there was Southwest

19   Housing Management Company; is that right?

20         A.   Correct.

21         Q.   All right.  Did you -- did you work at all with

22   them?

23         A.   Yeah.  There was coordination work with them, yes.

24         Q.   All right.

25              And then at some point in time you came to

1  know Jeffrey Carpenter?

2       A.   I did.

3       Q.   All right.  And that was before you were with

4  Southwest Housing Development; is that right?

5       A.   Yes.

6       Q.   When did you know -- or come to know

7  Mr. Carpenter?

8       A.   I think it was sometime around 2000 -- 2001 or

9  2002 at my previous job.  Jeff headed the management team

10  there and I -- I came to know of him then.

11       Q.   All right.  And what was the name of that company?

12       A.   Fore Property Company.

13       Q.   F-o-r-e?

14       A.   F-o-r-e, yes.

15       Q.   All right.

16            And Mr. Carpenter worked there too for the

17  management --

18       A.   Management company, yes.

19       Q.   All right.

20            And then you went to Southwest Housing

21  Development in 2003.  At some point, did you refer

22  Mr. Carpenter to the Southwest Housing organization?

23       A.   I did.

24       Q.   All right.  And at some point Mr. -- Mr. Carpenter

25  actually took your referral and came on with Southwest

1    Housing Management; is that right?

2         A.    Correct.

3         Q.    And what was your understanding of Mr. Carpenter's

4    job responsibilities there as executive vice president for

5    Southwest Housing Management?

6                   MS. GIBSON:   Object.   Lack of foundation.

7                   THE COURT:   Overruled.

8         Q.    (By Mr. Donohue) Did you have an understanding

9    what --

10        A.    Yeah.   Yes.   Jeff's duties included, you know, to

11   head the management team, to make sure that the properties

12   were getting up, you know, were operating property --

13   properly and, you know, the lease was going well and the

14   properties were -- you know, he was responsible for

15   day-to-day operations of the property.

16        Q.    All right.

17                   In your position there as senior -- in

18   charge of development there at Southwest Housing

19   Development, who did you report to?

20        A.    Brian Potashnik.

21        Q.    All right.   And who did Mr. Carpenter report to?

22        A.    Brian Potashnik.

23        Q.    Brian Potashnik was the head of each of those

24   separate companies?

25        A.    Correct.

1      Q.    Now, at some point in time -- well, tell me.  What
2    was your relationship like with Mr. Carpenter?  I know you
3    worked and coordinated with Southwest Housing Management
4    there in your position at Southwest Housing Development, but
5    did you have any other relationship, business or personal or
6    otherwise, with Mr. Carpenter?
7      A.    Yes.  Jeff was a neighbor.  I mean, he lived just
8    five homes down the street, and so we would meet on -- you
9    know, we used to meet off -- off work.  And, you know, we
10   would go have drinks together and, you know, meet on a
11   regular basis, so...
12     Q.    All right.  So you just lived five houses down,
13   what, on Mimosa Street?
14     A.    Yeah.
15     Q.    And where would you have drinks?
16     A.    Trinity Hall.  And there was one, I think.  And
17   subsequently, you know, we would meet up at Sherlock.
18     Q.    Sherlock's?
19     A.    Yeah.
20     Q.    Did Mr. Jones, Keith Jones, also join you from
21   time to time?
22     A.    Yes.  Sure did.  Yes.
23     Q.    So the three of you would have beer or whatever it
24   was that you were drinking there at Sherlock's?
25     A.    Yes.

Appendix 1275

1          Q.     And did there come a time that you understand that

2     Mr. Carpenter ended up suing the Southwest Housing entities

3     and both Potashniks?

4          A.     Yes.

5          Q.     Did he ask you to join the lawsuit?

6          A.     At some point he urged us to.  Yes, he did.

7          Q.     All right.

8                        I'll represent to you that the actual

9     lawsuit was filed in March of 2008.

10         A.     Uh-huh.

11         Q.     Before the closing, when you left in April or May

12    of 2008, did he ask you to join the lawsuit before or after

13    he actually filed it in March of '08?

14         A.     Before.  Before he filed the lawsuit.

15         Q.     Before he filed it.

16                       Did he ask Mr. Jones to join in the

17    lawsuit?

18         A.     My recollection is that it came up at one of

19    our -- you know, one of our meetings at these -- at Trinity

20    or Sherlock's.  I don't recall exactly where, but I think

21    it came up, you know, when we were drinking.  It came up,

22    yes.

23         Q.     All right.

24         A.     So my recollection is Keith was there, but --

25         Q.     All right, Keith was there when Mr. Carpenter

1    asked you to join him in the lawsuit?

2         A.    Correct.

3         Q.    All right.  Did he ask Mr. Jones?  Or do you

4    recall?

5         A.    My recollection is that it came up at the table,

6    yeah.

7         Q.    So rather than directed just to you it was

8    directed to the table, to the both of you?

9         A.    Correct.

10        Q.    All right.  And what did you tell Mr. Carpenter?

11        A.    I said I don't need to.  I said I don't -- I don't

12   have any need to do that.  So I declined.

13        Q.    Go ahead.  I'm sorry.

14        A.    I declined.  I declined to join the lawsuit.

15        Q.    Did Mr. Jones?  Do you recall?  Did he have any

16   response to Mr. Carpenter's inquiry about joining the

17   lawsuit?

18        A.    I don't -- I don't recall what Mr. Jones said but

19   I think he declined as well.  But I really can't speak for

20   him.  I know that I declined, so...

21        Q.    All right.

22              Now, your deposition was taken in this case

23   by me in July of 2010.  Do you remember that?

24        A.    Yes.

25        Q.    All right.  And I'll represent to you that the

72

1    deposition of Mr. Carpenter, his first deposition in this

2    case, was taken in March; that same year, March of 2010.

3          A.   Okay.

4          Q.   All right?

5          A.   Uh-huh.

6          Q.   Between the time that Mr. Carpenter left Southwest

7    Housing and his deposition was taken in March of 2010, did

8    you have any discussions with Mr. Carpenter about what --

9    about his feeling or his belief or anything along that lines

10   that he was owed any bonus from the sales proceeds of the

11   sold companies?

12         A.   It's come up numerous times, numerous times.  And

13   he's referred -- he made representation that he was informed

14   that he -- that he was going to get a, you know, quote,

15   unquote, a piece of the deal.  So I don't know -- and he --

16   he would ask me what that meant.  Meaning he would try to

17   figure out what exactly that meant, that entailed, so...

18         Q.   All right.  So before his deposition was taken he

19   even asked you that he, what, felt like he had a piece of

20   the deal or what?

21         A.   He told me that he was represented -- it was

22   represented to him that he would have a piece of the deal.

23         Q.   All right.  Did he ever tell you what that piece

24   of the deal would be?

25         A.   No.

73

1          Q.    Did he ever ask you that, hey, do you think this
2     percentage or that percentage is fair?
3          A.    Correct.
4                He would -- you know, I think he was -- my
5     recollection is he was trying to figure out what that
6     percentage, what that piece of the deal actually meant.  So
7     he was trying to figure out if it was one percent or five
8     percent or ten percent or -- so it was -- you know, I think,
9     you know -- and most of the times that it came up it was he
10    was trying to figure out exactly what that meant.  So if
11    there was, I don't recall him telling me that there was a
12    set number, so...
13         Q.    All right.  He never told you a set percentage
14    before his deposition was taken in March of 2010.  But he
15    said that, what, he felt he had a piece of the deal?
16         A.    Yes.
17         Q.    All right.
18               And he never told you before his deposition
19    was taken what percentage, if any, he said that piece of the
20    deal is or should be or what he felt he should get?
21         A.    No.
22         Q.    All right.
23               He didn't say one percentage, three
24    percent, five percent, ten percent?
25         A.    No.  He -- you know, I mean, he would -- he would

1    try to figure out what that meant so that -- you know, he

2    has asked me if it was one percent or five percent or -- you

3    know, so it's -- he has thrown up that number, but the

4    number came out more as a question to me, you know, as what

5    exactly it meant when someone offered a piece of the deal.

6         Q.    So he was asking you -- did he ask you, Do you

7    think one percent or five percent --

8         A.    Yes.

9         Q.    -- or three percent would be fair?

10        A.    Correct.   That's exactly how it was, yes.

11        Q.    So he asked you what he [sic] thought -- what you

12   thought would be a fair percentage of the deal?

13        A.    Correct.

14        Q.    He didn't tell you that he had been promised a

15   percentage of the deal?

16        A.    No, he did not.

17        Q.    He didn't tell you that back in 2006, supposedly,

18   that Brian Potashnik had agreed to pay him three percent of

19   the deal?

20        A.    No, he did not.

21        Q.    That never came up?  He never -- never said that?

22        A.    No.

23        Q.    What about after his deposition was taken and you

24   read his deposition?

25                 Do you recall reading his deposition?

1       A.    Yeah.   That's the first thing that struck [sic]

2    out was I think there might have -- the first thing that

3    struck [sic] out was the three percent seemed like it was a

4    very set number from his deposition; that that's what was

5    offered to him by Brian.   But that's something that had

6    never come up when we -- when I went with him.   So I think I

7    made a note of it and said that that number was never --

8    never ever discussed with me.

9       Q.    Okay.   So after you read the deposition you were

10   struck in the deposition when he said he had three percent

11   of the deal?

12      A.    Correct.

13      Q.    And, in fact, you brought that up to Mr. Carpenter

14   after his deposition that, hey, you've never told me that

15   you had three percent of the deal?

16      A.    Yes.

17      Q.    And then what did he say?

18      A.    He declined.   He said that that's what I had,

19   so...

20      Q.    Although he'd never told you before his deposition

21   that that's what he had?

22      A.    Correct.

23      Q.    In fact, he was asking you what do you think is a

24   fair percentage?

25      A.    Yes.

```
 1        Q.    When he went to -- did he ever say before his
 2   deposition five percent, does five percent sound like a fair
 3   deal?
 4        A.    Well, he's asked me.  He's thrown out various
 5   numbers, you know.  And he says, Do you think one percent or
 6   five percent or ten percent?  He said, What does it mean
 7   when -- when I'm going to get a piece of the deal?  So...
 8        Q.    All right.  And what did you tell him in response
 9   when he was inquiring with you as far as these percentages
10   of the deal?
11        A.    I told him that even one percent was too high for
12   someone at his position.  That's my belief.  And I mentioned
13   that in my deposition because what the market is offering,
14   you know, that even that was a pretty high number.
15                    And I felt that, you know, one should value
16   your own self rather than -- when someone else calls you a
17   partner, he's basically trying to encourage you.  He's
18   trying to help you out, you know, and make you feel like
19   this is part of your team.  Just because he's called you a
20   partner doesn't mean it's a financial, you know,
21   relationship.
22                    And I kind of tried to help him out, at
23   least mention to him that, you know, market -- the market
24   for what his position is, is that what he has in his money
25   was way too much.  And I have had discussions with him that,
```

1    you know, that what they were offering of his work, what

2    other people were getting paid --

3         Q.   I don't want to go there, Mr. Sulahke.  I don't

4    want to go there.  Thank you very much.

5                   Let me ask you.  In observing what

6    Mr. Carpenter did as executive vice president for Southwest

7    Housing Management, did you ever observe him do anything

8    over and above what his job was for Southwest Housing

9    Management?

10        A.   Well, it's doing -- during the raid, I think there

11   was one -- I will -- you know, I mean, overall, the

12   coordination and everything else is typical of what a

13   management person would do.  But I do think that he has

14   helped out during the FBI raids and all that, you know; that

15   he did, you know --

16        Q.   All right.

17        A.   -- that he did work on it.

18        Q.   And was it your understanding that he did so at

19   the direction of the Potashniks?

20        A.   Correct.  He did so.

21        Q.   All right.

22                   But there were others that helped out as

23   far as gathering information that would have been

24   subpoenaed, that time frame?

25        A.   Yes.

78

1     Q.    But it wasn't just him alone?

2     A.    No.   Yeah, there was a team working on it.   Yes.

3     Q.    And same thing with the disaster that took place

4  down in Houston with Katrina --

5     A.    Uh-huh.

6     Q.    -- as well as Rita.   I understand that there was

7  a -- there was an overall team effort at the Southwest

8  Housing organization to help out those victims?

9     A.    Correct.

10    Q.    And it was including Mr. Carpenter as well as

11 others?

12    A.    Yes, but all at the direction of Brian.   Yes.

13    Q.    And it was financed.   It was all paid for by the

14 Potashniks, wasn't it?

15    A.    Correct.

16          MR. DONOHUE:   I'll pass the witness.

17          THE COURT:   Ms. Gibson.

18                CROSS-EXAMINATION

19 BY MS. GIBSON:

20    Q.    Mr. Sulahke, when you talk about Jeff saying, you

21 know, when he was mentioning five percent in connection with

22 the cut of the deal, do you recall that?

23    A.    I'm sorry?

24    Q.    When you were -- when you were saying that

25 Jeff Carpenter was asking you, like, would five percent be

79

1    reasonable --

2          A.    Yeah.  It wasn't, like, five percent, you know.

3    It was, like, is one percent reasonable or three percent

4    reasonable or five percent.

5          Q.    Right.

6          A.    So it wasn't, like, a set number.

7          Q.    What -- what time frame?  Can you pinpoint a time

8    frame when this discussion happened?

9          A.    This was when -- this was when the sale was

10   determined.  I mean it was when we -- when we were headed

11   towards the sale.  When the -- you know, when Brian and

12   Cheryl decided to sell the company.  So at that point in

13   time, you know, we started having some discussions on it.

14         Q.    So at the point in time Brian and Cheryl decided

15   to start the company -- or sell the company?

16         A.    Shortly after that, yes.

17         Q.    Okay, shortly after that.

18               And are you aware that after -- after

19   Brian Potashnik offered Jeff three percent -- I mean,

20   there's a formula -- three percent under a certain formula,

21   that Jeff went back and asked about whether he could get

22   five percent instead?

23         A.    No, I was never informed.  I was never told about

24   that.

25         Q.    Okay.  But all of this was at the beginning when

80

```
1    Brian and Cheryl initially decided to sell the business.
2    That's the time frame you're talking about?
3         A.   No, no.  This was when they decided.  This is
4    after they decided to sell the business.
5         Q.   Okay.  In that time frame?
6         A.   Yes.
7         Q.   Okay.
8                   You talked about someone calling
9    Jeff Carpenter a partner.  What are you talking about?
10        A.   That's what he represented to me that he was.
11   That he was, you know, being referred to as represented as a
12   partner, so...
13        Q.   Brian Potashnik had?
14        A.   Yeah.  That's what Jeff told me, yes.
15        Q.   Referred to him as a partner.  Okay.
16                  And you said at one point that
17   Jeff Carpenter asked you to join this lawsuit?
18        A.   Yes.
19        Q.   And you said that Keith Jones was there?
20        A.   Yes.
21        Q.   All right.  Are you --
22        A.   Oh, that was once, but there were -- this happened
23   a couple, two, three times at least, so...
24        Q.   Okay.
25                  Are you aware that when Keith Jones was
```

1  asked, "Did Jeff ever ask you or Deepak or anyone else that
2  you know of to consider or sue Brian or Cheryl Potashnik or
3  the Southwest entities," he said no?

4      A.   I can tell you -- like I said, I can tell you what
5  I was asked.  And I was asked to join the lawsuit and I
6  declined.

7      Q.   Are you aware that when Keith Jones was asked --
8  who you claim was there -- the question he never mentioned
9  that, hey, will you join me too, anything along those lines,
10 that he said no?

11     A.   No.

12     Q.   Were you aware of that?

13     A.   No.

14     Q.   Mr. Sulahke, you recommended Jeff Carpenter for
15 hire at Southwest Housing?

16     A.   I did.

17     Q.   Okay.

18          And you asked Jeff Carpenter to help you
19 out with work even after -- for your company even after he
20 left Southwest Housing?

21     A.   Very little.  And I chose not to continue with
22 that any further.

23     Q.   Okay.  But you said very little, so --

24     A.   Yeah.

25     Q.   -- so the answer is yes --

1          A.    Yes.

2          Q.    -- to help on some projects?

3                Do you recall sitting with Jeff at your

4    house on the couch that's parallel to the fireplace and

5    saying to Jeff you heard from Brian that Jeff may not have

6    to work again due to the asset sale payment to Jeff or words

7    to that effect?

8          A.    That's -- yes.

9          Q.    Did Jeff Carpenter work hard in his job at

10   Southwest Housing?

11         A.    Yeah.  He was there.  He was there a lot, but so

12   were all the executives.  I mean, we all worked very hard,

13   so...

14         Q.    And without getting into details, are bonuses part

15   of the reason you work -- people worked extra hard?

16         A.    No.

17               MR. DONOHUE:  Objection, Your Honor.

18   Violates the order in limine.

19               MS. GIBSON:  I'm not asking for details,

20   just working hard.

21               THE COURT:  Objection's sustained.

22               MS. GIBSON:  Okay.

23         Q.    (By Ms. Gibson) Do you remember that at some point

24   when you were having lunch with Rick Fore, Rick asked about

25   Jeff and Rick told you that Jeff was one of the best

Appendix 1288

1    operators he had -- he had ever experienced --

2                    MR. DONOHUE:   Objection.

3         Q.   (By Ms. Gibson) -- or words to that -- along those

4    lines?

5         A.   No.  I don't recall that.

6                    MR. DONOHUE:  Objection.  Objection.  Calls

7    for hearsay.

8                    MS. GIBSON:  Okay.  He already said he does

9    not recall.

10                   THE WITNESS:  No.

11        Q.   (By Ms. Gibson) Okay.  But you do recall sitting

12   on the couch in front of the fireplace and saying you heard

13   from Brian that Jeff may not need to work again due to the

14   asset sale payment to him?

15        A.   I don't know whether the asset sale but, you know,

16   he just said Jeff may not have to work again, you know,

17   if -- if the transactions went well, so...

18        Q.   And by the transactions you're talking about the

19   sale?

20        A.   The exact verbiage I don't know, but he did say

21   something to the effect that Jeff might not have to work

22   again.

23                   MS. GIBSON:  Pass the witness.

24                   THE COURT:  Mr. Donohue.

25                   MR. DONOHUE:  Thank you, Your Honor.

```
 1                    REDIRECT EXAMINATION

 2   BY MR. DONOHUE:

 3        Q.    Neither of the Potashniks ever tell you that they

 4   had -- that Mr. Carpenter had a piece of the deal, did they?

 5        A.    No, never.

 6        Q.    Did Mr. Carpenter ever represent to you, whether

 7   it be exaggeration or hyperbole, that he was an effective --

 8   that he was, in effect, the president of all the Southwest

 9   entities?

10        A.    Yes.

11                    MS. GIBSON:  I'm going to object to leading

12   and beyond the scope.  It's an entirely new topic.

13                    THE COURT:  I don't know whether it was --

14   I'm not sure who's witness it is, if it's an adverse

15   witness, but y'all are beyond the scope of her examination.

16                    MR. DONOHUE:  I'll pass the witness.

17                    THE COURT:  Ms. Gibson?

18                    MS. GIBSON:  Nothing further.

19                    THE COURT:  All right.

20                    Thank you, Mr. Sulahke.  You are free to

21   leave the courthouse and you're released from the subpoena.

22                    We're going back to Mr. Carpenter.

23                    Mr. Friedman?

24                    MR. L. FRIEDMAN:  Yes.  May I just have a

25   moment?
```

Appendix 1290

85

```
 1                    (Off the record)
 2                    JEFFREY CARPENTER,
 3    having been previously sworn, testified as follows:
 4                    CROSS-EXAMINATION (CONT'D)
 5    BY MR. L. FRIEDMAN:
 6        Q.    Mr. Carpenter, I took your deposition for the
 7    first time on March 16th, 2010.  And that was after you
 8    testified today that you had this oral agreement with
 9    Brian Potashnik to pay you a hundred -- $400,000.  Remember
10    when I took your deposition in 2010?
11        A.    Vaguely.
12        Q.    When I asked you about -- to tell me the amount of
13    money you were claiming for your earned, unpaid, annual
14    bonuses, you couldn't tell me the amount.  Do you remember
15    that?
16        A.    Not off the top of my head, no, sir.
17        Q.    All right.
18                    MR. L. FRIEDMAN:  Would you play
19    that section for me, please?  Page and line?  Yeah.
20                    MR. PAGE:  It's Page 12, Line 6, through
21    Page 13, Line --
22                    MR. L. FRIEDMAN:  Page 12, Line 6, through
23    13, Line 9.  March 16, 2010 deposition.
24                    Wait.
25                    Ms. Gibson, you there?
```

Appendix 1291

1          MS. GIBSON:  Yes.  Go ahead.

2               (Video playing)

3     Q.    "Mr. Carpenter, with regard to what I'm calling

4  claim number one, March 2004 to March 2005, can you give me

5  a specific dollar amount of your claim today?"

6     A.    "I can give you a range.  I cannot give you a

7  specific dollar amount."

8     Q.    "All right.  You've given me the range, but I'm

9  asking you for a specific dollar amount of your claim.  Can

10  you give me a specific dollar amount of your claim?"

11     A.    "No, I cannot."

12     Q.    "Okay.  With regard to claim number two, what I'm

13  calling claim number two, March of 2005 to March of 2006,

14  can you give me a specific dollar amount of your claim,

15  sir?"

16     A.    "No, sir."

17     Q.    "With regard to what I'm calling claim number

18  three, March of 2006 to March of 2007, can you give me a

19  specific dollar amount of your claim, sir?"

20     A.    "No, sir.  And I can tell you why for all three of

21  those, 'cause it's the same."

22               "Go ahead."

23     Q.    "The fun part about being a lawyer is that I get

24  to ask the questions."

25     A.    "Very good."

1       Q.   "Thank you."

2              "With regard to claim number four, can you

3   give -- what I'm calling claim number four from March of '07

4   to November 2nd, 2007, can you give me a specific amount of

5   your claim?"

6       A.   "No, sir."

7              (Video ended)

8       Q.   (By Mr. L. Friedman) All right.  Do you recall

9   giving that testimony in March of 2010, sir?

10      A.   As just seen, yes.

11      Q.   So in March of 2010 you could not state the amount

12   of your bonus claim, correct?  Isn't that correct?

13      A.   From what was shown on the screen, yes.

14      Q.   Now, also, you remember these personal notes that

15   you wrote in your Email to Cheryl and Brian Potashnik of

16   November 15th, 230 -- 2007.

17              MR. L. FRIEDMAN:  Do you have that,

18   Defendants' Number 24?  Show the whole thing through.

19      Q.   (By Mr. L. Friedman) We've discussed this Email

20   before?

21      A.   Yes.

22      Q.   Do you have it in front of you?

23      A.   I was looking for it.

24      Q.   Go ahead.  Take a minute.

25      A.   This is it.

1          Q.    Now, November 15th, 2007, is two weeks after your

2     employment was terminated by Southwest Housing Management,

3     correct?

4          A.    Yes.

5          Q.    And that was after -- supposedly, eight months

6     after you had this second oral agreement with Brian

7     Potashnik for earned, unpaid, annual bonuses where he and

8     you supposedly agreed to an amount of $400,000, correct?

9          A.    Yes.

10         Q.    All right.   So there's the date.

11               MR. L. FRIEDMAN:   Let's see the to and

12    from, please.

13         Q.    (By Mr. L. Friedman) And you identify that as your

14    Email, correct?

15         A.    Yes.

16         Q.    And on Page 4 of your Email or attached to this

17    Email is a separation agreement that you've previously

18    testified --

19               MR. L. FRIEDMAN:   Let's go to the

20    separation agreement attached.

21         Q.    (By Mr. L. Friedman) -- that you've previously

22    testified you drafted, correct?

23         A.    Yes.

24               MR. L. FRIEDMAN:   Go to Paragraph 4.   Bring

25    it to the top of the screen, please.

1          Q.    (By Mr. L. Friedman) So in that Paragraph 4 you

2    say the company and the Potashniks acknowledge that employee

3    has earned and is owed unpaid annual wages and bonuses in

4    the amount of $600,000.   See that?

5          A.    Yes.

6          Q.    You wrote that?

7          A.    Yes.

8          Q.    You wrote that eight months after you claimed you

9    had an oral agreement with Brian Potashnik?

10         A.    Yes.

11         Q.    For $400,000?

12         A.    Yes.

13         Q.    Is that another mistake?

14         A.    No.

15         Q.    Still negotiating?

16         A.    Negotiating that one, yes.

17         Q.    You didn't have a firm agreement.   You were still

18   negotiating that, right?

19         A.    That was firm.   I was negotiating for more.

20         Q.    You wanted more.

21         A.    I wanted more, based on my agreement.

22         Q.    I'm going to put down 11/15/07 wanted more.

23               Okay.   So, also, on November 15th -- I'm

24   sorry.   On March 14th, you send personal notes.

25               Do you have the personal notes?

1      A.   I just had them.   Those personal notes?

2      Q.   Yeah.

3                MS. GIBSON:   Those aren't redacted.   Just

4      FYI.

5                MR. L. FRIEDMAN:   Well, let's go to the

6      employment agreement.   I'm sorry.   Let's go to the schedule

7      on Page 3 of those personal notes.

8      Q.   (By Mr. L. Friedman) Now, these personal notes

9      were dated March 14th, 2007, right?

10     A.   Yes.

11     Q.   And that was, what, a day or two or three after

12     your supposed -- your drive with Mr. Potashnik?

13     A.   Yes, sir.

14     Q.   How many days?   One day?   Three days?

15     A.   A few days.

16     Q.   A few days.

17                A few days after your drive with

18     Mr. Potashnik you handed him a schedule showing him the

19     bonuses that you're entitled to, right?

20     A.   No, sir.

21     Q.   It says --

22     A.   I showed him --

23     Q.   -- unearned --

24     A.   -- what I was --

25     Q.   Excuse me.

91

1              Showed unearned bonuses unpaid, wage

2      difference unpaid, annual bonuses paid, you acknowledge the

3      first-year bonus, due 600,000.  Isn't that what you said,

4      due 600,000?

5          A.   This was part of the discussion for, basically, a

6      performance review and what I brought in as a document for

7      discussion, yes.

8          Q.   So after you made -- your testimony is that after

9      you made your oral agreement for a three-percent bonus and

10     after you made --

11              MR. L. FRIEDMAN:  Sorry, Judge.

12         Q.   (By Mr. L. Friedman) -- after you made an oral

13     agreement for the earned, unpaid, annual bonus you're still

14     negotiating with Brian Potashnik for more?

15         A.   At that time, yes.

16         Q.   At that time was a few days after you'd made your

17     second oral agreement, according to you?

18         A.   Yes.  And --

19         Q.   I'll take yes.

20         A.   -- I confirmed --

21         Q.   I'll take yes as an answer.

22         A.   -- that as well.

23         Q.   Let's go to the employment agreement, amended

24     employment agreement, which you also sent to Brian Potashnik

25     on March 14th.  Do you remember that?

1   A. Vaguely.

2     MR. L. FRIEDMAN:  Okay, let's go to the

3 amended employment agreement.

4     (Pause)

5     Am I waiting on you, Mr. Page, or are you

6 waiting on me?

7   Q. (By Mr. L. Friedman) So this is a copy of the

8 amended employment agreement that you submitted to

9 Brian Potashnik on March 14th, 2007, a few days after your

10 alleged oral agreement for $400,000 on the unpaid, earned,

11 annual bonus.  Remember this?

12   A. Yes.

13   Q. And if we look at Page 2 right over here --

14     MR. L. FRIEDMAN:  Can we pull this

15 paragraph up?

16   Q. (By Mr. L. Friedman) -- you mention not the

17 400,000 that allegedly you agreed to orally a couple days

18 before.  You've now, in your prepared amended oral

19 agreement -- I'm sorry -- amended employment agreement

20 you're saying to Mr. Potashnik the employer entities also

21 acknowledge that employee is to be paid compensation for

22 unpaid and past-due earnings of income compensation,

23 including wages and bonuses in the amount of $600,000 from

24 the period of March 15th, 2004, to March 14th, 2007.

25     Remember that?

1      A.    Yes.

2      Q.    So you've already testified you're not claiming

3  any wages in this lawsuit, right?

4      A.    Correct.

5      Q.    And you've already testified that within a few

6  days before you sent this to Mr. Potashnik you had agreed on

7  a $400,000 earned, unpaid, bonus number?

8      A.    Yes.

9      Q.    So here you were still, what, negotiating for

10 more?

11     A.    I believe I was due more and I presented that.

12     Q.    Were you negotiating for more?

13     A.    I was negotiating for more.

14     Q.    So your --

15     A.    And I was asked --

16     Q.    Sir.

17     A.    -- to put this proposal together.

18     Q.    I'll take -- I'll take more.  More is enough.

19     A.    Okay.

20     Q.    So your alleged oral agreement with Mr. Potashnik

21 wasn't final, right?

22     A.    It was final up to the 400,000.

23     Q.    It was final, except you wanted more?

24     A.    Correct.

25               MR. L. FRIEDMAN:  You can take that down.

```
 1          Q.    (By Mr. L. Friedman) Now --

 2                    MR. L. FRIEDMAN:  Has this been admitted?

 3                    MR. DONOHUE:   (Inaudible).

 4                    MR. L. FRIEDMAN:  Does he have a copy?

 5                    MR. DONOHUE:  No.

 6                    MR. L. FRIEDMAN:  Your Honor, may I

 7   approach the witness?

 8                    THE COURT:  Okay.

 9                    MR. L. FRIEDMAN:  I'll give you a copy of

10   Defendants' 6.

11                    MS. GIBSON:   Thank you.

12          Q.    (By Mr. L. Friedman) Mr. Carpenter, do you

13   recognize Defendants' 6?

14                    MR. DONOHUE:  Defendants' 25.

15                    MR. L. FRIEDMAN:  I'm sorry.  Defendants'

16   25.  I was confused because it says Exhibit 6.

17          Q.    (By Mr. L. Friedman) It's Defendants' 25.

18          A.    Just one moment.

19                    (Pause)

20          A.    Yes.

21                    MR. L. FRIEDMAN:  Now I'll move for

22   admission of 25, Your Honor.

23                    MS. GIBSON:  There seems to be a random

24   document attached to it.

25                    THE COURT:  That shouldn't be attached?
```

Appendix 1300

1                    MS. GIBSON:  That should not be attached.

2                    THE COURT:  Let me see it, Mr. --

3                    MR. DONOHUE:  Your Honor, we agree.  There

4      is a random document that needs to come off and does not

5      need to be part of that exhibit.  It's the last page.

6                    THE COURT:  Other than that, was there an

7      objection?

8                    MS. GIBSON:  No.

9                    THE COURT:  Okay, 25 is admitted.

10                    MR. L. FRIEDMAN:  So let's -- would you put

11     it up, Mr. Page?

12          Q.    (By Mr. L. Friedman) Let's just go to the second

13     page.  The second page of this exhibit, Carpenter 083 --

14     there you go -- reflects the same Email from you to the

15     Potashniks that we discussed earlier in your testimony,

16     correct?

17          A.    Yes, sir.

18          Q.    And the third page of this exhibit, 084, is

19     Cheryl Potashnik's Email of 12/11/07 back to you?

20          A.    Yes, sir.

21          Q.    All right.

22                    Now, in this Email Cheryl says -- this is

23     December 11th, 2007.  This is about five weeks after your

24     termination at Southwest Housing Management, right?

25          A.    Yes, sir.

1       Q.    All right.

2             Cheryl says, Jeff, as you are aware, we

3    have honored your current employment contract by paying you

4    six weeks severance equal to six weeks base salary.

5             As required by law, you and your eligible

6    dependents are also entitled to elect COBRA benefits.

7    Devona Gray has contacted you recently regarding this and

8    you will be receiving the paperwork shortly.

9             However, as you know, your employment

10   contract does not provide for you to receive any bonus after

11   termination.  I spoke with Brian and he told me that he

12   never agreed to pay you three percent of gross after the

13   sale of the business, as you proposed in your draft

14   separation agreement.

15            As you are aware, the sale of the business

16   has not yet occurred.  If and when the sale occurs, it is

17   only at that time that we will be able to assess if any of

18   the net profits will be shared with various employees.  For

19   this reason as well as other factors involved, we cannot

20   make any promises or enter into any specific agreements with

21   anyone for possible future payments relating to the future

22   sale of the business.

23            Also, we have not agreed to pay you 600,000

24   for unpaid wages and bonuses, as you have also proposed in

25   your draft separation agreement.  Such payments would not be

1   consistent with your employment contract.  Finally, I would
2   like to remind you of your obligations under Paragraph 9 of
3   your employment agreement.
4              Then Cheryl says, If you are still
5   interested in our reasonable offer to pay you $150,000 in
6   accordance with the separation agreement we previously
7   provided to you, please let me know by December 17th, 2007.
8              Mr. Carpenter, the message that
9   Cheryl Potashnik is conveying here is the same message that
10  she gave you in the secretly recorded conversation that you
11  recorded on November 2nd, 2007, correct?
12       A.    Somewhat.
13       Q.    Yeah.  She said not going to make any commitments,
14  correct?
15       A.    Yes.
16       Q.    Going to wait till the -- sees what the sales
17  proceeds are, correct?
18       A.    Yes.
19       Q.    And specifically rejects your proposal or
20  negotiations for 600,000 in unpaid wages and/or bonuses,
21  right?
22       A.    Yes.
23       Q.    Now, by December 11, 2007, you were paid all of
24  your wages?
25       A.    Yes.

```
 1        Q.    But yet you're still making claims for wages?

 2        A.    No.

 3        Q.    All right.

 4        A.    I was making claim for the oral agreements.

 5        Q.    I'm going to accept -- I accept no.

 6              Now, when I took your deposition two weeks

 7    ago, do you recall testifying that your three-percent bonus

 8    was based off of the Cascade LOI?  It included three percent

 9    of the gross sales price minus normal closing costs,

10    including broker's fees, title fees, legal fees, things like

11    that.  And then, also, minus other employees' bonuses before

12    your three percent would be calculated.

13              Do you remember that?

14        A.    Yes.

15        Q.    So, as of two weeks ago, your testimony --

16    according to your testimony, is that other employees'

17    bonuses would be deducted from a calculation before your

18    bonus was calculated, correct?

19        A.    That's correct.

20        Q.    All right.

21              I'm going to write that down, sir, then

22    pass the witness.

23              MR. L. FRIEDMAN:  Mr. Page, what was the

24    date of that?  Was it 3/18?

25              MS. GIBSON:  Let me know when you're ready,
```

Appendix 1304

1    Larry.

2                        MR. L. FRIEDMAN:  Okay.

3                        The deposition was 3/18?

4                        MR. PAGE:  3/16.

5                        MR. L. FRIEDMAN:  I'm sorry.  January 16.

6                        MS. GIBSON:  It was the 15th.

7                        MR. DONOHUE:  Yeah, it was 15th.

8                        MR. L. FRIEDMAN:  So we'll go January 15.

9                        MR. DONOHUE:  15th, 2018.

10       Q.    (By Mr. L. Friedman) Deduct payments to other

11   employees before J.C.'s -- you know it's Jeff Carpenter?

12       A.    Yes.

13       Q.    -- before Jeff Carpenter's bonus is calculated.

14   That's correct, isn't it?

15       A.    That's -- that was the agreement.

16       Q.    All right.

17                        MR. L. FRIEDMAN:  I'll pass the witness,

18   Your Honor.

19                        THE COURT:  Ms. Gibson.

20                        REDIRECT EXAMINATION

21   BY MS. GIBSON:

22       Q.    Mr. Carpenter, looking at -- Mr. Friedman has

23   talked about various words used to describe this latter

24   deduction.  What type of bonus are you talking about?  What

25   type of employee bonus is coming off?

1          A.    It was the -- whether we're calling it stay bonus,

2    retention bonus, or severance bonus of the corporate-related

3    people.

4          Q.    Okay.

5                Mr. Carpenter, you said you're not seeking

6    wages.  What -- what are you talking about when you talk

7    about wages?

8          A.    My annual compensation of 200,000.

9          Q.    Salary --

10         A.    Salary.

11         Q.    -- is what that means?

12         A.    Yes.

13         Q.    Okay.

14               Mr. Friedman spent some time talking about

15    your written agreement with Southwest Housing and that

16    amendments and modifications had to be in writing.  Remember

17    that?

18         A.    Yes, ma'am.

19         Q.    We're going to talk about that for a moment.

20               And if you would, because I think this

21    exhibit is on the bench up here, just look along on your

22    screen with me, okay?

23         A.    Oh, okay.

24         Q.    Under Paragraph 3, duties --

25               THE WITNESS:  Pardon me.  That easel is --

101

```
1                    MR. DONOHUE:  I'll move it.
2                    THE WITNESS:  -- in my way now.
3                    MS. GIBSON:  I'm sorry?
4                    MR. DONOHUE:  I'll move it back.
5                    THE WITNESS:  The easel is in my way.
6      Sorry.
7                    Thank you.
8          Q.   (By Ms. Gibson) Okay.  You see in Paragraph 3B
9      that this contract anticipates that at some point in the
10     future you may be employed for affiliates of Southwest
11     Housing Management?
12         A.   That is correct.
13         Q.   Okay.
14                   And does that paragraph contemplate there
15     may be some separate deals in the future?
16         A.   Yes.
17         Q.   And if you look back on day one under this
18     employment agreement, you see that the bonus range is only
19     for the first year?
20         A.   Yes, ma'am.
21         Q.   Calendar year of employment?
22         A.   Yes.
23         Q.   And they're going to provide a separate detailed
24     bonus plan within 90 days?
25         A.   Yes.
```

1      Q.    Okay.   That -- was that done?

2      A.    No, it was not.

3      Q.    Okay.

4            So from day one this document contemplated

5      you may have future separate deals, though --

6      A.    Yes.

7      Q.    -- on bonuses?

8            Okay.   Does anything in this employment

9      agreement say that a separate bonus plan would have to be an

10     amendment to the employment agreement?

11     A.    No.

12     Q.    Okay.   And, in fact, this document, does it appear

13     to refer to future separate deals?

14     A.    No.

15     Q.    The detailed bonus -- well, I realize it only

16     covers the first calendar year.   But with respect to talking

17     about a future plan being provided, does it contemplate

18     future deals?

19     A.    Yes, it does.

20     Q.    And as for getting your oral handshake agreements

21     in writing, Brian Potashnik and Cheryl Potashnik, did they

22     say they would do that?

23                    MR. L. FRIEDMAN:   Leading.

24                    THE COURT:   Overruled.

25                    THE WITNESS:   Multiple times.   Many times.

1          Q.    (By Ms. Gibson) Okay.

2                And as far as how long you were going to

3     stay with -- stay despite the asset sale and not having a

4     job, did -- did the Potashniks ever ultimately get

5     everything out of you that they asked you to do?

6          A.    Yes.

7          Q.    Okay.

8                Did the Potashniks ever say to you, Jeff,

9     stop, we don't have an agreement, you don't need to stay?

10         A.    No.

11         Q.    I'm talking about before the end of your work.

12         A.    No.

13         Q.    Okay.

14               Did they ever say, Jeff, you don't need to

15    work so hard because we don't have a deal, we're not

16    actually going to pay you the three-percent bonus or the

17    annual bonuses?

18               MR. L. FRIEDMAN:  Leading, Your Honor.

19               THE COURT:  Overruled.

20               THE WITNESS:  No.  Absolutely not.

21         Q.    (By Ms. Gibson) Okay.

22               Everyone wanted this to be in writing, but

23    did Brian Potashnik or Cheryl Potashnik ever say it had to

24    be in writing to be enforceable?

25         A.    No.

1        Q.    Did they ever say before you had completed your

2    work for them that all you were going to get was severance

3    under the written agreement?

4        A.    Never.

5        Q.    That was brought up first after --

6        A.    Yes.

7        Q.    -- they got the work out of you?  Okay.

8              Before you finished and did everything they

9    asked you to, did they ever tell you, Jeff, you have no

10   legal right before October 31st?

11       A.    Cheryl -- Cheryl did in conversation a week

12   before.

13       Q.    Okay.

14       A.    Saying that I had no legal right.

15       Q.    Right, but when was your work done?  Well,

16   let's --

17       A.    Per Brian, October 12th; per Cheryl's request,

18   October 31st.

19       Q.    Okay.

20              And what you're referring to where Cheryl

21   says no legal rights, when did that conversation occur?

22   Wasn't it around your birthday?

23       A.    Yes.

24       Q.    When was your birthday?

25       A.    November 2nd.

1        Q.   Okay, so that happened before or after --

2        A.   After.

3        Q.   -- they got everything out of you that they

4    needed?

5        A.   After.

6        Q.   Okay.

7        A.   After my employment.

8        Q.   Before October 31st or the earlier date where

9    Brian said you've done everything requested and you can take

10   another job and you would get paid, before either of those

11   dates, did they ever say during all of these conversations

12   about annual bonuses and three percent, Jeff, you have no

13   legal rights?

14       A.   No.

15       Q.   Instead, am I correct that -- what are some of the

16   phrases they did say to you during meetings before October

17   31st?  What were they saying about your annual bonuses and

18   your three percent?

19       A.   That they were earned.  That they were earned.

20   Thank you.  You worked -- you did above and beyond.

21       Q.   Did they ever pull out --

22       A.   It was accolades.

23       Q.   Okay.

24       A.   I never had any disagreements or -- only until

25   this.

1          Q.    Before October 31st, 2007, did they ever pull out

2     your written employment agreement with Southwest Housing

3     Management and say, Jeff, these provisions, you know, we're

4     not going to give you anything?

5          A.    No.

6          Q.    Okay.

7                They only pulled out that document when?

8     They only started talking about it when, just generally?

9          A.    My -- my last day.

10         Q.    Is that November 2nd?

11         A.    Yes.

12         Q.    Okay, let's talk about the timeline.  Do you

13    recall Larry Friedman asking you about the transcript

14    telephone conversation?

15         A.    Right.

16         Q.    Okay.  So -- and you can use your outline for

17    dates with me, okay.  This is not a memory test.

18         A.    Okay.

19         Q.    So get that if you need it.

20                When did Brian Potashnik say that you would

21    get paid, whether you leave now or later, on both your

22    annual bonuses and three-percent sale proceeds?

23         A.    October 12th.

24         Q.    Okay.

25         A.    At his house in the courtyard.

1          Q.    All right.  Okay.  And did he tell you your

2     work -- whether or not your work was done as far as he was

3     concerned?

4          A.    Yes.

5          Q.    Did he tell you whether or not all of the bonuses

6     were fully earned?

7          A.    Yes.

8          Q.    Okay.

9                And then Cheryl Potashnik, what was the

10    date all work was done per her request to you?

11         A.    At the time the transition took place of the

12    management of Pinnacle taking over, which was November 1st.

13    So, essentially, my last day would have been October 31st.

14         Q.    Okay, so October 31st.

15               And then what do you get the evening of

16    November 1st after they got everything they wanted out of

17    you?

18         A.    Standard -- a standard severance agreement saying

19    that any -- no monies will be paid after termination and I

20    have no -- I'm paraphrasing -- I have -- they have no

21    obligations to any of the agreements.

22         Q.    Okay.  And so that's when you get the separation

23    agreement asking to release all rights.  And then what's the

24    date of the transcripts of the conversation --

25               MR. L. FRIEDMAN:  Usually, we make these

```
 1    boards after the witness testified.

 2                MS. GIBSON:  I'm scrolling --

 3                MR. L. FRIEDMAN:  Not before he testifies

 4    so he can get his answers from the board.

 5                MS. GIBSON:  I'm scrolling it up.  I just

 6    accidentally did it too far.

 7                MR. L. FRIEDMAN:  Okay.

 8        Q.    (By Ms. Gibson) What's the date of the transcripts

 9    of conversations that you were talking about?

10        A.    The vid -- or the call that I recorded?

11        Q.    Yes.

12        A.    November 2nd.

13        Q.    Okay.  So that conversation happens on the 2nd.

14    And the separation agreement that they sent on the 1st, that

15    asks you to release everything?

16        A.    Yes.

17        Q.    You see that?

18                And the only thing they put in here was

19    wages earned through employee's termination date and some

20    PTO, right?

21        A.    Correct.

22        Q.    So, as of November 1st, did you feel like the

23    Potashniks had firmly --

24                MR. L. FRIEDMAN:  Leading.

25        Q.    (By Ms. Gibson) As of No -- when's the first time
```

Appendix 1314

1    you had a firm conviction in your heart that the Potashniks

2    were reneging on their agreement?

3                    MR. L. FRIEDMAN:  Leading.

4                    THE COURT:  Overruled.

5                    THE WITNESS:  Without any conviction at

6    all, November 1st, when I received that document.

7        Q.    (By Ms. Gibson) Okay.

8                    And then Mr. Friedman asked you about a

9    December 11, 2007 Email from Cheryl Potashnik saying that

10   you're not entitled to any bonuses after you're gone.

11       A.    That's correct.

12       Q.    Okay.  And that was -- okay.

13                   And so all of these events, whether

14   suddenly pointing to your agreement, talking about we can't

15   commit, you have no legal rights, giving you only PTO and

16   some past-due wages, all of that happened after what -- did

17   that -- all of that happened before or after you had done

18   everything that both of them asked you for?

19       A.    After I performed the --

20       Q.    At any -- at any point before October 12, did

21   Brian Potashnik tell you you didn't have a deal?

22       A.    No.

23       Q.    At any point prior to October 31, 2007, did

24   Cheryl Potashnik ever say anything about you didn't have a

25   deal?

```
 1          A.    No.
 2          Q.    Did they sit back and did they see that you were
 3    working hard?
 4          A.    They had to, yes.
 5          Q.    Did they acknowledge that?
 6          A.    Yes.
 7          Q.    They let you do it?
 8          A.    Absolutely.
 9          Q.    Did they know you expected to be paid both the
10    annual bonuses and the three-percent deal?
11          A.    Absolutely.  And as outlined.
12          Q.    And --
13                     MS. GIBSON:  Do you have a redacted of your
14    D14?
15                     MR. L. FRIEDMAN:  No, but (inaudible) --
16                     MS. GIBSON:  Okay.
17                     MR. L. FRIEDMAN:  Want the redacted?
18                     MS. GIBSON:  Yeah.
19                     Mark out whatever you want to mark out and
20    I'll ask about that in a minute.
21          Q.    (By Ms. Gibson) Okay.  You recall Mr. Friedman
22    saying that you were negotiating a new deal with Cheryl on
23    severance, you were attempting to negotiate a deal?
24          A.    On the unearned --
25          Q.    After --
```

1        A.      -- on the unearned bonuses.

2        Q.      Right.  After October 31st.  Do you recall

3    Mr. Friedman talking to you about that?

4        A.      Yes.

5        Q.      Okay.

6                Who asked you to draft something up?

7        A.      Cheryl.

8        Q.      Okay.  At that point, was your work done or not?

9        A.      It was completed.

10       Q.      Okay.  And so if y'all managed to work something

11   out after that, that would have been a new deal?

12       A.      Yes.

13       Q.      The $600,000 that you had left for them or you

14   calculate certain amounts, what did that represent at the

15   time when you dropped that off with Brian in March of '07?

16       A.      It represented the maximum earned or maximum bonus

17   potential, annual bonus potential.

18       Q.      Okay.  Did you feel like you deserved it?

19       A.      I did.  I worked around the clock seven days a

20   week.

21       Q.      Okay.

22               Did you believe your deal was still in

23   place at that time with Brian?

24       A.      Absolutely.

25       Q.      Okay.

Appendix 1317

1          And did Brian ever get back with you on the

2     proposal, the 600,000?

3     A.    No.

4     Q.    Okay.  And so had he said he would get back with

5     you and let you know the final total amount on annual

6     bonuses?

7     A.    Yes.  Then and --

8     Q.    Okay.

9     A.    -- and other occasions.

10          MS. GIBSON:  Larry, I've got a redacted

11    one.  I didn't realize I redacted it.

12          MR. L. FRIEDMAN:  Sorry.

13          MS. GIBSON:  That's okay.

14    Q.    (By Ms. Gibson) This is on your personal notes?

15    A.    Yes, ma'am.

16    Q.    This is Exhibit 63.  This is also part of what you

17    dropped off with Brian?

18    A.    This is what I reviewed.  Gave Brian a copy.  We

19    reviewed it at the restaurant.

20    Q.    Okay.

21    A.    And --

22    Q.    So, as of 3 --

23    A.    -- and then gave a copy to Cheryl as well.

24    Q.    Okay.

25          So, as of 3/14/2007, in your notes you talk

1    about certain amounts that came from Brian's mouth,

2    including extra bonuses were told of Fairway, 50,000;

3    McKinney, 50,000; Vegas, 100- to 200,000?

4         A.   Yes, ma'am.

5         Q.   Do you see that?

6         A.   Yes.

7         Q.   Okay.

8              Now, on Vegas, Vegas would be the source of

9    the money?

10        A.   Yes.

11        Q.   Okay.

12             But did Brian acknowledge to you that he

13   owed you on additional bonuses 200,000, but he -- but he

14   said he hoped to get a hundred- to 200- out of Vegas?

15        A.   Yes.

16        Q.   And on top of that, do you know in what you

17   dropped off to him that he acknowledged that there were

18   separate earned bonuses in there that would be coming to you

19   from conversions that he would apply as well?

20        A.   Yes.

21        Q.   Okay.  And so does that indicate or not indicate

22   that he intended to pay you more than the 300,000 that are

23   specifically mentioned?

24        A.   Yes, more.

25        Q.   And so for those numbers, what -- how did you get

114

1    another 50,000 and 50,000?

2         A.    Well, with that attachment was the chart of the

3    600,000 proposal; you know, the maximum proposal.

4         Q.    During all of your discussions, though, what had

5    y'all discussed as the lowest amount?

6         A.    400,000.

7         Q.    The lowest amount, the minimum you would ever get.

8    Not just these numbers.   The minimum under the range.

9         A.    Well, the lowest, according to the agreement,

10   would be 50,000 a year.

11        Q.    Okay, and is that where you're getting the

12   additional hundred thousand, this two-year minimum on the

13   dollars that he --

14        A.    Yes.

15        Q.    -- intended to pay you out of conversion on top of

16   this?

17        A.    Yes.

18        Q.    And that was the oral deal out of Brian's mouth as

19   of March of 2007?

20        A.    Yes, prior to that meeting.

21        Q.    And do you recall that Mr. Friedman accused me of

22   giving you -- what's he call it?   What does he call your --

23   your notes?   I can't think of it right now.

24               MR. SANFORD:   Script.

25        Q.    (By Ms. Gibson) Script.

Appendix 1320

115

```
1          A.    Script.

2          Q.    He accused me of giving you a script?

3          A.    Right.

4          Q.    Okay.

5                I am handing you what's been marked as

6    Plaintiff's Exhibit 70.  Do you recognize Exhibit 70 as

7    notes that you personally took?

8          A.    Yes.

9          Q.    Or typed up, I guess?

10         A.    Yes.

11         Q.    And when did you type up these notes?

12         A.    Shortly after my being finished.  Actually, it was

13   the 3rd of November through the 5th of November.

14         Q.    Okay, sometime between November 3rd and November

15   5?

16         A.    Yes.

17               MS. GIBSON:  Plaintiff --

18         A.    It was three days.

19               MS. GIBSON:  Plaintiff offers Exhibit 70.

20               THE COURT:   Any objection?

21               MS. GIBSON:  It is -- I already redacted

22   it.

23               MR. DONOHUE:  I was going to say I haven't

24   looked through to see about redactions.

25               Subject to any further redactions, we'd
```

Appendix 1321

1    have no objection.

2                    MS. GIBSON:  Okay.

3                    Plaintiff offers Exhibit 70.

4                    THE COURT:  It's -- 70 is admitted but not

5    published until we can look at it in more detail.

6                    MR. DONOHUE:  Very good.  Thank you,

7    Your Honor.

8                    MS. GIBSON:  It is -- may I go ahead and

9    portion publish --

10                   THE COURT:  Yeah.

11                   MS. GIBSON:  -- portions?  Okay.

12        Q.    (By Ms. Gibson) All right.  And you see in the

13   notes that you took shortly after the Potashniks plead to

14   back out, you see you talked about during this time period

15   Brian and I met at Cafe Express?

16        A.    Yes.

17        Q.    Okay.  And you said what about what you said you

18   would receive?

19        A.    Three percent from the gross compensation from the

20   sale transaction, less closing costs, brokerage fees,

21   attorney fees related to the transaction, title fees, and

22   other normal closing costs.  And less any deductions of any

23   compensation paid to any other employees, referring to

24   corporate.

25        Q.    Okay.

```
 1                      And when you -- you used -- you know, when
 2      you use different words in the last deduction, is there
 3      actually a different meaning?
 4           A.    No.
 5           Q.    What does it all mean?  What's the last deduction?
 6           A.    That --
 7           Q.    What type of bonuses are being deducted, what type
 8      of compensation?
 9           A.    Oh, the retention stay or severance.
10           Q.    Okay.
11           A.    Whatever terminology we're giving to the corporate
12      office.
13           Q.    Okay.
14                      And then during -- during that
15      conversation, the two of you tried to run an estimate?
16           A.    Yes.
17           Q.    Okay.
18           A.    Brian's very good with figures, I'm pretty good,
19      and we ran through them.
20           Q.    Okay.  And the estimate was how much?
21           A.    A million 20, based -- that was based off the LOI,
22      which was 36 million.  It actually kind of had the caveat of
23      37 million.  We were using -- ultimately, we brought it down
24      to 34 million to get to that number, a million 20.
25           Q.    Okay.
```

Appendix 1323

118

1     A.    And that's based off 34 million.

2     Q.    And then if you -- if we flip further here, you

3     talk about something that happened on October 12th.   And is

4     that around the date that you were talking about?

5                 MR. L. FRIEDMAN:   What page?

6                 MS. GIBSON:   I'm sorry.   Bates 37.

7     Q.    (By Ms. Gibson) Is that what you were talking

8     about when he said you could go?

9     A.    Yes.

10    Q.    Okay.   And that you would get paid either way?

11    A.    That's correct.

12    Q.    Whether you left sooner or later?

13    A.    Yes.

14    Q.    Jeff, let's say one of the -- just as an example,

15    let's say one of the teachers living in one of the apartment

16    communities, she has an agreement for salary and a certain

17    amount of bonus, okay.   If she asks for more, does that mean

18    she doesn't have a deal for her existing salary and bonus?

19    A.    No.

20    Q.    Let's talk about the final results on the

21    three-percent deal.   If the asset sale was a complete loss

22    and there was no revenue to sellers, how much would you get?

23    A.    Zero.

24    Q.    Even though that was the case, though, did Cheryl

25    and Brian Potashnik want to make sure, though, that there

1    was enough money for them personally?  Is that what they're

2    referring to in the November 2nd conversations in the

3    transcript?

4         A.    I believe so, yes.

5         Q.    At one point you talked about a more firm

6    commitment.  Do you recall that?

7         A.    Yes.

8         Q.    Did you have a firm commitment on a handshake

9    three-percent deal --

10        A.    Yes, we did.

11        Q.    -- even though you asked for something more firm?

12        A.    Yes.

13        Q.    Did you have a firm commitment from

14   Brian Potashnik on at least some amount of annual bonus

15   money?

16        A.    Yes.

17        Q.    And so on the percentage deal, other than attempts

18   to add the wherefore, whereas, lawyer language, you can

19   document that deal even if you don't know what the future

20   is?

21        A.    Oh, absolutely.

22        Q.    Okay.  And the only reason you couldn't is if you

23   wanted to make sure you got -- an individual got what they

24   needed first?

25        A.    Yes.

1        Q.    And Mr. Friedman had talked about the end date for
2    your work being October 31, 2007?
3        A.    Yes.
4        Q.    And -- but when you reached the handshake
5    agreement with Brian Potashnik on the three-percent,
6    sale-proceeds-formula bonus, what was the anticipated close
7    date for the sale?
8        A.    April -- excuse me -- April, May of 2007.
9        Q.    Okay.  And did you clarify during your deposition
10   that October 31, 2000 -- the October -- that October 31,
11   2007, wasn't even something that was foreseeable at the time
12   you and Brian made --
13       A.    Correct.
14       Q.    -- the handshake deal?
15       A.    Correct.  I'm not in the foreseeable.  Not
16   mentioned; not foreseen.
17       Q.    Okay.  Do you recall Mr. Friedman accusing you of
18   going to work for another company in your last week of
19   employment?
20       A.    Yes.
21       Q.    Okay, let's talk about that for a minute.  If you
22   take a look at either Plaintiff's 2 or Defendants' Exhibit
23   4, do you see the moonlighting provision?
24       A.    Yes.
25       Q.    Simply requires you to be -- to not do anything

1      that would materially interfere with the performance of your

2      duties.

3          A.   That's what it says --

4          Q.   Okay.

5          A.   -- yes.

6          Q.   Consulting -- consulting for American Housing

7      Foundation, how much of that happened before you left?

8          A.   A weekend.

9          Q.   One weekend.  Off the clock?

10         A.   Off the clock.

11         Q.   All right.

12         A.   Touring local properties.

13         Q.   Okay.

14              And Mr. Friedman then claimed that your own

15     exhibit proved that you had gone.  Do you remember that?

16         A.   Yes.

17         Q.   Let's take a look at the exhibit.  This is Exhibit

18     61, but I'm just going to ask you to look on the screen.

19     You see it says time period is for services performed and

20     rendered from January 1, 2008, to March 31, 2009?

21         A.   Yes.

22         Q.   On Line 4.

23              Okay.  Mr. Friedman didn't point that part

24     out?

25         A.   Correct.

```
 1        Q.    And -- but the time frame is for unpaid wages for
 2   March 31, 2009, to April 7, 2009?
 3        A.    Correct.
 4        Q.    Okay.  Mr. Friedman didn't point out that part
 5   either, did he?
 6        A.    No, sir -- no, ma'am.
 7        Q.    That's okay.  You can call me sir.
 8              And if you go to the next page, do you see
 9   there's a date, debt incurred, starting October 24, 2007?
10        A.    Yes.
11        Q.    Okay.  And you see on one of these pages -- this
12   is hard to read, but it talks about something that closed in
13   October of 2007?
14        A.    Yes.
15        Q.    A wire transfer on 10/14/07?
16        A.    Yes.
17        Q.    Okay.  What was that from AHF?
18        A.    That was a hundred-unit property that was going
19   through a complete rehab in Amarillo, an acquisition.
20        Q.    Okay.  Did they give you credit for that even
21   though you weren't working there?
22        A.    I wasn't working there.  I wasn't doing anything
23   with it.  But being close to the start date, they gave that
24   to me as a gift.
25        Q.    Well --
```

Appendix 1328

1   A. A credit.

2   Q. -- it's -- they gave you credit on it?

3   A. They gave me credit because I'll be -- I would be

4 working on it.

5   Q. Okay.

6     And if we back up on the claim form,

7 it clarifies above, under basis for claim, that you are

8 seeking wages, salaries, and compensation -- woops.  Sorry.

9 Your social is on there.  I'll take that off.  Unpaid

10 compensation for services performed March 31, 2009, to April

11 7, 2009?

12   A. Correct.

13   Q. Right?

14     Mr. Friedman didn't point that out either?

15   A. Correct.

16   Q. And you see that there is also a claim down here

17 for wages, salaries, or commissions of a certain amount

18 earned within 90 days before the filing?

19   A. Yes.

20   Q. Okay.  And the filing is October 8, 2009?

21   A. Yes.

22   Q. Okay.

23     So as far as comp for actual work, was all

24 of this after you left Southwest Housing?

25   A. Yes.

```
 1          Q.    Okay.

 2          A.    Absolutely.

 3          Q.    They just gave you credit for a deal because you

 4    were about to come over?

 5          A.    Yes.  I believe it was October 31st.

 6          Q.    And by early October of 2007, had Brian already

 7    given you permission to go if you wanted?

 8          A.    On October 12th, yes.

 9          Q.    Okay.  You remember Mr. Friedman talking about

10    sole discretion?

11          A.    Yes.

12          Q.    Okay.  But when -- whether it's sole discretion or

13    not and regardless of what the standards are --

14                (Reporter sneezed)

15                MR. L. FRIEDMAN:  Bless you.

16          Q.    (By Ms. Gibson) -- did Brian --

17                MS. GIBSON:  Sorry.  Bless you.

18                THE WITNESS:  Bless you.

19          Q.    (By Ms. Gibson) Whether or not bonuses were

20    discretionary and whether or not they got to set the amount,

21    regardless of what the standards are for earning it, did

22    Brian tell you he earned it -- you had earned it?

23          A.    Yes.

24          Q.    Okay.  And did Brian give you some specific

25    numbers that we just talked about, the Fairway, McKinney --
```

1        A.    Yes.

2        Q.    -- Vegas numbers?  Okay.

3              And so even though they're sole discretion,

4     has Brian, at that point, exercised his discretion?

5        A.    Yes.

6        Q.    Okay.

7              And regardless of what the standards are,

8     regardless of company performance, regardless of financially

9     how well the businesses were doing, did he tell you those

10    bonuses were earned?

11       A.    Yes.

12             MS. GIBSON:  Your Honor, I thought I would

13    be able to finish real quick.

14             THE COURT:  You want to take a lunch break?

15             MS. GIBSON:  Yeah, that's what I was

16    thinking.  I was hoping I could get done.

17             THE COURT:  We'll take an hour and 10

18    minutes for lunch, ladies and gentlemen.  We'll see you back

19    at 1:15.

20             (The jury exited the courtroom.)

21             (Lunch recess taken)

22             (The jury entered the courtroom.)

23             THE COURT:  Welcome back.  Good afternoon,

24    ladies and gentlemen.

25             We'll continue with the trial.

1    Mr. Carpenter is the witness; Ms. Gibson is the attorney

2    asking questions on redirect.  And we'll go an hour and 10

3    minutes, until about 2:25, before we take a break.

4                        Ms. Gibson, if you'd pick up where you left

5    off.

6                        MS. GIBSON:  Thank you.

7         Q.   (By Ms. Gibson) Mr. Carpenter, do you recall

8    Mr. Friedman saying that you still retain confidential

9    information on the laptop as of today?

10        A.   Yes.

11        Q.   Okay.  Let's talk about that for a minute.

12                       I'm handing you a little notebook thing.

13   Do you recognize the name on it?

14        A.   Yes.  TERIS.

15        Q.   Okay.  Who -- briefly, what did TERIS do in this

16   case?

17        A.   TERIS cloned the computer based on certain agreed

18   upon (witness cleared throat) -- excuse me -- key words that

19   both sides of counsel agreed upon.

20                       MR. L. FRIEDMAN:  I'm going to bet this is

21   about to violate the limine, Judge.

22                       THE COURT:  Okay.

23                       MS. GIBSON:  What?  I don't -- I don't know

24   how.

25                       MR. L. FRIEDMAN:  I'm going to bet this --

Appendix 1332

127

```
 1        Q.    (By Ms. Gibson) And where --
 2                    MR. L. FRIEDMAN:  -- is about to get into
 3   discovery matters.
 4                    THE COURT:   Come over here.
 5                    (Sidebar conference held)
 6                    THE COURT:   Vikki, the objection's
 7   overruled.
 8        Q.    (By Ms. Gibson) And after TERIS imaged that laptop
 9   based on the parties' chosen search terms, did both parties
10   get a copy?
11        A.    Yes.
12        Q.    Okay.   And as for the laptop itself, where has
13   it been since this lawsuit started?
14        A.    Primarily, under lock and key with my attorneys.
15        Q.    Mr. Friedman asked you about going to ADR.   Do you
16   recall that?
17        A.    No, I do not.
18        Q.    Alternative Dispute Resolution?
19        A.    Okay.
20        Q.    Before filing suit?
21        A.    Oh, okay.   As part of the employment agreement?
22        Q.    Right.
23                    Let's talk about that for a moment.   Did
24   you -- in the telephone transcript on November 2nd, did
25   Cheryl Potashnik practically invite you to go ahead and sue
```

1    if that's what you wanted to do?

2         A.    Yes.

3         Q.    And with respect to that provision of the

4    agreement, had the Potashniks affirmatively informed you

5    that they didn't intend to --

6                        MR. L. FRIEDMAN:   Leading, Your Honor.

7    Suggesting the answer.

8                        MS. GIBSON:   Let me rephrase that.

9         Q.    (By Ms. Gibson) Had the Potashniks repudiated the

10   deal with you before that provision would have been

11   triggered to go to ADR?

12                       MR. L. FRIEDMAN:   Still.

13                       THE COURT:   Overruled.

14                       THE WITNESS:   Yes.

15        Q.    (By Ms. Gibson) Do you recall Mr. Friedman asking

16   you about a provision in the written employment agreement

17   talking about this is the entire agreement of the parties?

18        A.    Yes.

19        Q.    Okay.   And you recall Mr. Friedman saying that the

20   effective date of that agreement was in February of 2004?

21        A.    Yes.

22        Q.    Okay.   As of February of 2004 -- or I'm sorry.   As

23   of the time the parties said that was their entire

24   agreement, as of what date would that be the entire

25   agreement?

Appendix 1334

1       A.   I believe their one date -- I think it was

2   February 13; I'm not exactly sure -- was the -- on the

3   first, second line on the front page of the '04.  Both

4   parties didn't sign until 2/25/04.  I didn't start working

5   until March 15th of '04.

6       Q.   Okay.  And was one of those the effective date of

7   when that was the entire agreement?

8       A.   I assume so, yes.

9       Q.   Okay.  Did anything in that contract say this was

10  the entire agreement all the way into the future forever?

11      A.   No.

12      Q.   And, in fact, did the agreement contemplate

13  that there would be future separate deals --

14      A.   Yes, it did.

15      Q.   -- concerning --

16           DO you recall Mr. Friedman asking you if

17  Brian Potashnik said I am authorized to represent certain

18  sellers in the asset sale?

19      A.   Yes.

20      Q.   Did he need to say those exact words to you?

21      A.   No.

22      Q.   Okay.

23           What was your understanding of who owned

24  every entity involved in this lawsuit?

25      A.   Brian Potashnik.

1          Q.    What was your understanding as to whether Brian
2    was an officer of each of the entities in this lawsuit who
3    sold assets in the asset sale?
4          A.    Brian Potashnik.
5          Q.    And did you see that he was listed as agent for
6    sellers in the purchase and sale agreement?
7          A.    Yes, I did.
8          Q.    Okay.
9                And what did he say about whether or not
10   Cheryl Potashnik had blessed the three-percent deal?
11         A.    That she agreed to it.
12         Q.    Okay.  And when -- when was that?  When did he
13   tell you that?
14         A.    When I tried to renegotiate for five percent.
15   Basically, the following day.
16         Q.    And in connection -- Mr. -- who had you been
17   informed, early on, mainly handled compensation issues?
18         A.    I'm sorry.  Would you mind repeating?
19         Q.    Early on -- well, let me just do this.  Remember
20   Mr. Friedman used portions of your declaration?
21         A.    Yes.
22         Q.    Okay.  And, of course, also in that -- and here
23   you talk further about why all of the five defendants were
24   parties to the three-percent deal?
25         A.    Yes.

1        Q.    Okay.  And you say that was clear based on

2   additional work you were to do and did do to benefit each of

3   them --

4        A.    Yes.

5        Q.    -- in efforts to sell?  Okay.

6              That's the Southwest Housing and the

7   Potashniks --

8        A.    Affordable Housing assets.

9        Q.    Okay.  And also your discussions with the

10  Potashniks?

11       A.    Yes, ma'am.

12       Q.    Okay.

13             And, also, Mr. Potashnik was the highest

14  level person at all of the entities, and you had been

15  informed early on that he usually handled compensation

16  agreements?

17       A.    Yes.

18       Q.    Who told you that he -- who told you that he

19  usually handled compensation agreements?

20       A.    Cheryl Potashnik.

21       Q.    Okay.  So did Brian Potashnik appear to have

22  authority to make a deal on seller -- certain formula seller

23  proceeds?

24       A.    Yes, ma'am.

25       Q.    And Mr. Friedman also played various clips from

1    your deposition?

2         A.    Yes.

3         Q.    Okay.

4               But you also remember various other points

5    in your deposition that clarify these things.  For example,

6    when he said at least on December 11, 2000 --

7               MR. L. FRIEDMAN:  Your Honor, I know she's

8    not going to read from his deposition.

9               THE COURT:  She's -- are you reading what

10   Mr. Friedman introduced?

11              MS. GIBSON:  No.  No.  I'm just showing

12   that there are other portions --

13              THE COURT:  Okay.  You can ask him if he

14   recalls and see if he needs his memory refreshed.

15              MS. GIBSON:  Okay.

16        Q.    (By Ms. Gibson) Do you recall saying that what the

17   Potashniks said on December 11, 2007, was a lie that there

18   was -- when they said there was no deal?

19        A.    Yes.

20              MR. L. FRIEDMAN:  Line and page, please.

21              MS. GIBSON:  I'm sorry.  132 -- oh, this is

22   in the 2010 volume.  Let me know when you're there.

23              MR. L. FRIEDMAN:  Do we have that?

24              MS. GIBSON:  Okay.

25              MR. L. FRIEDMAN:  Hold on.

```
1                    MR. DONOHUE:  132?

2                    MS. GIBSON:  Yeah.

3                    MR. L. FRIEDMAN:  Your Honor, she can't

4       impeach her own witness.  She can just ask him the

5       questions.

6                    THE COURT:  That's -- you're the one that

7       asked for page and line.  That's why I told her -- asked her

8       if he remembers what he said, if she needs it to refresh his

9       memory.

10                   MR. L. FRIEDMAN:  Okay.

11                   MS. GIBSON:  That's what I thought I was

12      doing.  Does he remember what he said --

13                   THE COURT:  That's what you were doing.

14      Keep going.

15                   MS. GIBSON:  Okay.

16                   Are y'all ready?

17                   MR. L. FRIEDMAN:  Yeah.

18                   MS. GIBSON:  Okay.

19      Q.    (By Ms. Gibson) And do you remember in response to

20      Mr. Friedman saying you just didn't have the deal on

21      December 11th, would you agree with that, do you recall what

22      you said?

23      A.    Yes.  I did not agree with that.

24      Q.    Okay.  Do you recall saying, no, we had a deal?

25      A.    No, we -- yes, I recall we had a deal.
```

1      Q.    Okay.

2            Do you recall whether or not you disagreed

3      with the Potashniks' statement that the payments you were

4      requesting would not be consistent with your employment

5      contract?

6      A.    Yes.

7      Q.    What did you say?

8      A.    That they could be modified orally and they still

9      need to be discussed.

10     Q.    Okay.   And do you recall also saying her

11     interpretation, I disagree?

12     A.    I do.

13            MR. L. FRIEDMAN:   Line and page, please?

14            MS. GIBSON:   That was 136, 25 to 1 and 5.

15     And I'm moving to 159 to 10 to 17.

16            MR. L. FRIEDMAN:   I'm sorry.   159, 17?

17            MS. GIBSON:   Yes.

18            MR. L. FRIEDMAN:   Thank you.

19            MS. GIBSON:   Wait, 159, 10 to 17.

20            MR. L. FRIEDMAN:   Okay.

21     Q.    (By Ms. Gibson) And do you recall Mr. Friedman

22     asking, Well, you had no deal for a bonus 'cause you

23     couldn't get it in writing and you couldn't get Brian or

24     Cheryl or Southwest Housing or anyone else to agree with it?

25     Isn't that the truth?

1                          Do you recall your answer?

2         A.   I disagreed with that statement.

3         Q.   And do you recall saying I disagree?

4         A.   I disagree.

5                   MS. GIBSON:  And I'm now at Page 174, 18 to

6    25.

7                   (Pause)

8                   MS. GIBSON:  Are you there?

9                   MR. L. FRIEDMAN:  Yes.

10        Q.   (By Ms. Gibson) And do you recall Mr. Friedman

11   asking you, But the truth is nobody knew if Cheryl Potashnik

12   or Brian Potashnik said, Jeff Carpenter, we have a deal?

13   Isn't that the truth?

14                  And do you recall exactly what you said to

15   that answer?

16        A.   I disagreed with that.

17        Q.   Okay.  Do you recall saying that is not the truth?

18   We had a deal.  We had a deal.

19        A.   That's correct.

20        Q.   Okay.  And these are only a few examples?

21        A.   Yes, ma'am.

22                  MS. GIBSON:  Pass the witness.

23                  THE COURT:  All right.

24                  Mr. Friedman?

25                  MR. L. FRIEDMAN:  Sure.  Just briefly.

1                          RECROSS EXAMINATION

2     BY MR. L. FRIEDMAN:

3          Q.    Mr. Carpenter, all of these examples from your

4     deposition were examples when you disagreed with me when I

5     was examining you, not Brian or Cheryl Potashnik, correct?

6          A.    Questions that you asked, though.

7          Q.    Questions I asked you, correct?

8          A.    On behalf of the Potashniks.

9          Q.    Yeah.  These weren't examples of telling the

10    Potashniks at the time of those conversations you're wrong,

11    we have a deal?

12         A.    I don't understand what you're saying.

13         Q.    The passages your lawyer was referring to in your

14    deposition was you telling me at the deposition you

15    disagreed with my questions, correct?

16         A.    In reference to the Potashniks and you

17    representing the Potashniks as if they asked the question,

18    yes.

19         Q.    Yes.  Correct.  Thank you.

20                     Number two, you keep saying that the

21    Potashniks never denied your deal, right?

22         A.    Correct.

23         Q.    Well, if there wasn't any deal, they didn't have

24    to deny it, correct?

25         A.    Pardon me?

1    Q.   If there was no oral agreements, they didn't have

2    to deny there was an oral agreement, correct?

3    A.   I had an oral -- I have an oral agreement --

4    Q.   I know that's your contention, but that wasn't my

5    question.

6    A.   I don't understand your question.  I'm sorry.

7    Q.   Let me clarify it.

8    A.   Thank you.

9    Q.   If there were not two oral agreements, as you

10   allege, the Potashniks didn't have to deny there were two

11   oral agreements, correct?

12   A.   I guess you could take that stance, yes.

13   Q.   Okay.

14        And when you had the opportunity to

15   confront the Potashniks in those two secretly recorded

16   conversations with your two alleged oral agreements, you

17   didn't confront them, correct?

18   A.   I did not confront them.  My goal and purpose was

19   to --

20   Q.   I'll take that -- I'll take that as an answer.

21        Even though your wife Vikki Carpenter told

22   you to go get your deal recorded?

23   A.   She did not say deal.

24   Q.   She said go get your agreement on tape.  It was

25   her suggestion to record the Potashniks to get your deal on

```
1    tape.  Isn't that true, sir?
2          A.    She knew that --
3          Q.    Sir --
4          A.    -- we had a deal and the separation agreement --
5          Q.    Sir, is it true --
6          A.    -- was --
7          Q.    -- or not?  It's the only question.
8          A.    The way you're presenting it is untrue.
9          Q.    Okay.
10               Did Mrs. Potashnik make -- I'm sorry.  Did
11    Mrs. Carpenter make the suggestion that you go record your
12    conversations with Brian and Cheryl Potashnik?
13         A.    I believe she did.
14         Q.    Well, you heard her testify she did.
15         A.    Yes, but I'm not exactly clear if she did or
16    didn't.
17         Q.    Okay.  So you don't believe --
18         A.    We were talking.
19         Q.    -- you don't believe her testimony?
20         A.    That's not true.
21         Q.    You were here when she testified.
22         A.    That's not true.  We --
23         Q.    You accept her testimony when she testified from
24    where you're sitting that she told you to go record these
25    conversations?
```

Appendix 1344

1          A.   She knew I was very upset.

2          Q.   Sir, my only question is, Mrs. Carpenter told you

3     to record conversations with Brian and Cheryl Potashnik?

4          A.   Yes.

5          Q.   And you followed her instructions, yes?

6          A.   To find out why the separation --

7          Q.   Sir, you followed her instructions.  Yes or no?

8          A.   Yes.

9          Q.   Okay.

10              How many conversations with Brian Potashnik

11    did you record?

12         A.   As I stated before, just the one.

13         Q.   How many conversations with Cheryl Potashnik did

14    you record?

15         A.   Just the one.

16         Q.   Okay.  And in those conversations you never

17    confronted them with either one of your alleged oral

18    agreements, correct?

19         A.   We -- I referred --

20         Q.   It's just a yes or --

21         A.   -- and discussed the agreements.

22         Q.   It's a yes-or-no question.

23         A.   I did not bring up the agreements specifically.

24    That was not the goal.

25         Q.   Thank you.

1                      Now, you own a laptop yourself?

2          A.    Yes.

3          Q.    You own a cell phone?

4          A.    Yes.

5          Q.    Did you own a cell phone in 2007?

6          A.    I don't recall.  No, I don't think so.

7          Q.    Did you own --

8          A.    Only the one that Brian gave me, yes.

9          Q.    Did you have a cell phone on the days that you

10    allege these oral agreements took place?

11         A.    Yes.

12         Q.    Okay.  But even though you had a cell phone on

13    those days and the day after, you didn't send a text to

14    Brian or Cheryl or an Email to Brian or Cheryl saying thank

15    you for this agreement or I'm confirming this agreement and

16    here are the ingredients, one, two, three, four, five, six.

17    You never did that, did you?

18         A.    I did it in an attempt --

19         Q.    Sir --

20         A.    -- with the severance agreement --

21         Q.    Sir --

22         A.    -- that was requested.

23         Q.    Sir --

24         A.    That's --

25                    MR. L. FRIEDMAN:  Unresponsive, Your Honor.

1          THE COURT:  Okay, listen to his question.

2     Answer only his question, please.

3          Q.   (By Mr. L. Friedman) I'm not trying to fight with

4     you.  I'm just saying you never sent a text to Brian and

5     Cheryl when you made the agreement or a day afterwards

6     confirming your agreement.  Isn't that true?

7          A.   Only in the separation agreement.  That's true.

8          Q.   And you never sent a text or Email to Brian and

9     Cheryl when you made your first or second oral agreement;

10    isn't that true?

11         A.   Not detailing the agreement.

12         Q.   All right.  That's all I'm asking you.

13              And isn't it also true that you've never

14    testified about your second oral agreement until today?

15         A.   You'd know better than I.  I'm not sure.

16         Q.   I do know better than you, but the question is you

17    never testified about that second oral agreement until

18    today.  Today was the first time you ever mentioned it;

19    isn't that true?

20         A.   Oh, the -- yes, the 400.  Yes.

21              MR. L. FRIEDMAN:  I have nothing further,

22    Your Honor.

23              THE COURT:  All right.  Thank you.

24              Ms. Gibson?

25              MS. GIBSON:  Plaintiff rests.

Appendix 1347

1                    THE COURT:   You're passing this witness,

2    though?

3                    MS. GIBSON:   Oh, yeah.

4                    THE COURT:   Okay.

5                    Thank you, Mr. Carpenter.

6                    (End of proceedings)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3         I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12        I further certify that the total cost for the

13   preparation of the Reporter's Record is $939.50 and will be

14   paid by Friedman & Feiger, LLP.

15        WITNESS MY OFFICIAL HAND this the 27th day of February,

16   2018.

17

18

19                         /S/ Vikki L. Ogden
                           _____
20                         VIKKI L. OGDEN, Texas CSR# 6309
                           Official Court Reporter
21                         Dallas County Court at Law No. 5
                           600 Commerce Street, Floor 5
22                         Dallas, Tx. 75202
                           (214)653-6443
23                         Certification Expires:  12/31/18

24

25

1    REPORTER'S RECORD (EXCERPT)

2    VOLUME 8 of 14

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
LISA MATZ
Clerk

3    Trial Court Cause No. CC-08-02072-E

4    JEFFREY W. CARPENTER,              )    IN THE DALLAS COUNTY
                                       )
5          Plaintiff,                  )
                                       )
6    VS                                )    COURT AT LAW NO. 5
                                       )
7    SOUTHWEST HOUSING DEVELOPMENT      )
     COMPANY, INC., ET AL,             )
8                                       )
           Defendants.                 )    DALLAS, TEXAS
9    _____

10

                    TRIAL ON THE MERITS

11

12   _____

13

14        On the 30th day of January, 2018, the following

15   proceedings came on to be heard within the presence

16   of a jury, in the above-entitled and -numbered cause;

17   and the following proceedings were had before the

18   HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19   Dallas County, Texas:

20        Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25

```
1                          APPEARANCES:

2
    MS. AMY GIBSON
3   SBN 00793801
    Gibson Wiley, PLLC
4   1500 Jackson Street, Suite 714
    Dallas, Texas 75201
5   (214)522-2121
    Attorney for Plaintiff
6
            -AND-
7
    MR. BRIAN SANFORD
8   SBN 17630700
    Sanford Firm
9   1910 Pacific Avenue, Suite 15400
    Dallas, Texas 75201
10  (469)361-9111
    Attorney for Plaintiff
11
            -AND-
12
    MR. LAWRENCE "LARRY" FRIEDMAN
13  SBN 07469300
    MR. MICHAEL DONOHUE
14  SBN 05989380
    MR. JASON FRIEDMAN
15  SBN 24059784
    Friedman & Feiger, LLP
16  5301 Spring Valley Road, Suite 200
    Dallas, Texas 75254
17  (972)788-1400
    Attorneys for Defendants
18
            -AND-
19
    MR. RYAN HALE
20  SBN 24097784
    Hawkins Parnell Thackston & Young, LLP
21  4514 Cole Avenue, Suite 500
    Dallas, Texas 75205-5412
22  (214)780-5138
    Appellate Attorney for Defendants
23

24
    ALSO PRESENT:  Steve Page, A/V Technician
25
```

Appendix 1351

```
                         VOLUME 8

January 30, 2018                              PAGE

Proceedings -----------------------------     4


DEFENDANTS'
WITNESS:
                  Direct   Cross   Redirect   Recross
Aaron Goldstein     5        6        7         --


Plaintiff Rests --------------------------     8

Defendants' Motions for Directed Verdict ------    8

Court's Rulings --------------------------    21

Both Sides Close -------------------------    22

Plaintiff's Motions ----------------------    24

Defendants' Motions for Directed Verdict ------   28

Court's Ruling ---------------------------    34

Defendants' Motions for Directed Verdict ------   36

Court's Ruling ---------------------------    44

Defendants' Motion for Directed Verdict -------   44

Court's Ruling ---------------------------    46

Defendants' Motion for Directed Verdict -------   46

Court's Ruling ---------------------------    48

Defendants' Motion for Directed Verdict -------   48

Court's Ruling ---------------------------    49

Adjournment ------------------------------    49

Court Reporter's Certificate ------------------   50
```

```
1                    P R O C E E D I N G S

2                      January 30, 2018

3               THE COURT:  Let me see you on the side over

4   here first.

5               (Sidebar conference held)

6               THE COURT:  Plaintiff's not resting.  We're

7   calling a witness out of order.

8               All right.

9               (The witness entered the courtroom.)

10              THE COURT:  Mr. Goldstein, if you'd come

11  all the way up here.

12              Mr. Friedman, is this your witness?

13              MR. J. FRIEDMAN:  Yes, Your Honor.

14              THE COURT:  Okay.  If you'd go ahead and

15  call your witness.

16              MR. J. FRIEDMAN:  I call Mr. Goldstein.

17              THE COURT:  All right.

18              Mr. Goldstein, if you'd come from all the

19  way over here.  Just have a seat back here.

20              MR. L. FRIEDMAN:  For the record,

21  Your Honor, I was Mr. Friedman first.

22              THE COURT:  There's a passel of

23  Mr. Friedmans.

24              Just have a seat right here.

25              This next witness, Mr. Goldstein, was
```

1    already sworn in.  We swore him in outside your presence,

2    but his testimony is under oath just like all the witnesses.

3                    Whenever you're ready.

4                    <mark>AARON GOLDSTEIN,</mark>

5    having been previously sworn, testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. J. FRIEDMAN:

8         Q.    Good afternoon, Mr. Goldstein.  My name's

9    Jason Friedman.

10                    We've never spoken before; is that correct?

11        A.    No.

12        Q.    And you understand you're a witness in this case,

13   correct?

14        A.    Yes.

15        Q.    And were you contacted by plaintiff's counsel,

16   Ms. Gibson?

17        A.    Yes.

18        Q.    How many times were you contacted by her?

19        A.    I believe it was just once.  On a Friday, the day

20   I got subpoenaed.  I believe so.

21        Q.    And what -- what was that conversation?

22        A.    She wanted to know if I recalled a conversation I

23   had with Jeff or she said I had with Jeff in his backyard

24   when I was doing some landscaping at their house.

25        Q.    And did you remember the conversation?

1          A.    No, I did not.  She said it was about 10 or 11

2     years ago.  There's no way I can recall that.

3          Q.    And what did she tell you happened?

4          A.    She asked if I recalled congratulating Jeff on the

5     sale of the company.  But I told her, I'm sorry, I don't

6     recall that.  If I did it, you know, I don't recall that.

7          Q.    Was that it?  Was that all you told Ms. Gibson?

8          A.    I told her something that was that important I

9     felt should have been written down.  I'm sure it was in

10    writing somewhere or an Email, if we had Email back that

11    long ago.  And she said, no, there wasn't anything in

12    writing.  And I just think something that important would

13    have been.  And I think that was the extent of it.  We

14    talked only for a few minutes.

15                I asked her if she was going to depose me

16    to find out if I recalled anything.  And she said, no, that

17    I just have -- I'd go as a witness and I'd have to show up

18    in court.

19         Q.    All right.  Thank you for your time.

20                MR. J. FRIEDMAN:  I'll pass the witness.

21                THE COURT:  All right.

22                Ms. Gibson.

23                    CROSS-EXAMINATION

24    BY MS. GIBSON:

25         Q.    Mr. Goldstein, are you aware that oral agreements

```
 1    are enforceable in Texas?
 2         A.   I think you told me that.
 3                   MR. J. FRIEDMAN:  I object, Your Honor.
 4                   MS. GIBSON:  Okay.
 5                   MR. J. FRIEDMAN:  Calls for a legal
 6    conclusion.
 7                   THE COURT:  It does, but --
 8                   MS. GIBSON:  He answered.  I'm done.
 9                   THE COURT:  Okay.  Fair enough.  You pass
10    the witness?
11                   MS. GIBSON:  Pass the witness.
12                   THE COURT:  Okay.
13                   Thank you, Mr. Goldstein.
14                   THE WITNESS:  Thank you.
15                   THE COURT:  Or did you have anything?
16    Mr. Friedman, any redirect?
17                   MR. J. FRIEDMAN:  Yes, a couple questions,
18    Your Honor.
19                         REDIRECT EXAMINATION
20    BY MR. J. FRIEDMAN:
21         Q.   Was Ms. Gibson aggressive when trying to put words
22    in your mouth?
23         A.   No.
24         Q.   No?
25         A.   No.  She just wanted to know if I recalled the
```

1    conversation.

2         Q.    Okay.   Thank you.

3                     THE COURT:   Very good.

4                     Pass the witness?   All right, thank you.

5                     Ladies and gentlemen, we'll take about a

6    20-minute break, maybe 25 minutes.   We'll see how long.   And

7    we'll take a 20-minute break.

8                     (The jury exited the courtroom.)

9                     THE COURT:   Y'all come on up.

10                     Vikki, let's get on the record that

11   plaintiffs rest.   Is that right, Ms. Gibson?

12                     MS. GIBSON:   Yes.

13                     THE COURT:   All right.

14                     (Lengthy pause)

15                     THE COURT:   We're off the record right now.

16                     (Off the record)

17                     THE COURT:   We're on the record now.

18                     THE REPORTER:   Okay.

19            DEFENDANTS' MOTIONS FOR DIRECTED VERDICT

20                     MR. L. FRIEDMAN:   Thank you, Your Honor.

21                     Let's address a couple of things that are

22   obvious.   I'd like to move for a directed verdict in favor

23   of Cheryl Potashnik.   The witness testified that he had no

24   agreement with Cheryl Potashnik, period.   I don't think

25   there's any evidence that there was any agreement with

1   THE STATE OF TEXAS

2   COUNTY OF DALLAS

3       I, Vikki L. Ogden, Official Court Reporter in and for

4   the County Court at Law Number 5 of Dallas County, State of

5   Texas, do hereby certify that to the best of my ability the

6   above and foregoing contains a true and correct

7   transcription of all portions of evidence and other

8   proceedings requested in writing by counsel for the parties

9   to be included in the Reporter's Record, in the above-styled

10  and -numbered cause, all of which occurred in open court or

11  in chambers and were reported by me.

12      I further certify that the total cost for the

13  preparation of the Reporter's Record is $310.00 and will be

14  paid by Friedman & Feiger, LLP.

15      WITNESS MY OFFICIAL HAND this the 16th day of October,

16  2018.

17

18

19                          /S/ Vikki L. Ogden
                            _____
20                          VIKKI L. OGDEN, Texas CSR# 6309
                            Official Court Reporter
21                          Dallas County Court at Law No. 5
                            600 Commerce Street, Floor 5
22                          Dallas, Tx. 75202
                            (214)653-6443
23                          Certification Expires:  12/31/18

24

25

1   REPORTER'S RECORD

2   VOLUME 10 of 14

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
Clerk

3   Trial Court Cause No. CC-08-02072-E

4   JEFFREY W. CARPENTER,              )   IN THE DALLAS COUNTY
                                       )
5           Plaintiff,                 )
                                       )
6   VS                                 )   COURT AT LAW NO. 5
                                       )
7   SOUTHWEST HOUSING DEVELOPMENT      )
    COMPANY, INC., ET AL,              )
8                                      )
            Defendants.                )   DALLAS, TEXAS
9   _____

10

11                   TRIAL ON THE MERITS

12  _____

13

14       On the 31st day of January, 2018, the following

15  proceedings came on to be heard within the presence

16  of a jury, in the above-entitled and -numbered cause;

17  and the following proceedings were had before the

18  HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19  Dallas County, Texas:

20       Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25

```
 1                              APPEARANCES:

 2

        MS. AMY GIBSON
 3      SBN 00793801
        Gibson Wiley, PLLC
 4      1500 Jackson Street, Suite 714
        Dallas, Texas 75201
 5      (214)522-2121
        Attorney for Plaintiff
 6
                -AND-
 7
        MR. BRIAN SANFORD
 8      SBN 17630700
        Sanford Firm
 9      1910 Pacific Avenue, Suite 15400
        Dallas, Texas 75201
10      (469)361-9111
        Attorney for Plaintiff
11
                -AND-
12
        MR. LAWRENCE "LARRY" FRIEDMAN
13      SBN 07469300
        MR. MICHAEL DONOHUE
14      SBN 05989380
        MR. JASON FRIEDMAN
15      SBN 24059784
        Friedman & Feiger, LLP
16      5301 Spring Valley Road, Suite 200
        Dallas, Texas 75254
17      (972)788-1400
        Attorneys for Defendants
18
                -AND-
19
        MR. RYAN HALE
20      SBN 24097784
        Hawkins Parnell Thackston & Young, LLP
21      4514 Cole Avenue, Suite 500
        Dallas, Texas 75205-5412
22      (214)780-5138
        Appellate Attorney for Defendants
23


24
        ALSO PRESENT:  Steve Page, A/V Technician
25
```

Appendix 1360

```
1                          VOLUME 10

2    January 31, 2018                            PAGE

3    Proceedings ----------------------------------     4

4    Defendants' Request to Reopen Charge Conference    6

5    Court's Ruling -------------------------------     7

6    Defendants' Bill of Exception -----------------    7

7    Court's Ruling -------------------------------    16

8    Alternate Juror Dismissed --------------------    17

9    Closing Argument by Ms. Gibson ---------------    22

10   Defendants' Objection and Motion for Mistrial -   36

11   Court's Ruling -------------------------------    37

12   Defendants' Objection ------------------------    37

13   Court's Ruling -------------------------------    38

14   Closing Argument by Mr. L. Friedman -----------   38

15   Rebuttal Argument by Ms. Gibson ---------------   68

16   Deliberations Held ---------------------------    78

17   Jury Questions -------------------------------    78

18   Adjournment ----------------------------------    81

19   Court Reporter's Certificate ------------------   82

20

21

22

23

24

25
```

1    case with them at this point.

2                    We thank you.

3                    JUROR NUMBER 7:   Thank you very much.

4                    MR. DONOHUE:   Thank you for your service.

5                    MR. SANFORD:   Thank you.

6                    MS. GIBSON:   Thank you.

7                    (Off the record)

8                    (Recess taken)

9                    (The jury entered the courtroom.)

10                    THE COURT:   Welcome back and good morning,

11   ladies and gentlemen.

12                    We're entering the final stage of the

13   trial.   The remaining portions of the trial are the Court's

14   charge and the closing arguments.

15                    The Court's charge is a written document.

16   It contains legal instructions and definitions.   And the

17   legal instructions and definitions give you guidance on

18   answering the jury questions.   It's your answers to the jury

19   questions that will constitute the verdict.   And after you

20   return a verdict I take your verdict and reduce that to a

21   judgment, and it's the judgment that closes the case.

22                    As you can see, the Court's charge is 23

23   pages for this particular case.   What we're going to do

24   first today is go over the first 21 pages of the Court's

25   charge.   That's all the instructions, definitions, and jury

1   questions.

2                       Then we'll have the closing arguments.

3   Each side will have 45 minutes for closing argument.   And

4   then after the closing arguments we'll go over the last two

5   pages of the Court's charge.   One page has instructions for

6   presiding juror and the other is called the verdict

7   certificate page, where you certify your verdict after you

8   answer the jury questions.

9                       So the first thing we're going to do is go

10  over the first 21 pages of the Court's charge.   The rules of

11  court require me to read the charge aloud to you.   That way

12  it becomes part of the record and also gives me assurance

13  that you've heard the instructions and definitions at least

14  once.   And it also allows you to hear the jury questions

15  before you hear the closing arguments so that you'll put

16  into some perspective what the closing argument is.

17                      So we're going to start on Page 1 at the

18  top of the page where it says ladies and gentlemen of the

19  jury.

20                      (Charge read aloud)

21                      THE COURT:   And then you'll see on Page 22

22  is the page of instructions for the presiding juror and

23  Page 23 is the verdict certificate page, and we'll go over

24  those two pages with you after the closing arguments.

25                      We'll now turn to the closing arguments.

1   The closing arguments, like the opening statements in the

2   case, are not evidence.  They're argument.  The closing

3   arguments provide an opportunity for the attorneys to argue

4   to you what they believe the evidence showed.

5                    The attorneys have 45 minutes to present a

6   closing argument.  By rule of court, the attorney for the

7   plaintiff, the party with the burden of proof, gets to go

8   first and last.  What that means is that Ms. Gibson, who

9   represents Mr. Carpenter, will break up her time.  And this

10  is an approximation:  She'll first go -- she'll break up her

11  45 minutes, approximately 25 minutes and 20 minutes.  So you

12  will hear first from her the 25 minutes.

13                   Then we're going to take a break.  And then

14  when you come back from the break we'll hear from

15  Mr. Friedman or Mr. Donohue for up to 45 minutes.  After

16  that we'll go back to Ms. Gibson for her rebuttal, which

17  will be approximately 20 minutes.  After that we'll go over

18  the last two pages of the Court's charge.  After that we'll

19  ask that you retire to the jury room.

20                   So, again, the next thing we're going to do

21  is the first portion of plaintiff's closing argument

22  presented by Ms. Gibson, and should go about 25 minutes.

23  And after that we'll take a break.

24                   Is everyone okay going 25 minutes?

25                   MS. GIBSON:  Your Honor, before we begin,

1   may we move the flip charts?

2                     THE COURT:   Sure.

3                     MS. GIBSON:   Can everybody see?  Can y'all

4   see?

5                     Larry, can you see?

6                     MR. L. FRIEDMAN:   Yes, ma'am.

7                     MS. GIBSON:   Okay.

8                     THE COURT:   Did you want a warning at 25

9   minutes or before 25 minutes?

10                     MS. GIBSON:   I'm sorry?

11                     THE COURT:   Did you want a warning at 25 or

12   before 25?

13                     MS. GIBSON:   Before, please.

14                     ==PLAINTIFF'S CLOSING ARGUMENT==

15                     MS. GIBSON:   Good morning.

16                     In -- in a little while you-all will go

17   into the deliberation room to decide this case and you will

18   have three jobs.  Your first job will be to answer the

19   questions that Judge Greenberg gives you.  You're second job

20   will be to make sure all other jurors are following the law.

21   If another juror does not follow the law during

22   deliberations, you have the right to tell the bailiff so

23   that he can inform the judge.  And your third job in

24   deliberations will -- to be able to explain why you feel the

25   way you do when answering -- when answering the questions in

1  the charge.  So, during my closing, I'd like to give you

2  some ways to help you do that.

3          First, recall that the rules we are here

4  for are the business financial safety rules.  Businesses

5  must live up to their agreements with those who have lived

6  up to theirs to protect businesses, workers, and families

7  from harm.  Safety Rule Number 2, those who operate

8  businesses in Texas must honor Texas law about enforcement

9  of oral agreements, especially handshake agreements, to

10  protect businesses, workers, and their families from harm.

11          In this case everyone agrees that in Texas

12  oral agreements can be enforceable.  You've heard from

13  Cheryl Potashnik that if it's a handshake and the parties

14  agree, that's an agreement.  The Court has also instructed

15  you that despite the language in the written employment

16  agreement with Southwest Housing Management that that

17  agreement -- oops, too far.

18          THE COURT:  I think you turned up -- you

19  should turn on the light here.  There you go.

20          MS. GIBSON:  The written agreement may be

21  modified by a later oral agreement, even though it provides

22  that it can be modified only in writing.  That is Texas law

23  that supports oral handshake deals.

24          You remember talking in jury selection

25  about some of the bigness -- biggest commitments that we

1  make in life are oral, and this case will be about whether
2  we put the honor back in a handshake deal.   You will decide.
3           In some of the beginning instructions from
4  the Court, I'd like to talk about a few of those.   One is
5  preponderance of the evidence.   The definition explains that
6  this is the greater weight of the credible evidence
7  presented in the case.   If you do not find that a
8  preponderance of the evidence supports a yes answer, then
9  answer no.   Preponderance of evidence is not measured by the
10  number of witnesses and number of documents.
11           But, importantly, at the end the Court has
12  summarized what preponderance of evidence means.   In sum,
13  it just means that you must find that the fact or the
14  answers to the question is more likely true than not true.
15  What does that mean?  We make decisions based on more likely
16  true than not true every day.   It comes down to what you
17  feel in your gut.   If you feel probably this happened, that
18  is enough to meet the burden.   Although the burden is only
19  more likely true than not true, however, we believe we will
20  show that we have shown you much more than needed to meet
21  that burden that something probably happened.
22           Additionally, you're entitled to consider
23  circumstantial evidence.   In fact, in oral-agreement cases
24  that is generally how -- always how these cases are decided.
25  All you need to do is look -- you may find a fact if it can

1   be fairly and reasonably inferred from other facts.  This is

2   akin to having a puzzle that has a missing puzzle piece or

3   two missing puzzle pieces.  You can see how everything fits

4   by what -- the facts surrounding it.

5                   And we also use this type of evidence every

6   day.  For example, when you-all came up for jury selection I

7   didn't see you come in downstairs.  I wasn't there, I didn't

8   see it, but I know reasonably that you-all went through a

9   metal detector and security to get inside because I know the

10  program and the policy in place in the courthouse.  That's

11  an example of how we reasonably infer facts every day, even

12  when someone wasn't there to witness.

13                  Question 1, Did Jeff Carpenter and

14  Southwest Housing Management agree to pay annual bonuses to

15  Jeff Carpenter covering the period from March 15, 2005,

16  through March 15, 2007?  You saw the instruction on

17  authority and apparent authority and vice principal.  All of

18  those instructions go to something fairly simple; and that

19  is, Brian Potashnik, who was the owner of Southwest Housing

20  Management, he was the president of Southwest Housing

21  Management, and he was a director of Southwest Housing

22  Management.  And the Secretary of State records are in the

23  exhibits if anyone wants to check.  He had the authority to

24  enter deals on behalf of that company.

25                  He is -- you don't need authority, apparent

Appendix 1368

26

1    authority, and vice principal to find that he had the power

2    to act.  You only need one.  And the easiest way to answer

3    this question is that Brian Potashnik was a corporate

4    officer.  That means that what Brian Potashnik says and the

5    deals he makes are the acts of the company he is speaking

6    for; here, Southwest Housing Management.

7              Now, was there a deal for the annual

8    bonuses after year one?  Take a look back at the employment

9    agreement.  From day one, the agreement contemplates -- why

10   does this -- why is this light not coming on?

11             THE COURT:  Rick, will you check that

12   background light?

13             MS. GIBSON:  It says back light on.

14             From day one, the parties contemplated that

15   there might be future deals when this agreement was signed.

16   First of all, it contemplated that at some point

17   Jeff Carpenter might be employed by affiliates of the

18   company.  That would mean at some point he might be doing

19   work for Affordable Housing Construction and for the

20   development arm of the company.

21             Thank you so much.

22             Second, when it comes to the bonuses, the

23   original agreement only covered the first calendar year with

24   a range between a minimum discretionary bonus of 50,000

25   upward to, potentially, 200,000.  But from the beginning the

1    agreement contemplated that the parties would later agree as

2    to future bonuses.  In other words, there would be -- they

3    contemplated from day one that there could be a separate

4    future deal.  Although no bonus plan was actually provided

5    in writing, as the agreement required, Brian Potashnik and

6    Jeff Carpenter discussed bonuses after year one orally.

7              Additionally, you may conclude that the

8    oral deal on bonuses was either a separate oral deal or that

9    it modified this contract.  You decide.  Either way, you get

10   to the same result because the original contract only

11   covered bonuses in the first year and certain other items

12   that are not at issue in this case.  It did not cover the

13   three-percent deal.  Certainly, no asset sale was

14   contemplated at that time, and bonuses after year one were

15   orally discussed and agreed to with Brian Potashnik.

16             You heard the testimony that

17   Brian Potashnik and Jeff Carpenter continued to use the same

18   range, the 50,000 to 200,000, in their discussions.  They

19   continued to use 50,000 as the minimum, and they did this

20   orally.  And recall that things -- that's how things were

21   done here initially as far as orally.

22             Initially, for example, the advance on

23   bonus of $50,000, that advance was given before the bonus

24   was due; and, yet, there was no written modification to the

25   agreement.  That was handled orally.

1          As another example, recall that
2    Cheryl Potashnik believed that Jeff got a raise at some
3    point.  And although it wasn't truly a raise, she thought it
4    was; and that was done orally without any written
5    modification to the original employment agreement.
6          With respect to the agreement with
7    Brian Potashnik, that is in Exhibit 63.  These are notes of
8    a conversation with Brian Potashnik on March 14, 2007.  And
9    here they discuss earned bonuses and dollars that were to
10   come from the -- from conversions to be applied to earned
11   bonuses.  Now, he doesn't say a number there, but their
12   discussions were that 50,000 would be the minimum.  And then
13   he talked about extra bonuses out of Fairway and 50,000;
14   McKinney property for 50,000; and Vegas between 100- and
15   200,000.  Now, on the Vegas property, Brian Potashnik is
16   acknowledging that he believes Jeff Carpenter has earned
17   200-, but hopes to fund that from a deal on Vegas
18   properties.
19          And from that -- and that's Exhibit 63 --
20   the numbers are -- this is not for year one.  But in year
21   two, the 50,000 minimum; year three, 50,000 minimum.  And
22   then the total of the numbers that came from
23   Brian Potashnik's mouth in the prior exhibit, 50,000,
24   50,000, and 200,000, totals 400-.
25          It is undisputed that Jeff Carpenter was

1  not paid those bonuses.  So, with respect to failure to

2  comply with the agreement, the answer is yes.  And with

3  respect to the damages question the answer is 400,000.

4  Again, taken from what Brian Potashnik agreed with

5  Jeff Carpenter in March of 2007 was already earned and owed

6  at that point.

7           With respect to Question 4, this is -- this

8  is the three-percent deal, which is a separate oral deal, or

9  you can find that it orally modified the original agreement.

10  You decide.

11           Again, the instruction is that the written

12  agreement with Southwest Housing Management may be modified

13  later, even though it provides that it can only be modified

14  in writing.

15           The parties involved in the asset sale were

16  all people for whom or entities for whom Brian Potashnik was

17  a vice principal, because he was an officer of each of them

18  and they were all sellers in the asset sale.  And these are

19  Affordable Housing Construction, Southwest Housing

20  Development, Southwest Housing Management, and

21  Brian Potashnik.  They are all listed as sellers in the

22  attachment to the purchase and sale agreements.  Brian had

23  the power to bind all of them to promise three percent of

24  certain -- of certain asset-sale proceeds pursuant to the

25  formula.

1          Now, one -- in addition, we know that
2   the -- we know from the PSA that the sellers are listed on
3   the schedule.
4          Now, Jeff was to stay on as long as needed.
5   There's a timeline, however, on what is as long as needed.
6   What did that mean?  Recall that originally closing was
7   anticipated.  The specific agreement was struck on October
8   13th, 2006.  It's undisputed that at that time the closing
9   was anticipated for spring or summer of 2007.  So,
10  originally, as long as needed was anticipated to be through
11  closing the following spring or summer.
12         Then at one point there was an indication
13  that JC, Jeff Carpenter, may be picked up for transition.
14  And that's just the period of time after the sale has
15  happened when someone stays on temporarily to make sure
16  that the purchaser has everything they need and that things
17  are going smoothly.  However, ultimately, as long as needed
18  ended up being, Brian says, on October 12, 2007, that Jeff
19  can leave and get paid either way on annual bonuses and
20  three percent.  His work is done.
21         Cheryl Potashnik asked him to stay through
22  transition to new management with the purchaser, and that
23  date is October 31st.  So, as long as needed changed over
24  time and ultimately ended up being through October 31, 2007;
25  because the next day, on November 1st, the management

1    transferred to the purchaser and his work was done.  Though,

2    Brian said that his work was done on October 12th, by

3    October 12th of '07.

4            With respect to an agreement, if somebody

5    asks how do we know there was actually an agreement, we know

6    from undisputed testimony that there was a stay program in

7    place.  The only person who denies that there was a stay

8    program in place is Brian Potashnik.  Brian Potashnik

9    contradicted Cheryl Potashnik's testimony that before they

10   sold the business they considered incentives to get

11   employees to stay.  It was important for continuity and

12   there was also a criminal investigation going on, which

13   meant they needed people to stay.

14           So, imagine a want ad and how difficult

15   it might be for them to get a replacement that late in the

16   day with criminal proceedings goings on.  The ad would

17   essentially call for someone who was highly qualified to

18   come on as the company is about to sell its assets and while

19   the company is being investigated criminally and the

20   criminal investigation is all over the news.  That's another

21   reason they needed them to stay.

22           Brian Potashnik denies there were bonuses

23   with anyone.  He consistently says, Never happened.

24   Brian Potashnik's credibility is at issue here.  Why else

25   was there an agreement?

1          Jeff Carpenter turned down a job with
2    higher pay.  You heard Jeff Richards, who testified by
3    video, say that they wanted to hire Jeff immediately but
4    Jeff stayed for months because he was expecting large
5    compensation for -- with his current employer and he might
6    risk losing that if he left.
7          We also know that Jeff participated in the
8    program, stay and pay.  Or whether you call it severance,
9    whether you call it stay bonus, it all means the same thing.
10          You heard from Keith Jones.  And although
11    accused of making up that language, Exhibit 52 and others
12    talk about Jeff's own participation in the stay-and-pay
13    incentives and the stay plan.  Jeff Carpenter was actually
14    helping decide stay bonuses for people lower than his level.
15          To believe that Jeff Carpenter -- there was
16    no agreement made with him when he was also part of the
17    program in setting those bonuses, you would have to believe,
18    for example, that someone paid all of their first string
19    sports team but didn't want to pay, didn't make an agreement
20    with one of their starting quarterbacks.
21          Also, in May 2006, when Brian Potashnik
22    announces the sale, at this point there's no number.  But
23    you heard from Deepak Sulakhe say that he heard from Brian
24    that Jeff Carpenter might not have to work again if the
25    transaction works out.  That explains references.  And those

1  are just a few examples of how we know there was an

2  agreement.

3               With respect to the damages on that

4  agreement, it's undisputed, of course, on violation that he

5  was not paid.  You have the calculation from the closing

6  documents:  Net sale proceeds to seller after closing

7  amount; deducted the amount of bonuses paid to other

8  employees; total bonuses paid out at sale were approximately

9  2.1 million; and the damages answer on the three-percent

10 formula is $926,970.

11              With respect to the question -- and,

12 importantly, when you are answering these questions we are

13 going to ask you to say the same number for several

14 questions, but you don't need to worry about whether there

15 will be a double recovery.  Jeff Carpenter can only recover

16 one amount one time, but that is handled with the Court

17 after you render your verdict.

18              You will be asked about compensable work in

19 connection with the asset sale, whether Jeff rendered

20 valuable services.  The point of those questions is if

21 someone ends an agreement, ends an agreement early, or if

22 you find there was no agreement, if Jeff Carpenter performed

23 valuable services, he can still get compensation.

24              One question is excluding the asset sale

25 happened.  This is just annual bonuses for working harder.

1    The other question is his services in making the asset sale
2    happen, and that goes to the three-percent deal.  The
3    reasonable value of that is what Brian Potashnik said it
4    was; originally, about $1,020,000.  But we've reduced that
5    to be the same as the amount for the original agreement.
6    And the valuable services he performed was that he stayed.
7    He stayed as long as needed.
8                 With respect to joint -- the question on
9    joint enterprise, this is talking about the asset sale.  And
10   the answer is yes for each defendant.  They had an
11   agreement.  It was expressed.
12                The agreement included sharing costs,
13   it included sharing profits, and it included sharing losses.
14   For example, it expressly has them share in operating
15   deficits, it expressly has them share in the profits, and
16   they also split the costs.  They split the cost 50-50.  So
17   that we know, had this been a total loss, which it wasn't,
18   they would have expressly shared in those losses.
19                THE COURT:  You have about three minutes
20   left in your first 25.
21                MS. GIBSON:  Okay.
22                With respect to the question on joint
23   venture, this is also in connection with the asset sale.
24   Affordable Housing Construction, Southwest Housing
25   Development, Southwest Housing Management, and

1    Brian Potashnik are all listed as sellers on the schedule to
2    the purchase and sale agreement.  All of them had an
3    agreement that we just talked about that had the same
4    interest.  That was to get the asset sold to a purchaser.
5              They had an agreement to share profits, the
6    agreement to share losses that we just went over, and a
7    mutual right of control or management of the venture because
8    Brian Potashnik was the owner, officer, and director of all
9    these three companies.  He is the one who controlled each
10   one.
11             And, finally, noted on the timeline, 10/12
12   is when Brian says Jeff will get paid whether he leaves now
13   or later.  That's on both agreements.  The work's done as
14   far as he's concerned.
15             As of October 31st, all work is done for
16   Cheryl Potashnik due to the management transition to seller.
17   And then, after the defendants got everything they wanted
18   from Jeff and all of his work is done, that is the first
19   time they sent a separation agreement asking him to release
20   all his rights for far less, pennies on the dollar, as to
21   what they had agreed to with Brian Potashnik.  And it is
22   only after that, in transcripts of conversations, that they
23   are saying Jeff Carpenter has no legal rights.  At no time
24   were words like that said until the defendants got
25   everything they needed.

1            And, finally, they deny the deal and say

2    the written agreement prevents any bonuses to be paid in

3    December of that year.

4            Thank you.

5            THE COURT:  All right.  You conclude your

6    argument?

7            Ladies and gentlemen, we'll take our

8    morning break.  We'll take a 15-minute break.  We'll see you

9    at 15 minutes -- about 10:43.

10            (The jury exited the courtroom.)

11            (Recess taken)

12            THE COURT:  We're on the record but outside

13    the presence of the jury.  Mr. Hale wanted to put an

14    objection to Ms. Gibson's closing argument on the record.

15            DEFENDANTS' OBJECTION AND MOTION FOR MISTRIAL

16            MR. HALE:  Yes, Your Honor.

17            On behalf of all defendants, we object to

18    the reference to it being in the news or all over the news

19    that there was an FBI investigation into Southwest Housing

20    or any of the other defendants.  We believe that it

21    encourages -- or it does encourage the jury to consider

22    evidence that's outside the record.  It's prejudicial to a

23    substantial right of the defendants to have the case tried

24    only on the evidence before them.  And by making references

25    to the FBI investigation or the news is highly inflammatory

1    and it encourages the jury to decide the case on an

2    emotional rather than on a logical basis.  And for that

3    reason we ask for an instruction to disregard any references

4    to the FBI investigation or it being in the news -- I'm

5    sorry -- just to the FBI investigation being in the news and

6    also ask for mistrial.

7                        COURT'S RULING

8                THE COURT:  Okay.  And both those are

9    denied.

10                    (Off the record)

11                 DEFENDANTS' OBJECTION

12                MR. HALE:  One more objection.

13                THE COURT:  All right.

14                MR. HALE:  We object to references to other

15    employees' bonuses.  We're trying the case here on whether

16    Jeff Carpenter had an agreement and he received an annual

17    bonus.  This would encourage the jury to decide the case on

18    evidence that's not before them and facts that aren't

19    relevant.  It violates the motion in limine and the Court's

20    ruling that there would be no references to other employees'

21    bonuses.  So we believe that it -- well, it does require or

22    encourages the jury to decide the case on an improper basis

23    and assume that because other employees may have gotten

24    bonuses that Jeff Carpenter would have been promised a bonus

25    as well.  It's also a violation of the motion in limine.

```
1                          COURT'S RULING
2                THE COURT:  All right.  It's overruled.
3                MR. HALE:  All right.  Thank you,
4    Your Honor.
5                (The jury entered the courtroom.)
6                THE COURT:  Welcome back and good morning
7    still, ladies and gentlemen.
8                We'll continue with the closing statements
9    [sic].  We have concluded the first portion of plaintiff's
10   closing statement -- closing argument.  So we'll hear now
11   from Mr. Friedman for up to 45 minutes.  And then after that
12   we'll hear for -- from Ms. Gibson for her rebuttal argument,
13   which will be about -- it's between 20 and 21 minutes that
14   she has left.  Then we'll go over those last two pages in
15   the charge.  Then we'll ask that you deliberate.
16               But the next thing we'll do is the closing
17   argument for defendants presented by Mr. Friedman.
18               And, Mr. Friedman, whenever you're ready.
19               DEFENDANTS' CLOSING ARGUMENT
20               MR. L. FRIEDMAN:  All right.
21               I'm back.
22               May it please the Court.
23               THE COURT:  Counsel.
24               MR. L. FRIEDMAN:  Counsel.
25               Ladies and gentlemen of the jury, once
```

Appendix 1381

1    again, I'm very proud to represent my friends, my long-term

2    friends, Cheryl and Brian Potashnik, and the Southwest

3    Management, Affordable Housing Construction, and Southwest

4    Development.  Cheryl Potashnik is no longer in the case.

5                     This is an important case, as I said at the

6    beginning, and you've heard a lot of evidence.  A lot of

7    things have passed by you from the witness stand in the last

8    couple of days.  And I want to thank you for your service, I

9    want to thank you for your attention, and I want to thank

10   you for your effort; because there have been a lot of

11   boards, there have been 30, 40 pieces of evidence, and

12   it hasn't all been easy to take in.  But I've watched you

13   and I know that you've paid attention.

14                     What I want to remind you is that the

15   plaintiffs have the burden of proof.  The plaintiffs have to

16   prove each and every element of their case by credible

17   evidence; not just by a board, not just by a PowerPoint, and

18   not just by Mr. Carpenter's self-serving Emails to himself.

19                     You know, I listened carefully to the

20   testimony of Mr. Carpenter and I watched the evidence that

21   was presented by Mr. Carpenter, and most of it -- or let me

22   take it back -- all of it came from Mr. Carpenter.  It was

23   Mr. Carpenter's Emails to himself, it was documents that

24   Mr. Carpenter generated, it was documents that Mr. Carpenter

25   sent to the Potashniks.  It was comments that Mr. Carpenter

1    made to Mr. Sulakhe, comments that Mr. Carpenter made to

2    Keith Jones, comments that Mr. Carpenter made to Mark Jones.

3    But there's no evidence that Brian Potashnik or

4    Cheryl Potashnik ever agreed to any agreement with regarding

5    [sic] bonus, compensation, severance, beyond what was in the

6    employment contract with Mr. Carpenter.

7                    This is not about safety rules.  You didn't

8    hear any evidence about safety rules.  This is not about a

9    gut feeling.  This is about evidence that you heard from the

10   stand.

11                   Ms. Gibson would like you to follow your

12   feelings.  That's not what the judge instructed you to do.

13   This -- your decision will be based on credible evidence.

14   And I'm going to summarize this for you and show you that

15   what Mr. Carpenter said was not credible evidence starting

16   from the beginning when he filed this lawsuit and starting

17   from the way he conducted himself in this courtroom from the

18   beginning of the case.

19                   Number one, he wasn't the lead witness.

20   Plaintiffs usually get up and tell their story.  They want

21   their story to be told.  They lead chin first.  That's not

22   what he did.  He wanted to hear what Brian Potashnik would

23   say; then he wanted to hear what Cheryl Potashnik would say

24   so that he could cover up whatever they had to say.  He

25   wanted to hear what Keith Jones had to say so that he, if

1    necessary, could contradict those people.

2                    It's important to note that none of the

3    witnesses Mr. Carpenter called supported his case.   None of

4    the witnesses that we called supported Mr. Carpenter's case.

5                    If you look at Deepak Sulakhe, who was here

6    the other day, he said Mr. Carpenter thought very highly of

7    himself.

8                    Mr. Carpenter asked him for advice about

9    what kind of compensation or what kind of severance he

10   should ask the Potashniks for.   Should I ask for one

11   percent?  Should I ask for three percent?  Do you think five

12   percent is too much?  That's not the communications of

13   someone who had an oral agreement back in March of 2006.

14   Those aren't the questions that somebody who already had an

15   agreement would be asking someone in Mr. Sulakhe's position.

16                   Aaron Goldstein, someone that Mr. Carpenter

17   said he bragged to about being a millionaire, Mr. Goldstein

18   said, I don't remember anything, I don't remember that

19   conversation, I don't remember Mr. Carpenter bragging to me.

20   Paul Cohen said the same thing.

21                   Mr. Carpenter said he was on the plane to

22   Vegas.   Mr. Carpenter bragged to him that he was going to be

23   a millionaire.   Probably something somebody would remember.

24   Common people becoming a millionaire, it's a big event.   In

25   fact, it's a big event for Mr. Carpenter.

1              If I was going to become a millionaire, I'd
2    remember it.  It's like being in your house during an
3    earthquake.  You remember that day.  You remember where you
4    were, you remember what you were wearing, you remember where
5    your slippers were, and you remember how you escaped from
6    your house.  Not Mr. Carpenter.
7              He gave 10 different versions of what the
8    oral agreement was.  He added to it, he subtracted to
9    it, and he gave you different dates.
10             In fact, he changed the theory of the case
11   from the beginning when he started a couple days ago.  When
12   he came here this was a contract case.  He wanted to
13   persuade you that there was an oral modification of his
14   contract, of his employment agreement.  Then as the case
15   went on and he heard the testimony, as of yesterday he said
16   from the witness stand, "I have no contract claim.  I have
17   no contract claim."  I wrote it down.  He said, "I have no
18   contract claim.  I'm not asking for relief under the
19   employment agreement."
20             What he said was I have two oral agreements
21   that I'm trying to enforce, and let me tell you about my
22   second oral agreement.  I don't know if you saw me.  I was
23   quite surprised because, notwithstanding other people in
24   this courtroom, I've now known Mr. Carpenter for over 10
25   years and I never heard anything about a second oral

43

1    agreement until yesterday.

2                    Because two things that Mr. Carpenter and I

3    agreed on, one is that the only contract he ever had with

4    Southwest Management was the employment agreement signed by

5    both parties, Southwest Management and Mr. Carpenter; and,

6    two, he can't recover a dime under that contract.  He and I

7    agree to both of those things.

8                    Now, at the beginning, I'm going to

9    summarize the case and show you the pleadings.  He was

10   telling you that he was due a bonus for the 2004/2005

11   period, his first year.  And it wasn't until I

12   cross-examined him that he admitted, oh, yeah, I got that

13   bonus, I got that $50,000.

14                   And I said, Mr. Carpenter, not only did you

15   get that $50,000, but the Potashniks were generous enough to

16   give you another 25,000 to pay the taxes on that 50,000;

17   isn't that true? He said, Oh, yeah, that's right.  So

18   you're not asking for the $50,000 bonus for the first year?

19   He said, No, I'm not.  So now we're only asking for bonuses

20   for years two and years three and maybe eight months at the

21   end?  He said, That's right, two years and eight months at

22   the end.

23                   When you get your jury charge you'll see

24   that he's not even asking for the eight months at the end.

25   He's now asking for 2005 to 2006 and 2006 to 2007.  And for

1     that he's asking you to award him about 600,000, which he

2     was asking for; about 200,000, which he was asking for; but

3     400,000, which is his new number, because Mr. Carpenter

4     admitted he renegotiates because he wanted more.   That's

5     what this is about.

6                  This whole case is about Mr. Carpenter.   He

7     wanted more.   He wanted more when he sued his first employer

8     or the previous employer, Brisbane.   After he separated from

9     his previous employer, he sued them because he wanted more.

10    And after he left Southwest Housing Management, sued his

11    next employer because he wanted more.

12                  Now, I don't know what Mr. Carpenter's

13    personal problems are.   He put in his personal notes that he

14    had a tax lien and litigation expenses.   He had personal

15    financial problems, problems with his wife and family.

16    That's really not our business but, obviously, there was

17    something going on that forced him to try to get more money

18    from Southwest Housing and the Potashniks.

19                  But one thing I do know is he didn't have

20    the first oral agreement and didn't have the second oral

21    agreement.   Because every time he proposed to get his

22    so-called oral agreement in writing, gave his proposed

23    amendment to employment contract to the Potashniks, they

24    refused to sign it.   Gave his draft severance agreement to

25    the Potashniks, they refused to sign it.   Every time he made

1    an effort to get something signed by the Potashniks they

2    just said no.  And the reason they said no was they didn't

3    agree to it.

4              There was never an oral agreement.  There

5    was never any agreement.  And no witness, no witness, no

6    third-party witness, substantiated any agreement other than

7    the employment agreement with Mr. Carpenter.

8              And I submit to you, based on

9    Mr. Carpenter's credibility and the circumstantial evidence

10   surrounding his credibility, not even Mr. Carpenter believed

11   he had an agreement, because he flip-flopped back and forth.

12   I made that agreement on March 6th, he said.  No, no, I made

13   it on October 13th.  No, no, I asked for 400,000.  No, no, I

14   asked for 600,000.

15             But I did and I didn't.  I wasn't sure and

16   I didn't know.  If he had made that agreement, he would

17   know.

18             You know, Mark Twain said if you tell the

19   truth you don't have to remember anything, because if you

20   tell the truth you know it.  You were there, you saw it, you

21   heard it, you smelled it, and you just repeat the truth over

22   and over again.  You tell the same story over and over and

23   over again.  But if you lie, you don't remember what you

24   said.  You don't remember what you said last time, you don't

25   remember what you said the time before, and you don't

1    remember what you said the time before that.  And that's how

2    you get caught and that's how you get tripped up, and that's

3    how Mr. Carpenter wound up here with at least 10 different

4    versions of what he calls a definitive agreement.

5              You know, oral contracts are legal in the

6    state of Texas if people agree, if there's a meeting of the

7    minds; if two people agree on the same material terms, they

8    know what the agreement is, they know how much the agreement

9    is, they know when it's going to be paid, they know what the

10   terms are, and they agreed to it.  It just never happened.

11             He never had a meeting of the minds with

12   Brian Potashnik for a lot of reasons.  Brian Potashnik was

13   busy.  Brian Potashnik was preoccupied.

14             And Brian Potashnik didn't believe that an

15   employee that worked for his company -- and he did his job.

16   Nobody's saying he didn't do his job.  But an executive

17   employee that was generously paid $200,000 plus a car

18   allowance, plus health insurance, plus paid time off, plus,

19   plus, plus, would get a million-dollar bonus after working

20   three-and-a-half years.  There were employees -- there were

21   other employees that were worthy in that company.

22             And you heard from Mr. Sulakhe, when he

23   read Mr. Carpenter's deposition and found -- and heard what

24   Mr. Carpenter claimed the deal was.  He was surprised.  He

25   was shocked.  Because he said that an employee in that

1  position, executive vice president of the company, didn't

2  merit that kind of bonus.

3          Now, look, this isn't General Motors.  This

4  is not Exxon Mobil.  This is an affordable housing company.

5  This an affordable housing company who uses their money to

6  build affordable housing projects for low-income families.

7  That million dollars could have been put to better use than

8  giving it away to an executive vice president.

9          Mr. Carpenter was offered a

10  hundred-fifty-thousand-dollar severance when he left, but he

11  turned it down.  Not because he didn't think it was a good

12  bonus; because he needed more.  He needed more.  He turned

13  down the hundred and fifty-thousand dollars.  It's not

14  credible.

15          So, I'm going to briefly go through the

16  case.  I know you've heard the evidence more than once --

17  probably sick of it by now -- so maybe I only have to hear

18  it one more time.

19          I've prepared a timeline.  I'm going to

20  give it to you just for illustrative purposes.  We're going

21  to collect it before you go and deliberate.

22          In fact, would you just pass it?

23          I've prepared a timeline.  I've made the

24  boxes on the timeline -- the dates and boxes -- different

25  colors to indicate every time Mr. Carpenter changed his

48

1    story.  So, quickly, he had an employment agreement on

2    February 13th, 2004.

3                    Steve, I don't think we need to go through

4    it.

5                    You remember the employment agreement.

6    It said what Mr. Carpenter's duties were.  It said that no

7    amendment can be had unless it's in writing and signed by

8    both parties.  It encompassed the subject matter of his

9    employment.  It encompassed the bonuses in Paragraph 4B.

10                   And if you remember at the beginning of the

11   case, Ms. Gibson and Mr. Carpenter were arguing that the

12   bonuses were not discretionary; that 4B entitled

13   Mr. Carpenter to bonuses for all three-and-a-half years.

14   But now at the end of the case, with the testimony and

15   evidence in, they've now acknowledged that the only bonus

16   he's entitled to under the contract was year one and that

17   the rest of the years were discretionary by the employer and

18   they're not asking for a bonus under the contract.  They're

19   only asking for a bonus now pursuant to a second oral

20   agreement, which we've heard about for the first time

21   yesterday.  And let me put that to bed.

22                   "What are the details?" I asked him.  He

23   said, "Well, I don't know the date.  It happened somewhere

24   before March 14, 2007."

25                   "Where were you?"  "We were driving

1  somewhere.  Maybe the Ash Creek Apartments and maybe the

2  Scyene Apartments and maybe one more.  I don't remember."

3           What were the details?  You know, we had an

4  oral agreement for $400,000.  Was it written?  No.  Was

5  it signed?  No.

6           Were you renegotiating?  Yeah, I was

7  renegotiating, just like I was renegotiating when I asked

8  for different amounts less than 400,000.

9           Mr. Carpenter was always a moving target

10  because he just wanted more.

11           The second time, on May 6, 2006, Carpenter

12  alleges that an oral agreement was made at Cafe de Brazil,

13  and I didn't learn about that till I took Mr. Carpenter's

14  deposition later on.

15           What was that deposition again?

16           MR. DONOHUE:  May 15th of 2010.

17           MR. L. FRIEDMAN:  May 15, 2010.

18           So, in 2010 -- play that clip we played

19  during trial -- 2010, when I took his deposition and asked

20  him when he made his oral agreement --

21           (Audio clip playing)

22     "Q.   Mr. Potashnik, concerning the three-percent

23  compensation on the so-called sale of the --"

24           MR. L. FRIEDMAN:  I'm sorry.  This was his

25  lawyer examining him.

1                   (Audio clip resumed)

2       "Q.    -- during the time frame of May -- I believe May

3  of '06 at lunch at --"

4       "A.    Cafe de Brazil, I believe."

5       "Q.    And can you describe what was said?"

6       "A.    Well, he was following up with, you know, here,

7  we have several different offers.  We discussed what we want

8  to do.  You're the key ingredient in doing -- in promoting

9  this."

10             "You know, development and construction,

11  you know, they're pretty much done.  You're going to be the

12  face of the company.  You'll be meeting with -- doing the

13  property tours.  You'll be doing, you know, actually, the

14  due diligence, the selling of the -- of the company and so

15  forth."

16             "And you're -- you're a key proponent of

17  why we're in the position to sell the company.  And with

18  that we would like to compensate you three percent of the

19  sales price.  And there was a stipulation with that, and

20  that was less normal closing costs, which I estimated was

21  close to a mill -- basically, a million dollars.  'Cause I

22  think at the time he said the offer was 37 million."

23       "Q.    What was your response?"

24       "A.    I was -- I was pleased with that, knowing that we

25  still had unresolved issues with, you know, 4B of my

1    agreement.  But I would like to have more.  I know I

2    contributed a great deal, but I was -- I was comfortable

3    with it."

4        "Q.   Did you accept his offer?"

5        "A.   Yes, I did."

6              (Audio clip stopped)

7              MR. L. FRIEDMAN:  So, in May of 2010, which

8    was eight years ago, he said his oral agreement happened in

9    March 14th --  I'm sorry -- May of 2006 and it happened at

10    Cafe de Brazil.  And the bonuses he was looking for was

11    pursuant to Paragraph 4B of his employment contract.

12              So, last week when I had my first

13    opportunity to cross-examine Mr. Carpenter and ask him about

14    the same deal, I said, "When did you make your oral

15    agreement?"  He said, "That oral agreement was October 13th,

16    2006."  I said, "Are you sure?"

17              No, first he said May 14th, 2006.  And I

18    said, "Are you sure?"  He said, "No, no, no.  That oral

19    agreement was October 13th, 2006."  And I said, "Are you

20    sure?"  And he said, "Yeah.  Absolutely."

21              And I said, "Where did that happen?"  He

22    said, "Cafe Express.  And I remembered that deposition."  I

23    said, "Are you sure about that?"  He said, "Oh, yeah, I

24    remember that."  And I said, "Well, what was that deal?"

25    And he said, "Three percent of the sales proceeds minus

1    normal closing costs."  And then he added, "Severance

2    bonuses -- minus severance bonuses paid to corporate

3    employees."

4                    No corporate employees because that's not

5    what it says on the jury charge and that's not what

6    Mr. Carpenter testified to several times later.  He

7    testified to all employees, he testified to any employees,

8    he testified to select employees.  And that's what happens

9    when you don't tell the truth.  You don't remember the story

10   you told before.

11                   So then we move on.  October 13th, when

12   Mr. Carpenter alleges his oral agreement, you recall the

13   next significant date.  I'm moving more quickly now.  On

14   March 14, 2007, Mr. Carpenter sends his amended employment

15   agreement to Mr. and Mrs. Potashnik.  And that's the first

16   time he said -- testified -- that he ever puts this oral

17   agreement in writing.

18                   Let's do this quickly.  Let's see it, the

19   amended employment agreement.

20                   So the significance here is that he says

21   they desire for employee to remain employed by employer

22   until the employer entities sell the sale to Cascade.  So,

23   in other words, when he first put it in writing he says,

24   "I'm going to stay till the end.  I'm going to stay till the

25   closing."

1              In the closest time to this alleged oral

2     agreement Mr. Carpenter says my deal was to stay till the

3     closing.  Now, you know that that's changed.  And now the

4     current story is, well, I only had to stay till I was

5     needed, and I decide when I was needed.

6              Let's -- let's move on.

7              Is there a "three percent" definition here?

8     I know there is.  Go to that in the amended agreement.

9              On top, he talks about three percent of his

10    gross compensation, including any fees or loans paid to

11    employer -- which is new -- less closing costs of brokerage

12    fees, attorney's fees, title fees, and all the normal

13    closing costs with all related closing costs -- new term --

14    capped at a maximum of three percent of the compensation

15    paid to employer, but without deduction, without deducting

16    any compensation paid to any other employees of any employer

17    entities.  The reason that's important is he changes the

18    "without deducting" to "with deducting" on all subsequent

19    iterations of his alleged oral employment agreement.  That

20    changes over and over again.

21              And, again, the description of who -- who

22    is involved, here it says any other employees.  Over there

23    he said corporate employees.  And you'll see over -- over

24    other times he said selected employees.  And if it's

25    selected employees then you know it could never agree to the

term because there's no evidence that anybody selected any
employees.

So we move on.  Focusing on the evidence,
Mr. Carpenter's terminated October 31st.  He secretly
records two conversations with Mr. and Mrs. Potashnik
because he's instructed by his wife to do so.  She wants him
to get the deal on tape.

And we've been over these recorded
conversations.  He has over 80 opportunities to speak.  And
the one thing he doesn't do in these recorded conversations
is confront the Potashniks and say, you know, Brian, we made
that oral agreement on either May 6, 2006, or he could say
October 13, 2006, Cafe de Brazil, Cafe Express, or he could
pick another restaurant, and here's what the terms are.  He
never says it because he knows if he says it Brian or Cheryl
is going to say, "What are you talking about?  We don't have
a deal."  So he skirts around and he goes around and around
and around.

And the two things you get out of those
conversations is both Brian and Cheryl say, "Look, man, we
can't make any commitments right now.  Everything's influx.
We don't know how it's going to shake out, but give us some
room and, you know, maybe at the end we'll pay you some
money."  Both Brian, both -- and Cheryl -- separate
conversations, tell him the same thing, but he doesn't give

1    up because he needs more.

2              This November 15th Email is the smoking

3    gun, so let's pull it up.  It's Jeff Carpenter's Email to

4    Cheryl.  And what does he say?  He says, "Last year, after

5    the Cascade transaction was announced and it became

6    reasonably clear that I would not be retained after closing

7    of that transaction, you implored me to stay with the

8    company through that time."

9              I asked him, "What does that time mean,

10   stay till the closing?"  He said, "Yes, that's what

11   it means.  And that continuity, my continued services, were

12   essential to the success of the transaction."

13             In exchange -- I ask him, "In exchange for

14   staying till the closing?"  He said, "Yeah."

15             You informed me that I would be entitled to

16   receive at three percent of the proceeds of that transaction

17   net of certain costs which, based on the structure at that

18   time, would represent an amount equal to $1 million.  This

19   in addition to the unpaid taxes, unpaid annual bonuses.

20   Asked him if that was accurate.  He said yes.

21             Of course, because he didn't tell the

22   truth, he left out any reference to paid bonuses or

23   compensation or any payments to employees, no matter how he

24   described it.  But the important thing here is in his own

25   words in his self-serving Email with the Potashniks on

1    November 15th, 2007, eight months, October -- oh, I'm sorry.

2    Five weeks after he was terminated he expresses that his

3    deal was to stay till closing.  Now that's changed over the

4    course of this trial.  Now he says all I had to do was stay

5    until I was needed.  That was the oral agreement.  But he

6    didn't think that was the oral agreement a couple weeks

7    after he supposedly made that oral agreement.

8                   THE COURT:  You've gone 25 minutes.

9                   MR. L. FRIEDMAN:  Thank you.

10                  Go ahead.  Next.

11                  Separation agreement, the same thing.  He

12   sends it over there the same day.

13                  We're going to do this quickly.  Let's go

14   to the green part.

15                  It's Mr. Carpenter saying that he's -- he

16   has earned $600,000, but he needs it immediately.  He needs

17   the money immediately.  Pay me now, pay the rest a couple of

18   days, 90 days.  I need it now.  And then I'll be paid the

19   rest --

20                  Let's go to three-percent combination.

21                  He also adds the term he wants the

22   Potashniks to unconditionally guarantee this personally.

23   That was never -- that was never part of the oral -- of any

24   oral agreement, no meetings of the minds.  They never had a

25   meetings of the minds and now Mr. Carpenter is adding on.

1    This is what he'd like to have.  It's not what they agreed
2    to.
3              No one ever talked about personal
4    guarantees.  And now he says the formula is the gross
5    compensation shall not include and shall specifically
6    include any amounts for the benefit of the Potashniks, the
7    company, its stockholders, in the form of fees, bonuses,
8    severance, payments, loans or otherwise.  Where'd that come
9    from?  It certainly wasn't in the oral agreement.
10             No credibility.  If you don't tell the
11   truth, you can't remember what you said before.  And this
12   story changes over and over again.
13             Mr. Page, his sworn petition, I think this
14   is the last one we're going to show and then we'll just talk
15   about it.
16             His sworn petition, if you remember how we
17   got here, he filed this lawsuit on March 8th, 2008.
18             Can we pull it up?
19             Mr. Carpenter swore at the time he filed
20   this lawsuit this was true and correct.  Remember the
21   declaration at the end, last page under penalty of perjury?
22             We'll come back to 26.  Let's go to the --
23   Mr. Carpenter signed and had notarized all factual averments
24   of statements contained in these paragraphs: 20; 21; 22; 25;
25   and 26.  We're going to come back to 26.

1          Plaintiff's original petition are within my

2     personal knowledge and true and correct.  That's how he

3     opened the door to this lawsuit.  So let's go to Paragraph

4     26.  Let's see what was true and correct at the time he

5     filed this lawsuit.  He says, When the sales process began,

6     one or more of the defendants agreed to pay me three percent

7     of the gross sale, less normal closing costs, brokerage

8     fees, attorney's fees related to the sale -- new term, not

9     criminal case -- title fees and normal closing costs.  This

10    agreement was -- or agreement was made in consideration for,

11    in part, plaintiff's remaining an employee of one or more of

12    the defendants to assist in effectuating the sale.

13          I asked him when he was on the stand, "Does

14    that mean stay till closing?"  He said, "Yeah."

15          He swore that this was true.  And by the

16    way, never mentioned anything about paying employees.  This

17    was in 2008 when he had a better -- better memory of that

18    so-called oral deal than he had last week, 10 years later.

19    But I guess that was true then.  This, maybe, is true now

20    about the criminal case, closing costs.  Mr. Carpenter will

21    say whatever he has to say to get more because that's all

22    this is about, getting Mr. Carpenter more.

23          But let's -- let's move forward.

24          So then he talks about the minimum of

25    150,000 in owed bonuses he wants placed in the registry of

1    the court.   So, in March of 2008, he was seeking $150,000 in

2    bonuses.   But because he wanted more, that figure has --

3    grew to 600,000.   Except now he can't justify it, so he's

4    asking for 400,000.

5                    Let's move on to the next, next item on

6    your timeline.

7                    Mr. Carpenter's deposition, if you

8    recall -- I'm not going to play it, Steve -- you remember I

9    asked him how much his claim was for on those bonuses.   I

10   said, "Can you give me an amount?"   He said, "No, I can't.

11   I can't identify an amount what those bonuses were for."

12                   His first amended petition he had a new

13   definition for his three percent, his claim for a

14   three-percent fee.   At that time he said minus compensation

15   to any employee.

16                   The declaration is interesting, which I

17   showed you, because that was the first time we learn in 2013

18   that he was claiming he made this oral agreement with

19   Mr. Potashnik on October 13th, 2006.

20                   THE COURT:   You have 15 minutes left.

21                   MR. L. FRIEDMAN:   Okay.

22                   Carpenter's interrogatory responses, he now

23   has operational unit assets to the gross sales price.

24   Second amended petition, he gets rid of the formula

25   altogether.   Third amended petition, no formula, but he now

1    admits that the bonuses are at the sole discretion of the

2    employer.  And then when I took his deposition two weeks ago

3    he said, man, I added new terms, I made mistakes, I was

4    still negotiating, and basically admitted he had no deal.

5                    I pinned him down.  I said, "All of these

6    things are not consistent."  Yeah.  I said, "You made

7    errors."  Yeah.  I said, "You made counter offers."  He

8    said, "No, no, no, I didn't make any counter offers."  But

9    he did.

10                   I said, "You made proposals."  He said,

11   "Yeah."  I said, "You included additional and different

12   terms."  He said, "Yeah."  And I -- and then he said

13   Brian Potashnik was supposed to put it in writing.

14                   And then last but not least, Carpenter's

15   testimony yesterday was shocking.

16                   Pull up that board.

17                   It's the same board from over there.

18   Mr. Page put it up here.

19                   For the first time we learn a second oral

20   agreement when he realized he couldn't recover under the

21   contract.  He had a second oral agreement in the car ride,

22   and that was not for the 2004/2005 bonus because he already

23   admitted that he had been paid for that.  But it was now for

24   the 2005/2006, 2006/2007 and eight months for 2007.

25   Yesterday, he was claiming for two years and eight months.

1    He's not claiming that today when you look at your jury

2    charge.

3                    He acknowledged he had absolutely no

4    contract claim.  So when Ms. Gibson said you can decide if

5    it's a modification to the contract or you can decide if it

6    was an oral agreement, that's not what Mr. Carpenter said.

7    He said, "I have no contract claim."  I was clear about it.

8    I wanted to know before we got here, contract claim, oral

9    agreement, 'cause I knew there was no oral agreements.

10                    Said to him, "You renegotiated?"  And he

11   did.  And I said, "What was the purpose here?"  He said,

12   "Well, I just wanted more."

13                    Let me go to the jury charge 'cause I think

14   that's important, and use my remaining time on the jury

15   charge.

16                    Go to Question Number 1.  So, Question

17   Number 1, I wouldn't mind going to the beginning of the

18   question.   Page back.

19                    The question is:  Did Jeff Carpenter and

20   Southwest Housing agree -- and every time you see agree,

21   according to Mr. Carpenter, he is talking about an oral

22   agreement.  He has eliminated his contract claim.  So every

23   time you see agree, he is only talking about the two oral

24   agreements he is seeking to enforce.

25                    Did Mr. Carpenter and Southwest Housing

62

1    Management -- not Brian Potashnik, not Development, not

2    Affordable Care, not a mother in Florida, only Southwest

3    Housing Management -- did Jeff Carpenter and Southwest

4    Housing Management agree that Southwest Housing Management

5    would pay one or more annual bonuses to Jeff Carpenter

6    covering the period from March 15th, 2009, to March 15,

7    2007?  And the answer's no.  The answer is no because none

8    of the witnesses, no third-party witness, not Keith Jones,

9    not Mark Jones, not Deepak Sulakhe, not any of the

10   third-party witnesses tendered any evidence that there was

11   an agreement.  Mr. Potashnik denied it, Cheryl Potashnik

12   denied it, and the only person that said there was a promise

13   was Mr. Carpenter.  And I'm arguing that Mr. Carpenter

14   doesn't have a little credibility.  He has no credibility.

15                He has changed his story so many times.

16   He's beyond mistakes.  He's beyond errors.  He has earned

17   the category of liar.

18                The answer to Number 1 is no.

19                Number 2, if you answered answered yes to

20   Number 1, then you would answer Number 2.  But for Number 2

21   it's -- the answer would be no answer, NA, no answer.

22                And if you follow me, I'll get you home by

23   3:00 o'clock today.

24                So the answer to two is no answer, NA.

25   Three, again, if you answered yes to Question Number 2, then

1   you have to answer this.  But the answer here, again, is NA,

2   no answer, or no or no answer.

3              Question Number 4 -- one and four are the

4   key questions here -- did any of the defendants named below

5   and Jeff Carpenter agree on October 13th, 2006, to pay

6   Jeff Carpenter three percent of the total of gross

7   asset-sale revenue to sellers, less normal closing costs,

8   less sale-proceeds bonuses made to employees if

9   Jeff Carpenter would stay as long as needed to help make the

10  asset sale happen?  The answer's no.

11             The answer's no for a couple of reasons.

12  Number one, Jeff Carpenter didn't know when he made this

13  agreement.  He testified in his deposition -- and which was

14  incorporated into evidence that you saw -- that it happened

15  in May of 2006.  Then he testified here that it happened on

16  October 13th, 2007.  That's not credible.  And there could

17  be no meeting of the minds if he had this agreement occur in

18  two different places, so it's impossible to have an

19  agreement.

20             In addition -- did I lose the question?

21  Can you go back?

22             In addition, if you look at the number one

23  where it says three percent of the gross asset-sale revenue

24  to sellers, Mr. Carpenter has changed that definition no

25  less than 10 different times.  And if he didn't know what

1    the agreement was there is no way that Southwest Management

2    could ever agree with him or anybody could ever agree with

3    him on what an oral agreement was.   There's no way.

4              He said three percent of the assets.   He

5    says three percent of the operational units.   He included

6    the general-partnership interests.   He said selected

7    employees, he said corporate employees, and at one point he

8    said without employees.   So, if he himself didn't know what

9    that agreement was, there could be no agreement in addition.

10             The only testimony you got from Brian and

11   Cheryl Potashnik from that witness stand was they didn't say

12   yes.   They never consented.   And I think that's credible

13   testimony consistent with what you heard.

14             And number two, again, if Jeff Carpenter

15   would stay as long as needed.   And you saw in Jeff

16   Carpenter's own words, his own Emails, back when he didn't

17   know he'd be scrutinized, that his deal was to stay till

18   closing, not as long as needed.   As long as needed was

19   something he changed during this trial so that he could get

20   more.

21             Let's go to the next one.

22             So the answer to 4 is no, no, no, and no.

23             Go back.

24             Because none -- none of these people or

25   entities could have entered into an oral agreement with

1    Mr. Carpenter.  And every time you see agreement, remember,
2    according to Mr. Carpenter, he's only here to enforce two
3    oral agreements; one on the so-called bonuses and the other
4    one on the three percent from the proceeds.
5                    And I will remind you Keith Jones, the CFO
6    and a CPA, never heard the term "pay to stay", never heard
7    the term "stay bonus".  Mark Jones, the community
8    development person, never heard the term "stay bonus", never
9    heard the term "pay to stay".
10                   After they testified, you'll recall
11   Mr. Carpenter started to say, well, they're interchangeable;
12   stay bonus, severance, pay to stay, severance, it's the
13   same.  That's what I meant.  And by yesterday he was calling
14   it severance too.  He was very flexible.
15                   THE COURT:  You have five minutes.
16                   MR. L. FRIEDMAN:  Thank you very much.
17                   So, on 5 -- 5, okay -- for each defendant
18   for whom you answered yes in Question 4, did that defendant
19   also fail to comply with such agreement, there wasn't any
20   agreement.  You have to answer no, no, no, no.  Please no,
21   no, no, no.
22                   Number 6, as of October 13th, 2006, was the
23   agreement found in question possibly performable in less
24   than one year?  I think it was.  I don't think it was
25   performable in less than one year.  I think it was possibly

1    performable in less than one year.  So you decide on that

2    and you make your own decision.

3                Next question, 7, what sum of money, if

4    any, if paid now in cash, would fairly and reasonably

5    compensate Jeff Carpenter for his damages, if any, that

6    resulted from such failure to comply with such oral

7    agreement?  The answer has to be zero because there was

8    never an oral agreement.  There wasn't an oral agreement

9    number one; there wasn't an oral agreement number two.

10               And remember, when I say oral agreement,

11   both parties had to agree on all the terms of an oral

12   agreement.  Both parties had to have a meeting of the minds

13   on all the material terms.  That means time, price, payment,

14   all of it.  And the evidence doesn't support a meeting of

15   the minds.

16               Number 8, did Jeff Carpenter perform

17   compensable work to stay on as long as he needed to help

18   make the asset sale happen for any of the below-named

19   defendants?  The answer's no.  Jeff Carpenter was paid well,

20   he worked well, and he didn't do anything outside his work

21   assignments.  You heard from Deepak Sulakhe and you heard

22   from Mark Jones he did what he was paid to do.

23               Did he answer subpoenas?  Yes.

24   Brian Potashnik asked him to answer subpoenas.

25               Did he go to Houston?  Yes, he did.  He did

1    some good work in Houston.  But he didn't do anything

2    outside the scope of his employment, and for that work he

3    doesn't get a bonus.  So the answer to that is no.

4              Question 11 -- I'm sorry -- Question 9,

5    what is the reasonable value of such compensable work at the

6    time and place it was performed?  The answer is zero or no

7    answer.

8              Number 12 -- I didn't know what this was

9    about -- if any of the defendants were engaged in a joint

10   enterprise in connection with the asset sale.  You heard no

11   evidence of anything about a joint enterprise connection

12   with the asset sale, nothing, zero.  So you have to answer

13   this question with no, no, no, and no.  No evidence about an

14   enterprise or endeavor, no enterprise about a common

15   purpose, no enterprise about community or pecuniary

16   interest, no enterprise about equal rights or the voice of

17   an enterprise, nothing.  You have to answer that no.

18             Same thing goes with Question Number 13.

19   It's virtually the same question.  There was no evidence in

20   this trial that addresses Question Number 13.

21             And the same thing with 14.  Is

22   Brian Potashnik responsible for the conduct of the entities

23   named below?  The answer is no.  Those entities are

24   separate, independent.  The entities act on their own.

25   Brian Potashnik is responsible for his conduct; these

1     entities are responsible for their own conduct.

2                   I'm going to give you back a little time.

3     And, ladies and gentlemen, truly, on behalf of the

4     Potashniks, Mike Donohue, Jason Friedman, Steve Page, our

5     paralegal Sarah Balog, Carla Williamson, appreciate your

6     time and effort.  You've been -- you've been great.  Thank

7     you very much.

8                   THE COURT:  Thank you, Mr. Friedman.

9                   Ms. Gibson, you get the last word as

10    between the attorneys.

11                  MR. L. FRIEDMAN:  I forgot to mention the

12    script, but y'all remember that.

13                  THE COURT:  You still have about 21

14    minutes.

15                  MS. GIBSON:  Thank you.

16                  I'm just going to get this back up.

17                  REBUTTAL ARGUMENT

18                  MS. GIBSON:  What defendants are saying in

19    this case is why this case has consequences.  For example,

20    one, the argument is because Jeff Carpenter has salary, even

21    though he stayed on as long as the Potashniks asked him to

22    and did everything requested of him, it is undisputed that

23    he worked hard;  that the Potashniks continually said when

24    they discussed the bonuses, "I would never screw you."  And

25    now at the end of the day they say his salary covered

69

1    everything.

2            What Jeff Carpenter gave, when you look at

3    Question 8, the valuable service he gave was he stayed.   He

4    stayed.   He turned down a more lucrative job offer.   And

5    what defendants' argument means is that for everybody, for

6    everyone, including those Mark Jones talked about -- the

7    teachers, the nurses, the firefighters, whoever it is --

8    that argument means no one would ever be able to be entitled

9    to a raise, to a promised bonus, or to anything additional

10   compensation because the argument is your salary covers

11   everything.   And at the end of the day the employer can deny

12   what it promised someone and that person did all of the

13   work.

14            Now, I'm not going to have enough time to

15   address everything I disagree with with Mr. Friedman.   But

16   Mr. Friedman said to look at self-serving, who's

17   self-serving and what's credible evidence.

18            Deepak Sulakhe said around the time that

19   they decided to sell the company -- this is in May of

20   2006 -- it was Brian that -- he repeated something Jeff said

21   to him.   Deepak said Brian Potashnik told him at this

22   time -- this is before they had the seller, before they had

23   a price -- Brian told Deepak that Jeff may not need to work

24   again if this transaction goes through.   Brian was obviously

25   promising something.

1          Jeff Richards testified that even though
2   they immediately wanted to hire Jeff Carpenter for more
3   money, more base salary, and more bonuses, Jeff Carpenter
4   turned it down because he needed to stay in order to get a
5   large compensation package.
6          And you've heard from Cheryl Potashnik.
7   Cheryl Potashnik said that they intended to pay Jeff
8   Carpenter a bonus out of the asset-sale proceeds; that they
9   did have a stay program because continuity was important.
10  And the intent of offering those stay bonuses was to get
11  people to stay on, despite the asset sale.  And, in
12  addition, there were criminal proceedings going on.
13         Keith Jones said that he and Jeff Carpenter
14  were both part of the stay program, which is equivalent to
15  the severance program.  He testified -- the CFO testified
16  that Jeff Carpenter and Keith Jones worked together on the
17  program to set other people's stay bonuses.
18         Mr. Friedman says if you lie you don't
19  remember what you said, and he takes issue with
20  Jeff Carpenter.  Jeff Carpenter, though, covered a lot of
21  ground.  He's been accused of using different words, but
22  you'll see that even though he said it in different words
23  they mean the same thing.  And that is human not to pair it,
24  the same words, every time for the same meaning.
25         For example, selected employees were part

1    of the stay-bonus program.  Stay bonus -- stay bonuses paid

2    to employees is the same program and the same employees.  If

3    you call it selected corporate employees, that's who was

4    part of the stay program beneath Jeff Carpenter.

5                    Severance and pay to stay, Keith Jones

6    admitted that those two words or phrases mean the same

7    thing.  Cafe Express versus Cafe Brazil, this is human to do

8    that.

9                    But Brian Potashnik reminds me of one of

10   those squeeze dolls.  All he says is "never happened".  Stay

11   program that Cheryl Potashnik said existed, Keith Jones said

12   was the plan, he says that never happened.  Brian Potashnik,

13   like the squeeze doll, says discussions of severance never

14   happened with any employees.  Brian Potashnik said

15   Jeff Carpenter ultimately wasn't that important and he never

16   had him tour with perspective purchasers; but we showed you

17   the Emails where Jeff Carpenter is marketing the sale to

18   prospective purchasers, including Cascade, that ultimately

19   bought the assets.

20                   We've talked about some of the biggest

21   commitments we make in life are oral, and that includes

22   Brian Potashnik's oral promise to tell the truth under oath.

23   If you want to look at credibility, look at who's telling

24   the truth as between Brian Potashnik, who's the one that

25   looked Jeff in the face and shook hands on it.  Who's

Appendix 1414

1    telling the truth is between those two.

2              You will see from the notes.  Look at

3    Exhibit 70.  Jeff may get some dates wrong every once in a

4    while, he may confuse Cafe Express with Cafe Brazil, but his

5    story has been generally consistent.

6              Now, there was a time when Jeff Carpenter

7    made a mistake in the formula, but look at Exhibit 50.  This

8    is where it started.  January 17, Keith Jones forwards a

9    form document.  Subject:  Document Keith is using.  That's

10   where this language got picked up.  It says without

11   deduction for any compensation paid to any other employees

12   from any of the employer entities.  That formula continued.

13   And when Jeff realized the mistake he corrected it, because

14   that's what honest people do.

15             He had no incentive to make that correction

16   other than that's the right thing to do.  Because making the

17   correction to offset bonuses paid to other employees, it

18   reduced his damages and it gave Friedman a chance to say he

19   was lying.  But still he didn't stick with the mistake.  He

20   corrected it because that is the right thing to do.  And

21   that is why stay bonuses come off of the formula.  It

22   originated from the form Keith Jones gave to Mr. Carpenter.

23             They also say that Jeff said even at the

24   end that the stay date for him was until closing.  But if

25   you look at the document used, he said last year after the

1    transaction was announced.  That's when he thought he needed
2    to stay until closing.
3              We've already gone over the timeline.  It's
4    the Potashniks, not Jeff, who changed as long as needed till
5    closing.  Then they want to make it come up through
6    transition.  He's willing to work with them on that.  Then
7    Brian Potashnik says you can leave, you'll get paid either
8    way, and Cheryl asked him to stay through transition and he
9    does so.  They changed as long as needed, not Jeff
10   Carpenter, and he did what they asked him to do.
11             With respect to claims that the parties
12   were still negotiating, this is not a deal where we were
13   trading documents back and forth before we start what we're
14   doing.  The handshake deal was made with Brian Potashnik and
15   Jeff stayed and continued to work.  It is Brian Potashnik
16   who said he would document it in writing at Jeff's request.
17   Brian never said it had to be in writing.  And after not
18   fulfilling that promise, they asked Jeff to take a stab at
19   it, and he did a bad job.
20             If Jeff suggested something more, that
21   doesn't mean you don't enforce the deal made on a handshake
22   deal.  For example, if someone asks me to mow their lawn and
23   I start mowing it and I'm partly through and I decide and
24   say could I have a little more, that doesn't mean we didn't
25   have a deal.

1            If a secretary says I have this salary and
2    bonus and they shake hands on it and she continues to work
3    and do what they asked her, if she says I think I should be
4    entitled to more, that doesn't change the deal on her salary
5    and bonus.  If it did, it would have consequences for
6    everyone; because that would mean anytime anyone asks for an
7    additional term for something more that would mean they have
8    nothing, nothing under the prior deal.  And that would have
9    consequences beyond this case.
10           Here, Jeff accepted Brian's handshake deal
11    by staying on.  That act accepted the deal.  And parties can
12    talk about additional terms or propose later additional
13    terms, but that doesn't prevent you from enforcing the terms
14    Brian agreed on on October 13, 2006, when he entered the
15    handshake deal.
16           Mr. Friedman say this whole case is about
17    Jeff Carpenter, but the rules involved in this case are
18    bigger than Jeff Carpenter.  They apply to folks like those
19    Mark Jones talked about living in affordable housing.  It's
20    nurses, it's teachers, it's firefighters, it's those who a
21    need fresh start for their American dream.  The rule
22    concerning handshake deals in Texas applies to everyone.
23    Whether you are slapping tar on a roof or you are an
24    executive, that rule protects everyone.
25           According to the Potashniks, they can enter

1    those agreements, those handshake deals, never say no, never
2    say stop, never say I don't think your agreement covers this
3    or we think we have an out until after the employee has done
4    all the work.  According to the defendants, whether or not
5    an employee gets paid isn't based on the rules we have in
6    Texas.  It is based on their whim and whether they decide to
7    do it or not.
8                      It is the defendants -- it's
9    Brian Potashnik who said he would put this in writing.  They
10   let Jeff Carpenter work all the way through the date they
11   needed him, told him he would get paid either way, and then
12   only after they got all that did they say no deal.  At no
13   time did anyone say no deal before.
14                     Cheryl Potashnik says she looked Jeff in
15   the eye and said, "I would never screw you on this."  If
16   there was no deal, there's not a need to say that type of
17   thing.  We know how hard you've worked.  You've earned it.
18                     With respect to the reasonable value of
19   services performing compensable work, this is Question 8.
20   When you look at this question, valuable materials
21   furnished, valuable services.  On that question the valuable
22   services are that Jeff stayed but the defendant didn't pay.
23                     Even if you find there was no agreement,
24   the answer to Question 8 and to the one similar for annual
25   bonuses should be that his staying was a valuable service

1    for which he should be compensated.  It's Brian Potashnik
2    that put a value on those services.  And in this case that's
3    just over $927,000.  That's actually lower than what Brian
4    initially said he was willing to pay, because the original
5    estimate was $1,020,000.  That is a specific amount and
6    shows that there was a formula at that time.
7                    Now, as to discrepancies between the two
8    deals, keep in mind there are two times that this was talked
9    about.  The first one was when Brian met in May of 2006 at
10   his home with Jeff Carpenter.  That's when he announces he's
11   selling the business.  That's when he's telling
12   Deepak Sulakhe that Jeff may never have to work again if
13   things go through.  It's later, the October deal, remember.
14   This was around the time, the letter of intent, and that is
15   in the exhibits.
16                   You have the date.  It was shortly before
17   that on October 13th they met at Cafe Express.  He informed
18   me that I would receive three percent minimum for all gross
19   compensation from the sale transaction, less closing cost of
20   brokerage fees, attorney's fees related to the transaction,
21   other normal closing costs, and less any deductions for any
22   compensation paid to any other employees.
23                   Now, the reason he used minimum here is
24   because they had -- they had estimated a certain amount of
25   closing costs and Jeff is putting that in there.  But this

Appendix 1419

1    exhibit, this is Exhibit 70, Jeff wrote these notes shortly

2    after the deal went south.

3            If you look through those notes and other

4    documents in the case you will find that Jeff, like most

5    humans, sometimes used different words for the same thing.

6    He and Keith Jones, working together on the stay-bonus

7    programs at times, called them different things; but the

8    Emails are in evidence as between Jeff and Keith working to

9    set those bonuses for other people.  Sometimes people get

10   dates wrong; sometimes they use the wrong word.

11           In fact, if you look at the closing

12   documents for the -- the closing memos for the asset sale

13   you'll see that in this multimillion-dollar deal at the top

14   of the escrow documents you'll see in 2008 they start to get

15   dates wrong.  That is human.  What's not human is someone

16   like Brian Potashnik, who's like a squeeze doll, and Jeff

17   says never happened, never happened, never happened.

18           We called them first so they got a chance

19   to tell their story first.  Mr. Friedman would have you

20   believe we called them first because we wanted to hear what

21   they said, but you saw me impeach Brian Potashnik

22   and Cheryl Potashnik with their depositions.  They've given

23   their depositions.  Jeff knew what they were already going

24   to say.  This was not a surprise.

25           At bottom line in this case, the rules that

1    get applied here apply to everyone to protect everyone.  And

2    those rules only help people if jurors choose to enforce

3    them.  You are the conscience of the community in this case

4    and you can put the honor back in handshake deals in Texas.

5                    Thank you.

6                    THE COURT:  Thank you, Ms. Gibson.

7                    Ladies and gentlemen, that concludes the

8    closing arguments.  We're going to go over these last two

9    pages of the charge.  Then we'll ask that you retire to the

10   jury room.

11                   Please go to Page 22, the second-to-last

12   page in the charge.  This page contains instructions for the

13   presiding juror.  We'll start at the top of the page.

14                   (Remainder of charge read aloud)

15                   THE COURT:  So we're going to ask you to go

16   back there, and Rick will bring to you everything that I

17   just said.  Leave those -- these things here, leave those

18   with Rick.  Leave them on the ledge there.

19                   (The jury exited the courtroom.)

20                   (Deliberations held)

21                   (Lunch recess taken)

22                   JURY QUESTIONS

23                   THE COURT:  Mr. Friedman is suggesting that

24   I would say give the terms ordinary meaning.

25                   MS. GIBSON:  Okay.

```
1                      THE COURT:  Do you object to that?
2                      If there's an instruction in there, usually
3    I put the instruction, "If the word has a legal definition,
4    use that; otherwise, give it its ordinary meaning."
5                      MS. GIBSON:  I think that's in there.  I
6    think that's in the charge.
7                      THE COURT:  Okay.
8                      I would just say please re-read the charge.
9                      MS. GIBSON:  I just thought the general --
10   I thought the general instruction said that.
11                     THE COURT:  It probably did.
12                     I instruct you to use the word in a way
13   that is different from its ordinary meaning.  Use the
14   meaning I gave you, which would be the proper legal
15   definition.  It didn't say, otherwise, give it the --
16                     MS. GIBSON:  I think that implies ordinary
17   meaning.
18                     THE COURT:  Right.  It does.
19                     MR. L. FRIEDMAN:  The charge conference has
20   been closed, Judge.
21                     (Laughter)
22                     MR. L. FRIEDMAN:  You can put your
23   objection on the record.
24                     (Laughter)
25                     MR. L. FRIEDMAN:  Jump in a lake.
```

Appendix 1422

80

1             THE COURT:  Jump -- that's right.

2             Okay.  You ready, Vikki?

3             The jury sent out a question.  "Could we

4   get a clarified explanation of the term 'possibly

5   performable'?"  That's in reference to Question 6.  And my

6   response is, "Thank you for your question.  You should give

7   those terms their ordinary meaning."

8             And no objection from plaintiff?

9             MS. GIBSON:  No objection.

10            THE COURT:  And there was a slight

11  objection from --

12            MR. L. FRIEDMAN:  Yeah.  No, we object,

13  Your Honor.  We think that the proper response should be to

14  instruct the jury to reread the charge.  So we'd have to

15  object.  Please note my objection.

16            THE COURT:  All right.  The objection's

17  noted on the record.

18            MR. L. FRIEDMAN:  And the ruling, please?

19            THE COURT:  Your ruling [sic] is overruled.

20  I'm going to --

21            MR. L. FRIEDMAN:  My objection is

22  overruled.  I don't make rulings.

23            (Laughter)

24            THE COURT:  Okay.

25            MR. L. FRIEDMAN:  You make rulings.

Appendix 1423

1                    THE COURT:  I think you've got me -- you
2       had me worn down.
3                    MR. L. FRIEDMAN:  But if you want me to
4       overrule your ruling, I'm available for volunteer work.
5                    (Off the record)
6                    (Deliberations resumed)
7                    (End of proceedings)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   THE STATE OF TEXAS

2   COUNTY OF DALLAS

3        I, Vikki L. Ogden, Official Court Reporter in and for

4   the County Court at Law Number 5 of Dallas County, State of

5   Texas, do hereby certify that to the best of my ability the

6   above and foregoing contains a true and correct

7   transcription of all portions of evidence and other

8   proceedings requested in writing by counsel for the parties

9   to be included in the Reporter's Record, in the above-styled

10  and -numbered cause, all of which occurred in open court or

11  in chambers and were reported by me.

12       I further certify that the total cost for the

13  preparation of the Reporter's Record is $502.00 and will be

14  paid by Friedman & Feiger, LLP.

15       WITNESS MY OFFICIAL HAND this the 22nd day of October,

16  2018.

17

18

19                      /S/ Vikki L. Ogden

20                      _____
                        VIKKI L. OGDEN, Texas CSR# 6309
                        Official Court Reporter
21                      Dallas County Court at Law No. 5
                        600 Commerce Street, Floor 5
22                      Dallas, Tx. 75202
                        (214)653-6443
23                      Certification Expires:  12/31/18

24

25

```
 1                    REPORTER'S RECORD

 2                   VOLUME 11 of 14              FILED IN
                                            5th COURT OF APPEALS
 3            Trial Court Cause No. CC-08-02072-E   DALLAS, TEXAS
                                            04/29/2019 6:14:22 PM
 4   JEFFREY W. CARPENTER,        )   IN THE DALLAS COUNTY
                                  )              Clerk
 5            Plaintiff,          )

 6   VS                           )   COURT AT LAW NO. 5
                                  )
 7   SOUTHWEST HOUSING DEVELOPMENT )
     COMPANY, INC., ET AL,        )
 8                                )
              Defendants.         )   DALLAS, TEXAS
 9   ─────────────────────────────────────────────────

10
                     TRIAL ON THE MERITS
11

12   ─────────────────────────────────────────────────

13

14       On the 1st day of February, 2018, the following

15   proceedings came on to be heard within the presence

16   of a jury, in the above-entitled and -numbered cause;

17   and the following proceedings were had before the

18   HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19   Dallas County, Texas:

20       Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25
```

Appendix 1426

```
 1                          APPEARANCES:

 2

    MS. AMY GIBSON
 3  SBN 00793801
    Gibson Wiley, PLLC
 4  1500 Jackson Street, Suite 714
    Dallas, Texas 75201
 5  (214)522-2121
    Attorney for Plaintiff
 6
               -AND-
 7
    MR. BRIAN SANFORD
 8  SBN 17630700
    Sanford Firm
 9  1910 Pacific Avenue, Suite 15400
    Dallas, Texas 75201
10  (469)361-9111
    Attorney for Plaintiff
11
               -AND-
12
    MR. LAWRENCE "LARRY" FRIEDMAN
13  SBN 07469300
    MR. MICHAEL DONOHUE
14  SBN 05989380
    MR. JASON FRIEDMAN
15  SBN 24059784
    Friedman & Feiger, LLP
16  5301 Spring Valley Road, Suite 200
    Dallas, Texas 75254
17  (972)788-1400
    Attorneys for Defendants
18
               -AND-
19
    MR. RYAN HALE
20  SBN 24097784
    Hawkins Parnell Thackston & Young, LLP
21  4514 Cole Avenue, Suite 500
    Dallas, Texas 75205-5412
22  (214)780-5138
    Appellate Attorney for Defendants
23


24
    ALSO PRESENT:  Steve Page, A/V Technician
25
```

Appendix 1427

```
1                        VOLUME 11

2     February 1, 2018                        PAGE

3     Proceedings -------------------------------    4

4     Deliberations Continued ----------------------    4

5     Jury Questions -------------------------------    4

6     Defendants' Request to Poll the Jury ----------    9

7     Court's Ruling -------------------------------   10

8     Defendants' Motion for Mistrial ---------------   10

9     Court's Ruling -------------------------------   10

10    Verdict --------------------------------------   10

11    Jury Polled ----------------------------------   14

12    Adjournment ----------------------------------   17

13    Court Reporter's Certificate ------------------   18

14

15

16

17

18

19

20

21

22

23

24

25
```

Appendix 1428

```
1                    P R O C E E D I N G S
2                      February 1, 2018
3                   (Deliberations continued)
4                   (Mr. Sanford and Mr. L. Friedman are not
5                    present in the courtroom.)
6                      JURY QUESTIONS
7                   THE COURT:   Question 8 is the quantum
8    meruit.
9                      MS. GIBSON:   Quantum meruit for the asset
10   sale?
11                     THE COURT:   For the asset sale.
12                     MS. GIBSON:   Okay.
13                     THE COURT:   What was the -- the jury's
14   question was, "What was the final bonus calculation from the
15   three-percent deal?"  My general instruction would be to use
16   your best collective memory.
17                     MR. J. FRIEDMAN:   Yeah.
18                     MS. GIBSON:   Can you -- would you tell them
19   if they disagree that they can ask the court reporter
20   to check them?  If they disagree on the testimony, that they
21   can ask the court reporter?
22                     MR. DONOHUE:   I don't think -- I'd say I
23   think either -- use your best collective memory is the
24   answer.
25                     MR. J. FRIEDMAN:   They could have taken
```

```
 1                      COURT'S RULING
 2              THE COURT:  All right, and that motion's
 3   denied.
 4             DEFENDANTS' MOTION FOR MISTRIAL
 5              MR. L. FRIEDMAN:  And then --
 6              THE COURT:  I'm sorry.
 7              MR. L. FRIEDMAN:  -- and then as a result
 8   I'd like to ask for another mistrial.
 9                      COURT'S RULING
10              THE COURT:  Okay.  And that's denied also.
11              Let's bring them in.
12              (The jury entered the courtroom.)
13              THE COURT:  Welcome back and good morning,
14   ladies and gentlemen.
15              Who was our presiding juror?
16              JUROR NUMBER 1:  I am, Your Honor.
17              THE COURT:  Thank you.  Is it Ms. Serachi
18   (phonetic)?
19              JUROR NUMBER 1:  Ciraci.
20              THE COURT:  Ciraci.  I'm sorry.
21              JUROR NUMBER 1:  That's close.
22                        VERDICT
23              THE COURT:  I'm going to read the jury
24   questions and your responses so that your verdict becomes
25   part of the record in the case.
```

1          Question Number 1 asked, Did Jeff Carpenter

2    and Southwest Housing Management agree that Southwest

3    Housing Management would pay one or more annual bonuses to

4    Jeff Carpenter covering the period of March 15, 2005,

5    through March 15, 2007?  To that question you responded no.

6          Question Number 2 asked -- because of your

7    response to Question Number 1 you were not required to

8    answer Question Number 2, and you did not.  Because of your

9    response to Question Number 2 you were not required

10   to answer Question Number 3, and you did not.

11         Question Number 4 asked, Did any of the

12   defendants below and Jeff Carpenter agree on October 13,

13   2006, to pay Jeff Carpenter, one, three percent of the total

14   of gross asset-sale revenue to sellers, less normal closing

15   costs, less sale-proceed bonuses paid to employees; two, if

16   Jeff Carpenter would stay as long as needed on to help make

17   the asset sale happen?  To that you responded yes as to

18   Affordable Housing Construction; yes as to Southwest Housing

19   Development; yes as to Southwest Housing Management; and yes

20   as to Brian Potashnik.

21         Question Number 5 asks, For each defendant

22   for whom you answered yes in Question 4, did that defendant

23   also fail to comply with the agreement?  As to Affordable

24   Housing Construction you responded yes; as to Southwest

25   Housing Management -- Development -- you responded yes; as

1     to Southwest Housing Management you responded yes; as to

2     Brian Potashnik you responded yes.

3                 Question Number 6 asked, As of October 13,

4     2006, was the agreement found in Question 4 possibly

5     performable in less than one year?  You responded yes.

6                 Question Number 7 asked, What sum of money,

7     if any, if paid now in cash, would fairly and reasonably

8     compensate Jeff Carpenter for his damages, if any, that

9     resulted from such failure to comply with the agreement?  To

10     that you responded $928,020.76.  That's 928, comma, 020,

11     point 76.

12                 Question Number 8 asked, Did Jeff Carpenter

13     perform compensable work staying on as long as needed to

14     help make the asset sale happen for any of the named-below

15     defendants for which he was not compensated?  As to

16     Afford -- as to all defendants you responded no.  Because of

17     your response to Question 8 you were not required to answer

18     Question 9, and you did not.

19                 Question Number 10 asked, Did Jeff

20     Carpenter perform compensable work for Southwest Housing

21     Management for which he was not compensated, excluding any

22     staying on to help make the asset sale happen?  To that you

23     respond no.  Because of your response to Question Number 10

24     you did not need to answer Question Number 11, and you did

25     not.

13

1          Question Number 12 asked, Which, if any, of

2    the defendants were engaged in a joint enterprise in

3    connection with the asset sale?  As to Affordable Housing

4    Construction you responded no; as to Southwest Housing

5    Development you responded no; as to Southwest Housing

6    Management you responded no; as to Brian Potashnik you

7    responded no.

8          Question 13 asked, Which, if any, of the

9    defendants were engaged in a joint venture in connection

10   with the asset sale?  As to Affordable Housing you responded

11   no; as to Southwest Housing Development you responded no; as

12   to Southwest Housing Management you responded no; as to

13   Brian Potashnik you responded no.

14          Question 14 asked, Is Brian Potashnik

15   responsible for the conduct of the entities named below?

16   And as to Affordable Housing Construction you responded yes;

17   as to Southwest Housing Development you responded yes; as to

18   Southwest Housing Management you responded yes.

19          And then going to the certificate page you

20   had two options.  The first option was our verdict is

21   unanimous; and the second option was your verdict is

22   not unanimous.  The five of you agreed to each and every

23   answer and have signed the certificate below, and you opted

24   for the second choice.  And so five of you joined in the

25   verdict.

1            You could have had six agree on some

2    answers but you didn't have six agree on all, but the five

3    who joined in the verdict each joined in every question that

4    was answered; is that correct?

5                    JUROR NUMBER 1:  That's correct,

6    Your Honor.

7                    THE COURT:  Okay.

8            And I'm going to poll the jury and I'm

9    going to ask if you joined in the verdict.  And if you

10   joined in the verdict, if you would say yes loud enough for

11   the court reporter to -- to hear you.  If you did not, if

12   you would say no loud enough for the court reporter to hear

13   you.  I'm going to refer to you by numbers.

14                    JURY POLLED

15                    THE COURT:  Ms. Ciraci, being number one,

16   Juror Number 1, did you join in that verdict?

17                    JUROR NUMBER 1:  Yes, sir.

18                    THE COURT:  Juror Number 2, did you join in

19   that verdict?

20                    JUROR NUMBER 2:  Yes.

21                    THE COURT:  Juror Number 3, did you join in

22   that verdict?

23                    JUROR NUMBER 3:  Yes.

24                    THE COURT:  Juror Number 4, did you join in

25   that verdict?

```
1                        JUROR NUMBER 4:   Yes.
2                        THE COURT:   Juror Number 5, did you join in
3       that verdict?
4                        JUROR NUMBER 5:   Yes.
5                        THE COURT:   Juror Number 6, did you join in
6       that verdict?
7                        JUROR NUMBER 6:   No.
8                        THE COURT:   Okay.  Very good.
9                        Ladies and gentlemen, we thank you.  This
10      concludes your jury service.  We thank you very much.
11                       I thank you.  Our court reporter -- the
12      official court reporter for this court is Vikki Ogden.  She
13      joins me in thanking you.  And our bailiff for all of our
14      trials is Rick Wilson.  He joins me in thanking you.  The
15      attorneys thank you.  Most importantly, the parties to the
16      lawsuit thank you.
17                       (Mr. Donohue is entered the courtroom.)
18                       You know that the events underlying this
19      case occurred more than 10 years ago.  So one thing that
20      everyone agrees on, whether they prevailed in the suit or
21      not, is that this is a case that needed to be resolved.  And
22      because of your jury service we are able to resolve this
23      case.  We will take your verdict and reduce it to a judgment
24      and the judgment will close this case.  And for that we
25      thank you very much.
```

Appendix 1435

1          Any restriction I placed on you to not

2    discuss the case with anyone else is, of course, lifted at

3    this point.  You're welcome to discuss the case with the

4    attorneys and the parties to the lawsuit.  You're welcome to

5    discuss the case with anyone else once you leave the

6    courthouse, but that is 100 percent up to you.  If you want

7    to discuss the case with them, you're welcome to.  If you

8    don't want to discuss the case to [sic] them, you don't have

9    to.  It's 100 percent up to you.

10          The law allows the attorneys to request

11   from you an affidavit if they believe an affidavit is called

12   for.  If they suspect jury misconduct, if you want to

13   cooperate with the attorney, you're certainly welcome to do

14   that.  If you do not want to cooperate with the attorney,

15   you need not.  Again, that is 100 percent up to you, but

16   that is an instruction I am required to give you by law.

17          With that I think, again, we're going to

18   thank you and we're going to break.  You're in the jury box

19   now.  We're going to ask you to go back to the jury room.

20          If you want to talk to anybody out here, go

21   from the jury room right back out here.  If you don't want

22   to talk to anybody, the bailiff takes you out through this

23   side hallway and you'll just kind of go around everybody.

24          So we'll ask you to come back to the jury

25   room now.

1                    (Off the record)

2                    (End of proceedings)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE STATE OF TEXAS

2    COUNTY OF DALLAS

3        I, Vikki L. Ogden, Official Court Reporter in and for

4    the County Court at Law Number 5 of Dallas County, State of

5    Texas, do hereby certify that to the best of my ability the

6    above and foregoing contains a true and correct

7    transcription of all portions of evidence and other

8    proceedings requested in writing by counsel for the parties

9    to be included in the Reporter's Record, in the above-styled

10   and -numbered cause, all of which occurred in open court or

11   in chambers and were reported by me.

12       I further certify that the total cost for the

13   preparation of the Reporter's Record is $118.00 and will be

14   paid by Friedman & Feiger, LLP.

15       WITNESS MY OFFICIAL HAND this the 21st day of October,

16   2018.

17

18

19                           /S/ Vikki L. Ogden

20                           _____
                             VIKKI L. OGDEN, Texas CSR# 6309
                             Official Court Reporter
21                           Dallas County Court at Law No. 5
                             600 Commerce Street, Floor 5
22                           Dallas, Tx. 75202
                             (214)653-6443
23                           Certification Expires:  12/31/18

24

25

REPORTER'S RECORD

VOLUME   12 of 14

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
LISA MATZ
Clerk

Trial Court Cause No. CC-08-02072-E

JEFFREY W. CARPENTER,                )    IN THE DALLAS COUNTY
                                     )
            Plaintiff,               )
                                     )
VS                                   )    COURT AT LAW NO. 5
                                     )
SOUTHWEST HOUSING DEVELOPMENT        )
COMPANY, INC., ET AL,                )
                                     )
            Defendants.              )    DALLAS, TEXAS

**TRIAL EXHIBITS**

1

**EXHIBIT INDEX**

2

3

**PLAINTIFF'S
NO.                DESCRIPTION**

4      1          Phone Conversations

5      2          Employment Agreement

6      3          Email

7      8          Recap of Expenses and Bonuses

8      9          Email

9      10         Magazine Cover

10     11         Letter of Intent

11     12         Purchase and Sale Agreement

12     13         Schedule A

13     14         Email Cover Sheet

14     15         Escrow Agreement (First Amendment)

15     16         Purchase and Sale Agreement (First Amendment)

16     17         Escrow Agreement (Second Amendment)

17     18         Escrow Agreement (Third Amendment)

18     19         Escrow Agreement (Fourth Amendment)

19     20         Escrow Agreement (Fifth Amendment)

20     21         Consulting and Asset Management Services
                  Agreement

21

22     22         Separation Agreement

23     23         Email

24     24         Email

25     27         Escrow Agreement (Sixth Amendment)

       28         Escrow Agreement (Seventh Amendment)

| 1 | | EXHIBIT INDEX (CONT'D) |
|---|---|---|
| 2 | | |
| 3 | PLAINTIFF'S NO. | DESCRIPTION |
| 4 | 29 | Escrow Agreement (Eighth Amendment) |
| 5 | 30 | Escrow Agreement (Ninth Amendment) |
| 6 | 31 | Escrow Agreement (Tenth Amendment) |
| 7 | 32 | Email |
| 8 | 33 | Closing Memorandum |
| 9 | 34 | Closing Memorandum |
| 10 | 35 | Email |
| 11 | 36 | Franchise Tax Report |
| 12 | 37 | Franchise Tax Report |
| 13 | 38 | Franchise Tax Report |
| 14 | 39 | Certificate of Termination of a Domestic Entity |
| 15 | 40 | Southwest Housing Associate Handbook |
| 16 | 40a | Certificate of Termination of a Domestic Entity |
| 17 | 41 | Email |
| 18 | 49 | Email |
| 19 | 50 | Email |
| 20 | 51-1 | Handwritten List |
| 21 | 52 | Notes |
| 22 | 53 | Expense Report |
| 23 | 54 | Expense Report |
| 24 | 55 | Declaration of Sandy Dixon |
| 25 | 56 | Certificate of Non-Foreign Status |

```
1                           EXHIBIT INDEX (CONT'D)

2
        PLAINTIFF'S
3       NO.              DESCRIPTION

4       57               Certificate of Non-Foreign Status

5       58               Email

6       59               Memorandum of Agreement

7       60               Email

8       61               Explanatory Note

9       62               Email

10      63               Amendment to Employment Agreement

11      64               Email

12      65               Email

13      66               Email

14      67               Email

15      68               Email

16      70               Jeff Carpenter's Notes

17

18

19

20

21

22

23

24

25
```

1                      **EXHIBIT INDEX (CONT'D)**

2

3    **DEFENDANTS'**
     **NO.**              DESCRIPTION

4    4            Employment Agreement

5    13           Amendment to Employment Agreement

6    14           Jeff Carpenter's Personal Notes

7    24           Gmail

8    25           Email

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               CAUSE NO. CC-08-02072-E

2    JEFFREY W. CARPENTER,           )    IN THE DALLAS COUNTY
                                  )

3           Plaintiff,            )
                                  )

4    VS                           )    COURT AT LAW NO. 5
                                  )

5    SOUTHWEST HOUSING DEVELOPMENT      )
   COMPANY, INC., ET AL,           )

6                                   )

          Defendants.          )    DALLAS, TEXAS

7

8

9        I, Vikki L. Ogden, Official Court Reporter in and for

10   the County Court at Law No. 5 of Dallas County, Texas, do

11   hereby certify that the following exhibit constitutes a true

12   and complete duplicate of the original exhibits admitted

13   into evidence during the proceedings in the above-entitled

14   and -numbered cause as set out herein before the Honorable

15   Mark Greenberg, beginning January 22, 2018.

16        WITNESS MY OFFICIAL HAND on this the 22nd day of

17   October, 2018.

18

19

20

                              /S/ Vikki L. Ogden

21   
                            Vikki L. Ogden, Texas CSR# 6309

22                            Official Court Reporter
                            Dallas County Court at Law No. 5

23                             600 Commerce Street, Floor 5
                            Dallas, Texas 75202

24                             (214)653-6443

25

## CONVERSATION BETWEEN
## JEFF CARPENTER AND BRIAN POTASHNIK

JC = Jeff Carpenter
BP = Brian Potashnik

| SPEAKER | CONVERSATION |
|---------|--------------|
| JC | Hello? |
| BP | Jeff? |
| JC | Hey Brian. How ya doing? |
| BP | Hey. What's going on? |
| JC | Uh, just trying to wrap up stuff. |
| BP | I know you had called twice but, last night uh, was my son's birthday and I didn't have my phone with me, so . . . |
| JC | Right. |
| BP | . . . I just got the message this morning. |
| JC | Well, um, I was gonna call ya last night, but uh, but or talk to you today just to uh, follow-up about you know, our uh, verbal agreements and so forth. Keith sent me a uh, a Separation Agreement last night. |
| BP | Uh-huh. |
| JC | That you know, because Cheryl said you know, listen I know you're in a, a financial crunch and you know, with everything going on we can give ya, you know, 30, you know, we'll pay you an extra month to help you through this. |
| BP | Right. |
| JC | You know . . . |
| BP | Right. |
| JC | . . . as the deals close you know, we're, we're gonna make honor on our word, what we said and you know, as we've talked that we'll continue to work to put this in writing. Well, I get this Severance Agreement and it basically says I sign my life away for the 30 days and that there's you know, that I have nothing to stand on. You know. |

Page 1

PLAINTIFF'S
EXHIBIT

Appendix 1445

| BP | Well, I mean, I don't know what to say, I mean it's, I don't even know other than the fact that our attorneys are requiring us that anybody that's leaving that's getting uh, paid severance to have that signed. That's what Cheryl told me so, I think that's what you're talking about. Um, and as far as our agreement goes, where we compensate you, as we promised, it's gonna depend on where we end up in all of this. You know. I mean, we've got Bank of America calling me right now and telling me they're ready to foreclose on Skyline because there's a three million dollar gap in the financing and the property's been performing so poorly, you know. And that's not to mention you know, other deals that are getting re-sized. So, we don't even know where we're gonna end up in terms of what we end up getting out of this if anything, you know? I mean, I don't know how to make a commitment, you know, based on not knowing whether or not you know, Cheryl and I are gonna end up with anything other than being in bankruptcy. I mean that's the reality. Jeff, Cascade still hasn't closed on one deal – hasn't closed one deal. |
| --- | --- |
| JC | Uh hmm. |
| BP | You know, and when they do close, who knows what the price will be? Who knows what, you know, it would be since that um, um, things like Skyline now and Heather Bend and you know, Aldine and all these deals that are re-sizing. You know, where are we gonna end up? I mean, it's uh, it's not a good situation. I mean, it's not like we're sitting here you know, sitting on a mountain of cash. Not to mention the fact that you know, our legal fees have just been astronomical in defending ourselves and defending the company. And you know, that's the cost of doing business Jeff. I mean, there's, there's just no, there's no way that it can be looked at any other way, you know. I mean ya know, I didn't go and rob a bank. You know, this is something that's directly related to the business. We're trying to negotiate with them now on these, you know, Dallas deals that they think might be tainted and I mean, it's, it's just a big mess. |
| JC | Uh hmm. |
| BP | So, you know, if I don't know where we stand and where we're gonna end up, as opposed to whether or not we would be bringing an indictment and you know, Basil telling me done deal, what am I supposed to do? I mean, I, I don't understand. What, what is it that I'm supposed to do? |
| JC | Do for me? |
| BP | Yea. |
| JC | Well, I can't . . . |

| BP | I can't even pay my bills. I can't, you know, I'm trying to stay out of bankruptcy. I have Bank of America calling me now telling you know, they're ready to put the company and me and Cheryl personally into bankruptcy. I mean, what do you want me to do? I mean, I'm telling you that we're, we're going to dig ourselves out of this thing and then hopefully, you know, at the end of the day, get something out of it from Cascade and get the deal closed and pay the costs that we have to defend ourselves and have money left over so that we can, you know, give you a bonus, give Sara a bonus and give Keith a bonus or whatever. But, you know, I mean, right now, nobody's asking and nobody is, you know, everybody understands the situation. You know, I, I don't, I don't know what else to tell you, you know? I mean, if you don't wanna sign something that you think is detrimental to you in some way, then don't sign it. But, I, I don't know what else to tell you, you know? |
|---|---|
| JC | Uh hmm. |
| BP | I mean, you have Cheryl and I both committed to you that when things work themselves out that there will be a bonus if there's anything there at the end of the day that we have where we can you know, actually give out bonuses. And, it has to be done, you know, on a level of trust and you know, it would be absolutely impossible to put anything in writing because there's so many moving parts to this. |
| JC | Uh hmm. |
| BP | I mean, look at Skyline alone that's three million bucks. That's just one deal. Another one, eight hundred thousand, you know? Uh, I mean, it just goes on and on. And, and our personal guarantees are already up there. You know? And I'm sick of, you know, this shit with Basil dragging on and on. And, for the life of me can't understand why these guys haven't been able to at least close one deal yet. So, you know, um, I mean, we're fucked right now. Unless Cascade gets their shit together and we figure out a way to salvage these deals and you know, at the end of the day have something left over – there isn't gonna be anything. You know? |
| JC | Uh hmm. |
| BP | I mean that's the reality. And I don't, I don't know what else to say other than, you know, it's obvious based on what's going on that that's the situation that we're in. I mean, and, you know, it sucks because obviously, at this point, we thought we'd have everything closed and that we would have some money. Um, we didn't think we would get, you know, would have been indicted. You know, I've been hearing for two years plus from Mike Uhl that you're not gonna get indicted, don't worry. They don't have a case. They don't have a case. You know. You know, we've had uh, McKinney's going after the contract again three times. Vegas, I don't know what? Four times? You know, those were two deals that we talked about getting some money out of. But, you know, at the end of the day, you've got Paul now in that deal because he, you know, was the one that got the loan and this is all |

Page 3

Appendix 1447

| | |
|---|---|
| | playing with the lock box I, I still don't even understand. Um, but, it just goes on and on, you know? |
| JC | Uh hmm. |
| BP | It just goes on and on. |
| JC | Well, it certainly has definitely not been uh, uncomplicated. |
| BP | Well, it's beyond complicated. It's a cluster fuck is what it is. And that's the whole problem right now. We just have no idea where this thing is going to uh, to settle out, you know. And I have the additional pressure, as does Cheryl on top of it, of not knowing where we're going to end up. You know, in our own lives personally and being separated as a family, God forbid and you know, I mean, I just don't uh, I don't know what to tell you. But it's, it's, it's a shitty situation. So, you know, if you want to talk to Cheryl about it, I'm sure she'll be happy to talk to you about it. But, I, I don't know what else to say. You know? |
| JC | Oh, on Monday when I met with Cheryl's, you know, she said that, you know, you know, um, you know, I know that you need something in writing. I know that, you know, there's gonna have to be some carve outs and all that but, I, I understand. And let's work it together over the next couple weeks and do something. You know . . . |
| BP | Well um . . . |
| JC | But . . . |
| BP | I mean, you're gonna have to talk to her about that because I don't, I don't see how you can possibly put something like this in writing right now the way things are, you know. I mean, why don't you explain to me how, how it can be done because you know, it's an impossibility. I mean, talk to Sara. No, nobody's got any agreement to get any bonuses on anything. You know, everybody's just saying, you know, that they know Cheryl and I are honorable and at the end of the day, if, you know, this thing ends up where we have money where we can bonus people out, then we'll do it. And at this point, that's the best that we can do. I mean there's not gonna be anything else because there's, there's no way of being able to memorialize anything that's in that, you know? |
| JC | Maybe it's just memorializing what you just said. |
| BP | How do you memorialize when someone says trust me? |
| JC | Brian, you told me, what a dozen times that we were gonna have it memorialized. |
| BP | With what? |

Appendix 1448

| JC | What's that? |
|----|----|
| BP | What?  Memorialize what? |
| JC | The, the, the bonus structure.  The current . . . |
| BP | The bonus structure . . . |
| JC | . . . bonus structure. |
| BP | . . . of what?  We, we don't know where this thing is gonna end up.  I, I, that's what I'm trying to explain to you.  We don't know if there's gonna be any money to bonus.  I mean, we are completely under water right now.  How can I make a commitment on a bonus when I can't even pay the bills?  I mean, I've got Bank of America forcing me into bankruptcy over Skyline.  That's just one deal, you know?  And I'm stuck in litigation with NAPICO.  I've got, you know, all these other deals.  You know, Aldine Bender and you know, all the tax issues that relate to the exemptions on these deals.  All the, you know, bull shit with Charter Mac and now they're, you know, harping about you know, we don't have money to re-size Heather Bend.  You know, I mean, at the end of the day, you know, we may be in a position where we have to file bankruptcy.  And the only thing that we're gonna have to hold onto, if we can even hold onto it, is our house which we would probably need to figure out a way to sell it or to do something just to pay lawyers – to keep our freedom.  So, how do you, what is there to memorialize? |
| JC | Uh hmm. |
| BP | I mean, we're trying to dig ourselves out of this thing for everybody's benefit.  But, we're so upside down right now and there's so many issues outstanding that we need to get cleared up before we know where we stand that there's no way that you can put anything like that in writing.  It's impossible.  If we could we would, but we can't. |
| JC | But on the Separation Agreement, I'm supposed to waive everything. |
| BP | I, I don't even know – I, I don't even remember that – I don't even know what it is, I mean, it's a . . . |
| JC | Well, I didn't either until late last night. |
| BP | Well, I guess, you know, Cheryl's been advised that you know, when employees leave if they're getting something, you know, if they're getting any severance that it's something that they need to sign in order to get it.  Okay?  It's a legal issue.  You know, and it's been told to her by the lawyers that you know, if someone's leaving the company and they're getting a severance that they need to sign it and it's typical.  And if it's not, you know, I, I don't know what else to say. |

Page 5

Appendix 1449

| JC | All right. |
|----|-----------|
| BP | You know?  I mean, let's see if we can turn some of this shit around and make some of these things go away so that you know, we can take care of Jeff Carpenter.  All right? |
| JC | Speechless. |
| BP | Wow.  All I can say is, is that, we're doing our best to try and dig ourselves out of this and until I get some clarity as to where we stand and the fact that we're not gonna get in a position of having to bankrupt the company and ourselves personally and lose everything, we'll be in a better position to – you and I have discussions about bonuses.  But, right now, you know, I, it's just not something that we can do if we had the money. |
| JC | Well, I, you know, I certainly understand. |
| BP | It's impossible. |
| JC | What's that? |
| BP | I said, "It's impossible." |
| JC | Well, I under, I certainly understand the fact that . . . |
| BP | You know, it's not like we don't wanna do it.  And even if we did wanna do it, we don't have it.  Secondly, you know, this is not a situation that anybody ever expected would happen or that we would, that we would be in right now.  And you're just going to have to, you know, trust us that when or if things get to the point where they turn out positive for us that, you know, at that point in time, we'll bonus out based on you know, I don't know, whatever, whatever's left over.  I don't know what that is, you know, not with what's going on right now. |
| JC | Uh hmm. |
| BP | I mean, it's not that anybody doesn't wanna do it.  It's not that anybody's, you know, trying to avoid doing anything.  But I mean, we had the same discussion with, with Sara.  You know? |
| JC | I, I don't know. |

| BP | Well, we did – with everybody. Nobody has any agreements. We're, we're just trying to pay bills – trying to stay out of prison. I mean, what more can I tell you? You know. I'm in the fight of my life right now and on top of that, I've got a company that's under water and I've got a buyer that, not only hasn't closed on anything, but you know, is putting me in a position where I've got banks like Bank of America putting a three million dollar re-sizing on the, on a property that's underperformed so badly that they're threatening, you know, to throw it into foreclosure. And I don't know what effect that's gonna have on Cascade. So, it's just fucked up. |
|---|---|
| JC | So how am I – excuse me, how do I stay in the loop? |
| BP | I, I don't know what you mean by that. |
| JC | Um. |
| BP | A few weeks ago, you came here and you told me that you had taken another job. Okay? That you were going to work for a American Housing. Okay? And at that point in time, I told you that whether you went to work for them or not or whoever it was that you went to work for that if things out tracked, if things turned out where we end up with something, okay, then we will honus out the people, like yourself, that we feel that you know, are entitled to getting something from that. But, it's not a good situation right now. And it's not a situation where it can even be put, put in writing. I mean, it's impossible. You know? |
| JC | Well, I guess – well, it's a good thing everybody else is gonna be staying, right? |
| BP | I don't know. I have no idea what – you know, I don't know who's staying, who's going, you know. I, I have no idea, you know. And as I said, I don't know if the deal is gonna close. Um, I mean, it's a complete cluster fuck. You know? I mean, obviously you know, you're not gonna be dealing with this crap at American Housing. But you know, I'll certainly keep in touch with you and we'll figure out you know, from time-to-time where we're at and hopefully, get through this, that's all. |
| JC | Okay. |
| BP | All right? I think Cheryl's going into the office. But if there's anything that you need me for, just give me a call. All right? |
| JC | All right. |
| BP | Okay. |

END OF CONVERSATION

Page 7

## CONVERSATION BETWEEN
## JEFF CARPENTER AND CHERYL POTASHNIK

JC = Jeff Carpenter
CP = Cheryl Potashnik

| SPEAKER | CONVERSATION |
|---------|--------------|
| JC | You ready?  49 today. |
| CP | You are? |
| JC | Yep. |
| CP | Happy Birthday. |
| JC | Thanks.  Was this what I was supposed to get?  Where, where . . . |
| CP | It doesn't include the severance payment. |
| JC | . . . where it waives all rights to everything of my concern and, you know, if then, the sale goes through.  How we do all that? |
| CP | It doesn't have anything to do with it. |
| JC | Yeah it does.  It, it says . . . |
| CP | No, it doesn't. |
| JC | Well, it says in here – it waives all those rights. |
| CP | Well, Jeff, you don't currently have any rights. |
| JC | Okay. |
| CP | You don't have any rights. |
| JC | Okay. |
| CP | You have conversations that we've had.  You have intentions that we've had.  You have what we intend to do and what we wanna do.  You don't have any rights.  That's about your employment and the rights that you had under your Employment Agreement and that type of thing.  It's a legal document.  It's not saying, Jeff you give up any hope of ever getting anything.  It's a legal document.  It's what you have rights to.  And if you think that you have other rights, then you shouldn't sign the document. |

Page 1

EXHIBIT
B

Appendix 1452

| | |
|---|---|
| JC | Okay. |
| CP | So, what I was gonna propose to you was – because I know that you have an urgency, and I know you guys are sitting around trying to come up with what, you know, the net number is at the end of the day on the sale and we can walk through that because you guys covered that, you know, 25% of what potential deductions in the purchase agreement are gonna be . . . |
| JC | Uh hmm. |
| CP | . . . uh, and we can go through that, we can definitely do that, but, you know, what my proposal to you today was gonna be is that – what I can build into that agreement for you after the (inaudible) of your employment so you have something to have is um, an agreement to pay – in addition to the 20 – the one month severance and your PTO bank and all of that stuff . . . |
| JC | Uh hmm. |
| CP | . . . to pay three years of bonus – the minimum bonus even though I'm uh, I'm having to, I'm not, I'm not saying that there was a minimum bonus, but an original Employment Agreement talked about $50,000. So, to build into your Agreement that um, the leader of the sale employment at the end of the year and that you would be guaranteed $150,000 pursuant to that Agreement. |
| JC | Uh hmm. |
| CP | And then that's something you would have a legal right to have. And then, you know, like I've told you before when we were on the phone with Keith, I've got to be able to see some preliminary on how this deal is gonna shake out before I can start making commitments and go above and beyond that because I need to make sure that, that when all is said and done and it shakes out and everybody else gets paid, that Brian and I have a certain amount of money that we can put towards our defense. |
| JC | Right. |
| CP | And until I know that I have that, I'm not making any more commitments. I did not know that, maybe within the next three to four weeks. And I don't have a great feeling that we're gonna be able to (inaudible 3:47 – 3:54) |
| JC | Right. |
| CP | Um. But you have to understand that there's investment banker fees, there's transfer fees on the debt, there's legal fees, there's resized escrow (inaudible) costs, you know, Skyline alone, Bank of America asking for $3 million. Phamer a big part of a million dollars when we close. |

Appendix 1453

| JC | Uh hmm. |
|----|---------|
| CP | I mean, I don't know what's gonna happen with that percent now because of a big scare of what interest is doing today.  So, you know, at the end of the day, you could not, you know, $37 million goes like that.  You know, it sounds like a lot of money, but on the business side and with all the contingent liability.  You know, it's scary.  And, the last thing I wanna do is make you commitments that can't be kept because then, you and I are gonna get sideways.  And I don't wanna do that.  And I don't want (inaudible).  But if you're intention is to do that, let's do that now.  Then, you know, we should just stop talking and you should do it.  But, I really wanna work with you and make sure you're taken care of.  But, it's not gonna be - there's no point in making promises that I can't keep and then we end up sideways with each other. |
| JC | Yeah, I, I, I understand that.  Just the way this reads doesn't cover that. |
| CP | That, that doesn't cover anything having to do with the sale because you don't have any rights under the sale.   You have rights under your employment agreement . . . |
| JC | Uh hmm. |
| CP | . . . and I have obligations as your employer. |
| JC | Is, is that why the, there just has never been, even prior to the indictment and everything, why we didn't get something in writing? |
| CP | Is what why? |
| JC | This, this, the strategy of being somewhat being non-committal?  I mean that . . . |
| CP | It's the same thing . . . |
| JC | . . . I've been, I've been trying to get something in writing since, let's see, I – Brian and, you know, informed me in May of '06. |
| CP | Jeff, maybe it, maybe it just boils down to that we're just not that smart.  I don't know what to tell you.  But that, it's been . . . |
| CP | Yeah?  (inaudible 6:28 – 6:52) |
| CP | Call me after you pick 'em up.  You know pick ups at 3:00.  Oh, oh, you're going back.  Okay, well just do that – I'm not gonna – okay, well I'm not gonna be ready for a while so – okay.  All right. |
| CP | Um, because of the way the (inaudible 7:24 – 7:40) |

Appendix 1454

| CP | You know it looked one way July 15th or June 15th whenever, I don't remember the exact time frame. But, you know, anticipating another six months of overhead and all the obligations that go along with it um, you know, it really starts to eat away at what's gonna be left. |
|---|---|
| JC | I, I understand. |
| CP | You know, and then it was like when, when we got indicted all of a sudden it was like oh my God. |
| CP | (inaudible 8:19 – 8:30) But, you know, there's just so much concern about what everybody's gonna do an how they're gonna react. |
| CP | My number one priority is to meet the obligations of the business. You know, we still got the business to practice and continue to operate. (inaudible) |
| JC | Uh hmm. |
| CP | And uh, so I mean, that – the uh, the lack of putting things in writing up to this point has just been not knowing what to put in a way that works for everybody. And I just haven't been able to, you know, figure out, figure it out to a point where I'm not afraid that we're leaving ourselves short. And that's why, if I can start to see, I can type up a closing statement and how the bottom line is gonna look then, I can (inaudible 9:29 – 9:35) I mean, I wanna see it. But, if it's a negative at the bottom, where we actually have to owe them, you know? |
| JC | Uh hmm. No, I understand that portion of it. |
| CP | But there's a lot of things that could happen between now and then and (inaudible 9:58 – 10:14) |
| JC | Uh if, you know the uh, the . . . |
| CP | If you wanna mark that agreement up . . . |
| JC | Uh hmm. |
| CP | . . . I'll look at it, you know. But, that's our standard agreement. I need to look at my additional copy and get – (inaudible 10:33 – 10:38) |
| JC | That what? |
| CP | Whether to include you. |
| JC | Right. Keith got an ear full when he sent that to me. |

Appendix 1455

| CP | (Inaudible) |
| --- | --- |
| JC | It, it -- and, and apparently, I spoke to you last night. |
| CP | You don't remember? |
| JC | Not much of it. |
| CP | I knew you were drunk. |
| JC | Oh I . . . |
| CP | 'Cause you called me and you didn't leave a message.  So, I called you back and then I talked to you.  And you were like, I didn't call you.  I'm like . . . |
| JC | I, I probably downed a half a bottle of Glen Levit real quick.  I was hot to say the least.  Um . . . |
| CP | Well, but the thing is Jeff is that you should, you should always talk to me before you get hot.  Because nine times out of 10, probably somebody else made a mistake. (inaudible) |
| JC | Well, that's fine.  So, we talk today.  Um, I, I, I understand how the number bear -- you know the, the cost of the transaction and all that stuff has gone through.  And you know, from day one, I said what about the, you know, the times prior to that when things were good.  Uh, about the earned bonuses that weren't distributed.  You know unfortunately or fortunately; or however, you want to look at it, I dealt with Brian on most of that.  And, it's always the next deal, the next deal, the next deal, the next deal . . . |
| CP | Things haven't been good around here for a long time. |
| JC | Oh, we had money coming -- we had some money coming in.  We closed a lot of deals. |
| CP | But Jeff, you don't understand that that doesn't mean that things are good.  That just means that there is money coming in.  That doesn't mean that the money coming in is enough to cover the money that's due out.  I mean . . . |
| JC | Well . . . |
| CP | . . . in 2005, or back in 2004, when we - Deepak and the allotment  group was working to get those pre-allotment loans and all those deals, I mean, it looked like with those pre-development loans we wouldn't have a problem then. |
| JC | Uh hmm. |

Appendix 1456

| CP | You know, the nature of, of real estate and the allotment business is that you never have any cash.  It's a very illiquid.  You know, I regret some of the decisions that we made and deals that we did and things like that but, I don't think you can really appreciate how much money has been . . . |
| --- | --- |
| JC | Well, I've been doing this . . . |
| CP | . . . lost. |
| JC | I've been mis – doing this a long time myself and I do understand that.  I also understand that other uh, executives and peers were – got paid their bonuses during that time period and wha never did. |
| CP | They got some of 'em. |
| JC | I mean, Deepak – it's my understanding and – got paid $275,000 in '05. |
| CP | I'd be shocked if that was true. |
| JC | I got zip. |
| CP | I'd be shocked if that was true. |
| JC | That's what I've been told. |
| CP | I've never seen that. |
| JC | Well.  So, you know, under – I understand the, the floating uh, barometer with the sale and, and all that and the percentage and everything.  I would like to have a more firmer commitment, you know, on those three years - which I think is very reasonable. |
| CP | Well, and like I said, I'd be willing to give you a minimum guarantee of the, of the base line fixed rate which is 150,000.  Beyond that, I'm not gonna today put anything in writing.  I can't. |
| JC | But if, if things improve, it could – would be considered on the back end. |
| CP | Well, that would be (inaudible) |
| JC | It'd be an additional bonus of that – the balance or however you wanna look at it? |
| CP | I don't understand the question.  I've said, if things improve – I mean, we have a way to compensate you based on expectations that you have – that we've talked about. |

Appendix 1457

| JC | Uh hmm. |
|----|---------|
| CP | So, that's all I can do. |
| JC | Okay. |
| CP | I'm not gonna put it in writing right now. |
| JC | How do we stay in touch and communication once I'm gone to see where we stand on certain things? |
| CP | Call me every day – I don't care. |
| JC | Okay. |
| CP | You know, I'm probably gonna have to call you and ask you questions and . . . you know, stay in touch and . . . |
| JC | Uh hmm. |
| CP | . . . whatever. I'm not gonna bullshit you Jeff I've told you. I'm not going to. You can come and look at whatever you wanna look at. You wanna see Brian and my savings account and every transaction that we've had since then to keep this company afloat, you can see it. I'm peeved. I'm not bullshitting you. |
| JC | I, I understand that . . . |
| CP | I'm sorry that it's happened, I know that. You know? But when, when you take a company like ours that relies on development business and you stop doing development, it's not pretty. |
| JC | I absolutely agree. It's been certainly both (inaudible) and understand that part of it. |
| CP | As do I. I mean, you know? |
| JC | I mean, all we needed to do was keep three deals a year going. |
| CP | I don't know if that was true but, I don't know if three deals is the number. |
| JC | Three, three to four. |
| CP | I don't really know, at this point, what the magic number would have been back then. One thing we needed to do was to do good deals. Not do . . . |

END OF CONVERSATION TO JUST BEFORE 16:59 THROUGH 41:10

Page 7

Appendix 1458

## EMPLOYMENT AGREEMENT

AGREEMENT (this "**Agreement**") made as of February 13, 2004, but effective as of the Employment Date (as hereinafter defined), between Southwest Housing Management Company, Inc., a Texas corporation (the "**Company**"), and Jeffrey W. Carpenter (the "**Employee**").

WHEREAS, the Company desires that the Employee be employed to serve as Executive Vice President with the Company, and the Employee desires to be so employed by the Company, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations and covenants contained in this Agreement, the parties agree as follows:

1. **Employment.**
    The Company hereby employs the Employee and the Employee hereby accepts such employment, subject to the terms and conditions set forth in this Agreement, as its Executive Vice President.

2. **At-Will Employment.**
    Employment under this Agreement shall begin as of March 15, 2004, the date hereof (the "**Employment Date**") and shall continue at the will of the Employee and/or the Company. Employee understands and agrees that his employment is at will and may be terminated at any time, with or without notice or cause, by the Company or by himself.

3. **Duties.**
    (a) The Employee shall perform the duties and functions assigned to him from time to time, in the sole discretion of the Company, and shall report to the President of the Company or such other person as directed by the President.

    (b) The Employee agrees to devote his working time, attention and energies to the performance of the businesses of the Company and of any of its affiliates by which he may be employed, and the Employee shall not, directly or indirectly, alone or as a member of any partnership or other organization, or as an officer, director or employee of any other corporation, partnership or other organization, be actively engaged in or concerned with any other duties or pursuits which materially interfere with the performance of his duties under this Agreement.

4. **Compensation.**
    (a) As compensation for the employment services to be rendered by the Employee under this Agreement, the Company agrees to pay, or cause to be paid, to the Employee a base salary at an annualized rate of $200,000.00, payable in equal installments bi-weekly. This statement of annualized salary does not represent a contract

EMPLOYMENT AGREEMENT - page 1

PLAINTIFF'S
EXHIBIT
2
1-20-15

SHM 0106

Appendix 1459

for a year or any other specific period of time.

    (b) Bonus structures will be reviewed and revised on an annual basis by the Company. In the first calendar year of employment, the minimum discretionary bonus potential will be $50,000.00, and will be based on achieving Company objectives. The maximum bonus potential in the first calendar year of employment will be $200,000, which will be determined based on overall profitability of the organization as a whole. A detailed bonus plan will be provided to the Employee within ninety days of the Employment Date. Any annual change(s) made to the bonus structure will be at the sole discretion of the Company. Employee must be employed by the Company at the end of the first calendar year for minimum discretionary bonus to be considered earned.

5. **Expenses.**

    a. The Company shall pay or reimburse the Employee, subject to prior approval and upon presentment of such vouchers, receipts and other supporting information as the Company may require, for all reasonable business and travel expenses which may be incurred or paid by the Employee in connection with the employment of the Employee by the Company in accordance with the Company's standard policies then in effect. The Employee shall comply with such restrictions and shall keep such records as the Company may require of its Employees generally facilitating compliance with the requirements of the Internal Revenue Code of 1986, as amended from time to time, and regulations promulgated there under.

    b. The Company shall reimburse the Employee the cost of relocation to the Dallas area in an amount not to exceed $36,000.00. Employee shall provide the Company with receipts and will receive reimbursement within fourteen days of submission of such receipts.

    c. The Company shall provide the Employee with temporary housing in a corporate furnished apartment for a maximum period of ninety days.

6. **Insurance and Other Benefits.**

    Employee shall be eligible for twenty days of total Paid Time Off per twelve month period. At the conclusion of 90 days of employment after Employee's Employment Date, Employee is eligible to participate in and receive any other benefits provided by the Company to other Employee employees, generally (including 401(k) plan participation, health insurance, dental coverage, life insurance and short and long-term disability insurance plans in accordance with the terms of such plans), all as determined from time to time by the Company. Company will reimburse the Employee for any COBRA insurance payments that may be incurred up through the date the Employee is eligible for Company benefits. Company shall pay Employee a monthly automobile allowance of $600.00. Employee will be eligible to participate in Company health club program. Company will adjust Employee's salary in the event the

EMPLOYMENT AGREEMENT - page 2

SHM 0107

Appendix 1460

Employee's share of the Company provided health coverage for the family exceeds $4,680.00.

7. **Termination of Employment; Effect of Termination.** Employee will not be entitled to any compensation or benefits pursuant to this Agreement effective upon the termination of employee's employment, the removal of Employee from the position of Executive Vice President, and/or upon the Employee's death, except as noted below. In the event of death of the Employee prior to the termination of his employment, the estate of the Employee shall thereupon be entitled to receive such portion of the Employee's annual salary and bonus as has been earned and unpaid through the date of his death.

a. In the event Company terminates Employee, Employee will receive severance in an amount equal to six weeks of base salary in a lump sum payable upon such termination.

8. **Representations and Agreements of the Employee.** (a) The Employee represents and warrants that he is free to enter into this Agreement and to perform the duties required under this Agreement, and that there are no employment contracts or understandings, restrictive covenants or other restrictions, whether written or oral, preventing the performance of his duties under this Agreement. Employee agrees to abide by all policies and practices of the Company as may be implemented from time to time.

(b) Employee acknowledges and agrees that all aspects of his terms, conditions and benefits not addressed herein are governed by the policies and practices of the Company as may be implemented from time to time in the sole discretion of the Company.

9. **Non-Competition and Non-Solicitation Covenants.** (a) The Employee acknowledges that, during the course of his employment by the Company, the Company will provide to Employee confidential or proprietary information, documents and other materials relating to the Company, its affiliates and their respective business which are not generally known to persons outside the Company (whether conceived or developed by the Employee or others) and confidential or proprietary information, documents and other materials entrusted to the Company by third parties, including, without limitation, any "know-how," trade secrets, customer lists, details of client or consultant contracts, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, business plans, acquisition plans of the Company or its affiliates that are valuable and not generally known to the competitors of the Company, whether or not in written or tangible form, and including all memoranda, notes, plans, reports, records, documents and other evidence thereof ("**Confidential Information**"). The Employee further acknowledges that during the course of his employment, he will be the recipient of goodwill generated by the Company's dealings with third parties.

(b) Employee agrees he will not directly or indirectly, during the term of

EMPLOYMENT AGREEMENT - page 3

SHM 0108

Appendix 1461

his employment by the Company, and thereafter, disclose to anyone, or use or otherwise exploit for his own benefit or for the benefit of anyone other than the Company or its affiliates, any Confidential Information. As a member of management, during the term of employment, the Employee will assume a pro-active role in educating subordinate employees regarding the appropriateness of language, behavior and the importance of confidentiality in business matters regarding the Company.

(c) Employee agrees that all Confidential Information conceived, discovered or made by Employee during the term of employment belongs to the Company. Employee will promptly disclose such Confidential Information to the Company and perform all actions reasonably requested by the Company to establish and confirm such ownership.

(d) All Confidential Information relating to the Company and its affiliates shall be the exclusive property of the Company and its affiliates, and Employee shall use all reasonable efforts to prevent any publication or disclosure thereof. Upon termination of Employee's employment with the Company, all documents, records, reports, writings and other similar documents containing Confidential Information, including copies thereof, then in Employee's possession or control shall be returned to and left with the Company.

(e) In addition, Employee shall not, directly or indirectly, during or for a period of one year after the termination of his employment, request or cause, directly or indirectly, any contracting party, supplier, vendor, investor, lender, municipality, government agency, quasi-governmental agency, or bond-issuing entity, or customer of the Company during the period of Employee's employment, to cancel or terminate any business relationship or dealings with the Company or any of its parents or affiliates.

(f) In addition, Employee shall not, directly or indirectly, during or for a period of one year after the termination of his employment, solicit, interfere with or entice, directly or indirectly, any employee (including any leased employee) of the Company, or any parent or affiliate, who worked for the Company (or its parent or affiliate) during the time that Employee worked for the Company (or its parent or affiliate), to leave the employment of the Company.

(g) If any portion of the restrictions set forth in this Section 9 should, for any reason whatsoever, be declared invalid by an arbitrator or court of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected. Employee acknowledges that the Company intends to expand its business into new geographic areas, that its sales and marketing prospects are for continued expansion into such areas, and that in his capacity as Senior Vice President of Property Management, he will have access to information and operations concerning such, and that therefore, the territorial, time and scope of activity limitations set forth in this Section 9 are reasonable and do not impose a greater restraint than is necessary for the adequate protection of the goodwill and other business interests of the Company. In the event any such limitation is deemed to be unreasonable by an arbitrator or court of competent jurisdiction, Employee and the Company agree that the arbitrator or court may reform the territorial, time and/or scope limitations of this Section 9.

(h) The existence of any claim or cause of action by Employee against the

EMPLOYMENT AGREEMENT - page 4

SHM 0109

Appendix 1462

Company shall not constitute a defense to the enforcement by the Company of the foregoing restrictive covenants.

10. **Alternative Dispute Resolution; Right to Injunction; Remedies.**

(a) Employee and the Company agree that in the event of any dispute or claim arising from or relating to this Agreement or the breach thereof, or to any other aspect of Employee's terms, conditions and/or benefits of employment or to any other aspect of his contacts with Company, the parties hereto shall use their best efforts to settle the dispute, claim, question, or disagreement. To this effect, they shall consult and negotiate with each other in good faith and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to both parties. If they do not reach such solution within a period of 30 days, then, upon written notice by either party to the other, such dispute or claim shall be submitted within the next 60 days to a one-half day mediation, with the mediation fee to be shared equally by the Employee and the Company, and with the mediator to be agreed upon by the Employer and the Company; provided, however, that if a mediator cannot be agreed upon, then one shall be appointed by the American Arbitration Association ("AAA") with all AAA and mediator fees to be shared equally by the Employee and the Company. If mediation is unsuccessful, then upon written notice by either party to the other and to AAA, within 30 days of the mediation, such dispute or claim shall be submitted for binding arbitration administered by AAA in accordance with the provisions of its Employment Dispute Arbitration Rules, except as provided in (b) below. Neither the Company nor the Employee may file any claim, complaint, charge or suit with any court or governmental agency against the other, or accept any damages or other relief as the result of any claim, complaint, charge or suit, except as provided in (b) below or as such restriction would otherwise be unlawful. All fees and costs up to $2000.00 charged by AAA and the arbitrator(s) shall be paid equally by the Employee and the Company; all fees and costs charged by AAA and the arbitrator(s) in excess thereof shall be paid by the Company. Each party shall bear its own attorneys' fees and costs of arbitration except as otherwise ordered by the arbitrator(s).

(b) The Employee recognizes that the services to be rendered by him under this Agreement integrally involve the training and Confidential Information provided by the Company, the loss of which cannot be adequately compensated for in damages. In the event of a breach of Section 9 or10 of this Agreement by the Employee, the Company shall be entitled to seek temporary injunctive relief from a court of proper jurisdiction pending the final decision and judgment in the arbitration as to such alleged breach. The Company shall not seek an award of attorneys' fees or costs incurred in bringing an action pursuant to this provision (b).

11. **Assignment.**

The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company.

EMPLOYMENT AGREEMENT - page 5

SHM 0110

Appendix 1463

12. **Amendment or Alteration**.

No amendment or alteration of the terms of this Agreement shall be valid unless made in writing and signed by both of the parties to this Agreement.

13. **Governing Law**.

This Agreement shall be governed by the laws of the State of Texas applicable to agreements made and to be performed therein. Any mediation, lawsuit or other proceeding in connection with this Agreement or Employee's employment or relationship with the Company shall occur or be brought in Dallas County, Texas.

14. **Severability**.

The holding of any provision of this Agreement to be invalid or unenforceable by a court of competent jurisdiction shall not affect any other provision of this Agreement, which shall remain in full force and effect.

15. **Notices**.

Any notices required or permitted to be given under this Agreement shall be sufficient if in writing, and if delivered by hand, or sent by certified mail, return receipt requested, to the addresses set forth below or such other address as either party may from time to time designate in writing to the other, and shall be deemed given as of the date of the delivery or mailing.

16. **Waiver or Breach**.

It is agreed that a waiver by either party of a breach of any provision of this Agreement shall not operate, or be construed, as a waiver of any subsequent breach by that same party.

17. **Entire Agreement and Binding Effect**.

This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and shall be binding upon and inure to the benefit of the parties to this Agreement and their respective legal representatives, heirs, distributors, successors and assigns. Notwithstanding the foregoing, no prior agreements between the Employee and the Company relating to the confidentiality of information, trade secrets and patents shall be affected by this Agreement.

18. **Survival**.

Neither the termination of the Employee's employment nor the change in his job title or position shall affect the enforceability of Sections 9, 10 and 11 of this Agreement.

19. **Further Assurances**.

EMPLOYMENT AGREEMENT - page 6

The parties agree to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

20. **Headings**.

The section headings appearing in this Agreement are for the purposes of easy reference and shall not be considered a part of this Agreement or in any way modify, demand or affect its provisions.

21. **Counterparts**.

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

EMPLOYMENT AGREEMENT - page 7

SHM 0112

Appendix 1465

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.

By: _____

Name: Brian Potashnik

Title: President

5910 North Central Expressway, Suite 1145

Dallas, Texas 75206

214/891-1402 phone

214/987-3677 fax

_____ 2/25/04

Jeffrey W. Carpenter

EMPLOYMENT AGREEMENT - page 8

SHM 0113

Appendix 1466

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.

By:_____
Name: Brian Potashnik_____
Title: President_____
5910 North Central Expressway, Suite 1145
Dallas, Texas 75206
214/891-1402 phone
214/987-3477 fax

Jeffrey W. Carpenter                    2/25/04

EMPLOYMENT AGREEMENT - page 8

# MULTIFAMILY

## M
## F
## E

### EXECUTIVE

**March 2005**

**Nice Work:**
**Offices**
**Go Residential**

page 68

**Plus:**
**When and Where to**
**Go Wireless**

**How to Respond to an**
**On-Site Crisis**

# TEXAS TWO-STEP

**Southwest Housing Takes the**
**Lead on Affordable Development**
page 56

Brian Potashnik
President
Southwest Housing



**M F E**
**10**

MULTIFAMILY EXECUTIVE
Celebrates 10 Years
of Industry Leadership

**PLAINTIFF'S**
**EXHIBIT**
16

Appendix 1468

# Change
# AGENTS

**Southwest Housing transforms neighborhoods and people's lives.**

Drive down the streets of southern Dallas' Cedar Crest neighborhood, and you'll see dismal barrack-style apartments, boarded-up storefronts, and buildings caked in a rainbow of graffiti, with store signs that are missing a letter or two. Continue just a little further, and you won't believe your eyes. There, in the middle of the grime and neglect, sits an urban oasis: Rosemont at Cedar Crest.

Once the site of a dilapidated shopping center, Southwest Housing's Cedar Crest property boasts a fashionable façade of red brick and Austin stone. Each apartment features a tiled entryway, 9-foot ceilings, ceiling fans, a kitchen island, and solid wood pantries. French doors open onto a large, inviting patio. To complete the package, residents at the 256-unit, family-targeted community are offered a range of services from after-school programs and family counseling to adult education and recreational activities.

"It's very rewarding to take people out of the worst housing projects in the city and into brand-new living conditions which they can not only be proud of, but grow as people," says Brian Potashnik, president of Southwest Housing, a Dallas-based affordable housing company.

Rosemont at Cedar Crest is just a small piece of the legacy Potashnik and his wife Cheryl, co-owner of the company, are leaving to the community. One of the largest affordable housing developers in the Southwest, the company has built 8,000 units of much-needed affordable senior and family housing throughout Texas, often replacing rundown apartments and shopping centers. Since 2000, Southwest has invested more than \$150 million in

By Rachel Z. Azoff

Kelly LaDuke

Appendix 1469

Pier 70                Confidential Draft
2801 Alaskan Way, Suite 200
Seattle, Washington 98121

Phone 206-215-9700; Fax 206-802-0040



October 16, 2006

Shariar Mohajer
Director
RBC Capital Markets
One Liberty Plaza, 6th Floor
New York, NY  10006

*Re:   Letter of Intent to Purchase the General Partner's Interest*

Dear Shar:

Following are the general terms upon which Seller is willing to sell and Buyer is willing to purchase certain assets of Seller in connection with the Partnerships and projects listed on Schedule A (the "Projects"):

1.    Seller.   Collectively, all Southwest Housing entities or persons affiliated therewith.

2.    Buyer.   Cascade Affordable Housing LLC, a Washington limited liability company, or an affiliate thereof.   Buyer and each entity it forms to purchase any of the assets to be sold must be jointly and severally liable for all representations, warranties, covenants and indemnification obligations under the Purchase Agreement.  Buyer must include a creditworthy entity sufficient to satisfy financial requirements of lenders, limited partners and others whose consent is required for the transaction ("Consent Parties").

3.    Assets to be Sold.  Any and all rights, benefits and interests in or derived from each Partnership or Project by Seller, directly or indirectly, including without limitation, general partnership interests, Class B limited partner interests, loan receivables, incentive management fees, distributions, capital proceeds, development fees, guaranty fees, asset management fees, property management fees and disposition fees and the agreements associated therewith (altogether, the "Assets").  The Assets shall include, in any event, 100% of the general partnership interest in each Partnership, except in those Partnerships where Southwest is not affiliated with the general partner.

4.    Obligations.  Buyer will assume, if required by lenders or limited partners, all obligations relating to the Assets.  Seller and Buyer will use their best efforts to cause the

ORL:1\CORP\SEC\611311.12
3122/0056 RMA la 8/31/2005 PMb

PLAINTIFF'S
EXHIBIT

1

Appendix 1470

Confidential Draft

Seller to be released by third parties from any guarantees and obligations relating to the Assets. The obligations between Seller and Buyer will be governed by a Purchase Agreement consistent with the terms hereof.

5.   Timeline. It is anticipated that following execution and delivery hereof, subject to the terms hereof:

(a)   Seller shall begin diligent efforts to make available to Buyer, the information set forth on Schedule B for each Project and shall make best efforts to provide all such information for each Project within 30 days of execution of this Letter of Intent;

(b)   the Seller and Buyer will work together and will have 30 days from the date hereof to obtain the conditional or preliminary written consent to the transaction of the limited partners in each Partnership and any non-profits in the Partnerships ("Partner Consents") and at the end of such 30 day period Seller and Buyer each have the right to terminate this transaction if such consents have not been obtained. In those situations where the lender and the limited partners are affiliated, Seller and Buyer shall also request assurances that if the limited partners consent then the lender will also consent;

(c)   Seller and Buyer will have 60 days from the date hereof to negotiate and enter into a definitive Purchase Agreement;

(d)   upon execution and delivery of a Purchase Agreement and receipt by Buyer of all information set forth in Schedule B for each project and Partner Consents, the Buyer will within 15 days make application to all lenders and regulatory agencies for their consent to the transaction (to expedite these consents applications, Buyer will prepare them prior to the execution of the Purchase Agreement); and

(e)   30 days after the Due Diligence Period, the transaction will close, subject to the procurement of all applicable consents. If all applicable consents have not been obtained by such time then either party (as long as such party is not in default) shall have the right to extend the closing date by an additional 30 days. If all applicable consents have not been obtained by the end of such extension period and if consents for the transfer of assets totaling at least 90% of the value of the Assets to be sold have been obtained, then a closing (the "Initial Closing") will occur with respect to those Assets and the sale of the remaining Assets to be sold will occur promptly upon obtaining the applicable consents. The Purchase Agreement shall contain provisions relating to the Buyer's contractual assumption of the duties and obligations relating to the Assets awaiting consent.

Appendix 1471

Confidential Draft

6.    Purchase Price.

(a)    Thirty-Six Million and No/100 Dollars (**$36,000,000.00**) paid in immediately available funds, at closing.   In addition, One Million and No/100 Dollars (**$1,000,000.00**) shall be paid at closing to Seller to reimburse Seller for all costs it incurs (regardless of whether Seller actually incurs more or less than $1,000,000.00) to secure the Partner Consents ("Partner Consent Compensation").

(b)    The Purchase Price will be increased by the amount of distributable cash flow (as defined and calculated pursuant to the controlling limited partnership agreement for each Partnership) due to Seller as of the end of the quarter prior to closing in the event such distributions have not been made as of the closing date.  The purchase price will be increased by the amount of cash flow estimated as due to Seller as of the end of the quarter in which closing occurs in the event closing occurs after the 45th day of the quarter.

(c)    Seller and Buyer agree that Seller shall be entitled to receive all cash developer fees to be paid on the deals identified on Schedule C which are anticipated to receive such cash developer fees prior to April 1, 2007, regardless of when actually paid. To the extent any such cash developer fees have not been paid prior to closing, the Seller shall be entitled to certain controls necessary to achieve the benchmarks necessary to cause those fees to be paid. Further, Seller and Buyer agree that Buyer shall be entitled to receive all cash developer fees to be paid on the deals identified on Schedule C which are anticipated to receive such cash developer fees after April 1, 2007, regardless of when actually paid.  To the extent any such fees are paid prior to closing, the purchase price with respect to the applicable Assets shall be reduced dollar for dollar.

(d)    Within 30 days of the date hereof, Buyer and Seller will use best efforts to agree on the allocation of the Purchase Price among the Assets.

7.    Deposits. Upon execution of the Purchase Agreement, Buyer will deposit with an independent escrow agent 1% of the total purchase price as the initial deposit and at the end of the due diligence period an additional 1% of the total purchase price as an additional deposit.  The deposit will be refundable to Buyer upon termination of the Purchase Agreement by the Buyer (only if Buyer is not in default under the Purchase Agreement) at any time during the due diligence period and after the expiration of the due diligence period only if Seller and Buyer are unable to obtain the consents from all Consent Parties necessary for an Initial Closing or if the Seller is in default or conditions to closing are unsatisfied due to Seller's performance under the Purchase Agreement.

At closing, all of the deposits will be credited against the Purchase Price.

8.    Closing.  Closing will occur at the offices of the Seller or at such other place as the parties may agree, at the time(s) specified in Paragraph 5(e) hereof.

9.    Due Diligence.  Buyer will have a 90 day period after the execution of the Purchase Agreement and receipt of all information in Schedule B that has not been

Appendix 1472

Confidential Draft

received (as identified in the Purchase Agreement) to conduct due diligence. Buyer will be permitted access to all material documentation in possession of the Seller relating to the Assets pursuant to a public link to Seller's website. Seller will be permitted to ask questions of applicable lenders, limited partners and housing authorities, provided Buyer has given Seller reasonable prior written notice thereof prior to initial contact and has given Seller an opportunity to participate in such discussions. Buyer will be entitled to access the Projects to perform noninvasive property inspections, and Seller will be entitled to reasonable prior written notice of Buyer's onsite inspection of any properties and will be entitled to accompany Buyer in such inspection. Buyer will indemnify Seller for any damages caused by Buyer's inspection.

10.     Representations and Warranties.  Seller will make absolute representations and warranties as to formation, organization, power, authority, execution, delivery and enforceability, title to the Assets, pending litigation, and complete disclosure of documentation in the possession of Seller relating to the Assets. All other representations and warranties will be made based on the actual knowledge of the Seller. Actual knowledge will include current recollection of Seller and any written notices to Seller from limited partners, lenders, housing authorities and governmental agencies contrary to the representation or warranty.

11.     Indemnification.  Prior to closing, Seller's sole remedy shall be retention of the deposit as described herein and Buyer's sole remedy will be the refund of the deposit. After closing, Buyer will indemnify Seller for any losses incurred by Seller relating to occurrences after closing and for any breach of representation, warranty or covenant by Buyer under the Purchase Agreement which survives closing. Similarly, Seller will indemnify Buyer for any losses incurred by Buyer relating to: (a) claims made by third parties under project documents for defaults existing as of closing, but not disclosed by Buyer prior to closing, (b) breaches by Seller of representations, warranties and covenants, which survive closing (c) any employment related issues occurring prior to closing, (d) third party claims relating to events occurring prior to closing and not covered by insurance or (e) compliance issues occurring prior to closing. Seller and Buyer will use their best efforts to obtain estoppel agreements from all consent providers. Seller and Buyer will each identify a creditworthy entity to support their indemnification obligations hereunder.

12.     Certain Limitations.  Any representations and warranties by Seller regarding the physical condition of the Projects will not survive closing, and no claim may be made with respect to the physical condition of the properties after closing. All other representations and warranties made by either party will survive closing for a period of two years, during which time a claim under such representation and warranty must be made or otherwise forfeited. The parties will have no obligations to the other for indirect or speculative damages or lost profits or for losses which are not incurred by the indemnified party in favor of third parties. Seller shall not be responsible for damages until damage amounts are in excess of $150,000 and Seller shall not be responsible for damages in excess of $3,400,000.

Appendix 1473

Confidential Draft

13.    Kickout Rights.  Seller will have the right to remove certain projects from this transaction for the purpose of curing the failure to meet a closing condition, any default by Seller and any event or fact pursuant to which Buyer desires to terminate the transaction.  Notwithstanding the foregoing, other than the Napico deals, Seller shall not kickout Assets representing total value in excess of 10% of the purchase price.

14.    Conduct of Business.  Sellers will agree to conduct business in the ordinary course consistent with past practices and to give Buyer notice of any matter which Seller becomes aware of that is or may result in a breach of a representation, warranty or covenant of Seller in the Purchase Agreement.  Further, Seller will agree to complete construction in accordance with all Project documentation.  Buyer will agree to conduct business in accordance with all project documents and will agree to notify Sellers of any matter which may cause Seller any liability, regardless of any releases to the contrary.

15.    Employees.  Within 30 days of the date hereof, Seller and Buyer shall agree on the treatment of all affected employees.  Seller shall supply Buyer with a list of compensation and benefits for all such employees.  It is anticipated that Buyer will retain all executive, accounting and management employees.

16.  ·  Tax Credits.  Seller will indemnify Buyer for all tax credit recapture due to compliance issues occurring prior to closing.  Seller shall be responsible for all tax credit adjusters associated with eligible basis and arising out of a cost certification, but only to the extent the adjuster is caused by the actual amount of credits being lower than the amount Seller has projected on Schedule D (on Projects that have not finished construction/cost certification by Closing), which Schedule D shall be completed within 30 days of the date hereof.  Buyer shall take all other basis risk including the risk of adjustment on IRS audit.

17.    Required Consents.  Buyer and Seller will, together, determine all required consents from Consent Parties and will cooperate to obtain all such consents.  It is anticipated that the consent of all lenders, partners and housing authorities will be required.

18.    Tax Matters.  Seller and Buyer will use a "closing of the books" method with respect to allocations of income and expense.  Seller and Buyer will cooperate with respect to the filing of any tax returns relating to the period prior to and immediately after closing.  Seller shall have the right to give prior written consent to any tax return relating to the tax period prior to closing.  Sellers anticipate receiving capital gain treatment in connection with the sale of general partner and Class B limited partner interests (and all rights, fees and distributions associated therewith or otherwise payable to the general partners or Class B limited partner) and ordinary income in connection with the sale of all other Assets.

19.    Expenses.  Each party shall pay its own legal counsel and accounting expenses in connection with this Letter of Intent, the Purchase Agreement and seeking consents.  Seller and Buyer will split on a 50/50 basis all transaction costs (except for the costs incurred to secure Partner Consents), including but not limited to (a) any assumption fees

Appendix 1474

Confidential Draft

or transfer fees required by lenders or housing agencies and (b) escrow and recording fees and transfer taxes (if applicable) for the closing. Transaction costs shall not include (x) the costs associated with securing Partner Consents and (y) sales commissions, which shall be paid by Seller to Seller's Broker if applicable. Seller and Buyer represent and warrant to each other that (except for RBC Capital Markets ("Seller's Broker")) there have been no brokers or salespeople involved in this transaction and to the extent there are, each party who engaged same shall hold the other party free and harmless from any demand for a fee. The costs associated with securing Partner Consents shall be the sole responsibility of Seller for which Seller shall receive the Partner Consent Compensation set forth in Section 6 hereof; however, such costs shall not include changes in the economic structure of a deal required by any partner (e.g. reserve requirements). Buyer shall pay for the cost of any title insurance if Buyer chooses to obtain such insurance; provided that if Buyer chooses not to obtain title insurance, then Seller shall deliver to Buyer the most recent title policy for each project and make a representation and warranty that, except as disclosed, Seller has not placed anything of record since the date of the title policy.

20. Exclusivity. The sixty (60) day period following the execution and delivery of this letter by both parties is referred to herein as the "Exclusive Period." For good and valuable consideration, the receipt and sufficiency of which are acknowledged, throughout the Exclusive Period (unless this letter is terminated by Buyer for any reason or by Seller under paragraph 5 hereof), Seller agrees not to directly or indirectly (i) solicit or initiate, or encourage submission of inquiries, proposals or offers from any potential buyer relating to the disposition of the Assets, or (ii) participate in any discussions or negotiations with any potential third party purchaser or furnish any such third party with any information with respect to the disposition of the Assets. The foregoing shall not include negotiations with housing authorities on the following deals: Primrose Houston 7 Housing, LP; TX Aldine Bender Housing, LP; TX Garth Housing LP; Heatherwilde Villas Housing, LP; TX Old Manor Housing, LP; Primrose SA IV Housing, LP.

21. Disclosure. Each party agrees that it will not issue any press release or other public disclosure of this letter or of the transaction contemplated hereby without the prior written approval of the other, unless, in the good faith opinion of counsel, such disclosure is required by law. Seller and Buyer will maintain the terms of this letter, as well as all negotiations concerning the transaction in strict confidence; provided, that (i) each party may disclose such information to its controlling persons, persons under common control with such party, affiliates and each of their respective employees, potential partners and investors, advisors and financing sources to the extent reasonably necessary (provided that such persons are directed to hold such information in confidence in accordance with this letter) and (ii) both parties may make disclosure to the extent required by law, regulation or legal process.

22. Nonbinding. This letter of intent shall be nonbinding, except for the provisions of paragraphs 20 and 21.

6

Appendix 1475

Confidential Draft

Cordially,

Basil P. Rallis, Director


Accepted _____                    Chayl Potochnik

Date 10/16/06 _____

Brian Potochnik                    cheryl Potochnik

ORL1\CORPSEC\911311.12
31220/0058 RMA tr 8/31/2006  PMb

7

Appendix 1476

# PURCHASE AND SALE AGREEMENT

### By and Among

## CASCADE AFFORDABLE HOUSING LLC

### and

### SELLERS (as listed on Schedule A)

Dated April 30, 2007

X905446.1
ORL1\CORPSEC\917721.7
31220/0059 RMA ls 4/30/2007 4:53 PM



CONFIDENTIAL
CAH-SW000268

Appendix 1477

## TABLE OF CONTENTS

Page

ARTICLE 1        PURCHASE AND SALE OF INTERESTS; CLOSING.................................2

   1.1        Agreement to Purchase and Sell.........................................................................2

   1.2        Purchase Price, Allocation and Tax Treatment. ................................................2

   1.3        Earnest Money...................................................................................................3

   1.4        Accrued Fees, Proration Adjustment and Cash Developers Fees. ........................3

   1.5        Closing..............................................................................................................6

   1.6        Seller's Closing Deliveries. ..............................................................................6

   1.7        Purchaser's Closing Deliveries.........................................................................9

ARTICLE 2        REPRESENTATIONS AND WARRANTIES OF SELLERS ....................11

   2.1        Ownership of Purchased Assets and Personal Property. ...................................11

   2.2        All Interests of Seller. .....................................................................................12

   2.3        Other Restrictions on Purchased Assets. .........................................................12

   2.4        Organization; Authority...................................................................................12

   2.5        Removal or Foreclosure on Interest.................................................................13

   2.6        Financial Statements........................................................................................13

   2.7        Disclosures......................................................................................................13

   2.8        Litigation. ........................................................................................................14

   2.9        Tax Matters......................................................................................................14

   2.10      Casualties.........................................................................................................15

   2.11      Brokers and Finders.........................................................................................15

   2.12      Labor and Employment Matters. .....................................................................15

   2.13      OFAC...............................................................................................................15

   2.14      Project Partnerships; General Partner...............................................................16

   2.15      Organization; Authority; No Violation.............................................................16

   2.16      Limited Partnership Status...............................................................................16

   2.17      Leases and Rent Rolls......................................................................................16

   2.18      Brokerage Arrangements..................................................................................17

   2.19      Service Contracts.............................................................................................17

   2.20      Sale Contracts..................................................................................................17

   2.21      No Sale or Refinancing Restrictions. ..............................................................17

50806446.4

-i-

DAL1\CORP\SEC\217721.7
31220\0006B RMA lk 4/30/2007 4:53 PM

**CONFIDENTIAL**
**CAH-SW000269**

Appendix 1478

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 2.22 | Licenses and Permits. | 17 |
| 2.23 | Title and Surveys; Ownership of Project Property; Real Estate Taxes. | 18 |
| 2.24 | Condemnation; Changes in Use. | 18 |
| 2.25 | Compliance With Laws. | 18 |
| 2.26 | Environmental Matters. | 19 |
| 2.27 | Physical Reports. | 19 |
| 2.28 | Insurance. | 19 |
| 2.29 | Projects Under Construction; Construction Contracts | 19 |
| 2.30 | Insolvency Proceedings. | 20 |
| 2.31 | Accounting. | 20 |
| 2.32 | Other Agreements or Arrangements Affecting Credits. | 20 |
| 2.33 | Valid Tax Credits. | 20 |
| 2.34 | Project Operation Requirements; Tax Credits. | 20 |
| 2.35 | No Employees. | 20 |
| 2.36 | No Other Assets. | 20 |
| 2.37 | Management of Projects. | 20 |
| 2.38 | Tax Credit Shortfalls. | 20 |
| 2.39 | Purchase Options or Rights of First Offer/Refusal. | 21 |
| 2.40 | Pests. | 21 |
| 2.41 | Schedules. | 21 |
| 2.42 | Deemed Modification to Representations and Warranties. | 21 |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | 21 |
| 3.1 | Organization; Authority. | 21 |
| 3.2 | No Violation. | 22 |
| 3.3 | Property Management. | 22 |
| 3.4 | Certain Notices to Seller. | 22 |
| 3.5 | OFAC. | 23 |
| 3.6 | Project Insurance Policies. | 23 |
| ARTICLE 4 | COVENANTS | 23 |
| 4.1 | Satisfaction of Conditions. | 23 |

50406446.4

-ii-

DRL1\CORPSEC\817721.7
31220/0058 RMA is 4/30/2007 4:53 PM

CONFIDENTIAL
CAH-SW000270

Appendix 1479

## SCHEDULES AND EXHIBITS

Page

| Schedule | Description |
|---|---|
| A | Projects, Project Partnerships, Sellers and Purchased Assets and Purchase Price Allocation |
| 1.1 | Permitted Interest Liens |
| 1.4(b) | Sample Proration Adjustment Calculation |
| 1.4(c) | Cash Developer Fees |
| 1.4(d) | Replacement Collateral and Expected Conversion Date |
| 2.1(b) | Compliance with Partnership Agreements |
| 2.1(c) | Partnership Capital |
| 2.1(e) | Economic Interest Documents |
| 2.1(f) | Other Assets |
| 2.2 | Excluded Interests |
| 2.5 | Threatened Removal or Foreclosure |
| 2.6 | Financial Statements |
| 2.7 | Defaults under Material Agreements |
| 2.8 | Litigation |
| 2.9 | Tax Matters |
| 2.10 | Recent Casualties |
| 2.12 | Labor and Employment Matters |
| 2.17 | Exclusions from Rent Rolls and Tenant Notice of Violation |
| 2.19 | Service Contracts |
| 2.23(d) | Tax Exemptions |
| 2.24 | Condemnation Proceedings |
| 2.26 | Environmental Matters |
| 2.28 | Insurance Policies and Pending Insurance Claims |
| 2.33(a) | Schedule of Tax Credits |
| 2.33(b) | Pre-8609 Projects |
| 2.37 | Third Party Property Managers |
| 2.38 | Tax Credit Shortfalls |
| 2.39 | Purchase Options and Right of First Refusal |
| 4.2 | Contemplated Actions |
| 5.4 | Required Consents |

| Exhibit | Description |
|---|---|
| A | Defined Terms |
| B | Web Docs |
| C | Office Docs |
| D | Escrow Agreement |
| E-1 | Form of Assignment and Assumption of Partnership Interest |
| E-2 | Form of Assignment and Assumption of Fee Agreements and Other Rights |

30834448.4
ORL1\CORP\BFD\#12214.4
3122\0\0056 RMA ta 4/29/2007 2:53 PM
ORL1\CORP\BFD\#17721.7
3122\0\0056 RMA ta 4/30/2007 4:53 PM

CONFIDENTIAL
CAH-SW000271

Appendix 1480

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "Agreement"), dated as of April 26, 2007, is made by and among Cascade Affordable Housing LLC, a Washington limited liability company (the "Purchaser"), and the Sellers listed on Schedule A attached hereto (individually and/or collectively as the context may require, the "Seller"). Unless otherwise indicated, all capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in Exhibit A attached hereto and made a part hereof.

### R E C I T A L S

A.    Seller is engaged in the business (the "Business") of sponsoring, developing and managing each of the multi-family residential projects identified by project name and address on Schedule A (the "Projects").

B.    Each Project is owned and operated by a limited partnership as set forth on Schedule A (collectively, the "Project Partnerships"), and Seller, pursuant to certain limited partnership agreements for certain Project Partnerships (together with partnership agreements from all other Project Partnerships, the "Project Partnership Agreements") owns partnership interests in certain Project Partnerships as set forth on Schedule A (collectively, the "Partnership Interests").

C.    In consideration for its services in connection with the Projects, Seller receives or is entitled to receive various payments, including, but not limited to, cash distributions, property management fees, incentive management fees, asset management fees, tax credit fees, principal amortization payments, disposition fees, sale and refinancing proceeds, repayment of operating deficit loans and deferred development fees (collectively, with all contractual rights associated therewith, the "Economic Interests," and together with the Partnership Interests, other than any interests excluded from the transaction contemplated hereby pursuant to the terms of this Agreement, the "Purchased Assets"). The Seller of each Economic Interest (which Economic Interest is separate from a Partnership Interest) and a description of such Economic Interest is also set forth on Schedule A.

D.    Seller has issued various guarantees and/or indemnities and has other obligations in connection with the Projects and the Purchased Assets, including, without limitation, guarantees relating to operating deficits, repurchase events, tax credit compliance and recapture, permanent loan closing, loan obligations, general partner obligations, developer obligations, environmental indemnities and other contractual obligations (altogether, the "Seller Obligations").

E.    Substantially all of the items listed on Exhibit B attached hereto, to the extent within Seller's possession or control, are or will be available within thirty (30) days of the date hereof on the Southwest Website (the "Web Docs"). The items listed on Exhibit C attached hereto (the "Office Docs") will be available for review at the offices of Seller or at the Project locations during the time period beginning on the date hereof and ending at the termination or expiration of this Agreement. Altogether, the Web Docs, the Office Docs, the Title Docs (defined below) and such other information as Seller shall disclose

1

ORL1\CORPSEC\917721.7
31220/0056 RMA ts 4/30/2007 4:55 PM

CONFIDENTIAL
CAH-SW000272
Appendix 1481

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

BUYER:

CASCADE AFFORDABLE HOUSING LLC, a Washington limited liability company

By: _____
Name: _____ STAN HAEPELSON _____
Its: _____ MANAGER _____

BUYER'S INDEMNITOR:

CASCADE HOLDINGS LLC, a Washington limited liability company

By: _____
Name: _____ STAN MANAGER _____
Its: _____ MANAGER _____

SELLER:

FOR EACH OF THE SELLERS LISTED ON SCHEDULE A HEREOF

By: _____
Brian Potashnik, authorized agent

SELLER'S INDEMNITOR:

SOUTHWEST GUARANTOR LLC

By: _____
Brian Potashnik, sole member

51

DAL:00000000 17717
31230000 RHA ti 4/30/2007 4:53 PM

**CONFIDENTIAL**
**CAH-SW000322**

Appendix 1482

## SCHEDULE A

**Southwest Cascade**
**Seller/Asset/Purchase Price Allocation**[1 2 3]



---

[1]  With respect to any partnership interest, unless footnoted otherwise, it will be a direct transfer of the partnership interest and will include any and all interests in the applicable partnership and all rights associated herewith or arising therefrom, including, without limitation, any and all rights relating to ownership, control, management, consent, allocations, credit, distributions and fees.

With respect to Developer Fees, unless otherwise footnoted, this will include assignment of all of Seller's rights under the Development Agreement.

[2]  Generally, Seller and Buyer agreed that the tax treatment will be capital gain for the sale of GP interests and Class B interests and ordinary income for developer fees and management rights.  However, a portion (i.e., that portion attributable to depreciation taken) of the amounts paid for partnership interests will be taxed at 25%.  Please check with the accountants.

[3]  We still need to identify which assets will be excluded.  For example, will we exclude unpaid contractor fees, development deficit loans, operating deficit loans, rights to disbursements from certain reserves?

ORL1\CORPSEC\880291.3
31220/0058 RMA ls 4/30/2007 9:11 AM

**CONFIDENTIAL**
**CAH-SW000001**

Appendix 1483

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 1. | MHMR Senior Housing, L.P. | a. MHMR Senior Housing Development Corporation | a. General Partner Interest[1] | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Corporation[2] | c. Loan Receivable[3] | [$          ] |
| | | | | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] and Loan Receivable[3][5] | |

---

[1]  Intentionally left blank.

[2]  This is a typo.  This entity does not exist.

[3]  May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]  Includes deferred management fee.

[5]  Includes receivable from Partnership for items that should have been paid by Partnership.

CONFIDENTIAL
CAH-SW000002

Appendix 1484

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 2. | Greenville Senior Housing, L.P. | a. Greenville Senior Housing Development Corporation | a General Partner Interest[1] | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$          ] |

---

[1] Cheryl Potashnik HUB.

[2] Includes deferred management fee.  Subject to A/P to Partnership for overpayment of management fee.

ORL1\CORPSEC\550291.3
31220/0056 RMA to 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000003
Appendix 1485

|   | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 3. | Texas Hampton Senior Housing, L.P. | a. Texas Hampton Senior Housing Development Corporation | a. General Partner Interest | [$          ] |
|   |   | b. Brian Potashnik | b. Class B Limited Partner Interest | [$          ] |
|   |   | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable [1] | [$          ] |
|   |   | d. Southwest Housing Management Corporation | d. Property Management Rights[2] and Loan Receivable [1][3] | [$          ] |

---

[1]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]  Includes deferred management fee.

[3]  Includes receivable from Partnership for items that should have been paid by Partnership.

CONFIDENTIAL
CAH-SW000004

Appendix 1486

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 4. | The Parks at Westmoreland Senior Housing, L.P. | a. The Parks at Westmoreland Senior Housing Development Corporation | a. General Partner Interest[1] | [$           ] |
| | | b. Brian Potashnik. | b. Class B Limited Interest | [$           ] |
| | | | c. Development Fee | [$           ] |
| | | c. Southwest Housing Development Company, Inc. | | |
| | | | d. Property Management Rights[2] and Loan Receivable[3] | [$           ] |
| | | d. Southwest Housing Management Corporation | | |

---

[1] There is an assignment of future cash flow to a church.

[2] Includes deferred management fee.

[3] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\660281.3
312296055 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000005

Appendix 1487

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 5. | Hillsboro Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$           ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$           ] |

---

[1]   HUB deal.  Villas Buenas, Inc. is owner of GP.  Possible buyout by Cheryl.

ORL1\CORPSEC\860291.3
31220/0036 RMA la 4/30/2007 9:11 AM

**CONFIDENTIAL
CAH-SW000006**

Appendix 1488

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 6. | Chattanooga Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$         ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[2] and Loan Receivable[3] | [$         ] |

[1]   HUB deal. El Dorado Housing Development Corp. is owner of GP. Cheryl has contract to purchase.

[2]   Includes deferred management fee.

[3]   Includes receivable from Partnership for items that should have been paid by Partnership.

CRI:1\CORPSEC\660291.3
31220/0055 RMA la 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000007

Appendix 1489

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 7. | Knollwood Villas, L.P. | a. Knollwood Villas Development Corporation | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Partner Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] and Loan Receivable[3] | [$          ] |

---

[1]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]   Includes deferred management fee. Subject to A/P to Partnership for overpayment of management fee.

[3]   Includes receivable from Partnership for items that should have been paid by Partnership.

ORL1\CORPSEC\860291.3
31220/0056 RMA is 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000008

Appendix 1490

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 8. | TX Bluffview Housing, L.P. | a. TX Bluffview Housing Development Corporation | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$          ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

CONFIDENTIAL
CAH-SW000009

Appendix 1491

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 9. | Arbors Housing Partners, Ltd.[1][5] | a. Arbors Creekside LLC | a. Class B Limited Interest | [$          ] |
| | | b Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivables[2] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] and Loan Receivable[2][4] | [$          ] |

---

[1]   Intentionally left blank.

[2]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   Includes receivable from Partnership for items that should have been paid by Partnership.

[5]   There is also an amount due to construction company, which is excluded from this transaction.

CONFIDENTIAL
CAH-SW000010

Appendix 1492

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 10. | TX Hillside Apartments, L.P.[4] | a. TX Hillside Development Corporation | a. General Partner Interest[1] | [$        ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$        ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[2] | [$        ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] and Loan Receivable | [$        ] |

---

[1]   Subject to a donation of cash flow to a church.

[2]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   There is a small tract of land which is part of the Project which may need to be transferred.

ORL1\CORPSEC\860291.3
31220/0058 RMA ts 4/30/2007 9:11 AM

**CONFIDENTIAL
CAH-SW000011**

Appendix 1493

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 11. | Colorado Creekside Housing, L.P.[3] | a. Colorado Creekside Housing Development, Inc. | a. General Partner Interest | [$                    ] |
|  |  | b. Brian Potashnik | b. Class B Limited Interest | [$                    ] |
|  |  | c. Southwest Housing Development Company, Inc. | c. Development Fee and Loan Receivable[1] | [$                    ] |
|  |  | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$                    ] |

---

[1]    May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]    Includes receivable from Partnership for items that should have been paid by Partnership.

[3]    There is an amount due to the construction company which is excluded from this transaction.

ORL1\CORPSEC\460291.3
3122\00058 RJM & 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000012

Appendix 1494

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 12. | Highland Gardens, L.P.[2] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$         ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[1] | [$         ] |

----

[1]  Includes deferred management fee.

[2]  HUB deal.  Casa Linda Development Corp. is owner of GP.  Possible buyout by Cheryl.

ORL1\CORPSEC\860291.3
31230\0056 RMA b 4/30/2007 9:11 AM

**CONFIDENTIAL**
**CAH-SW000013**
Appendix 1495

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 13. | Tahoe Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee | [$            ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$            ] |

---

[1]    HUB deal. El Dorado Housing Development Corp. is owner of GP. Cheryl has contract to purchase.

DRL1\CORPSEC\850291.3
3122000058 RMA tr 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000014
Appendix 1496

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 14. | Oak Hollow Housing, L.P. | a. Oak Hollow Housing Development Corporation | a. General Partner Interest[1] | [$           ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$           ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[2] and Loan Receivable[3] | [$           ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] | [$           ] |

---

[1]  Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated." If so, we need to discuss how this will occur.

[2]  See Charter Workout docs.

[3]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]  Includes deferred management fee.

ORL1\CORPSEC\660291.3
3122DA055 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000015
Appendix 1497

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 15. | Pleasant Valley Villas Housing, L.P.[4] | a. Pleasant Valley Villas Development, L.L.C. | a. General Partner Interest | [$    ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$    ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[1] and Loan Receivable[2] | [$    ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] | [$    ] |

---

[1]   See Charter Workout docs.

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

[4]   This is a fee due to contractor, which is excluded from this transaction.

ORL1\DRPSEC\657291.3
3122200055 RMA lb 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000016

Appendix 1498

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 16. | Clarkridge Villas Housing, L.P. | a. Clarkridge Villas Development, L.L.C. | a. General Partner Interest[1] | [$ ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$ ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[2] and Voluntary Loan[3] and Loan Receivable[4] | [$ ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[5] | [$ ] |

---

[1]  Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated." If so, we need to discuss how this will occur.

[2]  Cash developer fee stays with Southwest.

[3]  See Charter Workout docs.

[4]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[5]  Includes deferred management fee.

DRL:1\CORPSEC\660291.3
3122\0\0056 RMA ls 4/30/2007 9:15 AM

CONFIDENTIAL
CAH-SW000017

Appendix 1499

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 17. | Heatherwilde Villas Housing, L.P. | a. Heatherwilde Villas Development, L.L.C. | a. General Partner Interest | [$        ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$        ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[1] and Voluntary Loan[2] and Loan Receivable[3] | [$        ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[4] | [$        ] |

---

[1]   Cash developer fee stays with Southwest.

[2]   See Charter Workout docs. Also, when $1.5 million collateral account is used to resize debt, then that amount will become a voluntary loan.

[3]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[4]   Includes deferred management fee.

CONFIDENTIAL
CAH-SW000018

Appendix 1500

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 18. | Primrose SA II Housing, L.P. | a. Brian Potashnik | a. Class B Limited Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivables[1] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[2] | [$          ] |

---

[1]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2]  Includes deferred management fee.

ORL1\CORP\SEC\650291.3
5122R\0056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000019

Appendix 1501

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 19. | Southern Oaks Housing, L.P. | a. Southern Oaks Housing Development, L.L.C. | a. General Partner Interest[1] | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[2] and Voluntary Loan[3] and Loan Receivable[4] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[5] | [$          ] |

---

[1]  Research needs to be done as to whether Related will continue to require the GP to be "disaffiliated." If so, we need to discuss how this will occur.

[2]  Cash developer fee stays with Southwest.

[3]  See Charter Workout docs.

[4]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[5]  Includes deferred management fee.

**CONFIDENTIAL
CAH-SW000020**

Appendix 1502

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 20. | Hickory Trace Housing, L.P. | a. Hickory Trace Development, L.L.C. | a. General Partner Interest | [$          ] |
| | | b. Brian Potashnik | b. Class B Limited Interest | [$          ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee and Voluntary Loan[1] | [$          ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[2] | [$          ] |

---

[1]   See Charter Mac Workout docs.

[2]   Includes deferred management fee.

DRL1\CORPSEC\860291.3
31720/0056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000021
Appendix 1503

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 21. | Escondido Housing, L.P. | a. Escondido Housing Development, L.L.C. | a. General Partner Interest | [$               ] |
| | | b. Brian Potashnik. | b. Class B Limited Interest | [$               ] |
| | | c. Southwest Housing Development Company, Inc. | c. Development Fee[1] and Loan Receivable[2] | [$               ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights[3] | [$               ] |

---

[1]   Cash developer fee stays with Southwest. 25% of entire Developer Fee is paid to HSI. See Letter Agreement.

[2]   May be paid off with final capital contribution.

[3]   Includes deferred management fee.

ORL1\CORPSEC\660261.3
31220/0058 RMA ta 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000022

Appendix 1504

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 22. | Texas Birchwood Apartments, L.P.[1] | a. Texas Birchwood Properties Corporation | a. General Partner Interest | [$          ] |
| | | b. Southwest Housing Management Corporation | b  Property Management Rights | [$          ] |

---

[1]   Napico deal (in dispute).

ORL1\CORPSEC\650291.3
31220/4056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000023

Appendix 1505

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 23. | Texas-Estrada Apartments, L.P.[1][5] | a. Southwest Housing Investment, Inc. | a. General Partner Interest[2] | [$　　　] |
| | | b Southwest Housing Management Corporation | b Property Management Rights[3][4] | [$　　　] |

[1]   Napico deal (in dispute).

[2]   Need to research whether we need HSI's consent to transfer as HSI is 49% owner in Southwest Housing Investment, Inc.  Need Southwest Housing Investment, Inc. governing documents.  Does HSI have dissenter or appraisal rights?

[3]   Includes deferred management fee.

[4]   Subject to A/P to Partnership for overpayment of management fees.

[5]   There is a balance due to the contractor which is excluded from this transaction.

CONFIDENTIAL
CAH-SW000024

Appendix 1506

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 24. | Texas Brook Apartments L.P.[1] | a. Texas Brook Properties Corporation | a. General Partner Interest | [$        ] |
| | | b. Texas Brook Properties Corporation/Brian Potashnik | b. Development Fee | [$        ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[2][3] | [$        ] |

---

[1]   Napico deal (in dispute).

[2]   Includes deferred management fee.

[3]   Subject to A/P to Partnership for overpayment of management fees.

DRL1\CORP\SEC\660291.3
31220/0058 RMA ta 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000025

Appendix 1507

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 25. | Texas Melody Apartments L.P.[1] | a. Texas Melody Properties Corporation | a. General Partner Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc./Texas Melody Properties Corporation/ Brian Potashnik | b. Development Fee and Voluntary Loan | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

---

[1]   Napico deal (in dispute).

ORL1\CORP5ED860291.3
31220/0055 RMA b 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000026

Appendix 1508

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 26. | Texas Kimwood Properties Corporation[1] | a. Texas Kimwood Properties Corporation | a. General Partner Interest | [$            ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$            ] |

---

[1]  Napico deal (in dispute).

ORL1\CORPSED\860281.3
31225/0056 RMA ls 4/30/2007 9:11 AM

**CONFIDENTIAL
CAH-SW000027**

Appendix 1509

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 27. | Arlington Senior Housing L.P.[1] | a. Arlington Senior Housing Development Corporation | a. General Partner Interest | [$ ] |
| | | b. Southwest Housing Development Company, Inc./Arlington Senior Housing Development Corporation/Brian Potashnik | b. Development Fee and Loan Receivable[2] | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] | [$ ] |

---

[1]   Napico deal (in dispute).

[2]   May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3]   Includes deferred management fee.

CONFIDENTIAL
CAH-SW000028

Appendix 1510

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 28. | Heatherwilde Estates Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2][3] | [$        ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$        ] |

---

[1]   Does Mr. Leopold have authority to consent (on behalf of the General Partner) to the change in the property manager.

[2]   16.28% of Development Fee is paid to Housing Authority of Bexar County after Developer (although Master Agreement says non-Southwest entity is developer, Partnership Agreement says Southwest Housing Development Company, Inc. is a subcontractor of the developer – need subcontractor agreement) receives the full development fee.

[3]   Need to determine from docs if Southwest is entitled to any portion of the GP cash flow (not in Partnership Agreement, Master Agreement or Incentive Management Agreement).

ORL1\CORP\SEC\880291.3
3122\0055 RMA b 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000029

Appendix 1511

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 29. | Pleasant Valley Courtyards Housing, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2] and Loan Receivable[3] | [$           ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights | [$           ] |

---

[1]  HUB deal. Cheryl has contract to buyout.

[2]  Need docs to determine Southwest's interest in GP and Developer fees. Likely similar to Heatherwilde.

[3]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents. May be paid from perm loan proceeds which closed in third quarter, 2006.

OR:1\CORPSEC\880291.3
31220/0059 RMA la 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000030

Appendix 1512

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 30. | Primrose Houston I Development, L.P. | a. Primrose Houston I Development, L.L.C. | a. General Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Deferred Development Fee and Loan Receivable[1] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1] May be reclassified in upcoming audit.  Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner).  Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL\1\CORPSEC\650291.3
3122/00056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000031

Appendix 1513

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 31. | Primrose Houston South Housing, L.P. | a. Primrose Houston South Development, L.L.C. | a. General Partner Interest | [$ ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[1] | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORPSEC\650291.3
31229\0358 RMA ts 4/30/2007 9:11 AM

**CONFIDENTIAL
CAH-SW000032**

Appendix 1514

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 32. | TX Hampton Villas, L.P. | a. Arlington Villas SLP, L.L.C. | a. Class B Limited Interest | [$                    ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$                    ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$                    ] |

---

[1]  Master Agreement provides that Tarrant County Housing Partnership, Inc. receives 20% of the development fee as paid.  The Master Agreement also provides that SHDC receives the General Partner's Asset Management Fee, 20% of the General Partner's interest in cash flow and 5% of the General Partner's interest in capital proceeds.  Need final Master Agreement to verify.

ORL1\CORPSEC\860291.3
512260056 RMA ts 4/30/2007 9:11 AM

**CONFIDENTIAL
CAH-SW000033**

Appendix 1515

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 33. | Parmer Villas Housing, L.P. | a. Parmer Villas Development, L.L.C. | a. General Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[1] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[2] | [$          ] |
| | | d. Affordable Housing Construction, Inc. | d. Contractor's Profit | [$          ] |

---

[1] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[2] Includes deferred management fee.

CONFIDENTIAL
CAH-SW000034

Appendix 1516

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 34. | Primrose SA IV Housing, L.P.[4][5] | a. Jefferson Plaza SLP, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] and Loan Receivable[2] | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[3] | [$            ] |

---

[1] Master Agreement provides that 20% of deferred developer fee is shared with Our Casas, as paid. Master Agreement also provides that SHDC receives the GP Asset Management Fee, 20% of the GP's interest in cash flow and 10% of the GP's interest in capital proceeds.

[2] May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

[3] Includes deferred management fee.

[4] Loan extension may require change in underwriting criteria.

[5] Potential admission of SAHA which would change cash flow splits.

CONFIDENTIAL
CAH-SW000035

Appendix 1517

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 35. | TX Acme A South Housing, L.P.[3] | a. TX Acme A South SLP, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$            ] |
| | | c. Southwest Housing Development Company, Inc./Brian Potashnik | c. Guaranty Fee[2] | [$            ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$            ] |

---

[1]   Subject to amounts to be shared with HSI.

[2]   Pursuant to the Master Agreement, a $500,000 guarantee fee is to be paid from cash flow and capital proceeds after the developer fee is paid.

[3]   Unpaid Contractor fee is excluded.

CONFIDENTIAL
CAH-SW000036

Appendix 1518

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 36. | TX Pleasanton Housing, L.P.[3] | a. TX Pleasanton Housing SLP, L.L.C. | a. Class B Limited Interest[1] | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[2] | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

[1]  Master Agreement provides that Class B gets 50% of the GP's and Class B's collective interest in cash flow and 85% of the GP's and Class B's collective interest in capital proceeds.

[2]  Pursuant to the Master Agreement, SAAH gets first $100,000 of Developer Fee, then SHDC gets the next $400,000 and then SAAH gets 20% and SHDC gets 80%.

[3]  Potential replacement of SAAH with SAHA, which will change cash flow splits.

ORLNCORPSEC\860291:3
31229/0056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000037

Appendix 1519

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 37. | TX Garth Housing, L.P. | a. TX Garth Development, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

ORL1\CORP.SEC\880291.3
3123900056 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000038

Appendix 1520

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 38. | TX Crist Housing, L.P. | a. TX Crist Development SLP, L.L.C. | a. Class B Limited Interest | [$            ] |
| | | b. Primrose at Crist Development Company, LLC[1] | b. Development Fee | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

---

[1] Since SW owns only 75% of Primrose at Crist Development Company LLC, then I suggest Southwest Housing Development Company, Inc. sell its 75% interest therein.

CONFIDENTIAL
CAH-SW000039

Appendix 1521

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 39. | TX John West Housing, L.P. | a. TX John West Development SLP, L.L.C. | a. Class B Limited Interest | [$ ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$ ] |
| | | c. Southwest Housing Development Company, Inc./Brian Potashnik | c. Guaranty Fee[2] | [$ ] |
| | | d. Southwest Housing Management Corporation | d. Property Management Rights | [$ ] |

---

[1]   Master Agreement provides that HSI gets paid $50,000 at closing, then SHDC gets next payments until SHDC has received $283,333 and then HSI gets 15% and SHDC gets 85%.

[2]   Pursuant to the Master Agreement, a $500,000 guarantee fee is to be paid from cash flow and capital proceeds after the developer fee is paid.

CONFIDENTIAL
CAH-SW000040

Appendix 1522

|  | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 40. | Arbor Woods Housing, LP | a. Arbor Woods Housing Development, L.L.C. | a. General Partner Interest[1] | [$          ] |
|  |  | b. Southwest Housing Development Company, Inc. | b. Development Fee and Loan Receivable[2] | [$          ] |
|  |  | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1]  Cheryl Potashnik HUB deal.

[2]  May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL1\CORP\SEC\860281.3
31ZZ3\0058 RMA is 4/30/2007 9:11 AM

**CONFIDENTIAL
CAH-SW000041**
Appendix 1523

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 41. | TX Pasadena Housing, L.P. | a TX Pasadena Development, L.L.C. | a. Class B Limited Interest | [$ ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

ORL1\CORPSEC\680291.3
31229/0058 RMA ts 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000042

Appendix 1524

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 42. | TX Laureland Housing, L.P. | a. TX Laureland Development SLP, L.L.C. | a. Class B Limited Interest[1] | [$          ] |
| | | b. Laureland Development Company, LLC[2] | b. Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1] Class B gets 50% of the GP's and Class B's collective interest in cash flow and capital proceeds.

[2] Since Southwest Housing Development Company, Inc. owns 80% of Laureland Development Company, LLC, then I suggest Southwest Housing Development Company, Inc. sell its 80% member interest therein.

ORL/CORPSECV860291.3
312200X056 RMA ls 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000043

Appendix 1525

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 43. | TX Scyene Housing, L.P. | a. TX Scyene Development SLP, L.L.C. | a. Class B Limited Interest[1] | [$        ] |
| | | b. Scyene Development Company, LLC[2] | b. Development Fee | [$        ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$        ] |

---

[1]   Class B gets 50% of the GP's and Class B's collective interest in cash flow and capital proceeds.

[2]   Since Southwest Housing Development Company, Inc. owns 80% of Laureland Development Company, LLC, then I suggest Southwest Housing Development Company, Inc. sell its 80% member interest therein.

ORL1\CORPSEC\880291.3
31Z20\6056 RBA to 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000044

Appendix 1526

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 44. | Primrose Houston 7 Housing, L.P.[2] | a. Primrose Skyline Apartments SLP, L.L.C. | a. Class B Limited Interest | [$ ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$ ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$ ] |

---

[1]  Subject to amounts to be shared with SETH.  Also, cash developer fee stays with Southwest.  City of Houston HOME loan pending.

[2]  Appraisal District has appealed tax exemption decision of lower court in favor of Partnership.

ORL1\CORP\SEC\560291.3
31220/0056 RMA ta 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000045

Appendix 1527

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 45. | TX Tenison Housing, L.P. | a. TX Tenison Development, LLC | a. General Partner Interest[1] | [$        ] |
| | | b. CLG Consulting, Inc. | b. Development Fee[2] | [$        ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$        ] |

---

[1]   Cheryl Potashnik HUB deal.

[2]   Subject to amounts to be shared with HSI.

ORL1\CORPSEC\60291-3
3122\00056 RMA B 4/20/2007 9:11 AM

CONFIDENTIAL
CAH-SW000046

Appendix 1528

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 46. | TX Palacio Housing, L.P.[1][4] | a. Southwest Housing Development Company, Inc. | a. Development Fee[2] | [$        ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights[3] | [$        ] |

---

[1]   MAUC deal.

[2]   Subject to amounts to be shared with MAUC owned co-developer. Also, cash developer fee stays with Southwest.

[3]   To include rights to cash flow under the Partnership Agreement, Incentive Management Fee under the Incentive Management Agreement and the Partnership Management Fee under the Partnership Management Agreement.

[4]   Reimbursement to Southwest under Reimbursement Agreement are excluded from this transaction.

CONFIDENTIAL
CAH-SW000047

Appendix 1529

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 47. | New Braunfels 2 Housing, L.P.[2] | a. New Braunfels 2 SLP, L.L.C. | a. Class B Limited Partner Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

---

[1] Subject to amounts to be shared with SAHFC.

[2] Potential for public housing units.

ORL1\CORPSEC\60291.3
3122000056 RJ4A t1 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000048

Appendix 1530

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 48. | TX Aldine-Bender Housing, L.P.[1] | a. TX Aldine-Bender Development, L.L.C. | a Class B Limited Partner Interest | [$          ] |
| | | b. Southwest Housing Development Company, Inc. | b Development Fee | [$          ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$          ] |

---

[1]   Potential buyout of non profit GP.

ORL1\CORPSEC\860291.3
31ZR0\0056 RMA ta 4/XX/2007 9:11 AM

**CONFIDENTIAL**
**CAH-SW000049**

Appendix 1531

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 49. | TX Old Manor Housing, L.P. | a. TX Old Manor Housing SLP, L.L.C. | a. Class B Limited Partner Interest | [$            ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee[1] | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights[1] | [$            ] |
| | | d. Affordable Housing Construction, Inc. | d. Contractor Profit | [$            ] |

---

[1]  Subject to amounts to be shared with HSI.

ORLFICORPSEC\660281.3
31229/0086 RMA ts 1/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000050

Appendix 1532

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 50. | TX Bammel Housing, L.L.C. | a. TX Bammel Development, L.L.C. | a. Special Class B Partner Interest | [$         ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$         ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$         ] |

CONFIDENTIAL
CAH-SW000051

Appendix 1533

|     | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|-----|------------------|--------|------------------|---------------------------|
| 51. | Clark 05 Housing, L.P.[1] | a. Clark 05 SLP, L.L.C. | a. Class B Limited Partner Interest | [$                ] |
|     |                  | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$                ] |
|     |                  | c. Southwest Housing Management Corporation | c. Property Management Rights | [$                ] |

---

[1]   Potential for public housing units.

ORLNCORPSEC660251.3
312700056 RMA is 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000052

Appendix 1534

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 52. | Cedar Hill Senior Housing, L.P. | a. Cedar Hill Senior Housing Development, L.L.C. | a. General Partner Interest[1] | [$         ] |
| | | b. Southwest Housing Development Company, Inc. | b. Development Fee | [$         ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$         ] |

---

[1]   Cheryl Potashnik HUB.

CONFIDENTIAL
CAH-SW000053

Appendix 1535

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 53. | TX Timbercreek Housing, L.P. [1] | a. Southwest Housing Development Company, Inc. | a. Deferred Development Fee | [$            ] |
| | | c. Southwest Housing Management Corporation | c. Property Management Rights | [$            ] |

---

[1]   HUB deal.  GP is owned by B&L Development, Inc.  Potential buyout by Cheryl.

ORL1\CORP\SEC\8602S1.3
3122S\0055 RMA ta 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000054

Appendix 1536

| | Partnership Name | Seller | Purchased Assets | Purchase Price Allocation |
|---|---|---|---|---|
| 54. | Laredo Vista, L.P.[1] | a. Southwest Housing Development Company, Inc. | a. Deferred Development Fee | [$          ] |
| | | b. Southwest Housing Management Corporation | b. Property Management Rights and Loan Receivable[2] | [$          ] |

---

[1]   HUB deal. GP is owned by Villas Buenas, Inc. Potential buyout by Cheryl.

[2]   May be reclassified in upcoming audit. Auditors will determine type of loan (e.g. voluntary, operating deficit, completion) which affects priority and who the lender should be (e.g. general partner). Need to make sure applicable Southwest lender has the right to receive repayment under the Partnership documents.

ORL\1\CORP\SEC\880281.3
3172209268 RMA b 4/30/2007 9:11 AM

CONFIDENTIAL
CAH-SW000055

Appendix 1537

## CONSULTING AND ASSET MANAGEMENT SERVICES AGREEMENT
(SW Portfolio)

This Consulting and Asset Management Services Agreement (this "Agreement") is dated as of the 1ˢᵗ day of November, 2007, by and between Cascade Affordable Housing LLC, a Washington limited liability company ("Consultant"), and Southwest Housing Management Corporation, a ☐Texas☐ corporation ("SWM").

## RECITALS:

A.  Consultant as Purchaser and the Sellers listed on Schedule A to the Original Agreement have entered into a Purchase and Sale Agreement dated April 30, 2007 (the "Original Agreement"), as amended by Amendment No. 1 dated June 1, 2007, a Reinstatement of and Amendment No. 2 dated June 29, 2007, Amendment No. 3 dated July 16, 2007, Amendment No. 4 dated September 17, 2007, and Amendment No. 5 dated October 26, 2007 (collectively, the "Purchase Agreement"). Capitalized terms not defined in this Agreement shall have the meanings set forth in the Purchase Agreement.

B.  SWM provides property management and related services to the Projects.

C.  SWM desires to retain Consultant to provide certain consulting and asset management services to SWM and the Projects. Consultant desires to be retained by SWM to provide such services. Consultant desires to provide such services, in part, to assist Consultant in familiarizing itself with the operations of SWM and the Projects, and to provide for a smooth transition of property management and related services in connection with the future Closing under the Purchase Agreement.

NOW, THEREFORE, in consideration of the covenants, terms and conditions set forth herein, SWM and Consultant agree as follows:

SECTION 1.  RETENTION OF CONSULTANT.  SWM hereby retains Consultant to perform the Consulting and Asset Management Services defined herein (the "Services"), on the terms and conditions and in consideration of the payments and performance of the obligations set forth herein. In performing the Services, Consultant will be acting on its own behalf and not as a partner or venturer of SWM. Consultant agrees to further the interests of SWM by furnishing Consultant's skill, judgment and experience performing the Services. Consultant agrees to perform the Services in an expeditious manner consistent with the terms of the Purchase Agreement and this Agreement.

SECTION 2.  CONSULTANT'S RESPONSIBILITIES.  Consultant shall provide the following services and perform the following oversight and supervision functions in connection with SWM and each Project:

(a)  Consultant shall provide consulting and related services with respect to the day-to-day operation of SWM and the provision by SWM of property management and related services to the Projects. Such Services shall include communications

- 1 -

SB40344.5



PLAINTIFF'S
EXHIBIT
tabbies®
21

CONFIDENTIAL
CAH-SW000937

Appendix 1538

with senior and project level management personnel regarding Project operations and management, review of Project operating budgets, capital budgets and related operating activities.

(b)   Consultant shall provide consulting services with respect to SWM and Project compliance with the terms of the contractual and other obligations of the Projects, including matters with respect to compliance with affordable housing obligations, restrictions and requirements.

(c)   Consultant shall provide consulting services with respect to the operation and management of social service programs by SWM and the Projects.

(d)   Consultant shall provide asset management services to SWM and for the Projects relating to capital improvements and repairs, conversion to permanent financing, and management of investor capital contributions.

(e)   Consultant shall provide asset management services to SWM and for the Projects with respect to risk management issues and advise SWM regarding available insurance programs.

(f)   At the request of SWM, Consultant shall use reasonable efforts to cause the insurance program operated by Consultant and containing the coverages identified in Exhibit A attached hereto to become available for the Projects through expiration or earlier termination of this Agreement.

The Services rendered by Consultant shall be consistent with the terms, conditions and requirements of the Purchase Agreement and shall be performed in a competent, professional manner consistent with prevailing standards in the community. Consultant shall keep SWM informed of any activities of a material nature that Consultant proposes to take in connection with rendering the Services.

Notwithstanding anything in this Agreement to the contrary, the Services provided by Consultant hereunder shall be consulting and asset management services only and advising SWM with respect thereto. All final decisions on all matters relating to SWM and to the Projects shall remain vested exclusively in SWM, and Consultant shall have no authority to take any action or undertake any commitment binding upon SWM or any of the Projects.

SECTION 3.   COMMENCEMENT AND COMPLETION OF SERVICES.

(a)   Upon execution of this Agreement, Consultant shall promptly commence the Services and thereafter prosecute the Services diligently and continuously to completion, all in accordance with the terms of this Agreement and the Purchase Agreement.

(b)   Subject to the terms of this Agreement, Consultant shall continuously provide the Services up through the date of the Closing under the Purchase Agreement.

- 2 -

58049344.3

CONFIDENTIAL
CAH-SW000938

Appendix 1539

SECTION 4.  ON-SITE SERVICES. In providing the Services set forth in this Agreement, the parties anticipate that Consultant will have two (2) or more employees of Consultant (or one of its affiliates) physically present at the offices of SWM during normal business hours in order to interact on a continuous basis with SWM and its employees with respect to the operations of SWM and the Projects. SWM agrees to provide suitable office space, access to photocopiers, telephones, faxes, internet and parking for the employees of Consultant providing Services at SWM offices. SWM shall have no responsibility to provide compensation or benefits to employees of Consultant, and Consultant shall indemnify and hold SWM harmless for and from any losses, liabilities, damages and expenses relating to or arising out of the actions or inactions of such employees of Consultant.

SECTION 5.  CONSULTANT'S COMPENSATION; OPERATING SHORTFALLS.

(a)    Operating Revenues and Operating Expenses for SWM shall be calculated on a cash basis based on a calendar month (with the first calendar month being the month of November, 2007). SWM shall be entitled to all Operating Revenues and shall be responsible for all Operating Expenses for periods prior to November 1, 2007. In determining Operating Revenues and Operating Expenses, such calculations shall be made consistent with the customary and historic operating practices of SWM and without accelerating or deferring such revenues or expenses in order to impact Operating Revenues or Operating Expenses in any specific calendar month. Operating Expenses shall also include a reasonable allocation of expenses (including employment related expenses) of Southwest Housing Development Company, Inc. (an affiliate of SWM sharing overhead and other expenses with SWM).

(b)    In exchange for providing the Services as set forth herein, Consultant shall be entitled to a monthly consulting fee (the "Fee") in an amount equal to the amount (if any) by which Operating Revenue in any calendar month exceeds Operating Expenses for such month. Such Fee shall be payable monthly on or before the 15th day of each month for the Fee payable for the prior calendar month (i.e., the Fee with respect to the operations of SWM for the month of November, 2007 shall be due and payable to Consultant on or before December 15, 2007).

(c)    In exchange for the opportunity to become familiar with the internal operations of SWM and the Projects prior to Closing under the Purchase Agreement, Consultant agrees to pay to SWM an amount equal to the amount by which Operating Expenses in any month exceed the Operating Revenues for such month (an "Operating Shortfall"). Such Operating Shortfalls shall be paid by Consultant from time to time upon request by SWM and reasonable evidence from SWM of the basis for the Operating Shortfall, and shall be reconciled monthly by the 15th day of each month for the Operating Shortfall (if any) for the prior month (i.e., an Operating Shortfall with respect to the operations of SWM for the month of November, 2007 shall be reconciled on or before December 15, 2007). Notwithstanding the foregoing, Consultant shall not be required to fund any Operating Shortfall in any calendar month in excess of $60,000, and Operating Shortfalls in excess of $60,000 shall be funded by parties other than Consultant (and without deferring expenses to a later month or accelerating revenues to an earlier month in order to pay the remainder of such Operating Shortfall).

SCB49364.5

CONFIDENTIAL
CAH-SW000939

Appendix 1540

SECTION 6.  TERMINATION.  If either party shall fail to use its commercially reasonable efforts to perform in a timely manner any material obligation on its part to be performed under the terms of this Agreement ("Defaulting Party"), then the other party hereto ("Non-defaulting Party"), may, without prejudice to any other right or remedy, give written notice to the Defaulting Party of the Non-defaulting Party's intent to terminate this Agreement and this Agreement shall be terminated thirty (30) days after such written notice is received by the Defaulting Party unless the Defaulting Party shall, within such 30-day period, commence to cure any such default and thereafter in good faith expeditiously pursue cure of such default to completion.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, (a) either party shall have the right to terminate this Agreement immediately upon notice to the other party if the Purchase Agreement expires or is terminated, and (b) SWM may terminate this Agreement with or without cause at any time upon notice to Consultant.  Upon termination of this Agreement, Consultant shall remain entitled to its Fee (if any) and shall be responsible to fund Operating Shortfalls (if any) up to the date of such termination.

SECTION 7.  TAXES AND LICENSES.  Consultant shall be solely responsible for reporting net earnings, if any, from the performance of the Services and paying all federal and state income taxes and payroll taxes on such income as required by applicable law.  Consultant shall indemnify, defend and hold harmless SWM from and against the failure to pay all federal, state and local taxes or contributions imposed or required under employment insurance, social security and income tax or other laws with respect to Consultant and Consultant's employees engaged in the performance of the Services.  SWM shall have no obligation to withhold federal or state income taxes or payroll taxes under the Federal Insurance Contribution Act or under state or federal employment, disability or other laws from amounts due Consultant hereunder for the performance of the Services or to pay employer payroll taxes thereon.  Neither Consultant nor its employees shall be covered by any policy providing Workers' Compensation Insurance obtained by SWM or otherwise be entitled to Workers' Compensation Insurance or benefits obtained by SWM in connection with the performance of the Services.  Neither Consultant nor its employees shall be eligible for or allowed to participate in any retirement plan, group insurance policy providing life insurance, disability insurance or hospital or medical benefits, or any other plan providing benefits to employees of SWM with respect to performance of the Services.  Consultant shall obtain and maintain in effect any business or professional license required of persons in similar capacity whether self-employed or as an employee of others and will pay any business taxes or fees required in connection therewith.

SECTION 8.  COSTS AND ATTORNEY FEES.  If either SWM or Consultant should find it necessary to employ an attorney to enforce a provision of the Agreement or to recover damages for the breach hereof (including proceedings in bankruptcy), the prevailing party shall be entitled to be reimbursed for its court costs and reasonable attorneys' fees, in addition to all damages, through all levels of appeal.

SECTION 9.  WAIVER.  Any waiver by either of the parties of any breach of any covenant herein contained to be kept and performed by the other party shall only be enforceable if in writing and shall not be deemed or considered as a continuing waiver, and shall not operate

30549344.5

CONFIDENTIAL
CAH-SW000940

Appendix 1541

to bar or prevent the damaged party from declaring a forfeiture for any succeeding breach, either of the same condition or covenant or otherwise.

SECTION 10. BINDING EFFECT. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

SECTION 11. SEVERABILITY. If any portion or portions of this Agreement is declared void or unenforceable, it shall not affect the other provisions of this Agreement.

SECTION 12. ASSIGNMENT. Neither SWM nor Consultant shall assign this Agreement.

SECTION 13. GOVERNING LAW; INTERPRETATION. This Agreement shall be governed by the laws of the State of Texas. The headings of sections and paragraphs are for convenience only and shall not modify the rights and obligations created under this Agreement. In the event of any conflict between the terms and conditions of this Agreement and the terms of the Purchase Agreement, the terms and conditions of the this Agreement shall control.

SECTION 14. EMPLOYEES OF CONSULTANT. Consultant is acting under this Agreement as an independent contractor and nothing herein contained, or any acts of Consultant or SWM, nor any other circumstances, shall be construed to establish Consultant as an agent of SWM. Furthermore, it is not intended by this Agreement to create any partnership, joint venture or other agreement between Consultant and SWM, and no partnership, joint venture or other relationship is created hereunder other than SWM's retention of Consultant as an independent contractor. Consultant shall use its commercially reasonable efforts and shall do all things necessary and appropriate to perform the Services in an expeditious and economical manner consistent with sound professional practices. Consultant shall be responsible for each of Consultant's employees or other persons performing services to be performed by Consultant hereunder and for determining the manner and time of performance of all acts to be performed by Consultant hereunder. Consultant shall maintain all required industrial and workman's compensation insurance for all employees of Consultant.

(signatures follow)

- 5 -

SD149343

CONFIDENTIAL
CAH-SW000941

Appendix 1542

DATED the day and year first above written.

SWM:

SOUTHWEST HOUSING MANAGEMENT
CORPORATION, a _Texas_ corporation

By: _____

Its: _President_

CONSULTANT:

CASCADE AFFORDABLE HOUSING LLC, a
Washington limited liability company

By: _____

Its: _____

- 6 -

52849544.5

CONFIDENTIAL
CAH-SW000942

Appendix 1543

DATED the day and year first above written.

SWM:

SOUTHWEST HOUSING MANAGEMENT
CORPORATION, a _____ corporation

By: _____
    Its: _____

CONSULTANT:

CASCADE AFFORDABLE HOUSING LLC, a
Washington limited liability company

By: _____
    Its: _____ Manager

- 6 -

CONFIDENTIAL
CAH-SW000943

Appendix 1544

JJL/16/2006/FRI 06:30 PM  LA COSTA                                        FAX No. 760

# CLOSING MEMORANDUM

TO:        Distribution List
FROM:      Southwest Housing Development Company Inc. and its affiliates ("Seller")
           CAH-IDA Southwest LLC and its affiliates ("Buyer")
DATE:      July 17, 2008

### SALE OF GENERAL PARTNERSHIP INTERESTS AND RECEIVABLES
### SOUTHWEST PORTFOLIO
### SECOND CLOSING

1. On the morning of Friday, July 18, 2008, Ayva Capital LLC and 8th Street Capital LLC collectively will wire **$4,741,056.44** to Hexter-Fair Title Company (the "Escrow Agent") representing equity and mezzanine loan proceeds.

2. Escrow Agent is currently holding **$2,954,890** plus interest in escrow. Pursuant to the Thirteenth Amendment to Escrow Agreement among Escrow Agent, Buyer and Seller, **$2,451,535** of the funds in escrow will be applied to the closing and the remaining **$503,355** plus interest will remain in escrow with Escrow Agent.

3. In connection with the closing, and pursuant to a First Amendment to Holdback Escrow Instructions among Escrow Agent, Buyer and Seller, Escrow Agent will retain **$20,512.43** to be held by Escrow Agent under the Holdback Escrow Instructions associated with the initial closing.

4. Following the closing, Escrow Agent will disburse **$742,501.96** out of the available proceeds described above to pay the following costs to designated parties who have submitted to Buyer and Seller an invoice for payment.

| | | | |
|---|---|---|---|
| American Mgmt Services (Pinnacle) | Property Due Diligence | $ | 25,331.05 |
| Reznick | Accounting Services | $ | 10,069.50 |
| Alamo Title | Abstractor's Certificates | $ | 324.38 |
| Hexter Fair | Recording Fees, Title Reports, Wire Fees | $ | 1,733.00 |
| Unisearch | UCC Searches | $ | 552.50 |
| Gallagher Evelius | MMA DUS Loan Counsel - Pleasanton | $ | 5,650.00 |
| Naman Howell | Wells Fargo Legal Fees-Trustee | $ | 1,000.00 |
| Coats Rose | Pleasant Hill Housing Counsel | $ | 5,000.00 |
| Fulbright & Jaworski | SAHA/SAHFC Legal Fees and Costs | $ | 30,000.00 |
| Holland & Knight | MMA Legal Fees and Costs - ILP | $ | 7,500.00 |
| Holland & Knight | Capmark Legal Fees and Costs - ILP | $ | 31,678.88 |
| Capmark | Const. Loan Transfer Fees - Aldine Bender/Old Manor | $ | 63,900.00 |
| Citi | Lender Legal & Transfer Fees - Old Manor | $ | 130,750.00 |
| Citi | Lender Legal & Transfer Fees - Aldine Bender | $ | 121,475.00 |
| Naman Howell | Travis County HFC Consent Fee - Old Manor | $ | 1,500.00 |
| MMA | SLP Fees | $ | 7,500.00 |
| Pleasant Hill Housing | HUB Interest Purchase | $ | 50,000.00 |
| Thompson & Knight | CAH Texas Counsel | $ | 51,290.89 |
| Broad & Cassel | Seller's Counsel | $ | 84,279.98 |
| Foster Pepper PLLC | CAH counsel | $ | 112,966.78 |
| **Total Fees & Expenses** | | **$** | **742,501.96** |



PLAINTIFF'S EXHIBIT
33

Carpenter 0588

Appendix 1545

Southwest
Page 2 of 2

5. Following the closing, Escrow Agent will wire **$2,993,569.96** to Cascade Affordable Housing representing reimbursement of approved deposits, fees, and expenses.

6. Following the closing, Escrow Agent will wire **$2,314,644.09** to Seller (based on wire instructions to be provided by Seller) representing the net proceeds due Seller with respect to the sale.

7. Following the closing, Escrow Agent may retain to cover the fees and costs of Escrow Agent certain amounts to be separately approved in writing by Buyer.

8. Following the closing, Escrow Agent will wire any remaining funds in escrow to CAH-IDA Southwest LLC, but not including withheld amounts being held pursuant to First Amendment to Holdback Escrow Instructions between Seller, Buyer and Escrow Agent.

9. Escrow Agent's receipt of the funds described in Paragraph 2 above shall constitute conclusive proof that all conditions to closing and disbursement have occurred and that Escrow Agent is authorized to disburse funds as provided herein. Escrow Agent has no obligations to disburse any funds until it has received good funds (as defined in the Texas Title Insurance Regulations) with respect to all agreed disbursements set forth herein. All other closing costs, pro rations and other charges are being handled directly between Seller and Buyer. Escrow Agent shall not be liable, and all other parties hereto release Escrow Agent from all liability, for any loss or delay in payment of Escrowed Funds caused by the failure of any financial institution in which Escrowed Funds have been deposited. Escrow Agent shall disburse funds as provided above in a commercially reasonable manner, but shall not be liable for any consequential or other damages resulting from any delay in disbursement.

10. Wire instructions for referenced parties are attached hereto.

ON BEHALF OF EACH BUYER:

CAH-IDA Southwest LLC, a Delaware limited liability company

By CAH-IDA Holdings LLC, a Delaware limited liability company
Its Manager

By: _____
Basil Ratlis, Vice President.

SELLER:

ON BEHALF OF EACH OF THE SELLERS

By: _____
Name: Brian Potashnik
Its:    Authorized Agent

ACCEPTED:

Hexter-Fair Title Company
By: _____
Name: _____

Carpenter 0589

Appendix 1546



## CLOSING MEMORANDUM

TO:        Distribution List
FROM:      Southwest Housing Development Company Inc. and its affiliates ("Seller")
           CAH-IDA Southwest LLC and its affiliates ("Buyer")
DATE:      July 17, 2008

### SALE OF GENERAL PARTNERSHIP INTERESTS AND RECEIVABLES
### SOUTHWEST PORTFOLIO
### SECOND CLOSING

1. On the morning of Friday, July 18, 2008, Ayva Capital LLC and 8th Street Capital LLC collectively will wire **$4,741,056.44** to Hexter-Fair Title Company (the "Escrow Agent") representing equity and mezzanine loan proceeds.

2. Escrow Agent is currently holding **$2,954,890** plus interest in escrow. Pursuant to the Thirteenth Amendment to Escrow Agreement among Escrow Agent, Buyer and Seller, **$2,451,535** of the funds in escrow will be applied to the closing and the remaining **$503,355** plus interest will remain in escrow with Escrow Agent.

3. In connection with the closing, and pursuant to a First Amendment to Holdback Escrow Instructions among Escrow Agent, Buyer and Seller, Escrow Agent will retain **$20,512.43** to be held by Escrow Agent under the Holdback Escrow Instructions associated with the initial closing.

4. Following the closing, Escrow Agent will disburse **$742,501.96** out of the available proceeds described above to pay the following costs to designated parties who have submitted to Buyer and Seller an invoice for payment.

| | | | |
|---|---|---|---|
| American Mgmt Services (Pinnacle) | Property Due Diligence | $ | 25,331.05 |
| Reznick | Accounting Services | $ | 10,069.50 |
| Alamo Title | Abstractor's Certificates | $ | 324.38 |
| Hexter Fair | Recording Fees, Title Reports, Wire Fees | $ | 1,733.00 |
| Unisearch | UCC Searches | $ | 552.50 |
| Gallagher Evelius | MMA DUS Loan Counsel - Pleasanton | $ | 5,650.00 |
| Naman Howell | Wells Fargo Legal Fees-Trustee | $ | 1,000.00 |
| Coats Rose | Pleasant Hill Housing Counsel | $ | 5,000.00 |
| Fulbright & Jaworski | SAHA/SAHFC Legal Fees and Costs | $ | 30,000.00 |
| Holland & Knight | MMA Legal Fees and Costs - ILP | $ | 7,500.00 |
| Holland & Knight | Capmark Legal Fees and Costs - ILP | $ | 31,678.88 |
| Capmark | Const. Loan Transfer Fees - Aldine Bender/Old Manor | $ | 63,900.00 |
| Citi | Lender Legal & Transfer Fees - Old Manor | $ | 130,750.00 |
| Citi | Lender Legal & Transfer Fees - Aldine Bender | $ | 121,475.00 |
| Naman Howell | Travis County HFC Consent Fee - Old Manor | $ | 1,500.00 |
| MMA | SLP Fees | $ | 7,500.00 |
| Pleasant Hill Housing | HUB Interest Purchase | $ | 50,000.00 |
| Thompson & Knight | CAH Texas Counsel | $ | 51,290.89 |
| Broad & Cassel | Seller's Counsel | $ | 84,279.98 |
| Foster Pepper PLLC | CAH counsel | $ | 112,966.78 |
| **Total Fees & Expenses** | | $ | **742,501.96** |



PLAINTIFF'S EXHIBIT
34
1.24.18

Carpenter 0588

Appendix 1547

Southwest
Page 2 of 2

5. Following the closing, Escrow Agent will wire **$2,993,569.96** to Cascade Affordable Housing representing reimbursement of approved deposits, fees, and expenses.

6. Following the closing, Escrow Agent will wire **$2,314,644.09** to Seller (based on wire instructions to be provided by Seller) representing the net proceeds due Seller with respect to the sale.

7. Following the closing, Escrow Agent may retain to cover the fees and costs of Escrow Agent certain amounts to be separately approved in writing by Buyer.

8. Following the closing, Escrow Agent will wire any remaining funds in escrow to CAH-IDA Southwest LLC, but not including withheld amounts being held pursuant to First Amendment to Holdback Escrow Instructions between Seller, Buyer and Escrow Agent.

9. Escrow Agent's receipt of the funds described in Paragraph 2 above shall constitute conclusive proof that all conditions to closing and disbursement have occurred and that Escrow Agent is authorized to disburse funds as provided herein. Escrow Agent has no obligations to disburse any funds until it has received good funds (as defined in the Texas Title Insurance Regulations) with respect to all agreed disbursements set forth herein. All other closing costs, pro rations and other charges are being handled directly between Seller and Buyer. Escrow Agent shall not be liable, and all other parties hereto release Escrow Agent from all liability, for any loss or delay in payment of Escrowed Funds caused by the failure of any financial institution in which Escrowed Funds have been deposited. Escrow Agent shall disburse funds as provided above in a commercially reasonable manner, but shall not be liable for any consequential or other damages resulting from any delay in disbursement.

10. Wire instructions for referenced parties are attached hereto.

ON BEHALF OF EACH BUYER:

CAH-IDA Southwest LLC, a Delaware limited liability company

By CAH-IDA Holdings LLC, a Delaware limited liability company
Its Manager

By: _____
Basil Rallis, Vice President

SELLER:

ON BEHALF OF EACH OF THE SELLERS

By: _____
Name: Brian Potashnik
Its:    Authorized Agent

ACCEPTED:

Rexter-Fair Title Company
By: _____
Name: _____

Carpenter 0589

Appendix 1548

| | |
|---|---|
| **From:** | Brian Potashnik <BPotashnik@Southwesthousing.com> |
| **Sent:** | Monday, June 26, 2006 12:28 PM |
| **To:** | Jeff Carpenter <JCarpenter@Southwesthousing.com> |
| **Subject:** | FW: Greystone Meeting |

I would appreciate if you handled this meeting in SA for tomorrow. Please confirm with me that it works for you. Thanks

-----Original Message-----
**From:** Heinsman, Kelley [mailto:Kelley.Heinsman@rbccm.com]
**Sent:** Monday, June 26, 2006 7:59 AM
**To:** Cheryl Potashnik; Brian Potashnik; Sara Reidy; Keith Jones
**Cc:** Nordin, Natalie; Mohajer, Shar
**Subject:** Greystone Meeting

Good morning,

Please find below a short overview of Greystone & Co. for the meeting tomorrow. Attending from Greystone will be Shari Leigh Gordon and Bill Guessford (biography below). Brian, we will meet you in the lobby of the Marriott Riverwalk in San Antonio at 9:00 AM. On Wednesday, we will meet at Southwest's office at 8:30 AM for the management meeting and, if there's time, see a few more properties in Dallas. Greystone, Shariar, and myself are scheduled to fly out around 2:00 PM on Wednesday.

**Corporate Overview:**

Greystone & Co., Inc. with its affiliated companies, is a private investment and real estate organization with expertise in a range of loan products, servicing, trading, securitization and transaction structuring. The Greystone family of companies includes:

*   A leading national lender that offers multifamily, seniors housing, health care facility, small-balance commercial, and asset-based business loans via its Fannie Mae DUS™, FHA, conventional taxable, and tax-exempt direct lending programs.

*   A servicing company that services approximately $7 billion of multifamily, seniors housing and commercial loans;

*   An investment-banking group specializing in innovative transaction management, deal structuring, workouts and equity special situations.

*   A company trading in mortgages, federally guaranteed student loans and other debt obligations with a typical tax-exempt and taxable portfolio in excess of $1 billion

*   A real estate company active in development and redevelopment of residential rental and condominium properties, office properties, and health care facilities.

**Biographies:**

**Bill Guessford**

William B. Guessford is the Managing Director of Greystone's Acquisitions and REO division. He is the Senior Vice President of Greystone Property Management Corporation and is a member of the Loan Committee. He provides oversight of all REO properties and participates in the analysis and purchase of new assets. His group is responsible for the annual Fannie Mae property inspections and intervention in troubled assets. He has been managing multi-family properties throughout the United States since 1982, with an emphasis on troubled assets and HUD insured properties. Prior to joining Greystone, Mr. Guessford was an Asset Manager for Housing Preservation Associates, Inc., a Regional VP for Insignia Management Group and also managed properties for Trammell Crow Residential Services. Mr. Guessford is a Certified Property Manager from the Institute of Real Estate Management, holds the CAM, CAMII and CAMT designations through the National Apartment Association as well as the National Assisted Housing Professional designation through the National Assisted Housing Management Association.

**Kelley Heinsman**
RBC Capital Markets
3475 Piedmont Road NE Suite 650
Atlanta, GA 30305
Office:   404-260-4826
Fax:   404-260-4811
kelley.heinsman@rbccm.com

This E-Mail (including any attachments) may contain privileged or confidential information. It is intended only for the addressee(s) indicated above. The sender does not waive any of its rights, privileges or other protections respecting this information. Any distribution, copying or other use of this E-Mail or the information it contains, by other than an intended recipient, is not sanctioned and is prohibited. If you received this E-Mail in error, please delete it and advise the sender (by return E-Mail or otherwise) immediately.

This E-Mail (including any attachments) has been scanned for viruses. It is believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free. The sender accepts no responsibility for any loss or damage arising in any way from its use.

E-Mail received by or sent from RBC Capital Markets is subject to review by Supervisory personnel. Such communications are retained and may be produced to regulatory authorities or others with legal rights to the information.



PLAINTIFF'S
EXHIBIT
35

Appendix 1549

| From: | Keith Jones <kjones@Southwesthousing.com> |
|---|---|
| Sent: | Wednesday, January 17, 2007 10:31 AM |
| To: | Sara Reidy <SReidy@Southwesthousing.com>; Jeff Carpenter <JCarpenter@Southwesthousing.com> |
| Subject: | LOI document |
| Attach: | LOI-Cascade.tif |

<<LOI-Cascade.tif>>

**Keith R Jones**

Chief Financial Officer

Southwest Housing

5910 N. Central Expressway, Suite 1145

Dallas, Texas 75206

(214) 891-7848 Direct; (214) 987-9294 Fax

kjones@southwesthousing.com

*******************************************************************************************

The information contained in this transmission may contain privileged and confidential
information that may be privileged or protected by rules relating to non-public
information.  It is intended only for the use of the person(s) named above. If you are
not the intended recipient, please contact the sender by reply e-mail and destroy all
copies of the original message.

*******************************************************************************



PLAINTIFF'S
EXHIBIT
49

Appendix 1550

| From: | Jeff Carpenter |
|---|---|
| Sent: | Tuesday, March 13, 2007 3:37 PM |
| To: | Jeff Carpenter <JCarpenter@Southwesthousing.com> |
| Subject: | BP |

## Notes to Discuss Business Items with Brian:

1. Meadow Lane Fire... $35–40 K
2. Vegas... Refinance... Market...Sale... Refinance proceeds to JC dollars... Cohen fee...
3. Growth that from day one I lead active positive change from all central services, mgmt, construction and development
4. Pinnacle meeting and lack of personnel decisions
   a. Transition items:
      i. Personnel decisions...stay and pay incentives
      ii. List of questions
      iii. Office space and equipment and furnishings
      iv. REDACTE   stay plan REDACTED
5. FEMA reimbursements of $179k
6. Performance reviews, raises, bonuses earned and transition bonuses to existing corporate personnel and site staff. REDACTED
7. Shadow Mountain—Lowes Development next door.



PLAINTIFF'S
EXHIBIT
52

Appendix 1551

| From: | Basil Rallis <Brallis@cascadeaffordable.com> |
| Sent: | Thursday, April 12, 2007 4:46 PM |
| To: | Jeff Carpenter <jcarpenter@southwesthousing.com> |
| Cc: | Jeff Hoster <Jhoster@prmc.com>; Jeanne Wheeler <Jwheeler@prmc.com>; Rick Graf <Rgraf@prmc.com>; Cheryl Potashnik <cpotashnik@southwesthousing.com> |
| Subject: | Cascade Tour |

Jeff.

As I mentioned on the phone, on the 16th I will be in San Antonio, with Vicki Aponik, the underwriter for our investor. We were going to get started at 8:30 to see as many of the SA properties as we can by 2:30, when she needs to meet up with our market rate group Olympic Investors. We are flying to Dallas on the 17th, and she would like to see as many of the Dallas properties as possible starting mid morning of the 18th, until about 4, when she will need to get to the airport.

Let me know what will be easiest for you. Jeannie Wheeler, in Pinnacle's San Antonio office, can help us not get lost in San Antonio, but I could use your help in Dallas to cover as much ground as we can. Rick and Jeff Hoster would not be available because of other commitments. This is for Vicki to get a favor for the properties and locations.

Basil

Basil P. Rallis
Director
Cascade Affordable Housing
Pier 70
2801 Alaskan Way, Suite 200
Seattle, WA  98121
direct   (206) 215-9837
fax      (206) 802-1707
cell     (206) 595-0100
brallis@cascadeaffordable.com
www.cascadeaffordable.com

Visit Pinnacle's redesigned web site at http://www.pinnaclerealty.com

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. AMS LLC (dba Pinnacle) reserves the right to archive and monitor all e-mail communications through its networks. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system.



Appendix 1552

# Appendix Exhibit 14

# Declaration of Amy Gibson

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | |
| | § | Civil Action No. 3:23-CV-00769-N |
| Twin City Fire Insurance Company, | § | |
| | § | Jury Demand |
| *Defendant.* | § | |

---

### DECLARATION OF AMY GIBSON

---

1.      My name is Amy Elizabeth Gibson. The facts and statements that I make in this declaration are true and accurate. Unless otherwise stated or apparent from my testimony, I have personal knowledge of the facts and statements that I make in this declaration. I do not intend to waive any privilege in making this declaration. A true and correct copy of my current attorney biography is attached.

2.      I am one of the attorneys who represents Plaintiff Jeff Carpenter in this lawsuit. I am also one of the attorneys who represented Jeff Carpenter in the prior lawsuit giving rise to the *Stowers* claim at issue here. That prior lawsuit was in Dallas County Court at Law No. 5, Cause Number CC-08-2072-E, and styled *Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., and Brian Potashnik*. That prior lawsuit is abbreviated here as the "prior case." I also served as lead trial counsel for Jeff Carpenter in the prior case.

3.      This declaration authenticates certain documents in the *Appendix in Support of Jeff Carpenter's Motion for Summary Judgment*. That filing is abbreviated here as "Appendix."

4.      Each time this declaration testimony refers to true and correct copies, the following,  which were not part of the originals, are excepted: (1) the Appendix bates-numbers, and (2) any highlighting or similar markings that may be added to the Appendix exhibits to assist the Court in deciding the summary judgment motion.

5.      The two attachments to the Appendix Exhibit 2 Stipulation are true and correct copies of (1) the accompanying cover letter and *Final Judgment* in the prior case and (2) the turnover order in the prior case — *i.e.*, the *Order Granting Amended Motion for Turnover of Stowers Claim.*

6.      Appendix Exhibit 5 is a true and correct copy of excerpts from the liability insurance policy — including endorsements, declarations, notices, and a cover letter —, that Defendant Twin City Fire Insurance Company produced in this *Stowers* lawsuit. However, the Twin City document production bates-numbers were removed because they made the Appendix bates-numbers unreadable. These excerpts constitute the complete employment practices liability insurance agreement at issue in this *Stowers* lawsuit. These excerpts exclude irrelevant coverage parts, such as kidnapping and ransom.

7.      Appendix Exhibit 6 is a true and correct copy of a March 11, 2016 policy coverage analysis with original exhibits. The bright-yellow highlighting and red markings were part of the original coverage analysis document. I personally prepared that coverage analysis and sent that coverage analysis to Twin City Fire Insurance Company, through its attorney Steven Knight, for consideration in connection with the *Stowers* settlement offer in the prior case.

8.      Appendix Exhibit 6 includes the original exhibits to the March 11, 2016 policy coverage analysis. Those original exhibits include true and correct copies [other than any added highlighting and red marks that were not part of the originals] of:

      (1) *Jeffrey W. Carpenter's Second Amended Petition and Jury Demand* in the prior case — the operative petition on file during the *Stowers* offer consideration period;

      (2) excerpts from asset purchase and sale documents that the asset purchaser produced to me in the prior case;

      (3) Texas Secretary of State filings for the entity defendants in the prior case — I personally downloaded these filings from the Texas Secretary of State website, using our law firm password to access the website commonly known as *SOS Direct*, and searching for and finding the entity defendant filings with the Texas Secretary of State;

      (4) the file-stamped first page of the original petition in the prior case;

      (5) the returns of service for service of process on each defendant in the prior case.

9.      Appendix Exhibit 8 is a true and correct copy of the Charge of the Court including jury verdict in the prior case, with redaction of juror names.

10.     Appendix Exhibit 9 is a true and correct copy of excerpts from *Jeffrey Carpenter's Third Amended Petition and Jury Demand* in the prior case. This was the operative petition on file at the time of the jury verdict and final judgment in the prior case.

11.    Appendix Exhibit 13 is a true and correct copy of excerpts from the trial transcript in the prior case. These excerpts include the complete presentation to the jury other than most trial exhibits and trial visuals. These excerpts exclude pretrial hearings, most bench conferences, the charge conference, and most of jury selection.

**My name is Amy Elizabeth. My date of birth is December 7, 1968. I declare under penalty of perjury that my testimony above is true and correct.**

**Executed in Dallas County, Texas on July 12, 2024.**

Amy Elizabeth Gibson