CIVIL ACTION NO. 3:23-CV-00769-N

# In the United States District Court Northern District of Texas Dallas Division

JEFFREY CARPENTER,

*Plaintiff,*

v.

TWIN CITY FIRE INSURANCE COMPANY,

*Defendant.*

## TWIN CITY INSURANCE COMPANY'S BRIEF IN SUPPORT OF ITS RESPONSE TO CARPENTER'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. ii

Table of Authorities ........................................................................................................ iii

Relevant Background ........................................................................................................ 1

Argument ....................................................................................................................... 11

    I.    Twin City had no duty to accept Carpenter's policy limits demand because the
           Severance Pay Exclusion removes his claim from coverage. ........................... 11

          A.    Applicable Standards ........................................................................ 11

          B.    The Severance Pay Exclusion unambiguously excludes coverage ...................... 13

    II.    Limited coverage for bonuses awarded as a component of a front or back pay award
           does not open the door to coverage for Carpenter's severance payment claim. .............. 21

Conclusion ..................................................................................................................... 30

Certificate of Service ...................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Allison v. Citgo Petroleum, Corp*,
   151 F.3d 402 (5th Cir. 1998) ................................................................22

*Am. Physicians Ins. Exch. v. Garcia*,
   876 S.W.2d 842 (Tex.1994) ...................................................................7

*AMAX, Inc. v. Fletcher*,
   305 S.E.2d 601 (1983) ..........................................................................18

*American Home Assurance Co. v. CAT Tech LLC*,
   660 F.3d 216 (5th Cir. 2011) ................................................................12

*Baker v. Masco Builder Cabinet Group*,
   912 F.Supp.2d 814 (D.S.D. 2012) ...................................................16, 17

*Blaylock v. American Guar. Bank Liability Ins. Co.*,
   632 S.W.2d 719 (Tex. 1982) .................................................................13

*Carolina Cas. Ins. Co. v. Sowell*,
   603 F.Supp.2d 914 (N.D. Tex. 2009) .....................................................6

*Claybrook v. Sunoco GP LLC*,
   No: 1:18-CV-00029-TAV-CHS, 2023 WL 2207113 (E.D. Tenn. Feb. 23,
   2023) .....................................................................................................16

*Claybrook v. Sunoco GP, LLC*,
   No: 1:18-CV-29-TAV-CHS, 2023 WL 2664740 (E.D. Tenn. March 28, 2023) ....................16

*Coker v. Coker*,
   650 S.W.2d 391 (Tex. 1983) ...........................................................12, 13

*D'Arcy Petroleum, LLC v. Buster*,
   No. 3:19-cv-02770-M, 2020 WL 13157811 (N.D. Tex. Aug 17, 2020) ................................26

*Dailey v. Cordis Corp.*,
   No. 3:12-cv-518-0, 2013 WL 1245560 (N.D. Tex. March 26, 2013) ....................................29

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
   888 F.3d 753 (5th Cir. 2018) ................................................................26

*Drake v. Option One Mortgage Corp.*,
   No. SACV-09-01450-CIC(RNBx), 2010 WL 11464891 (C.D. Cal. April 15,
   2010) ...............................................................................................17, 18

*Evergreen Indem. Co. v. Tan It All, Inc.*,
    111 S.W.3d 669 (Tex. App.—Austin 2003, no pet.) ............................................12

*Farmers Automobile Insurance Association v. St. Paul Mercury Insurance Company*,
    482 F.3d 976 (7th Cir. 2007) ...........................................................................19

*Forbau v. Aetna Life Ins. Co.*,
    876 S.W.2d 132 (Tex. 1994)............................................................................24

*Gilyard v. Bank of America Corp.*,
    No. 3:09-cv-944-J-20TEM, 2011 WL 13295442 ..................................................24

*Goldman v. White Rose Distributing Company*,
    936 S.W.2d 393 (Tex. App.—Fort Worth 1997), *vacated pursuant to settlement*,
    949 S.W.2d 707 (Tex. 1997)............................................................................15

*Hankins v. DataPlex*,
    77 F.3d 477 (5th Cir. 1995) .............................................................................23

*Heidgerd v. Olin Corp.*,
    906 F.2d 903 (2d Cir. 1990)............................................................................18

*Horton v. Lawrence Cnty. Bd. of Educ.*,
    449 F.2d 793 (5th Cir. 1971) .......................................................................6, 21

*Ironshore Specialty Ins. Co. v. Aspen Underwriting Ltd.*,
    40 F. Supp. 3d 807 (W.D. Tex. 2014), *aff'd*, 788 F.3d 456 (5th Cir. 2015)...........12

*Jackson v. Host International, Inc.*,
    426 Fed. Appx. 215 (5th Cir. 2011)..................................................................23

*Jennings v. SSM Health Care St. Louis*,
    355 S.W.3d 526 (Mo. Ct. App. 2011)...............................................................17

*Kelley–Coppedge, Inc. v. Highlands Ins. Co.*,
    980 S.W.2d 462 (Tex. 1998)............................................................................13

*Kittansett Club v. Philadelphia Indem. Ins. Co.*,
    No. CIV.A. 11-11385-DJC, 2012 WL 3947954 (D. Mass. Sept. 10, 2012)............20

*Kostrzewski v. U.S. Steel Supply, Inc.*,
    No. 87-5098, 1987 WL 14672 (E.D. Penn. Nov. 3, 1987) ....................................18

*Martindale Lumber Co. v. Bituminous Cas. Corp.*,
    625 F.2d 618 (5th Cir. 1980) ...........................................................................29

*Miller v. Raytheon Co.*,
    716 F.3d 138 (5th Cir. 2013) .....................................................................21, 23

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*,
    907 S.W.2d 517 (Tex. 1995)........................................................................13

*National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. Kasler
Corporation*,
    906 F.2d 196 (5th Cir.1990)........................................................................11

*Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*,
    566 F.3d 452 (5th Cir. 2009).......................................................................12

*Nero v. Industrial Molding Corp.*,
    167 F.3d 921 (5th Cir. 1999).......................................................................27

*Pettway v. ACIPCO*,
    494 F.2d 211 (5th Cir. 1978).......................................................................23

*Reilly v. Rangers Mgmt., Inc.*,
    727 S.W.2d 527 (Tex. 1987)........................................................................30

*Southwest Housing v. Carpenter*,
    No. 05-19-00238-CV, 2020 WL 5056558 (Tex. App.—Dallas Aug. 27, 2020,
    pet. denied)...................................................................................................9

*Stanley Stores, Inc. v. Chavana*,
    909 S.W.2d 554 (Tex. App.—Corpus Christi 1995, writ denied)...........21

*Stout v. Smithfield Bioenergy*,
    LLC, No. 3:10-CV-1185-M, 2010 WL 5487843 (N.D. Tex. Dec. 30, 2010).........................15

*Tex. Farmers Ins. Co. v. Murphy*,
    996 S.W.2d 873 (Tex. 1999)........................................................................12

*Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*,
    511 S.W.3d 28 (Tex. 2017)..........................................................................13

*Thorne v. City of El Segundo*,
    802 F.2d 1131 (9th Cir. 1986)......................................................................23

*Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    67 F.4th 648 (4th Cir. 2023)........................................................................12

*Waste Corp. of America, Inc. v. Genesis Ins. Co.*,
    382 F. Supp. 2d 1349 (S.D. Fl. 2005), *aff'd,* 209 Fed. Appx. 899 (11th Cir.
    Dec. 6, 2006)................................................................................................19

*West v. Nabors Drilling USA, Inc.*,
    330 F.3d 379 (5th Cir. 2003).......................................................................22

**Other Authorities**

Fed. R. Civ. Prac. Rule 39(c) ...........................................................................................22

TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:51 ................................................6, 21

TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:52 ....................................................21

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEFFREY CARPENTER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-00769-N |
| | § | |
| TWIN CITY FIRE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| *Defendant*. | § | |

### TWIN CITY INSURANCE COMPANY'S BRIEF IN SUPPORT OF ITS RESPONSE TO CARPENTER'S MOTION FOR SUMMARY JUDGMENT

Jeffrey Carpenter sued Twin City's insured for breach of an oral agreement to pay him a severance package upon the termination of his employment. Carpenter prevailed and now, as the purported owner of the insured's *Stowers* claim, he sued Twin City for not accepting a pre-trial policy limits demand. Twin City had no duty to accept the demand because (i) the Policy's Severance Pay Exclusion excludes claims for "employment termination severance payments," and (ii) the Policy's definition of "Loss" does not include claims for salaries, wages, or bonuses. Because Carpenter's claim is not within the scope of coverage, his *Stowers* claim fails as a matter of law. Twin City requests the Court to reconsider its previous ruling denying its motion for summary judgment, deny Carpenter's cross-motion, and dismiss his lawsuit with prejudice.

### RELEVANT BACKGROUND

### *The Policy*

Twin City issued a Private Choice Encore Policy ("Policy") to its named insured, Southwest Housing Management—Carpenter's former employer. App. at 5. The Policy includes an "Employment Practices Liability Coverage Part" under which Twin City agreed to pay:

> **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the Policy Period or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the Insureds.

App. at 26 (bold terms in original).

The Policy defines "**Employment Practices Claim**" as including any:

> . . .
>
> (2)    civil proceeding commenced by the services of a complaint or similar pleading.

App. at 26 (bold terms in original).

The Policy defines "**Employment Practices Wrongful Act**" "as

> a **Wrongful Act** involving any:
>
> (1)    wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;
>
> (2)    sexual or other workplace harassment, including quid pro quo and hostile work environment;
>
> (3)    employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;
>
> (4)    invasion of privacy, employment-related defamation (including libel and slander) or any employment related misrepresentation;
>
> (5)    **Retaliation**;
>
> (6)    breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy

statement; or

(7)     violation of the Family and Medical Leave Act.

To the extent that any **Employment Practices Claim** alleges and **Employment Practices Wrongful Act** described above, "**Employment Practices Wrongful Act**" also means a **Wrongful Act** related to the above involving any:

(1)     employment-related wrongful infliction of emotional distress or mental anguish;

(2)     failure to create, provide for or enforce adequate or consistent employment-related policies or procedures; or

(3)     negligent retention, supervision, hiring or training.

App. at 27 (bold terms in original).

The Policy defines "**Wrongful Act**" as:

any actual or alleged:

(1)     error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

(2)     matter claimed against an Insured Person solely by reason of their serving ins such capacity.

App. at 27 (bold terms in original).

Finally, the Policy defines "**Loss**" as including:

[T]he amount that the Insureds are legally obligated to pay as a result of [an **Employment Practices] Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

. . .

**However**, the Policy makes it clear that

**Loss** shall not include:

. . .

3

> (2)    Non-monetary relief;
>
> . . .
>
> (5)    Salaries, wages, or bonuses, except as a component of a front or back pay award.

App. at 28 (bold term in original). Consequently, if the insured's employee were to assert a claim against his or her employer for non-monetary relief or for unpaid salaries, wages, or bonuses, the Policy does not cover the claim since those matters fall outside of the definition of "Loss."

Additionally, the Policy enumerates various exclusions to indemnity coverage. Relevant here is the Severance Pay Exclusion, which, consistent with the lack of coverage for claims for unpaid salaries, wages, and bonuses, states:

> Other than **Defense Costs**, the Insurer shall not pay **Loss** for any [**Employment Practices**] **Claim**:
>
> (1)    for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement.
>
> . . .

App. at 30 (bold terms in original).

### *Carpenter's Severance Package Agreement*

Carpenter is a former employee of Southwest Housing Management, which Brian and Cheryl Potashnik once owned. When the Potashniks decided to sell their company's assets and sever ties with all of their company employees, they and Keith Jones, the company's CFO, developed a severance program to incentivize certain employees, including Carpenter, to remain with the company until these events occurred. App. at 207-209 (Jones describing the severance program); *see also* App. at 260 ("Severance payroll e-mail").

According to Carpenter, he negotiated a severance package in the amount of three percent

4

of the proceeds from the sale of the company's assets, subject to certain adjustments. App. at 262. However, when the Potashniks sold their business and terminated Carpenter's employment, Jones sent Carpenter a separation agreement that was substantially less than the three percent formula. App. at 246-247 (Carpenter describing that the separation agreement, which he confirmed is the same thing as a severance agreement, did not conform to the three percent deal he had negotiated.)

Unwilling to accept the reduced severance package, Carpenter modified the separation agreement to include the material terms the Potashniks conveyed orally. *See* App at 262. ("Accordingly, I have taken the liberty of reworking and attach the draft separation agreement that you provided to incorporate those other elements."). Among other things, the separation agreement Carpenter presented to the Potashniks:

- ➤ Documents the termination of his employment. App. at 265, ⁋ 2.

- ➤ Describes how to calculate the three percent figure that enticed him to remain with the company through the sale and resulting termination of his employment with Southwest. App. at 265, ⁋ 5.

- ➤ Describes the consideration Carpenter offered in exchange for the three percent figure: his agreement to release all employment related claims, including "any claims, matters or actions related to Employee's . . . termination and separation from Company." App. at 266, ⁋ 8.[1]

The Potashniks, who denied that they promised Carpenter the three percent figure, declined to execute Carpenter's version of the separation agreement.

---

[1] Additional consideration included Carpenter's release of all tort claims as well as statutory employment claims, such as claims under the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, *etc*. App. at 266, ⁋ 8. This is typical in severance agreements.

*The Underlying Lawsuit*

In 2008, Carpenter sued the Potashniks, Southwest Housing Management, and related insured entities (collectively "Southwest") for breach of contract, claiming they repudiated the oral agreement to pay him the three percent severance package after selling the company's assets and terminating his employment. App. at 95. Carpenter's lawsuit met the Policy's definition of "Employment Practices Claim" because it was a "civil proceeding commenced by the service of a complaint or similar pleading." It also met the definition of "Employment Practices Wrongful Act" because it involved an alleged "breach of any oral, written, or implied employment contract." Accordingly, Twin City agreed to pay its insureds' defense costs since those expenses are included in the Policy's definition of "Loss." App. at 108. However, Twin City reserved its right to deny indemnity coverage because the Policy does not cover claims for salaries, wages, bonuses or severance payments.

In 2015, Carpenter filed his second amended petition, in which he continued to claim entitlement to a severance package under the three percent formula. App. at 114. By then, Carpenter had apparently obtained a copy of the Policy and realized that it excludes claims for severance payments. That may explain why he referred to the severance package as a "bonus" for which he was entitled to an equitable "back pay" award. App. at 131, 155.[2] In the alternative,

---

[2]    The common and ordinary meaning of back pay is "those lost wages and benefits that accrue from the date of a *wrongful termination* through trial." TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:51 (emphasis added); *see also Horton v. Lawrence Cnty. Bd. of Educ.*, 449 F.2d 793, 795 (5th Cir. 1971) ("Back pay is normally an integral part of the equitable remedy of reinstatement used by the federal courts to restore aggrieved litigants to the positions they should have occupied had it not been for the unlawful deprivation of their constitutional rights."). Carpenter, who never asserted a claim for wrongful termination or discrimination, cannot plead his way into the Policy's definition of "Loss." *See Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 928 (N.D. Tex. 2009) ("Artful pleadings of facts cannot bring excluded claims back within the policy's coverage.").

Carpenter asserted a claim for *quantum meruit,* claiming he stayed with the company and "performed valuable services" in relation to the sale for which he was not compensated. App. at 127.

Eventually, Carpenter offered to settle the lawsuit for the remaining Policy limits, with reference to "*Stowers.*" App. at 158. Twin City declined the demand because Carpenter's claim is not within the scope of coverage, rendering *Stowers* inapplicable.[3]  App. at 162.

### *The Trial and Verdict*

Throughout the trial, Carpenter's attorney attempted, unsuccessfully, to get multiple witnesses to characterize the dispute over the amount of Carpenter's severance package as a dispute over the amount of a "stay bonus." But none of the witnesses would play along.

➢ Jones—the architect of the severance program—corrected Carpenter's counsel, testifying: "I called it a severance." App. at 206, 207-09; *see also* App. at 210 (agreeing that the phrase "stay bonus program" is "a term that Ms. Gibson has injected.").

➢ Mrs. Potashnik (Geiser)—the owner of the company in charge of approving severance pay allowances—testified, "They were severance payments." App. at 217-18.

➢ Mr. Potashnik—the other owner of the company—testified, "Mrs. Gibson, you are not going to get me to call something that is severance a bonus because they were no[t] bonuses." App. at 223, 225.

➢ He also said, "The only thing that would have been paid to anybody over and above what their employment agreement called for would have been a severance. And I think Mr. Jones

---

[3]     To prevail on a *Stowers* claim, the plaintiff must prove: "(1) the claim against the insured is within the scope of coverage, (2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *See Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex.1994).

made that clear. I know that Ms. Geiser [Mrs. Potashnik] made that clear. And I hope that I am, in my testimony, doing the same." App. at 227; *see also* App. at 228-230.

➢ Carpenter—the co-architect of the severance program with Jones—testified that the money he claims is owed is the "same thing" as what Jones testified to be severance pay. App. at 242, 243-44; *see also* App. at 235-36 (describing the "severance bonus program").

➢ Carpenter also testified that the "severance package or severance agreement" that he received upon the termination of his employment failed to comply with the oral agreement. App. at 242, 246. That is when Carpenter modified the separation agreement to document the date his employment with Southwest ended and the three percent allowance given in exchange for his complete release of all employment related claims. App. at 262-69.

At one point during the trial, Carpenter's attorney switched from calling the program a "stay bonus" program to calling it a "stay-to-get-severance program"—a more apt description. App. at 211. Then, during closing arguments, she conceded that anytime she referred to a "stay bonus," she was actually referring to a severance package because "it all means the same thing." App. at 251-52. She even reiterated that "Keith Jones said that he and Jeff Carpenter were both part of the stay program, which is the equivalent to the severance program." App. at 254.

These acknowledgements are consistent with comments made during a pre-trial proceeding. Carpenter's counsel acknowledged that what she referred to as "stay bonuses" were necessarily "paid as severance because upon the sale . . . the three entity defendants weren't employing anyone anymore." App. at 200; *see also* App. at 201 ("So the stay bonuses ended up being a severance pay.").

The fact issue to be decided at trial was whether the Potashniks promised to pay Carpenter a severance package in the amount of three percent of the sale proceeds, conditioned on his staying

with the company through the point of sale, which marked the end of his employment with Southwest. Carpenter said they did. The Potashniks said they didn't.

Ultimately, the jury sided with Carpenter on that issue, finding that Southwest promised to pay him three percent of the sale proceeds if he remained with the company until the owners sold it and severed Southwest's ties with their employees. App at 174-76. Additionally, in response to Questions 8, the jury decided that Carpenter performed no "compensable work staying on as long as needed to help make the asset sale happen." App. at 179. In other words, Carpenter performed no additional work; all that he did was delay his inevitable separation date and release all employment related claims in exchange for a lucrative severance package.

The jury verdict and the final judgment do not characterize Carpenter's recovery as a back pay or front pay award—equitable remedies in employment discrimination and wrongful termination cases. Nor does the court of appeals' opinion affirming the judgment mention those equitable concepts. *See Southwest Housing v. Carpenter*, No. 05-19-00238-CV, 2020 WL 5056558 (Tex. App.—Dallas Aug. 27, 2020, pet. denied). Carpenter—who never claimed he was the victim of a wrongful employment practice or discrimination—obtained a final judgment on his ordinary contract claim. His recovery was in law, not equity.

### *The Current Lawsuit*

Carpenter sued Twin City, claiming to own any claim Southwest may have had against Twin City under *Stowers* for not accepting the settlement demand. ECF 1-2 at 17. Twin City's insured—Southwest—could have asserted that claim against Twin City long ago if it believed the Policy covered Carpenter's claim. However, Southwest never disputed Twin City's position that the Policy does not cover its payroll/severance obligations.

Early in this case, Twin City filed a motion for summary judgment in which it argued that

Carpenter's *Stowers* claim fails because his claim against Southwest was not within the scope of coverage. ECF 20. First, the Policy's definition of "Loss" carves out claims for salaries, wages, or bonuses unless awarded as a component of a back pay award—a particular type of an equitable remedy in wrongful termination and harassment cases—obviously not present here. *Id*. at 10-19. Second, the Policy's Severance Pay Exclusion excludes all claims "for employment termination severance payments," regardless of whether the payment is conditioned on the employee fulfilling a particular length of service. *Id*. at 8-10. After additional briefing, ECF 28, 30 & 33, the Court entered a Memorandum Opinion and Order, denying Twin City's motion. ECF 51.

Twin City's primary defense to Carpenter's *Stowers* claim was that his claim against Southwest was not within the scope of coverage for the reasons Twin City articulated in its motion. *See* ECF 20 & 33. Accordingly, to preserve the Court's and the parties' resources, Twin City stipulated in Carpenter's favor all of the *Stowers* elements *other than* the requirement that he prove that the claim was within the scope of coverage. ECF 57 at p. 13 of 366 (Appendix 0013). Subsequently, Carpenter filed what is, essentially, a cross-motion for summary judgment on coverage—the only issue that remains in this case. *See* ECF 55 & 56.

Carpenter's motion and brief presents three essential issues. First, he argues that the Policy's grant of coverage language—separate from exclusionary and limiting provisions—is satisfied because his lawsuit asserted an "Employment Practices Claim," as the Policy defines that phrase. *See* ECF 56 at 19-26. Second, he argues that the Policy's definition of "Loss," which removes coverage for claims for salaries, wages, and bonuses, is not applicable because the judgment is a back pay award, rendering the coverage limitation inapplicable. *See* ECF 56 at 26-32. Third, he argues that the Severance Pay Exclusion does not apply because the oral agreement was for him to "stay" until Southwest's owners sold the company's assets and severed its ties with

10

its employees. *See* ECF 56 at 33-37.

As discussed earlier, Twin City agrees that Carpenter's lawsuit constituted an "Employment Practices Liability Claim," which is why Twin City agreed to pay defenses costs as a covered "Loss," subject to its right to deny indemnity coverage. Accordingly, this response addresses Carpenter's remaining arguments concerning the two Policy provisions that eliminate or exclude coverage—the Severance Pay Exclusion and the exception to the definition of "Loss." For the reasons set forth below, both provisions apply, defeating Carpenter's *Stowers* claim as a matter of law. Twin City requests the Court to deny Carpenter's motion and to reconsider its prior ruling on Twin City's motion, which Twin City incorporates and re-urges. *See* ECF 19, 20 & 21.

ARGUMENT

**I.      Twin City had no duty to accept Carpenter's policy limits demand because the Severance Pay Exclusion removes his claim from coverage.**

**A.      Applicable Standards**

Carpenter begins his "Arguments and Authorities" section by saying "the maxims of contract interpretation regarding insurance policies operate squarely in favor of the insured." ECF 56 at 16 (quoting *Lubbock Cnty Hosp. Dist. v. National Union Fire Ins. Co*., 143 F.3d 239, 242 (5th Cir. 1998)). For that proposition, the court in *Lubbock County* cited *National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. Kasler Corporation,* 906 F.2d 196 (5th Cir.1990). In that case, the Fifth Circuit correctly stated, "Significantly, these special rules favoring the insured are only applicable where there is an ambiguity in the policy; if the term in question is susceptible of only one reasonable construction, then these rules do not apply." *Kasle*r, 906 F.2d at 198.

Indeed, courts have cautioned that the doctrine of *contra preferendum* is a device of last resort for construing ambiguous contract provisions. *Ironshore Specialty Ins. Co. v. Aspen*

11

*Underwriting Ltd.*, 40 F. Supp. 3d 807, 816 (W.D. Tex. 2014), *aff'd*, 788 F.3d 456 (5th Cir. 2015);

As one court put it, "It is essentially a tie breaking device used to prevent arbitrary decisions when all other methods of interpretation and construction prove unsatisfactory." *Evergreen Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App.—Austin 2003, no pet.). Courts should not strain to create an ambiguity and should resist the temptation to give up searching for plain meaning. *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, *PA*, 67 F.4th 648, 653 (4th Cir. 2023). Otherwise, "the *contra proferentem* thumb-on-the-scale would apply to nearly every interpretation of nearly every insurance policy." *Id.* (quoting *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (2019)).

As discussed *infra*, the Policy provisions at issue here are susceptible to only one *reasonable* interpretation—the one offered by Twin City. As such, the Policy must be interpreted "according to its plain meaning and give no deference to the insured's interpretation." *American Home Assurance Co. v. CAT Tech LLC*, 660 F.3d 216, 221 (5th Cir. 2011) (citing *Travelers Lloyds Ins. Co. v. Pac. Emp'rs Ins. Co.,* 602 F.3d 677, 681 (5th Cir. 2010); *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex. 1984)); *see also Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) ("In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."); *Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009) ("Where the language of a contract is clear, a court's inquiry should begin and end with the policy's language."). !

Under Texas law, courts interpret insurance policies according to the rules of contract construction. *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999). If policy language is worded so that it can be given a definite or certain legal meaning, courts construe it as a matter of law. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc*., 907 S.W.2d 517, 520 (Tex.

1995); *cf. Coker* 650 S.W.2d at 393. Additionally, when construing the policy's language, courts must give effect to all contractual provisions so that none will be rendered meaningless. *Kelley– Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); *Blaylock v. American Guar. Bank Liability Ins. Co.*, 632 S.W.2d 719, 722 (Tex. 1982). To determine the common and ordinary meaning of a term in an insurance policy, courts typically look first to dictionary definitions and then consider the term's usage in other authorities. *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017).

## B. The Severance Pay Exclusion unambiguously excludes coverage.

The Policy clearly and unambiguously excludes claims for severance payments. It states, "Other than Defense Costs, the Insurer shall not pay Loss for any Claim . . . for employment termination severance payments." App. at 30. The common and ordinary meaning of "severance pay" is "an allowance usually based on length of service that is payable to an employee *on termination of employment*."[4]

Here, it is undisputed that Carpenter's employment was with Southwest. It is undisputed that the Potashniks, on Southwest's behalf, promised to pay Carpenter an allowance if he remained a company employee until they sold the company's assets and severed its ties with its employees. It is undisputed that Carpenter stayed with the company until the Potashniks sold its assets and terminated his employment with the company. It is undisputed that the allowance became due at that time, but the Potashniks refused to pay. Clearly and unambiguously, the Severance Pay Exclusion removes Carpenter's claim from the scope of coverage.

To be sure, Jones, the architect of program, testified that it was a severance pay program. App. at 206, 207-09. Mrs. Potashnik, the owner of the company, testified that the payments were

---

[4]    *See* https://www.merriam-webster.com/dictionary/severance

severance payments. App. at 217-18. Mr. Potashnik, the co-owner of the company, testified that the payments were severance payments. App. at 223, 225, 227-230. Carpenter himself, who worked with Jones to develop the program, testified that the payments were intended as severance pay. App. at 235-36, 243-44, 246; *see also* App. at 262-69.

Likewise, Carpenter's attorney conceded that the program was a "stay-**to-get severance** program." App. at 211 (emphasis added). She conceded that the severance packages were to be "**paid as severance because upon the sale . . . the three entity defendants weren't employing anyone anymore**." App. at 200 (emphasis added); *see also* App. at 201 ("So the stay bonuses ended up being a severance pay."). She conceded that the money that was supposed to be paid to Carpenter upon the termination of his employment is the same thing as what Jones described as the severance pay program. In her words, "Keith Jones said that he and Jeff Carpenter were both part of the stay program, which is the equivalent to the severance program." App. at App. at 254.

By Carpenter's and his attorney's own admissions, Carpenter agreed to extend the length of his service to Southwest through the point of sale, after which his employment with the company would end. In exchange, Southwest promised to pay him an allowance that became due after the sale and the termination of his employment with the company, the consideration for which Carpenter offered to give Southwest a complete release of all employment related claims. Carpenter, who never bargained with Twin City, has no conceivable ability to shift the burden of his former employer's contractual obligation to fund a severance package to Twin City. The Severance Pay Exclusion clearly and unambiguously removes Carpenter's claim from the scope of coverage. The fact that Carpenter had to perform a condition precedent to recover the payment— to remain an employee through the sale, which brought his employment for the company to an end—does not change its character.

Carpenter ignores all of this and argues that, because he had to perform the condition precedent to receive his severance package, the payment was not "for employment termination." ECF 56 at 34-35. However, an employer placing a condition on the employee's entitlement to a severance package does not change the nature of the payment. The Potashniks wanted to sell the company's assets and sever all ties with company employees. The Potashniks needed the company to stay in operation to lure a buyer. To stay in operation, the Potashniks incentivized company employees to stay rather than resign, thus enabling *them* to sever the employment relationship on *their* schedule—after the sale. If the employees performed the condition precedent—staying rather than resigning—they would be entitled to receive their severance package that became due upon the termination of their employment with the company. As cases in Texas and around the country reflect, this arrangement is common.

➤ *Stout v. Smithfield Bioenergy*, LLC, No. 3:10-CV-1185-M, 2010 WL 5487843, at *1 (N.D. Tex. Dec. 30, 2010): "Plaintiffs are seven Texas residents who are former employees of Defendant Smithfield BioEnergy, LLC. In anticipation of the pending sale of Smithfield to Beacon Energy Corp., Mark Farrer, Smithfield's General Manager, sent a memorandum to Smithfield's employees informing them of the sale. The memorandum referenced a post-sale severance package for Smithfield employees and encouraged them to stay productive. By May 10, 2010, Beacon Energy had terminated all of the Plaintiffs. None received a severance package."

➤ *Goldman v. White Rose Distributing Company*, 936 S.W.2d 393 (Tex. App.—Fort Worth 1997), *vacated pursuant to settlement*, 949 S.W.2d 707 (Tex. 1997): "In 1988, Ronald and White's attorney, Gordon Appleman, began negotiating the sale of White Rose's assets to another company, Tarrant Distributing Company. Ronald requested a 'severance package'

15

for all employees, including a $500,000 severance bonus for himself, allegedly so that White Rose's management team would stay on until the sale occurred. The board of directors approved a $350,000 severance bonus for Ronald to be made on the day of the sale."

➤ *Claybrook v. Sunoco GP LLC*, No: 1:18-CV-00029-TAV-CHS, 2023 WL 2207113, at *14 (E.D. Tenn. Feb. 23, 2023) (Magistrate Report and Recommendations following an Arbitration): "In August of 2017, Sunoco announced that it was selling numerous stores in the southeastern part of the country to 7-Eleven in mid-October 2017. In order to incentivize Sunoco employees to stay with Sunoco until the sale, Sunoco promised all employees who were to be affected by the sale that if they stayed with Sunoco until the sale, they would receive a severance package."[5]

➤ *Baker v. Masco Builder Cabinet Group*, 912 F.Supp.2d 814 (D.S.D. 2012): Employees sued their employer for failing to pay severance payments after the employer announced: "It has also been rumored that the Company will renege on the severance that has been announced. This is to inform you that this will absolutely not happen. We will pay severance as we have in all other plant closures in accordance with what has already been

---

[5]    After her employment with Sunoco terminated, Claybrook was offered a job by a company called Axalta, which offered her benefits, including under the Family Medical Leave Act. *Id.* at *2. Claybrook accused Sunoco of defaming her to Axalta, causing the job offer to be rescinded. *Id.* She then accepted employment at a company called Quantum, which did not offer her the same benefits. *Id.* at *4. While at Quantum, she requested FMLA time off to care for her dying mother, but Quantum refused. Claybrook was forced resign, foregoing wages for a period that ended when she was able to re-enter the workforce. Claybrook sued Sunoco to recover the severance pay she was promised as well money she had to forego earning due Sunoco's wrongful conduct that caused her to involuntarily leave Quantum. She prevailed on both claims, recovering severance pay for the former and back pay for the latter. *See id.* at *14. *See also Claybrook v. Sunoco GP, LLC*, No: 1:18-CV-29-TAV-CHS, 2023 WL 2664740 (E.D. Tenn. March 28, 2023) (overruling objections to both aspects of Claybrook's recovery). This further demonstrates that the recovery of severance pay is not back pay under any stretch of the imagination.

announced. If employees remain until released, they will receive the following: 1) one week of pay per years of service, minimum two weeks, and 2) a onetime payment to help offset some of the Cobra premium costs." *Id.* at 818.[6]

➢ *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526 (Mo. Ct. App. 2011): "Dr. Anthony Jennings was hired in 2002 to serve as an emergency room physician at St. Joseph's Hospital West ("St. Joseph's"), an affiliate of SSM. In 2006 Dr. Jennings was promoted to medical director of Emergency Services at St. Joseph's, where he remained in that capacity until 2008. In the summer of 2008, SSM informed all of the Emergency Services Physicians employed at St. Joseph's, including Dr. Jennings, that their positions were being outsourced to a third-party vendor. Dr. Jennings alleges that during that meeting, SSM promised severances to all those physicians in attendance in exchange for their continued employment at St. Joseph's during the transition period. Dr. Jennings remained employed with SSM throughout the transition period until December 2008, at which point he was terminated. He received no severance payment." *Id.* at 529.

➢ *Drake v. Option One Mortgage Corp.*, No. SACV-09-01450-CIC(RNBx), 2010 WL 11464891 (C.D. Cal. April 15, 2010): "Here, Plaintiffs allege that H&R Block promised to pay severance benefits to Plaintiffs under the Standard Severance Package in exchange for Plaintiffs' continued employment. By making promises to California employees regarding

---

[6]    Notably, in addition to suing for the unpaid severance payments that were promised if the employees remained with the company through the sale, the employees asserted a claim under a state statute that permits enhanced damages when an employer withholds "wages." The plaintiffs attempted to characterize their claim for severance pay as "wages" because the payments were "in exchange for the service of maintaining employment . . . until closing" which they performed. *Id.* at 826. The court rejected the plaintiffs' attempt to mischaracterize the severance program. *Id.* at 827.

their continued employment in California, H&R Block purposefully availed itself of the privilege of doing business in California." *Id.* at *4.

➢ *Heidgerd v. Olin Corp.*, 906 F.2d 903 (2d Cir. 1990): "In the meantime, Olin realized that, in order to facilitate the sale of Winchester as a going concern, it needed to persuade employees to stay with the division at least through the period of negotiations. Accordingly, it instituted what it termed a 'special severance policy.' Under this special policy, salaried employees such as Heidgerd were to be offered severance benefits at a rate higher than the normal benefits if they remained with the Company at least through the period of uncertainty, and they would be entitled to receive those benefits even if they eventually rejected an offer with the eventual purchaser." *Id.* at 905-06.

➢ *Kostrzewski v. U.S. Steel Supply, Inc.*, No. 87-5098, 1987 WL 14672 (E.D. Penn. Nov. 3, 1987): "In Count I, plaintiff alleges that on or about August 22, 1986 he attended a meeting on the entire sales force of the Supply Division, at which time the Division's District Manager promised that those employees who agreed to satay on and provide additional assistance would receive full separation and termination benefits, including full severance pay in accordance with U.S. Steel and USX policies when the division was idled."

➢ *AMAX, Inc. v. Fletcher*, 305 S.E.2d 601 (1983): ARRS was a wholly owned subsidiary of Amax, Inc. In mid-1978, rumors began to circulate among ARRS personnel to the effect that Amax intended to sell ARRS and that the sale would result in a wholesale dismissal of ARRS employees. In order to stabilize the situation and prevent a loss of its personnel prior to the sale, certain Amax officials assured various ARRS staff members, including the plaintiff, that if they would stay on the job until the sale was consummated, they would receive severance pay in accordance with a written schedule set forth in ARRS 'Standard

Procedure No. E–7.' This schedule, by its terms, applied only to employees terminated "at the convenience of the company." *Id.* at 789.

These cases all demonstrate that businesses regularly use severance programs to incentivize employees to not "jump ship" upon the announcement that the company is to be sold. This motivation for offering to pay severance—maintaining a steady workforce until the employer severs ties—does not morph the severance payment into something insurable. It simply enables the company to control the timing of the ultimate separation from the company, even if the employee is awarded new employment with the buying company. Characterizing the payment as a payment "to stay" is the same thing as paying the employee for the employer's right to control the timing of the separation. In either case, the allowance is due when employment relationship ends, rendering it a payment *for* employment termination severance.

Carpenter's contrary argument is unreasonable and, if accepted, would incentivize employers to breach common and basic payroll obligations. Courts should not construe insurance policies in a manner that creates this moral hazard. As the Seventh Circuit Court of Appeals explained in the context of an overtime pay dispute:

> Insurance against a violation of an overtime law, whether federal or state, would enable the employer to refuse to pay overtime and then invoke coverage so that the cost of the overtime would come to rest on to the insurance company. The employer would have violated the overtime law with impunity, unjustly enriching itself by the difference between the overtime wage for the hours in question and the straight wage. No insurance company would knowingly write a policy that would enable the insured to trigger coverage any time it wanted a windfall.

*Farmers Automobile Insurance Association v. St. Paul Mercury Insurance Company*, 482 F.3d 976, 978–79 (7th Cir. 2007); *see also Waste Corp. of America, Inc. v. Genesis Ins. Co.*, 382 F. Supp. 2d 1349, 1354–55 (S.D. Fl. 2005), *aff'd*, 209 Fed. Appx. 899 (11th Cir. Dec. 6, 2006)

("Allowing an insured to control whether it will be covered for its act of breaching a contract places the insured in the unique posture of voluntarily choosing to do some act for which he knows an insurance company will compensate him even if he chooses wrongly. Who wouldn't buy insurance if he could decide whether to perform or decline to perform some act which would give him coverage for that action? Such a premise eliminates all risk to a potential insured."); *Kittansett Club v. Philadelphia Indem. Ins. Co.*, No. CIV.A. 11-11385-DJC, 2012 WL 3947954, at *6 (D. Mass. Sept. 10, 2012) ("allowing insureds to shift costs to their insurers merely by breaching existing obligations would create perverse incentives.") (citing *Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt.*, 369 F.3d 584, 593 (1st Cir. 2004)). The same rationale applies here.

The Potashniks offered severance packages to maintain a steady workforce so they could sell the company's assets and sever their company's ties with its employees. Having successfully done so, they, not Twin City, became liable for funding the severance packages they negotiated. Any contrary ruling would incentivize insureds to breach their payroll/severance obligations owed to their employees after deriving a substantial windfall—continuity that enabled the company to sell out and sever all employment ties. By applying the Policy's plain and ordinary meaning, the Court can avoid incentivizing insureds to breach severance agreements, which is an absurd result.

For all of these reasons, Twin City requests the Court to deny Carpenter's motion for summary judgment and reconsider its denial of Twin City's motion and brief, which Twin City adopts and incorporates herein. *See* ECF 19, 20 & 21. The underlying judgment for Carpenter's severance allowance that became due when his employment with Southwest ended is not covered. The Potashniks promised to pay Carpenter for employment severance if he completed a particular term, a condition precedent he performed. Therefore, Carpenter's claim is excluded, and his *Stowers* claim fails as a matter of law.

## II.   Limited coverage for bonuses awarded as a component of a front or back pay award does not open the door to coverage for Carpenter's severance payment claim.

The Policy's definition of "Loss" states: "Loss shall not include . . . salaries, wages, or bonuses, except as a component of a front or back pay award." App. at 24. In an attempt to avoid the Severance Pay Exclusion, Carpenters refers to the promised severance as a "bonus" that awarded for additional work or tasks related to the asset sale, thus constituting "back pay." Carpenter's argument strains, rather than effectuates, the Policy's clear and unambiguous limitation on what qualifies as "Loss."

Foremost, Carpenter's claim for the unpaid severance is not "back pay." The common and ordinary meaning, back pay is "lost wages and benefits that accrue from the date of a wrongful termination through trial." TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:51; *see also Horton*, 449 F.2d at 795  ("Back pay is normally an integral part of the equitable remedy of reinstatement used by the federal courts to restore aggrieved litigants to the positions they should have occupied had it not been for the unlawful deprivation of their constitutional rights."); *Stanley Stores, Inc. v. Chavana*, 909 S.W.2d 554, 563 (Tex. App.—Corpus Christi 1995, writ denied) ("The trial court has discretion to award back pay as equitable relief in an age discrimination lawsuit"). "The purpose of back pay is to 'make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination.'" *Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013) (quoting *Sellers v. Delgado Cnty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988)).

Back pay is available under numerous wrongful termination and anti-discrimination statutes. *See* TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:52 (citing Tile VII, 42 U.S.C.A. §§ 2000e5(g)(1), 2000e-16(d); ADEA, 29 U.S.C.A. § 626(b); ADA, 42 U.S.C.A. §12117(a), referring to remedies in 42 U.S.C.A § 2000e-5(g)(1); Rehabilitation Act, 29 U.S.C.A. §794(a)(a)(1), referring to remedies in 42 U.S.C.A. §§ 2000e5(g)(1), 2000e16(d); EPA, 29 U.S.C.A. §§

206(d)(3), 216(b), (c); IRCA, 8 U.S.C.A §§ 1981, 1983, 1985, § 9:55; Texas Commission on

Human Rights Act, TEX. LAB. CODE ANN. § 21.258(b)(1)); *see also* Barbara L. Johnson, *Damages*

*in Employment Law Cases*, 2017 ALI-CLE Course Materials ("Back pay is available under Title

VII, the ADA, the ADEA, the EPA, the Rehabilitation Act, the USERRA, and Sections 1981 and

1983. Once the plaintiff establishes that unlawful discrimination caused her loss, she is entitled to

back pay.").

Unsurprisingly, a search for "back pay" within the Fifth Circuit Pattern Jury Instructions

(Civil Cases) published in 2020 (a comprehensive piece developed by well-respected federal court

judges throughout the state) reveals that the phrase is mentioned seventeen times—each time in

the context of discrimination/wrongful termination claims.[7] Per the Pattern Jury Instructions, if a

district court permits a jury to render an advisory opinion on the amount of a back pay award, then

the following jury instruction applies:[8]

> Back pay includes the amounts the evidence shows Plaintiff [name] would have earned had [he/she] [remained an employee of Defendant [name]] [been promoted] [not been demoted] [other applicable circumstance]. These amounts include wages or salary and such benefits as life and health insurance, stock options, and contributions to retirement. You must subtract the amounts of earnings and benefits Defendant [name] received during the period in question.

This instruction is consistent with the definition of "back pay" from the Texas Pattern Jury

Charges. "'Back pay,'" the PJC instructs, "is that amount of wages and employment benefits that

---

[7]      https://www.lb5.uscourts.gov/juryinstructions/Fifth/2020civil.pdf

[8]      As the Fifth Circuit explained: "Because back pay is an equitable remedy, the district court need not empanel an advisory jury but can decide the back pay issue itself absent the parties' agreement to the correct amount." *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 394–95 (5th Cir. 2003). "Nevertheless, a district court may empanel an advisory jury on such issues in accordance with Rule 39(c) of the Federal Rules of Civil Procedure." *Allison v. Citgo Petroleum, Corp*, 151 F.3d 402, 423 n.19 (5th Cir. 1998).

*Paul Payne* would have earned if *he* had not been subjected to *his* employer's unlawful conduct less any wages, unemployment compensation benefits or worker's compensation benefits *he* received in the interim." Texas Pattern Jury Charges 115.30.

As noted, the purpose of a back pay award is to make the employee affected by wrongful termination and discrimination whole. *Miller*, 716 F.3d at 146. Consequently, where available, back pay is awarded over a period of time—the back pay period—that begins to run from the date of the discriminatory conduct and continues until the date of entry of judgment against the employer. *See Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986). This is important because if the back pay period includes the period of time when the employee would have been paid an annual bonus or some other financial benefits but for the wrongful termination, the bonus can be awarded as a *component* of the back pay award.

That was the issue in *Jackson v. Host International, Inc.*, 426 Fed. Appx. 215 (5th Cir. 2011), where the employee sued his employer for age discrimination after being terminated. *Id*. at 217. The employee prevailed and recovered a $227,500 back pay award, a component of which was "bonuses of 35% of his annual salary each year for the two and a half years between the termination of his employment and trial."[9] *Id.* at 217, 223; *see also Hankins v. DataPlex*, 77 F.3d 477 (5th Cir. 1995) (affirming a back pay award in an age discrimination case that included a $50,000 bonus as a component of the back pay award); *Pettway v. ACIPCO*, 494 F.2d 211, 263 (5th Cir. 1978) (recognizing, in an employment discrimination case, that "the ingredients of back pay should include more than 'straight salary.' Interest, overtime, shift differentials, and fringe benefits such as vacation and sick pay are among the items which should be included in back

---

[9]    The employer argued on appeal that there was insufficient evidence that the employee would have been paid the bonuses but for the termination, but the court found that issue unpreserved for appellate review. *Id*. at 223.

pay."); *Gilyard v. Bank of America Corp.*, No. 3:09-cv-944-J-20TEM, 2011 WL 13295442, *2 (denying, in an employment discrimination case, the defendant's motion to "preclude Plaintiff from recovering allegedly lost bonuses as a component of back pay in the event of a finding of liability.").

Here, the Policy extends coverage for Southwest's "Employment Practices Wrongful Act[s]"—a defined phrase that prominently includes claims for wrongful termination, wrongful failure to promote, wrongful demotion, wrongful deprivation of a career opportunity, sexual harassment, and employment discrimination. It is against this backdrop that the Policy must be construed. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) (In construing insurance policies, "[t]his court is bound to read all parts of a contract together to ascertain the agreement of the parties. The contract must be considered as a whole.").

The Policy states: "**Loss** shall not include . . . salaries, wages, or bonuses, except as a component of a front or back pay award." App. at 28. When an employee sues his or her employer for wrongful termination, discrimination, and the like, the employee may recover wages and bonuses he or she was unable to earn due to the employer's wrongful conduct. If the employee prevails and is awarded back pay that includes an unpaid bonus, the bonus portion of the award would fit the Policy's definition of "Loss" because it would be a "component" of a back pay award. But in the context of a non-discrimination and non-wrongful termination case like Carpenter's, when an employee sues for ordinary breach of contract to recover money the employer promised to pay but failed to pay, the claim is one for ordinary contract damages, not equitable back pay.

This is not a wrongful employment practices case. Indeed, Carpenter does not allege that he was wrongfully terminated, but rather that he was induced *not* to terminate his own employment until consummation of the sale by the promise of a severance package—a promise that went

24

unfulfilled. Carpenter did not sue his former employer for wrongful termination or anything similar, claiming that he would have been able to earn more money but for his employer's wrongful employment conduct. That explains why the trial court in the underlying lawsuit did not submit a jury question or instruction about an equitable award of back pay. It submitted an ordinary breach of contract question and an ordinary damages question. Back pay is not mentioned in the court's jury charge. It is not mentioned in the final judgment. It is not mentioned in the court of appeals' opinion. Because the underlying lawsuit has nothing to do with a back pay award, Carpenter's attempt to use the Policy's back pay provision to circumvent the definition of "Loss" and the Severance Pay Exclusion fails.

Carpenter ignores these controlling principles and, instead, argues that back pay colloquially means "owed but unpaid compensation for past performance." ECF 56 at 27. He goes on to cite the Court's previous order suggesting he had to perform additional work to be entitled to the severance payment. EDF 56 at 35. The Court should reject Carpenter's arguments for several reasons.

First, Twin City respectfully maintains that, to the extent this Court found that the severance payment was intended to compensate Carpenter for additional work performed, the Court erred. The jury expressly found that Carpenter did not "perform compensable work staying on as long as needed to help make the asset sale happen." App. at 179. He performed no additional work; all that he did was agree that his ultimate separation from Southwest would be when Southwest, not Carpenter, chooses. To entice Carpenter to stay on as a Southwest employee for as long as it suited Southwest, the Potashniks promised to pay him severance that became due after he performed the condition precedent—staying with the company until the sale which marked the end of his employment with Southwest.

Second, Carpenter's dictionary definitions are consistent with Twin City's position that back pay is a remedy for such things as past discrimination. For example, if an employee in a protected class performs work but is underpaid for that work due to discrimination, he or she may be entitled to back pay as an equitable award to compensate for past work. But that concept does not morph an ordinary breach of contract claim in the employment setting into back pay, which is inherently an equitable remedy.

Indeed, no Texas court has ever characterized ordinary contract damages as back pay. Certainly, Carpenter has cited no such case. So, what he is really asking this Court to do is *change* Texas law. He asks for this change, not to advance any broader public policy purpose; only to force Twin City, which never contracted with him, to pay that which it expressly excluded from coverage. Carpenter requests too much. As the Fifth Circuit instructs: "[A] federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018); *see also D'Arcy Petroleum, LLC v. Buster*, No. 3:19-cv-02770-M, 2020 WL 13157811, *10 (N.D. Tex. Aug 17, 2020) (same).

Third, and perhaps most importantly, Carpenter's argument that an employer's liability for compensation the employer agreed to pay but failed to pay in violation of an enforceable agreement is a covered back pay award renders all claims for salaries, wages, and bonuses covered *despite* being expressly carved out of the Policy's definition of "Loss." Attempting to address this conundrum, Carpenter offers a series of hypothetical examples he claims supports his view that certain claims for salaries, wages, and bonuses can still be excluded. *See* ECF 56 at 28-31. But a careful review of each example only underscores the futility of his argument.

In his first example, employee Jill filed a complaint with the Equal Employment

Opportunity Commission, accusing her employer of engaging in a pattern and practice of discrimination (unequal pay). ECF 56 at 28. The case settled, with the employer agreeing to monetary relief—$8.4 million to rectify the discrimination-fueled pay gap. It also agreed to non-monetary relief—hiring additional personnel for training, monitoring, and reporting to prevent discrimination. According to Carpenter, the $8.4 settlement is covered as back pay but the requirement to hire additional personnel is not because their wages are not a component of a back pay award. Carpenter is correct that the $8.4 million is covered as back pay since it, unlike the underlying judgment here, is an equitable award to resolve a charge of discrimination. He is also correct that the non-monetary relief is not covered—but not for the reasons he gives. It is not covered because the Policy's definition of "Loss" excludes non-monetary relief. App. at 28.

In his second example, wrongfully terminated Jack paid Mitt $125,000 to help him find replacement employment after he was wrongfully terminated. ECF 56 at 29. Jack then sued his employer for wrongful termination and recovered $500,000, which he would have been able to earn but for the wrongful termination, plus the money he paid to Mitt to mitigate his damages. According to Carpenter, the $500,000 is covered as back pay but the $125,000 is not since Mitt's salary is not a component of a back pay award. Carpenter is correct that the $500,000 is covered as back pay since it, unlike the underlying judgment here, is an equitable award for the wrongful termination. The money paid to Mitt may also be covered since the definition of "Loss" includes "damages" resulting from a "Claim." Once Jack paid Mitt to mitigate his damages, the payment became part of Jack's claimed damages (not an employee's claim for unpaid wages) resulting from the wrongful termination. *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 930 (5th Cir. 1999) (holding out-of-pocket expenses "for the cost of finding another job and relocating his family" "are in the nature of consequential damages").

27

In his third example, Julia sent a demand letter to her employer threatening a statutory claim for wrongful termination. ECF 56 at 29-30. The employer agreed to reinstate Julia's position, but had to hire a temporary employee to fill it until Julia was available to return to work. According to Carpenter, "The policy excludes wages that will be paid to the temporary worker, because those wages are not a component of a back pay or front pay." ECF 56 at 30. Like his other examples, no employee claimant asserted a claim for an unpaid salary, wage, or bonuses. The only claim asserted was by Julia, who sought non-monetary relief (the reinstatement of her position), which is excluded from the definition of "Loss."

In his fourth example, Josh filed a charge of discrimination with the EEOC because his employer would not provide a sign language interpreter. ECF 56 at 30. The case settled with the employer agreeing to hire a sign language interpreter. According to Carpenter, "The policy excludes the interpreter salary, because it is not a component of a back pay or front pay." ECF 56 at 30. Once again, no employee claimant asserted a claim for an unpaid salary, wage, or bonuses. The only claim asserted was by Josh, who sought non-monetary relief (an accommodation) which is excluded from the definition of "Loss."

In his fifth example, Jane was constructively discharged as a result of her employer's sexual harassment. ECF 56 at 31. She sued her employer and recovered $237,000 "in back pay for what Jane would have earned in the past if the employer had not constructively discharged her," as well as $35,000 she paid to a bodyguard for protection. According to Carpenter, the $237,000 is covered as back pay but the $35,000 is not since the bodyguard payment is not component of a back pay award. Carpenter is correct that the $237,000 is covered as back pay since it, unlike the underlying judgment here, is an equitable award for discrimination and constructive discharge. The money Jane paid the bodyguard may also be covered since the definition of "Loss" includes "damages"

28

resulting from a "Claim." Once Jane paid the bodyguard, the payment became part of her claimed damages (not an employee's claim for unpaid wages) resulting from the employer's harassment and vandalism.

Ultimately, none of Carpenter's examples demonstrates a situation where the language carving out claims for salaries, wages, and bonuses from the definition of "Loss" is given effect. Under his construction of the Policy, this carve-out language is rendered meaningless, underscoring the futility of his argument. *Martindale Lumber Co. v. Bituminous Cas. Corp.*, 625 F.2d 618, 623 (5th Cir. 1980) ("[A]n insurance policy is construed in its entirety so as to effectuate the intention of the parties, and in particular the courts do not interpret any provision so as to render other insuring provisions ineffective or meaningless."). Moreover, and tellingly, each of his examples that involve an actual back pay award to compensate the claimant for wrongfully termination, discrimination, and harassment—all claims that command an equitable pack pay award. Carpenter thus tacitly concedes that back pay is not a remedy for an employer's mere breach of a promise to pay a particular wage or bonus.

Fourth, construing the Policy as covering Carpenter's claimed severance allowance once again incentivizes employers to breach their payment obligations—the classic moral hazard. *See supra; see also* ECF No. 20 at 2-3, n. 3. For example, an insured could pay (only) $33,000 in premiums for an employment practices liability policy providing $1 million in coverage; hire a workforce, promising to pay them a combined $1 million in compensation; breach its promise after accepting labor valued at $1 million; and turn the resulting liability over to Twin City, deriving a $967,000 windfall. The Policy's exclusions, not to mention basic standards of contract interpretation, preclude such an unreasonable outcome. *See Dailey v. Cordis Corp.*, No. 3:12-cv-518-0, 2013 WL 1245560, *4 (N.D. Tex. March 26, 2013) (Under Texas law, "the Court should

not construe a contract provision in a manner that is unreasonable or absurd."); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (courts should avoid, when possible, construction that is unreasonable, inequitable, and oppressive).

For all of these reasons, the underlying judgment for the allowance that became due when Carpenter's employment with Southwest ended is not covered. Twin City requests the Court to deny Carpenter's motion and reconsider its denial of Twin City's motion, which Twin City adopts and incorporates herein. *See* ECF 19, 20 & 21.

## CONCLUSION

Twin City requests the Court to deny Carpenter's motion for summary judgment and reconsider the order denying Twin City's motion for summary judgment, which Twin City adopts and incorporates herein. Twin City requests all additional relief to which it may be entitled.

Respectfully submitted,

By:     */s/ Steven J. Knight*
     CHRISTINE KIRCHNER
     State Bar No. 00784403
     c.kirchner@chamberlainlaw.com
     STEVEN J. KNIGHT
     State Bar No. 24012975
     steven.knight@chamberlainlaw.com
     CHRIS M. LEMONS
     State Bar No. 24094799
     chris.lemons@chamberlainlaw.com
     CHAMBERLAIN, HRDLICKA, WHITE,
     WILLIAMS & AUGHTRY, P.C.
     1200 Smith Street, Suite 1400
     Houston, Texas 77002
     (713) 658-1818

     COUNSEL FOR TWIN CITY

MICHAEL W. JOHNSTON
State Bar No. 10840300
johnston@johnstonlegalgroup.com
JOHNSTON LEGAL GROUP P.C.
1616 Wabash Avenue
Fort Worth, Texas 76107-6598
(817) 820-0825

LOCAL COUNSEL FOR TWIN CITY

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record by electronic service on October 31, 2024.

_/s/ Steven J. Knight_
STEVEN J. KNIGHT