IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:23-CV-00769-N |
| TWIN CITY FIRE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| *Defendant* | § | |

**DEFENDANT'S APPENDIX IN SUPPORT OF
ITS RESPONSE TO CARPENTER'S MOTION FOR SUMMARY JUDGMENT**

Twin City Fire Insurance Company files this Appendix in support of its Response to Carpenter's Motion for Summary Judgment. The Appendix consists of the following documents.

| DOCUMENT DESCRIPTION | APPENDIX PAGE |
|---|---|
| Declaration of Steven Knight | App. 000001-000002 |
| Declaration of Joseph M. Coppola | App. 000003-000004 |
| Twin City Private Choice Encore Policy No. KB 0229269 | App. 000005-000094 |
| Carpenter's Original Petition | App. 000095-000107 |
| Twin City's Reservation of Rights Letter | App. 000108-000113 |
| Carpenter's Second Amended Petition | App. 000114-000133 |
| Carpenter's Third Amended Petition | App. 000134-000157 |
| Initial Settlement Demand | App. 000158-000161 |
| Response to Settlement Demand | App. 000162-000164 |
| Charge of the Court | App. 000165 - 000189 |
| Final Judgment | App. 000190 - 000196 |
| Reporter's Record Volume 1 of 11 – Pretrial Motions | App. 000197-000201 |

| Reporter's Record Volume 2 of 11 – Trial on Merits | App. 000202-000211 |
| Reporter's Record Volume 4 of 14 – Trial on Merits | App. 000212-000230 |
| Reporter's Record Volume 5 of 14 – Trial on Merits | App. 000231-000236 |
| Reporter's Record Volume 6 of 14 – Trial on Merits | App. 000237-000247 |
| Reporter's Record Volume 10 of 14 – Trial on Merits | App. 000248-000254 |
| Reporter's Record Volume 12 of 14 – Trial on Merits | App. 000255-00269 |

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.

By: _/s/Christine Kirchner_
CHRISTINE KIRCHNER
State Bar No. 00784403
c.kirchner@chamberlainlaw.com
STEVEN J. KNIGHT
State Bar No. 24012975
steven.knight@chamberlainlaw.com
CHRIS M. LEMONS
State Bar No. 24094799
chris.lemons@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 658-1818

COUNSEL FOR TWIN CITY FIRE INSURANCE COMPANY

MICHAEL W. JOHNSTON
State Bar No. 10840300
johnston@johnstonlegalgroup.com
JOHNSTON LEGAL GROUP P.C.
1616 Wabash Avenue
Fort Worth, Texas 76107-6598
(817) 820-0825

LOCAL COUNSEL FOR TWIN CITY FIRE INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record by electronic service on October 31, 2024:

Amy E. Gibson
amy@gwfirm.com
David L. Wiley
david@gwfirm.com
GIBSON WILEY PLLC
1500 Jackson Street # 109
Dallas, Texas 75201

      */s/Christine Kirchner*
CHRISTINE KIRCHNER

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



| | |
|---|---|
| JEFFREY W. CARPENTER, | § |
| | § |
| *Plaintiff* | § |
| | § |
| v. | § |
| | § CIVIL ACTION NO. 3:23-CV-00769-N |
| TWIN CITY FIRE INSURANCE | § |
| COMPANY, | § |
| | § |
| *Defendant* | § |

**DECLARATION OF STEVEN J. KNIGHT**

1. My name is Steven J. Knight. I am over the age of 21, of sound mind, have never been convicted of a felony, and am competent to make this declaration. Every statement herein is within my personal knowledge and is true and correct.

2. I am a shareholder of Chamberlain, Hrdlicka, White, Williams & Aughtry, and I am one of the attorneys of record for Twin City Fire Insurance Company in the above styled matter. The appendix in support of Twin City's motion for summary judgment and brief in support thereof includes true and correct copies of public court filings that I obtained.

3. Specifically, the appendix includes true and correct copies of the following court filings from a lawsuit styled *Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc., et al.*, Cause No. CC-08-02072-E; Dallas County Court at Law No. 5: Carpenter's Original Petition; Carpenter's Second Amended Petition; Carpenter's Third Amended Petition; Charge of the Court; and Final Judgment. I obtained from these court filings from the website, https://www.dallascounty.org/services/record-search/

4. The appendix also includes the following true and correct copies of excerpts from the trial of the Carpenter lawsuit: Reporter's Record Volume 1 (pages 1-3, 126, and 128); Reporter's Record Volume 2 (pages 1-4, 198, 204-206, 209, and 228); Reporter's Record Volume 4 (pages 1-5, 8, 131-133, 191-192, 199, 215-216, 229-230, 235-237); Reporter's Record Volume 5 (pages 1-4, 130, and 193); Reporter's Record Volume 6 (pages 1-6, 46-48, and 72-73); Reporter's Record Volume 10 (pages 1-3, 22, 32, 68, and 70); and Reporter's Record Volume 12 (pages 1-5, Plaintiff's Exhibit 64, and Defendant's Exhibit 24). I obtained directly from the Dallas Court of Appeals in Cause No. 05-19-00238-CV

5. I declare under penalty of perjury that the foregoing is true and correct."

EXECUTED in Harris County, Texas on June 27, 2023.

_____
STEVEN J. KIGHT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:23-CV-00769-N |
| TWIN CITY FIRE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| *Defendant* | § | |

## DECLARATION OF JOSEPH M. COPPOLA

1. My name is Joseph M. Coppola. I am over the age of 21, of sound mind, have never been convicted of a felony, and am competent to make this declaration. Every statement herein is within my personal knowledge and is true and correct.

2. I am a ___ for Hartford Fire Insurance Company ("Hartford"), which is affiliated with Twin City Fire Insurance Company. I am familiar with the manner in which Twin City's records are created and maintained by virtue of my duties and responsibilities.

3. The following documents that are included in the appendix in support of Twin City's motion for summary judgment and brief in support thereof are true and correct copies of the originally maintained paper or electronic documents from the claims file: Twin City Private Choice Encore Policy No. KB 0229269; Twin City's original reservation of rights letter dated June 10, 2008; the settlement demand dated February 11, 2016 received from a law firm called Gibson Wiley PLLC; and the response to the demand dated June 1, 2016, issued by Twin City's counsel.

4. The records were made at or near the time of each act, event, condition, opinion or diagnosis set forth in the records, and it is the regular practice of Twin City, or individuals or entities performing the claims function on Twin City's behalf, to make and/or maintain this type of record at or near the time of each act, event, condition, opinion, or diagnosis set forth in the record.

5. The records were made by, or from information transmitted by, persons with knowledge of the matters set forth. The records were kept in the course of regularly conducted business activity. It is the regular practice of the business activity to make and/or maintain the records.

6. I declare under penalty of perjury that the foregoing is true and correct."

EXECUTED in Bergen County, New Jersey, on June 27, 2023.

JOSEPH M. COPPOLA



## Hartford Financial Products

### Policy Separator Page

Insured Name:     SOUTHWEST HOUSING MANAGEMENT

Policy Number:    KB 0229269

Effective Date:    3/04/2007

Department:    H53    MIDDLE MARKET CORE BUSINESS

Underwriter:    SUSAN CARLEY

Job User:    Barber, Billie

Job Number:    570289

Job Name:    EPLPRINT

Date Printed:    3/08/2007    14:33:30

Endorsement No.: 14

This endorsement, effective on      3/04/08      at 12:01 A.M. standard time, forms a part of

Policy No.      00 KB 0229269-07      of the      TWIN CITY FIRE INSURANCE CO.

Issued to      SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### POLICY CHANGE

| | | |
|---|---|---|
| 1. ☐ | Policy Premium Changed To: $ | 9. ☐ Deductible/Retention Changed To: |
| 2. ☐ | Insured's Name Changed To: (see description or endorsement listed below) | 10. ☒ Expiration Date Is Changed To:  05/05/2008 |
| 3. ☐ | Insured's Address Changed To: (see description or endorsement listed below) | 11. ☐ Additional Insured(s) or Subject(s) of coverage deleted |
| | | 12. ☐ Policy Provision(s) Added |
| 4. ☐ | Anniversary Date Is Changed To: | 13. ☐ Policy Provision(s) Deleted |
| 5. ☐ | Additional Insured(s) or Subject(s) of coverage added | 14. ☐ Exercise Discovery Period, Extended Reporting Period or Tail Coverage Option |
| 6. ☒ | Additional Premium: $ 5,730 | |
| 7. ☐ | Return Premium: $ | 15. ☐ Other (see description or endorsement listed below) |
| 8. ☐ | Limit of Liability Changed To: $ | |

**Description of Policy Changes:**

IT IS HEREBY AGREED AND UNDERSTOOD THAT EFFECTIVE 03/04/2008 THE POLICY IS EXTENDED TO 05/05/2008 FOR AN ADDITIONAL PREMIUM OF $5,730.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Name and number of Endorsement(s) made part of the policy:**

HG 00 H008 00 0202          © 2002, The Hartford

App. 000006


THE HARTFORD

Date:   MARCH 8, 2007

        LORRAINE A KEHM
        LOCKTON COMPANIES OF COLORADO,
        INC.
        8110 EAST UNION AVE
        SUITE 700
        DENVER, CO 80237-2984


RE:   SOUTHWEST HOUSING MANAGEMENT

      **POLICY NUMBER**:   00 KB 0229269-07   3/04/2007


Dear   LORRAINE,

Enclosed please find an original and your copy of the policy for the above captioned account.

Thank you very much.


Sincerely,


SUSAN CARLEY


Enclosures


RN 00 R055 00 1098

App. 000007

TWIN CITY FIRE INSURANCE CO.
INDIANAPOLIS, IN 46268-0930

stock insurance company, herein
.led the Insurer



THE
HARTFORD

# PRIVATE CHOICE ENCORE! POLICY

## DECLARATIONS

**Policy Number:**    00 KB 0229269-07

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5: LIABILITY COVERAGE PARTS ELECTIONS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE, PROVIDED THAT SUCH NOTICE IS GIVEN NOT LATER THAN 60 DAYS AFTER ANY MANAGER BECOMES AWARE THAT SUCH CLAIM HAS BEEN MADE. DEFENSE COSTS ARE APPLIED AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**ITEM 1:  Named Entity and Address:**

SOUTHWEST HOUSING MANAGEMENT
5910 NORTH CENTRAL EXPRESSWAY
SUITE #1145
DALLAS, TX 75206

**ITEM 2:  Producer's Name and Address:**

81227
LOCKTON COMPANIES OF COLORADO,
INC.
8110 EAST UNION AVE
DENVER, CO 80237-2984

**ITEM 3:  Policy Period:**

**(A)**    Inception Date:        3/04/07

**(B)**    Expiration Date:        3/04/08
12:01 a.m. local time at the address shown in ITEM 1

**ITEM 4:  Premium:**        $33,706

PE 00 H002 02 1204                    © 2004, The Hartford                    Page 1 of 3

**ITEM 5:    Liability Coverage Part Elections:**

Only those Coverage Parts and Coverage Features that are designated with an "X" are included under this Policy

☐ Combined Aggregate Limit of Liability For All Coverage Parts $____N/A____

☐ Defense Outside the Limit of Liability

| COVERAGE PART | AGGREGATE LIMIT OF LIABILITY | DEDUCTIBLE | PRIOR OR PENDING DATE | COVERAGE FEATURES |
|---|---|---|---|---|
| ☐ Directors, Officers and Entity Liability | $ NOT COVERED | Insured Person Liability $ 0 <br><br> Corporate Reimbursement $ NOT COVERED | NOT COVERED | ☐ **Entity Liability Coverage** Deductible: $ NOT COVERED <br> Prior or Pending Date: NOT COVERED |
| ☒ Employment Practices Liability | $ 1,000,000 | $ 75,000 | 03/04/06 | ☐ **Third Party Liability Coverage** Sublimit of Liability: $ NOT COVERED <br> Deductible: $ NOT COVERED <br> Prior or Pending Date: NOT COVERED |
| ☐ Fiduciary Liability | $ 1,000,000 | $ 2,500 | 03/04/06 | ☒ **Settlement Program Coverage** Deductible: $ 0 <br> Prior or Pending Date: 03/04/06 |
| ☐ Miscellaneous Professional Liability | $ NOT COVERED | $ NOT COVERED | NOT COVERED | ☐ Retroactive Date: NOT COVERED |

**ITEM 6:    Non-Liability Coverage Part Elections:**

Only those Coverage Parts that are designated with an "X" are included under this Policy

| COVERAGE PART | LIMIT(S) OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| ☒ Crime | See Crime Coverage Part Dec. Page, Form No. PE00H11701 0904 | See Crime Coverage Part Dec. Page, Form No. PE00H11701 0904 |
| ☒ Kidnap and Ransom/Extortion | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. PE00H17101 0904 | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. PE00H17101 0904 |

PE 00 H002 02 1204

© 2004, The Hartford

App. 000009

**(A)** Duration:                12 MONTHS

**(B)** Premium*:               100%

\* Premium for the Extended Reporting Period elected shall be the indicated percentage of the sum of the annual premium specified for all Liability Coverage Parts, plus the annualized amounts of any additional premiums charged during the Policy Period.

**ITEM 8:    Endorsements:**

This Policy includes the following endorsements at issuance:

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**ITEM 9:    Address For Notices to Insurer:**

**For Claims other than Kidnap and Ransom/Extortion:**

The Hartford
Claims Department
Hartford Financial Products
2 Park Ave., 5th Floor
New York, New York  10016

**For all notices other than Claims:**

The Hartford
Compliance Department
Hartford Financial Products
2 Park Ave., 5th Floor
New York, New York  10016

For Kidnap and Ransom/Extortion Claims see Kidnap and Ransom/Extortion Coverage Part Declarations.

This Policy shall not be valid unless countersigned by the Insurer's duly authorized representative.

Date of Issue: _____          Countersigned by: _____

**Authorized Representative**

App. 000010

# PRIVATE CHOICE ENCORE! POLICY
## CRIME COVERAGE PART DECLARATIONS



THE
HARTFORD

In return for the payment of the premium, and subject to all the terms of this Coverage Part, we agree with you to provide the insurance stated in this Coverage Part.

**1.  Coverages, Limits of Insurance and Deductibles:**

Insuring Agreements, Limits of Insurance and Deductible Amounts shown below are subject to all of the terms of this Coverage Part that apply.

| Insuring Agreements Forming Part of This Coverage Part | Limit(s) of Insurance | Deductible Amount(s) |
|---|---|---|
| 1.  Employee Theft | $ 1,000,000 | $ 25,000 |
| 2.  Depositors Forgery or Alteration | $ 1,000,000 | $ 25,000 |
| 3.  Inside The Premises - *Money, Securities and Other Property* | $ 1,000,000 | $ 25,000 |
| 4.  Outside The Premises - *Money, Securities and Other Property* | $ 1,000,000 | $ 25,000 |
| 5.  Computer and Funds Transfer Fraud | $ 1,000,000 | $ 25,000 |
| 6.  Money Orders and Counterfeit Currency | $ 50,000 | $ 0 |

**2.  Cancellation of Prior Insurance:**  By acceptance of this Coverage Part you give us notice canceling prior policies or bonds numbered _____N/A_____ . The cancellation(s) is effective at the time this Coverage Part becomes effective.

**3.  Form Numbers of Endorsements Forming Part of This Coverage Part When Issued:**

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

App. 000011

# PRIVATE CHOICE ENCORE! POLICY
## KIDNAP AND RANSOM/EXTORTION COVERAGE PART
### DECLARATIONS



**THE HARTFORD**

In return for the payment of the premium, and subject to all the terms of this Coverage Part, we agree with you to provide the insurance stated in this Coverage Part.

**1.    Coverages, Limits of Insurance and Deductibles:**

Insuring Agreements, Limits of Insurance and Deductible Amounts shown below are subject to all of the terms of this Coverage Part that apply.

| Insuring Agreements Forming Part of This Coverage Part | Limit(s) of Insurance | Deductible Amount(s) |
|---|---|---|
| A.   Kidnap/Ransom/Extortion | $  1,000,000 | $  0 |
| B.   Expense | $  1,000,000 | $  0 |
| C.   Custody/Delivery | $  1,000,000 | $  0 |
| D.   Personal Accidental Death, Dismemberment & Disability Loss | | |
| (i)   Loss of Extremity | $  250,000 | $  0 |
| (ii)  All Other Personal Accidental Death, Dismemberment & Disability Loss | $  500,000 | $  0 |
| Coverage Part Limit of Insurance (Maximum Limit of Insurance for all loss under this Coverage Part): | $  N/A | |

**Independent Security Consultant:**    Control Risks Group

**3.    Notice under Section IV. General Agreements, (B) Conditions Precedent to Liability must be addressed to the Insurer's Independent Security Consultant:**

Control Risks Group
1600 K Street, NW
Suite 1600
Washington, DC 20006
Telephone (202) 449-3330 (main number – 9:00am-5:00pm EST)
011 44 20 7481 1851 (emergency number, London, England)
011 44 20 7970 2100 (main number, London, England)

(All Control Risks Group phone numbers accept collect calls.)

and to:

The Hartford
Attn: Joseph Coppola
Hartford Financial Products
Claims Department – Middle Market
2 Park Ave., 5th Floor
New York, New York  10016
212-277-0970

**4.    Form Numbers of Endorsements Forming Part of This Coverage Part When Issued:**

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**Cancellation of Prior Insurance:** By acceptance of this Coverage Part you give us notice canceling prior policies or bonds numbered ____N/A____. The cancellation(s) is effective at the time this Coverage Part becomes effective.

**ENDORSEMENT**

**GU 207**
**(6-78)**

This endorsement, effective on    3/04/07

at 12:01 A.M. standard time, forms a part of

Policy No.  00 KB 0229269-07    of the

TWIN CITY FIRE INSURANCE CO.

Issued to    SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

SCHEDULE OF FORMS AND ENDORSEMENTS

|   |   |   |   |
|---|---|---|---|
|   | RN00N02600 | 5/93 | IN WITNESS PAGE |
|   | PE00H01202 | 9/04 | PRIVATE CHOICE ENCORE! POLICY |
|   | PE00H01400 | 5/02 | EMPLOYMENT PRACTICES LIABILITY COVERAGE PART |
|   | PE00H01500 | 5/02 | FIDUCIARY LIABILITY COVERAGE PART |
|   | PE00H11801 | 9/04 | CRIME COVERAGE PART |
|   | PE00H17201 | 9/04 | KIDNAP AND RANSOM/EXTORTION COVERAGE PART |
| 1 | PE00H07401 | 8/05 | ADD SUBSIDIARY ENDORSEMENT |
| 2 | PE00H11100 | 3/04 | HIPAA COVERAGE (INCLUDING SUBLIMIT FOR PENALTIES) |
| 3 | PE00H12800 | 4/04 | JOINT INSURED |
| 4 | PE00H16000 | 4/04 | JOINT VENTURE, GENERAL PARTNERSHIP, LIMITED PARTNERSHIP OR LIMITED LIABILITY COMPANY |
| 5 | PE00H17500 | 4/04 | AMEND TERRITORY |
| 6 | PE00H24300 | 11/05 | ENCORE! PLUS ENDORSEMENT (COMMON TERMS AND CONDITIONS) |
| 7 | PE00M02400 | 9/04 | SPECIFIC INDIVIDUAL CLAIMANT EXCLUSION |
| 8 | PE42H05201 | 5/04 | TEXAS AMENDATORY - COMMON TERMS AND CONDITIONS ENDORSEMENT |
| 9 | PE42H08800 | 5/04 | TEXAS NUCLEAR LIABILITY EXCLUSION |
| 10 | PE00H24700 | 1/06 | AMEND EMPLOYEE BENEFIT PLANS PROVISIONS |
| 11 | PE00H23900 | 4/05 | GENETIC MAKEUP ENDORSEMENT |
| 12 | HR42H00300 | 6/05 | TEXAS CANCELLATION AND NONRENEWAL ENDORSEMENT |

Rev. Ed. Date (04/02)
GU 207 (6-78)

# ENDORSEMENT

GU 207
(6-78)

This endorsement, effective on    3/04/07

at 12:01 A.M. standard time, forms a part of

Policy No.    00 KB 0229269-07        of the

TWIN CITY FIRE INSURANCE CO.

Issued to    SOUTHWEST HOUSING MANAGEMENT

David Zwiener, President

### SCHEDULE OF FORMS AND ENDORSEMENTS

| 13 | PE42H17700 | 9/04 | TEXAS CHANGES |
| | HG00H05600 | 4/06 | IMPORTANT NOTICE TO POLICYHOLDERS – TERRORISM RISK INSURANCE ACT |
| | RN42N01400 | 1/93 | IMPORTANT NOTICE |
| | RN42R03001 | 10/98 | TEXAS NOTICE |

Rev. Ed. Date (04/02)
GU 207 (6-78)

App. 000014

# PRIVATE CHOICE ENCORE! POLICY

NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5: COVERAGE ELECTIONS PROVIDES CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE, PROVIDED THAT SUCH NOTICE IS GIVEN NOT LATER THAN 60 DAYS AFTER ANY MANAGER BECOMES AWARE THAT SUCH CLAIM HAS BEEN MADE. DEFENSE COSTS ARE APPLIED AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

## COMMON TERMS AND CONDITIONS

I.    **TERMS AND CONDITIONS**

    **(A)** All Coverage Parts included in this Policy are subject to the following Common Terms and Conditions. If any provision in these Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

    **(B)** Except as otherwise provided by specific reference to other Coverage Parts, the terms and conditions of each Coverage Part shall apply only to such Coverage Part.

II.    **COMMON DEFINITIONS**

The following terms, whether used in the singular or plural, shall have the meanings specified below:

    **(A)** **"Affiliate"** means any insurance company controlling, controlled by or under common control with the Insurer.

    **(B)** **"Application"** means the application for this Policy, including any materials or information submitted therewith, such application shall be on file with the Insurer and deemed a part of and attached hereto, as if physically attached hereto. **"Application"** also means an application for any policy in an uninterrupted series of policies issued by the Insurer, or an **Affiliate**, of which this Policy is a renewal or replacement.

    **(C)** **"Claim"** shall have the meaning specified for such term in each Coverage Part.

    **(D)** **"Debtor in Possession"** means a "debtor in possession" as such term is defined in Chapter 11 of the United States Bankruptcy Code as well as any equivalent status under any similar law.

    **(E)** **"Defense Costs"** means reasonable and necessary legal fees and expenses incurred in the investigation, defense or appeal of a **Claim**. Defense Costs shall include the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds. **Defense Costs** shall not include salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**.

    **(F)** **"Employee"** means any past, present, or future:

        **(1)** employee of an **Insured Entity** in such person's capacity as an employee, including any part time, seasonal, temporary, leased, or loaned employee; or

        **(2)** volunteer with an **Insured Entity** in such person's capacity as a volunteer.

    However, for purposes of the Crime Coverage Part, see the definition of **Employee** within the Crime Coverage Part, Section IV. DEFINITIONS, (D) Employee. For purposes of the Kidnap and

Ransom/Extortion Coverage Part, see the definition of **Employee** within the Kidnap and Ransom/Extortion Coverage Part, Section II. DEFINITIONS, (B) Employee.

**(G)** "**ERISA**" means the Employee Retirement Income Security Act of 1974.

**(H)** "**Financial Insolvency**" means the status of an **Insured Entity** as a result of:

    **(1)** the appointment of any conservator, liquidator, receiver, rehabilitator, trustee, or similar official to control, supervise, manage or liquidate such **Insured Entity**; or

    **(2)** such **Insured Entity** becoming a **Debtor in Possession**.

**(I)** "**Insured Entity**" means:

    **(1)** the **Named Entity**; or

    **(2)** any **Subsidiary**.

    **Insured Entity** shall include any such entity as a **Debtor in Possession**.

**(J)** "**Insured Person**" shall have the meaning specified for such term in each Coverage Part.

**(K)** "**Insureds**" shall have the meaning specified for such term in each Coverage Part.

**(L)** "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

**(M)** "**Liability Coverage Part**" means the Directors, Officers and Entity Liability, Employment Practices Liability, Fiduciary Liability and Miscellaneous Professional Liability Coverage Parts, if included in ITEM 5 of the Declarations.

**(N)** "**Loss**" shall have the meaning specified for such term in each Coverage Part.

**(O)** "**Manager**" means any natural person who is a past, present or future:

    **(1)** duly elected or appointed director, officer, member of the board of managers or management committee member of an **Insured Entity**;

    **(2)** in-house general counsel of an **Insured Entity**; or

    **(3)** executive of an **Insured Entity** created outside the United States of America to the extent that such executive holds a position equivalent to those described in (1) or (2),

For purposes of the Kidnap and Ransom/Extortion Coverage Part, see the definition of **Manager** within the Kidnap and Ransom/Extortion Coverage Part, Section II. DEFINITIONS, (P) Manager.

in such person's capacity in such position.

**(P)** "**Named Entity**" means the entity named in ITEM 1 of the Declarations.

**(Q)** "**Non-Liability Coverage Part**" means the Crime and Kidnap and Ransom/Extortion Coverage Parts in ITEM 6 of the Declarations.

**(R)** "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 3 of the Declarations or any earlier cancellation date.

App. 000016

**(S)** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, odors, noise, lead, oil or oil product, radiation, asbestos or asbestos-containing product, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes, without limitation, material to be recycled, reconditioned or reclaimed.

**(T)** **"Subsidiary"** means any:

    **(1)** corporation in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the outstanding securities representing the right to vote for the election of the board of directors of such corporation;

    **(2)** limited liability company in which and so long as the **Named Entity** owns or controls, directly or indirectly, the right to elect, appoint or designate more than 50% of such entity's managers;

    **(3)** corporation operated as a joint venture in which and so long as the **Named Entity** owns or controls, directly or indirectly, exactly 50% of the issued and outstanding voting stock and which, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock of such corporation, the **Named Entity** solely controls the management and operation of such corporation; or

    **(4)** foundation, charitable trust or political action committee in which and so long as such entity or organization is controlled by the **Named Entity** or any **Subsidiary** as defined (1) through (3) above.

**(U)** **"Wrongful Act"** shall have the meaning specified for such term in each Coverage Part.

## III.   COVERAGE EXTENSIONS

**(A)** **Spousal Liability Coverage**

Coverage shall apply to the lawful spouse of an **Insured Person** for a **Claim** made against such spouse, provided that:

    **(1)** such **Claim** arises solely out of:

        **(a)** such person's status as the spouse of an **Insured Person;** or

        **(b)** such spouse's ownership of property sought as recovery for a **Wrongful Act**;

    **(2)** the **Insured Person** is named in such **Claim** together with the spouse; and

    **(3)** coverage of the spouse shall be on the same terms and conditions, including any applicable Deductible, as apply to coverage of the **Insured Person** for such **Claim**.

No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse.

**(B)** **Estates and Legal Representatives**

In the event of the death, incapacity or bankruptcy of an **Insured Person,** any **Claim** made against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** shall be deemed to be a **Claim** made against such **Insured Person**. No coverage shall apply to any **Claim** for a **Wrongful Act** of such estate, heirs, legal representatives or assigns.

## IV.   LIMIT OF LIABILITY

Solely with respect to all **Liability Coverage Parts:**

App. 000017

(A)  The Limit of Liability for each Coverage Part in ITEM 5 of the Declarations shall be the maximum aggregate amount that the Insurer shall pay under such Coverage Part for all **Loss** from all **Claims** covered under such Coverage Part.

(B)  Notwithstanding the above, if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

(1)  such single Limit of Liability shall be the maximum aggregate amount that the Insurer shall pay for all **Loss** from all **Claims** covered under all included Coverage Parts combined; and

(2)  any amount specified as a Limit of Liability for any individual Coverage Part in ITEM 5 of the Declarations shall be subject to, part of, and not in addition to, the amount stated as the Combined Aggregate Limit of Liability For All Coverage Parts.

## V.    DEFENSE COSTS

Solely with respect to all **Liability Coverage Parts:**

(A)  **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

(B)  Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then payment of **Defense Costs** shall be in addition to any applicable Limit of Liability, provided that:

(1)  if a Limit of Liability is specified for any individual Coverage Part in ITEM 5 of the Declarations, then the maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under such Coverage Part shall be 50% of such Limit of Liability;

(2)  if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

(a)  the single maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under all included Coverage Parts combined shall be 50% of such Limit of Liability; and

(b)  any amount of **Defense Costs** available for any individual Coverage Part shall be subject to, part of, and not in addition to, the single maximum amount of **Defense Costs** available for all included Coverage Parts combined specified in (a) above; and

(3)  if the amount available for **Defense Costs** in (1) or (2) above is exhausted by the payment of **Defense Costs**, then **Defense Costs** shall be paid by the Insurer out of any remaining applicable Limit of Liability until the exhaustion of the applicable Limit of Liability.

## VI.    DEDUCTIBLE

Solely with respect to all **Liability Coverage Parts:**

(A)  The Insurer shall pay **Loss** in excess of the Deductible applicable to each **Claim** as specified in ITEM 5 of the Declarations.

(B)  The Deductible shall be borne by the **Insureds** uninsured at the **Insureds'** own risk.

(C)  Any **Defense Costs** incurred by the Insurer shall apply to the Deductible. The **Insureds** shall reimburse the Insurer upon request for any amounts paid regarding a **Claim** that are within the applicable Deductible for such **Claim**.

(D) If a **Claim** is covered under more than one Coverage Part, the applicable Deductible for each Coverage Part shall be applied separately to such **Claim**, provided that the maximum Deductible applied to such **Claim** shall not exceed the highest of such applicable Deductibles.

(E) No Deductible shall apply to **Loss** incurred by any **Insured Person** that an **Insured Entity** is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is not able to do so by reason of **Financial Insolvency.**

(F) If an **Insured Entity** is permitted or required by common or statutory law to indemnify an **Insured Person** for any **Loss,** or to advance **Defense Costs** on their behalf, and does not do so other than because of **Financial Insolvency,** then such **Insured Entity** and the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the Deductible that would have applied if such indemnification had been made.

(G) If a **Subsidiary** is unable to indemnify an **Insured Person** for any **Loss,** or to advance **Defense Costs** on their behalf, because of **Financial Insolvency,** then the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the applicable Deductible that would have applied if such indemnification had been made.

## VII.    DEFENSE AND SETTLEMENT

Solely with respect to all **Liability Coverage Parts:**

(A) The Insurer shall have the right and duty to defend any **Claim** for which the **Insureds** give notice to the Insurer, even if such **Claim** is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate.

(B) The Insurer's duty to defend any **Claim** shall cease upon exhaustion of any applicable Limit of Liability.

Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer's duty to defend any **Claim** shall cease upon exhaustion of the maximum aggregate amount of **Defense Costs** available under Section V. DEFENSE COSTS, and any applicable Limit of Liability.

If any Limit of Liability is exhausted, the premium for this Policy shall be deemed fully earned.

(C) The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

(D) The Insurer may, with the written consent of the **Insureds,** settle any **Claim** for a monetary amount that the Insurer deems reasonable.

(E) Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer may settle any **Claim** for a monetary amount that the Insurer deems reasonable and the consent of the **Insureds** shall not be required to settle a **Claim.**

(F) The **Insureds** shall give to the Insurer all information and cooperation as the Insurer may reasonably request.

## VIII.    NOTICE OF CLAIM

Solely with respect to all **Liability Coverage Parts:**

(A) As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable, provided that such notice shall be given not later than sixty (60) days

after any **Manager** becomes aware that such **Claim** has been made. Such notice shall specify the Coverage Part under which notice is being given.

**(B)** If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period** on the date that the Insurer receives the above notice.

## IX.    EXTENDED REPORTING PERIOD

**(A)** If any **Liability Coverage Part** is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under this Policy (the "Extended Reporting Period").

**(B)** To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor. The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within sixty (60) days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

**(C)** The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

**(D)** The Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the **Policy Period**.

**(E)** Coverage during the Extended Reporting Period shall apply to **Claims** made for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity. No coverage shall apply for any **Wrongful Act** occurring after such time.

**(F)** There is no separate or additional Limit of Liability for the Extended Reporting Period.

## X.    INTERRELATIONSHIP OF CLAIMS

Solely with respect to all **Liability Coverage Parts**:

All **Claims** based upon, arising from or in any way related to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

**(A)** any of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period;**

**(B)** notice of any **Wrongful Act** described above was given to the Insurer under this Policy pursuant to Section VIII. NOTICE OF CLAIM (B); or

**(C)** notice of any **Wrongful Act** described above was given under any prior insurance policy.

## XI.    ALLOCATION

Solely with respect to all **Liability Coverage Parts**:

App. 000020

If **Loss** is incurred that is partially covered and partially not covered by this Policy, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters or because a **Claim** is made against both covered and uncovered parties, such **Loss** shall be allocated as follows:

**(A)** 100% of **Defense Costs** shall be allocated to covered **Loss**; and

**(B)** **Loss** other than **Defense Costs** shall be allocated between covered and non-covered

**Loss** based upon the relative legal exposure of the parties to such matters.

## XII.    OTHER INSURANCE

If **Loss** arising from any **Claim** is insured under any other valid and collectible policy or policies, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## XIII.    CANCELLATION

**(A)** The Insurer may cancel this Policy for non-payment of premium by sending not less than 10 days notice to the **Named Entity**. This Policy may not otherwise be cancelled by the Insurer.

**(B)** Except as provided in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity, the **Insureds** may cancel this Policy by sending written notice of cancellation to the Insurer. Such notice shall be effective upon receipt by the Insurer unless a later cancellation time is specified therein.

**(C)** If the Insurer cancels this Policy, unearned premium shall be calculated on a pro rata basis. If the **Insureds** cancel this Policy, unearned premium shall be calculated at the Insurer's customary short rates. Payment of any unearned premium shall not be a condition precedent to the effectiveness of a cancellation. The Insurer shall make payment of any unearned premium as soon as practicable.

## XIV.    CHANGES IN EXPOSURE

Solely with respect to all **Liability Coverage Parts**:

**(A)  Mergers and New Subsidiaries**

If, before or during the **Policy Period**, any **Insured Entity**:

**(1)** merges with another entity such that the **Insured Entity** is the surviving entity; or

**(2)** acquires a **Subsidiary**,

then such newly merged or acquired entity and its subsidiaries, managers, directors, officers, and employees shall be **Insureds** to the extent such entities and persons would otherwise qualify as **Insureds** under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring after such merger or acquisition. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before such transaction or for any **Interrelated Wrongful Acts** thereto.

If the fair value of the assets of any newly merged or acquired entity exceed 25% of the total assets of the **Named Entity** as reflected in its most recent consolidated audited financial statements prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage under the **Liability Coverage Parts** for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

© 2004, The Hartford

App. 000021

**(B) Takeover of Named Entity**

If, during the **Policy Period**:

**(1)** the **Named Entity** merges into or consolidates with another entity such that the **Named Entity** is not the surviving entity; or

**(2)** more than 50% of the securities representing the right to vote for the **Named Entity's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert,

then coverage shall continue under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring before such transaction. No coverage shall be available for any **Wrongful Act** occurring after such transaction. Upon such transaction, this Policy shall not be cancelled and the entire premium for this Policy shall be deemed fully earned.

The **Insureds** shall give the Insurer written notice of such transaction as soon as practicable, but not later than ninety (90) days after the effective date of such transaction.

**(C) Loss of Subsidiary Status**

If, before or during the **Policy Period**, any entity ceases to be a **Subsidiary**, then coverage shall be available under the **Liability Coverage Parts** for such **Subsidiary** and its **Insured Persons**, but only for a **Wrongful Act** of such **Insureds** occurring before such transaction. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after such transaction.

## XV.    SUBROGATION

The Insurer shall be subrogated to all of the **Insureds'** rights of recovery regarding any payment of **Loss** by the Insurer under this Policy. The **Insureds** shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of any documents necessary to enable the Insurer to effectively bring suit in the name of the **Insureds**. The **Insureds** shall do nothing to prejudice the Insurer's position or any potential or actual rights of recovery.

## XVI.    APPLICATION

**(A)** The **Insureds** represent that the declarations and statements contained in the **Application** are true, accurate and complete. This Policy is issued in reliance upon the **Application**. If the **Application** contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by the Insurer, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented.

**(B)** For the purpose of determining coverage:

**(1)** knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and

**(2)** knowledge possessed by the **Named Entity's** chairman of the board, chief executive officer, chief operating officer, or chief financial officer or anyone signing the **Application** shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity**.

## XVII.    ACTION AGAINST THE INSURER

Solely with respect to all **Liability Coverage Parts**:

**(A)** No action shall be taken against the Insurer unless there shall have been full compliance with all the terms and conditions of this Policy.

App. 000022

**(B)** No **person** or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against the **Insureds** nor shall the Insurer be impleaded by the **Insureds** in any such **Claim.**

Solely with respect to the **Crime Coverage Part**:

**(A)** No legal action shall be taken against the Insurer involving loss unless the **Insured** has complied with all the terms of this Policy; and

**(B)** No legal action shall be taken against the Insurer involving loss until ninety (90) days after the **Insured** has filed proof of loss with us; and

**(C)** No legal action shall be taken against the Insurer involving loss unless such action is brought within two (2) years from the date that the **Insured** discovers such loss.

Solely with respect to the Kidnap And Ransom/Extortion Coverage Part:

No suit, action or proceeding for recovery of any claim under this Policy shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy shall have been complied with and the same be commenced within twenty-four (24) months after a claim for actual loss or expenses has been reported to the Insurer by the **Insured**.

## XVIII.    ASSIGNMENT

Assignment of interest under this Policy shall not bind the Insurer without its consent as specified in a written endorsement issued by the Insurer to form a part of this Policy.

## XIX.    BANKRUPTCY OR INSOLVENCY

Bankruptcy or insolvency of any **Insureds** shall not relieve the Insurer of any of its obligations under this Policy.

## XX.    AUTHORIZATION OF NAMED ENTITY

The **Named Entity** shall act on behalf of all **Insureds** with respect to all matters under this Policy, including, without limitation, giving and receiving of notices regarding **Claims,** cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Policy.

## XXI.    CHANGES

This Policy shall not be changed or modified except in a written endorsement issued by the Insurer to form a part of this Policy.

## XXII.    ENTIRE AGREEMENT

This Policy, including the Declarations, Common Terms and Conditions, included Coverage Part(s), **Application** and any written endorsements attached hereto, constitute the entire agreement between the **Insureds** and the Insurer relating to this insurance.

## XXIII.    NOTICES

**(A)** All notices to the **Insureds** shall be sent to the **Named Entity** at the address specified in ITEM 1 of the Declarations.

**(B)** All notices to the Insurer shall be sent to the address specified in ITEM 9 of the Declarations. Any such notice shall be effective upon receipt by the Insurer at such address.

## XXIV.    HEADINGS

PE 00 H012 02 0904
   00 KB 0229269-07    3/04/07          © 2004, The Hartford                    Page 9 of 10

The headings of the various sections of this Policy are intended for reference only and shall not be part of the terms and conditions of coverage.

## .V.   REFERENCES TO LAWS

**(A)** Wherever this Policy mentions any law, including, without limitation, any statute, Act or Code of the United States of America, such mention shall be deemed to include all amendments of, and all rules or regulations promulgated under, such law.

**(B)** Wherever this Policy mentions any law or laws, including, without limitation, any statute, Act or Code of the United States of America, and such mention is followed by the phrase "or any similar law", such phrase shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, statutes and any rules or regulations promulgated under such statutes as well as common law.

## XXVI.   COVERAGE TERRITORY

Coverage under this Policy applies worldwide.

© 2004, The Hartford

App. 000024



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

**TWIN CITY FIRE INSURANCE COMPANY**
HOME OFFICE - INDIANAPOLIS, INDIANA
ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
(A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

Brian S. Becker, Secretary

David Zwiener, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN

00 KB 0229269-07    3/04/07

App. 000025

## EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

### I.  INSURING AGREEMENTS

#### (A)  Employment Practices Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

#### (B)  Third Party Liability (Elective)

If Third Party Liability Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Third Party Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to the Third Party Liability Coverage Sublimit of Liability, Deductible, and Prior or Pending Date in Item 5 of the Declarations. Such Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this Coverage Part.

### II.  DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

#### (A)  "Benefits" means any form of compensation other than salaries, wages, bonuses, or **Stock Benefits**.

#### (B)  "Claim" means any:

##### (1)  **Employment Practices Claim**; or

##### (2)  **Third Party Claim.**

#### (C)  "Employment Practices Claim" means any:

##### (1)  written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

##### (2)  civil proceeding commenced by the service of a complaint or similar pleading;

##### (3)  formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document; or

##### (4)  arbitration proceeding commenced by a demand for arbitration,

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

**"Employment Practices Claim"** also means an audit conducted by the United States of America Office of Federal Contract Compliance Programs commenced by the receipt of a notice of violation, order to show cause, or a written demand for monetary or injunctive relief.

App. 000026

**"Employment Practices Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Employment Practices Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**"Employment Practices Claim"** shall not include any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.

(D) **"Employment Practices Wrongful Act"** means a **Wrongful Act** involving any:

(1) wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

(2) sexual or other workplace harassment, including quid pro quo and hostile work environment;

(3) employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;

(4) invasion of privacy, employment-related defamation (including libel and slander) or any employment-related misrepresentation;

(5) **Retaliation**;

(6) breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

(7) violation of the Family and Medical Leave Act.

To the extent that an **Employment Practices Claim** alleges an **Employment Practices Wrongful Act** described above, **"Employment Practices Wrongful Act"** also means a **Wrongful Act** related to the above involving any:

(1) employment-related wrongful infliction of emotional distress or mental anguish;

(2) failure to create, provide for or enforce adequate or consistent employment-related policies or procedures; or

(3) negligent retention, supervision, hiring or training.

(E) **"Independent Contractor"** means any natural person working in the capacity of an independent contractor pursuant to an **Independent Contractor Agreement**.

(F) **"Independent Contractor Agreement"** means any express contract or agreement between an **Independent Contractor** and an **Insured Entity** specifying the terms of the **Insured Entity's** engagement of such **Independent Contractor**.

(G) **"Insured Person"** means any:

(1) **Employee**;

(2) **Manager**; or

(3) regarding Insuring Agreement (A), an **Independent Contractor** provided that within 30 days of an **Employment Practices Claim** having been made against such **Independent Contractor** that the **Insured Entity** agrees in writing to indemnify such **Independent Contractor** for any **Loss** arising out of such **Claim**.

App. 000027

**(H)** **"Insureds"** means any:

    **(1)** **Insured Entity**; or

    **(2)** **Insured Person.**

**(I)** **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

**Loss** shall include punitive and exemplary damages, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, or the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall not include:

    **(1)** taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

    **(2)** non-monetary relief;

    **(3)** future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**;

    **(4)** **Stock Benefits**; or

    **(5)** salaries, wages, or bonuses, except as a component of a front or back pay award.

**(J)** **Retaliation** means negative treatment of an **Employee** or **Independent Contractor** based upon such person:

    **(1)** exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

    **(2)** refusing to violate any law;

    **(3)** assisting, testifying in, or cooperating with a proceeding or investigation regarding alleged violations of law by an **Insured Entity;**

    **(4)** disclosing or threatening to disclose alleged violations of law to a superior or to any governmental agency; or

    **(5)** filing any claim against an **Insured Entity** under the Federal False Claims Act or any similar "whistle blower" laws.

**(K)** **"Stock Benefits"** means any offering, plan or agreement between an **Insured Entity** and any **Employee** that grants stock, stock options or stock appreciation rights in the **Insured Entity** to such person, including, without limitation, restricted stock or any other stock grant. **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans.

**(L)** **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of an **Insured Entity. Third Party** shall not include **Employees**.

**(M)** **"Third Party Claim"** means any:

    **(1)** written demand for monetary damages or non-monetary relief commenced by the receipt of such demand;

App. 000028

**(2)** civil proceeding commenced by the service of a complaint or similar pleading;

**(3)** formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; or

**(4)** arbitration proceeding commenced by the filing of a demand for arbitration,

by or on behalf of a **Third Party**.

**"Third Party Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Third Party Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**(N)** **"Third Party Wrongful Act"** means a **Wrongful Act** involving any:

**(1)** discrimination against a **Third Party** based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law; or

**(2)** sexual harassment against a **Third Party**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

**(O)** **"Wrongful Act"** means any actual or alleged:

**(1)** error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

**(2)** matter claimed against an **Insured Person** solely by reason of their serving in such capacity.

## III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)** The Insurer shall not pay **Loss** for any **Claim**:

**(1)** for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

**(2)** based upon, arising from, or in any way related to any:

    **(a)** prior or pending demand, suit or proceeding against any **Insureds** as of; or

    **(b)** audit initiated by the Office of Federal Contract Compliance Programs before,

the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit, proceeding, or audit;

**(3)** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

**(4)** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

**(5)** for breach of any **Independent Contractor Agreement**; or

**(6)** for violation of the National Labor Relations Act or any similar law.

00 KB 0229269-07    3/04/07

App. 000029

**(B)** Other than an **Employment Practices Claim** for **Retaliation**, the Insurer shall not pay **Loss** for any **Claim**:

   **(1)** based upon, arising from, or in any way related to any:

   **(a)** discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

   **(b)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

   **(2)** based upon, arising from, or in any way related to any workers' compensation, unemployment compensation, disability benefits, or social security law, or any similar law;

   **(3)** for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

   **(4)** for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:

   **(a)** overtime wages; or

   **(b)** minimum wages.

**(C)** Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

   **(1)** for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement;

   **(2)** for costs associated with providing any accommodations required by the Americans With Disabilities Act or any similar law;

   **(3)** for **Benefits**, provided that this exclusion shall not apply to any **Employment Practices Claim** for wrongful termination, dismissal or discharge of employment; or

   **(4)** based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.

## IV.  EXCLUSION APPLICABLE TO INSURING AGREEMENT (B)

The Insurer shall not pay **Loss** for any **Third Party Claim** based upon, arising from or in any way related to any price discrimination or violation of any anti-trust law or any similar law designed to protect competition or prevent unfair trade practices.

## V.  OTHER INSURANCE

**(A)** The coverage provided under this Policy for any **Employment Practices Claim** shall be primary.

**(B)** Notwithstanding the above, the coverage provided under this Policy for any **Employment Practices Claim** made against a temporary, leased or loaned **Employee** or an **Independent Contractor** shall be excess of the amount of any deductible, retention and limits of liability under any other policy or policies applicable to such **Claim**, whether such other policy or policies are stated to be primary, contributory, excess, contingent or

App. 000030

otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## VI. COORDINATION OF COVERAGE

If this Coverage Part and either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part are included under this Policy, and a **Claim** is covered under this Coverage Part and any such other Coverage Part, **Loss** shall be first covered and paid under this Coverage Part.

If notice of a **Claim** has been given under either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part and a determination is made by the Insurer that such **Claim** would be covered under this Coverage Part if notice had been given under this Coverage Part, then the **Insureds** shall be deemed to have given notice of such **Claim** under this Coverage Part at the same time that notice was given under such other Coverage Part.

## VII. CHANGES IN EXPOSURE

**(A)** This section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)** In addition to the asset percentage size limit for automatic coverage of any newly merged or acquired entity specified in Common Terms and Conditions Section XIV. Changes in Exposure (A), if the number of employees of a newly merged or acquired entity exceeds 25% of the number of employees of all **Insured Entities** combined prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

## VIII. DEDUCTIBLE WAIVER

Regarding a **Claim** that is a class action civil proceeding, no Deductible shall apply to **Defense Costs** incurred in connection with such **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Deductible otherwise applicable to such **Claim**, if a:

**(A)** final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)** complete and final settlement with prejudice;

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

**FIDUCIARY LIABILITY COVERAGE PART**

I.  **INSURING AGREEMENTS**

(A)  **Fiduciary Liability**

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Fiduciary Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds** or by any person for whose **Wrongful Acts** the **Insureds** are legally responsible.

(B)  **Settlement Programs (Elective)**

If Settlement Program Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Settlement Fees** on behalf of the **Insureds** resulting from a **Settlement Program** for which a **Settlement Program Notice** is received by the Insurer during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to a Sublimit of Liability of $100,000. Such a Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this Coverage Part. This Insuring Agreement shall also be subject to the Settlement Program Coverage Deductible and Prior or Pending Date in Item 5 of the Declarations.

**DEFINITIONS**

The following terms, whether used in the singular or plural, shall have the meanings specified below:

(A)  **"Claim"** means any:

(1)  **Fiduciary Claim**; or

(2)  **Settlement Program Notice**.

(B)  **"Employee Stock Ownership Plan"** means any **Insured Plan** that invests more than 10% of its assets in securities of **Insured Entities.**

(C)  **"Fiduciary Claim"** means any:

(1)  written demand for monetary damages or injunctive relief commenced by the receipt of such demand;

(2)  civil proceeding commenced by the service of a complaint or similar pleading;

(3)  criminal proceeding commenced by the return of an indictment; or

(4)  formal administrative or regulatory proceeding commenced by the filing or service of a notice of charges, formal investigative order or similar document, including an investigation by the Department of Labor or Pension Benefit Guaranty Corporation.

**"Fiduciary Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Fiduciary Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**App. 000032**

**(D)** **"Insured Person"** means any:

   **(1)** **Manager**;

   **(2)** **Employee**; or

   **(3)** past, present, or future trustee of an **Insured Plan** in such person's capacity as a trustee.

**(E)** **"Insured Plan"** means any past, present, or future:

   **(1)** employee welfare benefit plan or employee pension benefit plan, as defined in **ERISA**, sponsored solely by an **Insured Entity**, or jointly by an **Insured Entity** and a labor organization, for the benefit of **Employees** only;

   **(2)** employee benefit plan, including an excess benefit plan, not subject to Title 1 of **ERISA**, sponsored solely by an **Insured Entity** for the benefit of **Employees** only;

   **(3)** government-mandated insurance program for unemployment, social security or disability benefits for **Employees** other than workers compensation; or

   **(4)** any other plan, fund, or program specifically included as an **Insured Plan** in a written endorsement issued by the Insurer to form a part of this Policy.

Notwithstanding the above, an **Insured Plan** shall not include any:

   **(1)** **Employee Stock Ownership Plan**; or

   **(2)** any multi-employer plan.

**(F)** **"Insureds"** means any:

   **(1)** **Insured Entity**;

   **(2)** **Insured Person**; or

   **(3)** **Insured Plan.**

**(G)** **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

**Loss** shall include punitive and exemplary damages and the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall not include:

   **(1)** taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed; or

   **(2)** non-monetary relief.

Notwithstanding the above, **Loss** shall include:

   **(1)** civil penalties of up to 5% imposed pursuant to **ERISA** Section 502(i) or up to 20% imposed pursuant to **ERISA** Section 502(l); or

App. 000033

     **(2)**  if Settlement Program Coverage is included, **Settlement Fees**.

**(H)**  **"Settlement Fees"** mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insureds** become legally obligated to pay as a result of a **Wrongful Act. Settlement Fees** shall not include costs of corrections, other than fees or penalties.

**(I)**  **"Settlement Program"** means any voluntary compliance resolution program or similar voluntary settlement program administered by the United States of America Internal Revenue Service or any other governmental body that is entered into by an **Insured Entity**.

**(J)**  **"Settlement Program Notice"** means a prior written notice to the Insurer by any **Insured Entity** of its intent to enter into a **Settlement Program** that includes a detailed description of the **Wrongful Act** for which notice will be given under the **Settlement Program**.

**(K)**  **"Wrongful Act"** means any actual or alleged:

     **(1)**  error, misstatement, misleading statement, act, omission, neglect or breach of duty constituting a violation of any responsibilities, obligations or duties imposed upon fiduciaries of an **Insured Plan** by **ERISA** or any similar law;

     **(2)**  error, misstatement, misleading statement, act, omission, neglect or breach of duty in counseling, providing interpretations, handling records, or effecting enrollment, termination or cancellation of **Employees**, participants, or beneficiaries under an **Insured Plan**; or

     **(3)**  matter claimed against any **Insureds** solely due to such **Insureds** acting in the capacity of a fiduciary of an **Insured Plan**.

## EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)**  The Insurer shall not pay **Loss** for any **Claim**:

     **(1)**  for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

     **(2)**  based upon, arising from, or in any way related to any prior or pending demand, suit or proceeding against any **Insureds** as of the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

     **(3)**  based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

     **(4)**  based upon, arising from, or in any way related to any:

          **(a)**  discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

          **(b)**  direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

     **(5)**  based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability:

App. 000034

    **(a)**  that would have been incurred in the absence of such contract or agreement; or

    **(b)**  assumed under any agreement or declaration of trust under which any **Insured Plan** was established;

**(6)**  based upon, arising from, or in any way related to the gaining, in fact, of any personal profit, remuneration or advantage to which the **Insureds** are not legally entitled; or

**(7)**  based upon, arising from, or in any way related to any deliberately fraudulent or criminal act or omission or any willful violation of law by the **Insureds** if a judgment or other final adjudication establishes such an act, omission or violation.

Regarding exclusions (6) and (7) above, no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**.

**(B)**  Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

  **(1)**  for failure to pay benefits pursuant to any **Insured Plan**, provided that this exclusion shall not apply to the extent that recovery of such benefits is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person**;

  **(2)**  based upon, arising from, or in any way related to a failure to fund, or collect contributions owed to, an **Insured Plan**; or

  **(3)**  for return or reversion of any contributions or assets to an **Insured Entity** from an **Insured Plan**.

## IV.  WAIVER OF RECOURSE

The Insurer shall have no right of recourse against any **Insureds** for any payment of **Loss** made by the Insurer under this Coverage Part because of a **Wrongful Act** by such **Insureds** if the premium for this Policy was paid for by other than an **Insured Plan**.

## V.  CHANGES IN EXPOSURE

**(A)**  This Section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)**  The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (A) Mergers and New Subsidiaries shall also apply to any employee benefit plan of any newly merged or acquired entity and to any trustee of such plan to the extent that such plan and trustee would otherwise qualify as **Insureds** under this Policy. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before the merger or acquisition of the entity or for any **Interrelated Wrongful Acts** thereto.

**(C)**  The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (C) Loss of Subsidiary Status shall also apply to any **Insured Plan** of a former **Subsidiary** and any trustee of such plan. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after an entity ceases to be a **Subsidiary**.

## VI.  TERMINATED PLAN COVERAGE

App. 000035

Subject to the terms and conditions of this Policy and Coverage Part, coverage shall be afforded for **Loss** resulting from any **Claim** against the **Insureds** for a **Wrongful Act** involving any **Insured Plan** terminated by an **Insured Entity**, including post-termination **Wrongful Acts**.

## VII. DEDUCTIBLE WAIVER

No Deductible shall apply to **Defense Costs** incurred in connection with a **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Deductible otherwise applicable to such **Claim**, if a:

**(A)**  final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)**  complete and final settlement with prejudice,

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

## CRIME COVERAGE PART

**INSURING AGREEMENTS**

Coverage is provided under the following Insuring Agreements for which there is a Limit of Insurance shown in the Declarations.

**(A)  INSURING AGREEMENT 1. - EMPLOYEE THEFT**

The Insurer will pay for direct loss of or damage to **Money**, **Securities** and **Other Property** that results directly from **Theft** by an **Employee**, whether or not identifiable, while acting alone or in collusion with other persons.

**(B)  INSURING AGREEMENT 2. - DEPOSITORS FORGERY OR ALTERATION**

**(1)**  The Insurer will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money** that are

    **(a)**  made or drawn upon the **Insured**; or

    **(b)**  made or drawn by one acting as the **Insured's** agent and drawn on the **Insured's** account or that are purported to have been so made or drawn.

**(2)**  The Insurer will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

**(3)**  If the **Insured** is sued for refusing to pay any instrument in B.1. above, on the basis that it has been forged or altered and the **Insured** has the Insurer's written consent to defend against that suit, the Insurer will pay for any reasonable legal expenses that the **Insured** incurs and pays in such defense. The amount that the Insurer will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement. If a Deductible Amount applies to this Insuring Agreement, the Insurer will also apply it to the amount of legal expenses incurred in this Insuring Agreement.

**(4)**  The **Insured** must include with its proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss and describing both sides of said instrument.

**(C)  INSURING AGREEMENT 3. -- INSIDE THE PREMISES**

**(1)**  The Insurer will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises** resulting directly from **Theft**, disappearance or destruction.

**(2)**  The Insurer will pay for loss of or damage to **Other Property**

    **(a)**  inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

    **(b)**  inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

**(3)**  The Insurer will pay for loss from damage to the **Premises** or its exterior resulting from an actual or attempted

    **(a)**  **Theft** of **Money** or **Securities**; or

    **(b)**  **Robbery** or **Safe Burglary** of **Other Property** if the **Insured** is the owner of the **Premises** or is liable for damage to it.

**(4)**  The Insurer will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** or unlawful entry into those containers.

**App. 000037**

**(D) INSURING AGREEMENT 4. – OUTSIDE THE PREMISES**

    **(1)**  The Insurer will pay for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

    **(2)**  The Insurer will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

**(E) INSURING AGREEMENT 5. - COMPUTER AND FUNDS TRANSFER FRAUD**

The Insurer will pay for loss of and loss from damage to **Money, Securities** and **Other Property** following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**

    **(1)**  to a person (other than a **Messenger**) outside those **Premises**; or

    **(2)**  to a place outside those **Premises**.

And, the Insurer will pay for loss of **Money** or **Securities** through **Funds Transfer Fraud** resulting directly from **Fraudulent Transfer Instructions** communicated to a **Financial Institution** and instructing such institution to pay, deliver, or transfer **Money** or **Securities** from the **Insured's Transfer Account**.

**(F) INSURING AGREEMENT 6. - MONEY ORDERS AND COUNTERFEIT CURRENCY**

The Insurer will pay for loss resulting directly from the **Insured's** having accepted in good faith and in the regular course of business, in exchange for merchandise, **Money** or services;

    **(1)**  money orders issued by any post office, express company or bank in the United States of America or Canada that are not paid upon presentation; and

    **(2)**  **Counterfeit** currency of the United States of America, Canada, or any other country in which the **Insured** maintains physical premises. Unless otherwise shown in the Declarations for this Coverage Part, the Limit of Insurance under this insuring agreement is $50,000. There is no deductible applying to loss covered under this agreement unless otherwise shown in the Declarations for this Coverage Part.

**II.  LIMIT OF INSURANCE**

The most that the Insurer will pay for loss in any one **Occurrence** is the applicable Limit of Insurance shown in the Declarations.

**III.  DEDUCTIBLE**

We will not pay for loss in any one **Occurrence** unless the amount of the loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. In the event that more than one Deductible Amount could apply to the same loss, only the highest Deductible Amount will be applied.

**IV.  DEFINITIONS**

    **(A)**  **"Banking Premises"** means the interior portion of that part of any building occupied by a banking institution or similar safe depository.

    **(B)**  **"Counterfeit"** means an imitation of an actual valid original that is intended to deceive and to be taken as an original.

© 2004, The Hartford

App. 000038

(C) **"Custodian"** means the **Insured**, or any of the **Insured's** partners, or members or any **Employee** while having the care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

(D) **"Employee"** means:

    (1) any natural person:

        (a) while in the **Insured's** service or for 60 days after termination of service; and

        (b) whom the **Insured** compensates directly by salary, wages, commissions; and

        (c) whom the **Insured** has the right to direct and control while performing services for it; including one:

        (d) who is a director or trustee while performing acts coming within the scope of the usual duties of an **Employee** or while acting as a member of any of the **Insured's** elected or appointed committees to perform on the **Insured's** behalf, specific, as distinguished from general directorial acts; or

        (e) who is a non-compensated officer; or

        (f) who is a volunteer who is not compensated, other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**; or

        (g) who is a former employee, director, partner, member or trustee retained as a consultant while performing services for the **Insured**; or

        (h) who is a student intern or guest student pursuing studies or duties in any of the **Insured's** offices or **Premises**; or

        (i) who is leased to the **Insured** under an agreement between the **Insured** and a labor leasing firm, while that person is subject to the direction and control of the **Insured** and performing services for the **Insured**; or

        (j) who is the **Insured's** partner or limited liability member, but the Insurer will not pay for loss caused by any partner or limited liability member, unless the amount of the loss exceeds the sum of

            i. any amounts the **Insured** owes that partner or limited liability member; and

            ii. the value of that partner's partnership interest, or that limited liability member's ownership interest determined by the closing of the **Insured's** organization's books on the date of discovery of the loss by the **Insured's** organization by anyone not in collusion with the person causing the loss, and

            iii. any applicable Deductible Amount; then the Insurer will pay the amount of loss excess of that sum, up to the Limit of Insurance applicable to Insuring Agreement 1.

    (2) a natural person who is a trustee, officer, **Employee**, administrator or manager, except an administrator or a manager who is an independent contractor, of any **Employee Benefit Plan(s)** insured under this Coverage Part; and the **Insured's** director or trustee while that person is handling **Money** or **Securities** or **Other Property** of **Employee Benefit Plan(s)** insured under this Coverage Part.

    (3) a natural person who is furnished temporarily to the **Insured** to substitute for a permanent **Employee** to meet seasonal or short term work load conditions and while that temporary person is subject to the **Insured's** direction and control and performing services for the **Insured**. However, such persons are excluded while having care and custody of property outside the **Premises**.

**Employee** does NOT mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character.

App. 000039

(E) **"Employee Benefit Plan(s)"** means any welfare or pension plan(s) as defined in the Employee Retirement Income Security Act (ERISA) of 1974, including amendments thereto and regulations promulgated thereunder, and which is sponsored by one or more of the **Insured(s)**.

(F) **"Financial Institution"** means a bank, savings bank, savings and loan association or similar thrift institution, a stockbroker, mutual fund, liquid assets fund, or similar investment institution in which the **Insured** maintains a **Transfer Account**.

(G) **"Forgery"** means the signing of the name of another person or organization with intent to deceive; it does not mean a signature that consists in whole or in part of one's own name signed with or without authority, in any capacity, for any reason.

(H) "**Fraudulent Transfer Instructions**" means

   (1) fraudulent electronic, telegraphic, facsimile, cable, teletype or telephone instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account and which instructions purport to have been authorized by the **Insured** but which have been fraudulently transmitted by another; or

   (2) fraudulent written instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account through an electronic funds transfer system at specified times or under specified conditions and which instructions purport to have been duly authorized by the **Insured** but which have been fraudulently issued, forged or altered by another.

(I) **"Funds Transfer Fraud"** means **Theft** of **Money** or **Securities** from any of the **Insured's Transfer Accounts** at a **Financial Institution** and occurring through **Fraudulent Transfer Instructions** communicated to such **Financial Institution**.

(J) **"Insured"** shall mean any **Insured Entity**.

(K) **"Investigative Expenses"** means reasonable expenses incurred and paid by the **Insured** in establishing the existence and amount of any direct loss covered under an Insuring Agreement within this Coverage Part. The reasonableness of such expenses shall be determined by the Insurer and shall not include the **Insured's** internal corporate obligations such as **Employee** wages or any other internal costs.

(L) **"Messenger"** means the **Insured**, any of the **Insured's** partners or members or any **Employee** while having care and custody of property outside the **Premises**.

(M) **"Money"** means currency, coins and bank notes in current use and having a face value; and travelers checks, register checks and money orders held for sale to the general public.

(N) **"Occurrence"** means

   (1) as respects the Employee Theft Insuring Agreement, all loss caused by, or involving, one or more **Employees**, whether the result of a single act or a series of acts.

   (2) as respects the Forgery or Alteration Insuring Agreement, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

   (3) as respects all other Insuring Agreements, an act or series of related acts involving one or more persons; or an act or event or a series of related acts or events not involving any person.

(O) **"Other Property"** or property means any tangible property other than **Money** or **Securities** that has intrinsic value but does not include any property excluded under this Coverage Part. **Other Property** does **not** include trade secrets, proprietary information, confidential information or any copyrights, patents, trademarks, proprietary manufacturing or processing procedures, or secret or confidential information, including but not limited to credit card numbers, bank account numbers or any similar information.

App. 000040

(P) **"Premises"** means the interior of that portion of any building that the **Insured** occupies in conducting its business.

(Q) **"Robbery"** means the unlawful taking of property from the care and custody of a person by one who has caused or threatened to cause that person bodily harm or committed an obviously unlawful act witnessed by that person.

(R) **"Safe Burglary"** means the unlawful taking of property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior, or, the taking of a safe or vault from inside the **Premises**.

(S) **"Securities"** means negotiable or non-negotiable instruments or contracts representing either **Money** or property and includes tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and, evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**; but does not include **Money**.

(T) **"Theft"** means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of the **Insured**.

(U) **"Transfer Account"** means an account maintained by the **Insured** at a **Financial Institution** from which the **Insured** or its authorized representative may cause the payment, transfer or delivery of **Money** or **Securities** by any means described in the **Fraudulent Transfer Instructions** definition.

(V) **"Watchperson"** means any person whom the **Insured** retains specifically to have the care and custody of property inside the **Premises** and who has no other duties.

## V.   EXCLUSIONS  *(Applying To All Insuring Agreements Unless Otherwise Specified)*

**This Coverage Part Does Not Apply To And The Insurer Will Not Pay For:**

**(A) Accounting or Arithmetical Errors or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**(B) Acts Committed By The Insured**

Loss resulting from **Theft** or any other dishonest or criminal acts committed by the **Insured** whether acting alone or in collusion with others.

**(C) Acts of Employees, Managers, Directors or Trustees**

Loss resulting from **Theft** or any other dishonest or criminal act committed by any of the **Insured's Employees**, managers, directors or trustees whether acting alone or in collusion with other persons or while performing services for the **Insured** or otherwise except when covered under Insuring Agreement 1.

**(D) Employee Cancelled Under Prior Insurance**

Loss caused by any of the **Insured's Employees** or by any **Employee** of the **Insured's** predecessor in interest, for whom similar prior insurance has been cancelled and not reinstated since the last cancellation.

**(E) Exchanges or Purchases**

Loss resulting from the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase.

**(F) Fire**

Loss from damage to the premises resulting from fire, however caused, except for loss of or damage to **Money** or **Securities** and loss from damage to a safe or vault under Insuring Agreement 3.

App. 000041

**(G) Governmental Action**

Loss resulting from seizure or destruction of **Money**, **Securities** or **Other Property** by order of governmental authority.

**(H) Indirect Loss**

Loss that is an indirect result of any act or **Occurrence** covered by this Coverage Part including but not limited to loss resulting from

**(1)** the **Insured's** inability to realize income that it would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**.

**(2)** payment of damages of any type for which the **Insured** is legally liable. But the Insurer will pay compensatory damages arising directly from a loss covered under this Coverage Part.

**(3)** payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence of or the amount of loss under this Coverage Part, provided, however, that the Insurer will reimburse the **Insured** for **Investigative Expenses** up to $5,000 (Five Thousand Dollars) it incurs per **Occurrence** with the Insurer's prior consent, to determine the amount of loss covered under this Coverage Part, provided that the amount of direct covered loss exceeds the Deductible Amount for the applicable Insuring Agreement. Such reimbursement is part of, and not in addition to, the Limit of Insurance for the applicable Insuring Agreement.

**(I) Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon

**(1)** an inventory computation; or

**(2)** a profit and loss computation.

However, where the **Insured** establishes wholly apart from such inventory computations that it has sustained a loss covered under this Coverage Part, then the **Insured** may offer its inventory records and actual physical count of inventory in support of the amount of loss claimed.

**J) Legal Expenses**

Expenses related to any legal action except when covered under Insuring Agreement 2.

**(K) Money Operated Devices**

Loss of **Money** contained in any money operated device unless a continuous recording instrument in the device records the amount of any **Money** deposited in it.

**(L) Motor Vehicles or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers, or semi-trailers or equipment or accessories attached to them. This exclusion shall apply only to Insuring Agreement 4.

**(M) Nuclear**

Loss resulting from nuclear reaction, nuclear radiation, radioactive contamination, chemical or biological contamination, or any related act or incident.

**(N) Risks Inherent in Insurance Operations**

Loss resulting directly or indirectly from contractual or extra contractual liability sustained by the **Insured** in connection with the issuance of contracts or purported contracts of insurance, indemnity or suretyship.

App. 000042

**(O)  Trading Losses**

Loss resulting directly or indirectly from any authorized or unauthorized trading of **Money, Securities** or **Other Property**, whether in the **Insured's** name or in a genuine or fictitious account.

**(P)  Transfer or Surrender of Property**

Loss of or damage to **Money, Securities** or **Other Property** after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**

**(1)**  on the basis of unauthorized instructions, unless covered under Insuring Agreement 5.; or

**(2)**  as a result of a threat to do bodily harm to any person; or

**(3)**  as a result of a threat to do damage to any property.

But this Exclusion does not apply under Insuring Agreement 4. to loss of **Money, Securities** and **Other Property** while outside the **Premises** or **Banking Premises** in the care and custody of a **Messenger** if the **Insured**:

**(a)**  had no knowledge of any threat at the time that the conveyance began; or

**(b)**  had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**(Q)  Vandalism**

Loss from damages to the **Premises** or to the exterior of any safe, vault, cash box, cash drawer or cash register by vandalism or mischief.

**(R)  Voluntary Parting of Title To or Possession of Property**

Loss resulting from the **Insured**, or anyone acting on its express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property. This exclusion shall apply only to Insuring Agreements 3. and 4.

**(S)  War and Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion, or revolution, or any related act or incident.

**(T)  Warehouse Receipts Losses**

Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

## VI.  GENERAL CONDITIONS

**(A)  ARMORED MOTOR VEHICLE COMPANIES**

Under Insuring Agreement 4. the Insurer will pay only for the amount of loss the **Insured** cannot recover

**(1)**  under its contract with the armored motor vehicle company; and

**(2)**  from any insurance or indemnity carried by or for the benefit of customers of the armored motor vehicle company, or from the armored motor vehicle company.

**(B)  CANCELLATION AS TO ANY EMPLOYEE**

App. 000043

Insuring Agreement 1. is cancelled as to any **Employee**

**(1)** immediately upon discovery by the **Insured** or any of its partners, members, managers, officers, directors or trustees not in collusion with the **Employee** of **Theft** or any other dishonest act in excess of $1,000 committed by the **Employee** whether before or after becoming employed by the **Insured**; or

**(2)** on the date specified in a notice mailed to the **Insured**. The date will be at least 30 days after the date of the mailing. And, the mailing of notice to the **Insured** at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

**(C) CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by the **Insured** as it relates to this Coverage Part at any time. It is also void if the **Insured** at any time intentionally conceals or misrepresents a material fact concerning

**(1)** this Coverage Part;

**(2)** the property covered under this Coverage Part;

**(3)** your interest in the property covered under this Coverage Part; or

**(4)** a loss under this Coverage Part.

**(D) CONSOLIDATION OR MERGER**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become **Employees** or the **Insured** acquires the use and control of any additional **Premises**

**(1)** the **Insured** must give us written notice within 90 days after the effective date of such consolidation or merger, or purchase or acquisition of assets or liabilities, and obtain the Insurer's written consent to extend this insurance to such additional **Employees** or **Premises**. The Insurer may condition its consent upon payment of an additional premium; but there shall only be a premium charge if such merger or acquisition results in a 15%, or greater, increase in the number of **Employees**, assets or revenues acquired through the merger or acquisition.

**(2)** For the first 90 days after the effective date of such consolidation or merger, or purchase or acquisition of assets or liabilities, any insurance afforded for **Employees** or **Premises** also applies to these additional **Employees** or **Premises** for acts committed within this 90-day period.

**(E) DISCOVERY**

**(1)** The Insurer will pay for loss which the **Insured** sustains through acts or events committed or occurring at any time and which are discovered by the **Insured** during the Policy Period or during the period provided in General Condition G., DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS.

**(2)** Discovery of loss occurs when the **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this Coverage Part has been, or may be incurred even though the exact amount or the details of the loss may not then be known.

**(3)** Discovery also occurs when the **Insured** receives notice of an actual or potential claim against it alleging facts, which if true, would constitute a covered loss under this policy.

**(4)** No coverage will be available under this Coverage Part for any loss of which the **Insured** was aware prior to the inception date of this Coverage Part.

**(F) DISCOVERY SUPERSEDING LOSS SUSTAINED COVERAGE – LIABILITY FOR PRIOR LOSSES**

PE 00 H118 01 0904                                © 2004, The Hartford
  00 KB 0229269–07    3/04/07                                                          Page 8 of 11

App. 000044

(1) If this Coverage Part has replaced similar prior insurance written by a company other than the Insurer, and such other insurance provided a period of time to discover loss occurring prior to the termination or cancellation of that coverage, and a loss is discovered within the period provided by prior insurance to discover losses, the Insurer will not pay for such loss unless the amount exceeds the Limit of Insurance under said prior Policy. The Insurer will then only pay the **Insured** for any excess loss subject to the Insuring Agreements, Exclusions and General Conditions of this Coverage Part.

(2) Any payment that the Insurer makes to the **Insured** under this insurance shall not exceed the difference between the amount of insurance under the **Insured's** prior Policy and the Limit of Insurance shown in the Declarations and the Insurer will not apply its **Deductible Amount** to any excess loss payment.

## (G) DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS

The Insurer will pay for loss that the **Insured** sustained prior to the effective date of termination or cancellation of this Coverage Part, which is discovered by the **Insured**:

(1) no later than 60 days from the date of the termination, cancellation or non-renewal; and

(2) as respects any **Employee Benefit Plan(s)**, no later than 1 year from the date of that termination, cancellation or non-renewal.

However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** to replace, in whole or in part, the insurance afforded by this Coverage Part, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

## (H) DUTIES IN THE EVENT OF LOSS

After the **Insured** discovers a loss or a situation which may result in a loss of, or damage to, **Money, Securities** or **Other Property**, it must

(1) notify the Insurer as soon as possible but no later than 90 days after discovery of loss;

(2) submit to examination under oath at the Insurer's request and give it a signed statement;

(3) give the Insurer a detailed, sworn proof of loss within 120 days;

(4) cooperate with the Insurer in the investigation and settlement of any claim; and

(5) with respect to Insuring Agreements 3. and 4., notify the police if the **Insured** has reason to believe that its loss involves a violation of law.

## (I) EMPLOYEE BENEFIT PLANS PROVISION

(1) The Insurer will pay for loss of or damage to Money, **Securities** or Other Property of any **Employee Benefit Plan(s)** sponsored exclusively by any **Insured** resulting directly from **Theft** by an **Employee**. The Limit of Insurance applicable to any **Employee Benefit Plan** shall equal the lesser of ten percent (10%) of the **Employee Benefit Plan** assets as of the beginning of such **Employee Benefit Plan** fiscal year or five hundred thousand dollars ($500,000).

(2) Any payments the Insurer makes to the **Insured** for loss sustained by any **Employee Benefit Plan** will be held by that **Insured** for the use and benefit of the **Employee Benefit Plan** sustaining the loss.

(3) If two or more **Employee Benefit Plans** are insured under this Coverage Part, any payment which the Insurer makes for loss sustained by two or more **Employee Benefit Plans**, or of commingled **Funds** or **Other Property** of two or more **Employee Benefit Plans**, which arises out of one **Occurrence**, is to be shared by each **Employee Benefit Plan** sustaining loss in the proportion that the Limit of Insurance required for each **Employee Benefit Plan** bears to the total of those limits.

## (J) JOINT INSURED

App. 000045

(1)  If more than one **Insured** is named in the Declarations, the first named **Insured** will act for itself and for every other **Insured** for all purposes of this Coverage Part. If the first named **Insured** ceases to be covered, then the next **Insured** will become the first named **Insured**.

(2)  If any **Insured**, partner, member or officer of an **Insured** has knowledge of any information relevant to this Coverage Part, that knowledge is considered to be knowledge of every **Insured**.

(3)  An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

(4)  If this Coverage Part or any of its Insuring Agreements is cancelled, terminated or non-renewed as to any **Insured**, loss sustained by that **Insured** is covered only if discovered by the **Insured** during the period of time provided in General Condition G., DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS. And this extended period to discover loss also terminates in accordance with paragraph 2 of that condition.

(5)  The Insurer will not pay a greater amount for loss sustained by more than one **Insured** than the Insurer would pay if all of the loss had been sustained by one **Insured**.

**(K) OWNERSHIP OF PROPERTY; INTERESTS COVERED**

(1)  The property covered under this Coverage Part is limited to **Money, Securities or Other Property**

    (a)  that the **Insured** owns or leases; or

    (b)  owned by the **Insured's** client and which the **Insured** holds on its **Premises** or which is in the custody of one acting as the **Insured's Messenger** and while such **Money, Securities** or **Other Property** is in transit; or

    (c)  for which the **Insured** is legally liable excepting loss of client **Money, Securities** or **Other Property** occurring on such client's premises.

(2)  However, this Coverage Part is for the **Insured's** benefit alone and no other person or organization has any rights or benefits. Any claim for a loss of client **Money, Securities** or **Other Property** occurring on the **Insured's Premises** or while in transit in the custody of a **Messenger** may only be made by the **Insured** in its proof of loss.

**(L) VALUATION**

(1)  Subject to the applicable Limit of Insurance, the Insurer will pay for

    (a)  loss of **Money** but only up to and including its face value. The Insurer may, at its option, pay for a loss of **Money** issued by any country other than the United States of America in either the face value in the **Money** issued in that country, or, in the United States of America dollar equivalent determined by the rate of exchange on the day that the loss occurred.

    (b)  loss of **Securities** but only up to and including their value at the close of business on the day that the loss was discovered. But, the Insurer may, at its option, 1) pay the value of such **Securities**, 2) replace them in kind in which event the **Insured** must assign to the Insurer all its rights, title and interest in and to those **Securities** or 3) pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the Insurer will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of

        i.   the value of the **Securities** at the close of the business on the day the loss was discovered; or

        ii.  the Limit of Insurance.

    (c)  loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation, subject to 2. below. However, the Insurer will not pay for more than the lesser of

App. 000046

    **i.**   the Limit of Insurance applicable to the lost or damaged property; or

    **ii.**  the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

    **iii.**  the amount that the **Insured** actually spends that is necessary to repair or replace the lost or damaged property.

**(2)** The Insurer will not pay on a replacement cost basis for any loss or damage

    **(a)**  until the lost or damaged property is actually repaired or replaced; and

    **(b)**  unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, the Insurer will pay based on actual cash value.

**(3)** The Insurer may, at its option, pay for loss of or damage to property other than **Money** in the **Money** of the country in which the loss occurred; or in the United States of America dollar equivalent of the **Money** of the country where the loss occurred determined by the rate of exchange on the day the loss was discovered. Any property that the Insurer pays for or replaces becomes its property.

**(4)** Loss of or loss from damage to any books or records of account or other records, tapes, disks, or electronic media used by the **Insured** in the business but only if such books, records, tapes or disks are actually reproduced and then only for not more than the blank books, pages, tapes and disks or other materials plus the cost of labor for the actual transcription or copying of data which the **Insured** shall furnish to reproduce such books, records, tapes or disks.

**(M) RECORDS**

The **Insured** must keep records of all property covered under this Coverage Part so that the Insurer can verify the amount of any loss.

# KIDNAP AND RANSOM/EXTORTION COVERAGE PART

## INSURING AGREEMENTS

**(A) Kidnap/Ransom/Extortion**

The Insurer shall reimburse **Ransom Monies** paid by the **Insured** or any **Insured Person** resulting from a covered **Kidnapping** or **Extortion Threat**.

**(B) Expense**

The Insurer shall reimburse **Expenses** paid by the **Insured** resulting from a covered **Kidnapping** or **Extortion Threat**, or resulting from a **Detention** or **Hijacking** of any **Insured Person**.

**(C) Custody/Delivery**

If, as a result of a covered **Kidnapping** or **Extortion Threat**, the **Insured** sustains a loss due to destruction, disappearance, confiscation or wrongful appropriation of **Ransom Monies** while being delivered to persons demanding the **Ransom Monies** by anyone who is authorized by the **Insured** or **Insured Person** to have custody thereof; the Insurer will reimburse the **Insured** for such loss.

**(D) Personal Accidental Death, Dismemberment & Disability Loss**

The Insurer shall pay the amount in Item 1 (D) of the Declarations of this Coverage Part for **Personal Accidental Death, Dismemberment & Disability Loss** from a covered **Kidnapping**, or resulting from a **Detention** or **Hijacking**.

## II. DEFINITIONS

The following terms, whether used in the singular or plural in this Coverage Part, shall have the meanings specified below:

**(A)** **"Detention"** means the involuntary confinement of an **Insured Person** for a period of not less than twenty four (24) hours, for whatever reason other than **Kidnapping**.

**(B)** **"Employee"** means:

**(1)** Any natural person:

**(a)** while in the service of the **Insured**;

**(b)** who is compensated directly by salary, wages or commissions by the **Insured**; and

**(c)** who the **Insured** has the right to direct and control while performing services for the **Insured**;

**(2)** Any natural person who is furnished temporarily to the **Insured**:

**(a)** to substitute for a permanent **Employee** as defined in paragraph (1) above, who is on leave; or;

**(b)** to meet seasonal or short-term work load conditions;

while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

**(3)** Any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business;

App. 000048

4)  Any natural person who is a former official, **Employee**, director, partner, **Member**, **Manager**, representative or trustee retained as a consultant while performing services for the **Insured**; or

(5)  Any natural person who is a guest student or intern pursuing studies or duties.

**Employee** shall not mean independent contractor.

(C)  **"Expense"** means, solely in connection with **Kidnapping, Extortion Threat, Detention** or **Hijacking**, the reasonable fees and expenses for, or cost of:

(1)  the independent security consultant in Item 2 of the Coverage Part Declarations Page;

(2)  an independent negotiator;

(3)  an independent public relations consultant and/or interpreter;

(4)  reasonable fees and expenses for legal services necessary to secure the release of an **Insured Person**;

(5)  an independent forensic analyst;

(6)  communication equipment, recording equipment and advertising incurred solely and directly to obtain the release of an **Insured Person**;

(7)  **"Reward"**, which shall mean the amount paid by the **Insured** or an **Insured Person** to an **Informant** for information which directly leads to the arrest and conviction of the individual(s) responsible for **Kidnapping, Extortion Threat, Detention** or **Hijacking**;

(8)  interest for a loan taken by the **Insured** or **Insured Person** from a financial institution for the purpose of paying **Ransom Monies** as payment under Insuring Agreement (A);

(9)  travel and accommodations incurred by an **Insured Person**;

(10)  **"Salary"**, which shall mean the amounts of compensation paid by the **Insured** at an annual rate, including bonuses, commissions, incentive payments, health and welfare and pension benefits (at the level in effect on the date of the **Kidnapping, Detention** or **Hijacking**) which the **Insured** continues to pay an **Insured Person**. Payment of **Salary** ends at the earliest of:

(a)  up to forty-five (45) days after such **Insured Person** is released, if the **Insured Person** is not yet back at work,

(b)  when such **Insured Person** suffers **Loss of Life**,

(c)  one hundred and twenty (120) days after the last credible evidence following abduction that the **Insured Person** is still alive; or

(d)  solely with respect to **Detention** or **Hijacking**, for twenty-four (24) months after the commencement of such **Detention** or **Hijacking**, whichever is more recent;

(11)  the **"Salary"** of a replacement **Employee** to conduct the duties of the **Insured Person** following the **Kidnapping, Detention or Hijacking** of such **Insured Person**. Such coverage shall apply to the **Salary** in effect at the time of such **Kidnapping, Detention or Hijacking** and will end forty-five (45) days after such **Insured Person** is released or suffers **Loss of Life**;

(12)  reasonable defense costs incurred by an **Insured** and judgments or settlements which an **Insured** becomes legally obligated to pay as a result of a judgment or settlement in any suit brought by an **Insured Person** (or the estate, heirs, or legal representatives) alleging negligence or incompetence:

App. 000049

    **a)**  in the hostage retrieval operations or negotiations in a covered **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** of such **Insured Person**; or

    **(b)**  in the prevention of a covered **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** of such **Insured Person**.

As additional conditions precedent to the Insurer's liability, the **Insured** shall (a) immediately notify the Insurer of any such claim or suit, (b) not admit liability in any such claim or suit. The Insurer shall have the right to investigate, negotiate or settle any such claim or suit or to take over the conduct of the defense thereof;

**(13)** personal financial loss suffered by an **Insured Person** as a result of a **Kidnapping, Detention** or **Hijacking** and the result of the inability to attend to personal financial matters including, but not limited to, failure to renew insurance contracts and the failure to exercise stock options;

**(14)** independent security guard services for a period of up to thirty (30) days during a **Kidnapping, Extortion Threat, Detention** or **Hijacking**;

**(15)** any other direct expenses, reasonable in amount and reasonably incurred by the **Insured**, including (a) fees for related medical services (including psychiatric care, reasonable costs for cosmetic, dental or plastic surgery) which is medically required to correct any permanent disfigurement sustained by an **Insured Person** or guest directly as a result of a **Kidnapping, Detention** or **Hijacking** within twenty four (24) months following their release, and (b) reasonable expenses incurred for a period of not more than 30 days for rest and rehabilitation of an **Insured Person** and his/her spouse and children following the release of such **Insured Person** from a **Kidnapping, Detention** or **Hijacking**, provided such expenses are incurred within six (6) months following the release of such **Insured Person** and the maximum Limit of Insurance for this coverage shall not exceed $25,000 per **Insured Person** per covered incident.

**(D)**  **"Extortion Threat"** means **Bodily Injury Extortion, Computer Virus Threat, Property Damage Extortion, Products Extortion** or **Trade Secrets Extortion** as herein defined:

    **(1)**  **"Bodily Injury Extortion"** means any threat, for the purpose of demanding **Ransom Monies,** communicated to the **Insured** or an **Insured Person** to kill, physically injure or kidnap an **Insured Person**.

    **(2)**  **"Computer Virus Threat"** means any threat, for the purpose of demanding **Ransom Monies**, communicated to the **Insured** to alter, adulterate, or destroy any of the **Insured's** computer programs through the introduction into the **Insured's** computer systems, instructions or data which are not authorized by the **Insured**.

    **(3)**  **"Property Damage Extortion"** means any threat, for the purpose of demanding **Ransom Monies,** communicated to the **Insured** to physically damage, contaminate or pollute any buildings or **Premises**, (including, furniture, fixtures, fittings, machinery or equipment [fixed or mobile]), works of art and other contents, bloodstock and livestock, owned or leased by the **Insured**.

    **(4)**  **"Products Extortion"** means any threat, for the purpose of demanding **Ransom Monies,** communicated to the **Insured** that products of the **Insured**, or products that are to be passed off as such, or goods which the **Insured** handles, will be contaminated, polluted or rendered substandard.

    **(5)**  **"Trade Secrets Extortion"** means any threat, for the purpose of demanding **Ransom Monies,** communicated to the **Insured** to disseminate, utilize or divulge information including formulas, patterns, patents, compilations of data, programs, devices, methods, techniques or processes, or other proprietary information which is particular to the **Insured** in the conduct of business, provided the **Insured** makes constant and conscious efforts not to disclose such information to any third party.

All such threats related by a common committed, attempted or threatened wrongful act or made simultaneously against the same **Insured** or **Insured Person** will be deemed to constitute a single **Extortion Threat**.

    00 KB 0229269-07  3/04/07
© 2004, The Hartford

**App. 000050**

**(E)** **"Hijacking"** means the illegal holding under duress of an **Insured Person**, in excess of four (4) hours, while traveling in any motor vehicle, aircraft, or waterborne vessel for whatever reason other than **Kidnapping.**

**(F)** **"Informant"** means any person, other than an **Insured Person**, providing information not otherwise obtainable, solely in return for a **Reward** offered by the **Insured**.

**(G)** **"Insured"** means the named **Insured** or any **Subsidiary** of the named **Insured**, which existed prior to the inception date of the Policy and was disclosed in the Application for this insurance.

**(H)** **"Insured Person"** means:

    **(1)** any **Employee**;

    **(2)** any director, trustee, partner, **Member**, **Manager**, proprietor (if the **Insured** is a sole proprietorship) or officer of an **Insured**;

    **(3)** any **Relative** of an **Employee**;

    **(4)** any natural person who is employed in the household of an **Employee** while in the home of such **Employee**;

    **(5)** any natural person who is a resident or a guest in the home of an **Employee**;

    **(6)** any customer or guest of an **Insured** on the **Premises** of an **Insured**;

    **(7)** any customer of an **Insured** or a guest traveling with an **Employee**; or

    **(8)** any natural person who is temporarily retained by any **Insured** or an independent security consultant to deliver a **Ransom Monies** or **Extortion Threat** payment.

**(I)** **"Kidnapping"** means any event or connected series of events of seizing, detaining, abducting or carrying away by fraudulent means, of the **Insured or** one or more **Insured Persons**, except a minor by a parent thereof (or by a person acting on behalf of a parent), for the purpose of demanding **Ransom Monies**.

**(J)** **"Loss of Extremity"** means the permanent physical separation or the total irrecoverable loss of use of a digit or part thereof, or an ear, nose or genital organ or part thereof by deliberate mutilation.

**(K)** **"Loss of Life"** means:

    **(1)** death, including clinical death, determined by a medical examiner or similar local governing medical authority; or

    **(2)** the lack of communication from an **Insured Person** or those responsible for the **Kidnapping, Detention or Hijacking** of such **Insured Person** for a period of one (1) year following the later of:

        **(a)** such **Kidnapping, Detention** or **Hijacking**;

        **(b)** the last communication from such **Insured Person**; or

        **(c)** the last communication from those responsible for such **Kidnapping, Detention** or **Hijacking**.

**(L)** **"Loss of Sight"** means the loss of sight of one or both eyes that is certified as being entire and irrevocable to the extent of legal blindness by a qualified medical practitioner specializing in ophthalmology and approved by the Insurer.

**(M)** **"Loss of Speech and/or Hearing"** means the permanent total loss of the capability of speech and/or hearing that is certified by a qualified medical practitioner specialist and approved by the Insurer.

App. 000051

(N) **"Loss of Use"** means the permanent total loss of function of a foot, hand, or thumb and index finger that is certified by two qualified medical practitioners (approved by the Insurer) as being beyond hope of improvement.

(O) **"Manager"** means a person serving in a directorial capacity for a limited liability company.

(P) **"Member"** means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

(Q) **"Personal Accidental Death, Dismemberment & Disability Loss"** means **Loss of Life, Loss of Use, Loss of Sight, Loss of Speech and/or Hearing**, or **Loss of Extremity** of an **Insured Person** when such **Personal Accidental Death, Dismemberment & Disability Accidental Loss**:

    (1) is unanticipated and independent of any illness, disease or other bodily malfunction of such **Insured Person**; and

    (2) arises from a source outside of such **Insured Person**.

(R) **"Premises"** means buildings, facilities or properties occupied by the **Insured** in conducting its business or a residence occupied by any director, officer or **Employee** of the **Insured**.

(S) **"Ransom Monies"** shall mean cash and/or marketable goods or services that the **Insured** shall have surrendered to meet a **Kidnapping** or **Extortion Threat** demand. In the case of marketable goods or services, the Insurer shall pay the actual cash value thereof at the time of surrender.

(T) **"Relative"** means a spouse, domestic partner, child, step-child, adopted child, adopted stepchild, foster child, spouse of married children, grandchild, sister, brother, parent, parent-in-law, step-parent, grandparent, grandparent-in-law.

## EXCLUSIONS

This Coverage Part does not apply:

(A) to loss due to any fraudulent, dishonest or criminal acts of the **Insured**, its **Employees**, any **Insured Person** or any person authorized by the **Insured** to have custody of **Ransom Monies**;

(B) to loss resulting from fraud by any **Insured Person** allegedly the subject of a **Kidnapping, Extortion Threat, Detention** or **Hijack** if the **Insured** had not, prior to payment, made reasonable efforts to determine that such **Kidnapping, Extortion Threat, Detention** or **Hijacking** was genuine;

(C) to loss due to confiscation or expropriation of **Reward** or **Ransom Monies** by any governmental authority;

(D) to loss of income not realized by the **Insured** as the result of a covered loss;

(E) to loss due to the surrender of **Ransom Monies**;

    (1) in any face to face encounter involving the use or threat of force or violence unless surrendered by a person who is in possession of such **Ransom Monies** at the time of such surrender for the sole purpose of conveying them to pay a previously communicated demand for **Ransom Monies**;

    (2) on the **Premises** unless brought onto the **Premises** after the receipt of the **Kidnapping** or **Extortion Threat** demand for the purpose of paying such demand;

(F) under Insuring Agreement (B)

    (1) due to any act or alleged act of the **Insured** or **Insured Person** which would be a criminal offense if committed by the same party in a country where the **Insured** is headquartered or of which the **Insured Person** is a national, unless the Insurer determines that such allegations were intentionally false,

**App. 000052**

fraudulent and malicious and made solely and directly to achieve political, propaganda or coercive effect upon or at the expense of the **Insured** or **Insured Person** who was subject to the **Detention** or **Hijacking**;

(2) due to any actual or alleged violation of the laws of a foreign country by the **Insured** or **Insured Person**, unless the Insurer determines that such allegations were intentionally false, fraudulent and malicious and made solely and directly to achieve political, propaganda or coercive effect upon or at the expense of the **Insured** or **Insured Person** who was subject to the **Detention** or **Hijacking;**

(3) due to the failure of the **Insured** or an **Insured Person** to properly procure or maintain immigration, work, travel, residence or similar visas, permits or other documentation;

(4) due to an **Insured Person** taking part in any political activity or the operations of any security or armed forces;

(5) due to an **Insured Person** traveling to a country after the U.S. Department of State issues a travel warning;

(6) due to an **Insured Person** traveling to or remaining in a country after the U.S. Government provides a directive to leave the country in question.

(G) loss sustained by one **Insured** to the advantage of any other **Insured**;

(H) loss resulting from fraud by an **Insured Person** allegedly the subject of a **Personal Accidental Death, Dismemberment & Disability Loss;**

(I) to any loss, including **Expenses** due to any **Kidnapping** and/or **Extortion Threat** that is part of a connected series of acts involving **Kidnapping** and/or **Extortion Threat** beginning prior to the **Policy Period**, or prior to the acquisition, consolidation or purchase of assets of another entity.

(J) to any **Expenses** related to recalling a product.

## IV.  GENERAL AGREEMENTS

(A)  **Beneficiary:**

The **Benefit Amount** for all other **Personal Accidental Death, Dismemberment & Disability Accidental Loss,** other than **Loss of Life,** will be paid to the **Insured Person**. The **Benefit Amount** for **Loss of Life** will be paid to the estate of the **Insured Person**

(B)  **Conditions Precedent to Liability:**

As a condition precedent to the Insurer's liability under Insuring Agreement (A), the **Insured** shall have approved the payment of **Ransom Monies**. In the event of a **Kidnapping** or **Extortion Threat** of an **Insured Person** or guest during the **Policy Period**, and prior to the payment of **Ransom Monies**, the first named **Insured** shall make every reasonable effort to:

(1) determine that the **Kidnapping** or **Extortion Threat** has actually occurred, and;

(2) give immediate oral notice to the independent security consultant referenced in C (1) of II. DEFINITIONS and oral or written notice to the Insurer; and

(3) notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction thereover of the demand for **Ransom Monies** and comply with their recommendations and instructions.

As additional conditions precedent to the Insurer's liability, the **Insured** shall:

(1) use all due diligence and do all things reasonably practicable to avoid or diminish any loss; and

© 2004, The Hartford

App. 000053

**(2)** use all reasonable efforts not to disclose the existence of this Coverage Part.

**(C) Consolidation – Merger**

If through consolidation or merger with, purchase or acquisition of assets or liabilities of, some other entity, any additional persons become an **Insured** or **Insured Persons** or the Insured acquires the use and control of any additional **Premises**:

**(1)** The **Insured** must give the Insurer written notice and obtain its written consent to extend this insurance to such additional **Insured Persons** or **Premises**. The Insurer may condition its consent upon payment of an additional premium; but

**(2)** For the first 90 days after the effective date of such consolidation, merger, or purchase or acquisition of assets or liabilities, any insurance afforded for **Insured Persons** or **Premises** also applies to these additional **Insured Persons** or **Premises** for acts occurring within this 90-day period.

As respects the coverage provided by this Coverage Part, with respect to the consolidation, merger, purchase or acquisition of assets or liabilities, no coverage shall apply if there are known incidents or threats as of the date of the acquisition, if such incidents or threats are known to:

**(a)** the **Insured**;

**(b)** any **Insured Person**;

**(c)** the entity from whom the **Insured** is consolidating, merging, purchasing or acquiring assets or liabilities; or

**(d)** the employees, officers, directors, managers, members or partners of an entity described in (c) above.

**(D) Expense Coverage**

The Insurer shall indemnify the **Insured** for **Expenses** incurred by the **Insured** for the purpose of investigating a **Kidnapping** or **Extortion Threat**, paying **Ransom Monies**, negotiating or obtaining the release of any **Insured Person** or guest, or other **Expenses** directly related to a **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking**; provided such **Kidnapping**, **Extortion Threat**, **Detention** or **Hijacking** is insured hereunder. Indemnification for **Expenses** under Insuring Agreement (A) shall be in addition to the Limit of Insurance; provided that the amount payable hereunder for **Expenses** involved with any loss under Insuring Agreement (A) shall not exceed the Limit(s) of Insurance stated in Item 1 of the Declarations for that Insuring Agreement.

**(E) Joint Insured**

**(1)** By acceptance of this Coverage Part, the first named **Insured** for itself and all other **Insureds** agree that this Coverage Part embodies all agreements existing between themselves and the Insurer or any of its agents relating to this insurance. The first named **Insured** will act for itself and for every other **Insured** for purposes of this insurance.

**(2)** If any **Insured** or **Insured Person** has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every **Insured** and **Insured Person**.

**(3)** An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

**(4)** All losses and other payments, if any, payable by the Insurer shall be payable to the first named **Insured**, and the Insurer shall not be responsible for the proper application of any payment made. The Insurer shall not be liable for loss sustained by one **Insured** to the advantage of any other **Insured**. If the **Insured** shall agree to and shall make payment to any **Insured** other than the first named **Insured** or to any **Insured Person**, such payment shall be treated as though made to the first named **Insured**.

App. 000054

(5)   The **Insurer** will not pay more for loss sustained by more than one **Insured** than the amount it would pay if all the loss had been sustained by one **Insured**.

**(F)   Limits of Insurance and Deductible**

(1)   The Insurer's Limit of Insurance shall apply only to that part of loss that is excess of the applicable Deductible Amount indicated in Item 1. of the Declarations of the Coverage Part.

(2)   Subject to (1) above, if a Coverage Part Limit of Insurance is shown in Item 1. of the Coverage Part Declarations, the Insurer's maximum liability for all loss during the **Policy Period** shall not exceed the Coverage Part Limit of Insurance stated in Item 1. of the Coverage Part Declarations.

(3)   Subject to (1) and (2) above, the Insurer's maximum liability for each loss shall not exceed the Limit(s) of Insurance set forth in Item 1 of the Declarations of this Coverage Part, regardless of the number of **Insureds** or **Insured Persons** sustaining the loss.

(4)   Payment of loss under this Coverage Part will not reduce the liability of the Insurer for other losses; provided that the maximum liability of the Insurer will not exceed the dollar amount as set forth in Item 1 in the Declarations of this Coverage Part:

(a)   Applicable to Insuring Agreement (A):  for all loss of property and other consideration actually surrendered as **Ransom Monies** and **Extortion Threat** payments arising from one **Kidnapping** or **Extortion Threat** or a series of related **Kidnappings** or **Extortion Threats**;

(b)   Applicable to Insuring Agreement (B):  for all **Expenses** arising from one **Kidnapping, Extortion Threat, Detention** or **Hijacking** or a series of related **Extortion Threats, Detentions** or **Hijackings**;

(c)   Applicable to Insuring Agreement (C):  for all loss of property and other consideration intended as **Ransom Monies** or **Extortion Threat** payments arising from one **Kidnapping** or **Extortion Threat** or a series of **Kidnappings** or **Extortion Threats**;

(d)   Applicable to Insuring Agreement (D):

(i)    If an **Insured Person** suffers more than one covered **Personal Accidental Death, Dismemberment & Disability Loss**, the Insurers maximum liability for all such **Personal Accidental Death, Dismemberment & Disability Loss** shall be the All **Other Personal Accidental Death, Dismemberment & Disability Loss** amount as set forth in 1. D. (ii) of the Declarations of this Coverage Part.

(ii)   If more than one **Insured Person** suffers a covered **Personal Accidental Death, Dismemberment & Disability Loss** resulting from the same **Kidnapping, Extortion Threat, Detention** or **Hijacking** or a series of related **Extortion Threats, Detentions** or **Hijackings**, the Insurers maximum liability for all such **Personal Accidental Death, Dismemberment & Disability Loss** shall be All Other **Personal Accidental Death, Dismemberment & Disability Loss** amount as set forth in 1. D. (ii) of the Declarations of this Coverage Part, which shall be divided proportionately among such **Insured Persons**.

Loss includes the total of **Ransom Monies**, net of all recoveries, which the **Insured** shall have (a) paid by reason of any one **Kidnapping**, alleged **Kidnapping** or **Extortion Threat**, or (b) lost while being delivered by reason of any one **Kidnapping**, alleged **Kidnapping** or **Extortion Threat**. A connected series of acts, incidents or events of **Extortion Threat** by one person or collaborating persons shall constitute one loss.

In the event there are multiple **Insureds** or **Insured Persons**, the maximum liability of the Insurer for loss sustained by one or all **Insureds** or **Insured Persons** shall not exceed the amount for which the Insurer would be liable if all losses were sustained by one **Insured** or **Insured Person**. The Limit of Insurance applicable to any loss shall not be cumulative from **Policy Period** to **Policy Period**.

App. 000055

**(G) Loss Sustained**

A loss shall be deemed to have been sustained under:

**(1)** Insuring Agreement (A), at the time of the surrender of the **Ransom Monies** or **Extortion Threat** payment;

**(2)** Insuring Agreement (B), at the time of payment of incurred **Expenses**;

**(3)** Insuring Agreement (C), at the time of the actual destruction, disappearance, confiscation or wrongful abstraction of **Ransom Monies**;

**(4)** Insuring Agreement (D), at the time of the **Accidental Loss**.

**(H) Personal Assets**

In the event that a demand for **Ransom Monies** or a **Bodily Injury Extortion Threat** is directed against any **Insured Person** rather than against the **Insured**, **Ransom Monies** surrendered, or intended to be surrendered by or on behalf of such **Insured Person** and the following resulting **Expenses**: (C)(1) through (9) and (C)(13) through (15); incurred by or on behalf of such **Insured Person** shall at the option of the **Insured**, be considered property or other consideration surrendered on behalf of the **Insured** and **Expenses** incurred by the **Insured**. The **Insured** must approve the **Ransom Monies** or **Extortion Threat** payment made by the **Insured Person**.

## V.  CONDITIONS AND LIMITATIONS:

**(A) RECOVERIES**

In the event of any payment under this Policy, all recoveries, less the actual cost to the Company of recovery, shall be distributed in the following manner: the **Insured** shall be reimbursed for any loss and/or **Expense** which exceed the amount of insurance provided by this Policy; the balance, if any, shall be applied to reimbursement of the Company to the extent of its payment and any remainder paid to the **Insured**. If there is no excess payment, any such recoveries shall be distributed first in reimbursement to the Company to the extent of its payment and any remainder paid to the **Insured**.

**(B) POLICY PERIOD**

This Coverage Part applies to loss or **Expenses** sustained at any time, provided that they result from a **Kidnapping, Extortion Threat, Detention** or **Hijacking** which occurs during the **Policy Period** and provided that any claim for such loss or **Expenses** is reported to the Company no later than twelve (12) months after the expiration of the **Policy Period**.

**(C) VALUATION**

The Company shall not be liable for more than the actual cash value of any **Ransom Monies** paid at the time it is paid less any amounts which are recovered from the persons to whom the **Ransom Monies** were paid. If a loss or **Expense** involves currency other than that of the United States of America, the Company shall not be liable for more than the United States dollar equivalent of the foreign currency as of the day when the foreign currency is paid as **Ransom Monies**. The rate of the exchange will be at the rate published in the Wall Street Journal on the day when the **Ransom Monies** are paid.

App. 000056

**ENDORSEMENT NO:**    1

⌐nis endorsement, effective 12:01 am,    3/04/07
of policy number    00 KB 0229269-07                            **forms part**

**issued to:**    SOUTHWEST HOUSING MANAGEMENT

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ADD SUBSIDIARY ENDORSEMENT

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**COMMON TERMS AND CONDITIONS**, section **II. COMMON DEFINITIONS, (T) "Subsidiary"**, is amended by the addition of the following:

**Subsidiary** also means:

AFFORDABLE HOUSING CONSTRUCTION, INC.
SOUTHWEST HOUSING INVESTMENTS
SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.

⌐ther terms and conditions remain unchanged.

David Zwiener, President

PE 00 H074 01 0805                    © 2005, The Hartford                    Page 1 of 1

App. 000057

ENDORSEMENT NO:    2

This endorsement, effective 12:01 am,        3/04/07                    forms part
of policy number        00 KB 0229269-07

issued to:        SOUTHWEST HOUSING MANAGEMENT

by:        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### HIPAA COVERAGE

### (INCLUDING SUBLIMIT FOR PENALTIES)

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**Fiduciary Liability Coverage Part,** Section II. DEFINITIONS (G), **Loss** is amended to include civil penalties imposed upon an **Insured** under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or any rules or regulations promulgated thereunder.

**Fiduciary Liability Coverage Part,** Section II. DEFINITIONS (K), **Wrongful Act** is amended to include any actual or alleged breach of the responsibilities, obligations or duties imposed upon an **Insured** by HIPAA or any rules or regulations promulgated thereunder.

The Insurer's aggregate Limit of Liability for all **Loss** involving civil penalties imposed upon an **Insured** under HIPAA or any rules or regulations promulgated thereunder shall be $25,000. Such Limit of Liability shall be part of, and not in addition to, the **Fiduciary Liability** aggregate limit of liability shown on the Declarations.

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H111 00 0304                    © 2004, The Hartford                    Page 1 of 1

ENDORSEMENT NO:    3

This endorsement, effective 12:01 am,    3/04/07    forms part
policy number    00 KB 0229269-07

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### JOINT INSURED

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

This endorsement modifies the Crime Coverage Part insurance provided under the following:

INSURING AGREEMENT -    ☒    EMPLOYEE THEFT - INSURING AGREEMENT 1.

☒    DEPOSITORS FORGERY OR ALTERATION - INSURING AGREEMENT 2.

☒    INSIDE THE PREMISES – MONEY, SECURITIES AND OTHER PROPERTY – INSURING AGREEMENT 3.

☒    OUTSIDE THE PREMISES – MONEY, SECURITIES AND OTHER PROPERTY – INSURING AGREEMENT 4.

☒    COMPUTER AND FUNDS TRANSFER FRAUD - INSURING AGREEMENT 5.

☒    MONEY ORDERS AND COUNTERFEIT CURRENCY – INSURING AGREEMENT 6

The following is/are added as a named Insured:

TX BROOK APTS LP;TX MELODY APTS LP;TX BIRCHWOOD APTS LP;HILLSBORO HSNG LP;
CHATTANOOGA HSNG,LP;KNOLLWOOD VILLAS,LP;TX HILLSIDE APTS LP;OAK HOLLOW HSNG,LP;
TX TIMBERCREEK,LP;CO CREEKSIDE HSNG,LP;TAHOE HSNG,LP;HIGHLAND GARDENS,LP;
CLARKRIDGE VILLAS HSNG,LP;SOUTHERN OAKS HSNG,LP;TX; KIRNWOOD APTS LP; ARLINGTON
SR HSNG LP;MHMR SR HSNG,LP;GREENVILLE SR HSNG,LP; TX HAMPTON SR HSNG LP;
PARKS AT WESTMORELAND SR HSNG,LP;ARBORS HSNG PARTNERS,LTD; TX BLUFFVIEW HSNG,
LP;CEDAR HILL SR HSNG,LP;HEATHERWILDE VILLAS HSNG,LP; PLEASANT VALLEY VILLAS
HSNG,LP;LAREDO VISTA,LP; HEATHERWILDE ESTATES HSNG,LP;PLEASANT VALLEY
COURTYARDS,LP;HICKORY TRACE HSNG,LP;PRIMROSE SA II HSNG,LP;PRIMROSE HOUSTON I
HSNG,LP;PRIMROSE HOUSTON SO HSNG,LP;TX HAMPTON VILLAS,LP; PRIMROSE HOUSTON
HSNG,LP;PRIMROSE SA IV HSNG,LP;ARBOR WOODS HSNG,LP;TX ALDINE-BENDER HSNG,LP;
TX OLD MANOR HSNG,LP;TX PASADENA HSNG,LP;TX LAURELAND HSNG,LP; TX JOHN WEST
HSNG,LP;TX CRIST HSNG,LP;TX GARTH HSNG,LP;TX SCYENE HSNG,LP;TX BAMMEL HSNG,LP;
PARMER VILLAS HSNG,LP;PRIMROSE HOUSTON 7 HSNG,LP;TX ACME A SO HSNG,LP; NEW
BRAUNFELS 2 HSNG,LP;TX PLEASANTON HSNG,LP;TX PALACIO HSNG,LP;HAYDEN 05 HSNG,LP;
EXCONDIDO HSNG,LP;TX TENISON HSNG,LP;CLARK 05 HSNG,LP

© 2004, The Hartford

App. 000059

ENDORSEMENT NO:    3

The following is/are deleted as a named Insured:

All other terms and conditions remain unchanged.

David Zwiener, President

App. 000060

ENDORSEMENT NO:    4

is endorsement, effective 12:01 am,    3/04/07    forms part
or policy number    00 KB 0229269-07

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## JOINT VENTURE, GENERAL PARTNERSHIP,

## LIMITED PARTNERSHIP OR LIMITED LIABILITY COMPANY

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

This endorsement applies to **INSURING AGREEMENT 1. – EMPLOYEE THEFT** of the Crime Coverage Part of the Policy.

I.   This insurance covers losses to any joint venture, general partnership, limited partnership or limited liability company in which the **Insured** participates, and coverage shall only apply to the **Insured's** percentage of ownership interest in the joint venture, general partnership, limited partnership or limited liability company. Coverage for loss shall only apply if such loss results directly from **Theft** by the **Insured's Employee(s)**. Losses caused by employees of other joint venture, general partnership, limited partnership or limited liability company participants are not covered under this Crime Coverage Part.

II.  Section **VI. GENERAL CONDITIONS,** paragraph **(K) OWNERSHIP OF PROPERTY; INTERESTS COVERED** is modified to be in compliance with this endorsement.

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H160 00 0404    © 2004, The Hartford    Page 1 of 1

**App. 000061**

ENDORSEMENT NO:    5

This endorsement, effective 12:01 am,    3/04/07
of policy number    00 KB 0229269-07    forms    part

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND TERRITORY

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

This endorsement applies to the Kidnap and Ransom/Extortion Coverage Part of the Policy.

**COMMON TERMS AND CONDITIONS**, Section **XXVI.**, **COVERAGE TERRITORY** is deleted and replaced by the following:

**XXVI.    COVERAGE TERRITORY**

Coverage under this Policy applies worldwide with the exception that, with respect to the Kidnap and Ransom/Extortion Coverage Part indicated above, there shall be no coverage for acts committed or events occurring within the following territories scheduled below:

**SCHEDULE OF EXCLUDED TERRITORIES:**

COLOMBIA

David Zwiener, President

PE 00 H175 00 0404    © 2004, The Hartford    Page 1 of 1

App. 000062

ENDORSEMENT NO:    6

This endorsement, effective 12:01 am,    3/04/07    forms part
policy number    00 KB 0229269-07

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ENCORE! PLUS ENDORSEMENT

## (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

**COMMON TERMS AND CONDITIONS,** are amended as follows:

1. Section **II., COMMON DEFINITIONS,** is amended by the addition of the following:

   **(v )**    **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

2. Section **II., COMMON DEFINITIONS, (I), Insured Entity,** is amended by the addition of the following:

   **Insured Entity** shall also include any such entity as a general partner of a limited partnership in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the limited partnership interest and such **Insured Entity** is the sole general partner.

3. Section **III., COVERAGE EXTENSIONS, (A), Spousal Liability Coverage,** is deleted and replaced with the following:

   **(A) Spousal/Domestic Partner Liability Coverage**

   Coverage shall apply to the lawful spouse or **Domestic Partner** of an **Insured Person** for a **Claim** made against such spouse or **Domestic Partner**, provided that:

   **(1)**    such **Claim** arises solely out of:

       **(a)**    such person's status as the spouse or **Domestic Partner** of an **Insured Person;** or

       **(b)**    such spouse or **Domestic Partner's** ownership of property sought as recovery for a **Wrongful Act**;

   **(2)**    the **Insured Person** is named in such **Claim** together with the spouse or **Domestic Partner**; and

   **(3)**    coverage of the spouse or **Domestic Partner** shall be on the same terms and conditions, including any applicable Deductible, as apply to coverage of the **Insured Person** for such **Claim**.

   No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse or **Domestic Partner**.

4. Section **VIII., NOTICE OF CLAIM, (A),** is deleted and replaced with the following:

   **(A)**    As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the termination of the **Policy Period**, or Extended Reporting Period as described in Section IX. Such notice shall specify the Coverage Part under which notice is being given.

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H243 00 1105    © 2005, The Hartford    Page 1 of 1

ENDORSEMENT NO:    7

This endorsement, effective 12:01 am,    3/04/07    forms part
of policy number    00 KB 0229269-07

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIFIC INDIVIDUAL CLAIMANT EXCLUSION

## EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, (A),** is amended to include the following:

(7   ) brought by, or on behalf of, the individual(s) listed below, and/or the estate, beneficiaries, heirs, legal representatives, and assigns of such individual(s):
   CHRISTINE SULLIVAN

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 M024 00 0904    © 2004, The Hartford    Page 1 of 1

ENDORSEMENT NO:     8

is endorsement, effective 12:01 am,     3/04/07     forms part
. policy number     00 KB 0229269-07

**issued to:**     SOUTHWEST HOUSING MANAGEMENT

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS AMENDATORY

## COMMON TERMS AND CONDITIONS ENDORSEMENT

Solely with respect to all **Liability Coverage Parts**:

I.     **Extended Reporting Period**

A.     It is hereby understood and agreed that the following paragraphs are added to Section **II. COMMON DEFINITIONS**:

(W  ) **Termination of Coverage**, whether undertaken by the Insurer or the **Insured** at any time, means:

(1)     cancellation or nonrenewal of a policy, other than for nonpayment of premium; or

(2)     decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured**.

B.     It is hereby understood and agreed upon that Section **IX. EXTENDED REPORTING PERIOD** is deleted and replaced by:

IX.     **EXTENDED REPORTING PERIOD**

(A)     Upon **Termination of Coverage**, the Named Entity shall be entitled to an automatic extended reporting period ("Automatic Extended Reporting Period") of thirty (30) days from the end of the **Policy Period** to report **Claims** under this Policy.

(B)     If this Policy is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under this Policy (the "Optional Extended Reporting Period").

(C)     To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor. The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within 60 days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

(D)     The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

PE 42 H052 01 0504     © 2004, The Hartford     Page 1 of 2

ENDORSEMENT NO:    8

**(E)**  The Optional Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the Automatic Extended Reporting Period, but the duration will not be less than twelve (12) months.

**(F)**  Coverage during the Automatic Extended Reporting Period or the Optional Extended Reporting Period shall apply to **Claims** made for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described in Section XIV. CHANGES IN EXPOSURE (B). No coverage shall apply for any **Wrongful Act** occurring after such time.

**(G)**  There is no separate or additional Limit of Liability for the Extended Reporting Period.

All other terms and conditions remain unchanged.

David Zwiener, President

App. 000066

ENDORSEMENT NO:    9

This endorsement, effective 12:01 am,    3/04/07    forms part
of policy number    00 KB 0229269-07

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS NUCLEAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following Coverage Parts:

PRIVATE CHOICE ENCORE POLICY

Soley for the purpose of this endorsement:

I.    **FIDUCIARY LIABILITY COVERAGE PART, MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE PART and DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART**, Section **II. DEFINITIONS** is amended to add:

M_.    **Nuclear Waste** means any waste material **(a)** containing **By-Product Material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **Source Material** content, and **(b)** resulting from the operation by any person or organization of any **Nuclear Reactor** or any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing **Spent Fuel**, or **(3)** handling, processing or packaging **Nuclear Waste**;

N_.    **Nuclear Reactor** means any apparatus designed or used to sustain nuclear fission in a self supporting chain reaction or to contain a critical mass of fissionable material;

O_.    **Spent Fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **Nuclear Reactor**;

P_.    **Source Material** and **By-Product Material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

II.    **DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART**, section **IV.**, **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, is amended to add:

(M )    based upon, arising from, or in any way related to any:

1.    discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

2.    direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, **Nuclear Waste** or radiation;

provided that this exclusion shall not apply to any **Derivative Action** otherwise covered under Insuring Agreement **(A) Insured Person Liability**.

PE 42 H088 00 0504    © 2004, The Hartford    Page 1 of 2

ENDORSEMENT NO:    9

III.  **FIDUCIARY LIABILITY COVERAGE PART**, section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, and **MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE PART**, section **III., EXCLUSIONS**, are amended to add:

(A8)  based upon, arising from, or in any way related to any:

    1.  discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

    2.  direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, **Nuclear Waste** or radiation.

All other terms and conditions remain unchanged.

David Zwiener, President

App. 000068

ENDORSEMENT NO:    10

s endorsement, effective 12:01 am,        3/04/07                    forms part
oɪ policy number      00 KB 0229269-07

**issued to:**         SOUTHWEST HOUSING MANAGEMENT

**by:**              TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND EMPLOYEE BENEFIT PLANS PROVISIONS

This endorsement modifies insurance provided under:

**PRIVATE CHOICE ENCORE! POLICY**

**CRIME COVERAGE PART** section **VI. GENERAL CONDITIONS, (I) EMPLOYEE BENEFIT PLANS PROVISIONS, (1),**
is amended by adding the following:

No deductible shall apply to such loss.

ther terms and conditions remain unchanged.

David Zwiener, President

PE 00 H247 00 0106                    © 2006, The Hartford                    Page 1 of 1

ENDORSEMENT NO: 11

This endorsement, effective 12:01 am,    3/04/07                              forms part
policy number    00 KB 0229269-07

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### GENETIC MAKEUP ENDORSEMENT

This endorsement modifies insurance provided under the following:

PRIVATE CHOICE ENCORE! POLICY

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, Section **II, DEFINITIONS, (D) (3),** is deleted and replaced by the following:

(3)   employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, genetic makeup or refusal to submit to genetic makeup testing, or other protected status established under federal, state or local law;

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H239 00 0405                    © 2005, The Hartford                    Page 1 of 1

ENDORSEMENT NO:    12

This endorsement, effective 12:01 am,    3/04/07
policy number    00 KB 0229269-07

forms part

**issued to:**    SOUTHWEST HOUSING MANAGEMENT

**by:**    TWIN CITY FIRE INSURANCE CO.

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS CANCELLATION AND NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

I.    The Cancellation provision of this Policy is deleted and replaced by the following:

### NOTICE OF CANCELLATION

A.    This Policy may be canceled by the **Insured** by surrender thereof to the **Insurer** or any of its authorized agents or by mailing to the **Insurer** a written notice stating when thereafter the cancellation shall be effective.

B.    The **Insurer** may cancel this Policy at any time during the term of this Policy only for nonpayment of premium.

C.    The **Insurer** shall deliver or mail to the **Insured** a written notice of cancellation at the address shown on this Policy not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reasons(s) for cancellation.

D.    The **Insurer** may not cancel this Policy based solely on the fact that the **Insured** is an elected official.

E.    If this Policy shall be cancelled by the **Insured**, the **Insurer** shall retain the customary short rate proportion of the premium hereon, except as otherwise provided in this Policy. If the **Insurer** cancels this Policy, the **Insurer** shall retain the pro rata proportion of the premium hereon.

II.    The following provision is added:

### NOTICE OF NONRENEWAL

A.    The **Insurer** may refuse to renew this Policy by delivering or mailing to the **Insured** a written Notice of Nonrenewal at the address shown on this Policy. Such written notice shall state the reason(s) for nonrenewal. The Notice of Nonrenewal must be delivered or mailed not later than the 60th day before the date on which this Policy expires. If the notice is delivered or mailed later than the 60th day before the date on which this Policy expires, the coverage shall remain in effect until the 61st day after the date on which the notice is delivered or mailed. Earned premium for any period of coverage that extends beyond the expiration date of this Policy shall be computed pro rata based on the previous year's rates.

B.    The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

HR 42 H003 00 0605    © 2005, The Hartford    Page 1 of 2

App. 000071

ENDORSEMENT NO:    12

C.    The **Insurer** may not refuse to renew this Policy based solely on the fact that the **Insured** is an elected official.

All other terms and conditions remain unchanged.

David Zwiener, President

App. 000072

ENDORSEMENT NO:    13

This endorsement, effective 12:01 am,    3/04/07    forms part
Policy number    00 KB 0229269-07

issued to:    SOUTHWEST HOUSING MANAGEMENT

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS CHANGES

## (Applicable to the Crime Coverage and Kidnap and Ransom/Extortion Coverage)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE! POLICY**

With respect to the Crime Coverage Part, the following condition is added to Section **VI., GENERAL CONDITIONS**.

With respect to the Kidnap And Ransom/Extortion Coverage the following is added to Section **V. CONDITIONS AND LIMITATIONS**.

**CLAIMS HANDLING**

Within 15 days after Insurer receives written notice of **Claim**, Insurer will:

    **a.**  acknowledge receipt of the **Claim**. If Insurer does not acknowledge receipt of the **Claim** in writing, Insurer will keep a record of the date, method and content of the acknowledgment;

    **b.**  begin any investigation of the **Claim**; and

    **c.**  request a signed, sworn proof of loss, specify the information **Insured** must provide and supply **Insured** with the necessary forms. Insurer may request more information at a later date, if during the investigation of the **Claim** such additional information is necessary.

**2.**  Insurer will notify **Insured** in writing as to whether:

    **a.**  the **Claim** or part of the **Claim** will be paid;

    **b.**  the **Claim** or part of the **Claim** has been denied, and inform **Insured** of the reasons for denial;

    **c.**  more information is necessary; or

    **d.**  Insurer needs additional time to reach a decision. If Insurer needs additional time, Insurer will inform **Insured** of the reasons for such need.

Insurer will provide notification, as described in **2.a.** through **2.d.** above, within 15 business days after Insurer receives the signed, sworn proof of loss and all information Insurer requested.

If Insurer has notified **Insured** that Insurer needs additional time to reach a decision, Insurer must then either approve or deny the **Claim** within 45 days of such notice.

PE 42 H177 00 0904    © 2004, The Hartford    Page 1 of 2

App. 000073

ENDORSEMENT NO: 13

3. Insurer will pay for covered loss or damage within 5 business days after:

    a. Insurer has notified **Insured** that payment of the **Claim** or part of the **Claim** will be made and has reached agreement with **Insured** on the amount of **loss**; or

    b. an award has been made.

However, if payment of the **Claim** or part of the **Claim** is conditioned on **Insured's** compliance with any of the terms of this Coverage Part, Insurer will make payment within 5 business days after the date **Insured** has complied with such terms.

4. The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

All other terms and conditions remain unchanged.

David Zwiener, President

**Named Insured:**   SOUTHWEST HOUSING MANAGEMENT

**Policy Number:**   00 KB 0229269-07

**Effective Date of this Notice:**   3/04/07

**Insurer:**   TWIN CITY FIRE INSURANCE CO.

# IMPORTANT NOTICE TO POLICYHOLDERS – TERRORISM RISK INSURANCE ACT

You are hereby notified that under the Terrorism Risk Insurance Act (the "Act") we must make terrorism coverage as defined by the Act available in your policy. However, the actual coverage provided by your policy for acts of terrorism, as is true for all coverages, is limited by the terms, conditions, exclusions, limits, other provisions of your policy, any endorsements to the policy and generally applicable rules of law.

The terrorism coverage as defined by the Act does not apply to Crime, Kidnap and Ransom/Extortion, or Miscellaneous Professional Liability coverage parts, if any or all of those coverage parts are elected under this policy

Any terrorism coverage as defined by the Act made available in our policies is partially reinsured by the United States of America under a formula established by the Act. Under this formula, for losses occurring in 2006, the United States will pay 90% of covered terrorism losses exceeding a statutorily established deductible paid by insurers until such time as insured losses under the program reach $100 billion. For losses occurring in 2007, the United States will pay 85% of covered terrorism losses exceeding a statutorily established deductible paid by insurers until such time as insured losses under the program reach $100 billion. If losses under the program reach $100 billion, Congress will determine the procedures for, and the source of, any payments for losses in excess of $100 billion.

You will not be required to pay a premium for terrorism coverage at this time. If, upon renewal of your policy, a premium is g to be charged for terrorism coverage, we will provide you with notification of what that premium will be.

Losses that are not eligible for federal reinsurance under the Act include, but are not limited to, losses due to acts of terrorism to property located outside the United States (as defined in the Act) and losses due to acts of domestic terrorism.

App. 000075

**IMPORTANT NOTICE**

To obtain information or make a complaint:

You may contact your agent.

You may call The Hartford Insurance Group at the toll-free telephone number for information or to make a complaint at:

**1-800-392-7805**

You may also write to The Hartford.

**The Hartford
Hartford Plaza
Hartford, CT. 06115**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

**1-800-252-3439**

You may write the Texas Department of Insurance

P.O. Box 149104
Austin, TX 78714-9104
Fax Number (512) 475-1771

**PREMIUM OR CLAIMS DISPUTES: Should you have a dispute concerning your premium or about a claim you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.**

**ATTACH THIS NOTICE TO YOUR POLICY: This notice is for information only and does not become a part or condition of the attached document.**

ILNP 85 16 06 92 TX
RN 42 N014 0000093KB  0229269-07    3/04/07

---

**AVISO IMPORTANTE**

Para obtener informacion o para someter una queja.

Puede comunicarse con su agente.

Usted puede llamar al numero de telefono gratis de The Hartford Insurance Group para informacion o para someter una queja al

**1-800-392-7805**

Usted tambien puede escribir a The Hartford.

**The Hartford
Hartford Plaza
Hartford, CT. 06115**

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas

P.O. Box 149104
Austin, TX 78714-9104
Fax Number (512) 475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS: Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI)**

**UNA ESTE AVISO A SU POLIZA: Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.**

Dear Insured:

Your insurance coverage is offered through one of the member insurance companies of The Hartford Insurance Group. The Hartford Insurance Companies recognize that minimizing the exposure to loss is a major concern for each policyholder. We maintain a fully staffed Loss Control Department which can assist you in identifying and reducing such loss exposure. If you are interested in obtaining more information on the nature of these loss control services, please contact your insurance producer or:

    The Hartford
    Hartford Plaza
    Hartford, CT  06115

    Telephone — (860)–547-4707

Please contact me if you require any other information.

RN 42 R030 01 1098
        00  KB  0229269–07      3/04/07

App. 000077



THE
HARTFORD

## RENEWAL APPLICATION FOR
# PRIVATE CHOICE ENCORE!

**NOTICE: THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE, PROVIDED THAT SUCH NOTICE IS GIVEN NOT LATER THAN 60 DAYS AFTER ANY MANAGER BECOMES AWARE THAT SUCH CLAIM HAS BEEN MADE. DEFENSE COSTS ARE APPLIED AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

### 1. GENERAL INFORMATION

a) Name of Company: *Southwest Housing Management*

b) Address: *5910 North Central Expwy #1145*
*Dallas, Texas 75206*

### 2. REQUESTED RENEWAL PROGRAM

__X__ Same coverage as expiring **OR** ___ Different program requested as follows:

*For those Coverage Parts you are seeking to purchase for the first time from The Hartford, please complete the applicable sections of the Private Choice Encore! Application (including Sections 11 & 12 if purchasing a Liability Coverage Part). — form # PE 00 H001 03 0804*

a) Liability Coverage Parts and Features Requested with desired Limit (Indicate with 'x')
- ❑ Directors & Officers — Limit:_____
- ❑ Employment Practices Liability — Limit:_____
  - ❑ 3rd Party Liability
- ❑ Fiduciary Liability — Limit:_____
- ❑ Miscellaneous Professional Liability — Limit:_____

Defense Outside the Limit is desired ___ Yes __ No
Please indicate if an Aggregate Limit for all purchased Liability Coverage Parts is desired ___Yes __ No

b) Non Liability Coverage Parts Requested with desired Limit (Indicate with 'x')
- ❑ Kidnap and Ransom/Extortion — Limit:_____
- ❑ Crime — Limit:_____ Deductible:_____

### 3. COMPANY INFORMATION

a) Total Revenues as of most recent fiscal year end: *2005* $ *145,405,659*
b) Total Assets as of most recent fiscal year end: $ *74,536,984*
c) Total Employees: *380*
d) In the next 12 months is the Company contemplating (or has the Company completed within the last year) any actual or proposed merger, acquisition or divestment, any registration for a public offering or a private placement of securities, any location, facility or office closings, consolidations or layoffs or any reorganization or arrangement with creditors under federal or state law? ___Yes _X_No
e) Has the Company, or anyone for whom insurance is intended, been involved in: any civil or criminal action or administrative proceeding alleging a violation of any federal or state law or regulation? _X_Yes ___No

© 2004, The Hartford                                        Page 1 of 5

f) Has the Company had any breach or violation of any debt covenant or loan agreement or any other material contractual obligation? ___Yes _X_No

g) Have the Company's auditors informed the Company of any disagreements or weaknesses with its accounting practices? ___Yes _X_No

If the answer is yes to any of the above, please provide details.

## 4. DIRECTORS & OFFICERS COVERAGE PART (Complete Only if Renewing this Coverage Part)

a) Over the past 12 months, has there been any change in the board of directors or senior management? ___Yes _X_No

b) Has there been any change in the Company's ownership structure within the last twelve months? ___Yes _X_No

If the answer is yes to any of the above, please provide details.

## 5. EMPLOYMENT PRACTICES LIABILITY COVERAGE PART (Complete Only if Renewing this Coverage Part)

a) For the current year, please list the following Employee information

| | | | |
|---|---|---|---|
| Total Employees | _____ | Union | 0 |
| Full Time | _____ | Independent Contractors | 0 |
| Part Time | _____ | | |

Please list the total number of employees in the following jurisdictions.

| | | | | | |
|---|---|---|---|---|---|
| MICHIGAN | — | TEXAS | _____ | FOREIGN | — |
| CALIFORNIA | — | OTHER | _____ | | |

b) Within the last year has the Company updated or modified its employment practices handbook, or human resources policies, procedures or department? If yes, please attach a copy of updated materials and a description of changes. _X_Yes ___No

## 6. FIDUCIARY LIABILITY COVERAGE PART (Complete Only if Renewing this Coverage Part)

a) During the past 12 months has there been, or during the next 12 months, does the Company anticipate any reduction in benefits including the merging or terminating or creation of any plan(s)? ___Yes _X_No

b) Are there any outstanding delinquent contributions to any plans? ___Yes _X_No

If the answer is yes to any of the above, please provide details.

## 7. MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE PART (Complete Miscellaneous Professional Liability Supplemental Application if this Coverage Part is Requested)

## 8. CRIME COVERAGE PART (Complete Only if Renewing this Coverage Part)

Have there been any changes to the Company's system of internal controls since last renewal? If yes, please provide details. ___Yes _X_No

## 9. KIDNAP AND RANSOM/EXTORTION COVERAGE PART (Complete Only if Renewing this Coverage Part)

Have there been any changes since last renewal with regard to foreign travel and foreign locations? If yes, please provide details. ___Yes _X_No

App. 000079

MATERIALS REQUESTED:

Please include the following:

- Most recent audited Financial Statement or Annual Report and CPA opinion
- Latest CPA letter to management and any written response thereto

THE INFORMATION PROVIDED IN THIS RENEWAL APPLICATION IS FOR UNDERWRITING PURPOSES ONLY AND DOES NOT CONSTITUTE NOTICE TO THE INSURANCE COMPANY OF A CLAIM OR POTENTIAL CLAIM UNDER ANY POLICY. IF YOU INTEND TO NOTICE A CLAIM OR POTENTIAL CLAIM FOR POSSIBLE COVERAGE, PLEASE COMPLY WITH THE NOTICE OF CLAIM CONDITIONS/PROVISIONS FOUND IN YOUR POLICY, BY SENDING WRITTEN NOTICE OF SUCH TO THE CLAIMS DEPARTMENT AT THE HARTFORD, HARTFORD FINANCIAL PRODUCTS, 2 PARK AVENUE, NEW YORK, NEW YORK 10016.

## FRAUD WARNING STATEMENTS

**ARKANSAS APPLICANTS: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.**

**COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.**

**DISTRICT OF COLUMBIA APPLICANTS:" IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."**

**FLORIDA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.**

**HAWAII APPLICANTS: FOR YOUR PROTECTION, HAWAII LAW REQUIRES YOU TO BE INFORMED THAT PRESENTING A FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT IS A CRIME PUNISHABLE BY FINES OR IMPRISONMENT, OR BOTH.**

**KENTUCKY APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.**

**LOUISIANA APPLICANTS: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.**

**MAINE APPLICANTS: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.**

**NEW JERSEY APPLICANTS:    ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.**

**NEW MEXICO APPLICANTS: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.**

**NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY MATERIAL FACT THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL BE ALSO SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.**

**OHIO APPLICANTS: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.**

**OKLAHOMA APPLICANTS: WARNING:  ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.**

**OREGON APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD AN INSURER: (1) BY SUBMITTING AN APPLICATION OR; (2) FILING A CLAIM CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAYBE VIOLATING STATE LAW.**

**PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.**

**TENNESSEE: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.**

**VIRGINIA APPLICANTS: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.**

**WEST VIRGINIA APPLICANTS:    ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.**

THE UNDERSIGNED AUTHORIZED OFFICER OF THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE.  THE UNDERSIGNED AUTHORIZED OFFICER AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY

App. 000081

THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE. THE "EFFECTIVE DATE" IS THE DATE THE COVERAGE IS BOUND OR THE FIRST DAY OF THE CURRENT LICY PERIOD, WHICHEVER IS LATER.

SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED AND IT WILL BE ATTACHED TO AND BECOME A PART OF THE POLICY.

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF.

THIS APPLICATION MUST BE SIGNED BY THE CHAIRMAN OF THE BOARD, CHIEF EXECUTIVE OFFICER OR THE PRESIDENT OF THE COMPANY

SIGNATURE _____

TITLE: _CFO_____  DATE _2-17-07_____

PLEASE SUBMIT THIS PROPOSAL AND APPROPRIATE MATERIALS TO:

(Enter the address and phone number of the local The Hartford office.)

App. 000082

Case 3:23-cv-00769-N Document 525 Filed 10/06/23 Page 86 of 242 PageID 9272

olicy Information                                                    +++
Policy Information

olicy      KB 0229269    Effective Date  3/04/07    Endorsement Date  3/04/08
ompany    0007          TWIN CITY FIRE INSURANCE CO.    Entry Date      2/28/08
o⌒t       81227         LOCKTON COMPANIES OF COLORADO    DENVER
ccount                  0000158358                      PRIVATELY HELD
nsured Name 1           SOUTHWEST HOUSING MANAGEMENT     Telephone       _____
nsured Name 2           _____
ddress 1                5910 NORTH CENTRAL EXPRESSWAY    Endorsement      1
ddress 2                SUITE #1145                     Coverage End    0/00/00
ddress 3                _____        User Id         BB22
ity/St/Zip/Country DALLAS            TX 75206      USA Can Dt/Cd    0/00/00
J SLA #                 _____                    SUSAN CARLEY
ivision     ?  410       Department    ? H53        Underwriter   ? 0090
ubproducer  ?  _____    Market Region ? 04         Prod Region   ? 01
nsured Type ?  03        Program       ? 966        SIC Code      ? 1522
illing Method  B         Payment Plan  ? 01         Letter of Cred N
ree Trade Zone ? 0 _____ Gross Revenue ? 6          Ref Dept      ? ___
erm            _14       Expiration Date  5/05/08   True Expire      5/05/08
rig Policy Year 2006     Related Policy  _____ Single Aggregate N
irect/Assumed  D         Auto Treaty     Y          Facultative     N
roduct         EOP       Previous Policy KB 0229269 Note Pad        Y
MD: 4 Surplus Lines Info  6 Policy Level Limits
     9 Additl Named Ins  10 Finish Inquiry       12 Note Pad

New
CLAIM
COPPOLA
ELLIS

**App. 000083**

## EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

### I.  INSURING AGREEMENTS

#### (A)  Employment Practices Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

#### (B)  Third Party Liability (Elective)

If Third Party Liability Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Third Party Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to the Third Party Liability Coverage Sublimit of Liability, Deductible, and Prior or Pending Date in Item 5 of the Declarations. Such Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this Coverage Part.

### II.  DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

#### (A)  "Benefits" means any form of compensation other than salaries, wages, bonuses, or **Stock Benefits**.

#### (B)  "Claim" means any:

(1)  **Employment Practices Claim**; or

(2)  **Third Party Claim**.

#### (C)  "Employment Practices Claim" means any:

(1)  written demand for monetary damages or non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

(2)  civil proceeding commenced by the service of a complaint or similar pleading;

(3)  formal administrative or regulatory proceeding, including, without limitation, a proceeding before the **Equal Employment Opportunity Commission** or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document; or

(4)  arbitration proceeding commenced by a demand for arbitration,

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor.**

**"Employment Practices Claim"** also means an audit conducted by the United States of America Office of Federal Contract Compliance Programs commenced by the receipt of a notice of violation, order to show cause, or a written demand for monetary or injunctive relief.

**App. 000084**

"**Employment Practices Claim**" also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Employment Practices Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

"**Employment Practices Claim**" shall not include any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.

(D)  "**Employment Practices Wrongful Act**" means a **Wrongful Act** involving any:

(1)  wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

(2)  sexual or other workplace harassment, including quid pro quo and hostile work environment;

(3)  employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;

(4)  invasion of privacy, employment-related defamation (including libel and slander) or any employment-related misrepresentation;

(5)  **Retaliation**;

(6)  breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

(7)  violation of the Family and Medical Leave Act.

To the extent that an **Employment Practices Claim** alleges an **Employment Practices Wrongful Act** described above, "**Employment Practices Wrongful Act**" also means a **Wrongful Act** related to the above involving any:

(1)  employment-related wrongful infliction of emotional distress or mental anguish;

(2)  failure to create, provide for or enforce adequate or consistent employment-related policies or procedures; or

(3)  negligent retention, supervision, hiring or training.

(E)  "**Independent Contractor**" means any natural person working in the capacity of an independent contractor pursuant to an **Independent Contractor Agreement**.

(F)  "**Independent Contractor Agreement**" means any express contract or agreement between an **Independent Contractor** and an **Insured Entity** specifying the terms of the **Insured Entity's** engagement of such **Independent Contractor**.

(G)  "**Insured Person**" means any:

(1)  **Employee**;

(2)  **Manager**; or

(3)  regarding Insuring Agreement (A), an **Independent Contractor** provided that within 30 days of an **Employment Practices Claim** having been made against such **Independent Contractor** that the **Insured Entity** agrees in writing to indemnify such **Independent Contractor** for any **Loss** arising out of such **Claim**.

**App. 000085**

(H) **"Insureds"** means any:

    (1) **Insured Entity**; or

    (2) **Insured Person**.

(I)   **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

**Loss** shall include punitive and exemplary damages, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, or the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall not include:

    (1) taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

    (2) non-monetary relief;

    (3) future compensation, including **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim**;

    (4) **Stock Benefits**; or

    (5) salaries, wages, or bonuses, except as a component of a front or back pay award.

(J) **Retaliation** means negative treatment of an **Employee** or **Independent Contractor** based upon such person:

    (1) exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

    (2) refusing to violate any law;

    (3) assisting, testifying in, or cooperating with a proceeding or investigation regarding alleged violations of law by an **Insured Entity**;

    (4) disclosing or threatening to disclose alleged violations of law to a superior or to any governmental agency; or

    (5) filing any claim against an **Insured Entity** under the Federal False Claims Act or any similar "whistle blower" laws.

(K) **"Stock Benefits"** means any offering, plan or agreement between an **Insured Entity** and any **Employee** that grants stock, stock options or stock appreciation rights in the **Insured Entity** to such person, including, without limitation, restricted stock or any other stock grant. **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans.

(L) **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of an **Insured Entity. Third Party** shall not include **Employees**.

(M) **"Third Party Claim"** means any:

    (1) written demand for monetary damages or non-monetary relief commenced by the receipt of such demand;

**App. 000086**

**(2)** civil proceeding commenced by the service of a complaint or similar pleading;

**(3)** formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; or

**(4)** arbitration proceeding commenced by the filing of a demand for arbitration,

by or on behalf of a **Third Party**.

**"Third Party Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Third Party Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**(N)** **"Third Party Wrongful Act"** means a **Wrongful Act** involving any:

**(1)** discrimination against a **Third Party** based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law; or

**(2)** sexual harassment against a **Third Party**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

**(O)** **"Wrongful Act"** means any actual or alleged:

**(1)** error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

**(2)** matter claimed against an **Insured Person** solely by reason of their serving in such capacity.

## III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)** The Insurer shall not pay **Loss** for any **Claim**:

**(1)** for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

**(2)** based upon, arising from, or in any way related to any:

**(a)** prior or pending demand, suit or proceeding against any **Insureds** as of; or

**(b)** audit initiated by the Office of Federal Contract Compliance Programs before,

the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit, proceeding, or audit;

**(3)** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

**(4)** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

**(5)** for breach of any **Independent Contractor Agreement**; or

**(6)** for violation of the National Labor Relations Act or any similar law.

PE 00 H014 00 0502                           ©2002, The Hartford                          Page 4 of 6
  00 KB 0229269-07    3/04/07

App. 000087

**(B)** Other than an **Employment Practices Claim** for **Retaliation**, the Insurer shall not pay **Loss** for any **Claim**:

  **(1)** based upon, arising from, or in any way related to any:

    **(a)** discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

    **(b)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

  **(2)** based upon, arising from, or in any way related to any workers' compensation, unemployment compensation, disability benefits, or social security law, or any similar law;

  **(3)** for violation of **ERISA** (except Section 510), the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

  **(4)** for violation of the Fair Labor Standards Act (except Equal Pay Act) or any similar law, including, without limitation, any law governing:

    **(a)** overtime wages; or

    **(b)** minimum wages.

**(C)** Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

  **(1)** for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement;

  **(2)** for costs associated with providing any accommodations required by the Americans With Disabilities Act or any similar law;

  **(3)** for **Benefits**, provided that this exclusion shall not apply to any **Employment Practices Claim** for wrongful termination, dismissal or discharge of employment; or

  **(4)** based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.

## IV. EXCLUSION APPLICABLE TO INSURING AGREEMENT (B)

The Insurer shall not pay **Loss** for any **Third Party Claim** based upon, arising from or in any way related to any price discrimination or violation of any anti-trust law or any similar law designed to protect competition or prevent unfair trade practices.

## V. OTHER INSURANCE

**(A)** The coverage provided under this Policy for any **Employment Practices Claim** shall be primary.

**(B)** Notwithstanding the above, the coverage provided under this Policy for any **Employment Practices Claim** made against a temporary, leased or loaned **Employee** or an **Independent Contractor** shall be excess of the amount of any deductible, retention and limits of liability under any other policy or policies applicable to such **Claim**, whether such other policy or policies are stated to be primary, contributory, excess, contingent or

otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## VI.  COORDINATION OF COVERAGE

If this Coverage Part and either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part are included under this Policy, and a **Claim** is covered under this Coverage Part and any such other Coverage Part, **Loss** shall be first covered and paid under this Coverage Part.

If notice of a **Claim** has been given under either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part and a determination is made by the Insurer that such **Claim** would be covered under this Coverage Part if notice had been given under this Coverage Part, then the **Insureds** shall be deemed to have given notice of such **Claim** under this Coverage Part at the same time that notice was given under such other Coverage Part.

## VII.  CHANGES IN EXPOSURE

(A)  This section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

(B)  In addition to the asset percentage size limit for automatic coverage of any newly merged or acquired entity specified in Common Terms and Conditions Section XIV. Changes in Exposure (A), if the number of employees of a newly merged or acquired entity exceeds 25% of the number of employees of all **Insured Entities** combined prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

## VIII.  DEDUCTIBLE WAIVER

Regarding a **Claim** that is a class action civil proceeding, no Deductible shall apply to **Defense Costs** incurred in connection with such **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Deductible otherwise applicable to such **Claim**, if a:

(A)  final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

(B)  complete and final settlement with prejudice;

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

App. 000089

**FIDUCIARY LIABILITY COVERAGE PART**

## I. INSURING AGREEMENTS

### (A) Fiduciary Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Fiduciary Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds** or by any person for whose **Wrongful Acts** the **Insureds** are legally responsible.

### (B) Settlement Programs (Elective)

If Settlement Program Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Settlement Fees** on behalf of the **Insureds** resulting from a **Settlement Program** for which a **Settlement Program Notice** is received by the Insurer during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to a Sublimit of Liability of $100,000. Such a Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this Coverage Part. This Insuring Agreement shall also be subject to the Settlement Program Coverage Deductible and Prior or Pending Date in Item 5 of the Declarations.

## DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

**(A)**   **"Claim"** means any:

  **(1)**   **Fiduciary Claim**; or

  **(2)**   **Settlement Program Notice.**

**(B)**   **"Employee Stock Ownership Plan"** means any **Insured Plan** that invests more than 10% of its assets in securities of **Insured Entities.**

**(C)**   **"Fiduciary Claim"** means any:

  **(1)**   written demand for monetary damages or injunctive relief commenced by the receipt of such demand;

  **(2)**   civil proceeding commenced by the service of a complaint or similar pleading;

  **(3)**   criminal proceeding commenced by the return of an indictment; or

  **(4)**   formal administrative or regulatory proceeding commenced by the filing or service of a notice of charges, formal investigative order or similar document, including an investigation by the Department of Labor or Pension Benefit Guaranty Corporation.

**"Fiduciary Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Fiduciary Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

App. 000090

(D) **"Insured Person"** means any:

    (1) **Manager**;

    (2) **Employee**; or

    (3) past, present, or future trustee of an **Insured Plan** in such person's capacity as a trustee.

(E) **"Insured Plan"** means any past, present, or future:

    (1) employee welfare benefit plan or employee pension benefit plan, as defined in **ERISA**, sponsored solely by an **Insured Entity**, or jointly by an **Insured Entity** and a labor organization, for the benefit of **Employees** only;

    (2) employee benefit plan, including an excess benefit plan, not subject to Title 1 of **ERISA**, sponsored solely by an **Insured Entity** for the benefit of **Employees** only;

    (3) government-mandated insurance program for unemployment, social security or disability benefits for **Employees** other than workers compensation; or

    (4) any other plan, fund, or program specifically included as an **Insured Plan** in a written endorsement issued by the Insurer to form a part of this Policy.

Notwithstanding the above, an **Insured Plan** shall not include any:

    (1) **Employee Stock Ownership Plan**; or

    (2) any multi-employer plan.

(F) **"Insureds"** means any:

    (1) **Insured Entity**;

    (2) **Insured Person**; or

    (3) **Insured Plan**.

(G) **"Loss"** means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

**Loss** shall include punitive and exemplary damages and the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy, that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall not include:

    (1) taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed; or

    (2) non-monetary relief.

Notwithstanding the above, **Loss** shall include:

    (1) civil penalties of up to 5% imposed pursuant to **ERISA** Section 502(i) or up to 20% imposed pursuant to **ERISA** Section 502(l); or

**(2)** if Settlement Program Coverage is included, **Settlement Fees**.

**(H)** **"Settlement Fees"** mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insureds** become legally obligated to pay as a result of a **Wrongful Act**. **Settlement Fees** shall not include costs of corrections, other than fees or penalties.

**(I)** **"Settlement Program"** means any voluntary compliance resolution program or similar voluntary settlement program administered by the United States of America Internal Revenue Service or any other governmental body that is entered into by an **Insured Entity**.

**(J)** **"Settlement Program Notice"** means a prior written notice to the Insurer by any **Insured Entity** of its intent to enter into a **Settlement Program** that includes a detailed description of the **Wrongful Act** for which notice will be given under the **Settlement Program**.

**(K)** **"Wrongful Act"** means any actual or alleged:

**(1)** error, misstatement, misleading statement, act, omission, neglect or breach of duty constituting a violation of any responsibilities, obligations or duties imposed upon fiduciaries of an **Insured Plan** by **ERISA** or any similar law;

**(2)** error, misstatement, misleading statement, act, omission, neglect or breach of duty in counseling, providing interpretations, handling records, or effecting enrollment, termination or cancellation of **Employees**, participants, or beneficiaries under an **Insured Plan**; or

**(3)** matter claimed against any **Insureds** solely due to such **Insureds** acting in the capacity of a fiduciary of an **Insured Plan**.

## EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)** The Insurer shall not pay **Loss** for any **Claim**:

**(1)** for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

**(2)** based upon, arising from, or in any way related to any prior or pending demand, suit or proceeding against any **Insureds** as of the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

**(3)** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

**(4)** based upon, arising from, or in any way related to any:

**(a)** discharge, dispersal, release, or escape of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release or escape; or

**(b)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste;

**(5)** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability:

App. 000092

     **(a)**  that would have been incurred in the absence of such contract or agreement; or

     **(b)**  assumed under any agreement or declaration of trust under which any **Insured Plan** was established;

  **(6)**  based upon, arising from, or in any way related to the gaining, in fact, of any personal profit, remuneration or advantage to which the **Insureds** are not legally entitled; or

  **(7)**  based upon, arising from, or in any way related to any deliberately fraudulent or criminal act or omission or any willful violation of law by the **Insureds** if a judgment or other final adjudication establishes such an act, omission or violation.

  Regarding exclusions (6) and (7) above, no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**.

**(B)**  Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

  **(1)**  for failure to pay benefits pursuant to any **Insured Plan**, provided that this exclusion shall not apply to the extent that recovery of such benefits is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person**;

  **(2)**  based upon, arising from, or in any way related to a failure to fund, or collect contributions owed to, an **Insured Plan**; or

  **(3)**  for return or reversion of any contributions or assets to an **Insured Entity** from an **Insured Plan**.

## WAIVER OF RECOURSE

The Insurer shall have no right of recourse against any **Insureds** for any payment of **Loss** made by the Insurer under this Coverage Part because of a **Wrongful Act** by such **Insureds** if the premium for this Policy was paid for by other than an **Insured Plan**.

## V.  CHANGES IN EXPOSURE

**(A)**  This Section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)**  The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (A) Mergers and New Subsidiaries shall also apply to any employee benefit plan of any newly merged or acquired entity and to any trustee of such plan to the extent that such plan and trustee would otherwise qualify as **Insureds** under this Policy. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before the merger or acquisition of the entity or for any **Interrelated Wrongful Acts** thereto.

**(C)**  The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (C) Loss of Subsidiary Status shall also apply to any **Insured Plan** of a former **Subsidiary** and any trustee of such plan. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after an entity ceases to be a **Subsidiary**.

## VI.  TERMINATED PLAN COVERAGE

**App. 000093**

Subject to the terms and conditions of this Policy and Coverage Part, coverage shall be afforded for **Loss** resulting from any **Claim** against the **Insureds** for a **Wrongful Act** involving any **Insured Plan** terminated by an **Insured Entity**, including post-termination **Wrongful Acts**.

## VII. DEDUCTIBLE WAIVER

No Deductible shall apply to **Defense Costs** incurred in connection with a **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Deductible otherwise applicable to such **Claim**, if a:

**(A)** final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)** complete and final settlement with prejudice,

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

CAUSE NO. _____



| JEFFREY W. CARPENTER, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHWEST HOUSING DEVELOPMENT | § | AT LAW NO. ___ |
| COMPANY, INC.; SOUTHWEST | § | |
| HOUSING MANAGEMENT COMPANY, | § | |
| INC.; AFFORDABLE HOUSING | § | |
| CONSTRUCTION, INC.; BRIAN | § | |
| POTASHNIK; and CHERYL POTASHNIK, | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND PETITION FOR
## TEMPORARY RESTRAINING ORDER AND INJUNCTION

TO THE HONORABLE JUDGE OF THE COURT:

Jeffrey W. Carpenter files this Original Petition and Petition for Temporary Restraining Order

and Injunction complaining of Defendants and would show the court the following:

## I.
## LEVEL III DISCOVERY CONTROL PLAN

1.    Discovery is intended to be conducted under Level III pursuant to Texas Rule of Civil

Procedure 190.4.

## II.
## PARTIES

2.    Plaintiff Jeffrey W. Carpenter is an individual residing in Dallas, Dallas County,

Texas.

3.    Defendant Southwest Housing Development Company, Inc. ("SWHD") is a Texas

corporation with its principal place of business in Dallas County, Texas.

4.    Defendant Southwest Housing Management Company, Inc. ("SWHM") is a Texas

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                        page 1
R:\6\0646\60881\SubsPldgs\Petition.doc

App. 000095

corporation with its principal place of business in Dallas County, Texas.

    5.      Defendant Affordable Housing Construction, Inc. ("AHC") is a foreign corporation with its principal place of business in Dallas County, Texas.

    6.      Defendant Brian Potashnik is a resident of Dallas, Dallas County, Texas.

    7.      Defendant Cheryl Potashnik is a resident of Dallas, Dallas County, Texas.

### III.
### SERVICE

    8.      Defendant Southwest Housing Development Company, Inc may be served as follows:

**Southwest Housing Development Company, Inc.**
**By Serving Its Registered Agent for Service of Process**
**Keith R. Jones**
**5910 N. Central Expwy., Suite 1145**
**Dallas, TX 75206**

or at any other location where it may be legally served.

    9.      Defendant Southwest Housing Management Company, Inc. may be served as follows:

**Southwest Housing Management Company, Inc.**
**By Serving Its Registered Agent for Service of Process**
**Keith R. Jones**
**5910 N. Central Expwy., Suite 1145**
**Dallas, TX 75206**

or at any other location where it may be legally served.

    10.     Defendant Affordable Housing Construction, Inc. may be served as follows:

**Affordable Housing Construction, Inc.**
**By Serving Its Registered Agent for Service of Process**
**Warren Kirshenbaum**
**5910 N. Central Expwy., Suite 1145**
**Dallas, TX 75206**

or at any other location where it may be legally served.

    11.     Defendant Brian Potashnik may be served as follows:

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction          page 2
R:\6\0646\60881\SubsPldgs\Petition.doc

**App. 000096**

**Brian Potashnik**
**4419 Highland Drive**
**Dallas, TX 75205**

or at any other location where he may be legally served.

12.    Defendant Cheryl Potashnik may be served as follows:

**Cheryl Potashnik**
**4419 Highland Drive**
**Dallas, TX 75205**

or at any other location where she may be legally served.

**IV.**
**JURISDICTION AND VENUE**

13.    Plaintiff seeks damages and relief for one or more of Defendants' breaches of contract committed in Dallas County, Texas. Defendants conduct business and/or reside or maintain principal places of business in Dallas County, Texas. Plaintiff's damages are in excess of the minimum jurisdictional limit of this court. Therefore, jurisdiction and venue are proper in this court.

**V.**
**FACTS**

14.    Brian and Cheryl Potashnik are two individuals under indictment by the United States of America for their involvement in real estate dealings done by and through their companies SWHD, SWHM, and/or AHC. Exhibit A (the "Indictment"). The real estate dealings generally involve low-income subsidized multi-family projects that relied on tax-exempt bonds and housing credits.

15.    The indicted felony offenses include:

    a.    Conspiracy to Commit Bribery Concerning a State Government Receiving Federal Benefits (Indictment p. 26);

    b.    Bribery Concerning a State Government Receiving Federal Benefits and aiding and abetting (Indictment p. 43);

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                                 page 3
R:\6\0646\60881\SubsPldgs\Petition.doc

**App. 000097**

c.   Conspiracy to Commit Bribery Concerning a Local Government Receiving Federal Benefits (Indictment p. 47); and

d.   Bribery Concerning a Local Government Receiving Federal Benefits and Aiding and Abetting (Indictment p. 91).

16.   The United States seeks for the Potashniks, upon conviction of any of the offenses, to forfeit "any and all property constituting or derived from proceeds traceable to the respective offense." Indictment p. 163.

17.   The factual allegations evidence various means used by the Potashniks to move money, and make payments, in an effort to conceal their activities including:

a.   using personal checks to conceal payments (Indictment p. 28);

b.   maintaining accounts under SWHM to conceal payment of bills (Indictment p. 29);

c.   using other entities' accounts to make payments (*e.g.*, Indictment p. 30); and

d.   purchasing money orders to conceal payments (*e.g.*, Indictment p. 39).

18.   The Potashniks also allegedly made birthday party contributions, cash payments, cash payments for purported consulting fees, and awarded construction contracts to further their activities and artifice. Indictment p. 50. They even insisted on invoices to help form the appearance of legitimacy. Indictment p. 51. They categorized payments falsely as legal fees (Indictment p. 57), as consulting fees (Indictment p. 58), and worked on building "files" for the transactions (Indictment p. 61).

19.   Each of these activities (and the many others in the Indictment not set forth specifically herein), singularly or collectively, display an ability and willingness to secrete, hide, or falsify financial transactions.

20.   On or around October 16, 2006, (prior to the July 27, 2007 indictment) one or more of

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                                           page 4
R:\6\0646\60881\SubsPldgs\Petition.doc

**App. 000098**

the Defendants and related or affiliated limited partnerships or similar entities, including those listed

herein, (collectively "Southwest Housing entities") entered a Letter of Intent ("LOI") with Cascade

Affordable Housing, LLC and its related entities (collectively "CAH"). The LOI is to purchase from

the Southwest Housing entities:

> Any and all rights, benefits and interests in or derived from each Partnership
> or Project by Seller, directly or indirectly, including without limitation,
> general partnership interests, Class B limited partner interests, loan
> receivables, incentive management fees, distributions, capital proceeds,
> development fees, guaranty fees, asset management fees, property
> management fees and disposition fees and the agreements associated
> therewith (altogether, the "Assets"). The Assets shall include, in any event,
> 100% of the general partnership interest in each Partnership, except in those
> Partnerships where Southwest is not affiliated with the general partner.

The LOI is signed by the Potashniks with no reference they signed for a specific entity or in a

capacity for an entity.

21.      The partnerships and projects identified included, but are not limited to:

> Arbor Woods Housing, L.P.
> Arbors Housing Partners, Ltd.
> Arlington Senior Housing, L.P.
> Cedar Hill Senior Housing, L.P.
> Chattanooga Housing, L.P.
> Clark 05 Housing, L.P.
> Clarkridge Villas Housing, L.P.
> Heatherwilde Estates Housing, LP
> Hickory Trace Housing, L.P.
> Highland Gardens, L.P.
> Hillsboro Housing, L.P.
> Knollwood Villas, L.P.
> Laredo Vista Housing, L.P.
> MHMR Senior Housing, L.P.
> New Braunfels 2 Housing, L.P.
> Oak Hollow Housing, L.P.
> Parmer Villas Housing, L.P.
> Pleasant Valley Courtyards Housing, L.P.
> Pleasant Valley Villas Housing, L.P.
> Primrose Houston 1 Housing, L.P.
> Primrose Houston 7 Housing, L.P.

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                                    page 5
R:\6\0646\60881\SubsPldgs\Petition.doc

**App. 000099**

Primrose Houston South Housing, L.P.
Primrose SA II Housing, L.P.
Primrose SA IV Housing, L.P.
Southern Oaks Housing, L.P.
Tahoe Housing, L.P.
Texas Birchwood Apartments, L.P.
Texas Brook Apartments, L.P.
Texas Hampton Senior Housing, L.P.
Texas Kimwood Apartments, L.P.
Texas Melody Apartments, L.P.
Texas-Estrada Apartments L.P.
TX Acme A South Housing, L.P.
TX Aldine-Bender Housing, L.P.
TX Bammel Housing, L.P.
TX Bluffview Housing, L.P.
TX Crist Housing, L.P.
TX Garth Housing, L.P.
TX Hampton Villas, L.P.
TX Hillside Apartments, L.P.
TX John West Housing, L.P.
TX Laureland Housing, L.P.
TX Old Manor Housing, L.P.
TX Palacio Housing, L.P.
TX Pasadena Housing, L.P.
TX Pleasanton Housing, L.P.
TX Scyene Housing, L.P.
TX Tenison Housing, L.P.
TX Timbercreek Housing, L.P.

22.    Generally, the sale is for interests in various housing developments. The properties are owned by limited partnerships. The limited partnerships generally have the same registered agent or registered agent address as the Southwest Housing Defendants. Additionally, the general partner of each limited partnership is normally a limited liability company with the same address as the limited partnership and the Southwest Housing Defendants. The principal for most of the general partners is usually either Mr. or Ms. Potashnik. Finally, apparently as part of the Sale, limited liability companies (with names generally beginning with "CAH-HDA" and continuing with names very similar to the limited partnerships and the general partners) were formed in August of 2007.

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                    page 6
R:\6\0646\60881\SubsPldgs\Petition.doc

App. 000100

23.    By way of example, Arbor Woods Housing, L.P.'s registered agent is:

Warren A. Kirshenbaum
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206

The principal is listed as:

Arbor Woods Development, L.L.C.
General Partner
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206

Arbor Woods Development, L.L.C. has its registered agent as

Keith R. Jones
5910 N. Central Expwy.
Dallas, Texas 75206

and its principal is

Cheryl Potashnik
Director-President
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206.

Exhibit B.

24.    As another example, Clark 05 Housing, L.P. has its registered agent as

Warren A. Kirshenbaum
5910 N. Central Expwy.
Dallas, Texas 75206

and its general partner as

Clark 05 Development, L.L.C.
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206

The general partner's registered agent is

Keith R. Jones
5910 N. Central Expwy., Suite 1145
Dallas, Texas 75206

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc
page 7

App. 000101

and the principal is

Brian Potashnik
Manager
5910 N. Central Expwy.
Dallas, Texas 75206.

Exhibit C.

25.     On or around March 12-14, 2008, one or more of the Defendants and/or the Southwest Housing entities will sell to CAH their interest in approximately 46 properties with approximately 6-8 interests in other property to be sold/closed in the near future (collectively the "Sale"). The Sale was approved by the Texas Department of Housing and Community Affairs on or about January 31, 2008. Exhibit D (portion of hearing transcript). The value of the Sale is estimated at a base price of $37 million. The sale is for all of the partnerships' interests in each property controlled by the Southwest Housing entities, their furniture, furnishings, and to assume an office space lease. Essentially, the Sale will leave only shells.

26.     When the Sale process began, one or more of the Defendants agreed to pay to Plaintiff 3% of the gross Sale less normal closing costs of brokerage fees, attorneys' fees related to the Sale (not the criminal case), title fees and other normal closing costs. The agreement was made in consideration for, in part, Plaintiff remaining an employee of one or more of the Defendants to assist in effectuating the Sale.

27.     Not surprisingly, as the Sale was close to becoming final, Brian and Cheryl Potashnik individually and/or as principals of the Southwest Housing Defendants or entities repudiated the performance of Defendants' contractual obligations, without excuse.

28.     Defendants' refusal to perform the contract is a breach of it.

29.     As set forth hereinabove, and in the Indictment (which is incorporated herein as if set

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\6088 l\SubsPldgs\Petition.doc

page 8

App. 000102

forth verbatim), the Potashniks are facing substantial criminal liabilities. Defendants have exhibited and shown over the course of years a proclivity and willingness to secrete funds, move funds through the use of various vehicles (checks, cash, traveler's checks, false invoices), and falsify documents.

30.    The Potashniks are currently subject to significant, potential legal liabilities, necessitating the expenditure of substantial sums for the defense of same. The Potashnik's trial date was recently continued until January 20, 2009 in part because of the case's complexity. Exhibit E.

31.    The Potashniks maintain off-shore financial accounts to which some, most, or all of the Sale's funds may be secreted and placed outside of the court's jurisdiction.

32.    Moreover, the Sale will leave shell entities with no continuing operations or revenue.

33.    Plaintiff, as set forth more fully below, does NOT seek to effect the Sale (and such would not be in his interests), but, instead seeks through equitable relief to have 3% of the net Sale (estimated to be $1,080,000) plus the minimum $150,000 in owed bonuses (as set forth below) placed into the registry of the Court. No amount is sought for the other components of the ultimate recovery potential at this time. Plaintiff will be irreparably injured and without adequate legal relief if the Sale's funds are dissipated, misused or secreted. The amount is a small fraction of the Sale.

34.    Additionally, in February 2004, Plaintiff entered an Employment Agreement with SHM. Exhibit F. In accordance with paragraph 4(b), Plaintiff was to receive between $50,000 and $200,000 for his 2004 year bonus, with subsequent years being paid similarly.

35.    Despite this clear contractual agreement, SHM has failed and refused to pay the bonuses, thereby breaching the contract.

## VI.
### FIRST CAUSE OF ACTION AGAINST DEFENDANTS:
### BREACH OF CONTRACT: SALE AGREEMENT

36.    Plaintiff pleads a cause of action pursuant to Texas state law against Defendants for

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                    page 9
R:\6\0646\60881\SubsPldgs\Petition.doc

App. 000103

breach of contract. The allegations contained in the preceding paragraphs of this Petition are hereby re-averred and re-alleged for all purposes with the same force and effect as if set forth verbatim.

37.    Plaintiff and one or more of the Defendants entered into a valid contractual agreement providing in part 3% of the net Sale as a bonus to Plaintiff. Plaintiff gave Defendants valuable consideration and fully performed all duties required of him under the contract and performed all conditions precedent or such were waived.

38.    Defendants' breached the contract. Defendants breached the contract by repudiating the performance of their obligations, without just excuse. Defendants have absolutely and unconditionally refused to perform the contract and have showed a fixed intention to refuse to perform.

39.    As a direct and proximate result of Defendants' breach of contract, Plaintiff has suffered damages, which are largely incalculable, in excess of the minimum jurisdictional limit of this court.

40.    As a result of the above-described breach of contact, Plaintiff was required to retain attorneys to prosecute this action and agreed to pay the retained attorneys a reasonable fee. Pursuant to Texas Civil Practice & Remedies Code § 38.001 *et seq.*, Plaintiff seeks his reasonable and necessary attorneys' fees. Plaintiff has performed all conditions precedent or such have been waived.

## VII.
## SECOND CAUSE OF ACTION AGAINST SHM:
## BREACH OF CONTRACT: EMPLOYMENT BONUS

41.    Plaintiff pleads a cause of action pursuant to Texas state law against SHM for breach of contract. The allegations contained in the preceding paragraphs of this Petition are hereby re-averred and re-alleged for all purposes with the same force and effect as if set forth verbatim.

42.    Plaintiff and SHM entered into a valid written contractual agreement for Plaintiff's

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                                                page 10
R.\6\0646\6088 1\SubsPldgs\Petition.doc

App. 000104

employment. As part of the agreement, Plaintiff was to receive yearly bonuses. Plaintiff gave SHM valuable consideration and fully performed all duties required of him under the contract and performed all conditions precedent or such were waived.

43.    SHM breached the contract by failing to pay Plaintiff required bonuses.

44.    As a direct and proximate result of SHM's breach of contract, Plaintiff has suffered damages in excess of the minimum jurisdictional limit of this court.

45.    As a result of the above-described breaches of contact, Plaintiff was required to retain attorneys to prosecute this action and agreed to pay the retained attorneys a reasonable fee. Pursuant to Texas Civil Practice & Remedies Code § 38.001 *et seq.*, Plaintiff seeks his reasonable and necessary attorneys' fees. Plaintiff has performed all conditions precedent or such have been waived.

## VIII.
## PRELIMINARY INJUNCTIVE RELIEF

46.    Plaintiff seeks preliminary injunctive relief pursuant to Texas state law. The allegations contained in the preceding paragraphs of this Petition are hereby re-averred and re-alleged for all purposes with the same force and effect as if set forth verbatim.

47.    The Sale is currently scheduled to occur on or before March 17, 2008. As a result of the Sale, Defendants and/or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved), singularly or collectively, will come into possession of sums, of which approximately 3% of the net is due Plaintiff. Additionally, Plaintiff is owed a minimum of $150,000.

48.    Defendants have exhibited and shown over the course of years a proclivity and willingness to secrete funds, move funds through the use of various vehicles (checks, cash, travelers

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction                                              page 11
R:\6\0646\60881\SubsPldgs\Petition.doc

App. 000105

checks, false invoices), and are currently subject to significant, potential legal liabilities, necessitating, the expenditure of substantial sums for the defense of same. Moreover, at the Sale's conclusion, only shells of the entities will remain.

49.    Plaintiff will be irreparably harmed if Defendants or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved) are allowed to dissipate, misuse, or abscond with the Sale's funds; funds that would otherwise be available to pay for a judgment against one or more of them. Plaintiff, unless this Court enjoins Defendants from dissipating a small portion of Sale's funds, will have no adequate remedy at law as Defendants would not be able to respond in damages, or such funds will be improperly secreted.

50.    Based on the foregoing, and the facts incorporated herein as if set forth verbatim, Plaintiff moves and prays for injunctive relief described in greater particularity in the Prayer, which is incorporated by reference as if set forth verbatim to protect Plaintiff.

## IX.
## JURY DEMAND

51.    Plaintiff demands that this court empanel a lawful jury to hear this case.

## X.
## RESERVATION OF RIGHTS

52.    Plaintiff specifically reserves the right to bring additional causes of action against Defendants and to amend this Petition as necessary.

## XI.
## PRAYER

THEREFORE, Plaintiff prays that the Court:

      a.    issue a temporary restraining order:

---

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc

page 12

App. 000106

(i)    restraining Defendants or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved) from dissipating the estimated 3% of the net Sale in the amount of $1,080,000 and the $150,000 minimum owed bonus; and

(ii)    requiring Defendants or those persons in active concert or participation with them (such as the Potashniks and the limited liability companies and limited partnerships over which they have control or in which they are involved), singularly or in combination, to interplead $1,230,000 to the court's registry within 24 hours of the Sale's closing and funding;

b.    set a date for a temporary injunction hearing and, at such time, issue a temporary injunction continuing the above relief during the pendency of this action;

c.    upon final trial the court enter judgment in favor of Plaintiff against Defendants, jointly or severally, for damages, both general and special, in an amount in excess of the minimum jurisdictional limit of this court and for reasonable attorney's fees, reasonable paralegal fees, cost of court, pre- and post-judgment interest at the highest rates allowed by law; and

d.    for such other and further relief, general or special, at law or in equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

**ROGGE DUNN**
Texas State Bar No. 06249500
**GREGORY M. CLIFT**
Texas State Bar No.: 00795835
**CLOUSE DUNN KHOSHBINLLP**
5200 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2142
Telephone: (214) 220-3888
Facsimile: (214) 220-3833

**ATTORNEYS FOR PLAINTIFF**

Plaintiff's Original Petition and Petition for Temporary
Restraining Order and Injunction
R:\6\0646\60881\SubsPldgs\Petition.doc

page 13

App. 000107



**THE HARTFORD**

Jason Ellis, Esq
Claims Consultant
2 Park Avenue, 5th Floor
New York, NY 10016
Tel: 212-277-0469
Fax: 917-456-3428
jason.ellis@thehartford.com

June 10, 2008

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**#7008 0150 0003 4560 6740**

Cheryl Potashnik
Southwest Housing Management
5910 North Central Expressway
Suite #1145
Dallas, TX 75206

Re:  **Insurer:**      Twin City Fire Insurance Co.
     **Insured:**     Southwest Housing Management
     **Policy:**      Private Choice Encore!
     **Policy No.:**  KB 0229269
     **Matter:**      **Jeffrey Carpenter**
     **Ref. No.:**    08384269

Dear Ms. Potashnik:

Twin City Fire Insurance Co. ("Twin City") acknowledges receipt of an April 28, 2008 facsimile from Edie Matthews of Lockton, forwarding a copy of the lawsuit entitled <u>Jeffrey W. Carpenter v. Southwest Housing Development Company, Inc.[1]; Southwest Housing Management Company, Inc.; Affordable Housing Construction, Inc.[2]; Brian Potashnik[3]; and Cheryl Potashnik[4]</u>, filed on or about March 12, 2008 in the District Court of Dallas County, Texas.    Ms. Matthews' correspondence constitutes Twin City's first notice of this matter received on April 29, 2008. I will be managing this matter on behalf of Twin City.   Please direct all correspondence to my attention using Twin City reference number 08384269.

Twin City issued Private Choice Encore! Insurance Policy No. KB 0229269 ("the Policy") to Southwest Housing Management ("SHM"), effective for the Policy Period of March 04, 2007 to June 05, 2008 ("the Policy Period").[5]  This claims made and reported policy has a Limit of

---

[1] Common Terms and Conditions, Section II. COMMON DEFINITIONS, (T) "Subsidiary", is amended by Endorsement No 1, adding Southwest Housing Development Company, Inc. to the definition of Subsidiary.
[2] Common Terms and Conditions, Section II. COMMON DEFINITIONS, (T) "Subsidiary", is amended by Endorsement No 1, adding Affordable Housing Construction, Inc. to the definition of Subsidiary.
[3] Bryan Potashnik is the President of Southwest Housing Management and therefore an **Insured** as defined by the Policy.
[4] Cheryl Potashnik is the Chief Operating Officer of Southwest Housing Management and therefore an **Insured** as defined by the Policy.
[5] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Policy.

Cheryl Potashnik
Southwest Housing Management
June 10, 2008
Page 2

Liability of $1,000,000 in the aggregate per Policy Period subject to a deductible of $75,000 per Claim. The Limit of Liability and the deductible both are inclusive of Defense Costs and indemnity payments.

### Factual Background

Based on the information provided to Twin City to date, we understand that this matter involves Mr. Carpenter's lawsuit alleging the following causes of action: Breach of Contract: Sales Agreement; Breach of Contract: Employment Bonus; and Preliminary Injunctive Relief.

In February 2004, Mr. Carpenter entered into an employment agreement with SHM whereby Mr. Carpenter was allegedly to receive between $50,000 and $200,000 for his 2004 bonus with subsequent years being paid similarly. Mr. Carpenter alleges that Defendants breached the employment agreement and have not paid Mr. Carpenter's bonus.

On or about April 7, 2008, the Defendants filed a Counter-claim against Mr. Carpenter.

We recognize that the allegations set forth in the lawsuit are unsubstantiated at this time. Nothing contained in this letter is intended to suggest that the allegations have any legal or factual merit. An obligation to defend exists based on the allegations in the lawsuit and, subject to the terms of the Policy, at this time, Twin City shall provide the named entities and individuals with a defense of this matter, subject to the reservation of rights set forth below.

### Preliminary Coverage Evaluation

Initially, we note that the scope of coverage afforded by the Policy is set forth in Section I. of the Employment Practices Liability ("EPL") Coverage Part of the Policy, which provides that:

> The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

Since Mr. Carpenter has made an Employment Practices Claim based on an alleged Employment Practices Wrongful Act within the meaning of the Policy, at this time, we will provide a defense to the named entities and individuals subject to the following reservation of rights. **As more fully explained below, the EPL Coverage Part provides Defense Costs <u>only</u> coverage.**

Under the Insuring Agreement, the EPL Coverage Part only provides coverage for Employment Practices Claims based upon an Employment Practices Wrongful Act as defined by the Policy. In the current case, Mr. Carpenter alleges breach of contract: sales agreement; this allegation does not fall within the Policy's enumerated Employment Practices Wrongful Acts. Therefore, with respect to this allegation, Mr. Carpenter does not trigger indemnity coverage under the

Cheryl Potashnik
Southwest Housing Management
June 10, 2008
Page 3

Policy because this allegation does not fall within the scope of coverage afforded by the Insuring Agreements in Section I. of the EPL Coverage Part of the Policy.[6]

We call your attention to Section III. (C)(4) of the EPL Coverage Part, which provides that:

(C)   Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:

   (4)   based upon, arising from, or in any way related to liability incurred for breach of any written employment contract, provided that this exclusion shall not apply to liability that would have been incurred in the absence of such contract.

Mr. Carpenter's breach of contract: employment bonus allegation arises from breach of his employment contract and therefore pursuant to Section III. (C)(4) the EPL Coverage Part only affords coverage for Defense Costs.

We also note that that pursuant to EPL Coverage Section I.(A) of the Insuring Agreements, the Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds.** The definition of Loss includes Defense Costs. We also note the Definition of Defense Costs under Section II.(E) of the Common Terms and Conditions, which specifically provides that:

**"Defense Costs"** means reasonable and necessary legal fees and expenses incurred in the investigation, defense or appeal of a **Claim**. **Defense Costs** shall include the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds. **Defense Costs** shall not include salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**.

Based upon the above, the Policy only provides coverage for Claims made against Insureds; therefore the Policy does not provide coverage for or pay for the prosecution of claims brought by or on behalf of the Company against other parties. Accordingly, no coverage is provided for Defendants' counter-claim against Mr. Carpenter.

We also direct your attention to Section II. (I) of the EPL Coverage Part of the Policy, which provides the following definition of **Loss**:

'**Loss**' means the amount that the **Insureds** are legally obligated to pay as a result of a **Claim**, including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest.

**Loss** shall include punitive and exemplary damages, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, or the multiple portion of any multiplied damage award where insurable by law. Regarding the insurability of such damages, the Insurer shall not contend for any reason, unless appropriate to do so as a matter of law or public policy,

---

[6] To the extent that the breach of contract: sales agreement is potentially deemed an Employment Practices Wrongful Act, Section III. (C)(4) would apply as discussed below.

Cheryl Potashnik
Southwest Housing Management
June 10, 2008
Page 4

that such damages are uninsurable. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall not include:

(1)   taxes, fines or penalties imposed by law, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

(2)   non-monetary relief;

(3)   future compensation, including **Benefits,** for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of an **Employment Practice Claim;**

(4)   **Stock Benefits;** or

(5)   salaries, wages, or bonuses, except as a component of a front or back pay award.

If an award includes punitive, exemplary, liquidated and/or multiple damages, Policy Section II. (I) defines Loss to preclude such damages in the instance where such damages are uninsurable by law or public policy. To the extent that Section II. (I) is applicable and punitive, exemplary, liquidated and/or multiple damages are uninsurable by law or public policy, Twin City reserves the right to deny coverage of such damages. In addition, Twin City reserves all of its rights pursuant to Section II. (I) of the EPL Coverage Part of the Policy, including but not limited to the right to disclaim liability for any other damages or non-monetary relief incurred by SHM that are excluded from the definition of Loss as set forth in Section II (I).

Although indemnity payments are precluded in this matter pursuant to Section III. (C)(4), we also note that the Policy's definition of **Loss** expressly excludes salaries, wages, or bonuses except as a component of a front or back pay award; therefore, Mr. Carpenter's claims for unpaid bonuses are not covered **Loss** under the Policy.

*Other Insurance*

The allegations constituting this Claim may give rise to coverage under other insurance policies. Accordingly, if you have not already done so, we advise you to immediately place all other applicable insurers on notice of this Claim. Please advise as to whether any other insurers have been placed on notice of this matter. In addition, we request that you provide us with the following documents: all correspondence *to* other insurer(s) placing them on notice of this Claim; all correspondence *from* other insurer(s) setting forth their position with regard to coverage under their respective policies; and a complete copy of the other insurance policy(ies) at issue.

*Defense Obligation*

Cheryl Potashnik
Southwest Housing Management
June 10, 2008
Page 5

We note that Section VII. (A) of the Common Terms and Conditions of the Policy, entitled "Defense and Settlement" provides the following:

> The Insurer shall have the right and duty to defend any **Claim** for which the **Insureds** give notice to the Insurer, even if such **Claim** is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate.

Twin City's right and duty to defend includes the right to appoint defense counsel. You have advised us, however, that you have retained Lawrence J. Friedman of Friedman & Feiger LLP to defend SHM in this matter. At this time, we consent to your retention of Mr. Friedman, contingent on defense counsel's agreement to abide by the Hartford's Litigation Management Program and to the Hartford's customary billing rates of $250/hour capped for Partners, $225/hour for Associates, and $95/hour for Paralegals; the remainder of the law firm's billing shall be borne solely by SHM and not credited towards the Policy. Twin City reserves all of its rights under Section VII. (A) as set forth above, including, but not limited to, the right to appoint defense counsel of its choice.

SHM policy contains a deductible of $75,000 per Employment Practices Claim, which is applicable towards Defense Costs and/or indemnity payments. Defense Costs include fees and costs generated in the defense of this matter by defense counsel. Please instruct defense counsel to bill SHM directly, with copies to the undersigned until the deductible has been exhausted, and then to bill the undersigned directly.

Lastly, please note that Section VII. (C) of the Common Terms and Conditions of the Policy provides:

> The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

Accordingly, Twin City reserves all rights under the above-referenced Policy provision. Pursuant to SHM's duty to cooperate with Twin City, we ask that we be apprised of any contemplated settlement offers before they are made. Please also be advised that SHM may not incur any Defense Costs in connection with or settle the referenced matter without Twin City's prior consent. To that end, Twin City does not pay pre-tender fees and costs pursuant to Section VII. (C). As such, any defense fees billed and costs incurred defending the matter prior to the date the matter was first reported to Twin City, on or about April 29, 2008, will not be credited against SHM's deductible obligation.

***Reservation of Rights***

Twin City's coverage position for this matter is premised upon the allegations asserted and presently known facts. Therefore, it is subject to change as additional allegations and facts develop. If you have any additional information you believe should be factored into our coverage analysis, please feel free to provide us with such information and we will review it for

Cheryl Potashnik
Southwest Housing Management
June 10, 2008
Page 6


its impact on coverage. In the interim, all rights under the Policy, at law and/or in equity are fully and mutually reserved.

Please feel free to contact me at (212) 277-0469, should you have any questions or wish to discuss this matter further.

Very truly yours,

Jason Ellis, Esq
Claims Consultant


cc:     Edie Matthews

10/5/2015 11:53:41
JOHN F. WARR
COUNTY CLE
DALLAS COUN

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **IN THE COUNTY COURT** |
| | § | |
| SOUTHWEST HOUSING | § | **AT LAW NO. 5** |
| DEVELOPMENT COMPANY, INC.; | § | |
| SOUTHWEST HOUSING | § | **DALLAS COUNTY, TEXAS** |
| MANAGEMENT CORPORATION, | § | |
| INC. a/k/a and d/b/a SOUTHWEST | § | |
| HOUSING MANAGEMENT | § | |
| COMPANY, INC.; AFFORDABLE | § | |
| HOUSING CONSTRUCTION, INC.; | § | |
| BRIAN POTASHNIK; and | § | |
| CHERYL POTASHNIK, | § | |
| | § | |
| **Defendants.** | § | |

| | |
|---|---|
| SOUTHWEST HOUSING | § |
| MANAGEMENT CORPORATION, | § |
| INC., | § |
| | § |
| **Counter-Plaintiff,** | § |
| | § |
| v. | § |
| | § |
| JEFFREY W. CARPENTER, | § |
| | § |
| **Counter-Defendant.** | § |

## JEFFREY W. CARPENTER'S SECOND AMENDED PETITION

Jeffrey W. Carpenter — through undersigned counsel — files his Second Amended Petition and respectfully states as follows.

## DISCOVERY PLAN

1.      Jeffrey W. Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## INTRODUCTION

2.      This is an unlawful employment practices case involving refusal to pay earned compensation.

## PARTIES

3.      Jeffrey W. Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.

4.      Southwest Housing Development Company, Inc. ("SH Development") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Development has filed an answer in this civil action.

5.      Southwest Housing Management *Corporation*, Inc. ("SH Management") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Management was also known as — and was doing business as and using as an assumed or common name — Southwest Housing Management *Company*, Inc. ("SH Management Company").  Examples include, but are not limited to, the following.  SH Management sometimes used the name SH

Management Company in its Texas Franchise Tax Public Information Reports that it filed with the Texas Secretary of State. SH Management used the name SH Management Company on an agreement that it is at issue in this civil action. SH Management was originally named in this civil action in its assumed or common name, as permitted under Texas Rule of Civil Procedure 28. SH Management filed an answer in its true name in response to those allegations. Texas permits substitution of the true name through an amended petition.

6.     Affordable Housing Construction, Inc. ("AH Construction") is a Nevada corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records. AH Construction has filed an answer in this civil action.

7.     Brian Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued. Brian Potashnik has filed an answer in this civil action.

8.     Cheryl Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued. Cheryl Potashnik has filed an answer in this civil action.

## JURISDICTION

9.     This Court has subject matter jurisdiction over this civil action because Jeffrey W. Carpenter seeks damages within its jurisdictional limits and because the claims asserted herein are not subject to exclusive jurisdiction in another court. This Court has personal jurisdiction over all parties in this civil action because (1) all parties have entered a general appearance before it, (2) all parties have maintained continuous and systematic ties to Texas that make them

at home in Texas, and (3) the claims asserted herein arose from all parties' purposeful activities in Texas and the exercise of jurisdiction is reasonable.

## VENUE

10.     Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.   Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(2) because the individual defendants' residence was in Dallas County, Texas at the time the causes of action asserted herein accrued.   Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(3) because the corporate defendants each maintained their principal office in Dallas County, Texas at the time the causes of action asserted herein accrued.

## VICE-PRINCIPAL STATUS

11.     A "vice principal" is someone who fits within at least one of the following categories: (1) corporate officers, or (2) others who represent the corporation in its corporate capacity, or (3) those who have authority to employ, direct, or discharge employees of the corporation, or (4) those engaged in the performance of non-delegable or absolute duties of the corporation, or (5) those to whom the corporation has entrusted the management of the whole or a department or division of the business.   The acts and omissions of a "vice principal" are the acts and omissions of the corporation itself.   A corporation may have more than one vice principal.

12.     Brian Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  Examples include, but are not limited to, the following.  Mr. Potashnik was the only person serving on the Board of Directors for SH Development, SH Management, and AH Construction [according to Texas Secretary of State records] when he engaged in his acts and omissions at issue in this civil action.  Mr. Potashnik was also a corporate officer of SH Development, SH Management, and AH Construction when he engaged in his acts and omissions at issue in this civil action.

13.     Brian Potashnik acted as a vice principal for SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed his intent to pay more than the minimum Annual Bonuses and promised to get same done.  Mr. Potashnik acted as a vice principal for SH Development, SH Management, and AH Construction when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

14.     Cheryl Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  For example, the website for SH Development, SH Management, and AH Construction listed Ms. Potashnik as a corporate officer at the times she engaged in her acts and omissions at issue in this civil action.

15.     Cheryl Potashnik acted as a vice principal for SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed her intent to pay more than the minimum Annual Bonuses and promised to get same done.  Ms. Potashnik acted as a vice principal for SH

Development, SH Management, and AH Construction when she confirmed that the Sale Proceeds Payment was earned and was due.

## **ACTUAL OR APPARENT AUTHORITY**

16.     A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.  Actual authority arises from a party's agreement that another act on behalf and for the benefit of the party.  This authority includes whatever else is proper, usual, and necessary to do what was expressly authorized.  More than one person may have actual authority to do something.

17.     Apparent authority exists if a party (1) knowingly permits another to hold himself or herself out as having authority or (2) through lack of ordinary care, gives another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his or her detriment.  Apparent authority may exist without actual authority.  More than one person may have apparent authority to do something.

18.     Brian Potashnik had actual or apparent authority to act on behalf of SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed his intent to pay more than the minimum Annual Bonuses and promised to get same done.  Mr. Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Cheryl Potashnik, and himself when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

App. 000119

19.     Cheryl Potashnik had actual or apparent authority to act on behalf of SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed her intent to pay more than the minimum Annual Bonuses and promised to get same done.  Ms. Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Brian Potashnik, and herself when she confirmed that the Sale Proceeds Payment was earned and was due.

## FIRST CLAIM FOR RELIEF:
## FAILURE TO COMPLY WITH & REPUDIATION OF AGREEMENT —
## ANNUAL BONUSES

20.     An employer must comply with its agreements to pay bonuses to its employees. When interpreting an agreement, the facts and circumstances surrounding execution of the agreement may be considered in most cases.  When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases.  A written agreement may be orally modified, even if the written agreement states otherwise, as long as the underlying agreement is not within the statute of frauds.

21.     An agreement may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing.  The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.  When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its obligation by failing to set the amount.

22.    **Failure to comply and repudiation:** The following is not intended to be exhaustive or to state all facts.  To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth.  Brian Potashnik helped recruit Jeffrey W. Carpenter ("Jeff") to join SH Management.  Brian Potashnik worked out (1) a base salary amount and (2) bonus range amounts with a minimum bonus and a maximum bonus.  Brian Potashnik expressed that the salary and bonus range were intended to place Jeff in the range of $400,000 in earnings a year [in addition to fringe benefits].  SH Management later hired Jeff as its Executive Vice President with employment beginning March 15, 2004.

23.    Brian Potashnik — as President of SH Management *Company* — had signed a written employment agreement in that regard (the "2004 Agreement").  SH Management Company agreed therein to a $200,000 base salary.  SH Management Company agreed therein to a bonus range in the first calendar year of employment that included a $50,000 minimum and a $200,000 maximum.  SH Management Company agreed therein to provide a more detailed bonus plan within the first 90 days of employment.  SH Management Company agreed therein to review and revise the bonus structure on an annual basis.

24.    SH Management did not provide a more detailed bonus plan.  SH Management did not revise the bonus structure on an annual basis.  SH Management did not eliminate the bonus plan.  Brian Potashnik and Cheryl Potashnik both confirmed at various points during the employment tenure that Jeff was owed and had earned — *i.e.,* fully performed and met their requirements for — annual bonuses for more than just the first year (the "Annual Bonuses").  Brian Potashnik and Cheryl Potashnik both expressed at various points during the employment tenure their intent to pay more than the minimum Annual Bonuses and promised to get it done

**App. 000121**

[*i.e.*, to pay same]. SH Management did not pay the Annual Bonuses. SH Management eventually repudiated the agreement for Annual Bonuses in late 2007. SH Management caused Jeff to suffer damages as a result.

25.    **Oral modification or oral agreement:** What the parties said and did in light of the surrounding circumstances, including the course of dealing, demonstrates oral modification of the 2004 Agreement or a separate oral agreement to a bonus structure with a $50,000 minimum and a $200,000 maximum in each calendar year of employment. Under Texas law, the 2004 Agreement could be orally modified despite language in the agreement to the contrary. Oral agreements on compensation — whether considered a modification to the 2004 Agreement or a new agreement to matters not address in the 2004 Agreement — were not unusual as a matter of practice for SH Management.

26.    **Pro rata Annual Bonus for last partial year of employment:** SH Management unilaterally terminated Jeff's employment without good cause in light of an impending conclusion to an asset sale. SH Management caused Jeff's last day of work to be on or about November 2, 2007. Thus, for the last annual bonus, SH Management owes Jeff a pro rata share of the Annual Bonus based on the months he worked in the relevant calendar year. This is sometimes called a *Riata Cadillac* claim, based on the Texas Supreme Court opinion in *Miller v. Riata Cadillac Co.*

27.    **Prevention of performance, prevention of condition, and limited right to revoke:** Whether the agreement for Annual Bonuses is considered bilateral or unilateral, SH Management could not lawfully prevent performance or a condition to receiving an Annual Bonus and thereby avoid its payment obligations. For example, SH Management could not

lawfully avoid payment of the last annual bonus by unilaterally terminating Jeff's employment without good cause and then claiming Jeff was not entitled to the last annual bonus because he was not employed on the distribution date. To the extent the agreement was a unilateral agreement, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that SH Management could not revoke the offer at that point.

28.    **Sole discretion:**  The provisions in the 2004 Agreement providing that the employer may make decisions in the employer's "sole discretion" include — as a matter of law — the requirement of "good faith" in connection with any such decisions.

29.    **Termination of employment:**  Under Texas law, SH Management cannot legally refuse to pay earned compensation after termination, regardless of whether or not the 2004 Agreement contains language to the contrary and regardless of whether or not earned compensation was payable at an earlier or later date.

30.    **Alternative pleading of ambiguity:**  Pleading in the alternative only, the following provisions of the 2004 Agreement are ambiguous under the circumstances in fact and in law: (1) the ¶ 4(b) provision referring to "the minimum discretionary bonus potential" and "the maximum bonus potential," and (2) the ¶ 7 provision claiming the employee is not entitled to compensation pursuant to the 2004 Agreement effective upon termination of employment, and (3) the ¶ 3 provisions describing duties and acceptable and unacceptable moonlighting.

31.    The ¶ 4(b) provision allows discretion within the minimum and maximum bonus range but no discretion as to payment of a minimum bonus. When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its

obligation by failing to set the amount. The ¶ 7 provision does not — and legally cannot — reduce or eliminate the obligation to pay earned compensation. The ¶ 7 provision does not state that the severance payment requires any release of claims and does not state that the severance payment is in lieu of earned compensation. The ¶ 3 provisions contemplate that affiliates of SH Management Company may also employ Jeff and that such employment would be a permissible working time, attention, and energies.

32.     **Additional Responsible [Liable] Person — Brian Potashnik:** Texas Secretary of State records and Texas Comptroller records show by omission that SH Management Company never existed or operated as a legal entity in Texas. The 2004 Agreement represented that SH Management Company was a Texas corporation. If SH Management *Company* is not an assumed name for SH Management, then Brian Potashnik signed the 2004 Agreement as the President of a non-existent company — SH Management *Company* — and thus signed in his individual capacity and is individually responsible for failure to comply with the 2004 Agreement. Alternatively, if SH Management *Company* is not an assumed name for SH Management, then SH Management had exclusively an oral agreement with Jeff for the Annual Bonuses.

**SECOND CLAIM FOR RELIEF:**
**FAILURE TO COMPLY WITH & REPUDIATION OF ORAL AGREEMENT —**
**SALE PROCEEDS PAYMENT**

33.     An employer must comply with its agreements to pay employees for work. A written agreement is of no higher legal significance than an oral agreement. When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases. An agreement

may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing. The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.

34.     **Failure to comply and repudiation:**  The following is not intended to be exhaustive or to state all facts. To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth. In May of 2006, Brian Potashnik was at home when he met with Jeff. Brian Potashnik expressed that he had good news and was selling the business. Brian Potashnik explained that Jeff might not have a job after the asset sale but that he needed Jeff to stay on and help make the asset sale happen. Brian Potashnik expressed that, other than himself and his wife Cheryl, Jeff was the most important person needed to make the sale happen. Brian Potashnik said that if Jeff stayed on and assisted in effectuating the asset sale for as long as needed, Jeff would be paid a bonus from the sale proceeds — Brian Potashnik worked out the formula further down the line (the "Sale Proceeds Payment").

35.     Brian Potashnik and Cheryl Potashnik saw that Jeff accepted and stayed on and got to work to make the asset sale happen. Around six months later, Brian Potashnik and Cheryl Potashnik saw that a potential purchaser had signed a letter of intent for the multi-million dollar asset sale. Brian Potashnik then met with Jeff. Brian Potashnik expressed that Jeff probably would not have a job after the sale but that he still needed Jeff to stay on as long as needed to help make the asset sale happen. Brian Potashnik told Jeff the formula for calculating the Sale Proceeds Payment and estimated the Sale Proceeds Payment at more than $1 million.

36.     Brian Potashnik and Cheryl Potashnik saw that Jeff stayed on and continued to work to make the sale happen. Brian Potashnik and Cheryl Potashnik learned that Jeff turned

App. 000125

down or deferred other employment in order to stay on. Brian Potashnik and Cheryl Potashnik saw that the asset sale would involve assets for several sellers — SH Development, SH Management, AH Construction, Cheryl Potashnik, Brian Potashnik, and entities that each of them owned or controlled. At various points, Brian Potashnik and Cheryl Potashnik expressed that the Sale Proceeds Payment was due to Jeff.

37.    Over a year later as the asset sale looked more certain and a target management transition date was announced, Cheryl Potashnik thanked Jeff for his work and told him that he would only be needed through the end of the week. In other words, Cheryl Potashnik confirmed that Jeff had fully performed his obligations under the agreement for the Sale Proceeds Payment. Jeff's last day of work was on or about November 2, 2007. SH Development, SH Management, AH Construction, Cheryl Potashnik, and Brian Potashnik all received proceeds from the asset sale. SH Development, SH Management, AH Construction, Cheryl Potashnik, and Brian Potashnik did not pay the Sale Proceeds Payment. Brian Potashnik and Cheryl Potashnik eventually repudiated the agreement for the Sale Proceeds Bonus in late 2007. These sellers caused Mr. Carpenter to suffer damages as a result.

38.    **Prevention of performance, prevention of condition, and limited right to revoke:** Whether the agreement for the Sale Proceeds Payment is considered bilateral or unilateral, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik could not lawfully prevent performance or a condition to receiving the Sale Proceeds Payment and thereby avoid their payment obligations. For example, none of them could lawfully avoid payment by unilaterally terminating Jeff's employment without good cause before the asset sale concluded and then claim Jeff was not entitled to Sale Proceeds Payment because he

was not employed on the distribution date. Jeff fully performed under the agreement before his employment ended and thus earned Sale Proceeds Payment before his employment ended. Pleading in the alternative only, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that the offer could not be revoked at that point. Pleading further in the alternative only, Mr. Carpenter is entitled to a pro rata share of Sale Proceeds Payment based on *Riata Cadillac* principles.

### ALTERNATIVE THIRD CLAIM FOR RELIEF:
### *QUANTUM MERUIT*

39.    Pleading in the alternative only, in the event of a finding that there is no enforceable agreement for the Annual Bonuses or Sale Proceeds Payment, or in the event of a finding that there is no agreement as to a specific term, Jeff is entitled to recovery under the theory of *quantum meruit* for the reasonable value of his services provided to SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik and to prevent unjust enrichment. Jeff conferred valuable services under such circumstances as reasonably notified these persons and entities that he, in performing such services for them, expected to be paid for those services, and they benefited from those services.

### ALTERNATIVE FOURTH CLAIM FOR RELIEF:
### PROMISSORY ESTOPPEL

40.    Pleading in the alternative only, Jeff is entitled to recovery of the Annual Bonuses and Sale Proceeds Payment under the theory of promissory estoppel. As to the Annual Bonuses, SH Management and [alternatively] Brian Potashnik in his individual capacity promised the bonuses to Jeff under circumstances that made reliance on that promise foreseeable, and Jeff

relied on that promise to his detriment. As to Sale Proceeds Payment, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik promised Sale Proceeds Payment to Jeff under circumstances that made reliance on that promise foreseeable, and Jeff relied on that promise to his detriment.

## ADDITIONAL JOINT RESPONSIBILITY [LIABILITY]

### Winding Up — Individual Liability for All Obligations of Entities

41.     Brian Potashnik and Cheryl Potashnik, as governing persons or officers or directors of SH Development and SH Management are individually responsible [and liable] for the claims asserted against these entities in this civil action. SH Development and SH Management completed the process of winding up [also known as dissolution or termination of existence] without providing the statutorily required notice to Jeff. At the time of termination and winding up, Jeff had a claim [which is defined per statute to include a contingent and unliquidated claim] pending against these entities. The lack of required notice renders Mr. Potashnik and Ms. Potashnik individually liable for obligations for which these entities are liable.

### Joint Employer

42.     SH Development, SH Management Corporation, and Affordable Housing are responsible [and liable] for failure to comply with the annual bonus agreement and agreement for a bonus from net proceeds of the asset sale, based on the joint employer doctrine. Although typically applied in discrimination cases, this doctrine recognizes that more than one entity may employ a person. For example, Affordable Housing issued at least one employment

compensation check to Mr. Carpenter, but "Southwest Housing Management" was listed as the employer on W2 forms; the same principals from each of these entities had the power to hire and fire Mr. Carpenter; the Southwest Housing website listed employees of these entities as employees of the same entity; on information and belief, payroll for all entities' employees was handled through one entity [with possible reconciliation between entities at a later date]; and overall, these entities were treated as a single unit as a practical matter for employment issues.

### Joint Venture, Joint Enterprise, or Implied Partnership — Bonus from Net Proceeds of Asset Sale

43.     SH Development, SH Management, and AH Construction are responsible [and liable] for failure to comply with the agreement for a bonus from net proceeds of the asset sale, based on the joint venture, joint enterprise, or implied partnership doctrine.  These entities had an agreement, a common purpose, a community of pecuniary interest, and an equal right of control concerning the asset sale and efforts to reach an asset sale [as to control, the same principals — Brian Potashnik and/or Cheryl Potashnik controlled each entity].  On information and belief, each entity was a party to the final asset sale agreement — precisely the end to the means of the agreement made with Mr. Carpenter concerning a bonus to stay on to help effectuate the sale of the Southwest Housing entities' assets.

App. 000129

## Alter Ego

44.     Brian Potashnik and Cheryl Potashnik are responsible [and liable] for failure to comply with the annual bonus agreement and agreement for a bonus from net proceeds of the asset sale, based on alter ego as outlined in the Texas Business Organizations Code [and its predecessor to the extent applicable]. They caused the corporate form to be used for the purpose of perpetrating and did perpetrate an actual fraud on Mr. Carpenter primarily for the direct personal benefit of each of them. For example, SH Development and SH Management — which they controlled — conducted a winding up and terminated their existence after the asset sale and failed to provide the statutorily required notice to Mr. Carpenter, whose lawsuit was pending at the time. As another example, they stated that asset sale proceeds were needed to help fund their individual defense of pending criminal charges. As another example, Mr. Potashnik signed Mr. Carpenter's initial employment agreement as an officer of an apparently non-existent entity and yet represented in that agreement that the entity was a Texas corporation.

## ATTORNEYS' FEES

45.     As a result of the conduct described above, Mr. Carpenter had to hire attorneys to pursue the claims asserted herein. Mr. Carpenter has agreed to pay his attorneys a reasonable fee. Mr. Carpenter seeks to recover reasonable and necessary attorneys' fees incurred in connection with this action, including all appeals, pursuant to the provisions of the Texas Civil Practice and Remedies Code, including claims for a contract and personal services.

App. 000130

## CONDITIONS PRECEDENT

46.      All conditions precedent to filing suit and to recovery on the claims asserted herein have occurred, been performed, or been waived.

## JURY DEMAND

47.      Mr. Carpenter requests a jury trial on all issues triable of right [or choice] by a jury.  He has paid the required jury fee.

## RELIEF REQUESTED

48.      Based on the foregoing, Jeffrey Carpenter requests the following relief:

    (A)     judgment on all counts of the petition;

    (B)     back pay [past wages];

    (C)     costs of court and attorneys' fees;

    (E)     pre-judgment and post-judgment interest as allowed by law; and

    (F)     such other and further relief, in law or in equity, to which he may show himself justly entitled.

Respectfully submitted,


_/s/ Amy Gibson_____
Amy Gibson
Texas State Bar No. 00793801
David L. Wiley
Texas State Bar No. 24029901

**Gibson Wiley PLLC**
1500 Jackson Street #714
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126
Email Addresses:

amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR JEFFREY
CARPENTER

**App. 000132**

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 5, 2015, a true copy of Jeffrey W. Carpenter's Second Amended Petition was served on all other parties through their lead attorneys of record as follows:

**VIA TEXAS E-FILE SYSTEM**

Mr. Lawrence J. Friedman
Mr. Michael Donohue
Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
lfriedman@fflawoffice.com
mdonohue@fflawoffice.com
jhfriedman@fflawoffice.com

_/s/ Amy Gibson_____
Amy E. Gibson

App. 000133

7/5/2016 6:50:10
JOHN F. WARR
COUNTY CLE
DALLAS COUN

CAUSE NO. CC-08-2072-E

| | |
|---|---|
| JEFFREY W. CARPENTER, §<br>§<br> Plaintiff, §<br>§<br>v. §<br>§<br>SOUTHWEST HOUSING §<br>DEVELOPMENT COMPANY, INC.; §<br>SOUTHWEST HOUSING §<br>MANAGEMENT CORPORATION, §<br>INC. a/k/a and d/b/a SOUTHWEST §<br>HOUSING MANAGEMENT §<br>COMPANY, INC.; AFFORDABLE §<br>HOUSING CONSTRUCTION, INC.; §<br>BRIAN POTASHNIK; and §<br>CHERYL POTASHNIK n/k/a §<br>CHERYL GEISER, §<br>§<br> Defendants. § | IN THE COUNTY COURT<br><br>AT LAW NO. 5<br><br>DALLAS COUNTY, TEXAS |

| |
|---|
| SOUTHWEST HOUSING §<br>MANAGEMENT CORPORATION, §<br>INC., §<br>§<br> Counter-Plaintiff, §<br>§<br>v. §<br>§<br>JEFFREY W. CARPENTER, §<br>§<br> Counter-Defendant. § |

## JEFFREY CARPENTER'S THIRD AMENDED PETITION AND JURY DEMAND

App. 000134

Jeffrey Carpenter — through undersigned counsel — files his Third Amended Petition and Jury Demand and respectfully states as follows.

## DISCOVERY PLAN

1.    Jeffrey Carpenter intends discovery to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## NATURE OF THE CASE

2.    This is an unlawful employment practices case involving refusal to pay earned compensation.

## PARTIES

3.    Jeffrey Carpenter is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued and who currently resides in Dallas County, Texas.

4.    Southwest Housing Development Company, Inc. ("SH Development") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Development has filed an answer in this civil action.

App. 000135

5.    Southwest Housing Management *Corporation,* Inc. ("SH Management") was a Texas corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records.  SH Management was also known as — and was doing business as and using as an assumed or common name — Southwest Housing Management *Company,* Inc. ("SH Management Company").  Examples include, but are not limited to, the following.  SH Management sometimes used the name SH Management Company in its Texas Franchise Tax Public Information Reports that it filed with the Texas Secretary of State.  SH Management used the name SH Management Company on an agreement that it is at issue in this civil action.  SH Management was originally named in this civil action in its assumed or common name, as permitted under Texas Rule of Civil Procedure 28.  SH Management filed an answer in its true name in response to those allegations.  Texas permits substitution of the true name through an amended petition.

6.    Affordable Housing Construction, Inc. ("AH Construction") is a Nevada corporation that maintained its principal office in Dallas County, Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records. AH Construction has filed an answer in this civil action.

7.    Brian Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Brian Potashnik has filed an answer in this civil action.

8.    Cheryl Potashnik is an individual who resided in Dallas County, Texas at the time the claims asserted herein accrued.  Cheryl Potashnik has filed an answer in this civil action.  Cheryl Potashnik is now known as Cheryl Geiser.

## JURISDICTION

9.    This Court has subject matter jurisdiction over this civil action because Jeffrey Carpenter seeks damages within its jurisdictional limits and because the claims asserted herein are not subject to exclusive jurisdiction in another court. This Court has personal jurisdiction over the Defendants in this civil action because (1) the Defendants have each entered a general appearance before it, (2) the claims asserted in this civil action arose directly from the Defendants' acts and omissions in Texas, and (3) the Defendants' affiliations with Texas are so continuous and systematic as to render each "essentially at home" in Texas.

## VENUE

10.    Venue is proper under Texas Civil Practice and Remedies Code § 15.002(a)(1) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(2) because the individual defendants' residence was in Dallas County, Texas at the time the causes of action asserted herein accrued.  Venue is also proper under Texas Civil Practice and Remedies Code § 15.002(a)(3) because the corporate defendants each maintained

their principal office in Dallas County, Texas at the time the causes of action asserted herein accrued.

## VICE-PRINCIPAL STATUS

11.    A "vice principal" is someone who fits within at least one of the following categories: (1) corporate officers, or (2) others who represent the corporation in its corporate capacity, or (3) those who have authority to employ, direct, or discharge employees of the corporation, or (4) those engaged in the performance of non-delegable or absolute duties of the corporation, or (5) those to whom the corporation has entrusted the management of the whole or a department or division of the business.  The acts and omissions of a "vice principal" are the acts and omissions of the corporation itself.  A corporation may have more than one vice principal.

12.    Brian Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  Examples include, but are not limited to, the following.  Brian Potashnik was the only person serving on the Board of Directors for SH Development, SH Management, and AH Construction [according to Texas Secretary of State records] when he engaged in his acts and omissions at issue in this civil action.  Brian Potashnik was also a corporate officer of SH Development, SH Management, and AH Construction when he engaged in his acts and omissions at issue in this civil action.

App. 000138

13.    Brian Potashnik acted as a vice principal for SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Brian Potashnik acted as a vice principal for SH Development, SH Management, and AH Construction when (1) he agreed to the terms of the Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

14.    Cheryl Potashnik was and is a vice principal of SH Development, SH Management, and AH Construction.  Examples include, but are not limited to, the following example.  The website for SH Development, SH Management, and AH Construction listed Cheryl Potashnik as a corporate officer at the times she engaged in her acts and omissions at issue in this civil action.

15.    Cheryl Potashnik acted as a vice principal for SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Cheryl Potashnik acted as a vice principal for SH Development, SH Management, and AH Construction when she confirmed that the Sale Proceeds Payment was earned and was due.

App. 000139

## ACTUAL OR APPARENT AUTHORITY

16.     A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.  Actual authority arises from a party's agreement that another act on behalf and for the benefit of the party.  This authority includes whatever else is proper, usual, and necessary to do what was expressly authorized.  More than one person may have actual authority to do something.

17.     Apparent authority exists if a party (1) knowingly permits another to hold himself or herself out as having authority or (2) through lack of ordinary care, gives another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his or her detriment.  Apparent authority may exist without actual authority.  More than one person may have apparent authority to do something.

18.     Brian Potashnik had actual or apparent authority to act on behalf of SH Management when (1) he agreed to the Annual Bonuses, (2) he confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment, and (3) he expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Brian Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Cheryl Potashnik, and himself when (1) he agreed to the terms of the

Sale Proceeds Payment at issue in this civil action and (2) he confirmed that the Sale Proceeds Payment was earned and was due.

19.     Cheryl Potashnik had actual or apparent authority to act on behalf of SH Management when (1) she confirmed the Annual Bonuses were owed — and had been earned — for more than just the first year of employment and (2) she expressed an intent to pay more than the minimum Annual Bonuses and promised to get same done [pay].  Cheryl Potashnik had actual or apparent authority to act on behalf of SH Development, SH Management, AH Construction, Brian Potashnik, and herself when she confirmed that the Sale Proceeds Payment was earned and was due.

**FIRST CLAIM FOR RELIEF:**
**FAILURE TO COMPLY WITH & REPUDIATION OF AGREEMENT —**
**<u>ANNUAL BONUSES</u>**

20.     An employer must comply with its agreements to pay bonuses to its employees.   When interpreting an agreement, the facts and circumstances surrounding execution of the agreement may be considered in most cases.  When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases.  A written agreement may be orally modified, even if the written agreement states otherwise, as long as the underlying agreement is not within the statute of frauds.

21.    An agreement may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing. The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed. When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its obligation by failing to set the amount.

22.    **Failure to comply and repudiation:** The following is not intended to be exhaustive or to state all facts. To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth. Brian Potashnik helped recruit Jeffrey Carpenter ("Jeff") to join SH Management. Brian Potashnik worked out (1) a base salary amount and (2) bonus range amounts with a minimum bonus and a maximum bonus for regular annual bonuses. Brian Potashnik expressed that the salary and bonus range were intended to place Jeff in the range of $400,000 in earnings a year [in addition to fringe benefits]. SH Management later hired Jeff as its Executive Vice President with employment beginning March 15, 2004.

23.    Brian Potashnik — identifying himself as President of SH Management *Company* — signed a written employment agreement in that regard (the "2004 Agreement"). SH Management Company agreed therein to a $200,000 base salary. SH Management Company agreed therein to a bonus range in the first calendar year of employment that included a $50,000 minimum and a $200,000 maximum. SH Management Company agreed therein to provide a more detailed

bonus plan within the first 90 days of employment. SH Management Company agreed therein to review and revise the bonus structure on an annual basis.

24.    SH Management did not provide a more detailed bonus plan. SH Management did not revise the bonus structure on an annual basis. SH Management did not eliminate the bonus plan. Brian Potashnik and Cheryl Potashnik both confirmed at various points during the employment tenure that Jeff was owed and had earned — *i.e.,* fully performed and met the requirements for — regular annual bonuses for more than just the first year (the "Annual Bonuses"). Brian Potashnik and Cheryl Potashnik both expressed at various points during the employment tenure their intent to pay more than the minimum Annual Bonuses and promised to get it done [*i.e.,* to pay same]. SH Management did not pay the Annual Bonuses. SH Management eventually repudiated the agreement for Annual Bonuses in late 2007. SH Management caused Jeff to suffer damages as a result.

25.    **Oral modification or oral agreement:** What the parties said and did in light of the surrounding circumstances, including the course of dealing, demonstrates oral modification of the 2004 Agreement or a separate oral agreement for a regular bonus structure with a $50,000 minimum and a $200,000 maximum in each calendar year of employment. Under Texas law, the 2004 Agreement could be orally modified despite language in the agreement to the contrary. Oral agreements on compensation — whether considered a modification to the 2004 Agreement or a new agreement to matters not addressed in the 2004 Agreement — were not

unusual as a matter of practice for SH Management.

26.    **Pro rata Annual Bonus for last partial year of employment:**  SH Management unilaterally terminated Jeff's employment with it without good cause in light of a pending asset sale and related management transition to the purchaser. Brian Potashnik and Cheryl Potashnik caused Jeff's last day of work to be on or about November 2, 2007.  Thus, for the last annual bonus, SH Management owes Jeff a pro rata share of the Annual Bonus based on the months he worked in the relevant calendar year.  This is sometimes called a *Riata Cadillac* claim, based on the Texas Supreme Court opinion in *Miller v. Riata Cadillac Co.*

27.    **Prevention of performance, prevention of condition, and limited right to revoke:**  Whether the agreement for Annual Bonuses is considered bilateral or unilateral, SH Management could not lawfully prevent performance or a condition to receiving an Annual Bonus and thereby avoid its payment obligations.  For example, SH Management could not lawfully avoid payment of the last annual bonus by unilaterally terminating Jeff's employment without good cause and then claiming Jeff was not entitled to the last annual bonus because he was not employed on the distribution date.  To the extent the agreement for Annual Bonuses was a unilateral agreement, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that SH Management could not revoke the offer at that point.

28.  **Sole discretion:**  The provisions in the 2004 Agreement providing that the employer may make decisions in the employer's "sole discretion" include — as a matter of law — the requirement of "good faith" in connection with any such decisions.

29.  **Termination of employment and earned compensation:**  Under Texas law, SH Management cannot legally refuse to pay earned compensation after termination, regardless of whether or not the 2004 Agreement contains language to the contrary and regardless of whether or not earned compensation was payable at an earlier or later date.

30.  **Alternative pleading of ambiguity:**  Pleading in the alternative only, the following provisions of the 2004 Agreement are ambiguous under the circumstances, in fact and in law: (1) the ¶ 4(b) provision referring to "the minimum discretionary bonus potential" and "the maximum bonus potential," and (2) the ¶ 7 provision claiming the employee is not entitled to any compensation or benefits pursuant to the 2004 Agreement effective upon termination of employment, and (3) the ¶ 3 provisions describing duties and acceptable and unacceptable moonlighting.

31.  The ¶ 4(b) provision allows discretion within the minimum and maximum bonus range but no discretion as to payment of a minimum bonus. When an employer has discretion to set a bonus amount within a minimum and maximum range, the employer may not avoid its obligation by failing to set the amount.  The ¶ 7 provision does not — and legally cannot — reduce or eliminate the

obligation to pay earned compensation. The ¶ 7 provision does not state that the severance payment requires any release of claims and does not state that the severance payment is in lieu of earned compensation. The ¶ 3 provisions contemplate that affiliates of SH Management Company may separately employ Jeff and that such additional employment would be a permissible use of working time, attention, and energies — *e.g.*, permissible moonlighting.

32. **Additional responsible [liable] person — Brian Potashnik — or SH Management oral agreement:** Texas Secretary of State records and Texas Comptroller records show by omission that SH Management Company never existed or operated as a legal entity in Texas. The 2004 Agreement represented that SH Management Company was a Texas corporation. If SH Management *Company* is not an assumed name for SH Management, then Brian Potashnik signed the 2004 Agreement as the President of a non-existent company — SH Management *Company* — and thus signed in his individual capacity and is individually responsible for compliance with the 2004 Agreement and the Annual Bonuses. Alternatively, if SH Management *Company* is not an assumed name for SH Management, then SH Management had exclusively an oral agreement with Jeff for the Annual Bonuses.

## SECOND CLAIM FOR RELIEF:
## FAILURE TO COMPLY WITH & REPUDIATION OF ORAL AGREEMENT —
## <u>SALE PROCEEDS PAYMENT</u>

33.     An employer must comply with its agreements to pay employees for work.   A written agreement is of no higher legal significance than an oral agreement.  When deciding whether parties reached an agreement, what the parties said and did in light of the surrounding circumstances, including the course of dealing, may be considered in most cases.  An agreement may be implied from and evidenced by the parties' conduct in light of the surrounding circumstances, including the course of dealing.  The contemplation of additional or future terms or written documents does not defeat enforcement of the terms already agreed.

34.     **Failure to comply and repudiation:**  The following is not intended to be exhaustive or to state all facts.  To the extent necessary, all other paragraphs in this petition are incorporated as if fully set forth.   In May of 2006, Brian Potashnik was at home when he met with Jeff.  Brian Potashnik expressed that he had good news and was selling the business.  Brian Potashnik explained that Jeff might not have a job after the asset sale but that he needed Jeff to stay on and help make the asset sale happen.  Brian Potashnik said that if Jeff stayed on for as long as needed to help make the asset sale happen, Jeff would be paid a bonus from the sale proceeds.  Brian Potashnik determined the formula later (the "Sale Proceeds Payment").

**App. 000147**

35.    Brian Potashnik and Cheryl Potashnik saw that Jeff accepted and stayed on and got to work to help make the asset sale happen.  Around six months later, Brian Potashnik and Cheryl Potashnik signed a letter of intent for a multi-million dollar asset sale.   Brian Potashnik thereafter met with Jeff.   Brian Potashnik expressed that Jeff probably would not have a job after the sale but that he still needed Jeff to stay on as long as needed to help make the asset sale happen. Brian Potashnik told Jeff the formula for calculating the Sale Proceeds Payment. Brian Potashnik and Jeff estimated the Sale Proceeds Payment at more than $1 million.

36.    Brian Potashnik and Cheryl Potashnik saw that Jeff stayed on and continued to work to make the sale happen.  Around six months later, Brian Potashnik signed a Purchase and Sale Agreement as "authorized agent" for "each of the sellers" listed — which included SH Development, SH Management, AH Construction, Brian Potashnik, Cheryl Potashnik, and entities that each of them owned or controlled.  At various points, Brian Potashnik and Cheryl Potashnik expressed that the Sale Proceeds Payment was due to Jeff.

37.    Brian Potashnik and Cheryl Potashnik ultimately learned that Jeff had deferred the start date of other employment in order to stay on as long as needed to help make the asset sale happen.  As the asset sale looked more certain and agreement was reached to transition management to the purchaser, Cheryl Potashnik thanked Jeff for his work and told Jeff that he would only be needed

App. 000148

through the end of the week. In other words, Cheryl Potashnik confirmed that Jeff had fully performed his obligations under the agreement for the Sale Proceeds Payment.

38.    Brian Potashnik signed an agreement effective November 1, 2007 to transition management to the asset purchaser. Brian Potashnik and Cheryl Potashnik caused Jeff's last day of work to be on or about November 2, 2007. Brian Potashnik and Cheryl Potashnik repudiated the agreement for the Sale Proceeds Payment in late 2007. Defendants and sellers in the assets sale — SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik — received more than $33 million in net profits from the asset sale. These defendant sellers caused Jeff to suffer damages as a result of their conduct.

39.    **Prevention of performance, prevention of condition, and limited right to revoke:** Whether the agreement for the Sale Proceeds Payment is considered bilateral or unilateral, SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik could not lawfully prevent performance or a condition to receiving the Sale Proceeds Payment and thereby avoid their payment obligations. For example, none of them could lawfully avoid payment by unilaterally terminating Jeff's employment without good cause before the asset sale concluded and then claim Jeff was not entitled to the Sale Proceeds Payment because he was not employed on the distribution date. Jeff fully performed his end of the bargain before his employment ended — he stayed. Jeff

**App. 000149**

thus earned the Sale Proceeds Payment before his employment ended. Pleading in the alternative only, Jeff began performance and engaged in sufficient performance to make a binding agreement, in the sense that the offer could not be revoked at that point. Pleading further in the alternative only, Jeff is entitled to a pro rata share of the Sale Proceeds Payment based on *Riata Cadillac* principles.

## ALTERNATIVE THIRD CLAIM FOR RELIEF: *QUANTUM MERUIT*

40.    Pleading in the alternative only, Jeff is entitled to recover Annual Bonuses under the theory of *quantum meruit* for the reasonable value of his services provided to SH Management and [alternatively] Brian Potashnik to prevent unjust enrichment. Pleading further in the alternative only, Jeff is entitled to recover a Sale Proceeds Payment under the theory of *quantum meruit* for the reasonable value of his services provided to defendant sellers SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik to prevent unjust enrichment. For both Annual Bonuses and a Sale Proceeds Payment, Jeff conferred valuable services under such circumstances as reasonably notified these persons and entities that he, in performing such services for them, expected to be paid for those services, and they benefited from those services.

<u>**ADDITIONAL JOINT AND SEVERAL RESPONSIBILITY [LIABILITY]**</u>

## Winding up — individual liability for SH Development and SH Management obligations

41.     Brian Potashnik and Cheryl Potashnik, as governing persons or officers or directors of SH Development and SH Management are individually responsible [and jointly and severally liable] for all claims asserted against these entities in this civil action, including attorneys' fees.   SH Development and SH Management completed the process of winding up [also known as dissolution or termination of existence] without providing the statutorily required notice to Jeff. At the time of termination and winding up, Jeff had a claim [which is defined per statute to include a contingent and unliquidated claim] pending against these SH Development and SH Management.   The lack of required notice renders Brian Potashnik and Cheryl Potashnik individually liable for obligations for which SH Development and SH Management are liable.

## Joint employer — Annual Bonuses and Sale Proceeds Payment

42.     SH Development, SH Management, and AH Construction are responsible [and jointly and severally liable] for all claims related to the Annual Bonuses and all claims related to the Sale Proceeds Payment, based on the joint employer doctrine.   Although the joint employer doctrine is typically applied in discrimination cases, this doctrine recognizes that more than one entity may employ

App. 000151

a person. For example, AH Construction issued at least one employment compensation check to Jeff, but "Southwest Housing Management" was listed as the employer on IRS Forms W-2; the same principals from SH Development, SH Management, and AH Construction had the power to hire and fire Jeff; the Southwest Housing website listed employees of SH Development, SH Management, and AH Construction as employees of the same entity; on information and belief, payroll for all entities' employees was handled through one entity [with possible reconciliation between entities at a later date]; and overall, these entities were treated as a single unit as a practical matter for employment issues.

### Joint venture, joint enterprise, or implied partnership — Sale Proceeds Payment

43.     SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik are responsible [and jointly and severally liable] for all claims related to the Sale Proceeds Payment, based on the joint venture, joint enterprise, or implied partnership doctrine. SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik had an agreement, a common purpose, a community of pecuniary interest, and an equal right of control concerning the asset sale and efforts to reach an asset sale. As to control, the same principals — Brian Potashnik and/or Cheryl Potashnik controlled SH Development, SH Management, and AH Construction. And SH Development, SH Management, AH Construction, Brian Potashnik, and Cheryl Potashnik were all sellers in, and

App. 000152

parties to, the final Purchase and Sale Agreement. This was precisely the end to the means of the agreement made with Jeff concerning the Sale Proceeds Payment.

## Alter ego individual liability — Annual Bonuses and Sale Proceeds Payment

44.     Brian Potashnik and Cheryl Potashnik are responsible [and jointly and severally liable] for all claims related to the Annual Bonuses and all claims related to the Sale Proceeds Payment, based on alter ego as outlined in the Texas Business Organizations Code [and its predecessor to the extent applicable]. Brian Potashnik and Cheryl Potashnik caused the corporate form to be used for the purpose of perpetrating and did perpetrate an actual fraud on Jeff primarily for the direct personal benefit of each of them. For example, SH Development and SH Management — which they controlled — wound up and terminated their corporate existence without providing the statutorily required notice to Jeff. As another example, Brian Potashnik and Cheryl Potashnik each expressed that they needed asset sale proceeds to help fund their legal defense team in connection with criminal indictments against them. As another example, Brian Potashnik signed Jeff's initial employment agreement as an officer of an apparently non-existent entity and yet represented in that agreement that the entity was a Texas corporation.

## ATTORNEYS' FEES

45.    As a result of the conduct described above, Jeff hired attorneys to pursue the claims asserted herein.  Jeff seeks to recover reasonable attorneys' fees incurred in connection with this action, including all appeals, pursuant to the provisions of the Texas Civil Practice and Remedies Code, including claims for rendered services and claims for an oral or written agreement.

## CONDITIONS PRECEDENT

46.    All conditions precedent to filing suit and to recovery on the claims asserted herein have occurred, been performed, or been waived.

## JURY DEMAND

47.    Jeff requests a jury trial on all issues triable of right [or choice] by a jury.  He has paid the required jury fee.

## OTHER

48.    **Arbitration allegations:**  SH Management alleges that Jeff failed to bring his claims in arbitration before filing this civil action.  But SH Management waived its right to arbitrate any claims in this civil action.  SH Management agreed to remove claims from arbitration and consolidate those claims back in this case for a jury trial.

App. 000154

49.     **Settlement and mediation allegations:** SH Management alleges that Jeff failed to use best efforts to settle and failed to demand mediation. SH Management allegations in this regard are barred, in whole or in part, under the doctrine of futility. Despite two prior mediations, SH Management refuses to be accountable for its actions and has most recently emphasized that it does not intend to pay a dime in this case.

50.     **No federal claims:** Jeff does not assert any claim, cause of action, or request for relief under any federal law in this or any other pleading in this civil action.

## RELIEF REQUESTED

51.     Based on the foregoing, Jeffrey Carpenter requests the following relief:

(A)     judgment on all counts of the petition;

(B)     judgment that defendants found responsible on any single claim are jointly and severally liable for the damages found, including back pay, costs of court, attorneys' fees, and prejudgment and postjudgment interest

(C)     back pay [past wages];

(D)     costs of court and attorneys' fees;

(E)     pre-judgment and post-judgment interest as allowed by law; and

(F)     such other and further relief, in law or in equity, to which he may show himself justly entitled.

Respectfully submitted,

*/s/ Amy Gibson*

_____

Amy Gibson
Texas State Bar No. 00793801
David L. Wiley
Texas State Bar No. 24029901

**Gibson Wiley PLLC**
1500 Jackson Street #714
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126
Email:
amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR JEFFREY
CARPENTER

**App. 000156**

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 5, 2016, a true copy of Jeffrey Carpenter's Third Amended Petition and Jury Demand was served on all other parties through their lead attorneys of record as follows:

**VIA TEXAS E-FILE SYSTEM**

Mr. Lawrence J. Friedman
Mr. Michael Donohue
Mr. Jason Friedman
Friedman & Feiger, L.L.P.
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
lfriedman@fflawoffice.com
mdonohue@fflawoffice.com
jhfriedman@fflawoffice.com

*/s/ Amy Gibson*

Amy E. Gibson

**App. 000157**



**Gibson Wiley PLLC**
ATTORNEYS & COUNSELORS AT LAW

February 11, 2016

**VIA EMAIL**

Mr. Jason Friedman                          **Offer of Compromise Subject**
Friedman & Feiger, L.L.P.                   **to Texas Rule of Evidence 408**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254

     **Re:**   *Carpenter v. Southwest Housing Development Company, Inc. et. al.*
           **Cause No. CC-08-2072-E**
           **Dallas County Court at Law No. 5**

Dear Mr. Friedman:

I represent and write on behalf of Jeff Carpenter to extend a *Stowers* demand in the above-referenced lawsuit. Please forward this demand to your clients, the liability insurer that is providing your clients with a defense in this case, and to any claim administrator acting on behalf of that insurer.

This *Stowers* demand uses the following defined terms and phrases.

1.     <u>policy</u>: means the complete Private Choice Encore! Policy under which a liability insurer has provided, and is providing, a defense to your clients in this lawsuit;

2.     <u>insureds</u>: has the same meaning that Insureds has in the policy;

3.     <u>insurer</u>: means the liability insurer that is providing your clients with a defense in the lawsuit;

4.     <u>lawsuit</u>: refers to the above-captioned lawsuit;

5.     <u>arbitration</u>: refers to the arbitration proceeding that was consolidated into the lawsuit.

---

1500 Jackson Street #714, Dallas, Texas 75201 | *Telephone* 214.522.2121 | *Facsimile* 214.522.2126

**App. 000158**

Mr. Jason Friedman
February 11, 2016
Page 2 of 3

Jeffrey W. Carpenter agrees to completely and fully release Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. d/b/a Southwest Housing Management Company, Inc., Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., Brian Potashnik, Cheryl Potashnik, and all other insureds of and from (1) any and all claims, counterclaims, liability theories, damages, and other relief (a) asserted in the lawsuit, (b) arising out of the same subject matter and that could have been asserted in the lawsuit, (c) asserted in the arbitration, or (d) arising out of the same subject matter and that could have been asserted in the arbitration, and (2) any potential third-party claims to all or part of the Settlement Payment, for the following consideration:

1.     Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. d/b/a Southwest Housing Management Company, Inc., Southwest Housing Management Company, Inc., Affordable Housing Construction, Inc., Brian Potashnik, and Cheryl Potashnik completely and fully release Jeffrey W. Carpenter of and from any and all claims, counterclaims, liability theories, damages, and other relief (a) asserted in the lawsuit, (b) arising out of the same subject matter and that could have been asserted in the lawsuit, (c) asserted in the arbitration, or (d) arising out of the same subject matter and that could have been asserted in the arbitration.

2.     Payment from or on behalf of the insurer in the following amount — remaining policy limits as of February 12, 2016 at 11:59 p.m. local time in Dallas, Texas *minus* $50,000.00 (the difference is the Settlement Payment) — and made payable jointly to Jeffrey W. Carpenter and the Gibson Wiley PLLC IOLTA Trust Account.

Jeffrey W. Carpenter will accomplish the above-described release of any potential third-party claims to all or part of the Settlement Payment as follows. Jeffrey W. Carpenter represents that no individual or entity has asserted or may assert any lien or other claim to the Settlement Proceeds, other than as follows:

(A)     Gibson Wiley PLLC has an assignment in the amount of any unpaid attorneys' fees and advanced expenses in this case, but that assignment will be extinguished with the Settlement Payment; and

Mr. Jason Friedman
February 11, 2016
Page 3 of 3

    (B)    Gardere Wynne Sewell, LLP claims a contract right to have unpaid attorneys' fees and expenses deducted from the Settlement Payment, but Jeffrey W. Carpenter has directed his attorneys' to withhold from his share of the recovery and maintain in the Gibson Wiley PLLC IOLTA Trust Account — until agreement is reached with Gardere Wynne Sewell PLLC on the just amount owed — the total amount of unpaid attorneys' fees and expenses reflected on Gardere Wynne Sewell, LLP invoices sent to him for payment.

Jeffrey W. Carpenter represents that Clouse Dunn Khoshbin LLP has released any claim to attorneys' fees or expenses in this case and will provide the insurer with the communication reflecting same. Jeffrey W. Carpenter represents that neither the lawsuit nor the arbitration has ever involved medical care or treatment and that he has never been enrolled in, or otherwise received payments from, Medicare or Medicaid.

    This offer will be deemed revoked as to your clients at 6:00 p.m. local time in Dallas, Texas on February 18, 2016. If your clients all agree to the release in consideration paragraph 1 and all consent to the total settlement, they need to provide written notice to the insurer. This offer will then be deemed revoked as to the insurer at 6:00 p.m. local time in Dallas, Texas on March 18, 2016.

    Separate letters should assist the insurer or claim administrator in evaluating this *Stowers* demand and will follow. In the meantime, let me know if anyone needs any information from me in order to reasonably assess this *Stowers* demand.

                   Sincerely,

                   Amy E. Gibson

**Subject:** RE: CC-08-02072-E; Carpenter v. Southwest Housing entities et al
**Date:** Thursday, February 13, 2014 at 5:02:48 PM Central Standard Time
**From:** Rogge Dunn
**To:** Amy Gibson
**CC:** David L. Wiley, CDB

Amy:

We are not making any claim for attys' fees or expenses from Mr. Carpenter.   If you hit Big time verdict,  a case of first growth Bordeaux wine would be nice, but not required—this confirms we release all claims for the attys' fees we incurred to help him.

Good luck at trial.   Please let me know how it turns out.


Regards,



**Rogge**

Clouse Dunn LLP
1201 Elm Street, Suite 5200
Dallas, Texas 75270-2142

**Dir  (214) 220-0077**
Fax  (214) 220-3833
Cell  (214) 356-6666
Main (214) 220-3888 ext. 230
**Website:** http://www.cdklawyers.com/rogge_dunn.php

**BOARD CERTIFIED**
Texas Board of Legal Specialization
**Board Certified | Civil Trial Law**

**Board Certified | Labor and Employment Law**


**The statements contained herein are not intended to and do not constitute an opinion as to any tax or other matter. They are not intended or written to be used, and may not be relied upon, by you or any other person for the purpose of avoiding penalties that may be imposed under any Federal tax**

*15 15-122*
*061 01*

## CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

**ATTORNEYS AT LAW**

STEVEN J. KNIGHT
SHAREHOLDER
DIRECT DIAL NO.(713) 654-9603
E-MAIL: steven.knight@chamberlainlaw.com

1200 SMITH STREET, SUITE 1400

**HOUSTON, TEXAS 77002**

(713) 658-1818    (800) 342-5829

(713) 658-2553 (FAX)

www.chamberlainlaw.com

ATLANTA
PHILADELPHIA
SAN ANTONIO

June 1, 2016

### CONFIDENTIAL SETTLEMENT COMMUNICATION

Via E-Mail

Amy Gibson
Gibson Wiley PLLC
1500 Jackson Street, No. 714
Dallas, Texas 75201
amy@gwfirm.com

      Re:   *Carpenter v. Southwest Houston Development Company, Inc., et al.*; No. CC-08-2072-E; Dallas County Court at Law No. 5

Dear Ms. Gibson:

      In your May 20, 2016, e-mail, you confirmed that the settlement demand you conveyed to Jason Friedman, which contemplated, among other things, "[p]ayment from or on behalf of the insurer in the following amount – remaining policy limits as of February 12, 2016 at 11:59 p.m. local time in Dallas Texas minus $50,000 (the difference is the Settlement Payment)" would "expire and be deemed revoked on Wednesday, June 1, 2016 at 6:00 p.m. local time in Dallas, Texas." On May 23, 2016, I shared with you the insurer's views concerning the lack of coverage in connection with Mr. Carpenter's claims and the fact that the information provided and known to date compelled the conclusion that an ordinarily prudent insurer would not accept Mr. Carpenter's policy-limit demand, considering the likelihood and degree of the insured's potential exposure.[1] Nevertheless, we invited you and Mr. Carpenter to join the carrier and the defendants in mediation to attempt, in good faith, to resolve the matter. Counsel for defendants expressed a willingness to mediate. However, you informed me on the telephone that Mr. Carpenter was unwilling to participate. At this time, Twin City declines to pay Mr. Carpenter "remaining policy limits as of February 12, 2016 at 11:59 p.m. local time in Dallas Texas minus $50,000 (the difference is the Settlement Payment)." If you and Mr. Carpenter change your minds about mediating in good faith, please call me.

      On a separate note, I received a letter from you today, shortly before your 6:00 p.m. deadline. You do not appear to address any of the coverage issues that I explained in my May 23,

---

[1]    Nothing contained in this letter, or any correspondence, written or verbal, shall constitute a waiver of any of Twin City's coverage positions and legal defenses, as all such coverage positions and legal defenses are expressly reserved.

Ms. Gibson
June 1, 2016
**2** | P a g e

2016, letter. Nor do you appear to dispute that Mr. Carpenter has not identified a witness to support his claim that an oral promise of a 3% bonus was made; that Defendants deny the existence of an oral agreement for a 3% bonus; or that Mr. Carpenter's former colleague and friend testified that Mr. Carpenter, essentially, originated that figure. Rather, you state that you "called more than once" to ask if the insurer needed additional information. But as you know, the case has been stalled for years due to Plaintiff's failure to produce documents that Defendants requested through discovery. Even while seeking policy limits, Plaintiff still has not produced, or even offered to produce, the missing information. Moreover, the only specific information you offered to supply was the purchase/sale contracts, and it appears you sent those with updated disclosures at 8:48 p.m. yesterday evening, on the eve of your settlement demand deadline. Your updated disclosures arrived with over *190 pages* of information. Having just sent this information, you state "[t]he insurer *now* has updated disclosures that provide more than enough information concerning this claim." Your implicit recognition that the updated disclosures should be considered in connection with your demand begs the question, why wait until 8:48 p.m. on May 31, 2016, to send the information? And as for the lap-top documents, you state Defendants "backed up the contents of Jeff's laptop," and you point to an attached e-mail as proof. It is our understanding the defense counsel does not have the documents and it was your failure to produce them that has necessitated multiple continuances. Moreover, the e-mail you attach only states "we will need to make a backup," not that the back-up was accomplished.

I appreciate your offer concerning supplying additional information. Since the lack of production of the lap-top documents has effectively stalled discovery in this case, please advise if you will consider leaving your offer open until after Defense counsel has received and had a meaningful chance to analyze the documents that have not been produced. Additionally, as noted, if you and Mr. Carpenter reconsider mediation, please let me know that as well.

Sincerely,

Steven J. Knight

SJK:

**DeVaughn, Margaret**

| | |
|---|---|
| **From:** | Knight, Steven J. |
| **Sent:** | Wednesday, June 01, 2016 5:10 PM |
| **To:** | Amy Gibson (amy@gwfirm.com) |
| **Cc:** | Michael Donohue (mdonohue@fflawoffice.com); DeVaughn, Margaret; Knight, Steven J. |
| **Subject:** | Carpenter v. Southwest Housing |
| **Attachments:** | Document.pdf |

CONFIDENTIAL SETTLEMENT COMMUNICATION

Dear Ms. Gibson,

Please find the attached response to the pending settlement demand. Also, please confirm your receipt of this e-mail. If you'd like to discuss the response, please call.  Thank you.

Sincerely,

**STEVEN J. KNIGHT**
steven.knight@chamberlainlaw.com
Direct 713-654-9603 | Cell 713-504-5396 | Fax 713-658-2553



**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY**
1200 Smith Street, Suite 1400
Houston, Texas 77002

Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this e-mail message is privileged and confidential and is intended for the sole use of the intended recipient(s). If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

App. 000164

# Presiding Juror

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | In the County Court |
| | § | |
| Southwest Housing | § | of Dallas County |
| Development Company, Inc.; | § | |
| Southwest Housing | § | at Law N° 5 |
| Management Corporation, | § | |
| Inc. a/k/a and d/b/a Southwest | § | |
| Housing Management | § | |
| Company, Inc.; Affordable | § | |
| Housing Construction, Inc.; | § | |
| Brian Potashnik, | § | |
| | § | |
| *Defendants.* | § | |

---

## CHARGE OF THE COURT

---

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Page 1 of 23

CC-08-02072-E
CCC
CHARGE OF COURT
1746765

Here are the instructions for answering the questions.

1.  Do not let bias, prejudice, or sympathy play any part in your decision.

2.  Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

Some of the exhibits may contain redactions. The portions of those exhibits have been redacted because I have excluded the redacted portions from the evidence. You should disregard any redactions just as you would disregard any other evidence that I have excluded from the record.

3.  You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.  If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.  All the questions and answers are important. No one should say that any question or answer is not important.

6.  Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

Preponderance of the evidence means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

App. 000166

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Certain testimony has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. This deposition testimony is entitled to the same consideration as if the witness had been present and had testified from the witness stand in court.

7.    Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.    Do not answer questions by drawing straws or by any method of chance.

9.    Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not consider attorneys' fees. Do not guess about attorneys' fees.

10.    Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

Page 3 of 23

App. 000167

11.    The answers to the questions must be based on the decision of at least five of the six jurors. The same five jurors must agree on every answer. Do not agree to be bound by a vote of anything less than five jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

Page 4 of 23

App. 000168

## DEFINITIONS

As used in this Charge of the Court, Southwest Housing Development means Southwest Housing Development Company, Inc.

As used in this Charge of the Court, Southwest Housing Management means Defendants Southwest Housing Management Corporation, Inc., also known as and doing business as Southwest Housing Management Company, Inc.

As used in this Charge of the Court, Affordable Housing Construction means Affordable Housing Construction, Inc.

App. 000169

## QUESTION 1

Did Jeff Carpenter and Southwest Housing Management agree that Southwest Housing Management would pay one or more annual bonuses to Jeff Carpenter covering the period from March 15, 2005 through March 15, 2007?

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. More than one person may have a party's actual authority.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists. More than one person may have a party's apparent authority.

When a **vice-principal** of a corporation commits some act, that act may be deemed to be the act of the corporation itself. A corporation can have more than one vice-principal. A person is a "vice-principal" if—

Page 6 of 23

1.  that person is a corporate officer; or

2.  that person has authority to employ, direct, and discharge an employee of a corporation; or

3.  the corporation has confided to that person the management of the whole or a department or division of the business of the corporation.

A person is a manager or is employed in a managerial capacity if—

1.  that person has authority to employ, direct, and discharge an employee of a corporation; or

2.  a corporation has confided to that person the management of the whole or a department or division of the business of a corporation.

Answer "Yes" or "No."

Answer: ___NO___

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 2

Did Southwest Housing Management fail to comply with the agreement to pay Jeff Carpenter one or more annual bonuses covering the period from March 15, 2005 through March 15, 2007?

Answer "Yes" or "No."

Answer: __NA__

App. 000172

If you answered "Yes" to Question 2, then answer the following question. Otherwise, do not answer the following question.

QUESTION 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with the agreement to pay Jeff Carpenter one or more annual bonuses covering the period from March 15, 2005 through March 15, 2007?

You are instructed that any monetary recovery for such annual bonus is subject to federal income taxes.

Consider the following elements of damages, if any, and none other.

a. past lost compensation in the form of annual bonuses

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer ____NA_____

Page 9 of 23

App. 000173

QUESTION 4

Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
2. if Jeff Carpenter would stay as long as needed on to help make the asset sale happen

An agreement may be oral, written, or partly oral and partly written.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized. More than one person may have a party's actual authority.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists. More than one person may have a party's apparent authority.

When a **vice-principal** of a corporation commits some act, that act may be deemed to be the act of the corporation itself. A corporation can have more than one vice-principal. A person is a "vice-principal" if—

1.  that person is a corporate officer; or

2.  that person has authority to employ, direct, and discharge an employee of a corporation; or

3.  the corporation has confided to that person the management of the whole or a department or division of the business of the corporation.

A person is a manager or is employed in a managerial capacity if—

1.  that person has authority to employ, direct, and discharge an employee of a corporation; or

2.  a corporation has confided to that person the management of the whole or a department or division of the business of a corporation.

Answer "Yes" or "No" for each:

Affordable Housing Construction      _YES_

Southwest Housing Development      _YES_

Southwest Housing Management      _YES_

Brian Potashnik      _YES_

Page 11 of 23

If you answered "Yes" to Question 4 for any defendant, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 5

For each defendant for whom you answered "Yes" in Question 4, did that defendant also fail to comply with such agreement?

Answer "Yes" or "No" for each defendant for whom you answered "Yes" in Question 4:

Affordable Housing Construction        _YES_

Southwest Housing Development         _YES_

Southwest Housing Management         _YES_

Brian Potashnik                               _YES_

Page 12 of 23

If you answered "Yes" to Question 4 for any defendant, then answer the following question. Otherwise, do not answer the following question.

QUESTION 6

As of October 13, 2006, was the agreement found in Question 4 possibly performable in less than one year?

Answer "Yes" or "No."

Answer: __YES__

App. 000177

If you answered "Yes" to Question 5 for any defendant, then answer the following question. Otherwise, do not answer the following question.

QUESTION 7

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with such agreement?

You are instructed that any monetary recovery for such sale proceeds payment is subject to federal income taxes.

Consider the following elements of damages, if any, and none other.

a. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer: ___$928,020.76___

Page 14 of 23

## QUESTION 8

Did Jeff Carpenter perform compensable work staying on as long as needed to help make the asset sale happen for any of the below-named defendants for which he was not compensated?

Jeff Carpenter performed compensable work if he rendered valuable services or furnished valuable materials to a defendant; that defendant accepted, used, and benefited from the services or materials; and, under the circumstances, that defendant was reasonably notified that Jeff Carpenter expected to be compensated for the services or materials.

Answer "Yes" or "No" for each:

Affordable Housing Construction        _____NO_____

Southwest Housing Development        _____NO_____

Southwest Housing Management        _____NO_____

Brian Potashnik        _____NO_____

App. 000179

If you answered "Yes" to Question 8, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 9

What is the reasonable value of such compensable work at the time and place it was performed?

Answer in dollars and cents, if any.

Answer: _____NA_____

App. 000180

## QUESTION 10

Did Jeff Carpenter perform compensable work for Southwest Housing Management for which he was not compensated, excluding any staying on to help make the asset sale happen?

Jeff Carpenter performed compensable work if he rendered valuable services or furnished valuable materials to a defendant; that defendant accepted, used, and benefited from the services or materials; and, under the circumstances, that defendant was reasonably notified that Jeff Carpenter expected to be compensated for the services or materials.

Answer "Yes" or "No":

Answer: ___NO_____

App. 000181

If you answered "Yes" to Question 10, then answer the following question. Otherwise, do not answer the following question.

QUESTION 11

What is the reasonable value of such compensable work at the time and place it was performed?

Answer in dollars and cents, if any.

Answer: __N A_____

App. 000182

## QUESTION 12

Which, if any, of the defendants were engaged in a joint enterprise in connection with the asset sale?

A "joint enterprise" exists if the persons or entities concerned have (1) an agreement, either express or implied, with respect to the enterprise or endeavor; and (2) a common purpose; and (3) a community of pecuniary interest in the common purpose of the enterprise, among the members of the group; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

Answer "Yes" or "No" for each:

Affordable Housing Construction _____NO_____

Southwest Housing Development _____NO_____

Southwest Housing Management _____NO_____

Brian Potashnik _____NO_____

App. 000183

## QUESTION 13

Which, if any, of the defendants were engaged in a joint venture in connection with the asset sale?

A "joint venture" exists if the persons or entities concerned have (1) a community of interest in the venture, (2) an agreement to share profits, (3) an express agreement to share losses, and (4) a mutual right of control or management of the venture.

Answer "Yes" or "No" for each:

Affordable Housing Construction ___NO___

Southwest Housing Development ___NO___

Southwest Housing Management ___NO___

Brian Potashnik ___NO___

App. 000184

## QUESTION 14

Is Brian Potashnik responsible for the conduct of the entities named below?

Brian Potashnik is "responsible" for the conduct of an entity if—

Brian Potashnik used the entity for the purpose of perpetrating and did perpetrate an actual fraud on Jeff Carpenter primarily for the direct personal benefit of Brian Potashnik.

Answer "Yes" or "No" for each:

Affordable Housing Construction    _YES_

Southwest Housing Development    _YES_

Southwest Housing Management    _YES_

App. 000185

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

1.    have the complete charge read aloud if it will be helpful to your deliberations;

2.    preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

3.    give written questions or comments to the bailiff who will give them to the judge;

4.    write down the answers you agree on;

5.    get the signatures for the verdict certificate; and

6.    notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

You may answer the questions on a vote of five jurors. The same five jurors must agree on every answer in the charge. This means you may not have one group of five jurors agree on one answer and a different group of five jurors agree on another answer.

If five jurors agree on every answer, those five jurors sign the verdict. If all six of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

All jurors should deliberate on every question. You may end up with all six of you agreeing on some answers, while only five of you agree on other answers. But when you sign the verdict, only those five who agree on every answer will sign the verdict.

You are again instructed that it is your duty not to communicate with, or permit yourselves to be addressed by, any other person about any subject relating to the case.

*Submitted by —*
*Mark Greenberg*
*Judge Presiding*
*January 31, 2018*

Page 22 of 23

App. 000186

## Verdict Certificate

Check one:

_____ Our verdict is unanimous. All six of us have agreed to each and every answer. The presiding juror has signed the certificate for all six of us.


_____    _____
Signature of Presiding Juror    Printed Name of Presiding Juror


✓ Our verdict is not unanimous. Five of us have agreed to each and every answer and have signed the certificate below.


Signature                          Name Printed

1. _Samantha Ciraci_          Samantha Ciraci

2. _Norma Parson_             NORMA PARSON

3. _Lisa Billingsley_         Lisa Billingsley

4. _LJosephs_                 Lauryn Josephs

5. _Jimmy Nguyen_             Jimmy Nguyen


Page 23 of 23

IS question 8 in reference to the 3% deal?

Thank you for your questions. You should ~~que~~ ~~the~~ interpret the question according to the ~~the~~ the ordinary meaning of the question.

Yes

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2018 FEB -1 AM 9:49

What was the final bonus calc-ulation from the 3% deal?

Thank you for your question. You should use your best collective memory as to the evidence.

Yes

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2018 FEB -1 AM 9:49

App. 000188

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2018 JAN 31 AH 8: 53

In reference to question #6 on
page 13 —

Could we get a clarified explanation
of the term "possibly performable"?

Thank you for your
question. @ you should
give those words their
@ ordinary meaning

[signature]

CAUSE NO. CC-08-2072-E

| | | |
|---|---|---|
| Jeffrey W. Carpenter, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | In the County Court |
| | § | |
| Southwest Housing | § | of Dallas County |
| Development Company, Inc.; | § | |
| Southwest Housing | § | at Law Nº 5 |
| Management Corporation, | § | |
| Inc. a/k/a and d/b/a Southwest | § | |
| Housing Management | § | |
| Company, Inc.; Affordable | § | |
| Housing Construction, Inc.; | § | |
| Brian Potashnik; and | § | |
| Cheryl Potashnik n/k/a | § | |
| Cheryl Geiser, | § | |
| | § | |
| *Defendants.* | § | |

## FINAL JUDGMENT

This case was called to jury trial on January 23, 2018. Jeffrey W. Carpenter appeared in person and through counsel and announced ready for trial. Brian Potashnik and Cheryl Potashnik n/k/a Cheryl Geiser appeared in person and through counsel and announced ready for trial. Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and

Affordable Housing Construction, Inc. appeared through their representatives and through their counsel and announced ready for trial.

Before jury trial, during a motions hearing, four counter-plaintiffs — Cheryl Potashnik n/k/a Cheryl Geiser, Brian Potashnik, Southwest Housing Development Company, Inc., and Affordable Housing Construction, Inc. — announced their intent to voluntarily dismiss all their counterclaims against Jeffrey W. Carpenter, which they originally filed on April 7, 2008. This dismissal was accomplished with the September 9, 2015 filing of *Defendants' First Amended Answer and Defendant's First Amended Counterclaim Against Jeffrey W. Carpenter*, in which only Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. continued to pursue counterclaims. Before jury trial, on the record, Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc. dismissed with prejudice all remaining counterclaims against Jeffrey W. Carpenter.

After close of evidence and before closing arguments in the jury trial, the Court granted the motion of Cheryl Potashnik n/k/a Cheryl Geiser for directed verdict on the claims against her. Cheryl Potashnik n/k/a Cheryl Geiser and Jeffrey W. Carpenter were each unsuccessful on the counterclaims and claims between them. As a result, no costs are awarded to Cheryl Potashnik n/k/a

Cheryl Geiser. The Court also finds good cause not to award costs to Cheryl Potashnik n/k/a Cheryl Geiser. First, Cheryl Potashnik n/k/a Cheryl Geiser and Jeffrey W. Carpenter were each unsuccessful on the counterclaims and claims between them. Second, awarding costs to Cheryl Potashnik n/k/a Cheryl Geiser would, as a practical matter under the circumstances, burden Jeffrey W. Carpenter with paying shared defense costs for the four defendants against whom he was successful. All defendants shared the same legal counsel. All defendants shared the same liability insurance carrier. With few exceptions, all defendants asserted the same defenses. For all oral depositions that Cheryl Potashnik n/k/a Cheryl Geiser initiated, all defendants jointly noticed and took those depositions. All defendants counted as one side — or one party — for purposes of paying for court-ordered mediations.

A jury and one alternate juror, consisting of 7 citizens good and true, were empaneled and sworn and thereafter heard the admissible evidence. Having retained the original 6 jurors during the course of the trial, the Court dismissed the alternate juror before deliberations. The Court then submitted its Charge to the jury, which was followed by the closing arguments of the lawyers. Thereafter, on February 1, 2018, the jury returned a five-to-one verdict in favor of Jeffrey W. Carpenter and against Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing

App. 000192

Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc. on certain claims. The Court then received and accepted the jury's verdict, which is incorporated by reference as if fully set forth herein.

Before jury trial, all parties agreed to try to the Court the issue of attorneys' fees under Texas Civil Practice and Remedies Code Chapter 38. That portion of the case was called to trial on November 15, 2018. Jeffrey W. Carpenter appeared in person and through his counsel and announced ready for trial. Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc. appeared through their counsel and announced ready for trial. The Court heard the admissible evidence and the arguments of counsel and took judicial notice as appropriate. At the conclusion of the presentation, the Court announced its ruling on the record, noting that a written judgment would follow.

Having considered the verdict of the jury, the Court's ruling on attorneys' fees, the admissible evidence, the record in this case, the arguments of counsel, and the previous orders of the Court, it is hereby

FINAL JUDGMENT CAUSE NO. CC-08-2072-E — PAGE 4 OF 7

App. 000193

ORDERED, ADJUDGED and DECREED that Jeffrey W. Carpenter do have and recover of and from Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc., jointly and severally:

a. actual damages in the amount of $928,020.76;

b. prejudgment interest on actual damages [$928,020.76] at the rate of 5.25% per annum simple interest from March 11, 2008 through the day before the date of this Judgment;

c. reasonable attorneys' fees in the amount of $820,818.00 for the prosecution of this case through the day before the date of this Judgment for Plaintiff Jeffrey W. Carpenter's breach of contract claim against Defendants Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc.;

d. costs of court; and

e. postjudgment interest on all of the amounts above at the rate of 5.25% per annum, compounded annually, from the date of this Judgment until the date this Judgment is satisfied.

It is further ORDERED, ADJUDGED and DECREED, that if any defendant other than Defendant Cheryl Potashnik n/k/a Cheryl Geiser unsuccessfully appeals this Judgment, then Jeffrey W. Carpenter shall additionally recover from such unsuccessful appealing defendant — or jointly and severally from such unsuccessful appealing defendants if more than one such defendant unsuccessfully appeals — the following amounts, representing

App. 000194

conditional and reasonable attorneys' fees that would be incurred by Jeffrey W. Carpenter in any such appeal:

a.  $86,625.00 for an appeal to the Dallas Court of Appeals, excluding oral argument and rehearing response;

b.  an additional $9,900.00 for oral argument, if any, before the Dallas Court of Appeals;

c.  an additional $9,900.00 for a response to a motion for rehearing, if the Dallas Court of Appeals requests that Jeffrey W. Carpenter file such a response;

d.  an additional $32,175.00 for a petition for review or response to a petition for review filed with the Supreme Court of Texas;

e.  an additional $37,125.00 for merits briefing, if the Supreme Court of Texas requests briefing on the merits;

f.  an additional $14,850.00 for oral argument, if any, before the Supreme Court of Texas; and

g.  an additional $7,425.00 for a response to a motion for rehearing, if the Supreme Court of Texas requests that Jeffrey W. Carpenter file such a response.

All other relief requested by any individual or entity in this case and not specifically granted herein or previously disposed of is DENIED.

This Judgment finally disposes of all parties and all claims and is appealable.

FINAL JUDGMENT CAUSE NO. CC-08-2072-E — PAGE 6 OF 7

The Court ORDERS execution to issue for this Judgment.

Signed this ___17___ day of _____December_____, 2018.

_Mark Greenberg_

Mark Greenberg
Judge, Dallas County Court at Law No. 5

App. 000196

REPORTER'S RECORD

VOLUME 1 of 11

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
Clerk

Trial Court Cause No. CC-08-02072-E

| | | |
|---|---|---|
| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| | ) | |
| SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., ET AL, | ) | |
| | ) | |
| Defendants. | ) | DALLAS, TEXAS |

PRETRIAL MOTIONS

On the 22nd day of January, 2018, the following
proceedings came on to be heard outside the presence
of a jury, in the above-entitled and -numbered cause;
and the following proceedings were had before the
HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,
Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

APPEARANCES:

**MS. AMY GIBSON**
SBN 00793801
**MR. DAVID WILEY**
SBN 24029901
Gibson Wiley, PLLC
1500 Jackson Street, Suite 714
Dallas, Texas 75201
(214)522-2121
Attorneys for Plaintiff

        -AND-

**MR. BRIAN SANFORD**
SBN 17630700
Sanford Firm
1910 Pacific Avenue, Suite 15400
Dallas, Texas 75201
(469)361-9111
Attorney for Plaintiff

        -AND-

**MR. LAWRENCE "LARRY" FRIEDMAN**
SBN 07469300
**MR. MICHAEL DONOHUE**
SBN 05989380
**MR. JASON FRIEDMAN**
SBN 24059784
Friedman & Feiger, LLP
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972)788-1400
Attorneys for Defendants

        -AND-

**MR. RYAN HALE**
SBN 24097784
Hawkins Parnell Thackston & Young, LLP
4514 Cole Avenue, Suite 500
Dallas, Texas 75205-5412
(214)780-5138
Appellate Attorney for Defendants

VOLUME 1

January 22, 2018                                          PAGE

Proceedings ----------------------------------      4

Witnesses Sworn ------------------------------      4

Rule Invoked ---------------------------------      5

Defendants' Motions to Exclude ---------------      7

Defendants' Motion to Exclude Plaintiff's Evidence   45

Plaintiff's Motion for Sanctions --------------     54

Motions in Limine -----------------------------     83

Motions in Limine Agreements ------------------     97

Motions in Limine (Cont'd) --------------------     99

Pretrial Conference ---------------------------    163

Court's Rulings -------------------------------    167

Adjournment -----------------------------------    175

Court Reporter's Certificate ------------------    176

Exhibit Certification -------------------------    177

### EXHIBIT INDEX
### (FOR HEARING ONLY)

| DEFENDANTS'<br>NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Miscellaneous documents | 43 | 45 |

App. 000199

MS. GIBSON:  Well, that --

MR. DONOHUE:  That's what that was.  That's not a bonus.  That's severance pay.

MS. GIBSON:  Those -- those --

MR. L. FRIEDMAN:  And everyone was offered severance, including Mr. Carpenter.  Everyone took the severance except Mr. Carpenter.  Everyone stayed till the end except Mr. Carpenter.  No one sued the company except Mr. Carpenter.

MS. GIBSON:  Your Honor, that misstates what happened.  The stay bonuses ultimately were paid as severance because upon the sale, obviously, the three entity defendants weren't employing anyone anymore.

THE COURT:  Are you drawing some legal distinction between a severance and a bonus?

MR. L. FRIEDMAN:  First of all, severance is a common term that we all know.

THE COURT:  Right.

MR. L. FRIEDMAN:  Stay bonus is a term that Ms. Gibson made up like Donald Trump makes up fake news and things like that.

THE COURT:  I don't know whether --

MR. L. FRIEDMAN:  It's not a term that's used in the industry or anywhere else.  There's no such thing as a stay bonus other than in this case.

MS. GIBSON:  Well, it -- it --
Your Honor --

MR. WILEY:  We don't have any agreements.

MS. GIBSON:  So the stay bonuses ended up being a severance pay.  Okay.  So, for example, different people were asked to stay different lengths of time.  And let's say I stayed through the end of this week as asked.  They're selling the company and so the stay bonuses were paid out, and my understanding is -- I haven't seen the agreement -- but in these severance agreements.  But it's one in the same.

The severance, for example, there are documents that talk about pay -- or I'm sorry -- stay and pay for employees' amounts and there are also documents that list the stay and pay amounts in a severance payment spreadsheet because they're one in the same.  Once their work is done, the company is being sold.  And so there is a severance of employment at that point, even if people continued to work for the purchaser.

MR. L. FRIEDMAN:  So, I understand my challenge in this case that I will have to address things that are simply made up.  Severance is one thing.  Those were offered, accepted, and paid.  Discretionary bonus was something else.  Mr. Potashnik will testify to that early in the case.  That should put an end to it.

**05-19-00238-CV**                                          1

1                      REPORTER'S RECORD

2                    VOLUME 2 of 11              FILED IN
                                            5th COURT OF APPEALS
3            Trial Court Cause No. CC-08-02072-E  DALLAS, TEXAS
                                            04/29/2019 6:14:22 PM
4     JEFFREY W. CARPENTER,          )    IN THE DALLAS COUNTY
                                                LISA MATZ
5              Plaintiff,            )          Clerk

6     VS                             )    COURT AT LAW NO. 5
                                     )
7     SOUTHWEST HOUSING DEVELOPMENT  )
      COMPANY, INC., ET AL,          )
8                                    )
              Defendants.            )    DALLAS, TEXAS
9     ───────────────────────────────────────────────

10

11                  **TRIAL ON THE MERITS**

12    ───────────────────────────────────────────────

13

14         On the 23rd day of January, 2018, the following

15    proceedings came on to be heard within the presence

16    of a jury, in the above-entitled and -numbered cause;

17    and the following proceedings were had before the

18    HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19    Dallas County, Texas:

20         Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25

```
 1                              APPEARANCES:

 2

 3        MS. AMY GIBSON
          SBN 00793801
 4        Gibson Wiley, PLLC
          1500 Jackson Street, Suite 714
 5        Dallas, Texas 75201
          (214)522-2121
 6        Attorneys for Plaintiff

 7               -AND-

 8        MR. BRIAN SANFORD
          SBN 17630700
 9        Sanford Firm
          1910 Pacific Avenue, Suite 15400
10        Dallas, Texas 75201
          (469)361-9111
11        Attorney for Plaintiff

12               -AND-

13        MR. LAWRENCE "LARRY" FRIEDMAN
          SBN 07469300
14        MR. MICHAEL DONOHUE
          SBN 05989380
15        MR. JASON FRIEDMAN
          SBN 24059784
16        Friedman & Feiger, LLP
          5301 Spring Valley Road, Suite 200
17        Dallas, Texas 75254
          (972)788-1400
18        Attorneys for Defendants

19               -AND-

20        MR. RYAN HALE
          SBN 24097784
21        Hawkins Parnell Thackston & Young, LLP
          4514 Cole Avenue, Suite 500
22        Dallas, Texas 75205-5412
          (214)780-5138
23        Appellate Attorney for Defendants

24
          ALSO PRESENT:  Steve Page, AV Technician
25
```

Case 3:23-cv-00769-N     Document 65     Filed 10/31/24     Page 207 of 272     PageID 5393
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 96 of 248   PageID 213

3

1                            VOLUME 2

2     January 23, 2018                                        PAGE

3     Proceedings ------------------------------------     5

4     Motions in Limine (Cont'd) --------------------     5

5     Court's Rulings -------------------------------    13

6     Witnesses Sworn -------------------------------    17

7     Jury Instructions -----------------------------    25

8     Plaintiff's Voir Dire -------------------------    31

9     Defendants' Voir Dire -------------------------    82

10    Venire Person 24 Excused ----------------------    99

11    Defendants' Voir Dire (Cont'd) ----------------   100

12    Individual Voir Dire --------------------------   111

13    Jury Strikes ----------------------------------   118

14    Jury Announced and Sworn ----------------------   134

15    Opening Statement by Ms. Gibson ---------------   136

16    Opening Statement by Mr. L. Friedman ----------   151

17    Defendants' Motion to Call Keith Jones --------   168

18    Court's Ruling --------------------------------   170

19
      PLAINTIFF'S
20    WITNESSES:
                    Direct      Cross    Redirect    Recross
21    Cheryl Geiser   175        ---       ---         ---
      Keith Jones     198        209       227         235
22

23    Defendants' Motion to Disregard ---------------   240

24    Defendants' Motion for Mistrial ---------------   241

25    Court's Ruling --------------------------------   241

Case 3:23-cv-00769-N   Document 65   Filed 10/31/24   Page 208 of 272   PageID 5394
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 97 of 248   PageID 214

4

| 1 | | VOLUME 2 (Cont'd) | | |
|---|---|---|---|---|
| 2 | January 23, 2018 | | | PAGE |
| 3 | Court's Ruling on Deposition Objections ------- | | | 243 |
| 4 | Adjournment ---------------------------------- | | | 243 |
| 5 | Court Reporter's Certificate ------------------ | | | 244 |
| 6 | Exhibit Certification ------------------------- | | | 245 |

7

**EXHIBIT INDEX**
**(FOR PRETRIAL HEARING ONLY)**

DEFENDANTS'

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | GMail | 7 | 7 |
| 2 | Employment Agreement | 7 | 7 |

****************************************************************
****************************************************************

**EXHIBIT INDEX**
**(FOR TRIAL ONLY)**

PLAINTIFF'S

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Phone Conversations | 22 | 23 |
| 2 | Employment Agreement | 22 | 23 |
| 3 | Email | 22 | 23 |
| 4 | Severance Allowance List | 238 | -- |
| 5 | Amendment to Employment Agreement | 238 | -- |

DEFENDANTS'

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 53 | Objections and Responses to Interrogatories | 222 | --- |

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 209 of 272    PageID 5395
Case 3:23-cv-00769-N  Document 15  Filed 06/08/23  Page 98 of 248  PageID 215

198

1              THE COURT:  If you'd call the witness for

2    the record.

3              MS. GIBSON:  Oh, yes.  The plaintiff calls

4    Keith Jones.

5              THE COURT:  All right.  Very good.  He's on

6    the stand.

7                        <u>KEITH JONES,</u>

8    having been first duly sworn, testified as follows:

9                        DIRECT EXAMINATION

10   BY MS. GIBSON:

11      Q.   Mr. Jones, you are the former chief financial

12   officer for the business, the businesses that

13   Brian Potashnik and Cheryl Potashnik ran?

14      A.   The three Southwest Housing companies, yes.

15      Q.   Okay.  And your salary was allocated across one or

16   more of those entities?

17      A.   Yes.

18      Q.   Okay.  Was it allocated across all three?

19      A.   Yes.

20      Q    All right.

21              And during your tenure as CFO, you -- you

22   worked with Jeff Carpenter on setting sale-proceeds bonuses

23   for other employees as part of the -- as -- let me -- let me

24   say that again.  You worked -- well, let me just do this.

25   I'm handing you what's been marked Exhibit 4.  Do you

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 210 of 272    PageID 5396
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 99 of 248   PageID 216

204

1    issue, okay.  When you are talking about a stay bonus you

2    are talking about an incentive to stay on and do a lot of

3    extra work toward the asset sale, correct?

4         A.    Extra work?  I'm trying to keep key employees from

5    leaving before the sale goes through so we can continue to

6    run the business.

7         Q.    Okay.  So stay bonus is to keep employees from

8    leaving before asset sale.  Is that what you said, before

9    the asset sale?

10        A.    Yes.

11        Q.    Okay.

12              Okay.  And once the companies were sold,

13   meaning Southwest Housing Management, Southwest Housing

14   Development, Affordable Housing Construction, at that point

15   all of the employees who were remaining would be severed

16   from employment, correct, with --

17        A.    With --

18        Q.    -- with those entities?

19        A.    With those entities, yes.

20        Q.    Okay.  And then --

21        A.    They -- they would be -- they would have been let

22   go and then another company picked them up if they were

23   going with the new company.

24        Q.    Okay.

25              And so whether someone was going to

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 211 of 272    PageID 5397
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 100 of 248   PageID 217

205

1    continue to work for the purchaser or not, there was,

2    effectively, at the asset sale, a severance of the

3    employment relationship with the selling entities:

4    Southwest Housing Management, Development, and Affordable

5    Housing Construction?

6        A.    Yes.

7        Q.    Okay.  And so in that sense a stay bonus -- you

8    and Jeff sometimes called the stay bonuses also a severance

9    because it would be at the end of the day, at the end of

10   employment?

11       A.    That's what a sever -- yes, the severance payroll

12   is.

13       Q.    Okay.  So the stay bonus and severance due to the

14   sale are essentially the same thing, correct?

15       A.    I guess so.  I called it a severance.

16       Q.    Right.  So, a bonus to stay, paid at the end, is

17   also called a severance.  I mean, you're not talking about

18   something different than severance, are you?

19       A.    No.

20       Q.    Okay.

21             And y'all may have called them other words

22   at times too, like, retention bonuses or something?

23       A.    Possibly.

24       Q.    Okay.  But -- but you referred often to the stay

25   bonus as severance, correct?

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 212 of 272    PageID 5398
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 101 of 248    PageID 218

206

1          A.    I called it severance, yes.

2          Q.    Okay.

3                      And you and Jeff Carpenter and Sara Reidy

4     were also intended to be part of the stay-bonus program,

5     correct?

6                      MR. DONOHUE:  Objection, Your Honor.

7     That -- that misrepresents what he just testified.  It's a

8     severance or severance bonus program.  That's what he called

9     it.

10                     THE COURT:  He can clarify.

11                     Overruled.

12                     THE WITNESS:  I discussed with Brian a

13    severance package for myself.

14         Q.    (By Ms. Gibson) Okay.  And was it your

15    understanding -- although I know you weren't present when

16    different deals were made, was it your understanding that

17    Jeff Carpenter and Sara Reidy were also part of that

18    program?

19         A.    I assumed that, yes.

20         Q.    Okay.

21                     And at one point you Emailed Jeff Carpenter

22    a copy of the agreement you were going to use, correct?

23         A.    I believe I did.

24                     MS. GIBSON:  Mr. Friedman.

25                     MR. L. FRIEDMAN:  Thank you.

1          MR. DONOHUE:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3     BY MR. DONOHUE:

4          Q.   Mr. Jones, to be clear so there's no confusion,

5     you called the program that Ms. Gibson's asked you about a

6     severance program that you and Mr. Carpenter dealt with,

7     correct?

8          A.   Correct.

9          Q.   You didn't call it a -- what is the term she

10    used -- a stay-bonus program.  You didn't call it that, did

11    you?

12         A.   I don't believe I did, no.

13         Q.   Did you hear anybody else call -- call it a

14    stay-bonus program at the time that you were there at the

15    Southwest Housing entities?

16         A.   I can't recall.

17         Q.   All right.

18                    That's a term that Ms. Gibson has injected.

19    And injected, in fact, in your deposition here a couple of

20    weeks ago, correct?

21         A.   I believe so.

22         Q.   This million dollars of cash bleeding for criminal

23    defense attorneys, in truth, the property portfolios were

24    doing very poorly from 2004 through 2007, weren't they?

25         A.   Yes.

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 214 of 272    PageID 5400
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 102 of 248    PageID 219
228

```
 1           Q.   Whether you call the stay bonus or these bonuses a

 2      severance or a stay bonus, the intent of both is to get

 3      people to stay, correct?

 4           A.   Correct.

 5           Q.   All right.

 6                     And Jeff Carpenter was part of the

 7      stay-bonus program or severance to, you know,

 8      stay-to-get-severance program, whatever you want to call it,

 9      as well as yourself and Sara Reidy, correct?

10           A.   I was under that impression, yes.

11           Q.   Okay.

12                     And it was -- there was a lot of additional

13      work to do because of an asset sale, correct?

14           A.   Correct.

15           Q.   All right.

16                     And Jeff Carpenter stayed, correct?

17           A.   Yes.

18           Q.   All right.

19                     So, if he stayed and didn't get paid the

20      promised stay bonus, then there was something he did that he

21      didn't get paid for, correct?

22                     MR. DONOHUE:  Objection, calls for

23      speculation.

24                     THE COURT:  All right.  Overruled.

25                     MR. DONOHUE:  Assumes facts not in
```

**05-19-00238-CV**                                                                          1

REPORTER'S RECORD

VOLUME 4 of 14                           FILED IN
                                    5th COURT OF APPEALS
<u>Trial Court Cause No. CC-08-02072-E</u>   DALLAS, TEXAS
                                    04/29/2019 6:14:22 PM

JEFFREY W. CARPENTER,            )   IN THE DALLAS COUNTY
                                                LISA MATZ
              Plaintiff,         )               Clerk

VS                              )    COURT AT LAW NO. 5

SOUTHWEST HOUSING DEVELOPMENT   )
COMPANY, INC., ET AL,           )

              Defendants.        )   DALLAS, TEXAS

---

**TRIAL ON THE MERITS**

---

     On the 24th day of January, 2018, the following

proceedings came on to be heard within the presence

of a jury, in the above-entitled and -numbered cause;

and the following proceedings were had before the

HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

Dallas County, Texas:

     Proceedings reported by Computerized Stenotype Machine.

App. 000212

Case 3:23-cv-00769-N   Document 65   Filed 10/31/24   Page 216 of 272   PageID 5402
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 184 of 248   PageID 301

2

```
 1                          APPEARANCES:

 2

 3     MS. AMY GIBSON
       SBN 00793801
 4     Gibson Wiley, PLLC
       1500 Jackson Street, Suite 714
 5     Dallas, Texas 75201
       (214)522-2121
 6     Attorneys for Plaintiff

 7            -AND-

 8     MR. BRIAN SANFORD
       SBN 17630700
 9     Sanford Firm
       1910 Pacific Avenue, Suite 15400
10     Dallas, Texas 75201
       (469)361-9111
11     Attorney for Plaintiff

12            -AND-

13     MR. LAWRENCE "LARRY" FRIEDMAN
       SBN 07469300
14     MR. MICHAEL DONOHUE
       SBN 05989380
15     MR. JASON FRIEDMAN
       SBN 24059784
16     Friedman & Feiger, LLP
       5301 Spring Valley Road, Suite 200
17     Dallas, Texas 75254
       (972)788-1400
18     Attorneys for Defendants

19            -AND-

20     MR. RYAN HALE
       SBN 24097784
21     Hawkins Parnell Thackston & Young, LLP
       4514 Cole Avenue, Suite 500
22     Dallas, Texas 75205-5412
       (214)780-5138
23     Appellate Attorney for Defendants

24

25     ALSO PRESENT:  Steve Page, AV Technician
```

Case 3:23-cv-00769-N     Document 65     Filed 10/31/24     Page 217 of 272     PageID 5403
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 185 of 248   PageID 302

3

```
1                          VOLUME 4

2   January 24, 2018                              PAGE

3   Proceedings ----------------------------------    6

4   Defendants' Motion to Poll the Jury -----------    6

5   Court's Ruling -------------------------------    7

6
    PLAINTIFF'S
7   WITNESS:
                    Direct     Cross    Redirect    Recross
8   Cheryl Geiser      8        ---       ---         ---

9
    Defendants' Motion for Mistrial ---------------   121
10
    Court's Ruling -------------------------------    121
11
12  PLAINTIFF'S
    WITNESSES:
13                  Direct     Cross    Redirect    Recross
    Cheryl Geiser    122        144       183         ---
14  Rick Graf        196        ---       ---         ---
    Brian Potashnik  199        ---       ---         ---
15
16  Defendants' Objection and Motion for Mistrial -   241

17  Court's Ruling -------------------------------    242

18  Adjournment ----------------------------------    243

19  Court Reporter's Certificate ------------------   244

20

21

22

23

24

25
```

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 218 of 272    PageID 5404
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 186 of 248    PageID 303

4

```
 1                            EXHIBIT INDEX

 2
     PLAINTIFF'S
 3   NO.              DESCRIPTION              OFFERED     ADMITTED

 4    8               Recap of Expenses and      14          14
                      Bonuses
 5
      9               Email                       18          18
 6
     10               Magazine Cover              62          62
 7
     11               Letter of Intent           66          67
 8
     12               Purchase and Sale          72          73
 9                    Agreement

10   13               Schedule A                  --          76

11   14               Email Cover Sheet          80          80

12   15               Escrow Agreement           84          84
                      (First Amendment)
13
     16               Purchase and Sale          86          86
14                    Agreement
                      (First Amendment)
15
     17               Escrow Agreement           89          89
16                    (Second Amendment)

17   18               Escrow Agreement           89          90
                      (Third Amendment)
18
     19               Escrow Agreement           91          91
19                    (Fourth Amendment)

20   20               Escrow Agreement           92          --
                      (Fifth Amendment)
21
     21               Consulting and Asset       93          94
22                    Management Services
                      Agreement
23
     22               Separation Agreement       98          99
24
     23               Email                      123         123
25
     24               Email                      125         125
```

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 219 of 272    PageID 5405
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 187 of 248    PageID 304

5

```
1                    EXHIBIT INDEX (CONT'D)

2

3    PLAINTIFF'S
     NO.           DESCRIPTION           OFFERED      ADMITTED

4    27            Escrow Agreement      138          138
                   (Sixth Amendment)
5
     28            Escrow Agreement      138          138
6                  (Seventh Amendment)

7    29            Escrow Agreement      138          138
                   (Eighth Amendment)
8
     30            Escrow Agreement      138          138
9                  (Ninth Amendment)

10   31            Escrow Agreement      138          138
                   (Tenth Amendment)
11
     32            Email                 138          138
12
     33            Closing Memorandum    138          138
13
     34            Closing Memorandum    138          138
14

15

16
     DEFENDANTS'
17   NO.           DESCRIPTION           OFFERED      ADMITTED

18   24            Gmail                 162          163

19

20

21

22

23

24

25
```

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 220 of 272    PageID 5406
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 188 of 248    PageID 305

8

```
 1    before then, please let -- get my attention or Vikki's
 2    attention and we'll take a break whenever you need to.
 3                  In general, depending on how the day works
 4    out, we take one 15-minute break in the morning and we take
 5    two 10-minute breaks in the afternoon.  But if that schedule
 6    doesn't work for you very well, we can always change that up
 7    and, for example, take a break every hour on the hour if
 8    that would be more comfortable to you.  You'll have a better
 9    idea after today.
10                  Ms. Gibson, it's still your witness, and if
11    you'll pick up just where you left off.
12                  MS. GIBSON:  Yes, Your Honor.  May I move
13    the --
14                  THE COURT:  Sure.
15                  MS. GIBSON:  -- clipboard now that the
16    jury's in?
17                  Can everybody see?  Can you see,
18    Ms. Geiser?
19                      CHERYL GEISER,
20    having previously been sworn, testified as follows:
21                  DIRECT EXAMINATION (CONT'D)
22    BY MS. GIBSON:
23        Q.   Ms. Geiser --
24                  MS. GIBSON:  May I approach the easel,
25    Your Honor?
```

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 221 of 272    PageID 5407
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 189 of 248    PageID 306

131

1    intend to pay --

2        Q.    A bonus --

3        A.    -- an asset-sale bonus.  That's your words.

4        Q.    Okay.  I know.  You think asset sale -- I forget

5    that you think they're different.

6        A.    They are different.

7        Q.    A -- a bonus out of asset sale proceeds is not

8    compensation pursuant to that agreement that he would be

9    giving up.  That would be a separate deal, correct?

10       A.    I don't know if that's true or not.

11       Q.    Well, earlier you covered --

12               THE COURT:  You --

13       Q.    (By Ms. Gibson) -- all of the compensation

14   pursuant to that agreement, right?

15       A.    Yes.

16       Q.    Okay.

17               In connection with closing of the asset

18   sale, about $2.1 million is the total amount of bonuses to

19   other employees paid out of -- paid in connection with the

20   asset sale, correct?

21       A.    They were severance payments.

22       Q.    But -- but that's -- the severance payments, I

23   mean, you were here for Keith Jones' testimony, right?

24       A.    Yeah, and I believe he said they were severance

25   payments.

1    Q.   Right.  But those severance payments were what

2    you-all had intended to pay employees to stay.

3    A.   I don't really have a lot of memory of the

4    severance bonus plan or what was negotiated or with

5    employees that worked for Jeff.  That was more or less

6    something that Jeff and Keith handled.  I just know that

7    every employee received -- every -- certain employees

8    received amounts in connection with signing a separation

9    agreement when the sale went through and they were

10   transferred to the new buyer.

11   Q.   Okay.  And it was a severance because people were

12   no longer going to be working for the business?

13   A.   They were no longer going to be working for

14   Southwest Housing Management or whatever entity they worked

15   for.  They were going to be severed from our company and

16   then rehired by the buyer's company.

17   Q.   Okay.

18        You recall being in your deposition.

19   And I'm at Page 81, 3.  Do you recall that I asked you, Do

20   you know the total amount paid out in sale-proceeds bonuses

21   to employers other than your -- to employees other than

22   yourself and Brian?  And you say, "Yes."  And I say, "What's

23   the total?"  And then you say, "The total bonuses paid out

24   at sale were approximately 2.1 million."

25   A.   Correct.

1      Q.   And the 2.1 million paid out, that you said were

2   paid out in sale-proceeds bonuses, that --

3      A.   Paid out of the proceeds from the sale.

4      Q.   I'm sorry?

5      A.   Paid out of proceeds from the sale.

6      Q.   Okay.  Well, in the question you didn't take issue

7   with sales-proceeds bonus --

8      A.   Sorry I forgot to take issue with you --

9      Q.   -- but you do now.

10     A.   -- on that particular time --

11     Q.   Okay.

12     A.   -- because I've taken issue with it --

13     Q.   The total is -- is 2.1 million?

14     A.   Uh-huh.

15     Q.   And those payouts were not pursuant to any

16   writing, correct?

17     A.   I don't know if that's true as it related to

18   everybody.

19     Q.   Okay.  Were the majority of those bonuses paid out

20   based on oral --

21               MR. L. FRIEDMAN:  Objection.

22               MS. GIBSON:  I'm sorry.  Let me start over.

23     Q.   (By Ms. Gibson) Were the majority of those bonuses

24   out of the asset-sale proceeds paid even though there wasn't

25   a writing?

1          Q.   (By Ms. Gibson) That's the document that I'm

2     referring to.

3          A.   Okay, we're back to the separation agreement that

4     was attached to Jeff's Email.  And what is the question?

5          Q.   Mr. Friedman was asking you questions where

6     it said without deduction for -- and I'm paraphrasing

7     because I don't have it in front of me -- but without

8     deduction for bonuses or payments to other employees.

9          A.   This agreement does not mention anything about

10     other employees' bonuses that I see in this document.

11          Q.   Okay.  Well, are you aware that Jeff Carpenter had

12     been working from a form that Keith Jones provided to him?

13          A.   I've become aware of that in the course of this

14     lawsuit, but --

15          Q.   And you're aware that Mr. Carpenter has already

16     said that in using that form he made a mistake on that

17     piece?

18               MR. L. FRIEDMAN:  Objection.  She assumes

19     facts not in evidence.

20          Q.   (By Ms. Gibson) You're aware of that?

21               THE COURT:  She's aware or not.

22               THE WITNESS:  I know that this came up in

23     his deposition, and I don't know if he was aware at the time

24     he wrote this or if he aware at the time he filed his

25     initial lawsuit in which he talks about his alleged deal.  I

1    don't remember at what point in time he made that mistake.

2        Q.    (By Ms. Gibson) And he has made clear that the

3    formula did deduct other stay bonuses paid to other -- to

4    other employees?

5        A.    I don't think he has made that clear, no.

6        Q.    That's the problem --

7        A.    I mean, that was his testimony at his deposition.

8        Q.    Right.  And it doesn't -- in doing so, in making

9    that correction, it doesn't help Jeff Carpenter's damages.

10    In fact, it reduces them, correct?

11        A.    It just proves that he didn't have a deal.  He

12    couldn't articulate the deal.  He didn't have a deal.

13                It changed from this time.  It changed,

14    what, 11 times through the course of these 10 years.  His

15    deal has changed.  He said he made a mistake.  I don't agree

16    with that.

17                THE COURT:  Answer only the question she's

18    asking.

19        Q.    (By Ms. Gibson) Okay, I understand your position

20    in this case, Ms. Geiser.  But in correcting a mistake and

21    saying it was to be the opposite, including that bonuses

22    paid to other employees were to come off, that would

23    actually reduce Mr. Carpenter's damages, correct?

24        A.    Ultimately, yes.

25        Q.    Okay.  And in making that correction, because

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 226 of 272    PageID 5412
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 190 of 248    PageID 307

199

```
 1    Mr. Graf.

 2                    Can this witness be excused?

 3                    MS. GIBSON:  Yes.

 4                    THE COURT:  If you were subpoenaed, you're

 5    released from your subpoena and you're free to leave the

 6    courthouse now.  If you'd like to stay and observe the

 7    trial, you can, but you're free to leave the courthouse now.

 8                    THE WITNESS:  Thank you.

 9                    All right.  Ms. Gibson.

10                    Y'all, don't stand up back there.  I was

11    just going to swear in the witness.

12                    MS. GIBSON:  Plaintiff calls Brian

13    Potashnik.

14                    THE COURT:  Mr. Potashnik, let me swear you

15    in before you step up there.

16                    THE WITNESS:  Okay.

17                    (Witness sworn)

18                    THE COURT:  Have a seat here.

19                         BRIAN POTASHNIK,

20    having been first duly sworn, testified as follows:

21                         DIRECT EXAMINATION

22    BY MS. GIBSON:

23        Q.   Mr. Potashnik, in considering an asset sale, when

24    you were considering selling Southwest Housing entities, did

25    you consider the potential of a mass exodus of employees?
```

```
1        A.   Page 3 of what?  What document?

2        Q.   Page 3 of the same conversation.

3        A.   Oh, the secretly recorded conversation.  Okay.

4        Q.   Okay.

5             You say, "I mean, I'm telling you that

6   we're -- we're going to dig ourselves out of this thing and

7   then hopefully, you know, at the end of the day, get

8   something out of it from Cascade and get the deal closed and

9   pay the costs that we have to defend ourselves and have

10  money left over so that we can, you know, give you a bonus,

11  give Sara a bonus, give Keith a bonus."

12            And you heard Keith Jones testify that

13  there was a program of bonuses to get people to stay?

14       A.   No.  I -- I heard Keith Jones testify that there

15  was no stay bonus.  Because I have never heard that

16  expression until you made it up here at trial or prior to

17  trial.  There's no --

18       Q.   You've never heard of a stay bonus?

19       A.   I never heard stay bonus, no.  I never have.

20            But that being said, the bonuses that you

21  refer to Keith Jones referred to as severance, which is what

22  I referred to it as and which is what it was.  And that was

23  only in the event that there was any proceeds left over, as

24  Cheryl pointed out, from the sale of the assets.

25       Q.   So, you heard Keith Jones explain that when he
```

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 228 of 272    PageID 5414
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 191 of 248   PageID 308

216

1    spoke about the severance bonuses those were the same --

2        A.   No, no, no.

3        Q.   Sir, let me finish answering [sic] my question,

4    please, okay.

5             You heard Keith Jones testify that the

6    severance bonuses were the same thing as what I was calling

7    the stay bonuses?

8        A.   No, that's incorrect.

9        Q.   That's incorrect?

10       A.   He didn't say that.  He said what you stated as a

11   stay bonus was in fact severance.

12       Q.   He testified that he got that severance as an

13   incentive to stay.  Do you recall that?

14       A.   The severance, not severance bonus as you --

15       Q.   The amount in that severance --

16       A.   -- term it.

17       Q.   -- was his --

18       A.   Excuse me.

19       Q.   -- incentive to stay?

20       A.   Ms. Gibson, you are not going to get me to call

21   something that is severance a bonus because there were no

22   bonuses.

23       Q.   The truth is the bonuses from the asset-sale

24   proceeds to get Sara and Keith and Jeff Carpenter to stay is

25   exactly what you are talking about when you say -- refer to

1    Ms. Gibson.  I don't know what else to say.

2              With all due respect, it was 12 years ago.

3    I don't recall recall having conversations with any

4    employees individually about whether or not they would have

5    jobs or what the situation was, because I didn't know and it

6    was not incumbent upon me to be the one to either keep them

7    with the new company or let them go.  That was up to

8    Mr. Graf, who you just had on the stand.

9        Q.    (By Ms. Gibson) That wasn't the question we were

10    talking about.  We were talking about --

11        A.    Well, I'm trying to answer it so we can keep from

12    repeating the same question.

13              THE COURT:  Let her ask the questions.

14        Q.    (By Ms. Gibson) What I have just put up was about

15    discussions about you wanting input from Jeff Carpenter --

16        A.    No, I didn't --

17        Q.    -- concerning other employees.

18        A.    I didn't.  I didn't ask for input.

19        Q.    Did you and Cheryl Geiser discuss -- wait.  Sorry.

20    I'm on the wrong page.  I'm going backwards.

21              Do you recall telling Jeff Carpenter that

22    you wanted his input on the amount of sale-proceeds bonuses

23    to be paid to certain key corporate employees beneath the

24    executive level?

25        A.    No, Ms. Gibson.  Again, there were no discussions

1    regarding bonuses.  The only thing that would have been paid

2    to anybody over and above what their employment agreement

3    called for would have been a severance.  And I think

4    Mr. Jones made that clear.  I know that Ms. Geiser made that

5    clear.  And I hope that I am, in my testimony, doing the

6    same.

7        Q.   When I asked you this question at your deposition,

8    your answer was just, "No, never happened", right?

9        A.   Same answer I'm giving today.

10        Q.   Do you recall telling Jeff that you wanted his

11    bonus to be reduced by the key corporate employee bonuses

12    because that would give Jeff an incentive to choose an

13    amount that was high enough to keep them, but he wouldn't be

14    giving his favorite employees some astronomical bonus?

15        A.   No.  There's -- again, I don't know how many times

16    I have to answer the question.  There were no discussions

17    regarding anything that was not under a written,

18    agreed-upon, employment agreement that was offered to

19    anybody or discussed with anybody other than severance.  And

20    that is my answer in its entirety.  As many times as you

21    want to frame the question or ask the question, let's just

22    cut to the chase.  There was no discussions regarding

23    bonuses, period.

24        Q.   Mr. Potashnik, you know I'm going to continue to

25    ask the questions --

1    I'm answering your question.

2        Q.   Yeah.  I think I understood that one.

3        A.   Okay.  Good.

4        Q.   I'm not going to ask you about details; just in

5    general.  Did you discuss the sale-proceeds bonus with

6    Keith -- Keith Jones -- at some point in time?

7                    MR. L. FRIEDMAN:  Objection, relevance.

8                    MS. GIBSON:  It's part of the program.

9                    MR. L. FRIEDMAN:  There's no program.

10                   THE WITNESS:  There's no program.  There's

11   no program.

12                   MR. L. FRIEDMAN:  Lack of foundation.

13                   THE COURT:  All right.  Fair enough.  The

14   lack-of-predicate objection is sustained.

15       Q.   (By Ms. Gibson) You recall Keith Jones talking

16   about a program to offer bonuses to get employees to stay?

17       A.   I recall Keith Jones saying that there was no

18   stay-bonus program, as you seem to be --

19       Q.   I didn't say --

20       A.   No, no, no, you are very determined to get the

21   stay bonus, but the reality --

22                   THE COURT:  Mr. Potashnik, let her finish

23   her question.

24                   MR. L. FRIEDMAN:  Well, he was in the

25   middle of an answer when she interrupted him.

1          THE COURT:  He needs to answer questions,

2     not comment on her question.

3               Repeat your question, Ms. Gibson.

4               MR. L. FRIEDMAN:  So my request is we get

5     back to question and answer, and she let him --

6               THE COURT:  Right.

7               MR. L. FRIEDMAN:  -- finish before she

8     interrupts him, and he let her finish before he interrupts

9     her.

10              THE COURT:  Fair enough.

11              Stay with question and answer.

12              THE WITNESS:  Yes, Your Honor.

13              THE COURT:  And that's for both.

14              MS. GIBSON:  Absolutely.

15              THE WITNESS:  Yes, ma'am?

16      Q.   (By Ms. Gibson) You recall Keith Jones talking

17     about a program in place to offer bonuses to get people to

18     stay in light of the asset sale, correct?

19      A.   No.

20      Q.   You don't recall that.  All right.

21      A.   I recall Mr. Jones saying that there was no

22     stay-bonus program, but there was in fact potential

23     severance being paid to employees upon the sale of the

24     company.

25      Q.   Mr. Potashnik, I'm not using the stay bonus or

1    severance.  I'm just saying bonus.  Bonuses for you --

2        A.   Well, there's a -- there's a -- there's a big

3    difference --

4        Q.   I'm just saying --

5        A.   -- to me.  So I can't distinguish --

6        Q.   What word do you want -- what word do you want me

7    to use?

8        A.   Well, it depends on whether or not it's referred

9    to in the employment agreement as a bonus or if it's

10   referred to, in fact, by Mr. Jones in his testimony as what

11   it was, which was a severance.

12       Q.   My question is about bonuses offered to employees

13   to try and get them to stay.  You don't like the word

14   "bonus".  What word would you like me to use to --

15       A.   Ms. Gibson, your question was about Keith Jones

16   and what his testimony referred to.  And as I pointed out,

17   his --

18       Q.   Well, let me just ask --

19       A.   -- testimony referred to the fact that there was

20   no stay bonus but there was a severance paid to those

21   employees that were going to be with the company at the time

22   of the asset sale and beyond --

23       Q.   Okay.

24       A.   -- if, in fact, Cascade decided to keep them as

25   employees.

1

1          REPORTER'S RECORD

2          COA NO. 05-19-00238-CV

3       TRIAL CAUSE NO. cc-08-02072-e   FILED IN
                                        5th COURT OF APPEALS
                                           DALLAS, TEXAS
4            VOLUME 5 OF 14            04/29/2019 6:14:22 PM
                                           LISA MATZ
5   JEFFREY CARPENTER,        )    IN THE COUNTY COURT
                              )              Clerk
6       Plaintiff,            )
                              )
7   VS.                       )    AT LAW NO. 5
                              )
8   SOUTHWEST HOUSING          )
    DEVELOPMENT COMPANY, INC., )
9   SOUTHWEST HOUSING          )
    MANAGEMENT COMPANY, INC.,  )
10  AFFORDABLE HOUSING         )
    CONSTRUCTION, INC., BRIAN  )
11  POTASHNIK and CHERYL       )
    POTASHNIK,                 )
12                            )
        Defendants.           )    DALLAS COUNTY, TEXAS
13  -------------------------------------------------------

14

15              TRIAL ON THE MERITS

16

17  -------------------------------------------------------

18

19

20          On the   25th day of January, 2018, the

21  following proceedings came on to be heard in the above-

22  entitled and numbered cause before the Honorable Mark

23  Greenberg, Judge presiding, held in Dallas County, Texas

24

25          Proceedings reported by machine shorthand.

                    Georgina Ware
                Certified Shorthand Reporter

2

```
 1              A P P E A R A N C E S

 2

 3        Ms. Amy Gibson
          GIBSON, WILEY, PLLC
 4        SBOT NO. 00793801
          1500 Jackson Street, Suite 714
 5        Dallas, Texas 75201
          PHONE:  (214) 522-2121
 6
          Mr. Brian Sanford
 7        THE SANFORD FIRM
          SBOT NO. 17630700
 8        1910 Pacific Avenue, Suite 15400
          Dallas, Texas  75201
 9        PHONE:  (469) 361-9111

10        ATTORNEYS FOR THE PLAINTIFF

11

12             AND

13

14        Mr. Lawrence Friedman
          SBOT NO. 07469300
15        Mr. Michael Donohue
          SBOT NO. 05989380
16        Mr. Jason Friedman
          SBOT NO. 24059784
17        FRIEDMAN & FEIGER ATTORNEYS AT LAW
          5301 Spring Valley Road, Suite 200
18        Dallas, Texas  75254
          PHONE:  (972) 788-1400

19        Mr. Ryan Hale
          HAWKINS, PARNELL, THACKSTON & YOUNG, LLP
20        SBOT NO. 24097784
          4514 Cole Avenue, Suite 500
21        Dallas, Texas  75205
          PHONE:  (214) 780-5100

22

23        ATTORNEYS FOR THE DEFENDANT

24

25
```

Georgina Ware
Certified Shorthand Reporter

App. 000232

3

```
 1                    I N D E X

 2                   VOLUME 04

 3             (TRIAL ON THE MERITS)

 4                                        Page   Vol.

 5   January 25, 2018

 6   Appearances . . . . . . . . . . . . . .   02      05

 7   Proceedings . . . . . . . . . . . . .     05      05

 8   PLAINTIFF'S WITNESSES
                    Direct    Cross   V. Dire/S. Rosa   Vol.
 9   JEFF RICHARDS     07, 15   13,              --      05
     BRIAN POSTASHNIK   16,      --              --      05
10   PAUL COHEN       100, 108  106,            --      05
     VIKKI CARPENTER   112, 127 116, 128        --      05
11   JEFFREY CARPENTER 130,      --             --      05

12   DEFENDANT'S WITNESS
                    Direct    Cross     V. Dire/S. Rosa  Vol.
13   MARK JONES    65, 95    86, 97              --      05

14   Adjournment . . . . . . . . . . . . . .   233      05

15   Court Reporter's Certificate. . . . . . . 234      05

16                   EXHIBIT INDEX

17   PLAINTIFF'S

18   NO.     DESCRIPTION          OFFERED   ADMITTED   VOL.

19   20.     Escrow Agreement        18        18       05

20   35.     E-mail                  21        21       05

21   39.     Secretary of State Doc. 47        47       05

22   40.     Employee Handbook       33        33       05

23   40(a). Cert. of Termination     49        49       05

24   41.     E-mail                  38        39       05

25   49.     E-Mail                 185       185       05
```

Georgina Ware
Certified Shorthand Reporter

App. 000233

4

EXHIBIT INDEX (cont'd)

PLAINTIFF'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 50. | E-Mail | 193 | 193 | 05 |
| 51. | Hartfield's Note | 202 | 202 | 05 |
| 52. | E-Mail | 207 | | 05 |

DEFENDANT'S

| 14. | JC Personal Notes | 121 | 122 | 05 |
|-----|-------------------|-----|-----|----|

Georgina Ware
Certified Shorthand Reporter

App. 000234

```
 1              THE COURT:  All right.  Thank you,

 2   Ms. Carpenter.  If you'll have a seat back over there

 3   with Mr. Carpenter.

 4              Ms. Gibson, it's still your case.

 5              MS. GIBSON:  I'm sorry?

 6              THE COURT:  It's still your -- if you'll

 7   call your next witness, please.

 8              MS. GIBSON:  Okay.  Plaintiff calls Jeff

 9   Carpenter.

10              THE COURT:  Mr. Carpenter, if you'd come up

11   here, sir.  Before you step up there, let me swear you

12   in.

13              THE WITNESS:  Yes, sir.

14              (Witness sworn.)

15              THE COURT:  Have a seat right here,

16   Ms. Gibson will ask you questions first.

17              And we're still going to about 45 minutes

18   before we take a break.

19                   JEFFREY CARPENTER,

20   having been first duly sworn, testified as follows:

21                   DIRECT EXAMINATION

22   BY MS. GIBSON:

23       Q.  Would you please tell the jury your full name.

24       A.  Jeffrey Wayne Carpenter.

25       Q.  And, Mr. Carpenter, to clear something up, can
```

Georgina Ware
Certified Shorthand Reporter

App. 000235

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 239 of 272    PageID 5425
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 198 of 248    PageID 315

193

1          MS. GIBSON:   And Plaintiffs offer

2    Exhibit 50.

3          MR. FRIEDMAN:   -- I think voir dire would be

4    appropriate.  I mean, the subject says amendment to

5    employment agreement to a blank document and what's

6    attached is not a blank document.

7          THE COURT:   Okay.  Overruled.  But your --

8    we'll put your substantive objection and that objection

9    too on the record at a later time.

10          MR. FRIEDMAN:   Okay.  Thank you.

11          THE COURT:   50 is admitted.

12          (Plaintiff's Exhibit No. 50 is admitted.)

13          MR. FRIEDMAN:   50?

14          THE COURT:   50.

15    Q.   (By Ms. Gibson)  So on January 17, 2007, Keith

16    Jones is sending you a form for what?

17    A.   It was --

18    Q.   Why is he sending you a form?

19          THE COURT:   The question is:  What is the

20    form for, not --

21          MR. FRIEDMAN:   The purpose of the form.

22          THE WITNESS:   The purpose of the form was we

23    were informed to try to expedite memorializing each

24    individual severance bonus program, whatever you want to

25    call it.  We don't know who -- anything about each

App. 000236

**05-19-00238-CV**

1

REPORTER'S RECORD

VOLUME 6 of 14

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
04/29/2019 6:14:22 PM
LISA MATZ
Clerk

Trial Court Cause No. CC-08-02072-E

| JEFFREY W. CARPENTER, | ) | IN THE DALLAS COUNTY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS | ) | COURT AT LAW NO. 5 |
| | ) | |
| SOUTHWEST HOUSING DEVELOPMENT | ) | |
| COMPANY, INC., ET AL, | ) | |
| | ) | |
| Defendants. | ) | DALLAS, TEXAS |

TRIAL ON THE MERITS

     On the 29th day of January, 2018, the following

proceedings came on to be heard within the presence

of a jury, in the above-entitled and -numbered cause;

and the following proceedings were had before the

HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

Dallas County, Texas:

     Proceedings reported by Computerized Stenotype Machine.

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 241 of 272    PageID 5427
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 104 of 248    PageID 221

2

1                              APPEARANCES:

2

3       MS. AMY GIBSON
        SBN 00793801
        Gibson Wiley, PLLC
4       1500 Jackson Street, Suite 714
        Dallas, Texas 75201
5       (214)522-2121
        Attorney for Plaintiff
6
                     -AND-
7

8       MR. BRIAN SANFORD
        SBN 17630700
        Sanford Firm
9       1910 Pacific Avenue, Suite 15400
        Dallas, Texas 75201
10      (469)361-9111
        Attorney for Plaintiff
11
                     -AND-
12

13      MR. LAWRENCE "LARRY" FRIEDMAN
        SBN 07469300
        MR. MICHAEL DONOHUE
14      SBN 05989380
        MR. JASON FRIEDMAN
15      SBN 24059784
        Friedman & Feiger, LLP
16      5301 Spring Valley Road, Suite 200
        Dallas, Texas 75254
17      (972)788-1400
        Attorneys for Defendants
18
                     -AND-
19

20      MR. RYAN HALE
        SBN 24097784
        Hawkins Parnell Thackston & Young, LLP
21      4514 Cole Avenue, Suite 500
        Dallas, Texas 75205-5412
22      (214)780-5138
        Appellate Attorney for Defendants
23

24
        ALSO PRESENT:  Steve Page, A/V Technician
25

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 242 of 272    PageID 5428
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 105 of 248    PageID 222

3

1                          VOLUME 6

2    January 29, 2018                                    PAGE

3    Proceedings ----------------------------------      6

4
     PLAINTIFF'S
5    WITNESS:
                        Direct    Cross    Redirect     Recross
6    Jeffrey Carpenter     6        83       ---          ---

7
     Adjournment -----------------------------------    214
8
     Court Reporter's Certificate ------------------    215
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 243 of 272    PageID 5429
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 106 of 248    PageID 223

4

```
 1                              EXHIBIT INDEX

 2
    PLAINTIFF'S
 3  NO.                  DESCRIPTION          OFFERED      ADMITTED

 4  36                   Franchise Tax Report    28          29

 5  37                   Franchise Tax Report    28          29

 6  38                   Franchise Tax Report    28          29

 7  51-1                 Handwritten List        30          30

 8  52                   Notes                   44          45

 9  53                   Expense Report           9          10

10  54                   Expense Report           9          10

11  55                   Declaration of          14          14
                         Sandy Dixon
12
    56                   Certificate of          26          26
13                       Non-Foreign Status

14  57                   Certificate of          26          26
                         Non-Foreign Status
15
    58                   Email                   33          34
16
    59                   Memorandum of Agreement 36          37
17
    60                   Email                   39          39
18
    61                   Explanatory Note        43          43
19
    62                   Email                   49          49
20
    63                   Amendment to Employment 52          52
21                       Agreement

22  64                   Email                   58          59

23  65                   Email                   58          59

24  66                   Email                   58          59

25  67                   Email                   62          63
```

5

| | | | |
|---|---|---|---|
| 1 | | EXHIBIT INDEX (Cont'd) | |

**PLAINTIFF'S**

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 68 | Email | 76 | 76 |
| 69 | Summary (Demonstrative) | 78 | -- |

**DEFENDANTS'**

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 4 | Employment Agreement | 124 | 125 |
| 13 | Amendment to Employment Agreement | 163 | 163 |
| 24 | Email | 163 | 163 |

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 245 of 272    PageID 5431
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 108 of 248   PageID 225

6

```
 1                    P R O C E E D I N G S

 2                    January 29, 2018

 3               (The jury entered the courtroom.)

 4               THE COURT:  Welcome back.  Good morning,

 5     ladies and gentlemen.

 6                    We're going to start right into the trial.

 7     Our witness, when we stopped on Thursday, was Mr. Carpenter.

 8     We were still on his direct examination, which means that

 9     the attorney calling the witness is still asking questions.

10     So we'll ask Ms. Gibson to pick up where she left off.  And

11     we'll go until about 10:20 or 10:25 before we take a break.

12                    And, Ms. Gibson, if you'd just pick up

13     where you left off.

14                    MS. GIBSON:  Sure.

15                    JEFFREY W. CARPENTER,

16     having been previously sworn, testified as follows:

17                    DIRECT EXAMINATION (Cont'd)

18     BY MS. GIBSON:

19          Q.   Mr. Carpenter, before we get back into the

20     timeline, you heard Ms. Geiser say that your salary covers

21     everything?

22          A.   Yes.

23                    MR. L. FRIEDMAN:  I'm going to object to --

24          Q.   (By Ms. Gibson) And with respect --

25                    MR. L. FRIEDMAN:  -- to the
```

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 246 of 272    PageID 5432
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 109 of 248    PageID 226

46

```
 1          Q.   Okay.  And what -- what were the group of
 2     employees you were responsible for?
 3          A.   I was responsible for corporate management
 4     personnel.
 5          Q.   All right.  And --
 6          A.   Whether they were in the corporate office or
 7     satellite offices that we had.
 8          Q.   Okay.  And what was -- without telling us any one
 9     specific deal, what was your role in setting stay-and-pay
10     incentives for corporate employees?
11          A.   Brian initially made some recommendations -- made
12     a recommendation, which I thought was over generous.
13          Q.   Well, we're not talking about specific employee
14     deals.
15          A.   Okay.
16          Q.   Okay.  In general, just for the entire group,
17     what -- what was your role in setting stay-and-pay
18     incentives?
19          A.   Setting -- setting the retention, stay and pay,
20     severance bonus, whatever we want to call it.  And I worked
21     with Keith Jones as well, and we -- to present it to Brian
22     and Cheryl.
23          Q.   Okay.  And did you also play a role in selecting
24     who would receive a stay-and-pay --
25          A.   Yes.
```

Case 3:23-cv-00769-N     Document 65     Filed 10/31/24     Page 247 of 272     PageID 5433
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 110 of 248   PageID 227

47

```
 1          Q.   -- incentive?

 2          A.   Yes, ma'am.

 3          Q.   Okay.  Is this the same thing or different from

 4     what Keith Jones called severance?

 5          A.   No.  Same thing.

 6          Q.   Same thing.

 7                    And what was the purpose of setting these

 8     stay-and-pay incentives?

 9          A.   Well, it was very important for retention of

10     employees.  Very nervous about the new company coming on

11     board and bringing their own people.  But also to keep the

12     eye on the ball so they'd be motivated and focused to

13     continue to do their job and continue to stay on course, the

14     right course.

15          Q.   Okay.  And is this in connection with the asset

16     sale?

17          A.   And may I add to keep the continuity flowing

18     properly?

19          Q.   Okay.  What do you mean by continuity?

20          A.   The integrity of Southwest Housing until Cascade

21     or Pinnacle took control.

22          Q.   Okay.  And then --

23          A.   To maintain the standards.

24          Q.   -- and then you also refer -- you also refer to

25     this as a stay plan?
```

1          A.    Yes.

2          Q.    Is that the same thing?

3          A.    Yes.

4          Q.    Okay.  And is this part of the plan or program to

5     pay severance or stay bonuses that Keith Jones testified

6     about?

7                     MR. L. FRIEDMAN:  Leading.

8                     THE COURT:  Overruled.

9          A.    Yes.

10         Q.    (By Ms. Gibson) All right.  Mr. Carpenter, do you

11    recall when Brian Potashnik testified that he never had you

12    lead any tours for prospective sellers or investors?

13         A.    Yes.

14         Q.    I'm sorry.  Respective purchasers?

15         A.    Yes, I recall him saying that I was not involved.

16         Q.    Okay.  And were you, in fact, involved in that?

17         A.    Yes, I was.

18         Q.    Okay.

19                     I'm handing you what's been marked

20    Plaintiff's Exhibit 62.  Do you recognize Plaintiff's 62 as

21    an Email from Basil Rallis to you on April 12th, 2007?

22         A.    Yes, I do.

23         Q.    And is this in connection with something you

24    received during the course of your work in connection with

25    the asset sale?

Case 3:23-cv-00769-N   Document 65   Filed 10/31/24   Page 249 of 272   PageID 5435
Case 3:23-cv-00769-N   Document 15   Filed 06/08/23   Page 111 of 248   PageID 228

72

1          A.    Well, on the 1st, late in the afternoon after 5:00

2     o'clock -- excuse me -- I received an Email from

3     Keith Jones.  Basically, it was my termination paperwork and

4     severance package or severance agreement.

5          Q.    Okay.

6          A.    Excuse me.  Separation agreement.

7          Q.    Okay.  Same thing, though, as far as separating

8     from the company?

9          A.    Yes.

10         Q.    Okay.

11                      And did that -- did that document they sent

12    you confirm your deal?

13         A.    No, not at all.

14         Q.    What did it do?

15         A.    It basically said I had no rights to any of the

16    agreements and that I would not be paid whether it's earned,

17    you know.  After my dismissal there would be no more

18    payments of anything.

19         Q.    And what did they offer you in that proposed

20    separation agreement?

21         A.    At first they offered $50,000.

22         Q.    I mean what -- what pay items were in that

23    agreement that Keith Jones sent to you?

24         A.    Oh, it was -- it was standard.  It was PTO, any

25    accrued vacation.  I believe my deal had my written

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 250 of 272    PageID 5436
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 112 of 248    PageID 229

73

1    employment agreement, had six weeks automatic severance when

2    I would leave the company.  It mentioned COBRA.  And the

3    separation agreement basically took -- would wipe out all

4    the agreements that I have with Brian and Cheryl and the

5    whole reason why I stayed.

6        Q.    Okay.  When you say it would wipe out all of your

7    agreements, is that because it's requiring you to release --

8        A.    Yes.

9        Q.    -- all claims?

10                Did you sign it?

11       A.    No.

12       Q.    After that, did you continue to try and work

13   something out with the Potashniks?

14       A.    Yes, I did.

15       Q.    Okay.  And, ultimately, what did -- what happened

16   with that?

17       A.    Cheryl and I -- I gave it another try and

18   submitted not the best of documents, but --

19                MR. L. FRIEDMAN:  I'm sorry.  I didn't hear

20   that.

21                THE WITNESS:  I said I submitted -- I

22   believe I submitted another try at memorializing the

23   situation.  Cheryl said that she was going to -- that

24   it would take her a few days before she could get to it.

25                MR. L. FRIEDMAN:  This is nonresponsive,

**05-19-00238-CV**

1

1   REPORTER'S RECORD

2   VOLUME 10 of 14            FILED IN
                              5th COURT OF APPEALS
3   <u>Trial Court Cause No. CC-08-02072-E</u>  DALLAS, TEXAS
                              04/29/2019 6:14:22 PM
4   JEFFREY W. CARPENTER,        )   IN THE DALLAS COUNTY
                                 )   Clerk
5           Plaintiff,           )

6   VS                          )   COURT AT LAW NO. 5
                                 )
7   SOUTHWEST HOUSING DEVELOPMENT )
    COMPANY, INC., ET AL,        )
8                                )
            Defendants.          )   DALLAS, TEXAS
9   ─────────────────────────────────────────────

10

11                  **TRIAL ON THE MERITS**

12  ─────────────────────────────────────────────

13

14      On the 31st day of January, 2018, the following

15  proceedings came on to be heard within the presence

16  of a jury, in the above-entitled and -numbered cause;

17  and the following proceedings were had before the

18  HONORABLE MARK GREENBERG, Judge presiding, held in Dallas,

19  Dallas County, Texas:

20      Proceedings reported by Computerized Stenotype Machine.

21

22

23

24

25

App. 000248

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 252 of 272    PageID 5438
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 200 of 248    PageID 317

2

```
 1                              APPEARANCES:

 2
       MS. AMY GIBSON
 3     SBN 00793801
       Gibson Wiley, PLLC
 4     1500 Jackson Street, Suite 714
       Dallas, Texas 75201
 5     (214)522-2121
       Attorney for Plaintiff
 6
                  -AND-
 7
       MR. BRIAN SANFORD
 8     SBN 17630700
       Sanford Firm
 9     1910 Pacific Avenue, Suite 15400
       Dallas, Texas 75201
10     (469)361-9111
       Attorney for Plaintiff
11
                  -AND-
12
       MR. LAWRENCE "LARRY" FRIEDMAN
13     SBN 07469300
       MR. MICHAEL DONOHUE
14     SBN 05989380
       MR. JASON FRIEDMAN
15     SBN 24059784
       Friedman & Feiger, LLP
16     5301 Spring Valley Road, Suite 200
       Dallas, Texas 75254
17     (972)788-1400
       Attorneys for Defendants
18
                  -AND-
19
       MR. RYAN HALE
20     SBN 24097784
       Hawkins Parnell Thackston & Young, LLP
21     4514 Cole Avenue, Suite 500
       Dallas, Texas 75205-5412
22     (214)780-5138
       Appellate Attorney for Defendants
23


24
       ALSO PRESENT:  Steve Page, A/V Technician
25
```

```
1                          VOLUME 10

2   January 31, 2018                                    PAGE
```

```
3   Proceedings ------------------------------------   4

4   Defendants' Request to Reopen Charge Conference    6

5   Court's Ruling ---------------------------------   7

6   Defendants' Bill of Exception ------------------   7

7   Court's Ruling ---------------------------------  16

8   Alternate Juror Dismissed ----------------------  17

9   Closing Argument by Ms. Gibson -----------------  22

10  Defendants' Objection and Motion for Mistrial -  36

11  Court's Ruling ---------------------------------  37

12  Defendants' Objection --------------------------  37

13  Court's Ruling ---------------------------------  38

14  Closing Argument by Mr. L. Friedman ------------  38

15  Rebuttal Argument by Ms. Gibson ----------------  68

16  Deliberations Held -----------------------------  78

17  Jury Questions ---------------------------------  78

18  Adjournment ------------------------------------  81

19  Court Reporter's Certificate -------------------  82
```

```
20

21

22

23

24

25
```

1   may we move the flip charts?

2                       THE COURT:  Sure.

3                       MS. GIBSON:  Can everybody see?  Can y'all

4   see?

5                       Larry, can you see?

6                       MR. L. FRIEDMAN:  Yes, ma'am.

7                       MS. GIBSON:  Okay.

8                       THE COURT:  Did you want a warning at 25

9   minutes or before 25 minutes?

10                      MS. GIBSON:  I'm sorry?

11                      THE COURT:  Did you want a warning at 25 or

12  before 25?

13                      MS. GIBSON:  Before, please.

14                      **PLAINTIFF'S CLOSING ARGUMENT**

15                      MS. GIBSON:  Good morning.

16                      In -- in a little while you-all will go

17  into the deliberation room to decide this case and you will

18  have three jobs.  Your first job will be to answer the

19  questions that Judge Greenberg gives you.  You're second job

20  will be to make sure all other jurors are following the law.

21  If another juror does not follow the law during

22  deliberations, you have the right to tell the bailiff so

23  that he can inform the judge.  And your third job in

24  deliberations will -- to be able to explain why you feel the

25  way you do when answering -- when answering the questions in

1              Jeff Carpenter turned down a job with

2    higher pay.  You heard Jeff Richards, who testified by

3    video, say that they wanted to hire Jeff immediately but

4    Jeff stayed for months because he was expecting large

5    compensation for -- with his current employer and he might

6    risk losing that if he left.

7              We also know that Jeff participated in the

8    program, stay and pay.  Or whether you call it severance,

9    whether you call it stay bonus, it all means the same thing.

10             You heard from Keith Jones.  And although

11   accused of making up that language, Exhibit 52 and others

12   talk about Jeff's own participation in the stay-and-pay

13   incentives and the stay plan.  Jeff Carpenter was actually

14   helping decide stay bonuses for people lower than his level.

15             To believe that Jeff Carpenter -- there was

16   no agreement made with him when he was also part of the

17   program in setting those bonuses, you would have to believe,

18   for example, that someone paid all of their first string

19   sports team but didn't want to pay, didn't make an agreement

20   with one of their starting quarterbacks.

21             Also, in May 2006, when Brian Potashnik

22   announces the sale, at this point there's no number.  But

23   you heard from Deepak Sulakhe say that he heard from Brian

24   that Jeff Carpenter might not have to work again if the

25   transaction works out.  That explains references.  And those

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 256 of 272    PageID 5442
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 204 of 248    PageID 321

68

1    entities are responsible for their own conduct.

2              I'm going to give you back a little time.

3    And, ladies and gentlemen, truly, on behalf of the

4    Potashniks, Mike Donohue, Jason Friedman, Steve Page, our

5    paralegal Sarah Balog, Carla Williamson, appreciate your

6    time and effort.  You've been -- you've been great.  Thank

7    you very much.

8              THE COURT:  Thank you, Mr. Friedman.

9              Ms. Gibson, you get the last word as

10   between the attorneys.

11             MR. L. FRIEDMAN:  I forgot to mention the

12   script, but y'all remember that.

13             THE COURT:  You still have about 21

14   minutes.

15             MS. GIBSON:  Thank you.

16             I'm just going to get this back up.

17                  REBUTTAL ARGUMENT

18             MS. GIBSON:  What defendants are saying in

19   this case is why this case has consequences.  For example,

20   one, the argument is because Jeff Carpenter has salary, even

21   though he stayed on as long as the Potashniks asked him to

22   and did everything requested of him, it is undisputed that

23   he worked hard; that the Potashniks continually said when

24   they discussed the bonuses, "I would never screw you."  And

25   now at the end of the day they say his salary covered

Case 3:23-cv-00769-N    Document 65    Filed 10/31/24    Page 257 of 272    PageID 5443
Case 3:23-cv-00769-N    Document 15    Filed 06/08/23    Page 205 of 248    PageID 322

70

1          Jeff Richards testified that even though
2  they immediately wanted to hire Jeff Carpenter for more
3  money, more base salary, and more bonuses, Jeff Carpenter
4  turned it down because he needed to stay in order to get a
5  large compensation package.
6          And you've heard from Cheryl Potashnik.
7  Cheryl Potashnik said that they intended to pay Jeff
8  Carpenter a bonus out of the asset-sale proceeds; that they
9  did have a stay program because continuity was important.
10  And the intent of offering those stay bonuses was to get
11  people to stay on, despite the asset sale.  And, in
12  addition, there were criminal proceedings going on.
13          Keith Jones said that he and Jeff Carpenter
14  were both part of the stay program, which is equivalent to
15  the severance program.  He testified -- the CFO testified
16  that Jeff Carpenter and Keith Jones worked together on the
17  program to set other people's stay bonuses.
18          Mr. Friedman says if you lie you don't
19  remember what you said, and he takes issue with
20  Jeff Carpenter.  Jeff Carpenter, though, covered a lot of
21  ground.  He's been accused of using different words, but
22  you'll see that even though he said it in different words
23  they mean the same thing.  And that is human not to pair it,
24  the same words, every time for the same meaning.
25          For example, selected employees were part

App. 000254

1                          REPORTER'S RECORD

2                      VOLUME   12 of 14   .                FILED IN
                                                    5th COURT OF APPEALS
3              Trial Court Cause No. CC-08-02072-E    DALLAS, TEXAS
                                                    04/29/2019 6:14:22 PM
4    JEFFREY W. CARPENTER,              )   IN THE DALLAS COUNTY
                                        )                Clerk
5              Plaintiff,               )

6    VS                                 )   COURT AT LAW NO. 5
                                        )
7    SOUTHWEST HOUSING DEVELOPMENT      )
     COMPANY, INC., ET AL,              )
8                                       )
               Defendants.              )   DALLAS, TEXAS

9    _____

10

11                        **TRIAL EXHIBITS**

12   _____

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT INDEX**

**PLAINTIFF'S**

| NO. | DESCRIPTION |
|-----|-------------|
| 1 | Phone Conversations |
| 2 | Employment Agreement |
| 3 | Email |
| 8 | Recap of Expenses and Bonuses |
| 9 | Email |
| 10 | Magazine Cover |
| 11 | Letter of Intent |
| 12 | Purchase and Sale Agreement |
| 13 | Schedule A |
| 14 | Email Cover Sheet |
| 15 | Escrow Agreement (First Amendment) |
| 16 | Purchase and Sale Agreement (First Amendment) |
| 17 | Escrow Agreement (Second Amendment) |
| 18 | Escrow Agreement (Third Amendment) |
| 19 | Escrow Agreement (Fourth Amendment) |
| 20 | Escrow Agreement (Fifth Amendment) |
| 21 | Consulting and Asset Management Services Agreement |
| 22 | Separation Agreement |
| 23 | Email |
| 24 | Email |
| 27 | Escrow Agreement (Sixth Amendment) |
| 28 | Escrow Agreement (Seventh Amendment) |

```
 1                    EXHIBIT INDEX (CONT'D)

 2
        PLAINTIFF'S
 3      NO.            DESCRIPTION

 4      29             Escrow Agreement (Eighth Amendment)

 5      30             Escrow Agreement (Ninth Amendment)

 6      31             Escrow Agreement (Tenth Amendment)

 7      32             Email

 8      33             Closing Memorandum              ʼ

 9      34             Closing Memorandum

10      35             Email

11      36             Franchise Tax Report

12      37             Franchise Tax Report

13      38             Franchise Tax Report

14      39             Certificate of Termination of a Domestic Entity

15      40             Southwest Housing Associate Handbook

16      40a            Certificate of Termination of a Domestic Entity

17      41             Email

18      49             Email

19      50             Email

20      51-1           Handwritten List

21      52             Notes

22      53             Expense Report

23      54             Expense Report

24      55             Declaration of Sandy Dixon

25      56             Certificate of Non-Foreign Status
```

```
 1                    EXHIBIT INDEX (CONT'D)

 2
        PLAINTIFF'S
 3      NO.         DESCRIPTION

 4      57          Certificate of Non-Foreign Status

 5      58          Email

 6      59          Memorandum of Agreement

 7      60          Email

 8      61          Explanatory Note

 9      62          Email

10      63          Amendment to Employment Agreement

11      64          Email

12      65          Email

13      66          Email

14      67          Email

15      68          Email

16      70          Jeff Carpenter's Notes

17

18

19

20

21

22

23

24

25
```

1                    EXHIBIT INDEX (CONT'D)

2

3       **DEFENDANTS'**
        **NO.**            DESCRIPTION

4       4          Employment Agreement

5       13         Amendment to Employment Agreement

6       14         Jeff Carpenter's Personal Notes

7       24         Gmail

8       25         Email

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| From: | Keith Jones |
|---|---|
| Sent: | Wednesday, April 25, 2007 1:16 PM |
| To: | Jeff Carpenter <JCarpenter@Southwesthousing.com> |
| Subject: | Severance payroll |
| Attach: | PTO 3-30-07.pdf |

Please take a look at this and cross out or add to this list

<<...>>



| Severance Allowance Name | TYPE | Hire Date | REDAC Severance | REDA Severance | Home Department |
|---|---|---|---|---|---|
| REDACTED | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | 1 Corporate |
| | | | | | **1 Corporate Total** |
| | | | | | 2 Affordable |
| | | | | | 2 Affordable |
| | | | | | 2 Affordable |
| | | | | | 2 Affordable |
| | | | | | 2 Affordable |
| | | | | | 2 Affordable |
| | | | | | 2 Affordable |
| | | | | | 2 Affordable |
| | | | | | **2 Affordable Total** |



Jeffrey Carpenter <jwc0101@gmail.com>

## SA
5 messages

**Jeffrey Carpenter <jwc0101@gmail.com>**                                    Thu, Nov 15, 2007 at 7:37 AM
To: cpotashnik@southwesthousing.com, bpotashnik@southwesthousing.com

Brian and Cheryl:

As you are well aware, from the day I joined the company on March 15, 2004, no one has been more committed and dedicated to the success of the company, or more protective and supportive of you, than I. As both of you repeatedly have acknowledged, and based on your commitments to me, I have on numerous occasions sacrificed my time, family life, vacation, and short term financial interests for the betterment of the company and your financial well-being. Indeed, I have stayed with the you and the company through extraordinarily difficult times and financial difficulty, stemming from
Katrina, and other setbacks. Of course, as you also know, this was not done wholly altruistically, but was instead based on your express representations to me that your financial commitments to me, in the form of earned bonuses and other unpaid compensation, would be honored. Last year, after the Cascade transaction was announced and it became reasonably clear that I would not be retained after closing of that transaction, you implored me to stay with the company through that time, as that continuity and my continued services were essential to the success of that transaction. In exchange, you informed me that I would be entitled to receive at 3% of the proceeds of that transaction, net of certain costs, which based on the structure at that time would represent an amount in excess of $1,000, 000.00; this is in addition to the unpaid annual bonuses. At various times thereafter, you repeatedly assured me that you would honor our agreement if I remained with the company and that I should trust you that it would get done, notwithstanding your failure to produce a written agreement. Up to the recent time, I have continued to rely on your repeated and express assurances that our agreements would be honored, and have continued to work for the company, passing on other opportunities, pursuant to your requests.

Upon the new management transition/consulting occurring on November 1 st; you informed me that the company no longer needed my services and advised that my employment was being terminated. Still, you advised that the company and you would honor your commitments to me, understanding that the timing and manner of payment were subject to the financial condition of the company and the closing of the Cascade transaction. You know, of course, how shocked I was to later receive a draft separation agreement that failed to recognize those commitments and, in fact, purported to release the company of liability for them.

While I fully understand that current circumstances make it difficult to fix the timing, manner and conditions of the company's and your financial commitments to me, that in no way justifies abandoning them, and I must respectfully insist that you and the company live up to your promises, on which I relied to my substantial detriment, financially and otherwise. Accordingly, I have taken the liberty of reworking and attach the draft separation agreement that you provided to incorporate those other elements. Of course, as I have repeatedly said, I am understanding of the Company's condition and the uncertain status of the Cascade transaction. As such, I am more than willing to explore mutually agreeable ways to address those issues while still preserving the spirit of our agreement and our mutual interest in the financial success of the company and this transaction. The attached document is a draft only and that once the substantive points are confirmed, I reserve the right to have it formally reviewed by an attorney to confirm that it is complete.

I would welcome the opportunity to discuss this with you and look forward to resolving this matter on mutually agreeable terms.

Sincerely,

Jeff

> DEFENDANTS'
> EXHIBIT NO.
>
> 024  √

**CARPENTER 0074**

Gmail - SA                                                          Page 2 of 3

📎  JWC-SA 11-14-07.DOC
    40K

---

**Cheryl Potashnik <cpotashnik@southwesthousing.com>**          Thu, Nov 15, 2007 at 4:28 PM
To: Jeffrey Carpenter <jwc0101@gmail.com>

Jeff,


We will take a look at this and get back to you as soon as possible.


Thanks,

Cheryl

---

**From:** Jeffrey Carpenter [mailto:jwc0101@gmail.com]
**Sent:** Thursday, November 15, 2007 7:37 AM
**To:** Cheryl Potashnik; Brian Potashnik
**Subject:** SA

[Quoted text hidden]

---

**Jeffrey Carpenter <jwc0101@gmail.com>**                        Wed, Dec 5, 2007 at 11:37 AM
To: jeffc@americanhousing.org

[Quoted text hidden]

---

**Jeff Carpenter <jeffc@americanhousing.org>**                   Wed, Dec 5, 2007 at 5:25 PM
To: Cheryl Potashnik <cpotashnik@southwesthousing.com>
Cc: "jwc0101@gmail.com" <jwc0101@gmail.com>

Cheryl,


Last Tuesday, December 27th I spoke to Keith and he mentioned that you were in the process of
responding to me regarding the attachment and my personal situation. As of today, I have not
received anything and tomorrow will be three weeks since I originally sent the information to you
and Brian.


Please let me know the status as soon as possible as you mentioned, as time is of the essence for

CARPENTER 0075

App. 000263

Gmail - SA                                                          Page 3 of 3

me to bring this to an amicable resolution.

Thank you!

Jeff

From: Jeffrey Carpenter [mailto:jwc0101@gmail.com]
Sent: Wednesday, December 05, 2007 11:37 AM
To: Jeff Carpenter
Subject: Fwd: SA

[Quoted text hidden]

Jeffrey Carpenter <jwc0101@gmail.com>                    Fri, Feb 1, 2008 at 6:01 PM
To: jeffc@americanhousing.org

---------- Forwarded message ----------
From: Jeff Carpenter <jeffc@americanhousing.org>
Date: Dec 5, 2007 5:25 PM
Subject: RE: SA
[Quoted text hidden]

CARPENTER 0076

http://mail.google.com/mail/?ui=2&ik=77e3a14cb8&view=pt&search=inbox&th=11643872    2/7/2008

## SEPARATION AGREEMENT

This Separation Agreement ("Agreement") is entered into by and between Southwest Housing Management, Affordable Housing Construction, and Southwest Housing Development, their affiliates, subsidiaries, parents, partners, assigns and related entities, which are collectively referred to herein as "Company", and Brian Potashnik and Cheryl Potashnik (together referred to herein as the "Potashniks"), on the one hand, and Jeff Carpenter, who is referred to herein as "Employee", "you", and/or "your", on the other hand, as follows:

1.  Any and all employment relationships between Employee and Company are agreed to have terminated at the close of business on November 2, 2007 ("Termination Date").

2.  Employee shall be paid wages earned through the Employee's Termination Date, November 2, 2007, less applicable withholdings. Additionally, employer agrees to pay an additional full thirty days of Employee's regular base wages as severance, less applicable withholdings. In addition to the payment of wages and benefits earned, the Company agrees to pay Employee a payment in the amount of $13,143.70 for the balance of accrued PTO (136.70 hours) to date, less applicable withholdings, provided the Employee does not revoke this Agreement.

3.  The foregoing payments shall be made to Employee, less applicable withholdings, in one check payable to "Jeff Carpenter"; this payment shall be made available for Employee on the later to occur of November 21, 2007 or seven (7) days following execution of this agreement.

4.  The Company and the Potashniks acknowledge that Employee has earned and is owed unpaid annual wages and bonuses in the amount of $600,000.00. This amount shall be paid to Employee, less applicable withholdings, according to the following schedule:  (i) $300,000.00 shall be paid to Employee upon the earliest of (x) the first closing of any of the Potashniks/ Company' interests in any project partnerships as outlined in the PSA with Cascade Affordable Housing, LLC and/or its affiliates; (y) the sale of any land held by the Company, including but not limited to the Las Vegas owned community;  or (z) December 15, 2007; and (ii) $300,000.00 shall be paid to Employee on the earlier to occur of (x) the second closing as outlined in the PSA with Cascade Affordable Housing, LLC and/or its affiliates or any successor in interest thereto; and (y) February 15, 2008. Provided, however, that in the event of the closing of a sale or transfer of the Company or any other transaction that results in the sale or transfer of all or a majority of the Company's assets, a merger of the Company with another entity, or otherwise results in a change in control or transfer of majority ownership of the Company, which shall include but expressly is not limited to the second closing of the PSA with Cascade Affordable Housing, LLC, within one year of the date of this Agreement (a "Transaction"), then all unpaid portions of the amount provided in this paragraph shall become immediately due and payable within seven (7) days of the closing of such Transaction.

5.  In addition to the foregoing amounts, Employee will be paid within seven (7) days of the date of closing of any Transaction as defined above, an amount in cash equal to three percent (3%) of the gross compensation or consideration, whether in the form of cash, stock, assumption of debt, fees, loans, or otherwise, for the purchase of the Company, less reasonable costs of closing. In the event that a Transaction is effected that results in a sale or transfer of less than 100% of the Company's outstanding stock or assets, then the gross compensation amount for purposes of this paragraph shall be calculated as if a transfer of 100% of the Company were

CARPENTER 0077

App. 000265

being made. By way of example only, if 80% of the Company were transferred for $20,000,000.00, then the gross compensation amount would be deemed to be $25,000,000.00, and Employee would be entitled to receive $750,000.00. The gross compensation amount for purposes of this paragraph shall not exclude, and shall specifically include, any amounts paid to or for the benefit of the Potashniks, the Company, and/or its stockholders in the form of fees, bonuses, severance payments, loans, or otherwise. In addition, the gross compensation amount shall be deemed fully earned and paid on the closing date of the Transaction, regardless of whether the terms of the Transaction provide for payment over time, any holdback of funds, or for reduction or other downward adjustment of the gross compensation amount in the future. In the event that the terms of the Transaction provide for any future upward adjustment in the gross compensation amount, then Employee shall be entitled to receive an amount in cash equal to 3% of such upward adjustment at the time that it is made and paid.

6.   In order for Employee to evaluate the Company's compliance with the foregoing provision, Employee shall be entitled, upon reasonable advance notice, to inspect the books and records of the Company, including but not limited to all documents relating to any Transaction.

7.   In order to induce Employee to enter into this Agreement, the Potashniks, jointly and severally, hereby personally and unconditionally guarantee payment to Employee of all amounts provided for herein strictly in accordance with this Agreement.

8.   Subject to compliance with this Agreement and payment in full of all of the amounts provided for herein, and in consideration of the promises made by the Company and the Potashniks herein, the sufficiency of which Employee acknowledges, Employee agrees to DISCHARGE and RELEASE Company, its successors, affiliates, subsidiaries, stockholders, members, managers, partners, representatives, agents, predecessors, officers, directors, employees, and attorneys, and the Potashniks, from any claims, demands, and/or causes of action whatsoever, presently known or unknown, that are based upon facts occurring on or prior to the date of this Agreement, including but not limited to, the following: (a) Any rights or statutory claims arising under the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, Employee Order 11246, the Civil Rights Acts of 1866, 1964 and 1991, the Family and Medical Leave Act of 1993, the Employee Retirement Income Security Act, the Worker Adjustment Retraining and Notification Act, the Equal Pay Act, the Labor Code related to the Workers' Compensation Act, the Colorado Payday Law, and/or the Colorado Commission on Human Rights Act; (b) any tort or contract claims; or (c) any claims, matters or actions related to Employee's employment and/or affiliation with, or termination and separation from, Company, provided, however, that this release shall not apply to any of Employee's rights under this Agreement.

9.   Employee may be eligible pursuant to COBRA law, to continued health insurance coverage, at his own expense, for up to 18 months from the Termination date. Employee acknowledges previous receipt of all notices with respect thereto. Further, Employee agrees and acknowledges that he is responsible for filing any such elections with respect to the continuation of any health insurance coverage and it is expressed that the Company shall take no further actions on Employee's behalf with respect to the continuation of health insurance coverage, except as provided by law. Employee's rights, if any, pursuant to the COBRA law are independent of, and not conditioned on his agreement to the terms of this agreement.

CARPENTER 0078

App. 000266

10.    Employee Agrees to Maintain Confidentiality of Trade Secrets and Confidential Information

**A.** Employee acknowledges that, during the course of his employment with Company, Employee became privy to certain trade secrets, confidential knowledge and other company information and Employee agrees that he shall not, without the prior written consent of Company, at any time after the date of execution of this Agreement use, disseminate, disclose, or communicate any trade secrets or confidential information to any person or entity outside Company. As used herein, the term "confidential knowledge and information" means, but shall not be limited to, all information concerning the Company's methods, plans, policies, software, lists, procedures and other proprietary property and the names, addresses, telephone numbers, of its clients or customers, information concerning the particular characteristics and requirements set forth by the Clients regarding their needs and policies, and from Clients with which the Company does or attempts to do business. The term also includes trade secrets which includes proprietary data or other information which was communicated to or otherwise learned or acquired by Employee during his employment relationship with Company and which is not readily available to the public.

**B.** Employee further agrees to promptly deliver all passwords, cash, documents, memoranda, records, notes, and other material in his possession, whether prepared by him or others, and all copies thereof, that contain any confidential knowledge or information, to the Company no later than close of business on November 2, 2007 and Employee acknowledges and agrees that he shall have no further rights therein. Employees shall not retain or give to any third parties copies of any such material, or allow any third parties access to such information and materials.

11.    Additional Covenants by Employee

A. **Confidentiality.** The parties do not intend by this Agreement that Employee shall be at any time prevented from working in competition with Company. However, the parties do agree that Employee shall not use or allow others to use confidential information or trade secrets learned by Employee for the benefit of any company or individual other than the Company.

B. **Non-disparagement.** You agree that you will not, at any time, publicly criticize or disparage the Company, or privately criticize or disparage the Company in a manner intended or reasonably calculated to result in public embarrassment to, or injury to the reputation of, the Company in any community in which the Company or any of its subsidiaries or affiliates engage in business. Should you violate this provision, the Company has the right to demand repayment of the severance payment made to you hereunder and you shall be obligated to repay such sums on demand. This Agreement does not prohibit Employee from responding to a subpoena or as otherwise required by law and such a response shall not constitute a violation of this Agreement.

C. **Reasonableness of Restrictions.** Employee acknowledges that the restrictions, scope of prohibited activities, and time duration of the provisions of the preceding paragraphs are reasonable and are no broader than are necessary to maintain the confidentiality of the confidential knowledge and information and the goodwill associated with Company's goods and services, and to protect the other legitimate business interests of Company.

D. **Consideration.** The consideration for the terms of this Agreement and covenants contained herein include the payments to be made to Employee and/or on Employee's behalf under this Agreement.

CARPENTER 0079

App. 000267

12.    Employee agrees to direct any request for a reference to Devona Gray, PHR, Human Resources Manager, or her successor. In accordance with Company policy, Mrs. Gray or her successor will limit the responses to requests for references by any third party written or verbal to Employee's dates of employment, position held, and confirmation of salary received.

13.    Employee agrees that he shall not disclose, or cause to be disclosed, the terms of this Agreement, or the fact that this Agreement exists, except to his attorneys, accountants and/or tax advisors, or to the extent otherwise required by law.

14.    This Agreement represents the complete agreement between the parties hereto concerning the subject matter in this Agreement and supersedes all prior agreements or understandings, written or oral.  This Agreement is in full accord and satisfaction and compromise of any and all existing or potential claims by Employee arising out of facts, events, activities, or omissions which occurred prior to the date on which Employee signs this Agreement. Employee understands and the Company and Potashniks acknowledge that Employee is not waiving any rights or claims under this Agreement or that may arise after the date this Agreement is executed.

15.    No attempted modification or waiver of any of the provisions of this Agreement shall be binding on either party unless in writing and signed by both Employee and Company.  Each of the sections contained in this Agreement shall be enforceable independently of every other section in this Agreement, and the invalidity or nonenforceability of any section shall not invalidate or render nonenforceable any other section contained in this Agreement.

16.    Other than representations, covenants, and other matters contained or referred to in this Agreement, Employee agrees that there have been no other representations related to this Agreement and that he is not relying on any other representations in executing this Agreement.

17.    It is further understood that for a period of seven (7) days following the execution of this Agreement in duplicate originals, Employee may revoke the Agreement, and the Agreement shall not become effective or enforceable until the revocation period has expired. Revocation can be made by delivering a written notice of revocation to Keith Jones, CFO, Southwest Housing Management, 5910 N. Central Expressway, Suite 1145, Dallas, Texas 75206. For this revocation to be effective, written notice must be received on the 7th calendar day after Employee signs the Agreement.  If Employee revokes this Agreement, it shall not be effective or enforceable and Employee will not receive the benefits provided hereof; however, Employee shall still receive the earned wages and benefits set forth in Paragraph 2 of this Agreement.

18.    This Agreement has been entered into voluntarily and not as a result of coercion, duress, or undue influence. Employee acknowledges that he has read and fully understands the terms of this Agreement and has been advised to consult with an attorney before executing this Agreement.  Further, Employee agrees that he has been afforded the opportunity to consider this Agreement for a period of 21 days prior to execution of the Agreement.

JEFFREY CARPENTER, Employee

BY:_____

DATE:_____


BRIAN POTASHNIK, Individually                CHERYL POTASHNIK, Individually

BY:_____                BY:_____

DATE:_____                DATE:_____


SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC.

SOUTHWEST HOUSING MANAGEMENT COMPANY, INC.

AFFORDABLE HOUSING CONSTRUCTION, INC.

BY:_____
    BRIAN POTASHNIK
ITS: PRESIDENT

DATE:_____

CARPENTER 0081